Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                      :
In re                                 :          Chapter 11 Case No.
                                      :
GENERAL MOTORS CORP., et al.,         :          09-_____ (___)
                                      :
                Debtors.              :          (Jointly Administered)
                                      :
------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY**
**OF ORDER PURSUANT TO 11 U.S.C. § 105(a)**
**ENFORCING PROTECTIONS OF 11 U.S.C. §§ 362, 365(e)(1), AND 525**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

**Background**

1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.      For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry.  The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.  Over many years, the Company has supplied one in five vehicles sold in the United States.  It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world.  General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company continues as a leading global technology innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.      William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands.  General Motors began as a holding company for Buick Motor Company, and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.      Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.      GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.      The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

and functional support.  Each geographic region has its own management team, subject to

oversight by the Company.  Substantially all of General Motors' worldwide car and truck

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and

through distributors and dealers outside North America, most of which are independently owned.

In addition to the products sold to dealers for consumer retail sales, General Motors sells cars

and trucks to fleet customers, including rental car companies, commercial fleet companies,

leasing companies, and governmental units.

   8.  As of March 31, 2009, General Motors employed approximately 235,000

employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were

salaried employees.  In the United States, approximately 62,000 (68%) of the employees were

represented by unions.  The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") represents the largest portion of General Motors'

U.S. unionized employees (totaling approximately 61,000 employees).

   9.  As of March 31, 2009, General Motors had consolidated global recorded

assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.

Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

   10.  In 2008, the Company was confronted by the worst economic downturn

and credit market conditions since the Great Depression of the 1930s.  Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and

volatile fuel prices.

   11.  This economic turmoil resulted in significant financial stress on the

automotive industry.  In the last quarter of 2008, new vehicle sales in the United States

plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell

precipitously, thereby draining liquidity that, one year prior, had been considered adequate to

fund operations.  As a result of the impending liquidity crisis, the Company was compelled to

seek financial assistance, on a secured basis, from the federal government in order to sustain the

Company's operations and avoid the potential for systemic failure throughout the domestic

automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential

shutdown of numerous ancillary businesses.

        12.    The federal government recognized the potentially devastating negative

effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States

Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury

Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant

to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's

domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also

guaranteed each of the other guarantors' obligations that were entered into concurrently with the

U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and

security interest in substantially all the assets of GM and each of the guarantors that were

previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

        13.    The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.    On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars. The President outlined a series of actions that GM would have to undertake to receive additional federal assistance. In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM. In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.    President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market." *Id.* The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.

What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives. Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction"). The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases. Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

21.    In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.    The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## The 363 Transaction

23.    Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.    Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition  Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital

stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.     The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.     Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are

quickly sold and transferred to New GM.  Any delay will result in significant irretrievable

revenue perishability to the detriment of all interests and will exacerbate consumer resistance to

readily accept General Motors products.  Expeditiously restoring and maintaining consumer

confidence is a prerequisite to the successful transformation and future success of New GM.

28.     The expedited approval and execution of the 363 Transaction is the

foundation of the U.S. Government's objective "to create the GM of the future," and to preserve

and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure

that the cars of the future are built where they've always been built – in Detroit and across the

Midwest – to make America's auto industry in the 21st century what it was in the 20th century –

unsurpassed around the world." *Presidential Remarks* at 7.

## Jurisdiction

29.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

30.     By this Motion, the Debtors seek entry of an order, pursuant to section

105(a) of the Bankruptcy Code, enforcing the automatic stay imposed by section 362 of the

Bankruptcy Code, the antitermination and antimodification provisions of section 365(e)(1) of the

Bankruptcy Code, and affirming the protections against discriminatory treatment contained in

section 525 of the Bankruptcy Code.

31.     The Debtors operate a global business and maintain extensive dealings

with creditors, customers, suppliers, and other parties who operate outside of the United States

and may not be familiar with the provisions of United States bankruptcy law.  The Debtors seek

the relief requested herein to inform these and other parties, if necessary, of the protections

granted to the Debtors by sections 362, 365, and 525 of the Bankruptcy Code and to alleviate any

confusion regarding the effect of these chapter 11 cases on the Debtors, the Debtors' non-Debtor

subsidiaries and affiliates, and the Debtors' foreign non-Debtor subsidiaries and affiliates

("Foreign Affiliates").

> 32.    The Court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code.  Section 105(a) empowers the court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

Granting the relief requested herein is fully consistent with the terms of the Bankruptcy Code

and will facilitate a smooth and orderly transition into chapter 11.

## Enforcing Section 362 of the Bankruptcy Code

> 33.    As a result of the commencement of the Debtors' chapter 11 cases, and by

operation of law pursuant to section 362 of the Bankruptcy Code, the automatic stay enjoins all

entities from, among other things: (a) commencing or continuing any judicial, administrative, or

other action or proceeding against any of the Debtors that was or could have been initiated before

the Commencement Date; (b) recovering a claim against any of the Debtors that arose before the

Commencement Date; (c) enforcing a judgment against any of the Debtors or property of their

estates that was obtained before the Commencement Date; or (d) taking any action to collect,

assess, or recover a claim against any of  the Debtors that arose before the Commencement Date.

11 U.S.C. § 362.

> 34.    The injunction contained in section 362 is self-executing.  It constitutes a

fundamental debtor protection that, in combination with other provisions of the Bankruptcy

Code, provides a debtor with the "breathing spell" that is essential to the ability to successfully

resolve its liabilities. *See, e.g.*, *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*,

945 F. Supp. 603, 608 (S.D.N.Y. 1996) ("[Section] 362 is meant to give 'the debtor a breathing

spell from his creditors [and permit] the debtor to attempt a repayment or reorganization plan, or

simply to be relieved of the financial pressures that drove him into bankruptcy.'") (quoting

S. Rep. No. 95-989, at 54-55 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5840-

41).

        35.     The protections of the automatic stay apply to a debtor's property

wherever it is located and by whomever held. *See, e.g., Underwood v. Hilliard* (*In re Rimsat,*

*Ltd.*), 98 F.3d 956, 961 (7th Cir. 1996) (bankruptcy court's *in rem* jurisdiction over property of

estate permits injunctions against foreign proceedings pursuant to automatic stay). The

automatic stay therefore applies to the Debtors' assets and operations throughout the globe.

        36.     Notwithstanding the self-executing and global nature of section 362, not

all parties affected or potentially affected by the commencement of a chapter 11 case are aware

of the automatic stay. Nor are all parties cognizant of its significance and impact. Therefore it is

prudent to advise third parties of the existence and effect of section 362 of the Bankruptcy Code

through an order of the Bankruptcy Court that restates this important provision.

### Enforcing Section 365(e)(1) of the Bankruptcy Code

        37.     Section 365 of the Bankruptcy Code prohibits any party to an executory

contract or unexpired lease with the Debtors from, among other things, modifying or terminating

such contract or lease, or any right or obligation under such contract or lease, at any time after

the commencement of the case solely because of a provision in such contract or lease that is

conditioned on: (a) the insolvency or financial condition of the debtor at any time before the

closing of the Debtors' chapter 11 cases, (b) the commencement of the Debtors' chapter 11 cases,

or (c) the appointment of a trustee in the Debtors' chapter 11 cases.  11 U.S.C. § 365(e)(1).

38.    Accordingly, any action by a third party to modify or terminate an

executory contract or unexpired lease or enforce their terms against the Debtors are prohibited

absent court approval.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (while debtor

may enforce terms of contract against creditor, creditor is "precluded from . . . enforcing the

contract terms" of an executory contract prior to assumption by the debtor); *see also U.S. Postal

Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir. 1994) ("After a debtor commences a

Chapter 11 proceeding, but before executory contracts are assumed or rejected under § 365(a),

those contracts remain in existence, enforceable by the debtor but not against the debtor.").

Thus, a third party must continue to perform under an executory contract or unexpired lease until

it is assumed or rejected.

39.    Notwithstanding the self-executing and global nature of section 365(e)(1),

not all parties affected or potentially affected by the commencement of a chapter 11 case are

aware of this provision.  Nor are all parties cognizant of its significance and impact.  Therefore,

it is prudent to advise third parties of the existence and effect of section 365(e)(1) of the

Bankruptcy Code through an order of the Bankruptcy Court that restates this important

provision.

### Enforcing Section 525 of the Bankruptcy Code

40.    Section 525 of the Bankruptcy Code provides that "a governmental unit

may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other

similar grant to [or] discriminate with respect to such a grant against . . . a debtor."  11 U.S.C. §

525.  As with the automatic stay, the prohibition on governmental discrimination against the Debtors is both self-executing and global.

41.     The Debtors possess licenses and other grants from numerous governmental units, both domestically and internationally, that permit the Debtors to conduct their businesses.  Some of these governmental units may not be cognizant of the protections afforded to the Debtors by section 525 of the Bankruptcy Code and, therefore inadvertently may contravene its provisions.  To insure that governmental units worldwide do not hamper the Debtors' operations in contravention of section 525, the Debtors seek to inform such governmental entities of the existence and implications of section 525 of the Bankruptcy Code.

### The Debtors' International Presence

42.     The Debtors' assets and operations span the globe, making the relief requested herein especially appropriate in these chapter 11 cases.  The Debtors conduct business in virtually every major country in the world, and divide their operations into four regions: North America, Europe, Asia Pacific, and Latin America/Africa/Mid-East ("LAAM").  The majority of the Debtors' vehicles are sold outside of North America, with 24% of sales in 2008 coming from Europe, 15% from the Asia Pacific region, and another 18% from LAAM.

43.     In Europe alone, GM sells vehicles in more than 40 markets, operates 10 vehicle-production facilities in seven countries, and employs approximately 55,500 people.  In the Asia Pacific region, GM markets seven automotive brands in 11 countries and maintains offices throughout the region, including in Beijing, Tokyo, and Melbourne.  GM is also the largest overseas automaker in China, the world's fastest growing automotive market by volume.  In the LAAM region, GM engages in both sales and manufacturing, selling more than one million units annually and employing approximately 35,000 people.

44.    Consequently, numerous customers, suppliers, creditors, and other stakeholders reside outside of the United States and may not be familiar with American bankruptcy law.  To ensure that the protections already contained in the Bankruptcy Code are enforced across the Debtors' assets and operations worldwide, the Debtors seek entry of an order that articulates and confirms the applicable provisions of sections 362, 365, and 525 of the Bankruptcy Code.  The Debtors submit that the existence of such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by sections 362, 365, and 525, particularly because the automatic and self-executing nature of the these protections may not be recognized by foreign creditors or tribunals unless embodied by an order of this Court.

### Notice

45.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers— Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

46.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
        June 1, 2009

                                        /s/ Stephen Karotkin
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                            :
In re                                       :          **Chapter 11 Case No.**
                                            :
**GENERAL MOTORS CORP.**, *et al.*,          :          **09-_____ (___)**
                                            :
                            **Debtors.**     :          **(Jointly Administered)**
                                            :
-------------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. § 105
## ENFORCING PROTECTIONS OF 11 U.S.C. §§ 362, 365(e)(1), AND 525

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to section 105(a) of title 11,

United States Code (the "Bankruptcy Code") for entry of an order enforcing the automatic stay

imposed by section 362 of the Bankruptcy Code, prohibiting the modification or termination of

any executory contract or unexpired lease, or any right or obligation under such contract or lease,

pursuant to section 365(e)(1) of the Bankruptcy Code, and affirming the protections against

discriminatory treatment contained in section 525 of the Bankruptcy Code, all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York of Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the Office of the United States Trustee

for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys

for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement,

(v) the attorneys for the agent under GM's prepetition amended and restated secured revolving

credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a

consolidated basis), (vii) the attorneys for the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "Hearing"); and

upon the record of the Hearing and all of the proceedings had before the Court; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that, pursuant to section 362 of the Bankruptcy Code, all persons

(including individuals, partnerships, corporations, and all those acting for or on their behalf) and

all foreign or domestic governmental units (and all those acting for or on their behalf) are stayed,

restrained, and enjoined from:

(a)    commencing or continuing any judicial, administrative, or other action or proceeding against the Debtors, including the issuance or employment of process, that was or could have been initiated before the Debtors' chapter 11 cases commenced;

(b)    enforcing, against the Debtors or their estates, a judgment obtained before the commencement of the Debtors' chapter 11 cases;

(c)    collecting, assessing, or recovering a claim against the Debtors that arose before the commencement of these chapter 11 cases;

(d)    taking any action to obtain possession of property of the estates or of property from the estate or to exercise control over property of the Debtors' estates;

(e)    taking any action to create, perfect, or enforce any lien against property of the Debtors' estates;

(f)    taking any action to create, perfect or enforce any lien against property of the Debtors, to the extent that such lien secures a claim that arose before the commencement of the Debtors' chapter 11 cases;

(g)    offsetting any debt owing to the Debtors that arose before the commencement of these chapter 11 cases against any claim against the Debtors.

; and it is further

ORDERED that all persons and all foreign and domestic governmental units, and all those acting on their behalf, including sheriffs, marshals, constables, and other or similar law enforcement officers and officials are stayed, restrained, and enjoined from in any way seizing, attaching, foreclosing upon, levying against, or in any other way interfering with any and all property of the Debtors or the Debtors' estates, wherever located; and it is further

ORDERED that pursuant to 365 of the Bankruptcy Code, all persons (including individuals, partnerships, corporations, and all those acting for or on their behalf) and all foreign or domestic governmental units (and all those acting for or on their behalf) are prohibited from modifying or terminating any executory contract or unexpired lease, or any right or obligation

under such contract or lease, at any time after the commencement of the Debtors' chapter 11

cases solely because of a provision in such contract or lease that is conditioned on:

      (a)  the insolvency or financial condition of the debtor at any time before the closing of the Debtors' chapter 11 cases;

      (b)  the commencement of the Debtors' chapter 11 cases; or

      (c)  the appointment of a trustee in the Debtors' chapter 11 cases;

and it is further

      ORDERED that this Order shall not affect the substantive rights of any party or

any of the exceptions contained in sections 362(b) and 365(e)(1) of the Bankruptcy Code of the

right of any party in interest to seek relief from the automatic stay in accordance with section

362(d) of the Bankruptcy Code or with respect to an executory contract or unexpired lease under

section 365 of the Bankruptcy Code; and it is further

      ORDERED that, pursuant to section 525 of the Bankruptcy Code, all foreign and

domestic governmental units are prohibited and enjoined from (i) denying, revoking, suspending,

or refusing to renew any license, permit, charter, franchise, or other similar grant to, (ii) placing

conditions upon such a grant to, or (iii) discriminating against any of the Debtors (or another

person with whom the Debtors have been associated) solely because any of the Debtors is a

debtor under the Bankruptcy Code, or may have been insolvent before or during these chapter 11

cases; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2009

_____
United States Bankruptcy Judge