Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
**In re**                                                   :    **Chapter 11 Case No.**
                                                            :
**GENERAL MOTORS CORP.**, *et al.*,                         :    09-_____ (___)
                                                            :
                                    Debtors.                :    **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 363(c)(1) AND 503(b)(1)(A) GRANTING ADMINISTRATIVE EXPENSE STATUS TO UNDISPUTED OBLIGATIONS TO VENDORS ARISING FROM POSTPETITION DELIVERY OF GOODS AND SERVICES ORDERED PREPETITION AND AUTHORIZING DEBTORS TO PAY SUCH OBLIGATIONS IN ORDINARY COURSE OF BUSINESS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent:

### Background

        1.      On the date hereof (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.  For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry. The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado. Over many years, the Company has supplied one in five vehicles sold in the United States. It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world. General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon. Today, the Company continues as a leading global technology innovator. Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.  William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands. General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury.  Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5. Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6. GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

7. The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support. Each geographic region has its own management team, subject to oversight by the Company. Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8. As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees. In the United States, approximately 62,000 (68%) of the employees were represented by unions. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9. As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

**The Economic Downturn and the U.S. Treasury Loan**

10. In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s. Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.  This economic turmoil resulted in significant financial stress on the automotive industry. In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years. The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations. As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.  The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy. On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility"). A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility. The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions. The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

13. The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability. On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14. On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars. The President outlined a series of actions that GM would have to undertake to receive additional federal assistance. In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM. In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15. President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market." *Id.* The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out*.

*Id.* at 5-6 (emphasis added).

16. The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives. Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction"). The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17. The U.S. Treasury will provide the financing to create New GM. The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability. The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18. On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion. GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19. As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "<u>Temporary Shutdown</u>"). As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20. On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion. GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

**The Exchange Offer**

21. In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer"). The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company. The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22. The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

**The 363 Transaction**

23. Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24. Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction. These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases. As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.     The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation. The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry. The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.     Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27. The gravity of the circumstances cannot be overstated. The need for speed in approving and consummating the 363 Transaction is crucial. The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM. Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products. Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28. The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved. To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world." *Presidential Remarks* at 7.

### Jurisdiction

29. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

30. By this Motion, pursuant to sections 363(c)(1) and 503(b)(1)(A) of the Bankruptcy Code, the Debtors seek authority (i) to grant administrative priority status to all undisputed obligations of the Debtors owing to Vendors (as defined herein) arising from the

postpetition delivery of goods and services ordered prior to the Commencement Date and (ii) to pay such obligations in the ordinary course of business.

### The Debtors' Obligations to Vendors

31. In connection with the normal operation of their businesses, the Debtors rely on various suppliers (collectively, the "Vendors"), to provide the Debtors with the goods and services necessary for the Debtors' production and distribution of their products to customers.

32. As of the Commencement Date, the Debtors have certain prepetition purchase orders (the "Prepetition Orders") outstanding with various Vendors for goods and services ordered by the Debtors. As a consequence of the commencement of these chapter 11 cases, Vendors may be concerned that the obligations arising from goods shipped or services ordered prepetition and delivered postpetition, pursuant to the Prepetition Orders, will be treated as general unsecured claims against the Debtors' estates.

33. Without the benefit of an order authorizing the Debtors to pay for postpetition deliveries of goods and services under prepetition agreements, Vendors may refuse to ship such goods (or may recall shipments thereof) or perform services under such Prepetition Orders unless the Debtors issue substitute purchase orders postpetition. This is particularly true for Vendors located in foreign jurisdictions, who are even less familiar with the impact of the commencement of a chapter 11 case on the payment for goods shipped or services ordered prepetition and delivered postpetition.

### The Relief Requested Is in the Best
### Interests of the Debtors and Their Estates

34. Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services, including

those ordered prepetition, are afforded administrative expense priority status. *In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d Cir. 1993) (holding an obligation from postpetition performance related to prepetition transaction is entitled to administrative expense priority); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (same). Thus, the granting of the relief sought herein with respect to goods and services ordered prepetition and delivered postpetition will not provide the Vendors with any greater priority than they otherwise would have if the relief herein were not granted and will not prejudice any other party in interest. Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Prepetition Orders to provide the Vendors with assurance of such administrative priority. Notwithstanding the Temporary Shutdown, the attendant disruption to the continuous flow of goods and services to the Debtors could adversely affect the Debtors' ability to maintain and control the production and delivery of their products. Such a disruption could, in turn, jeopardize customer confidence in the Debtors' ability to conduct business.

35.    Moreover, the Debtors' satisfaction of undisputed obligations in respect of the Prepetition Orders consistent with their customary practices is equally important and is authorized under section 363(c)(1) of the Bankruptcy Code (debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing"). Any impairment of the Debtors' ability to obtain or access goods and/or services that are required in the operation of their businesses will, in turn, impair the Debtors' ability to operate efficiently and comply with customer deadlines, adversely affecting the Debtors' ability to preserve enterprise value.

36.    Finally, any payments made by the Debtors in respect of the Prepetition Orders should not be deemed to constitute a postpetition assumption pursuant to section 365 of

the Bankruptcy Code. The Debtors reserve all of their rights under the Bankruptcy Code with respect thereto.

37. Based upon the foregoing, the Debtors submit that the relief requested herein is necessary, appropriate, and in the best interest of the Debtors' estates and creditors and, therefore, should be granted in these chapter 11 cases.

### Notice

38. Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

39. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11 Case No.
                                            :
GENERAL MOTORS CORP., et al.,               :    09-_____ (___)
                                            :
                    Debtors.                :    (Jointly Administered)
                                            :
------------------------------------------------------------x
```

**ORDER PURSUANT TO 11 U.S.C. §§ 363(c)(1) AND 503(b)(1)(A) GRANTING ADMINISTRATIVE EXPENSE STATUS TO DEBTORS' UNDISPUTED OBLIGATIONS TO VENDORS ARISING FROM POSTPETITION DELIVERY OF GOODS AND SERVICES ORDERED PREPETITION AND AUTHORIZING DEBTORS TO PAY SUCH OBLIGATIONS IN ORDINARY COURSE OF BUSINESS,**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 363(c)(1) and 503(b)(1)(A) of title 11, United States Code (the "Bankruptcy Code"), for entry of an order granting administrative expense status to the Debtors' undisputed obligations to vendors (the "Vendors") arising from the postpetition delivery of goods and services ordered in the prepetition period (the "Prepetition Orders") and to pay such obligations in the ordinary course of business, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

NY2:\1988926\14\16MNY14!.DOC\72240.0635

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

    ORDERED that the Motion is granted as provided herein; and it is further

    ORDERED that the undisputed obligations of the Debtors arising under the Prepetition Orders shall be afforded administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code; and it is further

    ORDERED that, pursuant to section 363(c)(1), the Debtors are authorized to pay

3

in the ordinary course of their business all undisputed obligations arising from the postpetition delivery or shipment by Vendors of goods and services under the Prepetition Orders consistent with their customary practices; and it is further

ORDERED that nothing in this Order or the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of or basis for any claims against the Debtors arising in connection with the Prepetition Orders; and it is further

ORDERED that nothing in this Order or in the Motion shall be deemed to constitute the assumption of any agreement pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
_____, 2009

_____
United States Bankruptcy Judge