Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :        Chapter 11 Case No.
                                    :
GENERAL MOTORS CORP., et al.,       :        09-_____ (___)
                                    :
                    Debtors.        :        (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO**
**11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c) AND 364(a), AND**
**FED. R. BANKR. P. 6003 AND 6004 (A) AUTHORIZING DEBTORS TO**
**(i) CONTINUE USING EXISTING CASH MANAGEMENT SYSTEM,**
**(ii) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO**
**USE OF CASH MANAGEMENT SYSTEM, AND (iii) MAINTAIN EXISTING**
**BANK ACCOUNTS AND BUSINESS FORMS; (B)  EXTENDING TIME TO**
**COMPLY WITH 11 U.S.C. § 345(b); AND (C) SCHEDULING A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

## Background

1.      On the date hereof (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

3.      For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry. The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado. Over many years, the Company has supplied one in five vehicles sold in the United States. It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world. General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon. Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.      William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the

automotive market by dividing it into distinct price segments, ranging from low-priced to luxury.

Based on that strategy, the Company proceeded to build an automotive manufacturing giant

offering distinctive brands and models for each market segment.

5.      Over the past century, the Company grew into a worldwide leader in

products and services related to the development, manufacture, and marketing of cars and trucks

under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden,

HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced

nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The

recent severe economic downturn has had an unprecedented impact on the global automotive

industry.  Nevertheless, particularly in the United States, the automotive industry remains a

driving force of the economy.  It employs one in ten American workers and is one of the largest

purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization
proceedings in Sweden in February 2009.

and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of

U.S. industrial production by value, are related to the automotive industry.

    6.  GMAC LLC ("<u>GMAC</u>") is a global finance company that provides a

range of financial services, including customer vehicle financing to the Company's customers

and automotive dealerships and other commercial financing to the Company's dealers.

    7.  The Company's automotive operations include four automotive segments

– GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific –

each of which functions as independent business units with coordinated product development

and functional support.  Each geographic region has its own management team, subject to

oversight by the Company.  Substantially all of General Motors' worldwide car and truck

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and

through distributors and dealers outside North America, most of which are independently owned.

In addition to the products sold to dealers for consumer retail sales, General Motors sells cars

and trucks to fleet customers, including rental car companies, commercial fleet companies,

leasing companies, and governmental units.

    8.  As of March 31, 2009, General Motors employed approximately 235,000

employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were

salaried employees.  In the United States, approximately 62,000 (68%) of the employees were

represented by unions.  The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "<u>UAW</u>") represents the largest portion of General Motors'

U.S. unionized employees (totaling approximately 61,000 employees).

9.      As of March 31, 2009, General Motors had consolidated global recorded

assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.

Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

**The Economic Downturn and the U.S. Treasury Loan**

10.      In 2008, the Company was confronted by the worst economic downturn

and credit market conditions since the Great Depression of the 1930s.  Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and

volatile fuel prices.

11.      This economic turmoil resulted in significant financial stress on the

automotive industry.  In the last quarter of 2008, new vehicle sales in the United States

plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell

precipitously, thereby draining liquidity that, one year prior, had been considered adequate to

fund operations.  As a result of the impending liquidity crisis, the Company was compelled to

seek financial assistance, on a secured basis, from the federal government in order to sustain the

Company's operations and avoid the potential for systemic failure throughout the domestic

automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential

shutdown of numerous ancillary businesses.

12.      The federal government recognized the potentially devastating negative

effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States

Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury

Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant

to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's

domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also

guaranteed each of the other guarantors' obligations that were entered into concurrently with the

U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and

security interest in substantially all the assets of GM and each of the guarantors that were

previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

13.     The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

6

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future." Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.    President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.* The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a
> tool that, with the backing of the U.S. Government, can make it
> easier for General Motors . . . to *quickly* clear away old debts that
> are weighing [it] down so that [it] can get back on [its] feet and
> onto a path to success; a tool that we can use, even as workers stay
> on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply
> broken up, sold off, and no longer exists. We're not talking about
> that. And what I'm *not talking about is a company that's stuck in
> court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to

demonstrate its viability plan to achieve the foregoing objectives. Consistent with the

President's guidance, the Company began a deeper, more surgical analysis of its business and

operations in an effort to develop a viability plan that would accommodate the needs of its

secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.  Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

### The Exchange Offer

21.    In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company

and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## **The 363 Transaction**

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363

Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.     The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.     Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.     The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve

and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure

that the cars of the future are built where they've always been built – in Detroit and across the

Midwest – to make America's auto industry in the 21st century what it was in the 20th century –

unsurpassed around the world."  *Presidential Remarks* at 7.

## Jurisdiction

29.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

30.    By this Motion, pursuant to sections 105(a), 345(b), 363(b), 363(c), and

364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry

of an order: (A) authorizing them to (i) continue to operate their cash management systems (the

"Cash Management System"), as described in detail herein, including the continued maintenance

of existing bank accounts (the "Bank Accounts") at the existing banks (the "Banks") and the

continued transfers of funds among the Debtors and their affiliates in the ordinary course of

business, consistent with their prepetition practices, (ii) honor certain prepetition obligations

related to the use of the Cash Management System, and (iii) maintain existing business forms;

(B) extending the time to comply with section 345(b) of the Bankruptcy Code, which would

require the Banks to post a bond or deposit securities accounting for all funds deposited by the

Debtors; and (C) scheduling a final hearing on the relief requested herein.  A list of Banks and

Bank Accounts is attached hereto as Exhibit "A."

# I.

## DESCRIPTION OF THE DEBTORS'
## BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

31.     In the ordinary course of their businesses, the Debtors have historically utilized the Cash Management System to fund their operations, as well as the operations of certain of their non-Debtor affiliates.  The Cash Management System, which is managed by the Debtors' treasury personnel in New York with the assistance of certain third-party processing service providers, consists of two principal components:  (i)  an integrated, centralized cash management system in the United States (the "U.S. Cash Management System"), under which funds collected by the Debtors and certain domestic non-Debtor subsidiaries at various banks in locations throughout the United States are, through a series of transactions, transferred to concentration accounts and used, through other accounts, to pay operating expenses and fund other expenditures of the Debtors, and (ii) certain systems used by the Debtors, together with certain of their domestic and foreign affiliates, to manage their cash and payables efficiently on a global level, including in connection with the payment of the Debtors' foreign vendors (the "Foreign Cash Management System").[2]

32.     As described further herein, to the extent not inconsistent with the U.S. Treasury Loan Agreement and the Debtors' postpetition credit facility (the "DIP Loan

---

[2] As described below, most of the transactions within the Foreign Cash Management System are between and among non-Debtors.  The Debtors submit that they do not need Court authority for such transactions to continue, but they are describing the Foreign Cash Management System in some detail to provide the Court and other parties in interest with a general understanding of how General Motors manages its cash globally, including how the Debtors' transactions within the Foreign Cash Management System fit into the cash management system as a whole.

Agreement"), as either may be amended,[3] the Debtors seek to maintain the Cash Management

System postpetition to continue the uninterrupted operations of the Debtors and their direct and

indirect subsidiaries, which the Debtors believe is necessary to maximize and preserve value for

their estates.  The components of the Cash Management System are organized around three

principal functions:  cash collection, concentration, and disbursement.

**The U.S. Cash Management System**

**A.      Overview of the U.S. Cash Management System**

33.      The Debtors use the U.S. Cash Management System to facilitate cash

forecasting and reporting, monitor collection and disbursement of funds, and maintain control

over the administration of the various Bank Accounts required to effect the collection,

disbursement, and movement of cash for their U.S. dollar transactions.  The movement of funds

through the U.S. Cash Management System is described below and is illustrated in the charts

attached hereto as Exhibit "B."

34.      <u>Cash Management Banks and Accounts</u>.  Substantially all of the Debtors'

U.S. operating accounts are held at ten U.S. banks (the "<u>Cash Management Banks</u>"):  JPMorgan

Chase Bank N.A. (Michigan) ("<u>JPM Michigan</u>"), JPMorgan Chase Bank N.A. (New York)

("<u>JPM NY</u>"), JPMorgan Chase Bank N.A. (Illinois) ("<u>JPM Illinois</u>"), Bank of America, N.A.

(California) ("<u>BofA CA</u>"), Bank of America, N.A. (Tennessee) ("<u>BofA TN</u>"), Bank of New

York Mellon ("<u>BNY Mellon</u>"), Citibank, N.A. ("<u>Citibank</u>"), Comerica Bank ("<u>Comerica</u>"),

Harris N.A. ("<u>Harris Bank</u>"), and State Street Bank ("<u>State Street</u>").  Each Cash Management

---

[3] The U.S. Cash Management System that existed prior to December 31, 2008 has been affected by the terms of the
U.S. Treasury Loan Agreement and the DIP Loan Agreement, as those agreements have placed certain restrictions
on GM's ability to fund its overseas operations.

Bank maintains a concentration account (a "<u>Concentration Account</u>") and one or more attached

zero balance accounts ("<u>ZBAs</u>").  As of April 30, 2009, there were approximately 164 ZBAs in

the U.S. Cash Management System, each serving a specific purpose (generally, collection or

disbursement).

35.     <u>The Treasury Management System</u>.  The Debtors employ a system known

as the "GM Treasury Management System" ("<u>GMTM</u>") to manage the daily flow of funds

through the U.S. Cash Management System, reconcile the Concentration Accounts, and post cash

transactions to the general ledger in an automated fashion.

36.     <u>Participating Subsidiaries</u>.  While GM is the largest participant in the U.S.

Cash Management System and is the legal owner of most of the Bank Accounts associated

therewith, several of GM's U.S. subsidiaries (the "<u>Participating Subsidiaries</u>") also participate in

the U.S. Cash Management System in one or more of several ways:[4]

- Some Participating Subsidiaries, such as Debtor Saturn Corp., have their own ZBA accounts that are part of the U.S. Cash Management System.[5]  Cash in these Participating Subsidiaries' ZBAs is swept into a Concentration Account daily and commingled with GM's cash.  Other Participating Subsidiaries do not have their own bank accounts.  Rather, collections and disbursements on their behalf are made into and from GM Bank Accounts.  GM accounts for the cash of each of those Participating Subsidiaries through the use of intercompany accounting (specifically, "6350 accounts," as reflected on the general ledger), which are periodically settled by GM through adjustments on GM's books.[6]

---

[4] U.S. subsidiaries that are not Participating Subsidiaries do their own collections and disbursements.  Debtors Saturn, LLC and Saturn Distribution Corporation are Participating Subsidiaries.  Debtor Chevrolet-Saturn of Harlem, Inc. is not a Participating Subsidiary.

[5] Some of these Participating Subsidiaries also have their own bank accounts that are not part of the U.S. Cash Management System.

[6] When U.S. subsidiaries purchase goods and services from one another, they either settle in cash or through these intercompany accounts.

- Beginning November 20, 2008, GM entered into U.S. Intercompany Lending Facility Agreements (the "Cash Management Loan Agreements") with several subsidiaries.[7]  Under these agreements, all of those Participating Subsidiaries' cash as of the date of the Cash Management Loan Agreements was swept into GM's accounts and treated as loans to GM (the "Cash Management Loans") rather than in the manner set forth in the preceding paragraph.  Under the original terms of the Cash Management Loan Agreements, the loan balance would increase as cash was swept into the Concentration Accounts from a Participating Subsidiary's ZBA and decrease as GM transferred cash from the Concentration Accounts to the Participating Subsidiary's ZBA.  Recently, the arrangement was modified such that GM continues to hold a portion of the cash of those Participating Subsidiaries pursuant to the Cash Management Loan Agreements, but the subsidiaries' accounts are no longer ZBAs.  Instead, those Participating Subsidiaries maintain their own accounts with some cash balance and GM transfers cash to them as needed, thereby decreasing the loan balance under the Cash Management Loan Agreement.  The Cash Management Loans accrue interest at the one-month LIBOR plus 0.25% (which interest is capitalized monthly) and have one month terms that automatically renew.  The loans are repayable on demand by a Participating Subsidiary and prepayable by GM without penalty at any time.[8]

37.    Regardless of whether they are net users of cash or net producers of cash, all Participating Subsidiaries are heavily dependent on the U.S. Cash Management System and could not operate without access to cash from the U.S. Cash Management System, because each entity's daily cash needs fluctuate and those entities sometimes require access to GM's cash to operate.  In addition, many of the Participating Subsidiaries do not have bank accounts and/or do not have the mechanisms in place to make payments to vendors themselves and are entirely reliant on GM for those functions.

---

[7]  Most of these entities had not, prior to such date, been Participating Subsidiaries.  Rather, they maintained their own bank accounts independent of the U.S. Cash Management System.  Through the Cash Management Loans, GM was able to get access to cash needed to fund operations.  Debtor Saturn Distribution Corporation executed a Cash Management Loan.

[8]  As of April 30, 2009, approximately $263 million was outstanding under the Cash Management Loans.

**B.      Collection**

38.      <u>Sources of Collection</u>.  The Debtors generate and receive funds primarily

from the following sources:  (i) collection of vehicle receivables (from sales to dealers), (ii)

collection of vehicle service parts and accessories receivables, (iii) collection of Powertrain

receivables, and (iv) collection of OnStar subscription fees.  Vehicle receivables are divided into

two categories:  (i) those from GMAC LLC ("<u>GMAC</u>"), in cases where GMAC has financed

dealers' purchases of vehicles from GM, and (ii) those from non-GMAC sources, which are

generally banks that have financed dealers' purchases of vehicles (GM refers to these as "outside

discount companies").

39.      <u>Collections Accounts</u>.  GM and certain Participating Subsidiaries maintain

ZBA lockbox and deposit accounts for the collection of receipts ("<u>Collections Accounts</u>").

Various Collections Accounts are maintained at JPM Michigan, JPM NY, JPM Illinois, BofA

CA, BofA TN, BNY Mellon, Harris Bank and Citibank.  Other than vehicle receivables, most of

the Debtors' collections are received into the Collections Accounts.  With a few exceptions, no

disbursements are made from Collections Accounts.

40.      <u>Other Collection Methods</u>.  The majority of vehicle receivables (75-80%)

are financed through GMAC (dealer financing).  With respect to those receivables, GMAC

generally deposits the funds directly into the Concentration Account at JPM NY (the "<u>NY</u>

<u>Concentration Account</u>") the day after the vehicle is shipped.[9]  Non-GMAC vehicle receivables,

which are subject to a receivables securitization facility, are paid by the funding bank on the

---

[9] As part of the arrangement that results in GMAC paying for vehicles prior to the invoice date (which is usually the delivery date), GM pays an interest expense to GMAC which is netted out.  In addition, from time to time, GM may have to make payments to GMAC for lease residuals, *i.e.*, if the actual value of a vehicle at the end of its lease is less than the expected value of such vehicle at the time the lease was made, GM shares the loss with GMAC.

vehicle's expected delivery date into a special purpose entity ("SPE") account maintained at JPM

Michigan or BNY Mellon.  When the receivables are collected, cash moves from one SPE

account (collections account) to another SPE account (accumulation account) at the same bank.

Funds are then transferred from the SPE owned accumulation account to a Concentration

Account.  Similarly, funds from a securitization facility relating to receivables from the Middle

East are collected into an SPE account at JPM NY and then transferred to the NY Concentration

Account.

      41.    Third Party Borrowing.  GM also occasionally receives funds through

third party loan agreements and bond issuances.  Funds resulting from these forms of borrowing

are deposited directly into a Concentration Account rather than into a ZBA.

## C.    Concentration

      42.    Each day the excess funds in each Collections Account are swept into the

associated Concentration Account.  On a daily basis, each Concentration Account electronically

transmits detail on prior day activity to JPM Michigan for reporting through GMTM.  GM's New

York Treasurer's Office Cash Desk ("NYTO Cash Desk") analyzes the bank statements in

conjunction with internal forecasts of cash requirements to determine the cash excess or shortfall

in relation to the daily target balance for each of the Concentration Accounts.  The NYTO Cash

Desk, using GMTM, then initiates wire transfers among the Concentration Accounts to (a) move

money into accounts with a shortfall and (b) concentrate excess cash (above the daily target

balance) at the NY Concentration Account for investment.  Certain Concentration Accounts

(JPM Michigan, JPM NY, JPM Illinois, and Citibank) have sweep arrangements so that amounts

in excess of a threshold amount, are automatically swept into an interest bearing account held at

the same Cash Management Bank at the end of each business day.

43.    <u>The Central Concentration Account</u>.  The Concentration Account at JPM

Michigan (the "<u>Central Concentration Account</u>") acts as the hub for the Concentration Accounts

comprising the U.S. Cash Management System.  Any movement of funds between two

Concentration Accounts involves back-to-back transfers: one from the transmitting

Concentration Account to the Central Concentration Account, and one from the Central

Concentration Account to the receiving Concentration Account.

44.    <u>The NY Concentration Account</u>. The JPM NY Concentration Account is

linked to the custody account through which the U.S. Cash Management System's investments

are executed (the "<u>NY Custody Account</u>").  Currently, the NY Custody Account has only one

investment portfolio, which is comprised of certain liquid investments in compliance with GM's

investment guidelines (the "<u>Investment Guidelines</u>").[10]  Investments purchased using excess cash

are held at the NY Custody Account until such investments are liquidated and returned to the

JPM NY Concentration Account.  In addition, GM has an additional custody account at JPM NY

in which it holds one security.

**D.    Disbursements**

45.    <u>Disbursement Accounts</u>.  The Debtors maintain certain ZBAs for the

purpose of making specific types of disbursements (the "<u>Disbursement Accounts</u>").

Disbursement Accounts maintained by Debtors as part of the U.S. Cash Management System

include the following:

---

[10]   Description of the Investment Guidelines are set forth below in Section II.

(a)    Disbursements to the Debtors' vendors are made through Disbursement Accounts held at JPM Michigan, JPM NY, JPM Illinois, BofA TN, BNY Mellon, Harris Bank and Citibank. Vendor disbursements are made on a daily basis with the significant majority of disbursements made on the "MNS-2" date each month.[11]

(b)    Disbursements for the Debtors' obligations to various taxing authorities are paid from a Disbursement Account held at JPM NY.

(c)    Historically, dividends were paid from Disbursement Accounts held at BofA CA.  However GM suspended dividend payments for its common stock on July 15, 2008.

(d)    Disbursements for payroll obligations to hourly employees of the Debtors are made from Disbursement Accounts held at BofA TN, JPM Michigan, JPM NY, BNY Mellon and Citibank.

(e)    Disbursements for payroll obligations to salaried employees are made from Disbursement Accounts held at JPM Michigan.

(f)    Disbursements for healthcare and other employee benefits are paid from Disbursement Accounts held at JPM Michigan, JPM NY, BofA CA, BofA TN, Comerica and State Street.

(g)    Disbursements to GMAC on account of GM's guarantee of certain GMAC lease residuals are paid out of a Disbursement Account held at JPM NY.

(h)    Disbursements to dealers based on dealer incentive programs are paid out of a Disbursement Account held at Citibank and JPM NY.

46.    <u>Disbursement Methods</u>.  For the most part, disbursements are centralized and processed with the assistance of certain third party service providers, such as Affiliated Computer Services, Inc. ("<u>ACS</u>").  As payments are made from a Disbursement Account, the balance becomes negative.  Historically, at the close of business each day, the Cash Management

---

[11]  The MNS-2 date is the date established by the Debtors' Multilateral Netting System ("<u>MNS-2</u>"), which provides, on average, that payment will be made on the second day of the second month following Seller's shipment date of goods (or date of services) or Buyer's receipt date of the goods (or date of services).  The MNS-2 date for each month is established in advance.

Banks automatically transferred funds from the appropriate Concentration Account into any attached Disbursement Account with a negative balance such that, after the transfer, the balance returned to zero.  Effective January 2, 2009, BofA Tn and BofA Ca discontinued end of day zero balance funding.  Those Banks now require that funds be manually transferred into the Disbursement Accounts by GM by specified cutoff times before the close of business.  BNY Mellon has also discontinued automated end of day zero balance funding, but does execute a Treasury Assistance transfer at 10 a.m. each day that transfers funds from the GM Concentration Account to any Disbursement Account with negative balances such that, after the transfer, the balance is returned to zero.  All Banks require that GM pre-fund all electronic payments (ACH) before the payments are released into the ACH clearing system.

47.    _Other Disbursements_.  Disbursements for certain corporate purposes (*e.g.*, equity injections into subsidiaries and repayment of debt), as well as disbursements to GMETC (as defined and described below), are paid directly out of the NY Concentration Account.  GM makes disbursements on behalf of its Participating Subsidiaries that do not have bank accounts.  In addition, for administrative convenience, GM initiates wire transfers out of the NY Concentration Account on behalf of itself and its Participating Subsidiaries.

**E.    Other Transactions/Accounts**

48.    _SPE Accounts_.  Although not held in the name of the Debtors, JPM Michigan, JPM NY and Citibank maintain accounts (the "_SPE Accounts_") for various SPEs.  The SPEs are created and generally funded by GM for a variety of reasons, *e.g.*, tax benefits, regulatory requirements, or the facilitation of securitization transactions.  In certain situations, GM funds the SPE with an amount of funds the SPE is expected to use consistent with its

purpose. Balances in such SPE accounts are expected to diminish over time and are not expected to become available for use in the Debtors' general operations. Historically, funds held in certain SPE Accounts were not commingled with other funds in the U.S. Cash Management System. Recently, however, as described above, certain former SPEs have entered into Cash Management Loans with GM, thereby becoming Participating Subsidiaries.

49. UST Controlled Account. Pursuant to the U.S. Treasury Loan Agreement, GM has established a deposit account JPM NY (the "UST Controlled Account"), which is subject to a deposit account control agreement for the benefit of the U.S. Treasury. Under the U.S. Treasury Loan Agreement, GM is required to maintain funds in the UST Controlled Account in an amount that together with the value of inventory of GM and certain of its subsidiaries that constitute collateral to secure the obligations under the U.S. Treasury Loan Agreement equals at least $250 million.

50. Foreign Exchange Transactions. In the ordinary course of business, GM enters into foreign exchange transactions to offset its foreign currency exposure for select currency pairs. Under General Motors policy, GM executes trades with banks with which ISDA agreements are in place. Given the international scope of their operations, such transactions are crucial to the Debtors' financial success. Absent use of such financial instruments, the Debtors would face significant exposure to adverse changes in exchange rates. Sometimes GM and GM Canada enter into transactions to exchange U.S. dollars and Canadian dollars at arms' length foreign exchange rates. These transactions decrease the external exchange of foreign currency funds with external counterparties, and thus decrease the transaction costs for the enterprise and enable GM and GM Canada to obtain funding necessary to continue their operations.

51.    <u>Non-U.S. Accounts</u>.  Because bank accounts in the United States can generally only hold U.S. dollars, GM maintains eleven accounts in London and six accounts in Canada for the purpose of receiving and disbursing foreign currency pursuant to various foreign exchange hedging transactions and commercial disbursements.  GM prefers not to carry a balance in such accounts and attempts to exchange the foreign currency into U.S. dollars immediately upon receipt.[12]  The U.S. dollars are settled into a JPMorgan NY Account and then GM transfers the funds into a ZBA at JPM Illinois.

52.    <u>Foreign Subsidiary Accounts</u>.  Various of the Debtors' foreign subsidiaries maintain accounts in the United States.  These non-Debtor accounts are not implicated by these chapter 11 cases and are not included in this Motion.

53.    <u>Payroll Pay-Through Accounts</u>.  As of April 30, 2009, the Debtors maintained approximately five payroll pay-through accounts at regional banks.  These accounts were historically maintained to permit hourly employees who do not have bank accounts to cash their payroll checks; however, the accounts are no longer used for this purpose.  They are currently maintained for relationship reasons with banks that are lenders under the GM's secured credit facility.

54.    <u>Collateral Accounts</u>.  As of April 30, 2009, the Debtors maintained approximately 38 accounts that constitute restricted cash, as they are cash collateral accounts or escrow accounts established for various specific purposes.

---

[12]  GM also engages in non-deliverable commodity hedging transactions to protect against large increases in commodity prices.  Although the transactions are based on the global exposure of GM and its subsidiaries with respect to commodities prices, all such hedging are conducted at the GM entity level.

55.    <u>Intercompany Transactions</u>.  GM and its subsidiaries provide each other goods and services in the ordinary course of business under various intercompany arrangements (the "<u>Allied Transactions</u>").  The Debtors are seeking authority to continue to make payments on account of Allied Transactions in the ordinary course of business, including the payment of prepetition claims to affiliates.

56.    <u>Intercompany Funding</u>.  GM and its subsidiaries have historically transferred cash to one another through one-off transactions as the need has arisen.  When it has been determined that either GM or one of its Debtor or non-Debtor subsidiaries needs cash (which may be a result of one of the subsidiaries putting in such a request), General Motors may provide such funding in accordance with its internal policies and the credit limits established for each entity.  These necessary funding transactions are accomplished through intercompany loans, capital injections, or dividends, with all appropriate corporate formalities being observed and after determination of the ideal method of such transfer, taking into account legal, financial, and tax considerations.[13]  These transactions have decreased borrowing costs for the enterprise and enabled valuable subsidiaries to obtain funding necessary to continue their operations.  In addition, because these entities are part of the Debtors' overall corporate ownership structure,

---

[13] In addition, General Motors sends annual surveys to various General Motors subsidiaries to determine their financial situation, and, in particular, their cash positions.  Based on the survey, if it is determined that financial and legal considerations support the payment of a dividend based on the results of the survey for a particular subsidiary, GM may cause that subsidiary to pay dividends to its direct parent (which may then be further paid as a dividend to all subsidiaries' ultimate parent, GM).  Dividend payments from subsidiaries are generally transferred using manually initiated wire transfers or through the MNS Netting Process (as defined below).  Dividends from foreign affiliates are generally converted into U.S. dollars through GMETC (as defined below).

If a U.S. subsidiary needs funding, GM has typically provided the funding through an equity contribution or an intercompany loan.  If a subsidiary outside of the United States needs funding, then it is usually accomplished through a loan from GMETC or an equity contribution by the parent (which may ultimately be funded by GM).  Under certain circumstances (due to legal, financial, or tax considerations), the funding is accomplished through a loan from one subsidiary to another.

throughout the entirety of these transactions the funds have historically remained within General

Motors' control.  As noted, the U.S. Treasury Loan Agreement and DIP Loan Agreement impose

limitations on GM's investments in subsidiaries.

**The Foreign Cash Management System**

57.    The Foreign Cash Management System is comprised of (i) processes

performed by General Motors Europe Treasury Company AB ("GMETC"), a wholly owned,

indirect subsidiary of GM domiciled in Trollhattan, Sweden, which performs several functions

for General Motors, (ii) a North American payables process, and (iii) certain GM subsidiaries

that were created to share common resources (for example, GMGTO, as defined and described

below).

**A.    GMETC**

58.    GMETC serves three primary purposes for the General Motors enterprise:

(i) cash pooling ("Cash Pooling"), (ii) foreign exchange risk management, and (iii) clearinghouse

for payables.  Each of these is described below in more detail.  GMETC does not have any direct

employees; however, its day to day functions are handled through various service agreements

entered into with other GM affiliates for necessary services, e.g., risk management, cash

management, accounting, legal, and back office support.[14]

59.    Shortly before the Commencement Date, in connection with bridge

financing provided by the German government to Adam Opel GmbH ("Adam Opel"), GMETC,

---

[14] The affiliates providing such services include GM (cash management, middle and back office support and accounting), GMUST (as defined below) (foreign exchange management and MNS (as defined below)), and Saab Automobile AB (tax compliance, legal, corporate governance compliance).  GMETC pays for these services using revenues generated by the interest rate spread between deposits and loans and a spread charged on foreign exchange spot transactions.

Adam Opel, and certain other European subsidiaries of General Motors agreed that such

subsidiaries would cease participating in the GMETC aspect of the Foreign Cash Management

System (the "European Separation").  Instead, the functions formally performed by GMETC for

such subsidiaries will be performed by Adam Opel.  Accordingly, the descriptions below relating

to GMETC's functions will not apply to such European subsidiaries after the European

Separation.

      60.    GMETC as a Cash Pooling Entity.  Through Cash Pooling, GMETC

collects excess cash from foreign subsidiaries that have generated excess cash, provides liquidity

to subsidiaries in need of liquidity, and optimally invests the enterprise's cash.  General Motors'

cash investment policy requires that all GM foreign subsidiaries and GM majority-owned foreign

joint ventures deposit any excess cash (any amount in excess of the amount of cash necessary to

fund day-to-day operating activities and one month of forecasted payments for capital

expenditures and non-operating activities) with GMETC (the "Deposits"), unless there exist legal

limitations or tax inefficiencies.

      61.    Foreign subsidiaries that are majority controlled by GM are eligible to

borrow money from the pool of Deposits collected by GMETC through loans (the "Loans") from

GMETC.  Most subsidiaries have a Deposit/Loan Agreement with GMETC that governs the

general terms of Deposits or Loans between GMETC and the entity.  All Loans made by

GMETC are limited to amounts (the "Loan Limits") approved as per GM's formal delegation of

authority (through which certain individuals are authorized to approve transactions up to

individualized specified amounts). [15]  Any Deposit amounts remaining after taking into account

outstanding Loans are invested by GMETC in a portfolio primarily comprised of bank deposits,

certificates of deposit and corporate commercial paper in compliance with GM's Investment

Guidelines.[16]

       62.      To manage the foreign currency and interest rate risk arising from

providing the Cash Pooling services, GMETC performs foreign exchange hedging on its own

behalf.  Recently, all of GMETC's foreign exchange hedging transactions have been with its

parent, GM International Sales Ltd.  To reduce its foreign exchange exposure, GMETC recently

enacted a policy whereby it makes Loans in the currency in which it has the greatest amount of

available cash from Deposits (which has recently been U.S. dollars).

       63.      The Debtors have not historically participated in the Cash Pooling aspect

of GMETC.  However, recently, in connection with the European Separation, intercompany

notes GM issued to certain European entities were to be transferred to GMETC.

       64.      <u>GMETC as Foreign Exchange Risk Management Provider</u>.  In the

ordinary course of business, GMETC enters into foreign exchange hedging transactions to offset

global net foreign currency exposure for select currency pairs.  Under General Motors policy,

most General Motors entities (but not GM) hedge their foreign exchange risk through GMETC,

using GM's affiliate General Motors U.S. Trading Corporation ("<u>GMUST</u>") as a broker for such

transactions under service agreements.  GMETC executes back-to-back trades with the General

---

[15] GM and GMETC have never loaned each other money directly (although liquidity has occasionally been
transferred between their respective centrally managed portfolios through transactions with other General Motors
entities).

[16] The Investment Guidelines are described below in more detail.

Motors entity and the banks (the latter utilizing ISDAs).  These trades are identical in every

respect except in opposite directions.

65.    The Debtors do not participate in the foreign exchange risk management

aspect of GMETC.

66.    <u>GMETC as a Clearinghouse</u>.  GMETC's final function, and the only one

in which the Debtors participate, is as a clearinghouse for certain payables.  Specifically GMETC

facilitates the payment by GM and certain of its subsidiaries (the "<u>MNS Participants</u>") of their

payables to foreign affiliates for Allied Transactions (the "<u>Foreign Allied Transactions</u>") and

payables to third party foreign vendors (the "<u>Foreign Third Party Transactions</u>" and together

with the Foreign Allied Transactions, the "<u>Foreign Transactions</u>") by enabling each MNS

Participant to make a single payment in its native currency to GMETC to satisfy many of the

MNS Participant's Foreign Transactions payables.[17]  Each month, each MNS Participant inputs

data into a computer system ("<u>GEPARA</u>") relating to payments owed in respect of allied and

non-allied Foreign Transactions.  By netting amounts due from each MNS Participant to all other

MNS Participants for Allied Transactions and adding each MNS Participant's obligations in

respect of Third Party Transactions, GMETC determines a single payment due from each MNS

Participant to GMETC on account of all of the MNS Participant's Foreign Transactions for a

particular period (or a single payment due from GMETC to a MNS Participant if the net amounts

owed to the MNS Participant from the other MNS Participants is in excess of its Foreign

---

[17] General Motors maintains standard terms for purchasing that apply whether the transaction is an allied transaction
or a non-allied transaction.  Substantially all Foreign Transactions in which GM or any U.S. subsidiary engages are
settled (paid for) through GMETC (although certain subsidiaries use an intermediary – "Staff Accounting" – to
process payments between the U.S. subsidiary and GMETC).

Transactions).  General Motors refers to this process as the Multilateral Netting System (the

"MNS Netting Process").

67.    After performing the MNS Netting Process and calculating each entity's

net payable/receivable, GMETC makes payments to suppliers and MNS Participants for all the

Foreign Transactions on particular settlement dates in the appropriate currency.[18]  Although there

are weekly settlement dates, the majority of such payments are made monthly on the "MNS-2"

settlement date, the last of which was May 28, 2009.  In order for the banks to be able to make

payments on the applicable settlement date, each MNS Participant with a payable position must

make its payment to GMETC one business day before such settlement date.  To the extent that

GM or a Participating Subsidiary is a net paying entity, the amount of such entity's required

payment each month is transferred from an account held by GM at JPM NY to a GMETC

account at Deutsche Bank.

68.    To accomplish the MNS Netting Process and enable payment in the

appropriate currency in connection with the MNS Netting Process, GMETC maintains one multi-

currency master funding account and funding accounts in various currencies at Deutsche Bank.[19]

In addition, GMETC oversees accounts at Deutsche Bank on account of MNS Participants.

GMETC exchanges the amounts received into the appropriate local currency and makes

payments to the third party vendors and MNS Participants on the settlement date.

69.    Generally, GM is a net paying entity into the GMETC structure.  GM's

average monthly payment in 2008 was approximately $400 million; however, the amount

---

[18] GMETC makes each such payment out of an account it maintains at Deutsche Bank.

[19] Some funding accounts are held in the name of Adam Opel GmbH, but these accounts function in the same
manner as the GMETC accounts.

increases substantially on the first MNS-2 date of every quarter, as the net of royalty payments

and engineering services to and from GMGTO (as defined below), respectively, are due on such

date.[20]  The Debtors are requesting authority to continue their payments in the GMETC structure

in the ordinary course, including the MNS Netting Process and the payment of prepetition

Foreign Allied Transactions.

**B.      North American Netting Process**

          70.      General Motors uses a separate netting process for certain of its North

American entities (the "North American Netting Process").  Specifically, with respect to allied

and non-allied transactions by General Motors entities in the United States, Canada, and Mexico

in U.S. dollars, Canadian dollars, and Mexican pesos, GM engages in a weekly netting process

that is similar to the MNS Netting Process performed by GMETC.  The Debtors are requesting

authority to continue their payments in connection with the North American Netting Process in

the ordinary course, including the payment of prepetition Allied Transactions in connection

therewith.

**C.      Pooling of Resources and Functions**

          71.      Pooling of Intellectual Property.  Several years ago, as has been

undertaken by other large multinational corporations, General Motors decided to centralize its

intellectual property by transferring same to a single subsidiary, GM Global Technology

Operations ("GMGTO").  GMGTO (i) purchases engineering services from certain General

Motors subsidiaries that provide such services under engineering services agreements and (ii)

licenses intellectual property to General Motors subsidiaries that use such intellectual property

---

[20] The increase is driven by the fact that GMGTO is a net payer during the MNS Process (GMGTO is a Participating
Subsidiary and its payments are made from a GM bank account).

(generally major full-fledged manufacturing operations) under license agreements.  GMGTO

charges royalties for the use of its intellectual property based on region – each region is

responsible for paying royalties equal to 5% of such region's net sales and the liability is

allocated within the region among entities that are licensees.[21]  Engineering charges and royalty

payments are payable quarterly and processed through GMETC on the first MNS-2 date of each

quarter (in arrears for the prior quarter).  Because certain of those charges are based on forecasts,

the participants true-up the following quarter's payments based on the variance between actual

and estimated fees due.  As a result of the recent reduction in global sales of automobiles,

royalties paid to GMGTO have decreased significantly, causing GMGTO to be a net user of cash

(as its costs for engineering services exceed its revenues from royalty charges).  The GMGTO

structure enables General Motors to manage global engineering resources optimally, support

shared architectures and part reuse, avoid duplication of design and engineering effort, and better

manage and control intellectual property and exchanges of technology.

       72.    <u>Pooling of Purchasing</u>.  As has been undertaken by other large

multinational corporations, General Motors conducts certain of its purchasing-related functions

on a global basis.  General Motors Global Service Operations, Inc. ("<u>GMGSO</u>") was established

effective January 1, 2007 to consolidate certain structural costs incurred globally relating to the

function of purchasing into a single subsidiary, and to bill those costs out to the benefiting

General Motors entities.  GMGSO establishes a global budget for purchasing-related activities

(wages, leases, utilities, etc.) and contracts for purchasing services performed by various General

---

[21] GM's subsidiary GM Daewoo Auto and Technology Company ("<u>GMDAT</u>"), which is not wholly-owned by GM,
pools its  engineering services and intellectual property with GMGTO under a separate arrangement using a
different methodology that factors in GMDAT's actual engineering costs and forecasted sales as a percentage of
General Motors' sales to allocate the engineering burden.

Motors entities that perform purchasing services on behalf of other entities (the "Service

Entities").  In this context, the "services" are the purchasing-related activities.  The Service

Entities bill GMGSO for the costs relating to the purchasing activities,[22] plus a mark-up.

GMGSO, in turn, bills the General Motors "OEM" entities (the "Customer Entities"), which are

the entities that assemble vehicles, a fee for the purchasing services.  The GMGSO Customer

Entities' fees are determined by a formula that allocates GMGSO's aggregate costs among the

Customer Entities based on the number of units produced by each such entity.[23]  GMGSO's

payments to the Service Entities and the Customer Entities' payments to GMGSO are payable

quarterly and generally processed through GMETC on the first MNS-2 date of each quarter.

Because certain of those charges are based on actual and forecast data, the participants true-up

one quarter's billing in the following quarter's payments based on the variance between actual

and estimated fees due.  General Motors' global purchasing organization enables GM to obtain

lower costs on purchased parts for General Motors vehicles produced around the world.  The

GMGSO structure further supports cost containment by minimizing the administrative cost of the

inter-company billing that naturally follows from the global function.

    73. <u>Pooling of Tooling</u>.  Recently, General Motors decided to centralize its

ownership of shared vendor tooling (equipment for making parts located at suppliers) ("Vendor

---

[22] The actual price of the purchased product is not billed through GMGSO, just the costs of services relating to purchasing (*i.e.*, the supplier contracts are directly between the GM Affiliate manufacturer and the outside supplier).

[23] GMDAT is both a Service Entity and a Customer Entity.  GMDAT's Customer fee is capped such that GMDAT pays less than it would under the standard GMGSO Customer Agreement.  Therefore, GM APO Holdings LLC, ("GMAPO") acts as an intermediary between GMDAT and GMGSO such that GMAPO is the Service Entity and Customer to GMGSO under standard GMGSO agreements.  GMDAT is a Service Entity to GMAPO under a standard agreement, and GMDAT is a Customer of GMAPO under the unique GMDAT Customer Agreement pursuant to which GMDAT's Customer fee is capped.  This structure isolates the funding shortfall of the unique GMDAT Customer agreement in GMAPO.  To date the GMAPO funding shortfall has been covered by loans from General Motors Corp.

Tooling"). As a result, General Motors created and funded (through an equity contribution, as well as intercompany loans) two entities, GM Global Tooling Company, Inc. ("ToolCo U.S.") and Global Tooling Services Company Europe Ltd. ("ToolCo UK" and together with ToolCo U.S., "ToolCo"), to purchase Vendor Tooling for the enterprise. ToolCo purchases new Vendor Tooling directly from vendors and bills other General Motors entities their allocable share of the tooling cost, plus an arms' length markup based on an allocation formula, in a similar manner as GMGTO and GMGSO. ToolCo is expected to use the funds it generates from charging other entities to repay the intercompany loans. The main benefit General Motors derives (and expects to derive) from ToolCo is that it facilitates the sharing of tools between General Motors entities globally and supports initiatives that provide cost savings in the product development process. It is also expected to provide General Motors with efficiencies in recovering the value-added tax (VAT) incurred on the vendor tools.

74.     The Debtors are requesting authority to make all payments to GMGTO, GMGSO, and ToolCo in the ordinary course, including payment of prepetition claims owed thereto.

**D.     Functioning of Overall Foreign Cash Management System**

75.     The Foreign Cash Management System and other processes in place allow the Debtors to track obligations owing between related entities and ensure that all Foreign Transactions cleared through the MNS Netting Process and the North American Netting Process are accounted for appropriately on each entity's books. Through the MNS Netting Process and the North American Netting Process, the Debtors significantly reduce the number of intercompany transactions, the transaction costs related thereto, and the Debtors' overall foreign

exchange transaction requirements.  Similarly, GMGTO, GMGSO, and ToolCo provide the

Debtors with substantial efficiencies for various functions and the Debtors' operations, as well as

General Motors' global operations, would be disrupted if they were to cease ordinary course

business conduct with respect thereto.

        76.     Given that the Debtors' systems are set up to pay foreign vendors and

Foreign Allied Transactions through the Foreign Cash Management System, the Debtors believe

it would be extremely difficult, disruptive, and inefficient to operate without the Foreign Cash

Management System, because they do not have systems in place to process and pay invoices in

respect of Foreign Transactions (including postpetition transactions) out of the U.S. Cash

Management System.  In addition, it would be necessary to open dozens of foreign currency

accounts to be able to pay invoices relating to Foreign Transactions in the appropriate currency.

## II.

## THE DEBTORS' INVESTMENT GUIDELINES

        77.     As noted, the U.S. Cash Management System's investments are held in the

JPM NY Custody Account and the Foreign Cash Management System's investments are held by

GMETC in accounts with Deutsche Bank and BNY Mellon (collectively, the "Investment

Portfolios").  The Investment Portfolios are comprised of certain liquid investments in

compliance with GM's Investment Guidelines.[24]  Requirements contained in GM's Investment

Guidelines for GM's investments include:

| Guidelines | Policy |
|---|---|
| Benchmark | Overnight USD LIBID |
| Max. Investment Maturity | 30 days for Sovereigns and Agencies; 2 weeks for all other investments |

---

[24] The investment guidelines were modified on December 12, 2008 to make them more conservative.

| Issuer Limits | No more than 10% of combined Cash Management portfolio value invested in single issuer (except for U.S. and German Sovereign and Agency obligations, which have no limit). Securities which appreciate in value after purchase in excess of limits defined below may be retained |
|---|---|
| Currencies | USD Only |

| Investment Sector | Sector Limit | Required Credit Rating | Issue/Issuer Limit | Authorized Instruments |
|---|---|---|---|---|
| Sovereign Securities, Agency Securities, Supranationals,[25] State and Local Obligations | Min. 20% in: <br> • Sovereigns and Agencies from Governments set forth under acceptable Repo Collateral <br> • Supranationals | • Either S&P rating of AAA or Moody's rating of Aaa is required * <br> • Investments in non-rated Farmer Mac are allowed | • No limit for U.S. Treasuries <br> • Others limited to $75 million unless specific limit provided by Treasury Operations Group ("TOG") | Structures: Bullets, Fixed, Floating <br> Repo Collateral: <br> • Government and Agencies only <br> • 100% margin for Tri-Party, 102% for Deliveries versus Payment, Deviations to be approved by Assistant Treasurer <br> • Maximum maturity of collateral is 30 years. <br> • Acceptable government and agency collateral from: Australia, Austria, Belgium, Canada, Denmark, Finland, France, Germany, Ireland, Italy, Japan, Luxembourg, Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, U.K., U.S. |
| Repurchase Transactions: Delivery-Versus-Payment (DVP) and Tri-Party | | Same as above (rating of underlying securities applies) | • $1 billion per approved counterparty <br> • Issuer limited to $75 million unless specific limit provide by TOG | |

---

[25] This includes entities such as World Bank, European Bank of Reconstruction and Development, etc

| Investment Sector | Sector Limit | Required Credit Rating | Issue/Issuer Limit | Authorized Instruments |
|---|---|---|---|---|
| Bank Obligations | Max 60% | Fitch IBCA F-1/A rating or higher (or equivalent rating from S&P or Moody's if Fitch rating not available)* | • Issuer limited to $25 million unless specific limit provided by TOG | Domestic CDs, Yankee CDs and TDs, Offshore TDs, Bankers Acceptances, Bank Holding Company CP, Promissory Notes |
| Corporate Obligations (financial and non-financial entities) | Max. 40% but no more than 15% for financials | Either S&P or Moody's A-1/P-1 rating or higher* | • Issuer limited to $75 million unless specific limit provided by TOG | • CP only |
| Asset Backed Securities | Not allowed | | | |
| Money Market Funds | Not allowed | | | |

*If both S&P and Moody's ratings exits then the lower of the two prevails.
Note: To the extent any of these limits cannot be achieved in the U.S. Cash Management System portfolio, the shortfall or excess has to be compensated in the GMETC portfolio.

78.     In addition to accounts held for investment at JPM NY, GM holds approximately $5 million as a participant in the Gulf Coast Rebuilding Challenge following Hurricane Katrina and $8 million as part of its Minority Bank Program. Under the programs, GM has invested in certificates of deposit with numerous regional banks in amounts less than the Federal Deposit Insurance Corporation ("FDIC") insurance maximum so that the entire investment is insured by the FDIC. GM holds a single security in a custody account at JPM NY, in which it holds one security, as well as three additional domestic accounts[26] in which it holds securities with a combined value of less than $1 million and one safekeeping account with Citibank Egypt where it holds shares of an Egyptian business partner entity. GM maintains no other accounts for the purpose of holding investments.

---

[26] JPM special account, Bear Stearns Brokerage Account, Merrill Lynch Brokerage Account

# III.

## THE RELIEF REQUESTED IS WARRANTED

**A.     Continuation of the Debtors' Centralized Cash Management System
        Is in the Best Interests of the Debtors, Their Estate, and All Parties in Interest**

79.     The Debtors' operation of their Cash Management System constitutes an
ordinary course, usual, and essential business practice.  In addition, the Cash Management
System provides significant benefits to the Debtors including, *inter alia*, the ability to (i) control
corporate funds centrally, (ii) invest idle cash, (iii) ensure the availability of funds when
necessary, and (iv) reduce costs and administrative expenses by facilitating the movement of
funds and the development of more timely and accurate account balance and presentment
information.  Furthermore, the use of a centralized cash management system reduces interest
expenses by enabling the Debtors to utilize funds within the system rather than relying upon
short-term borrowing to fund the Debtors' and their non-Debtor subsidiaries' cash requirements.
Any disruption in the operation of the Cash Management System could have a severe and
adverse impact upon the value of the Debtors.

80.     The operation of the Debtors' businesses requires that the Cash
Management System continue during the pendency of these chapter 11 cases.  Requiring the
Debtors to adopt new, segmented cash management systems at this early and critical stage of
these cases, or to extract the Debtors from the Cash Management System, would be expensive,
create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of
their global network of domestic and foreign businesses.  Any such disruption could have a
severe and adverse impact upon the Debtors' ability to reorganize, as well as on the value of their
subsidiaries.  Consequently, maintenance of the existing Cash Management Systems, including

the Debtors' continued ability to transfer funds among themselves and their affiliates, is not only

essential but in the best interests of all creditors and other parties-in-interest.

81.     The Debtors' Cash Management System allows the Debtors to manage all

of their cash flow needs centrally and includes the necessary accounting controls to enable the

Debtors, as well as their creditors and this Court, to trace funds through the system and ensure

that all transactions are adequately documented and readily ascertainable.  The Debtors will

continue to maintain detailed records reflecting all transfers of funds to the same extent the

books and records were maintained before the Commencement Date.  In this way, all transfers

and transactions will be properly documented, and accurate intercompany balances will be

maintained.

82.     As discussed above, an important aspect of the Debtors' complex Foreign

Cash Management System is GMETC, through which the Debtors, from time to time, engage in

transactions, particularly their Foreign Transactions and foreign exchange transactions.  The

North American Netting process serves a similar function for the Debtors' North American

Operations.  In addition, the use of pooling entities enables the Debtors to obtain global

efficiencies.  The Debtors intend to continue to utilize the Foreign Cash Management System in

their business operations, as well as for the continued, efficient cash management of their

affiliates.

83.     In furtherance of the foregoing, the Debtors request that all Banks at

which their Bank Accounts are maintained be authorized and directed to continue to administer

such accounts as they were maintained prepetition, without interruption and in the usual and

ordinary course.  The Banks should also be authorized and directed to pay any and all checks,

drafts, wires, and ACH transfers issued on the Bank Accounts for payment of any claims arising

on or after the Commencement Date so long as sufficient funds are in those accounts.  To

effectuate the foregoing, the Debtors request that the Banks be authorized and directed to honor

all representations from the Debtors as to which checks should be honored or dishonored.  To the

extent that the Debtors have directed that any prepetition checks be dishonored, they reserve the

right to issue replacement checks to pay the amounts related to such dishonored checks,

consistent with orders of this Court.

        84.     The continuation of the Debtors' Cash Management System is permitted

by section 363(c)(1) of the Bankruptcy Code.  Section 363(c)(1) of the Bankruptcy Code

authorizes the debtors in possession to "use property of the estate in the ordinary course of

business without notice or a hearing."  The purpose of section 363(c)(1) of the Bankruptcy Code

is to provide a debtor in possession with the flexibility to engage in ordinary course transactions

required to operate its business without unneeded oversight by its creditors or the Court.  *Med.*

*Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Enron*

*Corp.*, Case No. 01-16034 (ALG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003);

*Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal*

*Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).

        85.     Included within the purview of section 363(c) is a debtor's ability to

continue the "routine transactions" necessitated by a debtor's cash management system.  *Amdura*

*Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

A debtor's request for authorization to continue to use its existing cash management system has

been held to be entirely consistent with section 363(c)(1) of the Bankruptcy Code, which allows

a debtor-in-possession to "use property of the estate in the ordinary course of business." *See*

*Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir.

1985).   Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code

to continue the collection, concentration, and disbursement, including intercompany transfers, of

cash pursuant to their Cash Management System described above.

86.     To the extent the movement of cash between Debtors and non-Debtors is

out of the ordinary course of business, it is permitted by sections 363(b)(1) and 105(a) of the

Bankruptcy Code, as it is justified by the unique facts and circumstances of these cases.   Section

363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."   Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title.   No provision of this
> title providing for the raising of an issue by a party in interest shall be
> construed to preclude the court from, *sua sponte*, taking any action or
> making any determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of process.

87.     As this Court has stated, "[w]here the debtor articulates a reasonable basis

for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts

will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related*

*Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986).   When a valid business justification exists, the law vests the debtor's decision to

use property out of the ordinary course of business with a strong presumption that "'in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

88.    The Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and hearing.  11 U.S.C. § 364(a); *see, e.g., In re Amdura Corp.*, 75 F.3d at 1453 (10th Cir. 1996); *Mulligan v. Sobiech*, 131 B.R. 917, 921 (S.D.N.Y. 1991).  The Debtors, therefore, seek authorization, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of their Cash Management System.

89.    The Court may exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."  Continuing the Cash Management System is vital to the efficient and economic administration of these chapter 11 cases,.  Therefore, it is within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System.

90.    Continuation of the intercompany transactions in the Cash Management System, including Allied Transactions and subject to restrictions in the U.S. Treasury Loan Agreement and the DIP Loan Agreement, is in the best interests of the Debtors, their estates, and all parties in interest.  The Debtors' equity interests in (and intercompany receivables from) their subsidiaries and affiliates are valuable assets of the estate.  If the Debtors' subsidiaries are not funded and cannot meet their obligations and manage their cash as a result of these chapter 11 cases, there is a likelihood that they will decrease substantially in value, causing great harm to

the Debtors, their estates, and their creditors.  In addition, the integrated Cash Management

System enables the Debtors to achieve great efficiencies and put the system's cash to its best use.

As such, it is in the best interests of the Debtors' estates for the Debtors to continue funding

those subsidiaries they believe have value, which will benefit the Debtors' estates.

91.     Furthermore, the Cash Management System allows the Debtors to function

as a unified enterprise, and to achieve value through consolidating various brands.  GM, as the

parent corporation, derives its strength as a brand and as a company from its subsidiaries.

Without the continued interrelationship among GM and its subsidiaries, the Debtors may not

succeed in reorganizing and emerging from chapter 11 as a going concern.  Accordingly, the

Debtors submit that the continuation of the intercompany transactions within the Cash

Management System is in the best interests of the Debtors' estates and their creditors.

92.     These procedures are similar to those employed by comparable corporate

enterprises.  Moreover, the relief requested herein is routinely granted in other chapter 11 cases.

*See, e.g., In re Chrysler LLC.*, Case No. 09-50002 (AJG) [Docket No. 1303] (Bankr. S.D.N.Y.

May 20, 2009) (debtors authorized to continue cash management system including to engage in

intercompany transactions to debtor and non-debtor affiliates); *In re Bearing Point, Inc.*, Case

No. 09-10691 (REG) (Bankr. S.D.N.Y. March 13, 2009) [Doc. No. 221] (debtors authorized to

continue centralized cash management system, including intercompany transfer of funds); *In re*

*Lyondell Chemical Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 12, 2009) [Doc. No.

1194] (debtors authorized to continue cash management system, including to make intercompany

transactions with debtor and non-debtor affiliates, provided that each debtor making transfers to

non-debtor affiliates have contribution claims against such non-debtor affiliates); *In re Lehman*

*Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. (Nov. 6, 2008) [Doc. No. 1416] (debtors authorized to utilize centralized cash management system, including intercompany funding); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005) [Doc. No. 882] (debtors authorized to continue to continue centralized cash management system, including to engage in intercompany transactions in the ordinary course); *In re Northwest Airlines Corp.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) [Doc. No. 615] (debtors authorized to continue centralized cash management system, including to transfer funds between debtors and their affiliates as necessary to maintain their operations); *In re Atkins Nutritionals, Inc.*, Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Aug. 1, 2005) [Doc. No. 36] (debtors authorized to make payments on behalf of their non-Debtor subsidiaries and affiliates in accordance with their cash management system); *In re Loral Space & Commc'ns LTD.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) [Doc. No. 26] (debtors authorized to make payments on behalf of their non-Debtor subsidiaries and affiliates in accordance with their cash management system).  Similar authorization is appropriate in these chapter 11 cases.

93.     Based on the foregoing, the Debtors believe that maintenance of the existing Cash Management System is in the best interests of their estate and all parties in interest. Therefore, the Debtors seek authority to maintain and use their Cash Management System during their chapter 11 cases.

**B.     Honoring Certain Prepetition Obligations of the Debtors
         Related to the Cash Management System Is in the Best
         Interests of the Debtors, Their Estate, and All Parties in Interest**

94.     In connection with their use of the Cash Management System, the Debtors incur periodic service charges and other fees to the Banks and other third-party service providers

for the maintenance of the Cash Management System (the "Service Charges").  As of the
Commencement Date, the Debtors estimate they owe approximately $381,000 in prepetition
Service Charges.  Payment of the prepetition Services Charges is in the best interests of the
Debtors, their estates, and all parties in interest as it will prevent any disruption to the Cash
Management System.  Because the Banks have setoff rights with respect to the Service Charges,
payment of any prepetition Service Charges to the Banks would not affect unsecured creditors,
and the issue of paying any such Service Charges would simply be a matter of timing.

95.    Accordingly, by this Motion, the Debtors seek authority, pursuant to
sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 to pay,
at the Debtors' sole discretion, the prepetition Service Charges, if any.

96.    Similar relief has been granted in other cases in this district.  *See, e.g., In
re Bearing Point, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. March 13, 2009) [Doc. No.
221]; *In re Lyondell Chemical Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 12,
2009) [Doc. No. 1194]; *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr.
S.D.N.Y. (Nov. 6, 2008) [Doc. No. 1416]; *In re Lexington Precision Corp.*, Case No. 08-11153
(MG) (Bankr. S.D.N.Y. Apr. 2, 2008) [Doc. No. 25]; *In re Silicon Graphics, Inc.*, Case No. 06-
10977 (BRL) (Bankr. S.D.N.Y. July 19, 2006) [Doc. No. 375]; *In re Delphi Corp.*, Case No. 05-
44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005) [Doc. No. 882]; *In re Delta Air Lines, Inc.*, Case
No. 05-17923 (PCB) (Bankr. S.D.N.Y. Oct. 6, 2005) [Doc. No. 644]; *In re Northwest Airlines
Corp.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) [Doc. No. 615]; *In re Loral
Space & Commc'ns LTD.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) [Doc.
No. 26].

C.      **Section 345(b) of the Bankruptcy Code**

97.     Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain from the entity with which the money is deposited a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303. Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation.

98.     Investment of cash in strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in large cases such as these, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H 10,767 (Oct. 4, 1994), 1994 WL 545773.

99.     Many of the Bank Accounts are maintained at banks that have been approved by the United States Trustee for the Southern District of New York (the "U.S.

Trustee") as authorized depositories ("Authorized Depositories").  Accordingly, the Debtors

believe that any funds that are deposited in these accounts are secure and, thus, the Debtors are in

compliance with section 345 of the Bankruptcy Code.  Certain Bank Accounts, however, are

located at non-Authorized Depositories (the "Non-Approved Bank Accounts"), including several

foreign bank accounts.  The Debtors anticipate that many of the Non-Approved Bank Accounts

will contain on average less than $250,000 in cash, the amount currently insured by the FDIC.

For accounts containing an amount less than or equal to $250,000 — the Debtors believe that

such amounts are secure and that they are in compliance with section 345 of the Bankruptcy

Code.  In addition, on October 14, 2008, the FDIC announced the Temporary Liquidity

Guarantee Program (the "TLGP"), pursuant to which the FDIC offered unlimited FDIC

insurance on non-interest bearing business transaction accounts through December 31, 2009.  To

the extent funds in the Non-Approved Bank Accounts exceed the amounts insured by the FDIC,

are not covered by the TLGP, or are held in foreign bank accounts, the Debtors propose to

engage in discussions with the U.S. Trustee to determine what modifications to those Bank

Accounts, if any, are necessary under the circumstances.

100.    To enable such discussions, if they become necessary, the Debtors request

a 45-day extension (or such additional time to which the U.S. Trustee may agree) of the time

period in which to either comply with section 345(b) of the Bankruptcy Code or to make other

arrangements that would be acceptable to the U.S. Trustee.  *See generally In re Serv.*

*Merchandise Co.*, Inc., 240 B.R. 894 (Bankr. M.D. Tenn. 1999) (noting that some of the factors

to consider in determining whether cause exists "for relief from the strictures of § 345(b)" is

whether benefits to the debtors outweigh the harm, if any, to the estate).

101.    The Debtors believe that any funds held in the Bank Accounts in excess of

the amounts insured by the FDIC or the TLGP are secure and that obtaining bonds to secure

these funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary in the context

of these cases.  "Cause" exists under section 345(b) of the Bankruptcy Code to waive this

requirement because, among other considerations, (i) the vast majority of Debtors' banks are

highly rated, federally-chartered banks subject to supervision by federal banking regulators, (ii)

the Debtors retain the right to remove funds held at the banks and establish new bank accounts as

needed, (iii) the cost associated with satisfying the requirements of section 345 is burdensome,

and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the

management of the Debtors' business.  Moreover, a bond secured by the undertaking of a

corporate surety would be prohibitively expensive, if such bond were available at all.

102.    Similarly, the Debtors believe that their investments in accordance with

the Investment Guidelines provide the protection contemplated by section 345(b) of the

Bankruptcy Code, notwithstanding the absence of a "corporate surety" requirement.  The

Investment Guidelines permit the Debtors to invest in those investments that will provide the

greatest amount of return for the Debtors while at the same time giving significant consideration

to the safety of the investments.  While the Investment Guidelines do not require a corporate

surety for investments, they do limit the placement of investments with financially strong entities

and require ample diversification.  The Debtors believe that as long as their investments are

restricted in accordance with the Investment Guidelines, no corporate surety is required to afford

protection to creditors.  Further, the Investment Guidelines limit a Debtor's investment with any

one issuer.  In addition, as explained above, the Debtors' Investment Portfolio consists of certain

liquid investments in compliance with GM's investment guidelines, which have recently been

revised to ensure more conservatism.  The Debtors intend to use a 45-day extension of the

requirement to seek compliance with section 345 and engage in discussions with the U.S. Trustee

regarding the investment portfolio.

103.   If pursuant to discussions with the U.S. Trustee, it shall become necessary

to modify the Investment Portfolio or the Cash Management System, the Debtors request

authority to make such modifications.  The Debtors anticipate that the modifications to the Cash

Management System may include, without limitation, the opening of new bank or investment

accounts.  In accordance therewith, the Debtors request that the Court authorize and direct

financial institutions to honor the Debtors' request to open or close, as the case may be, the Bank

Accounts or additional bank or investment accounts as may be necessary in connection with the

foregoing.

104.   Bankruptcy courts in this and other districts have recognized that strict

compliance with section 345 of the Bankruptcy Code may be contrary to the Debtors'

rehabilitative goals and unduly burdensome and have thus granted relief similar to that requested

herein.  *See, e.g., In re Chrysler LLC.*, Case No. 09-50002 (AJG) [Doc. No. 1303] (Bankr.

S.D.N.Y. May 20, 2009); *In re Bearing Point, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y.

March 13, 2009) [Doc. No. 221]; *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555

(JMP) (Bankr. S.D.N.Y. (Nov. 6, 2008) [Doc. No. 1416]; *In re Frontier Airlines Holdings, Inc.*,

Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 2, 2008) [Doc. No. 185]; *In re Lexington

Precision Corp.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 22, 2008) [Doc. No. 86]; *In re

Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Doc. No. 226]; *In re

*WorldCom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct 22, 2002) [Doc. No. 1608]; *In re Adelphia Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Mar. 27, 2002) [Doc. No. 29]; *In re Global Crossing Ltd.*, Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002) [Doc. No. 52].

**D.    Maintenance of the Debtors' Existing Bank
Accounts and Business Forms Is Warranted**

105.    As part of the Cash Management System, the Debtors maintain numerous Bank Accounts.  The Debtors routinely deposit and withdraw funds from the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers.  Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Commencement Date, the closure of the Debtors' prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them.  The Debtors believe, however, that their transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to their Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of these cases with the same account numbers.  If enforced in these cases, such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to pursue alternatives to maximize the value of their estates.  Indeed, as described in detail above, the Debtors' Bank Accounts comprise an established cash management system that the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of their businesses.

106.    Accordingly, the Debtors seek a waiver of the U.S. Trustee requirement that their Bank Accounts be closed and that new postpetition bank accounts be opened.  To avoid

delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to complete these cases successfully and rapidly, it is important that the Debtors be permitted to continue to maintain their existing Bank Accounts.  If necessary, the Debtors should also be permitted to open new accounts wherever they are needed, regardless of whether such banks are designated depositories in this jurisdiction; provided that if such banks are not designated depositories the Debtors will give the U.S. Trustee notice of such newly-opened accounts.

107.    Unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim.  The Banks may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored.  Furthermore, notwithstanding anything to the contrary in any other "first day" order or other order of this Court, the Debtors request the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Commencement Date.  The Banks shall not be liable to any party for following the Debtors' instructions or representations regarding which checks should be honored or for implementing the automatic transfer of funds between their Bank Accounts.

108.    By preserving business continuity and avoiding disruption and delay to the Debtors' disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served.  The confusion that would otherwise result, absent the relief requested herein, would not serve the Debtors' rehabilitative efforts.

109.    Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Commencement Date.

110.    In addition, to minimize expenses, the Debtors further request they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Commencement Date, without reference to their status as debtors in possession; *provided, however*, that as soon as reasonably practicable, the Debtors shall commence marking "Debtors in Possession" and the chapter 11 case number under which these cases are being jointly administered on their checks.

111.    If the Debtors are not permitted to maintain and utilize their current Bank Accounts and their existing Business Forms, the resultant prejudice will include significant (i) disruption to the Debtors' ordinary financial affairs and business operations, (ii) delay in the administration of the Debtors' estate, and (iii) cost to the estates to set up new systems, open new accounts, print new business forms, and print new checks.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and notoriety of these cases, the press releases issued by the Debtors, and information

circulating within the automotive industry.  Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

112.    In other chapter 11 cases, Bankruptcy Courts have recognized that strict enforcement of the requirement that a debtor in possession close their bank accounts does not serve the rehabilitative process of chapter 11.  Accordingly, these Courts have waived such requirements and replaced them with alternative procedures similar to those proposed here.[27]  , *See e.g., In re Chrysler LLC.*, Case No. 09-50002 (AJG) [Doc. No. 1303] (Bankr. S.D.N.Y. May 20, 2009); *In re Bearing Point, Inc*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. March 13, 2009) [Doc. No. 221]; *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. (Nov. 6, 2008) [Doc. No. 1416]; *In re Lexington Precision Corp.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 2, 2008) [Doc. No. 25]; *In re Silicon Graphics, Inc.*, Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 19, 2006) [Doc. No. 375]; *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005) [Doc. No. 882]; *In re Loral Space & Commc'ns LTD.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) [Doc. No. 26]; *In re WorldCom, Inc.*, Case No. 02-13533 (AJG) (Bankr. Oct. 15, 2002) [Doc. No. 1602].  Similar authorization is appropriate in these chapter 11 cases.

### The Debtors Have Satisfied Bankruptcy Rule 6003

113.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after the

---

[27] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon request of the attorneys for the Debtors', including at the hearing to consider the Motion.

Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business

operations rely heavily on the efficient functioning of their Cash Management System, including

the intercompany movement of funds (such as the MNS Process).  Any disruption in the

continuation of their Cash Management System could cause severe disruption to General

Motors' global operations and cause a severe decline in the value of the estates.  Accordingly,

the Debtors submit that the relief requested herein is necessary to avoid immediate and

irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

114.    To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### The Relief Requested is Appropriate

115.    Based upon the foregoing, the Debtors submit that the relief requested

herein is essential, appropriate, and in the best interest of the Debtors' estates and creditors, and

therefore, should be granted.

### Notice

116.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, (xi) the attorneys for the ad hoc

bondholders committee, and (xii) the Banks listed on Exhibit A.  The Debtors submit that, in

view of the facts and circumstances, such notice is sufficient and no other or further notice need

be provided.

117.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:  New York, New York
           June 1, 2009


/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

### Banks and Bank Accounts

**Account Type Key**
ZBA: Zero Balance Account
ODC : Non GMAC Collection Accounts
DEP: Deposit Account
PAR: Parent Account
BAL: Balance Account
LBX: Lockbox
FSC: FISC Accounts

### DOMESTIC BANK ACCOUNTS

# Saturn Corporation

| | Account Type | Account Name | Account Number (Last Four Digits) |
|---|---|---|---|
| Bank of America, N.A. (Tennessee)<br>540 W. Madison<br>Chicago, IL 60661<br>312-828-8016<br>Contact: Masteneh Masghati | DEP | SATN DEPOSITS-MISCELLANEOUS RE | 6363 |

**Account Type Key**
ZBA: Zero Balance Account
ODC: Non GMAC Collection Accounts
DEP: Deposit Account
PAR: Parent Account
BAL: Balance Account
LBX: Lockbox
FSC: FISC Accounts

# Saturn Distribution Corp

| | Account Type | Account Name | Account Number |
|---|---|---|---|
| Citibank, N.A. (New York)<br>388 Greenwich Street 22nd Floor<br>New York NY 10013<br>212-816-2933<br>Contact: Sarah Terner | ZBA | SATURN DIST CORP | 1256 |

# Chevrolet-Saturn of Harlem, Inc.

| | Account Type | Account Name | Account Number |
|---|---|---|---|
| JP Morgan Chase<br>55 W. 125th Street<br>New York, NY 10027<br>212-860-0261<br>Contact: Randy Polanco | PAR | Chevrolet-Saturn of Harlem, Inc. | 7901 |

**Account Type Key**

ZBA: Zero Balance Account
ODC: Non GMAC Collection Accounts
DEP: Deposit Account
PAR: Parent Account
BAL: Balance Account
LBX: Lockbox
FSC: FISC Accounts

# GM

|  | Account Type | Account Name | Account Number |
|---|---|---|---|
| Bank of America, N.A. (San Francisco) | ZBA | GM SEDGWICK/WORKERS COMP | 4593 |
| 540 W. Madison | ZBA | GM CORP SEDGWICK CMS REIMB ACC | 5336 |
| Chicago, IL 60661 | ZBA | DISABILITY EXPENSE A/C | 6285 |
| 312-828-8016 | ZBA | DISABILITY RECEIPTS A/C | 6308 |
| Contact: Mastaneh Masghati | ZBA | GM CORP W/C CDA ACCOUNT | 1071 |
|  | ZBA | SEDGWICK DISP EXP SETTLE ACCT | 5239 |
|  | ZBA | SEDGWICK WORKERS COMP SETT ACC | 5247 |
|  | DEP | INSURED W/C PGM SPEC DEP ACCT | 7156 |
|  | ZBA | GMC COMMON DIVIDEND LEGACY | 2094 |
|  | ZBA | GM CORP DIVIDEND DISBURSEMENTS | 8902 |
|  | ZBA | GM COMMON DIVIDEND | 6150 |
|  | ZBA | GMC COMMON DIVIDEND LEGACY | 7885 |
|  | PAR | GM CORPORATION | 0215 |
|  | DEP | EAG RECEIVABLES TEMPE, AZ | 3787 |
|  | ZBA | SATN DISBURSEMENTS (CLASS) | 6347 |
|  | ZBA | SATN DISBURSEMENTS (NEW) | 9187 |
| Bank of America, N.A. (Tennessee) | PAR | GENERAL MOTORS CORPORATION | 5539 |
| 540 W. Madison |  |  |  |
| Chicago, IL  60662 |  |  |  |
| 312-828-8016 |  |  |  |
| Contact:  Masteneh Masghati |  |  |  |
| Bank of New York Mellon |  |  |  |
| 500 Ross Street | ODC | DEALER ACCTG  VEHICLE RETURNS | 4443 |
| Mellon Client Service Center Suite 1360 | ODC | DEALER ACCTG  VEHICLE CREDITS | 2371 |
| Pittsburgh PA 15262-0001 | ZBA | NAO DEALER ACCTG - INT SUPP | 3882 |
| 412-234-6175 | PAR | GM CORPORATION | 9901 |
| Contact: Bob Ladley |  |  |  |
|  | ZBA | NAO - HOURLY PAYROLL | 0481 |
|  | ZBA | GM HOURLY PAYROLL ACH FUNDING | 6214 |
| Citibank, N.A. (New York) | BAL | GM SUPPLIERS LLC | 5748 |

| | | | |
|---|---|---|---|
| 388 Greenwich Street 22nd Floor | DEP | NAO - DEALER ACCT.- ACHDEBITS | 6383 |
| New York NY 10013 | | | |
| 212-816-2933 | | | |
| Contact: Sarah Terner | | | |
| | PAR | GM CORPORATION | 1878 |
| | BAL | GM SPECIAL OPERATIONS | 6552 |
| | GMC | OVERSEAS REMIT ACCT | 1997 |
| | BAL | GM AUTO RECEIVABLES CORP. | 7474 |
| | BAL | GM AUTO LEASE PURCHASE | 8321 |
| | DEP | TRADES PAY PGM - SPEC DEP ACCT | 6278 |
| | DEP | NYTO - SUPPLIER REMIT | 2921 |
| | ZBA | CAFCO SETTLEMENT ACCOUNT | 8369 |
| | ZBA | NAO - HOURLY PAYROLL | 4623 |
| | ZBA | STAF EFT DISB | 2982 |
| | ZBA | STAF-CNTL DISB | 4646 |
| | ZBA | NAO, DEALER ACCT.-CONT. DISB. | 1286 |
| | BAL | GM CORPORATION UST | 5721 |
| Comerica Bank | ZBA | GMC BENEFIT SETTLEMENT | 1846 |
| 500 Woodward Avenue | PAR | GM CORPORATION | 2827 |
| Detroit MI 48226 | BAL | GMC-FLEXIBLE COMP PROG | 6547 |
| 313-222-5431 | | | |
| Contact:Thomas Vandermulen | | | |
| Harris N.A. (Illinois) | PAR | GM CORPORATION | 672-3 |
| 115 South LaSalle St. 12th Floor | LBX | MOHO LOCKBOX | 1323 |
| Chicago IL 60603 | | | |
| 312-461-7432 | | | |
| Contact: Jack Kane | | | |
| | | | |
| JPMorgan Chase Bank N.A. (Illinois) | DEP | ATDV LOCKBOX #93647 | 6476 |
| 611 Woodward Avenue | BAL | ALLISON TRAN DIV DEPOSIT ACCT | 5-333 |
| Detroit MI 48226 | DEP | DLRA LBOX-CHICAGO #70595 | 6344 |
| 313-256-2218 | PAR | GM CORPORATION | 3191 |
| Contact: Bill Bitonti | | | |
| | ZBA | GM FX SETTLEMENT ACCT | 6164 |
| | DEP | GMPD LOCKBOX-NEWARK #13595 | 6190 |
| | DEP | GMPD LOCKBOX-CHICAGO #93112 | 6417 |
| | DEP | GMPD LOCKBOX-CHARLOTTE #195053 | 6786 |
| | DEP | GMPD LOCKBOX-DALLAS #890158 | 6816 |
| | DEP | GMPD LOCKBOX-L.A. #100061 | 6840 |
| | ZBA | BOCG DET PR CNTL DIS | 2176 |
| | ZBA | CPCG CNTL DISB | 2184 |
| | | | |
| JPMorgan Chase Bank N.A. (Michigan) | ZBA | GM ICP | 58-94 |
| 611 Woodward Avenue | ZBA | GM ICP REIMBURSEMENTS | 25-64 |
| Detroit MI 48226 | ZBA | FIDELITY LUMP SUM DISB | 73-04 |
| 313-256-2218 | ZBA | FIDELITY INACTIVES | 47-06 |

Contact: Bill Bitonti

| | | | |
|---|---|---|---|
| ZBA | FIDELITY MED 'B' | 47-14 |
| ZBA | FIDELITY OVERPAYMENT REFUND | 66-10 |
| ZBA | FIDELITY ACCLARIS SAL FLX ACCT | 5-507 |
| ZBA | FIDELITY ACCLARIS HLY FLX ACCT | 5-523 |
| ZBA | GMC BENEFIT SETTLEMENT ACCT | 45-53 |
| ZBA | GM BOFA HRA (NONCORENEWHIRES) | 0407 |
| DEP | GM U.S. CUSTOMS RECEIPTS | 7-184 |
| ODC | DEALER ACCTG  VEHICLE RETURNS | 3-084 |
| ODC | DEALER ACCTG  VEHICLE CREDITS | 9-354 |
| DEP | BUICK PGA RECEIPTS | 9-734 |
| DEP | NAO DELAR ACTG. - GSA | 98-83 |
| ODC | SATN SAAB COLL VEH DRAFTS | 4-724 |
| ODC | NONGMAC FINANCED DLR COMP CAR | 4-880 |
| ODC | GMAC DLR FINANCED COMP CAR | 5-556 |
| DEP | COMP CAR LOAN AUCTION ACCT | 5-564 |
| ODC | AUCTION ACH CREDITS ACCOUNT | 1-828 |
| DEP | VSSM LICENSING & MERCHANDISING | 2-420 |
| DEP | VSSM INT'L LICENSING ROYALTIES | 2-446 |
| DEP | FLT COMM OPS-MED DTY ROY RECS | 9-553 |
| DEP | GM ASSET ACCT WIRE RECPT SDA | 82-06 |
| ZBA | Salaried Retiree HRA | 3803 |
| PAR | GM CORPORATION | 67-90 |
| DEP | GMC,HCS/MASTER CARD,SPEC. DEP. | 07-63 |
| ZBA | GM R&D Lithium Ion Battery | 4090 |
| DEP | GM PERSONNEL ADMINISTRATION | 48-93 |
| DEP | SPO DEPOSITORY ACCT | 32-50 |
| FSC | GMPT - DEPOSITORY ACCOUNT | 00-83 |
| DEP | GMPT LBX 77680 | 75-41 |
| DEP | GMPT LBX 78056 | 0-313 |
| DEP | GMPT LBOX 771280 | 32-76 |
| ZBA | GMPT ASSET ACCT LKBX 77681 SDA | 81-98 |
| DEP | GM CORP HUMAN FACTORS | 76-84 |
| DEP | ROAD TO HYDROGEN | 33-84 |
| DEP | GENERAL MOTORS CORP. CARB | 4-454 |
| DEP | R & D GMX 569 U.S. GOVT | 1-614 |
| DEP | DOE WASTE HEAT RECOVERY | 3-694 |
| DEP | R & D CLEAN FUELS | 4-549 |
| DEP | R & D EMISSIONS DEVICES | 4-564 |
| DEP | ACAT / NHTSA - U.S. GOVT | 2-690 |
| DEP | NREL HEAVY HYBRID | 67-21 |
| DEP | VISUALIZATION FUEL CELL WTR TR | 67-39 |
| DEP | GM CORP AUTO UWB SHORT RANGE | 67-47 |
| DEP | GMT800 GOVERNMENT PROGRAM | 67-96 |
| DEP | R & D HIGH EFFICIENCY ENG. | 68-04 |
| DEP | ONSTAR LEXUS DIGITAL CORP | 70-91 |
| DEP | ONSTAR LEXUS PERSONAL CALLING | 71-09 |

| | | | |
|---|---|---|---|
| | DEP | GMC INTEGRATED TRACTIION DRIVE | 9-470 |
| | DEP | GMC EGR BOOST EFT SETTLEMENT | 9-488 |
| | DEP | NYSERDA 957 | 1132 |
| | DEP | GM LOGISTICS - TRAFFIC LOG. | 4393 |
| | ZBA | INTL TRAF LOG LKBX 77789 SDA | 21-65 |
| | DEP | GM LOGISTICS - COMM TRAFFIC | 1383 |
| | DEP | GM LOGISTICS - MIAMI | 63-03 |
| | DEP | GMU SPECIAL DEPOSITORY | 5-094 |
| | DEP | GM CORP OFFICE WIRE RECEIPTS | 01-45 |
| | DEP | GMC ALLISON TRANS REIMBURSE | 8-936 |
| | ZBA | MTOM - SALARIED PAYROLL | 68-84 |
| | ZBA | MTOM LLC HRLY PAYROLL - ACH | 3118 |
| | ZBA | GMC SALARIED MATCHED PR | 47-46 |
| | ZBA | NAO - HOURLY PAYROLL | 74-26 |
| | ZBA | MTM HOURLY PARYROLL ACCOUNT | 8-467 |
| | ZBA | DDP - SALARY | 2987 |
| | ZBA | DDP - HOURLY | 2995 |
| | ZBA | FIDELITY ACCLARIS SAL FLX ACH | 3126 |
| | ZBA | FIDELITY ACCLARIS HLY FLX ACH | 3134 |
| | ZBA | BOCG - C.O. - CNTL DISB | 46-46 |
| | ZBA | CPCG-MANSFIELD-EFT DISB | 3343 |
| | ZBA | ONSTAR DISB ACCT | 30-32 |
| | ZBA | GM CORP OEM TELEMATICS SERV | 42-78 |
| | DEP | SAT CORP-GMAC ROYALTY PAYMENTS | 2-438 |
| | DEP | GM HEADQUARTERS CASHIER | 01-63 |
| | DEP | EAG CO LBX 77696 | 3-694 |
| | DEP | GM CENT OFF ACH RECP SETT ACCT | 01-37 |
| | DEP | GFSS AR-FREIGHT CLAIMS-FOR U.S. | 0258 |
| | DEP | ONSTAR PERSONAL CALLING | 53-74 |
| | DEP | ONSTAR/LEXUS LINK | 18-04 |
| | DEP | GM ONSTAR - DEPOSITORY AC | 46-03 |
| | DEP | ONSTAR OEM TELEMATICS SERVICES | 4-583 |
| | DEP | XM SATELLITE RADIO DEP ACCT | 5-341 |
| | ZBA | Plug-In Hybrid 319, EFT Settlement Account | 4918 |
| | | | |
| JPMorgan Chase Bank N.A. (New York) | ZBA | ALL TRANS-CNTL DISB | 7579 |
| 611 Woodward Avenue | ZBA | GM BENE ACCT | 2644 |
| Detroit MI 48226 | ZBA | GM SALARIED FLEX | 7376 |
| 313-256-2218 | ZBA | WORK. COMP. LIAB. CIGNA SETTLM | 4180 |
| Contact: Bill Bitonti | FSC | DLRA MILITARY SALES | 2048 |
| | ZBA | NAO DEALER ACCTG. EFT DISB. | 0189 |
| | FSC | DELCO SYST. OPS., SPEC. DEPOS. | 7068 |
| | SEC | GM ENHANCED CUSTODY | 0170 |
| | DEP | GMIMCO REMTIIANCES | 3523 |
| | BAL | GM USD CORP ACCT AT JPMC | 3760 |

|  | PAR | GM CORPORATION | 2095 |
|---|---|---|---|
|  | FSC | OVERSEAS REMIT ACCT | 4605 |
|  | GMC | FSC ACCT | 3058 |
|  | DEP | GMCC - CREDIT CARD | 0114 |
|  | ZBA | GM DEBT SETTLEMENT ACCT | 5-072 |
|  | FSC | GMOO SPECIAL DEPOSITORY ACC | 9839 |
|  | FSC | GMPD SPECIAL DEPOSITORY ACC | 9813 |
|  | FSC | AC DELCO - FSC DEPOSITS | 3959 |
|  | FSC | GM TRADE RECEIVABLE LLC | 1075 |
|  | FSC | GMTC SPECIAL DEPOSITORY ACCT | 6478 |
|  | SEC | GM LIQUIDITY CUSTODY | 0171 |
|  | FSC | GMC GMB OVERSEAS DEP | 1948 |
|  | DEP | CEP SPECIAL DEPOSITORY | 0765 |
|  | ZBA | NAO - HOURLY PAYROLL | 4775 |
|  | ZBA | NAO, DEALER ACCT.-CONT. DISB. | 1757 |
|  | ZBA | CPCG-CNTL. DISB | 2520 |
|  | ZBA | GMC FED TAX SETTLEMENT | 0399 |
|  | ZBA | NAO EFT DISBURSEMENT ACCT. | 1721 |
|  | ZBA | CHEV CENTRAL OFFICE DIS | 3719 |
|  | FSC | GMC PATENT SECTION | 2248 |
|  | FSC | GMC NAO-WARREN OVERSEAS DEPOS. | 1646 |
|  | ZBA | PROD LIAB INSURANCE SETTLE A/C | 6683 |
|  | ZBA | WORKERS COMP LIAB INS A/C | 6717 |
|  | ZBA | PROD. LIABIL. CIGNA SETTLEMENT | 4156 |
|  | ZBA | GEN. LIABIL. CIGNA SETTLEMENT | 4164 |
|  | ZBA | AUTOM. LIABIL. CIGNA SETTLEM. | 4172 |
|  | ZBA | EIL/POLLUT. LIAB. SETTLEMENT | 4198 |
|  | FSC | ONSTAR/OEM SERVICES | 1208 |
|  | ZBA | GM GLOBAL TECH INC | 5749 |
|  | ZBA | ONSTAR GLOBAL SERVICES | 3092 |
|  | GMC | GM CORPORATION UST COLLATERAL ACCT | 3795 |
| State Street Bank | PAR | GM CORPORATION | 0747 |
| 105 Rosemont Road | DEP | GMC SALARIED STOCK OPTION | 8-398 |
| Westwood MA 02090 | DEP | SALARIED STOCK OPTION 2 | 1141 |
| 781-302-6068 |  |  |  |
| Contact: Christine Cronin |  |  |  |
| Bank of China | PAR | GM CORPORATION | 0683 |
| 410 Madison Ave. |  |  |  |
| New York, NY 10017 |  |  |  |
| 212-935-3101 |  |  |  |
| Contact: David Hoang |  |  |  |
| M&T Bank | PAR | GM CORPORATION | 3671 |

25 South Charles Street
Baltimore MD  21201
410-244-4792
Contact:  Lynn Mathy

| | | | |
|---|---|---|---|
| Citizens Bank | PAR | GM CORPORATION | 6889 |

328 South Saginaw Street
Flint, MI  48502-2401
810-282-0085
Contact: Karen Vance

| | | | |
|---|---|---|---|
| KeyBank | PAR | GM CORPORATION | 5008 |

127 Public Square
Cleveland, OH  44114
216-689-3696
Contact: Helen France

| | | | |
|---|---|---|---|
| Fifth Third Bank of NW OH | PAR | GM CORPORATION | 0536 |

606 Madison Ave
Toledo, OH  43604
419-259-0318
Contact: Joel Jerger

## FOREIGN BANK ACCOUNTS

| | | |
|---|---|---|
| JP Morgan Chase NA (London) | General Motors Corporation, Australian Dollar | 0406 |
| 611 Woodward Avenue | General Motors Corporation, Canadian Dollar | 0407 |
| Detroit, Mi. 48226 | General Motors Corporation, Swiss Franc | 0405 |
| 313-256-2218 | General Motors Corporation, Danish Krone | 0411 |
| Contact: Bill Bitonti | General Motors Corporation, Euro | 0401 |
| | General Motors Corporation, British Pound | 0402 |
| | General Motors Corporation, Japanese Yen | 0404 |
| | General Motors Corporation, Mexican Peso | 0415 |
| | General Motors Corporation, Norwegian Krone | 0409 |
| | General Motors Corporation, New Zealand Dollar | 0412 |
| | General Motors Corporation, Swedish Krona | 0408 |
| | General Motors Overseas Distribution Corporation | 8901 |
| | General Motors Overseas Distribution Corporation | 8902 |
| | General Motors Overseas Distribution Corporation | 8904 |
| | General Motors Overseas Distribution Corporation | 8908 |
| Toronto Dominion Bank | General Motors Corporation, Can. Dollar Disb. | 0181 |
| 100 Wellington St. W | General Motors Corporation, Can. Dollar EFT Disb. | 0505 |
| CP Tower 28th Floor | General Motors Corporation, OnStar Can. Dollar Disb. | 0823 |
| Toronto, Ontario M5K 1A2 | General Motors Corporation, Can. Dollar EDI/EFT Disb. | 9652 |
| 416-982-8976 Contact: Debbie McCarrol | | |

## Custody/Brokerage Accounts

| | | |
|---|---|---|
| Citibank, N.A. NY | General Motors Corporation, Core Portfolio | 0591 |
| 388 Greenwich Street 22nd Floor New York NY 10013 212-816-2933 Contact: Sarah Terner | Saturn Distribution Corporation | 6563 |
| Citibank, N.A. Cairo Branch | General Motors Corporation Custody Acct | 9100 |
| 388 Greenwich Street 22nd Floor New York, NY 10013 212-816-2933 | General Motors Corporation Custody Cash Account EGP | 9506 |
| Contact: Sarah Terner | General Motors Corporation Custody Cash Account USD | 9018 |
| JPMorgan Chase Bank N.A. (New York) | GM Treasurer's Office Enhanced Fund | 0170 |
| 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | GM Treasurer's Office Liquidity Fund | 0171 |
| JPMorgan Chase Bank 383 Madison Ave. – 5th Floor New York, NY 10179 212-622-2619 Contact: Ara Movsesian | Special Equity Account | 6952 |
| Bear Stearns | Bear Stearns Brokerage | 1828 |

(JPMorgan)
115 South
Jefferson Road
– D4
Whippany NJ,
07981
973-793-7699
Contact:
Robert
Reimers

Pierce, Fenner                   ML Brokerage                        0869
& Smith Inc.
250 Vesey St.
New York, NY
10080
212-449-0484
Contact:
Charles J.
Phlon

## RESTRICTED CASH ACCOUNTS

| Held By | Account Name | Account Number |
|---|---|---|
| Bank of New York Trust<br>Andrew Asmdeo<br>101 Barclay St.<br>New York, NY 10286<br>212-298-1756 | General Motors/AISLIC 2006 Escrow Account | 4786 |
| JP Morgan Chase<br>Money Market Service Center<br>10420 Highland Manor Dr. 2nd Floor<br>Temple, Fl 33610<br>866 737 5826 | General Motors & Nat Union Fire Account | 2912 |
| JP Morgan Chase<br><br>Money Market Service Center<br>10420 Highland Manor Dr. 2nd Floor<br>Temple, Fl 33610<br>866 737 5826 | General Motors & Nat Union Fire Account | 1219 |
| Bank of New York Trust<br>Andrew Asmdeo<br>101 Barclay St.<br>New York, NY 10286<br>212-298-1756 | Westchester Fire/GMC Pledged collateral<br>Account | 6144 |
| Wachovia<br>Richard Catanese<br>481 West Germantown Pike<br>Plymouth Meeting, PA 19462<br>888-800-3567 | NiHill & Riedley/General Motors<br>Account | 4268 |
| Wachovia<br>Richard Catanese<br>481 West Germantown Pike | NiHill & Riedley/General Motors<br>Account | 9732 |
| | General Motors Corp-Motor Ins Corp Account | 4787 |

Plymouth Meeting, PA 19462
888-800-3567
Bank of New York Trust
Andrew Asmdeo
101 Barclay St.
New York, NY 10286
212-298-1756

| | | |
|---|---|---|
| Natixis | GM Arrowood | 3-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp CA | 1-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp CA | 1-002 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp NY | 8-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-002 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-003 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp TX | 4-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | SafeCo Ins Co or America Pledgee FBO | |
| Blackrock | General Motors Account | 8163 |
| 100 Bellevue Parkway | | |
| Wilmington, DE 19809 | | |
| 1-800-441-7450 | TCA, Secured Party FBO: General Motors Corp | |
| Smith Barney | Acct | 0164 |

Denise Yuu
185 Asylum Street 2nd Floor
Hartford, CT 06103
860-275-0700

| | | |
|---|---|---|
| BONY MATT LEWIS<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3219 | LINDEN RD MI COLLATERAL | 1365 |
| PNC BANK<br>Product Client Services<br>620 Liberty Ave.<br>Pittsburgh, PA 15265<br>1-877-824-5001 | ALLEGHENY POWER DEPOSIT | 9632 |
| JP Morgan:<br>Joyce Bryant<br>611 Woodward Ave.<br>Detroit, MI 48226<br>866-696-4212 | NATIONAL FUEL GAS DIST DEPOSIT | 4886 |
| Tenesse Valley Authority<br>JT Long<br>26 Century Blvd. – One Century Pl.<br>0CP-1K<br>Nashville, TN 37214<br>615-232-6103 | TVA DEPOSIT | 4912 |
| JP Morgan:<br>Joyce Bryant<br>611 Woodward Ave.<br>Detroit, MI 48226<br>866-696-4212 | SO CAL EDISON DEPOSIT | 4434 |
| JP Morgan:<br>Joyce Bryant<br>611 Woodward Ave.<br>Detroit, MI 48226<br>866-696-4212 | SRP DEPOSIT | 0452 |
| BONY:<br>PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229 | CENTERPOINT ENERGY ESCROW | 6016 |
| BONY:<br>PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229 | PEPCO ESCROW | 0893 |
| BONY:<br>PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229 | ST LAWRENCE GAS ESCROW | 6760 |
| BONY: | DOMINION RETAIL ESCROW | 6023 |

PHIL TRIOLO
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:

| PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229<br>BONY: | CONOCO PHILIPS ESCROW | 6022 |
| --- | --- | --- |
| PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229<br>BONY: | PANHANDLE/TRUNKLINE ESCROW | 6166 |
| PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229<br>BONY: | GEORGIA POWER ESCROW | 6017 |
| PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286<br>212-815-3229 | SEQUENT ENERGY ESCROW | 6009 |
| Citibank:<br>Sarah Terner<br>388 Greenwich Street 22nd Floor<br>New York, NY 10013<br>212-816-2933 | AMEREN LC | 2099 |
| Citibank:<br>Sarah Terner<br>388 Greenwich Street 22nd Floor<br>New York, NY 10013<br>212-816-2933 | C REISS COAL | 2973 |
| Citibank:<br>Sarah Terner<br>388 Greenwich Street 22nd Floor<br>New York, NY 10013<br>212-816-2933 | ATMOS ENERGY MARKETING LC | 3869 |
| Citibank:<br>Sarah Terner<br>388 Greenwich Street 22nd Floor<br>New York, NY 10013<br>212-816-2933 | CORAL ENERGY CANADA LC | 4976 |
| BONY:<br>PHIL TRIOLO<br>101 Barclay Street<br>New York, NY 10286 | CENTERPOINT ENERGY GAS TRANSMISSION | 3433 |
| 212-815-3229 | CENTERPOINT ENERGY RESOURCES CORP | 2894 |

BONY:
PHIL TRIOLO
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                    PEA ESCROW                              0492
101 Barclay Street
New York, NY 10286
212-815-3229

# EXHIBIT B

## U.S. Cash Management System Chart



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
In re                                     :                    **Chapter 11 Case No.**
                                          :
**GENERAL MOTORS CORP.,** *et al.*,       :                    **09-_____ (___)**
                                          :
                        **Debtors.**      :                    **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c) AND
364(a) AND FED. R. BANKR. P. 6003 AND 6004 (A) AUTHORIZING THE DEBTORS
TO (i) CONTINUE USING EXISTING CASH MANAGEMENT SYSTEM, (ii) HONOR
CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE OF THE CASH
MANAGEMENT SYSTEM, AND (iii) MAINTAIN EXISTING BANK ACCOUNTS AND
BUSINESS FORMS; (B) EXTENDING TIME TO
COMPLY WITH 11 U.S.C. § 345(b), AND (C) SCHEDULING A FINAL HEARING**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation ("GM") and certain of its subsidiaries, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a),

345(b), 363(b), 363(c) and 364(a) of title 11, United States Code (the "Bankruptcy Code"), for

entry of an order (A) authorizing the Debtors (i) to continue to operate their cash management

systems, including the continued maintenance of existing bank accounts and the continued

transfers of funds among the Debtors and their affiliates in the ordinary course of business,

consistent with their prepetition practices, (ii) to honor certain prepetition obligations related to

the use of the Cash Management System, (iii) to maintain existing business forms, (B) granting

an extension of time to comply with section 345 of the Bankruptcy Code, and (C) scheduling a

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

final hearing on the relief requested , all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided to:  (i) the Office of the United States Trustee for the Southern District of New York,

(ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the

agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under

GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of

the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the

attorneys for the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America, (viii) the attorneys for the International Union of Electronic,

Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America,

(ix) the United States Department of Labor, (x) the attorneys for the National Automobile

Dealers Association, (xi) the attorneys for the ad hoc bondholders committee and (xii) each of

the banks listed on Exhibit A hereto (the "Banks") ((i)-(xii) collectively, the "Notice Parties"),

and it appearing that no other or further notice need be provided; and a hearing having been held

to consider the relief requested in the Motion (the "Hearing"); and upon the record of the

Hearing and all of the proceedings had before the Court; and the Court having found and

determined that the relief sought in the Motion is necessary to avoid immediate and irreparable

harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and is in the

best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; on an interim basis as

provided herein; and it is further

ORDERED that the Debtors are authorized and empowered, pursuant to sections

105(a) and 363(c) of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash

Management System maintained by the Debtors prior to the Commencement Date; to collect,

concentrate, and disburse cash in accordance with the Cash Management System, including

intercompany funding; and to make ordinary course changes to their Cash Management System

without further order of the Court and it is further

ORDERED that pursuant to section 105(a) of the Bankruptcy Code, each of the

Banks is authorized and directed to continue to honor transfers as directed by the Debtors of

funds among their Bank Accounts and to the Debtors; and it is further

ORDERED that the Debtors shall maintain accurate records of all transfers within

the Cash Management System so that all postpetition transfers and transactions shall be

adequately and promptly documented in, and readily ascertainable from, their books and records,

to the same extent maintained by the Debtors prior to the Commencement Date; and it is further

ORDERED that the Debtors are authorized to: (i) designate, maintain and

continue to use any or all of their existing Bank Accounts listed on Exhibit A annexed to the

Motion, in the names and with the account numbers existing immediately prior to the

Commencement Date, (ii) deposit funds in and withdraw funds from such accounts by all usual

means including, without limitation, checks, wire transfers, automated clearinghouse transfers

3

and other debits, (iii) pay any bank fees or charges associated with the Bank Accounts, and (iv)

treat their prepetition Bank Accounts for all purposes as debtors in possession accounts; and it is

further

ORDERED that except as otherwise provided in this Order, all financial

institutions in which the Debtors maintain the Bank Accounts as of the Commencement Date are

authorized and directed to continue to maintain, service, and administer such Bank Accounts

without interruption and in the usual and ordinary course, and to receive, process, honor and pay

any and all checks, drafts, wires, or other transfers by the holders or makers thereof, as the case

may be; provided, however, that nothing contained herein shall (i) require a financial institution

to honor any check, wire, or other transfer unless the account has good and collected funds at the

time of the requested action or (ii) authorize any such financial institution to honor any check,

draft, wire, or other transfer issued or dated prior to the Commencement Date, except as

otherwise provided by further order of this Court; provided further, however, that any such

financial institution is authorized to accept and honor all representations from the Debtors as to

which check, ACH transfer, draft, wire, or other transfer drawn or issued by the Debtors prior to

the Commencement Date should be honored pursuant to an order of this Court, and such bank

shall not have any liability to any party for relying on such representation by the Debtors as

provided for herein, nor shall any Bank honoring or not honoring any check or other item as a

result of good faith error be liable to any party therefor; and it is further

ORDERED that with respect to those Bank Accounts which are not located in

Banks that are Authorized Bank Depositories and with respect to any of their investments, the

Debtors shall have 45 days (or such additional time as the U.S. Trustee may agree to) from the

entry of this Order (the "Extension Period") to either come into compliance with section 345(b)

of the Bankruptcy Code or to make such other arrangements as agreed with the U.S. Trustee; and it is further

ORDERED that with respect to any deposit or investment currently insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States, upon the termination or modification of such insurance or guarantee, the Debtors shall either come into compliance with section 345(b) of the Bankruptcy Code or seek appropriate relief from the Court; and it is further

ORDERED, that nothing contained herein shall prevent the Debtors from opening any additional bank accounts, or closing any existing Bank Account(s) as they may deem necessary and appropriate, and the Banks and other financial institutions are directed to honor the Debtors' request to open or close, as the case may be, such Bank Accounts or additional bank accounts; and it is further

ORDERED, that notwithstanding anything to the contrary contained in this Order, all rights of JPMorgan Chase Bank N.A. ("JPMC"), if any, to assert cash collateral and/or setoff rights with respect to amounts in one or more of the Debtors' accounts as of the Commencement Date against prepetition obligations (the "Obligations") of Debtors owed to JPMC as of the Commencement Date (the "Commencement Date Balances") are expressly preserved.  In the event that it is determined by this Court that JPMC has such rights, then (i) JPMC shall have the right to seek leave of the Court to setoff an amount in the Debtors' accounts equivalent to the Commencement Date Balances, irrespective of whether such funds constitute prepetition or postpetition funds, and (ii) for purposes of this paragraph, the Commencement Date Balances shall constitute the cash collateral for which JPMC is entitled to adequate protection for any diminution of the Commencement Date Balances, which adequate protection shall be (i) with

respect to setoffs relating to obligations under GM's prepetition revolving credit agreement dated

as of July 20, 2006 (as amended, supplemented or otherwise modified), the same forms of

protection provided under the Interim Cash Collateral Order covering the secured parties under

such agreement and (ii) with respect to setoffs relating to all other obligations, including those

arising under the Term Loan Agreement dated as of November 29, 2006 (as amended,

supplemented or otherwise modified), the same forms of adequate protection provided under the

Interim Term Loan Adequate Protection Order.  The Debtors reserve the right to object to and

challenge any such assertion by JPMC.  JPMC will not seek to assert cash collateral or setoff

rights with respect to the Commencement Date Balances or otherwise seek to prevent the

Debtors' use of any cash collateral so long as the Termination Date has not occurred under the

either of the orders referenced in this paragraph; and it is further

ORDERED, that nothing in this Order shall authorize the Debtors to use or

otherwise impair cash collateral previously pledged by them as security for letters of credit,

bonds and similar obligations owed by the Debtors to JPMC; and it is further

ORDERED that the automatic stay is hereby modified to authorize any Bank that

has issued a letter of credit at the request of the Debtors, upon notice to the Debtors and upon

receipt of written consent by the Debtors, to set off any cash deposits it is specifically holding as

collateral for such letter of credit against any amount paid by the bank to the beneficiary of the

letter of credit upon postpetition draw of the letter of credit, subject to the terms of any

agreement between the Debtors and the Bank relating to the letter of credit; *provided, however*,

that the Bank agrees to return to the Debtors' estates, within three business days of such setoff,

the excess of any cash deposits it is holding as collateral for all letters of credit it has issued at

the request of the Debtors over the amount of collateral the Debtors are required to provide with

6

respect to all outstanding letters of credit issued by the Bank at the request of the Debtors; and it is further

ORDERED that as soon as reasonably practicable, the Debtors shall mark "Debtors in Possession" and the chapter 11 case number under which these cases are being jointly administered on their checks; and it is further

ORDERED that, pursuant to section 364(a) of the Bankruptcy Code, the Debtors are authorized in connection with the ordinary course of their Cash Management System to obtain unsecured credit and incur unsecured debt in the ordinary course of business from their affiliates without notice and a hearing; and it is further

ORDERED, that to the extent a Bank in the ordinary course of the Cash Management System incurs an overdraft, failed securities transaction or other event giving rise to an uncovered debit, irrespective of whether arising pre or postpetition, such Bank shall be authorized to cover such overdraft, failed securities transaction or debit from funds of the Debtors in its possession and available for such purpose; and it is further

ORDERED that the Debtors are authorized to continue to use their Cash Management System and to fund Debtor and non-Debtor affiliates as they did prior to the Commencement Date; and it is further

ORDERED that the Debtors are authorized to continue to honor and make payments in respect of prepetition and postpetition intercompany obligations to subsidiaries and affiliates (Debtor and non-Debtor) in accordance with their prepetition practices; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay prepetition amounts outstanding as of the Commencement Date, if any, owed to the Banks and other third parties that directly or indirectly provide services to the Debtors in connection with the Cash

7

Management System as service charges for the maintenance of the Cash Management System;

provided that no Bank shall be obligated to continue cash management services for the Debtors if

the Debtors do not pay such prepetition and postpetition charges within five business days after

receiving notice from a Bank that the Debtors have not paid such charges when due in the

ordinary course; and it is further

ORDERED that the Debtors are hereby authorized to execute any additional

documents and reasonably cooperate with the financial institutions as may be required to carry

out the intent and purpose of this Order; and it is further

ORDERED that the Debtors are authorized to implement the Investment

Guidelines and invest and deposit their cash and cash equivalents in accordance therewith in

addition to the investments permitted by section 345 of the Bankruptcy Code; and it is further

ORDERED that the Investment Guidelines may be amended by order of the Court

from time to time upon motion by the Debtors; and it is further

ORDERED that the Debtors' compliance with the Investment Guidelines shall be

deemed to constitute compliance with section 345 of the Bankruptcy Code, and the Debtors are

relieved from the obligations under section 345(b) to obtain a bond from any entity with which

money is deposited or invested in accordance with the Investment Guidelines; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing to consider entry of an order granting the relief

requested in the Motion on a final basis shall be held on _____, 2009 at __:00 _.m. (Eastern

Time); and any objections to entry of such order shall be in writing, filed with the Court in

accordance with General Order M-242, and served upon those parties entitled to receive service

of this Cash Management Order (as provided below), in each case so as to be received no later

than 4:00 p.m. (Eastern Time) on _____ _, 2009; and it is further

ORDERED that the Debtors shall serve this Order within three business days of

its entry on the Notice Parties; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:    New York, New York
          _____, 2009

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

## Banks and Bank Accounts

**Account Type Key**

ZBA: Zero Balance Account

ODC : Non GMAC Collection Accounts

DEP: Deposit Account

PAR: Parent Account

BAL: Balance Account

LBX: Lockbox

FSC: FISC Accounts

## DOMESTIC BANK ACCOUNTS

# Saturn Corporation

| | Account Type | Account Name | Account Number (Last Four Digits) |
|---|---|---|---|
| Bank of America, N.A. (Tennessee) 540 W. Madison Chicago, IL 60661 312-828-8016 Contact: Masteneh Masghati | DEP | SATN DEPOSITS-MISCELLANEOUS RE | 6363 |

**Account Type Key**
ZBA: Zero Balance Account
ODC: Non GMAC Collection Accounts
DEP: Deposit Account
PAR: Parent Account
BAL: Balance Account
LBX: Lockbox
FSC: FISC Accounts

# Saturn Distribution Corp

| | Account Type | Account Name | Account Number |
|---|---|---|---|
| Citibank, N.A. (New York)<br>388 Greenwich Street 22nd Floor<br>New York NY 10013<br>212-816-2933<br>Contact: Sarah Terner | ZBA | SATURN DIST CORP | 1256 |

# Chevrolet-Saturn of Harlem, Inc.

| | Account Type | Account Name | Account Number |
|---|---|---|---|
| JP Morgan Chase<br>55 W. 125th Street<br>New York, NY 10027<br>212-860-0261<br>Contact: Randy Polanco | PAR | Chevrolet-Saturn of Harlem, Inc. | 7901 |

**Account Type Key**

ZBA: Zero Balance Account
ODC: Non GMAC Collection Accounts
DEP: Deposit Account
PAR: Parent Account
BAL: Balance Account
LBX: Lockbox
FSC: FISC Accounts

# GM

| | Account Type | Account Name | Account Number |
|---|---|---|---|
| Bank of America, N.A. (San Francisco) | ZBA | GM SEDGWICK/WORKERS COMP | 4593 |
| 540 W. Madison | ZBA | GM CORP SEDGWICK CMS REIMB ACC | 5336 |
| Chicago, IL 60661 | ZBA | DISABILITY EXPENSE A/C | 6285 |
| 312-828-8016 | ZBA | DISABILITY RECEIPTS A/C | 6308 |
| Contact: Mastaneh Masghati | ZBA | GM CORP W/C CDA ACCOUNT | 1071 |
| | ZBA | SEDGWICK DISP EXP SETTLE ACCT | 5239 |
| | ZBA | SEDGWICK WORKERS COMP SETT ACC | 5247 |
| | DEP | INSURED W/C PGM SPEC DEP ACCT | 7156 |
| | ZBA | GMC COMMON DIVIDEND LEGACY | 2094 |
| | ZBA | GM CORP DIVIDEND DISBURSEMENTS | 8902 |
| | ZBA | GM COMMON DIVIDEND | 6150 |
| | ZBA | GMC COMMON DIVIDEND LEGACY | 7885 |
| | PAR | GM CORPORATION | 0215 |
| | DEP | EAG RECEIVABLES TEMPE, AZ | 3787 |
| | ZBA | SATN DISBURSEMENTS (CLASS) | 6347 |
| | ZBA | SATN DISBURSEMENTS (NEW) | 9187 |
| | | | |
| Bank of America, N.A. (Tennessee) | PAR | GENERAL MOTORS CORPORATION | 5539 |
| 540 W. Madison | | | |
| Chicago, IL  60662 | | | |
| 312-828-8016 | | | |
| Contact:  Masteneh Masghati | | | |
| | | | |
| Bank of New York Mellon | | | |
| 500 Ross Street | ODC | DEALER ACCTG  VEHICLE RETURNS | 4443 |
| Mellon Client Service Center Suite 1360 | ODC | DEALER ACCTG  VEHICLE CREDITS | 2371 |
| Pittsburgh PA 15262-0001 | ZBA | NAO DEALER ACCTG - INT SUPP | 3882 |
| 412-234-6175 | PAR | GM CORPORATION | 9901 |
| Contact: Bob Ladley | | | |
| | ZBA | NAO - HOURLY PAYROLL | 0481 |
| | ZBA | GM HOURLY PAYROLL ACH FUNDING | 6214 |

| | | | |
|---|---|---|---|
| Citibank, N.A. (New York) | BAL | GM SUPPLIERS LLC | 5748 |
| 388 Greenwich Street 22nd Floor | DEP | NAO - DEALER ACCT.- ACHDEBITS | 6383 |
| New York NY 10013 | | | |
| 212-816-2933 | | | |
| Contact: Sarah Terner | | | |
| | PAR | GM CORPORATION | 1878 |
| | BAL | GM SPECIAL OPERATIONS | 6552 |
| | GMC | OVERSEAS REMIT ACCT | 1997 |
| | BAL | GM AUTO RECEIVABLES CORP. | 7474 |
| | BAL | GM AUTO LEASE PURCHASE | 8321 |
| | DEP | TRADES PAY PGM - SPEC DEP ACCT | 6278 |
| | DEP | NYTO - SUPPLIER REMIT | 2921 |
| | ZBA | CAFCO SETTLEMENT ACCOUNT | 8369 |
| | ZBA | NAO - HOURLY PAYROLL | 4623 |
| | ZBA | STAF EFT DISB | 2982 |
| | ZBA | STAF-CNTL DISB | 4646 |
| | ZBA | NAO, DEALER ACCT.-CONT. DISB. | 1286 |
| | BAL | GM CORPORATION UST | 5721 |
| | | | |
| Comerica Bank | ZBA | GMC BENEFIT SETTLEMENT | 1846 |
| 500 Woodward Avenue | PAR | GM CORPORATION | 2827 |
| Detroit MI 48226 | BAL | GMC-FLEXIBLE COMP PROG | 6547 |
| 313-222-5431 | | | |
| Contact:Thomas Vandermulen | | | |
| | | | |
| Harris N.A. (Illinois) | PAR | GM CORPORATION | 672-3 |
| 115 South LaSalle St. 12th Floor | LBX | MOHO LOCKBOX | 1323 |
| Chicago IL 60603 | | | |
| 312-461-7432 | | | |
| Contact: Jack Kane | | | |
| | | | |
| JPMorgan Chase Bank N.A. (Illinois) | DEP | ATDV LOCKBOX #93647 | 6476 |
| 611 Woodward Avenue | BAL | ALLISON TRAN DIV DEPOSIT ACCT | 5-333 |
| Detroit MI 48226 | DEP | DLRA LBOX-CHICAGO #70595 | 6344 |
| 313-256-2218 | PAR | GM CORPORATION | 3191 |
| Contact: Bill Bitonti | | | |
| | ZBA | GM FX SETTLEMENT ACCT | 6164 |
| | DEP | GMPD LOCKBOX-NEWARK #13595 | 6190 |
| | DEP | GMPD LOCKBOX-CHICAGO #93112 | 6417 |
| | DEP | GMPD LOCKBOX-CHARLOTTE #195053 | 6786 |
| | DEP | GMPD LOCKBOX-DALLAS #890158 | 6816 |
| | DEP | GMPD LOCKBOX-L.A. #100061 | 6840 |
| | ZBA | BOCG DET PR CNTL DIS | 2176 |
| | ZBA | CPCG CNTL DISB | 2184 |
| | | | |
| JPMorgan Chase Bank N.A. (Michigan) | ZBA | GM ICP | 58-94 |

611 Woodward Avenue

Detroit MI 48226

313-256-2218

Contact: Bill Bitonti

| | | |
|---|---|---|
| ZBA | GM ICP REIMBURSEMENTS | 25-64 |
| ZBA | FIDELITY LUMP SUM DISB | 73-04 |
| ZBA | FIDELITY INACTIVES | 47-06 |
| ZBA | FIDELITY MED 'B' | 47-14 |
| ZBA | FIDELITY OVERPAYMENT REFUND | 66-10 |
| ZBA | FIDELITY ACCLARIS SAL FLX ACCT | 5-507 |
| ZBA | FIDELITY ACCLARIS HLY FLX ACCT | 5-523 |
| ZBA | GMC BENEFIT SETTLEMENT ACCT | 45-53 |
| ZBA | GM BOFA HRA (NONCORENEWHIRES) | 0407 |
| DEP | GM U.S. CUSTOMS RECEIPTS | 7-184 |
| ODC | DEALER ACCTG  VEHICLE RETURNS | 3-084 |
| ODC | DEALER ACCTG  VEHICLE CREDITS | 9-354 |
| DEP | BUICK PGA RECEIPTS | 9-734 |
| DEP | NAO DELAR ACTG. - GSA | 98-83 |
| ODC | SATN SAAB COLL VEH DRAFTS | 4-724 |
| ODC | NONGMAC FINANCED DLR COMP CAR | 4-880 |
| ODC | GMAC DLR FINANCED COMP CAR | 5-556 |
| DEP | COMP CAR LOAN AUCTION ACCT | 5-564 |
| ODC | AUCTION ACH CREDITS ACCOUNT | 1-828 |
| DEP | VSSM LICENSING & MERCHANDISING | 2-420 |
| DEP | VSSM INT'L LICENSING ROYALTIES | 2-446 |
| DEP | FLT COMM OPS-MED DTY ROY RECS | 9-553 |
| DEP | GM ASSET ACCT WIRE RECPT SDA | 82-06 |
| ZBA | Salaried Retiree HRA | 3803 |
| PAR | GM CORPORATION | 67-90 |
| DEP | GMC,HCS/MASTER CARD,SPEC. DEP. | 07-63 |
| ZBA | GM R&D Lithium Ion Battery | 4090 |
| DEP | GM PERSONNEL ADMINISTRATION | 48-93 |
| DEP | SPO DEPOSITORY ACCT | 32-50 |
| FSC | GMPT - DEPOSITORY ACCOUNT | 00-83 |
| DEP | GMPT LBX 77680 | 75-41 |
| DEP | GMPT LBX 78056 | 0-313 |
| DEP | GMPT LBOX 771280 | 32-76 |
| ZBA | GMPT ASSET ACCT LKBX 77681 SDA | 81-98 |
| DEP | GM CORP HUMAN FACTORS | 76-84 |
| DEP | ROAD TO HYDROGEN | 33-84 |
| DEP | GENERAL MOTORS CORP. CARB | 4-454 |
| DEP | R & D GMX 569 U.S. GOVT | 1-614 |
| DEP | DOE WASTE HEAT RECOVERY | 3-694 |
| DEP | R & D CLEAN FUELS | 4-549 |
| DEP | R & D EMISSIONS DEVICES | 4-564 |
| DEP | ACAT / NHTSA - U.S. GOVT | 2-690 |
| DEP | NREL HEAVY HYBRID | 67-21 |
| DEP | VISUALIZATION FUEL CELL WTR TR | 67-39 |
| DEP | GM CORP AUTO UWB SHORT RANGE | 67-47 |
| DEP | GMT800 GOVERNMENT PROGRAM | 67-96 |

|  | | | |
|---|---|---|---|
| | DEP | R & D HIGH EFFICIENCY ENG. | 68-04 |
| | DEP | ONSTAR LEXUS DIGITAL CORP | 70-91 |
| | DEP | ONSTAR LEXUS PERSONAL CALLING | 71-09 |
| | DEP | GMC INTEGRATED TRACTIION DRIVE | 9-470 |
| | DEP | GMC EGR BOOST EFT SETTLEMENT | 9-488 |
| | DEP | NYSERDA 957 | 1132 |
| | DEP | GM LOGISTICS - TRAFFIC LOG. | 4393 |
| | ZBA | INTL TRAF LOG LKBX 77789 SDA | 21-65 |
| | DEP | GM LOGISTICS - COMM TRAFFIC | 1383 |
| | DEP | GM LOGISTICS - MIAMI | 63-03 |
| | DEP | GMU SPECIAL DEPOSITORY | 5-094 |
| | DEP | GM CORP OFFICE WIRE RECEIPTS | 01-45 |
| | DEP | GMC ALLISON TRANS REIMBURSE | 8-936 |
| | ZBA | MTOM - SALARIED PAYROLL | 68-84 |
| | ZBA | MTOM LLC HRLY PAYROLL - ACH | 3118 |
| | ZBA | GMC SALARIED MATCHED PR | 47-46 |
| | ZBA | NAO - HOURLY PAYROLL | 74-26 |
| | ZBA | MTM HOURLY PARYROLL ACCOUNT | 8-467 |
| | ZBA | DDP - SALARY | 2987 |
| | ZBA | DDP - HOURLY | 2995 |
| | ZBA | FIDELITY ACCLARIS SAL FLX ACH | 3126 |
| | ZBA | FIDELITY ACCLARIS HLY FLX ACH | 3134 |
| | ZBA | BOCG - C.O. - CNTL DISB | 46-46 |
| | ZBA | CPCG-MANSFIELD-EFT DISB | 3343 |
| | ZBA | ONSTAR DISB ACCT | 30-32 |
| | ZBA | GM CORP OEM TELEMATICS SERV | 42-78 |
| | DEP | SAT CORP-GMAC ROYALTY PAYMENTS | 2-438 |
| | DEP | GM HEADQUARTERS CASHIER | 01-63 |
| | DEP | EAG CO LBX 77696 | 3-694 |
| | DEP | GM CENT OFF ACH RECP SETT ACCT | 01-37 |
| | DEP | GFSS AR-FREIGHT CLAIMS-FOR U.S. | 0258 |
| | DEP | ONSTAR PERSONAL CALLING | 53-74 |
| | DEP | ONSTAR/LEXUS LINK | 18-04 |
| | DEP | GM ONSTAR - DEPOSITORY AC | 46-03 |
| | DEP | ONSTAR OEM TELEMATICS SERVICES | 4-583 |
| | DEP | XM SATELLITE RADIO DEP ACCT | 5-341 |
| | ZBA | Plug-In Hybrid 319, EFT Settlement Account | 4918 |
| JPMorgan Chase Bank N.A. (New York) | ZBA | ALL TRANS-CNTL DISB | 7579 |
| 611 Woodward Avenue | ZBA | GM BENE ACCT | 2644 |
| Detroit MI 48226 | ZBA | GM SALARIED FLEX | 7376 |
| 313-256-2218 | ZBA | WORK. COMP. LIAB. CIGNA SETTLM | 4180 |
| Contact: Bill Bitonti | FSC | DLRA MILITARY SALES | 2048 |
| | ZBA | NAO DEALER ACCTG. EFT DISB. | 0189 |
| | FSC | DELCO SYST. OPS., SPEC. DEPOS. | 7068 |

|  | SEC | GM ENHANCED CUSTODY | 0170 |
|  | DEP | GMIMCO REMTIIANCES | 3523 |
|  | BAL | GM USD CORP ACCT AT JPMC | 3760 |
|  | PAR | GM CORPORATION | 2095 |
|  | FSC | OVERSEAS REMIT ACCT | 4605 |
|  | GMC | FSC ACCT | 3058 |
|  | DEP | GMCC - CREDIT CARD | 0114 |
|  | ZBA | GM DEBT SETTLEMENT ACCT | 5-072 |
|  | FSC | GMOO SPECIAL DEPOSITORY ACC | 9839 |
|  | FSC | GMPD SPECIAL DEPOSITORY ACC | 9813 |
|  | FSC | AC DELCO - FSC DEPOSITS | 3959 |
|  | FSC | GM TRADE RECEIVABLE LLC | 1075 |
|  | FSC | GMTC SPECIAL DEPOSITORY ACCT | 6478 |
|  | SEC | GM LIQUIDITY CUSTODY | 0171 |
|  | FSC | GMC GMB OVERSEAS DEP | 1948 |
|  | DEP | CEP SPECIAL DEPOSITORY | 0765 |
|  | ZBA | NAO - HOURLY PAYROLL | 4775 |
|  | ZBA | NAO, DEALER ACCT.-CONT. DISB. | 1757 |
|  | ZBA | CPCG-CNTL. DISB | 2520 |
|  | ZBA | GMC FED TAX SETTLEMENT | 0399 |
|  | ZBA | NAO EFT DISBURSEMENT ACCT. | 1721 |
|  | ZBA | CHEV CENTRAL OFFICE DIS | 3719 |
|  | FSC | GMC PATENT SECTION | 2248 |
|  | FSC | GMC NAO-WARREN OVERSEAS DEPOS. | 1646 |
|  | ZBA | PROD LIAB INSURANCE SETTLE A/C | 6683 |
|  | ZBA | WORKERS COMP LIAB INS A/C | 6717 |
|  | ZBA | PROD. LIABIL. CIGNA SETTLEMENT | 4156 |
|  | ZBA | GEN. LIABIL. CIGNA SETTLEMENT | 4164 |
|  | ZBA | AUTOM. LIABIL. CIGNA SETTLEM. | 4172 |
|  | ZBA | EIL/POLLUT. LIAB. SETTLEMENT | 4198 |
|  | FSC | ONSTAR/OEM SERVICES | 1208 |
|  | ZBA | GM GLOBAL TECH INC | 5749 |
|  | ZBA | ONSTAR GLOBAL SERVICES | 3092 |
|  | GMC | GM CORPORATION UST COLLATERAL ACCT | 3795 |
| State Street Bank | PAR | GM CORPORATION | 0747 |
| 105 Rosemont Road | DEP | GMC SALARIED STOCK OPTION | 8-398 |
| Westwood MA 02090 | DEP | SALARIED STOCK OPTION 2 | 1141 |
| 781-302-6068 |  |  |  |
| Contact: Christine Cronin |  |  |  |
| Bank of China | PAR | GM CORPORATION | 0683 |
| 410 Madison Ave. |  |  |  |
| New York, NY  10017 |  |  |  |
| 212-935-3101 |  |  |  |

Contact:  David Hoang

| | | | |
|---|---|---|---|
| M&T Bank | PAR | GM CORPORATION | 3671 |
| 25 South Charles Street | | | |
| Baltimore MD  21201 | | | |
| 410-244-4792 | | | |
| Contact:  Lynn Mathy | | | |
| | | | |
| Citizens Bank | PAR | GM CORPORATION | 6889 |
| 328 South Saginaw Street | | | |
| Flint, MI  48502-2401 | | | |
| 810-282-0085 | | | |
| Contact: Karen Vance | | | |
| | | | |
| KeyBank | PAR | GM CORPORATION | 5008 |
| 127 Public Square | | | |
| Cleveland, OH  44114 | | | |
| 216-689-3696 | | | |
| Contact: Helen France | | | |
| | | | |
| Fifth Third Bank of NW OH | PAR | GM CORPORATION | 0536 |
| 606 Madison Ave | | | |
| Toledo, OH  43604 | | | |
| 419-259-0318 | | | |
| Contact: Joel Jerger | | | |

## FOREIGN BANK ACCOUNTS

| | | |
|---|---|---|
| JP Morgan Chase NA (London) | General Motors Corporation, Australian Dollar | 0406 |
| 611 Woodward Avenue | General Motors Corporation, Canadian Dollar | 0407 |
| Detroit, Mi. 48226 | General Motors Corporation, Swiss Franc | 0405 |
| 313-256-2218 | General Motors Corporation, Danish Krone | 0411 |
| Contact: Bill Bitonti | General Motors Corporation, Euro | 0401 |
| | General Motors Corporation, British Pound | 0402 |
| | General Motors Corporation, Japanese Yen | 0404 |
| | General Motors Corporation, Mexican Peso | 0415 |
| | General Motors Corporation, Norwegian Krone | 0409 |
| | General Motors Corporation, New Zealand Dollar | 0412 |
| | General Motors Corporation, Swedish Krona | 0408 |
| | General Motors Overseas Distribution Corporation | 8901 |
| | General Motors Overseas Distribution Corporation | 8902 |
| | General Motors Overseas Distribution Corporation | 8904 |
| | General Motors Overseas Distribution Corporation | 8908 |
| Toronto Dominion Bank | General Motors Corporation, Can. Dollar Disb. | 0181 |
| 100 Wellington St. W | General Motors Corporation, Can. Dollar EFT Disb. | 0505 |
| CP Tower 28th Floor | General Motors Corporation, OnStar Can. Dollar Disb. | 0823 |
| Toronto, Ontario M5K 1A2 | General Motors Corporation, Can. Dollar EDI/EFT Disb. | 9652 |
| 416-982-8976 | | |
| Contact: Debbie McCarrol | | |

## Custody/Brokerage Accounts

| | | |
|---|---|---|
| Citibank, N.A.<br>NY | General Motors<br>Corporation, Core<br>Portfolio | 0591 |
| 388 Greenwich<br>Street 22nd<br>Floor<br>New York NY<br>10013<br>212-816-2933<br>Contact: Sarah<br>Terner | Saturn Distribution<br>Corporation | 6563 |
| Citibank, N.A.<br>Cairo Branch<br>388 Greenwich<br>Street 22nd | General Motors<br>Corporation Custody<br>Acct | 9100 |
| Floor New<br>York, NY 10013<br>212-816-2933<br>Contact: Sarah | General Motors<br>Corporation Custody<br>Cash Account EGP | 9506 |
| Terner | General Motors<br>Corporation Custody<br>Cash Account USD | 9018 |
| JPMorgan<br>Chase Bank<br>N.A. (New<br>York) | GM Treasurer's Office<br>Enhanced Fund | 0170 |
| 611<br>Woodward<br>Avenue<br>Detroit MI<br>48226<br>313-256-2218<br>Contact: Bill<br>Bitonti | GM Treasurer's Office<br>Liquidity Fund | 0171 |
| JPMorgan<br>Chase Bank<br>383 Madison<br>Ave. – 5th Floor<br>New York, NY<br>10179<br>212-622-2619<br>Contact: Ara<br>Movsesian | Special Equity Account | 6952 |

| | | |
|---|---|---|
| Bear Stearns (JPMorgan) 115 South Jefferson Road – D4 Whippany NJ, 07981 973-793-7699 Contact: Robert Reimers | Bear Stearns Brokerage | 1828 |
| Pierce, Fenner & Smith Inc. 250 Vesey St. New York, NY 10080 212-449-0484 Contact: Charles J. Phlon | ML Brokerage | 0869 |

## RESTRICTED CASH ACCOUNTS

| Held By | Account Name | Account Number |
|---|---|---|
| Bank of New York Trust Andrew Asmdeo 101 Barclay St. New York, NY 10286 212-298-1756 | General Motors/AISLIC 2006 Escrow Account | 4786 |
| JP Morgan Chase Money Market Service Center 10420 Highland Manor Dr. 2nd Floor Temple, Fl 33610 866 737 5826 | General Motors & Nat Union Fire Account | 2912 |
| JP Morgan Chase | General Motors & Nat Union Fire Account | 1219 |
| Money Market Service Center 10420 Highland Manor Dr. 2nd Floor Temple, Fl 33610 866 737 5826 | | |
| Bank of New York Trust Andrew Asmdeo 101 Barclay St. New York, NY 10286 212-298-1756 | Westchester Fire/GMC Pledged collateral Account | 6144 |
| Wachovia Richard Catanese 481 West Germantown Pike Plymouth Meeting, PA 19462 888-800-3567 | NiHill & Riedley/General Motors Account | 4268 |
| Wachovia | NiHill & Riedley/General Motors Account | 9732 |

Richard Catanese
481 West Germantown Pike
Plymouth Meeting, PA 19462
888-800-3567

| | | |
|---|---|---|
| Bank of New York Trust | General Motors Corp-Motor Ins Corp Account | 4787 |
| Andrew Asmdeo | | |
| 101 Barclay St. | | |
| New York, NY 10286 | | |
| 212-298-1756 | | |
| Natixis | GM Arrowood | 3-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp CA | 1-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp CA | 1-002 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp NY | 8-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-002 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp OH | 7-003 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | | |
| Natixis | GM Workers Comp TX | 4-001 |
| Michelle Alvarez | | |
| 9 West 57th Str. 35th Floor | | |
| New York, NY 10019 | | |
| 201-761-6547 | SafeCo Ins Co or America Pledgee FBO General Motors Account | 8163 |
| Blackrock | | |
| 100 Bellevue Parkway | TCA, Secured Party FBO: General Motors Corp Acct | 0164 |
| Wilmington, DE 19809 | | |

1-800-441-7450
Smith Barney
Denise Yuu
185 Asylum Street 2nd Floor
Hartford, CT 06103
860-275-0700

| | | |
|---|---|---|
| BONY MATT LEWIS | LINDEN RD MI COLLATERAL | 1365 |
| 101 Barclay Street | | |
| New York, NY 10286 | | |
| 212-815-3219 | | |
| PNC BANK | ALLEGHENY POWER DEPOSIT | 9632 |
| Product Client Services | | |
| 620 Liberty Ave. | | |
| Pittsburgh, PA 15265 | | |
| 1-877-824-5001 | | |
| | | |
| JP Morgan: | NATIONAL FUEL GAS DIST DEPOSIT | 4886 |
| Joyce Bryant | | |
| 611 Woodward Ave. | | |
| Detroit, MI 48226 | | |
| 866-696-4212 | | |
| Tenesse Valley Authority | TVA DEPOSIT | 4912 |
| JT Long | | |
| 26 Century Blvd. – One Century Pl. | | |
| 0CP-1K | | |
| Nashville, TN 37214 | | |
| 615-232-6103 | | |
| JP Morgan: | SO CAL EDISON DEPOSIT | 4434 |
| Joyce Bryant | | |
| 611 Woodward Ave. | | |
| Detroit, MI 48226 | | |
| 866-696-4212 | | |
| JP Morgan: | SRP DEPOSIT | 0452 |
| Joyce Bryant | | |
| 611 Woodward Ave. | | |
| Detroit, MI 48226 | | |
| 866-696-4212 | | |
| BONY: | | |
| PHIL TRIOLO | CENTERPOINT ENERGY ESCROW | 6016 |
| 101 Barclay Street | | |
| New York, NY 10286 | | |
| 212-815-3229 | | |
| BONY: | | |
| PHIL TRIOLO | PEPCO ESCROW | 0893 |
| 101 Barclay Street | | |
| New York, NY 10286 | | |
| 212-815-3229 | | |
| BONY: | | |
| PHIL TRIOLO | ST LAWRENCE GAS ESCROW | 6760 |
| 101 Barclay Street | | |
| New York, NY 10286 | DOMINION RETAIL ESCROW | 6023 |

212-815-3229
BONY:
PHIL TRIOLO
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                          CONOCO PHILIPS ESCROW                    6022
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                          PANHANDLE/TRUNKLINE ESCROW               6166
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                          GEORGIA POWER ESCROW                     6017
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                          SEQUENT ENERGY ESCROW                    6009
101 Barclay Street
New York, NY 10286
212-815-3229

Citibank:
Sarah Terner                         AMEREN LC                                2099
388 Greenwich Street 22nd Floor
New York, NY 10013
212-816-2933
Citibank:
Sarah Terner                         C REISS COAL                             2973
388 Greenwich Street 22nd Floor
New York, NY 10013
212-816-2933
Citibank:
Sarah Terner                         ATMOS ENERGY MARKETING LC                3869
388 Greenwich Street 22nd Floor
New York, NY 10013
212-816-2933
Citibank:
Sarah Terner                         CORAL ENERGY CANADA LC                   4976
388 Greenwich Street 22nd Floor
New York, NY 10013
212-816-2933

BONY:
PHIL TRIOLO                          CENTERPOINT ENERGY GAS TRANSMISSION      3433
101 Barclay Street                   CENTERPOINT ENERGY RESOURCES CORP        2894

New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO
101 Barclay Street
New York, NY 10286
212-815-3229
BONY:
PHIL TRIOLO                    PEA ESCROW                              0492
101 Barclay Street
New York, NY 10286
212-815-3229