Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                        :
**In re**                               :         **Chapter 11 Case No.**
                                        :
**GENERAL MOTORS CORP.**, *et al.*,     :         **09-_____ (___)**
                                        :
                    **Debtors.**        :         **(Jointly Administered)**
                                        :
---------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO**
**11 U.S.C. §§ 105(a), 363(b), AND 507, (I) AUTHORIZING DEBTORS TO**
**(a) PAY CERTAIN EMPLOYEE COMPENSATION AND BENEFITS AND**
**(b) MAINTAIN AND CONTINUE SUCH BENEFITS AND OTHER**
**EMPLOYEE-RELATED PROGRAMS AND (II) DIRECTING**
**BANKS TO HONOR PREPETITION CHECKS FOR**
**PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

submit this Motion for authority (a) for the Debtors to (i) pay certain wages, salaries, and other

compensation and benefits to employees and other personnel and (ii) maintain and continue

certain benefits and other employee-related programs, and (b) for the Debtors' financial

institutions to honor and process checks and transfers related to such benefits, programs and

compensation.  In support of this Motion, the Debtors respectfully represent as follows:

## Background

1.        On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

2.        Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

3.        For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.      William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands. General Motors began as a holding company for Buick Motor Company, and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.      Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

6.      GMAC LLC ("<u>GMAC</u>") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.      The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned.  In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.      As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "<u>UAW</u>") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.      As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.  Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

## The Economic Downturn and the U.S. Treasury Loan

10.     In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s. Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.     This economic turmoil resulted in significant financial stress on the automotive industry. In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years. The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations. As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.     The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy. On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility"). A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility. The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

        13.      The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "<u>Long-Term Viability Plan</u>") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"<u>Presidential Task Force</u>").

## The U.S. Treasury-Sponsored Program for GM

        14.      On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

        15.      President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.*  The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a
> tool that, with the backing of the U.S. Government, can make it
> easier for General Motors . . . to *quickly* clear away old debts that
> are weighing [it] down so that [it] can get back on [its] feet and
> onto a path to success; a tool that we can use, even as workers stay
> on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply
> broken up, sold off, and no longer exists.  We're not talking about
> that.  And what I'm *not talking about is a company that's stuck in
> court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to

demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the

President's guidance, the Company began a deeper, more surgical analysis of its business and

operations in an effort to develop a viability plan that would accommodate the needs of its

secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a

healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology

leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable

in that timeframe, then the Company should consider undertaking a new, more aggressive plan

using an expedited, Bankruptcy Court-supervised process to implement the purchase of the

Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the

Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of

the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the

Company to implement the sale and to support the new enterprise, it requires that the sale of

assets occurs promptly to preserve value and avoid the devastating damage the industry would

suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S.

Treasury also indicated that if such a transaction were consummated, it would assure that New

GM had adequate financing and a capital structure that would assure New GM's long-term

viability.  The U.S. Government consistently has emphasized that a fundamental premise of its

approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid

potentially fatal revenue perishability by restoring confidence in GM employees, its customers,

its vendors, as well as the communities that depend on GM.  New GM will be perceived by

consumers as a reliable, economically sound automobile company that will stand behind its

products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to

increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM

borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance

large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily

shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve

weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's

assembly facilities remain operating, while other assembly facilities continue to be shut down.  A

number of those assembly facilities that currently are shut down are expected to resume

operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

### The Exchange Offer

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

### The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition  Holdings LLC (the "Purchaser"), a purchaser

sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.    Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.     The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  *Presidential Remarks* at 7.

### General Motors' Workforce

29.     The Debtors' workforce is composed of a large number of manufacturing workers represented by unions and managerial, functional, and administrative staff not represented by unions.  As is customary in the vehicle manufacturing industry, and similar to what other premier OEMs provide to their employees, the Debtors provide their unionized and non-unionized active, inactive, and former employees ("Employees") with a standard range of compensation, retirement, and welfare benefits, including incentive compensation, retirement, health, insurance, fringe benefits and other welfare benefits.  Also as is customary in the vehicle manufacturing industry, the Debtors provide their eligible retired Employees with retirement,

health and life insurance benefits (such persons currently or hereafter receiving such post-retirement benefits, "Retirees").

30.    As is common for a major corporation directly and indirectly owning a number of subsidiaries, the Debtors also provide compensation and employee benefits to the employees and retirees of several of their subsidiaries who are not Debtors.  Therefore, with respect to payment of salary, wages and other compensation, and benefits Debtors' Employees (and the numbers cited thereof) include employees of direct or indirect subsidiaries for which a Debtor serves as payroll agent.  With respect to the provision of employee benefits, Debtors' Employees and Retirees (and the numbers cited thereof) include employees and retirees of direct or indirect subsidiaries of a Debtor.

31.    As of the Commencement Date, the Debtors and their direct and indirect subsidiaries employed approximately 224,000[2] Employees, of whom (a) approximately 69,000 (31%) are not represented by unions (collectively, the "Salaried Employees")[3] and (b) approximately 155,000 (69%) of whom are members of various unions, each of which has enter into a collective bargaining agreement with the Debtors (each individually a "CBA," and collectively, the "CBAs") (collectively, the "Hourly Employees").

32.    Salaried Employees of the Debtors may be broken down into three categories (with the approximate number of associated individuals in the parenthetical after the group name):  (i) U.S. non-executive Salaried Employees (26,000) (collectively, the "Classified Employees"),  (ii) U.S. executives (1,048) (collectively, the "Executives"), and (iii) officers (12]

---

[2] As the Commencement Date, approximately 105,000 Employees were employed by the Debtors' North American automotive segment.

[3] Approximately 200 unionized Employees participate in the Debtors' employment benefit plans for Salaried Employees, and such Employees are deemed to be Salaried Employees for purposes of this motion.

(collectively, the "Officers").  As of the Commencement Date, approximately 53,500 of the

Debtors' Employees in the United States were represented by the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"),

approximately 850 were represented by the International Union of Electronic, Electrical,

Salaried, Machine and Furniture Workers and Communications Workers of America (the "IUE-

CWA"), and a small number were represented by other unions.

33.    In the ordinary course of business, Debtors also incur compensation and

expense reimbursement obligations with respect to the engagement of certain individual

independent contractors currently under contracts and related arrangements with the Debtors

("Independent Contractors") and leased employees covered by employee supplier agreements

("Contract Service Personnel").  As of the Commencement Date, the Debtors employed

numerous Independent Contractors and approximately 1185 Contract Service Personnel.

### Jurisdiction

34.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

35.    By this Motion, the Debtors request that the Court enter an order, pursuant

to sections 105(a), 363, 507(a)(3), and 507(a)(4) of the Bankruptcy Code, (a) authorizing, but not

directing, the Debtors, in their sole discretion and in the exercise of their business judgment, as

deemed necessary to continue to operate and preserve value, to (i) pay all their wages, salaries,

and other compensation (collectively, the "Compensation Obligations") and Employee and

Retiree benefits, which include, among other things, health care, pension, and life insurance

benefits (each as defined below and collectively, the "Employee Benefits Obligations," and

together with the Compensation Obligations, the "Prepetition Employee Obligations") and

(ii) authorizing, but not directing, the Debtors, in their discretion and in the exercise of their

business judgment, as deemed necessary to continue to operate and preserve value, to continue

and honor the Employee Benefits Obligations; and (b) directing all financial institutions to

receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors'

accounts in satisfaction of the Prepetition Employee Obligations.[4]

36.    The Debtors also seek authorization to withhold all federal, state, local,

and foreign income taxes as required by applicable law, to pay all employment, unemployment,

social security, and similar taxes (including, without limitation, taxes relating to the Federal

Insurance Contributions Act ("FICA") and the Federal Unemployment Tax Act ("FUTA"))

(collectively, the "Payroll Taxes"), whether withheld from wages or paid directly by the Debtors

to governmental authorities (the "Governmental Taxes"), as well as make other payroll

deductions, including, but not limited to, retirement and other employee benefit plan

contributions, union dues, garnishments, and voluntary deductions.  Such payments are also

included in the defined term, "Prepetition Employee Obligations."

### Basis For Relief Requested

37.    In the ordinary course of the Debtors' business, the Debtors incur payroll

and various other obligations and provide benefits to Employees for the performance of services.

38.    Section I(A) of this Motion describes the Employees' prepetition and

postpetition wages and salaries, including any commissions and incentive compensation for

which the Employees are eligible.  Section I(B) of this Motion describes the Employees'

vacation, sick leave, personal leave, expense reimbursement, severance policies, and certain

---

[4] Concurrently herewith, the Debtors have filed a motion for authority to, among other things, continue their cash management system.

other policies and programs.  The Debtors request authority to continue all of these programs in accordance with past practice and pay all prepetition and postpetition amounts payable thereunder.

39.     Section II(A) of this Motion sets forth the Debtors' healthcare and other welfare benefit plans and their obligations thereunder.  Section II(B) of this Motion describes the Debtors' retirement plans, including tax qualified plans and non-qualified deferred compensation plans.  Section II(C) of this Motion describes the Debtors' workers' compensation programs and their obligations thereunder.  Section II(D) of this Motion addresses other benefits that the Debtors provide to their Employees and Retirees.  As set forth in section II(E) of this Motion, the Debtors seek authority to pay Payroll Taxes, Governmental Taxes, garnishments, union dues, withhold income taxes, and make other payroll deductions.  Section II(F) of this Motion describes the Debtors' administrative obligations in connection with maintaining the programs associated with the Prepetition Employee Obligations.  In addition, pursuant hereto, the Debtors request that third party processors be directed to continue to provide to the Debtors those services that the processors provided prior to the Commencement Date.

40.     Lastly, the Debtors request this Court to direct banks to honor prepetition checks for the payment of the Prepetition Employee Obligations.

I.      **WAGES, SALARIES AND OTHER COMPENSATION[5]**

A.      **Employee Compensation: Wages, Salaries, and Incentive Compensation**

---

[5] The 2007 UAW-GM National Agreement (the "UAW CBA") was amended effective May 29, 2009.  Certain sections of the UAW CBA modify wage and benefit matters including some of the benefit plans and programs for UAW-represented Employees and Retirees described in this Motion.  This does not impact the prepetition amounts owed and most of the postpetiton amounts for which Debtors seek permission to pay and continue.  The changes are reflected in such terms as eligibility provisions and payment durations and may generally be described as favorable to the Debtors in that benefit costs and liabilities are reduced.  Additionally, select benefit plans and programs corresponding to Salaried Employees are being modified in 2009 to reduce costs by eliminating certain plans and programs or significantly modifying them and may also be described as favorable to the Debtors.

(a)    *Salaried Employees*

41.    The Debtors' average monthly payroll for their Salaried Employees is approximately $221 million.  On a semi-monthly basis (generally the 15th and the last business day of each month), the Debtors pay Salaried Employees by electronic funds transfer or check for current salaried amounts owed, plus any prior-period overtime.  The Debtors' Salaried Employees were most recently paid on May 28, 2009.  Certain Salaried Employees are also compensated for overtime work and are paid in arrears.  As of the Commencement Date, the Debtors estimate that they owe their Salaried Employees approximately $650,000 for prepetition overtime work.  The Debtors estimate that obligations with respect to Salaried Employees' wages relating to the period prior to the Commencement Date are *de minimis*.

42.    In February 2009, the Debtors announced that base salaries for their Salaried Employees would be temporarily reduced effective May 1, 2009 through December 31, 2009.  These reductions in the Salaried Employees' base salaries range from 0 to 10%.  The Debtors seek authority to review and adjust the Salaried Employees' base salaries as deemed necessary to continue to operate and preserve value in the exercise of their business judgment.

(b)    *Hourly Employees*

43.    The Debtors' average monthly payroll[6] for their Hourly Employees, is approximately $251 million.  Hourly Employees are paid on a weekly basis (either on Thursday or Friday), by electronic funds transfer or check.  Hourly Employees were most recently paid on May 27, 2009.  Approximately 29% of payroll for Hourly Employees is paid by check.  The Debtors estimate that obligations with respect to Hourly Employees' wages relating to the period prior to the Commencement Date are approximately $40 million, plus approximately $243

---

[6] Payroll figures include hourly straight time pay, overtime paid in the ordinary course, cost of living adjustments, and shift premium payments for Hourly Employees who work overnight or weekend shifts.

million in accrued but unused vacation and holiday pay which is payable on an "as used" basis

throughout 2009. Additionally, the Debtors estimate that as much as $19 million of the Hourly

payroll issued by checks may not have cleared the Debtors' accounts prior to the

Commencement Date.

      (c)    *Contract Service Personnel and Independent Contractors*

      44.    The Debtors engage Independent Contractors under contracts and related

arrangements, and Contract Service Personnel largely through agencies and other third parties

(the "Contract Personnel Suppliers"), to perform specialized functions for the Debtors, including,

but not limited to, engineering, information technology, clerical work, plant supervision and

other functional work. The Debtors typically pay invoices relating to Contract Service Personnel

in accordance with the terms of the various Contract Service Personnel agreements. The terms

of such agreements provide that the Contract Service Personnel hired pursuant to those

agreements are not Employees of the Debtors. The Debtors are concerned that the Contract

Service Personnel and Independent Contractors may refuse to work if they are not paid for their

services, or that the Contract Personnel Suppliers may deploy certain Contract Service Personnel

to other companies, and, accordingly, the Debtors seek authority to pay the Contract Service

Personnel, the Contract Personnel Suppliers and Independent Contractors for such services. The

Debtors estimate that, as of the Commencement Date, approximately $4.2 million is owed to the

Contract Service Personnel, Contract Personnel Suppliers and Independent Contractors with

respect to services rendered relating to the period prior to the Commencement Date. Because

many of the Contract Service Personnel and Independent Contractors are engineers, information

technology personnel, and other skilled persons who are critical to the Debtors' operations or

who interact directly with suppliers, customers, and other third parties with whom the Debtors

conduct business, the Debtors seek authority to pay these parties the amounts owed with respect to prepetition work performed and to continue payments in the ordinary course of business.

(d)    *New Hire and Other Special Arrangements*

45.    The Debtors have entered into arrangements with certain newly hired Employees that establishes a minimum amount of annual compensation for a transition period to induce such Employees to accept employment with the Debtors.  In addition, the Debtors have also entered into special arrangements with a small number of current Employees to incentivize them to lead and execute the divestiture of specific business lines.  There are currently 8 Employees covered under these arrangements.  The Debtors estimate that the contractual amounts owed to such Employees aggregate approximately $1.3 million which, pursuant to the contracts, is to be paid through September 30, 2009, or at the completion of the business line divestitures.  These contractual amounts are in addition to such Employees' regular salary.  Because each of the Employees who were promised additional compensation payments are heavily relied upon by the Debtors, the Debtors seek authority to pay these Employees amounts owed on account of prepetition work performed and to continue payments under these arrangements in the ordinary course of business and when due.

(e)    *Incentive Compensation Arrangements*

46.    <u>Incentive Plans</u>.  Historically, the Debtors have maintained a number of incentive plans (the "<u>Incentive Plans</u>") designed to provide incentive compensation to Salaried and Hourly Employees in order to encourage exceptional Employee performance for the benefit of the Debtors' businesses.  Some of these Incentive Plans are required by the CBAs, and others are not.  Eligibility for the Incentive Plans depends on the Employees' classification or level, and the actual amount of the incentive compensation depends on whether the Debtors and the eligible Employee meet certain performance objectives.  The Debtors currently offer, in the ordinary

course of business, several different Incentive Plans, including the 2007 Annual Incentive Plan, the 2007 Long-Term Incentive Plan, the 2007 Cash-Based Restricted Stock Unit Plan, the Enhanced Variable Pay Plan, the Sales Incentive Plan, and the Profit Sharing Plan for Hourly-Rate Employees. Although the Debtors' performance in 2008 would have yielded a small payout under the 2007 Annual Incentive Plan and the Enhanced Variable Pay Plan, the Debtors determined that, based on the sharply declining sales volumes resulting in the deterioration of financial performance and the downturn in the global economy, no payouts would be made with respect to the 2008 performance period. Nonetheless, the Debtors hereby seek authority, in its discretion, to continue the Incentive Plans in the ordinary course of business.

47.    _Sales Incentive Plans_.  The Debtors maintain, in the ordinary course of business, two incentive plans for Salaried Employees in the Debtors' sales, service, and marketing operations (the "_Sales Incentive Plans_").  The Sales Incentive Plans provide incentives for Salaried Employees to achieve specific targets with respect to sales and dealership satisfaction ratings.  As of the Commencement Date, amounts accrued under these plans, but not yet paid, are _de minimis_.

48.    _Profit Sharing Plan_.  As required under various CBAs, the Debtors maintain, in the ordinary course of business, the General Motors Profit Sharing Plan for Hourly-Rate Employees in the U.S. (the "_Profit Sharing Plan_").  The Profit Sharing Plan is for Employees represented by Unions who fulfill the plan's criteria, as required under various CBAs.  Pursuant to the Profit Sharing Plan, eligible Employees share in the Debtors' profits from operations in the United States.  No payments under the Profit Sharing Plan were made in 2008, and no amounts are owing with respect to the prepetition period.  The Debtors hereby seek authority to continue the Profit Sharing Plan in the ordinary course of business.

B.    **Other Employee Compensation: Vacation, Sick and Personal
Leave, Expense Reimbursement, Severance, and Other Compensation**

49.    The Debtors provide their Employees with other forms of compensation, including vacation pay, sick leave and personal time-off pay, reimbursement of certain expenses, downtime absence pay, and severance.  These forms of compensation not only are usual and customary in the Debtors' industry, but also are necessary for the Debtors to retain qualified Employees to operate their businesses and continue to honor commitments under their CBAs. Accordingly, the Debtors seek authority to continue to honor outstanding prepetition obligations with respect to such items in the ordinary course of business and to continue these programs postpetition in accordance with their terms, as deemed necessary to continue to operate and preserve value in the exercise of their business judgment.

(a)    *Vacation and Holidays*

50.    Salaried Employee Vacation and Holiday Policies.  All regular full-time and regular part-time Salaried Employees are eligible to accrue paid vacation.  For these Salaried Employees, vacation time varies from 0 weeks to 5 weeks per year, depending on the Employees' length of service.  Except as otherwise provided by state law, vacation time vests at the rate of 25% of the annual allotment per completed calendar quarter, and unused vacation time does not carry over from year to year.  Salaried Employees are only entitled a payout for accrued but unused vacation time in particular circumstances, including, but not limited to, certain employment terminations.  In addition, various business units of the Debtors periodically declare vacation periods during which some or all of Salaried Employees' vacation days must be used. Salaried Employees are also eligible for paid holidays, the number of which varies slightly from year to year.  Typically, holidays include national holidays and the last week of the calendar

year.  The Debtors do not believe that there are any material amounts outstanding as to the

prepetition period.

51.    Flexible Compensation Program.  The Flexible Compensation Program

(the "FCP") is designed to provide increased flexibility in managing Salaried Employees'

compensation.  The FCP provides Salaried Employees with an FCP payment of an annual set

amount, with the option to receive the payment in cash and/or to exchange a portion of the FCP

payment for other benefits.  The availability, amount, and options under the FCP may vary from

year to year and generally include various combinations of lump sum cash payments,

contributions to the Salaried Employee's 401(k) account, and the opportunity to purchase 1 to 5

days off at the cost of $175 per day.  For 2008, the maximum amount payable under the FCP

equaled approximately $1,900 for each full-time Salaried Employee.  There are currently no

prepetition obligations with respect to the FCP.  The FCP, and related payments, are suspended

and 5 days of vacations were provided in lieu thereof for 2009.  The Debtors seek authority to

continue the FCP in the ordinary course of business in the exercise of their business judgment.

52.    Hourly Employee Vacation Policies.  Pursuant to certain CBAs, Hourly

Employees receive between 0 and 5 weeks of vacation time per year, based on seniority

(vacation policies vary depending on the applicable CBA).  Generally, an Hourly Employee has

on average 160 hours (i.e., 4 weeks) of vacation annually.  Vacation time vests at the rate of 50%

at the end of 13 worked pay periods and vests ratably over the next 13 pay periods until it is fully

vested at the end of 26 worked pay periods (for a full-time Hourly Employee, generally by July

1st of each year).  Pursuant to the terms of certain CBAs, including those governing Employees

who are members of the UAW or the IUE-CWA, the Debtors must pay eligible Employees for

any accrued but unused vacation time outstanding at the end of the calendar year by February 1st

of the following year.  Hourly Employees also are entitled to paid holidays, the number of which varies slightly from year to year.  Hourly Employees, including Employees who are members of the UAW or the IUE-CWA, receive holiday pay for all company-declared holidays, which generally include national holidays and the last week of each calendar year.

53.    At any time, almost all Employees have accrued vacation and holiday eligibility.  The Debtors anticipate that their Employees will utilize accrued vacation time and take holiday time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  The Debtors request authority to continue their vacation and holiday policies in the ordinary course and pay any outstanding prepetition amounts related thereto.

(b)    *Sick Leave and Personal Leave*

54.    <u>Sick Leave</u>.  The Debtors' sick leave policy for Employees varies.  For absences up to one week (for reasons other than vacation or holidays), Salaried Employees must obtain authorization from their managers and are generally paid for their time off, consistent with the requirements under the Fair Labor Standards Act necessary to maintain an "exemption" from obligations to provide overtime pay for all hours worked in excess of 40 hours.  If a Salaried Employee is absent for more than one week, then the short-term or long-term disability plans for Salaried Employee, as described more fully below, apply.

55.    Hourly Employees who are absent from work (for reasons other than vacation or holidays) are not paid for their time off.  If an Hourly Employee is sick for more than 5 days or has been hospitalized due to personal injury or disabled by an accident, then the Debtors' applicable short-term or long-term disability plans for Hourly Employee, as described more fully below, apply.

56.    <u>Personal Leave</u>.  All Employees may be eligible for leaves of absence, either pursuant to the Debtors' absence policy or applicable law.  Employees are eligible for paid leaves of absence for jury duty, up to 7 days of bereavement leave upon the death of certain qualifying family members, disability leave (as described below), and other absences for educational, military duty, and certain personal reasons.  Additionally, Hourly Employees under certain CBAs are entitled to be paid for military duty lasting for 30 days or less, and Salaried Employees may be paid for 15 days of military service less any military pay received.  However, for Hourly and Salaried Employees currently in the military relating to the conflict in the Middle East, a wage differential and benefits are continued while such Employees are on active duty.  In certain instances, Employees may also take unpaid personal leaves of absence for a variety of purposes.  The Debtors believe that, as of the Commencement Date, the estimated amount of accrued but unpaid benefits with respect to leaves of absence is *de minimis*.

(c)    *Expense Reimbursement*

57.    <u>Reimbursable Business Expenses</u>.  In the ordinary course of business, the Debtors routinely reimburse Employees, Directors, Independent Contractors, and Contract Service Personnel for certain expenses incurred as part of their duties and in furtherance of the Debtors' businesses, including travel, lodging, professional seminars, ground transportation, business meals, stipends for temporary assignments, and other similar items reimbursable under the Debtors' existing policies (collectively, the "<u>Reimbursable Business Expenses</u>").  All such Reimbursable Business Expenses are incurred with the understanding that they would be reimbursed by the Debtors.  Typically, those seeking reimbursement submit receipts for reimbursement which are processed through the normal expense report and accounts payable process.  The Debtors reimburse out-of-pocket expenses via payroll.  It is difficult for the Debtors to accurately determine the amount of Reimbursable Business Expenses outstanding as

of the Commencement Date because not all expense reports have been submitted with respect to all of such items.  The Debtors estimate, however, that approximately $160,000[7] as of the Commencement Date in Reimbursable Business Expenses attributable to the prepetition period remain outstanding.  Pursuant to this Motion, the Debtors seek authority to pay all Reimbursable Business Expenses in the ordinary course of business, including those incurred prior to the Commencement Date, and to continue their policies relating to Reimbursable Business Expenses.

58.    Corporate Card Program.  The Debtors also maintain corporate card programs (the "Corporate Card Program") with Citibank N.A. and certain of its affiliated credit card providers whereby Employees can incur Reimbursable Business Expenses, and purchase goods and services for, or incidental to, the business of the Debtors.  Business related credit card charges under the Corporate Card Program are paid directly to credit card providers by the Debtors.  Failure to pay for these expenses will disrupt the Debtors' business operations and cause Employees to be concerned about personal liability for business related charges, which would distract the Employees from devoting their full attention to the Debtors' business and the orderly administration of these chapter 11 cases.  Moreover, failure to pay for these business related charges may also, under certain agreements related to the Corporate Card Program, authorize certain credit card providers to seek recovery from Employees.  Accordingly, the Debtors seek authority to pay all prepetition obligations with respect to the Corporate Card Program, and to otherwise continue the Corporate Card Program in the ordinary course of business.

---

[7] This amount includes amounts owed directly to Employees and amounts owed to credit card providers on behalf of the Employees.

59.    <u>Relocation Expenses</u>.  The Debtors provide certain Employees and

employees of certain of the Debtors' foreign subsidiaries with relocation related expenses (the

"<u>Relocation Expenses</u>") to incentivize desirable candidates to accept positions with the Debtors

or incentivize existing Employees or employees of certain of the Debtors' foreign subsidiaries to

accept transfers to other locations within the Debtors' operations (nationally or internationally),

(collectively, the "<u>Relocating Employees</u>").  Relocation Expenses include those incurred through

the Debtors' Domestic Salary Relocation Program, Hourly Relocation Allowance Program, and

Expatriate Relocation Program.  The Debtors seek authorization to pay Relocation Expenses in

the ordinary course of business to ensure that Relocating Employees are reimbursed for expenses

they incurred in connection with their relocation for the Debtors' benefit and with the

expectation that they would be reimbursed.

(i)    <u>Domestic Salaried Relocation Program</u>.  For certain Salaried

Employees transferred to a different domestic location at the Debtors' request (the "<u>Salaried</u>

<u>Relocating Employees</u>"), the Debtors reimburse certain Relocation Expenses.  As part of the

program, depending on the relocating Employee's family size and distance of relocation, the

Debtors advance lump sum payments and after-the-fact reimbursements to domestic Salaried

Relocating Employees to cover incidentals and temporary living arrangements.  This program

has been recently modified to reduce Relocation Expenses by fixing the amount of reimbursable

expenses at the outset of the Salaried Relocating Employees' relocation.  The Domestic Salaried

Relocation Program also provides reimbursement in connection with home sale expenses, new

home closing costs, tuition losses, and losses associated with sales of homes (which are capped)

or cancellation of leases.  Employees who are transferred to an area with unusually high living

costs may be eligible for relocation premiums.  The premiums are designed to compensate

Employees for the portion of the living cost differential between the Detroit area and the high-cost area.  Premium dollar calculations are based upon a percent of annualized base salary.  As of the Commencement Date, the Debtors estimate that approximately $53 million is owed pursuant to the Domestic Salaried Relocation Program.

(ii)    <u>Hourly Relocation Program</u>.  For certain Hourly Employees, including Employees who are members of the UAW, who are transferred to a different plant at the Debtors' request, the Debtors pay a relocation allowance (the "<u>Relocation Allowance</u>").  Under the Hourly Relocation Program, the Hourly Employees selected for relocation may choose one of two options.  Under the first option, Hourly Employees transferring to another plant retain the right to return to their original community, but not necessarily to their original plant, and are given a Relocation Allowance in the amount of $4,800.  Under the second option, the Debtors pay selected Hourly Employees a maximum amount of $30,000 to transfer to another plant (the "<u>Enhanced Relocation Allowance</u>").  The Enhanced Relocation Allowance is meant to cover Relocation Expenses, serve as an incentive to relocate to a plant where more work is available, and encourage the Hourly Employees to remain at the new plant.  Consistent with these purposes, the Enhanced Relocation Allowance is paid out as follows: Hourly Employees receive $6,000 to cover miscellaneous up-front cash expenditures, $16,000 upon relocation, and the balance one year later.  In addition, at management's discretion, Hourly Employees at closed plants were eligible to be given a Special Enhanced Relocation Allowance of $75,000, however, the Special Enhanced Relocation Allowance was discontinued unilaterally by the Debtors on March 1, 2009.  As of the Commencement Date, approximately $19.4 million was owed with respect to Enhanced Relocation Allowances.

(iii)    <u>Expatriate Relocation Program</u>.  To facilitate Relocating

Employees' relocation to the Debtors' foreign subsidiaries and back, as well as between the

foreign subsidiaries (the "<u>Expatriate Employee</u>"), the Debtors provide reimbursement of

relocation expenses either by advancing funds to such Expatriate Employees in lump sum cash

payments, expense reimbursement, additions to the Expatriate Employee's pay, or payment

directly to the vendor (the "<u>Expatriate Relocation Expenses</u>").  If the Expatriate Employee has

transferred to a country with a higher cost of living, he or she may receive a cost of living

allowance in their monthly pay to offset the increased living expenses in the host country.  Each

Expatriate Employee also receives use of a company car at the expatriate location and a

"mobility premium" to its compensation as an incentive to accept the international assignment,

and depending on each Expatriate Employee's facts and circumstances, the Debtors also may pay

the cost of housing, schooling, or utilities, which are partially offset by deductions from the

Expatriate Employee's pay.  Expatriate Relocation Expenses, which are largely based on family

size, country of assignment, and distance of relocation, vary.  Expatriate Employees are also

provided with health care benefits while on assignment through the International Health Care

Plan (the "<u>IHCP</u>").  The IHCP provides health care coverage that is generally similar to the

coverage provided to Salaried Employees.  Historically, on average, the Debtors have expended

approximately $17 million per month on the Expatriate Relocation Program.  As of the

Commencement Date, the Debtors believe outstanding obligations with respect to the Expatriate

Relocation Expenses relating to the period prior to the Commencement Date aggregate

approximately $17 million.

60.    <u>Vehicle Evaluation Programs</u>.  The Debtors maintain company car

programs through which certain Salaried Employees and Directors are provided vehicles

manufactured by the Debtors to use and evaluate for a period of time (e.g., 6 months) (the

"Vehicle Evaluation Programs").  The Vehicle Evaluation Programs require the participating

Employees and Directors to evaluate the vehicles driven and provide detailed feedback.  These

programs provide early data on quality, safety, and captured-test-fleet performance which

provides vital user feedback to Debtors in improving their products to make them more

acceptable to consumers and therefore competitive with the products of other vehicle

manufacturers.  Each of the Debtors' competitors are believed to maintain vehicle evaluation

programs, such that loss of the Vehicle Evaluation Programs would put Debtors at a competitive

disadvantage.  Program participants are charged a monthly administration fee, which is withheld

semi-monthly as a payroll deduction.  Depending on the applicable Vehicle Evaluation Program,

the Debtors may reimburse participants, in their sole discretion, for insurance, maintenance and

gas expenses associated with the use of the vehicles.  Participation in the largest, broad-based

product evaluation program is nontaxable to the participants.  Participation in the smaller

programs covering certain Salaried Employees, Executive Employees, Directors, and certain

Salaried Employees working in New York City is taxable to the participants, with tax protection

provided in certain cases.  The Debtors estimate that the aggregate accrued but unpaid amounts

due under the Vehicle Evaluation Programs as of the Commencement Date is *de minimis*.  The

Debtors seek authority to pay all prepetition obligations with respect to the programs, to continue

to withhold the administration fees and provide tax protection, as applicable, and to continue the

Vehicle Evaluation Programs in the ordinary course of business.

       61.    Legal Costs Advancements.  Consistent with the Debtors' By-Laws and

long standing policies and procedures, all of the Employees are generally entitled to

advancement from the Debtors for their legal costs and indemnification from the Debtors for any

settlements and judgments that may be rendered against them relating to their employment with the Debtors.  In the ordinary course of business, the Debtors provide counsel to and pay for the defense costs of certain Employees who are not otherwise covered by any applicable insurance policy (or as to which insurance coverage has been exhausted) and who have been individually named in arbitration proceedings, litigations or are the subject of governmental investigations relating to their employment with the Debtors ("Legal Costs Advancements").  In 2008  the Debtors have expended approximately $155,000 per month on Legal Costs Advancements.

62.    In view of the fact that the Legal Costs Advancements are being incurred in connection with litigation relating to Employees rendering services on behalf of the Debtors, the Debtors believe that it would be inappropriate to impose these costs on their Employees. These costs would impose an undue economic burden on the affected Employees and without such reimbursement, many employees would be unable to maintain appropriate representation and risk substantial personal liability.  In addition, it is foreseeable that a finding of wrongdoing or liability against the Employees may be used, or attempted to be used, to judicially prejudice or prosecute claims against the Debtors.  Accordingly, in order to protect their interests, and the concomitant interests of the estates, the Debtors request authority to advance the legal costs of the Employees in the ordinary course of business.

63.    Tuition Reimbursement for Salaried Employees.  In the ordinary course of business, the Debtors reimburse job-related education expenses for certain degreed programs for Salaried Employees.  To receive tuition reimbursement, the Employee's manager must approve the requested program by determining that the requested program will help the Salaried Employees acquire skills that will assist them with their jobs.  The tuition assistance program has been suspended as of January 1, 2009.  The Debtors estimate that as of the Commencement Date,

the eligible tuition expenses that have not yet been paid to those Salaried Employees eligible to receive tuition reimbursements (i.e., Salaried Employees who have completed the job-related education prior to the suspension of the program) is *de minimis*.

64.    <u>Tuition Assistance for Eligible Hourly Employees</u>.  For eligible UAW and IUE-CWA Union members, the Debtors provide tuition assistance up to a maximum amount of $8,400 for a 12 month period.  In 2008, over 38,000 Hourly Employees received benefits under this program.  In 2009, the average cost to the Debtors for this program is just over $1 million per month.  As of the Commencement Date, the Debtors estimate that approximately $4 million is owed to schools and eligible Hourly Employees under these programs.

65.    <u>Adoption Assistance</u>.  In addition, in the ordinary course of business, the Debtors provided adoption assistance to certain of their Salaried Employees.  Pursuant to this program, the Debtors reimbursed their Salaried Employees for amounts incurred in connection with adoption of child, such as fees paid to adoption agencies.  Although this program has been suspended for the 2009 plan year, there may remain *de minimis* amounts outstanding to no more than nine Salaried Employees as of the Commencement Date.

(d)    *Severance*

66.    <u>Salaried Separation Plans</u>.  The Debtors maintain four severance benefit plans for full-time and flex service Salaried Employees, all of which are customary in the automotive industry.  The General Motors Severance Program (the "<u>GMSP</u>") and the Mutual Separation Policy (the "<u>GMMSP</u>" collectively, the "<u>Classified Salaried Separation Plans</u>") cover Classified Salaried Employees.  The GMSP covers Classified Salaried Employees who are involuntary terminated due to a plant closure, reductions in-force or other permanent separation, and provides for the continuation of the Salaried Employee's base salary and benefits for a

period up to 6 months,[8] and 3 months of outplacement services, provided that the Salaried Employee signs a release of claims against the Debtors.  The GMMSP covers Classified Salaried Employees who come to a mutual agreement with the Debtors to voluntarily resign and provides for the continuation of the Salaried Employee's base salary and benefits for a period up to 4 months, and 3 months of outplacement services, provided that the Employee signs a release of claims against the Debtors.  The GM Executive Severance Program (the "GMESP") and the GM Executive Mutual Separation Policy (the "GMEMSP" and together with the GMESP, the "Executive Separation Plans") are comparable to the Classified Salaried Separation Plans except that the maximum duration for the salary continuation for the GMESP is up to 12 months, and the GMEMSP provides up to 10 months salary continuation for Executive Employees. Additionally, the maximum duration of outplacement services under the Executive Separation Plans is 6 months.  It should be noted that, pursuant to the U.S. Treasury Loan Agreement, the Debtors are prohibited from making any severance payments to the Debtors' named Officers and the next 20 most highly compensated Employees.  Within the last 12 months, approximately 2,700 Salaried Employees have received severance benefits under both the Classified Salaried Separation Plans and the Executive Separation Plans.  The Debtors estimate that, as of the Commencement Date, the aggregate prepetition obligations with respect to severance and benefits under the Salaried Separation Plans will be approximately $66 million ($60 million in severance and $6 million in health care).

   67. <u>Hourly Separation Plans</u>.  The Debtors also have agreed to terminate certain Hourly Employees in accordance with collectively bargained attrition plans as a result of events such as plant closings, downsizing, restructuring, or job elimination.  In many cases, the

---

[8] The severance period depends on the length of service of the Employee and whether such Employee is a Non-Executive Salaried Employee or Executive Employee.

terminated Hourly Employees are eligible to receive a lump sum cash payment and payment for

vested but unused vacation days upon leaving the Debtors' employment.  Similarly, to encourage

early retirement, the Debtors offered lump sum cash payments to Hourly Employees who retire

early.  In 2006 and 2008 the Debtors entered into agreements with the UAW and the IUE-CWA

regarding special attrition programs (the "Union Attrition Programs") which were designed to

further reduce the number of Hourly Employees.  Benefits under the Union Attrition Programs

consist of (i) pension and benefit packages for normal and voluntary retirements, including

incentive payments from the hourly pension plan as an annuity with a lump sum option, (ii)

mutually satisfactory retirements for Employees aged 50 or more, with 10 years or more years of

credited services, (iii) pre-retirement leaves for Employees with 26 to 29 years of service where

Employees grow into a "30 and out" retirement; and (iv) buy-outs where Employees accept lump

sum cash payments and sever all ties with GM other than for deferred vested pension benefits.

In addition, the Debtors agreed to reimburse Hourly Employees who were under age 55 as of

December 31, 2008, for any tax penalties imposed with respect to lump sum cash distributions to

such Hourly Employee's pension plan.  As of the Commencement Date, the Debtors estimate the

aggregate obligation with respect to all yet unreimbursed tax penalties is in the amount of

approximately $28.5 million.  The Debtors currently have obligations outstanding to

approximately 1,700 Hourly Employees who continue to receive wage and benefit packages

under the Union Attrition Programs.  The Debtors estimate that as of the Commencement Date,

the aggregate obligations with respect to severance benefits under the 2008 Union Attrition

Programs are in the amount of approximately $94 million.

            68.      In addition, on February 3, 2009, the Debtors announced the 2009 Special

Attrition Program for Hourly Employees.  The 2009 Special Attrition Program offers a cash

incentive of $20,000, coupled with a voucher for up to $25,000 toward the purchase of a new

GM vehicle to Hourly Employees who elect to retire early or voluntarily terminate their

employment.  As of the Commencement Date, the Debtors estimate that the aggregate amount

with respect to obligations under the 2009 Special Attrition Program are approximately $139

million.

69.    The Debtors request authority to continue honoring severance benefits

under the Salaried Separation Plans, the Union Attrition Programs, and all other severance

programs for the benefit of current and former Employees and to pay all prepetition amounts

related thereto.

(e)    *Other Bargained-For Benefits*

70.    <u>Supplemental Unemployment Benefit Compensation</u>.  As required under

certain CBAs, the Debtors provide supplemental unemployment benefit compensation pursuant

to the Debtors' 2007 Supplemental Unemployment Benefit Plans (the "<u>SUB Plan</u>") to certain of

their Hourly Employees.  The Hourly Employees qualify if they have one or more years of

seniority, but are laid off due to reduction in force, discontinuance of a plant or operation,

temporary layoff, or inability to do work offered by the plant.  Pursuant to the SUB Plan, these

Employees receive 95% of their weekly after-tax wage, less appropriate deductions and offsets

for the maximum period of 48 weeks following layoff, after which period the Employees are

eligible to participate in a Guaranteed Income Stream Plan, as described below.  Typically, SUB

Plan benefits are paid one week in arrears, although payment only occurs upon evaluation of the

Employee's unemployment documentation and thus, in many cases, an Employee's SUB Plan

benefits may be paid two or more weeks in arrears.  Obligations under this program in calendar

year 2009 average approximately $40 million per month.  Because it is difficult to estimate

which Employees may have outstanding documentation, the Debtors are unable to precisely

determine how much they owe under the SUB Plan with respect to the period prior to the Commencement Date.  The Debtors request authority to continue to provide SUB Plan benefits in the ordinary course of business, whether arising prepetition or postpetition.

71.    Guaranteed Income Stream Plans.  As required under certain CBAs, the Debtors provide supplemental unemployment benefit compensation pursuant to the Debtors' Guaranteed Income Stream Plans ("GIS Plan") to certain of their Hourly Employees, upon the expiration of benefits under the Debtors' SUB Plans.  The GIS Plans provide monthly benefits for Hourly Employees with greater than ten (10) years of seniority, who are laid off due to reduction in force, discontinuance of a plant or operation, temporary layoff, or inability to do work offered by the plant.  Although no benefits have been paid for the 2008 plan year, the GIS Plans have not been terminated.  The Debtors request authority to continue the GIS Plans in the ordinary course of business in the exercise of their business judgment.

## II.    WELFARE, RETIREMENT, OTHER BENEFITS, AND WORKERS' COMPENSATION[9]

72.    The Debtors provide their Salaried Employees and Hourly Employees with a standard range of welfare, retirement, insurance, fringe benefits and other welfare benefits.  Participants in Debtors' employee benefit plans also include the employees (and their eligible dependents) of certain directly or indirectly owned subsidiaries of the Debtors who participate in the Debtors' employee benefit plans, and with respect to provision of employee

---

[9] The 2007 UAW-GM National Agreement (the "UAW CBA") was amended effective May 29, 2009.  Certain sections of the UAW CBA modify wage and benefit matters including some of the benefit plans and programs for UAW-represented Employees and Retirees described in this Motion.  This does not impact the prepetition amounts owed and most of the postpetiton amounts for which Debtors seek permission to pay and continue.  The changes are reflected in such terms as eligibility provisions and payment durations and may generally be described as favorable to the Debtors in that benefit costs and liabilities are reduced.  Additionally, select benefit plans and programs corresponding to Salaried Employees are being modified in 2009 to reduce costs by eliminating certain plans and programs or significantly modifying them and may also be described as favorable to the Debtors.

benefits.  Thus, for the purposes of this Motion, "Employees" (and the number cited thereof) also includes such employees.

73.     The Debtors also provide certain post-retirement benefits to their retired Salaried Employees and Hourly Employees who become eligible upon retirement for the post-retirement benefits offered by the Debtors (such persons currently or hereafter receiving such post-retirement benefits, "Salaried Retirees" and "Hourly Retirees," respectively, and collectively, the "Retirees").  As of the Commencement Date, the Debtors provide post-retirement benefits to approximately 116,000 Salaried Retirees and 377,000 Hourly Retirees.

74.     Subject to certain limitations and depending on the benefit, the Debtors' employee benefit plans and post-retirement benefit plans allow the surviving spouse of a deceased Employee or Retiree ("Surviving Spouses") to receive the deceased Employee's employee benefits or the deceased Retiree's post-retirement benefits, as the case may be.[10]  For the purposes of this Motion, the terms "Employees" and "Retirees" (and the numbers cited thereof) includes such Surviving Spouses.

A.     **Welfare Benefit Plans**

75.     The Debtors have established plans and policies to provide their Salaried and Hourly Employees and their eligible dependents, as the case may be, with: (a) health benefits, including medical, prescription drug, dental, mental health, extended care coverage, and vision; (b) disability benefits, including short and long-term disability; (c) insurance benefits, including life insurance, death benefits, and long term care insurance; and (d) health reimbursement and flexible spending account plans ((a), (b), (c), and (d) collectively, the "Welfare Benefits").  Welfare Benefits for Hourly Employees vary based on nationally

---

[10] This also includes the right to continue benefits coverage available to other dependents of the deceased Employee or Retiree.

negotiated CBAs, to the extent applicable, and which types of coverage the Hourly Employees elect during the enrollment period. The Debtors have established plans to provide their Salaried and Hourly Retirees and their eligible dependents, as the case may be, with: (y) health benefits, including medical, prescription drug, dental, mental health, extended care coverage, Medicare reimbursement, and vision and (z) life insurance, and long-term care insurance (collectively, the "Retiree Welfare Benefits"). The Debtors provide the Welfare Benefits and Retiree Welfare Benefits through self-insured and private insurance arrangements, which are funded by employer contributions and Employee, Retiree or other participant contributions.

76.    The Debtors use, or have obligation to use, trusts qualified as voluntary employee beneficiary associations under section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Revenue Code"), and sponsored by the Debtors or a union (each, a "VEBA"), as a funding vehicle to hold reserves to meet their future obligations to provide certain Retiree Welfare Benefits to their Hourly Retirees. The Debtors sponsor one VEBA (the "GM Internal VEBA") which held $9.4 billion as of March 31, 2009, and as to which the Debtors have no additional funding obligation. The funds held in the GM Internal VEBA have been contractually obligated to be applied to provide future Retiree Welfare Benefits of certain Hourly Retirees.

77.    On October 29, 2005, the Debtors entered into a Memorandum of Understanding ("MOU") with the United Automobile, Aerospace, Agricultural Workers of America (UAW) with the objective to mitigate the Debtors' exposure to the large costs of providing certain Retiree Welfare Benefits to UAW Hourly Retirees, which was finalized in December 2005 as a Settlement Agreement between the Debtors, the UAW, and a class of UAW Hourly Retirees ("2005 Settlement Agreement"). On March 31, 2006, the U.S. District Court for the Eastern District of Michigan entered an Order and Final Judgment approving the 2005

Settlement Agreement, which was affirmed by the Sixth Circuit Court of Appeals on August 7, 2007.  Pursuant to the terms of the 2005 Settlement Agreement, the Debtors were obligated to pay an independent VEBA (the "Mitigation VEBA"), approximately $3 billion in 3 equal installments –two of which have been paid prior to the Commencement Date—and one installment of approximately $1 billion remaining due in 2011.  Costs with respect to certain UAW Hourly Retiree Welfare Benefits are paid by the Debtors out of their general assets and are reimbursed for a portion of such payments by the Mitigation VEBA.  The reimbursement is made monthly based on actuarial estimates.  After the end of the year, the prior year's annual estimates paid by the Mitigation VEBA are compared to the Debtors actual experience and any true-up amount is paid to, or received from, the Mitigation VEBA, including interest at a rate equal to the prevailing year trend rate for retiree medical costs.  By this Motion, the Debtors request authority to continue to pay those certain Hourly Retiree Welfare Benefits, subject to reimbursement from and true-up with the Mitigation VEBA as currently handled in the ordinary course of business.

78.    On September 27, 2007, the Debtors entered into another MOU with the UAW aimed at transferring responsibility for the Debtors' costs of providing certain health care benefits to an independent VEBA (the "VEBA Trust").  This MOU was finalized on February 21, 2008 as a Settlement Agreement between the Debtors, the UAW, and a class of UAW Hourly Retirees ("2007 Settlement Agreement").  On July 31, 2008, the U.S. District Court for the Eastern District of Michigan entered an Order and Final Judgment approving the 2007 Settlement Agreement, for which no appeal was filed.  The U.S. District Court for the Eastern District of Michigan also canceled the 2005 Settlement Agreement and ordered the assets and liabilities of the Mitigation VEBA be transferred to the VEBA Trust in January 2010, including

the Debtors' obligation to pay $1 billion to the Mitigation VEBA in 2011.  Pursuant to the terms

of the 2007 Settlement Agreement,[11] the Debtors are to transfer, as of January 1, 2010, their

obligations to provide UAW Retiree medical benefits to a new Welfare Benefits plan established

and maintained by an Employees' Beneficiary Association and funded by the VEBA Trust.  The

2007 Settlement Agreement provides that the Debtors will pay an amount aggregating

approximately $17.52[12] billion to the VEBA Trust.

       (a)     *Health Benefits*

       79.     Generally, an important element of the Welfare Benefits is medical,

prescription drug, mental health, dental, vision, and other similar coverage (collectively, the

"Health Benefits," and the Debtors' plans under which they are provided and administered,

collectively, the "Health Benefit Plans").  Most of the Debtors' Employees and Retirees (both

Hourly and Salaried) and their eligible dependents are participants in Health Benefit Plans that

are self-insured (although some are fully insured).

       80.     Claims Administration.  The self-insured Health Benefit Plans are

administered by Blue Cross and Blue Shield of Michigan ("BCBSM"), Medco, Connecticut

General Life Insurance Company ("CIGNA"), and others (collectively, the "Administrators").

The Debtors pay administration and processing fees in accordance with the Administrator's

specific service agreement or through the purchase of a health maintenance organization

("HMO") contract or other fully-insured contract.  On an annual basis, the Debtors pay their

---

[11] The 2008 Settlement Agreement fixes and caps the Debtors obligations and provides that the Debtor is not responsible for, and does not guarantee, the payment of future benefits to plan participants, the asset returns of the funds in the New UAW VEBA, or the sufficiency of assets in the New UAW VEBA to fully pay the obligations of the New Benefit Plan.  In the event the assets of the New UAW VEBA are not sufficient to fully fund the obligations of the New Benefit Plan, the New Benefit Plan will be required to reduce benefits to plan participants.

[12] This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009 and excludes approximately $10 billion corresponding to the GM Internal VEBA.

Administrators a total of approximately $164 million in fees for administration and processing services.

81.     Health care providers, on behalf of the participants, or the participants themselves, submit medical claims directly to the Administrators.  Upon receipt of a request for payment, the Administrators review the claim and pay the covered portion of Health Benefits for which the participant is eligible.  Typically, claims are paid from a bank account established by the Administrators and funded by the Debtors on a daily basis.

82.     The timing and procedures related to the claims payment process under the Health Benefit Plans vary among each of the Administrators.  There is typically some lag time between the time the participant receives the medical care, when the claim is submitted for reimbursement, and when the claim is paid.  The Debtors estimate that, as of the Commencement Date, an aggregate of approximately $382 million ($99 million with respect to Employees and $283 million with respect to Retirees) is or will be payable with respect to self-insured claims relating to the period prior to the Commencement Date.  By this Motion, the Debtors request authority to fund the bank accounts, pay all such claims (including reimbursements of Administrators for claims paid by them), plus any plan administrative fees or claims handling charges owed to the Administrators in connection therewith and to continue such programs in accordance with existing practice.

83.     The Debtors also offer fully-insured Health Benefits Plans in certain states where Employees, Retirees, and their eligible dependents reside.  The plans are administered by numerous insurance companies (the "Alternate Administrators").  Processing of claims under these plans is substantially similar to self-insured Health Benefit Plans.  However, the Debtors' payment terms are established in advance based on negotiated rate agreements establishing

premiums for a given period of time.[13]  By this Motion, the Debtors seek authority to continue

these payment terms in the ordinary course of business.

84.    <u>Health Benefits For Salaried Employees</u>.  In general, Salaried Employees

and their eligible dependents are eligible for Health Benefits commencing on the Salaried

Employees' date of hire.[14]  The Health Benefits for Salaried Employees are partially funded

through monthly premiums and cost-sharing features such as deductibles and/or co-payments

paid by the participants.  The remainder is funded from the general assets of the Debtors.  For

medical, prescription drug, and mental heath coverage, Salaried Employees may choose between

a variety of plans, including the Health Savings Account Preferred Provider Organization,

Enhanced Preferred Provider Organization, or an HMO, where available.[15]  Employee

contributions vary depending on the plan chosen.  Additional Health Benefits provided to

Salaried Employees and their dependents include extended care coverage, dental and vision

benefits.  Salaried Employees and their dependents may continue coverage at their own expense

under the Debtors' Health Benefit Plans (the "<u>COBRA Continuation Coverage</u>") for a period of

up to 18 months following an Employee's termination of employment, or up to 36 months for a

dependent's "qualifying event," such as loss of other coverage or a change in marital or

dependent status.  As of the Commencement Date, approximately 80,000 Salaried Employees

and their eligible dependents were covered by the Debtors' Salaried Employee Health Benefit

Plans.  As of the Commencement Date, the Debtors estimate that the aggregate outstanding

---

[13] The Debtors also fund a small portion of COBRA benefits for severed Employees in accordance with their statutory obligations.  The Debtors hereby seek authority to fund such obligations in the ordinary course of business.

[14] In this context, salaried Employees include regular full-time Employees and flexible service Employees.

[15] Salaried Employees are immediately enrolled in an HSA-PPO plan and must make an election within 31 days to avoid defaulting to self-only coverage.

amount for Health Benefits for Salaried Employees and their dependents was approximately $21

million[16] per month.

85.    <u>Health Benefits for Salaried Retirees</u>.  In general, eligible Salaried

Employees, and their eligible dependents, may continue to participate in the Debtors' Health

Benefit Plans following their retirement.  To become eligible to participate with corporate

contributions, a Salaried Employee must have been hired prior to January 1, 1993 and retire with

30 years of service (if hired prior to 1988), retire at age 60 and provided at least 10 years of

service to GM, or retire at or after age 55 and prior to age 60 when age and service total 85.

Salaried Retirees who do not meet these eligibility requirements to receive corporate

contributions, may continue to participate provided they pay the full cost of health care coverage.

The Health Benefits for Salaried Retirees are partially funded through monthly contributions and

cost-sharing features such as deductibles and/or co-payments paid by the participants.  The

remainder is funded from the general assets of the Debtors.  For all Salaried Retirees, the total

amount of health care coverage is capped.  For medical, prescription drug, and mental health

coverage, Salaried Retirees may choose between a variety of plans, including the Health Savings

Account Preferred Provider Organization, Enhanced Preferred Provider Organization or an

HMO, where available.  Retiree contributions vary depending on the plan chosen.  Additional

Health Benefits provided to Salaried Retirees and their dependents include dental, extended care

coverage, vision benefits and COBRA Continuation Coverage.  As of the Commencement Date,

approximately 37,000 Salaried Retirees and their eligible dependents[17] are covered by the

Debtors' Salaried Retiree Health Benefit Plans.  For the 2009 calendar year, the Debtors

---

[16] This figure includes participants receiving COBRA benefits.

[17] This figure includes participants receiving COBRA benefits.

anticipate expending approximately $16 million per month in connection with the Health

Benefits for Salaried Retirees.  Effective January 1, 2009, the Debtors eliminated Health Benefits

coverage for Salaried Retirees age 65 or older.  Upon reaching age 65, Salaried Retirees receive

a special pension benefit of $300 per month to partially offset the Salaried Retiree's increased

cost of Medicare and other healthcare coverage.

86.     <u>Health Benefits for Hourly Employees</u>.  In general, Hourly Employees are

eligible for Health Benefits, including comprehensive medical, dental, vision, mental health, and

prescription drug coverage, pursuant to the Hourly Employees' applicable CBAs, after 7 months

of service with the Debtors.  These benefits may extend to Employees' dependents, including

spouses and children.  The Health Benefits for Hourly Employees are partially funded through

cost-sharing features, such as co-payments paid by the participants.  The remainder is funded

from the general assets of the Debtors.  Hourly Employees may choose their particular medical

coverage from either a Traditional Care Network, or an HMO plan, if offered (contributions vary

depending on the plan chosen).  Hourly Employees and their dependents may remain eligible for

COBRA Continuation Coverage if they lose health coverage due to a "qualifying event."

Approximately 153,000 Hourly Employees and their dependents are currently covered by the

Debtors' Health Benefit Plans.[18]  For the 2009 calendar year, the Debtors anticipate expending,

in connection with the Health Benefits for Hourly Employees, approximately $68 million per

month.

87.     <u>Health Benefits for Hourly Retirees</u>.  In general, eligible Hourly

Employees and their eligible dependents may continue to participate in Debtors' Health Benefit

Plans following their retirement.  To become eligible to participate with corporate contribution,

---

[18] This figure includes participants receiving COBRA benefits.

an Hourly Retiree who retires at age 60 must have provided at least 10 years of service to

Debtors, or have provided 30 years of service to the Debtors, or retire at or after age 55 and prior

to age 60, when age and service total 85. Hourly Retirees with less than 10 years of service may

continue to participate provided they pay the full cost of health care coverage. The Health

Benefits for Hourly Retirees are partially funded through Medicare reimbursements, monthly

premiums, and cost-sharing features such as deductibles, co-insurance, and/or co-payments paid

by the participants. The remainder is funded from the general assets of the Debtors. Hourly

Retirees may choose their particular medical and prescription drug coverage from either a

Traditional Care Network or an HMO plan, if offered. Additional Health Benefits provided to

Hourly Retirees and their dependents include mental health, dental and vision benefits and

COBRA Continuation Coverage. Approximately 599,000 Hourly Retirees and their dependents

are currently covered by the Debtors' Hourly Retiree Health Benefit Plans.[19] For the 2009

calendar year, the Debtors anticipate expending approximately $235 million per month, in

connection with the Health Benefits for Hourly Retirees and their dependents. Certain of these

costs are reimbursed under the GM Mitigation VEBA.

88.    As of the Commencement Date, the Debtors estimate that the aggregate

outstanding unpaid amount for such Health Benefits is approximately $396 million[20] which

constitute known and estimated self-insured reserves and related administrative costs. By this

Motion, the Debtors seek authority to make all payments, satisfy all claims, and pay all

remittances and other amounts with respect to Health Benefits covering Employees, Retirees and

---

[19] This figure includes participants receiving COBRA benefits.

[20] $103 million correspond to Health Benefits for Employees ($81 million with respect to Hourly Employees and $22 million with respect to Salaried Employees), and $293 million for Retirees ($274 million with respect to Hourly Retirees and $19 million with respect to Salaried Retirees).

their eligible dependents relating to the period prior to the Commencement Date in the ordinary course of business and to continue honoring all of these benefits and associated costs postpetition.

89.    <u>Divested Unit Post-Retirement Welfare Benefit Obligations</u>.  In the ordinary course of business, the Debtors have divested certain of their business units into either stand-alone businesses or as acquisitions made by other companies.  In connection with these divestitures, the Debtors entered into several agreements with the purchasers to retain or to transfer the obligation to provide post-retirement healthcare and insurance benefits to the purchasers' employees and retirees who had previously provided services to Debtors before divestment of their business units.  Specifically, the Debtors retained the post-retirement benefit obligations for the Debtors' employees and retirees who were eligible for post-retirement benefits under Debtors' Retiree Welfare Benefit Plans as of the date of the divestiture.  In accordance with such agreements, the Debtors may be obligated for a portion of the post-retirement benefits provided by the purchasers based on the number of  years of such employees' or retirees' services to the Debtors.  As of the Commencement Date, the Debtors estimate that approximately $6.6 million in reimbursements is due in respect of the divested business units.  By this Motion, the Debtors seek authority to continue such divested unit post-retirement benefit obligations and pay any accrued but unpaid prepetition amounts.

(b)    *Other Welfare Benefits*

90.    The Debtors provide their Employees, Retirees and their eligible dependents, with certain life insurance and disability benefits including: (a) basic, optional, personal accident, dependent, and supplemental life insurance; (b) short-term and long-term disability; and (c) other insurance provided at Employee's expense, and (d) personal umbrella liability insurance ((a), (b), (c), and (d) collectively, the "<u>Insurance Benefits</u>").

91.     <u>Life Insurance</u>.  The Debtors provide life insurance to Employees, Retirees and their eligible dependents pursuant to group policies issued and administered by MetLife. The type of insurance benefits the Debtors provide is based on the classification of the Employee or Retiree and the terms of the applicable CBA.  The Debtors provide, at no cost to participants, basic life insurance ("<u>Basic Life Insurance</u>") to all Salaried and Hourly Employees and eligible Salaried and Hourly Retirees.  The Debtors fully insure for Basic Life Insurance for Salaried Employees, Salaried Retirees, Hourly Employees and Hourly Retirees by paying annual premiums that are intended to cover the total cost of the benefits under a "participating insured" relationship with a retrospective financial arrangement.  If the amount of the benefits exceeds the premiums, the Debtors pay an additional premium, and if the premiums exceed the benefits, the administrator reimburses the Debtors the following year.  All Employees and Retirees may purchase optional and dependent life insurance coverage at their own expense in a variety of increments.  The Debtors also provide certain supplemental life insurance programs covering Executives.

(i)     <u>Life Insurance For Salaried Employees</u>.  Basic Life Insurance coverage equals two times a Salaried Employee's annual base salary while active.  For flexible service Salaried Employees, the benefit amount is $15,000.  An additional death benefit of 50% of the Salaried Employee's annual base salary is available if the Salaried Employee dies within one year of an accident while on the Debtors' business.  Under some plans, Salaried Employees with terminal illnesses may accelerate up to half of their life insurance benefits.  Each Salaried Employee may purchase optional life insurance in varying amounts from 1 to 8 times the Employee's annual base salary and dependent life insurance, and personal accident insurance on the lives of the Salaried Employee's spouse and dependent children in varying amounts.  As of

the Commencement Date the Debtors estimate that costs associated with providing Basic Life

Insurance to Salaried Employees will aggregate approximately $6.7 million for the 2009 fiscal

year.

          (ii)      <u>Life Insurance for Salaried Retirees</u>.  Salaried Retirees hired prior

to January 1, 1993 may continue to participate in Debtors' Salaried Employees Basic Life

Insurance plan throughout their retirement, provided they had at least 10 years of credited service

at the time of retirement.[21]  Salaried Retirees hired on or after January 31, 1993 are not allowed

to participate, but have the opportunity to convert their Basic Life Insurance to an individual

policy without proof of good health.  Salaried Retirees' Basic Life Insurance reduces upon

retirement.  The extent and timing of the reduction is dependent upon the Retirees' last day

worked.  Depending on their last day worked, and provided that the Salaried Retiree is not over

the age of 65 and has total and permanent disability, such are entitled, as a component of their

Basic Life Insurance, to a survivor income benefit, which covers the living expenses of their

Surviving Spouses and dependents for a period of two years following their death.  Salaried

Retirees may continue to purchase optional, dependent life insurance, and personal accident

insurance coverage, though only at the same amounts in force at the time of their retirement and

only if they were hired prior to January 1, 2001.  As of the Commencement Date, the Debtors

estimate that costs associated with providing Basic Life Insurance to Salaried Retirees will

aggregate approximately $110.9 million for the 2009 fiscal year.

          (iii)      <u>Life Insurance for Hourly Employees</u>.  Subject to applicable

CBAs, Basic Life Insurance coverage begins on the first day of service, and benefits under the

plan range from $32,500 to $86,500, depending on base hourly rate.   An additional death benefit

---

[21] Salaried Retirees who retire earlier than age 65 may have to pay for their Basic Life Insurance coverage if they do not have at least 30 years of service.

of 50% of that amount is available if the Hourly Employee dies within one year of an accident.

Under some plans, Hourly Employees with terminal illnesses may accelerate up to half of their

life insurance benefits.  As a component of their Basic Life Insurance, Hourly Employees are

entitled to a survivor income benefit, which covers the living expenses of their Surviving

Spouses and dependents for a period of two years following their death.  Each Hourly Employee

may purchase optional life, dependent life, and personal accident insurance in varying amounts.

As of the Commencement Date, the Debtors estimate that costs associated with providing Basic

Life Insurance to Hourly Employees will aggregate approximately $12 million for the 2009

fiscal year (which includes a $11.5 million annual premium).

        (iv)    <u>Life Insurance for Hourly Retirees</u>.  Hourly Retirees may continue

to participate in Debtors' Hourly Employee Basic Life Insurance plan throughout their

retirement; however, the amount of coverage is reduced at age 65 to the amount in force at age

65 times 1½% for each year of service.  As a component of their Basic Life Insurance, certain

total and permanent disability Hourly Retirees are entitled to a survivor income benefit, which

covers the living expenses of their Surviving Spouses and dependents for a period of two years

following their death.  Hourly Retirees may continue to purchase optional life, and dependent

life, and personal accident insurance coverage.  As of the Commencement Date, 2009, the

Debtors estimate that costs associated with providing Basic Life Insurance to Hourly Retirees

will aggregate approximately $208.1 million for the 2009 fiscal year.

        92.    As of the Commencement Date, the Debtors estimate that the aggregate

outstanding unpaid amount for such Basic Life Insurance benefits is approximately $18.4 million

($0.9 million with respect to Employees and $17.5 million with respect to Retirees) which

constitutes accrued amounts payable to MetLife with respect to the coverage and under the life insurance policies.

93.     By this Motion, the Debtors seek authority to make all payments, satisfy all claims made by the participant's beneficiaries (including reimbursements of administrators for claims paid by them), and pay all remittances and other amounts with respect to Basic Life Insurance benefits covering Employees, Retirees and their eligible dependents relating to the period prior to the Commencement Date in the ordinary course of business and to continue honoring all of these benefits and associated costs postpetition.  The Debtors also seek authority to continue the optional life, dependent life, and personal accident insurance policies in the ordinary course of business.  To the extent any deductible amounts have accrued or the Debtors have withheld premiums to cover the cost of such policies with respect to the period prior to the Commencement Date, they seek authority to pay such premiums to the insurer.

94.     <u>Life Insurance for Executives</u>.  For Salaried Employees and Salaried Retirees designated as Officers or Executives, the Debtors maintain a self-insured supplemental life benefits program ("<u>SLBP</u>"), providing the beneficiary of an active Officer or Executive who dies while in active service with a payment 2 or 3 times the Officer's or Executive's annual base salary (depending on the date of appointment), and providing the beneficiary of a Retired Officer or Executive who dies with a payment of 1 or 1.5 times the Officer's or Executive's annual base salary (depending on the date of appointment).  Claims are paid from an account established and funded by the Debtors on an as-needed basis.  The Debtors also maintain a supplemental group life insurance program ("<u>SGLI</u>") which covers approximately 1,234 former Executives who are retired.  The SGLI is fully-insured and administered by MetLife, with 100 percent of premiums paid by the Debtors.  SGLI provides a benefit in retirement equal to 1.5 times the Officer's or

Executive's final annual base salary. The Debtors anticipate expenses associated with the SLBP

and SGLI for the 2009 fiscal year aggregate approximately $16 million and $25 million,

respectively.[22] The Debtors seek authority to fund the related bank account and to continue these

programs in the ordinary course of business and to pay any prepetition amounts related thereto.

95.    Short-Term and Long-Term Disability Benefits. The Debtors provide

eligible Hourly and Salaried Employees with short-term and long-term disability benefits

(collectively, the "Disability Benefits") at no cost to eligible Employees. Salaried Employees

who do not meet the Debtors' eligibility requirements may purchase their own Disability

Benefits.

96.    Salaried Employees Short-Term Disability Benefits. Salaried Employees

are eligible for short-term disability benefits ("Short-Term Disability") which are payable upon

notification of sickness or other disability that prevents the Salaried Employees from performing

their occupational duties. Salaried Employees are eligible for Short-Term Disability benefits

after 6 months of service in amounts equal to 75% to 100 % of their base salary for up to 12

months. Executives receive Short-Term Disability benefits of 100% of their annual base salary

for up to 12 months. As of the Commencement Date, there were approximately 400 Salaried

Employees receiving Short-Term Disability benefits. The Debtors spend, on average,

approximately $1.2 million per month for Salaried Employees Short-Term Disability benefits.

Salaried Employees Short-Term Disability benefits are paid in accordance with the Debtors'

regular payroll practices. The Debtors estimate that additional obligations with respect to

---

[22] In addition, the Debtors maintain individual life insurance policies for one current Executive and for four Retired Executives. All premiums related to 3 of the 5 policies have already been paid and the insurance continues in force. The Debtors seek authority to continue premium payments related to the remaining two policies in the ordinary course of business.

accrued but unpaid Salaried Employees Short-Term Disability benefits relating to the period

prior to the Commencement Date aggregate approximate $1 million.

97.    <u>Salaried Employees Long-Term Disability Benefits</u>.  If they continue to be

unable to perform their occupational duties after 12 months on Short-Term Disability leave,

Salaried Employees with 10 years of service are eligible for extended disability benefits

("<u>Extended Disability</u>").  The Debtors provide Extended Disability benefits without cost to

eligible Employees at the rate of 60% of the Salaried Employees' monthly base salary.  At their

own expense, Salaried Employees with less than 10 years of service may elect supplemental

extended disability benefits ("<u>Supplemental Extended Disability</u>"), which is self-insured and

paid through employee pre-tax contributions.  The Supplemental Extended Disability is

administered through Sedgwick CMS.  Benefits under the Supplemental Extended Disability are

taxable and paid out at the rate of 60% of the Salaried Employees' monthly base salary as of

September 1 of the year prior to the first day of disability.  Benefits paid under Extended

Disability are taxable and paid at the rate of 60% of the Salaried Employee's monthly base salary

as of their last day worked prior to disability.  In addition, both the Extended Disability and

Supplemental Extended Disability benefits are reduced to the extent the Salaried Employee

receives government entitlements or other retirement benefits.  For most Salaried Employees

(those hired after January 1, 2001), Extended Disability and Supplemental Extended Disability

benefit payments are made for the length of the disability until the Salaried Employee either

returns to work or attains the age of 65.  As of the Commencement Date, there were 105 Salaried

Employees receiving Extended Disability benefits and 38 Salaried Employees receiving

Supplemental Extended Disability benefits.  The Debtors spend, on average, approximately

$500,000 per month for Salaried Employees Extended Disability benefits.[23]  Salaried Employees

Extended Disability benefits are paid by the Debtors' third-party administrator, Sedgwick CMS.

The Debtors estimate that as much as $100,000 of Salaried Employees Extended Disability

benefits issued by checks may not have cleared the Debtors' accounts prior to the

Commencement Date.  The Debtors estimate that additional obligations with respect to earned

but unpaid Salaried Employees Extended Disability benefits relating to the period prior to the

Commencement Date aggregate approximate $600,000.  With respect to contributions paid for

Salaried Employee's Supplemental Extended Disability Benefits, the Debtors make monthly

deductions from the salaries of participating Salaried Employees.  As of the Commencement

Date, the Debtors estimate that the aggregate amount of such earned but unremitted contributions

is approximately $20,000.

98.    <u>Hourly Employees Short-Term Disability Benefits</u>.  Subject to applicable

CBAs, Hourly Employees' Short-Term Disability benefits are payable for sickness, accidents, or

other disabilities preventing the Hourly Employees from performing their occupational duties

and equal a negotiated weekly rate that is payable for up to 52 weeks.  As of the Commencement

Date, there were approximately 2,500 Hourly Employees receiving Short-Term Disability

benefits.  The Debtors spend, on average, approximately $3.5 million per month on account of

Hourly Employees' Short-Term Disability benefits.  Hourly Employees' Short-Term Disability

benefits are paid by the Debtors' third-party administrator, Sedgwick CMS.  The Debtors

estimate that as much as $1.3 million of Hourly Employees' Short-Term Disability benefits

issued by checks may not have cleared the Debtors' accounts prior to the Commencement Date.

---

[23] As of the Commencement Date, the Debtors have accrued $162.6 million for Salaried Employees' Extended Disability Benefits.  This amount is actuarially derived and includes the present value of anticipated payments to currently disabled Salaried Employees and an accrual for the possibility of current Salaried Employees becoming disabled in the future.

The Debtors estimate that additional obligations with respect to earned but unpaid Hourly

Employees' Short-Term Disability benefits relating to the period prior to the Commencement

Date aggregate approximate $4.2 million.

99.    <u>Hourly Employees Extended Disability Benefits</u>.  Subject to applicable

CBAs, if Hourly Employees continue to be unable to perform their occupational duties after 12

months on Short-Term Disability leave, Hourly Employees are eligible to receive Extended

Disability benefits, which equal a negotiated monthly rate.  For Hourly Employees with less than

10 years of service and continued disability, Extended Disability benefits are payable for the

length of the disability until such Hourly Employee returns to work, provided, however, that the

benefits are not payable for the length of the disability if it is more than the Hourly Employee's

prior length of service.  For Hourly Employees with more than 10 years of service and continued

disability, benefits are provided for the length of the disability until such Hourly Employee either

returns to work or attains the age of 65.[24]  As of the Commencement Date, there were 474

Hourly Employees receiving Extended Disability benefits.  The Debtors typically spend

approximately $1.9 million per month on account of Hourly Employees' Extended Disability

Benefits.  Hourly Employees' Extended Disability benefits are paid in accordance with the

Debtors' regular payroll practices.  The Debtors estimate that as much as $1 million of Hourly

Employees' Extended Disability benefits issued by checks may not have cleared the Debtors'

accounts prior to the Commencement Date.  The Debtors estimate that additional obligations

with respect to accrued but unpaid Hourly Employees' Extended Disability benefits relating to

the period prior to the Commencement Date aggregate approximate $2.2 million.

---

[24] As of the Commencement Date, the Debtors have accrued $275.4 million for Hourly Employees' Extended
Disability benefits.  This amount is actuarially derived and includes the present value of anticipated payments to
currently disabled Hourly Employees and an accrual for the possibility of current Employees becoming disabled in
the future.  Note that this amount includes unrecognized actuarial gains.

100.    The Debtors self-insure the Disability Benefits.  The Debtors maintain no insurance policies or other funding mechanisms (except salaried Supplemental Extended Disability Benefits) to cover the costs of the Disability Benefits, and Disability Benefits are paid entirely out of the general assets of the Debtors.  As of the Commencement Date, the Debtors estimate that the aggregate outstanding unpaid amount for such Disability Benefits is approximately $184.8 million ($13.5 with respect to Short-Term Disability benefits and $171.3 million with respect to Extended Disability benefits).  All outstanding unpaid amounts are accrued as the Debtors maintain no reserves for this unpaid amount.  By this Motion, the Debtors seek authority to make all payments, satisfy all claims (including reimbursements of administrators for claims paid by them), and pay all remittances and other amounts with respect to Disability Benefits covering disabled Employees relating to the period prior to the Commencement Date in the ordinary course of business and to continue honoring all of these benefits and associated costs postpetition.  The Debtors also seek authority to continue the Disability Benefits in the ordinary course of business.

101.    <u>Other Insurance Provided at Employees' Expense</u>.  The Debtors maintain the following voluntary insurance programs, which they intend to continue in the ordinary course of business so that Employees' individual policies will not be cancelled.  The Debtors neither fund nor make guarantees for the payment of these benefits, but withhold the premiums from Salaried Employees' payroll and submit them to the insurer on the Employees' behalf.  To the extent any deductible amounts have accrued or the Debtors have withheld premiums with respect to the period prior to the Commencement Date, they seek authority to pay such premiums to the insurer.

(i)      <u>Personal Accident Insurance</u>.  The Debtors provide all Employees with the opportunity to purchase personal accident insurance ("<u>Personal Accident Insurance</u>") in a variety of coverage levels ranging from $10,000 to $1,000,000.  Personal Accident Insurance covers accidental dismemberment or other defined accidental losses.  It is not payable if the injury is self-inflicted or if other excluded events occur.

(ii)      <u>Long-Term Care Insurance</u>.  All Salaried Employees may elect to purchase long-term care insurance administered by John Hancock Life Insurance Company (which is also the claims fiduciary under the program).

102.    <u>Personal Umbrella Liability Insurance</u>.  The Debtors provide, at their own expense, personal umbrella liability insurance (the "<u>PULI</u>") for Executives, Officers, and Directors, their spouses, and other eligible family members.  The PULI is administered through AON Risk Services and is provided by Chubb Custom Insurance Company.  The Debtors pay premiums in advance at the beginning of the plan year.  Income is imputed to eligible participants for the value of this benefit.  PULI is currently provided to eligible Retirees for up to 5 years following their retirement.  The retirement benefit will be discontinued on January 1, 2010.  The Debtors seek authority to continue to provide PULI for Executives, Officers, and Directors, their spouses, and other eligible family members in the ordinary course of business.

(c)    *Flexible Spending Accounts, Health Savings Accounts and Health Reimbursement Agreements*

103.    <u>Flexible Spending Accounts</u>.  The Debtors provide their Salaried Employees with flexible spending account plans pursuant to which some Employees maintain accounts for healthcare and dependent care.  The Debtors also provide their Hourly Employees spending account plans for their dependent care and for certain newly hired Hourly Employees for health care.  Under the flexible spending account plans Employees have pre-tax amounts

withheld from their paychecks, which subsequently can be used to reimburse Salaried and

Hourly Employees for their dependant care expenses and for their eligible healthcare expenses,

such as insurance deductible amounts, co-payments, and other health care and/or dependent care

expenses.  Salaried Employees' healthcare and dependent care spending accounts and Hourly

Employees' dependent care spending accounts are composed entirely of Employee contributions.

The Debtors submit that these monies are being held in trust for the benefit of those contributing

Employees and, therefore, are not property of the Debtors' estates.  Hourly Employees'

healthcare spending accounts, applicable to newly hired Hourly Employees hired after October

15, 2007, are composed of notional account allocations from the Debtors.  The Debtors maintain

notional accounts for these eligible Employees.  The Debtors seek authority to pay all amounts,

including those notional account monies, whether pre- or postpetition, in connection with these

plans and programs and intend to continue them in the ordinary course of business.

104.    Health Savings Accounts.  The Debtors provide certain Salaried

Employees access to a health savings account administered by Bank of America for Salaried

Employees and similar access for non-Medicare Salaried Retirees who select the health savings

account preferred provider organization health plan option.  The health savings accounts are

funded solely by Employee and Retiree contributions.  The Debtors pay a per-contract-per-

month fee to Bank of America for the administrative services provided.  Prepetition amounts

owed to Bank of America are de minimis.  By this Motion, the Debtors seek authority to continue

such administrative services.

105.    Health Reimbursement Arrangements.  The Debtors provide notional

account allocations for certain former GM Salaried Employees who transferred to Detroit Diesel

Corporation when it was divested on January 1, 1988, for which GM retained health care

obligations in retirement.  The Debtors maintain these notional accounts for these eligible former

Salaried Employees for their eligible health care expenses.  Amounts paid under this

arrangement are considered by Debtors to be *de minimis* as only 21 eligible former Employees

are covered under this arrangement.  By this Motion, the Debtors seek authority to maintain the

notional accounts and pay all eligible health care expenses from the accounts, whether pre- or

postpetition, and to continue them in the ordinary course of business.

B.      **Retirement Plans**

106.    <u>Defined Benefit Plans</u>.  The Debtors sponsor two tax-qualified defined

benefit pension plans for the benefit of Employees and Retirees:  the General Motors Retirement

Program for Salaried Employees ("<u>SRP</u>") and the General Motors Hourly-Rate Employees

Pension Plan ("<u>HRP</u>") (collectively, the "<u>Defined Benefit Plans</u>").  A description of these plans

is not included because there are no accrued and unpaid contributions to such plans and no

contributions are expected to be made in the near future.

107.    <u>Defined Contribution Plans</u>.  The Debtors maintain three defined

contribution plans for the benefit of their Employees and Retirees:  the General Motors Savings –

Stock Purchase Program for Salaried Employees in the United States ("<u>S-SPP</u>"), the General

Motors Personal Savings Plan for Hourly-Rate Employee in the United States ("<u>PSP</u>"), and the

General Motors Income Security Plan for Hourly-Rate Employees in the United States ("<u>ISP</u>")

(collectively, the "<u>Defined Contribution Plans</u>").  The Defined Contribution Plans provide for

pre-tax or after-tax salary contributions of eligible compensation up to the limits set by the

Revenue Code.  In addition, Employees and Retirees generally may take loans in any amount

between $1,000 and one-half of the current eligible assets in their account up to $50,000 with a

fixed rate of interest.  State Street Bank & Trust serves as Trustee for all Defined Contribution

Plans.  In the past, the Debtors have paid matching and/or other employer contributions

depending on Employee eligibility, the governing CBA, and the Employee's participation.  On

several occasions, the Debtors have, however, altered or suspended these contributions.  For

example, the Debtors suspended S-SSP matching contributions effective January 1, 2006,

reinstated the contributions effective January 1, 2007, and then suspended the contributions

effective November 1, 2008.  The S-SPP, PSP, and ISP are described in more detail below.

Approximately 75,000 Employees and 121,000 former Employees or their beneficiaries

participate in the Defined Contribution Plans.

(i)    S-SPP.  Salaried Employees are eligible to participate in the S-SPP

6 months after their date of hire.  Salaried Employees hired on or after July 1, 2008 are

automatically enrolled in the S-SPP with a deferral rate of 3% of eligible salary.  Under the S-

SPP, and subject to limits set by the Revenue Code, Salaried Employees are able to defer

compensation on a pre-tax, after-tax, and Roth after-tax basis up to 50% of eligible salary and to

defer up to 100% of their payment under the Flexible Compensation Program, if any, to the S-

SPP.  Salaried Employees over the age of 50 are also eligible to make "catch-up" contributions

in the form of additional deferrals to the S-SPP of up to 50% of their annual base salary.  The S-

SPP provides for discretionary matching contributions up to a certain predefined limit based

upon eligible base salary (the "Matching Contribution").  S-SPP participants may choose to

invest contributions in numerous investment options, including the Debtors' common stock (the

"Common Stock Fund"),[25] transfer assets and change investment options on a daily basis, and

take loans from their S-SPP accounts.  The Debtors also contribute certain other amounts to

cover certain retirement benefits.  For Salaried Employees hired on and after January 1, 1993, the

Debtors annually contribute 1% of Salaried Employees' annual base Salary (the "1% Benefit

---

[25] As of September 29, 2008, purchases and exchanges into the Common Stock Fund were suspended.  Effective at
the close of business on May 29, 2009, the Common Stock Fund was eliminated as an investment option.

Contribution") and for Salaried Employees hired on and after January 1, 2001, the Debtors

annually contribute an additional 4% of the Salaried Employees' annual base salary (the "4%

Retirement Contribution").  The Salaried Employees' contributions vest immediately.  Matching

Contributions, the 4% Retirement Contribution, the 1% Benefit Contribution and earnings are

fully vested, unless the Salaried Employee has less than 3 years of service.  For Employees hired

before January 1, 2007, the Debtors' contributions vest at the earlier of: (a) the end of the

calendar year of contribution; or (b) attaining three years of credited service.  For Employees

hired after January 1, 2007, the Debtors' contributions vest upon attaining three years of credited

service, so that if such an S-SSP participant leaves his or her employment with the Debtors, all of

the employer contributions are forfeited.  The Debtors contributed approximately $153 million to

the S-SPP in the 2007 plan year and approximately $128 million during the 2008 plan year.  In

October 2008, the Debtors announced the suspension of the Matching Contribution for the S-SPP

effective November 1, 2008.  The Debtors provide access to an online investment advice tool to

S-SSP participants, for which the Debtors pay an annual usage fee.  Prepetition amounts owed

for these services are *de minimis*.  The Debtors request authority to continue the S-SSP,

including the online investment tool, the 1% Benefit Contribution, and 4% Retirement

Contribution, and to reinstate or make other adjustments to the Matching Contributions, as

deemed necessary to continue to operate and preserve value in the exercise of their business

judgment.

     (ii)    PSP.  The Debtors maintain the PSP for certain Hourly Employees

and currently do not make any employer contributions to the PSP, except as identified below.

Hourly Employees who have been employed by the Debtors for 90 days are eligible to enroll in

the PSP.  Hourly Employees hired on or after July 1, 2008, are automatically enrolled in the PSP

with a deferral rate of 3% of eligible weekly pay. Under the PSP and subject to IRS limits, Hourly Employees may defer on a pre-tax, after-tax, and Roth after-tax basis up to 60% of eligible weekly pay. Hourly Employees over the age of 50 are also eligible to make "catch-up" contributions in the form of additional deferrals to the PSP of up to 40% of their eligible pay. The Hourly Employees' contributions are fully vested in the PSP. The Debtors' contributions vest in accordance with the terms of the Hourly Employees' applicable CBA. PSP participants may choose to invest contributions in numerous investment options under the PSP and may transfer assets and change investment options on a daily basis. Hourly Employees may also take loans from their PSP accounts. Additionally, Hourly Employees represented by the UAW and hired on or after October 1, 2007 receive an employer contribution of $1.00 per compensated hour worked into their PSP account. The Debtors' $1.00 per compensated hour contributions vest upon attainment of three years of credited service. The Debtors' contributions to the PSP were insignificant for 2007 and were approximately $4 million in 2008.

(iii)    ISP. The Debtors also make contributions to an individual account savings plan (the "ISP") for certain Employees represented by the International Brotherhood of Electrical Workers (the "IBEW"), and a limited number of non-represented Hourly Employees as well as Hourly Retirees who have continued to maintain their ISP accounts. Covered Employees may also make contributions to their ISP account. The ISP is essentially an individual account savings plan that a Hourly Employee may draw benefits from upon retirement, layoff, or other termination of employment.

108.    The Debtors estimate that as of the Commencement Date, the aggregate accrued and unpaid amounts of contributions attributable to salary deferrals and the Debtors' contributions under the Defined Contribution Plans to be approximately $2 million. Beginning

January 1, 2009, the Debtors will begin to accrue quarterly contributions in the amount of approximately $3 million per quarter.  The Debtors request authority to continue the Defined Contribution Plans in the Debtors' sole discretion and to make prepetition and postpetition payments pursuant to such plans in the ordinary course of business.

109.    <u>Non-Qualified Plans</u>.  The Debtors also maintain several plans that are not qualified under the Internal Revenue Code for tax purposes, including the GM Executive Retirement Plan ("<u>ERP</u>"), the Benefit Equalization Plan ("<u>BEP</u>"), which is a component of ERP, and the GM Deferred Compensation Plan ("<u>DCP</u>," and collectively with the ERP, and BEP, the "<u>Non-Qualified Plans</u>").  Pursuant to this Motion, the Debtors seek authority to continue the Non-Qualified Plans and to make prepetition and postpetition payments pursuant to such plans in the ordinary course of business.

(i)    <u>ERP</u>.  The Debtors maintain the ERP for Officers and Executives to incentivize them to maintain long-standing employment with the Debtors.  The ERP is an unfunded, nonqualified deferred compensation plan which provides Officers and Executives (or their designated beneficiaries) supplemental retirement income based on the Officers' or Executives' compensation and years of service with the Debtors.  To be eligible for full benefits under the ERP, the Officers or Executives must have 10 years of credited service in the General Motors Retirement Program for Salaried Employees ("<u>SRP</u>") and attain age 60 prior to retirement.  Officers or Executives are eligible for a reduced benefit if they have 10 years of credited service under the SRP and attain at least age 55 prior to retirement.  Currently, the Debtors provide ERP benefits to approximately 3,500 former Officers and Executives (or in certain cases, their surviving beneficiaries).

(ii)    Officers or Executives who began receiving benefits prior to January 1, 2007 generally receive monthly benefits in the form of a lifetime annuity.  Officers or Executives who commenced receiving benefits after that date receive their benefits in the form of a 5-year annuity.  Under this Motion, the Debtors seek authority to continue to pay prepetition and postpetition ERP benefits up to $8,000 per month for those retired Officers and Executives receiving a lifetime annuity, and the actuarial equivalent amount per month for those (including Officers and Executives who retire during the pendency of these cases) receiving a five-year annuity.  These limits will result in a significant reduction in benefits paid for some retired Officers and Executives. The Debtors believe that the prepetition obligation, on account of ERP benefits, is *de minimis* as of the Commencement Date.

(iii)    <u>BEP</u>.  The BEP is a component of the ERP and provides for individual accounts for eligible Executives with employer Matching Contributions, 1% Benefit Contributions, and 4% Retirement Contributions above the maximum amount allowed by the Revenue Code to be contributed to the S-SPP.  The Debtors request authority to continue the BEP in the ordinary course of business, as deemed necessary to continue to operate and preserve value in the exercise of their business judgment.

(iv)    <u>Deferred Compensation Plans</u>.  The Debtors maintain a Deferred Compensation Plan for active and retired Executives and Officers and a separate Deferred Compensation Plan for active and retired non-Employee Directors (collectively, the "<u>DCP Participants</u>"). The Deferred Compensation Plan permits eligible DCP Participants to defer all or a portion of any amount received under the Annual Incentive Plan and the Debtors' Long-Term Incentive Plans, and the plan for non-Employee Directors permits deferral of retainer fees[26] or

---

[26] A portion of the annual retainer is subject to mandatory deferral.

Board of Directors fees, as applicable, on a pre-tax basis.  Amounts deferred under the Deferred

Compensation Plans are attributable solely to the DCP Participants, not the Debtors.  The

Debtors maintain notional accounts for DCP Participants deferrals and earnings thereon.  The

accounts are maintained as bookkeeping entries with amounts invested in one or more

investment options, as directed by the DCP Participants.  Upon deferral, DCP Participants who

are Executives or Officers may elect a date or event (e.g., retirement) in the future for

distribution of assets.  In addition, DCP Participants who are Executives and Officers with

account balances established before December 31, 2005, may request unscheduled distributions

of that portion of their account balance, subject to a 10% penalty.  Non-Employee Director assets

are distributed in one to ten annual installments, as elected by the Director, beginning in January

of the year following retirement.  No new deferrals from the Annual Incentive Plan or the Long-

Term Incentive Plan into the Deferred Compensation Plan have been permitted since December

31, 2005.  Currently, the Deferred Compensation Plans hold account balances for approximately

40 Participants which total approximately $2.2 million.  Debtors submit that these monies are

being held in trust for the benefit of those contributing DCP Participants and, therefore, are not

property of the Debtors' estate.  Pursuant to this Motion, the Debtors request authority to

continue the Deferred Compensation Plan in the ordinary course of business, as deemed

necessary to continue to operate and preserve value in the exercise of their business judgment.

C.    **Other Benefits**

110.    The Debtors maintain certain recognition and awards programs for both

Hourly and Salaried Employees.  Salaried Employees are recognized for outstanding individual

or team accomplishments; these recognition awards typically consist of gift certificates or non-

cash awards having a value up to $5,000 per Employee.  The Debtors' average monthly cost of

these awards are approximately $60,000.  The Debtors also maintain a Suggestion Program for

Hourly and Salaried Employees, which provides cash awards based on ideas that improve

Debtors' operations and achieve cost savings. Payments for this Program were suspended in

December 2008. Prior to suspension the average monthly cost was approximately $1.4 million

for Hourly Employees and $400,000 for Salaried Employees. To help stimulate and recognize

inventive activity by employees, monetary awards are paid to current and retired employees (for

inventions submitted when employed by Debtors). Awards, paid at various stages of the

invention, patent application and implementation process, total approximately $383,000 per

month for Salaried Employees and $3800 per month for Hourly Employees. Other benefits

provided to Employees include, but are not limited to, trainee programs (including training

courses offered to Employees through General Motors University and fellowships at

management business schools); a dependent scholarship program providing up to $1,500

annually per eligible child of Hourly Employees to be used for tuition expenses and endowment

funds for participating schools; tuition assistance; legal services for Hourly Employees;

employee assistance programs (the "EAP Programs"); Executive physicals; Executive financial

planning services (for which income is imputed to the executive); adoption assistance; vehicle

purchase programs; and other programs (collectively, the "Other Benefit Obligations"). The

costs of the Other Benefit Obligations vary by program, and the programs are important to

maintaining Employee morale and retaining the Debtors' workforce. It should be noted,

however, that in October 2008, the Debtors announced the suspension of the Salaried programs

for Tuition Assistance, Adoption Assistance, and Dependent Scholarship reimbursements,

effective January 1, 2009.

       111.    Tax-qualified Transportation Program. The Debtors request authority to

continue the Tax-qualified Transportation Program in New York city in the Debtors' sole

discretion and to make prepetition and postpetition deductions and payments pursuant to such

program in the ordinary course of business.

D.     **Workers' Compensation Obligations**

112.     Under the laws of the various jurisdictions in which they operate, the

Debtors are required to maintain workers' compensation policies and programs and provide

Employees with workers' compensation coverage for claims arising from or related to workplace

injuries and illnesses incurred during the course of their employment by the Debtors.

Accordingly, and in accordance with applicable requirements of local law, the Debtors maintain

workers' compensation programs (the "Workers' Compensation Programs") in all states in

which they have operations.  The Workers' Compensation Programs enable Employees to bring

claims for medical benefits and lost wages arising from qualifying work-related injuries and

illnesses.

113.     In 26 states where they operate,[27] Debtors' Workers' Compensation

Programs are self-insured.  Pursuant to this coverage, Employees seeking reimbursement for

work-related injuries and illnesses file their claims directly against the Debtors.  The Debtors

have contracted with Sedgwick CMS, a third-party administrator, to administer the Debtors' self-

insured Workers' Compensation Programs.  Sedgwick CMS or the Debtors' Employees

investigate the claims against the Debtors and validate those deemed meritorious.  In connection

with their self-insured Workers' Compensation Programs, the Debtors maintain letters of credit,

security deposits, or surety bonds in the aggregate amount of approximately $453 million for the

benefit of the workers' compensation bureaus of the 26 states in which the Debtors self-insure.

---

[27] The states include Alabama, California, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky,
Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina,
Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

Debtors also maintain an excess umbrella insurance policy with Lexington and others (which

includes multiple coverage, including product liability, auto liability, general liability, etc.) to

cover workers' compensation claims (the "Umbrella Policy"). The Umbrella Policy is subject to

a $25 million deductible and an aggregate coverage limit of $835 million provided by a panel of

insurers and reinsurers. The Debtors pay an annual premium of $15.5 million to maintain the

Umbrella Policy.

114.    In the remainder of states in which the Debtors operate, the Debtors insure

their workers' compensation liabilities through a series of jurisdiction-specific, high deductible

workers' compensation policies issued by National Union Fire Insurance Company. Pursuant to

these policies, Employees seeking reimbursement for work-related injuries and illnesses file their

claims directly against the Debtors. Sedgwick CMS administers the insured claims. The

Debtors pay premiums to purchase insurance policies with differing deductibles, the amounts of

which vary with state law requirements. The Debtors are obligated to reimburse National Union

for any policy deductible amounts.

115.    If the Debtors are not authorized to pay their prepetition workers'

compensation obligations, the Debtors expect that the letters of credit, security deposits, and/or

surety bonds will be drawn, resulting in millions of dollars of claims against the Debtors' estates.

Moreover, if they are not permitted to honor their workers' compensation obligations, (a)

alternative arrangements for workers' compensation coverage likely would be more costly, (b)

the failure to provide coverage may, in some states, subject the Debtors or their officers to

significant penalties and possibly a shut down of operations, and (c) the Debtors may have their

qualified self-insured employer status revoked in the respective states, resulting in substantially

higher costs.

116.    The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not paid claims and incurred but not reported ("IBNR") claims.  The Debtors estimate their IBNR claims through an actuarial process that is common in the insurance industry.  As of the Commencement Date approximately 12,500 workers' compensation claims were pending against the Debtors.  The Debtors estimate that the aggregate amount payable on account of incurred but not yet paid claims and IBNR claims arising prior to the Commencement Date is approximately $1.47 billion.  Of course, not all of this amount is immediately due, but rather would be payable throughout the succeeding months and even years.  The Debtors estimate that cash payments for the next 12 months related to prepetition workers' compensation claims will be approximately $240 million.

117.    The Debtors intend to continue to review the proposed treatment of the Debtors' obligations under Workers Compensation Programs in the various states in which they operate or have in the past operated.  Although this review is ongoing, the Debtors seek authority to pay all amounts related to workers' compensation claims and IBNR claims that arose prior to the Commencement Date as they become due in the ordinary course of business (including reimbursements of administrators for claims paid by them), including all insurance premiums and administrative costs, and to continue their Workers' Compensation Programs in the ordinary course, as deemed necessary to continue to operate and preserve value in the exercise of their business judgment in all states other than Alabama, Georgia, New Jersey and Oklahoma.  In these four states, the Debtors do not currently intend to pay amounts related to workers' compensation claims and IBNR claims that arose prior to the Commencement Date.

E.    **Social Security, Income Taxes, and Other Withholdings**

118.    The Debtors also withhold from Employees' wages (i) federal, state, local, and foreign income withholding, payroll, employment, unemployment, social security, and

similar taxes, including, but not limited to, taxes relating to FICA and FUTA (collectively and as defined above, the "Payroll Taxes"); (ii) Employee contributions for health plans, disability, and additional life insurance; (iii) Employee contributions to Defined Contribution Plans; (iv) legally ordered deductions such as wage garnishments and tax levies; (v) voluntary charitable contributions; (vi) union dues; (vii) health care, flexible spending account and health savings account contributions; (viii) other voluntary savings; and (ix) other miscellaneous deductions (collectively, with the Payroll Taxes, the "Employee Deductions").

119.    The Debtors on a regular basis forward amounts equal to the Employee Deductions from their general operating accounts to appropriate third-party recipients.  The Debtors believe that the Employee Deductions, to the extent they remain in the Debtors' possession, constitute moneys held in trust and, therefore, are not property of the Debtors' estates.  Although the Debtors believe that it is appropriate to forward these funds to the proper third party recipients, because of the filing of the chapter 11 cases, and out of an abundance of caution, the Debtors seek approval of this Court to do so.

120.    The Debtors also are obligated to directly pay certain federal, state, local, and foreign income, payroll, employment, unemployment, social security, and similar taxes (including, but not limited to, taxes relating to FICA) to governmental authorities (as defined above, the "Governmental Taxes").  The failure to pay such amounts may subject certain Employees or Directors to potential personal and criminal liability.  To avoid such consequences, the Debtors seek the authority to make these payments to the appropriate governmental authorities even where such payments relate to the period prior to the Commencement Date.

F.      **Administrative Obligations**

121.    As referenced above, the Debtors utilize the services of numerous professionals, consultants, and other administrators in the ordinary course of business to which

they outsource the administration of many Prepetition Employee Obligations.  These

administrative services include administering the Debtors' Welfare Benefits, Health Benefits,

Insurance Benefits, Defined Contribution Plans, and workers' compensation obligations;

facilitating the administration and maintenance of their books and records; assisting with legal

compliance issues; providing legal and independent consultant input on corporate governance

matters; assisting with outplacement services; and conducting special administrative and legal

compliance functions in respect of Employee benefit plans and programs (collectively, the

"Administrative Obligations").  These entities include those referenced throughout this Motion

as well as administrators such as Fidelity Investments and Electronic Data Systems.  The

services provided by these third parties ensure that the Debtors' employee benefit plans and

programs are administered in the most cost-efficient manner and in compliance with all

applicable laws.  The Debtors request authority to pay any and all prepetition Administrative

Obligations related to the Employee benefit programs described in this Motion and to continue

the services performed these third parties in the normal course of business.

      122.    Additionally, to assure that all Employee Obligations are administered and

paid without interruption, the Debtors request that all third party benefit providers and third party

processors with whom the Debtors directly or indirectly have contracted to provide services be

directed to continue to provide to the Debtors those services they provided prior to the

Commencement Date, provided that they are compensated therefore in the ordinary course.

III.      **DIRECTION TO THE BANKS**

      123.    In furtherance of the foregoing, the Debtors also seek an order (a)

authorizing and directing all financial institutions upon which any checks, drafts, electronic

funds transfers, or wire transfers are drawn in payment of the Prepetition Employee Obligations

– either before, on, or after the Commencement Date – to honor all such checks or drafts issued,

upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts; and (b) prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts with respect to Prepetition Employee Obligations. The Debtors request that such financial institutions be authorized and directed to rely on the representations of the Debtors as to which checks, drafts, or wire transfers are in payment of the Prepetition Employee Obligations.

124.    The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

125.    The Debtors' Employees are among their most valuable assets and absolutely vital to the reorganization effort.  Accordingly, it is imperative that Employee morale be maintained and that the Debtors have the authority to assure that Employees do not unduly suffer as a consequence of the commencement of these cases.  Indeed, in the absence of  granting the relief requested herein, it is unquestionable that literally tens of thousands of current and former Employees will suffer undue economic hardship which will have a detrimental impact on the administration of these chapter 11 cases.

126.    Continued payment, without interruption, of prepetition wages, salaries, and commissions, and the continuation, without interruption, of the compensation and benefits plans, policies, programs, and practices attendant to the Prepetition Employee Obligations as described in this Motion are necessary and essential and will assure a smooth transition into chapter 11.  Indeed, if the relief requested herein is not granted, there is no question that the Debtors' business operations will suffer to the detriment and prejudice of all parties in interest.

## **Applicable Authority**

127.    Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, employee

claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay"

earned within 180 days before the Commencement Date are afforded priority unsecured status to

the extent of $10,950 per employee.  Similarly, section 507(a)(5) of the Bankruptcy Code

provides that employees' claims for contributions to certain employee benefit plans are also

afforded priority unsecured status to the extent of $10,950 per employee covered by such plan,

less any amount paid pursuant to section 507(a)(4).

128.    Furthermore, section 363(b)(1) of the Bankruptcy Code provides that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate."  11 U.S.C. § 363(b)(1).  A Bankruptcy Court's use of its

equitable powers to "authorize the payment of prepetition debt when such payment is needed to

facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs, Inc.*, 98

B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under section 105 of the Bankruptcy Code, which

provides that a Bankruptcy Court "may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions" of the Bankruptcy Code, the "court can permit pre-plan

payment of a pre-petition obligation when essential to the continued operation of the debtor."  *In*

*re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at

177).

129.    As stated, the relief requested in this Motion is necessary for the Debtors'

businesses to continue to operate in the ordinary course and to maximize value for all

stakeholders.  The Employees are vital to the continued operation of the Debtors' businesses and

to their successful reorganization. The relief sough herein is entirely consistent with the intent

and purpose of section 105(a) of the Bankruptcy Code and the rehabilitative purpose of chapter 11.

130.    This same rationale applies with respect to Retirees.  The morale of the Debtors' active Employees certainly is dependent on the security and assurance that their benefits will not be terminated when they are retirees.  Further, a signification portion of the benefits sought to be maintained for the Retirees are within the purview of section 1114 of the Bankruptcy Code.

131.    The Debtors also submit that, to the extent any Employee is owed in excess of $10,950, satisfaction and payment of such amount is necessary and appropriate, and may be authorized under sections 105(a) and 363(b) of the Bankruptcy Code pursuant to the "doctrine of necessity."   The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."  *Ionosphere Clubs, Inc.*, 98 B.R. at 176 (authorizing the payment of prepetition employee wages and benefits while acknowledging the judicial power to "authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); *see also Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower Court order authorizing payment of prepetition wages, salaries, expenses, and benefits).  This doctrine is consistent with the paramount goal of chapter 11 of "facilitating the continued operation and rehabilitation of the debtor."  *Id.* at 176.  Indeed, the necessity of payment doctrine provides ample authority for the entirety of the relief sought in this Motion.

132.    The Debtors believe that a substantial portion of the Prepetition Employee Obligations constitutes priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, these obligations must be paid in full before any of the Debtors' general unsecured obligations may be satisfied. Accordingly, the relief requested herein largely will affect only the timing of the payment of these priority obligations, and should not prejudice the rights of general unsecured creditors or other parties in interest.

133.    With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtors, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code with respect to such obligations. Moreover, the portion of the Payroll Taxes withheld from an employee's wages on behalf of an applicable Taxing Authority and the other Employee Deductions are held in trust by the Debtors. As such, Payroll Taxes and other Employee Deductions are not property of the Debtors' estates under section 541 of the Bankruptcy Code. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (concluding that withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

134.    Nothing in this Motion nor any payments made by the Debtors pursuant to this Motion, shall be deemed an assumption, adoption, or rejection of any employee benefit plan, CBA, employment agreement, or other program or contract or shall otherwise affect the Debtors' rights under sections 365 and 1113 of the Bankruptcy Code to assume or reject any executory contract between the Debtors and the contract counterparty or the Debtors' rights under section 1114 of the Bankruptcy Code, if applicable, to modify or terminate retiree benefits.

**The Debtors Have Satisfied Bankruptcy Rule 6003**

135.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or

part of a claim that arose before the filing of the petition" prior to twenty days after the

Commencement Date. Fed. R. Bankr. P. 6003. As described herein and in the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business

operations rely heavily on the continued dedication and service of the Debtors' Employees. If

the Debtors are unable to fulfill their obligations to their Employees, the Debtors' workface may

not remain dedicated to the Debtors, thus placing the Debtors' businesses in jeopardy.

Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate

and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## **Waiver of Bankruptcy Rules 6004(a) and (h)**

136.    To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

137.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee. The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

138.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
In re                                         :              **Chapter 11 Case No.**
                                              :
**GENERAL MOTORS CORP.,** *et al.*,           :              **09-_____ (___)**
                                              :
                         **Debtors.**         :              **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 507 (I) AUTHORIZING DEBTORS TO (a) PAY CERTAIN EMPLOYEE COMPENSATION AND BENEFITS, AND (b) MAINTAIN AND CONTINUE SUCH BENEFITS AND OTHER EMPLOYEE-RELATED PROGRAMS AND (II) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a), 363,

507(a)(3), and 507(a)(4) of title 11, United States Code (the "Bankruptcy Code"), for entry of an

order (i) authorizing, but not directing, the Debtors to pay all their employee obligations,

including prepetition claims of the Debtors' employees, any independent contractors, including

those provided by employee supplier agreements, who currently are under contracts and related

arrangements with the Debtors (collectively, and solely for the purposes of this Motion, the

"Employees"), and those prepetition claims on account of benefits to be provided to any of the

Debtors' retirees and their surviving spouses (collectively, the "Retirees"), (ii) authorizing, but

not directing, the Debtors to pay all prepetition benefits with respect to and continue the Debtors'

various employee benefit plans and programs (collectively, the "Prepetition Employee

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

Obligations"), and (iii) directing all banks to honor prepetition checks for payment of Prepetition

Employee Obligations and prohibiting banks from placing any holds on, or attempting to reverse,

any automatic transfers to Employees' accounts for Prepetition Employee Obligations, all as

more fully described in the Motion; and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and

All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided to (i) the Office of the United States

Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the

attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan

agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured

revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the

Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for

the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "Hearing"); and

upon the record of the Hearing and all of the proceedings had before the Court; and the Court

having found and determined that the relief sought in the Motion is necessary to avoid immediate

and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Debtors are authorized (but not directed) to pay or otherwise honor all Prepetition Employee Obligations, the most significant of which are described in the Motion, including, but not limited to, Employees' prepetition and postpetition wages and salaries, including any commissions and incentive compensation for which the Employees are eligible; vacation, sick leave, personal leave, expense reimbursements, expenses related to the Corporate Card Program, and severance; health, insurance, retirement, and all other employee benefit programs and all claims and insurance premiums with respect thereto; tax-qualified, and non-tax-qualified retirement plans; workers' compensation programs and all claims and insurance premiums with respect thereto; and all other benefits to, or for the benefit of, the Employees, and to continue each of the Employee programs in the ordinary course of business; provided, however, that such payment, continuance of Employee programs, other honoring of such Prepetition Employee Obligations, or entry of this Order shall not make such obligations administrative expenses of the Debtors' estates entitled to priority status under sections 503 and 507 of the Bankruptcy Code; and it is further

ORDERED that the financial institutions listed on Exhibit A of this Order, upon which any checks are drawn in payment of the Prepetition Employee Obligations, either before, on, or after the date on which the Debtors filed these chapter 11 cases, are hereby authorized and directed to honor, upon presentation, any such checks; and it is further

ORDERED that such financial institutions are authorized and directed to rely upon the representations of the Debtors as to which checks are in payment of the Prepetition Employee Obligations; and it is further

ORDERED that the Debtors may pay all federal, state, local, and foreign Payroll Taxes, Governmental Taxes, and all other Employee Deductions, whether related to the period prior or subsequent to the Commencement Date; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay any and all costs in connection with maintaining administration or paying third parties to maintain, administer, and provide record-keeping relating to the various Employee benefit programs and any trusts related thereto that may be outstanding as of the Commencement Date in the ordinary course of business; and it is further

ORDERED that any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Order; and it is further

ORDERED that neither this Order, nor any payments made by the Debtors pursuant to the Motion or this Order, shall be deemed to change the classification of any claim or to in any way change the rights or create new rights of any Employee or other person, including, without limitation, the creation of any right to payment entitled to administrative expense priority pursuant to sections 503 and 507 of the Bankruptcy Code; and it is further

ORDERED that, pursuant to section 362(d) of the Bankruptcy Code, to the extent any of the Debtors' employees hold claims under the Debtors' Workers' Compensation Programs, these employees are authorized, at the Debtors' direction, to proceed with their

workers' compensation claims in the appropriate judicial or administrative forum under the

Workers' Compensation Program; and it is further

ORDERED that nothing contained in this Order shall constitute or be deemed to

constitute the assumption or rejection of any employee benefit plan, CBA, employment

agreement, or any other contract, program, or agreement under section 365 or 1113 of the

Bankruptcy Code and all of such rights under such sections and section 1114 of the Bankruptcy

Code are reserved; and it is further

ORDERED that notwithstanding any provision in the Bankruptcy Code or Federal

Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the

implementation, enforcement, or realization of the relief granted in this Order, and the Debtors

may, in their discretion and without further delay, take any action and perform any act authorized

under or contemplated by this Order; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
      [_____], 2009

_____
United States Bankruptcy Judge

**Exhibit A**
**Bank Accounts**

| Bank Name | Bank Mailing Address | Account Held By | Last Four Digits of Account # |
|---|---|---|---|
| Bank of America, N.A. | 540 W. Madison<br>Chicago, IL 60661<br>312-828-8016<br>Contact: Mastaneh Masghati | General Motors Corporation | 7156<br>6285<br>6308<br>5336<br>1071<br>4593<br>5239<br>5247 |
| Bank of New York Mellon | 500 Ross Street<br>Mellon Client Service Center<br>Suite 1360<br>Pittsburgh PA 15262-0001<br>412-234-6175<br>Contact: Bob Ladley | General Motors Corporation | 6214<br>0481 |
| Citibank, N.A. | 388 Greenwich Street 22nd Floor<br>New York NY 10013<br>212-816-2933<br>Contact: Sarah Terner | General Motors Corporation | 4623 |
| Comerica Bank | 500 Woodward Avenue<br>Detroit MI 48226<br>313-222-5431<br>Contact: Thomas Vandermulen | General Motors Corporation | 1846 |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue<br>Detroit MI 48226<br>313-256-2218<br>Contact: Bill Bitonti | General Motors Corporation | 2995<br>2987<br>5523<br>3134<br>5507<br>3126<br>4706<br>7304<br>4714<br>6610<br>5894<br>2564<br>4553<br>4746<br>7426<br>3803<br>0407<br>2644<br>7376<br>4775<br>4180 |