LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By: DAVID S. JONES
    JEFFREY S. OESTERICHER
    MATTHEW L. SCHWARTZ
    JOSEPH N. CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile: (212) 637-2750

- and -

John J. Rapisardi
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x
                                                                         ::
In re:                                                                   ::  Chapter 11
                                                                         ::
GENERAL MOTORS CORP., *et al.*,                                          ::  Case No. 09-50026 (REG)
                                                                         ::
                                         Debtors.                        ::  (Jointly Administered)
------------------------------------------------------------------------ x

### STATEMENT OF THE UNITED STATES OF AMERICA UPON THE COMMENCEMENT OF GENERAL MOTORS CORPORATION'S CHAPTER 11 CASE

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

    The United States of America, on behalf of the United States Department of the Treasury ("Treasury" or the "Government"), by its attorney Lev L. Dassin, Acting United States Attorney, respectfully submits this statement (i) in support of the above-captioned cases (collectively, the "Cases") commenced under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") by General Motors Corporation ("GM") and certain of its affiliates (collectively, the "Debtors"); (ii) to articulate for the Court and all parties in interest the Government's role in these Cases as existing senior secured lender, proposed debtor-in-possession lender, and as de facto sponsor of the "363 Transaction" that the Debtors have determined to pursue in these Cases; and (iii) to set out the statutory authority pursuant to which Treasury has acted and intends to act.

## INTRODUCTION

1.  GM's bankruptcy is an extraordinary and momentous event, signifying that GM – an icon of American ingenuity, productivity and capitalism – has reached a crossroads. For more than a century, GM has pioneered the development and manufacture of American automobiles, provided employment to hundreds of thousands of people, indelibly marked the lives and communities that form the infrastructure of America's automotive industry, and forged a vast network of global relationships and synergies.

2.  GM has weathered many storms over the course of its existence, often during difficult economic climates. But the current global economic downturn and its widespread negative impact on the automotive industry have forced GM to the precipice of liquidation. The gravity of this threat cannot be overstated; it extends well beyond the traceable boundaries of GM's business enterprise. Not only is the fate of GM at stake, but so are the livelihoods of innumerable American workers, suppliers, and dealers – and indeed the American economy as a whole.

3.  The Government is committed to working with GM to ensure that GM can develop an effective long-term plan to restore the company to its place at the forefront of American industry. Today, GM has decided that the best way to effectuate that vision is to enter bankruptcy, for the purpose of quickly consummating the 363 Transaction so that a new, leaner

and more competitive GM can emerge, while achieving the best possible recovery for the GM estates and their stakeholders. The Government fully supports GM in its decision, and is willing to provide the billions of dollars of funding necessary to help GM create a new force in the automotive industry.

### THE GOVERNMENT'S ROLE IN THESE CASES

4.    In response to the troubles plaguing the American automotive industry, the United States of America, through Treasury and the Presidential Task Force on the Auto Industry (the "Auto Task Force"),[1] has implemented various programs to support and stabilize the domestic automotive industry. Those programs have included, among other things, providing credit support for receivables issued by certain domestic automobile manufacturers,[2] and support for consumer warranties.[3]

5.    Treasury has also provided direct loans to automobile manufacturers. Specifically, at GM's request in late 2008 and following arm's length negotiations, Treasury determined to make available to GM billions of dollars in emergency secured financing (the "Prepetition Loan") in order to sustain GM's operations while it developed a new business plan.

---

[1]    The Auto Task Force is a cabinet-level group led by Treasury Secretary Timothy F. Geithner and National Economic Council Director Laurence H. Summers. It includes the Secretaries of Transportation, Commerce, Labor, and Energy, as well as the Chair of the President's Council of Economic Advisors, the Director of the Office of Management and Budget, the Environmental Protection Agency Administrator, and the Director of the White House Office of Energy and Climate Change. The members of the Auto Task Force, along with their official designees and the Auto Task Force's advisors, are charged with advising the President of the United States on the state of, and support for, the domestic auto industry. See Press Release, The White House Office of the Press Secretary, Geithner, Summers Convene Official Designees to Presidential Task Force on Auto Industry (Feb. 20, 2009), http://www.whitehouse.gov/the_press_office/Geithner-Summers-Convene-Official-Designees-to-Presidential-Task-Force-on-the-Auto/.

[2]    See Auto Supplier Support Program: Stabilizing the Auto Industry at a Time of Crisis, http://www.treas.gov/press/releases/docs/supplier_support_program_3_18.pdf.

[3]    See Obama Administration's New Warrantee Commitment Program, http://www.treas.gov/initiatives/eesa/AIFP/WarranteeCommitmentProgram.pdf.

At the time that Treasury first extended credit to GM under the Prepetition Loan, there was absolutely no other source of financing available: no party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating.

6. The first loan came in December 2008, after GM submitted its proposed viability plan to Congress. That plan contemplated GM's shift to smaller, more fuel-efficient cars, a reduction in the number of GM brand names and dealerships, and a renegotiation of GM's agreement with its labor union, among other things. As part of its proposed plan, GM sought emergency funding in the form of an $18 billion federal loan.

7. After negotiations, Treasury and GM entered into a loan agreement on December 31, 2008, that provided GM up to $13.4 billion in financing on a senior secured basis. Under that term loan facility, GM immediately borrowed $4 billion, followed by $5.4 billion less than a month later, and the remaining $4 billion on February 17, 2009. The GM-Treasury loan agreement required GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress. Among other conditions on Treasury's willingness to provide financing, GM was to demonstrate its long-term viability by reducing its outstanding public debt (approximately $27 billion) by two-thirds, and converting from cash to common stock at least half of the value of its $20 billion contribution to a union health care trust.

8. Treasury and GM subsequently entered into amended credit agreements to provide for an additional $2 billion in financing that GM borrowed on April 24, 2009, and another $4 billion that GM borrowed on May 20, 2009. The funds advanced to GM under the Prepetition Loan – as of the petition date, approximately $19.4 billion in total (all on a senior

secured basis) – therefore were critical to GM's survival during the past several months. They are equally critical to GM's survival today.

9.      Although the Government's decision to provide financing is intended to avoid the drastic and systemic consequences that would result from a GM liquidation, Treasury – as the steward of taxpayer dollars – has insisted from the start as a condition of its financial support that GM take the steps necessary to transform itself into a competitive, and successful, player in the global automotive market. Indeed, the threat of liquidation is not the only impetus for the Government's decision to loan substantial <u>additional</u> taxpayer funds to GM in the form of the proposed approximately $33.3 billion debtor-in-possession facility, which will provide critical funding to GM pending the expeditious approval and consummation of the 363 Transaction (the "<u>DIP Loan</u>").[4] To be clear, Treasury has loaned, and proposes to loan, GM billions of dollars not just to spare the economy the consequences of GM's liquidation, but also because the Government has concluded – as a result of an exhaustive analysis conducted by Treasury and the Auto Task Force – that a new, vastly improved, and competitive "New GM" is an attainable prospect worthy of fervent pursuit, and warranting decisive action.

10.     Accordingly, from the moment that it put the very first dollar of emergency financing into GM, Treasury has acted as a prudent lender seeking to protect its investment, and thus expressly conditioned its financial commitment upon GM's meaningful progress towards long-term viability. Following President Obama's March 30, 2009, announcement that GM's efforts to develop a long-term viability plan had fallen short – and that the advancement of any additional federal loans to GM beyond the subsequent sixty-day period

---

[4]   In addition, both the government of Canada and the government of Ontario, through Export Development Canada (collectively, "<u>Canada</u>"), propose to provide $9.1 billion in debtor-in-possession and other financing to support GM's North American operations.

would require a more aggressive effort to map out a clear path to long-term viability – efforts to arrive at a solution intensified. Indeed, President Obama's remarks of March 30th left no doubt that exhaustive effort would be required over the ensuing sixty days if GM was to have access to additional federal funding after June 1st:

> [W]hat we're asking for is difficult. It will require hard choices by companies. It will require unions and workers who have already made extraordinarily painful concessions to do more. It'll require creditors to recognize that they can't hold out for the prospect of endless government bailouts. . . . It will require efforts from a whole host of other stakeholders, including dealers and suppliers. Only then can we ask American taxpayers who have already put up so much of their hard-earned money to once more invest in a revitalized auto industry. But I'm confident that if each are willing to do their part, if all of us are willing to do our part, then this restructuring, as painful as it will be in the short term, will mark not an end, but a new beginning for a great American industry . . . .

Barack H. Obama, President of the United States, Remarks by the President of the United States on the American Automotive Industry (Mar. 30, 2009), available at http://www.whitehouse.gov.

11. In connection with the effort that followed, Treasury and the Auto Task Force, together with their advisors, continued their already-extensive due diligence and analysis of all material aspects of a successful New GM. GM and other stakeholders conducted their own analyses, as well. Ultimately, all agreed that the only viable course is for GM to pursue – with the support of Treasury, Canada, and other constituents – a transaction under section 363(b) of the Bankruptcy Code (the "363 Transaction"). The transaction ultimately agreed upon contemplates the formation of a new Treasury-sponsored entity that, assuming GM receives no better offer, will acquire certain substantial assets of GM.[5] As part of the 363 Transaction, (i)

---

[5] This summary of the 363 Transaction and the transactions contemplated to occur subsequently (but substantially contemporaneously) is qualified by reference to the documentation associated with those transactions.

that newly-formed acquisition vehicle ("New GM"), as assignee of Treasury's rights and claims under the Prepetition Loan and the DIP Loan, will credit bid substantially all of GM's indebtedness under those loans against certain assets of GM, and (ii) New GM will contribute 10% of its common equity to GM (plus two tranches of warrants at various strike prices, each for an additional 7.5% equity stake), for distribution under this Court's supervision in these Cases.[6] Subsequently (but substantially simultaneously with the closing of the 363 Transaction), New GM will allocate 17.5% of its common equity on an undiluted basis to a new Voluntary Employee Beneficiary Association formed pursuant to an agreement between New GM and its unionized work force (the "New VEBA"), and 11.7% of its common equity (pre-dilution) to Canada. As a result, upon the full consummation of the 363 Transaction and subsequent allocations of New GM equity, Treasury ultimately is contemplated to hold an undiluted 60.8% stake in New GM.

12. The 363 Transaction and allocations of certain agreed-upon value from New GM to the New VEBA, Canada, and to existing GM for disposition in these Cases, have garnered support from a broad spectrum of constituents. GM, GM's work force, Treasury, Canada, GM's other secured lenders, and more than 54% of GM's approximately $27 billion of unsecured bondholders (collectively, the "Supporting Bondholders") all support the consummation of the 363 Transaction and the related allocations of value from New GM. This transformation, however, must be completed quickly. Prompt approval and consummation of the 363 Transaction is essential to avoid any further erosion of consumer confidence or disturbance to GM's supply chain. Moreover, as stated, Treasury contemplates providing GM with the

---

[6] Under certain circumstances, a post-closing purchase price adjustment could result in 2% more of common equity being paid to GM.

approximately $33.3 billion DIP Loan so that GM can maintain its operations pending the close of the 363 Transaction, and fund the wind-down of these estates. The continued availability of such financing is expressly conditioned upon, among other things, the decisively swift approval and closing of the 363 Transaction. Absent such financing, GM faces immediate liquidation.

13. If the Court approves the 363 Transaction and New GM is as successful as Treasury expects it to be based upon its extensive due diligence and analysis, New GM will save hundreds of thousands of jobs, protect important healthcare, pension, and other benefits for its employees and retirees, and benefit the dealers, suppliers, and other businesses that depend upon New GM for their own existence. But time is of the essence. Any delay risks permanent, and possibly fatal, harm to the viability of New GM. Treasury therefore is strictly conditioning its willingness to provide financing on prompt completion of the 363 Transaction. In turn, because Treasury's financing unquestionably maximizes value to the estates, timely approval of the proposed DIP Loan and the 363 Transaction is essential.

**THE GOVERNMENT'S AUTHORITY TO EXTEND THE PREPETITION LOAN AND THE DIP LOAN, AND TO SPONSOR THE 363 TRANSACTION**

14. Treasury is participating in these Cases as an existing senior secured lender to GM under the Prepetition Loan, and as proposed senior secured lender to GM under the contemplated DIP Loan. The Government is well aware that GM's bankruptcy comes quickly on the heels of Chrysler's. Although the two companies and their cases are different in many important respects, both involve iconic American automotive manufacturers seeking swift approval of transactions under section 363 of the Bankruptcy Code, with significant financing provided by the United States Government. As was well-publicized, certain disaffected creditors sought to hold up Chrysler's restructuring, arguing both that its 363 transaction ran afoul of the Bankruptcy Code, and that the Government was somehow unauthorized to make the payments

necessary to fund the transaction. Although the Government is hopeful that those arguments ran their course in the Chrysler case, we here briefly set forth the legal authority that supports the Government's participation in these Cases.

### A. Treasury Is Authorized to Provide Funding to GM Under the Troubled Asset Relief Program

15. Treasury proposes to commit in excess of $52 billion to GM as an existing senior secured lender under the Prepetition Loan, and as a proposed senior secured lender under the contemplated DIP Loan. Treasury also proposes to acquire ultimately a majority stake in New GM, which will acquire significant assets from the Debtors pursuant to the 363 Transaction. That stake flows from Treasury's exercise of remedial measures as secured lender (i.e., credit bidding), upon terms and conditions exhaustively and in good faith negotiated among Treasury, GM, GM's workers, the Supporting Bondholders, Canada, and certain other parties in interest up until the very last moment prior to the commencement of these Cases.

16. As the Chrysler objectors noted, Treasury's authority to take any of these actions – to enter into the Prepetition Loan or make the DIP Loan – turns on its ability to make payments to an automotive company. In fact and in law, however, there is no legitimate question about Treasury's authority to take these actions.

17. The Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765 (2008), created the Troubled Asset Relief Program ("TARP"), which generally authorizes the purchase by the United States of "troubled assets from any financial institution." 12 U.S.C. § 5211. "Troubled assets" are defined to include, among other things, "any . . . financial instrument that the Secretary [of the Treasury], after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such

-9-

determination, in writing, to the appropriate committees of Congress." 12 U.S.C. § 5202(9)(B). "Financial institution" is broadly defined to include "any institution . . . established and regulated under the laws of the United States or any State, territory, or possession of the United States . . . and having significant operations in the United States . . . ." 12 U.S.C. § 5202(5).

18. The express purposes of EESA are, among other things, to "restore liquidity and stability to the financial system of the United States," and to ensure that expenditure of taxpayer funds "protects home values, college funds, retirement accounts, and life savings," "preserves homeownership and promotes jobs and economic growth," and "maximizes overall returns to the taxpayers of the United States." 12 U.S.C. § 5201.

19. Consistent with these purposes, and pursuant to section 101(d) of EESA, 12 U.S.C. § 5211(d), the Secretary of the Treasury has promulgated guidelines for allocating resources under TARP to "prevent a significant disruption of the American automotive industry that poses a systemic risk to financial market stability and will have a negative effect on the real economy of the United States." See Guidelines for Automotive Industry Financing Program, http://www.financialstability.gov/docs/AIFP/AIFP_guidelines.pdf.

20. Furthermore, on December 19, 2008, the Secretary of the Treasury issued a written determination, in consultation with the Chairman of the Board of Governors of the Federal Reserve System, that certain holding companies engaged in the manufacturing of automotive vehicles are eligible for funding under the TARP Significant Failing Institutions Program. See Determination of the Secretary of the Treasury, Dec. 19, 2008. By letters dated December 23, 2008, to "the appropriate committees of Congress" – the Senate Committees on Finance; the Budget; Banking, Housing and Urban Affairs; and Appropriations; and the House Committees on Appropriations; the Budget; Financial Services; and Ways and Means – then-

Secretary of the Treasury Henry M. Paulson, Jr. delivered a written notification of that determination pursuant to section 3(9)(B) of EESA, 12 U.S.C. § 5202(9)(B). True and correct copies of the Secretary's determination and letters to Congress are attached as Exhibit A.

21.    On April 29, 2009, the Secretary of the Treasury issued a written determination reaffirming that automotive manufacturers are eligible for TARP funding under Treasury's Automotive Industry Financing Program. See Determination of the Secretary of the Treasury, Apr. 29, 2009 (attached hereto as Exhibit B). The April 29th determination has the effect of providing notice that the postpetition financing to be provided by Treasury to GM satisfies the requirements of EESA for use of TARP funds.

22.    There is therefore no legitimate question that Treasury had, and has, ample statutory authority to use TARP funds to provide financial assistance to GM – funds which, as noted above, have already saved GM from an all but certain and calamitous liquidation, and which will facilitate the creation of a new entity that will carry a revitalized, transformed, competitive, and viable enterprise into the automotive business of the 21st century and beyond. See 12 U.S.C. § 5211(c)(4) (authorizing Treasury Secretary to "establish[] vehicles . . . to purchase, hold, and sell troubled assets and issue obligations"); id. §§ 5216(a)-(c) (authorizing Treasury Secretary to "exercise any rights received in connection with," "manage," and "sell, or enter into securities loans, repurchase transactions, or other financial transactions in regard to, any troubled asset purchased under this chapter").

23.    The only argument to the contrary – advanced by the dissident secured debtholders in Chrysler[7] – questions whether an automotive manufacturer can be a "financial

---

[7]    Ultimately, Judge Gonzalez concluded that Chrysler's creditors lacked standing to assert any arguments about the authority for the Government's loans, because they had no injury in fact traceable to

-11-

institution" within the meaning of EESA. Putting aside the determinations made by two Treasury Secretaries that they are (which determinations are entitled to significant judicial deference), GM plainly fits within the statutory language because it is an "institution . . . established and regulated under the laws of the United States or any State, territory, or possession of the United States . . . and having significant operations in the United States." 12 U.S.C. § 5202(5). GM is established under Delaware law, is "regulated" by the United States and by numerous states, and has "significant operations in the United States." It is therefore a "financial institution" within the meaning of EESA.[8]

**B.    GM, Treasury, and Others Negotiated the Terms of
       the 363 Transaction in Good Faith, and at Arm's Length**

24.    The other principal argument relating to the Government's role in the Chrysler bankruptcy was the baseless insinuation that the Government somehow dominated the negotiations of Chrysler's section 363 transaction to such an extent that the transaction was not made in good faith. As in Chrysler, any such suggestion about the negotiation of the 363 Transaction involving GM lacks merit.[9]

25.    While the Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m), the Second Circuit has explained that the "[g]ood faith

---

the source of the funding. See Opinion and Order Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program, In re Chrysler LLC, No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 31, 2009).

[8]   There is also no colorable argument that the Prepetition Loan and the DIP Loan do not involve Treasury's acquisition of a "troubled asset," defined to include, in addition to certain instruments pertaining to mortgage-backed securities, "any other financial instrument." 12 U.S.C. § 5202(9). EESA's broad definition plainly reaches the types of debt instruments acquired by Treasury through its provision of approximately $19.4 billion of secured financing to GM under the Prepetition Loan and approximately $33.3 billion of secured financing under the DIP Loan.

[9]   See Opinion Granting Debtors' Motion Seeking Authority to Sell, Pursuant to 11 U.S.C. § 363, Substantially All of the Debtors' Assets, In re Chrysler LLC, No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 31, 2009) (holding that "the consummation of the Sale Transaction was conducted in good faith and at arms' length and is in the best interest of the Debtors' estates").

-12-

of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

26.    As set forth above, the 363 Transaction was the product of intense arm's length negotiations over the course of several months. The Government's conduct in these negotiations epitomizes good faith: the Government has provided and will provide billions of dollars in financing that no other lender would provide, on below-market terms, in order to avoid GM's liquidation, preserve the Government's existing investment in GM, and enable an outcome that serves both the broad spectrum of economic stakeholders in these Cases and the public at large.

## CONCLUSION

27.    The bankruptcy of one of America's automotive giants is undoubtedly historic. But while the commencement of GM's bankruptcy is an extraordinary event, ultimately the course of action outlined by GM is necessary, and the relief GM asks for lies comfortably within the experience of this Court. Today, GM has chosen to pursue its path to long-term viability through these Cases and the expedited 363 Transaction, a decision the Government fully supports. Indeed, Treasury, as senior secured prepetition lender and proposed DIP lender, has made clear that its financial support for GM is predicated entirely upon the prompt approval of the 363 Transaction – the only alternative to GM's immediate liquidation and the disastrous consequences that would come with it.

Dated: June 1, 2009
      New York, New York

                                  LEV L. DASSIN
                                  Acting United States Attorney for the
                                  Southern District of New York,
                                  Attorney for the United States of America

                        By:    /s/  Matthew L. Schwartz_____
                                  DAVID S. JONES
                                  JEFFREY S. OESTERICHER
                                  MATTHEW L. SCHWARTZ
                                  JOSEPH N. CORDARO
                                  Assistant United States Attorneys
                                  86 Chambers Street, Third Floor
                                  New York, New York 10007
                                  Telephone: (212) 637-2739/2698/1945/2745
                                  Facsimile:  (212) 637-2750
                                  E-mail:  david.jones6@usdoj.gov
                                             jeffrey.oestericher@usdoj.gov
                                             matthew.schwartz@usdoj.gov
                                             joseph.cordaro@usdoj.gov

John J. Rapisardi, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
– Of Counsel to the Presidential
Task Force on the Auto Industry –
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:   (212) 504-6666
E-mail:  john.rapisardi@cwt.com