Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :        Chapter 11 Case No.
                                    :
GENERAL MOTORS CORP., et al.,       :        09-_____ (___)
                                    :
                  Debtors.          :        (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO**
**11 U.S.C §§ 105(a) AND 363(b) (I) AUTHORIZING DEBTORS TO PAY**
**PREPETITION OBLIGATIONS TO FOREIGN CREDITORS AND**
**(II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS**
**TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

**Background**

1.     On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

   2.  Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

   3.  For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

   4.  William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

     5.     Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

     6.     GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

     7.     The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific –

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned.  In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.    As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.    As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.  Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

10.    In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.    This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.    The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

13.     The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability.  On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President outlined a series of actions that GM would have to undertake to receive additional federal assistance.  In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.     President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market." *Id.*  The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.     The U.S. Government set a deadline of June 1, 2009 for the Company to

demonstrate its viability plan to achieve the foregoing objectives. Consistent with the

President's guidance, the Company began a deeper, more surgical analysis of its business and

operations in an effort to develop a viability plan that would accommodate the needs of its

secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a

healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology

leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable

in that timeframe, then the Company should consider undertaking a new, more aggressive plan

using an expedited, Bankruptcy Court-supervised process to implement the purchase of the

Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the

Bankruptcy Code (the "363 Transaction"). The purchaser would immediately take ownership of

the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the

Company to implement the sale and to support the new enterprise, it requires that the sale of

assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases. As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation. The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry. The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.    Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.    The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.    The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  *Presidential Remarks* at 7.

## Jurisdiction

29.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

30.    By this Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, prepetition claims (the "Foreign Claims") owing to vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (collectively, the "Foreign

Creditors"), including, without limitation, claims for payment for materials and services provided

to the Debtors, as well as import or tax obligations, and (b) authorizing and directing the

Debtors' banks and other financial institutions (collectively, "Banks") to receive, process, honor,

and pay, to the extent of funds on deposit, checks or electronic transfers used by the Debtors to

pay prepetition obligations to the Foreign Creditors without further order of the Court.  The

Foreign Creditors include foreign vendors and foreign governmental authorities, among others.

The Debtors estimate that the outstanding obligations owing to all Foreign Creditors relating to

the period prior to the Commencement Date aggregate approximately $120 million.[2]

### Basis For Relief Requested

31.    GM is the world's largest automaker and has been the annual global

industry sales leader for 77 years.  As stated, GM employs approximately 235,000 people in 35

countries and in 2008, GM delivered 8.4 million cars and trucks worldwide.  The Debtors'

purchasing and other business transactions are necessarily global and, accordingly, the Debtors

have numerous foreign suppliers, vendors, service providers and other non-domestic

relationships which are necessary and often critical to the Debtors' ongoing manufacturing

operations and revenue generating capacity.

32.    Although the scope of the automatic stay provided for in section 362 of

the Bankruptcy Code is universal, the Court is well aware of the difficulty (if not impossibility)

of enforcing the stay in foreign jurisdictions if the creditor as to which enforcement is sought has

no presence in the United States.  As a result, despite the commencement of these cases and the

---

[2] The Debtors concurrently herewith are filing a separate motion for entry of an order authorizing the payment of prepetition claims of certain essential suppliers, vendors and service providers (the "Essential Vendor Motion").  In some instances, an essential supplier may also be a Foreign Creditor.  The amount sought to be expended in this Motion does not take into account this overlap.

imposition of the automatic stay, the Foreign Creditors likely would be able to immediately pursue remedies and seek to collect prepetition amounts owed to them.  Indeed, there is the real risk that Foreign Creditors may attach or seize the Debtors' foreign assets even prior to obtaining a judgment – thereby potentially disrupting operations.  Further, foreign governmental entities also might take remedial action and seize assets including supplies or goods needed domestically for the Debtors' manufacturing operations or in other locations in GM's global enterprise.

33.     Additionally, in the absence of payment of their Foreign Claims, there is a distinct risk that certain Foreign Creditors will cease to continue to do business with the Debtors, thereby jeopardizing the ability of the Debtors to obtain supplies and other materials which are essential to the ability of the Debtors to run their manufacturing facilities and produce vehicles.

34.     The Debtors' facilities use the "just-in-time" supply method for manufacturing their vehicles, a method which is standard in the automotive industry.  As a result, the Debtors do not keep in stock a significant inventory of the components supplied by many of the Foreign Creditors which are suppliers, and accordingly, the Debtors rely upon frequent shipments of components from such Foreign Creditors to assure the continued operation of their facilities.

35.     In addition, many of the Foreign Creditors are sole-source suppliers of certain parts or other items necessary for the Debtors' manufacturing operations, furnishing most or all of the Debtors' requirements.  In many instances these parts or items are manufactured to the Debtors' precise  specifications, and are subject to numerous tests and quality control processes which can often take months before it is determined that the part is suitable for use in the Debtors' manufacturing operations.  The Debtors utilize sole-source suppliers to minimize

capital investment, control quality, and to maintain consistency, all of which serve to minimize costs and achieve manufacturing and production efficiencies.

36.    Replacing Foreign Creditors which are sole-source suppliers simply is not feasible.  The lead time necessary for a new supplier to manufacture to the Debtors' specifications, including obtaining any tooling or other equipment necessary to the manufacturing process, and for the quality control and testing processes to be completed, necessarily would take in many instances weeks or months – circumstances which are simply incompatible with the manner in which the Debtors' facilities operate.  The failure of one sole-source Foreign Creditor to continue shipping in and of itself could cause the shut down of an entire vehicle manufacturing line.

37.    If the Foreign Creditors fail to ship necessary supplies or otherwise refuse to engage in business with the Debtors, or if foreign governmental entities or Foreign Creditors take remedial action, the impact on the Debtors' manufacturing facilities could be devastating to the Debtors' business operations.  It is patently clear that the substantial losses and overall risk to the Debtors' businesses that undoubtedly would arise from the failure to pay Foreign Creditors far outweigh the costs associated therewith.  It should also be noted that because, as stated, certain Foreign Creditors may be governmental units, their Foreign Claims may be entitled to priority under section 507(a)(8) of the Bankruptcy Code in any event.

38.    Finally, if the Debtors do not have the ability to pay Foreign Creditors as requested herein, the going concern value of the GM enterprise will be severely impaired, thereby jeopardizing the 363 Transaction to the detriment and prejudice of all parties in interest.

39.    In order to maximize the value of the payment of the prepetition Foreign Claims in the ordinary course of business, the Debtors propose (unless otherwise waived by the

Debtors in their discretion) that in exchange for payment of their prepetition claims, the Foreign

Creditors continue to provide goods and services to the Debtors on the most favorable terms in

effect between such Foreign Creditor and the Debtors in the twelve month period preceding the

Commencement Date or on such other favorable terms as the Debtors and the Foreign Creditor

may otherwise agree (the "Customary Trade Terms").  The Debtors propose that the Customary

Trade Terms apply for the balance of the term of the Foreign Creditor's agreement with the

Debtors, *provided* that the Debtors pay for the goods and services in accordance with the

payment terms provided in the agreement.  If any Foreign Creditor is paid with respect to its

prepetition claim and thereafter does not continue to provide goods, services, or other items to

the Debtors on Customary Trade Terms, any payments made will be deemed an avoidable

postpetition transfer under section 549 of the Bankruptcy Code and will be recoverable by the

Debtors in cash upon written request.  Upon recovery by the Debtors, the Foreign Creditors'

claim will be reinstated as a prepetition claim in the amount recovered.  The Debtors also seek

authorization, but shall not be obligated, to obtain written verification, before issuing payment to

a Foreign Creditor, that such Foreign Creditor will continue to provide goods and services to the

Debtors on Customary Trade Terms as described above; *provided, however*, that the absence of

such written verification will not limit the Debtors' rights and relief sought herein.

## Applicable Authority

40.    The relief requested herein is supported by several provisions of the

Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain

circumstances, and by well-settled case law.  For example, Courts have authorized debtors to

make payments to foreign creditors under sections 363(b) of the Bankruptcy Code.  *See, e.g.*, *In*

*re UAL Corp.*, Ch. 11 Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002).  In addition,

sections 1107(a) and 1108 of the Bankruptcy Code also provide authority for the relief sought in this Motion.  Those sections vest a debtor in possession with authority to continue operating its business, and as a fiduciary, a debtor in possession has an obligation to maximize value for all stakeholders which may require the payment of certain prepetition claims.  *See, e.g.*, *In re Mirant Corp.,* 296 B.R. 427 (Bankr. N.D. Tex. 2003); *In re CoServ, L.L.C.*, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).  Lastly, many Courts have authorized the payment of prepetition obligations pursuant to section 105(a) of the Bankruptcy Code, which allows a Bankruptcy Court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999).

A.    This Court May Authorize Payment of the Foreign
      Claims Pursuant to Section 363(b) of the Bankruptcy Code

41.    The Court has the authority to grant the relief requested in this Motion pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts have properly relied on section 363(b)'s broad authority to expend money to authorize debtors in possession to pay prepetition claims of foreign creditors in circumstances where, as here, the estate will obtain more value for all creditors or avoid more harm by making the prepetition payments.  *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (Bankr. M.D. Fla. 2005) (authorizing debtor to pay, pursuant to 363(b), certain foreign creditors' prepetition claims where such payments were "necessary" and "appropriate" to debtor's reorganization).  Here, because the relief requested in this Motion is critical to the maintenance and operation of the Debtors' manufacturing facilities and revenue-generating capacity, and generally contemplates that payments will be made to

Foreign Creditors who agree to provide goods or services on Customary Trade Terms, the transaction between the Debtors and such Foreign Creditors is authorized by section 363(b) of the Bankruptcy Code.

B.    The Payment of the Foreign Claims Is an
      Appropriate Exercise of the Debtors' Fiduciary Duties

        42.    The Debtors, as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. at 497.  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

        43.    There are certain instances in which a debtor in possession can appropriately fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *Id*.  The *CoServ* Court specifically noted that pre-plan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole-suppliers of a given product." *Id.* at 497-98.  The *CoServe* Court considered three factors in determining whether payment of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

44.    All of these factors clearly exist here.  As demonstrated above, the Debtors

must deal with the Foreign Creditors in view of the limitations on the ability to enforce the

automatic stay and the critical nature that many of the Foreign Creditors have on the Debtors'

ability to maintain the continued operation of their manufacturing facilities and retain the value

of their business operations.  The dislocation, prejudice, loss of value, and adverse impact on the

Debtors' business enterprise is grossly disproportionate to the amount likely to be paid to

Foreign Creditors in order to assure the flow of necessary goods, supplies, and services, avoid

any untoward disruption of business operations and/or a significant increase in costs, and ensure

the viability of the 363 Transaction.  Lastly, as demonstrated above, there is no practical

alternative to effectively deal with the Foreign Creditors other than as proposed herein.

C.    The "Necessity Of Payment" Doctrine
      Supports the Relief Requested in the Motion

45.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any

order, process, or judgment that is necessary to carry out the provisions of this title."  11 U.S.C.

§ 105(a).  A Bankruptcy Court's use of its equitable powers to "authorize the payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a

novel concept."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).

46.    The "necessity of payment" doctrine further supports the relief requested

in this Motion.  The "necessity of payment" doctrine recognizes the existence of the judicial

power to authorize a debtor in a reorganization case to pay prepetition claims where such

payment is essential to the continued operations of the debtor.  *See In re Lehigh & New England*

*Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that Court may authorize payment of

prepetition claims if such payment is essential to continued operation of debtor, such as where there is a "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Penn Cent. Transp. Co.*, 467 F.2d 100 n.1 (3d Cir. 1972) (holding that "necessity of payment" doctrine "permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re C.A.F. Bindrey*, 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (holding that payment of prepetition claims is warranted when payment is "critical to the debtor's reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176.  Payments to foreign creditors, which are necessary to ensure that critical foreign vendors will continue to supply goods and services essential to the conduct of the business, are often paid pursuant to the "necessity of payment" doctrine, also recognizing that it is particularly difficult to enforce the automatic stay in foreign countries.  *See, e.g.*, *In re WorldCom, Inc.*, Ch. 11 Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2002) (allowing payment of prepetition obligations to foreign creditors on the basis that such creditors may exercise remedies in contravention of automatic stay in foreign jurisdictions).

47.    As stated, the limitations of the enforceability of the automatic stay, the risk of the exercise of remedial rights, and the critical nature of goods and services relating to the Foreign Creditors mandate that the relief requested in this Motion be granted.  Indeed, many of the Foreign Creditors likely are also critical vendors and all of the factors demonstrating the need to pay such claimants as set forth in the "Essential Vendor Motion" filed contemporaneously herewith, are equally applicable here.  Simply stated, payment of the Foreign Claims as proposed

in this Motion will assure the orderly operation of the Debtors' businesses and avoid costly disruptions and the significant loss of value and irreparable harm attendant thereto.

48.    To facilitate the payment of Foreign Creditors, the Debtors request that the banks that provide banking services to the Debtors be authorized and required to (a) honor any checks drawn against their accounts, but not cleared prior to the Commencement Date, and (b) complete any fund transfer requests made but not completed prior to the Commencement Date. In addition, the Debtors respectfully request authorization to issue postpetition checks and to make postpetition fund transfer requests to replace any prepetition checks and prepetition transfers to Foreign Creditors that may be dishonored by the banks.

**The Debtors Have Satisfied Bankruptcy Rule 6003**

49.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after the Commencement Date. Fed. R. Bankr. P. 6003. As described herein and in the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business operations rely heavily on the relief requested herein, because otherwise holders of Foreign Claims are likely to take action either remedially or by not providing critical goods, supplies, and services which will cause serious adverse consequences, including loss of value and a detrimental impact on the ability to consummate the 363 Transaction. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## **Waiver of Bankruptcy Rules 6004(a) and (h)**

50.     To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

51.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

52.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
      June 1, 2009

            /s/ Stephen Karotkin
            Harvey R. Miller
            Stephen Karotkin
            Joseph H. Smolinsky

            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, New York 10153
            Telephone: (212) 310-8000
            Facsimile: (212) 310-8007

            Attorneys for Debtors
            and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                           :
In re                                      :            **Chapter 11 Case No.**
                                           :
**GENERAL MOTORS CORP.,** *et al.*,        :            **09-_____ (___)**
                                           :
                      **Debtors.**         :            **(Jointly Administered)**
                                           :
------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) (I) AUTHORIZING DEBTORS TO PAY PREPETITION OBLIGATIONS TO FOREIGN CREDITORS AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the Motion, dated June 1, 2009 (the "Motion"), [1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a) and 363(b)

of title 11, United States Code (the "Bankruptcy Code"), for entry of an order (i) authorizing the

Debtors to pay, in the ordinary course of business, as and when due, any prepetition claims

owing to Foreign Creditors, and (ii) authorizing and directing the Banks to honor and pay, to the

extent of funds on deposit, any prepetition checks drawn or fund transfer requests made for

payment of claims owing to Foreign Creditors without further order of the Court, all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order

M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the Office of the United States Trustee

for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys

for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement,

(v) the attorneys for the agent under GM's prepetition amended and restated secured revolving

credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a

consolidated basis), (vii) the attorneys for the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "Hearing"); and

upon the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (the

"Henderson Affidavit"), the record of the Hearing, and all of the proceedings had before the

Court; and the Court having found and determined that the relief sought in the Motion is

necessary to avoid immediate and irreparable harm to the Debtors and their estates, as

contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates,

creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

       ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Debtors are authorized (but not required) to pay, in their discretion and in the ordinary course of business, as and when due, the Foreign Claims; and it is further

ORDERED that in exchange for payment of the Foreign Claims, unless otherwise waived by the Debtors in their sole discretion, the Foreign Creditors shall be required to continue to provide goods and services to the Debtors on the most favorable terms in effect between such Foreign Creditor and the Debtors in the twelve (12) month period preceding the Commencement Date or on such other favorable terms as the Foreign Creditor and the Debtors may otherwise agree (the "Customary Trade Terms").  The Customary Trade Terms shall apply for the remaining term of the Foreign Creditor's agreement with the Debtors, *provided* that the Debtors pay for the goods in accordance with the payment terms provided in the agreement; and it is further

ORDERED that the Debtors are hereby authorized, but not directed, to obtain written verification, before issuing payment to a Foreign Creditor, that such Foreign Creditor will, if relevant, continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Creditor's agreement with the Debtors; *provided*, *however*, that the absence of such written verification shall not limit the Debtors' rights hereunder; and it is further

ORDERED that if any Foreign Creditor is paid with respect to its prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, any payments made to the Foreign Creditor shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and shall be

recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the

claim shall be reinstated as a prepetition claim in the amount recovered; and it is further

ORDERED that all Banks are hereby authorized and directed to receive, process,

honor, and pay, to the extent of funds on deposit, any and all checks and transfer requests

evidencing amounts paid by the Debtors under this Order whether presented prior to or after the

Commencement Date.  Such banks and financial institutions shall be authorized to rely on the

representations of the Debtors as to which checks are issued or authorized to be paid pursuant to

this Order; and it is further

ORDERED that nothing contained herein shall (a) constitute, or shall be deemed

to constitute, the assumption of any contract or agreement under section 365 of the Bankruptcy

Code, or (b) create or be deemed to create any rights in favor of, or enhance the status of any

claim held by, any person; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), this Order shall be

effective and enforceable immediately upon entry, and the Debtors may, in their discretion and

without further delay, take any action and perform any act authorized under this Order; and it is

further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that the Final Hearing to consider entry of an order granting the relief

requested in the Motion on a final basis shall be held on _____, 2009 at __:00 _.m. (Eastern

Time); and any objections to entry of such order shall be in writing, filed with the Court in

accordance with General Order M-242, and served upon those parties entitled to receive service

of this Order as provided below, in each case so as to be received no later than 4:00 p.m. (Eastern Time) on _____ _, 2009; and it is further

ORDERED that the Debtors shall serve this Order within three business days of its entry on (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors, (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.


Dated:      New York, New York
            _____, 2009


_____
UNITED STATES BANKRUPTCY JUDGE