Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                            :
**In re**                                   :          **Chapter 11 Case No.**
                                            :
**GENERAL MOTORS CORP., et al.,**           :          **09-_____ (___)**
                                            :
                          **Debtors.**      :          **(Jointly Administered)**
                                            :
------------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDER**
**PURSUANT TO 11 U.S.C. §§ 105(a) AND 363**
**AUTHORIZING DEBTORS TO HONOR PREPETITION**
**OBLIGATIONS TO CUSTOMERS, DEALERS, AND TRADE**
**CUSTOMERS AND TO OTHERWISE CONTINUE WARRANTY,**
**CREDIT CARD, OTHER CUSTOMER, DEALER, AND TRADE**
**CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

submit this Motion for authority to (a) fully honor and continue their warranty programs and

(b) fully honor and continue certain prepetition customer programs.  In support of this Motion,

the Debtors respectfully represent as follows:

## Background

1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

3.      For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.      William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the

automotive market by dividing it into distinct price segments, ranging from low-priced to luxury.

Based on that strategy, the Company proceeded to build an automotive manufacturing giant

offering distinctive brands and models for each market segment.

5.      Over the past century, the Company grew into a worldwide leader in

products and services related to the development, manufacture, and marketing of cars and trucks

under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden,

HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced

nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The

recent severe economic downturn has had an unprecedented impact on the global automotive

industry.  Nevertheless, particularly in the United States, the automotive industry remains a

driving force of the economy.  It employs one in ten American workers and is one of the largest

purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic

and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of

U.S. industrial production by value, are related to the automotive industry.

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization
proceedings in Sweden in February 2009.

6.    GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.    The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.    As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.    As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

## The Economic Downturn and the U.S. Treasury Loan

10.     In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.     This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.     The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

   13. The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "<u>Long-Term Viability Plan</u>") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"<u>Presidential Task Force</u>").

<u>**The U.S. Treasury-Sponsored Program for GM**</u>

   14. On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

   15. President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.* The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger." *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure
> as a tool that, with the backing of the U.S. Government, can
> make it easier for General Motors . . . to *quickly* clear away
> old debts that are weighing [it] down so that [it] can get
> back on [its] feet and onto a path to success; a tool that we
> can use, even as workers stay on the job building cars that
> are being sold.
>
> What I'm not talking about is a process where a company is
> simply broken up, sold off, and no longer exists.  We're not
> talking about that.  And what I'm *not talking about is a
> company that's stuck in court for years, unable to get out*.

*Id.* at 5-6 (emphasis added).

      16.    The U.S. Government set a deadline of June 1, 2009 for the Company to

demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the

President's guidance, the Company began a deeper, more surgical analysis of its business and

operations in an effort to develop a viability plan that would accommodate the needs of its

secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a

healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology

leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable

in that timeframe, then the Company should consider undertaking a new, more aggressive plan

using an expedited, Bankruptcy Court-supervised process to implement the purchase of the

Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the

Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of

the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

### The Exchange Offer

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

### The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser

sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.    Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.     The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  *Presidential Remarks* at 7.

## Jurisdiction

29.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

30.     The Debtors' customers are the lifeblood of their business.  In this highly competitive business, customer satisfaction is the key to survival.  Before the Commencement Date and in the ordinary course of their business, the Debtors offered certain customer programs

and engaged in certain customer practices to develop and sustain a positive reputation in the
marketplace for their services and to engender customer loyalty.

31.     As described above, the Debtors' business operations primarily involve
the manufacture and distribution of motor vehicles through a network of authorized dealers
("Dealers") operating under the Buick, Chevrolet, Pontiac, GMC Truck, Hummer, Saturn, Saab,
and Cadillac trade names.  As of April 30, 2009, the Debtors sold vehicles to approximately
6,099 Dealers in the United States, 708 in Canada, and 270 in Mexico.  Dealers, in turn, resell
vehicles and parts to retail consumers and are primarily responsible for maintaining the business
relationships with consumers.  The Dealers negotiate pricing with their customers and provide
service and repair following a vehicle purchase.  Sales incentives are a major component of the
economic relationship between the Debtors and their Dealers.

32.     In addition to the vehicles sold to Dealers for consumer retail sales, the
Debtors also have a direct customer relationship with businesses and governmental units that
purchase at least five motor vehicles from the Debtors per year ("Fleet Customers").  Sales to
Fleet Customers are consummated through the Debtors' network of Dealers, and in some cases,
directly by the Debtors.  In 2008 worldwide fleet sales amounted to approximately 2.3 million
units, approximately 820,000 of which were sold in the United States.  Fleet sales represent in
excess of 25% of the Debtors' total vehicle-unit sales.

33.     The operations of the Debtors are not limited to the sale of vehicles, as the
sale of automotive parts and accessories to direct customers are also integral to the business of
the Debtors.  The Debtors conduct the automotive parts and accessories business through various
brands, including, ACDelco, GM Parts, GM Performance Parts, GM Restoration Parts, and GM
Accessories; and maintain relationships with buying groups and various primary and secondary

customers, including, dealers, distributors, jobbers, independent repair facilities, and various group purchasing organizations (collectively, "Trade Customers").

34.     Prior to the Commencement Date and in the ordinary course of their businesses, the Debtors maintain certain customary business practices and programs for the benefit of Dealers, Fleet Customers and Trade Customers in connection with the marketing and promotion of the sale of their vehicles, and parts and accessories (collectively, the "Customer Programs").  Such practices and programs include, among others, warranty programs, recall programs, credit card programs, sales incentive programs, Dealer support programs, customer rebates and allowances, and repurchase programs, certain of which are described in greater detail below.  The objective of the Customer Programs is to maximize revenues and profitability, generate customer loyalty and goodwill, ensure consumer satisfaction, and maintain a competitive position in the marketplace.

35.     Pursuant to sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code, the Debtors request authority in their business judgment to (a) perform and honor their prepetition obligations related to the Customer Programs as they deem appropriate, and (b) continue, renew, replace, implement new, and/or terminate one or more of the Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

36.     The Debtors believe that the assurance to the consumer public that all vehicle and parts warranties (whether pre- or postpetition) will be honored on an uninterrupted basis is crucial to their ongoing business operations and goodwill, and absolutely essential to maintaining customer loyalty.  Similarly, maintenance of the other Customer Programs will further the same goals and serve to preserve long-standing relationships, promote the Debtors'

competitive position in the marketplace, and ultimately enhance revenue and profitability. The

aggregate cost to the Debtors to honor and continue the Customer Programs is insignificant when

compared to the irreparable harm and detrimental impact on their businesses that will be suffered

if these programs are abandoned. Maintenance of the Customer Programs is essential to the

ability of the Debtors to effectively compete in the market and to the continued viability of the

Debtors' business enterprise.

    37.    The following are general descriptions and examples of certain of the

Customer Programs provided by the Debtors. They include the Debtors' Warranty and Service

Programs, Recall Programs, GM Card Programs, Sales Incentive Programs, Dealer Support

Programs, Vehicle Repurchase Programs, and Trade Customer Programs (each as defined

below). The following is not all inclusive and does not set forth all of the Customer Programs

that are provided by the Debtors.

    A.    <u>Warranty and Service Programs</u>

    38.    Like all automotive manufacturers, GM provides a written warranty of

various parts, systems, and accessories in connection with the retail sale of its parts and motor

vehicles. Dealers, in turn, agree to perform repairs on qualified vehicles upon the owner's

request and in some very limited circumstances, arrange for the repurchase of the vehicle. In

exchange, GM has agreed to reimburse its Dealers and certain Fleet Customers for such services

in accordance with GM's Service Policies and Procedures Manual (the "<u>Service Manual</u>"),

which applies to all Dealers throughout the United States. Ultimately, retail customers and Fleet

Customers obtain a wide range of after-sale vehicle services and products through the Dealer

network, such as maintenance, light repairs, collision repairs, vehicle accessories, courtesy

transportation, road-side assistance, and extended service warranties (collectively, the "Warranty and Service Programs for Consumers and Fleet Customers").

39.     GM's reimbursement levels provide Dealers with reasonable compensation for performing warranty work.  Pursuant to the Service Manual, and subject to local regulatory requirements, GM typically reimburses its Dealers in the United States based on a uniform methodology that uses a fixed markup over the Dealer list price of the parts, plus the Dealer's established hourly rate for labor, multiplied by GM's labor-time guidelines, which provide the labor hours allotted for a specific repair.  Although Dealers typically submit reimbursement requests promptly following the repairs they perform, the Dealers have up to 180 days from the service date to submit warranty reimbursement claims.  During 2008, the Debtors estimate that they accrued approximately $273 million per month in obligations in connection with the Warranty and Service Programs for Consumers and Fleet Customers.

40.     In addition to these reimbursements to Dealers, in order to maintain customer satisfaction, the Debtors sometimes reimburse customers for out-of-pocket expenses or inconvenience in connection with informal claims consumers send to the Debtors alleging individual problems with the quality or performance of the GM vehicles purchased or leased, or with the purchased automotive parts and accessories that arise from but are not covered by the written warranties, but that are nevertheless considered part of the Debtors' Warranty and Service Programs for Consumers and Fleet Customers.  On occasion, the Debtors repair or repurchase such vehicles as part of their consumer satisfaction efforts.  On occasion, the Debtors resolve such customer satisfaction issues through its own alternate dispute resolution mechanism, state-run dispute resolution mechanisms or in-court resolution.  The Debtors estimate that, during

2008, they accrued approximately $3 million per month in obligations in connection with these customer satisfaction efforts.

41.    In the case of Trade Customers, GM also provides limited written warranties to Trade Customers and to consumers under a third-party insured program underwritten by Universal Warranty Corp. ("Trade Customer Warranty," and together with the Warranty and Service Programs for Consumers and Fleet Customers, the "Warranty and Service Programs").

42.    It is self-evident that continuation of the Warranty and Service Programs is essential to the Debtors' ongoing business operations, to the maintenance of customer goodwill and loyalty, and to efforts to preserve the residual value of GM-branded products in the marketplace.  Any risk that these programs will not continue in accordance with past practice would irreparably damage the GM enterprise and its reputation in the marketplace, to the detriment and prejudice of all parties in interest.  Indeed, if existing and future consumers cannot rely on the continued availability and honoring of warranty claims, GM's entire customer base would likely erode.

B.    Recall Programs

43.    In the ordinary course of their businesses, the Debtors, like all other OEMs, sometimes are required by federal law to institute recall campaigns to correct suspected defects in vehicles (the "Recall Programs").  Repair and maintenance work related to such Recall Programs (generally performed by the Dealers) occasionally is necessary to both (a) comply with applicable law and (b) maintain public confidence in the quality of the Debtors' brands and the safety of their vehicles.  Indeed, from time to time, the Debtors initiate their own Recall Programs to repair vehicles or have their vehicles checked by authorized repair technicians for

certain potential defects.  As of the Commencement Date, approximately $173.2 million was due and owing to Dealers under the Recall Programs.  By this Motion, the Debtors seek authority to continue to honor the Recall Programs and related policies in the ordinary course of business.

C.       GM Card Program

44.       The Debtors maintain several credit card affinity programs maintained by third party financial institutions whereby GM provides reward points redeemable for discounts on GM-branded automotive products in exchange for fees and a share of revenues generated by use of the credit cards (the "GM Card Earnings and Redemption Allowance Program" or the "GM Card Program").  The GM Card Program represents an extremely valuable marketing tool for Dealers and is responsible for building customer loyalty as well as introducing new customers to GM-branded products.

45.       Continuation of the GM Card Program is important to GM's sale efforts at this critical time by permitting the redemption of points by potential customers who might otherwise not purchase a GM product.  Additionally, prohibiting the further redemption of points would send the wrong message to customers about the viability of GM.  By this Motion, the Debtors request authority to honor, in their discretion, the GM Card Program in the ordinary course of business, including, without limitation, allowing the continued redemption of reward points earned prior to the Commencement Date as well as authorizing the continued performance by the Debtors under agreements with the financial institutions administering the GM Card Program.[2]

---

[2] The authorization sought hereunder is not intended to constitute an assumption of any contract or agreement pursuant to section 365 of the Bankruptcy Code.

D.        Sales Incentive Programs

46.        As stated, the Debtors' motor vehicles and certain GM-branded automotive products are sold through various dealerships across the United States and abroad.  In connection with their relationships with the Dealers and other participants in sales channels through which the Debtors sell such products, the Debtors in the ordinary course of business provide certain rebates, sales allowances, and other incentives (collectively, the "Sales Incentive Programs") to support the development, promotion, and marketing of GM-branded vehicles.

47.        There may be numerous types of sales incentives available at any particular time, including a choice of incentives for specific models and custom vehicles that Dealers offer to their customers.  Sales Incentive Programs generally are brand specific, model specific, or regionally specific, and are for specified time periods, which may be extended. Dealers that achieve targeted benchmarks may be eligible for rebates and allowances against Dealer invoices.  With respect to Fleet Customers, the Debtors frequently enter into contracts offering rebates if such customers meet certain sales quotas.  These rebate programs encourage Fleet Customers to concentrate their vehicle purchases on GM-branded vehicles in order to achieve those preferred pricing levels.

48.        Sales Incentive Programs are an integral part of the sales package available to consumers, Dealers and Fleet Customers and a fundamental part of the Debtors' ongoing operations and marketing effort.  These programs also enable and encourage Dealers to actively and successfully promote the Debtors' products.  The inability to honor the Sales Incentive Programs in the ordinary course of the Debtors' business would undermine the sales efforts of both GM and its Dealers with respect to both retail and Fleet Customers.

49.     Given the Debtors' current efforts to reduce the overall number of Dealers in the GM dealer network going forward, the Debtors must provide assurances that the Debtors can and will continue to honor all of their financial obligations to those Dealers the Debtors wish to retain.  For those Dealers that will not be continuing, the ability to honor these prepetition accruals will be essential to the Debtors' ability to negotiate agreements providing for the orderly wind-down of such Dealers in a manner which maintains the market value of the Debtors' vehicles and reduces substantially the number of vehicles that would otherwise be returned to the Debtors under various financing arrangements.

50.     The Debtors incur liabilities for the Sales Incentive Programs based upon the terms of their agreements with the relevant customers.  As of the Commencement Date, approximately $412 million was due and owing to Dealers under the Sales Incentive Programs.  Based on the foregoing, the Debtors request authorization to honor all of their obligations under the Sales Incentive Programs and to continue them as deemed appropriate, in the ordinary course of business, without further application to the Court.

E.     Dealer Support Programs

51.     Given the extent of GM's dependence upon its Dealers, GM has long taken steps to ensure the success and financial stability of its Dealer network.  To achieve that goal, GM has implemented a variety of Dealer support programs that, among other things, facilitate (i) cash flows between GM and its Dealers, (ii) Dealers' ability to finance their inventory, and (iii) shared advertising by regionally affiliated Dealer associations (the "Dealer Support Programs").  The Debtors incur certain liabilities, credits, and obligations to their Dealers pursuant to these Dealer Support Programs.  Below is a sampling of the most significant Dealer Support Programs.

52.     First, Dealers are entitled to a refund equal to approximately 3% of each

vehicle Manufacturer's Suggested Retail Price ("MSRP").  These payments, which are called

"holdbacks," accumulate over time and provide GM with a steady cash reserve to ensure that

GM will have positive cash flow with each of its dealerships.  Dealers receive refunds of

"holdbacks" on either a monthly or quarterly basis.

53.     Second, Dealers are entitled to a refund equal to approximately 2-2.5% of

MSRP as part of GM's wholesale floor-plan support program.  Although this program ultimately

compensates Dealers for a portion of the overhead expenses incurred selling GM products, it also

encourages Dealers to maintain an inventory of vehicles at the dealerships rather than purchasing

vehicles on an "as needed" basis.  Like the holdback, Dealers receive refunds for floor-plan

support on either a monthly or quarterly basis.

54.     Third, the Debtors also participate in programs with their Dealers that

obligate the Debtors to support future regional-marketing efforts.  Dealers benefit from this

program because the Debtors are able to coordinate marketing campaigns on a regional basis for

multiple Dealers.  Moreover, Dealers obtain cost efficiencies by receiving marketing support

from the Debtors and from combining their marketing efforts with other Dealers.

55.     Fourth, Dealers are entitled, from time to time, to reimbursement for

certain costs associated with product marketing, vehicle delivery and handling.

56.     The Debtors estimate that as of the Commencement Date, the accrued and

unpaid liabilities with respect to Dealer Support Programs aggregate approximately $677

million.  By this Motion, the Debtors seek authorization to honor all obligations under the Dealer

Support Programs and to continue them as deemed appropriate, in the ordinary course of

business, without further application to the Court.

F.        Vehicle Repurchase Programs

57.        As indicated above, historically, more than twenty-five percent (25%) of all cars and trucks sold by the Debtors are purchased by Fleet Customers, including daily rental-car companies, commercial fleet customers, leasing companies, and governmental units.  To remain competitive with other OEMs, the Debtors entered into agreements relating to certain fleet transactions, particularly with daily rental-car customers, which require that the Debtors guarantee the repurchase of customers' fleet vehicles at contractually agreed upon depreciation values (the "Vehicle Repurchase Programs").  Such vehicles are then made available for sale in the used vehicle market.

58.        Maintaining the relationships and the goodwill that the Debtors have established with their Fleet Customers is critical to the long-term prospects of the Debtors' businesses.  In order to maintain these relationships, the Debtors believe they must continue to honor contractual obligations to Fleet Customers relating to Vehicle Repurchase Programs in the ordinary course of their businesses.  Indeed, the failure to honor these programs will irreparably harm these relationships and undoubtedly result in the loss of a significant revenue stream by Fleet Customers switching to other OEM's for their purchasing needs.  The Debtors estimate that outstanding liabilities with respect to Vehicle Repurchase Programs relating to the period prior to the Commencement Date aggregate approximately $2.7 billion.  This amount, however, does not take into account the approximately $1.7 billion in revenue generated by the Debtors from the resale of the repurchased vehicles which provides a substantial offset to these payments.  Although this represents a significant expenditure by the Debtors, it is a necessary element to maintaining existing Fleet Customers and securing new Fleet Customers and the revenue

associated therewith.  Accordingly, the Debtors respectfully request that the Court authorize but

not direct the Debtors to continue to honor Vehicle Repurchase Programs in their discretion.

> G.    Trade Customer Programs

59.    In the ordinary course of business, the Debtors offer various customer

programs for their Trade Customers, the most significant of which include, but are not limited to,

rebates for pre-approved marketing initiatives, rebates for success in satisfying certain specified

strategic sales targets, credits for certain inventory returns, and credits based on purchase volume

that can be redeemed for merchandise (collectively, "Trade Customer Programs").

60.    As of the Commencement Date, the Debtors owed approximately $63

million to Trade Customers on account of Trade Customer Programs.  By this Motion, the

Debtors request authorization to honor all of their obligations under the Trade Customer

Programs and to continue them as deemed appropriate, in the ordinary course of business,

without further application to the Court.

**Ample Support Exists to Authorize the**
**Debtors to Honor and Continue Their Customer Programs**

61.    Under section 503(b)(1) of the Bankruptcy Code, a debtor may incur, and

the Court, after notice and hearing, shall allow as administrative expenses, among other things,

"the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1).

Under section 363(b) of the Bankruptcy Code, a debtor may, in the exercise of its sound business

judgment and after notice and hearing, use property of the estate outside of the ordinary course

of business.  *Id.* § 363(b).

62.    Furthermore, to supplement the explicit authority described above, section

105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A

Bankruptcy Court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177); *see also In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (Bankr. M.D. Fla. 2005) (recognizing and applying sections 105(a) and 363 of the Bankruptcy Code to justify the payment of prepetition obligations in appropriate circumstances); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) ("While prepetition claims are normally disposed of in a plan of reorganization and in accordance with statutory priorities, there are well-established 'necessity of payment' and similar exceptions."); *In re Lehigh & N. England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Debtors submit, and it hardly can be legitimately disputed, that the continuing support of their customers is imperative to their ongoing operations and the viability of the enterprise, and the uninterrupted continuance of the Customer Programs is critical to maintaining and preserving such support.

63.    In a long line of well-established cases, federal Courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport Ry.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945), *cert. denied*, 325 U.S. 873 (1945) (Second Circuit extends doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R.

09-50026-reg    Doc 42    Filed 06/01/09    Entered 06/01/09 10:53:50    Main Document
Pg 24 of 29

279, 285-86 (S.D.N.Y. 1987), *appeal dismissed*, 838 F.2d 59 (2d Cir. 1988) (approving lower

Court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

        64.     The "doctrine of necessity" functions in chapter 11 cases as a mechanism

by which the Bankruptcy Court can exercise its equitable power to allow payment of critical

prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Boston & Me.*

*Corp.,* 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to

authorize trustees to pay claims for goods and services that are indispensably necessary to the

debtors' continued operation).  The doctrine is frequently invoked early in chapter 11 cases,

particularly in connection with payment of prepetition claims.  The Court in *In re Structurelite*

*Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), indicated its accord with "the

principle that a Bankruptcy Court may exercise its equity powers under section 105(a) to

authorize payment of prepetition claims where such payment is necessary to 'permit the greatest

likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'"

The Court stated that "a *per se* rule proscribing the payment of prepetition indebtedness may

well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."  *Id.* at

932.  The rationale for the doctrine of necessity rule is consistent with the paramount goal of

chapter 11 — "facilitating the continued operation and rehabilitation of the debtor."  *Ionosphere*

*Clubs*, 98 B.R. at 176.  Pursuant to section 105(a) of the Bankruptcy Code, this Court is

empowered to grant the relief requested herein.

        65.     As described above, the Customer Programs are an integral element of the

Debtors' marketing effort and relationship with consumers, and critical to the Debtors' ability to

effectively compete in the marketplace.   The failure to maintain the Customer Programs will

completely undermine the Debtors' sales efforts and place the Debtors at a severe, and perhaps

        

insurmountable, competitive disadvantage.  This is particularly true with respect to the Warranty and Service Programs which, if not honored and continued, would have a devastating impact on the Debtors' credibility in the market and its ability to effectively and competitively sell vehicles.

66.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval of the assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.

### The Debtors Have Satisfied Bankruptcy Rule 6003

67.     Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after the Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business operations rely heavily on the relief requested herein.  Without the authority to honor the Customer Programs immediately, the Debtors' competitive position will be irreparably undermined to the detriment and prejudice of all parties in interest.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

68.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

69.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors, (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

70.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

                              /s/Stephen Karotkin
                              Harvey R. Miller
                              Stephen Karotkin
                              Joseph H. Smolinsky

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                              :
In re                                         :        **Chapter 11 Case No.**
                                              :
**GENERAL MOTORS CORP.**, *et al.*,           :        **09-_____ (___)**
                                              :
                          **Debtors.**        :        **(Jointly Administered)**
                                              :
----------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363 AUTHORIZING**
**DEBTORS TO HONOR PREPETITION OBLIGATIONS TO**
**CUSTOMERS, DEALERS, AND TRADE CUSTOMERS AND TO OTHERWISE**
**CONTINUE WARRANTY, CREDIT CARD, OTHER CUSTOMER, DEALER**
**AND TRADE CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a) and 363 of

title 11, United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, among other things,

authorizing the Debtors to perform and honor, in the ordinary course of business, the Debtors'

prepetition obligations related to all warranty and all other Customer Programs, all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York of Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the Office of the United States Trustee

for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys

for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement,

(v) the attorneys for the agent under GM's prepetition amended and restated secured revolving

credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a

consolidated basis), (vii) the attorneys for the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "Hearing"); and

upon the record of the Hearing and all of the proceedings had before the Court; and the Court

having found and determined that the relief sought in the Motion is necessary to avoid immediate

and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003,

and is in the best interests of the Debtors, their estates, creditors, and all parties in interest and

that the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that, pursuant to sections 105(a) and 363 of the Bankruptcy Code and

Bankruptcy Rule 6003, the Debtors, in their business judgment, are (a) authorized to perform and

fully honor all obligations with respect to vehicle, and parts and accessory warranties whether

arising prior to or after the Commencement Date; and (b) authorized (but not directed) to

perform and fully honor their prepetition obligations related to all other Customer Programs as

they deem appropriate, in the ordinary course of business, in each case, without further

application to or order of the Court; and it is further

ORDERED that nothing herein shall be construed to limit, or in any way affect,

the Debtors' ability to dispute any claim by a customer with respect to any Customer Program;

and it is further

ORDERED that nothing contained in this Order shall be deemed to constitute an

assumption of any executory contract pursuant to section 365 of the Bankruptcy Code; and it is

further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
      _____, 2009

                                    _____
                                    United States Bankruptcy Judge