Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :         Chapter 11 Case No.
                                    :
GENERAL MOTORS CORP., et al.,       :         09-_____ (___)
                                    :
                    Debtors.        :         (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO**
**11 U.S.C. §§ 105 AND 546(c) ESTABLISHING**
**AND IMPLEMENTING EXCLUSIVE AND GLOBAL**
**PROCEDURES FOR TREATMENT OF RECLAMATION CLAIMS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

**Background**

1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

2.       Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.       For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.       William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the

automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.    Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.    GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.    The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.      As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.      As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

10.      In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.      This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to

seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.    The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

13.    The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability.  On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.    On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President outlined a series of actions that GM would have to undertake to receive additional federal assistance.  In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.    President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market."  *Id.*  The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists.  We're not talking about

that.  And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.  Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid

potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion. GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown"). As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion. GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

21.    In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer"). The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company. The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to

consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company

and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the

Bankruptcy Code.

22.    The Exchange Offer expired on May 26, 2009 without achieving the

threshold of required tendered acceptances.

**The 363 Transaction**

23.    Recognizing that the Exchange Offer might not be successful, the

Company and the U.S. Treasury determined that it would be in the best interests of the Company

and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency

basis while the Exchange Offer was being solicited.

24.    Consistent therewith, over the past several weeks, GM and its Debtor

subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with

respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser

sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as

embodied in the MPA, contemplates that substantially all of GM's assets, including the capital

stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation

to New GM and preserve both the viability of the GM enterprise and the U.S. automotive

industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the

benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or

one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with

services reasonably required by the Sellers and such subsidiaries to wind down or otherwise

dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363

Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the

ongoing provision of certain employee and retiree benefits.

25.     The Debtors intend to use the chapter 11 process to expeditiously

consummate the 363 Transaction and establish New GM as an economically viable OEM,

serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical

element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive

industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the

industry that would occur if New GM is unable to immediately commence bankruptcy-free

operations.

26.     Notably, both the Government of Canada and the Government of Ontario,

through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to

participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability

of GM's North American enterprise.

27.     The gravity of the circumstances cannot be overstated.  The need for speed

in approving and consummating the 363 Transaction is crucial.  The business and assets to be

transferred are extremely sensitive and will be subject to major value erosion unless they are

quickly sold and transferred to New GM.  Any delay will result in significant irretrievable

revenue perishability to the detriment of all interests and will exacerbate consumer resistance to

readily accept General Motors products.  Expeditiously restoring and maintaining consumer

confidence is a prerequisite to the successful transformation and future success of New GM.

28.     The expedited approval and execution of the 363 Transaction is the

foundation of the U.S. Government's objective "to create the GM of the future," and to preserve

and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world." *Presidential Remarks* at 7.

## Jurisdiction

29.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

30.    By this Motion, the Debtors seek to establish and implement exclusive procedures (the "Reclamation Procedures") for the treatment of all unpaid claims seeking reclamation of goods pursuant to section 546(c) of the Bankruptcy Code (the "Reclamation Claims") that may be asserted against the Debtors.

31.    Prior to the Commencement Date and in the ordinary course of their businesses, the Debtors purchased on credit a variety of raw materials, parts, supplies, and other goods used in their operations (collectively, the "Goods").  As of the Commencement Date, the Debtors were in possession of certain Goods that had been delivered to them, but for which they had not yet been invoiced or made payment to the suppliers.  As a result of the commencement of these chapter 11 cases, the Debtors may receive Reclamation Claims from various vendors or other parties (collectively, the "Sellers") with respect to the Goods.  Inasmuch as the Temporary Shutdown commenced on May 18, 2009, however, the amount of Reclamation Claims is not expected to be as significant as would have been the case had the Debtors maintained their normal business operations up to the Commencement Date.

32.     Avoiding costly and distracting litigation relating to Reclamation Claims is critical at this stage of the Debtors' chapter 11 cases.  If the Debtors are unable to establish and implement uniform procedures to resolve Reclamation Claims, they could be faced with the prospect of simultaneously defending numerous reclamation proceedings at a time when their efforts should be focused on preserving enterprise value.

33.     To avoid piecemeal litigation that would interfere with the Debtors' efforts to preserve enterprise value, the Debtors seek entry of an order, pursuant to sections 105(a) and 546(c) of the Bankruptcy Code, (i) establishing Reclamation Procedures for the reconciliation and allowance of all Reclamation Claims,[2] and (ii) prohibiting the Sellers from interfering with the delivery of the Goods.  The Debtors submit that the Reclamation Procedures will effectively and efficiently streamline the process of resolving Reclamation Claims to the benefit of both the Debtors and Sellers.

**Proposed Reclamation Procedures**

34.     The Debtors propose the following procedures (the "Reclamation Procedures") for processing and reconciling Reclamation Claims:

a.      Any Seller asserting a Reclamation Claim must satisfy all procedural and timing requirements entitling it to have a right to reclamation under section 546(c) of the Bankruptcy Code;

b.      Any Seller asserting a Reclamation Claim must submit a written demand asserting such Reclamation Claim (a "Reclamation Demand") which must (i) include (A) a description of the Goods subject to the Reclamation

---

[2] Certain Sellers may receive payment on account of certain prepetition claims pursuant to other motions that have been contemporaneously filed by the Debtors, including (i) the Debtors' motion seeking authorization to pay claims arising under section 503(b)(9) of the Bankruptcy Code, which provides for the allowance, as an administrative expense, of the value of any goods received by the Debtors within 20 days before the Commencement Date in which such goods have been sold to the Debtors in the ordinary course of the Debtors' businesses; (ii) the Debtors' motion seeking authorization to pay prepetition claims of certain essential suppliers and vendors; and (iii) the motion seeking authorization to pay prepetition obligations to foreign creditors (collectively, the "Contemporaneous Motions").  To the extent a Seller receives payment on account of its prepetition claim pursuant to an order approving any of these Contemporaneous Motions, the Reclamation Procedures shall not apply to such Seller.

Demand; (B)  the name of the Debtor to whom such Goods were delivered; (C) copies of any purchase orders and invoices relating to such Goods; and (D) any evidence regarding the date(s) such Goods were shipped to and received by the Debtors; and (ii) be delivered to (A) the Debtors, c/o General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, MI 48090-9025, Attn:  Warren Command Center, Mailcode 480-206-114; and (B) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Nathan M. Pierce, Esq., so as to be received in accordance with the deadlines set forth in section 546(c) of the Bankruptcy Code;

c.    Upon receipt of a Reclamation Demand, the Debtors will serve upon the Seller, at the address indicated in its Reclamation Demand, a copy of the order granting this Motion;

d.    No later than 120 days after entry of the order granting the relief requested herein (the "Reclamation Notice Deadline"), the Debtors will file with the Court a notice (the "Reclamation Notice"), listing the Reclamation Claims and the amount (if any) of each such Reclamation Claim that the Debtors determine to be valid.  The Debtors will serve the Reclamation Notice on the following parties (the "Notice Parties"): (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) attorneys for any statutory committee of unsecured creditors (the "Committee") appointed in these chapter 11 cases; and (iii) each Seller listed in the Reclamation Notice, at the address indicated in the respective Seller's Reclamation Demand;

e.    If the Debtors fail to file the Reclamation Notice by the Reclamation Notice Deadline, any holder of a Reclamation Claim that submitted a Reclamation Demand in accordance with paragraph 34(b) of this Motion may bring a motion on its own behalf to seek relief with respect to its Reclamation Claim;

f.    Any party that wishes to object to the Reclamation Notice must file and serve an objection (a "Reclamation Notice Objection") on the Notice Parties and attorneys for the Debtors at Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Nathan M. Pierce, Esq., so as to be received no later than 4:00 pm (Eastern Time) on the twentieth (20th) day after the date on which the Reclamation Notice is filed (the "Objection Deadline").  Any Reclamation Notice Objection must include (i) a copy of the Reclamation Demand, with evidence of the date mailed to the Debtors; and (ii) a statement describing with specificity the objections to the Reclamation Notice and any legal basis for such objections;

g.    Any Reclamation Claim listed in the Reclamation Notice for which no Reclamation Notice Objection was filed and served by the Objection Deadline shall be deemed allowed by the Court in the amount identified

13

by the Debtors in the Reclamation Notice, provided that all issues relating to the treatment of any such allowed Reclamation Claim shall be reserved;

h.  Notwithstanding and without limiting the foregoing, the Debtors would be authorized, but not required, to negotiate, in their sole discretion, with any Seller and to seek an agreement resolving the Seller's Reclamation Claim or Reclamation Notice Objection.  If the Debtors and a Seller agree on the validity, amount, or treatment of the Seller's Reclamation Claim, the Debtors will prepare and file with the Court a notice of settlement (a "Settlement Notice") and serve such Settlement Notice on the Notice Parties.  Each Notice Party will have ten (10) days from the date of service of such Settlement Notice to file with the Court and serve on the other Notice Parties and attorneys for the Debtors an objection thereto (a "Settlement Objection");

i.  If no Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is timely filed and served, such Reclamation Claim will be treated in accordance with the Settlement Notice without further order of the Court.

j.  If a Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is timely filed and served, the parties may negotiate a consensual resolution of such objection to be incorporated in a stipulation filed with the Court (a "Settlement Stipulation").  Upon the filing of a Settlement Stipulation, the applicable Reclamation Claim shall be allowed and treated in accordance with the terms of the Settlement Stipulation without further order of the Court.

k.  If no consensual resolution of a Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is reached within thirty (30) days after the date the Settlement Objection was filed and served, the Debtors may file a motion with the Court requesting a hearing to fix the allowed amount of the Reclamation Claim, unless the Debtors and the party filing the Settlement Objection agree to extend such thirty (30) day period; and

l.  If any Reclamation Claims are still subject to a pending Reclamation Notice Objection ninety (90) days following the Objection Deadline (or a later date as may be agreed to by the Seller and the Debtors) and no Settlement Notice has been filed therewith, the Debtors may file a motion with the Court to fix the allowed amounts of such Reclamation Claims and schedule a hearing to consider such motion.

35.  The Debtors propose that, except to the extent a Seller has received

payment on account of its prepetition claim pursuant to an order approving any of the

Contemporaneous Motions or pursuant to the United States Treasury Auto Supplier Support

Program, the Reclamation Procedures be the sole and exclusive method for resolving

Reclamation Claims.  As a result, the Debtors request that all Sellers be prohibited from seeking

any other means for the resolution or treatment of their Reclamation Claims, including, without

limitation, the following: (a) commencing adversary proceedings or contested matters against the

Debtors in connection with any Reclamation Claim, (b) seeking to obtain possession of any

Goods except as permitted by the Reclamation Procedures, or (c) interfering with the delivery of

any Goods to the Debtors.  The Reclamation Procedures will effectively and efficiently

streamline the process of resolving the Reclamation Claims for the Debtors and the Sellers alike,

without impacting the parties' substantive rights to pursue or contest the Reclamation Claims.

### **Basis for Relief Requested**

36.    Upon the commencement of a chapter 11 case, reclamation rights are

governed by section 546(c) of the Bankruptcy Code, which provides, in relevant part:

> [S]ubject to the prior rights of a holder of a security interest in such goods or the proceeds thereof, the rights and powers of the trustee . . . are subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title, but such a seller may not reclaim such goods unless such seller demands in writing reclamation of such goods—(A) not later than 45 days after the date of receipt of such goods by the debtor; or (B) not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.

11 U.S.C. § 546(c)(1).[3]

---

[3] Any seller that fails to provide notice in the manner described in section 546(c) "still may assert" an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code for goods delivered to the Debtors within 20 days before the Commencement Date in the ordinary course of the Debtors' businesses.  *See* 11 U.S.C. §§ 503(b)(9); 546(c)(2).

37.    In addition, pursuant to Bankruptcy Rule 9019(a), after notice and a hearing, the Court may approve a compromise or settlement between the Debtors and any Seller who files a Reclamation Demand and/or Reclamation Notice Objection.  Fed. R. Bankr. P. 9019(a).  The ability to negotiate with the Sellers will expedite the settlement of Reclamation Claims and assist the administration of these chapter 11 cases.

38.    Furthermore, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Debtors submit that establishing and implementing the Reclamation Procedures is necessary and appropriate and that the Reclamation Procedures are consistent with section 546(c) of the Bankruptcy Code and Bankruptcy Rule 9019.

39.    The Debtors believe that their ability to resolve Reclamation Claims in accordance with the Reclamation Procedures will assist in the consensual resolution of such claims and, ultimately, the maximization of value for the Debtors, their estates and creditors, and all parties in interest.  Therefore, the relief requested in this Motion is in the best interests of the Debtors and their respective estates and should be granted in all respects.

### Notice

40.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

41.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                          :
In re                                     :                    **Chapter 11 Case No.**
                                          :
**GENERAL MOTORS CORP.,** *et al.*,       :                    **09-_____ (___)**
                                          :
                          **Debtors.**    :                    **(Jointly Administered)**
                                          :
-----------------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 546(c) ESTABLISHING AND IMPLEMENTING EXCLUSIVE AND GLOBAL PROCEDURES FOR TREATMENT OF RECLAMATION CLAIMS

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a) and 546(c)

of title 11, United States Code (the "Bankruptcy Code"), for entry of an order authorizing the

Debtors to establish and implement procedures to reconcile all unpaid and resolve reclamation

claims (the "Reclamation Claims"), all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided to (i) the Office of the United States Trustee for the Southern District of New York,

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

(ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the

agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under

GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of

the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the

attorneys for the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America, (viii) the attorneys for the International Union of Electronic,

Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America,

(ix) the United States Department of Labor, (x) the attorneys for the National Automobile

Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee, and it

appearing that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing

and all of the proceedings had before the Court; and the Court having found and determined that

the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and

all parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

       ORDERED that the Motion is granted as provided herein; and it is further

       ORDERED that the Debtors are authorized to resolve all Reclamation Claims in

accordance with the following reclamation procedures (the "Reclamation Procedures"), which

are hereby approved and authorized in their entirety:

      a.       Any Seller asserting a Reclamation Claim shall satisfy all procedural and
timing requirements entitling it to have a right to reclamation under
section 546(c) of the Bankruptcy Code;

      b.       Any Seller asserting a Reclamation Claim shall submit a written demand
asserting such Reclamation Claim (a "Reclamation Demand") which shall
(i) include (A) a description of the Goods subject to the Reclamation

                                         2

Demand; (B) the name of the Debtor to which such Goods were delivered; (C) copies of any purchase orders and invoices relating to such Goods; and (D) any evidence regarding the date(s) such Goods were shipped to and received by the Debtors; and (ii) be delivered to (A) the Debtors, c/o General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, MI 48090-9025, Attn: Warren Command Center, Mailcode 480-206-114; and (B) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Nathan M. Pierce, Esq., so as to be received in accordance with the deadlines set forth in section 546(c) of the Bankruptcy Code;

c.    Upon receipt of a Reclamation Demand, the Debtors shall serve upon the Seller, at the address indicated in its Reclamation Demand, a copy of this Order;

d.    No later than 120 days after entry of this Order (the "Reclamation Notice Deadline"), the Debtors shall file with the Court a notice (the "Reclamation Notice"), listing the Reclamation Claims and the amount (if any) of each such Reclamation Claim that the Debtors determine to be valid. The Debtors shall serve the Reclamation Notice on the following parties (the "Notice Parties"): (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) attorneys for any statutory committee of unsecured creditors (the "Committee") appointed in these chapter 11 cases; and (iii) each Seller listed in the Reclamation Notice, at the address indicated in the respective Seller's Reclamation Demand;

e.    If the Debtors fail to file the Reclamation Notice by the Reclamation Notice Deadline, any holder of a Reclamation Claim that submitted a Reclamation Demand in accordance with subsection (b) of this decretal paragraph may bring a motion on its own behalf to seek relief with respect to its Reclamation Claim;

f.    Any party that wishes to object to the Reclamation Notice shall file and serve an objection (a "Reclamation Notice Objection") on the Notice Parties and attorneys for the Debtors at Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Nathan M. Pierce, Esq., so as to be received no later than 4:00 pm (Eastern Time) on the twentieth (20th) day after the date on which the Reclamation Notice is filed (the "Objection Deadline"). Any Reclamation Notice Objection shall include (i) a copy of the Reclamation Demand, with evidence of the date mailed to the Debtors; and (ii) a statement describing with specificity the objections to the Reclamation Notice and any legal basis for such objections;

g.    Any Reclamation Claim listed in the Reclamation Notice for which no Reclamation Notice Objection was filed and served by the Objection Deadline shall be deemed allowed by the Court in the amount identified by the Debtors in the Reclamation Notice, provided that all issues relating to the treatment of any such allowed Reclamation Claim shall be reserved;

h.  Notwithstanding and without limiting the foregoing, the Debtors are authorized, but not required, to negotiate, in their sole discretion, with any Seller and to seek an agreement resolving the Seller's Reclamation Claim or Reclamation Notice Objection.  If the Debtors and a Seller agree on the validity, amount, or treatment of the Seller's Reclamation Claim, the Debtors shall prepare and file with the Court a notice of settlement (a "Settlement Notice") and serve such Settlement Notice on the Notice Parties.  Each Notice Party shall have ten (10) days from the date of service of such Settlement Notice to file with the Court and serve on the other Notice Parties and attorneys for the Debtors an objection thereto (a "Settlement Objection");

i.  If no Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is timely filed and served, such Reclamation Claim shall be treated in accordance with the Settlement Notice without further order of the Court.

j.  If a Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is timely filed and served, the parties may negotiate a consensual resolution of such objection to be incorporated in a stipulation filed with the Court (a "Settlement Stipulation").  Upon the filing of a Settlement Stipulation, the applicable Reclamation Claim shall be allowed and treated in accordance with the terms of the Settlement Stipulation without further order of the Court.

k.  If no consensual resolution of a Settlement Objection with respect to a Reclamation Claim that is the subject of a Settlement Notice is reached within thirty (30) days after the date the Settlement Objection was filed and served, the Debtors may file a motion with the Court requesting a hearing to fix the allowed amount of the Reclamation Claim, unless the Debtors and the party filing the Settlement Objection agree to extend such thirty (30) day period; and

l.  If any Reclamation Claims are still subject to a pending Reclamation Notice Objection ninety (90) days following the Objection Deadline (or a later date as may be agreed to by the Seller and the Debtors) and no Settlement Notice has been filed therewith, the Debtors may file a motion with the Court to fix the allowed amounts of such Reclamation Claims and schedule a hearing to consider such motion.

; and it is further

ORDERED that the foregoing Reclamation Procedures are the sole and exclusive method for resolving unpaid Reclamation Claims asserted against the Debtors; and it is further

ORDERED that all Sellers are prohibited from seeking any other means for the resolution or treatment of their Reclamation Claims, including without limitation:

(a) commencing adversary proceedings and contested matters in connection with any

Reclamation Claims, (b) seeking to obtain possession of any Goods, and (c) interfering with the

delivery of any Goods to the Debtors; *provided, however,* that nothing in this Order shall bar a

Seller from asserting a claim pursuant to section 503(b)(9) of the Bankruptcy Code; and it is

further

ORDERED that any adversary proceedings or contested matters related to

Reclamation Claims, whether currently pending or initiated in the future, except those

proceedings initiated by the Debtors in accordance with the Reclamation Procedures, are stayed

and the claims asserted therein shall be resolved exclusively pursuant to the Reclamation

Procedures set forth herein; and it is further

ORDERED that, to the extent a Reclamation Claim has been paid by the Debtors

pursuant to another order entered by the Court in these chapter 11 cases, including any orders

authorizing the Debtors to pay prepetition claims of certain essential suppliers and vendors or

foreign creditors or pursuant to the United States Treasury Auto Supplier Support Program, the

Reclamation Procedures shall not apply to such Seller and any Reclamation Claim filed by such

Seller with the Court shall be deemed withdrawn without the need for any further order of the

Court; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
_____, 2009

_____
United States Bankruptcy Judge