Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                                   :

In re                                                     :         Chapter 11 Case No.
                                                         :
**GENERAL MOTORS CORP.,** *et al.*,     :         09-_____ (___)
                                                         :
                        Debtors.        :         **(Jointly Administered)**
                                                         :
------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDER
PURSUANT TO 11 U.S.C. §§ 105(a) AND 503(b)(9)
ESTABLISHING PROCEDURES FOR THE ASSERTION,
RESOLUTION, AND SATISFACTION OF
<u>CLAIMS ASSERTED PURSUANT TO 11 U.S.C. § 503(b)(9)</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        General Motors Corporation ("<u>GM</u>") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>"), respectfully represent:

### Background

        1.     On the date hereof (the "<u>Commencement Date</u>"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the "<u>Bankruptcy Code</u>"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

3.  For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry. The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado. Over many years, the Company has supplied one in five vehicles sold in the United States. It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world. General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon. Today, the Company continues as a leading global technology innovator. Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.  William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands. General Motors began as a holding company for Buick Motor Company, and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac. Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5. Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including: Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling. The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world. The recent severe economic downturn has had an unprecedented impact on the global automotive industry. Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy. It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips. Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6. GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7. The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific –

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned.  In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8. As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9. As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.  Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

**The Economic Downturn and the U.S. Treasury Loan**

10. In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11. This economic turmoil resulted in significant financial stress on the automotive industry. In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years. The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations. As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12. The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy. On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility"). A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility. The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions. The U.S. Treasury Facility is also collaterally secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

13. The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability. On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "<u>Long-Term Viability Plan</u>") to the automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "<u>Presidential Task Force</u>").

### The U.S. Treasury-Sponsored Program for GM

14. On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars. The President outlined a series of actions that GM would have to undertake to receive additional federal assistance. In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM. In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15. President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market." *Id.* The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out*.

*Id.* at 5-6 (emphasis added).

16.     The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives. Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction"). The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases. Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of

assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17. The U.S. Treasury will provide the financing to create New GM. The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability. The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18. On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion. GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19. As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "<u>Temporary Shutdown</u>"). As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20. On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion. GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

**The Exchange Offer**

21. In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer"). The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company. The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22. The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

**The 363 Transaction**

23. Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24. Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction. These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases. As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.     The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation. The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry. The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.     Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27. The gravity of the circumstances cannot be overstated. The need for speed in approving and consummating the 363 Transaction is crucial. The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM. Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products. Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28. The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved. To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world." *Presidential Remarks* at 7.

### Jurisdiction

29. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

30. Section 503(b)(9) of the Bankruptcy Code provides for the allowance, as an administrative expense, of the value of any goods sold to the Debtors in the ordinary course of the Debtors' businesses and received by the Debtors within 20 days before the Commencement Date:

> After notice and a hearing, there shall be allowed, administrative expenses . . . including –
>
> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under [title 11] in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9).

31.     Prior to the Commencement Date and in the ordinary course of their businesses, the Debtors purchased on credit a variety of raw materials, parts, supplies, and other goods (collectively, the "Goods") for use in their operations.  As of the Commencement Date, the Debtors were in possession of certain Goods that had been delivered to them by various vendors or other parties (collectively, the "Vendors"), but for which the Debtors had not yet made payment.  The Debtors estimate that the value of such unpaid Goods delivered within 20 days prior to the Commencement Date is approximately $1.01 billion.

32.     Because section 503(b)(9) is a relatively recent addition to the Bankruptcy Code, the Debtors believe that there will be some uncertainty among Vendors over the procedures and methods they must undertake to properly assert administrative expense claims thereunder.  This may result in numerous inquiries and demands on the Debtors' employees and professionals, as well as in the initiation of piecemeal litigation, which would divert the attention of the Debtors and their professionals from the more pressing task of administering the chapter 11 cases.  To avoid the resulting distraction, delay, and expense that may ensue, the Debtors seek entry of an order, pursuant to sections 105(a) and 503(b)(9) of the Bankruptcy Code, (i) authorizing the Debtors to establish exclusive procedures (the "Procedures") for the assertion

under Bankruptcy Code section 503(b)(9) of unpaid claims[2] (the "503(b)(9) Claims") and the resolution, allowance, and satisfaction thereof and (ii) prohibiting Vendors from pursuing 503(b)(9) Claims outside the Procedures.

## Proposed Procedures

33.    The Debtors propose the following Procedures with respect to all 503(b)(9) Claims:

(a) Any Vendor asserting a 503(b)(9) Claim must prepare a proof of claim (a "Proof of 503(b)(9) Claim") that sets forth (i) the value of the goods the claimant contends the Debtors received within twenty days prior to the Commencement Date; (ii) documentation, including invoices, receipts, bills of lading and the like, identifying the particular goods for which the claim is being asserted; and (iii) documentation regarding which Debtor the goods were shipped to, the date the goods were received by such Debtor, and the alleged value of such goods;

(b) All Proofs of 503(b)(9) Claims must be filed with The Garden City Group, Inc. GM Claims Agent, P.O. Box 9386, Dublin, Ohio 43017-4286, Attn: Craig Johnson, with a copy served on (i) the Debtors, c/o General Motors Corporation, General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, MI 48090-9025, ATTN: Warren Command Center, Mailcode 480-206-114; and (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Nathan M. Pierce, Esq.), so as to be received no later than the ninetieth day after the Commencement Date (the "503(b)(9) Claim Filing Deadline");

(c) The Debtors shall have 60 days after the 503(b)(9) Claim Filing Deadline to file with the Court and serve any objections to timely filed 503(b)(9) Claims (the "Objection Deadline");

---

[2] Certain Vendors may receive payment on account of their prepetition claims pursuant to other motions that have been contemporaneously filed by the Debtors, including (i) the Debtors' motion seeking authorization to pay prepetition claims of certain essential suppliers and vendors; and (ii) the Debtors' motion seeking authorization to pay prepetition obligations to certain foreign creditors (collectively, the "Other Contemporaneous Motions"). To the extent a Vendor receives payment on account of its prepetition claim pursuant to an order approving any of these Other Contemporaneous Motions, the Procedures shall not apply to such Vendor.

NY2:\1991711\14\16_TB14!.DOC\72240.0635    13

(d) Vendors shall have 20 days from the Objection Deadline to file with the Court and serve any replies to such objections;

(e) All timely filed 503(b)(9) Claims will be deemed allowed unless objected to by the Debtors on or before the Objection Deadline;

(f) Notwithstanding and without limiting the foregoing, the Debtors are authorized, but not required, to negotiate, in their sole discretion, with any Vendor and to seek an agreement resolving any objection to such Vendor's 503(b)(9) Claim. The approval of such an agreement will be subject to notice and a hearing; and

(g) To the extent a 503(b)(9) Claim is allowed, such 503(b)(9) Claim will be satisfied pursuant to and as set forth in such plan of reorganization as shall be confirmed by the Court, or as otherwise ordered by the Court after notice and an opportunity for a hearing.

34. The Debtors propose that the Procedures be the sole and exclusive method for the assertion, resolution, allowance, and satisfaction of 503(b)(9) Claims and request that all Vendors be prohibited from invoking any other means therefor, including, without limitation, the filing of a motion for allowance, or to compel payment, of any 503(b)(9) Claims.

## The Relief Requested Is in the Best Interests of the Debtors and their Estates

35. Because the Debtors, in the ordinary course of their businesses, typically purchase billions of dollars of goods on a monthly basis from a variety of Vendors, the Debtors expect that numerous 503(b)(9) Claims may be filed. Accordingly, the establishment of an orderly, uniform process for their resolution is warranted. Deferring litigation of claims and establishing uniform procedures for resolving such claims is a common practice in chapter 11 cases, as is the establishment of a bar date. *See* Fed. R. Bankr. P. 3003(c)(3) ("The court shall fix . . . the time within which proofs of claim or interest may be filed."); *see also In re Steve & Barry's Manhattan LLC*, No. 08-12579, (Bankr. S.D.N.Y. July 31, 2008) (order establishing procedures for resolution of section 503(b)(9) claims); *In re Quebecor World (USA) Inc., et al.*, Case No. 08-10152 (JMP) (Bankr. S.D.N.Y. Apr. 21, 2008) (same); *In re Dana Corp.*, Case No.

06-10354 (BRL) (Bankr. S.D.N.Y. July 19, 2006) (same). Moreover, the Debtors believe that the Procedures will facilitate the Debtors' ability to negotiate with Vendors, expediting the resolution of 503(b)(9) Claims and assisting with the economic administration of these chapter 11 cases.

36. Section 105(a) of the Bankruptcy Code provides that Bankruptcy Courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). The Debtors submit that establishing and implementing the Procedures is necessary and appropriate and that the Procedures are consistent with the provisions of section 503(b)(9) of the Bankruptcy Code.

37. The Debtors believe that their ability to address 503(b)(9) Claims in this uniform manner will assist in the timely resolution of such claims and, promote the orderly and efficient administration of these cases. Therefore, the relief requested in this Motion is in the best interests of the Debtors and their respective estates, and should be granted in all respects.

### Notice

38. Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers— Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

39. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

                              /s/ Stephen Karotkin
                              Harvey R. Miller
                              Stephen Karotkin
                              Joseph H. Smolinsky

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
GENERAL MOTORS CORP., et al.,                 :    09-_____ (___)
                                              :
                    Debtors.                  :    (Jointly Administered)
                                              :
-----------------------------------------------------------------x
```

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 503(b)(9)
ESTABLISHING PROCEDURES FOR THE ASSERTION,
RESOLUTION, AND SATISFACTION OF
CLAIMS ASSERTED PURSUANT TO 11 U.S.C. § 503(b)(9)**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105(a) and 503(b)(9) of title 11, United States Code (the "Bankruptcy Code"), establishing exclusive procedures for the assertion, resolution, allowance, and satisfaction of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"), all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the Office of the United States Trustee

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

NY2:\1991711\14\16_TB14!.DOC\72240.0635

for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

    ORDERED that the Motion is granted as provided herein; and it is further

    ORDERED that the following Procedures (the "Procedures"), which Procedures are hereby authorized and approved in their entirety shall apply to all 503(b)(9) Claims:

(a)    Any claimant asserting a 503(b)(9) Claim (a "Claimant") shall prepare a proof of claim (a "Proof of 503(b)(9) Claim") that sets forth (i) the value of the goods the Claimant contends the Debtors received within twenty days prior to the Commencement Date; (ii) documentation, including invoices, receipts, bills of lading and the like, identifying the particular goods for which the 503(b)(9) Claim is being asserted; and (iii) documentation regarding which

        Debtor the goods were shipped to, the date the goods were received by such Debtor, and the alleged value of such goods;

(b) All Proofs of 503(b)(9) Claims must be filed with The Garden City Group, Inc. GM Claims Agent, P.O. Box 9386, Dublin, Ohio 43017-4286, Attn: Craig Johnson, with a copy served on (i) the Debtors, c/o General Motors Corporation, General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, MI 48090-9025, ATTN: Warren Command Center, Mailcode 480-206-114; and (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Nathan M. Pierce, Esq.), so as to be received no later than the ninetieth day after the Commencement Date (the "<u>503(b)(9) Claim Filing Deadline</u>");

(c) The Debtors shall have 60 days after the 503(b)(9) Claim Filing Deadline to file with the Court and serve upon Claimants any objections to timely filed 503(b)(9) Claims (the "<u>Objection Deadline</u>");

(d) Claimants shall have 20 days from the Objection Deadline to file with the Court and serve upon the Debtors and their attorneys any replies to such objections;

(e) All timely filed 503(b)(9) Claims shall be deemed allowed unless objected to by the Debtors on or before the Objection Deadline;

(f) Notwithstanding and without limiting the foregoing, the Debtors are authorized, but not required, to negotiate, in their sole discretion, with any Claimant and to seek an agreement resolving any objection to such Claimant's 503(b)(9) Claim. The approval of such an agreement shall be subject to notice and a hearing; and

(g) To the extent a 503(b)(9) Claim is allowed, such 503(b)(9) Claim shall be satisfied pursuant to and as set forth in such plan of reorganization as shall be confirmed by the Court, or as otherwise ordered by the Court after notice and an opportunity for a hearing.

; and it is further

        ORDERED that the foregoing Procedures are the sole and exclusive method for the assertion, resolution, allowance, and satisfaction of 503(b)(9) Claims against the Debtors; and it is further

        ORDERED that all Vendors are prohibited from utilizing any other means for the assertion, reconciliation, allowance, resolution, or satisfaction of their 503(b)(9) Claims, including, without limitation, the filing of a motion for allowance, or to compel payment, of any

503(b)(9) Claims; and it is further

ORDERED that, to the extent a Vendor asserting a claim under section 503(b)(9) of the Bankruptcy Code has been paid pursuant to another order entered by the Court in these chapter 11 cases, including without limitation any orders authorizing the Debtors to pay prepetition claims of certain essential suppliers and vendors or foreign creditors, the Procedures shall not apply and any such claim under section 503(b)(9) asserted by such Vendor shall be deemed withdrawn without the need for any application to, or further order of, the Court; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
_____, 2009

_____
United States Bankruptcy Judge