Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                  :
In re                             :        Chapter 11 Case No.
                                  :
GENERAL MOTORS CORP., et al.,     :        09-_____ (___)
                                  :
                   Debtors.       :        (Jointly Administered)
                                  :
------------------------------------------------------------x
```

## MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363(b) AUTHORIZING PAYMENT OF CERTAIN PREPETITION (I) SHIPPING AND DELIVERY CHARGES FOR GOODS IN TRANSIT, (II) CUSTOMS DUTIES, AND (III) TOOLING AND MECHANICS LIEN CHARGES

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

### Background

1.       On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.    For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry.  The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.  Over many years, the Company has supplied one in five vehicles sold in the United States.  It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world.  General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company continues as a leading global technology innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.    William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands. General Motors began as a holding company for Buick Motor Company, and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the

automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.    Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including: Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling. The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world. The recent severe economic downturn has had an unprecedented impact on the global automotive industry. Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy. It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips. Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.    GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.    The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support. Each geographic region has its own management team, subject to oversight by the Company. Substantially all of General Motors' worldwide car and truck

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.    As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "<u>UAW</u>") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.    As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

**The Economic Downturn and the U.S. Treasury Loan**

10.    In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

11.    This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to

seek financial assistance, on a secured basis, from the federal government in order to sustain the

Company's operations and avoid the potential for systemic failure throughout the domestic

automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential

shutdown of numerous ancillary businesses.

12.     The federal government recognized the potentially devastating negative

effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States

Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury

Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant

to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's

domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also

guaranteed each of the other guarantors' obligations that were entered into concurrently with the

U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and

security interest in substantially all the assets of GM and each of the guarantors that were

previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

13.     The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President outlined a series of actions that GM would have to undertake to receive additional federal assistance.  In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.     President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market."  *Id.*  The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists.  We're not talking about

that.  And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.     The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases. Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.     The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid

potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion. GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown"). As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion. GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

### The Exchange Offer

21.    In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer"). The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company. The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to

consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.    The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## The 363 Transaction

23.    Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.    Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction. These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases. As part of the 363

Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation. The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry. The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.    Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("<u>EDC</u>"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.    The gravity of the circumstances cannot be overstated. The need for speed in approving and consummating the 363 Transaction is crucial. The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM. Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products. Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.    The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved. To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world." *Presidential Remarks* at 7.

### Jurisdiction

29.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

30.    By this Motion, the Debtors seek entry of an order authorizing, but not directing, them to (a) pay those prepetition shipping and delivery charges to Shippers and Warehousemen (each as defined below) that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of raw materials, parts, components, certain finished goods, indirect materials, tooling, machinery, and equipment (collectively, the "Goods") held by such Shippers and Warehousemen, (b) pay prepetition customs duties and such other incidental prepetition import expenses as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain Goods in transit and to satisfy the liens, if any, in respect thereof, and (c) pay Tool Makers and Mechanics (each as defined below) and discharge the liens, if any, that the Tool Makers and Mechanics may have on the Debtors' property.

31.    The Debtors further request that this Court authorize and direct all banks and other financial institutions on which checks are drawn or electronic funds are transferred with respect to Shipping and Warehousing Charges (as defined below), customs duties, Tooling

Charges (as defined below) or Mechanics Lien Charges (as defined below) to receive, process, honor, and pay, to the extent of funds on deposit any and all such checks or electronic transfers, whether such checks or transfers were issued before or after the Commencement Date, upon the receipt by each such bank of notice of such authorization without further order of the Court.

### Shipping and Warehousing Charges

32.    Prior to the Commencement Date, as an integral part of their businesses, the Debtors used and made payments to domestic and foreign commercial common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services, deconsolidators, distributors, logistics management companies, and other third-party service providers (collectively, the "Shippers") to ship, transport, store, engage in customs business and otherwise facilitate the movement of goods through customs, and deliver Goods through established national and international distribution networks, as well as a network of third-party warehouses (the "Warehousemen") to store Goods in transit  (such payments, the "Shipping and Warehousing Charges").  Such activities have been curtailed, however, as a result of the Temporary Shutdown.

33.    The automotive industry is shipping intensive.  Goods are transferred from suppliers and vendors to the Debtors' numerous facilities, between the Debtors' manufacturing facilities, and from the Debtors' facilities to dealers and distributors worldwide.  The services provided by the Shippers and Warehousemen are critical to the day-to-day operations of the Debtors' businesses.  At any given time, there are countless shipments en route to and from the Debtors' various facilities.  Therefore, certain Shippers and Warehousemen currently are in possession of Goods that are vital to the Debtors' operations.  The Debtors estimate that, as of the Commencement Date, approximately $141 million in Shipping and Warehousing Charges remain outstanding.  Inasmuch as the Temporary Shutdown commenced on May 18, 2009,

however, this amount is significantly lower than would have been the case had the Debtors maintained their normal business operations up to the Commencement Date.

34.      In light of the commencement of these chapter 11 cases, certain Shippers and Warehousemen who hold Goods for delivery to or from the Debtors may refuse to release such Goods pending receipt of payment for their prepetition services, which would disrupt the Debtors' operations.  Indeed, under some state laws, a Shipper or Warehouseman may have a lien on the respective Goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such Goods.[2]  Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection as holders of possessory liens.

35.      The Debtors rely on the timely shipment of Goods to prevent interruptions in their supply and delivery network.  Indeed, because of the nature of the Debtors' businesses, and particularly in light of the Debtors' "just in time" inventory policy resulting in low inventory reserves, even one delayed shipment could cause a plant to shut down.  This concern equally applies to those assembly facilities that are currently part of the Temporary Shutdown once they

---

[2] For example, section 7-307 of New York's Uniform Commercial Code provides, in pertinent part:

> A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law.

N.Y. U.C.C. § 7-307(1).

Section 7-209(1) of New York's Uniform Commercial Code provides for a similar lien for warehousemen:

> A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

*Id.* § 7-209(1).

resume operations.  Accordingly, because the Debtors are, in many cases, dependent on third-party Shippers and Warehousemen, it is essential that the commencement of these chapter 11 cases not give any third-party Shippers and Warehousemen any reason or excuse to cease performing timely services or to retain products, equipment, or Goods.

36.     The Debtors seek to make those payments to Shippers and Warehousemen that they determine, in the exercise of their business judgment, are necessary or appropriate.  The Debtors also seek authorization, but not direction, to obtain written verification before issuing payment to a Shipper or Warehouseman for prepetition Shipping and Warehouse Charges, that such Shipper or Warehouseman will (a) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed prior to Commencement Date and (b) not cancel on less than ninety (90) days' notice any contract or agreement pursuant to which it provides services to the Debtors; *provided, however*, that the absence of such written verification shall not limit the Debtors' rights sought hereunder.  If any Shipper or Warehouseman should accept payment on account of a prepetition obligation of the Debtors premised on its compliance with (a) and (b) above, and thereafter fails to comply with such conditions, any payments to such Shipper or Warehouseman for such prepetition obligations shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, shall be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors of such payment, the claim for which payment was recovered shall be reinstated as a prepetition claim in the amount so recovered.  Nothing in this paragraph shall preclude a Shipper or Warehouseman from contesting the treatment set forth herein by making a written request to the Debtors to schedule a hearing before this Court, which

hearing the Debtors shall set for the next regularly scheduled omnibus hearing date occurring more than ten (10) days after the date of such request.

### Customs Duties

37.     The Debtors also seek authority for themselves, and their customs brokers acting as their agents, to continue to make necessary payments of customs duties, import-related taxes, and other incidental import expenses (collectively, the "Customs Duties") to the U.S. Customs and Border Protection Agency (the "U.S. Customs Service") and to non-U.S. customs authorities, where such obligations arose prior to the Commencement Date.  In the ordinary course of their businesses, the Debtors purchase from overseas certain raw materials, parts, components, prototypes, vehicles, and other finished goods, tooling, machinery, and equipment that they use in the operation of their businesses, and import such goods into the United States and other jurisdictions (collectively, the "Imported Goods").  The Debtors' purchase of the Imported Goods is vital to their business operations.  For example, without the uninterrupted purchase and delivery of Imported Goods, the Debtor' plants relying on such shipments may run out of inventory and be forced to shut down within a matter of days.

38.     If Customs Duties are not timely paid, the U.S. Customs Service and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions.  Absent payment, (i) the Debtors' customs brokers may, in some instances, assert shipper's and warehousemen's liens against the Imported Goods, (ii) the U.S. Customs Service may assert a lien against such goods under 19 C.F.R. § 141.1 (2005), and (iii) non-U.S. customs authorities may assert similar liens or take other action against the Debtors in their respective jurisdictions.  Accordingly, the Debtors submit that it is in the best interests of their estates and creditors that they be authorized to pay such Customs Duties to ensure continuous manufacturing

operations.  The Debtors estimate that the amount of Customs Duties owed, but unpaid, is approximately $5 million.

39.    A substantial portion, if not all, of the Customs Duties sought to be paid hereunder would be entitled to priority pursuant to section 507(a)(8)(F) of the Bankruptcy Code. Section 507(a)(8)(F), in pertinent part, affords eighth priority in payment to the allowed unsecured claims of governmental units for:

> (F) a customs duty arising out of the importation of merchandise –
>
> (i)   entered for consumption within one year before the date of the filing of the petition;
>
> (ii)   covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or
>
> (iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date, if the Secretary of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date.

11 U.S.C. § 507(a)(8).

40.    As priority claims, the Customs Duties must be paid in full before the Debtors make any distributions to holders of general unsecured claims in connection with a chapter 11 plan.  Accordingly, the proposed relief most likely will affect only the timing of the payment of the Customs Duties and, therefore, will not prejudice the rights of general unsecured creditors.

41.    Thus, payment of the Customs Duties will benefit the Debtors' estates because (a) the Debtors' operations might otherwise be interrupted, (b) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided, and (c) potential

liens, fines, penalties, and interest charges will be avoided.  Accordingly, the Debtors request

that this Court authorize the Debtors to pay prepetition Customs Duties in the approximate

amount of $5 million.

### Tooling and Mechanics Lien Charges

42.    Tooling Charges.  The Debtors use customized and specific tools, dies,

molds, and other equipment ("Tooling," and each piece a "Tool") to manufacture automobiles

and automobile parts.[3]  The Debtors' Tooling is built by a number of third parties ("Tool

Makers") which deliver and install the Tooling in their facilities as well as in the facilities of the

Debtors' Tier 1 and Tier 2 suppliers ("Suppliers").  Because the Tooling is not paid for in full

until after the Tooling has been designed, constructed, tested, validated, and in many instances

has already began producing essential parts and supplies, it is critical that the Debtors be

authorized to make payments to Tool Makers or reimburse Suppliers ("Tooling Charges") to

ensure the uninterrupted delivery of Tooling and the parts and supplies they produce.

43.    The process through which the Tooling is developed and purchased often

begins years prior to the Debtor actually being able to use the Tooling to make viable parts.  The

contracts between the Debtors and their Suppliers typically include two components:  (i) a

requirements contract for the parts and (ii) a related contract to purchase the Tooling necessary to

build such parts.  Generally, the Supplier will then directly contract with Tool Makers to produce

the Tooling.  These types of contracts are common in the industry because the Debtors require

ownership of the Tooling necessary for the construction of their parts and supplies.  Ownership

of the Tooling enables GM to have flexibility in choosing suppliers and denies any one supplier

---

[3] For example, Tooling includes the molds and dies GM owns that are used to build seats for their vehicles.

the ability to hold GM hostage to slow-downs or other threats of production since GM owns the Tooling.

44.     Once the Debtors or a Supplier has contracted with a Tool Maker to build Tooling, periodic progress payments are often made to that Tool Maker pending passage of the required quality and performance tests – often in the facilities of the applicable Supplier.  To perform these quality and related tests, however, the Debtors, or the Tier 1 or Tier 2 suppliers that will be using the Tooling, must take possession of the Tooling and install it in their facilities. Thus, the Tooling has been built, installed with the Supplier, and is either undergoing final testing or actually producing parts, but has not yet been paid for.  The Debtors' failure to pay Suppliers or Tool Makers for GM's Tooling could result in a slow-down or other threats of reduced production to the detriment of the Debtors and their estates.  The continued payments to Tooling Suppliers and Tool Makers is critical to the Debtors' businesses and their operations.

45.     The Debtors also have outstanding contracts with Suppliers and Tool Makers for Tooling that currently is in the construction process.  The Debtors believe that certain Tool Makers may refuse to continue construction on this Tooling, or refuse to deliver such Tooling to the Debtors or their Suppliers based on the assertion of a mechanics' or toolmakers' lien, if their claims for previously delivered Tooling are left unsatisfied.[4]  As with so many aspects of the Debtors' businesses, this Tooling is essential to the continued production of automobiles.  Accordingly, the Debtors request the authority, but not direction, to pay Tool Makers and reimburse Suppliers for any prepetition amounts necessary to satisfy any Tool Makers' liens and claims in order to ensure the uninterrupted development, delivery, and use of

---

[4] In many of the states where the Debtors own and use tooling there are specific laws granting Tool Makers the ability to place a lien on Tooling sold to their customers without requiring the parties to enter into a security agreement.  *See, e.g.*, Michigan Compiled Law Service § 570.563

the Tooling.  The Debtors estimate that approximately $250 million of Tooling Charges are outstanding as of the Commencement Date.

46.    <u>Mechanics Liens</u>.  Where an entity has performed repair, construction, installation, or similar services ("<u>Mechanic</u>") for the Debtors, applicable state law may grant such Mechanic a lien against the real or personal property of the Debtors that was the subject of such services (whether or not that property is still in the possession or control of the Mechanic) to secure payment of the amounts owed by the Debtors to such Mechanic (collectively, the "<u>Mechanics Lien Charges</u>").  The Debtors estimate that the Mechanics Lien Charges outstanding as of the Commencement Date aggregate approximately $12 million, and as such, are relatively de minimis.  Moreover, the Debtors believe that all such charges are far less than the value of the property that is encumbered.  Accordingly, the Debtors request authority to make those payments in satisfaction of prepetition Mechanics Lien Charges that the Debtors determine, in the exercise of their business judgment, are necessary or appropriate.

### <u>Applicable Authority</u>

47.    Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *Id.* § 105(a).  A Bankruptcy Court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

48.    Federal courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See*, *e.g.*, *Miltenberger v. Logansport Ry.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945), *cert. denied*, 325 U.S. 873 (1945) (Second Circuit extends doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987), *appeal dismissed*, 838 F.2d 59 (2d Cir. 1988) (approving lower Court order authorizing payment of prepetition wages, salaries, expenses, and benefits); *In re Boston & Me. Corp.,* 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) ("Since the enactment of the Code, various courts have permitted debtors-in-possession to pay pre-petition debts on the grounds that payment of such claims was necessary to effectuate a successful reorganization, or at least to give the debtor the opportunity to propose any type of plan at all.").

49.    This doctrine of necessity functions in a chapter 11 case as a mechanism by which the Bankruptcy Court can exercise its equitable power to facilitate a successful reorganization by allowing payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See Just for Feet*, 242 B.R. at 824 (recognizing that "[c]ertain pre-petition claims by employees and trade creditors . . . may need to be paid to facilitate a successful reorganization"). The doctrine is frequently invoked early in a chapter 11 case. The Court in *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), indicated its accord

with "the principle that a Bankruptcy Court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately."  The Court stated that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."  *Id.* at 932.  The rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11 -- "facilitating the continued operation and rehabilitation of the debtor."  *Ionosphere Clubs*, 98 B.R. at 176.  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

50.     The critical need for the continued receipt and distribution of Goods and equipment that Shippers or Warehousemen may hold on the Commencement Date amply justifies the grant of the relief sought herein.  The prompt payment to Shippers and Warehousemen, which may be necessary to obtain delivery of the Goods and equipment in their possession, is crucial for the orderly and efficient operation of the Debtors' businesses.  Unless the Debtors have the authority to pay for these essential services, their businesses will suffer irreparable harm.

51.     Moreover, providing payments to the Shippers and Warehousemen as requested herein is necessary because a disruption of the Debtors' operations will have a detrimental impact on the Debtors' supply base, many of which are entirely dependent on the Debtors.  In the event these suppliers are forced to cease operations, the Debtors may have no source of supply of critical items.  As a result, the Debtors' operating assembly facilities would be forced to shut down, and the facilities that have not yet resumed operations as part of the Temporary Shutdown will be unable to resume operations.

52.     Furthermore, if the Debtors do not have the ability to pay Shippers and Warehousemen as requested herein, there is a significant risk that a smooth transfer of the Debtors' assets to New GM in accordance with the 363 Transaction will be jeopardized.  The 363 Transaction is predicated on the concept that the New GM will continue to operate by means of a seamless transition.  The MPA contains a covenant that provides that the Debtors will continue to operate in the ordinary course up until the closing.  Accordingly, failure to obtain the relief requested herein will endanger the Debtors' ability to consummate the 363 Transaction.

53.     While it is difficult to estimate with certainty the total amount of Shipping and Warehousing Charges that may be due and owing as of the Commencement Date, the Debtors submit that the estimate of $141 million to be paid to Shippers and Warehousemen if the requested relief is granted, is warranted in view of the essential need for the receipt and delivery of Goods as scheduled and the additional losses the Debtors will suffer if plant operations are negatively affected.  The payment of such amount also is clearly warranted based on the substantial disruption to the Debtors' operations and revenue generating capacity that will occur if they cannot obtain as scheduled the Goods held by the Shippers and Warehousemen on the Commencement Date.  The payment of Tool Maker and Mechanics Lien Charges is supported by these same principles.  Indeed, if the relief requested is not granted, the immediate irreparable harm that will be suffered is self-evident.

54.     Additionally, it is critical that the Debtors obtain relief to pay Customs Duties to avoid the imposition of monetary penalties or other sanctions, by the U.S. Customs Service or by non-U.S. customs authorities.  Moreover, absent payment, the Debtors' customs brokers, the U.S. Customs Service, and non-U.S. customs authorities might assert liens against the Imported Goods, which could interfere with the delivery of such goods to the Debtors'

manufacturing facilities and similarly interfere with the Debtors' operations. Non-U.S. customs authorities also might take action against the Debtors in their respective jurisdictions.

55.    Authorization of the payment of all charges requested herein shall not be deemed to constitute postpetition assumption or adoption of any of the related agreements pursuant to section 365 of the Bankruptcy Code. The Debtors reserve all of their rights under the Bankruptcy Code with respect thereto. In addition, nothing in this Motion shall be an admission as to any possessory lien.

56.    Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interest of their estates and creditors and, therefore, should be granted.

## The Debtors Have Satisfied Bankruptcy Rule 6003

57.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after the Commencement Date. Fed. R. Bankr. P. 6003. As described herein and in the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business operations rely heavily on the uninterrupted delivery of parts and supplies to their plants and facilities, both with respect to those plants and facilities that are currently operating and those that are temporarily shut down but will resume operations. To avoid the future permanent shutdown of an entire assembly line, resulting in immediate and extensive losses, the Debtors must be authorized to pay the Shipping and Warehousing Charges, Customs Duties, Tooling Charges, and Mechanics Lien Charges. The failure to grant the relief requested herein will cause serious adverse consequences, including loss of value and a detrimental impact on the ability to consummate the 363 Transaction. Accordingly, the Debtors submit that the relief requested

herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule

6003 is satisfied.

## **Waiver of Bankruptcy Rules 6004(a) and (h)**

58.     To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

59.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

60.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                                       :          Chapter 11 Case No.
                                                            :
GENERAL MOTORS CORP., et al.,                               :          09-_____ (___)
                                                            :
                                      Debtors.              :          (Jointly Administered)
                                                            :
------------------------------------------------------------x
```

## ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AUTHORIZING PAYMENT OF CERTAIN PREPETITION (I) SHIPPING AND DELIVERY CHARGES FOR GOODS IN TRANSIT, (II) CUSTOMS DUTIES, AND (III) TOOLING AND MECHANICS LIEN CHARGES

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105 and 363(b) of

title 11, United States Code (the "Bankruptcy Code") for entry of an order authorizing, but not

directing, the Debtors to pay certain prepetition shipping, warehouse, tooling and lien claimant's

charges, and customs duties, all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to

(i) the Office of the United States Trustee for the Southern District of New York, (ii) the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under

GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's

prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty

largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried,

Machine and Furniture Workers—Communications Workers of America, (ix) the United States

Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and

(xi) the attorneys for the ad hoc bondholders committee, and it appearing that no other or further

notice need be provided; and a hearing having been held to consider the relief requested in the

Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings had

before the Court; and the Court having found and determined that the relief sought in the Motion

is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as

contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates,

creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

    ORDERED that the Motion is granted as provided herein; and it is further

    ORDERED that the Debtors are authorized, but not directed, to make payments in

respect of all Shipping and Warehousing Charges, whether relating to the period prior to or after

the Commencement Date, as the Debtors determine, in the exercise of their business judgment,

to be necessary or appropriate to obtain the release of raw materials, parts, components, certain

finished goods, indirect materials, tooling, machinery, equipment, and other property; and it is further

ORDERED that with respect to any payments that are made on account of prepetition Shipping and Warehousing Charges, unless otherwise waived by the Debtors in their sole discretion, the Shippers and Warehousemen receiving such payments shall (a) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed prior to the Commencement Date and (b) agree that they shall not be permitted to cancel on less than ninety (90) days' notice any contract or agreement pursuant to which they provide services to the Debtors.  If any Shipper or Warehouseman accepts payment pursuant to this Order on account of a prepetition obligation of the Debtors premised upon its compliance with (a) and (b) above, and thereafter fails to comply with such conditions, any payments made pursuant to this Order shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and, therefore, shall be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.  Nothing in this decretal paragraph, however, shall preclude a Shipper or Warehouseman from contesting such treatment by making a written request to the Debtors to schedule a hearing before this Court, which hearing the Debtors shall set for the next regularly scheduled omnibus hearing date occurring more than ten (10) days after the date of such Shipper's or Warehouseman's request; and it is further

ORDERED that the Debtors are authorized, but not directed, to obtain written verification, before issuing payment hereunder, from any Shipper or Warehouseman that such Shipper or Warehouseman shall (a) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed prior to the

Commencement Date and (b) agree that it shall not be permitted to cancel on less than ninety

(90) days' notice any contract or agreement pursuant to which it provides services to the Debtors,

*provided, however,* that the absence of such written verification shall not limit the Debtors' rights

hereunder; and it is further

ORDERED that the Debtors are authorized, but not directed, to make payments in

respect of all Tooling Charges, whether relating to the period prior to or after the

Commencement Date, as the Debtors determine, in the exercise of their business judgment, to be

necessary or appropriate to ensure the delivery and use of all Tooling for the Debtors or their

Suppliers and obtain the release of liens against the Debtors' Tooling (whether or not that

property is in the possession or control of the Tool Maker); and it is further

ORDERED that the Debtors are authorized, but not directed, to make all

payments in respect of all Mechanics Lien Charges, whether relating to the period prior to or

after the Commencement Date, as the Debtors determine, in the exercise of their business

judgment, to be necessary or appropriate to obtain the release of liens against real or personal

property of the Debtors (whether or not that property is in the possession or control of any

Mechanic); and it is further

ORDERED that the Debtors and their customs brokers, acting as their agents, are

hereby authorized, but not directed, to make all payments in respect of Customs Duties, whether

relating to the period prior to or after the Commencement Date; and it is further

ORDERED that all applicable banks and other financial institutions are hereby

authorized and directed to receive, process, honor, and pay, to the extent of funds on deposit, any

and all checks and electronic transfers evidencing amounts paid by the Debtors pursuant to this

Order, whether they were issued before or after the Commencement Date; and it is further

ORDERED that nothing in this Order shall be deemed (a) an assumption, adoption, or authorization to assume any contracts or other agreements pursuant to section 365 of the Bankruptcy Code, (b) a requirement that the Debtors make any of the payments authorized herein, or (c) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law; and it is further

ORDERED that nothing in this Order or the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of or basis for any claims against the Debtors arising in connection with the Shipping and Warehouse Charges, Customs Duties, Tooling Charges or Mechanics Lien Charges; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
_____, 2009


_____
United States Bankruptcy Judge