Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                  :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.**, *et al.*, | : | **09-_____ (___)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDER**
**PURSUANT TO 11 U.S.C. §§ 363(b), 507(a)(8), 541, AND 105(a),**
**AUTHORIZING DEBTORS TO PAY PREPETITION TAXES AND ASSESSMENTS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

**Background**

        1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## General Motors' Businesses

3.      For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry.  The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.  Over many years, the Company has supplied one in five vehicles sold in the United States.  It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world.  General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company continues as a leading global technology innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.      William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands.  General Motors began as a holding company for Buick Motor Company, and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.       Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including: Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling. The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world. The recent severe economic downturn has had an unprecedented impact on the global automotive industry. Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy. It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips. Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.       GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.       The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

and functional support.  Each geographic region has its own management team, subject to

oversight by the Company.  Substantially all of General Motors' worldwide car and truck

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and

through distributors and dealers outside North America, most of which are independently owned.

In addition to the products sold to dealers for consumer retail sales, General Motors sells cars

and trucks to fleet customers, including rental car companies, commercial fleet companies,

leasing companies, and governmental units.

        8.     As of March 31, 2009, General Motors employed approximately 235,000

employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were

salaried employees.  In the United States, approximately 62,000 (68%) of the employees were

represented by unions.  The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") represents the largest portion of General Motors'

U.S. unionized employees (totaling approximately 61,000 employees).

        9.     As of March 31, 2009, General Motors had consolidated global recorded

assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.

Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

        10.     In 2008, the Company was confronted by the worst economic downturn

and credit market conditions since the Great Depression of the 1930s.  Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and

volatile fuel prices.

        11.     This economic turmoil resulted in significant financial stress on the

automotive industry.  In the last quarter of 2008, new vehicle sales in the United States

plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell

precipitously, thereby draining liquidity that, one year prior, had been considered adequate to

fund operations.  As a result of the impending liquidity crisis, the Company was compelled to

seek financial assistance, on a secured basis, from the federal government in order to sustain the

Company's operations and avoid the potential for systemic failure throughout the domestic

automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential

shutdown of numerous ancillary businesses.

        12.     The federal government recognized the potentially devastating negative

effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States

Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury

Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant

to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's

domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also

guaranteed each of the other guarantors' obligations that were entered into concurrently with the

U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and

security interest in substantially all the assets of GM and each of the guarantors that were

previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

        13.     The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.     President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.*  The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.

What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives. Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction"). The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases. Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.     The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.     On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.     As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital

stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation
to New GM and preserve both the viability of the GM enterprise and the U.S. automotive
industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the
benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or
one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with
services reasonably required by the Sellers and such subsidiaries to wind down or otherwise
dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363
Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the
ongoing provision of certain employee and retiree benefits.

       25.      The Debtors intend to use the chapter 11 process to expeditiously
consummate the 363 Transaction and establish New GM as an economically viable OEM,
serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical
element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive
industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the
industry that would occur if New GM is unable to immediately commence bankruptcy-free
operations.

       26.      Notably, both the Government of Canada and the Government of Ontario,
through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to
participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability
of GM's North American enterprise.

       27.      The gravity of the circumstances cannot be overstated.  The need for speed
in approving and consummating the 363 Transaction is crucial.  The business and assets to be
transferred are extremely sensitive and will be subject to major value erosion unless they are

quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.    The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world." *Presidential Remarks* at 7.

## Jurisdiction

29.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Taxes and Assessments

30.    In the ordinary course of business, the Debtors incur certain sales, use, property, excise, gross receipts, franchise, income, and other taxes and governmental charges that are payable directly to the federal government and various state and local taxing authorities ("Taxing Authorities").

31.    Real and Personal Property Taxes.  The Debtors own a substantial amount of real and personal property located in various states throughout the country that is subject to state and local property taxes ("Real Property Taxes" and "Personal Property Taxes,"

respectively, and collectively, "<u>Property Taxes</u>").  Property Taxes are normally determined on an annual basis.  Depending on the state where the property is located, Property Taxes are paid in arrears and remitted annually, semi-annually, or quarterly.  There is often a significant lag between the period when such taxes accrue and the payment due date.  Hence, Property Taxes accruing in 2008 may not be due until several months into 2009 and 2010.  Real Property Taxes almost always create a lien on or security interest in the taxed property.  Property Taxes may also be remitted to Taxing Authorities for certain leased property that requires the Debtors to make the appropriate payments.  Moreover other payments in lieu of taxes ("<u>PILOT Payments</u>") and other government compensation payments are made in order to comply with certain property tax incentive agreements.  The Debtors estimate that they remit approximately $215 million in Property Taxes to the applicable Taxing Authorities, annually.  The Debtors believe that, as of the Commencement Date, approximately $215 million of Property Taxes are accrued but unpaid.

32.     <u>Sales Taxes</u>.  Certain states require businesses to collect from customers an assortment of state and local sales taxes (collectively, "<u>Sales Taxes</u>"), and remit same to Taxing Authorities.  Typically, Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price invoiced to the customer.  Sales Taxes are trust fund taxes and are collected on behalf of the Taxing Authorities from the customers.  If trust fund taxes are not remitted timely, Taxing Authorities often impose personal liability on officers of a corporation.  The Debtors incur liability for Sales Taxes principally from the sale of signage, promotional materials, and other not for resale miscellaneous items.  The Debtors estimate that they remit approximately $13.2 million in Sales Taxes to the applicable Taxing Authorities annually.  The Debtors believe that, as of the

Commencement Date, approximately $1.1 million in Sales Taxes is due and owing for periods prior to and including such date.

33.    Use Taxes.  The Debtors may be responsible for the payment of use taxes ("Use Taxes") when they purchase certain tangible personal property for use in a jurisdiction where the acquisition of such property is taxable, but the vendor did not charge Sales Tax.  The Use Taxes arise either (i) in the ordinary course of the Debtors' manufacturing operations or, (ii) when the Debtors provide an exemption certificate to the vendor declaring that such property is to be acquired tax free, but subsequently use the property in a taxable manner, or (iii) when the Debtors maintain a direct payment designation from certain Taxing Authorities and are obligated to self-assess and remit the appropriate Use Taxes.  Under these circumstances, the vendor is not obligated to charge or remit Sales Taxes.  Nevertheless, the purchaser, in this case one of the Debtors, would be obligated to self-assess and pay the Use Taxes when applicable.  In addition, certain Taxing Authorities impose personal liability on officers of a corporation if the corporation fails to pay Use Taxes.  The Debtors estimate that they remit approximately $45 million in Use Taxes to the applicable Taxing Authorities annually.  The Debtors believe, that as of the Commencement Date, approximately $3 million in Use Taxes is due and owing for periods prior to and including such date.

34.    Excise Taxes.  The Debtors incur excise taxes ("Excise Taxes") with respect to the manufacture and sale of certain components used in the manufacturing of vehicles. For example, the Debtors are subject to the "Gas Guzzler Tax," which is a form of excise tax assessed on new cars that do not meet required fuel economy levels and the "Ozone Depleting Chemicals Tax," which is a form of excise tax assessed on the sale or use of ozone depleting chemicals in the production process.  The Debtors estimate that they remit approximately $6

million in Excise Taxes to the applicable Taxing Authorities annually.  The Debtors believe that, as of the Commencement Date, approximately $500,000 in Excise Taxes is due and owing for periods prior to and including such date.

35.    Gross Receipts Taxes.  Certain states and municipalities assess gross receipts taxes and/or business and occupation taxes (collectively, "Gross Receipts Taxes") which are levied against the seller of goods (tangible or otherwise) or the provider of services in that particular jurisdiction.  "Gross receipts" usually are comprised of the total receipts of a business received from goods sold and services rendered in that state and are remitted annually, monthly, or quarterly.  Generally, Gross Receipts Taxes are levied against the Debtors upon their shipment of vehicles to, or sale of vehicles in, the relevant taxing jurisdiction.  The Debtors estimate that they remit approximately $25 million in Gross Receipts Taxes to the applicable Taxing Authorities annually.  The Debtors believe that, as of the Commencement Date, approximately $2,500,000 in Gross Receipts Taxes is due and owing for periods prior to and including such date.

36.    Franchise Taxes.  The Debtors pay franchise taxes and registration fees (collectively, "Franchise Taxes") to certain of the Taxing Authorities so that the Debtors can operate their business in the applicable taxing jurisdiction.  Some states assess a flat Franchise Tax on all businesses, and other states assess a Franchise Tax based on some measure of income, gross receipts, net worth, or other measure of value. Certain states impose personal liability on the directors, officers, and employees of a corporation if that corporation fails to pay Franchise Taxes.  Additionally, the Debtors' failure to pay the Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction.  Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and

divert management's attention from the reorganization process.  The Debtors estimate that they remit approximately $8 million in Franchise Taxes to the applicable Taxing Authorities annually. The Debtors believe that, as of the Commencement Date, less than $4 million in Franchise Taxes is due and owing for periods prior to and including such date.

37.    Business License Fees and Annual Report Taxes.  Many municipal and county governments require the Debtors to obtain a business license and pay corresponding business license fees ("Business License Fees").  The criteria used to establish whether a company is required to obtain a business license, and the manner in which the Business License Fees are computed, varies by jurisdiction.  Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction, and others upon gross receipts.  Certain state governments also require the Debtors to pay annual report or bi-annual report taxes ("Annual Report Taxes") in order to be in good standing for purposes of conducting business within that state.  The Debtors believe less than $100,000 of Business License Fees or Annual Report Taxes is due and owing for periods prior to and including the Commencement Date.

38.    Other Governmental Assessments.  The Debtors pay a variety of other taxes not listed above which could result in personal liability on the directors, officers, and employees of the Debtors or could impact the ability of the Debtors to operate in certain jurisdictions including, but not limited to, income tax, the Michigan Business Tax and its predecessor, the Michigan Single Business Tax (collectively, "Other Governmental Assessments").  The Debtors believe that less than $500,000 of Other Governmental Assessments is due and owing for periods prior to and including the Commencement Date.

## Method of Payment

39.     As stated above, in connection with the normal operation of their business, the Debtors incur and pay Property Taxes, Sales Taxes, Use Taxes, Excise Taxes, Gross Receipts Taxes, Franchise Taxes, Business License Fees, Annual Report Taxes, and Other Governmental Assessments (collectively, the "Taxes and Assessments").  Jurisdictions differ with regard to the frequency of when the Taxes and Assessments must be remitted, with payments ranging from monthly to quarterly to semi-annually to annually.  The Taxes and Assessments are paid to the relevant Taxing Authority in accordance with the requirements of the respective Taxing Authority, including payments with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers").

## Relief Requested

40.     By this Motion, the Debtors seek authorization to pay, in their sole discretion, any of the Taxes and Assessments, including any penalties and interest thereon determined to be owed for periods prior to the Commencement Date and all those Taxes and Assessments subsequently determined upon audit, or otherwise, to be owed for periods prior to the Commencement Date.

41.     In addition, prior to the Commencement Date, certain Taxing Authorities were sent Checks or received Electronic Transfers in respect of Taxes and Assessments that may not have cleared the Debtors' banks or other financial institutions (together, the "Banks") as of the Commencement Date.  To the extent any Check or Electronic Transfer has not cleared the Banks as of the Commencement Date, the Debtors further request the Court to authorize the Banks to receive, process, honor, and pay such Checks or Electronic Transfers if and to the extent the Debtors request same.  Consistent with the foregoing, to the extent the Taxing

Authorities have not otherwise received payment for all prepetition Taxes and Assessments owed, the Debtors seek authorization to issue replacement checks or provide for other means of payment to the Taxing Authorities, to the extent necessary to pay all outstanding prepetition Taxes and Assessments.

**Cause Exists to Authorize the Debtors'
Payment of Prepetition Taxes and Assessments**

42.    Ample cause exists to authorize the payment of the prepetition Taxes and Assessments.  There are various bases for granting the relief requested in this Motion, including the following:  (i) interest and penalties may accrue on certain unpaid Property Taxes even after the Commencement Date; (ii) non payment of Property Taxes, PILOT Payments and other government compensation payments could void various tax incentive agreements resulting in additional tax payments, (iii) the Debtors' Sales and Excise Taxes are trust fund taxes and not property of the estate; (iv) if unpaid, many taxes (e.g., Use Taxes) may carry officer or director liability, and governmental entities may sue the Debtors' directors and officers, thereby distracting them from the Debtors' reorganization efforts; (v) the Debtors meet the standard specified under 363(b) of the Bankruptcy Code; (vi) certain of the Taxes and Assessments may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; and (vii) section 105 of the Bankruptcy Code and the Court's general equitable powers permit the Court to grant the relief sought.

43.    Section 506(b) of the Bankruptcy Code provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C § 506(b).  Thus, with respect to the Debtors' Property Taxes, interest as well as any penalties assessed on Property Taxes due under state law will continue to accrue even after the Commencement Date.  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 238-49 (1989) (holding that section 506(b) entitles a creditor to receive postpetition interest on a nonconsensual oversecured claim allowed in a bankruptcy case).  Further, to the extent that the 363 Transaction is approved, the Debtors, as a precondition to transfer the property, need to be current with respect to their Property Tax obligations.  The existence of unpaid prepetition obligations could delay the consummation of the 363 Transaction.  Therefore, authorization is necessary and in the best interest of the Debtors' estate.

44.    Like most domestic OEMs, the Debtors have various tax incentive agreements in place around the country that generates annual tax savings of more than $130 million, and many of those agreements require the timely payment of Property Taxes.  If prepetition Property Taxes, PILOT Payments, and other government compensation payments are not paid, the tax incentive agreements could be automatically voided or cancelled, thus, resulting in higher property tax payments, or even result in the repayment of taxes previously saved in prior tax years.

45.    Some of the Taxes and Assessments are collected by the Debtors on behalf of the applicable Taxing Authority and are held in trust by the Debtors for the benefit of the Taxing Authorities.  As such, these funds do not constitute property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code.  *See, e.g.*, *Begier v. IRS*, 496 U.S. 53, 59-61 (1990) (withholding taxes are property held by debtors in trust for another and, as such, are not property of debtors' estates); *Al Copeland Enters., Inc. v. Texas*, 991 F.2d 233, 235 (5th Cir. 1993) (debtors' prepetition collection of sales taxes and interest thereon were held subject to trust

and were not property of estate); *Shank v. Wash. State Dep't of Revenue (In re Shank)*, 792 F.2d

829, 830 (9th Cir. 1986) (sales taxes required by state law to be collected by sellers from their

customers are "trust fund" taxes); *DeChiaro v. N.Y. State Tax Comm'n,* 760 F.2d 432, 433 (2d

Cir. 1985) (sales taxes are "trust fund" taxes); *In re Am. Int'l Airways, Inc.*, 70 B.R. 102, 103

(Bankr. E.D. Pa. 1987) (excise and withholding taxes are "trust fund" taxes); *see generally In re

Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1060 (3d Cir. 1993) (indicating that even if a statute

does not establish an express trust, a constructive trust may be found).  Because some of the

Taxes and Assessments are not property of the Debtors' estates, these funds are not available for

the satisfaction of creditors' claims.

    46.  Moreover, many federal, state, and local statutes impose personal liability

on the officers and directors for certain taxes owed by such entities.  Thus, to the extent that the

relevant Taxes and Assessments remain unpaid by the Debtors, the Debtors' directors, officers,

and executives may be subject to lawsuits or criminal prosecution during the pendency of these

chapter 11 cases.[2]  Any such lawsuit or criminal prosecution (and the ensuing potential liability)

would distract the Debtors and their officers, directors, and executives from devoting their full

attention to the Debtors' business and the orderly administration of these chapter 11 cases.  The

Debtors believe that this would materially and adversely affect their ability to operate in the

ordinary course of business and to administer these chapter 11 cases, with resulting detriment to

all parties in interest.

    47.  Section 363(b) of the Bankruptcy Code, which provides that "the trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

---

[2] Because they are not debtors in these proceedings, the officers and directors of the Debtors are not protected by the automatic stay pursuant to 28 U.S.C. § 1334.

property of the estate," 11 U.S.C. § 363(b)(1), also provides a statutory basis for the relief sought

herein.  Under this section, a court may authorize a debtor to pay certain prepetition claims.  *See*

*In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  To approve the use of a

debtor's assets outside the ordinary course of business pursuant to section 363(b), a court must

find that a sound business justification existed for the use of such assets.  *See, e.g.*, *In re Enron*

*Corp.*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005).  The business judgment rule is satisfied where "'the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R.

650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)),

*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). It has been stated that "[w]here the debtor articulates

a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re*

*Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this District have

consistently declined to interfere with corporate decisions absent a showing of bad faith, self-

interest, or gross negligence, and have upheld a board's decisions as long as such decisions are

attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.  The

relief requested by the Debtors to pay the prepetition Taxes and Assessments becoming due in

the ordinary course of business satisfies this business judgment standard.

48.    In addition, payment of the prepetition Taxes and Assessments is critical

to the Debtors' efforts to preserve enterprise value.  Nonpayment of these obligations may cause

the Taxing Authorities to take precipitous action, including, but not limited to, preventing the

Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic

stay, and perhaps attempting to file liens, all of which would disrupt the Debtors' day-to-day

operations.  Failing to pay such amounts could also trigger unwarranted governmental action in

the form of increased audits, which would be disruptive of the Debtors' operations and

detrimental to all parties in interest.  As such, paying the Taxes and Assessments is well within

the Debtors' sound business judgment.  Indeed, the Debtors submit that payment of such

amounts may actually reduce the amounts ultimately paid to the Taxing Authorities because

penalties and interest will be avoided by prompt payment.

49.    Further, most, if not all, of the Debtors' prepetition Taxes and

Assessments are afforded priority status under section 507(a)(8) of the Bankruptcy Code.  These

include unsecured claims of governmental units for a tax on or measured by income or gross

receipts for a taxable year ending on or before the Commencement Date (11 U.S.C.

§ 507(a)(8)(A)), a property tax incurred before the Commencement Date and last payable

without penalty after one year before the Commencement Date (*id.* § 507(a)(8)(B)), a tax

required to be collected or withheld and for which the debtor is liable in whatever capacity (*id.*

§ 507(a)(8)(C)), and, under certain circumstances, an employment tax on wages, salaries, or

commissions (*id.* § 507(a)(8)(D)).  Accordingly, as administrative and priority claims, most if

not all of such prepetition Taxes and Assessments must be paid in full before any general

unsecured obligations of the Debtors may be satisfied.

50.    Finally, pursuant to section 105(a) of the Bankruptcy Code, the Court "

may issue any order, process, or judgment that is necessary to carry out the provisions of this

title."  *Id.* § 105(a).  The Debtors submit that the relief requested herein is necessary and

appropriate to carry out the provisions of the Bankruptcy Code.

## Payment of Checks Issued and Other Transfers
## Made in Respect of Prepetition Taxes and Assessments

51.      The Debtors further request that all applicable Banks, including, but not

limited to, those set forth on Exhibit A annexed hereto, be authorized to receive, process, honor,

and pay any and all Checks or Electronic Transfers drawn on the Debtors' accounts when the

Debtors request in their sole discretion payment of prepetition Taxes and Assessments owed to

the Taxing Authorities, whether those Checks or Electronic Transfers were presented prior to or

after the Commencement Date, and other transfers be made, provided that sufficient funds are

available in the applicable accounts to make such payments.  The Debtors represent that each of

these Checks, Electronic Transfers, or other transfers can be readily identified as relating directly

to the authorized payment of prepetition Taxes and Assessments.  Accordingly, the Debtors

believe that Checks, Electronic Transfers, and other transfers, other than those relating to

authorized payments, will not be honored inadvertently.

52.      Nothing in this Motion should be construed as impairing the Debtors'

right to contest the amount of any Taxes and Assessments that may be owed to any Taxing

Authority, and the Debtors expressly reserve all of their rights with respect thereto.

## The Debtors Have Satisfied Bankruptcy Rule 6003

53.      Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or

part of a claim that arose before the filing of the petition" prior to twenty days after the

Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business

operations rely heavily on their compliance with applicable federal, state and local law.  If the

Debtors are unable to immediately comply with the requirements of the applicable Taxing

Authorities, the Debtors' ability to conduct business in each certain jurisdiction will be placed in

jeopardy.  Furthermore, as stated above, without the relief requested herein, the Debtors'

officers, directors, and other employees may be subject to lawsuits or criminal prosecution

during the pendency of these chapter 11 cases.  The threat of a lawsuit or criminal prosecution,

and any ensuing liability, especially during the early stages of the Debtors' chapter 11 cases,

would distract the Debtors and their personnel, to the detriment of all parties in interest.

Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate

and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

54.     To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

55.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

56.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:  New York, New York
        June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

## Bank Accounts

| Bank Name | Bank Mailing Address | Account Held By | Last Four Digits of Account # |
|---|---|---|---|
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 0399 |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 3343 |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 2176 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
                                  :

**In re**                                  :                 **Chapter 11 Case No.**
                                  :

**GENERAL MOTORS CORP.,** *et al.*,     :          **09-_____ (____)**
                                  :

                    **Debtors.**       :          **(Jointly Administered)**
                                  :
---------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 363(b),**
**507(a)(8), 541, AND 105(a) AUTHORIZING**
**DEBTORS TO PAY PREPETITION TAXES AND ASSESSMENTS**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 363(b), 541, and

105(a) of title 11, United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order

(i) authorizing the Debtors to pay, in their sole discretion, all Property Taxes, Sales Taxes, Use

Taxes, Excise Taxes, Gross Receipts Taxes, Franchise Taxes, Business License Fees, Annual

Report Taxes, and Other Governmental Assessments (collectively, the "Taxes and

Assessments") relating to periods prior to the Commencement Date, including any penalties and

interest thereon determined to be owed for periods prior to the Commencement Date and all

those Taxes and Assessments subsequently determined upon audit, or otherwise, to be owed for

periods prior to the Commencement Date, and (ii) authorizing the Debtors' banks and other

financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole

---
[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

discretion, to receive, process, honor, and pay any and all checks and electronic transfers related to the prepetition Taxes and Assessments, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests

of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Debtors are authorized, but not directed, in their sole

discretion, to pay all Taxes and Assessments relating to periods prior to the Commencement

Date, including any penalties and interest thereon determined to be owed for periods prior to the

Commencement Date and all those Taxes and Assessments subsequently determined upon audit,

or otherwise, to be owed for periods prior to the Commencement Date to the proper Taxing

Authorities; and it is further

ORDERED that all applicable Banks, including, but not limited to, those

identified on Exhibit A annexed hereto, shall be, and hereby are, authorized and directed, when

requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all

checks or electronic transfers drawn on the Debtors' accounts to pay the Taxes and Assessments,

whether those checks were presented prior to or after the Commencement Date, provided that

sufficient funds are available in the applicable accounts to make the payments; and it is further

ORDERED that nothing in the Motion or this Order shall be construed as

impairing the Debtors' right to contest the validity or amount of any Taxes and Assessments that

may be due to any Taxing Authorities, and all of the Debtors' rights with respect thereto are

hereby reserved; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
     _____, 2009

 

_____
United States Bankruptcy Judge

# EXHIBIT A

## Bank Accounts

| Bank Name | Bank Mailing Address | Account Held By | Last Four Digits of Account # |
|---|---|---|---|
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 0399 |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 3343 |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 2176 |