Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                            :
**In re**                                   :           **Chapter 11 Case No.**
                                            :
**GENERAL MOTORS CORP.,** *et al.,*         :           **09-_____ (___)**
                                            :
                        **Debtors.**        :           **(Jointly Administered)**
                                            :
-------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDERS**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 507 (i)**
**AUTHORIZING USE OF CASH COLLATERAL, (ii) GRANTING ADEQUATE**
**PROTECTION TO THE REVOLVER SECURED PARTIES,  (iii) GRANTING**
**ADEQUATE PROTECTION TO THE TERM LOAN SECURED PARTIES, AND**
**(iv) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

1.      By this motion and pursuant to sections 105, 361, 362, 363, and 507 of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the Debtors request

authority to use cash collateral of certain secured parties under the Debtors' prepetition revolving

credit facility,[1] and authority to grant adequate protection (a) to the Debtors' prepetition

revolving secured lenders against diminution in the value of cash collateral and other collateral

of the revolving lenders resulting from the Debtors' use thereof and from the imposition of the

automatic stay, and (b) to certain prepetition term loan secured lenders under the Debtors'

prepetition term loan,[2] against diminution in the value of the term loan secured lenders' collateral

resulting from the Debtors' use thereof and from the imposition of the automatic stay.

2.    <u>Revolver</u>.  Specifically, the Debtors request (a) authority to use (i) current

cash and cash equivalent proceeds of (A) property of the estates that constitutes Collateral (as

defined in the Revolver Facility) and (B) property of the estates that constitutes Additional

Collateral (as defined in the Revolver Facility), each under the Revolver Facility, ((A) and (B)

collectively, the "<u>Prepetition Revolver Collateral</u>"), in the Debtors' possession as of the date

hereof (the "<u>Commencement Date</u>"), (ii) additional cash and cash equivalent proceeds of

Prepetition Revolver Collateral hereafter generated, and (iii) cash and cash equivalents in bank

accounts of the Revolver Agent or Revolver Secured Parties, all of which cash and cash

---

[1]    That certain Amended and Restated Credit Agreement, dated as of July 20, 2006 (as amended, supplemented or otherwise modified, the "<u>Revolver Facility</u>") among the Company, General Motors of Canada Limited ("<u>GM Canada</u>"), Saturn, LLC ("<u>Saturn</u>"), as a guarantor, Citicorp USA, Inc., as administrative agent (in such capacity, the "<u>Revolver Agent</u>"), JPMorgan Chase Bank, N.A., as syndication agent, and certain secured parties including the banks and other financial institutions party to the Revolver Facility as lenders (the "<u>Revolver Lenders</u>"). The "<u>Revolver Secured Parties</u>" comprise the US Secured Parties, the Canadian Secured Parties and the Hedging Secured Parties, each as defined in the Revolver Facility and the loan documents related thereto.

[2]    That certain Term Loan Agreement, dated as of November 29, 2006, among the Borrower, Saturn and JPMorgan Chase Bank, N.A., as administrative agent (the "<u>Term Loan Agent</u>"), and the lenders party thereto from time to time ("<u>Term Loan Lenders</u>"), as amended by that First Amendment, dated March 4, 2009, and as further amended, supplemented and otherwise modified from time to time (the "<u>Term Loan</u>").

equivalent proceeds described under romanette (i) through (iii) above may be cash collateral (the "Cash Collateral") of the Revolver Agent and the Revolver Secured Parties within the meaning of section 363(a) of the Bankruptcy Code; and (b) authority to grant to the Revolver Agent and the Revolver Secured Parties adequate protection against diminution in value resulting from the imposition of the automatic stay and from the Debtors' use of the Prepetition Revolver Collateral and the Cash Collateral (the "Revolver Adequate Protection Obligations"), all as set forth more fully in the proposed interim order with respect to the use of Cash Collateral of the Revolver Secured Parties annexed hereto as Exhibit A (the "Interim Revolver Cash Collateral Order").

3.      Term Loan.  The Debtors request authority to grant to the Term Loan Agent and Term Loan Lenders adequate protection against diminution in value resulting from the imposition of the automatic stay and from the Debtors' use of (a) certain equipment and fixtures, (b) all documents and general intangibles attributable solely to such equipment or fixtures, (c) all books and records pertaining solely to such equipment or fixtures, and (d) proceeds or products of such equipment or fixtures ((a)-(d) collectively, the "Term Loan Collateral"), in which a security interest was granted for the benefit of the Term Loan Agent and the Term Loan Lenders under that certain Collateral Agreement, dated as of November 29, 2006 (the "Term Loan Collateral Agreement") among GM and Saturn, as grantors, and the Term Loan Agent (the "Term Loan Adequate Protection Obligations"), all as set forth more fully in the proposed interim order with respect to the grant of adequate protection to the Term Loan Agent and the Term Loan Lenders annexed hereto as Exhibit B (the "Interim Term Loan Adequate Protection Order").

4.      The Debtors also request the scheduling of a final hearing (the "Final Hearing") on the relief requested herein.

## **Bankruptcy Rule 4001 Concise Statement**

5.      In accordance with Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the

Southern District of New York (the "Local Rules"), below is a summary of selected terms for (a)

the Interim Revolver Cash Collateral Order[3] and (b) the Interim Term Loan Adequate Protection

Order:[4]

**A.      Interim Revolver Cash Collateral Order**

(i)      Amount.  The Debtors estimate they hold in excess of $1.5 billion in cash and cash equivalents in bank accounts as of the Commencement Date, all of which cash may be Cash Collateral.  In addition, the Debtors anticipate that postpetition financing (the "DIP Facility") received under the order approving the Debtors' postpetition financing (the "Interim DIP Order") will not be sufficient to meet all anticipated disbursements without the use of Cash Collateral.  Accordingly, the Debtors request immediate interim approval for the use of all Cash Collateral, including the Cash Collateral in their bank accounts as of the Commencement Date, as well as cash received postpetition that constitutes Cash Collateral.

(ii)     Parties with Interest in Cash Collateral.  The parties with an interest in the Cash Collateral are the Revolver Agent and the Revolver Secured Parties.  Motion at ¶ 1; Interim Revolver Cash Collateral Order at ¶ 3(b).

(iii)    Purpose for Use of Cash Collateral.  The Debtors seek authorization to use the Cash Collateral to preserve the value of estate assets and to accomplish their strategic objectives to maximize the value of the estates.  Motion at ¶ 65; Interim Revolver Cash Collateral Order at ¶ 3(f).

(iv)     Adequate Protection.  The Revolver Agent and Revolver Secured Parties will be granted adequate protection as follows:

(a)  Section 507(b) Claim.  A superpriority claim, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses, including sections 326, 328, 330, 331 and 726 of the Bankruptcy

---

[3]      To the extent the summary is inconsistent with the Interim Revolver Cash Collateral Order, the Interim Revolver Cash Collateral Order shall control.

[4]      To the extent the summary is inconsistent with the Interim Term Loan Adequate Protection Order, the Interim Term Loan Adequate Protection Order shall control.

Code, for the Revolver Adequate Protection Obligations, (i) subject to the Carve-Out and any superpriority claims granted to the DIP Lenders pursuant to the Interim DIP Order, and (ii) *pari passu* with any adequate protection superpriority claim granted in favor of the Term Loan Agent and Term Loan Lenders.  Interim Revolver Cash Collateral Order ¶ 6(a).

(b) <u>Adequate Protection Liens</u>.  Certain security interests and liens, subject only to the Carve-Out, including:

(i) <u>Lien On Unencumbered Property</u>.  A valid, binding, continuing, enforceable, fully-perfected first lien on, and security interest in, all tangible and intangible (x) postpetition property (excluding claims payable from or with recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code "<u>Avoidance Actions</u>") of the Debtors, which, but for the commencement of the Cases, would constitute Prepetition Collateral (as defined in the Interim Revolver Cash Collateral Order), and (y) property (excluding Avoidance Actions), other than property set forth in (x), whether existing on or as of the Commencement Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Commencement Date (collectively, the "<u>Unencumbered Property</u>"), <u>provided that</u>, with respect to Unencumbered Property described in clause (y) the lien granted pursuant to this paragraph (i) shall be immediately junior to any lien granted to the DIP Lenders, as defined in and pursuant to the Interim DIP Order and (ii) shall be *pari passu* with any adequate protection liens granted to secure adequate protection obligations in favor of Term Loan Lenders.

(ii) <u>Liens Junior To Certain Existing Liens</u>.  A valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property (excluding Avoidance Actions) of the Debtors whether now existing or hereafter acquired, (i) subject and junior to valid, perfected and unavoidable liens in existence immediately prior to the Commencement Date or to valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code, (ii) subject and junior to any lien granted to the DIP Lenders, as defined in and pursuant to the Interim DIP Order, and (iii) *pari passu* with any other adequate protection liens granted to secure adequate protection obligations in favor of the Term Loan Lenders.

(iii) <u>Liens Senior To Certain Other Liens</u>.  Except as set forth in the Interim Revolver Cash Collateral Order, the Revolver Adequate Protection Liens (as defined in the Interim Revolver Cash Collateral Order) shall not be (i) subject or subordinate to (A) any lien or security interest that is

avoided and preserved for the benefit of any of the Debtors and their respective estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Commencement Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest granted under sections 363 or 364 of the Bankruptcy Code or otherwise.

Interim Revolver Cash Collateral Order ¶ 6(b).

(c) <u>Current Payment of Interest & Fees</u>.  The Debtors will pay current interest on all outstanding obligations under the Revolver Facility, calculated at the non-default rate.  The Debtors will also pay certain letter of credit fees, current non-default interest, and other fees, charges and expenses in respect of any outstanding Non-Loan Exposure.  Such interest and fees will be payable monthly.  If the Revolver Lenders' secured obligations are not paid in full within 45 business days, then (a) sections 2.1 and 2.3 of the Second Amendment[5] (described below) to the Revolver Facility shall be void *ab initio* and of no force and effect and (b) the Revolver Secured Parties may seek interest at the default rate under the Revolver Facility.  Interim Revolver Cash Collateral Order at ¶ 6(c).

(d) <u>Reimbursement</u>.  The Debtors are authorized and directed, within 10 days of the submission of invoices, to pay or reimburse all reasonable fees, costs and charges incurred by the Revolver Agent in accordance with the terms and provisions of the Revolver Facility, which fees, costs and expenses shall not be subject to separate approval by the Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Interim Revolver Cash Collateral Order at ¶ 6(d).

(v)   <u>Carve-Out</u>.  The "<u>Carve-Out</u>" includes an amount sufficient to pay:

(a) allowed professional fees and disbursements of professionals retained by the Debtors and any Committee and allowed expenses of Committee members not to exceed $20,000,000, and

---

[5]   <u>Section 2.1</u> waives an increase in the otherwise applicable interest rate that would be triggered by an event of default resulting from a bankruptcy filing by a borrower or a significant subsidiary.

<u>Section 2.3</u> provides that so long as General Motors Canada Limited ("<u>GM Canada</u>") complies with its obligations under the Revolving Credit Facility and neither GM Canada nor any of its significant subsidiaries are the subject of an bankruptcy event of default thereunder, the lenders will forbear from accelerating the obligations owing by GM Canada upon a bankruptcy filing by GM for a period of 45 days.

(b) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930,

provided that

(x) so long as no event of default has occurred, the Debtors may pay fees and expenses allowed and payable under Bankruptcy Code sections 330 and 331, which payment shall not reduce the Carve-Out, and

(y) the Carve-Out shall not include any fees or disbursements related to the investigation, commencement, or prosecution of any claims against the DIP Lenders or parties granted adequate protection under the Interim DIP Order.

Interim Revolver Cash Collateral Order at ¶ 6; Interim DIP Order at ¶ 15.

(vi)  Preservation of Rights.

(a) No claim or lien senior or *pari passu* to those granted in the Interim Revolver Cash Collateral Order shall be granted or allowed while any portion of the Revolver Adequate Protection Obligations remain outstanding.  Interim Revolver Cash Collateral Order at ¶ 12(a).

(b) If any order dismissing these cases is entered, the order must provide that (i) the superpriority claim and Revolver Adequate Protection Liens, each as defined in the Interim Revolver Cash Collateral Order, shall maintain their priorities until all Revolver Adequate Protection Obligations are paid in full, and (ii) this Court shall retain jurisdiction for the purpose of enforcing such claims, liens and security interests.  Interim Revolver Cash Collateral Order at ¶ 12(b).

(c) If any provision of the Interim Revolver Cash Collateral Order is reversed, modified, vacated or stayed, the validity, priority and enforceability of any Revolver Adequate Protection Obligations or any Revolver Adequate Protection Liens shall not be affected, and any use of Cash Collateral or any Revolver Adequate Protection Obligations incurred under the Interim Revolver Cash Collateral Order prior to the receipt of notice of the reversal, stay, modification or vacatur shall be governed in all respects by the original Interim Revolver Cash Collateral Order, and the Revolver Agent and Revolver Secured Parties shall be entitled to all rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code and the Interim Revolver Cash Collateral Order.  Interim Revolver Cash Collateral Order at ¶ 12(c).

(d) Except as provided in the Interim Revolver Cash Collateral Order, the rights and remedies of the Revolver Agent and the Revolver Secured Parties granted by the Interim Revolver Cash Collateral Order shall survive, and shall not be

modified, impaired or discharged by dismissal, conversion of any of these cases to a case under chapter 7, the entry of an order confirming a plan of reorganization, or any other act or omission. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Revolver Adequate Protection Obligations. The terms and provisions of the Interim Revolver Cash Collateral Order shall continue in the Cases or in any superseding chapter 7 case under the Bankruptcy Code, and all rights and remedies of the Revolver Agent and the Revolver Secured Parties granted by the Interim Revolver Cash Collateral Order shall continue until all Revolver Adequate Protection Obligations are indefeasibly paid in full in cash. Interim Revolver Cash Collateral Order at ¶ 12(d).

(vii)   <u>Limitations on Use of Collateral</u>. The Debtors shall use the Cash Collateral solely as provided in the Interim Revolver Cash Collateral Order. Notwithstanding anything in any other order of this Court to the contrary, no Prepetition Collateral (as defined in the Interim Revolver Cash Collateral Order), Prepetition Revolver Collateral, Cash Collateral, or the Carve-Out may be used to (a) contest the validity, perfection, priority, extent or enforceability of any amount due under Revolver Facility or the liens or claims granted under the Interim Revolver Cash Collateral Order, (b) assert any claims and defenses or any other causes of action against the Revolver Agent, the Revolver Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Revolver Agent's assertion, enforcement or realization on the Prepetition Collateral or the Collateral (each as defined in the Interim Revolver Cash Collateral Order), or (d) seek to modify any of the rights granted to the Revolver Agent and the Revolver Secured Parties in the Interim Revolver Cash Collateral Order or the Revolver Facility, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent. Interim Revolver Cash Collateral Order at ¶ 13.

(viii)  <u>Termination Date</u>. The Debtors' right to use Cash Collateral will terminate on the earliest to occur of (a) the first business day that is 45 days after the Commencement Date or (b) upon 5 business days' written notice after the occurrence and continuance of any Event of Default, as defined in the Interim Revolver Cash Collateral Order. Interim Revolver Cash Collateral Order at ¶ 7.

(ix)    <u>Events of Default</u>. The following events, constitute an event of default:

(a)   failure to make any payment to the Revolver Agent or the Revolver Secured Parties as required in the Interim Revolver Cash Collateral Order;

(b)   failure to comply with material terms of the Interim Revolver Cash Collateral Order or any covenant or agreement specified in the order, and such failure continues unremedied for three (3) business days after notice thereof;

  (c) dismissal or conversion to chapter 7 of any of the Cases or the appointment of a trustee with plenary powers or an examiner with enlarged powers;

  (d) entry of an order affecting the Interim Revolver Cash Collateral Order in a manner materially adverse to the Revolver Secured Parties, as reasonably determined by them;

  (e) the filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of certain liens or any other cause of action with respect to certain obligations under the Revolver Facility or the prepetition liens securing such obligations;

  (f) the making of any payment on account of any prepetition indebtedness or payables in excess of $25 million in the aggregate; and

  (g) five (5) business days after the acceleration of the DIP Facility attached to the Interim DIP Order.

Interim Revolver Cash Collateral Order at ¶¶ 7(a)-(g).

(x) <u>Section 506(c) Waiver</u>.  Subject to the entry of the final order, and except as provided in the Carve-Out, no costs or expenses of administration shall be charged against the Prepetition Collateral, as defined in the Interim Revolver Cash Collateral Order, pursuant to section 506(c) without the prior written consent of the Revolver Agent.  Interim Revolver Cash Collateral Order at ¶ 8.

(xi) <u>Avoidance Actions</u>.  The administrative expense claim and adequate protection liens of the Revolver Agent and the Revolver Secured Parties shall not be payable from or have recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code.  Interim Revolver Cash Collateral Order at ¶¶ 6(a)-(b).

**B.** **Interim Term Loan Adequate Protection Order**

(i) <u>Parties with Interest in Term Loan Collateral</u>.  The parties with an interest in the Term Loan Collateral are the Term Loan Agent and the Term Loan Lenders. Motion at ¶ 1; Interim Term Loan Adequate Protection Order at ¶ 3(b).

(ii) <u>Purpose for Grant of Adequate Protection</u>.  The Debtors require the use of Term Loan Collateral in the operation of their business in order to maximize the value of the estates.  Motion at ¶ 74; Interim Term Loan Adequate Protection Order at ¶ 3(f).

(iii) <u>Adequate Protection</u>.  The Term Loan Agent and Term Loan Lenders will be granted adequate protection as follows:

  (a) <u>Section 507(b) Claim</u>.  A superpriority claim, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative

expenses, including sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, for the Adequate Protection Obligations, (i) subject to the Carve-Out and any superpriority claims granted to the DIP Lenders as defined in and pursuant to the Interim DIP Order, and (ii) *pari passu* with any adequate protection superpriority claim granted in favor of the Adequate Protection Claims, as defined in the Interim Term Loan Adequate Protection Order.  Interim Term Loan Adequate Protection Order ¶ 5(a).

(b) <u>Adequate Protection Liens</u>.  Certain security interests and liens, subject only to the Carve-Out, including:

(i) <u>First Priority Lien on Certain Property</u>.  A valid, binding, continuing, enforceable fully perfected lien on, and security interest in, all postpetition property (other than claims payable from or with recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>")) of the Debtors which, but for the commencement of the Cases, would constitute Prepetition Collateral, as defined in the Interim Term Loan Adequate Protection Order.

(ii) <u>Lien On Unencumbered Property</u>.  A valid, binding, continuing, enforceable, fully-perfected first lien on, and security interest in, all tangible and intangible property (excluding Avoidance Actions), other than property set forth in (i) above, whether existing on or as of the Commencement Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Commencement Date, provided that, the lien granted pursuant to this paragraph (i) shall be immediately junior to any lien granted to the DIP Lenders, and (ii) shall be pari passu with any adequate protection liens granted to secure Adequate Protection Claims, as defined in the Interim Term Loan Adequate Protection Order.

(iii) <u>Liens Junior To Certain Existing Liens</u>.  A valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property (excluding Avoidance Actions) of the Debtors whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Commencement Date or to valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected after the Commencement Date as permitted by section 546(b) of the Bankruptcy Code, <u>provided</u> <u>that</u> the lien granted pursuant to this paragraph shall also be subject and junior to any lien granted to the DIP Lenders, as defined in and pursuant to the Interim DIP Order, and shall be *pari passu* with any adequate protection liens granted to secure any Adequate Protection Claims, as defined in the Interim Term Loan Adequate Protection Order.

(iv) <u>Liens Senior To Certain Other Liens</u>.  Except as set forth in the Interim Term Loan Adequate Protection Order, the Term Loan Adequate Protection Liens (as defined therein) shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any of the Debtors and their respective estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Commencement Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest granted under sections 363 or 364 of the Bankruptcy Code or otherwise.

Interim Term Loan Adequate Protection Order ¶ 5(b).

(c) <u>Current Payment of Interest & Fees</u>.  The Debtors will pay current interest on all outstanding Obligations under the Term Loan, calculated at the non-default rate.  Such interest and fees will be payable monthly.  Interim Term Loan Adequate Protection Order at ¶ 5(c).

(d) <u>Reimbursement</u>.  The Debtors are authorized and directed, within 10 days of the submission of invoices, to pay or reimburse all reasonable fees, costs and charges incurred by the Term Loan Agent in accordance with the terms and provisions of the Term Loan, which fees, costs and expenses shall not be subject to separate approval by the Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Interim Term Loan Adequate Protection Order at ¶ 5(d).

(e) <u>Insurance</u>.  The Debtors are required to maintain insurance on the Term Loan Collateral as required in the Term Loan Collateral Agreement. Interim Term Loan Adequate Protection Order at ¶ 5(e).

(iv)    <u>Carve-Out</u>.  The "<u>Carve-Out</u>" includes an amount sufficient to pay:

(a)  allowed professional fees and disbursements of professionals retained by the Debtors and any Committee and allowed expenses of Committee members not to exceed $20,000,000, and

(b)  all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930,

<u>provided</u> that

(x)  so long as no event of default has occurred, the Debtors may pay fees and expenses allowed and payable under Bankruptcy Code sections 330 and 331, which payment shall not reduce the Carve-Out, and

(y) the Carve-Out shall not include any fees or disbursements related to the investigation, commencement, or prosecution of any claims against the DIP Lenders or parties granted adequate protection under the Interim DIP Order.

Interim Term Loan Adequate Protection Order at ¶ 5; Interim DIP Order at ¶ 15.

(v)   Preservation of Rights.

(a)   No claim or lien senior or *pari passu* to those granted in the Interim Term Loan Adequate Protection Order shall be granted or allowed while any portion of the Term Loan Adequate Protection Obligations remain outstanding. Interim Term Loan Adequate Protection Order at ¶ 11(a).

(b)   If any order dismissing these cases is entered, the order must provide that (i) the superpriority claim and Term Loan Adequate Protection Liens, each as defined in the Interim Term Loan Adequate Protection Order, shall maintain their priorities until all Term Loan Adequate Protection Obligations are paid in full, and (ii) this Court shall retain jurisdiction for the purpose of enforcing such claims, liens and security interests.  Interim Term Loan Adequate Protection Order at ¶ 11(b).

(c)   Except as provided in the Interim Term Loan Adequate Protection Order, the rights and remedies of the Term Loan Agent and the Term Loan Lenders granted by the Interim Term Loan Adequate Protection Order shall survive, and shall not be modified, impaired or discharged by dismissal, conversion of any of these cases to a case under chapter 7, the entry of an order confirming a plan of reorganization, or any other act or omission.  Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations, as defined in the Interim Term Loan Adequate Protection Order.  The terms and provisions of the Interim Term Loan Adequate Protection Order shall continue in the Cases or in any superseding chapter 7 case under the Bankruptcy Code, and all rights and remedies of the Term Loan Agent and the Term Loan Lenders granted by the Interim Term Loan Adequate Protection Order shall continue until all Term Loan Adequate Protection Obligations are indefeasibly paid in full in cash.  Interim Term Loan Adequate Protection Order at ¶ 11(c).

(vi)   Limitations on Use of Collateral.  The Debtors shall use the Term Loan Collateral solely as provided in the Interim Term Loan Adequate Protection Order. Notwithstanding anything in any other order of this Court to the contrary, no Collateral or Prepetition Collateral (each as defined in the Interim Term Loan Adequate Protection Order), or the Carve-Out may be used to (a) contest the validity, perfection, priority, extent or enforceability of any amount due under Term Loan or the liens or claims granted under the Interim Term Loan Adequate Protection Order, (b) assert any claims and defenses or any other causes of action against the Term Loan Agent, the Term Loan Lenders or their respective agents,

affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) seek to modify any of the rights granted to the Term Loan Agent and the Term Loan Lenders in the Interim Term Loan Adequate Protection Order or the Term Loan, in the case of each of the foregoing clauses (a) through (c), without such party's prior written consent.  Interim Term Loan Adequate Protection Order at ¶ 12.

(vii)     <u>Termination Date</u>.  The Debtors' right to use Term Loan Collateral will terminate upon 5 business days' written notice after the occurrence and continuance of any Event of Default, as defined in the Interim Term Loan Adequate Protection Order. Interim Term Loan Adequate Protection Order at ¶ 6.

(viii)    <u>Events of Default</u>.  The following events, constitute an event of default:

(a)  failure to make any payment to the Term Loan Agent or the Term Loan Lenders as required in the Interim Term Loan Adequate Protection Order;

(b)  failure to comply with material terms of the Interim Term Loan Adequate Protection Order or any covenant or agreement specified in the order, and such failure continues unremedied for three (3) business days after notice thereof;

(c)  dismissal or conversion to chapter 7 of any of the Debtors' chapter 11 cases or the appointment of a trustee with plenary powers or an examiner with enlarged powers;

(d)  entry of an order affecting the Interim Term Loan Adequate Protection Order in a manner materially adverse to the Term Loan Lenders, as reasonably determined by them;

(e)  the filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of certain liens or any other cause of action with respect to certain obligations under the Term Loan or the prepetition liens securing such obligations;

(f)  the making of any material payment not set forth in the Approved Budget on account of any prepetition indebtedness or payables; and

(g)  the failure to pay the Obligations, as defined in the Interim Term Loan Adequate Protection Order, within 45 days after the Commencement Date.

Interim Term Loan Adequate Protection Order at ¶¶ 6(a)-(g).

(ix)     <u>Section 506(c) Waiver</u>.  Subject to the entry of the final order, and except as provided in the Carve-Out, no costs or expenses of administration shall be charged against the Collateral, as defined in the Interim Term Loan Adequate

Protection Order, pursuant to section 506(c) without the prior written consent of the Term Loan Agent.  Interim Term Loan Adequate Protection Order at ¶ 7.

(x)    <u>Avoidance Actions</u>.  The administrative expense claim and adequate protection liens of the Term Loan Agent and the Term Loan Lenders shall not be payable from or have recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code.  Interim Term Loan Adequate Protection Order at ¶¶ 5(a)-(b).

## **Background**

6.    On the Commencement Date, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

7.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

## **General Motors' Businesses**

8.    For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "<u>General Motors</u>" or the "<u>Company</u>"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry.  The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.  Over many years, the Company has supplied one in five vehicles sold in the United States.  It is the largest original equipment manufacturer ("<u>OEM</u>") in the country and the second largest in the world.  General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

9.    William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the

automotive market by dividing it into distinct price segments, ranging from low-priced to luxury.

Based on that strategy, the Company proceeded to build an automotive manufacturing giant

offering distinctive brands and models for each market segment.

10.    Over the past century, the Company grew into a worldwide leader in

products and services related to the development, manufacture, and marketing of cars and trucks

under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden,

HUMMER, Opel, Pontiac, Saab,[6] Saturn, Vauxhall, and Wuling.  The Company has produced

nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The

recent severe economic downturn has had an unprecedented impact on the global automotive

industry.  Nevertheless, particularly in the United States, the automotive industry remains a

driving force of the economy.  It employs one in ten American workers and is one of the largest

purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic

and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of

---

[6] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization
proceedings in Sweden in February 2009.

U.S. industrial production by value, are related to the automotive industry.

11.    GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

12.    The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

13.    As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

14.    As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

**The Economic Downturn and the U.S. Treasury Loan**

15.    In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

16.    This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

17.    The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were

previously unencumbered, as well as a junior priority lien on encumbered assets, subject to

certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

18.    The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"Presidential Task Force").

### The U.S. Government Sponsored Program for GM

19.    On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

20.    President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.* The President observed that the Company needs a "fresh start to implement the restructuring

plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it]

restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a
> tool that, with the backing of the U.S. Government, can make it
> easier for General Motors . . . to *quickly* clear away old debts that
> are weighing [it] down so that [it] can get back on [its] feet and
> onto a path to success; a tool that we can use, even as workers stay
> on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply
> broken up, sold off, and no longer exists.  We're not talking about
> that.  And what I'm *not talking about is a company that's stuck in
> court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

21.     The U.S. Government set a deadline of June 1, 2009 for the Company to

demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the

President's guidance, the Company began a deeper, more surgical analysis of its business and

operations in an effort to develop a viability plan that would accommodate the needs of its

secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a

healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology

leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable

in that timeframe, then the Company should consider undertaking a new, more aggressive plan

using an expedited, Bankruptcy Court-supervised process to implement the purchase of the

Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the

Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases. Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

22.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

23.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

24.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A

number of those assembly facilities that currently are shut down are expected to resume

operations by July 13, 2009 if the 363 Transaction is approved.

25.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to

increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional

$4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

26.    In an effort to achieve long-term viability without resort to the bankruptcy

process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange

offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The

Company believed that the Exchange Offer would provide the least intrusive means to

restructure its indebtedness for the future success of the Company.  The Company, however, did

announce in connection with the Exchange Offer that if it did not receive enough tenders to

consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company

and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the

Bankruptcy Code.

27.    The Exchange Offer expired on May 26, 2009 without achieving the

threshold of required tendered acceptances.

## The 363 Transaction

28.    Recognizing that the Exchange Offer might not be successful, the

Company and the U.S. Treasury determined that it would be in the best interests of the Company

and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency

basis while the Exchange Offer was being solicited.

29.    Consistent therewith, over the past several weeks, GM and its Debtor

subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with

respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser

sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as

embodied in the MPA, contemplates that substantially all of GM's assets, including the capital

stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation

to New GM and preserve both the viability of the GM enterprise and the U.S. automotive

industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the

benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or

one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with

services reasonably required by the Sellers and such subsidiaries to wind down or otherwise

dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363

Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the

ongoing provision of certain employee and retiree benefits.

        30.     The Debtors intend to use the chapter 11 process to expeditiously

consummate the 363 Transaction and establish New GM as an economically viable OEM,

serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical

element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive

industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the

industry that would occur if New GM is unable to immediately commence bankruptcy-free

operations.

        31.     Notably, both the Government of Canada and the Government of Ontario,

through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to

participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

32.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

33.     The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  *Presidential Remarks* at 7.

## Jurisdiction

34.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Prepetition Funding of the Debtors' Operations

35.     Prior to the Commencement Date, the Debtors' primary funding included the following loans and credit facilities, each of which is described below in more detail:

    (a)     the Revolver Facility;

    (b)     the Term Loan;

    (c)     the Gelco Facility;[7] and

    (d)     the U.S. Treasury Loan Agreement.

36.    As described below, the Debtors also pledged certain assets to lenders under the Supplier Receivables Facility (as defined below).

## A.    Revolver Facility

37.    The Revolver Facility provides for a revolving credit facility in the maximum aggregate principal amount of $4.48 billion.[8]  Obligations of GM arising under the Revolver Facility (the "US Obligations") are direct obligations of GM, while obligations of GM Canada (the "Canadian Obligations", and, together with the US Obligations, the "Revolver Obligations") arising under the Revolver Facility are direct obligations of GM Canada.  The US Obligations are guaranteed by Saturn and the UST guarantors (as defined below), and the Canadian Obligations are guaranteed by GM and Saturn (together, the "Revolver Guarantors") and the UST Guarantors.

38.    Under the Revolver Facility, the obligations of GM and each of its subsidiaries under any (i) lines of credit, (ii) letters of credit (other than any letters of credit issued under the Revolver Facility) and (iii) automated clearing house and overdraft

---

[7]    The Gelco Facility is that certain Loan and Security Agreement, dated as of October 2, 2006 (as amended, the "Gelco Credit Agreement") between the Borrower and Gelco Corporation (d/b/a GE Fleet Services ("Gelco")), as amended by the First Amendment, dated as of September 27, 2007, the Second Amendment, dated as of November 29, 2007, the Third Amended, dated as of February 17, 2009 and as further amended, supplemented and otherwise modified from time to time (the "Gelco Facility").

[8]    The Revolver Facility also provided for an unsecured revolving credit facility in the maximum aggregate principal amount of $152,000,000, which expired on June 16, 2008.

arrangements, in each case, provided by any Revolver Lender (or any affiliate thereof) and listed

on a schedule to the Revolver Facility (the "Non-Loan Schedule"), solely to the extent such

Revolver Lender remains a Revolver Lender (the "Non-Loan Exposure"), are guaranteed by the

Revolver Guarantors and the UST Guarantors.

39.    To secure (i) the Revolver Obligations and (ii) the Non-Loan Exposure

that is listed on the Non-Loan Schedule as Non-Loan Exposure secured by the same collateral

that secures the US Obligations (the "US Non-Loan Exposure"), the Revolver Guarantors

entered into (a) that certain U.S. Security Agreement, dated as of July 20, 2006 (the "US Security

Agreement") among each of the Revolver Guarantors and the Revolver Agent and (b) that

certain Guaranty and Security Agreement, dated as of February 11, 2009 (the "UST-Related

Guaranty and Security Agreement"), among the Revolver Guarantors, the UST Guarantors, and

the Revolver Agent.

40.    Pursuant to the US Security Agreement and the UST-Related Guaranty

and Security Agreement, the Revolver Agent was granted, for the benefit of (i) the Revolver

Agent and (ii) any other holder of Revolver Obligations and US Non-Loan Exposure, (a) a

security interest in, and continuing senior liens on, (1) certain inventory owned by the Revolver

Guarantors, (2) certain receivables owned by the Revolver Guarantors, (3) 65% of the

outstanding capital stock of Controladora General Motors, S.A. de C.V. owned by GM (the

"Pledge Stock"), and (4) chattel paper, documents, general intangibles, books and records,

proceeds, supporting obligations and products of, or attributable to, such inventory, receivables

or Pledge Stock (the "Initial US Revolver Collateral") , and (b) a security interest in, and

continuing second liens on, the Initial UST Collateral (as defined below)[9] (the "UST-Related Collateral," and, collectively, with the Initial US Revolver Collateral, the "US Revolver Collateral"):

41.    To secure (i) the Canadian Obligations and (ii) the Non-Loan Exposure that is listed on the Non-Loan Schedule as Non-Loan Exposure secured by the same collateral which secures the Canadian Obligations (the "Canadian Non-Loan Exposure"), GM Canada entered into that certain General Security Agreement (Canadian Borrower), dated as of July 20, 2006 (the "Canadian Security Agreement") by and between the GM Canada and the Revolver Agent.

42.    Pursuant to the Canadian Security Agreement, the Revolver Agent was granted, for the benefit of (i) the Revolver Agent and (ii) any other holder of Canadian Obligations and Canadian Non-Loan Exposure, a security interest in, and continuing liens on, (i) certain inventory owned by GM Canada; (ii) certain other goods, including equipment machinery, plant and tools owned by GM Canada; (iii) certain accounts, notes and notes receivable receivables owned by GM Canada; (iv) books, accounts, other records, parts, components, and proceeds of, or relating to such inventory, other goods, accounts and notes receivable; and (v) certain real property owned by GM Canada (the "Canadian Revolver Collateral").

---

[9]    The Prepetition Revolver Agent's lien, for the benefit of (i) the Prepetition Revolver Agent and (ii) any other holder of Revolver Obligations and US Non-Loan Exposure, on 65% of the equity interests of GM Canada is a third priority lien, subject to the first priority lien thereon granted to the U.S. Treasury, to secure the U.S. Treasury Loan Obligations (as defined below) and a second priority lien thereon granted to Export Development Canada ("EDC"), to secure GM Canada's obligations under the Loan and Security Agreement, dated as of April 29, 2009, among GM Canada, EDC and the other loan parties party thereto.

43.    Under the Revolver Facility, the obligations of GM and each of GM's subsidiaries under certain non-speculative hedging arrangements, involving one or more debt instruments, interest rates, currencies or commodities and any extensions or replacements thereof covering substantially the same risk with respect to substantially the same debt instruments, interest rates, currencies or commodities, as applicable, held by any Revolver Lender with commitments under the Revolver Facility (or, following the termination of such commitments, obligations loans outstanding under the Revolver Facility) equal to at least the lesser of (i) $10,000,000 or (ii) 0.223215 percent of the aggregate Revolver Obligations (or any affiliate thereof) (the "Hedging Secured Parties," and such obligations, the "Hedging Obligations"), are guaranteed by the Revolver Guarantors and the UST Guarantors.

44.    To secure the Hedging Obligations, the Revolver Guarantors entered into that certain Second Priority US Security Agreement, dated as of July 20, 2006 July 20, 2006 (the "Second Priority US Security Agreement"), among the Revolver Guarantors and the Revolver Agent.

45.    Pursuant to the Second Priority US Security Agreement and the UST-Related Guaranty and Security Agreement, the Revolver Agent was granted, for the benefit of the Hedging Secured Parties, (a) a security interest in, and continuing second priority liens on, the US Revolver Collateral and (b) a security interest in, and continuing third priority liens on, the Initial UST Collateral.[10]

46.    As of May 23, 2009, (i) the outstanding principal amount of all US Obligations was approximately $3,865 million; (ii) the outstanding principal amount of all

---

[10]    The Prepetition Revolver Agent's lien, for the benefit of the Hedging Secured Parties, on 65% of the equity interests of GM Canada is a fourth priority lien.

Canadian Obligations was approximately $611 million; (iii) the outstanding amount of all US

Non-Loan Exposure was approximately $116 million; and (iv) the outstanding amount of all

Canadian Non-Loan Exposure was approximately $6 million. The borrowings under the

Revolver Facility were used to fund general working capital requirements.  The Debtors believe

that, as of the Commencement Date, the value of the assets encumbered by the Revolver Agent,

for the benefit of the holders of the Revolver Obligations, the Non-Loan Exposure and the

Hedging Obligations (the "Total Exposure") exceeds the aggregate amount of the Total

Exposure.

**B.      The Term Loan**

47.      The Term Loan provides for a term loan facility in the maximum

aggregate principal amount of $1,500,000,000.

48.      Under the Term Loan, the obligations of GM are guaranteed by Saturn.

49.      To secure GM's and Saturn's obligations under the Term Loan (the "Term

Loan Obligations"), GM and Saturn entered into the Term Loan Collateral Agreement.  Pursuant

to the Term Loan Collateral Agreement, the Term Loan Agent was granted a security interest in,

and continuing senior liens on, the Term Loan Collateral for the benefit of the Term Loan Agent

and the Term Loan Lenders.

50.      As of May 23, 2009, the outstanding principal amount of the Term Loan

was $1,466,250,000.  The borrowings under the Term Loan were used to fund general working

capital requirements.  The Debtors believe that, as of the Commencement Date, the value of the

assets encumbered by the Term Loan Agent, for the benefit of the holders of Term Loan

Obligations, exceeds the aggregate amount of the Term Loan Obligations.

**C.      The Gelco Facility**

51.      Pursuant to the Gelco Credit Agreement, GM's obligations under the

Gelco Facility (the "Gelco Facility Obligations") were secured by (i) all automobiles or light

trucks owned by GM and used in one of GM's "company car programs", (ii) all automobiles or

light trucks held by GM as inventory, for which a certificate of title has been issued by the State

of Michigan or for which a properly tendered application for a certificate of title has been

received by the Michigan Secretary of State, (iii) all accounts, chattel paper or general

intangibles arising from the sale or disposition of the foregoing, (iv) all accounts of GM where

the sale proceeds of the foregoing are to be deposited as identified on Schedule IV to the Gelco

Credit Agreement, (v) all books and records relating to any of the foregoing, and (vi) all

proceeds of the foregoing, including any insurance proceeds with respect to any of the foregoing

(the "Gelco Collateral").

52.      As of May 27, 2009, the outstanding principal amount of the loans under

the Gelco Facility was $125,000,000.  The borrowings under the Gelco Facility were used to

fund general working capital requirements.  The Debtors believe that, as of the Commencement

Date, the value of the assets encumbered by Gelco exceeds the aggregate amount of the Gelco

Facility Obligations.

**D.      The U.S. Treasury Loan Agreement**

53.      As described more fully in paragraphs 17-25 above, the U.S. Treasury

Facility provided GM emergency financing in the form of a secured term loan facility in the

maximum amount of $19.7 billion.

54.    GM's obligations under (i) the U.S. Treasury Loan Agreement[11] and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009 and May 27, 2009 (collectively, the "Additional Notes") issued by GM to the U.S. Treasury as additional compensation for the extensions of credit under the U.S. Treasury Loan Agreement are guaranteed by certain domestic subsidiaries of GM (the "UST Guarantors")[12] and Saturn pursuant to that certain Guaranty and Security Agreement, dated as of December 31, 2008 (as amended, the "UST Guaranty and Security Agreement") entered into by each of Saturn and the UST Guarantors for the benefit of the U.S. Treasury, in its capacity as the lender under the U.S. Treasury Loan Agreement (the obligations of Saturn and the UST Guarantors under the UST Guaranty and Security Agreement, together with GM's obligations under the U.S. Treasury Loan and the Additional Notes, collectively, the "U.S. Treasury Loan Obligations").

---

[11]    GM's obligations under the U.S. Treasury Loan Agreement with respect to the borrowing of $414,410,034 thereunder in connection with the U.S. Treasury supported warranty program (the "Warranty Advance") are not guaranteed by the UST Guarantors and are not secured by the UST Collateral (as defined below).

[12]    The UST Guarantors include the following domestic subsidiaries of GM: Annunciata Corporation, Argonaut Holdings, Inc., General Motors Asia Pacific Holdings, LLC, General Motors Asia, Inc., General Motors International Holdings, Inc., General Motors Overseas Corporation, General Motors Overseas Distribution Corporation, General Motors Product Services, Inc., General Motors Research Corporation, GM APO Holdings, LLC, GM Eurometals, Inc., GM Finance Co. Holdings LLC, GM GEFS L.P., GM Global Technology Operations, Inc., GM Global Tooling Company, Inc., GM LAAM Holdings, LLC, GM Preferred Finance Co. Holdings LLC, GM Technologies, LLC, GM-DI Leasing Corporation, GMOC Administrative Services Corporation, OnStar, LLC, Riverfront Holdings, Inc., Riverfront Holdings Phase II, Inc., Environmental Corporate Remediation Company, Inc., Grand Pointe Holdings, Inc., Remediation and Liability Management Company, Inc., GM Subsystems Manufacturing, LLC, GM Global Steering Holdings, LLC, and Saturn Distribution Corporation. Saturn Distribution Corporation is a Debtor in these cases.

55.      To secure the U.S. Treasury Loan Obligations, GM entered into the U.S.

Treasury Loan Agreement, Saturn and the UST Guarantors entered into the UST Guaranty and

Security Agreement, and GM, Saturn and certain of the UST Guarantors entered into that certain

Equity Pledge Agreement, dated as of December 31, 2008 (as amended, the "Equity Pledge

Agreement," and, together with the U.S. Treasury Loan Agreement and the UST Guaranty and

Security Agreement, collectively, the "UST Security Documents") for the benefit of the U.S.

Treasury, in its capacity as the lender under the U.S. Treasury Loan Agreement.

56.      Pursuant to the UST Security Documents, GM, Saturn and the UST

Guarantors granted to the U.S. Treasury, in its capacity as the lender under the U.S. Treasury

Loan Agreement, a security interest in, and continuing senior liens on, substantially all of GM's,

Saturn's, and the UST Guarantors' assets that were not previously encumbered, including (i)

GM's, Saturn's and the UST Guarantors' equity interests in most of their domestic subsidiaries

and certain of their foreign subsidiaries (limited in most cases to 65% of the equity interests of

the pledged foreign subsidiaries), (ii) intellectual property, (iii) real estate (other than

manufacturing plants or facilities), (iv) inventory that was not pledged to other lenders, and (v)

cash and cash equivalents in the U.S., in each case of (i) through (v) above, subject to certain

exclusions (the "Initial UST Collateral").  In addition, (i) GM and Saturn granted to the U.S.

Treasury, in its capacity as the lender under the U.S. Treasury Loan Agreement, a security

interest in, and continuing junior liens on, the Initial US Revolver Collateral, and (ii) GM granted

to the U.S. Treasury, in its capacity as the lender under the U.S. Treasury Loan Agreement, a

security interest in, and continuing junior liens on, the Gelco Collateral (the Initial UST

Collateral, together with the Initial US Revolver Collateral and the Gelco Collateral, collectively,

the "UST Collateral").

57.      In connection with the U.S. Treasury Loan Agreement, the U.S. Treasury, in its capacity as the lender therein, entered into that certain Intercreditor Agreement, dated as of February 11, 2009 (the "UST- Related Intercreditor Agreement"), with the Revolver Agent, in its capacity as agent for the Revolver Lenders and holders of the Non-Loan Exposure and as agent for the Hedging Secured Parties, governing their respective rights with respect to the Initial UST Collateral and the Initial US Revolver Collateral.  Pursuant to the UST-Related Intercreditor Agreement, the Revolver Agent and the U.S. Treasury agreed, among other things, that (a) the liens of the U.S. Treasury on the Initial UST Collateral shall be senior and prior to the liens of the Revolver Agent on the Initial UST Collateral and (b) the liens of the Revolver Agent on the Initial US Revolver Collateral shall be senior and prior to the liens of the U.S. Treasury on the Initial US Revolver Collateral.

58.      In connection with the grant of the security interest in, and junior liens on, the Gelco Collateral, for the benefit of the U.S. Treasury, the U.S. Treasury and Gelco entered into that certain Intercreditor Agreement, dated as of February 17, 2009 (the "Gelco Intercreditor Agreement"), governing their respective rights with respect to the Gelco Collateral.  Pursuant to the Gelco Intercreditor Agreement, the U.S. Treasury agreed, among other things, that the liens of Gelco on the Gelco Collateral shall be senior and prior to the liens of the U.S. Treasury on the Gelco Collateral.

59.      As of May 27, 2009, the aggregate outstanding principal amount of U.S. Treasury Loan Obligations was approximately $ 19.4 billion plus approximately $1.2 billion outstanding principal under the Additional Notes.  The borrowings under the U.S. Treasury Loan Agreement were used to fund general working capital requirements.

**E.    The Supplier Receivables Facility**

60.    The Supplier Receivables Facility, defined below, provides for a total maximum commitment of $3.5 billion.

61.    Under that certain Credit Agreement, between GM LLC, as Borrower, and the U.S Treasury, as Lender, dated as of April 3, 2009 and related agreements (the "Supplier Receivables Facility"), GM LLC (a non-Debtor subsidiary of GM) purchases accounts receivable of participating suppliers.  Pursuant to that certain Pledge Agreement (the "Supplier Receivables Pledge Agreement"), dated as of April 3, 2009, among GM and Saturn as Pledgors, the U.S. Treasury as Lender, and Citibank, N.A. as paying agent and collateral agent, GM pledged its equity interest in GM LLC to the U.S. Treasury, and both GM and Saturn pledged their respective interests in certain accounts, including certain securities accounts and financial assets, to Citibank, N.A., as collateral agent.

62.    The accounts and other assets pledged by GM and Saturn pursuant to the Supplier Receivables Pledge Agreement, constitute property of the Debtors' estates in which a third party, the U.S. Treasury, holds a security interest, and may constitute cash or cash equivalents.

**Relief Requested**

63.    By this Motion, and pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, the Debtors request (i) authority to use Cash Collateral, (ii) entry of the Interim Revolver Cash Collateral Order granting adequate protection to the Revolver Secured Parties against diminution in value of the Cash Collateral and the Prepetition Revolver Collateral resulting from the imposition of the automatic stay and the Debtors' use of the Cash Collateral and the Prepetition Revolver Collateral, (iii) entry of the Interim Term Loan Adequate Protection

Order granting adequate protection to the Term Loan Agent and the Term Loan Lenders against

diminution in value resulting from the imposition of the automatic stay and the Debtors' use of

the Term Loan Collateral, and (v) the scheduling of the Final Hearing pursuant to Bankruptcy

Rule 4001.

**The Relief Requested with Respect
to the Revolving Lenders is Warranted**

**A.    The Debtors' Need to Use Cash Collateral**

64.    In the ordinary course of business, the Debtors use a cash management

system to collect, transfer, and disburse efficiently the funds generated by the Debtors' business

operations.  The Cash Management Motion[13] describes the Debtors' cash management system

and seeks authority to continue using such system in the ordinary course of business on a

postpetition basis.

65.    As described more fully above and in the Affidavit of Frederick A.

Henderson Pursuant to Local Bankruptcy Rule 1007-2, (the "Henderson Affidavit"), the Debtors

require the use of Cash Collateral and other Prepetition Revolver Collateral, including on an

immediate, interim basis, in order to preserve the value of estate assets and to accomplish their

strategic objectives to maximize the value of the estates.  Currently, the Debtors lack sufficient

unencumbered funds with which to operate their businesses on an ongoing basis.  Moreover, the

financing being provided to the Debtors under the Interim DIP Order is not sufficient to pay all

---

[13]    Contemporaneously herewith the Debtors filed the Debtors' Motion Pursuant to Debtors'
Motion Pursuant to Sections 105(a), 363(b), 363(c) and 364(a) of the Bankruptcy Code
and Bankruptcy Rules 6003 and 6004 (A) For Authorization to (i) Continue Using Their
Existing Centralized Cash Management System, (ii) Honor Certain Prepetition
Obligations Related to the Use of the Cash Management System, and (iii) Maintain
Existing Bank Accounts and Business Forms, (B) Waive Requirements of Section 345(b)
of the Bankruptcy Code, and (C) to Schedule a Final Hearing (the "Cash Management
Motion").

their postpetition obligations, as demonstrated by the initial budget attached to the Interim DIP

Order (the "Approved Budget").  As a result, the Debtors have an urgent and immediate need for

cash to continue to operate pending the 363 Transaction.  In the absence of the use of the Cash

Collateral, the Debtors will not be able to satisfy their basic obligations, their operations would

be severely disrupted, and the continued operation of the Debtors' businesses even for a limited

period of time may not be possible.  These events would jeopardize the 363 Transaction and

could lead to liquidation.  Accordingly, the Debtors require use of Cash Collateral to avoid

immediate and irreparable harm to the Debtors' estates and request that the Interim Revolver

Cash Collateral Order be entered.

**B.    The Proposed Use of Cash Collateral and Adequate
       Protection for the Revolver Lenders Should Be Approved**

66.    The Interim Revolver Cash Collateral Order is the product of extensive,

good faith negotiations.  The Debtors have determined that no alternative financing is available

on better terms than those provided in the Interim Revolver Cash Collateral Order.

67.    Pursuant to section 363(c)(2) of the Bankruptcy Code a debtor may not

use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section."  11 U.S.C. § 363(c)(2).  The Revolver Secured Parties have

consented to the use of their Cash Collateral upon the terms set forth in the proposed Interim

Revolver Cash Collateral Order and outlined in this motion.  Accordingly, the Debtors' use of

Cash Collateral may be authorized.

68.    Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection'

is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate

protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of

adequate protection, including a cash payment or periodic cash payments, additional liens,

replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11

U.S.C. § 361.

69.     In order to protect the Revolver Secured Parties from any diminution in

value of their respective interests in the Cash Collateral and the Prepetition Revolver Collateral,

the Debtors propose to provide adequate protection to the Revolver Secured Parties (the

"Proposed Revolver Adequate Protection") in the form of (i) the superpriority claim, (ii) the

adequate protection liens, (iii) continued payment of interest and fees at the non-default rate, and

(iv) reimbursement of certain reasonable fees and expenses, in each case as set forth more fully

in paragraphs 6(a)-(d) of the Interim Revolver Cash Collateral Order.

70.     The determination of adequate protection is a "fact-specific inquiry." *In

re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of

each case….") (citation omitted).  The focus of the adequate protection requirement is to

preserve the secured creditor's position at the time of the bankruptcy filing and protect the

secured creditor from diminution in the value of its collateral during the reorganization process.

*Id.* at 288 (citation omitted); *Beker*, 58 B.R. at 736.  *See In re WorldCom, Inc.*, 304 B.R. 611,

618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code,

which sets forth how adequate protection may be provided under section 363, makes clear that

the purpose is to insure that the secured creditor receives the value for which the creditor

bargained for prior to the debtor's bankruptcy."). "However, neither the legislative history nor

the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by

the parties." *In re WorldCom, Inc.* at 619. *See Beker*, 58 B.R. at 741 ("Adequate protection, not

absolute protection, is the statutory standard.").

71.     The Debtors believe that the Revolver Secured Parties are oversecured and

the surplus of the Prepetition Revolver Collateral's value in excess of the amount outstanding

under the Revolver Facility provides additional adequate protection for the use of Cash

Collateral.  Moreover, the Debtors anticipate full payment of all amounts owing under the

Revolver Facility within 45 days.  The Proposed Revolver Adequate Protection will sufficiently

protect the Revolver Secured Parties' interests in the Cash Collateral.  Accordingly, the Proposed

Revolver Adequate Protection is fair and reasonable and sufficient to satisfy the requirement of

section 363(c)(2) of the Bankruptcy Code.

**C.     Interim Approval for the Use of Cash Collateral Should Be Granted**

72.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use

cash collateral may not be commenced earlier than 15 days after the service of such motion.

Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on

the motion and authorize the use of cash collateral to the extent necessary to avoid immediate

and irreparable harm to a debtor's estate pending a final hearing.

73.     Pursuant to Bankruptcy Rules 4001(b), the Debtors request that the Court

conduct an expedited preliminary hearing on the Motion and (a) authorize the Debtors to use the

Cash Collateral of the Revolver Secured Parties in order to (i) maintain and finance the ongoing

operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the

Debtors' estates and all parties in interest, and (b) schedule a Final Hearing on the relief

requested herein.

**The Relief Requested with Respect
to the Term Loan Lenders is Warranted**

**A.      The Debtors' Need to Use Term Loan Collateral**

74.      As described more fully above and in the Henderson Affidavit, the

Debtors require the use of Term Loan Collateral in the operation of their business.  In the

absence of the use of the Term Loan Collateral, the continued operation of the Debtors'

businesses even for a limited period of time would not be possible.

**B.      The Proposed Term Loan Adequate Protection Should be Approved**

75.      In order to protect the Term Loan Agent and the Term Loan Lenders from

any diminution in value resulting from the imposition of the automatic stay and the Debtors' use

of the Term Loan Collateral, the Debtors propose to provide adequate protection to the Term

Loan Agent and the Term Loan Lenders (the "Proposed Term Loan Adequate Protection") in the

form of (a) the superpriority claim, (b) the adequate protection liens, (c) continued payment of

interest and fees, (d) reimbursement of certain reasonable fees and expenses, and (e)

maintenance of insurance on Term Loan Collateral, in each case as described more fully in

paragraphs 5(a)-(e) of the Interim Term Loan Adequate Protection Order.

76.      The Debtors believe that the Term Loan Agent and the Term Loan

Lenders are oversecured and anticipate full payment of all amounts owing under the Term Loan

within 45 days.  The Proposed Term Loan Adequate Protection will sufficiently protect the

interests of the Term Loan Agent and the Term Loan Lenders in the Term Loan Collateral.

Accordingly, the Proposed Term Loan Adequate Protection is fair and reasonable and sufficient

to satisfy the requirement of section 363(c)(2) of the Bankruptcy Code.

**C.      The Debtors Have Satisfied Bankruptcy Rule 6003**

77.      Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve "a motion to use . . .

property of the estate" prior to twenty days after the Commencement Date. FED. R. BANKR. P.

6003.  As described herein and in the Henderson Affidavit, the Debtors' ability to preserve their

operations requires the immediate use of the Term Loan Collateral.  Without access to the use of

Term Loan Collateral, the Debtors would suffer immediate, substantial, and irreparable harm.

Accordingly, the Debtors submit that Bankruptcy Rule 6003 is satisfied.

### Notice

78.      Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New

York, New York 10017, Attention: Peter V. Pantaleo, Esq., and David J. Mack, Esq., attorneys

for the Revolver Agent, (v) Morgan, Lewis & Bockius LLP, 101 Park Ave, New York, NY

10178, Attention: Richard S. Toder, Esq., Andrew D. Gottfried, Esq., and Richard S. Petretti,

Esq., attorneys for the Term Loan Agent, (vi) the holders of the fifty largest unsecured claims

against the Debtors (on consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys

for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the

unofficial committee of unsecured bondholders.  The Debtors submit that, in view of the facts

and circumstances, such notice is sufficient and no other or further notice need be provided.

79.      No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
          June 1, 2009


                                    /s/ Stephen Karotkin
                                    Harvey R. Miller
                                    Stephen Karotkin
                                    Joseph H. Smolinsky

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

# EXHIBIT A

Interim Revolver Cash Collateral Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-[   ] (     ) |
| GENERAL MOTORS CORPORATION, *et al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtor. | ) | |
| | ) | |

INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION REVOLVER SECURED PARTIES AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)

("INTERIM CASH COLLATERAL ORDER")

Upon the motion, dated June 1, 2009 (the "Motion"), of General Motors Corporation (the "Company") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned case (the "Cases") for interim and final orders under sections 105, 361, 362, 363(c) and 363(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), seeking, inter alia:

(I)        authorization for the Debtors to (a) use the Cash Collateral (as defined in

paragraph 3(b) below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all

other Prepetition Collateral (as defined below), and (b) provide adequate protection to the Secured

Parties,[2] (collectively, the "Revolver Secured Parties") under the Amended and Restated Credit

Agreement, dated as of July 20, 2006 (as amended, supplemented or otherwise modified, the

"Revolver Facility") among the Company, General Motors of Canada Limited, Saturn, LLC, as a

guarantor, Citicorp USA, Inc., as administrative agent for the lenders thereunder and any affiliate

---

[1]        The Debtors in these cases include: the Company, Saturn, LLC, Saturn Distribution Corporation, and Chevrolet-Saturn of Harlem, Inc.

[2]        Defined terms used in this order and not otherwise defined have the meaning given to such term in the Loan Documents, as such term is defined in the Revolver Facility, as defined below. The Secured Parties comprise the US Secured Parties, the Canadian Secured Parties and the Hedging Secured Parties – the US Secured Parties and the Canadian Secured Parties have a first priority lien on the Collateral (as defined in the Revolver Facility, the "Revolver First Lien Collateral") and a junior lien on the Additional Collateral and the Hedging Secured Parties have a second priority lien on the Revolver First Lien Collateral and a further junior lien on the Additional Collateral.

of such lender holding Non-Loan Exposure and Hedging Obligations (in such capacity, the

"Revolver Agent"), JPMorgan Chase Bank, N.A., as syndication agent, and the banks and other

financial institutions party thereto as lenders;

(II)    subject to entry of the Final Order, the waiver by the Debtors of any right to

surcharge against the Collateral (as defined in paragraph 6 below) pursuant to section 506(c) of the

Bankruptcy Code; and

(III)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final

Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the

Debtors on a final basis to continue to use the Cash Collateral and authorizing and approving the

relief requested in the Motion to become effective pursuant to the Final Order.

The interim hearing having been held by this Court on _____ ___, 2009 (the "Interim Hearing")

and upon the record made by the Debtors at the Interim Hearing and after due deliberation and

consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on June 1, 2009 (the

"Petition Date"), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and

1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Notice of the Motion, the relief requested therein and the Interim Hearing was served by

the Debtors on (a) the Office of the United States Trustee for the Southern District of New York, (b) the attorneys

for the U.S. Treasury, (c) the attorneys for Export Development Canada, (d) the Term Loan Agent (as defined

below), (e) counsel to the Term Loan Agent, (f) the Revolver Agent, (g) counsel to the Revolver Agent, (h) the

holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (i) the attorneys for the

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (j) the

attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (k) the United States Department of Labor, (*l*) the attorneys for the National

Automobile Dealers Association, (m) the attorneys for the ad hoc bondholders committee, and (n) the Internal

Revenue Service. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested

therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.  *Findings Regarding the use of Cash Collateral and Prepetition Collateral.*

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors' Obligations are secured by first liens granted to the Revolver Agent on the property of the estates that constitutes Revolver First Lien Collateral and junior liens granted to the Revolver Agent on the property of the estates that constitutes Additional Collateral (collectively, the "Prepetition Collateral"). As of the Petition Date, the Debtors (i) were in possession of cash proceeds of Prepetition Collateral and may hereafter generate additional cash proceeds of Prepetition Collateral, and (ii) maintained cash in bank accounts at the Revolver Agent or Revolver Secured Parties, all of which cash and cash proceeds may be cash collateral of the Revolver Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(c)    The terms of the use of the Cash Collateral pursuant to this Order are fair and reasonable, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(d)    The terms of the use of Cash Collateral have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the Revolver Agent and the Revolver Secured Parties and pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, the Revolver Agent and the Revolver Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order.

(e)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).   Absent granting the interim relief sought by this Order, the Debtors' estates will be immediately and irreparably harmed.   The use of Cash Collateral in accordance with this Order is in the best interest of the Debtors' estates.

(f)    The Revolver Agent and the Revolver Secured Parties have consented to the use of the Cash Collateral on the terms set forth herein.

NY2:\1998599\18\16%4N18!.DOC\72240.0635

3

4.        *Authorization Of Use of Cash Collateral and Prepetition Collateral.*

(a)        The Debtors are hereby authorized to use the Cash Collateral in accordance with the
Approved Budget, as defined in the Motion, in the form attached to the Court's order authorizing the Debtors to
obtain post petition financing (the "<u>DIP Order</u>"), substantially in form and substance delivered to the Revolver
Agent prior to the Petition Date, during the period from the Petition Date through and including the Termination
Date (as defined below) in accordance with the terms and conditions of this Order.

(b)        Except as expressly set forth herein, this Order does not address the disposition of any
Prepetition Collateral outside the ordinary course of business or the Debtors' use of the Cash Collateral resulting
therefrom.

5.        *Entitlement to Adequate Protection.*

In consideration for the consent of the Revolver Agent and the Revolver Secured Parties to the use
of Cash Collateral in accordance with the terms hereof, and as a result of the imposition of the automatic stay
pursuant to section 362 of the Bankruptcy Code, the Revolver Secured Parties are entitled, pursuant to sections 361,
362, and 363(c)(2) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral,
including, without limitation, the Cash Collateral and Additional Collateral, in an amount equal to the aggregate
diminution in value of the Prepetition Collateral, including, without limitation, any such diminution resulting from
the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition
Collateral (including Additional Collateral) (the amount of such diminution in value, the "<u>Adequate Protection
Obligations</u>").

6.        *Adequate Protection Claims and Liens.*

As adequate protection, the Revolver Agent and the Revolver Secured Parties are hereby granted
the following claims, liens, rights and benefits:

(a)        <u>Section 507(b) Claim</u>.   The Adequate Protection Obligations due to the Revolver
Secured Parties shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code, with
priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any
provision of the Bankruptcy Code, including, without limitation, sections 326, 328, 330, 331 and 726 of the
Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any

creditor, in any of the Cases or any subsequent proceedings under the Bankruptcy Code (the "Superpriority Claim"), provided that the Superpriority Claim (i) shall not be payable from or have recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), (ii) shall be subject and subordinate only to the Carve-Out, as defined below, and any superpriority claims granted to the DIP Lenders, as defined in and pursuant to the DIP Order and (iii) shall be *pari passu* with any adequate protection superpriority claim granted in favor of (x) the lenders ("Term Lenders") from time to time under that certain Term Loan Agreement (the "Prepetition Term Loan"), dated as of November 29, 2006, among the Borrower, Saturn, LLC, and JPMorgan Chase Bank, N.A., as administrative agent (the "Term Loan Agent"), and, as amended by that First Amendment, dated March 4, 2009, and as further amended, supplemented and otherwise modified from time to time, and (y) the secured parties under the U.S. Treasury Loan Agreement, as defined in the Motion.

> (b)    **Adequate Protection Liens.**    As security for the Adequate Protection Obligations owing to the Revolver Secured Parties, effective and perfected as of the Petition Date, the following security interests and liens are hereby granted to the Revolver Agent, for its own benefit and the benefit of the Revolver Secured Parties (all property identified in clauses (i) and (ii) below, other than the exceptions set forth therein, being collectively referred to as the "Collateral"), subject only to the Carve-Out (all such liens and security interests granted to the Revolver Agent, for its benefit and for the benefit of the Revolver Secured Parties pursuant to this Order, the "Revolver Adequate Protection Liens"):

>> (i)    **Lien On Unencumbered Property.**    A valid, binding, continuing, enforceable, fully-perfected first lien on, and security interest in, all tangible and intangible (x) postpetition property (excluding Avoidance Actions) of the Debtors, which, but for the commencement of the Cases, would constitute Prepetition Collateral, and (y) property (excluding Avoidance Actions), other than property set forth in (x), whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), provided that, with respect to Unencumbered Property described in clause (y) the lien granted pursuant to this paragraph (i) shall be immediately junior to any lien granted to the DIP Lenders, as defined in and pursuant to the DIP Order and (ii) shall be *pari passu* with any adequate protection liens granted to

secure adequate protection obligations in favor of Term Lenders or to secure adequate protection obligations granted in favor of the secured parties under the U.S. Treasury Loan Agreement, as defined in the Motion.

(ii)     Liens Junior To Certain Existing Liens.   A valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property (excluding Avoidance Actions) of the Debtors whether now existing or hereafter acquired, that is subject and junior to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, provided that the lien granted pursuant to this paragraph shall also be subject and junior to any lien granted to the DIP Lenders, as defined in and pursuant to the DIP Order, and shall be *pari passu* with any adequate protection liens granted to secure adequate protection obligations in favor of the Term Lenders or to secure adequate protection obligations granted in favor of the secured parties under the U.S. Treasury Loan Agreement, as defined in the Motion.

(iii)     Liens Senior To Certain Other Liens.   Except as set forth herein, the Revolver Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any of the Debtors and their respective estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest granted under sections 363 or 364 of the Bankruptcy Code or otherwise.

For purposes hereof, the "Carve-Out" shall have the same meaning as provided in the DIP Order, provided that the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Revolver Secured Parties, and nothing in this Order shall impair the right of any party to object to the reasonableness of any

such fees or expenses to be paid by the Debtors' estates.   Notwithstanding anything herein to the contrary, the Carve-Out shall not apply to any Collateral proceeds or other amounts paid to the Revolver Agent for itself or for the benefit of the Revolver Secured Parties pursuant to the terms of this or any other order and all proceeds and other amounts shall be paid free and clear of the Carve-Out.

(c)      Current Payment of Interest, Fees, etc.   The Debtors shall pay to the Revolver Agent for the benefit of the Revolver Secured Parties (i) current interest on all outstanding Obligations calculated at the non-default rates (excluding the right to select Eurodollar options after the Petition Date) and in the manner set forth in the Revolver Facility, (ii) current payment of all Letter of Credit fees and all fronting fees together with all costs and expenses that may be payable to any Issuing Bank pursuant to sections 2A.3(a) and (b) of the Revolver Facility and (iii) current non default interest, letter of credit and fronting fees and other fees, charges and expenses in respect of any outstanding Non-Loan Exposure and Hedging Obligations (in each case under the foregoing subclauses (i), (ii) and (iii), including amounts which may have accrued prior to the Petition Date).   Such interest and fees shall be payable monthly on the last business day of each month and on the Termination Date, provided that costs and expenses payable pursuant to sections 2A.3(a) and (b) of the Revolver Facility shall be payable within 2 business days of request thereof.   Notwithstanding anything herein to the contrary, if and only if the Secured Obligations (including, without limitation, the Non-Loan Exposure) secured by the Collateral shall not have been indefeasibly paid in full (without taking into account any default rate of interest accruing from the Petition Date to the date of payment provided payment shall have occurred on or before 45 days from the Petition Date as provided in that certain Second Amendment and Consent dated as of May 28, 2009 to the Revolver Facility (the "Second Amendment")) and in cash (and with respect to any letters of credit then outstanding, including Letters of Credit issued pursuant to the Revolver Facility and letters of credit that constitute Non-Loan Exposure, either such letters of credit shall have been returned undrawn and marked "cancelled" to the relevant issuing bank or shall have been cash collateralized on terms reasonably acceptable to the relevant issuing bank in an amount equal to 105% of the face amount of each such letter of credit) on or before 45 days after the Petition Date, then (i) the provisions of Section 2.1 and 2.3 of the Second Amendment to the Revolver Facility shall be void *ab initio* and of no force and effect, and (ii) the Revolver Secured Parties' right at any time to seek payment of interest as of the Petition Date at

the default rate set forth in Sections 2.12(f) and 2.12(A)(f), as applicable, of the Revolver Facility (and the right to seek default interest in respect of any Non-Loan Exposure) shall be fully preserved.

    (d)  <u>Reimbursement.</u> The Debtors are authorized and directed, within 10 days of submission of invoices therefor (which invoices shall be concurrently provided to the US Trustee and any Committee), to pay or reimburse all pre or post Petition Date reasonable fees, costs and charges incurred by the Revolver Agent (including, without limitation, the reasonable fees and out-of-pocket disbursements of counsel to the Revolver Agent), in accordance with the terms and provisions of the Revolver Facility, in each case, in connection with matters relating to this Order and the monitoring of the Cases or the enforcement and protection of the rights and interests of the Revolver Agent in respect of the Adequate Protection Obligations and the Obligations.   None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

    7.  <u>Termination.</u> The Debtors' right to use the Cash Collateral shall terminate (the date of any such termination, the "<u>Termination Date</u>") on the earliest to occur of (x) 45 days after the Petition Date or (y) upon 5 business days' written notice (the "<u>Notice</u>") to the Debtors (with a copy to counsel for any Committee, counsel for the United States Treasury and the United States Trustee) after the occurrence and continuance of any of the following events (the "<u>Events of Default</u>") beyond any applicable grace period set forth below:

    (a)  Failure of the Debtors to make any payment to the Revolver Agent or the Revolver Secured Parties as and when required by this Order;

    (b)  Failure of the Debtors to (i) comply with any material terms of this Order, or (ii) comply with any other covenant or agreement specified in this Order (other than those described in clause (i) above) and such failure to comply with any such other covenant or agreement shall continue unremedied for more than three (3) business days after written notice thereof is received from the Revolver Agent;

    (c)  Any of the Cases shall be dismissed or converted to a Chapter 7 case; or a Chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Debtor (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Cases;

NY2:\1998599\18\16%4N18!.DOC\72240.0635

8

(d)      An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Order in a manner that the Revolver Agent reasonably determines to be materially adverse to the interests of the Revolver Secured Parties;

(e)      A filing by any Debtor (or any successors and assigns) of any motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Obligations or any other cause of action against and/or with respect to the Obligations, the prepetition liens securing such Obligations, the Revolver Agent or any of the Revolver Secured Parties;

(f)      Other than payments authorized by the Court and which are permissible under the DIP Order, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables in excess of $25 million in the aggregate during the Cases; or

(g)      Five (5) business days after the acceleration of the DIP Facility, as defined in the Motion and attached to the DIP Order.

The Debtors shall promptly provide Notice to the Revolver Agent (with a copy to counsel for any Committee, the United States Treasury, and the United States Trustee) of the occurrence of any Event of Default.   Notwithstanding clauses (c) and (f) of the foregoing, the Termination Date arising from the occurrence of the events set forth therein shall not occur unless and until the lenders under the DIP Facility, as defined in the Motion, have exercised remedies.

8.      *Limitation On Charging Expenses Against Collateral.*   Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Revolver Agent and Majority Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Revolver Agent and Majority Lenders.

9.      *Payments Free and Clear.*   Any and all payments or proceeds remitted to the Revolver Agent on behalf of the Revolver Secured Parties pursuant to the provisions of this Order or any subsequent order of this Court

shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

10.    *Reservation of Rights of Revolver Secured Parties.*    Based upon the consent of the Revolver Agent and the Majority Lenders, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Revolver Secured Parties in the Prepetition Collateral and the Cash Collateral.    Notwithstanding any other provision hereof, the grant of adequate protection to the Revolver Secured Parties pursuant hereto is without prejudice to the right of the Revolver Agent and the Majority Lenders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.    Except as expressly provided herein, nothing contained in this Order (including, without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Revolver Secured Party.

11.    *Perfection Of Revolver Adequate Protection Liens.*

        The Revolver Agent is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.    Whether or not the Revolver Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

12.    *Preservation Of Rights Granted Under The Order.*

        (a)    Except as set forth herein, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the Revolver Agent and the Revolver Secured Parties shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and Revolver Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the

Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claim and the Revolver Adequate Protection Liens, shall continue in full force and effect and shall maintain their priorities as provided in this Order until all Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claim and the Revolver Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     The use of Cash Collateral shall be deemed an extension of credit pursuant to section 364 of the Bankruptcy Code by the Revolver Secured Parties. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Revolver Agent of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the Revolver Adequate Protection Liens.   Notwithstanding any such reversal, stay, modification or vacatur, any use of Cash Collateral or any Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by the Revolver Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the Revolver Agent and the Revolver Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, and this Order with respect to all uses of Cash Collateral, and all Adequate Protection Obligations.

(d)     Except as expressly provided in this Order or in the Loan Documents, the Adequate Protection Obligations, the Superpriority Claim and all other rights and remedies of the Revolver Agent and the Revolver Secured Parties granted by the provisions of this Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining Adequate Protection Obligations.   The terms and provisions of this Order

shall continue in the Cases or in any superseding chapter 7 case under the Bankruptcy Code, and the Revolver

Adequate Protection Liens, the Superpriority Claim and all other rights and remedies of the Revolver Agent and the

Revolver Secured Parties granted by the provisions of this Order shall continue in full force and effect until all

Adequate Protection Obligations are indefeasibly paid in full in cash.

        13.        *Limitation On Use Of Collateral*.   The Debtors shall use the proceeds of the Prepetition Collateral

(including the Cash Collateral) solely as provided in this Order.   Notwithstanding anything herein or in any other

order of this Court to the contrary, no Collateral, Prepetition Collateral (including the Cash Collateral) or the Carve-

Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or

enforceability of any amount due under the Loan Documents, or the liens or claims granted under this Order or the

Loan Documents, (b) assert any claims and defenses or any other causes of action against the Revolver Agent and

the Revolver Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives,

attorneys or advisors, (c) prevent, hinder or otherwise delay the Revolver Agent's assertion, enforcement or

realization on the Prepetition Collateral or the Collateral in accordance with the Loan Documents or this Order, or

(d) seek to modify any of the rights granted to the Revolver Agent and the Revolver Secured Parties hereunder or

under the Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior

written consent.

        14.        *Binding Effect; Successors And Assigns*.   The provisions of this Order, including all findings

herein, shall be binding upon all parties in interest in the Cases, including without limitation, the Revolver Agent,

and the Revolver Secured Parties, any Committee, and the Debtors and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the estates of the Debtors,

an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal

representative of any Debtor or with respect to the property of the estate of any Debtor) and shall inure to the benefit

of the Revolver Agent, the Revolver Secured Parties and the Debtors and their respective successors and assigns,

provided that, except to the extent expressly set forth in this Order, the Revolver Agent and the Revolver Secured

Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

15.    *Limitation of Liability.*    In permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the Loan Documents, the Revolver Agent and the Revolver Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).    Furthermore, nothing in this Order shall in any way be construed or interpreted to impose or allow the imposition upon the Revolver Agent or any of the Revolver Secured Parties any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

16.    *No Impact on Certain Contracts/ Transactions.*    No rights of any entity under Sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Order as to any contract or transaction of the kind listed in such Sections of the Bankruptcy Code.

17.    *Default Interest.*    Upon payment in full of the Secured Obligations and the Non-Loan Exposure in accordance with the provisions of the Second Amendment, the Revolver Secured Parties shall no longer have any right to seek payment of postpetition interest at the default rate under the Revolver Facility.

18.    *Effectiveness.*    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

19.    *Final Hearing*.    The Final Hearing is scheduled for _____, 2009 at _____ _.m., Eastern time, before this Court.

The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing, including without limitation, notice of any Extraordinary Provisions described in the introductory language to this Order) to the parties having been given notice of the Interim Hearing, all known lienholders, the cash management banks with which the Debtors maintain deposit, lockbox, concentration, disbursement and similar accounts, and to any other party that has filed a request for notices with this Court and to any Committee after the

NY2:\1998599\18\16%4N18!.DOC\72240.0635

13

same has been appointed, or Committee counsel, if the same shall have been appointed.   Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) the Office of the United States Trustee for the Southern District of New York, (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:   Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.), (c) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn:   Lawrence S. Buonomo, Esq.), (d) Cadwalader, Wickersham & Taft LLP, of counsel to the Presidential Task Force on the Auto Industry, One World Financial Center, New York, NY 10281; Attn: John J. Rapisardi, Esq., (e) Vedder Price P.C., counsel to Export Development Canada, 1633 Broadway, 47th Floor, New York, NY 10019, Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq. and McMillan LLP, counsel to EDC, Brookfield Place, Suite 4400, 181 Bay Street, Toronto, Ontario, Canada M5J 2T3, Attn: Peter A. Willis, (f) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Peter V. Pantaleo, Esq., and David J. Mack, Esq., attorneys for the Revolver Agent, (g) Morgan, Lewis & Bockius LLP, 101 Park Ave, New York, NY 10178, Attention: Richard S. Toder, Esq., Andrew D. Gottfried, Esq., and Richard S. Petretti, Esq., attorneys for the Term Loan Agent, (h) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (i) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (j) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (k) the United States Department of Labor, (*l*) the attorneys for the National Automobile Dealers Association, (m) the attorneys for the ad hoc bondholders committee, and (n) counsel to any Committee appointed in the Cases, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow actual receipt by the foregoing no later than _____, 2009 at ___., Eastern time.

Dated:  _____ __, 2009
      New York, New York


                _____
                UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

<u>Interim Term Loan Adequate Protection Order</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) Case No. 09-[   ] (     ) |
| GENERAL MOTORS CORPORATION, *et al.*,[1] | ) Jointly Administered |
| | ) |
| Debtor. | ) |
| | ) |

INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND FED. R. BANKR. P. 2002, 4001 AND 9014
(I) GRANTING ADEQUATE PROTECTION TO TERM LOAN SECURED PARTIES AND (II)
<u>SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)</u>

("<u>INTERIM TERM LOAN ADEQUATE PROTECTION ORDER</u>")

Upon the motion, dated June 1, 2009 (the "<u>Motion</u>"), of General Motors Corporation (the "<u>Company</u>") and

its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned

case (the "<u>Cases</u>") for interim and final orders under sections 105, 361, 362, 363(c) and 363(e) of title 11 of the

United States Code, 11 U.S.C. §§ 101, <u>et seq</u>. (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), seeking, <u>inter alia</u>:

(I)        to provide adequate protection to the Secured Parties,[2] (collectively, the "<u>Term</u>

<u>Loan Secured Parties</u>") under the Term Loan Agreement dated as of November 29, 2006 (as

amended, supplemented or otherwise modified, the "<u>Term Loan Facility</u>") among the Company,

Saturn, LLC, as a guarantor, JPMorgan Chase Bank, N.A., as administrative agent for the lenders

thereunder (in such capacity, the "<u>Term Loan Agent</u>"), Credit Suisse Securities (USA) LLC, as

syndication agent and the banks and other financial institutions party thereto as lenders pursuant to

sections 361, 362 and 363 of the Bankruptcy Code as a result of the use of the Prepetition

Collateral (as defined below);

---

[1]        The Debtors in these cases include: the Company, Saturn, LLC, Saturn Distribution Corporation, and
Chevrolet-Saturn of Harlem, Inc.

[2]        Defined terms used in this order and not otherwise defined have the meaning given to such term in the
Loan Documents, as such term is defined in the Term Loan Facility.

(II)        subject to entry of the Final Order, the waiver by the Debtors of any right to surcharge the Collateral (as defined in paragraph 5 below) pursuant to section 506(c) of the Bankruptcy Code; and

(III)        to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") approving the relief requested in the Motion to become effective pursuant to the Final Order.

The interim hearing having been held by this Court on _____ ___, 2009 (the "Interim Hearing") and upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.        *Jurisdiction*.   This Court has core jurisdiction over the Cases commenced on June 1, 2009 (the "Petition Date"), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        *Notice*.   Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (a) the Office of the United States Trustee for the Southern District of New York, (b) the attorneys for the U.S. Treasury, (c) the attorneys for Export Development Canada, (d) the Term Loan Agent (as defined below), (e) counsel to the Term Loan Agent, (f) the Revolver Agent, (g) counsel to the Revolver Agent, (h) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (i) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (j) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers— Communications Workers of America, (k) the United States Department of Labor, (*l*) the attorneys for the National Automobile Dealers Association, (m) the attorneys for the ad hoc bondholders committee, and (n) the Internal Revenue Service. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.      *Findings Regarding the use of Prepetition Collateral.*

(a)      Good cause has been shown for the entry of this Order.

(b)      The Debtors' Obligations are secured by liens granted to the Term Loan Agent on the property of the estates that constitutes Collateral under, and as defined in, the Term Loan Facility (the "Prepetition Collateral").

(c)      The terms of the use of the Prepetition Collateral pursuant to this Order are fair and reasonable, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(d)      The terms of the use of the Prepetition Collateral have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Term Loan Agent and pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, and the Term Loan Agent and the Term Loan Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order.

(e)      The Debtors have requested entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).   Absent granting the interim relief sought by this Order, the Debtors' estates will be immediately and irreparably harmed.   The use of the Collateral in accordance with this Order is in the best interest of the Debtors' estates.

(f)      Except as expressly set forth herein, this Order does not address the disposition of any Prepetition Collateral or the proceeds thereof outside the ordinary course of business.

4.      *Entitlement to Adequate Protection.*

As a result of the Debtors' use of the Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Term Loan Secured Parties are entitled, pursuant to sections 361, 362 and 363 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral (the amount of such diminution in value, the "Adequate Protection Obligations").

5.        *Adequate Protection Claims and Liens*.

As adequate protection, the Term Loan Agent and the Term Loan Secured Parties are hereby granted the following claims, liens, rights and benefits:

(a)        Section 507(b) Claim.    The Adequate Protection Obligations due to the Term Loan Secured Parties shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in any of the Cases or any subsequent proceedings under the Bankruptcy Code (the "Superpriority Claim"), provided that the Superpriority Claim (i) shall not be payable from or have recourse to the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), (ii) shall be subject and subordinate only to the Carve-Out, as defined below, and any superpriority claims granted to the DIP Lenders, as defined in and pursuant to the Court's order authorizing the Debtors to obtain post petition financing (the "DIP Order"), and (iii) shall be *pari passu* with any adequate protection superpriority claim granted in favor of any other adequate protection claims (collectively, the "Adequate Protection Claims"), including any adequate protection claim granted in connection with (x) the Amended and Restated Credit Agreement, dated as of July 20, 2006 among the Company, General Motors of Canada Limited, Saturn, LLC, Citicorp USA, Inc., as administrative agent for the lenders thereunder (in such capacity, the "Revolver Agent") and the banks and other financial institutions party thereto, and (y) the U.S. Treasury Loan Agreement, as defined in the Motion.

(b)        Adequate Protection Liens.    As security for the Adequate Protection Obligations owing to the Term Loan Secured Parties, effective and perfected as of the Petition Date, the following security interests and liens are hereby granted to the Term Loan Agent, for its own benefit and the benefit of the Term Loan Secured Parties (all property identified in clauses (i) through (iii) below, other than the exceptions set forth therein, being collectively referred to as the "Collateral"), subject only to the Carve-Out (all such liens and security interests granted to the Term Loan Agent, for its benefit and for the benefit of the Term Loan Secured Parties pursuant to this Order, the "Term Loan Adequate Protection Liens"):

NY2:\1999804\15\16V2415!.DOC\72240.0635

4

(i)　　　First Priority Lien on Certain Property.　A valid, binding, continuing, enforceable fully perfected lien on, and security interest in, all postpetition property (excluding Avoidance Actions) of the Debtors which, but for the commencement of the Cases, would constitute Prepetition Collateral.

(ii)　　　Lien On Unencumbered Property.　A valid, binding, continuing, enforceable, fully-perfected first lien on, and security interest in, all tangible and intangible property (excluding Avoidance Actions), other than property set forth in (i) above, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date, provided that, the lien granted pursuant to this paragraph (i) shall be immediately junior to any lien granted to the DIP Lenders, as defined in and pursuant to the DIP Order, and (ii) shall be *pari passu* with any adequate protection liens granted to secure Adequate Protection Claims.

(iii)　　　Liens Junior To Certain Existing Liens.　A valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property (excluding Avoidance Actions) of the Debtors whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, provided that the lien granted pursuant to this paragraph shall also be subject and junior to any lien granted to the DIP Lenders, as defined in and pursuant to the DIP Order, and shall be *pari passu* with any adequate protection liens granted to secure any Adequate Protection Claims.

(iv)　　　Liens Senior To Certain Other Liens.　Except as set forth herein, the Term Loan Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any of the Debtors and their respective estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date,

including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest granted under sections 363 or 364 of the Bankruptcy Code or otherwise.

For purposes hereof, the "Carve-Out" shall have the same meaning as provided in the DIP Order, provided that the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Term Loan Secured Parties, and nothing in this Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.   Notwithstanding anything herein to the contrary, the Carve-Out shall not apply to any Collateral proceeds or other amounts paid to the Term Loan Agent for itself or for the benefit of the Term Loan Secured Parties pursuant to the terms of this or any other order and all proceeds and other amounts shall be paid free and clear of the Carve-Out.

(c)    Current Payment of Interest, Fees, etc.   The Debtors shall pay to the Term Loan Agent for the benefit of the Term Loan Secured Parties current interest on all outstanding Obligations (including any interest accrued but unpaid prior to the Petition Date) calculated at the non-default rates (excluding the right to select Eurodollar options after the Petition Date) and in the manner set forth in the Term Loan Facility.   Such interest and fees shall be payable monthly on the last business day of each month and on the Termination Date (as defined below).   Notwithstanding anything herein to the contrary, if and only if the Obligations shall not have been indefeasibly paid in full, without taking into account any default rate of interest, and in cash on or before 45 days after the Petition Date, then the Term Loan Secured Parties' right at any time to seek payment of interest as of the Petition Date at the default rate set forth in Section 2.09(d) of the Term Loan Facility shall be fully preserved.

(d)    Reimbursement.    The Debtors are authorized and directed, within 10 days of submission of invoices therefor (which invoices shall be concurrently provided to the US Trustee and any Committee), to pay or reimburse all pre or post Petition Date reasonable fees, costs and charges incurred by the Term Loan Agent (including, without limitation, the reasonable fees and out-of-pocket disbursements of counsel to the Term Loan Agent), in accordance with the terms and provisions of the Term Loan Facility, in each case, in

connection with matters relating to this Order and the monitoring of the Cases or the enforcement and protection of the rights and interests of the Term Loan Agent in respect of the Adequate Protection Obligations and the Obligations.    None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

(e)    <u>Maintenance of Adequate Insurance</u>.    Debtors shall maintain insurance on the Pre-Petition Collateral in accordance with Section 4.02 of the Collateral Agreement dated as of November 29, 2006 between certain of the Debtors and the Term Loan Agent.

6.    <u>Termination</u>.    The Term Loan Secured Parties' agreement that the provisions set forth in paragraph 5 of this order constitute adequate protection shall terminate (the date of any such termination, the "<u>Termination Date</u>") upon 5 business days' written notice (the "<u>Notice</u>") to the Debtors (with a copy to counsel for any Committee, the United States Treasury and the United States Trustee) after the occurrence and continuance of any of the following events (the "<u>Events of Default</u>") beyond any applicable grace period set forth below:

(a)    Failure of the Debtors to make any payment to the Term Loan Agent or Term Loan Secured Parties as and when required by this Order;

(b)    Failure of the Debtors to (i) comply with any material terms of this Order, or (ii) comply with any other covenant or agreement specified in this Order (other than those described in clause (i) above) and such failure to comply with any such other covenant or agreement shall continue unremedied for more than three (3) business days after written notice thereof is received from the Term Loan Agent;

(c)    Any of the Cases shall be dismissed or converted to a Chapter 7 case; or a Chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Debtor (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Cases;

(d)      An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Order in a manner that the Term Loan Agent reasonably determines to be materially adverse to the interests of the Term Loan Secured Parties;

(e)      A filing by any Debtor (or any successors and assigns) of any motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Obligations or any other cause of action against and/or with respect to the Obligations, the prepetition liens securing such Obligations, the Term Loan Agent or any of the Term Loan Secured Parties;

(f)      Other than payments authorized by the Court and which are set forth in the approved budget, in the form as of the date hereof attached to the DIP Order, any Debtor shall make any material payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables;

(g)      Five business days after the acceleration of the DIP Facility, as defined in the motion to approve the DIP Order.

(h)      Failure of the Debtors to indefeasibly pay in full and in cash the Obligations, without taking into account any interest at the default rate, on or before 45 days after the Petition Date.

The Debtors shall promptly provide Notice to the Term Loan Agent (with a copy to counsel for any Committee, the United States Treasury, and the United States Trustee) of the occurrence of any Event of Default.   Notwithstanding clauses (c) and (f) of the foregoing, the Termination Date arising from the occurrence of the events set forth therein shall not occur unless and until the lenders under the DIP Facility, as defined in the Motion, have exercised remedies.

7.      *Limitation On Charging Expenses Against Collateral*.   Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Term Loan Agent and

Majority Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Term Loan Agent and Majority Lenders.

8.       *Payments Free and Clear*.   Any and all payments or proceeds remitted to the Term Loan Agent on behalf of the Term Loan Secured Parties pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

9.       *Reservation of Rights of Term Loan Secured Parties*.   This Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Term Loan Secured Parties in the Prepetition Collateral.   Except as expressly provided herein, nothing contained in this Order shall impair or modify any rights, claims or defenses available in law or equity to any Term Loan Secured Party, including without limitation, the Term Loan Secured Parties' right to seek further and other adequate protection upon the occurrence of any Event of Default as listed in paragraph 6; provided, that, Debtors shall have the right to object or respond to any such rights, claims or defenses and to any such motion by the Term Loan Secured Parties.

10.      *Perfection Of Term Loan Adequate Protection Liens.*

The Term Loan Agent is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.   Whether or not the Term Loan Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

11.      *Preservation Of Rights Granted Under The Order.*

(a)       Except as set forth herein, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the Term Loan Agent and the Term Loan Secured Parties shall be granted or

allowed while any portion of the Adequate Protection Obligations remain outstanding, and Term Loan Adequate

Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the

benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with

any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)        If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or

otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the

Bankruptcy Code) that (x) the Superpriority Claim and the Term Loan Adequate Protection Liens, shall continue in

full force and effect and shall maintain their priorities as provided in this Order until all Adequate Protection

Obligations shall have been paid and satisfied in full (and that such Superpriority Claim and the Term Loan

Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y)

this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens

and security interests referred to in clause (x) above.

(c)        Except as expressly provided in this Order or in the Loan Documents, the Adequate

Protection Obligations, the Superpriority Claim and all other rights and remedies of the Term Loan Agent, and the

Term Loan Secured Parties granted by the provisions of this Order shall survive, and shall not be modified, impaired

or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy

Code, dismissing any of the Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining Adequate Protection Obligations.   The terms and provisions of this Order

shall continue in the Cases or in any superseding chapter 7 case under the Bankruptcy Code, and the Term Loan

Adequate Protection Liens, the Superpriority Claim and all other rights and remedies of the Term Loan Agent and

the Term Loan Secured Parties granted by the provisions of this Order shall continue in full force and effect until all

Adequate Protection Obligations are indefeasibly paid in full in cash.

12.        *Limitation On Use Of Proceeds and Products of Prepetition Collateral*.   Notwithstanding

anything herein or in any other order of this Court to the contrary, no Collateral, Prepetition Collateral or the Carve-

Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or

NY2:\1999804\15\16V2415!.DOC\72240.0635

10

enforceability of any amount due under the Loan Documents, or the liens or claims granted under this Order or the Loan Documents, (b) assert any claims and defenses or any other causes of action against the Term Loan Agent and the Term Loan Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) seek to modify any of the rights granted to the Term Loan Agent and the Term Loan Secured Parties hereunder or under the Loan Documents, in the case of each of the foregoing clauses (a) through (c), without such party's prior written consent.

13.     *Order Governs.*   In the event of any inconsistency between the provisions of this Order or any other order of the Court in the Cases, the provisions of this Order shall govern.

14.     *Binding Effect; Successors And Assigns.*   The provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including without limitation, the Term Loan Agent, and the Term Loan Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor) and shall inure to the benefit of the Term Loan Agent, the Term Loan Secured Parties and the Debtors and their respective successors and assigns.

15.     *Limitation of Liability.*   In exercising any rights or remedies as and when permitted pursuant to this Order or the Loan Documents, the Term Loan Agent and the Term Loan Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).   Furthermore, nothing in this Order shall in any way be construed or interpreted to impose or allow the imposition upon the Term Loan Agent or any of the Term Loan Secured Parties any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

NY2:\1999804\15\16V2415!.DOC\72240.0635

11

16.     *No Impact on Certain Contracts/ Transactions.*    No rights of any entity under Sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Order as to any contract or transaction of the kind listed in such Sections of the Bankruptcy Code.

17.     *Effectiveness.*    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

18.     *Final Hearing.*    The Final Hearing is scheduled for _____, 2009 at _____ _.m., Eastern time, before this Court.

The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing, including without limitation, notice of any Extraordinary Provisions described in the introductory language to this Order) to the parties having been given notice of the Interim Hearing, all known lienholders, the cash management banks with which the Debtors maintain deposit, lockbox, concentration, disbursement and similar accounts, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.   Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) the Office of the United States Trustee for the Southern District of New York, (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:   Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn:   Lawrence S. Buonomo, Esq.), (d) Cadwalader, Wickersham & Taft LLP, of counsel to the Presidential Task Force on the Auto Industry, One World Financial Center, New York, NY 10281; Attn: John J. Rapisardi, Esq., (e) Vedder Price P.C., counsel to Export Development Canada, 1633 Broadway, 47th Floor, New York, NY 10019, Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq. and McMillan LLP, counsel to EDC, Brookfield Place, Suite 4400, 181 Bay Street, Toronto, Ontario, Canada M5J 2T3, Attn: Peter A. Willis, (f) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Peter V. Pantaleo, Esq., and David J. Mack, Esq., attorneys for the Revolver Agent, (g) Morgan, Lewis & Bockius LLP, 101 Park Ave, New York, NY 10178, Attention: Richard S. Toder, Esq., Andrew D. Gottfried, Esq., and Richard S. Petretti, Esq., attorneys for the Term Loan Agent, (h) the holders of the fifty largest unsecured claims

NY2:\1999804\15\16V2415!.DOC\72240.0635

against the Debtors (on a consolidated basis), (i) the attorneys for the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America, (j) the attorneys for the International Union of

Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (k) the

United States Department of Labor, (*l*) the attorneys for the National Automobile Dealers Association, (m) the

attorneys for the ad hoc bondholders committee, and (n) counsel to any Committee appointed in the Cases, and shall

be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow

actual receipt by the foregoing no later than _____, 2009 at ___., Eastern time.

Dated:    _____ __, 2009
          New York, New York

                              _____
                              UNITED STATES BANKRUPTCY JUDGE