**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                :

In re                                            :        Chapter 11
                                                :

General Motors Corporation, *et al.,*        :        Case No. _____
                                                :
                                                :        (Jointly Administered)
                    Debtors.        :
                                                  :
------------------------------------------------------- x

### DECLARATION OF WILLIAM C. REPKO
### IN SUPPORT OF DEBTORS'
### PROPOSED DEBTOR IN POSSESSION FINANCING FACILITY

I, William C. Repko, make this Declaration under 28 U.S.C. § 1746 and state:

1.      I am a Senior Managing Director with Evercore Group L.L.C. (together with its wholly-owned subsidiaries, agents, independent contractors and employees, "Evercore"), financial advisor to General Motors Corporation and the other above-captioned debtors and debtors in possession (collectively the "Debtors" and, together with their non-debtor affiliates, "GM"). I make this Declaration in support of the request of the Debtors that the Court approve the proposed debtor in possession financing (the "DIP Financing") as more fully described in the Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (i) Authorizing the Debtors to Obtain Postpetition Financing, Including on an Immediate, Interim Basis; (ii) Granting Superpriority Claims and Liens; (iii) Authorizing the Debtor to use Cash Collateral; (iv)

Granting Adequate Protection to Certain Prepetition Secured Parties; (v) Authorizing the Debtor to Prepay Certain Secured Obligations in Full Within 45 Days; and (vi) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion")[1]. Except as otherwise indicated, my testimony in this Declaration is based upon my personal knowledge and experience acquired in the ordinary and regular course of my profession, my review of relevant documents and information supplied to me by members of GM's management team or professionals retained by GM and my personal knowledge and experience of the automotive industry and GM's businesses and financial condition. If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.

## I.      Qualifications

2.      I have considerable experience with Chapter 11 restructurings and other distressed company circumstances.  I have over 35 years of restructuring experience, including in complex restructuring transactions involving large corporations, money center and investment banks, and other creditors on numerous Chapter 11 transactions and restructurings, including, specifically, debtor in possession financing transactions.

3.      I attach my complete curriculum vitae as Exhibit A.

4.      I joined Evercore in September 2005 and since that time have been a Senior Managing Director in the corporate advisory business and co-head of the

---

[1] Unless otherwise defined in this Declaration, capitalized terms shall have the same meaning as in the DIP Motion.

corporate restructuring practice.  Prior to joining Evercore, I was chairman and head of

the Restructuring Group at J.P. Morgan Chase & Co.  I joined a predecessor firm of J.P.

Morgan in 1973, and I served as head of the Restructuring Group at J.P. Morgan from

1991 until 2004.  The Restructuring Group was responsible for delivering debt capital to

companies operating in, exiting from, or seeking to avoid Chapter 11.  Throughout my

tenure at J.P. Morgan and its predecessor firms, its Restructuring Group was at or near the

top of league tables of the industry.  In my capacity as head of the Restructuring Group, I

was involved in all facets of restructuring, including originating, structuring, and

negotiating the terms and conditions of debtor in possession financing facilities, managing

the internal approval process of these credits, and working with the firm's sales desk and

directly with investors in syndicating such facilities.  I worked on hundreds of these

offerings, including in connection with the vast majority of large U.S. public companies

that sought relief under Chapter 11 during my tenure as head of the Restructuring Group.

My clients included Enron, Federal Mogul, Harnischfeger, United Airlines, Worldcom,

Adelphia, Kmart, Waste Management, and LTV.   In addition, I have substantial

automotive industry financing experience. Over the past 20 years, I have worked on

numerous financings for automotive companies. In particular, in 1992 I led the Chemical

Bank restructuring team as the designee of the bank's Chief Credit Officer in the

refinancing of Chrysler Financial's bank facilities. In 1993, performing the same role, I

was the senior credit officer in conjunction with GM's and GMAC's $30 billion

refinancing of their global credit facilities. In 2006, I advised Ford Motor Company on

several financing options.   In 2007, I assisted Visteon on its capital raise and Cerberus in its financing to support the purchase of Chrysler LLC ("Chrysler") and Chrysler Financial.

5.     Established in 1996, Evercore is a leading investment banking boutique and investment management firm. Evercore's Advisory business counsels its clients on mergers, acquisitions, divestitures, restructurings and other strategic transactions.   Evercore's Investment Management business comprises private equity investing, institutional asset management and wealth management. Evercore serves a diverse set of clients around the world from its offices in New York, San Francisco, Boston, Washington D.C., Los Angeles, Houston, London, Mexico City and Monterrey, Mexico.  Its corporate advisory and restructuring advisory groups have together advised on over $600 billion of transactions.  Its restructuring professionals provide investment banking and financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in Chapter 11 proceedings and out-of-court restructurings.

6.     Evercore's professionals have been retained as investment bankers and financial advisors in a number of troubled company situations, including among others:  Lyondell Chemical Company, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan 6, 2009), Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sep. 14, 2005), Parmalat U.S.A. Corp., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Feb. 24, 2004), Loews Cineplex Entertainment Corp., Case No. 01-40346 (ALG) (Bankr.

S.D.N.Y. Feb. 15, 2001), and PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 23, 2008).

       7.     Supporting me with the ongoing GM engagement has been a team of approximately twelve Evercore professionals. Since approximately June 2008, Evercore's GM team has been in place on this project full-time. Primarily assisting me in this effort have been (a) Roger C. Altman, Chairman, (b) William Hiltz, Senior Managing Director, (c) J. Stephen Worth, Managing Director, and (d) Stephen Sieh, Managing Director.

       8.     Roger C. Altman, Chairman of the Board of Evercore, began his investment banking career at Lehman Brothers and became a general partner of that firm in 1974. Beginning in 1977, he served as Assistant Secretary of the U.S. Treasury for four years. He then returned to Lehman Brothers, later becoming co-head of overall investment banking, a member of that firm's Management Committee and its Board. He remained in those positions until the firm was sold to Shearson/American Express. In 1987, Mr. Altman joined The Blackstone Group as Vice Chairman, head of the firm's merger and acquisition advisory business and a member of its Investment Committee. Mr. Altman also had primary responsibility for Blackstone's international business. Beginning in January 1993, Mr. Altman returned to Washington and served as Deputy Secretary of the U.S. Treasury. In 1996, he formed Evercore, which has become a leading international investment banking boutique. Mr. Altman holds an A.B. from Georgetown University and an M.B.A. from the University of Chicago. Mr. Altman has been actively

involved in advising GM on strategic and financial matters, and has been involved in discussions with the U.S. Treasury, GM board and senior management with respect to several potential strategic investors.

9.     William Hiltz is a Senior Managing Director of the corporate advisory business and is a member of Evercore's Management Committee.  In addition, Mr. Hiltz has management responsibility for all of Evercore's investment management businesses.  Mr. Hiltz has 32 years of experience in the investment banking business.  He received a B.A. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania. Mr. Hiltz has primarily been responsible for assisting GM with developing possible alliances and other long-term financing efforts.

10.     J. Stephen Worth is a Managing Director of Evercore's corporate advisory business.  Mr. Worth has over 20 years of investment banking experience, starting his career at J.P. Morgan & Co.  Mr. Worth has extensive experience in advising and financing companies in the automotive and general industrial sectors.  Mr. Worth graduated with a B.A. in math and physics from Wesleyan University.  Mr. Worth has been primarily responsible for day-to-day discussions with GM relating to possible alliances and other long-tem financing efforts.

11.     Stephen Sieh is a Managing Director of Evercore's corporate advisory business and restructuring practice.  Prior to joining Evercore in 2007, Mr. Sieh spent over eight years at Lazard, most recently as a Director of the firm's Restructuring

Group.  Mr. Sieh has extensive experience in a wide range of corporate finance activities, including, mergers and acquisitions, corporate lending and Chapter 11 and out-of-court restructurings.  Mr. Sieh received a B.S. degree from the Carroll School of Management Honors Program at Boston College, and received an M.B.A. from the Columbia University Graduate School of Business.  Mr. Sieh has primarily been responsible for developing GM's long-tem financing alternatives and analyzing GM's needs in a potential restructuring.

12.    Prior to the Commencement Date, Evercore and I worked closely with GM's management, financial staff and other professionals in GM's restructuring efforts; analyzed GM's liquidity and projected cash flows; acquainted ourselves with GM's businesses, operations, properties and finances; advised GM in its evaluation of financing alternatives and of its assessment of a potential combination with Chrysler; assisted GM in obtaining $13.4 billion in emergency financing under the Troubled Assets Relief Program ("TARP"); assisted GM in the structuring and documentation of a proposed exchange offer; and assisted GM in connection with preparations for commencement of these cases.

13.    Accordingly, I have developed substantial knowledge regarding GM that allows me to provide an assessment of GM's liquidity position, the proposed sale of assets to a newly formed entity ("Vehicle Acquisition Holdings LLC"), and the financing needs of GM, as debtor-in-possession.

14.    Contemporaneously with the filing of the DIP Motion, I understand that the Debtors are filing a motion for authorization and approval of the sale of substantially all of their assets to Vehicle Acquisition Holdings LLC, and to consummate that sale (the "363 Sale").

## II.    Compensation for Evercore's Services

15.    The terms of Evercore's compensation for this engagement are fully set forth in the Engagement Letter, dated September 5, 2008, as amended on December 23, 2008, April 28, 2009, and as amended and restated on May 29, 2009.  The Engagement Letter and all amendments are attached to this Declaration as Exhibit B.

16.    Prior to the Commencement Date, GM paid Evercore total fees of $24.1 million and reimbursed expenses in the amount of $397,035 for all services rendered.  Pursuant to the Engagement Letter, Evercore will receive a fee of $2.5 million for assisting GM in the structuring and implementation of the debtor in possession financing and a net fee of $13.0 million if the transaction which is the subject of the 363 Motion is consummated.  There is no allocable share of the foregoing fees that will be paid directly to me.  Of course, the allowance of the foregoing fees is subject to bankruptcy court approval.

17.    In addition, Evercore has been and is engaged by GM to provide advice to GM with respect to the Delphi Corporation restructuring ("Delphi Engagement").  The terms of Evercore's compensation for the Delphi Engagement are fully set forth in the Delphi Engagement Letter dated June 1, 2008 and amended on March

31, 2009.  Prior to the Commencement Date, GM paid Evercore total fees of $5.5 million and reimbursed expenses in the amount of $76,888 for all services rendered related to this engagement.  Additional compensation may be earned under the Delphi Engagement in certain circumstances.

### III.    *Professional Services Rendered By Evercore to GM*

18.    Pursuant to the Engagement Letter, Evercore has provided such financial and strategic advisory services as GM and Evercore deemed appropriate in connection with these Chapter 11 cases.  In particular, Evercore has provided substantial advisory services to GM with respect to possible debtor in possession financing.

19.    In addition, since June 2008, Evercore has worked in conjunction with GM's management and its advisors on a number of ongoing projects, including cash management, financial analyses and forecasting, assistance with development of alternative business plans and models, assessments of financial alternatives and strategies, GM's submissions to the U.S. Government, initiating discussions of possible debtor in possession financing and other financing with major participants in the market,  and the proposed 363 Sale of assets to Vehicle Acquisition Holdings LLC.

### IV.    *Relevant Background Information*

20.    For the first two quarters of 2008, GM's financial performance and liquidity continued to be adversely impacted by the economic recession.  With crude oil prices rapidly rising and reaching $148 per barrel in July 2008, sales of large SUV and

pick-up trucks, two segments in which GM traditionally had significant market share, dramatically declined. The Seasonally Adjusted Annual Rate of Auto Industry Sales in the U.S. ("SAAR") fell to 13.6 million in June 2008, 13% below the same prior year period, and continued to decline reaching 10.3 million in December 2008.

21.     To offset the decline in liquidity and conserve cash, GM continued to accelerate its existing cost cutting initiatives and initiated new ones.

22.     GM also sought to access the capital markets to augment its liquidity.

23.     Evercore began working with GM in June of 2008 to advise GM on capital-raising options and other strategic alternatives as GM prepared to make a public announcement of its liquidity preservation plan in conjunction with its 2Q2008 earnings release in July.

### B.     GM's Attempts to Obtain Private Secured Financing

24.     In early July 2008, the equity and debt markets continued to show a lack of investor confidence, which significantly hampered GM's ability to meaningfully enhance its liquidity through either a public equity offering or an unsecured debt financing.  As the chart in attached Exhibit C illustrates, the price of GM's common stock had declined by 49% to $11.75 from May 1st, 2008 to July 1st 2008, the price of GM's long-term unsecured bonds had reportedly traded down from the mid-70s in early May to the mid-50s by early July and its credit default swaps (insurance-like contracts that promise to cover losses on certain securities in the event of a default) had widened to

1,832 bps by July 1st, 2008, further widening to 9,097 by year end  (see attached Exhibit D).

25.     At this point, the only capital-raising alternative available to GM appeared to be a potential issuance of secured debt financing using all of GM's unpledged and available collateral, including the stock of certain of its foreign subsidiaries, certain intangible assets, including its brands, and intellectual property.  In July, GM began discussions with several potential underwriters regarding such a transaction.

26.     Significant effort was expended by GM, its team of financial and legal advisors and its potential underwriters to develop a secured financing offering. However, during the second half of 2008 the financial markets continued to deteriorate to an unprecedented state of distress.   Neither the leveraged-loan market nor the market for secured high yield bonds had sufficient liquidity, and sellers of leveraged loans and bonds vastly outweighed buyers, putting severe pressure on market trading levels. Consequently, GM and its advisors concluded that, not only would the proceeds that could be raised by the offering be insufficient to provide GM with sufficient liquidity, but also that the financing would be prohibitively costly and would impair GM's future capital-raising alternatives when considering, among other factors, the pricing that buyers would have demanded, the collateral that would have to have been pledged, and the covenants with which GM would have had to comply.

27.     In early August 2008, Chrysler approached GM to begin discussions regarding a potential combination of the two companies.  Evercore worked

closely with GM to analyze the proposed transaction.  In addition to strategic implications, a potential combination with Chrysler was initially viewed by GM as a potential catalyst for obtaining significant incremental financing from GM's and Chrysler's existing lenders, several of which were common to both companies, due to improved pro-forma credit statistics, a more positive long term outlook for the combined company and the likelihood that the trading value of the loans would improve post-transaction.

28.    Evercore continued to work closely with GM as it pursued negotiations with Chrysler between September and early November of 2008.  By early November 2008, however, two critical facts led GM to suspend its merger talks with Chrysler: (i) lenders were unwilling to provide sufficient incremental liquidity to the proposed merged company, and (ii) the business environment and GM's operating performance had continued to decline severely such that GM may have exhausted its liquidity prior to the consummation of the contemplated transaction.

29.    Consequently, in early November 2008, GM was compelled to redirect its capital-raising focus to the "last resort" source of funds: the U.S. Government.

VIII.    *Necessity of DIP Financing for Proposed 363 Sale Transaction*

30.    I understand that GM is seeking this Court's authorization to enter into the proposed DIP Financing as described in the DIP Motion, in order to fund working capital and certain other costs pending consummation of the 363 Sale.  DIP Financing in this context is critical to preserving the value of GM.  If the proposed DIP Financing is

approved, the Debtors' ability to minimize disruption to their businesses, instill confidence in their various stakeholders, and maximize asset values will be substantially enhanced. If the proposed DIP Financing is not approved, or is modified on terms that are unacceptable to the U.S. Treasury and Export Development Canada (the "EDC"), GM will collapse and will, in all likelihood, liquidate in a distressed and, at least initially, a disorganized way. Manufacturing plants that are currently idle, but that are planned to reopen in July, may likely never re-open. The resultant loss of jobs, directly related to GM employment but also related to suppliers, dealers and other supporting businesses, will be catastrophic. Financing transactions, from GM direct debt, supplier debt, as well as wholesale and retail installment contracts related to auto purchases, will come under substantial recovery degradation. There are profound potential damaging effects of a GM collapse that are not easily anticipated, but which have the potential to multiply and adversely impact the United States' and the global economies.

31.    During the course our engagement for GM, Evercore and I analyzed the Debtors' DIP budget and contacted potential lenders for debtor in possession financing.

32.    In particular, Evercore and I contacted several institutions during the second quarter of 2009 to assess their interest in providing debtor in possession financing to assist the Debtors' restructuring efforts in the event GM were to seek protection under Chapter 11.

33.     The financial institutions contacted were involved with GM as potential underwriters during the capital-raising in the fall of 2008 and were named Dealer Managers in the Exchange Offer and Consent Solicitation on Form S-4 dated April 27, 2009, as subsequently amended. As such, these institutions were familiar with GM's financial condition, collateral values and the operational changes evidenced by GM's revised business plans and had the ability to adequately assess the prospects for the repayment of the prospective DIP Facility.

34.     None of the financial institutions that Evercore and I contacted expressed any interest in providing a debtor in possession financing facility for the Debtors.  In fact, the institutions specifically communicated that they were <u>not</u> willing to consider such a financing.  Indeed, based on my experience, the amounts in question exceed the legal lending limits of any financial institution I am aware of. Thus, DIP Financing of the magnitude contemplated in the DIP Motion would require an extraordinary degree of cooperation to arrange and syndicate among a large number of financial institutions. This, given current market conditions, is not achievable.

35.     The U.S. Treasury and the EDC are the only entities that have offered to provide the requisite debtor in possession financing, but solely pursuant to the DIP Financing terms set forth in the DIP Motion, and, in particular, <u>only</u> in connection with GM's pursuit of the proposed 363 Sale.  Moreover, the U.S. Treasury and the EDC have committed to convert all but $8 billion of its DIP Financing and its prepetition secured indebtedness to GM to equity in New GM, if the 363 Sale is consummated.

36.     As described in the DIP Motion, the proposed DIP Financing from the U.S. Treasury and the EDC provide for funding of up to $33.3 billion of additional capital.

## OPINION

37.     Based upon my review of the DIP Financing terms set forth in the DIP Motion and, in light of current market conditions and the unprecedented size of the proposed DIP Financing, and considering the other matters discussed above, it is my opinion that:

i.     GM is unable to obtain necessary credit other than the proposed DIP Financing from the U.S. Treasury and the EDC;

ii.     no alternative debtor in possession financing (public or private) is available to finance (a) these Chapter 11 proceedings; or (b) any other form of bankruptcy liquidation or reorganization of GM; and

iii.     the terms and conditions of the proposed DIP Financing are fair and reasonable.

**[Remainder of page left intentionally blank]**

38.     I declare under penalty of perjury that the foregoing statements are

true and correct.

Executed on May 31, 2009

_____
William C. Repko

## **Exhibits to DIP Affidavit**

A.       William Repko's Curriculum Vitae

B.       Evercore Engagement Letter and Amendments

C.       Chart of Trading Prices of GM's Common Stock

D.       Chart of Trading Prices of GM's Long-Term Unsecured Bonds and Credit Default
         Swaps

**Exhibit A**
**(William Repko's Curriculum Vitae)**

### William Repko's Curriculum Vitae

William C. Repko
Senior Managing Director
Evercore Group L.L.C.
55 East 52nd Street
New York, NY 10055

Evercore Group L.L.C.                                      New York, NY
Senior Managing Director                       September, 2005 – present

Partner in the Firm's advisory business and co-head of the Firm's Restructuring Practice. Activities include advisory and negotiations in financial restructurings, M&A advisory, and leveraged finance. Since joining the Firm, assisted clients in raising approximately $90 billion in completed financings, primarily in the leveraged loan market, advised clients on complex negotiations involving reductions in obligations aggregating approximately $75 billion and advised on M&A transactions with total enterprise value in excess of $70 billion.

JP Morgan                                                    New York, NY
Managing Director                             August, 1973 – June, 2005

Joined a predecessor organization of JP Morgan in 1973. After completion of the bank's management training program, and teaching credit analysis to incoming management trainees, Mr. Repko joined the Bank's Corporate Lending Division. After a brief departure from the Bank to work for a competitor, Mr. Repko rejoined the Bank's lending group.

In 1982, Mr. Repko assumed responsibility for the Bank's exposure to International Harvester Company and Allis Chalmers and led the out-of-Court restructurings of those companies. He also joined the Bank's Special Loan Group to work exclusively on workouts.

In 1987, Mr. Repko was asked to assume responsibility for the Bank's effort to convert a portion of its approximately $9 billion of Emerging Market debt (primarily Mexico, Brazil, Chile and Argentina) into equity positions in local businesses.

In 1991, Mr. Repko assumed the position of Senior Vice President, reporting to the Chief Credit Officer of the Bank in charge of Special Projects. Thereafter, he successfully managed the Bank's lead of the re-financings of Chrysler, General Motors and International Business Machines. During this period, the Bank formed the Restructuring Group, which Mr. Repko headed until his retirement in 2005.

In, 1998, in response to the Asian debt crisis, the Bank formed a Restructuring Advisory Group based in Hong Kong, which was a matrix report to Mr. Repko, in addition to his existing responsibilities. The Group successfully advised Debtor Corporations in Indonesia, Thailand, Korea and the Philippines.

In the United States, the Restructuring Group was responsible for the Bank's leveraged finance business to trouble corporations, including Debtor-in-Possession financing, exit financing and out-of-Court restructuring financings. Over the 14 year period, Mr. Repko and his staff successfully managed hundreds of transactions using a variety of financing mechanisms for, among others, Adelphia, Worldcom, Enron, United Airlines, Lucent Technologies, Kmart, Caldors, Bradlees Stores, Waste Management, Motorola, Harnischfeger, among others.

At the time of his retirement, Mr. Repko was head of the Restructuring business, was a senior "partner" on JP Morgan's leveraged lending business and was a member of the Management Committee of the Firm's fixed income business.

Education

Lehigh University                                                                          Bethlehem, PA
Bachelor of Science – Finance                                                            June, 1973

Additional Information

Member American Bankruptcy Institute, past director, the Turnaround Management Association, speaker at industry conferences, one of ten Initial Inductees into the Turnaround Management Association's Hall of Fame.

**Exhibit B**
**(Evercore Engagement Letter and Amendments )**

# EVERCORE GROUP L.L.C

September 5, 2008

Mr. Walter G. Borst
Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Walter:

This engagement letter (this "Agreement") formalizes the arrangement between Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company") regarding the retention of Evercore by the Company as a financial advisor for the purposes set forth herein.

Under the terms of this Agreement, Evercore will provide financial advisory services to the Company in connection with its strategic planning process, capital markets activities, and evaluation of strategic alternatives. Evercore will provide financial advisory services as customarily may be required in connection with engagements of this type.

As compensation for the services rendered by Evercore hereunder, the Company agrees to pay Evercore a monthly retainer fee of $500,000, payable in arrears, beginning June 23, 2008. In the event Evercore is subsequently retained as financial advisor during the next 6 months on any strategic and financial alternatives involving a merger, sale of all or part of the equity, business or assets of the Company or other significant corporate transaction (a "Transaction"), the monthly retainer fees would be creditable against any success fee payable under the separate engagement, in whole or in part as determined solely by the Company after consultation with Evercore. The company also agrees to reimburse Evercore for its reasonable and customary expenses (including legal and other professional fees, expenses and disbursements) incurred in connection with its engagement.

The Company recognizes and consents to the fact that (a) Evercore will use and rely on the accuracy and completeness of public reports and other information provided by others, including information provided by the Company, other parties and their respective officers, employees, auditors, attorneys or other agents in performing the services contemplated by this Agreement, and (b) Evercore does not assume responsibility for, and may rely without independent verification upon, the accuracy and completeness of any such information.

The Company will provide to Evercore all information and data requested by Evercore that the Company reasonably deems appropriate in connection with Evercore's engagement. The Company will use its reasonable best efforts to ensure that any information heretofore or hereafter furnished to Evercore is and will be true and correct in all material respects and does not and will not omit any material fact required to make the

Letter to Mr.Walter Borst
General Motors Corporation
September 5, 2008
Page 2

information given to Evercore not misleading. The Company will use its reasonable best efforts to notify Evercore promptly of any material change or correction in information regarding the business or financial condition of the Company that it has provided to Evercore when it becomes aware of such material change or of an error necessitating such correction.

The Company agrees that any information or advice rendered by Evercore under this engagement shall be kept confidential by the management and Board of Directors of the Company, is solely for the use of the management and Board of Directors of the Company and may not be provided to, or relied upon by, others without the consent of Evercore. Evercore understands that the Company may need to share Evercore's information and advice with its attorneys, auditors or other advisers, and Evercore hereby consents to any such sharing, provided however, that no such third party may rely on such information or advice without the written consent of Evercore.

Evercore's engagement hereunder may be terminated by the Company or by Evercore at any time upon written notice and without liability or continuing obligation to the Company or to Evercore (except for any compensation earned and expenses incurred by Evercore prior to the date of termination and as specified below); provided that the Indemnification Agreement attached hereto as Schedule I will remain operative regardless of any such termination.

Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth in the Indemnification Agreement, the Indemnified Persons (as defined in the Indemnification Agreement), any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Evercore hereunder. The Company acknowledges that Evercore is not acting as an agent of the Company or in a fiduciary capacity with respect to the Company and that Evercore is not assuming any duties or obligations other than those expressly set forth in this Agreement. Nothing contained herein shall be construed as creating, or be deemed to create, the relationship of employer and employee between the parties, nor any agency, joint venture, or partnership. Evercore shall at all times be and be deemed to be an independent contractor. No party to this Agreement nor its employees or agents shall have any authority to act for or to bind the other party in any way or to sign the name of the other party or to represent that that the other party is in any way responsible for the acts or omissions of such party.

This Agreement (including the Indemnification Agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. This Agreement may not be amended or modified except in writing signed by each of the parties.

Letter to Mr. Walter Borst
General Motors Corporation
September 5, 2008
Page 3

The Company acknowledges that Evercore's affiliates engage in the private equity business, asset management business and related activities (collectively, "Non-Broker Dealer Businesses"). In the ordinary course of our Non-Broker Dealer Businesses, Evercore's affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of their customers, in debt or equity securities or senior loans of the Company or any other company that may be involved in a transaction with the Company. Evercore represents and warrants that it has reasonable policies and procedures in place to prevent its affiliates from using material, non-public information in Evercore's possession.

For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

The parties hereby irrevocably consent to the exclusive jurisdiction of any New York State or United States federal court sitting in New York County over any action or proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard in such New York State or federal court. The parties irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to each party at its address set forth above. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). The parties further waive any objection to venue in the State of New York and any objection to any action or proceeding in such state on the basis of *forum non conveniens*.

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

*[Signature page follows]*

Letter to Mr. Walter Borst
General Motors Corporation
September 5, 2008
Page 4

　　　　　If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

　　　　　　　　　　Very truly yours,

　　　　　　　　　　EVERCORE GROUP L.L.C.


By:　　_____
　　　　　[Name] William O. Hiltz
　　　　　[Title] Senior Managing Director


Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By:　　_____
　　　　　[Name] Walter G. Borst
　　　　　[Title] Treasurer

<u>Schedule I</u>

**Indemnification Agreement**

September 5, 2008

Mr. Walter G. Borst
Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Walter:

      In connection with the engagement of Evercore Group L.L.C. ("Evercore") to render financial advisory services to General Motors Corporation (the "Company") pursuant to the engagement letter, dated September 5, 2008, the Company and Evercore are entering into this Indemnification Agreement (this "Agreement").  It is understood and agreed that in the event that Evercore or any of its members, partners, officers, directors, advisors, representatives, employees, agents, affiliates or controlling persons, if any (each of the foregoing, including Evercore, an "Indemnified Person"), become involved in any capacity in any claim, action, proceeding or investigation brought or threatened by or against any person, including the Company's stockholders, related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, the Company will promptly reimburse each such Indemnified Person for its reasonable legal and other expenses (including the reasonable out of pocket cost of any investigation and preparation) as and when they are incurred in connection therewith, provided that such reimbursement may be remitted to the Company as provided below.

      The Company will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expense to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, whether or not any pending or threatened claim, action, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expense is initiated or brought by or on the Company's behalf and whether or not in connection with any claim, action, proceeding or investigation in which the Company or an Indemnified Person is a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment to have resulted primarily from such Indemnified Person's gross negligence, bad faith or willful misconduct.

      The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, except to the extent that any loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment to have resulted primarily from such Indemnified Person's gross negligence, bad faith or

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 2

willful misconduct.  Each Indemnified Person shall promptly remit to the Company any amounts
paid to such Indemnified Person under this Agreement in respect of losses, claims, damages,
liabilities or expense that resulted from such Indemnified Person's gross negligence, bad faith or
willful misconduct.

    If for any reason the foregoing indemnification is unavailable to an Indemnified Person or
insufficient to hold it harmless, then the Company shall contribute to the loss, claim, damage,
liability or expense for which such indemnification is unavailable or insufficient in such proportion
as is appropriate to reflect the relative benefits received, or sought to be received, by the Company
and its security holders on the one hand and the party entitled to contribution on the other hand in
the matters contemplated by Evercore's engagement as well as relative fault of the Company and
such party with respect to such loss, claim, damage, liability or expense and any other relevant
equitable considerations.  To the extent permitted by applicable law, in no event shall Evercore or
any other Indemnified Person be required to contribute an aggregate amount in excess of the
aggregate fees actually paid to Evercore for such financial advisory services.  The Company and
Evercore agree that it would not be just and equitable if contribution hereunder were determined by
pro rata allocation or by any other method that does not take into account the equitable
considerations referred to herein.  The Company's reimbursement, indemnity and contribution
obligations under this Agreement shall be in addition to any liability which the Company may
otherwise have, shall not be limited by any rights Evercore or any other Indemnified Person may
otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs
and personal representatives of the Company, Evercore, and any other Indemnified Persons.

    If any claim, action, proceeding or investigation shall be brought, threatened or asserted
against an Indemnified Person in respect of which indemnity may be sought against the Company,
Evercore shall promptly notify the Company in writing, and the Company shall be entitled, at its
expense, and upon delivery of written notice to Evercore, to assume the defense thereof with
counsel reasonably satisfactory to Evercore.  Such Indemnified Person shall have the right to
employ separate counsel in any such claim, action, proceeding or investigation and to participate in
the defense thereof, but the fees and expenses of such counsel shall be at the expense of such
Indemnified Person unless (i) the Company has agreed in writing to pay such fees and expenses, (ii)
the Company has failed to assume the defense, pursue the defense diligently or to employ counsel in
a timely manner or (iii) counsel has advised such Indemnified Person that in such action, claim, suit,
proceeding or investigation there is a conflict of interest between the Company's position and the
position of the Indemnified Person.  It is understood, however, that in the situation in which an
Indemnified Person is entitled to retain separate counsel pursuant to the preceding sentence, the
Company shall, in connection with any one such claim, action, proceeding, investigation or separate
but substantially similar or related claims, actions, proceedings or investigations in the same
jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable
fees and expenses of only one separate firm of attorneys at any time for all such Indemnified
Persons, which firm shall be designated in writing by Evercore.  The Company shall not be liable for
any settlement or compromise of any claim, action, proceeding or investigation (or for any related

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 3

losses, claims, damages, liabilities or expenses) if such settlement or compromise is effected without the Company's prior written consent (which will not be unreasonably withheld).

The Company agrees that, without Evercore's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution is reasonably likely to be sought hereunder (whether or not Evercore or any other Indemnified Person is an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release from the settling, compromising or consenting party of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation.

No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York.

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 4


   This Agreement shall remain in effect indefinitely, notwithstanding any termination of Evercore's engagement.

                              Very truly yours,

                              EVERCORE GROUP L.L.C.


                              By: _____
                                  [Name] William O. Hiltz
                                  [Title] Senior Managing Director


Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By: _____
    [Name] Walter G. Borst
    [Title] Treasurer

December 23, 2008

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Adil:

This letter (this "Amendment") amends that certain engagement letter entered into between Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company") dated September 5, 2008 (the "Agreement"), regarding the retention of Evercore by the Company as a financial advisor for the purposes set forth therein.

Unless otherwise noted, all defined terms set forth in this Amendment shall have the same meaning as set forth in the Agreement. The Agreement shall continue in full force and effect in accordance with the provisions thereof, except that, effective as of the date hereof, the following sections of the Agreement are amended as follows:

 1.  The second full paragraph on page 1 of the Agreement is deleted in its entirety and replaced with the following:

> "Under the terms of this Agreement, Evercore will provide financial advisory services to the Company in connection with its strategic planning process, capital markets activities, and evaluation of strategic and financial alternatives, including the possibility of a debt exchange, reorganization, merger, sale or other significant transaction. Evercore will provide financial advisory services as customarily may be required in connection with engagements of this type. In rendering its services to the Company hereunder, Evercore is not assuming any responsibility for the Company's underlying business decision to pursue or not to pursue any business strategy or to effect or not to effect any Restructuring or Other Transaction (both as defined below). Evercore shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall Evercore be responsible for providing any tax, legal or other specialist advice."

 2.  The third full paragraph on page 1 of the Agreement is deleted in its entirety and replaced with the following:

> "As compensation for the services rendered by Evercore hereunder, the Company agrees to pay Evercore, upon execution of this Amendment, the following fees in cash as and when set forth below:

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 2

1) Commencing on January 1, 2009, the Company agrees to pay Evercore a monthly retainer fee in the amount of $1,000,000, payable in advance, until termination of this Agreement (the "New Monthly Retainer Fee"). For the avoidance of doubt, the $500,000 monthly retainer payments due to Evercore under the original agreement dated September 5, 2008 (the "Old Monthly Retainer Fee") shall cease upon payment of the December 2008 Old Monthly Retainer Fee. The New Monthly Retainer Fees would be creditable against any Restructuring Fee as determined solely by the Company after consultation with Evercore, but in no case shall the amount creditable be greater than $4,000,000.; and

2) A restructuring fee (a "Restructuring Fee"), payable upon the consummation of any Restructuring (as defined below) according to the following schedule:

   a) 0.15% of the face value of Existing Obligations (as defined below) restructured for amounts up to $10,000,000,000;

   b) 0.10% of the face value of Existing Obligations restructured for amounts from $10,000,000,000 up to $20,000,000; and

   c) An additional $5,000,000 for any amount of the face value of Existing Obligations restructured above $20,000,000.

As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization and/or recapitalization including without limitation, cancellation, forgiveness, satisfaction, retirement, purchase and/or a material modification or amendment to the terms of the Company's outstanding indebtedness (including bank debt, bond debt, preferred stock, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, unfunded pension liabilities, lease obligations, partnership interests and other liabilities (collectively, the "Existing Obligations") including pursuant to a sale, repurchase or an exchange transaction, a plan, or a solicitation of consents, waivers, acceptances or authorizations. For the avoidance of doubt, the term "Existing Obligations" shall exclude any amounts relating to the VEBA that the UAW may agree to restructure.

In the event that the Company undertakes any other significant transaction, such as a reorganization, restructuring, merger, sale of all or part of the equity, business or assets of the Company or other significant corporate transaction (an "Other Transaction"), the Company agrees that it will pay to Evercore a reasonable and customary Transaction fee, with the exact amount to be mutually agreed. Evercore understands that the Company is likely to work with more than one financial advisor in connection with an Other Transaction, with Evercore to receive not less than half of the total financial advisory fees paid by the Company in connection with such Other Transaction. The company also agrees to reimburse Evercore for its reasonable and customary expenses (including legal and other professional fees, expenses and disbursements) incurred in connection with its engagement."

DEC 23 2008 17:36  FR ASST TREASURER    212 659 3695 TO 912482874595        P.03/04

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 3

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

*[signature page follows]*

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 4


Very truly yours,

EVERCORE GROUP L.L.C.

By:

William Repko
Senior Managing Director


Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By:

Adil Mistry
Assistant Treasurer

# EVERCORE GROUP L.L.C.

April 28, 2009

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Adil:

This letter (the "Second Amendment") amends the engagement letter entered into between
Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company") dated
September 5, 2008 (the "Agreement") and the letter amendment dated December 23, 2009 to the
Agreement (the "Amendment"), regarding the retention of Evercore by the Company as a financial
advisor for the purposes set forth therein.

Because of the substantial work performed by Evercore in pursuit of a Transaction (as defined in
the Agreement), including the evaluation and analysis of the Company's alternatives for financial
restructuring and debt reduction, assistance in drafting the exchange offer prospectus, providing
tactical advice in the structure of the exchange offer, providing extensive support with respect to
submissions to the U.S. Treasury and assistance in due diligence performed by the U.S. Treasury and
their advisors, assistance in negotiations with and due diligence performed by lenders and their
advisors, assistance in due diligence performed by the UAW and its advisors, the evaluation of
strategic alternatives for the Company and preparation for a potential bankruptcy filing, we have
agreed that certain modifications to the compensation payable to Evercore are appropriate at this
time.

Unless otherwise noted, all defined terms set forth in this Second Amendment shall have the same
meaning as set forth in the Agreement. The Agreement shall continue in full force and effect in
accordance with the provisions thereof, as previously amended by the Amendment, except that,
effective as of the date hereof, the Agreement (as amended) is amended as follows:

GM agrees to pay Evercore two non-refundable cash fees as follows: (a) $5,000,000 on April 29,
2009; and (b) $5,000,000 upon the filing with the Securities and Exchange Commission of the first
amendment to the Registration Statement with respect to the pending exchange offers or May 11,
2009, whichever occurs first. Such fees shall each be deemed an advance, and shall each be fully
creditable, against any Restructuring Fee payable pursuant to the Agreement, as amended. For the
avoidance of doubt, New Monthly Retainer Fees shall also be credited against any Restructuring Fee
as contemplated by and subject to the cap included in the Amendment.

      In no event shall the Company be required to pay more than $30,000,000 in the
aggregate for Restructuring Fees (such maximum amount shall be prior to any and all
amounts offset against Restructuring Fees pursuant to this Agreement, as amended,

including the non-refundable cash fees set forth above and any creditable New Monthly Retainer Fees).

The paragraphs on page 2 of the Amendment (which addressed the definition of "Restructuring" and the compensation payable to Evercore if an "Other Transaction" is consummated) are deleted in their entirety and replaced with the following:

> "As used in this Agreement, the term "Restructuring" shall mean, collectively, (a) any restructuring, reorganization and/or recapitalization that involves cancellation, forgiveness, satisfaction, retirement and/or purchase of the Company's outstanding indebtedness (including bank debt, bond debt, preferred stock, and other on and off balance sheet indebtedness), leases (both on and off balance sheet), unfunded pension liabilities including pursuant to a sale, repurchase or an exchange transaction (collectively, the "Existing Obligations") or (b) any merger, consolidation or other such sale of the Company or the sale of all or substantially all of its assets. The Company also agrees to reimburse Evercore for its reasonable and customary out-of-pocket expenses (including legal and other professional fees, expenses and disbursements) incurred in connection with its engagement."

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

*[signature page follows]*

Very truly yours,

EVERCORE GROUP L.L.C.

By:

William Repko
Senior Managing Director

Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By:

Adil Mistry
Assistant Treasurer

May 29, 2009

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Gentlemen:

This amended and restated engagement letter (this "Agreement"), executed as of the date above, is to formalize the arrangement between Evercore Group L.L.C. ("Evercore") and General Motors Corporation (together with any direct or indirect subsidiaries, the "Company") regarding the retention of Evercore by the Company as a financial advisor for the purposes set forth herein.

This Agreement amends and restates the engagement letter dated September 5, 2008 between the parties, as amended (the "Original Engagement Letter"); provided, however, the Company's obligations to indemnify Evercore pursuant to the Indemnification Agreement, between the parties effective as of September 5, 2008 (the "Indemnification Agreement"), shall remain unaltered.

Pursuant to the Second Amendment, dated as of April 28, 2009, to the Original Engagement Letter and in connection with the services provided by Evercore, the Company (x) agreed to pay and paid to Evercore a portion of the Restructuring Fee (as defined below) equal to $5 million on April 29, 2009 and (y) agreed to pay and paid to Evercore another $5 million portion of the Restructuring Fee on May 14, 2009 (such fees, the "Forward Restructuring Fees").

Pursuant to the Original Engagement Letter and in connection with the services provided by Evercore, the Company agreed to pay and has paid to Evercore monthly retainer fees (such fees, the "Advisory Fees").

**<u>Assignment Scope:</u>**

The Company hereby retains Evercore as its financial advisor to provide the Company with general investment banking advice and to advise it in connection with any Restructuring, Financing and/or Sale transactions (each defined below) on the terms and conditions set forth herein.

As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization and/or recapitalization (including, but not limited to, a Restructuring pursuant to 11 U.S.C. §101 *et seq.*, as from time to time amended, and any other current or future federal statute or regulation that may be applicable to a Restructuring of the Company (11 U.S.C. §101 *et seq.* and those other statutes and regulations are referred to herein generically as the "Bankruptcy Code")) that involves cancellation, forgiveness, satisfaction, retirement and/or purchase of the Company's outstanding indebtedness (including bank debt, bond debt, preferred

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 2

stock, and other on and off balance sheet indebtedness), leases (both on and off balance sheet) and unfunded pension liabilities (collectively, the "Existing Obligations") or (b) any merger, consolidation, or other such sale of the Company or the sale of all or substantially all of its assets. For the avoidance of doubt, the term "Existing Obligations" shall exclude any amounts relating to the VEBA that the UAW may agree to restructure.

**Description of Services:**

1.  Evercore agrees, in consideration of the compensation provided in Section 2 below, to perform the following services, to the extent it deems such services necessary, appropriate and feasible:

    a.  Reviewing and analyzing the Company's business, operations and financial projections;

    b.  Advising and assisting the Company in a Restructuring, Financing and/or Sale transaction, if the Company determines to undertake such a transaction;

    c.  Providing financial advice in developing and implementing a Restructuring, which would include:

        i.  Assisting the Company in developing a restructuring plan or plan of reorganization, including a plan of reorganization pursuant to the Bankruptcy Code (any such plans are referred to generically herein as the "Plan");

        ii.  Advising the Company on tactics and strategies for negotiating with various stakeholders regarding the Plan;

        iii.  Providing testimony, as necessary, with respect to matters on which Evercore has been engaged to advise the Company in any proceedings under the Bankruptcy Code that are pending before a court (generically referred to herein as the "Bankruptcy Court") exercising jurisdiction over the Company as a debtor; and,

        iv.  Providing the Company with other financial restructuring advice as Evercore and the Company may deem appropriate.

    d.  If the Company pursues a Financing, assisting the Company in:

        i.  Structuring and effecting a Financing;

        ii.  Identifying potential Investors (as defined below) and, at the Company's request, contacting such Investors; and,

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 3

    iii.  Working with the Company in negotiating with potential Investors.

As used in this agreement, the term "Financing" shall mean a private issuance, sale or placement of newly issued or treasury equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors or security holders (each such lender or investor, an "Investor"), including any "debtor-in-possession financing" or "exit financing" in connection with a case under the Bankruptcy Code or a rights offering or any loan or other financing or obligation, except to the extent issued to existing Investors of the Company in exchange for their existing securities.

It is understood that nothing contained herein shall constitute an express or implied commitment by Evercore to act in any capacity or to underwrite, place or purchase any financing or securities, which commitment, if any, shall be set forth in a separate underwriting placement or other appropriate agreement relating to a Financing.

  e.  If the Company pursues a Sale, assisting the Company in:

    i.  Structuring and effecting a Sale;

    ii.  Identifying interested parties and/or potential acquirors and, at the Company's request, contacting such interested parties and/or potential acquirors; and

    iii.  Advising the Company in connection with negotiations with potential interested parties and/or acquirors and aiding in the consummation of a Sale transaction.

As used in this agreement, the term "Sale" shall mean, whether or not in one transaction, or a series of related transactions, (a) the disposition to one or more third parties whether or not pursuant to the Bankruptcy Code of all or a portion of the issued and outstanding equity securities or any other issued and outstanding securities of the Company by the existing security holders of the Company; or (b) an acquisition, merger, consolidation, or other business combination, including a sale pursuant to the Bankruptcy Code, of which all or a portion of the business, assets or existing equity or securities of the Company are, directly or indirectly, sold or transferred to, or combined with, another company (other than an ordinary course intra-company transaction or ordinary course sales of inventory); or (c) an acquisition, merger, consolidation, sale, including a sale pursuant to the Bankruptcy Code, or other business combination pursuant to a successful "credit bid" of any securities by existing securities holders; or (d) the formation of a joint venture, partnership or similar entity, or any similar sale transaction.

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 4

    f. Rendering an opinion (a "Fairness Opinion") to the Board of Directors of the Company as to the fairness, from a financial point of view, of the consideration to be paid or received by the Company in connection with a Master Sale and Purchase Agreement (the "MSPA") with Auto Acquisition LLC ("NewCo") and the other parties named therein, which will provide for a sale of the Purchased Assets (the "Purchased Assets"), as defined in the MSPA, pursuant to authorization that will be sought under section 363 of the Bankruptcy Code (11 U.S.C. §101, et seq.) (the "NewCo Transaction"). It is understood that the Opinion shall be in such form and with such assumptions and qualifications as determined appropriate by Evercore. It is further understood that Evercore will express no view, and assume no liability, as to the future distribution of the purchase price to holders of any securities of the Company or to any creditor or interest holder of the Company or to any class of creditors or interest holders of the Company; nor will Evercore evaluate or express any opinion as to the recovery that might be available to the holders of any securities of the Company or to any creditor or interest holder of the Company or to any class of creditors or interest holders of the Company in a bankruptcy proceeding or other restructuring, whether or not the Company proceeds with the NewCo Transaction. In rendering its services to the Company hereunder, Evercore is not assuming any responsibility for the Company's underlying business decision to pursue or not to pursue any business strategy or to effect or not to effect any Restructuring, Financing, and/or Sale or other transaction.

Evercore shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services to the Company, and shall have no responsibility for design or implementation of operating, organizational, administrative, cash management or liquidity improvements; nor shall Evercore be responsible for providing any tax, legal or other specialist advice. The Company confirms that it will rely on its own counsel, accountants and similar expert advisors for legal, accounting, tax and other similar advice.

**Fees:**

2. As compensation for the services rendered by Evercore hereunder, the Company agrees to pay Evercore the following fees in cash as and when set forth below:

    a. A monthly fee of $400,000 (a "Monthly Fee"), payable on the 1st day of each month of our engagement hereunder, for a period of 24 months, commencing June 1, 2009 through (and including) May 1, 2011 and then decreasing to $250,000 per month thereafter until the earlier of effectiveness of a Plan or termination pursuant to Section 5.

    b. A fee (a "Fairness Opinion Fee") in an amount of $6 million, payable in cash on May 29, 2009. 50% of the Fairness Opinion Fee (the "Opinion Fee Credit") shall be creditable against the NewCo Transaction Fee (as defined below).

    c. Restructuring and Sale Fees:

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 5

    i.    A fee (a "Restructuring Fee") equal to $30,000,000 payable upon the consummation of any Restructuring (as defined above). The full amount of the Forward Restructuring Fees (the "Forward Restructuring Fee Credit") shall be creditable (without duplication) against the Restructuring Fee on a dollar-for-dollar basis. $4,000,000 of the Advisory Fees (the "Advisory Fee Credit") shall be creditable (without duplication) against the Restructuring Fee on a dollar-for-dollar basis. The Financing Fee Credit (as defined below) shall be creditable against the Restructuring Fee (without duplication) on a dollar-for-dollar basis.

    ii.    A fee (a "Sale Fee"), payable upon consummation of any Sale (other than described in clause (d)(i) below), equal to the product of (a) the Aggregate Consideration (as defined below) of a Sale as set forth in Annex 1 and (b) applicable percentage, as set forth in Annex 1. The table attached as Annex 1 represents the applicable percentage as a fee for Aggregate Consideration received in connection with the Sale (for the avoidance of doubt, Aggregate Consideration of $5 billion would equate to a Sale Fee of $17.5 million (before taking into account any applicable credits).

        As used in this Agreement, the term "Aggregate Consideration" shall mean the total fair market value (determined at the time of the closing of a Sale by the Company and Evercore in good faith) of all consideration paid or payable to, or received by, directly or indirectly, the Company, its Bankruptcy estate, its creditors and/or the security holders of the Company in connection with a Sale including all (i) cash, securities (equity or otherwise) and other property, (ii) Company indebtedness assumed, satisfied, or paid by a purchaser (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company and (iii) amounts placed in escrow and deferred, contingent and installment payments.

    iii.    50% of any Sale Fee (a "Sale Fee Credit") shall be creditable against any Restructuring Fee; provided, such Sale Fee credit shall be creditable only after the credit of the Forward Restructuring Fee Credit and the Advisory Fee Credit against the Restructuring Fee.

d.    A fee (the "NewCo Transaction Fee") equal to $30,000,000, payable upon consummation of the NewCo Transaction. The Forward Restructuring Fee Credit, the Advisory Fee Credit and the Opinion Fee Credit shall be creditable, in each case on a dollar-for-dollar basis, against the NewCo Transaction Fee. The NewCo Transaction Fee shall be payable upon closing of the transaction proposed by the Company as the NewCo Transaction, regardless of whether the buyer approved by the bankruptcy court shall be NewCo or another bidder that has made a higher or otherwise better offer.

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 6

e.  A fee or fees (collectively, a "Financing Fee"), payable upon consummation of any
    Financing and incremental to any Restructuring Fee or Sale Fee as follows:

    i.   A fee in the amount of $2,500,000 for assisting the Company in the structuring
         and implementation of debtor-in-possession ("DIP") Financing under the
         Bankruptcy Code (the "DIP Structuring Fee").

    ii.  For any Financing other than a DIP Financing provided by the United States
         Government (the "Other Financing" and the corresponding fee, the "Other
         Financing Fee"), a 3% fee of the gross proceeds provided by such financing.

    iii. For the avoidance of doubt, no Financing Fee (other than the DIP Structuring Fee)
         shall be payable in connection with the NewCo Transaction.

    50% of any Financing Fee, but excluding any DIP Structuring Fee, (the "Financing Fee
    Credit") shall be credited (without duplication) on a dollar-for-dollar basis against the
    Restructuring Fee.

f.  In addition to any fees that may be payable to Evercore and, regardless of whether any
    transaction occurs, the Company shall promptly reimburse to Evercore (a) all reasonable
    out-of-pocket expenses (including reasonable travel and lodging, data processing and
    communications charges, courier services and other appropriate expenditures) and (b)
    reasonable fees and expenses of legal counsel, if any, in each case incurred by Evercore
    in connection with the services provided hereunder. Notwithstanding the foregoing, the
    Company's reimbursement of all reasonable fees and expenses of legal counsel shall be
    subject to the Company's Legal Staff Disbursement Guidelines. Evercore agrees to
    provide, in a timely manner, such detailed documentation of expenses as may be
    reasonably requested by the Company. The Company has previously advanced $100,000
    for the expenses and fees of legal counsel to Evercore.

g.  A fee ( the "Delphi Fee") in the amount of $2 million for advisory services relating to
    Delphi Corporation ("Delphi"), payable upon (i) consummation of any plan of
    reorganization of Delphi Corporation or (ii) the sale or other transfer of all or
    substantially all of the assets or business of Delphi in a single transaction or series of
    related transactions. For avoidance of doubt, the Delphi Fee is not creditable against any
    fee.

h.  If Evercore provides services to the Company for which a fee is not provided herein, such
    services shall, except insofar as they are the subject of a separate agreement, be treated as
    falling within the scope of this Agreement, and the Company and Evercore will agree
    upon a fee for such services based upon good faith negotiations.

i.  Notwithstanding anything to the contrary in this Agreement, Evercore shall not be
    obligated to credit any fee against any other fee earned under this Agreement unless the
    Bankruptcy Court approves this Agreement and allows all fees provided for hereunder in
    their entirety; provided, however, that nothing herein shall permit Evercore to collect:

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 7

       1. in connection with the NewCo Transaction, aggregate fees in excess of the aggregate of the NewCo Transaction Fee, DIP Structuring Fee, Fairness Opinion Fee and Monthly Fees, in each case to the extent earned by Evercore and payable by the Company, if the Bankruptcy Court were to allow all such fees and the full amount of the Advisory Fee Credit, Forward Restructuring Fee Credit and Opinion Fee Credit were applied to such fees; or

       2. in connection with a Restructuring and/or Sale (other than the NewCo Transaction), aggregate fees in excess of the Restructuring Fee, Financing Fee, Sale Fees, Fairness Opinion Fee and Monthly Fees, in each case to the extent earned by Evercore and payable by the Company, if the Bankruptcy Court were to allow all such fees and the full amount of the Advisory Fee Credit, Forward Restructuring Fee Credit, Financing Fee Credit and Sale Fee Credit were applied to such fees.

  j. All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

  k. In addition, the Company and Evercore acknowledge and agree that more than one fee may be payable to Evercore under subparagraphs 2(c), 2(d), 2(e) 2(g) and/or 2(h) hereof in connection with any single transaction or a series of transactions, it being understood and agreed that if more than one fee becomes so payable to Evercore in connection with a series of transactions, each such fee shall be paid to Evercore. Notwithstanding the foregoing, the Company and Evercore acknowledge and agree that Evercore shall only be entitled to either (a) the NewCo Transaction Fee or (b) a Restructuring Fee and/or a Sale Fee, and not both (a) and (b). For the avoidance of doubt, if Evercore is entitled to the NewCo Transaction Fee, Evercore shall not be entitled to any Restructuring Fee or Sale Fee.

**<u>Retention in Bankruptcy Code Proceedings:</u>**

3. In the event of the commencement of Chapter 11 proceedings, the Company agrees that it will use best efforts to obtain prompt authorization from the Bankruptcy Court to retain Evercore on the terms and conditions set forth in this Agreement under the provisions of 11 U.S.C. §§ 327 and 328 subject to the standard of review provided in Section 328(a), and not subject to the standard of review under 11 U.S.C. § 330 or any other standard of review. Subject to being so retained, Evercore agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and orders of the Bankruptcy Court. The Company shall supply Evercore with a draft of the application and proposed retention order authorizing Evercore's retention sufficiently in advance of the filing of such application and proposed order to enable Evercore and its counsel to review and comment thereon. Evercore shall be under no obligation to provide any services under this agreement in the event that the

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 8

Company becomes a debtor under the Bankruptcy Code unless Evercore's retention under
the terms of this Agreement is approved under Section 328(a) by final order of the
Bankruptcy Court, not subject to appeal, which order is acceptable to Evercore. In so
agreeing to seek Evercore's retention under Section 328(a), the Company acknowledges that
it believes that Evercore's general restructuring experience and expertise, its knowledge of
the capital markets and its merger and acquisition capabilities will inure to the benefit of the
Company in pursuing any Restructuring, Sale and/or Financing, that the value to the
Company of Evercore's services hereunder derives in substantial part from that expertise and
experience and that, accordingly, the structure and amount of the contingent fees are
reasonable under the standard set forth in Section 328(a), regardless of the number of hours
to be expended by Evercore's professionals in the performance of the services to be provided
hereunder.  No fee payable to any other person, by the Company or any other party, shall
reduce or otherwise affect any fee payable hereunder to Evercore.

**Other:**

4.  Evercore's engagement hereunder is premised on the assumption that the Company will
    make available or cause to make available to Evercore all information and data that Evercore
    reasonably deems appropriate in connection with its activities (the "Information") on the
    Company's behalf and will not omit or withhold any material information unless required by
    applicable law.  The Company will use its reasonable best efforts to ensure that any
    Information heretofore and hereafter furnished to Evercore is and will be true and correct in
    all material respects and does not and will not omit any material fact required to make
    Information not misleading. The Company will use its reasonable best efforts to notify
    Evercore promptly of any material change or correction in Information regarding the
    business or financial condition of the Company that it has provided to Evercore when it
    becomes aware of such material change or of an error necessitating such correction.  The
    Company recognizes and consents to the fact that (a) Evercore will use and primarily rely on
    the Information and information available from generally recognized public sources in
    performing services contemplated by this Agreement without have independent verification
    of same and (b) Evercore does not assume responsibility for the accuracy and completeness
    of the Information or any such information. It is also understood that the Fairness Opinion
    may state that Evercore has not verified and can rely on any such information described in
    Section 4, including the Liquidation Analysis prepared by Alix Partners.

5.  Evercore's engagement hereunder may be terminated by the Company or Evercore at any
    time without liability or continuing obligation to the Company or Evercore, except that
    following such termination of this Agreement, (a) Evercore shall remain entitled to any fees
    accrued and payable pursuant to Section 2 but not yet paid prior to such termination or
    expiration, as the case may be, and to reimbursement of expenses incurred prior to such
    termination and (b) in the case of termination by the Company, Evercore shall remain
    entitled to payment of all fees contemplated by Section 2 (subject to the terms and conditions
    therein, including application of any credits) hereof in respect to any Restructuring, Sale

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 9

and/or Financing announced or occurring during the period from the date hereof until 12 months following such termination. Notwithstanding the foregoing, other than the NewCo Transaction, nothing in this Agreement shall preclude the Company from engaging another firm to advise the Company regarding any Sale, and in such case, Evercore shall not be entitled to a Sale Fee in connection with such transaction. Upon the consummation of the NewCo Transaction, Evercore's engagement shall be terminated.

6.  Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth in accordance with the Indemnification Agreement , the Indemnified Persons (as defined in the Indemnification Agreement), any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Evercore hereunder. The Company acknowledges that Evercore is not acting as an agent of the Company or in a fiduciary capacity with respect to the Company and that Evercore is not assuming any duties or obligations other than those expressly set forth in this Agreement. Nothing contained herein shall be construed as creating, or be deemed to create, the relationship of employer and/or employee between the parties, nor any agency, joint venture or partnership. Evercore shall at all times be and be deemed to be an independent contractor. Nothing herein is intended to create or shall be construed as creating a fiduciary relationship between Evercore and the Company or its Board of Directors. No party to this Agreement nor its employees or agents shall have any authority to act for or to bind the other party in any way or to sign the name of the other party or to represent that that the other party is in any way responsible for the acts or omissions of such party.

7.  As part of the compensation payable to Evercore hereunder, the Company agrees to indemnify Evercore and certain related persons in accordance with the Indemnification Agreement. Such indemnification provisions are an integral part of this Agreement, and the terms thereof are incorporated by reference herein. Such indemnification provisions shall survive any termination or completion of Evercore's engagement hereunder.

8.  The Company agrees that it is solely responsible for any decision regarding a transaction, regardless of the advice provided by Evercore with respect to such a transaction. The Company acknowledges that the Company's appointment of Evercore pursuant to this Agreement is not intended to achieve or guarantee the closing of a transaction and that Evercore is not in a position to guarantee the achievement or closing of a transaction.

9.  The Company recognizes that Evercore has been engaged only by the Company and that the Company's engagement of Evercore is not deemed to be on behalf of and is not intended to confer rights on any shareholder, partner or other owner of the Company, any creditor, lender or any other person not a party hereto or any of its affiliates or their respective directors, officers, members, agents, employees or representatives. Unless otherwise expressly agreed, no one, other than senior management or the Board of Directors of the Company, is

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 10

authorized to rely upon the Company's engagement of Evercore or any statements, advice, opinions or conduct by Evercore. Without limiting the foregoing, any advice, written or oral, rendered to the Company's Board of Directors or senior management in the course of the Company's engagement of Evercore are solely for the purpose of assisting senior management or the Board of Directors of the Company, as the case may be, in evaluating the Restructuring, Sale, Financing or other transaction and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with a transaction. Any advice, written or oral, rendered by Evercore may not be disclosed publicly or made available to third parties without the prior written consent of Evercore; except as may be required pursuant to a subpoena, order, requirement or request of a court of competent jurisdiction or by a judicial or administrative or legislative body or committee (including disclosure obligations of the Company under applicable securities laws); provided that, the Company shall have promptly notified Evercore of the receipt or existence of any such subpoena, order, requirement or request. Notwithstanding the foregoing, the terms of this letter agreement may be disclosed (a) in any proceeding filed by or against it under title 11 of the Code or (b) to the United States Department of the Treasury.

10. In order to coordinate Evercore's efforts on behalf of the Company during the period of Evercore's engagement hereunder, the Company will promptly inform Evercore of any discussions, negotiations, or inquiries regarding a potential transaction, including any such discussions or inquiries that have occurred during the six month period prior to the date of this Agreement.

11. This Agreement (including the Indemnification Agreement) between Evercore and the Company, embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect this Agreement in any other respect, which will remain in full force and effect. This Agreement may not be amended or modified except in writing signed by each of the parties.

12. In the event that, as a result of or in connection with Evercore's engagement for the Company, Evercore becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Evercore for the reasonable fees and expenses of its counsel incurred in responding to such a request, subject to the Company's Legal Staff Disbursement Guidelines. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the Indemnification Agreement.

13. The Company agrees that Evercore shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 11

hereunder; provided, however, Evercore shall have obtained the Company's written consent prior to the placement or publication of any such advertisement.

14. The Company acknowledges that Evercore's affiliates engage in the private equity business, asset management business and related activities (collectively, "Non-Broker Dealer Businesses"). Subject to the maintenance of an appropriate "wall" between those persons working on transactional matters related to this Agreement and those persons connected with the Non-Broker Dealer Businesses, and any other appropriate precautions, in the ordinary course of Evercore's Non-Broker Dealer Businesses, Evercore's affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities or senior loans of the Company or any other company that may be involved in a transaction with the Company.

15. The Company agrees to provide and procure all corporate, financial and other information regarding the Company and control persons, as Evercore may require to satisfy its obligations as a U.S. financial institution under the USA PATRIOT Act.

16. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

17. Except as provided herein, the parties hereby irrevocably consent to the exclusive jurisdiction of any New York State or United States federal court sitting in the Borough of Manhattan of the City of New York over any action or proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard in such New York State or federal court. The parties irrevocably agree to waive all rights to trial by jury in any such action or proceeding and irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to each party at its address set forth above. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). The parties further waive any objection to venue in the State of New York and any objection to any action or proceeding in such state on the basis of forum non conveniens.

*[Signature page to follow]*

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 12

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

Very truly yours,

Evercore Group L.L.C.

By: _____
William C. Repko
Senior Managing Director

Agreed to and Accepted as of the Date
May 29, 2009:

General Motors Corporation

By: _____
Adil Mistry
Assistant Treasurer

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 13

Annex 1
Asset Sale Fee Schedule

Asset Sale Fee Schedule representing the applicable percentage(s) as a fee for Aggregate
Consideration received in connection with a Sale:

$30 billion and above - 0.12%
$25 billion - 0.14%
$20 billion - 0.17%
$15 billion - 0.20%
$12.5 billion - 0.23%
$10 billion - 0.25%
$7.5 billion - 0.30%
$5 billion - 0.35%
$3 billion - 0.45%
$2.5 billion - 0.50%
$1.6 billion - 0.60%
$800 million - 0.80%
$500 million - 0.90%
$250 million - 1.40%

If the amount of Aggregate Consideration obtained in a Sale falls between any two of the dollar
amounts listed above, then the applicable percentage shall be interpolated on a straight-line basis
between such two dollar amounts.

**Exhibit C**

**Trading Prices of GM's Common Stock**



Source: Factset

**Exhibit D**

**Trading Prices of GM's Long-Term Unsecured Bonds
and Credit Default Swaps**



Source: Factset



Source: AdvantageData