Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                    :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.**, *et al.*, | : | **09-_____ (___)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

### MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 363(b), 503(b), AND 105(a) AND FED. R. BANKR. P. 6003 AND 6004 (I) AUTHORIZING DEBTORS TO (a) CONTINUE THEIR LIABILITY, PRODUCT, PROPERTY, AND OTHER INSURANCE PROGRAMS AND (b) PAY ALL OBLIGATIONS IN RESPECT THEREOF, AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

### Background

1.       On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

2.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.    For over one hundred years, GM, together with its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the "Company"), has been a major component of the U.S. manufacturing and industrial base, as well as the market leader in the automotive industry. The Company's brands have been the standard bearer in the development of the American automotive industry, having produced some of the most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado. Over many years, the Company has supplied one in five vehicles sold in the United States. It is the largest original equipment manufacturer ("OEM") in the country and the second largest in the world. General Motors' highly-skilled engineering and development personnel also designed and manufactured the first lunar roving vehicle driven on the moon. Today, the Company continues as a leading global technology innovator. Currently, it is setting the automotive industry standard for "green" manufacturing methods.

4.    William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple brands. General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac. Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.       Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including: Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling. The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world. The recent severe economic downturn has had an unprecedented impact on the global automotive industry. Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy. It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips. Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.       GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

7.       The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support.  Each geographic region has its own management team, subject to oversight by the Company.  Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

8.       As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of the employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

9.       As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

10.       In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and
volatile fuel prices.

11.    This economic turmoil resulted in significant financial stress on the
automotive industry.  In the last quarter of 2008, new vehicle sales in the United States
plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell
precipitously, thereby draining liquidity that, one year prior, had been considered adequate to
fund operations.  As a result of the impending liquidity crisis, the Company was compelled to
seek financial assistance, on a secured basis, from the federal government in order to sustain the
Company's operations and avoid the potential for systemic failure throughout the domestic
automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential
shutdown of numerous ancillary businesses.

12.    The federal government recognized the potentially devastating negative
effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the United States
Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury
Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant
to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's
domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also
guaranteed each of the other guarantors' obligations that were entered into concurrently with the
U.S. Treasury Facility.  The U.S. Treasury Facility is secured by a first priority lien on and
security interest in substantially all the assets of GM and each of the guarantors that were
previously unencumbered, as well as a junior priority lien on encumbered assets, subject to
certain exceptions.  The U.S. Treasury Facility is also collaterally secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain

exceptions.

13.     The U.S. Treasury Facility required that the Company develop a plan to

transform GM and demonstrate future viability.  On February 17, 2009, in order to address this

condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the

automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the

"Presidential Task Force").

### The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term

Viability Plan did not meet the federal government's criteria to establish GM's future viability

and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President

outlined a series of actions that GM would have to undertake to receive additional federal

assistance.  In conjunction with this announcement, in the interests of the Company's receiving

further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June

1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since

2003, was appointed as Chairman of the Board, and it also was announced that a majority of the

Board would be replaced over the next few months because it "will take new vision and new

direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the

American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.     President Obama also stated that the U.S. Treasury would extend to the

Company adequate working capital for a period of sixty days while it worked with the Company

to develop, propose, and implement a more aggressive viability plan that would include a

"credible model for how not only to survive, but to succeed in th[e] competitive global market."

*Id.*  The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists.  We're not talking about that.  And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.     The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should consider undertaking a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the Company to implement the sale and to support the new enterprise, it requires that the sale of assets occurs promptly to preserve value and avoid the devastating damage the industry would suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability.  The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM.  New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.    As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

### The Exchange Offer

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

### The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction.  These negotiations culminated in the proposed Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser

sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA").  The 363 Transaction, as

embodied in the MPA, contemplates that substantially all of GM's assets, including the capital

stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation

to New GM and preserve both the viability of the GM enterprise and the U.S. automotive

industry.  The assets excluded from the sale will be administered in the chapter 11 cases for the

benefit of the stakeholders in the chapter 11 cases.  From and after the closing, the Purchaser or

one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with

services reasonably required by the Sellers and such subsidiaries to wind down or otherwise

dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363

Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the

ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously

consummate the 363 Transaction and establish New GM as an economically viable OEM,

serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical

element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive

industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the

industry that would occur if New GM is unable to immediately commence bankruptcy-free

operations.

26.    Notably, both the Government of Canada and the Government of Ontario,

through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to

participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability

of GM's North American enterprise.

27.      The gravity of the circumstances cannot be overstated.  The need for speed

in approving and consummating the 363 Transaction is crucial.  The business and assets to be

transferred are extremely sensitive and will be subject to major value erosion unless they are

quickly sold and transferred to New GM.  Any delay will result in significant irretrievable

revenue perishability to the detriment of all interests and will exacerbate consumer resistance to

readily accept General Motors products.  Expeditiously restoring and maintaining consumer

confidence is a prerequisite to the successful transformation and future success of New GM.

28.      The expedited approval and execution of the 363 Transaction is the

foundation of the U.S. Government's objective "to create the GM of the future," and to preserve

and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure

that the cars of the future are built where they've always been built – in Detroit and across the

Midwest – to make America's auto industry in the 21st century what it was in the 20th century –

unsurpassed around the world."  *Presidential Remarks* at 7.

### Jurisdiction

29.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

30.      In connection with the operation of their businesses, the Debtors maintain

various Insurance Programs (as defined below) through hundreds of insurance carriers (the

"Insurance Carriers").  Annexed hereto as Exhibit A is a list of each of the Insurance Programs,

identifying, among other things, the type of coverage, the limits and deductibles under the

policies, the expiration date, the insurance broker, and the aggregate annual premiums due
thereunder.[2]

31.     By this Motion, the Debtors request entry of an order pursuant to sections
363(b), 503(b), and 105(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i)
authorizing the Debtors to continue their Insurance Programs on an uninterrupted basis in
accordance with the same practices and procedures as were in effect prior to the Commencement
Date and (ii) authorizing the Debtors to pay in their sole discretion, all undisputed premiums,
deductibles, self-insured retention amounts, administrative fees, broker fees, and other
obligations relating to the Insurance Programs, as applicable, that were or are due and payable, or
related to the period before or after the Commencement Date (the "Insurance Obligations").

32.     In furtherance of the foregoing, the Debtors request that the Court
authorize and direct the banks and other financial institutions at which the Debtors maintain
disbursement accounts, including, but not limited to, those listed on Exhibit C annexed hereto
(the "Banks") to receive, honor, process, and pay, to the extent of funds on deposit, any and all
checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to
the Insurance Programs or the Insurance Obligations.

### Insurance Programs

33.     The Debtors maintain various property, casualty, and management liability
related insurance programs, which provide the Debtors with insurance coverage for liabilities
relating to, among other things, general commercial claims, property damage, automobile

---

[2] In addition to the Insurance Programs listed on Exhibit A, the Debtors maintain numerous other insurance policies
and programs with respect to employee benefits, including workers' compensation, health, dental, disability, and life
insurance.  These programs and policies are addressed in a separate motion filed contemporaneously herewith
pertaining to the Debtors' employee wage and benefit programs.

damage, general foreign liability, directors' and officers' liability, fiduciary liability, crime,

employers' liability, excess umbrella, and various other product and property related and general

liabilities (collectively, the "Insurance Programs").  Continuation of these policies is essential to

the operation of the Debtors' businesses.

34.    The Debtors are required to pay premiums under the Insurance Programs

based upon fixed rates established by the applicable Insurance Carrier.  The annual premiums for

these policies aggregate approximately $209 million.  In most instances, the Debtors pay these

premiums directly to the Insurance Carriers at the commencement of the respective policies.  In

addition to annual premiums, pursuant to certain of the Insurance Programs, the Debtors are

required to pay various deductibles and self-insured retention amounts for claims asserted under

the policies.  The amounts of the applicable deductibles are set forth in Exhibit A.  As of the

Commencement Date, the Debtors are not aware of any prepetition claims for which the

deductible has not been paid.  However, out of an abundance of caution, the Debtors are seeking

the Court's authorization to pay any such undisputed obligations, in their discretion, as they

come due.

**Insurance Service Providers**

35.    The Debtors employ various parties (collectively "Insurance Service

Providers") to assist them with the procurement, placement, negotiation of their Insurance

Programs; the investigation and settlement of claims; and other related services, including but

not limited to property inspections and actuarial reviews, on behalf of the Debtors.  Each of the

Insurance Service Providers is paid a fee by the Debtors or a commission by the Insurance

Carriers or a combination of both.  Accordingly, there will be fees and/or commissions due to the

Insurance Service Providers associated with policy renewals, and such fees and commissions

will be paid as part of the premiums associated with such renewals. Annexed hereto as <u>Exhibit B</u> is a list of fees paid to the Insurance Service Providers related to the Insurance Programs. As of the Commencement Date, the Debtors are not aware of any other fees or commissions owed to the Insurance Service Providers. However, out of an abundance of caution, the Debtors are seeking the Court's authorization to pay any such undisputed obligations, in their discretion, as they come due.

<u>**Applicable Authority**</u>

36.    Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur, and the Court, after notice and a hearing, shall allow, as administrative expenses, among other things, "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). In addition, pursuant to section 363(b) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside of the ordinary course of business. *Id.* § 363(b). The Debtors submit that the use of estate funds for payment of undisputed prepetition Insurance Obligations is permitted by sections 503(b)(1) and 363(b) of the Bankruptcy Code as necessary costs of preserving the estate.

37.    Furthermore, to supplement these explicit powers, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* §105(a). A Bankruptcy Court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the

debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98

B.R. at 177).

38.     In a long line of well-established cases, federal courts consistently have

permitted postpetition payment of prepetition obligations where necessary to preserve or enhance

the value of a debtor's estate for the benefit of all creditors.  *See e.g., Miltenberger v. Logansport*

*C. & S.W. Ry. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to

reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v.*

*Mealey*, 147 F.2d 268 (2d Cir. 1945) (extending doctrine for payment of prepetition claims

beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Comp. v.*

*Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving

lower Court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

39.     The "doctrine of necessity" functions in a chapter 11 reorganization as a

mechanism by which the Bankruptcy Court can exercise its equitable power to allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Lehigh &*

*New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that Court may authorize

payment of prepetition claims if such payment was essential to continued operation of debtor); *In*

*re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing existence of judicial

power to authorize trustees to pay claims for goods and services that are indispensably necessary

to debtors' continued operation).  The doctrine is frequently invoked early in a chapter 11 case,

particularly in connection with the payment of prepetition claims.  The Court in *In re*

*Structurelite Plastics Corp.* indicated its accord with "the principle that a bankruptcy court may

exercise its equity powers under section 105(a) to authorize payment of pre-petition claims

where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and

payment of creditors in full or at least proportionately.'"  86 B.R. 922, 931 (Bankr. S.D. Ohio

1988) (quoting *Chateaugay Corp.*, 80 B.R. at 287).  The Court stated that "a *per se* rule

proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the

effectuation of the rehabilitative purposes of the Code."  *Id.* at 932.  The rationale for the

doctrine of necessity rule is consistent with the paramount goal of chapter 11 – "facilitating the

continued operation and rehabilitation of the debtor."  *Ionosphere Clubs*, 98 B.R. at 176.

Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to

grant the relief requested herein.

### Continuing the Insurance Programs and Paying All Undisputed Obligations in Respect Thereof Is Necessary to Preserve the Value of the Debtors' Estates

40.     The nature of the Debtors' businesses and the extent of their operations

make it essential for the Debtors to maintain their Insurance Programs on an uninterrupted basis.

The nonpayment of any premiums, deductibles, or related fees under any of the Insurance

Programs could result in one or more of the Insurance Carriers declining to renew their insurance

policies or refusing to enter into new insurance agreements with the Debtors in the future.  If the

Insurance Programs lapse without renewal, the Debtors could be exposed to substantial liability

for personal and/or property damages to the detriment of all parties in interest.  Moreover, the

Debtors would then be required to obtain replacement policies on an expedited basis at a

significant cost to the estates.

41.     The continuation of the Insurance Programs, on an uninterrupted basis,

and the payment of all undisputed prepetition and postpetition Insurance Obligations relating to

the Insurance Programs are essential to preserve the Debtors' businesses and preserve the value

of the Debtors' estates for all creditors.  In addition, pursuant to the guidelines established by the

Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee Guidelines"), the Debtors are obligated to remain current with respect to their Insurance Programs.  Accordingly, the Debtors are seeking the Court's authorization to continue the Insurance Programs and related programs and policies as the same were in effect as of the date of the commencement of the Debtors' chapter 11 cases and to pay any undisputed prepetition Insurance Obligations as they come due in the ordinary course of business.

42.    To the extent any Insurance Program or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of any programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts on account of the Insurance Obligations shall not affect the Debtors' right to contest the amount or validity of these obligations.

**Applicable Banks Should Be Authorized and Directed to Honor and
Pay Checks Issued and Make Other Transfers to Pay Insurance Obligations**

43.    As a result of the commencement of the Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Banks may dishonor or reject the Debtors' checks and electronic fund transfers with respect to the Insurance Obligations. Therefore, the Debtors request that the Court authorize and direct the Banks listed on Exhibit C, and any other bank the Debtors are authorized to do business with, to process, honor, and pay all prepetition and postpetition checks issued or to be issued, and electronic fund transfers requested

or to be requested, by the Debtors with respect to their Insurance Obligations, to the extent of

funds on deposit.  The Debtors also seek authority to issue new postpetition checks or effect new

electronic fund transfers with respect to the Insurance Obligations to replace any prepetition

checks or electronic fund transfer requests that may be dishonored or rejected.

44.    The Debtors represent that each of these checks or transfers can be readily

identified as relating directly to payments under the Insurance Obligations.  Accordingly, the

Debtors believe that prepetition checks and transfers other than those relating to the Insurance

Programs will not be honored inadvertently.

### The Debtors Have Satisfied Bankruptcy Rule 6003

45.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or

part of a claim that arose before the filing of the petition" prior to twenty days after the

Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business

operations rely heavily on the continuation of the Insurance Programs on an uninterrupted basis,

and payment of all undisputed prepetition Insurance Obligations are essential to preserve the

Debtors' businesses and the value of the Debtors' estates for all stakeholders.  The nature of the

Debtors' businesses and the extent of their operations make it essential for the Debtors to

maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of

any premiums, deductibles, or related fees under any of the Insurance Programs could result in

one or more of the insurance carriers terminating their existing policies, declining to renew their

insurance policies or refusing to enter into new insurance agreements with the Debtors in the

future.  If the Insurance Programs are allowed to lapse without renewal, the Debtors could be

exposed unnecessarily to substantial liability for damages resulting to persons and property of

the Debtors and others, which could cripple the Debtors financially and irreparably impair their

prospects for a successful reorganization.  The Debtors submit that the relief requested herein is

necessary to comply with the U.S. Trustee Guidelines and to avoid immediate and irreparable

harm.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid

immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### **Waiver of Bankruptcy Rules 6004(a) and (h)**

46.    To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### **Notice**

47.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

48.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

| Coverage | Insurer | Renewal | Broker | Limit | Deductible | Premium | Comment |
|---|---|---|---|---|---|---|---|
| **Property Coverages** | | | | | | | |
| *Property*[*]<br>• Incl. Boiler & Machinery<br>• Incl. Electronic Data Processing<br>• Inc. Theft (tangible property) | Various | 3/1 | Marsh | $3.0 billion Combined Property Damage and Business Interruption | $75 million / $150 aggregate | $22,911,306 | Premium net of service fees and taxes. |
| *Crime (Money and Securities)* | Lloyds Lead Various Insurers | 4/1 | Marsh | $150 million & Every Loss | $25 million | $1,443,750 | Premium net of service fees and taxes. |
| *Marine*[*] | Allianz/ Various/ General International Limited ("GIL") | 10/1 | Marsh | $60 million | $250,000 | $8,775,000 | Premium net of service fees and taxes. General International Limited is GM's wholly owned Captive insurance company. |
| *Terrorism Risk & Insurance Act* | GIL | 1/1 | None | $1 billion | None | $2,005,000 | Access to Federal Program. |
| *In Transit Cargo* | Kiln/ Millenium | 10/1 | Glencairn/ Goss | $30 million | None | $4,500,000 | Premium net of service fees and taxes. |
| *Business Travel Accident* | GIL | 1/1 | None | Up to $2.5M depending on coverage | $0 | $350,875 | Primarily covers GM Europe travelers. |
| *International Service Personnel* | AIU | 4/1 | Marsh | $1.3 million PL/ $100,000 PD | $250 PD only | $255,132 | Premium net of service fees and taxes. |
| *Household Goods* | GIL | 1/1 | None | $5.0 million | None | $1,443,000 | Net of taxes. |
| *Auto Physical Damage*[*] | Self Insured | N/A | N/A | N/A | N/A | N/A | None. |
| **Property Premium** | | | | | | **$41,684,063** | |
| **Liability Coverages** | | | | | | | |
| *Non U.S. Liability Program*<br>• General Liability<br>• Auto Liability<br>• Employers Liability | ACE (fronted) | 9/1 | Aon | $2.5 million – Self Insured through Captive | $0 to the Business Units / $25 million to the Corporation in the Global Excess Liability Program | $8,958,696 | Does not include the costs for collateral. |
| *Domestic Liability Program*[*]<br>• General Liability<br>• Auto Liability<br>• Employers Liability<br>• Insured Workers Comp. | AIG (fronted) | 9/1 | Aon | $10 Million evidenced for General Liability, Auto Liability, Employers Liability | $25 million for General Liability, Auto Liability, Employers Liability | $750,453 | Does not include the costs for collateral. |
| *Global Excess Liability Program*[*]<br>• General Liability | Lexington Lead/ Various | 9/1 | Aon | $835 million | $25 million for General Liability, | $16,560,463 | Includes Environmental |

| Coverage | Insurer | Renewal | Broker | Limit | Deductible | Premium | Comment |
|---|---|---|---|---|---|---|---|
| • Auto Liability<br>• Employers Liability<br>• Insured Workers Comp. | Excess Insurers | | | | Auto Liability, Employers Liability, $35 million for Products Liability | | Policies and Federal Excise Taxes. |
| *Executive Risk* | Great American | 4/1/09 to 4/1/12 | Aon | $100 million | None | $396,170 | Confidentiality Required. |
| *Ad Wrap Program* | Various | 5/15 | Aon | Various | Various | $682,262 | Package Program. |
| *Environmental*<br>• *Pollution*<br>• *Underground Storage Tanks/Aboveground Storage Tanks*<br>• *IL Closure*<br>• *MI Corrective Action*<br>• *NJ Closure*<br>• *OH Closure/Post Closure* | AIG/ACE | 4/1 | Aon | $8 million<br><br>$4 million<br><br>$604,945<br>$3,794,191<br>$293,500<br>$15,505,923 | None | $206,396 | Cover is site specific. |
| *Personal Umbrella Liability Insurance* | Chubb | 1/1 | Aon | $10 million / $5 million / $2 million | Various | $2,308,460 | Active Executives, Retired Executives, Non-Employee members of the Board of Directors, Designated Individuals. |
| *Surety* | Travellers, Liberty/SafeCo, GMAC Re:, CNA, ACE, Chubb, Zurich | As Required | Aon | Depends on type of Surety required | $0 | $1,323,294 | Premiums based on 230 bonds in force. |
| *Directors and Officers*<br>• *Coverage A- Individuals*<br>• *Coverage B/C – Corporate* | AIG Lead/ Various Insurers | 12/15 | Aon | $485 million (side A)<br>$140 million (side B/C)<br>Two Year Limit | None for Individual / $25 million for Corporate | $100,743,250 | $21,674,991 CY2007 charges paid in CY2008 not included. |
| *Fiduciary Liability* | AIG Lead/ Various Insurers | 12/15 | Aon | $250 million | $25 million Securities Related / $7.5 million all other | $33,500,000 | 25% of total D&O costs. |
| *Aircraft Hull & Liability Primary & Excess Aviation Products**[*] | AAU | 9/1 | Aon | $50 million Primary / $1 billion Excess | None | $1,367,507 | Aircraft idled and in storage. |

---

[*]  Self Insured retentions are not included.

| Coverage | Insurer | Renewal | Broker | Limit | Deductible | Premium | Comment |
|---|---|---|---|---|---|---|---|
| **Liability Premium** | | | | | | | **$166,590,555** |
| | | | | | **Total GM Premium** | | **$208,274,618** |
| **Promark Coverages[1]** | | | | | | | |
| *Investment Co. Blanket Bond* | Chubb / AIG | 5/28 | Marsh | $2.5 million (each for Promark and Promark ARS) | None | $25,370 | Two policies: Promark & Promark ARS Fund. |
| *Investment Advisors Errors & Omissions* | Vigilant Insurance (Chubb) / Axis | 5/28 | Marsh | $10 million aggregate (each for Promark and Promark ARS) | $1,000,000 / $250,000 (ARS) | $453,678 | Two policies: Promark & Promark ARS Fund. |
| *ERISA Bonds* | Vigilant Insurance (Chubb) | 5/28 | Marsh | $1 million per plan (each for Promark and Promark ARS) | None | $70,500 | Two policies: Promark & Promark ARS Fund. |
| *Crime Bond* | Federal Insurance (Chubb) | 5/28 | Marsh | $25 million | $1 million | $104,300 | Promark Trust. |
| **Promark Premium** | | | | | | | **$653,848** |

---

[1] Promark is a wholly-owned subsidiary of General Motors Corporation.

**EXHIBIT B**

| Broker & Service Fees Related to Insurance Programs | | | |
|---|---|---|---|
| **Name** | **Service Provided** | **Period** | **Fees** |
| *Marsh* | Broker & Risk Fees | 3/1 to 3/1 | $3,279,250 |
| *Aon* | Broker & Risk Fees | 12/31 to 12/31 | $4,855,665 |
| *Glencairn* | Broker & Risk Fees | 10/1 to 10/1 | $250,000 |
| *Goss* | Broker & Risk Fees | 10/1 to 10/1 | $84,000 |
| *ESIS* | Third Party Administrator – Liability Claims | 1/1/ to 1/1 | $13,163,600 |
| *Zurich* | International Property Fronting | 3/1 to 3/1 | $615,000 |
| *Allianz* | Marine Admin. Fee | 10/1 to 10/1 | $85,800 |
| *HSB* | Boiler Inspection | 3/1 to 3/1 | $143,000 |
| *XL Gaps* | Plant Inspection | 3/1 to 3/1 | $2,371,213 |
| *ACE America Insurance Company* | International Liability Fronting | 9/1 to 9/1 | $1,206,460 |
| *National Union Fire Insurance Company of Pittsburgh (AIG)* | U.S. Liability Fronting | 9/1 to 9/1 | $750,453 |
| **Total Service Fees** | | | **$26,804,441** |

## EXHIBIT C

## Bank Accounts

| Bank Name | Bank Mailing Address | Account Held By | Last Four Digits of Account # | Type of Account |
|---|---|---|---|---|
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4156 | Products Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4164 | General Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4172 | Auto Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4180 | Workers Compensation |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                         :

In re                             :               **Chapter 11 Case No.**

                                           :

**GENERAL MOTORS CORP.**, *et al.*,     :               **09-_____ (___)**

                                           :

                    **Debtors.**        :               **(Jointly Administered)**

                                           :
---------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 363(b), 503(b), AND 105(a) AND FED. R. BANKR. P. 6003 AND 6004 (I) AUTHORIZING DEBTORS TO (a) CONTINUE THEIR LIABILITY, PRODUCT, PROPERTY, AND OTHER INSURANCE PROGRAMS AND (b) PAY ALL OBLIGATIONS IN RESPECT THEREOF, AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS

Upon the Motion, dated June 1, 2009 (the "<u>Motion</u>"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "<u>Debtors</u>"), pursuant to sections 363(b), 503(b), and

105(a) of title 11, United States Code (the "<u>Bankruptcy Code</u>") and Rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order  (i)

authorizing the Debtors to (a) continue their Insurance Programs and (b) pay all undisputed

obligations in respect thereof, on an uninterrupted basis, consistent with their practices in effect

prior to the commencement of the Debtors' chapter 11 cases, including the payment of all

undisputed premiums, deductibles, administrative fees, Insurance Service Providers' fees, and

other obligations arising under the Insurance Programs, whether relating to the period prior to or

after the commencement of these chapter 11 cases (collectively, the "<u>Insurance Obligations</u>"),

and (ii) authorizing and directing the banks and other financial institutions at which the Debtors

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

maintain disbursement accounts, including, but not limited to, the Banks listed on Exhibit A

annexed hereto (the "Banks"), to honor and process checks and electronic fund transfers

requested by the Debtors related to such obligations to the extent of funds on deposit, all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order

M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the Office of the United States Trustee

for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys

for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement,

(v) the attorneys for the agent under GM's prepetition amended and restated secured revolving

credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a

consolidated basis), (vii) the attorneys for the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "Hearing"); and

upon the record of the Hearing and all of the proceedings had before the Court; and the Court

having found and determined that the relief sought in the Motion is necessary to avoid immediate

and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Debtors are authorized and empowered to maintain their Insurance Programs without interruption, on the same basis, and in accordance with the same practices and procedures that were in effect prior to the commencement of the Debtors' chapter 11 cases; and it is further

ORDERED that the Debtors are authorized to pay, in their sole discretion, all undisputed Insurance Obligations, including, without limitation, all undisputed premiums, deductibles, administrative fees, Insurance Service Providers' fees, and all other obligations relating to the Insurance Programs, including those Insurance Obligations that (i) were due and payable or related to the period before the commencement of these chapter 11 cases, and (ii) are or become due and payable or related to the period after the commencement of these chapter 11 cases, in each instance without further order of the Court; and it is further

ORDERED that the Banks, including, but not limited to, those on the list annexed hereto as Exhibit A, are authorized and directed to honor, process, and pay, to the extent of funds on deposit, any and all prepetition checks or electronic fund transfer requests issued by the Debtors in respect of any Insurance Obligation, whether pre- or postpetition; and it is further

ORDERED that any Bank, including, but not limited to those on the list annexed hereto as Exhibit A, may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Commencement Date should

be honored pursuant to this Order, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein; and it is further

ORDERED that nothing in this Order or the Motion shall be construed as prejudicing the rights of the Debtors to dispute or contest the amount of or basis for any claims against the Debtors in connection with or relating to the Debtors' Insurance Programs; and it is further

ORDERED that, to the extent that any Insurance Program or any related contract or agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, neither this Order nor any payments made in accordance with this Order shall constitute the postpetition assumption of any such Insurance Program, contract, or related agreement pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions of the Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
_____, 2009

_____
United States Bankruptcy Judge

# EXHIBIT A

## Bank Accounts

| Bank Name | Bank Mailing Address | Account Held By | Last Four Digits of Account # | Type of Account |
|---|---|---|---|---|
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4156 | Products Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4164 | General Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4172 | Auto Liability |
| JPMorgan Chase Bank N.A. | 611 Woodward Avenue Detroit MI 48226 313-256-2218 Contact: Bill Bitonti | General Motors Corporation | 4180 | Workers Compensation |