Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
:
**In re**                                      :          **Chapter 11 Case No.**
:
**GENERAL MOTORS CORP.**, *et al.*,            :          **09-_____ (___)**
:
        **Debtors.**                           :          **(Jointly Administered)**
:
------------------------------------------------------------x

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT**
**TO 11 U.S.C. §§ 105, 363, AND 364 AUTHORIZING DEBTORS TO**
**(I) PAY PREPETITION CLAIMS OF CERTAIN ESSENTIAL SUPPLIERS,**
**VENDORS AND SERVICE PROVIDERS; (II) CONTINUE TROUBLED**
**SUPPLIER ASSISTANCE PROGRAM; AND (III) CONTINUE PARTICIPATION**
**IN THE UNITED STATES TREASURY AUTO SUPPLIER SUPPORT PROGRAM**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

<u>**Background**</u>

1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

2.    Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.    For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.    William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.      Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world.  The recent severe economic downturn has had an unprecedented impact on the global automotive industry.  Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy.  It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.      GMAC LLC ("GMAC") is a global finance company that provides a range of financial services, including customer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers.

7.      The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

and functional support.  Each geographic region has its own management team, subject to

oversight by the Company.  Substantially all of General Motors' worldwide car and truck

deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and

through distributors and dealers outside North America, most of which are independently owned.

In addition to the products sold to dealers for consumer retail sales, General Motors sells cars

and trucks to fleet customers, including rental car companies, commercial fleet companies,

leasing companies, and governmental units.

8.    As of March 31, 2009, General Motors employed approximately 235,000

employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were

salaried employees.  In the United States, approximately 62,000 (68%) of the employees were

represented by unions.  The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") represents the largest portion of General Motors'

U.S. unionized employees (totaling approximately 61,000 employees).

9.    As of March 31, 2009, General Motors had consolidated global recorded

assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.

Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

### The Economic Downturn and the U.S. Treasury Loan

10.    In 2008, the Company was confronted by the worst economic downturn

and credit market conditions since the Great Depression of the 1930s.  Consumers were faced

with illiquid credit markets, rising unemployment, declining incomes and home values, and

volatile fuel prices.

11.    This economic turmoil resulted in significant financial stress on the

automotive industry.  In the last quarter of 2008, new vehicle sales in the United States

plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell

precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations. As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

12.     The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy. On December 31, 2008, GM and the United States Department of the Treasury (the "U.S. Treasury") entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility"). A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility. The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions. The U.S. Treasury Facility is also collaterally secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

13.     The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability. On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the automobile task force appointed by President Obama to deal with the issues confronting the

automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

## The U.S. Treasury-Sponsored Program for GM

14.     On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars.  The President outlined a series of actions that GM would have to undertake to receive additional federal assistance.  In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM.  In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

15.     President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market."  *Id.*  The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger."  *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and

onto a path to success; a tool that we can use, even as workers stay
on the job building cars that are being sold.

What I'm not talking about is a process where a company is simply
broken up, sold off, and no longer exists.  We're not talking about
that.  And what I'm *not talking about is a company that's stuck in
court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

16.    The U.S. Government set a deadline of June 1, 2009 for the Company to
demonstrate its viability plan to achieve the foregoing objectives.  Consistent with the
President's guidance, the Company began a deeper, more surgical analysis of its business and
operations in an effort to develop a viability plan that would accommodate the needs of its
secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a
healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology
leadership.  The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable
in that timeframe, then the Company should  consider undertaking a new, more aggressive plan
using an expedited, Bankruptcy Court-supervised process to implement the purchase of the
Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the
Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of
the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.
Although the U.S. Treasury has committed to provide debtor in possession financing for the
Company to implement the sale and to support the new enterprise, it requires that the sale of
assets occurs promptly to preserve value and avoid the devastating damage the industry would
suffer if the business operations were not promptly extricated from the bankruptcy process.

17.    The U.S. Treasury will provide the financing to create New GM.  The U.S.
Treasury also indicated that if such a transaction were consummated, it would assure that New
GM had adequate financing and a capital structure that would assure New GM's long-term

viability. The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perishability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.

18.     On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion. GM borrowed the additional $2 billion in working capital loans on April 24, 2009.

19.     As part of the Company's efforts to rationalize its business and to balance large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve weeks (the "Temporary Shutdown"). As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down. A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

20.     On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion. GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

**The Exchange Offer**

21.     In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer"). The Company believed that the Exchange Offer would provide the least intrusive means to

restructure its indebtedness for the future success of the Company. The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

22.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

### The 363 Transaction

23.     Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

24.     Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction. These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise

dispose of the excluded assets and administer the chapter 11 cases.  As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

25.    The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation.  The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry.  The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

26.    Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise.

27.    The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

28.    The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve

and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To

paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure

that the cars of the future are built where they've always been built – in Detroit and across the

Midwest – to make America's auto industry in the 21st century what it was in the 20th century –

unsurpassed around the world."  *Presidential Remarks* at 7.

### Jurisdiction

29.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

30.     By this Motion, the Debtors seek entry of an order authorizing, but not

directing, them to pay prepetition claims of certain of their vendors, suppliers, service providers,

and similar entities that are essential to maintaining the going concern value of the Debtors'

business enterprise (the "Essential Vendors," whose prepetition claims shall be identified as

"Essential Vendor Claims").  These vendors are essential to maximizing value because either

they are the only source for a particular part, supply, or service, or obtaining a replacement

source would entail substantial delay or significantly increased costs.  Support for the Essential

Vendors is further justified because many of these companies will not be able to sustain their

own operations unless their outstanding prepetition obligations are paid.  The failure of these

Essential Vendors would result in the Debtors losing the ability to obtain parts and supplies in a

manner necessary to operate their facilities or to effectuate the proposed 363 Transaction in an

orderly and efficient manner.  Examples of the Essential Vendors are companies that provide the

Debtors with (i) product parts; (ii) machinery, equipment, and tooling; and (iii) maintenance,

repair, logistics, and other service items.

31.    Additionally, the Debtors request that they be granted the authority, but not the direction, to continue providing financial and operational assistance to their most financially and operationally distressed suppliers and vendors ("<u>Troubled Supplier Assistance</u>") and to make all payments and extend all accommodations pursuant thereto, whether related to the period prior to or after the Commencement Date, in the ordinary course of the Debtors' businesses.  Even with payment of their prepetition claims, there is a distinct risk that these vendors will not have the economic resources necessary to sustain operations and assure an ongoing supply of critical goods and services for the Debtors' assembly facilities without receiving Troubled Supplier Assistance, leaving the Debtors with no readily alternative source of supply.

32.    Finally, by this motion, the Debtors seek authority to continue their participation in the United States Treasury Auto Supplier Support Program (the "<u>UST Supplier Program</u>") which gives necessary support to suppliers during this unprecedented period of economic upheaval.

A.    <u>Proposed Terms and Conditions of Payments to Essential Vendors</u>

33.    To maintain their operations and maximize the value received in a sale of the Debtors' assets, the Debtors seek discretionary authority to pay certain prepetition Essential Vendor Claims to the extent necessary to reasonably assure the uninterrupted function of the Debtors' ongoing operations, the timely resumption of the Debtors' assembly facilities most of which temporarily shut down prior to the commencement of these cases, and the efficient transition of the Debtors' businesses to New GM, taking into account factors such as whether the vendors are sole-source suppliers, the existing contractual relationships with the vendors and suppliers, and the financial condition of the vendors and suppliers and, therefore, their ability to provide goods and services in the absence of payment of prepetition amounts owing.

34.    To minimize the amount of payments required, the Debtors request authority, subject to any limitations provided in the proposed debtor in possession financing facility, to identify Essential Vendors in their business judgment and as circumstances warrant. In determining whether a creditor is an Essential Vendor, the Debtors, in their discretion, will consider, among other things, (a) whether the goods or services the vendor provides relate to the Debtors' core business of manufacturing, selling, and marketing vehicles, (b) whether the goods or services the vendor provides could be replaced or acquired on a timely basis or on similar or better terms, (c) whether failure to pay the vendor would require the Debtors to incur substantially higher costs for goods or services postpetition, (d) whether the enforcement of a contract with a vendor that refuses to ship product or provide services could be accomplished in a timely and cost-efficient manner without unduly disrupting the Debtors' operations in light of all relevant circumstances, (e) the impact of the failure to pay on the Debtors' sales and future revenue, (f) whether failure to pay a vendor would disrupt or delay the Debtors' or a purchaser's ability to resume operations, and (g) the financial condition of the vendor and the ability of the vendor to sustain its business without being paid outstanding amounts owed.

B.    <u>Continuation of Customary Trade Terms</u>

35.    The Debtors intend in appropriate circumstances to condition the payment of Essential Vendor Claims on an agreement of such Essential Vendor in the form of a trade agreement, substantially similar to the agreement attached as Exhibit A, (each a "<u>Trade Agreement</u>"), obligating the Essential Vendor to continue supplying goods and services to the Debtors on (a) MNS-2 payment terms or such other more favorable payment terms as may be

customary between such supplier and the Debtors,[2] (b) the terms and conditions embodied in the

Debtors' general terms and conditions or such other more favorable trade terms, practices and

programs in effect between such supplier and the Debtors in the twelve months prior to the

Commencement Date, and (c) those other terms that ensure the continued flow of goods and

services, the expeditious resolution of claim disputes, and the unfettered transfer of vendors'

relationships to the Purchaser of the Debtors' business (collectively the "Customary Trade

Terms"), or such other favorable trade terms to which the Debtors and the Essential Vendor

agree.

36.     Nothing in this Motion or any order approving this Motion shall constitute

a waiver by any of the Debtors of their rights to contest any invoice of or any other liability

asserted by an Essential Vendor under applicable nonbankruptcy law or otherwise.

37.     If an Essential Vendor refuses to furnish goods and/or services to the

Debtors on Customary Trade Terms following receipt of payment of its Essential Vendor Claim

or fails to comply with its Trade Agreement, then the Debtors seek authority, in their discretion

and without further action or order of this Court, to declare that (a) any Trade Agreement

between the Debtors and such Essential Vendor is terminated (if applicable), and (b) all

payments made to such Essential Vendor with respect to its Essential Vendor Claim be deemed

to have been made in payment of the Essential Vendor's then-outstanding postpetition claims.

The Debtors also reserve the right to seek an order of this Court requiring that the Essential

Vendor immediately repay the Debtors the amount of any payment made to the Essential Vendor

with respect to its Essential Vendor Claim in excess of the postpetition claim of such Essential

---

[2] "MNS-2" refers to the most common payment terms in the Debtors' industry, whereby payment for goods supplied is generally due on the second business day of the second month following the receipt of such goods. For example, under these terms, payment for goods received by the Debtors during the month of May 2009 is due on July 2, 2009.

Vendor, without giving effect to any rights of setoff, reclamation, or otherwise.  By virtue of the foregoing, the Debtors reserve the right to seek to return the parties to their position immediately prior to the entry of the order approving this Motion with respect to all prepetition claims in the event that a Trade Agreement is terminated or an Essential Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment of its Essential Vendor Claim.

38.    The Debtors further propose that any Trade Agreement terminated as a result of an Essential Vendor's refusal to comply with its terms may be reinstated if:

(a)    such determination is subsequently reversed by this Court, for good cause shown that the determination was materially incorrect;

(b)    the default under any Trade Agreement was fully cured by the Essential Vendor not later than five (5) business days following the Debtors' notification to the Essential Vendor that a default had occurred; or

(c)    the Debtors, in their discretion, reach a favorable alternative resolution with the Essential Vendor.

C.    Limited Waiver and Court Review

39.    Additionally, given the just-in-time and sole-source nature of the Debtors' businesses, the Debtors are concerned that some suppliers who do not meet the standards required for payment pursuant to this Motion may attempt to inappropriately use the sole-source nature of their contract with the Debtors as leverage to receive payment of prepetition claims by threatening, notwithstanding their contractual obligations, to withhold shipment of products or refuse to provide services to the Debtors unless such claims are paid pursuant to this Motion. While such an action would violate the automatic stay provisions set forth in section 362 of the Bankruptcy Code, the Debtors fear that such action will be taken nevertheless.  The Debtors anticipate that a small percentage of their suppliers that are either unfamiliar with the provisions of the Bankruptcy Code or simply decide to be recalcitrant will engage in such behavior.  With

respect to many of such suppliers, the Debtors would be left with no practical short-term

response or alternative to such threats.  Accordingly, the Debtors would face the likely shutdown

of certain of their operations within such an abbreviated time period that it would be impossible

for them to obtain effective relief from this Court, even on an expedited basis.  Thus, the Debtors

would be forced either to violate an order of this Court (by paying such supplier) or risk allowing

their plants and facilities to be idled or not timely restarted.  Moreover, certain suppliers whose

contracts will expire in the near future may demand treatment as an Essential Vendor, using that

as leverage to renegotiate a new contract with more onerous terms for the Debtors.

          40.     To address these situations, the Debtors request that they be granted the

authority to elect, in their discretion, to waive the conditions of this Motion for payment of an

Essential Vendor Claim (the "Waiver") and to pay conditionally the claim of such suppliers (the

"Recalcitrant Suppliers"), subject to the procedures outlined herein.  In the event that the Debtors

grant a Waiver to a Recalcitrant Supplier, the Debtors will file a Notice of Waiver in

substantially the form annexed hereto as Exhibit B (the "Notice of Waiver") and, within five (5)

business days of the payment pursuant to the Waiver, either (a) file an Order to Show Cause in

substantially the form attached as Exhibit C (an "Order to Show Cause") with this Court

requiring that the Recalcitrant Supplier appear and show cause why the Recalcitrant Supplier

should not be held in violation of the automatic stay provisions of 11 U.S.C. § 362 for willfully

threatening to withhold essential goods or services from the Debtors under one or more contracts

between the Debtors and the Recalcitrant Supplier and be required to immediately disgorge the

payment received pursuant to the Waiver plus interest and costs or (b) if the Debtors determine

that the Recalcitrant Supplier has not violated the automatic stay provisions of 11 U.S.C. § 362

or the Debtors, in their discretion, elect not to file an Order to Show Cause, provide notice of

such determination and the amount paid to the Recalcitrant Supplier pursuant to the Waiver to (i) the U.S. Trustee, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for the official committee of unsecured creditors (the "Creditors' Committee"), (iv) the agent under GM's prepetition secured term loan agreement and the agent under GM's prepetition amended and restated secured revolving credit agreement, and (v) prior to the appointment of the Creditors' Committee, the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis).

41.    In the event the Debtors file an Order to Show Cause with respect to a Recalcitrant Supplier, the Debtors propose that, at the first regularly scheduled hearing occurring at least five (5) business days following entry of the Order to Show Cause by this Court, the Recalcitrant Supplier be required to appear before this Court and demonstrate why it should not be held in violation of the automatic stay. The Debtors request that in the event the Court determines that the Recalcitrant Supplier violated the automatic stay, the Court order the Recalcitrant Supplier to disgorge the amount of the payment made to the Recalcitrant Supplier by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the federal judgment rate or such other higher rate as this Court specifies, within three (3) business days of entry of such order. The Debtors expressly reserve the right to file any motions, adversary complaints, or other pleadings to pursue other remedies including, without limitation, injunctive relief.

D.    Payment of the Essential Vendor Claims Is Critical to the
       Debtors' Business Operations and Necessary to Assure a Successful Sale

*Payment of the Essential Vendor Claims Will*
*Significantly Streamline the Process of Assigning Contracts to the Purchaser*

42.    In connection with the MPA, the Debtors will be seeking to assume and assign their contracts with a vast majority of the Essential Vendors (the "Essential Vendor Contracts") to the Purchaser pursuant to section 365 of the Bankruptcy Code.

43.    Although the Purchaser is expected to acquire most, but not all, of the Debtors' automotive brands and assembly facilities as part of the 363 Transaction, the vast majority of the Debtors' suppliers provide goods and/or services across many brands and to multiple assembly plants.  Therefore, it is contemplated that, with very few exceptions, the Purchaser will require the goods and services provided by virtually all of the Debtors' suppliers and vendors to some extent.

44.    Any assumption and assignment executed pursuant to section 365 of the Bankruptcy Code requires the Debtors to cure or provide adequate assurance that they will promptly cure all defaults existing under Essential Vendor Contracts at the time of the assignment.

45.    Payment of the Essential Vendor Claims and the entry into Trade Agreements related thereto will streamline the assumption and assignment process and ensure the smooth and efficient transition of the Debtors' businesses to the Purchaser.  As section 365 of the Bankruptcy Code requires the Debtors to cure all defaults under the Essential Vendor Contracts in connection with the assumption and assignment to the Purchaser, the Debtors would be required to pay the prepetition claims of these suppliers even in the absence of the relief sought in this motion.  Payment of the Essential Vendor Claims, therefore, has the effect of simplifying the contract cure process in connection with the 363 Transaction.

46.    Because it is anticipated that the 363 Transaction will require the assumption, assignment and cure of substantially all Essential Vendor Contracts, there is no prejudice to other creditor stakeholders as these payments would be made in any event at the time of assumption and assignment.  Moreover, any purchaser will require that these payments be made so the existing supplier base is ready and able to provide necessary supplies and services after the closing of the sale.  If this authority is denied, the overall value of the Debtors' enterprise could be dramatically reduced as it will not have access to the essential supplies and services required to build and sell automobiles.  Accordingly, this will result in a reduced purchase price, a diminished distribution to creditors, and the general loss of significant economic value.  Finally, it should be noted that the source of payment for these Essential Vendor Claims will be a Government-Sponsored DIP Facility that is not intended to be repaid out of the proceeds of the 363 Transaction or the Debtors remaining assets.  Accordingly, creditors are not prejudiced by the payment of these Essential Vendor Claims.

*Payment of the Essential Vendor Claims Is*
*Necessary to Maintain Debtors' Ongoing Assembly Operations*

47.    Certain of the Debtors' assembly facilities are operating as of the Commencement Date and are anticipated to continue operations uninterrupted through and after the closing of the 363 Transaction.  Payment of the Essential Vendor Claims is necessary to ensure a continuous supply of the critical goods and services necessary to maintain such ongoing operations and avoid potentially catastrophic damages to the Debtors' estates.

48.    The Debtors, consistent with industry practice, operate on a "just-in-time" inventory delivery system.  Component parts from suppliers typically are assembled onto vehicles within a few hours after the delivery of the parts to the Debtors' assembly facilities.  If

the Debtors do not receive even a small fraction of their production parts, the Debtors' plants

relying on such shipments will likely have to shut down within a matter of days.

49.     In addition, to achieve the economies of scale required to compete in the

automotive industry, the Debtors generally use a single supplier for specific parts for each

vehicle line and frequently purchase all of their requirements for a particular part from one

supplier.  Each of these parts is expressly designed and manufactured for the Debtors and is

fabricated in accordance with unique specifications and quality control requirements imposed by

the Debtors before it can be used in manufacturing the Debtors' vehicles.  Additionally, many of

the products and supplies purchased by the Debtors are manufactured according to federally-

mandated safety standards.  In this regard, numerous tests, sometimes taking place over the

course of several months, must be run to validate and qualify each of the parts.  Even if another

source of supply could be found, the time and resources necessary to develop, manufacture,

validate and deliver the appropriate product could not be effected in a manner that could avoid a

complete disruption of the vehicle manufacturing process.  As a result, a sole-source supplier's

failure or inability to make scheduled shipments of critical parts can have immediate and

draconian consequences for the Debtors, including the virtual immediate shutdown of an entire

vehicle production line.

50.     If the Essential Vendors fail to ship parts or the Debtors are compelled to

secure other sources of supply, the Debtors' assembly facilities and plants would promptly shut

down with virtually an immediate cessation of the Debtors' primary source of revenue.

Moreover, if a shutdown were to occur, the Debtors would continue to incur the considerable

fixed costs attendant to the idled facilities without generating any significant revenue to defray

such fixed costs.  Maintaining and assuring the full and uninterrupted flow of supplies from just-

in-time, sole-source suppliers, therefore, is critical to the Debtors' continued operations and an

interruption in the delivery of such supplies would be devastating to the Debtors and the

Debtors' sale effort.

*Payment of the Essential Vendor Claims Is Critical to Timely*
*Resumption of the Debtors' Temporarily Shut Down Assembly Operations*

51.    Certain of the Debtors' assembly facilities temporarily shutdown

operations prior to the Commencement Date and are anticipated to resume operations in the near

future and before the closing of the 363 Transaction.  Payment of the Essential Vendor Claims is

necessary to ensure that suppliers to these assembly facilities are prepared and able to supply the

critical goods and services necessary to the timely resumption of operations.  Without a

"pipeline" of goods ready for delivery, the Debtors' facilities would be unable to resume

operations on a timely basis, damaging the Debtors' estates and detrimentally impacting the 363

Transaction.

52.    If even a small fraction of the Debtors' suppliers are unable to provide

essential parts, materials, and services to the Debtors' plants relying on such goods and services,

those plants will likely be unable to resume operations in accordance with the currently

anticipated schedule.  Even if the Debtors were able to find an alternative source of such parts,

materials, or services, the time and resources necessary to develop, manufacture, validate and

deliver the appropriate product would likely prevent the Debtors' operations from coming back

on-line in the timeframe expected and contemplated by the 363 Transaction.  As a result, even

though certain of the Debtors' facilities are currently shutdown, a failure to pay the Essential

Vendor Claims attendant to those facilities will result in irreparable harm to the Debtors' estates

and will significantly impact enterprise value.

*Payment of the Essential Vendor Claims Is Necessary*
*Due to the Significant Financial Distress Among the Supplier Base*

53.     Many of the Debtors' Essential Vendors are dependent on the Debtors for
a substantial, if not the entire, portion of their revenues.  A significant number of the Essential
Vendors require payment of their prepetition claims in order to have sufficient funds to pay for
their own pending orders of raw materials and other goods necessary to their own manufacturing
operations and commitments to the Debtors.  Additionally, with respect to the Debtors'
temporarily shutdown assembly facilities, many of the Essential Vendors do not have the
financial capability to acquire the goods and materials that will be necessary to have a pipeline of
critical parts ready to ship to the Debtors as those assembly facilities resume operations.

54.     As a result, in some instances, without payment of the Essential Vendor
Claims, the Essential Vendors will have no alternative but to cease their own operations, leaving
the Debtors with no source of critical parts and services.  The relief requested herein is,
therefore, essential to avoid immediate and irreparable harm.  Without it, the Debtors' operating
assembly facilities likely will be forced to shut down and the Debtors' temporarily shutdown
assembly facilities will not be able to resume operations, thereby choking the Debtors' source of
revenue and undermining the entire sale effort.

55.     Further, there is an immediate need for the relief sought in this motion in
order to instill a level of confidence in the Debtors' supplier base and the lenders to these
Essential Vendors.  Many of the Essential Vendors have borrowed from their own working
capital lending sources in reliance on the Debtors' accounts receivable.  Absent the Debtors
being granted the authority to pay the Essential Vendor Claims, it is likely that the Debtors'
accounts receivable may be declared ineligible collateral against which the Essential Vendors'

working capital lending sources will no longer advance, thereby creating an immediate liquidity

issue for the Essential Vendors and putting the Debtors' supply of critical goods at risk.

*The DIP Lender Supports, and the 363 Transaction*
*Contemplates and Requires, the Payment to Critical Vendors*

56.    The DIP lender is fully supportive of the relief requested in this motion

and has agreed to permit funding of critical vendor payments in recognition of the risks of a

fragile supplier base.  It is also understood that these payments must be made in conjunction with

the assumption and cure of executory contracts to be assigned.  As such, payment of the

Essential Vendor Claims at this time does not serve to diminish, and may actually enhance, the

recoveries available to other unsecured creditors.

*Essential Vendors Must Continue to Produce Parts and*
*Supplies to Support and Maintain the Debtors' Customers' Vehicles*

57.    The Debtors must ensure that their dealer network and maintenance

facilities have access to an uninterrupted flow of service parts and supplies necessary for the

proper care and maintenance of their customers' vehicles.  This service is essential to preserving

the value of the Debtors' brands and maximizing the going concern value of the business

enterprise.  Customers must be able to receive authentic parts and supplies to maintain and repair

their GM vehicles.  A failure of this type for GM's current customers could devastate the

Debtors' brands and customers' confidence in them.  Those Essential Suppliers producing

service and maintenance parts must be supported during these bankruptcy cases to ensure that the

flow of parts and supplies is uninterrupted and the value of the Debtors' estates maintained.

E.    Financially Distressed Suppliers

58.    With respect to certain of the Debtors' suppliers and service providers,

many of which are sole-source suppliers which generate a substantial portion of their revenues

from the Debtors, the timely payment of prepetition invoices may not be enough to sustain their

operations and thereby assure an ongoing source of supply of critical goods and services for the

Debtors' assembly facilities.  Accordingly, in the ordinary course of business, the Debtors have

provided certain financial and operational assistance to their most distressed suppliers and

vendors in order to help assure the continuation of their businesses.  This assistance can take

several forms including, but not limited to, the following:

 (a) purchasing the raw material and/or finished goods inventory used in the manufacturing process for the Debtors' goods, which raw material inventory, in many instances, is subject to a bailment agreement in favor of the Debtors;

 (b) providing lump sum subsidies or surcharge payments in order to address near term liquidity;

 (c) lending moneys to a supplier either through purchasing a participation in an existing credit facility of the supplier or by lending funds directly to the supplier or reimbursing certain operational expenses, in each case, pursuant to appropriate documentation;

 (d) accelerating the payment of the invoices of a troubled supplier or vendor, again in order to address a near term liquidity need; and

 (e) limiting rights of setoff and recoupment.

As stated, Troubled Supplier Assistance is critical to the Debtors' operations and ability to assure

the continued operation of their assembly plants and resumption of production at plants which

have temporarily shutdown.  Delphi Corporation is a representative example of a troubled

supplier that relies on GM's accommodations to survive.  Without this support, there is a distinct

risk that suppliers of critical parts, components, supplies, and services will not have the

economic resources to survive, leaving the Debtors with no readily alternative source for these

items.

 59. To minimize the amount of payments required, the Debtors request

authority, subject to any limitations provided in the proposed debtor in possession financing

facility, to identify suppliers requiring this assistance in their business judgment and as

circumstances warrant.  In view of the importance of Troubled Supplier Assistance to the

ongoing operations of the GM enterprise, the Debtors request that they be granted authority to

continue providing Troubled Supplier Assistance and to make all payments and extend all

accommodations pursuant thereto, whether related to the period prior to or after the

Commencement Date, in the ordinary course of the Debtors' businesses.

60.     Further, the Debtors request that they be granted the authority, in their

discretion, to provide Troubled Supplier Assistance to any suppliers that may become financially

or operationally distressed after the Commencement Date in the ordinary course of the Debtors'

businesses and without any further order from this Court.

F.     <u>Participation in the United States Treasury Auto Supplier Support Program</u>

61.     The Debtors also request the authority to continue to participate in the

UST Supplier Program.  The UST Supplier Program is designed to stabilize the auto supply base

and restore credit flows to this critical sector of the American economy.  By participating in the

UST Supplier Program the Debtors will enable certain of their suppliers to sell goods to the

Debtors, and in turn sell the receivables for those goods sold into the UST Supplier Program at a

discount.  This will provide suppliers with desperately needed funding to continue operating their

businesses and help unlock credit more broadly in the supplier industry.  Through the UST

Supplier Program suppliers are assured timely payments for sold goods, and the Debtors are

assured that their supplier base will remain financed and able to produce the essential parts and

supplies necessary to manufacture automobiles.

62.     To participate in the UST Supplier Program, the Debtors formed a finance

entity, GM Supplier Receivables LLC, to which suppliers can sell their outstanding GM

receivables for immediate payment.  This finance entity is jointly funded by the Debtors and the

U.S. Treasury.

63.     The UST Supplier Program will enable suppliers to receive payments, funded in part by the Debtors.  These ongoing payments are as important and necessary as the payment of the Essential Vendor Claims discussed above.  There, as here, these payments are justified and critical to the successful operation of the Debtors' businesses and the maximization of enterprise value.  Supplier instability creates greater uncertainty for the Debtors as they heavily rely on their suppliers' uninterrupted operations; participation in the UST Supplier Program will reduce this uncertainty and benefit all parties in interest.  For the above stated reasons, the Debtors request the authority, in their sole discretion and in the ordinary course of their businesses, to fully participate in the UST Supplier Program and make all payments required with respect thereto.

### **Applicable Authority**

64.     The relief requested in this Motion is supported by established authority under sections 363 and 364 of the Bankruptcy Code, *see, e.g.*, *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005), and under sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors in possession with authority to continue operating their businesses.  In addition, courts regularly have authorized payment of prepetition obligations under section 105(a) of the Bankruptcy Code, which allows a Bankruptcy Court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code.  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

A.     This Court May Grant the Relief Requested in This Motion
       Pursuant to Sections 363 and 364 of the Bankruptcy Code

65.     The Court may grant the relief requested herein pursuant to sections 363 and 364 of the Bankruptcy Code.  *See, e.g.*, *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for

authority to make critical vendor payments, and section 105 is used to fill in the blanks.");

*Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983)

(pursuant to section 363, court authorized contractor to pay prepetition claims of some suppliers

who were potential lien claimants because payments were necessary for general contractors to

release funds owed to the debtors).

      66.     The Debtors propose to pay Essential Vendor Claims largely on the

condition that each Essential Vendor agrees to extend customary trade terms and enters into a

Trade Agreement.  By providing value to the Debtors, principally in the form of postpetition

credit extensions, these Essential Vendors may be compensated pursuant to section 364 of the

Bankruptcy Code.  The Essential Vendors' provision of "new value" in exchange for payment of

their prepetition claims warrants approval of the relief requested in this Motion pursuant to

section 363(b) of the Bankruptcy Code.

      67.     Further, as discussed above, the continued flow of supplies and services

provided by the Essential Vendors is vital to GM's business operations.  Indeed, the

consequences of not granting the relief requested herein would be devastating.  Although the

Debtors acknowledge that the Essential Vendor Claims may be large, these chapter 11 cases and

their impact on the national economy are unprecedented.  The Debtors and their affiliates employ

in excess of 235,000 employees and have operations throughout the world.  A breakdown in the

supply chain will have globally adverse ramifications and draconian consequences to the GM

business enterprise, its employees, and the substantial number of communities where the

operations of the Debtors and their suppliers are conducted.

B.    Payment of the Essential Vendor Claims Is an
      Appropriate Exercise of the Debtors' Fiduciary Duties

68.    The Debtors, as debtors in possession, are fiduciaries operating their business for the benefit of creditors and other parties in interest.  As fiduciaries, the Debtors have a duty to protect and preserve their estates and maximize value for all stakeholders.

69.    In *In re CoServe, L.L.C.*, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002), the court enunciated three considerations for determining whether a payment of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

273 B.R. at 498.

70.    Here, all of these circumstances exist and clearly support the relief requested.  The Debtors undoubtedly must deal with the Essential Vendors, and, as stated, the harm, loss of economic advantage, and loss of value that will be incurred in the absence of the relief sought herein, far outweigh the amount of prepetition claims that may be paid.  Finally, it is patently clear that in view of the nature of the Debtors' supplier base, there is no practical alternative to the relief sought if business operations are to continue and a successful 363 Transaction is to be achieved.

C.    The "Necessity of Payment" Doctrine and the Court's
      General Equitable Powers Authorize the Relief Requested

71.    The Debtors' proposed payment of the Essential Vendor Claims should also be authorized pursuant to section 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Section 105(a) empowers the Court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C.

§ 105(a).  A Bankruptcy Court's use of its equitable powers to "authorize the payment of

prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a

novel concept."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under

[section] 105, the court can permit pre-plan payment of a pre-petition obligation when essential

to the continued operation of the debtor."  *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va.

1992) (citing *Ionosphere Clubs*, 98 B.R. at 177); *see also In re Just for Feet, Inc.*, 242 B.R. 821,

825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that

payment of the prepetition claims is critical to the debtor's reorganization"); *In re Eagle-Picher*

*Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-

petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious

threat to the Chapter 11 process.").

        72.    Federal courts consistently have permitted postpetition payment of

prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for

the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport Ry.*, 106 U.S. 286, 312 (1882)

(payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of

[crucial] business relations"); *In re Lehigh Co. & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir.

1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the

continued operation of the [business] during reorganization, payment may be authorized even if

it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945) (Second Circuit

extends doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich.*

*Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R.

279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition

wages, salaries, expenses, and benefits), *appeal dismissed,* 838 F.2d 59 (2d Cir. 1988).

73.     The "doctrine of necessity" functions in a chapter 11 reorganization as a

mechanism by which the Bankruptcy Court can exercise its equitable power to allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Columbia*

*Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-

petition claim is essential to the continued operation of [the debtor], payment may be

authorized"); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the

existence of a judicial power to authorize trustees to pay claims for goods and services that are

indispensably necessary to the debtors' continued operation).  The doctrine is frequently invoked

early in a reorganization, particularly in connection with those chapter 11 sections that relate to

payment of prepetition claims.  In *In re Structurelite Plastics Corp.*, the court indicated its accord

with "the principle that a bankruptcy court may exercise its equity powers under section 105(a)

to authorize payment of prepetition claims where such payment is necessary to 'permit the

greatest likelihood of survival of the debtor and payment of creditors in full or at least

proportionately.'"  86 B.R. 922, 931 (Bankr. S.D. Ohio 1988).  The court stated that "a per se

rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the

effectuation of the rehabilitative purposes of the Code."  *Id.* at 932.  The rationale for the

doctrine of necessity rule is consistent with the paramount goal of chapter 11, — "facilitating the

continued operation and rehabilitation of the debtor."  *Ionosphere Clubs*, 98 B.R. at 176.

74.     As stated above, the payment of the Essential Vendor Claims is critical.

Without this relief, the Debtors' assets will permanently lose significant value.  Under these

circumstances, the exercise of the Court's equitable powers to grant the relief requested in this

Motion is not only appropriate but also essential to the preservation of value for all parties in interest.

75.    All of the foregoing rationale is equally applicable to continuation of Troubled Supplier Assistance and participation in the UST Supplier Program with respect to the Debtors' financially and operationally distressed suppliers.  The suppliers receiving assistance are a subset of the Essential Vendors and are similarly critical to the Debtors' ability to operate their assembly facilities.  The Debtors' ability to continue to provide support through these programs as requested herein will assure a continued source of critical supplies, parts, products, and services and avoid the interruption of the manufacturing process and the disruption, dislocation, and loss of revenue necessarily attendant thereto.

D.    Financial Institutions Should Be Directed to Honor and
       <u>Process Checks and Transfers Related to Essential Vendors</u>

76.    The Debtors pay their Essential Vendors with funds drawn by checks (the "<u>Checks</u>") or by electronic funds transfers (the "<u>Electronic Transfers</u>").  Before the Commencement Date, the Debtors remitted Checks or Electronic Transfers on account of certain vendor claims that may not have cleared as of the Commencement Date.  To the extent any of the Checks or Electronic Transfers have not cleared their respective banks or other financial institutions (collectively, the "<u>Banks</u>") as of the Commencement Date, the Debtors request that this Court authorize and direct the Banks, at the Debtors' direction, to receive, process, honor, and pay the Checks and Electronic Transfers to the extent of funds on deposit, without the need for further Court approval.  The Debtors also seek authority to issue replacement Checks, resubmit Electronic Transfers, or otherwise make payment to Essential Vendors on account of the Essential Vendor Claims without the need for further Bankruptcy Court approval if they have not been paid.  Each of the Checks and Electronic Transfers can be readily identified as relating

directly to the authorized payment of amounts owed with respect to the Essential Vendor Claims.

Accordingly, if the relief requested herein is granted, the Checks and Electronic Transfers, other

than those related to authorized payments, will not be honored inadvertently.

## The Debtors Have Satisfied Bankruptcy Rule 6003

77.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or

part of a claim that arose before the filing of the petition" prior to twenty days after the

Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, the Debtors' business

operations rely heavily on the uninterrupted delivery of parts, services and supplies.  Because of

the Debtors' just-in-time and sole-source inventory delivery system, the failure of any Essential

Vendor to deliver parts and supplies would have immediate and detrimental consequences to the

Debtors' business operations and would decrease value to the detriment and prejudice of all

parties in interest.  Accordingly, the Debtors submit that the relief requested herein is necessary

to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

78.    To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

79.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury,

(iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term

loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated

secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against

the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the United States Department of Labor, (x) the

attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc

bondholders committee.  The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

        80.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

        WHEREFORE the Debtors respectfully request entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

            /s/ Stephen Karotkin          
            Harvey R. Miller
            Stephen Karotkin
            Joseph H. Smolinsky

            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, New York 10153
            Telephone: (212) 310-8000
            Facsimile: (212) 310-8007

            Attorneys for Debtors
            and Debtors in Possession

## Exhibit A

**Trade Agreement**



Global Purchasing and Supply Chain

Cadillac Building
M/C 480-206-136
30009 Van Dyke Ave
Warren MI 48090-9025

June ___, 2009

TO:    [Vendor]
       [Name]
       [Address]

Dear Valued Supplier:

As you are no doubt aware, General Motors Corporation, and certain of its direct and indirect subsidiaries (collectively, the "Company"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case" and the "Bankruptcy Court," respectively) on June 1, 2009 (the "Commencement Date"). On the Commencement Date, the Company requested the Bankruptcy Court's authority to pay certain of its suppliers in recognition of the importance of its relationship with such suppliers to its ongoing operations. On June __, 2009, the Bankruptcy Court entered an order (the "Order") authorizing the Company to pay the prepetition claims of certain suppliers, subject to such suppliers agreeing to the terms set forth below in this agreement (the "Trade Agreement"). A copy of the Order is enclosed.

In order to receive payment on prepetition claims, each selected supplier must agree to enter into a Trade Agreement, the provisions of which are outlined below, including agreeing to continue supplying goods to the Company based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as (a) MNS-2 payment terms or such other more favorable payment terms as may be customary between a supplier and the Company,[1] (b) the terms and conditions embodied in the Company's general terms and conditions or such other more favorable trade terms, practices and programs in effect between a supplier and the Company in the twelve months prior to the Commencement Date and (c) those other terms that ensure the continued flow of goods and services, the expeditious resolution of claim disputes, and the transfer of suppliers' relationships to the Purchaser of the Company's business.

---

[1] "MNS-2" refers to the most common payment terms in the Company's industry, whereby payment for goods supplied is generally due on the second business day of the second month following the receipt of such goods. For example, under these terms, payment for goods received by the Company during the month of May 2009 is due on July 2, 2009.

For purposes of administration of the essential supplier program, as authorized by the Bankruptcy Court, and payment of your prepetition claim, the Company and you agree as follows:

1. The Company will make payment of the amount existing as validly due and owing for shipments received by the Company prior to the Commencement Date (a "Trade Claim") on the next regularly scheduled MNS-2 payment date or otherwise applicable contract payment date, provided the Company has received, as directed herein, a copy of this Trade Agreement (without modification) executed by a duly authorized representative of your company within seven (7) business days following the Bankruptcy Court's entry of the Order.

2. Payment of your Trade Claim will be applied first against the most recent outstanding prepetition amounts owing to you from the Company.

3. You will continue to supply goods or provide services, as applicable, to the Company, on the terms set forth in the applicable contracts or purchase orders between you and the Company, including the purchase price for such goods or services, except as modified by this Trade Agreement, until the later of (i) the Company's emergence from chapter 11, or (ii) the expiration of the applicable contract between you and the Company (the "Term").

4. You consent to (i) the assignment of any or all of the contracts and purchase orders between you and the Company, as modified by this Trade Agreement, to New GM, and (ii) in connection with the assumption and assignment of any one or more of the contracts or purchase orders between you and the Company, the "Cure Dispute Resolution Process," a copy of which is available upon request to the Company. You further agree that any dispute you have regarding the proposed cure amount related to the contracts and purchase orders between you and the Company will be subject to the Cure Dispute Resolution Process.

5. You will continue to supply goods or provide services, as applicable, to any non-Debtor affiliate of the Company with which you do business, on the terms set forth in the applicable contracts or purchase orders between you and such non-Debtor affiliate, including the purchase price for such goods and services, during the Term. Further, you will cause your affiliates and/or subsidiaries who are doing business with any non-Debtor affiliate of the Company to continue to supply goods or provide services, as applicable, to such non-Debtor affiliate, on the terms set forth in the applicable contracts or purchase orders between such parties, including the purchase price for such goods and services, during the Term.

6.      The following trade terms will apply during the Term:

    a.      The Company will make payment to you for all goods shipped or services provided by you to the Company on MNS-2 payment terms or such other more favorable payment terms as may be customary between you and the Company;

    b.      You will not impose any credit limit or cap on the Company's purchases from you;

    c.      Any specific, favorable commercial or credit terms in effect between GM and the supplier during the 12 months prior to the bankruptcy;

    d.      Except as provided in this Trade Agreement, the Company's general terms and conditions will apply to all the Company's purchases from you; and

    e.      All terms and conditions of the applicable contracts or purchase orders between you and the Company will remain in full force and effect except as specifically modified by this Trade Agreement.

7.      You acknowledge and agree that, to the extent you have terminated or attempted to terminate any contract between you and the Company prepetition, such contract is hereby reinstated and, as a consequence of such reinstatement, you are deemed to have waived any defaults which may have occurred under any contract between you and the Company.

8.      You hereby grant the Company an option to extend the applicable contracts between you and the Company, in the Company's discretion, through the date of the Company's emergence from chapter 11.

9.      You acknowledge that other than "Unpaid Tooling"[2] all "Tooling"[3] being utilized by you to manufacture parts for the Company, whether under direct agreements between you and the Company or agreements between you and third parties, is owned by the Company and is being held by you and, to the extent that you have transferred such Tooling to third parties,

---

[2] The term "Unpaid Tooling" means Tooling for which Company has not paid the purchase price set forth in the applicable purchase order for such Tooling to a supplier or any of its predecessor(s) in interest.

[3] The term "Tooling" means collectively all tooling (including primary tooling and secondary tooling), dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and any documentation including engineering specifications, PPAP books and test reports, together with any accessions, accessories, attachments, parts, substitutions, replacements and appurtenances thereto, used by a supplier in connection with its manufacture of parts for the Company.

by such third parties, as bailees-at-will. Upon payment in full of the applicable purchase order price for any item of Unpaid Tooling, less any amounts necessary to satisfy outstanding liens of third-parties on such Tooling, if any, such item shall thereafter be included in the definition of Tooling and be acknowledged to be owned by the Company;

In the event of a dispute between you and the Company as to whether any Tooling is Unpaid Tooling, pending resolution of the dispute the Tooling subject to the dispute will be presumed to be owned by the Company, the Company will have the right to take immediate possession of such Tooling and you will not withhold delivery of possession of such Tooling; provided, however, such Tooling will remain subject to any claim or right to payment you may have for the disputed amounts (despite your relinquishment of possession).

The rights and obligations contained in this paragraph 9 are in addition to (and not in lieu of) the rights of the Company under its respective purchase orders, including its global terms and conditions of purchase, and any other agreements between you and the Company, and will continue in full force and effect notwithstanding the expiration or termination of this Trade Agreement.

10. You will not file or otherwise assert against any of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any prepetition amounts allegedly owed to you by the Company including, but not limited to, the Trade Claim. Furthermore, if you have taken steps to file or assert such a lien prior to entering into this Trade Agreement, you agree to immediately take any actions required to remove such lien.

11. You will not assert any reclamation claim or similar claim, including any claim under section 503(b)(9) of the Bankruptcy Code, on account of any goods shipped to the Company prepetition and for which you have not been paid.

12. If you fail or refuse, at any time, to continue to supply goods or provide services, as applicable, to the Company on the terms set forth in this Trade Agreement, any payments received by you on account of your Trade Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to you. Furthermore, you will immediately repay to the Company any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceed the outstanding postpetition obligations owed to you, without giving effect to any rights of setoff, reclamation or otherwise.

13.     You acknowledge you have reviewed the terms and provisions of the Order and you consent to be bound by all such terms.

You further agree that you will keep the terms of this Trade Agreement, together with all related settlement discussions between you and the Company, strictly confidential.  You may disclose the terms of this Trade Agreement only to your management personnel that need to know such information to implement the terms of this Trade Agreement, legal counsel and other advisors with whom you have a recognized legal privilege and your working capital lender, if so requested; provided that all such parties have been informed of the confidentiality restrictions contained herein and have agreed in writing to abide by such restrictions.  You agree that you will be responsible and directly liable for any breach of the confidentiality provisions set forth in this Trade Agreement by your management personnel, legal counsel, other advisors and, if applicable, working capital lender.  You acknowledge that failure to honor the confidentiality provisions contained herein would cause irreparable harm to the Company.  Any discussions by you with any third parties, including the press or media or consultants, regarding this Trade Agreement and its terms are expressly prohibited.

The Company expressly reserves all of its rights at law and in equity, including without limitation, all of its rights as debtor-in-possession under the Bankruptcy Code.  Without limiting the generality of the foregoing sentence, this Trade Agreement, and any payment made hereunder, does not constitute (a) a waiver of the Company's rights (i) to dispute any claim, (ii) to reject any agreement, contract, purchase order or other document under section 365 of the Bankruptcy Code, or (iii) to take, or refrain from taking, any other action under any applicable section of the Bankruptcy Code or any other applicable law or (b) an approval, adoption, or assumption of any agreement, contract, purchase order, or other document under section 365 of the Bankruptcy Code or any other applicable law, all of the Company's rights with respect to which are expressly reserved.

This Trade Agreement may be executed in any number of originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and together will constitute one and the same instrument.  The parties agree that their respective signatures can be delivered by facsimile or e-mail, and that facsimile and e-mail signatures will be treated as originals for all purposes.  The individual signing this Trade Agreement on behalf of each party represents and warrants that he or she has all power and authority necessary to execute this Trade Agreement on such party's behalf.

This Trade Agreement is made in the State of Michigan and will be governed by, and construed and enforced in accordance with the laws of the State of Michigan, without regard to conflicts of law principles.  The parties acknowledge that the Bankruptcy Court will have exclusive jurisdiction over any case or controversy arising out of or relating to this Trade Agreement or its subject matter and that all litigation arising out of or relating to this Trade Agreement or its subject matter must be commenced in the Bankruptcy Court.  Please sign below to acknowledge your consent to the terms of this Trade Agreement and return an executed copy to the Company either by email to SupplierCallCenter@gm.com or by facsimile to 1-248-312-7191.

If you have any questions about this Trade Agreement or our financial restructuring, please do not hesitate to call Supplier Information Call Center toll free at 1-888-409-2328 or 1-586-947-3000.

Sincerely,

**GENERAL MOTORS CORPORATION**

_____

By:_____

Title:_____

Date:_____, 20_____

**ACKNOWLEDGED AND AGREED:**

_____

By:_____

Title:_____

Date:_____, 20_____

## EXHIBIT B

## NOTICE OF WAIVER

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                    :

**In re**                              :          **Chapter 11 Case No.**

                                      :

**GENERAL MOTORS CORP.,** *et al.***,**     :          **09-_____ (___)**

                                      :

                       **Debtors.**      :          **(Jointly Administered)**

                                      :
-------------------------------------------------------------x

<u>**NOTICE OF WAIVER**</u>

PLEASE TAKE NOTICE that on June 1, 2009, General Motors Corporation

("<u>GM</u>") and certain of its wholly-owned direct and indirect subsidiaries, as debtors and debtors

in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>"), filed their

Motion Pursuant to Sections 105, 363, and 364 of title 11, United States Code (the "<u>Bankruptcy</u>

<u>Code</u>") for entry of an order authorizing Debtors to (I) pay prepetition claims of certain essential

suppliers, vendors, and service providers, (II) continue Troubled Supplier Assistance Program,

and (III) continue participation in the United States Treasury Auto Supplier Support Program

(the "<u>Motion</u>").

PLEASE TAKE FURTHER NOTICE that on _____ , 20[__], the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order granting the relief requested in the Motion (the "Order").

PLEASE TAKE FURTHER NOTICE that, pursuant to the authority granted to the Debtors pursuant to the Order, the Debtors have determined to waive the conditions for payment of an Essential Vendor Claim (as defined in the Motion) with respect to **[INSERT NAME OF SUPPLIER]** ("Recalcitrant Supplier") and conditionally pay prepetition claims of the Recalcitrant Supplier in the amount of $_____ on _____ , 20[__].

PLEASE TAKE FURTHER NOTICE that the Debtors may, at their election, file a proposed Order to Show Cause requesting that the Bankruptcy Court order the Recalcitrant Supplier to appear before the Bankruptcy Court and demonstrate why the Recalcitrant Supplier should not be held in violation of the automatic stay provisions of 11 U.S.C. § 362.  In such event, the Debtors will notify you of the applicable hearing date.

Dated: New York, New York
       June 1, 2009

_____
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# **EXHIBIT C**

## **ORDER TO SHOW CAUSE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
In re                                     :                    Chapter 11 Case No.
                                          :
**GENERAL MOTORS CORP.,** *et al.*,       :                    09-_____ (____)
                                          :
                              Debtors.    :                    (Jointly Administered)
                                          :
-------------------------------------------------------------x

<u>ORDER TO SHOW CAUSE</u>

Upon the Motion, dated June 1, 2009 (the "<u>Motion</u>"), of General Motors

Corporation and certain of its wholly-owned direct and indirect subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>"),

pursuant to sections 105, 363, and 364 of title 11, United States Code (the "<u>Bankruptcy Code</u>")

for entry of an order authorizing Debtors to (I) pay prepetition claims of certain essential

suppliers, vendors, and service providers, (II) continue Troubled Supplier Assistance Program,

and (III) continue participation in the United States Treasury Auto Supplier Support Program;

and upon the Order of this Court entered on _____, 2009 (the "<u>Order</u>"), granting the relief

requested in the Motion; and upon the Debtors' Notice of Waiver, dated _____, 20[__]with

respect to [**NAME OF RECALCITRANT SUPPLIER**] ("<u>Recalcitrant Supplier</u>"); and it

appearing that proper and adequate notice of the Debtors' request for entry of this Order to Show

Cause (the "<u>Show Cause Order</u>") has been given and that no other or further notice is necessary;

and after due deliberation; and good and sufficient cause appearing therefor, it is hereby,

ORDERED that the Debtors have complied with the procedures provided in the

Order in determining to waive the conditions for payment of an Essential Vendor Claim (as

defined in the Motion) with respect to the Recalcitrant Supplier and conditionally paying

prepetition claims of the Recalcitrant Supplier in the amount of $_____ on

_____, 20[__]; and it is further

ORDERED that the Recalcitrant Supplier is hereby ordered to show cause before

this Court at a hearing to be held at _____ a.m./p.m. Eastern Time on _____, 20[__]

before the Honorable _____, United States Bankruptcy Judge, in the Bankruptcy Court,

Courtroom _____, One Bowling Green, New York, New York 10004-1408 (the "Hearing") why

the Recalcitrant Supplier should not be held in violation of the automatic stay provisions of 11

U.S.C. § 362 for willfully threatening to withhold essential goods or services from the Debtors

under one or more contracts between the Debtors and the Recalcitrant Supplier; and it is further

ORDERED that service of this Show Cause Order shall be made upon (i) the

Recalcitrant Supplier, (ii) the attorneys for the U.S. Treasury, (iii) the Office of the United States

Trustee for the Southern District of New York, (iv) the attorneys for the official committee of

unsecured creditors (the "Creditors' Committee"), (v) the agent under GM's prepetition secured

term loan agreement and the agent under GM's prepetition amended and restated secured

revolving credit agreement, and (vi) prior to the appointment of the Creditors' Committee, the

holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis).

Notice served pursuant to the preceding sentence shall be via electronic or first class mail,

postage prepaid.  No further notice of the Hearing or of the entry of this Show Cause Order need

be served by the Debtors; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  New York, New York
               _____, 2009

_____
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                    :

**In re**                     :            **Chapter 11 Case No.**
                    :

**GENERAL MOTORS CORP.,** *et al.*,    :        **09-_____ (___)**
                    :

             **Debtors.**    :        **(Jointly Administered)**
                    :
----------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 364 AUTHORIZING
DEBTORS TO (I) PAY PREPETITION CLAIMS OF CERTAIN ESSENTIAL
SUPPLIERS, VENDORS, AND SERVICE PROVIDERS, (II) CONTINUE TROUBLED
SUPPLIER ASSISTANCE PROGRAM, AND (III) CONTINUE PARTICIPATION IN
THE UNITED STATES TREASURY AUTO SUPPLIER SUPPORT PROGRAM**

Upon the Motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation and certain of its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 363, and 364

of title 11, United States Code (the "Bankruptcy Code"), for entry of an order authorizing

Debtors to:  (I) pay prepetition claims of certain essential suppliers, vendors, and service

providers, (II) continue Troubled Supplier Assistance Program, and (III) continue participation in

the United States Treasury Auto Supplier Support Program, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under

Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

---

[1] Capitalized terms used herein and not otherwise defined herein have the meanings ascribed to such terms in the
Motion

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to (i) the Office of the United States Trustee for the Southern

District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the

attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for

the agent under GM's prepetition amended and restated secured revolving credit agreement,

(vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated

basis), (vii) the attorneys for the International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America, (viii) the attorneys for the International Union of

Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of

America, (ix) the United States Department of Labor, (x) the attorneys for the National

Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee,

and it appearing that no other or further notice need be provided; and a hearing having been held

to consider the relief requested in the Motion (the "Hearing"); and upon the Affidavit of

Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"),

the record of the Hearing, and all of the proceedings had before the Court; and the Court having

found and determined that the relief sought in the Motion is necessary to avoid immediate and

irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and

is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Debtors are authorized, but not directed, in the reasonable

exercise of their business judgment, to pay all, or a portion, of the Essential Vendor Claims upon

such terms and in the manner provided in this Order and the Motion; and it is further

ORDERED that the Debtors shall be authorized to require certain Essential

Vendors to enter into a Trade Agreement as a condition to payment of their Essential Vendor

Claims; and it is further

ORDERED that this Order is intended to authorize, but shall not require, the

Debtors to enter into Trade Agreements, it being the express intention of this Court that the

Debtors shall enter into Trade Agreements only when the Debtors determine, in their sole

discretion, that it is appropriate to do so; and it is further

ORDERED that if an Essential Vendor refuses to supply goods and/or services to

the Debtors on Customary Trade Terms following receipt of payment of its Essential Vendor

Claim (regardless of whether such Essential Vendor has entered into a Trade Agreement), or

fails to comply with any Trade Agreement, then the Debtors may, in their sole discretion and

without further order of this Court, (a) declare that any Trade Agreement between the Debtors

and such Essential Vendor is terminated (if applicable) and (b) declare that the payments made to

the Essential Vendor on account of its Essential Vendor Claim be deemed to have been made in

payment of then-outstanding postpetition claims of such supplier.  Such Essential Vendor shall

then immediately repay to the Debtors the amount of any payment made to the Essential Vendor

with respect to its Essential Vendor Claim to the extent that payments on account of such

Essential Vendor Claim exceed the postpetition claims of such supplier then outstanding without

giving effect to any rights of setoff, reclamation, or otherwise.  In the event that a Trade

Agreement is terminated or an Essential Vendor refuses to supply goods and/or services to the

Debtors on Customary Trade Terms following receipt of payment on its Essential Vendor Claim

(regardless of whether such Essential Vendor has entered into a Trade Agreement), it is the

express intention of this Court to return the parties to their position immediately prior to the entry

of this Order with respect to all prepetition claims; and it is further

ORDERED that the Debtors may, in their sole discretion, reinstate a Trade

Agreement if:

(a)    the Debtors' determination to terminate a Trade Agreement is subsequently reversed by this Court, after notice and a hearing following a motion by the Essential Vendor, for good cause shown that the determination was materially incorrect;

(b)    the underlying default under the Trade Agreement was fully cured by the Essential Vendor not later than five (5) business days following the Debtors' notification to the Essential Vendor that a default had occurred; or

(c)    the Debtors, in their discretion, reach a favorable alternative agreement with the Essential Vendor

; and it is further

ORDERED that the Debtors are authorized, but not directed, to elect, in their sole

discretion, to waive the conditions of this Order for payment of an Essential Vendor Claim (the

"Waiver") and to conditionally pay the claim of a supplier or service provider (the "Recalcitrant

Supplier"), subject to the following procedures:

(a)    In the event that the Debtors grant a Waiver to a Recalcitrant Supplier, the Debtors shall file the Notice of Waiver in substantially the form attached to the Motion as Exhibit B and, within five (5) business days of the payment pursuant to the Waiver, either (a) file an Order to Show Cause in substantially the form attached to the Motion as Exhibit C (an "Order to Show Cause") with this Court requiring that the Recalcitrant Supplier appear and show cause should why the Recalcitrant Supplier should not be held in violation of the automatic stay provisions of 11 U.S.C. § 362 for willfully threatening to withhold essential goods or services from the Debtors under one or more contracts between the Debtors and the Recalcitrant Supplier and be required to immediately disgorge the payment received pursuant to the Waiver or (b) if the Debtors determine that the Recalcitrant Supplier has not violated the automatic stay  provisions of 11 U.S.C. § 362 or the Debtors, in their discretion, elect not to file an Order to Show

Cause, provide notice of such determination and the amount paid to the Recalcitrant Supplier pursuant to the Waiver to (i) the U.S. Trustee, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for the official committee of unsecured creditors (the "Creditors' Committee"), (iv) the agent under GM's prepetition secured term loan agreement and the agent under GM's prepetition amended and restated secured revolving credit agreement, and (v) prior to the appointment of the Creditors' Committee, the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis).

(b)     In the event that the Debtors file an Order to Show Cause with respect to a Recalcitrant Supplier, at the first regularly scheduled hearing occurring at least five (5) business days following entry of the Order to Show Cause by this Court, the Recalcitrant Supplier shall be required to appear before this Court and demonstrate that such Recalcitrant Supplier should not be held in violation of the automatic stay.

(c)     Should the Court determine that, by its conduct, the Recalcitrant Supplier has violated the automatic stay, the Recalcitrant Supplier shall be required to disgorge the amount of the payment made to the Recalcitrant Supplier by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the federal judgment rate or such other higher rate as this Court specifies, within three (3) business days.

(d)     Nothing contained herein shall limit the Debtors' right to file any motions, adversary complaints, or other pleadings to pursue other remedies, including, without limitation, injunctive relief

; and it is further

ORDERED that the form of Notice of Waiver and the form of Order to Show Cause are hereby approved in all respects for use in accordance with the provisions of this Order; and it is further

ORDERED that the Debtors are authorized (but not directed) to continue to provide Troubled Supplier Assistance and to make all payments and extend all accommodations pursuant thereto whether relating to the period prior to or after the Commencement Date; and it is further

ORDERED that the Debtors are authorized (but not directed), in their discretion, to provide Troubled Supplier Assistance to any suppliers that may become financially or operationally distressed after the Commencement Date in the ordinary course of the Debtors' businesses and without any further order from this Court; and it is further

ORDERED that the Debtors are authorized, in their sole discretion and in the ordinary course of their businesses, to fully participate in the United States Treasury Auto Supplier Support Program (the "UST Support Program") and to make all payments required with respect thereto; and it is further

ORDERED that nothing herein shall be construed (i) to limit, or in any way affect, the Debtors' ability to dispute any Essential Vendor Claim, or (ii) as a waiver by any of the Debtors of their rights to contest any invoice or other claim of an Essential Vendor under applicable law; and it is further

ORDERED that nothing contained in the Motion or in this Order shall be deemed to constitute an assumption, adoption, or rejection of any executory contract or agreement between the Debtors and any third party or to require the Debtors to make any of the payments authorized herein; and it is further

ORDERED that each of the Banks is authorized and directed to receive, process, honor, and pay, to the extent of funds on deposit, all Checks and Electronic Transfers issued in respect of Essential Vendor Claims, Troubled Supplier Assistance, and UST Support Program whether presented prior to or after the Commencement Date without further Order of the Court, and such Banks are authorized to rely on the representations of the Debtors as to which checks and Electronic Transfers are issued or authorized to be paid pursuant to this Order; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that the Final Hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2009 at __:00 _.m. (Eastern Time); and any objections to entry of such order shall be in writing, filed with the Court in accordance with General Order M-242, and served upon those parties entitled to receive service of this Order as provided below, in each case so as to be received no later than 4:00 p.m. (Eastern Time) on _____, 2009; and it is further

ORDERED that the Debtors shall serve this Order within three business days of its entry on (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors, (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated:      New York, New York
            _____, 2009

                            _____
                            UNITED STATES BANKRUPTCY JUDGE