Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.,** *et al.*, | : | **09-_____ (___)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**MOTION FOR ENTRY OF ORDER**
**AUTHORIZING DEBTORS TO ENTER INTO, AND**
**APPROVING, RATIFICATION AGREEMENT WITH GMAC LLC**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

respectfully represent:

**Background**

        1.     On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in

these chapter 11 cases.

2.        Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

### General Motors' Businesses

3.        For over one hundred years, GM, together with its approximately 463

direct and indirect wholly-owned subsidiaries (collectively, "General Motors" or the

"Company"), has been a major component of the U.S. manufacturing and industrial base, as well

as the market leader in the automotive industry.  The Company's brands have been the standard

bearer in the development of the American automotive industry, having produced some of the

most striking and memorable automotive designs, including: Corvette, Riviera, and Eldorado.

Over many years, the Company has supplied one in five vehicles sold in the United States.  It is

the largest original equipment manufacturer ("OEM") in the country and the second largest in the

world.  General Motors' highly-skilled engineering and development personnel also designed

and manufactured the first lunar roving vehicle driven on the moon.  Today, the Company

continues as a leading global technology innovator.  Currently, it is setting the automotive

industry standard for "green" manufacturing methods.

4.        William C. Durant founded General Motors in 1908 to implement his

vision of one company growing through the creation and management of multiple brands.

General Motors began as a holding company for Buick Motor Company, and, by 1916, the

Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile,

and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., General Motors adopted the

groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury. Based on that strategy, the Company proceeded to build an automotive manufacturing giant offering distinctive brands and models for each market segment.

5.    Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including: Buick, Cadillac, Chevrolet, GMC, Daewoo, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling. The Company has produced nearly 450,000,000 vehicles globally and operates in virtually every country in the world. The recent severe economic downturn has had an unprecedented impact on the global automotive industry. Nevertheless, particularly in the United States, the automotive industry remains a driving force of the economy. It employs one in ten American workers and is one of the largest purchasers of U.S.-manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips. Almost 4% of the United States gross domestic product, and nearly 10% of U.S. industrial production by value, are related to the automotive industry.

6.    The Company's automotive operations include four automotive segments – GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific – each of which functions as independent business units with coordinated product development and functional support. Each geographic region has its own management team, subject to oversight by the Company. Substantially all of General Motors' worldwide car and truck deliveries (totaling 8.4 million in 2008) are marketed through retail dealers in North America and

---

[1] As a result of the global economic crisis and its effect in the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

through distributors and dealers outside North America, most of which are independently owned. In addition to the products sold to dealers for consumer retail sales, General Motors sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

7.    As of March 31, 2009, General Motors employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  In the United States, approximately 62,000 (68%) of U.S. employees were represented by unions.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") represents the largest portion of General Motors' U.S. unionized employees (totaling approximately 61,000 employees).

8.    As of March 31, 2009, General Motors had consolidated global recorded assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. Global revenues recorded for fiscal year 2008 aggregated approximately $150 billion.

## Financing Services and GMAC

9.    GMAC LLC ("GMAC") provides a range of financial services, including consumer vehicle financing to the Company's customers and automotive dealership and other commercial financing to the Company's dealers.  GMAC is also involved in the following businesses:  residential mortgage services, automobile service contracts, personal automobile insurance coverage, and selected commercial insurance coverage.  Founded in 1919 as a wholly-owned subsidiary of GM, GMAC was established both (i) to provide dealers with the financing necessary to acquire and maintain vehicle inventories and (ii) to provide customers new vehicle financing.  GMAC is a global finance company, operating in and servicing North America, Latin America, Europe, and Asia-Pacific.  It specializes in automotive finance, real estate finance,

insurance, commercial finance, and online banking.  Throughout its history, GMAC has served

as the single most important source of financing for the Company and its dealers and customers.

Indeed, the growth of the American automotive sector was fueled in large part by the availability

of affordable financing through GMAC.  As of March 31, 2009, GMAC had approximately $180

billion in assets and operations in 40 countries servicing approximately 15 million customers

around the world.

       10.     In November 2006, GM sold a 51% controlling ownership interest in

GMAC to a consortium of investors, including Cerberus FIM Investors, LLC, Citigroup Inc.,

Aozora Bank Limited, and a subsidiary of the PNC Financial Services Group, Inc. (collectively,

the "FIM Holdings").  In 2008, GMAC's operations and lending were severely impacted by the

global economic downturn and credit crisis.  In an effort to stabilize its operations and access

additional sources of liquidity, GMAC applied to become a bank holding company under the

Bank Holding Company Act of 1956, and its application was approved on December 24, 2008.

       11.     In connection with the requirement of the Board of Governors of the

Federal Reserve System for GMAC to raise new capital as a condition to GMAC's becoming a

bank holding company, the United States Department of the Treasury (the "U.S. Treasury")

requested that GM enter into a membership interest subscription agreement with GMAC and

FIM Holdings (the "GMAC Transaction"), pursuant to which GM agreed to purchase additional

common membership interests in GMAC (the "New GMAC Equity").  On January 16, 2009, as

contemplated by the GMAC Transaction, GM and the U.S. Treasury entered into a loan and

security agreement (the "GMAC Loan and Security Agreement"), pursuant to which GM

borrowed $884 million from the U.S. Treasury (the "Loan") for the purpose of purchasing the

New GMAC Equity.  As a result, GM's common equity interest in GMAC increased from 49%

to approximately 60%. Under the terms of the GMAC Loan and Security Agreement, the U.S.

Treasury has the right to exchange GM's obligations in respect of the Loan for the New GMAC

Equity, in full satisfaction of GM's obligations outstanding under the Loan at any time. On May

26, 2009, the U.S. Treasury notified GM that it would be exercising its exchange right, and on

May 29, 2009, the New GMAC Equity was transferred to the U.S. Treasury (the "New GMAC

Equity Exchange"), GM's obligations under the GMAC Loan and Security Agreement were

fully satisfied, and the GMAC Loan and Security Agreement was terminated.

        12.      Pursuant to additional commitments made by GM to the Board of

Governors of the Federal Reserve System, GM agreed to reduce its ownership interest in GMAC

to less than 10% of the voting and total equity in GMAC. In compliance with these

commitments, on May 22, 2009, GM transferred 78,828 units of GMAC's common membership

interests into a trust (the "GM Trust") established on that date with an independent trustee. All of

the GMAC equity held in the GM Trust must be disposed of within three years. Neither GM, nor

any of its affiliates or subsidiaries, has control over the GM Trust and, as such, GM does not

have the ability to direct the trustee as to how to dispose or vote the GMAC common

membership interests held in the GM Trust. As a result of the transfer of GMAC's common

membership interests into the GM Trust and the New GMAC Equity Exchange with the U.S.

Treasury described above, GM now holds approximately 53,452 common membership interests,

or approximately 9.9% of the total number of outstanding GMAC common membership

interests. GM also holds 1,021,764 preferred membership interests in GMAC. Other than such

common membership interests and preferred membership interests, GM does not directly or

indirectly hold any equity interests in GMAC. In addition, GM no longer has the right to appoint

any voting members to the GMAC Board of Directors and has committed not to exercise any controlling influence over the affairs of GMAC.

### The Economic Downturn and the U.S. Treasury Loan

13.     In 2008, the Company was confronted by the worst economic downturn and credit market conditions since the Great Depression of the 1930s.  Consumers were faced with illiquid credit markets, rising unemployment, declining incomes and home values, and volatile fuel prices.

14.     This economic turmoil resulted in significant financial stress on the automotive industry.  In the last quarter of 2008, new vehicle sales in the United States plummeted to their lowest per capita levels in fifty years.  The Company's revenues fell precipitously, thereby draining liquidity that, one year prior, had been considered adequate to fund operations.  As a result of the impending liquidity crisis, the Company was compelled to seek financial assistance, on a secured basis, from the federal government in order to sustain the Company's operations and avoid the potential for systemic failure throughout the domestic automotive industry, with an attendant effect on hundreds of thousands of jobs and the sequential shutdown of numerous ancillary businesses.

15.     The federal government recognized the potentially devastating negative effect of a GM failure on the U.S. economy.  On December 31, 2008, GM and the U.S. Treasury entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility").  A number of the Company's domestic subsidiaries guaranteed GM's obligations under the U.S. Treasury Facility and also guaranteed each of the other guarantors' obligations that were entered into concurrently with the U.S. Treasury Facility.  The U.S.

Treasury Facility is secured by a first priority lien on and security interest in substantially all the assets of GM and each of the guarantors that were previously unencumbered, as well as a junior priority lien on encumbered assets, subject to certain exceptions. The U.S. Treasury Facility is also collaterally secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, subject to certain exceptions.

16.    The U.S. Treasury Facility required that the Company develop a plan to transform GM and demonstrate future viability. On February 17, 2009, in order to address this condition, GM submitted a proposed viability plan (the "Long-Term Viability Plan") to the automobile task force appointed by President Obama to deal with the issues confronting the automobile industry and advise him and the Secretary of Treasury in connection therewith (the "Presidential Task Force").

## The U.S. Treasury-Sponsored Program for GM

17.    On March 30, 2009, President Obama announced that the Long-Term Viability Plan did not meet the federal government's criteria to establish GM's future viability and, as a result, did not justify a substantial new investment of taxpayer dollars. The President outlined a series of actions that GM would have to undertake to receive additional federal assistance. In conjunction with this announcement, in the interests of the Company's receiving further support from the U.S. Treasury, G. Richard Wagoner, Jr., who had been CEO since June 1, 2000, agreed to resign as Chairman and CEO of GM. In addition, Kent Kresa, a director since 2003, was appointed as Chairman of the Board, and it also was announced that a majority of the Board would be replaced over the next few months because it "will take new vision and new direction to create the GM of the future." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 4 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

18.     President Obama also stated that the U.S. Treasury would extend to the Company adequate working capital for a period of sixty days while it worked with the Company to develop, propose, and implement a more aggressive viability plan that would include a "credible model for how not only to survive, but to succeed in th[e] competitive global market." *Id.* The President observed that the Company needs a "fresh start to implement the restructuring plan" it develops, which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers staying on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

19.     The U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate its viability plan to achieve the foregoing objectives. Consistent with the President's guidance, the Company began a deeper, more surgical analysis of its business and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational transformation, and (iv) technology leadership. The U.S. Treasury indicated that, if an out-of-court restructuring was not achievable in that timeframe, then the Company should undertake to implement a new, more aggressive plan using an expedited, Bankruptcy Court-supervised process to implement the purchase of the

Company's assets by a U.S. Treasury-sponsored purchaser pursuant to section 363 of the

Bankruptcy Code (the "363 Transaction").  The purchaser would immediately take ownership of

the purchased assets as "New GM" free from the entanglement of the bankruptcy cases.

Although the U.S. Treasury has committed to provide debtor in possession financing for the

Company to implement the sale and to support the new enterprise, it requires that the sale of

assets occurs promptly to preserve value and avoid the devastating damage the industry would

suffer if the business operations were not promptly extricated from the bankruptcy process.

      20.    The U.S. Treasury will provide the financing to create New GM.  The U.S.

Treasury also indicated that if such a transaction were consummated, it would assure that New

GM had adequate financing and a capital structure that would assure New GM's long-term

viability.  The U.S. Government consistently has emphasized that a fundamental premise of its

approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid

potentially fatal revenue perishability by restoring confidence in GM employees, its customers,

its vendors, as well as the communities that depend on GM.  New GM will be perceived by

consumers as a reliable, economically sound automobile company that will stand behind its

products and extend value to the purchasing public.

      21.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to

increase the availability under the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM

borrowed the additional $2 billion in working capital loans on April 24, 2009.

      22.    As part of the Company's efforts to rationalize its business and to balance

large vehicle inventories, on April 24, 2009, the Company announced that it would temporarily

shut down certain production facilities starting on May 4, 2009 for a period not to exceed twelve

weeks (the "Temporary Shutdown").  As of the Commencement Date, certain of the Company's

assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of those assembly facilities that currently are shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

23.    On May 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion to $19.4 billion.  GM borrowed the additional $4 billion in working capital loans on May 22, 2009.

## The Exchange Offer

24.    In an effort to achieve long-term viability without resort to the bankruptcy process and its negative effect on revenue, on April 27, 2009, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company believed that the Exchange Offer would provide the least intrusive means to restructure its indebtedness for the future success of the Company.  The Company, however, did announce in connection with the Exchange Offer that if it did not receive enough tenders to consummate the Exchange Offer, it would likely seek to achieve the joint goals of the Company and the U.S. Treasury, as the Company's largest secured creditor, by initiating cases under the Bankruptcy Code.

25.    The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## The 363 Transaction

26.    Recognizing that the Exchange Offer might not be successful, the Company and the U.S. Treasury determined that it would be in the best interests of the Company and its stakeholders to prepare for the implementation of the 363 Transaction on a contingency basis while the Exchange Offer was being solicited.

27.      Consistent therewith, over the past several weeks, GM and its Debtor subsidiaries (the "Sellers") have been engaged in negotiations with the U.S. Treasury with respect to the 363 Transaction. These negotiations culminated in the proposed Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"). The 363 Transaction, as embodied in the MPA, contemplates that substantially all of GM's assets, including the capital stock of the majority of its subsidiaries, will be sold to the Purchaser to effect the transformation to New GM and preserve both the viability of the GM enterprise and the U.S. automotive industry. The assets excluded from the sale will be administered in the chapter 11 cases for the benefit of the stakeholders in the chapter 11 cases. From and after the closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their remaining subsidiaries with services reasonably required by the Sellers and such subsidiaries to wind down or otherwise dispose of the excluded assets and administer the chapter 11 cases. As part of the 363 Transaction, the Debtors, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.

28.      The Debtors intend to use the chapter 11 process to expeditiously consummate the 363 Transaction and establish New GM as an economically viable OEM, serving its customers, employees, suppliers, and the interests of the nation. The MPA is a critical element of the program adopted by the U.S. Treasury to rehabilitate the domestic automotive industry. The 363 Transaction furthers public policy by avoiding the fatal damage to the industry that would occur if New GM is unable to immediately commence bankruptcy-free operations.

29.     Notably, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have agreed to participate in the DIP financing provided by the U.S. Treasury to assure the long-term viability of GM's North American enterprise, but only on the condition that the 363 Transaction is expeditiously approved.  The extent of the Canadian participation will be approximately $9.1 billion.

30.     The gravity of the circumstances cannot be overstated.  The need for speed in approving and consummating the 363 Transaction is crucial.  The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM.  Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products.  Expeditiously restoring and maintaining consumer confidence is a prerequisite to the successful transformation and future success of New GM.

31.     The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective "to create the GM of the future," and to preserve and strengthen the U.S. automotive industry and the tens of thousands of jobs involved.  To paraphrase President Obama's remarks, the 363 Transaction "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  *Presidential Remarks* at 7.

## Jurisdiction

32.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

33.     As noted above, a significant portion of the wholesale, retail and other related product financing received by GM dealers and their customers is provided through GMAC.  Related thereto, GM and GMAC are parties to dozens of agreements that govern their longstanding financing and operating relationship.  On the Commencement Date, GM and GMAC entered into a Ratification Agreement (the "Ratification Agreement")[2], which provides for the continuation of the parties' prepetition financing and operating relationships during these chapter 11 cases through the closing of the 363 Transaction.  The continuation of this relationship pursuant to the Ratification Agreement is vital to the preservation and maintenance of the going concern values of the Debtors.  Absent GMAC continuing to provide financing postpetition, the Debtors' dealers and customers would be left unable to finance the purchase of vehicles manufactured by the Debtors and the flow of revenues into the Debtors would be substantially impacted, if not cease.  Accordingly, GM's ability to continue operating would be considerably tested without the continued financial support of GMAC.

34.     By this Motion, pursuant to sections 105, 362, 363, 364(b), 364(e), 365 and 503(b) of the Bankruptcy Code, and Rules 2002, 4001, 6003, 6004 and 9014(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9014-2

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Ratification Agreement.  A copy of the Ratification Agreement is attached to this Motion as Exhibit "A".

of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "Local Rules"), the Debtors respectfully seek entry of an order, substantially in the form

attached hereto as Exhibit "B" (the "Order"), authorizing the Debtors to enter into, and granting

approval of, the Ratification Agreement.

35.    The Ratification Agreement provides for the Debtors and GMAC to

continue to perform their respective obligations during these chapter 11 cases under the

following prepetition financial and operating agreements and arrangements between the parties:

(i)    That certain Master Services Agreement between the parties made as of November 30, 2006 (as amended and restated on May 22, 2009, and effective as of December 29, 2008, the "MSA"), the Specified Integrated Agreements (as defined and identified in the MSA), and all implementing agreements arising under or relating to any of the Specified Integrated Agreements (the "Implementing Agreements") (collectively, the MSA, the Specified Integrated Agreements and the Implementing Agreements, as such agreements have heretofore or may hereafter be amended, modified or supplemented, the "MSA Documents"), and;

(ii)    All other existing contractual arrangements between the Debtors and GMAC that memorialize the ordinary course of business, financial and operating arrangements between the parties (collectively, the "Other Agreements" and, together with the MSA Documents, as such agreements have heretofore or may hereafter be amended, modified or supplemented, the "Operative Documents").[3]

GM and its dealers and customers depend upon the financial support and services provided by

GMAC under the Operative Documents.  Under the terms of the Ratification Agreement, the

Debtors will continue to incur obligations and make all payments from and after the

Commencement Date in the ordinary course pursuant to the Operative Documents.  In return,

---

[3]  The Operative Documents include the following main agreements between GM and GMAC, in addition to dozens of implementing and related agreements:  (1) Amended and Restated Master Services Agreement, (2) Amended and Restated Dealer Finance Service Agreement, (3) Information Technology Agreement, (4) Insurance Services Agreement, (5) Intellectual Property Agreement, (6) Amended and Restated International Consumer Financing Services Agreement, (7) Marketing Services Agreement, (8) Amended and Restated Canada Consumer Financing Services Agreement, (9) Remarketing Service Agreement and (10) Amended and Restated United States Consumer Financing Services Agreement.  Contemporaneously with the filing of this Motion, the Debtors have filed a joint motion with GMAC requesting authority to file these agreements under seal.  Accordingly, the above Operative Documents are not included with the publicly filed and served version of this Motion.

GMAC will continue to provide the Debtors and their dealers and customers with critical and necessary wholesale, retail and other related product financing during these chapter 11 cases.

36.     The Ratification Agreement does not require the immediate assumption of the Operative Documents.  The Debtors are separately seeking authority under the MPA to assume and assign the Operative Documents in connection with the 363 Transaction.  Nor are the Debtors requesting by this Motion to elevate any obligations of the Debtors incurred and due under the Operative Documents prior to the Commencement Date to administrative expense status.  Rather, by this Motion, the Debtors seek authority only to continue to perform under the Operative Documents pursuant to the terms of the Ratification Agreement and to incur, accrue and pay in the ordinary course administrative expenses related to their postpetition performance thereunder from the Commencement Date until the closing of the 363 Transaction.  This will allow for the seamless transition of essential vehicle financing to New GM and assure GMAC of continued performance by the Debtors and then New GM under the Operative Documents following the 363 Transaction.

37.     The Ratification Agreement is the result of extensive arms' length negotiations between the Debtors and GMAC, and is an essential component of the Debtors efforts to efficiently administer their estates.  The salient terms of the Ratification Agreement are summarized below, qualified in full by the terms of the Ratification Agreement itself:

- Term.  The term of the Ratification Agreement is from the Commencement Date until (i) the close of the 363 Transaction pursuant to a sale order entered by the Court (the "Sale Order") or (ii) an event of termination occurs (as described below) (the Term of the Ratification Agreement is hereinafter referred to as the "Interim Period").

- Performance During Interim Period.  Each of GMAC and each Debtor (a) acknowledges the Operative Documents to which it is a party and (b) agrees,

at all times during the Interim Period, to perform its obligations in accordance with (but subject to) the terms of such Operative Documents and the Order.

- <u>Obligations of GM</u>. All payments are to be made by the Debtors as and when they become due during the Interim Period in accordance with the Operative Documents, including, without limitation, exposure reduction payments in accordance with Section 4 of the MSA and payment of vehicle repurchase obligations, all of which, as consideration for the continued agreement by GMAC to perform its obligations under the Operative Documents, are to be paid to GMAC. All payments made to GMAC during the Interim Period are not subject (except to the extent provided under the Operative Documents) to any discharge, reduction, setoff, recoupment, avoidance, disgorgement, offset, defense, counterclaim, or similar claim by the Debtors and their estates, which are unconditionally waived and released by the Debtors.

- <u>Assumption and Assignment Pursuant to the Sale Order and Release of Debtors</u>. GMAC agrees to the assumption and assignment of the Operative Documents by the Debtors, and the assumption by the Purchaser of the Operative Documents and all prepetition obligations arising thereunder pursuant to the Sale Order. GMAC further agrees that such assumption and assignment of the Operative Documents and prepetition obligations pursuant to the Sale Order shall be deemed to effectuate an automatic and immediate release by GMAC against the Debtors, their shareholders, affiliates, subsidiaries and representatives to the extent that the released claims have been assumed by the Purchaser pursuant to the Sale Order.

- <u>Release of Prepetition Claims Against GMAC</u>. Upon the occurrence of both the entry of the Sale Order and assumption and assignment of the Operative Documents to the Purchaser under the Sale Order, in consideration of GMAC's agreements in the Ratification Agreement, including its agreement to perform its obligations under the Operative Documents during the Interim Period, each Debtor will release GMAC and its shareholders, affiliates, subsidiaries and representatives from all prepetition claims, including any actions brought pursuant to Chapter 5 of the Bankruptcy Code, as more fully set forth in the Ratification Agreement.

- <u>Setoff.</u> GMAC's setoff rights against obligations owed by the Debtors to GMAC on the Commencement Date or during the Interim Period, arising under the Operative Documents shall be preserved; provided, however, that during the Interim Period GMAC is prohibited from exercising any setoff rights under the Operative Documents without first obtaining an order from the Court authorizing their right to setoff. Further, GMAC shall provide at least three (3) business days notice to the Debtors and other relevant notice parties before seeking any such order from the Bankruptcy Court, provided that, during such period, GMAC shall not, to the extent of the amounts sought

to be setoff, be required to make any payments otherwise due the Debtors or provide loans, advances, other financial accommodations or other extensions of credit to the Debtors during such period.

- <u>Termination.</u> If any of the following events occur, GMAC is entitled to cease performing under the Ratification Agreement (unless otherwise agreed to by the Debtors and GMAC): (a) a material breach of the Ratification Agreement or any of the MSA Documents or any other material Operative Document by the Debtors following three (3) business days notice from GMAC and a reasonable opportunity to cure, provided, however, that GMAC shall not (to the extent permitted by the Operative Documents or in the event of a material breach of the Ratification Agreement) be required to provide loans, advances or other financial accommodations directly to the Debtors during such period; (b) dismissal of any of these chapter 11 cases or conversion to a Chapter 7 case under the Bankruptcy Code; (c) the Ratification Order is not entered by the Bankruptcy Court on or before June 5, 2009; (d) the Ratification Order or the Sale Order is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court; (e) the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; (f) the appointment of an examiner with special powers to operate the Debtors' businesses pursuant to Section 1104(a) of the Bankruptcy Code; (g) the failure by the Debtors to (x) obtain entry of the Sale Order by the Bankruptcy Court and (y) close the 363 Transaction, on or before August 15, 2009, or such later date as the Debtors and Purchaser may agree in writing, such date not to be later than September 15, 2009; or (h) the filing by any subsidiary or affiliate of GM of a proceeding in Canada under the Companies Creditors Arrangement Act ("<u>CCAA</u>"), unless such subsidiary or affiliate has obtained the approval by an appropriate court to continue to perform its obligations under all of its agreements with GMAC, including but not limited to, any Operative Document on terms and conditions substantially similar to the Ratification Agreement.

38.    If approved, the Ratification Agreement will allow the Debtors to continue their respective financial and operating arrangements with GMAC postpetition. As described in more detail below, the Debtors have an immediate and critical need to continue these financing arrangements with GMAC in order to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships with suppliers, wholesale dealerships and customers, (iii) provide their dealers ( "<u>GM Dealers</u>" or the "<u>Dealers</u>") with certain financing and services, including, but not limited to, (a) new and used vehicle inventory

financing, (b) capital loans, (c) equipment loans, (d) real estate loans, (e) dealer insurance

products and services, (f) remarketing services, and (g) electronic cash and drafting settlement

systems (collectively, the "Dealer Financing") and (iv) provide certain retail financing to the

Debtors' and Dealers' fleet and retail customers (the "Consumers"), including, but not limited to,

(a) consumer retail financing, (b) commercial retail financing, and (c) commercial fleet financing

(collectively, the "Retail Financing").

       39.    Absent the relief requested by this Motion and approval of the Ratification

Agreement, GMAC will not agree to continue to provide financing to the Debtors, their Dealers

and Consumers postpetition. Without the provision of such financing by GMAC, the Debtors'

sales of vehicles would drop precipitously, as their Dealers would be unable to stock their

showrooms, and Consumers would have fewer financing options to purchase GM vehicles. This

would have a devastating impact on the Debtors' businesses and would jeopardize their ability to

continue as a going concern at this critical juncture in their history.  Accordingly, approval of the

Ratification Agreement is vital to the Debtors operations during their chapter 11 cases and is

therefore in the best interests of the Debtors, their creditors and all parties in interest.

**The Debtors Urgent Need to Enter into the Ratification Agreement**

       40.    Throughout its history, GMAC has been the primary, and sometimes only,

source of financing for GM's dealers and customers to purchase vehicles manufactured by the

Debtors.  Based on the current economic downturn and crisis in the credit markets, the Debtors

have an urgent and immediate need during their chapter 11 cases to continue the Operative

Documents with GMAC pursuant to their entering into the Ratification Agreement.  Indeed, no

alternative source of wholesale or retail financing is available to the Debtors to replace, at the

levels required, the critical and necessary financing provided by GMAC under the Operative

Documents.

41.    By far, the largest source of revenue for the Debtors comes from the

purchase of their vehicles by GM Dealers.  Dealer Financing provided by GMAC under the

Operative Documents is what enables GM Dealers to continue to purchase new and used GM

vehicles. Under the Operative Documents, GMAC provides readily accessible and commercially

affordable Dealer Financing that enables GM Dealers to purchase new and used GM vehicles on

a wholesale basis, provides fleet financing for GM Dealers to buy GM vehicles they rent or lease

to others, provides wholesale vehicle inventory insurance to GM Dealers, provides automotive

extended service contracts through GM Dealers, provides financing necessary for GM dealers to

offer incentive programs to its retail customers, and provides working capital to GM Dealers to

operate their dealerships in the ordinary course.

42.    In addition, pursuant to the Operative Documents, GMAC routinely

advances payment directly to the Debtors on behalf of the Dealers for their wholesale purchase

of GM vehicles.  In 2008, over 75% of GM Dealers relied on GMAC to finance their vehicle

purchases and other business activities.  GM Dealers are the main channel by which the Debtors

are able to sell their vehicles to GM Consumers and therefore it is imperative for the Debtors to

be able to continue to offer financing to its Dealers under the Operative Documents during their

chapter 11 cases.

43.    Similarly, under the Operative Documents, GMAC provides Retail

Financing to a broad spectrum of prime and non-prime Consumers at market rates or below

market rates to purchase GM vehicles from the Dealers.  For many Consumers, credit offered by

GMAC (and to a lesser extent other financing sources) is the primary means by which they can

purchase GM vehicles.  The entire business model of GM, and indeed the automobile industry

overall, is dependent on the ability of Consumers to obtain credit to purchase automobiles.  In the

midst of the current credit crisis and market turmoil, the ability of Consumers to obtain financing

to purchase GM vehicles is severely curtailed, and in many cases, non-existent. Therefore, Retail

Financing provided by GMAC under the Operative Documents is critical to GM's ability to

continue to sell its vehicles to Consumers. Accordingly, the Debtors have determined, in their

sound business judgment, that it is necessary to their business to enter into the Ratification

Agreement and continue the Operative Documents.

44.     In addition to providing critical Dealer Financing and Retail Financing,

GM and GMAC provide significant services and resources to each other under the Operative

Documents based on their historic relationship.  The interrelated transactions and dealings

between GM and GMAC embodied in the Operative Documents contribute significantly to the

success of GM by generating efficiencies and enhanced results for GM, including business

opportunities and referrals, data and resource sharing, economies of scale, leveraging staff

expertise, and administrative conveniences.  Combined, these efficiencies result in highly

valuable and significant organizational, operational, business, and financial synergies for GM.

45.     If approved, the Ratification Agreement and continuation of the Operative

Documents will provide GM Dealers and Consumers with immediate and ongoing financing to

continue to purchase vehicles manufactured by the Debtors.  Moreover, the continuation of

GM's financing and operating relationship with GMAC pursuant to the Ratification Agreement

will restore confidence to GM's employees, creditors, Dealers and Consumers, thereby further

preserving and enhancing the value of the Debtors estates.  Absent the requested relief, however,

GM Dealers and Consumers could be left without any other financing options to purchase GM

vehicles, which could result in irreparable harm to the Debtors' businesses and significantly

jeopardize the Debtors ability to maximize its value as a going concern.  Accordingly, timely

approval of the Ratification Agreement and continuation of the Operative Documents is

imperative to the Debtors chapter 11 cases.

### Authority to Enter into the Ratification Agreement

46.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second

Circuit (and elsewhere) have required that a debtors proposed use of property pursuant to section

363(b) be based on the sound business judgment of the debtor.  *See*, *e.g*., *Licensing By Paolo,*

*Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of Equity Sec. Holders*

*v.Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re GlobalCrossing*

*Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675

(Bankr. S.D.N.Y. 1989).  When a valid business justification exists, the law vests the debtor's

decision with a strong presumption that the debtor's management and directors, in approving the

proposed use of property pursuant to section 363(b), "'acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company.'"  *Official*

*Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147

B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)),

*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

47.    Nor will courts second-guess a reasonably founded business judgment in

the context of section 363(b).  As Judge Lifland stated in *Committee of Asbestos-Related*

*Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y.

1986), "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." Id. at 616.  Indeed, the burden of rebutting the presumption in favor of a

debtor exercising its business judgment under section 363(b) falls to the party opposing the

requested relief.  *See In re Integrated Res.*, 147 B.R. at 656 (citing *Aronson v. Lewis*, 473 A.2d

805, 812 (Del. 1984)).  And, that burden is heavy indeed, for the business judgment rule defers to

a management decision that can be "attributed to any rational business purpose."  *Williams v.*

*Geier*, 671 A.2d 1368, 1378 & n.20 (Del. 1996); *see also In re Integrated Res.*, 147 B.R. at 656.

        48.     Here, the Debtors are clearly exercising their sound business judgment by

seeking approval of the Ratification Agreement.  As noted above, the Debtors ability to continue

to operate their business and successfully reorganize is dependent on GMAC continuing to

provide Dealer Financing and Retail Financing postpetition pursuant to the terms of the

Operative Documents.  GMAC has historically been the primary source of such financing and

the current turmoil in the credit markets has left the Debtors unable to obtain Dealer Financing or

Retail Financing, at the levels required, from any other source.  Therefore, absent approval of the

Ratification Agreement and continuation of the Operative Documents, Dealers and Consumers

will be left unable to finance their purchase of vehicles manufactured by the Debtors.

Accordingly, the Debtors respectfully request that the Court authorize them to enter into the

Ratification Agreement and perform their obligations thereunder, pursuant to section 363(b) of

the Bankruptcy Code.

### Authority to Obtain Unsecured Credit

        49.     As discussed in detail above, GMAC will continue to extend significant

amounts of credit postpetition to provide Dealer Financing and Retail Financing to and for the

benefit of the Debtors under the Operative Documents.  Section 364(b) of the Bankruptcy Code

provides that the court, after notice and a hearing, may authorize the trustee to obtain unsecured

credit or to incur unsecured debt other than subsection (a) of this section, allowable under section

503(b)(1) of this title as an administrative expense.  11 U.S.C. § 364(b).  A debtor's request for

authority to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code is subject

to the court's discretion and a finding that the debtor has exercised its reasonable business

judgment.  *See  In re Ames Dep't Stores*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 2003) (sections

364(a) and (b) of the Bankruptcy Code allow a debtor to obtain unsecured credit with an

administrative expense status in the exercise of the debtors sound business judgment); *see also In

re Ashford Hotels*, 226 B.R. 797 (Bankr. 1998 S.D.N.Y. ) (stating that section 364(b) of the

Bankruptcy Code allows a trustee, in exchange for credit, to give a lender an administrative

priority claim); *In re Schuler*, 354 B.R. 37, 42 (Bankr. W.D.N.Y. 2006) (section 364(b)

authorizes a debtor in possession to obtain credit only with authorization from the court, after

notice and a hearing).

       50.    The Debtors, in their sound business judgment, have determined that it is

both critical and necessary for GMAC to continue to provide unsecured credit to support Dealer

Financing and Retail Financing under the Operative Documents.  As noted, the automotive

market meltdown and the crisis in the credit markets have made it virtually impossible for the

Debtors to obtain, at the levels required, alternative credit to support Dealer Financing and Retail

Financing.  Therefore, the Debtors entry into the Ratification Agreement and continuation of the

Operative Documents is essentially the only postpetition financing available to satisfy these

needs and is critically necessary if the Debtors are to preserve value for their stakeholders and

survive the current disruption in the capital markets.  Accordingly, the Debtors submit that the

circumstances of these cases and the unprecedented crises in the credit markets justifies the

Debtors request to continue to obtain unsecured under the Operative Documents pursuant to

section 364(b).

51.     Moreover, the terms and conditions of the Ratification Agreement are fair

and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore,

GMAC should also be accorded the benefits of section 364(e) of the Bankruptcy Code to the

extent any or all of the provisions of the Ratification Agreement, or any order of this Court

pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of

this or any other court.

## The Debtors Have Satisfied Bankruptcy Rule 6003

52.     Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion "to use, sell,

lease, or otherwise incur an obligation regarding property of the estate" prior to twenty days after

the Commencement Date.  As described above, authorization to enter into the Ratification

Agreement and continuation of the Operative Documents is necessary to avoid immediate and

irreparable harm, and, therefore, the requirements of Bankruptcy Rule 6003 for expedited relief

are satisfied.

## Waiver of Bankruptcy Rules 2002(a), 6004(a) and 6004(h)

53.     Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale,

or lease of property, other than cash collateral, not in the ordinary course of business shall be

given pursuant to Rule 2002(a)(2), (c)(1), (i), and (j)."  Bankruptcy Rule 2002(a) provides that at

least 20 days' notice by mail shall be given to all creditors and indenture trustees of "a proposed

use, sale, or lease of property of the estate other than in the ordinary course of business, unless

the court for cause shown shortens the time or directs another method of giving notice."

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ...

is stayed until the expiration of 10 days after entry of the order, unless the court orders

otherwise."

54.    Based upon the foregoing and to implement the relief requested

successfully, the Debtors request that the Court waive the notice requirements under Bankruptcy

Rules 2002(a) and 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of

property under Bankruptcy Rule 6004(h).

**<u>Notice</u>**

55.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii)

the attorneys for EDC; (iv) the attorneys for the agent under GM's prepetition secured term loan

agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured

revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the

Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America, (viii) the attorneys for

the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—

Communications Workers of America, (ix) the U.S. Department of Labor, (x) the attorneys for

the National Automobile Dealers Association, (xi) the attorneys for the ad hoc bondholders

committee and (ix) Otterbourg, Steindler, Houston & Rosen, 230 Park Avenue, New York, New

York, 10169 (Attn: Daniel Wallen, Esq., Jonathan N. Helfat, Esq. and Steven B. Soll, Esq.),

attorneys for GMAC. The Debtors submit that, in view of the facts and circumstances, such

notice is sufficient and no other or further notice need be provided.

56.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
       June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Exhibit A**
**Ratification Agreement**

RATIFICATION AGREEMENT

This RATIFICATION AGREEMENT (the "**Ratification Agreement**"), dated as of June 1, 2009, is by and between GMAC LLC, a Delaware limited liability company, on its behalf and on behalf of certain affiliates which are parties to the Operative Documents (defined below) (collectively, "**GMAC**"), and General Motors Corporation ("**GM**"), a Delaware corporation, and certain of its subsidiaries which are parties to the Operative Documents.

W I T N E S S E T H:

WHEREAS, GM and certain of its subsidiaries (each as Debtors and Debtors-in-possession, collectively, the "**Debtors**") have commenced cases under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, and, pursuant thereto, each of them has retained possession of their respective assets and been authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, the inter-related transactions and dealings between GM and/or its subsidiaries, on the one hand, and GMAC and/or its subsidiaries, on the other hand, contribute significantly to the success of GM and GMAC, usually generating efficiencies and enhanced results for each of them, including business opportunities and referrals, data and resource sharing, economies of scale, leveraging staff expertise, and administrative conveniences, all of which combined, result in highly valuable and significant organizational, operational, business and financial synergies;

WHEREAS, the parties entered into that certain Master Services Agreement, dated as of November 30, 2006 (as amended, supplemented and otherwise modified prior to May 22, 2009, the "**Original MSA**") which, among other things, integrated and supplemented certain agreements under which the parties have provided various services and financial accommodations to one another as set forth therein, including, the terms and conditions more specifically set forth in the Specified Integrated Agreements (defined below);

WHEREAS, on December 24, 2008, in connection with the conversion of GMAC Bank, a wholly owned Subsidiary of GMAC, from a Utah industrial loan company to a Utah commercial bank, the Board of Governors of the Federal Reserve System approved the application of GMAC to become a bank holding company under Section 3 of the Bank Holding Company Act of 1956, as amended.  Pursuant to a letter agreement entered into between GM and GMAC, dated as of December 29, 2008 (the "**Letter Agreement**"), in connection with the approval, GM and GMAC agreed to amend and restate the Specified Integrated Agreements (defined below), including the Original MSA, in accordance with the terms set forth in the Letter Agreement.

WHEREAS, to document more formally the terms set forth in the Letter Agreement, the parties entered into that certain Amended and Restated Master Services Agreement dated as of May 22, 2009, and made effective as of December 29, 2008 (the "**MSA**"), to, *inter alia*, memorialize certain modifications to the existing contractual arrangements and other business

and financial course of dealings, which, together with the amendment of certain of the Specified Integrated Agreements (as defined and identified in the MSA, the "**Specified Integrated Agreements**"), and all implementing agreements arising under or relating to any of the Specified Integrated Agreements (the "**Implementing Agreements**"), (the MSA, the Specified Integrated Agreements and the Implementing Agreements, as such agreements have heretofore or may hereafter be amended, modified and supplemented, collectively referred to as the "**MSA Documents**");

WHEREAS, there are other existing contractual arrangements between the Debtors and GMAC that memorialize the ordinary course of business, financial and operating arrangements between the parties (collectively, as the same may be amended, modified and supplemented from time to time, the "**Other Agreements**" and, together with the MSA Documents, collectively, the "**Operative Documents**"); and

WHEREAS, GMAC has the right to seek the entry of an order of the Bankruptcy Court compelling the Debtors to immediately assume or reject the Operative Documents and to refrain from providing any financial accommodations to or for the benefit of the Debtors thereunder, but has agreed to refrain from exercising such rights in consideration of the Debtors entering into this Ratification Agreement subject to entry of the Ratification Order; and

WHEREAS, entry into the Ratification Agreement and continuation of the Operative Documents is essential to the continued operation of the Debtors' businesses and in the best interests of the Debtors' estates, creditors, and other parties in interest, for reasons including, among others, that the Operative Documents (i) are critical to the Debtors' ability to continue to operate their businesses as a going concern, both from the perspective of their ability to sell vehicles on a wholesale basis to their dealers and for such dealers to sell the Debtors' vehicles on a retail basis to their customers; and (ii) are consistent with the long standing contractual arrangements under which the parties have conducted their businesses over the past many years in the ordinary course;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein provided, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the parties mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Definitions:  As used herein, the terms set forth and defined in the MSA Documents shall have the meanings given to them in the MSA Documents and such definitions are incorporated herein by reference in their entirety.

1.2    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Operative Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court or the United States District Court for the Southern District of New York.

(b)    "**Chapter 11 Cases**" shall mean the Chapter 11 cases of the Debtors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(c)    "**Commencement Date**" shall mean the date of the commencement of the Chapter 11 Cases.

(d)    "**Event of Default**" as defined in Section 4.

(e)    "**Interim Period**" shall have the meaning ascribed to such term in the Ratification Order.

(f)    "**Post-Petition Obligations**" shall mean all obligations of the Debtors to GMAC, to the extent accrued, payable or incurred during the Interim Period, arising under or related to the Operative Documents.

(g)    "**Pre-Petition Obligations**" shall mean all obligations of GM to GMAC, of any kind or nature, arising at any time before the Commencement Date.

(h)    "**Purchaser**" shall mean (i) Vehicle Acquisition Holdings LLC, a Delaware limited liability company, a purchaser sponsored by the United States Department of the Treasury or (ii) any other Person reasonably acceptable to GMAC, in the case of this clause (ii), pursuant to an asset purchase agreement reasonably acceptable to GMAC.

(i)    "**Ratification Agreement**" shall mean this Ratification Agreement, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, with the consent of the parties hereto.

(j)    "**Ratification Order**" shall mean the order entered by the Bankruptcy Court which approves this Ratification Agreement.

(k)    "**Sale Order**" shall mean the order or orders entered by the Bankruptcy Court which approves the sale of all, or substantially all, of the Debtors' assets and which sale (the "**Sale**") provides for, among other things, (x) the full assumption by the Debtors, and the assignment to and assumption by the Purchaser, of the Operative Documents and the Pre-Petition Obligations under the Operative Documents pursuant to, *inter alia*, Section 365 of the Bankruptcy Code, and (y) the full release by the Debtors, their successors and assigns, and the Debtors' estates in favor of GMAC, as set forth in Section 5.2 herein.

2.    <u>ACKNOWLEDGMENT</u>.

2.1    <u>Obligations</u>.    It is understood and agreed by the Debtors and GMAC that all payments are to be made by the Debtors as and when they become due during the Interim Period, in accordance with the Operative Documents, including, without limitation, exposure reduction payments in accordance with Section 4 of the MSA and payment of vehicle repurchase obligations, all of which, as consideration for the continued agreement by GMAC to perform its obligations under the Operative Documents, are to be paid to GMAC, without being subject (except to the extent provided under the Operative Documents) to any discharge, reduction,

setoff, recoupment, avoidance, disgorgement, offset, defense, counterclaim, or similar claim by the Debtors and their estates, which are hereby unconditionally waived and released by the Debtors and their estates.

        2.2    <u>Binding Effect of Operative Documents</u>.  Each party hereto acknowledges, confirms and agrees that: (a) each of the Operative Documents to which it is a party was duly executed and delivered to such party by the other party and each is in full force and effect as of the date hereof, (b) subject to the provisions of this Ratification Agreement, the agreements and obligations of each party contained in the Operative Documents constitute the legal, valid and binding obligations of such party enforceable against it in accordance with the terms thereof, and (c) each Debtor has no valid defense, offset or counterclaim to the enforcement of such obligations.

        2.3    <u>Effect of Chapter 11 Cases and Sale</u>.  Conditioned upon the approval of this Agreement and the performance by Debtors hereunder, GMAC acknowledges, confirms and agrees that, notwithstanding anything herein or in any the Operative Documents to the contrary, neither the commencement of the Chapter 11 Cases nor the Sale shall constitute an Event of Default or otherwise entitle GMAC to terminate, or cease its performance under, the Operative Documents.

    3.    <u>RATIFICATION</u>

        3.1    <u>Performance During Interim Period</u>.  Each of GMAC and each Debtor hereby (a) acknowledges the Operative Documents to which it is a party and (b) agrees, at all times during the Interim Period, to perform its obligations in accordance with (but subject to) the terms of such Operative Documents and the Ratification Order.

        3.2    <u>Sale Order</u>.  Upon entry of the Sale Order by the Bankruptcy Court, the Operative Documents shall, effective immediately prior to the closing of the Sale, be deemed adopted and assumed in full by the Debtors and considered as agreements between such Debtors, on the one hand, and GMAC, on the other hand, and shall, upon the closing of the Sale, be assigned to and assumed by the Purchaser of the Debtors' assets pursuant to the Sale Order, all in accordance with and pursuant to Section 365 of the Bankruptcy Code.

        3.3    <u>No Assumption and Priority of Obligations</u>.  This Ratification Agreement itself shall not be deemed to constitute a post-petition assumption by the Debtors of the Operative Documents pursuant to Section 365 of the Bankruptcy Code, and except as expressly provided herein or in the Ratification Order, nothing shall alter the priority of the Pre-Petition Obligations.

    4.    <u>EVENTS OF DEFAULT</u>.

        4.1    <u>Events of Default</u>.  The Debtors agree that the occurrence of any of the following conditions or events constitute an event of default (each an "**Event of Default**") which shall entitle GMAC to cease performing under this Ratification Agreement:

(a)      A material breach of this Ratification Agreement or any of the MSA Documents or any other material Operative Document by the Debtors following three (3) business days notice from GMAC and a reasonable opportunity to cure, provided, however, that GMAC shall not (to the extent permitted by the Operative Documents or in the event of a material breach of this Ratification Agreement) be required to provide loans, advances or other financial accommodations to the Debtors during such period and, provided further, that (i) a material breach of an Operative Document shall be deemed not to have arisen unless such breach entitles GMAC to cease performing under such Operative Document by its terms or operation of law, and (ii) nothing herein is intended to supersede or modify any dispute resolution procedures set forth in any of the Operative Documents;

(b)      conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(c)      dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(d)      the filing by any subsidiary or affiliate of GM of a proceeding in Canada under the Companies Creditors Arrangement Act ("CCAA") or other insolvency proceeding, unless, to the extent required, such subsidiary or affiliate has promptly obtained the approval of such Canadian Court having jurisdiction over such proceeding, granting such entity the authority to continue to perform its obligations under all of its agreements with GMAC, including but not limited to, any Operative Document to which such entity is a party, on terms and conditions substantially similar to the terms and conditions of this Ratification Agreement;

(e)      the Ratification Order is not entered by the Bankruptcy Court on or before June 5, 2009;

(f)      the Ratification Order or the Sale Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of GMAC (and no such consent shall be implied from any other authorization or acquiescence by GMAC);

(g)      the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(h)      the appointment of an examiner with special powers to operate the Debtors' businesses pursuant to Section 1104(a) of the Bankruptcy Code;

(i)      the failure by the Debtors to (x) obtain entry of the Sale Order by the Bankruptcy Court and (y) close the Sale, on or before August 15, 2009, or such later date as the Debtors and the Purchaser may agree in writing, such date not to be later than September 15, 2009.

4.2      Notices.   During the Interim Period, any Notice provisions in the Operative Documents are hereby amended by adding that any notices, requests and demands also be sent to the following parties:

| | |
|---|---|
| If to the Debtors: | GM Treasurer<br>767 Fifth Avenue, 14th Floor<br>New York, NY  10153<br>Facsimile:  212.418.3630 |
| with a copy to: | Weil, Gotshal & Manages, LLP,<br>767 Fifth Avenue<br>New York, NY  10153<br>Facsimile No.: 212.310.8007<br>Attn:  Joseph H. Smolinsky, Esq. |
| If to GMAC: | GMAC President Auto Finance<br>Mail Code 482-B12-D11<br>200 Renaissance Center<br>P.O. Box 200<br>Detroit, MI  48265<br>Facsimile:  313.665.6309 |
| with a copy to: | General Counsel<br>MC-482-B09-B11<br>200 Renaissance Center<br>P.O. Box 200<br>Detroit, MI  48265<br>Facsimile:  313.665.6189 |
| with a copy to: | Otterbourg, Steindler, Houston & Rosen, P.C.<br>230 Park Avenue<br>New York, NY  10169<br>Facsimile: (212) 682-6104<br>Attn:  Jonathan N. Helfat, Esq. and Steven B. Soll, Esq. |

5.    SETOFF and RELEASE.

5.1    Setoff.  GMAC's setoff rights against obligations owed by the Debtors to GMAC on the Commencement Date or during the Interim Period, arising under the Operative Documents shall be preserved; provided, however, that during the Interim Period GMAC is prohibited from exercising any setoff rights under the Operative Documents without first obtaining an order from the Court authorizing their right to setoff.  Further, GMAC shall provide at least three (3) business days notice to the Debtors, and certain other parties as required by the Ratification Order, before seeking any such order from the Bankruptcy Court, provided that,

during such period, GMAC shall not, to the extent of the amounts sought to be setoff, be required to make any payments otherwise due the Debtors or provide loans, advances, other financial accommodations or other extensions of credit to the Debtors during such period.

        5.2    <u>Release of Pre-Petition Claims</u>.

        (a)    Upon the occurrence of both entry of the Sale Order and assumption and assignment of the Operative Documents to the Purchaser under the Sale Order, in consideration of the agreements of GMAC contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Debtor, on behalf of itself, its estate, and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges GMAC and its respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (GMAC and all such other parties being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action (including any actions brought pursuant to Chapter 5 of the Bankruptcy Code), suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, "**Pre-Petition Released Claims**") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any of the Debtors, their estates, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Operative Documents.

        (b)    Upon the occurrence of both entry of the Sale Order and assumption and assignment of the Operative Documents to the Purchaser under the Sale Order, each Debtor, on behalf of itself, its estate and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Debtor pursuant to this Section 5.2;

provided, however, that the foregoing Sections 5.2(a) and (b) shall not release any party to the Operative Documents (other than the Debtors to the extent provided in Section 6 below) from continuing to perform its respective obligations pursuant to the terms thereof.

        6.    <u>ASSUMPTION AND ASSIGNMENT PURSUANT TO THE SALE ORDER</u>.

The assumption and assignment of the Operative Documents by the Debtors, and the assumption by the Purchaser of the Operative Documents and the Pre-Petition Obligations under the Operative Documents pursuant to the Sale Order is hereby agreed and consented to by GMAC. It is further agreed that such assignment and assumption of the Operative Documents and Pre-Petition Obligations pursuant to the Sale Order shall be deemed to effectuate an automatic and

immediate release by GMAC of any and all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity which GMAC or any of its successors or assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Debtors and each of their respective existing and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (but in any event excluding the Purchaser from the foregoing), upon, or by reason of any nature, cause or thing whatsoever which in each case arises at any time on or prior to the consummation of such assumption and assignment of the Operative Documents pursuant to the Sale Order (the foregoing, collectively, the "**GM Released Claims**"); <u>provided</u> however, that the GM Released Claims shall be released only to the extent assumed by the Purchaser at the time of the Sale.

7.    <u>MISCELLANEOUS</u>.

7.1    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

7.2    <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

7.3    <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by facsimile shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by facsimile also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

7.4    <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the execution hereof by GM and GMAC and the entry of the Ratification Order by the Bankruptcy Court.

*[remainder of page intentionally blank; signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

GENERAL MOTORS
CORPORATION, as Debtor
and Debtor-in-Possession

By:  /s/ Walter Borst_____

Name:  Walter Borst_____

Title:  Treasurer_____

SATURN LLC, as Debtor and Debtor-in-Possession

By: /s/ Adil Mistry

Name: Adil Mistry

Title: Vice President

SATURN DISTRIBUTION CORPORATION, as
Debtor and Debtor-in-Possession

By:  /s/ Adil Mistry

Name:  Adil Mistry

Title:  Vice President

CHEVROLET-SATURN OF HARLEM, INC., as
Debtor and Debtor-in-Possession

By: /s/ Niharika Ramdev

Name: Niharika Ramdev

Title: Vice President

GMAC LLC

By:  /s/ Tim Russi

Name:  Tim Russi

Title:  CFO, Global Auto Finance and Insurance

**Exhibit B**
**Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                            :
In re                                       :          **Chapter 11 Case No.**
                                            :
**GENERAL MOTORS CORP.,** *et al.*,         :          **09-_____ (___)**
                                            :
                        Debtors.            :          **(Jointly Administered)**
                                            :
-------------------------------------------------------------x

**ORDER PURSUANT TO**
**11 U.S.C. §§ 105, 362, 363, 364(b), 364(e), 365**
**AND 503(b) AND FED. BANKR. P. RULES 2002, 4001, 6003, 6004**
**AND 9014(1), AUTHORIZING THE DEBTORS TO ENTER INTO,**
**AND APPROVING, RATIFICATION AGREEMENT WITH GMAC LLC**
**(THE "RATIFICATION ORDER")**

**Whereas**, the Court has before it the Motion (the "**Motion**")[1] of General Motors

Corporation ("**GM**" or the "**Debtor**") and its affiliated debtors, each as debtors and debtors-in-

possession (collectively, the "**Debtors**"), in the above-captioned case (the "**Cases**"), seeking,

among other things, authorization to enter into, and approval of, that certain Ratification

Agreement entered into between GM and GMAC LLC and certain of its affiliates (collectively,

"**GMAC**"), made as of June 1, 2009 (the "**Ratification Agreement**"), pursuant to Sections 105,

362, 363, 364(b), 364(e), 365 and 503(b) of Title 11 of the United States Code, 11 U.S.C. §§

101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6003, 6004 and 9014(1) of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 4001-2 and 9014-2

of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "**Local Rules**"); and

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion or where applicable the Ratification Agreement.

**Whereas**, the inter-related transactions and dealings between the Debtors, on the one hand, and GMAC, on the other hand, contribute significantly to the success of the Debtors and GMAC, usually generating efficiencies and enhanced results for each of them, including business opportunities and referrals, data and resource sharing, economies of scale, leveraging staff expertise, and administrative conveniences, all of which combined, result in highly valuable and significant organizational, operational, business and financial synergies; and

**Whereas**, GM and GMAC entered into that certain Master Services Agreement, dated as of November 30, 2006 (as amended, supplemented and otherwise modified prior to May 22, 2009, the "**Original MSA**") which, among other things, integrated and supplemented certain agreements under which the parties have provided various services and financial accommodations to one another as set forth therein, including, the terms and conditions more specifically set forth in the Specified Integrated Agreements (as defined therein); and

**Whereas**, on December 24, 2008, in connection with the conversion of GMAC Bank, a wholly owned subsidiary of GMAC, from a Utah industrial loan company to a Utah commercial bank, the Board of Governors of the Federal Reserve System approved the application of GMAC to become a bank holding company under Section 3 of the Bank Holding Company Act of 1956, as amended.  Pursuant to a letter agreement entered into between GM and GMAC, dated as of December 29, 2008 (the "**Letter Agreement**"), in connection with the approval, GM and GMAC agreed to amend and restate the Specified Integrated Agreements, including the Original MSA, in accordance with the terms set forth in the Letter Agreement; and

**Whereas**, to document more formally the terms set forth in the Letter Agreement, the parties entered into that certain Amended and Restated Master Services Agreement dated as of

May 22, 2009, and made effective as of December 29, 2008 (the "**MSA**"),[2] to, *inter alia*, memorialize certain modifications to the existing contractual arrangements and other business and financial course of dealings, which, together with the amendment of certain of the Specified Integrated Agreements (as defined and identified in the MSA, the "**Specified Integrated Agreements**"), and all implementing agreements arising under or relating to any of the Specified Integrated Agreements (the "**Implementing Agreements**"), (the MSA, the Specified Integrated Agreements and the Implementing Agreements, as such agreements have heretofore or may hereafter be amended, modified and supplemented, collectively referred to as the "**MSA Documents**"); and

Whereas, there are other existing contractual arrangements between the Debtors and GMAC that memorialize the ordinary course of business, financial and operating arrangements between the parties (collectively, as the same may be amended, modified and supplemented from time to time, the "**Other Agreements,**" and, together with the MSA Documents, the "**Operative Documents**"); and

Whereas, GMAC has the right to seek the entry of an order of the Court compelling the Debtors to immediately assume or reject the Operative Documents and to refrain from providing any financial accommodations to or for the benefit of the Debtors thereunder, but has agreed to refrain from exercising such rights in consideration of the Debtors entering into the Ratification Agreement subject to the entry of this Order; and

Whereas, entry into the Ratification Agreement and continuation of the Operative Documents during the period from the date of filing of the Cases (the "**Commencement Date**")

---

[2] Contemporaneously with the filing of the Motion, the Debtors have filed a joint motion with GMAC requesting authority to file under seal the MSA and certain of the other main Operative Documents.

until (i) the closing of the Sale pursuant to the Sale Order (as each of those terms are defined below) or (ii) an event of termination occurs as set forth in Paragraph 12 below (the "**Interim Period**"), are essential to the continued operation of the Debtors' businesses and in the best interests of the Debtors' estates, creditors, and other parties in interest, for reasons including, among others, that the agreements at issue (a) are critical to the Debtors' ability to continue to operate their businesses as a going concern, both from the perspective of their ability to sell vehicles on a wholesale basis to their Dealers (as defined below) and for such Dealers to sell the Debtors' vehicles on a retail basis to their customers, and (b) are consistent with the long standing contractual arrangements under which the parties have conducted their businesses over the past many years in the ordinary course; and

**Whereas**, upon the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, dated June 1, 2009 (the "**Henderson Affidavit**"), the record of the hearing and all of the proceedings had before the Court (the "**Hearing**"), it appears that no alternative source of wholesale or retail financing is available to the Debtors to replace, at the levels required, the critical and necessary financing provided by GMAC under the Operative Documents; and

**Whereas**, it further appears that (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.), (ii) this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (iii) venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and

**Whereas**, no previous application has been made, and after limited notice appropriate under the circumstances and Hearing, and due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED AND DECREED THAT:**

1.    *Jurisdiction:*  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice:*  The notice given by the Debtors of the Motion and the Hearing constitutes appropriate and sufficient notice under the circumstances and complies with Bankruptcy Rules 4001(a), (c) and 6003(b).

3.    *Findings Regarding the Ratification Agreement:*

(a)    Good cause has been shown for the entry of this Order and the relief requested in the Motion is hereby granted.

(b)    The Debtors have an immediate need to continue their respective pre-petition financial and operating arrangements with GMAC pursuant to the terms set forth in the Operative Documents in order to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships, suppliers, wholesale dealerships and customers, (iii) provide their dealers (the "**Dealers**") with certain financing and services, including, but not limited to, (A) new and used vehicle inventory financing, (B) capital loans, (C) equipment loans, (D) real estate loans, (E) dealer insurance products and services, (F) remarketing services, and (G) electronic cash and drafting settlement systems (collectively, the "**Dealer Financing**"), (iv) provide certain retail financing to the Debtors' and the Dealers' fleet and retail customers (the "**Customers**"), including, but not limited to, (A) consumer retail financing, (B) commercial retail financing, and (C) commercial fleet financing (collectively, the "**Retail Financing**"), (v) obtain unsecured credit from GMAC, and (vi) perform such other and further acts as may be contemplated by, or required in

connection with, the Operative Documents. The Debtors' continued access to funding, financial arrangements, credit extensions and other arrangements provided under or enabled by the Operative Documents is vital to the preservation and maintenance of the going concern values of the Debtors. The Debtors have demonstrated their need to obtain post-petition financing pursuant to Bankruptcy Code Section 364 and Bankruptcy Rule 4001(c).

(c)    The Operative Documents are necessary to ensure the continued on-going business of the Debtors.

(d)    The Debtors and GMAC negotiated and entered into the Operative Documents and Ratification Agreement in good faith, at arm's length and without collusion. GMAC is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code.

(e)    The Debtors entering into the Ratification Agreement reflects the Debtors' exercise of prudent business judgment and is consistent with their fiduciary duties.

(f)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(c)(2) and 6003(b). The Debtors have demonstrated that, absent granting the relief sought by this Order, the Debtors' estate will be immediately and irreparably harmed. Entry into the Ratification Agreement and continuation of the Operative Documents is therefore in the best interest of the Debtors' estates and essential to a successful reorganization. Pursuant to Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

4.    *Authorization to Enter into the Ratification Agreement:* Pursuant to Sections 363, 364(b) and 365 of the Bankruptcy Code, the Ratification Agreement is hereby approved in all respects and the Debtors are authorized to perform their obligations arising under the Ratification

Agreement and Operative Documents during the Interim Period. As provided in the Ratification Agreement, the Debtors are authorized and directed to continue their prepetition financial and operating agreements and arrangements with GMAC pursuant to the terms set forth therein and in the Operative Documents.

(a)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized during the Interim Period to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Ratification Agreement and Operative Documents, including, without limitation:

(i)     The execution, delivery and performance during the Interim Period of the Ratification Agreement and Operative Documents, including any exhibits attached thereto, and any amendments, modifications and supplements thereunder, as may be required; and

(ii)     The performance during the Interim Period of all other acts required under or in connection with the Ratification Agreement and Operative Documents, subject to Paragraph 7 below.

(b)     The automatic stay of Section 362(a) of the Bankruptcy Code is hereby modified to the extent (but only to the extent) necessary to enable the counter-parties to the Ratification Agreement and Operative Documents to participate in, perform their obligations, exercise their rights and take actions in accordance with those agreements, subject to Paragraph 7 below.

(c)     To the extent arising, accruing, payable or incurred during the Interim Period, the Debtors' obligations under the Ratification Agreement and Operative Documents shall constitute administrative expense claims pursuant to Section 503(b) of the Bankruptcy Code which shall be paid in the ordinary course of business in accordance with the provisions of the Ratification Agreement and Operative Documents.

(d)     No payments made by the Debtors during the Interim Period pursuant to and in accordance with the Ratification Agreement and Operative Documents, except to the extent provided under the Operative Documents, shall be (i) stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Section 502(d) of the Bankruptcy Code), or (ii) subject, in whole or in part, to any discharge, defense, reduction, setoff, recoupment, avoidance, disgorgement, counterclaim, or similar claim by the Debtors and their estates, which are hereby unconditionally waived and released by the Debtors and their estates.

5.      *Conditions on the Ratification Agreement and Operative Documents:*  As provided in Paragraph 4 above, during the Interim Period, the Ratification Agreement and Operative Documents shall continue in full force and effect between the parties in accordance with their terms, subject to the following requirements:

(a)     At the hearing (the "**Sale Hearing**"), to approve the sale of all, or substantially all, of the Debtors' assets (the "**Sale**"), the Debtors shall seek an Order (the "**Sale Order**") pursuant to Section 365(a) of the Bankruptcy Code which provides for, among other things, (x) the full assumption by the Debtors and their assignment to and assumption by the Purchaser (as defined in the Ratification Agreement) of the Operative Documents and the Pre-Petition Obligations under the Operative Documents pursuant to,

*inter alia*, Section 365 of the Bankruptcy Code, and (y) the full release by the Debtors, their successors and assigns, and the Debtors' estates in favor of GMAC, as set forth in Section 5.2 of the Ratification Agreement.

(b)    The Debtors' shall maintain warranty programs of new and used vehicles during the Interim Period in accordance with the Debtors' ordinary course of business practices prior to the Commencement Date, and the Debtors shall seek an Order of this Court authorizing the Debtors to continue to perform under their pre-petition warranty coverage with respect to new and used vehicles sold prior to the Commencement Date as well as with respect to new and used vehicles sold after the Commencement Date.

6.    *Priority of Obligations:*    At all times during the Interim Period, pursuant to Sections 364(b) and 503(b)(1) of the Bankruptcy Code, to the extent deemed necessary or applicable, all of the Debtors' obligations to GMAC, to the extent arising, accruing, payable or incurred during the Interim Period in the ordinary course, including, without limitation, claims for exposure reduction payments under Section 4 of the MSA, pursuant to the Operative Documents, shall constitute allowed administrative expense claims against the Debtors including, without limitation, all obligations of GM to GMAC arising under any vehicle repurchase agreement that (i) becomes due and payable during the Interim Period or (ii) becomes due and payable after the Interim Period with respect to a vehicle with an invoice date or GMAC floorplan advance date prior to the end of the Interim Period.

7.    *Setoff:*    GMAC's setoff rights against obligations owed by the Debtors to GMAC on the Commencement Date or during the Interim Period, arising under the Operative Documents shall be preserved; provided, however, that during the Interim Period GMAC is prohibited from exercising any setoff rights under the Operative Documents without first

obtaining an order from the Court authorizing their right to setoff.  Further, GMAC shall provide at least three (3) business days notice to the Debtors, the other notice parties listed in Paragraph 13 below and the attorneys of any official committees formed in the Cases before seeking any such order from the Bankruptcy Court, provided that, during such period, GMAC shall not, to the extent of the amounts sought to be setoff, be required to make any payments otherwise due the Debtors or provide loans, advances, other financial accommodations or other extensions of credit to the Debtors during such period.

8.      *Preservation of Rights Granted Under the Order*:

(a)      Nothing contained herein shall limit GMAC's right to request adequate protection.

(b)      If an order dismissing or converting any of the Cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, this Order shall be binding on the Chapter 7 trustee appointed by the Court.

(c)      If any of all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity of any payments made or obligations of the Debtors arising, accruing, or incurred in favor of or payable to GMAC pursuant to the Operative Documents during the Interim Period, (ii) the validity or enforceability of the obligations of the Debtors to GMAC which, as provided in Paragraph 6 above, shall be treated as administrative expense claims, or (iii) GMAC's entitlement to all of the rights, remedies, privileges and benefits granted in Section 364(e) of the Bankruptcy Code, this Order and/or pursuant to the Ratification Agreement and/or Operative Documents, to the extent applicable.

(d)      Neither the Motion nor this Order shall itself be deemed to constitute a post-petition assumption by the Debtors of the Operative Documents pursuant to section 365 of the Bankruptcy Code.

9.      *Governing Law*:  Except to the extent that the Bankruptcy Code applies, the Ratification Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding any conflict of law provisions which would require applications of laws of another state.

10.      *Order Governs*:  In the event of any inconsistency between the provisions of this Order and the Ratification Agreement and/or Operative Documents, the provisions of this Order shall govern.

11.      *Binding Effect; Successors and Assigns*   This Order, including all findings herein, shall be binding upon all creditors and parties in interest in these Cases, including, without limitation, the DIP Lenders, any Committee appointed in these Cases, the Debtors and their respective successors and assigns (including any estate representative or any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of GMAC, and the Debtors and their respective successors and assigns; *provided, however,* that GMAC shall have no obligation to perform under any of the Operative Documents or to permit the use of any financing, continue any financial arrangement or extend any financing or credit to any Chapter 7 trustee or similarly responsible person appointed for the estates of the Debtors.

12.      *Termination*:  The Interim Period shall terminate if any of the Events of Default as set forth in the Ratification Agreement occur, unless otherwise agreed to by the Debtors and GMAC.

13.    *Notice:*   The Debtors shall promptly mail copies of this Order, to the extent that ECF notice is not sufficient to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee, and (xii) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York, 10169 (Attn.: Daniel Wallen, Esq., Jonathan N. Helfat, Esq. and Steven B. Soll, Esq.), attorneys for GMAC.

Dated: New York, New York
          _____, 2009

_____
UNITED STATES BANKRUPTCY JUDGE