Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                              :

**In re**                              :         **Chapter 11 Case No.**
                              :

**GENERAL MOTORS CORP.,** *et al.*,    :         **09-_____ (___)**
                              :

                  **Debtors.**        :         **(Jointly Administered)**
                              :
---------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION PURSUANT
TO 11 U.S.C. §§ 105, 363(b), (f), (k), (m) AND 365, AND FED. R. BANKR. P. 2002,
6004 AND 6006, TO (I) APPROVE (A) THE SALE PURSUANT TO THE MASTER
SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS
LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

ARGUMENT ............................................................................................................................ 3

I.      THE 363 TRANSACTION IS AN EXERCISE OF SOUND BUSINESS
        JUDGMENT AND SHOULD BE APPROVED UNDER SECTION 363(b)................... 3

        A.      The 363 Transaction Is The Only Alternative To Preserve Value And
                Obtain The U.S. Government Support Necessary For The  Company To
                Finance Its Operations ............................................................................................ 9

        B.      The 363 Transaction Is Also Justified Because It Avoids The Dire
                Consequences Of A Liquidation.......................................................................... 11

        C.      The Debtors Have Satisfied All Of The Other Section 363(b) Factors .............. 13

II.     THE 363 TRANSACTION SHOULD BE APPROVED FREE AND CLEAR OF
        ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS .................. 20

III.    THE 363 TRANSACTION IS NOT A *SUB ROSA* PLAN ............................................ 23

IV.     THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
        CONTRACTS AND UNEXPIRED LEASES IS NECESSARY TO
        EFFECTUATE THE 363 TRANSACTION ................................................................. 27

V.      THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY
        BANKRUPTCY RULES 6004(g) AND 6006(d)......................................................... 30

CONCLUSION....................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page(s)**

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*,
    184 B.R. 648 (S.D.N.Y. 1995) ........................................................................24

*Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*,
    56 B.R. 186 (Bankr. N.D. Ga. 1986), *aff'd*, 805 F.2d 1515 (11th Cir. 1986) ........................23

*In re Andy Frain Servs., Inc.*,
    798 F.2d 1113 (7th Cir. 1986) ........................................................................8

*Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.)*,
    88 B.R. 576 (E.D.N.Y. 1988) ........................................................................18

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ........................................................................7

*Baker v. Latham Sparrowbush Assocs.*,
    72 F.3d 246 (2d Cir. 1995) ........................................................................14

*In re BearingPoint, Inc.*,
    Case No. 09-10691 (Bankr. S.D.N.Y. Apr. 7, 2009) ........................................................................18

*In re Betty Owens Sch., Inc.*,
    1997 WL 188127 (S.D.N.Y. Apr. 17, 1997) ........................................................................14

*In re Bon Ton Rest. & Pastry Shop, Inc.*,
    53 B.R. 789 (Bankr. N.D. Ill. 1985) ........................................................................29

*In re Bygaph, Inc.*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) ........................................................................29

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*,
    103 B.R. 524 (Bankr. D.N.J. 1989) ........................................................................29

*In re Child World, Inc.*,
    142 B.R. 87 (Bankr. S.D.N.Y. 1992) ........................................................................28

*In re Chrysler LLC*,
    Case No. 09-50002 (Bankr. S.D.N.Y. May 7, 2009) ........................................................................18

*Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*,
    94 B.R. 343 (E.D. Pa. 1988) ........................................................................22

# TABLE OF AUTHORITIES
### (continued)

**Cases**                                                                                    **Page(s)**

Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K. Corp.),
   127 F.3d 904 (9th Cir. 1997) ................................................................30

Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),
   60 B.R. 612 (Bankr. S.D.N.Y. 1986)........................................................6

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
   722 F.2d 1063 (2d Cir. 1983) ........................................................ passim

In re Condere Corp.,
   228 B.R. 615 (Bankr. S.D. Miss. 1998)...................................................24

Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News
   Network Inc.), 980 F.2d 165 (2d Cir. 1992) ............................................5

COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.),
   524 F.3d 373 (2d Cir. 2008) ..............................................................27

In re Decora Indus., Inc.,
   2002 WL 32332749 (D. Del. May 20, 2002) .........................................14

In re Del. & Hudson Ry. Co.,
   124 B.R. 169 (D. Del. 1991)...............................................................14

In re Drexel Burnham Lambert Group, Inc.,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992).................................................2, 3

In re Drexel Burnham Lambert Group, Inc.,
   960 F.2d 285 (2d Cir. 1992) ..............................................................26

In re Drexel Burnham Lambert Group Inc.,
   995 F.2d 1138 (2d Cir. 1993) ............................................................15

In re Dundee Equity Corp.,
   1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992) ..................................21

In re Enron Corp.,
   2003 WL 21755006 (Bankr. S.D.N.Y. July 28, 2003) ............................22

Fla. Dep't of Revenue v. Piccadilly Cafeteria, Inc.,
   128 S. Ct. 2326 (2008)...................................................................5, 8

## TABLE OF AUTHORITIES
### (continued)

| Cases | Page(s) |
|---|---|

*In re Fleming Cos.*,
    499 F.3d 300 (3d Cir. 2007) ...............................................29

*Futuresource LLC v. Reuters Ltd.*,
    312 F.3d 281 (7th Cir. 2002) ...............................................21

*In re Global Crossing Ltd.*,
    295 B.R. 726 (Bankr. S.D.N.Y. 2003)...............................................6

*In re Global Serv. Group, LLC*,
    316 B.R. 451 (Bankr. S.D.N.Y. 2004)...............................................3

*Hargrave v. Township of Pemberton (In re Tabone, Inc.)*,
    175 B.R. 855 (Bankr. D.N.J. 1994) ...............................................22

*In re Haven Eldercare, LLC*,
    390 B.R. 762 (Bankr. D. Conn. 2008) ...............................................18

*Int'l Creditors of Cont'l Air Lines v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
    780 F.2d 1223 (5th Cir. 1986) ...............................................25

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989)...............................................4

*In re Ionosphere Clubs, Inc.*,
    100 B.R. 670 (Bankr. S.D.N.Y. 1989)...............................................6, 28

*In re Jamesway Corp.*,
    201 B.R. 73 (Bankr. S.D.N.Y. 1996)...............................................30

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*,
    111 F.3d 269 (2d Cir. 1997) ...............................................20

*In re Lehigh Valley Prof'l Sports Clubs, Inc.*,
    2000 WL 567905 (Bankr. E.D. Pa. May 5, 2000) ...............................................24

*In re Lehman Bros. Holdings Inc.*,
    Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008)...............................................18

*In re Lehman Bros. Holdings Inc.*,
    Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008)...............................................13

# TABLE OF AUTHORITIES
### (continued)

| Cases | Page(s) |
| --- | --- |

*In re Lehman Bros. Holdings, Inc.,*
    2009 WL 667301 (S.D.N.Y. Mar. 13, 2009) ......................................................................7

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci),*
    126 F.3d 380 (2d Cir. 1997) ..................................................................................7, 20

*In re Lion Capital Group,*
    49 B.R. 163 (Bankr. S.D.N.Y. 1985) ........................................................................26

*In re Marvel Entm't Group, Inc.,*
    222 B.R. 243 (D. Del. 1998) ..................................................................................24

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ..........................................................................................14

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),*
    478 F.3d 452 (2d Cir. 2007) ....................................................................................5

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ......................................................................................14, 15

*In re Naron & Wagner, Chartered,*
    88 B.R. 85 (Bankr. D. Md. 1988) ..............................................................................26

*In re Natco Indus., Inc.,*
    54 B.R. 436 (Bankr. S.D.N.Y. 1985) ........................................................................29

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),*
    78 F.3d 18 (2d Cir. 1996) ....................................................................................27

*NRLB v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) .........................................................................................2, 3

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
    Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992) , *appeal dismissed,* 3 F.3d 49 (2d Cir.
    1993) .........................................................................................................6

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
    Elec. Power Coop, Inc.),* 119 F.3d 349 (5th Cir. 1997) ..........................................................24

## TABLE OF AUTHORITIES
### (continued)

**Cases**                                                                      **Page(s)**

*Official Unsecured Creditors' Comm. v. Stern (In a SPM Mfg. Corp.)*,
    984 F.2d 1305 (1st Cir. 1993)..................................................................24

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.*
    *(In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) ..........................5

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*,
    4 F.3d 1095 (2d Cir. 1993) ......................................................................27

*PBGC v. Braniff Airways Inc. (In re Braniff Airways, Inc.)*,
    700 F.2d 935 (5th Cir.), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983)......................25

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)..................................................................................3

*Ready v. Rice*,
    2006 WL. 4550188 (D. Md. Sept. 26, 2006) ..........................................8

*In re Refco., Inc.*,
    Case. No. 05-60006 (Bankr. S.D.N.Y. Nov. 17, 2005) ...........................7

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ................................................................28

*In re Rickel Home Ctrs., Inc.*,
    240 B.R. 826 (D. Del. 1998), *aff'd*, 209 F.3d 291 (3d Cir.), *cert. denied*, 531 U.S.
    873 (2000)................................................................................................30

*In re Rock Indus. Mach. Corp.*,
    572 F.2d 1195 (7th Cir. 1978) ................................................................20

*Rubinstein v. Alaska Pac. Consortium (In re New English Fish Co.)*,
    19 B.R. 323 (Bankr. W.D. Wash. 1982)..................................................23

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*,
    872 F.2d 36 (3d Cir. 1989) ......................................................................28

*In re Sire Plan, Inc.*,
    332 F.2d 497, 499 (2d Cir. 1964))..........................................................8

## TABLE OF AUTHORITIES
### (continued)

**Cases**                                                                    **Page(s)**

*In re Smart World Tech. LLC*,
  423 F.3d 166 (2d Cir. 2005) ..............................................................................21

*Smith v. Van Gorkum*,
  488 A.2d 858 (Del. 1985) ..................................................................................6

*In re Steve &  Barry's Manhattan LLC*,
  Case. No. 08-12579 (Bankr. S.D.N.Y. Aug. 22, 2008) ......................................7

*In re Tempo Tech. Corp.*,
  202 B.R. 363 (D. Del. 1996)..............................................................................19

*In re Trans World Airlines, Inc.*,
  2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001)........................................ *passim*

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) ..............................................................................23

*In re Vitanza*,
  1998 WL 808629 (Bankr. E.D. Pa. 1998) ..........................................................30

*In re WBQ P'ship*,
  189 B.R. 97 (Bankr. E.D. Va. 1995)...................................................................20

*In re White Motor Corp.*,
  75 B.R. 944 (Bankr. N.D. Ohio 1987)................................................................21

*Williams v. Geier*,
  671 A.2d 1368 (Del. 1996) ..................................................................................7

*In re WorldCom, Inc.*,
  2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........................................3

**Statutes & Rules**

11 U.S.C. § 105................................................................................................1, 21

11 U.S.C. § 363............................................................................................ *passim*

11 U.S.C. § 365............................................................................................ *passim*

# TABLE OF AUTHORITIES
### (continued)

| Statutes & Rules | Page(s) |
|---|---|
| 11 U.S.C. § 1107(a) | 5 |
| H.R. Rep. No. 95-595, *reprinted in*, 1978 U.S.C.C.A.N. 5963 | 4 |
| Fed. R. Bankr. P. 2002 | 1, 17 |
| Fed. R. Bankr. P. 2003 | 17 |
| Fed. R. Bankr. P. 6004 | 1, 5, 30, 31 |
| Fed. R. Bankr. P. 6006 | 1, 30, 31 |

**Other Authorities**

| | Page(s) |
|---|---|
| 7 Collier on Bankruptcy ¶ 1100.01 (15th ed. rev. 2008) | 4 |
| 3 Collier on Bankruptcy ¶ 363.02 (15th ed. rev. 2008) | 14 |

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company"), submit this Memorandum of Law in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m) and 365, and Fed. R. Bankr. P. 2002, 6004 and 6006, to (i) Approve (a) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other Interests; (b) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Other Relief; and (ii) Schedule Sale Approval Hearing (the "363 Motion").[1]

## PRELIMINARY STATEMENT

There can be no doubt that the Company's decision to enter into the 363 Transaction represents an exercise of sound and prudent business judgment -- the overriding consideration under section 363(b) -- for that transaction represents the *only* available option to preserve and maximize the value of the assets to be sold; to save GM, a lynchpin of the domestic automotive industry; and to ensure its continued existence and viability. The well-documented financial crisis that has befallen the Company since 2008, and that has threatened not only the Company and its nearly quarter of a million workers, but also the jobs of hundreds of thousands of other United States workers and the viability of thousands of businesses that supply or are otherwise dependent upon the Company, has already necessitated billions of dollars of assistance by the U.S. Government. That assistance, however, which to date has sustained the Company's

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the 363 Motion; the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, sworn to on June 1, 2009 (the "First Day Affidavit" or "Henderson Affidavit"), filed contemporaneously with the 363 Motion; or the proposed Master Sale and Purchase Agreement among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated June 1, 2009 (the "MPA").

operations (and, thus, avoided both the Company's and an industry-wide failure), is *not* committed going forward:  that is, there will be no additional Government assistance (either inside or outside of chapter 11) *unless* the 363 Transaction is expeditiously approved.  And, absent such Governmental assistance, there is no viable alternative at all to preserve the Company's business.

Absent approval of the 363 Transaction, the Company will be forced to liquidate, yielding only a fraction of the value that the assets subject to the sale have as a going concern.  A liquidation will result in virtually all of the proceeds going to satisfy, in part or fully, the billions of dollars of secured loans to GM.  That scenario will not only result in significantly lesser recoveries by the Company's creditors, but also drastic consequences for its customers, current, and even former, employees, suppliers and dealers -- and, in turn, the overall United States automotive industry and the Midwest and national economies.  Chapter 11 -- including section 363(b) -- is designed, and repeatedly has been applied, precisely to avoid this result.  As noted in *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992), the "'fundamental purpose of reorganization is to prevent [the] debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'"  *Id.* at 760 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).

In short, the 363 Transaction -- and *only* the 363 Transaction -- avoids systemic failure and provides a genuine opportunity for the business to survive and thrive in an economically viable entity, and, in the process, to maximize value for all of its stakeholders and stabilize and foster both consumer and market confidence.  There simply is *no* other alternative: there is no other purchaser to buy the business; no investor to capitalize the business; no other financing source for the long term; not even another source to provide financing for a chapter 11

case.  The Debtors therefore request that the Court approve the 363 Transaction expeditiously

and ensure, in the words of President Obama, that "the cars of the future are built where they've

always been built -- in Detroit and across the Midwest -- to make America's auto industry in the

21st century what it was in the 20th century -- unsurpassed around the world."  Barack H.

Obama, U.S. President, Remarks on the American Automotive Industry, at 7 (Mar. 30, 2009).

## STATEMENT OF FACTS

The Debtors refer the Court to, and expressly incorporate herein, the factual

background set forth in the 363 Motion and the Henderson Affidavit, as well as the supporting

declarations of J. Stephen Worth of Evercore Group LLC (the "Worth Declaration"), William C.

Repko of Evercore Group LLC (the "Repko Declaration") and Albert A. Koch of AlixPartners,

LLP (the "Koch Declaration"), each sworn to on May 31, 2009.

## ARGUMENT

### I.    THE 363 TRANSACTION IS AN EXERCISE OF SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED UNDER SECTION 363(b)

It is axiomatic that going concern value exceeds liquidation value.  Thus, it is in

the best interests of all stakeholders that, whenever possible, avoidance of liquidation and

preservation of going concern value, and the preservation of a business, jobs and correlated

interests, should be the objectives of any bankruptcy case.  *See In re Drexel Burnham Lambert*

*Group, Inc.*, 138 B.R. 723, 759-60 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528

(1984)).  *See also Reading Co. v. Brown*, 391 U.S. 471, 475 (1968) ("[T]he words 'preserving

the estate' include the larger objective . . . of operating the debtor's business with a view to

rehabilitating it"); *In re Global Serv. Group, LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004)

("[C]hapter 11 is based on the accepted notion that a business is worth more to everyone alive

than dead") (citations omitted); *In re WorldCom, Inc.*, 2003 WL 23861928, at *51 (Bankr.

S.D.N.Y. Oct. 31, 2003) (same); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1989) ("[T]he paramount policy and goal of Chapter 11, to which all other bankruptcy

policies are subordinated, is the rehabilitation of the debtor").

The 363 Transaction achieves the objectives of enhancing value and preserving a

business that is a critically important part of the national economy, thereby avoiding liquidation

and, thus, comporting with the essential purpose of chapter 11:

> The purpose of a business reorganization case, unlike a liquidation
> case, is to restructure a business's finances so that it may continue
> to operate, provide its employees with jobs, pay its creditors, and
> produce a return for its stockholders.  *The premise of a business
> reorganization is that assets that are used for production in the
> industry for which they were designed are more valuable than
> those same assets sold for scrap.*  Often, the return on assets that a
> business can produce is inadequate to compensate those who have
> invested in the business.  Cash flow problems may develop, and
> require creditors of the business, both trade creditors and long-term
> lenders, to wait for payment of their claims.  If the business can
> extend or reduce its debts, it often can be returned to a viable state.
> *It is more economically efficient to reorganize than to liquidate,
> because it preserves jobs and assets.*

H.R. Rep. No. 95-595, at 220, *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6179 (emphasis added);

*see also* 7 Collier on Bankruptcy ¶ 1100.01 (15th ed. rev. 2008) ("Chapter 11 embodies a policy

that it is generally preferable to enable a debtor to continue to operate and to reorganize its

business rather than simply to liquidate a troubled business.  Continued operation may enable the

debtor to preserve any positive difference between the going concern value of the business and

the liquidation value.  Moreover, continued operation can save the jobs of employees, the tax

base of communities, and generally reduce the upheaval that can result from termination of a

business").

Against this backdrop, the authority for the 363 Transaction, which enables the

Company to sell its major assets as a going concern, rather than simply liquidating them, is clear

in the Bankruptcy Code and under the cases. *See*, *e.g.*, *Fla. Dep't of Revenue v. Piccadilly Cafeteria, Inc.*, 128 S. Ct. 2326, 2331 n.2 (2008) (recognizing that debtors often sell "substantially all of [their] assets as a going concern" and then "submit[] for confirmation a plan of liquidation . . . providing for the distribution of the proceeds resulting from the sale"). Specifically, section 363(b) authorizes a debtor to sell assets other than in the ordinary course of business by providing, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"); Fed. R. Bankr. P. 6004(f)(1) (providing that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction").

Although section 363(b) states the general principle that debtors in possession may sell property of the estate outside of the ordinary course of business, it does not set forth a standard for determining when it is appropriate for a court, in an exercise of its sound discretion, to authorize such a sale or other disposition of a debtor's assets. Courts in the Second Circuit (and elsewhere) have required that the decision to sell assets outside the ordinary course of business be based on the sound business judgment of the debtor. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (holding that an asset sale under section 363(b) "is permissible if the 'judge determining the . . . application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (same); *Official Comm. of Unsecured Creditors of LTV Aerospace &*

*Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same); *see also In re Lionel*, 722 F.2d at 1069, 1071 (holding that, in considering a section 363(b) motion, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," but must simply find a "good business reason" supporting the proposed transaction).

Nor will courts second-guess a reasonably founded business judgment in the context of section 363(b). As Judge Lifland stated in *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986), "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Id.* at 616. When a valid business justification exists, the law vests the debtor's decision to sell or otherwise dispose of assets outside the ordinary course of business with a strong presumption that the debtor's management and directors, in approving the sale or other disposition, "'acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also In re Integrated Res.*, 147 B.R. at 656 (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *See In re Integrated*

*Res.*, 147 B.R. at 656 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  And, that

burden is heavy indeed, for the business judgment rule defers to a board decision that can be

"attributed to any rational business purpose."  *Williams v. Geier*, 671 A.2d 1368, 1378 & n.20

(Del. 1996).  Here, under any analysis, it would be irrational *not* to enter into the 363

Transaction.

Just as the decision to engage in a sale or other disposition at all is, in the end, a

business judgment, so, too, is the decision regarding the timing of that transaction.  *See*, *e.g.*,

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) (holding that

an early sale is permissible "if a good business purpose exists to support it") (citation omitted).

Indeed, circumstances often exist where, and the courts repeatedly have upheld debtors' business

judgments that, such a transaction in the earliest days of a chapter 11 case is necessary (and

especially, as here, critical) to the ultimate success of the reorganized business.  For example,

courts frequently approve sales, in a wide range of businesses, where the debtor's assets -- and

future prospects -- are rapidly deteriorating.  In fact, this Court, on a number of recent occasions,

has approved the sale or transfer of all or substantially all of a debtor's assets in the very early

stages of a chapter 11 case.  *See*, *e.g.*, *In re Lehman Bros. Holdings, Inc.*, 2009 WL 667301, at *8

(S.D.N.Y. Mar. 13, 2009) (affirming bankruptcy court's approval of sale of debtors' investment

banking business three days after the filing of sale motion); *see also In re Steve & Barry's

Manhattan LLC*, Case. No. 08-12579 (Bankr. S.D.N.Y. Aug. 22, 2008) (order attached hereto as

Exhibit A) (approving sale of debtors' entire retail business 45 days after filing); *In re Refco,

Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y. Nov. 14, 2005) (order attached hereto as Exhibit B)

(approving sale of regulated commodities futures merchant bank 28 days after commencement of

bankruptcy case).

Moreover, the Second Circuit has stressed that "perishability" of assets is not the *sine qua non* for approval. *See In re Lionel*, 722 F.2d at 1070 (specifically approving the decision in *In re Sire Plan, Inc.*, 332 F.2d 497, 499 (2d Cir. 1964)). In *In re Sire*, the debtors' sale of their principal asset -- a partially completed hotel -- was approved because, according to the Second Circuit in *Lionel*, "a good business opportunity was presently available, so long as the parties could act quickly." *In re Lionel*, 722 F.2d at 1069. *A fortiori*, approval is appropriate where perishability and timing *are* substantial factors, as the courts so hold. *See*, *e.g.*, *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1128 (7th Cir. 1986) (affirming sale order with respect to substantially all of the debtor's assets where lower court, "under very difficult circumstances, showed great concern for salvaging [the debtor] and protecting the jobs of its numerous employees"); *Ready v. Rice*, 2006 WL 4550188, at *3 (D. Md. Sept. 26, 2006) (the "fast-deteriorating condition" of the debtor's property "called for a prompt sale"); *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *14 (Bankr. D. Del. Apr. 2, 2001) ("Given TWA's precarious financial history, . . . a rejection or denial of the Sale Motion would have resulted in an immediate and precipitous decline in the financial affairs of TWA with a very high probability, if not certainty, of liquidation"); *see also Piccadilly*, 128 S. Ct. at 2342 ("[O]ne major reason why a transfer may take place before rather than after a plan is confirmed is that the preconfirmation bankruptcy process takes time. . . . And a firm (or its assets) may have more value (say, as a going concern) where a sale takes place quickly. . . . Thus, an immediate sale can often make more revenue available to creditors or for reorganization of the remaining assets") (Breyer, J., dissenting).

The public (and not merely the debtor's) interest in avoiding the enormous impact of the failure of a major corporation -- even when far less dramatic in its systemic impact upon

an entire industry or the national economy than a failure of GM -- also has been appropriately

taken into account not only by the boards of directors of chapter 11 debtors, but by courts

considering whether to approve proposed sale transactions.  As the court observed in *In re Trans*

*World Airlines*:

> [T]here is a substantial public interest in preserving the value of
> TWA as a going concern and facilitating a smooth sale of
> substantially all of TWA's assets to American.  This includes the
> preservation of jobs for TWA's 20,000 employees, the economic
> benefits the continued presence of a major air carrier brings to the
> St. Louis region, and preserving consumer confidence in purchased
> TWA tickets American will assume under the sale.  I also believe
> the Sale Order implements the public interest that favors an
> organized rehabilitation . . . of a financially distressed corporation
> which lies at the core of chapter 11.  I conclude that the alternative
> to the Sale Order in this case is a free-fall chapter 11 leading to a
> liquidation with the subsequent substantial disruption of diverse
> economic relationships and likelihood of material adverse harm to
> a very broad spectrum of creditor constituencies.

2001 WL 1820326, at *14.  The billions of dollars that the Government has provided and the

further billions that it is willing to provide to the Company if -- but *only* if -- the 363 Transaction

is approved is eloquent and compelling proof of the Government's belief that the Company's

business can be rehabilitated, and its recognition of the dire need for and national interest in this

transaction.

> A.    **The 363 Transaction Is The Only Alternative To Preserve Value And
> Obtain The U.S. Government Support Necessary For The Company To
> Finance Its Operations**

As discussed above and at length in the 363 Motion and the Henderson Affidavit,

nothing could be more exigent or precarious than the Debtors' current financial posture.  Indeed,

to say that the 363 Transaction at this time, to be followed by plan confirmation, is a "sound

business judgment" would be the quintessential understatement.  The Debtors have simply run

out of money; they owe billions of dollars that they cannot repay; and, for obvious reasons, they

are therefore completely unable to continue operating their business absent the 363 Transaction. Indeed, since December 2008, the Debtors have relied exclusively on Government funding (more than $19 billion in the aggregate) to prevent the sudden termination of the Company's operations. *See* Henderson Aff. ¶¶ 102-05. But that funding, absent the 363 Transaction, is no longer committed.

In addition, the Company's efforts to find an alternative to the sale have confirmed what was already obvious: there are *no* other lenders or investors willing or able to invest in the Company, whether as debtor in possession financing or otherwise. This is not surprising, given that the U.S. Treasury possesses a first priority security interest in substantially all of GM's unencumbered assets and a junior lien on GM's encumbered assets. *See id.* at ¶ 103. Moreover, the Debtors' obligations to the Government, which were not scheduled to mature until December 30, 2011, have become almost immediately due and payable as a result of the Government's failure to certify the Debtors' restructuring (or "viability") plan by the June 1, 2009 deadline. *See id.* at ¶ 58. Specifically, pursuant to the terms of the loan facilities, GM agreed, on or before March 31, 2009 (which date was later extended to June 1, 2009), to submit to the Auto Task Force a written certification and report detailing the progress it had made in implementing its restructuring efforts and any deviations from its restructuring targets (together with an explanation as to why such deviations did not jeopardize the Company's long-term viability). *See id.* Upon reviewing that report, if the Auto Task Force was unable to conclude that the Company had taken all necessary steps to achieve and sustain its long-term viability, international competitiveness and energy efficiency, advances under the Government loan facilities would become due and payable on the 30th day thereafter. *See id.*

The 363 Transaction is the *only* alternative to a liquidation and, thus, is certainly a good alternative for the Company's stakeholders. And, it simultaneously provides a genuine opportunity to let the Company's business survive and thrive as a viable entity: it is designed to optimize New GM's ability to compete immediately and successfully on a global basis -- the prerequisite for additional billions of dollars of Government financing and related support, as well as the Government's forbearance with respect to the more than $19 billion already extended under (and secured by) the existing facilities. *See* Henderson Aff. ¶¶ 14-15, 74-76 (explaining that the U.S. Government is *not* willing to provide financing in any other scenario but the 363 Transaction). The 363 Transaction ensures continued financing (particularly given the Government's substantial interest in GM) and, thus, permits maximization of the value of the Debtors' assets, while, at the same time, enabling the business to be sold and continue operations without the current financial and operating distress and free of bankruptcy, as part of an immediately viable going concern.

**B.    The 363 Transaction Is Also Justified Because It Avoids The Dire Consequences Of A Liquidation**

The 363 Transaction is critical to the Debtors' ability to curb the rapidly decreasing value of the Purchased Assets and maintain vital integrated relationships with existing and potential customers, current and former employees, suppliers, dealers and partners (the loss of any of which would significantly and likely permanently impair the Company's business and future prospects, even putting aside the impact of the rapid decline in global vehicle sales). *See generally* Henderson Aff. ¶¶ 82-96. For example, a protracted bankruptcy process, among other things, would:

- dramatically and irreversibly erode sales and GM's market share. It will substantially erode customers' confidence in GM's ability to stay in business, provide parts and service over the long-term, ensure the availability of warranty coverage or maintain

acceptable resale values, all of which will result in a significant, precipitous and irreversible decline in GM's sales, global revenues, profitability and cash flow;

- endanger the viability of GM's dealers and suppliers that depend on volume sales to GM, causing systemic failures;

- distract managerial and union employees from the performance of their duties or, worse yet, cause them to seek other job opportunities, while, at the same time, rendering it extremely difficult, if not impossible, to attract new employees;

- lead many of GM's suppliers, dealers and partners (including certain joint-venture partners) to terminate their relationships with GM, require financial assurances or enhanced performance, or refuse to provide trade credit on the same terms as the bankruptcy cases; and

- foreclose GM's ability to obtain debtor in possession financing sufficient to sustain operations during case administration, which likely would force the Debtors' liquidation.

*See generally* Henderson Aff. ¶¶ 82-96.  The 363 Transaction, pursuant to which New GM would continue to operate the Debtors' business freed of any taint of bankruptcy (in exchange for consideration to the Company), is intended to address the foregoing concerns and, among other things, stabilize and foster the dealer and supplier networks that are crucial to the success and restoration of consumer and market confidence.  At the same time, the 363 Transaction maximizes the value of the Company's business for the benefit of all of the Debtors' economic stakeholders.

The 363 Transaction makes not just good, but overwhelming business sense, as it: (i) saves one of the largest and most important global businesses from the almost certain risk of a near term liquidation, which would minimize (rather than maximize) the value of the assets -- and which would have extraordinary, if not incalculable, systemic economic and societal consequences not only to the Company's customers, employees, suppliers and dealers, but also to the entire automotive industry, the Midwest and the overall United States economy; (ii) saves countless smaller businesses and their tens (if not hundreds) of thousands of jobs in the process;

and (iii) creates a new entity with the operational and balance sheet flexibility to compete successfully (and, thus, generate substantial value) going forward (with the most fundamental benchmark, as indicated by the Government, being the near term generation of positive cash flow and an adequate return on capital).  As Judge Peck observed this past September in approving the sale of Lehman Brothers' North American business within a week of the filing of Lehman Brothers' chapter 11 case:

> I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous, and those adverse consequences are meaningful to me as I exercise this discretion.  The harm to the debtor, its estates, the customers, creditors, generally, the national economy, and the global economy could prove incalculable.
>
> *        *        *
>
> And so, as to those objectors who say it would be establishing bad precedent to approve this transaction, I say no.  This is not bad precedent.  To the contrary.  It's an extraordinary example of the flexibility that bankruptcy affords under circumstances such as this.  It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value.  I am proud to have been part of this process.

*In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008), Transcript of Sale Approval Hearing, at 250, 252 (excerpts attached hereto as Exhibit C).  The same can be said even more strongly here, which, like *Lehman Brothers*, is the extraordinary case where the outcome will have consequences extending far beyond the particular transaction at issue.

### C.    The Debtors Have Satisfied All Of The Other Section 363(b) Factors

Given the Debtors' sound business justification for the proposed sale, the inquiry turns to whether:  (i) adequate and reasonable notice of the sale has been provided to interested

parties; (ii) the purchase price is fair and reasonable; and (iii) the sale has been proposed in good

faith.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1070 (2d Cir. 1983); *In re Betty Owens Sch., Inc.*, 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17,

1997); *accord In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora

Indus., Inc.*, 2002 WL 32332749, at *3 (D. Del. May 20, 2002).  *See also* 3 Collier on

Bankruptcy ¶ 363.02[3] (15th ed. rev. 2008) ("It is now generally accepted that section 363

allows [sales of substantial assets] in chapter 11, as long as the sale proponent demonstrates a

good, sound business justification for conducting the sale before confirmation (other than

appeasement of the loudest creditor), that there has been adequate and reasonable notice of the

sale, that the sale has been proposed in good faith, and that the purchase price is fair and

reasonable.  These factors are considered to assure that the interests of all parties in interest are

protected and that the sale is not for an illegitimate purpose").  These factors are all satisfied

here.

　　　　As to the adequacy of notice, the U.S. Supreme Court has repeatedly emphasized

the flexibility of the due process requirement.  *See Morrissey v. Brewer*, 408 U.S. 471, 481

(1972) ("It has been said so often by this Court and others as not to require citation of authority

that due process is flexible and calls for such procedural protections as the particular situation

demands").  An "elementary and fundamental requirement of due process . . . is notice

reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections."  *Mullane v. Cent.

Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Baker v. Latham Sparrowbush

Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it of the

pendency of the action and affords an opportunity to respond, the due process clause is not

offended"); *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993)

("[T]he Due Process Clause requires the best notice practical under the circumstances").

Constitutional requirements of due process will have been satisfied if notice was given with "due

regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314-15.

Any suggestion that the notice that the Debtors intend to provide here is

inadequate, in light of the exigencies of the situation and the well-publicized facts pre-dating the

filing, would defy credulity.[2]  No trustee, examiner or statutory creditors' committee has been

appointed yet in these chapter 11 cases.  Accordingly, pursuant to the Debtors' proposed notice

procedures, the Debtors intend to serve notice of the 363 Motion, and an opportunity to be heard

with respect to the same, on:

- the attorneys for the U.S. Treasury;

- the attorneys for Export Development Canada;

- the attorneys for the agent under the Debtors' prepetiton secured term loan agreement;

- the attorneys for the agent under the Debtors' prepetition amended and restated secured revolving credit agreement;

- the attorneys for the Creditors Committee (and, if no statutory committee of unsecured creditors has been appointed, the holders of the 50 largest unsecured claims against the Debtors on a consolidated basis);

- the attorneys for the UAW;

---

[2] For example, in April 2009, as part of its overall restructuring efforts, GM launched a public exchange offer for approximately $27 billion of its unsecured bonds ("Exchange Offer") -- conditioned on the receipt of tenders representing at least 90% of the aggregate principal amount of the outstanding notes -- which was intended to provide a means to support GM's future success, while enabling it to continue operating outside of chapter 11 (and thereby obviate the risk of a potentially precipitous decline in revenues that would result from a prolonged bankruptcy case).  *See* Henderson Aff. ¶¶ 71-73.  The terms of the Exchange Offer, GM's rationale for launching it and the likely consequences in the event of insufficient tenders (including the commencement of these chapter 11 cases) were set forth in detail in a registration statement on Form S-4 that was filed with the Securities and Exchange Commission (the "SEC") on April 27, 2009 -- and the likelihood of a chapter 11 filing and the 363 Transaction were then emphasized in the filing of an amended registration statement on Form S-4/A that was filed with the SEC on May 14, 2009.

- the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America;

- the U.S. Department of Labor;

- the attorneys for the National Automobile Dealers Association;

- the attorneys for the ad hoc bondholders committee;

- any party who, in the past three years, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the MPA;

- non-Debtor parties to the Assumable Executory Contracts;

- all parties who are known to have asserted any lien, claim, encumbrance or interest in or on the Purchased Assets;

- the SEC;

- the Internal Revenue Service;

- all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities;

- all applicable state and local taxing authorities;

- the Federal Trade Commission;

- the U.S. Attorney General/Antitrust Division of the Department of Justice;

- the U.S. Environmental Protection Agency and similar state agencies;

- the United States Attorney's Office;

- all dealers with current agreements for the sale or leasing of GM brand vehicles;

- the Office of the United States Trustee for the Southern District of New York;

- all entities that requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and

- all other known creditors and equity security holders of the Debtors.

In addition, the Debtors propose, pursuant to Bankruptcy Rules 2003(d) and 2002(l), that publication notice with respect to the 363 Motion be effected in the global edition of *The Wall Street Journal*, the national edition of *The New York Times*, the global edition of *The Financial Times*, the national edition of *USA Today*, the *Detroit Free Press/Detroit News*, *Le Journal de Montreal*, the *Montreal Gazette*, *The Globe and Mail* and *The National Post*, as well as on the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at <http://www.gmcourtdocs. com>.

The Debtors submit that no other or further notice need be given, particularly given the publicity that, for months, has surrounded, among other things, the deterioration of the Company's business and the Company's consideration, in conjunction with the U.S. Treasury and the Auto Task Force, among others, of its strategic options -- not to mention the publicity attendant to the commencement of the Debtors' chapter 11 cases.[3]  In fact, given such publicity, it is an absolute certainty (irrespective of the additional notice that the Debtors intend to provide) that the Debtors' largest creditors have already retained counsel and, with the assistance of such counsel and other sophisticated advisors, have long been evaluating the Debtors' financial condition; addressing (and rejecting) their own role as purchasers, investors or financing sources; and evaluating the proposed sale -- all rendering additional notice (particularly in the present circumstances) unnecessary.  For the very same reasons, the Debtors also submit that their proposed Sale Procedures to govern the submission of any competing offers based on the MPA are also appropriate and, under the circumstances, will enable the Debtors to realize the maximum value from the sale of the Purchased Assets.

---

[3] For proof of the same, the Court need only take judicial notice of the media coverage surrounding Chrysler's recent bankruptcy filing, which was preceded and then immediately followed by articles on the first page of virtually every major newspaper across the country, thousands upon thousands of business wires from every major outlet, and lead coverage on every major network and cable news broadcast.

Further, the Debtors have proposed a hearing date on the 363 Motion of June 30, 2009, with an objection deadline 11 days earlier, which affords all parties in interest a 19-day period to review the 363 Motion and the Debtors' related disclosures and evaluate, prepare and file any objections thereto.  That notice period easily comports with recent precedent in this Court approving, for example, significantly shorter notice periods of two, three and 12 days. *See*, *e.g.*, *In re Lehman Bros.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008) (order attached hereto as Exhibit D) (allowing two days for objections and permitting oral objections at September 19, 2008 sale approval hearing); *In re BearingPoint, Inc.*, Case No. 09-10691 (Bankr. S.D.N.Y. Apr. 7, 2009) (order attached hereto as Exhibit E) (allowing three days for objections and scheduling sale approval hearing for 10 days later (April 17, 2009)); *In re Chrysler LLC*, Case No. 09-50002 (Bankr. S.D.N.Y. May 7, 2009) (order attached hereto as Exhibit F) (allowing 12 days for objections and scheduling sale approval hearing for eight days later (May 27, 2009)).[4]

As to the sufficiency of the Purchaser's purchase price, there can be no debate that the 363 Transaction will enable the Debtors to realize the greatest value for the Purchased Assets.  Simply put, not a single offer, request for information or expression of interest -- with respect to acquiring the Company or its business or providing all or part of the financing necessary for it to survive (either inside or outside of chapter 11) -- has been received from any

---

[4] *See also In re Haven Eldercare, LLC*, 390 B.R. 762, 769-70 (Bankr. D. Conn. 2008) (under "unique and extraordinary circumstances," cause existed for shortening to two days the 20-day notice period to approve sale to credit bidder where debtors were in "financial extremis," value of assets was deteriorating, debtors were unable to find cash purchaser to bring into auction process, and there was "no credible evidence to support a claim that additional notice might materially enhance the outcome for any . . . constituency"); *Apex Oil Co. v. Vanguard Oil & Serv. Co. (In re Vanguard Oil & Serv. Co.)*, 88 B.R. 576, 580 (E.D.N.Y. 1988) (holding that bankruptcy court acted within its discretion in approving sale despite objection to improper notice where delay risked decreasing value of all assets in estate and appellant failed to demonstrate how it was materially prejudiced by alleged due process violation).

other potential purchaser, equity investor or lender.  *See* Worth Aff. ¶¶ 20-24, 30; *see also* Repko

Aff. ¶¶ 24-29, 31-35.

Of course, the lack of such interest is not (and, even after the Debtors' requested

notice period, cannot be) at all surprising, given the publicity surrounding the Company's (and

the entire automotive industry's) poor and continually deteriorating sales and financial

performance, its operational and structural challenges (on the labor, product brand, dealership

and various other fronts), and the impact of the global recession on the Company and other

domestic auto manufacturers -- and GM's outstanding obligation to repay to the U.S. Treasury

more than $19 billion of secured loans.  The failure of *any* other potential purchaser, investor or

financier to come forward over the past several months is compelling support for the 363

Transaction and demonstrates that there is no alternative, as the Company cannot survive any

delay in administration.  *See*, *e.g.*, *In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996)

(dismissing appeal from bankruptcy court's approval of sale of substantially all of chapter 11

debtor's assets and holding that "[w]ithout a sizeable pool of potential buyers, with only one

buyer willing to negotiate terms of a purchase, and the [d]ebtor's severe cash flow predicament,

the bankruptcy court did not err when it approved the sale," which it agreed was negotiated in

good faith; "combined with the [d]ebtor's cash crunch, the lack of other companies engaged in

th[e] industry weighed heavily in justifying an expeditious sale . . . as a going concern").

Moreover, even putting aside the complete lack of third-party interest in either

purchasing or investing in GM, the consideration being paid by the U.S. Treasury here provides

value that dwarfs the value that would be expected to be received in a liquidation (*i.e.*, $6.5

billion to $9.7 billion, after accounting for liquidation costs of $2.0 billion to $2.7 billion (*see*

Koch Decl. at 7)) -- which only underscores the fairness of the proposed sale terms.  And, while

the Company's secured creditors would receive some distribution in a liquidation -- namely, recoveries ranging from 26.3% to 77.1% for GM's secured bank lenders and 12.7% to 23.7% for the U.S. Treasury  -- the Company's unsecured creditors, in contrast to the 363 Transaction, would receive *nothing* in that scenario.  *See id.*

In sum, the 363 Transaction is the result of arm's length, good faith negotiations by and between the Debtors and the U.S. Treasury, as sponsor.  Moreover, the Company, despite significant efforts, has been unable to identify any viable alternative to the 363 Transaction, either inside or outside of chapter 11, and therefore made the reasonable business judgment to negotiate and sell the Purchased Assets.  And, the MPA is the "product of an arm's length transaction," *In re WBQ P'ship*, 189 B.R. 97, 102, 103 (Bankr. E.D. Va. 1995), that encompassed negotiated concessions from the UAW and VEBA representatives to modify, and make significantly less onerous, the CBA and VEBA settlement.  *See* Henderson Aff. ¶¶ 17-18, 76; *see also In re Gucci*, 126 F.3d at 390 (holding that good faith is destroyed by "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders'" -- but not by "hard bargaining" by the purchaser) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (same).

## II.    THE 363 TRANSACTION SHOULD BE APPROVED FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  *See In re Smart World Tech. LLC*, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").[5]

Pursuant to the 363 Motion, and in order to permit a viable New GM, the Debtors request that the Court authorize the 363 Transaction free and clear of all liens, claims, encumbrances and other interests, other than the liabilities expressly assumed by the Purchaser, as set forth in the MPA.  The 363 Transaction will satisfy section 363(f) because any entities holding an interest in the Purchased Assets will have received notice and have been afforded a sufficient opportunity to object to the requested relief.  Any such entity that does not object should be deemed to have consented.  As the Seventh Circuit aptly explained in *Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002):

> It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one

---

[5] In addition, section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a); and, that authority, separate and apart from section 363(f), extends to the approval of asset sales free and clear of all claims and liabilities.  *See, e.g.*, *In re White Motor Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (holding that the court's power to approve a sale free and clear of tort claims originated from section 105(a), rather than section 363(f), subject only to the limits on the court's power to discharge claims under section 1141).

> of those conditions is the consent of the interest holder, and lack of
> objection (provided of course there is notice) counts as consent.  It
> could not be otherwise; transaction costs would be prohibitive if
> everyone who *might* have an interest in the bankrupt's assets had
> to execute a formal consent before they could be sold.

*Id.* at 285-86 (internal citations omitted) (emphasis in original); *see also In re Enron Corp.*, 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).  As such, to the extent that no party holding a lien, claim, encumbrance or other interest objects to the relief requested in the Sale Order, the sale of the Purchased Assets free and clear of all such interests, except for any liabilities expressly assumed by the Purchaser, satisfies section 363(f)(2).

Moreover, to the extent a specific lien, claim, encumbrance or other interest does not satisfy the consent requirement of section 363(f)(2), such lien, claim, encumbrance or other interest satisfies one or more of the other conditions set forth in section 363(f) and will be adequately protected by attachment to the net proceeds of the sale, or interest will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  For example, each of the parties holding liens on the Purchased Assets could be compelled to accept a monetary satisfaction of such interests, satisfying sections 363(f)(5).

In addition, the Purchased Assets may be sold free and clear of all successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and

clear of successor liability claims, as well.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *see also Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defects claims), *aff'd*, 805 F.2d 1515 (11th Cir. 1986); *Rubinstein v. Alaska Pac. Consortium (In re New English Fish Co.)*, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

Accordingly, the Purchased Assets should be transferred to the Purchaser free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor or transferee liability, and other than any liabilities expressly assumed by the Purchaser, with such interests to be transferred and to attach to the net sale proceeds from the Purchased Assets or satisfied as may be agreed upon by the parties.

## III.    THE 363 TRANSACTION IS NOT A *SUB ROSA* PLAN

The MPA does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of creditors.  Indeed, the courts have made clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume some but not all of the debtor's liability, or because some creditors may benefit disproportionately compared with others whose claims are not being assumed by the purchaser.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001).  As explained in *In re Trans World Airlines*:

> [N]othing in section 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval.  The purpose of a section 363(b) sale is to transform assets . . . into cash in an effort to maximize value. *Distribution of the value generated in accordance with section*

> *1129 and other priority provisions occurs and is intended to occur subsequent to the sale.*
>
> \*        \*        \*
>
> The treatment of creditors in a section 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. *Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.*

*Id.* (emphasis added).

Notably, courts in this and other jurisdictions have long considered whether a preconfirmation sale transaction constitutes a *sub rosa* plan of reorganization, and have suggested various factors that aid in that determination -- but *none* of those factors exist here. *See*, *e.g.*, *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654 & n.6 (S.D.N.Y. 1995) (where aspects of transaction dictate terms of plan); *see also Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop, Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) (settlement disposing of all claims; restriction upon creditors' right to vote; disposition of virtually all assets); *Official Unsecured Creditors' Comm. v. Stern (In a SPM Mfg. Corp.)*, 984 F.2d 1305, 1317 (1st Cir. 1993) (agreement to vote for particular plan); *In re Lehigh Valley Prof'l Sports Clubs, Inc.*, 2000 WL 567905, at \*6 (Bankr. E.D. Pa. May 5, 2000) (transactions or agreements fixing terms of plan by securing court's imprimatur on pre-confirmation motions without protections afforded creditors through confirmation process); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 251 (D. Del. 1998) (all parties must be given opportunity to litigate details of reorganization plan); *In re Condere Corp.*, 228 B.R. 615, 626-29 (Bankr. S.D. Miss. 1998) (term sheet dictating allocation of sale proceeds among secured and priority claimants; requirement of creditors to cast votes for or dictate terms of any plan; deal

contingent upon concessions by creditors; and requirement of waiver of claims by independent creditors).

Accordingly, while the Debtors recognize that a sale of assets may not be approved where such sale dictates the terms of a plan of reorganization, thereby denying creditors the procedural protections of the plan process, *see Int'l Creditors of Cont'l Air Lines v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1227-28 (5th Cir. 1986); *PBGC v. Braniff Airways Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939 (5th Cir.), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983), that is not what is proposed here.  Rather, the MPA simply provides for a sale:  the Debtors will sell and assign assets; and the Government, in exchange, will provide consideration consisting of forgiveness of debt, cash (including by financing only an expeditious chapter 11 sale process), assumption of liabilities and stock in New GM.  That consideration unquestionably is the highest and best available, and of far more value than the Debtors' refusing to sell and simply liquidating (again, their *only* other alternative).  The foundation of the MPA is the creation of New GM, which the Government is willing to create and fund -- in a manner that the Debtors themselves cannot -- so that the nation can retain and strengthen a basic and necessary United States automotive industry.  And, in that respect, any payments that are made to the Debtors' creditors in connection with the 363 Transaction (other than payments of Cure Amounts in connection with the assumption and assignment of the Assumable Executory Contracts) will be voluntarily made by New GM.

In addition, the 363 Transaction provides that the Purchaser will enter into new collective bargaining and VEBA agreements.[6]  This is essential to the Company's transformation, and, despite extensive efforts, the Company has been unable to reach a

---

[6] The UAW has made clear that any amended collective bargaining agreement is contingent on the Purchaser providing retiree medical benefits, as contemplated by the new VEBA agreement.

comparable agreement with the UAW.  In the event that the 363 Transaction is not approved, it

is unclear whether the Debtors (if they even were to survive in chapter 11) would be able to

reach an agreement with the UAW that would enable them to emerge from these chapter 11

cases as a viable entity pursuant to a standalone plan -- which, among other things, would be

contingent on obtaining (notwithstanding the complete lack of available, non-Governmental

sources) several billion dollars in exit financing to refinance the Debtors' secured debt, pay

administrative expense claims and fund operations (including substantial capital expenditures).

Of course, the biggest risk associated with a standalone plan, as discussed above, is that the

Debtors simply would not survive for an extended period of time, with their assets becoming

essentially worthless.

Finally, the 363 Transaction, if approved, will facilitate the ultimate development

and formulation of a chapter 11 plan for the Debtors and the distribution of the sale consideration

and the Debtors' remaining assets, while the Debtors' creditors will be afforded their full

protections under the Bankruptcy Code to assert their claims and participate in the plan process.

*See In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) (holding that the

"sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale

will not restructure [the] rights of creditors"); *cf. In re Lion Capital Group*, 49 B.R. 163, 177

(Bankr. S.D.N.Y. 1985) (settlement agreement did not dictate terms of plan of reorganization

where it "frees up assets for an estate and permits formulation of a plan").  *See also In re Drexel*

*Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (emphasizing the discretion

vested in the court in approving a transaction outside of, but that paves the way for, a plan of

reorganization and, thus, "is unquestionably an essential element of [the] ultimate

reorganization"); *In re Lionel*, 722 F.2d at 1071 (holding that a debtor may take significant

action, despite an allegation that the action deprives a party in interest of essential protections

under chapter 11 (*i.e.*, the safeguards of disclosure, voting, acceptance and confirmation), if there

is an articulated business justification); *accord In re Trans World Airlines*, 2001 WL 1820326, at

*12 ("It is true, of course, that TWA is converting a group of volatile assets into cash.  It may

also be true that the value generated is not enough for a dividend to certain groups of unsecured

creditors.  It does not follow, however, that the sale itself dictates the terms of TWA's future

chapter 11 plan.  The value generated through the Court approved auction process reflects the

market value of TWA's assets and the conversion of the assets into cash is the contemplated

result under § 363(b)").

## IV.    THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IS NECESSARY TO EFFECTUATE THE 363 TRANSACTION

As stated above, to facilitate and effect the sale of the Purchased Assets, the

Debtors also seek authority to assume and assign certain contracts and unexpired leases to the

Purchaser.  Section 365 of the Bankruptcy Code allows the debtor to maximize the value of the

its estate by assuming and assigning executory contracts and unexpired leases that benefit the

estate and by rejecting those that do not.  11 U.S.C. § 365(a); *see COR Route 5 Co., LLC v. The

Penn Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008).  Section 365

authorizes the proposed assumptions and assignments, provided that any defaults under such

contracts and leases are cured and adequate assurance of future performance is provided.  *See* 11

U.S.C. § 365(f)(2).

The "business judgment" test is the standard applied by courts in determining

whether an executory contract or unexpired lease should be assumed.  *See Nostas Assocs. v.

Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *see also*

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More

exacting scrutiny would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the estate,

and threaten the court's ability to control a case impartially").  Thus, the assumption of a contract

under section 365 should be approved if the court finds that the debtor has exercised its sound

business judgment in determining that such assumption is in the best interests of its estate.  *See*

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40

(3d Cir. 1989); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re*

*Ionosphere Clubs, Inc.*, 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989).

Section 365(b) requires that a debtor in possession meet certain requirements to

assume an executory contract or unexpired lease:

> If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee
> will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the
> trustee will promptly compensate, a party other than the debtor to
> such contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C) provides adequate assurance of future performance
> under such contract or lease.

11 U.S.C. § 365(b).[7]  The Contract Website sets forth the cure amounts GM believes are required

to be paid -- and that New GM will pay -- pursuant to section 365 in connection with the

_____

[7] This section does not apply to a default that is a breach of a provision relating to:

> (A) the insolvency or financial condition of the debtor at any time
> before the closing of the case;
>
> (B) the commencement of a case under this title;

assumption and cure of the Assumable Executory Contracts ("Cure Amounts"), which the parties

to such contracts will have ample opportunity to contest.

Moreover, pursuant to section 365(f)(2), a debtor in possession may assign an

executory contract or unexpired lease of nonresidential property if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a

"practical, pragmatic construction" based on "the facts of the proposed assumption."  *In re*

*Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007); *Carlisle Homes, Inc. v. Arrari (In re Carlisle*

*Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R.

436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean

absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*,

53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case,

the required assurance will fall considerably short of an absolute guarantee of performance").

Adequate assurance may be given by demonstrating, among other things, the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance present when prospective assignee of a lease from debtor has

---

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

*Id.* at § 365(b)(2).

financial resources and has expressed a willingness to devote sufficient funding to business in

order to give it strong likelihood of succeeding; chief determinant of adequate assurance is

whether rent will be paid); *see also In re Vitanza*, 1998 WL 808629, *26 (Bankr. E.D. Pa. 1998)

("The test is not one of guaranty but simply whether it appears that the rent will be paid and

other lease obligations met").

The Debtors will present facts at the Sale Hearing to demonstrate the financial

credibility, willingness and ability of the Purchaser or any successful bidder to perform under the

Assumable Executory Contracts.  Indeed, the Purchaser is a new entity, free of the enormous

debt the Debtors have been forced to operate under, and, thus, with a much stronger balance

sheet than the entity with whom the Debtors' counterparties originally contracted.  The Sale

Hearing thus will provide the Court and other interested parties the opportunity to evaluate the

ability of the Purchaser or any other successful bidder to provide adequate assurance of future

performance under the Assumable Executory Contracts, as required by section 365(b)(1)(C).[8]

## V.    THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY BANKRUPTCY RULES 6004(g) AND 6006(d)

Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 10 days after entry of the order.  *See* Fed. R. Bankr. P. 6004(g).  Along

---

[8] Pursuant to the 363 Motion, the Debtors also request that the Sale Order provide that anti-assignment provisions in certain of the Assumable Executory Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of such contracts within the meaning of section 365(f).  *See* 11 U.S.C. § 365(f)(1); *see also Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K. Corp.)*, 127 F.3d 904, 910-11 (9th Cir. 1997) ("[N]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365").  In addition, section 365(f)(3) further prohibits the enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *see also In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions"), *aff'd*, 209 F.3d 291 (3d  Cir.), *cert. denied*, 531 U.S. 873 (2000).

these same lines, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an

executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 10

days, unless the Court orders otherwise.  *See* Fed. R. Bankr. P. 6006(d).

        To preserve the value of the Debtors' estates and limit the costs of administering

and preserving the Purchased Assets, it is critical that the Debtors consummate the 363

Transaction.  Accordingly, the Debtors request that the Court waive the 10-day stay periods

under Rules 6004(g) and 6006(d) or, in the alternative, if an objection to the sale of the

Purchased Assets or to the assignment of any Purchased Contract was filed (and later denied),

reduce the stay period to the minimum amount of time reasonably required by the objecting party

to file any appeal.

**<u>CONCLUSION</u>**

        For the foregoing reasons, as well as those set forth in the 363 Motion, the 363

Transaction should be approved.

Dated: June 1, 2009                  Respectfully submitted,
     New York, New York

                                       /s/ Harvey R. Miller
                                       Harvey R. Miller
                                       Stephen Karotkin
                                       Joseph H. Smolinsky

                                       WEIL, GOTSHAL & MANGES LLP
                                       767 Fifth Avenue
                                       New York, New York 10153
                                       Telephone:  (212) 310-8000
                                       Facsimile:  (212) 310-8007

                                       Attorneys for Debtors
                                       and Debtors in Possession