# Exhibit D

## AIRCRAFT LEASE AGREEMENT (S/N 4019)
dated as of  November ____, 2005

This Aircraft Lease Agreement (S/N 4019) (together with all supplements, annexes, exhibits and schedules hereto hereinafter referred to as the "**Lease**" or "**Agreement**") is between **AVN Air, LLC**, with an office at **4 North Park Drive Suite 500, Hunt Valley, MD 21030** (together with its successors and assigns, if any "**Lessor**") and **General Motors Corporation**, a corporation organized and existing under the laws of the State of Delaware with its mailing address and chief place of business at **300 Renaissance Center, Detroit, MI 48265-3000** (hereinafter called "**Lessee**").

1. **LEASING:**

    (a)  Subject to the terms and conditions set forth below, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the aircraft, including the airframe, engines and all appurtenant equipment and property (together hereinafter the "**Aircraft**") described in Annex A.

    (b)  Lessor shall purchase the Aircraft from the manufacturer or supplier thereof ("**Supplier**") and lease it to Lessee if on or before the Last Delivery Date (specified in Annex B) Lessor receives each of the following documents in form and substance reasonably satisfactory to Lessor:  (i) a copy of this Lease executed by each of Lessor and Lessee, (ii) the Purchase Document(s) Assignment and Consent substantially in the form of Annex C, with copies of the purchase order(s) or other purchase documents attached thereto;  (iii) evidence of insurance which complies with the requirements of Section 10, together with a letter from the insurance broker stating that the insurance coverages comply with the requirements of Section 10, (iv) evidence of an N number for the Aircraft together with an assignment of the rights thereto to Lessor; (v) evidence that the Aircraft has been duly certified as to type and airworthiness by the Federal Aviation Administration ("**FAA**"); (vi) evidence that Lessor's designated FAA escrow agent (which may be FAA counsel) has received in escrow the executed bill(s) of sale (which shall include, without limitation, a full warranty bill of sale from the Supplier (in form and substance reasonably satisfactory to the Lessor) and, if necessary, a standard form FAA Bill of Sale) and AC Form 8050-1 Aircraft Registration Form (except for the pink copy which shall be available to be placed on the Aircraft upon acceptance thereof), and an executed duplicate of this Lease, all in proper form for filing with the FAA; (vii) an opinion from Kimberly K. Hudolin, Esq., attorney for Lessee, confirming the authority of Lessee to execute and deliver this Lease; (viii) a completed inspection and/or survey with respect to the Aircraft in accordance with the requirements set forth in the Certificate of Acceptance; (ix) an opinion from Winston & Strawn LLP with respect to certain federal income tax matters related to the Aircraft and this Lease; (x) fuel receipts demonstrating that at the time of closing, the Aircraft is physically located in the State of Connecticut; and (xi) such other documents as Lessor may reasonably request.  Lessor's obligation to lease the Aircraft hereunder is further conditioned upon (1) delivery of the Aircraft, Lessee's execution and delivery to Lessor of a Certificate of Acceptance in the form of Annex D upon delivery of the Aircraft and (2) filing of all necessary documents with, and the acceptance thereof by, the FAA.

    (c)  Lessee's obligation to lease the Aircraft from Lessor shall be subject to and conditioned upon Lessee receiving on or prior to the Commencement Date as defined in Section 2(a) below, all of the following in form and substance reasonably satisfactory to it: (i) four (4) duly executed originals of the Lease, including all Annexes thereto executed by each of Lessor and Lessee; (ii) confirmation that FAA Counsel has received in escrow the Registration Application in the name of Lessor (except for the pink copy, which shall be available to be placed on board the Aircraft upon acceptance thereof) and executed duplicates of this Lease, including the Annexes, executed by each of Lessor and Lessee, all of the foregoing being in proper form for recording by the FAA; (iii) Lessee shall have received evidence reasonably satisfactory to Lessee that Lessor is registered in the State of Michigan to collect Michigan use tax as a lessor on or before the Commencement Date (as that term is defined in Section 2(a) of this Lease); and Lessor shall affirmatively elect within the State of Michigan to remit to the State the use tax payments Lessor shall receive from Lessee on the Rent Payments (as defined in Section 2(b) of this Lease) as such

606144

Rent Payments are made; and Lessor shall execute and deliver by certified mail to the Michigan Department of Treasury ("DOT") sent on the date this Lease is executed DOT Forms 1989 (Rev. 2-05) and 4281 (Rev. 2-05), together with an executed copy of this Lease and Lessor's Michigan use tax collection registration as attachments to such forms; and Lessor shall have provided Supplier with any and all sales or use tax exemption certificates in connection with Lessor's purchase of the Aircraft; and Lessor shall provide a copy to Lessee of all forms and certificates, including attachments thereto, that Lessor submits to the State of Michigan or Supplier pursuant to this Section 1(c)(iii); and (iv) in addition to the above listed conditions precedent, Lessor covenants and agrees that upon satisfaction of all conditions precedent in Section 1(b) and Lessee's acknowledgment that all the conditions to the Lease as aforestated have been satisfied, Lessor shall release from escrow the documents held by FAA Counsel on behalf of Lessor and shall authorize FAA Counsel to file and record all appropriate documentation, including, without limitation, the Lease on the delivery date of the Aircraft.

(d)  Lessor hereby appoints Lessee its agent for inspection and acceptance of the Aircraft from the Supplier. Once the Certificate of Acceptance has been signed, Lessee may not cancel this Lease.

## 2.    TERM, RENT AND PAYMENT:

(a)  The rent ("**Rent**") payable for the Aircraft and Lessee's right to use the Aircraft begins on the date Lessee signs the Certificate of Acceptance ("**Commencement Date**"). The term ("**Term**") of this Lease shall commence on the Commencement Date and shall continue, unless earlier terminated pursuant to the provisions of this Lease, until and including the expiration date stated in Annex B. The Term of this Lease shall include any extension or renewal terms of the Term, and all provisions of this Lease shall apply during any such extension or renewal terms, except as may be otherwise specifically agreed to in writing.

(b)  Lessee shall pay Rent to Lessor by electronic transfer of funds initiated by Lessee to the Payment Bank Account indicated in Annex B or to such other account as Lessor may designate in writing at least ten (10) days prior to any Basic Term Rent Date as defined in Annex B. Rent payments shall be in the amount, payable at such intervals and due in accordance with the provisions of Annex B. (Each payment of Rent is hereinafter referred to as a "**Rent Payment**".)  In no event shall any Advance Rent or any other Rent Payment be refunded to Lessee.

(c)  All payments of Rent shall be made in United States Dollars ("**U.S. Dollars**") in immediately available funds.

## 3.    [RESERVED]

## 4.    TAXES AND FEES:

(a)  Lessee shall (if permitted by law) report and pay promptly and shall indemnify and hold each Indemnified Party (as defined in Section 14(a)) harmless (on an after-tax basis to such Indemnified Party) against all taxes, fees and assessments due, imposed, assessed or levied against the Aircraft (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee, by the United States of America or any state or political subdivision thereof, or any international or foreign governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, gross or net income, franchise, stamp, value added, custom duties, landing fees, airport charges, navigation service charges, route navigation charges or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "**Taxes**" and individually a "**Tax**"); provided, however, that Lessee shall have no liability for Taxes (i) which are on or measured by the net income of Lessor except (A) as provided in Section 14(c) and (B) to the extent such income tax is imposed by a foreign government or international authority as a result of (and would not have

been imposed but for) the use, location or operation of the Aircraft or of the Lessee (or any sublessee) in such jurisdiction, (ii) which are in the nature of franchise taxes, doing business taxes, capital taxes or similar taxes (including, but not limited to, the Michigan Single Business Tax, but excluding any sales, use or similar taxes), or (iii) which are gross receipts or gross income taxes except (A) to the extent imposed by a foreign government or international authority as a result of (and would not have been imposed but for) the use, location or operation of the Aircraft or of the Lessee (or any sublessee) in such jurisdiction or (B) which are or are in the nature of sales, use or similar taxes (including rental taxes imposed by any state or local jurisdiction in the United States) (any Taxes described in clauses (i), (ii) or (iii) being referred to herein as an "**Excluded Tax**"). Lessee shall promptly reimburse (on an after tax basis) Lessor (and any Indemnified Party) for any Taxes (other than Excluded Taxes) charged to or assessed against Lessor or such Indemnified Party; provided, however, that Lessee shall have no liability to reimburse or indemnify Lessor for any Excluded Taxes collected by way of withholding. Lessee shall show Lessor as the owner of the Aircraft on all Tax reports or returns on which such information is required, and send Lessor evidence of Lessee's payment of Taxes upon request. All of Lessor's rights, privileges and indemnities contained in this Section 4 shall survive the expiration or other termination of this Lease. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

(b)  If a claim is made against Lessor for a Tax with respect to which Lessee is liable for payment or indemnity under this Section 4 (**"Imposition"**) and Lessee is not otherwise aware of such claim, Lessor shall promptly give Lessee notice in writing of such claim; provided, however, that Lessor's failure to give notice will not relieve Lessee of its obligations hereunder unless such failure precludes the contest of such Imposition. So long as (i) no Event of Default as defined in Section 12(a) has occurred and is continuing, (ii) the contest of such Imposition does not involve any material danger of the sale, forfeiture or loss of the Aircraft or any interest therein or any risk of criminal penalties, (iii) if Lessor so requests, Lessee has provided Lessor with an opinion of tax counsel that a reasonable basis exists for contesting such claim, (iv) the amount of the Imposition for which Lessee would be required to indemnify Lessor exceeds $5,000; (v) Lessee shall have acknowledged in writing its obligation to indemnify Lessor with respect to such Imposition; (vi) Lessee shall have agreed to pay all reasonable costs and expenses incurred by Lessor in connection with such contest; (vii) Lessor shall have determined that contesting (or continuing to contest) such Imposition will not result in any material adverse consequences to Lessor and (viii) Lessor shall not have elected to waive its right to indemnification with respect to such claim for Taxes, then Lessor at Lessee's written request will permit Lessee to contest, at Lessee's expense, in good faith in the name of Lessee (or of Lessor if under applicable law such Imposition cannot be contested in Lessee's name) the validity, applicability or amount of such Tax. The provisions of this subsection (b) of this Section 4 shall survive the expiration or other termination or cancellation of this Lease and the return of the Aircraft for any reason whatsoever. If Lessor shall receive any refund or other reduction in Taxes that is directly attributable to an indemnity paid by Lessee under this Section 4, Lessor shall promptly pay to Lessee the amount of such refund or reduction, together with any interest received by (or credited to) Lessor which is attributable to such indemnity paid by Lessee.

**5.    REPORTS; COVENANTS:**  Lessee will provide Lessor with the following in writing (except as otherwise provided herein) within the time periods specified: (a) notice of any tax lien or other lien which attaches to the Aircraft and the full particulars of the tax lien or other lien, within ten (10) days after Lessee becomes aware of the tax lien or other lien, (b) (i) Lessee's complete financial statements, certified by a recognized firm of certified public accountants, within ninety (90) days of the close of each fiscal year of Lessee and (ii) Lessee's unaudited quarterly financial statements within forty-five (45) days of the close of each fiscal quarter of Lessee (items (b)(i) and (b)(ii) shall be deemed delivered to Lessor when they are posted on Lessee's website or filed with the Securities and Exchange Commission (**"SEC"**) and accessible to the public via EDGAR); (c) notice to Lessor of the Aircraft's location, and the location of all information, logs, documents and records relating to the Aircraft and its use, maintenance and/or condition, and information as to the extent to which the Aircraft has been used or located outside the United States during any period, promptly upon request; (d) notice to Lessor of the relocation of the Aircraft's primary

606144                                                    3

hangar location, at least ten (10) days prior to any relocation; (e) notice of loss or damage to the Aircraft which would cost more than the lesser of (A) ten percent (10%) of the original Capitalized Lessor's Cost or (B) Two Hundred Fifty Thousand Dollars ($250,000.00) to repair or replace, within ten (10) days of such loss or damage; (f) notice of any accident involving the Aircraft causing personal injury or property damage, within ten (10) days of such accident; (g) evidence of insurance required by the terms hereof, promptly upon request by Lessor (including a letter from the insurance broker confirming that the insurance coverages comply with the requirements of Section 10); (h) on the last business day of the month of January of each year during the Term commencing with January, 2007, if requested by Lessor, a certificate of an authorized executive of Lessee stating that such executive has reviewed the activities of Lessee and that, to the best of such executive's knowledge, there exists no Event of Default or event which with notice or lapse of time (or both) would become an Event of Default; (i) such information as may be required to enable Lessor to file any reports required by any governmental authority as a result of Lessor's ownership of the Aircraft, promptly upon request of Lessor; (j) copies of any manufacturer's maintenance service program contract for the airframe or engines, promptly upon request by Lessor; (k) evidence of Lessee's compliance with FAA airworthiness directives and advisory circulars and of compliance with other maintenance provisions of Section 7 hereof and the return provisions of Section 11, promptly upon request of Lessor; and (l) such other reports or information as Lessor may reasonably request.

6.    **DELIVERY, REGISTRATION, USE AND OPERATION:**

(a)  The Aircraft shall be delivered directly from the Supplier to Lessee.

(b)  Lessee shall pay any out-of-pocket search and FAA filing fees necessary for the Aircraft to be duly registered in the name of Lessor under the Title 49, Subtitle VII of the United States Code, as amended (the "**FAA Act**"), and shall not register the Aircraft under the laws of any other country.

(c)  The possession, use and operation of the Aircraft shall be at the sole risk and expense of Lessee. Lessee acknowledges that it accepts full "operational control" of the Aircraft (as defined in the Federal Aviation Regulations ("**FAR**")). Lessee agrees that the Aircraft will be used and operated in all material respects: (i) in compliance with any and all statutes, laws, ordinances, regulations and standards or directives issued by any governmental agency applicable to the use or operation thereof; (ii) in compliance with any airworthiness certificate, license or registration relating to the Aircraft issued by any agency; (iii) in compliance with all safety and security directives of the FAA and similar government regulations relating to aircraft security; and (iv) in a manner that does not modify or impair any existing warranties on the Aircraft or any part thereof. Lessee will operate the Aircraft, to the extent material to its obligations under this Agreement, predominantly in the conduct of its business and will not use or operate, or permit the Aircraft to be used or operated, in all material respects, (aa) in violation of any United States export control law, (bb) to the extent material to its obligations under this Lease, in a manner wherein the predominant use during any twelve month period is for a purpose other than transportation for Lessee, or in a manner, for any time period, such that Lessor or a third party shall be deemed to have "operational control" of the Aircraft, or (cc) for the carriage of persons, property or mail for hire (except as expressly provided herein) or the transport of contraband. The Aircraft will, at all times be operated by duly qualified pilots holding at least a valid airline transport pilot certificate and instrument rating and any other certificate, rating, type rating or endorsement appropriate to the Aircraft, purpose of flight, condition of flight or as otherwise required by the FAR. Every pilot of the Aircraft shall be employed and/or paid and contracted for by Lessee, shall meet all recency of flight requirements and shall meet the requirements established and specified by the insurance policies required under this Lease and the FAA. The primary hangar location of the Aircraft shall be as stated in Annex B. Lessee shall not relocate the primary hangar location to a hangar location outside the United States. Lessor may examine and inspect the Aircraft and its maintenance records, wherever located, on land and in flight, after giving Lessee reasonable prior notice, and provided that any such examination and inspection is conducted at a time mutually agreed upon by Lessor and Lessee; provided, however, that no notice or agreed upon time shall be necessary upon the occurrence and during the continuation of an Event of Default. Any such inspection shall be limited to a

visual, walk-around inspection; provided, however, that Lessor shall, subject to the foregoing, have the ability to undertake a more thorough inspection of the Aircraft, at Lessor's cost (unless an Event of Default has occurred and is continuing, in which case such inspection shall be at Lessee's cost), in the event that, upon inspection of the Records, Lessor reasonably determines on a good faith basis that such an inspection is necessary to determine compliance by Lessee with its obligations hereunder. Lessor may, upon reasonable notice to Lessee, at Lessor's own expense (unless an Event of Default has occurred and is continuing, in which case such copies shall be at Lessee's cost) and without interfering with Lessee's use or maintenance of the Aircraft, make copies of any of the Aircraft's maintenance records at the location where they are maintained. Lessee shall give Lessor fifteen (15) business days' prior written notice of and allow Lessor to observe any major depot level inspection of the Aircraft.

(d) AT ALL TIMES DURING THE TERM OF THE LEASE, THE AIRCRAFT WILL BE LOCATED AND USED SOLELY WITHIN THE CONTINENTAL UNITED STATES; PROVIDED, HOWEVER THAT THE AIRCRAFT MAY BE TEMPORARILY LOCATED IN OR OPERATED OVER AREAS OUTSIDE THE CONTINENTAL UNITED STATES SO LONG AS SUCH USE CONSTITUTES LESS THAN FIFTY PERCENT (50%) OF THE TOTAL ANNUAL OPERATING HOURS OF THE AIRCRAFT IN ANY GIVEN CALENDAR YEAR DURING THE TERM OF THIS LEASE. NOTWITHSTANDING THE FOREGOING, AT ALL TIMES DURING THE TERM OF THE LEASE, LESSEE AGREES NOT TO OPERATE OR LOCATE THE AIRCRAFT, OR ALLOW THE AIRCRAFT TO BE OPERATED OR LOCATED IN OR OVER (i) ANY GEOGRAPHIC AREA WHICH IS NOT COVERED BY THE INSURANCE POLICIES REQUIRED BY THIS LEASE, OR (iii) ANY JURISDICTION OR NATION WHEREIN THE OPERATION OR LOCATION THEREOF WOULD VIOLATE ANY APPLICABLE LAW, REGULATION, OR RESTRICTION, INCLUDING, BUT NOT LIMITED TO, THE U.S. EXPORT ADMINISTRATION REGULATIONS AND THE U.S. INTERNATIONAL TRAFFIC IN ARMS REGULATIONS. LESSEE ALSO AGREES TO PROHIBIT ANY NATIONAL OF ANY NATION INTO WHICH THE IMPORTATION OF THE AIRCRAFT OR TECHNOLOGY INCLUDED IN THE AIRCRAFT WOULD BE PROHIBITED BY REGULATIONS OF THE OFFICE OF FOREIGN ASSETS CONTROL, US DEPARTMENT OF TREASURY (**"OFAC"**) FROM OPERATING THE AIRCRAFT, UNLESS SUCH PERSON IS A PERMANENT RESIDENT OF THE UNITED STATES OR HAS BEEN ADMITTED INTO THE UNITED STATES AS A REFUGEE OR ASYLEE.

(e) The engines set forth on Annex A shall be used only on the airframe described in Annex A or on another airframe leased to Lessee by Lessor.

(f) Lessor shall not disturb Lessee's quiet enjoyment of the Aircraft during the Term of this Lease unless an Event of Default has occurred and is continuing under this Lease.

(g) Lessee expressly assumes sole and exclusive responsibility for the determination and implementation of all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts directly or indirectly affecting the Aircraft, any part thereof, or any persons who (whether or not on board the Aircraft) may sustain any injury or damage as a result of any such acts. Lessee expressly acknowledges that Lessee's implementation of such security measures and systems is a material obligation of Lessee under this Lease, and that Lessor shall have absolutely no responsibility therefor. Upon request by Lessor from time to time, Lessee shall provide Lessor with such evidence as is reasonably requested by Lessor regarding Lessee's compliance with its obligations under this Section. However, in no event shall Lessor have any duty or obligation to monitor, review or assess any security measures maintained by Lessee or Lessee's compliance with the provisions of this Section. Any review by Lessor of such evidence as is provided pursuant to Lessor's request hereunder shall be for Lessor's informational purposes only, and there shall be no inference or implication therefrom that Lessor has reviewed or approved the adequacy or sufficiency of such recommendations or of the actual security measures or systems employed by Lessee. Without limiting the generality of the foregoing, it is expressly understood and acknowledged that Lessee, being in sole "operational control" of the Aircraft, is uniquely in

a position to identify and implement those security measures necessary to comply with this Section and that in doing so, Lessee has not relied upon, and shall not rely upon, any statement, act, or omission of Lessor.

(h) (i)  The airframe of the Aircraft shall have a warranty by the manufacturer thereof that extends for fifteen (15) years from the date of delivery of the Aircraft or 15,000 flight hours, which warranty shall extend to primary and secondary aircraft structures.  A warranty of seven years from the date of delivery of the Aircraft shall be provided for all parts and components. (ii)  Each of the engines installed on the airframe of the Aircraft shall have a warranty by the manufacturer thereof that extends for the first to occur of six (6) years from the date of delivery of the Aircraft or 3,700 flight hours.

7.    MAINTENANCE:

(a)  Lessee agrees that the Aircraft will be maintained in compliance with any and all statutes, laws, ordinances, regulations and standards or directives issued by any governmental agency applicable to the maintenance thereof, in compliance with any airworthiness certificate, license or registration relating to the Aircraft issued by any agency and in a manner that does not modify or impair any existing warranties on the Aircraft or any part thereof.

(b)  Lessee shall be responsible for maintaining, inspecting, servicing, repairing, overhauling and testing the Aircraft (including each engine) in accordance with (i) all maintenance manuals initially furnished with the Aircraft, including any subsequent amendments or supplements to such manuals issued by the manufacturer from time to time, (ii) all mandatory or otherwise required  **"Service Bulletins"** issued, supplied, or available by or through the manufacturer and/or the manufacturer of any engine or part with respect to the Aircraft, and (iii) all airworthiness directives applicable to the Aircraft issued by the FAA or similar regulatory agency having jurisdictional authority, and causing compliance to such directives to be completed through corrective modification in lieu of operating manual restrictions.  Lessee shall be responsible for maintaining all records, logs and other materials required by the manufacturer for enforcement of any warranties or by the FAA.  All maintenance procedures required hereby shall be undertaken and completed in accordance with the manufacturer's recommended procedures, and by properly trained, licensed, and certificated maintenance sources and maintenance personnel, so as to keep the Aircraft and each engine in as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear excepted, and so as to keep the Aircraft in such operating condition as may be necessary to enable the airworthiness certification of such Aircraft to be maintained in good standing at all times under the regulations of the FAA.

(c)  Lessee agrees, at its own cost and expense, to (i) cause the Aircraft and each engine thereon to be kept numbered with the identification in serial number therefor as specified in Annex A; (ii) prominently display on the Aircraft that N number, and only that N number, specified in Annex A; and (iii) notify Lessor in writing thirty (30) days prior to making any change in the configuration (other than changes in configuration mandated by the FAA), appearance and coloring of the Aircraft from that in effect at the time the Aircraft is accepted by Lessee hereunder, and in the event of such change or modification of configuration, coloring or appearance, to restore, upon request of Lessor, the Aircraft to the configuration, coloring or appearance in effect on the Commencement Date or, at Lessor's option to pay to Lessor an amount equal to the reasonable cost of such restoration.  Lessee will not place the Aircraft in operation or exercise any control or dominion over the same until such Aircraft marking has been placed thereon.  Lessee will replace promptly any such Aircraft marking which may be removed, defaced or destroyed.

(d)  Lessee shall be entitled from time to time during the Term of this Lease to acquire and install on the Aircraft at Lessee's expense, any additional accessory, device or equipment as Lessee may desire (each such accessory, device or equipment, an **"Addition"**), but only so long as such Addition (i) is ancillary to the Aircraft; (ii) is not required to render the Aircraft complete for its intended use by Lessee; (iii) does not alter or impair the originally intended function or use of the Aircraft; and (iv) can be readily removed without causing material damage.  Title to each Addition which is not removed by Lessee prior to the

return of the Aircraft to Lessor shall vest in Lessor upon such return. Lessee shall repair all damage to the Aircraft resulting from the installation or removal of any Addition so as to restore the Aircraft to its condition prior to installation, ordinary wear and tear excepted.

(e) Any alteration or modification (each an **"Alteration"**) with respect to the Aircraft that may at any time during the Term of this Lease (i) be necessary or advisable to comply with Lessee's obligations pursuant to this Lease or (ii) be required to comply with any applicable law or any governmental rule or regulation, in each case, shall be made at the expense of Lessee. Any repair made by Lessee of or upon the Aircraft or replacement parts, including any replacement engine, installed thereon in the course of repairing or maintaining the Aircraft, or any Alteration, shall be deemed an accession, and title thereto shall be immediately vested in Lessor without cost or expense to Lessor. Lessee may install on the Aircraft parts or components that are not the property of Lessor or Lessee, but are instead provided by the airframe or engine manufacturers or entities authorized to perform repairs with respect to the Aircraft on a temporary basis pending installation or reinstallation of parts or components that are, at the time of installation, property of Lessor.

(f) Except as permitted under this Section 7, Lessee will not modify the Aircraft or affix or remove any accessory to the Aircraft leased hereunder.

(g) The parties acknowledge that the Aircraft will be operated from time to time under Part 135 of the FAR as provided herein. The Aircraft shall be maintained and, as required, operated in accordance with the applicable Part 135 standards.

## 8.    LIENS, SUBLEASE AND ASSIGNMENT:

(a)    EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED BELOW, LESSEE SHALL NOT SELL, TRANSFER, ASSIGN OR ENCUMBER THE AIRCRAFT, ANY ENGINE OR ANY PART THEREOF, LESSOR'S TITLE OR ITS RIGHTS UNDER THIS LEASE. EXCEPT AS EXPRESSLY PROVIDED HEREIN, LESSEE SHALL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR (SUCH CONSENT NOT TO BE UNREASONABLY WITHHELD), SUBLET, CHARTER OR PART WITH POSSESSION OF THE AIRCRAFT OR ANY ENGINE OR PART THEREOF OR ENTER INTO ANY INTERCHANGE AGREEMENT. Lessee shall not permit any engine to be used on any other Aircraft except for another aircraft leased to Lessee by Lessor. Lessee shall keep the Aircraft, each engine and any part thereof free and clear of all Liens (as defined below) other than those which result from (i) the respective rights of Lessor and Lessee as herein provided; (ii) Lessor's Liens; (iii) Liens for taxes not yet due; and (iv) inchoate materialmen's, mechanics', workmen's, repairmen's, employees' or other like Liens arising in the ordinary course of business of Lessee for sums not yet delinquent or being contested in good faith in proceedings that do not involve a risk of the loss of possession of or title to the Aircraft, any engine or any part thereof. "**Liens**" shall mean all liens, charges, security interests, leaseholds, and encumbrances of every nature and description whatever, including, without limitation, any of the same arising in connection with or created by any Taxes (other than Lessor's Liens) and rights and interests of third parties under management, charter, pooling, interchange, sublease, timeshare, overhaul, repair or other similar agreements or arrangements. "**Lessor's Liens**" shall mean any Lien affecting the Collateral or any part thereof (including, without limitation, the Aircraft) arising as a result of (i) Lessor's rights under or pursuant to this Lease; (ii) any claim arising from any transfer by Lessor of an interest in the Collateral or this Lease; (iii) any claim against Lessor not related to the transactions contemplated by this Lease; (iv) any act or omission of Lessor not expressly contemplated by this Lease or not permitted without consent (which consent has not been granted) by Lessee or that is in violation of any term of this Agreement or not taken as a result of the occurrence and continuance of an Event of Default as permitted by this Lease; or (v) taxes imposed against Lessor or the consolidated group of taxpayers of which it is a member other than taxes which (1) are not to be indemnified against by Lessee under this Lease, or (2) are to be indemnified against by Lessee under this Lease and Lessor fails or refuses to contest such taxes after a request from Lessee that Lessor contests such taxes as provided in Sections 4(b) or 14(d) hereof; provided, however, that there shall

606144                                7

be excluded from this definition and no Lessor's Lien shall exist if such Lien is being diligently contested in good faith so long as neither such proceedings nor Lien involves a material danger of the sale, forfeiture or loss of the Collateral or adversely affects Lessee's rights under this Lease.

(1)    Third Party Use.    Notwithstanding the foregoing, provided that no Event of Default has occurred and is continuing, Lessee may (i) enter into arrangements regarding the Aircraft if and to the extent permitted under 14 C.F.R. Part 91.501, (ii) subject the Aircraft to interchange agreements or similar arrangements entered into by Lessee in the ordinary course of its business, (iii) permit an air carrier holding a current and valid certificate under 14 C.F.R. Part 135 to charter the Aircraft, and/or (iv) sublease the Aircraft to a sublessee from time to time pursuant to a sublease. Any such third party arrangement must include the following terms and conditions:  (A) the other party to said agreement is and remains a solvent domestic company or person; (B) the arrangement shall not convey any Lien or other property right or interest in or against the Aircraft; (C) the term of any such third party arrangement shall not exceed the then remaining Term of this Lease (after giving effect to any termination or cancellation); (D) any such third party arrangement shall be expressly subject and subordinate to this Lease and the rights of Lessor hereunder and in and to the Aircraft, including without limitation, Lessor's right to repossession pursuant to this Lease and to void, cancel or terminate any such third party arrangement upon such repossession; (E) Lessee reimburses Lessor for any and all costs incurred by it in connection therewith; and (F) the terms of any third party arrangement referred to in this subsection 8(a)(1) shall:  (x) provide that the third party thereunder may not further dispose, interchange, time share, sublease or transfer its interests in or the right to operate the Aircraft (y) not have any terms inconsistent with the terms of this Lease or cause Lessee to breach any of its representations, warranties, covenants or agreements under this Lease, and (z) not include any purchase option or similar title transfer mechanism and, in the case of a sublease, shall otherwise be a "true" lease for commercial law purposes.

No such interchange, chartering and/or subleasing by Lessee will reduce any of the obligations of Lessee hereunder or the rights of Lessor hereunder, and all of the obligations of Lessee hereunder shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety.

(b)    Lessor may assign this Lease, or any part hereof and/or the Aircraft to any assignee that at the time of such assignment (i) is a Citizen of the United States as defined in Section 40102(15) of the FAA Act, (ii) has a net worth of at least $75,000,000 (provided, however, that if the assignee itself does not have a net worth of at least $75,000,000, such assignee shall, if reasonably requested by Lessee, provide a guaranty (in form and substance reasonably satisfactory to Lessee) of such assignee's obligations hereunder by an affiliate having a net worth of at least $75,000,000), and (iii) is not a Competitor (as defined below) of Lessee or any of its affiliates.  Lessee hereby waives (solely as to any such assignee or assignee's assigns) and agrees not to assert against any such assignee, or assignee's assigns, any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.  No assignment, transfer or sale shall materially change Lessee's duties or materially increase its burdens or risks hereunder, or which such assignment, transfer or sale materially affect Lessee's interests hereunder. Lessee agrees that if Lessee receives written notice of an assignment complying with the terms hereof from Lessor, Lessee will pay all rent and all other amounts payable under this Lease to such assignee or as instructed by Lessor.  Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee and shall cooperate with Lessor and any such assignee in delivering to such assignee a certificate of insurance in compliance with the requirements of this Lease, reflecting assignee as loss payee  and/or  additional insured.  For the purposes hereof, "**Competitor**" shall mean any person engaged in (or an affiliate of any person engaged in) the design, engineering, manufacture, assembly or distribution of motor vehicles, motor vehicle components or motor vehicle parts.

(c)    Lessee may assign or transfer all or part of its right, title and interest in this Lease and the right to operate the Aircraft to an affiliate of Lessee upon notice to Lessor; provided that Lessee executes a guaranty in form and substance reasonably satisfactory to Lessor (a "**Guaranty**") in favor of Lessor

guaranteeing the payment and performance of the obligations of such assignee or transferee. Lessee may not merge or consolidate with another party (other than with or into an affiliate of Lessee or Guarantor, if applicable) in a transaction or series of transactions unless (i) Lessee is the surviving entity, or (ii) the surviving entity's credit quality is not materially weaker than Lessee's. Lessee may not assign or otherwise transfer its rights or obligations with respect to this Lease or the Aircraft, except as provided in this Lease, without the prior written consent of Lessor, which shall not be unreasonably withheld.

9.    **LOSS, DAMAGE AND STIPULATED LOSS VALUE:** Lessee hereby assumes and shall bear the entire risk of any loss, theft, confiscation, expropriation, requisition, damage to, or destruction of, the Aircraft, any engine or part thereof from any cause whatsoever, including without limitation, intentional criminal acts and acts of terrorism. If for any reason the Aircraft, or any engine thereto suffers an Event of Loss (as defined below), Lessee shall promptly and fully notify Lessor in writing. If an Event of Loss has occurred which affects only the engine(s) of the Aircraft, then Lessee, at its own cost and expense, shall repair such engine so that it is restored to the condition required pursuant to this Lease, or replace such engine(s) with an engine(s) that shall (i) be free and clear of all Liens, (ii) have a value, utility and useful life (without regard to hours and cycles) at least equal to, and be in as good an operating condition as, the engine with respect to which such Event of Loss has occurred, assuming such engine was in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss and (iii) be compatible with the other engine, and Lessee shall cause title to such engine(s) to be transferred to Lessor for lease to Lessee under this Lease. Upon transfer of title to Lessor of such engine(s), such engine(s) shall be subject to the terms and conditions of this Lease, and Lessee shall execute whatever documents or filings Lessor reasonably deems necessary and appropriate in connection with the substitution of such replacement engine(s) for the original engine(s). If an Event of Loss has occurred with respect to the Aircraft in its entirety, on the next Rent Payment Date (as defined in the Annex B) after an Event of Loss (the "**Payment Date**"), Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value as set forth in Annex F calculated as of the Rent Payment Date prior to such Event of Loss; and (ii) all Rent and other amounts which are due under this Lease as of the Payment Date. Upon an Event of Loss with respect to the entire Aircraft and payment by Lessee of all sums due hereunder, the Term of this Lease as to the Aircraft shall terminate and Lessor shall transfer to Lessee, without warranty, title to the Aircraft (unless the insurer takes title to the Aircraft as salvage). Any payments received from any governmental authority or any other person as a result of a Casualty Occurrence with respect to the Aircraft shall be applied first to reimburse Lessee up to the amount of the Stipulated Loss Value paid to Lessor and then (i) if and to the extent of any proceeds of insurance carried by Lessee, shall be paid to Lessee and (ii) if and to the extent received from any governmental authority or other person, shall be divided between Lessor and Lessee as their interests appear.

"**Event of Loss**" with respect to the Aircraft, the airframe or any engine shall mean any of the following events with respect to such property: (i) loss of such property or the use thereof (which results in an insurance settlement (unless the insurer has denied such insurance coverage) on the basis of loss or for a period of one hundred eighty (180) days after such loss (whichever is less)) due to theft, disappearance, destruction, act of terrorism, hijacking, damage beyond repair or rendition of such property permanently unfit for normal use for any reason whatsoever; (ii) any damage to such property which results in an insurance settlement with respect to such property on the basis of a total loss or constructive total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, such property by the act of any government (foreign or domestic) or of any state or local authority or any instrumentality or agency of the foregoing, which, in the case of a requisition for use, continues for more than one hundred eighty (180) days (or, in the case of the U.S. government or any agency or instrumentation thereof, beyond the Expiration Date ("**Requisition of Use**"); or (iv) as a result of any rule, regulation, order or other action by any government (foreign or domestic) or governmental body (including, without limitation, the FAA or any similar foreign governmental body) having jurisdiction, the use of such property shall have been prohibited, or such property shall have been declared unfit for use, for a period of six (6) consecutive months, unless Lessee, prior to the expiration of six-month period, shall have undertaken and, in the opinion of the Lessor, shall be diligently carrying forward all steps which are necessary or desirable to permit the normal use of

such property by Lessee or, in any event, if use shall have been prohibited, or such property shall have been declared unfit for use, for a period of twelve (12) consecutive months. The date of such Event of Loss shall be the date of such theft, disappearance, destruction, damage, Requisition of Use, prohibition, or unfitness for use for the stated period. An Event of Loss with respect to the Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to the airframe. An Event of Loss with respect to any engine shall not, without loss of the airframe, be deemed an Event of Loss with respect to the Aircraft.

10.  **INSURANCE:**  Lessee shall secure and maintain in effect at its own expense throughout the Term of the Lease insurance against such hazards and for such risks as Lessor may require.  All such insurance shall be with companies reasonably satisfactory to Lessor and having a rating of at least A- from A.M. Best Company.  Without limiting the generality of the foregoing, Lessee shall maintain, subject to self-insured retentions consistent with industry standards (but only if such self-retention is consented to in writing by Lessor) (i) liability insurance covering public liability and property, cargo and sudden accidental pollution coverage (that, with respect to sudden accidental pollution coverage only, results from an aircrash or similar event causing abnormal operation of the Aircraft), in amounts not less than Three Hundred Million United States Dollars ($300,000,000.00) for any single occurrence; (ii) all-risk aircraft hull and engine insurance (including, without limitation, with respect to any engine or part thereof while removed from the aircraft and single foreign object damage insurance) in an amount which is not less than the then Stipulated Loss Value; and (iii) confiscation, expropriation and war risk, hijacking and allied perils insurance (which insurance shall include coverage against acts of terrorism and similar criminal acts) in an amount which is (x) for physical damage, not less than the then Stipulated Loss Value and (y) for liability coverage, not less than Fifty Million United States Dollars ($50,000,000.00) for any single occurrence (subject to the insurance provisions noted on Annex B).  All insurance shall: (1) name Lessor as loss payee and additional insured (without responsibility for premiums) with respect to the Aircraft, (2) provide that any cancellation or substantial change in coverage shall not be effective as to the Lessor for thirty (30) days after written notice from the insurer of such cancellation or change, (3) insure Lessor's interest regardless of any breach of warranty or other act or omission of Lessee, (4) include a severability of interest clause providing that such policy shall operate in the same manner as if there were a separate policy covering each insured, (5) waive any right of set-off against Lessee or Lessor, and any rights of subrogation against Lessor, and (6) be primary and not be subject to any offset by any other insurance carried by Lessor or Lessee.  Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for and to receive payment of and to execute or endorse all documents, checks or drafts in connection with all policies of insurance in respect to physical damage claims regarding the Aircraft.  Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default.  Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance proceeds with respect to physical damage claims.  Lessor may, at its option, apply proceeds of insurance with respect to physical damage claims, in whole or in part, to (A) repair the Aircraft, or repair or replace any part thereof, or (B) satisfy any obligation of Lessee to Lessor under this Lease.

11.  **RETURN OF AIRCRAFT:**

     (a)  At expiration or termination of this Lease (the **"Return Date"**), Lessee shall, at Lessee's expense, return the Aircraft to Lessor, at a location within the continental United States as Lessor shall reasonably direct.  Lessee shall also return all logs, loose equipment, manuals and data associated with the Aircraft, including without limitation, inspection, modification and overhaul records required to be maintained with respect to the Aircraft under this Lease or under the applicable rules and regulations of the FAA or the manufacturer's recommended maintenance program, along with a currently effective FAA airworthiness certificate.  Lessee shall, upon request, assign to Lessor its rights under any manufacturer's maintenance service contract or extended warranty for the Aircraft, any engine or part thereof.  The Aircraft shall be returned in the condition in which the Aircraft is required to be maintained pursuant to Section 7, but with all logos or other identifying marks of Lessee removed.  Additionally, Lessee shall ensure that the Aircraft complies with all requirements and conditions set forth on Annex F hereto.  Lessee shall pay for all costs to comply with this Section 11(a).

(b)  Lessor shall arrange for an Aircraft/Records and Condition survey of the Aircraft on the Return Date to determine if the Aircraft has been maintained and returned in accordance with the provisions of this Lease.  The Aircraft shall be (1) in the repair and condition as when originally delivered to Lessee, ordinary wear and tear excepted, and (2) be free and clear of all Liens, except Lessor's Liens.  Lessor shall be responsible for the cost of such inspection.  If the results of such inspection indicate that the Aircraft, any engine thereto or part thereof, has not been maintained or returned in accordance with the provisions of this Lease, Lessee shall pay to Lessor within ten (10) days of demand, as liquidated damages, the estimated cost ("**Estimated Cost**") of servicing or repairing the Aircraft, engine or part.  The Estimated Cost shall be the arithmetic mean of two quotes or estimates of the cost of such repairs obtained from the manufacturer of the Aircraft or any other duly licensed aircraft repair firm with Lessor and Lessee each obtaining one such quote or estimate.  Lessee shall bear the cost, if any, incurred by Lessor in obtaining such quotes.

(c)  If Lessee fails to return the Aircraft on the Return Date, Lessor shall be entitled to damages equal the Rent for the Aircraft, pro-rated on a per diem basis, for each day the Aircraft is retained beyond the Return Date.  Such damages for retention of the Aircraft after the Return Date shall not be interpreted as an extension or reinstatement of the Term.

(d)  All of Lessor's rights contained in this Section shall survive the expiration or other termination of this Lease.

## 12.  EVENTS OF DEFAULT AND REMEDIES:

(a)  The term "Event of Default", wherever used herein, shall mean any of the following events under this Lease: (i) Lessee breaches its obligation to pay Rent or any other sum when due (assuming Lessee has received at least ten (10) days advance written notice of such other sums due); or (ii) Lessee breaches any of its insurance obligations under Section 10; or (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor to Lessee, except that so long as (A) Lessee is diligently attempting to cure such failure and such failure is of such a nature that it can be cured by practical means within an additional ninety (90) days but cannot be cured within such thirty day period, and (B) there exists no material risk of the sale, forfeiture or loss of the Aircraft or Lessor's rights, title or interests with respect thereto or imposition of civil or criminal penalties or other sanctions against Lessor, then such failure shall not constitute an Event of Default for an additional ninety (90) days; or (iv) any representation or warranty made by Lessee in connection with this Lease shall be false or misleading in any material respect; provided, however, that, to the extent Lessor exercises discretion in making the determination that a default has occurred under this Clause (iv), Lessor shall exercise such discretion in a commercial reasonable manner; or (v) Lessee or any required guarantor or other obligor for any of the obligations hereunder (if applicable, collectively "**Guarantor**") becomes insolvent or ceases to do business as a going concern; or (vi) a petition is filed by or against Lessee or any Guarantor under any bankruptcy, insolvency or similar laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date; or (vii) any Guarantor revokes or attempts to revoke its guaranty or fails to observe or perform any covenant, condition or agreement to be performed under any guaranty or other related document to which it is a party; or (viii) there is any dissolution or termination of existence of Lessee or any Guarantor (except in a transaction permitted pursuant to Section 8(c)).

(b)  Upon the occurrence of any Event of Default and so long as the same shall be continuing, Lessor may, at its option, at any time thereafter, exercise one or more of the following remedies, as Lessor in its sole discretion shall lawfully elect:  (i) demand that Lessee immediately pay as liquidated damages, for loss of a bargain and not as a penalty, an amount equal to the Stipulated Loss Value of the Aircraft, computed as of the Basic Term Rent Date prior to such demand together with all Rent and other amounts due and payable for all periods up to and including the Basic Term Rent Date following such demand; (ii) demand that Lessee pay all amounts due for failure to maintain or return the Aircraft as provided herein and cause Lessee to assign to Lessor Lessee's rights under any manufacturer's service program contract or any extended warranty contract in force for the Aircraft; (iii) proceed by appropriate court action, either at law

or in equity, to enforce the performance by Lessee of the applicable covenants of this Lease or to recover damages for breach hereof; (iv) by notice in writing terminate this Lease, whereupon all rights of Lessee to use of the Aircraft or any part thereof shall absolutely cease and terminate, and Lessee shall immediately return the Aircraft in accordance with Section 11, but Lessee shall remain liable as provided in Section 11; (v) request Lessee to return the Aircraft to a designated location in accordance with Section 11; (vi) peacefully enter the premises where the Aircraft may be and take possession of the Aircraft; (vii) sell or otherwise dispose of the Aircraft at private or public sale, in bulk or in parcels, with or without notice, and without having the Aircraft present at the place of sale; (viii) lease or keep idle all or part of the Aircraft; (ix) use Lessee's premises for storage pending lease or sale or for holding a sale without liability for rent or costs for a period not to exceed sixty (60) days; (x) collect from Lessee all reasonable out-of-pocket costs, charges and expenses to third parties, including reasonable legal fees and disbursements of outside counsel, incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies with respect thereto; (xi) terminate any arrangement between Lessee and any third party under Section 8(a)(1); (xii) exercise its rights under any guaranty; and/or (xiv) draw and apply the proceeds under any letter of credit or apply any security deposit, as applicable, to the obligations of the Lessee hereunder.

(c)  Lessor shall have the right to any proceeds of sale, lease or other disposition of the Aircraft, if any, and shall have the right to apply same in the following order of priorities:  (i) to pay all of Lessor's reasonable out-of-pocket costs, charges and expenses to third parties incurred in enforcing its rights under this Lease or in taking, removing, holding, repairing, selling, leasing or otherwise disposing of the Aircraft; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Lease; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor.  Lessee shall pay any deficiency in (i) and (ii) immediately.

(d)  The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute.  Waiver of any Event of Default shall not be a waiver of any other or subsequent Event of Default.

## 13.  NET LEASE:

Lessee is unconditionally obligated to pay all rent and other amounts due for the entire Term of this Lease no matter what happens, even if the Aircraft is damaged or destroyed, if it is defective or if Lessee no longer can use it.  Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Lease whether Lessee's claim arises out of this Lease, any statement by Lessor, Lessor's liability or any Supplier's liability, strict liability, negligence or otherwise.

## 14.  INDEMNIFICATION:

(a)  Lessee hereby agrees to indemnify (on an after tax basis) Lessor and any other entity which has an ownership interest in, is owned by or is under common ownership with, Lessor, and the respective or collective officers, directors, agents, employees, successors and assigns of each (each, an "**Indemnified Party**") from and against any and all losses, damages, penalties, injuries, claims, demands, actions and suits, (collectively "**Claims**") whether in law or equity, or in contract, tort, or otherwise, including reasonable fees of outside counsel and disbursements to third parties and other reasonable out-of-pocket costs of investigation or defense paid to third parties, including those incurred upon any appeal arising out of or relating to the Aircraft or this Lease, except to the extent the Claims result from Indemnified Party's gross negligence or willful misconduct.  This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims that may be imposed on, incurred by or asserted against an Indemnified Party in any way  arising out of (i) the selection, manufacture, purchase, acceptance or rejection of the Aircraft, the ownership of the Aircraft during the term of this Lease, and the delivery, lease, possession, maintenance, uses, condition, return or operation of the Aircraft (including, without limitation, latent and other defects, whether or not discoverable by Lessor, any Indemnified Party or Lessee and any claim for patent,

trademark or copyright infringement or environmental damage); (ii) the condition of the Aircraft sold or disposed of at the time of the termination of use by Lessee, any sublessee or employees of Lessee; (iii) any breach of Lessee's obligations under the Lease or the failure by Lessee to comply with any term, provision or covenant contained in this Lease or any other agreement executed by Lessee in connection with this Lease or the Aircraft or with any applicable law, rule or regulation with respect to the Aircraft, or the nonconformity of the Aircraft or its operation with any applicable law; (iv) vandalism, hijacking, destruction, bombing, terrorism or similar acts directly or indirectly affecting the Aircraft, any part thereof, or any persons who (whether or not on board the Aircraft) may sustain any injury or damage as a result of any such acts, regardless of whether or not Lessee was at the time of such use, complying with the security requirements of the Lease or applicable law; (v) any actions brought against any Indemnified Party that arise out of Lessee's actions (or actions of Lessee's agents); or (vi) any Indemnified Party's reliance on any representation or warranty made or deemed made by Lessee (or any of its officers) under or in connection with this Lease or any report or other information delivered by Lessee pursuant hereto which shall have been incorrect in any material respect when made or deemed made or delivered.  Lessee shall pay on demand to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any of the foregoing.  Such Indemnified Party shall give Lessee prompt written notice of any Claim hereby indemnified against, and Lessee shall be entitled to control the defense thereof, so long as no Event of Default has occurred and is continuing, and defense counsel is reasonably acceptable to Lessor; provided the failure of such Indemnified Party to provide such notice shall relieve Lessee of its obligation to indemnify hereunder solely and to the extent that Lessee has been materially prejudiced by such Indemnified Party's failure to provide prompt notice to Lessee.  Notwithstanding anything to the contrary contained herein, Claims do not include Taxes or Losses (as defined in Section 14(c)), indemnification for which is addressed in other provisions of this Lease.

(b)  Lessee hereby represents, warrants and covenants that at no time during the Term of this Lease will Lessee take or omit to take, nor will it permit any sublessee to take or omit to take, any action (other than an action that is a Permitted Act as defined below), which will result in the disqualification of the Aircraft for, or recapture of, all or any portion of the items of deduction specified in the "Tax Benefits" section in Annex B (such items of deduction, the **"Tax Benefits"**).  **"Permitted Act"** means any act that is expressly required by or is expressly permitted by this Lease, including, where abstention from action is expressly required or expressly permitted by this Lease, an omission of failure to act in accordance with this Lease.  "Permitted Act" does not include an act that results in the Aircraft, during the term of this Lease, being treated as having its "primary" use (as such term is used in Treas. Reg. Section 1.168(i)-(4)(d)(2)(i)), consist of the "commercial or contract carrying of passengers or freight", as such term is used in Asset Class 00.21 of Revenue Procedure 87-56 (or any successor Revenue Procedure or authority).  The remedy for any violation of this Section 14(b) is limited to the indemnity set forth in Section 14(c).

(c)  If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Lease (other than a breach that results from an act of Lessor) (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its federal income tax return all or any portion of the Tax Benefits with respect to the Aircraft, or (ii) any Tax Benefit claimed on the federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being  a **"Loss"**), then Lessee shall pay to Lessor, as an indemnity and as additional rent, a lump sum amount which, on an after tax basis, shall be sufficient to preserve Lessor's Net Economic Return as if such Loss had not occurred.  Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount.  **"Net Economic Return"** shall mean Lessor's anticipated after tax economic yields and cash flows, computed taking into account the Tax Benefits, and otherwise on the same assumptions, including tax rates, set out in the proposal of Lessor for lease financings for Lessee dated July 28, 2005.  For purposes of calculating Loss under this Section 14(c), bonus depreciation (within the meaning of Section 168(k)(4) of the Code), is not included in Tax Benefits and thus is not taken into account in computing the amount of any indemnity due hereunder.

(d) Lessor shall promptly notify Lessee of the receipt from the Internal Revenue Service of a written final revenue agent's report, 30-day letter or notice of deficiency in which an adjustment is proposed to the federal income taxes of Lessor for which Lessee would be required to indemnify Lessor under subsection (c) of this Section 14; provided, however, that failure to provide such notice will not relieve Lessee of its obligations hereunder except to the extent such failure precludes the contest of such proposed adjustment. If Lessee, within thirty (30) days of receipt of notice from Lessor, requests the Lessor to do so, Lessor shall contest the proposed adjustment and, provided Lessee is complying with its obligations under this subsection (d), shall not, without the consent of Lessee (not to be unreasonably withheld), settle such proposed adjustment; provided, however, that Lessor shall not be obligated to contest such adjustment unless (i) Lessee provides Lessor with an opinion of independent counsel (selected by Lessor and reasonably acceptable to Lessee) that a reasonable basis exists to contest the adjustment, (ii) no Event of Default has occurred and is continuing under the Lease, (iii) Lessor has determined in good faith that the contest shall not result in a material risk of the loss or forfeiture of the Aircraft, (iv) the amount for which Lessee would be required to indemnify Lessor with respect to such proposed adjustment exceeds Fifty Thousand Dollars ($50,000.00), (v) Lessee shall have acknowledged in writing its obligation to indemnify Lessor with respect to such Loss resulting under Section 14(c), (vi) Lessee shall have agreed to pay all reasonable costs and expenses incurred by Lessor in connection with such contest, and (vii) Lessor shall not have elected to waive its right of indemnification with respect to such proposed adjustment.  Lessor shall afford Lessee reasonable opportunities to consult with Lessor and shall keep Lessee reasonably informed of the nature of all actions taken to contest such proposed adjustment, provided that Lessor shall have ultimate discretion to determine the nature (and forum) of (including the extent to which the proposed adjustment is contested at the administrative level), and shall control the prosecution of, all such actions.  If Lessor determines to contest any adjustment by paying the additional tax and suing for a refund, Lessee shall timely advance to Lessor, on an interest-free basis, an amount equal to the sum of any tax, interest, penalties and additions to tax required to be paid and shall indemnify Lessor against any adverse federal income tax consequences resulting from Lessor's receipt of such advance.  Upon realization of any refund or other reduction in federal income tax by Lessor directly attributable to an advance or indemnity paid by Lessee, Lessor shall promptly pay to Lessee the amount of such refund or reduction, together with any interest realized by Lessor which is attributable to the amount advanced or indemnity paid by Lessee.  The provisions of this subsection (d) of this Section 14 shall survive the expiration or other termination or cancellation of this Lease and the return of the Aircraft for any reason whatsoever.

(e) All references to Lessor in this Section 14 include Lessor, the member of Lessor (and, if the member of Lessor is a limited liability company, the member of such limited liability company), and the consolidated taxpayer group of which Lessor and its member are members. All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Lease,  The rights, privileges and indemnities of Lessor contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

## 15. DISCLAIMER:

LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE AIRCRAFT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES AND THAT LESSOR IS LEASING THE AIRCRAFT IN AN "AS IS" CONDITION. LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION (EXCEPT AS SET FORTH IN SECTION 18), EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE AIRCRAFT LEASED UNDER THIS LEASE OR ANY COMPONENT THEREOF, OR ANY ENGINE INSTALLED THEREON, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO CONDITION, AIRWORTHINESS, DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE.  All such risks, as between Lessor and Lessee, are to be borne by Lessee.  Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee

or any other person with respect to any of the following: (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by the Aircraft, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Aircraft, or any other circumstance in connection with the Aircraft; (ii) the use, operation or performance of the Aircraft or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of the Aircraft. If, and so long as, no default exists under this Lease, Lessee shall be, and hereby is, authorized during the Term of this Lease to assert and enforce, at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Aircraft, and Lessor shall reasonably cooperate with Lessee, at Lessee's expense, in the making of any such claims and the enforcement of such rights, to the extent that Lessee shall reasonably request.

## 16.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE:

Lessee hereby represents and warrants to Lessor that on the date of this Lease and at all times during the Term of this Lease:

(a)   Lessee has adequate power and capacity to enter into, and perform under, this Lease and all related documents (together, the **"Documents"**) and is duly qualified to do business wherever necessary to comply with its obligations pursuant to this Lease, including the jurisdiction(s) where the Aircraft is or is to have its primary hangar location.

(b)   The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, fraudulent conveyance or other transfer, laws affecting creditors' rights generally, principles of equity (whether in a court of law or equity) and the implied covenant of good faith and fair dealing.

(c)   No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d)   The entry into and performance by Lessee of the Documents will not:  (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's Certificate of Incorporation or By-Laws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon the Aircraft pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Lease) to which Lessee is a party.

(e)   As of the date of execution of this Lease, there are no suits or proceedings pending or, to Lessee's knowledge, threatened in court or before any commission, board or other administrative agency against or affecting Lessee except those that if determined adversely to Lessee would not result in a Material Adverse Effect.  As used in this Section 16(e) and in Section 16(p), **"Material Adverse Effect"** means a material adverse effect on (1) the ability of Lessee to perform its obligations under this Lease, (2) the value, condition, marketability or operation of the Aircraft or Lessor's interest therein, or (3) the validity or enforceability of this Lease or any provision thereof.

(f)   Each of the financial statements of Lessee filed with the SEC with Lessee's Form 10K for the year ended December 31, 2004 and 10Q for the quarter ended September 30, 2005, presents fairly the financial condition and results of operations of Lessee as of such date in accordance with generally accepted accounting principles (as of such date) consistently applied and from the date of such financial statements until the date of execution of this Lease, there has been no material adverse change in the business or financial condition of Lessee such that Lessee would be unable to satisfy its obligations under

606144                                        15

this Lease. Neither (1) a strike, lockout or other labor disruption, nor (2) an impact to net worth of any minimum pension liability adjustments pursuant to paragraphs 36 and/or 37 of FAS 87 shall constitute a material adverse change under this Lease.

(g)   Lessee's exact legal name is as set forth in the first sentence of this Lease and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its organization (specified in the first sentence of this Lease)

(h)   Lessee's form and jurisdiction of organization are as stated herein above, and Lessee agrees to give Lessor not less than ten (10) days notice prior to any change to its form or jurisdiction of organization.

(i)   A copy of this Lease, and a current and valid AC Form 8050-1 will be kept on the Aircraft at all times during the Term of this Lease.

(j)   Lessee has selected the Aircraft, manufacturer and vendor thereof, and all maintenance facilities required hereby.

(k)   Lessee shall be responsible for maintaining all logs, books and records (including any computerized maintenance records) pertaining to the Aircraft and engines and their maintenance during the Term in accordance with FAA rules and regulations.

(l)   Lessee shall notify the local Flight Standards District Office of the FAA forty-eight (48) hours prior to the first flight of the Aircraft under this Lease.

(m)   Lessee shall operate the Aircraft in full compliance with all laws and regulations applicable to it.

(n)   On the Commencement Date, the Aircraft shall be complete for its intended use by Lessor, and treated as "placed-in-service" by Lessor for income tax purposes.

(o)   Throughout the Term of this Lease, (i) Lessee will not use or operate and will not permit the Aircraft to be used or operated "predominantly" outside the United States as that phrase is used in Section 168(g)(1)(A) of the Code and (ii) the Aircraft will not be treated as "tax exempt use property" for purposes of Section 168(h) of the Code.

(p)   Lessee is not currently violating, and will not during the Term of this Lease violate, any laws or regulations applicable to it except where non-compliance does not result in a Material Adverse Effect (as defined in Section 16(e) of this Lease).   Specifically, Lessee represents that (i) no person who owns a controlling interest in or otherwise controls Lessee is or shall be listed on the Specially Designated Nationals and Blocked Person List maintained by OFAC, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders or regulations , and (ii) Lessee is and will be in compliance with all applicable Bank Secrecy Act ("**BSA**") laws and regulations on BSA compliance and on the prevention and detection of money laundering violations.

## 17.   EARLY TERMINATION:

(a)   On or after the First Termination Date (specified in Annex B), Lessee may, so long as no Event of Default exists under this Lease, terminate this Lease as of a Rent Payment Date ("**Termination Date**"). Lessee must give Lessor at least one hundred twenty (120) days' prior written notice of the termination; provided, however, that a responsible executive of Lessee with knowledge of and responsibility for the Aircraft certifies in writing to Lessor (the form and substance of which certification shall be reasonably acceptable to Lessor) that the Aircraft has become obsolete or surplus to Lessee's needs.

(b) Lessee shall, and Lessor in cooperation with Lessee may, solicit cash bids for the Aircraft on an AS IS, WHERE IS basis without recourse to or warranty from Lessor, express or implied ("AS IS BASIS"). Lessee shall consult with Lessor on, and keep Lessor reasonably informed of, Lessee's solicitation activities. Lessee shall (i) prior to the Termination Date, certify to Lessor any bids received by Lessee; and (ii) on the Termination Date, pay to Lessor all Rent and other sums then due and unpaid as of the Termination Date. Neither Lessee nor its agents shall be permitted to bid.

(c) If all amounts due hereunder have been paid on the Termination Date, (i) Lessor shall sell the Aircraft on an AS IS BASIS for cash to the highest bidder; and (ii) Lessee shall pay to Lessor any difference between the Termination Value (calculated as of the Termination Date) and, if less, the proceeds of such sale (net of any related out-of-pocket expenses, including any sales, transfer or similar taxes). If such sale is not consummated on not more than three (3) occasions during the Term, no termination shall occur and Lessee shall pay to Lessor any out-of-pocket expenses incurred by Lessor.

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Aircraft. In that event, on the Termination Date Lessee shall (i) return the Aircraft (in accordance with Section 11); and (ii) pay to Lessor all Rent and other sums then due and unpaid as of the Termination Date, and the Termination Value (calculated as of the Termination Date) less the amount of the highest bid certified by Lessee to Lessor.

## 18.   REPRESENTATIONS AND WARRANTIES OF LESSOR:

Lessor hereby represents and warrants to Lessee that on the date of this Lease and at all times during the Term of this Lease:

(a) Lessor has adequate power and capacity to enter into, and perform its obligations under, the Documents to which it is a party and is duly licensed and qualified to do business wherever necessary to comply with its obligations pursuant to this Lease.

(b) The Documents have been duly authorized, executed and delivered by Lessor and constitute valid, legal and binding agreements, enforceable against Lessor in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, fraudulent conveyance or transfer, laws affecting creditors' rights generally, principles of equity (whether in a court of law or equity) and the implied covenant of good faith dealing.

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance of its obligations by Lessor of the Documents except such as have already been obtained.

(d) The entry into and performance of its obligations by Lessor of the Documents will not:  (i) violate any judgment, order, law or regulation applicable to Lessor or any provision of Lessor's certificate of formation or operating agreement or other governance documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon the Aircraft pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument or agreement (other than this Lease) to which Lessor is a party.

(e) There are no suits or proceedings known to Lessor to be pending or threatened in writing in court or before any commission, board or other administrative agency against or affecting Lessor, which (if adversely determined) would have a material adverse effect on the ability of Lessor to fulfill its obligations under this Lease.

(f) The transactions contemplated by this Lease are within the scope of the ordinary course of Lessor's business.

19. **END OF LEASE OPTIONS:**

(a) <u>Purchase Option</u>.

(i)    On the Expiration Date (specified in Annex B), Lessee may, so long as no Event of Default exists hereunder and this Lease has not been earlier terminated, purchase the Aircraft on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes). Lessee must give Lessor at least one hundred eighty (180) days, but not more than two hundred forty (240) days, prior written notice of its intent to purchase.

(ii)    **"Fair Market Value"** shall mean the price which a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Aircraft in an arm's-length transaction to a willing seller under no compulsion to sell. In determining the Fair Market Value: (i) the Aircraft shall be assumed to be in the condition in which it is required to be maintained and returned under this Lease, (ii) any installed additions to the Aircraft shall be valued on an installed basis; and (iii) costs of removal of the Aircraft from the current location shall not be a deduction from the value of the Aircraft. If Lessor and Lessee are unable to agree on the Fair Market Value at least sixty (60) days before Lease expiration, Lessor and Lessee shall each appoint a nationally recognized independent appraiser (collectively the "**Initial Independent Appraisers**") to determine Fair Market Value. If the Initial Independent Appraisers are unable to agree on the Fair Market Value of the Aircraft, they shall mutually appoint a third appraiser, who shall choose between the Fair Market Value amounts proposed by the two Initial Independent Appraisers. The Initial Independent Appraisers' agreed determination, or the decision of the third independent appraiser, as the case may be, shall be final, binding and conclusive. Each party shall bear all costs associated with any appraiser appointed by it, and the parties shall bear equally the costs associated with the third appraiser, if one is required.

(iii)    Lessee shall be deemed to have waived this purchase option unless it provides Lessor with written notice of its irrevocable election to exercise the option within fifteen (15) days after the Fair Market Value is told to Lessee.

(b) <u>Renewal Option</u>.

(i)    On the Expiration Date, Lessee may, so long as no Event of Default exists hereunder and this Lease has not been earlier terminated, renew the term of this Lease for a term mutually agreeable to the parties hereto and at the then Fair Market Rental Value (plus all applicable sales taxes). Lessee must give Lessor at least one hundred eighty (180) days, but not more than two hundred forty (240) days, prior written notice of its intent to renew.

(ii)    **"Fair Market Rental Value"** shall mean the rent which a willing lessee (who is neither a lessee in possession nor a used equipment dealer) would pay for the Aircraft in an arm's-length transaction to a willing lessor under no compulsion to lease. In determining the Fair Market Rental Value: (i) the Aircraft shall be assumed to be in the condition in which it is required to be maintained and returned under this Lease and (ii) any installed additions to the Aircraft shall be valued on an installed basis. If Lessor and Lessee are unable to agree on the Fair Market Rental Value at least sixty (60) days before Lease expiration, Lessor  and Lessee shall each appoint an independent appraiser (collectively the "**Initial Independent Rental Appraisers**") to determine Fair Market Rental Value. If the Initial Independent Rental Appraisers are unable to agree on the Fair Market Rental Value of the Aircraft, they shall mutually appoint a third rental appraiser, who shall choose between the Fair Market Rental Value amounts proposed by the two Initial Independent Rental Appraisers. The Initial Independent Rental Appraisers' agreed determination, or the decision of the third independent rental appraiser, as the case may be, shall be final, binding and conclusive. Each party shall bear all costs associated with any appraiser appointed by it, and the parties shall bear equally the costs associated with the third independent rental appraiser, if one is required.

(iii)    Lessee shall be deemed to have waived this renewal option unless it provides Lessor with written notice of its irrevocable election to exercise the option within fifteen (15) days after the Fair Market Rental Value is told to Lessee.

(c)  Return of the Aircraft.

If Lessee does not exercise or fails to consummate either of its options under Sections 19(a) and 19(b) above, then, on the Expiration Date, Lessee shall return the Aircraft to Lessor as provided in Section 11 of, and Annex F to, this Lease.

## 20.  MISCELLANEOUS:

(a)  LESSEE AND LESSOR HEREBY UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS LEASE, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT.  THIS WAIVER IS IRREVOCABLE.  THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LEASE, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION.   THIS LEASE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b)  The Aircraft shall remain Lessor's property unless Lessee purchases the Aircraft from Lessor, and until such time Lessee shall only have the right to use the Aircraft as a lessee.  Any cancellation or termination by Lessor of this Lease, pursuant to the provisions of this Lease, shall not release Lessee from any then outstanding obligations to Lessor hereunder.

(c)  Time is of the essence of this Lease.  Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument reasonably necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement.  If and to the extent that the Cape Town Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters specific to Aircraft Equipment (collectively, the "Cape Town Convention") each enter into force pursuant to their terms, Lessee shall take such action as may be required thereunder.  Lessee shall take further action at its own cost as Lessor may reasonably request to establish and protect Lessor's rights and interests in the Aircraft and this Lease, and if Lessee fails for any reason to execute and deliver such documents to Lessor, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto, together with any filings with the FAA or pursuant to the Cape Town Convention describing the Aircraft and any engines, attachments, appurtenances and parts relating thereto, and any additional collateral, and containing any other information required by the applicable Uniform Commercial Code, the FAA regulations or statutes applicable to it, or the Cape Town Convention.  At the request of Lessor following any expiration or termination of this Lease, Lessee shall execute and deliver to Lessor, for filing with the FAA or any registry established pursuant to the Cape Town Convention, such documents as Lessor shall require to evidence and confirm the expiration or termination of this Lease and the release of the Aircraft from the terms and conditions hereof, and if Lessee fails for any reason to execute and deliver such documents to Lessor, Lessee hereby irrevocably authorizes Lessor to sign Lessee's name to such documents and file such documents with the FAA and/or any registry established pursuant to the Cape Town Convention.  All notices required to be given hereunder shall be deemed adequately given if delivered in hand or sent by certified mail to the addressee at the addresses stated in Annex B to this Lease, or at such other place or places as such addressee may have

designated in writing. This Lease and any Annexes hereto constitute the entire agreement of the parties with respect to the subject matter hereof, and all Annexes referenced herein are incorporated herein by reference. NO VARIATION OR MODIFICATION OF THIS LEASE OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF EACH PARTY TO THIS LEASE. Any provision of this Lease which may be determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Lessee hereby waives any provision hereof prohibited or unenforceable in any respect.

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable out-of-pocket amounts paid to third parties and obligations to third parties incurred or assumed by Lessor in effecting such compliance shall constitute additional Rent due to Lessor. Lessee shall pay the additional Rent within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of any Event of Default.

(e) Any Rent or other amount not paid to Lessor when due shall bear interest from the due date until paid, at the lesser of ten percent (10%) per annum or the maximum rate allowed by law. Any provisions in this Lease which are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto. Notwithstanding anything to the contrary contained in this Lease, in no event shall this Lease require the payment or permit the collection of amounts in excess of the maximum permitted by applicable law.

(f) THIS LEASE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE (EXCEPT AS TO THE EFFECT OF TITLE 14, SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW)), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE AIRCRAFT. Lessee and Lessor hereby irrevocably consent and agree that any legal action, suit, or proceeding arising out of or in any way in connection with this Agreement may be instituted or brought in the courts of the State of New York located in New York County or the U.S. District Court for the Southern District of New York, and by execution and delivery of this Lease, Lessee and Lessor hereby irrevocably accept and submit to, for themselves and in respect of their property, generally and unconditionally, the exclusive jurisdiction of any such court, and to all proceedings in such courts.

(g) This Lease may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and either of the parties hereto may execute this Lease by signing any such counterpart. Only Counterpart No. 1 of this Lease shall be considered "Chattel Paper" for purposes of the UCC.

(h) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "**Transactions**"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions; the preceding two clauses are intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose; in addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or

any federal tax matter or federal tax idea related to the Transactions. The obligations of confidentiality contained herein, as they relate to the Transactions, shall also not prohibit either party from submitting copies of any of the Documents or providing information concerning the Transactions to any governmental or international authority as required by applicable law or regulation; from providing Documents or information concerning the Transactions in response to any subpoena or other compulsory legal process (provided that the party receiving said subpoena or other compulsory legal process shall give as much notice of the request as is possible in the circumstances to the other party); or from submitting copies of the Documents or information concerning the Transactions to any court or tribunal in connection with the resolution of any dispute under any of the Documents; or from disclosing copies of the Documents or information concerning the Transactions as appropriate to actions authorized by the Documents.

(i) Lessee and Lessor intend that this Lease constitutes a true lease for income tax purposes and that Lessor shall be treated as the owner of the Aircraft for such purposes, and agree to file all tax returns and other tax filings in all respects consistent with such intentions. Lessor and Lessee intend that this Lease constitutes and true "lease" and a "finance lease" as such terms are defined in Article 2A and not a sale or retention of a security interest. In order to secure the prompt and full payment and performance as and when due of any and all obligations and indebtedness of Lessee to Lessor, now existing or hereafter created of any kind whatsoever, Lessee hereby collaterally assigns, grants, and conveys to Lessor, a security interest in and lien on all of Lessee's right, title and interest in and to all of the following (the "Collateral"): (i) this Lease and any present and future subleases, management agreements, interchange agreements, charter agreements and any other present and future agreements of any kind whatsoever relating to the Aircraft or any part thereof and all rent, charter payments, reimbursements and other disbursements, remittances or other amounts payable with respect thereto; (ii) (in the event that contrary to the intentions of Lessee and Lessor, a court determines that this Lease is not a "true" lease under the Uniform Commercial Code) the Aircraft and all present and future parts, accessories, accessions and attachments thereto, and all present and future replacements, substitutions and exchanges for such goods; (iii) proceeds of the foregoing, including all related goods, accounts, chattel paper, documents, instruments, general intangibles, letters of credit, letters of credit rights, investment property, deposit accounts, and supporting obligations, insurance proceeds, warranty and requisition payments; and (iv) all present and future books and records relating to any of the foregoing and/or the Aircraft (including, without limitation, all tapes, cards, computer programs, computer runs and computer data in the possession or control of Lessee, any computer service bureau, or other third party). The collateral assignment, security interest and lien granted herein shall survive the termination, cancellation or expiration of this Lease until such time as Lessee's obligations under this Lease are fully and indefeasibly discharged.

(j) Without limiting any other provision of this Lease, Lessee shall perform and comply with all of its obligations, and possess, use, operate, insure, maintain, and comply with all applicable laws service, return and/or store the Aircraft (or cause any or all of the same to be done) and take all other actions contemplated in this Lease and the other Documents executed in connection therewith at its sole risk, cost and expense. Solely to the extent of the out-of-pocket cost of Uniform Commercial Code, FAA, Cape Town Convention or other applicable title and lien searches, reports, filing and recording fees, charges and taxes, and costs, Lessee shall pay such fees, costs and expenses incurred by or on behalf of Lessor at any time in connection with this Lease, whether or not the transactions contemplated hereby are consummated. Notwithstanding anything in the foregoing to the contrary, Lessee shall be responsible for all out-of-pocket costs and fees paid to third parties (including reasonable outside attorneys' fees) arising out of any amendments to this Lease or the other Documents requested by Lessee.

(k) Each party will promptly execute or otherwise authenticate any documents, filings and other records, including, amendments to this Lease, UCC, FAA, Cape Town Convention filings or other applicable filings and acknowledgments of assignment, and will take such further action as the other party may reasonably request in order to carry out more effectively the intent and purposes of this Lease and to establish and protect said party's rights and remedies under this Lease, or otherwise with respect to the Aircraft and/or the Collateral. Lessee irrevocably authorizes Lessor to file UCCs or other filings with respect to the Aircraft or Collateral in all cases consistent with the terms of this Lease. Lessee agrees not to

file any corrective or termination statements with respect to any UCC or other filings as provided for in this Lease relating to the Aircraft or any Collateral.

**21.   TRUTH-IN-LEASING:**

(a)  LESSEE HAS REVIEWED THE AIRCRAFT'S MAINTENANCE AND OPERATING LOGS SINCE ITS DATE OF MANUFACTURE AND HAS FOUND THAT THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER PART 14 CFR 91.409(f) OF THE FEDERAL AVIATION REGULATIONS.  LESSEE CERTIFIES THAT THE AIRCRAFT PRESENTLY COMPLIES WITH THE APPLICABLE MAINTENANCE AND INSPECTION REQUIREMENTS OF PART 14 CFR 91.409(f) OF THE FEDERAL AVIATION REGULATIONS.

(b)  LESSEE CERTIFIES THAT LESSEE, AND NOT LESSOR, IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE DURING THE TERM HEREOF.  LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS ITS RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

(c)  LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER PART14 CFR 91.409(f) OR PART 14 CFR 135 OF THE FEDERAL AVIATION REGULATIONS FOR OPERATIONS TO BE CONDUCTED UNDER THIS LEASE.  LESSEE UNDERSTANDS THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE, OR AIR CARRIER DISTRICT OFFICE.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Aircraft Lease Agreement (S/N 4019) to be executed by their duly authorized representatives as of the date first above written.

LESSOR:                                      LESSEE:

**AVN Air, LLC**                             **General Motors Corporation**
**By its Manager**
**General Electric Capital Corporation**

By: _____                    By:_____
Name:  Camille E. Mihalic                    Name:_____
Title:   Vice President                      Title:_____


This is Counterpart No. 6 of a total of 6 counterparts.  Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

AIRCRAFT LEASE

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Aircraft Lease Agreement (S/N 4019) to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

**AVN Air, LLC**
**By its Manager**
**General Electric Capital Corporation**

By:_____
Name:  Camille E. Mihalic
Title:   Vice President

LESSEE:

**General Motors Corporation**

By:_____
Name: Niharika Ramdev
Title:  Director, Global Funding & Cash
         Management

This is Counterpart No. 6 of a total of 6 counterparts.  Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

AIRCRAFT LEASE

**ANNEX A**
**TO AIRCRAFT LEASE AGREEMENT (S/N 4019)**
**DATED AS OF NOVEMBER ___, 2005**
**Description of Aircraft and Aircraft Markings**

I.     **Description**

Gulfstream Aerospace Corporation, Model G-IV (also known as a G350 (G-IV-X)) Aircraft which consists of the following components:

(a) Airframe bearing FAA Registration Mark N989GA (to be changed to N5115) and Manufacturer's Serial No. 4019;

(b) Two (2) Rolls-Royce Tay Mk 611-8C engines bearing Manufacturer's Serial Nos. 85052 and 85053 respectively (each of which has 750 or more rated takeoff horsepower or the equivalent of such horsepower);

(c) Standard accessories, avionics and optional equipment and such other items fitted or installed on the Aircraft and set forth on Schedule 1 hereto.

II. **Aircraft Markings (referenced in the MAINTENANCE Section of Lease)**

(a) Four-by-six inch plaque to be maintained in cockpit and affixed in conspicuous position stating:

**AVN Air, LLC** as owner and Lessor.
**General Motors Corporation** as Lessee under a certain
Aircraft Lease Agreement (S/N 4019) dated as of November ___, 2005,
has operational control of this aircraft.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

(b)  Similar markings shall be permanently affixed to each engine.

Initials:

Lessee:_____

Lessor_____

ANNEX A

(b)  Similar markings shall be permanently affixed to each engine.


Initials:

Lessee: _____

Lessor _____


ANNEX A

### SCHEDULE 1 TO ANNEX A TO AIRCRAFT LEASE AGREEMENT (S/N 4016)

#### Auxiliary Power Unit

Honeywell GTCP36-150(GIV) Serial No. P-126

#### Production-Installed Avionics Systems

- Four (4) Honeywell DU-1310 Flat Panel Display Units
- Two (2) Honeywell DC-884 Display Controllers
- One (1) Honeywell DP-884 Display Brightness Panel
- One (1) Honeywell/Kollsman Visual Guidance System (VGS)
- Three (3) Honeywell MAU-913 Modular Avionics Units
- One (1) Honeywell GP-500 Flight Guidance Panel
- Three (3) Honeywell MC-850 Multifunction Control Display Units
- Three (3) Honeywell AZ-200 Air Data Modules
- One (1) Honeywell WU-880 Weather Radar Receiver/Transmitter Antenna
- Two (2) Honeywell WC-884 Weather Radar Controllers
- Three (3) Honeywell IR-500 LASEREF V Micro Inertial Reference Units
- Two (2) Honeywell MRC-855A Modular Radio Cabinets
- Three (3) Honeywell AV-900 Audio Panels
- One (1) Honeywell MT-860 Third Navigation/Communication Cabinet
- Two (2) Honeywell RT-300 Radio Altimeters
- One (1) L3 Cockpit Voice Recorder (CVR)
- One (1) Cockpit Voice Recorder (CVR) Control Panel
- One (1) L3 Flight Data Recorder (FDR)
- Two (2) Davtron Digital Clocks
- One (1) Goodrich EBDI-4000 Radio Magnetic Indicator (RMI)
- One (1) Goodrich Magnetometer
- One (1) Goodrich GH-3100 Standby Attitude/Airspeed/Altitude Indicator
- One (1) Honeywell RT-951Traffic Alert Collision Avoidance System (TCAS 2000)
- Two (2) Mason Cursor Control Devices
- One (1) MagnaStar radio telecommunication unit (ARTU)
- One (1) MagnaStar duplexer/low noise amplifier (D/LNA)
- One (1) Miltope printer (cockpit)

#### Optional Avionics Systems

- One (1) Honeywell MCS – 7000 SATCOM
- One (1) Honeywell/GEC 2020 Head Up Display

- One (1) Kollsman Enhanced Vision System

### Cabin Communications

<u>Passenger Audio System</u>

- One (1) Baker PA/chime amplifier   (990-1254-068)

- Ten (10) DT Systems mid/tweeter speaker assemblies   (DT-A8GA)

- Four (4) DTSystems subwoofer speakers   (DT-AUS4MSGA)

- Two (2) Alto 6-channel amplifiers   (105210-0001)

- Three (3) DTSystems paging speakers (cabin area)   (DT-PA2N)

- One (1) DTSystem paging speaker ( lavatory)   (DT-PA2N)

- One (1) DTSystems paging speaker (galley area)   (DT-PA2N)

<u>Cabin Stereo Equipment</u>

- One (1) compact disc player / controller

<u>Cabin Video Equipment</u>

- One (1) multi-region digital video disc player
- One (1) multi-standard VHS video cassette player
- One (1) Airshow 17" LCD monitor   (2700-1-2)
- One (1) Rosen 15" LCD monitor   (1500-002)

- Six (6) Rosen 7" LCD Monitors   (7000-060/061)

<u>Airshow Network Passenger Flight Information System</u>

- One (1) Airshow data communication unit   (920060)
- One (1) Airshow installation kit   (910426)
- One (1) Airshow flight deck controller   (922000-2)
- One (1) mouse

**ANNEX B**
**DATED THIS ___ DAY OF NOVEMBER, 2005**
**TO AIRCRAFT LEASE AGREEMENT (S/N 4019)**
**DATED AS OF NOVEMBER ___, 2005**

[INTENTIONALLY OMITTED FOR FAA FILING PURPOSES]

606182

**ANNEX C**
**TO AIRCRAFT LEASE AGREEMENT (S/N 4019)**
**DATED AS OF NOVEMBER ___, 2005**

[INTENTIONALLY OMITTED FOR FAA FILING PURPOSES]

606136

# ANNEX D
## TO AIRCRAFT LEASE AGREEMENT (S/N 4019)
## DATED AS OF NOVEMBER ___, 2005

### CERTIFICATE OF ACCEPTANCE

**AIRCRAFT LEASE AGREEMENT (S/N 4019)** dated as of November ___, 2005 (the "**Lease**"), between **AVN Air, LLC** together with its successors and assigns, if any, as lessor (the "**Lessor**"), and **General Motors Corporation**, as lessee (the "**Lessee**").

**A.** The Aircraft:  Lessee hereby certifies, as of the date set forth below, that the Aircraft as set forth and described in Annex A to the Lease has been delivered to Lessee, inspected by Lessee, found to be in good order and fully equipped to operate as required under applicable law for its intended purpose, and is fully and finally accepted under the Lease.

**B.** Representations by Lessee:  Lessee hereby represents and warrants to Lessor that on the date hereof:

(1) The representations and warranties of Lessee set forth in the Lease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof.

(2) Lessee has satisfied or complied with all conditions precedent and requirements set forth in the Lease which are required to be or to have been satisfied or complied with on or prior to the date hereof.

(3) No Default or Event of Default under the Lease has occurred and is continuing on the date hereof.

(4) Lessee has obtained, and there are in full force and effect, such insurance policies with respect to the Aircraft, as are required to be obtained under the terms of the Lease.

(5) Lessee has furnished no equipment for the Aircraft other than as sold to Lessor and as stated on Annex A hereto or permitted as an addition thereto pursuant to the Lease.

(6) The Lessee has inspected the Aircraft and all pertinent records therefor and the Aircraft has no damage history.

(7) The nameplates required to be affixed to the Aircraft and to each engine pursuant to the MAINTENANCE Section of the Lease have been duly affixed.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

606138

**IN WITNESS WHEREOF,** Lessee has caused this Certificate of Acceptance to be duly executed by its officers thereunto duly authorized.

Lessee:

GENERAL MOTORS CORPORATION

By: _____

Name:  Kenneth E. Emerick

Title:  Executive Director,
        Worldwide Travel Services

Date: November ___, 2005

ANNEX D

**ANNEX E**
**TO AIRCRAFT LEASE AGREEMENT (S/N 4019)**
**DATED AS OF NOVEMBER ___, 2005**

[INTENTIONALLY OMITTED FOR FAA FILING PURPOSES]

606139

# ANNEX F
## TO AIRCRAFT LEASE AGREEMENT (S/N 4019)
## DATED AS OF NOVEMBER ___, 2005
## ADDITIONAL MAINTENANCE AND RETURN CONDITIONS

1. In addition to the requirements set forth in the MAINTENANCE Section and the RETURN OF AIRCRAFT Section of the Lease, the Lessee shall comply with the following terms and conditions:

(a)  On the Return Date, Lessee (i) shall have completed the next required periodic inspection on the Aircraft, and the next periodic inspection on each engine; (ii) shall ensure that each engine shall have available operating hours until both the next scheduled "hot section" inspection and next scheduled major overhaul of not less than 50% of the total operating hours respectively available between such hot section inspections or major overhauls; and (iii) shall ensure that the airframe shall have at least: (aa) one-half the available operating hours; and (bb) one-half the available operating months until the next scheduled major airframe inspection allowable between major airframe inspections.; and (iii) shall ensure that the life limited components as detailed in chapter five of the Aircraft's maintenance manual, Time Limits and Maintenance Checks, have at least one-half the available hours/cycles/months until next scheduled replacement.

(b)  In the event that any of such engines or airframe does not meet the conditions set forth in paragraph (a) above, Lessee shall pay Lessor an amount equal to the sum of (i) for each engine, the product of:  the current estimated cost of the next scheduled hot section inspection (including in such estimated cost, all required replacement of life limited parts) multiplied by the fraction wherein the numerator shall be the remainder (0 if negative) of (x) the actual number of hours of operation since the previous hot section inspection, minus (y) 50% of the total operating hours allowable between hot section inspections, and the denominator shall be the total operating hours allowable between hot section inspections, plus (ii) for each engine, the product of:  the current estimated cost of the next scheduled major overhaul (including in such estimated cost, all required replacement of life limited parts) multiplied by the fraction wherein the numerator shall be the remainder (0 if negative) of (x) the actual number of hours of operation since the previous major overhaul minus (y) 50% of the total operating hours allowable between major overhauls, and the denominator shall be the total operating hours allowable between major overhauls, plus (iii) the product of: the current estimated cost of the next scheduled major airframe and pressure vessel inspection ( including in such estimated cost, all required replacement of life limited parts) multiplied by the greater fraction wherein the number shall be the remainder (0 if negative) of (x) the actual number of respective operating hours or months of operation since previous major airframe and pressure vessel inspection, minus (y) 50% of the respective total operating hours or months of operation allowable between scheduled major airframe and pressure vessel inspections, and the denominator shall be the  respective total operating hours or months of operation between scheduled major airframe and pressure vessel inspections.  All prorated inspection and/or overhaul charges, if any, shall be payable as supplemental rent and shall be due upon presentation to Lessee of an invoice setting forth in reasonable detail the calculation of such amounts due including the names of all sources used for the required cost estimates.  (Unless both Lessor and Lessee agree to alternative source(s), the manufacturers of the airframe and engines shall be used as the sources for all cost estimates.)  In the event that the Lessee returns the Aircraft with a Manufacturer's Service Program (in the nature of a power-by-the-hour program) contract covering the engines as to which Lessee has paid for all usage of the engines during the term of this Lease, and which is freely assignable to Lessor at Lessor's option, the provisions of Sections (a)(ii) and (b)(i) and (ii) of this Annex F shall not apply.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

(c)    Upon return of the Aircraft: (i) each fuel tank shall contain the same quantity of fuel as was contained in such tanks when such Aircraft was delivered to Lessee, (which shall be presumed to be fifty percent (50%) of full capacity unless otherwise specified in the purchase order or other purchase documents or, in the case of differences in such quantity, an appropriate adjustment will be made by payment at the then current market price of fuel.

Initials:  Lessee                                    Lessor:

ANNEX F

(c)    Upon return of the Aircraft: (i) each fuel tank shall contain the same quantity of fuel as was contained in such tanks when such Aircraft was delivered to Lessee, (which shall be presumed to be fifty percent (50%) of full capacity unless otherwise specified in the purchase order or other purchase documents or, in the case of differences in such quantity, an appropriate adjustment will be made by payment at the then current market price of fuel.

Initials:  Lessee_____        Lessor: _____

ANNEX F