# Exhibit H

## LEASE AGREEMENT

## GENERAL MOTORS CORPORATION

THIS LEASE AGREEMENT, made and entered into this _5th_ day of _July_, 1984, by and between the BOARD OF COUNTY ROAD COMMISSIONERS OF THE COUNTY OF WAYNE, MICHIGAN, a public body corporate, with principal offices located at 415 Clifford, Detroit, Michigan 48226, hereinafter referred to as the "BOARD"; and GENERAL MOTORS CORPORATION, a Delaware corporation, with principal offices located at 3044 West Grand Boulevard, Detroit, Michigan 48202, hereinafter referred to as the "TENANT";

WITNESSETH:

WHEREAS, pursuant to the provisions of the Aeronautics Code of the State of Michigan, the BOARD operates and maintains the Detroit Metropolitan Wayne County Airport, located in the City of Romulus, County of Wayne, Michigan, hereinafter referred to as the "AIRPORT"; and

WHEREAS, the BOARD has the authority to lease premises and facilities at the AIRPORT and to grant rights and privileges with respect thereto; and

WHEREAS, the TENANT desires to lease from the BOARD certain premises at the AIRPORT.

NOW, THEREFORE, in consideration of the premises and mutual undertakings of the parties hereto, it is agreed as follows:

## ARTICLE I

### 1.1 PREMISES

The BOARD, for and in consideration of the rents specified herein and the stipulations and covenants herein given on the part of the TENANT, by these presents does grant, demise and lease unto the TENANT for the TENANT's exclusive use, and the TENANT does

hereby hire and take from the BOARD the following premises, here-inafter referred to collectively as the "PREMISES", located at the Airport:

A.  Hangar Building No. 530, containing seventy-eight thousand six hundred thirty (78,630) square feet of floor space, more or less, as delineated on Exhibit A, attached hereto and made a part hereof; and

B.  Two hundred thirty thousand (230,000) square feet, more or less, of paved aircraft ramp area, as delineated on said Exhibit A; and

C.  One hundred twelve thousand (112,000) square feet, more or less, of paved vehicle and equipment parking area, as delineated on said Exhibit A; and

D.  Four hundred sixty-five thousand nine hundred sixty (465,960) square feet, more or less, of unimproved land, as delineated on said Exhibit A.

The BOARD makes no warranties or representations with respect to the condition, fitness or safety of the PREMISES or any part thereof, and TENANT accepts the same "as is" on the commencement date hereof.

## 1.2  USE OF PREMISES

During the initial term of this AGREEMENT, TENANT shall have the right to occupy the PREMISES solely for purposes of constructing and installing additions, alterations and improvements thereto and preparing the same for occupancy and use during the primary term for the purposes hereinafter authorized. The construction and installation of all such additions, alterations and improvements shall be subject to the terms and conditions hereinafter set forth.

During the primary term hereof, TENANT shall have the right, subject to the terms, conditions and covenants set forth in this AGREEMENT, to use the PREMISES including all additions and

I-2

improvements thereto (a) for any aviation or aviation-related activity which is necessary or incidental to the conduct of TEN-ANT's non-commercial air transportation operations, and (b) for purposes incidental to the transportation of its employees by commercial aircraft. TENANT shall not utilize the PREMISES for any other purpose without the prior written consent of the BOARD.

The rights granted to TENANT under this Section 1.2 to use the PREMISES for the purposes and subject to the conditions herein set forth shall be extended to any corporation which is a subsidiary of TENANT at no additional cost. The term "subsidiary" shall be construed to mean any corporation of which the TENANT at the time owns or controls, directly or indirectly, more than fifty percent (50%) of the shares of stock having general voting power under ordinary circumstances to elect a majority of the board of directors, managers or trustees of such corporation.

## 1.3 USE OF AIRPORT

In common with others so authorized, TENANT shall have the right to the use of the AIRPORT's runway and taxiway systems for the operation of aircraft owned or leased by TENANT and utilized by TENANT in the conduct of its non-commercial air transportation operations, which aircraft shall be construed to be based private aircraft exempt from payment of landing fees under the AIRPORT's Schedule of Landing and Use Fees in effect on the date of commencement of this AGREEMENT. In the event that the board shall at any time hereafter adopt a schedule of landing and use fees applicable to based private aircraft, TENANT shall be obligated to pay such fees in addition to the rentals, fees and charges hereinafter specified.

## 1.4 TERM

The initial term of this AGREEMENT shall commence April 1, 1984 and expire upon commencement of the primary term hereof.

I-3

The primary term hereof shall commence December 1, 1984 and terminate November 30, 2009.

## 1.5  RENTAL

In consideration for the TENANT's exclusive use of the PREMISES during the initial and primary terms hereof, the TENANT shall pay to the BOARD a total rental in the amount of twelve million two hundred seventy-four thousand two hundred forty dollars ($12,274,240.00), which amount shall be payable in monthly installments as follows:

April 1, 1984 through November 30, 1984    - $ 9,280.00 per month

December 1, 1984 through November 30, 2009 - $40,666.67 per month

Monthly installments shall be payable in advance on or before the first day of each month of the initial and primary terms hereof, the first installment being due and payable on or before April 1, 1984.

## 1.6  RENEWAL OPTIONS

The TENANT shall have the option to renew this AGREEMENT for three (3) additional five (5) year terms at the same rental rates for land, buildings and all other fixed improvements on the PREMISES as are in effect for similar AIRPORT properties under policies or practices of the BOARD then current on the date of exercise of the option by TENANT, but otherwise on the same terms and conditions; provided that the TENANT shall, not less than one hundred eighty (180) or more than two hundred ten (210) days prior to the termination date of the then current term (primary or renewal, as the case may be), give to the BOARD written notice of TENANT's exercise of such option. Upon receipt of such notice, the BOARD shall promptly give to TENANT written notice of the rental rates then current for similar AIRPORT properties and, within sixty (60) days of the date of such notice, TENANT shall accept or reject such rates in writing. Should TENANT fail to exercise its option as aforesaid, or should TENANT fail to accept the rental rates for

I-4

the renewal term as above provided, then and in either event this
AGREEMENT shall terminate upon expiration of the then current term
and TENANT shall vacate the PREMISES on or before the date of such
expiration.

### 1.7  AIRCRAFT FUEL

In the event TENANT purchases or otherwise acquires aircraft
fuel from a source other than a fixed base operator authorized by
and under contract with the BOARD, for each gallon so purchased or
acquired TENANT shall pay to the BOARD, in addition to all other
rentals, fees and charges specified in this AGREEMENT, a fuel flow-
age fee at the same rate per gallon as is then paid to the BOARD by
such fixed base operators.

Fuel flowage fees shall be due and payable within fifteen (15)
days following the end of each calendar month, and with each pay-
ment to the BOARD, TENANT shall transmit, on forms prescribed by
the BOARD and certified by the person in charge of the TENANT's
financial records, a report providing such information as the BOARD
may require to verify the amount of fees.

### 1.8  TENANT IMPROVEMENTS

As additional consideration for TENANT's exclusive use of the
PREMISES and the renewal options granted under Section 1.6 hereof,
the TENANT shall expend, on or before October 1, 1986, not less
than three million dollars ($3,000,000.00), including engineering
costs, for the construction and installation of additions,
alterations and improvements to the PREMISES, which additions,
alterations and improvements may include, for purposes of
illustration only, a new office building, new or expanded
automobile parking facilities and underground fuel storage
facilities, as well as additions, alterations and improvements to
existing facilities.

All work in pursuance of TENANT's obligation hereunder shall
be subject to the BOARD's advance written approval of all plans and
specifications and to the AIRPORT construction and alteration

I-5

permit requirements and inspection provisions hereinafter set forth, respectively, in sections 2.4 and 2.5.

Upon completion of each construction project, TENANT shall furnish the BOARD with a set of "as built" plans and, if applicable, underground "as built" drawings.

## 1.9  UTILITIES

The BOARD shall supply electricity to the PREMISES on a metered basis and charge the TENANT therefor at rates not exceeding those which TENANT would pay if it established the same demand and took the same quantity directly from the public utility supplying such service to the AIRPORT.  Charges for TENANT's use of electricity shall be payable within ten (10) days after receipt of invoice therefor.

The TENANT shall arrange directly with the appropriate utility company or supplier for the supply of water, sewerage, telephone and natural gas services and for TENANT's payment to the utility company or supplier for TENANT's use of such services.

In the event TENANT requires any addition or improvement to, or increase in the capacity of, any utility system servicing the PREMISES, the full cost of such addition, improvement or increase shall be borne solely by the TENANT.

Heating and air conditioning, and all costs in connection therewith, shall be the sole responsibility of TENANT.

## 1.10  SHUTTLE BUS SERVICE

If TENANT designates a specific automobile parking area within the PREMISES for use by its employees travelling on commercial airlines, the BOARD will, upon TENANT's written request, establish and maintain regular shuttle bus service to that area through extension of existing AIRPORT long-term parking lot shuttle service.

In consideration for such service and for the right granted to maintain an automobile parking area for the purposes set forth above, TENANT shall pay to the BOARD a monthly fee of ten dollars ($10.00) for each parking space within the area designated, the total number of such spaces to be determined and confirmed in writing by the parties hereto prior to commencement of the shuttle service.

The aforesaid fee shall be payable in advance on or before the first day of each month, the first payment being due and payable on or before the date of commencement of service, which payment shall be on a pro rata basis if said date is other than the first day of the month. The ten dollar ($10.00) fee per parking space shall remain firm until November 30, 1989, at which time or any time thereafter, but not more frequently than at five (5) year intervals, said fee shall, at the BOARD's sole option, be subject to review and adjustment based on the cost of shuttle bus operations.

Either party hereto may terminate the aforesaid shuttle bus service and all future obligations of both parties with respect thereto, including TENANT's monthly fee obligation, upon thirty (30) days advance written notice to the other party.

1.11 PAYMENT

All sums payable to the BOARD by the TENANT shall be considered rent for all purposes hereunder. If the TENANT shall fail to pay any rent when the same is due and payable, the TENANT shall, in addition to the full amount due, pay to the BOARD a late payment charge equal to one percent (1%) of the amount due per month for each month, or part thereof, that such sums shall not have been paid.

1.12 TRADE FIXTURES

TENANT, at its own expense, shall have the right to install, maintain, operate and replace any and all trade fixtures and other personal property in connection with TENANT's operation, use or oc-

I-7

cupancy of the PREMISES, all of which shall be and remain the property of TENANT.

It is understood that, for the purposes of this AGREEMENT, the term "trade fixtures" shall include, but shall not be limited to, any signs, electrical or otherwise, used for purposes of identifying TENANT; and all machinery and equipment used in connection with TENANT's operations, whether or not such signs, machinery or equipment are bolted or otherwise attached to any fixed improvement.

TENANT shall repair any damage to fixed improvements caused by the removal of trade fixtures by placing said fixed improvements in the same condition as when constructed or installed, normal wear and tear excepted.

### 1.13 EASEMENTS

TENANT's rights and privileges under this AGREEMENT are subject to all existing utility and other easements, if any, as generally delineated in Exhibit A.

### 1.14 TAXIWAY AND ROAD MAINTENANCE

The BOARD shall maintain all AIRPORT roadways and taxiways providing access to the PREMISES in good and adequate condition, and shall maintain free and uninterrupted access to the PREMISES at all times, Acts of God and circumstances over which the BOARD has no control excepted.

### 1.15 BOARD'S RIGHT TO AUDIT

TENANT shall make available to the BOARD, or its authorized representative, at any time Monday through Friday between the hours of 9:00 A.M. and 5:00 P.M., at TENANT's Airport offices, all records, books or other pertinent information as may be required for audit purposes to verify (1) the amount of any fees and charges due the BOARD pursuant to this AGREEMENT and (2) the amount of TENANT's expenditures for the construction and installation of additions, alterations and improvements to the PREMISES pursuant to its obligations under Section 1.8 hereof.

I-8

ARTICLE II

2.1 <u>MAINTENANCE AND REPAIR</u>

The TENANT, at its sole cost and expense, shall keep and maintain the entire PREMISES, including all facilities and fixed improvements at any time constructed or installed thereon, in sanitary and sightly condition and in good repair, reasonable wear and tear excepted, and shall provide all necessary janitorial and snow removal services.

Where the TENANT fails to perform any obligation required by this section and the BOARD gives the TENANT written notice of such failure, if the TENANT fails to perform such obligation within thirty (30) days after receipt of such notice; or, if the obligation is of such character as to require more than thirty (30) days to perform and the TENANT shall fail within said thirty (30) day period to commence and thereafter proceed diligently to perform such obligation, then and in either of such events, the BOARD may (at its option and in addition to its other remedies) perform such obligation for the account of the TENANT and any sum so expended by the BOARD shall be additional rent for all purposes hereunder and shall be due and payable thirty (30) days after the date of mailing to TENANT of an invoice therefor.

In the event the TENANT's failure to perform any obligation under this section adversely affects or endangers the health or safety of the public or the BOARD's employees and if the BOARD so states in its aforesaid notice, the BOARD may, but shall not be obligated to, perform such obligation at any time after giving such notice and without awaiting the expiration of said thirty (30) day period. Any sum expended by the BOARD in the performance of such obligation shall be additional rent for all purposes hereunder and shall be due and payable thirty (30) days after the date of mailing to TENANT of an invoice therefor.

II-1

If the BOARD performs any of the TENANT's obligations pursuant
to the provisions of this section, the BOARD shall not be liable to
the TENANT for any loss resulting from such performance.

## 2.2  LIMITATION OF BOARD'S OBLIGATIONS

The BOARD shall not be obligated to provide any utility
services or facilities other than as specified herein or to
increase the voltage or capacity of any utility service or facility
existing on the effective date hereof.  The BOARD shall not, under
any circumstances, be liable to the TENANT or any person for any
personal injury or property damage occasioned by any defect or mal-
functioning of plumbing, heating, air cooling, or air conditioning
equipment and ducts, electrical wiring or insulation thereof, gas
pipes, or steam pipes, or from the backing-up of any sewer pipe, or
from the bursting, leaking, or running of any tank, tub, washstand,
toilet, or waste pipe, drain, or any other pipe or tank in, on, or
about the PREMISES, or from the escape of steam or hot water from
any boiler or radiator, or for any damage or injury occasioned by
water being on or coming from the roof, stairs or walks, or any
other place on or near the PREMISES.

## 2.3  RIGHT OF INGRESS AND EGRESS

The TENANT shall have the full rights of ingress to and egress
from the PREMISES for the TENANT, its employees, guests, and other
invitees.   Such right shall also extend to persons supplying
materials or furnishing services to the TENANT.

## 2.4  ALTERATIONS, ADDITIONS OR IMPROVEMENTS

Any alterations, additions, or improvements to the PREMISES
shall be made at the TENANT's own expense, and only after ap-
plication for an AIRPORT construction or alteration permit, payment
of charges therefor, and return of the permit approved by the Air-
port Manager.  On the date of termination or cancellation of this
AGREEMENT all alterations, additions, or improvements to the PRE-

MISES shall become the property of the BOARD, free and clear of any lien and any right, claim or demand of the TENANT.

## 2.5  INSPECTION

The BOARD shall have the right to make periodic inspections during construction of any addition to or alteration of any fixed improvement on the PREMISES and TENANT shall reimburse the BOARD for the reasonable cost thereof.  The BOARD shall have the right, at its sole cost and expense, to make periodic inspection of the PREMISES other than during periods of construction.

## 2.6  INDEMNIFICATION

The TENANT shall indemnify, defend and hold harmless the BOARD, the County of Wayne, and their respective commissioners, officers, employees, agents and representatives from and against any and all claims, demands, causes of action, suits or judgments including, but not limited to, those for death of or injury to persons and for loss of or damage to property, arising or alleged to arise, either directly or indirectly, (a) out of or in connection with the TENANT's use and/or occupancy of the PREMISES, or (b) out of the acts or omissions of the TENANT, its officers, employees, agents, representatives, contractors, guests or invitees where such acts or omissions occur on the PREMISES, or (c) out of any acts or omissions of the TENANT, its officers, employees, agents or representatives where such acts or omissions occur elsewhere at the AIRPORT; provided, however, that the TENANT shall not be liable hereunder for any injury, death, damage or loss caused by the BOARD's sole negligence or by the joint negligence of the BOARD and any person other than the TENANT.

II-3

**2.7  INSURANCE**

Subject to the conditions hereinafter set forth, TENANT, at its own expense and in its own name and in the BOARD's name as additional insured, as their respective interest may appear, shall maintain and keep in force during the term of this AGREEMENT the following policies of insurance, which shall be written by a financially responsible insurance company or companies satisfactory to the BOARD:

A.  All Risk Physical Damage Insurance in an amount not less than one hundred percent (100%) of the replacement cost of all insurable fixed improvements located on the PREMISES.

B.  Comprehensive General Liability Insurance, which includes coverage for premises and operations and a contractual liability endorsement covering the obligations assumed by TENANT to indemnify BOARD under the terms of this AGREEMENT, or, in lieu of a contractual liability endorsement, a policy from which any contractual exclusion has been deleted.  Said policy shall provide liability insurance for personal injury and property damage with a combined single limit of not less than five million dollars ($5,000,000.00) for each occurrence.

C.  Aircraft Liability Insurance for personal injury and property damage with a combined single limit of not less than five million dollars ($5,000,000.00) per occurrence.

D.  No Fault Automobile Insurance in accordance with the laws of the State of Michigan and having coverage for residual liability with a combined single limit of not less than one million dollars ($1,000,000.00) per occurrence for bodily injury and property damage, or qualification as a self-insurer, as evidenced by a certificate issued by the secretary of state of the State of Michigan.

II-4

E.    Worker's Disability Compensation Insurance coverage as required by the laws of the State of Michigan, or participation in any self-insured worker's disability compensation program approved by the State of Michigan, and Employer's Liability Insurance in an amount of not less than one hundred thousand dollars ($100,000.00).

Each such policy shall provide for at least thirty (30) days advance written notice to BOARD prior to any cancellation, termination, or material modification of the policy, or any part thereof, in any manner adverse to the interests of the BOARD.

As evidence of compliance with this section, TENANT shall forthwith deliver to the Insurance Division of BOARD either a certified copy of each insurance policy required hereunder, or, a certificate of insurance, or, in the case of No Fault Automobile and/or Worker's Disability Compensation Insurance only, a certificate of self-insurance issued in accordance with applicable Michigan law; provided, however, that TENANT shall, within thirty (30) days following the written request of the Airport Manager, replace any insurance certificate with a certified copy of each insurance policy. If, at any time, any of the policies shall be or become unsatisfactory to BOARD as to form or substance, or if the companies issuing such policies shall be or become unsatisfactory to BOARD, TENANT shall promptly obtain new and satisfactory policies in replacement.

Any insurance hereinabove required may be provided under either a separate policy or a blanket policy.

Compliance with this section shall be a continuing condition to TENANT's enjoyment of the rights and privileges granted under this AGREEMENT. In the event TENANT fails to maintain and keep in force insurance as hereinabove required, TENANT shall forthwith cease all operations from and at the PREMISES until such failure is completely remedied.

II-5

## 2.8 · DAMAGE TO OR DESTRUCTION OF FIXED IMPROVEMENTS

If any insurable fixed improvement on PREMISES leased here-
under shall be partially damaged or totally destroyed by fire, the
elements, or other casualty covered by the insurance required to be
maintained by TENANT as above provided in Section 2.7A, or by the
public enemy, the same shall be repaired or replaced promptly and
with due diligence by TENANT; provided, however, that in making
such repair or replacement, TENANT may make changes in the plans
and specifications of such fixed improvement if the value of the
fixed improvement after repair or replacement is the same as or
greater than its value immediately prior to the damage, and pro-
vided further, that any change from the original plans and
specifications shall be subject to the prior written approval of
the BOARD.

TENANT's failure to repair or replace promptly and with due
diligence as aforesaid shall be a breach of the conditions of this
lease and grounds for the BOARD to exercise its rights under Sec-
tion 3.6 hereof.

## 2.9   QUIET ENJOYMENT

The BOARD covenants and agrees that it is well seized of the
PREMISES and has good title thereto, free and clear of all liens
and encumbrances having priority over this AGREEMENT; and that the
BOARD has the right and authority to lease the same as herein set
forth.   The BOARD further covenants that all things have happened
and been done to make its granting of said lease effective; and,
except as otherwise specifically provided in this AGREEMENT, the
BOARD warrants to TENANT peaceful possession and quiet enjoyment of
any PREMISES leased hereunder during the term hereof upon perfor-
mance of TENANT's covenants herein.

**2.10 EMINENT DOMAIN**

In addition to any other right TENANT may have hereunder, TEN-
ANT shall have the right to intervene and appear in its own behalf
in any eminent domain proceeding affecting the PREMISES and to re-
cover any award to which it may be adjudged entitled in connection
with TENANT's fixed improvements, trade fixtures, and other per-
sonal property, it being understood that, as between the BOARD and
TENANT, TENANT shall be entitled to the portion of the condemnation
award for the trade fixtures and other personal property thereon
and the portion representing the unamortized cost of any fixed
improvements constructed by TENANT after the commencement date
hereof, such amortization to be on a straight line basis over the
primary term of this AGREEMENT.

ARTICLE III

**3.1  SIGNS**

The TENANT shall not erect or install any exterior signs without the previous written consent of the BOARD.

**3.2  ASSIGNMENT AND SUBLETTING**

The TENANT agrees not to assign or in any manner transfer this AGREEMENT or any estate or interest therein without the previous written consent of the BOARD, and not to sublet said PREMISES or any part or parts thereof or allow any person to otherwise use the PREMISES without like consent.

**3.3  RIGHT OF ENTRY BY BOARD**

The BOARD shall have the right to enter upon the PREMISES at all reasonable hours for the purpose of inspecting the same, or of making repairs, additions or alterations to any property owned and controlled by the BOARD.

**3.4  BOARD'S RIGHT TO EXHIBIT PREMISES**

For a period commencing ninety (90) days prior to termination of this AGREEMENT, the BOARD may have reasonable access to the PREMISES for the purpose of exhibiting the same to prospective tenants.

**3.5  TENANT'S INTEREST NOT TRANSFERABLE**

Neither this AGREEMENT, nor any interest therein nor any estate thereby created shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law.

**3.6  BOARD'S RIGHT TO REENTER AND OPTION TO TERMINATE**

In the event of any failure of the TENANT to pay any sum due the BOARD within ten (10) days after the same shall be due, or any failure to perform any other of the terms, conditions or covenants of this AGREEMENT to be observed or performed by the TENANT for

more than thirty (30) days after written notice of such default shall have been mailed to the TENANT, or if the TENANT shall become bankrupt or insolvent, or file any debtor proceedings, or take or have taken against the TENANT in any court pursuant to any statute either of the United States or any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of the TENANT's property, or if the TENANT makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement for the benefit of creditors, or if the TENANT shall abandon said PREMISES, or suffer this AGREEMENT to be taken under any writ of execution, then the BOARD, in addition to other rights or remedies it may have, shall have the immediate right of reentry and may remove all persons and property from the PREMISES and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of the TENANT, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

Any act of TENANT described in this section shall be deemed a material breach of the TENANT's obligation hereunder, and upon such breach by the TENANT, the BOARD may, at its option and in addition to any other remedy available to the BOARD, terminate this AGREEMENT and all rights of the TENANT hereunder, by giving to the TENANT notice in writing of the election of the Board to so terminate.

### 3.7  RIGHT TO RELET

Should the BOARD elect to reenter the PREMISES, as herein provided, or should it take possession thereof pursuant to legal proceedings or pursuant to any notice provided for by law, it may either terminate this AGREEMENT or it may from time to time without terminating this AGREEMENT, make such alterations and repairs as may be necessary in order to relet the PREMISES, and relet said PREMISES or any part thereof for such term or terms (which may be for a term extending beyond the term of this AGREEMENT) and at such rental or rentals and upon such other terms and conditions as the BOARD in its sole discretion may deem advisable; upon each such reletting all rentals received by the BOARD from such reletting shall be applied, first, to the payment of any indebtedness from the TENANT to the BOARD other than rent due hereunder; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorney's fees and of costs of such alterations and repairs; third, to the payment of rent due and unpaid hereunder, and the residue, if any, shall be held by the BOARD and applied in payment of future rent as the same may become due and payable hereunder.  In the event such rentals received from such reletting during any month be less than that to be paid during that month by the TENANT hereunder, the TENANT shall pay any such deficiency to the BOARD.  Such deficiency shall be calculated and paid monthly.  No such reentry or taking possession of said PREMISES by the BOARD shall be construed as an election on its part to terminate this AGREEMENT unless a written notice of such intention be given to the TENANT or unless the termination thereof be decreed by a court of competent jurisdiction.  Notwithstanding any such reletting without termination, the BOARD may at any time thereafter elect to terminate this AGREEMENT for such previous breach.  Should the BOARD at any time terminate this AGREEMENT for any breach, in addition to any other remedies it may have, it may recover from

the TENANT all damages it may incur by reason of such breach,
including the cost of recovering the PREMISES, actual attorney's
fees, and including the worth at the time of such termination of
the excess, if any, of the amount of rent and charges equivalent to
rent specified ███████ in this AGREEMENT for the remainder of the
stated term over the then reasonable value of the PREMISES for the
remainder of the stated term, all of which amounts shall be
immediately due and payable from the TENANT to the BOARD.

### 3.8  LEGAL EXPENSES

In case suit shall be brought for recovery of possession of
the PREMISES, for the recovery of rent or any other amount due the
BOARD because of the breach of any other covenant herein contained
on the part of the TENANT to be kept or performed, and such breach
shall be established, the TENANT shall pay unto the BOARD all
expenses incurred therefor, including actual attorney's fees and
costs.

### 3.9  BANKRUPTCY

Nothing herein shall be construed to enlarge or diminish the
rights and obligations of either party hereto under the Bankrupty
Reform Act of 1979, as amended, with respect to the BOARD's rights
to cancel this AGREEMENT in the event the TENANT becomes a debtor
in accor- dance with said Act.

### 3.10  TAXES

The TENANT shall be responsible for and shall pay before
delinquency all municipal, county or state taxes lawfully assessed
during the term of this AGREEMENT against any leasehold interest or
personal property of any kind, owned by or placed in, upon or about
the PREMISES by the TENANT; provided, however, the TENANT shall not
be deemed to be in default of this section pending the outcome of
any legal proceeding instituted to determine the validity of such
taxes.

III-4

### 3.11 NOTICE BY TENANT

The TENANT shall give immediate notice to BOARD in case of fire or accidents on the PREMISES.

### 3.12 SUCCESSORS

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of the said parties; and if there shall be more than one tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any asignee of the TENANT unless the assignment to such assignee has been approved by the BOARD in writing as provided in this AGREEMENT.

### 3.13 WAIVER

One or more waivers of any covenant or condition by the BOARD shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by the BOARD to or of any act by the TENANT requiring the BOARD's consent or approval shall not be deemed to waive or render unnecessary the BOARD's consent or approval to or of any subsequent similar act by the TENANT.

### 3.14 CONSTRUCTION

Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relation-ship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained herein, or any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant. Whenever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders.

### 3.15 NON-LIABILITY

The BOARD shall not be responsible or liable to the TENANT for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connected with the PREMISES hereby leased.

### 3.16 ACCORD AND SATISFACTION

No endorsement or statement on any check or any letter accompanying any check or payment shall be deemed an accord and satisfaction, and the BOARD may accept such check or payment without prejudice to the BOARD's right to recover the balance of any unpaid account or pursue any other remedy in this AGREEMENT provided.

### 3.17 LIENS AND SECURITY INTEREST

In the event a mechanic's lien or security interest shall be filed against the PREMISES or the TENANT's interest therein as a result of any repairs, improvements, additions or alterations made by the TENANT, TENANT shall, within ten (10) days after receiving notice of such lien, discharge such lien, either by payment of the indebtedness due the lien claimant or by filing a bond (as provided by statute) as security therefor. In the event the TENANT shall fail to discharge such lien, the BOARD shall have the right, but shall not be obligated, to procure such discharge by filing such bond and the TENANT shall pay the cost of such bond to the BOARD as rent immediately upon receipt of invoice therefor.

### 3.18 CAPTIONS AND SECTION NUMBERS

The captions, section numbers, and article numbers appearing in this AGREEMENT are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections or articles of this AGREEMENT nor in any way affect this AGREEMENT.

### 3.19 PARTIAL INVALIDITY

If any term, covenant or condition of this AGREEMENT or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this AGREEMENT, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant or condition of this AGREEMENT shall be valid and be enforced to the fullest extent permitted by law.

### 3.20 NO OPTION

The submission of this AGREEMENT for examination does not constitute a reservation of or option for the PREMISES, and this AGREEMENT becomes effective as an agreement only upon execution thereof by the BOARD.

### 3.21 BOARD'S RIGHT TO CURE

Should the BOARD elect to pay any sum or sums or incur any obligations or expense by reason of the failure, neglect or refusal of the TENANT to perform or fulfill any one or more of the conditions, covenants or terms of this AGREEMENT, the TENANT shall pay unto the BOARD as rent the sum or sums so paid or the expense so incurred immediately upon receipt of invoice therefor.

### 3.22 COVENANT PURSUANT TO REQUIREMENTS OF THE DEPARTMENT OF TRANSPORTATION

The TENANT for itself, its personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree as a covenant running with the land that (1) no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national

origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the TENANT shall use the premises in compliance with all other requirement imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally-assisted Programs of the Department of Transportation - Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations may be amended.

In the event of breach of any of the above nondiscrimination covenants, the BOARD shall have the right to terminate the agreement and to reenter and repossess said land and the facilities thereon, and hold the same as if said AGREEMENT had never been made or issued.

### 3.23 AFFIRMATIVE ACTION ASSURANCES PURSUANT TO REQUIREMENTS OF THE FEDERAL AVIATION ADMINISTRATION

The TENANT assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E, to insure that no person shall on the grounds of race, creed, color, national origin, or sex be excluded from participating in any employment activities covered in 14 CFR Part 152, Subpart E. The TENANT assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this subpart. The TENANT assures that it will require that its covered suborganizations provide assurances to the TENANT that they similarly will undertake affirmative action programs and that they will require assurances from their suborganizations, as required by 14 CFR Part 152, Subpart E, to the same effect.

### 3.24 STATE REQUIREMENTS

In accordance with 1976 Public Act of Michigan No. 453, the parties hereto covenant not to discriminate against an employee or

applicant for employment with respect to hire, tenure, terms, con-
ditions, or privileges of employment, or a matter directly or
indirectly related to employment because of race, color, religion,
national origin, age, sex, height, weight, or marital status, and
to require a similar covenant on the part of any subcontractor
employed in the performance of this AGREEMENT.

### 3.25 AFFIRMATIVE ACTION PROGRAM

The parties hereto agree to carry out and be subject to the
provisions of Addendum 1, entitled "NON-DISCRIMINATION CLAUSE FOR
ALL WAYNE COUNTY ROAD COMMISSION CONTRACTS", attached hereto and
made a part hereof.

### 3.26 MINORITY BUSINESS ENTERPRISES

The TENANT agrees to comply with the following policy and
requirements of the Department of Transportation:

(1) Policy.  It is the policy of the Department of Transporta-
tion that minority business enterprises as defined in 49 CFR Part
23 shall have the maximum opportunity to participate in the perfor-
mance of contracts financed in whole or in part with Federal funds
under this AGREEMENT.  Consequently the MBE requirements of 49 CFR
Part 23 apply to this AGREEMENT.

(2)  MBE Obligation.  (i) The recipient or its contractor
agrees to ensure that minority business enterprises as defined in
49 CFR Part 23 have the maximum opportunity to participate in the
performance of contracts and subcontracts financed in whole or in
part with Federal funds provided under this AGREEMENT.  In this
regard all recipients or contractors shall take all necessary and
reasonable steps in accordance with 49 CFR Part 23 to ensure that
minority business enterprises have the maximum opportunity to
compete for and perform contracts.  Recipients and their
contractors shall not discriminate on the basis of race, color,
national origin, or sex in the award and performance of
DOT-assisted contracts.

Failure of a contractor or subcontractor to carry out the requirements set forth in paragraph 23.43(a) of 49 CFR Part 23 shall constitute a breach of contract and, after notification of the Department, may result in termination of the agreement or contract by the recipient or such remedy as the recipient deems appropriate.

The definitions set forth in paragraph 23.5 of 49 CFR Part 23 shall apply to the foregoing statements concerning minority business enterprises.

### 3.27 FEDERAL GOVERNMENT AGREEMENTS

This AGREEMENT shall be subordinate to the terms, conditions, and covenants of any existing or future agreements between the BOARD and the United States of America relative to the operation and maintenance of the AIRPORT, the execution of which has been or may be required as a condition precedent to the expenditure of federal funds for the development of the AIRPORT.

### 3.28 NATIONAL EMERGENCY

All terms, conditions, and covenants of this AGREEMENT shall be subordinate to the rights of the United States of America to lease or otherwise assume control over the Airport or any part thereof during time of war or national emergency for military or naval use, and any terms, conditions, and covenants of this AGREEMENT inconsistent with the terms, conditions, and covenants of such agreement with the United States of America shall be suspended thereby.

### 3.29 AIRPORT DEVELOPMENT

The BOARD reserves the right to further develop and improve the AIRPORT, including, without limiting the generality hereof, its landing areas, regardless of the desires or views of the TENANT in this regard and without interference or hindrance by the TENANT and free from any liability to the TENANT for interference with its activities or liability for loss occurring to the TENANT as a result of such development or improvement.

### 3.30 COMPLIANCE WITH LAWS, RULES AND REGULATIONS

The TENANT shall comply with any and all rules and regulations adopted by the BOARD with respect to use of the Airport. It shall also comply with all applicable federal and state laws and regulations. The TENANT shall, at its own expense, obtain any and all lawfully required governmental licenses and permits and pay all assessed service charges necessary for such use.

Pursuant to the BOARD's authority under the Michigan Aeronautics Code to lease premises and to regulate activities at the Airport, the terms and conditions of this AGREEMENT and the Airport Rules and Regulations shall take precedence over, and shall govern the parties hereto to the exclusion of, any local governmental law or ordinance in conflict therewith.

### 3.31 VENDING MACHINES

The TENANT may operate vending machines for use by its employees and business invitees only. Such vending machines shall not be accessible to members of the general public or the employees of persons other than the TENANT.

### 3.32 CHOICE OF LAW AND FORUM; SERVICE OF PROCESS

This AGREEMENT shall be construed and enforced according to the laws of the State of Michigan. Any action in regard hereto arising out of the terms and conditions hereof shall be instituted and litigated in the courts of the State of Michigan and in no other. Pursuant to Michigan Public Act No. 88 of 1974 and in accordance with this AGREEMENT, the parties hereto submit to the jurisdiction of the courts of the State of Michigan. In the event the TENANT has failed to maintain a registered agent to accept service of process in Michigan, the TENANT hereby consents to service of any such process by any means provided by statute or court rule in such case made and provided.

**3.33 SURRENDER OF POSSESSION**

Upon the expiration or earlier termination of this AGREEMENT or any renewal hereof, the TENANT shall forthwith surrender possession of the PREMISES in as good condition as when received, reasonable wear and tear excepted.

**3.34 CANCELLATION BY TENANT**

Notwithstanding any other provision of this AGREEMENT, the TENANT shall have the right to cancel this AGREEMENT upon the occurrence of any one of the following:

A.  Breach of any provision of this AGREEMENT by the BOARD and the failure of the BOARD to remedy such breach within sixty (60) days after receipt of notice thereof from the TENANT.

B.  Upon thirty (30) days advance written notice to the BOARD in the event of issuance, by any court of competent jurisdiction, of any injunction substantially restricting the use of the Airport for airport purposes and the continuing of said injunction, whether permanent or temporary, for a period of at least ninety (90) days.

C.  Upon thirty (30) days advance written notice to the BOARD in the event that the United States Government, or any authorized agency thereof, assumes the operation, control or use of the Airport or any substantial part thereof in such a manner as substantially to restrict the TENANT's use of the PREMISES for a period of at least ninety (90) days.

**3.35 PROTECTION OF AERIAL APPROACHES**

The BOARD reserves the right to take any action it considers necessary to protect the aerial approaches of the AIRPORT against obstruction, together with the right to prevent TENANT from erecting or permitting to be erected, any building or other

III-12

structure on the AIRPORT which, in the opinion of the BOARD, would

limit the usefulness of the AIRPORT or constitute a hazard to

aircraft.

## ARTICLE IV

### 4.1   ENTIRE AGREEMENT

This AGREEMENT consists of the Articles numbered I through IV and the attached documents described as Exhibit A, and Addendum 1. This AGREEMENT. sets forth all the covenants, promises, conditions and understandings between the BOARD and the TENANT concerning the PREMISES and TENANT's use thereof.   No alteration, amendment, change, or addition to this AGREEMENT shall be binding upon either party hereto unless reduced to writing and signed by each party.

### 4.2   NOTICES

All notices, demands, or other writings in this AGREEMENT provided to be given or made or sent, or which may be given or made or sent, by either party hereto to the other, shall be given, or made or sent by certified or registered mail, postage prepaid and addressed as follows:

To BOARD:    BOARD OF WAYNE COUNTY ROAD COMMISSIONERS

415 Clifford Street

Detroit, Michigan  48226

To TENANT:    GENERAL MOTORS CORPORATION

Argonaut Realty Division

Attention:  Director of General Motors Facilities

485 West Milwaukee Avenue

Detroit, Michigan 48202

The address to which any notice, demand, payment, or other writing may be given or made or sent may be changed by written notice given by the party requesting such change.

IV-1

IN WITNESS WHEREOF, the parties hereto have caused this
AGREEMENT to be executed on their behalf by their respective duly
authorized officers, their corporate seals to be hereunto affixed
and attested by their proper corporate officers, all as of the day
and year first above written.

Attest:                              BOARD OF COUNTY ROAD COMMISSIONERS
                                     OF THE COUNTY OF WAYNE, MICHIGAN

_Frederick J. Canciani_              By _William M. Oglesby_
. . . Secretary and Clerk            Its: Managing Director/
                                          Director of Aviation


Attest:                              GENERAL MOTORS CORPORATION

_____             By _T. O. Mathues_
. . . Secretary                             T. O. Mathues
                                     Its  Vice President

                                     By _Marguerite Romzick_
                                            MARGUERITE ROMZICK
                                     Its  ASSISTANT SECRETARY

JJT:mkw
06-04-84



IV-2

AFFIRMATIVE ACTION PROGRAM

WAYNE COUNTY ROAD COMMISSION

POLICY STATEMENT

March 15, 1984


The Board of Wayne County Road Commissioners hereby reaffirms its policy of non-discriminatory practices so that no person shall, on the basis of race, color, religion, sex -- except where sex is a bona fide occupational qualification -- national origin, age, or being handicapped, be excluded from participation in any activity under jurisdiction of the Road Commission.

The Board will, where possible, recruit, hire, train and promote persons in all job titles so as to further the principles of equal employment opportunity.

The Board insures that all personnel actions will be made in accordance with the principles of equal employment opportunity.

This policy includes non-discrimination in service to the public, employment opportunity and economic opportunity.

This policy is being issued in accordance with Presidential Executive Orders 11246, 11375 and implementing rules and regulations.


BOARD OF WAYNE COUNTY ROAD COMMISSIONERS


William M. Oakley
Managing Director/Director of Aviation

GENERAL MOTORS CORPORATION
CERTIFICATION

I, MARGUERITE ROMZICK, do hereby certify:

That I am the duly appointed and duly acting Assistant Secretary of General Motors Corporation;

That the following resolutions were duly adopted at a meeting of the Board of Directors of General Motors Corporation, duly called, at which a quorum was present, and which was held on April 2, 1979, and that said resolutions are in full force and effect:

> RESOLVED, That the resolutions adopted by this Board on April 3, 1967, on the subject "Real Estate Transactions - Authorizations - Contracts - Leases - Deeds" be, and the same hereby are, revoked, and the following resolutions be, and they hereby are, adopted in lieu thereof:

> RESOLVED, That the President, each Executive Vice President, the Vice President in charge of the Technical Staffs Group, and the Vice President having supervision of the real estate activities of the Corporation, be, and they hereby are, designated and authorized severally to make, execute, acknowledge and deliver on behalf and in the name of the Corporation, contracts and agreements for the purchase, sale, exchange, letting as lessor or as lessee, or other acquisition, disposition, occupation, possession or use of real estate or any interest therein, of whatever kind and wherever situate, as well as deeds, grants, leases, releases, satisfactions, options, escrows, licenses, assignments, discharges, easements, conveyances and all other instruments and assurances, including covenants of warranty, appropriate to the effectuation of such contracts and agreements; and further

> RESOLVED, That the Director, GM Facilities, be, and he hereby is additionally designated and authorized to take all the action authorized in the action authorized in the preceding resolution, limited, however, to transactions involving the acquisition and disposition of residences of employes transferred by General Motors Corporation or its subsidiaries.

That  *T. O. MATHUES*  is the  *VICE PRESIDENT*  of General Motors Corporation having supervision of the real estate activites of the Corporation.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said General Motors Corporation this *29th* day of *June* , *1984*.

*[signature]*

MARGUERITE ROMZICK
Assistant Secretary

ADDENDUM 1

NON-DISCRIMINATION CLAUSE
FOR ALL WAYNE COUNTY ROAD COMMISSION CONTRACTS

In connection with the performance of work under this contract, the CONTRACTOR agrees as follows:

1. The CONTRACTOR shall take affirmative action to see that no employee or applicant for employment is discriminated against with respect to his or her hire, tenure, terms, conditions, or privileges of employment because of his or her race, color, religion, national origin, or ancestry, or because of his or her age or sex, except where based on a bona fide occupational qualification.

2. The CONTRACTOR shall comply with the provisions and intent of Act 251, Public Acts of Michigan of 1955, as amended, and the provisions of Executive Order 11246 and Executive Order 11375 as the affirmative action and shall impose the same requirements on all subcontractors.

3. The CONTRACTOR shall furnish information required by the Equal Employment Compliance Unit of the Board of County Road Commissioners of the County of Wayne, hereinafter referred to as the "Board," concerning its affirmative action program.

4. The Equal Employment Compliance Unit shall have the authority and responsibility to investigate the CONTRACTOR and all subcontractors to ensure compliance with the provisions contained herein which shall include:
   a. Employment policies and hiring practices.
   b. Evaluation of employment data submitted by CONTRACTORS.
   c. Engaging in contract compliance reviews to discuss non-discriminatory employment practices and informing the CONTRACTOR of its responsibility and contractual obligations to ensure equal employment opportunity.

5. After all discussions and review procedures have been exhausted and compliance with the contractual obligations has not been obtained, the Equal Compliance Unit shall prepare in writing the facts and recommendations regarding any material breach of the contract to the Board for its disposition and action.

6. In the event of the CONTRACTOR'S non-compliance with the non-discrimination provisions of this Addendum, the Board shall impose such sanctions as it may determine to be appropriate, including, but not limited to:
   a. Withholding of payments to the CONTRACTOR under the contract until the CONTRACTOR complies; and/or
   b. Cancellation, termination or suspension of the contract in whole or in part; or
   c. Conditioning of contracts upon a program of future compliance approved by the Board.

7. The CONTRACTOR shall include the provisions of Paragraphs 1 through 9 in every subcontract, including procurements of materials and leases of equipment. The CONTRACTOR shall take such action with respect to any subcontract or procurement as the Board may direct as a means of enforcing such provisions, including sanctions for non-compliance.

8. Notwithstanding the use herein of such terms as "contract," "subcontract," "contractor," and "subcontractor," it is the intent of the parties hereto that this Addendum shall apply without reservation or limitation to the document to which it is annexed by specific reference, whether such document be identified as a contract, agreement or lease, and shall bind the person, firm or corporation named therein as the party contracting with the Board; and, further, that the words "subcontract" and "subcontractor" shall be construed to include, respectively, subleases and sublessees.

9. The CONTRACTOR shall formulate and adopt an affirmative action program similar to the Board's Affirmative Action Program, dated February 24, 1972, as amended, a copy of which may be obtained at the Board's Main Office, 415 Clifford Street, Detroit, Michigan.

AA2                                                            Revised 2/13/7

