Neil A. Goteiner (NG 1644)
Dean M. Gloster (*Pro Hac Vice* Application Pending)
Nan E. Joesten (*Pro Hac Vice* Application Pending)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Attorneys for General Motors Retirees Association

Return Date:  To Be Determined
Opposition Date:  To Be Determined

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>GENERAL MOTORS CORPORATION,<br><br>Debtor. | Chapter 11 Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

### APPLICATION OF THE GENERAL MOTORS RETIREES ASSOCIATION FOR ORDER TO APPOINT A RETIREE COMMITTEE PURSUANT TO 11 U.S.C. § 1114(D)

TO THE HONORABLE ROBERT E. GERBER, UNITED STATES BANKRUPTCY JUDGE:

The General Motors Retirees Association ("GMRA"), an organization representing the interests of over 122,000 salaried retirees, their spouses and survivors of General Motors Corporation ("GM"), and its affiliated Debtor entities (collectively, the "Debtors"), respectfully requests the Court authorize the appointment of an official Section 1114 Committee ("Committee") pursuant to 11 U.S.C. §1114(d) to represent those retirees, spouses and survivors regarding their protected benefits.

24677\1957102.1

**BACKGROUND**

1.      For GM salaried retirees who started work before January 1, 1993, GM provides medical, prescription drug, life insurance, dental, vision care and other retiree benefits, all as defined in and protected under Bankruptcy Code section 1114.  For many tens of thousands of retirees, some of these benefits are essential and almost irreplaceable:  The medical and prescription drug benefits are critical for their health and practical survival, especially because GM has undergone many years of downsizing and forced or encouraged early retirements.  Many tens of thousands of these retirees are still under 65 and thus not yet eligible for Medicare.  Their GM-provided group life insurance is also critical for taking care of their dependants and survivors upon their deaths:  Without these GM policies, they would have to qualify for life insurance individually, after disclosing pre-existing medical conditions that could make that insurance unavailable or prohibitively expensive.

2.      Unlike the hourly workers and retirees represented by the United Auto Workers[1], the salaried retirees the GMRA speaks for do not have a collective bargaining agreement to protect their benefits, or a separately funded voluntary employee benefit association to pay for those benefits, or an ownership interest offered to them in the restructured GM to provide for those benefits in the future.  Unlike those hourly workers, they have not had months of negotiations with the U.S. Treasury Department, GM and other constituents about what of their benefits they'll retain with "New" GM or how much in stock and notes will back up those benefits in a funded trust.

3.      The salaried retirees protected by Section 1114 are not the top executives or upper management, because the income-based exception in Section 1114(m) excludes the most highly

---

[1] The United Auto Workers union has negotiated extensively on behalf of its workers and retirees before the bankruptcy and has the separate right to represent its hourly retirees' interests under Bankruptcy Code section 1114(c)(1).

24677\1957102.1                                                         2

compensated.  Instead, they are the many, many tens of thousands of former secretaries, engineers, clerks, buyers, quality inspectors, middle managers and other non-hourly employees who in many cases have spent most of their lives building GM into the world's leading automotive company.  Many of them retired decades ago, when GM plan booklets still stated absolutely that GM would continue to provide their health benefits in retirement, without the more recent language that GM retained some rights to "amend, modify, or terminate" some of those benefits.

4. On June 1, 2009, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code, and on June 1, 2009, also filed a motion for joint administration of Debtor General Motors and its various debtor subsidiaries in Chapter 11 cases for procedural purposes. (The "Joint Administration Motion", docket number 16.)

5. The General Motors Retirees Association, a national advocacy organization expressly devoted to the preservation of pension, health care and other benefits earned by GM retirees, was formed in April, 2009.  The GMRA is a broad-based organization of GM salaried retirees, incorporated as a tax exempt employee benefit association.  GMRA operates a comprehensive web site, www.gmret.org, devoted to educating and informing GM salaried retirees and other current and future retirees about the GM bankruptcy and its implications for GM retirees.  GMRA is led by a 14-person board, comprising a president, treasurer/secretary, membership director, communications director, web master, and nine regional vice-presidents across the United States.  As of May 31, GMRA had thousands of members, and membership is growing in greater numbers as each day passes, currently at a rate of approximately 500 more members per week.  Even though the GMRA's web site has only been operational for eleven weeks, it reached 13,000 unique visitors in May.

6.       Unlike the numerous other primarily social organizations of GM retirees formed for other purposes, the GMRA was established for the specific purpose of preserving GM retirees' benefits and representing and educating retirees about those benefits.  It is a member of the broader National Retiree Legislative Network, an umbrella organization of individual retirees and various companies' retiree associations, formed to advocate, in court and in Congress, for effective legislative and judicial protections of the benefits of retirees inside and outside of bankruptcy.

**THE COURT SHOULD IMMEDIATELY APPOINT A SECTION 1114 COMMITTEE TO REPRESENT SALARIED RETIREES WHO ARE AT RISK OF LOSING CRITICAL BENEFITS.**

7.       Section 1114 and its framework for retiree committee representation simply provide a reasonable process and some limited protections for these absolutely critical retiree benefits, especially for retirees whose benefits are <u>not</u> protected by a collective bargaining agreement (and thus not protected by the similar provisions of Bankruptcy Code Section 1113). Section 1114 authorizes a committee to negotiate on behalf of affected retirees regarding changes to these benefits and otherwise provides substantive requirements the debtor must demonstrate to justify modifications of retiree benefits during the bankruptcy case (and for the 180 days before the filing, while the debtor was insolvent.)  This sets up a simple structure for a reasonable and quick negotiation:  The debtor can chose to meet the substantive standards:  that the modifications are clearly favored by a balance of the equities and (in the case of changes during the bankruptcy) are "necessary;" are rejected without "good cause" by the committee; treat the other creditors, the debtors and the affected retirees "fairly and equitably," all in a process that requires only a short time frame.  <u>See</u> 11 U.S.C. §§ 1114(g), (*l*).  Typically, to avoid that process and to achieve greater certainty, the debtor negotiates a practical deal with the Section 1114 retiree committee:  In return for the agreement that the debtor can make some cuts

during the bankruptcy (and in the 180 days preceding) the debtor makes commitments to reduce the devastating impact of some of the changes and often commits to some limited protections for the remaining reduced benefits into the future, post-confirmation, which are enforceable under Section 1129(a)(13).

8. On June 1, 2009 GM also filed a motion to consummate a sale of substantially all of the debtors' meaningful assets to "New" GM, with the sale motion to be heard on June 30, 2009. "New" GM will be similar to old GM under what appears to be the same management but different ownership, but without the liabilities and without the need to comply with the other provisions necessary to confirm a restructuring under a bankruptcy plan. As the debtors explain, the prearranged terms of the proposed sale to "New" GM reflect a "resolution" reached by the debtors "the Purchaser" and the UAW "addressing the ongoing provision of certain employee and retiree benefits." (Joint Administration, p. 10 ¶ 24.)

9. Of course, the only "certain…retiree benefits" that agreement and sale actually provide for is massive funding of a trust for the benefit solely of hourly workers and retirees represented by the UAW, in the form of notes from and stock of the "New" GM. On June 1, 2009 GM announced in a FAQ to its other retirees:

> General Motors is working with the U.S. Treasury to reduce some retiree benefit obligations by roughly two-thirds. This reduction will impact salaried retiree life insurance, salaried retiree health care, executive non-qualified pension, executive retiree life insurance and non-UAW hourly life insurance and we are still working on how to accomplish this in the most appropriate way. We are currently in discussions with the U.S. Treasury regarding the reductions and we will communicate to the affected employees and retirees as soon as this matter is resolved. It is our intent to address this matter as quickly as we can.

10. Presented with these facts, GM's estimated over 122,000 non-union current retirees and surviving spouses need immediate appointment of an official Section 1114

committee to represent them on retiree benefits issues as defined and required by the Bankruptcy Code. The GMRA hereby requests the Court appoint such a Committee, with the members to be selected by the U.S. Trustee's office, to act as the authorized representative of the salaried retiree creditors, pursuant to Section 1114 (the "Retiree Committee"), so the salaried retirees have the adequate representation to which they are entitled, and can participate in the current negotiations over their benefit cuts.

### THE NEED FOR A SECTION 1114 COMMITTEE TO REPRESENT SALARIED RETIREES IS URGENT AND IMMEDIATE.

11. GM may argue that appointment of a Section 1114 committee to protect salaried retirees is premature and should be delayed until GM announces further proposed cuts to retiree benefits—after it consummates the sale of its assets to "New" GM. But the need is now and urgent. First, GM has already announced further cuts to health benefits, effective January 1, 2010, that it will end health care coverage for disabled salaried retirees below the age of 65, replacing that coverage with a medical expense credit of only $260 a month. Second, GM intends to cut remaining benefits for retirees not represented by the UAW by two thirds "as quickly as we can" and is "currently in discussions" with U.S. Treasury to negotiate those cuts. Third, GM has been in negotiations for literally months over preserving the retiree benefits of the hourly workers represented by the UAW, but now wishes to have sale of all of its assets accomplished by "quick approval."

12. In any event, there are already changes a salaried retiree committee must evaluate and address: Section 1114(*l*) permits retirees to challenge modifications to their benefits made not only in the bankruptcy but also in the 180 days before the bankruptcy filing at a time when the debtor was insolvent, and GM has made several such benefits changes.

13.     On January 1, 2009, people aged 65 years and older among approximately 97,400 GM salaried retirees, as well as their dependents lost their GM-sponsored and subsidized medical, dental, vision, hearing aid, prescription drug, extended care and catastrophic coverage benefits.  In lieu of these benefits, the salaried retirees and surviving spouses received only a taxable $300 per month increase in their pension payments, which was (a) inadequate to replace the eliminated benefits; (b) a payment out of essentially their own money, from an already under-funded pension plan; and (c) subject to loss, if GM's pension fund suffers a distress termination during these proceedings or in the future.[2]  By January 1 of this year, GM was already insolvent and relying on funds from the U.S. Treasury to continue its operations, working on a plan to offer its bondholders only cents on the dollar in stock of a restructured company.

14.     In February of this year, GM also announced a reduction of the life insurance benefits provided to its retirees, effective in most cases on May 1, 2009.[3]  While active workers will continue to receive life insurance equal to two times their salary, for most retirees, the amount of life insurance will drop to 75% of final salary during the first ten years of retirement, and then will drop to only 25% of final salary for the group who needs it the most – those retired at least 10 years.[4]  *See* General Motors, *Total Compensation Journal*, Journal No. 45 (Feb. 2009) at 6, *available at* http://www.gmretireesclubofarizona.com/GM%20Benfits%202-12-09.pdf.

---

[2] In that event, the affected retirees, spouses and survivors over 65 would not even get credit for the $300 per month increase, in the calculation of their share of assets from the terminated under-funded pension or for Pension Benefit Guaranty Corporation ("PBGC") minimum guaranties:  The PBGC disregards (or partially disregards, depending on the timing of the change) increases in benefits that newly occurred within the five years before turnover of a pension plan to the PBGC.

[3] Life insurance benefits are specifically protected by Bankruptcy Code Section 1114(a) as "benefits in the event of…death".

[4] This benefit change, implemented within the 180 days before the bankruptcy filing, is also subject to the prohibitions of Section 1114(*l*) because it was made while GM was insolvent.

15.    If challenged under Section 1114(*l*), the benefits modified in the 180 days before bankruptcy must be reinstated unless this Court finds, after notice and a hearing, that "the balance of the equities clearly favors such modification." 11 U.S.C. § 1114(*l*). Particularly given that the UAW-represented workers have not given up these same benefits, whether the equities support those modifications depends in large part on what commitments GM is willing to make to salaried retirees about their remaining benefits. Unless a retiree committee is appointed to address these issues, they will only be raised and resolved on a piecemeal basis, and with the sheer numbers of retirees likely and able to join in an objection without a committee speaking on their behalf, will be almost impossible to resolve consensually, efficiently or in a way that gets the salaried retirees anything meaningful.

**THE CRITICAL NATURE OF THESE BENEFITS AND THEIR ENORMOUS MAGNITUDE REQUIRES REPRESENTATION FOR THE SALARIED RETIREES ON THESE ISSUES.**

16.    The retiree benefits at issue here are absolutely critical. As Congress recognized in adding Section 1114 to the Bankruptcy Code, because retirees already made their contribution to the company, sometimes decades ago, "there is nothing that retirees have that the company needs." <u>Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary</u>, 100th Cong., 1st Sess. 16 (statement of Sen. Heinz). Salaried retirees, on limited fixed incomes with high medical needs, are dependent on their health, prescription drug, and other retiree benefits for their basic health and in some cases even survival. Likewise, their group life insurance from GM (unavailable at any reasonable cost otherwise for many of them, because of pre-existing medical conditions) is in many cases an essential means for providing for their spouses and other survivors after death.

17.     The enormous magnitude of the benefits at stake also mandates the appointment of an official Section 1114 committee to represent salaried retirees on these issues. At the end of 2008, GM reportedly had $28.9 billion dollars in non-pension post employment benefit obligations. This was more than the under-funding in all of its pension plans combined, even when those pension plan assets were measured near the bottom of a steep stock market decline. The size and importance of the retiree benefits at issue make the retirees one of GM's largest real stakeholders, and they need and deserve representation in this bankruptcy through a Section 1114 Committee. GM has pledged only that it will cut the benefits by two-thirds, and not made any commitments that "New" GM will continue what's left for any meaningful amount of time.

### THIS COURT SHOULD APPOINT A SECTION 1114 RETIREE COMMITTEE EVEN IF GM ASSERTS THE BENEFITS AT STAKE ARE "AMENDABLE."

18.     GM or other stakeholders may oppose appointment of a salaried retiree committee on the grounds that GM has retained certain rights to amend the salaried retirees' benefits outside bankruptcy. A few courts have held, on a divided issue of law where other courts disagree, that Section 1114 does not protect in bankruptcy benefits the debtor retained the unfettered right to amend outside bankruptcy. See, e.g., LTV Steel Co. v. United Mine Workers, 945 F.2d 1205, 1208–09 (2d Cir. 1991) (refusing to require retiree benefits during bankruptcy because benefits were not required to be paid pre-petition); but see In re Farmland Indus., Inc., 294 B.R. 903, 916–17 (Bankr. W.D. Mo. 2003) ("There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue."); see also In re Ames Dep't Stores, Inc., 1992 WL 373492 (S.D.N.Y. Nov. 30, 1992), *rev'd on other grounds*,76 F.3d 66 (2d Cir. 1996) (finding "the Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces a drastic and most

undeserving result" and ordering the Debtor to follow the requirements of Section 1114). Those few cases finding that Section 1114 does not protect amendable benefits were tacitly overruled when Congress added Bankruptcy Code Section 1114(l) as part of the 2005 Bankruptcy Code amendments.

### SECTION 1114 CLEARLY PROTECTS EVEN BENEFITS GM RESERVED THE RIGHT TO MODIFY OUTSIDE BANKRUPTCY.

19. The clear wording of the statute, Bankruptcy Code Section 1114(a), provides that all the defined retiree benefits are protected by the process and substantive standards of Section 1114, and does not exclude those that can be modified outside bankruptcy. Under Section 1114, retiree benefits subject to its protection are those payments made, "under *any* plan, fund, or program … maintained or established … by the debtor prior to filing a petition commencing a case under this title" for the purpose of providing retired employees non-pension benefits. 11 U.S.C. § 1114(a) (emphasis added.). Section 1114(e)(1) provides that notwithstanding any other provision of Title 11, a debtor, "shall timely pay and shall not modify *any* retiree benefits" except if the court, after notice and hearing, orders such modification or the debtor and authorized representative agree to the modification of benefits. 11 U.S.C. § 1114(e)(1) (emphasis added).

20. Nowhere does the statute purport to recognize, much less carve out, an exception for so-called "amendable benefits." On the contrary, "the statute makes no distinction whatsoever about the basis on which retiree benefits are paid" – including "whether the employer has the power to modify such agreement or plan outside of bankruptcy" – "but rather includes 'any plan, fund, or program' maintained or established by the debtor prior to filing." Susan J. Stabile, Protecting Retiree Medical Benefits In Bankruptcy: The Scope Of Section 1114 Of The Bankruptcy Code, 14 Cardozo L. Rev. 1911, 1932 (1993).

21. Where the language of a statute is clear, the language must be deemed conclusive and applied according to its ordinary meaning. Application of the plain meaning rule here means that Section 1114 reaches "any retiree benefit," amendable or not. Thus: "[T]he language of the statute makes it quite clear that – absent the occurrence of two statutory conditions – the debtor in possession is required to continue the payment of retirement benefits at prepetition levels …. *The statute contains no other basis for debtors to modify or cease the payment of retiree benefits*." In re Speco Corp., 195 B.R. 674, 678 (S.D. Ohio 1996) (emphasis added).

22. Congress also made it clear that the broad reach of Section 1114 includes benefits a debtor can modify when it added Bankruptcy Code Section 1114(*l*) to the statute. Section 1114(*l*) necessarily applies to benefits the debtor could amend or modify outside bankruptcy, because it is triggered only when the debtor did modify those benefits in the 180 days before the bankruptcy filing, while insolvent. 11 U.S.C. § 1114(*l*).

### MANY OF THE SALARIED RETIREES MAY HAVE VESTED BENEFITS.

23. The over 122,000 salaried retirees worked for various of the debtors or their predecessors, under different benefit programs, at different times, and many of them left under specific early retirement incentive programs. Many of them left GM decades ago, when GM's benefit descriptions flatly provided that they would get medical and other benefits in retirement as long as they were then retirement-eligible, and did not contain language (added years later, after those employees' full service and retirement) that GM retained the right to modify or terminate that commitment.

### IN ANY EVENT APPOINTMENT OF A SALARIED RETIREE COMMITTEE IS APPROPRIATE IN THE COURT'S DISCRETION.

24. Section 1114(d) permits the Court, even if the debtor is not seeking to amend benefits protected by Section 1114, to appoint a retiree committee "if the court otherwise

determines it is appropriate." 11 U.S.C. § 1114(d).  In this, one of the three largest bankruptcy case ever filed, involving more retirees than any other in history, it is definitely "appropriate."  That is particularly true because GM is already simultaneously negotiating changes with the U.S. Treasury Department to the retiree benefits at issue while simultaneously seeking to shortcut the bankruptcy process by an immediate sale of all of its assets.  The retiree committee should be negotiating over their benefits, and through their ability to bind retirees or otherwise oppose the sale of assets on their behalf, should use Section 1114 as intended—to preserve something for the retirees and to avoid the cruelest cuts.

25.    The Court should also immediately appoint a Section 1114 committee to represent salaried retirees now, because they are the group least able to protect themselves before the bankruptcy:  Bondholders could have invested elsewhere or sold their bonds earlier.  The salaried retirees already put in their decades of service and retired and cannot go back in time to start over.  And the UAW spent months negotiating protections for its members and retirees, but the salaried retirees were excluded from them.

26.    GM is also trying to manage the bankruptcy process to be as rapid as possible, perhaps even more rapid than is reasonable or fair.  That is another reason a retiree committee is appropriate and essential.  If GM wants an "instant emergence" bankruptcy, without the usual protections of a confirmed plan, then a retiree committee must be on the scene to ensure that the salaried retirees' rights and benefits are not trampled in the stampede toward the exit.

27.    The unfairness of hourly retirees keeping their benefits and even getting a stake in New GM to fund their health benefit trust, while salaried retirees receive no protections, also cries out for the need for salaried retiree representation in this process.  The cornerstone of

Section 1114 is that it requires a balancing of whether salaried retirees' cuts are "fair and equitable" given what others are sacrificing, or keeping.

28.     There are also compelling reasons of judicial efficiency and the ability to accomplish something meaningful that argue for a committee, not 122,000 retirees separately asserting their rights. A Section 1114 retiree committee provides the only practical means that the salaried retirees can preserve anything, and the only hope for GM and the other stakeholders for an efficient, swift and practical resolution regarding any disputes over salaried retiree benefit changes and any asset sale. While the debtor and other creditor groups may unfairly want the salaried retirees to remain powerless as the economics are divided, even that narrow and self-interested view is short-sighted: Without a retiree committee with exclusive authority to represent salaried retirees on issues related to retiree benefits as defined in the Bankruptcy Code, literally tens of thousands of retirees may file individual objections to each motion that conceivably impacts their benefits, but none of them will be able to get anything in settlement for resolving those objections, because none of them have the ability to bind all retirees.[5]

29.     Finally, from a practical standpoint, establishing an 1114 Committee can also maximize the opportunity for salaried retirees to be eligible for the Health Coverage Tax Credit ("HCTC"), in the event a GM defined benefit pension plan is ever terminated, either during these proceedings (which is not under discussion) or in the future. (Which continues to be a risk in these uncertain times.) Because of changes signed into law February 17, 2009, as part of the

---

[5]In the bankruptcy case of GM spin-off (and parts supplier) Delphi Corporation, a company only a fraction of the size of GM, over 245 retirees each filed individual objections to the cuts to their benefits that Delphi sought to impose before a Section 1114 committee was appointed. Docket, In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y.) Although the bankruptcy court there did not appoint a section 1114 committee before the benefit changes were implemented, it did appoint a committee to negotiate with the debtor to settle any appeal from the court's order. That settlement ultimately resulted in the funding of a multi-million dollar voluntary employee benefit association trust for the benefit of retirees to set up a health benefit program for them that might be eligible for hundreds of millions of dollars of additional Health Coverage Tax Credit subsidies under 26 U.S.C. § 45.

American Recovery and Reinvestment Act ("ARRA"), the HCTC now provides an 80% federal tax subsidy, on a monthly basis, to pay the medical premium costs of retirees aged at least 55 but not yet 65 whose pensions have been turned over to the PBGC, as long as they are enrolled in "qualifying coverage." See 26 U.S.C. §§ 35(a), 35(c)(1)(C).[6]  These retirees under 65 are those most in need of a medical subsidy, since their medical needs are typically high but they are not yet eligible for Medicare.  "Qualifying coverage" now also explicitly includes a benefit program set up through a Voluntary Employee Benefit Association (VEBA) sponsored by an 1114 Committee or set up by order of a Bankruptcy Court.  26 U.S.C. § 35(e)(1)(K).[7]  Unfortunately, however, that provision of the statute is effective only until December 31, 2010.  After that, a benefit provided through a VEBA set up by an 1114 Committee (but not necessarily simply through order of a Bankruptcy Court) will still be eligible for the HCTC, but only if it is identified as a benefit in lieu of COBRA continuation coverage under applicable IRS Private Letter Rulings.  See IRS Private Letter Ruling 200432012 (2004).[8]

30.     Of course, none of the retirees want any pension benefits to be terminated, now or in the future.  But these are uncertain times.  An 1114 committee could set up a VEBA for salaried retirees to provide excellent cost-effective health benefits, as has been done in other Chapter 11 cases, which would be eligible for an 80% federal tax credit subsidy under the

---

[6] The HCTC is an unusual federal tax credit, which pays for medical premiums on a monthly basis, instead of simply reimbursing taxpayers at the end of the year. See http://www.pbgc.gov/workers-retirees/benefits-information/content/page13692.html.

[7] This is important, because otherwise, many states lack programs that are specified as "qualifying coverage" for the HCTC, and many of those that do qualify are expensive minimal catastrophic policies. *See generally*, "How Well Do Health Coverage Tax Credits Help Displaced Workers Obtain Health Care?" Statement of Dan Dorn of the Urban Institute to Committee of Education and Labor, U.S. Congress, March 26, 2007. http://edlabor.house.gov/testimony/032607StanDorntestimony.pdf

[8] Because GM has announced benefit changes within one year of its bankruptcy filing, those retirees should be eligible for lifetime COBRA continuation coverage under 29 U.S.C. § 1163(6).

24677\1957102.1                                    14

HCTC, and only such a benefit provided through an 1114 Committee VEBA may be eligible for that tax credit beyond 2010, under applicable IRS Private Letter Rulings.[9]

## CONCLUSION

31. Sophisticated GM bondholders who bought their bonds at a deep discount will have representation in this bankruptcy, at estate expense, through a creditors committee or separate bondholders' committee. The hourly workers and hourly retirees represented by the UAW, who have negotiated for months with GM and their New GM co-owners, the U.S. Treasury, over the deal this bankruptcy is intended to implement, also have extensive protections: their powerful union, their collective bargaining agreements, their continuing leverage through organized labor at the assembly line floor, and the deal they have already cut after those months of negotiations. But the tens of thousands of salaried retirees have absolutely nothing protecting their many tens of billions of dollars of absolutely critical health, prescription drug, life insurance and other benefits--benefits they and their survivors in many cases count on literally for life and health. They have nothing, except the provisions of Section 1114 of the Bankruptcy Code, which Congress intended would give them some minimal leverage and modest protection in this bankruptcy for these most essential of benefits.

32. They will get that modest and most limited protection, however, only if this Court implements the directive of Congress and the provisions of Bankruptcy Code Section 1114 and orders the formation of an official committee under Section 1114 to protect those interests. The GMRA respectfully asks that the Court do so.

---

[9] The subsidy drops to 65% of the benefit cost after December 31, 2010, unless the ARRA legislation is extended.

24677\1957102.1                                15

Dated:   San Francisco, California
           June 2, 2009

                        FARELLA BRAUN & MARTEL LLP

                        By:    */s/ Neil A. Goteiner*
                               Neil A. Goteiner
                               Dean M. Gloster
                               Nan E. Joesten

                        235 Montgomery Street
                        San Francisco, California  94104
                        (415) 954-4400

                        Attorneys for General Motors Retirees Association