**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
                                                              :
In re                                                         :          Chapter 11
                                                              :
General Motors Corporation, *et al.,*                         :          Case No. _____
                                                              :
                                                              :          (Jointly Administered)
                      Debtors.                                :
                                                              :
------------------------------------------------------------- x

# DECLARATION OF J. STEPHEN WORTH
# IN SUPPORT OF THE
# PROPOSED SALE OF DEBTORS' ASSETS TO VEHICLE ACQUISITION HOLDINGS LLC

I, J. Stephen Worth, make this Declaration under 28 U.S.C. § 1746 and state:

1.     I am a Managing Director with Evercore Group L.L.C. (together with its wholly-owned subsidiaries, agents, independent contractors and employees, "Evercore"), financial advisor to General Motors Corporation and the other above-captioned debtors and debtors in possession (collectively the "Debtors" and, together with their non-debtor affiliates, "GM"). I submit this Declaration in support of the proposed sale and transfer of substantially all of the Debtors' assets (the "Purchased Assets") to a newly formed entity ("Vehicle Acquisition Holdings LLC"), all as more fully described in the Motion (as defined below).[1]

---

[1] Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing (the "Motion").

2.      Except as otherwise indicated, all statements in this Declaration are based upon my reviews and discussions of relevant documents, and my personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based upon such reviews and discussions of the documents, and my personal knowledge and experience, including the fairness opinion attached as Exhibit A hereto and incorporated into this Declaration by reference (the "Opinion").

## QUALIFICATIONS OF DECLARANT AND EVERCORE

3.      I have considerable experience with valuation in the context of mergers, acquisitions, financings and restructurings.  I have over 20 years of experience advising major corporations and other constituents on numerous transactions, many of which have been in the automotive sector.  I have been the person at Evercore primarily responsible for day-to-day discussions with GM relating to possible alliances and other long-term financing efforts.

4.      I attach my complete curriculum vitae as Exhibit B.

5.      I joined Evercore in 2006 as a Managing Director in the corporate advisory business, with specific responsibility for Evercore's automotive sector focus.  Prior to joining Evercore, I was a Managing Director in the Global Industrials Group and co-head of Global Automotive at UBS Investment Bank.  I have extensive experience in advising companies in the automotive and general industrial sectors.  My automotive experience includes a wide range of advisory assignments including mergers, acquisitions, financings and restructurings with companies both public and private, component suppliers, vehicle manufacturers and service providers.  Companies for whom I have worked on automotive advisory assignments include, among others, General Motors Corporation, Ford Motor Company, Chrysler LLC, Lear Corporation, Visteon, ArvinMeritor, Gillig Corporation, CooperStandard Automotive, Dana

Corporation, Delphi Automotive, Standard Products, Venture Industries, TI Automotive, Honeywell Corp., Midas Inc., Textron Automotive, Federal Mogul, Faurecia, and TRW Inc.

6.     Established in 1996, Evercore is a leading investment banking boutique and investment management firm. Evercore's Advisory business counsels its clients on mergers, acquisitions, divestitures, restructurings and other strategic transactions. Evercore's Investment Management business comprises private equity investing, institutional asset management and wealth management. Evercore serves a diverse set of clients around the world from its offices in New York, San Francisco, Boston, Washington D.C., Los Angeles, Houston, London, Mexico City and Monterrey, Mexico. Its corporate advisory and restructuring advisory groups have together advised on over $600 billion of transactions. Its restructuring professionals provide investment banking and financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in Chapter 11 proceedings and out-of-court restructurings.

7.     Evercore's professionals have been retained as investment bankers and financial advisors in a number of troubled company situations, including among others: Lyondell Chemical Company, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan 6, 2009), Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 8, 2005), Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sep. 14, 2005), Parmalat U.S.A. Corp., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Feb. 24, 2004), Loews Cineplex Entertainment Corp., Case No. 01-40346 (ALG) (Bankr. S.D.N.Y. Feb. 15, 2001), Adelphia Communications Corp., Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jun. 25, 2002), UAL Corp., Case No. 02-B-48191 (Bankr. N.D. Ill. Dec. 9, 2002), and PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 23, 2008).

8.      Supporting me with the ongoing GM engagement has been a team of approximately twelve Evercore professionals.  Since approximately June 2008, Evercore's GM team has been in place on this project full-time.  Primarily assisting me in this effort have been (a) Roger C. Altman, Chairman, (b) William C. Repko, Senior Managing Director, (c) William Hiltz, Senior Managing Director, and (d) Stephen Sieh, Managing Director.

9.      Roger C. Altman, Chairman of the Board of Directors of Evercore, began his investment banking career at Lehman Brothers and became a general partner of that firm in 1974.  Beginning in 1977, he served as Assistant Secretary of the U.S. Treasury for four years. He then returned to Lehman Brothers, later becoming co-head of overall investment banking, a member of the firm's Management Committee and its Board.  He remained in those positions until that firm was sold to Shearson/American Express.  In 1987, Mr. Altman joined The Blackstone Group as Vice Chairman, head of the firm's merger and acquisition advisory business and a member of its Investment Committee.  Mr. Altman also had primary responsibility for Blackstone's international business.  Beginning in January 1993, Mr. Altman returned to Washington and served as Deputy Secretary of the U.S. Treasury.  In 1996, he formed Evercore, which has become a leading international investment banking boutique.  Mr. Altman holds an A.B. from Georgetown University and an M.B.A. from the University of Chicago.  Mr. Altman has been actively involved in advising GM on strategic and financial matters, and has been involved in discussions with the U.S. Treasury, the GM board and senior management with respect to potential strategic investors.

10.      William C. Repko is a Senior Managing Director of Evercore's corporate advisory business and is co-head of the firm's restructuring practice.  Prior to joining Evercore, Mr. Repko served as chairman and head of The Restructuring Group at J.P. Morgan Chase &

Co., where he focused on providing comprehensive solutions to clients' liquidity and reorganization challenges. Mr. Repko entered the workout banking world in 1973 at Manufacturers Hanover Trust, which after a series of mergers became part of J.P. Morgan Chase. During his 35 year banking career, Mr. Repko has been associated with the restructurings of such companies as United Airlines, Enron, WorldCom, International Business Machines, Waste Management, Goodyear, El Paso, Kmart, Texaco, Federal Mogul, Southern California Edison, Lucent Technologies, LTV, Global Crossing, International Harvester, Xerox and Rockefeller Center Properties. Mr. Repko has a B.S. in Finance from Lehigh University. Mr. Repko has primarily been responsible for day-to-day discussions with GM relating to possible alliances and other long-tem financing efforts.

11.    William Hiltz is a Senior Managing Director of the corporate advisory business and is a member of Evercore's Management Committee. In addition, Mr. Hiltz has management responsibility for all of the firm's investment management businesses. Mr. Hiltz has 32 years of experience in the investment banking business. He received a B.A. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania. Mr. Hiltz has primarily been responsible for assisting GM with developing possible alliances and other long-tem financing efforts.

12.    Stephen Sieh is a Managing Director of Evercore's corporate advisory business and restructuring practice. Prior to joining Evercore in 2007, Mr. Sieh spent over eight years at Lazard, most recently as a Director of the firm's Restructuring Group. Mr. Sieh has extensive experience in a wide-range of corporate finance activities, including mergers and acquisitions, corporate lending and Chapter 11 and out-of-court restructurings. Mr. Sieh received a B.S. degree from the Carroll School of Management Honors Program at Boston

College, and received an MBA from the Columbia University Graduate School of Business. Mr. Sieh has primarily been responsible for developing GM's long-tem financing alternatives and analyzing GM's needs in a potential restructuring.

13.    At several points prior to the current engagement, but in particular since June 2008, Evercore and I worked closely with GM's management, financial staff and other professionals in GM's restructuring efforts; analyzed GM's liquidity and projected cash flows; acquainted ourselves with GM's businesses, operations, properties and finances; advised GM in its evaluation and negotiation of a potential combination with Chrysler LLC; assisted GM in obtaining the initial $13.4 billion emergency financing under the Troubled Assets Relief Program; assisted GM in the structuring and documentation of a proposed exchange offer to unsecured bondholders; and assisted GM in connection with preparations for commencement of these cases, including detailed work relating to the proposed 363 Sale.

14.    Accordingly, I, along with Evercore, have developed substantial knowledge regarding GM that allows us to provide an assessment of GM's cash flow position, an assessment of the proposed 363 Sale, an assessment of the liquidation valuation that has been prepared for GM, and the relative benefits and risks of the proposed 363 Sale.

15.    Given Evercore's and my background and expertise, I am qualified to provide the testimony referred to herein.

## INFORMATION CONSIDERED

16.    In preparing this Declaration and in addition to the information referenced herein, I have reviewed and considered the materials specifically set forth in the Opinion.

### SCOPE OF EVERCORE'S INITIAL AND AMENDED ENGAGEMENT

17.    The terms of Evercore's compensation for this engagement are fully set forth in the Engagement Letter, dated September 5, 2008, as amended on December 23, 2008, April 28, 2009, and as amended and restated on May 29, 2009.  As part of the May 29 amendment, Evercore's engagement was amended to include rendering an opinion to the Board of Directors of General Motors Corporation (the "Board") as to the fairness, from a financial point of view, of the Purchase Price to be received by GM in connection with the 363 Sale.  The Engagement Letter and all amendments are attached to this Declaration as Exhibit C.

18.    Prior to the Commencement Date, GM paid Evercore total fees of $24.1 million and reimbursed expenses in the amount of $397,035 for all services rendered.  Pursuant to the Engagement Letter, Evercore will receive a fee of $2.5 million for assisting GM in the structuring and implementation of the debtor in possession financing and a net fee of $13.0 million if the transaction which is the subject of the 363 Motion is consummated.  There is no allocable share of the foregoing fees that will be paid directly to me.  Of course, the allowance of the foregoing fees is subject to bankruptcy court approval.

19.    In addition, Evercore has been and is engaged by GM to provide advice to GM with respect to the Delphi Corporation restructuring ("Delphi Engagement").  The terms of Evercore's compensation for the Delphi Engagement are fully set forth in the Delphi Engagement Letter dated June 1, 2008 and amended on March 31, 2009.  Prior to the Commencement Date, GM paid Evercore total fees of $5.5 million and reimbursed expenses in the amount of $76,888 for all services rendered related to this engagement.  Additional compensation may be earned under the Delphi Engagement in certain circumstances.

## PROPOSED 363 SALE

20.     GM has analyzed a range of alternatives to raise liquidity, reduce its financial leverage and achieve its operational objectives, including the use of the U.S. Bankruptcy Code. It has been GM's preferred objective to restructure its business out-of-court, based on a concern that revenue would decline rapidly and confidence in GM's brands would be permanently impaired in a bankruptcy. As a result, to the extent bankruptcy strategies have been considered, the focus has been on achieving a very rapid exit of GM's operating businesses from bankruptcy.

21.     As part of its engagement, the Engagement Team (as defined below) worked closely with GM in the development of its liquidity preservation plan and on its attempts to raise new capital in July-September of 2008, advised GM on a potential combination with Chrysler in the fall of 2008, assisted in the development of the Viability Plan submitted to the U.S. Treasury on February 17, 2009 (in particular Appendix J and Appendix L to that submission), reviewed and analyzed the update to the operating plan developed by GM from April through May of 2009, as well as the scenarios for a new, post-363 Sale GM ("NewCo") developed in contemplation of the 363 Sale. In addition, we have reviewed and relied upon the Liquidation Analysis of GM prepared by AlixPartners LLP (the "Liquidation Analysis"), a copy of which is attached hereto as Exhibit D, for purposes of the Opinion.

22.     Timing was an important consideration in the decision to pursue the 363 Sale, notably the combination of: (a) the challenge in reaching agreement with labor unions on restructuring of legacy costs and achieving competitive wages and benefits, (b) the time requirements for a public solicitation for a pre-packaged bankruptcy, (c) the June 1, 2009 maturity of the Series D Convertible Notes, (d) the likelihood that continued uncertainty over the

future of GM would continue to negatively impact business performance, and (e) the deadlines established by the U. S. Treasury as GM's largest lender.

23.    The Debtors also have filed the <u>Declaration of William C. Repko in Support of Debtors' Proposed Debtor in Possession Financing Facility</u>, a copy of which (without exhibits) is attached hereto as Exhibit E.

24.    The availability of financing, or lack thereof, is a principal factor in GM's decision to pursue the 363 Sale.  The combination of (a) the fact that no bona fide potential buyers other than Vehicle Acquisition Holdings LLC have expressed an interest in acquiring GM, (b) that there is no alternative source to finance a restructuring for GM, either in or out of bankruptcy, and (c) that the DIP Financing proposal offered by the U.S. Treasury and Export Development Canada is conditioned on the 363 Sale, support the conclusion that the Company is faced with a choice between the 363 Sale or the immediate liquidation of the business.  Evercore worked closely with GM to review its options at each stage of the process.

25.    The terms and conditions of the proposed 363 Sale are set forth in the Master Sale and Purchase Agreement and are described in the Motion.

26.    Financial projections for NewCo are attached as an appendix to the Fairness Opinion Presentation to the Company's Board of Directors and included in Exhibit F. The projections were developed by GM to reflect, among other things, the effects of their operational and financial restructuring plan as well as the impact of the bankruptcy filing in the context of the 363 Sale.  As described in Exhibit F, the financial projections were utilized by Evercore for purposes of establishing a range of values for the common equity of NewCo.

27.    The Liquidation Analysis prepared by AlixPartners LLP concludes that the realizable value of the assets of GM (net of the costs of liquidation) would range between approximately $6 and $10 billion.

## EVERCORE FAIRNESS OPINION PROCESS

28.    When providing a fairness opinion, Evercore follows a standard procedure by which the team of professionals working on the engagement (the "Engagement Team") conducts the review and analysis necessary for the rendering of the opinion, including the review of all relevant documentation available to it, the review of relevant business plans provided by the company, financial projections and underlying assumptions provided by the company, and the preparation of financial analyses. The determination whether to issue the fairness opinion is made by an Evercore Opinion Committee. The Opinion Committee is formed based on the following guidelines: (a) the Opinion Committee shall consist of at least two Senior Managing Directors of the firm selected based on such factors as may be relevant under the circumstances, (b) no member of the Engagement Team shall be a member of the Opinion Committee, (c) members must promptly notify the Chief Operating Officer and the Legal and Compliance Department if they believe their presence on the Opinion Committee creates any potential conflicts of interest.

29.    An Evercore Opinion Committee met on May 20, 2009 to review (i) the history of the transaction, (ii) the status of negotiations among the Parties, (iii) preliminary draft financial projections prepared by GM and the methodology used for valuation purposes, (iv) a draft liquidation analysis prepared by AlixPartners LLP ("AlixPartners") earlier in the year, (v) our understanding of transaction structure as of that date, and (vi) the scope of the proposed opinion. An Evercore Opinion Committee also convened on May 28, 2009 for purposes of

reviewing the final proposed transaction and unanimously approved the Opinion to be provided

to GM's Board of Directors.

## <u>SUMMARY OF EVERCORE'S FAIRNESS OPINION</u>

30.     Among the factors that we found persuasive in reaching our conclusion,

and subject to the various limitations and assumptions described in the Opinion, were the

following:  (1) our understanding, based on discussions with GM management, that GM has

insufficient funds to continue operating as a going concern beyond May of 2009; (2) our

understanding, based on discussions with GM management and Evercore's experience, that (a)

no sufficient sources of financing exist for GM as a going concern other than that provided by

the U.S. Treasury, and (b) no bona fide potential buyers have expressed an interest in acquiring

GM other than the proposed 363 Sale involving the U.S. Treasury; (3) the values ascribed to the

Debtors' assets and liabilities in the Liquidation Analysis; (4) the amount of the cash and non-

cash consideration to be received by GM in connection with the 363 Sale; and (5) the value

ascribed to certain liabilities of GM to be assumed by Vehicle Acquisition Holdings LLC in

connection with the 363 Sale, as set forth in estimates provided to us by GM or otherwise

estimated by Evercore.   A summary of valuation methodologies employed by Evercore in

evaluating a range of values of the common equity of NewCo is attached hereto as Exhibit G.

31.     The conclusion and description of supporting factors summarized above

are qualified by reference to the full text of the Opinion, which sets forth, among other things,

the assumptions made, the methodologies and procedures employed and matters considered by

Evercore in preparing the Opinion, and the review undertaken in connection with rendering the

Opinion.

32.      On May 30 and 31, 2009, Evercore reviewed with the Board and senior management of GM the financial terms of the proposed 363 Sale and the related materials set forth on Exhibit F attached hereto.  Following the review with the Board and senior management on May 31, Evercore rendered to the Board Evercore's fairness opinion (which opinion was subsequently confirmed by delivery of the Opinion).

33.      The Opinion states that as of that date and subject to the various limitations and assumptions described in the Opinion, the consideration to be received by GM pursuant to the Master Sale and Purchase Agreement is fair, from a financial point of view, to GM.

**[Remainder of page left intentionally blank]**

34.    I declare, under penalty of perjury, that the forgoing is true and correct, to the best of my knowledge.

Executed this 31 day of May, 2009

_____
J. Stephen Worth

## **Exhibits to 363 Sale Affidavit**

A.    Fairness Opinion Letter

B.    Stephen Worth's Curriculum Vitae

C.    Engagement Letter and Amendments

D.    Liquidation Analysis Prepared by AlixPartners

E.    William Repko DIP Affidavit (without Exhibits)

F.    Materials Relating to Fairness Opinion Presentation to GM Board of Directors

G.    Summary of Evercore's Valuation Methodology

**Exhibit A:**

**<u>Fairness Opinion Letter</u>**

# EVERCORE GROUP L.L.C.

May 31, 2009

The Board of Directors

General Motors Corporation

300 Renaissance Center

Detroit, MI 48265

Members of the Board of Directors:

We understand that General Motors Corporation, a Delaware corporation ("GM" or the "Company"), proposes to enter into a Master Sale and Purchase Agreement (the "MSPA" or the "Agreement"[1]), with the Purchaser ("NewCo"), which will provide for a sale of the Purchased Assets (the "Purchased Assets"), as defined in the Agreement, pursuant to authorization that will be sought under section 363 of the Bankruptcy Code (11 U.S.C. §101, et seq.) (the "363 Sale"). As a result of the 363 Sale, GM will cause the Purchased Assets to be transferred to NewCo, in exchange for which the Company will receive the Purchase Price (the "Purchase Price"), as defined in the Agreement. The terms and conditions of the 363 Sale are more fully set forth in the Agreement, and terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Agreement.

The Board of Directors of the Company has asked us whether, in our opinion, the Purchase Price is fair, from a financial point of view, to the Company.

In connection with rendering our opinion, we have, among other things:

    i.    Reviewed a draft of the Agreement (and related documents) dated May 31, 2009, which we assume are in substantially final form and will not vary in any respect material to our analysis;

---

[1] Capitalized terms used in this Opinion and not otherwise defined herein shall have the meanings set forth in the Agreement.

Letter to GM Board of Directors
May 31, 2009
Page 2

    ii.    Analyzed certain publicly available financial statements and other publicly available business information relating to GM that we deemed relevant to our analysis;

    iii.    Analyzed certain internal non-public financial and operating data concerning GM prepared and furnished to us by the management of GM;

    iv.    Analyzed certain financial projections concerning NewCo (the "NewCo Projections") furnished to us by the management of GM;

    v.    Reviewed certain non-public historical and projected operating data relating to the Company and to NewCo prepared and furnished to us by the management of GM;

    vi.    Discussed the past and current operations, financial condition, prospects and projections of GM and NewCo with the management of GM (including their views on the risks and uncertainties of achieving such projections, including the NewCo Projections);

    vii.    Compared the financial performance of GM with that of other selected companies and their securities;

    viii.    Considered the experience of Evercore professionals who worked with GM with respect to potential financing opportunities and strategic alternatives considered by the Company;

    ix.    Reviewed a liquidation analysis of GM (the "Liquidation Analysis") prepared by AlixPartners LLP ("AlixPartners") with the support of the management of GM;

    x.    Discussed the Liquidation Analysis with AlixPartners and the management of the Company; and

    xi.    Performed such other analyses and examinations and considered such other factors as we have, in our sole judgment, deemed appropriate for purposes of this opinion.

In conducting its analysis and determination of fairness for purposes of this opinion, Evercore has considered that GM faces extremely difficult operating and financial circumstances.

Letter to GM Board of Directors
May 31, 2009
Page 3

Evercore has assumed, with the Company's permission, the following regarding GM's financial situation as of the date hereof:

&mdash; Should GM not receive adequate additional financing from the U.S. and Canadian governments or other sources, the Company expects to have insufficient liquidity to operate its business in June of 2009 and beyond.

&mdash; Having unsuccessfully sought capital from a wide variety of potential private sources over the past year, the Company and its advisors believe that there are no sources of private capital willing to fund the Company's near-term cash needs in the ordinary course of business.

&mdash; The Company and its advisors have attempted to find sources of financing other than the debtor in possession financing proposal (the "DIP Proposal") being offered by the U.S. and Canadian governments in conjunction with the 363 Sale, but have not found any entity that has expressed any interest in pursuing an alternative financing transaction.

&mdash; The U.S. and Canadian governments have not offered any additional financial assistance to GM other than the DIP Proposal offered in connection with the 363 Sale.

&mdash; If GM were to decline the DIP Proposal, and in doing so decline the 363 Sale, the Company would be forced to seek relief under the Bankruptcy Code and liquidate its assets as described in the Liquidation Analysis.

&mdash; The Company is not aware of any other potential partners, purchasers or acquirers that have proposed an alternative, or a serious or credible interest in developing an alternative, to the 363 Sale.

Therefore, Evercore has, with the Company's permission, relied on management's and Evercore's conclusion that GM's range of options has narrowed to a choice between (i) the 363 Sale or (ii) a bankruptcy liquidation as described in the Liquidation Analysis. In arriving at our opinion, we have taken into consideration the financial position of the Company, including the

Letter to GM Board of Directors
May 31, 2009
Page 4

fact that it is contemplating a filing under Chapter 11 of the Bankruptcy Code, and the effect that such a filing would have on the Company's operations, financial position and business outlook. We have taken into account the foregoing facts and assumptions (together with the other facts and assumptions set forth in this opinion, including, among other things, the Company's belief that, should it not proceed with the 363 Sale, it would be forced to liquidate within bankruptcy) when assessing the "fairness" of the Purchase Price for the purposes of this opinion.

For purposes of our analysis and opinion, we have assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by us, including the Liquidation Analysis, and we assume no liability therefor. At the Company's direction, we (i) did not rely upon any standalone financial forecasts relating to the Company (except for the Liquidation Analysis) and (ii) did not perform certain analyses that we would customarily prepare for the Company in connection with a fairness opinion, because of the Company's determination that such forecasts and analyses are not meaningful as a result of the extraordinary circumstances of the Company described herein. With respect to the NewCo Projections referred to above, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of management of the Company as to the future financial performance of NewCo under the business assumptions reflected therein. With respect to the Liquidation Analysis, we have assumed that it has been reasonably prepared by AlixPartners on bases reflecting the best currently available information and good faith judgments of AlixPartners and GM management, as well as the business assumptions reflected therein. We express no view as to any of the NewCo Projections or financial data relating to the Company or to NewCo, or the assumptions upon which any of those projections or data are based, nor do we express any view as to the feasibility of NewCo's achieving those projections or for NewCo's ability to support the capital structure upon which those projections are based, nor do we express any view, or assume any liability, as to the projected proceeds of a liquidation of the Company, including with respect to the distribution, if any, of such proceeds or other assets of the Company to any class of creditors or interest holders, relying as we do on the Liquidation Analysis. Furthermore, we express no view, and assume no liability, as to the future distribution of the Purchase Price to holders of any

Letter to GM Board of Directors
May 31, 2009
Page 5

securities of the Company, to any creditor or interest holder of the Company, or to any class of creditors or interest holders of the Company; nor do we evaluate or express any opinion as to the absolute or relative recoveries that might be available to the holders of any securities of the Company, to any creditor or interest holder of the Company, or to any class of creditors or interest holders of the Company in a bankruptcy proceeding or other liquidation or restructuring of the Company, whether or not the Company proceeds with the 363 Sale.

We have assumed, at the direction of the Company, that the value of the Assumed Liabilities equals the dollar amount of such liabilities as they would be reflected on the Company's balance sheet, with the exception of the Company's pension and OPEB liabilities to be assumed by the Purchaser, which we have assumed, with the permission of the Company, to be valued at the present value of NewCo's expected future cash contributions. For purposes of rendering our opinion, we have assumed, in all respects material to our analysis, that the representations and warranties of each party contained in the Agreement are true and correct, that each party will perform all of the covenants and agreements required to be performed by it under the Agreement and that all conditions to the consummation of the 363 Sale will be satisfied without material waiver or modification thereof. We have further assumed that all governmental, regulatory or other consents, approvals or releases necessary for the consummation of the 363 Sale will be obtained without any material delay, limitation, restriction or condition that would have an adverse effect on the Company or the consummation of the 363 Sale.

We have not made nor assumed any responsibility for making any independent valuation or appraisal of the assets or liabilities of the Company, nor have we otherwise evaluated the solvency or fair value of the Company or of NewCo. Our opinion is necessarily based upon information made available to us as of the date hereof and financial, economic, market and other conditions as they exist and as can be evaluated on the date hereof. It is understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise or reaffirm this opinion.

We have not been asked to evaluate, and express no opinion with respect to, any matter other than the fairness to the Company, from a financial point of view, of the Purchase Price. We do not express any view on, and our opinion does not address, the fairness of the Purchase

Letter to GM Board of Directors
May 31, 2009
Page 6

Price or the 363 Sale to, or any consideration that may be received in connection therewith by, the holders of any securities, creditors or other constituencies of the Company, nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of the Company, or any class of such persons, whether relative to the Purchase Price or otherwise.  We have assumed that there will be no material modifications to the proposed structure of the 363 Sale.  Our opinion does not address the underlying business decision of the Company to engage in the 363 Sale.  In arriving at our opinion, we were not instructed to solicit, and did not solicit, interest from any third party with respect to the acquisition of any or all of the Company Common Stock, or any business combination or other extraordinary transaction involving the Company.  This letter, and our opinion, does not constitute a recommendation to the Board of Directors or to any other persons in respect of the 363 Sale.  We express no opinion herein as to the price at which shares, bonds, bank debt or other securities of the Company or of NewCo will trade at any time.  We are not legal, regulatory, accounting or tax experts and have assumed the accuracy and completeness of assessments by the Company and its advisors with respect to legal, regulatory, accounting and tax matters.

We will receive a fee for our services upon the rendering of this opinion.  The Company has also agreed to reimburse our expenses and to indemnify us against certain liabilities arising out of our engagement.  We will also be entitled to receive a fee if the 363 Sale is consummated.  Prior to this engagement, we, Evercore Group L.L.C., and its affiliates provided financial advisory services to the Company and had received fees for the rendering of these services including the reimbursement of expenses.

In the ordinary course of business, affiliates of Evercore Group L.L.C. may actively trade the securities, or related derivative securities, or financial instruments of the Company and its affiliates, for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities or instruments.

This letter, and the opinion expressed herein is addressed to, and for the information and benefit of, the Board of Directors in connection with their evaluation of the proposed 363 Sale.  This opinion is not intended to be and does not constitute a recommendation to the GM Board of

Letter to GM Board of Directors
May 31, 2009
Page 7

Directors as to whether they should approve the 363 Sale, nor does it constitute an opinion as to whether the Bankruptcy Court will authorize the 363 Sale. No person or entity other than the Board of Directors of the Company should rely on this opinion for any purpose. The issuance of this opinion has been approved by an Opinion Committee of Evercore Group L.L.C.

This opinion may not be disclosed, quoted, referred to or communicated (in whole or in part) to any third party for any purpose whatsoever except with our prior written approval, except the Company may reproduce this opinion in full in any document that is required to be filed with the Bankruptcy Court; provided, however, that all references to us or our opinion in any such document and the description or inclusion of our opinion therein shall be subject to our prior consent with respect to form and substance, which consent shall not be unreasonably withheld or delayed.

*[Signature Page to Follow]*

Letter to GM Board of Directors
May 31, 2009
Page 8

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the
Purchase Price is fair, from a financial point of view, to the Company.

Very truly yours,

EVERCORE GROUP L.L.C.

By: _William O. Hiltz_____

William O. Hiltz

Senior Managing Director

**Exhibit B:**

**<u>Stephen Worth's Curriculum Vitae</u>**

Stephen Worth's Curriculum Vitae

Stephen Worth is a Managing Director of the firm's corporate advisory business and responsible for Evercore's automotive sector focus.

Prior to joining Evercore in 2006, Mr. Worth was a Managing Director in the Global Industrials Group and co-head of Global Automotive at UBS Investment Bank since 2001. Previously, Mr. Worth was a Managing Director at J.P. Morgan & Co. in its Global Industrials Investment Banking Group.  Mr. Worth has twenty years of investment banking experience, starting his career at J.P. Morgan in 1988.  From 1990 to 1995, Mr. Worth worked for J.P. Morgan in its Latin American M&A Group, from both New York and São Paulo, Brazil.  After 1995, Mr. Worth focused on M&A and capital structure advisory for a wide variety of North American industrial and consumer companies as a Vice President and then Managing Director at J.P. Morgan's New York office.

Mr. Worth has extensive experience in advising and financing companies in the automotive and general industrial sectors including General Motors (2008 - present), Gillig Corporation in its sale to CC Industries (2008), Cerberus in their acquisition of Chrysler (2007), General Motors, Chrysler and Ford during the course of 2006/07, Chrysler LLC in the defeasement of its healthcare obligations, the Special Committee of Lear Corporation with respect to the $5.3 billion offer from Icahn & Associates (2007), the sale of Lear's Interiors division to W.L. Ross, The Cypress Group in their $1.2 billion leveraged buyout of CooperStandard Automotive, General Motors in its record breaking $18 billion financing in 2003, TRW Inc. on the $7 billion acquisition of LucasVarity plc, and Standard Products in its sale to Cooper Tire.

Mr. Worth graduated with a B.A. in math and physics from Wesleyan University in 1988.

**Exhibit C:**

**Engagement Letter and Amendments**

# EVERCORE GROUP L.L.C

September 5, 2008

Mr. Walter G. Borst
Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Walter:

This engagement letter (this "Agreement") formalizes the arrangement between
Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company")
regarding the retention of Evercore by the Company as a financial advisor for the purposes
set forth herein.

Under the terms of this Agreement, Evercore will provide financial advisory services
to the Company in connection with its strategic planning process, capital markets activities,
and evaluation of strategic alternatives. Evercore will provide financial advisory services as
customarily may be required in connection with engagements of this type.

As compensation for the services rendered by Evercore hereunder, the Company
agrees to pay Evercore a monthly retainer fee of $500,000, payable in arrears, beginning June
23, 2008. In the event Evercore is subsequently retained as financial advisor during the next
6 months on any strategic and financial alternatives involving a merger, sale of all or part of
the equity, business or assets of the Company or other significant corporate transaction (a
"Transaction"), the monthly retainer fees would be creditable against any success fee payable
under the separate engagement, in whole or in part as determined solely by the Company
after consultation with Evercore. The company also agrees to reimburse Evercore for its
reasonable and customary expenses (including legal and other professional fees, expenses
and disbursements) incurred in connection with its engagement.

The Company recognizes and consents to the fact that (a) Evercore will use and rely
on the accuracy and completeness of public reports and other information provided by
others, including information provided by the Company, other parties and their respective
officers, employees, auditors, attorneys or other agents in performing the services
contemplated by this Agreement, and (b) Evercore does not assume responsibility for, and
may rely without independent verification upon, the accuracy and completeness of any such
information.

The Company will provide to Evercore all information and data requested by
Evercore that the Company reasonably deems appropriate in connection with Evercore's
engagement. The Company will use its reasonable best efforts to ensure that any
information heretofore or hereafter furnished to Evercore is and will be true and correct in
all material respects and does not and will not omit any material fact required to make the

Letter to Mr. Walter Borst
General Motors Corporation
September 5, 2008
Page 2

information given to Evercore not misleading. The Company will use its reasonable best efforts to notify Evercore promptly of any material change or correction in information regarding the business or financial condition of the Company that it has provided to Evercore when it becomes aware of such material change or of an error necessitating such correction.

The Company agrees that any information or advice rendered by Evercore under this engagement shall be kept confidential by the management and Board of Directors of the Company, is solely for the use of the management and Board of Directors of the Company and may not be provided to, or relied upon by, others without the consent of Evercore. Evercore understands that the Company may need to share Evercore's information and advice with its attorneys, auditors or other advisers, and Evercore hereby consents to any such sharing, provided however, that no such third party may rely on such information or advice without the written consent of Evercore.

Evercore's engagement hereunder may be terminated by the Company or by Evercore at any time upon written notice and without liability or continuing obligation to the Company or to Evercore (except for any compensation earned and expenses incurred by Evercore prior to the date of termination and as specified below); provided that the Indemnification Agreement attached hereto as Schedule I will remain operative regardless of any such termination.

Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth in the Indemnification Agreement, the Indemnified Persons (as defined in the Indemnification Agreement), any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Evercore hereunder. The Company acknowledges that Evercore is not acting as an agent of the Company or in a fiduciary capacity with respect to the Company and that Evercore is not assuming any duties or obligations other than those expressly set forth in this Agreement. Nothing contained herein shall be construed as creating, or be deemed to create, the relationship of employer and employee between the parties, nor any agency, joint venture, or partnership. Evercore shall at all times be and be deemed to be an independent contractor. No party to this Agreement nor its employees or agents shall have any authority to act for or to bind the other party in any way or to sign the name of the other party or to represent that that the other party is in any way responsible for the acts or omissions of such party.

This Agreement (including the Indemnification Agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such provision in any other respect, which will remain in full force and effect. This Agreement may not be amended or modified except in writing signed by each of the parties.

Letter to Mr. Walter Borst
General Motors Corporation
September 5, 2008
Page 3

The Company acknowledges that Evercore's affiliates engage in the private equity business, asset management business and related activities (collectively, "Non-Broker Dealer Businesses"). In the ordinary course of our Non-Broker Dealer Businesses, Evercore's affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of their customers, in debt or equity securities or senior loans of the Company or any other company that may be involved in a transaction with the Company. Evercore represents and warrants that it has reasonable policies and procedures in place to prevent its affiliates from using material, non-public information in Evercore's possession.

For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

The parties hereby irrevocably consent to the exclusive jurisdiction of any New York State or United States federal court sitting in New York County over any action or proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard in such New York State or federal court. The parties irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to each party at its address set forth above. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). The parties further waive any objection to venue in the State of New York and any objection to any action or proceeding in such state on the basis of *forum non conveniens*.

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

*[Signature page follows]*

Letter to Mr. Walter Borst
General Motors Corporation
September 5, 2008
Page 4

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

Very truly yours,

EVERCORE GROUP L.L.C.

By: _____

[Name] William O. Fitz

[Title] Senior Managing Director

Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By: _____

[Name] Walter G. Borst

[Title] Treasurer

<u>Schedule I</u>

**Indemnification Agreement**

September 5, 2008

Mr. Walter G. Borst
Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Walter:

In connection with the engagement of Evercore Group L.L.C. ("Evercore") to render financial advisory services to General Motors Corporation (the "Company") pursuant to the engagement letter, dated September 5, 2008, the Company and Evercore are entering into this Indemnification Agreement (this "Agreement"). It is understood and agreed that in the event that Evercore or any of its members, partners, officers, directors, advisors, representatives, employees, agents, affiliates or controlling persons, if any (each of the foregoing, including Evercore, an "Indemnified Person"), become involved in any capacity in any claim, action, proceeding or investigation brought or threatened by or against any person, including the Company's stockholders, related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, the Company will promptly reimburse each such Indemnified Person for its reasonable legal and other expenses (including the reasonable out of pocket cost of any investigation and preparation) as and when they are incurred in connection therewith, provided that such reimbursement may be remitted to the Company as provided below.

The Company will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expense to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, whether or not any pending or threatened claim, action, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expense is initiated or brought by or on the Company's behalf and whether or not in connection with any claim, action, proceeding or investigation in which the Company or an Indemnified Person is a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment to have resulted primarily from such Indemnified Person's gross negligence, bad faith or willful misconduct.

The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to, arising out of or in connection with Evercore's engagement, Evercore's performance of any service in connection therewith or any transaction contemplated thereby, except to the extent that any loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment to have resulted primarily from such Indemnified Person's gross negligence, bad faith or

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 2

willful misconduct. Each Indemnified Person shall promptly remit to the Company any amounts paid to such Indemnified Person under this Agreement in respect of losses, claims, damages, liabilities or expense that resulted from such Indemnified Person's gross negligence, bad faith or willful misconduct.

If for any reason the foregoing indemnification is unavailable to an Indemnified Person or insufficient to hold it harmless, then the Company shall contribute to the loss, claim, damage, liability or expense for which such indemnification is unavailable or insufficient in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by the Company and its security holders on the one hand and the party entitled to contribution on the other hand in the matters contemplated by Evercore's engagement as well as relative fault of the Company and such party with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. To the extent permitted by applicable law, in no event shall Evercore or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to Evercore for such financial advisory services. The Company and Evercore agree that it would not be just and equitable if contribution hereunder were determined by pro rata allocation or by any other method that does not take into account the equitable considerations referred to herein. The Company's reimbursement, indemnity and contribution obligations under this Agreement shall be in addition to any liability which the Company may otherwise have, shall not be limited by any rights Evercore or any other Indemnified Person may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Evercore, and any other Indemnified Persons.

If any claim, action, proceeding or investigation shall be brought, threatened or asserted against an Indemnified Person in respect of which indemnity may be sought against the Company, Evercore shall promptly notify the Company in writing, and the Company shall be entitled, at its expense, and upon delivery of written notice to Evercore, to assume the defense thereof with counsel reasonably satisfactory to Evercore. Such Indemnified Person shall have the right to employ separate counsel in any such claim, action, proceeding or investigation and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Company has agreed in writing to pay such fees and expenses, (ii) the Company has failed to assume the defense, pursue the defense diligently or to employ counsel in a timely manner or (iii) counsel has advised such Indemnified Person that in such action, claim, suit, proceeding or investigation there is a conflict of interest between the Company's position and the position of the Indemnified Person. It is understood, however, that in the situation in which an Indemnified Person is entitled to retain separate counsel pursuant to the preceding sentence, the Company shall, in connection with any one such claim, action, proceeding, investigation or separate but substantially similar or related claims, actions, proceedings or investigations in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of only one separate firm of attorneys at any time for all such Indemnified Persons, which firm shall be designated in writing by Evercore. The Company shall not be liable for any settlement or compromise of any claim, action, proceeding or investigation (or for any related

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 3

losses, claims, damages, liabilities or expenses) if such settlement or compromise is effected without the Company's prior written consent (which will not be unreasonably withheld).

The Company agrees that, without Evercore's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution is reasonably likely to be sought hereunder (whether or not Evercore or any other Indemnified Person is an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release from the settling, compromising or consenting party of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation.

No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York.

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

Indemnification Agreement
General Motors Corporation
September 5, 2008
Page 4

     This Agreement shall remain in effect indefinitely, notwithstanding any termination of Evercore's engagement.

                        Very truly yours,

                        EVERCORE GROUP L.L.C.

By: _____
            [Name] William O. Hiltz
            [Title] Senior Managing Director

Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By: _____
           [Name] Walter G. Borst
           [Title] Treasurer

December 23, 2008

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Adil:

This letter (this "Amendment") amends that certain engagement letter entered into between
Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company") dated
September 5, 2008 (the "Agreement"), regarding the retention of Evercore by the Company as a
financial advisor for the purposes set forth therein.

Unless otherwise noted, all defined terms set forth in this Amendment shall have the same meaning
as set forth in the Agreement. The Agreement shall continue in full force and effect in accordance
with the provisions thereof, except that, effective as of the date hereof, the following sections of the
Agreement are amended as follows:

   1. The second full paragraph on page 1 of the Agreement is deleted in its entirety and replaced
with the following:

        "Under the terms of this Agreement, Evercore will provide financial advisory
    services to the Company in connection with its strategic planning process, capital markets
    activities, and evaluation of strategic and financial alternatives, including the possibility of a
    debt exchange, reorganization, merger, sale or other significant transaction. Evercore will
    provide financial advisory services as customarily may be required in connection with
    engagements of this type. In rendering its services to the Company hereunder, Evercore is
    not assuming any responsibility for the Company's underlying business decision to pursue or
    not to pursue any business strategy or to effect or not to effect any Restructuring or Other
    Transaction (both as defined below). Evercore shall not have any obligation or responsibility
    to provide "crisis management" for or business consultant services to the Company, and
    shall have no responsibility for designing or implementing operating, organizational,
    administrative, cash management or liquidity improvements; nor shall Evercore be
    responsible for providing any tax, legal or other specialist advice."

   2. The third full paragraph on page 1 of the Agreement is deleted in its entirety and replaced with
the following:

        "As compensation for the services rendered by Evercore hereunder, the Company
    agrees to pay Evercore, upon execution of this Amendment, the following fees in cash as
    and when set forth below:

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 2

1) Commencing on January 1, 2009, the Company agrees to pay Evercore a monthly retainer fee in the amount of $1,000,000, payable in advance, until termination of this Agreement (the "New Monthly Retainer Fee"). For the avoidance of doubt, the $500,000 monthly retainer payments due to Evercore under the original agreement dated September 5, 2008 (the "Old Monthly Retainer Fee") shall cease upon payment of the December 2008 Old Monthly Retainer Fee. The New Monthly Retainer Fees would be creditable against any Restructuring Fee as determined solely by the Company after consultation with Evercore, but in no case shall the amount creditable be greater than $4,000,000.; and

2) A restructuring fee (a "Restructuring Fee"), payable upon the consummation of any Restructuring (as defined below) according to the following schedule:

    a) 0.15% of the face value of Existing Obligations (as defined below) restructured for amounts up to $10,000,000,000;

    b) 0.10% of the face value of Existing Obligations restructured for amounts from $10,000,000,000 up to $20,000,000; and

    c) An additional $5,000,000 for any amount of the face value of Existing Obligations restructured above $20,000,000.

As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization and/or recapitalization including without limitation, cancellation, forgiveness, satisfaction, retirement, purchase and/or a material modification or amendment to the terms of the Company's outstanding indebtedness (including bank debt, bond debt, preferred stock, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, unfunded pension liabilities, lease obligations, partnership interests and other liabilities (collectively, the "Existing Obligations") including pursuant to a sale, repurchase or an exchange transaction, a plan, or a solicitation of consents, waivers, acceptances or authorizations. For the avoidance of doubt, the term "Existing Obligations" shall exclude any amounts relating to the VEBA that the UAW may agree to restructure.

In the event that the Company undertakes any other significant transaction, such as a reorganization, restructuring, merger, sale of all or part of the equity, business or assets of the Company or other significant corporate transaction (an "Other Transaction"), the Company agrees that it will pay to Evercore a reasonable and customary Transaction fee, with the exact amount to be mutually agreed. Evercore understands that the Company is likely to work with more than one financial advisor in connection with an Other Transaction, with Evercore to receive not less than half of the total financial advisory fees paid by the Company in connection with such Other Transaction. The company also agrees to reimburse Evercore for its reasonable and customary expenses (including legal and other professional fees, expenses and disbursements) incurred in connection with its engagement."

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 3


Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.


*[signature page follows]*

Engagement Letter Amendment
General Motors Corporation
December 23, 2008
Page 4

Very truly yours,

EVERCORE GROUP L.L.C.

By:

William Repko
Senior Managing Director

Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By:

Adil Mistry
Assistant Treasurer

# EVERCORE GROUP L.L.C.

April 28, 2009

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Dear Adil:

This letter (the "Second Amendment") amends the engagement letter entered into between Evercore Group L.L.C. ("Evercore") and General Motors Corporation (the "Company") dated September 5, 2008 (the "Agreement") and the letter amendment dated December 23, 2009 to the Agreement (the "Amendment"), regarding the retention of Evercore by the Company as a financial advisor for the purposes set forth therein.

Because of the substantial work performed by Evercore in pursuit of a Transaction (as defined in the Agreement), including the evaluation and analysis of the Company's alternatives for financial restructuring and debt reduction, assistance in drafting the exchange offer prospectus, providing tactical advice in the structure of the exchange offer, providing extensive support with respect to submissions to the U.S. Treasury and assistance in due diligence performed by the U.S. Treasury and their advisors, assistance in negotiations with and due diligence performed by lenders and their advisors, assistance in due diligence performed by the UAW and its advisors, the evaluation of strategic alternatives for the Company and preparation for a potential bankruptcy filing, we have agreed that certain modifications to the compensation payable to Evercore are appropriate at this time.

Unless otherwise noted, all defined terms set forth in this Second Amendment shall have the same meaning as set forth in the Agreement. The Agreement shall continue in full force and effect in accordance with the provisions thereof, as previously amended by the Amendment, except that, effective as of the date hereof, the Agreement (as amended) is amended as follows:

GM agrees to pay Evercore two non-refundable cash fees as follows: (a) $5,000,000 on April 29, 2009; and (b) $5,000,000 upon the filing with the Securities and Exchange Commission of the first amendment to the Registration Statement with respect to the pending exchange offers or May 11, 2009, whichever occurs first. Such fees shall each be deemed an advance, and shall each be fully creditable, against any Restructuring Fee payable pursuant to the Agreement, as amended. For the avoidance of doubt, New Monthly Retainer Fees shall also be credited against any Restructuring Fee as contemplated by and subject to the cap contained in the Amendment.

In no event shall the Company be required to pay more than $30,000,000 in the aggregate for Restructuring Fees (such maximum amount shall be prior to any and all amounts offset against Restructuring Fees pursuant to this Agreement, as amended,

including the non-refundable cash fees set forth above and any creditable New Monthly Retainer Fees).

The paragraphs on page 2 of the Amendment (which addressed the definition of "Restructuring" and the compensation payable to Evercore if an "Other Transaction" is consummated) are deleted in their entirety and replaced with the following:

> "As used in this Agreement, the term "Restructuring" shall mean, collectively, (a) any restructuring, reorganization and/or recapitalization that involves cancellation, forgiveness, satisfaction, retirement and/or purchase of the Company's outstanding indebtedness (including bank debt, bond debt, preferred stock, and other on and off balance sheet indebtedness), leases (both on and off balance sheet), unfunded pension liabilities including pursuant to a sale, repurchase or an exchange transaction (collectively, the "Existing Obligations") or (b) any merger, consolidation or other such sale of the Company or the sale of all or substantially all of its assets. The Company also agrees to reimburse Evercore for its reasonable and customary out-of-pocket expenses (including legal and other professional fees, expenses and disbursements) incurred in connection with its engagement."

Each party has all necessary corporate or limited liability company, as applicable, power and authority to enter into this Agreement. All corporate or limited liability company, as applicable, action has been taken by each party necessary for the authorization, execution, delivery of, and the performance of all obligations of each of the parties under the Agreement, and each signatory below is duly authorized to sign this Agreement on behalf of the party it represents.

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

*[signature page follows]*

Very truly yours,

EVERCORE GROUP L.L.C.

By:

William Repko
Senior Managing Director

Agreed to and Accepted as of the Date
First Written Above:

GENERAL MOTORS CORPORATION

By:

Adil Mistry
Assistant Treasurer

May 29, 2009

Mr. Adil Mistry
Assistant Treasurer
General Motors Corporation
767 Fifth Avenue
New York, NY 10153

Gentlemen:

This amended and restated engagement letter (this "Agreement"), executed as of the date above, is to formalize the arrangement between Evercore Group L.L.C. ("Evercore") and General Motors Corporation (together with any direct or indirect subsidiaries, the "Company") regarding the retention of Evercore by the Company as a financial advisor for the purposes set forth herein.

This Agreement amends and restates the engagement letter dated September 5, 2008 between the parties, as amended (the "Original Engagement Letter"); provided, however, the Company's obligations to indemnify Evercore pursuant to the Indemnification Agreement, between the parties effective as of September 5, 2008 (the "Indemnification Agreement"), shall remain unaltered.

Pursuant to the Second Amendment, dated as of April 28, 2009, to the Original Engagement Letter and in connection with the services provided by Evercore, the Company (x) agreed to pay and paid to Evercore a portion of the Restructuring Fee (as defined below) equal to $5 million on April 29, 2009 and (y) agreed to pay and paid to Evercore another $5 million portion of the Restructuring Fee on May 14, 2009 (such fees, the "Forward Restructuring Fees").

Pursuant to the Original Engagement Letter and in connection with the services provided by Evercore, the Company agreed to pay and has paid to Evercore monthly retainer fees (such fees, the "Advisory Fees").

**Assignment Scope:**

The Company hereby retains Evercore as its financial advisor to provide the Company with general investment banking advice and to advise it in connection with any Restructuring, Financing and/or Sale transactions (each defined below) on the terms and conditions set forth herein.

As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization and/or recapitalization (including, but not limited to, a Restructuring pursuant to 11 U.S.C. §101 *et seq.*, as from time to time amended, and any other current or future federal statute or regulation that may be applicable to a Restructuring of the Company (11 U.S.C. §101 *et seq.* and those other statutes and regulations are referred to herein generically as the "Bankruptcy Code")) that involves cancellation, forgiveness, satisfaction, retirement and/or purchase of the Company's outstanding indebtedness (including bank debt, bond debt, preferred

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 2

stock, and other on and off balance sheet indebtedness), leases (both on and off balance sheet) and unfunded pension liabilities (collectively, the "Existing Obligations") or (b) any merger, consolidation, or other such sale of the Company or the sale of all or substantially all of its assets. For the avoidance of doubt, the term "Existing Obligations" shall exclude any amounts relating to the VEBA that the UAW may agree to restructure.

**Description of Services:**

1. Evercore agrees, in consideration of the compensation provided in Section 2 below, to perform the following services, to the extent it deems such services necessary, appropriate and feasible:

   a. Reviewing and analyzing the Company's business, operations and financial projections;

   b. Advising and assisting the Company in a Restructuring, Financing and/or Sale transaction, if the Company determines to undertake such a transaction;

   c. Providing financial advice in developing and implementing a Restructuring, which would include:

      i. Assisting the Company in developing a restructuring plan or plan of reorganization, including a plan of reorganization pursuant to the Bankruptcy Code (any such plans are referred to generically herein as the "Plan");

      ii. Advising the Company on tactics and strategies for negotiating with various stakeholders regarding the Plan;

      iii. Providing testimony, as necessary, with respect to matters on which Evercore has been engaged to advise the Company in any proceedings under the Bankruptcy Code that are pending before a court (generically referred to herein as the "Bankruptcy Court") exercising jurisdiction over the Company as a debtor; and,

      iv. Providing the Company with other financial restructuring advice as Evercore and the Company may deem appropriate.

   d. If the Company pursues a Financing, assisting the Company in:

      i. Structuring and effecting a Financing;

      ii. Identifying potential Investors (as defined below) and, at the Company's request, contacting such Investors; and,

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 3

    iii.  Working with the Company in negotiating with potential Investors.

As used in this agreement, the term "Financing" shall mean a private issuance, sale or placement of newly issued or treasury equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors or security holders (each such lender or investor, an "Investor"), including any "debtor-in-possession financing" or "exit financing" in connection with a case under the Bankruptcy Code or a rights offering or any loan or other financing or obligation, except to the extent issued to existing Investors of the Company in exchange for their existing securities.

It is understood that nothing contained herein shall constitute an express or implied commitment by Evercore to act in any capacity or to underwrite, place or purchase any financing or securities, which commitment, if any, shall be set forth in a separate underwriting placement or other appropriate agreement relating to a Financing.

e.  If the Company pursues a Sale, assisting the Company in:

    i.  Structuring and effecting a Sale;

    ii.  Identifying interested parties and/or potential acquirors and, at the Company's request, contacting such interested parties and/or potential acquirors; and

    iii.  Advising the Company in connection with negotiations with potential interested parties and/or acquirors and aiding in the consummation of a Sale transaction.

As used in this agreement, the term "Sale" shall mean, whether or not in one transaction, or a series of related transactions, (a) the disposition to one or more third parties whether or not pursuant to the Bankruptcy Code of all or a portion of the issued and outstanding equity securities or any other issued and outstanding securities of the Company by the existing security holders of the Company; or (b) an acquisition, merger, consolidation, or other business combination, including a sale pursuant to the Bankruptcy Code, of which all or a portion of the business, assets or existing equity or securities of the Company are, directly or indirectly, sold or transferred to, or combined with, another company (other than an ordinary course intra-company transaction or ordinary course sales of inventory); or (c) an acquisition, merger, consolidation, sale, including a sale pursuant to the Bankruptcy Code, or other business combination pursuant to a successful "credit bid" of any securities by existing securities holders; or (d) the formation of a joint venture, partnership or similar entity, or any similar sale transaction.

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 4

    f.  Rendering an opinion (a "Fairness Opinion") to the Board of Directors of the Company as to the fairness, from a financial point of view, of the consideration to be paid or received by the Company in connection with a Master Sale and Purchase Agreement (the "MSPA") with Auto Acquisition LLC ("NewCo") and the other parties named therein, which will provide for a sale of the Purchased Assets (the "Purchased Assets"), as defined in the MSPA, pursuant to authorization that will be sought under section 363 of the Bankruptcy Code (11 U.S.C. §101, et seq.) (the "NewCo Transaction"). It is understood that the Opinion shall be in such form and with such assumptions and qualifications as determined appropriate by Evercore. It is further understood that Evercore will express no view, and assume no liability, as to the future distribution of the purchase price to holders of any securities of the Company or to any creditor or interest holder of the Company or to any class of creditors or interest holders of the Company; nor will Evercore evaluate or express any opinion as to the recovery that might be available to the holders of any securities of the Company or to any creditor or interest holder of the Company or to any class of creditors or interest holders of the Company in a bankruptcy proceeding or other restructuring, whether or not the Company proceeds with the NewCo Transaction. In rendering its services to the Company hereunder, Evercore is not assuming any responsibility for the Company's underlying business decision to pursue or not to pursue any business strategy or to effect or not to effect any Restructuring, Financing, and/or Sale or other transaction.

Evercore shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services to the Company, and shall have no responsibility for design or implementation of operating, organizational, administrative, cash management or liquidity improvements; nor shall Evercore be responsible for providing any tax, legal or other specialist advice. The Company confirms that it will rely on its own counsel, accountants and similar expert advisors for legal, accounting, tax and other similar advice.

**Fees:**

2.  As compensation for the services rendered by Evercore hereunder, the Company agrees to pay Evercore the following fees in cash as and when set forth below:

    a.  A monthly fee of $400,000 (a "Monthly Fee"), payable on the 1st day of each month of our engagement hereunder, for a period of 24 months, commencing June 1, 2009 through (and including) May 1, 2011 and then decreasing to $250,000 per month thereafter until the earlier of effectiveness of a Plan or termination pursuant to Section 5.

    b.  A fee (a "Fairness Opinion Fee") in an amount of $6 million, payable in cash on May 29, 2009. 50% of the Fairness Opinion Fee (the "Opinion Fee Credit") shall be creditable against the NewCo Transaction Fee (as defined below).

    c.  Restructuring and Sale Fees:

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 5

    i.    A fee (a "Restructuring Fee") equal to $30,000,000 payable upon the consummation of any Restructuring (as defined above). The full amount of the Forward Restructuring Fees (the "Forward Restructuring Fee Credit") shall be creditable (without duplication) against the Restructuring Fee on a dollar-for-dollar basis. $4,000,000 of the Advisory Fees (the "Advisory Fee Credit") shall be creditable (without duplication) against the Restructuring Fee on a dollar-for-dollar basis. The Financing Fee Credit (as defined below) shall be creditable against the Restructuring Fee (without duplication) on a dollar-for-dollar basis.

    ii.    A fee (a "Sale Fee"), payable upon consummation of any Sale (other than described in clause (d)(i) below), equal to the product of (a) the Aggregate Consideration (as defined below) of a Sale as set forth in Annex 1 and (b) applicable percentage, as set forth in Annex 1. The table attached as Annex 1 represents the applicable percentage as a fee for Aggregate Consideration received in connection with the Sale (for the avoidance of doubt, Aggregate Consideration of $5 billion would equate to a Sale Fee of $17.5 million (before taking into account any applicable credits).

        As used in this Agreement, the term "Aggregate Consideration" shall mean the total fair market value (determined at the time of the closing of a Sale by the Company and Evercore in good faith) of all consideration paid or payable to, or received by, directly or indirectly, the Company, its Bankruptcy estate, its creditors and/or the security holders of the Company in connection with a Sale including all (i) cash, securities (equity or otherwise) and other property, (ii) Company indebtedness assumed, satisfied, or paid by a purchaser (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company and (iii) amounts placed in escrow and deferred, contingent and installment payments.

    iii.    50% of any Sale Fee (a "Sale Fee Credit") shall be creditable against any Restructuring Fee; provided, such Sale Fee credit shall be creditable only after the credit of the Forward Restructuring Fee Credit and the Advisory Fee Credit against the Restructuring Fee.

d.    A fee (the "NewCo Transaction Fee") equal to $30,000,000, payable upon consummation of the NewCo Transaction. The Forward Restructuring Fee Credit, the Advisory Fee Credit and the Opinion Fee Credit shall be creditable, in each case on a dollar-for-dollar basis, against the NewCo Transaction Fee. The NewCo Transaction Fee shall be payable upon closing of the transaction proposed by the Company as the NewCo Transaction, regardless of whether the buyer approved by the bankruptcy court shall be NewCo or another bidder that has made a higher or otherwise better offer.

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 6

   e.  A fee or fees (collectively, a "Financing Fee"), payable upon consummation of any Financing and incremental to any Restructuring Fee or Sale Fee as follows:

       i.  A fee in the amount of $2,500,000 for assisting the Company in the structuring and implementation of debtor-in-possession ("DIP") Financing under the Bankruptcy Code (the "DIP Structuring Fee").

      ii.  For any Financing other than a DIP Financing provided by the United States Government (the "Other Financing" and the corresponding fee, the "Other Financing Fee"), a 3% fee of the gross proceeds provided by such financing.

     iii.  For the avoidance of doubt, no Financing Fee (other than the DIP Structuring Fee) shall be payable in connection with the NewCo Transaction.

     50% of any Financing Fee, but excluding any DIP Structuring Fee, (the "Financing Fee Credit") shall be credited (without duplication) on a dollar-for-dollar basis against the Restructuring Fee.

   f.  In addition to any fees that may be payable to Evercore and, regardless of whether any transaction occurs, the Company shall promptly reimburse to Evercore (a) all reasonable out-of-pocket expenses (including reasonable travel and lodging, data processing and communications charges, courier services and other appropriate expenditures) and (b) reasonable fees and expenses of legal counsel, if any, in each case incurred by Evercore in connection with the services provided hereunder. Notwithstanding the foregoing, the Company's reimbursement of all reasonable fees and expenses of legal counsel shall be subject to the Company's Legal Staff Disbursement Guidelines. Evercore agrees to provide, in a timely manner, such detailed documentation of expenses as may be reasonably requested by the Company. The Company has previously advanced $100,000 for the expenses and fees of legal counsel to Evercore.

   g.  A fee ( the "Delphi Fee") in the amount of $2 million for advisory services relating to Delphi Corporation ("Delphi"), payable upon (i) consummation of any plan of reorganization of Delphi Corporation or (ii) the sale or other transfer of all or substantially all of the assets or business of Delphi in a single transaction or series of related transactions. For avoidance of doubt, the Delphi Fee is not creditable against any fee.

   h.  If Evercore provides services to the Company for which a fee is not provided herein, such services shall, except insofar as they are the subject of a separate agreement, be treated as falling within the scope of this Agreement, and the Company and Evercore will agree upon a fee for such services based upon good faith negotiations.

   i.  Notwithstanding anything to the contrary in this Agreement, Evercore shall not be obligated to credit any fee against any other fee earned under this Agreement unless the Bankruptcy Court approves this Agreement and allows all fees provided for hereunder in their entirety; provided, however, that nothing herein shall permit Evercore to collect:

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 7

    1. in connection with the NewCo Transaction, aggregate fees in excess of the aggregate of the NewCo Transaction Fee, DIP Structuring Fee, Fairness Opinion Fee and Monthly Fees, in each case to the extent earned by Evercore and payable by the Company, if the Bankruptcy Court were to allow all such fees and the full amount of the Advisory Fee Credit, Forward Restructuring Fee Credit and Opinion Fee Credit were applied to such fees; or

    2. in connection with a Restructuring and/or Sale (other than the NewCo Transaction), aggregate fees in excess of the Restructuring Fee, Financing Fee, Sale Fees, Fairness Opinion Fee and Monthly Fees, in each case to the extent earned by Evercore and payable by the Company, if the Bankruptcy Court were to allow all such fees and the full amount of the Advisory Fee Credit, Forward Restructuring Fee Credit, Financing Fee Credit and Sale Fee Credit were applied to such fees.

j.   All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

k.   In addition, the Company and Evercore acknowledge and agree that more than one fee may be payable to Evercore under subparagraphs 2(c), 2(d), 2(e) 2(g) and/or 2(h) hereof in connection with any single transaction or a series of transactions, it being understood and agreed that if more than one fee becomes so payable to Evercore in connection with a series of transactions, each such fee shall be paid to Evercore.  Notwithstanding the foregoing, the Company and Evercore acknowledge and agree that Evercore shall only be entitled to either (a) the NewCo Transaction Fee or (b) a Restructuring Fee and/or a Sale Fee, and not both (a) and (b). For the avoidance of doubt, if Evercore is entitled to the NewCo Transaction Fee, Evercore shall not be entitled to any Restructuring Fee or Sale Fee.

## Retention in Bankruptcy Code Proceedings:

3.   In the event of the commencement of Chapter 11 proceedings, the Company agrees that it will use best efforts to obtain prompt authorization from the Bankruptcy Court to retain Evercore on the terms and conditions set forth in this Agreement under the provisions of 11 U.S.C. §§ 327 and 328 subject to the standard of review provided in Section 328(a), and not subject to the standard of review under 11 U.S.C. § 330 or any other standard of review. Subject to being so retained, Evercore agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and orders of the Bankruptcy Court. The Company shall supply Evercore with a draft of the application and proposed retention order authorizing Evercore's retention sufficiently in advance of the filing of such application and proposed order to enable Evercore and its counsel to review and comment thereon. Evercore shall be under no obligation to provide any services under this agreement in the event that the

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 8

Company becomes a debtor under the Bankruptcy Code unless Evercore's retention under the terms of this Agreement is approved under Section 328(a) by final order of the Bankruptcy Court, not subject to appeal, which order is acceptable to Evercore. In so agreeing to seek Evercore's retention under Section 328(a), the Company acknowledges that it believes that Evercore's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Restructuring, Sale and/or Financing, that the value to the Company of Evercore's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent fees are reasonable under the standard set forth in Section 328(a), regardless of the number of hours to be expended by Evercore's professionals in the performance of the services to be provided hereunder. No fee payable to any other person, by the Company or any other party, shall reduce or otherwise affect any fee payable hereunder to Evercore.

**Other:**

4. Evercore's engagement hereunder is premised on the assumption that the Company will make available or cause to make available to Evercore all information and data that Evercore reasonably deems appropriate in connection with its activities (the "Information") on the Company's behalf and will not omit or withhold any material information unless required by applicable law. The Company will use its reasonable best efforts to ensure that any Information heretofore and hereafter furnished to Evercore is and will be true and correct in all material respects and does not and will not omit any material fact required to make Information not misleading. The Company will use its reasonable best efforts to notify Evercore promptly of any material change or correction in Information regarding the business or financial condition of the Company that it has provided to Evercore when it becomes aware of such material change or of an error necessitating such correction. The Company recognizes and consents to the fact that (a) Evercore will use and primarily rely on the Information and information available from generally recognized public sources in performing services contemplated by this Agreement without have independent verification of same and (b) Evercore does not assume responsibility for the accuracy and completeness of the Information or any such information. It is also understood that the Fairness Opinion may state that Evercore has not verified and can rely on any such information described in Section 4, including the Liquidation Analysis prepared by Alix Partners.

5. Evercore's engagement hereunder may be terminated by the Company or Evercore at any time without liability or continuing obligation to the Company or Evercore, except that following such termination of this Agreement, (a) Evercore shall remain entitled to any fees accrued and payable pursuant to Section 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination and (b) in the case of termination by the Company, Evercore shall remain entitled to payment of all fees contemplated by Section 2 (subject to the terms and conditions therein, including application of any credits) hereof in respect to any Restructuring, Sale

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 9

and/or Financing announced or occurring during the period from the date hereof until 12 months following such termination. Notwithstanding the foregoing, other than the NewCo Transaction, nothing in this Agreement shall preclude the Company from engaging another firm to advise the Company regarding any Sale, and in such case, Evercore shall not be entitled to a Sale Fee in connection with such transaction. Upon the consummation of the NewCo Transaction, Evercore's engagement shall be terminated.

6.  Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth in accordance with the Indemnification Agreement , the Indemnified Persons (as defined in the Indemnification Agreement), any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Evercore hereunder. The Company acknowledges that Evercore is not acting as an agent of the Company or in a fiduciary capacity with respect to the Company and that Evercore is not assuming any duties or obligations other than those expressly set forth in this Agreement. Nothing contained herein shall be construed as creating, or be deemed to create, the relationship of employer and employee between the parties, nor any agency, joint venture or partnership. Evercore shall at all times be and be deemed to be an independent contractor. Nothing herein is intended to create or shall be construed as creating a fiduciary relationship between Evercore and the Company or its Board of Directors. No party to this Agreement nor its employees or agents shall have any authority to act for or to bind the other party in any way or to sign the name of the other party or to represent that that the other party is in any way responsible for the acts or omissions of such party.

7.  As part of the compensation payable to Evercore hereunder, the Company agrees to indemnify Evercore and certain related persons in accordance with the Indemnification Agreement. Such indemnification provisions are an integral part of this Agreement, and the terms thereof are incorporated by reference herein. Such indemnification provisions shall survive any termination or completion of Evercore's engagement hereunder.

8.  The Company agrees that it is solely responsible for any decision regarding a transaction, regardless of the advice provided by Evercore with respect to such a transaction. The Company acknowledges that the Company's appointment of Evercore pursuant to this Agreement is not intended to achieve or guarantee the closing of a transaction and that Evercore is not in a position to guarantee the achievement or closing of a transaction.

9.  The Company recognizes that Evercore has been engaged only by the Company and that the Company's engagement of Evercore is not deemed to be on behalf of and is not intended to confer rights on any shareholder, partner or other owner of the Company, any creditor, lender or any other person not a party hereto or any of its affiliates or their respective directors, officers, members, agents, employees or representatives. Unless otherwise expressly agreed, no one, other than senior management or the Board of Directors of the Company, is

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 10

authorized to rely upon the Company's engagement of Evercore or any statements, advice, opinions or conduct by Evercore. Without limiting the foregoing, any advice, written or oral, rendered to the Company's Board of Directors or senior management in the course of the Company's engagement of Evercore are solely for the purpose of assisting senior management or the Board of Directors of the Company, as the case may be, in evaluating the Restructuring, Sale, Financing or other transaction and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with a transaction. Any advice, written or oral, rendered by Evercore may not be disclosed publicly or made available to third parties without the prior written consent of Evercore; except as may be required pursuant to a subpoena, order, requirement or request of a court of competent jurisdiction or by a judicial or administrative or legislative body or committee (including disclosure obligations of the Company under applicable securities laws); provided that, the Company shall have promptly notified Evercore of the receipt or existence of any such subpoena, order, requirement or request. Notwithstanding the foregoing, the terms of this letter agreement may be disclosed (a) in any proceeding filed by or against it under title 11 of the Code or (b) to the United States Department of the Treasury.

10. In order to coordinate Evercore's efforts on behalf of the Company during the period of Evercore's engagement hereunder, the Company will promptly inform Evercore of any discussions, negotiations, or inquiries regarding a potential transaction, including any such discussions or inquiries that have occurred during the six month period prior to the date of this Agreement.

11. This Agreement (including the Indemnification Agreement) between Evercore and the Company, embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect this Agreement in any other respect, which will remain in full force and effect. This Agreement may not be amended or modified except in writing signed by each of the parties.

12. In the event that, as a result of or in connection with Evercore's engagement for the Company, Evercore becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Evercore for the reasonable fees and expenses of its counsel incurred in responding to such a request, subject to the Company's Legal Staff Disbursement Guidelines. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the Indemnification Agreement.

13. The Company agrees that Evercore shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 11

hereunder; provided, however, Evercore shall have obtained the Company's written consent prior to the placement or publication of any such advertisement.

14. The Company acknowledges that Evercore's affiliates engage in the private equity business, asset management business and related activities (collectively, "Non-Broker Dealer Businesses"). Subject to the maintenance of an appropriate "wall" between those persons working on transactional matters related to this Agreement and those persons connected with the Non-Broker Dealer Businesses, and any other appropriate precautions, in the ordinary course of Evercore's Non-Broker Dealer Businesses, Evercore's affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities or senior loans of the Company or any other company that may be involved in a transaction with the Company.

15. The Company agrees to provide and procure all corporate, financial and other information regarding the Company and control persons, as Evercore may require to satisfy its obligations as a U.S. financial institution under the USA PATRIOT Act.

16. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission shall constitute valid sufficient delivery thereof.

17. Except as provided herein, the parties hereby irrevocably consent to the exclusive jurisdiction of any New York State or United States federal court sitting in the Borough of Manhattan of the City of New York over any action or proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard in such New York State or federal court. The parties irrevocably agree to waive all rights to trial by jury in any such action or proceeding and irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to each party at its address set forth above. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles). The parties further waive any objection to venue in the State of New York and any objection to any action or proceeding in such state on the basis of forum non conveniens.

*[Signature page to follow]*

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 12

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Company, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

Very truly yours,

Evercore Group L.L.C.

By: _____
William C. Repko
Senior Managing Director

Agreed to and Accepted as of the Date
May 29, 2009:

General Motors Corporation

By: _____
Adil Mistry
Assistant Treasurer

Mr. Adil Mistry
General Motors Corporation
May 29, 2009
Page 13

Annex 1
Asset Sale Fee Schedule

Asset Sale Fee Schedule representing the applicable percentage(s) as a fee for Aggregate
Consideration received in connection with a Sale:

$30 billion and above - 0.12%
$25 billion - 0.14%
$20 billion - 0.17%
$15 billion - 0.20%
$12.5 billion - 0.23%
$10 billion - 0.25%
$7.5 billion - 0.30%
$5 billion - 0.35%
$3 billion - 0.45%
$2.5 billion - 0.50%
$1.6 billion - 0.60%
$800 million - 0.80%
$500 million - 0.90%
$250 million - 1.40%

If the amount of Aggregate Consideration obtained in a Sale falls between any two of the dollar
amounts listed above, then the applicable percentage shall be interpolated on a straight-line basis
between such two dollar amounts.

**Exhibit D:**

**<u>Liquidation Analysis Prepared by AlixPartners</u>**

GM Corporation
Liquidation Analysis
May 27, 2009



Chicago  Dallas  Detroit  Düsseldorf  London  Los Angeles  Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo

AlixPartners

2

# Executive Summary

## Liquidation Analysis Key Assumptions

1. The hypothetical Liquidation Analysis ("Liquidation Analysis") was prepared to assess the potential recovery creditors would receive under a Chapter 7 liquidation as of June 1, 2009.

2. The Liquidation Analysis was prepared based on a review of the Debtors' records, discussions with management and our prior experience. Estimates of liquidation values were determined primarily by assessing classes of assets as opposed to valuing specific assets.

3. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds, that although developed and considered reasonable by Debtors' management and its professionals, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.

4. An orderly wind-down of this magnitude and complexity would be unprecedented and fraught with considerable execution risk. In addition , the Debtor has material operations outside of the United States and would be subject to the laws of numerous foreign jurisdictions making liquidation very complex and difficult.

5. If the liquidation of the Company occurred it would be the first major domestic OEM to be liquidated in recent history and therefore no historical references are available.

6. This Liquidation Analysis assumes no other OEM or major supplier liquidates. If another OEM or major supplier were to liquidate at the same time the value of the assets could  be adversely impacted.

7. The Liquidation Analysis assumes the Debtors commence a liquidation under chapter 7 of the U.S. Bankruptcy code on June 1, 2009. The Liquidation Analysis assumes the majority of the assets are sold in a 2 year period. Based on the size and complexity of the Debtors the claim resolution and final disbursement would likely be longer than 2 years.

8. The Liquidation Analysis reflects the combined assets of the Debtors (GM Corporation, Saturn, Saturn Distribution Corp and Chevrolet -Saturn of Harlem, Inc). The Non-Debtor subsidiaries value is reflected as investment in Subsidiaries.

3

## Liquidation Analysis Key Assumptions - Continued

9.  No DIP financing is available to the Debtors. The Liquidation Analysis assumes the bankruptcy court grants the Company the use of cash collateral to fund the liquidation and grants liens to the secured lenders in certain unencumbered assets.

10. The Liquidation Analysis assumes that at the time the wind-down process begins, disbursements are limited to expenditures related to the security, maintenance and disposal of the Debtors' assets.

11. The asset net book value (excluding cash and government funding) used in the Liquidation Analysis is based on the March 31, 2009 balance sheet provided by the Company.

12. The estimated cash and outstanding US Treasury obligations at the time of the liquidation are based on the "Plan B" 13-Week Cash Forecast dated May 26, 2009.

13. The Liquidation Analysis assumes a chapter 7 liquidation of the Debtors would result in liquidation or government intervention at many of the Debtors' foreign subsidiaries, resulting in little or no equity value. Certain other entities could potentially be sold on a going concern basis in order to maximize the value. The going concern value of the select non-debtor subsidiaries is based on discussions with management and a review of certain historical and prospective financial information. The value of non-debtor subsidiaries takes into consideration the impact of the U.S. chapter 7 liquidation process, the current status of the financial and automotive markets, and the potential "damaged goods" or fire sale perception of potential bidders.

14. The Liquidation Analysis includes an estimate of fees associated with the appointment of a chapter 7 trustee and compensation for the trustee incurred during the liquidation process in accordance with section 326 of the U.S. Bankruptcy Code. Due to the size of the estimated distributions, the chapter 7 trustee fees are estimated at 1% of the total proceeds generated from non-cash assets during the liquidation rather than the 3% maximum allowed under the U.S. Bankruptcy Code.

15. Chapter 7 professional fees include the cost of liquidators, attorneys, accountants, brokers and other professionals retained by the chapter 7 trustee during the liquidation period. The chapter 7 professional fees are estimated at 1.5% of the total proceeds generated from non-cash assets during the liquidation period.

4

# Liquidation Analysis Key Assumptions - Continued

16. Wind down costs reflect the payment of corporate payroll and operating costs during liquidation, based upon the assumption that certain plant and corporate personnel will be retained to oversee the liquidation process. This includes the maintenance and closure of accounting records and the completion of certain administrative tasks including payroll, tax forms, and records. In addition, minimal staffing at the physical locations would be required to complete the closure of the facilities, disassemble the equipment, and oversee the sale process for equipment and real estate. Certain facility expenses would continue to be incurred until all of the facilities are liquidated.

17. For presentation purpose the Liquidation Analysis assumes other secured obligations such as capital leases, secured municipal bonds, the GE Fleet Loan and synthetic lease obligations will receive the value of their collateral.

18. The Liquidation Analysis assumes the General Unsecured Claims are equal to those presented on the March 31, 2009 balance sheet. Certain contingent General Unsecured Claims that would likely occur in a hypothetical Chapter 7 Liquidation such as lease and contract rejection claims, additional pension termination claims or other litigation claims are not reflected on the March 31, 2009 balance sheet. If an estimate of these contingent claims were to be included it is likely the estimated General Unsecured Claim amount would increase.

19. The Liquidation Analysis is based on information available as of May 27, 2009. There is no obligation to revise or update the Liquidation Analysis.

5

# Executive Summary

**General Motors Corporation**
**Liquidation Analysis**
**Consolidated Debtors**
**As of June 1, 2009**

(In USD Billions)

| | Hypothetical Liquidation Value | | | Est Claim | Hypothetical Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | Low | High | Midpoint | | Low | High | Midpoint |
| **ASSETS** | | | | | | | |
| Cash & Cash Equivalents | $ 2.0 | $ 2.0 | $ 2.0 | | | | |
| Accounts Receivable | 0.5 | 0.6 | 0.5 | | | | |
| Inventory | 0.6 | 0.9 | 0.8 | | | | |
| Property, Plant & Equipment | 1.3 | 2.1 | 1.7 | | | | |
| Other Assets | 0.2 | 0.4 | 0.3 | | | | |
| Equity in Subsidiaries | 3.5 | 4.5 | 4.0 | | | | |
| Intellectual Property | 1.0 | 1.2 | 1.1 | | | | |
| **Total Proceeds From Assets** | **$ 9.1** | **$ 11.7** | **$ 10.4** | | | | |
| | | | | | | | |
| Costs Associated With Liquidation | | | | | | | |
| Chapter 7 Trustee Fees | $ 0.1 | $ 0.1 | $ 0.1 | | | | |
| Other Professional Fees | 0.1 | 0.1 | 0.1 | | | | |
| Wind Down Costs | 2.5 | 1.8 | 2.2 | | | | |
| Total | $ 2.7 | $ 2.0 | $ 2.4 | | | | |
| | | | | | | | |
| **Estimated Net Proceeds Available for Distribution** | **$ 6.5** | **$ 9.7** | **$ 8.1** | | | | |
| | | | | | | | |
| **RECOVERIES** | | | | | | | |
| Revolving Credit Facility | | | | $ 3.9 | $ 2.7 | $ 3.0 | $ 2.8 |
| *Recovery Rate* | | | | | 70.2% | 77.1% | 73.7% |
| Term Loan | | | | $ 1.5 | $ 0.4 | $ 0.9 | $ 0.6 |
| *Recovery Rate* | | | | | 26.3% | 60.8% | 43.6% |
| First U.S. Treasury Facility | | | | $ 20.5 | $ 2.6 | $ 4.9 | $ 3.7 |
| *Recovery Rate* | | | | | 12.7% | 23.7% | 18.2% |
| | | | | | | | |
| Administrative and Priority Claims | | | | $ 2.8 | $ 0.7 | $ 1.0 | $ 0.9 |
| *Recovery Rate* | | | | | 26.8% | 34.1% | 30.5% |
| | | | | | | | |
| **General Unsecured Claims** | | | | **$ 116.5** | **$   -** | **$   -** | **$   -** |
| *Recovery Rate* | | | | | 0.0% | 0.0% | 0.0% |

**Asset Value**
- The value of the assets was based on a review of the March 31, 2009 balance sheet, discussions with management and other professionals
- Equity in Subsidiaries reflects the estimated value of both foreign and domestic subsidiaries. The value of the subsidiaries was determined on a distressed going concern basis for subsidiaries considered to be solvent stand alone businesses

**Costs Associated with Liquidation**
- Chapter 7 and Other Professional Fees were determined as a percentage of recovery value.
- Wind Down Costs reflect the estimated costs to secure, maintain and sell the estates assets.

**Secured Debt Recoveries**
- Secured debt recoveries are based on the recovery value of the collateral for each facility.
- The First US Treasury Facility claim is based on the current balance of $19.4 billion, plus the obligations under the Warrant Promissory Note.

**Administrative and Priority Claims**
- The estimated $2.8 billion of Administrative and Priority claims is primarily comprised of employee claims and s503(b)(9) claims. The Debtors and their advisors believe these estimates are conservative, and could be much higher, in the event of an actual Chapter 7 liquidation.

**General Unsecured Claims**
- The Liquidation Analysis assumes the General Unsecured Claims are equal to those presented on the March 31, 2009 balance sheet. Certain contingent General Unsecured Claims that would likely occur in a hypothetical Chapter 7 Liquidation such as lease/contract rejection claims, additional pension termination claims or other litigation claims are not reflected on the March 31, 2009 balance sheet. If an estimate of these contingent claims were to be included in the estimated General Unsecured Claim amount would increase.

7

## Asset Recovery and Wind Down Costs

# Asset Recovery Summary

**General Motors Corporation**
**Liquidation Analysis**
**Consolidated Debtors**
As of June 1, 2009

(In USD Billions)

| ASSETS | Adj. Book Value | Estimated Recovery Percentage | | | Hypothetical Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Midpoint | Low | High | Midpoint |
| Cash and Cash Equivalents | $ 2.0 | 100% | 100% | 100% | $ 2.0 | $ 2.0 | $ 2.0 |
| Accounts Receivable | 1.3 | 34% | 44% | 39% | 0.5 | 0.6 | 0.5 |
| Inventories | 3.2 | 20% | 29% | 24% | 0.6 | 0.9 | 0.8 |
| Property, Plant & Equipment | 17.7 | 7% | 12% | 10% | 1.3 | 2.1 | 1.7 |
| Other Assets | 4.1 | 6% | 11% | 8% | 0.2 | 0.4 | 0.3 |
| Equity in Subsidiaries | N/A | | | | 3.5 | 4.5 | 4.0 |
| Intellectual Property | N/A | | | | 1.0 | 1.2 | 1.1 |
| **Total Proceeds From Assets** | | | | | $ 9.1 | $ 11.7 | $ 10.4 |
| Costs Associated With Liquidation | | | | | | | |
| Chapter 7 Trustee Fees | | | | | $ 0.1 | $ 0.1 | $ 0.1 |
| Other Professional Fees | | | | | 0.1 | 0.1 | 0.1 |
| Wind Down Costs | | | | | 2.5 | 1.8 | 2.2 |
| Total | | | | | $ 2.7 | $ 2.0 | $ 2.4 |
| **Estimated Net Proceeds Available for Distribution** | | | | | $ 6.5 | $ 9.7 | $ 8.1 |

Notes:
- Adjusted book value is based on the March 31, 2009 balance sheet except for the Cash Balance, which is based on the Company's "Plan B" 13-week forecast dated May 26, 2009.

- The Company utilizes a U.S. cash pool account. The amount included in the above analysis represents the estimated cash available to the Company on June 1, 2009.

8

# Asset Recovery – Accounts Receivable

**Accounts Receivable**
*(in USD Billions)*

| | | Book Value at March 31, 2009 | Estimated Recovery % | | Estimated Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| GMAC | (1) | $ 0.32 | 0% | 0% | $ - | $ - |
| Non-GMAC Floor Plan Lenders | (2) | 0.41 | 34% | 48% | 0.14 | 0.20 |
| U.S. Government | (3) | 0.15 | 100% | 100% | 0.15 | 0.15 |
| Other | (4) | 0.43 | 38% | 53% | 0.16 | 0.23 |
| **Total** | | $ 1.31 | 34% | 44% | $ 0.45 | $ 0.57 |

(1)  Assumes GMAC utilizes set-off rights, resulting in a net claim against the debtors.

(2)  Comprised primarily of dealer inventory financed by non-GMAC lenders.  Non-GMAC lender recoveries assume some set-off and reflect recent increases in delinquencies.

(3)  These receivables are due from the Federal Government for fleet sales and thus assumed to be fully recoverable.

(4)  Includes numerous miscellaneous receivables and receivables related to parts sold to third party wholesalers and retailers.

## Asset Recovery - Inventory

**Inventory**
*(in USD Billions)*

| | | Book Value at March 31, 2009 ( 5 ) | Estimated Recovery % | | Estimated Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| Finished Goods | ( 1 ) | $ 0.93 | 28% | 46% | $ 0.26 | $ 0.43 |
| Raw Materials | ( 2 ) | 1.82 | 19% | 26% | 0.34 | 0.46 |
| Supplies | ( 3 ) | 0.07 | 20% | 25% | 0.01 | 0.02 |
| Other | ( 4 ) | 0.39 | 4% | 8% | 0.02 | 0.03 |
| **Total** | | $ 3.21 | 20% | 29% | $ 0.63 | $ 0.94 |

( 1 )  This balance includes vehicles used by GM employees for evaluation as well as pre-driven vehicles repurchased from dealers. Recovery levels for these vehicles are adjusted to reflect decrease in value from usage and effects of a Chapter 7 liquidation on vehicle values. Recovery is net of GE Fleet Loan of $125 million.

( 2 )  Balance includes both parts from suppliers, raw materials such as sheet metal, precious metals and service parts. Precious metals reflect a high recovery based on the nature of the asset as well as recent GM sales of excess stock. Recovery levels on other materials reflect scrap values adjusted for some continued demand for parts for existing vehicles in service.

( 3 )  This balance includes production supplies such as grease and cleaning agents which are assumed to be saleable.

( 4 )  The other balance is made up of several types of inventory. Approximately half of the balance reflects parts and new vehicles sold to "high risk" dealerships for which the revenue can not be recognized due to significant payment risk. The inventory is reflected on the GM balance sheet, but is owned and located at the individual dealers. The Liquidation Analysis assumes no recovery on these items.

( 5 )  A reduction in GM's book value of inventory of approximately $600 million related to the Company's LIFO reserve is not included in the figure shown above. If the LIFO reserve were included, hypothetical liquidation values would be unchanged while the estimated low and high recovery percentages of total inventory would increase to 24% and 36%, respectively.

10

# Asset Recovery – Plant, Property and Equipment

## Property, Plant & Equipment
### (in USD Billions)

| | | Book Value at March 31, 2009 (1) | Estimated Recovery % | | Estimated Recovery | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low | High | Low | High |
| Machinery & Equipment | ( 2 ) | $ 11.30 | 6% | 11% | $ 0.62 | $ 1.24 |
| Real Estate | ( 3 ) | 5.70 | 12% | 15% | 0.66 | 0.86 |
| Other | ( 4 ) | 0.70 | 0% | 0% | - | - |
| **Total** | | $ 17.70 | 7% | 12% | $ 1.28 | $ 2.11 |

( 1 )  Book values are net of accumulated depreciation.

( 2 )  Includes signficant amounts of tooling which is expected to have de minimus value.  Non-tooling M&E recovery is estimated based on discussions with management, recent sale experience and other market indications.

( 3 )  Recovery levels reflect current depressed real estate market conditions as well as North American auto industry overcapacity.  For manufacturing properties, recovery levels are further influenced by the age of the manufacturing facilities and potential for asset closure and remediation costs which would result in de minimus recoveries.  Estimated recovery related to non-manufacturing is based on our review of internal estimates of fair market value of these properties adjusted for the effects of the liquidation.

( 4 )  Balance consists of equipment on capital leases.  The Liquidation Analysis assumes any proceeds from the sale of these assets would be used to satify the capital lease obligations.

11

# Asset Recovery – Other Assets

## Other Assets & Intellectual Property
*(in USD Billions)*

| | | Book Value at March 31, 2009 | Estimated Recovery % Low | Estimated Recovery % High | Estimated Recovery Low | Estimated Recovery High |
|---|---|---|---|---|---|---|
| *Operating Lease Assets* | (1) | $ 1.53 | 0% | 0% | $ - | $ - |
| *Restricted Cash* | (2) | 0.97 | 0% | 5% | - | 0.05 |
| *Derivative Assets* | (3) | 0.04 | 90% | 100% | 0.03 | 0.04 |
| *Other Current* | (4) | 0.89 | 21% | 35% | 0.19 | 0.31 |
| *Other Noncurrent* | (5) | 0.68 | 4% | 6% | 0.02 | 0.04 |
| **Total** | | $ 4.10 | 6% | 11% | $ 0.25 | $ 0.43 |
| *Technology and Trademarks* | (6) | N/A | N/A | N/A | $ 0.98 | $ 1.19 |

(1) Balance consists of the estimated residual value of vehicles sold to rental car companies with guaranteed buy-back provisions, and thus must be accounted for as capital leases. It is assumed that in the event of a Chapter 7 liquidation GM would reject the contracts and not repurchase the vehicles due to significant declines in residual values.

(2) Minimal recovery assumed given cash is held against liabilities.

(3) Currently in-the-money derivative contracts at fair market value as of May 23, 2009.

(4) Balance consists primarily of prepaid expenses, deferred charges and certain vehicles not included in inventory. Assumed recovery level for vehicles is similar to that of other finished goods, while recoveries of prepaids is assumed to be minimal.

(5) Balance consists primarily of deferred charges such as capitalized debt issuance costs. These assets are assumed to be unrealizable in the event of a Chapter 7 liquidation.

(6) Recovery levels include potential proceeds for sales of Debtor owned brand names, including Chevrolet, Cadillac, Pontiac, Buick, GMC, Saturn and Hummer. A significant portion of the value is from the sale of the brands to foreign subsidaries. GM powertrain technology is also assumed to have market value. The remainder of technologies, such as GM's vehicle architecture are assume to have no value in the event of a liquidation due to specific uses of the technology and global overcapacity in the automotive industry.

# Asset Recovery – Equity in Subsidiaries

**Equity in Subsidiaries**
*(in USD Billions)*

| | Note | Estimated Value | |
|---|---|---|---|
| | | Low | High |
| *U.S. Operations* | (1) | $ 1.04 | $ 1.50 |
| *Foreign Operations* | (2) | 2.46 | 2.96 |
| ***Total Equity In Subsidiaries*** | | **$ 3.51** | **$ 4.46** |

(1) Includes GMAC carve-out assets, OnStar, real estate at non-debtor subsidiaries and equity in other domestic subsidiaries.

(2) Includes GM Asia Pacific, GM Europe, GM Latin America and all other international operations. The proceeds from the sale of technology and brands utilized by the foreign entities have been reflected in the intellectual property value.

13

# Costs Associated with Liquidation

- **Chapter 7 Trustee Fees**
  - Fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Due to the size of the estimated distributions the Trustee fees are estimated at 1% of the total proceeds generated from non-cash assets during the liquidation rather than the 3% maximum allowed under the Bankruptcy Code.

- **Other Professional Fees**
  - Amounts include the cost of liquidators, attorneys, accountants, brokers and other professional retained by the Trustee during the liquidation period. The professional fees are estimated at 1.5% of the estimated proceeds generated from non-cash assets during the liquidation period.

- **Wind-Down Costs**
  - **Manufacturing** - Indirect labor costs required to secure manufacturing assets and buildings.
  - **Commercial** - Labor and costs required to maximize value of inventory and to mitigate Dealer issues.
  - **Engineering Costs** - Engineering costs relate to resources needed to identify intellectual property to maximize potential recovery
  - **Corporate Overhead** - General expenses including accounting, legal, information systems and other expenses required for the Debtors to maintain records and assist in the orderly wind-down of the business.
  - **Holding Costs** – Include costs to secure and decommission facilities, real estate taxes, utilities and insurance.

| (Millions) | Structural Cost Analysis | | | | Wind-Down Cost Assumed in Analysis | | | | | | Wind-Down Costs % of Run Rate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2009 (1) Annual Run Rate | 2009 (2) Adjustments | 2009 Adj. Annual Run Rate | 2009 Base Qtly Run Rate | Months | | | | | Total | Months | | | | |
| | | | | | 1-3 | 4-6 | 7-9 | 10-12 | 13-24 | | 1-3 | 4-6 | 7-9 | 10-12 | 13-24 |
| **High** | | | | | | | | | | | | | | | |
| Manufacturing | 10,872 | (5,030) | 5,842 | 1,461 | 277 | 40 | 3 | 3 | 12 | 335 | 19% | 3% | 0% | 0% | 0% |
| Engineering | 4,621 | (877) | 3,744 | 936 | 97 | 6 | - | - | - | 103 | 10% | 1% | 0% | 0% | 0% |
| Commercial | 6,078 | (2,319) | 3,759 | 940 | 66 | 6 | - | - | - | 72 | 7% | 1% | 0% | 0% | 0% |
| Other | 4,757 | (2,419) | 2,338 | 585 | 351 | 234 | 156 | 117 | 175 | 1,033 | 60% | 40% | 27% | 20% | 8% |
| | 26,328 | (10,645) | 15,683 | 3,921 | 791 | 266 | 159 | 120 | 187 | 1,543 | 20% | 7% | 4% | 3% | 1% |
| Holding Costs | | | | | 253 | 105 | 105 | 105 | 322 | 890 | | | | | |
| | | | | | 1,044 | 391 | 264 | 225 | 509 | 2,433 | | | | | |
| | | | | | | | | Use | $ | 2,500 | | | | | |
| **Low** | | | | | | | | | | | | | | | |
| Manufacturing | | | 1,461 | 1,461 | 195 | 30 | 1 | 1 | 6 | 233 | 13% | 2% | 0% | 0% | 0% |
| Engineering | | | 936 | 936 | 66 | 6 | - | - | - | 72 | 7% | 1% | 0% | 0% | 0% |
| Commercial | | | 940 | 940 | 34 | 6 | - | - | - | 41 | 4% | 1% | 0% | 0% | 0% |
| Other | | | 585 | 585 | 214 | 156 | 127 | 88 | 101 | 686 | 37% | 27% | 22% | 15% | 4% |
| | | | 3,921 | 3,921 | 509 | 198 | 128 | 89 | 107 | 1,031 | 13% | 5% | 3% | 2% | 1% |
| Holding Costs | | | | | 228 | 83 | 83 | 83 | 253 | 729 | | | | | |
| | | | | | 737 | 281 | 211 | 172 | 360 | 1,760 | | | | | |
| | | | | | | | | Use | $ | 1,800 | | | | | |

Notes:
1) Amount is based on assumed structural cost run rate in Viability Plan. The amount includes significant cost cuts from the current run rate.
2) Adjustments to run rate are primarily the elimination of non-cash items, sales expenses, indirect purchases and benefit obligations.

14

15

# Creditor Recovery Analysis

# Hypothetical Recovery to Government Loans

## First US Treasury Facility

The First U.S. Treasury Facility is secured by guarantees of certain subsidiaries, security interests in certain assets, pledges of stock in domestic and foreign subsidiaries, and a warrant agreement. The warrant agreement includes a warrant to the U.S. Treasury to purchase a quantity of GM common stock and a $749 million promissory note increasing by 6.67% of any additional borrowings with the same terms as the First U.S. Treasury Facility.

| (USD Billions) | | First U.S. Treasury Facility | |
|---|---|---|---|
| | | **Low** | **High** |
| Collateral Value | (1) | $ 4.2 | $ 5.7 |
| Share of Wind-Down Costs | (2) | (1.6) | (0.8) |
| Net Recovery | | 2.6 | 4.9 |
| **Recovery Rate** | | **12.7%** | **23.7%** |
| Estimated Claim | (3) | $ 20.5 | $ 20.5 |

**Notes:**
(1) Reflects asset recovery estimate of collateral for each loan
(2) Wind-Down costs were allocated based on recovery value
(3) Estimated claim is based on the current outstanding balance of $19.4 billion, plus the estimated obligation under the Warranty Promissory Note.

16

# Hypothetical Recovery to Senior Secured Creditors

**Revolving Credit Facility**
GM's obligations under the Revolving Credit Agreement are secured by first priority liens on certain inventory and receivables of GM and Saturn and 65% of GM's interests in its wholly-owned Mexican subsidiary, Controladora General Motors, S.A. de C.V.; and second priority liens on the collateral securing GM's obligations under the First U.S. Treasury Loan Agreement.

**Secured Term Loan**
GM's obligations under the Term Loan Agreement are guaranteed by Saturn and secured by certain equipment and machinery owned by GM and Saturn.

**Other Secured Debt**
The Debtors additional secured obligations such as capital leases, certain municipal bonds, the GE Fleet Loan and synthetic lease obligations have been netted against the value of the assets that are secured by the obligation.

**The Liquidation Analysis assumes the Senior Secured Lenders allow their cash collateral to be used to fund the liquidation process**

| (USD Billions) | | Low | | | High | |
|---|---|---|---|---|---|---|
| | | Revolving Credit Facility | Secured Term Loan | | Revolving Credit Facility | Secured Term Loan |
| Collateral Value | (1) | $ 3.1 | $ 0.6 | | $ 3.6 | $ 1.2 |
| Share of Wind-Down Costs | (2) | (0.4) | (0.2) | | (0.6) | (0.3) |
| Net Recovery | | 2.7 | 0.4 | | 3.0 | 0.9 |
| **Recovery Rate** | | **70.2%** | **26.3%** | | **77.1%** | **60.8%** |
| Estimated Claim | (3) | $ 3.9 | $ 1.5 | | $ 3.9 | $ 1.5 |

**Notes:**
(1) Reflects asset recovery estimate of collateral for each loan
(2) Wind-Down costs were allocated based on recovery value
(3) Estimated claim is based on outstanding balance as of March 31, 2009. The Revolving Credit Facility does not include the Canadian portion of the loan of approximately $600 million. The Liquidation Analysis assumes the Canadian collateral is sufficient to cover the Canadian obligations.

# Hypothetical Recovery to Administrative and Priority Claims

(USD Billions)

| | | Low | High |
|---|---|---|---|
| Unencumbered Collateral | (1) | $ 1.2 | $ 1.3 |
| Share of Wind-Down Costs | (2) | (0.5) | (0.3) |
| Net Available for Administrative and Priority Claims | | $ 0.7 | $ 1.0 |
| Estimated Administrative and Priority Claims | (3) | $ 2.8 | $ 2.8 |
| **Recovery** | | 26.8% | 34.1% |
| Estimated Amounts Available for General Unsecured Claims | (4) | $ - | $ - |
| Estimated General Unsecured Claims | | $ 116.5 | $ 116.5 |
| **Estimated Recovery Rate** | | 0.0% | 0.0% |

**Notes:**
(1) Reflects asset recovery estimate of collateral not encumbered by secured debt obligations.
(2) Wind-Down costs were allocated based on recovery value
(3) Estimated Administrative and Priority Claims

| Type | Total |
|---|---|
| 503(b)9 | $ 0.9 |
| Employee Obligations | 1.4 |
| Priority Tax Obligation | 0.5 |
| Estimated Administrative and Priority Claims | $ 2.8 |

(4) The Liquidation Analysis assumes the General Unsecured Claims are equal to those presented on the March 31, 2009 balance sheet. Certain contingent General Unsecured Claims that would likely occur in a hypothetical Chapter 7 Liquidation such as lease/contract rejection claims, additional pension termination claims or other litigation claims are not reflected on the March 31, 2009 balance sheet. If an estimate of these contingent claims were to be included it is likely the estimated General Unsecured Claim amount would increase.

**Exhibit E:**

**William Repko DIP Affidavit (without Exhibits)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------  x
           :
In re                   :    Chapter 11
           :
General Motors Corporation, *et al.,*    :    Case No. _____
           :
           :    (Jointly Administered)
         Debtors.    :
           :
-------------------------------------------------------  x

**DECLARATION OF WILLIAM C. REPKO**
**IN SUPPORT OF DEBTORS'**
**PROPOSED DEBTOR IN POSSESSION FINANCING FACILITY**

    I, William C. Repko, make this Declaration under 28 U.S.C. § 1746 and state:

        1.    I am a Senior Managing Director with Evercore Group L.L.C. (together with its wholly-owned subsidiaries, agents, independent contractors and employees, "Evercore"), financial advisor to General Motors Corporation and the other above-captioned debtors and debtors in possession (collectively the "Debtors" and, together with their non-debtor affiliates, "GM"). I make this Declaration in support of the request of the Debtors that the Court approve the proposed debtor in possession financing (the "DIP Financing") as more fully described in the Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (i) Authorizing the Debtors to Obtain Postpetition Financing, Including on an Immediate, Interim Basis; (ii) Granting Superpriority Claims and Liens;  (iii) Authorizing the Debtor to use Cash Collateral; (iv)

Granting Adequate Protection to Certain Prepetition Secured Parties; (v) Authorizing the Debtor to Prepay Certain Secured Obligations in Full Within 45 Days; and (vi) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion")[1]. Except as otherwise indicated, my testimony in this Declaration is based upon my personal knowledge and experience acquired in the ordinary and regular course of my profession, my review of relevant documents and information supplied to me by members of GM's management team or professionals retained by GM and my personal knowledge and experience of the automotive industry and GM's businesses and financial condition. If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.

## I.    *Qualifications*

2.    I have considerable experience with Chapter 11 restructurings and other distressed company circumstances.  I have over 35 years of restructuring experience, including in complex restructuring transactions involving large corporations, money center and investment banks, and other creditors on numerous Chapter 11 transactions and restructurings, including, specifically, debtor in possession financing transactions.

3.    I attach my complete curriculum vitae as Exhibit A.

4.    I joined Evercore in September 2005 and since that time have been a Senior Managing Director in the corporate advisory business and co-head of the

---

[1] Unless otherwise defined in this Declaration, capitalized terms shall have the same meaning as in the DIP Motion.

corporate restructuring practice.  Prior to joining Evercore, I was chairman and head of

the Restructuring Group at J.P. Morgan Chase & Co.  I joined a predecessor firm of J.P.

Morgan in 1973, and I served as head of the Restructuring Group at J.P. Morgan from

1991 until 2004.  The Restructuring Group was responsible for delivering debt capital to

companies operating in, exiting from, or seeking to avoid Chapter 11.  Throughout my

tenure at J.P. Morgan and its predecessor firms, its Restructuring Group was at or near the

top of league tables of the industry.  In my capacity as head of the Restructuring Group, I

was involved in all facets of restructuring, including originating, structuring, and

negotiating the terms and conditions of debtor in possession financing facilities, managing

the internal approval process of these credits, and working with the firm's sales desk and

directly with investors in syndicating such facilities.  I worked on hundreds of these

offerings, including in connection with the vast majority of large U.S. public companies

that sought relief under Chapter 11 during my tenure as head of the Restructuring Group.

My clients included Enron, Federal Mogul, Harnischfeger, United Airlines, Worldcom,

Adelphia, Kmart, Waste Management, and LTV.   In addition, I have substantial

automotive industry financing experience. Over the past 20 years, I have worked on

numerous financings for automotive companies. In particular, in 1992 I led the Chemical

Bank restructuring team as the designee of the bank's Chief Credit Officer in the

refinancing of Chrysler Financial's bank facilities. In 1993, performing the same role, I

was the senior credit officer in conjunction with GM's and GMAC's $30 billion

refinancing of their global credit facilities. In 2006, I advised Ford Motor Company on

several financing options.   In 2007, I assisted Visteon on its capital raise and Cerberus in its financing to support the purchase of Chrysler LLC ("Chrysler") and Chrysler Financial.

5.      Established in 1996, Evercore is a leading investment banking boutique and investment management firm. Evercore's Advisory business counsels its clients on mergers, acquisitions, divestitures, restructurings and other strategic transactions.   Evercore's Investment Management business comprises private equity investing, institutional asset management and wealth management. Evercore serves a diverse set of clients around the world from its offices in New York, San Francisco, Boston, Washington D.C., Los Angeles, Houston, London, Mexico City and Monterrey, Mexico.  Its corporate advisory and restructuring advisory groups have together advised on over $600 billion of transactions.  Its restructuring professionals provide investment banking and financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in Chapter 11 proceedings and out-of-court restructurings.

6.      Evercore's professionals have been retained as investment bankers and financial advisors in a number of troubled company situations, including among others:  Lyondell Chemical Company, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan 6, 2009), Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sep. 14, 2005), Parmalat U.S.A. Corp., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Feb. 24, 2004), Loews Cineplex Entertainment Corp., Case No. 01-40346 (ALG) (Bankr.

S.D.N.Y. Feb. 15, 2001), and PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan.
23, 2008).

7.     Supporting me with the ongoing GM engagement has been a team
of approximately twelve Evercore professionals.    Since approximately June 2008,
Evercore's GM team has been in place on this project full-time.    Primarily assisting me in
this effort have been (a) Roger C. Altman, Chairman, (b) William Hiltz, Senior Managing
Director, (c) J. Stephen Worth, Managing Director, and (d) Stephen Sieh, Managing
Director.

8.     Roger C. Altman, Chairman of the Board of Evercore, began his
investment banking career at Lehman Brothers and became a general partner of that firm
in 1974.   Beginning in 1977, he served as Assistant Secretary of the U.S. Treasury for
four years.   He then returned to Lehman Brothers, later becoming co-head of overall
investment banking, a member of that firm's Management Committee and its Board.   He
remained in those positions until the firm was sold to Shearson/American Express.   In
1987, Mr. Altman joined The Blackstone Group as Vice Chairman, head of the firm's
merger and acquisition advisory business and a member of its Investment Committee.
Mr. Altman also had primary responsibility for Blackstone's international business.
Beginning in January 1993, Mr. Altman returned to Washington and served as Deputy
Secretary of the U.S. Treasury.   In 1996, he formed Evercore, which has become a leading
international investment banking boutique.   Mr. Altman holds an A.B. from Georgetown
University and an M.B.A. from the University of Chicago.   Mr. Altman has been actively

involved in advising GM on strategic and financial matters, and has been involved in discussions with the U.S. Treasury, GM board and senior management with respect to several potential strategic investors.

9. William Hiltz is a Senior Managing Director of the corporate advisory business and is a member of Evercore's Management Committee. In addition, Mr. Hiltz has management responsibility for all of Evercore's investment management businesses. Mr. Hiltz has 32 years of experience in the investment banking business. He received a B.A. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania. Mr. Hiltz has primarily been responsible for assisting GM with developing possible alliances and other long-term financing efforts.

10. J. Stephen Worth is a Managing Director of Evercore's corporate advisory business. Mr. Worth has over 20 years of investment banking experience, starting his career at J.P. Morgan & Co. Mr. Worth has extensive experience in advising and financing companies in the automotive and general industrial sectors. Mr. Worth graduated with a B.A. in math and physics from Wesleyan University. Mr. Worth has been primarily responsible for day-to-day discussions with GM relating to possible alliances and other long-tem financing efforts.

11. Stephen Sieh is a Managing Director of Evercore's corporate advisory business and restructuring practice. Prior to joining Evercore in 2007, Mr. Sieh spent over eight years at Lazard, most recently as a Director of the firm's Restructuring

Group.  Mr. Sieh has extensive experience in a wide range of corporate finance activities, including, mergers and acquisitions, corporate lending and Chapter 11 and out-of-court restructurings.  Mr. Sieh received a B.S. degree from the Carroll School of Management Honors Program at Boston College, and received an M.B.A. from the Columbia University Graduate School of Business.  Mr. Sieh has primarily been responsible for developing GM's long-tem financing alternatives and analyzing GM's needs in a potential restructuring.

12.    Prior to the Commencement Date, Evercore and I worked closely with GM's management, financial staff and other professionals in GM's restructuring efforts; analyzed GM's liquidity and projected cash flows; acquainted ourselves with GM's businesses, operations, properties and finances; advised GM in its evaluation of financing alternatives and of its assessment of a potential combination with Chrysler; assisted GM in obtaining $13.4 billion in emergency financing under the Troubled Assets Relief Program ("TARP"); assisted GM in the structuring and documentation of a proposed exchange offer; and assisted GM in connection with preparations for commencement of these cases.

13.    Accordingly, I have developed substantial knowledge regarding GM that allows me to provide an assessment of GM's liquidity position, the proposed sale of assets to a newly formed entity ("Vehicle Acquisition Holdings LLC"), and the financing needs of GM, as debtor-in-possession.

14.     Contemporaneously with the filing of the DIP Motion, I understand that the Debtors are filing a motion for authorization and approval of the sale of substantially all of their assets to Vehicle Acquisition Holdings LLC, and to consummate that sale (the "363 Sale").

## II.     Compensation for Evercore's Services

15.     The terms of Evercore's compensation for this engagement are fully set forth in the Engagement Letter, dated September 5, 2008, as amended on December 23, 2008, April 28, 2009, and as amended and restated on May 29, 2009.  The Engagement Letter and all amendments are attached to this Declaration as Exhibit B.

16.     Prior to the Commencement Date, GM paid Evercore total fees of $24.1 million and reimbursed expenses in the amount of $397,035 for all services rendered.  Pursuant to the Engagement Letter, Evercore will receive a fee of $2.5 million for assisting GM in the structuring and implementation of the debtor in possession financing and a net fee of $13.0 million if the transaction which is the subject of the 363 Motion is consummated.  There is no allocable share of the foregoing fees that will be paid directly to me.  Of course, the allowance of the foregoing fees is subject to bankruptcy court approval.

17.     In addition, Evercore has been and is engaged by GM to provide advice to GM with respect to the Delphi Corporation restructuring ("Delphi Engagement").  The terms of Evercore's compensation for the Delphi Engagement are fully set forth in the Delphi Engagement Letter dated June 1, 2008 and amended on March

31, 2009.  Prior to the Commencement Date, GM paid Evercore total fees of $5.5 million and reimbursed expenses in the amount of $76,888 for all services rendered related to this engagement.  Additional compensation may be earned under the Delphi Engagement in certain circumstances.

### III.    Professional Services Rendered By Evercore to GM

18.    Pursuant to the Engagement Letter, Evercore has provided such financial and strategic advisory services as GM and Evercore deemed appropriate in connection with these Chapter 11 cases.  In particular, Evercore has provided substantial advisory services to GM with respect to possible debtor in possession financing.

19.    In addition, since June 2008, Evercore has worked in conjunction with GM's management and its advisors on a number of ongoing projects, including cash management, financial analyses and forecasting, assistance with development of alternative business plans and models, assessments of financial alternatives and strategies, GM's submissions to the U.S. Government, initiating discussions of possible debtor in possession financing and other financing with major participants in the market,  and the proposed 363 Sale of assets to Vehicle Acquisition Holdings LLC.

### IV.    Relevant Background Information

20.    For the first two quarters of 2008, GM's financial performance and liquidity continued to be adversely impacted by the economic recession.  With crude oil prices rapidly rising and reaching $148 per barrel in July 2008, sales of large SUV and

pick-up trucks, two segments in which GM traditionally had significant market share, dramatically declined. The Seasonally Adjusted Annual Rate of Auto Industry Sales in the U.S. ("SAAR") fell to 13.6 million in June 2008, 13% below the same prior year period, and continued to decline reaching 10.3 million in December 2008.

21.    To offset the decline in liquidity and conserve cash, GM continued to accelerate its existing cost cutting initiatives and initiated new ones.

22.    GM also sought to access the capital markets to augment its liquidity.

23.    Evercore began working with GM in June of 2008 to advise GM on capital-raising options and other strategic alternatives as GM prepared to make a public announcement of its liquidity preservation plan in conjunction with its 2Q2008 earnings release in July.

### B.    GM's Attempts to Obtain Private Secured Financing

24.    In early July 2008, the equity and debt markets continued to show a lack of investor confidence, which significantly hampered GM's ability to meaningfully enhance its liquidity through either a public equity offering or an unsecured debt financing.  As the chart in attached Exhibit C illustrates, the price of GM's common stock had declined by 49% to $11.75 from May 1st, 2008 to July 1st 2008, the price of GM's long-term unsecured bonds had reportedly traded down from the mid-70s in early May to the mid-50s by early July and its credit default swaps (insurance-like contracts that promise to cover losses on certain securities in the event of a default) had widened to

1,832 bps by July 1st, 2008, further widening to 9,097 by year end  (see attached Exhibit D).

25.     At this point, the only capital-raising alternative available to GM appeared to be a potential issuance of secured debt financing using all of GM's unpledged and available collateral, including the stock of certain of its foreign subsidiaries, certain intangible assets, including its brands, and intellectual property.  In July, GM began discussions with several potential underwriters regarding such a transaction.

26.     Significant effort was expended by GM, its team of financial and legal advisors and its potential underwriters to develop a secured financing offering. However, during the second half of 2008 the financial markets continued to deteriorate to an unprecedented state of distress.   Neither the leveraged-loan market nor the market for secured high yield bonds had sufficient liquidity, and sellers of leveraged loans and bonds vastly outweighed buyers, putting severe pressure on market trading levels. Consequently, GM and its advisors concluded that, not only would the proceeds that could be raised by the offering be insufficient to provide GM with sufficient liquidity, but also that the financing would be prohibitively costly and would impair GM's future capital-raising alternatives when considering, among other factors, the pricing that buyers would have demanded, the collateral that would have to have been pledged, and the covenants with which GM would have had to comply.

27.     In early August 2008, Chrysler approached GM to begin discussions regarding a potential combination of the two companies.  Evercore worked

closely with GM to analyze the proposed transaction. In addition to strategic implications, a potential combination with Chrysler was initially viewed by GM as a potential catalyst for obtaining significant incremental financing from GM's and Chrysler's existing lenders, several of which were common to both companies, due to improved pro-forma credit statistics, a more positive long term outlook for the combined company and the likelihood that the trading value of the loans would improve post-transaction.

28.    Evercore continued to work closely with GM as it pursued negotiations with Chrysler between September and early November of 2008. By early November 2008, however, two critical facts led GM to suspend its merger talks with Chrysler: (i) lenders were unwilling to provide sufficient incremental liquidity to the proposed merged company, and (ii) the business environment and GM's operating performance had continued to decline severely such that GM may have exhausted its liquidity prior to the consummation of the contemplated transaction.

29.    Consequently, in early November 2008, GM was compelled to redirect its capital-raising focus to the "last resort" source of funds: the U.S. Government.

## VIII.    *Necessity of DIP Financing for Proposed 363 Sale Transaction*

30.    I understand that GM is seeking this Court's authorization to enter into the proposed DIP Financing as described in the DIP Motion, in order to fund working capital and certain other costs pending consummation of the 363 Sale. DIP Financing in this context is critical to preserving the value of GM. If the proposed DIP Financing is

approved, the Debtors' ability to minimize disruption to their businesses, instill confidence in their various stakeholders, and maximize asset values will be substantially enhanced.  If the proposed DIP Financing is not approved, or is modified on terms that are unacceptable to the U.S. Treasury and Export Development Canada (the "EDC"), GM will collapse and will, in all likelihood, liquidate in a distressed and, at least initially, a disorganized way. Manufacturing plants that are currently idle, but that are planned to reopen in July, may likely never re-open. The resultant loss of jobs, directly related to GM employment but also related to suppliers, dealers and other supporting businesses, will be catastrophic. Financing transactions, from GM direct debt, supplier debt, as well as wholesale and retail installment contracts related to auto purchases, will come under substantial recovery degradation. There are profound potential damaging effects of a GM collapse that are not easily anticipated, but which have the potential to multiply and adversely impact the United States' and the global economies.

31.    During the course our engagement for GM, Evercore and I analyzed the Debtors' DIP budget and contacted potential lenders for debtor in possession financing.

32.    In particular, Evercore and I contacted several institutions during the second quarter of 2009 to assess their interest in providing debtor in possession financing to assist the Debtors' restructuring efforts in the event GM were to seek protection under Chapter 11.

33.     The financial institutions contacted were involved with GM as potential underwriters during the capital-raising in the fall of 2008 and were named Dealer Managers in the Exchange Offer and Consent Solicitation on Form S-4 dated April 27, 2009, as subsequently amended. As such, these institutions were familiar with GM's financial condition, collateral values and the operational changes evidenced by GM's revised business plans and had the ability to adequately assess the prospects for the repayment of the prospective DIP Facility.

34.     None of the financial institutions that Evercore and I contacted expressed any interest in providing a debtor in possession financing facility for the Debtors.  In fact, the institutions specifically communicated that they were <u>not</u> willing to consider such a financing.  Indeed, based on my experience, the amounts in question exceed the legal lending limits of any financial institution I am aware of. Thus, DIP Financing of the magnitude contemplated in the DIP Motion would require an extraordinary degree of cooperation to arrange and syndicate among a large number of financial institutions. This, given current market conditions, is not achievable.

35.     The U.S. Treasury and the EDC are the only entities that have offered to provide the requisite debtor in possession financing, but solely pursuant to the DIP Financing terms set forth in the DIP Motion, and, in particular, <u>only</u> in connection with GM's pursuit of the proposed 363 Sale.  Moreover, the U.S. Treasury and the EDC have committed to convert all but $8 billion of its DIP Financing and its prepetition secured indebtedness to GM to equity in New GM, if the 363 Sale is consummated.

36.    As described in the DIP Motion, the proposed DIP Financing from the U.S. Treasury and the EDC provide for funding of up to $33.3 billion of additional capital.

## OPINION

37.    Based upon my review of the DIP Financing terms set forth in the DIP Motion and, in light of current market conditions and the unprecedented size of the proposed DIP Financing, and considering the other matters discussed above, it is my opinion that:

i.    GM is unable to obtain necessary credit other than the proposed DIP Financing from the U.S. Treasury and the EDC;

ii.    no alternative debtor in possession financing (public or private) is available to finance (a) these Chapter 11 proceedings; or (b) any other form of bankruptcy liquidation or reorganization of GM; and

iii.    the terms and conditions of the proposed DIP Financing are fair and reasonable.

**[Remainder of page left intentionally blank]**

38.    I declare under penalty of perjury that the foregoing statements are

true and correct.

Executed on May 31, 2009

_____
William C. Repko

**Exhibit F:**

**<u>Materials Relating to Fairness Opinion Presentation to GM Board of Directors</u>**

CONFIDENTIAL

# PROJECT MAINE

**Presentation to the Board of Directors**

May 31, 2009

EVERCORE PARTNERS

These materials have been prepared by Evercore Group L.L.C. ("Evercore") for the Board of Directors of General Motors Corporation ("GM" or the "Company") to whom such materials are directly addressed and delivered and may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Evercore. These materials are based on information provided by or on behalf of the Company and/or other potential transaction participants, from the Company's other advisors, including AlixPartners, from public sources or otherwise reviewed by Evercore. Evercore assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company and/or other potential transaction participants and/or the Company's other advisors or obtained from public sources, Evercore has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of such management (or, with respect to estimates and forecasts obtained from the Company's other advisors or public sources, represent reasonable estimates). No representation or warranty, express or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past, the present or the future. These materials were designed for use by specific persons familiar with the business and affairs of the Company. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials have been developed by and are proprietary to Evercore and were prepared exclusively for the benefit and internal use of the Board of Directors of the Company.

These materials were compiled on a confidential basis for use by the Board of Directors of the Company in evaluating the potential transaction described herein and not with a view to public disclosure or filing thereof under state or federal securities laws, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Evercore.

These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Evercore (or any affiliate) to provide or arrange any financing for any transaction or to purchase any security in connection therewith. Evercore assumes no obligation to update or otherwise revise these materials.

Evercore and its affiliates do not provide legal, accounting or tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Evercore or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer.

EVERCORE PARTNERS

# I. Overview of Transaction & Evercore Process

EVERCORE PARTNERS

*Confidential*

# Overview of Transaction & Evercore Process

## Transaction Overview

**Scope of Assignment**

- Evercore Group L.L.C. ("Evercore") has been asked by the General Motors Corporation ("GM", "GM OldCo" or the "Company") Board of Directors whether, in Evercore's opinion, the Purchase Price is fair, from a financial point of view, to the Company in connection with the sale and transfer (the "363 Sale") of the Purchased Assets (the "Purchased Assets") to NewCo ("NewCo" or the "Purchaser") as defined in the Master Sale and Purchase Agreement (the "MSPA"). The terms and conditions of the 363 Sale are more fully set forth in the MSPA, and terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Agreement

**Transaction Structure**

- The Purchaser intends to acquire from the Company the Purchased Assets in exchange for the Purchase Price (the "Purchase Price") as defined in MSPA, including the Assumed Liabilities (the "Assumed Liabilities") as defined in the MSPA, all in accordance with the terms outlined in the MSPA and subject to section 363(k) of the Bankruptcy Code

**Key Provisions on the DIP**

- The Purchaser is providing debtor-in-possession financing to the Company at the commencement of the Bankruptcy Case in connection with and conditioned on the 363 Sale

- The Purchaser's DIP financing matures on the earlier of (a) 90 days, (b) the Closing of the 363 Sale or (c) in the event the Bankruptcy Court enters an order approving an Alternative Transaction

- If the Bankruptcy Court does not approve the 363 Sale, the DIP loan would be in default

---

Note:   All capitalized terms within this document refer to their definition in the Master Sale and Purchase Agreement

*Confidential*

# Overview of Transaction & Evercore Process

## Transaction Overview

**Purchased Assets**

**NewCo**

**GM OldCo**

Retained Liabilities:
Unsecured Bonds & Convertibles
2007 VEBA Obligation [1]
Other Retained Liabilities
+
Excluded Assets:
Excluded Cash, Personal Property,
Real Property, and
other Excluded Assets

**Purchase Price**

1. A Bankruptcy Code 363(k) credit bid equal to an estimated $49bn of Indebtedness of the Company owed to the Purchaser as of the Closing pursuant to the UST Credit Facilities and the DIP Facility;

2. UST Warrant exercisable into GM 1 2/3's;

3. 10% of the common equity of NewCo plus NewCo warrants as follows

   a) 7-year warrants to acquire 7.5% of NewCo exercisable at $15.0bn equity value;

   b) 10-year warrants to acquire 7.5% of NewCo exercisable at $30.0bn equity value;

4. Assumption by the Purchaser of the Assumed Liabilities

(1)   It is assumed that the 2007 VEBA Obligation will be waived post Closing

*Confidential*

# Overview of Transaction & Evercore Process

## Overview of NewCo Capitalization



**U.S. and Canadian Governments**

**72.5% of NewCo common equity**, $8.0bn Note and $2.5bn Preferred

**New VEBA**

**17.5% of NewCo common equity**, $2.5bn Note, $6.5bn Preferred and 2.5% in Warrants

**GM OldCo**

**10.0% of NewCo common equity** received as consideration in the Purchase Price and an aggregate of 15.0% in Warrants[1]

**NewCo**

**Pension & OPEB Obligations**

- Establishment of a Canadian Health Care Trust structure to defease OPEB obligations with $0.9bn cash and $0.7bn note
- Pre-funding of assumed Canadian Pension with $3.6bn cash
- Significant reduction in other non-UAW OPEB obligations

(1)   In the event the total allowed unsecured claims against Old GM exceed $35.0bn the U.S Treasury has agreed that New GM would issue up to an additional 2% of New GM common equity to Old GM

# Overview of Transaction & Evercore Process

## Information Considered

■ In connection with rendering our opinion, Evercore has, among other things:

i.   Reviewed a draft of the Agreement (and related documents) dated May 31, 2009, which we assume are in substantially final form and will not vary in any respect material to our analysis;

ii.  Analyzed certain publicly available financial statements and other publicly available business information relating to GM that we deemed relevant to our analysis;

iii. Analyzed certain internal non-public financial and operating data concerning GM prepared and furnished to us by the management of GM;

iv.  Analyzed certain financial projections concerning NewCo (the "NewCo Projections") furnished to us by the management of GM;

v.   Reviewed certain non-public historical and projected operating data relating to the Company and to NewCo prepared and furnished to us by the management of GM;

vi.  Discussed the past and current operations, financial condition, prospects and projections of GM and NewCo with the management of GM (including their views on the risks and uncertainties of achieving such projections, including the NewCo Projections);

vii. Compared the financial performance of GM with that of other selected companies and their securities;

viii. Considered the experience of Evercore professionals who worked with GM with respect to potential financing opportunities and strategic alternatives considered by the Company;

ix.  Reviewed a liquidation analysis of GM (the "Liquidation Analysis") prepared by AlixPartners LLP ("AlixPartners") with the support of the management of GM;

x.   Discussed the Liquidation Analysis with AlixPartners and the management of the Company; and

xi.  Performed such other analyses and examinations and considered such other factors as we have, in our sole judgment, deemed appropriate for purposes of this opinion.

*Confidential*

# Overview of Transaction & Evercore Process

## Evercore Evaluation Process

■ In conducting its analysis and determination of fairness for purposes of this opinion, Evercore has considered that GM faces extremely difficult operating and financial circumstances. Evercore has assumed, with the Company's permission, the following regarding GM's financial situation as of the date hereof:

–  Should GM not receive adequate additional financing from the U.S. government or other sources, the Company expects to have insufficient liquidity to operate its business in June of 2009 and beyond.

–  Having unsuccessfully sought capital from a wide variety of potential private sources over the past year, the Company and its advisors believe that there are no sources of private capital willing to fund the Company's near-term cash needs in the ordinary course of business.

–  The Company and its advisors have attempted to find sources of financing other than the debtor in possession financing proposal (the "DIP Proposal") being offered by the U.S. government in conjunction with the 363 Sale, but have not found any entity that has expressed any interest in pursuing an alternative financing transaction.

–  The U.S. government has not offered any additional financial assistance to GM other than the DIP Proposal offered in connection with the 363 Sale.

–  If GM were to decline the DIP Proposal, and in doing so decline the 363 Sale, the Company would be forced to seek relief under the Bankruptcy Code and liquidate its assets as described in the Liquidation Analysis.

–  The Company is not aware of any other potential partners, purchasers or acquirers that have proposed an alternative, or a serious or credible interest in developing an alternative, to the 363 Sale.

■ Therefore, Evercore has, with the Company's permission, relied on management's and Evercore's conclusion that GM's range of options has narrowed to a choice between (i) the 363 Sale or (ii) a bankruptcy liquidation as described in the Liquidation Analysis.

# Overview of Transaction & Evercore Process

## Evercore Evaluation Process (continued)

■ In arriving at our opinion, we have also taken into consideration the financial position of the Company, including the fact that it is contemplating a filing under Chapter 11 of the Bankruptcy Code, and the effect that such a filing would have on the Company's operations, financial position and business outlook. We have taken into account the foregoing facts and assumptions (together with the other facts and assumptions set forth in this opinion, including, among other things, the Company's belief that, should it not proceed with the 363 Sale, it would be forced to liquidate within bankruptcy) when assessing the "fairness" of the Purchase Price for the purposes of this opinion.

■ For purposes of our analysis and opinion, we have assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by us, including the Liquidation Analysis, and we assume no liability therefore.

■ At the Company's direction, we (i) did not rely upon any standalone financial forecasts relating to the Company (except for the Liquidation Analysis) and (ii) did not perform certain analyses that we would customarily prepare for the Company in connection with a fairness opinion, because of the Company's determination that such forecasts and analyses are not meaningful as a result of the extraordinary circumstances of the Company described herein.

■ With respect to the NewCo Projections referred to above, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of management of the Company as to the future financial performance of NewCo under the business assumptions reflected therein.

■ With respect to the Liquidation Analysis, we have assumed that it has been reasonably prepared by AlixPartners on bases reflecting the best currently available information and good faith judgments of AlixPartners and GM management, as well as the business assumptions reflected therein.

*Confidential*

# Overview of Transaction & Evercore Process

## Evercore Evaluation Process (continued)

- We express no view as to any of the NewCo Projections or financial data relating to the Company or to NewCo, or the assumptions upon which any of those projections or data are based, nor do we express any view as to the feasibility of NewCo's achieving those projections or for NewCo's ability to support the capital structure upon which those projections are based, nor do we express any view, or assume any liability, as to the projected proceeds of a liquidation of the Company, including with respect to the distribution of such proceeds or other assets of the Company to any class of creditors or interest holders, relying as we do on the Liquidation Analysis.

- Furthermore, we express no view, and assume no liability, as to the future distribution of the Purchase Price to holders of any securities of the Company, to any creditor or interest holder of the Company, or to any class of creditors or interest holders of the Company; nor do we evaluate or express any opinion as to the absolute or relative recoveries that might be available to the holders of any securities of the Company, to any creditor or interest holder of the Company, or to any class of creditors or interest holders of the Company in a bankruptcy proceeding or other liquidation or restructuring of the Company, whether or not the Company proceeds with the 363 Sale.

- We have assumed, at the direction of the Company, that the value of the Assumed Liabilities equals the dollar amount of such liabilities as they would be reflected on the Company's balance sheet, with the exception of the Company's pension and OPEB liabilities to be assumed by the Purchaser, which we have assumed, with the permission of the Company, to be valued at the present value of NewCo's expected future cash contributions.

- The full text of our opinion sets forth the procedures followed, assumptions made, matters considered and limitations on the review we have undertaken in connection with our opinion. **You are urged to read the opinion in its entirety.**

EVERCORE PARTNERS

# II.  Analysis of Proposed Transaction

EVERCORE PARTNERS

*Confidential*

# Analysis of Proposed Transaction

## Framework for Financial Analysis

### Components of Purchase Price

- **Indebtedness to the Purchaser,** the amount of which was estimated based on the expected balance outstanding (provided by the Company) as of July 31, 2009

- **The UST Warrant** exercisable into 20% of GM 1 2/3's common stock, which the Seller and Purchaser agree have a value of no less than $1,000

- **The value of NewCo equity,** which was estimated based on (i) discounted cash flow analysis, (ii) present value of future equity value analysis, and (iii) peer group trading multiples analysis, each as applied to the NewCo financial projections attached in the Appendix, *and* **the value of warrants** for an aggregate 15% in NewCo stock estimated using a combination of (a) Black Scholes Merton option pricing model and (b) discounted intrinsic values

- **Assumed Liabilities** of the Debtor transferred to the Purchaser, the amounts of which were estimated as of July 31, 2009

### Comparison

- The Purchase Price, net of cash transferred to the Purchaser

- The **Liquidation Analysis** prepared by AlixPartners reflecting the estimated proceeds from the liquidation of all of the assets of the Company, net of the costs to achieve those proceeds



# Analysis of Proposed Transaction

## Composition of Credit Bid

*Confidential*

*($ in billions)*

*363 Sale Credit Bid*

| Pre-Petition UST Loans | Refinancing of Revolver & M&E Loan | Delphi / Supplier Funding | Dealer Financing | Net Cash Flow & Contingencies | Total Funding | Warrant Notes & Other | UST NewCo Debt | Credit Bid |

- $19.4  (+$0.4bn)
- $5.9
- $7.0
- $2.1
- $18.3
- $52.7  (Additional Canada Funding +$6.3bn)
- $2.8
- $6.7  (+$1.3bn)
- $48.7

*U.S. DIP $33.3bn*

= Direct and Post-Closing Canadian Funding excludes Canadian participation in DIP

**EVERCORE PARTNERS**                    12

*Confidential*

# Analysis of Proposed Transaction
## Summary of NewCo Imputed Valuation Analysis

*($ in billions)*

### Imputed NewCo Equity Value as of 7/31/09

| Methodology | |
|---|---|
| **Base Case** | **Discounted Cash Flow**<br>4.00x – 5.00x Terminal EBITDA Multiple; 9.5% – 11.5% WACC |
| | **Trading Multiples**<br>0.40x – 0.50x 2010 TEV / Revenue Multiple |
| | **Present Value of Future Equity**<br>4.00x – 5.00x 2012 & 2013 TEV / EBITDA Multiple<br>6.00x – 8.00x 2012 & 2013 TEV / EBIT Multiple |
| **Downside** | **Discounted Cash Flow**<br>4.00x – 5.00x Terminal EBITDA Multiple; 9.5% – 11.5% WACC |
| | **Trading Multiples**<br>0.40x – 0.50x 2010 TEV / Revenue Multiple |
| | **Present Value of Future Equity**<br>4.00x – 5.00x 2012 & 2013 TEV / EBITDA Multiple<br>6.00x – 8.00x 2012 & 2013 TEV / EBIT Multiple |

Imputed Range of $38.0 – $48.0bn

Base Case:
- DCF: $37.3 – $53.9
- Trading Multiples: $25.4 – $38.1
- PV Future Equity (EBITDA): $37.7 – $50.2
- PV Future Equity (EBIT): $37.5 – $53.1

Downside:
- DCF: $33.6 – $49.8
- Trading Multiples: $22.8 – $35.4
- PV Future Equity (EBITDA): $34.9 – $46.8
- PV Future Equity (EBIT): $34.1 – $48.7

Scale: $10.0  $20.0  $30.0  $40.0  $50.0  $60.0  $70.0

EVERCORE PARTNERS

13

Confidential

# Analysis of Proposed Transaction

## NewCo Equity and Warrants

*($ in billions)*

### Imputed Value of Equity and Warrants in NewCo

| | % NewCo Ownership | Strike Price | Term | NewCo Value | |
|---|---|---|---|---|---|
| Purchaser Warrant A | 7.5% | $15.0 | 7 years | $2.1 | - | $2.9 |
| Purchaser Warrant B | 7.5% | $30.0 | 10 years | 1.5 | - | 2.1 |
| **Total Value from Warrants** | **15.0%** | | | **$3.6** | - | **$5.0** |
| **Value of 10% in NewCo** | **10.0%** | NA | NA | **$3.8** | - | **$4.8** |
| Total Equity and Warrants in NewCo | | | | $7.4 | - | $9.8 |



# Analysis of Proposed Transaction

*Confidential*

## Summary Purchase Price Analysis

($ in billions)

**Comparison of the Purchase Price to Realizable Value in a Liquidation**

| | |
|---|---|
| Credit Bid | $48.7 |
| Assumed Liabilities | $48.4 |
| Equity and Warrants in NewCo | $7.4 - $9.8 |
| UST Warrant | $0 |
| Purchase Price | $104.5 - $106.9 |
| Cash to NewCo | $13.4 |
| Net Purchase Price | $91.2 - $93.6 |

Legend:
- UST NewCo Debt
- Accounts Payable
- PV of Pension Contributions
- Employee Obligations
- Warranties
- Other

Liquidation Analysis $6 - $10

Note: Does not include realizable value of Excluded Assets

EVERCORE PARTNERS

15

# Analysis of Proposed Transaction

## Capitalization of NewCo

*Confidential*

*($ in billions)*

- NewCo's capital structure is expected to be substantially improved as a result of:

  - The Purchaser's credit bid of $49bn in indebtedness in exchange for NewCo equity and $2.5bn of Preferred Stock

  - The elimination of $27bn of unsecured debt

  - The decrease of $18bn in the VEBA obligation in exchange for NewCo equity and $6.5bn of Preferred Stock

  - The reduction in projected Canadian pension contributions, CAW OPEB obligation and Other OPEB obligations

- The Transaction achieves the strategic objective of providing sufficient liquidity to execute the operating plan and significantly deleverage the capital structure

## Pro-Forma Enterprise Value of NewCo

| | | | |
|---|---:|---:|---:|
| **NewCo Equity Value** | $38.0 | - | $48.0 |
| Excess Cash | | | (12.3) |
| Government Debt | | | 8.0 |
| Other Debt | | | 6.1 |
| PV of UAW VEBA Obligations | | | 3.7 |
| PV of CAW VEBA Obligations | | | 0.7 |
| PV of Expected Future Pension Contributions | | | 9.9 |
| Preferred | | | 9.0 |
| **Total NewCo Enterprise Value** | $63.1 | - | $73.1 |

| *Credit Statistics* | 2010 | 2011 | 2012 |
|---|---:|---:|---:|
| Net Debt & Pfd. / EBITDA | 2.5x | 1.2x | 0.6x |
| Total Debt & Pfd. / EBITDA | 3.8 | 2.2 | 1.9 |
| EBITDA / Interest | 3.6 | 6.6 | 7.5 |
| EBITDA / (Interest + Capex) | 1.0 | 1.5 | 1.8 |

EVERCORE PARTNERS

Appendix

EVERCORE PARTNERS

*Confidential*

# Appendix

## NewCo Financial Summary – Income Statement

*($ in billions)*

| | Consolidated NewCo | | | | | | NewCo Downside | | | | | |
| | NewCo Base | | | | | | | | | | | |
| | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales** | $78.3 | $97.6 | $108.9 | $121.4 | $125.8 | $126.0 | $75.4 | $96.3 | $107.1 | $119.5 | $123.9 | $124.0 |
| Contribution Costs | (55.7) | (66.0) | (73.8) | (83.0) | (86.0) | (86.3) | (53.5) | (65.0) | (72.5) | (81.7) | (84.6) | (84.9) |
| **Contribution Margin** | $22.7 | $31.7 | $35.1 | $38.3 | $39.8 | $39.7 | $21.9 | $31.3 | $34.6 | $37.8 | $39.3 | $39.1 |
| | | | | | | | | | | | | |
| Structural Costs | ($38.3) | ($30.4) | ($30.2) | ($31.0) | ($31.4) | ($31.0) | ($38.2) | ($30.4) | ($30.1) | ($30.9) | ($31.3) | ($30.9) |
| FX and Other Income | 0.1 | 0.3 | 0.5 | 0.4 | 0.5 | 0.7 | 0.1 | 0.3 | 0.5 | 0.4 | 0.5 | 0.7 |
| **EBIT** [1] | ($15.6) | $1.6 | $5.4 | $7.8 | $8.9 | $9.4 | ($16.3) | $1.2 | $5.0 | $7.3 | $8.4 | $8.9 |
| | | | | | | | | | | | | |
| Equity Income | $0.3 | $0.4 | $0.5 | $0.5 | $0.6 | $0.6 | $0.3 | $0.4 | $0.5 | $0.5 | $0.6 | $0.6 |
| Minority Interest | 0.5 | (0.2) | (0.2) | (0.3) | (0.4) | (0.4) | 0.5 | (0.2) | (0.2) | (0.3) | (0.4) | (0.4) |
| Net Interest Expense | (2.8) | (3.1) | (2.7) | (2.6) | (2.1) | (1.7) | (2.8) | (3.2) | (2.8) | (2.6) | (2.1) | (1.7) |
| **Earnings Before Tax** | ($17.5) | ($1.3) | $3.0 | $5.3 | $6.9 | $7.8 | ($18.3) | ($1.7) | $2.5 | $4.9 | $6.5 | $7.4 |
| | | | | | | | | | | | | |
| *Memo:* | | | | | | | | | | | | |
| EBITDA [2] | ($7.8) | $6.4 | $10.2 | $12.8 | $13.8 | $14.4 | ($8.6) | $6.0 | $9.7 | $12.3 | $13.4 | $13.9 |
| US SAAR (Light and Heavy Vehicles) | 10.5 | 12.5 | 14.3 | 16.0 | 16.4 | 16.8 | 10.5 | 12.5 | 14.3 | 16.0 | 16.4 | 16.8 |
| US Market Share | 18.5% | 18.5% | 18.1% | 18.0% | 18.1% | 18.0% | 17.7% | 18.0% | 17.7% | 17.5% | 17.6% | 17.5% |
| Wholesale Volumes (000's) | 3,894 | 4,586 | 5,123 | 5,805 | 6,087 | 6,144 | 3,747 | 4,528 | 5,045 | 5,720 | 6,002 | 6,059 |
| Revenue Per Unit | 20,121 | 21,291 | 21,258 | 20,909 | 20,671 | 20,500 | 20,117 | 21,265 | 21,237 | 20,887 | 20,641 | 20,470 |

Source:   GM Viability Plan as of 5/31/09
Note     Pro Forma 2009 figures reflect GM "OldCo" through July 31, 2009 and GM "NewCo" thereafter
(1)      EBIT adjusted to exclude Equity Income and Minority Interest
(2)      EBITDA equals EBIT adjusted to exclude Equity Income, Minority Interest plus D&A

18

EVERCORE PARTNERS

# Appendix

*Confidential*

## NewCo Financial Summary – EBT to OCF

*($ in billions)*

### Consolidated NewCo

| | NewCo Base | | | | | | NewCo Downside | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Automotive Adjusted EBT** | **($17.5)** | **($1.3)** | **$3.0** | **$5.3** | **$6.9** | **$7.8** | **($18.3)** | **($1.7)** | **$2.5** | **$4.9** | **$6.5** | **$7.4** |
| Adjustments for Capital Spending | | | | | | | | | | | | |
| Depreciation & Amortization | 7.7 | 4.8 | 4.8 | 5.0 | 5.0 | 5.0 | 7.7 | 4.8 | 4.8 | 5.0 | 5.0 | 5.0 |
| Capital Expenditures | (4.5) | (4.5) | (5.1) | (5.5) | (4.9) | (4.9) | (4.5) | (4.5) | (5.1) | (5.5) | (4.9) | (4.9) |
| Capex Setups | (0.5) | (0.0) | 0.2 | 0.1 | (0.1) | 0.0 | (0.5) | (0.0) | 0.2 | 0.1 | (0.1) | 0.0 |
| Adjustments for Retirement Benefits | | | | | | | | | | | | |
| Pension Expense/(Income) | 1.8 | 1.8 | 1.9 | 1.7 | 1.7 | 0.9 | 1.8 | 1.8 | 1.9 | 1.7 | 1.7 | 0.9 |
| OPEB Expense (Incl. Mitigation VEBA) | 0.1 | (0.3) | (0.3) | (0.3) | (0.3) | 0.2 | 0.1 | (0.3) | (0.3) | (0.3) | (0.3) | 0.2 |
| OPEB Cash Payments | (3.4) | (0.9) | (0.6) | (0.7) | (0.6) | (0.6) | (3.4) | (0.9) | (0.6) | (0.7) | (0.6) | (0.6) |
| Other Cash Retirement Payments | (4.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) | (4.4) | (0.4) | (0.4) | (0.5) | (0.5) | (0.5) |
| Other Adjustments | | | | | | | | | | | | |
| Net Tax Refunds/(Payments) | (0.2) | (0.1) | (0.3) | (0.4) | (0.4) | (0.4) | (0.2) | (0.1) | (0.3) | (0.4) | (0.4) | (0.4) |
| Working Capital | 1.0 | 0.2 | 0.6 | 0.4 | 0.2 | (0.3) | 0.7 | 0.3 | 0.6 | 0.4 | 0.2 | 0.3 |
| Sales Allowances | (3.0) | 0.0 | 0.2 | 0.6 | 0.2 | 0.2 | (3.2) | 0.0 | 0.2 | 0.6 | 0.2 | 0.2 |
| Other Adjustments | (2.9) | 1.6 | 1.4 | 1.1 | 1.1 | 0.7 | (3.0) | 1.6 | 1.4 | 1.1 | 1.1 | 0.7 |
| **Automotive OCF before Special Items** | **($25.8)** | **$1.0** | **$5.4** | **$6.9** | **$8.2** | **$8.2** | **($27.0)** | **$0.8** | **$4.8** | **$6.4** | **$7.7** | **$7.7** |

Source:  GM Viability Plan as of 5/31/09
Note:    Pro Forma 2009 figures reflect GM "OldCo" through July 31, 2009 and GM "NewCo" thereafter

**EVERCORE PARTNERS**

# Appendix

## NewCo Financial Summary – OCF to NCF

*Confidential*

*($ in billions)*

| | Consolidated NewCo — NewCo Base | | | | | | NewCo Downside | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | PF 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Automotive OCF before Special Items** | ($25.8) | $1.0 | $5.4 | $6.9 | $8.2 | $8.2 | ($27.0) | $0.8 | $4.8 | $6.4 | $7.7 | $7.7 |
| Asset Sales | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | - | 0.1 | 0.1 | 0.1 | 0.1 | - | - |
| Delphi Impact | (3.7) | (0.5) | (0.1) | (0.0) | 0.0 | 0.1 | (3.7) | (0.5) | (0.1) | (0.0) | 0.0 | 0.1 |
| Cash Restructuring Costs | (4.2) | (1.4) | (0.3) | (0.1) | (0.0) | (0.0) | (4.2) | (1.4) | (0.3) | (0.1) | (0.0) | (0.0) |
| Hourly Pension Plan Contributions | - | - | - | - | (1.9) | (4.4) | - | - | - | - | (1.9) | (4.4) |
| **Automotive OCF after Special Items** | ($33.5) | ($0.7) | $5.2 | $6.9 | $6.3 | $3.9 | ($34.8) | ($1.0) | $4.6 | $6.4 | $5.8 | $3.4 |
| GMAC Asset Carve-Out Cash Flows | 1.0 | 0.5 | - | - | - | - | 1.0 | 0.5 | 0.5 | - | - | - |
| GMAC Distributions/GMAC Flows | (2.5) | 1.4 | 0.5 | 0.2 | 0.1 | 0.1 | (2.5) | 1.4 | 0.5 | 0.2 | 0.1 | 0.1 |
| **Automotive OCF after Special Items** | ($35.0) | $1.2 | $5.7 | $7.1 | $6.4 | $4.0 | ($36.3) | $1.0 | $5.1 | $6.6 | $5.9 | $3.5 |
| VEBA Withdrawals (Salaried and Hourly) | 0.0 | - | - | - | - | - | 0.0 | - | - | - | - | - |
| UAW/CAW IT VEBA Contributions | (1.0) | (0.6) | (0.6) | (0.6) | (2.3) | (0.6) | (1.0) | (0.6) | (0.6) | (0.6) | (2.3) | (0.6) |
| Credit Facility Draws/(Repayments) | (5.4) | (0.2) | (0.4) | (0.7) | (0.6) | (0.6) | (5.4) | (0.2) | (0.4) | (0.7) | (0.6) | (0.6) |
| Debt Maturities | (3.3) | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | (3.3) | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 |
| Debt Financing | 0.3 | 0.3 | - | - | - | - | 0.3 | 0.3 | - | - | - | - |
| US Government Funding | 45.5 | (3.9) | (2.8) | - | - | - | 45.5 | (2.8) | (3.9) | - | - | - |
| Canadian Government Funding | 9.5 | (0.7) | (0.6) | - | - | - | 9.5 | (0.5) | (0.8) | - | - | - |
| Gov't Loan for GMAC Rights Offering | 0.9 | - | - | - | - | - | 0.9 | - | - | - | - | - |
| Section 136 Loans | - | 2.0 | 1.8 | 1.4 | 0.5 | - | - | 2.0 | 1.8 | 1.4 | 0.5 | - |
| Other Non-Operating Cash Flows | (10.1) | 1.7 | (0.2) | (0.2) | (0.2) | (0.2) | (10.1) | 1.7 | (0.2) | (0.2) | (0.2) | (0.2) |
| **Net Cash Flow** | $1.3 | ($0.2) | $3.0 | $7.1 | $3.8 | $2.6 | $0.0 | $0.9 | $1.2 | $6.6 | $3.3 | $2.1 |
| **Cash Balance (incl. ST-VEBA)** | $15.3 | $15.1 | $18.1 | $25.2 | $29.0 | $31.6 | $14.0 | $14.9 | $16.1 | $22.7 | $26.0 | $28.1 |
| Managerial Debt Balance (Incl. Preferred) | (22.8) | (20.3) | (18.5) | (19.3) | (19.2) | (18.6) | (22.8) | (21.6) | (18.5) | (19.3) | (19.2) | (18.6) |
| **Net Liquidity** | ($7.5) | ($5.2) | ($0.4) | $5.9 | $9.8 | $13.0 | ($8.8) | ($6.7) | ($2.4) | $3.4 | $6.8 | $9.5 |

Source: GM Viability Plan as of 5/31/09
Note: Pro Forma 2009 figures reflect GM "OldCo" through July 31, 2009 and GM "NewCo" thereafter

# Appendix

## NewCo Capital Structure

*Confidential*

*($ in billions)*

### NewCo Capitalization

#### NewCo Base Case

| | Post-363 8/1/09 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| *Secured Debt* | | | | | | | |
| Government Debt | $8.0 | $8.0 | $3.4 | - | - | - | - |
| Section 136 Funding | - | - | 2.0 | 3.8 | 5.2 | 5.7 | 5.6 |
| Subsidiary Indebtedness & Other | 6.1 | 5.8 | 5.9 | 5.6 | 5.1 | 4.5 | 4.0 |
| **Total Secured Debt** | **$14.1** | **$13.8** | **$11.3** | **$9.5** | **$10.3** | **$10.2** | **$9.6** |
| *Unsecured Debt* | | | | | | | |
| UAW VEBA Obligations | $3.7 | $2.8 | $2.8 | $3.1 | $3.4 | $2.2 | $2.4 |
| CAW VEBA Note | 0.7 | 0.7 | 0.8 | 0.8 | 0.9 | 0.6 | 0.6 |
| **Total Unsecured Debt** | **$4.4** | **$3.6** | **$3.6** | **$3.9** | **$4.3** | **$2.8** | **$3.1** |
| *Preferred* | | | | | | | |
| UST / Canadian Preferred Stock | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 |
| UAW VEBA Preferred Stock [1] | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 |
| **Total Preferred** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** |
| **Total Debt and Preferred** | **$27.5** | **$26.3** | **$24.0** | **$22.4** | **$23.6** | **$22.0** | **$21.7** |
| Less: Excess Cash [1] | (12.3) | (9.4) | (7.8) | (9.9) | (16.1) | (19.6) | (22.2) |
| **Net Debt and Preferred** | **$15.1** | **$16.9** | **$16.2** | **$12.5** | **$7.5** | **$2.5** | **($0.5)** |
| *Financials and Credit Statistics* | | | | | | | |
| EBITDA [2] | NA | ($7.8) | $6.4 | $10.2 | $12.8 | $13.8 | $14.4 |
| Net Debt & Pfd. / EBITDA | NM | NM | 2.5x | 1.2x | 0.6x | 0.2x | (0.0x) |
| Total Debt & Pfd. / EBITDA | NM | NM | 3.8 | 2.2 | 1.9 | 1.6 | 1.5 |
| EBITDA / Interest [3] | NM | NM | 3.6 | 6.6 | 7.5 | 8.8 | 9.3 |
| EBITDA / (Interest + Capex) | NM | NM | 1.0 | 1.5 | 1.8 | 2.1 | 2.2 |

#### NewCo Downside Case

| | Post-363 8/1/09 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| *Secured Debt* | | | | | | | |
| Government Debt | $8.0 | $8.0 | $4.7 | - | - | - | - |
| Section 136 Funding | - | - | 2.0 | 3.8 | 5.2 | 5.7 | 5.6 |
| Subsidiary Indebtedness & Other | 6.1 | 5.8 | 5.9 | 5.6 | 5.1 | 4.5 | 4.0 |
| **Total Secured Debt** | **$14.1** | **$13.8** | **$12.6** | **$9.5** | **$10.3** | **$10.2** | **$9.6** |
| *Unsecured Debt* | | | | | | | |
| UAW VEBA Obligations | $3.7 | $2.8 | $2.8 | $3.1 | $3.4 | $2.2 | $2.4 |
| CAW VEBA Note | 0.7 | 0.7 | 0.8 | 0.8 | 0.9 | 0.6 | 0.6 |
| **Total Unsecured Debt** | **$4.4** | **$3.6** | **$3.6** | **$3.9** | **$4.3** | **$2.8** | **$3.1** |
| *Preferred* | | | | | | | |
| UST / Canadian Preferred Stock | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 | $2.5 |
| UAW VEBA Preferred Stock [1] | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 |
| **Total Preferred** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** | **$9.0** |
| **Total Debt and Preferred** | **$27.5** | **$26.3** | **$25.3** | **$22.4** | **$23.6** | **$22.0** | **$21.7** |
| Less: Excess Cash [1] | (10.8) | (8.4) | (7.7) | (8.0) | (13.8) | (16.7) | (18.8) |
| **Net Debt and Preferred** | **$16.7** | **$18.0** | **$17.6** | **$14.4** | **$9.8** | **$5.3** | **$2.9** |
| *Financials and Credit Statistics* | | | | | | | |
| EBITDA [2] | NA | ($8.6) | $6.0 | $9.7 | $12.3 | $13.4 | $13.9 |
| Net Debt & Pfd. / EBITDA | NM | NM | 2.9x | 1.5x | 0.8x | 0.4x | 0.2x |
| Total Debt & Pfd. / EBITDA | NM | NM | 4.2 | 2.3 | 1.9 | 1.6 | 1.6 |
| EBITDA / Interest [3] | NM | NM | 3.3 | 6.2 | 7.2 | 8.5 | 9.0 |
| EBITDA / (Interest + Capex) | NM | NM | 1.0 | 1.5 | 1.7 | 2.0 | 2.1 |

Source:  GM Viability plan as of 5/31/09
(1)  Excess cash defined as total GM cash less cash required for working capital
(2)  EBITDA equals EBIT adjusted to exclude Equity Income, Minority Interest plus D&A
(3)  EBITDA to cash interest expense including preferred dividends

EVERCORE PARTNERS

# Appendix
## NewCo DCF

*Confidential*

*($ in billions)*

### Summary Valuation As of 07/31/09

| | Base Case | | Downside Case | |
| --- | --- | --- | --- | --- |
| | Low | High | Low | High |
| Terminal Multiple | 4.00x | 5.00x | 4.00x | 5.00x |
| WACC | 11.5% | 9.5% | 11.5% | 9.5% |
| Core Enterprise Value | $60.5 | $75.4 | $58.4 | $72.9 |
| Value of Unconsolidated Subsidiaries & Other Assets | 9.7 | 12.7 | 9.7 | 12.6 |
| PV of Restructuring Costs (Including Delphi) | (4.0) | (4.0) | (4.0) | (4.0) |
| Minority Interest | (2.9) | (2.9) | (2.9) | (2.9) |
| **Enterprise Value** | **$63.2** | **$81.1** | **$61.1** | **$78.5** |
| Net Debt | ($12.3) | ($12.3) | ($13.8) | ($13.8) |
| PV of Pension Contributions | (9.3) | (10.6) | (9.3) | (10.6) |
| PV of CAW/UAW Obligations | (4.4) | (4.4) | (4.4) | (4.4) |
| **Net Obligations** | **($26.0)** | **($27.2)** | **($27.6)** | **($28.8)** |
| **NPV** | **$37.3** | **$53.9** | **$33.6** | **$49.8** |

(1)   Assumes 2% growth rate on Terminal EBITDA

22

EVERCORE PARTNERS

# Appendix

*Confidential*

*($ in billions)*

## NewCo Present Value of Equity

**Valuation and Sensitivities**

### Base Case

| | EBITDA Multiple 2012 (Low - High) | EBITDA Multiple 2013 (Low - High) | EBIT Multiple 2012 (Low - High) | EBIT Multiple 2013 (Low - High) |
|---|---|---|---|---|
| Forward Multiple | 4.00x - 5.00x | 4.00x - 5.00x | 6.00x - 8.00x | 6.00x - 8.00x |
| Cost of Equity | 13.5% - 13.5% | 13.5% - 13.5% | 13.5% - 13.5% | 13.5% - 13.5% |
| Core Enterprise Value | $71.6 - $86.3 | $72.0 - $86.9 | $71.2 - $90.7 | $71.6 - $91.4 |
| Uncon. Subs. & Other Assets | 11.6 - 15.7 | 12.8 - 17.3 | 11.6 - 15.7 | 12.8 - 17.3 |
| FV of Restr. Costs (Inc. Delphi) | 0.6 - 0.6 | 0.6 - 0.6 | 0.6 - 0.6 | 0.6 - 0.6 |
| Minority Interest | (4.1) - (4.1) | (4.5) - (4.5) | (4.1) - (4.1) | (4.5) - (4.5) |
| Enterprise Value | $79.7 - $98.5 | $80.9 - $100.3 | $79.4 - $102.9 | $80.6 - $104.8 |
| Net Debt | ($4.8) - ($4.8) | ($1.2) - ($1.2) | ($4.8) - ($4.8) | ($1.2) - ($1.2) |
| FV of Pension Contributions | (12.1) - (12.1) | (10.8) - (10.8) | (12.1) - (12.1) | (10.8) - (10.8) |
| FV of UAW VEBA Obligations | (3.4) - (3.4) | (2.2) - (2.2) | (3.4) - (3.4) | (2.2) - (2.2) |
| FV of CAW VEBA Obligations | (0.9) - (0.9) | (0.6) - (0.6) | (0.9) - (0.9) | (0.6) - (0.6) |
| Net Obligations | ($21.1) - ($21.1) | ($14.9) - ($14.9) | ($21.1) - ($21.1) | ($14.9) - ($14.9) |
| Future Value of Equity | $58.6 - $77.3 | $66.0 - $85.4 | $58.2 - $81.8 | $65.7 - $89.9 |
| PV of Future Equity | $38.0 - $50.2 | $37.7 - $48.8 | $37.8 - $53.1 | $37.5 - $51.4 |

### Downside Case

| | EBITDA Multiple 2012 (Low - High) | EBITDA Multiple 2013 (Low - High) | EBIT Multiple 2012 (Low - High) | EBIT Multiple 2013 (Low - High) |
|---|---|---|---|---|
| Forward Multiple | 4.00x - 5.00x | 4.00x - 5.00x | 6.00x - 8.00x | 6.00x - 8.00x |
| Cost of Equity | 13.5% - 13.5% | 13.5% - 13.5% | 13.5% - 13.5% | 13.5% - 13.5% |
| Core Enterprise Value | $69.2 - $83.5 | $69.8 - $84.3 | $68.0 - $86.5 | $68.5 - $87.4 |
| Uncon. Subs. & Other Assets | 11.6 - 15.6 | 12.8 - 17.2 | 11.6 - 15.6 | 12.8 - 17.2 |
| FV of Restr. Costs (Inc. Delphi) | 0.6 - 0.6 | 0.6 - 0.6 | 0.6 - 0.6 | 0.6 - 0.6 |
| Minority Interest | (4.1) - (4.1) | (4.5) - (4.5) | (4.1) - (4.1) | (4.5) - (4.5) |
| Enterprise Value | $77.4 - $95.6 | $78.8 - $97.6 | $76.1 - $98.6 | $77.5 - $100.7 |
| Net Debt | ($7.2) - ($7.2) | ($4.1) - ($4.1) | ($7.2) - ($7.2) | ($4.1) - ($4.1) |
| FV of Pension Contributions | (12.1) - (12.1) | (10.8) - (10.8) | (12.1) - (12.1) | (10.8) - (10.8) |
| FV of UAW VEBA Obligations | (3.4) - (3.4) | (2.2) - (2.2) | (3.4) - (3.4) | (2.2) - (2.2) |
| FV of CAW VEBA Obligations | (0.9) - (0.9) | (0.6) - (0.6) | (0.9) - (0.9) | (0.6) - (0.6) |
| Net Obligations | ($23.5) - ($23.5) | ($17.7) - ($17.7) | ($23.5) - ($23.5) | ($17.7) - ($17.7) |
| Future Value of Equity | $53.9 - $72.1 | $61.0 - $79.9 | $52.6 - $75.1 | $59.7 - $83.0 |
| PV of Future Equity | $34.9 - $46.8 | $34.9 - $45.7 | $34.1 - $48.7 | $34.1 - $47.4 |

*Confidential*

Appendix

# Peer Group Historical Forward EBITDA / EBIT Multiples



Note:    Figures represent Automotive only results excluding one time charges, pension expense and including pension service cost. US average composed of Ford and GM. European average composed of Daimler, BMW, Volkswagen, Peugeot, Fiat and Renault. Japanese average composed of Toyota, Honda and Nissan

EVERCORE PARTNERS

24

# Appendix

## Assumed Liabilities

*Confidential*

*($ in billions)*

| Category | Estimated 7/31/09 | Description |
|---|---|---|
| Sales & Marketing | $15.5 | ▪ Dealer obligations, warranty obligations, customer deposits, deferred revenue and marketing liabilities |
| Non-UAW VEBA OPEB | 8.4 | ▪ UAW Life, IUE Health and Life, Salaried Health and Life, Legal Services Plans and SERP |
| UST NewCo Debt | 6.7 | ▪ Exit financing facility not bid in purchase price and asssumed by NewCo |
| Pension | 5.4 | ▪ Present value of estimated future pension cash contributions |
| Accounts Payable | 5.4 | ▪ Payables to suppliers |
| Employee Obligations | 3.8 | ▪ Employee payroll, post-employment benefits, training and Delphi Pension Guarantee |
| Other | 3.1 | ▪ Rent and other operational liabilities; tax obligations; worker's compensation; legal liabilities, capital leases and other liabilities |
| **Total Assumed Liabilities** | **$48.4** | |

EVERCORE PARTNERS

**Exhibit G:**

**<u>Summary of Evercore's Valuation Methodology</u>**

## Summary of Evercore's Valuation Methodology

For purposes of preparing and issuing the Opinion, Evercore has undertaken a valuation analysis to determine an estimated range of values of NewCo's common equity on a going concern basis (the "Equity Value"). Due to the inclusion of NewCo common equity in the Purchase Price in the 363 Sale, the estimated range of values of NewCo's common equity must be considered in evaluating, as detailed in the Opinion, the overall fairness of the proposed 363 Sale. The following is a brief summary of certain financial analyses performed by Evercore to arrive at its range of estimated Equity Values.

### *Valuation Methodology*

In performing these analyses, Evercore relied upon numerous assumptions provided by the Company with respect to industry performance, business and economic conditions, and the future operations and financial condition of NewCo. Evercore reviewed these assumptions with the Company's management, and was directed by the Company's management to use NewCo financial projections for the purposes of its valuation analysis. Evercore believes that its valuation analysis must be considered as a whole and that reliance on only one of the methodologies used or portions of the analysis performed, without considering the entire analysis, could create a misleading or incomplete conclusion as to Equity Value. Evercore did not draw, in isolation, conclusions from or with regard to any one analysis or factor, nor did Evercore place any particular reliance or weight on any individual analysis. Rather, Evercore arrived at its views based on all the analyses undertaken by it assessed as a whole.

*Discounted Cash Flow Analysis*

The Discounted Cash Flow Analysis (the "DCF Analysis") is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Although formulaic methods are used to derive the key estimates for this methodology, their application and interpretation involve complex considerations and judgments concerning potential variances in the estimated financial and operating characteristics of NewCo, which in turn affect its cost of capital and terminal multiples.

Under this methodology, Evercore discounted estimated future cash flows by NewCo's weighted average cost of capital, estimated as described in the following paragraph (the "Discount Rate"). The applicable Discount Rate reflects the weighted average rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The core enterprise value of NewCo was determined by calculating the present value of NewCo's unlevered, fully-taxed free cash flows based on the Company's projections for those cash flows, plus an estimate for the value of the firm beyond the projection period known as the terminal value, plus the present value of the deferred tax assets including net operating loss ("NOL") carryforwards.  The terminal value was derived by applying a multiple to NewCo's estimated Cash EBITDA in the final year of the projection period, discounted back to July 31, 2009 (the "Valuation Date") by the Discount Rate. With respect to NewCo, "Cash EBITDA" and "Cash EBIT" were calculated by excluding from EBITDA and EBIT, respectively, estimates prepared by the Company's management of the pension-related expenses and the New VEBA-related expenses (the cash impacts of which were valued separately for the purposes of

Evercore's analysis), and non-cash Other OPEB expenses pro forma for the effects of the 363 Sale.

      To estimate the Discount Rate applicable to NewCo, Evercore used the cost of equity, the cost of preferred stock, and the after-tax cost of debt for NewCo, weighted by NewCo's equity, preferred stock and debt to total capitalization ratios, respectively. Evercore calculated the cost of equity based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. In determining the terminal multiple, Evercore used the Long Term Cash EBITDA Multiple Range (as detailed in "Trading Multiples Analysis", below) for the Peer Group.

      In applying the above methodology, Evercore utilized the Company's detailed NewCo Projections to derive unlevered after-tax free cash flows for the projection period. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital, sales allowances and other reserves, and capital expenditures. For purposes of the DCF analysis, Evercore assumed NewCo to be a full taxpayer at a regional-weighted corporate income tax rate of 35 percent, based on estimates provided by the Company's management and separately adjusted for the value of current and future deferred tax assets. These cash flows, along with the terminal value, were discounted back to the Assumed Effective Date using the range of Discount Rates described in Exhibit E.

      The estimated value of NewCo's NOL carryforwards and other deferred tax attributes (both domestic and foreign) was provided by the Company, and involves assumptions made by the Company regarding utilization of deferred tax assets in time periods significantly beyond the duration of the projection period. To value NewCo's tax attributes, the expected

annual tax benefit from utilization was discounted at the cost of equity that was used to calculate the applicable Discount Rate used in the above DCF analysis. The outstanding balance of deferred tax assets and NOL carryforwards at NewCo reflects the effects of restructuring and subsequent 363 Sale, including the expected cancellation of debt income. Certain deferred tax assets were assumed to exist as a result of additional NOL carryforwards generated in 2009 and beyond, which were assumed to reduce NewCo's cash taxes payable during the projection period and thereafter. This analysis assumes that utilization of NewCo's non-U.S. tax attributes will not be limited in any way by the Company's reorganization or other restructuring events.

In order to arrive at the range of estimated Equity Values, the core enterprise value of NewCo as calculated above was adjusted by (i) adding the estimated value of the Unconsolidated Subsidiaries and Other Assets (as detailed in "Valuation of Other Assets and Liabilities" below), (ii) subtracting the estimated value of the Restructuring Costs and Minority Interest (also as detailed in "Valuation of Other Assets and Liabilities" below), (iii) subtracting the estimated amount of NewCo's net debt and (iv) subtracting the estimated value of NewCo's expected future pension contributions and VEBA obligations (also as detailed in "Valuation of Other Assets and Liabilities" below).

### *Valuation of Other Assets and Liabilities*

Evercore and the Company valued several additional expected streams of cash flows separately, outside of the core enterprise value, including the following: (i) the value of NewCo's stakes in its unconsolidated subsidiaries, including GM Europe, which the Company assumes will become an unconsolidated subsidiary of NewCo following a transaction with an as yet undetermined third party investor, and its expected asset sales (together, the "Unconsolidated Subsidiaries and Other Assets"), (ii) the value of expected future cash restructuring costs and

future potential cash flows to Delphi (together, the "Restructuring Costs"), (iii) the value of its

Minority Interest and (iv) the value of its expected future pension contributions and VEBA

obligations. Under the Present Value of Future Equity Analysis methodology, the estimated

future values of these amounts were added or subtracted separately to Evercore's estimates of

core enterprise value, calculated as described below under the heading "Present Value of Future

Equity Analysis", in order to arrive at the range of estimated future equity values, which were in

turn discounted back to the Valuation Date as an estimate of the Equity Value as of that date.

Under the DCF Analysis and the Trading Multiples Analysis, these amounts were added or

subtracted separately to Evercore's estimates of core enterprise value, calculated as described

above under the heading "Discount Cash Flow Analysis" and below under the heading "Trading

Multiples Analysis", respectively, in order to arrive at the range of estimated Equity Values.

### Trading Multiples Analysis

The Trading Multiples Analysis was based on the enterprise values of publicly

traded companies that have operating and financial characteristics similar to NewCo (the "Peer

Group"). Under this methodology, the enterprise value for each Peer Group company was

determined by examining the trading prices for the equity securities of such company in the

public markets and adding the aggregate amount of outstanding net obligations including, but not

limited to, underfunded pension plans and OPEB obligations (as applicable), for such company.

In addition, Evercore made adjustments to both balance sheet and income statement metrics for

each Peer Group company in order to remove the impact of financing operations and focus on

core automotive operations.  Enterprise value is commonly expressed as a multiple of various

measures of operating performance, most commonly revenue, EBITDA and EBIT.  With respect

to the Peer Group, "Cash EBITDA" and "Cash EBIT" were calculated by excluding from

EBITDA and EBIT, respectively, both pension-related expenses and non-cash OPEB related-expenses. Evercore examined such enterprise value multiples for each Peer Group company, as well as each Peer Group company's operational performance, operating margins, profitability, leverage and business trends. Based on these analyses, financial multiples and ratios were calculated and applied to NewCo's estimated operational performance.

A key factor to this approach is the selection of Peer Group companies with relatively similar business and operational characteristics to NewCo. No Peer Group company is either identical or directly comparable to NewCo. Accordingly, Evercore's comparison of the Peer Group companies to the business of NewCo was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the Peer Group companies and NewCo, and is subject to limitations due to sample size and the availability of meaningful market-based information. Common criteria for selecting Peer Group companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. On the basis of general comparability to NewCo in one or more of these criteria, Evercore selected the following publicly traded companies as the Peer Group companies: Bayerische Motoren Werke AG, Daimler AG, Fiat S.p.A., Honda Motor Co., Ltd., Nissan Motor Co., Ltd., PSA Peugeot Citroen, Renault S.A., Toyota Motor Corporation and Volkswagen AG.

Evercore estimated a range of Equity Values for NewCo under the Trading Multiples Analysis methodology by applying a range of revenue multiples derived from the Peer Group to the Company's estimates for NewCo's 2010 revenue, generating a range of basic

enterprise values for NewCo.  The estimated core enterprise value of NewCo was determined by adding the estimated value of the deferred tax assets including NOL carryforwards to that range of basic enterprise values. The valuation analysis of the deferred tax assets was performed in a similar manner to that described in "Discounted Cash Flow Analysis" above. The estimated equity value of NewCo was then calculated by (i) adding the estimated value of the Unconsolidated Subsidiaries and Other Assets (as detailed in "Valuation of Other Assets and Liabilities" above), (ii) subtracting the estimated value of the Restructuring Costs and Minority Interest (also as detailed in "Valuation of Other Assets and Liabilities" above), (iii) subtracting the estimated amount of NewCo's net debt and (iv) subtracting the estimated value of NewCo's expected future pension contributions and VEBA obligations (also as detailed in "Valuation of Other Assets and Liabilities" above).

### *Present Value of Future Equity Analysis*

Evercore estimated a range of Equity Values for NewCo under this methodology by first applying the range of Long Term Cash EBIT and Long Term Cash EBITDA multiples (both as defined below) to the Company's estimates of NewCo's forward Cash EBITDA and forward Cash EBIT (as defined below) for 2013 and 2014, generating a range of terminal values for NewCo as of 2012 and 2013, respectively.  Evercore selected the years 2013 and 2014 to reflect the long term, normalized earnings capacity of NewCo. The estimated ranges of core enterprise values of NewCo as of 2012 and 2013 were determined by adding the estimated value of the deferred tax assets including NOL carryforwards to those ranges of terminal values. The valuation analysis of the deferred tax assets was performed in a similar manner to that described in "Discounted Cash Flow Analysis" above. The ranges of estimated equity values of NewCo as

of 2012 and 2013 were then calculated by (i) adding the estimated value as of that time of the Unconsolidated Subsidiaries and Other Assets (as detailed in "Valuation of Other Assets and Liabilities" above), (ii) subtracting the estimated value as of that time of the Restructuring Costs and Minority Interest (also as detailed in "Valuation of Other Assets and Liabilities" above), (iii) subtracting the estimated amount as of that time of NewCo's net debt and (iv) subtracting the estimated value as of that time of NewCo's expected future pension contributions and UAW VEBA obligations (also as detailed in "Valuation of Other Assets and Liabilities" above). The ranges of estimated equity values of NewCo as of 2012 and 2013 were then discounted back to the Valuation Date as ranges of estimated of the Equity Values as of that date.

Because the automotive industry does not, in its current state, reflect normal valuation multiples that would be used in this type of valuation analysis, Evercore estimated a normalized range of market multiples of estimated forward Cash EBITDA and Cash EBIT for the Peer Group (the "Long Term Cash EBITDA Multiple Range" and the "Long Term Cash EBIT Multiple Range"), based on historical ranges from 2003 to the present, in order to examine long term trends in Cash EBITDA and Cash EBIT multiples for the industry. Evercore calculated the market multiple in each year by dividing the enterprise value of each Peer Group company as of its fiscal year end by its estimated Cash EBITDA and Cash EBIT for the following fiscal year, as estimated at that time by Wall Street equity research analysts, including adjustments for pension and OPEB-related expenses made on a historical basis. In determining the applicable Long Term Cash EBITDA and Long Term Cash EBIT Multiple Ranges, Evercore considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and estimated revenue, Cash EBITDA and Cash EBIT, historical enterprise value/Cash

EBITDA and enterprise value/Cash EBIT trading multiples, Cash EBITDA and Cash EBIT margins, the impact of financial distress on trading values, size, and similarity in business lines.

### *Warrant Valuation Methodologies*

Evercore estimated a range of values for the NewCo equity warrants to be issued to the Company using two methodologies: (i) the Black-Scholes option valuation model and (ii) a fundamental valuation methodology whereby the difference between the estimated Equity Value of NewCo as of 2013 (determined using the Present Value of Future Equity Analysis methodology, as detailed above) and the strike price of the warrant was calculated, with that difference then discounted back to the Valuation Date using the Cost of Equity (as detailed above).

**THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY EVERCORE. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.**