**DORSEY & WHITNEY LLP**
250 Park Avenue
New York, New York 10177
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
Eric Lopez Schnabel (ES 5553)
Attorneys for Entergy

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENERAL MOTORS CORP., *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

---

### OBJECTION OF ENTERGY TO MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 366 (I) APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR <u>DISCONTINUING SERVICE</u>

Entergy Mississippi, Inc. ("<u>Entergy</u>") submits this Objection (this "<u>Objection</u>") to

the Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 366

(I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II)

Establishing Procedures for Resolving Objections by Utility Companies, and (III)

Prohibiting Utilities from Altering, Refusing, or Discontinuing Service [Docket No. 58]

(the "<u>Utility Motion</u>") and to the Court's Order Pursuant to 11 U.S.C. §§ 105(a) and 366

(I) Approving Debtors' Proposed Form of Adequate Assurance of Payment,

(II) Establishing Procedures for Resolving Objections by Utility Companies, and

(III) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service (the "<u>Order</u>")

[Docket No. 173]. In support of this Objection, Entergy respectfully represents as

follows:

4822-6860-0067\3

## PRELIMINARY STATEMENT

1.      As more fully explained below, Entergy objects to the Utility Motion and

Order with respect to the appropriate level and form of adequate assurance for Entergy.

Entergy will be satisfied if it receives a cash deposit in the amount of $125,700.00 from

the Debtors (the "Required Deposit").  The amount approximates a two-month deposit

for the Entergy Account (defined below) and is (i) allowed by the Regulations (defined

below) and deemed reasonable by the applicable regulatory bodies; (ii) permitted by the

terms and conditions of service on the Entergy Account; and (iii) necessary to furnish

Entergy with adequate assurance of payment that is satisfactory to Entergy, as required

by 11 U.S.C. § 366(c)(2).  If Entergy does not receive the Required Deposit from the

Debtors on or before July 1, 2009, Entergy should be free to terminate service pursuant to

§ 366(c)(2).

2.      The Debtors' proposal to provide Entergy with a cash deposit an amount

equal to two weeks of utility services is unacceptable to Entergy.  Instead, Entergy seeks

an "adequate" level of deposit akin to the "adequate" level of protection provided to the

Debtors' secured lenders.  Although the Debtors may argue that Entergy is seeking a

"guarantee" of payment, nothing could be further from the truth.  Just as a secured lender

seeking "adequate" protection receives the degree of protection necessary to cover the

expected diminution in the value of its collateral, Entergy seeks the degree of protection

necessary to cover its exposure on the Entergy Account.  Because the Required Deposit is

based on historical charges, it will not protect Entergy against charges that exceed

historical amounts due to weather or other factors beyond Entergy's control.  Nor will the

Required Deposit protect Entergy against substantial increases in fuel costs that may result in increased charges to the Debtors.

3.      Accordingly, Entergy requests that its Objection be sustained and that the Debtors provide the Required Deposit to Entergy or be subject to termination of service after the thirtieth day of these cases.  Entergy reserves its rights to serve discovery upon the Debtors and to amend or supplement this Objection as the discovery process is completed.

## BACKGROUND

4.      On June 1, 2009 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court").

5.      On the Petition Date, the Debtors filed various motions including the Utility Motion.

6.      The Debtors continue to operate their businesses and manage their assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code, and no trustee or examiner has been appointed these cases.

### Entergy Background

7.      Entergy is, among other things, a provider of electric utility services, including both retail electric service and wholesale electric transmission services, in several markets including those of the Debtors' operations.

8.      Entergy is a "utility" as that term is used in § 366 of the Bankruptcy Code. The Debtors included Entergy on the "Utility Service List" attached to the Utility Motion as Exhibit A.

9.      Electric service providers such as Entergy are subject to various state and local regulations promulgated by public utility commissions and are subject to a number of other state laws, requirements of tariffs, and terms and conditions of service on file with regulatory authorities (collectively, the "Regulations").

10.     Entergy provides electric services to the Debtors in Mississippi under one account (the "Entergy Account").

11.     Entergy's exposure on the Entergy Account is as much as approximately $125,700.00 at any time.[1]

**The Utility Motion and the Order**

12.     Through the Utility Motion, the Debtors requested that the Court enter an order (i) approving the Debtors' proposed adequate assurance of payment for postpetition utility services; (ii) establishing procedures for resolving objections interposed by utility companies relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the utility companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases or debt for services rendered prepetition.  (Utility Mot. ¶ 33.)

---

[1]   Entergy continues to investigate and obtain information regarding its claims and adequate assurance demand.  Accordingly, Entergy reserves its rights to supplement and amend these figures as additional information is obtained.

13.    On the Petition Date, the Court entered the Order granting the Utility Motion.

14.    The Debtors propose to provide adequate assurance of payment for postpetition services by providing each Utility Company,[2] within seven days of such Utility Company's request, with a cash deposit in the amount of two weeks' worth of Utility Services, calculated based on a twelve-month historical average (the "<u>Adequate Assurance Deposit</u>").  (*See* Utility Mot. ¶ 35.)  The deadline for such requests is June 15, 2009.  (Order 3.)  As a condition to requesting and accepting an Adequate Assurance Deposit, the requesting utility company will be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment within the meaning of § 366.  (*Id.*)  Likewise, any utility company that does not request an Adequate Assurance Deposit or object to the motion before June 15 will be deemed adequately assured.  (Order 3.)

15.    Pursuant to the Order, any Utility Company desiring assurance of payment for utility services exceeding the Adequate Assurance Deposit must file an objection with the Court.  (Utility Mot. ¶ 38.)  The objection must be in writing and set forth the form and amount of payment requested, the locations for which Utility Services are provided, the Debtors' payment history, and the reasons that the Adequate Assurance Deposit is not sufficient.  (Order 3. )

## **The Regulations**

16.    Electric utilities are among the most heavily regulated businesses in the United States, and their ability to demand deposits is governed by regulatory agencies

---

[2]    Unless otherwise defined herein, capitalized terms have the meanings given in the Utility Motion.

that exist, in part, to protect the public. Electric utility providers such as Entergy are subject to various state and local regulations promulgated by public utility commissions and are subject to a number of other state laws, requirements of tariffs, and terms and conditions of service on file with regulatory authorities.

17. Entergy's applicable state Regulations provide that Entergy may require a deposit based on two times an industrial customer's peak monthly charges.

18. Entergy's exposure on the Entergy Account is as much as approximately $125,700.00 at any time. This amount is equal to the amount that Entergy would be entitled to receive from a new or defaulting customer pursuant to the Regulations outside of bankruptcy.

## OBJECTION

19. Entergy objects to the Utility Motion and the Order for the following reasons. First, the proposed Adequate Assurance Deposit is patently "inadequate" to protect Entergy from detriment as it continues to provide service to the Debtors, especially in light of the Debtors' agreement on what constitutes "adequate" protection for a secured lender. Second, the Adequate Assurance Deposit offers materially less protection than the Regulations, thus placing Entergy in a worse position than it would occupy in a non-bankruptcy context. Third, the proposed form of assurance is unsatisfactory to Entergy. Finally, the Utility Motion and the Order contravene the clear congressional intent as set forth in § 366 of the Bankruptcy Code and underscored by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

**A.      The Debtors' Proposed Adequate Assurance Deposit Is Inadequate.**

20.      The term "assurance of payment" is defined by the Bankruptcy Code and refers to the specific forms of protection against loss that debtors must provide to a utility to prevent the utility from exercising its right to "alter, refuse, or discontinue service." *See* 11 U.S.C. § 366(c)(1)(A).  With respect to the necessary amount of such protection, § 366(c) requires that it be "adequate" but does not otherwise define the term.

21.      In their DIP Motion[3] the Debtors correctly recognize that the purpose of *adequate* protection is "to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use."  DIP Motion ¶ 72 (quoting *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988)).  In other words, the concept of "adequate" is used to permit the debtor to stay in business without forcing the secured creditor to subsidize its operations.  Similarly, in the context of § 366, the concept of adequate assurance of payment is used to permit the debtor to "keep the lights on" without forcing utilities to subsidize the debtors' operations.

22.      The Debtors offer no reason why the meaning of "adequate" in the context of "adequate protection" under § 363 should be different from the meaning of "adequate" in the context of "adequate assurance of payment" under § 366(c).  In both cases "adequacy" necessarily reflects the degree to which the creditor is protected from a potential loss, and in both cases the focus should be on what is reasonably necessary to

---

[3]  *See* Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 361, 362, 363, & 364 (i) Authorizing Debtors to Obtain Postpetition Financing, Including on an Immediate, Interim Basis; (ii) Granting Superpriority Claims & Liens; (iii) Authorizing Debtors to Use Cash Collateral; (iv) Granting Adequate Protection to Certain Prepetition Secured Parties; (v) Authorizing Debtors to Prepay Certain Secured Obligations in Full Within 45 Days; & (VI) Scheduling a Final Hearing Pursuant to Bankr. R. 4001 [Docket No. 64] (the "DIP Motion").

protect the secured lender or utility from suffering a loss due to the debtor's continued operations.

23.     Given their assertions in the DIP Motion and their failure to demonstrate why the meaning of "adequate" should be different here, the Debtors should be judicially estopped from arguing that the meaning of the word "adequate" in this context means anything other than the amount necessary to compensate a creditor for its potential loss. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) ("Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding.").

24.     The Required Deposit, unlike the Adequate Assurance Deposit, is adequate because it is analogous to the replacement lien that secured creditors receive as adequate protection for their potential diminution of value.  In fact, the Required Deposit offers less protection than the replacement lien, because the lien secures the entire claim of diminution regardless of the amount, while the Required Deposit is just an estimate of the claim and could prove to be too low.

25.     Accordingly, this Court should reject the notion that the amount of the assurance of payment for Entergy should be discounted by some assessment of the probability of a loss, just as it would reject such discounting on the amount of protection it would afford a secured creditor by a similar assessment of the probability of diminution in value.  In both cases adequacy means protecting against the worst-case scenario and not some middle ground based on a speculative discount.[4]

---

[4]   In any event, the facts do not warrant any such discount.  The Debtors' ability to pay Entergy's invoices is entirely speculative.  Although the Debtors "intend to pay all postpetition obligations owed to the Utility Companies in a timely manner and anticipate sufficient funds available to permit them to

26.     Moreover, the Required Deposit is not a guarantee of payment for services but a realistic amount determined with reference to the real exposure Entergy faces on the Entergy Account.  For example, under the ordinary billing terms and the applicable Regulations that govern the Entergy Account, Entergy reads and records usage on a meter located at the Debtors' operations approximately every thirty days (30 days of exposure).  Within seven days of a reading, a bill invoicing the past thirty days' charges is issued to the Debtors (37 days of exposure).  The Debtors then have ten to fifteen days to make a payment on those bills (47 to 52 days of exposure).  If the Debtors miss a payment, the account can then be terminated within a week or so of the invoice due date (54 to 60 days of exposure).  Accordingly, if the Debtors are unwilling or unable to make any more payments on the Entergy Accounts, approximately sixty days' charges will be unpaid from the time the meter is read, the bill is sent, the bill becomes past due, and the termination actually occurs.

27.     Based on the Debtors' historical charges and Entergy's billing practices on the Entergy Account, Entergy may have, at times, exposure on the Entergy Account totaling as much as $125,700.00.  Only the Required Deposit will adequately assure Entergy that it will receive payment for future services to the Debtors.  Should the Debtors increase the charges they incur beyond historical levels or should the cost of providing utility service increase, both matters that are outside Entergy's control, Entergy's Required Deposit could well turn out to be insufficient.

---

do so," Utility Mot. ¶ 34, they admit that they recently experienced revenues falling precipitously, "thereby draining liquidity that, one year prior, had been considered adequate to fund operations," *id.* ¶ 11.  This argument carries little weight as no debtor in a chapter 11 ever anticipates not having sufficient funds to meet its postpetition obligations.  Therefore, whether Entergy will be paid is entirely dependent on the proposed DIP facility (which has not yet been approved), under which ability to borrow will no doubt depend on numerous conditions relating to the Debtors' historically poor operating results.

28.     By requesting the Required Deposit, Entergy simply seeks to approximate its exposure and to enforce its rights under applicable non-bankruptcy law in the context of § 366 as amended.  In comparison, the Adequate Assurance Deposit in an amount equal to an estimate of two weeks of utility services is obviously pulled out of a hat and places Entergy in a worse position under § 366(c) than it would be outside of bankruptcy.

29.     Accordingly, the Required Deposit should be upheld as the amount required to satisfy Entergy, because it seeks only to approximate Entergy's exposure on the Entergy Account and actually offers less protection than the *adequate* protection offered to the Debtors' secured creditors.

**B.      The Adequate Assurance Deposit Is Materially Less Than Amounts Specifically Allowed by § 366 of the Bankruptcy Code and the Applicable Regulations.**

30.     The Adequate Assurance Deposit is not adequate under applicable Regulations, requirements of tariffs, and terms and conditions of service on file with regulatory authorities and adopted by agreement between the Debtors and Entergy.  As set forth in the Utility Motion, the Debtors propose to provide each utility company that so requests, as adequate assurance of payment, a cash deposit equal to "two (2) weeks of Utility Services, calculated based on the historical average over the past 12 months." (Utility Mot. ¶ 35.)

31.     Entergy and the other Utility Companies do not have the luxury of inventing the rules under which they operate.  While the Debtors may argue that under Entergy's interpretation of § 366(c) the Utility Companies can require an arbitrary or punitive amount of adequate assurance, nothing could be further from the truth.  Electric utilities are among the most heavily regulated businesses in the United States, and their

10

ability to demand deposits is constrained by regulatory agencies that exist, in large part, to protect the public from monopolistic overreaching.  *See, e.g.*, Rules and Regulations Governing Public Utility Service 1(B) (Mississippi Public Service Commission) ("These rules are intended to define good practice, insure adequate service, and prevent discrimination, unfair practices, and unreasonable demands.").  Accordingly, Entergy's request that it receive the Required Deposit, to which Entergy is entitled under the Regulations, before the thirtieth day of these cases is reasonable and authorized by § 366.

32.    Deposit requests in an amount based on two months' charges are expressly allowed by Regulations in Mississippi.  *See* Rules and Regulations Governing Public Utility Service, Rule 9(A)(1) (Mississippi Public Service Commission).

33.    The Regulations demonstrate the inadequacy of the Adequate Assurance Deposit, which is, at best, one-fourth of the amount authorized under applicable non-bankruptcy law.  In contrast, Entergy's Required Deposit merely reflects the two-month requirement permitted under the applicable Regulations.

**C.    The Adequate Assurance Deposit Vitiates Entergy's Rights Under § 366.**

*1)    The Adequate Assurance Deposit Impermissibly Permits the Debtors to Extend the Thirty-Day Injunction Provided in § 366(c)(2).*

34.    Before October 17, 2005, the effective date of BAPCPA, the § 366 scheme worked in three phases.  The first phase provided that a utility could not terminate services solely based on bankruptcy filing or prepetition unpaid utility charges within the first twenty days after the order for relief.  11 U.S.C. § 366(a) (2000).  The second phase provided that within that twenty-day period, the debtor must furnish some form of adequate assurance of future payment to the utility; if the debtor failed to do so, the utility could discontinue services.  *Id.* at § 366(b).  In the final phase, § 366 allowed a

11

party, typically the debtor, to move to modify the level of adequate assurance required in phase two. *Id.*

35.    BAPCPA added a new and critically important phase.  Under BAPCPA, the first two phases are no different.  However, a new phase is inserted between the second and final phases.  After the debtor tenders adequate assurance during the twenty-day period, the new phase requires (i) that the debtor provide "adequate assurance of payment . . . that is satisfactory to the utility" within thirty days of the petition date, and (ii) that the utility actually "receive" such assurance of payment.  11 U.S.C. § 366(c)(2). Thus, after the initial twenty-day period, the utility may determine for itself pursuant to applicable non-bankruptcy law whether the assurance actually received from the debtor is satisfactory.  *See In re Lucre, Inc.*, 333 B.R. 151, 154 (W.D. Mich. 2005) (subsection (c)(3) right to seek modification of adequate assurance by the court "arises only after the adequate assurance payment has been agreed upon by the parties").

36.    Earlier this year, a bankruptcy court refused the debtors' request for an order granting a "standard" utility motion.  *See* Memorandum Order, *In re Pilgrim's Pride Corp.*, No. 08-45664 (Bankr. N.D. Tex. Jan. 4, 2009) (No. 51) (attached hereto as Exhibit B).  The court reasoned that § 366(c)(2) "imposes no requirement that a utility come to the court before altering, refusing or discontinuing service. . . .  Likewise nothing in section 366 suggests that the court may set a time limit within which a utility must contest a debtor's proposal of adequate assurance or that the court may prohibit a utility from thereafter demanding further or alternate assurance."  *Id.*  Accordingly, the court denied the utility motion outright on any basis – interim or final.

37.    BAPCPA inverted the pre-BAPCPA § 366 process.  Before BAPCPA, the

debtor would tender its adequate assurance – typically nothing more than an

administrative expense claim – and the utilities would litigate to secure additional

assurances.  Now, after the first twenty days, the utility may determine for itself what

assurances the debtor must actually deliver to the utility, and the debtor must litigate to

reduce the amount of such assurances.  Both processes may lead to settlement, but by

enacting BAPCPA Congress clearly intended to provide greater protections to the utilities

during the pendency of such settlement discussions or litigation.

38.    The Debtors seek to reverse Congress' carefully constructed process in

direct contravention of the statutory language.  If a debtor has offered what it believes to

be adequate assurance under § 366(b), § 366(c) permits the utility to unilaterally reject

such assurance after the twenty-day period.  If the debtor fails to add the additional

assurance required by the utility, the utility is statutorily entitled to terminate service after

the thirtieth day of the case.  11 U.S.C. § 366(c)(2) ("A utility may alter, refuse, or

discontinue utility service if during the thirty-day period beginning on the date of the

filing of the petition, the utility does not receive from the debtor or the trustee adequate

assurance of payment for utility service that is satisfactory to the utility.").  The statutory

language is unconditional.  Congress patently intended to vest utilities with the right to

receive adequate assurance of payment *satisfactory to the utility* within the first thirty

days of a chapter 11 bankruptcy case, and the right to terminate service after thirty days

absent such assurance.

39.    Any reasonable reading of these subsections shows that the Debtors

cannot simply offer the Adequate Assurance Deposit and then, notwithstanding § 366,

13

force Entergy to comply with procedures that suit the Debtors. Instead, to avoid

termination, the Debtors must, within the first thirty days after the Petition Date, deliver

the Required Deposit into Entergy's hands or obtain an order modifying the amount of

the Required Deposit after notice and a hearing. *See* 11 U.S.C. § 366(c)(2) and (3). If,

after the thirty-day period, Entergy has not received the Required Deposit or a deposit in

an amount approved by the Court, Entergy has the unfettered right to alter, refuse, or

discontinue service. *See* 11 U.S.C. § 366(c)(2). Accordingly, the Court should not

approve the Adequate Assurance Deposit with respect to Entergy. Such approval would

impermissibly thereby enjoin Entergy from terminating service for lack of adequate

assurance after the thirtieth day from the Petition Date.

40.     The Court's Order also presents procedural problems as it arguably may

modify Section 366(c)(2) in the event that adequate assurance disputes are not resolved at

the June 25, 2009 hearing on the Utility Motion. The Order was apparently entered

contrary to Section 366(c)(3) as no notice of the Utility Motion was given to the Utilities

in this case prior to the entry of the Order. To the extent that any dispute regarding

Entergy's Required Deposit is not resolved prior to the 30th day after the Petition Date,

Entergy reserves the right to enforce any and all of its rights under Section 366, including

its right to terminate service and/or dispute whether any extension of the 30-day period

may have been properly granted in this case.

41.     No authority exists in § 366 or any other section of the Bankruptcy Code

for the Adequate Assurance Deposit. The Order impermissibly enjoins the exercise of

Utility Companies' rights through creation of extra-statutory rights in the Debtors. *See*

*United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) ("Section 105(a) does not

14

authorize a bankruptcy court to create "substantive rights that would otherwise be unavailable under the Code"); *MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Cmmc'ns, Inc.*, 262 B.R. 893, 898-99 (D. Del. 2001)) ("While Section 105(a) gives a bankruptcy court general equitable powers, those powers are limited by the provisions of the Bankruptcy Code.").  Although parties can and often do agree to extend statutorily created deadlines or forbear the enforcement of a right, Entergy does not consent to the Debtors' request for a judicial rewrite of the statutorily created termination rights in § 366(b) and (c) of the Bankruptcy Code.

> *(2)*    ***The Debtors Improperly Seek to Impose the Burden Upon Entergy to Establish a Lack of Adequate Assurance.***

42.    In determining what adequate assurance a utility is entitled to receive from a debtor, the burden of proof lies squarely with "the debtor, the petitioning party." *In re Stagecoach Enters., Inc.*, 1 B.R. 732, 736 (Bankr. M.D. Fla. 1979).  The Debtors seek to shift this burden to the Utility Companies.

43.    Whereas § 366 gives utilities the right to determine what level of adequate assurance is "satisfactory" to the utility subject to modification by the court, the Order determines that Entergy has received adequate assurance of payment regardless of whether Entergy accepts the Adequate Assurance Deposit, prevails on an objection to the Adequate Assurance Deposit, or fails to act before the June 15 deadline.  *Compare* Order 3 (deeming Utility Providers to have received adequate assurance of payment upon acceptance of the Adequate Assurance Deposit or failure to request the Adequate Assurance Deposit or timely object) *with* § 366(c)(2) (giving a utility the right to terminate service if the utility does not receive adequate assurance of payment that is "satisfactory to the utility" during the first 30 days of the case).  Pursuant to § 366,  the

15

utility – not the debtor – determines the adequate level of assurance of payment, subject

to the debtor's right to seek modification by the court.  In contrast, pursuant to the Order,

the Debtors determine the adequate level of assurance of payment, subject to Entergy's

"right" to submit to the Debtor's procedures – procedures that, not surprisingly, provide

less protection than § 366.

44.    In addition to the impermissible injunction discussed above, the Order also

require utilities seeking additional assurance of payment to file an objection with the

Court.  Any objection must "(a) be in writing, (b) set forth the amount and form of

additional assurance of payment requested, (c) set forth the location(s) for which Utility

Services are provided, (d) include a summary of the Debtors' payment history to such

Utility Company, including any security deposits, and (e) set forth why the Utility

Company believes the Proposed Adequate Assurance is not sufficient adequate assurance

of payment."  Order at 3.  Further, the objection must be received by June 15, 2009, or

the utility company "is deemed to have adequate assurance that is satisfactory to it."  (*Id.*)

45.    In contrast to the evidentiary requirements set forth in the Order,

§ 366(c)(3)(A) provides that the court may, upon the request of an interested party, hold a

hearing to determine whether an assurance of payment is adequate.  However, the court is

expressly forbidden to consider the evidence the Order requires from the utility

companies. *See* 11 U.S.C. § 366(c)(3)(B)(ii) (prohibiting a court from considering "the

payment by the debtor of charges for utility service in a timely manner before the date of

filing of the petition").  Accordingly, in addition to shifting the evidentiary burden to

Entergy as a condition to Entergy exercising its rights, the Order not merely permits but

requires the use of inadmissible evidence in evaluating the adequacy of assurance of

payment.  The Court is expressly prohibited from even considering the Debtors' payment history, let alone permitting that history to influence the assessment of the reasonableness of Utility Companies' requested adequate assurance.

46.    In conclusion, the Utility Motion as to Entergy should be denied, and Entergy should remain free to terminate services should it not receive the Required Deposit on or before the thirtieth day of these cases.

WHEREFORE, Entergy respectfully requests that this Court enter an order: (i) compelling the Debtors pursuant to § 366 to immediately furnish to Entergy an aggregate postpetition cash deposit of $125,700.00 or removing any barrier to Entergy's termination of services pursuant to § 366(c)(2) and (ii) granting such further relief as is appropriate.

Dated:  June 9, 2009                    DORSEY & WHITNEY LLP

                                         /s/ Eric Lopez Schnabel
                                        250 Park Avenue
                                        New York, New York 10177
                                        Telephone:  (212) 415-9200
                                        Facsimile:  (212) 953-7201
                                        Eric Lopez Schnabel (ES 5553)
                                        Attorneys for Entergy

## EXHIBIT A

**RULES AND REGULATIONS GOVERNING PUBLIC UTILITY SERVICE
(MISSISSIPPI PUBLIC SERVICE COMMISSION )
RULE 9**

**(See attached.)**



**Rules and Regulations Governing Public Utility Service > 9**

Issued by the MISSISSIPPI PUBLIC SERVICE COMMISSION

*Compiled with Amendments - Effective March 1, 1993*

No Call Program

Water

Sewer

Gas

Electric

Telecom

Complaints

SEARCH

ARCHIVES

### RULE 9. CUSTOMER DEPOSITS

A. DEPOSIT REQUIREMENTS

(1) REGULAR CUSTOMER CLASSIFICATION Each utility may require from any customer or prospective customer a cash deposit to guarantee the payment of any such bills due or which may become due from such customer and safe return of all property belonging to the utility installed at the customer's premises or elsewhere. Such required deposit shall not exceed an amount equivalent to a single estimated average bill in the case of residential customers and two estimated maximum bills for any other customers; provided, however, for all utilities as defined in 77-3-3(d)(3) of the Mississippi Code of 1972, the required deposit shall not exceed the average final bill of customers with similar class and type of service. Each utility may require a reasonable deposit to guarantee safe return of personal property placed in the possession of the customer.*

(2) SPECIAL CUSTOMER CLASSIFICATION Upon request, each utility shall refund the Cash Deposit collected from a residential customer or waive any requirement of Cash Deposit from a residential customer when such person meets the following specific criteria:

(a) Presents satisfactory proof that his or her age is sixty (60) years or more. A birth certificate shall be considered satisfactory proof of age.

(b) indicates that he or she is a primary user of the utility service and subscribed for such service in his or her own name.

(c) Affirms responsibility for the payment of bills for the utility.

(d) Has demonstrated a reasonable payment pattern by having had no balance carried forward from one month's bill to the next during the prior twelve month period. In the event that such deposit has been refunded or waived and the customer's payment pattern changes from the foregoing to one of greater frequency of past due bills or bills with prior balances, customers will be required to restore the deposit so refunded or waived plus any additional amount required to guarantee payment up to the limits set forth in paragraph (1 ) above.**

B. RECORDS OF DEPOSIT Each utility having on hand deposits from customers shall keep records to show (1 ) the name of the customer making the deposit, (2) the account number or other identification of the premises occupied by the customer making the deposit, (3) the amount and date of making the deposit, and (4) a record of each transaction concerning the deposit.

C. RECEIPTS Each utility shall issue to every customer from whom a deposit is received a non-assignable receipt. Each utility shall provide reasonable ways and means whereby the depositor who makes application for the return of his deposit or any balance to which he is entitled but is unable to produce the original receipt may receive his deposit or balance.

D. USE OF DEPOSIT Upon final discontinuance of service, the utility shall apply such deposit to any amount due by the customer for service and for damage or loss of all utility property. If any balance is due the customer, it shall be promptly refunded.

E. UPON SALE OR TRANSFER OF UTILITY Upon sale and transfer of any utility or one or more operating units thereof, the seller shall file with the Commission, under oath, a list showing the names of all customers served by such utility (or such unit, or units) who have to their credit a deposit, the date such deposit was made and the amount thereof.

F. ADDITIONAL DEPOSIT A new or additional deposit may be required upon reasonable written notice of the need for such a requirement in any case where a deposit has been refunded or is found to be inadequate as above provided for, or where a customer's credit standing is not satisfactory to the utility. The service of any customer who fails to comply with these requirements may be discontinued upon reasonable written notice.

G. INTEREST

(1) Cash deposits made by customers which are held by any public utility for one (1) year or more, shall earn simple interest that is no less than the twelve month average of the 10-year Treasury Note Yield as published by the Federal Reserve System, but not to exceed the general interest rate established by Mississippi Code Ann. §75-17-1(1). The applicable interest rate will be determined and posted on the Commission's website on or before December 15th of each calendar year and will be effective for the prospective year.***

(2) All accrued interest held by a utility organization shall be paid in cash or credited to the customer's account on or before July 1st of each successive third year during which service is connected, The principal sum of the Cash Deposit and any unpaid interest shall be applied to the customer's final bill, and any excess amount shall be paid to the customer in cash. Cash Deposits held for less than one full year shall earn no interest.

*Rule 9. A.(1), as amended by Order of the Commission in Docket U-3761. effective February 5, 1980.

**Rule 9. A.(2). as amended by Order of the Commission in Docket U-3468, effective May 8, 1978.

***Rule 9(G)(1) Amended by Order of the Commission in 2003-AD-161, effective October 1, 2003 ( Seventh Amendment)

Previous / Table of Contents / Next

Return

| Executive Secretary | | MPSC | | MPUS | | Site Map | | Related Links | | Contact Us | | Home Page |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## EXHIBIT B

*IN RE PILGRIM'S PRIDE CORP.*, NO. 08-45664
(BANKR. N.D. TEX. JAN. 4, 2009) (NO. 51)

(See attached.)

2009 Bankr. LEXIS 2, *; 51 Bankr. Ct. Dec. 3

LEXSEE



Analysis
As of: Mar 27, 2009

**In re PILGRIM'S PRIDE CORPORATION, et al., Debtors.**

**Chapter 11, Case No. 08-45664 (DML), JOINTLY ADMINISTERED**

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION**

**2009 Bankr. LEXIS 2; 51 Bankr. Ct. Dec. 3**

**January 4, 2009, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Before the court was a bankruptcy debtor's motion pursuant to 11 U.S.C.S. §§ 105(a) and 366 to (i) approve debtors' proposed form of adequate assurance; (ii) establish procedures for resolving objections by utility companies; and (iii) prohibit utilities from altering, refusing, or discontinuing service.

**OVERVIEW:** Agreements were reached with each of the objecting utilities, and the court approved the arrangements and held that debtors and the objecting parties were bound by their agreements. The objecting parties had each been afforded "adequate assurance of payment" of post-petition billings as required by 11 U.S.C.S. § 366 and each was barred from altering, refusing or discontinuing utility service to debtors under 11 U.S.C.S. § 366(c)(2) on the basis that it did not received satisfactory adequate assurance of payment. However, as to the utilities that had failed to object, nothing in 11 U.S.C.S. § 366 suggested that the court could set a time limit within which a utility had to contest a debtor's proposal of adequate assurance or that the court may prohibit a utility from thereafter demanding further or alternate assurance. Thus, the court concluded that it could not grant the relief debtors sought in the motion (that any utility that failed to object to the motion was barred from asserting that the assurances of payments proposed in the motion were not adequate).

**OUTCOME:** The agreements with the objecting parties were approved. Any utility that did not object to the motion, and did not receive adequate assurance of payment for utility service that was satisfactory to such utility,

could alter, refuse or discontinue utility service to debtors. The court reserved jurisdiction to determine whether any utility seeking to alter, refuse or discontinue utility service had complied with applicable non-bankruptcy law.

**CORE TERMS:** assurance, notice, utility service, non-bankruptcy, discontinue, applicable law, objecting parties, satisfactory, termination, reasonable notice, discontinuing, prepetition, terminate, altering, objecting, customer, plain meaning, discontinuance, commencement, alteration, announced, approve, default

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Administrative Powers > Utility Services*
[HN1]See 11 U.S.C.S. § 366(c)(2).

*Bankruptcy Law > Case Administration > Administrative Powers > Utility Services*
[HN2]See 11 U.S.C.S. § 366(c)(3)(A).

*Governments > Legislation > Interpretation*
[HN3]A court is governed by the plain meaning of a statute.

*Bankruptcy Law > Case Administration > Administrative Powers > Utility Services*

2009 Bankr. LEXIS 2, *; 51 Bankr. Ct. Dec. 3

[HN4]The plain meaning of 11 U.S.C.S. § 366(c)(2) is that a utility may alter, refuse or discontinue service if it does not receive adequate assurance of payment for utility service that is satisfactory to the utility. 11 U.S.C.S. § 366(c)(2) imposes no requirement that a utility come to the court before altering, refusing or discontinuing service, though clearly Congress knew how to condition an action upon first seeking a hearing (11 U.S.C.S. §§ 362, 1104(a) and 1113(d)). Likewise nothing in 11 U.S.C.S. § 366 suggests that the court may set a time limit within which a utility must contest a debtor's proposal of adequate assurance or that the court may prohibit a utility from thereafter demanding further or alternate assurance.

*Bankruptcy Law > Case Administration > Administrative Powers > Utility Services*

[HN5]If the Bankruptcy Code does not restrict actions by a utility once the 30 days specified in 11 U.S.C.S. § 366(c)(2) have passed, neither does it excuse a utility from complying with the requirements of other applicable law before terminating service to a customer, including one of debtors. State or local law typically requires notice prior to termination of service by a utility. Even absent a notice period specified in applicable law a utility may not terminate service to a customer without giving the customer reasonable notice.

*Bankruptcy Law > Case Administration > Administrative Powers > Utility Services*

[HN6]If a utility elects to terminate service to a debtor under the Bankruptcy Code, it may not, in doing so, rely on notice given prior to the commencement of the debtor's bankruptcy case. Termination in reliance on such a prepetition notice (or based upon a prepetition failure to pay or other prepetition default) would violate 11 U.S.C.S. §§ 362(a)(1) and 362(a)(6). Termination (alteration, refusal or discontinuance) of service by a utility based on a debtor's (or trustee's) failure to provide adequate assurance of payment, may occur only after such notice as is required under other non-bankruptcy applicable law, or, in any event, after reasonable notice. The bankruptcy court, of course, has and retains the jurisdiction to determine whether notice of a termination of service to any debtors by a utility meets the requirements of applicable law or reasonableness.

COUNSEL:  [*1] For Pilgrims Pride Corporation, fka WLR Foods, Inc., fka AgraTech Seeds Inc., fka Wampler Foods, Inc., fka Gold Kist Inc., fka Pilgrims Pride Corporation of Georgia, Inc., fka GK Peanuts, Inc., fka WLR, fka Pilgrims Pride Corporation of Virginia, Inc., fka Pilgrims Pride Corporation of Delaware, Inc., Pittsburg, TX, Debtor: Elisa R. Behar Lemmer, New York,

NY; Gary T. Holtzzer, Weil, Gotshal & Manges LLP, Dallas, TX; Stephen A. Youngman, Weil, Gotshal & Manges, Dallas, TX; Victoria Vron, Weil Gotshal & Manges LLP, New York, NY.

For Official Committee of Unsecured Creditors, Creditor Committee: Jason S. Brookner, Andrews Kurth LLP, Dallas, TX; Jonathan Irvin Levine, Paul N. Silverstein, Andrews Kurth LLP, New York, NY.

JUDGES: D. Michael Lynn, United States Bankruptcy Judge.

OPINION BY: D. Michael Lynn

OPINION

MEMORANDUM ORDER

[Related to Docket No. 51]

Before the court is the *Debtor's Motion Pursuant to Sections 105(a) and 366 of the Bankruptcy Code to (i) Approve Debtors' Proposed Form of Adequate Assurance; (ii) Establish Procedures for Resolving Objections by Utility Companies; and (iii) Prohibit Utilities from Altering, Refusing, or Discontinuing Service* (the "Motion") [1] filed by Debtors. [2] By the Motion Debtors [*2] seek certain relief respecting utilities that serve Debtors' various facilities. A number of objections were filed to the Motion [3] and the court held a hearing on the Motion on December 30, 2008 (the "Hearing").

    1 The Motion was filed at docket no. 51.
    2 As used herein, the term "Debtors" shall have the same meaning as in the Motion.
    3 Objections to the Motion were filed by Carroll Electric Membership Corporation, Jackson Electric Membership Corp., Rayle Electric Membership Corp., South Carolina Electric & Gas Co., Public Service of North Carolina, Inc., Scana Energy Marketing of Georgia, Scana Energy Marketing, Inc., Southeast Alabama Gas Dist., Deep East Texas Electric, Inc., Upshur County Rural Electric Co-Op, Corp., Duke Energy Carolinas, LLC, Shenandoah Valley Electric Cooperative, CenterPoint Energy Gas Transmission Co., CerterPoint Energy Entex, CenterPoint Energy Arkla, CerterPoint Energy Services, Inc., Alleghney Power, Florida Power Corp. d/b/a Progress Energy Florida, Carolina Power & Light Co. d/b/a Progress Energy Carolinas, Piedmont Natural Gas, Virginia Electric and Power Co. d/b/a Dominion Virginia Power, American Electric Power, Municipal and Cooperative Utilities, Alabama [*3] Power Co., Bicounty Water Supply,

09-50026-mg    Doc 511    Filed 06/09/09    Entered 06/09/09 12:27:00    Main Document
Pg 24 of 25

2009 Bankr. LEXIS 2, *; 51 Bankr. Ct. Dec. 3

Wood County Electric Cooperative, Bowie Cass Electric Cooperative, Additional Municipal and Cooperative Utilities, TXU Energy Retail Company, LP, El Dorado Water Utilities, City of Sumpter, South Carolina, Marshall County Gas District and Improvement Authority for the City of Fort Payne.

At the Hearing Debtors advised the court that, following discussions with the objecting parties, agreements had been reached with each and, in light of this, all objections to the Motion were withdrawn. The court invited parties objecting to the Motion (most of which had announced appearances at the Hearing) to address the Motion, but no party did so. The court therefore announced it would approve the arrangements agreed to between Debtors and each objecting party, and the court now reiterates that approval, holding that Debtors and the objecting parties are bound by their agreements and that the objecting parties have each been afforded "adequate assurance of payment" of post-petition billings as required by section 366 of the Bankruptcy Code (the "Code") [4] and each is therefore barred from, altering, refusing or discontinuing utility service to Debtors or any of them [*4] under section 366(c)(2) of the Code on the basis that it did not receive satisfactory adequate assurance of payment.

4   11 U.S.C. §§ 101, et. seq.

The objecting parties, however, do not constitute the entire universe of utilities that serve Debtors. Debtors accordingly ask in the Motion that the court conclude that any utility that failed to object to the Motion is now barred from asserting that the assurances of payments proposed in the Motion are not adequate. While Debtors propose a loop hole for any utility that may not have had notice of the Motion, the effect of granting the relief sought in the Motion would be to force upon the non-objecting utilities "adequate assurance of payment" deemed sufficient by Debtors.

In determining the relief it may grant upon the Motion, the court is governed by Code § 366(c)(2). Section 366(c)(2) states:

[HN1]Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in section (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service [*5] that is satisfactory to the utility.

See 11 U.S.C. § 366(c)(2).

While section 366(c)(4) (which deals with offset of prepetition utility deposits) is not relevant to the court's disposition of the Motion, section 366(c)(3)(A) states [HN2]"On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2)." See 11 U.S.C. § 366(c)(3)(A).

[HN3]The court is governed by the plain meaning of a statute. See Lamie v. United States Trustee, 540 U.S. 526, 537, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004), United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989). [HN4]The plain meaning of section 366(c)(2) is that a utility "may alter, refuse or discontinue...service" if it does not receive "adequate assurance of payment for utility service that is satisfactory to the utility." Section 366(c)(2) imposes no requirement that a utility come to the court before altering, refusing or discontinuing service, though clearly Congress knew how to condition an action upon first seeking a hearing (see, e.g., Code §§ 362, 1104(a) and 1113(d)). Likewise nothing in section 366 suggests that the court may set a time limit within which a utility must contest a debtor's [*6] proposal of adequate assurance or that the court may prohibit a utility from thereafter demanding further or alternate assurance. The court thus concludes that it cannot grant relief to Debtors as sought in the Motion.

At first blush, this would seem to leave Debtors' operations poised precariously on the verge of disaster. If a critical utility should determine that the assurance of payment proposed by Debtors is not "satisfactory" nothing in section 366 prevents that utility from altering, refusing or discontinuing service to Debtors. The consequences of an unexpected termination of utility service to one of Debtors could be catastrophic. As stated in the Motion, Debtors' business requires uninterrupted service from certain utilities, and, if a critical utility may terminate service to one of Debtors without notice, substantial loss would likely occur.

The court concludes, however, that the situation is not so desperate as it first appears. [HN5]If the Code does not restrict actions by a utility once the 30 days specified in section 366(c)(2) have passed, neither does it excuse a utility from complying with the requirements of other applicable law before terminating service to a customer, [*7] including one of Debtors. [5] State or local law typically requires notice prior to termination of service by a utility. [6] Even absent a notice period specified in applicable law a utility may not terminate service to a customer without giving the customer reasonable notice.

5   Congress knew how to avoid the application of applicable of non-bankruptcy law. See, e.g., Code §§ 362, 1145, 545 and 524. Had Congress wished to exempt utilities action under section 366 from applicable non-bankruptcy law, it would have said so.

6   See, e.g., 16 TEX. ADMIN. CODE § 25.29 (1999) (Disconnection of Service); Alabama Public Service Commission General Rule 12 (1998) (found                    at http://www.psc.state.al.us/Administrative/GenRules 01 10 05.pdf).

Moreover, [HN6] if a utility elects to terminate service to a debtor under the Code, it may not, in doing so, rely on notice given prior to the commencement of the debtor's bankruptcy case. Termination in reliance on such a prepetition notice (or based upon a prepetition failure to pay or other prepetition default) would violate Code §§ 362(a)(1) and 362(a)(6). Termination (alteration, refusal or discontinuance) of service by a utility based on a debtor's (or trustee's) failure [*8] to provide adequate assurance of payment, the court thus holds, may occur only after such notice as is required under other non-bankruptcy applicable law, or, in any event, after reasonable notice. This court, of course, has and retains the jurisdiction to determine whether notice of a termination of service to any Debtors by a utility meets the requirements of applicable law or reasonableness.

As Debtors must therefore have at least reasonable notice of any utility's decision to terminate service, Debtors will have an opportunity to negotiate adequate assurance with the utility or, if necessary, to invoke Code § 366(c)(3) to obtain a determination from the court respecting adequate assurance. Pending a determination under section 366(c)(3), the court can, if necessary, provide temporary injunctive relief to preserve Debtors' estates and their respective businesses. Thus, full force and effect may be given to Code § 366 without undue risk to Debtors and their economic constituencies.

For the foregoing reasons, the Motion is disposed of as follows:

It is:

**ORDERED** that the agreements regarding adequate assurance of payment among Debtors and the parties objecting to the Motion are APPROVED [*9] and the parties objecting to the Motion are deemed to have received from Debtors adequate assurance of payment within the meaning of Code § 366(c)(2) and, therefore, may not alter, refuse or discontinue utility service to any of Debtors absent a default in postpetition payment by such Debtor (in which case such utility may act as permitted by applicable non-bankruptcy law); and it is further

**ORDERED** that any utility that did not object to the Motion which provides service to any of Debtors, which utility did not, pursuant to the Motion receive adequate assurance of payment for utility service that is satisfactory to such utility, may, after 30 days after the commencement of these cases and only after compliance with all applicable non-bankruptcy law, including giving any notice that is required under applicable law and is in any event no less reasonable, alter, refuse or discontinue utility service to Debtors or any of them; and it is further

**ORDERED** that this court reserves jurisdiction to determine whether any utility seeking to alter, refuse or discontinue utility service to Debtors or any of them has complied with applicable non-bankruptcy law, including giving required, or at least [*10] reasonable notice to Debtors of such alteration, refusal or discontinuance; and it is further

**ORDERED** that nothing herein shall prejudice the rights of Debtors or any of them or any other party in interest to seek appropriate relief from this court under Code § 366(c)(3) or Code § 105(a), including in the event any utility should give notice of its intent to alter, refuse or discontinue services to Debtors or any of them.

**Signed January 4, 2009**

/s/ D. Michael Lynn

**United States Bankruptcy Judge**