UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                        Chapter 1*1*

    General Motors Corporation

                                       Case No. 09-50026 (_____)


                            Debtor(s).
-----------------------------------------------------------x

## LOSS-MITIGATION REQUEST – BY A CREDITOR

I am a creditor (including a holder, servicer or trustee of a mortgage or lien secured by property used by the Debtor ~~as a principal residence~~) of the Debtor in this case. I hereby request loss mitigation with respect to *[Identify the property, loan and creditor(s) for which you are requesting loss mitigation]*:

122 BONDS, CUSIP#370 442 AJ4


**SIGNATURE**

I ~~have~~ will reviewed the Loss Mitigation Procedures *when they are located*, and I understand that if the Court orders loss mitigation in this case, I will be bound by the Loss Mitigation Procedures. I agree to comply with the Loss Mitigation Procedures, and I will participate in loss mitigation in good faith. If loss mitigation is ordered, I agree to provide the Court with a written or verbal status report stating whether or not the parties participated in one or more loss mitigation sessions, whether or not a settlement was reached, and whether negotiations are ongoing. I agree that **I will not require the Debtor to request or cause dismissal of this case** as part of any resolution or settlement that is offered or agreed to during the loss mitigation period.

Sign: *Douglas M. Chapman*          Date: June 2, 2009

Print Name:              Douglas M. Chapman

Title:                   Owner of Bonds

Firm or Company:         NA

Telephone Number:        (714)838-9632

E-mail address (if any): suendoug@att.net

*See attached Statement.*

June 2, 2009

To the Honorable Judge Robert Gerber
US Bankruptcy Court of New York

RE: GM's Chapter 11 filing, case 09-50026.

Judge Gerber:

My wife and I own bonds in General Motors. Reading and watching the events surrounding the struggle of the company brought us to the conclusion that we are being treated very unfairly as bond owners, and that we and the public are being treated unfairly by our government.

Our system of capitalism is being shoved aside for political purposes by a congress and president after wrongly claiming a public good. The president has stated that "some folks must sacrifice," but he does not say why these political friends of his (such as those in the labor unions), should profit at our expense, both by a late infusion of tax dollars and by a loss of our bonds' value.

But, more importantly, I do not believe Chapter 11 law in the US Bankruptcy Code is being followed by the government team who is directing GM.

I believe I can outline a bankruptcy plan for GM that can work without further government intervention.

First, I would like to point out that this bankruptcy process, as it is being handled, will be seen by the bond investor for decades in the future as a possible outcome for his new investment that cannot be properly evaluated or mitigated through planning whenever a bond is offered by any large company. This produces the opposite result in terms of investor confidence that would occur if investor saw the government supporting the bond

1

holders' claim to GM assets, rather then diluting the bonds' value as has occured in this case.

The plan before you has made the late investment of government dollars senior to all other claims, with a result that will be chilling far beyond this one bankruptcy case.

The outlined remedy is also a threat to the investor's confidence when decisions are made regarding the formation of capital by companies when stock is offered to the public. How can the investor rely on his investment being treated normally by our laws when this experience shows by this case, if approved, that the investor can be competing against his own government through his investment? Certainly, Ford or other car companies will see the new GM proposal by this new filing as producing a company majority owned by the government. Even though statements are made that would indicate some distance would be maintained between government officials and the company, I have no doubt company officials will be called to testify before congressional committees, and other debates will give preference information to the new GM company that will suggest a different direction at the very least regarding management decisions. This is called "micro-managing." This result cannot be avoided in the future.

Finally, how can we hold up this process to the rest of the developing world as an shining example of capitalism at it best? We cannot!

My plan for the Chapter 11 bankruptcy process for General Motors:

Step 1: Existing common stock disposition.

Declare a 1 for 100 reverse stock split that will increase the value of each outstanding share of the company, and leave existing shareholders with some stake in the company (or some other ratio based on your oversight of the evaluation of debt and total capital assets). The same common shares can now be used for the following steps. I am assuming the new post reverse split would generate a $75 per share valuation

2

approximately. Of course, the existing shareholders could be wiped out entirely, but I do not believe this is the best result. If possible, some equity should be recognized as owned by the existing shareholders.

Step 2: Converting bond obligations to stock.

Determine which outstanding debts have a claim on the company's capital assets and those debts that do not have such a claim and should be cancelled. I believe the bond debt clearly has a claim on GM's capital assets, and senior to common, but the funds provided by the government as working capital were simply a loan that were a substitute for selling common stock to add working funds that otherwise would have come from common stock sales. These finds should be considered as no more senior than common stock, or cancelled. The government's funds not only postponed the bankruptcy (that should have been filed last November), but badly harmed the standing of the bond holders' claims on those assets, and perhaps the common owners' claims as well.

When bond owners made their purchase of a bond backed by the company's fixed assets, it was made without the understanding that the government would come along with a large infusion of funds and then make a claim on those same limited fixed capital assets of the company. The questions before you are: Was the government's investment characterized as preferred shares or similar to a bank loan? And did the government identify fixed assets over and above the assets backing the outstanding bonds that could collateralize this new government funding? If so, then bond holders should be fully repaid. If either of these question cannot be answered properly, then your honor can and should reduce or dismiss this government debt through bankruptcy.

Step 3: Issuing of warrants.

Issue common shares to the bond owners together with purchase rights or warrants (which should be separately free-trading) that can be used by the bond owner to purchase one share of common stock for each warrant. I propose that 20 shares of the new post-

3

split stock should be issued for each bond of $1000 face amount including accrued interest at the time of filing. For each share of stock issued, the stock should be accompanied by several warrants. The warrants should give the holder the right to purchase stock at slightly less than the indicated value of $50 per share used for the bond conversion. I also suggest $45 for each warrant that would convert to one share of stock. I suggest three to six warrants should be issued for each share of stock that is distributed to bond holders depending on the company's requirement for funds. Of course, the warrant owner would not have to exercise the warrant, but could sell it or let it expire. If sold, the buyer could then exercise the warrant. The warrants can be laddered with respect to their expiration date, such as a near expiration of 45 days, one at 90 days, and then perhaps one year. [The longer warrant could be contingent on the conversion of the shorter warrants, so they could be attached to them at your option. In the example below, I am treating them as separate.]

For example, if three warrants are issued for each share issued to bond owners at the $50/share value, and one A warrant for 45 days, one B warrant for 90 days, and one C warrant for one year, then one can calculate at least the maximum capital contributed if all warrants are exercised, although some may expire. In time the market will decide what support it will give to the company, given the management's working plan which should be made public given this alternative market funding source.

Optionally, a warrant could also be issued to all shareholders which would included the holders of the shares resulting from the reverse split. Per the filing, 610 million pre-split common shares are outstanding, which is reduced to 6.1 million after the reverse split. Warrants issued to these owners could result in additional funding.

For the $27 billion of bonds, the resulting shares issued would result in 540 million shares issued to bond holders ($27 billion divided by $50). The A and B warrants, if fully exercised, would result in two times this amount or 1.08 billion shares. The A and B warrants would produce, within 90 days, up to $48.6 billion. One half of this would be available in 45 days of up to $24.3 billion.

4

Of course, the C warrants would produce another $24.3 billion in one year.

Another number warrants could be issued if this plan is found to fall short of providing the required funds (A through D, for example, or A through F). Also, another ratio between common and warrants could be employed, such as one warrant per each 10 shares of common but exercised at the same price.

Although the funds projected to be raised by this plan seem quite large, please note that Bank of America has raised nearly $30 billion from the capital market in the last month. The capital markets are capable of providing these funds, regardless of what is suggested by government representatives. GM can also raise the required capital amount given that the company will now be viewed by the investor has having no debt. In addition, labor costs that will be now much more equal to the labor costs of many other manufacturing companies in the same communities where GM operates, unlike their past labor costs. This will be seen as more positive for the investor than has been the case in the past.

If the company finds that more funds have been raised than are required after some time has elapsed, then it can elect to repurchase stock on the capital markets, thereby returning the money back to the investor, and supporting the stock by reducing the stock outstanding. This has the natural effect of increasing the value of the stock for the investor. Of course, if the market price is too high for its stock, the company could put aside funds for long-term capital purposes or later repurchase of common stock.

Step 4: Dealer rights.

Declare that the company must honor their obligation to supply product to existing dealers under clear terms that will not require undue capital from GM. Each dealer should provide its own financing for product and other operations at the dealer sites. The support of dealers by GM by providing funding or financing should be limited by clear statements to the dealers. The marketplace, in this case the dealer, should determine if

that dealer should to continue supplying product to their community, and not the company. The company should be instructed to price its product simply by calculating what price is needed to support its costs, plus its reasonable profit. Since the normal practice is to list the suggested retail price on the product, your honor should insist that this suggested price not be adjusted by region or by dealer preference. Dealers should be free to raise or lower the suggested price to their customers depending on market forces each dealer faces. Dealers have also invested much of their capital in their facilities, and through their franchise agreement should have a claim on at least continued dealer pricing, if not on GM assets or GM financial support. Dealers should be allowed to decide if and when they can continue to sell GM products rather then suffering a loss of franchise pricing beyond their control. Forcing dealers to close should not be seen as a necessary ingredient to increase sales of GM products. Clearly, fewer dealers would reduce the exposure of GM's products to the marketplace, so this reduced exposure would normally reduce sales, not increase those sales.

Step 5: Product pricing and dealer obligations.

Order that the new GM company shall compute the new pricing for each product that can be supported by the company for its dealer network given the new cost structure. Declare that GM shall rebate the difference between existing unsold dealer inventory that was paid for by the dealer at pre-bankruptcy prices and the new published dealer price for each identical product. This will make whole dealers that bought product in good faith prior the bankruptcy. The move also helps to provide funds to dealers which can be used to purchase new product as sales occur.

Step 6: Labor agreement.

Order that the labor agreement previously negotiated with the government operatives working with GM shall be set aside by the bankruptcy. Also, a reduction of wages shall be put into place which reflects the labor wages prevailing in similar labor processes in

6

the regions where GM operates. This would require some study which could be done with your review.

Step 7: Pension agreement.

Declare that the pension benefits vested in employees of the company shall be turned over to the Pension Benefit Guarantee Corporation, and that going forward a 401K savings program will be offered to take the place of the defined benefit pension for existing employees and new hires. Order that going forward no pension will be offered to current and future new hires for at least ten years. This will give investors more confidence in their converting of the warrants that undue pressure will not be made on the capital of the company. Currently, most large companies are eliminating their defined benefit pension plans and offering instead the defined contribution 401K plans. This simply matches this trend, which I believe is a good trend for both the employee and company. Employees that do not have vesting in the previous pension plan could be offered some 401K deposits to offset the loss of accumulated time toward the pension, which was not vested at the time of filing for Chapter 11.

Step 8: Employee health benefits.

Require the company to find health insurance that requires a co-pay amount to be paid by the employee. Such policies are the norm offered by large companies in our country and are less costly then the benefit current in place. This excessive health care cost born by the company in the past has caused too much burden for the company and one of many reasons the company is less competitive. GM should be required to change this benefit as well.

Step 9: Loss of assets through closed plants and layoffs.

Charge the company with re-evaluating the plans to lay off 20,000 employees (as has been widely reported in the press) and re-evaluate the plans to close specific plants.

Allow the new costs and pricing to take effect and let the market dictate which products will be viable in the future. These closings and layoffs can wait a short time without materially affecting the outcome, but assets could be lost through the forced closing process described to date.

Step 10: Supplier pricing and past debt.

Require GM to review all supplier pricing agreements and agree to pay a portion of supplier debt that can be justified through a review of continued support of GM components and better pricing bids for future supply to GM.

These are the main steps that have come to my mind to date. I hope these ideas are useful.

About myself:

I keep thinking that I would like to be a part of the process, even helping the company improve its products. I have spent 45 years in mechanical and electrical projects for the aerospace industries. One of the things we learn to carefully consider in the aerospace designs is reliability and safety, as well as offering a long life for the designs. I recently retired from Rockwell Collins, which is a large producer of aerospace products.

I don't see my role in the company except perhaps serving on the governing board, or perhaps some role in producing better design guidelines for improving the company's products. I would love to go through the company's designs and find areas where those designs could be improved, producing more quality for the customer and end user. This process could produce more demand for the company's product if properly described to the marketplace as changes are implemented, providing real quality improvements that are actually made and which can be documented clearly. I suppose this process will be left to others. It should start now.

8

I currently serve on a governing board of a small water district in my area, so I would not be able to move to another state without leaving that board, and my wife Sue informs me that she could not leave her grandchildren to move to some distant location. Oh will, it was an interesting thought at least.

Respectively,

*Douglas M. Chapman*

Douglas M. Chapman
13252 Fairmont Way
Santa Ana, CA 92705-1863
Home phone: (714)838-9632