EXHIBIT A

SHAREHOLDER AND OPERATIONS AGREEMENT

**SHAREHOLDERS AND OPERATIONS AGREEMENT**

**BETWEEN**

**PENTASTAR AVIATION, LLC**

**AND**

**GENERAL MOTORS CORPORATION**

Dated as of October __, 2001

# TABLE OF CONTENTS

Page

**ARTICLE I. Operation of the Company** ................................................................2
    **1.1 Purpose of the Company** ................................................................2
    **1.2 Aircraft** ................................................................................................2
    **1.3 FAA and DOT Approvals** ................................................................2
    **1.4 Pentastar Business Opportunities.** ................................................2
    **1.5 Growth of Operations** ......................................................................4
    **1.6 Use of Aircraft** ..................................................................................4
    **1.7 Pilot Training** ....................................................................................5
    **1.8 Use of GM Name.** ..............................................................................5

**ARTICLE II. Capitalization and Financing** ..........................................................6
    **2.1 Additional Capital** ............................................................................6
    **2.2 Other Financing** ................................................................................6
    **2.3 Annual Budgets** ................................................................................7
    **2.4 Citizenship Requirements** ..............................................................8

**ARTICLE III. Management of the Company** ..........................................................8
    **3.1 Board of Directors** ............................................................................8
    **3.2 Actions of the Board** ........................................................................9
    **3.3 Officers** ............................................................................................12
    **3.4 Shareholders** ..................................................................................12

**ARTICLE IV. Shareholder Rights** ..........................................................................12
    **4.1 Transfer Restriction** ......................................................................12
    **4.2 Transfers to Affiliates** ....................................................................13
    **4.3 Put and Call Rights** ........................................................................13
    **4.4 Encumbrances** ................................................................................16
    **4.5 Recordation of Transfers** ..............................................................18
    **4.6 Effect of Attempted Transfer in Violation of Agreement** ..........18
    **4.7 Legend** ............................................................................................17
    **4.8 Non-Exclusive License** ..................................................................17

**ARTICLE V. Certain Obligations of Pentastar and GM** ......................................18
    **5.1 Citizenship Change** ........................................................................18

5.2 Nonsolicitation..................................................................................................18

ARTICLE VI. Accounting ........................................................................................19
6.1 Fiscal Year, Financial Statements ......................................................19
6.2 Access .................................................................................................19
6.3 Confidentiality ....................................................................................20

ARTICLE VII. Services ...........................................................................................22
7.1 Services...............................................................................................22
7.2 Services Agreement ............................................................................23
7.3 Agreement for FAR 135 Operations ..................................................23
7.4 Insurance ............................................................................................23

ARTICLE VIII. Definitions ....................................................................................23

ARTICLE IX. General .............................................................................................27
9.1 Modification, Waiver .........................................................................27
9.2 Entire Agreement, Exclusivity of Certain Provisions .......................27
9.3 Notices ...............................................................................................27
9.4 Assignment .........................................................................................29
9.5 No Third Party Beneficiaries .............................................................29
9.6 Severability .........................................................................................29
9.7 Counterparts; Facsimile Transmission ..............................................29
9.8 Headings, Table of Contents ..............................................................30
9.9 Governing Law ...................................................................................30
9.10 Regulation References ......................................................................30
9.11 Termination .......................................................................................30
9.12 Settlement of Disputes .....................................................................30

# SHAREHOLDERS AND OPERATIONS AGREEMENT

THIS SHAREHOLDERS AND OPERATIONS AGREEMENT ("Agreement"), made as of this ___ day of October, 2001, between Pentastar Aviation, LLC, a Michigan limited liability company ("Pentastar"), and General Motors Corporation, a Delaware corporation ("GM"), shareholders of Automotive Air Charter, Inc., a Delaware corporation (the "Company"). Pentastar and GM are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Pentastar and GM have entered into a Stock Purchase Agreement dated of even date herewith (the "Stock Purchase Agreement"), pursuant to which GM will sell, and Pentastar will purchase, the amount of Shares (as defined therein) necessary to accomplish the following ownership percentages in the Company: Pentastar to own 75% of the Company, and GM to own 25% of the Company; and

WHEREAS, Pentastar and GM wish to delineate their rights and obligations as shareholders of the Company.

NOW, THEREFORE, in consideration of the mutual promises and benefits to be derived hereunder, Pentastar and GM agree as follows:

## ARTICLE I.
## Operation of the Company

1.1 <u>Purpose of the Company</u>.  The purpose of the Company will be to engage in aircraft charter operations that require a Part 135 Certificate and a Part 298 Authorization. Such operations will be conducted on a worldwide basis.

1.2 <u>Aircraft</u>  The Company will lease aircraft from GM and third parties for the purpose of conducting charter operations. GM will not be obligated to make its aircraft available to the Company, except as may in the future be otherwise agreed. GM may elect to, or not to, commit its aircraft for any particular charter flight.  Once GM commits to such an obligation, it will use all reasonable commercial efforts not to abrogate that obligation except by reason of force majeure or other circumstances beyond GM's control or unless it has made arrangements for a replacement aircraft.

1.3 <u>FAA and DOT Approvals</u>  The Company will diligently maintain, apply for and pursue the necessary documentation and approvals from the FAA and the DOT, and such other documentation and approvals from other Governmental Authorities as the Parties may in the future agree to seek, in order to carry on its business. Such documentation and approvals will

2

include, but not be limited to, a Part 135 Certificate and a Part 298 Authorization issued in the

name of the Company, and appropriate operations specifications.

1.4 <u>Charter Business Opportunities</u>.  During the term of this Agreement, Pentastar and

Lakeshore Capital, LLC, a Michigan limited liability company ("Lakeshore") and the sole

member of Pentastar, agree to refer all aircraft passenger charter business opportunities of which

they become aware solely to, and otherwise conduct all such aircraft passenger charter business

solely through, the Company; provided, however, that the foregoing restrictions shall not apply to

Pentastar's and its Affiliates' charter broker services for DaimlerChrysler Corporation and its

Affiliates.  During the term of this Agreement, GM agrees, on behalf of itself and its Affiliates, to

use its reasonable best efforts to contract for all of its requirements for aircraft passenger charter

service departing from the Metropolitan Detroit area solely with the Company, except to the

extent that in GM's reasonable discretion, confidentiality concerns by GM would make using the

Company's aircraft passenger charger services inappropriate or unless circumstances beyond the

GM travel department's authorized control would make using the Company's aircraft passenger

charter services inappropriate.

1.5 <u>Growth of Operations</u>  The Parties intend that the Company will seek to add aircraft

leased on a temporary basis from third parties to its Part 135 Certificate as its resources permit;

provided that the addition of any aircraft to the Company's Part 135 Certificate shall require the

unanimous consent of the Board of Directors, which consent shall not unreasonably be withheld

or delayed; provided further that no such consent shall be required if (i) such aircraft is under

management with either of Pentastar or GM, or (ii) prior to the aircraft being added to the

Company's Part 135 Certificate, a safety audit of the operator of such aircraft has been conducted

by an independent third party auditor reasonably acceptable to both of the Parties, at the

operator's expense, and the results of such audit are reasonably satisfactory to both of the Parties

(or such operator has provided an action plan for correcting any deficiencies identified during

such audit which is reasonably satisfactory to both of the Parties).  The Parties further intend that

the Company will market its charter services of all aircraft within the Company's inventory to the

public and seek to expand its charter business.  During the term of this Agreement, the Company

shall not issue different published aircraft passenger charter rates for the same type of aircraft.

      1.6 <u>Use of Aircraft</u>  During the term of this Agreement, the Parties agree that GM shall

have a right of first refusal with respect to the use of GM aircraft for aircraft passenger charter

flights arranged by the Company under 14 C.F.R. Part 135 ("Charter Flight"), other than for

which a Charterer requests (a) an aircraft of the type not then owned by GM or (b) a specific

aircraft of the type then owned by GM but other than a GM-owned aircraft (a "Specific

Request"). During the term of this Agreement, when the Company receives any request for a

Charter Flight ("Flight Order"), the Company shall forthwith notify GM of such Flight Order,

unless such request is a Specific Request.  Except in connection with a Specific Request, the

Company shall recommend  GM-owned aircraft to a prospective Charterer if a GM-owned

aircraft is appropriate for the requested mission.

4

GM shall have a period of twenty-four (24) hours, after receiving such notification of the Flight Order, within which to notify the Company that GM elects to provide one of its aircraft for the Charter Flight; provided that the Flight Order is received by the Company from the Charterer more than five (5) days before the date of departure of the Charter Flight ("Departure Date"). If the Company receives a Flight Order less than five (5) days before the Departure Date, GM shall have four (4) hours, or such reasonable shorter period of time if four (4) hours is impracticable under the circumstances, to notify the Company of its election to exercise its right of first refusal.

If GM does not notify the Company of GM's election to provide one of its aircraft for a Charter Flight within the time period provided for in the preceding paragraph, the Company shall be free to use any other aircraft for the Charter Flight.

1.7 <u>Pilot Training</u>. The Company will be responsible for insuring that arrangements have been made for training required for Part 135 operations for pilots accepted by the Company as qualified from a pool of pilots nominated by Pentastar and GM as well as other sources acceptable to the Company to perform services for the Company on a part-time basis. The Company will enter into agreements with these pilots individually for their services.

1.8 <u>Use of GM Name</u>. Prior to the use of the name "General Motors", "GM" or any other trade names, trademarks or service marks owned or used, whether exclusively or jointly, by GM or any of its Affiliates (which term the Parties acknowledge does not include the Company), in

any press release or otherwise in connection with any marketing efforts, the Company shall

obtain the prior consent of GM.

## ARTICLE II.
### Capitalization and Financing

2.1 <u>Additional Capital</u>.  Subject to Section 3.4, the Parties may increase the capital of the

Company by means of additional capital contributions from time to time upon such terms and

conditions as they may agree and each Party will, at all times, have the right to maintain its then

current equity percentage upon payment, at the time of any such capital increase, of an amount

equal to the total amount of such capital increase multiplied by its then existing equity

percentage, or, in the case of a capital decrease or liquidation, to receive proceeds proportional to

its percentage ownership at the time of any such capital decrease or liquidation. This Agreement

will apply in all respects to any new shares in the Company which may be issued in the future.

2.2 <u>Other Financing</u>.  The Company will meet its needs for operating cash from its

revenues and, to the extent such revenues are insufficient (the extent of such insufficiency, a

"Revenue Shortfall"), through loans from Pentastar or from third parties upon such commercially

reasonable terms and conditions as the Company and the Parties (and, if applicable, the relevant

third party) may agree.  In the event of any Revenue Shortfall, Pentastar shall make (or shall have

third parties make, as provided above) loans to the Company in an amount at least equal to such

Revenue Shortfall.

In the event that a third party lender requires Pentastar to subordinate to such third party any loan(s) made by Pentastar to the Company as a prerequisite to such third party providing financing to the Company, then Pentastar agrees to subordinate such loan(s) to such third party lender upon terms mutually acceptable to Pentastar and such third party lender. All such loans made by Pentastar or any third party to the Company will be non-recourse to GM. The interest rate on any loans made by Pentastar to the Company shall be at the rate of interest publicly announced by Comerica Bank, Detroit, Michigan, from time to time as its prime rate ("Comerica Prime Rate"), which rate shall be adjusted to reflect the then applicable Comerica Prime Rate in effect as of the first day of each calendar month. Loans made by Pentastar to the Company shall be repaid within a period of two (2) years from the date on which they were made, and in any event such loans shall be repaid in full before any dividends or distributions are declared by the Company or paid to the Parties.

2.3 Annual Budgets. On or before February 1, 2002, the Parties shall have caused the Company to prepare an annual budget for the balance of calendar year 2002 and to submit such annual budget to the Board of Directors. Such annual budget shall be approved unanimously by the Board of Directors within fifteen (15) days of its submission. For each subsequent fiscal year, the Parties will cause the Company to prepare an annual budget and submit it to the Board of Directors at least 90 days prior to the start of the relevant fiscal year. The Board of Directors will approve the annual budget for each fiscal year at least 75 days prior to the start of the relevant fiscal year by (i) unanimous vote, if the aggregate amount of expenses reflected in such

7

annual budget exceeds the aggregate amount of expenses reflected in the annual budget for the immediately preceding fiscal year (as amended or revised in accordance with the immediately succeeding paragraph) by more than 10%, or (ii) otherwise, by majority vote.

The Board of Directors may review and amend or revise the then-current annual budget from time to time; provided that any amendment or revision that increases the amount of expenses reflected in such annual budget by more than 10% in the aggregate during the current fiscal year will require the unanimous consent of the Board of Directors.  Expenses incurred and borrowings and other commitments made by the Company will be consistent with applicable budget limits as set forth in the approved annual budget as the same may be amended or revised as provided in the immediately preceding sentence.

2.4 <u>Citizenship Requirements</u>.  During the term of this Agreement, the ownership and control of Shares in the Company, the composition of the Board of Directors of the Company, and the slate of its officers will comply at all times with the U.S. citizenship requirements established by 49 U.S.C. Section 40102(a)(15) and applicable DOT precedent.

## ARTICLE III.
## Management of the Company

3.1 <u>Board of Directors</u>.  The business of the Company will be managed under the
direction of the Board of Directors, under the control of the stockholders. All Board members'
votes will be equal. The Board will consist of three members. Pentastar will be entitled to
nominate two directors and GM will be entitled to nominate one director. Each of the nominees
for director, and, in the event of a vacancy in any of such positions, each of the nominees for
their replacements, will qualify as a U.S. Citizen. In the event of a vacancy of any directorship
for any reason, a replacement director will be nominated by the Party that nominated the vacating
director.

The number of directors may from time to time be increased or decreased provided that
such increase or decrease, as the case may be, is approved by the unanimous consent of the
Parties and, provided further, that no change can be effected which would adversely affect the
Company's status as a U.S. Citizen. Each of the Parties will vote its Shares to elect its
nominee(s) and the nominee(s) of the other Party; provided, however, that no person can serve as
a director or be nominated as a director if such event would cause the Company to lose its status
as a U.S. Citizen.

3.2 <u>Actions of the Board</u>.  Any action or resolution adopted by a majority of the members
of the Board of Directors present at a duly constituted meeting will be the act of such Board of

9

Directors, except for such actions as to which a higher than majority vote is required as set forth

below, in any other provision of this Agreement or pursuant to applicable law. The directors will

serve without compensation for such service.

The following matters will require the unanimous consent of the Board of Directors,

which consent will not unreasonably be withheld or delayed:

(a)    Any amendment to Section 3.2 (Maintenance), Section 4.2 (Insurance) and

the Division of Revenues provision of Exhibit A of any Agreement for

FAR 135 Operation (the Company's standard form of which is attached as

Exhibit B hereto, as set forth in Section 7.3) or any successor provision

regarding the same subject matter;

(b)    Alteration of the nature of the Company's principal business or

discontinuance of all or any material part of its business;

(c)    The addition of any aircraft to the Company's Part 135 Certificate, to the

extent such unanimous consent is required under Section 1.5; and

(d)    Any change in the identity of the Persons serving the Company in the

positions of Director of Operations, Director of Maintenance and Chief

Pilot;

(e)    Any amendment to the Company's standard form of Pilot Service

10

Agreement (a copy of which is attached as Exhibit C hereto);

(f)    Any amendment to the Services Agreement dated of even date herewith

between the Company and Pentastar; and

(g)    Any approval of , or amendment or revision to, the annual budget of the

Company, to the extent such unanimous approval is required under

Section 2.3.

3.3 <u>Officers</u>.  The officers of the Company will include (i) a President, (ii), a Vice

President - Treasurer and Secretary, (iii) a Vice President – Administration, (iv) a Vice President

- Technical Services, and (v) a Vice President – Charter Services.  The President, the Vice

President - Treasurer and Secretary, the Vice President - Technical Services and the Vice

President – Charter Services will be nominated by Pentastar. The Vice President -Administration

will be nominated by GM.

Each of the nominees for such offices, and, in the event of a vacancy of any of such

positions for any reason, each of the nominees for their replacements, will qualify as a U.S.

Citizen. In the event of a vacancy of any of such positions for any reason, their replacements will

be nominated by the Party indicated above and confirmed by the Board. The Parties will direct

their respective Board representatives to vote in favor of the other Party's nominees for these

offices. The powers and duties of the officers will be as set forth in the Company's Certificate of

Incorporation and By-Laws or in a resolution adopted by the Board of Directors.

11

In the event that the Board of Directors creates additional offices, GM will be entitled to
nominate persons to hold one-third of such offices and Pentastar will be entitled to nominate
persons to hold two-thirds of such offices. Each of the nominees will qualify as a U.S. Citizen.

3.4 Shareholders

Except in connection with the exercise of the Pentastar Put Rights pursuant to Section
4.3(b), the following matters will require the unanimous consent of the shareholders of the
Company:

<blockquote>

(a)     Merger, reorganization, share exchange, consolidation, business
combination, recapitalization, liquidation, dissolution or other similar
transaction involving the Company;

(b)     Any sale of all or substantially all of the Company's assets, including but
not limited to a sale or cancellation of the Company's DOT or FAA
operating authority;

(c)     Any amendment to the Company's Certificate of Incorporation or By-
Laws that would materially and adversely affect either Party; and

(d)     Any increase in the capital of the Company or any issuance of any shares
in the Company or any indebtedness of the Company convertible into
shares of the Company.

</blockquote>

12

## ARTICLE IV.
## Shareholder Rights

4.1 <u>Transfer Restriction</u>.  Neither Party will sell, assign, encumber or otherwise transfer

any Shares owned by it to any Person, except with the prior written consent of the other Party or

as permitted in this Article IV. Except with the prior written consent of the Parties, Lakeshore

will not sell, assign or otherwise transfer any membership interests owned  by it in Pentastar (the

"Pentastar Interests") if, immediately following such sale, assignment or transfer, Lakeshore

and/or its Affiliates do not own greater than fifty percent (50%) of the voting equity interests in

Pentastar.  Each Party and Lakeshore acknowledges and agrees that the restrictions on transfer of

Shares and Pentastar Interest are reasonable in view of the purpose and intent of the Parties and

Lakeshore.

4.2 <u>Transfers to Affiliates</u>.  Either Pentastar or GM may transfer its Shares in the

Company to its Affiliates; provided, in either case, that (a) such transfer will not relieve the

transferring party of its obligations hereunder; (b) such transferee agrees in writing to be bound

by all of the provisions of this Agreement applicable to the transferring party; (c) such transferee

agrees in writing to sell, assign or transfer all such Shares to another Affiliate of the ultimate

parent company of the transferring party should such transferee cease to be such an Affiliate; and

(d) such transferee will qualify as a U.S. Citizen.

4.3 <u>Put and Call Rights</u>.  (a) GM will have the right to require Pentastar to purchase all,

but not less than all, of GM's Shares in the Company (the "GM Put Rights") at any time, for a

cash price equal to the greater of $1 or the pro rata portion of the positive Book Value (as defined below) of such Shares. GM may exercise its GM Put Rights by delivery of a written notice to Pentastar. Pentastar will purchase GM's Shares in the Company at a closing to be held on a date specified by GM in the written notice to Pentastar that is no earlier than 30 days and no later than 60 days following receipt by Pentastar of the written notice of GM's exercise of its GM Put Rights.

(b)    Pentastar will have the right to require GM to purchase all, but not less than all, of Pentastar's Shares in the Company (the "Pentastar Put Rights") at any time, for a cash price equal to the greater of $1 or the pro rata portion of the positive Book Value of such Shares. Pentastar may exercise its Pentastar Put Rights by delivery of written notice to GM. GM will purchase Pentastar's Shares in the Company at a closing to be held on a date specified by Pentastar in the written notice to GM that is no earlier than 90 days and no later than 120 days following receipt by GM of the written notice of Pentastar's exercise of its Pentastar Put Rights. On or before the date of such closing, the Parties agree that they shall cause the Company to assign to Pentastar, without charge therefor, all of the assets of the Company of whatever kind, tangible and intangible, including, without limitation, the Part 135 Intellectual Property and the Company's Confidential Information, but excluding the Part 135 Certificate, and Pentastar shall assume all of the liabilities of the Company reflected on the Company's most recent month end balance sheet and all liabilities of the same type as reflected on such balance sheet which were incurred by the Company in the ordinary course of business since the date of such balance sheet. It is the

14

intent of the Parties that, subject to Pentastar's acquiring its own Part 135 Certificate, the charter

business operations of the Company relating to the aircraft listed on the Company's Part 135

Certificate which are managed by Pentastar (the "Managed Aircraft") will be transferred to

Pentastar.  In connection with such closing, GM agrees that it shall, and shall cause the Company

to, cooperate in good faith with Pentastar in the transfer of the Managed Aircraft to such new

Part 135 Certificate as may be designated in writing by Pentastar.  In connection therewith, the

owners of such Managed Aircraft shall be free to terminate their respective Agreements with the

Company for FAR 135 Operation without penalty.

      (c)     Pentastar will have the right to purchase all, but not less than all, of GM's Shares

in the Company (the "Call Rights") at any time, for a cash price equal to the Net Present Value

(as defined below) of the assumed net operating profit that would have been realized by GM over

the two year period following the purchase by Pentastar of GM's Shares in the Company

pursuant to the exercise of such Call Rights, such net operating profit to be determined assuming

that the charter revenue of GM would be equal, on an annualized basis, to the charter revenues

paid to GM by the Company in the immediately prior one-year period,  and the variable operating

costs incurred by GM would be equal to the variable operating costs for such one-year period as

published by Conklin & de Decker (or, if no longer published by Conklin & de Decker, as

published in such other publication as most closely approximates Conklin & de Decker's

determination of variable operating costs).  Such assumed net operating profit will be determined

jointly by GM and Pentastar, acting reasonably and in good faith.  GM will notify Pentastar in

writing of the amount it believes to be due, such notice to set forth in reasonable detail the basis

for such determination. Pentastar may exercise its Call Rights by delivery of a written notice to

GM. Pentastar will purchase GM's Shares in the Company at a closing to be held on a date

specified by Pentastar in a written notice to GM that is no earlier than 90 days and no later than

120 days following receipt by GM of notice of Pentastar's exercise of its Call Rights.

(d) For purposes of this Section 4.3, the term "Book Value" means the sum of (i) the

Company's total assets minus total liabilities as of the date of the closing under Section 4.3(a) or

4.3(b), as applicable, determined in accordance with U.S. generally accepted accounting

principles, and (ii) $100,000 (which represents the deemed value of the Part 135 Certificate and

related air operations manuals), and "Net Present Value" shall be determined by using the then

current rate for two year notes of the U.S. Treasury.

4.4 Encumbrances. Subject to Section 4.1 above, neither Party will create or permit to

exist any security interest, lien, claim, pledge, option, right of first refusal, agreement, limitation

on the voting rights, charge or other encumbrance of any nature whatsoever in respect of the

Shares in the Company held by it, other than any lien in respect of taxes which are either not yet

assessed, or if assessed, are not yet due and payable or are being contested in good faith by

appropriate proceedings (and for the payment of which adequate reserves with respect thereto

shall have been provided) or other similar liens or encumbrances arising in the ordinary course of

business which, individually or in the aggregate, are not substantial in amount, and do not

prevent or detract from such Party's performance of its obligations hereunder.

4.5 <u>Recordation of Transfers</u>.  The Parties shall cause the Company to record the transfer

of either Party's Shares in the Company or any rights or obligations relating thereto, only if such

transfer is made in accordance with this Article IV.

4.6 <u>Effect of Attempted Transfer in Violation of Agreement</u>.  No attempted transfer of

any Shares in the Company or any rights or interests appertaining thereto, whether by operation

of law or otherwise, in violation of any provision of this Article IV will be effective to pass any

title, rights, obligations or interest therein.

4.7 <u>Legend</u>.  The face of each certificate representing shares in the Company will bear the

following legend: "The sale, encumbrance or other transfer of the shares of capital stock of

Automotive Air Charter, Inc. represented by this certificate is restricted by the provisions of a

Shareholders and Operations Agreement dated as of October __, 2001, by and between Pentastar

Aviation, LLC and General Motors Corporation. A copy of these restrictions is available for

inspection at the principal office of Company. Any attempted sale, encumbrance or other transfer

of the interests represented by this certificate in violation of the provisions of such Agreement

will be null and void."

4.8 <u>Non-Exclusive License</u>.  During the term of this Agreement, each of the Parties shall

have a worldwide, non-exclusive, non-transferable (other than to Affiliates), royalty-free license

to use any air operations manuals and other materials owned by the Company and related to the

Company's Part 135 Certificate, including any intellectual property rights relating thereto

(collectively, the "Part 135 Intellectual Property").  Upon the closing of any sale of GM's Shares

to Pentastar pursuant to Sections 4.3(a) or 4.3(c) hereof or any sale of Pentastar's Shares to GM

pursuant to Sections 4.3(b) or 5.1 hereof, the Company shall grant to GM a worldwide, perpetual,

non-exclusive, non-transferable (other than to Affiliates), royalty-free license to use any of the

Part 135 Intellectual Property in connection with GM's application for a Part 135 Certificate or

GM's operation of a charter operation under FAR Part 135.

## ARTICLE V.
### Certain Obligations of Pentastar and GM

5.1 <u>Citizenship Change</u>.  Pentastar will notify GM in writing immediately in the event

that Pentastar becomes aware that events are planned, are reasonably likely to occur or have

occurred that will cause or have caused Pentastar, any of its nominees for director or officer, or

the Company, to lose his or its status as a U.S. Citizen.  In the event that any such change would

cause the Company to lose its status as a U.S. Citizen, GM will have the right to require

Pentastar to sell to GM all of Pentastar's Shares in the Company.  GM may exercise such right by

giving written notice to Pentastar within thirty (30) days after receipt of such written notice from

Pentastar, and the sale of Pentastar's Shares to GM will be deemed an exercise by Pentastar of

the Pentastar Put Rights in accordance with the provisions of Section 4.3(b).

5.2 <u>Nonsolicitation</u>. GM agrees that during the term of this Agreement, GM will not,

directly or indirectly (whether as an owner, shareholder, member, partner, manager, consultant,

joint venturer, agent, lender or otherwise), solicit, interfere with, or endeavor to entice away from

18

Pentastar, any Managed Aircraft customer of Pentastar; provided that nothing in the foregoing

shall prohibit GM from doing business with, or managing any aircraft on behalf of, any Person

who approaches GM in connection with such business or aircraft management services without

any prior solicitation by GM.

## ARTICLE VI.
### Accounting

6.1 <u>Fiscal Year, Financial Statements</u>.  The Company's fiscal year will be the calendar

year. Monthly and annual financial statements prepared by the Company in accordance with U.S.

generally accepted accounting principles consistently applied will be submitted by the Company

to the Parties within two (2) Business Days of the end of the relevant month or fiscal year (as

applicable), in such forms as are required to permit the Parties to include the Company's results

in their own consolidated financial statements; provided, however, in the event that the Company

is not able to provide such financial statements to the Parties timely, the Company shall provide

to the Parties within such two (2) Business Day period a good faith estimate thereof and shall

submit to the Parties such financial statements as soon as reasonably practicable thereafter.

6.2 <u>Access</u>.  The Parties will at all times have access to the books and records (including,

without limitation, all Flight Orders, all telephone logs (setting forth or relating to flight

requests), financial reports and all books and records demonstrating compliance with Regulations

of the FAA relating to the Company's Part 135 Certificate) and premises of the Company, except

that neither Party may have access to records that indicate the destination or passenger list of any

flight flown or to be flown by the other Party on its own behalf.

6.3 <u>Confidentiality</u>. (a) For a period of three (3) years from the date of receipt under this

Agreement, any Party or the Company receiving Confidential Information (each, a "Recipient")

will not, without the prior written consent of the Party or the Company providing such

Confidential Information (a "Provider"):

(i)  use any portion of the Provider's Confidential Information for any purpose other

than in connection with the business of the Company, by the Parties with respect to managing

their ownership interests in the Company or in connection with the license granted pursuant to

Section 4.8; or

(ii) disclose any portion of the Confidential Information to any Persons other than the

representatives, officers, employees and agents of the Company or the Parties who reasonably

need to have access to the Confidential Information or who have previously agreed to be bound

by this Section 6.3; provided, however, that the Recipient of the Confidential Information of the

Provider shall be liable for any breach of this Agreement by any of the representatives, officers,

employees and agents to whom the Recipient has disclosed the Confidential Information.

Without in any way limiting the foregoing, each Recipient of any Confidential

Information will use its reasonable best efforts to prevent any disclosure of any Provider's

Confidential Information in breach of this Section 6.3.

20

(b)      Notwithstanding the foregoing, no Recipient shall have any obligation to hold

Confidential Information in confidence to the extent that (i) such Confidential Information

becomes generally available to the public other than as a result of unauthorized disclosure by the

Recipient or by Persons to whom the Recipient has made such Confidential Information

available; (ii) such Confidential Information was received by one of the Parties or the Company

on a nonconfidential basis from a third party whom the Recipient reasonably believed to be

lawfully possessing and lawfully entitled to disclose such Confidential Information; (iii)

disclosure of such Confidential Information is specifically authorized in writing by the relevant

Provider; (iv) disclosure of such Confidential Information is required by law, regulation, court

order or other legal process, and the Recipient complies with Section 6.3(e) of this Agreement, or

(v) such Confidential Information is already known to the Recipient prior to its receipt from the

relevant Provider, or was developed independently by the Recipient having no substantive

knowledge of the Provider's information.

(c)      Subject to Section 4.3(c) and Section 4.8, Confidential Information furnished by

the Company pursuant to this Section 6.3 will remain the property of the Company, and will, at

the Company's request, forthwith be returned to the Company or at the direction of the Company

be destroyed, together with all copies made by the Recipient and by anyone to whom such

Confidential Information has been made available by the Recipient.    Upon request, the Recipient

will send the Company a destruction certificate.

21

(d)     Confidential Information furnished by a Party pursuant to this Section 6.3 will remain the property of the furnishing Party, and will, at the furnishing Party's request, forthwith be returned to such Party or at the direction of the furnishing Party be destroyed, together with all copies made by the Recipient and by anyone to whom such Confidential Information has been made available by the Recipient. Upon request, the Recipient will send the furnishing Party a destruction certificate.

(e)     In the event that a party is faced with legal action or a requirement under Regulations of a Governmental Authority to disclose Confidential Information received hereunder, the Recipient will forthwith notify the Provider, and, upon the request and at the expense of the latter, will cooperate with the Provider in contesting such disclosure.  Except in connection with failure to discharge responsibilities set forth in the preceding sentence, no Recipient will be liable in damages for any disclosures required to be made pursuant to judicial action or Regulations of a Governmental Authority.

## ARTICLE VII.
### Services

7.1 <u>Services</u>.  Until otherwise agreed by the Parties, the Company will be staffed with employees and will contract for various services to be provided by the Parties or by third parties.

7.2 <u>Services Agreement</u>.  Certain services will be performed by Pentastar for the benefit of, and on behalf of, the Company pursuant to a Services Agreement in the form attached hereto as Exhibit A (the "Services Agreement").

7.3 <u>Agreement for FAR 135 Operations</u>.  Each agreement entered into by the Company with an aircraft owner for the purposes of having the Company charter such owner's aircraft to third parties shall be substantially in the form attached hereto as Exhibit B (each, an "Agreement for FAR 135 Operation").

7.4 <u>Insurance</u>.  Pentastar will cause the Company to obtain and maintain in full force and effect at all times insurance of the type and in the amounts set forth in Exhibit D hereto.

**ARTICLE VIII.**
**Definitions**

The following terms, as used herein, shall have the following meanings:

"Affiliate" means, as to any Person, any other Person directly or indirectly controlling, controlled by or under common control with the designated Person.  For purposes of this definition, "control" (including, the terms "controlling," "controlled by," and "under common control with") as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement for FAR 135 Operation" shall have the meaning provided in Section 7.3.

23

"Book Value" shall have the meaning provided in Section 4.3(d).

"Business Day" shall mean any day on which banks in Detroit, Michigan are open for business.

"Call Rights" shall have the meaning provided in Section 4.3(c).

"Charterer" shall mean a customer of the Company's aircraft passenger charter flight business.

"Charter Flight" shall have the meaning provided in Section 1.6.

"Comerica Prime Rate" shall have the meaning provided in Section 2.2.

"Confidential Information" means all confidential and proprietary information relating to the business of the Company (i) originating from the furnishing Party, (ii) originating from the Company, (iii) originating from Persons acting on behalf of the furnishing Party or the Company (as the case may be) or (iv) which the furnishing Party or the Company has received in confidence from a third party, which, in each case, is clearly and conspicuously designated "CONFIDENTIAL" or with such other label identifying the information as confidential or proprietary, or identified verbally by the disclosing party as confidential at the time of disclosure which is confirmed in writing to the recipient party within thirty (30) days of verbal disclosure.

"Dispute" shall have the meaning provided in Section 9.12.

"DOT" means the United States Department of Transportation.

"Experts" shall have the meaning provided in Section 9.12.2.

"FAA" means the United States Federal Aviation Administration.

"Flight Order" shall have the meaning provided in Section 1.6.

"GM Put Rights" shall have the meaning provided in Section 4.3(a).

"Governmental Authority" shall mean any United States federal, state or local, or foreign, court, administrative department or agency, commission or other governmental authority or instrumentality.

"Notice of Referral to Experts" shall have the meaning provided in Section 9.12.2.

"Part 135 Certificate" means an air carrier certificate with Part 135 operations specifications issued pursuant to 14 CFR Part 135.

"Part 135 Intellectual Property" shall have the meaning provided in Section 4.8.

"Part 298 Authorization" means an authorization to engage in charter flight operations issued pursuant to 14 CFR Part 298.

"Person" means, without limitation, an individual, partnership, joint venture, corporation, limited liability company, trust, business association or other entity, unincorporated organization, or government or governmental entity.

"Provider" shall have the meaning provided in Section 6.3.

"Pentastar Put Rights" shall have the meaning provided in Section 4.3(b).

"Recipient" shall have the meaning provided in Section 6.3.

"Regulations" shall have the meaning provided in Section 9.10.

"Revenue Shortfall" shall have the meaning provided in Section 2.2.

"Services Agreement" shall have the meaning provided in Section 7.2.

"Specific Request" shall have the meaning provided in Section 1.6.

"U.S. Citizen" means an individual or entity that meets the citizenship requirements set forth in 49 U.S.C. Section 40102(a)(15) and applicable DOT precedent. For ease of reference only, these sources currently define a U.S. Citizen as (1) an individual who is a citizen of the United States and is not employed by a Person that is not a U.S. Citizen; (2) a partnership each of whose partners is an individual who is a citizen of the United States; or (3) a corporation or association organized under the laws of the United States or a state, the District of Columbia, or a territory or possession of the United States, of which the president and at least two-thirds of the

26

board of directors and other managing officers are citizens of the United States, and in which at least 75 percent of the voting interest is owned or controlled by persons that are citizens of the United States, and which is in fact under the actual control of citizens of the United States.

### ARTICLE IX.
### General

9.1 <u>Modification, Waiver</u>.  This Agreement may be modified only by a written instrument executed by the Parties hereto. Any of the terms and conditions of this Agreement may be waived in writing at any time by the Party entitled to the benefits thereof.

9.2 <u>Entire Agreement, Exclusivity of Certain Provisions</u>.  This Agreement (including the Exhibits hereto, which are hereby incorporated by reference and made a part hereof), and the Stock Purchase Agreement constitute the entire understanding of the Parties in respect of the subject matter of this Agreement, and supersede all other prior agreements, negotiations, correspondence, undertakings, communications, memoranda, understandings, representations and warranties, oral or written, between the Parties in respect of the subject matter hereof. The relationship between Pentastar and GM regarding the matters covered hereby is contractual on the basis of this Agreement and the agreements contemplated hereby and Pentastar and GM do not have a special relationship of trust or reliance as to such matters.

9.3 <u>Notices</u>.  All notices, requests, demands and other communications hereunder will be in writing and will be deemed to have been duly given on the date of delivery, if delivered by hand or by telex or telecopy confirmed in writing, or three Business Days after mailing, if mailed

by first class registered or certified mail (with postage prepaid, return receipt requested) to the

parties at the following addresses:

    if to Pentastar:

        Pentastar Aviation, LLC
        Oakland County International Airport
        7310 Highland Road
        Waterford, MI 48327
        Attention: President
        Telecopier: (248) 666-8270

    with a copy to:

        Terrence B. Larkin
        Bodman, Longley & Dahling LLP
        201 W. Big Beaver, Suite 500
        Troy, MI 48084
        Telecopier: (248) 743-6002

    if to GM:

        GM Worldwide Travel Services
        530 East Services Drive
        Detroit Metro Airport
        Detroit, MI 48242-0010
        Attention: Executive Director
        Telecopier: (734) 942-5601

    with a copy to:

        General Motors Corporation
        Mail Code 482-208-870
        3031 West Grand Boulevard
        Detroit, MI 48202
        Attention: Karen A. Merkle
        Telecopier: (313) 974-1688

or to such other address or to such other Person as any Party will have last designated by notice to the other Party.

9.4 <u>Assignment</u>. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, but will not be assignable, by operation of law or otherwise, by any Party hereto without the prior written consent of the other Party.

9.5 <u>No Third Party Beneficiaries</u>. Except as otherwise provided herein, nothing in this Agreement will confer any rights upon any Person which is not a Party or a successor or permitted assignee of a Party to this Agreement.

9.6 <u>Severability</u>. Every term and provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity will not affect the validity of the remainder of this Agreement.

9.7 <u>Counterparts; Facsimile Transmission</u>. This Agreement may be executed in several counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. This Agreement may be executed and delivered by facsimile transmission with the same effect as if a manually signed original was personally delivered.

9.8 <u>Headings, Table of Contents</u>.  The article and section headings and the table of contents hereof are for convenience of reference only, and will not be deemed to alter or affect the meaning or interpretation of any provision hereof.

9.9 <u>Governing Law</u>.  This Agreement will be construed, performed and enforced in accordance with the laws of the State of Michigan without giving effect to any applicable principles of conflicts of laws.

9.10   <u>Regulation References</u>.  References made herein to statutes, laws, regulations and rules promulgated by the government of the United States and/or any of its agencies ("Regulations") will be deemed to include any amendments to such Regulations or any successor Regulations at the time they become effective.

9.11   <u>Termination</u>.  This Agreement will terminate on the earlier of (i) the written agreement of the Parties; (ii) the dissolution of the Company; (iii) the acquisition by either Party of all the Shares in the Company of the other Party; or (iv) the sale by either Party of all of its Shares in the Company to a third party (other than an Affiliate of such Party in accordance with Section 4.2 hereof) (which in all cases shall be subject to the consent of the other Party).

9.12   <u>Settlement of Disputes</u>.  Any controversy or claim arising out of or relating to the negotiation, execution, interpretation, performance, nonperformance, termination, expiration or breach of this Agreement (each, a "Dispute") shall be resolved as provided in this Section 9.12. In connection with any Dispute under this Agreement, each Party shall provide the other Party

with reasonable access during normal business hours to any and all non-privileged records, information and data pertaining to any such Dispute.

9.12.1 <u>Mutual Discussions</u>. If a Dispute occurs, any Party may provide written notice to the other Party of the existence of such Dispute. Within five (5) Business Days of the date on which such other Party received such notice, each of the Parties shall designate in writing to the other Party a senior executive as its representative who shall be authorized to resolve such Dispute. The Parties' representatives shall meet and attempt in good faith to resolve the Dispute by mutual discussions to take place during a period of thirty (30) days from the date on which written notice of such Dispute was given. In connection with any Dispute under this Agreement, each Party shall provide the other Party with reasonable access during normal business hours to any and all non-privileged records, information and data pertaining to any such Dispute.

9.12.2 <u>Expert</u>. If any Dispute is not resolved between the Parties pursuant to Section 9.12.1 within the time period set forth therein, then either Party may refer such Dispute to a panel of three independent third party experts (the "Experts") by giving written notice of its intent to do so (a "Notice of Referral to Experts"). Each such Expert shall have experience in the type of business and operations carried on by the Company and shall not be a present employee or agent of, or consultant or counsel to, either Party or any Affiliate of either Party. Each Party shall appoint one (1) Expert and deliver written notice of such appointment to the other Party within ten (10) days of the date of the Notice of Referral to Experts (or, in the case of the non-referring Party, within ten (10) days of the receipt by such non-referring Party of the Notice of

31

Referral to Experts, if later). The two (2) Party-appointed Experts shall jointly appoint the third

Expert (who shall be the chairperson) and deliver written notification of such appointment within

ten (10) days after the appointment of the second Party-appointed Expert. If either Party fails to

appoint its Expert within the ten (10) day period for such appointment referred to above, or if the

two Party-appointed Experts fail to appoint the third Expert within the ten (10) day period for

such appointment referred to above, then such Expert shall be appointed by the American

Arbitration Association or as may otherwise be agreed by the Parties. Each Party shall appear

before the Experts and present its case at a hearing on the date and at the place designated by the

Experts, which date shall not be more than ten (10) days after the date of the last Expert's

appointment (or as soon as practicably possible thereafter). All decisions of the panel of Experts

shall be by majority vote. The Experts shall render their decision with respect to the Dispute

within ten (10) days of the date of the hearing referred to in the preceding sentence (or as soon as

practicably possible thereafter), and shall advise the parties in writing of the same (together with

the reasons therefor).  The decision of the Experts shall have the same force and effect as an

arbitral award, and shall be final and binding upon both Parties, except in the event of fraud, and

judgment thereon may be entered in any court having jurisdiction thereof.  The Experts shall

determine whether, and the extent to which, the Parties will be entitled to discovery of

documents in connection with the referral of any Dispute to the Experts under this Section

9.12.2; provided that the Parties shall in any event provide each other with access to non-

privileged records, information and data as set forth in Section 9.12. Any evidence given or state-

ments made in the course of the hearing may not be used against a Party in any other proceeding.

9.12.3 <u>Arbitration</u>. (a) If neither Party elects to refer a Dispute to a panel of

Experts in accordance with Section 9.12.2, such Dispute shall be finally settled by arbitration in

Detroit, Michigan, or such other place as the Parties mutually agree, in accordance with the then

applicable Commercial Arbitration Rules of the American Arbitration Association. The

arbitration shall be conducted before a tribunal composed of three (3) arbitrators. Each Party

shall appoint an arbitrator and deliver written notification of such appointment to the other Party

within fifteen (15) days after referral of the Dispute to arbitration. The two (2) Party-appointed

arbitrators shall jointly appoint the third (who shall be the chairperson) and deliver written

notification of such appointment within fifteen (15) days after the appointment of the second

Party-appointed arbitrator.

(b) Any arbitration commenced hereunder shall be completed within one hundred twenty

(120) days of the appointment of the tribunal absent agreement of the Parties to the contrary. The

Parties shall be entitled to such discovery as the tribunal shall determine; provided, however, that

each of the Parties shall provide the other Party with access to non-privileged records,

information and data as set forth in Section 9.12. All decisions of the tribunal shall be pursuant to

a majority vote. Any interim or final award shall be rendered by written decision (which written

decision shall state the reasons therefor). The judgment of the tribunal shall be final and binding

on the Parties (<u>i.e.</u>, not subject to appeal), except in the event of fraud, and the Parties agree that

33

judgment on an arbitration award may be entered in any state or federal court having jurisdiction thereof.

(c) If a Party fails to appoint its arbitrator within a period of fifteen (15) days after referral of the Dispute to arbitration, or if the two Party-appointed arbitrators cannot agree upon the third arbitrator within a period of fifteen (15) days after appointment of the second Party-appointed arbitrator, then such arbitrator shall be appointed by the American Arbitration Association or as may otherwise agreed by the Parties.

(d) Only persons who are experienced in the type of business and operations carried on by the Company shall be appointed as arbitrators and no arbitrator shall be a present employee or agent of, or consultant or counsel to, either Party or any Affiliate of either Party.

9.12.4 <u>Costs, Damages</u>. The Parties shall each bear their own costs and fees in connection with any Expert proceeding or arbitration under this Section 9.12, and each shall bear one-half of the fees, costs and expenses of an Expert proceeding or arbitration under this Section 9.12. The Parties waive any claim to any damages in the nature of punitive, exemplary, or statutory damages in excess of compensatory damages, and any Expert or arbitration tribunal constituted under this Section 9.12 is specifically divested of any power to award such damages.

9.12.5 <u>Consolidation of Proceedings</u>. The Parties recognize that related disputes between them may also arise under or relating to the Stock Purchase Agreement. In the event that arbitration is commenced under the Stock Purchase Agreement while an arbitration is pending

34

under this Agreement, the Parties hereby authorize a tribunal constituted under Section 9.15 of

the Stock Purchase Agreement to consolidate the two proceedings in a single arbitration under

such Section 9.15.

## SIGNATURES ON NEXT PAGE

IN WITNESS WHEREOF, each Party has caused this Shareholders and Operations

Agreement to be executed and delivered by its duly authorized representative as of the date first

above written.

PENTASTAR AVIATION, LLC


By:_____
Name:  Thomas D. Seeber
Title:   President and Chief Operating Officer


GENERAL MOTORS CORPORATION


By:_____
Name:  Kenneth E. Emerick
Its:     Executive Director,
          General Motors Worldwide Travel Services

36

## AGREEMENT OF LAKESHORE CAPITAL, L.L.C.

Lakeshore Capital, LLC, a Michigan limited liability company and the sole member of

Pentastar, has executed this Agreement in the space provided below for the sole purpose of

indicating its agreement to be bound by the provisions of Sections 1.4 and 4.1 of the  above

Shareholders and Operations Agreement.


LAKESHORE CAPITAL, LLC


By:_____
Name:  Thomas D. Seeber
Its:      Executive Vice President and
          Chief Operating Officer


37