# EXHIBIT A

## SERVICE CONTRACT
## FOR
## ENTERPRISE CONTACT CENTER SERVICES

THIS SERVICE CONTRACT (this "Service Contract") is entered into as of **June 23, 2008** (the "Service Contract Acceptance Date") by and between OnStar Corporation ("Customer Contracting Party"), with offices at 400 Renaissance Center, Detroit MI 48265, and Convergys Corporation at 201 East 4th Street, Cincinnati OH 45201.

**RECITALS**

WHEREAS, Customer Contracting Party wishes to obtain from Vendor Contracting Party, and Vendor Contracting Party wishes to provide to Customer Contracting Party, certain services;

WHEREAS, each of Customer Contracting Party and Vendor Contracting Party desires that the Terms and Conditions for Services (attached hereto as Exhibit 1.2 as modified by Exhibit 1.3) (collectively, the "Terms and Conditions") be incorporated by reference into this Service Contract;

WHEREAS, the Terms and Conditions allow for the Parties (as defined in the Terms and Conditions) to enter into one or more Transaction Agreements (as defined in the Terms and Conditions) pursuant to this Service Contract, and the Parties may enter into one or more Transaction Agreements in order to further define the services to be provided hereunder; and

WHEREAS, as set forth in the Terms and Conditions, this Service Contract, the Terms and Conditions and any Transaction Agreements entered into pursuant to this Service Contract are collectively referred to as the "Agreement";

NOW, THEREFORE, for and in consideration of the covenants and agreements set forth below and in the Terms and Conditions, Customer Contracting Party and Vendor Contracting Party hereby agree as follows.

### ARTICLE I.    INTRODUCTORY PROVISIONS

1.1    **Definitions.**

Terms used in the Agreement with initial capital letters shall have the respective meanings set forth herein or, if not set forth herein, in the Terms and Conditions (including the defined terms set forth therein) or, if not set forth in either of the foregoing, in Supplemental Glossary of Terms attached hereto as Exhibit 1.1.

1.2    **Exhibits.**

This Service Contract hereby incorporates by reference the following exhibits:

| | |
|---|---|
| Exhibit 1.1 | Supplemental Glossary of Terms |
| Exhibit 1.2 | Terms and Conditions |
| Exhibit 1.3 | Modifications to the Terms and Conditions |
| Exhibit 1.4 | Transaction Agreements |
| Exhibit A | OnStar SOW |
| Exhibit 3.A.10 | Communications SOW |
| Exhibit 4 | Performance Management Schedule |
| Exhibit 5 | Pricing and Payment |
| Exhibit 5.1 | Pricing Deal Structure |
| Exhibit 7 | Change Control Procedures |
| Exhibit 8 | Data and Physical Security |

1

        Exhibit 10.1    Insurance
        Exhibit 10.5    Notices
        Exhibit 11      Business Continuity Requirements

**1.3    Terms and Conditions.**

Exhibit 1.3 sets forth certain modifications to the Terms and Conditions of Exhibit 1.2 that are agreed upon by the Parties in connection with the execution of this Service Contract. All references in the Agreement to the Terms and Conditions shall refer to the Terms and Conditions as modified pursuant to this Section 1.3.

**1.4    Transaction Agreements.**

The Parties may enter into one or more Transaction Agreements pursuant to this Service Contract at the time this Service Contract is entered into or during the Term. Exhibit 1.4 sets forth those Transaction Agreements entered into concurrently with this Service Contract.

**1.5    Hierarchy of Terms.**

(1)    <u>Terms and Conditions, Service Contract and Transaction Agreement</u>. Section 1.3 of the Terms and Conditions sets forth the hierarchy among the Terms and Conditions, Service Contract and any Transaction Agreements.

(2)    <u>Body of Agreements and Exhibits</u>. In the event of any conflict between the terms of the body of either this Service Contract, the Terms and Conditions, or any Transaction Agreement, on the one hand, and the terms in any of the exhibits attached thereto (excluding Exhibits 1.2, 1.3, and 1.4), on the other hand, the terms in the body of this Service Contract, the Terms and Conditions, or any such Transaction Agreement shall prevail.

**1.6    Cross-References.**

This Service Contract and any applicable Transaction Agreements may provide parenthetical cross-references to one or more provisions in the Terms and Conditions. These cross-references are provided for convenience of reference only.

### ARTICLE II.    TERM

**2.1    Initial Term.**

The Initial Term of this Service Contract shall commence on **June 23, 2008** (the "Service Contract Effective Date") and shall continue until later of: (i) the Expiration Date, (ii) the last date during which any Transaction Agreement entered into pursuant to this Service Contract remains in effect; and (iii) the last date during which Vendor is obligated to provide any Termination Assistance Services. The Expiration Date of this Service Contract is **June 23, 2011**.

**2.2    Renewal.**

This Transaction Agreement may, at Customer's discretion, be renewed for two separate 12-month Renewal Terms upon written notice to Vendor no later than 90 days before the expiration of the Initial Term. (*See* Terms and Conditions, Section 2.2).

## ARTICLE III.   SERVICES

3.1   **Designated Services.**

Exhibit 3 contains the Statement of Work describing the Services that Vendor may be requested to provide to Customer under this Service Contract. Each Transaction Agreement, if any, shall specifically set forth the Designated Services to be provided by Vendor pursuant to such Transaction Agreement. Vendor shall provide Supplemental Services, if any, as set forth in Section 4.2 of the Terms and Conditions.

3.2   **Statement of Work, Specifications, Acceptance Criteria, Milestones.**

The Statement of Work sets forth the applicable Specifications, Acceptance Criteria, and deliverable and payment milestones that Vendor must meet for each deliverable to be provided under this Service Contract. The Statement of Work shall also include the manner and location of delivery of such deliverables. The Statement of Work shall further include any assistance, integration, and support services to be provided by Vendor to third parties under the Service Contract.

3.3   **Customer and Vendor.**

For purposes of the Agreement, unless otherwise expressly set forth in the Agreement, the term "Vendor" shall mean only Vendor Contracting Party and the term "Customer" shall mean only Customer Contracting Party.

3.4   **Third Party Service Providers.**

Subject to Section 6.1(1) of the Terms and Conditions, Customer may, now or in the future, use one or more third-party service providers to provide services that relate to, interact with, or depend upon the Services. Vendor shall provide all reasonable cooperation to Customer and such third-party service providers in connection with the provision of such services by such third-party service providers.

3.5   **Hardware and Software.**

(1)   Customer Hardware and Customer Software.

Any applicable Transaction Agreement contains a list of the Customer Hardware, Customer Software (including audit software (*See* Terms and Conditions, Section 22.5)), and Customer Assets to be used in connection with the Services to be provided under this Service Contract and the terms under which, and the manner in which such Customer Hardware, Customer Software, and Customer Assets will be used (including, without limitation, whether any such Customer Hardware, Customer Software, or Customer Assets will be transferred or relocated). In addition to the requirements set forth in Section 15.1(2) of the Terms and Conditions, Customer shall be responsible for obtaining all rights necessary to permit use of such Customer Hardware, Customer Software, and Customer Assets in the manner contemplated herein or by the applicable Transaction Agreement. At Customer's request, Vendor shall provide reasonable assistance to Customer in connection with obtaining such rights. (*See* Terms and Conditions, Section 13.3)

(2)   Vendor Hardware and Vendor Software.

Any applicable Transaction Agreement contains a list of the Vendor Hardware and Vendor Software to be used in connection with the Services to be provided under this Service Contract and the terms under which, and the manner in which such Vendor Hardware and Vendor Software will

be used (including, without limitation, whether any such Vendor Hardware or Vendor Software will be transferred or relocated. In addition to the requirements set forth in Section 15.1(1) of the Terms and Conditions, Vendor shall be responsible for obtaining all rights necessary to permit use of such Vendor Hardware and Vendor Software in the manner contemplated herein or by the applicable Transaction Agreement. At Vendor's request, Customer shall provide reasonable assistance to Vendor in connection with obtaining such rights.

(3)     Communications Services.

The Statement of Work specifies the communications lines and associated services that Vendor is to use to provide the Services.

### 3.6 Critical Systems.

Any applicable Transaction Agreement contains a description of Critical Systems relevant to this Service Contract (*See* Terms and Conditions Sections 1.1(1)(c) and 10.2). Any applicable Transaction Agreement also specifies any time periods within which Vendor must restore such Critical Systems pursuant to Sections 10.2, 17.1, 17.2, and 25.3(3) of the Terms and Conditions.

### 3.7 Transition Plan.

In addition to the obligations set forth in Article IX of the Terms and Conditions, each of the parties shall cooperate fully with the other to effectuate an orderly, effective transition of responsibilities for the applicable Services to Vendor, including the execution of such agency letters, consents, and other documentation and assistance as may be required to effectuate the transition of the appropriate Customer operations to Vendor. During Transition Periods under the Agreement, Customer shall provide Vendor with reasonable access to the applicable Customer Sites for the purpose of enabling Vendor to observe Customer's affected operations and assess the measures that will be necessary to effectuate an orderly, effective transition of responsibility for the applicable Services to Vendor.

## ARTICLE IV.   SERVICE LEVELS

### 4.1 Service Levels.

Exhibit 4 sets forth the Service Levels applicable to this Service Contract. Each Transaction Agreement may include a separate Service Level Exhibit for Service Levels applicable thereto.

### 4.2 Failure to Meet Performance Levels

Upon 60 days written notice to Vendor, Customer may terminate a particular Transaction Agreement, if (1) Vendor fails to meet at least 90% of the Expected Performance Level for any Critical Performance Metric (both defined in the Performance Management Schedule) two months during a rolling 12-month period, or (2) Vendor fails to meet at least 90% of the Minimum Performance Level for a particular Critical Performance Metric for any two months during a rolling 12-month period.

### 4.3 Remedies.

Except as otherwise expressly set forth in any applicable Transaction Agreement, Customer's remedies for Vendor's failure to meet any of the Critical Performance Levels or to otherwise provide the Services in accordance with the Agreement shall include the option of requiring Vendor, at no cost to Customer, to re-perform the applicable Services to the extent necessary to correct such failure. The Direct Damages Cap shall not limit the payment of any Performance

- 4 -

Level Credits and the amounts of any such Performance Level Credits shall not be included in the determination of the aggregate amount of damages allowed under the Direct Damages Cap.

4.4    **Notification of Problems.**

Vendor shall provide to Customer written notice of any acts or omissions (whether by Customer, Vendor or any third party), any failure by Customer to perform any of Customer's obligations under the Agreement and any other events that may affect Vendor's performance of Vendor's obligations under the Agreement or that may excuse Vendor's failure to perform Vendor's obligations. Vendor shall provide such written notice within seven (7) days after Vendor first knew or should have known of such acts, omissions, or failures by Customer or other events. Such written notice shall describe in reasonable detail such acts, omissions, failures by Customer or other events and the manner in which the foregoing may affect Vendor's performance or may excuse Vendor's failure to perform its obligations. Any such acts, omissions, failures by Customer or events for which Vendor does not provide written notice as set forth in this Section shall not under any circumstances serve as the basis for excusing Vendor's failure to perform its obligations under the Agreement. Any such acts, omissions, failures by Customer or events for which Vendor does provide written notice as set forth in this Section shall not automatically excuse any failure by Vendor to perform its obligations under the Agreement. Vendor shall have the burden of demonstrating that the Agreement allows for any such acts, omissions, failures by Customer or other events for which Vendor provided written notice as set forth above to excuse any such failure by Vendor and, if Vendor demonstrates the foregoing, such failure by Vendor shall be excused only to the extent such failure is caused by the foregoing in the manner described such the written notice. Any dispute regarding whether, and to what extent, any such failure by Vendor is excused by the foregoing shall be resolved according to the dispute resolution procedures set forth in Article XXIV of the Terms and Conditions.

## ARTICLE V.    PAYMENT

5.1    Charges, Pricing Methodology, Pricing Detail.

Exhibit 5 sets forth the Charges, pricing methodologies, and pricing detail applicable to the Services described in Exhibit 3. The Transaction Agreements, if any, shall set forth all Charges, pricing methodologies, and required pricing detail applicable to the Services to be provided pursuant to such Transaction Agreements. Such pricing detail shall include Customer's required format for detailed price, delivery, cost to Customer and utilization information. Vendor shall invoice, and Customer shall pay, all Charges as detailed in Exhibit 5. (*See* Terms and Conditions, Sections 18.1, 18.2 and 18.3)

5.2    **[Intentionally omitted.]**

5.3    Taxes.

The Charges as set forth in the Exhibits hereto do not include any sales, use, service, or similar taxes that may be levied on the Vendor's products or services as provided pursuant to the Agreement. Vendor shall include, as a separate charge and not embedded in its pricing, such taxes in its invoices to Customer. Furthermore, Vendor shall, prior to delivery of the applicable services, submit its proposal to Customer, clearly marked as "GM TAX STAFF REVIEW REQUIRED," in the event Vendor proposes that Customer take responsibility for such taxes (other than taxes imposed under U.S. tax laws) to the extent applicable to products or services performed or used outside the U.S. Vendor acknowledges that such Customer tax review is required prior to any acceptance by Customer of responsibility for such taxes. (*See* Terms and Conditions, Section 20.3.)

## ARTICLE VI.  STAFFING

### 6.1  Vendor Contract Manager.

The Vendor Contract Manager is listed in Exhibit I.2 of any applicable Transaction Agreement (*See*, Terms and Conditions, Section 12.1).

### 6.2  Key Employees.

Vendor and Customer shall designate Key Employees in the manner set forth in Section 12.2 of the Terms and Conditions. The number of Key Employees under this Service Contract shall be detailed in any applicable Transaction Agreement. Any applicable Transaction Agreement contains an initial list of employees of Vendor that are designated as Key Employees. The Parties shall complete the list of Key Employees prior to the end of the Transition Period.

### 6.3  Competitive Processes.

Any applicable Transaction Agreement contains a list of those parts of the Services that constitute a Competitive Process. (*See* Terms and Conditions, Section 12.2(6))

### 6.4  Employee Transfer.

(1) **Employment Opportunity.** Within sixty (60) days after the Effective Date of this Service Contract, Customer shall identify any employees of Customer and its third-party service providers, if any, that Vendor may consider for employment, subject to any restrictions on Customer with respect thereto. Vendor shall interview any such employees that Vendor determines to be desirable candidates within thirty (30) days after the date that such employees are identified by Customer. Within ten (10) days after completion of such interviews, Vendor shall issue written offers of employment to each of such employees that it deems appropriate to hire.

(2) **Other Considerations.** Each of such employees of Customer and its third-party service providers, if any, who accept employment with Vendor shall become employees of Vendor and shall serve under the exclusive direction and control of Vendor, and shall not be deemed to be employees or agents of Customer or its third-party service providers. Vendor shall be solely responsible for, and shall hold Customer harmless for, paying all such employees' compensation attributable to their employment with Vendor, including wages, benefits, taxes, worker's compensation, disability and other insurance, and for withholding or deducting such items, to the extent required by applicable law.

(3) **No Third-Party Beneficiaries.** This Service Contract is intended to be an arrangement between Vendor and Customer and is not entered into for the individual benefit of any employees of Customer or its third-party service providers, if any, and none of such employees shall be deemed to be a third-party beneficiary of this Service Contract.

### 6.5  Fraud.

As set forth herein, Vendor will be responsible for any fraud perpetrated by any of its employees, including but not limited to, contract employees hired by Vendor. Fraud shall include, but not necessarily be limited to, financial fraud, redemption point fraud and other intentional wrong

- 6 -

doing. Vendor shall notify Customer promptly upon Vendor's discovery of fraudulent activity, or reasonable suspicion of fraudulent activity, by Vendor's employees in connection with the provision of Services under this Agreement. Customer shall notify Vendor promptly upon Customer's discovery of fraudulent activity or reasonable suspicion of fraudulent activity by Vendor's employee in connection with the provision of Services under this Agreement. Vendor will immediately remove from the Customer account employees suspected to have committed fraud on customers or Customer.

Customer shall have the right to interview employees of Vendor directly if Customer has reasonable suspicion to believe that fraudulent activity has occurred by Vendor's employees (whether discovered through notice by Vendor or discovered independently by Customer) in connection with the provision of Services under this Agreement. In connection with the foregoing, Vendor will be given advance notice of such interview and shall have an opportunity to be present at such interview. Customer will provide Vendor with all evidence obtained during the investigation prior to Vendor permitting Customer to interview a Vendor employee. Prior to the interview, Vendor and Customer shall meet, in person or by telephone, to coordinate jointly the interview process and any line of interrogation to be discussed. It is the intention of both parties that a representative of Vendor (human resources, security or otherwise) be present at all interviews conducted by Customer; if, however, Vendor can not make a representative available to participate in such interview in person or by telephone within 24 hours of Customer's request for an interview, and the circumstances require such interview on an urgent basis,, then Customer shall not be required to delay such interview to wait for Vendor presence. In any event the parties shall extend best efforts to conduct the employee interview prior to the time of any employee's removal from the Customer's account.

The foregoing Customer rights shall extend to employees who may have committed such fraud, and any employee who Customer reasonably believes may have information regarding such fraudulent activity. In the event the removed employee is determined to be innocent after investigation, the employee may be returned to Customer's account.

Vendor will indemnify, defend and hold harmless Customer and its officers, directors, employees and agents from and against any and all losses, damages, liabilities, claims, obligations, costs, expenses (including without limitation reasonable attorneys' fees) of any kind or nature which arise out of the settlement or final judgment of any claim or allegation of a third party relating to fraudulent actions by Vendor or its employees. The limitations of liability set forth in Section 29.6 of the Terms and Conditions are not applicable to the indemnity provided herein.

### ARTICLE VII.    CHANGE CONTROL PROCEDURES

**7.1    Change Control Procedures.**

Customer reserves the right at any time to direct Changes, or cause Vendor to make Changes to the Services or to otherwise change the scope of the work covered by this Service Contract and Vendor agrees to promptly make such Changes. Customer shall equitably adjust any difference in time for performance resulting from such Changes after receipt of documentation in such form and detail as Customer may reasonably direct. (*See* Terms and Conditions, Section 11.2.)

**7.2    Modification to Change Control Procedures.**

Vendor shall submit its Change Control Procedures to Customer as set forth in Exhibit 3. Upon Customer's acceptance of such Change Control Procedures, such Change Control Procedures shall take precedence over any conflicting provisions in Section 7.1 hereof. Any such accepted change Control Procedures shall preferably be incorporated herein as Exhibit 7.

7.3   **Price Change Pursuant to Change Requests.**

If either Party proposes a Change hereunder pursuant to the Change Control Procedures, the impact of such Change shall be determined in the manner set forth below.

(1)   **Existing Resources.** To the extent the proposed Change can be reasonably accommodated within the specified existing level of resources, not including overtime work, then being used by Vendor in performing its obligations hereunder, and without degradation of Vendor's compliance with all applicable performance requirements, the Charges payable by Customer under the Agreement shall not be increased. To the extent a Change proposed by either Party will reduce Vendor's cost to fully perform its obligations hereunder, the Charges payable by Customer under the Agreement shall be equitably adjusted to reflect such projected cost savings.

(2)   **Price Resolution.** To the extent the proposed Change is not subject to sub-section (1) above, the Parties will attempt in good faith to negotiate a fixed price for the proposed Change. If the Parties are unable to negotiate a fixed price, then Vendor shall quote Customer a charge for such Change equal to Vendor's incremental direct cost of providing such Change plus a profit margin equal to two percent (2%) less than Vendor's annual operating margin as reported in its most recent Annual Report. Vendor shall include with its quote the information used by Vendor to determine its incremental costs and the appropriate profit margin.

7.4   **Vendor's Response.**

Vendor shall respond promptly to all Change Requests made by Customer pursuant to the Change Control Procedures. Vendor shall use reasonable efforts to comply with any deadlines or similar time periods specified in any such Change Requests.

## ARTICLE VIII. DATA AND PHYSICAL SECURITY

8.1   **Data Security.**

Vendor shall establish and maintain safeguards against the destruction, loss, alteration, or unauthorized disclosure of the Customer Data in the possession of Vendor or Vendor Agents in accordance with Customer's security standards set forth in Exhibit 8. (*See* Terms and Conditions, Sections 16.3 and 16.5)

8.2   **Security Procedures.**

Vendor shall maintain and enforce data and physical security standards and procedures at each of the Sites in accordance with the standards and procedures set forth in Exhibit 8. (*See* Terms and Conditions, Section 16.5)

8.3   **Personal Information.**

In addition to the obligations otherwise set forth in the Agreement, Vendor shall be responsible to protect, and to ensure all Vendor Agents protect, Personal Information in the manner set forth in Exhibit 8. Notwithstanding any provision to the contrary in the Agreement, Vendor shall not provide Personal Information in any form to any third party (including any Vendor Agent) without Customer's prior written consent.

## ARTICLE IX. REPORTS AND MEETINGS

### 9.1 Performance and Status Reports.

The Statement of Work and any applicable Transaction Agreement specifies the reports and system availability statistics to be provided by Vendor pursuant to Section 10.3 of the Terms and Conditions. Vendor shall provide such reports in the manner and format, and according to the schedules, set forth in the Statement of Work.

### 9.2 Meetings.

At the frequency set forth in the Statement of Work and any applicable Transaction Agreement, Customer Contract Manager and Vendor Contract Manager and their respective designees, shall meet at a location designated by Customer or, at Customer's option, shall conduct a telephone conference call, to discuss the Parties' performance of their respective obligations under the Agreement.

## ARTICLE X. MISCELLANEOUS

### 10.1 Insurance.

(1) **Types and Amount.** During the Term, Vendor will maintain policies of insurance in the types and amounts set forth in Exhibit 10.1. For the avoidance of doubt, the insurance requirements of Exhibit 10.1 are subject to the terms and conditions of this Agreement.

(2) **Reputable Insurers.** All insurance policies will be issued by reputable insurance companies rated "A" or better by A.M. Best. If such policies do not contain a separation of insureds provision, they will be endorsed to provide cross-liability coverage.

(3) **Subcontractors.** Vendor will include all subcontractors employed by it as additional insureds under its policies or will cause each subcontractor to purchase and maintain insurance of the type specified above and listing Customer as an additional insured. When requested by Customer, Vendor will furnish copies of certificates of insurance evidencing coverage for each subcontractor.

### 10.2 Third Party Agreements.

Any applicable Transaction Agreement identifies the Third Party Agreements relevant to this Agreement. Any applicable Transaction Agreement specifies whether any such Third Party Agreements are Vendor Administered Agreements and, if so, whether Customer or Vendor will be financially responsible for such Vendor Administered Agreements. (*See* Terms and Conditions, Article VIII)

### 10.3 Substantial Change in Volume.

The following is the volume percentage applicable to Section 23.1 of the Terms and Conditions:

Changes in Charges based on volume change will be determined in accordance with Exhibit 5 (Pricing and Payment).

- 9 -

10.4 **Direct Damages Cap.**

The following are additional amounts, if any, applicable to the Direct Damages Cap:

None.

(*See* Terms and Conditions, Section 29.6.)

10.5 **Notices.**

(1) All notices, requests, consents and other communications required or permitted under the Agreement shall be addressed as set forth in Exhibit 10.5.

(2) Vendor shall notify the Customer Contract Manager in writing at least ninety days prior to the termination or expiration of any license or lease relating to the Services or of the Services or any portion thereof. Such notice shall include the details of such termination or expiration, a reasonable description of the options for renewal and, to the extent Vendor knows, should have known, or reasonably can anticipate, a description of the potential impact of such termination or expiration on Customer's business environment.

10.6 **Governing Law.**

The Agreement shall be interpreted in accordance with, and governed by, the laws of the United States of America and the State of Michigan. (*See* Terms and Conditions, Section 31.10.) Each Party hereby consents to the exclusive jurisdiction of the state and federal courts located in the State of Michigan.

\* \* \* \* \*

**IN WITNESS WHEREOF,** this Service Contract has been executed by the Parties as of the Effective Date.

| VENDOR CONTRACTING PARTY | CUSTOMER CONTRACTING PARTY |
|---|---|
| By: *Andrea J Ayers* | By: *Terry Inch* |
| (Print) ANDREA J. AYERS | (Print) TERRY M. INCH |
| Title: PRESIDENT | Title: DIRECTOR - ON STAR SERVICE DELIVERY |
| Date: 12-7-07 | Date: 12-11-07 |

- 11 -

GLOBAL PURCHASING & SUPPLY CHAIN

By: _____[signature]_____

(Print) Andre DuPerry

Title: Dir. Purchasing

Date: 1-10-08