Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York  11530-9194
Telephone: (516) 741-6565
Facsimile: (516) 741-6706

      and

Russell R. Johnson III, Esq.
John M. Merritt, Esq.
Law Firm Of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone:  (804) 749-8861
Facsimile:  (804) 749-8862

Hearing Date and Time:  6/25/09 at 9:45 a.m.
Objection Deadline:  6/15/09 at 4:00 p.m.

*Co-Counsel for Virginia Electric and Power Company, d/b/a Dominion Virginia Power, The East Ohio Gas Company, d/b/a Dominion East Ohio, Salt River Project, Duke Energy Indiana, Inc., Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., American Electric Power, The Detroit Edison Company, Michigan Consolidated Gas Company, Consolidated Edison Company Of New York, Inc., Southern California Edison Company, Duke Energy Carolinas, LLC, Baltimore Gas and Electric Company, Delta Township Utilities, LLC, Delta Township Utilities II, LLC, Suez/VWNA/DEGS of Lansing, LLC, Shreveport Red River Utilities, LLC, Veolia Water Partners VI, LLC Massachusetts Electric Company d/b/a National Grid and Niagara Mohawk Power Corporation, d/b/a National Grid*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  | : |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **GENERAL MOTORS CORP.,** *et al.,* | : | **Case No. 09-50026 (REG)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

------------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

1.    Introduction ……………………………………………………….. 2

2.    Facts …………………………………………………………… 3

3.    Procedural Facts………………………………………………….......... 3

4.    The Utility Motion ……………………………………………………… 3

5.    Facts Regarding The Debtors …………………………………………... 7

6.    The 363 Transaction – Debtors' Sale Motion……………………………... 7

7.    Post-Petition Financing……………………………………………………11

8.    Facts Concerning The Utilities And The Joint Venture Utilities……………….15

9.    Discussion………………………………………………………………..23

       A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE
            UTILITIES AND THE JOINT VENTURE UTILITIES……………….23

            1.    The Utility Motion Should Be Denied As To the Utilities And
               The Joint Venture Utilities Because The Debtors Have Not
               Set Forth Any Basis For Modifying The Utilities' And The
               Joint Venture Utilities' Requested Deposits……………………26

            2.    The Court Should Reject The Proposed Procedures That
               Attempt To Add Time Consuming And Burdensome
               Requirements That Are Not Found In Section 366 ……………27

       B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE
            THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED
            BY THE UTILITIES AND THE JOINT VENTURE UTILITIES PURSUANT
            TO SECTION 366 OF THE BANKRUPTCY CODE…………………..28

## TABLE OF AUTHORITIES

CASES

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,*
    530 U.S. 1, 120 S. Ct., 147 L. Ed. 2d 1 (2000)...........................................24

*In the Matter of Robmac, Inc.,*
    8 B.R. 1 (Bankr. N.D. Ga. 1979)..........................................................30

*In re Begley,*
    760 F.2d 46 (3d Cir. 1985)..................................................................29

*In re Coastal Dry Dock & Repair Corp.,*
    62 B.R. 879 (Bankr. E.D.N.Y. 1986).....................................................29

*In re Cunha,*
    1 B.R. 330 (Bankr. E.D. Va. 1979)........................................................29

*In re Hanratty,*
    907 F.2d 1418 (3d Cir. 1990)...............................................................29

*In re Lucre, Inc.,*
    333 B.R. 151 (Bankr. W.D. Mich. 2005)................................................26

*In re Stagecoach Enterprises, Inc.,*
    1 B.R. 732 (Bankr. M.D. Fla. 1979).................................................26,29

*In re Utica Floor Maintenance, Inc.,*
    25 B.R. 1010 (Bankr. N.D.N.Y. 1982)...................................................29

*In re Viking Offshore (USA), Inc.,*
    2008 WL 782449 (Bankr. S.D. Tex. Mar. 20, 2008).................................28

*Lamie v. United States Trustee,*
    540 U.S. 526, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)........................24

*Rogers v. Laurain (In re Laurain),*
    113 F.3d 595 (6th Cir. 1997)................................................................24

*Virginia Electric and Power Company v. Caldor, Inc.,*
    117 F.3d 646 (2d Cir. 1997).................................................................28

*In re Robmac, Inc.,* 8 B.R.1,3-4 (Bankr. N.D. Ga. 1979)....................................30

**STATUTES**

11 U.S.C. §365……………………………………………………….…...10, 23

11 U.S.C. §366…………………………………………2-6, 19, 20, 23, 25-29, 31

Bankruptcy Code sections 1107(a) and 1108……………………………………….3

Rule 201 of the Federal Rules of Evidence………………………..…………….16

**OBJECTION OF CERTAIN UTILITY COMPANIES TO MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 366 (I) APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE**

**TO THE HONORABLE JUDGE ROBERT GERBER,**
**UNITED STATES BANKRUPTCY JUDGE:**

Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("DVP"), The East Ohio Gas Company, d/b/a Dominion East Ohio ("DEO"), Salt River Project ("SRP"), Duke Energy Indiana, Inc. ("DEI"), Duke Energy Ohio, Inc. ("Duke Ohio"), Duke Energy Kentucky, Inc. ("DEK"), Duke Energy Carolinas, LLC ("DEC"), American Electric Power ("AEP"), The Detroit Edison Company ("DTE"), Michigan Consolidated Gas Company ("MichCon"), Consolidated Edison Company Of New York, Inc. ("ConEd"), Southern California Edison Company ("SCE"), Baltimore Gas and Electric Company ("BGE"), Massachusetts Electric Company, d/b/a National Grid ("MECO"), Niagara Mohawk Power Corporation, d/b/a National Grid ("NIMO") (collectively, the "Utilities") and Delta Township Utilities, LLC ("Delta I"), Delta Township Utilities II, LLC ("Delta II"), Suez/VWNA/DEGS of Lansing, LLC ("Lansing"), Shreveport Red River Utilities, LLC ("Shreveport"), and Veolia Water Partners VI, LLC ("Veolia") (collectively, the "Joint Venture Utilities") by counsel, hereby object to the *Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, And (III) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service* (the "Utility Motion"), and set forth the following:

## **Introduction**

Section 366(c)(2) of the Bankruptcy Code requires a Chapter 11 debtor to provide utilities

with "adequate assurance of payment for utility service that is satisfactory to the utility" within

thirty (30) days of the Petition Date.  If a debtor believes that the amount of the utility's request

under Section 366(c)(2) needs to be modified, then the debtor, pursuant to Section 366(c)(3), can

file a motion seeking to modify the amount of the utility's request.  Despite the foregoing

statutory scheme, the Debtors filed the Utility Motion at the outset of this case seeking to

establish the amount of adequate assurance of payment as a two-week cash deposit (the

"Deposit") without any consideration of the Utilities' requests for adequate assurance of payment

pursuant to Section 366(c)(2).

Case law is clear that the Debtors bear the burden under Section 366(c)(3) to demonstrate

why, based on the facts of the case, the Court should modify the Utilities' and the Joint Venture

Utilities' requests for adequate assurance of payment satisfactory to the Utilities and the Joint

Venture Utilities under Section 366(c)(2).  Despite this burden, the Debtors fail to set forth any

factual basis in the Utility Motion why this Court should modify the Utilities' and the Joint

Venture Utilities' requests for adequate assurance of payment down to a two week deposit.

When the Debtors filed the Utility Motion, the Debtors were or should have been aware that: (A)

the Utilities issue bills to them, as well as the Utilities' other customers, at the end of the monthly

billing cycles; (B) the Joint Venture Utilities issue invoices to the Debtors at the end of each

month;  (C) the Utilities and the Joint Venture Utilities provide the Debtors with generous trade

terms in which to pay those invoices and a cure period if the Debtors fail to pay the invoice by

the applicable due date.  The Debtors, however, fail to address why, based on these known facts,

2

the Court should consider a two week deposit as adequate assurance of payment.  Accordingly,

the Court should deny the  Utility Motion because it was not filed in accordance with the

statutory scheme of Section 366(c) and the Debtors have failed to set forth any legal or factual

basis why this Court should modify the Utilities and Joint Venture Utilities' requests for

adequate assurance of payment.

## Facts

## Procedural Facts

1.      On June 1, 2009 (the "Petition Date"), General Motors Corporation and certain of

its subsidiaries (the "Debtors") commenced their cases (the "Bankruptcy Cases") that are now

pending in this Court by filing voluntary petitions for relief under Chapter 11 of Title 11 of the

United States Code, 11 U.S.C §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors continue to

operate their business and manage their properties as debtors in possession pursuant to

Bankruptcy Code sections 1107(a) and 1108.

2.      The Bankruptcy Cases are being jointly administered.

## The Utility Motion

3.      On the Petition Date, the Debtors filed the Utility Motion.

4.      Even though the Utility Motion commenced a contested matter, the Debtors failed

to serve the Utility Motion upon the Utilities and the Joint Venture Utilities in the manner of

service required under Rule 9014(b) of the Federal Rules of Bankruptcy Procedure.  Accordingly,

the Debtors failed to provide the Utilities and the Joint Venture Utilities with proper notice of the

Utility Motion in violation of the Utilities' and the Joint Venture Utilities' rights to due process.

5.      Thus, because the Utilities and the Joint Venture Utilities were not properly

3

served with the Utility Motion, they had no opportunity to respond to the Utility Motion or

otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on the Petition

Date, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief

sought by the Debtors) requires that there be "notice and a hearing" and the Utilities and the Joint

Venture Utilities were known entities that provided continuous prepetition utility goods and/or

services to the Debtors (the "First-Day Hearing").

6.    In the Utility Motion, the Debtors are requesting authority from the Court to

provide adequate assurance in an amount that is satisfactory to the Debtors – a position clearly in

violation of the express provisions of Section 366(c)(2), which requires the Debtors to provide

the Utilities and the Joint Venture Utilities with adequate assurance of payment satisfactory to

the Utilities and the Joint Venture Utilities.

7.    Moreover, instead of responding to or seeking to modify the adequate assurance

demands of their utility companies, the Debtors elected to file the Utility Motion and seek *ex*

*parte* Court approval for their own form of adequate assurance of payment consisting of the

Deposit,  but only to the utilities that: (a) timely submit a written request for the Deposit to

Debtors and to Debtors' counsel; (b) do not already hold a deposit equal to or greater than two

(2) weeks of utility services; and, (c) are not currently paid in advance for their utility services.

Accordingly and despite their statutory obligation under Section 366 to provide all of their

utilities with adequate assurance of payment, the Debtors are improperly seeking to limit their

payment of the Deposit only to those utilities that satisfy the Debtors' arbitrary criteria.

Furthermore, the Debtors imply that any utilities that are already holding a pre-petition deposit

equal to or greater than two (2) weeks of utility services should simply substitute that deposit for

4

post-petition adequate assurance.  Forcing any of the Utilities to use their pre-petition deposits as

post-petition deposits, however, constitutes an improper injunction against the Utilities because it

deprives the Utilities of their express statutory rights of recoupment under Section 366(c)(4).

8.      The Debtors also require that the Deposit be returned to the Debtors at the

conclusion of the Bankruptcy Cases if not returned or applied sooner.  Utility Motion at ¶¶ 35-36.

It is not clear, however, whether the Debtors are seeking the return of the Deposit before or after

all of the Debtors' post-petition invoices are paid in full.  As the Debtors should know, once the

Debtors close an account, either during or following the conclusion of their Bankruptcy Cases,

the applicable utility will issue an invoice for service provided from the last bill to the

termination date, which will need to be paid along with any other outstanding invoices on the

account.  Accordingly, if a utility is not permitted to apply the Deposit to all amounts due,

including the final amounts due for post-petition service, then the Deposit is not really serving as

security.

9.      In support of the Utility Motion, the Debtors:[1]

A.      Allege that "there are few, if any, defaults or arrearages of any significance

with respect to the Debtors' undisputed invoices for prepetition Utility Services, other than

payment interruptions that may be caused by the commencement of these chapter 11 cases."

Utility Motion at ¶ 31.  Section 366(c)(3)(B)(ii), however, specifically provides that "the

payment by the debtor of charges for utility service in a timely manner before the date of the

filing of the petition" is no longer to be considered in making a determination under Section

366(c).  Moreover, even though the Debtors claim to have timely paid their pre-petition invoices,

---

[1] In an ironic contradiction, Debtors also recognize that a debtor's timely payment history and the availability of an administrative expense priority are statutorily prohibited considerations under Section 366.  Utility Motion at ¶ 43.

as further shown herein, the Debtors owe the Utilities and the Joint Venture Utilities a substantial aggregate amount as of the Petition Date.

B.        Contend that the Deposit "in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business . . . constitute adequate assurance to the Utility Companies as contemplated by section 366 of the Bankruptcy Code." Utility Motion at ¶ 37; *see also* Utility Motion at ¶ 34.  The Debtors' purported ability and intention to pay all post-petition utility services in the ordinary course of business represents nothing more than the promise of an allowed administrative expense.  Section 366(c)(3)(B)(iii), however, expressly precludes the Court from considering the availability of an administrative expense priority when making a determination as to whether an assurance of payment is adequate.

10.      Finally, throughout the Utility Motion, the Debtors seek to avoid the procedural and substantive requirements of Section 366 by imposing upon the Utilities and the Joint Venture Utilities various burdensome procedures that are either not authorized by Section 366 or are contrary to its specific provisions. Utility Motion at ¶ 38.

11.      Following the *ex parte* First-Day Hearing, the Court entered the *Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, And (III) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service* (the "Interim Utility Order").

12.      In the Interim Utility Order, the Court, *inter alia*: (a) granted the Utility Motion on an interim basis; and, (b) set an objection deadline to the Utility Motion of June 15, 2009, at 4:00 p.m. and scheduled a Final Hearing on the Utility Motion on June 25, 2009, at 9:45 a.m.

6

## Facts Regarding the Debtors

13.    As of March 31, 2009, Debtors had consolidated global recorded assets totaling

$82,290,000,000 and liabilities totaling $172,810,000,000. *Affidavit Of Frederick A. Henderson*

*Pursuant To Local Bankruptcy Rule 1007-2* at Schedule 4 (hereinafter "Henderson Aff.").

14.    The Debtors filed their Bankruptcy Cases for the purpose of obtaining Court

approval and protection for the sale of substantially all the Debtors' assets and the assumption

and assignment of certain executory contracts and unexpired leases of personal property and

nonresidential real property to Vehicle Acquisition Holdings, LLC, and/or to the highest bidder

free and clear of liens, claims, encumbrances, and other interests (the "363 Transaction").

Henderson Aff. at ¶ 1.

15.    The Debtors contend that other than the 363 Transaction there is no viable

alternative for preserving the going concern value of the Debtors' businesses. Without

completion of the 363 Transaction, the Debtors will be forced to liquidate their assets.

Accordingly, the Debtors are seeking prompt approval from the Court for the 363 Transaction.

Henderson Aff. at ¶ 5.

## The 363 Transaction - Debtors' Sale Motion

16.    On the Petition Date, the Debtors filed *Debtors' Motion Pursuant To 11 U.S.C. §§*

*105, 363(b), (f), (k), And (m), And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006, To (I)*

*Approve (A) The Sale Pursuant To The Master Sale And Purchase Agreement With Vehicle*

*Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free And Clear Of Liens,*

*Claims, Encumbrances, And Other Interests; (B) The Assumption And Assignment Of Certain*

7

*Executory Contracts And Unexpired Leases; And (C) Other Relief; And (II) Schedule Sale Approval Hearing* (the "Sale Motion").

17.    Debtors propose the following pertinent deadlines for conducting the 363 Transaction: (a) June 22, 2009, at 5:00 p.m. – deadline for the submission of bids by any Qualified Bidder; and, (b) June 30, 2009 – the Sale Hearing wherein the Debtors shall seek approval of and authority to consummate the 363 Transaction.  Sale Motion at ¶¶ 1 & 49.

18.    In the Sale Motion, the Debtors state that the 363 Transaction, according to the terms set forth under the *Master Sale And Purchase Agreement* (the "MPA"),[2] contemplates that substantially all of the Debtors' assets, including substantially all of the equity interests of the Debtors' directly-held subsidiaries and joint ventures (other than certain excluded entities) (the "Purchased Assets") will be sold and transferred to the Purchaser, and that certain liabilities of the Debtors (the "Assumed Liabilities") will be assumed by the Purchaser.  Further, any of the Debtors' assets that are excluded from the 363 Transaction will be administered in the Debtors' Bankruptcy Cases.  Sale Motion at ¶ 16.

19.    In the Sale Motion, the Debtors indicate that the purchase price for the Purchased Assets shall be as follows: (a) a credit bid, pursuant to Section 363(k) of the Bankruptcy Code, in an amount equal to (i) the amount of indebtedness owed by the Debtors to the Purchaser as of the Closing pursuant to the UST Credit Facilities and the DIP Facility, less (ii) approximately $7.7 billion of indebtedness under the DIP Facility; (b) the UST Warrant which is the warrant issued by General Motors Corporation ("GM") to the US Treasury pursuant to and in consideration of the UST Credit Facilities; (c) the issuance by the Purchaser to  GM of 10% of the Common Stock

---

[2] Debtors attach a copy of the proposed MPA as Exhibit "A" to the Sale Motion.

8

of the Purchaser as of the Closing; (d) warrants to purchase up to 15% of the shares of Common

Stock of the Purchaser under certain terms and conditions; and, (e) the assumption by the

Purchaser of the Assumed Liabilities as set forth under Section 2.3(a) of the MPA.  In addition

and in the event that the estimated amount of allowed pre-petition general unsecured claims

exceeds $35 billion, then the Purchaser shall issue an additional 2% of the outstanding Common

Stock of the Purchaser as of the Closing.[3]  Sale Motion at ¶ 18.

20.    In the Sale Motion, Debtors also represent that substantially all executory

contracts with the Debtors' direct suppliers are likely to be assumed and assigned by the Debtors

to the Purchaser at or following the Closing.  Sale Motion at ¶ 22.

21.    In the Sale Motion, the Debtors describe the procedures set forth in the MPA

concerning the assumption and assignment of certain executory contracts and leases by the

Debtors to the Purchaser.  The Debtors state that the Purchaser has the right to designate as an

"Assumable Executory Contract", any executory contract or lease that the Purchaser may want to

assume subject to certain procedures set forth in the MPA.  Sale Motion at ¶ 69.

22.    In addition, Section 6.6(a) of the MPA provides that the Assumable Executory

Contract Schedule sets forth a list of executory contracts that the Debtors may assume and assign

to the Purchaser as part of the 363 Transaction.  The Assumable Executory Contract Schedule is

defined as Section 1.1A of the Seller's Disclosure Schedule.  Debtors do not attach a copy of the

Seller's Disclosure Schedule to the MPA.  In fact, under the MPA, the Seller's Disclosure

Schedule is defined as the Schedule provided and delivered by Debtors to the Purchaser

---

[3] UST Credit Facilities is defined under Section 1.1 of the MPA as follows: (i) the Loan and Security Agreement, dated December 31, 2008, between Parent and Sponsor and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009, and May 27, 2009 issued by Parent to Sponsor as additional compensation for

immediately prior to the execution of the MPA and as updated from time to time. Indeed, in the

Sale Motion, the Debtors make clear that the MPA attached as Exhibit A to the Sale Motion does

not include any schedules or exhibits. Sale Motion at ¶ 15, n.2.

23.     In the Sale Motion, the Debtors propose a mailing deadline of three (3) days after

entry of the order approving the Sale Motion as the Mailing Deadline (the "Mailing Deadline").

Further, on or before the Mailing Deadline, the Debtors shall serve by first-class mail, postage

prepaid, or other method reasonably calculated to provide notice, a notice of the assumption and

assignment of the Assumable Executory Contracts and the proposed cure amounts relating to the

Assumable Executory Contracts (the "Assumption and Assignment Notice") upon the non-

Debtor parties to the Assumable Executory Contracts. Sale Motion at ¶ 50.

24.     Concerning the requirements for the provision of adequate assurance of future

performance by the assignee pursuant to Section 365(f)(2)(B) of the Bankruptcy Code, the

Debtors propose that the financial credibility, willingness, and ability of the Purchaser to perform

under any executory contracts assumed and assigned as part of the 363 Transaction cannot be

credibly disputed. Accordingly, in the Sale Motion, the Debtors propose that the opportunity for

the Court and other interested parties to evaluate the ability of the Purchaser, or any other

successful bidder, to provide adequate assurance of future performance should occur at the Sale

Hearing. Sale Motion at ¶ 76.

25.     On June 2, 2009, the Court entered the *Order Pursuant To 11 U.S.C. §§ 105, 363*

*And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006 (I) Approving Procedures For Sale Of*

*Debtors' Assets Pursuant To Master Sale And Purchase Agreement With Vehicle Acquisition*

---

the extensions of credit under the Loan and Security Agreement, dated December 31, 2008. The DIP Facility is
more fully discussed herein.

*Holdings LLC, A U.S. Treasury-Sponsored Purchaser; (II) Scheduling Bid Deadline And Sale*

*Hearing Date; (III) Establishing Assumption And Assignment Procedures; And (IV) Fixing*

*Notice Procedures And Approving Form Of Notice* (the "Sale Procedures Order").  In the Sale

Procedures Order, the Court approved the Sale Motion and scheduled the Sale Hearing on June

30, 2009, at 9:45 a.m.  Further, the Court approved the Debtors' proposed notices described in

subparagraphs 9(a) through 9(d) of the Sale Procedures Order finding that the notices are good

and sufficient and that no other or further notice shall be required from the Debtors if said notices

are provided in the manner set forth under paragraph 9 of the Sale Procedures Order.

Accordingly, the Court approved the Mailing Deadline which, based upon the date of entry of the

Sale Procedures Order, is June 5, 2009.

### Post-Petition Financing

26.    On the Petition Date, the Debtors filed the *Motion Of Debtors For Entry Of An*

*Order Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364 (i) Authorizing The Debtors To Obtain*

*Postpetition Financing, Including On An Immediate, Interim Basis; (ii) Granting Superpriority*

*Claims And Liens; (iii) Authorizing The Debtors To Use Cash Collateral; (iv) Granting*

*Adequate Protection To Certain Prepetition Secured Parties; (v) Authorizing The Debtors To*

*Prepay Certain Secured Obligations In Full Within 45 Days; And (vi) Scheduling A Final*

*Hearing Pursuant to Bankruptcy Rule 4001* (the "Financing Motion").

27.    In the Financing Motion, the Debtors are seeking, *inter alia*, authority from the

Court to obtain post-petition financing by entering into the *$33,300,000,000 Secured*

*Superpriority Debtor-In-Possession Credit Agreement* (the "DIP Facility") that is substantially in

the form of **Exhibit A** attached to the Financing Motion.  Financing Motion ¶ 1.

11

28.    The DIP Facility constitutes an agreement between GM, as Borrower, and certain domestic subsidiaries as Guarantors, and the US Treasury and Export Development Canada ("EDC") (collectively, the "DIP Lenders") to provide immediate access to interim post-petition secured financing in the amount of $15.0 billion with a total commitment of post-petition secured financing in the amount of $33.3 billion.  Financing Motion ¶ 2.

29.    In the Financing Motion, Debtors allege that without access to the DIP Facility, the Debtors would be forced into immediate liquidation.  Moreover, the DIP Facility is the only source of post-petition secured financing available to the Debtors.  Financing Motion ¶ 62. Moreover, if the 363 Transaction is consummated, then a majority of the debts outstanding under the DIP Facility, with the exception of less than $1 billion, will be credit bid and/or assumed by the Purchaser such that the Debtors' estates will not become liable for such amounts.  Financing Motion ¶ 67.

30.    The proceeds from the DIP Facility are to be used by the Debtors in accordance with the budget which remains subject to the approval of the DIP Lenders (the "Budget"). Financing Motion at ¶ 2.  Debtors provide a copy of the initial Budget as an exhibit attached to the Financing Motion.  Further, the Debtors represent that the Budget will be adequate to pay all administrative expenses due or accruing during the period covered by the Budget.  Financing Motion ¶ 63.  The initial Budget attached to the Financing Motion, however, does not provide specific and/or detailed information concerning individual allocations for payment of administrative expenses.

31.    To secure the Debtors' repayment obligations under the DIP Facility, the DIP Lenders shall receive first-priority security interests in and liens on all unencumbered assets and

property of the Debtors and valid and perfected junior security interests in and liens on property and assets of the Debtors that are encumbered by non-avoidable liens (the "Senior-Post Petition Liens" and the "Junior Liens").  In addition, the DIP Lenders shall receive Superpriority administrative expense claims pursuant to Section 364(c) of the Bankruptcy Code (the "Super-Priority Claims").  The DIP Lenders' Senior Post-petition Liens, Junior Liens and Super-Priority Claims are subject only to the carve-out and to any permitted prior liens.  Financing Motion at ¶ 2.

32.    Finally, under the Financing Motion, the Debtors propose a carve-out in the aggregate amount of $20,000,000 to secure payment of professional fees, including Debtors' counsel, for all fees and expenses incurred in the Bankruptcy Cases including all fees and expenses incurred prior to any Event of Default by the Debtors under the DIP Facility (the "Carve-Out").  Financing Motion at ¶ 2(p).

33.    Contemporaneous with the filing of the Financing Motion, the Debtors also filed the *Motion Of Debtors For Entry Of Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, And 507 (i) Authorizing Use Of Cash Collateral, (ii) Granting Adequate Protection To The Revolver Secured Parties, (iii) Granting Adequate Protection To The Term Loan Secured Parties, And (iv) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001* (the "Cash Collateral Motion").

34.    Under the Collateral Motion, the Debtors seek authority from the Court for access to and use of cash collateral in the form of $1.5 billion in cash and cash equivalents which is the product of the Debtors' Pre-petition Revolver Facility (the "Cash Collateral").  Cash Collateral Motion at ¶¶ 2 & 5.

13

35.    The Debtors represent that access to the DIP Facility alone without the use of Cash Collateral will be insufficient to meet all of the Debtors' anticipated disbursements. Cash Collateral Motion at ¶ 5.

36.    In exchange for the Debtors' use of Cash Collateral, the Pre-petition Lender under the Pre-petition Revolver Facility shall be provided with a superpriority claim subject to the Carve-Out and the Super-Priority Claims of the DIP Lenders. Cash Collateral Motion at ¶ 5.[4]

37.    On June 2, 2009, the Court entered the *Interim Order Pursuant To Bankruptcy Code Sections 105(a), 361, 362, 363, 364 And 507 And Bankruptcy Rules 2002, 4001 And 6004 (A) Approving A DIP Credit Facility And Authorizing The Debtors To Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens And Super-Priority Status, (C) Authorizing The Use Of Cash Collateral, (D) Granting Adequate Protection To Certain Pre-Petition Secured Parties And (E) Scheduling A Final Hearing* (the "Interim Financing Order"). Under the Interim Financing Order, the Court, *inter alia*, granted the Financing Motion and authorized the Debtors to use the funds available under the DIP Facility in accordance with the Budget on an interim basis and in the interim commitment amount of $15 billion. In addition, the Court approved the Carve-Out and scheduled a final hearing for the Financing Motion on June 25, 2009, at 9:45 a.m.

38.    On June 1, 2009, the Court entered the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 And Fed. R. Bankr. P. 2002, 4001 And 9014 (I) Authorizing Debtors To Use Cash*

---

[4] In the Cash Collateral Motion, the Debtors are also seeking the continued use of certain equipment and fixtures which serve as the collateral for the Debtors' repayment obligations under a pre-petition Term Loan. Accordingly, in exchange for the use of Cash Collateral, the Debtors also propose that the superpriority claim provided to the Pre-petition Lender under the Pre-petition Revolver Facility shall be *pari passu* with any adequate protection superpriority claim granted in favor of the Debtors' pre-petition Term Loan Lenders.

14

*Collateral, (II) Granting Adequate Protection To Pre-Petition Revolver Secured Parties And (III)*

*Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(b)* (the "Interim Cash Collateral

Order"). Under the Interim Cash Collateral Order, the Court, *inter alia*, granted the Debtors'

access to and use of Cash Collateral, in accordance with the Budget, on an interim basis and

scheduled a final hearing for the Cash Collateral Motion on June 25, 2009, at 9:45 a.m.

### Facts Concerning the Utilities and the Joint Venture Utilities

39.     Each of the Utilities and the Joint Venture Utilities provided the Debtors with

prepetition utility goods and/or services and has continued to provide the Debtors with utility

goods and/or services since the Petition Date.

40.     Under the Utilities' billing cycles, the Debtors receive approximately one month

of utility goods and/or services before the Utility issues a bill for such charges. Once a bill is

issued, the Debtors have approximately 15 to 30 days to pay the applicable bill. If the Debtors

fail to timely pay the bill, a past due notice is issued and a late fee is subsequently imposed on the

account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities

issue a notice that informs the Debtors that they must cure the arrearage within a certain period of

time or their service will be disconnected. Accordingly, under the Utilities' billing cycles, the

Debtors could receive at least 2 months of unpaid charges before the utility could cease the

supply of goods and/or services for the post-petition payment default.

41.     Under the Joint Venture Utilities' billing cycles, the Debtors receive

approximately one month of utility goods and/or services before the applicable utility issues a bill

for such charges. Once a bill is issued, the Debtors have approximately 60 days to pay all

undisputed amounts of the applicable bill. Further, the Debtors have the right to raise a good-

15

faith dispute concerning any amount of a bill and withhold payment equal to that amount. For any amounts that are subsequently determined by the parties to be due and payable following the resolution of a good-faith dispute, the Debtors shall remit payment within ten (10) Business Days together with applicable interest. Accordingly, under the Joint Venture Utilities' billing cycles, the Debtors could receive at least 3 or more months of unpaid charges before the applicable utility could cease the supply of goods and/or services for the post-petition payment default.

42.     In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities and regulated billing cycles, the Utilities request this Court, pursuant to Rule 201 of the Federal Rules of Evidence, to take judicial notice of the Utilities' billing cycles. Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities are providing the following web site links to the tariffs and/or state laws, regulations and/or ordinances, and/or cooperative service rules:

A.     DVP:

http://www.dom.com/customer/vabus_rates.jsp

B.     DEO:

http://www.dom.com/customer/ohres_tariffs.jsp

C.     SRP:

Rules and Regulations:

http://www.srpnet.com/about/pdfx/rulesandregsrev2004.pdf

Price Plans:

https://www.srpnet.com/prices/pdfx/2008_ratebook_Nov08_final.pdf

D.     DEI:

16

http://www.duke-energy.com/rates/indiana/tariff.asp

     E.      Duke Ohio:

http://www.duke-energy.com/rates/ohio/electric.asp

     F.      DEK:

http://www.duke-energy.com/kentucky-business.asp

     G.      DEC:

http://www.duke-energy.com/rates/north-carolina.asp

     H.      AEP:

http://www.aepcustomer.com/tariffs/default.htm

     I.      DTE:

http://my.dteenergy.com/otherInformation/pdfs/detroitEdisonTariff.pdf.

     J.      MichCon:

http://my.dteenergy.com/otherInformation/pdfs/michConTariff.pdf

     K.      ConEd: http://www.coned.com/rates/

     L.      SCE:

http://www.sce.com/AboutSCE/Regulatory/tariffbooks/ratespricing/businessrates.htm

     M.      BGE:

Electric:
http://www.bge.com/portal/site/bge/menuitem.b0ab2663e7ca6787047eb471016176a0/

Gas:
http://www.bge.com/portal/site/bge/menuitem.d7305449a99570c7047eb471016176a0/

     N.      MECO:

https://www.nationalgridus.com/masselectric/business/rates/4_other.asp

O.    NIMO:

https://www.nationalgridus.com/niagaramohawk/business/rates/rates.asp

43.    As set forth herein, not all of the Utilities and Joint Venture Utilities are seeking
security deposits from the Debtors as their first alternative.  If, however, all of the Utilities and
Joint Venture Utilities were seeking cash deposits, the security deposits permitted by the
applicable Tariffs and/or necessary to secure the Joint Venture Utilities' billing exposure under
the applicable contracts are as follows:

| **Utility** | **No. of Accts.** | **Est. Pre-Pet. Debt** | **Dep. Request** |
| --- | --- | --- | --- |
| DVP | 1 | $60,000.00 | $140,738.00 (2-month) |
| DEO | 1 | $271,697.75 | $74,794.00 (2-month) |
| SRP | 24 | $62,482.82 | $202,034.00 (2-month) |
| DEI | 16 | $Not yet available | $755,760 (2-month) |
| Duke Ohio | 11 | $Not yet available | $119,220 (2-month) |
| DEK | 1 | $Not yet available | $10,675 (2-month) |
| DEC | 2 | $Not yet available | $40,460.00 (2-month) |
| AEP | 10 | $861,764.30 | $1,798,064 (2-month) |

| **Utilities** | **No. of Accts.** | **Est. Pre-Pet. Debt** | **Dep. Request** |
| --- | --- | --- | --- |
| DTE | 46 | $12,665,773.39 | $20,542,898 (3-month) |
| MichCon | 1 | $167,836.86 | $296,920.05 (3-month) |
| ConEd | 5 | $Not yet available | $152,365 (2-month) |
| SCE | 7 | $47,464.26 | $337,570.00 (2-month) |
| BGE | 3 | $68,000.00 | $70,382.00 (2-month) |

18

| | | | |
|---|---|---|---|
| MECO | 1 | $Not yet available | $77,710.73 (2-month) |
| NIMO | 5 | $Not yet available | $1,615,933.49 |
| Delta I | 1 | $70,984.43 | $276,320 (2-month) |
| Delta II | 1 | $525,772.44 | $2,453,480 (2-month) |
| Lansing | 1 | $213,637.43 | $2,273,240 (2-month) |
| Shreveport | 1 | $804,164.44 | $1,439,280 (2-month) |
| Veolia | 1 | $266,387.04 | $266,000 (2-month) |

44.    DVP maintained a pre-petition cash deposit on the Debtors pre-petition account in the amount of $140,738.00 that it will recoup, pursuant to Section 366(c)(4), against the Debtors' pre-petition debt in the approximate amount of $60,000.00. If the remaining credit, once the final prepetition debt is determined, is equal to or exceeds $70,369, DVP would accept moving that credit to its post-petition accounts to serve as its post-petition adequate assurance of payment.

45.    SRP maintained a pre-petition cash deposit on the Debtors' prepetition accounts in the amount of $151,059.00, which has accrued interest of $1,364.79. SRP, pursuant to Section 366(c)(4), shall recoup the pre-petition deposit against the pre-petition debt in the approximate amount of $62,482.82 which will leave a surplus pre-petition deposit in the approximate amount of $89,940.97 (the "SRP Surplus Deposit"). The majority of the Debtors' accounts with SRP pertain to a facility leased by GM (the "Proving Grounds"). Upon information and belief, on or around July 1, 2009, GM is moving from the Proving Grounds to a new facility located in Yuma, Arizona. Assuming GM will be vacating the Proving Grounds by July 1, 2009, SRP is willing to resolve its adequate assurance request as follows: (a) retaining the SRP Surplus Deposit to serve

19

as Debtors' post-petition deposit on the accounts; (b) the Debtors shall pay SRP's post-petition

invoices by the applicable due date; and (c) the Debtors shall promptly notify SRP when they no

longer require post-petition utility service from SRP.

46.    BGE maintained a pre-petition cash deposit on the Debtors' pre-petition accounts

in the amount of $34,697.00 that it will recoup, pursuant to Section 366(c)(4), against the

Debtors' pre-petition debt in the approximate amount of $68,000.00.

47.    SCE maintained a pre-petition cash deposit on the Debtors' prepetition accounts

in the amount of $319,150, which has accrued interest of $45,333.44.  SCE, pursuant to Section

366(c)(4), shall recoup the pre-petition deposit against the pre-petition debt in the approximate

amount of $47,464.26, which will leave a surplus pre-petition deposit in the approximate amount

of $317,019.18 (the "SCE Surplus Deposit").  Based upon the foregoing, SCE is willing to

resolve its adequate assurance request as follows: (a) retaining the SCE Surplus Deposit to serve

as Debtors' post-petition deposit on the accounts; (b) the Debtors shall pay SCE's  post-petition

invoices by the applicable due date; and (c) the Debtors shall promptly notify SCE if they no

longer require post-petition utility service from SCE.

48.    AEP maintained letters of credit in the amounts of $420,000 and $850,000 on the

Debtors' prepetititon accounts.

49.    As stated herein, the Utilities are entitled to seek two to three month cash deposits

from the Debtors pursuant to their Tariffs.  The following Utilities, however, will agree to forego

their requests for cash deposits in exchange for an advance payment arrangement with the

Debtors according to the following terms and conditions:

      A.    On or before June 30, 2009, the Debtors shall pay a catch-up advance
         payment to each of the Utilities and in the amounts identified below in

paragraph 48(D) to cover the charges for utility goods and/or services provided to the Debtors from the Petition Date through June 30, 2009.

B.  Commencing on July 1, 2009, and on or before the 1st day of each month thereafter while the Debtors remain under Bankruptcy Court protection and correspondingly continue to receive post-petition utility goods and/or services from the Utilities identified below, the Debtors shall tender an Advance Payment to the Utilities in the amounts set forth below in paragraph 48(D).

C.  Based upon the applicable Utilities' billing cycles as further set forth above, the parties agree and understand that the amount of each Monthly Advance Payment identified under herein is only an estimated amount. Accordingly, each Utility shall reconcile each Monthly Advance Payment against the Debtors' actual monthly usage after the conclusion of each post-petition billing cycle (beginning with the June 2009 billing cycle). If the Monthly Advance Payment exceeds the Debtors' actual usage, the credit shall be applied to the next month's invoice. If, however, the Monthly Advance Payment is less than the Debtors' actual usage for utility goods and/or services, then the applicable utility, in accordance with the Tariffs, shall issue an invoice to the Debtors for the remaining amount due, which the Debtors shall pay no later than the due date set forth on the invoice.

D.  Duke Energy Indiana, Inc. -- $377,880
Attn: Frank Via, Senior Business Operations Analyst
Duke Energy
9700 David Taylor Drive
Charlotte, NC  28262


The Detroit Edison Company -- $6,847,632.60
Michigan Consolidated Gas Company -- $98,973.33
Attn: Michael T. Wood, Esq.
One Energy Plaza
Suite 688 WCB
Detroit, Michigan 48226

American Electric Power - $899,032
Attn:  Gregory Holland
40 Franklin Road
P.O. Box 2021
Roanoke, VA  24022-2121

21

50.     As indicated herein, the following Utilities, including the Joint Venture Utilities, continue to provide post-petition utility goods and/or services to the Debtors under the following contracts:

A.     Delta I:  *Utility Services Agreement Between Delta Township Utilities, LLC And General Motors Corporation – Worldwide Facilities Group, GM – Delta Township,* dated September 6, 2001.

B.     Delta II:  *Utility Services Agreement Between Delta Township Utilities II, LLC And General Motors Corporation – Worldwide Facilities Group, GM – Lansing Delta Township,* dated April 14, 2004.

C.     Lansing:  *First Amended And Restated Utility Services Agreement Among Trigen/Cinergy-USFOS of Lansing, LLC, City of Lansing Board of Water and Light, And General Motors Corporation, Worldwide Facilities Group, Lansing Grand River Assembly Plant*, dated August 12, 2004.

D.     Shreveport:  *Utility Services Agreement Between Shreveport Red River Utilities, LLC And General Motors Corporation - Worldwide Facilities Group, GMTG - Shreveport*, dated November 15, 2000.

E.     Veolia:  *Utility Services Agreement Between USFilter Water Partners VI L.L.C. And General Motors Corporation – Worldwide Facilities Group, GMMFD – Pontiac North*, dated April 25, 2001.

51.     The Debtors have indicated to the Joint Venture Utilities identified in paragraph 49 above that the Debtors intend to assume and assign the contracts (the "Contract Utilities").

22

To date, however, most of the Contract Utilities have not received an Assumption and Assignment Notice from the Debtors and those that have are uncertain from the documentation provided if the contracts listed above are to be assumed and assigned as part of the proposed sale. Accordingly, and for purposes of resolving their requests for adequate assurance from the Debtors, the Contract Utilities: (a) need to confirm the certainty of Debtors' intention to assume their contract; and, (b) a date certain by which Debtors shall pay the cure amounts to the Contract Utilities pursuant to Section 365(b)(1)(A) of the Bankruptcy Code. Moreover, upon receipt of the cure payment from the Debtors, which are the amounts listed in the Estimated Pre-petition Debt Amounts column in paragraph 43 above, the Contract Utilities shall forego their deposit requests for adequate assurance of payment under Section 366(c) and agree that the assumption of their contract and receipt of the applicable cure payment, along with payment in full of their post-petition invoices shall constitute adequate assurance of payment to the applicable Contract Utility pursuant to Section 366(c) of the Bankruptcy Code.

## Discussion

### A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES AND THE JOINT VENTURE UTILITIES.

Sections 366(b) and (c) of the Bankruptcy Code, in pertinent part, provide:

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.

(c)(1)(A) For purposes of this subsection, the term "assurance of payment" means
    (i) a cash deposit;
    (ii) a letter of credit;
    (iii) a certificate of deposit;
    (iv) a surety bond;
    (v) a prepayment of utility consumption; or
    (vi) another form of security that is mutually agreed upon between the

23

utility and the debtor or the trustee.

   (B) For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment,

  (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

  (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

   (B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider
     (i) the absence of security before the date of the filing of the petition;
     (ii) the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition; or
     (iii) the availability of an administrative expense priority.

  (4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the debtor before the date of the filing of the petition without notice or order of the court.

11 U.S.C. §366.

  As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2)

24

makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its

utilities on or within thirty (30) days of the filing of the petition.  If a debtor believes the amount

of the utility's request needs to be modified, then the debtor can file a motion under Section

366(c)(3) requesting the court to modify the amount of the utility's request (the "Modification

Motion").  In this case, the Debtors have not filed a Modification Motion and they have

completely ignored the Utilities' and the Joint Venture Utilities' adequate assurance of payment

requests.  The Debtors filed the Utility Motion to improperly shift the focus of their obligations

under Section 366(c) from modifying the amount of the Utilities' and the Joint Venture Utilities'

adequate assurance requests to establishing the form and amount of adequate assurance of

payment acceptable to the Debtors.  Accordingly, because the Debtors are not properly before

this Court seeking to modify the amount of the Utilities' and the Joint Venture Utilities' requests,

this Court should deny the Utility Motion as to the Utilities and the Joint Venture Utilities.

Moreover, the Utilities and the Joint Venture Utilities are prejudiced by the Debtors'

failure to file a Modification Motion in accordance with the requirements of Section 366(c)(3)

because the Debtors have not provided the Utilities and the Joint Venture Utilities with any

pleading that sets forth the evidentiary or legal basis upon which they are relying to modify the

amount of the Utilities' and the Joint Venture Utilities' adequate assurance of payment requests.

Specifically, the Debtors have not presented this Court with any evidence as to: (1) Why the

Court should modify the amount of the Utilities' and the Joint Venture Utilities' adequate

assurance of payment requests; (2) What, if any, prejudice the Debtors would suffer by paying

the two or three month deposits requested by the Utilities and the Joint Venture Utilities (If the

Debtors can provide their professionals with a $20 million Carve-Out to secure the payment of

25

all allowed fees and expenses incurred in the Bankruptcy Cases, then the Debtors should be able

to provide the Utilities with the deposits requested herein); and (3) What, if any, prejudice the

Debtors would suffer by paying the Utilities and the Joint Venture Utilities in advance or paying

the Utilities and the Joint Venture Utilities a one-month deposit and requiring the Debtors to pay

the Utilities' and the Joint Venture Utilities' post-petition invoices within five (5) business days

of receipt.  Accordingly, the Court should not permit the Debtors to proceed to a hearing without

complying with the requirements of Section 366(c)(3).

> 1.    **The Utility Motion Should Be Denied As To the Utilities And The Joint Venture Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' And The Joint Venture Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the

Utilities' and the Joint Venture Utilities' requests for the adequate assurance of payment set

forth herein.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the

amount of the Utilities' and the Joint Venture Utilities' adequate assurance of payment requests

should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla.

1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden

of proof).  Despite the foregoing, the Debtors do not offer the Court with any evidence or

factually supported documentation to explain how or why the amount of the Utilities' and the

Joint Venture Utilities' adequate assurance of payment requests should be modified.

Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and

require the Debtors to comply with the requirements of Section 366(c) with respect to the

Utilities and the Joint Venture Utilities.  *See In re Lucre, Inc.*, 333 B.R. 151, 154 (Bankr. W.D.

26

Mich. 2005) (holding that the right of a debtor or trustee to seek modification of a utility's

deposit request "arises only after the adequate assurance payment has been agreed upon by the

parties.").

>  2.     **The Court Should Reject The Proposed Procedures That Attempt To Add Time Consuming And Burdensome Requirements That Are Not Found In Section 366.**

In addition to the Debtors' failure under the Utility Motion to abide by the requirements

of Section 366(c)(3), the Debtors also seek Court approval for procedures related to objections

filed against the Utility Motion.  For example, the Debtors propose that any objection to the

Utility Motion must, *inter alia*: (a) set forth the amount and form of additional assurance of

payment requested; (b) set forth the location(s) for which Utility Services are provided; (c)

include a summary of the Debtors' payment history to such Utility Company, including any

security deposits; and, (d) set forth why the Utility Company believes the Proposed Adequate

Assurance is not sufficient adequate assurance of payment (the "Proposed Procedures").  Utility

Motion at ¶ 38.   The Utilities will be supplementing this Objection with affidavits that will set

forth the applicable service locations so that all parties are in agreement with respect to the

accounts at issue.

Simply stated, the Proposed Procedures are not required under Section 366 of the

Bankruptcy Code and should not be approved by this Court.  Moreover, information regarding

prepetition payment history and security held by a utility, which the Utilities would be required to

provide to the Debtors as part of the Proposed Procedures, are statutorily irrelevant pursuant to

Section 366(c)(3)(B).  Section 366(c)(3)(B) provides:

> (B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider -

27

(i) the absence of security before the date of the filing of the petition;
(ii) the payment by the debtor of charges for utility service in a
timely manner before the date of the filing of the petition; or
(iii) the availability of an administrative expense priority.

Furthermore, the Debtors presumably have access to the same account information as the

Utilities.  Accordingly, the Debtors are merely seeking to impose these requirements and

procedures upon the Utilities to dissuade them from challenging the Debtors' request for relief

under the Utility Motion.

Finally, the Debtors' proposed procedure that would shift and place the burden upon the

Utilities and the Joint Venture Utilities to explain to the Debtors why the Deposit is not sufficient

adequate assurance of payment contravenes the express provisions of Section 366(c)(2) and

should be denied by this Court.  *See In re Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3

(Bankr. S.D. Tex. Mar. 20, 2008) ("The relief requested by Debtors would reverse the burden, by

making an advance determination that the proposed assurance was adequate. . . . the court lacks

the power to reverse the statutory framework for provision of adequate assurance of payment.").

Accordingly, the Debtors' Proposed Procedures should be denied as to the Utilities and the Joint

Venture Utilities because they are either not authorized by Section 366(c) or are contrary to its

specific provisions.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE
ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE
UTILITIES AND THE JOINT VENTURE UTILITIES PURSUANT TO
SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power*

*Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense,

28

without more, could constitute adequate assurance of payment in certain cases. Section

366(c)(1)(A) specifically defines the forms that assurance of payment may take as:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

A determination of adequate assurance is within the court's discretion, and is made on a

case-by-case basis, subject to the new requirements of Section 366(c). *See In re Utica Floor*

*Maintenance, Inc.*, 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); *In re Cunha*, 1 B.R. 330, 332-

33 (Bankr. E.D. Va. 1979). Section 366 of the Bankruptcy Code was enacted to balance a

debtor's need for utility services from a provider that holds a monopoly on such services, with

the need of the utility to ensure for itself and its rate payers that it receives payment for providing

these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or

other security "should bear a reasonable relationship to expected or anticipated utility

consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr.

E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the

length of time necessary for the utility to effect termination once one billing cycle is missed." *In*

*re Begley*, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility

consumption, the minimum period of time the Debtors could receive service from the Utilities

and the Joint Venture Utilities before termination of service for non-payment of bills is

approximately two (2) to three (3) months. Accordingly, the deposits requested by the Utilities

and the Joint Venture Utilities are reasonable. *See In re Stagecoach*, 1 B.R. at 735-36 (holding

29

that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities' billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

As set forth above, the Utilities' and the Joint Venture Utilities' adequate assurance requests are based on: (1) the Utilities' and the Joint Venture Utilities' billing exposure created by their respective state law tariffs and/or regulations (the "Tariffs") or their contracts; and (2) amounts that applicable public service commission, which are neutral third-party entities, permit the Utilities to request from their customers. Although the Utilities recognize that this Court is not bound by the Tariffs, the Tariffs are extremely relevant information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities and the Joint Venture Utilities.

In contrast, the Debtors do not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of two-week deposits. Moreover, as set forth above, the Debtors' offer of a two-week deposit appears illusory because the Debtors fail to clarify whether they seek the immediate return of such deposits, without offset, if they terminate service to an account. Furthermore, the Debtors proposed two-week deposits do not cover the Utilities' and the Joint Venture Utilities' monthly invoices and is woefully inadequate to cover exposure if the Debtors fail to timely pay for one month's service and receive another month's service before the applicable utility could terminate service for the post-petition payment default. The bottom line is that if the Debtors want to continue to receive the Utilities' and the Joint Venture Utilities' generous trade terms established by the Tariffs (i.e. bills issued monthly in arrears with due dates 15 to 30 days thereafter) and by the Contracts (i.e. bills issued monthly in

arrears with due dates 60 days thereafter), they need to provide the Utilities and the Joint Venture Utilities with more security than a two-week deposit. The Debtors are not asking their counsel to provide unsecured post-petition service, and even sought and obtained a significant carve-out for payment of their attorneys' fees, so they should not be allowed to treat the Utilities and the Joint Venture Utilities so differently.

WHEREFORE, the Utilities and the Joint Venture Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities and the Joint Venture Utilities;

2.    Awarding the Utilities and the Joint Venture Utilities the post-petition adequate assurance of payment pursuant to Section 366(c) in the amount and form satisfactory to the Utilities and the Joint Venture Utilities; and

3.    Providing such other and further relief as the Court deems just and appropriate.

Dated: Garden City, New York
       June 12, 2009

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

By: /s/ Jil Mazer-Marino
        Thomas R. Slome (TS-0957)
        Jil Mazer-Marino (JM-6470)

990 Stewart Avenue
Suite 300
P.O. Box 9194
Garden City, New York  11530-9194
Telephone: (516) 741-6565
Facsimile: (516) 741-6706

And

Russell R. Johnson III, Esq.
John M. Merritt, Esq.
LAW FIRM OF RUSSELL R. JOHNSON III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862

*Co-Counsel for Virginia Electric and Power Company,
d/b/a Dominion Virginia Power, The East Ohio Gas
Company, d/b/a Dominion East Ohio, Salt River Project,
Duke Energy Indiana, Inc., Duke Energy Ohio, Inc., Duke
Energy Kentucky, Inc., American Electric Power, The
Detroit Edison Company, Michigan Consolidated Gas
Company, Consolidated Edison Company Of New York,
Inc., Southern California Edison Company, Duke Energy
Carolinas, LLC, Baltimore Gas and Electric Company,
Delta Township Utilities, LLC, Delta Township Utilities II,
LLC, Suez/VWNA/DEGS of Lansing, LLC, Shreveport Red
River Utilities, LLC, Veolia Water Partners VI, LLC,
Massachusetts Electric Company, d/b/a National Grid and
Niagara Mohawk Power Corporation, d/b/a National Grid*

32