# **EXHIBIT B**



## SOFTWARE LICENSE AGREEMENT

THIS SOFTWARE LICENSE AGREEMENT ("Agreement") is made and entered into this 17th day of December 2004, (the "Effective Date") by and between SAS Institute Inc. (hereinafter "Licensor"), a corporation duly organized and existing under the laws of the State of North Carolina, and General Motors Corporation (hereinafter "GM"), a corporation duly organized and existing under the laws of the State of Delaware.

### RECITALS

GM desires to have the right to license from Licensor certain computer software programs and certain support and maintenance services.

Licensor is willing to license to GM computer software programs and provide services to GM in accordance with the terms and conditions set forth in this Agreement.

In consideration of the premises, and other good and valuable consideration received and to be received, Licensor and GM agree as follows:

## ARTICLE I. AGREEMENT, TERM, AND DEFINITIONS

1.1    <u>Agreement and Term</u>. GM and Licensor agree that the terms and conditions of this Agreement apply to the provision of Licensed Software and Services (as later defined) to GM by Licensor. The term of this Agreement commences on the Effective Date and the Agreement shall continue to be in effect until terminated by either party as set forth in this Agreement.

1.2    <u>Certain Definitions</u>. The following definitions apply to this Agreement:

(a)    "Applicable Specifications" means the functional, performance, operational, compatibility, and other specifications or characteristics of the Licensed Software described in applicable Documentation and such other specifications or characteristics of the Licensed Software agreed upon in writing by the parties.

(b)    "Documentation" means user guides, operating manuals, education materials, product specifications, technical manuals and supporting materials relating to the Licensed Software or used in conjunction with the Services, whether distributed in print, magnetic, electronic, or video format, in effect as of the date the Licensed Software is shipped, or the Service is provided, to GM.

(c)    "License Period" means one calendar year unless otherwise specified on a Purchase Order.

(d)    "Licensed Software" means Licensor's computer programs identified in signed Purchase Orders issued from time to time by GM and accepted by Licensor in accordance with this Agreement including, where applicable but not limited to, object code (including microcode)and/or source code (solely as set forth in Section 2.7 entitled Provision of Source Code to GM), that are provided or to be provided by Licensor pursuant to this Agreement. The definition of Licensed Software also includes any enhancements, translations, modifications, updates, releases, or other changes to Licensed Software which are provided or to be provided as part of Licensor's performance of warranty Service obligations or pre-paid support and maintenance Services pursuant to this Agreement.

52155  531426

IN      SIFE      RK  MLA

KBF

(e)    "Purchase Order" means the written order(s) submitted by GM, or any third party to whom GM has authorized to submit written order(s) on GM's behalf, to Licensor which identifies the Licensed Software and Services GM desires to obtain from Licensor.

(f)    "Services" means the support and warranty services, provided or to be provided by Licensor pursuant to this Agreement.

(g)    "Site" means geographically contiguous buildings, each of which, in whole or in part, is occupied or accessed by GM. "Geographically contiguous" means adjacent tracts or parcels of real property separated, if at all, only by publicly dedicated rights of way or private easements.

(h)    "Third Party Service Providers" means those third parties which require access to or use of the Licensed Software in order to provide services and/or products to GM and GM Affiliates.

(i)    "Warranty Period" means the period specified in Section 3.1(d) of this Agreement during which the Licensor is obligated to perform its warranty obligations.

## ARTICLE II. PROVISION OF LICENSED SOFTWARE

2.1    General.

(a) Affiliates. GM is entitled to obtain Licensed Software and Services for the benefit of and use by GM and GM Affiliates. GM Affiliates and their respective employees are entitled to use the Licensed Software and Services in accordance with this Agreement and have and are entitled to all rights, benefits, and protections granted to GM pursuant to this Agreement with respect to such Licensed Software and Services. GM is responsible for compliance by GM Affiliates with the terms and conditions set forth in this Agreement and is liable for any violations of the Agreement by an Affiliate to the same extent as if GM violated the Agreement. "GM Affiliates" means any company that shares information technology infrastructure, standards or processes with GM, and in which GM owns (directly or indirectly) at least five percent of the voting stock.

(b) Third Party Service Providers. Licensor acknowledges GM's reliance on Third Party Service Providers throughout its environment, including the environment in which the Licensed Software is to be used. Accordingly, Third Party Service Providers have all rights to access, use, and distribute the Licensed Software and Documentation as are granted to GM under this Agreement, solely for the benefit of and to the extent necessary to support the business operations of GM and GM Affiliates, without any further notification or accounting to Licensor. GM is responsible for compliance by such Third Party Service Providers with the terms and conditions of this Agreement and is liable for any violations of the Agreement by Third Party Service Providers to the same extent as if GM violated the Agreement. Third Party Service Providers may not use the Licensed Software for their own benefit or for the benefit of other third parties outside the scope of this Agreement and may not move the Licensed Software from the location originally licensed to GM without Licensor's written consent.

2.2    Delivery of the Licensed Software. GM may issue to Licensor written purchase orders identifying the Licensed Software and Services GM desires to obtain from Licensor, the type of license selected, the use restrictions, if any, and the license fee and taxes and any other information necessary to enable Licensor to process the order. Such purchase orders shall be consistent with the terms and conditions of this Agreement. Licensor shall promptly accept a purchase order by providing to GM a written or a verbal acceptance of such purchase order, or by commencing performance pursuant to such purchase order. Licensor shall accept purchase orders or alterations thereto, which do not establish new or conflicting terms and conditions from those set forth in this Agreement. Licensor shall also accept purchase orders incorporating terms and conditions which have been separately agreed upon in writing by the parties. Licensor may reject a purchase order that does not meet the conditions described above by promptly providing to GM a written explanation of the reasons for such rejection. Purchase orders or alterations thereto accepted in accordance with this Section are referred to as "Purchase Orders." GM shall have no responsibility or liability for Licensed Software or Services provided without

a Purchase Order. Upon acceptance by Licensor of one (1) or more Purchase Order(s), Licensor shall deliver the Licensed Software to GM on the delivery date set forth in the applicable Purchase Order or as otherwise agreed upon by the parties. Charges for transportation of Licensed Software shall be paid by Licensor. All risk of loss of, or damage to, the Licensed Software shall be borne by Licensor until receipt of delivery of such Licensed Software by GM. GM may cancel without charge all or any portion of the Licensed Software or Services at any time prior to delivery.

2.3    Right to Cancel for Delays. In the event of a delay in delivery of all or any portion of Licensed Software or Services listed on a Purchase Order not excused in this Agreement, GM may cancel without charge all or any portion of the Licensed Software or Services for which delivery or performance has been so delayed. GM shall not be liable for any expenses incurred by Licensor for canceled, undelivered, or returned Licensed Software or Services. GM shall receive a refund of all amounts paid to Licensor with respect to the canceled and/or returned Licensed Software or Services.

2.4    Acceptance of Licensed Software. Unless a different acceptance procedure is specified in a Purchase Order, GM shall accept delivered copy(ies) of the Licensed Software on the date (the "Acceptance Date") when all necessary Documentation has been received and the Licensed Software has operated in the GM facility where installed for a minimum of thirty (30) consecutive days without a Severity One or Severity Two Problem, as defined in Exhibit 2.4.   The Licensed Software shall be deemed to have operated in accordance with the requirements of this Section on any day, except usual holidays, if it is capable of being so operated, but is not operated at the election of GM. If, within such thirty (30) day period, GM or its Third Party Service Provider determines that the Licensed Software does not so perform, GM or its Third Party Service Provider shall so notify Licensor in writing, and Licensor shall have thirty (30) days from receipt of such notice to correct any non-conforming and/or non-performing features. If, after such thirty (30) day cure period, GM or its Third Party Service Provider determines that such Licensed Software fails to perform in accordance with and/or conform to its Applicable Specifications, GM may, at GM's sole option, terminate this Agreement without penalty to GM and return the Licensed Software and Documentation to Licensor, at Licensor's expense and without liability to GM or GM Affiliates, and any amounts paid by GM or its Third Party Service Provider for the Licensed Software and related Documentation shall promptly be refunded by Licensor to GM. Acceptance of Licensed Software does not waive any warranty rights provided in this Agreement for the Licensed Software.

2.5    Grant of License. For each item of Licensed Software received by GM, Licensor hereby grants GM a worldwide, nonexclusive, irrevocable (except as set forth in this Agreement), license to use, reproduce, distribute (including via electronic means), execute, store, and display the object code version of the Licensed Software for the License Period, (a "License") in accordance with the type of License selected and in accordance with the terms and conditions of this Agreement. The License also includes the right to use the source code version of Licensed Software in accordance with the terms and conditions of the Section of this Agreement titled "Provision of Source Code to GM". The Purchase Order shall designate the type of License which is selected; if the Purchase Order fails to designate the type of License desired, then such License shall be deemed to be a CPU Software License (as later defined in this Section).

     (a)    A "CPU Software License" permits employees and on-site contractors of GM, GM Affiliates and Third Party Service Providers to use the Licensed Software on any single computer (which may include more than one central processing unit) or item of equipment ("CPU") and to copy the Licensed Software as necessary for archival, maintenance, disaster recovery testing, or back-up purposes. Off-Site contractors of GM, GM Affiliates and Third Party Service Providers can use the Licensed Software as mutually agreed in writing from time to time by GM and Licensor. If GM desires to run parallel operations in the process of conducting a disaster recovery test or transferring operations from one CPU to another CPU, GM may operate the Licensed Software on two (2) CPUs, only one of which may be used for production work at any one time, for the period of time reasonably necessary to complete the disaster recovery test or transfer, not to exceed 60 days.

     (b)    A "Site Software License" permits GM, GM Affiliates and Third Party Service Providers to use the Licensed Software at the Site designated in the Purchase Order and to copy the Licensed Software as necessary for dissemination at the Site and for archival, maintenance, disaster recovery testing, or back-up purposes. Notwithstanding the foregoing, the Licensed Software may be used at other than the designated Site,

If (i) the designated Site cannot be used, (ii) the designated Site is replaced or changed by GM, or (iii) GM provides Licensor with prior written notice. If GM desires to run parallel operations in the process of conducting a disaster recovery test or transferring operations from one Site to another Site, GM may operate the Licensed Software at two (2) Sites, only one of which may be used for production work at any one time, for the period of time reasonably necessary to complete the disaster recovery test or transfer, not to exceed 60 days. .

(c)    A "Network Software License" permits GM , GM Affiliates and Third Party Service Providers to use the Licensed Software on any single computer, file server, or item of equipment which may be accessed by multiple, networked devices (collectively hereinafter referred to as the "Network"). Portions of the Licensed Software may be downloaded as appropriate for use by the devices on the Network. If GM desires to run parallel operations in the process of conducting a disaster recovery test or transferring operations from one Network to another Network, GM may operate the Licensed Software on two (2) Networks, only one of which may be used for production work at any one time, for the period of time reasonably necessary to complete the disaster recovery test or transfer, not to exceed 60 days. .

(d)    A "Corporate Software License" permits GM , GM Affiliates and Third Party Service Providers to use the Licensed Software at any GM location and on any items of equipment and to make and use unlimited copies of the Licensed Software.

(e)    A "User Based Software License" permits as many employees of GM, GM Affiliates and Third Party Service Providers as are licensed to use the Licensed Software and to copy the Licensed Software as necessary for archival, maintenance, disaster recovery testing, or back-up purposes. If GM desires to run parallel operations in the process of conducting a disaster recovery test or transferring operations, GM may operate the Licensed Software on two (2) CPUs, only one of which may be used for production work at any one time, for the period of time reasonably necessary to complete the disaster recovery test or transfer, not to exceed 60 days.

(f)    Any License granted under this Agreement permits GM to use Licensed Software for its corporate purposes and, without limitation, for the purposes of providing services to or processing data of GM, providing remote access to the Licensed Software, and performing disaster recovery, disaster testing, and backup as GM or its Third Party Service Providers deem necessary. GM may not use the Licensed Software to perform outsourcing services to third parties or use the software for the benefit of third parties outside the scope of this Agreement. GM Affiliates may not use the Licensed Software outside the scope of this Agreement.

2.6    Licensed Software Support Services. The support Services set forth below for the Licensed Software shall be provided by Licensor to GM during the License Term at no charge to GM other than the annual license Charges.

(a)    Licensor shall promptly notify GM and its Third Party Service Providers of any defects, errors or malfunctions ("Defects") in Licensed Software or Documentation through its normal channels for providing such information to Licensor's other customers and shall provide to GM modified versions of Licensed Software or Documentation which incorporate corrections of any Defects ("Corrections") at the same time as such Corrections are made generally available. Licensor shall also provide to GM all operational and support assistance necessary to cause Licensed Software to perform in accordance with its Applicable Specifications and remedial support designed to provide a by-pass or temporary fix to a Defect until the Defect can be permanently corrected. Licensor shall use its best efforts to respond to requests from GM or its Third Party Service Providers for Licensed Software support in a manner and time frame which are reasonably responsive considering the nature and severity of the Defect which gave rise to such request.

(b)    Licensor shall provide to GM all upgrades, modifications, improvements, enhancements, extensions, updates, and other changes to Licensed Software developed by Licensor which are generally made available to other customers of Licensor ("Improvements"). GM shall have the option to implement any improvement and any failure by GM to so implement shall not affect GM's right to continue to receive support and

-4-

maintenance Services.  If GM does not accept Improvements, the level of technical support will diminish over time.

    (c)    Licensor shall promptly provide to GM and its Third Party Service Providers any revisions to the existing Documentation to reflect all Corrections or Improvements.

    (d)    Licensor shall provide toll-free telephone hot-line support between the hours of 8:00 a.m. and 5:00 p.m. at the applicable maintenance location.

    (e)    In addition, Licensor shall provide to GM or its Third Party Service Providers, at the request of GM or its Third Party Service Providers, and at Licensor's then current established charges, additional telephone hot-line support up to twenty-four (24) hours per day, seven (7) days per week.

    (f)    To the extent agreed upon by the parties, Licensor shall provide to GM Licensed Software Installation and training.

2.7    Provision of Source Code to GM.  If requested by GM, Licensor will add GM as a beneficiary to its existing escrow of source code account that Licensor currently has in effect with Fort Knox.

2.8    Proprietary Markings.  GM shall not remove or destroy any proprietary markings or proprietary legends placed upon or contained within the Licensed Software or Documentation.

2.9    Duplication of Documentation.  GM may duplicate Licensed Software Documentation, at no additional charge, for GM's use in connection with the provision of Licensed Software so long as all required proprietary markings are retained on all duplicated copies.

2.10    Ownership of Licensed Software and Modifications.  The Licensed Software shall be and remain the property of Licensor or third parties which have granted Licensor the right to license the Licensed Software, and GM shall have no rights or interests therein except as set forth in this Agreement.  GM and its Third Party Service Provider shall be entitled to modify the Licensed Software and to develop software derivative of or interfacing with the Licensed Software ("GM Modifications") solely within the scope of the Agreement and not for sale, license or distribution to third parties outside the scope of the Agreement.  Except in connection with Licensor's performance of warranty service or prepaid maintenance services. All GM Modifications developed at GM's expense, which are developed by GM shall be and remain the property of GM, and Licensor and its Employees shall have no rights or interests therein.  Licensor has no technical software support obligations, as set forth in Section 2.6 of this Agreement entitled Software Support Obligations  related to GM Modifications.

2.11    Transfer of Licensed Software.  Upon any transfer or lease of equipment incorporating the Licensed Software to  (a) a Third Party Service Provider providing services for the benefit of GM, (b)  a GM Affiliate, or (c)  an entity taking ownership or control of such equipment as a result of a reorganization or restructuring of GM (such third parties referred to collectively as "Transferee"), the applicable License  (excluding the right to sublicense) may be assigned (transferred) to such Transferee and Transferee will agree in writing to accept the terms and conditions set forth in this Agreement.  Assuming no changes are made to the Licensed Software configuration or the scope of the use of the Licensed Software, any assignment of Licensed Software in accordance with this Section shall be at no additional charge to GM or Transferee, and GM shall have no further liability or responsibility with respect to such Licensed Software.  Such Transfer shall be effective for one year from its effective date. After one year, the Transferee shall either enter a new license agreement with Licensee or stop using the Transferred Software.

2.12    Protection of Licensed Software.  During the term of a License, GM will treat the Licensed Software and Documentation with the same degree of care and confidentiality which they provide for similar information of their own which they do not wish disclosed to the public, but not less than reasonable care.  This provision shall not apply to Licensed Software or Documentation, or any portion thereof, which is (i) already known by GM without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of GM [for purposes of this section, use of the Licensed Software by other customers of Licensor, does not place the

Licensed Software into the public domain], (iii) rightfully received from a third party without obligation of confidentiality, (iv) disclosed without similar restrictions by Licensor to a third party, (v) approved by Licensor for disclosure, or (vi) required to be disclosed pursuant to a requirement of a governmental agency or law so long as GM provides Licensor with timely prior written notice of such requirement.]

## ARTICLE III. WARRANTIES, INDEMNITIES, AND LIABILITIES

3.1    Warranty. Licensor represents and warrants that:

(a)    The Licensed Software is and shall be free and clear of all liens and encumbrances, and GM and its Third Party Service Providers shall be entitled to use the Licensed Software without disturbance;

(b)    No portion of the Licensed Software contains, at the time of delivery, any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," or other computer software routines or hardware components designed to (i) permit access or use of either the Licensed Software or GM's or its Third Party Service Providers' computer systems by Licensor or a third party not authorized by this Agreement, (ii) disable, damage or erase the Licensed Software or data, or (iii) perform any other such actions. Notwithstanding the above, GM acknowledges that the Licensed Software has a product authorization code which causes the Licensed Software to stop working shortly after expiration of the License Period. Upon payment of the license fee for the next License Period, a new product authorization code is provided which enables the Licensed Software to operate uninterrupted to the end of that License Period. ;

(c)    The Licensed Software and the design thereof shall not contain preprogrammed preventative routines or similar devices which prevent GM and its Third Party Service Providers from exercising the rights granted to them under this Agreement or from utilizing the Licensed Software for the purpose for which it was designed;.

(d)    Each Item of Licensed Software and its media shall be new and shall be free from defects in manufacture, materials, and design, and shall function properly under ordinary use and operate in conformance with its Applicable Specifications and Documentation for a period of one (1) year from the applicable Acceptance Date (the "Warranty Period") of such Licensed Software.

Licensor will provide warranty Service to GM at no additional charge and will include all Services or replacement Licensed Software or Licensed Software media necessary to enable Licensor to comply with the warranties set forth in this Agreement. Licensor shall pass through to GM any manufacturers' warranties which Licensor receives on the Licensed Software. All components of the Licensed Software delivered by Licensor are covered under the warranty set forth above.

EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, LICENSOR MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

3.2    Proprietary Rights Indemnification  Licensor represents and warrants that (i) at the time of entering this Agreement, no Licensed Software or Documentation provided under this Agreement is the subject of any litigation ("Litigation"), and (ii) at the time of delivery to GM, Licensor has all right, title, ownership interest, and/or marketing rights necessary to provide the Licensed Software and Documentation to GM and that each License, the Licensed Software and Documentation and their sale, license, and use hereunder do not and shall not directly or indirectly violate or infringe upon any copyright, patent, trade secret, or other proprietary or intellectual property right of any third party or contribute to such violation or infringement ("Infringement"). Licensor shall indemnify and hold GM and its Third Party Service Providers and their respective successors, officers, directors, employees, and agents harmless from and against any and all actions, claims, losses, damages, liabilities, awards, costs, and expenses (including legal fees) resulting from or arising out of any Litigation, any breach or claimed breach of the foregoing warranties, or which is based on a claim of an Infringement and Licensor shall

-6-

defend and settle, at its expense, all suits or proceedings arising therefrom. GM shall inform Licensor of any such suit or proceeding against GM and shall have the right to participate in the defense of any such suit or proceeding at its expense and through counsel of its choosing. Licensor shall notify GM of any actions, claims, or suits against Licensor based on an alleged infringement of any party's intellectual property rights in and to the Licensed Software or Documentation. In the event an injunction is sought or obtained against use of the Licensed Software or Documentation or in GM's or Licensor's opinion is likely to be sought or obtained, Licensor shall promptly, at its option and expense, either (A) procure for GM, the right to continue to use the infringing Licensed Software or Documentation as set forth in this Agreement, or (B) replace or modify the infringing Licensed Software or Documentation to make its use non-infringing while being capable of performing the same function without degradation of performance, or refund the license fee for the Licensed Software at issue for the then current license period and terminate the license to that Licensed Software . Licensor shall have no indemnity obligation to GM or its Third Party Service Providers under this Section 3.2 if the claim(s) of infringement is based upon (i) a modification of the Licensed Software made by GM, a GM Affiliate, or a Third Party Service Provider; or (ii) the continued use of the Licensed Software by GM or a GM Affiliate for greater than a reasonable period of time after a non-infringing alternative with no loss of functionality has been made available by Licensor for installation at Licensor's sole expense.

3.3    LIMITATION OF LIABILITY: NEITHER PARTY SHALL BE LIABLE TO THE OTHER PURSUANT TO THIS AGREEMENT FOR ANY AMOUNTS REPRESENTING LOSS OF PROFIT, LOSS OF BUSINESS OR INDIRECT, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES OF THE OTHER PARTY. THE FOREGOING SHALL NOT LIMIT THE INDEMNIFICATION, DEFENSE AND HOLD HARMLESS OBLIGATIONS SET FORTH IN THIS AGREEMENT.

The limit of either party's liability (whether in contract, tort, negligence, strict liability in tort or by statute or otherwise) to the other or to any third party concerning performance or non-performance by said party, or in any manner related to this Agreement, for any and all claims shall not in the aggregate exceed an amount equal to two (2) times the fees paid by GM to Licensor hereunder for the software product at issue.

The limitations or exculpations of liability set forth above shall not apply to (1) either party's liability (a) for claims, demands, loss, damage or expense relating to bodily injury or death of any person or damage to real and/or tangible personal property, or (b) resulting from its willful misconduct; and (2) Licensor's liability under Section 3.2 (Proprietary Rights Indemnification).

3.4    Insurance. Licensor shall maintain insurance coverage with carriers acceptable to GM and in the amounts set forth below. Licensor shall furnish to GM either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of GM's written request. The certificate will provide that GM will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Licensor's furnishing of certificates of insurance or purchase of insurance shall not release Licensor of its obligations or liabilities under this contract.

(a) Workers' Compensation: statutory limits for the state(s) in which this contract is to be performed (or evidence of authority to self insure);

(b) Employer's Liability: $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease;

(c) Commercial General Liability covering liability arising from premises, operations, independent contractors, products/completed operations, personal injury and advertising injury, and liability assumed under an insured contract: $5,000,000 each occurrence; and

(d) Automobile Liability (including owned, non-owned and hired vehicles): $5,000,000 each accident.

3.5    Survival of Article III. The provisions of this Article III shall survive the term or termination of this Agreement for any reason.

GM Software License Agreement

## ARTICLE IV.  PURCHASES AND PAYMENTS

4.1     Assignment of Right to Issue Purchase Orders.  GM may from time to time assign its right to issue Purchase Orders pursuant to this Agreement to a third party.  In such event, all warranty provisions of this Agreement shall extend to GM as if GM were the original purchaser.  Licensor acknowledges and agrees that any third party authorized by GM to issue Purchase Orders for GM shall have no responsibility or liability to Licensor for the Licensed Software and Documentation set forth on the Purchase Order.

4.2     Issuance and Acceptance of Third Party Service Provider Purchase Orders.  GM's authorized Third Party Service Provider may issue to Licensor written purchase orders ("Third Party Purchase Orders") identifying the Licensed Software and Services it desires to obtain from Licensor for GM.   Such Third Party Purchase Orders shall be consistent with the terms and conditions of this Agreement.  Licensor shall promptly accept a Third Party Purchase Order by providing to the issuing Third Party Service Provider a written or a verbal acceptance of such Third Party Purchase Order, or by commencing performance pursuant to such Third Party Purchase Order.  Licensor shall accept Third Party Purchase Orders or alterations thereto which do not establish new or conflicting terms and conditions from those set forth in this Agreement.  Licensor shall also accept Third Party Purchase Orders incorporating terms and conditions, which have been separately agreed upon in writing by the parties.  Licensor may reject a Third Party Purchase Order which does not meet the conditions described above by promptly providing a written rejection, including an explanation of the reasons for such rejection.

         The third party issuing purchase orders pursuant to the foregoing paragraph shall have no responsibility or liability for Licensed Software or Services provided without a Third Party Purchase Order.

4.3     Evaluation Purchase Orders.  GM or GM's authorized third parties may issue a Purchase Order or Third Party Purchase Order to Licensor for Licensed Software evaluation by GM or such Third Party Service Provider at no charge for an evaluation period agreed upon by the parties under the terms and conditions of a Trial and Evaluation Agreement in substantially the form set forth in Exhibit 4.3. Unless otherwise agreed in a Purchase Order or Third Party Purchase Order, such issuing party shall pay all related transportation and insurance costs. Such Licensed Software shall be protected in accordance with Section 2.12 of this Agreement titled "Protection of Licensed Software".  At the conclusion of the evaluation period, GM or such Third Party Service Provider shall have the option to acquire such Licensed Software pursuant to this Agreement or to return such Licensed Software to Licensor at Licensor's expense without obligation to Licensor.

4.4     Charges, Prices, and Fees.  Charges, prices, and fees ("Charges") and discounts, if any, for Licensed Software and Services shall be determined as set forth in Exhibit A, in a Purchase Order, or as otherwise agreed upon by the parties, unless modified as set forth in this Agreement.  Changes in hardware, number of users or number of workstations may result in additional Charges that will be billed as of the time of the change.  Any increase in a Charge that does not result from a change in the hardware, number of users or number of workstations shall not occur unless a minimum of twelve (12) months has elapsed since the effective date of the previously established Charge.  In no event shall Charges exceed Licensor's then current established charges, prices, and fees.

4.5     Payment Through Invoicing

         (a)     Except as otherwise set forth in this Agreement, any undisputed sum due to Licensor pursuant to this Agreement shall be paid on the date established by GM's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month after receipt by GM of a correct invoice therefor from Licensor.  Licensor shall invoice GM on or after the applicable Acceptance Date for the Licensed Software covered by such invoice.  Periodic payments, if any, due to Licensor pursuant to this Agreement shall be invoiced at the beginning of the period to which they apply.  Payment for any other Services shall be invoiced as agreed upon by the parties or, in the absence of an agreement, upon completion of such Services.

         (b)     A "correct" invoice shall contain (i) Licensor's name and invoice date, (ii) the specific Purchase Order number if applicable, (iii) description including serial number as applicable, price, and quantity of the

Licensed Software or Services actually delivered or rendered, (iv) credits (if applicable), (v) name (where applicable), title, phone number, and complete mailing address of responsible official to whom payment is to be sent, and (vi) other substantiating documentation or information as may reasonably be required from time to time. A correct invoice must be submitted to the appropriate invoice address listed on the applicable Purchase Order.

4.6    Taxes.  Unless GM provides Licensor with a valid tax exemption number or as otherwise provided herein, GM shall pay directly or reimburse Licensor for all taxes, assessments, permits and fees, however designated, which are levied upon this Software License or the Licensed Software and Services, or their use, excluding franchise taxes and taxes based upon Licensor's net income.

(a)    Licensor agrees to reasonably cooperate with GM and/or its Third Party Service Provider at GM's expense in the audit or minimization of any applicable tax and shall make available to GM and/or its Third Party Service Provider, and any taxing authority, all information, records, or documents relating to any audits or assessments attributable to or resulting from the payment process under this Agreement, and the filing of any tax returns or the contesting of any tax.

(b)    Neither GM nor its Third Party Service Provider shall be obligated to pay or reimburse Licensor for additions to taxes, penalties, interest, fees or other expenses or costs, if any, incurred by GM and/or its Third Party Service Provider as a result of, or attributable to, (i) Licensor's failure to verify taxability of a purchase, (ii) Licensor's failure to correctly calculate or remit taxes in a timely manner, or (iii) Licensor's negligence, misconduct or failure to file properly any required returns or reports, or other required documents.

(c)    Upon written notification by GM and/or its Third Party Service Provider and subsequent verification by Licensor, Licensor shall reimburse or credit any and all taxes erroneously paid by GM and/or its Third Party Service Provider to Licensor.

(d)    Where Licensed Software are destined or Services are performed internationally, then at the parties mutual agreement , payment may be made by GM and/or its Third Party Service Provider or its affiliate (i) in a country to the local representative of Licensor, (ii) in the United States, or (iii) in a country mutually agreed upon by the parties.

(e)    If GM, its Third Party Service Provider or an affiliate of GM is required by law to make any deduction or to withhold from any sum payable hereunder, then the sum payable by GM, its Third Party Service Provider or such affiliate of GM upon which the deduction is based shall be paid to Licensor net of such deduction or withholding. GM, its Third Party Service Provider or such affiliate of GM shall pay the applicable tax authorities any such required deduction or withholding.

## ARTICLE V.  TERMINATION

5.1    Termination for Cause.  In the event that either party materially or repeatedly defaults in the performance of any of its duties or obligations set forth in this Agreement, and such default is not substantially cured within thirty (30) days after written notice is given to the defaulting party specifying the default, then the party not in default may, by giving written notice thereof to the defaulting party, terminate the applicable License or Purchase Order relating to such default as of a date specified in such notice of termination.

5.2    Termination for Insolvency or Bankruptcy.  Either party may immediately terminate this Agreement and any Purchase Order by giving written notice to the other party in the event of (i) the liquidation or insolvency of the other party, (ii) the appointment of a receiver or similar officer for the other party, (iii) an assignment by the other party for the benefit of all or substantially all of its creditors, (iv) entry by the other party into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, or (v) the filing of a meritorious petition in bankruptcy by or against the other party under any bankruptcy or debtors' law for its relief or reorganization.

-9-

GM Software License Agreement

5.3    Termination of Software License    GM may terminate any License for any reason by providing written notice to Licensor. If GM elects to so terminate a License, GM shall return to Licensor or, at GM's option, destroy or uninstall, all copies of the Licensed Software and Documentation in GM's possession which are the subject of the terminated License, except as may be necessary for archival purposes.

5.4    Rights Upon Termination.    Unless specifically terminated as set forth in this Article, all Licenses (and GM's right to use the Licensed Software in accordance with such Licenses) and Purchase Orders which require performance or extend beyond the term of this Agreement shall, at GM's option, be so performed and extended and shall continue to be subject to the terms and conditions of this Agreement.

## ARTICLE VI.   MISCELLANEOUS

6.1    Binding Nature, Assignment, and Subcontracting. This Agreement shall be binding on the parties and their respective successors in interest and assigns, but Licensor shall not have the power to assign this Agreement without the prior written consent of GM, which consent shall not be unreasonably withheld. If Licensor subcontracts or delegates any of its duties or obligations of performance in this Agreement or in a Purchase Order to any third party, Licensor shall remain fully responsible for complete performance of all of Licensor's obligations set forth in this Agreement or in such Purchase Order and for any such third party's compliance with the non-disclosure and confidentiality provisions set forth in this Agreement.

6.2    Confidentiality.    Licensor acknowledges that in the course of performance of its obligations pursuant to this Agreement, Licensor may obtain confidential and/or proprietary information of GM or its affiliates. "Confidential Information" includes: information relating to development plans, costs, finances, marketing plans, equipment configurations, data, access or security codes or procedures utilized or acquired, business opportunities, names of customers, research, and development; the terms, conditions and existence of this Agreement; any information designated as confidential in writing or identified as confidential at the time of disclosure if such disclosure is verbal or visual; and any copies of the prior categories or excerpts included in other materials created by the GM.  Licensor hereby agrees that all Confidential Information communicated to it by GM or its affiliates whether before or after the Effective Date, shall be and was received in strict confidence, shall be used only for purposes of this Agreement, and shall not be disclosed by Licensor, its agents or employees without the prior written consent of GM.  This provision shall not apply to Confidential Information which is (i) already known by Licensor without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of Licensor, (iii) rightfully received from a third party (other than a GM affiliate) without obligation of confidentiality, (iv) disclosed without similar restrictions by GM to a third party (other than a GM affiliate), (v) approved by GM for disclosure, or (vi) required to be disclosed pursuant to a requirement of a governmental agency or law so long as Licensor provides GM with timely prior notice of such requirement. Except with respect to Licensed Software, which shall be governed by the Section of this Agreement titled "Protection of Licensed Software," information received by GM from Licensor shall only be considered proprietary and/or confidential after a separate agreement has been executed by a duly authorized representative of each party for the specific purpose of disclosing such information. The provisions of this Section shall survive the term or termination of this Agreement for any reason.

6.3    Media Releases.    Except for any announcement intended solely for internal distribution by Licensor or any disclosure required by legal, accounting, or regulatory requirements beyond the reasonable control of Licensor, all media releases, public announcements, or public disclosures (including, but not limited to, promotional or marketing material) by Licensor or its employees or agents relating to this Agreement or its subject matter, or including the name, trade name, trade mark, or symbol of GM or any affiliate of GM, shall be coordinated with and approved in writing by GM prior to the release thereof. Licensor shall not represent directly or indirectly that any Licensed Software or Service provided by Licensor to GM has been approved or endorsed by GM or include the name, trade name, trade mark, or symbol of GM or any GM Affiliate on a list of Licensor's customers without GM's express written consent.   Notwithstanding the above, Licensor may list GM as a customer of Licensor in Licensor's annual report.

6.4    Notices.    Wherever one party is required or permitted to give notice to the other pursuant to this Agreement, such notice shall be deemed given when delivered in hand, when mailed by registered or certified mail, return receipt requested, postage prepaid, or when sent by a third party courier service where receipt is verified by the receiving party's acknowledgment, and addressed as follows:

In the case of GM:

General Motors Corporation
M/C 482-B29-D84
200 Renaissance Center
Detroit, Michigan 48265

Attn: Purchasing Manager

With copy to:

General Motors Legal Staff
M/C 482-C23-D24
300 Renaissance Center
Detroit, MI 48265
Attn: IS&S Business Unit Counsel

In the case of Licensor:

Office of the General Counsel
SAS Institute Inc.
SAS Campus Drive
Cary NC  27513

With a copy to:

SAS Institute Inc.
SAS Campus Drive
Cary NC  27513

Attn: Contracts Administrator

Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective; first class, postage prepaid, mail shall be acceptable for provision of change of address notices.

6.5    Force Majeure.    The term "Force Majeure" shall be defined to include fires or other casualties or accidents, acts of God, severe weather conditions, strikes or labor disputes, war or other violence, or any law, order, proclamation, regulation, ordinance, demand, or requirement of any governmental agency. A party whose performance is prevented, restricted, or interfered with by reason of a Force Majeure condition shall be excused from such performance to the extent of such Force Majeure condition so long as such party provides the other party with prompt written notice describing the Force Majeure condition and takes all reasonable steps to avoid or remove such causes of nonperformance and immediately continues performance whenever and to the extent such causes are removed.

6.6    Severability.    If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable, or void, then both parties shall be relieved of all obligations arising under such provision, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If that is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted. If

-11-

the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance, then the remainder shall be enforced to the extent permitted by law.

6.7    Dispute Resolution.  In the event of any disagreement regarding performance under or interpretation of this Agreement and prior to the commencement of any formal proceedings, the parties shall continue performance as set forth in this Agreement and shall attempt in good faith to reach a negotiated resolution by designating a representative of appropriate authority to resolve the dispute.

6.8    Proposals and Special Projects.  GM may request a written proposal, quote, or bid from Licensor for the provision of Licensed Software and/or Services for a specific GM project which may be governed by separately negotiated terms and conditions.  In such event, any Licensed Software and Services obtained for such project shall be deemed for purposes of calculating accumulated purchases and any discounts set forth in this Agreement, to have been obtained pursuant to this Agreement.

6.9    Waiver.  Any waiver of this Agreement or of any covenant, condition, or agreement to be performed by a party under this Agreement shall (i) only be valid if the waiver is in writing and signed by an authorized representative of the party against which such waiver is sought to be enforced, and (ii) apply only to the specific covenant, condition or agreement to be performed, the specific instance or specific breach thereof and not to any other instance or breach thereof or subsequent instance or breach.

6.10    Remedies.  All remedies set forth in this Agreement, or available by law or equity shall be cumulative and not alternative, and may be enforced concurrently or from time to time.

6.11    International Business and Contacts.  This Agreement shall apply in countries outside the United States and its territories.  Licensor and GM and/or their respective agents, distributors, or affiliates authorized to conduct business in such countries may negotiate in good faith supplemental agreements incorporating further terms and conditions required by local law.  All Licensed Software and Services obtained pursuant to this Section shall be deemed for purposes of calculating the accumulated purchases and any discounts set forth in this Agreement; to have been obtained pursuant to this Agreement.  Licensor shall promptly provide GM and/or its Third Party Service Provider a list of Licensor's international representatives, by country or region, who are or will be knowledgeable of the terms and conditions contained in this Agreement (the "Licensor International Contact List").  The Licensor International Contact List shall include each representative's name, address, telephone number(s), and an electronic mail address.  Licensor shall provide to GM and/or its Third Party Service Provider an updated and/or corrected Licensor International Contact List from time to time as may be necessary in order to ensure GM and/or its Third Party Service Provider has correct and current Licensor international representative information.

6.12    International Currency Conversion.  Licensor agrees that Products and Services set forth in Exhibit A shall be made available on an international basis for in-country delivery.  GM Price and Terms are exclusive of all taxes, shipping fees, import and export duties.  Licensor shall provide the Licensed Software to GM on an international basis at fees no greater than those contained herein.

6.13    Compliance with Laws.  In the performance of Services or the provision of Licensed Software pursuant to this Agreement, Licensor shall comply with the requirements of all applicable laws, ordinances, and regulations of the United States or any state, country, or other governmental entity.  This Section incorporates by reference all provisions required by such laws, orders, rules, regulations, and ordinances, solely to the extent not already covered in this Agreement.  Licensor shall indemnify, defend, and hold GM and its Third Party Service Provider harmless from and against any and all claims, actions, or damages arising from or caused by Licensor's failure to comply with the foregoing.

6.14    Provision of Most Favorable Terms. Intentionally left blank.

6.15    Right of Setoff.  With respect to any amount that is due a Party pursuant to this Agreement, such Party may, upon notice to the other Party, deduct the entire amount owed to such Party against the charges otherwise

-12-

GM Software License Agreement

payable, expenses owed or other amounts due the other Party. The exercise of this right of set-off shall not affect a Party's right to other remedies provided for in this Agreement.

6.16    Electronic Pricing. Licensor shall provide GM with a copy of Licensor's Charges for Licensed Software set forth in Exhibit A in the electronic format set forth in Exhibit B, entitled "GM Standard Excel Data Format for General Motors Costing Database." Licensor hereby agrees to update the pricing contained within the electronic format to reflect pricing changes to Exhibit A. Licensor acknowledges that GM may modify the electronic format from time to time and that Licensor will conform to any reasonable modifications within five (5) business days of notice from GM.

6.17    Export. Neither party shall export any Licensed Software, Documentation or information protected hereunder by an obligation of confidentiality from the United States, either directly or indirectly, without first obtaining a license or clearance as required from the U.S. Department of Commerce or other agency or department of the United States Government. Licensor shall obtain, at it sole expense, any such licenses or clearances that are required to enable export of the Licensed Software and Documentation to authorized users or recipients as set forth herein.

6.18    Audit. GM agrees to maintain accurate records of the Licensed Software in GM's or its affiliates' possession. To ensure compliance with the terms of this Agreement, GM will provide to Licensor, upon its request, true and correct photocopies of such records, and other information as reasonably necessary to determine GM's compliance with this Agreement. At Licensor's request and subject to GM's security requirements, GM shall allow an audit of its records that are directly related to the use of the Licensed Software by a nationally recognized accounting firm. Such audit shall be conducted during GM's regular business hours at GM's offices and in such a manner as not to interfere unreasonably with GM's normal business activities. In no event shall such audits be conducted hereunder more frequently than once every twelve (12) months. If the audit reveals GM has underpaid Licensor by more than five percent (5%) of the amount owed, then GM will promptly reimburse Licensor for Licensor's reasonable expenses associated with such audit.

6.19    Survival of Terms. Termination or expiration of this Agreement for any reason shall not release either party from any liabilities or obligations set forth in this Agreement which (i) the parties have expressly agreed shall survive any such termination or expiration, or (ii) remain to be performed or by their nature would be intended to be applicable following any such termination or expiration.

6.20    GOVERNING LAW.    THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL NOT BE GOVERNED BY THE PROVISIONS OF THE 1980 UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS. RATHER THESE RIGHTS AND OBLIGATIONS SHALL BE GOVERNED BY THE LAWS, OTHER THAN CHOICE OF LAW RULES, OF THE STATE OF MICHIGAN.

6.21    Entire Agreement. This Agreement constitutes the entire and exclusive statement of the agreement between the parties with respect to its subject matter and there are no oral or written representations, understandings or agreements relating to this Agreement which are not fully expressed in the Agreement. This Agreement shall not be amended except by a written agreement signed by both parties. All exhibits, documents, and schedules referenced in this Agreement or attached to this Agreement, and each Purchase Order are an integral part of this Agreement. In the event of any conflict between the terms and conditions of this Agreement and any such exhibits, documents, or schedules or Purchase Orders, the terms of this Agreement shall be controlling. In the event of a conflict between the terms and conditions of this Agreement and a mutually agreed and signed Purchase Order, the mutually agreed and signed Purchase Order shall be controlling with respect to those transactions covered by that Purchase Order. Any other terms or conditions included in any pre-printed terms and conditions on the Purchase Orders, shrink-wrap license agreements, quotes, invoices, acknowledgments, bills of lading, or other forms utilized or exchanged by the parties shall not be incorporated in this Agreement or be binding upon the parties unless the parties expressly agree in writing or unless otherwise provided for in this Agreement. LICENSOR ACKNOWLEDGES GM'S STRICT REQUIREMENT THAT GM'S

-13-

END USERS OF THE LICENSED SOFTWARE ARE NOT AUTHORIZED TO ENTER INTO AGREEMENTS OR UNDERSTANDINGS ON BEHALF OF GM AND THAT ALL SUCH AGREEMENTS AND UNDERSTANDINGS ARE TO BE MADE SOLELY BY GM WORLD-WIDE PURCHASING. ACCORDINGLY, LICENSOR AGREES THAT ANY AGREEMENT OR UNDERSTANDING THAT IS ENTERED INTO IN VIOLATION OF THIS REQUIREMENT IS NOT EFFECTIVE AND SHALL NOT BE ENFORCEABLE AGAINST GM OR ANY GM AFFILIATE.

IN WITNESS WHEREOF, Licensor and GM acknowledge that each of the provisions of this Agreement were expressly agreed to and have each caused this Agreement to be signed and delivered by its duly authorized officer or representative as of the Effective Date.

GENERAL MOTORS CORPORATION

By: _____

Printed Name: _____

Title: _____

Date: 12/22/04

LICENSOR

By: _____

Printed Name: §sas.  John G. Boswell
Corporate Secretary
SAS Institute Inc.

Title: _____

Date: December 17, 2004

1.    **EXHIBIT 2.4**

## Definitions of Severity Levels

1.  **Severity One** shall mean: a Licensed Software problem exists such that an authorized user is unable to run the Licensed Software in a production environment and the problem has one or more of the following attributes with respect to GM's ability to conduct its business:

    - Major impact on business (e.g., loss of revenue, material expense impact, widespread problem);
    - Service outage where critical business processes are impacted and no workaround exists; or
    - An authorized user is high profile (e.g., high volume producer or business executive) and has been identified to Licensor in writing as such by GM.
    - An authorized user cannot circumvent the problem

2.  **Severity Two** shall mean: a Licensed Software problem exists that has one or more of the following attributes with respect to GM's ability to conduct its business:

    - Key business operations (e.g., completion of a car sale, service repair order, or parts invoice) are available to GM using abnormal processes such that these business operations are delayed or impeded;
    - Service outage or application problem where workaround exists, or performance degradation is not preventing critical business processes,
    - An authorized user is able to run the production Application but usability is severely limited; or
    - An authorized user has experienced continual or repeated problems.

**Exhibit 2.7**

## ESCROW AGREEMENT

[Please add your Source Code Agreement here.]

SAS Institute Inc.                                      License Agreement No. _____

## AMENDMENT NO. __
## TO
## INSTITUTE LICENSE AGREEMENT
## SOURCE CODE ESCROW

Customer name and address: _____ ("Customer")

_____

_____

WHEREAS, SAS Institute Inc., SAS Campus Drive, Cary, North Carolina, USA 27513 (the "Institute") and Customer desire to modify the License Agreement referenced above (the "License Agreement"), in consideration of further benefits to each;

NOW, THEREFORE, notwithstanding any provisions to the contrary contained in the License Agreement and any Supplements or Amendments thereto, the parties hereby agree as follows:

1.      The recitals set forth above are incorporated into this Amendment.

2.      The terms of this Amendment shall apply only to Software licensed under this License Agreement and any Supplements signed by Customer.

3.      Upon payment by Customer of the escrow fees for the current license period, the Institute shall place the source code for the latest version of the Software (the "Source Code") in escrow with DSI Technology Escrow Services, formerly Fort Knox Escrow Services, Inc., 2100 Norcross Parkway, Suite 150, Norcross, Georgia 30071 ("Escrow Agent"), to be held and furnished to Customer by Escrow Agent under the terms and conditions set forth herein; provided, however that the Institute shall have no obligation to provide the source code to third party materials included in the Software.

4.      Escrow Agent shall deliver the Source Code, or a copy thereof, to Customer only in the event that:

   4.1    Escrow Agent receives a writing from Customer providing the following:

      4.1.1   notification that the Institute, its assigns or successors (for the purposes of this paragraph 4, collectively "Institute"), has ceased business or has otherwise ceased, due to liquidation or dissolution, to market and support the Software;
      4.1.2   evidence satisfactory to Escrow Agent that Customer has previously notified the Institute of such event in writing;
      4.1.3   a demand that the Source Code be released and delivered to Customer;
      4.1.4   an undertaking from Customer that the Source Code being supplied to Customer will be used only for the purposes of maintaining and supporting the Software as permitted under the terms of this License Agreement;
      4.1.5   specific instructions from Customer for this delivery; and
      4.1.6   an initial check payable to Escrow Agent for Escrow Agent's then-current applicable published fee.

   4.2    Escrow Agent shall, within five (5) business days after receipt of all the documents specified in paragraph 4.1 above, send to the Institute a copy of all such documents. The Institute shall have thirty (30) days from the date on which the Institute receives such documents ("Objection Period") to notify Escrow Agent of its objection ("Objection Notice") to the release of the Source Code to Customer and to request that the issue of Customer's entitlement to a copy of the Source Code be resolved in accordance with the following provisions:

If the Institute shall send an Objection Notice to Escrow Agent during the Objection Period, the parties shall first endeavor to resolve the matter by mediation under the Commercial Mediation Rules of the American Arbitration Association. The mediator shall be selected by the Regional Office of the American Arbitration Association in closest geographic proximity to the Institute's U.S.A. headquarters and shall be knowledgeable regarding the computer Industry. Should the matter remain unresolved 60 days after appointment of the mediator, it shall be submitted to, and settled by arbitration by, a panel of three (3) arbitrators selected as follows. The Institute and Customer shall each select an arbitrator within sixty (60) days after written notice of arbitration is served and the selected arbitrators shall name a third arbitrator within sixty (60) days after such arbitrators are selected by such parties. If any of the three arbitrators remain unselected after the time period specified in this paragraph 4.2, such arbitrators shall be selected by the Regional Office of the American Arbitration Association described above, subject to the qualifications specified in this paragraph. The arbitrators shall apply North Carolina law without regard to choice of law provisions, except that in no event shall the North Carolina International Commercial Arbitration Act apply. The arbitrators shall be knowledgeable regarding the computer software industry. The place of arbitration shall be in the State of North Carolina, U.S.A., and the English language shall be used in the arbitral proceedings. The decision of the arbitrators shall be binding and conclusive on all parties involved, and judgment upon their decision may be entered in a court of competent jurisdiction. All costs of the arbitration incurred by the prevailing party and Escrow Agent, including reasonable attorney's fees and costs, shall be paid by the non-prevailing party.

4.3    If, at the end of the Objection Period, Escrow Agent has not received an Objection Notice from the Institute, then Escrow Agent shall deliver the Source Code to the Customer in accordance with the instructions specified in paragraph 4.1.5 above; provided, however, that Escrow Agent shall not deliver the Source Code until Customer has paid all fees then due Escrow Agent.

5.    The Institute may, upon sixty (60) days prior written notice to Customer, designate another depository to hold the Source Code in escrow, provided such other depository agrees to provide Customer terms no less favorable than those provided under this Amendment.

6.    Customer agrees that the Source Code released to Customer pursuant to the terms and conditions set forth herein shall be used by Customer only during the term of the Supplement under which the Software is licensed and solely for the purposes of maintaining and supporting the Software for use as permitted under this License Agreement. Upon expiration or termination of such Supplement, Customer shall, at the option of the Institute, its assigns or successor, either immediately return all copies of the Source Code to the Institute, its assigns or successor, destroy all copies of the Source Code and certify such destruction in a writing signed by an officer of Customer. Ownership of the Source Code shall remain with the Institute, its assigns or successors, or the Institute's licensors at all times. Customer further acknowledges and agrees that the Source Code contains Institute trade secrets and Customer shall keep the Source Code in the strictest confidence. The obligation of confidentiality is binding in perpetuity or for the maximum period permitted by law and, as such, survives the term of this License Agreement.

Source Code Escrow Amendment                                                            Page 3

Except as herein modified, all terms and conditions of the License Agreement and its Amendments and Supplements remain in full force and effect.

Accepted by:

Customer: _____          SAS Institute Inc.

By _____                  By _____
   Authorized signature                     Authorized signature

   _____                      _____
   Name (type or print)                     Name (type or print)

   _____                      _____
   Title                                    Title

On _____                  On _____
   Date                                     Date

lg01.0181/08MAR02     SAS and all other SAS Institute. Inc. product and service names are registered trademarks of SAS Institute Inc. In the USA and other countries. ® indicates USA registration. Other brand and product names are registered trademarks or trademarks of their respective companies.

**Exhibit 4.3**
### TRIAL SOFTWARE LICENSE AGREEMENT

This Trial Agreement ("Trial Software License Agreement") is entered into this _____ day of _____ by and between General Motors Corporation ("GM") and _____ ("Licensor").

## INTRODUCTION

      A.      Licensor is the Licensor and marketer of _____("Trial Software"),

      B.      GM wishes to use Trial Software on a trial basis.

      C.      GM, without incurring any obligation to purchase Licensor's software or services, desires to test and evaluate the performance of the Trial Software in accordance with the procedure stated below.

### AGREEMENT

1.      <u>Services to be Provided</u>. When this Trial Software License Agreement *is* signed, Licensor shall deliver the Trial Software to be used at [location] for testing and evaluating for use at GM's facilities located at [location of GM facilities].

2.      <u>No Obligation to Purchase</u>. GM does not incur any obligations to Licensor other than as set forth in this Agreement and specifically does not incur any obligation to purchase any products or services from Licensor by reason of entering into this Trial Software License Agreement. Ownership of the Trial Software shall remain with Licensor.

3.      <u>Test and Evaluation Period</u>. The Test and Evaluation Period shall begin when the Trial Software is installed and the GM users are up and running and extend for not more than sixty (60) days without written consent of both parties.

4.      <u>Testing</u>. The purpose of testing the Trial Software is to verify that the Trial Software will perform to its specifications.

5.      <u>Procedure Upon Conclusion of Test and Evaluation Period.</u>  Upon the conclusion of the Test and Evaluation Period, GM may, at its option, elect to either:

           (a)      request that Licensor remove the Trial Software, in which case Licensor, at Licensor's expense, shall promptly remove the Trial Software. In this event GM shall return all copies of the to Licensor; or

           (b)      proceed to purchase Licensor's Trial Software and services through the execution of a Purchase Order as described under the Agreement.

6.      <u>Termination</u>. This Trial Software License Agreement can be terminated at any time by either party upon written notice to the other party.

-17-

GM Software License Agreement

7.    <u>Proprietary Rights Indemnification and Limitation of Liability</u>.  Licensor will indemnify and hold GM harmless against any claim that GM's use of the Trial Software infringes a United States patent, copyright, trademark, mask work or any rights of a third party or constitutes misuse or misappropriation of a trade secret. Licensor will defend such action at its own expense and will pay the costs and damages awarded in any such action or the cost of settling such action.  Except as set forth above, THE LICENSED SOFTWARE IS PROVIDED "AS IS" WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED; Licensor and its licensors disclaim any liability connected with use of the Licensed Software; and neither Licensor nor its licensors shall be liable for (i) direct, special, incidental, consequential, punitive, or reliance damages (arising in contract or tort), or (ii) any claim against GM by a third party.

8.    <u>Notices</u>.  Any notices under this Trial Software License Agreement, shall be given to the addresses set forth below:

In the case of GM:

General Motors Corporation
200 Renaissance Center
482-b29-d84
Detroit, MI 48265
Telephone: 313-667-8728
Facsimile: 313-667-4622
Attn: Purchasing Manager, MSA IS&S Purchasing

With copy to:

General Motors Legal Staff
M/C 482-C23-D24
300 Renaissance Center
Detroit, MI 48265
Attn: IS&S Business Unit Counsel

In the case of Licensor:

Office of the General Counsel
SAS Institute Inc.
SAS Campus Drive
Cary NC  27513

With a copy to:

SAS Institute Inc.
SAS Campus Drive
Cary NC  27513

Attn: Contracts Administrator

Either party may from time to time change its address for notification purposes by giving the other party written notice of the new address and the date upon which it will become effective; first class, postage prepaid, mail shall be acceptable for provision of change of address notices.

9.    <u>Consideration</u>.  In consideration for this Trial Software License Agreement, GM agrees to reimburse Licensor any costs that Licensor may incur for the installation of the Trial Software.

-18-

10.    <u>Amendments</u>.    No amendment to this Trial Software License Agreement shall be binding upon either party unless it is in writing and is signed by the other party.

11.    <u>Governing Law</u>.    This Trial Software License Agreement shall be governed by the laws of the State of Michigan, without regard for the principles of conflicts of laws.

12.    <u>Entire Agreement</u>.    This Trial Software License Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written representations or agreements.

IN WITNESS WHEREOF, GM and Licensor have caused this Agreement to be executed by their duly authorized representatives on the day and year first written above.


Licensor.                                          GM

By:_____              By:_____

Date: _____              Date: _____



**EXHIBIT A**



**Charges, Prices, and Fees**

| Product Description | Part Number | U.S. List Price | GM Discount Percent | GM Net Price |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

GM Software License Agreement

**EXHIBIT B**

**GM Standard Excel Data Format for General Motors Costing Database**

[Insert file here.]

GM Software License Agreement