Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|   |   |   |
|:--|:--|:--|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.**, *et al.*, | : | **09-50026 (REG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------------x

## NOTICE OF FILING OF CERTAIN SCHEDULES AND
## EXHIBITS TO THE MASTER SALE AND PURCHASE AGREEMENT

PLEASE TAKE NOTICE that on June 1, 2009, the Debtors filed a Motion

Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and FED. R. BANKR. P. 2002,

6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase

Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free

and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and

Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II)

Schedule Sale Approval Hearing [Docket No. 92] (the "**Sale Motion**").

PLEASE TAKE FURTHER NOTICE that the Debtors filed a proposed Master

Sale and Purchase Agreement (the "**MSPA**"), annexed to the Sale Motion as Exhibit A, without

certain exhibits and schedules thereto.  Pursuant to footnote 2 of the Sale Motion, the Debtors

indicated that certain exhibits and schedules to the MSPA, excluding certain commercially

sensitive information, would be filed and made available at www.gmcourtdocs.com.

PLEASE TAKE FURTHER NOTICE that the following exhibits to the MSPA

have already been filed:

Exhibits
Exhibit F - Certain Excluded Owned Real Property
Exhibit G - Certain Retained Workers' Compensation Claims

PLEASE TAKE FURTHER NOTICE that the following exhibits and section of

the schedule to the MSPA are attached hereto and are available at www.gmcourtdocs.com:

Exhibits
Exhibit A – Form of Parent Warrant A
Exhibit B – Form of Parent Warrant B
Exhibit C – UAW Active Labor Modifications
Exhibit D – Form of UAW Retiree Settlement Agreement
Exhibit E – Form of VEBA Warrant
Exhibit H – Form of Sale Procedures Order
Exhibit I – Form of Sale Approval Order
Exhibit M – Form of Equity Registration Rights Agreement
Exhibit O – Form of Bill of Sale
Exhibit P – Form of Assignment and Assumption Agreement
Exhibit Q – Form of Novation Agreement
Exhibit R – Form of Government Related Subcontract Agreement
Exhibit S – Form of Intellectual Property Assignment Agreement
Exhibit U – Form of Assignment and Assumption of Real Property Leases
Exhibit X – Form of Certificate of Designation for Series A Preferred Stock
Exhibit Y – VEBA Note Term Sheet

Schedule
Section 1.1B – Key Subsidiaries
Section 1.1C – Knowledge of Sellers
Section 1.1D – Seller Key Personnel
Section 2.2(a)(xiii) – Other Matters
Section 2.2(b)(vii) – Certain Excluded Non-Executory Contracts
Section 2.2(b)(xi) – Certain Bankruptcy Avoidance Actions

Section 2.2(b)(xiii) – Excluded Insurance Policies
Section 2.2(b)(xvi) – Other Excluded Assets
Section 2.3(a)(xiv) - Other Assumed Liabilities
Section 2.3(b)(i) - Certain Retained Indebtedness
Section 4.1 - Organization and Good Standing
Section 4.2 - Authorization; Enforceability
Section 4.5 - Reports and Financial Statements; Internal Controls
Section 4.7 - Title to and Sufficiency of Assets
Section 4.8 - Compliance with Laws; Permits
Section 4.9 - Environmental Laws
Section 4.11 - Labor Matters
Section 4.12 - Investigation; Litigation
Section 4.14 - Intellectual Property and IT Systems
Section 4.15 - Real Property
Section 4.17 - Dealer Sales and Service Agreements for Continuing Brands
Section 4.19 - Certain Business Practices
Section 4.20 - Brokers and Other Advisors
Section 4.21 - Investment Representations

Dated: New York, New York
       June 12, 2009

                                    */s/ Stephen Karotkin*
                                    Harvey R. Miller
                                    Stephen Karotkin
                                    Joseph H. Smolinsky

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

**EXHIBIT A TO THE MSPA**

**FORM OF PARENT WARRANT A**

**EXHIBIT A**

**FORM OF PARENT WARRANT A**

**WARRANT AGREEMENT**

**dated as of *[_____], 2009***

**between**

***[VEHICLE ACQUISITION HOLDINGS LLC]***

**and**

**[●]**
**as Warrant Agent**

ARTICLE 1
DEFINITIONS

Section 1.01.        Certain Definitions ............................................................................. 1

ARTICLE 2
ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.        Issuance of Warrants .......................................................................... 6

Section 2.02.        Execution and Authentication of Warrants ......................................... 7

Section 2.03.        Form of Warrant Certificates .............................................................. 7

Section 2.04.        Transfer Restrictions and Legends ...................................................... 7

Section 2.05.        Transfer, Exchange and Substitution ................................................... 9

Section 2.06.        Global Warrants ................................................................................ 10

Section 2.07.        Surrender of Warrant Certificates ..................................................... 11

ARTICLE 3
EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.        Exercise of Warrants ......................................................................... 12

Section 3.02.        Procedure for Exercise ..................................................................... 12

Section 3.03.        Settlement of Warrants ..................................................................... 12

Section 3.04.        Delivery of Common Stock .............................................................. 13

Section 3.05.        No Fractional Shares to Be Issued .................................................... 14

Section 3.06.        Acquisition of Warrants by Company ............................................... 14

Section 3.07.        Direction of Warrant Agent .............................................................. 14

ARTICLE 4
[RESERVED]

ARTICLE 5
ADJUSTMENTS

Section 5.01.        Adjustments to Exercise Price .......................................................... 15

Section 5.02.        Adjustments to Number of Warrants ................................................. 18

Section 5.03.        Certain Distributions of Rights and Warrants.................................... 19

Section 5.04.        Shareholder Rights Plans .................................................................. 20

Section 5.05.        Other Adjustments if Net Share Settlement Applies ......................... 20

Section 5.06.        Discretionary Adjustments................................................................ 20

Section 5.07.        Restrictions on Adjustments ............................................................. 21

ii

Section 5.08.    Deferral of Adjustments ................................................................... 21

Section 5.09.    Recapitalizations, Reclassifications and Other Changes .................. 22

Section 5.10.    Consolidation, Merger and Sale of Assets ........................................ 24

Section 5.11.    Common Stock Outstanding ............................................................. 24

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 25

Section 5.13.    Calculations Final ............................................................................. 25

Section 5.14.    Notice of Adjustments ...................................................................... 25

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity .......... 26

Section 5.16.    Statements on Warrants .................................................................... 26

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ................................................................ 26

Section 6.02.    Mutilated or Missing Warrant Certificates ....................................... 27

Section 6.03.    Modification, Waiver and Meetings .................................................. 27

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes ................................................................. 29

Section 7.02.    Change of Warrant Agent ................................................................. 29

Section 7.03.    Compensation; Further Assurances ................................................... 30

Section 7.04.    Reliance on Counsel ......................................................................... 31

Section 7.05.    Proof of Actions Taken .................................................................... 31

Section 7.06.    Correctness of Statements ................................................................ 31

Section 7.07.    Validity of Agreement ...................................................................... 31

Section 7.08.    Use of Agents ................................................................................... 31

Section 7.09.    Liability of Warrant Agent ............................................................... 32

Section 7.10.    Legal Proceedings ............................................................................ 32

Section 7.11.    Other Transactions in Securities of the Company ............................ 32

Section 7.12.    Actions as Agent .............................................................................. 32

Section 7.13.    Appointment and Acceptance of Agency ......................................... 32

Section 7.14.    Successors and Assigns ..................................................................... 33

Section 7.15.    Notices .............................................................................................. 33

Section 7.16.    Applicable Law ................................................................................. 33

Section 7.17.    Benefit of this Warrant Agreement ................................................... 33

1766891

Section 7.18.    Registered Warrantholders..................................................................... 34

Section 7.19.    Inspection of this Warrant Agreement ................................................ 34

Section 7.20.    Headings ............................................................................................... 34

Section 7.21.    Counterparts ......................................................................................... 34


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ......    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ...................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS ...........................................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

1766891

# WARRANT AGREEMENT

This Warrant Agreement dated as of *[_____]*, 2009 is between *[Vehicle Acquisition Holdings LLC]*, a *[limited liability company]* organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, the Company is the resulting entity from the conversion of Vehicle Acquisition Company LLC from a Delaware limited liability company to a Delaware corporation;

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01.  *Certain Definitions.*  As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national

1

standing selected by the Board of Directors) and shall be determined by customary investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date,   (2) the price of each share of Common Stock will be the Closing Sale Price as of the date of determination and (3) all other assumptions shall be made by the Board of Directors in good faith based upon the advice of an independent investment bank of national standing selected by the Board of Directors at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

2

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.    Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, in connection with a dividend, issuance or distribution, the average of the Closing Sale Prices of the Common Stock for each of the 10 consecutive Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution.

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

3

"**Exercise Price**" means initially $30.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the seven (7) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stork or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[     ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrantholder.   If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could

4

obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption Notice**" has the meaning set forth in Section 5.09.

"**Reference Property**" has the meaning set forth in Section 5.09.

"**Reorganization Event**" has the meaning set forth in Section 5.09.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09.

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

## ARTICLE 2

### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01. *Issuance of Warrants.*    (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein).   The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with

6

Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.   All such Warrants shall be dated as of the Closing Date.

(b)     Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.   *Execution and Authentication of Warrants.*   (a)   Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)     Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)     No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.   *Form of Warrant Certificates.*   Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and  such as may be necessary to conform to customary usage.

Section 2.04.   *Transfer Restrictions and Legends.*   (a) Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

7

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

8

Section 2.05.  *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.   The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.   All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.   Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing. Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.   The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.   No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.   Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.   To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.   No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

9

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a)    The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

10

(d)    Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)    Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)    A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.    *Surrender of Warrant Certificates.*    Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to

11

time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

ARTICLE 3

EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    *Exercise of Warrants.*    At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).    Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.    *Procedure for Exercise.*    (a)    To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant.    However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03.    *Settlement of Warrants.*    (a)    Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.    Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any

12

fractional Warrant as provided in Section 3.05.   All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.   *Delivery of Common Stock.*    (a)   In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.   However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

1766891

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).    The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.    *No Fractional Shares to Be Issued.*    (a)    Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.    If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.    *Acquisition of Warrants by Company.*    The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.    *Direction of Warrant Agent.*    (a)    The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.    In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

14

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.   The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.   The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.   *Adjustments to Exercise Price.*  The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

15

$OS_1$    =    the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$    =    the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

$Y$    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.   In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or

16

shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.  In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or other distribution to all holders of Common Stock of shares of the Company's Capital Stock (other than Common Stock) or evidences of the Company's indebtedness, rights or warrants to purchase the Company's securities, or the Company's assets (excluding any dividend, distribution or issuance covered by clauses (a) or (b) above or (d) below), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or assets so distributed, expressed as an amount per share of Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that

17

are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$ = the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be   a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding"))   immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the Close of Business on the Record Date."

18

Section 5.02.   *Adjustments to Number of Warrants.*   Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.   *Certain Distributions of Rights and Warrants.*   (a)   Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

> (i)      are deemed to be transferred with such shares of Common Stock;

> (ii)     are not exercisable; and

> (iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.04).

(b)      If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.04).

(c)      In addition, except as set forth in Section 5.04, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.04):

> (i)      in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of

19

Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

Section 5.04.    *Shareholder Rights Plans.* If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.   If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.05.    *Other Adjustments if Net Share Settlement Applies.*   To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06.    *Discretionary Adjustments.*   The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days.   In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect.   The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of

20

the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07.   *Restrictions on Adjustments.*   (a)   Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)   Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)   upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)   for a change in the par value of the Common Stock.

(c)   In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)   No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on a basis and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)   No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made annually, on each anniversary of the Closing Date and   five Business Days prior to the Expiration Date, unless such adjustment has already been made.

(f)   If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.   *Deferral of Adjustments.*   In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date

21

for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.   For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.   *Recapitalizations, Reclassifications and Other Changes*.   (a)   If any of the following events occur:

(i)    any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)    any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, following the effective time of the transaction, other than with respect to a Reorganization Event described in Section 5.09(e), the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").   In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

22

(b)      At any time from, and including, the effective time of a Reorganization Event:

(i)      if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)      if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)      the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)      the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)      The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)      any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)      any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)      any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)      Other than as provided in Section 5.09(e), on or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.    If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall use commercially reasonable efforts to cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.    Any such amendment to this Warrant Agreement shall provide for

23

adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5.   In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.   The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.   Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)      Prior to the occurrence of any Reorganization Event set forth in Section 5.09(a)(iii) or (iv), with respect to which each share of Common Stock is converted into the right solely to receive Cash in an amount less than the Exercise Price, on or before the closing date of such Reorganization Event, the Company shall deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating the Company's intent to redeem all Warrants at a price per Warrant equal to the Black Scholes Warrant Value for such Warrant measured as of the date immediately prior to the closing date of such Reorganization Event.   In the event the Company delivers a Redemption Notice:  (i) any right to exercise a Warrant shall terminate at 5:00 p.m. on the closing date of such Reorganization Event; and (ii) following the closing of such Reorganization Event, the Warrants shall have no further rights except to receive, upon surrender of the Warrant Certificate, the redemption price set forth in such Redemption Notice, without interest.

(f)      The Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent in all material respects with this Section 5.09.

(g)      The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events.

(h)      If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 shall apply to such event or occurrence.

Section 5.10.   *Consolidation, Merger and Sale of Assets.*   (a)   The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)      the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)      the Company provides written notice of such assumption to the Warrant Agent.

(b)     In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.    *Common Stock Outstanding.*    For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12.    *Covenant to Reserve Shares for Issuance on Exercise.*    (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)     The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.   The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement.    The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.   Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)     If permitted or required by the rules of any national securities exchange or over the counter market or other domestic market on which the Common Stock is listed at any time, if any, the Company shall apply to have listed or quoted all shares of Common Stock issued upon exercise of the Warrants (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto) on any such exchange or market.

Section 5.13.   *Calculations Final.*   The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 5.14.   *Notice of Adjustments.*   Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.   The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.   The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.   *Warrant Agent Not Responsible for Adjustments or Validity.*   The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.   The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.   The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.   The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16.   *Statements on Warrants.*   The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant

26

Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.  However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

ARTICLE 6

OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.  All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*    (a)    This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of, among other things:

(i)      adding covenants for the benefit of the Warrantholders;

27

(ii)    adding a guarantor or other security for the benefit of the Warrantholders;

(iii)    surrendering any right or power conferred upon the Company;

(iv)    providing for the settlement upon exercise of Warrants if any reclassification or change of Common Stock or any consolidation, merger, sale, lease or other transfer of the consolidated assets of the Company and its subsidiaries substantially as an entirety occurs;

(v)    providing for the assumption of the Company's obligations in the case of a merger, consolidation, conveyance, sale, lease or other transfer;

(vi)    adjusting the Exercise Price or the Number of Warrants in the manner described in this Warrant Agreement;

(vii)    curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect; and

(viii)    adding or modifying any other provisions that the Company may deem necessary or desirable and which will not adversely affect the interests of the Warrantholders.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, either:

(i)    with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding; or

(ii)    by the adoption of a resolution at a meeting of Warrantholders called with proper notice at which a quorum is present by at least a number of Warrantholders of Warrants representing a majority of the Number of Warrants represented at such meeting.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

28

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    except as otherwise expressly permitted by provisions of this Warrant Agreement concerning specified reclassifications or corporate reorganizations, impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vi)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

(d)    The quorum at any meeting called to adopt a resolution will be Persons holding or representing Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    *Payment of Certain Taxes.*    (a)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.    *Change of Warrant Agent.*    (a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.    If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.    If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such

29

resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)     The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)     Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.  After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations.  Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder.  As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock.  Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)     Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act.   In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the

30

Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)     In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

31

Section 7.06.   *Correctness of Statements.*   The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07.   *Validity of Agreement.*   The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.   *Use of Agents.*   The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.   *Liability of Warrant Agent.*   The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.   The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.   *Legal Proceedings.*   The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.   *Other Transactions in Securities of the Company.*   The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant

32

Agreement.   Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 7.12.    *Actions as Agent.*    The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.   The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.   No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.   No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.   The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.    *Appointment and Acceptance of Agency.*    The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.    *Successors and Assigns.*    All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15.    *Notices.*    Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

*[VEHICLE ACQUISITION HOLDINGS LLC]*
*[_____]*
*[_____]*
Attention:   Treasurer
Telephone:   *[_____]*
Facsimile:   *[_____]*

With a copy to:

*[_____]*
*[_____]*
*[_____]*

33

Attention:   *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention:   Treasurer
Telephone:   *[_____]*
Facsimile:   *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.   *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.   *Benefit of this Warrant Agreement.*   Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.   *Registered Warrantholders.*   Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.   *Inspection of this Warrant Agreement.*   A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent).

34

1766891

The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 7.20. *Headings.* The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21. *Counterparts.* This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

35

1766891

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

*[VEHICLE                    ACQUISITION*
*    HOLDINGS LLC]*


By: _____
    Name:
    Title:


[●], as Warrant Agent


By: _____
    Name:
    Title:

**EXHIBIT A**

## FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE
SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD
OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION
STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN
ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT
TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH
LAWS.

A - 1

**EXHIBIT B**

**FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK**

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

D - 1

*[VEHICLE ACQUISITION HOLDINGS LLC]*

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between *[VEHICLE ACQUISITION HOLDINGS LLC]* and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2016.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number

D - 2

of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, *[VEHICLE ACQUISITION HOLDINGS LLC]* has caused this instrument to be duly executed.

Dated: _____

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____
      Name:
      Title:

Attest

By: _____
            Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
            Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

*[VEHICLE ACQUISITION HOLDINGS LLC]*

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.   Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.   A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:        [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____                _____
                                                                        (Registered Warrantholder)




                                                By:  _____
                                                        Authorized Signature
                                                        Address:
                                                        Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

The initial Number of Warrants represented by this Global Warrant is _____. In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date:    _____

_____
Name of Transferee

By:    _____
         Name:
         Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

> To *[VEHICLE ACQUISITION HOLDINGS LLC]* (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [_____]


[Insert name of transferee]


By: _____
   Name:
   Title:


E - 1

1766891

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[VEHICLE ACQUISITION HOLDINGS LLC]**
[_____]
[_____]
Attention:   Treasurer

Re:      DWAC Issuance
         Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.   The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[VEHICLE ACQUISITION HOLDINGS LLC]** and [●], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:          _____

                      _____   Original Issue or

                      _____   Transfer from Treasury Account

Broker Name:              _____

Broker's DTC Number:      _____

Contact and Phone:        _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:       [*Insert name*] via facsimile [*insert fax number*]
          Broker

1766891

**EXHIBIT B TO THE MSPA**

**FORM OF PARENT WARRANT B**

**EXHIBIT B**

**FORM OF PARENT WARRANT B**

**WARRANT AGREEMENT**

**dated as of _[_____]_, 2009**

**between**

***[VEHICLE ACQUISITION HOLDINGS LLC]***

**and**

**[●]**
**as Warrant Agent**

## ARTICLE 1
### DEFINITIONS

Section 1.01.    Certain Definitions .................................................................................. 1

## ARTICLE 2
### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.    Issuance of Warrants ................................................................................ 6

Section 2.02.    Execution and Authentication of Warrants .......................................... 7

Section 2.03.    Form of Warrant Certificates ................................................................ 7

Section 2.04.    Transfer Restrictions and Legends ........................................................ 7

Section 2.05.    Transfer, Exchange and Substitution .................................................... 9

Section 2.06.    Global Warrants .................................................................................... 10

Section 2.07.    Surrender of Warrant Certificates ...................................................... 11

## ARTICLE 3
### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    Exercise of Warrants ............................................................................ 12

Section 3.02.    Procedure for Exercise ........................................................................ 12

Section 3.03.    Settlement of Warrants ........................................................................ 12

Section 3.04.    Delivery of Common Stock ................................................................ 13

Section 3.05.    No Fractional Shares to Be Issued ...................................................... 14

Section 3.06.    Acquisition of Warrants by Company ................................................ 14

Section 3.07.    Direction of Warrant Agent ................................................................ 14

## ARTICLE 4
### [RESERVED]

## ARTICLE 5
### ADJUSTMENTS

Section 5.01.    Adjustments to Exercise Price ............................................................ 15

Section 5.02.    Adjustments to Number of Warrants .................................................. 18

Section 5.03.    Certain Distributions of Rights and Warrants.................................... 19

Section 5.04.    Shareholder Rights Plans .................................................................... 20

Section 5.05.    Other Adjustments if Net Share Settlement Applies ........................ 20

Section 5.06.    Discretionary Adjustments.................................................................. 20

ii

Section 5.07.    Restrictions on Adjustments ............................................................. 21

Section 5.08.    Deferral of Adjustments.................................................................. 21

Section 5.09.    Recapitalizations, Reclassifications and Other Changes .................. 22

Section 5.10.    Consolidation, Merger and Sale of Assets....................................... 24

Section 5.11.    Common Stock Outstanding ............................................................ 24

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 25

Section 5.13.    Calculations Final ........................................................................... 25

Section 5.14.    Notice of Adjustments ..................................................................... 25

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity.......... 26

Section 5.16.    Statements on Warrants .................................................................. 26

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ............................................................... 26

Section 6.02.    Mutilated or Missing Warrant Certificates ....................................... 27

Section 6.03.    Modification, Waiver and Meetings .................................................. 27

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes ............................................................... 29

Section 7.02.    Change of Warrant Agent ............................................................... 29

Section 7.03.    Compensation; Further Assurances .................................................. 30

Section 7.04.    Reliance on Counsel ....................................................................... 31

Section 7.05.    Proof of Actions Taken ................................................................... 31

Section 7.06.    Correctness of Statements............................................................... 31

Section 7.07.    Validity of Agreement ..................................................................... 31

Section 7.08.    Use of Agents.................................................................................. 31

Section 7.09.    Liability of Warrant Agent............................................................... 32

Section 7.10.    Legal Proceedings .......................................................................... 32

Section 7.11.    Other Transactions in Securities of the Company ............................ 32

Section 7.12.    Actions as Agent ............................................................................. 32

Section 7.13.    Appointment and Acceptance of Agency .......................................... 32

Section 7.14.    Successors and Assigns.................................................................... 33

Section 7.15.    Notices ............................................................................................ 33

iii

Section 7.16.    Applicable Law.................................................................... 33

Section 7.17.    Benefit of this Warrant Agreement.................................................... 33

Section 7.18.    Registered Warrantholders............................................................ 34

Section 7.19.    Inspection of this Warrant Agreement ............................................... 34

Section 7.20.    Headings ................................................................................ 34

Section 7.21.    Counterparts ............................................................................ 34


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ......    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS .........................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

1766889

# WARRANT AGREEMENT

This Warrant Agreement dated as of *[_____]*, 2009 is between *[Vehicle Acquisition Holdings LLC]*, a *[limited liability company]* organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, the Company is the resulting entity from the conversion of Vehicle Acquisition Company LLC from a Delaware limited liability company to a Delaware corporation;

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01.   *Certain Definitions.*   As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national

1

standing selected by the Board of Directors) and shall be determined by customary investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date,   (2) the price of each share of Common Stock will be the Closing Sale Price as of the date of determination and (3) all other assumptions shall be made by the Board of Directors in good faith based upon the advice of an independent investment bank of national standing selected by the Board of Directors at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

2

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.    Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, in connection with a dividend, issuance or distribution, the average of the Closing Sale Prices of the Common Stock for each of the 10 consecutive Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution.

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

3

"**Exercise Price**" means initially $55.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the ten (10) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stork or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrantholder.   If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could

4

obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption Notice**" has the meaning set forth in Section 5.09.

"**Reference Property**" has the meaning set forth in Section 5.09.

"**Reorganization Event**" has the meaning set forth in Section 5.09.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

5

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09.

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [•], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

## ARTICLE 2

### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.  *Issuance of Warrants.*    (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein).    The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with

6

Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)     Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.   *Execution and Authentication of Warrants.*   (a)   Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)     Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)     No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.   *Form of Warrant Certificates.*   Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and  such as may be necessary to conform to customary usage.

Section 2.04.   *Transfer Restrictions and Legends.*   (a) Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

7

(i)     Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)     Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)     All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)     Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)     Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)     Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

8

1766889

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.    The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.    All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.    Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing. Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.    The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.    No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.    Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.    To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.    No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

9

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a)    The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

10

(d)      Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)      Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees.  Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)      A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest.   Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend.   Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)      The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.   *Surrender of Warrant Certificates.*   Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof.   The Warrant Agent shall deliver to the Company from time to

11

time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    *Exercise of Warrants.*    At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).    Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.    *Procedure for Exercise.*    (a)    To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant.    However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03.    *Settlement of Warrants.*    (a)    Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.    Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any

12

fractional Warrant as provided in Section 3.05. All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.   *Delivery of Common Stock.*    (a)    In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.   However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

13

1766889

(c)        Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).    The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.    *No Fractional Shares to Be Issued.*    (a)    Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)        If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.   If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)        Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.    *Acquisition of Warrants by Company.*    The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.    *Direction of Warrant Agent*.    (a)    The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.    In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)        Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

1766889

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.   The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.   The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.  *Adjustments to Exercise Price.*  The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

15

1766889

$OS_1$ =    the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

X    =    the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

Y    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.   In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or

16

shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.  In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)     The dividend or other distribution to all holders of Common Stock of shares of the Company's Capital Stock (other than Common Stock) or evidences of the Company's indebtedness, rights or warrants to purchase the Company's securities, or the Company's assets (excluding any dividend, distribution or issuance covered by clauses (a) or (b) above or (d) below), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$     =     the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$     =     the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$     =     the Current Market Price; and

$FMV$     =     the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or assets so distributed, expressed as an amount per share of Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that

17

are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =    the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$    =    the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be  a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding"))  immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the Close of Business on the Record Date."

18

Section 5.02.  *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.  *Certain Distributions of Rights and Warrants.*  (a)  Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

> (i)    are deemed to be transferred with such shares of Common Stock;

> (ii)    are not exercisable; and

> (iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.04).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.04).

(c)    In addition, except as set forth in Section 5.04, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.04):

> (i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of

19

Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

Section 5.04.    *Shareholder Rights Plans.* If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.    If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.05.    *Other Adjustments if Net Share Settlement Applies.*    To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06.    *Discretionary Adjustments.*    The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days.    In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect.    The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of

20

the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07.    *Restrictions on Adjustments.*    (a)    Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on a basis and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made annually, on each anniversary of the Closing Date and   five Business Days prior to the Expiration Date, unless such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date

21

for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.   For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.   *Recapitalizations, Reclassifications and Other Changes*.   (a)   If any of the following events occur:

(i)   any recapitalization;

(ii)   any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)   any consolidation, merger or combination involving the Company;

(iv)   any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)   any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, following the effective time of the transaction, other than with respect to a Reorganization Event described in Section 5.09(e), the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").   In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

22

(b)     At any time from, and including, the effective time of a Reorganization Event:

(i)     if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)     if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)     the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)     the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)     The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)     any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)     any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)     any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)     Other than as provided in Section 5.09(e), on or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.    If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall use commercially reasonable efforts to cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.    Any such amendment to this Warrant Agreement shall provide for

23

adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5.   In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.   The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.   Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)      Prior to the occurrence of any Reorganization Event set forth in Section 5.09(a)(iii) or (iv), with respect to which each share of Common Stock is converted into the right solely to receive Cash in an amount less than the Exercise Price, on or before the closing date of such Reorganization Event, the Company shall deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating the Company's intent to redeem all Warrants at a price per Warrant equal to the Black Scholes Warrant Value for such Warrant measured as of the date immediately prior to the closing date of such Reorganization Event.   In the event the Company delivers a Redemption Notice:  (i) any right to exercise a Warrant shall terminate at 5:00 p.m. on the closing date of such Reorganization Event; and (ii) following the closing of such Reorganization Event, the Warrants shall have no further rights except to receive, upon surrender of the Warrant Certificate, the redemption price set forth in such Redemption Notice, without interest.

(f)      The Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent in all material respects with this Section 5.09.

(g)      The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events.

(h)      If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 shall apply to such event or occurrence.

Section 5.10.    *Consolidation, Merger and Sale of Assets.*    (a)   The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)      the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)      the Company provides written notice of such assumption to the Warrant Agent.

24

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.  *Common Stock Outstanding.*   For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12.  *Covenant to Reserve Shares for Issuance on Exercise.*   (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.   The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement.    The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.   Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)    If permitted or required by the rules of any national securities exchange or over the counter market or other domestic market on which the Common Stock is listed at any time, if any, the Company shall apply to have listed or quoted all shares of Common Stock issued upon exercise of the Warrants (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto) on any such exchange or market.

25

Section 5.13.    *Calculations Final.*    The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 5.14.    *Notice of Adjustments.*    Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.    *Warrant Agent Not Responsible for Adjustments or Validity.*    The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.   The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16.    *Statements on Warrants.*    The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant

26

Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.  However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

ARTICLE 6

OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.  All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*    (a)    This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of, among other things:

(i)    adding covenants for the benefit of the Warrantholders;

27

1766889

(ii)    adding a guarantor or other security for the benefit of the Warrantholders;

(iii)    surrendering any right or power conferred upon the Company;

(iv)    providing for the settlement upon exercise of Warrants if any reclassification or change of Common Stock or any consolidation, merger, sale, lease or other transfer of the consolidated assets of the Company and its subsidiaries substantially as an entirety occurs;

(v)    providing for the assumption of the Company's obligations in the case of a merger, consolidation, conveyance, sale, lease or other transfer;

(vi)    adjusting the Exercise Price or the Number of Warrants in the manner described in this Warrant Agreement;

(vii)    curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect; and

(viii)    adding or modifying any other provisions that the Company may deem necessary or desirable and which will not adversely affect the interests of the Warrantholders.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, either:

(i)    with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding; or

(ii)    by the adoption of a resolution at a meeting of Warrantholders called with proper notice at which a quorum is present by at least a number of Warrantholders of Warrants representing a majority of the Number of Warrants represented at such meeting.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

28

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    except as otherwise expressly permitted by provisions of this Warrant Agreement concerning specified reclassifications or corporate reorganizations, impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vi)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

(d)    The quorum at any meeting called to adopt a resolution will be Persons holding or representing Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    *Payment of Certain Taxes.*    (a)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.    *Change of Warrant Agent.*    (a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.    If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.    If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such

29

resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.  After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations.  Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder.  As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock.  Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act.   In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the

30

Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

31

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07.    *Validity of Agreement.*    The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.    *Use of Agents.*    The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.    *Liability of Warrant Agent.*    The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.    The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.    *Legal Proceedings.*    The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.    *Other Transactions in Securities of the Company.*    The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant

Agreement.   Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 7.12.   *Actions as Agent.*   The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.   The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.   No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.   No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.   The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.   *Appointment and Acceptance of Agency.*   The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.   *Successors and Assigns.*   All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15.   *Notices.*   Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

*[Vehicle Acquisition Holdings LLC]*
*[_____]*
*[_____]*
Attention:   Treasurer
Telephone:   *[_____]*
Facsimile:   *[_____]*

With a copy to:

*[_____]*
*[_____]*
*[_____]*

33

Attention:    *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention:    Treasurer
Telephone:    *[_____]*
Facsimile:    *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.    *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.    *Benefit of this Warrant Agreement.*    Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.    *Registered Warrantholders.*    Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.    *Inspection of this Warrant Agreement.*    A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent).

34

The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 7.20.    *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.    *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

35

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[*Vehicle Acquisition Holdings LLC]***

By: _____
    Name:
    Title:

[•], as Warrant Agent

By: _____
    Name:
    Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

A - 1

**EXHIBIT B**

## FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766889

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

1766889

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

D - 1

1766889

*[VEHICLE ACQUISITION HOLDINGS LLC]*

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between *[VEHICLE ACQUISITION HOLDINGS LLC]* and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2019.

   This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

   In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number

D - 2

of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, *[VEHICLE ACQUISITION HOLDINGS LLC]* has caused this instrument to be duly executed.

Dated: _____

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____
     Name:
     Title:

Attest

By: _____
     Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
     Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

*[VEHICLE ACQUISITION HOLDINGS LLC]*

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:       [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)       deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)       if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

1766889

Dated:_____          _____
                                                     (Registered Warrantholder)


                                        By:  _____
                                             Authorized Signature
                                             Address:
                                             Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

      The initial Number of Warrants represented by this Global Warrant is _____.  In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|      |      |      |      |      |
|      |      |      |      |      |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____


_____
Name of Transferee


By:  _____
    Name:
    Title:


(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

> To *[VEHICLE ACQUISITION HOLDINGS LLC]* (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [_____]


[Insert name of transferee]

By: _____
      Name:
      Title:


E - 1

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

*[VEHICLE ACQUISITION HOLDINGS LLC]*
[_____]
[_____]
Attention:    Treasurer

Re:    DWAC Issuance
        Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.   The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between *[VEHICLE ACQUISITION HOLDINGS LLC]* and [●], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:        _____

_____    Original Issue or

_____    Transfer from Treasury Account

Broker Name:        _____

Broker's DTC Number:        _____

Contact and Phone:        _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

**EXHIBIT C TO THE MSPA**

**<u>UAW ACTIVE LABOR MODIFICATIONS</u>**

## AGREEMENT BETWEEN GENERAL MOTORS CORPORATION AND THE UAW

### May 17, 2009

The UAW and GM have agreed to the terms set forth in this Agreement (including its attachments). This Agreement shall constitute an Addendum to the 2007 GM-UAW National Agreement.

With respect to the terms of the attached Memorandums of Understanding calling for suspensions of compensation or benefits, or other amendments to existing contractual provisions, the amendments and/or suspensions will last until the expiration of the 2007 UAW-GM National Agreement unless other expiration dates are specifically required by the Loan and Security Agreement between GM and the UST or, unless otherwise modified or terminated by the mutual agreement of the parties.

The provisions of this document and its attachments are subject to the terms of ratification by the membership of the UAW.

For the International Union, UAW:                For General Motors Corporation:

CSA_A01 with signature.doc

**EXHIBIT D TO THE MSPA**

**FORM OF UAW RETIREE SETTLEMENT AGREEMENT**

## UAW RETIREE SETTLEMENT AGREEMENT

This settlement agreement (together with the Exhibits hereto, the "Settlement Agreement"), dated [_____], 2009, is between [New Co] ("[New Co]"), by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), by and through its attorneys.  The UAW also enters into this Settlement Agreement as the authorized representative, as defined in Section 1114(c)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), of those persons receiving retiree benefits, as defined in Section 1114(a) of the Bankruptcy Code, pursuant to collectively bargained plans, programs and/or agreements between [New Co] and the UAW and who are members of the Class or the Covered Group, as those terms are defined herein.  This Settlement Agreement shall cover and has application to:

    (i)     the Class;

    (ii)    the Covered Group;

    (iii)   the Existing External VEBA;

    (iv)   the trustee and committee that administer the Existing External VEBA;

    (v)    the Existing Internal VEBA;

    (vi)   the trustees that administer the Existing Internal VEBA;

    (vii)   the UAW;

    (viii)  the [New Co] Plan; and

    (ix)   [New Co].

General Motors Corporation ("GM") agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU").  GM, the UAW, and the Class entered into a settlement agreement in the class action of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, *aff'd, Int'l Union, UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ("Henry I").  Thereafter, GM, the UAW, and the Class entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "Henry II Settlement").

Subsequent to entering into the MOU and the Henry II Settlement, GM filed a bankruptcy action, known as **[cite case]**, pursuant to which [New Co] purchased certain assets of GM (such purchase, the "Sale Transaction").  The UAW asserted that, under Document Nos. 13 and 91 of the GM-UAW National Agreement, [New Co] was bound by the terms of the MOU.  According to the UAW, any sale of GM's assets required UAW approval and, in the event of a sale, [New Co] was bound by the terms of the MOU.  [New Co] denied that Document Nos. 13 and 91 of the GM-UAW National Agreement and the MOU applied to [New Co] and took the position that it was free to make decisions with respect to retiree health care benefits on a unilateral basis.  After due consideration of the factual and legal arguments regarding this issue, as well as the costs, risks, and delays associated with litigating the issue, [New Co] and the UAW

have agreed to enter into this Settlement Agreement, which will be presented to the Bankruptcy Court for approval after notice is provided to affected parties.

This Settlement Agreement recognizes and approves on the basis set forth herein: (i) the adoption of the [New Co] Plan; (ii) the amendment of the [New Co] Plan to terminate coverage for and exclude from coverage the Class and the Covered Group; (iii) the transfer of the UAW Related Account of the Existing Internal VEBA to the New VEBA; (iv) the termination of participation by the Class and the Covered Group under the Existing Internal VEBA; (v) the termination of the Existing External VEBA in conjunction with the establishment of the New Plan, and the transfer to the New VEBA of all assets and liabilities of the Existing External VEBA; (vi) that all claims for Retiree Medical Benefits incurred after the Implementation Date by the Class and the Covered Group, including but not limited to COBRA continuation coverage where such election is or had been made on or after retirement and any coverage provided on a self-paid basis in retirement, shall be solely the responsibility and liability of the New Plan and the New VEBA; (vii) the Committee's designation under the New Plan and New VEBA as named fiduciary and administrator of the New Plan; (viii) that the New Plan shall replace the [New Co] Plan with respect to the provision of Retiree Medical Benefits to the Class and the Covered Group after the Implementation Date; (ix) that the New VEBA shall receive certain payments as described herein from the Existing Internal VEBA, the Existing External VEBA, and [New Co]; (x) that [New Co]'s obligation to pay into the New VEBA is fixed and capped as described herein; and (xi) that the New VEBA shall serve as the exclusive funding mechanism for the New Plan.

## 1.    Definitions

2009 Benefits Changes.  The term "2009 Benefits Changes" shall mean those plan design changes set forth in Exhibit F to this Settlement Agreement, which changes are effective on the later of July 1, 2009 and the Initial Effective Date.

Adjustment Event.  The term "Adjustment Event" is defined in Section 13 of this Settlement Agreement.

Admissions.  The term "Admissions" shall mean any statement, whether written or oral, any act or conduct, or any failure to act, that could be used (whether pursuant to Rules 801(d)(2) or 804(b)(3) of the Federal Rules of Evidence, a similar rule or standard under other applicable law, the doctrines of waiver or estoppel, other rule, law, doctrine or practice, or otherwise) as evidence in a proceeding of proof of agreement with another party's position or proof of adoption of, or acquiescence to, a position that is contrary to the interest of the party making such statement, taking such action, or failing to act.

Approval Order or Judgment.  The terms "Approval Order" or "Judgment" shall mean an order obtained from the Bankruptcy Court approving and incorporating this Settlement Agreement in all respects as set forth in Section 28 of this Settlement Agreement.

Bankruptcy Court.  The term "Bankruptcy Court" shall mean the United States Bankruptcy Court with respect to **[cite bankruptcy case]**.

Class or Class Members.  The term "Class" or "Class Members" shall mean all persons who are:

(i)  [New Co]-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii)  surviving spouses and dependents of any [New Co]-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii)  UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv)  surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(v)  [New Co]-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or under the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any [New Co]-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit (other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan.

Class Counsel.  The term "Class Counsel" shall mean the law firm of Stember, Feinstein, Doyle & Payne, LLC, or its successor, as well as such other counsel as may be retained thereby or work on behalf thereof.

Class Representatives.  The term "Class Representatives" shall mean Earl L. Henry, Bonnie J. Lauria, Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, Laverne M. Soriano, and John Huber.

Closing.  The term "Closing" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Closing Date.  The term "Closing Date" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Committee.  The term "Committee" shall mean the governing body set forth in Section 4.A of this Settlement Agreement that acts on behalf of the EBA and serves as the named

- 3 -

fiduciary and administrator of the New Plan, as those terms are defined in ERISA and that is so described in the Trust Agreement.

Common Stock.    The term "Common Stock" shall mean the number of shares of Common Stock, par value $0.01 per share, of [New Co], required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Court.    The term "Court" shall mean the United States District Court for the Eastern District of Michigan.

Covered Group. The term "Covered Group" shall mean:

(i)    all [New Co] Active Employees who had attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW or [New Co] and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan, the [New Co] Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii)    all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan, or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii)    all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(iv)    all former [New Co]-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit, and upon retirement are eligible for Retiree Medical Benefits from GM or [New Co], as applicable, and/or under the GM Plan, the [New Co] Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW or [New Co] and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v)    all eligible surviving spouses and dependents of a [New Co] Active Employee, former [New Co]-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM or [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan, as applicable.

Debt.    The term "Debt" shall mean notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

Dispute Party.    The term "Dispute Party" is defined in Section 26.B of this Settlement Agreement.

DOL.    The term "DOL" shall mean the United States Department of Labor.

- 4 -

Employees Beneficiary Association or EBA. The term "Employees Beneficiary Association" or "EBA" shall mean the employee organization within the meaning of section 3(4) of ERISA that is organized for the purpose of establishing and maintaining the New Plan, with a membership consisting of the individuals who are members of the Class and the Covered Group, and on behalf of which the Committee acts.

Equity Subscription Agreement. The term "Equity Subscription Agreement" shall mean the Equity Subscription Agreement, dated June 1, 2009, by and between the New VEBA and Vehicle Acquisition Holdings, LLC.

ERISA. The term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Existing External VEBA. The term "Existing External VEBA" shall mean the defined contribution – Voluntary Employees' Beneficiary Association trust established pursuant to the Henry I Settlement.

Existing Internal VEBA. The term "Existing Internal VEBA" shall mean the General Motors Welfare Benefit Trust that was maintained by GM and, as of the Closing Date, will be sponsored by [New Co].

General Motors Asset Management Valuation Policies and Procedures. The term "General Motors Asset Management Valuation Policies and Procedures" shall mean GMAM's valuation policies and procedures, copies of which have been provided to the UAW and Class Counsel, as the same may be amended from time to time by GMAM (who shall notify the UAW and the Committee about any such intended amendments in a timely manner).

GM. The term "GM" is defined in the third paragraph of this Settlement Agreement.

GMAM. The term "GMAM" shall mean Promark Global Advisors Inc., formerly known as General Motors Asset Management Corporation, and its subsidiaries, or, when specifically referring to the investment manager for the Existing Internal VEBA, Promark Investment Advisors, Inc., formerly known as General Motors Investment Management Corporation. GMAM is a wholly owned subsidiary of GM.

GM Plan. The term "GM Plan" shall mean the Retiree Medical Benefits as provided pursuant to the General Motors Health Care Program for Hourly Employees in effect under the Henry II Settlement for the Class and the Covered Group.

GM-UAW National Agreements. The term "GM-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between GM and the UAW covering GM employees represented by the UAW. The current GM-UAW National Agreement is dated October 15, 2007.

Henry I. The term "Henry I" is defined in the second paragraph of this Settlement Agreement.

Henry I Settlement. The term "Henry I Settlement" shall mean the settlement agreement, dated December 16, 2005, approved by the Court in Henry I.

Henry II. The term "Henry II" is defined in the second paragraph of this Settlement Agreement.

Henry II Settlement. The term "Henry II Settlement" is defined in the second paragraph of this Settlement Agreement.

Indenture. The term "Indenture" shall mean the loan agreement, credit agreement or other form of document to be entered into by [New Co] with respect to the [New Co] Note, substantially in the form set forth in Exhibit B to this Settlement Agreement.

Implementation Date. The term "Implementation Date" shall mean the later of December 31, 2009 or the Closing Date.

Indemnified Party. The term "Indemnified Party" is defined in Section 23 of this Settlement Agreement.

Indemnification Liabilities. The term "Indemnification Liabilities" is defined in Section 23 of this Settlement Agreement.

Indemnity Expenses. The term "Indemnity Expenses" is defined in Section 23 of this Settlement Agreement.

Independent Attestation. The term "Independent Attestation" shall mean an agreed-upon procedures engagement performed for [New Co], the UAW and the Committee by a nationally recognized independent registered public accounting firm selected by [New Co] and conducted in accordance with the attestation standards of the Public Company Accounting Oversight Board, the subject matter of which would be whether specified assets of the Existing Internal VEBA have been valued in accordance with the General Motors Asset Management Valuation Policies and Procedures. The agreed-upon procedures shall be mutually agreed among the accounting firm, [New Co] and the Committee in connection with any such engagement.

Initial Accounting Period. The term "Initial Accounting Period" shall mean the period before the date that [New Co] determines that its obligations, if any, with respect to the New Plan made available to the Class and Covered Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent.

Initial Effective Date. The term "Initial Effective Date" shall mean the date on which the Bankruptcy Court enters the Approval Order.

Interest. The term "Interest" shall mean an interest rate of 9 percent (9%) per annum (computed on the basis of a 360-day year consisting of twelve 30-day months and the number of days elapsed in any partial month), credited and compounded annually, unless otherwise specified in this Settlement Agreement.

Mitigation. The term "Mitigation" shall have the same meaning as in the Henry I Settlement.

MOU. The term "MOU" is defined in the third paragraph of this Settlement Agreement.

National Institute for Health Care Reform or Institute. The term "National Institute for Health Care Reform" or "Institute" is defined in Section 31 of this Settlement Agreement.

[New Co]. The term "[New Co]" is defined in the first paragraph of this Settlement Agreement.

[New Co] Active Employees.  The term "[New Co] Active Employees" shall mean those hourly employees of [New Co] or, for periods prior to the Closing Date, GM who, as of September 14, 2007 or any date thereafter, are covered by the 2007 GM-UAW National Agreement or are covered by any subsequent GM-UAW National Agreement or [New Co]-UAW National Agreement.  For purposes of this definition, "active employee" shall include hourly employees on vacation, layoff, protected status, medical or other leave of absence, and any other employees who have not broken seniority as of September 14, 2007.

[New Co] Equity.  The term "[New Co] Equity" shall mean the Common Stock, the Preferred Stock and the Warrant.

[New Co] Note.  The term "[New Co] Note" shall mean the $2.5 billion Note due July 15, 2017 of [New Co] substantially in the form set forth in Exhibit I hereto.

[New Co] Plan.  The term "[New Co] Plan" shall mean the GM Plan, as amended by the 2009 Benefits Changes.

[New Co]-UAW National Agreements.  The term "[New Co]-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between [New Co] and the UAW covering [New Co] employees represented by the UAW.

[New Co]-UAW Represented Employees.  The term "[New Co]-UAW Represented Employees" shall mean those individuals represented by the UAW in their employment with GM prior to the Closing Date, or [New Co] after the Closing Date.

New Plan.  The term "New Plan" shall mean the new retiree welfare benefit plan that is established and maintained by the EBA for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group, and that is funded in part by the [New Co] Separate Retiree Account of the New VEBA.

New VEBA.  The term "New VEBA" shall mean the UAW Retiree Medical Benefits Trust that was established pursuant to the Henry II Settlement and is further described in Section 4 of this Settlement Agreement.

Non-UAW Related Account.  The term "Non-UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

Pension Plan.  The term "Pension Plan" shall mean the General Motors Hourly-Rate Employees Pension Plan, as assumed by [New Co].

Preferred Stock.  The term "Preferred Stock" shall mean the number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share of [New Co], having terms substantially as set forth in Exhibit J hereto, required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Relevant [New Co] Equity Agreements.  The term "Relevant [New Co] Equity Agreements" shall mean (i) the Stockholders Agreement, among [New Co], the New VEBA, and the other [New Co] stockholder parties thereto, substantially in the form set forth in Exhibit K and (ii) the Equity Registration Rights Agreement, by and among [New Co], the New VEBA and the other parties thereto, substantially in the form set forth in Exhibit D hereto.

Retiree Medical Benefits.  The term "Retiree Medical Benefits" shall mean all post-retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.

SAP.  The term "SAP" is defined in Section 12.B of this Settlement Agreement.

Subsidiary.  The term "Subsidiary" shall mean any corporation or other entity of which at least a majority of the outstanding stock or other beneficial interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other governing body of such corporation or other entity (irrespective of whether or not at the time stock or other beneficial interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time owned by [New Co], or by one or more Subsidiaries, or by [New Co] and one or more Subsidiaries.

Transition Payments.  The term "Transition Payments" is defined in Section 12.A of the Settlement Agreement.

Trust Agreement.  The term "Trust Agreement" shall mean the UAW Retiree Medical Benefits Trust Agreement, as amended as set forth in Exhibit E to this Settlement Agreement.

UAW.  The term "UAW" is defined in the first paragraph of this Settlement Agreement.

UAW Related Account.  The term "UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

UAW Releasees.  The term "UAW Releasees" shall mean the UAW, the Class, the Class Representatives, Class Counsel and the Covered Group and anyone claiming on behalf of, through or under them by way of subrogation or otherwise.

Warrant.  The term "Warrant" shall mean Warrants to acquire shares of Common Stock, par value $0.01 per share, of [New Co] substantially in the form set forth in Exhibit L hereto, and required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

**2.  Purpose of New Plan and New VEBA**

The retiree benefits provided for in this Settlement Agreement have resulted from extensive negotiations and affect the rights of the Class and the Covered Group.  [New Co] Active Employees are not members of the Class.  Therefore, medical benefit coverage for [New Co] Active Employees prior to their retirement are not within the scope of this Settlement Agreement and shall continue to be provided in accordance with the terms of the applicable collective bargaining agreement and health care benefit plan.  Similarly, Retiree Medical Benefits for [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 are outside the scope of this Settlement Agreement and such benefits, if any, shall be provided in accordance with the applicable provisions of the GM-UAW National Agreements.

Nothing in this Settlement Agreement modifies the rights or obligations of [New Co] or the UAW to negotiate over health care benefits for [New Co] Active Employees who are not members of the Covered Group and future retirees who are not members of the Covered Group upon the expiration of the GM-UAW National Agreements, which have been assumed by [New Co],or at any earlier time if [New Co] and the UAW mutually agree.  Any changes resulting from subsequent negotiations shall be applied only to employees who retire after any such

agreement is reached and shall not otherwise affect the rights of Class Members or the Covered Group hereunder or [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 but who retire prior to the time any such agreement is reached.

With regard to participation in the [New Co] Plan, all references to retirees in this Settlement Agreement shall be deemed to include the Covered Group.  For purposes of this Settlement Agreement, any reference to health care benefits to be provided hereunder to Class Members or the Covered Group shall be deemed to include such benefits provided to any of their respective spouses and dependents subject to all the terms and conditions of the applicable plan, including but not limited to eligibility requirements.

The New Plan and the New VEBA shall, after the Implementation Date, be the employee welfare benefit plan and trust that are exclusively responsible for all Retiree Medical Benefits for which [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan formerly would have been responsible with respect to the Class and the Covered Group.  All assets paid or transferred by [New Co] to the New VEBA (including any investment returns thereon) shall be credited to the [New Co] Separate Retiree Account and must be used for the exclusive purposes of (A) providing Retiree Medical Benefits to the participants of the New Plan and their eligible beneficiaries and (B) defraying the reasonable expenses of administering the New Plan, as set forth in the Trust Agreement.  All obligations of [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan for Retiree Medical Benefits for the Class and the Covered Group arising from any agreement(s) between [New Co] and the UAW shall be forever terminated as of the Implementation Date.  [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement. Eligibility rules for the New Plan shall be the same as those currently included in the [New Co] Plan, and may not be expanded.

### 3.    Factual Investigation and Legal Inquiry and Decision to Settle

Throughout the 2009 negotiations over the terms of this Settlement Agreement, the parties engaged in extended discussions concerning the GM bankruptcy filing, the terms of the sale pursuant to Section 363 of the Bankruptcy Code, retiree medical costs, and the obligations attendant to [New Co] being determined a successor to GM with respect to retiree health care. The UAW was provided with extensive information as to [New Co's] projected financial condition and health care expenditures.  On behalf of the UAW, a team of investment bankers, actuaries, and legal experts have reviewed [New Co]'s information and provided the UAW with an assessment as to the state of [New Co]'s financial condition and analyzed the benefits of entering into this Settlement Agreement.   [New Co] representatives also met with UAW representatives and its team of experts to answer questions and provide further detail, as requested.

The UAW has completed due diligence with respect to the Settlement Agreement utilizing professional financial and legal advisors and has determined that it is fair, reasonable and in the best interest of the Class and the Covered Group.  Class Counsel has had access to the information provided to the UAW and has reviewed this Settlement Agreement and believes that, in consideration of all the circumstances, it is fair, reasonable, and in the best interest of all members of the Class.

### 4.    New Plan and New VEBA

A.    <u>Committee</u>.  The New Plan and New VEBA, both subject to ERISA, shall be administered by the Committee.  The Committee consists of 11 members, 5 of whom were appointed by the UAW and 6 of whom are independent members, who were appointed pursuant to the Court's July 31, 2008 order approving the Henry II Settlement.  In the event that any member of the Committee resigns, dies, becomes incapacitated or otherwise ceases to be a member, a replacement member shall be appointed, as described in the Trust Agreement.

B.    <u>Establish and Maintain</u>.  The EBA, acting through the Committee, shall establish and maintain the New Plan for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group as set forth in this Settlement Agreement.  The Committee shall begin administering the New Plan so as to be able to provide Retiree Medical Benefits for the Class and the Covered Group with respect to claims incurred after the Implementation Date.  The Committee established the New VEBA on October 16, 2008.  The New Plan shall be ERISA-covered and the New VEBA shall meet the requirements of Section 501(c)(9) of the Internal Revenue Code.  All payments to the New Plan and the New VEBA made or caused to be made by [New Co] under the Settlement Agreement are payments pursuant to section 302(c)(2) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. 186(c)(2).

C.    <u>Limitation on [New Co] Role</u>.  No member of the Committee shall be a current or former officer, director or employee of GM or [New Co] or any member of the GM or [New Co] controlled group; provided however, that a retiree who was represented by the UAW in his/her employment with GM or [New Co] or an employee of [New Co] who is on leave from [New Co] and who is represented by the UAW is not precluded by this provision from serving on the Committee.  No member of the Committee shall be authorized to act for [New Co] or shall be an agent or representative of [New Co] for any purpose.  Furthermore, [New Co] shall not be a fiduciary with respect to the New Plan or New VEBA, and will have no rights or responsibilities with respect to the New Plan or New VEBA other than as specifically set forth in this Settlement Agreement.

### 5.    Provision and Scope of Retiree Medical Benefits

A.    <u>On and Before the Implementation Date</u>.  With respect to claims incurred on and before the Implementation Date, without regard to whether such claims were incurred before, on or after the execution of this Settlement Agreement, Retiree Medical Benefits for the Class and the Covered Group will be provided either by GM or [New Co], as applicable, in accordance with the [New Co] Plan.  Mitigation payments from the Existing External VEBA (for those entitled thereto) shall continue to apply during this period.  The payment by [New Co] and/or the [New Co] Plan of Retiree Medical Benefits for claims incurred on and before the Implementation Date will not reduce [New Co]'s payment obligations to the New Plan and the New VEBA under this Settlement Agreement; but in no event shall [New Co] be responsible for payment of claims to the extent that such claims have been paid by GM or the GM Plan.

B.    <u>After the Implementation Date</u>.  With respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be the exclusive source of funds to provide Retiree Medical Benefits for the Class and the Covered Group, including but not limited to COBRA continuation coverage, where such election is made after retirement.  Neither [New Co], the [New Co] Plan, the Existing Internal VEBA, nor any

other [New Co] person, entity, or benefit plan shall have any responsibility or liability for Retiree Medical Benefits for individuals in the Class or in the Covered Group for claims incurred after the Implementation Date.  [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement.

C.    Amendment of the New Plan.    On and after January 1, 2010, the Committee shall have such authority to establish Benefits as described in the Trust Agreement, including raising or lowering benefits.  However, in no event may the Committee amend the New Plan or New VEBA to provide benefits other than Retiree Medical Benefits until the expiration of the Initial Accounting Period.  The ability of the New Plan and the New VEBA to pay for Retiree Medical Benefits will depend on numerous factors, many of which are outside of the control of UAW, the Committee, the New Plan and the New VEBA, including, without limitation, the investment returns, actuarial experience and other factors.

D.    Termination of [New Co] Plan and Reimbursement of [New Co].    The Approval Order shall provide that all obligations of [New Co] and all provisions of the [New Co] Plan in any way related to Retiree Medical Benefits for the Class and/or the Covered Group, and all provisions of applicable collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with this Settlement Agreement and the fundamental understanding that all [New Co] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement.  Summary Plan Descriptions of the [New Co] Plan shall reflect the termination of the responsibilities of [New Co] and the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein.

The New Plan and New VEBA shall reimburse [New Co] or the [New Co] Plan, as applicable, for any Retiree Medical Benefits advanced or provided by [New Co] or the [New Co] Plan with regard to claims incurred by members of the Class and the Covered Group after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred after the Implementation Date or where [New Co] is notified of an intent by a member of the Class and the Covered Group to retire under circumstances where there is insufficient time to transfer responsibility for Retiree Medical Benefits to the New Plan and [New Co] or the [New Co] Plan provides interim coverage for Retiree Medical Benefits.  To the extent such reimbursement may not be permitted by law, the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, and the Committee will fully cooperate with [New Co] to secure any legal or regulatory approvals that are necessary to permit such reimbursement.

6.    **Division of Existing Internal VEBA**

A.    UAW Related Account.    Pursuant to the Henry II Settlement GM divided the Existing Internal VEBA into two bookkeeping accounts.  One account consisted of the percentage of the Existing Internal VEBA's assets as of January 1, 2008 that was equal to the estimated percentage of GM's hourly OPEB liability covered by the Existing Internal VEBA attributable to Non-UAW represented employees and retirees, their eligible spouses, surviving spouses and dependents ("Non-UAW Related Account").  The second account consisted of the

- 11 -

remaining percentage of the assets in the Existing Internal VEBA as of January 1, 2008 ("UAW Related Account").

As of March 31, 2009, the amount in the UAW Related Account was valued at approximately $9.4 billion.

B.    Investment of Assets.    GMAM shall oversee the investment of the assets in the Existing Internal VEBA with respect to the UAW Related Account until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA pursuant to Section 12 of this Settlement Agreement.    All such assets shall continue to be invested under the existing investment policy (as may be amended from time to time by [New Co] who shall notify the UAW and the Committee about intended amendments in a timely manner) applicable to the Existing Internal VEBA.    Investment returns, net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), on all assets of the Existing Internal VEBA on and after January 1, 2008 shall be applied to these accounts proportionally in relation to the value of the assets in the UAW Related Account in relation to the total amount of assets in the Existing Internal VEBA.    In other words, investment returns (i.e., the percentage return on the total Existing Internal VEBA), net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), shall be applied to the value of the UAW Related Account and separately to the value of the Non-UAW Account (as adjusted to reflect any withdrawals by GM or [New Co]).    However, neither GM nor GMAM nor [New Co] guarantee or warrant the investment returns on the assets in the Existing Internal VEBA.

Until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA, [New Co] agrees to cause GMAM to periodically inform and hold discussions with the UAW and the Committee about the investment results of and decisions regarding the assets in the Existing Internal VEBA.    During such period, GMAM shall, with respect to the performance of its duties in managing the Existing Internal VEBA, participate in the following meetings and provide the following reports to the UAW and the Committee:    (i) quarterly reports of Existing Internal VEBA asset class and benchmark performance for relevant time periods; and (ii) semi-annual or quarterly meetings with UAW and/or Committee representatives to report on Existing Internal VEBA returns and analysis of performance, and to review significant activities affecting investments.    Any input from the UAW and/or the Committee shall not be a basis of GMAM's investment decisions within the meaning of the DOL regulations set forth at 29 C.F.R. § 2510-3.21(c).

C.    Disposition of Assets.    No amounts shall be withdrawn by [New Co] from the UAW Related Account, including its investment returns, until transfer to the New VEBA under Section 12.    GMAM and the Committee shall enter into discussions in advance of such transfer with regard to the method of transferring and/or otherwise handling any illiquid or otherwise non-transferable investments in the Existing Internal VEBA so as to preserve as much as possible the economic value of such investments and minimize any losses due to the liquidation of assets.    Such discussions shall commence in a timely fashion and be completed as soon as reasonably practicable.    The determinations made by GMAM as a product of these discussions with the Committee regarding the way to transfer illiquid or otherwise non-transferable investments in the Existing Internal VEBA shall be final and binding on [New Co], the UAW, the Committee, the Class and the Covered Group.

**7.**     [Reserved]

**8.      [New Co] Payments to New Plan and New VEBA**

[New Co]'s financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement.  The timing of all payments to the New VEBA shall be as set forth in Section 12 of this Settlement Agreement; it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group after the Implementation Date, and that all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group shall terminate as of the Implementation Date, as set forth in this Settlement Agreement.  All assets shall be transferred or paid by [New Co] free and clear of any liens, claims or other encumbrances.  Pursuant to this Settlement Agreement, [New Co] shall have the following, and only the following, obligations to the New VEBA and the New Plan, and all payments and transfers in this Section 8 of this Settlement Agreement shall be credited to the [New Co] Separate Retiree Account of the New VEBA:

A.     Special Attrition Plan.  In accordance with Section 12.A of this Settlement Agreement, [New Co] shall pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the terms of the Special Attrition Plan agreed to by GM and the UAW and ratified on May 29, 2009 (the "SAP"), excluding those [New Co] Active Employees who accepted buyouts.

B.     UAW Related Account.   In accordance with Section 12.B of this Settlement Agreement, [New Co] shall cause the transfer to the New VEBA of the assets (or, with regard to any illiquid or otherwise non-transferable investments, equivalent alternatives resulting from discussions between GMAM and the Committee pursuant to Section 6.C of this Settlement Agreement) of the UAW Related Account in the Existing Internal VEBA, net of Existing Internal VEBA trust expenses (which shall include expenses only to the extent permitted by ERISA).

C.     [New Co] Note.  In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the financial institution that will serve as trustee under the Indenture, if applicable, or to the other counterparty to the Indenture (the "Indenture Trustee") a counterpart signature page to the Indenture (and issue the [New Co] Note to the New VEBA pursuant to the terms and conditions thereof).  [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture).  [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Indenture (and the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture), or result in any such breach

- 13 -

or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Note to the New VEBA).

D.      [New Co] Equity.   In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement.  [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement).  [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement), or result in any such breach or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Equity to the New VEBA).

9.      [Reserved]

10.     [Reserved]

11.     [Reserved]

**12.     Deposits to the New VEBA**

A.      Transition Payments; SAP Payments.   Until the Implementation Date, within 30 days of any request by the Committee, [New Co] shall pay to the New VEBA such amounts ("Transition Payments") as the Committee shall request, provided that there shall be no more than five such requests prior to the Implementation Date and the aggregate of all such payments shall not exceed $19,950,000.  Such amounts shall represent an advance to the New VEBA to cover reasonable and necessary preparatory expenses incurred by the New Plan or New VEBA in anticipation of the transition of responsibility for Retiree Medical Benefits as of the Implementation Date as set forth in Section 5 of this Settlement Agreement.  These advance payments shall not increase or add to the amounts [New Co] has agreed to pay under this Settlement Agreement.

[New Co] shall also pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the SAP (excluding those [New Co] Active Employees who accepted buyouts). The contract cost shall be determined by the parties after execution of this Settlement Agreement as follows:

- 14 -

(i) The parties' respective actuaries shall meet and confer as soon as practicable to determine the average cost per contract for four retiree categories: (1) Pre-Medicare Eligible single, (2) Pre-Medicare family, (3) Medicare single, and (4) Medicare family.

(ii) Based upon the categories set forth in (i) above, the parties will develop an average annual cost calculation for each category.

(iii) As soon as reasonably practicable after conclusion of the SAP, the parties will jointly assign the SAP participants to the appropriate category according to their respective circumstances and calculate an average annual cost per SAP participant.

On or before January 5, 2010, [New Co] shall pay to the New VEBA such aggregate contract cost, discounted by the Interest rate set forth in this Settlement Agreement, for the twenty-four month period following the later of January 1, 2010 and the date of retirement under the SAP. The foregoing payment shall be reduced, dollar-for-dollar, by any Transition Payments made pursuant to this Section 12.A, plus Interest.

B.        Deposit of the UAW Related Account.  Within 10 business days after the Implementation Date, [New Co] shall direct the trustee of the Existing Internal VEBA to transfer to the New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA, the amount of which shall be determined as provided in Section 6 of this Settlement Agreement. The Approval Order shall provide that, upon such transfer, the Existing Internal VEBA shall be deemed to be amended to terminate participation and coverage regarding Retiree Medical Benefits for the Class and the Covered Group, effective as of the Implementation Date. Accruals for trust expenses (this shall only include expenses to the extent permitted by ERISA) through the date of transfer shall be made and an amount equal to the UAW Related Account's share of such accruals shall be retained within the Existing Internal VEBA to pay such expenses. After payment of these trust expenses is completed, a reconciliation of the accruals and the actual expenses (this shall only include expenses to the extent permitted by ERISA) shall be performed. [New Co] agrees to cause the payment to the New VEBA by the Existing Internal VEBA of any overaccruals for the UAW Related Account's share of such expenses. Similarly, in the event of an underaccrual the New VEBA shall return to the Existing Internal VEBA the amount of the underaccrual of expenses for the UAW Related Account.

C.        Deposit of the Existing External VEBA.  The Approval Order shall direct the committee and the trustees of the Existing External VEBA to transfer all assets and liabilities into the New VEBA and terminate the Existing External VEBA within 15 days after the Implementation Date. This transfer of assets and liabilities shall include, but not be limited to, the transfer of all rights and obligations granted to or imposed on the Existing External VEBA under Section 14.C(e) of the Henry I Settlement.

D.        Issuance of [New Co] Note.  On the Closing Date, [New Co] shall execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture and issue the [New Co] Note to the New VEBA under the Indenture. Such execution and delivery of the Indenture (and the issuance of the [New Co] Note to the New VEBA under the Indenture) shall only occur as permitted by law. [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement. The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals. If [New Co] and the New VEBA cannot timely obtain necessary legal or

- 15 -

regulatory approvals, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Note to the New VEBA that provide equivalent economic value to the New VEBA. Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture (and to issue the [New Co] Notes to the New VEBA under the Indenture) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the Indenture Trustee of the Indenture.

E.    Issuance of [New Co] Equity.    On the Closing Date, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement.    Such execution and delivery of the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) shall only occur as permitted by law.    [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement and any required federal or state bank regulatory approvals.    The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals.    If [New Co] and the New VEBA cannot timely obtain necessary legal or regulatory approvals, as specified in the Equity Subscription Agreement, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Equity to the New VEBA that provide equivalent economic value to the New VEBA.    Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the New VEBA the Relevant [New Co] Equity Agreements (and to issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the New VEBA of the Relevant [New Co] Equity Agreements to the relevant counterparties of each such agreement.    On the Closing Date, the New VEBA shall execute and deliver to [New Co] counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto).

If a deposit or payment or any portion thereof is made by [New Co] to the New VEBA by mistake under any provision of this Settlement Agreement, the Committee shall, upon written direction of [New Co], return such amounts as may be permitted by law to [New Co] (plus earnings thereon from the date of payment to but excluding the date of return) within 30 days of notification by [New Co] that such payment was made by mistake.    If a dispute arises with regard to such payment, the dispute will be resolved pursuant to Section 26 of this Settlement Agreement.

13.    **Adjustment Events**

A.    Adjustment Event.    "Adjustment Event" shall mean the determination of the value of any assets in lieu of which [New Co] elects to transfer cash to the New VEBA pursuant to Sections 8.B and 12.B of this Settlement Agreement.

B.    Due Diligence and Adjustment Mechanism.

In connection with any Adjustment Event, [New Co] shall deliver, as soon as practicable, to the Committee (or the UAW prior to establishment of the Committee) information in

- 16 -

reasonable detail about the determinations made with regard to such Adjustment Event and the work papers, underlying calculations and other documents and materials on which such determinations are based, including non-privileged materials from [New Co]'s advisors, if any (collectively, the "Determination Materials").

The Committee shall have 30 days from receipt of the Determination Materials from [New Co] to submit to [New Co] a written request for an Independent Attestation of a determination(s) listed in Section 13.A of this Settlement Agreement. As a part of this review process, the Committee may ask for additional information regarding the calculations, and the data and information provided by [New Co]. [New Co] shall as promptly as practicable, respond to all reasonable requests from the Committee for such additional information. However, a request for additional information shall not extend the 30 day review period, unless an extension is reasonably necessary to allow the Committee to review such additional information, but in no event longer than 45 days from receipt of the Determination Materials.

All determinations made with regard to a determination(s) listed in Section 13.A of this Settlement Agreement shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA, unless the Committee timely submits a request for an Independent Attestation. If the Committee timely submits such a request, [New Co] shall engage a nationally recognized independent registered public accounting firm to conduct an Independent Attestation regarding a determination(s) listed in Section 13.A of this Settlement Agreement. The Independent Attestation shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA.

Nothing in the foregoing paragraphs shall prevent the division, deposit, withdrawal or transfer of any assets the valuation of which is not in dispute pending resolution of the disputed amounts.

C.    Confidentiality.    All information and data provided by [New Co] to the UAW, Class Counsel, and/or the Committee as a part of this due diligence and adjustment process shall be considered confidential. The UAW, Class Counsel, and the Committee shall use such information and data solely for the purpose set forth in this Section 13 of the Settlement Agreement. The UAW, Class Counsel, and the Committee shall not disclose such information or data to any other person without [New Co]'s written consent, provided that the UAW, Class Counsel, and the Committee may disclose such information and data to their attorneys and professional advisors, subject to the agreement of such attorneys and advisors to the confidentiality restrictions set forth herein.

## 14.    Future Contributions

The UAW, the Class and the Covered Group may not negotiate any increase of [New Co]'s funding or payment obligations set out herein. The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New Co] to:  (i) provide any additional payments to the New VEBA other than those specifically required by this Settlement Agreement; (ii) make any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through any other means.  Provided that, the UAW may propose that [New Co] Active Employees be

permitted to make contributions to the New VEBA of amounts otherwise payable in profit sharing, COLA, wages and/or signing bonuses, if not prohibited by law.

### 15.    Pension Benefits

[New Co] and the UAW agree that this Settlement Agreement shall in no way obligate [New Co] to effect the amendment to the Pension Plan contemplated by Section 15 of the Henry II Settlement, but not implemented, to provide to retirees and eligible surviving spouses who are members of the Class or the Covered Group a flat monthly special lifetime benefit of $66.70, as provided for in the Henry II Settlement.

[New Co] and the UAW further agree that this Settlement Agreement shall in no way obligate the New Plan and New VEBA to assess an additional non-escalating monthly contribution payable by retirees and eligible surviving spouses of the Class and the Covered Group for Retiree Medical Benefits of $51.67 per month, as provided for in the Henry II Settlement.

The Approval Order shall provide that there will be no requirement to amend the Pension Plan as provided for in Section 15 of the Henry II Settlement.

### 16.    Administrative Costs

The New VEBA will be responsible for all costs to administer the New Plan and the New VEBA commencing on the Implementation Date and continuing thereafter.  The New Plan and the New VEBA trust agreement shall be drafted consistent with this requirement.

### 17.    Trust Agreement; Segregated Account; Indemnification

Assets paid or transferred to the New VEBA by or at the direction of [New Co], including all investment returns thereon, shall be used solely to provide Retiree Medical Benefits to the Class and the Covered Group as defined in this Settlement Agreement until expiration of the Initial Accounting Period.  Thereafter, Benefits will be provided to the Class and the Covered Group as described in the Trust Agreement.  The Trust Agreement shall provide: (i) for the [New Co] Separate Retiree Account to be credited with the assets deposited or transferred to the New VEBA by [New Co], or at [New Co]'s direction, under this Settlement Agreement; (ii) that the assets in the [New Co] Separate Retiree Account may be used only to provide Benefits (as defined in the Trust Agreement) for such Class and such Covered Group; and (iii) that under no circumstances will [New Co] or the [New Co] Separate Retiree Account be liable or responsible for the obligations of any other employer or for the provision of Retiree Medical Benefits or any other benefits for the employees or retirees of any other employer.

Further, the Trust Agreement shall provide that the Committee, on behalf of the New VEBA, shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the New VEBA's ability to own the [New Co] Note and the [New Co] Equity or as may be required to comply with all applicable laws and regulations, including but not limited to federal and state banking laws and regulations.

To the extent permitted by law, the New VEBA shall indemnify and hold the Committee, the UAW, [New Co], the [New Co] Plan, and the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the New Plan and New VEBA, unless such liability arises from their gross negligence or intentional misconduct, or

- 18 -

breach of this Settlement Agreement. The Committee shall not be required to give any bond or any other security for the faithful performance of its duties under the Trust Agreement, except as such may be required by law.

### 18. Subsidies

With regard to claims incurred after the Implementation Date, the New VEBA shall be entitled to receive any Medicare Part D subsidies and other health care related subsidies regarding benefits actually paid by the New VEBA which may result from future legislative changes, and [New Co] shall not be entitled to receive any such subsidies related to prescription drug benefits and other health care related benefits provided to the Class and the Covered Group by the New Plan and New VEBA.

### 19. [Reserved]

### 20. Cooperation

A. <u>Cooperation by [New Co]</u>. [New Co] will cooperate with the UAW and the Committee and at the Committee's request undertake such reasonable actions as will assist the Committee in the transition of responsibility for administration of the Retiree Medical Benefits by the Committee for the New Plan and the New VEBA. Such cooperation will include assisting the Committee in educational efforts and communications with respect to the Class and the Covered Group so that they understand the terms of the New Plan, the New VEBA and the transition, and understand the claims submission process and any other initial administrative changes undertaken by the Committee. Before and after the Implementation Date, at the Committee's request and as permitted by law, [New Co] will furnish to the Committee such information and shall provide such cooperation as may be reasonably necessary to permit the Committee to effectively administer the New Plan and the New VEBA, including, without limitation, the retrieval of data in a form and to the extent maintained by [New Co] regarding age, amounts of pension benefits, service, pension and medical benefit eligibility, marital status, mortality, claims history, births, deaths, dependent status and enrollment information of the Class and the Covered Group. At the request of the Committee, [New Co] will continue to perform the necessary eligibility work for a reasonable period of time, not to exceed 90 days after the Implementation Date in order to allow the Committee to establish and test the eligibility database, and for which [New Co] will be entitled to reimbursement for reasonable costs. [New Co] shall also assist the Committee in transitioning benefit provider contracts to the New VEBA. [New Co] shall also cooperate with the UAW and the Committee and undertake such reasonable actions as will enable the Committee to perform its administrative functions with respect to the New Plan and the New VEBA, including insuring an orderly transition from [New Co] administration of Retiree Medical Benefits to the New Plan and the New VEBA.

To the extent permitted by law, [New Co] will also allow retiree participants to voluntarily have required contributions withheld from pension benefits and to the extent reasonably practical, credited to the [New Co] Separate Retiree Account of the New VEBA on a monthly basis. A retiree participant may elect or withdraw consent for pension withholdings at any time by providing 45 days written notice to the Pension Plan administrator or such shorter period that may be required by law.

To the extent permitted by law and if applicable, [New Co] will also cooperate with the Committee to make provision for the New VEBA payments of the $76.20 Special Benefit to be incorporated into monthly [New Co] pension checks for eligible retirees and surviving spouses. It will be the responsibility of the Committee and the New VEBA to advise [New Co]'s pension administrator in a timely manner of eligibility changes with regard to the Special Benefit payment. The timing of the information provided to [New Co]'s pension administrator will determine the timing for the incorporation into the monthly pension check. It will be the responsibility of the Committee and the New VEBA to establish a bank account for the funding of the Special Benefit payments, and [New Co]'s pension administrator will be provided with the approval to draw on that account for the payment of the benefit. The Committee and the New VEBA will assure that the bank account is adequately funded for any and all such payments. If adequate funds do not exist for the payments, then [New Co]'s pension administrator will not make such payments until the required funding is established in the account. It will be the responsibility of the Committee and the New VEBA to audit the eligibility for, and payment of, the Special Benefit. Additionally, the Committee and the New VEBA will be responsible for the payment of reasonable costs associated with [New Co]'s administration of the payment of this Special Benefit and the pension withholdings, including development of administrative and recordkeeping processes, monthly payment processing, audit and reconciliation functions and the like.

[New Co] will be financially responsible for reasonable costs associated with the transition of coverage for the Class and the Covered Group to the New Plan and New VEBA. This shall include the cost of educational efforts and communications with respect to retirees, the New Plan's initial creation of administrative procedures, initial development of record sharing procedures, the testing of computer systems, the Committee's initial vendor selection and contracting, and other activities incurred on or before the Implementation Date, including but not limited to costs associated with drafting the trust agreement for the New VEBA, seeking from the Internal Revenue Service a determination of the tax-exempt status of the New VEBA, plan design and actuarial and other professional work necessary for initiation of the New Plan and New VEBA and the benefits to be provided thereunder. Payments made by [New Co] described in this Section shall not reduce its payment obligations under this Settlement Agreement, and if the New VEBA is a multi-employer welfare trust, the costs described in this Section, to the extent not allocable to a specific employer, shall be pro-rated among the participating companies based on the ratio of required funding for each company. Payment of these costs shall be provided for in the Approval Order.

B. <u>Cooperation With [New Co]</u>. The UAW and the Committee will cooperate and shall timely furnish [New Co] with such information related to the New Plan and New VEBA, in a form and to the extent maintained by the UAW and the Committee, as may be reasonably necessary to permit [New Co] to comply with requirements of the U.S. Securities and Exchange Commission, including, but not limited to, Generally Accepted Accounting Principles, including but not limited to SFAS 87, SFAS 106, SFAS 132R, SFAS 157, and SFAS 158 (as amended), for disclosure in [New Co]'s financial statements and any filings with the U.S. Securities and Exchange Commission.

21.        **Accounting Treatment**

[New Co] has maintained that a necessary element in its decision to enter into this Settlement Agreement is securing accounting treatment that is reasonably satisfactory to [New Co] regarding the transactions contemplated by this Settlement Agreement.  As soon as practicable, [New Co] will discuss the accounting for the New Plan and the New VEBA with [New Co]'s independent auditors, and if either [New Co] or its independent auditors determine it necessary, may also discuss the accounting with the staff of the U.S. Securities and Exchange Commission.  If, as a result of those discussions, [New Co] believes that the accounting for the transaction may not be a "settlement" as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, the parties, at the request of [New Co] shall meet in an effort to restructure the transaction to achieve such accounting, which provides equivalent economic value to the New VEBA.

22.        **Cooperation on Regulatory and Related Approvals**

[New Co], on behalf of itself, the New VEBA and all other parties in interest, shall timely apply for, and the UAW and the New VEBA shall fully cooperate in securing, any legal or regulatory approvals necessary to enable the parties to fulfill the obligations of this Settlement Agreement, including, without limitation, any prohibited transaction exemptions necessary for transactions between any party in interest and the New VEBA.  If [New Co] and the New VEBA do not timely obtain any necessary exemptions and the DOL does not otherwise assure the New VEBA and [New Co], to the reasonable satisfaction of each, that the necessary exemptions will be granted, the parties will meet and discuss an appropriate alternative which provides equivalent economic value to the New VEBA.

23.        **Indemnification**

Subject to approval by the Bankruptcy Court as part of the Judgment, [New Co] hereby agrees to indemnify and hold harmless the UAW and Class Counsel, and its officers, directors, employees and expert advisors (each, an "Indemnified Party"), to the extent permitted by law, from and against any and all losses, claims, damages, obligations, assessments, penalties, judgments, awards, and other liabilities related to any decision, recommendations or other actions taken prior to the date of this Settlement Agreement, including, without limitation, acting as the authorized representative of the Class and the Covered Group (collectively, "Indemnification Liabilities"), and shall fully reimburse any Indemnified Party for any and all reasonable and documented attorney fees and expenses (collectively, "Indemnity Expenses"), as and when incurred, of investigating, preparing or defending any claim, action, suit, proceeding or investigation, arising out of or in connection with any Indemnification Liabilities incurred as a result of an Indemnified Party's entering into, or participation in the negotiations for this Settlement Agreement and the transactions contemplated in connection herewith; provided, however, that such indemnity shall not apply to any portion of any such Liability or Expense that resulted from the gross negligence or willful misconduct by an Indemnified Party; provided, further, that such indemnity shall not apply to any Indemnification Liabilities to a [New Co] Active Employee for breach of the duty of fair representation.

Nothing in this Section 23 or any provision of this Settlement Agreement shall be construed to provide an indemnity for any member or any actions of the Committee; provided however, that an Indemnified Party who becomes a member of the Committee shall remain

entitled to any indemnity to which the Indemnified Party would otherwise be entitled pursuant to this Section 23 for actions taken, or for a failure to take actions, in any capacity other than as a member of the Committee; and provided further, that nothing in this Section 23 or any other provision of this Settlement Agreement shall be construed to provide an indemnity for any Indemnification Liabilities or Indemnity Expenses relating to (i) management of the assets of the New VEBA or (ii) for any action, amendment or omission of the Committee with respect to the provision and administration of Retiree Medical Benefits.

If an Indemnified Party receives notice of any action, proceeding or claim as to which the Indemnified Party proposes to demand indemnification hereunder, it shall provide [New Co] prompt written notice thereof.  Failure by an Indemnified Party to so notify [New Co] shall relieve [New Co] from the obligation to indemnify the Indemnified Party hereunder only to the extent that [New Co] suffers actual prejudice as a result of such failure, but [New Co] shall not be obligated to provide reimbursement for any Indemnity Expenses incurred for work performed prior to its receipt of written notice of the claim.  If an Indemnified Party is entitled to indemnification hereunder, [New Co] will have the right to participate in such proceeding or elect to assume the defense of such action or proceeding at its own expense and through counsel chosen by [New Co] (such counsel being reasonably satisfactory to the Indemnified Party).  The Indemnified Party will cooperate in good faith in such defense.  Upon the assumption by [New Co] of the defense of any such action or proceeding, the Indemnified Party shall have the right to participate in, but not control the defense of, such action and retain its own counsel but the expenses and fees shall be at its expense unless (a) [New Co] has agreed to pay such Indemnity Expenses, (b) [New Co] shall have failed to employ counsel reasonably satisfactory to an Indemnified Party in a timely manner, or (c) the Indemnified Party shall have been advised by counsel that there are actual or potential conflicting interests between [New Co] and the Indemnified Party that require separate representation, and [New Co] has agreed that such actual or potential conflict exists (such agreement not to be unreasonably withheld); provided, however, that [New Co] shall not, in connection with any such action or proceeding arising out of the same general allegations, be liable for the reasonable fees and expenses of more than one separate law firm at any time for all Indemnified Parties not having actual or potential conflicts among them, except to the extent that local counsel, in addition to its regular counsel, is required in order to effectively defend against such action or proceeding.  All such fees and expenses shall be invoiced to [New Co], with such detail and supporting information as [New Co] may reasonably require, in such intervals as [New Co] shall require under its standard billing processes.

If the Indemnified Party receives notice from [New Co] that [New Co] has elected to assume the defense of the action or proceeding, [New Co] will not be liable for any attorney fees or other legal expenses subsequently incurred by the Indemnified Party in connection with the matter.

[New Co] shall not be liable for any settlement of any claim against an Indemnified Party made without [New Co]'s written consent, which consent shall not be unreasonably withheld or delayed.  [New Co] shall not, without the prior written consent of an Indemnified Party, which consent shall not be unreasonably withheld or delayed, settle or compromise any claim, or permit a default or consent to the entry of any judgment, that would create any financial obligation on the part of the Indemnified Party not otherwise within the scope of the indemnified liabilities.

The termination of this Settlement Agreement shall not affect the indemnity provided hereunder, which shall remain operative and in full force and effect. Notwithstanding anything in

- 22 -

this Section 23 to the contrary, this Section 23 of the Settlement Agreement shall not be applicable with respect to any of the matters covered by Section 2.9 of the Equity Registration Rights Agreement.

### 24.    Costs and Attorneys Fees

A.    <u>Fees and Expenses</u>.  [New Co] agrees to reimburse the UAW and Class Counsel at or prior to the consummation of the transactions contemplated in Section 8 for reasonable attorney and professional fees and expenses based on hours worked and determined in accordance with the current market rates (not to include any upward adjustments such as any lodestar multipliers, risk enhancements, success fee, completion bonus or rate premiums) incurred in connection with the negotiation of the Equity Subscription Agreement, the Relevant [New Co] Equity Agreements, the Note, the Indenture, the Warrant and all related transaction agreements and the consummation of the closings thereunder, and all court proceedings, including without limitation, any litigation and discovery, related to obtaining the Approval Order and any other orders required to obtain final approval of the Sale Transaction and any related appeals and motion practice.  The parties may request that the Bankruptcy Court include in its Approval Order reference to [New Co's] reimbursement of fees and expenses pursuant to this Section 24.A.

B.    <u>Fees After the Closing Date</u>.  Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with either Henry II or Henry I or the bankruptcy proceeding, except that any party to this Settlement Agreement may seek such fees and costs as may be allowed by law.

### 25.    Releases and Certain Related Matters

A.    In consideration of [New Co]'s entry into this Settlement Agreement, and the other obligations of [New Co] contained herein, the UAW, acting on its own behalf and as authorized representative of the Class and the Covered Group, hereby consents to the entry of the Judgment, which shall be binding upon all Class Members and the Covered Group.

B.    As of the Closing Date, each UAW Releasee releases and forever discharges each other UAW Releasee and each other Indemnified Party and shall be forever released and discharged with respect to any and all rights, claims or causes of action that such UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of or based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with either Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

C.    As of the Closing Date, the UAW Releasees release and forever discharge [New Co], and its officers, directors, employees, agents, and subsidiaries, and the [New Co] Plan and its fiduciaries, with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims

arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

D.      As of the Closing Date, the UAW Releasees release and forever discharge the Existing External VEBA and the fiduciaries, trustees, and committee that administer the Existing External VEBA, and the Existing Internal VEBA and the fiduciaries, trustees, and committee that administer the Existing Internal VEBA with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken by such fiduciaries, trustee and/or committees to carry out this Settlement Agreement and to transfer assets of the Existing External VEBA and Existing Internal VEBA to the New VEBA in accordance with this Settlement Agreement and applicable law.

E.      As of the Closing Date, [New Co] releases and forever discharges the Class Representatives and Class Counsel from any and all claims, demands, liabilities, causes of action or other obligations of whatever nature, including attorney fees, whether known or unknown, that arise from their participation or involvement with respect to the assertion of the claims and negotiations leading to this Settlement Agreement. This release does not extend to obligations arising from the terms of the Settlement Agreement itself.

F.      Neither the entry into this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an Admission by or against [New Co] or any UAW Releasee of any fault, wrongdoing or liability whatsoever.

26.    **Dispute Resolution**

A.      <u>Coverage</u>.  Any controversy or dispute arising out of or relating to, or involving the enforcement, implementation, application or interpretation of this Settlement Agreement shall be enforceable only by [New Co], the Committee and the UAW, and the Approval Order will provide that the Bankruptcy Court will retain jurisdiction to resolve any disputes, and, in the event that the bankruptcy proceeding has been closed or dismissed, the parties agree that any necessary litigation to resolve such disputes shall be brought before the Court. Notwithstanding the foregoing, any disputes relating solely to eligibility for participation or entitlement to benefits under the New Plan shall be resolved in accordance with the applicable procedures such Plan shall establish, and nothing in this Settlement Agreement precludes Class Members from pursuing appropriate judicial review regarding such disputes; provided however, that no claims related to Retiree Medical Benefits for claims incurred after the Implementation Date may be brought against [New Co], any of its affiliates, or the [New Co] Plan.

B.    <u>Attempt at Resolution</u>.    Although the Bankruptcy Court retains exclusive jurisdiction to resolve disputes arising out of or relating to the enforcement, implementation, application or interpretation of this Settlement Agreement, the parties agree that prior to seeking recourse to the Bankruptcy Court, the parties shall attempt to resolve the dispute through the following process:

(i)    The aggrieved party shall provide the party alleged to have violated this Settlement Agreement ("<u>Dispute Party</u>") with written notice of such dispute, which shall include a description of the alleged violation and identification of the Section(s) of the Settlement Agreement allegedly violated.  Such notice shall be provided so that it is received by the Dispute Party no later than 180 calendar days from the date of the alleged violation or the date on which the aggrieved party knew or should have known of the facts that give rise to the alleged violation, whichever is later, but in no event longer than 3 years from the date of the alleged violation.

(ii)    If the Dispute Party fails to respond within 21 calendar days from its receipt of the notice, the aggrieved party may seek recourse to the Bankruptcy Court; provided however, that the aggrieved party waives all claims related to a particular dispute against the Dispute Party if the aggrieved party fails to bring the dispute before the Bankruptcy Court within 180 calendar days from the date of sending the notice.

All the time periods in Section 26 of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

C.    <u>Alternate Means of Resolution</u>.    Nothing in this Section shall preclude [New Co], the UAW, or the Committee from agreeing on any other form of alternative dispute resolution or from agreeing to any extensions of the time periods specified in this Section.

## 27.    Submission of the Settlement Agreement

The parties shall submit this Settlement Agreement to the Bankruptcy Court and jointly work diligently to have this Settlement Agreement approved by the Bankruptcy Court as soon as possible.  The parties shall give notice to all affected individuals, in a manner approved by the Bankruptcy Court.  The parties shall seek from the Bankruptcy Court any order necessary to comply with the Federal Rules of Bankruptcy Procedure or any other applicable rule of procedure or statutory requirement that must be met to give this Settlement Agreement full force and effect.

## 28.    Conditions

This Settlement Agreement is conditioned upon the occurrence or resolution of the conditions described in subparagraphs A and B of this Section.  The failure of the conditions described in subparagraphs A and/or B shall render this Settlement Agreement void.

A.    <u>Judgment/Approval Order</u>.    The Bankruptcy Court shall have entered a Judgment approving and accepting this Settlement Agreement in all respects and as to all parties, including [New Co], the UAW, the Class and the Covered Group and the Closing shall have occurred in reliance on such Judgment.  Such Approval Order shall be reasonably acceptable in form and substance to [New Co] and the UAW.  This condition shall be deemed to have failed upon issuance of an order disapproving this Settlement Agreement, or upon the issuance of an

- 25 -

order approving only a portion of this Settlement Agreement but disapproving other portions, unless [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, agree otherwise in writing.

        B.    <u>Existing Internal VEBA Sponsorship</u>.    [New Co], or one of its Subsidiaries, shall assume from GM sponsorship of the Existing Internal VEBA.  In connection therewith, [New Co] shall (i) have all of the rights, title and interest as plan sponsor, plan administrator or employer under the Existing Internal VEBA, (ii) have any responsibility, obligation or liability of plan sponsor or plan administrator relating to, the Existing Internal VEBA and each contract, agreement or arrangement established thereunder or relating thereto, and (iii) operate the Existing Internal VEBA in accordance with, and to otherwise comply with the [New Co]'s obligations under, this Settlement Agreement, effective as of the Closing Date and subject to approval by the Bankruptcy Court, including, without limitation, the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW Related Account in the Existing Internal VEBA to the New VEBA.

        **29.**    **No Admission; No Prejudice**

        A.    Notwithstanding anything to the contrary, whether set forth in this Settlement Agreement, the MOU, the Judgment, or any notice, any documents filed with the Court in either Henry I, Henry II, or the GM bankruptcy proceedings, any documents, whether provided in the course of or in any manner whatsoever relating to the discussions between [New Co] and UAW with respect to health care benefits or relating to this Settlement Agreement, whether distributed, otherwise made available to or obtained by any person or organization, including without limit, [New Co] Active Employees, Class Members, or their spouses, surviving spouses or dependents, or to the UAW or [New Co] in the course of the negotiations that led to entry into this Settlement Agreement, or otherwise:

        (i) [New Co] has denied, and continues to deny, that it is responsible for providing medical benefits to retirees.  Neither this Settlement Agreement nor any document referred to or contemplated herein may be construed as, or may be viewed or used as, an Admission by or against the [New Co] of any fault, wrongdoing or liability whatsoever, or as an Admission by [New Co] of any claim or argument made by or on behalf of the UAW, [New Co] Active Employees, the Class or the Covered Group, that it is the successor in interest of GM.  Without limiting in any manner whatsoever the generality of the foregoing, the performance of any settlement actions by [New Co] may not be construed, viewed or used as an Admission by or against [New Co].

        (ii) The UAW, acting on its own behalf and as the authorized representative of the Class Members, has claimed, and continues to claim, that the allegations, claims and contentions made against [New Co] have merit.  Neither this Settlement Agreement nor any document referred to or contemplated herein nor any settlement actions may be construed as, or may be viewed or used as, an Admission by or against any of the UAW, the Class Representatives or the Class Members of any fault, wrongdoing or liability whatsoever or of the validity of any claim or argument made by or on behalf of [New Co] that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor of interest to GM.  Without limiting in any manner whatsoever the generality of

the foregoing, the performance of any settlement actions by any of the UAW, the Class Representatives or the Class Members, including without limitation, the acceptance of any retiree health care benefits under any of the [New Co] health care plans set forth in this Settlement Agreement, may not be construed, viewed or used as an Admission by or against any of the UAW, the Class Representatives or the Class that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor to GM.

(iii) Entering into this Settlement Agreement and performance of any of the settlement actions shall not be construed as, or deemed to be evidence of, an Admission by any of the parties hereto, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal or forum for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement.

For the purposes of this Section 29, [New Co] refers to [New Co] and the UAW refers to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, as organizations, as well as any and all of their respective directors, officers, employees, and agents.

This Settlement Agreement and anything occurring in connection with reaching this Settlement Agreement are without prejudice to [New Co], the UAW and the Class.  The parties may use this Settlement Agreement to assist in securing the Judgment approving the settlement. It is intended that [New Co], the UAW, the Committee, the Class Representatives, the Class, the Covered Group and Class Counsel shall not use this Settlement Agreement, or anything occurring in connection with reaching this Agreement, as evidence against [New Co], the UAW, the Class or the Covered Group in any circumstance except where the parties are operating under or enforcing this Settlement Agreement or the Judgment approving this Settlement Agreement.

### 30.    Duration and Termination of Settlement Agreement

This Settlement Agreement will remain in effect unless and until terminated in accordance with this Section and as provided for in Section 28 of this Settlement Agreement. Termination of this Settlement Agreement may occur as follows:

(i)  If the Judgment is denied in whole or in material part, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(ii)  If an Approval Order satisfactory to the parties, as described in Section 28.A of this Settlement Agreement or any other order authorizing the Sale Transaction, is entered by the Bankruptcy Court, but overturned on appeal or otherwise such that there is or may be a material negative impact on the rights, obligations or benefits provided hereunder to the UAW, the Class, the Covered Group or [New Co], either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement upon 30 days' written notice to the other parties and the rights and

obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(iii) If any court, agency or other tribunal of competent jurisdiction issues a determination that any part of this Settlement Agreement is prohibited or unenforceable in any material respect, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

Notwithstanding the foregoing, Sections 22, 23, 26 and 29 shall survive the termination of this Settlement Agreement.

## 31.    National Institute for Health Care Reform

In recognition of the interest of [New Co], the UAW, the Class and the Covered Group in improving the quality, affordability, and accountability of health care in the United States, the parties agree that as a part of this settlement [New Co] and the UAW shall establish a National Institute for Health Care Reform ("Institute"). The Institute shall be established and receive its first annual funding payment as soon as practicable after the Initial Effective Date on the basis set forth in the term sheet attached hereto as Exhibit G to this Settlement Agreement. The annual funding payment will be payable in four equal quarterly installments. The funding and operation of the Institute shall be separate, independent and distinct from the New Plan and the New VEBA. Any payments by [New Co] to the Institute shall be governed exclusively by the term sheet and are not in any way related to [New Co]'s payment obligations as described in Sections 8 and 12 of this Settlement Agreement.

## 32.    Other Provisions

A.    References in this Settlement Agreement to "Sections," "Paragraphs" and "Exhibits" refer to the Sections, Paragraphs, and Exhibits of this Settlement Agreement unless otherwise specified.

B.    The Bankruptcy Court (or in the event the bankruptcy proceeding has been closed or dismissed, the Court) will, subject to Section 26 of this Settlement Agreement, resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement. Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Bankruptcy Court or the Court, as applicable, and expressly waives any argument it may have with respect to venue or forum non conveniens.

C.    This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement. This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

D.    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed

to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

E.    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

F.    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  For purposes of clarification and without limitation as to other beneficiaries, GM is intended to be a third party beneficiary of this Settlement Agreement.

G.    Each of [New Co], the UAW, the Committee, the Class and the Covered Group shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

H.    This Settlement Agreement shall be construed in accordance with applicable federal laws of the United States of America.

I.    Any provision of this Settlement Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent any provision of this Settlement Agreement is invalid or unenforceable as provided for in Section 32.J of this Settlement Agreement, it shall be replaced by a valid and enforceable provision agreed to by [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group (which agreement shall not be unreasonably withheld) that preserves the same economic effect for the parties under this Settlement Agreement; provided however, that to the extent that such prohibited or unenforceable provision cannot be replaced as contemplated and the consequences of such prohibited or unenforceable provision causes this Settlement Agreement to fail of its essential purpose then this Settlement Agreement may be voided at the sole discretion of the party seeking the benefit of the prohibited or unenforceable provision.  Class Counsel is expressly authorized to take all appropriate action to implement this provision.

J.    In the event that any payment referenced in this Settlement Agreement is due to be made on a weekend or a holiday, the payment shall be made on the first business day following such weekend or holiday.

K.    In the event that any legal or regulatory approvals are required to effectuate the provisions of this Settlement Agreement, [New Co], the UAW, the Class, and the Committee will fully cooperate in securing any such legal or regulatory approvals.

L.    Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing and delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, transmitted by email if in an Adobe Acrobat PDF file, or sent by registered or certified mail, postage prepaid, at the following addresses.  All such notices and communication shall be effective when delivered by hand, or, in the case of registered or certified mail, Federal Express or other carrier, upon receipt, or, in the case of facsimile or email transmission, when transmitted (provided, however, that any notice or communication transmitted by facsimile or email shall be immediately confirmed by a telephone call to the recipient.):

If to [New Co], addressed to:

> Diana Tremblay
> GMNA Vice President of Labor Relations
> [New Co]
> 2000 Centerpoint Parkway
> Pontiac, MI 48341
> Tel: (248) 753-2243

in each case with copies to:

> Francis S. Jaworski
> Office of the General Counsel
> [New Co]
> Mail Code 482-C25-B21
> 300 Renaissance Center
> P.O. Box 300
> Detroit, MI 48265-3000
> Tel: (313) 665-4914

> Cadawalder, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attention: R. Ronald Hopkinson/Lisa J. Pauquette/John J. Rapisardi
> Tel: (212) 504-6000

If to UAW, addressed to:

> Daniel W. Sherrick
> General Counsel
> International Union, United Automobile, Aerospace and
> Agricultural Implement Workers of America
> 8000 East Jefferson Avenue
> Detroit, MI  48214
> Tel: (313) 926-5216

- 30 -

with a copy to:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attention: A. Richard Susko/Richard S. Lincer/David I. Gottlieb
> Tel: (212) 225-2000

Each party may substitute a designated recipient upon written notice to the other parties.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED:**

By: _____          Date:

      Francis S. Jaworski
      [New Co]
      Mail Code 482-C25-B21
      300 Renaissance Center
      P.O. Box 300
      Detroit, MI 48265-3000
      Tel: (313) 665-4914
      francis.s.jaworski@gm.com

      COUNSEL FOR [New Co]


By: _____          Date:

      Daniel W. Sherrick  (P37171)
      8000 East Jefferson Avenue
      Detroit, MI  48214
      Tel: (313) 926-5216

      COUNSEL FOR
      INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA


**ACKNOWLEDGED AND CONFIRMED:**

By: _____          Date:

      William T. Payne
      Stember Feinstein Doyle & Payne, LLC
      Pittsburgh North Office
      1007 Mt. Royal Boulevard
      Pittsburgh, PA  15222
      Tel: (412) 492-8797
      wpayne@stargate.net

      CLASS COUNSEL

# EXHIBITS

Exhibit A:      Trust Agreement

Exhibit B:      Form of Indenture*

Exhibit C:      [Reserved]

Exhibit D:      Form of Equity Registration Rights Agreement

Exhibit E:      Form of Trust Agreement Amendment

Exhibit F:      2009 Benefits Changes

Exhibit G:      National Institute for Health Care Reform Term Sheet

Exhibit H:      [Reserved]

Exhibit I:      Form of [New Co] Note*

Exhibit J:      Form of Preferred Stock Certificate of Designation

Exhibit K:      Form of Stockholders Agreement**

Exhibit L:      Form of Warrant

*Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit [___] to the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto (the "MSPA").

**Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

# EXHIBIT A

# TRUST AGREEMENT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The form of trust agreement attached hereto includes references to Ford Motor Company, Inc. and Chrysler, LLC and to separate class action cases brought against each of those companies by the UAW and a class of each company's retirees.   The form of trust agreement in the attached Exhibit E is designed to accommodate the possibility that settlement agreements are entered into in those cases pursuant to which those companies would also deposit agreed-upon amounts into the trust described in the attached Exhibit E.   But there is currently no settlement agreement in either of those cases, and there is no guarantee that there will be such a settlement agreement, or that any potential settlement of those cases would include an agreement to pay any amount into the trust described in the attached Exhibit E.

In the event that there is no settlement agreement in either or both of those cases, or that any settlement of either or both of those cases does not include a form of trust agreement identical in all respects to the attached Exhibit E, the references to such company and the corresponding case and settlement agreement shall be removed from the form of trust agreement, and the trust agreement shall be conformed to relate solely to the remaining settlement agreements or to this Settlement Agreement as the case may be.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## UAW RETIREE MEDICAL BENEFITS TRUST

THIS TRUST AGREEMENT, entered into and effective as of _____, by and among _____, _____, _____, _____, _____, _____, _____, _____, _____, _____ (the "Committee") and _____ (the "Trustee").

### W I T N E S S E T H :

WHEREAS, General Motors Corporation ("GM"), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), along with respective Class Representatives of plaintiff class members in the case of *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007), have entered into a settlement agreement dated February __, 2008 ("GM Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for GM to make certain deposits and remittances to a trust established as a voluntary employees' beneficiary association (the "Trust"), and credited to the GM Separate Retiree Account in the Trust.

WHEREAS, Chrysler, LLC ("Chrysler"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Chrysler, LLC,* Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007), have entered into a settlement agreement dated _____, 2008 ("Chrysler Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Chrysler to make certain deposits and remittances to the Trust, and credited to the Chrysler Separate Retiree Account in the Trust.

WHEREAS, Ford Motor Company, Inc. ("Ford"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007). have entered into a settlement agreement dated _____, 2008 ("Ford Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Ford to make certain deposits and remittances to the Trust, and credited to the Ford Separate Retiree Account in the Trust.

WHEREAS, the Settlements contemplate a Committee, as more fully defined herein, (the "Committee") to act on behalf of employees' beneficiary associations (the "EBAs"), which are incorporated in the Trust;

WHEREAS, by an order dated _____, the Court approved the Chrysler Settlement, and by an order dated _____, the Court approved the Ford Settlement, and by an order dated _____, the Court approved the GM Settlement (collectively, the "Court Order");

WHEREAS, through operation of each Court Order the Committee was formed;

WHEREAS, the Trust consists of three separate employees' beneficiary associations (collectively, the "EBAs"), and the membership of each EBA includes the applicable Eligible Group;

WHEREAS, each EBA, acting through the Committee, will establish and maintain a separate employee welfare benefit plan (collectively the "Plans") on behalf of the members of the respective Eligible Groups;

WHEREAS, the Committee, on behalf of the EBAs, has entered into this Trust Agreement to implement the Trust, to be known as the "UAW Retiree Medical Benefits Trust," which shall include the GM Separate Retiree Account, the Ford Separate Retiree Account and the Chrysler Separate Retiree Account (collectively the "Separate Retiree Accounts"), to accept the deposits, contributions, transfers and remittances of, or attributable to, each Company in the respective Separate Retiree Account;

WHEREAS, the purpose of each Separate Retiree Account is to serve as a separate, dedicated account to be used for the sole purpose of funding Benefits provided under the related Plan to the Eligible Group under that Plan and defraying the reasonable expenses of such Plan, as set forth in the GM Retiree Settlement, Ford Retiree Settlement and the Chrysler Retiree Settlement respectively;

WHEREAS, the purpose of this Trust is to allow for the pooled investment of assets credited to each of the Separate Retiree Accounts and to provide the economy of scale to the Committee in providing services for each of the Plans, but not to allow for the assets attributable to any one Separate Retiree Account to offset liabilities or defray the expenses attributable to any other Separate Retiree Account;

WHEREAS, the Committee is willing to serve as the named fiduciary of each Plan and the Trustee desires to serve in such capacity with respect to the Trust;

WHEREAS, the Committee is willing to exercise the authority granted to it herein;

WHEREAS, the Trustee is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement;

WHEREAS, the Trust is intended to comply with the requirements of sections 419A(f)(5)(A) and 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deposits to the Trust are described in section 302(c)(2) of the Labor Management Relations Act, 1947, as amended ("LMRA");

NOW THEREFORE, in consideration of the premises and the covenants contained herein, the Committee and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1   <u>Authorized Investments</u>.  Subject to any investment guidelines established by the Committee and communicated to the Trustee pursuant to Section 10.4, "Authorized Investments" shall not be limited to investments that are defined as legal investments for trust funds under the laws of any jurisdiction.  Authorized Investments shall include, but shall not be limited to (i) cash held in interest bearing accounts or cash equivalents that are credited with earnings; (ii) bonds, debentures, notes, or other evidences of indebtedness; (iii) stocks (regardless of class) or other evidences of ownership in any corporation, partnership, mutual investment fund (including funds for which the Trustee or an affiliate thereof serves as investment manager), investment company, association, joint venture or business trust; (iv) derivative securities, including without limitation future contracts and option contracts; (v) investment contracts issued by legal reserve insurance companies; (vi) collective investment funds; and (vii) any other investment or transaction permitted by applicable law.

Section 1.2   <u>Beneficiary</u>.  A person designated as a beneficiary of a Participant by the Participant, who is in an Eligible Group and who is or may become entitled to Benefits under one of the Plans through his or her relationship with an Eligible Retiree or with a deceased retiree or employee of a Company.

Section 1.3   <u>Benefits</u>.  During the Initial Accounting Period with respect to each Plan, Benefits under each such Plan shall have the same meaning as "Retiree Medical Benefits" (as that term is defined under each Company Settlement), that is, post retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.  After the Initial Accounting Period ends with respect to a Plan, Benefits, pursuant to an amendment to such Plan, may include any benefit permissible under section 501(c)(9) of the Code and section 3(1) of ERISA.

Section 1.4   <u>Chair</u>.  The Member selected pursuant to Section 9.5 to perform the functions described in Article IX.

Section 1.5   <u>Chrysler</u>.  Chrysler LLC, a Delaware corporation with its principal offices in Auburn Hills, Michigan, and its successors and assigns.

Section 1.6   <u>Chrysler Eligible Group</u>.  The Class or Class Members and the Covered Group as set forth in the Chrysler Settlement and repeated verbatim in Exhibit A.

Section 1.7   <u>Chrysler Health Care Program</u>.  The employee welfare benefit plan maintained by Chrysler as in effect as of October 12, 2007, which provided retiree medical benefits to Chrysler employees who retired from UAW-represented bargaining units.

Section 1.8 <u>Chrysler Retiree EBA</u>.  The UAW Chrysler Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.9   <u>Chrysler Retiree Plan</u>.  The UAW Chrysler Retirees Medical Benefits Plan, as established and maintained by the Chrysler Retiree EBA, as may be amended from time to

time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Chrysler Eligible Group.

Section 1.10 <u>Chrysler Retiree Settlement</u>.  Settlement of the claims in *UAW v. Chrysler, LLC,* Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007).

Section 1.11 <u>Chrysler Separate Retiree Account</u>.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Chrysler Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Chrysler Retiree Plan; and (b) the Benefits provided pursuant to the Chrysler Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Chrysler Separate Retiree Account's share of investment expenses incurred.

Section 1.12 <u>Code</u>.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.13 <u>Committee</u>.  The group of Independent Members and UAW Members formed pursuant to the Settlements to implement the Trust, to administer each Plan, and to serve as a "named fiduciary" of each Plan within the meaning of section 402(a)(2) of ERISA, including the exercise of authority or control over Plan assets.

Section 1.14 <u>Company</u>.  The term Company shall mean Chrysler, Ford, or GM, as the case may be (collectively the "Companies").

Section 1.15 <u>Company Health Care Plan</u>.  The Chrysler Health Care Program for Hourly Employees, the Ford Retiree Health Program, and the General Motors Health Care Program for Hourly Employees, as the case may be (collectively "Company Health Care Plans").

Section 1.16 <u>EBA</u>.  The Chrysler Retiree EBA, the Ford Retiree EBA, or the GM Retiree EBA, as the case may be (collectively "EBAs").

Section 1.17 <u>Eligible Group</u>.  All individuals who satisfy the requirements to be included in either the Chrysler Eligible Group, the Ford Eligible Group, or the GM Eligible Group, as the case may be (collectively "Eligible Groups").

Section 1.18 <u>Eligible Retiree</u>.  A former employee retired from a Company who satisfies the requirements to be included in an Eligible Group.

Section 1.19 <u>Employer Security</u>.  Any obligation, note, warrant, bond, debenture, stock or other security within the meaning of section 407(d)(1) of ERISA that is acquired or held by the Trust (or arising from any such security through conversion) pursuant a deposit or transfer under one of the Settlements the acquisition or holding of which (i) is not prohibited by sections 406(a)(1)(E) or 406(a)(2) of ERISA, or (ii) is the subject of a prohibited transaction exemption provided under section 408 of ERISA.

Section 1.20 <u>Employer Security Sub-Account</u>.  The sub-account maintained by the Trustee within each Separate Retiree Account to hold separately any Employer Security and any

proceeds from the disposition of any Employer Security, at the direction of the Committee or the Independent Fiduciary pursuant to Article XI.

Section 1.21   ERISA.  The Employee Retirement Income Security Act of 1974, as amended through any date relevant under this Trust Agreement, and any successor statute thereto.

Section 1.22   Ford.  Ford Motor Company, a Delaware corporation with its principal office in Dearborn, Michigan, and its successors and assigns.

Section 1.23   Ford Eligible Group.  The Class or Class Members and the Covered Group as set forth in the Ford Settlement and repeated verbatim in Exhibit B.

Section 1.24   Ford Retiree Health Program.  The portion of the Hospital-Surgical-Medical-Drug-Dental-Vision Program maintained by Ford as in effect on and after the effective date of the 2007 UAW-Ford National Collective Bargaining Agreement, which provided retiree medical benefits to Ford hourly employees who retire from UAW-represented bargaining units.

Section 1.25 Ford Retiree EBA.  The UAW Ford Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.26 Ford Retiree Plan.  The UAW Ford Retirees Medical Benefits Plan, as established and maintained by the Ford Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Ford Eligible Group.

Section 1.27 Ford Retiree Settlement. Settlement of the claims in *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007).

Section 1.28 Ford Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Ford Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Ford Retiree Plan; and (b) the Benefits provided pursuant to the Ford Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Ford Separate Retiree Account's share of investment expenses incurred.

Section 1.29   GM.  The General Motors Corporation, a Delaware corporation with its principal offices in Detroit, Michigan, and its successors and assigns.

Section 1.30   GM Eligible Group.  The Class or Class Members and the Covered Group as set forth in the GM Settlement and repeated verbatim in Exhibit C.

Section 1.31 General Motors Health Care Program for Hourly Employees.  The collectively bargained General Motors Health Care Program for Hourly Employees as set forth in Exhibit C-1 of the 2007 and prior GM-UAW National Agreements, as applicable to those GM-UAW Represented Employees who had attained seniority prior to September 14, 2007.

Section 1.32  GM Retiree EBA.  The UAW GM Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.33 GM Retiree Plan.  The UAW GM Retirees Medical Benefits Plan, as adopted by the GM Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the GM Eligible Group.

Section 1.34 GM Retiree Settlement.  Settlement of the claims in *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007).

Section 1.35 GM Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any GM Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income and any other income and other income held in the Trust Fund exclusively to fund the GM Retiree Plan; and (b) the Benefits provided pursuant to the GM Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the GM Separate Retiree Account's share of investment expenses incurred.

Section 1.36 Implementation Date.  The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in the GM Retiree Settlement or the Chrysler Retiree Settlement, as applicable, or with respect to Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

Section 1.37 Independent Fiduciary.  The entity that may be appointed from time to time by the Committee to serve pursuant to Article XI.

Section 1.38  Independent Member.  An individual person who serves as a member of the Committee and is not appointed by UAW, who satisfies the requirements of section 9.1, and whose experience in such fields, without limitation, as health care, employee benefits, asset management, human resources, labor relations, economics, law, accounting or actuarial science indicates a capacity to fulfill the powers and duties of Article X in the manner described in Section 10.11, and wherever practicable, helps to provide a range of relevant experiences to the Committee.

Section 1.39  Initial Accounting Period.  With respect to each Plan, the period before the later of the date that (a) the respective Company determines that its obligations, if any, with respect to the Plan made available to the Participants and Beneficiaries included in that Company's Eligible Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent; or (b) the Company is no longer obligated to make any further payments or deposits to the Trust, including, but not limited to, any Shortfall Amounts.

Section 1.40 Investment Manager.  An investment manager within the meaning of section 3(38) of ERISA appointed by the Committee in accordance with the provisions of Section 10.5.

Section 1.41 <u>Liaison</u>.  An individual appointed to perform the functions described in Section 9.11.

Section 1.42 <u>LMRA</u>.  The Labor Management Relations Act, 1947, as amended, and any successor statute thereto.

Section 1.43 <u>Member</u>.  A member of the Committee or his or her successor.

Section 1.44 <u>Participant</u>.  An Eligible Retiree who has fulfilled all requirements for participation as determined pursuant to Sections 2.1 and 2.2, who pays any contribution that is required as a condition of coverage, and who receives coverage pursuant to the terms of a Plan.

Section 1.45 <u>Plan</u>.  The Chrysler Retiree Plan, the Ford Retiree Plan, or the GM Retiree Plan, as the case may be (collectively the "Plans").

Section 1.46 <u>Separate Retiree Account</u>.  The Chrysler Separate Retiree Account, the Ford Separate Retiree Account or the GM Separate Retiree Account, as the case may be (collectively the "Separate Retiree Accounts").

Section 1.47 <u>Settlements</u>.  The GM Retiree Settlement, the Chrysler Retiree Settlement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

Section 1.48 <u>Trust Agreement</u>.  This agreement and all of its exhibits, as now in effect and as it may be amended hereafter from time to time by the Committee, acting on behalf of the EBAs.

Section 1.49 <u>Trust or Trust Fund</u>.  The UAW Retiree Medical Benefits Trust established by this Trust Agreement, incorporating each EBA, and comprising all property or interests in property held by the Trustee from time to time under this Trust Agreement

Section 1.50 <u>Trustee</u>.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by the Committee in accordance with Section 8.3.  Any corporation continuing as the result of any merger or consolidation to which the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed automatically to be continuing as the Trustee.

Section 1.51 <u>UAW</u>.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, CLC, and any successor thereof.

Section 1.52 <u>UAW Member</u>.  An individual person who serves as a member of the Committee and is appointed by UAW, pursuant to the terms of the Settlements and Article IX of this Trust Agreement.

     Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the GM Retiree Settlement when relating to GM and/or the GM Eligible Group, the GM EBA, the GM Retiree Plan and the GM Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust

7

Agreement, shall have the meaning it has in the Chrysler Retiree Settlement when relating to Chrysler and/or the Chrysler Eligible Group, the Chrysler EBA, the Chrysler Retiree Plan and the Chrysler Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account.  If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

# ARTICLE II
## PARTICIPATION

Section 2.1   <u>Eligibility for Participation</u>.  Any Eligible Retiree or Beneficiary may receive Benefits funded, in whole or in part, by the Trust pursuant solely to the Plan adopted by the Committee in its discretion exercising the powers provided to it under Article X from time to time, on behalf of the EBA to which such Eligible Retiree or Beneficiary belongs.  In exercising its authority under Article X, the Committee may design each Plan to provide for separate bases of participation in the Plan for classes of Participants and Beneficiaries as set forth from time to time in the Plan so long as such design is reasonably related to the purposes for which the Trust was established and, provided further, that any such design only permits participation in the Plan by the Eligible Retirees or Beneficiaries who belong to the EBA on behalf of which the Committee adopted such Plan.   Participation in the Plan is contingent on the Eligible Retiree or Beneficiary satisfying any conditions set forth therein from time to time.  Under no circumstances may individuals other than Eligible Retirees or Beneficiaries be allowed to benefit from the Trust or participate in a Plan.

Section 2.2   <u>Determination by Committee</u>.  Any determination regarding the status of any individual as a Participant or Beneficiary under each Plan shall be solely and exclusively the responsibility of the Committee.

## ARTICLE III
## ESTABLISHMENT OF TRUST

Section 3.1    Purpose.  The Trust is established for the purpose of providing Benefits to the Participants and Beneficiaries in accordance with each Plan and as are permissible under section 501(c)(9) of the Code as set forth herein; and upon termination of the Trust, to provide such Benefits to such persons as are permissible under section 501(c)(9) of the Code as set forth herein.  The EBAs are incorporated within the Trust, each of which is intended to constitute a separate "employee organization" under section 3(4) of ERISA.  The Trust, together with each Plan, is intended to constitute a "voluntary employees' beneficiary association" under section 501(c)(9) of the Code.  Each Plan is intended to constitute an "employee welfare benefit plan" within the meaning of section 3(1) of ERISA.  The Trust is established to allow for the pooled investment of assets credited to each Separate Retiree Account and to provide the economy of scale to the Committee in purchasing services for each of the Plans.   Under no circumstances may the assets credited to one Separate Retiree Account offset the liabilities or defray the expenses attributable to another Separate Retiree Account.  Further, each Separate Retiree Account shall be maintained for so long as there remains assets credited thereto.

Section 3.2    Receipt of Funds.  The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company shall be accepted only upon the direction of the Independent Fiduciary.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

Section 3.3    No Diversion.  Except as otherwise provided herein, at no time shall any part of the corpus or income of the Trust Fund be used for or diverted to purposes other than funding Benefits for the exclusive benefit of the Participants and Beneficiaries, including payment of reasonable costs of establishment, amendment and administration of the Trust and each Plan, and at no time shall any part of the net earnings of the Trust Fund improperly inure to the benefit of any private individual as provided in section 501(c)(9) of the Code and section 1.501(c)(9)-4 of the Treasury Regulations promulgated thereunder.

Section 3.4    Fiduciary Duties.

(a) Except as otherwise provided either herein or by applicable law, the responsibilities of each fiduciary acting in such capacity shall be limited to the performance of those duties specifically assigned to it hereunder.  No fiduciary shall have any responsibility for the performance of any duty not specifically so assigned, except to the extent such responsibility is imposed by applicable law.  The Committee shall be the named fiduciary (as defined in section 402(a)(2) and as described in section 402(c)(3) of ERISA) hereunder with authority to control and manage the operation of the Trust, to the extent set forth herein, and with respect to each Plan independently, except that if an Independent Fiduciary is appointed by the Committee, the Independent Fiduciary, and not the Committee, shall be the named fiduciary with respect to all

10

discretionary actions regarding the valuation, acceptance, management, disposition and voting of Employer Securities.  Each fiduciary's responsibilities and duties with respect to each Plan shall be limited to the interests of that Plan's Participants and Beneficiaries.

(b) No Company is a fiduciary with respect to the Plans or the Trust.  In addition, (i) neither the Trustee, the Committee nor any person or entity related to the Plans or the Trust has any authority to bind any Company, either directly or indirectly, through any interpretations, findings of fact or conclusions regarding the Plans, the Trust and this Trust Agreement, (ii) no Company exercises any discretionary authority or discretionary control with respect to the management of any Plan or the Trust or exercises any authority or control with respect to the management or disposition of assets governed by this Trust Agreement, (iii) no Company renders investment advice for a fee or other compensation, direct or indirect, with respect to any assets governed by any Plan or by this Trust Agreement, and none has the authority or responsibility to do so, and (iv) no Company has discretionary authority or discretionary responsibility in the administration of any Plan or of the Trust.

Section 3.5   No Guarantee.  Nothing contained in the Trust or the Plans shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay Benefits to any person or make any other payment.  The obligation of a Plan to pay Benefits provided under such Plan is expressly conditioned on the availability of assets attributed to the Separate Retiree Account associated with that Plan to pay Benefits.  This Trust Agreement creates no obligation for any Company to deposit or remit any amount to the Trust Fund.  Except for payments of Benefits under a Plan, no Participant or Beneficiary shall receive any distribution of cash or other thing of current or exchangeable value, either from the Committee or the Trustee, on account of or as a result of the Trust Fund created hereunder.

Section 3.6   No Interest.  Except as provided in Section 12.2 with respect to Participants and Beneficiaries, none of the following persons or entities shall have any right, title or interest, whether legal or equitable, in the assets of the Trust Fund at any time, including following the termination of the Trust: the Companies, the UAW, the Committee, any Eligible Retiree, any Participant, or any Beneficiary.   At no time shall any account or separate fund be considered a savings account or investment or asset of any Eligible Retiree, Participant, Beneficiary, or class of Participants and Beneficiaries.

Section 3.7   Relationship to Settlements.  Notwithstanding anything in this Trust Agreement or the Plans to the contrary, neither the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall construe, interpret or apply this Trust Agreement or the Plans in a manner that would impair any right, would frustrate any purpose, or would be inconsistent with any provision in each applicable Settlement.  No construction, interpretation or application of the Trust or the Plans by the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall bind any Company with regard to any dispute or conflict involving the Company.   In the event of a conflict between the Trust Agreement or a Plan and the corresponding Settlement, such Settlement shall control.

# ARTICLE IV
## DEPOSITS TO THE TRUST FUND

Section 4.1    <u>Deposits from the Companies</u>.  The Trust Fund shall accept from the Companies deposits to the Trust Fund, as specified in each Company's Settlement.  All deposits from a Company shall be credited to that Company's respective Separate Retiree Account.

Section 4.2    <u>Remittances of Active Employee Contributions</u>.  The Trust Fund shall accept remittances of active employee contributions, if any.  All such remittances shall be credited to the respective Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the employee contributions are made.

Section 4.3    <u>Medicare Subsidies</u>.  The Trust Fund shall accept Medicare Part D subsidies and any other governmental payments relating to the benefits provided to Participants and Beneficiaries pursuant to the Plans and Trust.  All Medicare subsidies and other governmental payments shall be credited to each Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the subsidies or payments are made.

Section 4.4    <u>Participant Contributions</u>.  The Trust Fund shall accept contributions from Participants as permitted or required by the Committee.  Such Participant contributions may be remitted to the Trust Fund from each Company's pension plan pursuant to voluntary, authorized deductions from monthly pension payments from each Company's pension plan. All Participant contributions shall be credited to the Separate Retiree Account attributable to the Participant making the contribution.

Section 4.5    <u>Deposits and Remittances from Subsequent Employers of Future Eligible Retirees</u>.  In the event of a sale, disposition, joint venture, merger or other corporate transaction that results in the displacement of a Company's Active Employee who is a member of the Covered Group (as those terms are defined in the Company's Settlement), the Trust may, but need not, accept deposits and remittances from a subsequent employer of such displaced employee, provided that such deposits and remittances are pursuant to a collective bargaining agreement between such subsequent employer and UAW.  All deposits and remittances from a subsequent employer shall be credited to the appropriate Separate Retiree Account relating to the displaced employee.

Section 4.6 Other Legal Sources.  The Trust may accept money or property from sources other than those described in Sections 4.1, 4.2, 4.4 and 4.5, provided that acceptance from any such other source is permitted by law and that such money or property is credited to the appropriate Separate Retiree Account(s) to which such money or property relates.

# ARTICLE V
## PAYMENTS FROM THE TRUST FUND

Section 5.1  <u>Payments from the Trust Fund</u>.

(a) Subject to the direction of the Independent Fiduciary with respect to any Employer Security, and except as provided in paragraph (b) below, the Trustee shall make payments from the Trust Fund to pay Benefits under the Plans as directed by the Committee or its designee.  Any payment of Benefits under the Plans must be charged to the Separate Retiree Account attributable to the Participant or Beneficiary receiving the benefits.

(b) To the extent permitted by law, the Trustee shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of any Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Trustee may withhold all or any part of any payment as the Trustee in the exercise of its reasonable discretion may deem necessary to protect the Trustee and the Trust against any liability or claim on account of any income tax or other tax; and with all or any part of such payment so withheld, may discharge any such tax liability.  Any part of any such payment so withheld by the Trustee that may be determined by the Trustee to be in excess of any such tax liability will upon such determination by the Trustee be paid to the person or entity from whom or which it was withheld.

Section 5.2  <u>Method of Payments</u>.  The Trustee may make any payment required to be made by it hereunder, unless directed otherwise by the Committee, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Committee.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Trustee may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Committee, is settled by written stipulation of the parties concerned.

Section 5.3  <u>Excessive Payments</u>.  If the Trustee or the Committee determines that any payment under the Trust or any Plan is excessive or improper, the recipient shall make repayment thereof immediately following receipt of written notice from the Trustee or the Trustee's agent.  If the recipient fails to make repayment to the Trustee or Trustee's agent of such excessive or improper payment by the date requested by the Trustee or the Trustee's agent, the Trustee may deduct the amount of such excessive or improper payment from any other amounts thereafter payable to such person or may pursue repayment in accordance with the provisions of Section 6.1(p).  Until repaid to the Trustee or Trustee's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE VI
## TRUSTEE POWERS AND DUTIES

Section 6.1   Powers of the Trustee.  The Trustee shall have the following powers in addition to the powers customarily vested in trustees by law, provided however, that the Trustee's powers with respect to the investment of assets held in the Trust Fund shall be subject to (i) the funding policy established by the Committee and communicated to the Trustee under Section 10.3, (ii) any investment guidelines established by the Committee and communicated to the Trustee under Section 10.4, (iii) the instructions of an Independent Fiduciary appointed pursuant to Section 11.3, solely with respect to any Employer Security, and (iv) the instructions of the Committee or any Investment Manager appointed pursuant to Section 10.5:

(a)      With any cash at any time held by it, to purchase or subscribe for any Authorized Investment, and to retain such Authorized Investment in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(b)      To sell for cash or, with the consent of the Committee, on credit, to convert, to redeem, to exchange for another Authorized Investment, or otherwise to dispose of, any property at any time held by it, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(c)      To retain uninvested all or any part of the Trust Fund, provided that any uninvested assets shall be deposited in an interest-bearing account in any banking or savings institution, including an account established in the name of the Trustee if the Trustee is a depository institution;

(d)      To exercise any option appurtenant to any investment in which the Trust Fund is invested for conversion thereof into another Authorized Investment, or to exercise any rights to subscribe for additional Authorized Investments, and to make all necessary payments therefor, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(e)      To join in, consent to, dissent from or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, or readjustment of the finances of any corporations, entities or properties in which the Trust Fund may be invested, or the sale, mortgage, pledge, or lease of any such property or the property of any such corporation or entity on such terms and conditions as the Trustee may deem wise; to do any act (including the exercise of options, making of agreements or subscriptions, and payment of expenses, assessments, or subscriptions) which may be deemed necessary or advisable in connection therewith; and to accept any Authorized Investment which may be issued in or as a result of any such proceeding, and thereafter to hold the same, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(f)      To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or

14

by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(g)      To purchase any Authorized Investment at a premium or a discount;

(h)      Upon instruction from the Committee, to employ for the benefit of the Trust Fund suitable agents, actuaries, accountants, investment counselors, legal counsel and consultants, and to pay their reasonable expenses and compensation;

(i)      To purchase, to sell, to exercise, to allow to expire without exercise, and to honor the exercise of, options or contracts to purchase or sell stock, commodities, or other assets subject to such options or contracts, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(j)      With the consent of the Committee, to borrow, raise or lend moneys, for the purposes of the Trust in such amounts and upon such terms and conditions as the Committee, in its absolute discretion, may deem advisable, and for any such moneys so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging or mortgaging all or any part of the Trust Fund, provided that no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(k)      To cause any Authorized Investment in the Trust Fund to be registered in, or transferred into, its name as Trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund, and the Trustee shall be fully responsible for any misappropriation in respect to any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States, except as may otherwise be permitted under regulations promulgated by the Secretary of Labor;

(l)      To do all acts which it may deem necessary or proper and to exercise any and all powers of the Trustee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust;

(m)      To apply for, purchase, hold, transfer, pay premiums on, surrender, and exercise all incidents of ownership of any insurance contract, any guaranteed income, guaranteed investment, and similar contracts;

(n)      To invest in any collective investment fund, including a short-term collective investment fund maintained by the Trustee or an affiliate of the Trustee;

(o)      To collect income and distributions payable to the Fund;

(p)      Upon instruction from the Committee or, with respect to any Employer Security, only at the direction of the Independent Fiduciary, to begin, maintain or defend any

15

litigation necessary in connection with the administration of the Plans or the Trust, except that the Trustee shall not be obligated or required to do so unless it has been indemnified to its satisfaction against all expenses and liabilities sustained by it by reason thereof;

(q)    To pay any income tax or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund;

(r)    To retain any funds or property subject to any dispute without liability for payment of interest, or decline to make payment or delivery thereof until final and unappealed adjudication is made by a court of competent jurisdiction;

(s)    Upon instruction from the Committee, to grant consents, take actions and otherwise implement the rights of the Trustee;

(t)    With the consent of the Committee, to act in any jurisdiction where permitted by law to do so or to designate one or more persons, or a bank or trust company, to be ancillary trustee in any jurisdiction in which ancillary administration may be necessary; to negotiate and determine the compensation to be paid to any such ancillary trustee; and to pay such compensation out of principal or income or both; and such ancillary trustee shall be granted with respect to any and all property subject to administration by it all of the powers, authorities and discretion granted in this Trust Agreement to the Trustee; provided, however, that such action as may require the investment of additional funds or the assumption of additional obligations shall not be undertaken without the written consent of the Trustee; and

(u) To cooperate with any of the Companies and/or the UAW in obtaining any judicial or regulatory approvals or relief in accordance with each Company's respective Settlement.

Section 6.2    Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Trustee.

Section 6.3    Standard of Care.  The Trustee shall discharge its duties in the interests of each Plan's Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and Beneficiaries of each Plan and defraying reasonable expenses of administering the Trust and each Plan, and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims, consistent with the provisions of ERISA and the Code.  Subject to the provisions of ERISA, the Trustee will be under no liability or obligation to anyone with respect to any failure of the Committee to perform any of its obligations under the Plans or Trust Agreement or for any error or omission of the Committee.

Section 6.4    Determination of Rights.  The Trustee shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person for coverage under the Plans, or the entitlement of any person to Benefits or payments from the Plans.

16

Section 6.5   Continuance of Plans.  The Committee, the Trustee, the Independent Fiduciary, the Companies, and UAW do not assume any contractual obligation as to the continuance of the Plans, and no such party shall be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans.  The Trustee's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment, as may be further limited by the requirements of Section 3.5.

Section 6.6   Payment of Expenses.  The Trustee shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses, including fees and expenses of the Independent Fiduciary, reasonably incurred (and where applicable previously approved) by the Trustee or the Committee in connection with establishment, amendment, administration and operation of the Trust or Plans. The expenses shall be allocated to the Separate Retiree Account to which the expenses relate (or, if the expenses cannot reasonably be allocated to one Separate Retiree Account, they shall be allocated among the Separate Retiree Accounts on a reasonable basis as determined by the Committee in a manner that avoids subsidization of any Separate Retiree Account by another Separate Retiree Account).  The Committee shall by written certificate provided to the Trustee request payment for any expenses related to the administration of the Trust.  Upon receipt of the written certificate, the Trustee may make the payment requested by the Committee.

Section 6.7   Reimbursement.  The Trustee will apply the assets of the Trust to reimburse a Company or the respective Company Health Care Plan, as applicable, for any Benefits advanced or provided by the Company or the respective Company Health Care Plan with regard to claims incurred by a Participant on or after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred on or after such Implementation Date or where a Company is notified of an intent by a Participant to retire under circumstances where there is insufficient time to transfer responsibility for Benefits to the applicable Plan and the Company or the respective Company Health Care Plan provides interim coverage for Benefits.  The Trustee and the Committee will fully cooperate with the Company in securing any legal or regulatory approvals that are necessary to permit such reimbursement.  In addition, the Trustee will apply the assets of the Trust to reimburse a Company for any deposits it made by mistake to the Trust, as provided for in that Company's Settlement.  Further, with regard to the transfer of assets from an existing VEBA trust to a Separate Retiree Account, and assumption of any liabilities by a Plan, the Trustee shall apply the assets of the related Separate Retiree Account to satisfy all such liabilities.  In causing the Trust Fund to pay expenses pursuant to this Section 6.7, the Committee shall be acting in its fiduciary capacity with respect to a Plan and the Trust, on behalf of the respective EBA.

Section 6.8   Trustee Compensation.  The Trustee will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit D.  All compensation paid from the Trust Fund to the Trustee or its affiliates shall be disclosed to the Committee.

Section 6.9   <u>Consultation</u>.  The Trustee may engage or consult with counsel or other advisors and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such advisors.

Section 6.10   <u>Reliance on Written Instruments</u>.  The Trustee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 6.11   <u>Bonding</u>.  The Trustee shall be bonded to the extent and in the amount required by Section 412 of ERISA. To the extent permitted by applicable law, the costs of such bonding shall be expenses paid by the Trustee out of the assets of the Trust Fund under Section 6.6.

## ARTICLE VII
## TRUSTEE ACCOUNTS

Section 7.1   <u>Separate Retiree Accounts</u>.  At all times, the Trustee shall maintain each of the Separate Retiree Accounts as a separate account under the Trust for the assets deposited by each Company, or transferred at each Company's direction, to the Separate Retiree Account in accordance with the terms of each Company's Settlement.  Each Separate Retiree Account may be used only to provide Benefits for the Participants and Beneficiaries in the Plan funded by such Separate Retiree Account.  Under no circumstances may a Separate Retiree Account be liable or responsible for the obligations of the Trust to any Participant or Beneficiary other than a Participant or Beneficiary in the Plan that is attributable to the same Eligible Group as that Separate Retiree Account.  The Trustee shall separately account for the assets and liabilities of each Separate Retiree Account; including, without limitation: (a) deposits, contributions, remittances, subsidies, investment and other income from whatever source to each Separate Retiree Account; and (b) Benefits to Participants and Beneficiaries from each respective Separate Retiree Account, and the investment, administrative, and other expenses attributable to the maintenance of each such Separate Retiree Account.  In no event shall the assets of one Separate Retiree Account be used to offset the liabilities or defray the expenses attributable to another Separate Retiree Account.  Notwithstanding the proscriptions in this Section 7.1, unless the Committee expressly decides to establish segregated investment vehicles for specific Separate Retiree Accounts, the assets of the Separate Retiree Accounts, other than Employer Security Sub-Accounts, shall be invested on a pooled basis within the Trust Fund; provided that the interest of each Separate Retiree Account in such pooled Trust Fund is separately accounted for at all times.

Section 7.2   <u>Records</u>.  The Trustee shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to each Separate Retiree Account and the Trust as a whole, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Committee or such person or persons as the Committee may designate.

Section 7.3   <u>Annual Audit</u>.  The Committee shall appoint an auditor to conduct an annual audit of the Trust Fund, a statement of the results of which shall be provided to the Trustee and also made available for inspection by interested persons at the principal office of the Trust.

Section 7.4   <u>Claims Limited to Amounts in Applicable Account</u>.  In any legal action against the Trust Fund, the rights of any Participant or Beneficiary against the Trust Fund shall be limited to the amount of assets in the Separate Retiree Account attributable to such Participant or Beneficiary, and the rights of any other person or entity shall be limited to the amount of assets in the Separate Retiree Account attributable to the Plan to which the claim relates.

Section 7.5   <u>Furnishing Written Accounts</u>.  The Trustee shall furnish the Committee a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during each calendar quarter, and showing the securities and other properties held, and their fair market values at the end of each calendar quarter.  Such written account shall be furnished to the Committee within thirty (30) days after the close of each calendar quarter.

19

Section 7.6    <u>Accounting and Taxable Year, Cash Basis</u>.  The accounting and taxable year of the Trust shall be the calendar year.  All accounts of the Trustee shall be kept on a cash basis.

Section 7. 7    <u>Judicial Proceedings</u>.  If the Trustee and the Committee cannot agree with respect to any act or transaction reported in any statement, the Trustee shall have the right to have its accounts settled by judicial proceedings in which only the Trustee and the Committee shall be necessary parties.  Subject to the provisions of ERISA, the Trustee shall not be required to file, and no Participant or Beneficiary shall have any right to compel, an accounting, judicial or otherwise, by the Trustee.

# ARTICLE VIII
## PROCEDURES FOR THE TRUSTEE

Section 8.1   <u>Removal</u>.  The Trustee may be removed by the Committee at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Trustee of the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.2   <u>Resignation</u>.  The Trustee may resign by filing with the Committee a written resignation that shall take effect sixty (60) days after the date of such filing, unless prior thereto a successor Trustee has been appointed by the Committee.  In no event may the Trustee's resignation take effect before a successor Trustee has been appointed.  If the Committee fails to appoint a successor Trustee, the resigning Trustee may seek the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.3   <u>Successor Trustee</u>.  The Committee may appoint a successor Trustee by delivering to the successor Trustee an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an acceptance in writing, executed by the successor Trustee so appointed.  Such appointment shall take effect upon the date specified in Section 8.1 or 8.2, as applicable.  If no appointment of a successor Trustee is made by the Committee within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the removed or resigning Trustee, appoint a successor Trustee after such notice to the Committee and the removed or resigning Trustee, as such court may deem suitable and proper.

Section 8.4   <u>Amendment to Trust Document for Successor Trustee</u>.  The Committee may appoint a successor Trustee by securing from the successor Trustee an amendment to this Trust Agreement, executed by both the successor Trustee and an authorized representative of the Committee, which replaces the current Trustee with the successor Trustee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

Section 8.5   <u>Effect of Removal or Resignation of Trustee.</u>  Upon the removal or resignation of the Trustee in accordance with Section 8.1 or 8.2, the Trustee shall remain responsible for any and all actions taken by the Trustee prior to such removal or resignation, but except as required by ERISA shall not be responsible for any and all actions taken by the successor Trustee.

Section 8.6   <u>Merger or Consolidation of the Trustee</u>.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed to be continuing as the Trustee.

## ARTICLE IX
## PROCEDURES FOR COMMITTEE

Section 9.1   <u>Composition of Committee</u>.  The Committee shall consist of eleven individual persons, consisting of six (6) Independent Members and five (5) UAW Members.  No Member of the Committee shall be a current or former officer, director or employee of any of the Companies; provided, however, a retiree who was represented by the UAW in his or her employment with a Company, or an employee of a Company who is on leave from the Company and is represented by the UAW, may be a UAW Member.  No Member shall be authorized to act for a Company or be an agent or representative of a Company for any purpose.  Furthermore, no Company shall be a fiduciary with respect to any of the Plans or the Trust, and the Companies will have no rights or responsibilities with respect to the Plans or the Trust other than as specifically set forth in the Company Settlements. This limitation on Company participation on the Committee and the limitation set forth in Section 3.5 of this Trust Agreement are not subject to change, amendment or alteration. No Independent Member, or any family member, employer, or partner of an Independent Member, shall have any financial or institutional relationship with a Company or UAW if such relationship could reasonably be expected to impair such person's exercise of independent judgment.

Section 9.2   <u>Term of Office</u>.  Each Member shall continue to serve as such until his or her death, incapacity to serve hereunder, resignation, removal, or the expiration of his or her term. Independent Member terms shall be for three (3)-year periods, except the initial terms of four (4) of the six (6) original Independent Members, two (2) of whom shall have an initial term of two (2) years, and two of whom shall have an initial term of one (1) year, as described in Exhibit E.  An Independent Member may serve more than one term.

Section 9.3   <u>Resignation</u>.  A Member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least thirty (30) days' advance written notice to the Committee (or such shorter notice as the Committee may accept as sufficient) stating a date when such resignation shall take effect. Such resignation shall take effect on the date specified in the notice or, if a successor Member has been appointed effective as of an earlier date, on such earlier date.

Section 9.4   <u>Removal; Appointment of Successor Committee Members</u>.

(a)      An Independent Member may be removed or replaced, and a successor designated, at any time by an affirmative vote of nine (9) of the other Members of the Committee in the event that such other Members lose confidence in the capacity or willingness of the Independent Member being replaced or removed to fulfill his or her duties and responsibilities as a Member as set forth in this Trust Agreement.  In the event of a vacancy of an Independent Member position, whether by expiration of term, resignation, removal, incapacity, or death of an Independent Member, a successor Independent Member shall be elected by the affirmative vote of nine (9) Members, and when possible, such successor Independent Member shall be elected prior to the expiration of the term, resignation, removal, incapacity, or death of the Independent Member being replaced.

(b)    The UAW Members shall serve at the discretion of the UAW International President, and may be removed or replaced, and a successor designated, at any time by written notice from the UAW International President to the Committee.

(c)    Each successor Member shall signify his or her acceptance of the appointment and his or her responsibilities under this Agreement in writing.

(d)    If no appointment of a successor Independent Member is made within a reasonable time after his or her expiration of term, resignation, removal or other event, an arbitrator selected pursuant to the procedures established in Subsection 9.9(e) may be engaged upon application of any Member to appoint a successor Independent Member to the Committee.  If the failure to appoint an Independent Member is the result of factors unrelated to a dispute among Members, any Member may apply to a court of competent jurisdiction to ask the court to appoint a successor Independent Member to the Committee as such court may deem suitable and proper.

Section 9.5    Chair.  The Committee shall select a chair from among its Members (the "Chair").  The term of the Chair will continue until he or she ceases to be a Member, resigns as Chair or is replaced as Chair with another Member by majority vote among the remaining Members.

Section 9.6    Meetings.

(a)    The Committee shall hold meetings as frequently as is necessary to ensure the efficient administration of the Trust and Plan and shall hold a minimum of four (4) meetings during each calendar year.  The Chair, or any six (6) Members, may call a special meeting of the Committee by giving at least five (5) days' advance written notice of the time and place thereof to all other Members.

(b)    The Chair, or another such individual or individuals so designated by the Chair, shall (i) preside over Committee meetings; (ii) prepare the Committee meeting agenda; (iii) oversee Trust operations between Committee meetings and report to the Committee on such operations; and (iv) perform such other functions as the Committee determines.

(c)    One Member, or another individual so designated, shall maintain minutes of all Committee meetings, but such minutes need not be verbatim.  Copies of such minutes shall be provided to all Members and to such other parties as the Committee may designate.

Section 9.7    Place of Meeting; Telephonic Meetings.  Meetings of the Committee shall be held in the Detroit, Michigan metropolitan area as designated in the notice of meeting.  Meetings of the Committee may be held through any communications equipment or other technology if all persons participating can hear each other, and such participation in a meeting shall be considered presence at the meeting for all purposes, including Section 9.8.

Section 9.8    Quorum.  A majority of the Members of the Committee then in office shall constitute a quorum for the purpose of transacting any business; provided that at least one Independent Member and one UAW Member are present.

23

Section 9.9    <u>Vote of the Members</u>.

(a)    Each Member of the Committee present at the meeting shall have one vote. Except as otherwise specified in this Trust Agreement, all actions of the Committee shall be by majority vote of the entire Committee, provided that at least one Independent Member and one Union Member must be a Member in the majority for any Committee action to take effect. Notwithstanding anything in this Subsection 9.9(a) to the contrary, any action by the Committee taken after the 2011 calendar year that would not be permitted under Subsection 10.2(d) before the expiration of the 2011 calendar year shall require an affirmative vote of nine (9) Members to take effect.

(b)    The vote of any absent Independent Member of the Committee may be cast in accordance with a written proxy delivered to any other Independent Member of the Committee present at the meeting, and the vote of any absent UAW Member of the Committee may be cast in accordance with a written proxy delivered to any other UAW Member of the Committee present at the meeting.

(c)    In the event that a vacancy exists in the number of Independent Members, or that an Independent Member is absent (and has not delivered a proxy), a majority of the Independent Members present shall be entitled to cast the vote otherwise exercisable by the Independent Member not present.  In the event that a vacancy exists in the number of UAW Members, or that a UAW Member is absent (and has not delivered a proxy), a majority of the UAW Members present shall be entitled to cast the vote otherwise exercisable by the UAW Member not present.

(d)    In addition to decisions made at meetings, action may be taken without a meeting pursuant to a written (including e-mail) or telephone poll by the Chair (or his designee); provided that any action taken in a telephone poll must be confirmed in writing (including e-mail) by each Member who voted for the action taken either before or as soon as practicable following the vote (but no later than thirty (30) days after the vote).

(e)    In the event that an action does not take effect – including, without limitation, an action under Subsection 9.9(a) that requires nine (9) affirmative votes to take effect – notwithstanding all Independent Members voting in favor, or alternatively all UAW Members voting in favor, any Committee Member may refer the issue to arbitration pursuant to the procedures established from time to time by the Committee.  In addition, any Committee Member may refer the failure to appoint a successor Independent Member pursuant to Subsection 9.4(d) to an arbitrator, in which case the arbitrator may select the successor Independent Member.  The determination of the arbitrator shall be final and binding on all parties to the Trust.  The costs and expenses of such arbitration (including attorneys' fees for separate counsel for Members on each side of the issue) shall be paid from the Trust unless paid by any other source, or unless otherwise ordered by the arbitrator.  The arbitrator's decision must be consistent with the terms of the Trust and, if the dispute concerns an amendment to the Trust, the arbitrator may not issue a decision contrary to the terms of Section 12.1 hereof.

Section 9.10    Fees and Expenses.  To the extent permitted by ERISA, Members of the Committee will be entitled to reasonable compensation for the performance of their duties hereunder.  Members of the Committee may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of their duties.  The fees and expenses of the Committee shall be deemed to be fees and expenses of the Trust and shall be reimbursed from the Trust Fund consistent with the restrictions set forth in this Section 9.10.

(a)    Independent Members shall receive an annual retainer of $30,000, payable in equal quarterly installments in arrears, and a meeting fee of $2,000 for each meeting of the Committee in which such Independent Member participates, provided, however, that the combination of retainer and meeting fees shall not exceed $46,000 per calendar year. In the event that an Independent Member's tenure on the Committee ends on a day other than the last day of the quarter for which a quarterly installment of his or her annual retainer is due, he or she shall be paid for the pro rata portion of such quarter that coincides with his or her tenure on the Committee.  For purposes of the meeting fee, participation by telephone or other simultaneous communication device shall qualify an Independent Member for a participation fee only if the meeting is scheduled and anticipated to last at least one (1) hour.  Participation in telephonic conferences to address ad hoc issues do not qualify an Independent Member for a participation fee.

(b)    UAW Members who are eligible to receive compensation for participation on the Committee shall receive the amounts described in Subsection 9.10(a) above for Independent Members.  Any Member who is an employee of the UAW or a local union affiliated therewith shall not be eligible to receive compensation for service as a Member. Notwithstanding the prohibition on compensation otherwise described in this Subsection 9.10(b), UAW Members shall be entitled to receive reimbursements for reasonable expenses properly and actually incurred in the performance of a UAW Member's duties pursuant to this Trust Agreement.

(c)    The Chair shall receive a fee of $5,000 per year, payable in quarterly installments in arrears, for service as the Chair, in addition to the compensation received as a Member pursuant to Subsection 9.10(a) or Subsection 9.10(b), whichever is applicable.

(d)    Other than UAW Members who are prohibited from receiving compensation pursuant to Subsection 9.10(b), nothing herein shall prohibit or limit any Member from receiving fees from the Trust Fund for services rendered at the request of the Committee (e.g., reasonable fees for attendance at retiree meetings to explain the operation of the programs contemplated by the Settlements and/or this Trust Agreement).

(e)    The fees and limits described in Subsection 9.10(a) and (b) above shall be increased each calendar year after 2008 by each calendar year's percentage increase, if any, to the consumer price index for urban wages (CPI-W).

Section 9.11  Liaison.

(a)    The Liaison's primary roles, as further detailed in this section, shall be:

25

(1)     to work, as the Liaison deems appropriate, alongside any and all Trust personnel, outside advisors, consultants, professionals, and service providers retained by the Trust, on all matters pertaining to the operation of the Trust,

(2)     to stay informed about all facets of the Trust's activities, and

(3)     to maintain open lines of communications in regard to all activities of the Trust – including, without limitation, its funding status and the administration of the Benefits provided under the Plans – among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) retiree representatives and the UAW.

(b)     The Liaison shall not be a Member and shall not be entitled to a vote on any matter coming before the Committee.

(c)     The Liaison shall maintain open lines of communications regarding the activities of the Trust among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) the retiree representatives and the UAW in regard to all activities of the Trust.  Specifically, the Liaison shall maintain communications with, among others, elected leaders of retiree chapter organizations, Class Representatives (and, until the Implementation Date, Class Counsel), UAW officials (in addition to UAW Members), Trust personnel, and the Independent Members and UAW Members.

(d)     The Liaison may attend all meetings of the Committee and any Sub-Committee established pursuant to Section 10.8.

(e)     The Liaison shall be permitted to consult with and work alongside any and all Trust personnel on any facet of the operations of the Trust, including but not limited to activities related to investment of Trust assets, administration of the Benefits provided under the Plans, retention of outside advisors, consultants, professionals and service providers, and the hiring of personnel needed for operation of the Trust.

(f)     The Liaison shall have access to any and all information developed or utilized by Trust personnel in connection with the operation of the Trust, including but not limited to information provided by any outside advisors, consultants, professionals or service providers retained by the Trust.  In the event that the Liaison is provided information that is subject to a privilege that the Trust or Committee may assert, the Liaison shall not take any action that would cause such privilege to be violated.

(g)     The Liaison shall be permitted to work alongside Trust personnel in the development of recommendations that may be made to the Committee by Trust personnel regarding any matter to come before the Committee.

(h)    The Liaison shall be permitted to work alongside Trust personnel in connection with the work of any outside advisors, consultants, professionals or service providers retained by the Trust.

(i)    The UAW, acting through the International President, shall have the right to appoint the Liaison.

(j)    Until the first Implementation Date of any of the Company's Settlements, the Liaison may be an active employee on the UAW staff.  On and after such implementation date, the Liaison shall not be an active member of the UAW Staff (but such person shall not be prohibited from performing work for the UAW on a consulting or other part-time basis, on matters unrelated to the operation of the Trust; provided that such work does not interfere with the Liaison's ability to perform his or her duties as the Liaison).

(k)    The Trust shall provide compensation for the Liaison as provided as follows:

    (1)    If the Liaison is an active member of the UAW staff, the Trust shall not provide any compensation of any kind to the UAW Liaison.  In such circumstance, the Trust shall provide reimbursement to the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

    (2)    If the Liaison is not an active member of the UAW staff, and the UAW designates the Liaison to perform the duties of such office on a full-time basis, the Trust shall (a) pay the Liaison an annual salary of $140,000 adjusted annually on the same basis as the adjustments for Committee Members as described in Section 9.10(e), (b) pay meeting fees in the same manner as paid for Committee Members pursuant to Section 9.10(a), (c) provide the Liaison a package of employee benefits (insurance, pension, vacation, and other fringe benefits) no less favorable than that provided to Trust personnel at the senior management level, if any, and (d) reimburse the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

    (3)    If the Liaison is not an active member of the UAW staff and the UAW designates the Liaison to perform the duties of such office on less than a full-time basis, (a) the compensation provided in sub-section 9.11(k)(2)(a) above shall be reduced proportionately, (b) the Trust shall provide additional reasonable compensation for the performance of specific duties in the same manner as permitted for Committee Members pursuant to Section 9.10(d),  and (c) all other provisions of Section 9.11(k)(2) shall continue to apply without adjustment.

(l)      The Liaison shall be fully bound to adhere to the Code of Ethics attached as Exhibit I and any failure to adhere to the Code of Ethics shall be grounds for immediate disqualification.

## ARTICLE X
## POWERS AND DUTIES OF THE COMMITTEE

Section 10.1   <u>General</u>.  The Committee, acting on behalf of the EBAs, shall be responsible for the implementation, amendment and overall operation of the Trust Fund and the establishment, amendment, maintenance, and administration of the Plans.  Subject to the provisions of this Trust Agreement and applicable laws, the Committee shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Trust Fund, and to interpret the terms of the Plans and Trust.  Subject to Section 3.7, the decisions of the Committee will be final and binding on all Participants and Beneficiaries and all other affected parties to the maximum extent allowed by law.

Section 10.2   <u>Benefits</u>.

(a)    <u>Adoption of the Plans</u>.  The Committee, on behalf of the EBAs, shall adopt the Plans to provide Benefits to Participants and Beneficiaries and may amend the Plans from time to time. The terms of the Plans as initially adopted are set forth in subsection (d) of this section.  Thereafter, the Committee on behalf of the EBAs may amend the Plans from time to time to provide Benefits as it may determine in its sole and absolute discretion; provided, however, that the Committee shall have no authority to provide any benefits other than Retiree Medical Benefits until the end of the Initial Accounting Period.  Furthermore, the eligibility rules of each respective Plan shall be the same as those provided by the respective Company Health Care Plan and may not be expanded by the Committee.  The Plans may provide for different benefit structures for different groups of Participants or Beneficiaries, including, without limitation, different groups of Participants or Beneficiaries included in the same Eligible Group, and may provide for different contributions for such groups; provided, however, that such differences within or among Eligible Groups are reasonably related to a rational purpose and consistent with the relevant provisions of this Trust Agreement.  The rights of the Committee described in this Section 10.2 shall be exercised in a manner consistent with the Settlements.  Although the Committee shall be under no obligation to design the Plans to assure that the assets of the Trust Fund are sufficient to provide Benefits to all potential Participants and Beneficiaries of the Plans in all subsequent years, the Committee's long-term objective in designing the Plans, absent countervailing circumstances, shall be to provide meaningful health benefits to all Participants and Beneficiaries included in each Eligible Group.

(b)    <u>Benefits Design</u>.  The Plans shall provide Benefits designed by the Committee in its sole discretion, acting on behalf of the EBAs as a fiduciary to the Plans, subject to Sections 1.3, 10.2(a) and 10.2(d).  The Benefit design shall include rules to determine which of the Participants and Beneficiaries of the Trust will receive Benefits under the Plans, in what form and in what amount.  The Plans may include co-pays, Participant and Beneficiary contributions, and any other features that the Committee from time to time determines appropriate or desirable in its sole discretion.  In designing the Plans and the Benefits to be provided thereunder, the Committee may take into account circumstances that it determines to be relevant, including, without limitation, the degree to which

29

Participants and Beneficiaries have alternative resources or coverage sources, pension levels under the Company's pension plans have changed, and the resources of the Trust Fund based upon expected deposits, remittances, and other sources of funding.   In exercising its authority over benefit design, the Committee shall be guided by the principle that the Plans should provide substantial health benefits for the duration of the lives of all Participants and Beneficiaries.

(c)     Method of Providing Benefits.  Benefits under a Plan may be fully insured, partially insured or self-insured, as determined from time to time by the Committee in its sole discretion and in accordance with the funding policy established pursuant to Section 10.3.  In all events, the expected cost of Benefits to be provided under each Plan during any calendar year shall not exceed the amount of assets expected to be available under the Separate Retiree Account related to such Plan to cover such costs during such calendar year.

(d)     Initial Benefits.  Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Chrysler Retiree Plan shall provide the Benefits specified in Exhibit F(1), the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2), and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3).  The Benefits specified in Exhibits F(1), F(2) and F(3) shall be the Benefits provided for under the terms of each Company's respective Settlement.  During the period that the Plans are providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to Section 5.A.2(h) of the Settlement Agreement between GM and UAW dated December 16, 2005, Section ____ of the Settlement Agreement between Ford and UAW dated _____, and similar provisions of the Chrysler Health Care Program.

(e)     Medicare Part B Benefits.  The initial Benefits provided pursuant to Subsection 10.2(d) under each Plan shall include a subsidy of the Medicare Part B premiums attributable to such Participants in an amount no lower in dollar value than $76.20 per month.

(f)     Design Principles.  In exercising its authority under this Section 10.2, the Committee shall adhere to the design principles described in Exhibit G.  A Plan only may provide Benefits as defined in Section 1.3.

Section 10.3   Funding Policy.  Subject to the direction of the Independent Fiduciary with respect to the Employer Securities, the Committee will establish a funding policy for each Plan and communicate that funding policy to the Trustee.

Section 10.4   Investment Guidelines.  Except with respect to the authority of the Independent Fiduciary with respect to the Employer Securities, the Committee shall cause investment guidelines for managing (including the power to acquire and dispose of) all or any part of the Trust Fund and communicate that policy to the Trustee to be established.  In so doing, the Committee shall adhere to the investment practice standards set forth in Exhibit H.

Section 10.5    <u>Appointment of Investment Managers</u>.  The Committee may appoint one or more Investment Managers to manage, or to select one or more Investment Managers to manage, all or part of the Trust Fund and enter into an agreement with the Investment Manager(s).  If an Investment Manager is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1, as limited by investment guidelines adopted by the Committee, with respect to the portion of the Trust Fund over which it has investment discretion, and the Trustee's duties with respect to that portion of the Trust Fund shall be limited to following the instructions of the Investment Manager.

Section 10.6    <u>Government Reports and Returns</u>.  The Committee shall file all reports and returns, including but not limited to, any IRS Form 5500 series and IRS Form 990 series that are required to be made with respect to the Trust and a Plan.

Section 10.7    <u>Compromise or Settle Claims</u>.  The Committee may compromise, settle and release claims or demands in favor of or against the Trust or the Committee on such terms and conditions as the Committee may deem advisable, and payment shall be made from the Separate Retiree Account to which the claim or demand relates (or, if the claim or demand relates to more than one Separate Retiree Account, on a basis commensurate with the portion of the claim relating to each Separate Retiree Account).

Section 10.8    <u>Appointment of Third Parties; Delegation of Authority</u>.  The Committee may appoint a third party to perform any functions assigned to it by the Committee to the extent permitted under applicable law.  The Committee may by adoption of a written resolution delegate to any two or more Members the authority to act on behalf of the full Committee to the extent set forth in the resolution.  In the event of such a delegation, the resulting sub-committee shall have at least one Independent Member and one UAW Member, and subcommittee action shall require the affirmative vote of at least one Independent Member and one UAW Member. Any action taken on behalf of the Committee pursuant to the delegation shall be reported to the Committee at its next regularly scheduled meeting.

Section 10.9    <u>Consultation</u>.  The Committee may engage or consult with counsel or other advisors and, in accordance with the provisions of Section 6.6, may direct the Trustee to pay reasonable compensation therefor from the Trust Fund and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 10.10    <u>Reliance on Written Instruments</u>.  Each Member of the Committee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 10.11    <u>Standard of Care</u>.  The Committee and each Member shall discharge their duties in the interests of Participants and Beneficiaries of each Plan and for the exclusive purpose of providing Benefits to such Participants and Beneficiaries and defraying reasonable expenses of administering the Trust and each Plan and shall act with the care, skill, prudence

and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, consistent with the provisions of ERISA and the Code.  In exercising their discretion with respect to providing Benefits to Participants and Beneficiaries of each Plan, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in such Plan.  In exercising their discretion with respect to defraying reasonable expenses of administering the Trust or Plans, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in the Plans.

Section 10.12   <u>Bonding</u>.  The Members of the Committee shall be bonded in the amount required by section 412 of ERISA and may be covered by liability insurance in accordance with section 410(b) of ERISA.  To the extent permitted by applicable law, the costs of such bonding and insurance shall be expenses paid by the Trustee under Section 6.6.

Section 10.13   <u>Discretionary Authority</u>.  Except as the Committee's powers are limited by specific provisions of this Trust Agreement, including without limitation, the provisions of Article IX, the Committee (or its designee) shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret this Trust Agreement, each Plan and any other Plan documents, to make its own motions, resolutions, administrative rules and regulations, contracts, or instruments and to decide all matters arising in connection with the operation or administration of the Trust or Plans.  Benefits under the Plans will be paid only if the Committee or its designee decides in its discretion that the applicant is entitled to them.  Without limiting the generality of the foregoing, the Committee, on behalf of each EBA and the Trust, shall have the sole and absolute discretionary authority to:

(a)    take all actions and make all decisions with respect to the eligibility for, and the amount of, Benefits payable under a Plan;

(b)    formulate, interpret and apply rules, regulations and policies necessary to administer a Plan in accordance with its terms;

(c)    decide questions, including legal or factual questions, relating to the calculation and payment of Benefits under a Plan;

(d)    determine the standard of proof and the sufficiency of evidence as to any factual question arising under a Plan;

(e)    resolve and/or clarify any ambiguities, inconsistencies and omissions arising under this Trust Agreement, each Plan, or other Plan documents;

(f)    process, and approve or deny Benefit claims and rule on any Benefit exclusions;

(g)    settle or compromise disputed claims as provided in Section 10.7 on such terms as the Committee determines to be in the best interest of the Participants and Beneficiaries;

(h)    enforce any contribution, remittance or payment obligation set forth in Article IV; and

(i)    do all acts which it may deem necessary or proper and to exercise any and all powers of the Committee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust or Plans.

Subject to Section 3.7 of this Trust Agreement, all determinations made by the Committee or its designee with respect to any matter arising under the Trust, each Plan, and any other Plan documents shall be final and binding on all affected parties, including without limitation Participants, Beneficiaries, and any other persons who have claims against the Trust Fund and a Plan through any of them.  In the event that the terms of a Plan are inconsistent with the terms of this Trust Agreement, the Trust Agreement controls.

Section 10.14    No Individual Liability on Contracts.  The Members of the Committee shall not be liable personally, either individually or jointly, for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Members shall not be exempt from personal liability for willful misconduct, breach of fiduciary duty, or fraud, and the Trust shall not indemnify the Members for such liabilities.

Section 10.15    The Companies and UAW Not Liable for Conduct of Committee.  In their capacity as Members, the Members of the Committee, individually and jointly, are not officers, agents, employees, or representatives of the Companies or UAW.  In their capacity as Members, each Member is a principal acting independently of the UAW.  To the extent permitted by applicable law, the UAW (and their employees, officers, and directors) shall not be liable for any act, omission, contract, obligation, or undertaking of the Committee or its officers, agents, or representatives.  Under no circumstances will any Company or their employees, officers, directors or agents be responsible for or have any liability for any act, omission, contract, obligation or undertaking of the Committee or its officers, agents or representatives.

Section 10.16    Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Committee, Members, employees of the Committee, persons acting on the Committee's behalf pursuant to an express written delegation, and the Liaison (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys' fees, incurred personally in defense of any claim that seeks a recovery of any loss to a Plan or Trust Fund or for any damages suffered by any party to or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Committee – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Committee or an independent fiduciary), provided that the Committee shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 10.17    Indemnifications.  To the extent permitted by law, the Trust shall indemnify and hold the Committee, the UAW, the Companies, the Chrysler Health Care Program, the Ford

33

Retiree Health Program, the General Motors Health Care Program for Hourly Employees, the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the Plans and Trust, unless such liability arises from gross negligence, intentional misconduct or breach of their respective Company Settlement.  All costs associated with the indemnity provided under this Section 10.17 shall be borne solely by the Separate Retiree Account to which such costs relate.

Section 10.18    Subrogation and Reimbursement.    Subject to the limitations of Section 10.2(d), the Committee shall maintain, as part of each Plan, a comprehensive subrogation and reimbursement policy, updated from time to time as appropriate.

Section 10.19    Code of Ethics.    The Committee shall maintain a code of ethics to govern the conduct of Members and staff, if any, when acting on behalf of the Trust or a Plan or otherwise in their official capacity.  The initial code of ethics is attached at Exhibit I.  It may be amended by the Committee in light of experience and evolving standards, consistent with principles of good governance and fiduciary principles.

Section 10.20    Presumption of Control.    The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own GM's common stock, Ford's Common Stock, the 6.75% Series U Convertible Senior Debentures Issued by GM Due December 31, 2012, or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

# ARTICLE XI
# INDEPENDENT FIDUCIARY

Section 11.1  <u>General</u>.  Upon the appointment of an Independent Fiduciary by the Committee pursuant to Section 11.3, this Article XI shall be given effect.

Section 11.2  <u>Independent Fiduciary With Respect to Employer Security</u>.  Any provision of this Trust Agreement to the contrary notwithstanding, the Trustee shall have no discretionary authority or powers with respect to any Employer Security and all such discretionary authority shall rest with the Independent Fiduciary.  The Trustee shall hold any Employer Security in the respective Employer Security Sub-Account and shall be subject to direction by the Independent Fiduciary with respect to the acceptance, management, disposition, and voting of the Employer Security.  The Independent Fiduciary shall be a named fiduciary (as defined in section 402(a)(2) of ERISA) and investment manager (within the meaning of section 3(38) of ERISA) with respect to all discretionary actions regarding the valuation, acceptance, management, disposition, and voting of any Employer Security.  The Trustee shall be entitled to rely upon the identification by the Committee of the Independent Fiduciary until notified in writing by the Committee that an Employer Security Sub-Account's assets are no longer subject to the Independent Fiduciary's management.  During any period of time in which the Independent Fiduciary manages the Employer Security Sub-Accounts, the Trustee shall act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts.  The Trustee shall continue to receive all assets purchased against payment therefor and to deliver all assets sold against receipt of the proceeds therefrom.  The Independent Fiduciary may from time to time issue orders on behalf of the Trustee for the purchase or sale of securities directly to an underwriter or broker or dealer and for such purpose the Trustee shall, upon request, execute and deliver to such Independent Fiduciary one or more trading authorizations.  The Trustee shall have no responsibility or liability to anyone relating to the asset management decisions of the Independent Fiduciary except to the extent that the Trustee has failed to act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts.  The Trustee shall be under no duty to make or review any recommendation with respect to any such decision.  The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment made or sold pursuant to the direction of the Independent Fiduciary nor by reason of the failure to take any action with respect to any investment which was acquired pursuant to any such direction in the absence of further direction of the Independent Fiduciary.

Section 11.3  <u>Appointment of Independent Fiduciary</u>.  The Committee, in its sole discretion, shall appoint an Independent Fiduciary to manage the Employer Security Sub-Accounts, or for any other purpose as required by law, by delivering a written instrument to the Independent Fiduciary, which the Independent Fiduciary shall acknowledge in writing.  The Independent Fiduciary shall be a bank, trust company or registered investment adviser under the Investment Advisers Act of 1940, as amended.

Section 11.4  <u>Removal</u>.  The Independent Fiduciary may be removed by the Committee at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Independent Fiduciary of the appointment of a successor Independent Fiduciary in the manner set forth in

Section 11.6 below, provided that no such successor Independent Fiduciary shall be appointed in the event that the Trust then holds no Employer Security.

Section 11.5    <u>Resignation</u>.  The Independent Fiduciary may resign by delivering to the Committee a written resignation that shall take effect sixty (60) days after the date of such filing or such earlier date that a successor Independent Fiduciary has been appointed by the Committee.

Section 11.6    <u>Successor Independent Fiduciary</u>.  As expeditiously as is practicable under the circumstances, the Committee shall appoint a successor Independent Fiduciary by delivering to the successor Independent Fiduciary an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Independent Fiduciary, and by delivering to the removed or resigning Independent Fiduciary an acceptance in writing, executed by the successor Independent Fiduciary so appointed.  Such appointment shall take effect upon the date specified in Section 11.4 or 11.5 above, as applicable.  In the event that the Trust Fund acquires or holds an Employer Security with respect to which an Independent Fiduciary is required, and no appointment of a successor Independent Fiduciary is made by the Committee by the date specified in Section 11.4 or Section 11.5, whichever the case may be, any court of competent jurisdiction may, upon application by the retiring Independent Fiduciary, appoint a successor Independent Fiduciary after such notice to the Committee and the retiring Independent Fiduciary, as such court may deem suitable and proper.  The Committee, and a resigning and successor Independent Fiduciary shall avoid whenever possible any period during which no Independent Fiduciary has accepted an appointment to manage an Employer Security being held in a Employer Security Sub-Account.

Section 11.7    <u>Independent Fiduciary Compensation and Expenses</u>.  The Trustee will apply the assets of the Trust Fund in accordance with Section 7.1, to pay the fees and expenses of the Independent Fiduciary in the amounts and on the dates set forth in the agreement between the Independent Fiduciary and the Committee.

Section 11.8 <u>Confidential Information</u>.  In exercising its duties pursuant to Section 11.2, an Independent Fiduciary may receive confidential information from a Company under an agreement to not reveal such information to the Committee or any Member, subject to any obligation to disclose such information that may be imposed by ERISA, in which case the Company will be notified, in advance.

## ARTICLE XII
## AMENDMENT, TERMINATION AND MERGER

Section 12.1  <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Committee; provided that (i) under no circumstances shall any of the Plans or the Trust Agreement be amended or modified to provide benefits or payment for benefits other than Retiree Medical Benefits for the Participants and Beneficiaries until expiration of the Initial Accounting Period; (ii) no amendment shall alter or conflict with a Company's Settlement; and (iii) no amendment shall amend or modify Articles I, IV and XII, Sections 2.1, 3.1, 3.4(b), 3.5, 3.7, 5.1(a), 6.1(u), 6.5, 6.7, 7.1, 7.4, 9.1, 9.2, 9.3, 9.4, 9.7, 9.8, 9.9, 9.10, 10.1, 10.2(a), (b), (d), (e) and the last sentence of (f), 10.7, 10.13 (last flush paragraph), 10.15, 10.16, 10.17, 10.20, Exhibits F(1), F(2) and F(3), or the definitions of Eligible Groups in Exhibits A through C; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plans under section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall increase the responsibilities of the Trustee hereunder unless the Trustee has first consented to such amendment.

Section 12.2  <u>Termination</u>.

(a)  Before the expiration of the Initial Accounting Period with respect to each Plan, the Trust shall not be terminated.  Thereafter, the Trust and this Trust Agreement may be terminated by the Committee in writing, with a copy of such written instrument to be provided to the Trustee, whenever the Committee, on behalf of the EBAs, and in its sole discretion determines that the Trust is no longer effective in serving its purposes or that the interests of the Participants and Beneficiaries could be better served through an alternative arrangement taking into account the requirements of Section 7.1.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Committee in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of Benefits to Participants and Beneficiaries entitled to payments for claims arising prior to such termination; and (iii) at the discretion of the Committee, in accordance with section 501(c)(9) of the Code and ERISA, for the benefit of Participants and Beneficiaries in such fashion as the Committee determines.  The Companies, UAW or the Committee shall not have any beneficial interest in the Trust Fund. The Trust Fund shall remain in existence until all assets have been distributed.

(b)  Following termination, the Trustee and the Committee shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 12.3  <u>Transfer of Assets</u>.  After the Initial Accounting Period has expired with respect to a Plan, and to the extent permitted by applicable law and subject to the restrictions of Section 7.1, some or all of the assets of the Trust Fund attributable to a Separate Retiree Account with respect to which the Initial Accounting Period has expired, may at the discretion of the Committee acting in a fiduciary capacity be transferred directly to another trust for the purpose of providing Benefits to some or all of the Participants and Beneficiaries in the Plan

with respect to which the Initial Accounting Period has expired on such terms and conditions as the Committee may determine.

Section 12.4    <u>Merger of Trusts or Transfer of Assets</u>.  In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Chrysler, Ford, and GM – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

# ARTICLE XIII
# MISCELLANEOUS

Section 13.1   <u>Rights in Trust Fund</u>.  No Eligible Retiree, Participant, Beneficiary, or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right relating to the Trust or a Plan against the Trustee, the Committee, the Independent Fiduciary, UAW, or the Companies, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 13.2   <u>Non-Alienation</u>.  Except to the extent required by applicable law, the rights or interest of any Participant or Beneficiary to any Benefits or future payments hereunder or under the provisions of a Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant or Beneficiary, nor shall any such Participant or Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the Benefits or payments which he may expect to receive, contingent or otherwise, under a Plan or this Trust Agreement, provided that assignments of benefit payments to a health care provider under a Plan may be permitted pursuant to rules adopted by the Committee in its sole discretion.

Section 13.3   <u>Controlling Laws</u>.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 13.4   <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 13.5   <u>Headings</u>.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 13.6   <u>Usage</u>.  The plural use of a term defined in Article I in the singular shall mean all of the entities defined by such term.

Section 13.7   <u>Notices</u>.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (ii) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (iii) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the Trustee:</u>

[**insert name and address**]


<u>If to the Committee:</u>

[**insert name and address**]

39

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST

INDEPENDENT MEMBERS

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]


UAW MEMBERS

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]


TRUSTEE

[**insert name of institution**]

By: _____

_____
Print Name

_____
Title

Dated: _____

**<u>Exhibit A</u>**

**Chrysler Eligible Group**

**[To be copied from Settlement Agreement when it is final.  This will include both the
"Class" and the "Covered Group."]**

**Exhibit B**

**Ford Eligible Group**

**[To be copied from Settlement Agreement when it is final.  This will include both the "Class" and the "Covered Group."]**

**Exhibit C**

**GM Eligible Group**

The term "GM Eligible Group" as used in this Trust Agreement shall mean the Class or Class Members and the Covered Group as set forth in the GM Settlement and reiterated verbatim in this Exhibit C:

Class or Class Members.  The term "Class" or "Class Members" shall mean all persons who are:

(i)  GM-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii)  surviving spouses and dependents of any GM-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii) UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv)  surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(v)  GM-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any GM-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit

(other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan.

Covered Group. The term "Covered Group" shall mean:

(i) all GM Active Employees who have attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii) all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii) all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(iv) all former GM-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit (other than Delphi), and upon retirement are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v) all eligible surviving spouses and dependents of a GM Active Employee, former GM-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan.

**Exhibit D**

**[Trustee's fees]**

**Exhibit E**

| *Name* | *Date of Term Expiration* |
|---|---|
| Robert Naftaly*** | January 1, 2012 |
| Olena Berg-Lacey | January 1, 2012 |
| David Baker Lewis | January 1, 2011 |
| Teresa Ghilarducci | January 1, 2011 |
| Marian Udow-Phillips | January 1, 2010 |
| Ed Welch | January 1, 2010 |

Committee Chair: ***

---

**Biographical Material**

**Robert Naftaly, C.P.A.,** is the retired President and CEO of PPOM, an independent operating subsidiary of Blue Cross/Blue Shield of Michigan (BCBSM), and Executive Vice President, Chief Operating Officer for the Blues.  Previously, he was Senior Vice President, Chief Financial Officers and Treasurer for BCBSM.  Mr. Naftaly also served as the Director of the Department of Management and Budget of the State of Michigan from 1983 to 1987.  He has also served on several other Boards, including the Detroit Investment Fund, Walsh College, Meadowbrook Insurance Group, Blue Cross/Blue Shield of Maryland, and the Board of Governors of Wayne State University.

**Olena Berg-Lacey** served from 1993 to 1998 as Assistant Secretary of Labor, Employee Benefits Security Administration.  In that capacity, she directed the Department of Labor's activities regarding enforcement of ERISA, including fiduciary standards governing 700,000 private pension plans with over $3.5 trillion in assets.  From 1991 to 1993, she served in the State Treasurer's Office for the state of California, where she had primary responsibility for management and investment of more than $20 billion of assets on behalf of the State.  In that capacity, she also represented the California Treasurer on the board of the State's pension funds (CalPERS and CalSTRS) which together invest over $100 billion of retirement money on behalf of California's public employee retirement programs.  A graduate of the University of California and the Harvard Business School, Ms. Berg-Lacey has also held a variety of positions in the private sector involving asset management and institutional investments.

47

**David Baker Lewis** is a prominent attorney, with broad experience in municipal finance and municipal bond law. He is the Chairman of the Board of Directors of Lewis & Munday. He has served on the Boards of Directors of several major corporate entities, including Conrail, Comerica Bank, TRW, Henry Ford Health Systems, Harper-Grace Hospitals, the Detroit Medical Center and H & R Block. He has also been Associate Professor of Law at the Detroit College of Law, and served as the Chair of the National Association of Securities Professionals.

**Teresa Ghilarducci** is currently Professor of Economics and Schwartz Chair in Economic Policy Analysis at the New School in New York City. She previously served for 25 years as professor of Economics at Notre Dame University. She also served a fellowship in economics at the Harvard Law School. Her academic work focuses on the economics of retirement security. She served as a member of the Advisory Board to the Pension Benefit Guaranty Corporation (a Presidential appointment) from 1995 to 2002, and was appointed by the governor of Indiana to the Board of Trustees for the Indiana Public Employees' Retirement Fund for a term from 1997 to 2002. Congressional committees have called upon her to testify as an expert witness more than 12 times on a variety of subjects related to retirement security and other economic issues.

**Marianne Udow-Phillips** is currently the Director of the Center for Healthcare Quality and Transformation, a healthcare policy analysis group affiliated with the University of Michigan health care system and Blue Cross/Blue Shield. She previously served for 3 years as the Director of the Michigan Department of Human Services, the state agency responsible for delivering a wide variety of support services to Michigan residents. Prior to her appointment to the Department of Human Services, she served in a variety of executive positions, including Senior Vice President for Health Care Products and Provider Services and Senior Vice President for Corporate Strategy and Health Care Administration, at Blue Cross Blue Shield of Michigan. She has also served as the Senior Vice President and Vice President of Plans and Operations for Mercy Alternative and Care Choices.

**Ed Welch** is an attorney and currently serves as director of the Workers' Compensation Center in the School of Labor and Industrial Relations at Michigan State University. From 1991 to 1999 he was the editor of the newsletter *On Workers Compensation.* He was the Director of the Michigan Bureau of Workers' Disability Compensation from 1985 through 1990. Mr. Welch was elected a charter member for workers' compensation of the National Academy of Social Insurance and served as the Vice-President of the International Association of Industrial Accident Boards and Commissions as well as a member of the Board of Directors of the Institute for Work and Health, a research organization in Toronto, Ontario.

**<u>Exhibit F(1)</u>**

[Initial Benefits for Participants in the Chrysler Retiree Plan]

## **Exhibit F(2)**

[Initial Benefits for Participants in the Ford Retiree Plan]

## Exhibit F(3)

### Initial Benefits for Participants and Beneficiaries in the GM Retiree Plan

Beginning on the GM Implementation Date and continuing through 2011, the initial Benefits provided by the GM Retiree Plan shall include only the following:

- All Benefits for which GM, the General Motors Health Care Program for Hourly Employees, and any other GM entity or benefit plan would have been responsible before the GM Implementation Date – including, without limitation, the catastrophic plan and COBRA continuation coverage – at the levels described in the settlement agreement approved in Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) ("Henry I"):

- The mitigation payments funded before the GM Implementation Date by the General Motors Defined Contributions Health Benefit Trust shall offset the Participant contributions, deductibles, co-payments and co-insurance payments at the same levels as in Henry I.

- The dental benefits funded before the GM Implementation Date by the General Motors Defined Contribution Health Benefit Trust shall be provided at the same levels as provided before the GM Implementation Date.

- An additional Participant contribution of $51.67 per month shall be required from those Participants who receive after the GM Implementation Date a flat monthly special lifetime benefit from the General Motors Hourly-Rate Employees Pension Plan of $66.70 per month.

As provided in Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering the initial Benefits provided under this Exhibit F(3), including, without limitation, making any changes that could have been adopted by joint action of GM and the UAW pursuant to Section 5.A.2(h) of the settlement agreement approved in Henry I.

## Exhibit G

### Design Principles

The Committee recognizes the complexity and fragmented nature of our nation's ever-changing health care system.  To the extent practical, the Committee will seek to implement each Plan in a manner consistent with the guidelines set out below, subject to both the financial requirements of such Plan and its Purpose.

1. Health care includes individual patient treatment, the alleviation of pain and suffering and the development of practices and procedures to improve the health status of Participants.

2. The Committee shall promote quality health care delivered to Participants in a manner consistent with respect and dignity, and the recognition of the confidentiality of private patient information.

3. The Committee's goal is to provide health care that is effective, safe, efficient and timely, delivered in a culturally competent manner with a recognition of the physical and cognitive challenges present among aged Participants.

4. The Committee will pursue integrated health care approaches to better assess the health risks of Participants and achieve better health outcomes.

5. The Committee will operate each Plan and assess its performance in accordance with evolving best practices measured by both internal and external benchmarks.

6. The Committee shall provide health care coverage to Participants on a basis that is reasonably accessible to Participants, affordable and sustainable.

7. The Committee will develop avenues of communication to keep Participants informed with regard to access to care, the quality of care and operations of the Plan in which they participate.

8. In selecting health care plans and providers, the Committee shall favorably consider health care entities that are non-profit and act in a manner respectful of workers' rights.

9. In selecting health care plans and providers, the Committee will seek to provide both health care and health plan administration within the United States.

10. The Committee will make efforts to assure that Participants are treated with respect and dignity, with due consideration given to their physical and cognitive challenges.

## Exhibit H

## STATEMENT OF INVESTMENT PRACTICES

The following Statement of Investment Practices ("SIP") shall be adopted as "Best Practices" for the VEBA's Committee, Investment Managers and Independent Fiduciaries. It is the intent that these Best Practices evolve over time, taking into account developments in the law, changes in available investments and other changes as the Committee, from time to time, may determine relevant. To the extent that there are inconsistencies between this document and the Trust Agreement, the Trust Agreement shall control. All defined terms in this SIP shall have the same meaning as defined in the Trust Agreement for the VEBA unless otherwise defined herein. It is also intended that these Best Practices, as amended from time to time, be incorporated in an Investment Policy Statement developed by the Committee.

The Committee is the Named Fiduciary with management and control of the assets of the VEBA with the power as set forth in the Trust Agreement to: (1) appoint Investment Managers with respect to non-Employer Securities; (2) appoint Investment Managers who themselves have the power to appoint Investment Managers; and (3) appoint Independent Fiduciaries with respect to Employer Securities. The Committee shall retain such responsibility unless and until it delegates that duty pursuant to the terms of the Trust Agreement and such persons accept such responsibilities by a document in writing.

Where the Trust Agreement permits someone else to be appointed as an Investment Manager or Independent Fiduciary (the "Investment Fiduciaries"), as the case may be, and that person accepts such responsibilities by a document in writing, that person shall be an Investment Fiduciary, and the Committee shall act as the Appointing Fiduciary with responsibility for monitoring the performance of the Investment Fiduciary, except to the extent that the Investment Fiduciary is appointed by the Court pursuant to Section 11.6 of the Trust Agreement. The Committee may also appoint Investment Managers with the authority to appoint other Investment Managers, in which case any Investment Manager so appointed shall act as the Appointing Fiduciary, provided that the Committee shall retain responsibility to monitor any Investment Manager acting as an Appointing Fiduciary.

Subject to the requirements of the Trust Agreement with respect to the Employer Securities, the Committee may appoint one or more Investment Fiduciaries to manage all or part of the Trust Fund and enter into an agreement with any Investment Fiduciary so appointed. If an Investment Fiduciary is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1 of the Trust Agreement, as limited by investment guidelines adopted by the Committee and communicated to such Investment Fiduciary with respect to the portion of the Trust Fund over which it has investment discretion. The Trustee's duties with respect to that portion of the Trust Fund subject to such Investment Fiduciary's discretion and control shall be limited to following the instructions of the Investment Fiduciary to the extent consistent with Employee Retirement Income Security Act of 1974 ("ERISA"). The Investment Fiduciary so appointed is a fiduciary and must acknowledge so in writing as required by Section 3(38) of ERISA. Each Investment Fiduciary shall be monitored by the relevant Appointing Fiduciary.

Each Appointing Fiduciary should conduct periodic reviews of the appointed Investment Fiduciary not less than annually (and more frequently as appropriate under the circumstances)

with a view to determining whether such Investment Fiduciary should continue to be retained by the VEBA.

**S-1.1: The Committee shall develop and update from time to time an Investment Policy Statement that reflects these Investment Practices.**

The Investment Policy Statement should be a written statement developed by the Committee and updated from time to time that describes:

  a. a prudent process for the Committee to select and retain Investment Fiduciaries,

  b. the duties and responsibilities of the fiduciaries involved in asset management,

  c. asset allocation, diversification and rebalancing guidelines,

  d. appropriate investment guidelines, benchmarks and investment objectives against which the performance of the Investment Fiduciary is to be evaluated,

  e. the due diligence criteria for selection of Investment Fiduciaries,

  f. a general definition of the selection and monitoring criteria for Investment Fiduciaries, investments and service vendors,

  g. the actions that can or will be taken as a result of the monitoring,

  h. procedures for controlling and accounting for investment expenses.

  i. requirements that investments be managed in accordance with applicable laws, trust documents, and written investment guidelines.

  j. requirements that each fiduciary of the VEBA act in accordance with ERISA.

  k. requirements that each fiduciary of the VEBA act in accordance with the "prudent man" rule as defined in Section 404(a)(1)(B) of ERISA.

  l. requirements that each fiduciary of the VEBA shall discharge his, her  or its duties with respect to the VEBA solely in the interest of the participants and beneficiaries of each Plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering each Plan as required by Section 404(a)(1)(A) of ERISA.

  m. requirements that the VEBA be established and maintained pursuant to a written instrument as required by Section 402(a) of ERISA.

  n. requirements that the Committee and the Investment Fiduciaries act in accordance with any applicable Plan Document, guidelines and other documents governing each Plan as required by Section 404(a)(1)(D) of ERISA.

  o. requirements that copies of relevant documents governing the acts of the Investment Fiduciaries be provided to the Investment Fiduciaries.

  p. procedures under the VEBA for allocation of responsibilities for its operation and administration consistent with the Trust Agreement and Sections 402, 403 and 405 of ERISA.

  q. procedures requiring that any allocation or delegation permitted by the Trust Agreement or by Sections 402, 403 and 405 of ERISA be defined, documented and acknowledged at the time of such delegation of allocation.

  r. requirements that any entity assuming a position which involves the exercise of fiduciary duties with respect to the management of VEBA plan assets under ERISA should sign a written acknowledgement that it acknowledges the acceptance of such duties and has read these Best Practices, as amended from time to time, and agrees to act in accordance with them.

**S.-1.2    Fiduciaries and parties in interest should not be involved in self-dealing as prohibited in Section 406 of ERISA.**

    a.   No fiduciary shall cause a Plan to engage in a transaction, if such fiduciary knows or should know that such transaction constitutes a direct or indirect transaction between the plan and a party in interest to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(a) of ERISA

    b.   No fiduciary with respect to a Plan shall: (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan, to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(b) of ERISA.

    c.   The Committee should adopt policies and procedures with respect to conflicts of interests and the management of potential conflicts of interests.  Such policies should be disseminated to members of the Committee, Investment Fiduciaries, the Trustee and affected employees of the VEBA.  Each Investment Fiduciary and each affected employee should certify annually that he, she or it has received the applicable policies and procedures and confirm that he, she or it has complied with such policies in the previous year.  These policies initially should be based on the UAW conflict of interest policy.

    d.   No fiduciary should be retained for a reason other than competence, cost, experience and other matters relevant to the fiduciary's ability to perform the functions assigned to such fiduciary in a cost effective manner.

**S.-1.3 The Committee and each Investment Fiduciary should take prudent steps to protect and safeguard the assets from theft and embezzlement.**

    a.   The Committee should establish for procedures for the VEBA to maintain, or cause others to maintain, one or more fidelity bonds covering the plan fiduciaries and other persons who handle funds or other property of the plan as required by Section 412 of ERISA and Section 10.12 of the Trust Agreement.

    b.   The Committee should take prudent steps to seek payment of any contributions that are past due and have not been paid in accordance with Section 10.13 of the Trust Agreement.

**S.-1.4    Except to the extent permitted by Department of Labor Regulations, no fiduciary may maintain the indicia of ownership of any assets of the VEBA outside the jurisdiction of the district courts of the United States as required by Section 404(b) of ERISA.**

    a.   The Committee should establish procedures, which may consist of a covenant from its Investment Fiduciaries, to ensure that the indicia of ownership of the assets of the VEBA are not maintained outside the jurisdiction of the district courts of the United States, except as permitted by the Department of Labor Regulations.

**S.-2.1  The Committee should establish an investment strategy consistent with requirements of the Trust Agreement and  the purposes of the VEBA.**

    a.   The Committee should determine the expected modeled return on VEBA assets and identify an appropriate level of investment risk, taking into account expected returns over time and short-term liquidity needs.  In determining the expected return the Committee should consider:

        1.  Diversification requirements to reduce the VEBA's exposure to losses.
        2.  Selection of asset classes consistent with the expected risk and return.
        3.  The projected return of the portfolio relative to the funding objectives of the VEBA.
        4.  Such other factors as the Committee may deem appropriate.

    b.   The Committee should develop an investment strategy based upon such expected return and expected level of risk. In no circumstances shall the Committee be responsible for guaranteeing any expected return.

    c.   The Committee should review the VEBA's investment strategy at minimum once a year and make any changes as appropriate.

**S.-2.2  The Committee should establish investment guidelines to be communicated to Investment Fiduciaries consistent with the investment strategy developed.**

    a.   The investment guidelines should be sufficiently detailed to permit each Investment Fiduciary to implement and manage the specific investment strategy for which it was appointed.  In the discretion of the Committee, these investment guidelines provided to the Investment Fiduciary should:

        1.  Define the duties and responsibilities of the Investment Fiduciary
        2.  Define any applicable diversification and rebalancing guidelines.
        3.  Include any relevant selection criteria for asset classes and investments.
        4.  Set forth the appropriate benchmarks, indices, peer groups, and the investment objectives against which the performance of the Investment Fiduciary is to be evaluated.
        5.  Define such due diligence criteria for selecting investments that the Committee in the exercise of prudence determines the Investment Fiduciary should incorporate as part of its investment process.
        6.  Define the relevant monitoring criteria for the Investment Fiduciary.
        7.  Define the relevant procedures for controlling and accounting for investment expenses.

    b.   The Committee should review the investment guidelines at a minimum once each year to ensure that investment objectives are analyzed and modified as prudent.

**S.-3.1  The Committee  should select Investment Fiduciaries, delegate investment duties to such Investment Fiduciaries, and allocate assets to each Investment Fiduciary to manage consistent with the investment strategy and the investment guidelines applicable to it.**

    a.   The Committee should follow a due diligence process in selecting Investment Fiduciaries that selects among providers based on an objective assessment of their qualification, the quality of the work performed, the reasonableness of the fees, and any such other factors as the Committee deems appropriate and relevant.  The Committee should maintain a written record of the process used to select such Investment Fiduciaries.

b.  The Committee should establish procedures to reasonably assure that each Investment Fiduciary or other staff appointed by them has the necessary experience and qualifications needed to oversee the assets allocated to their portfolio.

1.  The Committee should maintain a list of Investment Fiduciaries, including, as part thereof, the Investment Fiduciaries' credentials and experience in carrying out the duties assigned to them.

2.  The Committee should require periodic reporting from the Investment Fiduciaries as to the work performed.

3.  To the extent the Committee hires staff with investment management-related responsibilities, the Committee should develop written job descriptions for such staff, including, as part thereof, the expected credentials and experience of all staff assigned or exercising such authority.

4.  All fees for investment management should be "reasonable compensation" as defined in Section 408(b)(2) of ERISA.

    i.  The Appointing Fiduciary should take reasonable steps to assure that all compensation, direct or indirect, is reasonable under Section 408(b)(2) of ERISA.

    ii.  If the compensation of the Investment Fiduciary will be performance based, the Appointing Fiduciary should review such proposed compensation arrangement in light of the risks associated with the manner of compensation and the potential amount to be paid.

    iii.  The Committee should review any proposed finder's fees or other forms of compensation for asset placement in connection with selection of Investment Fiduciaries to determine whether such compensation is reasonable.

    iv.  The Committee should periodically review such fees to determine if fees remain reasonable in light of the services performed.

5.  The Committee should establish a prudent process for periodically assessing the effectiveness of the VEBA's fiduciary structure including the Committee and other fiduciaries in meeting their responsibilities.

**S.-3.2  Each Investment  Fiduciary should give appropriate consideration to the facts and circumstances relevant to the particular investment or investment course of action in accordance with the "prudent man" rule of ERISA.**

a.  Each Investment Fiduciary shall prudently investigate the merits of any potential investment to be made for the VEBA.

b.  Appropriate consideration with respect to an investment includes a determination that the particular investment or investment course of action is reasonably designed to comply with the investment guidelines provided to the Investment Fiduciary, taking into consideration the risk of loss and the opportunity for gain associated with the investment or investment course of action.

c.  Each Investment Fiduciary should have the requisite expertise, knowledge and information necessary to prudently implement the investment strategy and guidelines.

d.  If the Investment Fiduciary lacks sufficient knowledge or sophistication to manage a portion of the VEBA's assets under its authority consistent with the investment strategy or guidelines, the Investment Fiduciary should delegate the investment duties to a knowledgeable professional.

**S.-3.3  Each Appointing Fiduciary shall periodically review the performance of the appointed Investment Fiduciary.**

a.  The Appointing Fiduciary should review the performance of the Investment Fiduciary appointed, at least annually and more frequently as circumstances may warrant, with regards to:

1.  Compliance with these investment practice standards, any investment guidelines and with the purposes and needs of the VEBA.

2.  Comparison of the investment's performance to appropriate benchmarks, indices, peer groups, and the investment objectives against which the performance of the Investment Fiduciary is evaluated.

3.  Compliance with the conflict of interest policy, as long as doing so is reasonable under the circumstances. (The Appointing Fiduciary may rely on a certification of the Investment Fiduciary that it has complied with such conflict of interest policies.)

4.  The quality and timeliness of the Investment Fiduciary's response to requests for information.

5.  The level of service provided as compared to the costs and fees.

6.  The quality and timeliness of the Investment Fiduciary's reports to the Appointing Fiduciary and, where applicable, the Committee, Trustee or plan participants and beneficiaries.

7.  Any education and information provided to the Appointing Fiduciary, the Committee or the plan participants by the Investment Fiduciary.

8.  Qualitative and/or organizational changes of Investment Fiduciaries, such as:

    i.  Staff turnover in determining whether the quality of the service or the investment results provided in the past may be maintained in the future.

    ii.  Changes in the organizational structure of the Investment Fiduciary, including mergers and/or acquisitions that could affect the quality of the service or the investment results in the future.

b.  The nature and results of the monitoring should be recorded in writing, including documentation of any actions recommended, reviewed or taken.

c.  Control procedures should be in place to periodically review policies for best execution and proxy voting.

1.  The Appointing Fiduciary should review the Investment Fiduciary to determine whether the Investment Fiduciary has reasonable procedures in place to secure best execution of the plan's brokerage transactions.  The Appointing Fiduciary may consider the cost of commissions for the transaction, the quality and reliability of the execution and any other factors as the Appointing Fiduciary deems relevant.

2.  The Appointing Fiduciary should establish a procedure to review any commissions paid on such transactions at the direction of the Investment Fiduciary to determine if they are reasonable in light of the value of the brokerage and research services or are otherwise permissible under Section 28(e) of the Securities Exchange Act of 1934.

3.  The Appointing Fiduciary should monitor the procedures employed by an Investment Manager in voting proxies and actions taken in connection with the voting of proxies to ensure that the interests of plan participants and beneficiaries are protected by such actions (or inaction), and are not subordinated to other considerations.  An Independent Fiduciary should retain all discretionary authority over voting proxies for the Employer Securities in accordance with Section 11.2 of the Trust Agreement.

**Exhibit I**

## Code of Ethics

In order for the Trust to continue the protection from the otherwise debilitating financial consequences that would accompany illness that has been afforded many thousands of UAW retirees of the automobile industry over the decades through the collective bargaining agreements between the UAW and Chrysler, Ford and GM – which protection has been essential to maintaining the dignity and financial security of such UAW retirees – the Committee must administer the Trust, and Trust personnel must act, in complete good faith and honesty, and with a single-minded dedication to protecting the interests of the Participants and Beneficiaries.  To this end, this Code of Ethics shall govern the conduct of all those persons charged with implementation and administration of the Trust.

The following principles shall apply to members of the Committee as well as to any and all employees, professional staff and others employed in any staff capacity by the Trust.  All such persons are referred to herein as "representatives and employees of the Trust."  The Committee shall also inform all vendors, suppliers, outside consultants, health care providers and any other parties performing services for or on behalf of the Trust of this Code of Ethics and inform them that the Committee expects all such persons or entities to respect the provisions of this Code of Ethics. (For purposes of this Code of Ethics, references to family or families means spouses, children, grandparents, grandchildren, uncles, aunts, nieces, nephews by blood or marriage).

1.    The assets of the Fund are held in trust for the benefit of the Participants and Beneficiaries.  The Participants and Beneficiaries are entitled to assurance that Trust assets are not dissipated, are invested wisely, and are spent only for proper purposes.

2.    The Participants and Beneficiaries are also entitled to assurance that representatives and employees of the Trust will be motivated solely by consideration of the best interests of the Participants and Beneficiaries, and will never allow their actions in administration of the Trust to be motivated in any respect by their own self-interest or any other factor that could result in decisions being taken that could work to the detriment of the Participants and Beneficiaries.

3.    Service as a representative or employee of the Trust is service *in the interest of the Participants and Beneficiaries.*  Pursuing any other goal will injure the reputation of the individual involved as well as the Trust itself.  Even more importantly, pursuing any goal other than the best interests of the Participants and Beneficiaries will undermine the Trust's ability to provide benefits to Participants and Beneficiaries.

4.    It is vital that all representatives and employees of the Trust conduct their day-to-day activities in accordance with these principles and in a manner consistent with the special responsibility they have to the Participants and Beneficiaries.  Employees and representatives of the Trust must demonstrate – by their

conduct as well as their words – that they are dedicated solely to helping the Participants and Beneficiaries and are not motivated by any other goal or in any sense seeking to enrich themselves, their families, or business associates, or gain any advantage for themselves, their families, or business associates from their relationship to the Trust.

5.    The Trust shall conduct its proprietary functions, including all contracts for purchase or sale or for rendering services in accordance with the best practices of well-run institutions, including the securing of competitive bids for major contracts.

6.    The Trust shall not permit any of its funds to be invested in a manner designed to result in profit or advantage for any representative or employee of the Trust, his or her family, or business associates.

7.    There shall be no contracts of purchase or sale or for rendering services which will result in profit or advantage for any representative of the Trust, his or her family or business associates.  Nor shall any representative or employee of the Trust accept profit or special advantage for himself or herself, his or her family or business associates from a business – including, without limitation, a vendor or service provider – with which the Trust has a business relationship of any kind.

8.    The Trust shall not make loans to its representatives or employees, or members of their families, for any purpose, including financing the private business of such persons.

9.    No representative or employee of the Trust shall have any compromising personal ties, direct or indirect, with outside agencies such as insurance carriers, brokers, or consultants – including with any representative, employee or agent of any such agencies, carriers, broker or consultants – doing business with the Trust.

10.    The Trust shall fully comply with all applicable legal and accounting requirements, including with respect to maintaining its books and records in accordance with accepted accounting practices and conducting periodic audits as required by law.  The financial records of the Trust shall be made available to retired participants and others as required by law.

11.    Any person who represents the Trust has a duty to serve the best interests of the Participants and Beneficiaries.  Therefore, every representative and employee of the Trust must avoid any outside transaction which even gives the appearance of a conflict of interest.  The special fiduciary nature of these positions requires the highest loyalty to the duties of the office.

12.    No representative or employee of the Trust shall have any personal financial interest which conflicts with her/his duties on behalf of the Trust.

13.     No representative or employee of the Trust shall have any substantial financial interest (even in the publicly-traded, widely-held stock of a corporation), in any business with which the Trust has any business relationship.

14.     No representative or employee of the Trust shall accept "kickbacks," under-the-table payments, gifts or entertainment of any value or any personal payment of any kind from a business or professional enterprise with which the Trust does business, nor arrange to have any such financial payments or perquisites inure to the benefit of their family or business associates.

15.     All staffing decisions and decisions regarding use of outside vendors shall be made based solely on consideration of the best interests of the Participants and Beneficiaries.  No staff shall be hired, nor any consultants or other vendors used in connection with the conduct of the Trust's affairs, as a result of personal or family ties to existing representatives or employees of the Trust, the UAW, or any of the contributing employers.

16.     The Participants and Beneficiaries are entitled to be reasonably informed as to how the Trust's assets are used and cared for.  Toward this end, the Committee shall – at least annually – provide reasonable notice (by mailed notice to Participants and Beneficiaries or other suitable means) in a form understandable by Participants and Beneficiaries of the status of the Trust and the applicable Separate Retiree Account, including:

    a.  The funding status of the applicable Separate Retiree Account.

    b.  The amount spent on Benefits from the applicable Separate Retiree Account in the prior year.

    c.  The amount spent on administrative costs (including items such as rent, utilities, consulting fees, outside services, salaries, and the like) from the applicable Separate Retiree Account in the prior year.

    d.  The number of Participants and Beneficiaries drawing benefits from the applicable Separate Retiree Account in the prior year.

    e.  The Committee's current projections regarding solvency of the applicable Separate Retiree Account, and any anticipated Benefit adjustments that may be required over the following five year period.

    f.  Applicable Company contributions and remittances made during the prior year.

    g.  The outcome of the Cash Flow Projection required by the Company Settlements with respect to the applicable Separate Retiree Account.

    h.  The investment returns for the preceding year, as well as such longer periods as the Committee may determine.

# EXHIBIT B

# FORM OF INDENTURE

Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit Y to the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto (the "MSPA").

# EXHIBIT C

# [Reserved]

# EXHIBIT D

# FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

## FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of *[_____]*, 2009 by and among *[_____]¹*, a Delaware corporation (the "Corporation"), *[Holdco]*, a *[trust established for the sole benefit of the United States Department of the Treasury] [a Delaware [limited liability company][corporation]]* (the "UST Holdco"), 7176384 Canada Inc., a corporation organized under the laws of Canada ("Canada"), the UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association (the "VEBA"), and *[Debtor]*, a Delaware corporation (the "Debtor").²

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST Holdco, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST Holdco, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

*Section 1.1    Certain Defined Terms*.  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with

---

[1] Vehicle Acquisition Holdings LLC will convert to a corporation and  change its name to *[New GM]* as of closing.

[2] In the event that any of the other Sellers under the Master Sale and Purchase Agreement, dated June 1, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

the SEC by the Corporation so that such registration statement or report would not be materially misleading; (b) would not be required to be made at such time but for the filing of such registration statement; and (c) the Corporation has a *bona fide* business purpose for not disclosing publicly.

"Adverse Effect" shall have the meaning set forth in **Section 2.1.6**.

"Advice" shall have the meaning set forth in **Section 2.7**.

"Agreement" shall have the meaning set forth in the Preamble.

"Canada" shall have the meaning set forth in the Preamble.

"Co-Managers" shall have the meaning set forth in Section **2.1.4(a)**.

"Common Stock" shall have the meaning set forth in the Recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise.  "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Corporation Shelf Registration" shall have the meaning set forth in **Section 2.2.1**.

"Debtor" shall have the meaning set forth in the Preamble.

"Demand Registration" shall have the meaning set forth in **Section 2.1.1(a)**.

"Demand Request" shall have the meaning set forth in **Section 2.1.1(a)**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) securities pursuant to one or more Demand Registrations pursuant to **Article 2** hereof, (b) securities registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) securities registered on Form S-3 or any successor form covering solely securities issued under a dividend reinvestment program.

"FINRA" shall have the meaning set forth in **Section 2.5(a)(xvii)**.

"Government Holder" means the UST Holdco or Canada.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions

of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Holder" means each of (a) the UST Holdco, Canada, the VEBA and the Debtor and (b) any direct or indirect transferee of any such Holder who shall become a party to this Agreement in accordance with **Section 2.10**.

"Indemnitee" shall have the meaning set forth in **Section 2.9.1**.

"Indemnitor" shall have the meaning set forth in Section 2.9.3(a) but shall, for the avoidance of doubt, exclude the Government Holders and the VEBA for purposes of providing indemnification hereunder.

"Initial Sale Time" shall have the meaning set forth in **Section 2.9.1**.

"Inspectors" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"IPO" means the Corporation's first public offering of Common Stock (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms).

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.6**.

"Lead Underwriters" shall have the meaning set forth in **Section 2.1.4(a)**.

"Losses" shall have the meaning set forth in **Section 2.9.1**.

"Market Value" shall mean with respect to any particular class or type of Registrable Securities (a) at any time securities of the same class or type as the applicable Registrable Securities are listed on a national securities exchange, the closing price of such class or type of securities on the trading day immediately preceding the date of the Demand Request or Transfer Notice, (b) at any time that the Warrants are not listed on a national securities exchange but the Common Stock is listed on a national securities exchange, for each Warrant, the closing price of one share of Common Stock multiplied by the number of shares of Common Stock for which such Warrant is then exercisable (assuming cashless exercise), or (c) other than in the case of clause (a) or clause (b), the estimated market value determined in good faith by the Corporation based upon the advice of a nationally recognized independent investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to UST Holdco or if UST Holdco is not the Requesting Holder, the Holders of a majority of the Registrable Securities covered by the Demand Request or Transfer Notice).

"Master Sale and Purchase Agreement" means the Master Sale and Purchase Agreement, dated as of June 1, 2009, by and among General Motors Corporation, Saturn LLC, Saturn

Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and Vehicle Acquisition Holdings LLC.

"Material Adverse Change" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Corporation and its subsidiaries, taken as a whole.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Piggyback Offering" shall have the meaning set forth in **Section 2.2.1**.

"Preferred Stock" shall have the meaning set forth in the Recitals.

"Records" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"Registrable Securities" means (a) Warrants and the shares of Common Stock and/or Preferred Stock owned from time to time by the UST Holdco, Canada, the VEBA and the Debtor as of the date hereof and set forth on Annex I hereto, (b) the shares of Common Stock issued or issuable to any Holder upon exercise of a Warrant, (c) any additional securities of the Corporation issued to the Debtor pursuant to Section 3.2 of the Master Sale and Purchase Agreement and (d) any equity security issued in exchange for or with respect to any shares of Common Stock referred to in clauses (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise.  As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with a registration statement; (ii) have been sold pursuant to Rule 144 under the Securities Act (or any successor provision); (iii) are held by a Holder that may sell all such Registrable Securities held by it in a single day pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision); (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are held by any Person who is not a Holder.  For purposes hereof, "a majority of the Registrable Securities" and "on the basis of the number of Registrable Securities" shall be determined assuming the exercise of the Warrants in full.

4

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants or financial advisors or any other Person acting on behalf of such Person.

"Requesting Holders" shall have the meaning set forth in **Section 2.1.1(a)**.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Shelf Registration" shall have the meaning set forth in **Section 2.1.2(a)**.

"Suspension Notice" shall have the meaning set forth in **Section 2.7**.

"Take-Down" shall have the meaning set forth in **Section 2.1.2(b)**.

"Transfer Notice" shall have the meaning set forth in **Section 2.1.2(b)**.

"UST Holdco" shall have the meaning set forth in the Preamble.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Designee" shall mean the person(s) authorized by the Committee (as defined in the UAW Retiree Medical Benefits Trust Agreement dated *[_____]* between *[_____]* and *[_____]*) to execute this Agreement and/or carry out the transactions contemplated hereby.

"Warrants" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally*.  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."  Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## REGISTRATION RIGHTS

*Section 2.1      Demand Registration.*

*Section 2.1.1    Request for Registration.*

(a)      Subject to **Section 2.1.3**, any Holder or Holders of Registrable Securities shall have the right to require the Corporation to file a registration statement under the Securities Act for a public offering of all or part of its or their Registrable Securities (a "Demand Registration"), by delivering to the Corporation written notice stating that such right is being exercised, naming, if applicable and to the extent known by such Holder or Holders, any other Holders whose Registrable Securities are to be included in such registration (collectively, the "Requesting Holders"), specifying the number and type of each such Holder's Registrable Securities to be included in such registration, specifying whether the Registrable Securities to be included by the Requesting Holder are all of the Registrable Securities then held by such Requesting Holder and, subject to **Section 2.1.4** hereof, describing the intended method of distribution thereof (a "Demand Request").  Subject to **Section 2.1.3**, after receipt of any Demand Request, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.

(b)      Subject to **Section 2.1.3** and **Section 2.1.7**, the Corporation shall file the registration statement in respect of a Demand Registration as promptly as practicable and, in any event, (i) with respect to the filing of a Form S-3, within forty-five (45) days and (ii) with respect to the filing of any other type of registration statement, within ninety (90) days after receiving a Demand Request, and shall use reasonable best efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

*Section 2.1.2    Shelf Registration; Take-Downs.*

(a)      Subject to **Section 2.1.3**, with respect to any Demand Registration, at any time that the Corporation is eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) with respect to the Registrable Securities, the Requesting Holders may request that the Corporation (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration, or (ii) at any time that a registration statement pursuant to Rule 415 covering Registrable Securities is effective, register additional Registrable Securities of the Requesting Holders pursuant to such shelf registration statement to effect such Demand Registration (in either case, a "Shelf Registration").  For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" for all purposes under this Agreement except as otherwise provided in **Section 2.1.3**.

(b)      Subject to **Section 2.1.3**, any Holder or Holders with Registrable Securities registered pursuant to a Shelf Registration that intends to effect an underwritten offering with respect to such Registrable Securities shall deliver a notice to the Corporation at least fifteen (15) days prior to the commencement of such underwritten offering, stating (i) that such Holder or Holders intend to effect an underwritten offering of all or part of the Registrable Securities

6

included by such Holder or Holders in the Shelf Registration, (ii) if applicable and to the extent known by such Holder, any other Holders whose Registrable Securities are to be included in the underwritten offering, (iii) the number and type of each such Holder's Registrable Securities to be included in such underwritten offering, (iv) whether the Registrable Securities to be included by such Holder are all of the Registrable Securities then held by such Holder, and (v) the proposed timetable for such underwritten offering.  Any Holder with Registrable Securities registered pursuant to a Shelf Registration that intends to effect any other sale or transfer of such Registrable Securities (each a "Take-Down") shall deliver a notice to the Corporation at least five (5) days prior to effecting such non-underwritten sale or transfer, stating (i) that such Holder intends to effect a non-underwritten sale or transfer of all or part of the Registrable Securities included by such Holder in the Shelf Registration, (ii) the number and type of the Registrable Securities to be included in such sale or transfer and (iii) the proposed manner and timetable for such sale or transfer.  A notice provided by any Requesting Holder pursuant to the first two sentences of this **Section 2.1.2(b)** is referred to herein as a "Transfer Notice."  Subject to **Section 2.1.3**, after receipt of any Transfer Notice, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.  For the avoidance of doubt, a Take-Down shall not be deemed to be a Demand Registration and shall not be subject to **Section 2.1.3**.

(c)    Subject to **Section 2.1.3**, the Corporation shall use its reasonable best efforts to keep any Shelf Registration requested pursuant to **Section 2.1.2(a)** continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Holders until the earlier of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) and (ii) the date as of which all of such Requesting Holders are permitted to sell their Registrable Securities without registration pursuant to Rule 144 under the Securities Act without volume limitation or other restrictions on transfer thereunder.

(d)    The Corporation shall, from time to time, supplement and amend the Shelf Registration if required by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for such Shelf Registration.

*Section 2.1.3   Limitations*.

(a)    A Holder shall not be permitted to request a Demand Registration prior to one hundred eighty (180) days after the date of this Agreement, unless prior thereto the Corporation has a class of equity securities registered under Section 12(b) of the Exchange Act.

(b)    A Holder (other than the UST Holdco) shall not be permitted to request a Demand Registration prior to the time the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act.

(c)    A Holder shall not be permitted to request a Demand Registration, or submit a Transfer Notice with respect to an underwritten offering pursuant to a Shelf Registration, within one hundred eighty (180) days after either (i) the effective date of a previous Demand Registration (other than a Shelf Registration) or (ii) the completion of any underwritten offering pursuant to a Shelf Registration.

(d)      A Holder shall not be permitted to submit a Demand Request, or a Transfer Notice for an underwritten offering, or effect any such Demand Registration or underwritten offering unless such Demand Request or Transfer Notice for an underwritten offering is for (i) a number of Registrable Securities having a Market Value equal to or exceeding $100 million in the aggregate, or (ii) all of the Registrable Securities then held by the Requesting Holder.

(e)      The Corporation shall not be required to effect, (i) until (but excluding) the third anniversary of the date hereof, more than two (2) Demand Registrations (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period, and (ii) from and including the third anniversary of the date hereof, more than one (1) Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period. Notwithstanding the foregoing, (i) the VEBA shall have the right, from and including the third anniversary of the date hereof, to request one additional Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) during any consecutive twelve (12) month period, and (ii) for the avoidance of doubt, the limitations set forth in this **Section 2.1.3** shall not apply to any non-underwritten Take-Down by any Holder under a Shelf Registration.

*Section 2.1.4    Demand Registrations for Underwritten Offerings.*

(a)      At the request of UST Holdco or Canada, or if UST Holdco or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities submitting a Demand Request or Transfer Notice for an underwritten offering of Registrable Securities, the Corporation shall direct the applicable underwriter to conduct such offering in the form of a "firm commitment." With respect to any such underwritten offering, (i) UST Holdco, or if UST Holdco is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering shall select the investment banking firm or firms to lead the underwritten offering (the "Lead Underwriters"); provided that such Lead Underwriters shall be reasonably acceptable to the Corporation, and (ii) the Corporation shall select the other investment banking firms, if any, to co-manage such underwritten offering (the "Co-Managers"), provided that such Co-Managers shall be reasonably acceptable to UST Holdco or Canada, or if UST Holdco or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering.

(b)      If a Demand Registration is for an underwritten offering or a transfer pursuant to a Shelf Registration involves an underwritten offering, no Holder may participate in any such underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation; provided that such arrangements are subject to the consent of UST Holdco, or if UST Holdco is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering, and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with

8

any such underwritten offering other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation (if agreed to) of each such Holder to indemnify the Lead Underwriters and any Co-Managers pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such offering and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

*Section 2.1.5   Rights of Nonrequesting Holders and the Corporation.*   Subject to **Section 2.1.3**, after receipt of any Demand Request or any Transfer Notice relating to an underwritten offering pursuant to a Shelf Registration, the Corporation shall promptly (but in any event within five (5) days) give written notice of (i) such proposed Demand Registration to all other Holders or (ii) such Transfer Notice to such other Holders whose securities are covered by such Shelf Registration, who shall have the right, exercisable by written notice to the Corporation within five (5) days of their receipt of the Corporation's notice, to elect to include in such Demand Registration or underwritten offering such portion of their Registrable Securities as they may request.   All Holders requesting to have their Registrable Securities included in a Demand Registration or underwritten offering shall be deemed to be "Requesting Holders" for purposes of this **Section 2.1**.   For the avoidance of doubt, subject to **Section 2.1.6**, the Corporation may register in any Demand Registration any equity securities of the Corporation.

*Section 2.1.6   Priority on Demand Registrations.*   With respect to any underwritten offering based on a Demand Registration (including an underwritten offering pursuant to a Shelf Registration), if the Lead Underwriters (after consultation with the Co-Managers) advise that the inclusion of the securities proposed to be included in such registration would adversely affect the price, timing or distribution of the offering or otherwise adversely affect its success (an "Adverse Effect"), the Corporation shall include in such underwritten offering (a) first, the Registrable Securities, pro rata among the Requesting Holders on the basis of the number of Registrable Securities owned by each such Requesting Holder, and (b) second, any other securities requested to be included in such underwritten offering (including securities to be sold for the account of the Corporation); provided, however, that if more than 25% of the Registrable Securities of any Holder subject to a Demand Request or Transfer Notice for an underwritten offering are excluded pursuant to the terms of this **Section 2.1.6** from the applicable Demand Registration or underwritten offering pursuant to a Shelf Registration, the offering shall not be deemed to constitute a Demand Registration for the purposes of **Section 2.1.3**.

*Section 2.1.7   Deferral of Filing; Suspension of Use.*   The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of any registration statement required by or filed pursuant to **Section 2.1**, at any time if (a) the Corporation determines, in its sole discretion, that such action or use (or proposed action or use) would require the Corporation to make an Adverse Disclosure, or (b) prior to receiving the Demand Request or Transfer Notice, as applicable, the board of directors of the Corporation had determined to effect a registered underwritten public offering of Company equity securities or

Company securities convertible into or exchangeable for Company equity securities for the Corporation's account and the Corporation had taken substantial steps (such as selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not exercise its rights to deferral or suspension pursuant to this **Section 2.1.7**, and shall not so effect any such deferral or suspension, for more than a total of one hundred eighty (180) days (which need not be consecutive) in any consecutive twelve (12) month period.  In making any such determination to defer the filing or effectiveness, or suspend the use, of a registration statement required by **Section 2.1**, the Corporation shall not be required to consult with or obtain the consent of any Holder or any investment manager therefor, and any such determination shall be in the sole discretion of the Corporation, and neither the Holders nor any investment manager for any Holder shall be responsible or have any liability therefor.  The Corporation shall promptly notify the Holders of any deferral or suspension pursuant to this **Section 2.1.7** and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable and will promptly notify each Holder in writing of the termination of any such deferral or suspension.

Section 2.1.8  Withdrawal from Demand Registration.  Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Corporation with written notice.  Upon receipt of such written notice, the Corporation shall continue all efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of **Section 2.1.3(b)** or **Section 2.1.3(d)**, in which case, the Corporation may in its sole discretion cease all efforts to proceed with registration or the underwritten offering.  If the Corporation ceases all efforts to secure registration or effect the underwritten offering pursuant to this **Section 2.1.8**, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering pursuant to a Shelf Registration for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Request or Transfer Notice or (ii) the Requesting Holders pay or reimburse the Corporation for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering; provided that if, after a Demand Registration has become effective or an underwritten offering of Registrable Securities has been commenced, it is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, it shall be deemed not to have been effected and shall not count as a Demand Registration or underwritten offering for the purposes of **Section 2.1.3**.

Section 2.2    Piggyback Offerings.

Section 2.2.1  Right to Piggyback.  Each time the Corporation proposes to offer any of its equity securities in a registered underwritten offering (other than pursuant to an Excluded Registration) under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than a Holder) (a "Piggyback Offering"), the Corporation shall give prompt written notice to each Holder of Registrable Securities (which notice shall be given not less than twenty (20) days prior to (i) the offering in the case of an underwritten offering pursuant to Rule 415 under the Securities Act (or any successor rule) (a "Corporation Shelf Registration") or (ii) the anticipated filing date of the

10

Corporation's registration statement in a registration other than a Corporation Shelf Registration), which notice shall offer each such Holder the opportunity to include any or all of its Registrable Securities in such underwritten offering, subject to the limitations contained in **Section 2.2.2** hereof.  Each Holder who desires to have its Registrable Securities included in such underwritten offering shall so advise the Corporation in writing (stating the number and type of Registrable Securities desired to be registered or included) within fifteen (15) days after the date of such notice from the Corporation. Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Securities in any underwritten offering pursuant to this **Section 2.2.1** by giving written notice to the Corporation of such withdrawal.  Subject to **Section 2.2.2** below, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein.  Notwithstanding the foregoing, the Corporation may at any time withdraw or cease proceeding with any such offering if it shall at the same time withdraw or cease proceeding with the offering of all other equity securities originally proposed to be included in such offering.

*Section 2.2.2   Priority on Piggyback Offerings.*

(a)    If a Piggyback Offering was initiated by the Corporation, and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities the Corporation proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder, and (iii) third, any other securities requested to be included in such Piggyback Offering. If as a result of the provisions of this **Section 2.2.2(a)**, any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw its request to include its Registrable Securities in such Piggyback Offering.

(b)    If a Piggyback Offering was initiated by a security holder of the Corporation (other than a Holder), and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities requested to be included therein by the security holders requesting such Piggyback Offering and the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such Piggyback Offering (including securities to be sold for the account of the Corporation). If as a result of the provisions of this **Section 2.2.2(b)** any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Securities in such Piggyback Offering.

(c)    No Holder may participate in a Piggyback Offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in customary form and reasonably satisfactory to the Holders, reasonably required under the terms

of such underwriting arrangements; _provided_, _however_, that no such Holder shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; _provided_, _further_, _however_, that (i) any obligation, if agreed to, of each such Holder to indemnify the underwriters pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such registration and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

      _Section 2.2.3  Selection of Underwriters_.    The Corporation shall select the investment banking firm or firms to manage the Piggyback Offering.

      _Section 2.2.4_   No registration of Registrable Securities effected pursuant to this **Section 2.2** shall be deemed to have been effected pursuant to **Section 2.1.1** or **Section 2.1.2** or shall relieve the Corporation of its obligations under **Section 2.1.1** or **Section 2.1.2**.

      _Section 2.3_     _SEC Form S-3_.   Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to cause Demand Registrations to be registered on Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) once the Corporation becomes eligible to use such form, and if the Corporation is not then eligible under the Securities Act to use such form, Demand Registrations shall be registered on the form for which the Corporation then qualifies. After becoming eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3, the Corporation shall use its reasonable best efforts to remain so eligible.

      _Section 2.4_     _Holdback Agreements_.

      (a)     The Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of the offering pursuant to a Demand Registration, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of any registration statement in connection with an underwritten Demand Registration (other than a Shelf Registration), except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Demand Request, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend

12

reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(b)    If any Holders of Registrable Securities provide a Transfer Notice relating to an underwritten offering of Registrable Securities registered pursuant to a Shelf Registration, the Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of such underwritten offering, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the pricing date for such underwritten offering, except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Transfer Notice, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(c)    Each Holder agrees, in the event of an underwritten offering of equity securities by the Corporation (whether for the account of the Corporation or otherwise), not to offer, sell, contract to sell or otherwise dispose of any Preferred Stock, Warrants, Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 under the Securities Act (except as part of such underwritten offering), during the sixty (60) day period (or such lesser period in each case as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, the pricing date for such underwritten offering); provided, however, that (i) any applicable period shall terminate on such earlier date as the Corporation gives notice to the Holders that the Corporation declines to proceed with any such offering and (ii) the sum of all holdback periods applicable to the Holders shall not exceed one hundred twenty (120) days (which need not be consecutive) in any given twelve (12) month period.

Section 2.5    *Registration Procedures.*

(a)    If and whenever the Corporation is required to effect the registration of any Registrable Securities pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Corporation shall use its reasonable best efforts to effect the registration and the sale, as applicable, of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as expeditiously as possible:

(i)    prepare and file with the SEC, pursuant to **Section 2.1** with respect to any Demand Registration, a registration statement on any appropriate form under the Securities Act with respect to such Registrable Securities and use its reasonable best efforts to cause such

registration statement to become effective as promptly as practicable; <u>provided</u> that as far in advance as practicable before filing such registration statement or any amendment thereto, the Corporation shall furnish to the selling Holders copies of reasonably complete drafts of all such documents prepared to be filed (including exhibits), and any such selling Holder shall have the opportunity to object to any information contained therein and the Corporation shall make corrections reasonably requested by such selling Holder with respect to such information prior to filing any such registration statement or amendment; <u>provided</u>, <u>further</u>, that the Corporation shall not file any such registration statement, and any amendment thereto, to which a Holder shall reasonably object in writing on a timely basis, unless in the Corporation's judgment such filing is necessary to comply with applicable law;

(ii)     except in the case of a Shelf Registration, prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the selling Holders thereof set forth in such registration statement;

(iii)     in the case of a Shelf Registration, comply with the provisions of **Section 2.1.2(c)** and **Section 2.1.2(d)**;

(iv)     furnish to each selling Holder of Registrable Securities and the underwriters of the securities being registered, without charge, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such selling Holders or underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such selling Holders or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.1.7**, **Section 2.4(c)**, **Section 2.6** and **Section 2.7** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by each selling Holder and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(v)     use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the Lead Underwriters or managing underwriters reasonably request (or, in the event the registration statement does not relate to an underwritten offering, as the selling Holders of a majority of such Registrable Securities being offered may reasonably request); use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts and things which may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such selling Holder in such jurisdictions; <u>provided</u>, <u>however</u>, that the Corporation shall not be required to (A) qualify

14

generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction or (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject;

(vi)    promptly notify each selling Holder and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation, or threatened initiation, of any proceedings for that purpose, or (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vii)    permit any selling Holder that might reasonably be deemed to be an underwriter or a Controlling Person of the Corporation to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Corporation in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(viii)    make available members of the management of the Corporation or the applicable Corporation subsidiaries for reasonable assistance in the selling efforts relating to any offering of Registrable Securities covered by a registration statement filed pursuant to this Agreement, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and road shows); provided, however, that management need only be made available for one such offering for each of the UST Holdco, Canada and the VEBA in any twelve (12) month period;

(ix)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Corporation's first fiscal quarter commencing after the effective date of a registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement shall be deemed to be satisfied if the Corporation timely files complete and

15

accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(x)    if requested by the Lead Underwriters, managing underwriters or any selling Holder, promptly incorporate in a prospectus supplement or post-effective amendment such information as the Lead Underwriters, managing underwriters or any selling Holder reasonably requests to be included therein, including, with respect to the Registrable Securities being sold by the selling Holders, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(xi)    as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each selling Holder;

(xii)    cooperate with the selling Holders and Lead Underwriters or the managing underwriters to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the Lead Underwriters, managing underwriters or such selling Holders may request at least two (2) business days prior to any sale of the Registrable Securities and keep available and make available to the Corporation's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(xiii)    promptly make available for inspection by any selling Holder, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or Representative retained by any such selling Holder or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (xiii) if (A) the Corporation believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) such selling Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in a form acceptable to the Corporation; and provided, further, that each selling Holder of Registrable Securities agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent

jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xiv)    furnish to each selling Holder and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Corporation (which may be in-house counsel) provided that such counsel is reasonably acceptable to such Holders and the underwriter, and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the selling Holders, Lead Underwriters or managing underwriters reasonably requests;

(xv)    cause the Registrable Securities included in any registration to be (A) in the case of an IPO, listed on a securities exchange or exchanges or an inter-dealer quotation system, as determined by the Corporation, or (B) in the case of a registration other than an IPO, (1) listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed or (2) quoted on an inter-dealer quotation system if similar securities issued by the Corporation are quoted thereon, as applicable;

(xvi)    provide a transfer agent and registrar for all Registrable Securities registered hereunder and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(xvii)    cooperate with each selling Holder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("<u>FINRA</u>");

(xviii)    during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xix)    notify each selling Holder of Registrable Securities promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xx)    subject to **Section 2.1.4(b)** and **Section 2.2.2(c)**, enter into such agreements (including underwriting agreements) as are customary in connection with an underwritten registration; and

(xxi)    advise each selling Holder of such Registrable Securities, promptly after it receives notice or obtains knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(b)    The selling Holders shall reasonably cooperate with the Corporation in the preparation and filing of any registration statement under the Securities Act pursuant to this Agreement and provide the Corporation with all information reasonably necessary to complete

such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of any selling Holder (or not proceed with such registration) if such selling Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.  Promptly following any sale or other transfer of any Registrable Securities, each Holder shall notify the Corporation in writing thereof, which notice shall specify the amount and type of securities involved, the date of the sale or transfer and whether the sale or transfer was effected under a registration statement or otherwise.

(c)    Each of the parties shall treat all notices of proposed transfers and registrations, and all information relating to any blackout periods under **Section 2.1.7** received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Holder) and shall not disseminate such information.

*Section 2.6    Issuer Free Writing Prospectuses*. The Corporation represents and agrees that, unless it obtains the prior consent of the Holders of a majority of the Registrable Securities participating in a registration or offering or the approval of the counsel for such Holders, and each of the Holders represents and agrees that, unless it obtains the prior consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Corporation represents that any Issuer Free Writing Prospectus shall not include any information that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Section 2.7    Suspension of Dispositions*.  Each Holder agrees that upon receipt of any notice (a "Suspension Notice") from the Corporation of the happening of any event of the kind described in **Section 2.5(a)(vi)(B)** or **(C)** or **Section 2.5(a)(xxi)** such Holder shall forthwith discontinue disposition of Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "Advice") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Corporation, such Holder shall deliver to the Corporation all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.  In the event the Corporation shall give any such notice, the time period regarding the effectiveness of registration statements set forth in **Section 2.5(a)(ii)** hereof, if applicable, shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Securities covered by such registration statement shall have received the copies of the supplemented or amended prospectus or the Advice.  The Corporation shall use its reasonable best efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable.

*Section 2.8    Registration Expenses*.  The Corporation shall pay all reasonable fees and expenses incident to the performance of or compliance with its obligations under this **Article 2**, including (a) all registration and filing fees, including fees and expenses (i) with respect to filings required to be made with all applicable securities exchanges and/or FINRA and (ii) of compliance with securities or "blue sky" laws including any fees and disbursements of counsel for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities pursuant to **Section 2.5(a)(v)**, (b) printing expenses, including expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by the Lead Underwriters or managing underwriter(s), if any, or by the Holder, (c) messenger, telephone and delivery expenses of the Corporation, (d) fees and disbursements of counsel for the Corporation, (e) expenses of the Corporation incurred in connection with any "road show" or other marketing efforts, (f) fees and disbursements of all independent certified public accountants (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to this Agreement) and any other Persons, including special experts, retained by the Corporation, and (g) fees up to $250,000 plus reasonable disbursements of one legal counsel for the Requesting Holders in connection with each registration or offering of their Registrable Securities or sale (including, for the avoidance of doubt, a Take-Down) of their Registrable Securities under a Shelf Registration but only if such registration, offering or sale either is effected or, pursuant to **Section 2.7**, is postponed.  For the avoidance of doubt, the Corporation shall not be required to pay any, and each Holder shall pay its own, underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any registration statement, or any other expenses of any Holder.  In addition, the Corporation shall bear all of its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange or inter-dealer quotation system on which similar securities issued by the Corporation are then listed and the fees and expenses of any Person, including special experts, retained by the Corporation.

*Section 2.9    Indemnification*.

*Section 2.9.1    Indemnification by the Corporation*.  The Corporation agrees to indemnify and hold harmless, to the fullest extent permitted by law, each Holder, the trustees of any Holder, the investment manager or managers acting on behalf of any Holder with respect to the Registrable Securities, Persons, if any, who Control any of them, and each of their respective Representatives (each an "Indemnitee"), from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable costs of investigation and legal expenses) ("Losses") arising out of or caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement described herein or any related prospectus or Issuer Free Writing Prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto), or arising out of or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the

Corporation in writing by such Indemnitee or any Person acting on behalf of such Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (a) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the respective Holder that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (b) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to such Holder a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (c) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (d) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (c) above.  This indemnity shall be in addition to any liability the Corporation may otherwise have under this Agreement or otherwise.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or any indemnified party and shall survive the transfer of Registrable Securities by any Holder.

Section 2.9.2   Indemnification by the Holders.   Each Holder (other than the Government Holders and the VEBA) agrees, to the fullest extent permitted under applicable law severally and not jointly, to indemnify and hold harmless each of the Corporation, its directors, officers, employees and agents, and each Person, if any, who Controls the Corporation, to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the respective Holder or such underwriter, as the case may be, expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto).  No claim against the assets of any Holder shall be created by this **Section 2.9.2**, except as and to the extent permitted by applicable law.  Notwithstanding the foregoing, no Holder shall be liable to the Corporation or any such Person for any amount in excess of the net amount received by the Holder from the sale of Registrable Securities in the offering giving rise to such liability.

Section 2.9.3   Indemnification Procedures.

(a)     In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted where indemnity may be sought by an Indemnitee pursuant to any of the preceding paragraphs of this **Section 2.9**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability which it may have to such Indemnitee except to the extent that the Indemnitor

20

was prejudiced by such failure to notify.  The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.9.3(a)**) the Indemnitee and any others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (a) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (b) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall only be responsible for the reasonable fees and expenses of such counsel.  It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any local counsel) for all such Indemnitees not having actual or potential differing interests or legal defenses among them, and that all such fees and expenses shall be reimbursed as they are incurred.  The Indemnitor shall not be liable for any settlement of any proceeding affected without its written consent.

(b)    If the indemnification provided for in this **Section 2.9** is unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such Losses, as well as any other relevant equitable considerations.  If the indemnification described in **Section 2.9.1** or **Section 2.9.2** is unavailable to an Indemnitee, the relative fault of the Corporation, any Holder and Persons acting on behalf of or Controlling the Corporation or any such Holder shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, a Holder or by Persons acting on behalf of the Corporation or any Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The Indemnitor shall not be required to contribute pursuant to this **Section 2.9.3(b)** if there has been a settlement of any proceeding affected without its written consent.  No claim against the assets of any Holder shall be created by this **Section 2.9.3(b)**, except as and to the extent permitted by applicable law.  Notwithstanding the foregoing, no Holder shall be required to make a contribution in excess of the net amount received by such Holder from the sale of Registrable Securities in the offering giving rise to such liability.  For the avoidance of doubt, neither the Government Holders nor the VEBA shall be required to make any contribution to any Indemnitee under this Section 2.9.3(b).

*Section 2.9.4   Survival.*  The indemnification contained in this **Section 2.9** shall remain operative and in full force and effect regardless of any termination of this Agreement.

*Section 2.10    Transfer of Registration Rights*. The rights and obligations of a Holder under this Agreement may be assigned to any transferee or assignee that directly acquires Registrable Securities from such Holder (including, without limitation, in connection with any such assignment by either Government Holder or the VEBA to an affiliate Controlled by such Governmental Holder or the VEBA, as applicable, and in connection with any such assignment by the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction), but only if (a) the respective Holder agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Corporation concurrent with such transfer or assignment and (b) concurrent with such transfer or assignment, such transferee or assignee furnishes the Corporation with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being transferred or assigned, and the transferee or assignee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein as a Holder hereunder.  Notwithstanding the foregoing, the rights of the Debtor under this Agreement shall not be assigned by the Debtor in connection with the distribution of any Registrable Securities from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction other than any distribution of any Registrable Securities that may be deemed to have been made from the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

*Section 2.11    Rule 144*.  After such time as the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act, the Corporation shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and shall take such further action as the Holders may reasonably request, all to the extent required from time to time to enable the Holders to sell Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC.  The Corporation shall promptly upon the request of any Holder furnish to such Holder evidence of the number of shares of Common Stock then outstanding, as of the most recent date practicable. Any sale or transfer by a Holder of Registrable Securities that could have been effected either as a sale of securities pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision) or a sale covered by a Shelf Registration shall be deemed for all purposes under this Agreement to be a sale or transfer by such Holder pursuant to, and in accordance with, Rule 144 under the Securities Act.

*Section 2.12    Preservation of Rights*.

(a)   The Corporation will not (x) grant any registration rights to third parties which are inconsistent with the rights granted hereunder or (y) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates the rights expressly granted to the Holders in this Agreement.

(b)  If the Corporation grants any registration rights to a third party that are more favorable to such party than the rights granted to the UST Holdco, Canada and the VEBA

hereunder, the UST Holdco, Canada and the VEBA shall be entitled to the same registration rights as such third party.

## ARTICLE 3
## TERMINATION

*Section 3.1    Termination.*    Other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the obligations of the Corporation hereunder shall terminate upon the time when there are no Registrable Securities remaining.    With respect to each Holder, other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the rights and obligations of such Holder hereunder shall terminate when such Holder no longer holds any Registrable Securities and, with respect to the Debtor, has no further right to receive additional securities of the Corporation pursuant to Section 3.2 of the Master Sale and Purchase Agreement.    Notwithstanding the foregoing, all liabilities or obligations under **Sections 2.8** and **2.9** and **Article 4** shall remain in effect in accordance with the terms of such provisions.

## ARTICLE 4
## MISCELLANEOUS

*Section 4.1    Notices*.    Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

[_____]
[_____]
[_____]
Attention:  [_____]
Telephone: [_____]
Facsimile:  [_____]

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
       R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile:  212-504-6666

If to the UST Holdco:

[_____]
[_____]
[_____]
Attention:  [_____]
Telephone: [_____]
Facsimile:  [_____]

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
            R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile:  212-504-6666

If to Canada:

7176384 Canada Inc.
1235 Bay Street, Suite 400
Toronto, ON M54 3K4
Attention:  Mr. Michael Carter
Facsimile:  416-934-5009

with a copy to:
Patrice S. Walch-Watson, Esq.
Torys LLP
79 Wellington Street West
Suite 3000
Toronto, ON M5K 1N2
Facsimile: 416-865-7380

If to the VEBA:

UAW Retiree Medical Benefits Trust
P.O. Box 14309
Detroit, Michigan 48214

with a copy to:
Daniel W. Sherrick
General Counsel
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan 48214

Telephone:  *[_____]*
Facsimile: 313-822-4844

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Attention: Richard S. Lincer & David I. Gottlieb


If to the Debtor:

[_____]
[_____]
[_____]
Attention:  [_____]
Telephone: [_____]
Facsimile:  [_____]

with a copy to:
Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attention: Brian R. Boch
            Catherine Abbott
Telephone: 312-222-9350
Facsimile: 312-527-0484

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller
            Stephen Karotkin
            Raymond Gietz
Telephone: 212-310-8000
Facsimile: 212-310-8007

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 4.1**, then to the last addressee as so designated.

Section 4.2    *Authority*.  Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.3    *No Third Party Beneficiaries*.  This Agreement shall be for the sole and exclusive benefit of (a) the Corporation and its successors and permitted assigns, (b) each Holder (including any trustee thereof) and any other investment manager or managers acting on behalf of such Holder with respect to the Common Stock, Preferred Stock, or the Warrants and their respective successors and permitted assigns and (c) each of the Persons entitled to indemnification under **Section 2.9** hereof.  Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 4.4    *No Personal Liability by Trustees*.  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the UST Holdco managers and the VEBA Designee not individually or personally but solely in their respective capacities as managers and trustees in the exercise of the powers and authority conferred and vested in them as such trustees and under no circumstances shall any trustee or former trustee have any personal liability in the trustee's individual capacity in connection with this Agreement or any transaction contemplated hereby.

Section 4.5    *Cooperation*.  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

Section 4.6    *Governing Law; Forum Selection*.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

Section 4.7    *WAIVER OF JURY TRIAL*.  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 4.8    *Successors and Assigns*.  Except as otherwise expressly provided herein, including pursuant to **Section 2.10**, neither this Agreement nor any of the rights, interests or

obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void. Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation, each Holder, and their respective successors and permitted assigns; provided, that, for the avoidance of doubt, any Person who receives securities of the Corporation as a distribution from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction (other than any such Person that is a successor in interest to the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction) shall not be bound by or have any rights pursuant to this Agreement.

Section 4.9    *Entire Agreement*.  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.  This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 4.10    *Severability*.    Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 4.11    *Enforcement of this Agreement*.  The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 4.12    *Amendment*.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 4.13    *Headings*.    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 4.14    *Counterparts; Facsimiles*.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.  All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

Section 4.15    *Time Periods*.    Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

Section 4.16    *No Binding Effect on U.S. Government*. Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be binding on or create any obligation on the part of the United States Department of the Treasury or any other department or any agency or branch of the United States Government, or any political subdivision thereof.

Section 4.17    *Canada*.    Notwithstanding anything in this Agreement to the contrary, Canada shall be bound by this Agreement only in its capacity as a Holder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch of the Government of Canada or subdivision thereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Equity Registration Rights Agreement on the date first above written

**[CORPORATION]**

By: _____
Name: _____
Title:  _____


**[UST HOLDCO]**

By: _____
Name: _____
Title:  _____


**7176384 CANADA INC.**

By: _____
Name: _____
Title:  _____

By: _____
Name: _____
Title:  _____


**UAW RETIREE MEDICAL BENEFITS TRUST**

By: _____
Name: _____
Title:  _____


**[DEBTOR]**

By: _____
Name: _____
Title:  _____

**Annex I**

| Holder | Number of Shares of Common Stock |
|---|---|
| UST Holdco | |
| Canada | |
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Common Stock for Which Warrants Are Initially Exercisable |
|---|---|
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Series A Preferred Stock |
|---|---|
| UST Holdco | |
| Canada | |
| VEBA | |
| Total: | |

# EXHIBIT E

# FORM OF TRUST AGREEMENT AMENDMENT

## AMENDMENT TO THE
## UAW RETIREE MEDICAL BENEFITS TRUST

WHEREAS, General Motors Corporation ("GM"), agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU").

WHEREAS, GM, the UAW, along with class representatives of the plaintiff class members in the case of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, aff'd, Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) entered into a settlement agreement, and thereafter, GM, the UAW, and the class representatives entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "GM Retiree Settlement"), which provides for GM to make certain deposits and remittances to the UAW Retiree Medical Benefits Trust (the "Trust") for the provision of retiree medical benefits.

WHEREAS, subsequent to entering into the MOU and the GM Retiree Settlement, GM filed a bankruptcy action known as ***[Insert case]*** (the "Bankruptcy Proceeding") pursuant to which [GM Newco] purchased certain assets of GM.

WHEREAS, the UAW asserted, and [GM Newco] denied, that [GM Newco] was bound by the terms of the MOU as a successor to GM and was therefore responsible for providing the retiree medical benefits contemplated in the MOU and the GM Retiree Settlement.

WHEREAS, [GM Newco] and the UAW entered into a settlement agreement (the "[GM Newco] UAW Retiree Settlement Agreement") that was approved by the court in the Bankruptcy Proceeding pursuant to which [GM Newco] agreed to provide retiree medical benefits to those that were entitled to retiree medical benefits from GM pursuant to the MOUs and the GM Retiree Settlement in exchange for UAW waiving its claim that [GM Newco] was a successor to GM and responsible for GM's liabilities under the MOUs and the GM Retiree Settlement.

WHEREAS, as part of the [GM Newco] UAW Retiree Settlement Agreement, [GM Newco] agreed to provide benefits under a plan adopted by [GM Newco] and subsequently amended pursuant to the terms of the [GM Newco] UAW Retiree Settlement Agreement.

WHEREAS, the [GM Newco] UAW Retiree Settlement Agreement provides for the Trust to be amended with respect to [GM Newco] to, among other things, allow the Committee to amend the [GM Newco] Retiree Plan on or after January 1, 2010 to modify benefit levels thereunder as well as to eliminate any reference in the Trust to the special pass-through benefit.

NOW THEREFORE, the Committee amends the Trust, effective ***[insert date]*** as follows (additions bold-underline) (deletions bold-strikethrough):

1.      Inserted after paragraph 16 in the preamble the following:

        **WHEREAS, the Trust is amended to provide for the settlement agreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated [insert date here].**

2.      The term "GM Eligible Group" is amended throughout to read "[GM Newco] Eligible Group."

3.      The term "GM Retiree EBA" is amended to read "[GM Newco] Retiree EBA."

4.      The term "GM Retiree Plan" is amended to read "[GM Newco] Retiree Plan."

5.      The term "UAW GM Retirees Medical Benefits Plan" is amended to read "[GM Newco] UAW Retirees Medical Benefits Plan."

6.      The term "GM Separate Retiree Account" is amended to read "[GM Newco] Separate Retiree Account."

7.      The term "GM Employer Security" is amended to read "[GM Newco] Employer Security."

8.      Section 1.32 is amended to read as follows:

~~GM~~**[GM Newco]** Retiree EBA.  The UAW ~~GM~~**[GM Newco]** Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

9.      Section 1.34 is amended to read as follows:

~~GM~~**[GM Newco] UAW** Retiree Settlement **Agreement**.   The settlement ~~of the claims in~~**agreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated** *[insert date here]* ~~*UAW v. General Motors Corp., Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007)*~~.

10.     Section 1.14 is amended to read as follows:

The term Company shall mean Newco, Ford, or ~~GM~~**[GM Newco]**, as the case may be (collectively the "Companies").

11.     Section 1.36 is amended to read as follows:

Implementation Date.  The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in ~~the GM Retiree Settlement or~~ the Newco UAW Retiree Settlement Agreement, **or the "Closing Date" as defined in the [GM Newco] UAW Retiree Settlement Agreement**, as applicable, or with respect to the Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

12.     Section 1.47 is amended to read as follows:

Settlements.  The ~~GM~~**[GM Newco] UAW** Retiree Settlement **Agreement**, the Newco UAW Retiree Settlement Agreement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

13.     Insert a new Section 1.54 after Section 1.53 to read as follows:

**[GM Newco].  [ _____ ], its successors and assigns.**

14.     Section 3.2 is amended to read as follows:

Receipt of Funds.  The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company, other than **(i)** any Newco Employer Security contributed pursuant to the Newco UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 25(A) thereof **or (ii) any [GM Newco] Employer Security contributed pursuant to the [GM Newco] UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 28(A) thereof**, shall be accepted only upon the direction of the Independent Fiduciary.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

15.     Insert a new Section 3.8 after Section 3.7 to read as follows:

**Notwithstanding any other provision of the Trust Agreement, including without limitation Sections 3.4, 6.1(f), 11.2 and Exhibit H, the Committee shall have the power to exercise any right of the Trust with respect to designation or replacement of any director of a Company.**

16.     Insert as the last sentence of Section 6.1 the following:

**For the avoidance of doubt, prior to the appointment of the Independent Fiduciary under Section 11.3, the Committee shall have all the powers of the Independent Fiduciary under this Section 6.1.**

17.     Section 9.9(a) is amended to read as follows:

Each Member of the Committee present at the meeting shall have one vote.  Except as otherwise specified in this Trust Agreement, all actions of the Committee shall be by majority vote of the entire Committee, provided that at least one Independent Member and one Union Member must be a Member in the majority for any Committee action to take effect.  Notwithstanding anything in this Subsection 9.9(a) to the contrary, any action by the Committee **to establish or modify Benefits** ~~taken after the 2011 calendar year that would not be permitted under Subsection 10.2(d) before the expiration of the 2011 calendar year~~ shall require an affirmative vote of nine (9) Members to take effect.

18.    Section 9.10(a) is amended to read as follows:

Independent Members shall receive an annual retainer of $30,000, payable in equal quarterly installments in arrears, and a meeting fee of $2,000 for each meeting of the Committee in which such Independent Member participates, provided, however, that the combination of retainer and meeting fees shall not exceed $46,000 per calendar year**; provided further, however, that in view of the need for more frequent meetings during 2009, this limit shall be applied in a manner that permits a maximum of 12 compensated meetings during 2009**.  In the event that an Independent Member's tenure on the Committee ends on a day other than the last day of the quarter for which a quarterly installment of his or her annual retainer is due, he or she shall be paid for the pro rata portion of such quarter that coincides with his or her tenure on the Committee.  For purposes of the meeting fee, participation by telephone or other simultaneous communication device shall qualify an Independent Member for a participation fee only if the meeting is scheduled and anticipated to last at least one (1) hour.  Participation in telephonic conferences to address ad hoc issues do not qualify an Independent Member for a participation fee.

19.    Section 9.11(b) is deleted.

20.    Section 10.2(d) is amended to read as follows:

Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2)~~, and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3)~~.  The Benefits specified in Exhibit~~s F(1),~~ F(2) ~~and F(3)~~ shall be the Benefits provided for under the terms of **the Ford Retiree** ~~each Company's respective~~ Settlement.  During the period that the **Ford Retiree** Plan~~s~~ ~~are~~ **is** providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to ~~Section 5.A.2(h) of the Settlement Agreement between GM and UAW dated December 16, 2005 and~~ Section <mark>___</mark> of the Settlement Agreement between Ford and UAW dated <mark>_____</mark>

21.    Section 10.20 is amended to read as follows:

Presumption of Control.  The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own ~~GM's~~**[GM Newco] Employer Securities under the terms of the [GM Newco] UAW Retiree Settlement Agreement** ~~common stock,~~ Ford's Common Stock~~, the 6.75% Series U Convertible Senior~~

~~Debentures Issued by GM Due December 31, 2012,~~ or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

22.    Section 12.4 is amended to read as follows:

In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Newco, Ford, and ~~GM~~**[GM Newco]** – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

23.    Exhibit F(3) is deleted.

24.    The last paragraph of Article I is amended to read as follows:

Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the ~~GM~~**[GM Newco] UAW Retiree** Settlement **Agreement** when relating to GM and/or the GM **Newco** Eligible Group, the GM EBA, the ~~GM~~**[GM Newco]** Retiree Plan and the ~~GM~~**[GM Newco]** Separate Retiree Account.   Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Newco UAW Retiree Settlement Agreement when relating to Newco and/or the Newco Eligible Group, the Newco EBA, the Newco Retiree Plan and the Newco Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account.  If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

25.    Any defined term under the Trust Agreement that has been replaced or modified pursuant to this Amendment shall be replaced or modified throughout the Trust Agreement.


*[The Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST**

<u>**INDEPENDENT MEMBERS**</u>

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]


<u>**UAW MEMBERS**</u>

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]

_____                Dated: _____
[**insert name**]


<u>**TRUSTEE**</u> [**insert name of institution**]


By: _____           Dated: _____
    [**insert name**]

# EXHIBIT F

# 2009 BENEFITS CHANGES

# 2009 Benefits Changes

Beginning with claims incurred on the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the benefit plan provided by GM for UAW- represented retirees, surviving spouses and their eligible dependents as amended by the Settlement Agreement approved by the Court July 31, 2008, will be changed as follows:

| | |
|---|---|
| Prescription Drug Co-Pays (applicable to all retirees, surviving spouses and their eligible dependents).[a] | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand (formulary and non-formulary)<br>• $25 Specialty<br><br>Mail Order (90 day supply)<br>• $20 Generic<br>• $50 Brand (formulary and non-formulary)<br>• $50 Specialty |
| Catastrophic Plan for retirees and surviving spouses (and their eligible dependents) who elect into the Plan or fail to pay required monthly contributions. | Plan no longer offered.<br><br>Impacted retirees, surviving spouses and eligible dependents will be defaulted into the Traditional Care Network (TCN) unless "no coverage" is specifically requested. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra).[a] | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension. |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Aciphex, Prevacid, Protonix).[a] | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome. |
| Vision Program | No longer offered. |
| Dental Program | No longer offered. |
| Emergency Room Co-Pay [a] | $100 (waived if admitted). |
| Medicare Part B Special Benefit ($76.20 per month for Medicare-eligible retirees) enrolled in Medicare | No longer offered by health plan.<br><br>This benefit is no longer offered by the Health Care Plan. This modification is not applicable to approximately 21,500 retirees and surviving spouses who are currently receiving the benefit and who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust. There will be no change in these payments from the pension trust for the retirees described in the preceding sentence. |
| "Protected Retirees" who meet the provisions of | Monthly contribution requirement of $11 (flat rate |

| the Affordability Test (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33). [a] | regardless of family status).<br><br>In all other respects, the same administrative provisions and plan design requirements applicable to all other General retirees shall apply. |
|---|---|
| | |
| Monthly Contribution Requirements (General Retirees) [a] | No change (currently $11/single and $23/family). |
| | |
| Deductible, Co-Pay and out-of-pocket (OOP) Requirements (General Retirees) | No changes<br>• Deductible: $164 single/$328 family<br>• Co-insurance: 10% in network 30% out of network<br>• OOP Max: $273 single in network $546 family in network |
| | |
| Implementation | The parties will work together to effect a mutually-agreed transition and implementation as soon as practicable.  GM and the UAW will mutually agree upon communications. |
| | |
| Dependents Eligibility – Retirees | Effective upon receipt of necessary court approvals, no new Principally Supported Children or Sponsored Dependents will be enrolled pursuant to the provisions the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any child enrolled as a Principally Supported Child pursuant to the provisions of the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent. |

a. Modifications also to be comprehended in the HMO plan designs.

2

# EXHIBIT G

# NATIONAL INSTITUTE FOR HEALTH CARE REFORM TERM SHEET

## National Institute for Health Care Reform

Term Sheet

1. The Institute will be established as an industrywide labor management committee to conduct research and to analyze the current financing and medical delivery systems in the United States, develop targeted and broad-based reform proposals to improve the quality, affordability and accountability of the system, and educate the public, policymakers and others about how these reforms could address the deficiencies in the current system, e.g., skyrocketing costs, massive number of people left uninsured, profit driven decision-making on delivery of care, etc.

2. The Institute is intended to be a premier research and educational health care reform "think tank" dedicated to understanding, evaluating and developing thoughtful and innovative reform measures that would improve the financing and medical delivery systems in the U.S. and expand access to high quality, affordable and accountable health coverage for all Americans.

3. The Institute will be authorized to:

    a. Engage economists, analysts, academics and others who are experts on the U.S. and other health care systems as well as the public policies, physician, hospital and other provider systems that would need to be changed to improve health care quality, affordability and accountability in the U.S.

    b. Conduct studies and analyses of the current system and alternative structures, including ways to provide more effective sources of coverage for early retirees, reduce prescription drug costs, ensure drug safety and better inform patients of appropriate drug choices.

    c. Operate as a clearinghouse for select best practices that should be employed throughout the medical delivery system to ensure that error-free, high quality health care is available throughout the U.S.

    d. Develop innovative policy solutions to improve the current health care system.

    e. Host forums for discussion and debate of public policies that would improve the health care system and facilitate the interaction of ideas among experts.

    f. Formulate wide-ranging communications materials that discuss and describe reform measures.

4. The Institute shall be established as a non-profit, tax-exempt organization pursuant to section 501(c)(3) of the Internal Revenue Code (the "Code").  Neither GM nor the UAW will do anything to jeopardize the 501(c)(3) status of the Institute or disqualify the Institute from obtaining this status.

5. GM agrees to provide funding to the Institute of $3 million annually for five (5) years, provided that Ford Motor Company and Chrysler Corporation participate in the Institute and provide proportional funding.

6. GM and the UAW will be free, at a future date, to establish other organizations to support the mission of the Institute, including but not limited to an organization qualified under section

501(c)(4) of the Code, provided that the governance of any such additional organization(s) shall be structured in accordance with Paragraphs 7 and 9 below.

7. The Institute shall be governed by a Board of Directors consisting of an equal number of labor and management representatives and a President. The Bylaws shall provide that, in any matter considered by the Board of Directors, the labor and management representatives shall have equal voting strength. The UAW shall appoint the labor representatives and GM shall appoint its management representative(s). GM, the UAW and any other contributing Institute members having a representative(s) on the Board shall have the right to change any of their appointed members at any time and for any reason. The President shall be entitled to participate in all meetings of the Board of Directors.

8. The Board shall operate according to a set of bylaws that are agreed to by the labor and management representatives of the Board consistent with the provisions of this term sheet.

9. The Board shall at all times strive to operate by consensus. In the event consensus can not be achieved, all decisions made by the Board shall be governed by a super-majority, except as otherwise provided in this paragraph 9 of this Term Sheet. A super-majority shall be defined as a minimum of all but one vote of the labor and management members of the Board, with no single company having the right to block a decision by the Board. The approval of additional Institute members, sponsors, affiliates or Board seats, any change to the voting or consensus requirements, and/or any change to the purpose or intent of the Institute will require the unanimous approval of the labor and management members of the Board.

10. The Institute shall work to minimize its administrative expenses and waste. GM and the UAW shall have the right to audit and review Institute finances and spending.

11. Lobbying will be permitted to the extent allowed for 501(c)(3) organizations. The names, brands, or logos of the UAW, GM and any other members of the Institute may not be used in Institute publications, press releases, statements, websites, or other communications or materials and the Institute or its employees or affiliates may not state, suggest or imply that any of the parties support any proposals, conclusions, or recommendations without the prior consent of the party whose support is being stated, suggested or implied. The UAW, GM and any other members of the Institute may use or reprint Institute material, but may not suggest support from any of the other parties or use their names, brands, or logos without their prior consent.

12. GM reserves the right to reduce or withdraw its funding upon 30 days notice if: a) Ford and/or Chrysler do not participate in the Institute and provide proportional financial support; b) the Institute loses its status as, or is failed to be recognized as, a section 501(c)(3) tax-exempt organization; c) inappropriate financial activity is discovered; (d) the institute, its employees or its members or affiliates engage in lobbying activities beyond those described in paragraph 11 of this Term Sheet; or e) any of the restrictions about the use of GM's name, brand, or logos is violated.

13. GM and the UAW will work together to assure the rapid and effective start-up of the Institute.

# EXHIBIT H

# [Reserved]

# EXHIBIT I

# FORM OF [NEWCO] NOTE

Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit Y to the MSPA.

# EXHIBIT J

# FORM OF PREFERRED STOCK CERTIFICATE OF DESIGNATIONS

FORM OF CERTIFICATE OF DESIGNATIONS

OF

SERIES A FIXED RATE CUMULATIVE PERPETUAL PREFERRED STOCK

OF

## [VEHICLE ACQUISITION HOLDINGS LLC][1]

*[Vehicle Acquisition Holdings LLC]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[_____]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares*. There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock"). The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions*. The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions*. The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the

---

[1] Note: Vehicle Acquisition Holdings LLC to convert to a corporation before Closing.

1

Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters*.   For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by *[_____]*, its *[_____]*, this *[__]* day of *[_____]*, 2009.

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____
Name: *[_____]*
Title: *[_____]*

3

1766819

ANNEX A

## STANDARD PROVISIONS

Section 1.    *General Matters; Ranking*. Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions*. As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends*.

(a)     **Rate**. Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)    **Priority of Dividends**. So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

6

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up*. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption*.

(a)    **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date").  On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)    **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)    **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)     **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)     **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)     **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)     **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)     **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)    **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)    Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)    Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10

7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)    Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)    **Changes after Provision for Redemption**. No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)    **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

11

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders*. To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices*. All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights*. No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates*. The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights*. The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form.*

(a)    The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)    If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC.  Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)    Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)    So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes.  Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)    Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)    Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees.  Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)    A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days.  In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest.  Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend.  Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.    *Transfer Restrictions and Legends.*  (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 15.    *Transfer, Exchange and Substitution*.    (a) Series A Preferred Share Certificates shall be issued in registered form only.  The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided.  All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)    A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer.  Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates.  The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent.  Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)    When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.    To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

(e)     If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16.  *Surrender of Series A Preferred Share Certificates*.  Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof.  The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17.  *Transfer Agent And Registrar*.  The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be *[_____]* (the "Transfer Agent"). The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

## EXHIBIT A

FORM OF SERIES A FIXED RATE CUMULATIVE
PERPETUAL PREFERRED STOCK
($25 LIQUIDATION PREFERENCE)

NUMBER                                                             SHARES

*[_____]*                                              *[_____]*

                                                      CUSIP *[_____]*

### [NEWCO]
### INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE
### THIS CERTIFICATE IS TRANSFERABLE

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

17

This is to certify that _____, is the owner of *[__]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of [NEWCO] (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated: [____], 2009

_____
Name:
Title:

_____
Name:
Title:

Countersigned and Registered

_____ ,
as Transfer Agent and Registrar

By: _____
            Authorized Signature

18

1766819

### [NEWCO]

[NEWCO] (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | - as tenants in common | UNIF GIFT MIN ACT- _____ Custodian _____ |
| TEN ENT | - as tenants by the entireties | (Minor) (Cust) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | under Uniform Gifts to Minors Act _____ (State) |

Additional abbreviations may also be used though not in the above list.

_____

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____

_____

_____ shares of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

Dated_____

_____
Signature

NOTICE: The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____

NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

20

**EXHIBIT B**

**FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS**

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

To [NEWCO] (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [_____]

[Insert name of transferee]

By: _____
     Name:
     Title:

21

## EXHIBIT C

## GLOBAL SHARE LEGEND

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO [NEWCO] (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766819

# EXHIBIT K

# FORM OF STOCKHOLDERS AGREEMENT

Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

# EXHIBIT L

# FORM OF WARRANT

**WARRANT AGREEMENT**

**dated as of *[_____]*, 2009**

**between**

***[VEHICLE ACQUISITION HOLDINGS LLC]***

**and**

**[●]**
**as Warrant Agent**

ARTICLE 1
DEFINITIONS

Section 1.01.        Certain Definitions...................................................................... 1

ARTICLE 2
ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.        Issuance of Warrants.................................................................. 6

Section 2.02.        Execution and Authentication of Warrants........................... 7

Section 2.03.        Form of Warrant Certificates ................................................ 7

Section 2.04.        Transfer Restrictions and Legends........................................ 7

Section 2.05.        Transfer, Exchange and Substitution .................................... 9

Section 2.06.        Global Warrants ....................................................................... 10

Section 2.07.        Surrender of Warrant Certificates ........................................ 11

ARTICLE 3
EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.        Exercise of Warrants................................................................ 12

Section 3.02.        Procedure for Exercise ........................................................... 12

Section 3.03.        Settlement of Warrants ........................................................... 12

Section 3.04.        Delivery of Common Stock .................................................... 13

Section 3.05.        No Fractional Shares to Be Issued ....................................... 14

Section 3.06.        Acquisition of Warrants by Company ................................. 14

Section 3.07.        Direction of Warrant Agent ................................................... 14

ARTICLE 4
[RESERVED]

ARTICLE 5
ADJUSTMENTS

Section 5.01.        Adjustments to Exercise Price ............................................... 15

Section 5.02.        Adjustments to Number of Warrants .................................. 18

Section 5.03.        Certain Distributions of Rights and Warrants.................... 19

Section 5.04.        Shareholder Rights Plans ....................................................... 20

Section 5.05.        Other Adjustments if Net Share Settlement Applies ........ 20

Section 5.06.        Discretionary Adjustments...................................................... 20

ii

Section 5.07.    Restrictions on Adjustments ............................................................ 21

Section 5.08.    Deferral of Adjustments.................................................................... 21

Section 5.09.    Recapitalizations, Reclassifications and Other Changes ................. 22

Section 5.10.    Consolidation, Merger and Sale of Assets ........................................ 24

Section 5.11.    Common Stock Outstanding ............................................................. 24

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 25

Section 5.13.    Calculations Final ............................................................................ 25

Section 5.14.    Notice of Adjustments ...................................................................... 25

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity .......... 26

Section 5.16.    Statements on Warrants .................................................................... 26

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ................................................................ 26

Section 6.02.    Mutilated or Missing Warrant Certificates ....................................... 27

Section 6.03.    Modification, Waiver and Meetings ................................................. 27

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes ................................................................ 29

Section 7.02.    Change of Warrant Agent ................................................................. 29

Section 7.03.    Compensation; Further Assurances ................................................. 30

Section 7.04.    Reliance on Counsel ......................................................................... 31

Section 7.05.    Proof of Actions Taken .................................................................... 31

Section 7.06.    Correctness of Statements ................................................................ 31

Section 7.07.    Validity of Agreement ...................................................................... 31

Section 7.08.    Use of Agents................................................................................... 31

Section 7.09.    Liability of Warrant Agent................................................................ 32

Section 7.10.    Legal Proceedings ............................................................................ 32

Section 7.11.    Other Transactions in Securities of the Company ............................ 32

Section 7.12.    Actions as Agent .............................................................................. 32

Section 7.13.    Appointment and Acceptance of Agency .......................................... 32

Section 7.14.    Successors and Assigns..................................................................... 33

Section 7.15.    Notices ............................................................................................. 33

1766885

Section 7.16.    Applicable Law ................................................................. 33

Section 7.17.    Benefit of this Warrant Agreement .................................... 33

Section 7.18.    Registered Warrantholders ................................................. 34

Section 7.19.    Inspection of this Warrant Agreement ............................... 34

Section 7.20.    Headings ............................................................................ 34

Section 7.21.    Counterparts ...................................................................... 34


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND ...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS ..........................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

iv

# WARRANT AGREEMENT

This Warrant Agreement dated as of *[_____]*, 2009 is between *[Vehicle Acquisition Holdings LLC]*, a *[limited liability company]* organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, the Company is the resulting entity from the conversion of Vehicle Acquisition Company LLC from a Delaware limited liability company to a Delaware corporation;

WHEREAS, pursuant to the UAW Retiree Settlement Agreement dated as of *[_____]*, 2009 between the Company, by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, by and through its attorneys (the "**UAW Retiree Settlement Agreement**"), the Company has agreed to issue to the Initial Warrantholder (as defined below) an aggregate initial Number of Warrants issued hereunder equal to 15,151,515, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01. *Certain Definitions.*   As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors) and shall be determined by customary investment

1

banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date,  (2) the price of each share of Common Stock will be the Closing Sale Price as of the date of determination and (3) all other assumptions shall be made by the Board of Directors in good faith based upon the advice of an independent investment bank of national standing selected by the Board of Directors at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement dated as of June 1, 2009 by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, as may be amended, modified or supplemented in accordance with its terms.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

2

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.  Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, in connection with a dividend, issuance or distribution, the average of the Closing Sale Prices of the Common Stock for each of the 10 consecutive Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution.

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

3

1766885

"**Exercise Price**" means initially $126.92 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, December 31, 2015, regardless of whether such date is a Trading Day.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" means UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association or any "affiliate" thereof (as defined under Rule 144 under the Securities Act).

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stork or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[   ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrantholder.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock

4

sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption Notice**" has the meaning set forth in Section 5.09.

"**Reference Property**" has the meaning set forth in Section 5.09.

"**Reorganization Event**" has the meaning set forth in Section 5.09.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

5

"**Shareholders Agreement**" means the Stockholders Agreement, dated as of *[_____]*, by and among *[_____]*, as may be amended, modified or supplemented in accordance with its terms.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**UAW Retiree Settlement Agreement**" has the meaning set forth in the Recitals.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09.

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.  *Issuance of Warrants.*  (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder,

6

together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 15,151,515 (such Number of Warrants subject to adjustment from time to time as described herein).  The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)    Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.  *Execution and Authentication of Warrants.*  (a)  Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)    Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.  *Form of Warrant Certificates.*  Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities

7

exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04. *Transfer Restrictions and Legends.* (a) Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i) Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii) Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b) All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i) Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii) Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

8

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.  *Transfer, Exchange and Substitution.*  (a)  Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing. Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are

9

satisfied.  To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.  *Global Warrants.*  (a)  The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary.  Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes.  Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the

10

Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)     Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees.  Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest.  Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend.  Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)     The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07. *Surrender of Warrant Certificates.*     Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and,

except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof.  The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

ARTICLE 3

EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.  *Exercise of Warrants.*  At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).  Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.  *Procedure for Exercise.*  (a)  To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant.  However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03.  *Settlement of Warrants.*  (a)  Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.  Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical**

12

**Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05. All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.    *Delivery of Common Stock.*    (a)  In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.  *No Fractional Shares to Be Issued.*  (a)  Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.  *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent*.  (a)  The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.  In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

14

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01. *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

15

$OS_1$   =   the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$   =   the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$   =   the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$   =   the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$   =   the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

$Y$   =   the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.  In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred.  To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible

16

securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.  In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or other distribution to all holders of Common Stock of shares of the Company's Capital Stock (other than Common Stock) or evidences of the Company's indebtedness, rights or warrants to purchase the Company's securities, or the Company's assets (excluding any dividend, distribution or issuance covered by clauses (a) or (b) above or (d) below), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$ =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$ =    the Current Market Price; and

$FMV$ =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or assets so distributed, expressed as an amount per share of Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other

17

national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ =  the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ =  the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =  the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$ =  the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)     For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be  a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding"))  immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the Close of Business on the Record Date."

Section 5.02. *Adjustments to Number of Warrants.*     Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each

18

Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03. *Certain Distributions of Rights and Warrants.* (a) Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)  are deemed to be transferred with such shares of Common Stock;

(ii)  are not exercisable; and

(iii)  are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.04).

(b)  If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.04).

(c)  In addition, except as set forth in Section 5.04, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.04):

(i)  in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had

19

retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

Section 5.04.  *Shareholder Rights Plans.*  If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.  If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.05.  *Other Adjustments if Net Share Settlement Applies.*  To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06.  *Discretionary Adjustments.*  The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days.  In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect.  The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting

20

1766885

from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.*    (a)    Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on a basis and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made annually, on each anniversary of the Closing Date and  five Business Days prior to the Expiration Date, unless such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08. *Deferral of Adjustments.*  In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock)

21

(each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.  For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.  *Recapitalizations, Reclassifications and Other Changes.*  (a)  If any of the following events occur:

(i)    any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)    any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, following the effective time of the transaction, other than with respect to a Reorganization Event described in Section 5.09(e), the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").  In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

22

(b)      At any time from, and including, the effective time of a Reorganization Event:

(i)      if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)      if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)      the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)      the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)      The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)      any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)      any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)      any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)      Other than as provided in Section 5.09(e), on or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.  If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall use commercially reasonable efforts to cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as

23

nearly equivalent as may be practicable to the adjustments provided for in this Article 5.  In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.  Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)    Prior to the occurrence of any Reorganization Event set forth in Section 5.09(a)(iii) or (iv), with respect to which each share of Common Stock is converted into the right solely to receive Cash in an amount less than the Exercise Price, on or before the closing date of such Reorganization Event, the Company shall deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating the Company's intent to redeem all Warrants at a price per Warrant equal to the Black Scholes Warrant Value for such Warrant measured as of the date immediately prior to the closing date of such Reorganization Event.  In the event the Company delivers a Redemption Notice:  (i) any right to exercise a Warrant shall terminate at 5:00 p.m. on the closing date of such Reorganization Event; and (ii) following the closing of such Reorganization Event, the Warrants shall have no further rights except to receive, upon surrender of the Warrant Certificate, the redemption price set forth in such Redemption Notice, without interest.

(f)    The Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 shall apply to such event or occurrence.

Section 5.10.  *Consolidation, Merger and Sale of Assets.*  (a)  The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

24

1766885

(b)     In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.  *Common Stock Outstanding.*  For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12.  *Covenant to Reserve Shares for Issuance on Exercise.*  (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)     The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.  The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.  Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)     If permitted or required by the rules of any national securities exchange or over the counter market or other domestic market on which the Common Stock is listed at any time, if any, the Company shall apply to have listed or quoted all shares of Common Stock issued upon exercise of the Warrants (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto) on any such exchange or market.

Section 5.13.  *Calculations Final.*  The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 5.14.  *Notice of Adjustments.*  Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15. *Warrant Agent Not Responsible for Adjustments or Validity.*  The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed,  herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.*  The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.  However, the Company may at any time in its sole discretion (which

26

1766885

shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01. *No Rights as Stockholders.* Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02. *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03. *Modification, Waiver and Meetings.* (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of, among other things:

(i)    adding covenants for the benefit of the Warrantholders;

(ii)    adding a guarantor or other security for the benefit of the Warrantholders;

(iii)    surrendering any right or power conferred upon the Company;

27

(iv)     providing for the settlement upon exercise of Warrants if any reclassification or change of Common Stock or any consolidation, merger, sale, lease or other transfer of the consolidated assets of the Company and its subsidiaries substantially as an entirety occurs;

(v)     providing for the assumption of the Company's obligations in the case of a merger, consolidation, conveyance, sale, lease or other transfer;

(vi)     adjusting the Exercise Price or the Number of Warrants in the manner described in this Warrant Agreement;

(vii)     curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect; and

(viii)     adding or modifying any other provisions that the Company may deem necessary or desirable and which will not adversely affect the interests of the Warrantholders.

(b)     Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, either:

(i)     with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding; or

(ii)     by the adoption of a resolution at a meeting of Warrantholders called with proper notice at which a quorum is present by at least a number of Warrantholders of Warrants representing a majority of the Number of Warrants represented at such meeting.

(c)     However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)     change the Expiration Date;

(ii)     increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

(iii)     impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)     except as otherwise expressly permitted by provisions of this Warrant Agreement concerning specified reclassifications or corporate reorganizations, impair or adversely affect the exercise rights of Warrantholders,

28

including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vi)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

(d)    The quorum at any meeting called to adopt a resolution will be Persons holding or representing Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

ARTICLE 7

CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*   (a)  The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*    (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

29

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.  *Compensation; Further Assurances.*  The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.  *Reliance on Counsel.*  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.  *Proof of Actions Taken.*  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.  *Correctness of Statements.*  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

31

1766885

Section 7.07.  *Validity of Agreement.*  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.  *Use of Agents.*  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.  *Liability of Warrant Agent.*  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.  *Legal Proceedings.*  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.  *Other Transactions in Securities of the Company.*  The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 7.12.  *Actions as Agent.*  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be

32

determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.   No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13. *Appointment and Acceptance of Agency.*   The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14. *Successors and Assigns.*  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15. *Notices.*   Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

*[Vehicle Acquisition Holdings LLC]*
*[_____]*
*[_____]*
Attention:  Treasurer
Telephone:  *[_____]*
Facsimile:  *[_____]*

With a copy to:

*[_____]*
*[_____]*
*[_____]*
Attention:  *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

1766885

*[_____]*
*[_____]*
Attention:  Treasurer
Telephone:  *[_____]*
Facsimile:  *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.  *Applicable Law.*  The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.  *Benefit of this Warrant Agreement.*   Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.  *Registered Warrantholders.*   Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.  *Inspection of this Warrant Agreement.*   A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 7.20.  *Headings.*   The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

1766885

Section 7.21. *Counterparts.* This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766885

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

*[Vehicle Acquisition Holdings LLC]*

By: _____
       Name:
       Title:


[•], as Warrant Agent

By: _____
       Name:
       Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT B**

## FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THESE SHARES OF COMMON STOCK ARE ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THESE COMMON SHARES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

B - 1

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766885

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

D - 1

*[VEHICLE ACQUISITION HOLDINGS LLC]*

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between *[VEHICLE ACQUISITION HOLDINGS LLC]* and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: December 31, 2015.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, *[VEHICLE ACQUISITION HOLDINGS LLC]* has caused this instrument to be duly executed.

Dated: _____

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____

Name:
Title:

Attest

By: _____
Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

*[VEHICLE ACQUISITION HOLDINGS LLC]*

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.  A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:     [•]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)     deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)     if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____        _____
(Registered Warrantholder)




By:   _____
Authorized Signature
Address:
Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

## SCHEDULE A

## SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

The initial Number of Warrants represented by this Global Warrant is _____. In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
                              Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____

_____
Name of Transferee

By: _____
      Name:
      Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

> To *[VEHICLE ACQUISITION HOLDINGS LLC]* (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [_____]

[Insert name of transferee]

By: _____
       Name:
       Title:

E - 1

1766885

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

***[VEHICLE ACQUISITION HOLDINGS LLC]***
[_____]
[_____]
Attention:  Treasurer

Re:      DWAC Issuance
         Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between ***[VEHICLE ACQUISITION HOLDINGS LLC]*** and [●], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:         _____

                          _____ Original Issue or

                          _____ Transfer from Treasury Account

Broker Name:              _____

Broker's DTC Number:      _____

Contact and Phone:        _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent


By: _____
Name:
Title:


cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

**EXHIBIT E TO THE MSPA**

**<u>FORM OF VEBA WARRANT</u>**

**EXHIBIT E**

**FORM OF VEBA WARRANT**

**WARRANT AGREEMENT**

**dated as of *[_____]*, 2009**

**between**

***[VEHICLE ACQUISITION HOLDINGS LLC]***

**and**

**[●]**
**as Warrant Agent**

## ARTICLE 1
## DEFINITIONS

Section 1.01.        Certain Definitions................................................................... 1

## ARTICLE 2
## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.        Issuance of Warrants................................................. 6
Section 2.02.        Execution and Authentication of Warrants......................... 7
Section 2.03.        Form of Warrant Certificates ........................................ 7
Section 2.04.        Transfer Restrictions and Legends.................................. 7
Section 2.05.        Transfer, Exchange and Substitution ................................. 9
Section 2.06.        Global Warrants....................................................... 10
Section 2.07.        Surrender of Warrant Certificates................................... 11

## ARTICLE 3
## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.        Exercise of Warrants............................................... 12
Section 3.02.        Procedure for Exercise ............................................ 12
Section 3.03.        Settlement of Warrants ........................................... 12
Section 3.04.        Delivery of Common Stock ......................................... 13
Section 3.05.        No Fractional Shares to Be Issued ................................. 14
Section 3.06.        Acquisition of Warrants by Company .............................. 14
Section 3.07.        Direction of Warrant Agent ....................................... 14

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## ADJUSTMENTS

Section 5.01.        Adjustments to Exercise Price ..................................... 15
Section 5.02.        Adjustments to Number of Warrants ............................... 18
Section 5.03.        Certain Distributions of Rights and Warrants.................... 19
Section 5.04.        Shareholder Rights Plans .......................................... 20
Section 5.05.        Other Adjustments if Net Share Settlement Applies ............. 20
Section 5.06.        Discretionary Adjustments......................................... 20
Section 5.07.        Restrictions on Adjustments ...................................... 21

ii

Section 5.08.    Deferral of Adjustments.................................................................. 21

Section 5.09.    Recapitalizations, Reclassifications and Other Changes .................. 22

Section 5.10.    Consolidation, Merger and Sale of Assets........................................ 24

Section 5.11.    Common Stock Outstanding ............................................................ 24

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 25

Section 5.13.    Calculations Final .......................................................................... 25

Section 5.14.    Notice of Adjustments .................................................................... 25

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity.......... 26

Section 5.16.    Statements on Warrants .................................................................. 26

## ARTICLE 6
## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ............................................................... 26

Section 6.02.    Mutilated or Missing Warrant Certificates ....................................... 27

Section 6.03.    Modification, Waiver and Meetings ................................................. 27

## ARTICLE 7
## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes ............................................................... 29

Section 7.02.    Change of Warrant Agent ............................................................... 29

Section 7.03.    Compensation; Further Assurances .................................................. 30

Section 7.04.    Reliance on Counsel ....................................................................... 31

Section 7.05.    Proof of Actions Taken ................................................................... 31

Section 7.06.    Correctness of Statements............................................................... 31

Section 7.07.    Validity of Agreement .................................................................... 31

Section 7.08.    Use of Agents.................................................................................. 31

Section 7.09.    Liability of Warrant Agent............................................................... 32

Section 7.10.    Legal Proceedings .......................................................................... 32

Section 7.11.    Other Transactions in Securities of the Company ............................ 32

Section 7.12.    Actions as Agent ............................................................................ 32

Section 7.13.    Appointment and Acceptance of Agency ......................................... 32

Section 7.14.    Successors and Assigns.................................................................... 33

Section 7.15.    Notices ........................................................................................... 33

Section 7.16.    Applicable Law............................................................................... 33

Section 7.17.    Benefit of this Warrant Agreement.................................................. 33

iii

Section 7.18.        Registered Warrantholders.................................................................. 34

Section 7.19.        Inspection of this Warrant Agreement .............................................. 34

Section 7.20.        Headings ............................................................................................ 34

Section 7.21.        Counterparts...................................................................................... 34


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ......    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS ..........................................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

iv

# WARRANT AGREEMENT

This Warrant Agreement dated as of *[_____]*, 2009 is between *[Vehicle Acquisition Holdings LLC]*, a *[limited liability company]* organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, the Company is the resulting entity from the conversion of Vehicle Acquisition Company LLC from a Delaware limited liability company to a Delaware corporation;

WHEREAS, pursuant to the UAW Retiree Settlement Agreement dated as of *[_____]*, 2009 between the Company, by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, by and through its attorneys (the "**UAW Retiree Settlement Agreement**"), the Company has agreed to issue to the Initial Warrantholder (as defined below) an aggregate initial Number of Warrants issued hereunder equal to 15,151,515, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors) and shall be determined by customary

1

investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date,    (2) the price of each share of Common Stock will be the Closing Sale Price as of the date of determination and (3) all other assumptions shall be made by the Board of Directors in good faith based upon the advice of an independent investment bank of national standing selected by the Board of Directors at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement dated as of June 1, 2009 by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, as may be amended, modified or supplemented in accordance with its terms.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted; *provided, however*, that in the absence of such

2

quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.   Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, in connection with a dividend, issuance or distribution, the average of the Closing Sale Prices of the Common Stock for each of the 10 consecutive Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution.

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

3

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $126.92 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, December 31, 2015, regardless of whether such date is a Trading Day.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" means UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association or any "affiliate" thereof (as defined under Rule 144 under the Securities Act).

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stork or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[     ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrantholder.   If the Common Stock is not traded on the New York Stock Exchange or

4

any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption Notice**" has the meaning set forth in Section 5.09.

"**Reference Property**" has the meaning set forth in Section 5.09.

"**Reorganization Event**" has the meaning set forth in Section 5.09.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

5

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Shareholders Agreement**" means the Stockholders Agreement, dated as of *[_____]*, by and among *[_____]*, as may be amended, modified or supplemented in accordance with its terms.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**UAW Retiree Settlement Agreement**" has the meaning set forth in the Recitals.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09.

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

6

1766885

Section 2.01.   *Issuance of Warrants.*   (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 15,151,515 (such Number of Warrants subject to adjustment from time to time as described herein).   The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.   All such Warrants shall be dated as of the Closing Date.

(b)      Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)      All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.   *Execution and Authentication of Warrants.*   (a)   Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)      Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)      No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.   *Form of Warrant Certificates.*   Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements,

7

stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and   such as may be necessary to conform to customary usage.

Section 2.04.   *Transfer Restrictions and Legends.*   (a) Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions,

8

certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)     Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.    The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.    All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)     A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.    Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing. Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.    The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.    No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.    Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)     Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form

1766885

satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.    To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.    No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.    If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.    *Global Warrants.*    (a)    The Warrants shall initially be issued in the form of Certificated Warrants.    However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on

10

their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)    Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)    Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees.   Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)    A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.   In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest.   Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend.   Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

1766885

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.    *Surrender of Warrant Certificates.*    Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof.    The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    *Exercise of Warrants.*    At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).    Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.    *Procedure for Exercise.*    (a)    To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant.    However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03.    *Settlement of Warrants.*    (a)    Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply

12

upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05. All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.    *Delivery of Common Stock.*    (a)    In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.    However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).    The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.    *No Fractional Shares to Be Issued.*    (a)    Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.    If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.    *Acquisition of Warrants by Company.*    The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent.*   (a)   The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.   In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)   Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)   The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.   The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.   The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.  *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)   The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$   =   the Exercise Price in effect immediately prior to the Close of

15

Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)      The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately

16

prior to the Close of Business on the Record Date for such issuance;

X    =    the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

Y    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.   In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.   In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or other distribution to all holders of Common Stock of shares of the Company's Capital Stock (other than Common Stock) or evidences of the Company's indebtedness, rights or warrants to purchase the Company's securities, or the Company's assets (excluding any dividend, distribution or issuance covered by clauses (a) or (b) above or (d) below), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

17

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or assets so distributed, expressed as an amount per share of Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =    the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$    =    the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

18

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be   a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding"))   immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding at the Close of Business on the Record Date."

Section 5.02.    *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.    *Certain Distributions of Rights and Warrants.*    (a)    Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)    are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.04).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each

such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.04).

(c)        In addition, except as set forth in Section 5.04, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.04):

(i)        in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)        in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

Section 5.04.    *Shareholder Rights Plans.* If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.   If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.05.    *Other Adjustments if Net Share Settlement Applies.*   To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the

20

Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06.   *Discretionary Adjustments.*   The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days.   In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect.   The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07.   *Restrictions on Adjustments.*   (a)   Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)   Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)   upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)   for a change in the par value of the Common Stock.

(c)   In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)   No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on a basis and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)   No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant

21

1766885

Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made annually, on each anniversary of the Closing Date and   five Business Days prior to the Expiration Date, unless such adjustment has already been made.

(f)     If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.   For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.    *Recapitalizations, Reclassifications and Other Changes.*    (a)    If any of the following events occur:

(i)     any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)   any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)     any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, following the effective time of the transaction, other than with respect to a Reorganization Event described in Section 5.09(e), the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").   In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

(i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

23

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    Other than as provided in Section 5.09(e), on or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.    If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall use commercially reasonable efforts to cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.    Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5.    In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.    The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.    Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)    Prior to the occurrence of any Reorganization Event set forth in Section 5.09(a)(iii) or (iv), with respect to which each share of Common Stock is converted into the right solely to receive Cash in an amount less than the Exercise Price, on or before the closing date of such Reorganization Event, the Company shall deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating the Company's intent to redeem all Warrants at a price per Warrant equal to the Black Scholes Warrant Value for such Warrant measured as of the date immediately prior to the closing date of such Reorganization Event.    In the event the Company delivers a Redemption Notice:    (i) any right to exercise a Warrant shall terminate at 5:00 p.m. on the closing date of such Reorganization Event; and (ii) following the closing of such Reorganization Event, the Warrants shall have no further rights except to receive, upon surrender of the Warrant Certificate, the redemption price set forth in such Redemption Notice, without interest.

(f)    The Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent in all material respects with this Section 5.09.

24

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 shall apply to such event or occurrence.

Section 5.10.    *Consolidation, Merger and Sale of Assets.*    (a)    The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.    *Common Stock Outstanding.*    For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12.    *Covenant to Reserve Shares for Issuance on Exercise.*    (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common

25

Stock specified in this Section 5.12.   The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement.    The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.   Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)     If permitted or required by the rules of any national securities exchange or over the counter market or other domestic market on which the Common Stock is listed at any time, if any, the Company shall apply to have listed or quoted all shares of Common Stock issued upon exercise of the Warrants (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto) on any such exchange or market.

Section 5.13.   *Calculations Final.*   The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 5.14.   *Notice of Adjustments.*   Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.   The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.   The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.   *Warrant Agent Not Responsible for Adjustments or Validity.*   The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same.

26

The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01. *No Rights as Stockholders.* Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02. *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company,

27

whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.   An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.   All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.   *Modification, Waiver and Meetings.*      (a)    This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of, among other things:

(i)      adding covenants for the benefit of the Warrantholders;

(ii)      adding a guarantor or other security for the benefit of the Warrantholders;

(iii)      surrendering any right or power conferred upon the Company;

(iv)      providing for the settlement upon exercise of Warrants if any reclassification or change of Common Stock or any consolidation, merger, sale, lease or other transfer of the consolidated assets of the Company and its subsidiaries substantially as an entirety occurs;

(v)      providing for the assumption of the Company's obligations in the case of a merger, consolidation, conveyance, sale, lease or other transfer;

(vi)      adjusting the Exercise Price or the Number of Warrants in the manner described in this Warrant Agreement;

(vii)      curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect; and

(viii)      adding or modifying any other provisions that the Company may deem necessary or desirable and which will not adversely affect the interests of the Warrantholders.

(b)      Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, either:

1766885

(i)    with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding; or

(ii)    by the adoption of a resolution at a meeting of Warrantholders called with proper notice at which a quorum is present by at least a number of Warrantholders of Warrants representing a majority of the Number of Warrants represented at such meeting.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    except as otherwise expressly permitted by provisions of this Warrant Agreement concerning specified reclassifications or corporate reorganizations, impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vi)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

(d)    The quorum at any meeting called to adopt a resolution will be Persons holding or representing Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

## ARTICLE 7

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    *Payment of Certain Taxes.*    (a)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising

29

Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.    *Change of Warrant Agent.*    (a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.   If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.   If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000.   The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.   After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and

30

obligations.    Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder.    As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock.    Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act.    In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of

31

such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.  *Proof of Actions Taken.*  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.  *Correctness of Statements.*  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07.  *Validity of Agreement.*  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.  *Use of Agents.*  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.  *Liability of Warrant Agent.*  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in

32

good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.    *Legal Proceedings.*    The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.    *Other Transactions in Securities of the Company.*    The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement.    Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 7.12.    *Actions as Agent.*    The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.    The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.    No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.    No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.    The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.    *Appointment and Acceptance of Agency.*    The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.    *Successors and Assigns.*    All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

1766885

Section 7.15. *Notices.* Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

*[Vehicle Acquisition Holdings LLC]*
*[_____]*
*[_____]*
Attention:   Treasurer
Telephone:   *[_____]*
Facsimile:   *[_____]*

With a copy to:

*[_____]*
*[_____]*
*[_____]*
Attention:   *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention:   Treasurer
Telephone:   *[_____]*
Facsimile:   *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16. *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17. *Benefit of this Warrant Agreement.* Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements

34

in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.  *Registered Warrantholders.*  Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.  *Inspection of this Warrant Agreement.*  A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 7.20.  *Headings.*  The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.  *Counterparts.*  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766885

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

*[Vehicle Acquisition Holdings LLC]*

By: _____
      Name:
      Title:

[●], as Warrant Agent

By: _____
      Name:
      Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

A - 1

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THESE SHARES OF COMMON STOCK ARE ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THESE COMMON SHARES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT C**

## FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

**EXHIBIT D**

### FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO *[VEHICLE ACQUISITION HOLDINGS LLC]* (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

*[VEHICLE ACQUISITION HOLDINGS LLC]*

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between *[VEHICLE ACQUISITION HOLDINGS LLC]* and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: December 31, 2015.

    This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

    In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number

D - 2

of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, *[VEHICLE ACQUISITION HOLDINGS LLC]* has caused this instrument to be duly executed.

Dated: _____

                                        *[VEHICLE ACQUISITION HOLDINGS LLC]*


                                        By: _____
                                              Name:
                                              Title:


Attest

By: _____
          Secretary


Countersigned as of the date above written:


[•], as Warrant Agent


By: _____
          Authorized Officer


D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

## *[VEHICLE ACQUISITION HOLDINGS LLC]*

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [•] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.   Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.   A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:    [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____ ; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____          _____
                                              (Registered Warrantholder)



                                       By:  _____
                                            Authorized Signature
                                            Address:
                                            Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

The initial Number of Warrants represented by this Global Warrant is _____. In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
                                          Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____

_____

Name of Transferee

By: _____

     Name:

     Title:

    (Sign exactly as your name appears on the other side of this Certificate)

    NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

1766885

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

> To *[VEHICLE ACQUISITION HOLDINGS LLC]* (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:  [_____]

[Insert name of transferee]

By: _____
    Name:
    Title:

E - 1

1766885

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

***[VEHICLE ACQUISITION HOLDINGS LLC]***
[_____]
[_____]
Attention:    Treasurer

Re:    DWAC Issuance
       Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.   The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between ***[VEHICLE ACQUISITION HOLDINGS LLC]*** and [•], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:          _____

                           _____  Original Issue or

                           _____  Transfer from Treasury Account

Broker Name:               _____

Broker's DTC Number:       _____

Contact and Phone:         _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:      [*Insert name*] via facsimile [*insert fax number*]
         Broker

1766885

**EXHIBIT H TO THE MSPA**

## <u>FORM OF SALE PROCEDURES ORDER</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                             :

In re                               :                 **Chapter 11 Case No.**

                                       :

**GENERAL MOTORS CORP.,** *et al.*,      :       **09-50026 (REG)**

                                       :

                     **Debtors.**        :       **(Jointly Administered)**

                                       :

-------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 AND FED. R. BANKR. P. 2002,**
**6004, AND 6006 (I) APPROVING PROCEDURES FOR SALE**
**OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE**
**AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,**
**A U.S. TREASURY-SPONSORED PURCHASER;**
**(II) SCHEDULING BID DEADLINE AND SALE HEARING DATE;**
**(III) ESTABLISHING ASSUMPTION AND ASSIGNMENT PROCEDURES;**
**AND (IV) FIXING NOTICE PROCEDURES AND APPROVING FORM OF NOTICE**

Upon the motion, dated June 1, 2009 (the "<u>Motion</u>"),[1] of General Motors

Corporation ("<u>GM</u>") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "<u>Debtors</u>" or the "<u>Company</u>"),[2] pursuant to sections

105, 363, and 365 of title 11, United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for,

among other things, entry of an order, (A) approving the proposed sale procedures annexed

hereto as Exhibit "A" (the "<u>Sale Procedures</u>"); (B) scheduling a bid deadline and sale hearing

date; (C) establishing procedures for assuming and assigning the Assumable Executory

Contracts; and (D) fixing notice procedures and approving forms of notice; and upon any

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Sale Procedures, or the MPA, as applicable.

[2] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

objections to the Motion (the "Objections"); and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York, (ii) the attorneys for the United

States Department of the Treasury (the "U.S. Treasury"), (iii) the attorneys for Export

Development Canada ("EDC"), (iv) the attorneys for the agent under GM's prepetition secured

term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and

restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims

against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union,

United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"),

(viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and

Furniture Workers—Communications Workers of America, (ix) the United States Department of

Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys

for the ad hoc bondholders committee, and it appearing that no other or further notice need be

provided; and a hearing having been held on June 1, 2009, to consider the relief requested in the

Motion (the "Sale Procedures Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the Sale

Procedures Hearing, and all of the proceedings had before the Court; and the Court having

reviewed the Motion and any Objections and found and determined that the relief sought in the

Motion as provided herein is necessary to avoid immediate and irreparable harm to the Debtors

and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:[3]

A.    The Debtors have articulated good and sufficient reasons for this Court to

grant the relief requested in the Motion regarding the sale process, including the Court's (i)

approval of the Sale Procedures, (ii) approval of the Assumption and Assignment Procedures,

(iii) approval of and authorization to serve the Sale Notice, the Assumption and Assignment

Notice, and the Special UAW Retiree Notice (each as hereinafter defined), and (iv) approval of

and authorization to publish the Publication Notice (the "Sale Procedures Relief").

B.    The Debtors have articulated good and sufficient reasons for, and the best

interests of their estates will be served by, this Court scheduling a subsequent hearing (the "Sale

Hearing") to consider whether to grant the remainder of the relief requested in the Motion,

including the approval of the sale of substantially all the assets (the "Purchased Assets") of the

Sellers in accordance with either the (i) proposed Master Sale and Purchase Agreement, dated as

of June 1, 2009, substantially in the form annexed to the Motion as Exhibit "A" (together with all

exhibits and agreements attached thereto, the "MPA"),[4] by and among GM and its Debtor

subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC (the

"Purchaser"), a purchaser sponsored by the U.S. Treasury, or (ii) such other Marked Agreement

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[4] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

that may constitute the Successful Bid (the "<u>Replacement Agreement</u>"), free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability (with the same to attach to the proceeds therefrom) pursuant to section 363 of the Bankruptcy Code (the "<u>363 Transaction</u>").

C.      The Purchased Assets are "wasting assets" that will not retain going concern value over an extended period of time.  As such, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis consistent with the provisions set forth herein and in the MPA.

D.      The notice of the Sale Hearing (the "<u>Sale Notice</u>"), substantially in the form annexed hereto as Exhibit "B," is reasonably calculated to provide parties in interest with proper notice of the proposed sale of the Purchased Assets, the Sale Procedures, the 363 Transaction, and the Sale Hearing.

E.      Publication of the Publication Notice, substantially in the form annexed hereto as Exhibit "C," as set forth herein is reasonably calculated to provide all unknown creditors and parties not otherwise required to be served with a copy of the Sale Notice pursuant to this Order with proper notice of the proposed sale of the Purchased Assets, the Sale Procedures, the 363 Transaction, and the Sale Hearing.

F.      The Assumption and Assignment Notice, substantially in the form annexed hereto as Exhibit "D," is reasonably calculated to provide all counterparties to the Assumable Executory Contracts with proper notice of the potential assumption and assignment of their respective executory contracts or Leases, any Cure Amounts relating thereto, and the Assumption and Assignment Procedures.

G.      The UAW Special Retiree Notice (as defined below) including the Cover Letter to UAW-Represented Retirees describing the 363 Transaction and the UAW Retiree

Settlement Agreement and the notice (together, the "UAW Retiree Notice") to the retirees of the

Debtors and of certain retirees of Delphi Corporation ("Delphi"), a former unit of GM, including

certain retirees of former Delphi units and former GM units, and their respective surviving

spouses, who are eligible to receive, now or in the future, Retiree Medical Benefits ( as defined

in the UAW-Retiree Settlement Agreement) (collectively, the "UAW-Represented Retirees"),

copies of which are annexed hereto as Exhibit "E," are reasonably calculated to provide the

UAW-Represented Retirees with proper notice of the 363 Transaction, the Sale Procedures, the

Sale Hearing, and the UAW Retiree Settlement Agreement.

> H.    The Motion and this Order comply with all applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Guidelines for the

Conduct of Asset Sales established by the Bankruptcy Court on September 5, 2006 pursuant to

General Order M-331.

> I.    The 363 Transaction includes the transfer of "personally identifiable

information" (as defined in section 101(41A) of the Bankruptcy Code).  As such, the transfer of

personally identifiable information shall not be effective until a Consumer Privacy Ombudsman

is appointed and issues its findings and the Court has an opportunity to review the findings and

issue any rulings that are appropriate.

> J.    Due, sufficient, and adequate notice of the relief requested in the Motion

and granted herein has been given to parties in interest.

> K.    This Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).

> NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.     The Sale Procedures Relief requested in the Motion is granted as provided herein.

2.     The Objections are overruled except as otherwise set forth herein.

3.     The Sale Procedures, which are incorporated herein by reference, are approved and shall govern all bids and sale procedures relating to the Purchased Assets.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Sale Procedures.

4.     The deadline for submitting a Qualified Bid shall be June 22, 2009 (the "Bid Deadline"), as further described in the Sale Procedures.

5.     The deadline for objecting to approval of the 363 Transaction, including the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability (or for UAW-Represented Retirees to object to the UAW Retiree Settlement Agreement), shall be June 19, 2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline"), *provided, however,* that in the event the Sale Procedures result in a Successful Bidder other than the Purchaser, the deadline for objecting to the sale of the Purchased Assets to such Successful Bidder shall be at the Sale Hearing.

6.     The Purchaser shall constitute a Qualified Bidder for all purposes and in all respects with respect to the Sale Procedures and is not required to make a Good Faith Deposit.

7.     The Court shall conduct the Sale Hearing on June 30, 2009, at 9:45 a.m. (Eastern Time), at which time the Court will consider approval of the 363 Transaction to the Successful Bidder and approval of the UAW Retiree Settlement Agreement.  In the event the Successful Bidder is not the Purchaser, non-Debtor parties to the Assumable Executory Contracts may raise objections to adequate assurance of future performance at the Sale Hearing.

8.      The Debtors are authorized to conduct the 363 Transaction (or other similar transaction if the Successful Bidder is a party other than the Purchaser) without the necessity of complying with any state or local bulk transfer laws or requirements.

9.      The notices described in subparagraphs (a)-(d) below are approved and shall be good and sufficient, and no other or further notice shall be required if given as follows:

(a)      The Debtors (or their agent) serve, within three (3) days after entry of this Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a copy of this Order upon: (i) the attorneys for the U.S. Treasury, (ii) the attorneys for Export Development Canada, (iii) the attorneys for the agent under the Debtors' prepetition secured term loan agreement, (iv) the attorneys for the agent under the Debtors' prepetition amended and restated secured revolving credit agreement (v) the attorneys for the statutory committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Creditors Committee") (if no statutory committee of unsecured creditors has been appointed, the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis), (vi) the attorneys for the UAW, (vii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America; (viii) the United States Department of Labor; (ix) the attorneys for the National Automobile Dealers Association, (x) the attorneys for the ad hoc bondholders committee; (xi) any party who, in the past three years, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the MPA, (xii) non-Debtor parties to the Assumable Executory Contracts, (xiii) all parties who are known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets, (xiv) the Securities and Exchange Commission, (xv) the Internal Revenue Service, (xvi) all applicable state attorneys general, local environmental enforcement agencies, and local regulatory authorities, (xvii) all applicable state and local taxing authorities, (xviii) the Federal Trade Commission, (ixx) all applicable state attorneys general, (xx) United States Attorney General/Antitrust Division of the Department of Justice, (xxi) the U.S. Environmental Protection Agency and similar state agencies, (xxii) the United States Attorney's Office, (xxiii) all dealers with current agreements for the sale or leasing of GM brand vehicles, (xxiv) the Office of the United States Trustee for the Southern District of New York, and (xxv) all entities that requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and

(b)      On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to

provide notice, the Sale Notice, substantially in the form annexed hereto as Exhibit "B," upon (i) all other known creditors and (ii) all equity security holders of the Debtors of record as of May 27, 2009.

(c)    On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the assumption and assignment of the Assumable Executory Contracts and the proposed cure amounts relating to the Assumable Executory Contracts (the "Assumption and Assignment Notice"), substantially in the form annexed hereto as Exhibit "C," upon the non-Debtor parties to the Assumable Executory Contracts.

(d)    On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the 363 Transaction and the UAW Retiree Settlement, as well as a cover letter from the UAW describing the UAW Retiree Settlement Agreement and communicating the UAW's support of the 363 Transaction, including the UAW Retiree Settlement Agreement (collectively, the "UAW Retiree Notice"), substantially in the form annexed hereto as Exhibit "E," upon (i) the UAW, (ii) the attorneys for the UAW, and (iii) all of the UAW-Represented Retirees.  On the Mailing Deadline or as soon as practicable thereafter, the Debtors will cause the MPA, the Motion, the Sale Procedures Order, the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto (other than those containing commercially sensitive information), to be published on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http:/www.gmcourtdocs.com, in an area dedicated to retiree-related information (this website disclosure and the UAW Retiree Notice, collectively the  "UAW Special Retiree Notice").

(e)    On the Mailing Deadline, or as soon as practicable thereafter, the Debtors shall cause the Publication Notice to be published (i) once in (a) the global edition of *The Wall Street Journal*, (b) the national edition of *The New York Times*, (c) the global edition of *The Financial Times*, (d) the national edition of *USA Today*, (e) *Detroit Free Press/Detroit News*, (f) *Le Journal de Montreal*, (g) *Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The National Post*, and (ii) on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http::/www.gmcourtdocs.com.

10.    The following procedures (the "Assumption and Assignment Procedures")

shall govern the assumption and assignment of the Assumable Executory Contracts in connection

with the sale of the Purchased Assets to the Purchaser:[5]

Determination of Assumable Executory Contracts

- The Sellers shall maintain a schedule (the "Schedule") of Executory Contracts and Leases that the Purchaser has designated as Assumable Executory Contracts. From the date of the MPA until thirty (30) days after the Closing Date (or a later date if mutually agreed upon by the Sellers and the Purchaser) (the "Executory Contract Designation Deadline"), the Purchaser may (i) designate any additional Executory Contracts or Leases as Assumable Executory Contracts and add such Assumable Executory Contracts to the Schedule or (ii) remove any Assumable Executory Contract from the Schedule, in which case the Executory Contract or Lease shall cease to be an Assumable Executory Contract. The right of the Purchaser to add or remove Executory Contracts and Leases from the Schedule is subject to certain exceptions.[6]

- For each Assumable Executory Contract, the Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing or a later date (the "Proposed Assumption Effective Date").

- In addition to the Schedule, the Sellers shall maintain a secure website (the "Contract Website") that the non-Debtor counterparty to an Assumable Executory Contract can access to find current information about the status of its respective Executory Contract or Lease. The Contract Website contains, for each Assumable Executory Contract, (i) an identification of each Assumable Executory Contract that the Purchaser has designated for assumption and assignment and (ii) the Cure Amounts that must be paid to cure any prepetition defaults under such respective Assumable Executory Contract as of the Commencement Date. The information on the Contract Website shall be made available to the non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor Counterparty"), but shall not otherwise be publicly available.

---

[5] If a party other than the Purchaser is the Successful Bidder, or if a transaction other than the 363 Transaction is consummated, then these Assumption and Assignment Procedures may be modified by further order of this Court.

[6] For example, if an Assumable Executory Contract has already been assumed and assigned, it cannot be removed from the Schedule.

<u>Procedures for Providing Notice of Assumption and Assignment</u>

- Following the designation of an Executory Contract or Lease as an Assumable Executory Contract, the Debtors shall provide notice (the "<u>Assumption and Assignment Notice</u>") to the Non-Debtor Counterparty to the Assumable Executory Contract, substantially in the form annexed hereto as Exhibit "D," setting forth (i) instructions for accessing the information on the Contract Website relating to such Non-Debtor Counterparty's Assumable Executory Contract and (ii) the procedures for objecting to the proposed assumption and assignment of the Assumable Executory Contract.

<u>Procedures for Filing Objections to Assumption and Assignment and Cure Amounts</u>

- Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "<u>Contract Objections</u>") must be made in writing, filed with the Court, and served on the Objection Deadline Parties (as defined below) so as to be received no later than ten (10) days after the date of the Assumption and Assignment Notice (the "<u>Contract Objection Deadline</u>") and must specifically identify in the objection the grounds therefor.  The "<u>Objection Deadline Parties</u>" are (i) the Debtors, c/o General Motors Corporation, 30009 Van Dyke Avenue, Warren, Michigan 48090-9025 (Attn:  Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

- Unless a Contract Objection is filed and served before the Contract Objection Deadline, the Non-Debtor Counterparty shall be deemed to have consented to the assumption and assignment of its respective Assumable Executory Contract and the respective Cure Amount and shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Sellers, their estates, or the Purchaser.

<u>Procedures for Resolving Objections</u>

- If a timely Contract Objection is filed solely as to the Cure Amount (a "<u>Cure Objection</u>"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date, the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable

following resolution of such disputed Cure Amount:  To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty may meet and confer in good faith to attempt to resolve any such objection without Court intervention.  A call center has been established by the Debtors for this purpose.  If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows:  (a) with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

- If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court.  If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

- If the Debtors, the Purchaser, and the non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

Effective Date of Assumption

- All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the Assumption Resolution Date (as defined below).  The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline or the only Contract Objection that has been filed on or prior to the Contract Objection Deadline is a Cure Objection, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection other than a Cure Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract.

- Contingent upon the approval of the 363 Transaction and concurrently with the consummation of the 363 Transaction (without prejudice to the conditions set forth in the MPA), (i) the UAW Collective Bargaining Agreement shall be deemed to be an Assumable Executory Contract as to which the Assumption and Assignment Notice need not be sent and which will not be listed on the Schedule or the Contract Website (ii) the Debtors shall assume and assign the UAW Collective Bargaining Agreement

to the Purchaser as of the Closing Date, and each non-Debtor party to the UAW
Collective Bargaining Agreement shall be deemed to have consented to such
assumption and assignment.

11.      Except as otherwise provided in paragraph 10 hereof with respect to

Assumable Executory Contracts, in order to be considered, an objection to the 363 Transaction

(or for UAW-Represented Retirees, the UAW Retiree Settlement Agreement), must be filed with

the Court and served upon the following so as to be received by the Objection Deadline:  (i)

Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New

York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky,

Esq.); (ii) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit,

Michigan 48265 (Attn:  Lawrence S. Buonomo, Esq.); (iii) Cadwalader, Wickersham & Taft

LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281

(Attn:  John J. Rapisardi, Esq.); (iv) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room

2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (v) Vedder Price, P.C.,

attorneys for EDC, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J.

Edelman, Esq. and Michael L. Schein, Esq.); (vi) the attorneys for the Creditors Committee; (vii)

the UAW, 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:  Daniel W. Sherrick,

Esq.); (viii) Cleary Gottlieb Steen & Hamilton LLP, attorneys for the UAW, One Liberty Plaza,

New York, New York 10006 (Attn: James L. Bromley, Esq.); (xi) Cohen, Weiss and Simon

LLP, attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn:  Babette

Ceccotti, Esq.); (xii) the Office of the United States Trustee for the Southern District of New

York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York

10004; and (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn:  David S. Jones, Esq. and Matthew L. Schwartz, Esq.).  Contract

Objections and Cure Objections must be filed and served in accordance with the procedure set forth in paragraph 10 herein.

12.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, to the consummation and performance of the 363 Transaction contemplated by the MPA or a Participation Agreement, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, of each of the Purchased Assets transferred as part of the 363 Transaction), the approval of the UAW Retiree Settlement Agreement, or the assumption and assignment of any Executory Contract or Lease.

13.     The U.S. Trustee is directed to appoint a Consumer Privacy Ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code as soon as practicable.

14.     Notwithstanding any possible applicability of Bankruptcy Rules 6004 or 6006, or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

15.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to this Order.

Dated: New York, York
       June [___] 2009


_____
United States Bankruptcy Judge

# EXHIBIT A

## SALE PROCEDURES

## SALE PROCEDURES

By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), sought, among other things, approval of the process and procedures through which it will determine the highest or otherwise best price for the purchase of substantially all the assets (the "Purchased Assets") of the Debtors (the "Sellers").  On June 2, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Sale Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best price for the Purchased Assets through the process and procedures set forth below (the "Sale Procedures").

On June 30, 2009, as further described below, in the Motion, and in the Sale Procedures Order, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing"), at which the Debtors shall seek entry of an order (the "Sale Order") authorizing and approving the sale of the Purchased Assets (the "363 Transaction") pursuant to either (i) that certain Master Sale and Purchase Agreement (the "MPA") between the Sellers and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), substantially in the form annexed as Exhibit "A" to the Motion, or (ii) a different Successful Bid (as defined below).

## Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors (with a copy to the Purchaser):

(i) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

(ii) The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the 363 Transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, and (y) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the 363 Transaction.

A "Qualified Bidder" is a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the 363 Transaction, whose bid meets all of the Bid Requirements described below *and* that the Debtors, in their discretion but after consulting with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors Committee") determine is likely to consummate the 363 Transaction, if selected as the Successful Bidder, after taking into account all relevant legal, regulatory, and business considerations.  The Purchaser is a Qualified Bidder and is not required to make a Good Faith Deposit (as defined below).

Within two (2) business days after the Debtors and the Purchaser receive from a Potential Bidder all the materials required by subparagraphs (i) and (ii) above, the Debtors shall determine, in consultation with their advisors, the UAW, and the Creditors Committee, and shall notify the Purchaser and the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.

## Obtaining Due Diligence Access

To obtain due diligence access or additional information regarding the Purchased Assets or the Sellers, a Qualified Bidder (other than the Purchaser) must first provide the Debtors with a written nonbinding expression of interest (the "Expression of Interest") regarding (i) the Qualified Bidder's proposed 363 Transaction, (ii) the purchase price range, (iii) the structure and financing of the 363 Transaction, (iv) any conditions to closing that it may wish to impose, and (v) the nature and extent of additional due diligence it may wish to conduct.  If the Debtors, in their business judgment, determine that a Qualified Bidder that has submitted an Expression of Interest is reasonably likely to make a bona fide offer that would result in greater value being received for the benefit of the Sellers' estates than under the MPA (a "Qualifying Expression of Interest"), then the Debtors shall afford such Qualified Bidder reasonable due diligence, including the ability to access information from a confidential electronic data room concerning the Purchased Assets (the "Data Room").

Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Sellers, the Purchased Assets, and/or the 363 Transaction to any person except to the Purchaser or another Qualified Bidder who makes a Qualifying Expression of Interest.  The Debtors shall give the Purchaser any confidential memoranda (the "Confidential Memoranda") containing information and financial data with respect to the Purchased Assets and access to all due diligence information provided to any other Qualified Bidder.

The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  If the Debtors determine that due diligence material requested by a Qualified Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Qualified Bidder, the Debtors shall post such materials in the Data Room and provide notification of such posting by electronic transmission to the Qualified Bidders and not previously provided to the Purchaser.

Unless the Debtors determine otherwise, the availability of additional due diligence to a Qualified Bidder will cease after the Bid Deadline (as defined below).

## Bid Deadline

**The deadline for submitting bids by a Qualified Bidder shall be June 22, 2009, at 5:00 p.m. (Eastern Time) (the "Bid Deadline")**

Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver (i) one written copy of its bid and (ii) two copies of the MPA that has been marked to show amendments and modifications to the MPA, including price and terms, that are being

2

proposed by the Qualified Bidder (a "<u>Marked Agreement</u>"), to (a) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.), (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (c) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman, Esq.); (d) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (e) the attorneys for the Creditors Committee; (f) the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "<u>UAW</u>"), 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn: Daniel W. Sherrick, Esq.); (g) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromely, Esq.); (h) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (i) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.)

## Due Diligence from Bidders

The Debtors and their advisors shall be entitled to due diligence from a Qualified Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the Debtors. Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors. Failure of a Qualified Bidder to fully comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by the Qualified Bidder is not a Qualified Bid.

## Bid Requirements

A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate a 363 Transaction pursuant to the Marked Agreement, (ii) confirming that the offer shall remain open until the closing of a 363 Transaction to the Successful Bidder (as defined below), (iii) enclosing a copy of the Marked Agreement, and (iv) including a certified or bank check, or wire transfer, in the amount of $500 million to be held in escrow as a good-faith deposit (the "<u>Good Faith Deposit</u>").

In addition to the foregoing requirements, a bid or bids must:

(a) provide that the Qualified Bidder (i) agrees to the assumption by the Debtors and assignment to such Qualified Bidder of any collective bargaining agreements entered into by and between the Debtors and the UAW with the exception of (a) the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW; and (b) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW, and (ii) will enter into the UAW Retiree Settlement Agreement;

(b) be on terms that are not materially more burdensome or conditional than the terms of the MPA;

(c) not be conditioned on obtaining financing or the outcome of unperformed due diligence by the bidder;

(d) not request or entitle the bidder to any breakup fee, expense reimbursement, or similar type of payment; and

(e) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

A timely bid received from a Qualified Bidder and that meets the requirements set forth above (the "Bid Requirements") will be considered a Qualified Bid if the Debtors, in consultation with their advisors, the UAW, and the Creditors Committee, reasonably believe that such bid would be consummated if selected as the Successful Bid (as defined below).  For all purposes hereof, the Purchaser's offer to acquire the Purchased Assets pursuant to the MPA shall constitute a Qualified Bid.

## Acceptance of Qualified Bids

The Debtors shall present to the Bankruptcy Court at the Sale Hearing the Qualified Bid that the Debtors, in their business judgment, determine, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the highest or best offer for the Purchased Assets and is in the best interests of the Debtors and their estates in the Debtors' chapter 11 cases (the "Successful Bid," and the bidder with respect thereto, the "Successful Bidder").  At the Sale Hearing, certain findings will be sought from the Bankruptcy Court, including that (i) the Successful Bidder was selected in accordance with these Bidding Procedures, and (ii) consummation of the 363 Transaction as contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Sellers and their estates in these chapter 11 cases.

In the event that, for any reason, the Successful Bidder fails to close the 363 Transaction contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the bid that the Debtors in their business judgment determined, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the next highest or otherwise best value for the Purchased Assets and is otherwise in the best interests of the Debtors after the Successful Bid (the "Next Highest Bidder").

## Return of Good Faith Deposit

Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Bidding Procedures shall be returned upon or within one (1) business day after entry of the Sale Order.  The Good Faith Deposit of the Successful Bidder required to submit such a deposit under the Bidding Procedures shall be held until the closing of

the 363 Transaction and applied in accordance with the Successful Bid.  The Good Faith Deposit of the Next Highest Bidder shall be retained in escrow until 48 hours after the closing of the 363 Transaction.  Pending the closing of the 363 Transaction, the Good Faith Deposit of the Successful Bidder and the Next Highest Bidder shall be maintained in an interest-bearing escrow account.  If the closing does not occur, the disposition of Good Faith Deposits shall be as provided in the Successful Bid and Next Highest Bid, as applicable.

## **EXHIBIT B**

**FORM OF SALE NOTICE**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                    :
In re                                               :          Chapter 11 Case No.
                                                    :
GENERAL MOTORS CORP., *et al.*,                     :          09-50026 (REG)
                                                    :
                              Debtors.              :          (Jointly Administered)
                                                    :
------------------------------------------------------------------x

### NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL
### OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE
### AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,
### A U.S. TREASURY-SPONSORED PURCHASER

PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General
Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively,
the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for
the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2,
2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale
Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the
"MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle
Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States
Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the
Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and
other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption,
assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and
unexpired leases of personal property and nonresidential real property (the "Assumable
Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement
Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures
for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving
a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the
Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and
the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of
objections, if any, to the relief requested in the Motion.

A.        THE MASTER SALE AND PURCHASE AGREEMENT

The total consideration under the MPA for the sale of the Purchased Assets is
equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the
Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and
Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3
billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued
to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A." In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

B.    THE SALE HEARING

The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York  10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time).  The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

**RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn:  Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn:  David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline"**).

The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

C.    COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order.  Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

Dated:  New York, New York
        June 2, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **EXHIBIT C**

**FORM OF PUBLICATION NOTICE**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                             :

In re                         :        Chapter 11 Case No.
                             :

**GENERAL MOTORS CORP.,** *et al.,*   :        09-50026 (REG)
                             :

                **Debtors.**     :        **(Jointly Administered)**
                             :
---------------------------------------------------------------x

## NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER

PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2, 2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption, assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and unexpired leases of personal property and nonresidential real property (the "Assumable Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of objections, if any, to the relief requested in the Motion.

A.      THE MASTER SALE AND PURCHASE AGREEMENT

The total consideration under the MPA for the sale of the Purchased Assets is equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3 billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A." In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

B.    THE SALE HEARING

The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time). The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

**RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline"**).

The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

C.    COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order.  Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

BY ORDER OF THE COURT

Dated:  New York, New York
        June 2, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT D

## FORM OF ASSUMPTION AND ASSIGNMENT NOTICE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                  :
In re                   :        **Chapter 11 Case No.**
                  :
**GENERAL MOTORS CORP.,** *et al.*,   :        **09-50026 (REG)**
                  :
          **Debtors.**     :        **(Jointly Administered)**
                  :
-------------------------------------------------------------x

### NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) CURE AMOUNTS RELATED THERETO

PLEASE TAKE NOTICE THAT:

      1.      By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a final hearing for approval of the 363 Transaction (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.      The MPA, which, together with certain ancillary agreements, contemplates a set of related transactions for the sale of substantially all the Debtors' assets, defined as the "Purchased Assets" in Section 2.2(a) of the MPA, including certain Contracts and Leases, subject to higher or better offers.

3.      The MPA contemplates, and the proposed order approving the Motion (the "Sale Order"), if approved, shall authorize the assumption and assignment to the Purchaser of certain Contracts and Leases pursuant to section 365 of title 11, United States Code (the "Bankruptcy Code").  The Sellers maintain a schedule containing Contracts and Leases that the Debtors may assume and assign to the Purchaser (collectively, the "Assumable Executory Contracts"). You are receiving this Notice because you are a party to one or more of the Assumable Executory Contracts.

4.      **THE SCHEDULE CONTAINS A LIST OF ASSUMABLE EXECUTORY CONTRACTS THAT MAY BE ASSUMED.  THE PURCHASER RESERVES THE RIGHT UNDER THE MPA TO EXCLUDE ANY ASSUMABLE EXECUTORY CONTRACT FROM THE LIST OF ASSUMABLE EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED BY NO LATER THAN THE DESIGNATION DEADLINE DISCUSSED IN PARAGRAPH 10 BELOW.**

5.      The Debtors maintain a secure website which contains information about your Assumable Executory Contracts, including amounts that the Debtors believe must be paid to cure all prepetition defaults under the respective contracts as of the Commencement Date in accordance with section 365(b) of the Bankruptcy Code (the "Cure Amounts").  In order to view the Cure Amount for the Assumable Executory Contract to which you are a party, you must log onto http://www.contractnotices.com (the "Contract Website").  To log on, please use the user name and password provided to you with this notice.  The username and password will enable you to access the Cure Amount for the particular Assumable Executory Contract to which you are a party.

6.      Please review the Cure Amount for your Assumable Executory Contract. In some instances, additional terms or conditions of assumption and assignment with respect to a particular Assumable Executory Contract is provided on the Contract Website.

7.      Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "Contract Objections"), including objections to the Cure Amount, must be made in writing and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") so as to be received **no later than ten (10) days after the date of this Notice** (the "Objection Deadline") by (i) the Debtors, c/o General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, Michigan 48090-9025 (Attn:  Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael

J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

8.      If a timely Contract Objection is filed solely as to the Cure Amount (a "Cure Objection"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date (as hereinafter defined), the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable following resolution of such disputed Cure Amount:  To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor Counterparty") may meet and confer in good faith to attempt to resolve any such objection without Court intervention.  The Call Center (as defined in paragraph 19) has been established by the Debtors for this purpose.  If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows:  (a) with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

9.      If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court.  If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

10.     If the Debtors, the Purchaser, and the Non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

11.     If you agree with the respective Cure Amount(s) listed in the Contract Website with respect to your Assumable Executory Contract(s), and otherwise do not object to the Debtors' assumption and assignment of your Assumable Executory Contract, you are not required to take any further action.

12.     Unless an Objection is filed and served before the Objection Deadline, you shall be deemed to have consented to the assumption and assignment of your Assumable Executory Contract and the Cure Amount(s) for your Assumable Executory Contract(s), and you shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, or the Purchaser.

13.     Up to the date that is thirty (30) days following the closing of the 363 Transaction, or if such date is not a Business Day (as defined in the MPA), the next Business

Day, or such other later date as mutually agreed upon by the Purchaser and the Debtors (the "Designation Deadline"), the Purchaser may, in its sole discretion, subject to certain limitations specified in the MPA (applicable only as between the parties thereto), exclude any of the Assumable Executory Contracts by providing notice on the Contract Website.  Upon such designation, the Contract or Lease referenced therein shall no longer be considered a Assumable Executory Contract, shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors.  Until the Designation Deadline, the Purchaser also may, subject to certain limitations specified in the MPA (applicable only as between the parties thereto) designate additional Contracts or Leases as Assumable Executory Contracts to be assumed and assigned by providing notice to the affected Non-Debtor Counterparties.  The Contract Website shall be updated from time to time to reflect the then current status of your contract as well as the proposed effective date (the "Proposed Assumption Effective Date"), if any, of the assumption and assignment of particular contracts.
'

14.    The Debtors' decision to assume and assign the Assumable Executory Contracts is subject to Bankruptcy Court approval and consummation of the 363 Transaction, and, absent such consummation, each of the Assumable Executory Contracts will not be assumed or assigned to the Purchaser and shall in all respects be subject to further administration under the Bankruptcy Code.  All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the date following expiration of the Objection Deadline if no Contract Objection, other than to the Cure Amount, has been timely filed, or, if a Contract Objection, other than to the Cure Amount, has been filed the date of the Assumption Resolution Stipulation or the date of a Bankruptcy Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract.  Until the Assumption Effective Date, assumption and assignment thereof is subject to the Purchaser's rights to modify the designation of Assumable Executory Contracts as set forth in paragraph 13 above.  Except as otherwise provided by the MPA, the Purchaser shall have no rights in and to a particular Assumable Executory Contract the Assumption Effective Date.

15.    The inclusion of any document on the list of Assumable Executory Contracts shall not constitute or deemed to be a determination or admission by the Debtors or the Purchaser that such document is, in fact, an executory contract or Lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.

16.    Any Contract Objection shall not constitute an objection to the relief generally requested in the Motion (e.g., the sale of the Purchased Assets by the Debtors to the Purchaser free and clear of liens, claims, encumbrances, and interests), and parties wishing to object to the relief generally requested in the Motion must file and serve a separate objection in accordance with the procedures approved and set forth in the order of the Bankruptcy Court approving the Sale Procedures.

17.    If a party other than the Purchaser is determined to be the highest and best bidder for the assets to be sold pursuant to the 363 Transaction, you will receive a separate notice providing additional information regarding the treatment of your contract(s) or Lease(s); *provided, however*, that if the applicable Cure Amount has been established pursuant to the procedures set forth in this Notice, it shall not be subject to further dispute if the new purchaser seeks to acquire such contract or Lease.

18.    This Notice is subject to the full terms and conditions of the Motion, the order of the Bankruptcy Court approving the Sale Procedures, and the Assumption and Assignment Procedures set forth in the order approving the Sale Procedures, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

19.  If you have questions about the Assumable Executory Contracts or proposed Cure Amounts, you may call 1-888-409-2329 (in the United States) or 1-586-947-3000 (outside the United States) (the "Call Center").

Dated:  New York, New York
        June 2, 2009

_____
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## <u>EXHIBIT E</u>

**FORM OF UAW RETIREE NOTICE**

### A Message to UAW GM Retirees

Dear Brothers and Sisters,

As we all know, GM is engulfed in a severe crisis.  GM's staggering losses during 2008 and 2009 have forced the company to file for bankruptcy.  The Company has also been forced to rely on loans from the federal government in order to maintain its operations.  In this environment, we are fighting every day to preserve and protect to the greatest extent possible our hard-won gains, particularly for the retirees, and surviving spouses of retirees, who helped build this industry with your years of loyal service.

Last December, after a lengthy process that included congressional hearings and petitioning the White House, the federal government granted GM a short-term emergency operating loan in order to avoid an immediate liquidation of the company at that time.  As part of that loan, GM was required to submit a restructuring plan to the Treasury Department by February 17, 2009.  On March 30, President Obama announced that the company's February 17 plan didn't go far enough in reducing costs and laying the groundwork for sustainability.  He said GM would have to identify additional cost savings and debt reductions if GM were to receive additional financial support.  The Treasury Department's auto task force also required deeper concessions from UAW members, retirees and other company stakeholders.

On May 28, GM announced that the Treasury Department would provide additional financial support in connection with a court-supervised restructuring of GM, in accordance with the terms of a broad restructuring agreement worked out between Treasury, GM, the UAW and representatives of GM's bondholders.

The agreement under which the Treasury Department will extend this new financial support includes a new schedule of contributions to the trust fund that will provide retiree medical benefits beginning in 2010.  It also includes modifications to the collective bargaining agreement for active employees.  The UAW active workforce ratified that agreement May 29.  Based on these agreements, the United States government will provide a total of over $50 billion in financial support to allow GM to complete its restructuring.

GM's recent bankruptcy filing is part of the agreement reached with the Treasury Department.  The goal of the bankruptcy filing is to allow for swift court approval of the restructuring so that the company can move forward to implement the agreements between the parties.

### Proposed Sale

To complete the restructuring, a new company will be formed which will purchase the operating assets of GM.  If approved by the Bankruptcy Court, the new company will enter into the agreements with the UAW covering both active and retired workers.  The initial ownership of the new corporation will be allocated as follows:

➢  72.5% --   United States and Canadian Governments

➢  17.5% --   UAW Retiree Benefits Trust Fund

➢ 10%   --   Bondholders

As part of the approval of the proposed sale, the Bankruptcy Court will also be asked to approve the new UAW Retiree Settlement Agreement, summarized below. As described more fully in Paragraph 6 of the attached document, if the court approves both the sale and the UAW Retiree Settlement Agreement, responsibility for providing retiree benefits for the duration of 2009, and for making the contributions to the VEBA, will shift to the new company (which will then own GM's operating assets).

Attached to this letter is a formal notice from the Bankruptcy Court regarding the proposed sale. As described in that notice, the Bankruptcy Court will soon hold a hearing to consider the proposed sale and the UAW Retiree Settlement Agreement.

**Pension Plan Continues Without Change**

The restructuring agreements provide that the new company will take over responsibility for the GM UAW pension plan. That plan will continue operations and pension benefits will be continued at their current level.

**Retiree Medical Benefits**

Retiree medical benefits were one of the most significant issues addressed in 2007 bargaining. The 2007 National UAW-GM Agreement established a new Trust Fund (called a "Voluntary Employees' Beneficiary Association" or "VEBA"), which is responsible for retiree medical benefits starting on January 1, 2010. The 2007 Agreement established a series of cash contributions by the Company to the VEBA, beginning on January 1, 2010.

In order for GM to receive the necessary government support -- which will allow the company to complete its restructuring and continue operations into the future -- we were required to support a series of changes to the retiree medical and VEBA agreements.

In this difficult situation, we were able to preserve the core medical benefits for retirees. These were hard fought issues and the changes described below are certainly painful. But if we had not agreed to support these changes, the U.S. Treasury would not have provided the additional support to GM. Without this critical government support, GM's near term future would be in serious peril and GM would face almost certain liquidation.

The following summarizes the principal features of the proposed agreement.

**Existing Internal VEBA Assets Transferred in January 2010.** Along with the new payment structure described below, in January 2010 the VEBA will receive the assets of an internal trust fund maintained at GM (called the "Internal VEBA"). The value of the assets in that fund is currently approximately $10 billion. GM had sought to use these assets to cover the cost of benefits prior to the January 1, 2010 implementation, which would have depleted these assets and diminished the cash balance in the new VEBA. We successfully resisted these efforts and

the new VEBA will therefore receive the full value of these Internal VEBA assets on January 1, 2010 as outlined in the 2007 agreement.

The assets in the Internal VEBA have been invested by GM on the VEBA's behalf since January 1, 2008.  The value of these assets has been negatively impacted by conditions in the investment market during 2008 and so far in 2009.  These assets will continue to be invested during the balance of 2009 and will be transferred to the new VEBA on January 1, 2010.

**New $2.5 Billion Note.**  Under the new funding structure, the VEBA will receive a new Note, payable in cash, with a principal amount of $2.5 billion.   Cash payments under the new Note (including accrued interest) will be $1.384 billion payable in each of 2013, 2015 and 2017.

**New $6.5 Billion in Preferred Stock.**  The VEBA will also receive Preferred Stock in the new company with a face value of $6.5 billion.  This Preferred Stock includes a 9% cash dividend payment structure, under which $585 million is payable annually for as long as the VEBA holds this stock.  This dividend payment must be made before the new company can pay any dividends to the holders of its common stock.  If the company delays payment of the dividends on the Preferred Stock, it will not be allowed to pay dividends to its common shareholders until it becomes current on the VEBA's Preferred Stock dividend obligations.  While this preference over the common shareholders makes it likely the new company will consistently pay the preferred dividend, there is a risk that market conditions or other factors beyond the control of the UAW may result in the company delaying these preferred dividends for some period of time.

**VEBA to own Significant GM Common Stock.**  Another requirement of the Treasury Department loans was that a portion of the value received by the VEBA be in the form of common stock.  To meet that requirement, the VEBA will receive an initial allocation of 17.5% of the stock in the new company.  The United States and Canadian Governments will receive 72.5% of the initial stock, and bondholders will receive 10%.

The VEBA will also have the right to designate a member of GM's Board of Directors, with UAW consent.  The VEBA will be required to vote its GM shares in the same proportion as the votes of other shareholders.

The overall restructuring of GM will eliminate a tremendous portion of GM's other debt obligations.  With a greatly improved balance sheet, as well as significant restructuring of business operations, there is a realistic prospect that the stock in the new company will represent significant value in the future.  If and when that occurs, a significant portion of that value will be captured by the VEBA through this stock ownership.

**Warrants.**  In addition to the direct ownership of the Preferred and Common Stock described above, the new VEBA will also receive a Warrant, which represents the right to an additional 2.5% of the Common Stock of the new company, with a strike price determined by an aggregate $75 billion equity value for the new company.  This will allow the VEBA to realize additional value if the total value of the stock of the new company exceeds that value at any point prior to expiration of the new Warrant.

The new VEBA agreement includes mechanisms for the VEBA to sell the Common and Preferred Stock, as well as the new Warrants, to other parties under certain conditions.

**Pension Pass Through Eliminated.**  One funding mechanism under the 2007 Agreement was called the "Pension Pass Through."  Under that arrangement, the new VEBA was scheduled to impose an additional monthly contribution requirement, and the GM pension benefits were to increase by a corresponding amount.  This mechanism has been eliminated and its value is instead reflected in the new Note and other instruments described above.

**Mitigation VEBA Assets Transferred.**  Under the existing agreements, an independent VEBA is  currently providing dental benefits and certain "mitigation" payments (i.e. covering a significant portion of the co-pays, deductibles and contributions that retirees would otherwise be required to pay under the 2005 agreement).  Under the 2007 Agreement and the proposed new agreement, the assets in this existing independent VEBA (called the "Mitigation VEBA") will be transferred into the new VEBA on January 1, 2010.  It is expected that the assets in the Mitigation VEBA will be approximately $700 million on January 1, 2010 but the actual balance will depend on investment performance and other factors during the balance of 2009.  As explained below, the dental benefits currently provided by the Mitigation VEBA will be eliminated in accordance with the proposed new agreement.

**VEBA Committee can adjust benefits beginning in 2010.**  As under the 2007 Agreement, the VEBA will be governed by an 11-member Committee, including 5 members appointed by the UAW and 6 Independent Members.  Under the 2007 Agreement, that Committee had the authority, starting on January 1, 2012, to adjust benefits so that benefit levels can be kept consistent with the assets in the Trust.  Under the proposed agreement, the Committee will be allowed to make necessary benefit adjustments beginning when the VEBA assumes responsibility on January 1, 2010.

## Immediate Changes in Benefit Levels Required

Under the 2007 Agreement, GM remained responsible for providing retiree medical benefits through the end of 2009, with the new VEBA taking over responsibility on January 1, 2010.  In the discussions over the last several weeks, the company sought an "early implementation" of this transition.  Had we agreed to that approach, the assets of the VEBA would have been depleted to pay benefits for the remainder of 2009.

We succeeded in avoiding this depletion of the VEBA's assets during 2009.  The new company will therefore continue to provide retiree medical benefits for the balance of 2009 until the new VEBA takes over responsibility.  In exchange, however, the Treasury Department insisted that the benefits be immediately reduced to reflect GM's difficult financial situation.  In order to maintain the support of the Government, therefore, we were required to agree to the following changes in benefits.  These changes will be effective on July 1, 2009 (or later if court approval is delayed beyond that date).

| Prescription Drug Co-Pays | Retail (34 day supply) |
| | • $10 Generic |
| | • $25 Brand |
| | |
| | Mail Order (90 day supply) |

| | |
|---|---|
| | • $20 Generic<br>• $50 Brand |
| Catastrophic Plan for retirees and surviving spouses who fail to pay required monthly contributions | No longer offered.   Retirees and surviving spouses currently in Catastrophic Plan will be given opportunity to join regular plan. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra) | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Achiphex, Prevacid, Protonix) | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome |
| Vision Program | No longer offered |
| Dental Program | No longer offered |
| Emergency Room Co-Pay | $100 (waived if admitted) |
| Medicare Part B Special Benefit ($76.20 per month for retirees enrolled in Medicare) | No longer offered by health plan.<br><br>This modification is not applicable to approximately 24,800 retirees and surviving spouses who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust.  The payments will continue for these pre-1979 retirees and surviving spouses. |
| "Low Income Retirees" (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33) | Monthly contribution requirement of $11 (flat rate regardless of family status)<br><br>In all other respects, these retirees and surviving spouses will be included in same plan as other retirees and surviving spouses. |
| Monthly Contribution Requirements (General Retirees) | No Change (currently $11/single and $23/ family) |
| Deductible and Co-Pay Requirements (General Retirees) | No Change (currently $164 annual deductible and $273 annual (single) out-of-pocket maximum) |
| Sponsored Dependents and Principally Supported Children | Consistent with changes made to the active medical program, the retiree medical program will not allow the designation of new "sponsored dependents" or "principally supported children."  The provisions allowing new dependents to be added as a result of adoption or legal guardianship will continue in effect. |

## The Future Outlook

In the early years of the VEBA's existence, it is unlikely that the VEBA will be able to sell the stock in the new company. The new VEBA will therefore be required to use the $10 billion in immediate contributions from the Internal VEBA at GM, along with the assets of the Mitigation VEBA and the $585 million annual cash dividend payment on the Preferred Stock, to provide retiree medical benefits during 2010 and 2011. Because of the uncertainty regarding the long-term value of the stock, the Committee will likely be required to make further adjustments in the benefit levels for 2010 and 2011. The extent of those future adjustments will depend on many factors, including investment returns in the Internal and Mitigation VEBA's during the remaining months of 2009, and whether the dividends on the new $6.5 billion in Preferred Stock are delayed.

If the stock can be sold in 2012 or thereafter for significant value, the Committee will be able to take that new value into account and restore some or all of the benefits that are being reduced under these arrangements. In other words, if the current restructuring efforts are successful and the company returns to viability, the UAW retirees stand to reap the benefit of that recovery through the VEBA's significant stock ownership.

We urge your support for these proposed agreements. In these difficult circumstances, we believe they provide the best possible protection for your retiree benefits.


In solidarity,


Ron Gettelfinger                  Cal Rapson**,** *Vice President*                       Bill Payne
*UAW  President*          *and Director, UAW GM Department*          *Counsel to the Class*

---

**Important Notes**

For further information about the proposed agreement and the process for court review of the proposed agreements and the proposed sale, please refer to the enclosed legal notice. Full and complete copies of the proposed retiree health agreement can be found on the website referred to in that notice.

**If you support the proposed agreement, you do not need to take any action at this time. Information about the modified medical plan will be sent to you following court approval. If you wish to object to the proposed agreements, you must file a written objection as described in the enclosed legal notice.**

Counsel to the Class Representatives participated in negotiation of the 2007 retiree medical agreements which were approved by the District Court for the Eastern District of Michigan on July 31, 2008. Although the Class Representatives are not formal parties to the new agreements described above, Counsel to the Class Representatives has reviewed the proposed agreements and is in full support of the efforts to obtain Bankruptcy Court approval of the new agreements. Counsel for the Class has entered an appearance in the Bankruptcy case and will be supporting approval of the proposed agreements.

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**GENERAL MOTORS CORP.**, *et al.*,                 :          **09-50026 (REG)**
                                                    :
                                    **Debtors.**    :          **(Jointly Administered)**
                                                    :
-------------------------------------------------------------x

### NOTICE TO DEBTORS' RETIREES REPRESENTED BY THE INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA OF SALE OF DEBTORS' ASSETS AND APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

PLEASE TAKE NOTICE THAT:

      1.      By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] have sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and other interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") consented to by representatives of members of the "Class" of the Debtors' retirees and surviving spouses represented by the UAW such representatives, the "Class Representatives") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a hearing for approval of the 363 Transaction and the UAW Retiree Settlement Agreement (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.    The Sale Hearing is scheduled to be conducted on June 30, 2009 at 9:45 a.m. (Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, Room 621, New York, New York 10004 (the "Bankruptcy Court"), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, to consider the approval of the MPA or any higher or better offer by a Successful Bidder (as defined in the Sale Procedures) and approval of the UAW Retiree Settlement Agreement.  If the Purchaser is the Successful Bidder, the Debtors anticipate seeking entry of an order approving the 363 Transaction substantially in the form of the order attached to the Motion as Exhibit "B" (the "Sale Order").  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

3.    Coverage of Retiree Medical Benefits (as defined in the UAW Retiree Settlement Agreement) will continue to be provided to UAW-Represented Retirees (as defined in the Sale Procedures Order) and their eligible dependents without interruption by either GM or the Purchaser up until December 31, 2009, in accordance with the terms of agreements negotiated and agreed to by the UAW, which include certain benefit reductions to take effect on July 1, 2009 (or, if later, Bankruptcy Court approval, if needed).

4.    Contingent upon the Bankruptcy Court's approval of the 363 Transaction, and concurrently with the sale of the Debtors' assets pursuant to the 363 Transaction, the Debtors will assume and assign to the Purchaser any collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment"), with the exception of (a) the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW ("MOU"); and (b) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (the "2008 Settlement Agreement"), which was approved by the United States District Court for the Eastern District of Michigan in the class action styled *Int'l Union, UAW, et al. v. General Motors Corporation*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) (final order entered July 31, 2008).

5.    The Purchaser has agreed, among other things, to enter into the proposed UAW Retiree Settlement Agreement, pursuant to which the Purchaser will make contributions to a voluntary employee beneficiary association trust (the "New VEBA") in respect of non-pension retiree benefits to the UAW-Represented Retirees on terms that differ from the terms of the MOU and the 2008 Settlement Agreement.  Among other things, the UAW Retiree Settlement Agreement provides for the funding of the New VEBA with a combination of (i) shares of the Purchaser's common stock representing 17.5% of the aggregate common equity interest in the Purchaser; (ii) a promissory note of the Purchaser in the principal amount of $2.5 billion, payable in three equal cash installments on July 15 of 2013, 2015, and 2017; (iii) shares of the Purchaser's cumulative perpetual preferred stock in the amount of $6.5 billion, with a 9% dividend per annum, payable quarterly in cash; (iv) warrants to acquire newly issued shares of the Purchaser representing 2.5% of the Purchaser's common equity outstanding at December 31, 2009, issuable at any time prior to December 31, 2015; and (v) the assets held in the existing voluntary employee beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser, which at March 31, 2009 had a value of approximately $9.4 billion.

6.      In addition, GM, the UAW, and the Class Representatives have entered into an agreement, dated May 29, 2009 (the "UAW Claims Agreement"), pursuant to which the UAW and Class Representatives agreed, subject to the consummation of the 363 Transaction and the UAW Retiree Settlement Agreement becoming effective following approval of the Bankruptcy Court, to take further actions to release claims against GM and its subsidiaries, and their employees, officers, directors, and agents, relating to retiree medical benefits pursuant to the MOU, Settlement Agreement, and UAW collective bargaining agreements, *provided* that such claims may be reinstated if the rights or benefits of the UAW-Represented Retirees under the UAW Retiree Settlement Agreement are adversely impacted by reason of any reversal or modification of the Bankruptcy Court's approval of the 363 Transaction or UAW Retiree Settlement Agreement.

7.      The UAW is the authorized representative of the UAW-Represented Retirees for purposes of approval of the UAW Retiree Settlement Agreement pursuant to section 1114 of the United States Bankruptcy Code.  At the Sale Hearing, the Debtors will request approval by the Bankruptcy Court of the UAW Retiree Settlement Agreement as an agreement with the UAW, as the authorized representative of the UAW-Represented Retirees.

8.      A copy of the MPA (without certain commercially sensitive attachments) and the Motion (including the proposed Sale Order), the Sale Procedures Order as entered by the Bankruptcy Court (with the Sale Procedures attached), the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto, may be obtained (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com/ or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

9.      **Responses or objections, if any, to the relief sought in the Motion, including the approval of the UAW Retiree Settlement Agreement, must be made in writing and filed with the Clerk of the Bankruptcy Court (at the address shown in paragraph 2 above), and served upon (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn:  James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (g) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004., so as to be received no later than June 19, 2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline").**

10.     The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, including approval of the UAW Retiree Settlement Agreement, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, and the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

11.     This Notice is subject to the full terms and conditions of the Motion, the Sale Procedures Order, the MPA, and the UAW Retiree Settlement Agreement, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

12.     If you have questions about the 363 Transaction or the UAW Retiree Settlement Agreement, you may call 1-800-489-4646 (the "Call Center").

Dated:  New York, New York
           June 2, 2009

 

 

_____

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT I TO THE MSPA**

**FORM OF SALE APPROVAL ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
: 
In re                                              :          **Chapter 11 Case No.**
                                                   :
**GENERAL MOTORS CORP.**, *et al.*,                :          **09-_____ (___)**
                                                   :
                               **Debtors.**        :          **(Jointly Administered)**
                                                   :
-------------------------------------------------------------x

### ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "Motion"), of General Motors

Corporation ("GM") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 363, and 365

of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry

of an order authorizing and approving (A) that certain Master Sale and Purchase Agreement,

dated as of June 1, 2009, by and among GM and its Debtor subsidiaries (collectively, the

"Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by

the United States Department of the Treasury (the "U.S. Treasury"), together with all related

documents and agreements as well as all exhibits, schedules, and addenda thereto (the "MPA"), a

copy of which is annexed hereto as Exhibit "A"; (B) the sale of the Purchased Assets[1] to the

Purchaser free and clear of liens, claims, encumbrances, and interests, including rights or claims

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

based on any successor or transferee liability; (C) the assumption and assignment of the

Assumable Executory Contracts; (D) the establishment of certain Cure Amounts; and (E) the

UAW Retiree Settlement Agreement; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and

All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided in accordance with this Court's Order,

dated June __, 2009 (the "Sale Procedures Order"), and it appearing that no other or further

notice need be provided; and a hearing having been held on June 30, 2009, to consider the relief

requested in the Motion (the "Sale Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the

Hearing, and all of the proceedings had before the Court; and the Court having reviewed the

Motion and any objections thereto (the "Objections") and found and determined that the relief

sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and

their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests of the

Debtors, their estates and creditors, and other parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to

this proceeding pursuant to Fed. R. Bankr. P. 9014.

B.      To the extent any of the following findings of fact constitute conclusions

of law, they are adopted as such.  To the extent any of the following conclusions of law

constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion, the MPA, and the 363

Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is

proper under 28 U.S.C. §§ 1408 and 1409.

D.      The statutory predicates for the relief sought in the Motion are sections

105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004,

and 6006.

E.      As evidenced by the affidavits and certificates of service and Publication

Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11

cases and the wasting nature of the Purchased Assets and based on the representations of counsel

at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient

notice of the Motion, the Sale Procedures, the 363 Transaction, the Assumption and Assignment

Procedures, the UAW Retiree Settlement Agreement, and the Sale Hearing have been provided

in accordance with Bankruptcy Rules 2002(a), 6004(a), and 6006(c) and in compliance with the

Sale Procedures Order; (ii) such notice was good and sufficient, reasonable, and appropriate

under the particular circumstances in these chapter 11 cases, and reasonably calculated to reach

and apprise all holders of liens, claims, encumbrances, and other interests, including rights or

claims based on any successor or transferee liability, about the Sale Procedures, the sale of the

Purchased Assets, the 363 Transaction, and the assumption and assignment of the Assumable

Executory Contracts, and to reach all UAW-Represented Retirees about the UAW Retiree

Settlement Agreement and the assumption by GM of that certain Letter Agreement, dated May

29, 2009, between GM, the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") and Stember, Feinstein, Doyle & Payne, LLC (the

"UAW Claims Agreement") relating thereto; and (iii) no other or further notice of the Motion,

the 363 Transaction, the Sale Procedures, the Assumption and Assignment Procedures, the UAW

Retiree Settlement Agreement, the UAW Claims Agreement, and the Sale Hearing or any

matters in connection therewith is or shall be required.  With respect to parties who may have

claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors

(including, but not limited to, potential contingent warranty claims against the Debtors), the

Publication Notice was sufficient and reasonably calculated under the circumstances to reach

such parties.

      F.      As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the

Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have adequately

marketed the Purchased Assets and conducted the sale process in compliance with the Sale

Procedures Order; (b) a reasonable opportunity has been given to any interested party to make a

higher or better offer for the Purchased Assets; (c) the consideration provided for in the MPA

constitutes the highest or otherwise best offer for the Purchased Assets and provides fair and

reasonable consideration for the Purchased Assets; (d) the 363 Transaction will provide a greater

recover for the Debtors' creditors than would be provided by any other practical available

alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (e) no other

entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or

their estates; (f) the consideration to be paid by the Purchaser under the MPA exceeds the

liquidation value of the Purchased Assets; and (g) the Debtors' determination that the MPA

constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound

exercise of the Debtors' business judgment.

G.      The actions represented to be taken by the Sellers and the Purchaser are

appropriate under the circumstances of these chapter 11 cases and are in the best interests of the

Debtors, their estates and creditors, and other parties in interest.

H.      Approval of the MPA and consummation of the 363 Transaction at this

time is in the best interests of the Debtors, their creditors, their estates, and all other parties in

interest.

I.      The Debtors have demonstrated compelling circumstances and a good,

sufficient, and sound business purpose and justification for the sale of the Purchased Assets

pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the

immediate approval of the MPA and the 363 Transaction because, among other things, the

Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion

is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11

cases and the risk of deterioration in the going concern value of the Purchased Assets pending

the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii)

preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the

widespread and adverse economic consequences for the Debtors, their estates, their creditors,

employees, the automotive industry, and the national economy that would be threatened by

protracted proceedings in these chapter 11 cases.

J.      The consideration provided by the Purchaser pursuant to the MPA (i) is

fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a

greater recovery to the Debtors' estates than would be provided by any other available

alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K.    The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

L.    In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

M.    Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

N.    The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  The 363 Transaction does not constitute a sub rosa plan of reorganization.

O.    The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Sellers nor the Purchaser has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

P.        The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Q.        The Purchaser is not an "insider" of any of the Debtors, as that term is

defined in section 101(31) of the Bankruptcy Code.

R.        The Debtors, the Purchaser, and the UAW, as the exclusive collective

bargaining representative of the Debtors' employees and the authorized representative of the

UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, engaged in good

faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree

benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters.

Conditioned upon the consummation of the 363 Transaction and approval of the Bankruptcy

Court, the Purchaser and the UAW have entered into that certain Retiree Settlement Agreement,

dated _____, 2009 (the "UAW Retiree Settlement Agreement"), which resolves the ongoing

provision of certain retiree benefits.  Under the UAW Retiree Settlement Agreement, the

Purchaser has agreed to make contributions of cash, stock, and warrants of New GM, as well as

to transfer the assets of an existing voluntary employees' beneficiary association sponsored by

GM and to be acquired by the Purchaser in the 363 Transaction, to a new voluntary employees'

beneficiary association sponsored by the UAW (the "New VEBA"), which will have the

obligation to fund certain health and welfare benefits for the Debtors' retirees and surviving

spouses represented by the UAW (the "UAW-Represented Retirees").  GM and the UAW, as the

authorized representative of the UAW-Represented Retirees, as well as the representatives for

the class of plaintiffs in a certain class action against GM (the "Class Representatives"), through

class counsel, Stemper, Feinstein, Doyle and Payne LLC ("Class Counsel"), negotiated in good

faith the UAW Claims Agreement, which requires the UAW and the Class Representatives to

take further actions to effectuate the extinguishment of certain claims against the Debtors, among

others, relating to retiree benefits in the event the 363 Transaction is consummated and the

Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree

Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse

impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree

Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the

UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof.

S.      Concomitantly with the 363 Transaction, the Debtors will assume and

assign to the Purchaser modified and duly ratified collective bargaining agreements entered into

by and between the Debtors and the UAW (the "UAW CBA Assignment").  The Debtors, the

Purchaser, the UAW and Class Representatives intend that their actions in connection with the

UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of

certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. §

186(c)(2).

T.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability, including, but not limited to (i) those that purport to give to any

party a right or option to effect any forfeiture, modification, right of first refusal, or termination

of the Sellers' or the Purchaser's interest in the Purchased Assets, or any similar rights, (ii) those

relating to taxes arising under or out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the consummation of the Sale (the "Closing"), and (iii)

(a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other

title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first

refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on

the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership and

(b) all debts arising in any way in connection with any agreements, acts, or failures to act, of any

of the Sellers or any of the Sellers' predecessors or affiliates, claims (as that term is defined in

the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or

other commitments, restrictions, interests and matters of any kind and nature, whether known or

unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement

of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including, but not limited to, Claims otherwise arising under doctrines of successor or

transferee liability to the extent permitted by law.

U.     The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction contemplated thereby, thus adversely affecting the Debtors,

their estates, and their creditors, if the sale of the Purchased Assets to the Purchaser, the

assignment of the Assumable Executory Contracts to the Purchaser, and the assumption of the

Assumed Liabilities by the Purchaser were not, except as otherwise provided in the MPA, free

and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever, or if

the Purchaser would, or in the future could, be liable for any of such liens, claims,

encumbrances, or other interests, including rights or claims based on any successor or transferee

liability.

V.     The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or

claims based on any successor or transferee liability, because, in each case, one or more of the

standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those (i)

holders of liens, claims, encumbrances, and other interests, including rights or claims based on

any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory

Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Those (i) holders of liens, claims, encumbrances, or other interests, including rights or claims

based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable

Executory Contracts who did object fall within one or more of the other subsections of section

363(f) of the Bankruptcy Code and are adequately protected by having their liens, claims,

encumbrances, and other interests, if any, including rights or claims based on any successor or

transferee liability, attach to the cash proceeds of the 363 Transaction ultimately attributable to

the property against or in which they claim a lien, claim, encumbrance, or other interest,

including rights or claims based on any successor or transferee liability.

       W.     Under the MPA, GM is transferring all title and interest in Memphis, TN

SPO Warehouse and White Marsh, MD Allison Transmission Plant (the "TPC Property") to the

Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims,

encumbrances, and interests, including any liens on the TPC Property under the Tennessee

Master Lease and Open End Leasehold Deeds of Trust, dated as of November 18, 1999, between

General Motors Corporation and Wilmington Trust Company, not in its individual capacity but

solely as Owner Trustee under the Trust Agreement dated as of May 28, 1999 ("Wilmington

Trust Company") and the related agreements and the Maryland Master Lease and Mortgages,

dated as of September 8, 1999, between General Motors Corporation and Wilmington Trust

Company and the related agreements (the "TPC North Agreement").  The TPC North Agreement

is a secured financing, and Wilmington Trust Company shall be entitled to a lien equal to the

value of the TPC Property in the proceeds received by the Sellers under the 363 Transaction as

adequate protection under section 363(e) of the Bankruptcy Code.  If the Debtors and

Wilmington Trust Company are unable to agree to the value of the TPC Property for the purpose

of determining the amount of Wilmington Trust Company's secured claim, the Debtors or

Wilmington Trust Company shall file a motion with this Court seeking a determination of the

amount of Wilmington Trust Company's secured claim.

X.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction if the sale of the Purchased Assets was not free and clear of all

liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability other than Assumed Liabilities, or if the Purchaser would, or in

the future could, be liable for any such liens, claims, encumbrances, and other interests,

including rights or claims based on any successor or transferee liability (collectively, the

"Retained Liabilities") that expressly are not assumed by the Purchaser, as set forth in the MPA.

The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that

none of the Purchaser, its affiliates, their present or contemplated members or shareholders

(other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will

have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at

law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability or Retained Liabilities.

Y.    The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Assumable Executory Contracts to the Purchaser in

connection with the consummation of the 363 Transaction, and the assumption and assignment

of the Assumable Executory Contracts is in the best interests of the Debtors, their estates and

creditors, and other parties in interest.  The Assumable Executory Contracts being assigned to,

and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets

being purchased by the Purchaser, and, accordingly, such assumption and assignment of the

Assumable Executory Contracts and liabilities are reasonable, enhance the value of the Debtors'

estates, and do not constitute unfair discrimination

      Z.    For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW;

- the Agreement between the UAW and General Motors Corporation, dated September 26, 2007 (effective October 15, 2007) (the "UAW CBA") shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. Assumption and assignment of the UAW CBA is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement Agreement). The Debtors, the Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

AA.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Assumable Executory Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.  The Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts and approval of the assumption and assignment for a particular Assumable Executory Contract thereunder, the Debtors shall be forever released from any and all liability under the Assumable Executory Contract.

BB.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein.  The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

CC.    The Debtors currently maintain certain privacy policies that govern the use of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code) in conducting their business operations.  The 363 Transaction may contemplate the transfer of certain personally identifiable information to the Purchaser in a manner that may not be consistent with certain aspects of their existing privacy policies.  Accordingly, on June __, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on June __, 2009.  The Court has given due consideration to the facts, including the exigent circumstances surrounding the conditions of the sale of personally identifiable information in connection with the 363 Transaction.  No showing has been made that the sale of personally identifiable information in connection with the 363 Transaction violates applicable nonbankruptcy law.

DD.    This Order constitutes approval, pursuant to Bankruptcy Rule 9019, of the compromise and settlement embodied in the UAW Retiree Settlement Agreement, and such compromise and settlement meets all of the requirements set forth in Bankruptcy Rule 9019.

EE.    This Order constitutes a final order within the meaning of 28 U.S.C. §.158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

## General Provisions

1.    The Motion is granted in its entirety, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved, as further described herein.

2.    All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservation of rights included in such Objections are overruled on the merits.

## **Approval of the MPA**

3.      The MPA, and all the terms and conditions thereof, is approved.

4.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under, and comply with the terms of, the MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and conditions of the MPA and this Order.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the MPA, together with all additional instruments and documents that the Sellers or the Purchaser deem necessary or appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the MPA.

6.      This Order and the MPA shall be binding in all respects upon all known and unknown creditors of, and equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability, all non-Debtor parties to the Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and their Affiliates and subsidiaries, the Purchased Assets, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the MPA or this Order.

## Transfer of Purchased Assets Free and Clear

7.      Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller may possess with respect thereto.

8.      Except as expressly permitted or otherwise specifically provided by the MPA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

9.      The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

10.     On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, including rights or claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance, or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

12.     All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

13.     Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

14.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order.

15.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the 363 Transaction contemplated by the MPA.

## Approval of the UAW Retiree Settlement Agreement

16.     The UAW Retiree Settlement Agreement, the transactions contemplated therein, and the terms and conditions thereof, are approved.  The Debtors, the Purchaser, and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to, and in accordance with, the terms and conditions of the UAW Retiree Settlement Agreement and this Order, including the obligation of the Purchaser to reimburse the UAW for certain expenses relating to the 363 Transaction and the transition to the New VEBA arrangements.  The Trust Amendments are approved and the VEBA

Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree

Settlement Agreement)

17.    In accordance with the terms of the UAW Retiree Settlement Agreement,

(a) as of the Closing, the requirement of Section 15 of the Settlement Agreement, dated July 31,

2008, in the class action styled *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action

No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) to amend the General Motors Hourly-Rate

Employees Pension Plan shall be terminated and void, and (b) on the later of December 31,

2009, or the Closing of the 363 Transaction, (i) the committee and the trustees of the Existing

External VEBA (as hereinafter defined) are directed to transfer to the New VEBA all assets and

liabilities of the voluntary employees' beneficiary association established pursuant to the

settlement agreement in the class action styled *UAW et al. v. General Motors Corp.*, No. 05-CV-

73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006), *aff'd*, *Int'l Union, UAW v. General Motors

Corp.*, 497 F.3d 615 (6th Cir. 2007) (the "Existing External VEBA") within fifteen (15) days

thereafter, and coverage under the Existing External VEBA as to the Class and Covered Group

(each as defined in the UAW Retiree Settlement Agreement) shall terminate upon the completion

of such transfer, and (ii) all obligations and liabilities of the Purchaser relating to retiree medical

benefits for the Class and Covered Group shall terminate, and the Purchaser shall not thereafter

have any such obligations and liabilities, in each case as provided in and in accordance with

Section 5(D) of the UAW Retiree Settlement Agreement.

### Approval of GM's Assumption of the UAW Claims Agreement

18.    Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized to perform their obligations under, or in connection with, the implementation of the

UAW Claims Agreement and comply with the terms of the UAW Claims Agreement pursuant

to, and in accordance with, the terms and conditions of the UAW Claims Agreement and this

Order.

### Assumption and Assignment to the Purchaser of Assumable Executory Contracts

19.     Pursuant to sections 105(a), 363, and  365 of the Bankruptcy Code and

subject to and conditioned upon the Closing of the 363 Transaction, the Debtors' assumption and

assignment to the Purchaser of the Assumable Executory Contracts is approved, and the

requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed

satisfied.

20.     The Debtors are authorized and directed in accordance with sections

105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of

the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures

Order and the MPA, the Assumable Executory Contracts free and clear of all liens, claims,

encumbrances, or other interests of any kind or nature whatsoever, including rights or claims

based on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute

and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably

deems may be necessary to assign and transfer the Assumable Executory Contracts and Assumed

Liabilities to the Purchaser.

21.     The Assumable Executory Contracts shall be transferred and assigned to,

pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and

effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable

Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of

the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,

pursuant to section 365(k) of the Bankruptcy Code.  The Sellers shall be relieved from any

further liability with respect to the Assumable Executory Contracts after such assumption and

assignment to the Purchaser.  Each Assumable Executory Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.  The Debtors may assume each of their respective Assumable Executory Contracts in accordance with section 365 of the Bankruptcy Code.  The Debtors may assign each Assumable Executory Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumable Executory Contract that prohibits or conditions the assignment of such Assumable Executory Contract or terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumable Executory Contract, constitute unenforceable antiassignment provisions which are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of each Assumable Executory Contract have been satisfied.  At such time as provided in the Sale Procedures Order and the MPA, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Purchased Contract.  Any portion of any of the Debtors' unexpired leases of nonresidential real property that purport to permit the respective landlords thereunder to cancel the remaining term of any such leases if the Sellers discontinue their use or operation of the Leased Real Property are void and of no force and effect and shall not be enforceable against the Purchaser, its assignees and sublessees, and the landlords under such leases shall not have the right to cancel or otherwise modify such leases or increase the rent, assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers' cessation of operations, the assignment of such leases to the Purchaser, or the interruption of business activities at any of the leased premises.

22.    All undisputed defaults or other obligations of the Sellers under the Purchased Contracts arising or accruing prior to the Assumption Effective Date (without giving

effect to any acceleration clauses or any default provisions of the kind specified in section

365(b)(2) of the Bankruptcy Code) shall be cured at the Assumption Effective Date or as soon

thereafter as practicable by payment of the Cure Amounts (as hereinafter defined) by the

Purchaser, and upon paying such amounts the Purchaser shall have no further liability or

obligation arising or accruing prior to the date of the Closing, except for disputed Cure Amounts

and as otherwise expressly provided in the MPA.  The Database maintained by the Debtors with

respect to the Assumable Executory Contracts, which is referenced and is accessible as set forth

in the Assumption and Assignment Notice, reflects the sole amounts necessary under section

365(b) of the Bankruptcy Code to cure all monetary defaults under the Assumable Executory

Contracts (the "Cure Amounts"), and no other amounts are or shall be due to the non-Debtor

parties in connection with the assumption by the Debtors and assignment to the Purchaser of the

Assumable Executory Contracts.

        23.     Each non-Debtor party to an Assumable Executory Contract is forever

barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the

Purchaser, their successors or assigns, or their respective property, any default arising prior to, or

existing as of, the Closing, or, against the Purchaser, any counterclaim, defense, setoff, or other

Claim asserted or assertable against the Sellers and (ii) imposing or charging against the

Purchaser or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as

a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory

Contracts.  The validity of such assumption and assignment of the Assumable Executory

Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to

an Assumable Executory Contract.

        24.     Except as provided in the MPA or this Order, after the Closing, the

Debtors and their estates shall have no further liabilities or obligations with respect to any

Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of

such Claims are forever barred and estopped from asserting such Claims against the Debtors,

their successors or assigns, and their estates.

      25.     The failure of the Sellers or the Purchaser to enforce at any time one or

more terms or conditions of any Assumable Executory Contract shall not be a waiver of such

terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and

condition of the Assumable Executory Contracts.

      26.     The assignments of each of the Assumable Executory Contracts are made

in good faith under sections 363(b) and (m) of the Bankruptcy Code.

### Additional Provisions

      27.     Except for the Assumed Liabilities expressly set forth in the APA, none of

the Purchaser, its successors or assigns, or any of their respective affiliates shall have any

liability for any Claim that arose prior to the Closing Date, relates to the production of vehicles

prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the MPA or any of the transactions or documents ancillary

thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:

(i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Purchased Agreements from and after the Closing);

(ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation

or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious

liabilities of any kind or character for any Claims, including, but not limited to, under any theory

of successor or transferee liability, de facto merger or continuity, environmental, labor and

employment, and products or antitrust liability, whether known or unknown as of the Closing,

now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or

unliquidated.

   28.  Effective upon the Closing and except as otherwise provided by

stipulation filed with or announced to the Court with respect to a specific matter, all persons and

entities are forever prohibited and enjoined from commencing or continuing in any manner any

action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or

other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with

respect to any (i) Claim other than Assumed Liabilities, or (ii) successor or transferee liability of

the Purchaser for any of the Debtors, including, without limitation, the following actions:  (a)

commencing or continuing any action or other proceeding pending or threatened against the

Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets,

including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner

any judgment, award, decree, or order against the Debtors as against the Purchaser, its

successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (c)

creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as

against the Purchaser or its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind for

any obligation of any of the Debtors as against any obligation due the Purchaser or its

successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (e)

commencing or continuing any action, in any manner or place, that does not comply, or is

inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or

actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or

refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

29.    Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the MPA or this Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers arising under or related to the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order and the MPA, the Purchaser shall not be liable for any Claims against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing.  The Purchaser has given substantial consideration under the MPA for the benefit of the holders of liens, claims, encumbrances, or other interests.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders liens, claims, encumbrances or other interests against the Sellers or their respective assets.

30.    The consideration provided by the Purchaser for the Purchased Assets under the MPA shall be deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

31.    The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

32.    If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

33.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated, and that the conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

34.     Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the MPA.

35.     Any amounts that become payable by the Sellers to the Purchaser pursuant to the MPA (and related agreements executed in connection therewith, including, but not limited to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code and (b) be paid by the Debtors in the time and manner provided for in the MPA without further Court order.

36.     The transactions contemplated by the MPA are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the 363 Transaction shall not affect the validity of the 363 Transaction (including the assumption and assignment of any of the Assumable Executory Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

37.     Subject to further Court order and consistent with the terms of the MPA and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or other audio or digital recordings and data in, or retrievable from, computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business, and (b) the cash management system maintained by the Debtors prior to the Closing pursuant to

the order of the Court entered on June __, 2009 (Docket No. ___), as such system may be necessary to effect the orderly administration of the Debtors' estates.

38.     Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Order.  Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

39.     No law of any state or other jurisdiction, including any bulk sales law or similar law, shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA, the Motion, and this Order.

40.     The terms and provisions of the MPA and this Order shall be binding in all respects upon, and shall inure to the benefit of the Debtors, their estates, and their creditors, the Purchaser and its respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting a lien, claim, encumbrance, or other interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

41.     The failure to specifically include any particular provisions of the MPA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the MPA be authorized and approved in its entirety.

42.     The MPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

43.     The provisions of this Order are nonseverable and mutually dependent on each other.

44.     Pursuant to Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

45.     This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets.

Dated: New York, York
              [_____ __], 2009

_____
United States Bankruptcy Judge

EXHIBIT A

## **MASTER SALE AND PURCHASE AGREEMENT**

TO BE INSERTED

**EXHIBIT M TO THE MSPA**

**FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT**

**EXHIBIT M**

**FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT**

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of *[_____]*, 2009 by and among *[_____]¹*, a Delaware corporation (the "Corporation"), *[Holdco]*, a *[trust established for the sole benefit of the United States Department of the Treasury] [a Delaware [limited liability company][corporation]]* (the "UST Holdco"), 7176384 Canada Inc., a corporation organized under the laws of Canada ("Canada"), the UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association (the "VEBA"), and *[Debtor]*, a Delaware corporation (the "Debtor").²

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST Holdco, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST Holdco, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS**

*Section 1.1    Certain Defined Terms*.  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

---

[1] Vehicle Acquisition Holdings LLC will convert to a corporation and change its name to *[New GM]* as of closing.

[2] In the event that any of the other Sellers under the Master Sale and Purchase Agreement, dated June 1, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with the SEC by the Corporation so that such registration statement or report would not be materially misleading; (b) would not be required to be made at such time but for the filing of such registration statement; and (c) the Corporation has a *bona fide* business purpose for not disclosing publicly.

"Adverse Effect" shall have the meaning set forth in **Section 2.1.6**.

"Advice" shall have the meaning set forth in **Section 2.7**.

"Agreement" shall have the meaning set forth in the Preamble.

"Canada" shall have the meaning set forth in the Preamble.

"Co-Managers" shall have the meaning set forth in Section **2.1.4(a)**.

"Common Stock" shall have the meaning set forth in the Recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Corporation Shelf Registration" shall have the meaning set forth in **Section 2.2.1**.

"Debtor" shall have the meaning set forth in the Preamble.

"Demand Registration" shall have the meaning set forth in **Section 2.1.1(a)**.

"Demand Request" shall have the meaning set forth in **Section 2.1.1(a)**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) securities pursuant to one or more Demand Registrations pursuant to **Article 2** hereof, (b) securities registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) securities registered on Form S-3 or any successor form covering solely securities issued under a dividend reinvestment program.

"FINRA" shall have the meaning set forth in **Section 2.5(a)(xvii)**.

"Government Holder" means the UST Holdco or Canada.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Holder" means each of (a) the UST Holdco, Canada, the VEBA and the Debtor and (b) any direct or indirect transferee of any such Holder who shall become a party to this Agreement in accordance with **Section 2.10**.

"Indemnitee" shall have the meaning set forth in **Section 2.9.1**.

"Indemnitor" shall have the meaning set forth in Section 2.9.3(a) but shall, for the avoidance of doubt, exclude the Government Holders and the VEBA for purposes of providing indemnification hereunder.

"Initial Sale Time" shall have the meaning set forth in **Section 2.9.1**.

"Inspectors" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"IPO" means the Corporation's first public offering of Common Stock (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms).

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.6**.

"Lead Underwriters" shall have the meaning set forth in **Section 2.1.4(a)**.

"Losses" shall have the meaning set forth in **Section 2.9.1**.

"Market Value" shall mean with respect to any particular class or type of Registrable Securities (a) at any time securities of the same class or type as the applicable Registrable Securities are listed on a national securities exchange, the closing price of such class or type of securities on the trading day immediately preceding the date of the Demand Request or Transfer Notice, (b) at any time that the Warrants are not listed on a national securities exchange but the Common Stock is listed on a national securities exchange, for each Warrant, the closing price of one share of Common Stock multiplied by the number of shares of Common Stock for which such Warrant is then exercisable (assuming cashless exercise), or (c) other than in the case of clause (a) or clause (b), the estimated market value determined in good faith by the Corporation based upon the advice of a nationally recognized independent investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to UST Holdco or if UST Holdco is not the Requesting Holder, the Holders of a majority of the Registrable Securities covered by the Demand Request or Transfer Notice).

"<u>Master Sale and Purchase Agreement</u>" means the Master Sale and Purchase Agreement, dated as of June 1, 2009, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and Vehicle Acquisition Holdings LLC.

"<u>Material Adverse Change</u>" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Corporation and its subsidiaries, taken as a whole.

"<u>Person</u>" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"<u>Piggyback Offering</u>" shall have the meaning set forth in **Section 2.2.1**.

"<u>Preferred Stock</u>" shall have the meaning set forth in the Recitals.

"<u>Records</u>" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"<u>register</u>," "<u>registered</u>" and "<u>registration</u>" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"<u>Registrable Securities</u>" means (a) Warrants and the shares of Common Stock and/or Preferred Stock owned from time to time by the UST Holdco, Canada, the VEBA and the Debtor as of the date hereof and set forth on <u>Annex I</u> hereto, (b) the shares of Common Stock issued or issuable to any Holder upon exercise of a Warrant, (c) any additional securities of the Corporation issued to the Debtor pursuant to Section 3.2 of the Master Sale and Purchase Agreement and (d) any equity security issued in exchange for or with respect to any shares of Common Stock referred to in clauses (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise.  As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with a registration statement; (ii) have been sold pursuant to Rule 144 under the Securities Act (or any successor provision); (iii) are held by a Holder that may sell all such Registrable Securities held by it in a single day pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision); (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are held by any Person who is not a Holder.  For purposes hereof, "a majority of the Registrable Securities" and

"on the basis of the number of Registrable Securities" shall be determined assuming the exercise of the Warrants in full.

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants or financial advisors or any other Person acting on behalf of such Person.

"Requesting Holders" shall have the meaning set forth in **Section 2.1.1(a)**.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Shelf Registration" shall have the meaning set forth in **Section 2.1.2(a)**.

"Suspension Notice" shall have the meaning set forth in **Section 2.7**.

"Take-Down" shall have the meaning set forth in **Section 2.1.2(b)**.

"Transfer Notice" shall have the meaning set forth in **Section 2.1.2(b)**.

"UST Holdco" shall have the meaning set forth in the Preamble.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Designee" shall mean the person(s) authorized by the Committee (as defined in the UAW Retiree Medical Benefits Trust Agreement dated *[_____]* between *[_____]* and *[_____]*) to execute this Agreement and/or carry out the transactions contemplated hereby.

"Warrants" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally*.  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."  Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

# ARTICLE 2
# REGISTRATION RIGHTS

*Section 2.1      Demand Registration.*

### *Section 2.1.1      Request for Registration.*

(a)      Subject to **Section 2.1.3**, any Holder or Holders of Registrable Securities shall have the right to require the Corporation to file a registration statement under the Securities Act for a public offering of all or part of its or their Registrable Securities (a "<u>Demand Registration</u>"), by delivering to the Corporation written notice stating that such right is being exercised, naming, if applicable and to the extent known by such Holder or Holders, any other Holders whose Registrable Securities are to be included in such registration (collectively, the "<u>Requesting Holders</u>"), specifying the number and type of each such Holder's Registrable Securities to be included in such registration, specifying whether the Registrable Securities to be included by the Requesting Holder are all of the Registrable Securities then held by such Requesting Holder and, subject to **Section 2.1.4** hereof, describing the intended method of distribution thereof (a "<u>Demand Request</u>").   Subject to **Section 2.1.3**, after receipt of any Demand Request, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.

(b)      Subject to **Section 2.1.3** and **Section 2.1.7**, the Corporation shall file the registration statement in respect of a Demand Registration as promptly as practicable and, in any event, (i) with respect to the filing of a Form S-3, within forty-five (45) days and (ii) with respect to the filing of any other type of registration statement, within ninety (90) days after receiving a Demand Request, and shall use reasonable best efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

### *Section 2.1.2      Shelf Registration; Take-Downs.*

(a)      Subject to **Section 2.1.3**, with respect to any Demand Registration, at any time that the Corporation is eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) with respect to the Registrable Securities, the Requesting Holders may request that the Corporation (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration, or (ii) at any time that a registration statement pursuant to Rule 415 covering Registrable Securities is effective, register additional Registrable Securities of the Requesting Holders pursuant to such shelf registration statement to effect such Demand Registration (in either case, a "<u>Shelf Registration</u>").   For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" for all purposes under this Agreement except as otherwise provided in **Section 2.1.3**.

(b)      Subject to **Section 2.1.3**, any Holder or Holders with Registrable Securities registered pursuant to a Shelf Registration that intends to effect an underwritten offering with respect to such Registrable Securities shall deliver a notice to the Corporation at least fifteen (15) days prior to the commencement of such underwritten offering, stating (i) that such Holder or Holders intend to effect an underwritten offering of all or part of the Registrable Securities

included by such Holder or Holders in the Shelf Registration, (ii) if applicable and to the extent known by such Holder, any other Holders whose Registrable Securities are to be included in the underwritten offering, (iii) the number and type of each such Holder's Registrable Securities to be included in such underwritten offering, (iv) whether the Registrable Securities to be included by such Holder are all of the Registrable Securities then held by such Holder, and (v) the proposed timetable for such underwritten offering.  Any Holder with Registrable Securities registered pursuant to a Shelf Registration that intends to effect any other sale or transfer of such Registrable Securities (each a "Take-Down") shall deliver a notice to the Corporation at least five (5) days prior to effecting such non-underwritten sale or transfer, stating (i) that such Holder intends to effect a non-underwritten sale or transfer of all or part of the Registrable Securities included by such Holder in the Shelf Registration, (ii) the number and type of the Registrable Securities to be included in such sale or transfer and (iii) the proposed manner and timetable for such sale or transfer.  A notice provided by any Requesting Holder pursuant to the first two sentences of this **Section 2.1.2(b)** is referred to herein as a "Transfer Notice."  Subject to **Section 2.1.3**, after receipt of any Transfer Notice, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.  For the avoidance of doubt, a Take-Down shall not be deemed to be a Demand Registration and shall not be subject to **Section 2.1.3**.

(c)    Subject to **Section 2.1.3**, the Corporation shall use its reasonable best efforts to keep any Shelf Registration requested pursuant to **Section 2.1.2(a)** continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Holders until the earlier of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) and (ii) the date as of which all of such Requesting Holders are permitted to sell their Registrable Securities without registration pursuant to Rule 144 under the Securities Act without volume limitation or other restrictions on transfer thereunder.

(d)    The Corporation shall, from time to time, supplement and amend the Shelf Registration if required by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for such Shelf Registration.

*Section 2.1.3    Limitations.*

(a)    A Holder shall not be permitted to request a Demand Registration prior to one hundred eighty (180) days after the date of this Agreement, unless prior thereto the Corporation has a class of equity securities registered under Section 12(b) of the Exchange Act.

(b)    A Holder (other than the UST Holdco) shall not be permitted to request a Demand Registration prior to the time the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act.

(c)    A Holder shall not be permitted to request a Demand Registration, or submit a Transfer Notice with respect to an underwritten offering pursuant to a Shelf Registration, within one hundred eighty (180) days after either (i) the effective date of a previous Demand Registration (other than a Shelf Registration) or (ii) the completion of any underwritten offering pursuant to a Shelf Registration.

(d)      A Holder shall not be permitted to submit a Demand Request, or a Transfer Notice for an underwritten offering, or effect any such Demand Registration or underwritten offering unless such Demand Request or Transfer Notice for an underwritten offering is for (i) a number of Registrable Securities having a Market Value equal to or exceeding $100 million in the aggregate, or (ii) all of the Registrable Securities then held by the Requesting Holder.

(e)      The Corporation shall not be required to effect, (i) until (but excluding) the third anniversary of the date hereof, more than two (2) Demand Registrations (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period, and (ii) from and including the third anniversary of the date hereof, more than one (1) Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period. Notwithstanding the foregoing, (i) the VEBA shall have the right, from and including the third anniversary of the date hereof, to request one additional Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) during any consecutive twelve (12) month period, and (ii) for the avoidance of doubt, the limitations set forth in this **Section 2.1.3** shall not apply to any non-underwritten Take-Down by any Holder under a Shelf Registration.

*Section 2.1.4   Demand Registrations for Underwritten Offerings.*

(a)      At the request of UST Holdco or Canada, or if UST Holdco or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities submitting a Demand Request or Transfer Notice for an underwritten offering of Registrable Securities, the Corporation shall direct the applicable underwriter to conduct such offering in the form of a "firm commitment." With respect to any such underwritten offering, (i) UST Holdco, or if UST Holdco is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering shall select the investment banking firm or firms to lead the underwritten offering (the "Lead Underwriters"); provided that such Lead Underwriters shall be reasonably acceptable to the Corporation, and (ii) the Corporation shall select the other investment banking firms, if any, to co-manage such underwritten offering (the "Co-Managers"), provided that such Co-Managers shall be reasonably acceptable to UST Holdco or Canada, or if UST Holdco or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering.

(b)      If a Demand Registration is for an underwritten offering or a transfer pursuant to a Shelf Registration involves an underwritten offering, no Holder may participate in any such underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation; provided that such arrangements are subject to the consent of UST Holdco, or if UST Holdco is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering, and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with

any such underwritten offering other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation (if agreed to) of each such Holder to indemnify the Lead Underwriters and any Co-Managers pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such offering and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

*Section 2.1.5   Rights of Nonrequesting Holders and the Corporation*.  Subject to **Section 2.1.3**, after receipt of any Demand Request or any Transfer Notice relating to an underwritten offering pursuant to a Shelf Registration, the Corporation shall promptly (but in any event within five (5) days) give written notice of (i) such proposed Demand Registration to all other Holders or (ii) such Transfer Notice to such other Holders whose securities are covered by such Shelf Registration, who shall have the right, exercisable by written notice to the Corporation within five (5) days of their receipt of the Corporation's notice, to elect to include in such Demand Registration or underwritten offering such portion of their Registrable Securities as they may request.  All Holders requesting to have their Registrable Securities included in a Demand Registration or underwritten offering shall be deemed to be "Requesting Holders" for purposes of this **Section 2.1**.  For the avoidance of doubt, subject to **Section 2.1.6**, the Corporation may register in any Demand Registration any equity securities of the Corporation.

*Section 2.1.6   Priority on Demand Registrations*.    With respect to any underwritten offering based on a Demand Registration (including an underwritten offering pursuant to a Shelf Registration), if the Lead Underwriters (after consultation with the Co-Managers) advise that the inclusion of the securities proposed to be included in such registration would adversely affect the price, timing or distribution of the offering or otherwise adversely affect its success (an "Adverse Effect"), the Corporation shall include in such underwritten offering (a) first, the Registrable Securities, pro rata among the Requesting Holders on the basis of the number of Registrable Securities owned by each such Requesting Holder, and (b) second, any other securities requested to be included in such underwritten offering (including securities to be sold for the account of the Corporation); provided, however, that if more than 25% of the Registrable Securities of any Holder subject to a Demand Request or Transfer Notice for an underwritten offering are excluded pursuant to the terms of this **Section 2.1.6** from the applicable Demand Registration or underwritten offering pursuant to a Shelf Registration, the offering shall not be deemed to constitute a Demand Registration for the purposes of **Section 2.1.3**.

*Section 2.1.7   Deferral of Filing; Suspension of Use*.  The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of any registration statement required by or filed pursuant to **Section 2.1**, at any time if (a) the Corporation determines, in its sole discretion, that such action or use (or proposed action or use) would require the Corporation to make an Adverse Disclosure, or (b) prior to receiving the Demand Request or Transfer Notice, as applicable, the board of directors of the Corporation had determined to effect a registered underwritten public offering of Company equity securities or

9

Company securities convertible into or exchangeable for Company equity securities for the Corporation's account and the Corporation had taken substantial steps (such as selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not exercise its rights to deferral or suspension pursuant to this **Section 2.1.7**, and shall not so effect any such deferral or suspension, for more than a total of one hundred eighty (180) days (which need not be consecutive) in any consecutive twelve (12) month period. In making any such determination to defer the filing or effectiveness, or suspend the use, of a registration statement required by **Section 2.1**, the Corporation shall not be required to consult with or obtain the consent of any Holder or any investment manager therefor, and any such determination shall be in the sole discretion of the Corporation, and neither the Holders nor any investment manager for any Holder shall be responsible or have any liability therefor. The Corporation shall promptly notify the Holders of any deferral or suspension pursuant to this **Section 2.1.7** and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable and will promptly notify each Holder in writing of the termination of any such deferral or suspension.

*Section 2.1.8  Withdrawal from Demand Registration.* Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Corporation with written notice. Upon receipt of such written notice, the Corporation shall continue all efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of **Section 2.1.3(b)** or **Section 2.1.3(d)**, in which case, the Corporation may in its sole discretion cease all efforts to proceed with registration or the underwritten offering. If the Corporation ceases all efforts to secure registration or effect the underwritten offering pursuant to this **Section 2.1.8**, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering pursuant to a Shelf Registration for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Request or Transfer Notice or (ii) the Requesting Holders pay or reimburse the Corporation for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering; provided that if, after a Demand Registration has become effective or an underwritten offering of Registrable Securities has been commenced, it is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, it shall be deemed not to have been effected and shall not count as a Demand Registration or underwritten offering for the purposes of **Section 2.1.3**.

*Section 2.2     Piggyback Offerings.*

*Section 2.2.1  Right to Piggyback.* Each time the Corporation proposes to offer any of its equity securities in a registered underwritten offering (other than pursuant to an Excluded Registration) under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than a Holder) (a "Piggyback Offering"), the Corporation shall give prompt written notice to each Holder of Registrable Securities (which notice shall be given not less than twenty (20) days prior to (i) the offering in the case of an underwritten offering pursuant to Rule 415 under the Securities Act (or any successor rule) (a "Corporation Shelf Registration") or (ii) the anticipated filing date of the

Corporation's registration statement in a registration other than a Corporation Shelf Registration), which notice shall offer each such Holder the opportunity to include any or all of its Registrable Securities in such underwritten offering, subject to the limitations contained in **Section 2.2.2** hereof. Each Holder who desires to have its Registrable Securities included in such underwritten offering shall so advise the Corporation in writing (stating the number and type of Registrable Securities desired to be registered or included) within fifteen (15) days after the date of such notice from the Corporation. Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Securities in any underwritten offering pursuant to this **Section 2.2.1** by giving written notice to the Corporation of such withdrawal. Subject to **Section 2.2.2** below, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein. Notwithstanding the foregoing, the Corporation may at any time withdraw or cease proceeding with any such offering if it shall at the same time withdraw or cease proceeding with the offering of all other equity securities originally proposed to be included in such offering.

*Section 2.2.2    Priority on Piggyback Offerings.*

(a)    If a Piggyback Offering was initiated by the Corporation, and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities the Corporation proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder, and (iii) third, any other securities requested to be included in such Piggyback Offering. If as a result of the provisions of this **Section 2.2.2(a)**, any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw its request to include its Registrable Securities in such Piggyback Offering.

(b)    If a Piggyback Offering was initiated by a security holder of the Corporation (other than a Holder), and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities requested to be included therein by the security holders requesting such Piggyback Offering and the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such Piggyback Offering (including securities to be sold for the account of the Corporation). If as a result of the provisions of this **Section 2.2.2(b)** any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Securities in such Piggyback Offering.

(c)    No Holder may participate in a Piggyback Offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in customary form and reasonably satisfactory to the Holders, reasonably required under the terms

of such underwriting arrangements; <u>provided</u>, <u>however</u>, that no such Holder shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; <u>provided</u>, <u>further</u>, <u>however</u>, that (i) any obligation, if agreed to, of each such Holder to indemnify the underwriters pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such registration and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

*Section 2.2.3  Selection of Underwriters*.  The Corporation shall select the investment banking firm or firms to manage the Piggyback Offering.

*Section 2.2.4*  No registration of Registrable Securities effected pursuant to this **Section 2.2** shall be deemed to have been effected pursuant to **Section 2.1.1** or **Section 2.1.2** or shall relieve the Corporation of its obligations under **Section 2.1.1** or **Section 2.1.2**.

*Section 2.3    SEC Form S-3*.  Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to cause Demand Registrations to be registered on Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) once the Corporation becomes eligible to use such form, and if the Corporation is not then eligible under the Securities Act to use such form, Demand Registrations shall be registered on the form for which the Corporation then qualifies. After becoming eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3, the Corporation shall use its reasonable best efforts to remain so eligible.

*Section 2.4    Holdback Agreements*.

(a)    The Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of the offering pursuant to a Demand Registration, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of any registration statement in connection with an underwritten Demand Registration (other than a Shelf Registration), except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Demand Request, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend

reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(b)     If any Holders of Registrable Securities provide a Transfer Notice relating to an underwritten offering of Registrable Securities registered pursuant to a Shelf Registration, the Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of such underwritten offering, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the pricing date for such underwritten offering, except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Transfer Notice, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(c)     Each Holder agrees, in the event of an underwritten offering of equity securities by the Corporation (whether for the account of the Corporation or otherwise), not to offer, sell, contract to sell or otherwise dispose of any Preferred Stock, Warrants, Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 under the Securities Act (except as part of such underwritten offering), during the sixty (60) day period (or such lesser period in each case as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, the pricing date for such underwritten offering); provided, however, that (i) any applicable period shall terminate on such earlier date as the Corporation gives notice to the Holders that the Corporation declines to proceed with any such offering and (ii) the sum of all holdback periods applicable to the Holders shall not exceed one hundred twenty (120) days (which need not be consecutive) in any given twelve (12) month period.

Section 2.5     Registration Procedures.

(a)     If and whenever the Corporation is required to effect the registration of any Registrable Securities pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Corporation shall use its reasonable best efforts to effect the registration and the sale, as applicable, of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as expeditiously as possible:

(i)     prepare and file with the SEC, pursuant to **Section 2.1** with respect to any Demand Registration, a registration statement on any appropriate form under the Securities Act with respect to such Registrable Securities and use its reasonable best efforts to cause such

registration statement to become effective as promptly as practicable; <u>provided</u> that as far in advance as practicable before filing such registration statement or any amendment thereto, the Corporation shall furnish to the selling Holders copies of reasonably complete drafts of all such documents prepared to be filed (including exhibits), and any such selling Holder shall have the opportunity to object to any information contained therein and the Corporation shall make corrections reasonably requested by such selling Holder with respect to such information prior to filing any such registration statement or amendment; <u>provided</u>, <u>further</u>, that the Corporation shall not file any such registration statement, and any amendment thereto, to which a Holder shall reasonably object in writing on a timely basis, unless in the Corporation's judgment such filing is necessary to comply with applicable law;

(ii)    except in the case of a Shelf Registration, prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the selling Holders thereof set forth in such registration statement;

(iii)    in the case of a Shelf Registration, comply with the provisions of **Section 2.1.2(c)** and **Section 2.1.2(d)**;

(iv)    furnish to each selling Holder of Registrable Securities and the underwriters of the securities being registered, without charge, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such selling Holders or underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such selling Holders or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.1.7**, **Section 2.4(c)**, **Section 2.6** and **Section 2.7** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by each selling Holder and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(v)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the Lead Underwriters or managing underwriters reasonably request (or, in the event the registration statement does not relate to an underwritten offering, as the selling Holders of a majority of such Registrable Securities being offered may reasonably request); use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts and things which may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such selling Holder in such jurisdictions; <u>provided</u>, <u>however</u>, that the Corporation shall not be required to (A) qualify

generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction or (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject;

(vi)      promptly notify each selling Holder and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation, or threatened initiation, of any proceedings for that purpose, or (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vii)      permit any selling Holder that might reasonably be deemed to be an underwriter or a Controlling Person of the Corporation to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Corporation in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(viii)      make available members of the management of the Corporation or the applicable Corporation subsidiaries for reasonable assistance in the selling efforts relating to any offering of Registrable Securities covered by a registration statement filed pursuant to this Agreement, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and road shows); provided, however, that management need only be made available for one such offering for each of the UST Holdco, Canada and the VEBA in any twelve (12) month period;

(ix)      otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Corporation's first fiscal quarter commencing after the effective date of a registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement shall be deemed to be satisfied if the Corporation timely files complete and

accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(x)        if requested by the Lead Underwriters, managing underwriters or any selling Holder, promptly incorporate in a prospectus supplement or post-effective amendment such information as the Lead Underwriters, managing underwriters or any selling Holder reasonably requests to be included therein, including, with respect to the Registrable Securities being sold by the selling Holders, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(xi)       as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each selling Holder;

(xii)      cooperate with the selling Holders and Lead Underwriters or the managing underwriters to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the Lead Underwriters, managing underwriters or such selling Holders may request at least two (2) business days prior to any sale of the Registrable Securities and keep available and make available to the Corporation's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(xiii)     promptly make available for inspection by any selling Holder, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or Representative retained by any such selling Holder or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (xiii) if (A) the Corporation believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) such selling Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in a form acceptable to the Corporation; and provided, further, that each selling Holder of Registrable Securities agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent

jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xiv)    furnish to each selling Holder and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Corporation (which may be in-house counsel) provided that such counsel is reasonably acceptable to such Holders and the underwriter, and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the selling Holders, Lead Underwriters or managing underwriters reasonably requests;

(xv)    cause the Registrable Securities included in any registration to be (A) in the case of an IPO, listed on a securities exchange or exchanges or an inter-dealer quotation system, as determined by the Corporation, or (B) in the case of a registration other than an IPO, (1) listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed or (2) quoted on an inter-dealer quotation system if similar securities issued by the Corporation are quoted thereon, as applicable;

(xvi)    provide a transfer agent and registrar for all Registrable Securities registered hereunder and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(xvii)    cooperate with each selling Holder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("FINRA");

(xviii)    during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xix)    notify each selling Holder of Registrable Securities promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xx)    subject to **Section 2.1.4(b)** and **Section 2.2.2(c)**, enter into such agreements (including underwriting agreements) as are customary in connection with an underwritten registration; and

(xxi)    advise each selling Holder of such Registrable Securities, promptly after it receives notice or obtains knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(b)    The selling Holders shall reasonably cooperate with the Corporation in the preparation and filing of any registration statement under the Securities Act pursuant to this Agreement and provide the Corporation with all information reasonably necessary to complete

such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of any selling Holder (or not proceed with such registration) if such selling Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.  Promptly following any sale or other transfer of any Registrable Securities, each Holder shall notify the Corporation in writing thereof, which notice shall specify the amount and type of securities involved, the date of the sale or transfer and whether the sale or transfer was effected under a registration statement or otherwise.

(c)    Each of the parties shall treat all notices of proposed transfers and registrations, and all information relating to any blackout periods under **Section 2.1.7** received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Holder) and shall not disseminate such information.

*Section 2.6    Issuer Free Writing Prospectuses*. The Corporation represents and agrees that, unless it obtains the prior consent of the Holders of a majority of the Registrable Securities participating in a registration or offering or the approval of the counsel for such Holders, and each of the Holders represents and agrees that, unless it obtains the prior consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Corporation represents that any Issuer Free Writing Prospectus shall not include any information that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Section 2.7    Suspension of Dispositions*.  Each Holder agrees that upon receipt of any notice (a "Suspension Notice") from the Corporation of the happening of any event of the kind described in **Section 2.5(a)(vi)(B)** or **(C)** or **Section 2.5(a)(xxi)** such Holder shall forthwith discontinue disposition of Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "Advice") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Corporation, such Holder shall deliver to the Corporation all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.  In the event the Corporation shall give any such notice, the time period regarding the effectiveness of registration statements set forth in **Section 2.5(a)(ii)** hereof, if applicable, shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Securities covered by such registration statement shall have received the copies of the supplemented or amended prospectus or the Advice.  The Corporation shall use its reasonable best efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable.

*Section 2.8      Registration Expenses.*  The Corporation shall pay all reasonable fees and expenses incident to the performance of or compliance with its obligations under this **Article 2**, including (a) all registration and filing fees, including fees and expenses (i) with respect to filings required to be made with all applicable securities exchanges and/or FINRA and (ii) of compliance with securities or "blue sky" laws including any fees and disbursements of counsel for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities pursuant to **Section 2.5(a)(v)**, (b) printing expenses, including expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by the Lead Underwriters or managing underwriter(s), if any, or by the Holder, (c) messenger, telephone and delivery expenses of the Corporation, (d) fees and disbursements of counsel for the Corporation, (e) expenses of the Corporation incurred in connection with any "road show" or other marketing efforts, (f) fees and disbursements of all independent certified public accountants (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to this Agreement) and any other Persons, including special experts, retained by the Corporation, and (g) fees up to $250,000 plus reasonable disbursements of one legal counsel for the Requesting Holders in connection with each registration or offering of their Registrable Securities or sale (including, for the avoidance of doubt, a Take-Down) of their Registrable Securities under a Shelf Registration but only if such registration, offering or sale either is effected or, pursuant to **Section 2.7**, is postponed.  For the avoidance of doubt, the Corporation shall not be required to pay any, and each Holder shall pay its own, underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any registration statement, or any other expenses of any Holder.  In addition, the Corporation shall bear all of its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange or inter-dealer quotation system on which similar securities issued by the Corporation are then listed and the fees and expenses of any Person, including special experts, retained by the Corporation.

*Section 2.9      Indemnification.*

*Section 2.9.1   Indemnification by the Corporation.*  The Corporation agrees to indemnify and hold harmless, to the fullest extent permitted by law, each Holder, the trustees of any Holder, the investment manager or managers acting on behalf of any Holder with respect to the Registrable Securities, Persons, if any, who Control any of them, and each of their respective Representatives (each an "Indemnitee"), from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable costs of investigation and legal expenses) ("Losses") arising out of or caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement described herein or any related prospectus or Issuer Free Writing Prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto), or arising out of or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the

Corporation in writing by such Indemnitee or any Person acting on behalf of such Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (a) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the respective Holder that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (b) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to such Holder a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (c) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (d) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (c) above.  This indemnity shall be in addition to any liability the Corporation may otherwise have under this Agreement or otherwise.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or any indemnified party and shall survive the transfer of Registrable Securities by any Holder.

Section 2.9.2  Indemnification by the Holders.  Each Holder (other than the Government Holders and the VEBA) agrees, to the fullest extent permitted under applicable law severally and not jointly, to indemnify and hold harmless each of the Corporation, its directors, officers, employees and agents, and each Person, if any, who Controls the Corporation, to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the respective Holder or such underwriter, as the case may be, expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto).  No claim against the assets of any Holder shall be created by this **Section 2.9.2**, except as and to the extent permitted by applicable law.  Notwithstanding the foregoing, no Holder shall be liable to the Corporation or any such Person for any amount in excess of the net amount received by the Holder from the sale of Registrable Securities in the offering giving rise to such liability.

Section 2.9.3  Indemnification Procedures.

(a)    In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted where indemnity may be sought by an Indemnitee pursuant to any of the preceding paragraphs of this **Section 2.9**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability which it may have to such Indemnitee except to the extent that the Indemnitor

was prejudiced by such failure to notify.  The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.9.3(a)**) the Indemnitee and any others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (a) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (b) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall only be responsible for the reasonable fees and expenses of such counsel.  It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any local counsel) for all such Indemnitees not having actual or potential differing interests or legal defenses among them, and that all such fees and expenses shall be reimbursed as they are incurred.  The Indemnitor shall not be liable for any settlement of any proceeding affected without its written consent.

(b)    If the indemnification provided for in this **Section 2.9** is unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such Losses, as well as any other relevant equitable considerations.  If the indemnification described in **Section 2.9.1** or **Section 2.9.2** is unavailable to an Indemnitee, the relative fault of the Corporation, any Holder and Persons acting on behalf of or Controlling the Corporation or any such Holder shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, a Holder or by Persons acting on behalf of the Corporation or any Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The Indemnitor shall not be required to contribute pursuant to this **Section 2.9.3(b)** if there has been a settlement of any proceeding affected without its written consent.  No claim against the assets of any Holder shall be created by this **Section 2.9.3(b)**, except as and to the extent permitted by applicable law.  Notwithstanding the foregoing, no Holder shall be required to make a contribution in excess of the net amount received by such Holder from the sale of Registrable Securities in the offering giving rise to such liability.  For the avoidance of doubt, neither the Government Holders nor the VEBA shall be required to make any contribution to any Indemnitee under this Section 2.9.3(b).

*Section 2.9.4   Survival.*  The indemnification contained in this **Section 2.9** shall remain operative and in full force and effect regardless of any termination of this Agreement.

*Section 2.10    Transfer of Registration Rights.* The rights and obligations of a Holder under this Agreement may be assigned to any transferee or assignee that directly acquires Registrable Securities from such Holder (including, without limitation, in connection with any such assignment by either Government Holder or the VEBA to an affiliate Controlled by such Governmental Holder or the VEBA, as applicable, and in connection with any such assignment by the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction), but only if (a) the respective Holder agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Corporation concurrent with such transfer or assignment and (b) concurrent with such transfer or assignment, such transferee or assignee furnishes the Corporation with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being transferred or assigned, and the transferee or assignee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein as a Holder hereunder.  Notwithstanding the foregoing, the rights of the Debtor under this Agreement shall not be assigned by the Debtor in connection with the distribution of any Registrable Securities from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction other than any distribution of any Registrable Securities that may be deemed to have been made from the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

*Section 2.11    Rule 144.*  After such time as the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act, the Corporation shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and shall take such further action as the Holders may reasonably request, all to the extent required from time to time to enable the Holders to sell Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC.  The Corporation shall promptly upon the request of any Holder furnish to such Holder evidence of the number of shares of Common Stock then outstanding, as of the most recent date practicable. Any sale or transfer by a Holder of Registrable Securities that could have been effected either as a sale of securities pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision) or a sale covered by a Shelf Registration shall be deemed for all purposes under this Agreement to be a sale or transfer by such Holder pursuant to, and in accordance with, Rule 144 under the Securities Act.

*Section 2.12    Preservation of Rights.*

(a)  The Corporation will not (x) grant any registration rights to third parties which are inconsistent with the rights granted hereunder or (y) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates the rights expressly granted to the Holders in this Agreement.

(b)  If the Corporation grants any registration rights to a third party that are more favorable to such party than the rights granted to the UST Holdco, Canada and the VEBA

hereunder, the UST Holdco, Canada and the VEBA shall be entitled to the same registration rights as such third party.

# ARTICLE 3
# TERMINATION

*Section 3.1    Termination.*    Other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the obligations of the Corporation hereunder shall terminate upon the time when there are no Registrable Securities remaining.    With respect to each Holder, other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the rights and obligations of such Holder hereunder shall terminate when such Holder no longer holds any Registrable Securities and, with respect to the Debtor, has no further right to receive additional securities of the Corporation pursuant to Section 3.2 of the Master Sale and Purchase Agreement.    Notwithstanding the foregoing, all liabilities or obligations under **Sections 2.8** and **2.9** and **Article 4** shall remain in effect in accordance with the terms of such provisions.

# ARTICLE 4
# MISCELLANEOUS

*Section 4.1    Notices*.    Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

*[_____]*
*[_____]*
*[_____]*
Attention: *[_____]*
Telephone: *[_____]*
Facsimile: *[_____]*

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
         R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile: 212-504-6666

If to the UST Holdco:

> *[_____]*
> *[_____]*
> *[_____]*
> Attention:  *[_____]*
> Telephone: *[_____]*
> Facsimile:  *[_____]*
>
> with a copy to:
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention: John J. Rapisardi
>             R. Ronald Hopkinson
> Telephone: 212-504-6000
> Facsimile:  212-504-6666

If to Canada:

> 7176384 Canada Inc.
> 1235 Bay Street, Suite 400
> Toronto, ON M54 3K4
> Attention:  Mr. Michael Carter
> Facsimile:  416-934-5009
>
> with a copy to:
> Patrice S. Walch-Watson, Esq.
> Torys LLP
> 79 Wellington Street West
> Suite 3000
> Toronto, ON M5K 1N2
> Facsimile: 416-865-7380

If to the VEBA:

> UAW Retiree Medical Benefits Trust
> P.O. Box 14309
> Detroit, Michigan 48214
>
> with a copy to:
> Daniel W. Sherrick
> General Counsel
> International Union, United Automobile, Aerospace and
> Agricultural Implement Workers of America
> 8000 East Jefferson Avenue
> Detroit, Michigan 48214

Telephone: *[_____]*
Facsimile: 313-822-4844

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Attention: Richard S. Lincer & David I. Gottlieb

If to the Debtor:

*[_____]*
*[_____]*
*[_____]*
Attention: *[_____]*
Telephone: *[_____]*
Facsimile: *[_____]*

with a copy to:
Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attention: Brian R. Boch
        Catherine Abbott
Telephone: 312-222-9350
Facsimile: 312-527-0484

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller
        Stephen Karotkin
        Raymond Gietz
Telephone: 212-310-8000
Facsimile: 212-310-8007

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 4.1**, then to the last addressee as so designated.

Section 4.2    *Authority*.  Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.3    *No Third Party Beneficiaries*.  This Agreement shall be for the sole and exclusive benefit of (a) the Corporation and its successors and permitted assigns, (b) each Holder (including any trustee thereof) and any other investment manager or managers acting on behalf of such Holder with respect to the Common Stock, Preferred Stock, or the Warrants and their respective successors and permitted assigns and (c) each of the Persons entitled to indemnification under **Section 2.9** hereof.  Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 4.4    *No Personal Liability by Trustees*.  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the UST Holdco managers and the VEBA Designee not individually or personally but solely in their respective capacities as managers and trustees in the exercise of the powers and authority conferred and vested in them as such trustees and under no circumstances shall any trustee or former trustee have any personal liability in the trustee's individual capacity in connection with this Agreement or any transaction contemplated hereby.

Section 4.5    *Cooperation*.  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

Section 4.6    *Governing Law; Forum Selection*.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

Section 4.7    *WAIVER OF JURY TRIAL*.  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 4.8    *Successors and Assigns*.  Except as otherwise expressly provided herein, including pursuant to **Section 2.10**, neither this Agreement nor any of the rights, interests or

obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void. Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation, each Holder, and their respective successors and permitted assigns; provided, that, for the avoidance of doubt, any Person who receives securities of the Corporation as a distribution from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction (other than any such Person that is a successor in interest to the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction) shall not be bound by or have any rights pursuant to this Agreement.

Section 4.9     *Entire Agreement*.  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.  This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 4.10     *Severability*.   Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 4.11     *Enforcement of this Agreement*.  The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 4.12     *Amendment*.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 4.13    *Headings*.    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 4.14    *Counterparts; Facsimiles*.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.  All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

Section 4.15    *Time Periods*.    Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

Section 4.16    *No Binding Effect on U.S. Government*.  Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be binding on or create any obligation on the part of the United States Department of the Treasury or any other department or any agency or branch of the United States Government, or any political subdivision thereof.

Section 4.17    *Canada*.    Notwithstanding anything in this Agreement to the contrary, Canada shall be bound by this Agreement only in its capacity as a Holder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch of the Government of Canada or subdivision thereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Equity Registration Rights Agreement on the date first above written

*[CORPORATION]*

By: _____

Name: _____

Title:   _____

*[UST HOLDCO]*

By: _____

Name: _____

Title:   _____

**7176384 CANADA INC.**

By: _____

Name: _____

Title:   _____

By: _____

Name: _____

Title:   _____

**UAW RETIREE MEDICAL BENEFITS TRUST**

By: _____

Name: _____

Title:   _____

*[DEBTOR]*

By: _____

Name: _____

Title:   _____

**Annex I**

| Holder | Number of Shares of Common Stock |
|---|---|
| UST Holdco | |
| Canada | |
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Common Stock for Which Warrants Are Initially Exercisable |
|---|---|
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Series A Preferred Stock |
|---|---|
| UST Holdco | |
| Canada | |
| VEBA | |
| Total: | |

1765163

**EXHIBIT O TO THE MSPA**

**<u>FORM OF BILL OF SALE</u>**

## EXHIBIT O

## FORM OF OMNIBUS BILL OF SALE

THIS OMNIBUS BILL OF SALE (this "Bill of Sale"), dated as of *[_____ __]*, 2009, is made by and among *[General Motors Corporation]*, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S LLC and S Distribution, "Transferors", and each a "Transferor"), and *[Vehicle Acquisition Holdings LLC]*, a Delaware *[limited liability company]* ("Transferee").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Transferors and Transferee are parties to that certain Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Transferors desire to sell, transfer, assign, convey and deliver to Transferee, and Transferee desires to purchase, accept and acquire from Transferors, all of Transferors' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment.  Pursuant to the Purchase Agreement, each Transferor hereby sells, transfers, assigns, conveys and delivers to Transferee any and all right, title and interest that such Transferor possesses in and to all of the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements), and Transferee hereby purchases, accepts and acquires from each Transferor such Purchased Assets.  Notwithstanding anything to the contrary contained herein, Transferors are not selling, transferring, assigning, conveying or delivering to Transferee any Excluded Assets.

Section 2.    Further Assurances.  Transferors shall execute any other documentation and take such other actions, at Transferee's sole cost and expense, as may be reasonably requested by Transferee to enable Transferee to perfect and sustain its rights in and to the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements).

Section 3.    Power of Attorney.  In furtherance of the foregoing, each Transferor irrevocably constitutes and appoints Transferee the true and lawful attorney of such Transferor with full power of substitution and give and grant unto Transferee full power and authority in the name and stead of such Transferor, but on behalf and for the benefit of Transferee, at any time and from time to time, to demand, sue for, recover and receive any and all Claims of every kind and description whatsoever relating to the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements), other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate

solely to the Excluded Assets or Retained Liabilities and any of the foregoing and to do all acts and things in relation to such Purchased Assets that Transferee shall deem desirable, for the purpose of fully vesting in Transferee all right, title and interest in and to such Purchased Assets. Such power of attorney is coupled with an interest and is irrevocable by such Transferor, by reason of such Transferor's dissolution or for any reason whatsoever.

Section 4.    Disclaimer. OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDITION OF THE PURCHASED ASSETS OR THE SUITABILITY THEREOF FOR ANY PURPOSE. OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS HEREBY EXPRESSLY DISCLAIM ANY WARRANTIES AS TO MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE CONDITION OF THE PURCHASED ASSETS. TRASNFERORS HAVE EXECUTED THIS BILL OF SALE TO SELL, TRANSFER, ASSIGN, CONVEY AND DELIVER TO TRANSFEREE THE PURCHASED ASSETS ON A AS-IS BASIS AND WHEREVER LOCATED, WITH ALL FAULTS.

Section 5.    Conflicts with Purchase Agreement. This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement. In the event of any conflict between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail. Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    Miscellaneous.

(a)    Governing Law. The construction, interpretation and other matters arising out of or in connection with this Bill of Sale shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    Successors and Assigns; No Third Party Beneficiaries. This Bill of Sale is for the sole benefit of Transferors, Transferee and their respective successors and permitted assigns, and nothing express or implied in this Bill of Sale is intended or shall be construed to confer upon or give to any Person, other than Transferors, Transferee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Bill of Sale.

(c)    Counterparts. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument. All signatures of the Parties may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

2

1759866

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Bill of Sale to be executed as of the date first written above.

**[GENERAL MOTORS CORPORATION]**

By: _____
    Name: *[_____]*
    Title:  *[_____]*

SATURN LLC

By: _____
    Name: *[_____]*
    Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: *[_____]*
    Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: *[_____]*
    Title:  *[_____]*

**[VEHICLE ACQUISITION HOLDINGS LLC]**

By: _____
    Name: *[_____]*
    Title: *[_____]*

**EXHIBIT P TO THE MSPA**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

# EXHIBIT P

## FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of *[_____ __]*, 2009, is made by and among *[General Motors Corporation]*, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S, LLC and S Distribution, "Assignors", and each a "Assignor"), and *[Vehicle Acquisition Holdings LLC]*, a *[Delaware limited liability company]* ("Assignee"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to transfer, assign and delegate to Assignee, and Assignee desires to accept and assume from Assignors, the Assumed Liabilities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment.  Each Assignor hereby assigns, transfers and delegates all of the Assumed Liabilities (other than the Leased Real Property Contracts and the Intellectual Property, which are governed by separate conveyance agreements) to Assignee, and Assignee hereby assumes and agrees to pay or perform as and when due, or otherwise discharge, such Assumed Liabilities.  Notwithstanding anything contained herein to the contrary, Assignors are not assigning, transferring or delegating to Assignee, and Assignee is not assuming or agreeing to pay, any Retained Liabilities.

Section 2.    Further Assurances.  Assignee shall execute any other documentation and take such other actions, at Assignors' sole cost and expense, as may be reasonably requested by Assignor to cause Assignee to accept and assume the Assumed Liabilities as contemplated by this Agreement.

Section 3.    Conflicts with Purchase Agreement.  This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 4.    <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

2

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Assignment and Assumption Agreement to be executed as of the date first written above.

*[GENERAL MOTORS CORPORATION]*

By: _____

       Name: *[_____]*
       Title:  *[_____]*

SATURN LLC

By: _____

       Name: *[_____]*
       Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____

       Name: *[_____]*
       Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

       Name: *[_____]*
       Title:  *[_____]*

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____

       Name: *[_____]*
       Title:  *[_____]*

**EXHIBIT Q TO THE MSPA**

**<u>FORM OF NOVATION AGREEMENT</u>**

# EXHIBIT Q

## FORM OF NOVATION AGREEMENT

*[General Motors Corporation]*, a corporation organized under the laws of Delaware with its principal office at 300 Renaissance Center, Detroit, MI 48265,  Saturn LLC, a limited liability company organized under the laws of Delaware with its principal office at *[_____]*, Saturn Distribution Corporation, a corporation organized under the laws of Delaware with its principal office at *[_____]*, and Chevrolet-Saturn of Harlem, Inc., a corporation organized under the laws of Delaware with its principal office at *[_____]* (each, a "Transferor," and collectively, the "Transferors"); *[Vehicle Acquisition Holdings LLC]*, a *[limited liability company]* organized under the laws of Delaware with its principal office at *[_____]* (the "Transferee"); and the United States of America (the "Government") enter into this Novation Agreement (this "Agreement") as of *[_____ ___]*, 2009.

(a) The parties agree to the following facts:

(1) The Government, represented by various Contracting Officers of *[insert federal agencies]*, has entered into certain Contracts with the Transferors, as listed on Exhibit A, and incorporated in this Agreement by reference. The term "Contracts," as used in this Agreement, means the contracts listed on Exhibit A and any other contracts between any Transferor and *[insert federal agencies]* not listed on Exhibit A on which performance has been contemplated, but which are not closed out on the effective date of this Agreement, and all modifications to such contracts made between the Government and any Transferor before the effective date of this Agreement (whether or not performance and payment have been completed and releases executed if the Government or any Transferor has any remaining rights, duties or obligations under these contracts). Included in the term "Contracts" are also all modifications made on or after the effective date of this Agreement that are under the terms and conditions of those contracts listed on Exhibit A.

(2)  As of *[_____ ___]*, 2009, the Transferors have transferred to the Transferree assets of the Transferors by virtue of the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Purchase Agreement"), as evidenced by an Omnibus Bill of Sale and an Omnibus Assignment and Assumption Agreement executed in connection therewith, copies of which are attached as Exhibit B and Exhibit C, respectively.

(3) The Transferee has acquired all the assets of the Transferors involved in performing the Contracts by virtue of the above-referenced transfer.

(4) The Transferee has assumed all obligations and liabilities of the Transferors under the Contracts by virtue of the above-referenced transfer.

(5) The Transferee is in a position to fully perform all obligations that may exist under the Contracts.

(6) It is consistent with the Government's interest to recognize the Transferee as the successor party to the Contracts novated to it.

1760153

(7) By letter, dated *[_____ ___]*, 2009, the Transferors filed evidence of the above-referenced transfer with the Government, including one copy each, as applicable, of the documents listed in Federal Acquisition Regulation 42.1204(e)(2).

(b)  IN CONSIDERATION OF THESE FACTS, THE PARTIES AGREE THAT, BY THIS AGREEMENT ---

(1) The Transferors confirm the transfer to the Transferee, and waive, on behalf of the Transferors but not on behalf of the Transferree, any claims and rights against the Government that it now has or may have in the future in connection with the Contracts.

(2) The Transferee agrees to be bound by and to perform each of the Contracts in accordance with the conditions contained in such Contracts. The Transferee also assumes all obligations and liabilities of, and all claims against, the Transferors under the Contracts novated to it as if the Transferee were the original party to the Contracts.

(3) The Transferee ratifies all previous actions taken by the Transferors with respect to the Contracts novated to it, with the same force and effect as if the action had been taken by the Transferee.

(4) The Government recognizes the Transferee as the Transferors' successor in interest in and to the Contracts novated to it. The Transferee by this Agreement becomes entitled to all rights, title, and interests of the Transferors in and to the Contracts novated to it as if the Transferee were the original party to the Contracts.  Following the effective date of this Agreement, the term "Contractor," as used in the Contracts, shall refer to the Transferee.

(5) The Exhibits to this Agreement are considered integral parts of this Agreement.

(6) Except as expressly provided in this Agreement, nothing in it shall be construed as a waiver of any rights of the Government against any Transferor or of any Transferor or the Transferee against the Government.

(7) All payments and reimbursements previously made by the Government to any Transferor, and all other previous actions taken by the Government under the Contracts, shall be considered to have discharged those parts of the Government's obligations under the Contracts. All payments and reimbursements under a Contract made by the Government after the date of this Agreement in the name of or to any Transferor shall have the same force and effect as if made to the Transferee, and shall constitute a complete discharge of the Government's obligations under the respective Contract, to the extent of the amounts paid or reimbursed.  Nothing herein shall be construed as a waiver of the right of the Transferree to pursue and prosecute claims previously asserted by any Transferor under a Contract novated to the Transferee, or the right of the Transferee to assert any pre-transfer claim that was not waived or released by any Transferor by operation of law (including the conduct of the parties), or mutually resolved by settlement or otherwise by any Transferor and the Government as evidenced by a written instrument executed prior to the effective date of this Agreement.

(8) Each Transferor and the Transferee agree that the Government is not obligated to pay or reimburse any of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the Contracts.

2

1760153

(9) Transferors jointly and severally guarantee payment of all liabilities and the performance of all obligations that the Transferee (i) assumes pursuant to and as of the effective date of this Agreement or (ii) may undertake in the future should the Contracts be modified under their terms and conditions; provided, however, that such future modifications are within the current scope of work and current periods of performance, including any existing options that provide the Government with the unilateral right to extend the term of a Contract. The Transferors waive notice of, and consent to, any such future modifications that are guaranteed by the Transferors pursuant to this paragraph (9)(ii).

(10) This Agreement, including its attachments, will be appended to each Contract through a modification to such Contract, and the provisions of this Agreement will apply to each such Contract as necessary to implement this Agreement.

(11)   The Contracts shall remain in full force and effect, except as modified by this Agreement. Each party has executed this Agreement as of the day and year first written above.

3

IN WITNESS WHEREOF, the undersigned have caused this Novation Agreement to be executed as of the date first written above.

**[*GENERAL MOTORS CORPORATION*]**

By: _____
   Name: *[_____]*
   Title: *[_____]*

SATURN LLC

By: _____
   Name: *[_____]*
   Title: *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____
   Name: *[_____]*
   Title: *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
   Name: *[_____]*
   Title: *[_____]*

**[*VEHICLE ACQUISITION HOLDINGS LLC*]**

By: _____
   Name: *[_____]*
   Title: *[_____]*

UNITED STATES OF AMERICA

By: _____
      Name: *[_____]*
      Title:  *[_____]*

## CERTIFICATE

I, _____, certify that I am the _____ of *[General Motors Corporation]*; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers. Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

    Name: _____

    Title: _____

**CERTIFICATE**

I, _____, certify that I am the _____ of Saturn LLC; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

## CERTIFICATE

I, _____, certify that I am the _____ of Saturn Distribution Corporation; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

    Name: _____

    Title: _____

## CERTIFICATE

I, _____, certify that I am the _____ of Chevrolet-Saturn of Harlem, Inc.; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

**Exhibit A**
**<u>Assigned Contracts</u>**

***[forthcoming]***

**Exhibit B**
**Omnibus Bill of Sale**

[attached]

**Exhibit C**
**Omnibus Assignment and Assumption Agreement**

[attached]

EXHIBIT C TO NOVATION AGREEMENT

1760153

**EXHIBIT R TO THE MSPA**

**FORM OF GOVERNMENT RELATED SUBCONTRACT AGREEMENT**

**EXHIBIT R**

**FORM OF GOVERNMENT RELATED SUBCONTRACT AGREEMENT**

This SUBCONTRACT AGREEMENT (this "Subcontract"), dated *[_____ __]*, 2009, is made by and between *[General Motors Corporation]*, a Delaware corporation ("Prime Contractor"), and *[Vehicle Acquisition Holdings LLC]*, a Delaware *[limited liability company]* ("Subcontractor," and together with the Prime Contractor, the "Parties").

**WHEREAS**, Prime Contractor and Subcontractor have entered into a Master Sale and Purchaser Agreement, dated as of June 1, 2009 (the "Purchase Agreement"), whereby Subcontractor has purchased the Government Prime Contracts (as defined in the Purchase Agreement) and the assets used by Prime Contractor to perform the Government Prime Contracts;

**WHEREAS**, Prime Contractor has entered into certain contracts with the United States Government (the "Government") and currently has pending certain contract proposals that it has submitted to the Government;

**WHEREAS**, Subcontractor will be notifying the Government of assignment of submitting requests (the "Novation Requests") to the Government to novate the Government Prime Contracts (each such Government Prime Contract requiring a Novation Request is referred to herein as a "Novation Contract," and collectively, the "Novation Contracts");

**WHEREAS**, the Government may wish to modify or extend any of the Novation Contracts, or issue new task orders or deliver orders under any such Novation Contract, in order to add additional work to such Novation Contract ("Additional Work"); and

**WHEREAS**, the Parties desire to arrange for the continued performance of the Novation Contracts in accordance with all of their respective requirements and terms until such time as the Government consents to the Novation Request.

**NOW, THEREFORE**, in consideration of the foregoing premises and the agreements contained herein, the Parties agree as follows:

**ARTICLE I**
**SCOPE OF WORK**

Section 1.1    *Incorporation of Government Prime Contracts*:  *Definitions*.  The Novation Contracts are incorporated by reference herein.  To give effect to the provisions contained in this Subcontract, with respect to the Government Prime Contracts once made a part of this Subcontract, any reference to the "Government" or the "Contracting Officer" shall mean Prime Contractor, unless such reference by its terms is applicable only to the Government.

Section 1.2    *Prime Contractor Responsibility*.  Prime Contractor shall retain its legal obligations as a prime contractor in accordance with the Novation Contracts.  Prime Contractor shall provide assistance as reasonably necessary (excluding legal, cost and pricing support) for

1766534

Subcontractor to perform under the Novation Contracts, upon written request, and at the cost and expense, of Subcontractor. Prime Contractor agrees to forward to Subcontractor any and all orders or requests for work issued by the Government after the Closing Date.

Section 1.3    *Subcontractor Responsibility*. Subcontractor shall diligently perform all requirements, and furnish to the Government all services and materials necessary to complete performance of the obligations, of each Novation Contract in accordance with the terms and conditions thereof. Without limiting the foregoing, unless Prime Contractor indicates otherwise by notice to Subcontractor or applicable law requires otherwise, Subcontractor shall be considered Prime Contractor's agent for purposes of: (a) collecting all amounts that may be due from the other party or parties to each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract; and (b) negotiating or otherwise handling all disputes and issues that may arise in connection with each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract. Subcontractor shall as promptly as practicable after entering into this Agreement, engage legal counsel and consultants well versed in U.S. government contract law and regulations to supplement the personnel within the Business (as defined in the Purchase Agreement) in the performance of these Novation Contracts.

## ARTICLE II
## RELATIONSHIP OF PARTIES

Section 2.1    *Cooperation*. Both Parties shall fully cooperate with each other to ensure that all requirements of the Novation Contracts and Additional Work, if applicable, are satisfied and that the transition of performance occurs without disruption or inconvenience to the Government.

Section 2.2    *Communications with Government*. Subcontractor shall, in the first instance, be responsible for communications with the Government regarding the Novation Contracts. Subcontractor shall promptly inform Prime Contractor of the substance of any such communications that are material. Prime Contractor will include Subcontractor (or update Subcontractor) with respect to any material communications with the Government regarding the Novation Contracts. Prime Contractor shall forward any written communications from the Government referring to or relating to the Novation Contracts to Subcontractor to be received not more than five (5) Business Days from receipt by Prime Contractor.

Section 2.3    *Disclosure*. The Parties hereby agree that the contents of this Subcontract may be made known to the Government.

Section 2.4    *Award of Additional Work*. While it may be necessary to seek extensions in delivery schedule or other routine modifications, it is not the intent of either party to expand the Novated Contracts to take on Additional Work beyond that which is within the scope of the subject contract. Within this parameter, if at any time prior to the expiration, termination, assignment, or novation of a Novation Contract, Subcontractor requests Prime Contractor (a) to seek an extension or modification of the Novation Contract and/or (b) to submit a proposal or compete for a new task order or delivery order under the Novation Contract, Prime Contractor shall make reasonable efforts (y) to request and obtain such an extension or modification, and/or

(z) to obtain award of additional work, such as a task order or delivery order.  Prime Contractor's obligation under the immediately preceding sentence is subject to the Parties' express understanding that Subcontractor shall, in the first instance, be responsible for the preparation of any request for extension or modification and of any task order or delivery order proposal and for the conduct of discussions or negotiations with the Government with respect to such request or proposal.  Subcontractor shall reimburse Prime Contractor for all out-of-pocket expenses and pay to Prime Contractor reasonable labor and expenses incurred by Prime Contractor in connection with its efforts to request and obtain such Additional Work (including, without limitation, reasonable attorney's fees).

Section 2.5    *Authorization.*

(a)    Prime Contractor hereby appoints and authorizes Subcontractor, its employees and designees, as its exclusive agent for the purpose of submitting proper invoices in Prime Contractor's name to the Government seeking any and all payments under the Novation Contracts.

(b)    Prime Contractor specifically authorizes Subcontractor to submit proper invoices to the Government consistent with the pricing and other requirements set forth in the Novation Contracts.  Prime Contractor shall pass on to Subcontractor, without any withholding or setoff, via wire transfer within five (5) Business Days any amounts paid by, and received from, the Government for performance by Subcontractor of its obligations under the Novation Contracts as incorporated herein.

(c)    In the absence of Subcontractor's failure to perform its duties or responsibilities under this **Article II**, Prime Contractor agrees to refrain from undertaking any actions which Subcontractor is authorized to undertake by this **Article II** unless requested to do so by Subcontractor.  Prime Contractor also agrees to refrain from retaining another agent to perform any of the actions covered in this **Article II**, thereby making Subcontractor its exclusive agent for the purposes set forth herein.

(d)    Subcontractor shall maintain true and correct books and records pertaining to such invoiced amounts and, upon reasonable notice, shall permit an independent entity hired by Prime Contractor, at Prime Contractor's own expense, to audit sufficiently such books and records to verify the accuracy and appropriateness of all charges.

(e)    For purposes of allowing Subcontractor to fulfill its obligations under this Subcontract, Prime Contractor hereby delegates authority to *[Subcontractor appointees]*, or their immediate subordinates, to enter into, execute, process and deliver for, or in the name of or on behalf of, Prime Contractor, any proper invoices, task/delivery orders and modifications, amendments or extensions thereto that may arise in the ordinary course relating to the Novation Contracts, as well as task or delivery order proposals in connection with any of the Novation Contracts (the "Contract Documents"); provided that the foregoing authority shall not permit Subcontractor or its employees to issue checks, drafts, or other orders on the funds of Prime Contractor.  Copies of all Contract Documents executed by Subcontractor pursuant to this provision shall be provided to Prime Contractor no later than three (3) Business Days after being executed.  Any

Contract Documents requiring signatures of both the Government and the Prime Contractor shall be ratified by a counter-signature by Prime Contractor and returned to Subcontractor within three (3) Business Days of receipt by Prime Contractor. Notwithstanding the foregoing, prior to executing any document pursuant to this provision that has a projected monetary value exceeding $**100,000,000**, Subcontractor shall notify Prime Contractor in writing to insure that Prime Contractor is apprised of significant engagements executed by Subcontractor on behalf of Prime Contractor.

(f)      Nothing in this **Article II** is intended or shall be construed to transfer any rights to any Government Prime Contract or usurp, violate or otherwise negate the requirements of the Anti-Assignment Act, 41 U.S.C. § 15(a) or the Assignment of Claims Act, 31 U.S.C. § 3727(a)(1)(b) (the "Acts").  In the event of any claim by any agency of the United States of a violation of any of the provisions of either of the Acts as a result of this **Article II**, Prime Contractor shall assist Subcontractor as is reasonably necessary to correct such claimed violations and seek the Government's ratification of any Contract Document claimed to be an unlawful assignment under the Acts.

## ARTICLE III
## ASSIGNMENT, TERM AND TERMINATION

Section 3.1      *Assignment of Novation Contract*.  Once a contract novation is obtained, (i) such Novation Contract will be deemed to have automatically transferred and assigned to Subcontractor on the terms set forth in the Purchase Agreement, (ii) the obligations arising out of the use, performance, ownership or operation of such Novation Contract after the Closing will be deemed to be Assumed Liabilities under the Purchase Agreement, and (iii) the rights pursuant to such Novation Contract will be deemed to be a Purchased Asset under the Purchase Agreement.

Section 3.2      *Term*.  The term of this Subcontract shall be from the Closing Date until the earlier of (x) such time as all of the Novation Contracts, including any extensions or options thereto exercised by the Government, are novated as set forth immediately above, completed or terminated or (y) such time this Subcontract is terminated upon mutual agreement by the Parties as evidenced in writing.  With respect to each Novation Contract, the responsibilities of the Parties hereunder shall begin upon the Closing Date for each Novation Contract then in effect and shall cease upon the earlier of:  (i) contract novation of such Novation Contract as set forth immediately above; (ii) completion or termination of such Novation Contract, including any renewals or options thereto exercised by the Government; (iii) receipt of a written determination by the Government that the Novation Contract may not be subcontracted to the Subcontractor; or (iv) termination of this Subcontract.

Section 3.3      *Termination*.  In the event that any one of the Novation Contracts is terminated in whole or in part by the Government prior to contract novation and prior to expiration of the term of this Subcontract, the rights of the Parties concerning the termination shall be governed by the provisions of the applicable termination clause (such as the termination for convenience provisions or the termination for default provisions, as applicable) set forth in such Novation Contract, except that Subcontractor's rights under such clause shall relate only to the period of subcontract performance hereunder for such Novation Contract.  Prime Contractor

may terminate Subcontractor's work under any Novation Contract if, and only if, such Novation Contract is terminated by the Government.

Section 3.4 *Government Proposals*. The terms of this Subcontract shall also apply to any Government Prime Contract awarded to Prime Contractor as a result of a pending bid or proposal that pertain exclusively to the Business and that by its terms requires novation (an "Awarded Contract"). The effective date of this Subcontract with respect to each such Awarded Contract shall be the date on which such Awarded Contract is awarded to Prime Contractor. For purposes of this Subcontract, the Parties' rights, duties and obligations with respect to each such Awarded Contract are the same as set forth in this Subcontract for Novation Contracts.

## ARTICLE IV
## INDEMNITY AND COMPLIANCE WITH APPLICABLE LAWS

Section 4.1 *Subcontractor Indemnification*. Prime Contractor shall indemnify, defend and hold harmless Subcontractor and its Affiliates and directors, officers, managers, employees and agents (the "Prime Contractor Indemnified Parties") from, against and in respect of any and all claims, causes of action, losses, grievances, damages, penalties, fines, amounts paid in settlement, costs and expenses (including, reasonable attorney's fees and disbursements) (the "Losses") incurred by the Prime Contractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Prime Contractor or any of its Affiliates, and/or (ii) the performance by Prime Contractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Subcontractor.

Section 4.2 *Prime Contractor Indemnification*. Subcontractor shall indemnify, defend and hold harmless the Prime Contractor and its respective Affiliates and directors, officers, managers, employees and agents (the "Subcontractor Indemnified Parties") from, against and in respect of any and all Losses incurred by the Subcontractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Subcontractor or any of its Affiliates, and/or (ii) the performance by Subcontractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Prime Contractor.

Section 4.3 *Compliance with Applicable Laws*. Prime Contractor agrees to indemnify and defend Subcontractor from any allegation of violation or actual violation of any Government Prime Contract or legal requirement imposed by a Government Prime Contract caused by the actions of Prime Contractor, Prime Contractor's employees, consultants or subcontractors of any Government Prime Contract arising out of Prime Contractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract. Subcontractor agrees to indemnify and defend Prime Contractor from (i) any allegation of violation or actual violation of law by Subcontractor or its employees, consultants or subcontractors arising out of Subcontractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract; or (ii) any violation or alleged violation of any legal requirement imposed by, or relating to, a Novation Contract. This provision shall survive the expiration or termination of this Subcontract.

1766534

Section 4.4     *Legal Requirements*.  The Parties agree to take necessary precautions to assure compliance with all legal requirements pertaining to the Novation Contracts.

## ARTICLE V
## CONFIDENTIALITY

Section 5.1     *Confidentiality*.  Each Party shall not, and shall cause its Affiliates, officers, directors, employees, representatives, agents and advisors, including attorneys, accountants, consultants, bankers and financial advisors ("Representatives") not to, disclose any information relating to the business of the other Party disclosed to it or its Representatives after the date of this Subcontract by reason of this Subcontract ("Confidential Information"), whenever furnished and regardless of the manner furnished, using efforts which are equivalent to those that the receiving Party uses to protect its own information of a similar nature; provided, however, that Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of disclosure directly or indirectly by the Party receiving such information or any of its Representatives, (ii) was independently acquired or developed by the Party receiving such information without violating any of its obligations hereunder, or (iii) is or becomes available to the receiving Party on a non-confidential basis from a person (other than the disclosing Party or its Representatives) who, to the receiving Party's actual knowledge, is not and was not bound by a confidentiality agreement with the disclosing Party or otherwise prohibited from transmitting the information to the receiving Party. Notwithstanding the foregoing, a Party may make such disclosure necessary to avoid committing a violation of Law or of any rule or regulation of any domestic or foreign securities association, stock exchange or national securities quotation system on which such Party's securities are listed or traded.

Section 5.2     *Survival*.  The provisions of this **Article V** shall survive any expiration or termination of this Subcontract.  Each Party shall use commercially reasonable efforts not to, and shall cause each of their Affiliates and each of their respective Representatives, successors and permitted assigns to use commercially reasonable efforts not to, attempt at any time to access any data, information or system of the other Party except as required to provide or receive services, as the case may be.

## ARTICLE VI
## DISPUTES

Section 6.1     *Resolution of Disputes*.  For the purposes of this Subcontract, the terms "claim," "certification" or "certify," and "dispute" shall have the meaning of the same terms as used in the Contract Disputes Act of 1978 (41 U.S.C. §§ 601-613), FAR Subpart 33.2, and FAR 52.233-1, "Disputes (DEC 1991)."  All disputes arising under or relating to this Subcontract shall be resolved under this **Article VI**.

Section 6.2     *Procedure*.  Subject to **Section 1.3**, with respect to any claim made by Subcontractor for which the Government is or may be liable, Subcontractor agrees that it will prepare its claim and will present it to Prime Contractor for submission to the Government under the Contract Disputes Act.  Prime Contractor agrees to submit any such claim to the Government, at the expense of Subcontractor and subject to Prime Contractor's determination, in

its reasonable discretion, as to the merit of such claim.  Prime Contractor shall promptly pay to Subcontractor any amount determined on appeal under the applicable Prime Contract, to the extent such payment relates to the period of Subcontract performance by Subcontractor; provided that such payment by the Prime Contractor is limited to the payment of amounts received from the Government in the dispute, as and when received from the Government. Subcontractor shall have the sole authority to direct the prosecution of the claim.  In the event of a denial of a claim by the Contracting Officer, Prime Contractor shall, at the direction and expense of Subcontractor, either appeal or file suit pursuant to the Contract Disputes Act and implementing regulations, or permit Subcontractor to proceed in Prime Contractor's name.  The Parties will be bound by the results of that process.

Section 6.3    *Procedure.*  With respect to any dispute between the Parties arising from or related to the Subcontract, for which the Government is not liable, the Parties shall attempt to reach an amicable resolution of the dispute.  If the Parties are unable to resolve amicably such a dispute within a reasonable time, the dispute shall be adjudicated in any state court sitting in New York City or any federal court sitting in the Southern District of New York in accordance with **Section 7.10**, applying the laws of the State of Michigan in accordance with **Section 7.9**.

Section 6.4    *Continuation of Performance*.  The Parties shall proceed diligently with performance of this Subcontract, pending final resolution of any request for relief, claim, appeal, dispute or action arising under or in connection with this Subcontract.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    *Notices*.  Any notice, request, instruction or other document to be given hereunder shall be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by facsimile, according to the instructions set forth below.  Such notices shall be deemed given: at the time delivered by hand, if personally delivered; one Business Day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered or certified mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

If to GM:

> *[General Motors Corporation]*
> *[_____]*
> *[_____]*
>
> Attn.: General Counsel
> Facsimile No.: *[_____]*
>
> With copies (which shall not constitute notice) to:
>
> *[_____]*
> *[_____]*

1766534

[_____]
[_____]

If to the Subcontractor:

[_____]
[_____]
[_____]
[_____]
Attention:       [_____]
Facsimile No.: [____-____-_____]

With a copy (which shall not constitute notice) to:

[_____]
[_____]
[_____]
[_____]
Attention:       [_____]
Facsimile No.: [____-____-_____]

or to such other address or to the attention of such other Party that the recipient Party has specified by prior written notice to the sending Party in accordance with the preceding.

Section 7.2    *Expenses; No Offset*.  Except as expressly provided in this Subcontract, each of the Parties shall bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Subcontract and the transactions contemplated hereby, whether or not such transactions are consummated.  Neither Party may make any offset against amounts due to the other Party or any of the other Party's Affiliates pursuant to this Subcontract or otherwise.

Section 7.3    *Assignment; Successors and Assigns*.  Neither this Subcontract nor any of the rights, interests or obligations provided by this Subcontract may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; provided, however, that either Party may assign its rights under this Subcontract to a Subsidiary. Subject to the preceding sentence and except as otherwise expressly provided herein, this Subcontract shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 7.4    *Amendment; Waiver*.  This Subcontract may be amended only by a written instrument executed and delivered by Prime Contractor and Subcontractor.  At any time prior to the termination of this Subcontract, the Parties may waive compliance with any provision of this Subcontract.  No agreement waiving any provision of this Subcontract shall be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

Section 7.5    *Severability*.  Whenever possible, each provision of this Subcontract shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Subcontract is held to be prohibited by or invalid under Law, such provision shall be ineffective

only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subcontract.

Section 7.6    *Counterparts*.    This Subcontract may be executed in two or more counterparts, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same Subcontract.

Section 7.7    *Descriptive Headings*.    The descriptive headings of this Subcontract are inserted for convenience only and shall not constitute a part of this Subcontract.

Section 7.8    *No Third-Party Beneficiaries*.    This Subcontract does not confer any rights or remedies upon any Person or entity, other than the Parties hereto and their respective successors and permitted assigns.

Section 7.9    *Governing Law*.    THE LAWS OF THE STATE OF MICHIGAN, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF MICHIGAN TO BE APPLIED, GOVERN ALL MATTERS ARISING OUT OF OR RELATING TO THIS SUBCONTRACT, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.

Section 7.10    *Forum Selection; Consent to Service of Process; Waiver of Jury Trial*. Each Party hereby irrevocably (i) submits to the exclusive jurisdiction of any state court sitting in New York City or any federal court sitting in the Southern District of New York in any Action arising out of or relating to this Subcontract, (ii) agrees that all claims in respect of such Action may be heard and determined only in any such court, (iii) hereby waives any claim of inconvenient forum or other challenge to venue in such court, and (iv) agrees not to bring any Action arising out of or relating to this Subcontract in any other court.  The Subcontractor irrevocably designates, appoints and empowers *[Subcontractor Designee]*, with offices on the date hereof in New York, as its agent with respect to any Action in New York, to receive on its behalf and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such Action, and agrees that the failure of the agent to notify the Subcontractor of any such service of process shall not impair or affect the validity of service.  The Subcontractor further irrevocably consents to the service of process out of any of the courts listed in this **Section 7.10** by the mailing of copies by registered or certified mail, postage prepaid, to the Subcontractor at its address set forth in **Section 7.1**, such service to become effective thirty (30) days after such mailing.  If for any reason *[Subcontractor Designee]* shall cease to be available to act as agent, the Subcontractor agrees to designate within ten (10) Business Days a new agent in New York on the same terms and for the same purposes. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS INDEMNIFIED PARTIES TO IRREVOCABLY WAIVE, ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS SUBCONTRACT AND/OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 7.11    *Entire Agreement*.    This Subcontract and the Purchase Agreement collectively constitute the entire agreement among the Parties and supersede any prior and

1766534

contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 7.12    *Assurances and Future Cooperation*.    The Parties agree, at any time and from time to time, at the requesting Party's expense, to execute, acknowledge where appropriate, and deliver such further instruments and documents and to take such other action as either Party may reasonably request in order to carry out the intent and purpose of this Subcontract.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties hereto have caused this Subcontract to be executed and delivered on _____.

*[GENERAL MOTORS CORPORATION]*

By: _____

    Name:

    Title:

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____

    Name:

    Title:

**EXHIBIT S TO THE MSPA**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

**EXHIBIT S**

**FORM OF OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

THIS OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Agreement"), dated as of *[_____ __]*, 2009, is made by and among *[General Motors Corporation]*, a Delaware corporation ("Parent"), S LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), and Chevrolet-Saturn of Harlem, Inc. ("Harlem," and together with Parent, S LLC and S Distribution, each an "Assignor," and collectively, "Assignors"), and *[Vehicle Acquisition Holdings LLC]*, a Delaware *[limited liability company]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to sell, transfer, assign, convey and deliver to Assignee, and Assignee desires to purchase, accept and acquire from Assignors all of Assignors' right, title and interest in and to all Intellectual Property and all rights and benefits associated with the foregoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment.  Assignors hereby sell, transfer, assign, convey and deliver to Assignee all right, title and interest that Assignors possess in and to all (a) Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property for the Discontinued Brands), and (b) all rights and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing (the "Assigned Intellectual Property"). The Assigned Intellectual Property shall include all (a) Patents set forth on Exhibit A, (b) Trademarks set forth on Exhibit B and (c) Copyrights set forth on Exhibit C.

Section 2.    Further Assurances.  Assignors shall execute any other documentation and take such other actions, at Assignee's sole cost and expense, as may be reasonably requested by Assignee to enable Assignee to perfect and sustain its rights in and to the Assigned Intellectual Property.

Section 3.    Power of Attorney.  Each Assignor irrevocably constitutes and appoints Assignee the true and lawful attorney of such Assignor with full power of substitution and gives and grants unto Assignee full power and authority in the name and stead of such Assignor, but on behalf and for the benefit of Assignee, at any time and from time to time, to demand, sue for,

recover and receive any and all Claims of every kind and description whatsoever incident or relating to the Assigned Intellectual Property and to do all acts and things in relation to the Assigned Intellectual Property that Assignee shall deem desirable, for the purpose of fully vesting in Assignee all right, title and interest in and to the Assigned Intellectual Property.  Such power of attorney is coupled with an interest and is irrevocable by such Assignor, by reason of such Assignor's dissolution or for any reason whatsoever.

Section 4.    Disclaimer.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS DO NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN CONNECTION WITH OR WITH RESPECT TO ANY OF THE ASSIGNED INTELLECTUAL PROPERTY OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT.  ALL OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY DISCLAIMED.  EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS ARE ASSIGNING THE ASSIGNED INTELLECTUAL PROPERTY TO ASSIGNEE ON AN "AS-IS, WHERE-IS" BASIS.

Section 5.    Conflicts with Purchase Agreement.  This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    Miscellaneous.

(a)    Governing Law. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic

2

delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

3

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Intellectual Property Assignment Agreement to be duly executed the day and year first written above.

**ASSIGNORS:**

***[GENERAL MOTORS CORPORATION]***

By: _____
    Name: *[_____]*
    Title: *[_____]*

S LLC

By: _____
    Name: *[_____]*
    Title: *[_____]*

S DISTRIBUTION CORPORATION

By: _____
    Name: *[_____]*
    Title: *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: *[_____]*
    Title: *[_____]*

**ASSIGNEE:**

***[VEHICLE ACQUISITION HOLDINGS LLC]***

By: _____
    Name: *[_____]*
    Title: *[_____]*

**State of** _____ )
                                    ) ss.
**County of** _____ )

        The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of *[General Motors Corporation]*, a Delaware corporation.

                                            _____
                                            Notary Public

**State of** _____ )
                                    ) ss.
**County of** _____ )

        The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Saturn LLC, a Delaware limited liability company.

                                            _____
                                            Notary Public

**State of** _____ )
                                    ) ss.
**County of** _____ )

        The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Saturn Distribution Corporation, a Delaware corporation.

                                            _____
                                            Notary Public

1759822

**State of** _____     )
                                          ) ss.
**County of** _____     )

     The foregoing instrument was acknowledged before me, the undersigned Notary Public, this \_\_\_\_ day of _____, 2009, by _____, the _____ of Chevrolet-Saturn of Harlem, Inc., a Delaware corporation.

_____

Notary Public

1759822

**Exhibit A**

**<u>Patents</u>**

***[to be provided by Parent]***

**Exhibit B**

**<u>Trademarks</u>**

***[to be provided by Parent]***

**Exhibit C**

<u>**Copyrights**</u>

***[to be provided by Parent]***

**EXHIBIT U TO THE MSPA**

**FORM OF ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES**

EXHIBIT U

## FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES (this "Assignment"), dated as of *[_____ __]*, 2009, is made by and among *[General Motors Corporation]*, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), and Saturn-Chevrolet of Harlem, Inc., a Delaware corporation ("Harlem," and together with Parent, S LLC and S Distribution, each an "Assignor," and collectively, "Assignors"), and *[Vehicle Acquisition Holdings LLC]*, a Delaware *[limited liability company]* ("Assignee").  Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Purchase Agreement"); and

WHEREAS, the Purchase Agreement requires Assignors to convey and transfer to Assignee, and Assignee to assume, all of Assignors' right, title and interest, whether as landlord, sublandlord, tenant or subtenant, as the case may be, in, to and under the leases and subleases relating to the properties listed on Exhibit A attached hereto and pertaining to the Transferred Real Property (collectively, the "Leases"), together with all rights, options, interests and benefits thereunder (including, without limitation, any guaranties and security deposits (together with all accrued interest thereon) held thereunder where Assignor is a landlord or sublandlord) (collectively, the "Additional Rights").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Assignment.  As of the Closing, Assignors hereby sell, assign, transfer, convey and deliver unto Assignee, its successors and assigns, all of the right, title and interest that Assignors possess in, to and under the Leases, together with all Additional Rights thereunder, excluding therefrom, any Retained Liabilities associated with the Leases and the Additional Rights, if any.

2.    Assumption.  Assignee hereby accepts such assignment of the Leases, together with the Additional Rights, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Leases that arise from and after the Closing, excluding therefrom, any Retained Liabilities associated with the Leases and the Additional Rights, if any.

3.    Rentals, Taxes and Deposits.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Leases shall be prorated

1765183

between Assignor and Assignee as of the Closing of this Assignment in accordance with the terms of the Purchase Agreement.

4.    <u>Conflicts with Purchase Agreement</u>.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

5.    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

6.    <u>Modification</u>.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

7.    <u>Governing Law</u>.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease, the Law of the jurisdiction where the applicable Lease is located.

8.    <u>Construction of Assignment</u>.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

9.    <u>Severability</u>.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

10.    <u>Captions</u>.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

11.    <u>Counterparts</u>.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery

2

signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1765183

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Assignment and Assumption of Real Property Leases as of the day and year first above written.

*[GENERAL MOTORS CORPORATION]*

By: _____

     Name: *[_____]*

     Title:  *[_____]*

SATURN LLC

By: _____

     Name: *[_____]*

     Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____

     Name: *[_____]*

     Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

     Name: *[_____]*

     Title:  *[_____]*

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____

     Name: *[_____]*

     Title:  *[_____]*

## EXHIBIT A

### *[forthcoming]*

**EXHIBIT X TO THE MSPA**

**FORM OF CERTIFICATE OF DESIGNATION FOR SERIES A PREFERRED STOCK**

## EXHIBIT X

### Form Of Certificate of Designations

### Of

### Series A Fixed Rate Cumulative Perpetual Preferred Stock

### Of

### [VEHICLE ACQUISITION HOLDINGS LLC][1]

*[Vehicle Acquisition Holdings LLC]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[_____]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares.* There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock"). The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions.* The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions.* The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

---

[1] Note: Vehicle Acquisition Holdings LLC to convert to a corporation before Closing.

1

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters*.  For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

1766819

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by *[_____]*, its *[_____]*, this *[___]* day of *[_____]*, 2009.

*[VEHICLE ACQUISITION HOLDINGS LLC]*

By: _____

Name: *[_____]*

Title: *[_____]*

3

ANNEX A

STANDARD PROVISIONS

Section 1.    *General Matters; Ranking*. Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions*. As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends*.

(a)    **Rate**. Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)     **Priority of Dividends**. So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

6

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up*. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption*.

(a)     **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date").  On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)     **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)     **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)    **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)    **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)    **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)    **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)    **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)      **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)      Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)      Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10

7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)    Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)    **Changes after Provision for Redemption**. No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)    **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

11

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders*. To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices*. All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights*. No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates*. The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights*. The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form.*

(a)    The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)     If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC.  Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)     Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)     So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes.  Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)     Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)     Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees.  Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)     A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days.  In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest.  Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend.  Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.    *Transfer Restrictions and Legends.*  (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

14

Section 15.    *Transfer, Exchange and Substitution.*    (a) Series A Preferred Share Certificates shall be issued in registered form only.  The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided.  All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)        A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer.  Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates.  The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act. No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent.  Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)        Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)        When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.    To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

(e)     If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16.  *Surrender of Series A Preferred Share Certificates*.  Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof.  The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17.  *Transfer Agent And Registrar*. The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be *[_____]* (the "Transfer Agent"). The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

1766819

## EXHIBIT A

FORM OF SERIES A FIXED RATE CUMULATIVE
PERPETUAL PREFERRED STOCK
($25 LIQUIDATION PREFERENCE)


NUMBER                                                                        SHARES

*[_____]*                                                          *[_____]*

CUSIP *[_____]*


### [NEWCO]
### INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE
### THIS CERTIFICATE IS TRANSFERABLE

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

17

This is to certify that _____, is the owner of *[__]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of [NEWCO] (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated: [____], 2009

_____          _____
Name:                                      Name:
Title:                                     Title:

                                           Countersigned and Registered
                                           _____,
                                           as Transfer Agent and Registrar

                                           By: _____
                                                   Authorized Signature

18

## [NEWCO]

[NEWCO] (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | - as tenants in common | UNIF GIFT MIN ACT- _____Custodian _____ |
| TEN ENT | - as tenants by the entireties | (Minor)          (Cust) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | under Uniform Gifts to Minors Act _____ (State) |

Additional abbreviations may also be used though not in the above list.

––––––––––––––––––––––

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____

_____

_____ shares

of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

Dated_____

_____
Signature

NOTICE:  The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____

NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

20

## EXHIBIT B

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

> To [NEWCO] (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:   [_____]

[Insert name of transferee]

By:   _____
            Name:
            Title:

21

# EXHIBIT C

## GLOBAL SHARE LEGEND

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO [NEWCO] (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

22

1766819

**EXHIBIT Y TO THE MSPA**

**VEBA NOTE TERM SHEET**

# EXHIBIT Y

# <u>VEBA NOTE TERM SHEET</u>

### *[Vehicle Acquisition Holdings LLC]*

**Term Sheet for Note due 2017**

Following is a summary of the proposed principal terms for the Note to be issued to the Voluntary Employees' Beneficiary Association ("<u>New VEBA</u>") in connection with the transactions related to the restructuring of the obligations of General Motors Corporation to the New VEBA.

| | |
|---|---|
| Issuer: | ***[Vehicle Acquisition Holdings LLC]*** (the "<u>Company</u>"). |
| Securities Offered: | US$2.5 billion Note (the "<u>Note</u>"). |
| Maturity Date: | July 15, 2017. |
| Interest/Payment: | Implied annual rate of 9% from July 15, 2009, payable in fixed payments in the following amounts in cash on July 15 of each of the following years: |

| Year | Amount |
|------|--------|
| 2013 | $1,384 million |
| 2015 | $1,384 million |
| 2017 | $1,384 million |

| | |
|---|---|
| Guarantees: | Any present and future U.S. subsidiaries of the Company that are borrowers or guarantors with respect to the UST Note will fully and unconditionally guarantee the performance of all obligations of the Company under the Indenture and the Note, which guarantees will be secured to the same extent, if any, as are the obligations of such borrower under, or guarantors of, the UST Note, and subordinated only to any Permanent Financing (as defined below).  Each guarantor of the Notes is herein referred to as a "<u>Guarantor</u>" and its guarantee is referred to herein as a "<u>Guarantee</u>." |
| Ranking: | The obligations of the Company under the Notes and of the Guarantors under the Guarantees will: |

- rank equally in right of payment with (1) any debt issued to the United Stated Department of Treasury ("<u>UST</u>") in the restructuring (the "<u>UST Note</u>") and (2) any debt issued to Canada in the restructuring (the "<u>Canada Note</u>");

- be secured on a pari passu basis by the collateral securing the UST Note;

- rank senior in right of payment to all unsecured indebtedness and other obligations of the Company that are by their terms subordinated to the Note;

- rank junior in right of payment to any permanent financing including UST delayed draw term loan, revolver or any other third party permanent financing entered into with the consent of UST ("Permanent Financing"); and

- be effectively subordinated in right of payment to all future first lien secured indebtedness and other obligations of the Company, to the extent of the value of the assets securing such obligations, and be structurally subordinated to all obligations of each of the Company's subsidiaries that are not Guarantors.

| | |
|---|---|
| Intercreditor Agreement | New VEBA, the UST and Canada shall enter into an intercreditor agreement in form and substance satisfactory to the UST, which shall provide that the UST Note, the Canadian Note and the Note shall rank equally and be pari passu and that the UST shall have the sole and exclusive right to exercise all remedies and to grant waivers with respect to the Note and the UST Note. |
| Transferability: | The Note will be transferable at any time in whole or in part to (1) the Company or its subsidiaries, or (2) an unlimited number of institutional accredited investors or qualified institutional buyers in transactions that (a) do not require registration under the Securities Act and (b) do not trigger registration under the Exchange Act; provided that if at any time the UST Note is registered under the Securities Act or exchanged for a note that is entitled to demand, shelf or piggyback registration rights, then the Note will be entitled to demand, shelf, and piggyback registration rights no less favorable than those of the UST Note. |
| Optional Redemption: | The Company may redeem the Note in whole or in part at any time at 100% of its principal amount, together with accrued and unpaid interest, if any, to the redemption date. |
| Covenants | The Note will have the same covenants as the UST Note, including, to the extent made by the Company under the UST Note, covenants in respect of Change of Control, Limitation of Incurrence of Indebtedness, Restricted Payments, Limitations on Liens, Limitation on Sale of Assets, Restrictions on Sale/Leaseback and Limitation on Merger/Consolidation. |
| Default Interest: | 2% penalty interest upon any default under the terms of the Note. |
| Events of Default: | Events of Default will be the same as those in the UST Note, including, without limitation: |

1. Default in payment on the Note when due, subject to any grace period in the UST Note.

2. Default in the observance or performance of covenants, subject to any grace period in the UST Note.

3. Bankruptcy or insolvency events, subject to any grace period in the UST Note.

4. Invalidity of Guarantees to the extent provided in the UST Note, subject to any grace period in the UST Note.

| | |
|---|---|
| Modifications: | Unless (1) UST has transferred more than 75% of the UST Note and (2) the portion of the UST Note held by UST has an outstanding principal |

2

amount that is less than the implied then current principal amount of the VEBA Note (assuming an implied 9% interest rate), any modifications agreed to by UST with respect to the terms of the UST Note will automatically modify, and be binding on, the Note, other than any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or by its express terms limits or restricts any right to bring suit for payment.

Governing Law:                        New York.

3

**EXECUTION COPY**

**Sellers' Disclosure Schedule**

This Sellers' Disclosure Schedule forms a part of that certain Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "Agreement"), made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser"). Unless otherwise defined herein, all capitalized terms used in this Sellers' Disclosure Schedule have the respective meanings assigned to them in the Agreement.

The representations and warranties of Sellers set forth in the Agreement are made and given subject to the disclosures contained in this Sellers' Disclosure Schedule. Inclusion of information in this Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party. The specific disclosures set forth in this Sellers' Disclosure Schedule have been organized to correspond to Section references in the Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in this Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of the Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

## Section 1.1B

### Key Subsidiaries

1.      General Motors Product Services, Inc.
2.      OnStar, LLC
3.      General Motors Overseas Distribution Corporation
4.      Argonaut Holdings, Inc.
5.      Riverfront Holdings, Inc.
6.      Adam Opel GmbH
7.      General Motors of Canada Limited
8.      GM Daewoo Auto & Technology Company
9.      General Motors de Mexico, S. de R.L. de C.V.
10.     General Motors do Brasil Ltda.
11.     GM Europe Treasury Company AB
12.     General Motors UK Limited
13.     General Motors Espana, S.L.
14.     GM Holden Ltd.
15.     General Motors Venezolana, C.A.
16.     General Motors Italia S.r.l.
17.     General Motors Powertrain - Germany GmbH
18.     GM Factoring Sociedade de Fomento Comercial Ltda.
19.     General Motors Powertrain- Austria GmbH
20.     General Motors India Private Limited
21.     General Motors Poland Spolka, z.o.o.
22.     General Motors CIS, LLC
23.     General Motors Belgium N.V.
24.     General Motors (Thailand) Limited
25.     General Motors de Argentina S.r.l.
26.     General Motors South Africa (Pty) Limited
27.     General Motors Strasbourg
28.     General Motors - Colmotores S.A.
29.     General Motors Auto LLC
30.     Controladora General Motors, S.A. de C.V.
31.     VM Motori S.p.A.
32.     DMAX, Ltd.

## **Section 1.1C**

### **Knowledge of Sellers**

1.    Walter G. Borst
2.    Lawrence S. Buonomo
3.    Troy A. Clarke
4.    Nicholas S. Cyprus
5.    Joseph H. DaMour
6.    Maureen Kempston Darkes
7.    Carl-Peter Foster
8.    Frederick A. Henderson
9.    Gregory E. Lau
10.   Robert S. Osborne
11.   David N. Reilly
12.   Ray G. Young

## Section 1.1D

### Seller Key Personnel

Group Vice Presidents of Parent and other executives of Parent more senior than Group Vice Presidents.

## Section 2.2(a)(xiii)

### Other Matters

Claims against a Transferred Entity arising in connection with the past sales of goods relating to transfer price adjustments in favor of Parent.

### Section 2.2(b)(vii)

**Certain Excluded Non-Executory Contracts**

Section 2.2(b)(xiii) of this Sellers' Disclosure Schedule is incorporated by reference herein and made a part of this Section 2.2(b)(vii) of this Sellers' Disclosure Schedule.

Pursuant to Section 6.5(a) of the Agreement, Purchaser shall, until the date that is two (2) Business Days prior to the Sale Hearing, have the right to designate additional non-Executory Contracts as Excluded Contracts.

## Section 2.2(b)(xi)

**Certain Bankruptcy Avoidance Actions**

Any and all Claims arising from, relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary.

## Section 2.2(b)(xiii)

### Excluded Insurance Policies

1.  Directors and Officers Insurance Policy No.: 480-99-87 with American Insurance Group and various other insurers.
2.  Aircraft Hull & Liability Primary No.: 280949/08A280949/08S1300044592/CVS101553/A1PR000169608AM/AB0802941 with AAU.
3.  Environmental Insurance Policies Nos.: Pollution 0907325; Closure/ Post Closure 0907328; Corrective Action 0907329; and Closure 0907330 related to Excluded Assets.
4.  Crime (Money and Securities) Insurance Policy No.: QA009604 for the period March 1, 2004 through March 1, 2005.
5.  Global Excess Liability Program, Policy No.: GIL 08-55 (Reinsurer Policy # 2973677) with various excess carriers providing coverage.

Pursuant to Section 6.5(a) of the Agreement, Purchaser shall, until the date that is two (2) Business Days prior to the Sale Hearing, have the right to designate additional Excluded Insurance Policies.

## **Section 2.2(b)(xvi)**

### **Other Excluded Assets**

None.

Pursuant to Section 6.5(a) of the Agreement, Purchaser shall, until the date that is two (2) Business Days prior to the Sale Hearing, have the right to designate Excluded Assets.

### Section 2.3(a)(xiv)

**Other Assumed Liabilities**

1.  Personal Liability of any of Sellers' directors, officers or employees with respect to Taxes that arise from Sellers' failure to satisfy such Taxes as a result of the Bankruptcy Cases.
2.  Promissory Note dated January 1, 2000, issued by Parent to Maryland Economic Development Corporation.
3.  Customer Warranty Program contemplated in connection with Amendment No. 4, dated May 27, 2009, to the Loan and Security Agreement dated as of December 31, 2008, between Parent, as borrower, and Sponsor, as the lender.
4.  Supplier Program contemplated in connection with that certain Credit Agreement, dated as of April 3, 2009, between GM Supplier Receivables LLC, as borrower, and Sponsor, as the lender.

Pursuant to Section 6.5(a) of the Agreement, Purchaser shall, until the date that is two (2) Business Days prior to the Sale Hearing, have the right to designate additional Assumed Liabilities.

## Section 2.3(b)(i)

### Certain Retained Indebtedness

1. Amended and Restated Credit Agreement, dated as of July 20, 2006, among Parent, GMCL, S LLC, Citicorp USA, Inc., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as syndication agent, and the banks and other financial institutions from time to time a party thereto (the "Revolving Credit Agreement").

2. Any derivative Contracts under which the non-Seller counterparty is a secured party pursuant to the Revolving Credit Agreement.

3. UST Credit Facilities.

4. Term Loan Agreement, dated as of November 29, 2006, among Parent, S LLC, the lenders a party thereto and the co-documentation and administrative agents a party thereto.

5. Loan and Security Agreement, dated as of October 2, 2006, between Parent and Gelco Corporation d/b/a GE Fleet Services as lender, as amended.

6. Bond Purchase and Paying Agency Agreement, dated as of May 28, 1986, between Parent and Credit Suisse.

7. Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among Parent, Deutsche Bank AG London, as fiscal agent, and Banque Generale de Luxembourg S.A., together with the fiscal agent as paying agents.

8. Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between General Motors Nova Scotia Finance Company, as issuer, Parent, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Bank Général du Luxembourg S.A. as paying agent.

9. Guarantee Agreement between Parent and the holders of the note under the Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between General Motors Nova Scotia Finance Company, as issuer, Parent, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Bank Général du Luxembourg S.A. as paying agent.

10. Senior Indenture, dated as of November 15, 1990, between Parent and Citibank, N.A., as trustee, and all securities issued thereunder.

11. Senior Indenture, dated as of December 7, 1995, between Parent and Citibank, N.A., as trustee, and all securities issued thereunder.

12. Senior Indenture, dated January 8, 2008, and First Supplemental Indenture, dated February 22, 2008, between Parent and Bank of New York, as trustee, and all securities issued thereunder.

13. NYCIDA IDB Harlem Auto Mall Industrial Development Revenue Bonds issued June 26, 2004, between Parent, as guarantor, New York City Industrial Agency, as issuer, and Argonaut Holdings, Inc., as agent.

14. Ohio Water Development Authority Solid Waste Revenue Bonds issued December 24, 2002, between Parent and Ohio Water Development Authority, as issuer.

15. City of Fort Wayne Pollution Control Revenue Bonds issued December 24, 2002; State of Ohio Pollution Control Revenue Bonds – Refunding issued April 4, 2002, between Parent and the City of Fort Wayne, Indiana, as issuer.

16. Michigan Strategic Fund Pollution Control Revenue Bonds – Refunding issued July 1, 1995, between Parent and Michigan Strategic Fund, as issuer.

17.     City of Moraine, Ohio Solid Waste Disposal Revenue Bonds issued July 1, 1999, between Parent and City of Moraine, Ohio, as issuer.

18.     City of Moraine, Ohio Solid Waste Disposal Revenue Bonds issued July 1, 1994, between Parent and City of Moraine, Ohio, as issuer.

19.     City of Indianapolis, Indiana Pollution Control Revenue Bonds issued April 27, 1984, between Parent and City of Indianapolis, Indiana.

20.     TPC North - 2004 Lease refinancing dated May 28, 1999 between Parent and Wilmington Trust Company (White Marsh, Maryland and SPO-Memphis).

### Section 4.1

**Organization and Good Standing**

None.

## Section 4.2

### Authorization; Enforceability

None.

## <u>Section 4.5</u>

**Reports and Financial Statements; Internal Controls**

None.

**<u>Section 4.7</u>**

**Title to and Sufficiency of Assets**

None.

## <u>Section 4.8</u>

### Compliance with Laws; Permits

None.

## <u>Section 4.9</u>

### Environmental Laws

None.

### Section 4.11

**Labor Matters**

Eighty-four retirees and 1102 current employees of GM Daewoo Auto & Technology Company filed claims in January and March of 2007, respectively, claiming that amounts such as research allowance and annual bonus had been wrongfully excluded from the calculation of ordinary wage. A verdict for this case was rendered in November 2008 (partially in favor of plaintiffs and partially in favor of defendant) and both plaintiffs and defendant appealed in December 2008.

## Section 4.12

**Investigation; Litigation**

None.

<u>Section 4.14</u>

**Intellectual Property and IT Systems**

<u>IP Litigation</u>

| | **Case Title** | **Court** | **Case No.** |
|---|---|---|---|
| | <u>U.S. Lawsuits</u> | | |
| 1. | Automotive Technologies International v. American Honda Motor Company et al. (including Parent) | D. DW | Civil Action No. 06-178-GMS |
| 2. | Automotive Technologies International v. General Motors et al. | E.D. TX | 2:08-CV-57 (JTW) |
| 3. | Chamberlain Group v. Lear (Parent intervened) | N.D. IL | 05 C 3449 |
| 4. | Dura Global Technologies v. Magna Donnelly (indemnity claim against Parent) | E.D. MI | 07-10945 |
| 5. | Dura Global Technologies v. Magna Donnelly II (indemnity claim against Parent) | E.D. TX | 6:08-CV-455 |
| 6. | Parent v. Urban Gorilla | U.S. District UT | 2:06 CV 133 |
| 7. | Kuhl Wheels LLC et al. v. General Motors | E.D. MI / CAFC | 06-CV-15204-DT / 2008-1158 |
| 8. | MHL TEK v. General Motors et al. | E.D. TX | 2:08-cv-00125-TJW-CE |
| 9. | MHL TEK LLC v. Nissan Motor Co. et al. (indemnity claim against Parent) | E.D. TX | 2:07-cv-289-TJW |
| 10. | Mitchell Corporation of Owosso v. General Motors | E.D. TX | 2:08-cv-178 |
| 11. | OnStar v. Micral et al. | N.D. OH | 3:08-cv-2047 |
| 12. | Ronald A. Katz Technology LP v. General Motors & In re Katz Interactive Call Processing Patent Litigation (including Parent) | E.D. Tex / C.D. CA | 9:06cv198 / 07-ML-01816-B-RGK (FFMx) |
| 13. | Parent v. Costar Inc. | C.D. CA | CV 08-7760 CAS (PLAx) |
| 14. | Pisani v. General Motors | US District RI | 1:09 CV 125 |
| 15. | Acadia University v. GM | Nova Scotia | |
| | <u>Non-U.S. Lawsuits</u> | | |
| 16. | Mohamed Samir Abdel Salam, in his capacity as legal representative of the Egyptian Company for Automobiles vs. GM Egypt | Giza First Instance Court, Egypt | |
| 17. | Rogerio Napolitano and Vladan Prokic v. General Motors do Brasil Ltda. | Brazil | 000.04.055200-4 |

| 18. | Nullity Actions against Ford Global Technolgies, regarding DE 9809865 / EP0953758B1 | Munich Patent Court | 10 Ni 21/07 (EU) |
| 19. | Ford Global Technologies v. Adam Opel | District Court, Duesseldorf | 4a O 409/06 |

Certain Unresolved IP Allegations

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
| --- | --- | --- | --- |
| 1. | AFT Adaptive Force Technology | License USPN 6,384,518 | Piezoelectric coupler |
| 2. | Alliacense | Infringement of MMP patent portfolio | OnStar Nav Unit; ABS, engine, chassis, climate control units; audio amplifier |
| 3. | American Outfitters | Infringe USPN D502,433 | H2 and H3 bumpers |
| 4. | Applied Interact LLC | License USPN 5,508,731; 5,249,044 | unspecified online sweepstakes |
| 5. | Armatron Int. | Infringement of USPN 5,160,927; 5,235,315; 5,432,516; 6,040,765 | Rendezvous, STS obstacle detection system (Bosch) |
| 6. | Avery Dennison | Infringement of USPN 6,228,486; 6,461,722; 6,756,095 | visor heat seal label Saturn Vue |
| 7. | BG Products | Infringement of USPN 6,478,036 | EGR cleaner |
| 8. | Clarke, Dennis | Infringement of USPN 6,794,438; 6,841,602 | thermoset polymers |
| 9. | Cooper Standard | Infringement of USPN 5,875,670 | weatherstripping crimping tool |
| 10. | Daimler AG | Infringement of USPN 6,328,358; 6,184,842; 6,433,753 | radome cover (Kaumagraph Flint Corp.) |
| 11. | De Villeroche, Gerard | Infringement of USPN 4,951,211 | vehicle guide and information system |
| 12. | Directed Electronics | Infringement of USPN 5,146,215; 5,650,774 | Subaru RKE/security systems |
| 13. | DTN/Meteorlogix | License USPN 6,753,784 | Weather alerting service |
| 14. | Duramax Marine | Infringement of TM "DURAMAX" | diesel marine engines |
| 15. | DVD6C | License of patents on DVD technology | Digital Works Inc. past supplier |

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 16. | Ford Global Tech. | Infringement of 4,930,836; 5,029,364; 5,364,157; 5,297,841; 5,782,523; 5,752,737; 5,803,516; 6,059,352; 6,581,955; 6,769,729; 7,144,064 | Various body patents |
| 17. | Ford Global Tech. | Infringement of USPN 6,044,318 | H2 throttle control |
| 18. | Ford Global Tech. | Infringement of USPN 6,173,693; EP0953758 | L850 direct injection head (Opel) |
| 19. | Ford Global Tech. | License USPN 7,157,026; 7,029,138; D501,784 | emergency trunk release handles |
| 20. | Gebre, Adamasu | Infringement of USPN 5,297,049; 5,504,683 | navigation systems (suit dismissed w/o prejudice) |
| 21. | General Patent Corp. | Infringement of USPN 5,864,604 | GM Card |
| 22. | Giri, Joseph | Infringement of copyright of mural "The Eagle Band" | Cadillac ad in April 2009 Motor Trend |
| 23. | Honeywell, Transense | Inventorship dispute | vehicle torque SAW sensor |
| 24. | Hoppenstein, Joel | License to USPN 7,246,089 | liability management method |
| 25. | IDT | License USPN 5,999,965 | unspecified VOIP call center systems |
| 26. | Isuzu | Indemnification | Agreement to indemnify in MHL v Nissan for sale of vehicles |
| 27. | Johnson Controls | Chamberlain trade secret | in-vehicle garage door opener |
| 28. | Katulka, Michael | Infringement of USPN 6,607,232 | tailgate support |
| 30. | Kiekert | Infringement of USPN 5,634,677 | Magna door latch on Enclave, Outlook, Acadia, and Traverse |
| 31. | Leemann, Karl and Ruchti, Heinz | Infringement of USPN 5,602,524 | Tire pressure monitoring |
| 32. | Little League Baseball | Infringement of TM "Little League Baseball" | TV commercial (image removed) |

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 33. | Lonzame, Pete | Infringement of USPN 5,349,328 (expired 10/23/02) | Tire pressure monitoring |
| 34. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna I |
| 35. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna II |
| 36. | Martin, P Jeff | unspecified design | design of Acadia |
| 37. | Meridian Enterprises | License to USPN 5,025,372 | reloadable or personalized cards |
| 38. | NGK Spark Plugs | Infringement of USPN 4,733,056 (exp 3/22/05) | planar oxygen sensor |
| 39. | Nissan | Infringement of USPN 5,135,444 | 5L40 and 5L50 transmissions |
| 40. | Philips | Infirngement of Philips/Sony disc patents | promotional disc w GQ magazine |
| 41. | Pisani, Carol | Fraud related to New Devices submission | seat belt warning |
| 42. | Resqnet.com | Infringement of USPN 5,530,961; 5,831,608; 5,792,659; 5,812,127 | terminal emulator software |
| 43. | Ripley Entertainment | Infringement of TM "Believe it or Not" | Internet-based ads |
| 44. | Scate Technologies | Infringement of unspecified IP | Vision software screen prints |
| 45. | Shelby Enterprises | Infringement of USPN 7,048,019; 7,059,365 | fuel filler pipe assemblies |
| 46. | Sorensen R&D | Infringement of USPN 4,935,184 | AC Delco cordless impact wrench |
| 47. | Suzuki | Indemnification | Agreement to indemnify in Wacoh v Chrysler for design of CAMI vehicles |
| 48. | Suzuki | Indemnification | Agreement to indemnify in MHL v GM for design of CAMI vehicles |

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 49. | The Welding Institute | Infringement of USPN 5,460,317; 5,813,592 | robotic welders designed for friction stir welding |
| 50. | Timken | Infringement of USPN 7,285,949 | 4L60E speed sensor |
| 51. | Toyota | Licence USPN 6,530,594; 6,279,941; 6,561,540; 6,089,594; 6,347,268; 6,170,864; 6,371,515 | supplemental restraint system technology |
| 52. | Uth Patents | License USPN 6,494,458; 6,494,460 | Dry Gas Seal Technology |
| 53. | Washington Research Foundation | Infringement of patents | Bluetooth chipsets |
| 54. | Wayne, Andrew, Teresa Barger | Wrongful prosecution of Andrew Barger | |
| 55. | William Reid and NetP&L, Inc. | Lawsuit dismissed w/o prejudice USPN 6,131,120 | GM Identity Management |
| 56. | ZF | Infringement of USPN RE39,960; 7,140,997; 7,217,218; 7,255,661; 7,335,127 | Six-speed FWD automatic transmissions |
| 57. | VW | Infringement of DE19802077C2 | On at least two levels installable luggage compartment panel |
| 58. | VW | Infringement of DE19523358C2 | Locking mechanism for a head restraint |
| 59. | VW | Infringement of DE 196 50 921 B4 | Support rod for headrest in road vehicle |
| 60. | VW | Infringement of EP 1 141 657 B1 | Method and device for reading navigation data |
| 61. | VW | Infringement of EP 0 70 1926 B2 | Multifunction Control Device |
| 62. | Daimler AG | Infringement of DE 44 45 580 C1 | Hard-top vehicle |
| 63. | PSA | | Third stop light with water nozzle |
| 64. | InteressenGemeinschaft für Rundfunk-schutzrechte KG | Infringement of EP 0 347 686 B1 | Rotating transmitter for digital pulses and method of using it |
| 65. | PSA | Infringement of EP 1 314 875 B1, EP 1 704 | Systems for the regeneration of |

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|---|
| | | 702 B1, EP 1 203 876 B1, EP 1 086 304 B1, FR 2 774 427, & FR 2 774 428 | diesel particle filters involving post fuel injections during the expansion stroke |
| 66. | Daimler AG | Infringement of DE10254695 B3 | Press-hardened part and method for the production thereof |
| 67. | H. Finke | Infringement of EP1334224B1 | Lining material for Roof Trim |
| 68. | Mittelhäuser | Infringement of EP 1 129 882 B1 | Fuel Filler Flap |
| 69. | Hörauf & Kohler Verwaltungs KG | Infringement of EP0906523 B1 | Glove Box /damping element |
| 70. | BOS GmbH & Co. KG | Infringement of EP 1 296 854 B1 | Flex-Rail-System |
| 71. | VW | Infringement of EP107442 9 | Light Switch Unit |
| 72. | Lindmayer | Infringement of DE195000999 | Door Latch |
| 73. | Kiekert | Infringement of DE4447687 C2 | Power-locking motor-vehicle door latch |

## <u>Section 4.15</u>

### Real Property

None.

## <u>Section 4.17</u>

**Dealer Sales and Service Agreements for Continuing Brands**

None.

## **Section 4.19**

### **Certain Business Practices**

None.

<u>**Section 4.20**</u>

**Brokers and Other Advisors**

1.      The Blackstone Group LP
2.      Lakeview Capital Management, Inc.
3.      Lazard Ltd.
4.      Morgan Stanley
5.      Evercore Partners
6.      AlixPartners
7.      D.F. King & Co., Inc.
8.      Deutsche Bank Group
9.      PricewaterhouseCoopers
10.     KPMG International
11.     Deloitte Development LLC
12.     Ernst & Young Global Limited
13.     Watson Wyatt Worldwide

## <u>Section 4.21</u>

**Investment Representations**

None.