

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re                             :      Chapter 11
:
DELPHI CORPORATION, <u>et al.</u>,      :      Case No. 05-44481 (RDD)
:
:      (Jointly Administered)
Debtors.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENT TO FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION**
**AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
       June 16, 2009

---

### DISCLAIMER

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF ANY MODIFICATIONS TO THE PLAN CONFIRMED BY THE BANKRUPTCY COURT ON JANUARY 25, 2008. THE BANKRUPTCY COURT WILL DETERMINE UNDER 11 U.S.C § 1127 WHETHER ACCEPTANCES OR REJECTIONS OF THE MODIFICATIONS WILL BE SOLICITED, AND ANY ACCEPTANCES OR REJECTIONS OF THE MODIFICATIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT. THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

---

THE INFORMATION CONTAINED IN THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT (HEREAFTER, THE "SUPPLEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) (THE "MODIFIED PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE MODIFIED PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS SUPPLEMENT, REGARDING THE MODIFICATIONS TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE MODIFIED PLAN.

ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS SUPPLEMENT AND THE MODIFIED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE MODIFIED PLAN.  SUMMARIES AND STATEMENTS REGARDING THE MODIFIED PLAN MADE IN THIS SUPPLEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ANNEXED TO THE MODIFIED PLAN AND THIS SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS SUPPLEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS SUPPLEMENT AND THE TERMS OF THE MODIFIED PLAN, THE TERMS OF THE MODIFIED PLAN SHALL GOVERN.

THIS SUPPLEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1127 OF THE UNITED STATES BANKRUPTCY CODE, AS IT INCORPORATES SECTION 1125 AND OTHER PROVISIONS OF THE BANKRUPTCY CODE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS SUPPLEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS SUPPLEMENT AND THE MODIFIED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS SUPPLEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS SUPPLEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE MODIFIED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN- POSSESSION IN THESE CASES.

## EXECUTIVE SUMMARY

This section provides an executive summary of:

- Events affecting Delphi's reorganization efforts since January 25, 2008, including the deterioration of the capital markets in general and the automotive industry in particular, and the commencement of chapter 11 reorganization cases for Chrysler LLC and General Motors Corporation

- The organization of the Supplement

- The background of Delphi's restructuring cases

- Material modifications to Delphi's confirmed plan of reorganization including the transfer of substantially all of the Company's operating businesses to an affiliate of Platinum Equity Capital Partners II, L.P. and the transfer of certain North American operations and the global steering operations to an affiliate of General Motors Corporation

- A hypothetical liquidation analysis

- Material modifications to the distributions to be made under the Confirmed Plan, which under the Modified Plan includes the elimination of consideration to classes other than Classes A-1, C-1, and C-2

On October 8 and 14, 2005, Delphi Corporation ("Delphi") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization that proposes how to treat claims against, and shareholder interests in, such a debtor company. A plan of reorganization must be voted on by holders of claims and interests, to the extent the class to which such holder belongs is impaired and receives or retains property under the plan on account of such claims or interests. In addition, the plan of reorganization must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is necessary for a debtor to emerge from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 2007 Plan"), together with a proposed Disclosure Statement with respect to the September 2007 Plan (the "September 2007 Disclosure Statement"). After a series of hearings in the Bankruptcy Court that concluded on December 7, 2007, on December 10, 2007, the Debtors filed the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Disclosure Statement") and the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "December 2007 Plan").

On December 10, 2007, the Bankruptcy Court entered an order approving the Disclosure Statement, and the Debtors commenced solicitation of acceptance or rejection of the December 2007 Plan.  On January 16, 2008, Delphi announced that the voting results with respect to the December 2007 Plan illustrated broad-based support for the plan.  Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the certain multi-district securities class action litigation (the "MDL"), and holders of equity security interests). One hundred percent of the ballots cast in the GM and MDL classes voted to accept the December 2007 Plan. Seventy-eight percent of voting shareholders voted to accept the December 2007 Plan.

On January 17, 2008, the Bankruptcy Court commenced the confirmation hearing (the "Confirmation Hearing") on the December 2007 Plan.  The December 2007 Plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008 (the "Confirmed Plan"), and the confirmation order became final on February 4, 2008.

A key component of the exit financing of the Confirmed Plan was the investment agreement (the "Investment Agreement") that the Debtors entered into with A-D Acquisition Holdings, LLC ("ADAH"), an affiliate of Appaloosa Management L.P. ("Appaloosa"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, UBS Securities LLC, Goldman, Sachs & Co., and Pardus DPH Holding LLC (collectively, the "Plan Investors").  On the terms and subject to the conditions of the Investment Agreement, as amended, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi.  In addition, the Investment Agreement, as amended, provided for a $1.575 billion discount rights offering that was made available to Delphi's unsecured creditors and holders of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing and conducting the discount rights offering, the Plan Investors refused to participate in the closing that was commenced and attended by all required parties other than the Plan Investors.  On that same date, Appaloosa delivered a letter purportedly terminating the Investment Agreement.  On May 16, 2008, Delphi filed complaints against the Plan Investors and related parties seeking redress of the unjustified breach of the Investment Agreement as well as damages related to the consequent delay of the Debtors' emergence from chapter 11.

Although the Debtors are pursuing actions against the Plan Investors, during the time since the Plan Investors' breach, the Debtors have worked diligently with their parties-in-interest, including their postpetition lenders, GM, the official committee of unsecured creditors (the "Creditors' Committee), the official committee of equity security holders (prior to its dissolution) (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees"), and other third parties to take actions that would allow the Debtors to formulate modifications to its Confirmed Plan and to emerge from chapter 11 without waiting for the full resolution of the Debtors' claims against the Plan Investors.  The Debtors have now reached agreements with necessary parties that will enable them to emerge from chapter 11 and, through the transactions described herein with affiliates of Platinum Equity Capital Partners II, L.P.

("Platinum") and General Motors Corporation ("GM"), will be able to continue to deliver high-quality products to their customers with the support of their supply base.

Throughout the second and third quarters of 2008, Delphi engaged in discussions with its stakeholders, including GM and representatives of both Statutory Committees, to develop modifications to the Confirmed Plan that would allow Delphi to emerge from chapter 11 on a standalone basis, without the support of plan investors.  In September 2008, Delphi reached critical agreements with GM that resulted in an expected net contribution from GM in the approximate amount of $10.6 billion and provided a partial solution to certain of the Debtors' pension funding obligations.  During this same period, however, the U.S. economy continued to weaken and vehicle production forecasts were lowered for the periods covered by the Debtors' business plan, both by third-party forecasting services as well as by the original equipment manufacturers themselves.

Following the effectiveness of the GM agreements on September 29, 2008, and having reaffirmed its business plan to contemplate the anticipated, reduced, automotive production volumes that resulted in reduced emergence funding needs, the Debtors believed they had developed modifications to the Confirmed Plan which would allow the Debtors to emerge from chapter 11.  Thus, on October 3, 2008, the Debtors filed the Plan Modification Approval Motion setting forth the proposed modifications to the Confirmed Plan and the Disclosure Statement, which included a reaffirmed business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity.

That same day, the United States House of Representatives approved the federal bailout plan, now known as the Troubled Asset Relief Program or "TARP."  On the following Monday, October 6, 2008, however, and for much of the rest of the month of October, the global credit markets seized up and the global capital markets experienced one of the five worst bear markets in their history.  On December 19, 2008, the White House announced that the federal government would lend $17.4 billion of the TARP funds to GM and Chrysler, portions of which GM and Chrysler received in December 2008 and the first half of 2009.

Despite the efforts of the federal government to provide stability to the capital markets and banks and to assist the financial viability of the domestic automotive industry, the markets remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for its modifications to the Confirmed Plan.  Moreover, in the fourth quarter of 2008 and the first quarter of 2009, forecasted and actual production volumes and sales at the U.S. original equipment manufacturers precipitously declined.  For example, the financial projections set forth in Delphi's business plan filed on October 3, 2008 were based on, among other factors, then-projected United States light vehicle sales of 14.2 million vehicles in 2009 and up to 16.3 million vehicles in 2011, with U.S. sales representing approximately 85% of North American sales.  Just three months later, on January 12, 2009, GM announced that its forecast for 2009 U.S. light vehicle sales would constitute only 10.3 million units, a staggering 3 million fewer units than were sold in 2008 and 6 million fewer units than were sold in 2007.  A more recent U.S. light vehicle sales forecast by third party forecasting service, IHS/Global Insight DRI, has projected an even further reduced sales outlook of 9.6 million units for 2009, while predicting that sales

will rise to 15.6 million units by 2012. Similarly, as of May 14, 2009, GM projected a downside of 9.3 million light vehicle units will be sold in the United States. Other OEM projections are similarly reduced. As shown on the chart below, the U.S. automotive industry has experienced the most precipitous drop in U.S. vehicle sale volumes in half a century.



As a result of the lack of available credit in the capital markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan. As a result, the Debtors were forced to remain in chapter 11. The collapse of the credit markets also made it difficult for the Debtors to refinance or extend the maturity of their DIP credit facility, which matured on December 31, 2008, on terms reasonably acceptable to the Debtors and their other stakeholders. Accordingly, in December 2008, the Debtors and the DIP Lenders entered into an accommodation agreement, as subsequently amended, to allow the Debtors to continue using certain of the proceeds of the DIP credit facility through June 30, 2009, among other things. In addition, and in connection with certain amendments to the accommodation agreement with the DIP Lenders, GM agreed to provide the Debtors with additional liquidity and to accelerate payment of certain GM receivables to allow the Debtors to maintain ongoing operations in this challenging economic environment.

During this time, the U.S. government's well-publicized involvement with the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into the

automotive industry, including GM, added yet another key stakeholder to the negotiations with the Debtors regarding their emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an additional $150 million in liquidity under an amendment to the previously-approved liquidity arrangement between Delphi and GM. The U.S. Treasury Department (the "U.S. Treasury"), however, acting pursuant to its authority under GM's loan agreement with the U.S. government, notified the Debtors and GM that it did not approve of the parties' seeking approval of these amendments at that time and requested additional time to consider these agreements and various alternatives with respect to the Debtors' emergence from chapter 11. Since that time, the Debtors and GM have been working on and negotiating a global solution to allow the Debtors to emerge from chapter 11. As part of that solution, the U.S. Treasury has now agreed to allow GM to provide up to an additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.

The formulation of the Modified Plan, the provisions of which are summarized more fully below, was the result of significant diligence on the part of the Debtors, their key stakeholders, and certain additional third parties. These results have all been achieved during a tremendously difficult time in the automotive industry. Because of the debilitating conditions in the automotive industry, more than 75 companies directly related to the automotive industry have sought chapter 11 protection in 2009 including, among others, Fleetwood Enterprises, Hayes-Lemmerz Incorporated, Mark IV Industries, Inc., Metaldyne Corporation, Milacron, Inc., Monaco Coach Corporation, Noble International Ltd., and Visteon Corporation. Moreover, even original equipment manufacturers are struggling, as evidenced by the chapter 11 filing of Chrysler LLC on April 20, 2009 and the chapter 11 filing by GM on June 1, 2009.

Against this backdrop, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, the Debtors have determined to implement their emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum, and GM Components Holdings, LLC ("GM Components"), an affiliate of GM. Ultimately, the emergence structure is similar to that which was contemplated in the Confirmed Plan, but instead of plan investors emerging as the majority owner of the continuing business enterprise through sponsorship of the Confirmed Plan, Delphi has agreed to contemporaneously effectuate transactions through which Parnassus will operate Delphi's U.S. and non-U.S. businesses going forward with emergence capital and capital commitments of approximately $3.6 billion and without the labor-related legacy costs associated with the North American sites that, together with Delphi's global Steering business, are being acquired by GM Components.

In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of their creditors, the Debtors have executed an agreement to reflect the foregoing transactions through a plan of reorganization. The Debtors will emerge with certain residual assets and liabilities which they intend to operate upon emergence but divest over time. Consummation of these transactions through the Modified Plan, which embodies concessions made by all parties-in-interest allowing for the resolution of these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a distribution to holders of general unsecured claims, as described further herein. Moreover, Delphi's emerging businesses will continue to develop technology and

products and produce them for the benefit of their customers under the guidance of Platinum, a company with experience providing operational support to companies to help them create long term value.

If, however, the Debtors receive any unsolicited alternative transaction proposal, in the exercise of their fiduciary duties, the Debtors will consider such proposal in accordance with the procedures established by the Bankruptcy Court in the Modification Procedures Order.  In that event, if any such alternative transaction proposal is deemed by the Debtors to be higher or otherwise better and is approved by the Bankruptcy Court, the Debtors will seek to confirm the Modified Plan and make the distributions provided thereunder on the basis of such approved alternative transaction.

The Debtors are seeking to modify the Confirmed Plan pursuant to section 1127 of the Bankruptcy Code.  The Confirmed Plan, with the modifications described herein, will be referred to herein as the "Modified Plan," and this Modified Plan supersedes in its entirety the October 3, 2008 proposed Plan modifications.  The purpose of this Supplement is to provide to the holders of Claims against the Debtors adequate information to make an informed judgment about the Modified Plan, which is annexed to this document as Appendix A.

This Supplement contains, among other things, descriptions and summaries of provisions of the Modified Plan.  Certain of Delphi's U.S. affiliates are not debtors in these chapter 11 cases (the "Chapter 11 Cases") and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions.  Certain provisions of the Modified Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.  Such modifications, however, are not anticipated to have a material adverse effect on the distributions contemplated by the Modified Plan.

## A.    Summary Of Material Modifications To The Confirmed Plan

As set forth above, the Plan Investors' failure to meet their obligations under the Investment Agreement delayed the Debtors' emergence from chapter 11.  The loss of this investment, and the resultant exposure to the continued uncertainty of the global capital markets, the current economic climate in the U.S., the depressed state of the global automotive industry, and the combined effect of these factors to depress valuation metrics, have led to a significant decrease in the Debtors' business enterprise value.  This result, combined with the Debtors' liquidity issues and the unfavorable economic environment, necessarily has led to significantly reduced recoveries under the Modified Plan for more senior classes and the elimination of recoveries for more junior classes but still maximizes recovery for stakeholders relative to any other alternative explored by the Debtors.  The chart below briefly summarizes some of the material modifications to the Confirmed Plan as reflected in the Modified Plan attached hereto as Appendix A, but the Modified Plan and the remainder of this Supplement should be reviewed in their entirety.

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Plan Investor** | Plan Investors' commitment to invest up to $2.55 billion | Acquisition of the Company's operating businesses by Parnassus Holdings II, LLC, an affiliate of Platinum Equity Capital Partners II, L.P., and of certain North American operations and the global Steering business by certain affiliates of General Motors Corporation |
| **Rights Offering** | $1.75 billion discount rights offering | No rights offering |
| **Emergence Capital and Capital Commitments** | $4.7 billion | No funded debt; instead non-recourse emergence capital funded by GM under the transaction agreements<br><br>Parnassus Holdings II, LLC has obtained approximately $3.6 billion in emergence capital and capital commitments to support the Company's operating businesses going forward |
| **Revolver** | $1.4 billion | Not applicable |
| **Total Enterprise Value** | Agreed plan value of $12.8 billion | Not applicable as a result of the Master Disposition Agreement and related transactions |

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Defined Benefit Pension Plans** | - $1.5 billion 414(l) Transfer of hourly pension plan to GM<br>- All salaried pension plans and remaining hourly pension plans assumed | - 414(l) Transfer of approximately $2.1 billion in net unfunded liabilities was effective on September 29, 2008<br><br>- Upon consummation of the Modified Plan, the remaining assets and liabilities of Delphi's hourly pension plan will no longer be the responsibility of the Debtors and will be addressed by GM.  Although the Debtors have sought additional information regarding the treatment of their pension plans prior to the date of this Supplement, the specific arrangements have not been finalized. The Debtors anticipate receiving additional direction from GM, the PBGC, and the U.S. Treasury on the terms of the PBGC Settlement Agreement, which the Debtors will use their best efforts to file by the Plan Exhibit Filing Date<br><br>- The Debtors expect that the salaried pension and certain subsidiary pension plans may be involuntarily terminated by the PBGC, which will receive a negotiated settlement, including an allowed unsecured prepetition claim |
| **GM** | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the 414(l) assumption | GM will purchase from Delphi for additional consideration certain assets of the Company and will be subject to certain obligations as set forth in the Master Disposition Agreement (which will supersede the Amended Master Restructuring Agreement that will be terminated), including providing certain funding, waiving certain claims and assuming various liabilities.  GM will not receive any distribution on account of its Allowed Claim |

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **DIP Facility Revolver Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **DIP Facility First Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date |
| **Senior Secured Hedge Obligations** | Paid in the ordinary course of business | Paid in the ordinary course of business with agreed collateralization upon emergence |
| **DIP Facility Second Priority Term Claim** | Paid in full on the Effective Date | Satisfied in full on the Effective Date through consummation of a transaction that provides for the cash payment of approximately $291 million, interest in Parnassus Holdings II, LLC in the nominal amount of $145.5 million with a preferred return at a per annum rate of interest of 8% and to be paid pursuant to a waterfall formula as part of the equity distribution of Parnassus Holding LLC and any unpaid balance to be paid ten years after the effective date of Modified Plan, and the first settlement or other proceeds from the Corporation's plan investor litigation up to approximately $146 million |
| **Secured Claims (Excluding DIP Claims)** | Paid in Cash in full or reinstated | Claims will either (i) be paid in equal installments of cash over a period of seven years from the effective date of the Modified Plan with interest accruing at the closing seven-year Treasury Bill rate on the effective date, plus 200 basis points, (ii) receive their collateral free and clear of liens, or (iii) receive such other treatment agreed upon by the parties that is more favorable to the Debtors |

|  | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| **Unsecured Creditors** | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br> -78.6% in new common stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Pro rata share of deferred consideration under the Master Disposition Agreement provided that any distribution to holders of general unsecured claims will be shared ratably with the anticipated general unsecured claim of the PBGC. |
| **Post-petition Interest** | Post-petition Interest to be paid on certain General Unsecured Claims | No post-petition interest will be accrued or paid on General Unsecured Claims under the Modified Plan |
| **MDL Litigation Claims** | Allowed claims with same treatment as General Unsecured Claims | No recovery under the Modified Plan |
| **Equity** | Direct grant of new common stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | No recovery under the Modified Plan |

**B.     Description Of Organization Of This Supplement And The Modified Plan**

The Supplement is divided into this executive summary and an additional 12 sections, each of which is sub-divided further under descriptive headings to aid in the understanding of the information contained herein.    The beginning of each section of the Supplement contains a summary of the information in the section and highlights certain modifications made since the approval of the Disclosure Statement.    The paragraphs that follow provide a brief overview of the contents of the Supplement.

The introduction and executive summary contain a general overview of the Debtors, and the events that have occurred since the confirmation of the Confirmed Plan in January 2008, including a summary of the terms of the Modified Plan.    The executive summary is qualified in

its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Supplement, the Appendices to the Supplement, including the Modified Plan, and in certain instances, the Disclosure Statement as filed in December 2007. The Modified Plan is attached to the Supplement as Appendix A. All capitalized terms not defined in this Supplement have the meanings ascribed to them in the Modified Plan, unless otherwise noted.

Sections I and II of this Supplement explain the chapter 11 process and provide an overview of voting procedures to accept or reject the Modified Plan.

Section III of this Supplement provides an overview of major events that have occurred during the Chapter 11 Cases since the solicitation of votes on the Confirmed Plan, including a description of various orders entered by the Bankruptcy Court, the debtor-in-possession financing obtained and used, the sales of assets, and the litigation between the Debtors and the Plan Investors. This section also describes the claims process and the Debtors' progress in reconciling claims. To provide information about Delphi's financial performance, historical financial results of the Company are attached to this Supplement as Appendix B.

Section IV of this Supplement contains a summary of the Modified Plan including, among other things, an explanation of the potential substantive consolidation of certain Debtors, the treatment of claims and interests under the Modified Plan, and the releases and exculpations provided by the Modified Plan to the Debtors and certain third parties.

Section V of this Supplement describes general considerations and risk factors to be evaluated in conjunction with the description of the Debtors' Modified Plan.

Sections VI and VII of this Supplement provide information on securities law matters and federal income tax consequences of distributions to be made under the Modified Plan.

Section VIII of this Supplement discusses certain bankruptcy law principles that the Debtors must meet for the Modified Plan to be confirmed by the Bankruptcy Court, including that the Modified Plan is feasible and meets the "best interests" test set forth in the Bankruptcy Code. This section also contains an analysis of the hypothetical liquidation of the Debtors performed in conjunction with the formation of the Modified Plan. Liquidation analyses showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached as Appendix C.

Finally, Sections IX-XII of this Supplement explain, among other things, the process by which confirmation of the Modified Plan may occur, conditions to confirmation and consummation of the Modified Plan and the Effective Date, voting requirements, and details about the hearing on the Modified Plan.

Creditors may vote to accept or reject the Modified Plan. In addition, the modifications must be approved by the Bankruptcy Court before Delphi can consummate the Modified Plan. The Modified Plan is the document that effectuates, among other things, distributions to creditors and shareholders and the releases of certain parties.

C.    **Commencement Of Chapter 11 Cases**

Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company.  Delphi's separation from GM was completed in May 1999.

Precipitating Delphi's entry into chapter 11 was a series of significant net losses for the Company.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses, both during the prepetition and postpetition periods.

- In calendar year 2004, the Company reported a net loss of approximately $4.8 billion. The reported net loss in calendar year 2004 reflects a $4.1 billion income tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in 2004 was $482 million.
- In 2005, the Company incurred net losses of approximately $2.4 billion (with a net operating loss of $2.0 billion).
- In 2006 the Company incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.  Net operating losses in calendar year 2006 were $4.5 billion.
- In 2007, the Company incurred a net loss of $3.1 billion.  Net operating losses in calendar year 2007 were $1.9 billion.
- In 2008, although the Company recorded net income of $3.0 billion in 2008, which included a gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.
- In the first quarter of 2009, although the Company recorded net income of $556 million, which included a gain of $1.2 billion in connection with the termination of the salaried OPEB plan, the Company's net operating loss of the first quarter was $534 million.

Delphi believes that the Company's financial performance deteriorated in the period prior to the chapter 11 filing because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for U.S. OEMs resulting in the reduced number of motor vehicles that such OEMs, including GM, produce annually in the United States and related pricing pressures, and (c) increasing commodity prices.

In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its

major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these Chapter 11 Cases for its U.S. businesses to preserve value for its stakeholders.

**D.      Overview Of Delphi's Transformation**

On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations (the "Transformation Plan").  During the course of its Chapter 11 Cases, including the period following April 4, 2008, Delphi implemented many of its key transformation goals, despite the harsh economic climate that began in 2007 and led to the current depressed global capital and equity markets.  Delphi's transformation activities during its Chapter 11 Cases produced an enterprise with more flexibility and a greater capability to respond to changing markets because of its more streamlined enterprise with a more focused product portfolio, reduced U.S. employment costs, the ability to adjust U.S. manufacturing with volume, a significant reduction in high cost production capacity, increasingly shared business processes and IT platforms between operating units, a simplified organizational structure, greater business diversification by customer, and greater business diversification by region.

The Company's stated goals for transforming five key areas of its business and its progress in realizing those goals throughout the cases is summarized below.

**Labor**

Modify the Company's labor agreements to create a competitive arena in which to conduct business

Agreements with all principal U.S. labor unions that:
- modified, extended, or terminated provisions of the Company's U.S. existing collective bargaining agreements with its unions;
- provided that GM would undertake certain financial obligations to Delphi's union-represented retirees; and
- modified retiree welfare benefits for union-represented retirees

Negotiated attrition programs with certain of Delphi's unions, implemented with the assistance of GM

These agreements will be assumed and assigned under the Master Disposition Agreement

**GM**

Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company

- The Global Settlement Agreement, which became effective in September 2008, provided a comprehensive resolution of the claims between Delphi and GM (other than ordinary course claims) in consideration for the 414(l) transaction, GM's assumption of financial responsibility for traditional U.S. hourly OPEB, and GM's commitments to Delphi
- The Master Restructuring Agreement, which became effective in September 2008, addressed GM's forward business commitments to Delphi and the parties' continuing obligations to each other; this agreement will be superseded by the Master Disposition Agreement
- The Master Disposition Agreement, which will become effective upon the Debtors' emergence, pursuant to which an affiliate of GM will acquire certain of the Debtors' North American operations and will assume certain liabilities in accordance therewith

**Product Portfolio And Manufacturing Footprint**

Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus

- Effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it had competitive and technological advantages
- The Company developed a revised operating structure that consisted of the following core business segments:
  - Electrical/Electronic Architecture
  - Powertrain Systems
  - Electronics and Safety
  - Thermal Systems
  - Delphi Product and Service Solutions
- The Company also identified non-core product lines and plants which have been held for sale or windown by Automotive Holdings Group
- During 2006-2009, the Company has worked to maximize the value of non-core assets for all stakeholders, commenced and/or completed the sale of certain bearings, brakes, chassis, catalyst, interiors and closures, power products, and steering businesses
- The Company identified eight core automotive sites in the United States and streamlined its global manufacturing footprint; both the "core" sites and the global operations will now be transferred pursuant to the Master Disposition Agreement

**Cost Structure**

Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint

- The Company made significant progress to ensure that its organizational and cost structure was competitive by entering into various outsourcing agreements, including outsourcing certain of its accounts receivable, accounts payable, and contract administration processes, which significantly reduced the Company's SG&A expenses
- The Company reduced the size of its salaried workforce and implemented benefit reductions for both active salaried employees and retirees
- The Company developed a competitive benchmark executive and non-executive compensation program

**Pension**

Devise a workable solution to the Company's pension funding situation

- The Company froze all but one of its defined benefit programs as of November 30, 2008, but will provide alternative defined contribution programs and will reach an agreement with GM or the PBGC regarding the frozen programs
- On September 29, 2008, the Company effectuated the first transfer under Section 414(l) of the Internal Revenue Code of certain hourly pension liabilities to GM with a subsequent transfer of assets and liabilities related to the hourly plan scheduled to occur upon the effective date of the Modified Plan. These transfers, combined with contributions upon emergence, has assisted the Company in addressing its hourly pension funding situation
- While the defined benefit programs were to be assumed under the Confirmed Plan, the salaried and subsidiary plans are no longer capable of assumption because of the deterioration of the capital markets in 2008 and 2009 and accordingly such plans may be involuntarily terminated by the PBGC

Although the realization of the Debtors' Transformation Plan has not led to an emergence structure that provides value to nearly all stakeholders as originally contemplated, the significant progress the Debtors made in streamlining their businesses throughout the Chapter 11 Cases has resulted in the willingness of third parties to invest in the Debtors' underlying business assets, including significant portions of its operations, through the transactions contemplated in the disposition agreement among the Debtors, Parnassus, GM Components, and certain affiliates thereof (the "Master Disposition Agreement"). The Debtors expect that the go-forward business

will maintain its prominence as one of the world's premier automotive suppliers under the ownership of Parnassus as it continues to supply customers around the world.

## E.    Key Emergence Issues

Following the inability of the Debtors to implement their proposed modifications to the Confirmed Plan in October 2008, the Debtors undertook steps in three primary areas which the Debtors believe have been critical to completing their transformation and positioning the Company to emerge from chapter 11: (i) reaching an agreement with Parnassus and GM Components for the disposition of the Debtors' primary business assets, (ii) resolving the Debtors' financing issues, and (iii) resolving the Debtors' pension issues. Critical to achieving resolution of each of these issues has been garnering the support of the U.S. Treasury for Delphi's plan of reorganization.  As a result of GM accepting TARP funds from the U.S. government, GM's use of capital is subject to significant governmental oversight, particularly for transactions valued at more than $100 million.  Because support from GM in a variety of forms was central to the resolution of each of these three issues, it was essential for the Debtors to attain U.S. Treasury support as well.  Having garnered that support in light of the Debtors' significant relationship with GM, the Debtors have been able to reach a consensual resolution with their parties-in-interest to Delphi's outstanding issues, which discussions have resulted in the agreements underlying the Modified Plan.

### 1.    Master Disposition Agreement

In September 2008, the Debtors reached agreements with GM to accelerate the effectiveness of certain agreements among the Debtors and GM that provided for the settlement of claims between the parties and proscribed the nature of the relationship between the Company and GM going forward.  These agreements contained many benefits inuring to the Debtors and were initially to become effective concurrently with the consummation of the Confirmed Plan. When the effectiveness of the Confirmed Plan was delayed, the Debtors sought and, on September 25, 2008 the Bankruptcy Court approved, the implementation of an Amended and Restated Global Settlement Agreement (the "Amended GSA") and Amended and Restated Master Restructuring Agreement (the "Amended MRA") with GM.  Through the Amended GSA and Amended MRA, the Debtors addressed, at least in part, two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) working to solve Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the original global settlement agreement and master restructuring agreement with GM approved in connection with the Confirmed Plan (the "Original GSA" and "Original MRA," respectively).  This estimate included the value of two 414(l) transfers of pension assets and liabilities to GM and the consideration provided by Delphi for both transfers.  The Amended GSA and Amended MRA became effective on September 29, 2008.

When the Amended GSA and Amended MRA were consummated, the Debtors believed that they were on the path to emergence, but due to the increasingly severe global economic downturn and the deterioration in forecasted production volumes from original equipment manufacturers, the Debtors found themselves in need of further liquidity.  Thus, the Company was required to continue exploring strategic alternatives.  To facilitate the Debtors' emergence from chapter 11 pursuant to the Modified Plan, during the first quarter of 2009, Delphi and GM engaged in extensive discussions with respect to GM's acquisition of Delphi's global steering business as well as certain of Delphi's North American facilities that employ hourly workers represented by the UAW and that are dedicated principally to supplying product to GM.

As the decline of the U.S. automotive industry continued, culminating with the chapter 11 filings of Chrysler LLC and GM, the Debtors continued to negotiate with GM regarding the terms of a potential sale of assets.  As a result of this process, certain other potential purchasers also engaged in dialogue with GM and the Debtors.  These expanded discussions raised the possibility of a well-capitalized third party purchaser acquiring substantially all of the Debtors' assets, other than those to be purchased by GM, and certain additional assets to remain with a reorganized company, to move the company forward.  As a result of these discussions, the Debtors secured the support of Platinum and GM and were able to negotiate the Master Disposition Agreement with GM Components and Parnassus.

Pursuant to Master Disposition Agreement, and subject to the terms described therein, certain of GM's affiliates would purchase certain of the Debtors' U.S. manufacturing facilities that primarily supply product to GM as well as the assets of the Debtors' global Steering business.  Concurrently, Parnassus would purchase a substantial portion of the remaining business assets, including the equity of the Debtors' non-U.S. subsidiaries.



From the purchasers, the Debtors would receive, among other things, cash, the assumption of liabilities, assumption of certain administrative claims and/or cash to fund payment of certain administrative claims, and certain deferred consideration. Additionally, as part of the consideration GM would provide, at closing GM would waive its multi-billion dollar claims, including its administrative expense claim under the GM Arrangement, its administrative expense claim under Section 4.04(a)(i) of the Amended GSA, and its prepetition claim.



The Master Disposition Agreement contains typical representation and warranties and sets forth certain covenants relating to bankruptcy actions, employees, intellectual property, operations, and taxes, among others. One of the bankruptcy covenants provides that under certain conditions, in lieu of the sale transactions contemplated under the Master Disposition Agreement being consummated as part of the Debtors' plan of reorganization, such sale transactions would proceed pursuant to section 363 of the Bankruptcy Code. Entry into the Master Disposition Agreement and the conditions precedent to the consummation thereof having been waived or satisfied are conditions to the effectiveness of the Modified Plan.

On June 1, 2009, GM filed a Form 8-K with the Securities Exchange Commission in which it disclosed that it had entered into the Master Disposition Agreement. GM's filing disclosed the business and facilities that it would be acquiring and stated that Delphi employees at each acquired facility will transfer to the company that acquires that facility. In addition, GM stated that in connection with its acquisition, GM would pay or assume approximately $600 million of Delphi obligations related to its Tranche A and Tranche B DIP Loans under the DIP Credit Agreement (each as defined below), including certain secured hedge transactions, approximately $300 million of Delphi obligations related to its Tranche C Loans, and approximately $200 million of other Delphi obligations to be shared with Parnassus, including administrative claims. In addition, GM stated that upon the closing of the transactions contemplated by the Master Disposition Agreement, GM would waive its administrative claims

associated with the GM Arrangement (in the approximate amount of $300 million) and transferred pension costs for hourly employees (in the approximate amount of $1.6 billion).

GM further disclosed that in connection with the Master Disposition Agreement, GM and Delphi amended their existing liquidity agreement (the "GM Arrangement," as defined below) to provide that GM would furnish a $250 million credit facility, subject to certain conditions. Upon the consummation of either the Modified Plan or a sale pursuant to section 363, GM would waive all amounts outstanding under this credit facility.

In addition, GM disclosed generally the capital structure of Parnassus. Specifically, GM will invest $2 billion of cash in consideration for "Class A Membership Interests" in the acquisition company and $500 million in a delayed draw term loan facility. Platinum will invest $250 million in cash in consideration for "Class B Membership Interests" in the acquisition company and $250 million in a delayed draw term loan facility. Finally, GM agreed to carry forward to the end of the related product program all existing Delphi supply agreements (including purchase orders) for North America, and Parnassus agreed to provide GM with certain requested protections to ensure continuity of supply.

As mentioned above, also on June 1, 2009, GM sought protection under chapter 11 of the Bankruptcy Code. Under applicable bankruptcy law, GM must receive Bankruptcy Court approval to enter into and perform under the Master Disposition Agreement. Pursuant to the terms of the Master Disposition Agreement, Bankruptcy Court authorization must be obtained prior to July 15, 2009 or the Master Disposition Agreement terminates automatically. GM is expected to file a motion on or about June 20, 2009 seeking authorization to enter into and perform under the Master Disposition Agreement, and the hearing at which GM's motion will be considered is currently scheduled for July 13, 2009. The Final Modification Approval Hearing is scheduled for July 23, 2009 and the Debtors are hoping to close the transaction on or prior to July 31, 2009.

### 2.    *Funding Issues*

Since April 4, 2008, the Debtors have sought to bolster their liquidity and to obtain commitments to fund their emergence from chapter 11 despite the frozen credit markets. To that end, the Debtors implemented a number of cash conservation measures, including temporary lay-offs and salaried benefit cuts for both active employees and retirees, delay of capital and other expenditures, and permanent salaried work-force reductions, among other cost saving measures, to ensure adequate liquidity for operations while the Company engaged in further restructuring efforts in response to changes in the global automotive industry. In addition, the Debtors have sought additional sources of short-term and long-term funding through their postpetition lenders, GM, the U.S. government, and other third parties, including through legal action against the Plan Investors.

In April 2008, the Debtors amended their postpetition credit facility and extended the maturity to December 31, 2008, which amendment became effective on May 9, 2008. Due to a positive market response and oversubscription for all three tranches of debt, the Debtors were able to increase the principal amount of the tranche C term loan by $254 million. As a result, the Debtors' postpetition credit facility consists of a $1.1 billion first priority revolving credit facility

("Tranche A"), a $500 million first priority term loan ("Tranche B"), and a $2.75 billion second priority term loan ("Tranche C," and collectively with Tranche A and Tranche B, the "DIP Loans," and the lenders thereto, the "DIP Lenders").  The obligations and rights of the Debtors and DIP Lenders are as set forth in the Second Amended and Restated Credit Agreement, which became effective on May 9, 2008 (the "DIP Credit Agreement").  Following the filing of the October 3, 2008 modifications to the Confirmed Plan, when it became clear that the Debtors would not be able to emerge prior to the December 31, 2008 maturity date, the Debtors sought another amendment of the postpetition credit facility.  As a result of the market turbulence, however, the Debtors were unable to extend the maturity date on terms reasonably acceptable to them and their other stakeholders.  Accordingly, with the support of the administrative agent (the "Administrative Agent") and the requisite lenders to the postpetition credit facility, the Debtors entered into an accommodation agreement (the "Accommodation Agreement") which allowed the Debtors, among other things, to continue using certain of the proceeds of the postpetition credit facility through June 30, 2009, subject to certain milestones, but prevented the further borrowing of funds under the DIP Credit Agreement.  The Accommodation Agreement was amended from time to time as the result of delays in meeting the milestones set forth in the Accommodation Agreement, as amended.  Absent a further amendment, the Debtors anticipate that on June 20, 2009, the Accommodation Agreement may terminate.  In such event, the Debtors will seek to negotiate further accommodations under the DIP Credit Agreement with the Required Lenders under the agreement.

To further support the Debtors' liquidity, since May 2008, GM has provided advances to the Debtors in amounts ranging from $50 million to $650 million (the "GM Arrangement") and accelerated payment of up to $300 million in certain payables to the Debtors through May 2009 (the "Pull-Forward Agreement").   In February 2009, Delphi sought and, subject to U.S. Treasury consent, GM agreed to provide an additional $150 million of advances to Delphi, which would have increased the total advances extended to Delphi to $450 million.  On March 23, 2009, however, U.S. Treasury notified GM and the Debtors in writing that U.S. Treasury did not approve the parties' seeking approval of these agreements until U.S. Treasury had a further opportunity to review the details of those transactions and the various alternatives for Delphi's emergence from chapter 11.  Thus, since the end of March, the Debtors have been constantly negotiating with their DIP Lenders to maintain needed liquidity while negotiating agreements that would enable them to bring their reorganization to a successful conclusion.

In mid-May, in resolution of U.S. Treasury's earlier objections, Delphi was informed that GM would be permitted to provide interim DIP financing to the Debtors to assist with their operations pending the closing of the Master Disposition Agreement as well as the reimbursement of certain post-closing expenses, in each case in amounts and on terms to be agreed between GM and Delphi.  This financing is being provided as an amendment to the GM Arrangement and will make available an aggregate $550 million in advances from GM.  Concurrent with its filing for chapter 11 protection, GM filed a motion seeking Bankruptcy Court approval to continue to provide financing to certain of its suppliers, including by lending funds directly to suppliers such as Delphi in the manner as set forth in the GM Arrangement.  The Bankruptcy Court granted GM interim approval of its motion and expressly provided that without further Court order, GM could continue payments and accommodations to financially or operationally distressed suppliers whether relating to the period prior to or following the commencement of GM's cases.

In addition, U.S. Treasury has agreed to provide funding to GM for GM Components' acquisition of certain of the Debtors' assets as provided in the Master Disposition Agreement. Finally, the agreement by Parnassus and GM Components to provide liquidity for the payment of (or the assumption of) certain of the Debtors' administrative claims has allowed the Debtors to present a feasible Modified Plan to the Bankruptcy Court for approval.

### 3.    Resolution Of Pension Issues

To emerge from chapter 11, the Debtors have also diligently worked to resolve their pension issues through negotiations with GM, U.S. Treasury, and the Pension Benefit Guaranty Corporation ("PBGC") and by taking action to implement certain cost-saving aspects of their pension transformation. First, in September 2008, the Debtors received Bankruptcy Court approval to freeze their U.S. hourly and salaried pension plans, with the exception of one relatively small defined benefit plan that remains unfrozen. Concurrently, through the effectiveness of the Amended GSA and Amended MRA, Delphi transferred a large portion of the hourly pension plan to GM's hourly pension plan by executing a section 414(l) transfer under the Internal Revenue Code (the "IRC"), to which the Debtors have attributed a value of $2.1 billion in net unfunded liabilities. Further, because the Debtors were making every effort to preserve their pension plans, in December 2008, Delphi filed with the IRS a pension funding waiver request for their salaried pension plan for the plan year ended September 30, 2008 to assist the Debtors in continuing to conserve cash.

In addition, GM has agreed to make certain arrangements, the details of which are still being finalized, such that Delphi will no longer have responsibility for the remainder of its hourly pension plan. Although the Debtors have explored numerous alternatives for its salaried pension plan and other "subsidiary" plans, none are feasible. Thus, in connection with the Modified Plan, the PBGC will explore initiating an involuntary termination of those plans. In light of this outcome, the Debtors, GM, U.S. Treasury, and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined in the IRC and/or ERISA (the "PBGC Settlement Agreement"). Pursuant to that anticipated settlement agreement and as set forth in the Modified Plan, the Debtors expect (a) to grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.4 of the Modified Plan and (b) that the PBGC will receive a cash payment in the amount of $30 million, from certain sources to be disclosed in the PBGC Settlement Agreement. The Debtors anticipate receiving additional direction from GM, the PBGC, and the U.S. Treasury on the terms of the PBGC Settlement Agreement, which the Debtors will use their best efforts to file by the Plan Exhibit Filing Date.

The cash and claim to be distributed to the PBGC is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's waiver of any and all

liens and claims not otherwise discharged by the Modified Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise.

Finally, as part of the Master Disposition Agreement, GM Components and Parnassus have agreed to explore plan sponsorship alternatives for certain of Delphi's defined contribution plans, including assumption of certain of those plans.

## F.    Events Impacting Reorganization

The Debtors believe the recoveries afforded to all stakeholders under the Modified Plan are the best recoveries available at this time.  Although the distributions to be received by certain stakeholders and the currency of such distributions have significantly changed since the confirmation of the Confirmed Plan, in light of the decline in global automotive production volumes, the deepening of the crisis in global debt and equity markets, and the delay in emergence caused by the Plan Investors' breach of the Investment Agreement, the Debtors believe that the Modified Plan should be approved.  Delphi believes any further delay in emerging from chapter 11 may lead to further and significant degradation of its total enterprise value and a corresponding reduction in stakeholder recoveries through, for example, the diminution of customer and supplier support, increased financing costs, constrained liquidity, and continued costs of operating under chapter 11 protection.

In addition, if at any time the Debtors become in default under the Accommodation Agreement resulting from their inability to meet the milestones contained therein, there could be a material adverse impact on the Company if the lenders choose to exercise remedies outside the Modified Plan.  Moreover, the Debtors believe that the expeditious resolution of these Chapter 11 Cases is paramount to maximize recovery for stakeholders; failure to do so may lead to significantly reduced recoveries.  In particular, without near-term resolution of the significant issues in these cases, including approval of the Modified Plan and execution of the agreements contained therein, the Company could be forced to wind down as set forth in the Hypothetical Liquidation Analysis attached as <u>Appendix C</u> hereto.  Alternately, the Administrative Agent and the DIP Lenders might seek to take control over all of Delphi's cash and apply it to the DIP Loans and/or take control of other collateral securing the DIP Loans (which comprises substantially all of the assets of Delphi's U.S. Debtor entities), immediately and without further order of or application to the Bankruptcy Court.  Should the DIP Lenders take control of the collateral, there may not be any other value remaining for any other stakeholders.  To prevent this outcome from occurring and preserve the distributions as set forth in the Modified Plan, the Debtors believe that the Modified Plan should be approved and consummated as soon as it is feasible to preserve value for their stakeholders.

## G.    Structure And Distributions Under The Modified Plan

Each of Delphi and its 41 Affiliate Debtors is a proponent of the Modified Plan within the meaning of section 1129 of the Bankruptcy Code.  The Modified Plan provides for the substantive consolidation of certain of the Debtors' Estates for voting and distribution purposes

only.  The Modified Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  After careful review of the Debtors' estimated recoveries in a liquidation scenario, and the recoveries that would be made possible by executing the transactions as set forth in the Modified Plan, the Debtors have concluded that the recovery to the Debtors' creditors will be maximized by the Modified Plan.  The Modified Plan incorporates many of the settlements that Delphi reached with critical stakeholders in these reorganization cases.  The Debtors, GM, and all of the Debtors' principal U.S. labor unions are parties to settlements with the Debtors which allow for various recoveries under the Modified Plan.

As set forth in the Modified Plan and pursuant to the transactions to be effectuated pursuant to the agreement between the Debtors, their non-Debtor affiliates, and the Administrative Agent, which will be deemed to occur on the Effective Date, the DIP Claims will be satisfied in full as provided by law.  In connection with that agreement, holders of DIP Claims will receive the following: (i) Tranche A DIP Lenders and Tranche B DIP Lenders will receive cash (the "Tranche A and B DIP Consideration") and (ii) Tranche C DIP Lenders will receive (a) approximately $291 million in cash, (b) their pro rata portion of the Parnassus Class C Interests (as discussed further below and as defined in the Modified Plan), and (c) up to approximately $146 million of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against Appaloosa Management L.P. and certain other plan investors or other parties arising from or relating to the Equity Purchase and Commitment Agreement to which Delphi is a party (the "Tranche C DIP Consideration," together with the Tranche A and B DIP Consideration, the "DIP Consideration").

The future distributions to be made to holders of Parnassus Class C Interests is set forth in Parnassus's operating agreement.  Under the terms of the operating agreement, holders of Parnassus Class C Interests are entitled to receive 5.0866% of the first $1 billion of distributions made to Parnassus interest holders.  Thereafter, holders of Parnassus Class C Interests are entitled to receive 5.7648% of the next $1,641,757,563 distributed to Parnassus interest holders.  The total amount distributable to holders of Parnassus Class C Interests is $145,510,040.  The Parnassus Class C Interests are subject to mandatory redemption on the 10th anniversary of Parnassus's operating agreement for the purchase price equal to $145,510,040 minus any previous distributions made to holders of Parnassus Class C Interests.  In addition, subject to the terms of Parnassus's operating agreement, holders of Parnassus Class C Interests are entitled to receive 8% mandatory quarterly payments on account of the unpaid balance of such interests.

In negotiating the DIP Credit Agreement, the Debtors, the Agent, and the DIP Lenders agreed to certain provisions that authorized the Agent to act upon the instruction of the majority of the two most senior tranches of the DIP facility (the "Required Lenders") for the benefit of all the DIP Lenders.  This negotiated provision was consented to by all the DIP Lenders. Accordingly, individual lenders do not have the right to enforce remedies individually under the DIP Credit Agreement, but rather remedies can only be enforced through collective action.  The remedies available to the DIP Agent upon an event of default are set forth in section 15 of the Security And Pledge Agreement.  Specifically, the parties agreed that, if an Event of Default (as defined in the DIP Credit Agreement) were to occur, the Administrative Agent could, and upon the request of Required Lenders would be required to, exercise the various rights and remedies permitted under section 7.01 of the DIP Credit Agreement and distribute any proceeds realized

from the exercise of remedies in the order of priority set forth in section 15(g). Accordingly, the DIP Credit Agreement gave the two most senior tranches of lenders the right to vote to direct the Administrative Agent to take certain actions in response to an Event of Default. The tranche of lenders most junior in priority consented to delegating these rights.

Because the DIP Lenders have all consented to the intercreditor arrangement among themselves, either through direct consent or by purchasing a portion of the debt covered by the DIP Credit Agreement, the Debtors believe that all DIP Lenders are bound by the Administrative Agent's exercise of remedies, including actions to assert control over property and interests under the Uniform Commercial Code (the "UCC"), as adopted by the state of New York, in satisfaction of the DIP Claims. In fact, the Bankruptcy Court generally endorsed the Debtors' collective action interpretation of the DIP Credit Agreement when it approved the Accommodation Agreement over the objection of certain participants. In the current economic environment, the Debtors are expecting a similar reaction to the Debtors' and the DIP Lenders' negotiated transfer or sale of collateral (the "Transferred Assets") under the Modified Plan (the "DIP Transfer"). The DIP Transfer is not expected to garner unanimous support of the DIP Lenders. Nevertheless, the DIP Lenders consented to the collective action principles contained in the DIP Credit Agreement and therefore only the Administrative Agent may enforce remedies – and at the direction of the Required Lenders, the Administrative Agent <u>must</u> enforce remedies. Pursuant to the Modified Plan, the Administrative Agent will be deemed to have exercised its enforcement rights by pursuing remedies under Article 9 of the UCC in full satisfaction and discharge of the DIP Lenders Claims. Because the DIP Lenders consented to this enforcement right, among others, the Debtors will have satisfied the requirement set forth in section 1129(a)(9) of the Bankruptcy Code. In accordance with the requirements of Section 9-620 of the UCC, the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement. If a party with standing objects to such notice within 20 days, the Debtors will provide those parties who are notified of the proposed transfer under Section 9-620 of the UCC with 10 days notice of a public sale pursuant to Section 9-610 of the UCC. Such notice also will set forth the procedures to be employed in connection with the public sale. Parties will then have an opportunity to purchase such the transferred assets in a public sale conducted in accordance with Section 9-610 of the UCC and the procedures set forth in the notice, but only if such parties' offer is selected as the highest or otherwise best competing proposal.

As shown in the diagram below, the first step in consummation of the Modified Plan is the issuance of one share of Reorganized DPH Holdings Co. common stock to the Post-Confirmation Trust and the cancellation of Existing Common Stock. Next, certain of Delphi's assets will be sold to Parnassus and other assets to GM pursuant to the Master Disposition Agreement. Then, the Administrative Agent will consummate the DIP Transfer to accept from the Reorganized Debtors certain of the proceeds from the sale of assets – specifically, the DIP Consideration – in satisfaction of the DIP Claims. Should an objection to the transfer be made or should an alternate party provide a competing proposal providing sufficient consideration whereby, at a minimum, the DIP Lenders would receive payment in cash for their claims, a disposition proceeding would be held. On the Effective Date, either the Administrative Agent or the party providing the competing proposal with the highest value, as applicable, will receive the disposition proceeds. In the event a competing proposal bests the amount of the DIP Lenders' credit bid, after payment of the DIP Claims in full and to the extent there are sufficient proceeds

remaining, additional distributions would be made to creditors in compliance with the absolute priority rule. Also on the Effective Date, the Debtors would make provisions for the payment of Administrative Claims (excluding such claims to be assumed by third parties). Further, the Debtors will establish a distribution account for certain deferred consideration under the Master Disposition Agreement from which distributions will be made as described below.



Under the terms of the GM settlement approved by Bankruptcy Court on September 25, 2008, GM holds an allowed administrative claim of $1.628 billion and an allowed general unsecured claim in the amount of $2.5 billion, each of which claims was to be satisfied with preferred stock if certain conditions were met. In addition, GM agreed to subordinate recoveries on its general unsecured claim until other holders of Allowed General Unsecured Claims have received a distribution equal to 20% of their Allowed General Unsecured Claims, if ever. Pursuant to the Master Disposition Agreement, GM has provided even further support and under the agreement, GM's administrative and prepetition claims will be waived or deemed satisfied. As part of the its agreement with the Debtors, in connection with the Modified Plan, GM will receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock.

Pursuant to the Modified Plan, holders of prepetition secured claims may be paid in full in Cash but will be impaired because the payments will be made in payments of equal installments over a period of seven years from the Effective Date rather in a lump sum upon the Effective Date. To the extent that a secured claim is entitled to postpetition interest under section 506 of the Bankruptcy Code, such interest will accrue at the rate equal to the closing seven-year Treasury Bill rate on the Effective Date of the Modified Plan, plus 200 basis points. Alternately, holders of secured claims, at the Debtors' election, may receive their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral was property of the estate. Finally, in certain circumstances, holders of secured claims may receive other treatment

as agreed to by the parties if it is more favorable to the Debtors than the treatment described above.

As required by section 1129(a)(9) of the Bankruptcy Code, as incorporated by section 1127, priority tax claims will not be impaired but will also receive deferred cash payments over a period of six years. Certain states have filed claims in the event that the Debtors do not make workers' compensation payments in those states in which the Debtors are self-insured. In the event that such obligations must be covered by the states, certain states may have claims that could be entitled to priority treatment. To the extent the claims are administrative claims, they will be satisfied under the Master Disposition Agreement or by DPH Holdings Co. Any prepetition claims will be satisfied through application of existing letters of credit, treatment under one of the priority classes, or as general unsecured claims. To the extent no timely claim has been filed, such liabilities will be discharged. To the extent there are any priority claims other than priority tax claims, holders of any such allowed claims will receive payment in full in cash, unless the holder agrees to alternate treatment.

In addition, in connection with actions anticipated to be implemented by the PBGC and the anticipated settlement agreement with the PBGC, which would include a waiver of all liens and claims against members of Delphi's "controlled group," the PBGC is anticipated to receive cash payment and an allowed general unsecured claim in the amount of $30 million and $3 billion, respectively.

As mentioned above, holders of unsubordinated allowed General Unsecured Claims (including the PBGC's allowed claim) will receive their pro rata share of deferred consideration in accordance with the Master Disposition Agreement. Pursuant to section 3.2.3 of the agreement, certain distributions will be made to holders of General Unsecured Claims if the transfer of assets as contemplated in the Master Disposition Agreement is implemented pursuant to the Debtors' Modified Plan. The distributions to holders of General Unsecured Claims will commence once an aggregate amount of $7.2 billion has been distributed to holders of interests in Parnassus (which amount does not include the 8% mandatory payments made to the holders of Parnassus Class C Interests). The operating agreement of Parnassus governs the terms of distributions made to holders of interests in Parnassus. When the $7.2 billion distribution level is reached, Parnassus will pay an amount equal to $3 to holders of General Unsecured Claims for every $97 dollars distributed to holders of interests in Parnassus. The maximum amount that will be distributed to the holders of General Unsecured Claims is $180 million. If the full $180 million is distributed to holders of General Unsecured Claims, the total distributions made to holders of interests of Parnassus would be approximately $13 billion. These recoveries, however, are not guaranteed and there can be no assurance that they will be realized.

Holders of TOPrS Claims will receive no distribution because of their subordinated status. Also, as discussed above, although GM received certain claims in connection with the Amended GSA, those claims will be waived under the terms of the Master Disposition Agreements and GM will receive no distribution on those claims pursuant to the Modified Plan, and thus unsecured creditors will not receive any distributions on account of such claims pursuant to section 4.04 of the Amended GSA.

Because of production declines in the automotive industry that have led to a deterioration in the Debtors' enterprise value (as discussed below), the Modified Plan provides no distribution to holders of existing Delphi common stock or holders of claims in Section 510(b) Note Claims, Section 510(b) Equity Claims, or Section 510(b) ERISA Claims.

Your vote will help to determine whether the Court confirms and approves the Modified Plan and the distributions it provides.  The Modified Plan contains many of the same elements as the Confirmed Plan, and thus the merits of certain objections to the Modified Plan's confirmation may depend on the vote on the Modified Plan.  **The Bankruptcy Court has determined that as section 1127(d) applies to the facts and circumstances of these Chapter 11 Cases, "holder" means the current holder of a Claim.  Thus, if you previously cast a ballot in connection with the Confirmed Plan, your prior vote to approve or reject the Confirmed Plan will not be counted.  To the extent you want to vote on the Modified Plan, you must return a ballot.**

In addition, the Debtors have requested that if no holder of a Claim or Interest in a particular class votes to accept or reject the Modified Plan, then the applicable class be deemed to have accepted the Modified Plan.  Thus, if you do not want such a presumption to arise, you should timely submit a ballot to accept or reject the Modified Plan.  The Bankruptcy Court has indicated that this issue will be considered, if necessary, at the Final Modification Approval Hearing.  Thus, your vote is important.

Although the Debtors need only establish under section 1127, as it incorporates section 1129(a)(7) of the Bankruptcy Code, that their stakeholders will receive at least as much under the Modified Plan as in a liquidation under chapter 7 of the Bankruptcy Code, based on the hypothetical liquidation analysis prepared by the Company with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc. (attached hereto as Appendix C) (the "Hypothetical Liquidation Analysis"), the Debtors believe that the value of the Estates of the Debtors is greater in the proposed reorganization than in a liquidation.

As disclosed in the Debtors' Hypothetical Liquidation Analysis, holders of General Unsecured Claims would not receive any recovery on their Claims because Claims senior in priority would not be paid in full.  The Debtors are not aware of any transaction other than the transactions proposed in the Modified Plan that would provide the prospect of any recoveries to holders of General Unsecured Claims.  Nevertheless, the Creditors' Committee does not endorse the Modified Plan.  A letter to stakeholders from the Creditors' Committee regarding their views and recommendation on the Modified Plan is included in the solicitation materials.  In its letter, the Creditors' Committee recommends that holders of General Unsecured Claims reject the Modified Plan because "the Committee believes that by rejecting the Plan, unsecured creditors will be exercising the remaining leverage available to them to try to compel the various parties to these transaction to provide unsecured creditors with a better return on their claims."  Based on the circumstances, the Debtors believe that if emergence transactions are not achieved through modifications to the Confirmed Plan because of insufficient stakeholder support, such transactions will likely be implemented through an alternative sale under section 363 of the Bankruptcy Code, which will not provide any recovery for holders of General Unsecured Claims, contingent or otherwise.  The Debtors urge that you vote in favor of the Modified Plan as it represents the only prospects for any potential recovery by holders of General Unsecured Claims that the Debtors are aware of.

The effectiveness of the Modified Plan, and thus the consummation of the Modified Plan, is subject to a number of conditions precedent.  There can be no assurances that these conditions will be satisfied.  In addition, the Debtors have reserved the right to amend or modify the Modified Plan as it applies to any of the Debtors.

**H.      Summary Of Treatment Of Claims And Interests Under The Modified Plan**

The Modified Plan contains separate classes for holders of Claims against and Interests in the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.  The table below summarizes the treatment of certain administrative and priority claims and sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each category.

### DIP Claims, Administrative Claims, And Priority Tax Claims

| Description | Treatment Under Plan |
|---|---|
| **DIP Claims and Hedge Obligations** | DIP Claims, in the original amount of $4.35 billion under the DIP Credit Agreement, consist of the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim.  In addition, the DIP Credit Agreement permits the Debtors to enter into hedging arrangements, pursuant to which the hedge counterparties share collateral pari passu with the Tranche A and Tranche B Lenders up to $350 million (the "Hedge Obligations").  Any hedge obligations above the $350 million threshold share collateral junior to the Tranche C Lenders.  Hedge Obligations currently are estimated to be approximately $200 million.  Under the Modified Plan, holders of the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the Hedge Obligation, will receive a full recovery.  Holders of the DIP Facility Second Priority Term Claim will receive the Tranche C DIP Consideration, which includes cash, equity interests, and portions of the proceeds from the Plan Investor litigation.<br><br>**Estimated Amount Of Claims:       Approximately $3.5 billion** |

| Description | Treatment Under Plan |
|---|---|
| **Administrative Claims (other than GM Claims)** | An administrative claim is a claim for payment of an expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and certain other Claims.  For illustrative purposes, the estimated amounts of Administrative Claims include Cure Claims.  Under the Modified Plan and the procedures provided therein, Administrative Claims will be paid in full in Cash in the ordinary course or as otherwise agreed or assumed by Parnassus or GM Components in the Master Disposition Agreement and subsequently paid in full in Cash in the ordinary course or as otherwise agreed.  The Debtors anticipate that all Allowed Administrative Claims will be paid in full. <br><br>**Estimated Amount Of Claims to be paid on the Effective Date: $142 million to $181 million, which consists primarily of cure amounts and other transaction-related expenses.** <br><br>**Certain Administrative Claims, such as payroll and trade claims not yet due under customary trade terms, will be assumed by Parnassus or GM Components pursuant to the Master Disposition Agreement and will be subsequently paid in the ordinary course of business.  In addition, certain other Administrative Claims that are generally not related to the businesses being transferred to Parnassus or GM Components will be retained by DPH Holdings Co. and will be subsequently paid in the ordinary course of business.** |
| **Priority Tax Claims** | A priority tax claim is a claim for payment of taxes by governmental units as specified in section 507(a)(8) of the Bankruptcy Code.  Under the Plan, Priority Tax Claims will be (1) paid equal cash payments over a period not to exceed six years after the assessment of the tax totaling the aggregate amount of the claim, (2) afforded other treatment that is agreed upon between the Debtors and the holder of the priority tax claim, or (3) paid in full in Cash. <br><br>**Estimated Amount Of Claims:        $17.3 to $17.4 million** |

The table below summarizes the classification and treatment of the principal prepetition Claims and Interests under the Modified Plan.  The classification and treatment for all Classes are described in more detail in <u>Section IV—Summary Of The Reorganization Plan</u>.  The table below also sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each Class based upon the Debtors' review of all proofs of claim and schedules not superseded by proofs of claim, and consideration of the provisions of the Modified Plan that affect the allowance of certain Claims.  No representation can be or is being made with respect to what estimated percentage of recovery will actually be realized by the holders of Allowed Claims in any particular Class.  This summary is qualified in its entirety by reference to the provisions of the Modified Plan, a copy of which is attached hereto as <u>Appendix A</u>.

**Classified Claims**

| Class Description | Treatment Under Plan |
|---|---|
| **Secured Claims** | Secured Claims are claims, other than DIP Lender Claims and Hedge Obligations, that are secured by liens on property in which the Debtors have an interest.  Under the Plan, Allowed Secured Claims will receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code, such interest will accrue at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date, plus 200 basis points; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as may be agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.<br><br>**Estimated Amount Of Claims:**     **$6.55 million to $6.70 million** |

| Class Description | Treatment Under Plan |
|---|---|
| **Flow-Through Claims** | A Flow-Through Claim is a claim arising from an Employee-Related Obligation asserted by a salaried employee who was (i) employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement for indemnification and (ii) employed as of June 1, 2009 for severance, except that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.  Flow-Through Claims will be unimpaired by the Modified Plan and will be satisfied by the relevant Buyer in accordance with the Master Disposition Agreement (subject to the preservation and flow-through of all Estate rights, claims, and defenses with respect to the Flow-Through Claims) or by the Reorganized Debtors. |
| **Other Priority Claims** | An Other Priority Claims is a claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, Allowed Other Priority Claims will be unimpaired by the Modified Plan and will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable.<br><br>**Estimated Amount Of Claims:    Based on the payments made by the Debtors pursuant to various first day orders, the estimated amount of Other Priority Claims is $0.** |

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims (other than GM's unsecured claim, which is treated below) include claims arising as a result of trade claims, claims arising from Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases.   Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  Under the Modified Plan, holders of Allowed General Unsecured Claims (other than TOPrS Claims) will receive an amount equal to $3 dollars for every $97 dollars in excess of $7.2 billion distributed by Parnassus to its members (which distributions, for the avoidance of doubt, do not include the 8% preferred return payable to holders of Parnassus Class C Interests), if and to the extent any such distributions are made, <u>provided</u>, <u>however</u>, that in no event will the distribution to holders of General Unsecured Claims exceed $180 million in the aggregate.  The value and timing of the distributions that holders of General Unsecured Claims may receive is speculative.<br><br>**Estimated Amount Of Allowed Claims: $3.40 billion to $3.62 billion, including TOPrS Claims of approximately $421 million.**<br><br>**Any distribution to holders of General Unsecured Claims will be shared ratably with the anticipated $3 billion general unsecured claim of the PBGC.**<br><br>**TOPrS Claims are included in General Unsecured class with Senior Notes, trade claims, and SERP claims, but distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims.  Accordingly, holders of TOPrS Claims will not receive a distribution.** |

| Class Description | Treatment Under Plan |
|---|---|
| **PBGC Claims** | PBGC Claims are PBGC General Unsecured Claims and Contingent PBGC Secured Claims, if any.  PBGC General Unsecured Claims are claims against the applicable Debtors or group of Debtors arising from or relating to the Pension Plans that are not secured by valid liens against the assets or property of the Debtors.  Contingent PBGC Secured Claims means any Claims of the PBGC which were granted conditional adequate protection liens pursuant to an order of the Bankruptcy Court.<br><br>On account of its PBGC Claims, the PBGC will receive certain consideration and an allowed general unsecured claim in the amount provided in either the Delphi-PBGC Settlement Agreement or a final order of the Bankruptcy Court, in full satisfaction, settlement, release, and discharge of, and in exchange for, such PBGC Claims.<br><br>**Estimated Amount Of Claims:        $3.03 billion** |
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The amended and restated agreements were approved by the Bankruptcy Court on September 25, 2008.  Pursuant to the Amended GSA and Amended MRA, GM received an allowed administrative claim of $1.628 billion on account of the first 414(l) hourly pension plan transfer and an allowed unsecured claim of $2.5 billion.  In addition, GM has an allowed administrative claim in amounts up to $550 million on account of liquidity provided pursuant to the GM Arrangement, as amended.  GM has agreed to subordinate any recovery on its unsecured claim until other holders of General Unsecured Claims (excluding holders of TOPrS Claims) have received a distribution equal to 20% of their allowed claims.   In addition, GM is party to the Master Disposition Agreement, which will be approved as part of the Modified Plan.  Pursuant to the Master Disposition Agreement, GM has agreed to waive its rights to a recovery on account of its Allowed Claims.<br><br>**Amount Of Allowed Claim:        Agreed Compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation pending in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes and TOPrS for damages or rescission in connection with the purchase or sale of those securities. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million.  Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) Note Claims.  Similarly, any holder of a Section 510(b) Note Claim who opts out of the Securities Settlement and has filed a claim that is ultimately allowed in the Chapter 11 Cases will receive no distribution. <br><br> **Amount of Allowed Claim:  Allocated share of $179 million Allowed Claim** |
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business.  Under the Modified Plan and subject to the Master Disposition Agreement, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated.  The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized DPH Holdings Co. and will not affect distributions to other creditors under the Modified Plan. <br><br> **Estimated Amount Of Claims:      N/A** |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date. Holders will receive no distribution under the Modified Plan. |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) Equity Claims arise from the securities actions consolidated in the MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million. Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) Equity Claims.  Similarly, any holder of a Section 510(b) Equity Claim who opts out of the Securities Settlement and has filed a claim that is ultimately allowed in the Chapter 11 Cases will receive no distribution.<br><br>**Amount of Allowed Claim:  Allocated share of $179 million Allowed Claim** |
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  Because such claims are subordinated to classes of claims to which there will be a distribution of less than 100%, the Debtors will make no distribution to holders of Section 510(b) ERISA Claims.<br><br>**Amount of Allowed Claim:  Allocated share of $24.5 million Allowed Claim** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Modified Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Modified Plan on account of such Other Interests. |

| Class Description | Treatment Under Plan |
|---|---|
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Modified Plan, interests in affiliate Debtors will not be impaired or cancelled by the Modified Plan.<br><br>**Estimated Amount Of Interests:    N/A** |

**THE DEBTORS BELIEVE THAT THE MODIFIED PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS <u>STRONGLY</u> <u>RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE MODIFIED PLAN.**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES ...................2
     A.    Definitions..............................................................................................2
     B.    Notice To Holders Of Claims And Interests...........................................2
     C.    Solicitation Package................................................................................3
     D.    General Voting Procedures, Ballots, And Voting Deadline ....................4
     E.    Questions About Voting Procedures........................................................4
     F.    Hearing And Deadline For Objections To Modifications Of Confirmed
           Plan .........................................................................................................5

III.    THE CHAPTER 11 CASES ...................................................................................6
     A.    Post-Confirmation Agreements With GM And The Postpetition Lenders
           Approved By The Bankruptcy Court........................................................7
           1.    Amended GSA And Amended MRA ...........................................7
           2.    GM Arrangement........................................................................8
           3.    The DIP Credit Agreement, Accommodation Agreement, And
                 Matters Related Thereto............................................................12
     B.    Agreements For Which Approval Is Sought Under The Modified Plan .............14
           1.    Master Disposition Agreement .................................................15
           2.    Transfer Of Collateral ..............................................................22
           3.    Pension Actions And Agreement With The PBGC ....................23
     C.    Significant Confirmation And Post-Confirmation Events.....................25
           1.    Confirmation Of The Confirmed Plan ......................................25
           2.    Investment Agreement And Plan Investor Litigation ...............25
           3.    Complaints Seeking Revocation Of Confirmation Order.........27
           4.    Disposition Of Assets ...............................................................28
           5.    Statutory Committees................................................................29
           6.    Exclusivity................................................................................29
           7.    Investigations, MDL Proceedings, And Settlements ................30
           8.    Preserving Estate Causes Of Action .........................................31
           9.    Termination Of Salaried OPEB ................................................32
     D.    Summary Of Claims Process .................................................................34
           1.    Schedules Of Assets And Liabilities And Statements Of Financial
                 Affairs.......................................................................................34
           2.    Claims Bar Date........................................................................34
           3.    Administrative Claims Bar Date................................................35
           4.    Proofs Of Claim And Other Claims ..........................................35
           5.    Claims Reconciliation Progress ................................................36
           6.    Key Classes Of Claims .............................................................36
           7.    Reclamation Claims Program ...................................................39
     E.    Professional Fees ..................................................................................40

IV.    SUMMARY OF THE MODIFIED PLAN................................................................41
     A.    Introduction...........................................................................................41

B.    Overall Structure Of The Modified Plan ....................................................43
    1.    Settlements During The Chapter 11 Cases ................................43
    2.    DIP Transfer..............................................................................44
C.    Substantive Consolidation Of Certain Debtors.....................................46
D.    Classification Of Claims And Interests..................................................48
    1.    The Debtors...............................................................................48
    2.    Classification Of Claims Against And Equity Interests In The
        Debtors ......................................................................................49
E.    Treatment Of Claims And Interests Under The Modified Plan............50
    1.    Treatment Of Unclassified Claims............................................50
    2.    Treatment Of Classified Claims And Interests .........................52
F.    Means For Implementation Of The Modified Plan................................58
    1.    Continued Corporate Existence ................................................58
    2.    Restructuring Transactions ........................................................59
    3.    Certificate Of Incorporation And Bylaws................................59
    4.    Directors And Officers Of Reorganized HoldCo And Affiliate
        Debtors ......................................................................................60
    5.    Consummation Of Disposition Transactions ............................60
    6.    Master Disposition Agreement .................................................60
    7.    Transfer Of Collateral...............................................................61
    8.    Post-Confirmation Reorganized DPH Holdings Share Trust ...62
    9.    Emergence Capital.....................................................................63
    10.    Management Compensation Plan ..............................................63
    11.    Procedures For Asserting Certain Claims.................................63
    12.    Cancellation Of Existing Securities And Agreements..............64
    13.    Sources Of Cash For Modified Plan Distributions ...................65
    14.    Establishment Of A General Unsecured Distribution Account ...65
    15.    Collective Bargaining Agreements............................................65
    16.    Pension Settlement ....................................................................66
    17.    Salaried OPEB Settlement ........................................................67
    18.    Preservation Of Causes Of Action ...........................................67
    19.    Reservation Of Rights................................................................68
    20.    Exclusivity Period .....................................................................68
    21.    Dismissal Of Complaints ..........................................................68
    22.    Corporate Action........................................................................68
    23.    Effectuating Documents; Further Transactions ........................68
    24.    Consummation Of Divestiture Transaction ..............................69
    25.    Exemption From Certain Transfer Taxes And Recording Fees...69
G.    Unexpired Leases And Executory Contracts .........................................69
    1.    Assumed And Rejected Leases And Contracts..........................69
    2.    Cure Procedures And Payments Related To Assumption Of
        Executory Contracts And Unexpired Leases .............................70
    3.    Assignment Pursuant To Restructuring Transactions................75
    4.    Rejection Damages Bar Date .....................................................76
    5.    Assumption and Assignment of Divestiture-Related Executory
        Contracts and Unexpired Leases................................................76

H.    Provisions Governing Distributions........................................................76
    1.    Time Of Distributions......................................................................76
    2.    No Interest On Disputed Claims .....................................................76
    3.    Disbursing Agent .............................................................................77
    4.    Surrender Of Securities Or Instruments..........................................77
    5.    Services Of Indenture Trustees, Agents, And Servicers..................77
    6.    Claims Administration Responsibility.............................................78
    7.    Delivery Of Distributions ...............................................................79
    8.    Procedures For Treating And Resolving Disputed And Contingent
          Claims And Interests.......................................................................79
    9.    Section 510(b) Opt Out Claims.......................................................81
    10.   Allocation Of Plan Distributions Between Principal And Interest ...........82
I.    Allowance And Payment Of Certain Administrative Claims ...............................82
    1.    DIP Facility Claims..........................................................................82
    2.    Pre-Confirmation Administrative Claim Procedures........................82
    3.    Professional Claims .........................................................................82
    4.    Substantial Contribution Compensation And Expenses Bar Date............83
    5.    Other Administrative Claims ...........................................................84
J.    Effect Of The Modified Plan On Claims And Interests.........................................84
    1.    Revesting Of Assets .........................................................................84
    2.    Discharge Of Debtors .......................................................................84
    3.    Compromises And Settlements.........................................................85
    4.    Release By Debtors Of Certain Parties.............................................85
    5.    Release By Holders Of Claims And Interests....................................86
    6.    Release By Unions ............................................................................87
    7.    Release Of GM By Debtors And Third Parties .................................88
    8.    Setoffs ...............................................................................................88
    9.    Subordination Rights ........................................................................88
    10.   Exculpation And Limitation Of Liability .........................................88
    11.   Indemnification Obligations .............................................................90
    12.   Exclusions And Limitations On Exculpation, Indemnification, And
          Releases.............................................................................................91
    13.   Injunction .........................................................................................91

V.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED........91
    A.    General Considerations .....................................................................92
    B.    Certain Bankruptcy Considerations ..................................................92
        1.    The Bankruptcy Court May Not Approve Debtors' Classification
              Of Claims And Interests...............................................................92
        2.    Failure To Satisfy Vote Requirement ..........................................92
        3.    The Confirmation Order Approving The Confirmed Plan May Be
              Revoked .......................................................................................93
        4.    The DIP Lenders May Fail To Exercise Remedies Under The DIP
              Credit Agreement.........................................................................93
        5.    The Debtors May Not Be Able To Secure Confirmation Of The
              Modified Plan...............................................................................93
        6.    Risk Of Non-Occurrence Of The Effective Date..........................93

       7.     Substantive Consolidation Risks.................................................94
       8.     The Integrity Of The Bar Date May Be Challenged....................94
  C.    The Debtors May Be Unable To Close The Transactions Set Forth In The
      Master Disposition Agreement ................................................................94
  D.    Liquidation Under Chapter 7 ..................................................................94
  E.    Business Factors And Competitive Conditions .......................................95
       1.     Consummation Of The Modified Plan Is Dependent On General
             Motors Corporation.....................................................................95
       2.     The Company Is Reliant On The Amended GM Arrangement To
             Provide Liquidity Through Emergence ....................................96

VI.    SECURITIES LAW MATTERS ........................................................................96

VII.   CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES
      OF THE MODIFIED PLAN...................................................................................96
  A.    United States Federal Income Tax Consequences To Holders Of Claims
      Against The Debtors ................................................................................97
       1.     Holders Of General Unsecured Claims Other Than TOPrS Claims..........98
       2.     Holders of TOPrS Claims ........................................................100
       3.     Holders of Secured Claims ......................................................100
       4.     Information Reporting And Backup Withholding ...................101
  B.    Importance Of Obtaining Professional Tax Assistance .......................101

VIII.  FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS
      TEST ...............................................................................................................101
  A.    Feasibility Of The Modified Plan ........................................................101
  B.    Acceptance Of The Modified Plan .....................................................102
  C.    Best Interests Test ................................................................................102
  D.    Application Of The Best Interests Test To The Liquidation Analysis To
      The Modified Plan ................................................................................103
       1.     Overview..................................................................................103

IX.    CONFIRMATION.................................................................................................105
  A.    Confirmation Without Acceptance Of All Impaired Classes:  The
      "Cramdown" Alternative .....................................................................105
  B.    Conditions To Confirmation And Consummation Of The Modified Plan ..........107
       1.     Confirmation ............................................................................107
       2.     Conditions To The Effective Date ...........................................107
  C.    Waiver Of Conditions Precedent .........................................................107
  D.    Retention Of Jurisdiction .....................................................................108

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
      MODIFIED PLAN...............................................................................................110

XI.    VOTING REQUIREMENTS ..............................................................................110
  A.    Parties-In-Interest Entitled To Vote.....................................................112
  B.    Classes Impaired Under The Modified Plan.......................................113

1.    Voting Impaired Classes Of Claims .......................................................113
2.    Unimpaired Classes Of Claims.............................................................113
3.    Impaired Classes Of Claims And Interests Deemed To Reject The Modified Plan...........................................................................................113
4.    Presumed Acceptance By Certain Classes Of Interests..........................114

XII.    CONCLUSION.......................................................................................114
A.    Hearing On And Objections To Confirmation......................................................114
1.    Final Modification Hearing.......................................................................114
2.    Date Set For Filing Objections To Confirmation Of The Modified Plan ......................................................................................................114
B.    Recommendation ..............................................................................................114

## **APPENDICES**
### **Updated as of June 16, 2009**

<table>
<tr><td>Appendix A</td><td>—</td><td>First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified)</td></tr>
<tr><td>Appendix B</td><td>—</td><td>Historical Financial Results</td></tr>
<tr><td>Appendix C</td><td>—</td><td>Updated Liquidation Analysis</td></tr>
</table>

# I.    INTRODUCTION

Delphi and the Affiliate Debtors submit this Supplement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), for use in the solicitation of votes on the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-in-Possession, As Modified (the "Modified Plan"), submitted by the Debtors and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). A copy of the Modified Plan is annexed hereto as <u>Appendix A</u>.

This Supplement sets forth certain information regarding the significant events that have occurred during the Chapter 11 Cases since the solicitation on the Confirmed Plan, and the anticipated emergence structure of Reorganized DPH Holdings Co. and the Reorganized Debtors. This Supplement also describes terms and provisions of the Modified Plan, including certain alternatives to the Modified Plan, certain effects of confirmation of the Modified Plan, and the manner in which distributions will be made under the Modified Plan.    In addition, this Supplement discusses the confirmation process and the voting procedures that holders of Claims in Impaired Classes must follow for their votes to be counted.    Many events that occurred prior to solicitation on the Debtors' Confirmed Plan are not covered in this Supplement but were described in the Disclosure Statement.    The Disclosure Statement is available free of charge at <u>www.delphidocket.com</u>.    In addition, copies of the Disclosure Statement may be made available upon request to KCC at the address set forth in <u>Section II.E. – Questions About Voting Procedures</u>, below.

FOR A DESCRIPTION OF THE MODIFIED PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE MODIFIED PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, SEE <u>SECTION IV – SUMMARY OF THE MODIFIED PLAN</u> AND <u>SECTION V – GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED</u>.

THIS SUPPLEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE MODIFIED PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE MODIFIED PLAN, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES.    ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.    FACTUAL INFORMATION CONTAINED IN THIS SUPPLEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.    THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

---

This section provides information regarding:

- The procedures and deadlines for casting a vote to accept or reject the Modified Plan

- Contact information for questions about voting procedures

- The date and time of the confirmation hearing and the requirements for filing objections to the Modified Plan

The key modifications to this section are as follows:

- The voting deadline for the Modified Plan is July 15, 2009

- Objections to the Modified Plan are due on July 15, 2009

- The Final Modification Hearing on the Modified Plan is July 23, 2009

---

### A.    Definitions

Except as otherwise provided herein, capitalized terms used and not otherwise defined in this Supplement have the meanings ascribed to them in the Modified Plan.  In addition, all references in this Supplement to monetary figures refer to United States of America currency unless otherwise expressly provided.

### B.    Notice To Holders Of Claims And Interests

This Supplement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Modified Plan and to others for informational purposes.  The purpose of this Supplement is to provide adequate information to enable the holder of a Claim against the Debtors to make a reasonably informed decision with respect to the Modified Plan prior to exercising the right to vote to accept or reject the Modified Plan.

The Bankruptcy Court approved this Supplement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims who are entitled to vote on the Modified Plan to make an informed judgment with respect to acceptance or rejection of the Modified Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS SUPPLEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE MODIFIED PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS SUPPLEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE MODIFIED PLAN.  This Supplement contains important information about the Modified Plan, considerations pertinent to acceptance or rejection of the Modified Plan, and

developments concerning the Chapter 11 Cases. **The Bankruptcy Court has determined that as section 1127(d) applies to the facts and circumstances of these Chapter 11 Cases, "holder" means the current holder of a Claim. Thus, if you previously cast a ballot in connection with the Confirmed Plan, your prior vote to approve or reject the Confirmed Plan will not be counted. To the extent you want to vote on the Modified Plan, you must return a ballot.**

THIS SUPPLEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE MODIFIED PLAN. No solicitation of votes may be made except after distribution of this Supplement, and no person has been authorized to distribute any information concerning the Debtors or the Modified Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS SUPPLEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically and expressly stated herein, this Supplement does not reflect any events that may occur subsequent to the date hereof whether or not such events have a material impact on the information contained in this Supplement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes of soliciting votes on the Modified Plan; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Supplement will be distributed to reflect such occurrences. Accordingly, the delivery of this Supplement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

### C.    Solicitation Package

Accompanying this Supplement are, among other things, copies of (1) the Modified Plan (Appendix A hereto), (2) the notice of, among other things, (i) the hearings set to consider approval of the Modified Plan, (ii) the deadline and procedures for filing objections to approval of the Modified Plan, (iii) the deadline and procedures for temporary allowance of certain claims for voting purposes, (iv) the treatment of certain unliquidated, contingent, or disputed claims for notice, voting, and distribution purposes, (v) the record date, (vi) the voting deadline for receipt of ballots, and (vii) information relating to releases and injunctions contemplated by the Modified Plan (the "Final Modification Hearing Notice"), and (3) for those entitled to vote, one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Modified Plan.

### D.        General Voting Procedures, Ballots, And Voting Deadline

After carefully reviewing the Modified Plan, this Supplement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Modified Plan by checking the appropriate box on the enclosed Ballot.  Please complete and sign your original Ballot (copies will not be accepted), and return it in the envelope provided.  You must provide all of the information requested by the appropriate Ballot.  Failure to do so may result in the disqualification of your vote on such Ballot.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Modified Plan, you must use only the coded Ballot or Ballots sent to you with this Supplement.

TO ENSURE THAT YOUR VOTE IS COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURN IT SO THAT IT IS **ACTUALLY RECEIVED** NO LATER THAN **JULY 15, 2009 AT 7:00 P.M. (PREVAILING EASTERN TIME)** (THE "VOTING DEADLINE") BY THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM OR INTEREST.  **KURTZMAN CARSON CONSULTANTS LLC IS THE VOTING AGENT FOR ALL CREDITORS EXCEPT NOTEHOLDERS.  FINANCIAL BALLOTING GROUP LLC IS THE VOTING AGENT FOR NOTEHOLDERS**.  YOUR BALLOT CONTAINS THE CONTACT INFORMATION FOR THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM.   THE CONTACT INFORMATION FOR BOTH VOTING AGENTS IS ALSO LISTED BELOW.

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.   BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, THE CREDITORS' COMMITTEE, COUNSEL TO THE DEBTORS, OR COUNSEL TO THE CREDITORS' COMMITTEE.**

### E.        Questions About Voting Procedures

If (1) you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim holdings or (2) you wish to obtain an additional copy of the Modified Plan, this Supplement, or any appendices or exhibits to such documents, please contact:

| All Creditors except Noteholders: | Noteholders: |
|---|---|
| Kurtzman Carson Consultants LLC | Financial Balloting Group LLC |
| 2335 Alaska Avenue | 757 Third Avenue, 3rd Floor |
| El Segundo, California 90245 | New York, New York 10017 |
| Att'n: Delphi Corporation | Att'n: Delphi Corporation Ballot |
| Telephone: (888) 249-2691 | Tabulation |
| Fax: (310) 751-1856 | Telephone: (866) 486-1727 |
| www.delphidocket.com | www.fbgllc.com |

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>SECTION XI– VOTING REQUIREMENTS</u>.

### F.    Hearing And Deadline For Objections To Modifications Of Confirmed Plan

Pursuant to section 1127 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the hearing on objections to modifications of the Confirmed Plan (the "Final Modification Hearing") to begin on July 23, 2009, at 10:00 a.m. (prevailing Eastern time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408.  The Final Modification Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Final Modification Hearing or at any subsequent adjourned Final Modification Hearing.  The Bankruptcy Court has directed that objections, if any, to the Modified Plan be filed with the Clerk of the Bankruptcy Court and served so that they are <u>ACTUALLY RECEIVED</u> on or before July 15, 2009, at 4:00 p.m. (prevailing Eastern time) by:

*Counsel for the Debtors*

        Skadden, Arps, Slate, Meagher & Flom LLP
        333 West Wacker Drive
        Suite 2100
        Chicago, Illinois 60606-1285
        Att'n:    John Wm. Butler, Jr.
                Ron E. Meisler
                Nathan L. Stuart
                Allison K. Verderber Herriott

        Skadden, Arps, Slate, Meagher & Flom LLP
        Four Times Square
        New York, New York 10036
        Att'n:    Kayalyn A. Marafioti

*United States Trustee*

        The Office of the United States Trustee
        33 Whitehall Street
        21st Floor
        New York, New York 10004
        Att'n:    Brian Masumoto

*Counsel for the Creditors' Committee*

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n:    Robert J. Rosenberg
          Mitchell A. Seider
          Mark A. Broude

*Counsel for the Postpetition Lenders*

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10022
Att'n:   Donald S. Bernstein
         Brian M. Resnick

*Counsel for the Master Disposition Agreement Parties*

*For Platinum Equity Capital Partners II, L.P.:*

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Att'n:   Adam C. Harris
         David J. Karp

*For General Motors Corporation:*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Att'n:   Jeffrey L. Tanenbaum
         Robert J. Lemons

## III.    THE CHAPTER 11 CASES

This section provides information regarding:

- Significant events in the Debtors' Chapter 11 Cases since January 2008, including significant orders that were entered, modifications to the Debtors' postpetition financing, and the disposition of certain of the Debtors' assets

- The resolution of certain securities, ERISA, and shareholder derivative litigation and the current status of related MDL Settlements

- Actions taken by the Debtors to preserve estate causes of action

- The claims reconciliation process and the resolution of key classes of claims

The key modifications to this section are as follows:

- The inclusion of a summary of the Master Disposition Agreement

- The description of the reclamation claims program has been modified to reflect a change in how claims of reclamation claimants will be handled

- Certain of the Debtors' statutory deadlines have been modified as follows: the Debtors' exclusive period in which to propose a plan of reorganization has been extended until 30 days after substantial consummation of the Confirmed Plan or any modified plan except as to the Creditors' Committee; the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property is now 30 days after substantial consummation of the Confirmed Plan or any modified Plan; and the current deadline by which the Debtors would be required to serve a summons and complaint upon each defendant under the Avoidance Procedures Order is 30 days after the substantial consummation of the Confirmed Plan or any modified plan

- The inclusion of a description of the investment agreement with certain plan investors that was the basis for the Confirmed Plan and the complaints that were filed after the Plan Investors refused to participate in the scheduled closing on April 4, 2008

- The inclusion of a description of the actions taken by the Debtors to terminate certain liabilities for other post-employment benefits for salaried employees

## A.    Post-Confirmation Agreements With GM And The Postpetition Lenders Approved By The Bankruptcy Court

### 1.    Amended GSA And Amended MRA

On September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended GSA and the Amended MRA.  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to portions of Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations as set forth in the Original GSA and Original MRA, which were approved as part of the Confirmed Plan but were not to become effective until the Debtors' emergence from chapter 11.  At the time that the Amended GSA and Amended MRA became effective in September 2008, Delphi estimated the value of the net consideration to be received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0

billion under the similar agreements filed as part of the Confirmed Plan).  By transferring nearly $2.1 billion of hourly plan net unfunded pension liabilities to the GM hourly plan through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi believed it had made progress towards achieving its pension funding strategy objectives for hourly employees.

The Amended GSA was intended to resolve outstanding issues among the Debtors and GM that had arisen or might arise before the Effective Date.  It addressed, among other things, commitments by the Debtors and GM regarding other post-employment benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters, releases, and claims treatment.  The Amended GSA was revised, however, to accelerate the effectiveness of the Original GSA and eliminate significant elements of conditionality to the performance of GM's obligations under the agreement.  In addition, GM agreed to consent to, and to waive its right to object to, any Delphi reorganization plan that provides for the GM releases, consideration, and interpretation provisions set forth in the Amended GSA.  GM also agreed to use its reasonable best efforts to satisfy the conditions precedent to the effectiveness of the Amended GSA.  Finally, GM agreed (i) subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if conditions were met for GM to receive preferred stock, but there was insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of new Delphi common stock at "Plan Equity Value," GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims could be reduced proportionally and (ii) that if any condition was not met for GM to receive preferred stock, 50% of distributions that would otherwise be made to GM on account of its administrative expense claims, up to a value of $300 million, would be conveyed to unsubordinated general unsecured creditors.

The Amended MRA addressed, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.  The effectiveness of the Amended MRA was concurrent with the effectiveness of the Amended GSA and GM's obligations under the MRA were not subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy UAW employees would survive any such termination).  Through the Amended MRA, Delphi and GM agreed to certain terms and conditions governing, among other things, the scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and a reorganized Delphi's rights to bid and qualify for new business awards.  Although the Debtors and GM have been operating under the terms of the Amended MRA, the parties have agreed that in connection with the Master Disposition Agreement, the Amended MRA would be terminated.

### 2.    GM Arrangement

Pursuant to various orders entered by the Bankruptcy Court during these Chapter 11 Cases, and in anticipation of entering into the Original GSA and Original MRA, the Debtors

expended significant sums that would have otherwise been reimbursed by GM following the effectiveness of these agreements.  In connection with the extension of the maturity date of the DIP Credit Agreement, as described below, on April 30, 2008, the Bankruptcy Court authorized the Debtors and GM and/or a GM affiliate to enter into an arrangement under which GM agreed to advance to Delphi up to $650 million in anticipation of the effectiveness of the Original GSA and Original MRA (the "GM Arrangement").  In return, GM would receive an administrative claim for such advances.

On August 7, 2008, GM agreed to amend the GM Arrangement to provide for an additional $300 million of availability above the existing $650 million available under the original agreement. When the Amended GSA and Amended MRA became effective on September 29, 2008, the original $650 million commitment terminated and the outstanding amounts set off against obligations owing from GM to Delphi under the Amended GSA and Amended MRA, but the additional $300 million commitment remained outstanding. The GM Arrangement was subsequently amended several times to extend the availability of the $300 million liquidity support from December 31, 2008 to June 30, 2009, among other things, subject to certain conditions and provisions for earlier termination upon the occurrence of specified events.   Concurrently, the Court also approved Delphi's entry into a Partial Temporary Accelerated Payment Agreement with GM (the "Pull-Forward Agreement"), which as subsequently amended, provided for GM to accelerate the payment of up to $300 million in trade accounts payable to Delphi over a three-month period during the first and second quarters of 2009.

On February 27, 2009, Delphi and GM entered into a fourth amendment to the GM Arrangement under which GM agreed to increase the aggregate principal amount under the GM Arrangement from $300 million to $350 million.  This $50 million increase in GM's total commitment under the GM Arrangement was accomplished by GM's conversion of a $50 million further accelerated trade payment it paid to the Debtors on January 30, 2009 into commitments under the GM Arrangement.  As a result, under the terms of the Pull-Forward Amendment, the trade payments payable by GM to the Debtors that were associated with the $50 million payment were reinstated and scheduled to be paid as if they had never been accelerated.  On March 3, 2009, Delphi and GM executed a fifth amendment to the GM Arrangement Amendment, which provided for GM's further increasing its commitments under the GM Arrangement from $350 million to $450 million.  This $100 million increase was made in conjunction with GM's exercising the "Unsold Business Option" referred to in Section 4.06(a)(i) of the Amended MRA with respect to Delphi's global steering and halfshaft business, which was the subject of the Option Exercise Agreement.  Neither the fourth nor fifth amendments were approved by the Court, in part, because the U.S. Treasury did not approve GM providing the additional funding under the agreements.

On June 1, 2009, the Debtors and GM entered into an amendment to and restatement of the GM Arrangement (the "Amended GM Arrangement") which supplants the fourth and fifth amendments and provides for a $250 million increase of GM's commitments under the GM Arrangement in the form of a new "GM Tranche C Commitment," which increase the U.S. Treasury (Auto Task Force) supports.

The new Tranche C Commitment is scheduled to terminate on the earlier of (i) September 30, 2009 (or October 30, 2009 if the termination date of the Master Disposition Agreement has been extended in accordance with its terms to October 30, 2009), (ii) the date on which the Debtors seek to amend or otherwise modify the plan of reorganization filed on October 3, 2008 in a manner not satisfactory to GM, (iii) the date the DIP Facility is repaid in full, (iv) the effective date of the Modified Plan, (v) the earlier of (a) the date the Court denies the motion seeking approval of the Sale Transactions, (b) July 23, 2009, unless the Court has approved the Sale Transactions by that date, or (c) seven days after the date the Court enters an order enjoining, restraining, or otherwise restricting the Debtors from seeking approval of the Modified Plan or the Stand Alone Sale (as defined below), if such order has not been reversed, (vi) the date on which the Sale Agreement terminates, and (vii) the date on which the Sale Transactions are consummated.  Notably, under the Amended GM Arrangement, upon the consummation of the Modified Plan or the Sale Transactions, all $550 million of the loans under the Amended GM Arrangement would be automatically cancelled and the Debtors will not be required to repay such loans.

The effectiveness of the Amended GM Arrangement is subject to certain conditions precedent set forth in Section 4.01 thereof, which include: (i) GM's approval of the terms of any amendments or modifications to the DIP Credit Agreement, Accommodation Agreement, or Confirmed Plan, (ii) this Court's entry of an interim order approving the Amended GM Arrangement,  and (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the effective date of the Tranche C Commitments (the "Tranche C Effective Date") as provided in the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) and (b) the giving of notice and direction by the DIP Lenders to the Agent with respect to actions contemplated under the Modified Plan.

With respect to the Sale Transactions, section 4.01 of the Amended GM Arrangement also requires as a condition to the effectiveness of the agreement that the Debtors have executed the documents in connection with the Sale Transactions and that they seek approval of the Sale Transactions concurrently through a plan of reorganization and a stand-alone section 363 sale. Specifically, on or before June 1, 2009, the Debtors are required to file a motion (the "Solicitation Motion"), in form and substance reasonably satisfactory to GM, which seeks, in the alternative, either (i) to approve, among other things, the modifications under the Modified Plan pursuant to which the Debtors will perform their obligations under the Sale Documents or (ii) approval to enter into and perform their obligations under the Sale Documents under section 363 of the Bankruptcy Code, independent of and not pursuant to or contingent on the effectiveness of, any plan of reorganization (the "Stand Alone Sale").  The Amended GM Arrangement requires that, on or prior to June 10, 2009, the Court enter an order, in form and substance reasonably acceptable to GM, approving the relief sought in the Solicitation Motion and scheduling a hearing for the approval of the Modified Plan or the Stand Alone Sale, to be held on or prior to July 23, 2009.

In addition, as set forth in section 4.04(e) of the Amended GM Arrangement, the Debtors must achieve certain milestones in order to make borrowings with respect to the new GM Tranche C Commitments.  These milestones state that on the date of each Tranche C Advance

requested on and after each of the dates set forth in the following clauses (i) – (v), the following conditions must have been satisfied:

- (i) on the tenth date after the Tranche C Effective Date, the interim order approving the Amended GM Arrangement must not be stayed, modified, or reversed or subject to any appeal,
- (ii) the Solicitation Order must have become final and non-appealable within ten days of the Tranche C Effective Date (the "Final Solicitation Order"),
- (iii) by July 2, 2009, the Borrower must have filed the 363 Implementation Agreement with the Bankruptcy Court pursuant to the Solicitation Order,
- (iv) by July 23, 2009, a hearing must have been held to approve the Modified Plan or the Stand Alone Sale, and the Bankruptcy Court must have entered an order, in form and substance reasonably acceptable to GM, approving the Modified Plan or the Stand Alone Sale (in either case, such order referred to herein as the "Sale Transactions Order"), and
- (v) within ten (10) days of the entry after the Sale Transactions Order and in any event no later than August 3, 2009, such Sale Transactions Order must have become final and non-appealable.

Moreover, the Debtors' ability to borrow with respect to the Tranche C Commitment is contingent upon, among other things, (i) no amendment or other modification to the DIP Credit Agreement or the Accommodation Agreement having been made and no motion to approve any such amendment or modification having been filed that is not reasonably acceptable to GM, (ii) no new agreement or amendment, extension, or other modification having been made and no motion to approve any such new agreement, amendment, extension, or other modification having been filed that requires payment of interest on account of the Tranche C loans under the DIP Credit Agreement,  (iii) neither the Agent nor any DIP Lender having taken any action to exercise remedies under the DIP Credit Agreement or the related security documents with respect to any collateral, other than (a) with respect to cash collateral held in cash collateral accounts as of the Tranche C Effective Date as provided in the DIP Credit Agreement and the other Loan Documents and (b) the giving of notice and direction by the DIP Lenders to the Agent with respect to actions contemplated under the Modified Plan, (iv) no motion or other pleading having been filed, without GM's consent, seeking approval of or entry of an order confirming a plan of reorganization, other than the Modified Plan (v) no stay, amendment, reversal, or other modification having been made in a manner that is not reasonably acceptable to GM to (a) the interim and/or final order approving the Amended GM Arrangement, (b) the Solicitation Order, or (c) the Sale Transactions Order, (vi) no stay, reversal, or other modification having been made in a manner that is not reasonably acceptable to GM to any future order relating to or approving amendments to the DIP Credit Agreement or Accommodation Agreement, (vii) no default, material breach (not waived by the applicable party or parties) by Delphi, or termination having occurred under any of the Sale Documents (as defined in the Amended GM Arrangement), and Delphi not having taken any action or filed any motion to terminate, modify, or reject any of the Sale Documents, and (viii) on the date of each advance under the Amended GM Arrangement, no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default having occurred and be continuing under the Amended GM Arrangement.

The Bankruptcy Court entered the interim order approving the Amended GM Arrangement on June 10, 2009 and granted the final order on June 16, 2009.

### 3. *The DIP Credit Agreement, Accommodation Agreement, And Matters Related Thereto*

Since January 5, 2007, the Debtors have been operating in these Chapter 11 Cases by utilizing the proceeds of a refinanced debtor-in-possession facility (the "DIP Facility") comprised of three tranches: (i) a first priority revolving credit facility ("Tranche A"), (ii) a first priority term loan ("Tranche B"), and (ii) a second priority term loan ("Tranche C"). On April 30, 2008, the Bankruptcy Court authorized the Debtors to enter into an amendment and restatement of the Refinanced DIP Credit Facility (the "Second Amended and Restated Credit Agreement" or "DIP Credit Agreement"), which became effective on May 9, 2008. The Second Amended and Restated Credit Agreement extended the term of the loan until December 31, 2008 and modified the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion. Concurrently with the Bankruptcy Court approving the Second Amended and Restated Credit Agreement, the Debtors also received authority to enter into the GM Arrangement.

Due to a positive market response and oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors anticipated borrowing under the Second Amended and Restated Credit Agreement, on May 9, 2008, the Debtors filed a motion seeking to increase the principal amount of the Tranche C Term Loan by approximately $254 million (the "Supplemental Second DIP Extension Motion"). The Second Amended and Restated Credit Agreement, including the revisions to Tranche A and Tranche B as well as the existing Tranche C, became effective on May 9, 2008. The increase in the principal amount of the Tranche C Term Loan of approximately $254 million was approved by the Bankruptcy Court on May 29, 2008.

As part of the Supplemental Second DIP Extension Motion, the Debtors stated that they anticipated transferring up to $750 million of repatriated funds from certain non-Debtor global affiliates to DASHI and ultimately to DAS LLC to reduce the borrowings on the DIP Financing Facility. To resolve concerns of the PBGC, the Debtors reached an agreement with the PBGC to provide adequate protection to the PBGC by granting to the PBGC conditional junior replacement liens in DASHI's assets that are already encumbered by the liens of the Debtors' DIP lenders in the amounts transferred from DASHI to DAS LLC up to $750 million. The PBGC's replacement liens are valid only to the extent that the PBGC has valid and perfected liens in the cash abroad before the repatriation of such funds. All of PBGC's claims, defenses, and arguments with respect to any challenges of the PBGC's liens are expressly reserved and preserved. The repatriation of funds was approved by the Bankruptcy Court on May 29, 2008, subject to the Creditors' Committee's and Wilmington Trust Company's right to (i) object, 10 days prior to a scheduled omnibus hearing for consideration at the omnibus hearing, to the repatriation of funds scheduled to occur during the calendar month following the hearing date and (ii) review repatriation of funds for consistency with cash flow projections. Nonetheless, pursuant to the Accommodation Agreement (as defined and described below), the Debtors are no longer repatriating cash because the Accommodation Agreement would require repatriated cash

to be paid to the DIP Lenders.  Moreover, as of April 15, 2009, the Debtors believe that the maximum amount assertable by the PBGC in connection with their conditional adequate protections liens was approximately $195 million on account of unpaid contributions.

In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated the Accommodation Agreement with the administrative agent (the "Agent") under the DIP Facility and obtained consent to this agreement from the requisite DIP Lenders.  Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the Tranche C lenders' consent to the Accommodation Agreement, to encourage Tranche C lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those Tranche C lenders which consented to the Accommodation Agreement.   Under the Accommodation Agreement the Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009 (the "Accommodation Period"), subject to the terms and conditions set forth in that agreement, as amended.  This Court authorized the Debtors to enter into the Accommodation Agreement by order entered on December 3, 2008 (the "DIP Accommodation Order") (Docket No. 14515) and the parties subsequently effectuated the agreement on December 12, 2008.

To remain in compliance with the Accommodation Agreement and maximize available liquidity, the Debtors and the requisite percentage of DIP Lenders who participated in the Accommodation Agreement (the "Participant Lenders") agreed to amend the Accommodation Agreement on January 30, 2009, which amendments were supplemented by agreement dated February 25, 2009 (as supplemented, the "First Accommodation Agreement Amendment").  The Court authorized the Debtors' entry into the First Accommodation Agreement Amendment by order entered on February 25, 2009 (the "First Accommodation Amendment Order") (Docket No. 16377).

As referenced above, on March 4, 2009, the Debtors filed motions seeking this Court's approval of the fourth and fifth amendments to the GM Arrangement and the Option Exercise Agreement.  These two motions were scheduled to be heard at an omnibus hearing on March 24, 2009.  The night before the hearing, however, counsel for the U.S. Treasury notified GM and the Debtors in writing that the U.S. Treasury would not permit GM to enter into these agreements until the U.S. Treasury had a further opportunity to review the details of those transactions and the various alternatives with respect to Delphi's emergence from chapter 11.  The Court thus adjourned the hearing on these motions to a subsequent date.

Because those agreements with GM, which would have provided significant liquidity to the Debtors, were unable to proceed because of the concerns of the U.S. Treasury, additional amendments to the Accommodation Agreement were necessary.  Accordingly, on March 31, 2009, the Debtors reached an agreement with the Participant Lenders to certain additional amendments to the Accommodation Agreement (as supplemented by agreements entered into on April 3 and April 22, 2009, the "Second Accommodation Agreement Amendment").   Among other things, the Second Accommodation Agreement Amendment required the Debtors to deliver to the Agent on or prior to May 4, 2009 a detailed term sheet (the "Term Sheet") agreed to by both GM and the Presidential Task Force on the Auto Industry setting forth the terms of a global resolution of matters relating to GM's contribution to the resolution of these chapter 11 cases.

The Court authorized the Debtors' entry into the Second Accommodation Agreement Amendment by final order entered on April 23, 2009. The Second Accommodation Agreement Amendment, among other things, modified the milestone dates in the Accommodation Agreement and provided interim liquidity by lowering the required cash collateral balances to facilitate continued discussions regarding a consensual resolution of these chapter 11 cases.

Following approval of the Second Accommodation Agreement Amendment, as supplemented, the Debtors continued to seek resolution on a Term Sheet but were unable to reach agreement by May 4, 2009. Thus, the Debtors and the DIP Lenders agreed to further amend the Accommodation Agreement to provide the Debtors additional time and sufficient liquidity to continue negotiations (the "Third Accommodation Agreement Amendment"). Under the Third Accommodation Agreement Amendment, among other things, the DIP Lenders and the Debtors extended the timeline to deliver a Term Sheet to the Agent to May 21, 2009 to avoid an early termination of the Accommodation Period and adjusted certain other termination provisions. In addition to the extension of these milestones, the Third Accommodation Agreement Amendment added a provision whereunder the Debtors agreed to continue to explore strategic alternatives for resolving the chapter 11 cases.

Subsequent to entry into the Third Accommodation Agreement, on June 1, June 8, and June 12, 2009, respectively, the Debtors and the DIP Lenders agreed to three further amendments of the Accommodation Agreement (the "Fourth Accommodation Agreement Amendment," "Fifth Accommodation Agreement Amendment," and "Sixth Accommodation Agreement Amendment"), which, among other things, further extended the date on which the Accommodation Period would end if the requisite DIP Lenders have not delivered a notice indicating approval of the Term Sheet – from June 9, 2009 to June 13, 2009, and currently to June 20, 2009. In addition to above, the Fourth Accommodation Agreement Amendment also waived certain defaults existing under the Accommodation Agreement associated with the delivery of the Term Sheet and extended certain milestones. Moreover, the Fifth Accommodation Agreement Amendment extended the period (from 10 to 25 business days) during which the requisite DIP Lenders may notify the Debtors that any new reorganization plan or any modifications to the Confirmed Plan are not satisfactory.

## B.    Agreements For Which Approval Is Sought Under The Modified Plan

To implement the Modified Plan, the Debtors are seeking approval of three primary agreements (each as defined below): the Master Disposition Agreement, the DIP Transfer, and the PBGC Settlement Agreement. These agreements among the Debtors and GM, Parnassus, the DIP Lenders, and the PBGC, respectively, form the backbone of the Modified Plan. Consequently, pursuant to the Modified Plan, the Debtors are requesting an order approving these three agreements. The Debtors desire to consummate the Modified Plan, including the Master Disposition Agreement, by the end of July 2009.

If, however, the Debtors receive any unsolicited alternative transaction proposal, in the exercise of their fiduciary duties, the Debtors will consider such proposal in accordance with the procedures established by the Bankruptcy Court in the Modification Procedures Order (the "Evaluation Procedures"). In that event, if any such alternative transaction proposal is deemed by the Debtors to be higher or otherwise better and is approved by the Bankruptcy Court, the

Debtors will seek to confirm the Modified Plan and make the distributions provided thereunder on the basis of such approved alternative transaction. The deadlines set forth in the Evaluation Procedures are designed to allow the Debtors to maintain their expected emergence date: (i) due diligence must be completed by July 9, 2009, (ii) any proposed alternative transaction must be submitted by July 10, 2009, (iii) determination of whether any such transaction is a qualified alternative transaction must occur by July 13, 2009, and, if necessary, (iv) any auction with respect to such qualified alternative transaction would take place on July 17, 2009.

The primary terms of the agreements underlying the Modified Plan are described below.

### 1.    Master Disposition Agreement

On June 1, 2009, the Debtors, Parnassus Holdings II, LLC ("Parnassus"), and GM Components Holdings, LLC ("GM Components") and certain of its affiliates (together, the "Buyers") reached an agreement regarding the sale and purchase of substantially all of Delphi's and its subsidiaries' businesses (the "Master Disposition Agreement"). Parnassus is an affiliate of Platinum Equity Capital Partners II, L.P. ("Platinum"). Platinum is a global firm specializing in the merger, acquisition, and operation of companies that provide services and solutions to customers in a broad range of business markets, including information technology, telecommunications, logistics, manufacturing, and entertainment distribution. Since its founding in 1995, Platinum has completed nearly 100 acquisitions across a broad range of industry segments.

The Debtors' determination to enter into the Master Disposition Agreement with the Buyers was based in part upon the value proposition that Platinum brings to Delphi and all of its stakeholders. Platinum has spent nearly three years and thousands of hours analyzing the Delphi business. Platinum has completed its due diligence on all major functional areas within Delphi including operations, finance, legal, treasury, human resources, intellectual property, environmental, real estate, tax, and information technology. Platinum has conducted world-wide site tours, held world-wide and domestic meetings with customers, had discussions with third-party service providers, has fully informed and negotiated transaction and supply agreements with Delphi and GM, and has a comprehensive understanding of Delphi's businesses and what is required to successfully transfer the four UAW keep sites and Steering to GM. Platinum has spent significant time with GM, the UAW, and Delphi management to explain to all of them Platinum's operational philosophy with respect to Delphi. The Debtors believe that Platinum's track record of bringing operational resources to assist in the management and growth of Delphi's transformed businesses is transparent and beneficial to the Debtors' stakeholders. The Debtors further believe that Platinum's participation in the Master Disposition Agreement provides Delphi with the benefits of substantial intellectual capital, operational expertise, detailed and comprehensive knowledge of Delphi and the marketplace, and a substantive operating plan to provide for the long-term viability of Delphi.

In terms of pre-closing diligence and transaction planning, the Debtors are informed that Platinum has spent tens of thousands of hours analyzing Delphi from a global, divisional, PBU, and product line perspective. Platinum has analyzed, in detail, Delphi's revenue and capital plans, its programs, commodity exposure, f/x exposure, manufacturing footprint, IT systems, engineering resources, and SG&A resources. In addition, Platinum has invested significant time

evaluating Delphi's allocation methodology for disbursing centralized costs such as engineering and SG&A in the context of understanding true profitability by geographic region. Based on this analysis, Platinum has prepared a complete strategic operating plan for Delphi going forward. This operating plan is not premised on revenues returning to their pre-2008 levels, rather it is a plan that contemplates a significant amount of restructuring and cost reduction initiatives within Delphi. Platinum has committed a large team of dedicated resources, both internal and external, with significant operational expertise to execute on this plan immediately.

Delphi is a large, complex, global organization with many interdependencies among its regions, divisions, and product lines. This dynamic makes a carve-out of any piece of the business very difficult. Based on this work, the Debtors believe that Platinum is well-equipped to manage the transfer of the four UAW keep sites and the Global Steering business to GM as contemplated in this transaction. Platinum has spent a considerable amount of time to understand what corporate functions the four UAW keep sites and the Global Steering business depend on from Delphi and how to create a smooth transition after the closing. Platinum has worked closely with the operational executives at GM and has begun to lay the groundwork for a detailed separation plan. In addition, Platinum and GM have worked extensively to execute a Transition Services Agreement that minimizes the disruption to GM and Delphi. Another key element of the carve-out is effectively transitioning the four UAW keep sites and Global Steering from Delphi's IT systems. Platinum has spent substantial amounts of time and money on information technology consultants working with Delphi to understand the IT transition requirements. Platinum's IT consultants alone have spent over 500 hours, including over 400 hours working with Delphi personnel to develop an overall IT separation strategy plan. Platinum has also worked extensively with Delphi's three main IT suppliers: CSC, HP, and EDS to develop the know-how to manipulate Delphi's IT infrastructure to provide flexibility within Delphi. In short, the Debtors believe that Platinum has an intimate understanding of what is required and the complexities that are involved, and has prepared accordingly to successfully navigate the transfer of the four UAW keep sites and the Global Steering business to GM.

The Master Disposition Agreement signed on June 1, 2009 among Delphi, Platinum, and GM was the result of numerous intensive negotiations. In particular, Platinum worked closely with GM to negotiate a Supply Agreement and other commercial agreements that achieved their goal for protection of supply. The Debtors believe that the transactions represented by the Master Disposition Agreement minimize execution risk and represent a global solution for Delphi.

In connection with the financing of Parnassus, in an equity commitment letter (the "Equity Commitment Letter"), three funds controlled by Platinum have agreed on a joint and several basis to provide $250 million of equity to Parnassus to complete the transaction, subject to the conditions in the Master Disposition Agreement and the Securities Purchase Agreement. Under the Master Disposition Agreement, Parnassus has agreed that it will not terminate the Equity Commitment Letter or amend or otherwise modify the terms of the Equity Commitment Letter in a manner, among other things, that would materially adversely impact the ability of Parnassus to consummate the transactions contemplated by the Master Disposition Agreement.

The parties' obligations under the Master Disposition Agreement are expressly subject to entry of the Modification Approval Order. The primary terms of the Master Disposition

Agreement are as follows.  The descriptions of each of the documents set forth herein are a summary and are qualified in their entirety by the actual terms and conditions of the documents which shall govern in all respects.  Please note that all capitalized terms used in this section, but not defined herein, have their respective meanings as set forth in the Master Disposition Agreement.

(a)    <u>General Terms</u>

Under the terms of the Master Disposition Agreement, Parnassus would acquire all of the equity and assets primarily related to Delphi's business, other than the GM Business (as defined below), specified excluded assets, and the business relating to certain pending transactions (the "Parnassus Business").  GM Components would acquire all of the equity and assets primarily related to the Delphi's Steering Business and certain UAW Sites, including certain of those facilities located in Grand Rapids, Michigan; Rochester, New York; Kokomo, Indiana; and Lockport, New York (the "GM Business" and, together with the Parnassus Business, the "Sale Businesses").

Certain Delphi assets are specifically excluded from the assets to be acquired by the Buyers, including without limitation, third party assets, certain insurance policies, books and records required to be retained, all of the rights and claims of Delphi and its subsidiaries available under the Bankruptcy Code, personnel records, certain scheduled excluded facilities, tax refunds relating to the excluded assets, inventory disposed of prior to the Closing and in the Ordinary Course of Business, cash pledged for the benefit of Senior DIP Lenders, pending transactions, certain intercompany receivables and wage escrow accounts for certain excluded employees (the "Excluded Assets").

The Master Disposition Agreement provides that GM Components would assume all administrative liabilities and other liabilities relating to the GM Business, certain hedging agreements and certain specified prepetition liabilities.  Parnassus would assume all administrative liabilities and certain prepetition liabilities relating to the Parnassus Business as well as specified director, officer, and employee related liabilities, which include assuming employment agreements (at Parnassus' discretion), obtaining insurance and undertaking other obligations under Delphi's policies that in the aggregate provide substantially similar economic benefits to such directors, officers and employees as currently in existence.  The prepetition liabilities assumed by Buyers include cure amounts relating to assumed contracts and certain taxes to the extent not discharged pursuant to the Modified Plan, in each case relating to the assets acquired by such Buyer.  Finally, Delphi would retain liability for all Excluded Assets and Excluded Facilities, certain Administrative Claims not assumed by Buyers, retained benefit plans, intercompany payables to Filing Affiliates and liabilities related to the DIP Agreement.

(b)    <u>Documentation</u>

The transaction would be effected pursuant to the Master Disposition Agreement and related documentation, including certain ancillary agreements (the "Ancillary Agreements") such as: (i) the necessary transfer agreements to effectuate the transfer of securities to Buyers, (ii) assignment and assumption agreements and bills of sale to effectuate the sale of the Acquired Assets to the Buyers, and (iii) transition services agreements to ensure Delphi's ability to operate

the remaining business and for Buyers to provide each other with the services required to operate their respective acquired businesses.  The Closing of the transfer agreements and the assignment and assumption agreements would take place simultaneously with the Closing.

(c)   <u>Purchase Price</u>

The purchase price would be comprised of the following: (i) Buyers would each assume the Assumed Liabilities and Cure Amounts applicable to their respective Businesses for Acquired Contracts and pay 50% of professional fees (in an amount not to exceed $15,000,000 per Buyer, or $30,000,000 in total) that are Administrative Claims required to be paid by certain affiliates, (ii) GM Components would also waive its prepetition claims and administrative clams in Bankruptcy Cases, pay the DIP Priority Payment Amount to Delphi, pay $291,020,079 to Delphi, pay certain scheduled expenses of Delphi and its affiliates, and a proportional post-closing payment to Delphi based on recoveries from the Appaloosa Claim as provided by the Plan of Reorganization, in addition to solicitation costs for approval of the Plan of Reorganization that are Administrative Claims (in an amount not to exceed $12,000,000) and (iii) Parnassus would also pay one dollar and issue its Class C Interest to Delphi, in addition to paying a post-closing amount pursuant to the Modified Plan.

(d)   <u>Representations And Warranties</u>

The Sellers and Delphi, jointly, would provide representations and warranties relating to themselves and the applicable Sale Companies, which are generally standard for a transaction of this type.  Significantly, all Seller's representations and warranties are qualified by Delphi's reports filed with the Securities and Exchange Commission and many contain materiality qualifiers or exceptions for matters that would not have a Material Adverse Effect (as defined in the Master Disposition Agreement) on the businesses being sold.  Buyers are also required to make standard representations and warranties, as well as GM (solely with respect to transaction financing).  The majority of the schedules to the representations and warranties provided by Sellers relate only to the Steering Business and all are provided only as of the date set forth on the schedules.  The representations and warranties in the Master Disposition Agreement do not survive Closing and no party would have any liability to the other parties after the Closing for any breaches of the representations and warranties.

(e)   <u>Operational Covenants</u>

The Master Disposition Agreement provides that, between the date of signing the Master Disposition Agreement and the Closing, Delphi would cause the Sellers to reasonably conduct the operations of the Sale Businesses in a manner reasonably intended to preserve the value of the Sale Businesses taking into account the current state of the auto industry and Delphi's liquidity, with limited exceptions.  The limited exceptions include items that may be provided for in the Master Disposition Agreement, set forth on a schedule, required by the Bankruptcy Court, or required by a change in applicable law.  In addition, Delphi would cause the Sellers to refrain from specified activities without the prior written consent of Buyers (which must not be unreasonably withheld), but only to the extent Delphi can comply by acting reasonably to preserve the value of the Sale Businesses, taking into account the current state of the auto industry and Delphi's liquidity.  In addition, and among other agreements, (i) the parties agree to

take actions necessary to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent those assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, which may include certain amendments or modifications to the Master Disposition Agreement (so long as such amendments or modifications do not result in a material adverse effect on Buyers, Acquired Assets or the Businesses or materially increase the Assumed Liabilities), (ii) Parnassus would, as of the Closing Date, enter into agreements, obtain insurance coverage and assume the obligations in connection with the Specified Directors, Officer, and Employee Related Liabilities, (iii) GM would guarantee and Parnassus would provide an equity commitment in favor of the performance and payment of all of their respective obligations under the Master Disposition Agreement until Closing, and (iv) the parties would agree to certain terms with respect to various international subsidiaries (including, Brazil, China, Mexico and Poland).

(f)    Additional Covenants

(i)    Bankruptcy Actions

Delphi will comply with the Bankruptcy Code, seek all applicable approvals, and on or prior to June 1, 2009, file (i) the Master Disposition Agreement with the modified Plan of Reorganization and (ii) a 363 motion seeking approval to enter into and perform their obligations under the Master Disposition Agreement under similar terms.

(ii)    Taxes

The Sellers would be responsible for preparing and filing the tax returns prior to Closing and the Buyers would be responsible for preparing and filing their respective tax returns after the Closing and must provide Sellers with the tax returns 60 days before the due date. The parties would generally cooperate with respect to tax matters and use commercially reasonable efforts and cooperate to exempt the transaction from any transfer taxes. Delphi has committed to seeking an exemption from transfer taxes but if such exemption is not granted, transfer taxes would be borne by the relevant Buyer.

(iii)    Employee Matters

At Closing, the applicable Buyer generally (i) would assume the employment contracts for all Non-U.S. Employees, (ii) would employ all active and inactive U.S. Hourly Employees, (iii) may offer employment to the U.S. Salaried Employees on Buyer's terms, and (iv) would assume certain specified collective bargaining agreements. Pension liabilities will be transferred pursuant to certain transfer agreements for foreign Sellers, and the Buyers will continue to provide benefit plans to the extent required by law and will assume the sponsorship of certain contribution plans. The severance obligations are generally paid to former U.S. Salaried Employees until Closing and U.S. Salaried Employees terminated after the date of the Master Disposition Agreement or employees at certain facilities will be entitled to severance payments pursuant to a formula set forth in Master Disposition Agreement on and after Closing.

(iv)    Intellectual Property

The Sellers would grant the respective Buyers non-exclusive licenses to certain shared intellectual property with the applicable sublicense rights pursuant to various IP licensing agreements.  The parties agree to make the shared intellectual property available to other parties and the Buyers would agree not to transfer or assign their respective rights to the shared intellectual property to any third party, subject to certain exceptions.

(v)    Environmental Permits

As soon as possible after Closing, Sellers must cooperate with Buyers to transfer, assign, or reissue any Environmental Permit necessary to operate the Sale Businesses.

(vi)    Termination of Certain Contracts

On the Closing Date, certain contracts would be terminated, including without limitation the following: the Amended MRA (except for certain specified provision which shall survive), the Option Exercise Agreement, the GM Arrangement and Amended GM Arrangement, as amended, various tax agreements between Delphi and GM for the allocation and indemnification of taxes, and various assignment and transfer agreements.

(vii)    Financing

GM is restricted from terminating or amending its financing arrangements for the transaction that would materially adversely impact the ability of GM or the Parnassus to consummate, without the consent of Delphi.

(viii)    Non-Solicitation

Delphi and the Sellers agree that until either the termination of the Master Disposition Agreement or Closing, they will not knowingly permit their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale of the businesses, provided that nothing in the Master Disposition Agreement will prevent or restrict Delphi's Board of Directors from taking actions which the Board reasonably believes are required by their fiduciary duties or are in accordance with the Modification Procedures Order entered by the Bankruptcy Court.

(g)    Closing Conditions

The respective obligations of each party to effect the transactions contemplated by the Master Disposition Agreement would be subject to the satisfaction or waiver of customary closing conditions, including an effective plan of reorganization, Bankruptcy Court and other governmental approvals and regulatory matters (including certain competition filings), as well as an amendment of the DIP Agreement as necessary to permit the consummation of the transactions.

In addition, the obligation of each of the Buyers to consummate the transactions contemplated by the Master Disposition Agreement would be subject to the satisfaction, or

waiver by such Buyer, at or prior to the Closing, of the following conditions: (i) the truth and correctness, as of the Closing Date, of the representations and warranties of the Sellers contained in the Master Disposition Agreement, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on the Seller's ability to consummate the transactions contemplated by the Master Disposition Agreement, (ii) the performance and compliance by the Sellers in all material respects with all agreements and obligations required by the Master Disposition Agreement to be performed or complied with by the Sellers at or prior to the Closing for the benefit of such Buyer, (iii) the delivery by the Sellers of duly executed copies of each of the Ancillary Agreements and the DIP Payoff Letters, (iv) the release of certain liens, and (v) their receipt of the requisite financing contemplated in financing agreements being entered into concurrently with the Master Disposition Agreement; and additionally GM Components' obligation to consummate the transaction is also conditioned on the transfer of Environmental Permits.

Finally, the obligation of the Sellers to consummate the transactions contemplated by the Master Disposition Agreement would be subject to the fulfillment at or prior to the Closing of the following conditions, which could be waived by the Sellers: (i) the truth and correctness, as of the Closing Date, of the representations and warranties of the Buyers contained in the Master Disposition Agreement, except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on the Buyers' ability to consummate the transactions contemplated by the Master Disposition Agreement, (ii) the performance and compliance by the Buyers in all material respects with all agreements and obligations required by the Master Disposition Agreement to be performed or complied with at or prior to the Closing, (iii) the delivery by the Buyer of duly executed copies of each of the Ancillary Agreements, (iv) the assumption by Buyers of certain collective bargaining agreements and certain related consents and (v) the satisfaction by Delphi that the hourly pension plans would not be an obligation of Delphi after the Closing.

(h)    Termination

The Master Disposition Agreement would be terminable prior to Closing upon mutual written consent of the Sellers and the Buyers and by any non-breaching party if the Closing has not occurred by September 30, 2009, subject to an automatic 60-day extension if all of the closing conditions are met except for governmental approvals.  In addition, Delphi would have the right to terminate if (i) the Interim Financial Amendments are not delivered by GM on or prior to June 1, 2009, (ii) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009 pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (iii) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10, 2009, or (iv) GM breaches any of its material covenants, obligations, or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

GM would have the right to terminate if (i) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders, (ii) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect at any time on or after June 10,

2009, (iii) Delphi breaches any of its material covenants, obligations or agreements under the GM-Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment, or (iv) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.

GM or Parnassus may terminate if (i) the Modification Approval Order is not entered by July 23, 2009, or (ii) such Modification Approval Order has not become a Final Order within ten days of its entry.

Further, the Master Disposition Agreement would automatically terminate, without further action by any party, on July 15, 2009 if GM becomes subject to a case under the Bankruptcy Code and (i) the required federal court approval of the Master Disposition Agreement and the Ancillary Agreements has not been obtained, or (ii) in the event that certain transfers, assignments and assumptions pursuant to the Master Disposition Agreement are not appropriately approved.

(i)    No Successor Liability

Except where expressly prohibited under applicable law, upon the Closing, the Buyers shall not be deemed to be the successor of the Filing Affiliates, have merged with the Filing Affiliates, be a continuation of the Filing Affiliates, or be liable for acts or omissions of the Filing Affiliates.

## 2.    *Transfer Of Collateral*

Pursuant to the DIP Transfer, the Agent, on behalf of the DIP Lenders, will receive the DIP Consideration from the Debtors.  The transfer of the Transferred Assets will be deemed to be in full satisfaction of the Debtors' obligations under the DIP Credit Agreement in accordance with Section 9-620 of the UCC.

If a party who is entitled to notice under Section 9-621(a) of the UCC or who otherwise has an interest in the Transferred Assets subordinate to the Administrative Agent (as set forth in the Security and Pledge Agreement) (each a "Subordinated Person") objects to the transfer of assets to the Agent, the assets will be sold at a public sale in accordance with Section 9-610 of the UCC.  The Debtors will provide Subordinated Persons with at least 10 days notice of a public sale of the Transferred Assets, along with procedures to be employed in connection with the public sale.  In the event of a public sale, the Agent will credit bid the full amount of the Debtors' obligations under the DIP Credit Agreement.  Parties may submit competing offers pursuant to public sale foreclosure procedures.  If there are no competing offers that provide more value than the Agent's credit bid, the Agent will receive the collateral in full satisfaction of the Debtors' obligations under the DIP Credit Agreement.  If a higher competing offer is accepted and the Debtors' enter into an alternate transaction, payment to the Agent of proceeds from the sale, up to the full amount of the debt, shall discharge the Debtors' obligations under the DIP Credit Agreement.

Consummation of the DIP Transfer will occur on the Effective Date, following the consummation of the Master Disposition Agreement.

### 3.    *Pension Actions And Agreement With The PBGC*

The final key tenet of the Transformation Plan was to devise a workable solution to the Debtors' current pension situation.  Excluding subsidiary plans, Delphi maintains two separate defined benefit pension plans for employees, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") and the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan").  Certain of the Delphi's subsidiaries also maintain separate defined benefit plans: (i) the ASEC Manufacturing Retirement Program (the "ASEC Plan"), (ii) the Delphi Mechatronics Retirement Program (the "Mechatronics Plan"), (iii) the Packard-Hughes Interconnect Bargaining Retirement Plan (the "PHI Bargaining Plan") and (iv) the PHI Non-Bargaining Retirement Plan (the "PHI Non-Bargaining Plan") (collectively, the "Subsidiary Plans" and together with the Salaried Plan and the Hourly Plan, the "Pension Plans").  The Debtors' funding obligations under the U.S. pension plans are governed by the IRC and ERISA.

The Debtors' goal throughout these Chapter 11 Cases was to preserve the benefits accrued under the existing defined benefit U.S. pension plans (including the Subsidiary Plans) for both the Debtors' hourly and salaried workforce. The Debtors had originally intended to assume and continue the Pension Plans on a frozen basis upon emergence from chapter 11.  As a result of the Plan Investors' breach of the Investment Agreement, the attendant delay in emerging from chapter 11, and the decline in the economy overall and in the automotive industry in particular, however, the Debtors needed to implement certain cost-saving aspects of their pension transformation in the latter half of 2008 rather than wait for emergence.  The Debtors accordingly filed the Hourly And Salaried Pension Program Modification Motion on September 12, 2008, which sought authority to freeze the Salaried Plan, the ASEC Plan, the Mechatronics Plan, and the PHI Non-Bargaining Plan effective September 30, 2008 and the Hourly Plan effective as soon as possible following Union consent.  The Court approved the motion on September 23, 2008 and the Salaried Plan, the ASEC Plan, the Mechatronics Plan, and the PHI Non-Bargaining Plan were frozen on September 30, 2008.  The Debtors obtained Union consent on the terms set forth in the implementation agreements and, after fulfilling the statutory notice requirements, froze the Hourly Plan on November 30, 2008.  By freezing the Pension Plans, Delphi halted the accrual of normal cost payments going forward, thereby preserving liquidity.

During the bankruptcy period, the Debtors have needed to obtain relief from the IRS and the PBGC to postpone contributions, to avoid a potential excise tax assessment, and to effectuate the IRC Section 414(l) transfer of Hourly Plan underfunded pension liabilities to the GM Hourly-Rate Employees Pension Plan (the "GM Hourly Plan").  Since the Petition Dates, the Debtors have generally only contributed "normal cost" contributions to the pension plans, or contributions that reflect the amounts related to service provided by plan participants post-filing.  These "normal cost" contributions are less than the minimum funding requirements established by the IRC and ERISA.  The IRC imposes a 10% excise tax penalty on the amount of any resulting funding deficiency.  Under the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.  Although the Debtors believed that they had defenses against such penalties, the Debtors sought a consensual resolution.  Thus, the Debtors negotiated with the IRS and the PBGC for conditional waivers of their minimum funding requirements under the Hourly Plan and Salaried Plan for the pension plan year ended September 30, 2006 and for the Hourly Plan for the plan year ended September 30, 2007.  As of the filing of this Supplement, Delphi has not sought another extension of the

funding waivers for the Hourly Plan. But, with respect to the Salaried Plan, in December 2008, Delphi filed a funding waiver request with the IRS seeking a waiver of the minimum funding requirement which, if accepted, would waive approximately $61 million in contributions for the plan year ended September 30, 2008. Approvals have not yet been granted for that request.

As previously discussed, on September 12, 2008, Delphi filed a motion for authorization to implement the Amended GSA and Amended MRA, a component of which is the effectuation of the Section 414(l) transfer in connection with the Hourly Plan. Under the Amended GSA and Amended MRA, to alleviate the Hourly Plan underfunding and resolve future contribution needs, the parties agreed that the Debtors would transfer the majority of the Hourly Plan to the GM Hourly Plan in two transfers totaling approximately $5.1 billion in net unfunded liabilities (the "414(l) Transfer"). Delphi completed the first step of the 414(l) Transfer effective on September 29, 2008. Consummating the first step of the 414(l) Transfer prior to September 30, 2008 avoided an accumulated funding deficiency for the Hourly Plan and prevented the potential assessment of the significant excise tax penalties discussed above. The second step of the 414(l) Transfer under the Amended GSA and Amended MRA would have occurred upon the consummation of a plan of reorganization that satisfied certain conditions set forth in the Amended MRA. Due to the state of the economy and the rapid deterioration in the automotive sector, the Debtors could not satisfy those conditions. Nevertheless, GM has agreed to make certain arrangements, the details of which are still under discussion, such that the Debtors shall no longer have responsibility for the Hourly Plan.

Despite the Debtors' effort to preserve their other pension plans, the Debtors were unable to secure sufficient capital to achieve that objective. Consequently, it is expected that the PBGC will terminate the Salaried Plan and the Subsidiary Plans. As a result, participants in those Pension Plans would collect their pension benefits from the PBGC as provided by law.

The Debtors and the PBGC anticipate entering into a settlement agreement to settle the PBGC's various claims against the Debtors and members of the Debtors' "controlled group" as defined by the IRC and/or ERISA. Pursuant to that settlement agreement and as set forth in the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of the Modified Plan, and the PBGC will receive a cash payment in the amount of $30 million, all of which is in consideration for (a) the discharge of the Contingent PBGC's Secured Claims, i.e., the conditional junior replacement liens in DASHI's assets that were already encumbered by the DIP Facility, which conditional liens were granted to the PBGC in connection with the transfer of repatriated funds from certain non-Debtor global affiliates, as described more fully in Section III.A – Post-Confirmation Agreements With GM and The Postpetition Lenders, (b) the liability to be assumed by the PBGC related to the expected involuntary termination of the Salaried Plan and the Subsidiary Plans, (c) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (d) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise. A copy of the PBGC Settlement Agreement is attached to the Modified Plan substantially in the form of Exhibit 7.17.

Except as provided in the PBGC settlement agreement and as set forth in Article V of the Modified Plan, on the Effective Date, all liens arising from or relating to the Pension Plans will be terminated and discharged.

In addition to the U.S. Pension Plan, Delphi Electronic Overseas Corporation ("DEOC"), a Debtor, maintains a defined benefit pension plan in the United Kingdom (the "DEOC Plan"). The DEOC Plan has an estimated funding deficit of approximately £32 million. Pursuant to the transaction contemplated by the Master Disposition Agreement, DEOC's business will be purchased by Parnassus or an affiliate of Parnassus. In connection with that transaction, if consummated pursuant to an asset purchase, the Debtors expect that the United Kingdom regulator would need to approve any proposed transfer of DEOC's pension plan to the Buyer, which approval is expected to include, among other things, an agreement between the plan trustees and the relevant Buyer providing for periodic pension contributions to fund the deficit over time. The current funding program provides for pension contributions of less than £3 million per year.

## C.    Significant Confirmation And Post-Confirmation Events

### 1.    Confirmation Of The Confirmed Plan

After a hearing on December 7, 2007 on the adequacy of the proposed disclosure statement (including modifications proposed after September 6, 2007), on December 10, 2007, Delphi filed the December 2007 Plan and the Disclosure Statement. The Court entered an order approving the adequacy of the December 2007 Disclosure Statement that same day. Thereafter, Delphi began solicitation of votes on the December 2007 Plan.

On January 16, 2008, Delphi announced the voting results on the December 2007 Plan, which illustrated broad-based support for the plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the MDL, and holders of interests). Of the total amount voted by all general unsecured creditors classes, 78 percent voted to accept the plan and one hundred percent of the ballots cast in the GM and MDL classes voted to accept the plan. Seventy-eight percent of voting shareholders voted to accept the plan. A hearing on the confirmation of the December 2007 Plan took place on January 17, 18, and 22, 2008. The Bankruptcy Court entered the order confirming the December 2007 Plan (with certain modifications) on January 25, 2008.

### 2.    Investment Agreement And Plan Investor Litigation

On July 18, 2007, Delphi announced that it had accepted a proposal for an equity purchase and commitment agreement (the "Investment Agreement") with the Plan Investors. Under the terms and subject to the conditions of the Investment Agreement, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Plan Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion discount rights offering that was made available to unsecured creditors. The discount rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund the Investment

Agreement, in April 2008 the Company cancelled the discount rights offering and returned all funds submitted.

An affiliate of Appaloosa had certain termination rights under the Investment Agreement. In the event of certain terminations of the Investment Agreement pursuant to the terms thereof, the Company could be obligated to pay the Investors $83 million plus certain transaction expenses.  As described previously, on April 4, 2008, as the Debtors prepared to close the transaction, Appaloosa delivered a letter purporting to terminate the Investment Agreement and asserting that the Plan Investors were entitled to be paid the fee of $83 million plus certain expenses and other amounts.  Delphi believes that Appaloosa wrongfully terminated the Investment Agreement and disputes the allegations that Delphi breached the Investment Agreement or failed to satisfy any condition to the Investors' obligations thereunder. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, including the commencement of legal action in the Court to seek all appropriate relief, including specific performance by the Investors of their obligations under the Investment Agreement.  On May 16, 2008, Delphi filed complaints in the Bankruptcy Court against the various Plan Investors which asserted claims for breach of contract and fraud, and asked the Bankruptcy Court to enter a judgment of specific performance and to pay compensatory and punitive damages in an amount to be determined in trial.  On July 28, 2008, the Bankruptcy Court ruled on certain motions to dismiss, granting the motions in part and denying them in part.

On August 5 and 6, 2008, the parties participated in confidential, non-binding mediation. Subsequent to the mediation, the parties have continued to prepare for litigation, including exchanging significant amounts of discovery material and taking more than 80 depositions of parties on both sides of the litigation.  On April 21 and 28, 2009, the defendants filed motions for summary judgment and on May 15 and 22, respectively, Delphi filed its response to the motions. These motions were argued on June 8, 2009.  The trial-ready date is currently set for July 20, 2009.

Under the Master Disposition Agreement, upon the closing of the transaction, subject to applicable law, GM (or its affiliate) will acquire the right to benefit from any lawsuit or settlement relating to the litigation described herein and will control the prosecution and settlement of the litigation, including the costs and expenses of such prosecution.  Delphi has agreed to cooperate in any prosecution of the litigation and act as the prosecuting party if requested by GM.  In such an event, GM will reimburse Delphi for reasonable costs and expenses related thereto.  Prior to and after the closing of the Master Disposition Agreement, Delphi will not consent to the entry of any judgment or settlement with respect to the litigation without the prior written consent of GM, which may not be unreasonably withheld.

After the closing of the Master Disposition Agreement, as further provided therein, GM will not consent to the entry of any judgment or settlement with respect to the litigation for an amount less than the maximum distribution to the Tranche C Lenders provided by Article 7.8(e)(iii) of the Modified Plan (the "Threshold") without the prior written consent of Delphi, which may not be unreasonably withheld.  Notwithstanding the foregoing, Delphi may not withhold consent unless it agrees to pay all of the fees and expenses associated with continuing the prosecution.  Alternately, if as a result of the entry of a judgment or settlement, the Tranche

C DIP Lenders will receive an amount equal to the Threshold,  Delphi will not have a consent right.  Further, GM will not consent to the entry of a judgment or settlement with respect to the litigation unless the resolution contains a full release by the defendants and does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees. Finally, GM will consult with Delphi regarding any request by Delphi to consent to the entry of any judgment or entry into any settlement with respect to the litigation.

The confirmation of the Modified Plan will not constitute any finding or ruling with respect to any claims, counterclaims, defenses, rights or issues in the adversary proceedings.  The defendants in those adversary proceedings deny any liability to the Debtors and dispute, among other things, that Delphi would be entitled to the remedy of specific performance, or to any recovery exceeding $250 million in total aggregate damages, in the event that Delphi were to prevail on any of its claims of breach of the Investment Agreement. The defendants further believe that they have or may have in the future valid counterclaims against the Debtors that are in excess of $100 million; the Debtors dispute the defendants' counterclaims.

The Debtors' description of facts and legal conclusions relating to the adversary proceedings do not constitute findings of the Court and shall not be deemed admissions of the defendants even if not objected to during plan confirmation proceedings. Further, in order to avoid objections to various documents that may be filed or prepared in connection with the Modified Plan, the Debtors have agreed that they will not assert that the Plan Investors' failure to object to any such document that may be filed with the Bankruptcy Court shall constitute a waiver or consent by the Plan Investors to such document under the Investment Agreement.

### 3.        *Complaints Seeking Revocation Of Confirmation Order*

On July 23, 2008, the Creditors' Committee and Wilmington Trust, as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Bankruptcy Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization on the grounds that it was procured by Appaloosa's and the other Plan Investors' fraud.  The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008.  The Creditors' Committee and Wilmington Trust have entered into a stipulation and consent order with Delphi whereby all activity in respect of the section 1144 complaints will be stayed until the earlier of (i) the service by the Creditors' Committee or Wilmington Trust upon the Debtors of a written notice terminating the stay with respect to the party's complaint or (ii) further order of the Bankruptcy Court.  Upon receipt of a notice of termination of stay, the Debtors will have thirty days, or such other period of time as the parties may agree or as may be ordered by the Bankruptcy Court, to answer or otherwise file a responsive pleading.  Upon the Effective Date of the Modified Plan, the proceedings initiated by the Creditors' Committee and the Wilmington Trust will be closed and the complaints seeking relief therefore will be dismissed as moot.

### 4.    *Disposition Of Assets*

#### (a)    Sale Of De Minimis Assets

On October 28, 2005, the Bankruptcy Court entered an order permitting the Debtors to sell certain assets of de minimis value.  The order approved procedures for selling assets, outside the ordinary course of business, without further court approval provided that the purchase price is less than $10 million for each transaction or in the aggregate for a related series of transactions. In connection with this order, the Debtors formulated internal approval procedures to both comply with closing conditions and satisfy the notice procedures set forth in the order.  During these Chapter 11 Cases, the Debtors have disposed of assets under the de minimis assets order.

#### (b)    Interiors And Closures

On December 21, 2007, the Bankruptcy Court entered an order approving the sale of substantially all of the tangible assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business (the "Interiors and Closures Business") to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group. On January 25, 2008, the Court entered an order approving the assumption and assignment of the executory contracts covered by certain objections, all of which were resolved prior to the January 25, 2008 hearing. On that date, the Court also approved a compromise with Inteva, which facilitated the closing of the sale of the Interiors and Closures Business with Inteva by modifying the payment structure under the Interiors and Closures Agreement in consideration for the waiver of certain of Inteva's conditions to closing. Delphi closed on the sale of the Interiors and Closures Business to Inteva on February 29, 2008. Delphi received proceeds from the sale of approximately $106 million consisting of $62.5 million of cash paid at closing (of which $35.1 million was paid to non-debtor foreign entities that participated in the sale)and notes at fair value for the remainder of the purchase price (none of which will be paid to non-debtor foreign entities).

#### (c)    Exhaust Emissions Business

On November 10, 2008, the Company entered into an agreement to sell substantially all the assets exclusively used in the Debtors' global exhaust emissions business (the "Exhaust Business") to Bienes Turgon S.A. de C.V. and certain of its affiliates for a purchase price of $17 million, subject to certain adjustments. On November 14, 2008, the Debtors filed a sale motion seeking a hearing on November 25, 2008 to approve bidding procedures in connection with the sale and a sale hearing on December 17, 2008.  No qualified bids were received for the Exhaust Business and on December 17, 2008, the Bankruptcy Court entered an order approving the sale. The majority of the closing of the sale occurred on April 30, 2009, with the closing of the transaction in two of the non-U.S. jurisdictions anticipated during the third quarter of 2009.

#### (d)    Steering And Halfshaft

On February 19, 2008, the Bankruptcy Court entered an order approving the sale of the Debtors' steering and halfshaft business (the "Steering Business") to Steering Solutions Corporation, a subsidiary of Platinum Equity, LLC, and a transaction facilitation agreement with GM.  Subsequent orders of the Court approved the assumption and assignment of the executory contracts covered by certain objections.  On March 3, 2009, the agreement with Steering

Solutions Corporation was mutually terminated by the parties to the agreement. Concurrently with the termination, the Company entered into an option exercise agreement with GM (the "Option Exercise Agreement"), pursuant to which the parties agreed that the conditions to GM's exercise of its option to purchase the Steering Business under section 4.06(a)(i) of the Amended MRA were satisfied in consideration for (and subject to) revised and supplemented terms of the sale of the Steering Business. As part of the Master Disposition Agreement, the Option Exercise Agreement would be terminated and the sale of the Steering Business to GM Components would proceed pursuant to the Master Disposition Agreement.

(e)    <u>Global Brakes And Ride Dynamics Businesses</u>

On March 30, 2009, the Company entered into an asset sale and purchase agreement with BeijingWest Industries Co., Ltd. for the sale of the Company's remaining brakes and ride dynamics businesses, subject to a competitive bidding process. The preliminary purchase price is $90 million, subject to adjustments, including an estimated upward pre-closing adjustment approximating $18 million. On March 31, 2009, the Debtors filed a sale motion seeking a hearing on April 23, 2009 to approve bidding procedures in connection with the sale and a hearing on May 21, 2009, authorizing and approving the sale of assets. The Bidding Procedures Order was entered on May 1, 2009. No qualified bids were received for the businesses and on May 21, 2009, the Court entered the order approving the sale. The closing of the sale is anticipated to occur in the fourth quarter of 2009. Upon consummation of the Modified Plan, the brakes and ride dynamics businesses will be held and operated by Parnassus until the closing of the sale.

**5.**    ***Statutory Committees***

On October 17, 2005, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the Creditors' Committee, pursuant to section 1102 of the Bankruptcy Code. On April 28, 2006, the United States Trustee appointed an official Committee of Equity Holders pursuant to section 1102 of the Bankruptcy Code to represent the interests of all equity holders in these cases. On April 23, 2009, because of the change of circumstances in the Debtors' Chapter 11 Cases, the Court entered an order directing the U.S. Trustee to disband the Equity Committee, which occurred on April 24, 2009.

**6.**    ***Exclusivity***

Pursuant to an order of the Bankruptcy Court dated January 6, 2006, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan of reorganization (the "Filing Period") through August 5, 2006, and to solicit acceptances of such plan (the "Solicitation Period") to October 4, 2006. Pursuant to further orders of the Bankruptcy Court entered on June 19, 2006, January 23, July 29, and December 20, 2007, and March 19 and April 30, 2008, the current Filing Period, except as to the Statutory Committees, was extended until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the Solicitation Period was extended until 90 days after substantial consummation of the Confirmed Plan or any modified plan. Pursuant to an agreement among the Debtors and the Statutory Committees, and subsequent orders entered on July 31, October 27, and, December 17, 2008 and March 24, 2009, the Filing Period was extended, solely as between the Debtors and the Statutory Committees, to

May 31, 2009 and the Solicitation Period was extended to July 31, 2009. On April 24, 2009, the Equity Committee was disbanded. Accordingly, pursuant to an agreement among the Debtors and the Creditors' Committee, and an order of the Bankruptcy Court entered on May 21, 2009, the Filing Period was extended, solely as between the Debtors and the Creditors' Committee, to July 31, 2009 and the Solicitation Period was extended to September 30, 2009. The May 21 order preserves the rights of the Creditors' Committee to contest the effect of section 1129(c) if any of the section 1121(d) exclusive periods vis-a-vis the Creditors' Committee expires.

### 7.    *Investigations, MDL Proceedings, And Settlements*

Prior to the Petition Date, Delphi restated earnings for fiscal years 2001-2003 which prompted, among other things, (a) formal investigations by several governmental agencies, (b) the commencement of certain class actions, including actions brought under ERISA and various securities laws, and (c) the review by a special committee of the Company's Board of Directors of certain shareholder derivative demands and related actions. The resolution and settlement of these matters, including the class actions against Delphi, certain potential contingent claims for indemnification against Delphi, and certain potential contingent claims against the insurers which provided Delphi's director and officer liability policies implicated by the earnings restatement was previously described in the Disclosure Statement.

Since April 2008, Delphi has engaged in discussions with the Lead Plaintiffs in the Securities Action, the ERISA Action Plaintiffs, and the various individual director and officer defendants concerning potential modifications to the MDL Settlements in light of the reduced recoveries available to Delphi's stakeholders. Based on these discussions, Delphi intends to enter into and seek approval in both the MDL Court and the Bankruptcy Court for certain amendments to the MDL Settlements which, if approved by a final order of both courts, would involve the following modifications to the MDL Settlements:

The Lead Plaintiffs would continue to be granted a single Allowed Claim in the face amount of $179 million and the ERISA Plaintiffs will continue to be granted a single Allowed Claim in the face amount of $24.5 million but in both cases, the Debtors will no longer be required to guarantee recoveries in the same form, ratio, and treatment as the general unsecured claimholders, but will instead be classified according to the priority scheme of the Bankruptcy Code, including Section 510(b) therein. Moreover, under the modifications as anticipated, Delphi will no longer have the obligation to cause a third party to pay $15 million to the Lead Plaintiffs on behalf of the class and the release of GM contained in the Securities Settlement will also be eliminated. Because they will receive no distribution on account of their claims under the Modified Plan and thus will be deemed to have rejected the Modified Plan, the Lead Plaintiffs and ERISA Action plaintiffs will not be entitled to vote on the Modified Plan.

Despite the treatment of the Lead Plaintiffs' and ERISA Action Plaintiffs' claims in the Chapter 11 Cases, each group of plaintiffs will receive distributions from insurance proceeds. The Lead Plaintiffs will receive a distribution of insurance proceeds up to $88.6 million, and $1.5 million from certain underwriters named as defendants in the MDL proceedings. The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million. Both groups of plaintiffs will also receive accrued interest, if any, which has been earned on these amounts since they were deposited into escrow in late 2007. If approved by both

the MDL Court and the Bankruptcy Court, the proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements upon the effectiveness of the MDL Settlements, which may occur prior to and independent from Delphi's emergence from chapter 11.   The releases granted to all parties in the MDL Settlement and the Insurance Settlement will, likewise, be effective and final upon the effectiveness of the MDL Settlements, independent of Delphi's emergence from chapter 11.  Thus, the resolution of the MDL Actions, and the related insurance settlement, which in their totality will resolve the various claims and contingent claims with respect to the earnings restatement, will become effective and final independent of Delphi's Modified Plan.

### 8.      *Preserving Estate Causes Of Action*

(a)      Avoidance Procedures Order

On August 16, 2007, the Bankruptcy Court entered an order (the "Avoidance Procedures Order") authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action arising under sections 544, 545, 547, 548, or 553 of the Bankruptcy Code, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action.  The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve valuable estate assets in a manner that would not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations. With respect to any avoidance causes of action that the Debtors abandoned in accordance with the procedures, the Debtors have reserved all rights, including the right under section 502(d) of the Bankruptcy Code, to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

Although hundreds of actions subject to these procedures have been commenced, the actions will likely remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.  The Debtors, with the assistance of their advisors and input from the Creditors' Committee, have evaluated the avoidance causes of action and considered the probable defenses the counterparties may raise and the relative merits of such arguments.  It is the Debtors' belief that given the nature of the majority of these actions, the availability of defenses to such actions, and the current state of the automotive supply industry, that pursuing these actions would be a costly and protracted process that might not provide significant value to the estate when compared to the harm it might cause to supplier relationships and the operation of the Debtors' businesses.  Thus, the Debtors believe it may be appropriate to retain only a limited number of avoidance actions with a higher likelihood of recovery and to discontinue the remaining avoidance actions and allow them to be dismissed.  If the Modified Plan becomes effective, certain of these actions will be dismissed as a result of prepetition contracts of suppliers being assumed and assigned to Parnassus and GM Components.  Others, however, are likely to be retained.  Under the Modified Plan, the Reorganized Debtors will only retain the Causes of Action arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws that are specifically listed on Exhibit 7.18 to the Modified Plan.

Finally, in connection with the terms of the Amended GSA and the Amended MRA, Delphi has dismissed the sealed complaint it filed against GM.

(b)    FICA Claimants' Estate Causes of Action

In 1999 and 2003, Delphi, a predecessor of DAS LLC, and Delphi Automotive Systems Services LLC (the "FICA Claimants") agreed to pay "ratification bonuses" shortly after the effective date of duly ratified collective bargaining agreements to certain union members. The FICA Claimants contend that the payments were not "wages" subject to taxation under the Federal Insurance Contributions Act ("FICA") but nevertheless withheld and paid FICA taxes to the IRS to avoid the possibility of becoming secondarily liable for the FICA taxes owed to the IRS by those union members. On January 18, 2008, the FICA Claimants filed an adversary proceeding against the United States to obtain a refund on their own behalf and on behalf of certain of their employees of certain payroll taxes paid to the IRS. The complaint, which was later transferred to the United States District Court for the Southern District of New York, seeks to recover the amount of FICA taxes paid, estimated to be $26,058,130, as well as interest. These estate causes of action are preserved under the Modified Plan and the Master Disposition Agreement provides that the net proceeds of the litigation will be shared evenly by Parnassus and GM Components.

9.    <em>Termination Of Salaried OPEB</em>

On February 4, 2009, the Debtors filed a motion (the "OPEB Motion") to cease contributions to the Debtors' medical and life insurance plans for salaried retirees ("Salaried OPEB"), effective April 1, 2009. Assuming an April 1, 2009 effective date, it was anticipated that upon the effectiveness of the proposed terminations there would be cash savings to the Debtors of approximately $200 million in the aggregate from 2009 through 2011 as well as the elimination of balance sheet liabilities in excess of $1.1 billion. The motion was heavily contested but the Bankruptcy Court entered an order in which it determined on a provisional basis, and subsequently on a final basis, among other things, that the Debtors have the authority to cease providing amendable welfare benefits without complying with the procedures of section 1114 of the Bankruptcy Code and that the Debtors had reserved the right to amend or terminate such benefits. As part of its provisional order, the Bankruptcy Court also directed the U.S. Trustee to create an official committee of retired employees (the "Retirees' Committee"), however, for the primary purpose of determining if competent evidence existed to establish whether any individual or group of retirees had vested benefits that would not be amendable at will.

Both the Retirees' Committee and a separate group of retirees (the "Association") appealed the Bankruptcy Court's ruling. On April 2, 2009, the Bankruptcy Court approved the Debtors' motion seeking approval of a settlement with the Retirees' Committee and the Association to resolve the appeals of the OPEB termination orders. The primary terms of the settlement are as follows:

- the Debtors will pay $8.75 million in overall subsidy payments to the Retirees' Committee for the benefit of Delphi's salaried retirees, not subject to reduction because of enrollment levels, and comprised of (i) a $1 million hardship fund,

payable at the beginning of May 2009; (ii) $500,000 VEBA set-up costs, payable at the beginning of May 2009 (which the Retirees' Committee may also use for the hardship fund or subsidizing retiree medical benefit costs); (iii) $1.25 million per month for five months, payable monthly at the beginning of each of June through October 2009; and (iv) one final payment of $1 million on November 1, 2009;

- through June 30, 2009, the Debtors will offer salaried retirees a non-retroactive benefits reinstatement opportunity as of the first of the following month. The Debtors will reasonably cooperate with retirees who elect to continue benefits on a self-pay continuation basis to permit payment deductions from their pension checks;

- pursuant to section 1129(a)(13) of the Bankruptcy Code, the Debtors' plan of reorganization, as modified, will provide for the continuation after its effective date of the payment of any unpaid subsidies in the amounts and on the schedule outlined above;

- the Debtors will pay up to an additional $250,000 in attorneys' fees to counsel for the Retirees' Committee and the Association (i.e., in addition to the $200,000 cap on attorneys' fees provided for by the Provisional Salaried OPEB Termination Order), subject to reasonableness review by the Debtors, and payable 60 days after submission of statements of account to the Debtors;

- the parties agree to seek authorization from the Court for the Retirees' Committee to establish a VEBA as contemplated by the provisions of 26 U.S.C. § 35(e)(1)(K) as amended by § 1899G of the American Recovery and Reinvestment Act of 2009 (Pub. L. No. 111-5, 123 Stat 115 (Feb. 17, 2009)) extending the Health Coverage Tax Credit to benefits provided through a VEBA set up by a section 1114 committee or authorized by a bankruptcy judge;

- any VEBA established by the Retirees' Committee under 26 U.S.C. § 501(c)(9) will be deemed to meet the Debtors' obligation under paragraph 5 of the Final OPEB Termination Order to establish under certain circumstances a VEBA for the purpose of qualifying covered employees who have retired or will retire for the tax credit available through the American Recovery And Reinvestment Act;

- the Debtors will cause their group life insurance provider, MetLife, to permit retirees to continue their current level of optional term life insurance coverage (as outlined under the program in the notices sent to retirees) without the need to re-qualify by providing medical information, and will request that MetLife return all copies of health questionnaire information provided by the retirees to continue the benefit; and

- upon entry of a final order approving the OPEB Motion and payment of the amounts due at the beginning of May 2009, the Retirees' Committee and the Association caused their appeals of the OPEB Termination Orders, including the motion to stay the effectiveness of the OPEB Termination Orders, to be voluntarily dismissed, with prejudice, and waived any and all rights to appeal the OPEB Termination Orders.

### D.    Summary Of Claims Process

The Debtors' claims administration process in these Chapter 11 Cases is at an advanced stage compared to other large, complex reorganization cases.  The Debtors have made significant progress in reconciling and allowing claims, primarily because one of the conditions in the Confirmed Plan was that the allowed or estimated amount for certain "trade and other unsecured claims" would not exceed $1.45 billion, the dollar threshold negotiated among the Debtors and the Plan Investors.

### 1.    Schedules Of Assets And Liabilities And Statements Of Financial Affairs

On January 20, 2006, the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements"). In compliance with the requirements under the Bankruptcy Code, separate Schedules and Statements were filed for the 42 debtors in the jointly-administered Chapter 11 Cases.  The Debtors filed amendments to the Schedules and Statements on February 1 and April 18, 2006, amendments for ten Debtors on October 12, 2007, an amendment for one Debtor on January 17, 2008, and amendments for ten Debtors on October 10, 2008.  The global notes and limitations with respect to the Schedules and Statements are incorporated by reference in, and comprise an integral component of, the Schedules and Statements, and should be referred to and reviewed in connection with the Schedules and Statements.

For financial reporting purposes, the Debtors, along with their subsidiaries which are not the subject of cases under the Bankruptcy Code, prepare consolidated financial statements that are filed with the SEC and that are audited annually.  Unlike the consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of each individual Debtor, except as otherwise noted.  The Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States, nor are they intended to fully reconcile to the consolidated financial statements filed by Delphi.

### 2.    Claims Bar Date

On April 12, 2006, the Bankruptcy Court entered an order (the "Bar Date Order") establishing July 31, 2006 as the general deadline for filing proofs of claim against the Debtors (the "Bar Date").  Proofs of claim were not required to be filed by any person or entity who

- agreed with the nature, classification, and amount of its Claim as described in the Schedules and Statements and whose Claim against a Debtor was not listed as "disputed," "contingent," or "unliquidated" in the Schedules,
- already filed a proof of claim against the correct Debtor,
- asserted only an administrative expense claim and not a claim otherwise subject to the Bar Date Order,
- asserted a claim solely on the basis of future pension or other post-employment benefits,

- had a claim that had been allowed by or paid pursuant to a Bankruptcy Court order,
- was the holder of certain notes, or
- held Delphi common stock.

The Bar Date Order also set a new Bar Date for claimants who might be affected by two specific events which might have occurred before or may occur after the Bar Date. First, if the Debtors amend the Schedules and Statements to reduce the undisputed, non-contingent, and liquidated amounts or to change the nature or classification of a particular Claim against a Debtor reflected therein, then the affected claimant has until 30 calendar days after such claimant is served with notice that the Debtors have amended their Schedules to file a proof of claim or to amend any previously filed proof of claim in respect of such amended scheduled claim. Second, holders of claims based on the rejection of executory contracts and unexpired leases have until the later of (i) the Bar Date or (ii) 30 calendar days after the effective date of such rejection to file a claim.

Under the Bar Date Order, any person or entity which was required to file a proof of claim, but failed to do so in a timely manner on or before the applicable Bar Date, is forever barred, estopped, and enjoined from (a) asserting any claim that such person or entity has against the Debtors that (i) is in an amount that exceeds the amount set forth in the Schedules and Statements as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules and Statements and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these Chapter 11 Cases in respect of such a claim, and the Debtors and their property will be forever discharged from any and all indebtedness or liability with respect to such a claim.

### 3. Administrative Claims Bar Date

Pursuant to the Modified Plan and the Modification Procedures, the Debtors will seek to establish July 10, 2009 as the bar date for asserting Administrative Claims that arose on or prior to June 1, 2009. The Debtors anticipate distributing a bar date notice describing the procedures for asserting an Administrative Claim that arose before June 1, 2009 with the solicitation materials. The Modified Plan also establishes a bar date for Administrative Claims arising between June 1, 2009 and the Effective Date of the Modified Plan. After the Effective Date of the Modified Plan, holders will have 30 days to submit Administrative Claims. No payments will be made on account of Administrative Claims until the claim is Allowed.

### 4. Proofs Of Claim And Other Claims

As of May 26, 2009 the Debtors had received approximately 16,850 proofs of claim, some of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. Although the Debtors have not completed the process of reconciling these proofs of claim and thus, the ultimate amount of such liabilities is not determinable at this time, the Debtors believe that the aggregate amount of claims filed is likely to exceed the amount that will ultimately be allowed by the Bankruptcy Court.

5.        *Claims Reconciliation Progress*

The Debtors have sought to resolve their claims pool on an expedited basis. With $34 billion in liquidated amounts plus certain unliquidated amounts asserted against the Debtors as of May 26, 2009 in approximately 16,850 proofs of claim, and certain scheduled liabilities for which no proof of claim was filed, the Debtors faced a challenging task. Between September 19, 2006 and May 26, 2009, the Debtors filed 33 Omnibus Claims Objections (as defined below). As of May 26, 2009, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,950 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered orders modifying approximately 3,998 claims, reducing the aggregate amounts asserted on those claims by $350 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors and their advisors devoted a significant amount of time to the claims resolution process. For example, the Debtors gained court approval of certain claims objection procedures, which are discussed in more detail below, applicable to claims that become contested when claimants respond to an omnibus objection. Pursuant to these procedures, the Debtors scheduled multiple claims for adjudication in a hearing before the Bankruptcy Court, held multiple "meet-and-confer" discussions and mediations, and ultimately resolved several contested claims during the period from October 2006 through May 26, 2009 before they were scheduled for hearing.

As of May 26, 2009 there are approximately 40 proofs of claim of the approximately 16,850 proofs of claim which still require further reconciliation by the Debtors.  The Debtors anticipate that some of these remaining proofs of claim will be withdrawn as they are reconciled and the Debtors intend to place all remaining proofs of claim that are not withdrawn on future omnibus claims objections

6.        **Key Classes Of Claims**

(a)        <u>GM Claims</u>

(i)        GM's Proof Of Claim

On July 31, 2006, GM filed an unliquidated amended proof of claim.  The claims asserted by GM included warranty/recall claims, overpricing and overpayment claims, short shipments claims, damaged goods claims, missed price reduction claims, lease and service contract claims, flowback employee post employment benefits and relocation cost claims, claims arising under the special attrition programs, UAW benefit guarantee claims, personal injury indemnification claims, environmental claims, federal, state, and other tax claims, and intellectual property claims.   For certain portions of its claim, GM provided documentation aggregating approximately $6 billion.  Under the Amended GSA, GM received a $2.5 billion allowed general unsecured claim.  In addition, certain of GM's warranty claims were settled by agreement of the parties as set forth more fully below.  Further, GM received an administrative expense claim in

an amount up to $2.055 billion arising from the IRC Section 414(l) Transfer and an administrative claim for obligations under the GM Arrangement.  As part of GM's consideration provided under the Master Disposition Agreement, at closing GM's administrative expense claim under Section 4.04(a)(i) of the Amended GSA, its administrative expense claim under the GM Arrangement, and its prepetition claim will be waived or deemed satisfied.

(ii)    Settlement Of GM Warranty Claims

GM asserted that it incurred costs and suffered damages arising from certain customer warranty claims and/or recall campaigns related to allegedly non-conforming parts and systems supplied by Delphi to GM.  These claims were not subject to the general settlement with GM as documented in the Original GSA and Original MRA.  During separate negotiations to resolve the warranty claims, GM advised Delphi that the amount of certain warranty claims had substantially increased from those asserted in GM's proof of claim.

On September 27, 2007, the Bankruptcy Court granted Delphi's motion to enter into and perform under a settlement agreement resolving the warranty claims (the "Warranty Settlement Agreement") with GM for a total estimated amount of approximately $200 million.  With certain limited exceptions, the agreement (i) settles all outstanding warranty claims and issues related to a component or assembly supplied by Delphi to GM that are (a) known by GM as of August 10, 2007, (b) determined by GM to be Delphi's responsibility in whole or in part, and (c) managed in GM's investigation process, and (ii) limits the liability related to certain other warranty claims that have become known by GM on or after June 5, 2007.  Under the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007 (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million as of the date of the Warranty Settlement Agreement or GM believed the claim would exceed $1 million, (iii) the claim, as of the date of the Warranty Settlement Agreement, was in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed as of the date of the Warranty Settlement Agreement, or reasonably should have believed at that time, that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it expected to receive payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Confirmed Plan, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, which favorably impacted Delphi's operating income in July 2008 by $112 million.

(b)    Environmental And Other Regulatory Claims And Investigations

Delphi is subject to the requirements of U.S. federal, state, local, and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating water discharge, waste management, and cleanup of contaminated sites.  Delphi has

an environmental management structure designed to facilitate and support its compliance with these requirements. Historically, Delphi has tried to comply with all such requirements and regulations, although the Debtors cannot provide assurance that they are at all times in compliance. The Debtors have made and will continue to make expenditures to comply with environmental requirements. Environmental requirements are complex, change frequently, and have tended to become more stringent over time. Accordingly, the Debtors cannot assure that environmental requirements will not change or become more stringent over time or that the Debtors' or the Reorganized Debtors (to the extent certain liabilities are not discharged) eventual environmental cleanup costs and liabilities will not be material.

Delphi is also subject to complex laws governing the protection of the environment and requiring investigation and cleanup of environmental contamination. Delphi is in various stages of investigation and cleanup at its manufacturing sites where contamination has been discovered. Additionally, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont Barrel Fill Site located in Tremont City, Ohio. In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures, possibly as much as $11-15 million in excess of existing reserves. Delphi believes, however, that this liability, among others, will be discharged pursuant to the Modified Plan. Delphi will continue to reassess any potential costs and, as appropriate, its environmental reserve as the investigation proceeds.

When it has been possible to provide reasonable estimates of Delphi's liability with respect to environmental sites, provisions have been made in accordance with U.S. GAAP. As of March 31, 2009, Delphi's reserve for such environmental investigation and cleanup was approximately $103 million. The majority of that liability will be discharged. Also as of March 31, 2009, Delphi believes that Reorganized DPH Holdings Co. will incur approximately $32 million in clean up costs at certain domestic sites. These liabilities may not be subject to discharge and even if subject to discharge, Reorganized DPH Holdings Co. might be subject to the same liability to the extent it is the owner or operator of such sites. Nevertheless, Delphi cannot ensure that U.S. environmental requirements will not change or become more stringent over time or that Reorganized DPH Holdings Co.'s eventual environmental cleanup costs and liabilities in the U.S. will not exceed the foregoing amount. Moreover, facility sales and/or closures relating to the restructuring process could trigger additional and perhaps material environmental remediation costs, as previously unknown conditions may be identified.

Environmental Obligations will either be treated in accordance with the Master Disposition Agreement, retained by Reorganized DPH Holdings Co., or discharged under the Modified Plan.

(c)    Workers' Compensation Claims

In many states where the Debtors conduct business, the Debtors self-insure their workers' compensation programs and, as required by state law, have obtained letters of credit for the benefit of the states in the event that the Debtors default on their obligations to pay workers compensation claims.  Certain states in which the Debtors are self-insured have filed contingent claims for repayment in the event that the Debtors do not satisfy prepetition workers' compensation liabilities.  If the Debtors default on such obligations, such states may allege that their claims for recovery of payments made to workers should be entitled to priority treatment by characterizing such claims as "excise taxes" under section 507(a)(8) of the Bankruptcy Code.  In addition, certain employees who filed contingent claims on account of workers' compensation payments they are receiving may, upon a default by the Debtors, assert that they are entitled to priority under section 507(a)(3) or (4).

The Debtors estimate that allowed claims asserted by states, if any, on account of contingent workers' compensation claims would be in amounts less than $10 million.  First, only a few states filed such claims on or prior to the Bar Date and the Debtors believe that, in the event they are determined to be excise taxes, such priority treatment would be limited to payments for injuries that occurred within three years of the commencement of the Chapter 11 Cases.  Second, priority treatment for timely claims asserted by individuals, in the event they are determined to be employee wage or benefit claims under 507(a)(3) or (4) are capped at $10,000 per individual, and the Debtors have made  payments to employees, including without limitation, workers' compensation payments to employees throughout the duration of the Chapter 11 Cases, in amounts that the Debtors believe likely exhausts the cap.  To the extent asserted workers' compensation claims are administrative expense claims related to their respective acquired assets, such claims will be assumed by one of the Buyers pursuant to the Master Disposition Agreement with remaining administrative claims to be retained and paid by DPH Holdings Co.  Any prepetition claims not barred by the Bar Date will be satisfied through the application of existing letters of credit, pursuant to the treatment set forth for either of the priority classes, or as set forth in Article 5.3 for allowed prepetition general unsecured claims, and will be discharged pursuant to the Modified Plan.  To the extent no timely claim has been filed, such liabilities are barred by the Bar Date Order and will be discharged pursuant to the Modified Plan.

## 7.    Reclamation Claims Program

On November 4, 2005, the Bankruptcy Court approved global procedures for receiving, reviewing, responding to, and resolving reclamation demands.  The Debtors received thousands of reclamation demands, including duplicate demands.  Due to the high volume of reclamation demands received by the Debtors, the Bankruptcy Court granted the Debtors a 45-day extension of the deadline to reconcile all reclamation claims.  After reviewing these demands, the Debtors identified 855 non-duplicate reclamation demands with a total face amount of approximately $282.7 million.

To facilitate the review process of these 855 reclamation demands and the requirement to respond to all reclamation demands within 135 days, the Debtors developed a comprehensive process for responding to all such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim amounts subject to certain reserved defenses.  Reclamation

response statements were sent to all 855 claimants on February 21, 2006. These statements, representing the results of many hours of review of invoices and billing records, identified total reclamation claims of approximately $18.4 million. Since that time as a result of additional negotiations and reconciliations, the current amount of reclamation claims has been reduced to approximately $17.5 million. As a result of almost continual negotiations with reclamation claimants since the Petition Date, 840 of the original 855 non-duplicate claims have now been resolved, subject to reservation of further defenses. Of the 840 resolved reclamation claims, 505 reclamation claims asserting an aggregate amount of approximately $163 million have been resolved in the amount of zero.

On June 5, 2009, the Debtors filed a motion seeking a judicial determination that the remaining 350 reclamation claims are subject to the Debtors' reserved defense that reclamation claims are not entitled to administrative priority status on the grounds that the goods and/or the proceeds from the sale of the goods for which claimants are seeking a reclamation claim are or were subject to a valid security interest (the "Prior Lien Defense"). By this motion, the Debtors sought entry of an order classifying these 350 reclamation claims as general unsecured nonpriority claims for all purposes, including for purposes of distribution under the Modified Plan. Creditors holding reclamation claims will not receive any voting rights on the Modified Plan on account of their reclamation claims but instead will receive voting rights provided for holders of general unsecured claims.

### E.    Professional Fees

At the commencement of these Chapter 11 Cases, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Compensation Order"). The Compensation Order requires professionals retained in these cases to submit monthly fee statements to the Debtors and requires the Debtors to pay 80% of the requested fees and 100% of the requested expenses pending interim approval by the Bankruptcy Court. The remaining 20% of fees requested in such fee statements are paid only upon further order of the Bankruptcy Court (the "Holdback"), which authority has been granted for the first six interim fee periods. The Compensation Order requires the professionals retained in these Chapter 11 Cases to file applications for approval of their fees and expenses for the preceding four-month period approximately every four months.

To monitor costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Chapter 11 Cases, the Debtors, the Creditors' Committee, and the U.S. Trustee negotiated the formation of a joint fee review committee (the "Fee Review Committee") to review, comment on, and, if necessary, object to the various fee applications filed in these Chapter 11 Cases. On May 5, 2006, the Bankruptcy Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the committee, its composition, mandate, and procedures. The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee. On August 17, 2006, the Bankruptcy Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc. as a fee analyst to assist the Fee Review Committee.

The fees approved by the Bankruptcy Court through September 30, 2007 for the Debtors', Creditors' Committee's, and Equity Committee's professionals, and estimated fees and expenses

for the seventh interim fee application period (October 1, 2007 through January 25, 2008), are as follows:

| Period | Dates | Fees | Expenses |
|---|---|---|---|
| First Interim Fee Application Period | 10/8/2005 – 1/31/2006 | $40,116,406 | $2,295,873 |
| Second Interim Fee Application Period | 2/1/2006 – 5/31/2006 | $56,680,150 | $4,081,250 |
| Third Interim Fee Application Period | 6/1/2006 – 9/30/2006 | $49,362,582 | $4,307,390 |
| Fourth Interim Fee Application Period | 10/1/2006 – 1/31/2007 | $49,295,947 | $3,358,907 |
| Fifth Interim Fee Application Period | 2/1/2007 – 5/31/2007 | $62,762,634 | $4,479,310 |
| Sixth Interim Fee Application Period | 6/1/2007 – 9/30/2007 | $45,342,099 | $3,302,078 |
| Seventh Interim Fee Application Period (Estimated) | 10/1/2007-1/25/2008 | $52,605,998 | $4,021,795 |

All fee applications filed in these cases are subject to final approval by the Bankruptcy Court. Pursuant to paragraph 33 of the Confirmation Order post-confirmation fees and expenses incurred are being paid in the ordinary course of business. Accordingly, the Fee Review Committee has not been active since the period following the entry of the Confirmation Order.

## IV.    SUMMARY OF THE MODIFIED PLAN

This section provides a summary of the Modified Plan, including:

- A discussion of the settlements embodied in the Modified Plan

- The classification and treatment of claims and interests

- The operative provisions of the Modified Plan, including the means for electing the board of directors of the reorganized Company, claims reconciliation and distributions, and releases of the Debtors and certain third parties

Key modifications to this section include:

- Changes to plan consideration to be received by unsecured creditors and equity security holders, including the elimination of postpetition interest on unsecured claims

- Procedures for appointment of the initial board of directors of the reorganized Company

- Adjustments to the claims reconciliation, distribution, and cure mechanics

- The elimination of releases and exculpation for the Plan Investors

### A.    Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its

creditors, and its shareholders.  In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtors and its assets.  In furtherance of these goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and may terminate all rights and interests of equity security holders.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE MODIFIED PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MODIFIED PLAN, WHICH ACCOMPANIES THIS SUPPLEMENT, AND TO THE EXHIBITS ATTACHED TO THE MODIFIED PLAN.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS SUPPLEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE MODIFIED PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS SUPPLEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE MODIFIED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE MODIFIED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE MODIFIED PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE MODIFIED PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST.  PLEASE TAKE NOTICE THAT YOUR PREVIOUS ACCEPTANCE OR REJECTION OF THE CONFIRMED PLAN WILL NOT BE COUNTED. THUS, TO THE EXTENT YOU WANT TO VOTE ON THE MODIFIED PLAN, YOU MUST RETURN A BALLOT.

### B.    Overall Structure Of The Modified Plan

If the modifications to the Confirmed Plan are approved by the Bankruptcy Court and consummated, (1) the Claims in certain Classes may be reinstated or modified and will receive distributions equal to the full amount of such Claims and (2) the Claims and Interests in other Classes will be modified or extinguished and will receive distributions in exchange for such Claims and Interests.  At certain times after the Effective Date, the Reorganized Debtors will distribute Cash or other consideration in respect of certain Classes of Claims and Interests as provided in the Modified Plan.  The Classes of Claims against and Interests in the Debtors created under the Modified Plan, the treatment of those Classes under the Modified Plan, and the securities and other property to be distributed under the Modified Plan are described below.

### 1.    Settlements During The Chapter 11 Cases

The foundation of Delphi's restructuring is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes.  The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, the DIP Lenders, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, and the PBGC (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries, as further modified, of the various holders of claims and interests under the Modified Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Modified Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests.  The Debtors also believe that the recoveries provided to holders of Claims under the Modified Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements.  Although certain of the Settlements have already become effected, others will be effected upon consummation of the Modified Plan.  In addition, the Amended MRA will be terminated pursuant to and superseded by the Master Disposition Agreement.

The claims and disputes being resolved by the Settlements include, among others:

- Resolution, including through the Amended GSA and Amended MRA, as modified by the Master Disposition Agreement, of Delphi's potential claims against GM, the risk with respect to continuity of supply to GM, the Statutory Committees' request to prosecute such claims, and GM's administrative claims and proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor Unions.

- The claims and causes of action asserted by various plaintiffs against certain defendants including the Debtors in the Multidistrict Litigation in the United States District Court for the Eastern District of Michigan.

- The claims that could be asserted and the liens that are asserted by the PBGC in connection with Delphi's hourly and salaried pension plans to the extent such liabilities are not transferred to GM or Parnassus.

- As described more fully below, the claims of the DIP Lenders and the effectuation of the DIP Transfer under the Modified Plan in satisfaction of the DIP Lender claims.

The substance of each of the Settlements is discussed elsewhere in this Supplement or in the Disclosure Statement. Although the Settlement Negotiation Parties disagree over the relative strengths and weaknesses of the claims and potential defenses asserted by certain parties to the Settlements and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the claims and disputes is crucial to confirmation of any plan. Clearly, any litigation concerning the settled matters would be exceptionally complicated and protracted, and given the magnitude of the values involved and the amount of claims at stake, would be hotly contested and expensive. Such litigation would in turn substantially prolong these Chapter 11 Cases, which all constituencies believe is not in the best interests of the Estates. For these reasons, the Debtors believe that the Settlements reached among the Settlement Negotiation Parties are in the best interests of the Estates and all stakeholders.

## 2.    *DIP Transfer*

A predicate to the consummation of the Modified Plan is the deemed occurrence of the DIP Transfer in full satisfaction of the DIP Lenders Claims. As previously described, in negotiating the DIP Credit Agreement, the Debtors, the Agent, and the DIP Lenders agreed to certain provisions that authorized the Agent to act upon the instruction of the Required Lenders, which are the majority of the two most senior tranches of the DIP facility, for the benefit of all the DIP Lenders. This negotiated provision was consented to by all the DIP Lenders. Accordingly, individual lenders do not have the right to enforce remedies individually under the DIP Credit Agreement, but rather remedies can only be enforced through collective action. Specifically, the parties agreed that, if an Event of Default (as defined in the DIP Credit Agreement) were to occur, the Administrative Agent may, and upon the request of Required Lenders is required to, exercise the various rights and remedies permitted under section 7.01 of the DIP Credit Agreement. Accordingly, the DIP Credit Agreement gave the two most senior tranches of lenders the right to vote to direct the Administrative Agent to take certain actions in response to an Event of Default. The tranche of lenders most junior in priority consented to delegating these rights.

Because the DIP Lenders have all consented to the intercreditor arrangement among themselves, either through direct consent or by purchasing a portion of the debt covered by the DIP Credit Agreement, the Debtors believe that all DIP Lenders are bound by the Administrative Agent's exercise of remedies, including actions to assert control over property and interests under the Uniform Commercial Code, as adopted by the state of New York, in satisfaction of the DIP Claims. In fact, the Bankruptcy Court generally endorsed the Debtors' collective action interpretation of the DIP Credit Agreement when it approved the Accommodation Agreement over the objection of certain participants. In the current economic environment, the Debtors are

expecting a similar reaction to the Debtors' and the DIP Lenders' negotiated transfer or sale of collateral (the "Transferred Assets") under the Modified Plan (the "DIP Transfer"). The DIP Transfer is not expected to garner unanimous support of the DIP Lenders. Nevertheless, the DIP Lenders consented to the collective action principles contained in the DIP Credit Agreement and therefore only the Administrative Agent may enforce remedies – and at the direction of the Required Lenders, the Administrative Agent must enforce remedies. Pursuant to the Modified Plan, the Administrative Agent will be deemed to have exercised its enforcement rights by pursuing remedies under Article 9 of the UCC in full satisfaction and discharge of the DIP Lenders Claims. Because the DIP Lenders consented to this enforcement right, among others, the Debtors will have satisfied the requirement set forth in section 1129(a)(9) of the Bankruptcy Code. In accordance with the requirements of Section 9-620 of the UCC, the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement. If a Subordinated Person objects to such notice within 20 days, the Debtors will provide those parties who are notified of the proposed transfer under Section 9-620 of the UCC with 10 days notice of a public sale pursuant to Section 9-610 of the UCC. Such notice also will set forth the procedures to be employed in connection with the public sale. Parties will then have an opportunity to purchase such the transferred assets in a public sale conducted in accordance with Section 9-610 of the UCC and the procedures set forth in the notice, but only if such parties' offer is selected as the highest or otherwise best competing proposal.

As shown in the diagram below, the first step in consummation of the Modified Plan is the issuance of one share of Reorganized DPH Holdings Co. common stock to the Post-Confirmation Trust and the cancellation of Existing Common Stock. Next, certain of Delphi's assets will be sold to Parnassus and other assets to GM pursuant to the Master Disposition Agreement. Then, the Administrative Agent will consummate the DIP Transfer to accept from the Reorganized Debtors certain of the proceeds from the sale of assets, specifically, the DIP Consideration, in satisfaction of the DIP Claims. Should an objection to the transfer be made or should an alternate party provide a competing proposal providing sufficient consideration whereby, at a minimum, the DIP Lenders would receive payment in cash for their claims, a disposition proceeding would be held. On the Effective Date, either the Administrative Agent or the party providing the competing proposal with the highest value, as applicable, will receive the disposition proceeds. In the event a competing proposal bests the amount of the DIP Lenders' credit bid, after payment of the DIP Claims in full and to the extent there are sufficient proceeds remaining, additional distributions would be made to creditors in compliance with the absolute priority rule. Also on the Effective Date, the Debtors would make provisions for the payment of Administrative Claims (excluding such claims to be assumed by third parties). Further, the Debtors will establish a distribution account for certain deferred consideration under the Master Disposition Agreement from which distributions will be made as described below.



Following the effectiveness of the Modified Plan, Reorganized DPH Holdings Co. will operate the retained sites. In addition, Reorganized DPH Holdings Co. will make distributions to holders of secured, priority, and unsecured claims, as set forth in detail below.

## C.    Substantive Consolidation Of Certain Debtors

The Modified Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' Estates for purposes of all actions associated with confirmation and consummation of the Modified Plan. The Court may order substantive consolidation in the exercise of its general equitable discretionary powers under section 105(a) of the Bankruptcy Code to ensure the equitable treatment of creditors. The effect of substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund. The Debtors in a particular consolidated Debtor group will be substantively consolidated with each other but not with any other Debtor.

Specifically, under the Modified Plan, the groups of Debtors that will be substantively consolidated with each other and the individual non-consolidated Debtors are as set forth in the diagram below. Each Debtor entity is labeled in the appropriate Debtor group color according to the key on the diagram, and is identified by the number of the group as set forth in the legend below.



In considering whether substantive consolidation of any of the Estates was appropriate, Delphi evaluated whether creditors relied on the separate existence of a particular Debtor when extending credit to that Debtor and whether the financial affairs of any of the Debtors were hopelessly entangled. Taking these and other factors into account, the Debtors determined that on balance, substantive consolidation of the Estates of the Delphi-DAS Debtors (Group 1), the DASHI Debtors (Group 2), the Connection Systems Debtors (Group 3), and the Specialty Electronics Debtors (Group 4) under the Modified Plan is appropriate and in the best interests of the Company's creditors. Moreover, the Debtors concluded that any harm their creditors may suffer from such substantive consolidation is negligible in light of the distributions that such creditors will receive under the Modified Plan.

On the Confirmation Date, and in accordance with the terms of the Modified Plan and the consolidation of the assets and liabilities for voting and distribution purposes of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics

Debtors, respectively, all Claims based upon guaranties of collection, payment, or performance made by the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, as to the obligations of another of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be released and of no further force and effect. Notwithstanding the foregoing, but subject to the Disposition Transactions, the Debtors reserve all rights with respect to their position on substantive consolidation as to any or all of the Debtors.

As part of the Confirmation Order, the Bankruptcy Court approved the Debtors' request for substantive consolidation as outlined above. The Debtors intend to seek the same approval of that substantive consolidation in connection with the Modified Plan. Thus, notwithstanding that the Bankruptcy Court has approved the substantive consolidation of certain of the Debtors' Estates in the Confirmation Order, the Modified Plan will serve as, and will be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If no proper objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served as provided in the Modification Procedures Order, or such other date as may be established by the Bankruptcy Court, the Modification Approval Order will serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Plan, and any objections thereto will be part of the Final Modification Hearing. The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such a hearing.

### D. Classification Of Claims And Interests

#### 1. The Debtors

There are a total of 42 Debtors. For the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors, and for balloting purposes, each Debtor or consolidated group of Debtors has been assigned its own number, as set forth in the chart below. The Claims against and Interests in each Debtor, in turn, have been assigned to separate lettered Classes with respect to each Debtor, based on the type of Claim involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted (or in whom such Interest is held) and the type of Claim or Interest in question. The numbers applicable to the various Debtors or consolidated groups of Debtors are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
| --- | --- |
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|------------------------------------------|
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

## 2. *Classification Of Claims Against And Equity Interests In The Debtors*

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of such class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

Claims against and Interests in each of the Debtors are divided into lettered Classes. Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appears in the case of each Debtor. For purposes of voting, claims within the Class will be counted for each applicable Debtor or group of consolidated Debtors. Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests will be grouped under the appropriate lettered Class from the following list:

Class A-1 — Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors.

Class B — Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors.

Class C-1 — Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors.

Class C-2 — Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors.

Class D — Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors.

Class E — Class E consists of all Section 510(b) Note Claims against Delphi Corporation.

| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi Corporation. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors. |
| Class I | Class I consists of all Other Interests in Delphi Corporation. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |
| Class K | Class K consists of all Other Priority Claims. |

The Debtors believe that they have classified all Claims and Interests in compliance with the requirements of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Modified Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make reasonable modifications of the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation.

EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE MODIFIED PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE MODIFIED PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS IN WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

### E.    Treatment Of Claims And Interests Under The Modified Plan

The classification and treatment of Claims against and Interests in the various Debtors are set forth in detail in the Modified Plan. A summary is provided below.

#### 1.    Treatment Of Unclassified Claims

##### (a)    Administrative Claims

An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

Subject to the Master Disposition Agreement and the provisions of the Modified Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim have agreed upon in writing; except that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim will be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim have agreed upon in writing or as determined by the Bankruptcy Court, which Claims will be satisfied in accordance with Article X of the Modified Plan, (y) holders of hedging claims arising under the DIP Facility will receive the treatment described in the Master Distribution Agreement, and (z) the holder of an Administrative Claim must have filed a proof of claim form no later than July 10, 2009, pursuant to the procedures described in Article 10.2 of the Modified Plan and the Modification Procedures Order, and such Claim must have become an Allowed Claim.    For the avoidance of doubt, the GM Administrative Claim will receive the treatment set forth in Article 2.3 of the Modified Plan.

At the June 10, 2009 hearing on modifications to the Confirmed Plan, certain of the DIP Lenders and the DIP Agent reserved their rights with respect to the Debtors' proposed treatment of the DIP Claims described above and disputed whether such treatment could constitute payment in full, absent Required Lender consent.    Certain DIP Lenders also assert that the transactions proposed in the Master Disposition Agreement and the Modified Plan would require DIP Lender consent to release the liens on the Debtors' collateral that were granted pursuant to the order approving the DIP Credit Agreement.    The Debtors disagree with these stated positions.

(b)    Priority Tax Claims

Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim will be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) of this paragraph, or (iii) payment in full in Cash, except that holders of Priority Tax

Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement will be treated in the manner set forth in the Master Disposition Agreement.

(c)    GM Administrative Claim

For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Delphi-GM Global Settlement Agreement, GM has received and will receive allowed administrative expense claims of no more in the aggregate than $2.055 billion (the "GM 414(l) Administrative Claim").    Upon the Effective Date and the consummation of the Master Disposition Agreement, GM will waive and release the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim, and GM will accordingly receive no distribution on account of such claims.

## 2.    Treatment Of Classified Claims And Interests

Pursuant to section 1127 of the Bankruptcy Code, as it incorporates section 1122, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Modified Plan and of receiving distributions pursuant to the Modified Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.   In accordance with section 1127 of the Bankruptcy Code, as it incorporates section 1123(a)(1), Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth above.  The Modified Plan, though proposed jointly, constitutes a separate plan proposed by each of the consolidated groups of Debtors and each of the Debtors individually within each group.    Therefore, except as expressly specified herein, the classifications set forth below will be deemed to apply separately with respect to each plan proposed by each such consolidated Debtor group.

### (a)    Classes Of Claims That Are Unimpaired

(i)    Class B (Flow-Through Claims).

Class B consists of all Flow-Through Claims that may exist against a particular Debtor. A "Flow Through Claim" means a claim arising from an Employee-Related Obligation, except that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.

The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, will be unaltered by the Modified Plan and will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor  is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which will be fully preserved), except that any Flow Through Claim assumed pursuant to the Master Disposition Agreement will receive the treatment specified therein.  The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases will be without prejudice to a Reorganized Debtor's right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court or other court of competent jurisdiction.

(ii)    Class J (Interests In Affiliate Debtors).

Class J consists of all Interests in Affiliate Debtors.  "Interests in Affiliate Debtors" means the legal, equitable, contractual, and other rights of any Person with respect to any equity securities of, or ownership interests in the Affiliate Debtors.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions or the Master Disposition Agreement, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Modified Plan.

(iii)    Class K (Other Priority Claims).

Class K consists of all Other Priority Claims.  "Other Priority Claims" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**(b)**    **Classes Of Claims That Are Impaired**

(i)    Class A-1 (Secured Claims).

Class A-1 consists of All Secured Claims that may exist against the applicable Debtor.  A "Secured Claim" means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, or  DIP Facility Second Priority Term Claim, that is secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

Except as otherwise provided in and subject to Article 9.8 of the Modified Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim will receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date plus 200 basis points (the "Secured Claim Interest Rate"), and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall have accrued at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Secured Claim; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as to which the Debtors or Reorganized Debtors, as the case may be, and the holder of such Allowed

Secured Claim have agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, with respect to the treatment in clause (i) and clause (iii) above, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied pursuant to the Modified Plan; except that such holder of an Allowed Secured Claim will be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtors are in compliance with Article 5.1 of the Modified Plan. To the extent the Debtors or the Reorganized Debtors elect the treatment set forth in clause (ii) above, all valid liens will be discharged and otherwise satisfied upon the receipt of the claimant's collateral by the holder of such Allowed Secured Claim.

(ii)     Class C-1 (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor.  The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Contingent PBGC Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

On the Effective Date, the Disbursing Agent will establish a distribution account to hold the proceeds, if any, of the General Unsecured MDA Distribution.  Except as otherwise provided in and subject to Articles 9.8 and 11.10 of the Modified Plan, commencing on the first Periodic Distribution Date occurring after the later of (i) the date when the proceeds of the General Unsecured MDA Distribution may be distributed to holders of General Unsecured Claims, (ii) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim, or (iii) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the proceeds of the General Unsecured MDA Distribution.  In addition, if applicable, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the proceeds of the General Unsecured MDA Distribution held in the Supplemental Distribution Account, except that no distribution from the Supplemental Distribution Account will be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient.  Distributions made pursuant to Articles 5.3, 5.4, 5.5, and 11.10 of the Modified Plan will be in complete satisfaction of all obligations of GM under Section 4.04 of the Delphi-GM Global Settlement Agreement.

(1)     Future Distributable Value

As mentioned above, holders of unsubordinated allowed General Unsecured Claims (including the PBGC's allowed claim) will receive their pro rata share of deferred consideration in accordance with the Master Disposition Agreement.  Pursuant to section 3.2.3 of the agreement,  certain distributions will be made to holders of General Unsecured Claims if the transfer of assets as contemplated in the Master Disposition Agreement is implemented pursuant to the Debtors' Modified Plan.  The distributions to holders of General Unsecured Claims will commence once an aggregate amount of $7.2 billion has been distributed to holders of interests in Parnassus (which amount does not include the 8% mandatory payments made to the holders of Parnassus Class C Interests).  The operating agreement of Parnassus governs the terms of distributions made to holders of interests in Parnassus.  When the $7.2 billion distribution level is reached, Parnassus will pay an amount equal to $3 to holders of General Unsecured Claims for every $97 dollars distributed to holders of interests in Parnassus.  The maximum amount that will be distributed to the holders of General Unsecured Claims is $180 million.  If the full $180 million is distributed to holders of General Unsecured Claims, the total distributions made to holders of interests of Parnassus would be approximately $13 billion.  These recoveries, however, are not guaranteed and there can be no assurance that they will be realized.

(2)    Liens Arising From Indenture Trustee Fees

The Debtors will seek to reach a resolution regarding the Indenture Trustee Fees but absent a settlement, the distribution to Senior Noteholders will be subject to the Indenture Trustee's liens which could materially reduce recoveries to holders of senior debt.

(3)    Satisfaction Of TOPrS' Subordination Provisions

The Indenture with respect to the Trust Preferred Securities, or TOPrS, dated as of October 28, 2003 (the "TOPrS Indenture"), provides that the TOPrS are subordinated to "Senior Debt."  "Senior Debt" is defined as any obligation of Delphi Corporation to its creditors other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the TOPrS, (ii) obligations evidenced by the TOPrS, and (iii) obligations that are expressly stated in the terms of the TOPrS (or in the TOPrS Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 of the TOPrS  Indenture with respect to such TOPrS) not to be Senior Debt.  In this regard, Delphi covenanted in the TOPrS Indenture that the TOPrS are subordinate and junior in right of payment to all Senior Debt to the extent provided therein, and each holder of the TOPrS covenanted and agreed to the subordination therein provided.

Article 17.01 of the TOPrS Indenture also provides that, in the event that Delphi shall default on any Senior Debt, no payments shall be made on account of the TOPrS until such default is cured, waived, or shall cease to exist and, in the event of a bankruptcy proceeding all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property (other than securities of Delphi or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the TOPrS, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) which would otherwise

(but for subordination) be payable or deliverable in respect of the TOPrS shall be paid or delivered directly to the Holders of Senior Debt until all Senior Debt shall have been paid in full. This subordination provision essentially provides that, should any payment be made to the TOPrS holders prior to payment in full of Senior Debt (except for certain securities as set forth above), those assets paid shall be held in trust for and turned over to the Senior Debt holders.

The TOPrS Indenture provides that Senior Debt shall not be deemed to have been paid in full unless the holders thereof receive cash, securities, or other property equal to the amount of such Senior Debt then outstanding. Once Senior Debt is paid in full, the holders of the TOPrS are subrogated to Senior Debt's rights to receive further distributions. Distributions to holders of TOPrS Claims will be reallocated and redistributed to holders of other General Unsecured Claims, including Senior Debt.

(iii)    Class C-2 (PBGC Claims)

Class C-2 consists of the Contingent PBGC Secured Claim and the PBGC General Unsecured Claim. A "Contingent PBGC Secured Claim" means any Claim of the PBGC asserted against the applicable Debtors or group of Debtors, which Claims were granted conditional adequate protection liens pursuant to the Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfer Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694) and the Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 And Cash Management Order Authorizing DASHI To Grant Adequate Protection to Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated July 30, 2008 (Docket No. 14005). The phrase "PBGC Unsecured Claim" means any Claim of the PBGC against the applicable Debtors or group of Debtors arising from or relating to the Pension Plans that are not secured by valid, perfected, and enforceable liens against the assets or property of the Debtors.

Pursuant to Article 7.17 of the Modified Plan, and except as otherwise provided in and subject to Articles 9.8 and 11.10 of the Modified Plan, the PBGC will receive, on the Distribution Date on account of its PBGC Claims in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed PBGC Claims, the treatment set forth in Article 7.17 of the Modified Plan.

(iv)    Class D (GM Unsecured Claim).

Class D consists of the GM Unsecured Claim that may exist against a particular Debtor. The phrase "GM Unsecured Claim" means any Claim of GM, excluding the GM Administrative Claim, and all other Claims and amounts to be treated pursuant to the Master Distribution Agreement, but will otherwise include all claims asserted in GM's proof of claim, and was allowed in the amount of $2.5 billion upon the effectiveness of the Amended GSA.

In full settlement, satisfaction, and release of the GM Unsecured Claim, GM will receive releases provided for in section 4.01 of the Amended GSA.

(v)    Class E (Section 510(b) Note Claims).

Class E consists of all Section 510(b) Note Claims that may exist against a particular Debtor.  A "Section 510(b) Note Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

Holders of Section 510(b) Note Claims will not be entitled to, and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) Note Claims.

(vi)    Class F (Intercompany Claims).

Class F consists of all Intercompany Claims that may exist against a particular Debtor. An "Intercompany Claim" means a Claim by a Debtor, an Affiliate of a Debtor, or a non-Debtor Affiliate against another Debtor, Affiliate of a Debtor, or non-Debtor Affiliate.

On the Effective Date, and subject to the Master Disposition Agreement, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, will not receive a distribution on the Effective Date and instead will either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Modified Plan.

(vii)    Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

On the Effective Date, the Existing Common Stock will be cancelled and extinguished. The holders of Existing Common Stock will not be entitled to, and will not, receive or retain any property or interest on account of such Existing Common Stock.

As more fully set forth on the record of the hearing held on December 6, 2007, a reservation of rights was placed on the record regarding the Equity Committee's assertion of claims, interests, defenses, and offsets against any and all holders of equity in these Chapter 11 Cases solely within Class 1G-1 with respect to the allocation of consideration among holders of Existing Common Stock based on the facts and circumstances in these Chapter 11 Cases and a reciprocal reservation of legal, equitable, contractual, and other rights, including rights under the Investment Agreement, was placed on the record regarding the rights reserved by the Plan Investors with respect to the reservation of rights by Equity Committee.

(viii)    Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims.  "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

Holders of Section 510(b) Equity Claims, will not be entitled to, and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) Equity Claims.

(ix)    Class H (Section 510(b) ERISA Claims).

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

The ERISA Settlement disbursing agent, on behalf of all holders of Section 510(b) ERISA Claims, will not be entitled to and will not receive or retain any property or interest in property pursuant to the Modified Plan on account of the Section 510(b) ERISA Claims.

(x)    Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

**F.    Means For Implementation Of The Modified Plan**

*1.    Continued Corporate Existence*

Subject to the Restructuring Transactions and Disposition Transactions contemplated by the Modified Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated by the Modified Plan and the Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases. The continued existence, operation, and ownership of such non Debtor Affiliates is a material component of the business of the Debtors and Reorganized Debtors, as applicable, and, as set forth in Article 11.1 of the Modified Plan but subject to the Restructuring Transactions and Disposition Transactions, all of the Debtors' equity interests and other property interests in such non Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

### 2.    *Restructuring Transactions*

On or following the Modification Approval Date, the Debtors, Reorganized DPH Holdings Co., or the Reorganized Debtors, as the case may be, will take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Restructuring Transaction Notice, including, but not limited to, all actions necessary to execute the Disposition Transactions and any other transactions described in the Modified Plan.  Such actions may include without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Modified Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Modified Plan; (c) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions.  The form of each Restructuring Transaction will be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction.

In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger will cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each merged Debtor under the Modified Plan.  In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) will assume and perform the obligations of such liquidating Debtor.  Implementation of the Restructuring Transactions will not affect the distributions under the Modified Plan.

### 3.    *Certificate Of Incorporation And Bylaws*

The Certificate of Incorporation of Reorganized DPH Holdings Co., substantially in the form attached to the Modified Plan as Exhibit 7.4(a), and Bylaws of Reorganized DPH Holdings Co., substantially in the form as attached to the Modified Plan as Exhibit 7.4(b), will be adopted and amended as may be required so that they are consistent with the provisions of the Modified Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Each Affiliate Debtor will amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 4.    Directors And Officers Of Reorganized HoldCo And Affiliate Debtors

The Debtors will file a notice listing the officers and directors of Reorganized DPH Holdings Co. no later than the Exhibit Filing Date.  Unless the Debtors otherwise file a notice on or prior to the Final Modification Hearing, the existing directors and officers of the Affiliate Debtors will continue to serve in their current capacities after the Effective Date.

### 5.    Consummation Of Disposition Transactions

#### (a)    Disposition Transactions To Occur On Effective Date

On the Effective Date, the Debtors will consummate the Disposition Transactions, pursuant to which, among other things, (i) the GM Acquired Assets including the GM Assumed Contracts will be transferred to GM Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, (ii) the Parnassus Acquired Assets including the Parnassus Assumed Contracts will be transferred to Parnassus free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, and (iii) the DIP Lenders will effectuate the DIP Transfer.

#### (b)    Sequence Of Effectuating Disposition Transactions

For purposes of implementing the Disposition Transactions on the Effective Date, such transactions will be deemed to occur on the Effective Date in the following order:  (i) Delphi's Existing Common Stock shall be cancelled and New Common Stock of Reorganized DPH Holdings shall be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust, (ii) Reorganized DPH Holdings will sell, transfer, assign, convey, and deliver all assets required to be delivered under the Master Disposition Agreement to the Buyers for the consideration described in the Master Disposition Agreement, and (iii) the DIP Lenders will effectuate the DIP Transfer.

### 6.    Master Disposition Agreement

#### (a)    Approval Of Master Disposition Agreement

The Modified Plan constitutes a request to authorize and approve the Master Disposition Agreement attached to the Modified Plan as Exhibit 7.7.

#### (b)    Sale Of Assets To GM Components

Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors will consummate the transfer, free and clear of any Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to the GM Buyer of the GM Acquired Assets, the GM Assumed Contracts and the GM Assumed Liabilities.

(c)        Sale Of Assets To Parnassus

Pursuant to the terms of the Master Disposition Agreement, section 1123(a)(5) of the Bankruptcy Code and the Modification Approval Order, on the Effective Date, the Debtors will consummate the transfer, free and clear of any Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to Parnassus of the Parnassus Acquired Assets, the Parnassus Assumed Contracts, and the Parnassus Assumed Liabilities.

## 7.      *Transfer Of Collateral*

(a)        Consensual Foreclosure

The Modified Plan constitutes a request to authorize and approve the transfer of the Transferred Assets under the DIP Credit Agreement to the DIP Agent and to deem such DIP Transfer to be a consensual foreclosure by the DIP Agent in full satisfaction and discharge of the DIP Claims pursuant to Article 9-620 of the UCC. The DIP Transfer is necessary to implement the Modified Plan and is integral to completing the transactions contemplated by the Modified Plan, including without limitation, the Master Disposition Agreement.

(b)        Alternative Foreclosure Procedures

The Debtors will provide notification of the DIP Lenders' intent to accept the Transferred Assets to all parties entitled to notice pursuant to section 9-621(a) of the UCC (the "Article 9 Notice"). The Article 9 Notice will set forth the parties entitled to file an objection, refer parties to the procedures for submitting a Competing Proposal, and provide the deadline for filing an objection. If the Debtors receive on or prior to the Article 9 Objection Deadline a valid objection to the DIP Agent's acceptance of the Transferred Assets under section 9-620 of the UCC, then the Debtors will promptly file and serve a subsequent notice pursuant to sections 9-611 and 9-613 of the UCC (the "Public Sale Foreclosure Notice"), which notice will set forth the procedures to be employed in connection the public sale of the Transferred Assets to be conducted pursuant to section 9-610 of the UCC (the "Public Sale Foreclosures Procedures"). On or following the tenth day following service of the Public Sale Foreclosure Notice, if ever, the Debtors will conduct the section 9-610 public sale and the DIP Agent will be deemed to have submitted a credit bid at the public sale in the full amount of the Debtors' outstanding obligations that are due and owing under the DIP Credit Agreement. To the extent a successful bidder is selected pursuant to the Public Sale Foreclosure Procedures, then the proceeds of such transaction will be used first to satisfy all outstanding obligations under the DIP Loan Documents in accordance with the terms of the DIP Credit Agreement and the DIP Accommodation Agreement, including, without limitation, the Security And Pledge Agreement, and then any additional proceeds will be transferred to the Reorganized Debtors and distributed as required by applicable law, including the absolute priority rule set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

(c)        Termination Of DIP Facility Claims And Cancellation Of Liens

Upon the consummation of the DIP Transfer on the Effective Date, (i) the DIP Facility Claims will be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all

Claims, liens, security interests, and obligations related thereto on Collateral wherever located will be fully discharged, released, terminated, and if necessary, deemed waived without need for any further action, (iii) the Debtors and the Reorganized Debtors will be fully discharged and released for all obligations of any kind relating to the DIP Facility, and which discharge and release will be deemed to be effective, pursuant to section 1141 of the Bankruptcy Code, and the Debtors and Reorganized Debtors shall have no further obligation to the DIP Lenders under and relating to the DIP Facility, and (iv) the DIP Lenders will be deemed to be bound to the provisions of Article XI of the Modified Plan and the Modification Approval Order.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, will take any and all commercially reasonable steps requested by the Reorganized Debtors that are necessary to cancel and/or extinguish such publicly filed liens and/or security interests.

      (d)    <u>DIP Facility Revolver Claim and DIP Facility First Priority Term Claim Distribution</u>

Pursuant to the DIP Transfer and Section 15(g) of the Security And Pledge Agreement, the DIP Agent will transfer Cash to the holders of DIP Facility Revolver Claims and DIP Facility First Priority Term Claims in an amount equal to the DIP Priority Payment Amount.

      (e)    <u>DIP Facility Second Priority Term Claim Distributions</u>

Pursuant to the DIP Transfer and Section 15(g) of the Security and Pledge Agreement, the DIP Agent will transfer to the holders of DIP Facility Second Priority Term Claims (i) $291,020,079 million in Cash, (ii) their pro rata portion of Parnassus Class C Interests, and (iii) up to $145,510,040 of the net proceeds (after deducting all related costs and expenses of Delphi and GM or any of its affiliates) from the pending lawsuit, including any settlement thereof, by Delphi against Appaloosa Management L.P. and certain of the other Plan Investors or other parties arising from or relating to the Investment Agreement to which Delphi is a party.

### 8.  *Post-Confirmation Reorganized DPH Holdings Share Trust*

      (a)    <u>Post-Confirmation Reorganized DPH Holdings Share Trust</u>

On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust Agreement, substantially in the form attached as Exhibit 7.9 to the Modified Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Modified Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust will become the sole shareholder of Reorganized DPH Holdings Co.

      (b)    <u>Appointment Of Post-Confirmation Trust Plan Administrator</u>

On the Effective Date,  the Post-Confirmation Trust Plan Administrator will be appointed in accordance with the Post-Confirmation Trust Agreement and the Post-Confirmation

Reorganized DPH Holdings Share Trust will be administered by the Post-Confirmation Trust Plan Administrator in accordance with the Post-Confirmation Trust Agreement.

### 9.    Emergence Capital.

On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors will receive the Emergence Capital sufficient to make payments as may be required on the Effective Date and conduct their post-reorganization operations.

### 10.    Management Compensation Plan

The Debtors or Parnassus will enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors and officers who will continue in such capacities (or similar capacities) after the Effective Date, as more fully stated with respect to the Reorganized Debtors on Exhibit 7.11 to the Modified Plan, except that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, such employee will be required to contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described with respect to the Reorganized Debtors on Exhibit 7.11 to the Modified Plan, may include equity and other incentive plans as components of compensation to be paid to executives after the Effective Date.

### 11.    Procedures For Asserting Certain Claims

(a)    SERP Claims

All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date, except that if (a) a SERP claimant's Original SERP Claim has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim.  All such Original SERP Claims not Scheduled or filed prior to the time set forth above as set forth in Article 7.12 of the Modified Plan will be forever barred from asserting such claims against the Debtors and their estates or the Reorganized Debtors and their property.  Any Claims arising out of the Original SERP after the Effective Date will be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP. In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) will be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

(b)    Prepetition Employee-Related Obligations

Except as set forth in Article 7.12(a) of the Modified Plan, all Persons holding or wishing to assert Prepetition Employee-Related Obligations must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 45 days after the Effective Date, except that such claimant need not file and serve an executed proof of claim to the extent that (a) such claimant's Prepetition Employee-Related Obligation has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) such a claimant already timely and properly filed a proof of claim asserting such Prepetition Employee-Related Obligation.   All Prepetition Employee-Related Obligations not Scheduled or filed prior to the time set forth above in Article 7.12(b) of the Modified Plan will be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.

## 12.    Cancellation Of Existing Securities And Agreements

On the Effective Date, except as otherwise specifically provided for in the Modified Plan (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, will be cancelled, except that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, as the case may be, will be released and discharged.   Any agreement that governs the rights of a holder (including the Indentures) of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer"), however, will continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under the Modified Plan as provided in Article IX of the Modified Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement, except that the preceding proviso will not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, the Modified Plan, the Modification Approval Order, or result in any expense or liability to the Reorganized Debtors.   The Reorganized Debtors will not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Modified Plan except as expressly provided in Article 9.5 of the Modified Plan, except, that nothing in Section 7.10 of the Modified Plan will preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

13.    *Sources Of Cash For Modified Plan Distributions*

Except as otherwise provided in the Modified Plan, Confirmation Order, or the Modification Approval Order, all Cash necessary for Reorganized DPH Holdings Co. to make payments pursuant to the Plan will be obtained from the Emergence Capital, existing Cash balances, the operations of the Debtors and the Reorganized Debtors.

14.    *Establishment Of A General Unsecured Distribution Account*

On the Effective Date, the Disbursing Agent will establish a distribution account on behalf of holders of General Unsecured Claims for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims in accordance with Article 5.3 of the Modified Plan and the Master Disposition Agreement.

15.    *Collective Bargaining Agreements*

(a)    UAW

Pursuant to the Modified Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the UAW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(b)    IUE-CWA

Pursuant to the Modified Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the IUE-CWA 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(c)    USW

Pursuant to the Modified Plan and in accordance with the USW 1113/1114 Settlement Approval Order, on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding, a copy of which is attached as Exhibit 2 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(d)    <u>IAM</u>

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, the IAM-Delphi Memorandum of Understanding, a copy of which is attached as Exhibit 6 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IAM-Delphi Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(e)    <u>IBEW</u>

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IBEW E&S Memorandum of Understanding, a copy of which is attached as Exhibit 4 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding, a copy of which is attached as Exhibit 5 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

(f)    <u>IUOE</u>

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding, a copy of which is attached as Exhibit 1 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding, a copy of which is attached as Exhibit 2 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding, a copy of which is attached as Exhibit 3 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding will be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned as set forth in the Master Disposition Agreement.

*16.    Pension Settlement*

(a)    <u>Delphi HRP.</u>

Upon the Effective Date, the Delphi HRP will no longer be the responsibility of the Debtors and will be addressed by GM.

(b)      Salaried and Subsidiary Pension Plans.

The Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan will be terminated (the "Salaried and Other Pension Plans").

(c)      PBGC Settlement.

Pursuant to section 1127 as it incorporates section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Modified Plan constitutes the Debtors' request to authorize and approve the settlement with the PBGC (the "PBGC Settlement Agreement"), attached to the Modified Plan substantially in the form of Exhibit 7.17.  Pursuant to the PBGC Settlement Agreement and the Modified Plan, the Debtors will grant the PBGC an allowed general unsecured nonpriority claim (the "PBGC General Unsecured Claim"), which will receive the treatment given to holders of General Unsecured Claims pursuant to Article 5.3 of the Modified Plan and other consideration for (i) no distribution being made on account of the Contingent PBGC Secured Claims other than the distribution to be made as set forth above, (ii) the PBGC's settlement of its claims arising under Title IV of ERISA with respect to the Salaried and Other Pension Plans, (iii) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by the Modified Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, and (iv) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise.  Except as specifically provided in the PBGC Settlement Agreement and as set forth in Article V of the Modified Plan, on the Effective Date, all liens arising from or relating to the Delphi HRP and/or the Salaried and Other Pension Plans will be terminated and discharged.

## 17.    Salaried OPEB Settlement

The Debtors will continue the payments on the schedule authorized under the Order Pursuant to 11 U.S.C § 363 and Fed. R. Bankr. P. 9019 For Order Approving Debtors' Compromise and Settlement with Committee of Eligible Salaried Retirees and Delphi Salaried Retirees' Association (Docket No. 16545).

## 18.    Preservation Of Causes Of Action

On August 16, 2007, the Bankruptcy Court entered the Avoidance Procedures Order, authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action.  The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve valuable estate assets in a manner that would not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.

With respect to preservation of causes of action, the Modified Plan provides that in accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Modified Plan or the Master Disposition Agreement, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Notwithstanding the foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws will not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.19 of the Modified Plan.

### 19.    *Reservation Of Rights*

With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with Article 7.19 of the Modified Plan (Preservation Of Causes Of Action), the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

### 20.    *Exclusivity Period*

The Debtors will retain the exclusive right to amend or modify the Modified Plan, and to solicit acceptances of any amendments to or modifications of the Modified Plan, through and until the Effective Date.

### 21.    *Dismissal Of Complaints*

Upon the Effective Date of the Modified Plan, the proceedings initiated by the Creditors' Committee and the Senior Notes Indenture Trustee for the revocation of the Confirmation Order will be closed and the complaints seeking relief therefor will be dismissed as moot.

### 22.    *Corporate Action*

Each of the matters provided for under the Modified Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided in the Modified Plan, and will be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

### 23.    *Effectuating Documents; Further Transactions*

Each of the Chief Executive Officer, Chief Financial Officer, and General Counsel of the Debtors, or their respective designees, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Modified Plan or to otherwise comply with applicable law. The secretary or assistant secretary of the Debtors will be authorized to certify or attest to any of the foregoing actions.

### 24.    *Consummation Of Divestiture Transaction*

In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing Debtor(s) to sell assets free and clear of liens, Claims, and encumbrances, such Debtor(s) and or Reorganized Debtor(s), as the case may be, will be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

### 25.    *Exemption From Certain Transfer Taxes And Recording Fees*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or from a Reorganized Debtors or to any other Person or entity pursuant to the Modified Plan, Master Disposition Agreement, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the Reorganized Debtors' real or personal property will not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.    **Unexpired Leases And Executory Contracts**

#### 1.    *Assumed And Rejected Leases And Contracts*

##### (a)    Executory Contracts And Unexpired Leases

All executory contracts and unexpired leases as to which any of the Debtors is a party will be deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) are the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (iii) will be rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (iv) have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached to the Modified Plan as Exhibit 8.1(a) – Rejected Contracts, or (vi) are otherwise rejected pursuant to the terms of the Modified Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement. Subject to the foregoing sentence and consummation of the Modified Plan, entry of the Plan Modification

Approval Order by the Bankruptcy Court will constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to this Article 8.l(a) will vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms, except as modified by the provisions of the Modified Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  Subject to the Master Disposition Agreement, the Debtors reserve the right to file a motion on or before the Modification Approval Date to reject any executory contract or unexpired lease.

(b)    Real Property Agreements

Each executory contract and unexpired lease that is assumed by the applicable Reorganized Debtor and relates to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Modified Plan.  In the event that the Effective Date does not occur, the Court will retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)    Exhibits Not Admissions

Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) of the Modified Plan nor anything contained in the Modified Plan will constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

**2.    Cure Procedures And Payments Related To Assumption Of Executory Contracts And Unexpired Leases**

(a)    Material Supply Agreements

The provisions (if any) of each Material Supply Agreement to be assumed under the Modified Plan which are or may be in default will be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under the Modified Plan, then any Cure distributed pursuant to section 8.2(a) of the Modified Plan on account of such Material Supply Agreement

will offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)      Cure Amount Notices

Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a Cure Amount Notice to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With respect to reconciling the amount of Cure, the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order and subsequently modified by the Modification Procedures Order, and implemented in accordance therewith will control and accordingly, Cure will be equal to (i) subject to modification by written agreement between the Debtors and the applicable counterparty to reduce the Allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, unless the Debtors send an Amended Cure Amount Notice (as defined below) to an applicable counterparty, in which case Cure will be determined pursuant to the procedures set forth in the Modification Procedures Order, or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty or (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.  The Debtors will send an amended notice with respect to such Cure Amount Notices for which the Debtors have since determined that the Cure Amount Proposal was overstated.  To reduce the overstated Cure amount to its proper amount, the Debtors may, at least 20 days prior to the Effective Date, file with the Court and serve a separate notice (the "Amended Cure Amount Notice") stating the amended Cure amount that the Debtors believe is necessary and proper to cure such contract.  Pursuant to the Modification Procedures Order, if an affected contract counterparty disagrees with the Cure amount listed on the Amended Cure Amount Notice, then the counterparty will file an objection within ten days of receipt of the Amended Cure Amount Notice to object to the amended Cure amount.  If no objection is timely received, each counterparty will be deemed to have consented to the Cure amount set forth on the Amended Cure Amount Notice.  Any unresolved objection to an Amended Cure Amount Notice will be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.

        (ii)       Objections To Cure Amount Notices And Payment Of Cure

The Cure Amount Notice provided procedures for contracts that were to be assumed by the Reorganized Debtors (and with respect to contracts to be assumed and assigned to GM or Parnassus pursuant to the Modification Procedures Order, such notice of assumption and assignment will provide procedures) for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract.  The Cure Amount Notice also provided procedures for each counterparty to object to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order, or if the counterparty responded to the Amended Cure Amount Notice in accordance with the procedures herein and in the Modification Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure will be paid, honored, or otherwise occur following the later of a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors or Reorganized Debtors, or a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement, expect that if there is a dispute as to the amount of Cure or adequate assurance that cannot be resolved consensually among the applicable counterparty and the Debtors, Reorganized Debtors, or the Buyers then notwithstanding anything to the contrary herein, in the Confirmation Order, in the Modification Procedures Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Plan.  If the non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order, or even if responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure will be paid in the amount set forth in the Cure Amount Notice or Amended Cure Amount Notice, as applicable, within a reasonable period of time following the Effective Date.

        (iii)     Form Of Cure Payments

Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, and supplemented by the Modification Procedures Order, a Cure Amount Notice, the First Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order,

Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply Agreement will be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to the Modified Plan and the Master Disposition Agreement.

(b)    Other Executory Contracts And Other Unexpired Leases

The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed or assumed and assigned under the Modified Plan which are or may be in default will be satisfied solely by Cure.  For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease.  Any Cure distributed pursuant to this section will offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Other Executory Contract or Other Unexpired Lease so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)    Cure Proposals

Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 of the Modified Plan by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

(ii)    Cure Proposal Objections

The Debtors or Reorganized Debtors will have the right to amend, modify, or supplement the Cure Proposal Objections.  Counterparties to an Other Executory Contract or Other Unexpired Lease that failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Modified Plan confirmed on January 25, 2008 will each be deemed to have waived its right to assert a default requiring Cure.  Any default existing as of January 25, 2008 will have been deemed cured as of the day following the Cure Proposal Submission Deadline and such party will forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure

Proposal Submission Deadline.  Counterparties will assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and will file and serve such claims before the Administrative Claims Bar Date in accordance with the Modification Approval Order and as otherwise set forth in Articles 10.2 and 10.5 of the Modified Plan.  If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection, then the disputed matter will be set for hearing in the Bankruptcy Court.  Any such hearing will be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon.  Cure, if any, will be paid, honored, or otherwise occur following the earlier of a consensual resolution or the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  Notwithstanding the above, if there is a dispute as to the amount of Cure or regarding adequate assurance that cannot be resolved consensually among the parties, notwithstanding anything to the contrary herein or in the Confirmation Order or the Modification Approval Order, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the assignee of such contract or lease.  To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Modified Plan.

(iii)    Payment Of Cure

Except as otherwise provided in Article VIII of the Modified Plan, to the extent a Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, will pay the Cure Proposal, if any, to the counterparty within a reasonable period of time following the Effective Date.  Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved consensually or by agreement or Final Order will be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

(c)    <u>Other Executory Contracts And Other Unexpired Leases Assigned To GM Or Parnassus</u>

Pursuant to the Master Disposition Agreement, the Debtors or Reorganized Debtors, as the case may be, will assign certain Other Executory Contracts and Other Unexpired Leases to GM Buyer or Parnassus.  In connection therewith and in accordance with the procedures set forth in the Modification Procedures Order, Delphi will serve each counterparty to a GM Assumed

Contract or Parnassus Assumed Contract the respective notice (together, the "MDA Assumption and Assignment Notices"), which will identify the respective Buyer as the party to whom all of the Debtors' right, title, and interest in the Other MDA Assumed Contracts will be assigned. Counterparties to Other MDA Assumed Contracts which failed to file and serve an objection to the MDA Assumption and Assignment Notice by the deadline set forth in the Modification Procedures Order will each be deemed to have waived its right to challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease and will be barred from challenging the ability of any Debtor or Reorganized Debtor, as the case may be, or the respective Buyer or its assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, and will be barred from making any other challenge pertaining to assumption. If there is an objection to the MDA Assumption and Assignment Notice and the parties cannot consensually resolve their dispute, then the disputed matter will be set for hearing in the Bankruptcy Court, which hearing will be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, will be paid, honored, and otherwise occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be. Notwithstanding anything to the contrary in the Modified Plan or in the Modification Approval Order, however, the Debtors or Reorganized Debtors, as the case may be, will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing Cure (and must if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) or adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors, as applicable, and the assignee. To the extent that disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer will establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure will not affect the closing of the Disposition Transactions or the Effective Date of the Modified Plan. Notwithstanding anything to the contrary in Article 8.2(c), Article 8.2(b)(ii) will control with respect to Cure amounts related to Other MDA Assumed Contracts.

        (d)      <u>Intercompany Executory Contracts And Intercompany Unexpired Leases</u>

Subject to the Master Disposition Agreement, any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease will be Reinstated and will be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

### 3.    *Assignment Pursuant To Restructuring Transactions*

To the extent that any Debtor, which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease will, upon assumption as contemplated in the Modified Plan, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

### 4.        Rejection Damages Bar Date

If the rejection by the Debtors (pursuant to the Modified Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

### 5.        Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases

In connection with their efforts related to divestiture transactions, the Debtors may seek entry of an order that, among other things, approves the assumption and assignment of certain executory contracts or unexpired leases to the buyer of a certain business or product line.  The Debtors, however, would not consummate the assumption of such contracts and leases until the earlier of the closing of the related divestiture transaction or the Effective Date.  Thus, the Modified Plan provides that if the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor to assume and assign or reject certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor does not assume and assign or reject such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption or rejection will be consummated pursuant to Article VIII of the Modified Plan and service of notice and any Cure payments owed to a non-Debtor counterparty under such contracts and leases will be made pursuant to Article 8.2 of the Modified Plan and (b) a Debtor or Reorganized Debtor, as applicable, will be permitted to either reject or assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.  Because the assumption may be consummated in connection with either the closing of the divestiture transaction or the Modified Plan, the Debtors would provide each non-Debtor counterparty under the applicable contracts and leases with both a cure notice in connection with the divestiture transaction and the Cure Amount Notice.  If the closing of the divestiture transaction occurs before the Effective Date, then the Cure Amount Claim would be paid in cash.  If the closing of the divestiture transaction occurs after the Effective Date, then the Cure Amount Claim in accordance with the Master Disposition Agreement or as otherwise provided under the Modified Plan.

## H.        Provisions Governing Distributions

### 1.        Time Of Distributions

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Modified Plan will be made on a Periodic Distribution Date.

### 2.        No Interest On Disputed Claims

Unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest will not accrue or be paid on

Claims or Interests, and no holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 3.    *Disbursing Agent*

The Disbursing Agent will make all distributions required under the Modified Plan except with respect to any holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions will be deposited with the appropriate Servicer, as applicable, who will deliver such distributions to the holders of Claims in accordance with the provisions of the Modified Plan and the terms of any governing agreement.  If any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, will make such distributions.

### 4.    *Surrender Of Securities Or Instruments*

On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") will be required to surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate will be cancelled solely with respect to the Debtors and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments.  This requirement does not apply to any Claims Reinstated pursuant to the terms of the Modified Plan.  No distribution of property under the Modified Plan will be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims in respect of such Certificate and will not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, will revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

### 5.    *Services Of Indenture Trustees, Agents, And Servicers*

The Reorganized Debtors will reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under the Modified Plan to holders of Allowed Claims, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties will report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the

reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

### 6.    *Claims Administration Responsibility*

(a)    <u>Reorganized Debtors</u>

The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in Article IX of the Modified Plan.

(b)    <u>Filing Of Objections</u>

Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests must be served and filed on or before the Claims/Interests Objection Deadline or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.  Notwithstanding any authority to the contrary, an objection to a Claim or Interest will be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service by the following means:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel who has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

(c)    <u>Determination Of Claims</u>

Any Claim determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Modified Plan.  The Modified Plan will not constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

(d)    <u>Claims Bar Date</u>

Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Article 8.3 of the Modified Plan for the filing of such claims, (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to

Articles 10.2 and 10.5 of the Modified Plan, or (iv) with respect to Claims that are Prepetition Employee Related Obligations, the bar date established pursuant to Article 7.9(b) of the Modified Plan will not be recognized, or recorded on the claims register, by the Claims Agent and will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court. Nothing in the Modified Plan will in any way alter, impair, or abridge the legal effect of the Bar Date Order or the rights of the Debtors, the Reorganized Debtors, or other parties-in-interest to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

### 7.    *Delivery Of Distributions*

#### (a)    Allowed Claims

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

#### (b)    Undeliverable Distributions

If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim, at which time all missed distributions will be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors until such distributions are claimed.  The Reorganized Debtors will make reasonable efforts to locate holders of undeliverable distributions.  All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim or an Allowed Interest, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

### 8.    *Procedures For Treating And Resolving Disputed And Contingent Claims And Interests*

#### (a)    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has

become an Allowed Claim.    All objections to Claims must be filed on or before the Claims/Interests Objection Deadline.

(b)    <u>Distribution Reserves</u>

The Reorganized Debtors or Disbursing Agent will withhold the Distribution Reserves, if any, from the property to be distributed to particular classes under the Modified Plan based upon the Face Amount of Disputed Claims.    The Reorganized Debtors or Disbursing Agent will withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata basis based upon the Face Amount of such Claims.    The Reorganized Debtors or Disbursing Agent will also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise.    Nothing in the Modified Plan or the Supplement will be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

(i)    Estimation Of Claims For Distribution Reserves

To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors will seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves.    Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors', Reorganized DPH Holdings Co., or the Reorganized Debtors' rejection of an executory contract pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated, however.    If the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.    All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.    Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(c)    <u>No Recourse To Debtors Or Reorganized Debtors</u>

Any Disputed Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution under the Modified Plan solely from the Distribution Reserve

established on account of such Disputed Claim.  In no event will any holder of a Disputed Claim have any recourse with respect to distributions made, or to be made, under the Modified Plan to holders of such Claims to any Debtor or Reorganized Debtor on account of such Disputed Claim, regardless of whether such Disputed Claim will ultimately become an Allowed Claim or regardless of whether sufficient Cash or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the Modified Plan.

(d)      <u>Distributions After Allowance</u>

Payments and distributions from the Distribution Reserve to each respective holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Modified Plan that govern distributions to such holder of a Claim.  On the first Periodic Distribution Date following the date when a Disputed Claim becomes undisputed, noncontingent, and liquidated, the Disbursing Agent will distribute to the holder of such Allowed Claim any proceeds from the General Unsecured MDA Distribution, or other property, from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim been an Allowed Claim on such dates and will not be limited by the Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims.  Upon such distribution, the Distribution Reserve will be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.

(e)      <u>De Minimis Distributions</u>

Neither the Disbursing Agent nor any Servicer will have any obligation to make a distribution on account of an Allowed Claim from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $25,000, except that the Reorganized Debtors will make, or cause to be made, a distribution on a Periodic Distribution Date of less than $25,000 if the Debtors expect that such Periodic Distribution Date will be the final Periodic Distribution Date or (ii) the amount to be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

**9.      *Section 510(b) Opt Out Claims***

No Section 510(b) Opt Out Claim will be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution that would otherwise have been distributed under the Modified Plan solely from the applicable portion of the Securities Settlement.  In no event will any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to or against any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim will ultimately become an Allowed Claim.

### 10.    *Allocation Of Plan Distributions Between Principal And Interest*

To the extent that any Allowed Claim entitled to a distribution under the Modified Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## I.    Allowance And Payment Of Certain Administrative Claims

### 1.    *DIP Facility Claims*

(a)    DIP Transfer

The DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim will be satisfied and discharged in their entirety pursuant to the DIP Transfer.

(b)    Cancellation Of Liens

Upon consummation of the DIP Transfer, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim will be deemed discharged, cancelled, and released and will be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders of the DIP Agent, as the case may be, will take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

### 2.    *Pre-Confirmation Administrative Claim Procedures*

Pursuant to the Modification Procedures Order, all requests for payment of an Administrative Claim through June 1, 2009 (other than as set forth in the Modification Procedures Order, Article 10.1, or Article 10.3 of this Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than July 10, 2009. Any request for payment of an Administrative Claim pursuant to this Article 10.2 that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim request made pursuant to this Article 10.2 without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim.

### 3.    *Professional Claims*

(a)    Final Fee Applications

All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses will be determined by the Bankruptcy Court.

(b)    Payment Of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors, Reorganized DPH Holdings Co., or the Reorganized Debtors will pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Modification Approval Order Date.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Modification Approval Date, the Professionals must estimate fees and expenses due for periods that have not been billed as of the Modification Approval Date and deliver such estimate to the Debtors, counsel for the Creditors' Committee, and the United States Trustee for the Southern District of New York.  Within 45 days after the Effective Date, a Professional receiving payment for the estimated period must submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable.  Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount will be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

(c)    Holdback Amount

On the Effective Date, the Debtors or the Reorganized Debtors will fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent will maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds will not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, will be paid to the Reorganized Debtors.

(d)    Post-Confirmation Date Retention

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business.

**4.    Substantial Contribution Compensation And Expenses Bar Date**

Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

### 5.    *Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of the Modified Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached to the Modified Plan as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors, and the Creditors' Committee no later than 30 days after the Effective Date.  Any request for payment of an Administrative Claim pursuant to Article 10.5 of the Modified Plan that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim.

## J.    **Effect Of The Modified Plan On Claims And Interests**

### 1.    *Revesting Of Assets*

Except as otherwise explicitly provided in the Modified Plan, on the Effective Date, all property comprising the Estates (including Retained Actions and Retained Assets, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court or are the subject of any of the Disposition Transactions) will revest in each of the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Modified Plan, the Confirmation Order, and the Modification Approval Order.

### 2.    *Discharge Of Debtors*

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Modified Plan or in the Confirmation Order, the distributions and rights that are provided in the Modified Plan will be in complete satisfaction, discharge, and release, effective

as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Modified Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Modified Plan. The Confirmation Order will be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

### 3.    *Compromises And Settlements*

In accordance with Article 9.6 of the Modified Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date. After the Effective Date, any such right will pass to the Reorganized Debtors as contemplated in Article 11.1 of the Modified Plan, without the need for further approval of the Bankruptcy Court.

### 4.    *Release By Debtors Of Certain Parties*

The releases provided in the Modified Plan and described below discharge and release certain parties from claims arising from prepetition actions and claims (including claims held by third parties, such as creditors and shareholders) and limit the liability against certain parties for acts or omissions arising out of or in connection with these Chapter 11 Cases unless such actions are the result of willful misconduct or gross negligence. The releases of each of the major constituencies in these cases, including the Debtors' officers, directors, and employees, the Creditors' Committee, the Equity Committee, the DIP Agent, the DIP Lenders, the Buyers, the Unions, and GM, allow the parties to participate in the Debtors' restructuring cases and protect individuals who have contributed to the restructuring process. The parties for whom releases are provided have participated in complex negotiations with an unprecedented scope. Moreover, the amounts contributed by each of these parties as part of settlements or other agreements are substantial. The contributions made by some parties amount to billions of dollars invested in Delphi's reorganization. Further, these parties conditioned their settlements and agreements on receiving the releases contemplated by the Modified Plan. Thus, because of the value provided to the Debtors' estates as a result of these critical and necessary settlements and agreements, the Debtors believe it is appropriate to provide the releases described below.

**Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 11.13 of the Modified Plan, effective as of the Effective Date (and with respect to the DIP Lenders,**

the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP Transfer, which will be deemed to occur on the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its respective Estate, will release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Modified Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases.    The Reorganized Debtors, including Reorganized DPH Holdings Co., and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date will be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.    Notwithstanding the foregoing, nothing in the Modified Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or  (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

The term "Released Parties" means, collectively, (a) all officers of each of the Debtors and Reorganized Debtors, all members of the boards of directors of each of the Debtors and Reorganized Debtors, and all employees of each of the Debtors and Reorganized Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) the DIP Steering Committee and all current and former members of the DIP Steering Committee in their respective capacities as such, (g) Parnassus, (h) Platinum, (i) all Professionals, (j) the Unions and current or former members, officers, and committee members of the Unions, (k) the Indenture Trustees, in their capacities as such, and (l) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

5.    *Release By Holders Of Claims And Interests*

On the Effective Date, (a) each Person who votes to accept the Modified Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the

obligations of the Debtors and the Reorganized Debtors under the Modified Plan, and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Modified Plan (each, a "Release Obligor"), will have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Modified Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Modified Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases; provided, however, that (A) Article 11.5 is subject to and limited by Article 11.13 of the Modified Plan and (B) Article 11.5 will not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other U.S. state, city, or municipal tax code, (ii) the environmental laws of the United States or any U.S. state, city, or municipality, (iii) any criminal laws of the United States or any U.S. state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any U.S. state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates will be as set forth in the Amended GSA and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

### 6.   *Release By Unions*

The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference in the Modified Plan in their entirety.

### 7.    *Release Of GM By Debtors And Third Parties*

**On the Effective Date, GM will receive all releases provided for in Section 4.01 of the Amended GSA, which provisions are incorporated by reference herein in their entirety.**

### 8.    *Setoffs*

Subject to Article 11.13 of the Modified Plan, the Debtors or the Reorganized Debtors, as applicable, may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Modified Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

### 9.    *Subordination Rights*

All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Modified Plan to holders of Claims having such subordination rights, and such subordination rights will be deemed waived, released, discharged, and terminated as of the Effective Date; provided, further, that the subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture) will be deemed satisfied through the distributions described in Article 5.4 of the Modified Plan, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims will not receive a distribution under the Modified Plan.    Except as otherwise specifically provided for in the Modified Plan, distributions to the various Classes of Claims under the Modified Plan will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Modified Plan.

Except as otherwise provided in the Modified Plan (including any Modified Plan Exhibits), the Confirmation Order, or the Modification Approval Order, the right of any of the Debtors, or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will be modified to reflect such subordination.    Unless the Modified Plan (including Modified Plan Exhibits), the Confirmation Order, or the Modification Approval Order, otherwise provide, no distributions will be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

### 10.    *Exculpation And Limitation Of Liability*

**Subject to Article 11.13 of the Modified Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent,**

the DIP Lenders in their capacities as such and as holders of Claims and Interests, GM, Parnassus, Platinum, the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents and any of such parties' successors and assigns, will not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Modified Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended, or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Modified Plan. Other than as provided for in Article 11.11 of the Modified Plan and in Article 11.13 of the Modified Plan, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the parties listed in Article 11.11 of the Modified Plan for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the Modified Plan, the Disclosure Statement, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the DIP Transfer, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases. For the avoidance of doubt, the exculpatory provisions of Article 11.11 of the Modified Plan, which apply to postpetition conduct, are not intended, nor will they be construed, to bar any governmental unit from pursuing any police or regulatory action. Moreover, nothing in the Modified Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Buyers from their obligations under the Master Disposition Agreement, (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment

Agreement or the transactions contemplated thereby, or (iv) any of the Debtors from their obligations under the Modified Plan or the transactions contemplated thereby.

### 11.    Indemnification Obligations

The Modified Plan contains provisions concerning the Indemnification Rights of Indemnitees. The term "Indemnitee" means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights. The term "Indemnification Rights" means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors. The term "Continuing Indemnification Rights" means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

Subject to Article 11.13 of the Modified Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights will be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which will remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and will not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, will maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for the remaining term of such policy and will maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage will be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, will indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy. Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation") the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these Chapter 11 Cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for

legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or setoff by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

### 12.    *Exclusions And Limitations On Exculpation, Indemnification, And Releases*

Notwithstanding anything in the Modified Plan to the contrary, no provision of the Modified Plan, the Confirmation Order, or the Modification Approval Order, including, without limitation, any exculpation, indemnification, or release provision, will modify, release, or otherwise limit the liability of any Person not specifically released under the Modified Plan, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

### 13.    *Injunction*

**Subject to Article 11.13 of the Modified Plan, and except as required and to the limited extent necessary to transfer the Transferred Assets to the DIP Lenders as provided in Article 7.8 of the Modified Plan, the satisfaction, release, and discharge pursuant to Article XI of the Modified Plan will act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Modified Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## V.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

This section provides information regarding:

- Considerations that holders of Claims and Interests should carefully consider before deciding whether to vote to accept or reject the Modified Plan

The key modifications to this section include additional risk factors relating to the following:

- The necessity of closing the transactions set forth in the Master Disposition Agreement and the effect that failure to close may have on the Modified Plan

- The key role of GM in the Debtors' restructuring efforts

- The current state of the capital markets

- Complaints seeking revocation of the Confirmation Order

Every holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Supplement (and the

documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Modified Plan.

## A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Modified Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors.  Certain Claims may receive partial distributions pursuant to the Modified Plan, and in some instances, no distributions at all.  Reorganization of the Debtors' business and operations under the proposed Modified Plan avoids the potentially adverse impact of a chapter 7 liquidation on the Debtors' employees and many of its customers and suppliers.

## B.    Certain Bankruptcy Considerations

If the Modified Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Modified Plan.  If a liquidation or protracted and litigated reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders and that recoveries to holders of General Unsecured Claims and others may be greatly diminished.  See Appendix C attached to this Supplement setting forth hypothetical chapter 7 liquidation scenarios.

### 1.    *The Bankruptcy Court May Not Approve Debtors' Classification Of Claims And Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Modified Plan complies with the requirements set forth in the Bankruptcy Code.  The Debtors created classes of Claims and Interests, each of which encompasses Claims or Interests that are substantially similar to the other Claims or Interests in each such class.  Although the Bankruptcy Court approved a similar classification as part of the Confirmed Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion at this time.

### 2.    *Failure To Satisfy Vote Requirement*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to approve the Modified Plan, the Debtors intend to seek confirmation of the Modified Plan. In the event that sufficient votes are not received, the Debtors will likely be forced to liquidate or sell their assets under unfavorable circumstances, which would not be as beneficial to the holders of General Unsecured Claims as their treatment under the Modified Plan. There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar to or as favorable to the Creditors as those proposed in the Modified Plan.

3.    *The Confirmation Order Approving The Confirmed Plan May Be Revoked*

Following confirmation of the Confirmed Plan in January 2008, as previously discussed, the Creditors' Committee and Wilmington Trust, as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Bankruptcy Court seeking revocation of the Confirmation Order on the grounds that it was procured by Appaloosa's and the other Plan Investors' fraud.  The Creditors' Committee and Wilmington Trust have entered into a stipulation and consent order with Delphi whereby all activity in respect of the section 1144 complaints will be stayed until the earlier of (i) the service by the Creditors' Committee or Wilmington Trust upon the Debtors of a written notice terminating the stay with respect to the party's complaint or (ii) further order of the Bankruptcy Court.  Upon receipt of a notice of termination of stay, the Debtors will have thirty days, or such other period of time as the parties may agree or as may be ordered by the Bankruptcy Court, to answer or otherwise file a responsive pleading.  Should the Creditors' Committee or Wilmington Trust initiate actions to revoke the Confirmation Order, the Debtors may not be able to confirm the Modified Plan.

4.    *The DIP Lenders May Fail To Exercise Remedies Under The DIP Credit Agreement*

To effectuate the DIP Transfer, pursuant to which the DIP Lenders will accept certain of the Debtors' assets in full satisfaction of the Debtors' obligations under the DIP Credit Agreement, the Administrative Agent must receive direction to exercise remedies from the Required Lenders.  It is uncertain whether the Administrative Agent will receive the direction to effectuate the DIP Transfer, and therefore, whether the DIP Transfer will occur.  If the DIP Transfer does not take place as outlined in the Modified Plan, there can be no assurance that the Modified Plan will be consummated.

5.    *The Debtors May Not Be Able To Secure Confirmation Of The Modified Plan*

There can be no assurance that the requisite acceptances to confirm the Modified Plan will be received. To confirm the Modified Plan, an impaired class must vote to accept the Modified Plan – there is no guarantee of such a result.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Modified Plan. A non-accepting creditor or equity holder of Debtors might challenge the adequacy of this Supplement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Supplement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Modified Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Modified Plan are fair and equitable to non-accepting Classes

6.    *Risk Of Non-Occurrence Of The Effective Date*

Although the Master Disposition Agreement provides that it may be terminated if the closing has not occurred by September 30, 2009, the Debtors anticipate occurrence of the

Effective Date of the Modified Plan and consummation of the Master Disposition Agreement by July 31, 2009.  There can be no assurance as to such timing, however.  If the Effective Date does not occur by July 31, 2009, at some point prior to September 30, 2009, the Debtors may not have access to sufficient liquidity to fund their operations.

### 7.    *Substantive Consolidation Risks*

The Modified Plan is premised upon substantively consolidating certain of the Debtors as set forth in Article 7.2 of the Modified Plan but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. Although the Bankruptcy Court approved the same substantive consolidation structure as part of the Confirmed Plan, there is no assurance that the Bankruptcy Court would overrule an objection to substantive consolidation at this time or that the Bankruptcy Court would otherwise enter an order granting the Debtors' motion for substantive consolidation as contemplated by the Modified Plan.

### 8.    *The Integrity Of The Bar Date May Be Challenged*

Certain parties may allege that the Bar Date should not apply to their claims as a result of excusable neglect or otherwise.  Accordingly, should the Bankruptcy Court grant leave to file late claims involving a material amount of secured or priority claims, the Debtors may not have sufficient cash to satisfy secured or priority claims under the Modified Plan.  In particular, both the States of New York and Michigan have asserted that they intend to seek leave to file late claims for excise taxes under 11 U.S.C. § 507(a)(8) relating to unpaid prepetition workers compensation claims that, if allowed, could result in priority claims that the Debtors would be unable to pay.  Moreover, should the Bankruptcy Court grant leave to file late claims involving a material amount of prepetition general unsecured claims, recoveries to holders of general unsecured claims could be diluted.

### C.    **The Debtors May Be Unable To Close The Transactions Set Forth In The Master Disposition Agreement**

The Debtors currently anticipate that they will be able to close the sales to GM and Parnassus in accordance with the Master Disposition Agreement.  There are many factors outside of the Debtors' control, however, including the ability of the Debtors to obtain necessary governmental consents to the sale or transfer of certain of their assets.  Moreover, it is possible that the Debtors may not be able to meet various closing conditions, and that GM and/or Parnassus would elect to cancel the sales as a result of these failures. In addition, as detailed further below, because GM has sought chapter 11 protection, GM may be unable to close the transaction.  Consequently, the Debtors can provide no assurance that they will be successful in consummating the transactions set forth in the Master Disposition Agreement.

### D.    **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation

would have on the recoveries of holders of Claims and Interests and the Debtors' liquidation analysis is set forth below in <u>Section VIII – Feasibility Of The Modified Plan And The Best Interests Test</u> and <u>Appendix C</u>, as attached hereto.

### E.    Business Factors And Competitive Conditions

#### 1.    Consummation Of The Modified Plan Is Dependent On General Motors Corporation

GM is an essential party to the transaction underlying the feasibility of the Modified Plan – the Master Disposition Agreement.  The assets and liabilities that GM is assuming as part of the sale will facilitate Delphi emerging from chapter 11.  GM, however, also has endured a severe liquidity crisis since the fall of 2008 and filed for chapter 11 protection on June 1, 2009.

In SEC filings prior to its chapter 11, GM reported a variety of challenges it is facing, including severe liquidity issues, its relationships with its unions, large shareholders and bondholders, and its cost and pricing structures.  As of May 31, 2009, GM had received $19.4 billion in government loans.  GM had stated that without such government funding under one or more current or future programs or some other form of supplemental liquidity, GM's estimated liquidity during the first two quarters of 2009 would fall significantly short of the minimum amount necessary to operate its business, even if GM successfully implemented all of its planned operating actions substantially within its control, unless economic and automotive industry conditions significantly improve, it received substantial proceeds from asset sales, took more aggressive working capital initiatives, gained access to capital markets and other private sources of funding, receives government funding under one or more current or future programs, or some combination of the foregoing.

Debtor-in-possession financing for GM's chapter 11 is being provided by U.S. Treasury only in the context of GM pursuing an expedited section 363 sale of its assets to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury.  Also as part of its negotiated 363 sale transaction, certain agreements have been reached with the UAW, GM's primary labor union.  Nonetheless, GM must still garner support from other constituents to successfully proceed in its chapter 11 cases.

In particular, as it pertains to the effectiveness of Delphi's Modified Plan, GM must seek Bankruptcy Court approval to perform under the Master Disposition Agreement.  GM and Delphi entered into the Master Disposition Agreement hours after GM filed for chapter 11 protection.  As a postpetition agreement of both GM and Delphi, the Master Disposition Agreement must be approved by the Bankruptcy Court in GM's chapter 11 cases as well as Delphi's.  It is anticipated that GM will move to assume the Master Disposition Agreement during June 2009, but there can be no assurance that GM's stakeholders will not object to such assumption and/or that the Bankruptcy Court will approve GM's motion to proceed with the purchase.  If GM is unable to assume the Master Disposition Agreement in the timeframe set forth therein, the Master Disposition Agreement may immediately terminate and Delphi might be forced to liquidate.  See <u>Appendix C</u> hereto.

2.      *The Company Is Reliant On The Amended GM Arrangement To Provide Liquidity Through Emergence*

As Delphi continues to operate in chapter 11, Delphi expects that its operations will continue to use cash and that it will have limited flexibility to further restructure its global operations to adapt to a prolonged downturn.  The credit market crisis has delayed the Debtors' emergence from chapter 11, making the Debtors particularly vulnerable to changes in the overall economic climate.   Furthermore, in light of the current economic climate in the global automotive industry, the Company anticipates continued operating challenges due to lower North American production volumes, slowing economic growth, the continuing global recession, related pricing pressures stemming from increasingly competitive markets, and continued commodity price volatility, which may place further pressures on Delphi's liquidity despite the progress of its transformation.  As a result, Delphi is dependant upon the advances provided by the Amended GM Arrangement.  Should Delphi be unable to maintain access to the liquidity provided by the Amended GM Arrangement, it may not be able to sustain operations through the consummation of the Modified Plan, which could result in a liquidation under chapter 7 of the Bankruptcy Code.

# VI.    SECURITIES LAW MATTERS

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors believe that to the extent that any consideration that is received under the Master Disposition Agreement pursuant to the Modified Plan and is subsequently distributed to holders of Claims would be considered securities, that the requirements of section 1145(a)(1) of the Bankruptcy Code would be satisfied and that such securities would be exempt from registration under the Securities Act and state securities laws.

# VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN

A summary description of certain United States federal income tax consequences of the Modified Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Modified Plan as discussed herein. Only the principal United States federal income tax consequences of the Modified Plan to certain holders of Claims who are entitled to vote to accept or reject the Modified Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the

Modified Plan. No rulings or other determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Modified Plan, and the discussion below is not binding upon the IRS or such other authorities. In addition, a substantial amount of time may elapse between the date of this Supplement and the receipt of a final distribution under the Modified Plan. Events occurring after the date of this Supplement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Modified Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Modified Plan to any holder of Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the IRC, Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Modified Plan, nor does it purport to address the United States federal income tax consequences of the Modified Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, partnerships or other pass-through entities, persons whose functional currency is not the United States dollar, the Buyers, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims as compensation for services, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes, and does not address the United States federal income tax consequences of the Modified Plan to holders that own Claims in more than one Class.

Each holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Modified Plan.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (i) any discussion of United States federal tax issues contained or referred to in this Supplement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

A.    **United States Federal Income Tax Consequences To Holders Of Claims Against The Debtors**

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Modified Plan to holders of Claims that are "United States

holders" as defined below. The character of any income, gain, or loss recognized for United States federal income tax purposes by holders of Claims will depend upon, among other things, the manner in which a holder acquired a Claim, the length of time the Claim has been held, whether the Claim was acquired at a discount, and, in the case of holders of General Unsecured Claims, whether such Claims are "securities" for United States federal income tax purposes. Furthermore, the timing and amount of any income, gain, or loss recognized for United States federal income tax purposes by holders of Claims will depend upon, among other things, whether the holder has claimed a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim, the holder's method of tax accounting, and whether the disposition of the Claim is eligible to be taken into account under the installment method defined in IRC Section 453. Therefore, holders of Claims should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Modified Plan. This discussion is written for holders that have not claimed a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and holders whose Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash or other property pursuant to the Modified Plan.

For purposes of the following discussion, a "United States holder" is a holder of Claims that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and elected to be treated as a United States person.

### 1.    *Holders Of General Unsecured Claims Other Than TOPrS Claims*

The United States federal income tax consequences of the discharge of General Unsecured Claims for the right to receive General Unsecured MDA Distributions (such right referred to herein as a "General Unsecured MDA Distribution Right") is uncertain and highly complex.

It is anticipated that the Reorganized Debtors will be subject to corporate level income taxes upon their receipt of any General Unsecured MDA Distributions. If the Reorganized Debtors do not have sufficient net operating loss carryovers or other tax attributes ("Tax Attributes") to offset their taxable income resulting from the receipt of General Unsecured MDA Distributions, holders of General Unsecured MDA Distribution Rights may only be entitled to receive the net amount of General Unsecured MDA Distributions after taking into account any corporate level income taxes payable by the Reorganized Debtors resulting from their receipt of such payments. No assurances can be provided that the Reorganized Debtors will have sufficient Tax Attributes to minimize the burden of such income tax liability of the Reorganized Debtors. In particular, the Debtors anticipate that they will undergo an "ownership change" (within the meaning of IRC Section 382) on the Effective Date. As a result, the Debtors' ability to use pre-

Effective Date Tax Attributes to offset any income resulting from the receipt of General Unsecured MDA Distributions may be limited. Furthermore, upon implementation of the Modified Plan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced. In general, the discharge of a debt obligation for no consideration or in exchange for cash and other property having a fair market value that is less than the "adjusted issue price" of the debt discharged gives rise to cancellation of indebtedness ("COD") income to the debtor. Because the debt discharge will occur in a title 11 bankruptcy case, any COD income will not be taxable to the Debtors. However, during the taxable year following the year of the debt discharge, such COD income will reduce certain of the Debtors' Tax Attributes which would otherwise be available to offset taxable income of the Reorganized Debtors resulting from their receipt of General Unsecured MDA Distributions.

The exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights likely constitutes a taxable exchange for United States federal income tax purposes on the Effective Date (the "Sale Treatment"), as discussed in subsection (a) below. However, the exchange of General Unsecured Claims may be eligible for "open transaction" treatment, as described in subsection (b) below (the "Open Transaction Treatment"). Holders of General Unsecured Claims are urged to consult their own tax advisors as to whether the exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights will be subject to Sale Treatment or Open Transaction Treatment.

(a)    <u>Sale Treatment</u>

Under the Sale Treatment, a holder of General Unsecured Claims would generally recognize income, gain, or loss in an amount equal to the difference between (1) the fair market value on the Effective Date of the General Unsecured MDA Distribution Rights and (2) the holder's adjusted tax basis in its General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above. A holder of General Unsecured Claims recognizing a loss as a result of the Modified Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A holder's tax basis in the General Unsecured MDA Distribution Rights received in exchange for its General Unsecured Claims would generally be equal to the fair market value of such General Unsecured MDA Distribution Rights on the Effective Date. The holding period for the General Unsecured MDA Distribution Rights would begin on the date after the Effective Date.

Upon receipt of a General Unsecured MDA Distribution, a holder of General Unsecured MDA Distribution Rights will generally recognize gain or loss equal to the difference, if any, between the amount of the General Unsecured MDA Distribution (net of any imputed interest, as described below) and the holder's tax basis in the General Unsecured MDA Distribution Right. If any General Unsecured MDA Distribution is less than the holder's tax basis in its General Unsecured MDA Distribution Right, the holder will be required to reduce its tax basis by the amount of such General Unsecured MDA Distribution, and such holder may not be allowed a loss until it is determined that no further payments will be made. Where the receipt of a payment terminates all rights to General Unsecured MDA Distributions, any gain or loss attributable to the payment generally would constitute capital gain or loss. It is unclear whether capital gain or

loss treatment would apply to any partial General Unsecured MDA Distributions. A holder of a General Unsecured MDA Distribution Right may be entitled to a loss in any year in which it is determined that its General Unsecured MDA Distribution Right has become worthless. The character of such loss as capital or ordinary loss will be determined by a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above.

Under IRC Section 483, a portion of any General Unsecured MDA Distribution may be deemed to constitute interest income that is subject to tax as ordinary income (subject to an exception relating to a de minimis sales price). The balance of the General Unsecured MDA Distribution will be treated as sales proceeds, with the consequences described above. The amount of such interest income will generally be equal to the excess of the amount received over the present value of such amount discounted back to the Effective Date at a discount rate equal to the applicable Federal rate prevailing on the Effective Date.

(b)    <u>Open Transaction Treatment</u>

The exchange of General Unsecured Claims for General Unsecured MDA Distribution Rights may constitute an "open transaction" for United States federal income tax purposes if the fair market value of the General Unsecured MDA Distribution Rights are not reasonably ascertainable as of the Effective Date. If the exchange constitutes an open transaction, a holder of General Unsecured Claims will not realize any gain or loss until, in the case of a cash method taxpayer, payment is received or, in the case of an accrual method taxpayer, all events occur which fix the right to receive the payment and the amount of such payment can be determined with reasonable accuracy. Any General Unsecured MDA Distributions received by a holder of General Unsecured Claims will be applied first against its basis in the General Unsecured Claim, thereby deferring any gain recognition until its tax basis is fully recovered. A holder of General Unsecured Claims will be required to defer any loss realized upon the receipt of a General Unsecured MDA Distribution if it may be entitled to future General Unsecured MDA Distributions.

**2.    *Holders of TOPrS Claims***

Holders of TOPrS Claims will receive no distribution on account of such Claims. A holder who holds TOPrS Claims will generally recognize a capital loss for United States federal income tax purposes in an amount equal to the holder's adjusted tax basis in its TOPrS Claims cancelled under the Modified Plan.

**3.    *Holders of Secured Claims***

Pursuant to the Modified Plan, the holders of Secured Claims may receive at the Debtors' discretion (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date, or (ii) their collateral, free and clear of liens, Claims, and encumbrances. The character of any income or loss relating to such payments as capital gain or loss or as ordinary income or loss will be determined based on a number of factors, including the factors described in "United States Federal Income Tax Consequences To Holders of Claims Against The Debtors" above. Holders of Secured Claims will generally recognize ordinary

income with respect to any postpetition interest received by them in accordance with their regular method of accounting for United States federal income tax purposes.

### 4.     *Information Reporting And Backup Withholding*

Certain payments, including payments in respect of accrued interest, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Modified Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### B.     **Importance Of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE MODIFIED PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

## VIII.   **FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS TEST**

### A.     **Feasibility Of The Modified Plan**

To confirm the Modified Plan, the Bankruptcy Court must find that confirmation of the Modified Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the plan. This requirement is imposed by section 1127 of the Bankruptcy Code, as it incorporates section 1129(a)(11), and is referred to as the "feasibility" requirement.  The Debtors believe that the Modified Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### B.    Acceptance Of The Modified Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept a plan, except under certain circumstances.  Section 1126(c) of the Bankruptcy Code (as incorporated by section 1127) defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Modified Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as either accepting or rejecting the plan unless such holders voted in connection with the Confirmed Plan. **The Bankruptcy Court has determined that in light of the circumstances present in these Chapter 11 Cases, under section 1127 of the Bankruptcy Code, it would be equitable to define "holders" as those parties that currently hold the relevant claims.  Because of this, your vote is important.  Even if you previously returned a ballot in connection with the Confirmed Plan, you must vote again in accordance with the procedures outlined elsewhere herein for your acceptance or rejection to be counted.**

### C.    Best Interests Test

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, as incorporated by section 1127, requires a bankruptcy court to find either that (i) all members of an impaired class of claims have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code.  In the Delphi cases, this "liquidation value" would consist primarily of the proceeds from the forced sale of Delphi's North American operations and rest of world operations.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the

ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.  The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

### D.   Application Of The Best Interests Test To The Liquidation Analysis To The Modified Plan

#### 1.   *Overview*

A liquidation analysis (the "Liquidation Analysis") prepared with respect to the Debtors is attached as <u>Appendix C</u> to this Supplement, and has been updated from the Liquidation Analysis appended to the Disclosure Statement.  The Debtors' updated Liquidation Analysis reflects the Debtors' progress in transforming its business operations since the December 2007 Disclosure Statement was approved by the Bankruptcy Court, as well as changes in the macro economic environment and automotive industry.  The December 2007 Liquidation Analysis was prepared assuming a December 31, 2007 Liquidation Date and was based on the unaudited book values as of March 31, 2007.  The updated Liquidation Analysis assumes a Liquidation Date of June 30, 2009 and is based on the unaudited book values as of December 31, 2008, with the exception of cash and working capital balances which have been estimated as of June 30, 2009.

Since the approval of the December 2007 Disclosure Statement, numerous events occurred that have impacted the Liquidation Analysis, including but not limited to following: (i) the continued wind-down of the AHG Division; (ii) the Debtors' divestitures of Catalyst, Interiors and Closures, North American Brake Product Assets, Brake Product Lines, Bearings Business Products, and Global Suspension Assets; (iii) the effectiveness of the Amended GSA and Amended MRA; (iv) the repatriation of dividends to DASHI under the DASHI Intercompany Transfer Order and subsequent loan of such monies to Delphi Automotive Systems LLC; (v) Corporate Restructuring Transactions involving DASHI and certain of its non-debtor subsidiaries; (vi) refinements to the claim estimates; and, most significantly, (vii) the unprecedented decline of the global automotive market, resulting in the Chapter 11 filing of one major U.S. OEM (Chrysler) and significant concerns regarding the viability of another major OEM (GM), without the implementation of significant restructuring actions.

As more fully described in <u>Appendix C</u>, many factors have contributed to a degradation of the "Net Proceeds Available for Distribution" in a hypothetical liquidation scenario.  The decline in Net Proceeds Available for Distribution between the Liquidation Analyses in the Confirmed and Modified Plans is primarily attributable to a decline in estimated recoveries associated with the Debtors' investment in the foreign subsidiaries, as well as other net

reductions to recoverable assets, offset by a decrease in projected wind-down costs, professional fees, and trustee fees. The following chart summarizes the changes in estimated Net Proceeds Available for Distribution in the Liquidation Analysis under the Confirmed Plan and the Modified Plan.

| *($ Billions)* | **Low Scenario** | **High Scenario** |
|---|---|---|
| Net Proceeds Available for Distribution (Confirmed Plan) | 7.5 | 10.4 |
| Change in Recovery Values: | | |
|    Reduction in Net Proceeds Related to Investment in Foreign Subsidiaries | (4.5) | (5.8) |
|    Other Net Reductions Including Cash Operating Losses | (3.7) | (4.0) |
| Sub-Total | (8.2) | (9.8) |
| Reduction in Wind-Down Costs and Professional and Trustee Fees | 1.7 | 1.2 |
| Total Change | (6.6) | (8.6) |
| Net Proceeds Available for Distribution (Modified Plan) | 0.9 | 1.8 |

The Debtors believe that any liquidation analysis is speculative. Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtors, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code, as incorporated by section 1127. The Debtors believe that the members of each Impaired Class will receive at least as much under the Modified Plan as they would in a liquidation in a hypothetical chapter 7 case. Holders of Claims will receive a better recovery through the distributions contemplated by the Modified Plan because it is unlikely that any holders of Claims would receive any distribution under hypothetical chapter 7 case due to the liquidation value of the Debtors' assets and the size of the DIP Lenders' Claims.

The following chart summarizes the range of creditor recoveries under the Debtors' updated Liquidation Analysis consistent with Substantive Consolidation under the Plan as well as a Substantive Consolidation – All Debtors. Under either scenario, the general unsecured creditors receive no recovery. The chart below also compares the hypothetical recoveries under the liquidation analysis included in the December 2007 Disclosure Statement.

| ($Millions)<br>Debtor(s) | Net Proceeds Available For Distribution | | All Secured Recovery [1] | | DIP [2] Recovery | | Setoff and Other Secured Recovery [1] | | Post IC Recovery [1] | | Admin & Priority Recovery [1] | | General Unsecured and PBGC Recovery | | GM GUC, TOP/S, and Equity Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lower $ | Higher $ | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower % | Higher % | Lower $ | Higher $ |
| **Substantive Consolidation Under The Plan** | | | | | | | | | | | | | | | | |
| **Delphi-DAS Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,781 | 5,338 | 76% | 100% | 100% | 100% | 0% | 0% | 0% | 30% | 0% | 30% | 0% | 0% | - | - |
| Modified Plan | 837 | 1,294 | 18% | 33% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (2,944) | (4,044) | -58% | -67% | -76% | -51% | 0% | -100% | 0% | -30% | 0% | -30% | 0% | 0% | - | - |
| **DASHI Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,564 | 5,036 | 100% | NA | NA | NA | NA | NA | 100% | 100% | 100% | 100% | 55% | 83% | - | - |
| Modified Plan | 1 | 397 | 1% | 44% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (3,563) | (4,639) | -99% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | -55% | -83% | - | - |
| **Delphi Medical Systems Colorado Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 15 | 20 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 9 | 22 | 15% | 33% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6) | 2 | -85% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Medical Systems Texas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 4 | 6 | 100% | NA | 100% | NA | NA | NA | 0% | 78% | 0% | 78% | 0% | 0% | - | - |
| Modified Plan | - | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (4) | (6) | -100% | NA | -100% | NA | NA | NA | 0% | -78% | 0% | -78% | 0% | 0% | - | - |
| **Delphi Medical Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 0 | 5 | 100% | NA | 100% | NA | NA | NA | 0% | 19% | 0% | 19% | 0% | 0% | - | - |
| Modified Plan | 0 | 0 | 0% | 0% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (5) | -100% | NA | -76% | NA | NA | NA | 0% | -19% | 0% | -19% | 0% | 0% | - | - |
| **Connection Systems Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 14 | 18 | 100% | NA | 100% | NA | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Modified Plan | 5 | 12 | 11% | 25% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (9) | (7) | -89% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Diesel Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 105 | 137 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 1% | - | - |
| Modified Plan | 10 | 28 | 9% | 23% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (95) | (109) | -91% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | -1% | - | - |
| **Delphi Mechatronic Systems, Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 22 | 29 | 100% | NA | 100% | NA | NA | NA | 0% | 42% | 0% | 42% | 0% | 0% | - | - |
| Modified Plan | 3 | 9 | 2% | 5% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (18) | (20) | -98% | NA | -76% | NA | NA | NA | 0% | -42% | 0% | -42% | 0% | 0% | - | - |
| **Specialty Electronics Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 6 | 7 | 100% | NA | 100% | NA | NA | NA | 100% | 100% | 100% | 100% | 0% | 0% | - | - |
| Modified Plan | 6 | 6 | 24% | 48% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (0) | (1) | -76% | NA | -76% | NA | NA | NA | -100% | -100% | -100% | -100% | 0% | 0% | - | - |
| **Delco Electronics Overseas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 42 | 47 | 100% | NA | 100% | NA | NA | NA | 12% | 0% | 12% | 0% | 0% | 0% | - | - |
| Modified Plan | 3 | 13 | 16% | 40% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (39) | (34) | -84% | NA | -76% | NA | NA | NA | -12% | 0% | -12% | -100% | 0% | 0% | - | - |
| **MobileAria Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3 | 3 | 100% | NA | 100% | NA | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 5 | 5 | 24% | 49% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 2 | 2 | -76% | NA | -76% | NA | NA | NA | 0% | -100% | 0% | -100% | 0% | 0% | - | - |
| **Delphi Furukawa Wiring Systems LLC** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 5 | 6 | 100% | NA | 100% | NA | NA | NA | 50% | 85% | 50% | 85% | 0% | 0% | - | - |
| Modified Plan | 12 | 14 | 16% | 26% | 24% | 49% | NA | NA | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | 8 | 8 | -84% | NA | -76% | NA | NA | NA | -50% | -85% | -50% | -85% | 0% | 0% | - | - |
| **Substantive Consolidation - All Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 7,459 | 10,434 | 100% | 100% | 100% | 100% | 100% | 100% | 65% | 100% | 65% | 100% | 0% | 18% | - | - |
| Modified Plan | 889 | 1,799 | 23% | 46% | 24% | 49% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | - | - |
| Variance | (6,569) | (8,635) | -77% | -54% | -76% | -51% | -100% | -100% | -65% | -100% | -65% | -100% | 0% | -18% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - The Confirmed Plan "All Secured Recoveries" reflect recoveries against DIP Facility and Setoff Claims, whereas the Modified Plan "All Secured Recoveries" represent recoveries against the DIP Facility, Secured Hedging Obligations, Pre-Petition Non-GM Setoff, and Other Secured Claims, which include postpetition intercompany claims. "Post IC Recoveries" reflect recoveries against DIP Facility and Setoff Claims, Administrative Claims in the Confirmed Plan and as Junior Secured Obligations in the Modified Plan.

2 - The Confirmed Plan "DIP Recovery" reflects recoveries against DIP Facility outstandings, whereas the Modified Plan "DIP Recovery" represents blended recoveries against DIP Tranche A and B outstandings, Secured Hedging Obligations (which are pari passu to DIP Tranche A and B claims), DIP Tranche C outstandings, and Pre-Petition Non-GM Setoffs (which are pari passu to DIP Tranche C claims). Modified Plan recoveries specific to each of these four types of claimants are provided in Exhibit E.

# IX.    CONFIRMATION

## A.    Confirmation Without Acceptance Of All Impaired Classes:  The "Cramdown" Alternative

Section 1127 of the Bankruptcy Code, through its incorporation of section 1129(b), provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims, without the consideration of votes of insiders, has accepted it.  The Court may confirm the Modified Plan at the request of the Debtors notwithstanding the Modified Plan's rejection (or deemed rejection) by impaired Classes as long

as the Modified Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.    A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Section 510(b) Note Claims, Existing Common Stock, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and Other Interests in Delphi are not being resolicited because such holders are not entitled to receive or retain under the Modified Plan any interest in property on account of their Claims and Interests.    Accordingly, the Debtors are seeking confirmation of the Modified Plan pursuant to section 1129(b) of the Bankruptcy Code, with respect to such Classes, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Modified Plan.    The Debtors believe that such Classes are being treated fairly and equitably under the Bankruptcy Code and thus believe the Modified Plan may be approved despite the rejection by certain Classes.

**B.      Conditions To Confirmation And Consummation Of The Modified Plan**

     *1.      Confirmation*

The Confirmation Order was entered on January 25, 2008 and became a final order on February 4, 2008.

     *2.      Conditions To The Effective Date*

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Modified Plan, as described in <u>Section IX.C. – Waiver Of Conditions To Confirmation And Consummation Of The Modified Plan</u> below:

- The Bankruptcy Court must have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Confirmed Plan. (Article 12.2(a) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Master Disposition Agreement, and all conditions precedent to the consummation of the Master Disposition Agreement must have been waived or satisfied in accordance with the terms thereof. (Article 12.2(b) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, and the DIP Agent must have effectuated the DIP Transfer.  (Article 12.2(c) of the Modified Plan)

- The Debtors or the Reorganized Debtors, as the case may be, must have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof.   (Article 12.2(d) of the Modified Plan)

- The Bankruptcy Court must have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Modified Plan. (Article 12.2(e) of the Modified Plan)

- Each Exhibit, document, or agreement to be executed in connection with the Modified Plan must be in form and substance reasonably acceptable to the Debtors. (Article 12.2(f) of the Modified Plan)

**C.      Waiver Of Conditions Precedent**

The conditions set forth in 12.2(e) and 12.2(f) of the Modified Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied

(including any action or inaction by the Debtors in their sole discretion). The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right, which may be asserted at any time.

**D.      Retention Of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Modified Plan, including, among others, the following matters:

- to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

- to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Modified Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

- to adjudicate any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under the Modified Plan;

- to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

- to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

- to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

- to issue orders in aid of execution, implementation, or consummation of the Modified Plan;

- to consider any modifications of the Modified Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order and the Modification Approval Order;

- to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Modified Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

- to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Modified Plan or the Confirmation Order or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Modified Plan; provided that retention of jurisdiction as to disputes involving GM will be as set forth in Article XIII (u) of the Modified Plan;

- to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

- to hear any other matter not inconsistent with the Bankruptcy Code;

- to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- to enter a final decree closing the Chapter 11 Cases;

- to enforce all orders previously entered by the Bankruptcy Court;

- to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim;

- to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents, the Master Disposition Agreement, except as provided in such documents; and

- to hear and determine all matters relating to the Contingent PBGC Secured Claims or the Delphi-PBGC Settlement Agreement.

Notwithstanding anything contained in the Modified Plan to the contrary, the Bankruptcy Court retains exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions. Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE MODIFIED PLAN

The Debtors believe that the Modified Plan affords holders of Claims the greatest realization on the Debtors' assets available at this time and, therefore, is in the best interests of such holders. If the Modified Plan is not confirmed, however, the likely alternative available would be liquidation of the Debtors. In this event, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code as set forth in the Liquidation Analysis attached hereto as Appendix C. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, as discussed in Section VIII – Feasibility Of The Modified Plan And The Best Interests Test and in Appendix C, the Debtors believe that unsecured creditors would receive no distribution if the Debtors were forced to liquidate and creditors senior to holders of General Unsecured Claims would receive more limited distributions, if any. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of the Debtors' assets.

## XI.    VOTING REQUIREMENTS

On June 16, 2009, the Bankruptcy Court entered the Modification Procedures Order approving, among other things, this Supplement, setting voting procedures, and scheduling the hearing on confirmation of the Modified Plan. A copy of the Final Modification Hearing Notice is enclosed with this Supplement. The Final Modification Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Modified Plan. The Final Modification Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of this Supplement.

If you have any questions about (i) the procedure for voting your Claim with respect to the packet of materials that you have received, (ii) the amount of your Claim holdings, or (iii) if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Modified Plan, this Supplement, any exhibits to such documents, or a copy of the Disclosure Statement as approved in December 2007, please contact:

| | |
|---|---|
| Voting Agent for All Creditors except Noteholders | Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, California 90245<br>Att'n: Delphi Corporation<br>Telephone: (888) 249-2691<br>Fax: (310) 751-1856<br>www.delphidocket.com |
| Voting Agent for Noteholders | Financial Balloting Group LLC<br>757 Third Avenue, 3rd Floor<br>New York, New York 10017<br>Att'n: Delphi Corporation Ballot Tabulation<br>Telephone: (866) 486-1727.<br>www.fbgllc.com |

The Bankruptcy Court may confirm the Modified Plan only if it determines that the Modified Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Modified Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Modified Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Modified Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Modified Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code, as incorporated by section 1127, in spite of the nonacceptance by one or more such Classes, (b) the Modified Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Modified Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Modified Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Modified Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

**THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE MODIFIED PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE MODIFIED PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY**

**COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE MODIFIED PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE MODIFIED PLAN IS FEASIBLE, AND THAT THE MODIFIED PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.**

**UNLESS THE BALLOT (OR MASTER BALLOT ON BEHALF OF A NOTEHOLDER) BEING FURNISHED IS TIMELY RECEIVED BY THE APPROPRIATE VOTING AGENT ON OR PRIOR TO JULY 15, 2009 AT 7:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.**

### A.     Parties-In-Interest Entitled To Vote

Under section 1127 of the Bankruptcy Code, as it incorporates other sections of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party-in-interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan.  If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan, and the plan proponent need not solicit such holder's vote.

The holder of a Claim or Interest that is Impaired under a plan is entitled to vote to accept or reject the plan if (1) the plan provides a distribution in respect of such Claim or Interest and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Claimholder has filed a Proof of Claim as to which no objection has been filed, or (c) such Claimholder has timely filed a motion pursuant to Federal Rule of Bankruptcy Procedure 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtor has not opposed the Motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Court.

A vote may be disregarded if the Court determines that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

The Bankruptcy Court has determined that in light of the circumstances present in these Chapter 11 Cases, under section 1127 of the Bankruptcy Code, it is equitable to define "holders" as those parties that currently hold the relevant claims.  Thus, even if a holder of a Claim or Interest previously returned a ballot in connection with the Confirmed Plan, the holder must cast a new ballot accepting or rejecting the Modified Plan so that such vote can be counted.  Pursuant to section 1127, if a holder of a Claim or Interest does not vote to accept or reject the Modified Plan by the Voting Deadline, that holder's prior vote will count as it was originally cast, but only to the extent that such holder is entitled to vote on the Modified Plan.

In addition, the Debtors have requested that if no holder of a Claim or Interest in a particular class votes to accept or reject the Modified Plan, then the applicable class be deemed to have accepted the Modified Plan.  Thus, if you do not want such a presumption to arise, you should timely submit a ballot to accept or reject the Modified Plan.  The Bankruptcy Court has indicated that this issue will be considered, if necessary, at the Final Modification Approval Hearing.  Thus, once again, your vote is important.

### B.    Classes Impaired Under The Modified Plan

#### 1.    *Voting Impaired Classes Of Claims*

The following Classes of Claims and Interests are Impaired under, and are entitled to vote to accept or reject, the Modified Plan:

| | |
|---|---|
| **Class 1A-1 through Class 12A-1** | (Secured Claims) |
| **Class 1C-1 through Class 12C-1** | (General Unsecured Claims) |
| **Class 1C-2 through Class 12C-2** | (Contingent PBGC General Unsecured Claims) |
| **Class 1D through Class 12D** | (GM Claim) |

#### 2.    *Unimpaired Classes Of Claims*

Classes B and K are Unimpaired under the Modified Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Modified Plan.  Their votes to accept or reject the Modified Plan will not be solicited.  Because all Debtors are proponents of the Modified Plan, Class F Intercompany Claims are deemed to have accepted the Modified Plan. The votes of holders of such Claims therefore will not be solicited.

#### 3.    *Impaired Classes Of Claims And Interests Deemed To Reject The Modified Plan*

Holders of Claims and Interests in Classes E, G-1, G-2, H, and I are not entitled to receive any distribution under the Modified Plan on account of their Claims or Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Classes E, G-1, G-2, H, and I are conclusively presumed to have rejected the Modified Plan, and the votes of holders of Claims or Interests in such Classes therefore will not be solicited.

### 4. *Presumed Acceptance By Certain Classes Of Interests*

Holders of Class J Interests in the Affiliate Debtors are conclusively presumed to have accepted the Modified Plan as such Interest holders are proponents of the Modified Plan and, as such, the votes of such Interest holders will not be solicited.

## XII.   CONCLUSION

### A.   Hearing On And Objections To Confirmation

### 1. *Final Modification Hearing*

The hearing on confirmation of the Modified Plan has been scheduled for July 23, 2009 at 10:00 a.m. (prevailing Eastern time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Modified Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties-in-interest.

### 2. *Date Set For Filing Objections To Confirmation Of The Modified Plan*

The time by which all objections to confirmation of the Modified Plan must be filed with the Court and received by the parties listed in the Final Modification Hearing Notice has been set for July 15, 2009 at 4:00 p.m. (prevailing Eastern time).  A copy of the Final Modification Hearing Notice is enclosed with this Supplement.

### B.   Recommendation

The Modified Plan provides for an equitable and early distribution to creditors of the Debtors, preserves the value of Delphi's business as a going concern, and preserves the jobs of employees.  The Debtors believe that any alternative to confirmation of the Modified Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by the Debtors' employees.  Moreover, the Debtors believe that their creditors will receive greater and earlier recoveries under the Modified Plan than those that would be achieved in liquidation or under an alternative plan.

**FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE MODIFIED PLAN.**

Dated: Troy, Michigan
June 16, 2009

DELPHI CORPORATION AND THE
AFFILIATE DEBTORS

By: /s/ John D. Sheehan
John D. Sheehan
Vice President, Chief Financial Officer

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft