ROBINSON BROG LEINWAND      Sale Approval Hearing Date: June 30, 2009 at 9:45 a.m
GREENE, GENOVESE & GLUCK, P.C.
1345 Avenue of the Americas
New York, New York 10105
(212) 603-6300
*Russell P. McRory*
*Fred B. Ringel*
*A. Mitchell Greene*
*Robert R. Leinwand*

MYERS & FULLER P.A.
2822 Remington Green Circle
Tallahassee, Florida 32308
(850) 878-6404
*Richard Sox (admission pro hac vice pending)*
*Shawn Mercer (admission pro hac vice pending)*
*Robert Byerts (admission pro hac vice pending)*

*Attorneys for the Greater New York Automobile Dealers Association*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | | |
|---|---|---|
| **In re:** | : | **CHAPTER 11** |
| | : | |
| **GENERAL MOTORS CORP.,** *et al.*, | : | **Case No. 09-50026 (REG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

-------------------------------------------------------------X

**GREATER NEW YORK AUTOMOBILE DEALERS ASSOCIATION'S
(1) MOTION FOR CONSIDERATION OF AMICUS CURIAE STATEMENT AND
(2) AMICUS CURIAE STATEMENT REGARDING, DEBTORS' MOTION
PURSUANT TO 11 U.S.C. §§ 105, 363(B), (F), (K), AND (M), AND 365 AND FED.
R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE (A) THE SALE
PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH
VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED
PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C)
<u>OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING</u>**

{00439015.DOC;1}

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Amicus Curiae, the Greater New York Automobile Dealers Association, by and through its undersigned counsel, hereby moves for leave to have the statement contained herein considered in connection with the above-captioned debtors and debtor-in-possession ("Debtors") Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (a) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (b) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Other Relief; and (II) Schedule Sale Approval Hearing (the "Sale Motion") (Dkt. No. 92).

## PRELIMINARY STATEMENT

1. The Greater New York Automobile Dealers Association ("GNYADA") is a nonprofit corporation organized under the laws of the State of New York representing approximately 600 franchised new car and truck dealers in Westchester, Rockland, New York City and Long Island (New York's nine downstate county region). Our members invest billions of dollars annually in facilities, personnel and products in order to sell, lease and service new and used cars and trucks. GNYADA advocates on behalf of its members before tribunals on issues affecting the retail motor vehicle trade, including issues concerning the relationships between motor vehicle manufacturers or distributors and dealers. Many of GNYADA's members are franchisees of the Debtor. GNYADA'S unique position and perspective permit it to offer insight to the Court unavailable from other parties on matters of law raised by the Debtors' Sale Motion. GNYADA requests

that the statement contained herein be considered by the Court in connection with the Debtors' Sale Motion.

2.  General Motors Corporation and certain of its subsidiaries (collectively, "GM" or the "Debtors") attempts, in connection with the proposed sale of assets, to force their dealers, through execution of Participation, Wind Down, or Deferred Termination Agreements (collectively, the "Avoidance Agreements"), to waive State laws designed to protect the dealers' investments from a manufacturer's coercive acts.

3.  The overall marketplace and competition benefit from the State regulation of motor vehicle manufacturers, distributors and dealers. In the Franchised Motor Vehicle Dealer Act, Vehicle and Traffic Law, Art. 17-A, § 460 *et seq* (the "New York Act"), New York's Legislature found that:

> *the distribution and sale of motor vehicles within this state vitally affects the general economy of the state and the public interest and the public welfare*, and that in order to promote the public interest and the public welfare and in the exercise of its police power, it is necessary to regulate motor vehicle manufacturers, distributors and factory or distributor representatives and to regulate dealers of motor vehicles doing business in this state in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state

*See* §460 (emphasis supplied).

4.  The presence of an active and effective motor vehicle dealer network ensures a competitive marketplace for consumers and businesses, private and public, to meet their transportation needs. GNYADA members, like other franchised dealers in the automobile industry, benefit from the enactment of legislation including, among other laws, the New York Act and the Automobile Dealers Day In Court Act ("ADDCA"), 15 U.S.C. §§ 1221, *et seq*., designed to protect them against the superior economic power of

the franchisors. These laws were enacted in recognition of "[t]he disparity of bargaining power between automobile manufacturers and their dealers [and are] intended to protect retail car dealers from abusive and oppressive acts by manufacturers . . . ." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox*, 439 U.S. 96, 100 (1978). The memorandum in support of the bill initially adopting the New York Act pointed to the "great disparity in bargaining power between the motor vehicle manufacturer and the motor vehicle dealer" and stated that it sought to provide "certain basic protection" for "the motor vehicle dealer who frequently has millions of dollars invested in dealership real property, equipment and good will [but] can do nothing to oppose the will of the manufacturer without jeopardizing this substantial investment." Memorandum in Support of Legislation, *reprinted in* Governor's Bill Jacket, 1983 N.Y. Laws, ch. 815. GNYADA members have an obvious interest in the manner in which these laws are construed and applied by the courts.

5. In the instant case, using the Avoidance Agreements, Debtors have conditioned their assumption of a dealer's franchise agreement upon that dealer's "agreement" to waive numerous protections in New York law. This is contrary to federal law (28 U.S.C. § 959(b)) which requires a debtor in possession to manage and operate its business in accordance with state law, and contrary to New York law which, like other State laws, forbids the prospective waiver of State law protections (New York Act § 463(2)(l)). Debtors have also utilized the Avoidance Agreements to nonrenew and terminate dealers and, in connection therewith, pay termination assistance amounting to only a fraction of the dealers' investment in the dealership facility and Debtors' products. The relief sought by the Debtors' Sale Motion, if granted by the Court, would result in the

{00439015.DOC;1}
4

modification of the franchises of Debtors' current dealers, contrary to the prohibition in the New York Act [§463(2)(ff)].

6. GNYADA does not oppose the 363 Sale, *per se,* and does not challenge the Debtors' business judgment regarding the overall transaction. Indeed, GNYADA supports a revitalized and competitive new GM. Rather, this Amicus Curiae statement addresses specific conduct of the debtor in possession that violates the New York Act and the ADDCA.

7. Specifically, the Debtor seeks this Court's approval of a transaction involving conduct towards its dealers that is unlawful under both State and Federal law. This Court should not permit such a result and, instead, should affirm the protections afforded by both Federal and New York law. In addition, the final sale order should affirm that any provision of a franchise related agreement, including the Avoidance Agreements, that contravenes New York and Federal law, is invalid and unenforceable.

## BACKGROUND

8. On June 1, 2009, Debtors filed voluntary petitions for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"), as well as a "Sale Motion" seeking authorization from this Court to sell substantially all the assets of General Motors Corporation and certain of its subsidiaries as a going concern to a "Purchaser" (referred to in the Sale Motion as "New GM" or in other instances, the "363 Acquirer") pursuant to a proposed Master Sale and Purchase Agreement and related agreements (as defined in the Sale Motion, the "MPA"). *See* Sale Motion at p. 2, ¶ 1; p. 8, ¶ 16.

{00439015.DOC;1}

5

9. According to the Sale Motion, GM plans to assume substantially all the franchise agreements currently in place with its existing dealers (the "Dealer Agreements"), and to assign those agreements to New GM pursuant to 11 U.S.C. § 365. *Id.* at p. 10, ¶ 19. As a condition of assuming these Dealer Agreements however, GM requires their modification through one of the Avoidance Agreements. For example, GNYADA members report that GM demands execution (without so much as a stray mark to vary the terms of the boilerplate agreement) of the Participation Agreement (copy attached hereto as "Exhibit B") if the dealer wants to be assigned to New GM. *See* Ex. A (cover letter) and Ex. B (Participation Agreement). The cover letter accompanying the Participation Agreement expressly provides: "In order for your Dealer Agreements to be assigned to the 363 Acquirer, you must execute the enclosed letter agreement." *See* Ex. A at p. 1. Dealers who do not timely execute and return the Participation Agreement will be presented to the Bankruptcy Court for rejection of their Dealer Agreements. *See* Sale Motion at p. 10, ¶ 20.

10. In response to numerous complaints from State and National dealer associations, GM agreed to amend certain portions of the Participation Agreement. *See* Ex. C. Nonetheless, the revisions fail to preserve many important legal protections afforded dealers in violation of both federal and state law.

11. GM has similarly offered Deferred Termination or Wind Down Agreements (copy attached as Exhibit D) to dealers who hold franchises of brands that GM has chosen to discontinue. *See* Affidavit of Frederick A. Henderson at p. 40, ¶¶ 93, 94 [Dkt. No 21]. These Deferred Termination and Wind Down Agreements provide for a small payment to the dealer, *see* Ex. D at p.2, ¶ 3, in return for a waiver of termination

{00439015.DOC;1}

6

assistance otherwise required by the Dealer Agreement or State law.  *See* Ex. D at p.3, ¶ 4(c).  Once again, GM demands timely execution of these agreements, with no opportunity to change any terms or conditions, or else the Dealer Agreement will be presented to the Bankruptcy Court for rejection.  *See* Ex. E, Cover Letter ("If we do not receive the enclosed agreement executed by you on or before June 12, 2009, GM will apply to the bankruptcy court to reject your dealer agreements.").

12.  The non-negotiable and no alternative ultimatum presented to New York's GM dealers is a true Morton's Fork, in which the dealers must choose between two equally unpleasant choices.  Upon making their decision, the dealers either lose the protections of their current Dealer Agreement as well as New York and Federal law, or lose their dealership and substantially all of their investment therein.  To compound the injury, the Participation and Wind Down Agreements both require the dealer to expressly "acknowledge(s) that its decisions and actions are entirely voluntary and free from any duress."  *See* Exhibit B ¶ 9(f), and Exhibit D ¶ 10. If the dealer chooses not to so acknowledge, then that the dealer would have its Dealer Agreement rejected and lose substantially its entire investment in the dealership.

## ARGUMENT

### The Consummation of the Sale Transaction and Incorporated
### Participation and Wind Down Agreements
### Violate State Dealer Statutes In Violation of 28 U.S.C. 959(b)

13.  Acting in its capacity as debtor-in-possession, GM has conditioned its assumption and assignment of Dealer Agreements upon its dealers' waiver of State law rights. The Debtors' conditioning their assumption of the Dealer Agreements upon a

{00439015.DOC;1}

7

waiver of rights under state law exceeds Debtors' authority under 28 U.S.C § 959(b), the Bankruptcy Code and fundamental equitable considerations.

14. Congress long ago recognized the need to protect dealers from oppressive acts by manufacturers:

> Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facility to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory. On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.

S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956). When Congress expressed its intent, it did not in any way indicate that Bankruptcy considerations trumped these fundamental policy underpinnings.

15. Broadly speaking, the New York Act prohibits automobile companies from, among other things, seeking to coerce dealers into signing agreements or otherwise acting contrary to their economic interests. *See* §463(2)(b). The language of the New York Act makes these, and similar unfair practices by manufacturers like General Motors, unlawful. *See, e.g.* §463(1) ("It shall be unlawful for any franchisor to directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer..."); §463(2) ("It shall be unlawful for any franchisor…"). Section 469-a of the New York Act grants the Commissioner of Motor Vehicles power to enforce the provisions of the New York Act. Section 469 of the New York Act grants dealers a private right of action that includes both monetary damages and an independent right to injunctive relief.

16. Debtors in possession, such as GM, must operate their property in accordance with valid state laws even when such operation requires monetary expenditures. 28 U.S.C. 959(b) provides:

> a debtor in possession, shall manage and operate the property in his possession…according to the requirements of valid state laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

17. In *Reading v. Brown*, 391 U.S. 471, 478, 485 (1968), the Supreme Court confirmed that debtors in possession have liability under state tort and agency laws. Later the Supreme Court further confirmed that section 959(b) "…supports our conclusion that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 505 (1986).

18. In the instant case, a plethora of state dealer laws protect dealers from unfair acts by manufacturers. *See e.g*. N.Y. Veh. & Tr. Law §463 (New York); Ga. Code. Ann. §10-1-662, *et seq* (Georgia); Fl. Stat. Ch. 320 (Florida); N.C. Gen. Stat. §20-285 *et seq* (North Carolina): Ariz. Rev. Stat. §28-4308 (Arizona); Mass. Gen. Laws. ch. 93B (Massachusetts); Mich. Comp. Laws §445.1573 (Michigan); Wash. Rev. Code §46.96.185 *et seq* (Washington); Ky. Rev. Stat. Ann. §190.040 *et seq* (Kentucky); 63 Pa. Cons. Stat. Ann. §818.12 (Pennsylvania). Debtors, fully aware of these state law protections for dealers, have attempted, through various agreements tendered to its dealers, to obtain the dealers' agreement that such laws do not apply to the dealers' franchises. However, Debtors offer no equitable rationale or legal basis for ignoring the dictates of 28 U.S.C. 959(b), and none exists.

19. As one bankruptcy jurist observed:

> The purpose of bankruptcy *is not to permit debtors or nondebtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business.* Bankruptcy does not grant the debtor a license to eliminate the marginal cost generated by compliance with valid state laws that constrain nonbankrupt competitors. The Congress has thus required that every debtor in possession and bankruptcy trustee manage and operate the debtor's property and business in compliance with state laws-good, bad, and indifferent-that apply outside of bankruptcy.

*In re White Crane Trading Co., Inc.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (emphasis supplied); *see also In re Vel Rey Properties, Inc.*, 174 B.R. 859, 866 (Bankr. D. D.C. 1994) (debtor cannot operate its business in violation of state laws; Section 959(b) ensures that debtors "do not gain an unfair advantage in the market by operating behind the shield of the bankruptcy laws in contravention of state law;" if a debtor can not be "reorganized in compliance with state laws, then bankruptcy is not the place for the debtor.")

20. As the forgoing precedent establishes, a debtor in possession cannot use a bankruptcy proceeding, and cannot misuse the Bankruptcy Code, to override state law in order secure a competitive advantage over others not in bankruptcy. Yet, that is precisely what is happening here. GM attempts to use this bankruptcy proceeding, and to misuse the Bankruptcy Code, to side step state and Federal law in an effort to gain a competitive advantage in the marketplace. In other words, GM is going far beyond simply rejecting disadvantageous contracts. Instead, GM seeks to change the competitive equilibrium in the marketplace through this 363 Sale and associated actions impacting the franchise agreements of its dealers. GM seeks, through this proceeding, to gain advantage over other manufacturers. Permitting GM in bankruptcy, to ignore state dealer laws upsets the competitive balance among GM and every other automotive manufacturer. GM's

conduct toward its dealers is both unauthorized by the Bankruptcy Code and unlawful under the Federal ADDCA and under state dealer laws, including the New York Act.

21. Through the Avoidance Agreements, Debtors attempt to subvert and avoid the protections of the dealer laws. For example, the New York Act provides that a manufacturer may not unfairly modify the franchise of a dealer. *See* § 463(2)(ff). A modification is unfair if it is not undertaken in good faith, for good cause, or would adversely and substantially alter the rights obligations, investment or return on investment of the dealer under the existing Dealer Agreement. *Id.*

22. The Avoidance Agreements proposed by GM constitute an unfair modification to existing Dealership Agreements. For example, the Participation Agreement provides, in relevant part: (a) "[t]o facilitate (the Dealer's) expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Lines to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations. . . ." *See* Participation Agreement at ¶ 3; (b) Paragraph 4 of the Participation Agreement, requires that (i) during the remaining term under the Dealership Agreements, the affected dealers abstain from selling any non-GM vehicles without the consent of GM or the 363 Acquirer (which consent may be granted or withheld by GM or the 363 Acquirer in their sole discretion), and (ii) if the affected dealer is currently operating a non-GM dealership on the dealership's premises, the affected dealer must cease such operations on or before December 31, 2009. *See* Participation Agreement, ¶ 4; and (c) Paragraph 5 of the Participation Agreement prohibits an affected dealer from protesting or challenging before a court or administrative agency the establishment or

{00439015.DOC;1}

relocation of a motor vehicle dealership that is at least six (6) miles from the affected dealer's current location.

23. Each of these provisions adversely and substantially alters the rights obligations, investment, or return on investment, of a dealer under its existing Dealer Agreement and under existing State laws. Yet, under the Participation Agreement, the dealer cannot challenge the modification to their franchise because if the dealer does so, the Participation Agreement strips the dealer of any right to continue to sell GM vehicles. *See, e.g.*, Participation Agreement at ¶ 6 ("Release; Covenant Not to Sue; Indemnity"). In short, the Debtors' attempts to obviate State dealer law contravenes 28 U.S.C. §959(b). This Court, in addressing the proposed asset sale, should confirm that the Avoidance Agreements Debtors have tendered to dealers to facilitate the assumption of the Dealer Agreements are void and unenforceable because such agreements contravene State franchise laws, such as the New York Act, and Federal law, such as the ADDCA.

**Debtors' Proposed Payments To Dealers Unfairly Fail To Compensate Rejected Dealers For Recent Expenditures Debtors Imposed On Dealers**

24. The amount of compensation provided by the Wind Down Agreements reflects but a fraction of the dealers' investments in their dealerships. As a condition of acquiring the franchise, Debtors required all dealers to demonstrate the presence of a facility meeting Debtors' requirements, often requiring the expenditure of millions of dollars to either construct or acquire. The amount of these investments has increased as Debtors required dealers to acquire additional GM line-makes in order to continue as a dealer. In recent years GM has moved aggressively to foster combinations of individual brands at each dealership. *See* Automotive News June 4, 2007, "Combo stores are top priority of new Buick, Pontiac, GMC bosses"; Automotive News June 16, 2008, "GM's

{00439015.DOC;1}

12

Marketing Moves Will Speed Dealer Consolidation." Debtors obviously knew of, fostered and participated in these acquisitions and combinations. Many of these acquisitions and combinations were completed as recently as months and even weeks before the commencement of this proceeding.

25. In connection with the required addition of a line-make at a dealership, Debtors required dealers to make some combination of expenditures to acquire the franchise itself, on the facility (to increase capacity), and on imaging and signage specific to the Debtors' brands.

26. These expenditures cost dealers, in many instances, millions of dollars to buy the franchise from another dealer, to construct or renovate a dealership facility to handle the additional line make, and/or to install and incorporate brand specific architectural features, signage and imaging features.

27. Debtors knew the particular amounts Debtors had required dealers to expend to acquire the line-make, to acquire, construct or expand a facility and to upgrade or modify the facility to meet Debtors' imaging requirements. Notwithstanding Debtors knowledge and encouragement of the dealers' expenditure of millions of dollars, the compensation Debtors provide in the Wind Down agreements is wholly insufficient.

28. Moreover, in the months leading up to this proceeding GM pushed dealers to buy more and more vehicles, knowing a bankruptcy filing was likely. GM pressured dealers to take on additional inventory to bolster GM's cash position.

29. The compensation Debtors provide to the dealers in the Wind Down Agreements is insufficient to meet the requirements of the Dealer Agreements and State laws. In light of the recent expenditures mandated by Debtors in connection with the

acquisition of other line-makes and acquiring additional inventory at GM's insistence, the compensation offered in the Wind Down Agreements is patently unreasonable and inequitable. GM required dealers to incur these costs and now offers them pennies on the dollar.

## CONCLUSION

Debtors' mandatory modifications to the Dealer Agreements unquestionably violate New York law and Federal law. Debtors' actions are unlawful under both state and federal law in violation of 28 U.S.C. §959(b). Bankruptcy does not vest Debtors with the power to thwart either state or federal law.

Payments to dealers proposed as part of the Wind Down Agreements are facially insufficient consideration where Debtors recently required dealers to expend resources to acquire line-makes, construct or renovate facilities and implement imaging programs. It is patently unreasonable and inequitable to cause dealers to incur additional expenses expanding dealerships and taking on additional inventory and then cutting them off at the knees in bankruptcy.

This Court should ensure that the equitable remedy of bankruptcy is not used to achieve the inequitable result that Debtors seek.

Dated: June, 19, 2009
      New York, New York

      ROBINSON BROG LEINWAND GREENE
      GENOVESE & GLUCK P.C.

      By: /s/ Russell P. McRory
      *Russell P. McRory*
      *Fred B. Ringel*
      *A. Mitchell Greene*
      *Robert R. Leinwand*
      1345 Avenue of the Americas
      New York, New York 10105
      Telephone: (212) 603-6300
      Facsimile: (212) 956-2164

      and

      MYERS & FULLER P.A.
      *Richard Sox*
      *Robert Byerts*
      *Shawn Mercer*
      2822 Remington Green Circle
      Tallahassee, Florida 32308

      *Attorneys for the Greater New York*
      *Automobile Dealers Association*

{00439015.DOC;1}