Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                             :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.,** *et al.*, | : | **09-50026 (REG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**DEBTORS' OBJECTIONS TO APPLICATION**
**OF GENERAL MOTORS RETIREES ASSOCIATION FOR THE**
**APPOINTMENT OF A RETIREES COMMITTEE PURSUANT TO 11 U.S.C. § 1114(D)**

# TABLE OF CONTENTS

**Page**

Background and Overview of GM's Salaried Retiree Benefits Programs ................................... 2

The Motion Should Be Denied ........................................................................................................ 4

    A.    GM Has an Unequivocal Contractual Right to Amend or Terminate
Salaried OPEB Plans............................................................................................. 4

    B.    Section 1114 of the Bankruptcy Code is Inapplicable to GM's
Modification or Termination of the Salaried OPEB Plans ................................... 7

    C.    A Retirees Committee Should Not Be Appointed in These Cases ...................... 12

Conclusion ................................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re Ames Department Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996) ....................................................10

*In re Ames Department Stores, Inc.*, 1992 U.S. Dist. LEXIS 18275 (S.D.N.Y. Nov. 30, 1992) ...........................................................................................................................................10

*In re Anchor Glass Container Corp.*, 342 B.R. 878 (Bankr. M.D. Fla. 2005) ..............................9

*CF & I Steel Corp.* v. *Conners* (In re CF & I Fabricators of Utah, Inc.), 163 B.R. 858 (Bankr. C.D. Utah 1994) .........................................................................................................9

*In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir. 1991) .......................................................8, 10, 11

*In re Delphi Corp.*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2009) ............9

*In re Doskicil Co.*, 130 B.R. 870 (Bankr. D. Kan. 1991)...........................................1, 8, 9, 10, 11

*In re Farmland Industries, Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003)................................10, 11

*In re Lykes Brothers S.S. Co.*, 233 B.R. 497 (Bankr. M.D. Fla. 1997)...........................................9

*Moore* v. *Metropolitan Life Insurance Co.*, 856 F.2d 488 (2d Cir. 1988).............................5, 6, 7

*In re N. Am. Royalties, Inc.*, 276 B.R. 860 (Bankr. E.D. Tenn. 2002)...........................................9

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) ......................................1, 4, 5, 6

## FEDERAL STATUTES

11 U.S.C. § 365(e)(1)...........................................................................................................11, 12

11 U.S.C. § 365(e)(2).................................................................................................................12

11 U.S.C. § 1114(d) ....................................................................................................1, 8, 10, 12

29 U.S.C. § 1051(l)...............................................................................................................11, 12

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("**GM**") and its affiliated debtors (collectively, the

"**Debtors**"), in opposition to the application of the General Motors Retirees Association

("**GMRA**") for the appointment of a retirees committee (the "**Retirees Committee**") pursuant to

section 1114(d) of title 11, United States Code (the "**Bankruptcy Code**"), dated June 2, 2009

(the "**Motion**") [Docket No. 263], respectfully represent:

### GMRA's Motion for the Appointment
### Of a Retirees Committee Should Be Denied

1.      Section 1114 of the Bankruptcy Code does not govern GM's Salaried

Retiree Benefits Plans.  It is incontrovertible that GM has always retained the contractual right to

terminate or otherwise modify retirement benefits under their Salaried Retiree Healthcare and

Life Insurance Plans.  *Sprague v. General Motors Corp*., 133 F.3d 388, 400 (6th Cir. 1998) (GM

has unequivocal right to amend or terminate non-union retiree healthcare and life insurance plans

and benefits thereunder).  The majority of courts that have decided the issue have determined

that section 1114 of the Bankruptcy Code does not apply to benefit plans under which the plan

sponsor reserves a right to amend or terminate such plans or benefits.  *See In re Doskicil Cos.*,

130 B.R 870 (Bankr. D. Kan. 1991).  Consequently, section 1114 should not be construed to

provide salaried retirees with more rights than they would have in a nonbankruptcy context.

2.      Moreover, GMRA's request is premature.  GM has not initiated any

proceedings in these chapter 11 cases to modify or terminate salaried retiree benefits.  Thus, the

appointment of a Retirees Committee at this juncture is inappropriate and would be an

unnecessary expense imposed upon the Debtors and their economic stakeholders.  The Motion

should be denied.

**Background and Overview of GM's Salaried Retiree Benefits Programs**

3.      On June 1, 2009, GM, a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks, filed for chapter 11 with the clear intent to preserve its going concern value for the benefit of all of its creditors.  To achieve this purpose, GM entered into a transaction with its largest secured creditor, the United States Department of the Treasury (the "**U.S. Treasury**"), to sell substantially all of its assets to Vehicle Acquisition Holdings LLC, an entity sponsored by the U.S. Treasury (the "**363 Transaction**").  On June 3, 2009, two days after the commencement of the instant chapter 11 cases, the U.S. Trustee appointed a statutory committee comprised of fifteen unsecured creditors (the "**Official Committee**") for these jointly administered chapter 11 cases.

4.      As part of its employee benefits programs, GM provided certain post-retirement welfare benefits coverage to retired salaried employees under the following plans:

      a.      GM Salaried Health Care Program (the "**Health Care Program**"), and

      b.      GM Life and Disability Benefits Program (the "**Life Insurance Program**," and together with the Health Care Program, the "**Salaried OPEB Plans**").

Hourly or unionized employees were provided similar benefits pursuant to particular collective bargaining agreements.

5.      In connection with the Salaried OPEB Plans, participants are solicited to re-enroll in such Plans as of the beginning of each calendar year.  During the fall of each calendar year, GM provides annual enrollment forms to salaried retirees, together with an enrollment brochure explaining changes in benefits that will take effect in the following calendar year.  The enrollment brochure and ancillary documents pertaining to the Salaried OPEB Plans

include an unequivocal statement of GM's retained right to amend or terminate its Salaried

OPEB Plans.

6.      Typically, GM reviews the terms and costs of each Salaried OPEB Plan,

together with its other employee welfare plans, during each calendar year and adopts changes to

take effect as of the beginning of the next calendar year, as noted above.  Such periodic changes

to GM's Salaried Retirees' Plans occur in the ordinary course of GM's operations.  Changes that

had been made to Salaried OPEB Plans prior to the commencement of these chapter 11 cases

included:

a.      In July 2008, the GM Board of Directors approved the elimination of certain coverage under the Health Care Program (including medical, dental, vision, and extended care coverage) for salaried retirees, surviving spouses, and their dependents, age 65 or older, that took effect January 1, 2009.  Under the terms of the changes, eligible dependents younger than 65 will continue to receive Health Care Program coverage until they reach age 65.  In connection with the benefit reductions, GM provided that most salaried retirees and surviving spouses at age 65 or over would receive a new monthly pension benefit of $300;

b.      In September 2008, GM made additional changes to the Salaried OPEB Plans to comply with a cap on salaried retiree health care that was approved by the GM Board of Directors on or about January 1, 2007.  The additional changes to the Salaried OPEB Plans were communicated to salaried retirees, their spouses, and eligible dependents as a part of the 2009 enrollment materials and the customary annual enrollment process;

c.      During 2006, GM announced reductions in the amount of salaried retiree life insurance coverage for salaried retirees as of January 1, 2007, with such reductions to become effective on January 1, 2017.  The life insurance coverage was to be reduced by 50%, but in no event would any participant have less than $25,000 of life insurance coverage.  Effective May 1, 2009, GM partly accelerated the effective date of a portion of the reductions in the amount of senior retiree life insurance coverage by reducing the amount of such coverage by 25%, but in no event less than $25,000 for any participant, *provided, however*, that such reduction would not

apply during the first ten years following a salaried employee's retirement from GM. This partial acceleration of the effective date was communicated to participants by individual letters mailed on or about February 16, 2009. The Employee Pension and Benefits Committee of GM approved the changes shortly before the mailing.

7.      The Motion fails to mention that the foregoing changes, other than the May 1, 2009 acceleration which was communicated to beneficiaries as described above, were communicated to salaried retirees, their spouses, and eligible dependents more than six months preceding the commencement date of these chapter 11 cases and that the changes were put into effect during the beginning of 2009 in the ordinary course of GM's operations and consistent with its past practices.

8.      As of the date hereof, GM has not proposed any further changes in any of the Salaried OPEB Plans.[1]

## The Motion Should Be Denied

### A.  GM Has an Unequivocal Contractual Right to Amend or Terminate Salaried OPEB Plans

9.      Each Salaried OPEB Plan explicitly reserves to GM the right to modify or terminate such plan. The summary plan description for each Salaried OPEB Plan expressly sets forth such retained right of GM. The retained right to amend or terminate was addressed in the *Sprague* case, *supra*, and upheld. The summary plan description described in that case is the same as the current summary plan description:

> General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet.

---

[1] The Motion incorrectly suggests that the Debtors are planning to terminate the GM Retirement Program for Salaried Employees (the "**Salaried Pension Plan**") (Motion ¶¶ 29, 30). Under the terms of the proposed 363 Transaction, the purchaser of the Debtors' assets will assume the Salaried Pension Plan. Master Sale and Purchase Agreement, Section 6.17(e).

*Your GM Benefits* (1984).

10.    In the *Sprague* case, the United States Court of Appeals for the Sixth

Circuit reviewed GM's Health Care Program and related documents and found that the Health

Care Program explicitly permits GM to unilaterally amend or terminate benefits under that

program.  133 F.3d at 400.

11.    As both the *Sprague* case, *supra*, and the United States Court of Appeals

for the Second Circuit have held, the ability of a company to amend or terminate retiree benefits

is governed solely by the plan document and summary plan description, and not by other

ancillary documents and communications a company may have sent to retirees.  *Id.; Moore v.

Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988).

12.    In a vain attempt to circumvent the established principles of law, the

Motion posits that many of the GM salaried retirees have vested benefits, but GMRA fails to

explain vesting in the context of the Employee Retirement Income Security Act of 1974

("**ERISA**").  ERISA regulates the construction, administration, and interpretation of employer-

provided insurance programs.  Welfare benefit plans are specifically excluded from the vesting

requirements of ERISA.  Vesting will not occur as to such plans when the employer sponsoring

the plan expressly reserves the right to amend or terminate the plan.  29 U.S.C. § 1051(1); *see

Moore,* 856 F.2d at 491; *Sprague*, 133 F.3d at 400.[2]  As to the consideration of vested benefits,

---

[2] As the Second Circuit noted in *Moore*, Congress explicitly rejected the concept of automatic vesting for medical
benefits for good policy reasons:

> With regard to an employer's right to change medical plans, Congress evidenced its
> recognition of the need for flexibility in rejecting the automatic vesting of welfare plans.
> Automatic vesting was rejected because the costs of such plans are subject to fluctuating
> and unpredictable variables.  Actuarial decisions concerning fixed annuities are based on

the Sixth Circuit, in *Sprague*, stated:

> To vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest "must be found in the plan documents and must be stated in clear and express language."

133 F.3d at 400 (*citing Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.), *cert. denied*, 510 U.S. 870 (1993)).

13.     The Motion is devoid of any credible proof that some salaried retiree benefits have vested. (Motion ¶¶ 3, 23). Rather, the Motion asserts that "decades ago," GM plan booklets stated that GM would continue to provide health care benefits for salaried retirees and did not explicitly state that such plan benefits could be amended or terminated. (*Id*). GMRA's assertion completely ignores and improperly fails to state that the *Sprague* case, *supra*, explicitly rejected the argument that GM's salaried retirees had vested benefits based on such plan booklets. 133 F.3d at 401 (if the terms of the retiree benefit plan and plan summary expressly reserve the right to modify or terminate retiree welfare benefits, an employer may do so, notwithstanding the fact that the plan summary, or an ancillary document related thereto, contains language stating that retirement benefits would be provided for life).

14.     GMRA also ignores the controlling Second Circuit precedent that old plan booklets and informal communications do not determine whether benefits have vested. In the *Moore* case, *supra*, the Second Circuit stated: "We hold that the unambiguous provisions of a

---

fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs. While these plaintiffs would be helped by a decision in their favor, such a ruling would not only fly in the face of ERISA's plain language but would also decrease protection for future employees and retirees.

856 F.2d at 492.

plan must govern, because altering a welfare benefit plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA." *Moore*, 856 F.2d at 489.

15.    GMRA has the burden of establishing the vesting of retiree benefits.  It has not sustained that burden.  GMRA has not presented a scintilla of evidence of retiree vesting and has not produced any plan-related document that explicitly states that any salaried retiree benefits are vested and not subject to GM's right to amend or terminate same.  The plan summary description of each Salaried OPEB Plan is set forth in a booklet entitled "Your Benefits in Retirement Summary Plan Description:  A Handbook for Salaried Retirees in the United States" (issued March 2005).  The booklet states:  "General Motors Corporation reserves the right to amend, change, or terminate the Plans and Programs described in this booklet."  Moreover, the booklet further states:

> The specific provisions of the Salaried Health Care Program, the range of covered services, eligibility rules and so forth may be amended, modified, suspended, increased, decreased or terminated by General Motors from time to time through the years.

16.    Manifestly, GM retained the unequivocal unilateral contractual right to amend and terminate the Salaried OPEB Plans.

**B.    Section 1114 of the Bankruptcy Code is Inapplicable to GM's Modification or Termination of the Salaried OPEB Plans**

17.    In light of GM's right to amend or terminate a Salaried OPEB Plan, section 1114 of the Bankruptcy Code does not apply to GM as a debtor in possession.  Resultantly, there is no need or justification for the appointment of a Retirees Committee in these cases.

18.    Section 1114(d) of the Bankruptcy Code provides:

The court, upon a motion by any party in interest, and after notice and a hearing, shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.

11 U.S.C. § 1114(d).

19.    The governing principle of law as to the instant Motion is aptly stated in *In re Doskicil*, 130 B.R 870. *Doskicil* was the first case to deal directly with the issue of whether a retirees committee should be appointed in a chapter 11 case under section 1114(d) when the debtor sponsor had expressly reserved a contractual right to modify the subject retirees' benefits plan. The *Doskicil* court noted that there existed no provision in section 1114 that indicated that Congress intended that provision to apply to employee benefit plans that are terminable or amendable unilaterally by the plan sponsor. *Id.* at 876. The *Doskicil* court reasoned that "[i]f there is no legal duty to the salaried retirees … why should the court appoint a committee to negotiate? The committee would hire attorneys and incur unnecessary expense for the [e]state." *Id.* at 877. The *Doskicil* court concluded that the appointment of a retirees committee in the perspective of the plan sponsor's contractual right to unilaterally amend or terminate the plan was unnecessary and wasteful.

20.    The *ratio decidendi* of the *Doskicil* line of cases has been adopted by the overwhelming majority of courts that have considered the applicability of section 1114 in the context of a sponsor-amendable or terminable benefits plan. The *Doskicil* court actually followed the rationale adopted in the Second Circuit in *In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir. 1991). In both *Chateaugay* and *Doskicil*, the courts held that a plan sponsor that has

reserved the contractual right to terminate or amend retiree benefits is not required to comply with section 1114 of the Bankruptcy Code and, further, that section 1114 does not protect retiree benefits beyond the contractual obligations of the plan sponsor, i.e., GM.  Inasmuch as section 1114 does not apply, the appointment of a Retirees Committee in these cases is inappropriate, unnecessary, and wasteful.  *See, e.g., In re Anchor Glass Container Corp.*, 342 B.R. 878 (Bankr. M.D. Fla. 2005) (finding that section 1114 does not apply to a debtor that unilaterally modified its retirees' rights under benefits program prior to filing and the appointment of a retirees committee would only cause delay);  *In re Lykes Bros. S.S. Co.*, 233 B.R. 497, 517 (Bankr. M.D. Fla. 1997) (finding that a retirees committee should not be appointed under section 1114 if the retiree benefits were "terminable under applicable non-bankruptcy law"); *In re N. Am. Royalties, Inc.*, 276 B.R. 860 (Bankr. E.D. Tenn. 2002) (holding that the debtor can terminate an employee benefits contract as allowed by its terms, despite the existence of section 1114), *CF & I Steel Corp. v. Conners (In re CF & I Fabricators of Utah, Inc.)*, 163 B.R. 858, 874 (Bankr. C.D. Utah 1994) (holding that section 1114 does not protect retiree benefits beyond contractual obligations of debtors).

21.    Recently, in the chapter 11 case of *In re Delphi Corp.*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2009), Bankruptcy Judge Drain reviewed and agreed with the rationale of *Doskicil*.  Judge Drain found that "if, in fact, the debtors have the unilateral right to modify a health or welfare plan, that modifiable plan is the plan that is to be maintained . . . with the debtors' pre-bankruptcy rights not being abrogated by the requirements of Section 1114") (Hr'g Tr. at 15, Mar. 10, 2009, annexed hereto as Exhibit "A").[3]

---

[3] Although Judge Drain agreed with the rationale of *Doskicil* and its related progeny, for reasons not pertinent to the cases at bar, he approved the appointment of a retirees committee for the limited purpose of determining whether there were any retirees holding vested benefits and restricted the costs of the retirees committee to $200,000.

22.     The *Chateaugay* and *Doskicil* line of cases comport with the policies underlying the Bankruptcy Code.  To appoint a Retirees Committee pursuant to section 1114(d) of the Bankruptcy Code in these cases would extend to the salaried retirees more substantive rights in bankruptcy than they had prior to the commencement of these chapter 11 cases.  Such a result is incongruous with basic bankruptcy principles.

23.     In the face of the overwhelming jurisprudential precedent adverse to its contentions, GMRA relies upon two decisions, *In re Ames Department Stores, Inc.,* 1992 U.S. Dist. LEXIS 18275 (S.D.N.Y. Nov. 30, 1992), annexed hereto as Exhibit "B," an unreported decision by the United States Bankruptcy Court for the Southern District of New York, and *In re Farmland Industries, Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003).  Neither decision rebuts the rationale of *Chateaugay, Doskicil*, and their progeny.  Moreover, the decision of the United States District Court for the Southern District of New York in the *Ames Department Stores* case, *supra*, affirming the unreported order of the Bankruptcy Court was severely criticized by the United States Court of Appeals for the Second Circuit in connection with an appeal from a different order in that case involving attorneys' fees.  *In re Ames Dep't Stores, Inc*., 76 F.3d 66 (2d Cir. 1996).  In the Second Circuit decision, the Court noted that the lower courts, in determining that section 1114 of the Bankruptcy Code had applicability to the subject retirees' benefits plan, had ignored "well recognized authority."  *Id.* at 71.  The lower court decisions in the *Ames Department Stores* case were clearly contrary to the Second Circuit precedent in *Chateaugay*, as noted in the *Ames* Court of Appeals decision.  *Id.*

24.     The Bankruptcy Court decision in the *Farmland Industries* case, *supra*, is a singular case representing that court's "view" that section 1114 prohibits a debtor from terminating or modifying any retiree's benefits during a chapter 11 case, unless there is

compliance with the procedures and requirements of section 1114, regardless of contractual

rights.  That is not the law in the Second Circuit.  The reasoning and the rationale of the

*Farmland Industries* case has not been followed and is not precedential.  There is no language in

section 1114 or in the legislative history pertaining to the enactment of that section that Congress

intended to override the contractual rights of a plan sponsor.  Consequently, the *Farmland*

*Industries* case is inapposite.

25.    GMRA also contends that the addition of section 1114(*l*) to the

Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005 (the "**2005 Amendments**") tacitly overrules the *Chateaugay* and *Doskicil* line of cases.

The argument is spurious.  Section 1114(*l*) provides:

> If the debtor, during the 180-day period ending on the date of the
> filing of the petition –
>
> (1) modified retiree benefits; and
> (2) was insolvent on the date such benefits were modified;
>
> the court, on motion of a party in interest, and after notice
> and a hearing, shall issue an order reinstating as of the date
> the modification was made, such benefits as in effect
> immediately before such date unless the court finds that the
> balance of the equities clearly favors such modification.

11 U.S.C. § 1114(*l*).

26.    In adopting section 1114(*l*), Congress did not indicate or express any

disagreement with the jurisprudential precedents established by the *Chateaugay* and *Doskicil* line

of cases.  In reviewing section 1114 as part of the 2005 Amendments, Congress did not make the

change urged by GMRA.[4]    A review of the language of section 1114(*l*) establishes that there

---

[4] When Congress intended for a provision of the Bankruptcy Code to override the explicit terms of a contract, it
made sure to provide so explicitly.  For example, section 365(e)(1) of the Bankruptcy Code provides that "an
executory contract or unexpired lease of the debtor may not be terminated or modified…" "notwithstanding a

was no intention to change the applicable principle of law.  The amendment to section 1114 does

not state in any manner that existing contractual rights on the part of a plan sponsor to

unilaterally amend or terminate salaried retiree benefits are eradicated and unenforceable upon

the commencement of a chapter 11 case.  Section 1114(*l*) merely provides for a look back at

actions taken by a plan sponsor during the 180-day period prior to the commencement of a

chapter 11 case so as to reverse amendments or terminations that were affected without the

sanction of contractual prerogatives.

### C.  A Retirees Committee Should Not Be Appointed in These Cases

        27.     Section 1114(d) provides that a committee of retirees shall be appointed

"if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines

that it is appropriate," to have such a committee serve as the authorized representative of persons

receiving salaried retiree benefits other than pursuant to a collective bargaining agreement.  11

U.S.C. § 1114(d).  GM has not sought to modify or avoid paying the salaried retiree benefits

under the Salaried OPEB Plans.  In that perspective, the appointment of a Retirees Committee in

these cases is premature and unnecessary.  If at some future time the circumstances warrant, the

Court may consider the appropriateness of the appointment of a Retirees Committee.

        28.     By virtue of the retained contractual right of GM to amend or terminate

the Salaried OPEB Plans, the salaried retirees do not hold claims against GM.  All benefits due

---

provision in [the] executory contract or unexpired lease" that provides a counterparty such right.  11 U.S.C.
§ 365(e)(1). Section 365(e)(2) of the Bankruptcy Code provides that section 365(e)(1) does not apply to a contract or
lease, "whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties" if
applicable law excuses a counterparty from accepting performance from or rendering performance to a party other
than the debtor.  11 U.S.C. § 365(e)(2).  Similarly, if Congress had intended section 1114 to apply in situations
where the plan documents provided the debtor with the right to amend or terminate benefits, it could have easily,
and presumably would have, stated in section 1114 that the debtors must follow its procedures "notwithstanding any
provision in the documents governing such retiree benefits that enables the debtor to terminate or modify retiree
benefits."

to salaried retirees have been paid and will continue to be paid until such time as a decision as to

amendment or termination may be made.  If a decision to amend or terminate is made, it will not

give rise to any allowable claims by salaried retirees.  Therefore, GMRA is not in a comparable

position to that of the Debtors' general unsecured creditors that may hold allowable claims

against the Debtors.  Further, even if salaried retirees did attain creditor status, there is no

credible proof that the Official Committee appointed in these cases does not adequately represent

their creditor interests.  The Official Committee, to the extent that any salaried retirees have

claims, is clearly able to and does represent the interests of all unsecured claimants.  It provides

adequate representation for all such interests.

[Rest of page intentionally left blank]

<u>**Conclusion**</u>

29.     Section 1114 of the Bankruptcy Code does not apply to the Salaried OPEB

Plans.  Accordingly, the appointment of a Retirees Committee is inappropriate and imposes an

unnecessary costs and burdens on the Debtors and their economic stakeholders.  The Motion

should be denied.

WHEREFORE the Motion for the appointment of a Retirees Committee should

be denied and the Debtors granted such other and further relief as is just.


Dated: New York, New York
          June 19, 2009



/s/ Harvey R. Miller
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

1    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - x
                                  :
3              In re             : Chapter 11
4                                 :
5    DELPHI CORPORATION, et al.,  : Case No. 05-44481 (RDD)
6                                 :
7                                 :
                                  : (Jointly Administered)
8    Debtors.                     :
9                                 :
     - - - - - - - - - - - - - - x
10

11        **MODIFIED BENCH RULING ON DEBTORS' SALARIED**
              **OPEB TERMINATION MOTION**
12

13   THE COURT:  I have before me a motion by the debtors in this

14   case for authority under Section 363(b) of the Bankruptcy Code

15   to modify, in various significant measures, what they refer to

16   as "OPEB" but what also can be described as welfare plans,

17   including health and insurance plans, under ERISA.  The debtors

18   take the position that notwithstanding that the subject matter

19   of these plans involves reimbursing or providing for the

20   reimbursement of "payments for retired employees and their

21   spouses and dependants, for medical, surgical or hospital care

22   benefits, or benefits in the event of sickness, accident,

23   disability or death," that their request need not, and in fact

24   should not, be governed by Section 1114 of the Bankruptcy Code.

25   The language I was quoting appears in Section 1114(a), which

1    defines, for purposes of Section 1114, the term "retiree

2    benefits."

3            Bankruptcy Code Section 1114(e) provides that

4    "notwithstanding any other provision of this title, the debtor

5    in possession . . . shall timely pay and shall not modify any

6    retiree benefits," except (as provided in Section

7    1114(e)(1)(A)) under Sections 1114(g) or (h) of the Bankruptcy

8    Code or, alternatively, if the debtor in possession and the

9    authorized representative of the recipients of those benefits

10   have agreed to the modification of such payments.  11 U.S.C. §

11   1114(e).

12           The debtors contend that Section 1114's regime does

13   not apply to the present request because the various welfare

14   plans are, under the terms of the plan documents themselves,

15   modifiable at will.  That is, the debtors contend that Section

16   1114 applies only to vested retiree benefits, or such benefits

17   that can be modified only by operation of the Bankruptcy Code,

18   such as rejection under Bankruptcy Code Section 365, and does

19   not otherwise alter the debtors' pre-bankruptcy rights or

20   agreements, including the right under applicable non-bankruptcy

21   law to modify or terminate such plans at will.  To preclude

22   such a modification, therefore, would itself modify the plans.

23           The debtors have approximately 15,000 present and

24   former employees who would be affected by this motion, many of

25   whom would clearly be affected in very dire ways.  The debtors

1   provided notice of the motion by actually sending a copy of it

2   to all of these individuals, and, under the Court's case

3   management order, that notice was sufficient, although it fell

4   within the bare minimum of the twenty days set forth in

5   Bankruptcy Rule 2002(a)(2).

6        The motion was objected to by approximately 1,600

7   individuals.  There have been, in addition, many slightly

8   untimely objections.  Most of those objections were by

9   unrepresented individuals.  However, some individuals or groups

10  of individuals have retained quite able counsel to represent

11  them, and I have considered their objections at length, both as

12  submitted in writing and made orally at this hearing.

13       The objectors essentially make two points.  First,

14  they contend that under the plain language of Section 1114, as

15  well as principles of statutory construction, the debtor's

16  interpretation of what constitutes a retiree benefit that is

17  required to be dealt with under Section 1114 is wrong and that,

18  instead, Congress, in Sections 1114(a) and (e), overrode the

19  pre-petition contracts between companies such as Delphi and the

20  beneficiaries of health and welfare plans and required that,

21  before those contracts could be modified -- notwithstanding the

22  language in those contracts permitting modification at will --

23  during the course of a Chapter 11 case (at least prior to the

24  effective date of a Chapter 11 plan), the debtor must go

25  through the process set forth in Section 1114 to meet the

1    requirements of either Section 1114(g), for emergency interim

2    relief, or Section 1114(h), for permanent relief.

3         They also contend, as a factual matter, that the

4    debtors' assertion that the OPEB benefits are modifiable at

5    will is incorrect.  Thus, they argue, even if the debtors'

6    interpretation of Section 1114 is right, the debtors' motion

7    should be denied because, in fact, the debtors do not have the

8    right to modify these benefits unilaterally under applicable

9    non-bankruptcy law.  They also argue that even if the current

10   factual record has not identified any retirees with vested

11   future benefits, the possibility that such retirees may exist

12   should preclude granting the debtors' motion.

13        As noted during oral argument, the first issue is an

14   issue that has long been identified by courts and commentators,

15   and one, as the parties have pointed out, where there is

16   conflicting authority.  The leading commentator on bankruptcy

17   law, Collier on Bankruptcy, analyzes this issue at some length

18   in 7 Collier on Bankruptcy, ¶¶ 1114.03[1] and [2] (15th ed.

19   2008) at 1114-15-20.  Citing the applicable case law, and to

20   the extent there is meaningful commentary, most of the

21   commentary, as well, Collier reaches the conclusion, in accord

22   with the majority of the courts that have addressed the issue,

23   that a debtor in possession need not comply with the procedures

24   and requirements of Section 1114 if it has the right to

25   terminate or modify benefits unilaterally under the welfare

1    plan in question and applicable non-bankruptcy law: "The

2    section applies only to benefits that have been previously

3    promised by the debtor; it does not create any new obligations

4    on the trustee or debtor in possession." Id. at 1114-16.

5    (Collier notes, however, the conflicting authority and

6    potentially conflicting arguments. Id. at 1114-18.)

7           The starting point for my analysis is the language of

8    the statute, and that is my ending point, as well, if the

9    provision's meaning is unambiguous and does not lead to a

10   clearly unintended or absurd result. In re Ron Pair Enters.,

11   489 U.S. 235, 242 (1989). But I conclude, particularly in

12   light of two fundamental principles underlying the Bankruptcy

13   Code, as well as my review of the statute, that the provision's

14   language does not compel the interpretation given by the

15   objectors.

16          Again, that interpretation is that Section 1114

17   creates a federal law overriding pre-petition contractual

18   rights of the debtors that would permit them to modify or

19   terminate retiree health and welfare benefits during the course

20   of a Chapter 11 case. Frankly, I cannot think of another

21   provision of the Bankruptcy Code that would create such a

22   federal right improving on the prepetition contractual rights

23   of a third-party constituent as a result of the filing of a

24   bankruptcy case.

25          Perhaps the closest analogy (other than Section

1    1114(l), which is discussed later) would be Bankruptcy Code

2    Section 546(b), which permits creditors to continue to perfect

3    certain interests for a limited period post-bankruptcy; but

4    even that extension is premised on preserving existing pre-

5    bankruptcy rights that were interrupted by the bankruptcy case.

6    Congress also arguably enacted such a provision when it amended

7    Section 546(c) under the 2005 amendments of the Code, in

8    BAPCPA.  Pub. L. No. 109-8, 119 Stat. 23.  However, that

9    provision, which refers to a forty-five day reclamation right,

10   has been interpreted by the majority of courts, I think

11   correctly, as not creating a federal right that improves upon

12   creditors' substantive rights under applicable non-bankruptcy

13   law.  As Judge Lifland stated in the Dana case, reading the

14   amendment to Section 546(c) to have imposed a substantial

15   change to an established pre-bankruptcy right would violate a

16   fundamental tenet of the Bankruptcy Code in that it would

17   enhance the substantive non-bankruptcy rights of one set of

18   creditors at the inevitable expense of other creditors simply

19   because a bankruptcy petition has been filed.  See In re Dana

20   Corp., 367 B.R. 409, 418 (Bankr. S.D.N.Y. 2007), which cites,

21   among other cases, Butner v. United States, 440 U.S. 48 (1979),

22   for the basic proposition that property interests in bankruptcy

23   cases are defined by state law or otherwise applicable non-

24   bankruptcy law unless some federal bankruptcy interest requires

25   a different result in recognition that prepetition contract

1    rights and property interests should not be analyzed

2    differently or enhanced simply because an interested party is

3    involved in a bankruptcy case.

4         Although it has not otherwise re-written prepetition

5    contracts to add rights against debtors, Congress has given

6    certain prepetition claims priority (for example domestic

7    support obligations and certain employee and benefit plan

8    claims, in Bankruptcy Code Sections 507(a)(1) and 507(a)(4)-

9    (5), respectively). But, in considering claims to be accorded

10   priority treatment in bankruptcy, courts have consistently

11   relied on a second, related fundamental bankruptcy principle

12   against which the objectors' interpretation of Section 1114

13   also collides. That is, as the Second Circuit recently

14   reiterated in In re Bethlehem Steel Corp., 479 F.3d 167, 172

15   (2d Cir. 2007), given the debtor's limited resources are

16   presumptively to be equally distributed in bankruptcy cases

17   among creditors, statutory priorities must be narrowly

18   construed. This is because bankruptcy is ultimately a zero sum

19   game: whatever is added as a priority to one constituent's

20   claim comes out of the other similarly situated constituents'

21   pockets. Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.,

22   547 U.S. 651, 667 (2006).

23         I believe that Congress is fully aware of these

24   fundamental principles when it amends the Bankruptcy Code, and,

25   accordingly, that when Congress amended Section 1114 it was not

- 3 -

1   writing on a clean slate.  Dewsnup v. Timm, 502 U.S. 410, 419

2   (1992).  Thus, one must be reluctant to accept arguments that

3   would interpret Section 1114 to effect a major change in pre-

4   Code practice if that change was not the subject of at least

5   some discussion in the legislative history.  Id.

6        Everyone understands the origin of Section 1114.  It

7   grew out of the suspension of health and welfare benefits by

8   LTV Corporation, after it filed its bankruptcy case, in the

9   belief that it had the duty to do so because Section 1113 of

10  the Bankruptcy Code didn't apply, and, therefore, it need not

11  pay benefits under such prepetition agreements unless they were

12  assumed under Section 365 of the Code.  That is, Bankruptcy

13  Code Section 1113 had been enacted to make the rejection of

14  collective bargaining agreements more difficult, but there was

15  no similar limitation on rejecting retiree benefits.  See

16  generally 7 Collier on Bankruptcy ¶ 1114.01[3], at 1114-11-12.

17       Congress reacted to LTV's decision by drafting what

18  eventually became Section 1114.  Id.  But, as was made clear

19  over seventeen years ago, the issue of whether Congress went

20  beyond precluding a debtor to cease performing its welfare and

21  benefit agreements without going through the process delineated

22  in Section 1114 to actually precluding a debtor from exercising

23  the non-bankruptcy law rights to modify or terminate those

24  agreements was viewed as open under the statute.  See In re

25  Ionosphere Clubs, 134 B.R. 515, 517 (Bankr. S.D.N.Y. 1991)

1   ("[Section 1114] has spawned diverse and sometimes inconsistent

2   interpretations and theories as to the substantive and

3   procedural standards necessary for modification of retiree

4   benefits.  Expressed colloquially, these interpretations are

5   all over the lot.").

6           In re Doskocil Cos., Inc., 130 B.R. 870 (Bankr. D.

7   Kan. 1991), first addressed the issue directly and concluded

8   that Section 1114 does not apply to modifications to retiree

9   benefits that the debtor has the right to modify or terminate

10  at will under applicable non-bankruptcy law.  Id. at 877.

11  Doskocil relied heavily, however, although not entirely, on In

12  re Chateaugay Corp., 945 F.2d 1205 (2d Cir. 1991), cert denied

13  502 U.S. 1093 (1992).  Chateaugay involves, as the objectors

14  point out, the issue raised by a modifiable agreement, but an

15  agreement that, post-bankruptcy, terminated by its terms.

16  However, the Second Circuit's analysis, consistent with Butner,

17  focused on the pre-petition non-bankruptcy law rights of the

18  parties and did not envision, except in the dissent, that

19  Congress created a new federal right under the predecessor of

20  Section 1114 (which for all intents and purposes, I view as

21  equivalent to Section 1114 on this issue) that effectively

22  froze the debtor's retiree obligations as of the petition date

23  regardless of the debtor's prepetition contract rights.  In re

24  Chateaugay Corp., 945 F.3d at 1208-09.

25          Doskocil has been cited favorably by a number of

1   courts, perhaps the most on point being the District Court of

2   New Jersey in In re New Valley Corp., 1993 U.S. Dist. LEXIS

3   21420 (D. N.J. Jan. 28, 1993).  See also In re North Am.

4   Royalties, Inc., 276 B.R. 860, 866 (Bankr. E.D. Tenn. 2002)

5   ("Section 1114 . . . says nothing about whether the debtor can

6   exercise a power reserved in the contract to terminate it and

7   thereby end any obligation for retiree benefits as defined in §

8   1114(a).  Despite § 1114, the debtor can terminate the contract

9   as allowed by the terms."); In re CF&I Fabricators of Utah,

10  Inc., 163 B.R. 858, 574 (Bankr. D. Utah 1994) ("The Bankruptcy

11  Code does not create new rights upon filing bankruptcy that

12  were not in existence prior to filing."), appeal dismissed, 169

13  B.R. 984 (D. Utah 1994); In re Lykes Bros. Steamship Co., Inc.,

14  233 B.R. 497, 517 (Bankr. M.D. Fla. 1997) (retiree benefits

15  were terminable at will and effectively terminated during the

16  chapter 11 case without requirement to comply with Section

17  1114).

18       Doskocil was, however, rejected by the analysis of

19  the Bankruptcy Court for the Western District of Missouri in In

20  re Farmland Indus., 294 B.R. 903 (Bankr. W.D. Mo. 2003).  An

21  unpublished opinion in the Ames Dep't Stores case by Bankruptcy

22  Judge Conrad also took the view that Section 1114 appears to

23  apply to contractually modifiable benefits, as did the District

24  Court in that case.  In re Ames Dep't Stores, Inc., 1992 U.S.

25  Dist. LEXIS 18275 (S.D.N.Y. Nov. 30, 1992), vacated on other

1  grounds, 76 F.3d 66 (2d Cir. 1996).  However, in the context of

2  a ruling on a fee application related to that dispute in the

3  Ames case, the Second Circuit noted in dicta that both of those

4  decisions were made without any reference to any of the case

5  law or analysis that I have just summarized; and, while the

6  Second Circuit did not rule how it would come out on the

7  interpretation of Section 1114's applicability to unvested,

8  modifiable-at-will rights, it noted favorably the numerous

9  authorities supporting the debtors' position.  In re Ames Dep't

10  Stores, 76 F.3d at 71.  In addition, Bankruptcy Judge Conrad,

11  himself, in In re Drexel Burnham Inc., 138 B.R. 723 (Bankr.

12  S.D.N.Y. 1992), favorably cited both Doskocil and Chateaugay

13  when approving confirmation of a chapter 11 plan that permitted

14  the modification of retiree plan benefits at will consistent

15  with the debtor's pre-petition plan documents.  Id. at 763.

16      The objectors have pointed out that Judge Conrad's

17  ruling, which appears to reflect an about-face from his

18  unreported ruling in Ames, is properly viewed as being under

19  Bankruptcy Code Section 1129(a)(13), not section 1114, and that

20  Section 1129(a)(13) can be read to say that no matter how

21  Section 1114 applies to OPEB benefits arising before the

22  effective date of a chapter 11 plan, a chapter 11 plan itself

23  need only preserve such benefits as they exist in that welfare

24  plan and go no further.  Thus, if those benefits are modifiable

25  or terminable at will, the objectors concede that Section

1    1129(a)(13) will not enhance the rights of plan beneficiaries

2    to preclude such modification or termination.  That is, I

3    think, the correct interpretation.

4         Whether this interpretation of Section 1129(a)(13)

5    supports the objectors' position on Section 1114, however, is

6    another matter.  Contrary to their interpretation of Section

7    1114, it strikes me as odd that Section 1114 would give broader

8    rights to the beneficiaries of welfare plans for the limited

9    postpetition pre-confirmation period than, as the objectors

10   concede, Section 1123(a)(13) does for the much more significant

11   period after the chapter 11 plan goes effective -- the chapter

12   11 plan being the primary focus of chapter 11 negotiations.  I

13   would rather harmonize the two provisions, that is, Sections

14   1129(a)(13) and 1114, by taking the view that each recognizes

15   that the debtor's obligations under retiree benefit plans that

16   are modifiable at will are qualified by a right under non-

17   bankruptcy law to modify or terminate.  See In re N. Am.

18   Royalties, Inc., 276 B.R. at 867, in which the court noted that

19   if Sections 1114 and 1129(a)(13) prevent termination as allowed

20   by the contract, Congress created a system for chapter 11

21   debtors that it did not impose outside of chapter 11 under

22   ERISA, a system, moreover, that would provide better treatment

23   for such benefits than pension benefits under a collective

24   bargaining agreement.  "Congress could have intended these

25   unusual results, but the court will not attribute that intent

1   to Congress without convincing evidence, which does not exist.

2   Instead, the court understands that § 1114 and § 1129(a)(13)

3   were enacted against the background of ERISA, which allows a

4   contract for retiree welfare benefits to provide the employer

5   the right to terminate." Id. (It should be noted that the one

6   case that specifically rejected the Doskocil approach,

7   apparently interpreted Section 1129(a)(13), contrary to Drexel

8   and other cases taking the same position (see In re Lykes Bros.

9   Steamship Co., Inc., 233 B.R. at 517; In re Federated Dep't

10  Stores, Inc., 132 B.R. 572, 575 (Bankr. S.D. Ohio 1991)), as

11  precluding post-effective date modification. In re Farmland

12  Indus., 294 B.R. at 917-18; see also In re Ormet Corp., 355

13  B.R. 37, 43 (S.D. Ohio 2006) ("Section 1129 simply requires

14  that a plan provide for the same level of retiree benefits that

15  § 1114 protects after the bankruptcy petition is filed." The

16  bankruptcy court had found Section 1129(a)(13) was satisfied

17  because it was modifiable at will, an issue that was not

18  appealed.))

19          The objectors also point to another provision of the

20  Bankruptcy Code, Section 1114(l), to support their view that at

21  least in this one area Congress intended to rewrite a debtor's

22  prepetition agreements in favor of a particular constituency

23  merely as a result of the filing of the bankruptcy petition.

24  Section 1114(l) was enacted in 2005 pursuant to the BAPCPA

25  amendments; it permits the court on the motion of a party in

1   interest and after notice and hearing to reinstate benefits

2   that were modified during the 180-day period preceding the

3   filing of the bankruptcy petition, unless the court finds that

4   the balance of the equities clearly favors such modification.

5   Thus, the objectors correctly argue, this provision does

6   represent an intrusion by Congress, contrary to the principle

7   set forth in Butner and the foregoing cases, into the parties'

8   prepetition contractual relations, one that is not, moreover,

9   like intrusions under Sections 547 and 544 and 548 of the Code,

10  which are for the benefit of the debtor's estate generally,

11  but, rather, is only for the benefit of a discrete group --

12  retirees under benefit plans.

13        Section 1114(l), however, does not specifically deal

14  with the issue of plans modifiable as of right and could

15  conceivably apply to pre-bankruptcy breaches by debtors in

16  financial distress of vested rights.  More importantly, even if

17  it does also apply to modifiable plans, I do not view Section

18  1114(l), which applies to a specific type of prepetition

19  action, as overruling Doskocil and the line of cases that

20  follow it, which apply to postpetition actions, nor does there

21  appear to me to be any legislative history or other policy

22  statement accompanying the 2005 amendment that would clearly

23  set forth Congress' intention generally in Section 1114(l) to

24  override, beyond its specific terms, the fundamental principle

25  that bankruptcy does not give new rights to individual parties

1    in interest or to cut back on the tenet set forth by the

2    Supreme Court in Butner.   I note in this regard that after

3    BAPCPA's enactment of Section 1114(l), a bill was introduced in

4    the House of Representatives that would have overturned the

5    Doskocil interpretation of Section 1114, but it was not

6    enacted.   See H.R. 3652, 110th Cong. § 9 (2007), which would

7    have added the following clause at the end of Section 1114(a):

8    ", whether or not the debtor asserts a right to unilaterally

9    modify such payments under such plan, fund or program."

10   Section 1114(l), then, can just as easily suggest that Congress

11   restricted special "vesting" under Section 1114 to the limited

12   circumstances set forth in the BAPCPA amendment, and, in a

13   broader sense, that Congress had actual knowledge of the

14   Doskocil majority rule when it enacted BAPCPA in 2005 and

15   failed to take action to alter the judiciary's interpretation

16   of and general adherence to it.

17        For those reasons I believe that the debtors'

18   interpretation of Section 1114 is the correct one, and that,

19   if, in fact, the debtors have the unilateral right to modify a

20   health or welfare plan, that modifiable plan is the plan that

21   is to be maintained under Section 1114(e), with the debtors'

22   pre-bankruptcy rights not being abrogated by the requirements

23   of Section 1114.

24        The second issue raised by the objectors is an

25   interesting issue to put in context, given the Second Circuit's

1    guidance in In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir.

2    1993), on the limited nature of summary proceedings, including

3    those under Section 363(b).  I believe, given the interplay

4    here of Section 363(b) with Section 1114, however, that before

5    a bankruptcy court should permit a debtor to modify or

6    terminate a health or welfare plan under Section 363(b) on the

7    theory that it has the right to do so under applicable non-

8    bankruptcy law, the debtor must make a significant showing that

9    it, in fact, has such a unilateral right and that the benefits

10   are not vested.

11          That is what the debtor has done here, however.

12   Given the benefit plan documents, including the summary plan

13   descriptions, or SPDs, and the absence of any evidence in this

14   record that would indicate that the debtors otherwise promised,

15   or the debtors' predecessors otherwise promised, to the

16   beneficiaries of those plans who are affected by this motion,

17   that, notwithstanding the language in the Delphi plan

18   documents, those plans are not modifiable at will.  The only

19   evidence that has been submitted to counter the language in the

20   Delphi plan documents (including the SPDs) pertains to the

21   plans of GM Corporation, the debtors' predecessor.  Those

22   documents, however, all predate the decision of the Sixth

23   Circuit in Sprague v. General Motors Corp., 133 F.3d, 388 (6th

24   Cir. 1998), which found GM's plan to be modifiable.  Given that

25   record, it appears to me that the debtors have very clearly

1   made the showing that they have the right to modify the plans

2   at will.

3         The objectors contend that since this Court sits in

4   the Second Circuit it should be bound by Second Circuit law on

5   this issue, and that under Second Circuit law, at least in some

6   respects pertaining to promises by a predecessor corporation

7   such as GM may be viewed differently from the holding of the

8   Court of Appeals in the Sixth Circuit's Sprague case.  No one

9   has briefed for me the choice of law issue and I've not

10   considered it at length, although I assume that general federal

11   law applies to what is ultimately a question under ERISA.  In

12   any event, I have two observations.  The first is that after

13   the issuance of the Sprague en banc opinion in January of 1998,

14   it would seem to me that any subsequent employee of Delphi who

15   had been covered by a GM plan would clearly be on notice of the

16   Sprague decision and how to interpret the language that existed

17   in the GM plans prior to his or her transfer to Delphi, and

18   that that notice would be, I believe, clear that the types of

19   provisions that have been submitted to me, for example, in

20   Exhibit 80, would not suffice to create a vested benefit right.

21   The employees whose benefit rights were actually determined by

22   Sprague would, moreover, appear to be bound by that decision.

23         Secondly, as set forth I believe most recently by the

24   Second Circuit in Bouboulis v. Transp. Workers Union of Am.,

25   442 F.3d 55 (2d Cir. 2006), but also in a number of District

1    Court decisions that have come down since then, including

2    Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,

3    2008 U.S. Dist. LEXIS 101780 (S.D.N.Y. Dec. 9, 2008), and Eagan

4    v. Marsh & McLennan Cos., Inc., 2008 U.S. Dist. LEXIS 6647

5    (S.D.N.Y. Jan. 29, 2008), the law in the Second Circuit,

6    although it may differ somewhat from the Sixth Circuit, is

7    still very restrictive when considering whether to give

8    beneficiaries of welfare plans rights that are not set forth by

9    a clear, affirmative promise in the plan documents, or through,

10    for example, a theory of promissory estoppel.  See also

11    Robinson v. Sheet Metal Workers' Nat'l Pension Fund, 515 F.3d

12    93, 99 (2d Cir. 2008).

13        So again, on this record, it appears to me clear that

14    the debtors have met their factual burden, which I view as a

15    serious one, to take this motion outside of the ambit of

16    Section 1114.

17        I view the burden to be so serious (and also

18    recognize that the notice here, while sufficient as a legal

19    matter, was sufficient only to permit fairly recent involvement

20    by counsel in a fairly abstruse area to develop the record)

21    that I believe, however, that I should exercise my authority

22    under Section 1114(d) to appoint a committee of retirees to act

23    as a representative notwithstanding my belief that the debtors,

24    on the basis of this record, are not bound by the 1114 regime

25    generally.  I believe that it would be appropriate, given the

1    importance of the factual issues and the timing of this motion,

2    to give that committee a specific charge, which is to review

3    the factual record to determine whether, under the logic that

4    I've just set forth with regard to vesting under ERISA, and

5    notwithstanding the language in the plan documents, there is

6    any group of beneficiaries of these plans, any retirees, who

7    would have vested rights, notwithstanding the language of the

8    plan documents and notwithstanding the Court's conclusion that

9    following Sprague they were on notice as to the inefficacy of

10    the argument that the documents addressed in Sprague overrode

11    the ability of GM to terminate the benefits at will or to

12    modify them at will, to the extent that they were not actually

13    bound by the Sprague ruling.

14         I believe, given the very clear expertise and active,

15    although recent, involvement of the three counsel for objector

16    groups, and the great number of objectors, that the U.S.

17    Trustee can form such a committee out of the people who are

18    participating in the courtroom today and that the committee can

19    move promptly to conduct its analysis and meet and confer with

20    the debtors on whether, in fact, there would be, under my

21    logic, a retiree or retirees who would be covered by Section

22    1114.

23         I should make it clear that service as a

24    representative on this committee would not preclude any

25    individual party's right to appeal my ruling, so that, although

1   they would be fulfilling this task, they would not be deemed to

2   have agreed with the first part of my ruling, which is that

3   Section 1114 doesn't apply to this motion unless there is a

4   vested benefit.

5          The work of that committee on this point should be

6   done so that any argument that would be made to modify my

7   provisional ruling would be heard on Wednesday, March 11 at 10

8   o'clock.  And I'm assuming that would mean that some formal

9   pleading would be filed in the preceding week and that there

10  would be a dialogue with the debtors.  I take the debtors at

11  their word that if, in fact, retirees are identified who do

12  have vested benefits, they would go through a Section 1114

13  process with them.  And so I think there should be an ongoing

14  dialogue with the debtors on that point.

15         I also believe that this committee should be

16  authorized to at least explore with the debtors the cost and

17  ability to utilize the federal tax credit identified by one of

18  the objectors.

19         I have debated whether to set a finite budget for the

20  committee's actions or merely a budget that I believe would be

21  sufficient to get them to a position where they might convince

22  me of the merits of exceeding that budget in a subsequent fee

23  application.  I've decided to do the latter, and that the

24  budget, which I don't view as a license to spend but merely as

25  what I believe clearly would be sufficient for this task, would

1   be 200,000 dollars.

2          As far as the preliminary grant of the motion, having

3   dealt with what I believe are the two main legal issues, let me

4   ultimately deal with the standard that I believe emerges from

5   that analysis, which is whether the debtors have satisfied good

6   business judgment under Section 363(b) of the Bankruptcy Code

7   in modifying the OPEB programs as set forth in their motion.

8   See In re Orion Pictures, 4 F.3d at 1099; In re N. Am.

9   Royalties, 276 B.R. at 766.

10          It is crystal clear to me, on this record and my

11   understanding of the case, that, at this time, and for the

12   foreseeable future, the debtors are well within their business

13   judgment in assuming that they will need to eliminate the

14   projected OPEB liability, which is projected to be in excess of

15   1.1 billion dollars, from their balance sheet in order to

16   reorganize.

17          I also believe, on this record, that given the

18   debtors' serious need to conserve cash and all of the other

19   steps they have taken to do so, as detailed primarily in

20   Mr. Miller's declaration, as well as my knowledge of the

21   current funding of the debtors, that every dollar counts for

22   these debtors, and, therefore, that the savings of 1.5 million

23   dollars a week and projected cash savings of seventy million

24   dollars a year for the pre-plan period, the period prior to the

25   effective date of a reorganization plan, is also of extreme

1    importance to the debtors, and that actions taken by the

2    debtors to save such money, including by modifying these

3    benefits, are taken in good business judgment in light of the

4    rights, as I see them, of the retirees.

5         The debtors, I believe properly, did not take this

6    step for almost four years given their assessment of the

7    business realities of their operations, the inducement to

8    employees of having such benefit plans in place, and their

9    desire to maintain good relations with their retirees.  But

10   over the last two or three months their business, like the auto

11   business generally, has gone through such enormous adverse

12   changes that I recognize that such changed circumstances lead

13   them to make this decision now.

14        So I will enter an order granting the motion,

15   including permitting the debtors to take the initial steps to

16   implement it.  Those initial steps, as far as they consist of

17   giving notice to employees, should also note that there is this

18   procedure in place to determine if anyone is, in fact, vested.

19   And also the order will provide for an opportunity for a

20   hearing on March 11 to convince me, consistent with the

21   parameters that I've outlined in this ruling, that there are

22   individuals or groups of individuals who in fact may be

23   properly vested and therefore would be covered by Section 1114.

24        Given the time constraints here, I'm not going to

25   require the debtors to settle that order but I think you should

1    work it out first with the U.S. Trustee and then promptly

2    circulate it to the counsel who've been active in this hearing

3    and then submitted to court.  Thank you.

4

5    Dated: March 10, 2009
     New York, New York

6

                                /s/ Robert D. Drain
7                               U.S. Bankruptcy Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit B



LEXSEE 1992 U.S. DIST. LEXIS 18275

**In re AMES DEPARTMENT STORES, INC., EASTERN RETAILERS SERVICE CORPORATION, et al., Debtors. AMES DEPARTMENT STORES, INC., EASTERN RETAILERS SERVICE CORPORATION, et al., Appellants, v. EMPLOYEES' COMMITTEE OF AMES DEPARTMENT STORES, INC., Appellee.**

**92 Civ. 6145 (KTD), 92 Civ. 6146 (KTD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1992 U.S. Dist. LEXIS 18275*

**November 30, 1992, Decided**

**PRIOR HISTORY:**    [*1]  Chapter 11 Reorganization Cases, Nos. 90 B 11233 through 90 B 11285.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant debtor sought review of two orders of the bankruptcy court, which granted the motion of appellee employees' committee and ordered the debtor to negotiate with the committee as authorized representative for certain retired employees of the debtor under *11 U.S.C.S. § 1114* and denied the debtor's motion for an order authorizing the unilateral termination of the retired employees life insurance plan (Plan).

**OVERVIEW:** The court affirmed the orders of the bankruptcy court. The debtor argued that the appointment of the committee as representative for the retired employees was unnecessary and expensive, and that requiring negotiations with the committee was contrary to the Plan because it unambiguously allowed the debtor to unilaterally terminate insurance benefits of retired employees. The court remarked that the only thing unnecessary and expensive was the appeal, and that appointment of the committee to represent the retired employees' interests was appropriate under *§ 1114*. The debtor could not cavalierly terminate the retirement benefits without following the requirements in *§ 1114*, which it apparently could not do because the debtor had conceded at argument that the termination was not necessary for reorganization. The court found that the appeal bordered on frivolous and suggested that it might have been simply a means to generate attorneys' fees.

**OUTCOME:** The court affirmed the orders of the bankruptcy court, directed the bankruptcy court to reduce any fees payable to counsel for the debtor in connection with the appeal, and stated an expectation that the bankruptcy judge would scrutinize all fee and disbursement requests by the debtor's attorneys to assure that no unnecessary work is paid for out of the estate.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Committees*
*Contracts Law > Debtor & Creditor Relations*
[HN1]  *11 U.S.C.S. § 1114* provides in part that the term "authorized representative" means the authorized representative designated pursuant to subsection (c) for persons receiving retiree benefits covered by a collective bargaining agreement or subsection (d) in the case of persons receiving retiree benefits not covered by such an agreement. Subsection (d) provides that the court, upon a motion by any party in interest, and after notice and a hearing, shall appoint a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.

*Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Duties & Functions > Reorganizations*

1992 U.S. Dist. LEXIS 18275, *

*Estate, Gift & Trust Law > Trusts > General Overview*
[HN2] The requirements of *11 U.S.C.S. § 1114* as to modification of retiree benefits provide in part subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably, and provide the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

**COUNSEL:** SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Attorneys for Ames Department Stores, Inc., Eastern Retailers Service Corporation, et al., Appellants/Debtors and Debtors-in-Possession, 919 Third Avenue, New York, NY 10022-3897, Of Counsel: Luc A. Despins, Esq., Thomas H. Day, Esq.

TOGUT, SEGAL & SEGAL, Attorneys for Appellee, the Official Employees Committee in the Ames Department Stores, Inc., Eastern Retailers Service Corporation, et al., reorganization cases, One Penn Plaza, New York, NY 10119, Of Counsel: Albert Togut, Esq., Susan F. Balaschak, Esq.

**JUDGES:** DUFFY

**OPINION BY:** KEVIN THOMAS DUFFY

**OPINION**

*MEMORANDUM & ORDER*

**KEVIN THOMAS DUFFY, D.J.:**

Appellants Ames Department Store, Inc., G.C. Murphy Company, Inc. (n/k/a/ Ames-G.C. Company, Inc. ("Ames-Murphy")), and its fifty-one affiliates, as debtors and debtors-in-possession of the above-captioned Chapter 11 cases (collectively referred to as "Debtor"), appeal from two final orders entered by Bankruptcy Judge Francis G. Conrad.

The first order signed by Bankruptcy Judge Conrad, dated June 12, 1992 and entered June 15, 1992 ("First Order"), granted the Employees' Committee's motion for [*2] an order appointing the Employees' Committee as an authorized representative for certain retired employees of Ames-Murphy ("Retired Employees") under *§ 1114 of the Bankruptcy Code* [1] and directed negotiations to be conducted between the Debtor and the Employees' Committee in an attempt to reach a settlement. The second order, dated July 9, 1992 and entered July 15, 1992 ("Second Order"), denied Debtor's motion seeking an order authorizing the unilateral termination of the life insurance welfare benefit plan ("Plan") of the Retired Employees.

1    [HN1] *Section 1114 of the Bankruptcy Code* provides in relevant part:

(b)(1) For purposes of this section, the term "authorized representative" means the authorized representative designated pursuant to subsection (c) for persons receiving retiree benefits covered by a collective bargaining agreement or subsection (d) in the case of persons receiving retiree benefits not covered by such an agreement.

* * * *

(d) The court, upon a motion by any party in interest, and after notice and a hearing, shall appoint a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.

*11 U.S.C. § 1114.*

[*3] The Debtor appeals the First Order on the basis that the appointment of a representative for the Retired Employees in this case is an "expensive and unnecessary gesture" which "would serve only to burden the estate with unnecessary costs." *See* Appellants' Brief at 23 and 25. The Debtor maintains that such appointment should be denied as an exercise of the Bankruptcy Court's discretion to protect the debtor from unnecessary and expensive negotiations. *Id.* at 24-25.

With respect to the Second Order, the Debtor asserts that the Plan contains unambiguous language reserving the right to unilaterally terminate the Retired Employees' insurance benefits. The Debtor contends, therefore, that in accordance with the Plan, the Bankruptcy Court should grant the Debtor the authority to terminate the Plan at will. *Id.* at 16-18. To that end, the Debtor maintains that negotiations with the Retired Employees run contrary to the plain language of the Plan, thereby rendering such talks unnecessary. *Id.*

It appears to me that the only thing which is expensive and unnecessary here is this appeal. Clearly, the interests and rights of the Retired Employees should not go unprotected. [*4] The appointment of the Employees' Committee as the authorized representative of the retirees, pursuant to *§ 1114 of the Bankruptcy Code*, affords the Retired Employees with an appropriate voice in

1992 U.S. Dist. LEXIS 18275, *

which to be heard during these proceedings. Further, I find that the Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces a drastic and most undeserving result. Thus, as directed by the Bankruptcy Court, the Debtor must follow the requirements of *§ 1114 of the Bankruptcy Code* [2] if it seeks to terminate the Retired Employees' life insurance benefits. It should be noted, however, that counsel for the Debtor apparently conceded on argument that the proposed termination of benefits is not "necessary for reorganization" and, as such, is not permissible under *§ 1114. See* Transcript of Hearing (November 24, 1992) at 8-9.

2    [HN2] The requirements of *§ 1114* provide in relevant part:

(f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall--

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide . . . the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

*11. U.S.C. § 1114.*

[*5] Accordingly, the two final orders issued by the Bankruptcy Court are, in all respects, affirmed and the Bankruptcy Court is directed to reduce any fees payable to counsel for the Debtor in connection with the appeal of these orders. This appeal borders on the frivolous and may well be put forward merely as a means to generate attorneys' fees to denude the bankrupt estate of any value whatsoever. It raises sufficient question as to the motivation of counsel that one would expect the Bankruptcy Judge to scrutinize all fee and disbursement requests by the Debtor's attorneys to assure that no unnecessary work is paid for out of the estate.

SO ORDERED.

DATED: New York, New York

November 30, 1992

KEVIN THOMAS DUFFY, U.S.D.J.