Victoria Garry (Pro Hace Vice Pending)
Assistant Attorney General
Collections Enforcement Section
1600 Carew Tower,
441 Vine Street
Cincinnati, Ohio 45202
(513) 852-1536 telephone
(513) 852-3484 facsimile

Robert Hart
Melissa Wright
Assistant Attorneys General
Consumer Protection Section
30 East Broad Street
Columbus, Ohio 43215
(614) 466.7828 telephone
(614) 466.8898 facsimile

Michelle T. Sutter
Assistant Attorney General
Environmental Protection Section
30 East Broad Street
Columbus, Ohio 43215
(614) 466-5276 telephone
(866) 483-1104 facsimile

Counsel for State of Ohio

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | |
|---|---|
| In re | **Chapter 11 Case No.** |
| **GENERAL MOTORS CORP.,** *et al.,* | *09-50026-REG* |
| Debtors. | **(Jointly Administered)** |

-----------------------------------------------------------------x

### THE OHIO ATTORNEY GENERAL'S LIMITED RESPONSE AND OBJECTION TO DEBTORS' SALE MOTION

The State of Ohio, ("Ohio") by and through Ohio Attorney General Richard Cordray, submits this limited response and objection ("Objection") to *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k) and (m) and 365, and Fed R. Bankr. P. 2002, 6004, 6006, to (I) Approve (A) The Master Sale and Purchase Agreement with Vehicle Acquisitions Holding, LLC, A US Treasury Sponsored Purchaser, Free and Clear*

*of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing* filed June 1st, 2009 (doc. 92) (the "Motion") to address, object and request clarification with respect to certain consumer protection and environmental issues significant to Ohio and all consumers regarding the proposed sale of Debtors' assets as more fully outlined below.

**I.    Lemon Law Issues**

1.    The first area of concern is clarification on whether the purchaser, Vehicle Acquisition Holdings, LLC ("NewCo" or "Purchaser") intends to assume lemon law claims under the Master Sale and Purchase Agreement ("MPA").  There are no explicit references to "lemon law" claims in the MPA provisions relating to purchased assets [Section 2.2] or assumed liabilities [Section 2.3], nor does the term appear in the MPA definitions section [Section 1.1]. Due to the absence of any specific MPA reference to "lemon law claims", interested parties must attempt to discern the Debtors' intent from the remaining language of the MPA; however, no clarity emerges in doing so.

2.    Pursuant to the MPA, the Purchaser will acquire "…all Claims relating to … Assumed Liabilities…" [Section 2.2(a)(xiii)] Assumed Liabilities includes, inter alia, "Liabilities arising under express written emission and limited new vehicle warranties, certified used vehicle warranties and pre-owned vehicle warranties …" relating to vehicles sold prior to the closing [Section 2.3(a)(vii)]. From MPA Section 1.1 "claims" is defined as follows:

"Claims means all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choses in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any

2

Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due to or to become due, and all rights and remedies with respect thereto.

3. Reading the Assumed Liabilities provision in conjunction with the definition of Claims, which includes "…arbitral proceedings or proceedings by or before any Governmental Agency," suggests that that the Purchaser may be assuming "lemon law claims" in a state sponsored arbitration program like Ohio's. However, this interpretation is inconsistent with the MPA's "Retained Liabilities" provisions, which provide that the Purchaser will not be assuming "Product Liability" claims, which include implied warranties [Section 2.3(b)(ix)] and "Liabilities arising out of, related to or in connection with any implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty" [Section 2.3(b)(xvi)].

4. Inasmuch as Ohio's lemon law claims are based upon statutory law, and not an express warranty by the Debtors or its authorized dealers, the MPA language appears to exclude "lemon law" claims on new motor vehicles sold prior to the closing as an implied warranty obligation arising under state law.

5. Ohio seeks confirmation on what exactly Purchaser intends to assume with respect to state lemon law claims and further objects to the extent that the MPA Assumed Liabilities and Assumed Assets do not include "lemon law claims" as described above.

**II.   Extended Service Contracts**

6   In addition to the express warranties offered on its new motor vehicles, Debtors also sold and serviced various customer service and motor vehicle repair and maintenance programs, such as the OnStar subscription service and the General Motors Protection Plan. These GM managed plans are collectively referred to in this Objection as

3

"extended service contracts," a generally accepted industry term for all such repair and maintenance contracts. Similar to "lemon law claims" there are no explicit references to "extended service contracts" in the MPA provisions on Purchased Assets [Section 2.2] or Assumed Liabilities [Section 2.3] although the definition of "Contracts" in Section 1.1 includes "product warranty or service agreements," a phrase arguably broad enough to encompass "extended service contracts" and similar GM sold maintenance and service agreements, if those agreements are Assumed Liabilities.

7.      However, the Assumed Liability provision in the MPA relating to warranties does not actually mention "contracts" or "extended service agreements" or any similar term, but rather refers merely to "certified used vehicle warranties and pre-owned vehicle warranties" [Section 2.3(a)(vii)] thus creating ambiguity as to whether or not the Debtors consider its "extended service agreements" to be warranties of the type the MPA indicates will be assumed by the Purchaser, or product liabilities of the type to be retained by the Debtors pursuant to MPA Section 2.3(b)(ix).

8.      Although a plausible argument can be made that the Purchaser is assuming extended service contact liabilities for motor vehicles sold before closing, **that affirmative performance obligation should be clearly set forth as an Assumed Liability to avoid coverage uncertainty**.

9.      Ohio seeks clarification on whether Purchaser will be assuming extended service contracts and further objects to the extent that the MPA Assumed Liabilities and Assumed Assets do not include "extended service contracts ."

**III.    Implied Warranties**

10.   The Debtors and Newco have prominently promoted the intent to instill consumer confidence in their products and business as demonstrated in paragraph 5 of their Sale Motion which states in relevant part :

"The success of an automotive manufacturing company depends on the ultimate retail sale of the vehicles it manufactures. Consumers must have confidence in GM's products, i.e., that a new GM will exist in the future so that it can stand behind its products."

11.   Ironically, the MPA does not comport with this stated intent, both as set forth in this Objection above regarding "lemon laws" and "extended service agreements," and as evidenced by the fact **that the MPA, if approved as submitted, will result in consumers losing long-standing fundamental federal and state warranty protections**. Implied warranties are creatures of statute conferring product performance protection to product purchasers, including purchasers of new motor vehicles, through the Magnuson-Moss Warranty Act of 1975, !5 U.S.C. 2301 *et seq*, and the Uniform Commercial Code [codified in Ohio as Revised Code Chapters 1301-1310].  These protections currently cover GM motor vehicle purchasers.

12.   The Debtors and Newco seek to deprive consumers of these statutory consumer protections in the MPA's Retained Liabilities provision in which the Debtors retain "all liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty…" [Section 2.3(b)(xvi)] Therefore, Newco will not assume, and pre-closing purchasers will not have, the protection conferred by these laws.

5

13. Ohio objects to the Motion since the MPA does not include implied warranties as an Assumed Asset and Assumed Liability of Newco.

**IV.   Sale of Personally Identifiable Information**

14. The Debtors plan to sell and/or transfer their customers' personally identifiable information ("PII") to a third party who is not an affiliate of the Debtors without the consent of the customers who provided that information. The sale contemplated by the Debtors is not consistent with the Debtors' privacy policy and is in violation of Ohio's Consumer Sales Practices Act ("CSPA"), R.C. 1345.01 et seq.

**A.   Debtors' Proposed Sale is Not Consistent With their Privacy Policies and Violates State Law. As Such, it is Not Authorized Under Section 363(b)(1)**

15. Section 363(b)(1) of the Bankruptcy Code authorizes the sale of PII in only two situations: (1) if the sale is consistent with the existing privacy policy, or (2) if the sale is approved by the court, after appointment of a consumer privacy ombudsman ("CPO") and consideration of all the facts, circumstances, and conditions of the proposed sale and after "finding that no showing has been made that such sale or lease would violate applicable nonbankruptcy law." 11 U.S.C. § 363(b)(1). Thus, a sale must meet one of two criteria – it must either be consistent with the debtor's existing privacy policy or it must not violate applicable law. Here, the Debtors fail to meet either one of those criteria.

16. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that if the debtor "in connection with offering a product or service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals [and] such policy is in effect on the date of the commencement of the case," then the

6

debtor "may not sell…personally identifiable information to any person unless" the sale is "consistent with such policy…" 11 U.S.C. § 363(b)(1).

17. The term "personally identifiable information," as defined in section 101(41A) of the Bankruptcy Code, means "private information about a debtor's customers that if disclosed, will result in contacting or identifying [an] individual physically or electronically" (e.g., name, address, telephone number, birth date, social security number, and credit card number). Id. § 101(41A).

18. Here, the Debtors contemplate the "transfer of certain personally identifiable information to a third party who is not an affiliate of the Debtors in a manner that may not be consistent with certain aspects of their existing privacy policies." Motion at ¶91. The Debtors' current U.S. online consumer privacy statement provides, in pertinent part:

> The information you share with us may be used by GM, our affiliates, our licensees, and dealers…It may also be shared in connection with the sale, transfer or financing of a significant part of a GM business. **We will not share your personal information with third parties other than these, or with any third party for their independent use without your permission.** (emphasis in original)
>
> http://www.gm.com/privacy/.

19. Customer information obtained by the Debtors typically includes contact information, vehicle information, demographic information and non-credit-related marketing profile information. However, in some circumstances, the Debtors may have obtained a customer's social security number. http://www.gm.com/privacy/

20. The sale contemplated by the Debtors is not consistent with certain aspects of the Debtors' privacy policies as it seeks to transfer customers' PII with third parties without obtaining the consent of the customers.

7

21. Through their privacy policy, Debtors made written promises to consumers regarding the terms of the consumer transaction they were engaging in and now seek to violate those promises. Promising consumers that their personal information will not be shared with any third party for their independent use without the customer's permission, and then offering that same information up for sale without providing notice to the consumers or an opportunity to object or consent, violates the Debtors' existing privacy policies and is unfair and deceptive as a matter of law. The Attorney General may seek to enjoin the sale of this information pursuant to the CSPA.

22. Further, the sale is particularly troublesome as it contemplates the possible transfer of social security numbers in addition to the other PII. The customer information should not be permitted to be sold without restriction as such information may contain confidential information, such as social security numbers, that have the potential to trigger various state data breach statutes.

23. Section 363(b)(1) of the Bankruptcy Code provides that a Debtor may not sell PII to any third party unless such a sale is consistent with the Debtor's privacy policy *or* a CPO is appointed. 11 U.S.C. § 363(b)(1). Debtors have sought the appointment of a CPO to assist the Court in its consideration of the facts, circumstances, and conditions of the proposed sale of personally identifiable information. Motion at ¶ 93.

24. Part of the CPO's role is to assist the Court in understanding the "applicable nonbankruptcy law." In connection with that role, one would expect the CPO to research applicable federal and state privacy laws and consult with the very state agencies that regulate those applicable privacy laws. Unfortunately, that has not happened here. Various States have attempted to communicate with the CPO regarding

their concerns pertaining to the sale of the PII. However, the CPO has refused to speak to the States regarding these concerns. Moreover, since the CPO's report will not be filed with this Court until after the June 19, 2009 objections deadline, the States, including Ohio, have no indication as to what the CPO may or may not recommend to this Court with respect to the Debtors' proposed sale of their customers' information.

25. Therefore, Ohio respectfully reserves the right to supplement this Objection after the CPO's report is filed to address any issues raised in the CPO's report and any Ohio laws that may be affected by the CPO's recommended course of action.

**V.    Environmental Issues**

26. Ohio also objects to the proposed sale as the Motion, MPA and Proposed Order are inconsistent and ambiguous as they pertain to environmental issues. Initially, it is unclear as to precisely which of Debtors' locations are intended to be sold. While Exhibit F to the Motion delineates "Certain Excluded Owned Real Property", the MPA defines Excluded Assets in part as "such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule". Currently, that Schedule merely states that the designation of "Excluded Assets" may be modified up until two days before the Sale Hearing. In the same vein, under Section 6.5 of the MPA the Purchaser may designate additional assets as "Excluded Assets" until two Business Days before the Sale Hearing or approximately a week after objections to the Sale are due.

27. It is important for Ohio to know the location of each of the sites intended to be sold to the Purchaser. Each of the sites is a current or potential source of environmental liability. Without knowing what properties will definitely be transferred

9

as part of the proposed Sale, Ohio is unable to properly monitor continued actions at each of the current GM sites. Ohio seeks clarification in this regard.

28. Additionally, the MPA is ambiguous and inconsistent as to what is being assumed by the Purchaser. For example, Section 2.3(a)(viii) states that "all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(B)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing…" Thus, this subsection by the Purchaser appears to assume Liabilities as to Transferred Real Property. In Section 2.3(b)(iv), however, "all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property…which, in the case of clauses (A), (B) and (C) arose prior to or at the Closing…" This language then appears to have Debtors retain environmental Liabilities associated with the Transferred Real Property. To the extent that these sections do not require the Purchaser to comply with environmental laws the Motion must be denied. See generally *In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir. 1992); *In re Torwico Electronics, Inc.*, 8 F.3d 146 (3d Cir. 1993). This is true even where the property may have been contaminated by the Debtors. The MPA must be

10

clarified to expressly state what the Purchaser is assuming vis-à-vis environmental liabilities.

### VI. Conclusion

29. A group of States, including Ohio, has communicated with counsel for the Debtors in an attempt to address concerns about a variety of issues, including the assumption of lemon law claims, implied warranty obligations to consumers, extended service contracts, privacy and environmental issues. The communication attempt was the States' good faith attempt to achieve clarity and resolution on how these important consumer rights and issues were to be addressed, and hopefully protected, during the bankruptcy proceedings and afterwards. While Debtors' counsel indicated that it was Debtors' intent that lemon law claims be covered by the sale agreement, counsel would make no firm commitment to clarifying the Sale Order language to insure such coverage. Moreover, Debtors' counsel also indicated that "implied warranty claims" were not to be assumed, and refused to consider an extension of time for Objection filing to further address this issue.

30. Therefore, Ohio is compelled to file this Objection, both to preserve these contested issues incase ongoing discussions with the Debtors fail to resolve them, and to clearly articulate Ohio's position that the MPA and resultant Sale Order should both unambiguously guarantee these important consumer and environmental protections. It would indeed be both ironic and unfortunate if the very consumer protections and warranties that consumers rely upon to make purchase decisions are jettisoned by the Debtors and the United States Government when those same entities are publicly

proclaiming that they want to preserve company goodwill in the marketplace as part of their survival strategy.

31.  Ohio's position is that the Sale should be conditioned upon the Purchaser assuming, for all motor vehicles manufactured and transferred, leased or sold to consumers by the Debtor or its authorized dealers to consumers prior to the Sale Closing, all state-based lemon law liabilities, the performance obligations on all GM sold and serviced extended service contracts, and all federal and state law implied warranties. To the extent that the MPA denies consumers these rights, Ohio strenuously objects to the Sale.

32.  Moreover, the Sale should be conditioned upon the Debtors taking the appropriate steps to ensure compliance with all federal and state privacy laws with respect to the sale of their customers' personally identifiable information to the Purchaser. Finally, the Sale should be conditioned upon the Purchaser complying with all Environmental Laws as to the Transferred Real Property. To the extent that the MPA excludes these obligations, Ohio objects.

Wherefore, for the reasons stated above, the State of Ohio respectfully objects to the approval of the Motion or entry of the proposed Order in its current form and requests that the Court grant relief only to the extent consistent with the positions taken herein.

Respectfully submitted,

Richard Cordray
Ohio Attorney General

/s/ Victoria Garry_____
Victoria Garry (Pro Hac Vice Pending)
Assistant Attorney General
Collections Enforcement Section
600 Carew Tower, 441 Vine Street
Cincinnati, Ohio 45202
(513) 852-1536 telephone
(513) 852-3484 facsimile
victoria.garry@ohioattorneygeneral.gov

Robert Hart
Melissa Wright
Assistant Attorneys General
Consumer Protection Section
30 East Broad Street
Columbus, Ohio 43215
(614) 466.7828 telephone

(614) 466.8898 facsimile
robert.hart@ohioattorneygeneral.gov
melissa.wright@ohioattorneygeneral.gov

Michelle T. Sutter
Assistant Attorney General
Environmental Protection Section
30 East Broad Street
Columbus, Ohio 43215
(614) 466-5276 telephone
(866) 483-1104 facsimile
michelle.sutter@ohioattorneygeneral.gov

Counsel for State of Ohio

1