Hearing Date and Time: June 30, 2009
Response Deadline: June 19, 2009

Thomas M. Kennedy
Susan M. Jennik
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place, 7th Floor
New York, New York 10003
Tel: (212) 358-1500
Attorneys for IUE-CWA

Suzanne Hepner
LEVY RATNER, P.C.
80 Eighth Avenue, Eighth Floor
New York, New York 10011
Tel: (212) 627-5297
Attorneys for United Steelworkers

Barbara Mehlsack
GORLICK KRAVITZ & LISTHAUS P.C.
17 State Street
New York, N.Y. 10004
Tel: (212) 269-2500
Attorneys for International Union of Operating Engineers
Locals 18S, 101S and 832S

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

In re                                             :        Chapter 11
                                                  :
General Motors Corporation, *et al.*              :        Case No. 09-50026 (REG)
                                                  :
                              Debtors.            :        (Jointly Administered)

-----------------------------------------------------------------------X

**OBJECTION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), k),**
**AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE**
**AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,**
**A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF**
**LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS;**
**B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;AND**
**(II) SCHEDULE SALE APPROVAL HEARING**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................3

    IUE-CWA ......................................................................................................3

    UNITED STEELWORKERS .........................................................................9

    INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS 18S, 101S
    AND 832S........................................................................................................15

    THE IMPACT OF THE PROPOSED TRANSACTION .................................20

SECTION 1114.........................................................................................................22

ARGUMENT:  THE SALES MOTION TREATS 50,000 UNION-
REPRESENTED RETIREES UNFAIRLY AND INEQUITABLY
AS COMPARED TO UAW-REPRESENTED RETIREES AND
OTHER CREDITORS ..............................................................................................24

    Section 1114  Is Violated By A Plan That Accords Some
    Retirees Protections That Are Denied To Others ............................................24

    It Is Grossly Unfair and Inequitable To Prefer One Union
    Group Over Another for Retiree Health Benefits .............................................27

    Wholly Apart From § 1114, The Bankrutpcy Code Does
    Not Permit Favoritism Among Equally Situated Groups
    Of Creditors ....................................................................................................28

    The Proposed § 363 Sale Will Preclude GM from Meeting
    Its § 1114 Procedural Obligations...................................................................29

    The May 31, 2009 Chrysler Decision Does Not Compel
    Approval of This Motion .................................................................................32

## TABLE OF AUTHORITIES

*Channel One*, 117 B.R. 493 (Bankr. ED. Mo. 1990)....................................................28

*Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651 (2006) ....................28

*IBT v. IML Freight*, 789 F.2d 1460 (10th Cir. 1986)....................................................27

*In re Chrysler LLC*, No. 09 B 50002 (AJG), 2009 WL 1507547 (Bankr.
    S.D.N.Y. May 31, 2009) ........................................................................35

*In re Delphi Corp.*, Case No. 05-44481 (S.D.N.Y. RDD)............................................4

*In re Dow Corning Corp.*, 198 B.R. 214 (Bankr. E.D. Mich. 1996) ...........................................29

*In re Engman*, 395 B.R. 610 (Bankr. W.D. Mich. 2008)...................................................28

*In re General Datacomm Industries, Inc.*, 309 B.R. 848 (D. Del. 2004) .......................................32

*In re Ionosphere Clubs, Inc.*, 134 B.R. 515 (Bankr. S.D.N.Y. 1991)..........................................25

*In re Lionel Corporation*, 722 F.2d 1063 (2d Cir. 1983)..........................................33, 34

*In re Northwest Airlines Corp.*, 366 B.R. 270 (Bankr. S.D.N.Y. 2007)........................................28

*In re Tower Automotive, Inc.*, 342 B.R. 158 (Bankr. S.D.N.Y. 2006)..........................................26

*Kaiser Aluminum Corp.*, 456 F. 3d 328 (3rd Cir. 2006) ....................................................27

*Kothe v. R.C. Taylor Trust*, 280 U.S. 224 (1930) ........................................................28

*Kuehner v. Irving Trust Co.*, 299 U.S. 445 (1937) ......................................................28

*Nathanson v. NLRB*, 344 U.S. 25 (1952).................................................................28

*Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986)..................................................34

*United States v. Embassy Restaurant, Inc.*, 359 U.S. 29 (1959)....................................................28

<u>Statutes</u>

Bankruptcy Code:

      11 U.S.C. § 105..................................................................................1
      11 U.S.C. § 363.......................................................................... *passim*
      11 U.S.C. § 365.....................................................................1, 26, 32
      11 U.S.C. § 1113....................................................................16, 26, 27

11 U.S.C. § 1113(b) ..................................................................................................27
11 U.S.C. § 1114 ............................................................................................... *passim*
11 U.S.C. § 1129(a)(13)............................................................................................25

Employee Retirement and Income Security Act:

29 U.S.C. § 1001, *et seq*.........................................................................................27

Federal Rules of Bankruptcy Procedure:

Rule 2002 ..................................................................................................................1
Rule 6004 ..................................................................................................................1
Rule 6006 ..................................................................................................................1

Retiree Benefits Bankruptcy Protection Act of 1998:

Pub.L. No. 100-334, 102 Stat. 610 ......................................................................24


Other Authorities

7 Collier on Bankruptcy, ¶ 1114.02[1] (15th ed. 2002)...............................................32

**PRELIMINARY STATEMENT**

1.      The Objecting Unions consist of the IUE-CWA, United Steelworkers ("USW")
and International Union of Operating Engineers ("IUOE").  These Unions object to Debtors'
Motion Pursuant to 11 U.S.C. §§ 105, 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P.
2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase
Agreement With Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser,
Free and Clear Of Liens, Claims, Encumbrances, and Other Interests; B) the Assumption and
Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and
(II) Schedule Sale Approval Hearing ("Sales Motion"), because the sale of the only viable
assets of General Motors Corporation ("GM" or "the Debtors") will, and is intended to, leave
the Debtors unable to pay for the retiree health obligations owed to more than 50,000 union-
represented retirees and their dependents.  Allowing GM to impose a *fait accompli* on this
group of union-represented retirees inevitably deprives them of their hard-earned retiree
benefits, grossly deforms the protections embedded within § 1114 of the Bankruptcy Code, 11
U.S.C. § 1114, and misapplies other relevant provisions of the Bankruptcy Code.

2.      Section 1114 requires a debtor to maintain its obligation to provide retiree
benefits unless and until it satisfies certain clear and compelling standards.  11 U.S.C. § 1114.
A debtor must demonstrate that any proposed reduction in retiree benefits is fair and equitable
under the circumstances.  Fairness under § 1114 should be evaluated by comparing the
treatment of these retirees to the treatment accorded other stakeholders in the GM bankruptcy
proceeding and, especially, other similarly situated participants in the GM retiree health plans.

3.      In that respect, GM has been not only unfair, but cruel, to the 50,000 retirees and
dependents represented by the Objecting Unions who are receiving or are eligible to receive

1

GM retiree health care but who are not represented by the United Auto Workers ("UAW"), GM's largest union.  GM has agreed to protect the health and life insurance benefits for similarly situated retirees who are represented by the UAW.  Those retirees will be provided health care through a UAW voluntary employee benefit association ("VEBA") which will receive more than $10 billion in cash, a note for $2.5 billion, preferred stock valued at $6.5 billion in the New GM paying a 9% dividend, and at least 17.5% of the shares in New GM. Retirees of the Objecting Unions and the UAW did virtually identical jobs under similar collective bargaining agreements; they are participants in the same hourly pension plan and were participants in similar health benefit plans.  However, the retirees of the Objecting Unions have been denied the right to participate in this VEBA, and GM has repudiated its prior agreement to create a similarly funded VEBA for retirees and dependents represented by at least one of the Objecting Unions, the IUE-CWA.

4.    If GM succeeds in leaving behind these union-represented retirees and dependents, they will be left with only an unsecured claim against old GM for more than $3 billion in retiree health care and hundreds of millions more for retirement life insurance. This retiree claim would receive only pennies if the assets of GM are sold in an arrangement in which the only economic benefit to be retained by the existing GM is 10% of the shares of Vehicle Acquisition Holdings LLC with warrants for additional shares if GM's capitalization grows to $15 billion and $30 billion.

5.    If the Sales Motion is approved as proposed, leaving only pennies for these union retirees, GM will have effectively eliminated its retiree health care obligations without having met even a single one of the carefully crafted criteria in § 1114 that must be met before

2

retiree health benefits can be modified, much less eliminated. This would be a subversion of the substantive and procedural protections of § 1114.

6.      GM and the U.S. Department of the Treasury ("Treasury") are well aware of the claims by the Objecting Unions. The Sales Motion, if approved, would deprive the retirees represented by the Objecting Unions of their benefits, without even the pretence of a § 1114 proceeding.

7.      It is up to this Court to recognize that the 50,000 Americans from the Objecting Unions, whose tax moneys are being utilized to fund this transaction, cannot be discarded simply because their unions currently have a less powerful bargaining position than other players.

## STATEMENT OF FACTS

**IUE-CWA**

8.      IUE-CWA has represented thousands of workers at GM since 1949 when the IUE was formed. The primary IUE-CWA concentration at GM was in the Packard Electric Division of GM which made electrical auto parts. The IUE-CWA represented other sectors of GM as well, including at least one assembly plant, in Dayton, Ohio, at which automobiles were finally assembled and delivered to dealers for sale to customers. By the late 1990's, before the spin-off of the Packard Division to Delphi, IUE-CWA represented 18,000 active GM employees. Until December 23, 2008, the IUE-CWA also represented 4,000 employees at an automotive assembly plant in Dayton, Ohio who did the exact same jobs as UAW represented employees at other GM automotive assembly plants. (Declaration of James Clark, dated June 1, 2009 ("Clark Dec."), ¶ 2.)

3

9.    At all material times, the collective bargaining contracts between GM and the

IUE-CWA required GM to provide life-time retiree medical and life insurance to IUE-CWA

represented employees.  The availability of life-time medical insurance was a critical

component of the IUE-CWA collective bargaining relationship with GM. (Clark Dec., ¶ 3.)

10.    In 1999, GM created and spun off Delphi Corporation ("Delphi") and the IUE-

CWA represented employees in the Packard Division became Delphi employees.  Delphi

assumed the obligation to provide retiree medical benefits to IUE-CWA members who

transferred to Delphi.  GM continued to be responsible for retiree medical and life insurance

benefits for those who retired before January 1, 2000, and for those IUE-CWA represented

employees who remained with GM after May 29, 1999.  IUE-CWA and GM also negotiated a

benefits guarantee in 1999 under which GM would again become responsible for all of the

other post-employment benefits ("OPEB") assumed by Delphi if Delphi defaulted on its

pension and retiree medical obligations before October 19, 2007 ("1999 Benefit Guarantee").

(Clark Dec., ¶4, Ex. A.)

11.    In October, 2005, Delphi filed for bankruptcy protection under Chapter 11 of the

Bankruptcy Code. *In re Delphi Corp.,* Case No. 05-44481 (S.D.N.Y. RDD). In 2007, in the

course of the Delphi bankruptcy, Delphi, GM and IUE-CWA negotiated a tripartite agreement

under which GM acknowledged that the 1999 Benefit Guarantee had been triggered and agreed

to again assume the obligation for IUE-CWA retirees from Delphi who were eligible for life-

time retiree health care benefits and life insurance coverage. (Clark Dec., ¶ 5, Ex. B.)

12.    IUE-CWA has represented the employees at the GM Moraine, Ohio truck plant

for many years. In 2007, GM and the IUE-CWA engaged in collective bargaining negotiations

for a successor labor agreement.  In those negotiations, GM demanded that the IUE-CWA agree

4

to transfer GM's obligations for any retired IUE-CWA members to a retiree VEBA, similar to the VEBA that GM had created in negotiations with the UAW. GM advised IUE-CWA that it would not agree to any increased wages or benefits at the Moraine facility if IUE-CWA did not consent to a VEBA for all IUE-CWA GM represented retirees. (Clark Dec., ¶ 6.)

13.    As of December 31, 2007, the IUE-CWA represented approximately 41, 000 potential retiree VEBA participants and their dependents, including retired GM and Delphi employees, active GM employees and active Delphi employees. (Clark Dec., ¶ 7.)

14.    Representatives of GM and the IUE-CWA met on April 2, 2008 at a meeting in New York City at the GM building. At this meeting GM presented its first full VEBA proposal. GM had calculated the present value of the retiree health obligations owed to IUE-CWA represented employees as $3.2 billion. GM offered to provide $2.265 billion in funding to a VEBA that would assume responsibility for all IUE-CWA GM retiree medical costs as of January 1, 2012. The actuaries retained by IUE-CWA calculated the present value of the retiree health obligations owed to IUE-CWA represented employees as $4.7 billion. IUE-CWA presented a counter proposal for a VEBA that would be funded by GM with $4.3 billion dollars. (Clark Dec., ¶ 9.)

15.    On October 8, 2008, GM and IUE-CWA met again in New York to complete negotiations on a VEBA. At this meeting, GM and the IUE-CWA agreed upon a VEBA that would be funded with $2.433 billion commencing on January 2, 2012. (Clark Dec., ¶ 14.)

16.    On November 17, 2008, GM provided the IUE-CWA with a second draft of the VEBA Agreement ("VEBA Agreement"). (Clark Dec., Ex. D.) Under this proposal, the VEBA would be funded by GM with approximately $2.5 billion dollars paid out through a

combination of cash, pension plan changes and a series of payments from 2010 through

January, 2015. (Clark Dec., ¶ 17.)

17.    On December 2, 2008, GM submitted to the Senate Banking Committee &

House of Representatives Financial Services Committee its restructuring Plan for Long-Term

Viability which states:

> GM agreed with the UAW to shift the liability of paying for health care for hourly
> retirees from GM to an independent trust (VEBA), scheduled to occur on January 1,
> 2010. Additionally, GM and the IUE-CWA have recently agreed to a similar
> arrangement to become effective January 1, 2012, for their retirees.

(Clark Dec., Ex. E at 17.)  (emphasis added.)

18.    On December 10, 2008, the IUE-CWA accepted the GM draft of the IUE-CWA

VEBA Agreement. (Clark Dec., Ex. F.)  In January, 2009, GM refused to take steps to

implement its VEBA agreement with the IUE-CWA because of the looming auto industry melt

down and the requirements imposed by the Treasury Department. (Clark Dec. ¶20.)

19.    At no point in the many recurring collective bargaining negotiations between the

IUE-CWA and GM over decades, or even in the more recent and tortured tripartite negotiations

among GM, Delphi and IUE-CWA during the Delphi bankruptcy, did GM ever contend that the

retiree health obligations owed to IUE CWA members were not vested.  The recent actions by

GM guaranteeing the OPEB benefits of Delphi and accepting a triggering of that guarantee as

part of the Delphi bankruptcy, are utterly inconsistent with an employer that is in any way

doubtful of its continuing obligation to provide life-time medical benefits to the IUE-CWA

retirees. (Clark Dec., ¶ 22.)

20.    Since January, 2009, however, GM has repudiated the VEBA Agreement that

the parties had carefully negotiated throughout 2008.  GM has refused to proceed with the

VEBA agreement with the IUE-CWA.  In contrast, GM has entered into an agreement with the

UAW that provides funding to a VEBA for continued medical benefits for UAW retirees who

are similarly situated to IUE-CWA retirees.  Retirement health benefits for UAW represented

retirees will be provided by a VEBA funded by New GM that will receive $10 billion or more

in cash, a note for $2.5 billion paying interest at 9%, preferred stock in the New GM paying a

dividend of 9% and 17.5% of the shares issued by New GM with an opportunity to increase that

stake to 20% of New GM. (Clark Dec., ¶ 23.)

21.    IUE-CWA has repeatedly requested clarification from GM concerning its

treatment of IUE-CWA retirees since January, 2009.  On May 26, 2009 the attorneys for IUE-

CWA sent the following email to the attorneys for GM:

> The IUE-CWA, like the rest of the world, is of course aware of GM's financial
> problems. Your letter states that "now that GM has reached a tentative settlement with
> the UAW". In fact, as you know, the tentative settlement was reached last week. It is
> common knowledge that GM will file a Chapter 11 petition on or before June 1, at most
> 5 days from tomorrow. The negotiations with the UAW spanned months. How is it GM
> anticipates reaching a consensual agreement with the IUE CWA (not to mention the
> USWA) in that span of time when GM has not even made a proposal? The IUE-CWA
> will not allow its members to be treated as second class citizens as far as retiree health
> care is concerned. They worked just as hard in their decades of employment for GM as
> any other auto industry workers.
>
> We agreed upon a conference call between the GM and IUE CWA leadership on May
> 15 in order to understand how, if at all, GM desired to modify the agreement on retiree
> OPEB that we had previously reached. At that time we were told that the UAW
> negotiations had not concluded but that an agreement was moving quickly and that GM
> wanted to sit down with the IUE CWA to reach an agreement "immediately". We set up
> a meeting in Detroit for May 20. On May 19 we were told that the IUE CWA
> discussions were on hold because there was no UAW agreement yet. We finally had a
> conference call on the morning of May 21 in which we were told that no agreement had
> been reached with the UAW. By noon that day the news was reporting that an
> agreement had been reached on a VEBA between UAW and GM. In the afternoon of
> May 21 I emailed GM asking why IUE-CWA had to wait until next week to find out
> what was being offered by GM. On May 22 I wrote Frank to ask why GM was not
> making a proposal to the IUE-CWA. We still do not have a proposal at this date and it is
> clear to us that the strategy is to present to the IUE CWA a last minute take it or leave it
> proposal that will offer the union no time at all to explore, understand and negotiate any
> alternatives. These are complex financial issues that cannot be resolved overnight
> especially since GM has known for months that it would be filing for Chapter 11 if it

was unable to reach an accord with its secured creditors. I find it difficult to believe that a mutually satisfactory solution can be reached if GM continues to delay even making a proposal to the IUE CWA. TK

(Clark Dec., ¶ 24, Ex. H.) (emphasis added.)

22.     On June 5, 2009, GM made a proposal to the IUE-CWA to eliminate retiree medical benefits for nearly 60% of the retirees and their dependents who are now entitled to that coverage ("June 5 Proposal"). (Clark Dec., Exhibit J.)  The June 5 Proposal eliminates retiree medical benefits entirely to all those over age 65 and those under 65 but eligible for Medicare. The June 5 Proposal also eliminates the Vision and Dental Programs and increases co-pays.  Retirees would be required to make monthly contributions to the company to participate in the plan and would be subjected to extraordinarily high deductibles.  For a family, the annual required contribution is $3,240 and the annual deductible is $5,000.  Thus, a retiree would have to spend $8,000 in a single year before GM made any payment for medical benefits.  (Clark Dec., ¶ 26.)

23.     On June 11, 2009, GM responded in part to the information request that had been made by IUE-CWA in response to the GM offer.  The GM response showed that GM's accumulated post-employment benefit obligation for IUE-CWA represented retirees was $2.868 billion as of December 31, 2008. (Clark Dec., Exhibit K.)  That total benefit obligation consisted of $2.690 billion in post-retirement health care based on the current benefit plans and $178 million in post-retirement life insurance benefits.   The health care benefit obligations were primarily (72%) owed to retirees post-65 years of age.  Only 28% of the retiree health care obligations were owed to retirees younger than 65.

24.     On a cost to cost basis, the drastically reduced plan of retiree health benefits GM proposed to IUE-CWA in June, 2008 is the equivalent of only 13% of the current plan.  All of

8

the post-65 participants are deprived of benefits entirely under the June 5 Proposal. The pre-65 participants have the value of their benefits cut by more than 50% from a value of $746 million to a value of $349 million. The proposal also calls for the elimination of dental and vision benefits which represents another reduction in benefit value of $18.9 million for retiree dental benefits and $17.8 million in retiree vision benefits.

25.    As GM compared the variance between the existing retiree benefits for IUE-CWA represented retirees and the "2010 Plan", GM computed that their proposal reduced retiree benefits to the IUE-CWA represented retirees by $2,435 billion, an astonishing 85% reduction.

26.    The GM/UAW VEBA participants, in contrast, are likely to experience a far less significant reduction in their benefits because the GM/UAW VEBA has been funded to a far greater extent. While the conversion of the GM/UAW VEBA funding from cash and notes to equity in the New GM in different forms makes it difficult to determine the exact percentage of funding, it is likely that the GM/UAW VEBA will have assets valued at more than two-thirds of the initial funding that the UAW and GM agreed to in 2007.

**UNITED STEELWORKERS**

27.    United Steelworkers is the largest industrial union in North America, representing approximately 850,000 workers in the United States, Canada, and the Caribbean. USW represents employees in nearly every sector of the industrial economy. (Bingham Decl., ¶ 3).

28.    United Steelworkers is the authorized representative for purposes of Section 1114 of the Bankruptcy Code, 11 U.S.C. § 1114, of approximately 6,200 retirees, spouses, surviving spouses and dependents receiving retiree benefits pursuant to collective bargaining

agreements between USW and GM.  The retirees represented by USW worked at two facilities located in and around Dayton, Ohio, namely, the Home Avenue and Vandalia plants.  In 1999, GM spun-off the Home Avenue and Vandalia plants, along with numerous other facilities, to Delphi Corporation ("Delphi").  (Bingham Decl., ¶ 4).

29.    For decades, the USW has been the bargaining agent of workers employed at two facilities in Dayton, Ohio – the Vandalia and Home Avenue plants – that were once owned by GM and now are owned by Delphi Corporation ("Delphi").  The Home Avenue plant bargaining unit was originally organized by the United Rubber Workers ("URW") in 1937, while in or around 1961 the URW became the bargaining agent at the Vandalia plant.  The URW merged with the USW in 1995.  The workers are represented today by the USW and its Local Union 87L.  Delphi recently closed the Home Avenue facility.  The Vandalia Plan remains in operation and presently employs approximately 140 bargaining unit employees.  (Bingham Decl., ¶ 5).

30.    The USW (and, before the merger, the URW) and GM were parties to National Agreements covering the Dayton employees; the GM-USW National Agreements were largely patterned after the National Agreements that GM entered with the United Auto Workers ("UAW"), which represented the vast majority of GM's workers.  (Bingham Decl., ¶ 6).

31.    The GM-USW National Agreements established a host of benefits, including pension benefits and retiree health and life insurance programs.  The USW employees participated in the same pension plan as the UAW and other unionized workers, and USW retirees received the same retiree health and life insurance benefits as the other unionized retirees.  (Bingham Decl., ¶ 7).

32.    On or around May 28, 1999, GM spun-off its parts making business to Delphi, which included the two Dayton plants represented by the USW.  Upon the creation of Delphi, USW ceased to represent active GM employees, which lead USW to be concerned about whether the USW retirees would continue to receive the same retiree benefits as those represented by labor organizations that continued to represent active GM workers.  (Bingham Decl., ¶ 8).  In light of USW's concern, GM and USW entered into a letter agreement dated December 10, 1999, in which GM agreed, in relevant part, as follows:

> General Motors acknowledges the Union's concern and provides assurance that those employees, retirees and surviving spouses who retire on or before January 1, 2000, will in the future, be extended the identical provisions of the GM Hourly Pension Plan, Life and Disability Benefits and Health Care Programs that are provided to other represented hourly employees and retirees who continue to be covered under such GM benefit programs.

(Bingham Decl., Exh. 1)  (emphasis added).

33.    In addition, GM and the USW entered into a Benefit Guarantee Agreement dated December 31, 1999 ("Benefit Guarantee") wherein GM agreed to guarantee the pension and retiree insurance benefits of the USW-represented employees who were employed by GM prior to the spin-off but who retired from Delphi after the date of the transaction.  (Bingham Decl., ¶ 9 and Exh. 2).  GM agreed to similar terms with the other unions representing its workers and retirees.  As a clear showing of the contractual nature of the commitment, GM agreed that

> the obligations as described in this letter will continue in effect with respect to each of the benefits described above, regardless of the expiration of any collective bargaining agreement, for as long as GM is providing the corresponding benefit to its hourly employees or retirees.  This agreement may be modified only by mutual agreement of the parties.

(Bingham Decl., Exh. 2, p. 3)  (emphasis added).  As it relates to retiree insurance, the Benefit Guarantee provides that in the event that on or before October 18, 2007, Delphi "due to

11

Financial Distress[1] fails or refuses to provide post-retirement medical benefits" or "due to

Financial Distress reduces the level of post-retirement medical benefits" to covered Delphi

retirees "below the level of benefits which, at that time, GM is providing to its hourly retirees,"

> <u>GM shall guarantee such retired Covered Employees post-retirement medical benefits at
> the level and scope in effect for hourly GM retirees</u> at the time of [the termination or
> reduction of benefits]. Further, any such coverage provided by GM shall be secondary
> to coverages, if any, provided by Delphi, any of its subsidiaries or affiliates, or any of
> their successor companies.

(Bingham Decl., Exh. 2, pp. 1-2) (emphasis added). The Benefit Guarantee provides for a

similar commitment relative to retiree life insurance benefits. (Bingham Decl., Exh. 2).

34.    Delphi filed its Chapter 11 case in October 2005 and, at some point in 2006,

entered into negotiations with each of the major labor unions representing its workers and/ or

retirees, including the USW. These negotiations continued into 2007. GM also participated in

these negotiations. GM and Delphi first reached agreements with the UAW and the IUE, and

then, in August 2007, reached an agreement with the USW and its Local Union 87L. (Bingham

Decl., ¶ 10).

35.    The August 2007 agreement was several hundred pages in length and covered

myriad issues relating to the collective bargaining agreements and other agreements covered the

workers and retirees of the USW-represented Dayton plants. A key aspect of the agreement

was "Attachment B," which is entitled "Term Sheet – Delphi Pension Freeze and Cessation of

OPEB, and GM Consensual Triggering of Benefit Guarantee" ("Term Sheet"). The signatories

to the Term Sheet are GM, Delphi, the USW, and USW Local Union 87L. (Bingham Decl., ¶

11 and Exh. 3).

---

[1]    The term "Financial Distress" is defined as including circumstances such as "a
significant drop in [Delphi's] credit rating, reorganization in bankruptcy, and a qualified
opinion by Delphi's auditors regarding Delphi's prospects as an on-going concern . . . ."

36.    The parties agreed that Delphi's cessation of benefits "will trigger . . . the

Benefit Guarantee as of the Cessation Date as set forth herein." (Bingham Decl., ¶ 15, Exh. 3).

And, as part of the transition of retiree benefits from Delphi to GM, the Term Sheet provides

that "GM agrees to provide post-retirement medical and employer paid post-retirement life

insurance" to covered participants.[2] (Bingham Decl., ¶ 12, Exh. 3).

37.    Regarding the program of benefits to be provided, the parties further agreed that

"[a]ll post-retirement medical benefits provided with respect to Covered Employees by GM

will be in accordance with all the ongoing terms, conditions and eligibility requirements of the

GM Health Care Program for Hourly Retirees" and that "GM will provide the applicable level

of post retirement medical benefits consistent with the terms" of a modified plan that GM and

IUE-CWA had negotiated "on the same basis as such benefits are provided to GM-IUE hourly

employees who retired from GM with eligibility to participate in the GM Health Care

Program." (Bingham Decl., Exh. 3, ¶ 17(C)). GM until now has honored these contractual

commitments. Other provisions of the August 2007 settlement agreement described the plan

design changes that were to be made to the GM retiree benefit programs. (Bingham Decl., ¶

13).

38.    The August 2007 agreement also included a letter dated August 16, 2007,

addressed to Dennis Bingham, president of USW Local Union 87L, by Dean W. Munger, GM's

Executive Director of Labor Relations, addressing future post-retirement health care coverage

("Future Coverage Letter"). (Bingham Decl., ¶ 14 and Exh. 4).

---

[2]    Covered participants include those who retired prior to the effective date of the Term
Sheet under the 1999 Delphi-USW Master Agreement; persons who on the effective date of the
Term Sheet were eligible to retire from Delphi but had yet to do so; and persons who obtained
sufficient pension service to retire within 7 years of the effective date pursuant to various
normal, early and disability forms of pension benefits. (Term Sheet, ¶ 17(A).

39.    Similar to the letter agreed-to in 1999 relative to future benefits, the Future

Coverage Letter addresses the treatment of USW-represented GM retirees after the expiration

of the GM-UAW agreement in 2011, and provides, as follows:

> GM understands USW-Local 87L's concerns [regarding future benefits] and provides
> assurance that future changes to the post-retirement health care benefits for USW-Local
> 87L retirees and surviving spouses, who are considered GM retirees and surviving
> spouses and who have retired no later than [the date set forth in the USW-GM-Delphi
> Special Attrition Program] will be based on changes to the post-retirement health care
> benefits for former GM employees who were represented by the UAW who are
> considered GM retirees or surviving spouses ("UAW Retirees"). Changes to the post-
> retirement health care benefits for USW Retirees will be proportional to the changes to
> those benefits for UAW Retirees based on the differences between the USW-Local 87L
> Plan Design Changes dated August 16, 2007 and the UAW Plan Design Settlement
> Agreement dated December 16, 2005.

(Bingham Decl., Exh. 4)  (emphasis added).

40.    The August 2007 settlement agreement among GM, Delphi, USW and USW

Local Union 87L includes other provisions, including the transfer of certain pension assets and

liabilities from the Delphi pension plan to the GM pension plan and the creation of a Special

Attrition program which was designed to encourage Delphi employees to retire from

employment.  A key element of the Special Attrition Program was the right of employees to

"check the box" and elect to receive post retirement health and life insurance benefits from GM.

(Bingham Decl., ¶ 16).

41.    GM presented USW with an offer on June 8, 2009, that falls far short of parity

with the terms offered to the UAW.  GM's proposal to USW is substantively similar to the

proposal tendered to IUE-CWA.  Because New GM proposes not provide any form of benefits

to retirees who are Medicare eligible, according to information furnished by GM,

approximately 4,100 of the USW Retirees will immediately lose any form of employer

provided coverage effective January 1, 2010, and more than 1,000 retirees between the ages of 60 and 64 will lose coverage in the coming years. (Bingham Decl., ¶ 17).

42.    As with its offer to IUE-CWA, GM has asked that USW waive its claim, which, according to data furnished by GM totals approximately $424 million. However, also according to data furnished by GM, the actuarial value of the revised program is approximately 15% of the current liabilities. (Bingham Decl., ¶ 18).

43.    Following the June 8 meeting, USW presented GM on June 10 with a comprehensive information request. USW presented another information request on June 14. GM responded in part to the information requests. (Bingham Decl., ¶ 19).

44.    The USW and GM met on June 17, 2009 in Detroit, Michigan. Representatives of the IUE-CWA and the IBEW were also present. The USW and IUE-CWA presented GM with a joint proposal. ("June 17 Proposal") (Attached as Exhibit 1). GM rejected the proposal. The USW and IUE-CWA stated at the end of the meeting that they were willing to continue bargaining with GM. (Bingham Decl., ¶ 20.)

## INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS 18S, 101S AND 832S

45.    The International Union of Operating Engineers ("IUOE") is a diversified trade union representing some 400,000 workers, including over 130,000 stationary engineers who work in operations and maintenance in building and industrial complexes.

46.    For many decades, a small group of stationary engineers who were responsible for maintaining the power, heating and ventilations systems in the GM facilities in Rochester, New York, Columbus, Ohio and Olathe, Kansas were represented by IUOE Locals Nos. 832S, 18S and 101S respectively ("IUOE Locals" or "IOUE").

47.    The stationary engineers in Rochester, Columbus and Olathe performed the same jobs as their counterparts in other GM facilities around the country who were and are represented by the UAW.

48.    For decades the IUOE Locals negotiated collective bargaining agreements with GM covering the stationary engineers in Rochester, Columbus and Olathe that were patterned after the UAW/GM agreements. The IUOE-represented stationary engineers participated in the same hourly pension plan and received the same health and life insurance benefits at retirement as the UAW stationary engineers and other unionized workers at GM.

49.    In 1999, when GM spun off its parts making operations to Delphi, the Rochester, Columbus and Oathe facilities were transferred to Delphi. Since then the Olathe and Columbus facilities have been shut down, while the Rochester facility continues to operate.

50.    The IUOE Locals are the authorized representatives for purposes of §1114 of the Bankruptcy Code of some 64 retirees and their spouses and dependents currently receiving retiree health and life insurance benefits from GM pursuant to agreements between GM and the IUOE Locals. The retirees worked at the Olathe, Columbus and Rochester facilities.

51.    Delphi filed a proceeding under Chapter 11 of the Bankruptcy Code and thereafter filed motions under §§ 1113 and 1114 of the Bankruptcy Code to reject its collective bargaining agreements with all of the unions representing its employees, including the IUOE Locals, and to reduce retiree health care, life insurance and other post employment benefits for retirees represented by its various unions.

52.    After many months, Delphi and GM entered into negotiations with the IOUE Locals, which in August 2007 resulted in significant modifications to the IUOE/Delphi collective bargaining agreements and agreements among the IUOE Locals, Delphi and GM that

16

GM would assume the obligation for post retirement health care and life insurance under the

GM Health Care Program for Hourly employees for existing IUOE represented retirees,for

employees of Delphi who "checked the box" and transitioned to GM for purposes of post

employment benefits, and for other IUOE represented Delphi employees who would become

eligible for retirement within 7 years under the agreements' specific criteria.

53.    The agreements between GM and Delphi and the IUOE Locals for GM to

assume post employment health care and life insurance benefits also included special attrition

programs to encourage the early retirement or severance of employees at the Columbus,

Rochester and Olathe facilities and the transfer of pension assets and liabilities from the Delphi

Hourly Pension Plan to the GM Hourly Pension Plan for the IUOE represented employees who

had retired or were participating in the special attrition program. The Agreements in question

are "Attachment B" entitled "Term Sheet - Delphi Cessation and GM Provision of OPEB" and

"Attachment C" "Delphi-GM-IBEW-IAM-IUOE Special Attrition Program-Transformation."

54.    The Agreements, which were approved by the Bankruptcy Court for the

Southern District of New York in Case No. 05-44481, were not subject to abrogation,

modification or rejection without the mutual consent of the IUOE Locals.

55.    Pursuant to the Agreements, GM agreed to provide to the IUOE represented

retirees post retirement health care and basic life insurance benefits in accordance with the

terms of the GM Health Care Program for Hourly Employees at the applicable level of medical

benefits and on the same basis "as such benefits are provided to GM IUE CWA hourly

employees who retired from GM with eligibility to participate in the GM Health Care

Program."

56.     On the evening of June 11, 2009, for the first time, GM representatives presented the IUOE Locals with a proposal for the provision of retiree health care and life insurance benefits by the "new company." The proposal effects a drastic reduction in the health care benefits available to pre Medicare retirees and eliminates all health care benefits for Medicare retirees, including disabled retirees. It reduces life insurance coverage from $35,000 to $10,000.

57.     The proposal also provides that as a condition for the new company providing retiree health care benefits to IUOE represented retirees, the IUOE Locals must: 1) give up any right in the future to request that the new company make any improvements in the level of retiree health care benefits; 2) concede to new company the right at any time in the future to modify or terminate retire health and life insurance benefits without notice to or agreement from the IUOE Locals; and 3) waive any claims against GM for retiree health or life insurance benefits.

58.     In response to an information request submitted by the IUOE Locals , GM has calculated that the present value of the current level of retiree health and life insurance benefits for 64 IUOE retirees and their dependents is $4.7 million, of which $3.3 million is for health care costs for Medicare retirees.

59.     GM has estimated that present value of the retiree health and life insurance benefits under the new company's proposal would be $700,000. The proposal thus affords the new company an 85% reduction in the costs of providing retiree health and life insurance benefits to the IUOE represented retirees.

60.     GM has informed the IUOE Locals that "the structuring team, with guidance from US Treasury, established an OPEB reduction target of two thirds." The reduction in

health care and life insurance costs for IUOE-represented retirees is 85% ,far in excess of the 2/3 target, which means that the IUOE represented retirees are bearing a disproportionate share of the burden of GM's reorganization.

61.    According to the calculations made by GM in response to the IUOE Locals information request, under the company's proposal, the average retiree and his spouse, who has "medium" level health care expenditures must pay out of pocket for premiums and deductibles in excess of $7000 before the company has to pay anything.

62.    The proposal results in the complete loss of any benefits for Medicare retirees, including any contribution to Part B Medicare costs or to the costs of providing prescription medicine as a result of Medicare's "donut hole."

63.    All of the IUOE represented retirees are over the age of 55.  There are 7 non Medicare retirees and 33 Medicare retirees.  The Medicare retirees include one 95 year old and twenty three retirees over the age of 70.  The likelihood that at this point in time these individuals will be able to purchase affordable supplemental health insurance is nil.

64.    The likelihood that any IUOE represented current or future retirees will be able to replace the life insurance benefit they have lost is also slim to nothing.

65.    When asked by the IUOE Locals what was the reason for requiring the IUOE Locals to give up the right to negotiate an improvement in retiree health and life insurance benefits in the event the new company was financially successful, the response was that the company's rationale for imposing this condition was "not relevant to the negotiation" and "invades attorney client privilege and work product doctrine."

## THE IMPACT OF THE PROPOSED TRANSACTION

66.     If GM is allowed to sell all of its valued assets to New GM in a transaction in

which all of the value to be generated has been already allocated among the UAW, secured

bond holders and unsecured bond holders, the Objecting Unions will be unable to defend their

interests in any § 1114 proceeding even if they are successful since the old GM will not have

any assets with which to provide the promised benefits even if ordered to do so by this Court.

(Clark Dec., ¶ 27.)

67.     The § 363 sale is projected to yield to old GM 10% of the shares of New GM,

together with warrants which would expand to 17.5% if the capitalization of New GM reaches

an aggregate fully diluted equity value of $15 billion, and to 25% if at any point within the next

10 years the fully diluted equity value of New GM reaches $30 billion.  Assuming the first set

of warrants are triggered at $15 billion, the old GM therefore has an asset worth of 17.5% of

$15 billion, or $2.6 billion, that will be spread over unsecured creditor claims of up to $35

billion, yielding perhaps 7.5 cents on the dollar.  And that recovery could be delayed for years.

It is painfully obvious that this transaction does not contemplate a meaningful recovery for the

retirees who are represented by the Objecting Unions.

68.     The Order entered on June 2, 2009 by this Court setting forth the procedures for

sale of Debtors' assets to Vehicle Acquisition Holdings, LLC, included, at paragraph G,

approval of the UAW Special Retiree Notice which described the notice of the § 363

transaction and the UAW Retiree Settlement Agreement that would be provided to the UAW

represented retirees of GM and Delphi.  There is no provision for notice to GM or Delphi

retirees represented by any other union. While the notices provided in the procedures may be

adequate to advise UAW represented retirees of the § 363 Sales Transaction and the UAW

Retiree Settlement Agreement, other equally deserving GM and Delphi retirees have not been

provided with notice and opportunity to object to this transaction despite the fact that if granted,

the § 363 sales motion will doom their critically important retiree health benefits by taking all

of the available assets out of the GM estate.

69.    The § 363 Transaction and the UAW Retiree Settlement are so intertwined that

compensation paid for one is equally chargeable to the other. The Sales Procedure Order is

clear, at paragraph 7, that the Court will simultaneously consider approval of the proposed §

363 Transaction and the UAW Retiree Settlement Agreement and that the effective date of any

assumption of the UAW collective bargaining agreement is contingent upon the approval of the

§ 363 Transaction. The Bid requirements provide not only that the Bidder will consummate the

§ 363 Transaction but must also enter into the UAW Retiree Settlement Agreement.   The

UAW has consultative rights concerning the acceptance of any qualified bidder.

70.    The Notice of Sale Hearing identifies the consideration to be paid under the

Master Sale and Purchase Agreement as the sum of a credit bid in the amount of loans

outstanding to Treasury and Export Development Canada, estimated to be approximately $48.3

billion at July 31, 2009, the surrender of certain GM warrants held by Treasury, 10% of the

shares in the Purchaser and warrants for an additional 15% of stock in the Purchaser if certain

equity value targets are met.

71.    Since the UAW Retiree Settlement is intertwined with the § 363 Transaction, it

is reasonable to consider the additional compensation payable under the UAW Retiree

Settlement to also constitute consideration for the sale of the GM assets, especially since any

bidder must also enter into the UAW Settlement Agreement.   There is ample room in this

preferred treatment of the UAW retirees for this Court to include coverage for the health claims of other GM union represented retirees.

72.     Indeed, the UAW Claims Agreement, described at paragraph 28, contemplated that this or an appellate court could modify the terms of the UAW Retiree Settlement Agreement.

73.     The human suffering that will be brought about by the loss of GM retiree health insurance is staggering.  Depriving some 50,000 people of their health insurance will have an immediate and devastating impact on the GM retiree plan participants.  The accompanying declaration of Debra Turner demonstrates the impact that she will suffer if she is unable to continue her GM retiree health insurance.  Ms. Turner relates that she took a medical retirement from GM in 1993.  She suffers from multiple sclerosis and rheumatoid arthritis.  She takes expensive medicine every day to try to control her illnesses which would cost $1,800 per month if purchased without health insurance.  Her pension from GM is only $1,500 to $1,600 per month.  Since her husband is also retiring it is doubtful that she can afford the premiums and co-pays that GM has demanded the Objecting Unions accept.  Without health insurance that she can afford, Ms. Turner will no longer be able to control her multiple sclerosis and the pain she suffers from her arthritis.  She will be relegated to a wheel chair and a life of constant and disabling pain.  She is understandably terrified of the prospect of life without the medical benefits that she worked many years as an automobile assembler to obtain.

## SECTION 1114

74.     The relevant portions of § 1114 collectively emphasize the need for any modifications in retiree benefits to assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably (See (f)(1)(A)), and are necessary to permit the

reorganization of the debtor and assure that all creditors, the debtor, and all of the affected

parties are treated fairly and equitably, and are clearly favored by the balance of the equities

(See (g)(3).)

75.    The relevant text of § 1114 is as follows:

(a)    For purposes of this section, the term "retiree benefits" means payments
to any entity or person for the purpose of providing or reimbursing payments for retired
employees and their spouses and dependents, for medical, surgical, or hospital care
benefits, or benefits in the event of sickness, accident, disability, or death under any
plan, fund, or program (through the purchase of insurance or otherwise) maintained or
established in whole or in part by the debtor prior to filing a petition commencing a case
under this title.

(b)(1)   For purposes of this section, the term "authorized representative" means
the authorized representative designated pursuant to subsection (c) for persons receiving
any retiree benefits covered by a collective bargaining agreement or subsection (d) in
the case of persons receiving retiree benefits not covered by such an agreement.

. . .

(c)(1)   A labor organization shall be, for purposes of this section, the authorized
representative of those persons receiving any retiree benefits covered by any collective
bargaining agreement to which that labor organization is signatory, unless (A) such
labor organization elects not to serve as the authorized representative of such persons, or
(B) the court, upon a motion by any party in interest, after notice and hearing,
determines that different representation of such persons is appropriate.

. . .

(e)(1)   Notwithstanding any other provision of this title, the debtor in
possession, or the trustee if one has been appointed under the provisions of this chapter
(hereinafter in this section "trustee" shall include a debtor in possession), shall timely
pay and shall not modify any retiree benefits, except that--

(A)    the court, on motion of the trustee or authorized representative, and after
notice and a hearing, may order modification of such payments, pursuant to the
provisions of subsections (g) and (h) of this section, or

(B)    the trustee and the authorized representative of the recipients of those
benefits may agree to modification of such payments, after which such benefits
as modified shall continue to be paid by the trustee.

. . .

(f)(1)    Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall--

(A)    make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

. . .

(2)    During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

(g)    The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that—

(1)    the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2)    the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3)    such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;

## ARGUMENT

### THE SALES MOTION TREATS 50,000 UNION-REPRESENTED RETIREES UNFAIRLY AND INEQUITABLY AS COMPARED TO UAW REPRESENTED RETIREES AND OTHER CREDITORS

#### Section 1114  Is Violated By A Plan That Accords Some Retirees Protections That Are Denied To Others

76.    The proposed Sales Motion is utterly incompatible with GM's obligations under

§ 1114.  Section 1114 was added to the Bankruptcy Code as part of the Retiree Benefits

Bankruptcy Protection Act of 1998 ("RBBPA"), Pub.L. No. 100-334, 102 Stat. 610, along with

§ 1129(a)(13), which requires as a condition of plan confirmation that a debtor provide retiree

benefits at the level established under § 1114 for the duration of the period that the debtor has

obligated itself to provide such benefits.  11 U.S.C. § 1129(a)(13). Congress's purpose in

enacting the RBBPA was to ensure that debtors did not seek to effect reorganization on the

back of retirees for the benefit of other parties in interest.  *In re Ionosphere Clubs, Inc.,* 134

B.R. 515, 523 (Bankr. S.D.N.Y. 1991).  Section 1114 "provides a status quo safeguard" that

requires a debtor to continue timely paying retirement benefits in full unless modified in

accordance with § 1114(e)(1)(A) or (B).  *Id.*  Any payments required to be made by the debtor

prior to when plan confirmation is effective are treated as allowed administrative expenses.  11

U.S.C. § 1114(e)(2).

77.    Congress' intent to avoid having Chapter 11 reorganizations take place on the

back of retirees is even more clearly violated by a proposal that would have a reorganization

take place on the back of some retirees while other similarly situated retirees obtain substantial

protections for their benefits.  The numerous press releases and reports on the approaching GM

bankruptcy have left no doubt that GM, the Treasury, the secured bond holders and the majority

of the unsecured bond holders are solidly behind a plan that provides some $30 billion in value

to a retiree health benefits VEBA that is restricted to UAW retirees alone.  The preliminary

steps to create this plan were made before the Chapter 11 filing.  The next crucial step is to

secure judicial approval for the prepackaged sale of GM's only meaningful assets principally to

the U.S. and Canadian Governments, the bond holders and the UAW VEBA.  Once this sale is

accomplished, the old GM will be left with no assets with which to satisfy its obligations under

§ 1114 to the retirees represented by the Objecting Unions.

78.     GM may haul out the old canard that retirees represented by the Objecting Union

are simply being treated in the same manner as other general unsecured creditors,  However,

this court, in *In re Tower Automotive, Inc.*, 342 B.R. 158 (Bankr. S.D.N.Y. 2006), held that the

plain language of § 1114 bars any contention that retirees are similarly situated to general

unsecured creditors.  The Court summarized the obligations of § 1114 and specifically noted

that a debtor cannot obtain an order allowing it to diminish retiree health benefits unless the

debtor demonstrates that under the modification all of the affected parties are treated fairly and

equitably and that the modification is clearly favored by the balance of the equities.  A § 363

process that treats 50,000 retirees and dependents represented by the Objecting Unions

substantially worse than other similarly situated union members cannot be said to be fair or

equitable or to be clearly favored by the balance of the equities.

79.     Section 1114 cannot be ignored in the § 363 sales approval process.  Section

1114 (e) states that "Notwithstanding any other provision of this title, [the debtor] shall timely

pay and shall not modify any retiree benefits."  The obligations of § 1114 trump any other

rights a debtor may have to shed its obligations under the Bankruptcy Code, including the rights

of a debtor under § 363.[3]  That statutory predominance precludes a use of § 363 to vitiate the

obligations imposed on GM by § 1114 to continue retiree health care and to avoid taking

actions that will render the clarion call of § 1114 silent.

---

[3]     Section 363 creates a general rule under the Bankruptcy Code. Norton, Bankruptcy Law and Practice
comments that "A number of provisions create Chapter 11 exceptions to general rules. For example, Code § 1113
(collective bargaining agreements) is an exception to Code § 365 (executory contracts). Similarly, Code § 1110
(aircraft equipment and vessel leases) is a kind of exception to the automatic stay under Code § 362, and Code
§ 1114 (pension rights) governs the more or less sui generis problem of retiree benefits.: That "sui generis
problem of retiree benefits" cannot be reconciled with this proposed sale under Code § 363.

**It Is Grossly Unfair and Inequitable To Prefer One Union Group Over Another for Retiree Health Benefits**

80.     The proposed GM § 363 sales plan hinges on its ability to treat UAW retirees better than similarly situated GM retirees who were represented by the Objecting Unions, and who participated in the same hourly pension and health benefits programs.  In a similar context, *Kaiser Aluminum Corp.*, 456 F. 3d 328 (3rd Cir. 2006) considered whether it is fair and equitable under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* for the PBGC to apply a reorganization test separately for each of the seven unions in the Kaiser Aluminum chain that had negotiated pension plans or whether the reorganization tests should be applied in the aggregate treating all union members and plans equally.  The court held that applying the reorganization test on a plan-by-plan basis would result in unfair and inequitable consequences in that it would require bankruptcy courts to give preference to some similarly situated constituents over others, stating:

> The Bankruptcy Court concluded that the PBGC's plan-by-plan approach would violate the Bankruptcy Code's requirement that debtors bargain fairly and equitably with unions. See 11 U.S.C. § 1113(b). The Bankruptcy Court believed that considering the plans piecemeal would give creditors 'the kind of leverage that would force the debtor to [initiate] bargaining . . . with one union and not with another.' (Hr'g Tr., Feb. 2, 2004, at App 445.)

465 F.3d at 333.

81.     In a related context, under § 1113 of the Code, in *IBT v. IML Freight*, 789 F.2d 1460 (10th Cir. 1986), the Tenth Circuit overturned a Bankruptcy Court order allowing rejection of a collective bargaining agreement because "equitable considerations are important here, and the bankruptcy judge must make findings to support a debtor's unequal treatment of its union employees."  In this case, the unequal treatment being accorded IUE-CWA and other non-UAW retirees is manifest and from the stand point of those members there can be no

27

showing that it is either fair or equitable that their benefits be gutted while the benefits provided to others are protected.

82.     In most bankruptcy cases with multiple unions, the claims by otherwise similarly situated union members, who differ only in the union that represents them, are treated equally. As the court noted in *In re Northwest Airlines Corp.*, 366 B.R. 270, 277 (Bankr. S.D.N.Y. 2007): "Similarly, it would make good sense to treat the prepetition grievances of the flight attendants in the same manner as the grievance claims of the members of the Debtor's other unions, by allowing their claims to 'ride through' the bankruptcy and be resolved and liquidated in the ordinary course." Any other approach runs smack into the provisions of § 1114 that requires any modification of retiree benefits to be fair and equitable.

### Wholly Apart From § 1114, The Bankrutpcy Code Does Not Permit Favoritism Among Equally Situated Groups Of Creditors

83.     The Supreme Court recently noted in *Howard Delivery Service, Inc. v. Zurich American Ins. Co.,* 547 U.S. 651 (2006), that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." See *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930); *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 451 (1937). In *Howard Delivery,* the Court noted, as well, the complementary principle that preferential treatment of a class of creditors is in order only when clearly authorized by Congress, citing *Nathanson v. NLRB*, 344 U.S. 25, 29 (1952); *United States v. Embassy Restaurant, Inc.*, 359 U.S. 29, 31 (1959).   Here, the treatment given to the similarly situated unionized retirees differs starkly.

84.     In addition to the special protections of § 1114, a fundamental tenet of bankruptcy law is that unfair treatment of creditors is prohibited, and that the debtors bear the burden to prove that creditors are being treated fairly.  *Channel One,* 117 B.R. 493, 496 (Bankr. ED. Mo. 1990); see also *In re Engman,* 395 B.R. 610, 620 (Bankr. W.D. Mich. 2008) (sale

must be made in "good faith" and must be "in the best interests of the estate and creditors"); *In re Dow Corning Corp.*, 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996) (sale must be "fair and equitable," "in good faith" and "in the best interests of the estate"). The Debtors cannot show that the proposed sale treats the retirees represented by the Objecting Unions fairly or equitably.

85.    The Bankruptcy Code principle seeking to secure equal treatment among creditors is grossly violated by this proposed plan to favor one group of union-represented retirees over all other union-represented retirees. If one class of creditors can be favored only where authorized by Congress, it is far more arbitrary and unfair to treat members within a single class of creditors differently. There is nothing in the Bankruptcy Code which authorizes the treatment of UAW represented members of the class of retiree health creditors far better than retirees represented by the Objecting Unions who are entitled to similar retiree health benefits.

### The Proposed § 363 Sale Will Preclude GM from Meeting Its § 1114 Procedural Obligations

86.    In addition to trampling the Congressional purpose behind § 1114, the proposed sale of assets under § 363 will preclude meaningful completion of the specific procedures set forth in § 1114. A Chapter 11 debtor is precluded from modifying any retiree health benefits except upon an order of the Court permitting such modification after compliance by the Debtor with the strict letter of § 1114(f) and (g). Section 1114(f)(1) compels GM to make a proposal that is limited to retiree health plan modifications that are necessary to permit reorganization and assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably. Since the § 363 sale is likely to render the bankruptcy estate of the existing GM unable to satisfy its general unsecured creditors, it will be impossible for GM to make an offer to retirees represented by the Objecting Unions that includes adequate compensation that will

29

assure that these retirees (who are both creditors and affected parties) are treated comparably to other creditors in general and UAW retirees in particular.  The § 363 sale process will force GM to violate is obligations under § 1114(f)(1).

87.    Section 1114(f)(2) obligates GM to meet at reasonable times and places and to confer in good faith in attempting to reach mutually satisfactory modifications of the retiree benefits.  GM refused to meet with IUE-CWA in the months and weeks preceding this Chapter 11 filing.  As noted above, GM repeatedly advised IUE-CWA that it could not make a proposal to IUE-CWA because Treasury would not authorize it to do so.  Although the statutory language contemplates that the § 1114 offers will be made to authorized unions after a debtor has filed a § 1114 motion, it is doubtful that Congress anticipated a situation in which a debtor and the U.S. Government, acting in concert, reached seriatim pre-petition deals with representatives of almost every major constituency to a Chapter 11 filing, except certain groups of retirees.

88.    GM finally held a meeting with the IUE-CWA and the USW on June 9, 2009, after the Sales Motion was made and well after the substantive deal was cut with other stakeholders.  GM is already in substantive violation of the obligation under § 1114(f)(2) that the parties meet for good faith negotiations.  The point of these negotiations is to permit them to occur before the deal is already done and the retirees can obtain meaningful relief.  Here, however, the established deals for the sale and distribution of GM's assets would make the occurrence of § 1114 meetings with the Objecting Unions a mockery of Congressional intent if the Sales Motion is approved.

89.    Section 1114(g) authorizes the court to enter an order modifying retiree benefits only where the debtor has made an offer which meets the requirements of § 1114(f) and where

30

the union has "refused to accept such proposal without good cause." The Objecting Unions

will have good cause to reject any proposal for the health care of its retirees that treats them in

any material manner worse than the UAW represented retirees. The agreements which entirely

dominate the proposed § 363 sale do not allow for the Objecting Union retirees to obtain the

same protection for their retiree benefits that UAW represented retirees have obtained. The

Objecting Unions will have good cause, indeed, compelling cause, to reject any offer that

reduces its members to second class citizens.

90.    Section 1114(g)(3) permits modification of retiree benefits only where GM

shows that "all creditors, the debtor, and all of the affected parties are treated fairly and

equitably, and is clearly favored by the balance of the equities." The lack of fairness and equity

has been noted before but it is necessary to point out that § 1114(g) also requires that a benefits

reduction be clearly favored by the balance of the equities. The equities to balance in this

regard include the right of GM hourly retirees who were represented by the Objecting Unions to

be treated equally for purposes of retiree health benefits versus the right of GM to favor one

group of union-represented retirees because it will have an ongoing relationship with that

union.

91.    The language of § 1114 mandating fair and equitable treatment cannot be

interpreted as authorizing favorable treatment to one group of similarly situated retirees. If

Congress intended that the ability of a union to bargain for mutually satisfactory modifications

in retiree benefits under § 1114(f)(2) meant that otherwise similarly situated retirees could be

deprived of health benefits simply because their unions no longer had a significant number of

active employees and therefore lacked equivalent bargaining power, it would not have used

language obligating all of the affected parties to be treated fairly and equitably. An

31

interpretation of § 1114 resting on the relative bargaining power of their unions ignores its

repeated calls for fairness and equity in the treatment of retiree health care.

92.     The proposed § 363 sale will preclude GM from being able to obtain an order

modifying retiree benefits for the Objecting Unions under § 1114, but the existing deals will

render the estate unable to satisfy the Objecting Unions retiree health care obligations. This

tension requires that the § 1114 process be completed prior to any approval of the sale of GM's

assets and precludes presumptive enforceability of the agreements made to divide up the

proceeds of the sale of GM's assets. In *In re General Datacomm Industries, Inc.,* 309 B.R. 848,

851-52 (D. Del. 2004), the district court affirmed the bankruptcy court's ruling that:

> even though the Agreements [to provide retiree medical benefits] 'could be viewed as
> ... executory contract[s] covered by Section 365,' Section 365 was inapplicable because
> the language 'notwithstanding any other provision of this title' in Section 1114(e)(1)
> applies to and 'overrides [Section] 365 with respect to retiree benefits.'

The district court ruled:

> [Debtor's] motion to eliminate the retirement benefits one day before forcing retirement
> of the Appellees appears to be an attempt to bypass Section 1114, and such an action is
> not consistent with the statute, which 'was enacted to protect the interests of Chapter 11
> debtors.'

*Id.* at 854 (citing *7 Collier on Bankruptcy,* ¶ 1114.02[1] (15th ed. 2002)). Similarly, here, the

Sale Motion under § 363 is overridden with respect to retiree benefits and cannot be used to

bypass § 1114.

### The May 31, 2009 *Chrysler* Decision Does Not Compel Approval of The Sales Motion

93.     This Court must deny the proposed sale of assets to New GM because the

transaction would render meaningless GM's commitment to provide parity among the treatment

of the UAW and non-UAW retirees and would render moot GM's obligations under §1114 to

maintain its retiree benefit programs pending relief pursuant to that section. Despite a historic

commitment to accord parity among the unionized retiree groups, GM and New GM have

chosen to favor the UAW Retirees through the various commitments made to the UAW VEBA,

while relegating the retirees represented by the Objecting Unions to a far inferior treatment.

This is gross abuse of this Court's authority under § 363 of the Code, 11 U.S.C. § 363.

94.    The Second Circuit in *In re Lionel Corporation*, 722 F.2d 1063 (2d Cir. 1983)

construed the then-recent Bankruptcy Reform Act of 1978 and considered whether a debtor,

acting pursuant to § 363 of the Code, could dispose of significant estate assets outside of a plan

of reorganization.[4]  The Second Circuit reviewed case law arising under previous iterations of

the bankruptcy laws and concluded that "the . . . Bankruptcy Code no longer requires such strict

limitations [as perishability or emergency] on a bankruptcy judge's authority to order

disposition of the estate's property; nevertheless, it does not go so far as to eliminate all

constraints on that judge's discretion." *See Lionel*, 722 F.2d at 1069.

95.    The Second Circuit reasoned that "there must be some articulated business

justification, other than appeasement of major creditors, for using, selling or leasing property

out of the ordinary course of business before the bankruptcy judge may order such disposition

under section 363(b)." *Id.* at 1070.  The court in *Lionel* adopted a rule which "requires that a

judge determining a § 363(b) application expressly find from the evidence presented before him

at the hearing a good business reason to grant such an application." *Id.* at 1071.  The court in

*Lionel* cautioned:

> In fashioning its findings, <u>a bankruptcy judge must not blindly follow the hue and cry of
> the most vocal special interest groups</u>; rather, he should consider all salient factors
> pertaining to the proceeding and, accordingly, act to further the diverse interests of the
> debtor, creditors and equity holders, alike.

---

[4]    The debtor in *Lionel* sought authorization to sell 82% of its common stock to a third
party. *See Lionel*, 722 F.2d at 1064.

33

*Id.* (emphasis added). The court then set forth a list of numerous considerations, which it

explained was "not intended to be exclusive," to guide a court's review of a sale of assets,

stating:

> He might, for example, look to such relevant factors as the proportionate value of the
> asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood
> that a plan of reorganization will be proposed and confirmed in the near future, the
> effect of the proposed disposition on future plans of reorganization, the proceeds to be
> obtained from the disposition vis-à-vis any appraisals of the property, which of the
> alternatives of use, sale or lease the proposal envisions and, most importantly, whether
> the asset is increasing or decreasing in value.

*Id.* Courts in other jurisdictions have generally followed the criteria described in *Lionel*. *See*

*e.g., Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) (adopting *Lionel*

and aggregating other cases in which courts have authorized the sale of all of a debtor's assets

under Section 363(b)).

96.    Here, GM has bent to the hue and cry of its "most vocal special interest groups,"

namely, New GM and the creditors of "old" GM.  New GM wishes to ignore decades of

bargaining history in which the retirees represented by the Objecting Unions have received

retiree benefits identical to those of the UAW retirees and in which GM affirmed again and

again its obligation to provide such benefits.  The creditors of "old" GM – the bankruptcy estate

– meanwhile, have sought both to have their cake and eat it too, seeking both to relegate the

retirees represented by the Objecting Unions to what could not even be called second-class

citizenship and eliminating any claim that may be asserted on their behalf for the lost value of

GM's retiree benefit commitments.

97.    As the Second Circuit explained in *Lionel*, it is the Bankruptcy Court's ask to

attempt to "act to further the diverse interests of the debtor, creditors and equity holders, alike."

*See* 722 F.2d at 1071.  Here, there is a distinct problem that did not exist in *Lionel* or even the

34

recently-decided *Chrysler* matter.  Allowing the sale to proceed, as proposed, will remove from GM its most valuable assets and leave behind practically nothing of value, an action which will render meaningless the protections afforded by § 1114 to the retirees represented by the Objecting Unions.

98.     On May 31, 2009, Judge Gonzalez of this Court approved Chrysler's Motion granting it approval to sell all of its assets pursuant to § 363.  *In re Chrysler LLC,* No. 09 B 50002 (AJG), 2009 WL 1507547 (Bankr. S.D.N.Y. May 31, 2009).  While both Chrysler and GM are OEM car companies, the circumstances behind their § 363 motions are very different because no union objected to the proposed UAW Chrysler VEBA settlement.  In Chrysler, the debtor did not propose to terminate any retiree health benefits and there had been no agreement between Chrysler and the IUE-CWA (or any other non-UAW unions) to create a VEBA to fund the benefits for non-UAW retirees.  The fairness considerations articulated under § 1114 were not raised, much less discussed, in the Chrysler § 363 approval decision.

WHEREFORE, the Objecting Unions respectfully request entry of an order conditioning approval of the Debtors' Sales Motion on an agreement by all parties to treat the retirees represented by the Objecting Unions in a manner that is fair and equitable and granting such other and further relief as the Bankruptcy Court deems just and proper.

Dated: June 19, 2009
      New York, NY

Respectfully submitted,

KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for IUE-CWA


By: /s/_____
    Thomas M. Kennedy
    Susan M. Jennik
    113 University Place, 7th Floor
    New York, New York 10003
    (212) 358-1500

LEVY RATNER, P.C.
Attorneys for United Steelworkers


By:/s/_____
    Suzanne Hepner
    80 Eighth Avenue, Eighth Floor
    New York, New York 10011
    Tel: (212) 627-8100

GORLICK KRAVITZ & LISTHAUS P.C.
Attorneys for International Union of Operating Engineers


By: /s/_____
    Barbara Mehlsack
    17 State Street
    New York, N.Y. 10004
    Tel: (212) 269-2500

# EXHIBIT 1

**PROPOSAL OF IUE-CWA AND UNITED STEELWORKERS
TO GENERAL MOTORS CORPORATION
June 17, 2009**

**RETIREE BENEFITS**

This proposal is made by IUE-CWA and United Steelworkers. It is understood that other labor organizations representing GM retirees may opt to propose identical terms to GM. The retirees, spouses, surviving spouses and dependents covered by this proposal shall be referred to herein as members of the "Covered Group."

**Covered Group**

IUE-CWA: As defined in the Memorandum of Understanding, Post-Retirement Medical Care, dated 11/17/08, Section 1(e). (See Appendix.)

USW: All retirees of the Home Avenue and Vandalia facilities who retired before the spin-off of Delphi Corporation; All persons who are "Covered Employees" within the meaning of Paragraph 17(A) of the Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee, dated August 16, 2007.

Other Unions: As defined by the union.

**Benefits**

Through December 31, 2009, the existing post-retirement plans to be maintained, except that the plans will be modified in the same manner as the changes made to the UAW retiree benefit plans.

**Retiree Benefits after December 31, 2009**

Option 1

Retirees in the Covered Group will obtain medical and life insurance coverage from the GM/UAW VEBA as of January 1, 2010, on the same basis and at the same level of benefits as provided for UAW retirees

The GM/UAW VEBA will receive in a combination of cash and stock in the new GM, the value of the medical and life insurance benefits associated with the Covered Group, with such amount to be determined by the parties.

Option 2

There shall be created a new VEBA for non-UAW represented union retirees ("Covered Group VEBA") that will be funded on a pro-rata basis of the funding for the UAW VEBA, *i.e.,* cash, note, warrants, preferred stock, and common stock. In addition, to

provide initial funding for the Covered Group VEBA, sufficient cash will be paid to the Covered Group VEBA on July 1, 2009 to allow it to provide benefits.

**ASSUMPTION BY NEWCO OF THE 2007 MORAINE CLOSURE AGREEMENT WITH IUE-CWA**

**Assumption by NEWCO of all obligations undertaken by GM in August 2007 with respect to certain USW-represented employees and retirees of Delphi.**

# APPENDIX

MEMORANDUM OF UNDERSTANDING, POST-RETIREMENT MEDICAL CARE, dated 11/17/08, SECTION 1(e):

Covered Group shall mean:

i.        All GM-IUE/CWA Active Employees who retire from GM under the terms of the GM-IUE/CWA 2003 GM-IUE/CWA National Agreement, or any successor agreement, after the date of the class-wide settlement agreement contemplated by this MOU under circumstances such that they and their eligible spouses, surviving spouses and dependents are eligible to receive Retiree Medical Benefits from GM or the GM Plan utilizing the eligibility provisions of the General Motors Health Care Program for Hourly Employees, as applicable to GM-IUE/CWA Represented employees under the Supplemental Agreement Covering Health Care Program of the 2003 GM-UAW National Agreement;

ii.       All eligible surviving spouses and dependents of a GM-IUE/CWA Active Employee who dies after the date of the class-wide settlement agreement contemplated by this MOU but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan under the terms of the 2003 GM-IUE/CWA National Agreement, or any successor agreement, utilizing the eligibility provisions of the General Motors Health Care Program for Hourly Employees, as applicable to GM-IUE/CWA Represented employees under the Supplemental Agreement Covering Health Care Program of the 2003 GM-UAW National Agreement;

iii.     All Delphi-IUE/CWA Active Employees who retire from Delphi after the date of the class-wide settlement agreement contemplated by this MOU with eligibility for Retiree Medical Benefits from GM and/or the GM Plan pursuant to the IUE-CWA-Delphi-GM Implementation Agreement dated September 25, 2008 and their eligible spouses, surviving spouses and dependents;

iv.     All surviving spouses and dependents of any Delphi-IUE/CWA Active Employee who dies after the date of the class-wide settlement agreement contemplated by this MOU but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from GM and/or the GM Plan pursuant to the IUE-CWA-Delphi-GM Implementation Agreement dated September 25, 2008;

v.       All GM-IUE/CWA Represented Employees of any previously sold, closed, divested or spun-off GM business unit (other than Delphi) who retire after

the date of the class-wide settlement agreement contemplated by this MOU with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the IUE/CWA, and their eligible spouses, surviving spouses and dependents;

vi.    All eligible surviving spouses and dependents of a GM-IUE/CWA Represented Employee of any previously sold, closed, divested or spun-off GM business unit (other than Delphi) who dies after the date of the class-wide settlement agreement contemplated by this MOU before retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan pursuant to the IUE-CWA-Delphi-GM Implementation Agreement dated September 25, 2008, regardless of when such eligibility would commence;

vii.    All Delphi-IUE/CWA Represented Employees of any previously sold, closed, divested or spun-off Delphi business unit who retire after the date of the class-wide settlement agreement contemplated by this MOU with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the IUE/CWA, regardless of when such eligibility would commence and their eligible spouses, surviving spouses and dependents;

viii.    All eligible surviving spouses and dependents of a Delphi-IUE/CWA Represented Employee of any previously sold, closed, divested or spun-off Delphi business unit who dies after the date of the class-wide settlement agreement contemplated by this MOU before retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the IUE/CWA, regardless of when such eligibility would commence;

ix.    All Moraine SEHO Employees that waive and do not receive from and after the Final Effective Date the $1 dollar per compensated hour 401k plan contribution as provided under Attachment B of the UAW-GM Entry Level Wage & Benefit Agreement of 2007 National Agreement between GM and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), or any similar contribution provided under any successor agreement, and who retire from GM after the date of the class-wide settlement agreement contemplated by this MOU under circumstances where their individual combined credited service for GM under GM-IUE/CWA collective bargaining agreements and GM-UAW collective bargaining agreements otherwise would result in their being individually eligible to participate in the GM Plan as determined according to criteria for such eligibility as existed in the 2003 GM-IUE/CWA National Agreement, and their eligible spouses, surviving spouses and dependents;

x.        All Delphi SEPO Employees that waive and do not receive from and after the Final Effective Date the $1 dollar per compensated hour 401k plan contribution as provided under Attachment B of the UAW-GM Entry Level Wage & Benefit Agreement of 2007 National Agreement between GM and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), or any similar contribution provided under any successor agreement, and who retire after the date of the class-wide settlement agreement contemplated by this MOU from GM under circumstances where their individual combined credited service under Delphi Hourly Pension Plan and the GM Hourly Pension Plan would result in their individually being eligible to participate in the GM Plan as determined according to criteria for such eligibility as existed in the 2003 GM-IUE/CWA National Agreement, and their eligible spouses, surviving spouses and dependents.