/
/
JONES & ASSOCIATES
1285 Sixth Avenue Suite 3500
New York, New York 10019
Telephone: (212) 554-4404
Facsimile: (212) 202-4416
Roland Gary Jones (RGJ-6902)

Counsel to State of West Virginia
    ex rel. Darrell V. McGraw, Jr.,
    Attorney General

Sale Approval Hearing Date: June 30, 2009 at 9:45 a.m.
Sale Motion Objection Deadline: June 19, 2009 5:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re:                                       :    CHAPTER 11
                                             :
**GENERAL MOTORS CORP.,** *et al.*,          :    Case No. 09-50026 (REG)
                                             :
                                             :    **(Jointly Administered)**
            **Debtors.**                     :
-------------------------------------------------------------X

**OBJECTION OF STATE OF WEST VIRGINIA EX REL. DARRELL V. MCGRAW, JR., ATTORNEY GENERAL, TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(B), (F), (K), AND (M), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A.U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

1

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

      The State of West Virginia ex rel. Darrell V. McGraw, Jr., Attorney General (the "Objector"), by and through its undersigned counsel, hereby files this objection to the Motion of General Motors Corp., et al. (the "Debtors") Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (a) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (b) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Other Relief; and (II) Schedule Sale Approval Hearing (the "Motion") (Dkt. No. 92) and respectfully states as follows:

## I. PRELIMINARY STATEMENT

      1.    Objector is the duly elected Attorney General of the State of West Virginia, and is responsible for the enforcement of West Virginia's (the "State") consumer protection laws, and furthering the State's interest in the health and well-being – both physical and economic – of its residents in general, and the State's interest in upholding the valid laws of the State and protecting the rights of dealers and consumers within the State.

      2.    The Motion of the Debtors, which seeks the "i) sale of the Debtors' assets pursuant to the proposed Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), free and clear of liens, claims, encumbrances, and other interests (the "363 Transaction"), (ii) the assumption and assignment of certain executory contracts and Leases, and

2

(iii) the approval of UAW Retiree Settlement Agreement" (¶2, the Motion), is an objectionable *sub rosa* plan that seeks to circumvent the safeguards inherent in requiring a debtor to create, file and seek the approval of a Chapter 11 plan for reorganization.

3.      The Motion is also seeks to legitimize an impermissible contravention of the laws to the State of West Virginia.

## II. BACKGROUND FACTS

4.      The Debtors are principally engaged in the business of the manufacturing and sale of automobiles.

5.      The Purchaser is a limited liability company sponsored by the United Stated Department of the Treasury for the sole purpose of continuing the business of the Debtors in order to create a "lynchpin of the domestic automotive industry" without the liens, claims and encumbrances of the Debtors. (¶2, the Motion).

6.      On June 1, 2009, the Debtors filed a Chapter 11 Bankruptcy Proceeding within the United States Bankruptcy Court for the Southern District of New York (the "Court").

7.      On June 2, 2009, the Court entered the Order Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving Procedures for Sale of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition Holdings, LLC, a U.S. Treasury-Sponsored Purchaser; (II) Scheduling Bid Deadline and Sale Hearing Date; (III) Establishing Assumption and Assignment Procedures; and (IV) Fixing Notice Procedures and Approving Form of Notice [D.I. 274] (the "Scheduling Order").

8.      The Scheduling Order provides that the deadline for objecting to approval of the Motion "shall be June 19, 2009 at 5:00 p.m. (Eastern Time)."

9. In the Motion, the Debtors invoke 11 U.S.C. § 363 and request an Order from the Court authorizing it to sell the Debtors' assets pursuant to a Proposed Master Sale and Purchase Agreement (the "MPA") free and clear of liens, claims, interests and encumbrances with the liens then attaching to the net proceeds of the sale.

10. The assets to be sold to the Purchaser shall consist of "rights, titles and interest that" the Debtors "possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interest or every kind and nature, owned, leased, used or held for use by" the Debtors "(including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing xxx." (*Please see* Section 2.2(a) of the MPA, Exhibit A to the Motion)

11. However, the MPA is not limited to the transfer of the Debtors' machinery, equipment, inventory, money, equity interests, intellectual property, etc. (*Please see* Section 2.2(a)(i) to (a)(xix) of the MPA, Exhibit A to the Motion). The Motion also seeks to transfer the Debtors' employees (*Please see* Section 6.17 of the MPA, Exhibit A to the Motion), the employees' benefit plans and collective bargaining agreements.

12. The Motion also seeks authority from the Court to "assume or reject any executory contracts and unexpired leases of the debtor" pursuant to 11 U.S.C. § 365(a). Those contracts that may be assumed by the Purchaser include those automobile dealership agreements (as defined under Section 4.17 of the MPA, Exhibit A to the Motion) that may or may not be included in the Assumable Executory Contract Schedule (*Please see* Section 6.6 of the MPA, Exhibit A to the Motion).

13. The Debtors, concurrently with the filing of the Motion, sent one of two letters (the "Letters") to their dealers within the State. Each letter informed the dealer that it had been tentatively chosen to either be a retained dealer or a terminated dealer. Each such letter informed the dealer that it had until June 12 to sign the letter absolutely unchanged and that the letters would serve to amend the dealership agreements. If they signed the respective letters, the Debtors indicated, they would move to assume the now amended dealership agreements. Those dealers that would not sign could have their dealership agreements rejected.

14. Unfortunately, the amended dealership agreements would result in the dealer having to waive the protections granted to it by State law, such as those embodied in W. Va. Code §§ 17A-6A-1 *et seq.* (West Virginia's motor vehicle dealer franchise statute). Such laws were enacted to uphold important public policies,[1] to protect decades long investments in brands and communities and to limit the disproportionate bargaining power of automobile manufacturers.

15. In sum, the Purchaser will, for all intents and purposes, <u>clone</u> the Debtors, with the same employees and officers, without the attendant baggage of contracts unwanted only because they prevented the Debtors' from running roughshod over the rights of their dealers.

### III. OBJECTION

**A. The MPA is an Improper *Sub Rosa* Reorganization Plan**

---

[1] W. Va. Code § 17A-6A-1:

The legislature finds and declares that the distribution and sale of motor vehicles in this State vitally affects the general economy and the public welfare and that in order to promote the public welfare and in the exercise of its police power, it is necessary to regulate motor vehicle dealers, manufacturers, distributors and representatives of vehicle manufacturers and distributors doing business in this State in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to ensure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally.

5

16. The principal purpose of federal bankruptcy laws is to provide debtors with a fresh start. Chapter 11 of the Bankruptcy prescribes the process by which a bankrupt corporation can obtain a new lease on life by a confirmed plan of reorganization.

17. The Supreme Court has recognized that Chapter 11 has two major objectives. First, it permits the successful rehabilitation of the debtor. *Bildisco*, 465 U.S. at 527, 104 S. Ct. at 1196. By preventing a Chapter 7 liquidation, Chapter 11 allows the debtor to "continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners," all of which are beneficial to the economy as a whole. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S. Ct. 2309, 2312, 76 L. Ed. 2d 515 (1983). Secondly, "Chapter 11 . . . embodies the general Code policy of maximizing the value of the bankruptcy estate." *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S. Ct. 2197, 2201, 115 L. Ed. 2d 145 (1991). The stated purposes of the Motion echo these two major Chapter 11 objectives.

18. Nominally, a corporation that files for Chapter 11 protection will emerge from it with a confirmed plan of reorganization. This is ideal because the process by which of a plan of reorganization is arrived at provides mechanisms to ensure that creditors are protected, e.g. the need for a proposed plan, a disclosure statement, voting requirements, etc.

19. However, Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1). Estate property may not, however, be so used "if it would amount to a sub rosa plan of reorganization." *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (addressing proposed settlement). The Court in the case of *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005) stated thus: "it is well established that section 363(b) is not to be utilized as a means of

6

avoiding Chapter 11's plan confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section. *See Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) ("The provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan."); *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226-28 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11.'" (citations omitted) "[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization. . . . If a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's [sic] rights under, for example 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless. Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan."); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-40 (5th Cir. 1983) (district court did not have authority under section 363(b) to approve transaction that required "significant restructuring of the rights of Braniff creditors," including provisions limiting permissible dispositions of proceeds of sale of all of debtor's assets), reh'g denied, 705 F.2d 450 (5th Cir. 1983); see also Collier's on Bankruptcy P363.02[4] (15th ed. rev. 2005) ("Attempts to determine plan issues in connection with the [section 363(b)] sale will be improper and should result in a denial of the relief requested.")."

7

20.     The transactions to be entered into by the Debtors and the Purchaser under the MPA contain many of the hallmarks of a Chapter 11 plan or reorganization without any of the creditor protections afforded by a Chapter 11 plan disclosure, solicitation and confirmation process. To illustrate, Section 1123(a)(5) of the Bankruptcy Code provides that a ***plan of reorganization*** may include provisions that: (i) the "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan" (§ 1123(a)(5)(B)); (ii) the "sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate" (§ 1123(a)(5)(D)); (iii) "satisfaction or modification of any lien" (§ 1123(a)(5)(E)); (iv) "curing or waiving of any default" (§ 1123(a)(5)(G)); and (v) "issuance of securities ... of any entity referred to in subparagraph (B) for cash, for property, for existing securities, or in exchange for claims or interests...." (§ 1123(a)(5)(J)).

21.     The transactions in the MPA emulate those contained in Section 1123(a)(5). Under the MPA (i) substantially all of the assets of the Debtors will be sold or transferred to the Purchaser; (ii) a very significant portion of the Debtors' liabilities will be resolved; (iii) defaults under contracts assumed by the Purchaser will be cured; and (iv) securities of the Purchaser will be issued to those with existing interests in the Debtors. In short, the MPA is a reorganization plan masquerading as a sale in order to avoid any of the burdens that accompany confirmation of a plan, including the protection afforded by the laws of this State to automobile dealerships within its borders.

22.     Another reason for holding that the MPA is an improper *sub rosa* plan of reorganization is the fact that there would be no difference in the identity of Debtors, similar to a

8

traditional Chapter 11 proceeding. In a Chapter 11 proceeding, a debtor emerges as the same corporation. Should the Court approve the MPA, the identities of the Debtors and the Purchaser will be substantially continuous, with hardly any difference except their names.

23. The Objector asserts that there will exist a substantial continuity in the identities of the Debtors and the Purchaser post-approval, so much so that if this were any other asset purchase, the liabilities of the Debtors would be attributable to the Purchaser as a result of a de facto merger. *Action Mfg. Co. v. Simon Wrecking Co.*, 387 F. Supp. 2d 439 (E.D. Pa. 2005)

24. In order to determine if there is a substantial continuation between a seller and a purchaser of assets, courts look to the following eight factors: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities and location; (4) production of the same products; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise. *Carolina Transformer*, 978 F.2d at 838; *Atlantic Richfield Co. v. Blosenski*, 847 F. Supp. 1261, 1287 (E.D. Pa. 1994). The Supreme Court has followed this "substantial continuity rule" in the labor law context by asking if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers. *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir. Conn. 1996) citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 96 L. Ed. 2d 22, 107 S. Ct. 2225 (1987); and *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 175 (5th Cir. 1985).

25. If the MPA is approved, the Purchaser will: (1) retain the employees of the Debtors; (2) retain the supervisory personnel of the Debtors; (3) retain the factories of the Debtors (i.e. the same production facilities and location); (4) retain the automobile designs of the

9

Debtors (i.e. production of the same products); (5) retain the trademarks of the Debtors (i.e. retention of the same name); (6) retain numerous other tangible and intangible assets of the debtors; (7) retain the business operations of the Debtors; (8) and will hold itself out as the successor of the Debtors.[2] In fact, the Purchaser's sole purpose for coming into being is to assume the business of the Debtors. In other words, the Purchaser will merely clone the Debtors, sans unwanted liabilities and undesirable contracts, which is the exact same result that will be achieved if the confirmation process for a reorganization plan is followed.

26.     The inescapable conclusions, therefore, is that the MPA is an improper *sub rosa* plan of reorganization.

### B. Section 363 and 365 of the Bankruptcy Code Do Not Override the Laws Governing this State's Automobile Dealerships

27.     The Debtors have not yet made any final decision on whether to reject or assume the dealership agreements that they have with this State's automobile dealers; rather they have sought to dictate changes in the agreements, the non-acceptance of which will result in the termination of that dealer's agreement.  This by itself is a violation of State law, which prohibits such acts. (W. Va. Code § 17A-6A-10)

28.     Nevertheless, it may be assumed that the Debtors and the Purchaser will seek to justify any rejection of a dealership contract and the attempted coercion of this State's automobile dealerships by the invocation of Sections 363 and 365 of the Bankruptcy Code and the alleged pre-emption of State law by the Bankruptcy Code.

---

[2]  Paragraph 9 of the Motion states:

"Importantly, the 363 Transaction will restore confidence on the part of consumers that they can purchase a GM vehicle without concerns regarding residual value, replacement parts, warranty obligations, and maintenance. Employees, suppliers, dealers, and communities will be able to depend on New GM as an economically viable and competitive enterprise."

10

29. There are three forms of preemption: express, field, and conflict preemption. Express preemption applies only by its terms (i.e., where a section provides language such as that it applies). In Section 363, only subsection (l), a provision not applicable here, has any express preemptive effect. *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 492 (3rd Cir. 1987).

30. In Section 365, while there are certain provisions that do apply notwithstanding non-bankruptcy law, they apply only in certain situations and there is no general statement that all such laws are swept aside with respect to the assumption process. Thus, one must parse the language carefully. Section 365(c), for instance, allows certain non-bankruptcy laws to apply to bar the assumption and assignment of contracts. Section 365(f), on the other hand allows the *assignment* of contracts despite certain non-bankruptcy laws, but that assignment is allowed only if the contract can be *assumed* pursuant to other provisions (including the non-bankruptcy law limitations imposed by Section 365(c)).

31. Those limits on the extent of express preemption make clear that field preemption – the broadest form of preemption – is not applicable. That limitation is further underscored by the applicability of 28 U.S.C. § 959(b) to all aspects of a debtor's operations while in bankruptcy. 28 U.S.C. § 959(b) *requires* debtor to obey the valid laws of the state in which it is operating during the case and has no exclusions that qualify its broad sweep. Thus, there plainly can be no argument that any portion of the Bankruptcy Code broadly preempts all applicable state law with respect to a given issue. Rather, at most, express preemption, supplemented perhaps by conflict preemption in certain areas, is the appropriate standard; i.e., can the provisions of Sections 363 and 365, be applied while, at the same time, the debtor also complies with applicable state law. If there is an inherent conflict between the two, then, to be sure, the

11

Supremacy Clause dictates that state law must yield, but that long-standing rules of construction emphasize that conflict preemption should not be assumed lightly.

32.     The mere fact that both federal and state law may apply in a particular situation does not inherently create a conflict or lead to the automatic conclusion that the state law is preempted. *See Pacific Gas and Elec. Co. v. California ex rel. California Dept of Toxic Substances Control*, 350 F.3d 932, 943 (9th Cir. 2003), quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996):

> First, we presume that Congress does not undertake lightly to preempt state law, particularly in areas of traditional state regulation.
>
> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied," we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'(internal citation omitted).

*See also Integrated Solutions, supra,* 124 F.3d at 492 ("Because we are reluctant to assume federal preemption, we noted that any analysis should begin with 'the basic assumption that Congress did not intend to displace state law.'" quoting *In re Roach*, 824 F.2d 1370, 1373-74 (3rd Cir. 1987)). *See also Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) ("courts never 'assume[ ] lightly that Congress has derogated state regulation.' *Travelers*, [514 U.S. 645, 653 (1995)]. Instead, courts 'address claims of preemption with the starting presumption that Congress does not intend to supplant state law.'"; thus, while Congress imposed broad preemption provisions in relation to ERISA plans, it did not preempt malpractice claim since there was no intent to preempt "traditional state laws of general applicability" that did not implicate the relationships between the traditional plan entities).

12

33. Acting in their capacity as debtors-in-possession, the Debtors have conditioned their assumption and assignment of the dealership agreements upon the dealers' waiver of various rights they enjoy under this State's laws. But, those laws continue to applicable in bankruptcy, pursuant to 28 U.S.C. 959(b), absent some clear indication that they have been preempted. "[T]he mandate of section 959(b) ... prohibits the use of bankruptcy as a ruse to circumvent applicable state consumer protection laws by those who continue to operate in the marketplace." *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 698 (Bankr. E.D. Cal. 1994). And, in a case, eventually affirmed by the Supreme Court, the Third Circuit noted, "Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business . . . ." *In re Quanta Resources Corp.*, 739 F.2d 912, 919 (3d Cir.1984), *aff'd sub nom., Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

34. In *Midlantic,* the Supreme Court found that state laws could apply even in the face of a section that provided that the trustee could "abandon *any* property of the estate that is burdensome to the estate or that is of inconsequential value." Despite the absence of any limitations on those powers, the Court found state law to be applicable, citing Section 959(b), and stating that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws," and that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers." *Midlantic Nat'l Bank*, 474 U.S. at 505.

35. The structure of the bankruptcy laws – with its exception from the automatic stay for police and regulatory actions, and the provisions in title 28 that require debtors to obey state laws and prohibit removal of police and regulatory actions – make it clear that the default

position is that debtors must obey the laws and that bankruptcy is not a free pass to ignore those obligations. As the court in *White Crane* further noted:

> The purpose of bankruptcy is not to permit debtors or nondebtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business. Bankruptcy does not grant the debtor a license to eliminate the marginal cost generated by compliance with valid state laws that constrain nonbankrupt competitors. The Congress has thus required that every debtor in possession and bankruptcy trustee manage and operate the debtor's property and business in compliance with state laws-good, bad, and indifferent-that apply outside of bankruptcy. *White Crane*, 170 B.R. at 702. In sum, Section 959(b) simply stands "for the uncontroversial proposition that a trustee must carry out his duties in conformity with state law." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 593 (9th Cir. 1993).

36.     The Debtors and the Purchaser seek to use bankruptcy as a way to write themselves an exemption from the regulatory scheme for the business in which they seek to operate and under which all other competing automobile dealers and manufacturers in this State must proceed. However, there is nothing in the Bankruptcy Code that allows the Debtors or the Purchaser to ignore this State's laws, especially those that prohibit the disguised coercion of this State's automobile dealers as indicated in the Letters.

37.     Assuming, for the sake of argument, that State law is in fact pre-empted by the Sections 363 and 365 of the Bankruptcy Code, the acts of the Debtors in coercing this State's dealers to sign the Letters or lose their business is simply not contemplated by the Bankruptcy Code. Under the Bankruptcy Code, a Chapter 11 debtor can only assume or reject its contracts. It does not state that the debtor can cause the amendment of an existing contract and thereafter assume it. Unfortunately, that is exactly what the Debtors are doing – they seek to force the dealers to enter into new agreements on a dictated, non-negotiated basis, which *new* agreements they then propose to assume.

38. The Debtors' actions are not only contrary to this State's laws, they are also at substantial odds with the well-settled principle under Section 365 that one must assume a contract *cum onere*; i.e., one cannot pick and choose the portions one likes and only assume those, while leaving the unwanted portions behind. Bankruptcy law generally does not permit a debtor or an estate to assume the benefits of a contract and reject the unfavorable aspects of the same contract. *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984); see also *DB Structured Products, Inc. v. American Home Mortgage Holdings, Inc. (In Re: American Home Mortgage Holdings, Inc.),* 402 B.R. 87 (2009 Bankr. Ct. Delaware).

**RELIEF REQUESTED**

Wherefore, for the reasons stated above, the State of West Virginia respectfully objects to the approval of the Motion and requests that the Motion be denied in its entirety.

Respectfully submitted,

Dated: June 19, 2009
New York, New York

By: /s/ Roland Gary Jones
Roland Gary Jones (RGJ-6902)
JONES & ASSOCIATES
1285 Sixth Avenue Suite 3500
New York, New York 10019
Telephone: (212) 554-4404
Facsimile: (212) 202-4416
Counsel for State of West Virginia
ex rel. Darrell V. McGraw, Jr.,
Attorney General

15