Andrew K. Lipetz, Esquire
Wasserman Grubin & Rogers, LLP
1700 Broadway, 42nd Floor
New York, NY 10019
Tel: 212-581-3320
FAX: 212-956-5255

Of Counsel

Jeffrey A. Less, Esquire
Jennifer L. Hoagland, Esquire
Helen Heifets, Esquire
Bazelon Less & Feldman, P.C.
1515 Market St., Suite 700
Philadelphia, PA 19102
Tel: 215-568-1155
FAX: 215-568-9319

Counsel for ACE American Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : |
| | : Chapter 11 |
| GENERAL MOTORS CORP., et al. | : |
| | : Case No. 09-50026 (REG) |
| Debtors | : |
| | : (Jointly Administered) |

**LIMITED OBJECTIONS OF ACE AMERICAN INSURANCE COMPANY TO MOTION OF DEBTORS, PURSUANT TO 11 U.S.C. §§ 105, 363(b),(f), (k), (m), AND 365 AND FED R. BANK. P. 2002, 6004 AND 6006, TO APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS, LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF.**

ACE American Insurance Company, on behalf of itself and its affiliated insurers and

reinsurers, through its undersigned counsel, submits the following Limited Objections to the

Motion of Debtors, Pursuant to 11 U.S.C. §105, 363 and 365, and Fed. R. Bank. P. 2002, 6004

1

and 6006, To Approve (A) The Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings, LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief (hereinafter, the "Sale Motion").

## I.    INTRODUCTION

1.    This Chapter 11 bankruptcy proceeding was instituted by the Debtors on June 1, 2009 by voluntary petitions for relief.

2.    On information and belief, the Debtors are operating their businesses and managing their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.    On June 1, 2009, the Debtors filed the Sale Motion, seeking, *inter alia*, the entry of an Order approving the sale of substantially all of Debtors' assets.

4.    For several years, Debtor General Motors Corporation ("GM") has been, and still is, a party to certain insurance policies and related agreements (collectively, the "ACE Policies and Agreements") with Movant ACE American Insurance Company and its affiliated insurers and reinsurers (individually and collectively, "ACE").

5.    The ACE Policies and Agreements are a part of the Debtors' overall Insurance Program, as discussed below in greater detail.

6.    The ACE Policies and Agreements are executory contracts, in that each of them requires both parties to continue performance, and failure of either party to complete performance would constitute a material breach excusing performance of the other party. *See, e.g., In re Wireless Data, Inc.*, 547 F.3d 484, 488 n.1 (2d Cir. 2008).

7.    GM representatives have informally advised ACE that GM intends to continue its performance in full under the ACE Policies and Agreements.

2

8.    Moreover, the Debtors have already obtained permission from this Court to continue the Debtors' performance (including but not limited to payment) under the ACE Policies and Agreements as a part of the Insurance Program.

9.    However, to date, ACE has received no written confirmation of GM's intention to assume the ACE Policies and Agreements. Nor has ACE received an explanation of the proposed terms of assumption.

10.    The Sale Motion does not make provision for the fulfillment and satisfaction of GM's obligations under the ACE Policies and Agreements. Rather, the Sale Motion and the Debtors' implementation of the provisions of that Motion provide incomplete, conflicting, and contradictory information.

11.    Accordingly, ACE files these limited objections to the proposed sale.  In the alternative, ACE requests that the Debtor GM  be directed to:

a.    assume or reject the ACE Policies and Agreements; and

b.    in the event of an assumption:

i.    provide for and effectuate a cure of any defaults and provide adequate assurances that it would cure the defaults under the ACE Policies and Agreements;  and

ii.    provide to ACE the information regarding the financial condition of the Purchaser, so that ACE could make an informed decision whether to agree to an assignment of the ACE Policies and Agreements  to the Purchaser; and

iii.    provide to ACE, as a condition of the assignment of the ACE Policies and Agreements to the Purchaser, a valid and acceptable written commitment from the Purchaser to fully perform Debtor GM's obligations under the ACE Policies and Agreements.

## II.    RELEVANT FACTS

### A.    The Foreign Casualty Insurance Program.

12.    For over twenty years, ACE has been providing a Foreign Casualty Insurance Program to the Debtors. The coverages extended under the Foreign Casualty Insurance Program have included and still include general liability, employee benefits, automobile liability and contingent automobile liability insurance.

13.    Debtors and their foreign affiliates have purchased the Foreign Casualty Insurance Program from ACE principally on a "fronted" basis.

14.    A "fronted" insurance policy cedes the risk from the insurer to either a reinsurer or back to the insured.

15.    In this case, the majority of the insured risk was ceded to General International Limited ("GIL"), a captive reinsurer that is owned by Debtor GM.

16.    The Foreign Casualty Insurance Program involved and still involves a "Master Policy" issued by ACE to Debtor GM and "Local Policies" issued by ACE to Debtor GM and/or to foreign subsidiaries and affiliates of Debtor GM. (A true and correct copy of certain portions of the Master Policy is attached as Exhibit 1 hereto).

17.    Under the Foreign Casualty Insurance Program, ACE was and is responsible for the payment of claims covered by the Master Policy and the Local Policies, and (with the exceptions noted below) ACE was and is entitled to obtain reimbursement for such payments from the reinsurer GIL.

18.    The principal exception to this arrangement concerns the first £100,000 (one hundred thousand pounds sterling) of claims presented under the Employer Liability policy issued to GM for its business operations in the United Kingdom (hereinafter, the "UKEL Policy"), which Debtor GM is obligated to reimburse to ACE.

4

19.     Debtor GM also is responsible for reimbursement of certain claims falling within an excess insurance policy layer.

20.     The Master Policy was and is one of many policies and agreements entered into by ACE and Debtor GM in connection with the Foreign Casualty Insurance Program for GM. Other agreements under that program included, but were not limited to:

a.     The UKEL Policy, a true and correct copy of which is attached as <u>Exhibit 2</u> hereto;

b.     A Security Agreement, a true and correct copy of which is attached as <u>Exhibit 3</u> hereto; and

c.     ACE Global Underwriters Foreign Casualty Cash Flow Binder (the "Binder").[1]

**B.     Other ACE Policies and Agreements.**

21.     Over the years, ACE has entered into other insurance policies and agreements with Debtors.

22.     For purposes of these objections, all such other policies and agreements shall be included within the ACE Policies and Agreements.

**C.     The Current Status of the ACE Policies and Agreements.**

23.     The Foreign Casualty Insurance Program has been entered into and renewed before the bankruptcy petitions were filed, and they remain in effect.

24.     The other ACE Policies and Agreements also remain in effect to the extent required by their terms and conditions.

---

[1] The ACE Policies and Agreements are so numerous and voluminous that not all of them can be attached to this Objection. The Policies and Agreements that are not attached to this Objection may be obtained from the undersigned counsel for ACE upon request.

25.    Debtor GM's continuing obligations under the ACE Policies and Agreements include, without limitation:

a.    Payments of premiums under the Master Policies, Local Policies and UK EL Policies (*see* Exh. 1 at Endorsement #58; Exh. 2 at 1);

b.    Reimbursement of ACE for claims up to £100,000 (British pounds sterling) under the UKEL policy (*see* Exh. 1 at Endorsement 49);

c.    Providing and maintaining collateral for GM's obligations under the UKEL and Master Policies (*see* Exh. 3 at §II);  and

d.    Providing and maintaining a Paid Loss Deposit Fund for payment of claims under the UKEL and Master Policies (*see id.* at §VII).

26.    ACE's obligations under the ACE Policies and Agreements include, without limitation providing insurance coverage and paying claims under the Master Policy, the Local Policies, and other ACE Policies.

27.    Thus, under the ACE Policies and Agreements, ACE has on-going and material obligations to Debtor GM, and Debtor GM has on-going and material obligations to ACE, so that failure of either party to complete performance would constitute a material breach excusing performance of the other party.

28.    The ACE Policies and Agreements are executory contracts within the meaning of §365 of the Bankruptcy Code. *In re Wireless Data,* 547 F.3d at 488 n.1.

29.    As set forth above, the ACE Policies and Agreements are part of the Debtors' Insurance Program.  That Insurance Program was described in the Debtors' Motion, filed on June 1, 2009, for Entry of Order Pursuant To 11 U.S.C. §§363(b), 503(b) & 105(a) & Fed. R. Bankr.

P. 6003 and 6004 Authorizing Debtors To Continue Their Liability, Product, Property and Other Insurance Programs (the "Insurance Motion").

30.    In the Insurance Motion, the Debtors asserted that "the continuation of the Insurance Programs, on an uninterrupted basis and the payment of all undisputed pre-petition and post-petition Insurance Obligations relating to the Insurance Programs are <u>essential to preserve the Debtors' business and preserve the value of the Debtors' businesses and preserve the value of the Debtors' estates for all creditors</u>." (Insurance Motion at ¶41) (emphasis added).

31.    The Insurance Motion expressly noted, however, that the Debtors did not yet seek to assume any of the Debtors' Insurance Programs.  On the contrary, the Insurance Motion and the Order granting the Insurance Motion expressly stated that the Debtors were not assuming any of the agreements related to the Debtors' Insurance Programs.  (*Id.* at ¶ 42).

32.    The Sale Motion, the proposed sale agreement, and the schedules attached thereto do not address the ACE Policies and Agreements.

**D.    The Relevant Provisions Of The Sale Motion And The MPA.**

33.    At the outset, neither the Sale Motion, nor the Master Sales and Purchase Agreement (the "MPA") which is attached as an Exhibit thereto, includes any express reference to ACE or to the ACE Policies and Agreements.

34.    The Sale Motion provides that the Debtors would issue notices to certain non-debtor counter-parties of the Debtors' intention to assume executory contracts with those counter-parties and assign them to the Purchaser. (*See* Sale Motion at ¶ 69.)

35.    The Sale Motion further provides that from the date of the MPA and until 30 days after the Closing Date (defined in the MPA as the date 3 days after certain conditions to the closing are met), the Debtors, with consent of the Purchaser, may designate additional executory contracts for assumption and assignment.  (*Id.*)

36.     The MPA provides that the Purchased Assets will include all contracts and all insurance policies, other than contracts and insurance policies that are excluded by being listed in Schedules 2.2 (b)(vii) and 2.2 (b)(xiii) to the MPA.    (*See* the MPA at §§2.2(a)(xi), 2.2.(a)(xvii), 2.2(b)(vii) and 2.2 (b)(xiii))

37.     The ACE Policies and Agreements are not listed in Schedules 2.2(b)(vii) and 2.2(b)(xiii) of the MPA as being excluded from the sale under the MPA.    This could be interpreted as an indication of the Debtors' intention to include the ACE Policies and Agreements into the assets that will be transferred to the Purchaser.    However, this is not clear.

38.     To date, ACE has received no notice of the Debtors' intention to assume and assign the ACE Policies and Agreements.[2]

39.     Failure by the Debtors to assume the ACE Policies and Agreements would be contrary to statements made by GM representatives that GM and the other Debtors intend to assume the ACE Policies and Agreements in full in the bankruptcy cases.

40.     ACE requires clarification of the Debtors' intentions with regard to the ACE Policies and Agreements, in particular a clear and unequivocal statement of whether the ACE Policies and Agreements will be assumed or rejected by the Debtors.

---

[2] ACE received a Notice of Debtors' Intent To Assume And Assign Certain Executory Contracts, which pursuant to the provisions of the Sale Motions, directed ACE to a secure website for information as to which contracts were being assumed and the amount of cure.  Unfortunately, the information on the secure website was unintelligible.  One contract was listed, but ACE has been unable to determine which, if any, of the ACE Policies and Agreements that listing referred to.  ACE's counsel then called the telephone number provided in the Notice, but was unable to obtain any additional information.  Furthermore, the Notice was addressed to an ACE employee who has no involvement whatsoever in ACE's relationship with Debtor GM, and, as a result, the Notice did not reach ACE's legal department until June 15, 2009 which was the deadline for objections to the Notices of Intent To Assume and Assign.

**E.**    **The Deadline for Objections.**

41.    As explained above, representatives of the Debtors have advised ACE that the Debtors intend to assume the ACE Policies and Agreements.

42.    On the other hand, documents filed to date by the Debtors in this case do not unequivocally provide for such assumption or state the terms of such assumption.

43.    ACE requires detailed information about the terms of the assumption and assignment of the ACE Policies and Agreements.

44.    However, the deadline for objections to the Sale Motion is June 19, 2009, and therefore ACE must file these objections in order to preserve its position.

45.    Accordingly, ACE objects to the proposed sale of the Debtors' assets on the grounds set forth below.

**III.    ACE'S OBJECTIONS TO THE MOTION**

46.    ACE objects to the Sale Motion because it fails to provide for the assumption of the ACE Policies and Agreements.

47.    ACE objects to the Sale Motion because it fails to provide sufficient information concerning the treatment of the ACE Policies and Agreements in connection with a proposed sale of assets.

48.    In the event that Debtor GM does seek to assume the ACE Policies and Agreements, ACE further objects to the Sale Motion to the extent that Debtor GM has failed to provide for and effectuate a cure of any defaults and has also failed to provide adequate assurances that it would cure the defaults under the ACE Policies and Agreement. The Bankruptcy Code prohibits an assumption of an executory contract unless, at the time of the assumption, the trustee or the debtor-in-possession cures or provides adequate assurance that it will promptly cure any defaults under that contract. 11 U.S.C. §365(b).

49.    In the event that Debtor GM does seek to assume the ACE Policies and Agreements and assign them to the Purchaser, ACE objects to the Sale Motion because assignment requires the consent of ACE, and ACE has not obtained a valid and acceptable written commitment from the Purchaser to perform Debtor GM's obligations under the ACE Policies and Agreements.

50.    In the event that Debtor GM does seek to assume the ACE Policies and Agreements and assign them to the Purchaser, ACE objects to the Sale Motion because assignment requires the consent of ACE, and in order to decide whether to provide such a consent, ACE requires access to information on the financial condition of the Purchaser.

51.    ACE further objects to any purported or proposed assignment of the ACE Policies and Agreements to the Purchaser without an assumption by Debtor GM.  An executory contract cannot be assigned unless it is first assumed by the assignor. *See, e.g.*, *In re S.E. Nichols*, 120 B.R. 745,747 (Bankr. S.D.N.Y. 1996) (a debtor who assumes an executory contract must assume both the benefits and the burdens of that contract).

52.    In the event that the Debtors improperly deem the ACE Policies and Agreements, or some of them, to be non-executory contracts which can be assigned without assumption, ACE objects and asserts that the ACE Policies and Agreements are, in fact, executory contracts which cannot be assigned without assumption.

53.    In the event that the Court determines, over ACE's objections, that the ACE Policies and Agreements, or some of them, constitute non-executory contracts, then ACE objects to the Sale Motion on the grounds that Debtors seek to assign the ACE Policies and Agreements to the Purchaser:

a.      Without providing to ACE the information regarding the financial condition of the Purchaser, so that ACE could make an informed decision whether to agree to an assignment of the ACE Policies and Agreements;  and

b.      Without a valid and acceptable written commitment from the Purchaser to perform Debtor GM's obligations under the ACE Policies and Agreements, which is a condition precedent to ACE's consent to an assignment of the ACE Policies and Agreements.

54.      ACE further objects to the Sale Motion to the extent that it seeks to transfer and assign the ACE Policies and Agreements "free and clear of liens, claims, encumbrances and other interests" (Motion at ¶1).  A transfer and assignment "free and clear of . . . claims and . . . other interests" purports to authorize the Purchaser to exercise greater rights than Debtor GM is entitled to exercise under the ACE Policies and Agreements.  An assignee, however, stands in the shoes of the assignor, and a debtor/assignor cannot enlarge its rights under an agreement with a third party. *See, e.g.*, *In re Best Film & Video Corp.*, 46 B.R. 861, 870 (Bankr. E.D. N.Y. 1985)(the Bankruptcy Code does not enlarge the rights of a debtor under a contract).

55.      ACE further objects to the Sale Motion to the extent the Debtors seek to transfer business records that relate to the ACE Policies and Agreements, unless the Purchaser is obligated to maintain such records and ACE is expressly granted access to such records, upon reasonable notice during business hours.

56.      Due to short notice and lack of information as described above, ACE reserves the right to assert any objection made by any other party and/or to present additional objections.

## IV.    WAIVER OF MEMORANDUM OF LAW.

57.    Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, ACE respectfully requests that the Court waive the requirement that ACE file a memorandum of law in support of these Limited Objections.

WHEREFORE, ACE American Insurance Company respectfully requests that the Court not approve the proposed sale pursuant to the MPA, or, in the alternative, that the Court provide the following relief:

a.    Direct Debtor GM to assume or reject the ACE Policies and Agreements;

b.    In the event of an assumption, direct the Debtor GM:

i.    to provide for and effectuate a cure of any defaults and provide adequate assurances that it would cure the defaults under the ACE Policies and Agreements;

ii.    to provide to ACE the information regarding the financial condition of the Purchaser, so that ACE could make an informed decision whether to agree to an assignment of the ACE Policies and Agreements to the Purchaser; and

iii.    to provide to ACE, as a condition of the assignment of the ACE Policies and Agreements to the Purchaser, a valid and acceptable written commitment from the Purchaser to fully perform Debtor GM's obligations under the ACE Policies and Agreements.

Respectfully Submitted

__s/ Andrew K. Lipetz_____
Andrew K. Lipetz, Esquire (AL 8945)
Wasserman Grubin & Rogers, LLP
1700 Broadway, 42nd Floor
New York, NY 10019
Tel: 212-581-3320
FAX: 212-956-5255


Counsel for Ace American Insurance Company


Of counsel

Jeffrey A. Less. Esquire
Jennifer L. Hoagland, Esquire
Helen Heifets, Esquire
Bazelon Less & Feldman, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19102
Telephone: 215-568-1155
Facsimile: 215-568-9319

# EXHIBIT 1



**ace usa**

# International
# Advantage

## Commercial Insurance Policy

## INTRODUCTION

This is your commercial insurance policy. It offers a wide range of protection designed to meet today's complex insurance needs. Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

## How to Read This Policy

This policy is keyed to the coverages shown in the Declarations. You have only those coverages for which a limit or other specification is shown in the Declarations.

This policy may provide several different kinds of coverage. The forms included explain the coverages shown in the Declarations, and include certain extensions of coverage that may apply.

Whenever a loss occurs or a claim is to be presented, there are certain things you must do to help us settle the claim. These are described in the **CONDITIONS** sections of your policy.

Finally, read the **COMMON POLICY CONDITIONS**. This section gives you information on when and where the policy will be in effect, the payment of premiums, changes in the policy and cancellation. The **COMMON POLICY CONDITIONS** also contains other important information about the policy.

## You, Your, We, Us, and Our

Throughout the policy the terms "you" and "your" mean the person, people, or organization shown as the Named Insured in the Declarations. "We," "us," and "our" mean the insurance company issuing this policy. Besides you, there may be other people "insured" under certain parts of the policy.

### Insured

The word "insured" means any person or organization qualifying as such under the WHO IS AN INSURED sections of the coverage form in which they appear.

### Word in Quotation Marks

Words and phrases that appear in quotation marks have the special meaning given to them in the Section - DEFINITIONS of the coverage form in which they appear.


By signing and delivering the policy to you, we state that it is a valid contract when counter-signed by our authorized representative.


### ACE AMERICAN INSURANCE COMPANY


*George D. Mulligan*
GEORGE D. MULLIGAN, Secretary

*John J. Lupica*
JOHN J. LUPICA, President


IT1221   version date:  02-2005          Page 2 of 2

ace usa

## INTERNATIONAL ADVANTAGE COMMERCIAL INSURANCE POLICY

Company Name: ACE American Insurance Company

# GENERAL DECLARATIONS

NAMED INSURED AND MAILING ADDRESS:

**General Motors Corporation, et. al.**

**300 Renaissance Center**

**Detroit, Michigan  48265-3000**

|  |  |
|---|---|
| POLICY NUMBER: | CSZ0302514 |
| RENEWED OR IN PLACE OF: | |
| PRODUCER NUMBER/OFFICE: | IT4571 / 5DM |

NAMED INSURED IS:  Corporation

OTHER INTEREST:    None

POLICY PERIOD:
    when coverage begins:  September 1, 2006
    when coverage ends:    September 1, 2007

DECLARATIONS EFFECTIVE:  September 1, 2006

PREMIUM AUDIT DOES NOT APPLY.

| Premium: | $1.00 waived | Due When Coverage Begins |
|---|---|---|

These Declarations apply for the Policy Period shown above from the Declarations Effective date. Together with the policy sections for Coverages, Common Policy Conditions and Endorsements, these Declarations complete your policy.  For renewal Policy Periods, all Endorsements for the expiring Policy Period are continued in full force and effect unless specifically deleted.

If the General Declarations indicate that the insurance is subject to audit or a reporting option, the premium stated is an estimate and subject to adjustment.

Name and Mailing Address of Producer:
**Aon Risk Services of Michigan**
3000 Town Center
Suite 3000
Southfield, Michigan 48075



**ace usa**

# LIABILITY COVERAGES
# DECLARATIONS
# (CGL CLAIMS-MADE)

| | |
|---|---|
| **NAMED INSURED:** | **General Motors Corporation, et. al.** |
| **POLICY NUMBER:** | **CSZ0302514    DECLARATIONS EFFECTVE:    September 1, 2006** |

**COVERGES**           **LIMITS OF INSURANCE**

*(Insurance applies only to those coverages for which a Limit of Insurance is shown)*

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM
### CLAIMS-MADE COVERAGE

| | |
|---|---|
| $ 2,500,000 | Each Occurrence |
| $10,000,000 | General Aggregate  (Other than Products/Completed Operations) |
| $ 5,000,000 | Products-Completed Operations Aggregate |
| $ 1,000,000 | Personal and Advertising Injury Limit (any one person or organization) |
| $ 1,000,000 | Damage To Premises Rented to You Limit (any one premises) |
| $    10,000 | Medical Expenses Limit (any one person) |

### RETROACTIVE DATE: 01/01/1972

This insurance does not apply to "Bodily Injury", "Property Damage" or "Personal and Advertising Injury"
which occurs before the Retroactive Date, if any, shown above.  If no date is shown, the Retroactive
Date will be the Declarations Effective Date shown above.

### EMPLOYEE BENEFITS LIABILITY ENDORSEMENT

| | |
|---|---|
| $2,500,000 | Each Claim |
| $2,500,000 | Annual Aggregate Limit |
| $    1,000 | Deductible (each claim) |

### CONTINGENT AUTOMOBILE LIABILITY COVERAGE FORM

| | |
|---|---|
| $2,500,000 | Each Accident – Combined Single Limit |
| $1,000,000 | Each Accident  - Auto Physical Damage (Actual Cash Value) |



**ace usa**

# LIABILITY COVERAGES DECLARATIONS (CGL CLAIMS-MADE)

---

### AUTO MEDICAL PAYMENTS

$    25,000        Each person/each accident

---

### HIRED AUTO PHYSICAL DAMAGE

| $1,000,000 | Maximum – each accident |
| $1,000,000 | Deductible each claim (may vary by local country) |

☐        PREMIUM AUDIT APPLIES.

☒        PREMIUM AUDIT <u>DOES NOT</u> APPLY.

---

### COVERAGE TERRITORY FOR LIABILITY COVERAGES

The Coverage Territory for COMMERCIAL GENERAL LIABILITY COVERAGE (CLAIMS-MADE COVERAGE), EMPLOYEE BENEFITS ENDORSEMENT, and CONTINGENT AUTOMOBILE LIABILITY COVERAGE means:

ANYWHERE IN THE WORLD but excluding:

1.    The United States of America (including its territories and possessions), and Puerto Rico;

2.    Any country or jurisdiction which is the subject of trade or economic sanctions imposed by the laws or regulations of the United States of America.

---

*Coverage Declarations Issued on:*        *September 27, 2006*

IT 1460      version date: 07-2003        Page 2 of 2        September 27, 2006



**ace usa**

Named Insured:     General Motors Corporation, et. al.

Policy Number:     CSZ0302514     Declarations Effective:   September 1, 2006

Company Name:     ACE American Insurance Company

# EMPLOYERS RESPONSIBILITY COVERAGES DECLARATIONS

### I.   BENEFITS FOR VOLUNTARY COMPENSATION

| | | |
|---|---|---|
| North Americans | : | State of Hire |
| Third Country Nationals | : | Country of Origin |
| Local Nationals | : | NOT COVERED |

### II.   REPATRIATION

| | |
|---|---|
| $100,000 | each employee |
| $500,000 | policy limit |

### III.  EMPLOYERS LIABILITY

| | | |
|---|---|---|
| Bodily Injury by Accident | $2,500,000 | each accident |
| Bodily Injury by Disease including by "endemic disease" | $2,500,000 | each employee |
| Bodily Injury by Disease including by "endemic disease" | $2,500,000 | policy limit |

In jurisdictions where we may be prevented by law or otherwise from paying on your behalf or defending you, we will:

1.  indemnify you for those sums you become legally obligated to pay as damages to which this insurance applies; and

2.  pay the cost of your defense and aid and manage such defense.

Coverage Territory for Employers Responsibility Coverages

This insurance applies

1.  to claims you make for "voluntary compensation" and repatriation for employees of your workplaces included below;

2.  to claims or suits for damages for employers liability brought against you by employees of your workplaces included below;

ANYWHERE IN THE WORLD but excluding:

1.  the United States of America (including its territories and possessions) and Puerto Rico;

2.  any country or jurisdiction which is the subject of trade or economic sanctions imposed by the laws or regulations of the United States of America.



**ace usa**

| | |
|---|---|
| Named Insured: | General Motors Corporation, et al |
| Policy Number: | CSZ0302514 |

| | | | |
|---|---|---|---|
| Endorsement No.: | 49 | Effective: | September 1, 2006 |
| Policy Year From: | September 1, 2006 | To: | September 1, 2007 |
| Company Name: | ACE American Insurance Company | | |

Premium:   ☒ Included     ☐ $ _____     Due When Coverage Begins

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ENDORSEMENT - SCHEDULED DEDUCTIBLE AGGREGATE

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE:**

"Scheduled Policy"

UK Employers Liability
Schedule of Locations:    United Kingdom
Policy No.:               47UK203938
Limit of Insurance:       UK Sterling 5,000,000
Deductible Amount:        UK Sterling 100,000 Per Claim

We agree with you that:

1. Coverage for UK Employers Liability is provided under "Scheduled Policy" No. 47UK203938 issued by ACE European Group Limited. There is no coverage under this Policy No. CSZ0301827 for UK Employers Liability and no Limit of Insurance for Commercial General Liability is provided under Policy No. 47UK203938. As used in this Endorsement, Employers Liability shall have the same meaning as set forth in Policy No. 47UK203938.

2. In consideration of a reduced or adjusted premium, the Limits of Insurance and the "Allocated Lost Adjustment Expense" set forth in "Scheduled Policy" No. 47UK203938 issued by ACE European Group Limited and identified above, are subject to and include the Deductible Amounts shown in the Schedule.

3. You shall have an obligation to reimburse us for those amounts paid by us or an "Affiliated or Non-Affiliated Company" to or on behalf of you or your "Affiliate" under "Scheduled Policy" No. 47UK203938 and which fall within the Deductible shown in the Schedule above.

IT1295    version date:  06-2006        Page 1 of 2        DB:  September 27, 2006

4.  You shall reimburse us by the due date shown on our invoice for any sums we have paid under Item 3., above, and invoiced to you.

## DEFINITIONS

When used in this endorsement:

**"Affiliate"** shall mean a person or entity that directly or indirectly controls and/or owns, is controlled and/or owned by, and/or is under common control and/or ownership with, the person or entity specified.

**"Affiliated or Non-Affiliated Companies"** shall mean Affiliates of the Company and any insurer that is not affiliated with the Company that issues to the Insured or the Insured's Affiliates one or more "Locally Admitted Policies" upon the Company's or the Company's Affiliate's request.

**"Allocated Loss Adjustment Expense"** shall mean any expenses, costs and interest provided for under the Supplementary Payment and/or "we will pay" provisions of this Policy, and any other expenses, costs, or interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or "suit" arising under this Policy or a "Locally Admitted Policy," which the Claims Service Organization shown in the Schedule, under its accounting practices, directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses shall include, but are not limited to, subrogation; all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, or chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of obtaining depositions and court reporters or recorded statements. "Allocated Loss Adjustment Expense" shall not include the salaries of our employees or the Claim Service Organization employees.

**"Deductible Amounts"** shall mean the amount of damages and "Allocated Loss Adjustment Expense" which you have a duty to reimburse us and which arise from any one loss covered by the "Scheduled Policy" No. 47UK203938.

**"Scheduled Policy"** shall mean a policy, binder, contract of insurance or other evidence of liability, all whether written or oral, issued by any "Affiliated or Non-Affiliated Company" to the Insured or to any Affiliate of the Insured that provides insurance coverage required of your or your "Affiliate" by statute, law, regulation or contract within the Coverage Territory which would apply to your or your "Affiliate's" operations, premises, "your products," or "your work," which is not within the scope of coverage or in addition to the Limits of Insurance provided under this policy, and which is shown in the Schedule.

All other terms and conditions remain unchanged.

Name of Named Insured: _____

Accepted and Agreed to by: _____ (insured)

Title:    _____

Date:    _____

IT1295    version date: 06-2006          Page 2 of 2          DB: September 27, 2006

## Renewal Certificate
### Endorsement #58
Page 1 of 4

**ace usa**
**U.S. International**

**Company: ACE American Insurance Company**

## General Policy Information

| | |
|---|---|
| **Named Insured:** **Address:** | **General Motors Corporation** **300 GM Renaissance Center** **Mail Code: 482-C19-D36** **Detroit, MI 48265-3000** |
| **Policy Number:** | **CSZ0302514** |
| **Policy Period:** | When Coverage Begins:    **September 1, 2008** When Coverage Ends:    **September 1, 2009** |
| **Policy Premium:** | **$3,000,000** Due When Coverage Begins |
| **Premium Audit:** | Does Not Apply |
| **Name and Mailing** **Address of Producer:** | **Aon Risk Services** 3000 Town Center, Ste. 3100 Southfield, MI 48075 |

**Your policy is renewed for the policy period shown above. Nothing herein contained shall be held to vary, alter, waive or extend any of the agreements, conditions, declarations, exclusions, limitations or terms of the policy, or endorsements attached thereto, other than as stated on this Renewal Certificate or as indicated below:**

Endorsement No. 59- Amendatory Endorsement (IT1057 01-2003)
Endorsement No. 60- Additional Insured- Designated Person or Organization (IT2030 09-2006)
Endorsement No. 61- Incidental Medical Malpractice Liability Insurance (IT1606 05-2008)
Endorsement No. 62- Income Tax Equalization (IT1188 02-2007)
Endorsement No. 63- Waiver of transfer of rights of Recovery Against Others to US (IT1536 10-2006)
Endorsement No. 64- Exclusion- Pollution (Hostile Fire Exception) (IT2004 04-2005)

# Renewal Certificate
## Endorsement #58
### Page 2 of 4

**MASTER
POLICY**

**As of September1, 2008 the following policy limits apply:**

### Comprehensive General Liability Including Products- Claims Made

| | |
|---|---|
| $ 2,500,000 | per occurrence |
| $10,000,000 | general aggregate |
| $ 5,000,000 | products/completed operations aggregate |
| $ 1,000,000 | personal & advertising injury aggregate |
| $ 1,000,000 | premises damage limit (each occurrence) |
| $     10,000 | medical expense limit (any one person) |

### Employee Benefits Liability – claims made

| | |
|---|---|
| $ 2,500,000 | each claim |
| $ 2,500,000 | annual deductible |
| $      1,000 | deductible- each claim |

### Contingent Auto Liability

| | |
|---|---|
| $ 2,500,000 | each accident |
| $     50,000 | underlying auto liability warranty limit |
| $     25,000 | medical payments- each person/each accident |

### Employers Responsibility Coverages

| Benefits for Voluntary Compensations | |
|---|---|
| North Americans: | State of Hire |
| Third Country Nationals: | State of Hire |
| Local Nationals: | Not covered; Contingent EL only |
| Repatriation: | $100,000 per person/$500,000 policy limit |

### Employers Liability

| | | |
|---|---|---|
| $2,500,000 | each accident | Bodily Injury by Accident |
| $2,500,000 | each employee | Bodily Injury by Disease |
| $2,500,000 | policy limit | Bodily Injury by Disease |

### Master Policy Deductible Limits

See Endorsement number: N/A

# Renewal Certificate
## Endorsement #58
### Page 3 of 4

**Premium
Collection**

**Premium to be collected in local countries:**

| | | |
|---|---|---:|
| Brazil | $ | TBD |
| Canada | $1,138,300 | |
| Hungary | $ | 8,000 |
| Japan | $ | 47,138 |
| Kazakhstan | $ | 4,000 |
| Korea | $ | 100,097 |
| Mexico | $ | 252,563 |
| Philippines | $ | 2,500 |
| Poland | $ | 32,331 |
| Portugal | $ | 129,422 |
| Russia | $ | 4,000 |
| South Africa | $ | 12,708 |
| Turkey | $ | 17,127 |
| **Total** | **$1,748,186** | |

**Premium to be collected in US:**

| | | |
|---|---|---:|
| Argentina | $ | 66,697 |
| Australia | $ | 283,200 |
| Austria | $ | 15,687 |
| Barbados | $ | 2,500 |
| Belgium | $ | 175,237 |
| Chile | $ | 12,568 |
| Colombia | $ | 2,517 |
| Denmark | $ | 30,477 |
| Ecuador | $ | 2,500 |
| Finland | $ | 18,980 |
| France | $ | 76,030 |
| Germany | $1,155,391 | |
| Greece | $ | 1,000 |
| Hong Kong | $ | 5,000 |
| Indonesia | $ | 5,053 |
| Ireland | $ | 86,489 |
| Israel | $ | 5,000 |
| Italy | $ | 370,998 |
| Netherlands | $ | 15,501 |
| Norway | $ | 5,000 |
| New Zealand | $ | 9,486 |
| Singapore | $ | 27,167 |
| Spain | $ | 852,224 |
| Sweden | $ | 550,125 |
| Switzerland | $ | 42,968 |

IT2013   version date: 07-2004                   LAM: 10.30.08

# Renewal Certificate
## Endorsement #58
### Page 4 of 4

|                  |             |
|------------------|-------------|
| Taiwan           | $     7,178 |
| Thailand         | $   439,897 |
| UAE              | $     7,500 |
| United Kingdom   | $1,577,583  |
| Venezuela        | $     2,500 |
| **Total**        | **$5,852,453** |

**Premium to be collected under Master/DIC Policy:**    $3,000,000

**TOTAL PROGRAM PREMIUM**    $12,312,600* *TBD*

Amounts shown above for local premium collection are exclusive of any applicable taxes and fees.

# EXHIBIT 2



## ace europe

| | |
|---|---|
| ACE European Group Ltd. | 020 7173 7000 tel |
| UK Head Office: | 020 7173 7800 fax |
| The ACE Building | |
| 100 Leadenhall Street | www.aceeurope.co.uk |
| London EC3A 3BP | |

## EMPLOYERS LIABILITY POLICY

### Schedule for Policy Number : 47UK203938

**INSURED:**  General Motors Corporation

**ADDRESS:**  Griffin House, Osborne Road, Luton, Bedfordshire. LU1 3YT

**PERIOD OF INSURANCE:**  **FROM:** 1st September 2008 L.S.T.

**TO:** 31st August 2009 L.S.T.

both days inclusive

L.S.T. (Local Standard Time) means the time applicable on the relevant date at the Address of the Insured as shown above

**RENEWAL DATE:**  1st September 2009

**BUSINESS:**  Car Manufacturer

| | Limit of Liability | Premium |
|---|---|---|
| **Employers Liability** | GBP5,000,000 | USD250,000.00 |

| | |
|---|---|
| Insurance Premium (excluding Taxes): | USD250,000.00 |
| Taxes: | USD  12,500.00 |
| Total premium (including Taxes): | USD262,500.00 |
| Including Commission of: | Nil |

POLICY FORM REFERENCE  :                           ELprimMN_3

Signed on behalf of ACE European Group Ltd.
Andrew Kendrick, Chairman and Chief Executive Officer

Countersigned

Part of the ACE Group of Insurance & Reinsurance Companies

ACE European Group Limited
Registered in England Number 1112892
Registered Office: 100 Leadenhall Street, London EC3A 3BP



## ace europe

**Endorsement No. 1 of 2008**
attaching to and forming part of Policy No: 47UK203938
issued by ACE European Group Limited.
In the name of General Motors Corporation

**IT IS HEREBY DECLARED AND AGREED THAT** the following alteration takes effect from 1st September 2008:

**Extension Added:**

**Court Attendance Costs**

In the event of any of the undermentioned parties attending court as a witness at the request of the Company in connection with a claim in respect of which the Insured is entitled to indemnity under this Policy the Company will provide compensation to the Insured at the following rates per day for each day on which attendance is required :-

| | | |
|---|---|---|
| (a) | any director or partner of the Insured | £ 250 |
| (b) | any Employee | £ 100 |

Provided always that

(i)     the Company shall not be liable unless the Company has sole conduct and control of all
        claims covered by these Extensions
(ii)    these Extensions shall not apply to any liability which is covered by any other policy

**Definition Added**

**The unqualified word "Insured" includes:**

(a)     The Named Insured and any executive officer, director or stockholder thereof while acting within the
        scope of his duties as such;

(b)     Civic Involvement Program/General Motors and its directors, officers or employees;

(c)     Divisions of General Motors and directly or indirectly wholly owned and substantially wholly owned
        Non-United States General Motors subsidiaries, including joint ventures entered into by the aforesaid if
        the division or the subsidiary has:

1.      at least a 50% financial interest in the joint venture, and

2.      exercises full management control of the joint venture, or
3.      has contractually assumed in writing the obligation to provide insurance such as is afforded by
        this policy for the joint venture in its entirety, and

4.      the joint venture is located outside the United States of America.

If conditions 1. and 2. and/or 3. are not satisfied, then "Insured" shall mean only the aforesaid division

Ace European Group Ltd is authorised and regulated by the Financial Services Authority Registered in England:
Number 1112892
Registered Office: The ACE Building, 100 Leadenhall Street, London EC3A 3BP

One of the ACE Group of Insurance & Reinsurance Companies

or subsidiary or a general motors and identity of the company under this policy shall be the
product of (a) the percentage interest of the insured in such liability of said joint venture and (b) the
total limit of liability insurance afforded the "Insured" by this policy.

Subject otherwise to the terms, exclusions and conditions of the Policy.

Signed _____

for and on behalf of ACE European Group Limited

Date of issue: 18th November 2008

Ace European Group Ltd is authorised and regulated by the Financial Services Authority Registered in England;
Number 1112892
Registered Office: The ACE Building, 100 Leadenhall Street, London EC3A 3BP

One of the ACE Group of Insurance & Reinsurance Companies



**ace europe**

ACE European Group Ltd.     020 7173 7000 tel

ACE Building     020 7173 7800 fax

100 Leadenhall Street,

London, EC3A 3BP     www.aceeurope.co.uk

ACE European Group Limited is authorised and regulated by the Financial Services Authority

# EMPLOYERS LIABILITY POLICY

In consideration of the Insured paying the Premium to ACE EUROPEAN GROUP LIMITED (hereinafter called "the Company") and having made a Proposal which shall be the basis of this contract and is deemed to be incorporated herein

The Company agrees to indemnify the Insured in the terms of this Policy and subject to the Limit of Liability stated in the Schedule against all sums which the Insured shall become legally liable to pay as damages in respect of Bodily Injury sustained by any Employee caused during the Period of Insurance within the Territorial Limits and arising out of and in the course of employment by the Insured in the Business

The Company will also pay Costs and Expenses in respect of any occurrence to which this Policy applies

The indemnity granted by this Policy is deemed to be in accordance with the provisions of any law relating to compulsory insurance of liability to Employees in Great Britain Northern Ireland the Isle of Man or the Channel Islands but the Insured shall repay to the Company all sums paid by the Company which the Company would not have been liable to pay but for the provisions of such law

**SIGNED** for and on behalf of the Company

**Andrew Kendrick** *Chairman and Chief Executive Officer*

**This Policy shall constitute the entire contract between the parties, and should be examined and if incorrect returned immediately for alteration**

ElprimMN_3     iii.08

## Definitions

1. **Limit of Liability** means the maximum amount as stated in the Schedule which the Company shall be liable to pay as damages and Costs and Expenses under this Policy in respect of any one claim against the Insured or series of claims against the Insured arising out of any one occurrence and for the purpose of such Limit of Liability the Insured shall be deemed to include all parties entitled to indemnity under this Policy regardless of whether such parties are designated as the Insured

2. **Costs and Expenses** means

    2.1  costs and expenses recoverable by any claimant from the Insured

    2.2  costs and expenses incurred with the written consent of the Company

    2.3  the solicitor's fees for representation at any coroner's inquest or fatal accident inquiry or in any court of summary jurisdiction

    2.4  compensation to the Insured at the following rates per day for each day on which any of the following persons attend court as a witness at the request of the Company

        a)    any director or partner of the Insured           GBP250

        b)    any Employee                          GBP100

3. **Territorial Limits** means anywhere within Great Britain Northern Ireland the Isle of Man or the Channel Islands and elsewhere in the world in respect of any Employee whilst temporarily outside the Territorial Limits stated above provided that such Employee normally resides within the Territorial Limits stated above

4. **Bodily Injury** means bodily injury to any Employee and shall include

    4.1  death illness and disease

    4.2  mental injury anguish or nervous shock sustained by any Employee as a result of actual or threat of bodily injury death illness or disease

5. **Business** means the Business described in the Schedule and shall include

    5.1  in connection with such Business

        a)    the sale or supply of food and/or drink to Employees or others

        b)    the provision of fire first aid security and ambulance services by the Insured and maintenance of the Insured's premises

    5.2  the provision by the Insured of sports social and welfare organisations primarily for employees

    5.3  private work undertaken by any Employee for any director, partner or employee of the Insured.

6. **Employee** means any person under a contract of service or apprenticeship with the Insured. Employee also includes the following while working for the Insured in connection with the Business, in which case they will be considered to be employed by the Insured.

    6.1  any person under a contract of service or apprenticeship with some other employer and who is hired to or borrowed by the Insured

    6.2  any labour master and any person supplied by him

    6.3  any person engaged as a labour-only sub-contractor and any person supplied by him

    6.4  any self-employed person performing work of a kind ordinarily performed under a contract of service or apprenticeship with the Insured

    6.5  any person supplied to the Insured under a contract or agreement the terms of which deem such person to be in the employment of the Insured for the duration of such contract or agreement

    6.6  any work experience student or trainee

7. **Insured** means the party or parties described as such in the Schedule

8. **Period of Insurance** means the period stated in the Schedule or any subsequent period for which the Insured shall have paid and the Company shall have accepted a renewal premium

## Extensions

**Indemnity to Principals and Others**

1.  The Company will also indemnify in the terms of this Policy

    1.1  in the event of the death of the Insured his/her legal personal representative in respect of liability incurred by the Insured

    1.2  any principal with whom the Insured has entered into an agreement to the extent required by such agreement but only in respect of liability for which the Insured would have been entitled to indemnity under this Policy if the claim had been made against the Insured

    and at the request of the Insured

    1.3  any officer or member of the Insured's catering sports social and welfare organisations and fire first-aid or ambulance services

    1.4  any director partner or employee of the Insured in respect of liability for which the Insured would have been entitled to indemnity under this Policy if the claim had been made against the Insured

    1.5  any director partner or employee of the Insured in respect of liability for private work undertaken by Employees with the consent of the Insured

    1.6  the owner of any plant hired by the Insured but only to the extent required by the conditions of hire.

    Provided that

    a)  such person(s) shall not be entitled to indemnity under any other policy

    b)  such principal/person(s) shall as though he/they were the Insured be subject to the terms of this Policy in so far as they can apply

    c)  the Limit of Liability shall not be increased hereby.

**Legal Defence Costs**

**Health and Safety at Work Act**

2.  The Company will indemnify the Insured or, at the request of the Insured, any Employee director or partner of the Insured, against legal costs and expenses incurred with the prior approval of the Company in the defence of any criminal proceedings brought for a breach of the Health and Safety at Work etc Act 1974 or the Health and Safety at Work (Northern Ireland) Order 1978 committed during the Period of Insurance in the course of the Business including legal costs and expenses incurred with the prior approval of the Company in an appeal against conviction arising from such proceedings

    Provided that this Extension shall not apply to

    a)  fines or penalties imposed by a court

    b)  proceedings consequent upon any deliberate act or omission

    c)  proceedings relating to matters not affecting the safety health and welfare of Employees

**Unsatisfied Court Judgements**

3.  In the event of a judgement for damages being obtained

    3.1  by any Employee or the personal representatives of any Employee in respect of Bodily Injury to the Employee caused during the Period of Insurance arising out of and in the course of employment by the Insured in the Business against any company or individual operating from premises within Great Britain Northern Ireland the Channel Islands or the Isle of Man in any court situate in the aforesaid territories and

3.2    remaining unsatisfied in whole or in part six months after the date of such judgement

then subject otherwise to the terms exclusions and conditions of this Policy the Company will at the request of the Insured pay to the Employee or the personal representatives of the Employee the amount of any such damages and any awarded costs to the extent that they remain unsatisfied

Provided that

a)    there is no appeal outstanding

b)    if any payment is made under the terms of this Extension the Employee or the personal representatives of the Employee shall assign the judgement to the Company

c)    all reasonable steps necessary have been taken to recover monies due from the party against whom the judgement was obtained

**Motor Contingent Liability**

4.    Exclusion 2 does not apply in respect of legal liability of the Insured named in the Schedule arising from the use in connection with the Business of any motor vehicle not the property of nor provided by the Insured.

Provided that this Extension shall not apply in respect of liability arising while such vehicle is being

a)    driven by the Insured

b)    driven with the general consent of the Insured or of the representative of the Insured by any person who to the knowledge of the Insured or of such representative does not hold a valid licence to drive such vehicle unless such person has held and is not disqualified from holding or obtaining such a licence

c)    used elsewhere than within the member countries of the European Union.

## Exclusions

**Radioactive Contamination**

1. Where the Insured under a contract or agreement has undertaken either

   1.1   to indemnify another party or

   1.2   to assume the liability of another party

   this Policy does not apply to liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from

   a) ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel

   b) the radioactive toxic explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof

**Further this Policy does not apply to liability**

**Employee Passengers**

2. for which compulsory motor insurance or security is required under any road traffic legislation in force within any member country of the European Union

**Employees Offshore**

3. to any Employee arising while Offshore

   Offshore means from the time of embarkation on to a vessel or aircraft for conveyance to any offshore rig offshore platform or offshore installation until disembarkation from a conveyance on to land upon return therefrom

**Terrorism**

4. caused by or arising from

   a) an Act of Terrorism

   and/or

   b) Bodily Injury, loss, Damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any Act of Terrorism.

   For the purpose of this Exclusion an Act of Terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

   Provided that this Exclusion shall only apply in respect of payments for damages of amounts in excess of GBP5,000,000 for any one claim or series of claims arising out of any one occurrence.

   If the Company alleges that by reason of this Exclusion any liability is not covered by this Policy, the onus of proving to the contrary shall be upon the Insured.

## Conditions

**Interpretation**

1. For the purposes of this Policy, Proposal means any signed proposal form and declaration and any information in connection with this insurance supplied by or on behalf of the Insured in addition thereto or in substitution therefor whether at the time of acceptance or prior or subsequent thereto.

   This Policy and the Schedule shall be read together as one document and any word or expression to which a specific meaning has been attached in any part of this Policy or of the Schedule shall bear such specific meaning wherever it may appear.

**Choice of Law**

2. This Policy of insurance shall be governed by and construed in accordance with the laws of England and Wales and the Commercial Court, Queen's Bench Division of the High Court of Justice, Royal Courts of Justice, The Strand, London WC2A 2LL shall have exclusive jurisdiction in respect of any dispute arising under or in connection with this Policy, including any dispute as to the formation or validity of the Policy.

**Alteration**

3. The Insured shall give notice to the Company of any material alteration or change in circumstances affecting the risk covered and until the Company shall have agreed in writing to accept liability for such altered risk the Company shall not be liable in respect of any occurrence due altogether or in part to any such alteration or change.

**Precautions**

4. It is a condition precedent to any liability of the Company under this Policy that the Insured at their own expense takes all reasonable precautions to prevent occurrences which may give rise to liability under this Policy and all reasonable steps

   4.1 to comply with all applicable statutory requirements and to maintain their ways works machinery plant and premises in good order and repair

   4.2 to remedy any defect or danger upon discovery thereof and take such additional precautions as the circumstances may require

   4.3 in the selection of employees.

**Claims Procedure**

5. It is a condition precedent to any liability of the Company under this Policy that in the event of any occurrence giving rise to or which may give rise to a claim under this Policy

   5.1 the Insured shall

      a) give written notice thereof (and full particulars of the occurrence) to the Company as soon as possible

      b) notify the Company in writing immediately he/they shall have knowledge of any impending prosecution inquest or fatal accident inquiry in connection with any occurrence for which there may be liability under this Policy

      c) forward to the Company immediately on receipt every claim notice letter verbal notice of claim or other originating process or any other document served on the Insured

      d) give all such information and assistance as the Company may require

   5.2 the Insured shall NOT negotiate admit liability or make any promise payment or settlement without the Company's written consent

5.3    the Company shall be entitled

    a)    if and so long as it desires, to take over and to have the sole conduct and control of any claim and legal proceedings or alternative disputes resolution relating thereto in the name of the Insured and shall have full discretion in the settlement of any claim

    b)    to prosecute in the name of the Insured but for the Company's benefit any claim for compensation or indemnity.

**Discharge of Liability**    6.    The Company may at its sole discretion in respect of any occurrence or occurrences covered by this Policy pay to the Insured the Limit of Liability applicable to such occurrence or occurrences (but deducting therefrom any sum or sums already paid), or any lesser sum for which the claim or claims arising from such occurrence or occurrences can be settled and the Company shall thereafter be under no further liability in respect of such occurrence or occurrences except for the payment of Costs and Expenses incurred prior to the date of such payment and for which the Company may be responsible hereunder.

**Non-Contribution**    7.    If at the time of the happening of any occurrence covered by this Policy there is any other existing insurance whether affected by the Insured or not covering the same liability the Company shall not be liable to indemnify the Insured in respect of such liability except so far as concerns any excess beyond the amount which would have been payable under such other insurance had this Policy not been effected.

**Premium Adjustment**    8.    If the first and renewal premiums under this Policy have been calculated (wholly or in part) upon estimates furnished by the Insured, the Insured shall keep proper records containing all particulars relative thereto and the Company shall be allowed to inspect such records at all reasonable times. The Insured shall within one month from the expiry of each Period of Insurance supply to the Company such particulars as the Company may require, whereupon the premium for such Period shall be adjusted and the difference paid by or allowed to the Insured as the case may be, subject to any Minimum Premium specified in the Schedule.

**Cancellation**    9.    The Company may cancel this Policy by sending not less than 30 days' notice thereof by recorded delivery letter to the Insured at the Insured's last known address. In such event the Company shall make a return of the proportionate part of the premium in respect of the unexpired Period of Insurance from the effective date of cancellation or if the premium has been based wholly or partly on any estimates the premium shall be adjusted in accordance with Condition 8.

Where any premium payable by direct debit instalments is not received, the Company will request payment for that unpaid premium in writing. If payment is not received within 15 days of that request, the Policy will be cancelled with effect from the date on which the initial unpaid direct debit was due.

**Contracts (Rights of Third Parties) Act**    10.    A person or company who is not a party to this Policy has no rights under the Contracts (Rights of Third Parties) Act 1999 in respect of this Policy. This condition does not affect any right or remedy which exists or is available notwithstanding such Act.

## Data Protection

ACE European Group Limited and its group companies ('ACE') will use the information supplied during the formation and performance of this Policy for policy administration, customer services, the payment of claims and the production of management information for business analysis. We will keep this information for a reasonable period.

Where sensitive personal data has been disclosed, including any medical or criminal record information, ACE will also use this information for these purposes. ACE are entitled to ask about criminal convictions in relation to insurance risks. There is no obligation to provide ACE with details of any convictions which are spent under the terms of the Rehabilitation of Offenders Act 1974. ACE may also transfer certain information to countries that do not provide the same level of data protection as the UK for the above purposes. A contract will be in place to ensure the information transferred is protected.

ACE may record telephone calls for quality control, fraud prevention and staff training purposes.

When personal or sensitive data is supplied to ACE about third parties other than the Insured, both during the formation and performance of this policy, ACE assumes that those third parties consent to the supply of this information to ACE, to ACE processing this data, including sensitive personal data, and to the transfer of their information abroad. ACE will also assume that the supplier of the information is authorised to receive, on their behalf, any data protection notices.

ACE may share personal and sensitive personal information with the following organisations for the purposes described above:

- our connected companies, service providers, agents and subcontractors including loss adjusters and claims investigators;
- our reinsurers who use this information to assess the terms of specific policies and to administer our insurance polices generally;
- other insurance companies about other insurance policies you may have;
- the police, other insurance companies, fraud reference agencies and other representative bodies in relation to the prevention and detection of fraudulent claims or as part of our money laundering checks.

We work with the police, other insurance companies, fraud reference and detection agencies and other representative bodies to prevent and detect fraudulent or exaggerated claims. As part of this we will share information about your claims with providers of software designed to assist in the detection of fraudulent claims. We may also use commercially available databases to prevent money laundering.

Other companies may contact these bodies for information to help them make decisions about insurance or similar services they provide to you.

Individuals whose information has been supplied to ACE are entitled to a copy of that information on payment of a fee and to have any inaccuracies corrected. Such information is available by contacting the Data Protection Officer at 100, Leadenhall Street, London EC3A 3BP.
We do not use personal information for marketing purposes, nor do we share it with any other company for marketing purposes, unless consent to do so has been received in writing from you.

## Complaints Procedure

We are dedicated to providing you with a high quality service, and want to maintain this at all times. If you feel that we have not offered you a first class service or you wish to make an enquiry regarding this insurance, please contact the intermediary who arranged this insurance for you or the manager of the branch of the company which issued your policy.

If you are still not satisfied, you may write to our Chief Executive of the company at ACE's head office – the address is shown on your policy.

ACE European Group Limited is a member of the Financial Ombudsman Service (FOS) and in limited circumstances, you can approach them for assistance if you remain dissatisfied with our response. Those limited circumstances are where the policy is taken out by:

a)        An individual

b)        A business with an annual group turnover of less than GBP1,000,000

c)        A charity with annual income of less than GBP1,000,000 and

d)        A trustee of a trust that has a net asset value of less than GBP1,000,000

The FOS's contact details are FOS, South Quay, 183 Marsh Wall, London, E14 9SR, Phone: 0845 080 1800 e-mail: enquiries@financial-ombudsman.org.uk

## Financial Services Authority

ACE European Group Limited, UK Head Office, 100 Leadenhall Street, London EC3A 3BP, authorised and regulated by the Financial Services Authority, registration number FRN202803. Full details can be found on the FSA's Register by visiting www.fsa.gov.uk/register or by contacting the FSA on 0845 606 1234



**ace usa**

| | |
|---|---|
| Named Insured: | General Motors Corporation |
| Policy Number: | CSZ0302514 |

| | | | |
|---|---|---|---|
| Endorsement   No.: | 66 | Effective: | February 1, 2009 |
| Policy Year From: | September 1, 2008 | To: | September 1, 2009 |
| Company Name: | ACE American Insurance Company | | |

Premium: ☒    Included    ☐    $_____    Due When Coverage Begins

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT – DELETION OF PRODUCTS LIABILITY COVERAGE

This endorsement modifies insurance under the following:

## COMMERCIALGENERAL LIABILITY COVERAGE FORM

In acknowledgement of consideration received, it is agreed that, effective February 1, 2009:

1.   The LIABILITY COVERAGES DECLARATIONS is amended in the COMMERCIAL GENERAL LIABILITY COVERAGE FORM CLAIMS-MADE COVERAGE item by deleting the following:

   **$5,000,000**          products/completed operations aggregate

   and replacing it with the following:

   **$5,000,000**          Completed Operations Aggregate

2.   **SECTION I – COVERAGES, COVERAGE A -  BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement, a.** Payment or Indemnification, is deleted in its entirety and replaced by the following:

   a.   Payment or Indemnification

      (1)   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" arising out of:

         i.   premises that you own or rent, or

         ii.   "your work", including "your work" after that work has been completed or abandoned,

IT1057    version date: 01-2003          Page 1 of 3                    SP: 5.7.2009

to which this insurance applies; or

(2)    In jurisdictions where we may be prevented by law or otherwise from paying on behalf of the insured, we will indemnify the insured for those sums that the insured becomes legally obligated to pay as damages because of such "bodily injury" or "property damage" to which this insurance applies.

(3)    The amount we will pay or indemnify as damages under subparagraphs **a.(1)** or **a.(2)** above is limited as described in SECTION III – LIMITS OF INSURANCE.

3.    **SECTION III – LIMITS OF INSURANCE** is amended as follows:

A.    Sub-paragraph **2.** is deleted in its entirety and replaced by the following:

2.    The General Aggregate Limit is the most we will pay for the sum of:

a.    Medical expenses under Coverage C;

b.    Damages under Coverage A, except damages because of "bodily injury" or "property damage" arising out of "your work" after that work has been abandoned; and

c.    Damages under Coverage B.

B.    Sub-paragraph **3.** is deleted in its entirety and replaced by the following:

3.    The Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" arising out of "your work" after that work has been completed or abandoned.

4.    **SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions for Coverage A** is amended by adding the following after "This insurance does not apply to:":

- **Your Product**

"Bodily injury" or "property damage" arising out of "your product".

5.    **SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions for Coverage A** is amended by adding the following to the **Contractual Liability** exclusion:

The exceptions to this exclusion in sub-paragraphs **(1)** and **(2)** above do not apply to any liability for damages because of "bodily injury" or "property damage" arising out of "your product".

6.   The provisions of **SECTION VI – EXTENDED REPORTING PERIOD** will not apply to such coverage for "bodily injury" or "property damage" arising out of "your product" as was provided under this Coverage Form prior to the effective date of this Endorsement.

All other terms and conditions of this policy remain unchanged.



**ace usa**

# International
# Advantage

## Commercial Insurance Policy
## Endorsements

## INTRODUCTION

This(ese) are your commercial insurance policy endorsements. They modify your coverage, please read them carefully. They may also add coverages to your existing policy.

### You, Your, We, Us, and Our

Throughout the policy and applicable endorsements, the terms "you" and "your" mean the person, people, or organization shown as the Named Insured in the Declarations. "We," "us," and "our" mean the insurance company issuing this policy. Besides you, there may be other people "insured" under certain parts of the policy.

### Insured

The word "insured" means any person or organization qualifying as such under the WHO IS AN INSURED sections of the coverage form in which they appear.

### Word in Quotation Marks

Words and phrases that appear in quotation marks have the special meaning given to them in the Section - DEFINITIONS of the coverage form in which they appear.

By signing and delivering the endorsement(s) to you, we state that it is a valid contract when counter-signed by our authorized representative.

### ACE AMERICAN INSURANCE COMPANY

*George D. Mulligan*

GEORGE D. MULLIGAN, Secretary

JOHN J. LUPICA, President

IT1111   version date: 02-2005                Page 2 of 2

# EXHIBIT 3

- 1 -

## SECURITY AGREEMENT

THIS AGREEMENT, effective immediately upon the date of signing, by and between General Motors Corporation, a Delaware corporation, (hereinafter the "Insured") and ACE American Insurance Company, a Pennsylvania corporation, (hereinafter the "Company").

WHEREAS, the Insured desires that the Company issue and continue the insurance policy(ies) more specifically described below in this Agreement; and

WHEREAS, the Company is willing to issue such insurance policy(ies) only if the Insured provides collateral to the Company in accordance with the terms of this Agreement; and

WHEREAS, the Insured has provided and is willing to continue to provide collateral in the form of a letter of credit or as otherwise required by the Company, and a paid loss deposit fund in accordance with this Agreement, to secure its obligations under the policy(ies).

NOW THEREFORE, the Insured and the Company, intending to be legally bound, agree as follows:

I.       Definitions.

A.       "Affiliate" shall mean a person or entity that directly or indirectly through one or more intermediaries controls or is controlled by, or is under common control with, the person or entity specified.

B.       "Affiliated or Non-Affiliated Company" shall mean affiliates of the Company and any insurer that is not affiliated with the Company that has issued to the Insured or its affiliates one or more Locally Admitted Policy upon the Company's or its Affiliate's prior written request.

C.       "Locally Admitted Policies" shall mean any policy, binder, contract of insurance or other evidence of liability issued by any Affiliated or Non-Affiliated Company to the Insured or to any affiliate of the Insured that provides Employers' Liability coverage relating to the United Kingdom and is issued as part of the insurance program documented by a Master Policy.

D.       "Master Policy" shall mean any policy, binder, contract of insurance or other evidence of liability issued by the Company to the Insured or to any affiliate of the Insured that provides insurance coverage outside of the continental United States and is listed on the respective Addenda hereto (including Addenda that may be added after the effective date of this Agreement).

E.       "Policies" shall mean Master Policy(ies) and Locally Admitted Policy(ies) identified on the attached Addenda, including Addenda that may be added after the effective date of this Agreement.

- 2 -

II.    The Insured hereby agrees that is shall provide to the Company and shall maintain and keep in force, a clean, unconditional, automatically renewable and irrevocable letter of credit (which letter of credit together with any supplemental, additional substitute or replacement letter or letters of credit are hereinafter referred to collectively as the "Letter of Credit" or "LOC") or, if the Company permits or requires, other collateral, in an amount determined by the Company and in a form acceptable to the Company issued by a bank or other financial institution acceptable to the Company (hereinafter the "Bank") to secure the payment by the Insured of all amounts the Insured is and will be obligated to pay pursuant to the provisions of the Policies and any extensions or renewals thereof, including, but not limited to, the following:

A.    amounts that the Insured is obligated to pay to the Company,

B.    amounts for which the Insured is obligated to reimburse the Company, and

C.    amounts that the Insured is obligated to pay to other parties, but which are paid by the Company,

(all of which amounts are hereinafter referred to as the "Insured's Obligations"). The Letter of Credit shall provide by its terms that it will be renewed automatically each year for an additional year unless written notice of non-renewal is sent by the financial institution at least sixty (60) days prior to the LOC's anniversary date.

III.    The Insured will, not less than thirty (30) days prior to the termination or expiration of the Letter of Credit, deliver to the Company, c/o ACE American Insurance Company, Attention:    Collateral Manager, 436 Walnut Street, Philadelphia, Pennsylvania 19106 a replacement Letter of Credit acceptable to the Company issued by the Bank, which will become effective immediately upon the termination or expiration of the prior Letter of Credit. The Company may require that the Insured adjust the amount of the Letter of Credit and any other collateral from time to time if the Company determines in its reasonable discretion that such adjustment is necessary as security for the Insured's Obligations. The Insured will provide any needed increases in the amount of the Letter of Credit or, if the Company permits or requires, any other collateral, within fifteen (15) days of the Company's request for any such additional required amount. The Insured will continue to provide the Company with the Letter of Credit issued by the Bank and other required or permitted collateral as security for the payment of the Insured's Obligations until the Company determines that there is no longer any need for such security. If there shall be a material deterioration in the financial condition of the bank or other financial institution which has issued the LOC such that the institution is no longer acceptable to the Company, or if such institution is put into receivership, or if required by applicable law, the Company shall have the right to require the Insured to replace the LOC or other collateral with a new LOC by a bank or other financial institution then acceptable to the Company, and the Insured shall upon the Company's request replace the Letter of Credit with a substitute Letter of Credit issued by the Bank as payment of the Insured's Obligations. The Insured recognizes that the Company may

- 3 -

continue to require the Letter of Credit issued by the Bank and any other required or permitted collateral as security for the payment of the Insured's Obligations after any cancellation, nonrenewal or replacement of the Policy.

IV.      If the Insured fails to provide the Company with a replacement LOC or other required or permitted collateral, or fails to provide the Company with any additional amount of such LOC required by the Company (and/or to provide any other collateral if requested or by the Company) within the time-frames set out in this Agreement, the Company will have the right to draw the full amount of the existing LOC and/or other collateral. The Company has the right to draw against the Letter of Credit in each instance where the Insured's Obligations for any reason (including insolvency or bankruptcy of the Insured) are not fulfilled.

V.      The amounts drawn by the Company under any letter of credit, and any interest thereon and proceeds thereof, shall be part of the collateral securing the Insured's Obligations. To further secure the Insured's Obligations, Insured hereby grants to the Company a continuing security interest in and lien on all of its right, title, and interest, if any, in amounts drawn by the Company under the LOC and all interest thereon and proceeds thereof.

The Insured hereby grants to the Company a security interest in and lien on any and all cash collateral held by the Company (the "Cash Collateral"). Cash Collateral includes any Paid Loss Deposit Fund, and any other cash provided by the Insured to secure the Obligations. The Company may hold the Cash Collateral as part of the collateral securing the Obligations in any account in the Company's name and with any financial institution as the Company determines in its sole discretion. The Company may commingle the Cash Collateral with the Company's own funds or the funds of other insureds.

The Company is authorized to use the Cash Collateral to pay any and all of the Insured's Obligations owing under this Agreement without further notice to, or demand of, the Insured.

The Company shall have no duty to invest the Cash Collateral and may hold the Cash Collateral in an interest bearing or non-interest bearing account as the Company determines in its sole discretion.

VI.      Annually, the Insured will provide audited financial statements, interim financial statements, and any other financial information requested by the Company for the purpose of evaluating the financial condition of the Insured.

VII.      The Insured has provided to the Company funds to establish and maintain a Paid Loss Deposit Fund (the "Fund"). The Company shall have the right at any time during the policy year to adjust the required level of the Fund (the "Adjusted Level") if the current Fund balance is insufficient to cover the average of the most recent three months of paid losses.

The Company shall maintain the Fund on behalf of the Insured and shall have the right to withdraw from the Fund the amount of the Insured's Obligations. The Company shall be the

- 4 -

only party entitled to make withdrawals from the Fund.

If at any time the balance in the Fund reaches the Adjusted Level, the Company shall notify the Insured in writing and not later than ten (10) days after receipt of such notice the Insured shall forward to the Company funds to be deposited in the Fund the amount required to bring the balance in the Fund up to the then required level (or the Adjusted Level).

If the Company becomes obligated to pay amounts representing the Insured's Obligations that exceed the balance in the Fund, the Insured shall, within thirty (30) days after receipt of a written demand by the Company, pay to the Company an amount equal to the difference between the balance in the Fund and the amount of such Insured's Obligations.

If the Insured fails to make a payment or deposit within the time required by this Agreement, the Company shall be entitled to draw on the Letter of Credit established pursuant to Article III of this Agreement to indemnify itself in the amount of the Insured's Obligations and shall have the right to increase the required level (or Adjusted Level) of the Fund by the amount of such unpaid payment or deposit.

Unless waived in writing by the Company, on each anniversary of this Agreement, the Company will recalculate the Adjusted Level of the Fund and, if higher than the current Adjusted Level, the Insured shall provide additional funds to the Company to secure the Insured's Obligations for all Policies, including but not limited to Policies issued for the renewed insurance program. The Company's recalculation will be based on the following formula: 3/12 of the expected paid losses that the Company estimates will be paid during the next twelve-month period, plus 3/12 of the actual paid losses during the last twelve month period. If the recalculated Adjusted Level is lower than the current Adjusted Level, then the Company shall return the overage to the Insured. As soon as practicable after all of the obligations and liabilities incurred by each party under this Agreement have been fully performed and discharged, the Company shall withdraw all amounts, if any, remaining in the Fund and pay such amounts in such Fund to the Insured. Such payment shall be made by wire transfer to a bank account designated by the Insured.

VIII.    Nothing in this Agreement will constitute a waiver of any other rights the Company may have in each instance where the Insured's Obligations for any reason (including insolvency or bankruptcy of the Insured) are not fulfilled. Upon the fulfillment of the Insured's Obligations, the Company shall return to the issuing Bank the excess, if any, of the funds drawn under the Letter of Credit over the Insured's Obligations.

IX.    This Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

X.    No amendment or modification of this Agreement shall be of any force or effect unless in writing and signed by the parties hereto.

- 5 -

XI     This Agreement may be signed in counterparts, all of which together shall constitute a single instrument.

IN WITNESS WHEREOF, this Agreement, effective on the date first mentioned above, has been executed by the parties hereto.

GENERAL MOTORS                          ACE AMERICAN
CORPORATION                             INSURANCE COMPANY

By _____              By _____

Name: Alan G. Geier                     Name: Louis J. Butler

Title: Director, Global Risk Finance    Title: Attorney-In-Fact
       & Insurance

Date: 4-28-09                           Date: _____

_Ginger A. Smith_

GINGER A. SMITH
NOTARY PUBLIC - MICHIGAN
WAYNE COUNTY
MY COMMISSION EXPIRES JUNE 12, 2011

- 6 -

Addendum No 1


To


Security Agreement
Effective September 1, 2006

| Policy | Policy Period | Issuing Company |
|---|---|---|
| Master Policy No. CSZ0302514 and all Locally Admitted Policies and any extension, renewal, amendment or endorsement of any such Master and Locally Admitted Policies | September 1, 2006 through September 1, 2007, September 1, 2007 through September 1, 2008, and September 1, 2008 through September 1, 2009, and any extension or renewal thereof | ACE American Insurance Company and Affiliated and Non-Affiliated Companies |

Addendum No 2

- 7 -

To

Security Agreement
Effective September 1, 2008

|  | | Additional Letter |
| Required Amount | Collateral | of Credit |
| of Letter of Credit | on hand | Required |
| --- | --- | --- |
| $20,074,166 | $19,660,200 | $413,966* |

|  | | Additional Paid Loss |
| Required Amount | | Deposit Fund |
| of Paid Loss | Paid Loss Deposit | Required |
| Deposit Fund | Fund on hand | |
| --- | --- | --- |
| $800,000 | $800,000 | NIL |

* Additional $413,966 LOC received on January 28, 2009.