Andrew K. Lipetz, Esquire
Wasserman Grubin & Rogers, LLP
1700 Broadway, 42nd Floor
New York, NY 10019
Tel: 212-581-3320
FAX: 212-956-5255

Of Counsel

Jeffrey A. Less, Esquire
Jennifer L. Hoagland, Esquire
Helen Heifets, Esquire
Bazelon Less & Feldman, P.C.
1515 Market St., Suite 700
Philadelphia, PA 19102
Tel: 215-568-1155
FAX: 215-568-9319

Attorneys for ESIS, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : |
| | : |
| GENERAL MOTORS CORP., et al. | : Chapter 11 |
| | : |
| Debtors | : Case No. 09-50026 (REG) |
| | : |
| | : (Jointly Administered) |
| | : |

**LIMITED OBJECTIONS OF ESIS, INC. TO MOTION OF DEBTORS, PURSUANT TO 11 U.S.C. §§ 105, 363(b),(f), (k), (m), AND 365 AND FED R. BANK. P. 2002, 6004 AND 6006, TO APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS, LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF**

ESIS, Inc. ("ESIS"), through its undersigned counsel, submits the following Limited

Objections to the Motion of Debtors, Pursuant to 11 U.S.C. §105, 363 and 365, and Fed. R.

Bank. P. 2002, 6004 and 6006, To Approve (A) The Sale Pursuant to the Master Sale and

Purchase Agreement with Vehicle Acquisition Holdings, LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief (hereinafter, the "Sale Motion").

## I.    INTRODUCTION

1.    This Chapter 11 bankruptcy proceeding was instituted by the Debtors on June 1, 2009 by voluntary petitions for relief.

2.    On information and belief, the Debtors are operating their businesses and managing their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.    On June 1, 2009, the Debtors filed the Sale Motion, seeking, *inter alia*, the entry of an Order approving the sale of substantially all of Debtors' assets.

4.    For several years, Debtor General Motors Corporation ("GM") has been, and still is, a party to Claims Administration Services Agreements ("the ESIS Agreements") with Movant ESIS.

5.    The ESIS Agreements are a part of the Debtors' overall Insurance Program, as discussed below in greater detail.

6.    The ESIS Agreements are executory, in that they require both parties to continue performance, and failure of either party to complete performance would constitute a material breach excusing performance of the other party.    *See, e.g.*, *In re Wireless Data, Inc.*, 547 F.3d 484, 488 n.1 (2d Cir. 2008).

7.    GM representatives have informally advised ESIS that GM intends to continue its performance in full under the ESIS Agreements.

8.      Moreover, the Debtors have already obtained permission from this Court to continue the Debtors' performance (including but not limited to payment) under the ESIS Agreements as a part of the Insurance Program.

9.      However, ESIS has to date received no formal written notice of GM's intention to assume the ESIS Agreements or written explanation of the proposed terms of assumption.

10.     The Sale Motion does not make provision for the fulfillment and satisfaction of GM's obligations under the ESIS Agreements.  Rather, the Sale Motion provides incomplete, conflicting, and contradictory information.

11.     Accordingly, ESIS files these limited objections to the proposed sale.  In the alternative, ESIS requests that the Debtor GM  be directed to:

a.      assume or reject the ESIS Agreements; and

b.      in the event of an assumption:

i.      provide for and effectuate a cure of any defaults and provide adequate assurances that it would cure the defaults under the ESIS Agreements;

ii.     provide to ESIS the information regarding the financial condition of the Purchaser, so that ESIS could make an informed decision whether to agree to an assignment of the ESIS Agreements to the Purchaser; and

iii.    provide to ESIS, as a condition of the assignment of the ESIS Agreements to the Purchaser, a valid and acceptable written commitment from the Purchaser to fully perform Debtor GM's obligations under the ESIS Agreements.

## II.    **RELEVANT FACTS**

### A.    **The Claim Administration Services Agreements Between Debtor GM And ESIS**

12.    In January of 2006, Debtor GM entered into a Claim Administration Services Agreement with the Movant ESIS. The 2006 ESIS Agreement was one of a series of ESIS Agreements that were entered into over the years and that are still in effect.

13.    The 2006 ESIS Agreement has been renewed on an annual basis, with the latest renewal taking place on January 1, 2009. A true and correct copy of the 2006 Agreement, including the January 1, 2009 Renewal Addendum, is attached as Exhibit 1 hereto.

14.    By its terms, the 2006 ESIS Agreement will remain in effect until December 31, 2009.

15.    Under the ESIS Agreements, ESIS serves as a third-party administrator (or "TPA") of claims asserted by and against GM.

16.    The claims that ESIS administers under the ESIS Agreements include first-party and third-party claims for personal injury and property damage, as well as certain products liability claims.

17.    ESIS's obligations under the ESIS Agreements include, without limitation, investigating, adjusting, settling and paying such claims (with payments being made from a Claim Fund funded by GM), maintaining claim files and other claim administration activities. (*See* Exh. 1 at Exhibit A thereto).

18.    Debtor GM's obligations under the ESIS Agreements include, without limitation, payment of all service fees in monthly installments, establishment of a Claim Fund, and payment of period amounts into that Claim Fund on ESIS's request and within one day thereof.

19.    The 2006 Agreement can be terminated by either party, without cause, on sixty (60) days notice, and it is also terminable for material breach with the period of notice depending on the nature of the breach. (*Id.* at January 1, 2009 Renewal Addendum, §11).

20.    Under the ESIS Agreements, ESIS has numerous on-going and material obligations to Debtor GM, and Debtor GM has numerous on-going and material obligations to ESIS, so that failure of either party to complete performance would constitute a material breach excusing performance of the other party.

21.    The ESIS Agreements are executory contracts within the meaning of §365 of the Bankruptcy Code. *In re Wireless Data*, 547 F.3d at 488 n.1.

22.    As set forth above, the 2006 Agreement with ESIS is part of the Debtors' Insurance Program. That Insurance Program was described in the Debtors' Motion, filed on June 1, 2009, For Entry of Order Pursuant To 11 U.S.C. §§363(b), 503(b) & 105(a) & Fed. R. Bankr. P. 6003 And 6004 Authorizing Debtors To Continue Their Liability, Product, Property And Other Insurance Programs (the "Insurance Motion").

23.    In the Insurance Motion, the Debtors asserted that "the continuation of the Insurance Programs, on an uninterrupted basis and the payment of all undisputed pre-petition and post-petition Insurance Obligations relating to the Insurance Programs are <u>essential to preserve the Debtors' business and preserve the value of the Debtors businesses and preserve the value of the Debtors' estates for all creditors.</u>" (Insurance Motion at ¶41) (emphasis added).

24.    The Insurance Motion expressly noted, however, that the Debtors did not seek to assume any of the Debtors' insurance programs, including the 2006 Agreement with ESIS. On the contrary, the Insurance Motion and the Order granting the Insurance Motion

expressly stated that the Debtors were not assuming any of the agreements related to the Debtors' Insurance Programs.  (*Id.* at ¶ 42).

25.    The Sale Motion and proposed sale agreement and the schedules thereto do not address the ESIS Agreement.

### B.    The Relevant Provisions of the Sale Motion and the MPA

26.    At the outset, neither the Sale Motion, nor the Master Sales and Purchase Agreement (the "MPA") which is attached as an Exhibit thereto, includes any express reference to the ESIS Agreements or to ESIS.

27.    The Sale Motion provides that the Debtors would issue notices to certain non-debtor counter-parties of the Debtors' intention to assume executory contracts with those counter-parties and assign them to the Purchaser. (*See* Sale Motion at ¶ 69.)

28.    The Sale Motion further provides that from the date of the MPA and until 30 days after the Closing Date (defined in the MPA as the date 3 days after certain conditions to the closing are met), the Debtors, with consent of the Purchaser, may designate additional executory contracts for assumption and assignment.  (*Id.*)

29.    The MPA provides that the Purchased Assets will include all Contracts, other than contracts that are excluded by being listed in Schedule 2.2 (b)(vii) to the MPA.  (*See* the MPA at §§2.2(a)(xi), 2.2(b)(vii).)[1]

30.    The ESIS Agreements are not listed in Schedule 2.2(b)(vii) of the MPA as being excluded from the sale under the MPA.  This could be interpreted as an indication of the

---

[1] The definition of the "Contracts" in the MPA includes "all agreements, contracts, arrangements, obligations and undertakings of any nature," and therefore it includes the Agreement.  (*See* the MPA at p.5).

Debtors' intention to include the ESIS Agreements into the assets that will be transferred to the Purchaser.   However, this is not clear.

31.    To date, ESIS has received only informal notice of the Debtors' intention to assume and assign the ESIS Agreements.

32.    ESIS requires clarification of the Debtors' intentions with regard to the ESIS Agreements, in particular a clear and unequivocal statement of whether the ESIS Agreements will be assumed or rejected by the Debtors.

### C.    Deadline for Objections

33.    As explained above, representatives of the Debtors have advised ESIS that the Debtors intend to assume the ESIS Agreements.

34.    On the other hand, documents filed to date by the Debtors in this case do not unequivocally provide for such assumption.

35.    ESIS requires detailed information about the terms of the assumption and assignment of the ESIS Agreements.

36.    However, the deadline for objections to the Sale Motion is June 19, 2009, and therefore ESIS must file these objections in order to preserve its position.

37.    Accordingly, ESIS objects to the proposed sale of the Debtors' assets on the grounds set forth below.

### III.    ESIS' OBJECTIONS TO THE MOTION

38.    ESIS objects to the Sale Motion because it fails to provide for the assumption of the ESIS Agreements.

39.    ESIS objects to the Sale Motion because it fails to provide sufficient information concerning the treatment of the ESIS Agreements in connection with a proposed sale of assets.

40.    In the event that Debtor GM does seek to assume the ESIS Agreements and assign them to the Purchaser, ESIS objects to the Sale Motion because assignment requires the consent of ESIS, and ESIS has not yet obtained a valid and acceptable written commitment from the Purchaser to perform Debtor GM's obligations under the ESIS Agreements.

41.    In the event that Debtor GM does seek to assume the ESIS Agreements and assign them to the Purchaser, ESIS objects to the Sale Motion because assignment requires the consent of ESIS, and in order to decide whether to provide such a consent, ESIS requires access to information on the financial condition of the Purchaser.

42.    In the event that Debtor GM does seek to assume the ESIS Agreements, ESIS further objects to the Sale Motion to the extent that Debtor GM has failed to provide for and effectuate a cure of any defaults and has also failed to provide adequate assurances that it would cure the defaults under the Agreement. The Bankruptcy Code prohibits an assumption of an executory contract unless, at the time of the assumption, the trustee or the debtor-in-possession cures or provides adequate assurance that it will promptly cure any defaults under that contract. 11 U.S.C. §365(b).

43.    ESIS further objects to any purported or proposed assignment of the ESIS Agreements to the Purchaser without an assumption by Debtor GM.   An executory contract cannot be assigned unless it is first assumed by the assignor. *See, e.g., In re S.E. Nichols*, 120 B.R. 745,747 (Bankr. S.D.N.Y. 1996) (a debtor who assumes an executory contract must assume both the benefits and the burdens of that contract).

44.    ESIS further objects to the Sale Motion to the extent that it seeks to transfer and assign the ESIS Agreements "free and clear of liens, claims, encumbrances and other interests" (Motion at ¶1).  A transfer and assignment "free and clear of . . . claims and . . .

other interests" purports to authorize the Purchaser to exercise greater rights than Debtor GM is entitled to exercise under the Agreement. An assignee, however, stands in the shoes of the assignor, and a debtor/assignor cannot enlarge its rights under an agreement with a third party. *See e.g.*, *In re Best Film & Video Corp.*, 46 B.R. 861, 870 (Bankr. E.D. N.Y. 1985)(the Bankruptcy Code does not enlarge the rights of a debtor under a contract).

45.     ESIS further objects to the Sale Motion to the extent the Debtors seek to transfer business records that relate to the claims administered by ESIS under the ESIS Agreements, unless the Purchaser is obligated to maintain such records and ESIS is expressly granted access to such records, upon reasonable notice during business hours.

46.     Due to short notice and lack of information as described above, ESIS reserves the right to assert any objection made by any other party and/or to present additional objections.

## IV.    WAIVER OF MEMORANDUM OF LAW

47.     Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, ESIS respectfully requests that the Court waive the requirement that ESIS file a memorandum of law in support of these Limited Objections.

WHEREFORE, ESIS respectfully requests that the Court not approve the proposed sale pursuant to the MPA, or, in the alternative, that the Court provide the following relief:

a.      Direct Debtor GM to assume or reject the ESIS Agreements;

b.      In the event of an assumption, direct the Debtor GM

i.      to provide for and effectuate a cure of any defaults and provide adequate assurances that it would cure the defaults under the ESIS Agreements;

      ii.    to provide to ESIS the information regarding the financial condition of the Purchaser, so that ESIS could make an informed decision whether to agree to an assignment of the ESIS Agreements to the Purchaser; and

      iii.    to provide to ESIS, as a condition of the assignment of the ESIS Agreements to the Purchaser, a valid and acceptable written commitment from the Purchaser to fully perform Debtor GM's obligations under the ESIS Agreements.

Respectfully Submitted

_s/ Andrew K. Lipetz_
Andrew K. Lipetz, Esquire (AL 8945)
Wasserman Grubin & Rogers, LLP
1700 Broadway, 42nd Floor
New York, NY 10019
Tel: 212-581-3320
FAX: 212-956-5255

Counsel for ESIS, Inc.

Of Counsel

Jeffrey A. Less. Esquire
Jennifer L. Hoagland, Esquire
Helen Heifets, Esquire
Bazelon Less & Feldman, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19102
Telephone: 215-568-1155
Facsimile: 215-568-9319

# EXHIBIT 1

# CLAIMS ADMINISTRATION
# SERVICES AGREEMENT

## between

## ESIS, Inc.

## and

## General Motors Corporation

ESIS – GM Claims Administration Services Agreement
Draft 12/05/05

# Table of Contents
## Claims Administration Services Agreement

**Section**
1.........................................................................................................Contract Term
2.....................................................................Basic Obligations of ESIS and Client
3..........................................................................................................Claim Reporting
4............................................................................................ Service Fees and Payment
5..........................................................................................................Claim Fund
6................................Claim Payments; Allocated Loss Expenses; Special Billed Amounts
7..............................................................................................Settlement Authority
8....................................................................................................Insurer Consent
9..................Online Information Services Obligations and Information Security Generally
10.......................................................................................... Confidentiality
11......................................................................Third Party Agreements; Subcontracting
12....................................................................................................... Cancellation
13.................................................................................. No Third Party Beneficiaries
14.........................................................................................Successors and Assigns
15......................................................................................Complete Agreement
16.....................................................................................................Modification
17.....................................................................................................No Waiver
18........................................................................Governing Law; Severability
19..................................................................Indemnification and Insurance
20............................................................................................ Internal Controls
21..................................................Key Employees; ESIS's Personnel at Client Sites
22....................................Information Gathering Practices; Ethical Representation
23.............................................................................................Transition Assistance
24.....................................................................................................Non-Solicitation
25....................................................................................Dispute Resolution
26.......................................................................................................... Notices

## Exhibit A
### Statement of Work

1....................................................................................Claims Adjustment Services
2.................................................................................... First Party Auto Services
3.............................................................. Risk Management Information Services (RMIS)

## Exhibit B
### ESIS Service Rate Schedule for General Motors Corporation

1...................................................................Billing Contract Numbers and Claim Types
2.............................................................Claims Adjustment Administration Fee
3....................................................................Contract Staff Service Fees
4........................................Risk Management Information Services Fees (RMIS Fees)

ESIS - GM Claims Administration Services Agreement
Draft 12/05/05

# Exhibit C
## Information Security Requirements

Section
1...................................................................................................... Information Security
2...................................................................................................Business Continuity Services

# Exhibit D
## Third Party Suppliers

# Exhibit E
## Insurance

# Exhibit F
## Internal Controls

1.......................................................................................Scope of Cooperation
2....................................................................... Assessments; Type II SAS 70 Audits
3........................................................................ Significant Changes; Quarterly Update
4.............................................................................................................Deficiencies

# Exhibit G
## Definitions

# CLAIMS ADMINISTRATION
# SERVICES AGREEMENT

This Agreement is entered into by and between ESIS, Inc. ("ESIS"), a Pennsylvania corporation with offices at 525 W. Monroe, Chicago, IL 60661, and General Motors Corporation, a Delaware corporation ("Client"), with offices at 300 Renaissance Center, Detroit, MI 48265.

## 1. Contract Term

Unless earlier terminated as provided in Section 12, this Agreement is effective as January 1, 2006 and will have an initial term ending on December 31, 2006. Thereafter, this Agreement will continue in effect for successive one-year periods ending on December 31st each year until terminated by either party by giving the other party written notice of its intent not to renew the Agreement at least 60 days prior to the end of the initial term, or renewal term..

## 2. Basic Obligations of ESIS and Client

ESIS agrees to perform all Included Services, as described in Exhibit A, the Statement of Work, in a professional manner and in accordance with its best professional judgment, consistent with all applicable state and federal laws and regulations, throughout the term of this Agreement in accordance with the terms of this Agreement. Client agrees to pay all Service Fees for Included Services in the required amounts and within the required time periods, as provided under Exhibit B, the ESIS Service Rate Schedule, and to provide funds for Claim Payments and Allocated Loss Expenses in the required amounts and within the required time period, as provided in Section 5.

## 3. Claim Reporting

Client will promptly report and refer to ESIS for service each Claim presented to Client or any of its affiliates that falls within the scope of this Agreement. ESIS will accept on behalf of Client and refer for service any Claim submitted directly to ESIS.

## 4. Service Fees and Payment

Client will timely pay all Service Fees established in Exhibit B, as well as any applicable state taxes or assessments on Client's purchase of Claims adjustment services. Invoices shall be submitted by ESIS, and paid by Client, in accordance with Exhibit B. If no payment date is specified elsewhere in this Agreement, invoices will be paid by GM on the date established by Client's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following the date of Client's receipt of the invoice.

### 5. Claim Fund

Client will establish a Claim Fund by initially depositing with ESIS the sum of $150,000.00 within fifteen (15) days of the effective date of this Agreement, and will continue to remit additional funds, upon ESIS's written request, sufficient to maintain a minimum balance (the "Required Level") in the Claim Fund in an amount of at least $150,000.00

### 6. Claim Payments; Allocated Loss Expenses; Special Billed Amounts

ESIS will make Claim Payments and Payments for Allocated Loss Expenses from funds deposited by Client for the Claim Fund, but any payment qualifying as a Special Billed Amount will be made from funds specially requested of, and provided by, Client for that payment. Client will remit funds for payments that qualify as Special Billed Amounts whenever specially requested in writing by ESIS, and immediately upon receipt of the request. ESIS will have no obligation to make any such payment until Client has remitted in advance the full amount of the funds specially requested by ESIS.

### 7. Settlement Authority

ESIS has no settlement authority under this Agreement. Subject to Client's approval of settlement offers, Client will permit ESIS to exercise full authority and control, in accordance with ESIS's best professional judgment, in all aspects of its investigation, adjustment, and other administration of Client's, and its affiliates' Claims.

### 8. Insurer Consent

Client will secure, and at all times maintain, any consent from Client's primary insurers that is necessary for ESIS to perform Claim adjustment services for Claims under Client's primary insurance policies. ESIS will not contact any of Client's excess insurers, nor release any claims data or information to such excess insurers, without the prior consent of Client.

### 9. Online Information Services Obligations and Information Security Generally

A. ESIS will promptly correct any malfunction of Global RiskAdvantage[SM], or reconstruct any Claim data that it renders inaccurate or lost. Client will furnish ESIS with adequate documentation of the malfunction or the lost or inaccurate data promptly after its discovery. Client agrees that ESIS's conditional obligation to correct or reconstruct is Client's only remedy for any such malfunction or inaccurate or lost data, and ESIS makes no other warranty, either express or implied, with respect to Global RiskAdvantage[SM] services, including, without limitation, any warranty of merchantability or fitness for a particular purpose.

B. ESIS will have the right to modify the range of Global RiskAdvantage[SM] to accommodate changes in technology or systems capabilities, provided that the modification not result in a decrease in the level of service negotiated by Client,

and that ESIS furnish Client with thirty (30) days advance notification of the modification.

C. Client warrants that only Users authorized by ESIS will access or use Global RiskAdvantage$^{SM}$ and that under no circumstances will any of Client's representatives disclose their Userids to any other individual nor use the Userid of any other individual, whether or not the other individual is himself/herself an authorized User.

Client will make use of all available security features ESIS provides in connection with Client's use of Global RiskAdvantage$^{SM}$ services and will immediately report any and all actual or potential security breaches to ESIS.

Client agrees to designate as users only those persons performing the claim and risk management functions of Client and its affiliates; to ensure that all information accessed through the use of RMIS services is disclosed and used only for those purposes; and to otherwise comply with all applicable federal and state laws and regulations regarding the privacy of the Personally Identifiable Data of individuals or organizations. Attached as Exhibit C are Client's requirements with respect to information security and business continuity when Included Services include the handling, storage or processing of information or data.

D. ESIS will perform the Included Services and maintain Global RiskAdvantage$^{SM}$ at all times in accordance with Exhibit C, Information Security Requirements.

## 10. Confidentiality

A. Client is willing to disclose Confidential Information and to permit ESIS to collect or develop Confidential Information only with the understanding that ESIS will maintain its confidentiality and will otherwise comply with all provisions of this Agreement. ESIS acknowledges that Client is disclosing Confidential Information to ESIS for the sole purpose of permitting ESIS to perform the Included Services, and agrees that it will not use or disclose Confidential Information for any other purpose. In addition, ESIS agrees that, except as may be required by law, it will not disclose, disseminate or otherwise make available Confidential Information to anyone, other than to those employees who have a need to know it in order for ESIS to fulfill its obligations under this Agreement, without the prior written agreement of Client.

B. ESIS will not transfer Confidential Information to any subsequent tier supplier unless there is a legal basis for such transfer under applicable laws. By way of example and not limitation, Confidential Information originating from a European Union country shall not be transferred to a subsequent tier supplier unless such subsequent tier supplier is located in a country deemed to have "adequate" data protection laws or is otherwise permitted to have European Union source data transferred to it.

**C.** ESIS shall provide for the physical, managerial and electronic security of Confidential Information such that Confidential Information is reasonably maintained and secured, ensuring it is safe from loss, theft, unauthorized access, copying, modification, use or disclosure during utilization, transmission and storage. Should any unauthorized breach occur, ESIS shall notify Client as soon as reasonably practicable, generally within 24 hours, after ESIS becomes aware of such breach.

**D.** At Client's request or upon completion of ESIS's use of Confidential Information, ESIS will return all copies of Confidential Information to Client or, at Client's request, will destroy Confidential Information and certify such destruction to Client. If Client requests the destruction of any Confidential Information, then ESIS will perform the destruction in accordance with Client's instructions and will:

   i.    use the destruction methods authorized by Client (e.g. shredding or burning or electronic erasure);
   ii.   protect the confidentiality of Confidential Information during the destruction process;
   iii.  not sub-contract the destruction work without the prior written authorization of Client; and
   iv.   provide Client with a destruction record confirming which Confidential Information has been destroyed, when, where and how. ESIS may retain a copy of Confidential Information for archival purposes only subject to ESIS's continuing obligations under this Section 6.

**E.** ESIS further agrees to defend, indemnify and hold Client harmless from any liability claims, damages, fines, penalties, costs, claims, demands and expenses (including costs of defense, settlement and reasonable legal fees), arising from or related to any breaches of Confidential Information by ESIS or ESIS's employees. ESIS shall have the right to control such litigation or Claim (including the right to settle), subject to the consent of Client, which consent will not be unreasonably withheld or delayed.

**F.** ESIS recognizes that the disclosure of Confidential Information may give rise to irreparable injury and acknowledges that remedies other than injunctive relief may not be adequate. Accordingly, Client has the right to seek equitable and injunctive relief to prevent the unauthorized disclosure of any Confidential Information, as well as such damages or other relief as is occasioned by such unauthorized use or disclosure.

**G.** In the event ESIS is required to disclose Confidential Information in connection with any judicial proceeding or government investigation, then ESIS shall promptly notify Client and allow a reasonable time before ESIS is required to disclose, for Client to seek a protective order from the appropriate court or government agency. Thereafter, ESIS may disclose Confidential Information but only to the extent required by law, subject to any applicable protective order.

H.  In addition, ESIS recognizes that its close association with Client's personnel and access to Confidential Information in the course of performing this Agreement may enable ESIS to evaluate publicly available information about Client from an insider's perspective and that Client's proprietary information would be revealed if such evaluations were published. Therefore, ESIS agrees not to publish, or help anyone publish, anything whatsoever about Client concerning the subject matter of this Agreement, except with the prior written consent of Client, or as otherwise required by law or regulation.

I.  For the avoidance of doubt neither Client nor ESIS shall be prevented from making use of know-how and principles learned or experience gained of a non-proprietary and non-confidential nature.

J.  Except as otherwise provided in Exhibit F., Internal Controls, any information that ESIS deems confidential will be transmitted only to Client's Director of Claim Activities or GM Legal Staff in writing or a designee authorized in writing to accept such information. At the time of such transmission, Client's Director of Claim Activities or GM Legal Staff will decide (1) if Client agrees that the information is confidential, (2) if Client needs the information, and (3) if the answers to (1) and (2) are yes, what restrictions will be placed on its distribution within Client's organization. If the answers to (1) and (2) are not yes, Client's Director of Claim Activities or GM Legal Staff will promptly notify ESIS and any information considered by ESIS to be confidential which is disclosed to Client's Director of Claim Activities or GM Legal Staff shall be promptly returned to ESIS. To the extent that items submitted to Client by ESIS are marked "Vendor Confidential" or words to that effect, such notation will serve as notice to third parties only and will create no obligation upon Client.

K.  In the event Client does accept such information, Client agrees that it shall treat the information with the same degree of care as it treats like information of its own, for a period of two (2) years after disclosure.

**Third Party Agreements; Subcontracting**

A.  A list of all third party agreements ("Third Party Agreements") to which ESIS is a party that will affect or be affected by the provision of the Included Services is attached in Exhibit D. ESIS shall provide Client with copies of the agreements to the extent permitted by the terms thereof. ESIS shall inform Client of all changes/amendments to such Third Party Agreements from time to time. ESIS shall abide by, and comply with, the terms of the Third Party Agreements and any changes thereto insofar as ESIS has agreed to, and has been made aware of, the same.

B. Each Party shall promptly upon discovery inform the other of any breach of, or misuse or fraud in connection with any Third Party Agreements and shall cooperate with each other to prevent or stay any such breach, misuse or fraud.

C. ESIS shall be responsible for: (i) notifying Client of any performance obligations, and maintaining any warranties, under the Third Party Agreements;(ii) interfacing with the supplier, including problem resolution in respect of the services provided under the Third Party Agreements; and (iii) providing Client reasonable notice of any renewal, termination or cancellation dates and charges in respect of the Third Party Agreements. At ESIS's request and with Client's written consent, ESIS shall, to the extent permitted by the Third Party Agreement, modify, terminate or cancel the Third Party Agreement. Any modification, termination or cancellation charges or charges imposed upon Client in connection with any such modification, termination or cancellation shall be borne by Client.

D. Client may contact, and have access to information from or audit, third party suppliers of services to ESIS.

E. ESIS will not subcontract its obligations under this Agreement without Client's written consent. If Client consents to a subcontracting arrangement, ESIS's agreement with the approved subcontractor shall be deemed to be a "Third Party Agreement" subject to this Section 11.

## 11. Cancellation

A. **Cancellation Without Cause** -- This Agreement may be terminated by either party, in advance of expiration, for no reason or for any reason, other than for material breach of its terms or conditions, (collectively, "without cause"), by the terminating party giving the other party at least sixty (60) days written notice prior to the effective date of cancellation. If Client cancels without cause, ESIS will cease rendering any Included Services on the effective date of cancellation and all Service Fees paid or previously owing for any Included Services will be deemed to have been fully earned by ESIS, whether or not the Service Fees for that Included Service have been prepaid in whole or in part. If ESIS cancels without cause, ESIS will credit Client with the amount of any prepaid Service Fees following the date of cancellation and will continue, if Client desires, to perform Claims adjustment services for all Claim files remaining open on the effective date of cancellation, subject to the rates set forth in Exhibit B.

B. **Cancellation for Material Breach** -- This Agreement may be terminated by either party, in advance of expiration, for material breach of its terms or conditions ("for cause") by giving thirty (30) written days notice to the other of intent to terminate for cause prior to the effective date of cancellation, provided however that the notice must have first identified the nature and scope of the claimed material breach, affording an opportunity to the breaching party to cure

the breach, and the breaching party must have failed to cure the breach within fifteen (15) days of receiving the notice. If Client cancels for cause, ESIS will credit Client with the amount of any prepaid Service Fees following the date of cancellation and will continue, if Client desires, to perform Claims adjustment services for all Claim files remaining open on the effective date of cancellation, subject to the rates set forth in the attached Exhibit B. If ESIS cancels for cause, ESIS will cease rendering any Included Services on the effective date of cancellation and all Service Fees paid or previously owing for any Included Services will be deemed to have been fully earned by ESIS, whether or not the Service Fees for that Included Service have been prepaid in whole or in part.

C. **Transition; Costs** -- When this Agreement expires or is cancelled, ESIS will cooperate with Client in returning to Client, or its designee, all Claim files remaining open on the effective date of termination and otherwise will provide the Transition Assistance Services as specified in Section 23. The costs of returning these claim files will be borne by the Client, unless Client has canceled this Agreement for cause, in which case, they will be borne by ESIS.

## 12. No Third Party Beneficiaries

This Agreement is intended to be for the sole benefit of ESIS and Client and its affiliates.

## 14. Successors and Assigns

The terms and conditions of this Agreement shall be binding upon and inure to the benefit of ESIS and Client and their respective successors and assigns; provided, however, that the obligations of the parties under this Agreement may not be delegated by either party without the other party's prior written consent.

## 15. Complete Agreement

This Agreement and Exhibit A (Statement of Work), Exhibit B (Service Rate Schedule), Exhibit C (Information Security Requirements), Exhibit D (Third Party Sub-contracts), Exhibit E (Insurance), Exhibit F (Internal Controls), and Exhibit G (Definitions), together with any addenda, sets forth the entire agreement between ESIS and Client with respect to Included Services, and there are no prior or contemporaneous promises, conditions or understandings that have not been either abandoned or fully incorporated into its terms and conditions.

## 16. Modification

No provision of this Agreement may be changed unless the change is set forth in a written addendum to this Agreement, signed by both parties.

### 17. No Waiver

If either ESIS or Client ever declines to insist on strict compliance with any term or condition of this Agreement or fails to exercise any right, it will be not deemed a waiver of any other right, nor to permit less than strict compliance with any term or condition on any future occasion.

### 18. Governing Law; Severability

This Agreement is intended to be governed by and construed in accordance with the laws of the State of Michigan without reference to its conflict of laws principles. Any provision that is prohibited or unenforceable in any state will be ineffective within that state, but only to the extent needed to avoid offending that state's laws, and without affecting the validity of the offending provision in any other state, nor the validity of any other provision of this Agreement.

### 19. Indemnification and Insurance

ESIS and Client (each an "Indemnitor") shall indemnify the other party (each an "Indemnitee"), its affiliates, and their respective directors, officers, employees, and agents from and against any demands, actions, liabilities, damages, or expenses (including reasonable attorneys' fees and other costs of defense) in connection with any real or alleged negligent or willful acts, or errors or omissions, of the Indemnitor, in the performance of Indemnitor's duties under this Agreement. The Indemnitor's duty under this paragraph is conditioned upon Indemnitee's prompt notice to Indemnitor of the demand, action, or other event which may require indemnification. To the extent that the liabilities, damages, or expenses may result in part from acts or omissions of the Indemnitee, the Indemnitee shall bear its proportionate share. The Indemnitee shall upon request be permitted to associate in the defense of any indemnified action but the Indemnitor shall have ultimate control of the defense, including any decision to settle except with respect to settlement including payment from Indemnitee.

<u>Insurance.</u> During the term of this agreement, ESIS will maintain policies of insurance in the types and amounts set forth in Exhibit E. All insurance policies will be issued by reputable insurance companies rated "A" or better by A.M. Best. If such policies do not contain a separation of insureds provision, they will be endorsed to provide cross-liability coverage. ESIS will include all subcontractors employed by it as additional insureds under its policies or will cause each subcontractor to purchase and maintain insurance of the type specified and listing Client as an additional insured. When requested by Client, ESIS will furnish copies of certificates of insurance evidencing coverage for each subcontractor.

### 20. Internal Controls

Client, at its expense, has the right to enter onto ESIS' premises to review and/or audit the appropriate records, including the administrative procedures of ESIS, to

substantiate the charges invoiced under this Agreement and to otherwise confirm compliance by ESIS with its obligations relating to Client's information and otherwise under this Agreement. ESIS will preserve all pertinent documents for the purpose of auditing charges invoiced by ESIS for a period of two (2) years after final payment, or such longer period as Client specifies in this Agreement. ESIS further agrees to cooperate fully with Client with all reasonable requests of Client during review(s) or audit(s) and agrees that such audit may be used as a basis for settlement of disputes which might arise regarding payments or otherwise under this Agreement. Where ESIS utilizes the services of third parties, ESIS must include in its contracts with such third parties a "right to audit" clause with terms and conditions substantially similar to those set out in this Section 20.

If the Included Services under this Agreement include either (i) an application that relates to Client's financial reporting obligations under rules and regulations of the United States Securities and Exchange Commission ("SOX Application") or (ii) infrastructure (including without limitation, data centers) or networks supporting a SOX Application, ESIS will cooperate and work with Client and Client's auditors as requested by Client in order to provide the necessary information to which ESIS has lawful access, or within ESIS's possession, that Client requires for its compliance obligations under the Sarbanes-Oxley Act of 2002, and otherwise support Client's financial reporting obligations in the manner set forth in Exhibit F.

## 21. Key Employees; ESIS's Personnel at Client Sites

A. Without the prior written consent of Client, ESIS agrees that it will not, during the Term and for a period of twelve (12) months following completion of the Services, assign those persons who directly and substantively performed services for Client under this Agreement and had access to Client's information to perform similar services for a competitor in the same line of business as Client. This clause is subject to any limitations imposed by local law.

B. In addition, the parties may designate certain employees as key employees in Exhibit A ("Key Employees"). Before assigning an individual as a Key Employee, whether as an initial assignment or as a replacement, ESIS shall notify Client of the proposed assignment shall introduce the individual to appropriate representatives of Client and shall provide Client with a resume and other information regarding the individual that may be reasonably requested by Client. ESIS's appointment of a Key Employee shall be subject to Client's written consent. ESIS and Client shall meet as appropriate to update the list of Key Employees.

C. ESIS shall provide Client with at least 3 months advance notice of its intent to reassign or replace any Key Employee within the 12 month period following his or her designation as a Key Employee, or with respect to Key Employees who are identified by the Client Project Manager as important to a particular project requiring fewer than 12 months to complete, prior to the time that such project is completed to the reasonable satisfaction of Client, except for the reasons set forth below:

    i.   replacement or reassignment of a Key Employee pursuant to Client's written consent to such reassignment;

    ii.   promotion of a Key Employee, within the ACE Group of Companies, to any position of increased responsibility;

    ii.   Key Employee's voluntary resignation from ESIS;

    iii.   involuntary termination of Key Employee by ESIS for any, or for no, reason; or

    iv.   inability of Key Employee to work due to death, sickness or disability.

**D.** If ESIS replaces or reassigns a Key Employee in violation of this provision, in addition to whatever rights and remedies Client may otherwise have, ESIS shall be responsible:

    i.   for replacing such Key Employee within thirty (30) days of the last day of such Key Employee's employment with ESIS; and

    ii.   for training such Key Employee's replacement at ESIS's sole expense.

**E.** ESIS shall not without Client's written consent (such consent not to be unreasonably withheld) move more than 20 percent of the Key Employees from Client's account during any 12 month period during which this Agreement is in effect, except as a result of a written request for reduction of Included Services.

**F.** When, in the performance of this Agreement, ESIS's personnel are to be located at Client sites, ESIS will furnish a complete list of all personnel to be located at Client sites and ESIS shall be responsible for all actions of its personnel. ESIS agrees to comply with all regulations and policies at Client sites, and Client reserves the right to bar employees, representatives or agents of ESIS from Client sites for failure to observe such regulations and policies. ESIS's personnel shall in no event be considered employees of Client; ESIS will remain responsible for all wages, taxes, benefits, payroll deductions, remittances, and other obligations with respect to its personnel.

## 22. Information Gathering Practices; Ethical Representation

**A.** ESIS agrees that its acquisition, use or disclosure of information on behalf of Client shall be in compliance with all applicable laws and any information security or other policies or procedures related to Personally Identifiable Data that Client may provide to ESIS and, in addition, shall be in compliance with the following ethical principle excerpted from GM Guidelines For Employee Conduct:

"There are, however, important limitations on how and what competitive information may be obtained. No improper means may be used to acquire confidential or propriety information from any competitor, supplier or customer. Improper means would include any form of industrial espionage, the payment of money or giving of any favor or consideration, or the hiring of a competitor's employees to obtain

Confidential Information. Information which may not be sought would include data on a competitor's unannounced new products or confidential data relating to costs, prices or profits."

B. ESIS further agrees that in the performance of Included Services under this Agreement ESIS's actions shall not in any manner be in contravention of the GM Guidelines For Employee Conduct and Winning With Integrity, and that Client shall be the sole judge of all such actions. In performing Included Services ESIS shall not take any action in violation of the U.S. Foreign Corrupt Practices Act and shall make no payment or transfer anything of value, directly or indirectly, to any employee or a government or instrumentality thereof, international organization, political party or official or candidate thereof, to influence any decision to obtain or retain business or secure other advantage. ESIS shall inform Client of any laws in the nature of lobbying registration or disclosure which may be found to apply to the Included Services, and assist Client in its consideration of and compliance with any such requirements.

## 23. Transition Assistance

Provided Client has furnished a written request for transition assistance within 10 days of any notice of intent to terminate or to not renew, ESIS shall, following the effective date of termination of this Agreement, provide such concomitant services identified by Client that may be required to facilitate the transfer of the performance of the Included Services to Client or Client's designee, including, providing to Client or third party personnel training in the performance of the Included Services (collectively, the "Transition Assistance Services ") in accordance with the following:

A. At no additional cost other than as specified in Exhibit B, ESIS shall provide to Client and any designated third party service provider:

   i.   in writing, to the extent available, applicable Client requirements, standards, policies, operating procedures and other documentation relating to the affected execution environment of the Included Services;

   ii.  an answer to all reasonable and pertinent verbal or written questions from Client regarding the Included Services on an "as needed" basis as agreed upon by Client and ESIS; and

   iii. access to the systems and sites from which the Included Services were provided, as necessary.

B. If requested by Client, ESIS shall assist Client in developing a plan that shall specify the tasks to be performed by the parties in connection with the Transition Assistance Services and the schedule for the performance of such tasks.

C. ESIS shall provide the Transition Assistance Services for a reasonable period of time, not to exceed twelve (12) months, following the date of termination of this Agreement (the "Termination Assistance Period"), at prices no worse to Client

than those prevailing for comparable services provided to non-renewed clients generally.

D. ESIS shall provide to Client, in the form and with the content requested by Client, inventories of the hardware and software used in connection with the provision of the Transition Assistance Services as needed.

E. ESIS acknowledges and agrees that it shall have an absolute and unconditional obligation to provide Client with Transition Assistance Services and ESIS's quality and level of performance during the Transition Assistance Period shall continue to comply with all provisions of this Agreement that by their express terms, or by reasonable implication, survive its termination.

## 24. Non-Solicitation

Client agrees that during any term of this Agreement, Client will not deliberately solicit for employment, any employee of ESIS having contact with Client during the performance of this Agreement, without the express consent of ESIS. Likewise, Client also agrees that during any such term, Client will not deliberately encourage, facilitate, or otherwise assist any organization that competes with ESIS for Client's risk management service opportunities to solicit or employ any such employee, without such consent. Notwithstanding the foregoing provisions, provided Client has furnished a written request to do so within 10 days of any notice of intent to terminate or to not to renew, ESIS will not unreasonably withhold such consent from Client to offer employment to and to hire all ESIS employees who have been dedicated to performing the Services.

## 25. Dispute Resolution

All disputes between the parties shall initially be referred to the individuals that ESIS and GM have assigned to this project as indicated in Section 26. If these individuals are unable to resolve the dispute within 10 business day(s) (or such other date agreed upon) after referral of the matter to them, the parties shall notify their respective senior management of the dispute. Upon notification to senior management, senior management may, if both parties agree, meet to resolve the dispute, but if senior management is unable to resolve the dispute then (whether or not such a meeting takes place) within 10 business days of referral (or such other period as the parties may agree), the parties may agree to submit the dispute to non-binding mediation before an independent dispute resolution mediator. If the parties are thereafter unable to resolve the dispute (whether or not such a mediation takes place) within 30 business days of referral (or such other period as the parties may agree), the parties may pursue other available legal and equitable remedies.

## 26. Notices

Except as otherwise specifically provided for in this Agreement, all notices required or permitted to be given by either party under or in connection with this Agreement will be in writing and will be deemed duly given when personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, or by prepaid recognized overnight delivery service, or by facsimile confirmed by letter, to the other party at the address set forth below, or such other address as may be requested by either party by like notice:

If to ESIS:        ESIS, Inc.
                   John Cummings,
                   Operations Officer
                   436 Walnut St.
                   Philadelphia, PA 19106

                   Facsimile: 215-640-5084

With a copy to:    ESIS, Inc.
                   436 Walnut St.
                   Philadelphia, PA 19106
                   Attention:  Office of General Counsel
                   Facsimile: 215-640-5551

If to Client:      General Motors Corporation
                   Thomas G.Upchurch
                   Director-Claims Administration
                   300 Renaissance Center
                   Mail Code : 482-C19-D36
                   Detroit, MI  48265
                   Facsimile: 313-665-0985

With a copy to:    General Motors Corporation
Office of the General Counsel
300 Renaissance Center
Detroit, MI 48265-3000
M.C. 482-C25-D81
Facsimile: (313) 665-3188

**IN WITNESS WHEREOF**, the parties have caused this Agreement and Exhibits, all of which shall be effective on the date first above-written, to be executed on their behalf by the undersigned duly authorized individuals.

**General Motors Corporation**        **ESIS, Inc.**

By: ...                  By: ...

Signature: _Thomas A. Upchurch_    Signature: _John Cummings_

Printed Name: Thomas G. Upchurch    Printed Name: John Cummings

Printed Title: Director -Claims         Printed Title: Regional Manager
             Administration

_JUNE 28, 2006_            _6/30/06_

Date:                            Date:

# Exhibit A
## Statement of Work

### 1. Claims Adjustment Services

ESIS will investigate, adjust, and otherwise administer Client's, and its affiliates' Claims that result from Occurrences taking place during the term of this Agreement. ESIS will provide Claims Adjustment Services for each Claim Type included in Exhibit B Table 1, unless otherwise provided under the Agreement, until it is either settled or paid, withdrawn, or becomes untenable under applicable statues of limitations.

A. In providing Claims Adjustment Services, ESIS will:

i. Open and maintain a file for each Claim submitted to ESIS by or on behalf of Client;

ii. Establish Claim reserves in accordance with Client's established practices, as such may be modified from time to time;

iii. Maintain confidentiality of Claim information to the extent required by applicable laws and regulations;

iv. Resist Claims where it would appear to be prudent, including arranging legal defense on Client's behalf when required;

v. Settle on Client's behalf, when it would appear that to resist would not be prudent, subject to Client's consent.

vi. Settle on Client's behalf, with Client's approval, those Claims that it would appear prudent to settle;

vii. Make Claim Payments and payments for Allocated Loss Expenses from the Claim Fund or for Special Billed Amounts;

viii. Investigate subrogation possibilities on Client's behalf, referring management of Client's and its affiliates' subrogation Claims, where appropriate in ESIS's judgment, to Client's designated subrogation service provider.

ix. Provide loss-related information periodically or upon Client request, showing the status of Client's Claim reserves, Claim Payments and Allocated Loss Expense payments.

x. Permit Client access and inspection of Claim Files as well as, at Client's expense, formal file audits of a representative sample of Claim Files;

xi. Close the Claim File when it has been either settled and paid, withdrawn or becomes untenable under applicable statutes of limitations;

xii. Dispose of closed Claim Files at Client's expense in accordance with Client's directions and in accordance with Client's established procedures as same may be modified from time to time;

xiii. Annually perform a Claim Fund Reconciliation; and

(a) Tender to Client any balance shown by the annual Claim Fund Reconciliation to exceed the Required Level; and

(b) Twenty-four (24) months after the termination of this Agreement or its last renewal, or at such time as Client or its affiliates no longer has any open Claims with ESIS, nor any reasonable prospect of any further Claims being reported to ESIS, whichever occurs latest, reconcile amounts Client has provided for the Claim Fund against Claim Payments and payments for Allocated Loss Expenses ("final Claim Fund Reconciliation") and tender to Client any remaining balance.

B. In providing these Claim Adjustment Services, ESIS is not required to:

   i. Accept for service any Claim Type for which a corresponding rate or fee has not been established and set forth in the attached Exhibit A., but must advise Client of any such Claim received and may with Client's prior approval accept them at rates agreed upon between Client and ESIS;

   ii. Determine or request insurance coverage for any Claim; monitor Client's exhaustion of self-insured retention, deductible, or coverage limits under any policy of insurance; or otherwise be considered by the Client to have acted or spoken, on any insurer's behalf, whether insurers of the ACE Group of Companies or other insurers of the Client;

   iii. Make any Claim Payments or payments for Allocated Loss Expenses on behalf of Client or its affiliates, or provide any other Claims adjustment services during any period of time in which Client has either failed to timely remit funds in the amounts requested by ESIS per Section 5 or to timely pay any Service Fee in the amount required by Section 4 and Exhibit B.

   iv. Accept any party, other than Client, as the party responsible for the payment of ESIS's Service Fees or the funding of Claim Payments and Allocated Loss Expenses of Client or its affiliates.

## 2. First Party Auto Services

A. ESIS will administer all physical damage losses to all GM-owned vehicles in the United States and Canada ("First Party Auto Services") with respect to first party auto Claim Types and provide these Included Services through a dedicated centralized unit ("Unit").

B. In providing these Included Services ESIS will, without limitation:

   i. Advise drivers of company vehicles involved in losses concerning towing and repair facilities. ESIS will direct that repairs be made only at GM dealerships and GM-approved body shops and specialty repair facilities, and only with genuine GM replacement parts.

   ii. Negotiate and pay repair costs.

   iii. Maintain a database of the losses with such categories of information and for such retention periods as Client may require.

   iv. Engage in day-to-day contact with GM and non-GM drivers involved in accidents with company cars.

    v.    Compile all paperwork necessary under GM guidelines for each vehicle involved in an accident, vandalized or stolen. The information compiled, which will include completed driver's incident report, body shop estimate, police report, security report (if necessary), vehicle pass, and a final copy of repair invoice, will be forwarded to the regional Company Vehicle Operations ("CVO") that has ownership of the vehicle.

    vi.    Locate and arrange for the movement of undriveable vehicles from storage yard to repair facilities.

    vii.    Create files in the Company Vehicle Management System ("CVMS") on the EE point screens on all damages to company vehicle. This information will include:

        (a) Identification of the repairing dealer, brief description of the damage, estimated price and final invoice; and

        (b) Notifying CVO Central Tagging Operation weekly of damaged vehicles to facilitate notification of employees/retirees as soon as possible.

    viii.    Notify appropriate regional manager if incident is a result of abuse or violation of CVO policy.

C.    ESIS, with CVO support will:

    i.    Make necessary calls to gather information on any vandalism or accident to GM-owned vehicles;

    ii.    Assist in filling out accident/incident reports; and

    iii.    Advise drivers of proper procedures in reporting accidents, vandalism and stolen vehicles to the police.

D.    As respects the movement of undriveable vehicles, Client shall cause ESIS and its agents to be endorsed by Client's insurer as additional insured on Client's policies of insurance covering company vehicles.

## 3.  Risk Management Information Services (RMIS)

ESIS Management Information Services as follows:

### A.  Online Risk Management Information Services – (Online RMIS)

    i.    **Basic Global RiskAdvantage**$^{SM}$ -- ESIS will make available the following RMIS functions:

Provide Client's designated representative(s) with user identification numbers and passwords (collectively, "userids") ("users") for the purpose of Internet-based access and use, for Client's benefit, of ESIS's proprietary web-based risk management information tool known as **Global** RiskAdvantage$^{SM}$, to enable Client to perform the following **Global** RiskAdvantage$^{SM}$ functions ("Basic Functions") with respect to Client's and its affiliates' Claims;

ESIS – GM Claims Administration Services Agreement
Draft 12/05/05

(a) Conduct a read-only inquiry of Claims data ESIS electronically maintains in ESIS's systems, including dates of loss, claimant identity, Claim payments, Allocated Loss Expense payments, recoveries, and other basic Claims data;

(b) Read adjusters' notes maintained on Claim files; and

(c) Prepare and transmit electronic diary messages to ESIS claim offices.

ii.    **Enhanced Global RiskAdvantage**[SM]

In addition to Basic Functions, ESIS will similarly make available the following **Global RiskAdvantage**[SM] functions ("Enhanced Functions") to those of Client's users who have been specially designated to perform them ("Enhanced Users"):

(a) Create reports using ESIS-defined fields/sorts to calculate, monitor, compare and/or evaluate Claim frequency and severity; Claim Payments and Allocated Loss Expenses; critical Claim timelines; and loss cost changes ("Management Information Reports");

(b) Create similar self-customized reports by using Client-defined fields/sorts;

(c) Utilize interactive drill-down to access Claim details that underlie Claim groupings;

(d) Print and/or save reports; and

(e) Export report data to Client's external software packages.

iii.  **Customized Management Information Reports**

ESIS will prepare and furnish Client those reports consistent with past practice and as additionally may be requested by Client.

iv.  **Claim Data Conversion, Consolidation and Carrier Tapes**

ESIS will convert, consolidate and load Client's and its affiliates' Claim data that Client or others have provided to ESIS into ESIS's systems, and/or to provide ESIS-compiled Claim data to Client and/or its designated insurers or other recipients, with the frequency, in the format, and at the service rates, which are described in Exhibit A Table 4.

3. **Key Employees. Key Employees**, as defined in Section 21, are designated as follows:

| | |
|---|---|
| Chris Sitowski | Claims Vice President |
| Sue Sala | Team Leader |
| Sue Lipa | Supervisor |
| Lou Ann Carns-Brazil | Team Leader |
| Lee Coblentz | Team Leader |

ESIS - GM Claims Administration Services Agreement
Draft 12/05/05

| Debbie Roche | Field Investigation Manager |
| Cheryl Ashton | Team Leader |
| Trish Jankowski-Fodor | Specialist |

ESIS - GM Claims Administration Services Agreement
Draft 12/05/05

# Exhibit B
## ESIS Service Rate Schedule for General Motors Corporation

### 1. Billing Contract Numbers and Claim Types

The following Billing Numbers for the following Claim Types have been assigned as indicated:

| | | |
|---|---|---|
| 2921 | Auto/General/Products | Domestic through 8/31/98 |
| 2922 | Workers' Compensation | Except AZ, OR, MD, ID, VA 9/1/93 to 8/31/94* |
| 2922 | Workers' Compensation | Effective 9/1/94 All States* |
| 2926 | Auto/General/Products | Canadian* -Not Renewed 8/31/97 |
| 2927 | Third Party Pollution/Overspray | Domestic |
| 2928 | Third Party Pollution/Overspray | Canadian -Not Renewed 8/31/97 |
| 2929 | MIC E & O Cases | Domestic & Canadian cancelled 3/1/02 |
| 3799 | Royal Takeover AL/GL/PR | Domestic |
| 2930 | Workers' Compensation | AZ, OR, MD, ID, VA, Only Not renewed 8/31/94 |
| 2990 | Workers' Compensation | Texas Only Not renewed 8/31/94 |
| 2994 | Workers' Compensation | Texas ("Royal claims") |
| 3512 | Workers' Compensation | Texas Only - Self Insured effective 9/1/94 cancelled 7/1/02 |
| 3798 | Workers' Compensation | Royal Takeover |
| 4313 | Auto/General/Products | Canadian effective 9/1/97 |
| 4359 | Third Party Pollution/Overspray | Canadian effective 9/1/97 |
| 3908 | GMAC Excess + Contingent | Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 8384 | GMAC Excess + Contingent Lexington | Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 4166 | GMAC Excess + Contingent | Canadian Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 8409 | GMAC Excess + Contingent Lexington | Canadian Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 4163 | GMAC Auto First Party | Effective 1/1/97 |
| 8213 | Products | Domestic Effective 9/1/98 |
| 8214 | General Liability | Domestic Effective 9/1/98 |
| 8215 | Auto Liability | Domestic Effective 9/1/98 |
| 8216 | Delphi First Party | Effective 1/1/99 cancelled 5/28/99 |
| 9205 | Auto Liability | Domestic Self-Insured Ohio Effective 9/1/01 |

\* Control account, which will be added to no. 2921 for billing in U.S. currency.

## Table 1

### 2. Claims Adjustment Administration Fee

For the initial term of this Agreement, no Claims Adjustment Administration Fee ("Administration Fee") for Claims adjustment will be charged to Client by ESIS.

### 3. Contract Staff Service Fees

The Contract Staff Service Fee ("Service Fee")is an annual projected Service Fee based upon ESIS's estimated annual cost (multiplied by a Staff Cost Multiplier), during the term of this Agreement, of maintaining sufficient staff to service

Client's Claims of the Claim Types described in Table 1 that result from Occurrences taking place during the term of this Agreement and, if applicable, any similar Claims remaining open at the expiration of, or newly reported but arising out of, any preceding term that has been continuously renewed since incepting. For the initial term of this Agreement, the Staff Cost Multiplier will be 2.38.

B.  On the date of expiration of the initial term of this Agreement, or of its last renewal term, or expiration of the Transition Assistance period, whichever is later: (1) ESIS will cease rendering any Claims Adjustment Services on any claim files remaining open (including those, if any, remaining open at the expiration of, or newly reported but arising out of, any preceding term that has been continually renewed since incepting); (2) ESIS will accept no further referrals of claims (including those, if any, arising out of any preceding term that has been continually renewed since incepting) from Client; (3) all Services Fees theretofore paid or payable to ESIS are deemed to be fully earned; (4) ESIS will cooperate with Client in returning to Client, or its designee, all such open claim files; and (5) the costs of returning these claim files will be borne by the Client.

C.  The projected annual Service Fee is payable in accordance with Section 4 of the Agreement. Each installment of the projected annual Service Fee is fully earned upon expiration of the quarter for which it is payable, subject only to this final reconciliation provision. After payment of Client's final installment, ESIS will determine its actual annual cost of maintaining the staff utilized to service Client's claims, multiply that actual annual cost by the Staff Cost Multiplier, and reconcile any difference between the resulting actual annual Service Fee and the projected annual Service Fee paid by Client. If the actual annual Service Fee is greater than the projected annual Service Fee paid by Client, then Client will pay ESIS the difference. If less, then ESIS will refund Client the difference.

D.  Real Estate costs associated with the Dedicated Unit will be the sole responsibility of the Client. These costs include all rent and related items, real estate taxes, fees and assessments, furniture, telephones and utilities.

E.  Billing Contract Numbers 2921, 8213, 8214, 8215, 3799, 3908, 4166, 9205 & 2927 are established for the administration of the Dedicated Centralized Unit handling the Automobile Liability, General Liability, Premises Liability and Products Liability Claims which may be tendered to the Unit.

F.  For any succeeding term, an estimate of the proposed annual Service Fee based on current salaries and expected merit increases, the proposed Staff Multiplier, the proposed Administration Fee, and the number of personnel proposed to be assigned, will be provided to Client by ESIS by the beginning of the fourth quarter of the initial term, and of each renewal term, of this Agreement, substantially in the form set forth in Table 2

ESIS - GM Claims Administration Services Agreement
Draft 12/05/05

| Position Type | Initial Staff | Projected Annual Service Fee |
|---|---|---|
| **BILLING CONTRACT # 2921** | | $8,336,721.00 |
| Staff for Products, General Liability, Vehicle Management and Operations Team | | |
| Claims Vice President | | |
| Clerk---Grade Level 10 | | |
| Clerk—Grade Level 13 | | |
| Clerk---Grade Level 14 | | |
| REP—Grade Level 20 | | |
| REP—Grade Level 21 | | |
| REP---Grade Level 22 | | |
| REP—Grade Level 23 | | |
| Team Leader—Grade 24 | | |
| Team Leader—Grade 26 | | |
| **Billing Contract # 3391** | | $610,372.00 |
| Staff for First Party Auto | | |
| Clerk—Grade Level 12 | | |
| Team Leader---Grade Level 24 | | |
| Staff for Excess & Contingent Program #3908 | | |
| Team Leader—Grade Level 24 | | |
| REP---Grade Level 21 | | |
| Total | | $8,947,093.00 |
| **Projected Annual Service Fee** | | **$8,947,093.00** |

**Table 2**

## 4. Global RiskAdvantage$^{SM}$ Services Fees (RMIS Fees)

For the initial term of this Agreement, RMIS Fee for Global RiskAdvantage$^{SM}$ access, storage, maintenance, OMNI and related systems charges in the amount of $397,732.00 is payable in accordance with Section 4 of the Agreement. Each periodic installment of the RMIS Fee is fully earned upon expiration of the quarter for which it is payable. An estimate of the annual Service Fee for Global RiskAdvantage$^{SM}$ access proposed for any succeeding term will be provided to Client by ESIS by the beginning of the fourth quarter of the initial term, and of each renewal term, of this Agreement, substantially in the form set forth in Table 3.

| Service Type | Master Contract 2921 | Contract 3391 | Contract 3908 & 4166 | Contract 2922 | Total Annual Fee |
|---|---|---|---|---|---|
| Claims Storage & Maintenance | | | | | |
| Risk Advantage | $238,639.00 | $159,093.00 | | | $397,732.00 |
| **RMIS** Programmer 1 Contract Employee | | | | | |
| Total Systems Fees | $238,639.00 | $159,093.00 | | | $397,732.00 |

**Table 3**

# Exhibit C
## Information Security Requirements

1. **Information Security**

   A. ESIS shall at all times perform the Included Services in accordance with Client's corporate security policy and practices, including without limitation, General Motors Information Security Policy and Practices (ISP&P) released June 30, 2005, a copy of which is on file with ESIS, including all updates and enhancements thereto as made by Client on a corporate basis.

   B. ESIS will take all necessary technical and organizational precautions to ensure that Claim information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction by third parties while such information is in the possession or under the control of ESIS and ensure that Claim information is not processed in other ways contradictory to privacy and/or data protection laws.

   C. Upon written request, ESIS will provide Client all necessary information regarding the processing of Claim information, including, but not limited to, where and how it is stored, who has access to it and why, and what security measures are taken to ensure that Claim information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction while in the possession or under the control of ESIS.

   D. ESIS will maintain sufficient procedures to detect and respond to security breaches involving Claim information. ESIS will inform Client as soon as practicable when ESIS suspects or learns of malicious or unauthorized activity involving Claim information.

   E. ESIS accepts Client's right to terminate this agreement and ESIS's services immediately without notice and with no indemnity if ESIS is found in violation of these Information Security requirements..

2. **Business Continuity Services**

   A. ESIS shall be responsible for the management and maintenance of business continuity services and associated resources to provide for restoration of Included Services, processes and technology used to provide Included Services within a timeframe expected in the industry from a large, well-managed services company engaged in business similar to ESIS's business. ("Business Continuity Program")

   B. ESIS will provide planning and implementation of contingency and disaster recovery processes to meet Client requirements for Business Continuity with

respect to the Included Services, processes and technology used to provide Services. Such plans will include, but are not limited to, identification of mission-critical applications, risk assessment, emergency procedures, restoration of facilities, and contingency procedures and operations. Such plans should be consistent with Client's policies.

C.  ESIS will work with Client to coordinate with all Third-Party Suppliers providing related Services, processes and technology used to provide Included Services to Client, such as infrastructure services, to ensure that the contingency planning and disaster recovery plan and procedures are seamlessly integrated. ESIS will perform disaster recovery testing on an annual basis, or on a schedule determined by Client. This includes back up and restoration of data and programs on servers and alternate site processing as necessary to ensure 7 x 24 coverage.

D.  ESIS will conduct periodic Business Continuity tests with respect to the Included Services, processes and technology used to provide Included Services to Client. ESIS' plans will include data back up frequency and disaster simulations with commitments to retest within 90 days if any disaster simulation fails to achieve expected results. ESIS will document the results of all Business Continuity testing and will periodically provide copies of the reports of such testing to Client.

E.  ESIS will participate as necessary in the performance of Client's Business Continuity testing on an annual basis. ESIS shall monitor and modify the list of mission-critical applications as necessary. The process will include a step where Client and ESIS reach agreement on the applications, processes and technology to be included in the list. Record retention policies and practices will be reviewed on a scheduled basis and refined by ESIS to ensure compliance with outside regulators.

F.  ESIS's responsibilities to provide Business Continuity services to Client shall include the following:

i.    With respect to the application servers and LAN servers at ESIS locations, ESIS shall provide, and maintain on magnetic media or other media and accessible to Client, backup, file recovery and historical files (all covering such period(s) of time as Client and ESIS may establish from time to time) of Claim information and software (including Source Code) utilized to process data.

ii.   ESIS shall provide off-site storage in a secure facility for the foregoing, as well as daily pickup and delivery to the off-site storage site.

iii.  ESIS shall backup (and verify that such backups have been properly completed) the Claim information and software residing on ESIS server systems in accordance with the Business Continuity Program.

iv.   In the event of a disaster, ESIS will:

(a)    Provide restoration of Included Services, processes and technology used to provide Included Services as required of ESIS by the Business Continuity Program. Ensure that Claim Information is recovered to the appropriate point in time as required by each application, process and technology used to provide the Included Services and as defined by the business continuity program;

(b)    Declare disasters in accordance with procedures existing at the time of declaration and notify Client of situations that may escalate to disasters as soon as practicable for all facilities for which ESIS has oversight responsibility;

(c)    Determine what Business Continuity resources to deploy in the event of a disaster, and conduct, supervise, and administer the operation and implementation of such resources;

(d)    Provide a single point of contact for Business Continuity related communications and activities;

(e)    Provide additional resources as necessary to maintain the provision of Included Services, processes and technology used to provide Included Services; and

(f)    Adjust the Business Continuity Program as necessary, to accommodate changes in Client's business volumes, application enhancements, business and operational needs, or new functions requested.

G.  ESIS shall report crisis events, disasters or potential disasters immediately upon identification and will perform root cause analysis of problems. ESIS will provide crisis management including, but not limited to, declaration of crisis, crisis monitoring, escalation, and conducting post-mortem. Following any crisis, ESIS shall conduct a post-crisis meeting with Client to understand the cause of the crisis and develop plans to eliminate or mitigate future occurrences.

H.  ESIS will be responsible for ensuring that all Business Continuity Program documentation of ESIS is updated pursuant to any modification of policy, procedure, software or hardware infrastructure, or supporting components or services by Client insofar as such modification relates to the Included Services processes or technology used to provide the Included Services to Client.

# EXHIBIT D
## Third Party Suppliers

None.

ESIS – GM Claims Administration Services Agreement
Draft 12/05/05

## Exhibit E
### Insurance

ESIS shall maintain insurance coverage in amounts not less than the following: (a) Workers' Compensation - Statutory Limits for the state or states in which this order is to be performed; (b) Employer's Liability- $500,000; (c) Commercial General Liability (including Premises, Operations, Independent Contractors, Products/Completed Operations and Contractual Liability) - $5,000,000 each occurrence; (d) Automobile Liability (including owned, non-owned and hired vehicles) - $5,000,000 each occurrence; and (e) Professional/Errors and Omissions Liability insurance appropriate to the ESIS's profession. Coverage must be for a professional error, act or omission arising out of the scope of services shown in this order - $5,000,000 per occurrence.

If any coverage is written on a Claims-made basis, the retroactive date, if any, shall precede the commencement of the performance of this agreement. In addition, ESIS shall purchase an extended reporting period if the retroactive date is advanced or if the policy is canceled or not renewed and not replaced by another claims-made policy with the same (or an earlier) retroactive date either during the term of this contract or within 3 years after completion of the contract.

All policies of insurance procured by ESIS herein shall be written as primary policies, not contributing with nor in excess of coverage that Client may carry. If ESIS's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage.

At Client's request, ESIS shall furnish to Client certificates of insurance evidencing compliance with the insurance requirements set forth above. The certificates will provide that Client shall be named an additional insured on the Commercial General Liability policy. The certificates shall provide that Client shall receive thirty (30) days' prior written notification from the insurer of any termination or material reduction in the amount or scope of coverages.

Such certificates shall be in a form acceptable to, and underwritten by insurance companies reasonably satisfactory to Client. By requiring insurance herein, Client does not represent that coverage and limits will necessarily be adequate to protect ESIS. The purchase of appropriate insurance coverage or the furnishing of certificates of insurance shall not release ESIS of its obligations or liabilities under this order. In the event of ESIS's breach of this provision, Client shall have the right to cancel the undelivered portion of any goods or services covered by this order and shall not be required to make further payments except for conforming services rendered prior to cancellation.

# Exhibit F
## Internal Controls

### 1. Scope of Cooperation

The scope of cooperation and information provided will be consistent with Client's Control Frameworks, as same may be modified or updated and notified to and mutually agreed with ESIS from time to time.

### 2. Assessments; Type II SAS 70 Audits

With respect to SOX Applications and the infrastructure and networks that support them, ESIS will commission a Type II Statement of Auditing Standards ("SAS") 70 audit of ESIS' internal control processes and procedures, as prescribed by the American Institute of Certified Public Accountants ("Audit"), covering at least a six-month period for the calendar year. Results, in the form of an Audit or Assessment Report, will be provided to Client's internal and external auditors for review no later than December 31 during each year in which this Agreement is in effect. ESIS and Client's internal and external auditors will work collaboratively to evaluate whether deficiencies, if any, in the ESIS internal control environment related to SOX Applications or the infrastructures or networks that support them are reasonably likely to adversely impact Client's Control Frameworks. Expenses of addressing and correcting any such deficiencies will be paid by ESIS, including reimbursement of Client costs and expenses incurred in performing any supplemental audit Client reasonably deems necessary.

### 3. Significant Changes; Quarterly Update

ESIS will provide Client's internal and external auditors a quarterly update identifying any significant changes in SOX Applications or the infrastructures or networks that support them that affect ESIS services and ESIS's ability to support Client's Control Frameworks. Any such significant changes must be tested with results reported to Client's internal and external auditors as provided in paragraph 5 below. ESIS agrees to not make any such significant changes in the fourth quarter of any calendar year without prior notice to Client.

### 4. Confidentiality

Client agrees that all Assessments, updates and other information required of ESIS to be provided pursuant to this Exhibit shall be deemed confidential when marked, "CONFIDENTIAL -- This report is intended for the use by the management of ESIS, Inc., its user organizations and the independent auditors of its user organizations," or words to that effect. Client agrees that it shall treat, and cause its internal and external auditors to treat, all such information with the same degree of care as Client treats like information of its own, and for a period of two (2) years after disclosure.

## 5. Deficiencies

If any audit or assessment contemplated under this Exhibit indicates that there are any deficiencies in the ESIS's internal control environment related to SOX Applications or the infrastructures or networks that support them, ESIS will, and will cause any ESIS agents to promptly take actions to correct such deficiencies, and reassess and report the progress thereof to Client on a quarterly basis. Any such corrective actions will be at ESIS's cost. Without limiting the foregoing, if Client reasonably determines that a risk identified in any audit or assessment

    i.  be considered a deficiency in Client's internal control environment (as such deficiency is defined in the standards of the Public Company Accounting Oversight Board);

    ii.  would require Client to disclose the risk in accordance with Section 302 of the Sarbanes-Oxley Act of 2002; or

    iii.  would prevent Client from asserting or Client's auditors from attesting o the effectiveness of its internal control environment pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, then, in addition to the actions set forth above, ESIS will use all commercially reasonable efforts to resolve such risk as soon as possible or as otherwise mutually agreed.

# Exhibit G

## Definitions

The following words and phrases appearing in title case have special meanings as provided in the definition. Other words and phrases appearing in title case throughout this Agreement shall have the special meanings they are given with their first operative use.

A. Allocated Loss Expense: Means an expense that ESIS incurs, on behalf of Client, or its affiliate, or that Client incurs, for services needed for the proper investigation, adjustment or other administration of a given individual Claim, and is generally recognized throughout the claims administration profession as either outside the scope of claims services permitted by claims professional licensure, or impracticable for the administrator's claims professional personally to perform due to geographical or logistical constraints, or similar cost-effectiveness concerns. Allocated Loss Expenses include, but are not limited to:
   - attorneys' fees and costs;
   - fees for official records of governmental agencies or for services of private investigators, photographers, appraisers, surveyors or other experts;
   - expenses incurred for medical and vocational cost containment services; and
   - extraordinary claim investigation expenses.

   Allocated Loss Expenses are the obligation of Client, and not of ESIS.

B. Claim means a monetary demand against Client, or its affiliate, as relief for bodily injury, disease or property damage sustained by a person or organization as the result of an Occurrence.

C. Claim File means a compilation of Claim information in electronic, paper or other form.

D. Claim Fund means the sum of money remitted by Client to ESIS that allows ESIS to make, on behalf of Client, or its affiliates, Claim Payments and payments for Allocated Loss Expenses.

E. Claim Fund Reconciliation means a statement that shows the amounts Client has remitted to ESIS for the Claim Fund against Claim Payments and Allocated Loss Expense payments.

F. Claim Payment means a payment ESIS will make on Client's, or its affiliate's, behalf in complete or partial satisfaction of a Claim. Claim Payments are the obligation of Client, and not of ESIS.

G. Claim Type means those types of Claims listed in Exhibit B, Table 1.

H. Confidential Information means all information (oral or written), documents, and, data (in any medium) that have been furnished to ESIS by Client, or have been developed or collected by ESIS in connection with the Included Services, including, but not limited to, Personally Identifiable Data.

I. Discretionary Settlement Authority Limit means the maximum amount of money that Client authorizes ESIS to offer in settlement of any one Claim without first securing approval from Client. Allocated Loss Expenses are neither subject to nor included in the Discretionary Settlement Authority Limit.

J. Fully Earned means that a Service Fee charged by ESIS for an Included Service is fully due and owing, with no obligation on the part of ESIS to refund all or any part of the Service Fee.

K. Included Service means a service ESIS provides that is described in Exhibit A, the Statement of Work, and for which a corresponding Service Fee has been provided in Exhibit B, Service Rate Schedule.

L. Personally Identifiable Data means any individually identifiable data from or about a person or data which, when associated with other data in the hands of or available to ESIS, allows for either identification of an individual or for an increase in data about an identified or identifiable individual. Personally Identifiable Data shall include, but not be limited to: (a) first and last name; (b) a home address or other physical address, including street name and name of city or town; (c) an email address or other online contact data (e.g., instant messaging user identifier); (d) a telephone number; (e) a social security number; (f) an Internet Protocol address; (g) a persistent identifier (e.g., a unique customer number in a cookie); (h) employee identification number; (i) beneficiary, spousal and dependent information; (j) health information; (k) benefits claim information; (l) salary, payroll, and banking information; and (m) any other data that is combined with any of the above.

M. Occurrence means an event or series of events deemed by Client to have given rise to unexpected bodily injury, disease or property damage causing loss to a person or organization, whether or not Client considers the event(s) or the injury, disease or damage to fall within the scope of any policy of insurance.

N. Service Fee means the compensation due and owing ESIS for Included Services to be rendered to Client and its affiliates.

O. Special Billed Amount means an individual Claim Payment, or individual Allocated Loss Expense payment, that will exceed the sum of $1,999,999.99 and the funds for which will be specially requested of Client by ESIS, and funded by Client, outside of the Claim Fund.

# Claims Administration Services Agreement
# Renewal Addendum

This Renewal Addendum is entered into by and between ESIS, Inc. ("ESIS"), a
Pennsylvania Corporation with offices at 525 W. Monroe, Chicago, IL 60661, and
General Motors Corporation, a Delaware Corporation ("Client"), with offices at 300
Renaissance Center, Detroit, MI 48265

Effective 1/1/08, the following revisions are made to the service agreement entered into
June 28, 2006.

## Claims Adjustment Administration Fee:

For this renewal term, an annual **Administration Fee** in the amount of $52,000.00 is
payable and will be invoiced to Client in 4 equal installments. Each $13,000.00
installment of the Administration Fee is fully earned upon expiration of the quarter for
which it is payable.

## Contract Staff Service Fees:

| Position Type | Initial Staff | Projected Annual Service Fee |
|---|---|---|
| **BILLING CONTRACT # 2921**<br><br>Staff for Products, General Liability, Vehicle Management and Operations Team<br>　　　　Claims Vice President<br><br>　　Clerk---Grade Level 10<br>　　Clerk—Grade Level 13<br>　　Clerk—Grade Level 14<br><br>　　REP—Grade Level 20<br>　　REP—Grade Level 21<br>　　REP—Grade Level 22 | | |

| | | |
|---|---|---|
| REP—Grade Level 23 | | |
| Team Leader—Grade 24 | | |
| Team Leader—Grade 26 | | |
| **Billing Contract # 3391** | | |
| Staff for First Party Auto | | |
| Clerk—Grade Level 12 | | |
| Team Leader—Grade Level 24 | | |
| Team Leader—Grade Level 24 | | |
| REP—Grade Level 21 | | |
| Total | | |
| **Projected Annual Service Fee** | | **$9,018,931** |

## Global RiskAdvantage Services Fees (RMIS Fees):

| Service Type | Total Annual Fee |
|---|---|
| Claims Storage & Maintenance | $315,208 |
| Risk Advantage | |
| RMIS Programmer 1 Contract Employee | $200,840 |
| Total Systems Fees | $516,048.00 |

**IN WITNESS WHEREOF,** the parties have caused this Agreement and Exhibits, all of which shall be effective on the date first above-written, to be executed on their behalf by the undersigned duly authorized individuals.

**General Motors Corporation**                         **ESIS, Inc.**

By:

Signature: _~Thomas A. Upchurch~_                Signature: _~Michael~_
~Thomas G. Upchurch~                                    ~Michael Hoberman~
Printed Name: Thomas G. Upchurch          Printed Name: Michael Hoberman
~Director - Claims Administration~            ~Senior Vice President~
Printed Title: Director-Claims Administration    Printed Title: Regional Manager

_~November 21, 2001~_                                    _~December 17, 2007~_
Date:                                                            Date:

### Addendum to
### Claims Administration Services Agreement

WHEREAS, ESIS, Inc. ("ESIS"), a Pennsylvania Corporation with offices at 525 W. Monroe, Chicago, IL 60661, and General Motors Corporation, a Delaware Corporation ("Client"), with offices at 300 Renaissance Center, Detroit, MI 48265 entered into a Claims Administration Services Agreement ("Agreement") effective January 1, 2006.

NOW THEREFORE, the parties enter into this Addendum to the Agreement effective January 1, 2009 pursuant to Section 16 of the Agreement.

The Agreement is hereby amended as follows:

Section 4 - Service Fees and Payment - is amended by adding the following as a new second paragraph:

For the third renewal term of this Agreement commencing on January 1, 2009, Client shall pay Service Fees to ESIS for the first forty-five (45) days of such third renewal term at the rates charged by ESIS to Client for the second renewal term that expires on December 31, 2008. Attached to this Addendum is an ESIS Invoice that documents the Service Fees charged to Client for this forty-five (45) day period and Client shall remit payment for these Service Fees no later than January 9, 2008. Prior to the expiration of the forty-five (45) day period in 2009 (i.e. before February 14, 2009), Client and ESIS shall enter into a Renewal Addendum that documents the rates that Client shall pay for the Service Fees for the entire third renewal term. At that time, if the new Service Fee rates are less than the rates charged to Client in the forty-five (45) day period described above, ESIS shall provide Client with a credit for such difference on the next ESIS invoice sent to Client. However, if the new Service Fee rates are more than the rates charged to Client in the forty-five (45) day period described above, ESIS shall document such additional charges for the forty-five (45) day period on the next ESIS invoice sent to Client and Client shall pay such additional Service Fees to ESIS in accordance with the payment terms contained in this Agreement or as modified in any Renewal Addendum.

All other terms and conditions of the Agreement and applicable Addenda to the Agreement previously entered into by the parties shall remain the same.

IN WITNESS WHEREOF, the parties have caused this Addendum effective on January 1, 2009 to be executed on their behalf by the undersigned duly authorized individuals.

General Motors Corporation                           ESIS, Inc.

By:                                                  By:

Kevin Scroggin                                       Michael Hoberman     David Patterson
Director Claims Administration                       Regional Manager      President
RISK MANAGEMENT

Date: 31 Dec 2008                                    Date: Dec. 31, 2008

**Addendum to**
**Claims Administration Services Agreement**

WHEREAS, ESIS, Inc. ("ESIS"), a Pennsylvania Corporation with offices at 525 W. Monroe, Chicago, IL 60661, and General Motors Corporation, a Delaware Corporation ("Client"), with offices at 300 Renaissance Center, Detroit, MI 48265 entered into a Claims Administration Services Agreement ("Agreement") effective January 1, 2006.

NOW THEREFORE, the parties enter into this Addendum to the Agreement effective February 15, 2009 pursuant to Section 16 of the Agreement.

The Agreement is hereby amended as follows:

Section 4 – Service Fees and Payment – is amended by adding the following as a new second paragraph:

For the third renewal term of this Agreement commencing on January 1, 2009, Client shall pay Service Fees to ESIS for the second forty-five (45) days of such third renewal term at the rates charged by ESIS to Client for the second renewal term that expires on December 31, 2008. Client will pay the Service Fees by the 20th day of the month preceding the month for which services are to be rendered.  Prior to the expiration of the second forty-five (45) day period in 2009 (i.e. before March 31, 2009), Client and ESIS shall enter into a Renewal Addendum that documents the rates that Client shall pay for the Service Fees for the entire third renewal term. At that time, if the new Service Fee rates are less than the rates charged to Client in the forty-five (45) day period described above, ESIS shall provide Client with a credit for such difference on the next ESIS invoice sent to Client. However, if the new Service Fee rates are more than the rates charged to Client in the forty-five (45) day period described above, ESIS shall document such additional charges for the forty-five (45) day period on the next ESIS invoice sent to Client and Client shall pay such additional Service Fees to ESIS in accordance with the payment terms contained in this Agreement or as modified in any Renewal Addendum.

All other terms and conditions of the Agreement and applicable Addenda to the Agreement previously entered into by the parties shall remain the same.

IN WITNESS WHEREOF, the parties have caused this Addendum effective on February 15, 2009 to be executed on their behalf by the undersigned duly authorized individuals.

General Motors Corporation                    ESIS, Inc.

By:                                           By:

_____                      _____
Kevin Scroggin                                Jim Boyd
Director-Risk Management                      Chief Financial Officer

Date: 19 FEB 2009                             Date: 2/19/09

## Claims Administration Services Agreement
### Renewal Addendum

This Renewal Addendum is entered into by and between ESIS, Inc. ("ESIS"), a Pennsylvania Corporation with offices at 525 W. Monroe, Chicago, IL 60661, and General Motors Corporation, a Delaware Corporation ("Client"), with offices at 300 Renaissance Center, Detroit, MI 48265

Effective 1/1/09, the following revisions are made to the Agreement that was effective January 1, 2006. The changes that are reflected in this Addendum are made for good and valuable consideration, the receipt of which is acknowledged by both parties.

The Agreement is hereby amended as follows:

Delete the existing Section 1. Contract Term and replace with the following paragraph:

Section 1- Contract Term- Unless earlier terminated as provided in Section 11, this Agreement is effective as of January 1, 2006 and will have an initial term ending on December 31, 2006. Thereafter, this Agreement will continue in effect for successive one-year periods ending on December 31st each year unless either party gives the other party written notice of its intent not to renew the Agreement at least 60 days prior to the end of the initial term, or renewal term.

Delete the existing Section 2. Basic Obligations of ESIS and Client and replace with the following paragraph:

Section 2- Basic Obligations of ESIS and Client. ESIS agrees to perform all Included Services in a professional manner and in accordance with its best professional judgment, consistent with all applicable state and federal laws and regulations and in accordance with this Agreement. Client agrees to pay all Service Fees for Included Services and provide funds for Claim Payments and Allocated Loss Expenses in the required amounts and within the required time periods as provided for in this Agreement.

Delete the existing Section 4-Service Fees and Payment and replace with the following paragraph:

Section 4- Service Fees and Payment. Client will pay all Service Fees, as well as any applicable state taxes or assessments on Client's purchase of Included Services in the required amounts and within the required time periods as provided for in this Agreement.
The projected annual Service Fee will be invoiced monthly in 12 equal installments and Client will pay each installment by the 20th of the month preceding the month for which services are to be rendered. Unless otherwise provided under Section 3B of Exhibit B, each installment of the projected annual Service Fee is fully earned upon expiration of the month for which services are to be rendered, subject only to the following reconciliation process. At the conclusion of the initial term or any renewal term, ESIS will determine its actual costs of maintaining the staff utilized to service Client's Claims, multiply that actual annual cost by the staff cost multiplier, and reconcile any difference between the resulting actual annual Service Fee and the projected annual Service Fee paid by Client. If the actual annual Service Fee is greater than the projected annual Service Fee paid by Client, then Client will pay ESIS the difference. If less, then ESIS will refund Client the difference.

Delete the existing Section 5- Claim Fund and replace with the following paragraph:

Section 5- Claim Fund- Client will establish a Claim Fund by depositing with ESIS a required sum of $250,000. The Client will continue to remit additional funds, upon ESIS' request, , within one (1) day of each request.

Delete Section 10- Confidentiality and replace with the following paragraphs:

1

**Section 10- Confidentiality-**

A.  ESIS and Client (each a "Disclosing Party") will disclose Confidential Information with each other (each a "Receiving Party") in connection with the performance of this Agreement.  For the purposes of this Agreement, "Confidential Information" shall mean all information revealed by or through the Disclosing Party which the Receiving Party either knows or reasonably should know to be proprietary and confidential in nature including without limitation: (i) information either expressly or implicitly identified as originating with or belonging to the Disclosing Party or marked or disclosed as confidential;  and (ii) information traditionally recognized as proprietary or trade secrets of the Disclosing Party such as all technical or non-technical information, organizational charts, flow charts, internal meeting minutes of the Disclosing Party, financial, accounting or marketing data, marketing strategies, customer relations, business plans, proposed products, analysis, forecasts, predictions, or projections, intellectual property, trade secrets, or know-how, and reports, analyses, studies or other materials containing or based on Confidential Information, customer lists, names, addresses and account numbers, capacities and volumes, security practices, operating procedures, computer hardware and software data and specifications, technology offerings, product and business proposals, plans and descriptions, bid strategies, pricing configurations, pricing methods, service configurations, products, processes or services, research, development, inventions, discoveries, concepts, ideas (whether patentable or not), accounting, manufacturing, purchasing, engineering, marketing, selling and merchandising.

B.  Confidential Information shall in no event include information which: (i) the Receiving Party knew at the time of first disclosure by the Disclosing Party; (ii) is or becomes generally known in the industry or public knowledge without default by the Receiving Party of its obligations hereunder;    (iii) the Receiving Party can demonstrate, from written records, has been independently developed through the Receiving Party's employees none of whom had access to the Confidential Information; or (iv) is generally furnished to third parties by the Disclosing Party without confidentiality restriction.

C.  The Receiving Party may disclose Confidential Information pursuant to obligations imposed by regulatory or governmental agencies or courts of competent jurisdiction provided that the Receiving Party provide to the Disclosing Party detailed written notice of such obligations in sufficient time (to the extent allowed by law) so as to permit the Disclosing Party to seek an appropriate protective order or otherwise intervene to protect the Confidential Information.

D. The Receiving Party may use the Confidential Information for the sole purpose of performance of this Agreement and for no other purpose. The Receiving Party agrees not to disclose the Confidential Information except to its employees or authorized representatives having a need-to-know such Confidential Information.

E.  The Receiving Party agrees that if there is a breach or threatened breach of the provisions of this Agreement, the Disclosing Party may have no adequate remedy in money or damages and accordingly shall be entitled to seek injunctive relief; provided, however, no specification in this Agreement of any particular remedy shall be construed as a waiver or prohibition of any other remedies in the event of a breach or threatened breach of this Agreement.

F.  All Confidential Information shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall have no rights to use the Confidential Information except as expressly provided herein.  No patent, copyright, trademark or other proprietary right is licensed, granted or otherwise conveyed by this Agreement with respect to the Confidential Information.  Within ten (10) days after written request from the Disclosing Party, the Receiving Party shall return to the Disclosing Party or destroy (as certified in writing by the senior most officer of the Receiving Party involved in the Transaction) all Confidential Information in tangible form that is in the Receiving Party's possession, custody or control (except as otherwise required by law or regulatory authority).

2

Delete the existing Section 11- Cancellation and replace with the following paragraph:

11.  Cancellation- This Agreement may be terminated:

A.  By either party, in advance of expiration, for no reason or for any reason, other than for material breach of its terms or conditions, (collectively, "without cause"), by the terminating party giving the other party at least sixty (60) days written notice prior to the effective date of cancellation.

B.  By either party, in advance of expiration, for material breach of its terms or conditions (for cause) by giving thirty (30) written days notice to the other party of intent to terminate for cause prior to the effective date of cancellation,  provided however that the notice must first have identified the nature and scope of the claimed material breach, affording an opportunity to the breaching party to cure the breach, and the breaching party must have failed to cure the breach within fifteen (15) days of receiving the notice.

C.  By ESIS, in advance of expiration, if Client does not pay Service Fees or provide funding for claims payments in accordance with the timeframes specified in this Agreement, by giving ten (10) written days notice prior to the effective date of cancellation to Client of its intent to terminate for failure to receive compensation or claims funding, and Client must have failed to cure such default within five (5) days of receiving the notice.

Delete the existing Section 23. Transition Assistance and replace with the following paragraph:

Section 23- Transition Assistance- Provided Client has furnished a written request for transition assistance within ten (10) days of intent to terminate or to not renew this Agreement, ESIS shall, following the effective date of termination of this Agreement, provide such concomitant services identified by Client that may be required to facilitate the transfer of the performance of the Included Services to Client or Client's designee (collectively, the "Transition Assistance Services").  Once the Transition Assistance Services and applicable fees for the provision of Transition Assistance Services have been agreed upon, the Parties shall document such Transition Assistance Services and applicable fees in an amendment to this Agreement executed by both parties.  The Transition Assistance Services and applicable fees shall be at prices no worse than the terminated contract for the remainder of the contract period.  Any extraordinary charges outside of the scope of the normal services provided will be negotiated separately..

Exhibit A of the Agreement is hereby amended as follows:

Delete the existing Section 3. Key Employees and replace with the following paragraph:

Section 3- Key Employees.  Key Employees, as defined in Section 21, are designated as follows:

| | |
|---|---|
| Chris Sitowski | Claim Vice President |
| Sue Sala | Operations Team leader |
| Sue Lipa | CDQ Coordinator |
| Debbie Roche | Manager |
| Cheryl Ashton | Team Leader |
| Trish Jankowski-Fodor | Negotiator |
| Jon Ball | Team Leader |

Exhibit B of the Agreement is hereby amended as follows:

3

Delete the existing Exhibit B and replace with the following:

Billing and Contract Numbers and Claim Types

The following Billing Numbers for the following Claim Types have been assigned as indicated:

**Table 1**

| Contract Number | Line of Business | Comment |
|---|---|---|
| 2921 | Auto/General Products | Domestic through 8/21/09 |
| 2922 | Workers' Compensation | Except AZ, OR, MD, ID, VA 9/1/93 to 8/31/94* |
| 2922 | Workers Compensation | Effective 9/1/94 All States * |
| 2926 | Auto/General/Products | Canadian * - Not renewed 8/31/97 |
| 2927 | Third Party Pollution/Overspray | Domestic |
| 2928 | Third Party Pollution/Overspray | Canadian * - Not renewed 8/31/97 |
| 2920 | MIC E&O Cases | Domestic and Canadian cancelled 3/1/02 |
| 3977 | Royal Takeover AL/GL/PR | Domestic |
| 2930 | Workers' Compensation | AZ, OR, MD, ID, VA, Only.  Not renewed 8/31/04 |
| 2990 | Workers' Compensation | Texas Only.  Not renewed 8/31/94 |
| 2994 | Workers' Compensation | Texas (Royal Claims) |
| 3512 | Workers' Compensation | Texas only – Self Insured effective 9/1/94. Cancelled 7/1/02 |
| 3798 | Workers' Compensation | Royal Takeover |
| 4313 | Auto/General Liability/Products | Canadian effective 9/1/97 |
| 4359 | Third Party Pollution Overspray | Canadian effective 9/1/97 |
| 3908 | GMAC Excess and Contingent | Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 8384 | GMAC Excess and Contingent Lexington | Effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 4166 | GMAC Excess and Contingent | Canadian effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 8409 | GMAC Excess and Contingent | Canadian effective 2/1/96 through 2/28/00 then effective 3/1/00 |
| 4163 | GMAC Auto First Party | Effective 1/1/97 |
| 8213 | Products | Domestic effective 9/1/98 |
| 8214 | General Liability | Domestic effective 9/1/98 |
| 8215 | Auto Liability | Domestic effective 9/1/98 |
| 8216 | Delphi First Party | Effective 1/1/99.  Cancelled 5/29/09. |
| 9205 | Auto Liability | Domestic Self Insured Ohio effective 9/1/01 |
| 5467 | Employers Liability | Domestic |
| 5620 | Products Post GMAC Carve Out | Domestic |
| 5930 | Products | Canadian |

- Control account, which will be added to number 2921 for billing in US currency.

4

5

2. **Claims Adjustment Administration Fee**

For the initial term of this Agreement, no Claims Adjustment Administration Fee ("Administration Fee") for Claims adjustment will be charged to Client by ESIS.

3. **Service Fees- Contract Staff Service Fees**

A. The Contract Staff Service Fee is an annual projected Service Fee based upon ESIS's estimated annual cost (multiplied by a Staff Cost Multiplier, during the term of this Agreement, of maintaining sufficient staff to service

Client's Claims of the Claim Types described in Table 1 that result from Occurrences taking place during the term of this Agreement and, if applicable, any similar Claims remaining open at the expiration of, or newly reported but arising out of, any preceding term that has been continuously renewed since incepting. For the initial term of this Agreement, the Staff Cost Multiplier will be 2.25.

B. On the date of termination, expiration or its last renewal: (1) ESIS will cease rendering any Included Services on any Claims Files remaining open (including those, if any, remaining open at the expiration of, or newly reported but arising out of, any preceding term that has been continually renewed since incepting); (2) ESIS will accept no further referrals of Claims (including those, if any, arising out of, any preceding term that has been continually renewed since incepting) from Client; (3) all Service Fees theretofore paid or payable to ESIS are deemed to be fully earned unless the Agreement is terminated by ESIS. If ESIS terminates the Agreement, ESIS will reimburse the claim all Service Fees on a pro-rated basis; (4) ESIS will cooperate with Client in returning to Client, or its designee, all such open Claim Files; and (5) the cost of retuning these Claims Files will be borne by the Client.

C. **Other Service Fees**
ESIS Employee related expenses;; RMIS Fees; Outside Investigator Vehicles; Vehicle Services; "Vehicle Fees"

D. Real Estate costs associated with the Dedicated Unit will be the sole responsibility of the Client. These costs include all rent and related items, real estate taxes, fees and assessments, furniture, telephones and utilities.

E. Billing Contract Numbers 2921, 8213, 8214, 8215, 3799, 3908, 4166, 9205 & 2927 are established for the administration of the Dedicated Centralized Unit handling the Automobile Liability, General Liability, Premises Liability and Products Liability Claims which may be tendered to the Unit.

F. For any succeeding term, an estimate of the proposed annual Contract Staff Service Fee based on current salaries and expected merit increases, the proposed Staff Multiplier, the proposed Administration Fee, and the number of personnel proposed to be assigned, will be provided to Client by ESIS by the beginning of the fourth quarter of the initial term, and of each renewal term, of this Agreement, substantially in the form set forth in Table 2.

G. Non file specific travel will be billed as incurred.

6

| Position Type | Initial Projected Staff | Annual Service Fee |
|---|---|---|
| BILLING CONTRACT # 2921 | | $7,665,700 |
| Staff for Products, General Liability, Vehicle Management and Operations Team | | |
| Claims Vice President | | |
| Clerk---Grade Level 10 | | |
| Clerk-Grade Level 13 | | |
| Clerk-Grade Level 14 | | |
| REP-Grade Level 20 | | |
| REP-Grade Level 21 | | |
| REP-Grade Level 22 | | |
| REP-Grade Level 23 | | |
| Team Leader-Grade 24 | | |
| Team Leader-Grade 26 | | |
| Billing Contract # 3391 | | $692,247 |
| Staff for First Party Auto | | |
| Clerk-Grade Level 12 | | |
| Team Leader-Grade Level 24 | | |
| Team Leader-Grade Level 24 | | |
| REP-Grade Level 21 | | |
| **Total** | | **$8,357,947** |
| **Projected Annual Service Fee** | | **$8,357,947** |

7

Table 2

| ESIS GM Program 2009 Program Costs | $ Amount |
|---|---|
| Direct GM Cost: (Salaries, EAP, Incentive Comp, etc.) | 5,089,061 |
| ESIS GM Office Expenses: | 1,300,125 |
| Support and Indirect Costs: | 1,968,761 |
| Total Price Load for Contract Staff Team | 8,357,947 |
| | |
| Other Employee Related Items | 20,000 |
| Non-file Specific Travel | 75,000 |
| RMIS Fee | 308,000 |
| RMIS Reports per request @ $185/HR | |
| Outside Investigators Vehicles: | 342,192 |
| Total Price | 9,028,139 |

## 4. Global RiskAdvantages® Services Fees (RMIS Fees)

For the initial term of this Agreement, RMIS Fee for Global RiskAdvantages® access, storage, maintenance, and related systems charges in the amount of $308,000 is payable in accordance with Section 4 of the Agreement. Each periodic installment of the RMIS Fee is fully earned upon expiration of the quarter for which it is payable. An estimate of the annual Service Fee for Global Risk Advantages® access proposed for any succeeding term will be provided to Client by ESIS by the beginning of the fourth quarter of the initial term, and of each renewal term, of this Agreement, substantially in the form set forth in Table 3.

Table 3

| Service Type | Master Contract 2921 | Contract 3391 | Contract 3908 & 4166 | Contract 2922 | Total Annual Fee |
|---|---|---|---|---|---|
| Claims Storage & Maintenance Risk Advantage | $184,800 | $123,200 | | | $308,000 |
| Total System Fees | $184,800 | $123,200 | | | $308,000 |

Delete the existing Exhibit E and replace with the following paragraphs:

ESIS shall maintain Insurance coverage in amounts not less than the following: (a) Workers' Compensation – Statutory Limits for the state or states in which this order is to he performed; (h) Employer's Liability-$500,000; (c) Commercial General Liability (including Premises, Operations, Independent Contractors, Products/Completed

8

Operations and Contractual Liability) -$5,000,000 each occurrence; (d) Automobile Liability (including owned, non-owned and hired vehicles) - $5,000,000 each occurrence; and (e) Professional/Errors and Omissions Liability insurance appropriate to the ESIS's profession. Coverage must be for a professional error, act or omission arising out of the scope of services shown in this order - $5,000,000 per claim.

All policies of insurance procured by ESIS herein shall be written as primary policies, not contributing with nor in excess of coverage that Client may carry. Additionally, if ESIS's liability policies do not contain the standard separation of Insured's provision, or a substantially similar clause, they shall be endorsed to provide a Cross-Liability Clause.

At Client's request, ESIS shall furnish to Client certificates of insurance evidencing compliance with the insurance requirements set forth above. The certificates will provide that Client shall be named an additional insured on the Commercial General Liability policy. The certificates shall provide that Client shall receive thirty (30) days' prior written notification from the insurer of any termination of coverages.

Such certificates shall be in a form acceptable to, and underwritten by insurance companies reasonably satisfactory to Client. By requiring insurance herein, Client does not represent that coverage and limits will necessarily be adequate to protect ESIS.

Exhibit G of the Agreement is hereby amended as follows:

Delete    the    existing    Section    O    and    replace    with    the    following    paragraph:

Special Billed Amount means an individual Claim Payment, or individual Allocated Loss Expense payment, that will exceed the sum of $500,000 and the funds for which will be specially requested of Client by ESIS, and funded by Client, outside of the Claim Fund.

Delete the existing Section 19 and replace with the following paragraph:

> ESIS and Client (each an "Indemnitor") shall indemnify the other party (each an "Indemnitee"), its affiliates, and their respective directors, officers, employees, and agents from and against any demands, actions, liabilities, damages, or expenses (including reasonable attorneys' fees and other costs of defense) in connection with any real or alleged negligent or willful acts, or errors or omissions, of the Indemnitor, in the performance of Indemnitor's duties under this Agreement. The Indemnitor's duty under this paragraph is conditioned upon Indemnitee's prompt notice to Indemnitor of the demand, action, or other event which may require indemnification. To the extent that the liabilities, damages, or expenses may result in part from acts or omissions of the Indemnitee, the Indemnitee shall bear its proportionate share. The Indemnitee shall upon request be permitted to associate in the defense at its own cost of any indemnified action but the Indemnitor shall have ultimate control of the defense, including any decision to settle except with respect to settlement including payment from Indemnitee.

> Insurance. During the term of this agreement, ESIS will maintain policies of insurance in the types and amounts set forth in Exhibit E. All insurance policies will be issued by reputable insurance companies rated "A" or better by A.M. Best. If such policies do not contain a separation of insureds provision, they will be endorsed to provide cross-liability coverage. ESIS will include all subcontractors employed by it as additional insureds under its policies or will

9

cause each subcontractor to purchase and maintain insurance of the type specified and listing Client as an additional insured. When requested by Client, ESIS will furnish copies of certificates of insurance evidencing coverage for each subcontractor.

Delete the existing Exhibit A, Section 1.iv and replace with the following paragraph:

Resist Claims where it would appear to be prudent, including arranging legal defense on Client's behalf when requested

IN WITNESS WHEREOF, the parties have caused this Agreement and Exhibits, all of which shall be effective on the date first above-written, to be executed on their behalf by the undersigned duly authorized individuals.

General Motors Corporation

By

Printed name:  Kevin Scroggin

Printed Title:  General Director of Corporate Risk Management

Date  31 MARCH 2009

ESIS, Inc.

By

Printed name:  Michael Hoberman

Printed Title: Senior Vice President

Date  3/31/09

**GM Canada Addendum to Service Agreement Renewal Addendum effective 1/1/09**

**Addition to Key Employees, as defined in Section 22.**

Susan Braun          Designated Senior Canadian Claim Administrator

**Addition Table 2 – Canadian Projected Annual Service Fee is as follows:**

| | |
|---|---|
| Billing Contract 5930 Canada | $135,424 |
| Total | $135,424 |
| Projected Annual Service Fee | $135,424 |

| ESIS GM Program Costs | $ Amount |
|---|---|
| Canadian Claim Administrator | $120,724 |
| RMIS Fee | $4,700 |
| Administration Fee | $10,000 |
| Total Price | $135,424 |

1.  **Global Risk Advantage Service Fees (RMIS Fees)**

Table 3 is amended as follows:

| Service Type | Contract 5930 Canada | Total Annual Fee |
|---|---|---|
| Claim Storage and Maintenance Risk Advantage | $4,700 | $4,700 |

All other terms and conditions of the Agreement and applicable Addenda to the Agreement previously entered into by the parties shall remain the same.

IN WITNESS WHEREOF, the parties have caused this Addendum effective on January 1, 2009 to be executed on their behalf by the undersigned duly authorized individuals.

General Motors Corporation                    ESIS, Inc.

By:                                           By:

Kevin Scroggin                                Jim Bead
General Director of Corporate Risk            Senior Vice President ESIS Finance
Management

Date: 20 MAY 2009                             Date: 5/30/09