SIDLEY AUSTIN LLP

Hearing Date and Time: June 30, 2009 at 9:45 a.m.

One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036
Kenneth P. Kansa (admitted *pro hac vice*)
Wendell M. Harp

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Teresa H. Chan

Counsel for the White Marsh/Memphis Secured Lenders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- X
In re:                                                    :    Chapter 11
                                                          :
GENERAL MOTORS CORP., *et al.*,                           :    Case No. 09-50026 (REG)
                                                          :
                              Debtors.                    :    (Jointly Administered)
----------------------------------------------------- X

**LIMITED OBJECTION OF WHITE MARSH/MEMPHIS SECURED LENDER
GROUP TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f),
(k), AND (m) AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006,
(I) TO APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE
AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION
HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS;
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF, AND
(II) SCHEDULING SALE APPROVAL HEARING AND, IN THE ALTERNATIVE,
<u>REQUEST FOR ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 363(e)</u>**

Norddeutsche Landesbank Girozentrale ("<u>Nord LB</u>"), together with the other

lenders that are members of the Lender Group (as defined below), hereby submits this Limited

Objection (the "<u>Limited Objection</u>") to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105,

363(b), (f), (k) and (m) and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief, and (II) Schedule [sic] Sale Approval Hearing (the "Sale Motion").  This Limited Objection should also be construed as a protective request by the Lender Group for adequate protection of the Lender Group's interests pursuant to section 363(e) of title 11 of the United States Code (the "Bankruptcy Code") in the event the primary relief sought by this Limited Objection is not granted.  In support of this Limited Objection, the Lender Group respectfully states as follows:

## INTRODUCTION

1.      The Lender Group does not object in principle to the sale of the Debtors' assets to the Purchaser pursuant to section 363 of the Bankruptcy Code, including the sale of the two facilities - a transmission manufacturing plant in White Marsh, Maryland (the "Maryland Facility") and a distribution center in Memphis, Tennessee (the "Tennessee Facility" and, collectively with the Maryland Facility, the "Facilities") - on which the Lender Group has uncontested first-priority mortgage liens and security interests.  This Limited Objection is submitted for the discrete purpose of preserving the rights and interests of the Lender Group as holders of first-priority secured claims against the Facilities.  As set forth herein, GM should comply with the requirements of the Bankruptcy Code and applicable case law by satisfying the Lender Group's claims in full or, alternatively, leaving the Lender Group's existing rights in the Facilities unaffected, while providing true adequate protection for the Lender Group's interests.

## DETAILS OF THE LENDER GROUP'S SECURED CLAIMS

2.      The Lender Group's secured claims stem from a synthetic lease/secured financing facility which began as a sale-and-leaseback transaction that was first entered into in 1999.  In summary, under that transaction General Motors Corporation ("GM"), one of the Debtors, sold a number of its facilities – including the Facilities – to a trust, with Wilmington Trust Company as the Trustee.  GM then leased those facilities back from the trust.  The trust financed the acquisition of the facilities from GM in part with funds provided by a number of commercial lenders, with Wells Fargo Bank Northwest, N.A. as agent.

3.      The sale-and-leaseback arrangement was amended and restated in June 2004, and the documents entered into at that time govern the transaction today.  The principal documents governing the transaction include (i) the Second Amended and Restated Participation Agreement and Amendment of Other Operative Documents, dated as of June 30, 2004 (the "Participation Agreement"), by and among General Motors Corporation ("GM" or the "Lessee"), Wilmington Trust Company, as Owner Trustee (the "Owner Trustee"), GM, as Certificate Holder, Hannover Funding Company ("Hannover"), as CP Lender, the financial institutions named on Schedule II thereto, as purchasers (the "Committed Lenders" and, together with Hannover, the Committed Lenders and the "Liquidity Providers" (as hereinafter defined), the "Lender Group"), Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator (the "Administrator"), and Wells Fargo Bank Northwest, N.A., as agent for Hannover and the Committed Lenders (as such agent, the "Agent"); (ii) the Amended and Restated Loan Agreement dated as of June 30, 2004 (the "Loan Agreement"), among the Owner Trustee, Hannover, the Agent and the Administrator; (iii) the Non-Recourse CP Note dated June 30, 2004 executed by the Owner Trustee in favor of Hannover (the "Note"); (iv) the Tennessee Master

3

Lease and Open End Leaseholds Deeds of Trust dated as of November 18, 1999 between GM

and the Owner Trustee, as amended by an amendment dated as of June 30, 2004 (collectively,

the "Tennessee Lease"); (v) the Tennessee Leasehold Deed of Trust dated as of November 18,

1999 from the Owner Trustee to Joseph B. Pitt, Jr., as Deed of Trust Trustee for the benefit of

First Security Bank, N.A. (as predecessor to Wells Fargo Bank Northwest, N.A.), as agent, as

amended by an amendment dated as of June 30, 2004 (collectively, the "Tennessee Deed of

Trust"); (vi) the Maryland Master Lease and Mortgages dated as of September 8, 1999 between

GM and the Owner Trustee, as amended by an amendment dated as of June 30, 2004

(collectively, the "Maryland Lease" and, together with the Tennessee Lease, the "Leases"); and

(vii) the Maryland Mortgage dated as of September 8, 1999 from the Owner Trustee to First

Security Bank, N.A. (as predecessor to Wells Fargo Bank Northwest, N.A.), as agent, as

amended by an amendment dated as of June 30, 2004 (collectively, the "Maryland Mortgage").

The Participation Agreement, the Loan Agreement, the Note, the Tennessee Lease, the

Tennessee Deed of Trust, the Maryland Lease and the Maryland Mortgage are sometimes

collectively referred to as the "Transaction Documents."[1] The Transaction Documents reflect the

terms of the following transaction (the "Transaction") which originally closed in 1999 and was

refinanced in June 2004.[2]

---

[1] Copies of the Transaction Documents are too voluminous to attach, but are available upon request.

[2] In the June 30, 2004 refinancing documented by the Transaction Documents, Hannover refinanced the debt that had been held by two (2) commercial paper issuing conduits managed by Bank of America, N.A.  Several institutions (the "Liquidity Providers"), who are the same group of financial institutions as the Committed Lender, provided liquidity support to Hannover pursuant to a Liquidity Asset Purchase Agreement dated as of June 30, 2004 (the "APA"). Pursuant to the terms of the APA, Hannover has now assigned its loan to the Liquidity Providers.

4.      In the original stage of the Transaction in 1999, GM sold eight (8) facilities to the owner trust for which the Owner Trustee acts as trustee (the "Owner Trust") and leased the facilities back from the Owner Trust.  The funding for the purchase by the Owner Trust came from two sources.  Equity participants in the transaction purchased beneficial interests in the Owner Trust, and debt participants, represented by the Agent, provided debt financing to the Owner Trust.  The Owner Trust granted mortgages on each of the facilities to the Agent for the benefit of the Lender Group.  Between September 2007 and June 2008, six (6) of those properties were sold and the corresponding debt repaid in accordance with the terms of the Transaction Documents.  The two remaining properties are the Maryland Facility and the Tennessee Facility.  The Tennessee Facility carries a loan balance of $26,800,000 and the Maryland Facility carries a loan balance of $63,900,000; accordingly, the aggregate loan balance applicable to the Facilities is $90,700,000.

5.      Each of the facility leases was structured as a synthetic lease; in other words, a lease that would be treated as an operating lease for accounting purposes, but a capital lease for all other (tax, commercial law and bankruptcy) purposes.  Sometime between the original closing and the refinancing that closed on June 30, 2004, GM bought out all of the beneficial interests in the Owner Trust, so that at that point, GM became both the beneficial owner of the properties (through its ownership of the beneficial interests in the Owner Trust) and the lessee of the properties.  At that point, each of the leases became a capital lease, and the Transaction Documents from June 2004 make clear that the Transaction constitutes a debt financing for GM and not true operating leases of the properties.

6.      The Participation Agreement provides explicitly that for all purposes, "… including financial accounting, federal and all state and local income tax purposes, state real

estate and commercial law and bankruptcy purposes, (A) the [Leases] will be treated as financing

arrangements, (B) the [Lender Group] will be deemed lenders making loans to [GM] in an

amount equal to the sum of the outstanding principal amount of the Loans, which loans are

secured by the [Facilities] pursuant to the terms of the [Transaction] Documents, and (C) [GM]

will be treated as the owner of the properties and will be entitled to all tax benefits ordinarily

available to an owner of property like the Properties for such tax purposes...."  See Participation

Agreement at § 5.1(a).  As further clarification, the Participation Agreement also provides that

"the parties hereto intend and agree that in the event of any ... petition under the United States

bankruptcy laws ... affecting [GM], ... the transactions evidenced by the [Transaction]

Documents are loans made to [GM] by the [Owner Trust] and the [Lender Group] in each case as

unrelated third party lenders."  See id. at § 5.1(b).

7.        The Transaction Documents provide that the refinancing arrangement

closed on June 30, 2004 would continue for five years, until June 30, 2009.  One year prior to

that date – in other words, June 30, 2008 – GM had the option under the Tennessee Lease and

the Maryland Lease to extend each capital lease for another five year term or to have the

property remarketed.  If GM did not affirmatively elect one of those options, then GM was

deemed to elect to end the arrangement at the end of the term and to take back the facilities in

exchange for payment of an amount specified in the documents.  That amount is equal to the

outstanding loan balance; i.e., $26,800,000 for the Tennessee Facility and $63,900,000 for the

Maryland Facility.  GM made no election under the documents by the June 30, 2008 deadline;

accordingly, it became obligated to pay the above amounts on June 30, 2009 as its price for

continued use of the Facilities.[3]  As a result of its action (or inaction) in June 2008, GM

presumably determined that the Facilities were worth at least $90,700,000 on June 30, 2008 and

would be so on June 30, 2009; otherwise, it would have elected to extend the leases or have the

facilities remarketed.

        8.        Consistent with the terms of the Transaction Documents, the Lender

Group has treated the Transaction as a secured financing arrangement.[4]  Specifically, the Agent

holds perfected, first-priority security interests in and mortgages on the Tennessee and Maryland

Facilities pursuant to the Leases, the Tennessee Deed of Trust and the Maryland Mortgage.  The

first-priority status of the mortgages and security interests securing GM's obligations to the

Lender Group is unaffected by GM's debtor-in-possession financing facility, which provides in

summary that the lenders thereunder are receiving a first-priority security interest only in

unencumbered property, while receiving a junior interest in any property that is subject to

previously-existing security interests, such as the Facilities.[5]  As a result, the Lender Group,

through the Agent, holds valid, first-priority, undisputed security interests in and mortgages on

the Maryland and Tennessee Facilities.

---

[3] In addition, the Loan Agreement and the Note provide for a June 30, 2009 final payment date
for the loan balance for each of the Facilities.

[4] The Lenders believe that GM likewise intends to treat the Transaction as a secured financing
arrangement.  If GM disputes the treatment of the Transaction as a secured financing and instead
wishes to treat it as a true lease arrangement, then the Tennessee Lease and Maryland Lease must
be assumed by GM and assigned to the Purchaser in the event the Purchaser wishes to continue
utilizing the Facilities.  To do so, existing defaults must be cured under the Tennessee Lease and
the Maryland Lease and the Purchaser must provide adequate assurance of its ability to perform
its obligations thereunder.  See 11 U.S.C. § 365(b), (f).

[5] See Interim Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507
and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and
Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting
Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral, (D)
Granting Adequate Protection to Certain Pre-Petition Secured Parties and (E) Scheduling a Final
Hearing dated June 2, 2009 [D.I. 292]  at ¶¶ (iv), 6.

## ARGUMENT

**1.    The Debtors Cannot Sell the Facilities Free and Clear of the Lender Group's Mortgages and Security Interests**

9.    The Debtors intend to transfer the Facilities to the Purchaser.  Further, pursuant to the Sale Motion and the Master Sale and Purchase Agreement (the "MSPA"), the Debtors intend to sell the Facilities free and clear of all liens, claims, encumbrances and interests, including the Lender Group's mortgages and security interests.  See Sale Motion at ¶¶ 66-68; MSPA at § 2.1.  The Debtors can sell the facilities free and clear of an interest in property only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) [the holder of such interest] consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) [the holder of such interest] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  The overarching point of this section is simple – in order to sell property free and clear of liens, a secured creditor's undisputed interest must be fully satisfied, it must consent, or its pre-existing position must otherwise be fully and properly preserved.

10.    The Debtors bear the burden of demonstrating that the section 363(f) factors are satisfied.  See, e.g., In re Beery, 295 B.R. 385, 397 (Bankr. D.N.M. 2003) (trustee bears burden of demonstrating that section 363(f) requirements are satisfied as to all interests in property sought to be transferred).  If the Debtors cannot make such a showing, the Lender

Group's mortgage liens and security interests will continue in the Facilities notwithstanding their transfer. See, e.g., 3 Collier on Bankruptcy ¶ 363.06[6][a] (15th ed. rev. 2009) ("...because a lien on real estate continues into the hands of a buyer, it appears that a trustee should not be able to sell real estate free of a lien unless the trustee can assert a basis for finding that one of the grounds of section 363(f) is satisfied").

11.   The Sale Motion and related materials do not demonstrate that any of the section 363(f) factors are satisfied. Subsections (2) and (4) are facially inapplicable, because the Lender Group has not consented to the proposed sale free and clear of its security interests and mortgages, and there is no dispute concerning the validity and priority of those security interests and mortgages. Likewise, no nonbankruptcy law authorizes the sale of the Facilities free and clear of the security interests and mortgages, so subsection (1) is inapplicable.[6] Indeed, the Debtors do not contend that any of subsections (1), (2), and (4) of section 363(f) is applicable.

12.   This leaves only sections 363(f)(3) and (f)(5) as potential bases for the free and clear sale of the Facilities. The Debtors have not demonstrated that section 363(f)(3) is satisfied. No purchase price for the Facilities has been specified. The Agent holds, for the benefit of the Lender Group, first-priority mortgage liens on the Facilities in the approximate aggregate amount of $90.7 million. Accordingly, in the event that the purchase price expressly allocated by the Debtors to the Facilities is sufficient to pay the amount of the Lender Group's mortgage liens and security interests, then the Lender Group does not dispute that section

---

[6] See Martin v. Golden Key Homes, Inc., 244 Md. 367, 374 (Md. 1966) ("[T]he first mortgagee can not be forced to allow a sale of the property free of his lien . . . ."); Bolerjack v. Fidelity Sav. & Loan Ass'n, 1988 WL 126839, *8 (Tenn. App. 1988) (noting that a senior lien may not be extinguished by sale absent the lien holder's consent); see also Compton v. Jessup, 68 F. 263, 298 ("The ordinary equitable rule is that the junior mortgagee cannot compel the sale of the premises free from the lien of the senior mortgage, against the consent of the senior mortgagee, but that his only remedy is to redeem the senior mortgage."); cf. Dewsnup v. Timm, 502 U.S. 410, 417 (1992) (creditor's lien stays with real property until foreclosure).

363(f)(3) is satisfied.  Because there is no such allocation, however, it is impossible for the

Debtors to carry their burden to show that section 363(f)(3) permits the free-and-clear sale of the

Facilities.

13.    This case is no different on this point than the situation faced by this Court

in In re General Bearing Corp., 136 B.R. 361, 366-67 (Bankr. S.D.N.Y. 1992).  In General

Bearing, this Court denied approval for a proposed sale of assets under section 363(f)(3) where

"the debtor has produced no evidence that the sale price is greater than the aggregate value of all

liens on the property to be sold….," nor had the debtor established the aggregate value of all

liens on the property to be sold.  Here, the Debtors have likewise not made any such showings.

Absent such an allocation, this Court should rule as it has previously and deny approval for the

proposed sale of the Facilities free and clear of the Lender Group's interests.

14.    Courts will also not find section 363(f)(3) to be applicable where the

literal language of the statute is not met, even if the proposed purchase price is the best offer

available (as the Debtors have asserted here).  See id. at 367; In re K&C Machine & Tool Co.,

816 F.2d 238, 240-41 (6th Cir. 1987) (denying sale of property under section 363(f)(3) for

undisputed best offer of $640,000 when aggregate liens on property totaled $1.1 million).  Here,

the Lender Group does not dispute that proposed offer the Purchased Assets as a whole may be

the best offer available.  Unless the Debtors demonstrate that the Lender Group's first-priority

secured claims will be satisfied in full out of the purchase price, however, section 363(f)(3) is not

applicable.

15.    Section 363(f)(5) likewise provides no basis for the Debtors to sell free

and clear of the Lender Group's mortgages and security interests.  In the Sale Motion and the

accompanying Memorandum of Law, the Debtors state that "each of the parties holding liens on

the Purchased Assets could be compelled to accept a monetary satisfaction of such interests,

satisfying sections [sic] 363(f)(5)." Memorandum of Law at ¶ 22.  In other words, the Debtors

contend that section 363(f)(5) applies whenever a claim or interest can be paid with money, even

if less than face value.  Most courts, however, reject this view of subsection (f)(5).  See, e.g., In

re PW, LLC, 391 B.R. 25, 42 (B.A.P. 9th Cir. 2008) (overruling bankruptcy court's

determination that section 363(f)(5) is satisfied anytime a lien can be satisfied with the payment

of money); In re Stroud Wholesale Corp., 47 B.R. 999, 1002 (E.D.N.C. 1985) (same).  Those

courts reason correctly that virtually all liens can be satisfied by the payment of money; as a

result, if subsection (f)(5) could be so easily satisfied, that subsection would essentially render

subsections (f)(1) through (4) superfluous.[7]  See Stroud, 47 B.R. at 1002; In re Beker Indus.

Corp., 63 B.R. 474, 478 (Bankr. S.D.N.Y. 1986) ("[t]o interpret § 363(f)(5) in the fashion

suggested by the Debtor would 'swallow up (f)(1) – (f)(4)…'").

16.    Instead, the critical question in determining whether section 363(f)(5)

applies is whether a "mechanism exists to address extinguishing the lien or interest without

paying such interest in full."  See PW, 391 B.R. at 43 (quoting In re Gulf States Steel, Inc. of

Ala., 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)).  Here, no such mechanism is apparent.

Importantly, cramdown under section 1129(b)(2) is not a hypothetical "legal or equitable

proceeding" in which the Lenders could be forced to accept less than the face amount of their

interest.  Various courts and Collier's have concluded that viewing cramdown as such a

proceeding is based on circular logic, and that it would both make section 363(f)(5) nearly all-

encompassing and permit a debtor to use 363(f) to evade the protections afforded to creditors in a

---

[7] An example makes the point.  If a homeowner sought to sell her home free and clear of her
mortgage, it would be absurd to suggest that because that mortgage could be repaid in cash, the
home could be sold free and clear without paying the mortgage in full.  The instant situation is
conceptually similar, albeit on a larger scale.

cramdown scenario. See PW, 391 B.R. at 46 ("use of the cramdown mechanism to allow a sale free and clear under 363(f)(5) uses circular reasoning - it sanctions the effect of a cramdown without requiring any of 1129(b)'s substantive and procedural protections"); In re Silver, 338 B.R. 277, 282-83 (Bankr. E.D. Va. 2004) (finding that section 363(f)(5) is not satisfied absent demonstration that secured creditors will receive payment in full and that an actual and not hypothetical satisfaction of all secured interests must be made); 3 Collier on Bankruptcy ¶ 363.06[6] (15th ed. rev. 2009) (same).

17.    This Court has previously rejected the contention that the existence of a hypothetical cramdown right can be a "legal or equitable proceeding" in which a secured creditor "could be compelled …to accept a money satisfaction" of less than the face amount of its interest. See Beker, 63 B.R. at 478. In Beker, the Court specifically considered whether a hypothetical 1129(b)(2) cramdown could be used to satisfy the requirements of section 363(f)(5). The Court concluded that it could not, observing that Congress could easily have cross-referenced section 1129(b)(2) in section 363(f)(5) if it wished. See id. In addition, the Court held that permitting the existence of a hypothetical 1129(b)(2) cramdown right – which would almost always exist – to satisfy section 363(f)(5) would cause subsection (f)(5) to swallow subsections (f)(1)-(4)). See id. In short, if Congress had intended the existence of a hypothetical cramdown right to satisfy 363(f)(5), it would have made its intentions clear and would not have included subsections (1) through (4) in the Bankruptcy Code. Accordingly, no mechanism is apparent by which the Lender Group could be forced to accept a money satisfaction of its interests that is less than the full amount of its interests, section 363(f)(5) does not permit the proposed sale free and clear.

18.    The section 363(f) requirements exist precisely to ensure that a sale of assets by a debtor does not unfairly prejudice the holders of liens, claims, encumbrances and interests in the property to be sold.  Here, the Debtors' proposed sale process does not clearly provide adequate treatment for the Lender Group's first-priority liens.  The Debtors have not demonstrated that any of the section 363(f) factors are applicable to the sale of the Facilities to the Purchaser.  Accordingly, absent satisfaction in full of the Lender Group's mortgage liens and security interests, the Debtors may not sell the Facilities free and clear of those liens and interests.

**2.      The Proposed Sale Process Impermissibly Frustrates the Lender Group's Rights to Credit Bid Their Secured Claims Under 11 U.S.C. § 363(k) and Otherwise Protect the Value of Their Claims**

19.    The proposed sale also frustrates the rights of the Lender Group to credit bid the amount of their mortgages and security interests in the Facilities.  Section 363(k) of the Bankruptcy Code provides that in any sale of property under section 363(b) that is subject to a lien, "….the holder of [a secured] claim may bid at such sale….," and may thereafter offset the amount of its claim against the purchase price of the property.  See 11 U.S.C. § 363(k); cf. Sale Motion at ¶ 18 (bulk of sale consideration for Purchased Assets is comprised of section 363(k) credit bid by the proposed Purchaser).[8]  A secured creditor's right to credit bid at any sale of property on which such creditor has a lien is a fundamental protection for that secured creditor in that it prevents a debtor from selling the property subject to the lien for inadequate consideration, thereby prejudicing the secured creditor.  As Collier's observes, "the right to credit bid enables a creditor, particularly an undersecured creditor, in essence to retake the property when it believes

---

[8] Rights to credit bid under section 363(k) are afforded to any holder of an "allowed claim."  The Lenders have filed (or will shortly file) a proof of claim on account of their secured claim in GM's chapter 11 case; as of such filing, their claim is deemed allowed pursuant to section 502(a) of the Bankruptcy Code.

that the price bid at the sale does not sufficiently reflect the value of the collateral."  3 Collier on

Bankruptcy ¶ 363.06[10] (15th ed. rev. 2009).

20.      Here, the Debtors' proposed sale process denies that protection.  The

Debtors have not allocated any portion of the proposed purchase price to the Facilities.  As a

result, the Lender Group is left without the ability to judge whether it is better served by credit

bidding the secured claims on the Facilities or consenting to the sale process.[9]

21.      It is illustrative that the Debtors and the Lenders would find themselves in

the same position vis-à-vis one another if the Debtors were seeking to consummate this sale

under a plan.  Section 1129(b)(2)(A) provides protections for the treatment of secured creditors

under a plan.  Where a plan provides for a sale of assets that are subject to secured claims,

section 1129(b)(2)(A)(ii) requires that any such sale be subject to a secured creditor's right to

credit bid.  This inclusion evidences Congress's view that the right of a secured creditor to credit

bid its claims is fundamental and absolute.  Cf. In re Kent Terminal Corp., 166 B.R. 555 (Bankr.

S.D.N.Y. 1994) (finding that chapter 11 plan was not "fair and equitable" because it denied

secured creditor the right to credit bid where the plan provided for the sale of collateral free and

clear of security interests).[10]

---

[9] This is comparable to the problem that would result under 1129(b)(2)(A) or, in the alternative,
under the best interests test, where the Lenders are simply left without the ability to judge
whether the Debtors' proposed transaction is better or worse for them than the alternative.  In the
absence of proper information and resolution of these questions, the Lenders have no alternative
but to submit this Limited Objection.

[10] For the avoidance of doubt, the Lenders note that they are entitled to credit bid the entirety of
their claims pursuant to section 363(k), including any alleged unsecured deficiency thereof.  See,
e.g., In re SubMicron Systems Corp., 432 F.3d 448 (3d Cir. 2006) ("[i]t is well settled among
district and bankruptcy courts that creditors can bid the full face value of their secured claims
under 363(k)" and "interpreting [section 363(k) to cap bids at the economic value of the
underlying collateral is theoretically nonsensical.")

3.      **The "Adequate Protection" Proposed by the Debtors Is Inadequate**

    *a.      The Debtors' Proposed Replacement Liens in Illiquid, Minority Common Equity Do Not Adequately Protect the Lenders' Interests*

    22.    Even if the Debtors were able to sell the assets free and clear of the Lender Group's liens and credit bid rights – and at present they cannot – they also do not provide the Lenders with "adequate protection" in violation of sections 361 and 363 of the Bankruptcy Code. Pursuant to Section 363(e) of the Bankruptcy Code, "….at any time, on request of an entity that has an interest in the property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The term "shall", as used in Section 363(e), makes clear that adequate protection must be provided as a precondition to the use, sale, or lease of a party's collateral.  See, e.g., United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., 484 U.S. 365 (1988); 3 Collier on Bankruptcy ¶ 363.05[2] (15th ed. rev. 2009) ("if adequate protection cannot be offered, [a] use, sale or lease of the collateral must be prohibited").  As a result of the Lender Group's request for adequate protection of their secured interest in the facilities, pursuant to Section 363(e), the Debtors cannot use, sell, or lease the collateral (i.e., the Facilities) until adequate protection is provided. See Timbers, 484 U.S. at 377.

    23.    The fundamental purpose of adequate protection is to ensure that a secured creditor will receive the "indubitable equivalent" of its secured claim.  The Second Circuit, through Judge Learned Hand, made the essence of that requirement clear long ago:

> *It is plain that "adequate protection" must be completely compensatory*; and that payment ten years hence is not generally the equivalent of payment now.  Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; *he wishes to get his*

> *money or at least the property*.  We see no reason to suppose that
> the statute was intended to deprive him of that in the interest of
> junior holders, unless by a substitute of the most indubitable
> equivalence.

In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir. 1935) (emphasis added).  The Supreme

Court has made clear that this concept of adequate protection – namely, that secured creditors'

interests may only be replaced with a substitute of "the most indubitable equivalence" – applies

where a debtor proposes to sell substantially all of its assets, whether pursuant to section 363 or a

plan.  See Timbers, 484 U.S. at 368, 382.  Put simply, the fundamental purpose of adequate

protection is to ensure that a secured creditor receives the full value of its secured claim.  See

Timbers, 484 U.S. at 377; In re Broomall Printing Corp., 131 B.R. 32, 37 (Bankr. D. Md. 1991)

("The claim of a secured creditor is entitled to protection to assure that the holder will ultimately

recover the amount of the claim, up to the value of the collateral.")

      24.     The Debtors propose inadequate protections for the Lender Group's

interests.  As set forth in the Sale Motion, the Debtors propose to provide "adequate protection"

to the Lender Group in exchange for the existing mortgage liens and security interests by having

those liens and security interests transfer and attach to the proceeds of the sale.  See Sale Motion

at ¶ 67.  While this is common and often unobjectionable in section 363 sales, the content of the

sale proceeds does not lend itself to bearing replacement liens.  The sale proceeds are principally

composed of a credit bid by the Purchaser, assumption by the Purchaser of the Assumed

Liabilities, and the UST Warrant (as such terms are defined in the Sale Motion) - in short,

property to which the replacement liens cannot attach.  See Sale Motion at ¶ 18.  The only

portion of the sale proceeds to which the replacement liens may be transferred and attach is the

10% common equity interest in the Purchaser that is to be issued by Purchaser to GM as of the

closing of the proposed sale.  See id.

25.     A replacement lien of indeterminate value on an illiquid minority stake of common equity in a newly-formed non-public entity does not adequately protect the Lender Group's interests.  The proposed sale order would replace the Lender Group's bargained-for mortgage liens and security interests in real property being used by GM today as an integral part of its business operations - and intended to be used by the Purchaser for the same purposes - with a security interest in equity, which is inherently inferior collateral.  Any portion of that equity would not be distributed to the Lender Group until confirmation of a plan for GM or other resolution of GM's bankruptcy occurs, which is at best far in the future, and the Lender Group would have no right to foreclose on or otherwise receive the equity stake in which it would be granted an interest in the meantime.[11]

26.     It cannot be doubted that a security interest in equity does not constitute adequate protection for a security interest in real property that matures by its terms on the day of the proposed sale hearing.  Indeed, the legislative history of the Bankruptcy Code specifically observes that equity securities do not constitute the "indubitable equivalent" of a secured claim.  See 124 Cong. Rec. at H11, 104 (daily ed. Sept. 28, 1978) ("unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent").  It follows that a security interest in that equity, which is subject to the same fluctuations in value as the equity itself, can also not be the indubitable equivalent of a secured claim.  Following that logic, in the context of satisfaction of a secured creditor's claim under 11 U.S.C. § 1129(b)(2), at least one court has rejected the efforts of a debtor to provide an illiquid equity interest as the "indubitable equivalent" of a secured creditor's claim.  See In re TM Monroe Manor Assocs. Ltd., 140 B.R.

---

[11] According to the Sale Motion, the proceeds of the proposed sale will also include warrants to purchase up to 15% of the shares of the common stock of the Purchaser.  As a replacement for a first-priority mortgage on and security interest in real property, a replacement security interest in warrants would be even weaker than one in common equity.

298 (Bankr. N.D. Ga. 1991) (rejecting proposed plan treatment where secured creditor would receive high-risk, illiquid equity in a third party partnership because such treatment "forces a secured creditor to expose itself to a greater risk than the creditor had ever contemplated initially").[12]

27.    The proposed replacement liens are also inadequate because the Debtors appear to intend that the Lender Group will hold a lien on the equity for the unknown period until the Debtors confirm a liquidating plan or convert the case, without payment of interest. This puts the Lender Group in a far worse position than their rights provide.  The Lender Group has bargained to receive payment of the outstanding loan balance relating to the Facilities ($90.7 million) on June 30, 2009.  By their actions a year prior to the Petition Date, the Debtors elected to pay that amount on June 30, 2009.  Moreover, by seeking to transfer the Facilities to the Purchaser as part of the proposed sale, the Debtors have reaffirmed the ongoing value of the Facilities to the business now conducted by GM and to be conducted post-sale by the Purchaser. The Debtors should accordingly be required to satisfy the Lender Group's claims in full or provide the Lender Group with true adequate protection for its secured claims.  What cannot be done is a sale free and clear of the Lender Group's liens with the Lender Group left in limbo as to what it will get (other than a facially-inadequate replacement interest) and when it will get it – that is precisely the opposite of the adequate protection required under the Bankruptcy Code.

---

[12] The Lender Group is aware that the bankruptcy court's decision referenced in the District Court's opinion in In re Westpoint Stevens, Inc., 330 B.R. 30 (S.D.N.Y. 2005) appears to have approved the distribution of stock to the secured creditors in that case in satisfaction of their claims.  The District Court did not in its opinion reach the substantive issue of whether such treatment was proper.

**b.      *The Debtors' Proposed Adequate Protection is Made Worse Still Because the Debtors Do Not Disclose the Extent of Secured Parties' Interests in the Replacement Collateral***

28.      In addition to the inadequacy of a lien on stock as replacement for the Lender Group's existing secured claim, the situation is muddied further by providing essentially no information as to the number or priority of secured claims that are also intended to receive replacement liens on the equity of the Purchaser to be distributed to GM.  The Henderson Affidavit acknowledges that GM is party to "various third party financing arrangements, including leveraged leases for equipment, synthetic leases, arrangements related to the financing of central utilities complexes, and several industrial revenue bond obligations...."  Henderson Affidavit at ¶ 130.  Neither the Henderson Affidavit nor any of the other materials filed by the Debtors appears to quantify those obligations, however, leaving the Lender Group without information as to the universe of claims that the Debtors also intend to have adequately protected through a grant of replacement liens on the 10% equity stake in the Purchaser.  Given these omissions, it is impossible for the Debtors to demonstrate that the Lender Group has been afforded adequate protection of its interests such that the sale free and clear of those interests can be approved.

29.      The Debtors have also stated that the proceeds of the sale, explicitly including the 10% equity interest in the Purchaser, "….will be administered in the chapter 11 cases to support the liquidation, wind-down, or other disposition of the Debtors' chapter 11 cases."  Henderson Affidavit at ¶ 80.  This suggests that the Debtors will or may deplete the equity interest in order to fund the administration of their estates.  Such a potential depletion of the proposed replacement collateral for the Lender Group casts further doubt on the idea that a security interest in the equity can adequately protect the Lender Group's interests.

30.     The Lender Group did not bargain for, and cannot be forced to accept, equity risk. This Court should rule that a restricted interest in a minority equity position, which may be shared with an unknown number of other secured creditors and subject to depletion, cannot be the "indubitable equivalent" of a first-priority security interest in identifiable real property. The Debtors have not met their indisputable burden to demonstrate that the Lender Group's interests will be adequately protected in a manner that will afford the Lender Group the full value of its claims. Instead, the Debtors offer only the bare statement that liens, claims, encumbrances and interests in the Purchased Assets will transfer and attach to the net proceeds of the sale. See Sale Motion at ¶ 67. This Court should rule that the Lender Group's interests are not adequately protected and, accordingly, either true adequate protection must be provided or approval of the sale of the Facilities on a free-and-clear basis should be denied.

### c.     Any Court Approval of the Sale Should be Conditioned on the Provision of True Adequate Protection

31.     The Lender Group has previously demonstrated why, as a matter of law, the sale free and clear of the Lender Group's mortgage liens and security interests cannot be approved. In the event the Court approves the sale of the Facilities free and clear notwithstanding the Lender Group's arguments, the Debtors should at a minimum be required to provide true adequate protection for the Lender Group's interests, ensuring that the Lender Group will receive the full amount of its claims, which is no more and no less than the law requires. This Court is required to order the provision of such adequate protection pursuant to section 363(e) of the Bankruptcy Code, which provides that "... the court …. shall prohibit or condition [the] use, sale, or lease  [of property subject to an interest] as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

32.    The Court should exercise its powers here to ensure that the Lender Group's interests are adequately protected.  Such adequate protection should take into account the fact that the Lender Group is being required to, in effect, make an involuntary loan to GM by having the term of the loan balance extended beyond its June 30, 2009 maturity.  Such adequate protection should include (i) the payment of interest on the Lender Group's claims in cash on an ongoing basis at the default rate specified in the Transaction Documents, (ii) the provision by GM of a replacement lien on cash or other stable, liquid collateral, and (iii) payment by GM of the Lender Group's reasonable professional fees and expenses incurred to date and going forward.   These protections are necessary to place the Lender Group in the position it would be in absent the proposed sale of its collateral – in other words, to truly and adequately protect the Lender Group's interests.

**4.    The Proposed Sale Structure Impermissibly Provides Value to the Purchaser While Ignoring the Senior Liens of the Lenders**

33.    The structure of the proposed sale is also fundamentally flawed because it appears to provide the Purchaser with the right to credit bid its junior liens on the White Marsh and Memphis facilities, improperly affording them a priority over the senior mortgage liens and security interests of the Lenders.  Specifically, it appears that under the secured term loan facility entered into by GM and certain of its affiliates with the U.S. Treasury on December 31, 2008 (the "U.S. Treasury Facility"), the U.S. Treasury purported to take a second-priority lien on real property owned by GM.[13]

---

[13] The Henderson Affidavit describes the U.S. Treasury Facility twice.  In the first description, the Henderson Affidavit states that the U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all unencumbered assets of GM, as well as a junior lien on encumbered assets, subject to certain exceptions.  See Henderson Affidavit at ¶ 55.  In the second description, the Henderson Affidavit states that the U.S. Treasury Facility is secured by first priority liens on unencumbered assets, as well as more limited second and third priority

34.      It is not clear from the record established by the Debtors whether U.S. Treasury's credit bid as part of the proposed sale includes a credit bid of any second-priority liens it might have on the White Marsh and Memphis facilities.  In the event that any such liens are being credit bid by U.S. Treasury, however, the Lender Group must by definition be fully secured.[14]  Otherwise, the second-priority liens have no value under section 506(a) of the Bankruptcy Code, and a worthless lien is effectively being credit bid as consideration for taking the facility.  This is inconsistent with the relative priority of the Lender Group's first-priority liens and the Purchaser's second-priority liens - indeed, it turns them upside down - and is impermissible on its face.

**5.      Exigent Circumstances Do Not Justify Ignoring the Clear Commands of the Bankruptcy Code**

35.      The Debtors expend considerable time and effort in their pleadings explaining the necessity of the proposed sale of their assets.  See Sale Motion at ¶¶ 8-11, 30-45; Henderson Affidavit at ¶¶ 82-96.  That discussion is relevant to the approval of the proposed sale as a whole, but it is not relevant to the issues raised by this Limited Objection.  This Court has observed before that it and all parties are constrained to follow the terms of the Bankruptcy Code and may not ignore the requirements of the Code in order to reach otherwise desirable outcomes.  See In re Westpoint Stevens, Inc., 333 B.R. 30, 51 (S.D.N.Y. 2005) ("[t]he fact that a transaction including a section 363(b) sale of assets may ultimately be in the best interests of a debtor's various constituencies does not authorize the Court to ignore the creditors' rights and procedural requirements of chapter 11.").

---

liens.  See id. at ¶ 103.  It is unclear from these descriptions whether the U.S. Treasury has in fact taken a second-priority lien on the Facilities.
[14] In such a circumstance, the proposed free-and-clear sale of the Facilities would be justified under section 363(f)(3) of the Bankruptcy Code, although the absence of adequate protection to the Lender Group would remain an issue, absent satisfaction of the Lender Group's claims.

36.     As detailed herein, the Debtors have not satisfied the Bankruptcy Code's mandate that in order to sell the Facilities free and clear of the Lender Group's mortgage liens and security interests, they must provide the Lender Group with adequate protection of its interests.  This Court should not - and cannot - permit the Debtors to avoid their burdens and evade the Bankruptcy Code's requirements by appealing to the urgency of the situation.

## CONCLUSION

37.     The Lender Group holds first-priority secured claims against the Facilities. The Lender Group does not oppose the sale of the Facilities to the Purchaser in principle, but the Debtors are required under the Bankruptcy Code to provide for the full satisfaction of the Lender Group's claims as a condition to selling the Facilities free and clear of the Lenders' secured claims.  Nothing in the Bankruptcy Code permits a debtor to afford the Purchaser all of the benefits of using the Facilities going forward, and reaping the value thereof, while bypassing the Lender Group's liens and requiring the Lender Group to extend credit to the estate indefinitely and interest-free, protected only by an undefined interest in inferior collateral.  The Debtors should be required to comply with their obligations under the Bankruptcy Code.

WHEREFORE, the Lender Group respectfully requests that (i) the sale of the

Facilities free and clear of the Lender Group's mortgages and security interests be conditioned

on the satisfaction of the Bankruptcy Code's requirements (or, in the alternative, the free and

clear nature of the sale be denied) for the reasons set forth herein, and (ii) this Court grant such

other and further relief as may be necessary.

Dated:  New York, New York
      June 19, 2009

    SIDLEY AUSTIN LLP
    Kenneth P. Kansa
    Wendell M. Harp
    One South Dearborn Street
    Chicago, Illinois 60603
    (312) 853-7000

    -   and   -

    /s/ Teresa H. Chan
    SIDLEY AUSTIN LLP
    Teresa H. Chan
    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5000

    *Counsel to the Lender Group*

NY1 7004527v.1