**Sale** Approval Hearing Date: June 30, 2009 at 9:45 a.m.
**Sale Motion Objection Deadline: June 19, 2009 5:00 p.m.**

Leslie C. Levy
Assistant Attorney General
Nebraska State Bar No. 20673
The Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, Nebraska 68509-8920
Telephone: (402)471-2811
Fax: (402) 471-4725
leslie.levy@nebraska.gov

ATTORNEYS FOR THE STATES OF ARKANSAS, ARIZONA, CALIFORNIA,
CONNECTICUT, COLORADO, DELAWARE, GEORGIA, IDAHO, IOWA,
ILLINOIS, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MASSACHUSETTS,
MARYLAND, MAINE, MICHIGAN, MINNESOTA, MISSOURI, MISSISSIPPI,
MONTANA, NEBRASKA, NORTH CAROLINA, NORTH DAKOTA, NEW JERSEY, NEW MEXICO,
NEVADA, OHIO, OKLAHOMA, PENNSYLVANIA, RHODE ISLAND, UTAH, VIRGINIA,
VERMONT, WASHINGTON, and WEST VIRGINIA

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **GENERAL MOTORS CORP.,** *et al.*, | : | **Case No. 09-50026 (REG)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |

-------------------------------------------------------------X

## LIMITED OBJECTION OF THE STATES OF ARKANSAS, ARIZONA, CALIFORNIA, CONNECTICUT, COLORADO, DELAWARE, GEORGIA, IDAHO, IOWA, ILLINOIS, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MASSACHUSETTS, MARYLAND, MAINE, MICHIGAN, MINNESOTA, MISSOURI, MISSISSIPPI, MONTANA, NEBRASKA, NORTH CAROLINA, NORTH DAKOTA, NEW JERSEY, NEW MEXICO, NEVADA, OHIO, OKLAHOMA, PENNSYLVANIA, RHODE ISLAND, UTAH, VIRGINIA, VERMONT, WASHINGTON, and WEST VIRGINIA

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

THE STATES OF Arkansas, Arizona, California, Connecticut, Colorado, Delaware, Georgia, Idaho,

1

Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Maine,

Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, North Carolina, North Dakota,

New Jersey, New Mexico, Nevada, Ohio, Oklahoma, Pennsylvania, Rhode Island, Utah,

Virginia, Vermont, Washington, and West Virginia  (collectively the "States"), file this Omnibus

Objection to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365

and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (a) the Sale Pursuant to the Master

Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-

Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (b)

the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c)

Other Relief; and (II) Schedule Sale Approval Hearing (the "Motion") (Dkt. No. 92) and in

support thereof show:

## I.  Preliminary Statement

The States do not oppose this sale, in general, or many of the provisions of the Motion, in

particular.  They do have numerous questions regarding the import of provisions of the Master

Purchase Agreement ("MPA") as to which they have either not yet been able to obtain

clarification from the Debtors or had those clarifications incorporated into a revised document.

As such, the first portion of this Objection is included for protective purposes, to ensure that the

States can continue to monitor these issues until a modified MPA is filed.

The other aspects of the Objection, though, are more substantive.  Initially, the States

object to the provisions of the Section 363 [1] sales order.  In the guise of setting the terms for the

purchase of assets, the MPA and the proposed Order greatly overreach, not only in violation of

---

[1]      Unless otherwise stated, all statutory references herein are to section of the Bankruptcy
Code, 11 U.S.C. ¶ 101 *et. seq.*

the Code but of state law, in  disregard of the provisions of 28 U.S.C. § 959(b).  The Order

proposes to eliminate the effect of *all* laws that might be applicable to this transaction, a concept

breathtakingly overbroad, not supported by anything in the Code and, ultimately, nonsensical.[2]

The proposed Order would further have the Court "find" *ipse dixit*, that a purchaser thereunder is

not a successor or transferee and that it cannot incur any unwanted liabilities *because* it is not a

successor.  The proposed Order contains at least 4 "findings" that a purchaser is not a successor

or transferee, and 10 "so ordered" paragraphs denying such status to the purchaser and reciting

the consequences of a lack of successor liability.  What does not exist, though, anywhere in the

Motion nor the accompanying Memorandum, is any indication by the Debtors as to what law

(federal common law, or state law, and if so, the law of which state(s)) should be analyzed to

decide whether, in fact, the new entity actually *is* a successor to GM.  Nor do they describe the

factual nature of the transaction and apply it against those criteria.

Rather, by virtue of their silence on the issues, they apparently are simply asserting that,

as a matter of law, for *all* types of liability and for *any* jurisdiction, the purchaser automatically

has no successor or transferee liability, simply because the purchaser does not *want* such

liability.  However, if successor liability only attaches to those who voluntarily assume it,

instances of such liability would be few and far between.  The law of successorship liability,

though, does not turn solely on the parties' intent, but rather on the actual facts of the nature of

the transfer between the parties.  That is not to say that such liability automatically attaches here

---

[2]    *See* Order, Par. 39 – "No law of any State or other jurisdiction . . . shall apply in any way
to the transactions contemplated by the Section 363 Transaction, the MPA, the Motion, and this
Order."  Read literally, if no laws "of any jurisdiction" apply, then laws of the *United States* such
as the Bankruptcy Code, equally do not apply to these issues.  Thus, if the Court actually entered
the order with that language, it would destroy its own jurisdictional basis to act!

– there are clearly certain limits applied through Section 363(f) and applicable nonbankruptcy law may or may not impose successor liability under the facts here[3] – but that determination, and the resultant order, must be far more refined than the shotgun approach taken here.

Here, for instance, although Newco has voluntarily accepted the employees' collective bargaining representatives, it undoubtedly would, under *Fall River,* have been treated as a successor for purposes of recognizing and bargaining with the Union, even if it had refused to do so.  In short, there is much existing law on successorship obligations and, as the Seventh Circuit noted in *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund, et al., v. Tasemkin, Inc.*, 59 F.3d 48, 50-51 (7th Cir. 1995), that law does not lose all force simply because a bankruptcy is involved.  That is particularly true where nonbankruptcy law provides rights to those doing business with the debtor and its successor (i.e. the dealers here), and the bankruptcy law does not preempt those State laws.

The States will discuss the issues in more detail below in order to indicate the limits that must be imposed on the attempts by the Debtor and the purchaser to write themselves

---

[3]    Indeed, it may be that successor liability applies in some circumstances, and not in others. The courts have typically used a broad approach in considering claims relating to employees and collective bargaining rights, while using a more stringent standard for purely contractual issues. *See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB* 482 U.S. 27, 41, 43 (1987) ("substantial continuity" test applied, without regard for changed ownership)  *Shares, Inc. v. NLRB,* 433 F.3d 939 (7th Cir. 2006) (*same); *Erica, Inc. v. NLRB*, 200 Fed.Appx. 344 (5th Cir. (2006) (bankruptcy sales order did not insulate successor from bargaining obligations.  On the other hand, successor liability may not attach for purposes of ordinary claims if there is not a continuity of ownership in addition to continuity of operations.  *See, e.g.*, *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 510-13 (6th Cir. 2005) (holding that, for purposes of patent litigation, Ohio law applied to issue of whether purchaser of assets out of bankruptcy case was a successor to debtor; under that law, more was required than "substantial continuity," "mere continuation" must be shown). Issues such as environmental law and personal injury claims may fall along a spectrum where relevant nonbankruptcy law may impose specific duties on purchasers of contaminated property.

exemptions from applicable law.  In doing so, as noted above, they do not seek to derail this sale – nor do they believe the changes they argue for would do so.  In particular, the Master Purchase Agreement ("MPA") itself provides substantial leeway for the sale to proceed without any adjustment to the price even if there may be limits on which assets can be purchased and which contracts assumed or rejected based on nonbankruptcy law considerations.[4]  Moreover, while the MPA provides in Section 9.19 that the purchaser shall not be deemed to be the successor of GM, nowhere does it state that such a status is a condition of the sale or that the purchaser will withdraw from the sale if that status is denied.  Thus, the language of the proposed Order is far more apocalyptic than the MPA itself.  In any event, no matter how worthy this transaction, it cannot justify wholesale disregard of all limits imposed by the Code and nonbankruptcy law.

## II.    Factual Background

In this case, the Debtors plan to sell several of their product lines to a new entity created solely for the purpose of acquiring those assets (referred to herein as "Newco").[5]  Although a few

---

[4]        *See*, e.g., Section 6.6(f) which, following language that allows the Purchaser to add or remove executory contracts for assumption or rejection provides that "No designation of any Executory Contract for assumption and assignment or rejection in accordance with this **Section 6.6** shall give rise to any right to any adjustment to the Purchase Price."  Similarly, Section 2.4 recognizes that some assets that the purchaser seeks to acquire may not be transferable due to licensing issues.  The paragraph merely requires the Debtors to use their best efforts to complete the transfer and Section 2.4(d) states "For the avoidance of doubt, the inability of any Contract, Transferred Equity Interest (or any other interest therein), Permit or other asset, which by the terms of this Agreement is intended to be included in the Purchased Assets to be assigned or transferred to Purchaser at the Closing shall not (i) give rise to a basis for termination of this Agreement pursuant to **ARTICLE VIII** or (ii) give rise to any right to any adjustment to the Purchase Price."  In short, rather than a fragile document whose terms cannot be altered in any way without a collapse of the deal, the MPA has considerable flexibility in its final results.

[5]        The Debtors are planning to separately sell their other brand lines to separate, preexisting, independent entities.  Those sales are not at issue here.  However, the fact that they still exist and remain part of the Debtors' operations after this sale closes may have some factual effect on the resolution of the successorship issues.

5

facilities will be closed, the vast bulk of their operations for those product lines will be transferred as a whole, with the employees, their supervisors, their managers, and the physical facilities continued intact.    Some changes were negotiated with the employees' collective bargaining representatives; otherwise, their working conditions remain unaltered.    Indeed, the Motion (Par. 65) states that the "transition services structure is designed to ensure a seamless continuity of operations for the benefit of employees, customers, suppliers, and employees of suppliers."[6] Prior to filing bankruptcy, the Debtors had reached agreement with many of their lenders on amounts that they would accept from the sale, had promised to continue warranty coverage for consumers, and, as noted, agreed  with the collective bargaining representative of their employees on working conditions for the active employees and treatment of benefits for the retirees.    Moreover, according to paragraph 22 of the Motion, "Substantially all the executory contracts associated with direct suppliers are likely to be assumed by the Sellers and assigned to the Purchaser at or following the Closing."  In short, while, to be sure, Newco will have a new board and will attempt to execute a new business model (presumably one that will result in greater success as is the goal of all Chapter 11 debtors), the overall aspect presented by Newco when it commences operations (at least as to the facilities acquired) will be virtually indistinguishable from the old GM it replaces.

Thus, of all the constituencies that might be affected by this bankruptcy, there are only three that have largely been left out of the consensual process resulting in Newco and the assumption of their liabilities – governmental claims and obligations for matters such as tax and environmental liabilities; personal injury and related claims of consumers (including claims

---

[6]    Note, though, that that agreement (Appendix T) has not yet been filed so it is not possible to determine exactly how that transition process will work.

under implied warranties of merchantability which Newco refuses to assume); and the rights that the Debtors' dealers seek to assert under their contracts and state laws governing the treatment of those contracts.    Some of these liabilities, determined unilaterally by GM and Newco, are proposed to be assumed by Newco; others, those parties insist, need not be assumed, based on the mere assertion that Newco is not a successor.    The States will deal with the legal arguments relating to these various issues below, including whether they are claims at all.    Before turning to those arguments, though, added factual background on the States' laws dealing with the relationships between dealers and manufacturers (the "Dealer Laws") and the Debtor's actions in regard to those contracts will help set the context for the States' objections herein.

A.    Statutory Treatment of Dealer Contracts

Issues regarding the disparity in treatment between auto manufacturers and dealers have been common for more than 80 years.    As early as the 1920s, Ford was using its superior power to force dealers to take cars that they did not want and could not sell, particularly when the Great Depression hit.    *See* Stewart Macaulay, *Law And The Balance Of Power: The Automobile Manufacturers And Their Dealers*, 13 (Russell Sage Foundation 1966) ("Macauley").    Contracts of adhesion that gave the manufacturers vast rights but imposed virtually no obligations on them were the norm – contracts that did not even require the manufacturer to supply cars to the dealers, for instance, were not uncommon.    Indeed, ironically, the very lack of mutual obligations were treated as a reason to find that these really were not enforceable  "contracts" at all and that, accordingly, no duty of "good faith" to the dealers existed.    Macauley, *supra*, at 24. As a result of these long-standing issues, Congress passed the Automobile Dealer's Day In Court Act ("ADDICA").in 1956 (codified at 15 U.S.C. 1221-1225).    In doing so, it noted that the "vast disparity in economic power and bargaining strength" between car dealers and car manufacturers

7

"has enabled the factory to determine arbitrarily the rules by which the two parties conduct their

business affairs" and makes "the dealer an easy prey for domination by the factory." S.Rep. No.

2073, 84th Cong., 2d Sess., 2 (1956).  The statute did not prove overly useful, though, in that,

while it imposed general duties of good faith in operating under or terminating the agreement, it

had no specific examples of what that required, and court decisions tended to take very narrow

views of that duty, providing little relief to affected dealers.[7] Macauley, *supra*, 106-112.

Accordingly, states also took steps, before and after the passage of the ADDICA, to

provide their own, more defined protections for dealers, and every state now governs that

relationship to a greater or lesser degree.  These Dealer Laws, while not identical, typically

include requirements such as the need for both manufacturers and dealers to obtain operating

licenses, limits on dealers being coerced to take unwanted vehicles, regulation of the right of a

manufacturer to terminate its relationship with a dealer and the transition process and remedies

for the dealer if the termination was allowed.  That transition process might require a minimum

shutdown period (typically in the range of 60-90 days); some assistance from the manufacturer to

ensure disposition of vehicles, parts, and/or tools, including buy-back assistance; and, in some

cases, assistance with lease payments on dealer premises.  Many laws also provide protection

against encroachment into the dealer's vicinity by other dealers, a regulation that has been

---

[7]    The operative provision at 15 U.S.C. 1522 states: "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court . . . without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, that in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

8

upheld by the Supreme Court, *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96 (1978).

Most critically, virtually all such laws bar manufacturers from coercing dealers to sign agreements that waive the provisions of the state law and make any contract that includes such waivers unenforceable.  The states recognized that, absent such protections, the manufacturers would simply demand that dealers sign such waivers as a condition to retaining their dealership agreements and their laws' requirements would quickly become a dead letter.  At no time, in the 53 years since the ADDICA was passed, has Congress limited or preempted the added protections provided by the state laws to those provided in the federal law.  To the contrary, 15 U.S.C. § 1525 explicitly states that "This chapter shall not invalidate any provision of the laws of any State except insofar as there is a direct conflict between an express provision of this chapter and an express provision of State law which cannot be reconciled."  Nor, has Congress sought to amend or revoke ADDICA, or indicated that it views the concerns that led to its passage as any less relevant now.  Indeed, the repeated hearings by various Congressional committees to review the actions of Chrysler and GM with respect to their dealers underscore that this is a continuing matter of concern for the federal government as well as the States.

B.    Treatment of Dealer Contracts in the Motion

Concurrent with its filing of the Motion (which, in addition to the sales language, contains additional provisions for assumption of contracts), the Debtors sent one of two letters to each of their dealers.  Each letter informed the dealer that it had been tentatively chosen to either be a retained dealer or a terminated dealer.  Each such letter informed the dealer that it had until June 12 to sign the letter without any changes and that the signed letters would amend the existing dealership agreements.  If they signed the respective letters, the Debtors indicated, they

9

would move to assume the now-amended dealership agreements.  If they did not, the tentatively

retained dealers who received a "Participation Letter," ("PL") (Appendix A) were informed that

they would be transferred to the ranks of the terminated dealers and treated accordingly.  The

terminated dealers were offered a "Wind-up Letter" ("WL") (Appendix B) that offered some

limited financial assistance, but that required them to forfeit all other rights they had under state

law.  If those dealers did not sign the WL, the Debtors stated that it would reject their contracts

and offer no assistance or otherwise comply with state laws regarding the rights of terminated

dealers.  The Debtors, after discussions with the National Auto Dealers Association, provided a

second letter that modified the terms of the PL (also included in Appendix A).  While that letter

somewhat ameliorated the harsh – and unlawful – demands of the original letter, many

problematic areas remain.[8]    Both the PL and the WL initially required the signatories to waive

their rights under State law (PL, pars. 6 and 8, WL, pars. 5 and 7).  While the amended PL letter

retreated from that provision somewhat, the WLs remain unaltered and provide that, upon

signing the agreement, the dealer agrees that it can be enjoined from any assertions about the

illegality of the agreement under state law (WL, par. 5(c)).  Both agreements require the dealers

to agree that the signing was purely voluntary and without any coercion – despite the fact that

they were presented as non-negotiable, take it or leave it deals that required dealers to waive all

violations of state law – including the provisions that made requests for such waivers unlawful.

(See PL, par. 9(f), WL, par. 10).

---

[8]    These are discussed in more detail below and in Appendices A and B, following copies of
the relevant agreements, with citations to relevant statutes of various States.  In order to not
unduly increase the length of this objection, only a limited number of citations are used, but
similar information can be supplied for all States if desired.

The retained dealers were initially told that they must order cars sufficient to meet sales quotas that were to be set unilaterally by Newco and that failure to do so would violate the agreement – in violation of laws of the States that prohibit dealers from being coerced to order unneeded inventory. (PL, Par. 2 and 3). The PL also provided (Par. 4) that the retained dealers must eliminate all non-GM brands from their premises by December 31, 2009 – again in violation of the laws of numerous States that bar dealers from being required to limit the brands that they must sell. The revised PL purports to soften the sales quota and inventory requirements as well as the exclusivity provisions, but stated that it reserved the right of Newco to demand exclusivity in at least some markets. (Other portions of the letter, though, stated that decisions on exclusivity would be made by mutual consent – but, in light of the coercive approach used here, it is debatable how consensual such a discussion may actually be.) Moreover, some States report that dealers who have signed the agreement have already complained to them that they have been pressured to take on unwanted inventory.

Under the WL (par. 3), dealers are offered a specified amount of assistance (varying by dealer) – with 25% to be paid immediately and the balance at the end of the dealer operations, although there are a variety of potential hold-back provisions. That amount is in lieu of any other rights the dealer would have under state law, which might provide a greater or lesser remedy. While the WL purports to allow the dealers to continue under their contracts until October 31, 2010, in reality, they can be terminated by as early as January 31, 2010. Further, dealers are no longer allowed to order any new vehicles after the agreement is signed and, after December 31, 2009, the contracts may be cancelled at any time on 30 days notice. (See WL, pars. 2(a) and 6(a)). As a result, these dealers, while operating under a purportedly "assumed" dealer agreement, are forced to accept a modification of the agreement that strangles their

11

operations early in the term of that agreement by denying them any new stock to sell (in violation of laws of the States that require manufacturers to supply inventory as needed). Moreover, the WL also requires those dealers to immediately turn over all of their customer information so that it can go to retained dealers, and they are barred from protesting any action by a retained dealer to move into their area and solicit their customers, even while their dealer agreements purportedly remain in place. (WL, pars. 2(b) and 7).

There are other problems with both letters (as set forth in the Appendices) but two provisions stand out. One requires dealers to keep all of its terms confidential, thereby attempting to impede the States from even learning of the existence of these efforts or the need to enforce their laws in respect thereto. (PL, par. 9(h) (as amended), WL, par. 9). The second purports to give the bankruptcy court *exclusive* jurisdiction to determine any issues related to these agreements, apparently in perpetuity (PL par. 9(g) (as amended), WL par. 13). During the case, that language potentially contradicts Section 362(b)(4) and 28 U.S.C. § 1452(a), which except police and regulatory actions of government agencies from the automatic stay and bar their removal from the state courts. Moreover, to the extent that the agreements regulate the relationship between the dealer and Newco – two non-debtor parties – in ways that will not affect the estate,[9] it is doubtful this court has any jurisdiction under 28 U.S.C. § 1334, much less exclusive jurisdiction over those issues. That is particularly true after the case is closed, yet this provision gives this Court that exclusive jurisdiction in perpetuity – in violation of the laws of

---

[9]    Section 365(k) removes GM – the actual debtor – and its estate from any continuing liability for breaches of the agreement after they are assumed. The proposed Order provides those protections to GM (par. 24).

most States, which place jurisdiction for issues under their Dealer Law exclusively in their motor

vehicle commissions or similar agencies.

The efforts to modify the agreements contractually (in ways that violate state law) are

compounded by the terms of the proposed sale order, which, as noted above, purports to remove

this transaction from the reach of *any* law whatsoever (see par. 39), thereby denying the dealers

any rights under the Dealer Laws, whether or not they "voluntarily" signed these agreements.

Moreover, the order purports, in paragraph 27(f) to bar any governmental entity from any

"proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with

respect to any (i) Claim other than Assumed Liabilities . . . including, without limitation, the

following actions . . .  (f) revoking, terminating, or failing or refusing to renew any license,

permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses

operated with such assets."  "Claim" is a defined term in the MPA that goes far beyond a Section

101(5) bankruptcy claim;[10] by barring governments from any proceedings relating to an MPA

"Claim" against the Purchaser or the Purchased Assets, this provision would serve to essentially

remove that party and those assets from the regulatory purview of the States – "*forever*."  Such a

prohibition greatly exceeds any limits that might be imposed by Section 525 – both as to the

scope of the protection and its apparently infinite duration.  By seeking entry of these provisions,

---

[10]    The MPA defines "Claims" as meaning "all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choices in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due or to become due, and all rights and remedies with respect thereto."  That includes numerous matters that are not "rights to payment," including most obviously "defenses" and "rights of recoupment," but also includes injunctive matters that do not fall under Section 101(5)(B) and matters that are too inchoate or unknown to constitute a present claim.

the Debtors seek to permanently insulate their efforts to force dealers to sign unlawful agreements from review or action by the States.  Those terms, moreover, would give Newco rights vis-a-vis dealers into the future that are denied all other manufacturers.  In short, dealers have been presented with a "take it or leave it" ultimatum – either waive your rights under state law so you can remain a dealer or at least receive some assistance on termination – or exercise your rights under that law and have the Debtors and Newco seek to deny you any rights and benefits altogether.  While the dealers signed an agreement containing a (non-negotiable) statement that "its decisions and actions are entirely voluntary and free from any duress," the facts plainly indicate otherwise.  Even with the changes made by GM to the PL, both that agreement and the WL still have provisions that violate the States' laws.  As such, the Dealer Laws provide that such "agreements" are not enforceable against the Dealers on a going forward basis to the extent of such unlawful provisions.

**III.  Argument and Specific Objections**

**A.        Section 363(f) Does Not Authorize the Relief Sought by the Motion**

        1.        Section 363(f)(5) does not provide for sales "free and clear" of "claims"

The States discuss below various objections to specific provisions of the MPA and its treatment of particular types of claims, but, more broadly, they object to the reliance on Section 363(f) as purported authority to impose the wide-ranging restrictions contained in the proposed Order and to distinguish between assumed and rejected liabilities as set out in the MPA.

Section 363(f) provides the authority by which a debtor may seek to sell assets "free and clear" of "interests" of third parties in the debtor's property and have those rights attach to the proceeds of the sale.  Everywhere else in the Code, the term "interest" is used to refer to some form of *in rem* lien or ownership interest in a particular asset.  That usage is fully consistent with

14

the Section 363(f) reference to an entity's "interest in [the debtor's] property." By contrast, referring to a "claim in someone's property" is quite an odd usage of the English language. *In personam* claims, by definition, are free floating obligations that do not attach to any piece of property but can be satisfied from any unencumbered asset of the debtor party.

On the other hand, Section 1141(c) provides that, upon confirmation of the plan, the property dealt with thereunder is "free and clear of all *claims and interests* of creditors, equity security holders, and of general partners in the debtor." (Emphasis added). By contrasting that language with the more limited provision in Section 363(f), it is clear that, under a plain meaning reading of the Code, a sale under Section 363(f), unlike plan confirmation under Section 1141(c), cannot provide for a sale free and clear of "claims." *See, e.g., Russello v. United States,* 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

The States are, to be sure, well aware of the fact that, as discussed in the Debtor's memorandum, many courts have concluded that, notwithstanding that patent difference in wording, Section 363(f) *does* authorize sales free and clear of claims. The reasoning in those cases, though, is tortured, i.e., a claim is really an "interest in property" simply because it somehow arises out of the fact that the debtor owned the property. *See, e.g., In re Trans World Airlines, Inc.,* 322 F.3d 283, 289-90 (3rd Cir. 2003) (holding that any claims that are "connected to, or arise from" the property in question are "interests." Under that reasoning, though, there would be few, if any, claims against a business that would not also be an interest[11] – in which

---

[11]     Since businesses do not have an independent existence apart from their assets and operations, it is difficult to imagine a claim that is not in some sense "connected to" the business

case, it is very difficult to imagine why the Code goes to pains to distinguish interests and claims everywhere else in the Code but conflates them here. *See, e.g.,* Sections 1122, 1123, 1124, 1125, 1126, 1127, 1129, and 1141, all of which refer to holders of "claims" as distinguished from holders of "interests." Put another way, had the Code not included all of those other sections which distinguished claims and interests, one might perhaps more reasonably be able to argue that claims were a subset of the term "interests," and could be included therein. Where, however, Congress has taken such great care in the Code to make clear that claims are different from interests, it defies the canon of construction cited above to assume that, in Section 363(f) – and only in that subsection – it changed its mind and intended to make those two terms coterminous.[12]

The States submit that the assumption that allowing sales free of successorship liability will result in higher payment offers has resulted in a skewed analysis of these provisions. They further submit that such a view cannot be allowed to override the plain meaning of the statute. First, any issue regarding purchase offers is amenable to bargaining by parties that takes into account the possibility of successorship liability. That possibility does not necessarily change the amount paid; at most, it merely revises who may receive the payments. But, that does not

---

operations or arising therefrom. A person might engage in a tort separate from any property he or she owns (liability for a punch in the nose is not dependent on being a landowner), but how would a business create a claim not "connected to" the assets with which it operates?

[12] In *TWA, supra,* 322 F.3d at 290, the Third Circuit argued that claims are included in the term "interest," because an interest must be more than a "lien," noting that Section 363(f)(3) refers to "liens" as only one form of interest. That argument is a red herring, though – of course, liens are not the only form of "interest" – ownership rights are the most obvious other form, but there may be other forms of "interests," such as attachments, *lis pendens* notices, and the like that might or might not fall strictly under the definition of a "lien." Such other forms of interests are plain enough to fully explain the drafting of Section 363(f) without any need to ignore the well-established distinction in the Code between "claims" and "interests."

16

violate the Code anymore than it violates the Code if purchasers *voluntarily* choose which liabilities they prefer by means of their assumption agreements.  According to the cases cited in the Debtor's memorandum of law, such decisions are merely a consequence of the purchase, not a violation of the Code's priority provisions.  *See In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *11 (Bankr. D. Del. 2001) ("the disparate treatment of creditors occurs as a consequence of the sale transaction itself [i.e., the buyer's decision as to what price to offer and what liabilities to assume] and is not an attempt by the debtor to circumvent the distribution scheme of the Code." They do not become any more improper if the preferences are imposed involuntarily under successorship liability rather than by the buyer's personal predilections.  As those courts have indicated, a sale under Section 363 is not the same as a Chapter 7 distribution or a Chapter 11 plan; if so, there is no reason why such a sale should be allowed to ignore all applicable law that deals with the consequences of such transfers.  The Seventh Circuit, in *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) provides a succinct description of why it is improper to allow debtors and purchasers to seek to use Section 363 transfers to immunize the buyer from all of the consequences of the transfer.

Accordingly, the States object to the provisions of the Order that purport to find that "claims" (as defined by Section 101(5)) are covered by Section 363(f)(5) and that, for that reason, the assets may be sold free and clear of those rights.

2.      If the Parties to the MPA seek a declaration as to whether the purchaser is a successor to the Debtor, they must actually litigate that issue before this Court

If Section 363(f)(5) does not, of its own weight, provide for sales "free and clear" of claims and the elimination of all successorship rights, that does not, conversely mean that the sale automatically *does* confer such rights on all parties and for all types of claims.  As indicated

17

in the *Mickowski* case, in some areas, there is an overwhelming federal interest and a consequent federal common law analysis of whether a transfer creates a successor. Labor and other employment issues is the most common area where such law is applied – but, here, the debtors have already resolved those issues, at least with respect to their collective bargaining units.[13] Other areas, such as environmental and tax claims, or personal injury liabilities, may turn on different considerations. As to the dealer liability issues, in view of the special concern for such rights and obligations shown by both the federal and state laws, the States respectfully submit that the same federal common law, "substantial continuity" test should be used for these issues as for employment issues.

Under that test, it is patently clear that Newco qualifies as the successor to the Debtors since everything about this transaction is intended to ensure a "seamless" transition for the operating facilities where the only difference will be who owns Newco. Employees, supervisors, facilities, and products will be unchanged and working conditions largely so, subject only to changes negotiated by the employees' representative.[14] That result plainly qualifies under *Fall River* for GM's own operations.[15] And, where laws in many States require acquirers to take on dealerships and impose procedural requirements for how changes may be made to the contractual

---

[13]     Even then, the analysis is not all or nothing; depending on the way a transaction and hiring decisions are structured, a successor purchaser may be required to recognize a union, but not necessarily to abide by the terms of its contract. *Fall River*, *supra*, 482 U.S. at 40-41.

[14]     To be sure, as time goes on, Newco will develop new products, run different ad campaigns, negotiate for new working conditions and the like. Successorship is gauged at the time of transfer; it does not require that the buyer's operations remain frozen in amber forever.

[15]     In *Fall River*, the Court noted that the issue was to be analyzed from the employees' perspective as to whether their jobs had changed and it was irrelevant that the new owner bought the assets on the open market after a seven-month hiatus in operations, unlike here where there will be no break in operations.

agreements with those parties, the Debtors and Newco can avoid a finding of substantial continuity as to the dealers, only by violating their obligations under those laws.[16]  As discussed below, there is no basis under the Code to allow such violations of those dealer laws.  In short, under the facts before the Court, there is much to indicate that Newco *is* a successor and little, other than its own desires, to indicate that it is not.  Certainly, the evidence does not warrant the sweeping pronouncements on successorship status that are contained in the Order, without any support in the Motion.

The States believe that, in the normal course, there is no need for those issues to be decided now, in the context of a Section 363 sales motion that merely needs to authorize a transfer of property.  If, though, the Court *chooses* to reach out at this time to determine those issues, it can only do so based on a full evidentiary record that allows it to actually analyze the factual and legal issues that go into a successorship determination.  There is no basis for simply signing off an order that proposes that the Court should "find" that such rights do not exist without any appropriate analysis of the issues.  If, upon analysis, it finds that successorship rights do *not* exist in some or all of the situations for which the Order seeks "free and clear" language as to claims, then it can find that the liabilities do not attach to Newco and include language to that effect in the Order.  The numerous Order provisions, however, that broadly eliminate all rights based on "successor or transferee liability" should be stricken unless and until that determination is made.  Moreover, any that do appear in the Order should be closely tailored to the applicable law on successorship.

---

[16]     The result would be much the same as if a purchaser bought a unionized facility and avoided a successorship finding by deliberately refusing to hire the unionized employees in order to avoid having to recognize the union.

19

Further, as a procedural matter, the States object to the way in which the Order is drafted. At present, the language dealing with these issues is so lengthy, convoluted, repetitive, and redundant that it becomes almost impossible to sort out what is actually being barred and what remains. Those provisions can and should also be substantially shortened; it is surely possible to state the rights and immunities provided to Newco in a paragraph or two, not in 14 separate ones. When one does try to sort through the provisions, it is clear, as discussed next, that major aspects of the Order would be improper, even assuming that the Court could authorize a sale "free and clear of claims."

**B.**      **Provisions of the Order are Overly Broad, Even if a Sale Could be Made "Free and Clear" of Claims**

1.      The Order sweeps too broadly in determining as to which claims the Sale can transfer "free and clear"

Even assuming Section 363(f)(5) could be read so broadly as to include "claims" in the "free and clear" sales process, the proposed Order sweeps in far more than what the Code defines as a claim. Moreover, the Order is highly confusing on the subject because it frequently mixes the term "claim" – an undefined term, which may or may not be meant to be the same as the Code's definition of "claim" in Section 101(5) – with the defined term "Claim" as used in the Motion. As noted above, the Motion defines "Claims" in terms that are vastly broader than a 101(5) bankruptcy claim, including items such as "defenses," rights or recoupment and setoff, and *any* form of action against the debtor, including purely injunctive relief.

Bankruptcy claims, though, while broad, are limited to "rights to payment" and exclude at least some equitable relief. *In re Chateaugay Corp.,* 944 F.2d 997, 1008 (2nd Cir. 1991) *In the Matter of Udell*, 18 F.3d 403, 408 (7th Cir. 1994) (right to equitable enforcement of contractual no-compete clause was not a "claim"). Including such matters in the term "Claim,"

20

and using that term in the Order, when they are *not* bankruptcy claims, creates unwarranted confusion.  Similarly, "defenses" are not rights to payment as they merely deny the debtor's rights.    Accordingly, defenses are not claims, and neither are rights of recoupment, since recoupment is also a defense and *not* a claim under Section 101(5). *See, e.g., Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2nd Cir. 2002); *In re Malinowski*, 156 F.3d 131, 133 (2nd Cir. 1998).  Statutory obligations that look to future enforcement rights, rather than seeking prior payments, generally are not claims either, but could easily fall under the "Claim" definition used in the MPA and, arguably could no longer bind Newco after the closing.  Finally, certain rights are too inchoate or unknown to rise to the level of a claim at the time of the bankruptcy case and courts have not allowed such claims to be discharged by debtors in a plan. *Chateauguay* 944 F.2d at 1003-1005 (discussing example of persons who might be injured post-confirmation if a bridge on which they were passing collapsed), *In the Matter of Crystal Oil Co.,* 158 F.3d 291, 296 (5th Cir. 1998) (environmental claim does not arise until agency can tie debtor to known release of hazardous substance*); Fogel v. Zell,*221 F.3d 955, 960 (7th Cir. 2000) (discussing fact that tort claim generally deemed not to exist until injury occurs); *In re Kewanee Boiler Corp.*, 198 B.R. 519, 527-28 (Bankr. N.D. Ill, 1996) (tort victim did not have even contingent claim until after injury occurred one year after confirmation).

Thus, even where the Code allows debtors to discharge clams by means of a plan, post-confirmation injuries cannot be swept under its terms (absent, perhaps, some form of trust fund set aside for "future claimants" as in the case of asbestos victims).  Here, though, where Section 363 says nothing about selling free and clear of "claims," the Debtors and the Purchaser seek to sweep all such matters into its own self-defined definition of a "Claim," and then use that definition interchangeably with an undefined form of "claim" throughout the Order.  The

21

provisions of the order, in turn, go every bit as far, if not farther than the rights granted to a reorganizing debtor upon confirmation.

Parties may certainly choose to use a defined term in any way that they wish in their own agreements such as the MPA, but the Court should not use such confusing terms in its order, to avoid ambiguity.  Within Paragraph T alone, for instance, the proposed order includes references to "claims" (undefined), "claims (as that term in defined in the Bankruptcy Code)", and "Claims" (as defined in the MPA) – and, for good measure, throws in references to "debts" as well as a plethora of other terms, (such as "obligations," "demands," "options," and "restriction").  Some of those terms are already included in the definition of "Claims," and some are not, which further leads to confusion as terms become circular and self-referential.

The problem in determining what liabilities Newco seeks to avoid assuming is compounded by the fact, as previously noted, that the Order deals with that topic in 14 separate paragraphs, which are substantially – but not absolutely – redundant of each other.  Again, to avoid confusion and to allow parties to have reasonable certainty as to their obligations, the Court should require that the Order only use terms defined therein, use them in a consistent manner, not allow the use of terms that are already defined in the Code in ways that are inconsistent with those definitions, and describe the relief granted in a succinct, clear, and nonrepetitive fashion, that parties can readily analyze.

And, in deciding what relief to grant, the Court must avoid allowing expansion of the already questionable concept of selling free and clear of bankruptcy claims so as to encompass obligations and rights that most assuredly are not bankruptcy claims at all.  While one can, at least, fit the right to payment of a bankruptcy claim into the Section 363(f)(5) paradigm – i.e., a right for which there can be a monetary satisfaction, that does not apply, by definition, to rights

that are not bankruptcy claims, i.e. "rights to payment."    As the Second Circuit noted in *Chateauguay*, an environmental agency cannot be forced to accept money and allow a polluter to contaminate the environment anew.    By definition, then, a governmental right to bar pollution cannot fall under Section 363(f)(5) because it does not involve a right to payment, is not a "claim," and, is not a matter as to which the party can be required (indeed, even allowed) to accept a monetary satisfaction.

Nor can a purchaser somehow magically insulate itself not only from the claims of other parties, but also from their right to *defend* themselves against actions by the purchasers, merely by including defenses, recoupment, and setoff in the definition of a Claim.    Those items may not properly be eliminated through a Section 363 order.    See *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 260-61 (3rd Cir. 2000) (setoff and recoupment are not interests, defenses are not claims, "Thus, we agree with the Bankruptcy Court in *In re Lawrence United Corp.* and hold that a right of recoupment is a defense and not an interest and therefore is not extinguished by a § 363(f) sale.").    Setoff, in particular, is protected by Section 553, which provides for the continued recognition of setoff rights under the Code.[17]

In short, to avoid having the Order infringe even further on the rights of parties holding claims against the debtors whose assets are being transferred to a third party, the Order should, at most, only extend that protection to "claims" under Section 101(5) and should avoid usage of the MPA term "Claim."    If Section 363(f)(5) does allow sales free and clear of bankruptcy "claims" as well as "interests," (a point with which the States disagree), then that is all that need be said –

---

[17]    The reference to Section 363 in Section 553 refers to the need to protect the *creditor's* right to adequate protection of its setoff rights; it is not authorization for the debtor and the purchaser to destroy those very rights in the course of a sale.    *See* 5 Collier on Bankruptcy (15th ed. rev.) ¶ 553.01; ¶ 553.06[5] and cases cited therein.

and all that the Code can possibly be read to allow. Disallowing every right that a party may have against a purchaser vastly exceeds the scope of what Section 363 or any other provision of the Code offers to purchasers.

>    2.    The proposed order improperly attempts to limit
>         governmental police and regulatory powers

In Paragraph 15, the Order provides that "to the extent provided by Section 525 of the Bankruptcy Code," governments may not deny, revoke, suspend or refuse to renew licenses, permits, grants, and the like relating to the assets sold to Newco on account of the filing of the cases or the consummation of the sale. In one sense, the paragraph is innocuous – if all it does is state that Section 525 applies if Section 525 applies, it adds nothing to the fact that, yes, Section 525 applies here as in any other case to the extent that the facts so warrant. On the other hand, to the extent that the section purports to dictate any conclusion about whether Section 525 does apply to this situation, it should be revised or eliminated. First, there is no evidence whatsoever, that any governmental entity has sought to take action against the Debtors (or Newco) based on the commencement of the cases. Second, it is unclear to whom the paragraph is meant to apply – the Debtors or Newco – and Section 525 applies to actions against the Debtors.[18] Third, if it purports to find that Section 525 applies automatically to the sale transaction, that goes beyond

---

[18]    It also refers to actions against parties "associated with the debtor." That has not generally been taken to refer to parties buying assets from a debtor, as opposed to, for instance, the spouse of a debtor. *In re Draughon Training Institute, Inc.*, 119 B.R. 927, 933 (Bankr. W.D. La. 1990) ("protection more properly extends to one who has been a co-owner, co-obligor, co-debtor, joint venturer, partner, agent, representative, or spouse of the debtor, rather than a transferee of the debtor."). (Compare *In re Betty Owen Schools, Inc.*, 195 B.R. 23, 29 (Bankr. S.D. N.Y. 1996) (Section 525 implicated where government directly tied its decision on purchaser's application to predecessor's actions). There is no showing of such a linkage here by any governmental entity and Newco, of course, asserts that it has no connection with the predecessor. As such, it is contradictory for it then to claim that it should be protected as being "associated with" that entity.

24

the limited terms of Section 525(a).  It only applies to actions based *solely* on the filing of a case

or the nonpayment of a dischargeable debt – neither of which applies to a sale transaction in and

of itself.

      While that paragraph is ambiguous, Paragraph 28 is not.  It provides:

> [A]ll persons and entities are *forever* prohibited and enjoined from
> commencing or continuing in any manner any action or other
> proceeding, whether in law or equity, in any judicial,
> administrative, arbitral, or other proceeding against the Purchaser,
> its successors and assigns, or the Purchased Assets with respect to
> any (i) Claim other than Assumed Liabilities, or (ii) successor or
> transferee liability of the Purchaser for any of the Debtors,
> including, without limitation, the following actions: . . . revoking,
> terminating, or failing or refusing to renew any license, permit, or
> authorization to operate any of the Purchased Assets or conduct
> any of the businesses operated with such assets.  (Emphasis
> added).

That provision is plainly improper.  On its face, this provision states that governmental entities

are *forever* barred from taking any adverse action with respect to licenses relating to the

Purchased Assets with respect to any Claim that is not an Assumed Liability.  Recalling that a

Claim includes "investigations," "demands," "proceedings" by governmental entities and much

more, it is clear that this would easily include enforcement of any governmental obligation that is

not an assumed liability.  As such, the provision is nonsensical.  Section 525 provides the scope

of the limitation on governmental permitting actions; this provision goes far beyond its terms

even if it were limited only to actions taken at the time of sale.  A provision, though, that *forever*

bars the government from denying licenses and permits with respect to certain assets for *any*

*reason whatsoever* is not authorized by anything in the Code or the case law.  That aspect of the

Order must be stricken.

25

Similarly, as noted above, paragraph 37 purports to eliminate the effect of *any* law on the transaction (including, if read literally, the Bankruptcy Code, itself).  Again, nothing in the Code or the case law authorizes such a prohibition, and the provision should be stricken.

3.      Other Objectionable Provisions

Paragraph 21 should have the words "Except as provided in Section 365(c)" added at the beginning.  As currently written, it eliminates the rights non-debtor parties have under that subsection, although the Code clearly makes Section 365(c) rights controlling over any rights given to the Debtors under Section 365(f).

Paragraph 22 appears to make the Debtor's database of purported cure amounts determinative of those issues, even if the other party does not agree.  It should be made clear what the dispute process is for those amounts and that the disputed amounts may still be asserted.  If that process is set out in another order, it should be cross-referenced here.  Further, in paragraph 23, the reference to barring "any counterclaim, defense, or setoff or other Claim" is improper and should be limited to only providing that those parties may not seek to pursue claims for cure payments to the extent they have been resolved by the Court.

References throughout the order (such as in Paragraph 24) to parties being "estopped" from taking certain actions should be stricken.  There is no basis under the proceedings herein to find that any party is "estopped" from taking any action.  At most, a party may be barred from acting by the terms of the Order or the provisions of the Code, but "estoppel" has a meaning of its own and consequences; it should not be used where it does not apply.

Paragraph 28 should also be stricken – much of it is completely redundant of numerous prior paragraphs that purport to relieve Newco of any unwanted liabilities.  Its sole new feature is a statement that, in view of the consideration provided by Newco, the holders of all liens, claims,

26

encumbrances, and other interests shall be *deemed* to have given their consent to a release of

Newco.  Consent, however, is something that a party must freely give, upon notice and with an

option to withhold it.  That is the sort of release that could be sought as part of a consensual plan

process, but the Debtors have chosen to forego that approach.  They cannot simply invent a

consent that does not exist (and that likely would not be given by parties whose liabilities are not

being assumed by Newco).  This paragraph should be stricken.

Paragraph 32(a) should be stricken as an incorrect description of the effect of a sale "free

and clear."  Those rights are not discharged, released, or terminated, they are "transferred" to the

purchase price.  And, to the extent the purchase price is insufficient, the Debtors obviously

remain liable for those obligations, except to the extent that they are purely *in rem* obligations.  If

the Debtors are allowed to sell "free and clear" of all claims, and receive certain funds therefrom,

they certainly cannot limit claimants to only seeking to be paid from those purchase amounts (as

opposed to the other funds in the estate).  Plans discharge claims, not sales agreements.

Paragraph 37 is meant to relieve some of the concerns arising from the ambiguous

language in the MPA with respect to the treatment of environmental claims.  However, it is still

not fully neutral on the subject; thus while it provides that it does not create any rights for the

government, it should also provide that the Order and the MPA do not, by their terms, serve to

eliminate "any rights against the Purchaser that would otherwise arise under applicable

nonbankruptcy law."

Paragraph 42 should be stricken.  This is a hugely important case with substantial new

and untested issues.  Denying parties any opportunity to appeal is plainly improper.  The

appellate courts have shown that they are capable of reviewing these issues in short order and that right should not be limited. here.[19]

### B.    Section 363 and 365 Do Not Allow Dealer Laws to be Overridden

Unlike Chrysler, which used separate procedings, the Debtors here have chosen to combine their sale motion with their assumption motion for many contracts, including notably, the dealer contracts.  In reviewing that request, it should be noted initially what was *not* being done in the Motion.  The Debtors had not yet made any final decision on whether to reject or assume these contracts when it filed the Motion; rather, coincident with that filing, it began to use heavy-handed tactics to dictate to the dealers changes that they *must* accept in their agreements with GM.  Only if they agreed to do so would the Debtors then make a final decision to assume the agreements.  During that process, though, the Debtors' actions remain fully subject to the exercise of the States' police and regulatory powers under their Dealer Laws.  Those laws, in turn, make it specifically unlawful to coerce dealers to revise their agreements or waive their rights under those laws of the States.  Much of what was done in securing dealers' agreement to those revised agreements likely violates the law in many States and they reserve their right to utilize their police and regulatory powers to bring complaints dealing with those actions as they deem appropriate.

Second, the Debtors are not moving to reject these agreements and cannot rely on any purported rights that they may or may not gain from court approval to breach their agreement as was argued in Chrysler.[20]    Rather, they are seeking to assume and assign agreements, a

---

[19]    It is far from clear that GM will suffer any harm during such a process.  Even while bankruptcy was looming, its sales in May increased 11% from the prior month.

[20]    The final order, there, it should be recalled, did not decide those issues or find any

proposition with wholly different language and applicable rights.[21]  In doing so, though, they do not seek to assume the existing agreements that they have with the dealers; rather, they forced the dealers to enter into new agreements (on a non-negotiated basis) which *new* agreements they then propose to assume.

That proposed course of action is itself at substantial odds with the well-settled principle under Section 365 that one must assume a contract *cum onere*; i.e., one cannot pick and choose the portions one likes and only assume those, while leaving the unwanted portions behind. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*, and the expenses and liabilities incurred may be treated as administrative expenses).  "It is well-settled that a debtor cannot assume part of an unexpired lease while rejecting another part; the debtor must assume the lease *in toto* with both the benefits and burdens intact." *In re S.E. Nichols, Inc*., 120 B.R. 745 (Bankr. S.D.N.Y. 1990).  A contract is assumed "in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens.  An executory contract cannot be rejected in part and assumed in part.  That is, the debtor or trustee is not free to retain the favorable features of a contract and reject the unfavorable ones."  *Matter of Village Rathskeller, Inc.*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992).  Yet, that is exactly the net effect of what the Debtors propose here – demand major changes to the agreements and only then agree to assume

---

preemption.  Rather, it merely stated the truism that *if* the Code and applicable case law gave rights to the Debtors, those rights could control over state law by virtue of the Supremacy Clause.  The order reserved rights to the dealers, though, to test that issue, even after rejection. (See Order entered June 9, 2009, Docket No. 3802, Case No. 09-50002.)

[21]    In that regard, as noted above, the proposed Order (see Par. 21) improperly seeks to deny parties their rights under Section 365(c)(1) to preclude assumption of their agreements based on certain types of anti-assignment provisions.  That provision must be corrected.

Pg 30 of 61

the revised version.  Such a process leaves little meaning to the proposition that contracts must be accepted *in toto*.

Even if one assumes that such a process is not necessarily unlawful as to contracts generally, the situation is markedly different where the Debtors seek to obtain substantively unlawful agreements by means that are procedurally unlawful.[22]  The Debtors (and Newco) seek to use bankruptcy as a way to write themselves a permanent exemption from the regulatory scheme for the business in which they seek to operate and under which all other competing dealers must proceed.  There is nothing in Section 363 or 365 that purports to preempt those laws or to allow them to be ignored by the Debtors.

1.    Preemption is Not Generally Favored

There are three forms of preemption: express, field, and conflict preemption.  Express preemption applies only by its explicit terms (i.e., where a section states that it applies, "notwithstanding applicable nonbankruptcy law").   In Section 363, only subsection (l), a provision not applicable here, has any express preemptive effect.  *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487, 493 (3rd Cir. 1987) ("neither § 363(b)(1) nor § 704(1) expressly authorizes the trustee to sell property in violation of state law transfer restrictions . . . 363(b)(1) and 704 are general enabling provisions that do not expand or change a debtor's interest in property merely because it files a bankruptcy petition").

In Section 365, while there are certain provisions that do apply "notwithstanding nonbankruptcy law," they apply only in certain situations not at issue here and there is no general statement that all nonbankruptcy laws are automatically swept aside with respect to the

---

[22]    While the States do not enforce the ADDICA, the actions of the Debtors and Newco here might well violate the "good faith" obligations under that statute as well.

assumption process.  Section 365(c), for instance, allows certain nonbankruptcy laws to apply to

bar the assumption and assignment of contracts.  Section 365(f), on the other hand allows

*assignment* of contracts despite nonbankruptcy laws precluding such assignments, but only if the

contract can be *assumed* – a right which remains subject to the nonbankruptcy law limits

imposed by Section 365(c).  Those limits on the extent of express preemption, thus, make clear

that field preemption – the broadest form of preemption – is not applicable.  That limitation is

further underscored by the applicability of 28 U.S.C. § 959(b) to all aspects of a debtor's

operations while in bankruptcy.  That section *requires* debtor to obey the valid laws of the state

in which it is operating during the case and has no exclusions that qualify its broad sweep.  Thus,

there plainly can be no argument that any portion of the Bankruptcy Code broadly preempts all

applicable state law with respect to a given issue.  Rather, at most, express preemption,

supplemented perhaps by conflict preemption if actually proven as to a particular statute, is the

appropriate standard; i.e., can the provisions of Sections 363 and 365, be applied while, at the

same time, the debtor also complies with applicable state law.  If there is an inherent conflict

between the two, then, to be sure, the Supremacy Clause dictates that state law must yield, but

that longstanding rules of construction emphasize that conflict preemption should not be

assumed lightly.  That is particularly true when one is applying those laws to operating non-

debtor entities, such as Newco, not to debtors in liquidation.

The mere fact that both federal and state law may apply in a particular situation does not

inherently create a conflict or lead to the automatic conclusion that the state law is preempted.

*See Pacific Gas and Elec. Co. v. California ex rel. California Dept of Toxic Substances Control*,

350 F.3d 932,  943 (9th Cir. 2003), quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996):

> First, we presume that Congress does not undertake lightly to preempt state law, particularly in areas of traditional state regulation.
>
> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied," we 'start with the assumption that the historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress.'(internal citation omitted).

*See also Integrated Solutions, supra,* 124 F.3d at 492 ("Because we are reluctant to assume federal preemption, we noted that any analysis should begin with 'the basic assumption that Congress did not intend to displace state law.'", quoting *In re Roach*, 824 F.2d 1370, 1373-74 (3rd Cir. 1987).). *See also Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) where the Fourth Circuit stated that "courts never 'assume[] lightly that Congress has derogated state regulation.' *Travelers*, [514 U.S. 645, 653 (1995)]. Instead, courts 'address claims of preemption with the starting presumption that Congress does not intend to supplant state law.'". Thus, it noted, that while Congress imposed broad preemption provisions in relation to ERISA plans, it did not preempt malpractice claims since there was no demonstrated intent to preempt "traditional state laws of general applicability" that did not implicate the relationships between the traditional plan entities.

Indeed, while not directly applicable to the judiciary, it is worthy of note that President Obama issued a directive to all executive departments and agencies on May 20, 2009, reminding them of the value of state law activities and directing them to review regulations issued over the last several years to ensure that they do not unduly infringe on prerogatives of the States. (See attachment A). The directive states *inter alia*:

32

> The Federal Government's role in promoting the general welfare and guarding individual liberties is critical, but State law and national law often operate concurrently to provide independent safeguards for the public. Throughout our history, State and local governments have frequently protected health, safety, and the environment more aggressively than has the national Government. Executive departments and agencies should be mindful that in our Federal system, the citizens of the several States have distinctive circumstances and values, and that in many instances it is appropriate for them to apply to themselves rules and principles that reflect these circumstances and values.

Those principles are no less applicable in considering whether preemption should be applied in judicial settings.

### 2.    Preemption of the States' Dealer Laws is Not Appropriate

GM has conditioned its assumption and assignment of the dealer agreements upon the dealers' waiver of various rights they enjoy under the States' laws. But, as noted, those laws continue to be applicable in bankruptcy, pursuant to 28 U.S.C. 959(b), absent some clear indication that they have been preempted. "[T]he mandate of section 959(b) ... prohibits the use of bankruptcy as a ruse to circumvent applicable state consumer protection laws by those who continue to operate in the marketplace." *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 698 (Bankr. E.D. Cal. 1994). And, as the Third Circuit noted, "Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business . . . ." *In re Quanta Resources Corp.*, 739 F.2d 912, 919 (3d Cir.1984), *aff'd sub nom., Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

In *Midlantic,* in affirming the Third Circuit, the Supreme Court found that state laws could apply even in the face of a section that provided that the trustee could "abandon *any* property of the estate that is burdensome to the estate or that is of inconsequential value."

33

Despite the absence of *any* explicit limitations on those powers, the Court found state law to be

applicable, citing Section 959(b), and stating that "Congress did not intend for the Bankruptcy

Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers."

*Midlantic Nat'l Bank*, 474 U.S. at 505.  The Court also looked to the actions of Congress in

enacting environmental laws generally as showing a concern that those regulatory concerns be

preserved even in bankruptcy.  By the same token, the presence of the ADDICA shows that

Congress has a long-established concern with the treatment of these dealer-manufacturer issues.

The structure of the bankruptcy laws – with its exception from the automatic stay for

police and regulatory actions, and the provisions in title 28 that require debtors to obey state laws

and prohibit removal of police and regulatory actions – make clear that the default position is

that debtors must obey nonbankruptcy laws and that bankruptcy is not a free pass to ignore those

obligations.  As the court in *White Crane* further noted:

> The purpose of bankruptcy is not to permit debtors or nondebtors
> to wrest competitive advantage by exempting themselves from the
> myriad of laws that regulate business. Bankruptcy does not grant
> the debtor a license to eliminate the marginal cost generated by
> compliance with valid state laws that constrain nonbankrupt
> competitors. The Congress has thus required that every debtor in
> possession and bankruptcy trustee manage and operate the debtor's
> property and business in compliance with state laws-good, bad,
> and indifferent-that apply outside of bankruptcy.

*White Crane*, 170 B.R. at 702.  In sum, Section 959(b) simply stands "for the uncontroversial

proposition that a trustee must carry out his duties in conformity with state law." *Hillis Motors,*

*Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 593 (9th Cir. 1993).

Indeed, that is true, even in situations equally as financially stressed (*albeit* on a smaller

scale) as the case here.  *See, e.g.*,,  *Gillis v. California*, 293 U.S. 62 (1934) (receiver barred from

operating without state-required bond, even if he was unable to obtain such a bond; " ultimate

34

09-50026-mg    Doc 2043    Filed 06/19/09    Entered 06/19/09 16:56:42    Main Document
Pg 35 of 61

inquiry is whether Congress can withhold from District Courts the power to authorize receivers in conservation proceedings to transact local business, contrary to state statutes obligatory upon all others.  That Congress has such power we think is clear, and the language of section 65 leaves no doubt of its exercise;" Section 65 is predecessor to current Section 959(b) with virtually identical language"); *In re 1820-1838 Amsterdam Equities, Inc.*, 191 B.R. 18, 21-22 (S.D.N.Y. 1996) (bankruptcy judge did not have power to temporarily enjoin civil and criminal sanctions actions by city against debtor even though debtor was arranging to correct violations); *In re Vel Rey Properties, Inc.*, 174 B.R. 859, 863-64 (Bankr. D. D.C. 1994) (Section 959(b) means that court has no power to authorize trustee to operate debtor in violation of state law, despite financial hardships and potential loss of value to estate).[23]    Similarly, in the context of plan confirmation, the courts have noted that bankruptcy is not meant to provide a guarantee of profitable operations to debtors.  Rather as the Ninth Circuit noted in *In re Baker & Drake, Inc.* , 35 F.3d 1348, 1354 (9th Cir. 1994)

> Simply making a reorganization more difficult for a particular debtor,[] however, does not rise to the level of "stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress." . . .  Congress's purpose in enacting the Bankruptcy Code was not to mandate that every company be reorganized at all costs, but rather to establish a preference for reorganizations, where they are legally feasible and economically practical. Thus, if compliance with NAC 706.371 were to render Baker financially unable to reorganize, neither Baker nor Nevada would thereby be violating any provision of the Bankruptcy Code. (Citations omitted).

---

[23]    *Cf. Saravia v. 1736 18th St., N.W., LP*, 844 F.2d 823, 826 (D.C. Cir. 1988) (rejection of leases by bankruptcy court did not authorize trustee to ignore local laws requiring provision of utility services to tenants and correction of housing code violations).

That is particularly true when a debtor's proposed actions would allow it to receive favorable treatment under the law far into the future. The Debtors here seek a "head start," not merely the "fresh start" the Code allows.

The state law provisions at issue here are not in conflict with the Code and there is nothing in the Code that allows the Debtors or Newco to ignore them in proceeding with the sales transaction and the assumption motion. The Participation Letters (even as amended) seek to have going-forward dealers be forced to operate without the legal protections that apply to every other dealer in the United States, including potentially being forced to accept unneeded inventory, operating under unrealistic sales quotas, accepting competing dealers within protected limits set by state law (and upheld by the Supreme Court), and being required to negotiate over their right to keep selling other brands when the Dealer Laws plainly guarantee them the right to do so. Those exemptions to the law would apparently be expected to operate on a permanent basis, long after the Debtors have exited the bankruptcy courts, giving a permanent operating advantage to Newco. The Debtors and Newco point to nothing in the Code that purport to authorize such actions even by the debtor, much less *by a non-debtor party after the closing of the Debtor's case.*

They presumably will argue that they may implement these provisions because the dealers "voluntarily" signed these agreements and "voluntarily" agreed to waive rights and protections. Those rights and protections, though, are not subject to waiver under the States' laws – for exactly the reasons seen here, i.e., that the dealers could easily be coerced into giving them up. The very request for such waivers is unlawful under most States' laws and the Court should not countenance it here. If the Debtors and Newco believe these are the dealers they want to maintain, they should assume their agreements as is – or at least not seek changes that

36

substantively and procedurally violate the States' Dealer Laws.  Moreover to the extent that the agreement requires that they also waive any rights they may have to file other claims in the Debtor's bankruptcy – a waiver for which they receive no consideration, that provision violates the Bankruptcy Code as well.

As to the dealers that are not being retained, the Debtors again purport to be assuming an agreement with them, but one which requires that they waive numerous protections under the States' Dealer Laws and accept relief that is far different from what they would be entitled to there.  However, to the extent that those dealers have monetary rights under the Dealer Laws, a straightforward rejection of those contracts with the same sort of effective date provisions as offered in the Wind-Up Letters would make any such damages prepetition general unsecured claims that would share *pro rata* in whatever dollars are available.  Thus, even if those rights had been greater in dollar terms than the amount being offered, they would not necessarily cost the Debtors more in real dollars.  Further, to the extent that the Dealer Laws would give those dealers injunctive rights as against either the Debtors or Newco (and many would afford the dealers at least some rights against Newco), the Debtors have offered no basis on which they can ignore such laws.

Rather, as with the retained dealers, the Debtors and Newco merely seek to abrogate those laws by means of "voluntary" agreements by dealers to waive those rights.  If it truly believed those wind-down provisions were attractive to dealers (and, for some, it is possible they might be), they could have offered dealers the option of rejection and application of the Dealer Laws (subject to the effect of Section 365 on the priority of monetary claims) or accepting revised dealer terms.  Such an agreement might have been voluntary – the one proffered here plainly is not.  Again, the States respectfully submit that, while the Court may approve

37

assumption of such agreements, the approval must not be conditioned on preemption of State

Dealer Laws that would invalidate at least some of the provisions in those agreements, or on

giving this Court exclusive jurisdiction in perpetuity to oversee their enforcement.  Instead, it

should simply carry out the process provided for in Section 365 and leave the continuing review

of such agreements and their enforceability to the State law tribunals that exercise such authority

for every other manufacturer-dealer arrangement in this country.

> **C.    The MPA is Ambiguous in Many Areas; As a Result, It is Impossible to Determine Whether Its Provisions Are Objectionable; The States Object Preliminarily and Reserve Their Rights as to Those Provisions Upon Their Clarification**

Finally, there are at least five areas in which the terms of the MPA are ambiguous,

contradictory, or simply do not address relevant issues.  As such, the States have been unable to

determine whether, in the end, an objection is actually necessary.  They have attempted to obtain

clarification of these issues from the Debtors on several occasions, beginning on June 2 and

continuing until the evening of June 18, and to have assurances that corrections will be made to

the MPA to the extent that it is agreed that changes are needed.  While some verbal clarifications

and assurances have been received with respect to certain points, nothing has yet been provided

in writing.  Accordingly, the States have no alternative but to file this protective objection to

ensure that such issues will be corrected before a final order enters.  The issues will only be

described briefly; the States reserve the right to supplement these objections should they not be

fully resolved prior to the sales hearing.

> 1.    Lemon Law Claims/Warranty Issues

Par. 2.3(a)(vii) of the MPA provides for Newco to assume all rights arising under written

warranties relating to vehicles, parts and equipment manufactured or sold by the Debtors prior to

the closing, while Par. 2.3(b)(xvi) provides that Newco does not intend to assume liabilities arising under implied warranties or statements made by the Sellers. The States sought to clarify how those provisions applied in several respects. First, most or all have "lemon laws," which are generally viewed as an extension of the warranty obligations of the manufacturer, but they provide remedies that extend beyond merely making repair attempts, which is the usual warranty obligation. Debtors' counsel indicated on June 15 that such obligations were likely covered, but did not clearly commit to amending the MPA to make that clear.

In light of the relationship between the Debtors and Newco (see further discussion below), as well as the statements by the United States government promising that all warranty obligations would be honored, the States accordingly object to any sale order that does not require assumption of such obligations and the MPA should be clarified to directly address that issue. Finally, in view of the nature of the relationship with Newco, the public statements made promising to protect "warranties" generally, and the fact that, under most States' laws, implied warranties may not be disclaimed, the States object to any refusal to transfer liabilities arising under implied warranties (and explicit statement by the Debtors' personnel) as well. Lemon laws frequently define "warranty" rights in terms of not only written manufacturer warranties, but also such implied warranties and dealer statements. Other state laws may define the scope of a warranty as including these factors as well. Thus, it is neither possible nor appropriate to attempt to dissect out this limited group of warranty obligations and disclaim them in violation of statements by public officials that "warranty" obligations would be broadly protected.

2.    Sale of Personally Identifiable Information

The Debtors propose to transfer, as part of the sale, all consumer personally identifiable information ("PII") that they maintain – without specifying in any way what the information may

entail.  The Debtors also maintain at least one privacy policy under which at least some of that information was gathered.  In view of the absence of any details on what is being transferred in the MPA, the States unsuccessfully attempted to obtain information from the Debtors on June 15 and the Consumer Privacy Ombudsman (CPO) thereafter.  The Debtors' representatives did not have the information and the CPO refused to meet with or discuss any issues with the States prior to the filing deadline.  Accordingly the States have no alternative but to file this precautionary objection.

They note the following: first, it appears that the Debtors' privacy policy generally contemplated that data could be transferred as part of the sale of the business, at least until immediately prior to the bankruptcy filing.  If so, that tends to alleviate concerns as to whether the sale would violate the States' "unfair and deceptive acts and practices'" (UDAP) statutes. Under those statutes, the States take the position that a sale of PII, in the face of a policy that promises *not* to sell PII, is a UDAP violation.  They have concluded, though, that, if (and only if) consumers are given option rights with respect to the data,[24] then the transfer will *not* be deceptive or unfair.  In that regard, they take a more stringent position from that adopted by the Federal Trade Commission in the *Toysmart* case in 2000.[25]

In the *Toysmart* case, an Internet debtor sought to sell a wide variety of extremely sensitive information, including data provided by children using its website, all in violation of a

---

[24]    The issue of whether the right should be "opt in" or "opt out" depends to some degree on the language of the policy and the sensitivity of the information.

[25]    As discussed below, there was no published decision in that case resolving these issues, or allowing the sale, and there have been few if any written opinions in a contested proceeding since then.  *Toysmart* is discussed in most of these matters simply because it was the first major dispute in this area and one in which there were substantial filings and argument.  Moreover, it was the impetus for the inclusion of the privacy sections at issue here.

policy promising *not* to sell such data to any third party.  The States and the FTC initially agreed
that such conduct violated the law.  The FTC, though, later tried to settle with the debtor by
creating the concept of a "qualified buyer," (a respectable entity in the same business that
promised that *it* would keep the data secure) and providing that a sale to such a buyer would not
violate the consumers' privacy rights under its statute.  The States, on the other hand, strenuously
objected, holding that "no sale of data" means "no sale," not a sale to a party that the *FTC* found
qualified.  The States' position was vindicated when Toysmart withdrew the sales motion and the
data was destroyed.

Notwithstanding that result, the CPO in Chrysler (the same person appointed here) issued
a report that repeatedly described the FTC's position in *Toysmart* as "governing law."  The
States were not able to respond to that report since, again, the CPO refused to meet or discuss the
issues with them, and his report was not filed until the day of the sales hearing.  Presuming that
the CPO will take a similar approach here, the States object, in advance, to any provision in this
CPO report that takes the view that the FTC position in *Toysmart* represents any form of law,
much less "governing" law.

While new privacy provisions were included in the 2005 amendments because of
*Toysmart*, nothing in those amendments remotely suggests that they were adopting the FTC's
contested position, as opposed to the States' position.  Further, assuming the FTC still adheres to
its *Toysmart* position, the States further object to any statement in the CPO's report that says
their laws are satisfied if the FTC position is adopted.  To the extent that the privacy policy here
may not actually prohibit the transfer or that the CPO insists on an acceptable option provision
(which was *not* part of the *Toysmart* settlement), the States' concerns may be obviated here, but,

in the absence of any information from the CPO, they file this objection now to ensure that their

concerns are taken into account by the CPO and their laws correctly read.

The States further note that, if drivers' license numbers, social security numbers,

financial information, or account passwords are transferred as PII, those pieces of data may

trigger their "data breach" statutes.  While those statutes are primarily intended to deal with

"hackers" and "identity thieves," they are not necessarily so limited.  At a minimum, they object

unless and until the CPO has fully investigated and reported on 1) what is being transferred, and

2) how such transfers interact with the States' laws, as construed by the States.  Absent such

information, the States object to any finding being entered that a "violation of [applicable ] law

has not been shown."

In addition, the States note that a corollary concern that arose after *Toysmart* was whether

upon receiving transferred PII, the new entity would qualify as one that could contact consumers

who have placed their name on the "Do Not Call" registry.  In general, at a minimum, a new

entity would have to be considered a successor to the old entity in order to enjoy that prior

entity's exemption from the registry for specified numbers.  Where, as here, the proposed Order

disclaims that status for Newco on some 14 occasions, Newco should be required to accept the

consequences and the CPO should find that it is required to refrain from calling consumers who

are on the registry.

3.    Workers' Compensation Claims

On its face, the MPA (Section 2.3(a)(x) and Exhibit G) appears to include claims from all

but four states in "Assumed Liabilities."  The States understand there are no current employees

in those four states and may not have been for some time.  In light of typical bonding

requirements, it may well be that there are no issues in those four states with respect to whether

42

there are adequate funds to cover any residual liabilities. All other states assumed, based on the language in Section 2.3(a)(x), that liabilities under their statutes were being assumed and thus they had no basis to object to the Motion with regards to this issue. On June 15, however, it became clear in the conversations with Debtors' counsel that the issue was *not* settled with respect to other states, *albeit* the Debtors did not want to talk to the States collectively on the issue. Upon further review, it was determined that Section 6.5(b) – 35 pages later in the document and under a heading that made no reference to workers' compensation – would allow the Debtors and Newco to make decisions on assuming workers' compensation claims up until two business days before the hearing, i.e., *nine days* after the deadline for objecting herein. Accordingly, the States file this precautionary objection to any refusal to treat workers' compensation claims (beyond those in the four states) as assumed liabilities, and reserve their right to file a supplementary objection after the deadline for the Debtors to amend the MPA, if Newco does seek to avoid assuming those obligations.

The States further object to the extent that any part of the determining factor on such assumption is based on whether the States will agree to treat Newco as a successor for purposes of determining its experience rating and/or its right to self insure. The States strongly believe that, if Newco seeks to disavow successor status where beneficial for its purposes, it should be bound by that claim for all purposes, including where it would impose added costs on Newco.[26] Allowing it to reject liability for those made sick, injured, or killed while in GM's service unless the States allow it to espouse contradictory legal positions about its status is plainly improper.

---

[26]    Self-insured status is typically dramatically cheaper than any insurance option available to an employer and experience ratings (and premium rates) often are higher for new entities.

43

4.      Tax Claims

The States adopt the issues raised by the State of Texas and join in its June 15 objection. (docket no. 1052).   They note specifically that the terms of the MPA are confusing and contradictory and that, moreover, their terms may contradict those of the Order (such as the language in Paragraph T(ii)).   After three conversations on the topic, the States believe that the Debtors and Newco now agree that any taxes that they were authorized to pay under the Debtors' first day motion and order (Docket Nos.  55 and 174), i.e., "Property Taxes, Sales Taxes, Use Taxes, Excise Taxes, Gross Receipts Taxes, Franchise Taxes, Business License Fees, Annual Report Taxes, and Other Governmental Assessments" are Assumed Liabilities.  That position is acceptable to the States but needs to be more clearly documented in the MPA or the Order (including removing the contradictory language in Paragraph T(ii)).

Similarly, the MPA provides for "Permitted Encumbrances" that may remain in place on transferred assets for, *inter alia*, certain taxes, but only if "adequate reserves" had been established for those taxes.  Debtors' counsel, however, could give no assurances that reserves were being established or in what amount.  The States, therefore, have no way of knowing if their liens will be recognized as Permitted Encumbrances by Newco or not, even if the underlying obligations have been accepted as Assumed Liabilities.  Accordingly, that issue still needs to be resolved.  The States also continue to object on the other issues raised in the Texas tax objection, such as the attempt to eliminate setoff rights with respect to taxes and, as discussed above, more broadly as to creditors' rights in general.

5.      Environmental Claims

Once again, the MPA is written so confusingly, it is impossible to tell what is intended to be transferred and what retained.  In that regard, the MPA uses defined terms "Liabilities" and

44

09-50026-mg    Doc 2043    Filed 06/19/09    Entered 06/19/09 16:56:42    Main Document
Pg 45 of 61

"Claims" that go far beyond bankruptcy claims in terms of the types of obligations covered (i.e., including matters that do not involve "rights to payment").  Moreover, the definitions include unknown liabilities that would not be bankruptcy Section 101(5) "claims."  *See, e.g., In re Chateauguay Corp.,* 944 F.2d  at 1003-1005 (discussing example of persons who might be injured post-confirmation if a bridge on which they were passing collapsed), *In the Matter of Crystal Oil Co.,* 158 F.3d 291, 296 (5th Cir. 1998) (environmental claim does not arise until agency can tie debtor to known release of hazardous substance).  Section 2.3(a)(viii) provides for the assumption of liabilities resulting from Newco's ownership or operation of the properties that it acquires, which, under *In re CMC Heartland Partners,* 966 F.2d 1143 (7th Cir. 1992), includes the obligation to clean up pre-existing contamination.  Section 2.3(b)(iv)(A), on the other hand, *excludes* all Liabilities arising out of prepetition violations of environmental law by the Debtors, including remedial obligations arising therefrom.  So, on the one hand, Newco is assuming the obligation to clean up prepetition contamination and, on the other hand, it is disclaiming the obligation to remedy prepetition violations that could cause exactly that same contamination.  It is, accordingly, impossible to tell from this what Newco intends to do with respect to these obligations.  The States attempted unsuccessfully on June 18th to obtain a determination from the Debtors and Newco as to what was intended here.  The States, accordingly, object to any order being entered approving the MPA until these contradictions are resolved.

Further, there is a great deal of statutory and case law that deals with the extent of a buyer's obligation for environmental obligations of the seller.  Those obligations turn, in large part, on whether the buyer is a successor within the meaning of those statutes and case law – a determination that turns on the facts of the transaction, not the desires of the purchaser as to whether or not it *wants* to be a successor.  Accordingly, as discussed further above, this Court is

not in a position to determine any issues regarding the successor liability of Newco or allowing it to escape liability for the clean-up obligations of the Debtors, without first undertaking a full evidentiary determination of whether Newco is, indeed, a successor to GM.  The States object to any provision of the MPA or the proposed Order that would simply dictate that result without completing a specific analysis of the facts and law applicable to successor status.[27]

## CONCLUSION

Wherefore, for the reasons stated above, the States respectfully object to the approval of the Motion or entry of the Order in their current form and request that the Court grant relief only to the extent consistent with the positions taken herein.

Signed:

                                             STATE OF NEBRASKA

                                             JON BRUNING,
                                             ATTORNEY GENERAL

                                             */s/Leslie C. Levy*
                                             Leslie C. Levy, # 20673
                                             Assistant Attorney General
                                             2115 State Capitol Building
                                             Lincoln, NE 68509-8920
                                             Tel.: (402) 471-2811
                                             Fax: (402) 471-4725
                                             leslie.levy@nebraska.gov

---

[27]     The States do not necessarily advocate that such an analysis is needed here.  The court's power under Section 363(f), as discussed above, deals with selling assets free and clear of other interests in that asset and attaching those interests to the proceeds of the sale.  Claims are not covered by Section 363(f) and, accordingly, determination of how to proceed on a particular claim can, appropriately be deferred to a later date when that claim is actually at issue.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of June, 2009, a true and correct copy of the

foregoing was served on all those parties receiving notice via the Court's Electronic Case Filing

System (through ECF) and the parties below via U. S. Mail First Class, postage prepaid on the

following parties:

Harvey Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153

John J. Rapisardi
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY  10281

James L. Bromley
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006

Babette Ceccotti
Cohen Weiss and Simon LLP
330 W. 42nd Street
New York, NY  10036

Michael J. Edelman
Michael L. Schein
Vedder Price PC
1633 Broadway  47th Fl.
New York, NY  10019

Diana G. Adams
Office of U. S. Trustee
33 Whitehall Street, 21st Fl.
New York, NY  10004

David S. Jones
Matthew L. Schwartz
U. S. Attorney's Office
86 Chambers Street, 3rd Fl.
New York, NY  10007

Warren Command Center,
Mailcode 480-206-114
General Motors Corporation
Cadillac Building
30009 Van Dyke Avenue
Warren, MI 48090-9025

Matthew Feldman, Esq.
U.S. Department of Treasury
1500 Pennsylvania Ave. NW, Room 2312
Washington, DC 20220

Kenneth Eckstien, Esq.
Thomas Moers Mayer, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

47

Lawrence S. Buonomo, Esq.    Daniel W. Sherrick
General Motors Corporation    UAW
300 Renaissance Center     8000 E. Jefferson Ave.
Detroit, MI 48265      Detroit, MI 48214

Chambers Copy
Hon. Robert E. Gerber
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Room 621
New York, NY 10004-1408

Dated: June 19, 2009

           */s/  Leslie C. Levy*
           Leslie C. Levy
           Assistant Attorney General

## APPENDIX A

Specific Violations of Law in Participation Letter ("PL") (as amended)

**1.    GM's Efforts to Amend These Agreements are Procedurally Flawed (Par. 6)**

The laws of many States prohibit adverse modifications of dealer agreements without adequate notice and an opportunity to protest the modification.  [Ark. Code Ann. § 23-112-101(a)(2)(P) (prohibiting vehicle manufacturers from failing "to continue in full force and operation a motor vehicle franchise agreement, notwithstanding a change, in whole or in part, of an established plan or system of distribution or ownership of the manufacturer of the motor vehicles…."); Md. Code Ann., Transp. II § 15-209(a);  RCW 46.96.030 (notice requirement to terminate), RCW 46.96.040 (good cause required)] If such a change is shown, the manufacturer may seek to show that it had "good cause" for the proposed changes.  Here, the PL plainly imposes such substantial adverse modifications – but, by their terms, they threaten the dealer with the loss of its business if it seeks to obtain the States' review of the terms of the PL or to protest the changes.

**2.    GM Violates the States Law on Inventory Purchases (Par. 2 and 3)**

In light of the long history of manufacturers forcing dealers to purchase excess inventory, the laws of many States bar manufacturers from attempting to require a dealer to order anything unless the debtor "voluntarily" chooses to request the item.  [NRS §60-1430.02, 60-1436; Ark. Code Ann. § 23-112-403(a)(1)(A); KRS 190.070(1)(a), KRS 190.040(1)(m); M.G.L. c 93B Section 4. (a) (b) It shall be a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative, to coerce, any motor vehicle dealer: (1) to accept or buy any motor vehicle, appliance, equipment, part or accessory, or any other commodity or service which has not been ordered or requested by the motor vehicle dealer; or to require a motor

49

vehicle dealer to accept, buy, order or purchase a motor vehicle, appliance, equipment, optional part or accessory, or any commodity or service or anything of value whether supplied or rendered by the manufacturer, distributor or franchisor representative in order to obtain any motor vehicle or any other commodity which has been ordered or requested by the motor vehicle dealer; Md. Code Ann., Transp. II § 15-207(c).

The original PL (par. 3) provided for Newco to unilaterally set sales quota and then demanded that the dealer must "order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Lines to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations . . . ." That mandatory requirement was scaled back in the amendments to a statement that GM expected its dealer would be able to sell more cars, that there would be a collaborative process to set sales goals in early 2010 and that the expectation was merely that dealers would order sufficient inventory to meet the sales goals. While such language is probably not violative, one State has already received calls indicating that the original, more rigid language is being enforced. The States reserve their rights to enforce their laws against either GM or Newco to the extent that they assert such pressure.

**3.     GM/Newco May Violate Dealers Right To Market Other Brands.   (Par. 4)**

Many states prohibit a manufacturer from unilaterally barring a dealer from carrying more than one manufacturer's product.  [Ark. Code Ann. §§ 23-112-403(a)(2)(N), 23-112-403(a)(2)(O); KRS 190.070(1)(g)(j); Md. Code Ann., Transp. II § 15-207(d)(1); RCW 46.96.185(1) (j) and (i) (unfair practice under RCW 19.86 for a manufacturer to terminate or coerce a dealership into agreeing that it will not sell another make or line of new motor vehicles), RCW 49.96.185(4) (unfair practice related to franchise agreement violates Consumer Protection Act)]. The original paragraph 4 in the PL flatly required dealers to eliminate any other brand

50

names from their premises by December 31, 2009.  After considerable discussion with objecting parties, the Debtor revised that language to insist only that dealers maintain an exclusive "showroom" for GM brands.  That provision might have been appropriate, but it was coupled with a statement that "GM reserves the right to require in certain markets that dealer provide completely exclusive GM facilities on the dealership premises going forward."  Thus, at most, a totally unlawful demand has been scaled back to an indeterminate status under which Newco still may demand that dealers forego their rights under state law to sell non-GM brands and limit themselves solely to the Debtors (and Newco's brands).  Again, this agreement by its very nature is intended to apply after closure of the sale and well into the future – allowing Newco to demand concessions and rights that other manufacturers are barred from exercising.

**4.      Dealer Location Provisions (par. 5).**

The PL amendment suggests that a 6-mile ratio for new dealership locations is already provided for by the dealer's contracts; the laws of various States require larger zones and the dealer's proposal would force existing dealers to accept additional locations within those zones for up to the next four years, thus again violating the laws. [KRS 190.047(6) (existing line dealers may protest competing new or relocated locations within ten (10) miles of their existing location); RCW 46.96.190 (prohibits a manufacturer from coercing or requiring a dealer to waive the dealer's right to protest the location of a new dealership within the current dealer's territory), RCW 46.96.150 (territory limits depending on population and other standards; allows the dealers to either arbitrate a dispute or file an administrative appeal with the state)].

**5.      Limitations of Rights to File Claims (par. 6).**

Contrary to the Codes' provisions that require a full "cure" of all amounts owed in order

to assume a contract, the PL provides for certain limited categories of expenses to be paid (i.e.,
SFE Bonuses for the second quarter of 2009; warranty claims for work in the last 90 days,
incentives and amounts owed under the dealers' "Open Account," and indemnity amounts).  In
order for the dealer to have its contract assumed, it must then agree to simply forfeit any other
claims or causes of action – whether accrued, pending, current or future, known or unknown –
with no compensation whatsoever and no cure.  The dealer agrees that it will not file any protest
of the terms of the PL and that it can be enjoined from doing so.  Moreover, the dealer must pay
GM's attorneys fees for any litigation arising out of *any* breach of the PL – including presumably
failure to make adequate sales, remove other brands, and the like.    These provisions violate not
only the Code's provisions on "cure," which bar the contract from being assigned if outstanding
damages thereunder are not paid, but also violate States' laws that require warranty claims to be
promptly paid by the manufacturer.   [Ark. Code Ann. § 23-112-313(b)(3); RCW 46.96.080
(requires compensation for inventory and equipment upon termination of a franchise); RCW
46.96.090 (requires compensation for facilities upon termination); RCW 46.96.105 (payment of
warranty work required)].

The provision also violates the provisions in the laws of the States that provide that
agreements to waive the protections of those laws (including their protest procedures) are void
and unenforceable. [Ark. Code Ann. § 23-112-403(b)(1) (prohibiting vehicle manufacturers from
requiring, as a condition of the grant or renewal of a franchise agreement, a waiver of any
remedies or defenses conferred by the statute); KRS 190.070(1)(i) (as to future claims); Md.
Code Ann., Transp. II § 15-207(f) (as to attorneys' fees only); M.G.L. c. 93B, section 4(2)(c) ( It
shall be deemed a violation of subsection (a) of section 3 for a manufacturer, distributor or
franchisor representative; (11) to coerce a motor vehicle dealer to assent to a release, assignment,

novation, waiver or estoppel which would prospectively relieve any person from liability imposed by this chapter.)]

## 6.   Modification of Other Agreements (par. 7).

This paragraph requires dealers to comply with the modifications made by the PA to their Dealer Agreements and to allow the Debtors and/or Newco to make changes to supplementary agreements with the Dealers ("Channel Agreements") which potentially violates provisions in States' laws that provide for how terms of a franchise may be modified.  [Ark. Code Ann. § 23-112-403(a)(2)(P) requires manufacturers to "continue[] in full force and operation a motor vehicle dealer franchise agreement," notwithstanding a change in the distribution system or ownership of the manufacturer; KRS 190.070(1)(e) as "franchise" is broadly defined to cover all agreements concerning the purchase and sale of the product; Md. Code Ann., Transp. II  § 15-207(e)(2)(i)] The statute, arguably, means that manufacturers must continue the EXISTING agreement, unaltered.   That is particularly true in that there appear to be no limits to the modifications that can be imposed.   The bar in subparagraph 7(b) on the dealer's right to sue with respect to the rejection of certain existing/outstanding agreements again may violate laws that deal with modifying agreements and protesting changes thereto. [Ark. Code Ann. § 23-112-403(b)(1) (prohibiting vehicle manufacturers from requiring, as a condition of the grant or renewal of a franchise agreement, a waiver of any remedies or defenses conferred by the statute)].  Finally, paragraph 7(c)'s requirements for increased floor plan capability and increased sales and inventory expectations again my violate bars on dealers being forced to order unneeded items or to meet unreasonable sales and service standards.   [Ark. Code Ann. § 23-114-403(a)(1)(A); RCW 46.96.185 (e) makes it an unfair practice to require a dealer to remodel or renovate existing facilities as a prerequisite to receiving a model or series of vehicles].

53

7.     **Jurisdiction Provisions (Par. 9(g) as amended).**

The PL provides for the bankruptcy court to have "exclusive" jurisdiction to "interpret, enforce, and adjudicate" issues arising under the PL.  That likely violates 28 U.S.C. 1334(b) to the extent that the disputes arise between the dealer and Newco (both non-debtor parties) about issues that will not affect the debtor's estate.  *See Concerto Software, Inc. v. Vitaquest Int'l, Inc.*, 290 B.R. 448, 454 (D. Me. 2003) (finding that the court lacked jurisdiction over dispute regarding contract assigned in bankruptcy because "case law provides that an assumption and assignment of an executory contract under section 365 substitutes the assignee for the debtor" and "[p]ursuant to section 365(k), the debtor is then 'relieved from any liability for any breach of contract occurring after such assignment.'") (citations omitted).  Moreover, "it is a fundamental proposition that parties cannot confer subject matter jurisdiction by agreement." *H & L Developers, Inc. v. Arvida/JMB Partners (In re H & L Developers, Inc.),* 178 B.R. 71, 75 n.6 (Bankr. E.D. Pa. 1994).  If the Debtors wish to obtain the benefits of assigning these agreements and relieving themselves of liability thereunder, they cannot simultaneously retain jurisdictional provisions that derive from their bankruptcy proceedings.

Most States provide that their Department of Motor Vehicles or similar agency has jurisdiction to regulate these matters.  [NRS §60-1433; Ark. Code Ann. § 23-112-104( authorizes the Arkansas Motor Vehicle Commission to seek injunctive relief in the Circuit Court for Pulaski County.); RCW 46.96.030 *et. seq.* (administrative jurisdiction upon dealer request);  Ark. Code Ann. § 23-112-105 (private causes of action in "any court of competent jurisdiction" are authorized); KRS 190.070(1)(i); KRS 190.020 (KMVC has supervision over the licensees . . . in respect to all the provisions of KRS 190.010 to 190.080); Md. Code Ann., Transp. II § 15-209(e)].  Thus, this is yet another attempt to override that state law and place these issues in the

54

bankruptcy court.  While that court may have jurisdiction over disputes between the debtor and

the dealer, that jurisdiction is not exclusive where the States may exercise police and regulatory

power.  And, by the same token, if there are actions involving the dealers that may be subject to

the automatic stay, that stay will not apply if the action is solely between two non-debtor parties

(Newco and the dealer).

## APPENDIX B

Specific Violations of Law in Wind-Up Letter ("WL")

1.      **Termination Date (par. 1)** – While the agreement purports to allow dealers to continue until October 31, 2010, Par. 2(a) actually allows termination by Newco on thirty days notice, starting after December 31, 2009.  Thus, a dealer expecting to continue for several more months can be forced to cease operations with only 30 days notice.  That period is less than the transition period allowed in most States' laws and the procedure is also not what is to be used.   In particular, for instance, while this process is plainly being driven by the Debtors, the WL forces the *dealer* to purportedly act to terminate the dealership, apparently to make it appear that this is a voluntary act by the dealer.   [NRS §60-1420, 60-1433; Ark. Code Ann. § 23-112-403(a)(2)(B) (requiring manufacturers to notify dealers at least 60 days prior to the effective date of a termination); KRS 190.045; Md. Code Ann., Transp. II  § 15-209(a), (d); RCW 46.96.070(90 days notice before effective date of termination required)].

2.      **Turnover of Data (par. 2(b))** – The Dealer must immediately give Purchaser access to all of its customer records to allow it and retained dealers to communicate with and solicit business from those customers.   The States' laws would not require/permit this sort of appropriation of property rights or encroachment on the terminating dealers' business during the transition period. [Md. Code Ann., State Gov't  10-616(p)(4); RCW 46.96.185 makes it an unfair practice to use confidential information, including customer lists, to unfairly compete with the dealer.  If the terminated dealer continues to operate as an unused dealership without a franchise, coercive turnover of the customer lists may be considered "unfair competition." A violation of RCW 46.96.185 is a violation of the Consumer Protection Act (RCW 46.96.185(4))].

3.      **Assistance Offered (pars. 3 and 4)** – This   provides that, in consideration of the

termination, the transfer of the right to use lists, and the releases, dealers will get a specified sum of money.  25% will be paid up front, and the remainder if Dealer has sold all inventory by termination effective date, provided assurances of payments to all taxing authorities, and satisfied numerous other conditions.  Even so, Par. 3(c) allows payment to be withheld if there are any "competing claims" until those claims have all been resolved.  These provisions are in lieu of all right allowed under the States' laws and dealers are given no option to insist upon their rights under those States' laws.  Specifically, Par. 4 provides that this payment is in lieu of all other rights under those statues including obligations to repurchase cars, tools, parts, etc.  or to provide other assistance.  The attempt to coerce agreement to waive those rights is a further, separate violation.

[Ark. Code Ann. § 23-112-403(a)(2)(K) (requiring dealers to buy back vehicle inventories, special tools, and so forth); KRS 190.045 if less than the statutory amounts; Md. Code Ann., Transp. II  §  15-207(b); RCW 46.96.080, 46.96.090].

4.      **Waiver of Rights – (par. 5(a)**) – The Dealer agrees that it waives *any* other rights against GM or acquirer arising out of dealer agreements, dealer operations, any payments or bonuses, except those owed for second quarter of 2009, warranty work within last 90 days, any amounts currently owed in Open Account, amounts owed under Par. 17.4 (indemnity provisions), all of which are subject to setoff by GM/acquirer.  GM or the acquirer may charge back false, fraudulent, unsubstantiated warranty claims for up to 2 years.  This violates provisions of the States' law requiring payment for warranty work [Ark. Code Ann. § 23-112-403(a)(2)(B) (requiring manufacturers to notify dealers at least 60 days prior to the effective date of a termination); M.G.L. c. 93B section 4(c) It shall be deemed a violation of subsection (a) of

57

section 3 for a manufacturer, distributor or franchisor representative: (11) to coerce a motor vehicle dealer to assent to a release, assignment, notation, waiver or estoppel which would prospectively relieve any person from liability imposed by this chapter; Md. Code Ann., Transp. II § 15-207(b)], as well as violating the rights of the dealers to file claims under the Code. This would also require dealers to waive their rights under various State laws to require an acquirer to accept their contract [Ark. Code Ann. § 23-112-403(a)(2)(P)] and use the normal State law procedures should it seek to terminate the agreement [Ark. Code Ann. § 23-112-403(a)(2)(C) (prohibiting terminations without good cause and establishing procedures for good-cause termination proceedings); KRS 190.045, KRS 190.070(1)(i).] . The attempt to coerce agreement to waive that provision is an additional violation.  [Ark. Code Ann. § 23-112-403(b)(1)].

5.      **Violation of Protest Rights - (par. 5(c))** – This  requires dealers to agree not to protest, file anything in any court, claim any of these provisions are unenforceable or void before a state law tribunal and so forth.  GM can enjoin dealers from taking any such actions, demand a right of specific performance of the waiver and, under Par. 5(d), the dealers must indemnify GM for its costs to enforce these provisions. Again, the forced waiver of statutory rights itself violates the statute. [NRS §60-1436; Ark. Code Ann. § 23-112-403(b)(1); KRS 190.045; Md. Code Ann., Transp. II §  15-206.1].

6.      **No Right to Purchase Additional Vehicles – (par. 6)** – After signing, the dealer has no right to order any more cars.  It can buy parts, but may not return any.  This violates laws of the States that require manufacturers to supply the reasonable needs of the dealership while the agreement is in effect. [Ark. Code Ann. §  23-112-403(a)(2)(A); KRS 190.070(2)(a) and subsection 3; Md. Code Ann., Transp. II §  15-207(d); RCW 46.96.185(1)(e)(unfair practice

58

under consumer protection act to give preferential treatment to some dealers)].

This also means that dealers will effectively be squeezed out of business long before the purported October 31, 2010, end date of the agreements.

7.      **Waiver of Rights to Protest Competing Dealers – (par. 7(a))** – This provides that GM and/or Newco can immediately move in a competing dealer and the dealer may not protest in any way.  Not only must it waive any suit of its own, but under Par. 7(b), it also may not "assist in the prosecution of any action, arbitration,  mediation, suit, etc." to "challenge, protest, prevent, impede or delay, directly or indirectly, any establishment of relocation whatsoever of motor vehicle dealerships.  Par. 7(b)(c) releases any claim that the dealer may have under state law regarding such violative actions and Par. 7(d) allows GM or Newco to enjoin any violations of these provisions by the dealer.  [Ark. Code Ann. § 23-112-311 (establishing dealers' rights to protest the addition or relocation of new motor vehicle dealers); Ark. Code Ann. § 23-112-403(b)(1) (prohibiting manufacturers from obtaining coerced waivers)]. These forced waivers of rights under the States' laws violate those laws [KRS 190.047(existing line dealers may protest competing new or relocated locations within ten (10) miles of their existing location); Md. Code Ann., Transp. II  § 15-208(e); RCW 46.96.140; 46.96.150 (dealer right to protest new dealership in market area)]  particularly when they would apparently extend so far as to even bar a dealer from cooperating in any action brought by the States to enforce their laws.

8.      **Confidentiality – (par. 9)** – The dealer is not allowed to reveal the terms or conditions of the WL, thereby again interfering with the States ability to monitor these agreements and determine if they violate the States' laws. [Md. Code Ann., Transp. II  § 15-203(b)].

9.      **Forced Statement of Voluntary Action (par. 10)** – The dealer is required to agree that its actions are "entirely voluntary and free from any duress," despite the fact that a failure to sign

59

the agreement will result in a threatened immediate loss of its business (in violation of the laws

of the States) and the fact that the dealer could not discuss or negotiate the terms of the WL in

any way. [Md. Code Ann., Transp. II §15-207(b)].

10.     **Jurisdiction (par. 9)** – As with the PL, the WL attempts to give the bankruptcy court

full, complete, and exclusive jurisdiction to interpret, enforce, and adjudicate disputes

concerning the terms of this agreement *and any other matter related thereto*.    Thus, this

provision not only suffers from the same infirmities under federal law and the laws of the States

but it goes even further by attempting to extend exclusive jurisdiction to any "matter related to"

the WL, whatever that may entail.   [Ark. Code Ann. § 23-112-104 (authorizes the Arkansas

Motor Vehicle Commission to seek injunctive relief in the Circuit Court for Pulaski County),

Private causes of action in "any court of competent jurisdiction" are also authorized under Ark.

Code Ann. § 23-112-105; KRS 190.070(1)(i), KRS 190.020 to the extent it seeks to deny the

KMVC the ability to "have supervision over the licensees . . . in respect to all the provisions of

KRS 190.010 to 190.080; Md. Code Ann., Transp. II § 15-209(e)].

11.     **Additional Agreements (par. 14)** – Despite the termination of its primary agreement,

the dealer must continue to abide by "Channel Agreements" which include obligations to

"construct or renovate facilities," to meet sales standards as a condition of receiving payments

(although the dealers are being denied any new inventory), and similar obligations.  The dealer

must also agree not to protest if GM rejects those agreements.  As well as being wholly one-

sided, this provision again violates the provisions of the laws of the States dealing with how

agreements with dealers may be modified, as well as the bars on coercing dealers to modify such

agreements.  [Ark. Code Ann. § 403(b)(2)(P) (prohibiting manufacturers from not continuing "in

full force and operation a motor vehicle franchise agreement, notwithstanding a change, in whole

or in part, of an established plan or system of distribution or ownership of the manufacturer of the motor vehicles offered for sale under the franchise agreement");  KRS 190.070(1)(e) as "franchise" is broadly defined to cover all agreements concerning the purchase and sale of the product; Md. Code Ann., Transp. II  § 15-207(b)].