**Hearing Date:** July 13, 2009, at 9:45 a.m. (Eastern Time)
**Objection Deadline:** July 8, 2009, at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Jeffrey L. Tanenbaum
Joseph H. Smolinsky
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                     :
In re                                :        Chapter 11 Case No.
                                     :
GENERAL MOTORS CORP., et al.,        :        09-50026 (REG)
                                     :
                   Debtors.          :        (Jointly Administered)
                                     :
------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDER APPROVING
(I) MASTER DISPOSITION AGREEMENT FOR PURCHASE OF CERTAIN
ASSETS OF DELPHI CORPORATION, (II) RELATED AGREEMENTS,
(III) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,
(IV) AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION,
AND (V) ENTRY INTO ALTERNATIVE TRANSACTION IN LIEU THEREOF**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Relief Requested ................................................................................................... 1

Jurisdiction ........................................................................................................... 2

Background ........................................................................................................... 2

I.     Commercial Relationship Between GM and Delphi ..................................... 2

II.     Delphi's Chapter 11 Cases ........................................................................... 4

III.    Proposed Transaction with Delphi and Parnassus ....................................... 7

       (a)  Master Disposition Agreement ................................................... 10

       (b)  Securities Purchase Agreement and Operating Agreement ...................................... 13

       (c)  Loan Agreement ......................................................................... 15

       (d)  Commercial Agreements .............................................................. 16

       (e)  PBGC Agreement ....................................................................... 16

       (f)  U.S. Treasury Approval and Funding ...................................... 18

       (g)  Delphi Court Approval of the Proposed Transaction ............................................. 18

The Court Should Approve GM's Entry Into and Performance
Under the MDA and All Related Documents ............................................... 20

The Court Should Approve GM's Entry Into and
Performance of an Acceptable Alternative Transaction ................................. 22

Assumption and Assignment of the Contracts Is Warranted
Under Section 365 of the Bankruptcy Code ................................................. 23

Notice ................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524 (Bankr. D.N.J. 1989) ..................................................................................................... 25

*In re Exide Techs.*, 340 B.R. 222 (Bankr. D. Del. 2006) ............................................ 24

*In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992) ............................... 20

*In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) ..................................................... 20

*Matter of Minges*, 602 F.2d 38 (2d Cir. 1978) .......................................................... 23

*In re Natco Industrial, Inc.*, 54 B.R. 436 (Bankr. S.D.N.Y. 1985) ............................ 25

*In re Network Access Solutions, Corp.*, 330 B.R. 67 (Bankr. D. Del. 2005).............. 23

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095 (2d Cir. 1993) ....................................................................................................... 23

*In re Riodizio, Inc.*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997)....................................... 23

*Sharon Steel Corp. v. National Fuel Gas Distributing Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36 (3d Cir. 1989) ......................................................................... 23

*In re Stable Mews Associates, Inc.*, 41 B.R. 594 (Bankr. S.D.N.Y. 1984)................. 23

*Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555 (Bankr. S.D.N.Y. 1996)................................................................... 23

## FEDERAL STATUTES

11 U.S.C. § 105 .......................................................................................................... 1

11 U.S.C. § 363 ................................................................................................1, 13, 20

11 U.S.C. § 365 ........................................................................................1, 23, 24, 25

28 U.S.C. § 157 .......................................................................................................... 2

28 U.S.C. § 1334 ........................................................................................................ 2

28 U.S.C. §§ 1408-1409 ............................................................................................. 2

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("**GM**") and its affiliated debtors, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

respectfully represent:

## <u>Introduction</u>

1.      The Debtors are on the verge of resolving one of the biggest obstacles that

has occupied them for approximately four years – securing a stable supply of component parts

from their largest supplier, Delphi Corporation ("**Delphi**"), which has operated under chapter 11

protection since October 2005.  Due to Delphi's current liquidity crisis and the potential for

foreclosure by Delphi's postpetition secured lenders (the "**Delphi DIP Lenders**") in the absence

of a consensual resolution, it is imperative that the Debtors immediately secure the supply of

parts from Delphi in order for GM's own reorganization to succeed.  Accordingly, GM has

entered into a transaction with Delphi and Parnassus (as defined below), which would be partly

owned by GM, whereby GM (primarily through wholly-owned non-debtor affiliates) would

purchase certain of Delphi's assets used primarily to manufacture parts for GM, and Parnassus

would purchase substantially all of Delphi's remaining operating assets (which are also used to

produce parts for GM and other customers).  This transaction would stabilize and secure for GM

the supply of essential parts.

## <u>Relief Requested</u>

2.      The Debtors request entry of an order pursuant to sections 105, 363, and

365 of title 11 of the United States Code (the "**Bankruptcy Code**") authorizing and approving

GM's (i) purchase, and guarantee of purchase, of certain assets of Delphi pursuant to the MDA

(as defined below and as may be modified so as not to materially increase payments to be made by GM), (ii) entry into the SPA, the Operating Agreement, the Loan Agreement, and the Commercial Agreements (all as defined below and as may be modified so as not to materially increase payments to be made by GM) with Parnassus Holdings II, LLC ("**Parnassus**") in connection with Parnassus's purchase of substantially all of the remaining operating assets of Delphi, (iii) assumption of certain executory contracts in connection with the sale of certain of Delphi's assets and assignment of such contracts and leases to Vehicle Holdings (as defined below), (iv) entry into an agreement with the Pension Benefit Guaranty Corporation (the "**PBGC**") in connection with such transaction, and (v) entry into an Acceptable Alternative Transaction (as defined below) with the successful bidder, if applicable, in the auction of Delphi's assets (as described further below).

## Jurisdiction

3.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### I.   *Commercial Relationship Between GM and Delphi*

4.       GM and Delphi have a complex history arising from their interdependent relationship.  Delphi consisted of divisions and subsidiaries of GM until GM's divestiture of Delphi in 1999.[1]  Since the spin-off, Delphi has been, and continues to be, GM's largest component parts supplier, accounting for approximately 11.3% of GM's North American

---

[1] The Debtors will shortly file with the Court one or more declarations supporting the factual assertions made herein.

purchases and 9.6% of GM's global purchases in 2008. Delphi is a sole-source, just-in-time,

supplier of many critical parts to GM, including parts that are used in essentially every GM

product line in North America.

5.      In turn, since the spin-off, GM has been, and continues to be, Delphi's

largest customer. Although Delphi's sales to GM have declined over the years, in 2008, Delphi's

sales to GM aggregated approximately $6.8 billion, or approximately 33% of Delphi's revenues.

Thousands of Delphi's employees work at plants whose production is primarily dedicated to

production for GM or GM's suppliers.

6.      Consistent with industry practice, GM operates on a "just-in-time"

inventory delivery system, in which component parts from suppliers are typically assembled onto

vehicles by GM within a few hours of the delivery of the parts to the vehicle assembly facility.

Because GM operates on a just-in-time inventory delivery system, it generally maintains little or

no inventory of parts on site, and relies instead upon frequent and regular shipments of parts

from its suppliers, including Delphi. Consequently, if Delphi ever ceases shipping even a small

fraction of production parts to GM, the GM plants relying on such shipments may run out of

inventory of such parts and have to shut down within a matter of days.

7.      Most parts that Delphi manufactures for GM are not readily available from

an alternate source due to, among other things, capacity issues within the automotive parts

supply industry, the length of time it takes to validate and obtain safety regulatory approval of a

new supplier's parts, and lead time to develop and build tools for manufacture. While GM can

accelerate efforts to resource Delphi parts in the event of a supply interruption, the sheer

magnitude of the parts to be resourced and revalidation required would take at least several

months to achieve.

8.     The shutdown of GM plants as a result of termination of deliveries of affected parts from Delphi could idle tens of thousands of GM workers, and it is estimated that GM's revenues would decrease significantly.  GM would also incur costs related to expedited resourcing efforts, including, but not limited to, hundreds of millions of dollars for duplicate tooling, premiums and price increases paid to alternative suppliers, and the continued costs of maintaining idled plants (such as plant overhead and other fixed costs).

9.     Moreover, because GM purchases parts from many other automotive parts suppliers, a GM shutdown will likely affect many of its other suppliers.  In the event of a shutdown of its North American facilities, GM would have no need for parts from its other suppliers and would be forced to stop purchasing all other parts used in the shut-down facilities, which include parts from over 1,500 other suppliers.  Such a loss of revenue could force those suppliers to seek bankruptcy protection themselves, thus creating a broader risk to GM's and other motor vehicle manufacturers' future sources of parts supply.

10.     In short, a prolonged cessation in the supply of parts from Delphi to GM would have a devastating effect on GM, its ability to reorganize, and the communities that depend on employment by GM and its community of parts suppliers.

## II.     *Delphi's Chapter 11 Cases*

11.     Faced with mounting operating losses, on October 8, 2005 (or October 14, 2005, with respect to certain Delphi affiliates) (the "**Delphi Petition Date**"), Delphi and certain of its affiliates (collectively, the "**Delphi Debtors**") each filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code.  Delphi's chapter 11 cases (the "**Delphi Cases**") are currently pending before the Honorable Robert D. Drain and are being jointly administered under Case No. 05-44481.

12.     Delphi completed a number of its restructuring objectives (such as
negotiating new agreements with its unions) and on January 25, 2008 confirmed a plan of
reorganization (the "**Confirmed Plan**").  But Delphi has been unable to consummate the
Confirmed Plan due to certain plan investors' (the "**Plan Investors**") refusal to consummate
transactions required to fund the consummation of the Confirmed Plan, the deterioration in the
global capital markets, and the continuing reduction in demand for vehicles, thereby decreasing
the production of Delphi's parts sold to original equipment manufacturers.[2]

13.     During the Delphi Cases, GM has been forced to spend billions of dollars
and incur billions of dollars of additional liabilities primarily to protect its supply base by
supporting Delphi.  The following are some of the most significant contributions made by GM in
the Delphi Cases:

- *Labor Solutions During Delphi's Cases.*  GM made several critical contributions to facilitate Delphi's implementation of new agreements with its unions in 2006, 2007, and 2009, including paying or assuming billions of dollars of liabilities to allow Delphi to implement special attrition programs for certain of its hourly employees, providing opportunities for certain hourly employees to flow back to work for GM, the transfer of significant pension and post-retirement health care obligations to GM, and entering into memoranda of understanding with Delphi's unions to subsidize certain payments that GM believes Delphi would otherwise have had to make to its hourly employees.

- *Global Settlement Agreement/Master Restructuring Agreement.*  To resolve many of the issues between GM and Delphi and increase Delphi's ability to exit chapter 11, GM and Delphi entered into a Global Settlement Agreement (as amended, the "**GSA**") and a Master Restructuring Agreement (as amended, the "**MRA**"), both of which have been amended several times during the Delphi Cases.[3]  The GSA and the

---

[2] Delphi commenced an action in this Court against the Plan Investors seeking damages from the Plan Investors' refusal to consummate the transactions (the "**Plan Investor Litigation**").  The Plan Investor Litigation is currently pending under Adversary Proceeding Case No. 08-01232 (RDD).

[3] All summaries in this Motion of any agreements are qualified in their entirety by the terms of such agreements and, in the event of any conflict between any summary and the applicable agreement, the terms of such agreement control.

MRA both became effective in the fall of 2008.  Pursuant to the GSA and the MRA, GM agreed, among other things:

- o  to assume post-retirement health care and basic life insurance benefits for the vast majority of Delphi's U.S. hourly retirees (beyond such assumptions already contemplated in the labor contributions described above);

- o  that the GM hourly pension plan would assume $2.1-2.4 billion of net liability of Delphi's hourly pension plan in exchange for an allowed administrative expense claim equal to 77.5% of the transferred net liability;[4]

- o  to subsidize through 2015 Delphi's U.S. hourly labor costs and, until closure or sale, the costs of operating several of Delphi's U.S. facilities;

- o  to a revenue plan to provide Delphi with a substantial, long-term book of GM business (in some cases, at pricing GM believes to be higher than market competitive levels) and enhanced opportunities to win future GM business; and

- o  to reduce GM's unsecured claims against the Delphi Debtors from an asserted amount in excess of $13 billion to an allowed claim of $2.7 billion (together with GM's allowed administrative expense claims under the GSA, the "**GM Allowed Claims**").

- • *Liquidity Support.*  While looking for alternatives to exit chapter 11, Delphi sought support from GM in the spring of 2008 to address Delphi's liquidity issues and avoid a shut down.  As a result, GM agreed to advance Delphi up to $650 million in exchange for claims with a priority junior to the claims of the Delphi DIP Lenders (as amended, the "**GM-Delphi Financing Agreement**").  Since then, GM has made certain amendments to the GM-Delphi Financing Agreement such that GM's commitment to fund loans to Delphi thereunder is currently $550 million (inclusive of outstanding loans).[5]  In addition, GM accelerated the payment of $300 million in trade payables to Delphi over a three month period beginning in the first quarter of this year.

---

[4] GM also agreed that if Delphi could consummate a reorganization plan meeting certain criteria, (i) the GM hourly pension plan would assume an additional approximately $3.2 billion of net liability (based on current estimated liabilities and asset values) of Delphi's hourly pension plan, (ii) GM would accept preferred stock in reorganized Delphi in lieu of repayment of GM's administrative and general unsecured claims against Delphi, and (iii) GM would, under certain conditions, share a portion of such preferred stock with Delphi's unsecured creditors.  Due to the state of the Delphi Cases, GM strongly believes that Delphi will not be able to consummate a reorganization plan meeting such criteria.

[5] GM's funding thereunder is authorized by the *Interim Order Pursuant to 11 U.S.C. §§ 105, 363, and 364 Authorizing Debtors to (i) Pay Prepetition Claims of Certain Essential Suppliers, Vendors, and Service Providers, (ii) Continue Troubled Supplier Assistance Program, and (iii) Continue Participation in the United States Treasury Auto Supplier Support Program, entered June 1, 2009* [Docket No. 175].

14.     Notwithstanding the billions of dollars of support GM has already
provided to Delphi, Delphi continues to need further liquidity support.  In addition, Delphi's
postpetition financing loans (the "**Delphi DIP Loans**") – in the current principal amount of
approximately $3.3 billion – matured on December 31, 2008 and are currently in default.
Delphi's DIP Lenders entered into a series of forbearance agreements, but the forbearance may
expire as early as June 23, 2009, at which point the Delphi DIP Lenders may seek to foreclose on
all or some portion of Delphi's assets.  The chaos that could ensue as a result of such
foreclosures could lead to a cessation of some or all of Delphi's operations.  A cessation of
operations by Delphi, whether due to liquidity constraints or foreclosures by the Delphi DIP
Lenders, could shut down GM's production and lead to the attendant consequences described
above.

### III.     *Proposed Transaction with Delphi and Parnassus*

15.     In GM's relationship with Delphi, protection of supply is paramount.  GM
cannot continue to fund Delphi's liquidity needs and must take measures to secure continuity of
supply.  In light of current circumstances, GM can only obtain confidence that its supply of
Delphi's parts will not be threatened by obtaining control of certain of Delphi's assets and/or
through a transfer of Delphi's assets to an entity that GM is comfortable will be a stable and
well-capitalized long-term supplier of parts to GM.  More specifically, GM needs to obtain
control of Delphi's global steering business and Delphi's U.S. plants that employ workers
represented by the International Union, United Automobile, Aerospace and Agricultural
Implement Workers of America (the "**UAW**") because those plants supply parts primarily to GM
and, in the case of the U.S. UAW plants, are important to GM's relationship with the UAW.  GM

would prefer the transfer of Delphi's other operating assets to a third party because GM is generally not the primary customer of parts produced by those assets, and ownership of those assets by GM would likely lead to loss of business from other customers (and thus reduce the value of those assets) and divert GM's resources from GM's own reorganization.  Because no other party has been willing to provide sufficient capital to fully reorganize these other assets, GM has agreed to provide significant funding to the entity that will own these assets under the Proposed Transaction (as defined below) to allow such entity to reorganize the assets and become a stable supplier to GM.

16.    Over the past several months, GM and Delphi have discussed with various parties, including the Delphi DIP Lenders and another potential purchaser of Delphi's assets, potential transactions to resolve the Delphi Cases.  Platinum Equity Capital Partners II, L.P. ("**Platinum**") was the only party to present a viable business, operating, and restructuring plan, including stability of supply to GM, and to commit to a binding transaction on the expedited timeline required by the current situation.  Accordingly, after extensive negotiations with Delphi and Platinum, GM determined that its most reliable and cost-effective option to secure the supply of parts from Delphi's facilities would be to enter into agreements with Delphi, Parnassus (which was formed by Platinum), Platinum, and certain of Platinum's affiliates to provide for Delphi's sale of substantially all of its operating assets to GM (including to certain of GM's non-debtor affiliates) and Parnassus (the "**Proposed Transaction**").  A more detailed description of the Proposed Transaction is set forth below, but the following summarizes the key elements:

- (i) Certain of GM's non-debtor subsidiaries, including GM Global Steering Holdings, LLC ("**GM Steering**") and GM Components Holdings, LLC ("**GM Components**"), will acquire Delphi's global steering business, its facilities in Kokomo, Indiana, Rochester, New York, Lockport, New York, and Grand Rapids, Michigan, and the Plan Investor Litigation (the "**GM Purchased Assets**"), (ii) Parnassus and certain of

its affiliates will acquire substantially all of the remaining Delphi operating assets (the "**Parnassus Purchased Assets**"), and (iii) Delphi will maintain the remainder of its assets until they are sold or wound down.

- GM and affiliates of Platinum will purchase equity stakes in Parnassus and commit to lend it funds.

- Affiliates of Platinum and/or its affiliates will control the operations of Parnassus.

- GM and Parnassus entered into and will enter into agreements to govern their commercial relationship and protect GM's supply of parts from Parnassus under certain circumstances, including if Parnassus encounters financial difficulties.

- GM anticipates that its total cash expenditures with respect to the Proposed Transaction will be approximately $3.9 billion (consisting of payments to Delphi or its creditors of approximately $1.1 billion, a $2 billion equity investment in Parnassus, a commitment to fund up to $500 million of loans to Parnassus, and a $250 million interim postpetition financing as part of the GM-Delphi Financing Arrangement).

- Platinum will provide up to $500 million in financing.

- GM expects the Proposed Transaction to close on or about July 31, 2009, which may be at approximately the same time as the proposed sale of substantially all of GM's assets (the "**Proposed GM Sale**") that is subject to the *Debtors' Motion to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC ("***Vehicle Holdings***"), Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing* (the "**GM Sale Motion**") [Docket No. 92]. Because protection of supply is essential to the Debtors' reorganization efforts, the Debtors intend to consummate the Proposed Transaction regardless of whether the Proposed GM Sale occurs.

- The Proposed Transaction remains subject to the Court's approval in the Delphi Cases, and could be topped by another bid pursuant to certain procedures established in the Delphi Cases.

17.    The Proposed Transaction would meet GM's goal of stabilizing the supply of parts currently manufactured by Delphi.  GM would acquire certain critical assets, while the other assets used to produce parts for GM would be transferred to a stable entity that would be well-capitalized and controlled by Platinum, which has the experience necessary to successfully

operate the assets.[6]  In the unlikely event that Parnassus encounters financial difficulties, GM

will have greater means to protect itself due to enhanced rights it is obtaining under commercial

agreements with Parnassus.  Finally, because Parnassus will be properly capitalized and GM has

confidence in Parnassus's business, operating, and restructuring plan, GM believes that it will

eventually be able to recover most, if not all, of the funds that it will invest in and loan to

Parnassus.

        18.     The following is a detailed explanation of the components of the Proposed

Transaction:

        (a)     **Master Disposition Agreement**

        19.     On June 1, 2009 (after the commencement of GM's chapter 11 case),

Delphi, GM Components, GM (solely with respect to certain sections of the MDA), and

Parnassus entered into a Master Disposition Agreement (the "**MDA**"), a copy of which is

attached hereto as **Exhibit A**, pursuant to which Delphi agreed to sell the GM Purchased Assets

to GM, GM Components, GM Steering, and certain non-debtor subsidiaries of GM Steering

(collectively, the "**GM Buyers**") and the Parnassus Purchased Assets to Parnassus and/or certain

of its affiliates (collectively, the "**Parnassus Buyers**").

        20.     The GM Buyers will provide the following consideration for the GM

Purchased Assets:

- Assumption of certain ordinary course of business liabilities associated with the GM Purchased Assets;

---

[6] Platinum has a successful track record of investing in and operating, among other types of companies, manufacturing and industrial companies.  More importantly, Platinum has been doing due diligence on Delphi's assets for more than three years and has devised a comprehensive business plan for Parnassus that is not dependent for success on the automotive industry returning to pre-recessionary sales levels and that GM believes will result in the financial and operational success of Parnassus.

- Assumption or payment of amounts necessary to cure defaults under Delphi's executory contracts that are to be assigned to the GM Buyers (GM estimates this amount will be no more than $90 million);

- Payment to Delphi of approximately $900 million in cash;

- Payment to Delphi of up to $50 million to fund certain expenses of winding down the Delphi Debtors' estates;

- Payment of 50% of Delphi's professional fees (such payment is capped at $15 million), plus the costs of solicitation of votes for Delphi's Modified Plan (as defined below) (such payment is capped at $12 million); and

- Payment to Delphi of up to approximately $145.5 million of the first net proceeds of the Plan Investor Litigation.[7]

    21.    In addition, GM has agreed to do the following in respect of the MDA:

- Guarantee the full and timely performance of the GM Buyers' obligations arising prior to or at the closing of the MDA; and

- Upon consummation of the Proposed Transaction, waive all recoveries in respect of the GM Allowed Claims and waive principal and interest in respect of loans outstanding under the GM-Delphi Financing Agreement.

    22.    Parnassus will provide the following consideration for the Parnassus

Purchased Assets:

- Assumption of certain ordinary course of business liabilities associated with the Parnassus Purchased Assets;

- Assumption or payment of the cure amounts related to the Parnassus Purchased Assets;

- Payment to Delphi of $1.00 in cash;

- Class C membership interests in Parnassus (a description of the rights attendant to such membership interests is below) will be issued to Delphi;

---

[7] After consummation of the MDA, GM will control the prosecution and settlement of the Plan Investor Litigation.

- Payment of certain amounts to Delphi's unsecured creditors (as described in more detail below); and

- Payment of 50% of Delphi's professional fees (such payment is capped at $15 million).

23.    The MDA automatically terminates if by July 15, 2009 (or such later date as the parties may agree to in writing) this Court does not approve (i) GM's entry into and performance under the MDA, the SPA (as defined below) and the related documents to which GM is or will be a party,[8] and (ii) GM's assumption of all purchase orders and commercial agreements between GM and Delphi (the "**GM Assumed Contracts**" and, together with the MDA, SPA, and related documents to which GM is or will be a party, the "**GM Assigned Contracts**") and the assignment of the GM Assigned Contracts to Vehicle Holdings.  The MDA also automatically terminates if by July 15, 2009 (or such later date as the parties may agree to in writing) GM has not agreed in writing to assume all of the GM Assumed Contracts upon the closing of the MDA and, if the Proposed GM Sale closes prior to July 15, 2009, Vehicle Holdings has not agreed in writing to assume certain of the GM Assigned Contracts upon the closing of the MDA.

(b)    **Securities Purchase Agreement and Operating Agreement**

24.    To provide funding for Parnassus's general corporate and working capital needs, GM, Parnassus, and an affiliate of Platinum entered into a Securities Purchase Agreement (the "**SPA**"), a copy of which is attached hereto as **Exhibit B**, on June 1, 2009 (after the commencement of GM's chapter 11 case) pursuant to which GM agreed to purchase Class A

---

[8] Because execution of the MDA was expected to occur prior to the commencement of GM's chapter 11 case, the MDA technically requires GM to *assume* the SPA and certain ancillary agreements to the MDA. In light of the execution of the SPA and these agreements after the commencement of GM's chapter 11 case, GM submits that the Court's approval of the SPA and these agreements reflects the actual intent of the parties to the MDA and will satisfy the applicable MDA requirements.

Membership Interests in Parnassus for $2 billion, and the Platinum affiliate agreed to purchase

Class B Membership Interests in Parnassus for $250 million.

 25. Parnassus's amended and restated operating agreement (the "**Operating**

**Agreement**"), a copy of which is annexed hereto as **Exhibit C**, sets forth the terms of future

distributions to holders of Parnassus's membership interests.  Under the terms of the Operating

Agreement, (i) of the first $1 billion available for distributions to Parnassus interest holders,

holders of Class A Membership Interests are entitled to receive 69.9134%, holders of Class B

Membership Interests are entitled to receive 25%, and holders of Class C Membership Interests

(which will be held by Delphi on behalf of certain junior Delphi DIP Lenders and are being

issued as part of the consideration for the Parnassus Purchased Assets) are entitled to receive

5.0866%, (ii) of the next $1,641,757,563 available for distribution to Parnassus interest holders,

holders of Class A Membership Interests are entitled to receive 79.2352%, holders of Class B

Membership Interests are entitled to receive 15%, and holders of Class C Membership Interests

are entitled to receive 5.7648%, (iii) of the next $1 billion available for distribution to Parnassus

interest holders, holders of Class A Membership Interests are entitled to receive 30% and holders

of Class B Membership Interests are entitled to receive 70%, and (iv) of any additional amounts

available for distribution to Parnassus interest holders, holders of Class A Membership Interests

are entitled to receive 40% and holders of Class B Membership Interests are entitled to receive

60%.

 26. Under the Operating Agreement, the maximum amount distributable to

holders of Class C Membership Interests is approximately $145.5 million.  The Class C

Membership Interests are subject to mandatory redemption on the tenth anniversary of the date

of the Operating Agreement for a purchase price equal to approximately $145.5 million minus

any previous distributions made to holders of Class C Membership Interests.  In addition, subject to the terms of the Operating Agreement, holders of Class C Membership Interests are entitled to quarterly payments equal to 8% of the unpaid balance of such interests.

27.     If the Proposed Transaction occurs pursuant to Delphi's Modified Plan (as opposed to a sale pursuant to section 363 of the Bankruptcy Code, as discussed below), Parnassus will make certain distributions to Delphi's unsecured creditors after an aggregate amount of $7.2 billion has been distributed to holders of interests in Parnassus (exclusive of the mandatory quarterly payments to the holders of the Class C Membership Interests).  After that point, Parnassus will distribute an amount equal to $3 to Delphi's unsecured creditors for every $97 distributed to holders of membership interests in Parnassus.  The maximum amount that will be distributed to Delphi's unsecured creditors is $180 million.

28.     Parnassus will be governed by a board of managers that initially will be comprised of seven managers, six of whom will be designees of the holders of Class B Membership Interests, and one of whom will be the designee of the holders of Class A Membership Interests so long as GM or certain of its transferees continue to own at least 50% of the Class A Membership Interests acquired by GM on the signing date of the Operating Agreement.

29.     GM's obligations under the SPA are conditioned upon, among other things, consummation of the MDA.

30.     It is contemplated that the structure of Parnassus may be changed from a Delaware limited liability company to a Luxembourg company, but such change will not result in any substantive changes to the economic or governance provisions of Parnassus.

    (c)      **Loan Agreement**

       31.     To ensure Parnassus's financial viability, GM and an affiliate of Platinum have agreed to make available to Parnassus upon closing of the SPA delayed draw term loans aggregating $750 million.  The loan commitment is documented pursuant to a loan agreement (the "**Loan Agreement**"), a copy of the form of which is annexed as **Exhibit D** hereto, that will be executed upon the closing of the SPA.  Pursuant to the Loan Agreement, and on a *pro rata* basis, GM will commit to fund $500 million of the loans and the Platinum affiliate will commit to fund $250 million of the loans.  The loans will be secured by liens on substantially all of Parnassus's assets.  The Loan Agreement will mature on the fifth anniversary of the closing date of the SPA.  The Loan Agreement prohibits cash distributions on account of the membership interests under the Operating Agreement at any time when any principal amounts are outstanding under the Loan Agreement.

    (d)      **Commercial Agreements**

       32.     On June 1, 2009 (after commencement of GM's chapter 11 case), GM and Parnassus also entered into a Commercial Agreement, an Access Agreement, and a Supply Agreement (collectively, the "**Commercial Agreements**"), redacted copies of which are attached hereto as **Exhibit E**, in connection with the Proposed Transaction for the purpose of establishing the parties' commercial relationship after consummation of the MDA.[9]  Among other things, the Commercial Agreements provide for (i) Parnassus's assumption of certain GM supply contracts relating to the businesses and facilities to be acquired by Parnassus, (ii) continuity of supply between Parnassus and GM Components relating to the businesses and

---

[9] The parties to the MDA contemplate also entering into certain transition services agreements as part of the Proposed Transaction (the "**Transition Services Agreements**").

facilities to be acquired by the parties, and (iii) certain supply protections in favor of GM, including intellectual property rights, an acknowledgement of GM-owned tooling, and the right under certain circumstances to access key Parnassus-acquired facilities in order to protect GM's parts supply.

       (e)      **PBGC Agreement**

       33.      Delphi's hourly and salaried pension plans are currently significantly underfunded (the hourly plan has a net underfunded liability of approximately $3.2 billion and the salaried plan has a net underfunded liability of approximately $2.1 billion). The PBGC has asserted liens against the assets of Delphi's non-debtor affiliates (which include the foreign assets under the Potential Transaction) to attempt to secure certain of the PBGC's pension-related claims against Delphi's ERISA control group. Although Delphi has disagreed that these asserted liens are valid or enforceable, neither GM nor Parnassus (nor presumably any other potential purchaser) is willing to purchase the assets (or shares in the non-debtor affiliates that own the assets) while they are subject to the threat of the PBGC liens. As a result, conditions precedent to the obligations of GM and Parnassus under the MDA are that the PBGC shall have agreed to remove its alleged liens on the assets subject to the Proposed Transaction. Additionally, Delphi's obligations under the MDA are conditioned on Delphi not being subject to liability in respect of its hourly pension plan after the closing of the MDA.

       34.      GM, Delphi, the PBGC, and the U.S. Treasury have engaged in discussions regarding an agreement to satisfy these conditions and render saleable the assets subject to the PBGC's asserted liens (a "**PBGC Agreement**"). As part of a PBGC Agreement, GM may agree to make a cash payment to the PBGC and/or assume all or some portion of the net underfunded liability of Delphi's hourly pension plan. GM will only agree to make these

contributions if they are necessary to enable the Proposed Transaction or any Acceptable

Alternative Transaction to proceed and the contributions are clearly outweighed by the benefits

GM would receive from the Proposed Transaction or an Acceptable Alternative Transaction. In

such circumstances, the GM contributions would be a sound exercise of GM's business

judgment. Additionally, as with the other aspects of the Proposed Transaction, any GM

contributions under a PBGC Agreement will be subject to U.S. Treasury consent.

35.     GM hopes that a PBGC Agreement can be reached before the hearing of

this Motion. If a PBGC Agreement is timely reached, GM expects to file it with the Court as a

supplement to this Motion and seek approval of the PBGC Agreement under section 363 of the

Bankruptcy Code as part of the relief requested herein. If a PBGC Agreement is not timely

reached, GM will separately seek any necessary Court approval of the PBGC Agreement.

(f)     **U.S. Treasury Approval and Funding**

36.     The United States Department of Treasury (the "**U.S. Treasury**") is the

Debtors' largest prepetition secured creditor and their postpetition secured lender. As such, the

U.S. Treasury was kept abreast of and participated in the negotiations over the Proposed

Transaction and approved GM's entry into the Proposed Transaction.

37.     Additionally, GM's postpetition secured loan will be the source of funds

to be paid by GM or the other GM Buyers in connection with the Proposed Transaction or an

Acceptable Alternative Transaction that requires funding by GM. To that end, with the approval

of the U.S. Treasury, GM's anticipated expenditures with respect to Delphi were built into the

initial 13-week budget submitted to the Court as part of approval of GM's postpetition financing

(the "**DIP Budget**") and the final DIP Budget is expected to reflect all of the expenditures to be

paid by GM or the other GM Buyers, including funding of capital to Parnassus under the SPA, in

connection with the Proposed Transaction or an Acceptable Alternative Transaction.

(g)    **Delphi Court Approval of the Proposed Transaction**

38.    On June 1, 2009, the Delphi Debtors filed a motion (the "**Plan**

**Modification Approval Motion**") in the Delphi Cases for, among other things, approval of

modifications to the Confirmed Plan (as so modified, the "**Modified Plan**") to, among other

things, incorporate the Proposed Transaction.  The Plan Modification Approval Motion also

seeks approval of the Proposed Transaction pursuant to section 363 of the Bankruptcy Code (the

"**Delphi 363 Sale**") in the event the Court does not approve the Modified Plan.[10]

39.    On June 16, 2009, in response to several objections by Delphi's creditors

to the Plan Modification Approval Motion, the Court entered an order that, among other things,

establishes procedures for the submission of bids for and, if appropriate, an auction of Delphi's

assets [Delphi Docket No. 17032] (the "**Bidding Procedures Order**").  The Bidding Procedures

Order provides that if qualified bids are received by July 10, 2009, the Delphi Debtors will hold

an auction on July 17, 2009 (the "**Delphi Auction**") and the Court will hold a hearing to consider

approval of the Modified Plan or, in the alternative, the Delphi 363 Sale, on July 23, 2009.  It is

anticipated that any transaction pursuant to a winning bid at the Delphi Auction would close on

or about July 31, 2009.

40.    Under the Bidding Procedures Order and the documents to which GM is a

party in connection with the Proposed Transaction, GM has the ability to negotiate an alternative

transaction with other potential bidders and has discretion to determine whether to participate in

---

[10] The parties to the MDA have agreed to enter into an agreement to make any amendments to the MDA
and related agreements necessary to implement the Proposed Transaction pursuant to a Delphi 363 Sale
(the "**363 Implementation Agreement**").

a potential bid.[11]  Specifically, GM could agree to participate in another bid by providing to

Delphi consideration similar to that which would be provided under the MDA and related

documents and by providing funding in the form of equity investments or loans similar to those

that would be provided to Parnassus under the Proposed Transaction.

41.     An alternative transaction might be beneficial to GM if it provides GM

with better deal terms (such as requiring less expenditures by GM and/or providing better returns

on amounts expended by GM) and/or resolves some or all of the objections Delphi's creditors

have to the Proposed Transaction.  GM's criteria for evaluating its support of an alternative

transaction will primarily focus on whether:

- The alternative transaction would be equally or more advantageous to GM as the Proposed Transaction;

- GM would be able to purchase the GM Purchased Assets on terms at least as favorable to GM as those in the Proposed Transaction;

- The purchaser of the other assets under the alternative transaction would be a stable and well-capitalized long-term parts supplier to GM with a strong management team and business, operating, and restructuring plan; and

- The alternative transaction would result in a resolution of the Delphi Cases and would have a high level of certainty of closing within the same timeframe as the Proposed Transaction.

42.     Accordingly, GM seeks approval herein of any alternative transaction that

it may enter into with another bidder, so long as the transaction is on terms, taken as a whole,

equally or more advantageous to GM as the Proposed Transaction, does not require GM to

---

[11] Under the Bidding Procedures Order, Delphi, after consultation with the retained professionals for Delphi's official committee of unsecured creditors and subject to review by the Court in the Delphi Cases (i) may determine which qualified alternative transaction, if any, is the highest or otherwise best offer and (ii) may reject, at any time any bid (other than GM and Parnassus's bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the bidding procedures, or the terms and conditions of the alternative transaction, or (c) contrary to the best interests of Delphi, its estates, and stakeholders.

expend materially more in the aggregate than it would expend in respect of the Proposed

Transaction, and is approved by the U.S. Treasury (an "**Acceptable Alternative Transaction**").

<div align="center">

**The Court Should Approve GM's Entry Into and
Performance Under the MDA and All Related Documents**

</div>

43.     Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a

hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1).  A court should approve a request for relief under

section 363 of the Bankruptcy Code where the debtor demonstrates a sound business justification

for seeking such relief.  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In this

regard, courts have applied the business judgment rule.  *See, e.g., In re Integrated Resources,

Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  The business judgment rule is "a presumption that in

making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interest of the company."  *Id.*

(internal citations and quotations omitted).  Courts are loath to interfere with corporate decisions

absent a showing of bad faith, self-interest, or gross negligence.  *Id.*  Further, parties opposing

the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity.  *Id.*

44.     GM's entry into and performance under the MDA, the SPA, the Operating

Agreement, the Loan Agreement, the Commercial Agreements, and any related documents

(including the Transition Services Agreements and the 363 Implementation Agreement) (the

"**Ancillary Agreements**") are in its sound business judgment and are in its best interest and the

best interest of its estate and its creditors.  In light of Delphi's liquidity position and the threat of

foreclosure by the Delphi DIP Lenders, the Debtors face an unacceptable risk of supply

interruption from Delphi.  As set forth in more detail herein, if Delphi cannot manufacture parts

for GM, GM's production lines will quickly come to a halt and GM will lose large amounts of

money at a time when it can ill-afford to do so.

45.    GM's ongoing business operations, and consequently its reorganization,

depends on its ability to maintain a stable supply base.  After years of contributing billions of

dollars to Delphi's restructuring efforts without obtaining stability of supply, GM must, at this

critical time in its history, take steps to ensure the continuity of its supply.  The only currently

available transaction that achieves that goal is the Proposed Transaction.  The Proposed

Transaction will give GM control of the crucial GM Purchased Assets and create in Parnassus a

stable, well-capitalized supplier that will be controlled by a proven operator.  The Proposed

Transaction also is the best currently available opportunity for GM to recover all or a material

portion of the funds that it will have to spend to complete the stabilization of the supply of parts

from Delphi.

46.    The need for GM to enter into the Proposed Transaction is also recognized

by the U.S. Treasury, the party with the largest stake in GM's reorganization.  The U.S. Treasury

has not only consented to the Proposed Transaction, but is willing to fund it under the Debtors'

postpetition financing.  This willingness is indicative of the importance of the Proposed

Transaction to GM's reorganization and the restructuring of the United States automotive

industry.

47.    Accordingly, GM's entry into and performance under the MDA, the SPA,

the Operating Agreement, the Loan Agreement, the Commercial Agreements, and any Ancillary

Agreements are an appropriate exercise of its business judgment and should be authorized by this

Court.

**The Court Should Approve GM's Entry**
**Into and Performance of an Acceptable Alternative Transaction**

48.    In the event that Parnassus is not the winning bidder at the Delphi

Auction, the Debtors seek authority for GM to enter into and perform under an Acceptable

Alternative Transaction.  As set forth above, an Acceptable Alternative Transaction may provide

GM with better deal terms and/or resolve objections by Delphi's creditors.  GM would only

exercise its discretion to enter into an Acceptable Alternative Transaction if it determined that

the alternative transaction would result in terms, taken as a whole, for GM that would be equally

or more advantageous than those of the Proposed Transaction.  And GM's discretion would be

bounded by the requirements that the Acceptable Alternative Transaction not result in GM

expending materially more in the aggregate than what it would expend in respect of the Proposed

Transaction and must be approved by the U.S. Treasury.  Accordingly, authorization for GM to

enter into an Acceptable Alternative Transaction, as long as such transaction is on terms, taken

as a whole, equally or more advantageous to GM as the Proposed Transaction, does not require

GM to expend materially more in the aggregate than what it would expend in respect of the

Proposed Transaction, and is approved by the U.S. Treasury, is in the best interest of GM, its

estate, and its creditors.

**Assumption and Assignment of the Contracts Is**
**Warranted Under Section 365 of the Bankruptcy Code**

49.    As a part of the purchase of the GM Purchased Assets, GM has agreed to

assume the GM Assumed Contracts, including those executory contracts that are being

transferred by Delphi to Parnassus pursuant to the MDA.  In addition, GM intends to assign the

GM Assigned Contracts to Vehicle Holdings upon the closing of the Proposed GM Sale and the

MDA requires Vehicle Holdings to agree to assume certain of the GM Assigned Contracts under

certain circumstances described above.[12]

50.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  It is well established that the

decision to assume or reject an executory contract is a matter within the "business judgment" of

the debtor.  *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d

1095, 1099 (2d Cir. 1993); *Matter of Minges*, 602 F. 2d 38 (2d Cir. 1978); *In re Stable Mews*

*Associates, Inc.*, 41 B.R. 594 (Bankr. S.D.N.Y. 1984).

51.    The "business judgment" test is not a strict standard, but instead merely

requires a showing that either assumption or rejection of the contract will benefit the debtor's

estate.  *See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores,*

*Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *In re Riodizio, Inc.*, 204 B.R. 417, 424

(Bankr. S.D.N.Y. 1997); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del.

2005).

52.    Upon finding that a debtor has exercised its business judgment in

determining that assumption of an agreement is in the best interests of its estate, the Court should

approve the assumption of the contract under section 365(a) of the Bankruptcy Code.  *See, e.g.,*

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-

---

[12] If the Proposed GM Sale is consummated prior to the closing of the Proposed Transaction or an
Acceptable Alternative Transaction, GM does not intend to assume and assign the GM Assigned
Contracts, or any other contracts between GM and Delphi or any of its affiliates, until the closing of the
MDA or an Acceptable Alternative Transaction.  Unless and until GM expressly assumes a GM Assumed
Contract or any other contract between GM and Delphi or any of its affiliates pursuant to the MDA, an
Acceptable Alternative Transaction, or otherwise, GM reserves all rights with respect to such GM
Assumed Contract or other contract.

40 (3d Cir. 1989); *cf. In re Exide Techs.*, 340 B.R. 222, 240 (Bankr. D. Del. 2006) (stating that,

under the business judgment standard, a court may not substitute its own judgment for that of the

debtor).

53.    In this case, assumption of the GM Assumed Contracts upon the closing of

the MDA or an Acceptable Alternative Transaction is a sound exercise of GM's business

judgment because such assumption is necessary to consummate the Proposed Transaction or an

Acceptable Alternative Transaction and consequently secure GM's supply base.  Further, if the

Proposed GM Sale closes, assignment of the GM Assigned Contracts to Vehicle Holdings is

rational and will be essential to Vehicle Holdings, as the GM Assigned Contracts will be

necessary to ensure that Vehicle Holdings obtains an uninterrupted supply of parts for the

vehicles it will be manufacturing.[13]

54.    When assuming an executory contract, section 365(b) of the Bankruptcy

Code requires a debtor to cure any defaults under the contract or provide adequate assurance that

it will promptly cure such defaults.  11 U.S.C. § 365.  In the instant case, the Debtors will cure or

provide adequate assurance of the prompt cure of defaults, if any, under the GM Assumed

Contracts upon assumption of the GM Assumed Contracts.

---

[13] GM sought approval to assume and assign certain of the GM Assigned Contracts pursuant to the GM
Sale Motion.  But GM is seeking the relief requested herein in respect of such contracts because (i) GM is
seeking authorization to assume the GM Assumed Contracts, regardless of whether the Proposed GM
Sale closes, (ii) certain of the GM Assigned Contracts may not have been included in the approval sought
under the GM Sale Motion, (iii) GM wishes to clarify that if the Proposed GM Sale closes before the
Proposed Transaction or an Acceptable Alternative Transaction closes, GM does not intend to assume and
assign to Vehicle Holdings any of the GM Assigned Contracts or any other contracts between GM and
Delphi or any of its affiliates until the closing of the Proposed Transaction or an Acceptable Alternative
Transaction, and (iv) unless and until GM expressly assumes a GM Assumed Contract or any other
contract between GM and Delphi or any of its affiliates pursuant to the MDA, an Acceptable Alternative
Transaction, or otherwise, GM reserves all rights with respect to such GM Assumed Contract or other
contract.

55.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if: (1) the debtor assumes the contract in accordance with the provisions of section 365; and (2) the assignee provides adequate assurance of future performance. 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985). In this case, adequate assurance of future performance is not at issue because the current and future counterparties to the GM Assigned Contracts (i.e., Delphi and Parnassus) require that GM assume and assign the majority of the GM Assigned Contracts as part of the Proposed Transaction and any purchaser in an Acceptable Alternative Transaction would presumably expect the same.

56.     Accordingly, the Court should authorize the assumption by GM of the GM Assumed Contracts and the assignment to Vehicle Holdings of the GM Assigned Contracts in connection with the Proposed Transaction or an Acceptable Alternative Transaction.

### Notice

57.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for Delphi, (iv) the attorneys for Parnassus and Platinum, (v) the attorneys for Export Development Canada, (vi) the attorneys for the agent under GM's prepetition secured term loan agreement, (vii) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (viii) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (ix) the attorneys for the UAW, (x) the

attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture

Workers—Communications Workers of America, (xi) the United States Department of Labor,

(xii) the attorneys for the National Automobile Dealers Association, (xiii) the attorneys for the ad

hoc bondholders committee, (xiv) the U.S. Attorney's Office, S.D.N.Y., (xv) the attorneys for

the PBGC, and (xvi) all entities that requested notice in these chapter 11 cases under Fed. R.

Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is

sufficient and no other or further notice need be provided.

        58.     Other than with respect to assumption and assignment of certain executory

contracts between GM and Delphi sought in the GM Sale Motion, no previous request for the

relief sought herein has been made by the Debtors to this Court or any other court.

        WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:  June 20, 2009
        New York, New York

        /s/ Robert J. Lemons
        Harvey R. Miller
        Stephen Karotkin
        Jeffrey L. Tanenbaum
        Joseph H. Smolinsky
        Robert J. Lemons

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtors
        and Debtors in Possession

## EXHIBIT A

### Master Disposition Agreement

FREEDOM OF INFORMATION ACT CONFIDENTIALITY REQUESTED

EXECUTION COPY

# MASTER DISPOSITION AGREEMENT

AMONG

DELPHI CORPORATION,

GM COMPONENTS HOLDINGS, LLC,

GENERAL MOTORS CORPORATION
(SOLELY WITH RESPECT TO ARTICLE 6 AND SECTIONS 9.11.1, 9.19, AND 9.38),

PARNASSUS HOLDINGS II , LLC,

AND

THE OTHER SELLERS AND OTHER BUYERS PARTY HERETO

DATED AS OF

June 1, 2009

(revised as of June ___, 2009)

# TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS.......................................................................................2

   1.1 Certain Defined Terms...............................................................................2

   1.2 Other Interpretive Provisions..................................................................25

ARTICLE 2. PURCHASE AND SALE. ................................................................25

   2.1 Transfers by Sellers and their Affiliates.................................................25

   2.2 Assumption of Liabilities.........................................................................32

   2.3 Retained Liabilities...................................................................................33

   2.4 JV Companies Liabilities, Sale Company Liabilities. ...........................34

   2.5 Deferred Items..........................................................................................34

   2.6 Restrictive Covenants...............................................................................35

   2.7 Allocation Among Buyers........................................................................36

ARTICLE 3. PURCHASE PRICE; ALLOCATION. ........................................36

   3.1 GM Purchase Price...................................................................................36

   3.2 Company Purchase Price..........................................................................37

   3.3 GM Purchase Price and Company Purchase Price Allocation..............38

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLERS. ......38

   4.1 Organization..............................................................................................38

   4.2 Authorization; Enforceability..................................................................39

   4.3 Capital Stock of the Sale Companies and JV Companies......................39

   4.4 No Conflict or Approvals.........................................................................40

   4.5 Sufficiency of Acquired Assets...............................................................41

   4.6 Intellectual Property.................................................................................41

   4.7 Personal Property Assets, Inventory.......................................................42

i

4.8 Real Property. .................................................................................................................42

4.9 Financial Statements..........................................................................................................43

4.10    Compliance with Law; Permits. ...............................................................................44

4.11    Proceedings; Orders. ................................................................................................44

4.12    Tax Matters. ..............................................................................................................44

4.13    Employee Benefits; Labor. .......................................................................................45

4.14    Contracts...................................................................................................................48

4.15    Environmental Matters. ............................................................................................49

4.16    Insurance. .................................................................................................................50

4.17    No Brokers' Fees. .....................................................................................................50

4.18    Affiliate Transactions. ..............................................................................................51

4.19    No Other Representations or Warranties...................................................................51

4.20    Fair Disclosure; Schedule Data................................................................................51

ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF GM BUYERS. ..................51

5.1 Organization......................................................................................................................51

5.2 Authorization; Enforceability...........................................................................................52

5.3 No Conflicts or Approvals................................................................................................52

5.4 Proceedings.......................................................................................................................53

5.5 Investment Representations...............................................................................................53

5.6 Financial Ability................................................................................................................53

5.7 Adequate Assurance of Future Performance.....................................................................54

5.8 No Brokers' Fees...............................................................................................................54

5.9 Anti-Money Laundering....................................................................................................54

5.10    Compliance with Laws. ............................................................................................54

5.11    No Undisclosed Agreements.....................................................................................55

ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF GM ................................... 55

6.1 Authorization; Enforceability ........................................................................ 55

6.2 No Conflicts or Approvals ............................................................................. 55

6.3 GM Financing Arrangements ........................................................................ 56

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF COMPANY BUYER ...... 56

7.1 Organization .................................................................................................. 56

7.2 Authorization; Enforceability ...................................................................... 56

7.3 No Conflicts or Approvals ............................................................................. 57

7.4 Proceedings ................................................................................................... 57

7.5 Investment Representations .......................................................................... 58

7.6 Equity Commitment Letter ........................................................................... 58

7.7 Adequate Assurance of Future Performance ................................................ 59

7.8 No Brokers' Fees ........................................................................................... 60

7.9 Anti-Money Laundering ................................................................................ 60

7.10    Compliance with Laws ............................................................................... 60

7.11    No Undisclosed Contracts .......................................................................... 60

ARTICLE 8. INTENTIONALLY OMITTED ................................................................ 60

ARTICLE 9. COVENANTS AND AGREEMENTS ....................................................... 61

9.1 Conduct of Business between Signing and Closing ..................................... 61

9.2 Bankruptcy Actions ...................................................................................... 63

9.3 Assumed Contracts; Cure Amounts .............................................................. 64

9.4 Tax Matters; Cooperation; Preparation of Returns; Tax Elections ............. 65

9.5 Employees; Benefit Plans; Labor Matters .................................................... 67

9.6 Pre-Closing Cooperation; Contact with Customers and Suppliers .............. 71

9.7 Technical Documentation; Trade Secrets ...................................................... 71

9.8 Corporate Names. .................................................................................... 71

9.9 Information Technology; Intellectual Property Rights and Licenses. ....................... 72

9.10    Shared Items Transferred to Buyers. .................................................... 77

9.11    Buyer Guarantee. ............................................................................ 77

9.12    Letters of Credit. ............................................................................ 77

9.13    Competition Clearance. .................................................................... 77

9.14    Further Actions. .............................................................................. 79

9.15    Further Assurances. ......................................................................... 79

9.16    Customs Duties. .............................................................................. 79

9.17    Enterprise Contracts. ....................................................................... 80

9.18    Confidentiality. .............................................................................. 80

9.19    Termination of Certain Agreements. .................................................... 81

9.20    Certain Mexican Matters. ................................................................. 82

9.21    Transfer of Certain Sale Securities. .................................................... 84

9.22    Certain Bank Accounts. .................................................................... 84

9.23    Certain China Matters. ..................................................................... 84

9.24    Certain Poland Matters. .................................................................... 85

9.25    Non-GM Customers. ........................................................................ 85

9.26    Transfer of Quotas in Saginaw Brazil. ................................................. 85

9.27    Transfer of the Brazilian Real Estate. .................................................. 86

9.28    Environmental Permits. .................................................................... 86

9.29    Conflict and Privilege Waivers. .......................................................... 86

9.30    Preservation of Environmental Records. ............................................... 87

9.31    DIP Transfer Matters. ...................................................................... 87

9.32    Reorganization and Restructuring. ...................................................... 88

iv

9.33    Certain Other Actions. .................................................................................88

9.34    Retained Plans. ...........................................................................................88

9.35    Certain India Matters. ................................................................................89

9.36    Pending Transactions. ................................................................................89

9.37    Delphi FICA Litigation ...............................................................................89

9.38    GM Financing. .............................................................................................89

9.39    Environmental Matters. .............................................................................90

9.40    Non-Solicitation. .........................................................................................90

9.41    Employment, Retirement, Indemnification, and Other Agreements, and
Incentive Compensation Programs. .......................................................91

9.42    India Matters. ..............................................................................................92

9.43    Prosecution and Settlement of Appaloosa Claim. ...................................92

ARTICLE 10. CONDITIONS TO CLOSING. ............................................................93

10.1    Conditions to Obligations of Sellers and Buyers. ..................................93

10.2    Conditions to Obligations of Sellers. .......................................................94

10.3    Conditions to Obligations of GM Buyers. ...............................................94

10.4    Conditions to Obligations of Company Buyer. .......................................95

ARTICLE 11. CLOSING. .............................................................................................96

11.1    Closing Time and Date. ..............................................................................96

11.2    GM Ancillary Agreements. ........................................................................97

11.3    Company Ancillary Agreements. ..............................................................99

11.4    Sellers' Deliveries at Closing. ..................................................................100

11.5    Buyers' Deliveries at Closing. ..................................................................101

11.6    Post-Closing Deliveries. ...........................................................................103

11.7    Post-Closing Transfer of Intellectual Property Rights. ........................103

**ARTICLE 12. TERMINATION.**................................................................104

   **12.1**   **Termination.**................................................................104

   **12.2**   **Procedure and Effect of Termination.**................................105

**ARTICLE 13. LIABILITY, SURVIVAL.**................................................106

   **13.1**   **LIMITATIONS OF LIABILITY.**.......................................106

   **13.2**   **Termination Fee.**.............................................................106

   **13.3**   **Survival.**.........................................................................106

**ARTICLE 14. MISCELLANEOUS.**.........................................................107

   **14.1**   **Fees and Expenses.**.........................................................107

   **14.2**   **Bulk Sales Laws.**............................................................107

   **14.3**   **Payments in Dollars.**......................................................107

   **14.4**   **Amendment.**...................................................................107

   **14.5**   **Assignment.**...................................................................107

   **14.6**   **No Successor Liability.**...................................................108

   **14.7**   **Waiver.**..........................................................................108

   **14.8**   **Notices.**.........................................................................109

   **14.9**   **Entire Agreement.**..........................................................110

   **14.10**    **Counterparts.**............................................................111

   **14.11**    **Publicity.**..................................................................111

   **14.12**    **Headings.**..................................................................111

   **14.13**    **Severability.**..............................................................111

   **14.14**    **Third Parties.**............................................................111

   **14.15**    **Governing Law.**.........................................................111

   **14.16**    **Venue and Retention of Jurisdiction.**.........................111

   **14.17**    **Risk of Loss.**.............................................................112

vi

14.18    Enforcement of Agreement. .................................................................................112

14.19    Sellers' Obligations. ..........................................................................................112

14.20    Bankruptcy Court Approval...............................................................................112

14.21    Reasonably Equivalent Value. ...........................................................................113

14.22    Identification of Exhibits and Schedules to be Filed Under Seal....................113

# MASTER DISPOSITION AGREEMENT

THIS MASTER DISPOSITION AGREEMENT (this "**Agreement**"), dated as of June 1, 2009 (revised as of June __, 2009), is among DELPHI CORPORATION, a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on <u>Schedule 1</u> and <u>Schedule 2</u>; GM COMPONENTS HOLDINGS, LLC, a Delaware limited liability company ("**Parent**"), on behalf of itself and the other buyers set forth on <u>Schedule 1</u>, which is to be provided by Parent to Delphi as provided in this Agreement (each a "**GM Buyer**," and, collectively with Parent and the Australian Buyer (as defined below), the "**GM Buyers**"); GENERAL MOTORS CORPORATION, a Delaware Corporation ("**GM**") (solely with respect to <u>ARTICLE 6</u> and <u>Sections 9.11.1</u>, <u>9.19</u>, <u>9.38.1</u> and <u>9.38.2</u>); PARNASSUS HOLDINGS II, LLC, a Delaware limited liability company on behalf of itself and the other buyers that may later be set forth on <u>Schedule 2</u> as provided in this Agreement ("**Company Buyer**," and collectively with the GM Buyers, the "**Buyer**" or "**Buyers**").

WHEREAS, Parent is a direct or indirect subsidiary of GM;

WHEREAS, Company Buyer is an Affiliate of Platinum Equity Capital Partners II, L.P.;

WHEREAS, Delphi, through certain of its Affiliates referred to in this Agreement, is engaged in the Steering Business and the business conducted at the UAW Sites (but excluding the business conducted at the technical centers included in the UAW Sites other than the Lockport technical center) (together, the "**GM Business**") and the Company Business (as hereinafter defined);

WHEREAS, the GM Securities Sellers (as hereinafter defined) own, directly or indirectly, the GM Sale Securities (as hereinafter defined), and the Company Securities Sellers (as hereinafter defined) own, directly or indirectly Company Sale Securities (as hereinafter defined);

WHEREAS, the GM Asset Sellers (as hereinafter defined) own the GM Acquired Assets (as hereinafter defined), and the Company Asset Sellers (as hereinafter defined) own the Company Acquired Assets (as hereinafter defined);

WHEREAS, on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101-1330 (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall be an Exhibit to the Plan of Reorganization (as hereinafter defined);

WHEREAS, Delphi and the applicable Sellers desire to sell substantially all of their assets and specified liabilities with respect to the GM Business and the Company Business to the applicable Buyers and the Buyers desire to acquire substantially all of such assets and the specified liabilities as set forth in this Agreement; and

1

WHEREAS, in furtherance of that desire and as contemplated by Sections 365, 1123 and 1146 of the Bankruptcy Code and in furtherance of the Filing Affiliates' plan of reorganization, the GM Securities Sellers, Company Securities Sellers, the GM Asset Sellers and Company Asset Sellers desire to sell or cause the sale to the applicable Buyers all of their respective right, title and interest in and to the GM Sale Securities, the Company Sale Securities, GM Acquired Assets (as hereinafter defined) and the Company Acquired Assets (as hereinafter defined), and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree as follows:

# ARTICLE 1.
# DEFINITIONS.

## 1.1    Certain Defined Terms.

As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"**Accounts Receivable**" means all trade accounts receivable, including intercompany trade receivables, and other rights to payment from customers and all other accounts or notes receivable from third parties and Affiliates and the full benefit of all security for such accounts or notes that are not received prior to the Closing Date.

"**Acquired Assets**" means the GM Acquired Assets and the Company Acquired Assets.

"**Acquired Contracts**" means all Contracts that relate to the GM Business or the Company Business, as the case may be, <u>provided</u> that in the case of Pre-Petition Contracts, the Acquired Contracts include only the Assumed and Assigned Contracts.

"**Administrative Assets**" of an Asset Seller, means books, records and instruments relating to the business, operations, condition of (financial or other), or results of operations of such Asset Seller with respect to the applicable Business and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, computer files, operating data and plans, sales materials and records, purchasing materials and records, personnel records of employees, billing records, sale order files, accounting records, other financial records, and related work papers that relate to the applicable Acquired Assets, budgets, pricing guidelines, ledgers, journals, deeds and title policies; <u>provided</u>, <u>however</u>, that Administrative Assets do not include Intellectual Property, Technical Documentation, Environmental Records or GM Environmental Records.

"**Administrative Claims**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, claims arising under the DIP Agreement, the actual, necessary costs and expenses, incurred on or after the Petition Date,

of preserving the estates and operating the business of Delphi, including wages, salaries, or commissions for services rendered after the Petition Date, professional claims, all fees and charges assessed against the estates under chapter 123 of title 28, United States Code, and all allowed claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

"**Affiliate**" means, with respect to any Person, any Person which directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" for purposes of this definition, means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person. For the purpose of applying this definition to GM under Section 9.13.2, "control" means ownership of more than twenty percent (20%) of the shares or other equity interests of such Person.

"**Agreement**" – Recitals.

"**Ancillary Agreements**" means the GM Ancillary Agreements or the Company Ancillary Agreements, as applicable.

"**Appaloosa Claim**" means Delphi's claims against Appaloosa Management L.P. or any other plan investors or other parties arising from or relating to the Equity Purchase and Commitment Agreement, dated as of August 3, 2007, as amended, including that certain litigation against Appaloosa Management L.P. and other plan investors who were party to such Equity Purchase and Commitment Agreement, as amended, and styled Delphi Corporation v. Appaloosa Management L.P., et al., filed in the U.S. Bankruptcy Court S.D.N.Y. on May 16, 2008 (Case No. 05-44481), including any settlements, modifications or claims related thereto.

"**Asset Sellers**" means the GM Asset Sellers and the Company Asset Sellers, as applicable.

"**Assumed Administrative Liabilities**" means the Administrative Claims excluding Liabilities under the DIP Agreement, with respect to the categories set forth on Schedule 1.1.A and, with respect to the GM Buyers, those Hedging Agreements which they assume.

"**Assumed and Assigned Contracts**" – Section 9.3.

"**Assumed Liabilities**" – GM Assumed Liabilities or Company Assumed Liabilities, as applicable.

"**Australian Assets**" means the GM Acquired Assets located or taken to be located in Australia.

"**Australian Buyer**" means the Australian Buyer of the Australian Assets, Rhodes Automotive manufacturing Pty Limited ABN 41 129 320 494.

"**Australian Seller**" means the Australian Seller of the Australian Assets, Delphi Automotive Systems Australia Limited ABN 31 065 439 885.

3

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Brazilian Real Estate**" means the fraction of the condominium stated as being owned by Delphi Brazil and enrolled under the real estate certificate (matrícula) No. 76.477 registered before the real estate register office of the City of Porto Alegre, State of Rio Grande do Sul.

"**Business**" means the GM Business or the Company Business, as applicable.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Loan Documents**" means the loan documents to be executed on or prior to the Closing pursuant to which GM and an Affiliate of Company Buyer have agreed to make certain loans and provide certain financial accommodations to Company Buyer.

"**Buyer(s)**" – Recitals.

"**Buyer Transition Services Agreement**" means the Transition Services Agreement in the form attached hereto as Exhibit 11.3.2 to be entered between GM Buyers and Company Buyer.

"**C Lenders**" means all Tranche C Lenders (as defined in the DIP Agreement).

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits at Closing and less all outstanding checks and electronic payments of the Business, in each case as determined in accordance with GAAP.

"**China Entities**" means Delphi Saginaw Lingyun Drive Shaft Co. Ltd., Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd. and Saginaw Steering (Suzhou) Co., Ltd.

"**China L/C**" – Section 9.23.1.

"**China L/C Period**" – Section 9.23.1.

"**Claims**" mean all bankruptcy claims (as defined in Section 101 of the Bankruptcy Code), other claims, written notices, causes of actions, proceedings, complaints, investigations and Proceedings, of any nature whatsoever.

"**Closing**" – Section 11.1.1.

"**Closing Date**" – Section 11.1.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

4

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union, works council or other representatives of Transferred Employees (including local agreements, amendments and supplements, and material letters and memoranda of understanding of any kind) that are in effect as of the date of this Agreement.

"**Commercial Agreement**" means the Commercial Agreement among the GM Buyers and Company Buyers of even date herewith.

"**Company Acquired Assets**" – Section 2.1.4.

"**Company Ancillary Agreements**" means the Transfer Agreements and other agreements referred to in Section 11.3.

"**Company Asset Buyer(s)**" means the Buyers set forth on Schedule 2, which Company Buyer will use commercially reasonable efforts to provide to Delphi ten (10) Business Days after the date of this Agreement, with respect to the assets set forth opposite their names.

"**Company Asset Sellers**" means Sellers set forth on Schedule 2, with respect to the assets set forth opposite their names.

"**Company Assumed Liabilities**" – Section 2.2.2

"**Company Business**" means all businesses of Delphi and its subsidiaries, other than the GM Business, the businesses solely conducted at the Excluded Assets and the businesses to be sold as part of the Pending Transactions.

"**Company Buyer**" – Recitals.

"**Company Confidentiality Agreement**" means the confidentiality agreement between Platinum Equity and Delphi, dated September 5, 2008.

"**Company IP License Agreement**" – Section 9.9.3.

"**Company Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the Company Business.

"**Company Owned Real Property**" means the Real Property owned by any of the Company Sale Companies or Company Asset Sellers as of the date of this Agreement or which constitute Company Acquired Assets, excluding any real property that constitutes GM Owned Real Property.

"**Company Purchase Price**" – Section 3.2.1.

"**Company Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property other than the Steering Purchased Intellectual Property and subject to rights granted to GM Buyers hereunder.

5

"**Company Real Property**" means the real property relating to the Company Business.

"**Company Sale Companies**" mean the Sale Companies being transferred to Company Buyer, directly or indirectly, under this Agreement.

"**Company Sale Securities**" mean all of the outstanding shares of the Sale Companies, and all of the outstanding shares of the JV Companies that are owned by Sellers as set forth on Schedule 2 to this Agreement.

"**Company Securities Buyers**" means the Buyers set forth on Schedule 2, which Company Buyers will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days before Closing but, in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**Company Securities Seller(s)**" means the securities sellers set forth on Schedule 2 to this Agreement, with respect to the Company Sale Securities set forth opposite their names.

"**Company Sellers**" means the Company Securities Sellers and Company Asset Sellers, as applicable.

"**Company Transfer Agreements**" means any agreements which govern the transfer of Company Acquired Assets under the laws of jurisdictions outside the United States.

"**Competing Transaction**" – Section 0.

"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate:  (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sale Companies; or (ii) which together with any of the Sale Companies is treated as a single employer under Section 414(t) of the Code.

"**Copyrights**" mean:  (i) all copyrights, works of authorship or copyrightable works existing anywhere (registered, published, unpublished, protected by statutory law or otherwise)

6

and registrations, renewals, revivals, reissuances, extensions and applications for copyright registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefor; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**CSC**" – Section 9.9.12.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of and/or assignment to Buyers of the Pre-Petition Contracts included within the Assumed and Assigned Contracts under the Plan Modification Order.

"**Data Room**" means the virtual data room maintained by Merrill Corporation in which the documents and information related to the Steering Business were disclosed to Parent's representatives and counsel and the virtual data rooms maintained by Delphi in which documents and information related to the other Acquired Assets, Sale Companies and applicable JV Companies were disclosed to Parent's and Company Buyer's representatives and counsel.

"**Day 1**" means work commenced among the Sellers, the GM Buyers and the Company Buyers to separate the information technology systems required to run the GM Business from the Sellers' and the Company Buyers' systems on the Closing Date or at a mutually agreed upon post-Closing Date.

"**Day 2**" means logical and physical separation such that the information technology systems required to run the GM Business in a stand-alone application environment, a stand alone database environment and a stand-alone physical data center environment, including, for example, in cases where a physical move of the application may be required, such as a move from a Delphi-wide environment to a GM Business dedicated environment.

"**Debt Obligations**", as applied to any Person, mean obligations (i) for borrowed money, (ii) evidenced by bonds, debentures, notes, and similar instruments, (iii) under financing or capital (as opposed to operating) leases (determined in accordance with GAAP) and other similar instruments, and (iv) all accrued interest, fees and charges in respect of any of the foregoing.

"**Deferred Item(s)**" – Section 2.5.1.

"**Delphi**" – Recitals.

"**Delphi Brazil**" means Delphi Automotive Systems do Brasil Ltda., a Brazilian limited liability company, with head office at Avenida Goiás, No. 1820 / 1860, in the City of São Caetano do Sul, State of São Paulo, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 00.857.758/0001-40.

"**Delphi FICA Litigation**" means the FICA refund claim being litigated in Delphi Corporation, Delphi Automotive Systems LLC, and Delphi Automotive Systems Services LLC v. United States of America, (Case no. 08 Civ 04487 (PKC) in the U.S. District court of the Southern District of New York) in which Delphi et. al. is seeking a refund of employment taxes relating to payments made to certain union members upon ratification of collective bargaining agreements in 1999 and 2003 together with any other similar claims relating to other pre-Closing periods.

"**Delphi HRP**" means the Delphi Hourly-Rate Employees Pension Plan.

"**Delphi India**" means Delphi Automotive Systems Pvt. Ltd.

"**Delphi Polska**" means Delphi Polska Automotive Systems Sp.z.o.o., a Polish company.

"**DEOC**" – Section 9.5.4.A.

"**DIP Agent**" means JPMorgan Chase Bank, N.A. in its capacity as the administrative agent under the DIP Agreement.

"**DIP Agreement**" means that certain Amended and Restated Revolving Credit, Term and Guaranty Agreement, dated as of May 9, 2008, among Delphi, the subsidiaries of Delphi named therein, the lenders party thereto and the DIP Agent, as amended through May 21, 2009.

"**DIP Lenders**" shall mean the Senior DIP Lenders and the C Lenders.

"**DIP Priority Payment**" means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the Closing Date, in dollars: (i) all outstanding and unpaid fees and expenses then due under Section 10.05 of the DIP Agreement (including any counsel and advisor fees payable under Section 10.05 of the DIP Agreement); (ii) accrued and unpaid interest and fees then due on account of Tranche A Loans (as defined in the DIP Agreement) and Tranche B Loans (as defined in the DIP Agreement); (iii) the then outstanding principal amounts of the Tranche A Loans and Tranche B Loans; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Agreement) that are not Assumed Liabilities for those Hedging Agreements (as defined in the DIP Agreement) that are not Assumed Liabilities; provided that any such amount under this subsection (iv) shall be reduced by the amount of the Hedging Agreements that are Assumed Liabilities.

"**EC Merger Regulation**" means Council Regulation of the European Community No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings.

"**EDS**" – Section 9.9.12.

"**Encumbrance**" means:    (i) with respect to the Sale Securities, any voting trust, shareholder agreement, proxy, preemptive right, right of first refusal, or other similar restriction; and (ii) with respect to the Acquired Assets (including the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates) or any other property or asset, any lien, charge, claim, pledge, security interest, conditional sale agreement or any other title retention agreement, lease, mortgage, security interest, option or other encumbrance

8

(including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over Personal Property).

"**Enterprise Contracts**" – Section 9.17.

"**Enterprise Providers**" – Section 9.17.

"**Environment**" means the following media (whether individually or commingled):  air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground) and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora and natural resources.

"**Environmental Law**" means any and all statutes, rules, regulations, ordinances, directives, decrees, treaties, provisions of any constitution and principles (including principles of the common law) and Governmental Orders applicable to the conduct and the operation of the Business, and relating to pollution or the protection of the Environment or protection of human health from environmental hazards, excluding workplace health and safety laws (including OSHA and similar foreign laws).

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained by the Business in respect of the Acquired Assets under Environmental Laws.

"**Environmental Records**" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to:  (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material in, about or under any Real Property; (ii) the environmental condition of the Real Property; and (iii) compliance with Environmental Laws by the Business; whether located at a Real Property or in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or otherwise provided to the GM Buyers or the Company Buyer for Real Property relating to the GM Business or the Company Business, respectively; excluding, however, any such records which are subject to the attorney-client, attorney work product or similar privilege because such records contain confidential communications, mental impressions, conclusions, opinions or legal theories of Sellers' counsel ("**Privileged Environmental Records**"); provided, however, that Sellers shall ensure that any material factual or technical information or data regarding the environmental condition or compliance status of any property or facility of the Business or the Real Property is otherwise contained in the Environmental Records.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Excepted Shared Intellectual Property**" means the Shared Intellectual Property listed in Schedule 9.9.1.A.

9

"**Excluded Assets**" – <u>Section 2.1.5</u>.

"**Excluded Facilities**" – <u>Section 2.1.5.F</u>.

"**Existing GM Assets**" – <u>Section 12.1.6</u>.

"**Facilities Separation & Relocation Plan**" – <u>Section 9.9.10</u>.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and are Asset Sellers and/or Securities Sellers:  Delphi Automotive Systems LLC, Delphi China LLC, Delphi Automotive Systems (Holding), Inc. and Delphi Technologies, Inc., and the Affiliates identified on <u>Schedule 1.1.F</u>.

"**Final Order**" means an order of the Bankruptcy Court or any court with jurisdiction, or findings and conclusions relating to an order of the Bankruptcy Court or any court with jurisdiction, as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Federal Rule of Civil Procedures 60(b)) or a petition for a writ of certiorari has expired and no such appeal, motion or petition is pending.

"**Final Plan Modification Hearing**" means the Bankruptcy Court hearing to approve the Plan Modification Order.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period, unless otherwise noted or disclosed herein.

"**GM**" – Recitals.

"**GM Acquired Assets**" – <u>Section 2.1.3</u>.

"**GM Ancillary Agreements**" – means the Transfer Agreements and other agreements referred to in <u>Section 11.2</u>.

"**GM Asset Buyer(s)**" means the Buyers set forth on <u>Schedule 1</u>, which GM will use commercially reasonable efforts to provide by Parent to Delphi not less than ten (10) Business Days after the date of this Agreement (it being understood that such Buyers identified after the date of this Agreement must agree in writing to be bound by all of the terms, conditions, and provisions in this Agreement and no other GM Buyer is released from its obligation hereunder), with respect to the assets set forth opposite their names and the Australian Buyer in respect of the Australian Assets.

"**GM Asset Sellers**" means Sellers set forth on <u>Schedule 1</u>, with respect to the assets set forth opposite their names and the Australian Seller in respect of the Australian Assets.

"**GM Assumed Contracts**" – <u>Section 12.1.6</u>

"**GM Assumed Liabilities**" – <u>Section 2.2.1</u>.

10

"**GM Business**" – Recitals.

"**GM Buyer(s)**" – Recitals.

"**GM/Company Ancillary Agreements**" means this Agreement, the Buyer Transition Services Agreement, the Supply Agreement, the Commercial Agreement, the Access Agreement, the Securities Purchase Agreement and any other agreement executed and delivered in connection therewith.

"**GM Confidentiality Agreement**" means the confidentiality agreement between GM and Delphi dated September 12, 2005, as amended.

"**GM-Delphi Agreement**" means the Agreement dated as of May 9, 2008 among GM, Delphi and the Filing Affiliates, as amended by Amendment No. 1 dated October 6, 2008, Amendment No. 2 dated November 7, 2008, and Amendment No. 3 dated January 30, 2009 and as amended and restated in its entirety pursuant to the Interim Financing Amendment.

"**GM-Delphi Liquidity Agreements**" mean (i) the GM-Delphi Agreement and (ii) the Partial Temporary Accelerated Payment Agreement dated as of December 12, 2008 (as amended through January 30, 2009.

"**GM Environmental Records**" mean any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys, agency inspection reports, compliance audit records or reports, communications or other written, printed or electronically or magnetically recorded materials, communications or data, relating to:  (i) the use, management, handling, transportation, release, storage, treatment or disposal of any Hazardous Material; (ii) environmental site conditions; and (iii) compliance with Environmental Laws, in each case concerning the GM Business or any GM Real Property, so long as such records were provided by GM to any of Sellers or Delphi Automotive Systems Corporation, a Delaware corporation, or their respective Affiliates, and which are still in the possession of Delphi's Legal Staff or Operations Support Group at Delphi's Troy headquarters or located at any GM Real Property.  Privileged Environmental Records shall not include any GM Environmental Records.

"**GM Financing**" – <u>Section 6.3</u>.

"**GM Financing Agreements**" – <u>Section 6.1</u>.

"**GM Leased Real Property**" – <u>Section 4.8.1</u>.

"**GM IP License Agreement**" – <u>Section 9.9.1</u>.

"**GM Licensed Intellectual Property**" – means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is used or held for use in the GM Business, including such rights in associated Contracts listed on <u>Schedule 4.14.1</u>.

"**GM Owned Real Property**" – <u>Section 4.8.2</u>.

11

"**GM Purchase Price**" – <u>Section 3.1.1</u>.

"**GM Real Property**" – means the GM Leased Real Property and the GM Owned Real Property.

"**GM Sale Companies**" mean the Sale Companies being transferred to GM Buyer, directly or indirectly, under this Agreement.

"**GM Sales Securities**" mean all of the outstanding shares of the Sale Companies and all of the outstanding shares of the JV Companies that are owned by Sellers as set forth on <u>Schedule 1</u> to this Agreement.

"**GM Securities Buyers**" means the Buyers set forth on <u>Schedule 1</u>, which GM Buyers will use their commercially reasonable efforts to provide to Delphi, ten (10) Business Days before Closing, but in any event, in sufficient time to complete filings under Competition/Investment Laws, with respect to the Sale Companies set forth opposite their names.

"**GM Securities Seller(s)**" means the securities sellers set forth on <u>Schedule 1</u> to this Agreement, with respect to the GM Sale Securities set forth opposite their names.

"**GM Sellers**" means the GM Securities Sellers and GM Asset Sellers, as applicable.

"**GM Transfer Agreements**" – <u>Section 11.2.3</u>.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states such as the European Union.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**GSA**" means the Global Settlement Agreement, as amended, effective as of September 29, 2008, between Delphi and GM.

"**Hazardous Materials**" means any element, mixture, chemical, hazardous substance, constituent, waste, pollutant, contaminant or material including petroleum or petroleum-based or petroleum-derived substances, polychlorinated biphenyls, asbestos-containing materials, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous), which are regulated, or can give rise to Losses under an Environmental Law or an Environmental Permit.

12

"**Hearing Date**" – <u>Section 9.2.2.</u>

"**Hedging Agreements**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic financial or pricing indices or measures of economic, financial or pricing risk or value, any similar transaction or any combination of the foregoing transactions.

"**HP**" – <u>Section 9.9.12</u>.

"**HSR Act**" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Income Tax**" or "**Income Taxes**" means any and all United States or non-United States federal, national, state or local Tax based on or measured in whole or in part by income or profits, including any interest, penalties or other additions thereto.

"**India L/C**" – <u>Section 9.35</u>.

"**India L/C Period**" – <u>Section 9.35</u>.

"**Information Tax Returns**" – <u>Section 9.4.3</u>.

"**Insurance Policies**" means all insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Interim Financing Amendment**" means that certain amended and restated GM-Delphi Liquidity Agreement, dated the date hereof, by and among GM and Delphi and the Filing Affiliates, that, among other things, provides up to $250 million of additional liquidity to Delphi through the Closing Date.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, office supplies, parts, packaging materials and other inventory and accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted or located at customers' premises on consignment, or wherever else located, which are used or held for use by Sellers or the Sale Companies in the conduct of the Business (together with all rights of Sellers against suppliers of such inventories).

"**IP License Agreements**" means collectively the GM IP License Agreement, the Company IP License Agreement and the Pending Transactions IP License Agreements.

"**IUE-CWA**" means the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its Local Unions 717 (Warren), 83698 (Clinton) and 83718 (Brookhaven).

13

"**JV Companies**" means the Steering JV Companies and the Company JV Companies.

"**KDAC**" means Korea Delphi Automotive Systems Corporation.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques, technologies, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, formulae, algorithms, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential together with the rights to sue or recover and retain damages and costs and attorneys' fees for present, past and future misappropriations or otherwise of any of the foregoing.

"**Knowledge**" means Knowledge of Company Buyer, Knowledge of GM Buyer or Knowledge of Sellers, as applicable.

"**Knowledge of Company Buyer**" or "**Company Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Delphi**" or "**Delphi's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of GM Buyer**" or "**GM Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order, but not including Environmental Laws.

"**Leases**" – Section 4.8.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet or otherwise, or due or to become due, including Debt

Obligations and those arising under any Law, Environmental Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means the GM Licensed Intellectual Property and the Company Licensed Intellectual Property.

"**Losses**" mean any and all Claims, Liabilities, losses, damages, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Manufacturing Facilities**" means the manufacturing facilities owned or operated by the Steering Business located at Saginaw, Michigan; Queretaro, Mexico; Juarez, Mexico; Sabinas Hidalgo, Mexico; Strasbourg, France; Somerton, Australia; Bangalore, India; Suzhou, China; Porto Alegre, Brazil; Gliwice, Poland; Gurgaon, India; and Tychy, Poland.

"**Material Adverse Effect**" means any change, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations or financial condition of the GM Business or the Company Business, as applicable, taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions (except to the extent such change, occurrence or development has a significantly disproportionate adverse effect on such Business); (ii) affecting companies in its industry or its markets generally (except to the extent such change, occurrence or development has a significantly disproportionate adverse affect on such Business); (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of this Agreement by Parent pursuant to Section 12.1 hereof; (v) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of such Business; (vi) resulting from any act or omission of any Seller taken with respect to the Company Business or the GM Business, as applicable, with the prior written consent of GM or the Company Buyer, as applicable; (vii) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (viii) resulting from the regulatory status of any Buyer; (ix) resulting from acts of war or terrorism, whether or not directed at such Business or Buyer; or (x) resulting from the financial condition of GM or any voluntary or involuntary filing of bankruptcy involving GM.

"**Material Contracts**" – Section 4.14.1.

"**Mexican VAT Amount**" – Section 9.20.1.

"**Mexico Deposit**" – Section 9.20.2.

"**Mexico LTAs**" – Section 9.20.1.

"**Modification Procedures Order**" means that certain Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider

Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Claims Bar Date and Alternative Hearing Date, as entered by the Bankruptcy Court on June __, 2009.

"**MRA**" means the Amended and Restated Restructuring Agreement dated September 12, 2008 between GM and Delphi.

"**New York Courts**" – Section 14.16.

"**Non-Solicitation Period**" – Section 0.

"**Non-U.S. Benefit Plan**" – Section 4.13.13.

"**Non-U.S. Employees**" means the employees (salaried and hourly) who are employed by Asset Sellers or Seller Affiliate in, and dedicated to, the Business in a country other than the United States immediately prior to the Closing and identified on Schedule 4.13.1.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.9.

"**Operating Agreement**" means the operating agreement contemplated in the Buyer Loan Documents substantially in the form of Exhibit 1.2.

"**Option Exercise Agreement**" means the Option Exercise Agreement dated March 3, 2009 between GM and Delphi.

"**Ordinary Course of Business**" means the usual, regular and ordinary course of a business consistent with the past practice thereof (including with respect to quantity and frequency); provided, however, that where the Sellers' practices are modified to address the effects of economic conditions affecting the automotive and automotive supply industry or current economic conditions, such term means practices consistent with the practices of Sellers and its Affiliates used in managing Delphi's business in general; and, provided further, that the Sellers' usual, regular and ordinary course of business shall be deemed to include practices which are consistent with the practices of the Sellers from and after the Petition Date to the extent consistent with the Bankruptcy Code or orders issued by the Bankruptcy Court.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Other Services**" – Section 9.17.

"**Other Steering Business Liabilities**" means the Liabilities of Non-Filing Affiliate Sellers that are attributable to the Steering Business other than Liabilities with respect to Income Taxes and Debt Obligations or Liabilities arising under any Environmental Law.

16

"**Other Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of Sellers used but not primarily used in the Business.

"**Parent**" – Recitals.

"**Parnassus Class C Interest**" means Class C membership interests in Parnassus in the nominal amount of $145.5 million, having an annual cash dividend at the rate of 8% (payable quarterly in arrears), and subject to mandatory redemption at the conclusion of the tenth year after issuance; and (1) being subject to mandatory redemption in such amounts as set forth in the operating agreement and at such times as distributions are made to the holders of the Class A and Class B interests of Parnassus, and (2) ranking pari passu in right of distribution with the holders of the Class A and Class B interests of Parnassus in the percentages set forth in the operating agreement. The Parnassus Class C Interest may be issued by Parnassus Holdings II, LLC or such other entity as may be the "Company Buyer" under this Agreement, and shall be held by either Sellers, a trust or an agent as determined by Sellers, provided, however, that regardless of the issuer or form, the Parnassus Class C Interest shall have substantially the same terms, conditions and economic entitlements as set forth herein.

"**Party(ies)**" means the Sellers and/or Buyers.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational invention and design registrations or applications, patents and patent applications, provisionals, substitutions, reissues, divisionals, continuations, continuations-in-part, extensions and reexaminations and all rights, in each case provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**PE Financing Agreements**" – means the Buyer Loan Documents, and Securities Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes, schedules, fee letters and other ancillary documents).

"**Pending Transactions**" means Seller's pending transactions set forth on Schedule 2.1.5.J.

"**Pending Transactions IP License Agreement**" – Section 9.9.4.

"**Permits**" means licenses, consents, approvals, permits and other Governmental Approvals, but not including Environmental Permits.

"**Permitted Encumbrance**" means: (i) security interests relating to vendor tooling arising in the Ordinary Course of Business and not delinquent; (ii) any Encumbrance that may be created by or on behalf of GM or its Affiliates with respect to the GM Acquired Assets or the GM Sale Securities, or by or on behalf of Company Buyer or its Affiliates with respect to the Company Acquired Assets or the Company Sale Securities or Buyers; and (iii) in relation to Real

Property:  (a) Encumbrances relating to any current real estate or ad valorem taxes, proceedings or assessments not yet due and payable or delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged prior to the Closing Date; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose (other than the failure of the applicable Buyer to own the relevant property); (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; and (e) easements, covenants, restrictions and other encumbrances of public record (provided that, in the event any such Encumbrance relates to a sum owed, the applicable Seller shall indemnify GM and the applicable Buyer against any costs or expenses arising therefrom); (iv) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the underlying asset to which such Encumbrances relate; and (v) in the case of Sale Securities of the JV Companies, restrictions contained in the joint venture agreement or shareholders agreement or related agreements affecting such Sale Securities.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere primarily used or held for use in the conduct of the applicable Business; provided, however, that the Personal Property does not include Intellectual Property.

"**Petition Date**" – Recitals.

"**Plan Modification Motion**" – Section 9.2.1.

"**Plan Modification Order**" means the order entered by the Bankruptcy Court approving the modifications to the Filing Affiliates' Plan of Reorganization under section 1127 of the Bankruptcy Code, including all transactions contemplated by this Agreement.

"**Plan of Reorganization**" or "**Plan**" means Delphi's joint plan of reorganization, including all schedules and exhibits thereto, as confirmed by the Bankruptcy Court on January 25, 2008, as modified by the Plan Modification Order entered by the Bankruptcy Court approving modifications to Delphi's joint plan of reorganization under section 1127 of the Bankruptcy Code.

"**Plan of Reorganization Documents**" means those documents that are to be filed by the Filing Affiliates with the Bankruptcy Court seeking modifications to the Plan of Reorganization.

"**Post-Closing Mexico Utilities**" – Section 9.20.2.

18

"**Post-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates on or after the Petition Date.

"**Pre-Petition Contracts**" mean the Acquired Contracts of the Filing Affiliates relating to the applicable Business entered into by such Filing Affiliates before the Petition Date.

"**President's Designee**" has the meaning given to such term in that certain Loan and Security Agreement by and between GM and The United States Department of the Treasury, dated as of December 31, 2008, as may be amended from time to time.

"**Privileged Environmental Records**" is defined within the definition of Environmental Records.

"**Proceeding**" means any action, claim, charge, complaint, grievance, demand, suit, proceeding, arbitration, citation, summons, subpoena, inquiry, or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority or any arbitrator or arbitration or grievance panel.

"**Product(s)**" means the UAW Site Products and the Steering Products.

"**PRP**" – Section 9.5.3.

"**Purchase Price**" means the GM Purchase Price and the Company Purchase Price.

"**Purchase Price Assumed Debt**" – Section 9.20.1.

"**Purchased Intellectual Property**" means the Steering Purchased Intellectual Property and the Company Purchased Intellectual Property.

"**Real Property**" means the Owned Real Property and the Leased Real Property.

"**Retained Liabilities**" – Section 2.3.

"**Retained Plans**" – Section 2.3.3

"**Saginaw Brazil**" means Saginaw Indústria e Comércio de Auto Peças Ltda., a Brazilian limited liability company, with head office at Rua Giuseppe Mandelli, No. 118, Bairro São João, in the City of Porto Alegre, State of Rio Grande do Sul, enrolled with the Brazilian General Taxpayers' Registration (CNPJ/MF) under No. 08.762.025/0001-34.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets and Sale Securities from applicable Sellers to applicable Buyers in accordance with this Agreement and the relevant Transfer Agreements.

"**Sale Companies**" mean the Affiliates of Delphi engaged in the applicable Business, the stock or other equity of which is being transferred to Buyer, directly or indirectly, under this Agreement, as indicated on Schedule 1 and Schedule 2 (excluding the JV Companies), Delphi Polska and Steeringmex.

"**Sale Securities**" mean the GM Sale Securities and the Company Sale Securities, as applicable.

"**SDN List**" – Section 5.9.

"**Section 363 Implementation Agreement**" – Section 9.2.2.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Purchase Agreement**" means that certain Securities Purchase Agreement dated the date hereof among Company Buyer, an Affiliate of Company Buyer and GM.

"**Securities Seller(s)**" means the GM Securities Sellers and the Company Securities Sellers.

"**Seller Employee Benefit Plans**" means Sellers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written policies, practices or understandings relating to employment as applicable to Transferred Employees whether or not collectively bargained.

"**Seller Transition Services Agreement**" – Section 11.3.3.

"**Seller U.S. CBAs**" means the nationally and locally negotiated Collective Bargaining Agreements between Sellers and the applicable union with respect to the U.S. Hourly Employees and, at the Lockport and Rochester sites, the represented U.S. Salaried Employees, including any letter agreements, memorandums of understanding, supplemental agreements and employee benefit plan agreements applicable to represented employees that were in effect immediately prior to the date of this Agreement and which are included on Schedule 4.13.11.

"**Sellers**" means the GM Securities Sellers with respect to the GM Sale Securities, the GM Asset Sellers with respect to the GM Acquired Assets, Company Securities Sellers with respect to the Company Sale Securities and the Company Asset Sellers with respect to the Company Acquired Assets, in each case including Filing Affiliates and non-Filing Affiliates that are Sellers. Seller means any one of such Sellers, as applicable.

"**Senior DIP Lender**" means collectively the Tranche A Lenders and Tranche B Lenders (as such terms are defined in the DIP Agreement).

"**Separation & Relocation Activities**" – Section 9.9.10.

"**Shared Intellectual Property**" means Intellectual Property owned by any Seller and/or any Seller's Affiliates that is used by more than one of the GM Business, the Company Business or the business of a Pending Transaction and includes customizations, interfaces, enhancements

and other modifications to Software licensed from Third Parties, but not used primarily for such Business.

"**Shared Licensed Intellectual Property**" means any Seller's and/or any Seller's Affiliates' rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party and that is used by the applicable Business, excluding Licensed Intellectual Property and, except in the case of Software licensed from GM or EDS, Software.

"**Shared Software Licenses**" means all shared licenses of Software that are currently used in the applicable Business under Delphi-wide Contracts but which are not primarily used by such Business.

"**Software**" means computer software and programs, including source code, object code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, development programs and systems, testing programs and systems, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto, in each case including all customizations, interfaces, enhancements and other modifications related to the foregoing.

"**Specified Director, Officer and Employee Related Liabilities**" – <u>Section 9.41</u>.

"**Steering Business**" means the global steering and halfshaft businesses operated by Delphi and its Affiliates, throughout the Delphi Steering Systems Division, including the design, testing, manufacture, development, marketing, sale and distribution of the Products, and all of the business conducted at the Manufacturing Facilities and the Delphi Steering Systems Division related business conducted at the Technical Centers and Sales Offices, except for (i) all assets, business lines, rights, Contracts and Claims of KDAC, wherever located, whether tangible or intangible, real, personal or mixed and (ii) all computer hardware, equipment, Software, Contracts, and other assets listed on <u>Schedule 2.1.5.K</u>

"**Steering Excluded Products**" means products identified in <u>Schedule 9.9.1.B</u>.

"**Steering JV Companies**" means the following joint ventures which are engaged in the manufacture, development and sale of Products: Delphi Saginaw Lingyun Drive Shaft Co. Ltd and Saginaw Lingyun Drive Shaft (Wuhu) Co., Ltd.

"**Steering Licensed Intellectual Property**" means rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is primarily used or held for use in or primarily related to, the Steering Business, including such rights in associated Contracts listed on <u>Schedules 1.1.D.1</u>, <u>1.1.D.2</u> and <u>1.1.D.3</u>.

"**Steering Products**" means the Products set forth in <u>Schedule 1.1.C</u>.

"**Steering Purchased Intellectual Property**" means any Seller's and/or any of their respective Affiliate's right, title and interest in Intellectual Property that is primarily used or held for use in, or primarily related to, the Steering Business, including the Intellectual Property listed in <u>Schedules 1.1.D.1</u>, <u>1.1.D.2</u> and <u>1.1.D.3</u>; subject to <u>Sections 2.1.3.H</u> and <u>2.1.4.I</u> in the case of

21

Intellectual Property relating to the UAW Sites and subject to the rights granted to Company Buyer hereunder.

"**Steering (Suzhou)**" – <u>Section 9.23.1</u>.

"**Steering Technology**" means the Patent Rights, Copyrights, Trade Secrets and Know-How initially developed primarily for use in the Products used in the Steering Business and which constitutes a critical manufacturing, design or engineering element specific to the Products as compared to comparable products manufactured by competitors of the Steering Business.

"**Steeringmex**" – <u>Section 9.20.1</u>.

"**Supply Agreement**" means the Supply Agreement among the GM Buyers and Company Buyers of even date herewith.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers and Sales Offices**" means the technical and customer support centers of the Steering Business located at Casa Grande, Arizona; Dearborn, Michigan; Saginaw, Michigan; Milford, Michigan; Russelsheim, Germany; Torino, Italy; Paris, France; Beijing, China; Shanghai, China; Hachioji, Japan; Krakow, Poland; SeongNam-si, Korea; Melbourne, Australia; Pune, India; Sao Caetano, Brazil; Bursa, Turkey and Eisenach, Germany, including any satellite offices thereto.

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business.

"**Temporarily Excluded Assets**" – <u>Section 11.1.2</u>.

"**Threshold**" - Section 9.43

"**Trade Secrets**" means:  (i) all forms and types of information, financial, business, scientific, technical, economic, manufacturing and/or engineering information, including

patterns, plans, compilations, specifications, tooling, program devices, formulae, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, program devices, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the information is the subject of efforts that are reasonable under the circumstances to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the other persons who can obtain economic value from its disclosure or use; (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present, future and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean trademarks, service marks, trademark and service mark applications and registrations, Internet domain name registrations, trade names, trade dress, fictitious names, assumed names, logos and slogans, including those listed on Schedule 1.1.D.2 together with all goodwill related to the foregoing and all rights to sue or recover and retain damages and costs and attorneys' fees for present, future and past infringement of any of the foregoing.

"**Transfer Agreements**" means the GM Transfer Agreements and the Company Transfer Agreements.

"**Transfer Regulation**" means any Law pursuant to which the employment of any employee of an Asset Seller (or any employee of any other Affiliate of Delphi, except for the Sale Companies, who is working for the applicable Business) will transfer to a Buyer in connection with the transactions contemplated by this Agreement, including pursuant to Directive 77/187/EC of the European Parliament and council and any Law adopted pursuant thereto, and any Law, works council or registered or  enforceable union agreement or written contract of employment.

"**Transfer Taxes**" – Section 9.4.5.

"**Transferred Account(s)**" – Section 9.22.

"**Transferred Asset Seller Employees**" means:  all U.S. Employees and Non-U.S. Employees who are employees of any Asset Seller or Seller Affiliate who become Buyers' employees pursuant to Section 9.5 hereof.  No individual who has retired or otherwise terminated employment with Sellers prior to Closing will be deemed to be a Transferred Asset Seller Employee.

"**Transferred Employees**" means:  (i) all Transferred Asset Seller Employees; and (ii) all employees of the Sale Companies.

"**Transferred Insurance Policies**" means all Insurance Policies which are primarily related to the GM Business, GM Acquired Assets or the GM Assumed Liabilities including those set forth on Schedule 1.1.E, but excluding those set forth on Schedule 1.1.D.

23

"**Transferred Non-U.S. Employees**" means all Transferred Asset Seller Employees who are Non-U.S. Employees.

"**Transferred U.S. Employees**" means all Transferred Asset Seller Employees who are either Transferred U.S. Hourly Employees or Transferred U.S. Salaried Employees.

"**Transferred U.S. Hourly Employees**" – Section 9.5.3.

"**Transferred U.S. Salaried Employees**" – Section 9.5.2.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America and its Local Unions 699 (Saginaw), 686 (Lockport – Hourly), 686 (Lockport – salaried), 1097 (Rochester – hourly), 1097 (Rochester – salaried), 292 (Kokomo), 167 (Grand Rapids).

"**UAW Sites**" means the manufacturing facilities owned or operated by Sellers and located in Grand Rapids, Michigan, Rochester, New York (excluding the Henrietta technical center); Kokomo, Indiana (including the Cuneo Warehouse, and including the technical center); and Lockport, New York (including the technical center).

"**UAW Site Products**" means products produced at the UAW Sites on or before the Closing Date and the additional products that GM and any Seller have agreed will be produced at the UAW Sites but does not include products which are manufactured at the Technical Centers at the UAW Sites if such products are not actually manufactured at the UAW Sites outside of the Technical Center.

"**U.S.**" means the United States of America.

"**U.S. Employees**" means U.S. Hourly Employees and U.S. Salaried Employees.

"**U.S. Hourly Employees**" means the hourly employees of Asset Sellers or a Seller Affiliate who are employed at or are bargaining unit members of the relevant Business in the United States immediately prior to the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with Buyer's prior written consent, not to be unreasonably withheld).

"**U.S. Income Taxes**" mean any Income Taxes due to the United States or to any state or locality in the United States.

"**U.S. Salaried Employees**" means the salaried employees who are employed by Sellers or a Seller Affiliate in or primarily assigned to the relevant Business in the United States as of the Closing and who are identified on Schedule 4.13.1 (as the same may be amended prior to the Closing Date with the applicable  Buyer's prior written consent, not to be unreasonably withheld).

"**USA PATRIOT Act**" – Section 5.9.

24

"**WARN ACT**" means the Worker Adjustment and Retraining Notification Act and any similar applicable foreign, state or local law, regulation or ordinance.

### 1.2    Other Interpretive Provisions.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America, and all references to "euros" or "€" are deemed references to the lawful money of the European Economic and Monetary Union. References to undertakings by the "Buyer(s)" or the "Seller(s)" are understood to be undertakings by Parent to cause the relevant Buyer(s) to perform, and by Delphi to cause the relevant Seller(s) to perform, as the case may be.

### ARTICLE 2.
### PURCHASE AND SALE.

### 2.1    Transfers by Sellers and their Affiliates.

**2.1.1.**    Purchase and Sale of the GM Sale Securities.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the GM Securities Sellers will sell, transfer, assign, convey and deliver to the GM Buyers, and the GM Buyers will purchase, accept and acquire, the GM Sale Securities free and clear of all Encumbrances except Permitted Encumbrances.

**2.1.2.**    Purchase and Sale of the Company Sale Securities.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the Company Securities Sellers will sell, transfer, assign, convey and deliver to the Company Buyer, and the Company Buyer will purchase, accept and acquire, the Company Sale Securities free and clear of all Encumbrances except Permitted Encumbrances; provided that the Sellers will consider in good faith any request of a Company Buyer to, in lieu of purchasing the Company Sale Securities, instead purchase the assets and assume the related liabilities of any Sale Company pursuant to a mutually agreeable asset purchase agreement with such Sale Company.

**2.1.3.**    Purchase and Sale of the GM Acquired Assets.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing, the GM Asset Sellers will sell, transfer, assign, convey and deliver to the GM Asset Buyers, and the GM Asset Buyers will purchase, accept and acquire from the GM Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances:

25

(i)    in respect of the Australian Assets, Delphi will procure and cause the Australian Seller to transfer, assign, convey and deliver to the Australian Buyer and the Parent will procure and cause the Australian Buyer to purchase, accept and acquire from the Australian Seller, free and clear of all Encumbrances except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers primarily used or held for use in, or primarily related to, the GM Business, whether tangible or intangible, real or personal and wherever located and by whomever possessed,

(ii)    the technical centers included in the UAW Sites;

(iii)    all proceeds received by any Seller in respect of the sale of (x) the brakes and suspension business and (y) the exhaust business;

(iv)    all rights to sue, or to benefit from any lawsuit or settlement relating to the Appaloosa Claim; and

(v)    The Hedging Agreements other than any Hedging Agreement that may be terminated at Closing;

(vi)    50% of the net proceeds from the Delphi FICA Litigation;

(vii)    The Mexico Deposit and the utility contracts referred to in Section 9.20.2;

(viii)    all properties, assets, rights, titles and interests of every kind and nature, owned by the GM Asset Sellers, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all assets related to the GM Business, including, without limitation, all of the following assets, in each case primarily related to the GM Business but excluding Excluded Assets pursuant to Section 2.1.5 (all of the assets to be sold, assigned, transferred and delivered to GM Asset Buyers hereby are called the "**GM Acquired Assets**"):

A.    All Accounts Receivable (including Accounts Receivable owed by Affiliates of Sellers), but excluding intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables);

B.    Real Property, which such Real Property shall be subject to the Company Buyer's lease rights with respect to the technical centers located in the Kokomo, Indiana and Lockport, New York;

C.    Personal Property (including the personal property, machinery and other assets located at the technical centers located in Lockport, New York and Kokomo, Indiana);

D.    Inventory;

E.    All of GM Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or

26

other similar tax credit arrangements with any Taxing Authority, that are primarily related to the GM Business or the GM Acquired Assets;

      F.     Administrative Assets;

      G.    Permits used or held for use in, or related to, the conduct of the GM Business or in the operations at the GM Real Property;

      H.    Steering Purchased Intellectual Property and Steering Licensed Intellectual Property;

      I.     Technical Documentation;

      J.     Prepaid expenses, deposits and advances;

      K.    Tax credits and Tax refunds related to the GM Business and the GM Acquired Assets, including Delphi's New York investment tax credit refund claim and any property tax refund related to the GM Business;

      L.     Cash that is held by Filing Affiliates in the U.S.;

      M.    Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

      N.    All Transferred Insurance Policies, and including all rights to the benefits, coverages and proceeds under such Transferred Insurance Policies; provided, however, that Sellers and Company Buyer will be named as additional named insureds on any such Transferred Insurance Policies to the extent they cover any of the Excluded Assets or Company Acquired Assets or relate to any Retained Liabilities or any Company Assumed Liabilities or to any Sale Company acquired by the Company Buyer, in each case, as applicable, and Seller and Company Buyer will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, Company Acquired Asset, Retained Liability or Company Assumed Liability or to any Sale Company acquired by the Company Buyer, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

      O.    All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section 2.1.3H above);

      P.     All warranties and Claims;

      Q.    Environmental Permits;

      R.    Environmental Records;

27

S.    GM Environmental Records;

T.    Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the UAW Sites; and

U.    Other books and records relating to the GM Business.

**2.1.4.**    <u>Purchase and Sale of the Company Acquired Assets</u>.  Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, at the Closing the Company Asset Sellers will sell, transfer, assign, convey and deliver to the Company Asset Buyers, and the Company Asset Buyers will purchase, accept and acquire from the Company Asset Sellers, free and clear of all Encumbrances, except Permitted Encumbrances, all properties, assets, rights, titles and interests of every kind and nature, owned by the Company Asset Sellers, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all assets related to the Company Business , including, without limitation, the following assets, but excluding the GM Sale Securities, the GM Acquired Assets, and the Excluded Assets pursuant to <u>Section 2.1.5</u> (all of the assets to be sold, assigned, transferred and delivered to Company Asset Buyers hereby are called the "**Company Acquired Assets**"):

A.    All Accounts Receivable (including Accounts Receivable owed by Affiliates of Sellers), but excluding intercompany receivables due from Filing Affiliates to Filing Affiliates (other than trade receivables);

B.    The Company Sale Securities;

C.    Company Real Property;

D.    Personal Property;

E.    Inventory;

F.    all of Company Asset Sellers' Acquired Contracts and rights under the Acquired Contracts, including any rights under tax abatements, incentive agreements, or other similar tax credit arrangements with any Taxing Authority that are not primarily related to the GM Business or the GM Acquired Assets;

G.    Administrative Assets;

H.    Permits used or held for use in, or related to, the conduct of the Company Business or in the operations at the Company Real Property;

I.    Company Purchased Intellectual Property and Company Licensed Intellectual Property;

J.    Technical Documentation;

K.    Prepaid expenses, deposits and advances;

L.    Motor vehicles owned or leased by Sellers (in each case, to the extent transferable pursuant to the terms of such leases or financing documents);

M.    All Insurance Policies; provided, however, that Sellers and GM Buyers will be named as additional named insureds on any such Insurance Policies to the extent they cover any of the Excluded Assets or GM Acquired Assets or relate to any Retained Liabilities or any GM Assumed Liabilities, in each case as applicable, and Seller and GM Buyers receive the benefit of all such claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Excluded Asset, GM Acquired Asset, Retained Liability or GM Assumed Liability, as applicable; and provided further that no changes shall be made by the named insured to any insurance policy that materially and  adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured;

N.    All Trademark Rights of any of the Sellers, including the name "Delphi" or any related or similar Trademark Rights to the extent the same incorporate the name "Delphi" or any variation thereof;

O.    All goodwill as a going concern and all other intangible properties other than Intellectual Property (which is covered in Section 2.1.4.I above);

P.    All warranties and Claims;

Q.    Environmental Permits;

R.    Environmental Records;

S.    Tax credits and Tax refunds related to the Company Business, including Delphi's Michigan MEGA tax credit entitlements and any property tax refunds related to the Company Business, as well as any other Tax credit or refund not covered by Sections 2.1.3.K or 2.1.5.G;

T.    50% of the net proceeds from the Delphi FICA Litigation; and

U.    Wage escrow accounts applicable to Transferred U.S. Hourly Employees who are PRPs at the sites included in the Company Acquired Assets.

V.    Other books and records relating to the Company Business.

**2.1.5.**    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties, assets, rights, title and interests of the Asset Sellers will not be included in the GM Acquired Assets or the Company Acquired Assets (the "**Excluded Assets**"):

A.    Third Party Assets.    Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third

29

party, including third party bailed assets, <u>provided</u>, <u>however</u>, that any Contracts, rights or licenses pertaining to such bailed assets will be transferred as part of the Acquired Assets.

B.    <u>Insurance Policies</u>.    All Insurance Policies related solely to the other Excluded Assets or listed on <u>Schedule 1.1.D</u>; provided, however, that Buyers and Sellers will be named as an additional named insured on any such Insurance Policies to the extent they cover any of the Acquired Assets of such Buyer or relate to any Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer and Buyers will receive the benefit of all claims and rights under third party property and casualty insurance policies and other insurance policies to the extent they relate to any Acquired Assets of such Buyer or Assumed Liabilities assumed by such Buyer, or any Sale Company acquired by such Buyer; and provided further that no changes shall be made by the named insured to any insurance policy that materially and adversely affects the rights of any additional named insured that is a party to this Agreement, without the prior written consent of the additional named insured.

C.    <u>Records</u>.    Any books, records (including Tax records) and other materials primarily relating to Excluded Assets or Retained Liabilities, or that any Asset Seller is required by Law to retain (<u>provided</u> that the Asset Sellers shall provide Buyers with copies of the same), all Tax Returns of any Asset Seller for time periods prior to Closing, and related work papers.

D.    <u>Bankruptcy Rights</u>.    All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions including avoidance actions and arising under such Sections by operation of law or otherwise, including without limitation any and all proceeds of the foregoing.

E.    <u>Personnel Records</u>.    All work histories, personnel and medical records of employees and former employees of any Asset Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; <u>provided</u>, <u>however</u>, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, at the election of the applicable Buyer(s) the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if the Asset Sellers so elect.  Upon written request of the Asset Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to the Asset Sellers (or an Affiliate of the Asset Sellers as directed) at which time the Asset Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records to such Buyer; <u>provided</u>, no such records will be provided unless the Asset Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local Law without

30

material adverse consequences to the Asset Sellers or to any Affiliate of the Asset Sellers.

F.    Excluded Facilities.    All Real Property (including any improvements located thereon) listed in Schedule 2.1.5.F (the "**Excluded Facilities**") and personal property and other assets located at the Excluded Facilities.

G.    Tax Refunds.    All refunds, credits, prepayments or deferrals of or against any Taxes, including deferred Taxes of any nature, in each case that relate to Excluded Assets and relate to periods or portions thereof prior to the Closing; provided that, in no event, shall any Buyer be required to make a payment to a Seller with respect to any of the foregoing other than providing to the applicable Seller any Tax refunds received by such Buyer with respect to Taxes paid by a Seller or its Affiliates or refundable tax credits with respect to a period prior to the Closing.

H.    Inventory and Other Assets.    All Inventory of the GM Business and the Company Business disposed of by Sellers prior to Closing in the Ordinary Course of Business, and not in violation of this Agreement;

I.    Cash Collateral.    Cash collateral pledged for the benefit of the Senior DIP Lenders.

J.    Pending Transactions.    All of Sellers' Pending Transactions as set forth on Schedule 2.1.5.J, other than the proceeds relating to the brakes and suspension business and exhaust business.

K.    Other Excluded Assets.    The assets listed on Schedule 2.1.5.K.

L.    Filing Affiliate Receivables.    Intercompany receivables due from Filing Affiliates to other Filing Affiliates (other than trade receivables).

M.    Wage Escrow Accounts.    Wage escrow accounts applicable to Non-Transferred Hourly Employees at the sites included in the Excluded Facilities.

At any time prior to Closing, upon notice by Buyer to Delphi, Delphi will consider in good faith a request to exclude from the transactions contemplated by this Agreement, *de minimis* additional assets or real property.  In the event Delphi agrees to do so the applicable definitions of Acquired Assets, and/or Real Property will be amended as set forth in such notice to remove the additional excluded assets or real property and the definition of Excluded Assets and/or Excluded Facilities, if applicable, may be amended as provided in such notice to include such additional excluded assets or real property or Manufacturing Facilities.

At any time prior to Closing, upon notice to Delphi, GM Buyers, or any of them, may elect to exclude from the transactions contemplated by this Agreement the assets and related Liabilities related to the Manufacturing Facilities located in Strasbourg, France and/or Gurgaon, India.  In such event, the applicable definitions of Purchased Assets, Sale Companies, Securities Sellers, Manufacturing Facilities, Products and/or Real Property will be amended as set forth in such notice to remove the additional excluded assets, real property, Sale Companies or

31

Manufacturing Facilities and the definition of Excluded Assets and/or Excluded Facilities, if applicable, may be amended as provided in such notice to include such additional excluded assets, real property or Manufacturing Facilities. In the event GM Buyers elect to exclude either such Manufacturing Facilities, GM Buyers will increase the aggregate amount of the expenses it will be required to fund under Section 3.1.1.F by the amount of the net actual incremental costs incurred by Sellers as a result of GM Buyers excluding such Manufacturing Facilities in an amount mutually agreed to by the parties acting reasonably.

     **2.1.6.**   <u>Post-Closing Deliveries</u>.

     A.   Should Sellers or Buyers, in their reasonable discretion, determine after the Closing that any Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver such Acquired Assets to the appropriate Buyers at such Buyer's cost (limited to expenses paid to third parties in compliance with a request from such Buyer and not including any internal fee, cost or overhead of the Sellers). Should Buyers, in their reasonable discretion, determine after the Closing that an asset was delivered to the wrong Buyer or an Excluded Asset was delivered to a Buyer, such receiving Buyer will promptly provide them to correct the Buyer or return it to the appropriate Seller, with any related costs to be split evenly between such Buyers or by the Buyer transferring to the Seller.

     B.   After the Closing, Sellers shall permit, and hereby authorize, Buyers to collect, in the name of Sellers, all Accounts Receivable constituting part of such Buyers' Acquired Assets and to endorse with the name of any applicable Seller for deposit in such Buyers' accounts any checks or drafts received in payment thereof. Sellers shall promptly deliver to the applicable Buyers any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of such Buyers' Acquired Assets.

**2.2**    <u>**Assumption of Liabilities.**</u>

     **2.2.1.**   <u>GM Assumed Liabilities.</u>

   Subject to the terms and conditions set forth herein the GM Buyers will assume only the following Liabilities, and no other Liabilities of Sellers (collectively, the "**GM Assumed Liabilities**"):

     A.   Assumed Administrative Liabilities with respect to the GM Acquired Assets;

     B.   the Hedging Agreements;

     C.   the Other Steering Business Liabilities;

     D.   the following, and only the following, pre-petition Liabilities as they relate to the GM Acquired Assets:

32

(i)        Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the GM Buyers in accordance with Section 9.3; and

(ii)       To the extent not discharged pursuant to the Plan of Reorganization, for each GM Buyer, (i) the real and personal property Taxes with respect to the GM Acquired Assets to be acquired by it, (ii) any other Taxes with respect to the GM Business to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, including withholding, FICA and FUTA Taxes related to the employees of the GM Business, and (iii) to the extent that payroll services were provided by or through GM and the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, withholding, FICA and FUTA Taxes related to the employees of the Company Business;

**2.2.2.**    Subject to the terms and conditions set forth herein, the Company Buyers will assume only the following Liabilities, and no other Liabilities of Sellers (collectively, the "**Company Assumed Liabilities**"):

A.    Assumed Administrative Liabilities with respect to the Company Acquired Assets;

B.    the Specified Director, Officer and Employee Related Liabilities; and

C.    the following and only the following pre-petition Liabilities as they relate to the Company Acquired Assets:

(i)        Cure Amounts for Pre-Petition Contracts included among the Assumed and Assigned Contracts assumed by the Company Buyers in accordance with Section 9.3; and

(ii)       To the extent not discharged pursuant to the Plan of Reorganization, for the Company Buyer, (i) real and personal property Taxes with respect to the Company Acquired Assets, and (ii) to the extent the non-payment of such Taxes could result in personal liability to the employees, officers or directors of Asset Sellers, any other Taxes with respect to the Company Business, including withholding, FICA and FUTA Taxes related to the employees of the Company Business, unless such Taxes are assumed pursuant to Section 2.2.1.D(ii).

**2.3**    **Retained Liabilities.**

All Liabilities of the Sellers which are not Assumed Liabilities are herein collectively referred to as the "**Retained Liabilities**", including without limitation:

**2.3.1.**    Those Sellers who are Filing Affiliates will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) the Administrative

33

Claims set forth on Schedule 2.3.1 and except as set forth in Sections 2.2.1.D(ii) and 2.2.2.C(ii), post-petition Liabilities for all Taxes;

**2.3.2.**    The applicable Sellers will remain responsible for and shall pay, perform or discharge (or cause to be paid, performed or discharged) all Liabilities relating to:

A.    the Excluded Assets; and

B.    the Excluded Facilities.

**2.3.3.**    The applicable Sellers will remain responsible for and shall pay, perform or discharge their obligations under the Delphi Retirement Program for Salaried Employee, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan, (collectively, the "**Retained Plans**").

**2.3.4.**    Intercompany payables due to Filing Affiliates from Filing Affiliates (other than trade payables).

**2.3.5.**    All Liabilities relating to the DIP Agreement and the Interim Financing Amendment (in each case any supplement, amendment, modification thereto or any agreement(s) or instrument that is in replacement or substitution therefor).

**2.4**    **JV Companies Liabilities, Sale Company Liabilities.**

Notwithstanding anything to the contrary herein, the Liabilities of the JV Companies and the Sale Companies will not be affected by the Agreement, and the Sellers will have no obligations for such Liabilities.

**2.5**    **Deferred Items.**

**2.5.1.**    Non-Assignability.    To the extent that any Contract, Permit or Environmental Permit included in the Acquired Assets is not capable of being assigned, transferred or reissued (whether pursuant to the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable Law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (including a Governmental Authority) ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained or the applicable Buyer specifically indicates in writing (with specific reference to this Section 2.5.1 and the Deferred Item at issue) at Closing that it desires such Deferred Item be transferred notwithstanding such restriction and indemnifies the applicable Seller for any liability relating to such transfer; provided that Sellers may not assign such right to indemnity to any Person.

**2.5.2.**    Efforts to Obtain Necessary Consents.    At the applicable Buyer's request, the applicable Seller will, at the requesting Buyer's sole cost and expense, use commercially reasonable efforts, and take such other commercially reasonable actions as such Buyer may request, and such applicable Buyer will, at its expense, cooperate with such Seller, to

obtain the necessary Consents and to resolve the impracticalities of assignment, transfer or reissuance referred to in <u>Section 2.5.1</u> before or after the Closing.

  **2.5.3.**  <u>If Consents Cannot be Obtained</u>. To the extent that the Consents referred to in <u>Section 2.5.1</u> are not obtained by the applicable Seller, or until the impracticalities of assignment, transfer or reissuance referred to therein are resolved, such Sellers' sole responsibility with respect to such matters, notwithstanding <u>Sections 2.1.3</u> and <u>2.1.4</u>, will be to appoint the applicable Buyer as its agent to use such Buyer's commercially reasonable efforts during the twelve (12) month period commencing with the Closing to: (i) provide to the applicable Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to such Buyer, without incurring a financial obligation to such Buyer; and (iii) enforce for the account of such Buyer and at the cost of such Buyer any rights of such Seller arising from any Deferred Item referred to in <u>Section 2.5.1</u> against such issuer thereof or other party or parties thereto; <u>provided</u>, <u>however</u>, that any such efforts shall be made with the consent of such Buyer.  Such Buyer will pay such Seller or the Buyer acting as Seller's agent the cost (including the cost of any internal resources) of providing the benefits of any Deferred Item.

  **2.5.4.**  <u>Obligation of Buyer to Perform</u>. To the extent that any Buyer is provided the benefits pursuant to <u>Section 2.5.3</u> of any Deferred Item, such Buyer will perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of such Seller thereunder or in connection therewith and if such Buyer fails to perform to the extent required herein, such Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under <u>Section 2.5.3</u> in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or upon such Buyer's request, such Seller will perform, at such Buyer's sole cost and expense, in which case such Buyer will reimburse such Seller's costs of such performance immediately upon receipt of an invoice therefor.

  **2.5.5.**  <u>Standard of Care</u>. Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyers; provided such gross negligence or willful misconduct standard shall not apply with respect to the remittance of any collected Accounts Receivable to Buyers under any deferred items.  Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

  **2.6**  **<u>Restrictive Covenants</u>.**

  To the extent that the GM Acquired Assets include a contract or other obligation, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit the GM Buyers from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Sellers shall at the request of the GM Buyers use commercially reasonable efforts to terminate such contract or obligations and, at the election of the GM Buyers, such contract or obligation shall be

35

excluded from the Acquired Assets; and in such case, Sellers and the GM Buyers shall use their respective commercially reasonable efforts, at GM Buyer's cost, to provide the GM Buyers with the rights and benefits of such excluded contract or obligation. To the extent that the GM Acquired Assets include a contract or obligation pursuant to which a third party has a preemptive or similar right to purchase any asset (including an equity interest in a joint venture), Sellers shall use commercially reasonable efforts to cause such third party not to exercise such right; and in such case, Sellers and GM Buyers shall use their respective commercially reasonable efforts, at GM Buyer's cost, to provide the GM Buyers with the rights and benefits of such asset (other than with respect to joint ventures).

To the extent that the Company Acquired Assets include a contract or other obligation, including without limitation non-compete or non-solicitation agreements, which would restrict or inhibit the Company Buyers from engaging in, owning an interest in any Person engaged in, or providing support (financial or otherwise) to any Person engaged in, any line of business, Sellers shall at the request of the Company Buyers use commercially reasonable efforts to terminate such contract or obligations. To the extent that the Company Acquired Assets include a contract or obligation pursuant to which a third party has a preemptive or similar right to purchase any asset (including an equity interest in a joint venture), Sellers shall use commercially reasonable efforts to cause such third party not to exercise such right.

**2.7**     <u>**Allocation Among Buyers**</u>.

To the extent it is unclear whether a particular asset or liability should be considered a GM Acquired Asset or a Company Acquired Asset, or a GM Assumed Liability or a Company Assumed Liability, as the case may be (such as allocation of Accounts Receivable and accounts payable to a particular site), Delphi, GM Buyers and the Company Buyers will work together in good faith to reasonably allocate such assets or liabilities. In addition, with respect to accounts payable and Accounts Receivable relating to the UAW Sites the receivables will be collected and allocated and the payables paid and allocated to the appropriate Buyer as mutually agreed upon between Company Buyers and GM Buyers. Prior to Closing, the GM Buyer and Company Buyer will in good faith agree upon how intercompany receivables and intercompany payables shall be allocated between them following the Closing Date.

<div align="center">

**ARTICLE 3.**
**PURCHASE PRICE; ALLOCATION.**

</div>

**3.1**     <u>**GM Purchase Price**</u>.

    **3.1.1.**     On the Closing Date, subject to the terms and conditions of this Agreement, in consideration of the Sale, Parent, on behalf of the GM Buyers, will pay a purchase price (the "**GM Purchase Price**") consisting of the following components:

        A.     The assumption of the applicable Assumed Liabilities of the GM Business;

        B.     The assumption or payment of the applicable Cure Amounts of the GM Business;

<div align="center">36</div>

C.    The waiver by GM of its pre-petition Claims, Administrative Claims and future Claims in the Bankruptcy Cases including without limitation any such Claims pursuant to Global Settlement Agreement, as amended, effective as of September 29, 2008 and each of the GM-Delphi Liquidity Agreements;

D.    The payment to Delphi of the DIP Priority Payment;

E.    The payment to Delphi of $291,020,079 in cash;

F.    The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on Exhibit 3.1.1.F; and

G.    50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval of the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to this Section 3.1.1.G, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

**3.1.2.**    The GM Purchase Price will be paid or delivered to the Person provided above.

**3.1.3.**    Following the Closing, GM Buyer shall pay to Delphi the portion of the net proceeds that are recovered in connection with the pursuit of the Appaloosa Claim as provided by the Plan of Reorganization, subject to the terms, conditions and limits specified therein, which such payment shall be made regardless of whether the transactions contemplated hereby are consummated pursuant to a Plan of Reorganization or a Plan Modification Order.

**3.2**    **Company Purchase Price.**

**3.2.1.**    On the Closing Date, and subject to the terms and conditions of this Agreement, in consideration of the Sale, the Company, on behalf of the Company Buyer, will pay a purchase price (the "**Company Purchase Price**") consisting of the following components:

A.    The assumption of the applicable Assumed Liabilities of the Company Business;

B.    The assumption or payment of the applicable Cure Amounts of the Company Business;

C.    $1.00 (one dollar); and

D.    The payment to Delphi (to be held either by Sellers, a trust or an agent, as determined by Sellers) of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries.

37

**3.2.2.**    The Company Purchase Price will be paid or delivered to the Person provided above.

**3.2.3.**    Following the Closing, Company Buyer shall pay to a disbursement agent such amounts payable to the unsecured creditors of Delphi and the Filing Affiliates pursuant to the Plan of Reorganization as filed on the date of execution of this Agreement (without modification as to the consideration to be paid under this <u>Section 3.2.3</u> unless consented to by Company Buyer), for distribution to such unsecured creditors on behalf of Delphi and the Filing Affiliates, subject to the terms, conditions and limits as set forth in the Plan of Reorganization, which payment to the disbursement agent shall only be made if the transactions contemplated hereby are consummated pursuant to a Plan of Reorganization.

**3.2.4.**    50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization).

### 3.3    GM Purchase Price and Company Purchase Price Allocation.

The DIP Priority Payment shall be delivered, if so directed, by Delphi directly to the DIP Agent to be held by the DIP Agent as collateral for the outstanding obligations under the DIP Agreement or as may otherwise be agreed upon by the DIP Agent and Delphi.  At Closing, Delphi shall deliver to the Buyers payoff letters in customary form or reasonably satisfactory to GM from the DIP Agent setting forth the DIP Priority Payment.  The sum of the GM Purchase Price and the Company Purchase Price and any other relevant items, including the GM Assumed Liabilities and the Company Assumed Liabilities, shall be allocated among the GM Acquired Assets, GM Sale Securities, Company Acquired Assets and Company Sale Securities as jointly determined by Delphi, GM and Company Buyer within a reasonable period of time, but not longer than 90 days after the Closing Date.  To the extent permitted by Law, the Sellers and Buyers agree to abide by such allocation for all Tax purposes, and shall take no position on any Tax return inconsistent with such allocation.  Without limiting the foregoing, the Sellers and Buyers shall file IRS Form 8594 in a manner consistent with such allocation.  Each of the Sellers and Buyers will use their respective commercially reasonable efforts to sustain such allocation in any subsequent audit, similar proceeding, appeal, or court proceeding.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF SELLERS.

Except as set forth in Delphi's reports filed with the Securities and Exchange Commission, each Seller represents and warrants severally and jointly with Delphi to the applicable Buyers only with respect to itself and with respect to the Acquired Assets or Sale Securities being sold by such Seller to such Buyer as follows:

### 4.1    Organization.

Each Seller represents to the applicable Buyer that such Seller and, if applicable, the Sale Company being sold by such Seller is a legal entity duly organized, validly existing, and except

38

as would not reasonably be expected to have a Material Adverse Effect, in good standing under the Laws of its jurisdiction of incorporation or organization. Each Seller represents to the applicable Buyer that such Seller and such, if applicable, Sale Company has or will the full requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed has not had and would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect on the ability of Sellers to consummate the transactions contemplated by this Agreement. Delphi represents to the GM Buyer that it has delivered prior to the execution of this Agreement, or will deliver prior to Closing, deliver to the GM Buyer true and complete copies of the certificate of incorporation and by-laws or similar Organizational Documents of each of the Sale Companies relating to the Steering Business as in full force and effect on the date hereof.

### 4.2    Authorization; Enforceability.

Each Seller represents to the applicable Buyer that subject to entry and effectiveness of the Plan Modification Order, and the effectiveness of an appropriate amendment to the DIP Agreement permitting the sale of the Business and entry of a Final Order from the Bankruptcy Court related thereto, each such Seller has or will have at Closing, the requisite corporate or other organizational power and authority to: (i) execute and deliver to the applicable Buyer this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements, including to own, hold, sell and transfer (pursuant to this Agreement) the Acquired Assets and the Sale Securities. Subject to entry and effectiveness of the Plan Modification Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements to the applicable Buyer by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Person. Each Seller represents to the applicable Buyer that this Agreement has been duly executed and delivered to the applicable Buyer by such Seller, and the Ancillary Agreements will be duly executed and delivered by such Seller, as applicable, and, assuming due authorization, execution and delivery the applicable Buyers, constitutes, or will constitute, a valid and binding agreement of each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except: (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability; and (b) that enforceability of this Agreement is subject to entry and effectiveness of the Plan Modification Order.

### 4.3    Capital Stock of the Sale Companies and JV Companies.

4.3.1.    Except as set forth on Schedule 4.3.1, each Securities Seller represents to the applicable Buyer that (i) such Securities Seller's equity interests in the Sale Company and, if applicable, JV Company, is owned, directly or indirectly, by such Securities Seller as set forth

on Schedule 1 and Schedule 2 to the Agreement (which Schedule also sets forth the number and type of such equity interests held by each Securities Seller); (ii) such Securities Seller's Sale Securities are duly authorized, validly issued, fully paid up and non-assessable and are not subject to any preemptive rights; and (iii) there are no voting trust agreements or other contracts, agreements or arrangements, to which any Securities Seller is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities.

**4.3.2.**       Except as set forth on Schedule 4.3.1 or Schedule 4.3.2, each Securities Seller represents to the applicable Buyer that there is no outstanding security, right, subscription, warrant, option, privilege or other agreement, commitment or contract, preemptive, contractual or otherwise that gives the right to:  (i) purchase or otherwise receive or be issued any share capital or similar equity interest of such Sale Company or, if applicable, a JV Company or any security of any kind convertible into or exchangeable or exercisable for any share capital of such Sale Company or, if applicable, a JV Company; or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to a holder of share capital or similar equity interest of such Sale Company or, if applicable, a JV Company, including any rights to participate in the equity or income of such Sale Company or, if applicable, a JV Company, or to participate in or direct the election of any directors of such Sale Company or, if applicable, a JV Company or the manner in which any share capital or similar equity interest of such Sale Company or, if applicable, a JV Company, are voted.

**4.3.3.**       Each Securities Seller represents to the applicable Buyer that at Closing upon payment of the Purchase Price, such Securities Seller will convey to the applicable Buyer valid and marketable title to (x) all of the issued and outstanding shares of capital stock of such Sale Company; and (y) if applicable, all shares of the JV Companies currently owned by such Securities Seller;  in each case, free and clear of all Encumbrances except Permitted Encumbrances.

**4.4**       **No Conflict or Approvals.**

Except as set forth on Schedule 4.4, each Seller represents to the applicable Buyer that subject to entry and effectiveness of the Plan Modification Order and the effectiveness of an appropriate amendment to the DIP Agreement permitting the sale of the Business and entry of a final order from the Bankruptcy Court related thereto, the execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements do not:  (i) violate, conflict with or result in a breach of Organizational Documents of such Seller or, if applicable, the JV Companies; (ii) violate or result in a breach of any Governmental Order or Law applicable to such Seller, such Sale Company or the JV Companies or any of their respective properties or assets; (iii) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations of, declarations or filings with the Bankruptcy Court; or (iv) result in a breach, right of acceleration, termination, modification or cancellation of any of the Material Contracts of such Seller or Sale Companies; except:  (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a Material Adverse Effect on the ability of such Seller to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

40

### 4.5    **Sufficiency of Acquired Assets.**

Except as set forth on Schedule 4.5, the Acquired Assets and assets of the Sale Companies, together with the Intellectual Property rights to be licensed from Sellers to Buyers pursuant to the IP License Agreement and the services to be provided to Buyers pursuant to the Transition Services Agreement, comprise all of the assets necessary to carry on the Company Business and the Steering Business in all material respects as they are now being conducted.

### 4.6    **Intellectual Property.**

**4.6.1.**    Schedule 1.1.D.1, Schedule 1.1.D.2 and Schedule 1.1.D.3, respectively, list all the issued Patent Rights and Patent Rights applications, all Trademark Rights registrations and applications therefor, and all Copyright registrations and applications therefor, included in the Purchased Intellectual Property for the Steering Business identified as of the date of this Agreement. Except as: (i) set forth in Schedule 1.1.D.1; or (ii) instances in which such issued Patent Rights or Patent Rights applications are jointly owned with a third party, or (iii) as would not reasonably be expected to result in a Material Adverse Effect and subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest in their respective Purchased Intellectual Property, and have the right to transfer such Sellers' right, title and interest in them and have the right to license the Shared Intellectual Property as set forth in this Agreement. Buyers shall have the right to bring actions for all past, present and future infringement or unauthorized use of the Purchased Intellectual Property.

**4.6.2.**    There are no licenses to Affiliates of Sellers of Steering Technology other than those set forth in Schedule 4.6.2.

**4.6.3.**    Except as set forth in Schedule 4.6.3 with respect to the Steering Business as of the date of such schedule, and except as would not reasonably be expected to have Material Adverse Effect: (i) each Seller has not, to such Seller's Knowledge, infringed, misappropriated or otherwise violated, and the operation of the Business as currently conducted does not to such Sellers' Knowledge infringe, misappropriate or otherwise violate any Intellectual Property rights of any third party to any extent that would have a Material Adverse Effect; and (ii) each Seller has no Knowledge of any allegation by any third party of such Seller's Intellectual Property infringement or misappropriation, resulting from the operation of the Business during the last three (3) years that would have a Material Adverse Effect.

**4.6.4.**    Except as set forth in Schedule 4.6.4 with respect to the Steering Business as of the date of such schedule, each Seller has no Knowledge of any material infringement, misappropriation or other violation of such Seller's Purchased Intellectual Property by any Person that would have a Material Adverse Effect

**4.6.5.**    Except as set forth on Schedule 4.6.5 with respect to the Steering Business as of the date of such schedule, and except as would not reasonably be expected to have Material Adverse Effect: (i) Delphi has received no notice of a claim by any third party contesting the validity, enforceability, use or ownership of any of the material Purchased Intellectual Property within the past three (3) years that to Delphi's Knowledge is currently

41

outstanding or is threatened; and (ii) each Seller and Sale Company has taken reasonable measures to protect the confidentiality and value of such Seller's and Sale Company's Trade Secrets included in the Purchased Intellectual Property.

### 4.7.    **Personal Property Assets, Inventory.**

**4.7.1.**    Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, such Asset Seller and such Sale Company have good title to, or hold by valid and existing lease or license, all of their Personal Property included in their respective Acquired Assets.  All such Personal Property is free and clear of all Encumbrances, other than Permitted Encumbrances.

**4.7.2.**    Each Seller represents to the applicable Buyer that such Sale Company and such Asset Seller, with respect to their Acquired Assets, will own, or have valid leasehold interests in, all of their Personal Property and Inventory being transferred to applicable Buyers under this Agreement, and to each Seller's Knowledge, all of their respective transferred Personal Property used by the applicable Business are in such condition (considering age and purpose for which they are used) as to enable the applicable Business to be conducted as currently conducted without material disruption.

**4.7.3.**    Each Seller represents to the applicable Buyer that except as would not result in a Material Adverse Effect, the Inventory included in such Seller's Acquired Assets will, as of the Closing, be:  (i) located at the Real Property; (ii) of a quality usable and saleable in the Ordinary Course of Business, subject to normal allowances for spoilage, damage and outdated items.

### 4.8    **Real Property.**

**4.8.1.**    Leased Properties.  Schedule 4.8.1 lists the address of all real property leased, subleased or equivalent leasehold rights in U.S. and non-U.S. jurisdictions, by any GM Sale Company or constituting GM Acquired Assets (the "**GM Leased Real Property**"), including any option to purchase the underlying property and leasehold improvements thereon and all security deposits deposited on or on behalf of each Seller related to such leases.  Delphi has made available to Parent true and complete copies of the leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) (the "**Leases**") and subleases covering the GM Leased Real Property (as amended to the date of this Agreement). With respect to the GM Leased Real Property, each lease and sublease and except as otherwise specified on Schedule 4.8.1 or where the failure of any of the following to be true and correct has not and would not reasonably be expected to have a Material Adverse Effect:

A.    The Leases are, to the Knowledge of the applicable Seller, in all material respects, valid, binding, enforceable and in full force and effect, in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law); and

B.      (i) None of the Sale Companies, or the Asset Sellers or, to the Knowledge of the applicable Seller, any other party to its Leases, is in material breach under its Leases, other than with respect to monetary defaults by such Asset Sellers under the Leases that are curable by payment of all Cure Amounts, if applicable, and, to the Knowledge of Sellers, no event has occurred which, with the delivery of notice or passage of time or expiration of any grace period would constitute a material breach of the respective Sale Company's or its Asset Seller's obligations under the Leases (except with respect to breaches that need not be cured under Section 365 of the Bankruptcy Code for the Filing Affiliates to assume and assign the Leases to Buyer, if applicable); and (ii) none of the Sale Companies or the Asset Sellers has received a notice of breach with respect to its Leases.

**4.8.2.**      Owned Properties.  Schedule 4.8.2 lists the address of all real property owned by any of the GM Sale Companies or GM Asset Sellers or which constitutes GM Acquired Assets (the "**GM Owned Real Property**").  With respect to each such parcel of the GM Owned Real Property and except as otherwise specified on Schedule 4.8.2, the identified owner has good and marketable fee simple title, or equivalent title rights in non-U.S. jurisdictions, to the parcel of the GM Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

**4.9**      **Financial Statements.**

**4.9.1.**      The GM Sellers represent to the GM Buyers as follows with respect to the Steering Business:  Schedule 4.9.1 sets forth the unaudited combined balance sheets of the Global Steering Business as of December 31, 2005 and 2006 and the related unaudited combined statements of income for the years ended December 31, 2005 and 2006 (referred to as the "Historical Financial Statements").  Except as set forth on Schedule 4.9.1, and limited to such applicable Seller's Knowledge with respect to the JV Companies, each Historical Financial Statement was, at the time prepared, (i) true, correct and complete in all material respects with respect to the purpose for which it was prepared, as of the date thereof, subject to the absence of notes and normal year end adjustments; (ii) consistent with prior practice, subject to the exceptions and adjustments described in Schedule 4.9.2; (iii) prepared from the accounting records of the Asset Sellers, Sale Companies and JV Companies, in accordance with the specific accounting treatments consistently used by Seller in preparation of its books and records; (iv) with respect to the Historical Financial Statements, subject to the exceptions and adjustments set forth in Schedule 4.9.2, presents fairly in all material respects the financial condition and the results of operations of the combined business as of the respective dates of and for the periods referred to in such financial statements; and (v) in accordance with GAAP.  For the avoidance of doubt, subparagraph (iii) shall take precedence over subparagraphs (iv) and (v), and subparagraph (iv) shall take precedence over subparagraph (v).

**4.9.2.**      The GM Sellers represent to the GM Buyers as follows:  Except as specifically reflected or reserved against in the December 31, 2006 balance sheet that is part of the Historical Financial Statements or otherwise disclosed on Schedule 4.9.2, there are no Liabilities that would be required to be disclosed in accordance with GAAP against, relating to or affecting the Steering Business, other than Liabilities incurred in the Ordinary Course of Business since December 31, 2006.

43

**4.10**    **Compliance with Law; Permits**

Except as set forth on Schedule 4.10, each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, its applicable Business is currently in material compliance with all material Laws.  Each of the Sale Companies possess all Permits necessary to own, lease and operate its assets and conduct the applicable Business as currently conducted, and the Asset Sellers possess all Permits necessary to own, lease and operate their respective Acquired Assets except as would not reasonably be expected to result in a Material Adverse Effect.   The representations and warranties relating to Environmental Laws and Environmental Permits are exclusively set forth in Section 4.15.

**4.11**    **Proceedings; Orders.**

Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, and except for the pendency of the Bankruptcy Cases (and except with respect to compliance with Environmental Laws, which is covered by Section 4.15), there are no Proceedings or Governmental Orders pending against such Sale Company or such Asset Sellers or, to the Knowledge of each Seller, the JV Companies, and to the Knowledge of each Seller there are no Proceedings or Governmental Orders threatened against any of such Sale Company, such Asset Sellers or the JV Companies with respect to its applicable Business.

**4.12**    **Tax Matters.**

**4.12.1.**    Except as set forth in Schedule 4.12.1, each Sale Company and Asset Seller has:  (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all of its material Tax Returns required to be filed and, when filed, such Tax Returns were true, correct and complete in all material respects; and (ii) paid all of its material Taxes shown thereon as due and owing, except in the case of Filing Affiliates, Taxes which may have been prohibited by the Bankruptcy Code.

**4.12.2.**    The Sellers and Sale Companies have each withheld and paid all of their respective material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Transferred Employee.

**4.12.3.**    Except as set forth in Schedule 4.12.3, no Sale Company has received any notice of assessment with respect to the potential underpayment of Taxes or other deficiency.  Except as disclosed in Schedule 4.12.3, all assessments made as a result of any examinations with respect to, in connection with, associated with or related to, the Sale Companies have been fully paid or are fully reflected as a liability in the financial statements of the Sale Company.

**4.12.4.**    No Sale Company is a party to any agreement, Contract or plan that has resulted or would result, separately or in the aggregate, in the payment of any excess parachute payments within the meaning of Code Section 280G.

44

**4.12.5.**    Except with respect to Taxes not yet due and payable or as set forth in Schedule 4.12.5, there are no tax liens on the Acquired Assets or on any of the assets of the Sale Companies that arose in connection with any failure (or alleged failure) to pay any Tax.

**4.12.6.**    Except as set forth in Schedule 4.12.6, no Sale Companies have waived any statue of limitations or agreed to any extension of time with respect to an assessment or deficiency of Taxes.

**4.13**    **Employee Benefits; Labor.**

**4.13.1.**    Schedule 4.13.1 contains a list of all U.S. Employees and Non-U.S. Employees of the Steering Business, and employees of the Sale Companies included in the Steering Business, including for all such employees: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed (including without limitation those on layoff status) or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual base rate of compensation; (vi) each person's date of hire; and (vii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement), in each case, to the extent permitted to be disclosed under applicable Law (including local privacy laws).

**4.13.2.**    Schedule 4.13.2, sets forth a list of the Seller Employee Benefit Plans, including each Non-U.S. Benefit Plan for the employees of the Steering Business and each Employee Benefit Plan for U.S. Employees.

**4.13.3.**    To the extent applicable to employees of the Steering Business and each Seller Employee Benefit Plan for U.S. Employees, copies of the following materials have been delivered or made available to Parent with respect to each Seller Employee Benefit Plan to the extent applicable to the Steering Business: (i) current plan documents, any related trust agreements, service provider agreements, insurance contracts or agreements with investment managers; (ii) the most recent summary plan description and summary of material modifications to the extent not included in the summary plan description in each case distributed to employees; (iii) current agreements and other documents relating to the funding or payment of benefits; and (iv) the most recent actuarial valuation report, if applicable.

**4.13.4.**    Except as set forth in Schedule 4.13.4, or where the failure to comply would not have a Material Adverse Effect, the Seller Employee Benefit Plans are in compliance with their terms and applicable requirements of ERISA, the Code and other Laws (if applicable). Each Seller Employee Benefit Plan and related trust which is intended to be qualified within the meaning of Section 401 or 501, as applicable, of the Code has received a favorable determination letter as to its qualification and to the Knowledge of Sellers, nothing has occurred that could reasonably be expected to adversely affect such determination.

**4.13.5.**    Except as: (i) set forth in Schedule 4.13.5; and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge of Sellers, material threatened Proceedings in the U.S. with respect to any Seller Employee Benefit Plans of

the Steering Business or that otherwise might have a Material Adverse Effect with respect to the other Seller Employee Benefit Plans applicable to any U.S. Employees.

      **4.13.6.**    Except as set forth in <u>Schedule 4.13.6</u> no event or condition has occurred in connection with which any of the Sale Companies or Sellers or any member of the Controlled Group (as defined below) could be subject to any material Liability or Encumbrance under Title IV of ERISA.

      **4.13.7.**    None of the Sale Companies nor any member of the Controlled Group (as defined below) currently has or for the past five (5) years has had an obligation to contribute to a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code.

      **4.13.8.**    With respect to each group health plan that is subject to Section 4980B of the Code maintained by any entity described in this <u>Section 4.13.8</u>, the Sale Companies and each member of the Controlled Group (as defined below) have complied with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA, except where the failure to so comply would not have a Material Adverse Effect.  Except as set forth on <u>Schedule 4.13.8</u>, no Seller Employee Benefit Plan provides welfare coverage that extends after the termination of employment other than for continued coverage provided pursuant to the requirements of Section 4980B of the Code or other similar provision of state law.  For purposes of this Agreement, "**Controlled Group**" means any trade or business (whether or not incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sale Companies; or (ii) which together with any of the Sale Companies is treated as a single employer under Section 414(t) of the Code.

      **4.13.9.**    Sellers are not in default in performing any of their obligations under any Seller Employee Benefit Plan or any related trust agreement or insurance contract with respect to the Steering Business or, in the case of any other business of the Sellers, where such default would reasonably be expected to result in a Material Adverse Effect.  Except as set forth on <u>Schedule 4.13.9</u>, all contributions and other payments required to be made by Sellers to any Seller Employee Benefit Plan with respect to any period ending before or at the Closing Date have been made or reserves adequate for such contributions or other payments have been or will be set aside therefor.  There are no material outstanding Liabilities of, or related to, any Seller Employee Benefit Plan other than Liabilities for benefits to be paid in the Ordinary Course of Business to participants in such Seller Employee Benefit Plan and their beneficiaries in accordance with the terms of such Seller Employee Benefit Plan.  Except as set forth on <u>Schedule 4.13.9</u>, there are no Contracts or other arrangements providing for any bonus or other payments to any Transferred Employees arising as a result of the transactions contemplated hereby.

      **4.13.10.**    No transaction contemplated by this Agreement will result in liability under Sections  4062, 4063, 4064, or 4069 of ERISA or otherwise, with respect to Sellers or Buyers or any corporation or organization controlled by or under common control with any of the foregoing within the meaning of Section 4001 of ERISA, and no event or condition exists or has existed which would reasonably be expected to result in any such liability with respect to the foregoing within the meaning of Section 4001 of ERISA.

09-50026-mg    Doc 2096    Filed 06/20/09    Entered 06/20/09 14:00:26    Main Document
Pg 85 of 372

**4.13.11.** Schedule 4.13.11 lists all material Collective Bargaining Agreements applicable to employees of the Steering Business or U.S. Hourly Employees. Sellers have given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements with respect to the Steering Business and the Seller's business in the U.S. Except as disclosed on Schedule 4.13.11, Sellers are, and for the past twelve (12) months (i) with respect to the Steering Business and the Seller's business in the U.S. have remained in material compliance with each Collective Bargaining Agreement and (ii) with respect to the Seller's non-U.S. business have remained in compliance with each Collective Bargaining Agreement except where failure to be in compliance would have a Material Adverse Effect. With respect to the transactions contemplated under this Agreement, any notice required under any Law or Collective Bargaining Agreement has been or prior to Closing will be given, and Seller will be in compliance with all bargaining obligations with any employee representative except where failure to be in compliance would have a Material Adverse Effect.

**4.13.12.** Except as disclosed on Schedule 4.13.12: (i) with respect to the Seller's Steering Business and Seller's U.S. business, there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers or any Sale Company; (ii) with respect to the Seller's Steering Business and Seller's U.S. business, neither Sellers nor any Sale Company has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; (iii) with respect to the Seller's Steering Business, no material labor grievance relating to any employee of Sellers or any Sale Company is pending as of the date of Schedule 4.13.12; and (iv) with respect to the Seller's Steering Business and Seller's U.S. business, neither Sellers nor any Sale Company has any labor negotiations in process with any labor union or other labor organization. Except as set forth on Schedule 4.13.12 or as would not have a Material Adverse Effect, there are no pending litigations, administrative proceedings, grievances, arbitrations, investigations or claims against Sellers or any Sale Companies whether under applicable Laws, Collective Bargaining Agreements, employment agreements or otherwise asserted by any present employee or former employee (or their representative) or any other Person as relates to the Business, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work, and, to Sellers' Knowledge, there are no such claims which have yet to be asserted.

**4.13.13.** With respect to each benefit plan, bonus, deferred compensation, severance pay, pension, profit-sharing, retirement, insurance, stock purchase, stock option, vacation pay, sick pay or other fringe benefit plan, arrangement or practice that is currently sponsored or maintained outside the jurisdiction of the United States by any Sale Company, that is not subject to the laws of the United States, and that covers an employee of a Sale Company that resides or works outside the United States (each a "**Non-U.S. Benefit Plan**"), the following representations are made with respect to those Non U.S. Benefit Plans (x) with respect to the Seller's Steering Business and (y) except as would not have or reasonably be expected to have a Material Adverse Effect, with respect to the Seller's businesses other than the Seller's Steering Business:

A.    All employer and employee contributions, to the extent directly paid by the employer, to each Non U.S. Benefit Plan required by law or by the terms of such Non U.S. Benefit Plan have been made, or, if applicable, accrued in accordance with GAAP; and

B.    Each Non U.S. Benefit Plan required to be registered or approved has been registered or approved and has been maintained in good standing with applicable regulatory authorities.  Each Non U.S. Benefit Plan is now and always has been operated in material compliance with all applicable Laws.

**4.14    Contracts.**

**4.14.1.**    Schedule 4.14.1 sets forth a true and complete list as of the date of such schedule of each of the following Contracts to which such Sale Company, or such Asset Seller with respect to the Steering Business, is a party or by which any of them is bound, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

A.    Contracts (other than purchase order Contracts) involving the expenditure by the Sale Companies or the Asset Sellers in respect of the Steering Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such contracts that are terminable by the Sale Companies or the Asset Sellers without penalty on not more than one hundred eighty (180) days notice;

B.    Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of material Debt Obligations with respect to the Steering Business;

C.    Guarantees of obligations (other than endorsements made for collection) involving the potential expenditure by the Sale Companies or the Asset Sellers in respect of the Steering Business after the date of this Agreement of more than $500,000 in any instance;

D.    Contracts under which any Seller or the Sale Companies has licensed material Purchased Intellectual Property to, or material Licensed Intellectual Property from, any other Person with respect to the Steering Business;

E.    Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the Sale Companies or the relevant Asset Seller party thereto with respect to the Steering Business;

F.    All Contracts containing any provision or covenant prohibiting or materially limiting the ability of any Sale Company to engage in any Business activity or in any region or compete with any Person with respect to the Steering Business;

G.    All Contracts (other than purchase order Contracts with Affiliates) between the Sale Companies or Asset Sellers with respect to the Steering Business, on

48

the one hand, and any Seller or its officers, directors or Affiliates (other than the Sale Companies or any of the Asset Sellers with respect to the Steering Business);

H.    Contracts (other than purchase order Contracts) providing that a Sale Company or any Asset Seller in respect of the Steering Business will receive future payments aggregating more than $2,500,000 per annum or $10,000,000 in the aggregate prior to the expiration of such Contract;

I.    Collective Bargaining Agreements, works council agreements and similar agreements with any labor organization or employee representative with respect to the Steering Business;

J.    All letters of credit, performance bonds and other similar items issued and outstanding in connection with the Steering Business; and

K.    Agreements compromising, settling or resolving any material dispute affecting a Seller or a Sale Company pursuant to which, on or after the execution date of this Agreement, any Seller, with respect to a matter that would otherwise become an Assumed Liability, or any Sale Company will be required to pay consideration valued in excess of $500,000 or to satisfy monitoring or reporting obligations to any Governmental Authority outside the Ordinary Course of Business with respect to the Steering Business.

**4.14.2.**    As of the date of such schedule and with respect to the Steering Business, except as set forth in <u>Schedule 4.14.2</u>, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, no event has occurred or would be reasonably likely to occur as of the date of such schedule that constitutes a material default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyers, if applicable) by: (i) any of the Sale Companies or any Asset Seller under any Material Contract; or (ii) any other party to any Material Contract.  As of the date of such schedule and with respect to the Steering Business, <u>Schedule 4.14.2</u> identifies all Post Petition Contracts included within the Material Contracts, other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business.

**4.14.3.**    The Sellers have made or will make available to the GM Buyers a true and correct copy of all written Contracts disclosed on <u>Schedule 4.14.1</u> (other than purchase orders and those subject to confidentiality provisions that prohibit disclosure to third parties), in each case together with all amendments, waivers or other changes thereto.

**4.15**    **Environmental Matters.**

Except as disclosed in <u>Schedule 4.15</u>, since January 1, 1999, to the Knowledge of each of the Sellers with respect to such Seller's Business or except as would not reasonably be expected to result in a Material Adverse Effect:

**4.15.1.**    The Business is in compliance with Environmental Laws and with Environmental Permits applicable to the Business and the Real Property;

49

**4.15.2.**    From February 1, 2009 through the Closing, no lien, restrictive covenant, engineering and/or institutional control or other land or resource use restriction has been, nor shall any be, recorded against or imposed upon the Real Property under Environmental Laws;

**4.15.3.**    None of the Sale Companies or the Asset Sellers with respect to their respective Acquired Assets and their Business has received any written notice from a Governmental Authority alleging that the Business as currently operated violates in any material respects any Environmental Laws or Environmental Permits;

**4.15.4.**    Each Sale Company and Asset Seller with respect to their respective Acquired Assets and their Business has not received and has no Knowledge of the issuance of any Claim under Environmental Law with respect to the Real Property;

**4.15.5.**    Each Sale Company and Asset Seller with respect to their respective Acquired Assets and their Business has obtained and maintains in full force and effect all Environmental Permits required for the operation of the Business and occupancy of the Real Property; and

**4.15.6.**    By the Closing Date, Sellers shall have delivered or otherwise made available to (a) the GM Buyers, the GM Environmental Records and all Environmental Records at any GM Real Property relating to the GM Business, and (b) the Company Buyer, all Environmental Records at any Company Real Property relating to the Company Business.

**4.16**    <u>Insurance</u>.

**4.16.1.**    <u>Schedule 4.16</u> contains a complete and correct list, in all material respects, of all material policies of insurance, other than Insurance Policies relating to multiple business lines of Delphi, covering any of the assets primarily used in the Steering Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.

**4.16.2.**    Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, with respect to their Transferred Insurance Policies, all such policies are outstanding and in full force and effect and neither the Sale Companies, the Asset Sellers nor the Person to whom any policy has been issued has received any notice of cancellation or termination in respect of any policy or is in default thereunder. Each Seller represents to the applicable Buyer that neither such Sale Company, such Asset Sellers nor the Person to whom any Policy has been issued has received notice that any insurer under such Transferred Insurance Policies is denying coverage or defending under a reservation of rights clause.

**4.17**    <u>No Brokers' Fees</u>.

Each Seller represents to the applicable Buyer that such Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyers, the Sale

Companies or the JV Companies would be liable (including any claim for a finder's fee or brokerage commission).

### 4.18    Affiliate Transactions.

Each Seller represents to the applicable Buyer that except as would not reasonably be expected to result in a Material Adverse Effect, (i) none of its officers or directors of any Seller provides or causes to be provided any assets, services or facilities used or held for use in connection with the Business; and (ii) the Business does not provide or cause to be provided any assets, services or facilities to any such officer or director.

### 4.19    No Other Representations or Warranties.

Except for the representations and warranties contained in this Article 4: (i) the Sellers make no other express or implied representation or warranty to any of the Buyers; and (ii) no Seller is making any representations with respect to any plan(s) of Buyers for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose. For the avoidance of doubt, except for the representations and warranties contained in this Article 4, no warranty or representation is given on the contents of the documents provided during due diligence, including any information in any Data Room and any other reports, financial forecasts, projections or information furnished by or on behalf of Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

### 4.20    Fair Disclosure; Schedule Data.

**4.20.1.**    The information set forth in each Section of the Schedules shall be deemed to provide the information contemplated by, or otherwise qualify, the representation and warranties of the Sellers set forth in the corresponding section or subsection of the agreement and any other representation of the Sellers, but only to the extent that it is reasonably apparent on the face of the Schedule that it applies to such other representation.

**4.20.2.**    The information set forth on the schedules referred to in this Article 4 in each case is only provided as of the date set forth on such schedule. To the extent that a schedule is dated prior to the date of this Agreement, the related representation in this Agreement is only made as of such date.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES OF GM BUYERS.

GM Buyers jointly and severally represent and warrant to the GM Sellers and Company Buyers as follows:

### 5.1    Organization.

Each GM Buyer represents to the GM Sellers that it is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization. Each GM Buyer represents to the GM Sellers that it has the full requisite corporate

or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed:  (i) has not had and would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of GM Buyers to consummate the transactions contemplated by this Agreement; or (ii) would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on GM Buyers.

### 5.2    Authorization; Enforceability.

Each GM Buyer represents to the GM Sellers that it has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to the GM Sellers and perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements to the GM Sellers by each GM Buyer and the performance by each of them of their respective obligations hereunder and thereunder, in the case of Parent have been, and in the case of the other Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such GM Buyer and, upon such authorization, no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.  This Agreement has been duly executed and delivered by the GM Buyers, and the Ancillary Agreements will be duly executed and delivered by the applicable GM Buyers and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable GM Buyers, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

### 5.3    No Conflicts or Approvals.

Each GM Buyer represents to the GM Sellers that the execution, delivery to the GM Sellers and performance by GM Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the GM Buyers of the transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by the GM Buyer of the Organizational Documents of the GM Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by GM Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the GM Buyer or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to GM Buyer or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of GM Buyer to consummate the transactions contemplated by this Agreement.

52

**5.4**      **Proceedings.**

Each GM Buyer represents to the GM Sellers that as of the date hereof, there are no Proceedings pending or, to the Knowledge of GM Buyer, threatened against GM Buyer that would reasonably be expected to restrain, delay or inhibit the ability of GM Buyer to consummate the transactions contemplated by this Agreement. Each GM Buyer represents to the GM Sellers that as of the date hereof, such GM Buyer is not subject to any Governmental Order that would reasonably be expected to restrain, delay or otherwise inhibit the ability of such GM Buyer to consummate the transactions contemplated by this Agreement.

**5.5**      **Investment Representations.**

**5.5.1.**      Each GM Buyer represents to the GM Sellers that the GM Buyer is acquiring the GM Sale Securities for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction. Each GM Buyer agrees with GM Sellers that it will not transfer any of the GM Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**5.5.2.**      Each GM Buyer represents to the GM Sellers that such GM Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**5.5.3.**      Each GM Buyer represents to the GM Sellers that such GM Buyer understands that the acquisition of the GM Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Each GM Buyer represents to the GM Sellers that GM Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the GM Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**5.5.4.**      Each GM Buyer further understands and acknowledges to the GM Sellers that the GM Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees with GM Sellers that the GM Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, pursuant to an applicable exemption therefrom.

**5.5.5.**      GM Buyer acknowledges to GM Seller that the offer and sale of the GM Sale Securities has not been accomplished by the publication of any advertisement.

**5.6**      **Financial Ability.**

GM Buyers have the financial ability or will have available at Closing, sufficient Cash in immediately available funds to pay the GM Purchase Price, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.

**5.7**      **Adequate Assurance of Future Performance.**

Each GM Buyer represents to the Sellers that such GM Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance (or future performance of any applicable subsidiary of a GM Buyer) under each applicable Acquired Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Acquired Contract. Each GM Buyer acknowledges to the applicable GM Seller and agrees with the GM Seller that if it is necessary to provide a Contract counter-party with additional assurances to satisfy such GM Buyer's obligations to provide adequate assurance in accordance with this Section 5.7, all such costs and expenses or other actions required will be borne and performed by such GM Buyer without recourse to Sellers.

**5.8**      **No Brokers' Fees.**

Except for Evercore Partners and AlixPartners (which shall be paid by GM or a GM Buyer), payment of whose fees will be solely GM's responsibility, each GM Buyer represents to the GM Sellers that such GM Buyer has not employed any finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

**5.9**      **Anti-Money Laundering.**

Each GM Buyer represents to the GM Sellers that such GM Buyer is in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer operates or does business. Neither such GM Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and such GM Buyer is not affiliated in any way with, nor providing financial or material support to, any such persons or entities. Each GM Buyer agrees that should it or any GM Buyer, or any of their directors, officers or affiliates be named at any time prior to Closing on the SDN List, or any other similar list maintained by the U.S. Government, it will inform Delphi in writing immediately.

**5.10**      **Compliance with Laws.**

Each GM Buyer represents to the GM Sellers that such GM Buyer is in compliance with all Laws applicable to such GM Buyer, except with respect to those violations that would not

54

reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting such GM Buyer from consummating the transactions contemplated by this Agreement.

### 5.11    No Undisclosed Agreements.

GM Buyer has disclosed and will disclose all written agreements between it and the Company Buyer relating to the subject matter of this Agreement or Delphi.

## ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES OF GM

### 6.1    Authorization; Enforceability.

GM represents to Delphi that it has the requisite corporate power and authority to execute and deliver the Buyer Loan Documents and the Securities Purchase Agreement (together, and including, without limitation, any and all exhibits, annexes, schedules, fee letters and other ancillary documents, the "**GM Financing Agreements**") and this Agreement and perform its obligations thereunder and hereunder.  The execution and delivery of this Agreement and the GM Financing Agreements by GM and the performance by GM of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action on the part of GM, and no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the GM Financing Agreements or the transactions contemplated hereby or thereby.  This Agreement and the Securities Purchase Agreement have been duly executed and delivered by GM and the Buyer Loan Documents will have been duly executed and delivered by GM on or prior to the Closing and, assuming due authorization, execution and delivery by the other parties hereto and thereto (other than the GM Buyers), subject to obtaining requisite Bankruptcy Court approval, constitutes, or in the case of the Buyer Loan Documents will constitute as of the Closing, a valid and binding agreement of GM, enforceable against GM in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

### 6.2    No Conflicts or Approvals.

GM represents to Delphi that the execution, delivery and performance by GM of this Agreement and the GM Financing Agreements (when executed) and the consummation by GM of the transactions contemplated hereby and thereby do not and will not:  (i) violate, conflict with or result in a breach by the GM of the Organizational Documents of GM; (ii) violate, conflict with or result in a breach of, or constitute a default by GM (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the GM or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to GM or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act and other applicable Competition/Investment Law, and obtaining

55

requisite Bankruptcy Court approval, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of GM to consummate the transactions contemplated by this Agreement, the Securities Purchase Agreement or the Buyer Loan Documents (when executed). GM has received the Consent of the President's Designee with respect to the transactions contemplated by this Agreement.

### 6.3    GM Financing Arrangements.

GM represents to Delphi that it has delivered to Delphi (a) a true, correct and complete signed copy of the Securities Purchase Agreement, including all exhibits and schedules thereto and (b) a true correct and complete copy of the form of Buyer Loan Documents, including all exhibits and schedules thereto, pursuant to which GM has agreed to provide to the Company Buyer on or prior to the Closing Date the equity and debt financing described therein (the "**GM Financing**"). The GM Financing Agreements are subject to no contingencies or conditions other than those set forth in the copies of the GM Financing Agreements delivered to Delphi. As of the date hereof, no event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of GM under the GM Financing Agreements.

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF COMPANY BUYER.

The Company Buyer represents and warrants (and to the extent there is more than one Company Buyer, the Company Buyers jointly and severally represent and warrant to) to the Company Sellers and the GM Buyers, as follows:

### 7.1    Organization.

The Company Buyer represents to the Company Sellers that it is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization. The Company Buyer represents to the Company Sellers that it has the full requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed or admitted to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed: (i) has not had and would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Company Buyer to consummate the transactions contemplated by this Agreement; or (ii) would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Company Buyer.

### 7.2    Authorization; Enforceability.

The Company Buyer represents to the Company Sellers that it has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to the Sellers and perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements by the Company Buyer and the performance by each of them of their respective obligations hereunder and thereunder, have been, and in the case of

the other Company Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Company Buyer and, upon such authorization, no other corporate or shareholder proceedings or actions are necessary to authorize or consummate this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby. The Company Buyer represents to the Company Sellers that this Agreement has been duly executed and delivered by the Company Buyer to the Company Sellers, and the Ancillary Agreements will be duly executed and delivered by the Company Buyer and, assuming due authorization, execution and delivery by Company Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable Company Buyer, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law) and, in addition, the Parnassus Class C Interest, when issued and delivered in accordance with the terms of this Agreement and the Operating Agreement, will be duly authorized, validly issued, fully paid, and non-assessable and free of all preemptive rights, Liens, voting or transfer restrictions and encumbrances, except as specifically set forth in the Operating Agreement or as may be provided under federal or state securities laws.

### 7.3    No Conflicts or Approvals.

The Company Buyer represents to the Company Sellers that the execution, delivery to the Sellers and performance by Company Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the Company Buyer of the transactions contemplated hereby and thereby do not and will not:  (i) violate, conflict with or result in a breach by the Company Buyer of the Organizational Documents of the Company Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by Company Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which the Company Buyer or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to Company Buyer or any of its properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of Company Buyer to consummate the transactions contemplated by this Agreement.

### 7.4    Proceedings.

The Company Buyer represents to the Company Sellers that as of the date hereof, there are no Proceedings pending or, to the Knowledge of Company Buyer, threatened against Company Buyer that could reasonably be expected to restrain, delay or inhibit the ability of Company Buyer to consummate the transactions contemplated by this Agreement. The Company Buyer represents to the Company Sellers that as of the date hereof, Company Buyer is not subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Company Buyer to consummate the transactions contemplated by this Agreement.

**7.5**    <u>Investment Representations.</u>

**7.5.1.**    The Company Buyer represents to the Company Sellers that the Company Buyer is acquiring the Sale Securities for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction. Company Buyer agrees with Sellers that it will not transfer any of the Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**7.5.2.**    The Company Buyer represents to the Company Sellers that Company Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**7.5.3.**    The Company Buyer represents to the Company Sellers that Company Buyer understands that the acquisition of the Company Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk. The Company Buyer represents to the Company Sellers that Company Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**7.5.4.**    Company Buyer further understands and acknowledges to Company Sellers that the Company Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees with Company Sellers that the Company Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, pursuant to an applicable exemption therefrom.

**7.5.5.**    Company Buyer acknowledges to Company Seller that the offer and sale of the Sale Securities has not been accomplished by the publication of any advertisement.

**7.6**    <u>Equity Commitment Letter.</u>

**7.6.1.**    The Company Buyer has provided to Sellers a true, complete and correct copy of the executed Equity Commitment Letter. The execution and delivery of the PE Financing Agreements and the Equity Commitment Letter by the Company Buyer and its affiliated parent(s) party thereto and the performance by each of them of their respective obligations thereunder have been duly authorized by each such party thereto and no other corporate, shareholder, partner or similar proceedings or actions are necessary to authorize or consummate the transactions contemplated by the Equity Commitment Letter. Each of the Equity Commitment Letter and the Securities Purchase Agreement has been duly executed and delivered by the Company Buyer and its Affiliated Parents' Party thereto, is in full force and effect on the date hereof and constitutes (and at the Closing, the Buyer Loan Documents will have been duly executed and delivered by the Company Buyer and its affiliated Parent(s) Party thereto and, assuming due authorization, execution and delivery by GM, will constitute) a valid

58

and binding agreement of such parties, enforceable against each of them in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).  The Equity Commitment Letter and the PE Financing Agreement are subject to no contingencies or conditions other than those set forth in the copies of the execution versions thereof delivered to Delphi, the Securities Purchase Agreement or (if the Buyer Loan Documents were in effect) the Buyer Loan Documents.

    **7.6.2.**  The execution, delivery and performance by the Company Buyer and its affiliated parent(s) party thereto of the Equity Commitment Letter and the PE Financing Agreements to which they are a party:  (i) violate, conflict with or result in a breach by any of the parties thereto of their organizational documents; (ii) violate, conflict with or result in a breach of, or constitute a default by any of the parties thereto (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which such party or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any party thereto or any of its properties or assets; or (iv) require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of such party to consummate the transactions contemplated by the Equity Commitment Letter and the PE Financing Agreements.

    **7.6.3.**  Upon the closing of the transactions contemplated by the Securities Purchase Agreement, the Buyer Loan Documents and the Equity Commitment Letter, Company Buyer (i) will have sufficient funds available to pay the Company Purchase Price, any fees and expenses incurred by Company Buyer in connection with this Agreement and any other amounts necessary under this Agreement and (ii) has not incurred any obligation, commitment, restriction or Liability of any kind that would materially impair or materially adversely affect such resources and capabilities.

  **7.7**  <u>**Adequate Assurance of Future Performance.**</u>

  The Company Buyer represents to the Company Sellers that Company Buyer will be able to provide, at or prior to Closing, adequate assurance of its future performance (or future performance of any applicable subsidiary of Buyer) under each applicable Assumed and Assigned Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract.  Company Buyer acknowledges to Company Seller and agrees with Seller that if it is necessary to provide a contract counter-party with additional assurances to satisfy Company Buyer's obligations to provide adequate assurance in accordance with this <u>Section 7.7</u>, all such costs and expenses or other actions required will be borne and performed by Buyer without recourse to Sellers.

**7.8**     **No Brokers' Fees.**

The Company Buyer represents to the Company Sellers that Company Buyer has not employed any finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

**7.9**     **Anti-Money Laundering.**

The Company Buyer represents to the Company Sellers that Company Buyer is in compliance with:  (i) all applicable provisions of the USA PATRIOT Act as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Company Buyer operates or does business.  Neither any Company Buyer nor any of its directors, officers or affiliates is identified on the SDN List or otherwise the target of an economic sanctions program administered by OFAC, and no Company Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Company Buyer agrees that should it or any Company Buyer, or any of their directors, officers or affiliates be named at any time prior to Closing on the SDN List, or any other similar list maintained by the U.S. Government, will inform Delphi in writing immediately.

**7.10**     **Compliance with Laws.**

The Company Buyer represents to the Company Seller that Company Buyer is in compliance with all Laws applicable to Company Buyer, except with respect to those violations that would not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Company Buyer from consummating the transactions contemplated by this Agreement.

**7.11**     **No Undisclosed Contracts.**

Company Buyer has disclosed and will disclose all written agreements between it and the GM Buyers relating to the subject matter of this Agreement or Delphi.

**ARTICLE 8.**
**INTENTIONALLY OMITTED**

## ARTICLE 9.
## COVENANTS AND AGREEMENTS.

### 9.1    Conduct of Business between Signing and Closing.

**9.1.1.**    Except as: (a) contemplated by this Agreement; (b) disclosed on Schedule 9.1.1 with respect to the Steering Business and in a business plan previously provided to Buyers with respect to the UAW Sites or the Company Business; (c) required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller); or (d) required by or resulting from any changes of applicable Laws, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to reasonably conduct the operations of the GM Business and the Company Business, as applicable, in a manner reasonably intended to preserve the value of the GM Sale Securities, Company Sale Securities, GM Acquired Assets and Company Acquired Assets, as the case may be, taking into account the current state of the auto industry and Delphi's liquidity.

**9.1.2.**    Except (a) as contemplated by this Agreement or as disclosed on Schedule 9.1.1; or (b) as required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to refrain from doing any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned) in each case only to the extent Delphi can comply by acting reasonably to preserve the value of the GM Sale Securities, Company Sale Securities, GM Acquired Assets and Company Acquired Assets taking into account the current state of the auto industry and Delphi's liquidity:

A.    In the case of any applicable Sale Company, acquire assets or commit to capital expenditures (or in the case of any applicable Asset Seller, acquire assets or commit to capital expenditures with respect to assets that would become Acquired Assets) with an aggregate value exceeding $5,000,000, in each case excluding acquisitions of Assets or capital expenditures made in the Ordinary Course of Business in accordance with the applicable Business' budgeted capital expenditures;

B.    Except in each case, for $50,000,000 secured financing facility with respect to Delphi's Mexican operations and €125,000,000 secured financing facility with respect to Delphi's operations in Germany (the proceeds of which financing shall not be used outside of Germany), (i) in the case of any applicable Sale Company, incur, assume or guarantee any Debt Obligations in excess of $1,000,000 or voluntarily purchase, cancel, prepay or otherwise provide for a complete or partial discharge in advance of a scheduled payment date with respect to any material Debt Obligations (in each case, other than intercompany Debt Obligations that are repaid on or before Closing); and (ii) in the case of any applicable Seller with respect to an applicable Business, incur, assume or guarantee any Debt Obligation that would become an applicable Assumed Liability;

61

C.    (i) With respect to any applicable Sale Company, declare or pay dividends from such Sale Company to any Person other than another Sale Company, other than transfers of up to $104 million; (ii) with respect to any applicable Sale Company incorporated or organized in the U.S. enter into any loan agreement or provide any loan to another Sale Company incorporated or organized outside the U.S., or (iii) with respect to any applicable Sale Company incorporated or organized outside the U.S., enter into any loan agreement with or provide any loan to another Sale Company incorporated or organized in the U.S.;

D.    Incur any Encumbrance on any assets of any applicable Sale Company or any applicable Acquired Assets, in each case, other than Permitted Encumbrances or in the Ordinary Course of Business;

E.    Settle or compromise any Proceeding in excess of $2,500,000 with respect to an Assumed Liability;

F.    Hire any individual with a base salary in excess of $200,000 per annum;

G.    With respect to any applicable Sale Company, other than in the Ordinary Course of Business, make any material election relating to Taxes (except such that are consistent with past practice) or settle or compromise any material Tax liability or amend any material Tax return;

H.    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; or (ii) made in conformance with GAAP);

I.    Enter into any partnership or joint venture agreement between any applicable Sale Company and any other Person or modify any organizational agreement with respect to an applicable JV Company in a manner which is materially adverse to a GM Buyer or Company Buyer as the case may be;

J.    Enter into, terminate or make any material amendment to a Material Contract other than in the Ordinary Course of Business;

K.    Amend any Organizational Document of any applicable Sale Company or applicable JV Company unless required under applicable law;

L.    Make any material change in its methods of management, marketing, accounting or operating or practices relating to payments;

M.    Fail to maintain insurance in a manner consistent with the applicable Seller's past practice;

N.    Accelerate the collection of Accounts Receivable in any Sale Company incorporated or organized in the U.S. in a manner not consistent with the Ordinary Course of Business;

62

O.    Pay trade payables more slowly than has been the Ordinary Course of Business;

P.    Take or permit to be taken any action outside the Ordinary Course of Business which results in a material increase in deferred revenue obligations;  or

Q.    Agree or commit to do any of the foregoing.

**9.1.3.**    Except (a) as contemplated by this Agreement or as disclosed on Schedule 9.1.1; or (b) as required by Final Order of the Bankruptcy Court (pursuant to a motion, application or other request made by or on behalf of a Person other than any Seller or any Affiliates of any Seller), from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and the Sale Companies to refrain from doing any of the following with respect to the GM Business or the Company Business without the prior written consent of the applicable Buyers (which consent will not be unreasonably withheld or delayed, or conditioned):

A.    Split, combine or reclassify any capital stock or other equity interests or purchase or sell any capital stock or other equity interests of any Sale Company or JV Company or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests;

B.    Sell or otherwise dispose of any applicable Acquired Assets and assets of any applicable Sale Company having an aggregate value exceeding $1,000,000, excluding sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case other than in the Ordinary Course of Business and the Pending Transactions;

C.    Merge or consolidate any applicable Sale Company or JV Company with or into any other Person or enter into any agreement requiring any such merger or consolidation;

D.    Increase the cash compensation or grant the right to receive any severance, termination or retention pay of the Transferred Employees other than:  (i) in the Ordinary Course of Business; or (ii) as required by any agreement in effect as of the date hereof or as required by Law; or

E.    Except as required by Law, enter into or amend any applicable Seller Employee Benefit Plan, the consequence of which would be to materially increase any Liability to be assumed by applicable Buyers.

### 9.2    Bankruptcy Actions.

**9.2.1.**    On or before June 1, 2009, Delphi will, and will cause the other Sellers that are Filing Affiliates to file this Agreement as an exhibit to its modified Plan of Reorganization and seek approval for, among other things, the Filing Affiliates to enter into and perform their obligations under this Agreement and the Ancillary Agreements in connection with

the resolicitation of votes on the modified Plan of Reorganization, and to seek alternative relief in such motion under section 363 of the Bankruptcy Code to enter into and perform their obligations under the Agreement and the Ancillary Agreements independently of and not pursuant to, or contingent on, any Plan of Reorganization (the "**Plan Modification Motion**") and any order entered by the Bankruptcy Court granting relief under the Plan Modification Motion pursuant to either section 363 or section 1127 of the Bankruptcy Code shall be referred to herein as the "**Plan Modification Order**").

        **9.2.2.**    Delphi shall obtain a hearing date for the Plan Modification Motion, which date shall be no later than July 23, 2009 (the "**Hearing Date**"), and such scheduling order shall affirmatively state that the Court will conduct on the Hearing Date an asset sale hearing under section 363 of the Bankruptcy Code if the Bankruptcy Court does not otherwise conduct a plan modification hearing and approve such modifications under section 1127 of the Bankruptcy Code on the Hearing Date.  The scheduling order shall also include dates that are reasonably acceptable to the Buyers for the filing of the agreement discussed below in Section 9.2.3 (the "**Section 363 Implementation Agreement**") (which shall be filed on the exhibit filing deadline for the Modified Plan), the deadline for any objections to be filed in opposition to the section 363 sale and/or the Section 363 Implementation Agreement (which shall be the same day as objections to the proposed modifications to the Confirmed Plan shall be due), and the deadline for filing a proposed form of section 363 sale order (which shall be the same day as proposed revisions to the Plan Modification order shall be due).

        **9.2.3.**    Delphi and Buyers agree that the transaction pursuant to section 363 of the Bankruptcy Code will be on terms which result in (a) Buyers purchasing the same assets, and assuming the same liabilities, as provided in Article 2 hereof, and (b) Delphi receiving the same consideration, including the financial support for Delphi estates' wind-down requirements, as provided in Article 3 hereof; provided, however, that the amounts payable under Section 3.2.3 of this Agreement shall not be included in the consideration paid under the section 363 sale transaction.  Delphi and Buyers acknowledge and recognize that certain amendments to this Agreement and the Ancillary Agreements will be required to implement the agreement in this Section 9.2.3 and agree that they will negotiate and enter into the Section 363 Implementation Agreement to document such amendments and implementation understandings as are required to give effect hereto.

        **9.3**        **Assumed Contracts; Cure Amounts.**

     As part of the Plan of Reorganization Documents, Delphi will move to assume and assign to the applicable Buyers the Pre-Petition Contracts listed on Schedule 9.3 and assign the Post-Petition Contracts to the applicable Buyer (collectively, the "**Assumed and Assigned Contracts**") and will provide notice thereof to the Contract counterparties and all other parties in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. With respect to contracts assumed by such Buyer, each Buyer shall pay all Cure Amounts as have already been established: (i) through prior orders of the Bankruptcy Court that were entered in 2008 in connection with the Sale to Steering Solutions Corporation that was terminated on March 3, 2009; (ii) pursuant to the procedures established by the Bankruptcy Court in connection with Delphi's Plan of Reorganization that was confirmed by the Bankruptcy Court in January 2008, as such plan may be amended from time to time; or (iii) as otherwise agreed to by such

Buyer, Delphi, and the Contract counter-party or, absent an already established amount or such agreement, by order of the Bankruptcy Court in the time and manner specified by the Plan Modification Order; provided, however, within five days after entry of a final, non-appealable order of the Bankruptcy Court establishing a Cure Amount for which the applicable Buyer is responsible or adequate assurance on terms not reasonably acceptable to the relevant Buyer, such Buyer may direct Delphi to, and Delphi shall, reject such Assumed and Assigned Contract. Such motion or subsequent notice shall identify the specific Cure Amount established (or otherwise agreed) for each Pre-Petition Contract and state that such Cure Amount shall be the only cure required to assume such Contract pursuant to Section 365 of the Bankruptcy Code and/or assign it to such Buyer and that such counter-party shall be barred and enjoined from asserting against any Buyer, the Acquired Assets and Sellers that any additional prepetition defaults, breaches, or claims of pecuniary loss exists with respect to such Contract. The applicable Buyer shall have the ability to add or delete Contracts to, or from, Schedule 9.3 up and through the time of the Final Plan Modification Hearing in its sole and absolute discretion so long as the appropriate notice is provided to the Contract counter-party and any delay in approval of the assignability of and Cure Amount for such additional Contracts shall not affect the Closing. With respect to any Assumed and Assigned Contracts that are "shared" and relate to the business, assets or entity acquired hereunder by more than one Buyer, then the applicable Buyers will agree that one of the Buyers will become the assignee of the shared Assumed and Assigned Contract and will also agree to an equitable allocation of Cure Amounts between them; however, if one Buyer elects not to pay its share pursuant to this sentence, then the other Buyer can pay the entire Cure Amount and will have no liability or other obligation with respect to the Assumed and Assigned Contracts to the Buyer refusing to so pay, notwithstanding anything to the contrary in this Agreement. In the Plan of Reorganization Documents, Delphi shall provide for a mechanism reasonably satisfactory to the applicable Buyer to ensure that those Contracts to be assumed and assigned to such Buyer at Closing are actually assigned to such Buyer at Closing notwithstanding any contested Cure Amounts; provided that the applicable Buyer shall establish an escrow account funded with cash sufficient to pay the face amount of the disputed Cure Amounts asserted, the excess funds of which shall be returned to such Buyer as Cure Amounts are resolved.

### 9.4    Tax Matters; Cooperation; Preparation of Returns; Tax Elections.

**9.4.1.**    Asset Sellers will be responsible for the preparation and filing of all Tax Returns of Asset Sellers for all tax periods ending on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Buyers will make available to Asset Sellers during normal business hours (and to Asset Sellers' accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by the Asset Sellers to prepare these Tax Returns. Asset Sellers will be responsible for and will make all payments required with respect to any such Tax Returns.

**9.4.2.**    For Sale Companies and JV Companies, Seller will be responsible for the preparation and filing of all Tax Returns for all tax periods that are due on or prior to the Closing, including without limitation amended returns, applications for loss carryback refunds and applications for estimated tax refunds.

**9.4.3.**     For Sale Companies and JV Companies, Buyers will be responsible for the preparation and filing of all Tax Returns for all periods that are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and combined Tax Returns of Delphi will include the operations of the Business), including any IRS Forms 5471, 8858 and 8865 relating to the Sale Companies and the JV Companies transferred, directly or indirectly, in the transactions contemplated by this Agreement (the "**Information Tax Returns**") (which IRS Forms 5471, 8858 and 8865 Delphi will also be required to file under applicable Law). Buyers shall provide to Sellers a copy of any Information Tax Returns at least sixty (60) days prior to their due date which shall be extended. For the avoidance of doubt, Buyers shall indemnify, defend and hold harmless the Sellers and their Affiliates for any and all Losses which are imposed on, sustained, incurred or suffered by or against the Sellers or their Affiliates resulting from any failure to timely file the Information Tax Returns.

**9.4.4.**     Sellers shall be responsible for the customs filings for goods released from the border prior to Closing and Buyers shall be responsible for the customs filings for goods in-transit as of and after the Closing.

**9.4.5.**     The Sellers and the Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers and deliveries to be made to the Buyers hereunder from, or minimize, any transfer, documentary, sales, use, registration, recording, stamp, value-added and other such taxes (including all applicable real estate transfer taxes) and related fees (including notarial fees as well as any penalties, interest and additions to tax), together with any foreign income Taxes attributable to any gain realized by any Seller (but excludes any U.S. Income Taxes) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Plan Modification Order, in accordance with Section 1146 of the Bankruptcy Code. If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the Acquired Assets to the Buyers will contain the following or similar endorsement; provided that in no case will the Sellers be liable for such Transfer Taxes or the Tax due on Tax Returns related thereto:

> Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146.

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Plan Modification Order, such Transfer Taxes and costs arising out of or incurred in connection with this Agreement will be borne solely by the relevant Buyer. The party that is legally required to file a Tax Return relating to Transfer Taxes shall be responsible for preparing and timely filing the Tax Returns relating to such Transfer Taxes. In the event VAT (or GST) is levied on an asset transfer, Seller must provide the relevant Buyer with a VAT (or GST) compliant invoice and assist in the recovery of the VAT (or GST), if possible.

**9.4.6.**     Delphi and Buyer will cooperate in connection with: (i) the preparation and filing of any Tax Return (including any Information Tax Returns), Tax election, Tax consent or certification or any claim for a Tax refund including any duty drawback claims; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in

66

respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes direct access to accounting and finance personnel.

**9.4.7.** Sellers will, in their sole discretion, cooperate in good faith with Buyers and Buyers' agents to minimize any U.S. federal and state payroll tax liabilities that either party may bear, including that the payroll taxes of the U.S. Transferred Employees will be treated in accordance with the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53, to which treatment Buyers hereby consent.

**9.4.8.** Sellers will provide Buyers with such certifications as are necessary to exempt all payments made hereunder from withholding under Internal Revenue Code Section 1445.

**9.4.9.** Sellers will assign to the applicable Buyers, and will cooperate with the applicable Buyers to obtain any necessary approvals or consents to effect such assignment, any and all interests in, or rights to, any property tax abatements, incentive agreements, or other similar arrangements with any Taxing Authority primarily related to the Business or the Acquired Assets to the extent allowed under applicable Law. If, after the transfer occurs, a repayment of all or a portion of any such property tax abatement, incentive agreements, or other similar arrangements with any Taxing Authority is required because of any action taken by a Buyer or such Buyer's Affiliates (other than any actions contemplated by this Agreement), then such Buyer will be responsible for such repayment.

**9.4.10.** Sellers will provide Buyers with all information and documentation reasonably available and requested, to permit Buyers to apply for and receive a Research and Experimentation tax credit under Code Section 41 with respect to the Business, including gross receipts and qualified research expenses for the 1984-1988 base period, plus the amount of gross receipts for the immediately preceding four years.

**9.4.11.** Neither Buyers nor any Affiliate of Buyers shall take any action which could increase any of the Sellers' liability for Taxes. Neither Buyers nor any of their Affiliates shall make any election under Section 338(g) of the Code (or any analogous provision of state, local or non-United States Tax Law) with respect to the purchase of the Sale Securities pursuant to this Agreement without the prior written consent of Delphi, which consent may not be unreasonably conditioned, delayed or withheld.

**9.4.12.** Liabilities for Taxes related to the debonding or other change in customs status of the Acquired Assets resulting from Buyers not establishing the required legal entities and obtaining the necessary authorizations from the relevant Governmental Authority to receive the Acquired Assets in their customs status shall be borne by the Buyers. Sellers and Buyers agree to cooperate in good faith to obtain such authorizations.

**9.5**     **Employees; Benefit Plans; Labor Matters.**

**9.5.1.**     Transferred Non-U.S. Employees. Effective as of the Closing, the relevant Buyer will assume the existing employment Contracts of all Non-U.S. Employees (including entering into replacement, or novation of, existing employment Contract, their terms, or substitution of employer, where applicable) if and to the extent required by applicable

67

Transfer Regulations or the applicable Transfer Agreement, and will take all necessary steps to assume the employment Contracts of all employees employed the Sale Companies immediately prior to Closing if and to the extent that their employment is governed by any Transfer Regulation.

      **9.5.2.**    <u>Transfer of U.S. Salaried Employees</u>.  Effective as of the Closing, the relevant Buyer will offer employment to the U.S. Salaried Employees of the relevant Business whom the respective Buyer elects to employ in its sole discretion.  U.S. Salaried Employees who accept Buyers' offer of employment (by reporting to work or otherwise) are referred to herein as ("**Transferred U.S. Salaried Employees**").

          A.    For all Transferred U.S. Salaried Employees, the relevant Buyer's offer of employment will be on terms established in Buyer's sole discretion.  The applicable Buyers shall use reasonable efforts to tender such offers to employees no later than ten (10) days prior to Closing.

          B.    Subject to applicable Law, Transferred U.S. Salaried Employees will be regarded as newly hired regular employees of the relevant Buyer at a level/classification determined by Buyers, except that Buyers will recognize length of service with Sellers and Buyer with respect to participation in any Buyer severance program, and for vacation eligibility, and with respect to Company Buyer, participation in any Company Buyer Non-Qualified Retirement Program.

          C.    Buyers will waive application of any new-hire waiting period with respect to Transferred U.S. Salaried Employee participation in and eligibility for benefits under any applicable Buyer Employee Benefit Plan for salaried employees.

          D.    Buyers reserve the right to amend, modify, suspend or terminate all terms and conditions of employment, including all benefit plans and programs at Buyers' discretion.

          E.    The relevant Buyers will assume all salaried Seller U.S. CBAs applicable at the Rochester and Lockport sites.

          F.    The GM Buyers shall have the right to hire any U.S. Salaried Employees currently employed at any facility of GM or its Affiliates or any of the technical centers included within the definition of the UAW Sites.

      **9.5.3.**    <u>Transfer of U.S. Hourly Employees</u>.  Effective as of the Closing, the relevant Buyers will employ all active and inactive U.S. Hourly Employees (e.g., currently on the rolls, whether on temporary layoff, indefinite layoff, workers' compensation, disability, or other leaves of absence), including without limitation pre-retirement program participants ("**PRPs**")) of the relevant Business. U.S. Hourly Employees who accept Buyers' offer of employment (by reporting to work or otherwise) are referred to herein as "**Transferred U.S. Hourly Employees**".

          A.    The relevant Buyers will assume the terms and conditions of all applicable Seller U.S. CBAs in effect at the relevant Business.  Assumption of the terms

and conditions of applicable Seller U.S. CBAs pursuant to this <u>Section 9.5.3A</u> shall not constitute assumption of Sellers's pre-Closing Liabilities under Seller U.S. CBAs (including, without limitation, any Liabilities related to the Retained Plans which shall be retained by Sellers);   provided however, that nothing in <u>Section 9.5.3A</u> shall be deemed to impair, nullify or cancel the relevant Buyer's assumption of liabilities elsewhere in this Agreement, if any.

> B.    Buyers will recognize the seniority status of all Transferred U.S. Hourly Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyers.

> C.    Buyers will waive application of any new-hire waiting period with respect to participation in any applicable Buyer Employee Benefit Plan for U.S. Hourly Employees.

**9.5.4.**    <u>Employee Benefit Plans</u>.

> A.    From and after the Closing (i)  each Sale Company will continue to be responsible for all accrued pension liabilities and assets for all of its Transferred Non-U.S. Employees and all current employees, and (ii)  in the case of Delphi Electronics Overseas Corporation ("**DEOC**"), the entity specified by Company Buyer (in its sole discretion) to be the purchaser of the DEOC assets, will assume all accrued pension liabilities and assets for all of DEOC's Transferred Non-U.S. Employees and all current employees.   The Parties will comply with the specific mechanism for transfer of applicable pension liabilities and assets of Non-U.S. Transferred Employees as specifically set out in the relevant Transfer Agreement (the form and substance of which shall be reasonably acceptable to each of the Parties).

> B.    Subject to the applicable Buyer's assumption of the Seller U.S. CBAs pursuant to <u>Section 9.5.3</u>, nothing contained in this Agreement requires Buyers to establish an employee benefit pension plan with respect to any Transferred U.S. Employees.

> C.    Where  required by law, the relevant Buyer must continue to provide employee benefit plans to Transferred Employees or former employees of Sellers.   The Company Buyer will administer for Buyers, employee benefit plans applicable to Transferred Employees or former employees of Sellers in accordance with the terms of the Transition Services Agreement.

> D.    Transferred U.S. Employees' and their dependents' and beneficiaries' active participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) will cease at Closing.

> E.    The parties will explore plan sponsorship alternatives including GM Buyer and Company Buyer assumption if deemed to be in the best interests of the plan participants and beneficiaries.   As of the Closing Date, the GM Buyer will assume sponsorship of the following Seller tax qualified defined contribution plans: Seller's Delphi Salaried Retirement Savings Program (formerly the Delphi Saving-Stock

Purchase Program), the Delphi Personal Savings Plan for Hourly-Rate Employees, and the Delphi Income Security Plan for Hourly-Rate Employees if deemed to be in the best interests of the plan participants and beneficiaries. As of the Closing Date, the Company Buyer will assume sponsorship of the following Seller tax qualified defined contribution plans if deemed to be in the best interests of plan participants and beneficiaries: the Packard Hughes Interconnect Retirement Savings Plan, the Delphi Diesel 401(k) plan, and the Delphi Medical 401(k) Savings Plan.

      **9.5.5.**   <u>COBRA</u>.  Sellers will retain all obligations relating to compliance with the continuation health care coverage requirements of Section 4980B and Sections 601 through 608 of ERISA regarding qualifying events in regard to Transferred U.S. Employees arising from or prior to the transactions contemplated under this Agreement.

      **9.5.6.**   <u>WARN Act</u>.  The relevant Buyers will assume all WARN Act Liabilities, if any, arising at the relevant Business from any employment loss or layoff of U.S. Salaried Employees, U.S. Hourly Employees, and/or U.S. Transferred Employees occurring on or after the Closing Date.  On or before the Closing Date, Sellers shall provide Buyers with a list of employee layoffs, by location, implemented by Sellers in the ninety (90) day period preceding the Closing Date.  Sellers will retain all WARN Act obligations and liabilities relating to layoff of U.S. Salaried Employees, U.S. Hourly Employees, and/or Transferred Asset Seller Employees by Sellers on or prior to the Closing Date.

      **9.5.7.**   <u>Grievances</u>.  The relevant Buyers will assume responsibility to administer all labor grievances and arbitration proceedings  based on events occurring after the Closing Date.

      **9.5.8.**   <u>Cooperation</u>.  Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this <u>Section 9.5</u>.

      **9.5.9.**   <u>Union and Works Council Notifications</u>.  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

      **9.5.10.**   <u>No Third Party Rights</u>.  Nothing in this <u>Section 9.5</u> and its subparts, express or implied, shall create a third party beneficiary relationship or otherwise confer any benefit, entitlement, or right upon any person or entity other than the parties hereto or serve to amend or create any employee benefit plan or arrangement.

      **9.5.11.**   <u>Severance</u>.

        A.   With respect to any former U.S. Salaried Employees of any Seller whose employment has been terminated prior to the date hereof and are or may be entitled to severance or termination payments or similar benefits, Sellers shall use their commercially reasonable efforts to cause any obligation to pay such severance or

termination payments to cease as of the Closing, and neither Company Buyer nor GM Buyers shall have any Liability relating to any such payments or benefits.

        B.     With respect to (i) any U.S. Salaried Employees of any Seller whose employment is terminated on or after the date hereof but at or before Closing or (ii) any U.S. Salaried Employees working at Automotive Holdings Group or Athens as of the Closing and whose employment is terminated after the Closing, each of Company Buyer and GM Buyer shall make the following payments on and after the Closing:

        (i)     at the Closing, Company Buyer shall pay to GM Buyer an amount equal to 50% of the amount of any cash payments made by Delphi on or after the date hereof and prior to Closing; and

        (ii)     from and after the Closing, each of Company Buyer and GM Buyer agree to pay Delphi 50% of the amount of any cash payments made by a Seller to any such terminated U.S. Employees but in no event more than would be payable under the Delphi severance program in effect as of May 1, 2009;

provided that the aggregate amount of any payments made by each of GM Buyer or Company Buyers pursuant to this Section 9.5.11 shall not exceed $12,500,000 (which in the case of GM Buyer shall include an amount payable by Company Buyer pursuant to clause (i) above).

### 9.6    Pre-Closing Cooperation; Contact with Customers and Suppliers.

For purposes of Buyers' transition efforts, each applicable Seller shall provide the applicable Buyers or their representatives upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of any Seller or Sale Company, reasonable access during normal business hours to the employees, facilities, books and records of the Business. Each applicable Seller will cooperate, and cause their employees to cooperate, with the applicable Buyer's efforts to transition the ownership and operation of the applicable Business. Each Buyer may meet with the applicable suppliers, customers, and service providers of and to the applicable Business in order to discuss transitional matters and post closing business arrangements and to take actions necessary such that such Buyer may begin operating the applicable Business immediately upon Closing.

### 9.7    Technical Documentation; Trade Secrets.

Each Seller has delivered, or will deliver on or before the Closing Date, to the applicable Buyer, a copy of all Technical Documentation (including, but not limited to, documented Know-How and Trade Secrets) included in the Acquired Assets and Other Technical Documentation being acquired by such Buyer.

### 9.8    Corporate Names.

    **9.8.1.**    The GM Buyers will have the right (including the right to authorize their relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the GM Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi after the Closing

Date in a manner consistent with past practice of the Business and the name and reputation associated therewith.

**9.8.2.**    The GM Buyers will promptly, and in any event within one (1) year of the Closing Date, cease all use and cause the GM Sale Companies to cease all trademark and trade name use of the name "Delphi" and any trademarks, trade names, brand names or logos relating thereto as used by GM Sellers or the GM Sale Companies as of the Closing Date (including on any signs, billboards, advertising materials, telephone listings, labels, stationery, office forms, packaging or other materials of the GM Sale Companies) in connection with the businesses of the GM Sale Companies or otherwise.  Notwithstanding the foregoing, the GM Buyers and the GM Sale Companies shall not be required to repackage existing finished goods and any existing inventories or service materials of the GM Business in existence at the Closing and may use up or sell off the same in the Ordinary Course of Business.

**9.8.3.**    Promptly following the Closing, the GM Buyers will cause each of the Sale Companies, and will use commercially reasonable efforts to cause each JV Company, to amend its certificate of incorporation, partnership agreement, limited liability company agreement and other applicable documents, in order to change the names of such companies to a name not containing the word "Delphi", with such changes to take effect pursuant to the terms of the respective transfer deed governing the sale of each GM Sale Company and applicable JV Company.  The GM Buyers will make all required filings with Governmental Authorities to effect such amendments.  If any preceding change is not permissible by law or commercially reasonable within one (1) year of the Closing Date, the GM Sale Companies or applicable JV Company shall operate under a "d/b/a" or other similar business name.

**9.8.4.**    If the Company Buyer believes that the GM Buyers have breached or failed to perform in any material respect any of the GM Buyer's obligations contained in Sections 9.8.2 and 9.8.3, the Company Buyer shall provide the GM Buyer with written notice of the alleged breach.

**9.8.5.**    Nothing herein shall prevent or limit the rights of the GM Buyers to use the name "Saginaw Steering" or the like.

**9.9**    **Information Technology; Intellectual Property Rights and Licenses.**

**9.9.1.**    Steering Licenses. Each Seller and Company Buyer, hereby grants, on behalf of itself and its Affiliates, to GM Buyers, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to GM Buyers' Affiliates, successors, assigns and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Steering Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.1 ("**GM IP License Agreement**").  Further, each of Seller and Company Buyer, on behalf of itself and its Affiliates, hereby grants to GM Buyers, as of the Closing Date with respect to the Steering Business, a sublicense to the extent permitted by and

subject to the terms and conditions of Seller's existing agreements (including any such agreements acquired hereunder by Company Buyer's) to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the GM IP License Agreement. The licenses and sublicenses granted to GM Buyers under this <u>Section 9.9.1</u> do not extend to the Steering Excluded Products identified on <u>Schedule 9.9.1.B</u>. Further, the license and sublicense granted pursuant to the GM IP License Agreement and this <u>Section 9.9.1</u> are not assignable in whole or in part except to a purchaser of all or substantially all of the Steering Business to which the license pertains.

     **9.9.2.**   <u>UAW Site Licenses</u>. Each Seller hereby grants, on behalf of itself and its Affiliates, as of the Closing Date, to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to:

     A.   make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, necessary to service contracts with existing non-GM customers include with the Acquired Assets; and

     B.   to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute UAW Site Products and any derivatives and/or re-use/extension thereof, for GM Buyer's (and GM Buyer's affiliates') original equipment (OE) and original equipment–sales (OE-S) distribution channels for vehicles and vehicle parts and aftermarket requirements of GM Buyer's products produced by the Business.

     Any system developed by or with GM shall be considered a GM OE system under this license.

     **9.9.3.**   <u>Company Licenses</u>. Seller hereby grants, on behalf of itself and its Affiliates, to Company Buyer, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on <u>Schedule 9.9.1.A</u>) with the right to sublicense to Company Buyer Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by the Company Business prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of <u>Exhibit 9.9.3</u> ("**Company IP License Agreement**"). Further, Seller, on behalf of itself and its Affiliates, hereby grants to Company Buyer, as of the Closing Date with respect to the Company Business, a sublicense to the extent permitted by and subject to the terms and conditions of Seller's existing agreements, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Company IP License Agreement. The licenses and sublicenses granted to Company Buyer under this <u>Section 9.9.3</u> do not extend to the Steering

Excluded Products identified on Schedule 9.9.1.B.  Further, the license and sublicense granted pursuant to the Company IP License Agreement and this Section 9.9.3 are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

      **9.9.4.**     Pending Transaction Licenses. Company Buyer hereby grants, on behalf of itself and its Affiliates, to Seller, as of the Closing Date, a worldwide, perpetual, fully paid-up, irrevocable, royalty free, non-exclusive license to the Shared Intellectual Property (other than the Excepted Shared Intellectual Property identified on Schedule 9.9.1.A) with the right to sublicense to Seller Affiliates, successors, assigns, customers and/or designated suppliers, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and future products and services of the type provided by Seller in connection with the business of a Pending Transaction prior to the Closing Date and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, pursuant to the License Agreement in the form of Exhibit 9.9.4 ("**Pending Transactions IP License Agreement**").  Further, Company Buyer, on behalf of itself and its Affiliates, hereby grants to Seller, as of the Closing Date with respect to the business of a Pending Transaction, a sublicense to the extent permitted by and subject to the terms and conditions of any existing agreements included within the Acquired Assets, to develop, manufacture (including the right to have made), use, import, export, offer to sell and sell products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith pursuant to the Pending Transactions IP License Agreement.  The licenses and sublicenses granted to Seller under this Section 9.9.4 do not extend to the Steering Excluded Products identified on Schedule 9.9.1.B.  Further, the license and sublicense granted pursuant to the Pending Transactions IP License Agreement and this Section 9.9.4 are not assignable in whole or in part except to a purchaser of all or substantially all of the business to which the respective license(s) relate.

      A.    In the event that a Pending Transaction fails to be completed and is terminated, and subject to any rights granted under any existing court approved contract with any Seller, each of Seller and Company Buyer agrees to make Intellectual Property owned by Sellers and Sellers' affiliates used in the business subject to the failed Pending Transaction available for sale or paid-up license to any purchaser of the assets subject to the failed Pending Transaction.

      B.    In the event that a Pending Transaction fails to be completed and is terminated and Seller decides that it will not seek a new purchaser of the assets subject to such Pending Transactions, subject to any rights granted under any existing court approved contract with any Seller, and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' Affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products sold to GM Buyers by the business subject to the failed Pending Transaction.

C.    In the event that, in connection with the operation of the business of a Pending Transaction, there is a breach of a current supply commitment to GM or any of its Affiliates under circumstances where such breach threatens to interrupt supply to GM or any GM Affiliate, then, subject to any Seller obligations under any existing court approved contract with any Seller and contingent upon closing of this Agreement, each Seller grants, on behalf of itself and its Affiliates to GM Buyers, with the right to sublicense to Affiliates and/or designated suppliers, a perpetual, fully paid up, worldwide, non-exclusive irrevocable license under Intellectual Property owned by Sellers and Sellers' affiliates to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute products subject to the threatened interruption of supply. The rights set forth in this paragraph shall lapse if a Pending Transaction is consummated according to an existing court approved agreement related to the Pending Transaction or a party that is or becomes an approved supplier of GM acquires the business of the Pending Transaction.

**9.9.5.**    Licenses Generally.

(i)    Each Party shall make all Shared Intellectual Property available to each other Party and to the Seller by delivering to such other Party all Other Technical Documentation and other technical information in its possession reasonably necessary to continue the other Party's Business or of a Pending Transaction.

(ii)    Each Party may assign or otherwise transfer this license and its rights or obligations under this license to any affiliated or successor company or to any purchaser of a substantial part of such Party's business to which this license relates. In addition, each Party may sublicense or otherwise delegate, in whole or in part, this license and its rights or obligations to any such affiliate, successor or purchaser.

(iii)    This license is binding upon successors, heirs and assigns of the Sellers and Buyers and any and all future owners of the Shared Intellectual Property.

(iv)    This Agreement governs over any inconsistent or otherwise different terms contained in the IP License Agreements.

**9.9.6.**    Further Understandings.  It is further understood and agreed that the licenses granted above in this Section 9.9 do not include any right to use any Trademark Rights.

**9.9.7.**    Shared Intellectual Property.  Each of the Sellers, GM Buyer and Company Buyer agree that it will not transfer or assign its rights to the Shared Intellectual Property to any third party unless such third party:  (i) is informed of and agrees to accept such transfer or assignment subject to the license granted herein; and (ii) agrees that any subsequent transfer or assignment will be subject to a similar restriction on future transfers and assignments.

**9.9.8.**    Shared Licensed Intellectual Property.  Sellers and the applicable Buyers, as the case may be, extend and hereby grant to each other Party its rights under the

Shared Licensed Intellectual Property to the extent that such licenses can be extended to such other Parties, including a right to other Parties to sublicense to any entity that is a successor or assignee of any portion of the Business or the business of a Pending Transaction operated by such other Parties.

**9.9.9.** <u>Transfer of Shared Software Licenses</u>. For those Shared Software Licenses of the Steering Business set forth on <u>Schedule 9.9.9</u>, Sellers and the applicable GM Buyers and Company Buyer shall transfer to the applicable GM Buyers the number of license seats or other license rights specified for each applicable license. The Parties will cooperate to develop a similar list for the UAW Sites. Sellers shall be responsible for any obligations under any Shared Software Licenses or Software licenses primarily used in the Business that are due and payable prior to the Closing Date, for maintenance payments, license fees and any other fees due to applicable third party licensors of the Shared Software Licenses or Software licenses. Buyers acknowledge that they shall be responsible for all license transfer fees and the costs of obtaining and making payments under any post-Closing maintenance agreements required in order to use the foregoing license rights.

**9.9.10.** <u>Separation Activities</u>. Buyers will be solely responsible for their respective and their allocable share of Sellers' costs, of all separation, relocation, start-up costs and other related activities related to the separation of the GM Business (the "**Separation & Relocation Activities**"), including: (i) all Day 1 and Day 2 separation activities, including any activities performed by Delphi personnel or its informational technology suppliers; (ii) modification of the Buyers payroll system in preparation for Day 1 and transitional services; (iii) segregation of the manufacturing facilities and technical centers to be co-located following Closing; (iv) relocation from any technical center or sales offices as identified in the Facilities Separation & Relocation Plan; and (v) any setup fees required by third party service providers. Buyers acknowledge and agree that it is necessary to promptly begin the Separation & Relocation Activities and that the execution of the foregoing Separation & Relocation Activities are their sole responsibility. The parties shall reasonably cooperate with each other to implement such activities, separations and relocations in an effort to complete the activities contemplated by this <u>Section 9.9.10</u> in a reasonable, expeditious and cost-effective manner which in the case of the Steering Business shall be in accordance with the facilities separation and relocation plan set forth in <u>Schedule 9.9.10</u> relating to the Steering Business (the "**Facilities Separation & Relocation Plan**"). Other than the costs to be borne by the Buyers with respect to Separation & Relocation Activities, as described above, no Buyer will have any further obligation to provide information technology services, or to pay costs with respect thereto, except as may be provided in the applicable Transition Services Agreements to be entered into by the Buyers (as contemplated by this Agreement). Following completion of the Separation & Relocation Activities, the Buyers will have no further obligation with respect to IT services or related costs except as set forth in the Transition Services Agreement.

**9.9.11.** <u>Assignments</u>. Sellers shall assist Buyers in obtaining assignments from predecessors in interest to the Purchased Intellectual Property, or in obtaining other recordable instruments to reflect the applicable Buyers' ownership of the Purchased Intellectual Property.

**9.9.12.** <u>Outsourced Service Providers</u>. Sellers, without having to incur additional costs, shall cooperate with GM with respect to GM entering into new agreements with

Sellers' outsourced service providers and software license providers, including Electronic Data Systems Corporation, EDS Information Systems, LLC and its affiliates (collectively, "**EDS**"), Computer Sciences Corporation and its affiliates (collectively, "**CSC**"), and the Hewlett Packard Company and its affiliates (collectively, "**HP**"); provided that there is no material out-of-pocket cost or other material adverse financial impact to Sellers or their Affiliates.

### 9.10    **Shared Items Transferred to Buyers.**

With respect to any contracts with goods or services included in the Acquired Assets and that are used by both the GM Business and Company Business, including with respect to the Steering Business contracts that are set forth on Schedule 9.10, and that will be transferred to one of the Buyers at Closing, the applicable Buyers will provide the other applicable Buyer with the benefits of such contracts in substantially the same manner described in Section 2.5 above regarding Deferred Items, and other applicable Buyer who does not receive such contract will reimburse the Buyer who did receive such contract for such benefits in substantially the manner described in Section 2.5, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Buyer and the other party or parties to such contract or contracts, or until the termination of such contract or contracts.

### 9.11    **Buyer Guarantee.**

**9.11.1.**    GM guarantees the full and timely performance of all of GM Buyer's obligations hereunder arising prior to or at the Closing; provided that GM shall have no Liability or responsibility for any obligations of any GM Buyer arising after the Closing.  This is a guarantee of payment and performance and not of collection.

**9.11.2.**    Company Buyer has delivered to Sellers an equity commitment letter, dated the date hereof, and the affiliated parent(s) of Company Buyer's obligations shall be limited to those set forth in such equity commitment letter.

### 9.12    **Letters of Credit.**

Each applicable Buyer agrees to use its commercially reasonable efforts to cause Delphi and its Affiliates to be absolutely and unconditionally relieved by no later than 360 days following the Closing of all Liabilities and obligations arising out of the letters of credit, performance bonds and other similar items issued and outstanding in connection with the Business, to the extent set forth on Schedule 9.12 hereof or to the extent Delphi or its Affiliates later inform the applicable Buyer of such an item, and the applicable Buyers will indemnify Delphi and its Affiliates against any Losses of any kind whatsoever with respect to such Liabilities and obligations.

### 9.13    **Competition Clearance.**

**9.13.1.**    Subject to the terms hereof, Buyers and Sellers agree to cooperate and to use commercially reasonable efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required for the Closing under the HSR Act, EC Merger Regulation and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action thereunder, and

to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement. The Parties will use commercially reasonable efforts to complete Schedule 9.13.1, no later than three (3) Business Days after the date hereof which will include a list of all countries in which competition filings may be required or are appropriate. In this respect, each applicable Buyer will make (or continue to prosecute, if made previously) all the competition filings set forth in Schedule 9.13.1 promptly, but in no event later than thirty (30) days after the date hereof, and such Buyers will: (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any response prepared by such Buyer prior to Buyers' submitting such response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval. Notwithstanding the foregoing, the Parties agree that none of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect (including on the ability of a Party to consummate the transactions contemplated by this Agreement and the Ancillary Agreements) or otherwise be in violation of applicable Law. Each Party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements. If the competition authority in any such country: (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the competition authority regarding, and comply with, any conditions or modifications requested by such competition authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers). Such compliance may require modifications in structure, economic and other relationships. The applicable Buyers will be solely responsible for all costs and expenses incurred by such Party in negotiating and agreeing to the required conditions or modifications with the competition authorities. Notwithstanding anything herein to the contrary, in no event shall GM or its Affiliates be obligated to dispose of, or divest themselves of, any line of business or restrict themselves from engaging in a line of business in which they are currently engaged, in order to obtain any regulatory approvals.

**9.13.2.** From the date of this Agreement until Closing, each Buyer will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the GM Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; (iii) significantly

78

increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the GM Transfer Agreements; <u>provided</u>, <u>however</u> the foregoing shall not restrict Buyers or their respective Affiliates from acquiring an interest in any entity (or any Affiliate of any entity) to which they convey any of their assets or rights.

### 9.14    **Further Actions.**

**9.14.1.**    The Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the GM Transfer Agreements.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.  To the extent the form of any of the agreements or instruments required to effectuate the transactions contemplated by this Agreement have not yet been agreed upon the parties will act reasonably in finalizing the forms of such agreements or instruments.

**9.14.2.**    At all times prior to the Closing each Party will notify the other Parties in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in <u>ARTICLE 10</u>  to be satisfied, promptly upon any of them becoming aware of the same.

**9.14.3.**    Nothing in this Agreement or the Ancillary Agreements will prevent or restrict GM, the GM Buyers, or their respective Affiliates and representatives from taking any action that is in accordance with paragraph 46 of the Modification Procedures Order.

### 9.15    **Further Assurances.**

Subject to the terms and conditions herein provided, the Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements.  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement or the Ancillary Agreements, the Parties shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other Party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; <u>provided</u> that the cost of such action or of such instruments and documents related thereto shall be borne by the relevant Buyer.  The foregoing covenant will survive the Closing of the transactions contemplated herein.

### 9.16    **Customs Duties.**

Each Party expressly agrees to reimburse the other Party for customs-related duties, fees and associated costs incurred by one Party on behalf another Party after Closing.  Taxes, except those which are not assessed on an ad valorem basis, incurred in connection with goods co-

loaded on containers that clear customs intentionally or unintentionally under one Party's importer/exporter identification numbers and bonds/guarantees post-Closing, shall be borne by the owner of the co-loaded goods; other Taxes (those which are not assessed on an ad valorem basis) on such co-loaded goods shall be shared pro-rata based on value.

### 9.17    Enterprise Contracts.

The Parties acknowledge that: (i) the Business currently benefits from certain services or receives certain products of the type listed on Schedule 9.17 ("**Other Services**") provided by third parties ("**Enterprise Providers**") under enterprise contracts with Delphi and/or one of its Affiliates ("**Enterprise Contracts**"); and (ii) it may not be practical for GM Buyers to enter into replacement contracts with all of such Enterprise Providers as of the Closing Date.  After signing this Agreement and prior to Closing, GM Buyers will use commercially reasonable efforts to enter into replacement contracts covering such Other Services.  In the event that GM Buyers are unable to secure such replacement contracts, after having used commercially reasonable efforts as required by the preceding sentence, Sellers will use commercially reasonable efforts to make available to GM Buyers the Other Services provided under such Enterprise Contracts of the type described on Schedule 9.17.  GM Buyers will pay Sellers the cost (including the cost of any internal resources) of providing such Other Services.  The obligations in this Section 9.17 shall not apply to: (i) any Contracts that are Acquired Assets; (ii) any service provided under the Transition Services Agreement; (iii) any services or products identified in Schedule 9.17 under the heading "Products/Services excluded from Section 9.17" in the Transition Services Agreement as an "Excluded Service"; or (iv) products or services which the applicable Sellers are prohibited from providing to Buyers pursuant to applicable Law.  For avoidance of doubt, GM Buyers will not be restricted in any way from engaging directly with the current outsourced service providers with respect to current direct and shared services, Day 1 separation activities and Day 2 preparation.  GM will have access to the current statements of work, service level agreements and other agreements etc. with outsourced service providers.

### 9.18    Confidentiality.

After the Closing, Sellers shall, and shall cause their Affiliates to, maintain as confidential and shall not use or disclose (except as required by law, as necessary to defend against a Claim or as authorized in writing by the applicable Buyer) any confidential information (including any confidential Environmental Records and any confidential GM Environmental Records) concerning the businesses and affairs of the Business, except to the extent such confidential information; (i) was used by Delphi's divisions other than the Business prior to the Closing Date; (ii) becomes generally available to the public other than as a result of a disclosure by Delphi or its representatives in violation of the terms hereof; (iii) becomes available to Delphi on a non-confidential basis from a source other than the Buyers or their representatives; or (iv) is covered by the licenses granted pursuant to the IP License Agreements (provided that confidential information excepted from the obligations of this Section 9.18 only by this subsection (iv) will be treated in the same manner as Sellers treat their own confidential information).  In the event any Seller or any of their Affiliates is required by law to disclose any confidential information, such Party shall promptly notify the applicable Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with such Buyer to preserve the confidentiality of such

information consistent with applicable law.  GM shall be the beneficiaries of any confidentiality or nondisclosure agreement entered into with respect to a potential acquisition of the steering assets of Delphi before the Closing between Delphi or its Affiliates, on the one hand, and any Person, on the other, and shall be entitled to enforce such agreement after the Closing Date.

**9.19**   **Termination of Certain Agreements.**

**9.19.1.**    Effective on the Closing Date, without further action by the Parties, the following agreements shall be terminated in their respective entireties and the Parties thereto shall have no further obligations thereunder:

A.    the Option Exercise Agreement;

B.    the Connector Penetration Agreement dated August 7, 2001 (which Buyers do not hereby admit exists);

C.    the Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, dated as of October 1998;

D.    the Amended and Restated Agreement for the Allocation of U.S. Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM;

E.    the Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes dated as of December 16, 1998 between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, provided that Delphi's obligations shall be limited amounts received by Delphi after the date of this Agreement;

F.    the Lease Agreement dated as of May 1, 2000 between Delphi Canada Inc. and General Motors of Canada Limited, as amended August 1, 2002;

G.    the Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

H.    the Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited dated as of May 1, 2000;

I.    the Trademark and Trade Name Agreement dated as of January 1, 1999 between Delphi Automotive Systems Corporation (n/k/a Delphi), DAS, and GM;

J.    the Intellectual Property Contracts Transfer Agreement dated as of December 4, 1998, between DTI and GM, as amended October 31, 2001;

K.    the Intellectual Property License Agreement dated as of December 4, 1998, between DTI and GM;

L.    the Intellectual Property Transfer Agreement dated as of December 4, 1998 between DTI and GM;

81

M.    the GM-Delphi Technology Transfer Agreement between Delphi Technologies, Inc. and GM dated December 4, 1998;

N.    the Battery Facilitation Agreement – Transaction Summary dated as of March 21, 2005 between Delphi and GM;

O.    the Letter Agreement dated August 10, 2004 regarding potential changes in Delphi's battery operations signed by Mary Boland (GM) and John Blahnik (Delphi);

P.    the Letter Agreement dated June 30, 2005 regarding the sale by Delphi of its global battery business to JCI signed by Bo Andersson (GM) and Steve Olsen (Delphi);

Q.    the Letter Agreement dated June 30, 2005 regarding the potential subsidy to be paid by Delphi to JCI for employees at the New Brunswick battery plant; and

R.    the GM-Delphi Liquidity Agreements.

The Parties will execute and deliver such further instruments or agreements as may be reasonably requested by the other Parties in order to further evidence the foregoing terminations. Notwithstanding any provision to the contrary herein, to the extent that any agreement listed in this section contains a license under any form of Intellectual Property to any GM Buyer or affiliate thereof, or any option to purchase any patent or other intellectual property, or any commitment not to challenge or claim ownership in any Trademark of any GM Buyer, such license(s), option(s) and commitment(s) shall survive and remain in full force and effect.

9.19.2.    Effective on the Closing Date, without further action by the Parties the MRA shall (except as specifically set forth below) be terminated in its entirety and the parties thereto shall have no further obligations thereunder (other than as specifically set forth in this Section 9.19.2), including, without limitation, any obligations of Delphi for payments with respect to flowbacks under Section 5.11 of the MRA or otherwise.  Notwithstanding the foregoing, GM agrees to pay any and all amounts due to Delphi which accrue under the MRA for periods prior to Closing regardless of the date on which such amounts become due under the terms of the MRA.  In addition, GM shall continue to be responsible for the payment of all costs and amounts due to Delphi under the MRA with respect to the Athens Facility (as defined in the MRA).

9.19.3.    Effective on the Closing Date, without further action by the Parties, Sellers shall be deemed to have waived any and all Claims (past and future) against GM or its Affiliates pursuant to the GSA and the GM-Delphi Liquidity Agreements.

9.20    **Certain Mexican Matters.**

Delphi and the applicable Sellers commit to the following with respect to the GM Buyers:

82

**9.20.1.**    **Mexico LTAs**.  Immediately before Closing, Delphi will cause the asset sale transactions contemplated in the local transfer agreements set forth in Schedules 9.20.1(i)-(iii) ("**Mexico LTAs**") (consolidation of assets of the Steering Business currently operated by Rio Bravo Electricos, S.A. de C.V., Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V. and Delphi Automotive Systems, S.A. de C.V. into Steeringmex) to be completed in accordance with the terms and conditions set forth in the Mexico LTAs.  The Mexico LTAs set forth the terms under which the assets described therein are transferred by various Delphi Affiliates to Steeringmex, S. de R.L. de C.V., a Mexican limited liability company ("**Steeringmex**").    Under Section 5B of certain of the Mexico LTAs, a second installment payment of purchase price is required to be made (the "**Purchase Price Assumed Debt**").  Notwithstanding anything to the contrary in ARTICLE 3 of this Agreement, neither of the following items will be included in any determination of the GM Purchase Price:  (i) the Purchase Price Assumed Debt; and (ii) the Mexican VAT aggregating $1,324,408 USD (the "**Mexican VAT Amount**") under certain of the Mexico LTAs that is recoverable by Steeringmex, with respect to the payment required to be made under Section 5A of such Mexico LTAs.  At GM Buyer's request, immediately before Closing, Sellers will, at GM Buyers' sole cost and expense, cause Delphi Ensamble de Cables y Components, S. de R.L. de C.V. to file an action in the nature of a claim for declaratory judgment regarding the validity of the title to the GM Owned Real Property and to continue the proceeding at GM Buyers' sole cost and expense until its conclusion.  In this case, transfer of title to the GM Owned Real Property in Mexico will not be carried out to Steeringmex prior to closing, but promptly following the conclusion of the aforementioned declaratory judgment, as set forth in the corresponding Mexico LTA.

**9.20.2.**    **Utility Contracts**.  A Seller Affiliate will allow Steeringmex, until thirty (30) days after Closing, to continue to receive electricity ("**Post-Closing Mexico Utilities**") under certain mutually agreed utility contracts listed in Schedule 9.20.2 to this Agreement from the applicable utility service provider(s), including keeping that certain $180,000.00 deposit (the "**Mexico Deposit**") in place.  Steeringmex will enter into separate utility contracts with the applicable utility service provider(s).  Within ten (10) days after receipt of an invoice for the Post-Closing Mexico Utilities, Steeringmex will pay the applicable Seller Affiliate for the Post-Closing Mexico Utilities.

**9.20.3.**    **Certain GM Acquired Assets Located in Mexico**.  The GM Acquired Assets that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable GM Asset Sellers to the applicable GM Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant GM Acquired Assets' temporary importation customs status.  Specifically, the applicable GM Sellers shall transfer temporary imported Acquired Assets of the Steering Business through the so-called "virtual export pedimentos" and the applicable GM Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation.  The applicable GM Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

**9.20.4.**    **Certain Company Acquired Assets Located in Mexico**.    The Company Acquired Assets of the Company Business that are located in Mexico and subject to a temporary importation customs regime shall be transferred by the applicable Company Asset

Sellers to the applicable Company Asset Buyers in full compliance with any legal and/or administrative provision that may apply in order to, when applicable, preserve the relevant Acquired Assets' temporary importation customs status. Specifically, the applicable Company Sellers shall transfer temporary imported Company Acquired Assets through the so-called "virtual export pedimentos" and the applicable Company Asset Buyers shall prepare and effectuate the so-called "virtual import pedimentos" as permitted under Mexican law and regulation. The applicable Company Asset Buyers and Sellers shall exercise reasonable commercial efforts and shall cooperate to effectuate these "virtual export/import" transactions.

### 9.21    Transfer of Certain Sale Securities.

In order to effectuate the sale of the Sale Securities pursuant to Section 2.1.1 hereof, Sellers may, prior to Closing and after consultation with the applicable Buyers, transfer certain of the Sale Securities to special purpose vehicles in the form of intermediate holding companies. In the event of any such transfer, the shares of the intermediate holding company will become the Sale Securities transferred hereunder.

### 9.22    Certain Bank Accounts.

Parent will duly execute and deliver to Delphi Corporation, the Novation Letter in the form attached hereto as Exhibit 9.22 in order to transfer certain lock box bank accounts at J.P. Morgan Chase, N.A. to Buyers (the "**Transferred Account(s)**") with an effective date as of the Closing Date. On or before the Closing Date, Delphi will counter-sign such Novation Letter and deliver the same to J.P. Morgan Chase, N.A. In the event any Party receives any payments which are not included among such Party's Acquired Assets, such receiving Party will remit such payment to the appropriate other party within five (5) Business Days of receipt.

### 9.23    Certain China Matters.

**9.23.1.**    An Affiliate of the China Sellers has established a letter of credit (the "**China L/C**") in support of Saginaw Steering (Suzhou) Co., Ltd., a Sale Company ("**Steering (Suzhou)**"). Delphi will cause such Affiliate to keep the China L/C in place for no more than three hundred sixty (360) days following Closing (the "**China L/C Period**"). Parent will cause Steering (Suzhou) to establish, in no event later than three hundred sixty (360) days following Closing, a replacement for the China L/C. Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause Steering (Suzhou) to pay to the relevant Seller Affiliate all costs incurred by such Seller Affiliate in connection with keeping the China L/C open during the China L/C Period.

**9.23.2.**    The GM Buyers acknowledge Sellers' beneficial ownership of the China Entities until the Closing Date and agree that, until the Closing, it shall have no rights other than to hold legal title with respect to the China Entities. The GM Buyers agree not to encumber the China Entities or interfere with the operation of the business conducted by the China Entities until the Closing. Upon Closing, all of GM Sellers' beneficial ownership and/or other interests in the China Entities shall automatically transfer to Steering Holding Pte. Ltd; provided, however, that in the event this Agreement does not become effective or this Agreement is terminated pursuant to ARTICLE 12, the GM Buyers shall, upon Delphi's request, take all

84

steps and actions necessary to promptly transfer to Delphi or its designee any and all legal ownership rights the GM Buyers may have with respect to the China Entities or, at Delphi's election, Steering Holding Pte. Ltd or Rhodes Holding II Sarl, as applicable.

### 9.24    Certain Poland Matters.

Delphi will use commercially reasonable efforts to transfer all of its shares in Delphi Polska to a Dutch BV (created or purchased off the shelf between the signing of this Agreement and Closing) which, following the transfer, will own all the shares in Delphi Polska. Sellers will use commercially reasonable efforts to create or purchase such Dutch BV following the execution of this Agreement. In the event Sellers are unable to register such Dutch BV with the relevant Governmental Authorities within fifteen (15) days following the date of this Agreement, upon request, Parent agrees to create or purchase a Dutch BV to be used to purchase the shares of Delphi Polska. GM Buyers will reimburse Sellers for all costs incurred in creating, acquiring or transferring the Dutch BV as such costs are incurred by Sellers or their Affiliates. Delphi will not indemnify GM Buyer for any Tax or other Liabilities of the Dutch BV.

### 9.25    Non-GM Customers.

Each Buyer may consult with any customers of the Business that such Buyer is acquiring hereunder to discuss the potential impact of the transactions contemplated hereunder on the ongoing commercial relationship between such Business and any such customers.

### 9.26    Transfer of Quotas in Saginaw Brazil.

Prior to Closing, the applicable GM Sellers will take all actions required to cause Delphi Brazil to acquire the one (1) quota of the capital of Saginaw Brazil held by Jefferson Felix de Oliveira, a Brazilian citizen, married, mechanic engineer, resident and domiciled in the City of Porto Alegre, State of Rio Grande do Sul, with office at Rua Giuseppe Mandelli, No. 118, Bairro São João, in the City of Porto Alegre, State of Rio Grande do Sul, Zip Code, bearer of the Identity Card R.G. No. No. 5.004.573.671 SSP/RG, enrolled with the Brazilian Individual Taxpayers' Register (CPF/MF) under No. 491.466.290-68. As a result of such transfer, Delphi Brazil will become the lawful owner of one hundred percent (100%) of the quotas of Saginaw Brazil.

A.    Simultaneously with the transfer of the sole quota mentioned in this Section 9.26, the applicable GM Sellers will cause Delphi Brazil to execute an amendment to the articles of organization of Saginaw Brazil in accordance with applicable Brazilian Law, pursuant to which the applicable GM Sellers shall become the new owners of one hundred percent (100%) of the quotas in Saginaw Brazil representing 54,639,116 (fifty-four million six hundred and thirty-nine thousand one hundred and sixteen) quotas. As a result, the applicable GM Sellers will become the lawful owners of all, but not less than all, of one hundred percent (100%) of the quotas of Saginaw Brazil. The Applicable GM Sellers will cause Saginaw Brazil to file the amendment to the articles of organization mentioned above for registration with the competent commercial registry and perform all actions that may be required to obtain such registration as soon as practicable, but in any event no later than thirty (30) days from

the date of the execution of the amendment to the articles of organization of Saginaw Brazil, in compliance with applicable Brazilian Law.

B.     Prior to Closing, the applicable GM Sellers intend all the quotas of Saginaw Brazil to be dividended from Delphi Brazil to the applicable GM Sellers.  Prior to Closing, Delphi Brazil will take all actions required to register the dividend from Delphi Brazil to the applicable GM Sellers and the foreign investment of the applicable GM Sellers in the capital of Saginaw Brazil before the Brazilian Central Bank in accordance with applicable Brazilian Law.

**9.27     Transfer of the Brazilian Real Estate.**

Delphi Brazil acquired the Brazilian Real Estate on March 3, 1999 and contributed the Brazilian Real Estate to the capital of Saginaw Brazil, on April 1, 2008 as payment-in of its equity interest in the capital of Saginaw Brazil. Notwithstanding the above, Delphi Brazil has not registered the transfer of the Brazilian Real Estate to Saginaw Brazil in the real estate enrollment certificate (matrícula) of the competent real estate register to officer.  Promptly following the Closing, the Brazil Sellers will, and will cause Delphi Brazil to (i) perform any and all actions that may be required to transfer the Brazilian Real Estate owned by Delphi Brazil to Saginaw Brazil, free and clear of any Encumbrance, other than Permitted Encumbrances, in accordance with applicable Law; and (ii) execute any and all documents that may be required to perfect the transfer of the Brazilian Real Estate to Saginaw Brazil in accordance with applicable Law, including but not limited to executing and registering a Public Deed for Transfer of Real Property for Corporate Capital Payment (Escritura de Conferência de Bens para Integralização de Capital Social) in the real estate enrollment certificate (matrícula) of the Brazilian Real Estate before the competent real estate register office of the City of Porto Alegre, State of Rio Grande do Sul, Brazil.  GM Buyers will be solely responsible for all taxes, costs and expenses in connection with such transfer, in accordance with all applicable Brazilian legal requirements.

**9.28     Environmental Permits.**

On the date of the execution of this Agreement or as soon as reasonably possible thereafter, and following the Closing, Sellers shall cooperate with Buyers in taking all reasonable steps to facilitate the transfer, assignment or procurement of the reissuance of any Environmental Permit necessary to operate the Business.

**9.29     Conflict and Privilege Waivers.**

A.     Effective as of the execution date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates, successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Environmental Law related matter for which any Buyer may be required to respond, involving in each case the applicable Acquired Assets, the Business, the Sale Companies or their respective

86

assets and not relating to any Excluded Facility.  In addition, effective on the execution date of this Agreement, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Environmental Law related matter for which any Buyer may be required to respond, in each case involving the applicable Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Facility.  Within fifteen (15) days after the execution date of this Agreement, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form attached as Exhibit 9.29.A together with a list of their consultants and advisors.

B.    Effective on the Closing Date of this Agreement, Sellers waive and will cause their respective Affiliates to waive any potential conflicts of interest, attorney-client privilege, attorney work product privilege, or other applicable privilege or conflict which may prevent the provision of services to Buyers or their respective Affiliates successors or assigns, or disclosure to Buyers or their Affiliates, successors or assigns, by any employee, consultant to, attorney for, advisor to, or other Person who has worked with or for, Sellers or their Affiliates with respect to any Liability (other than as addressed in subsection (A) above) for which any Buyer may be required to respond, involving in each case the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.  In addition, effective on the Closing Date, Sellers hereby consent to all such consultants, attorneys, advisors, or other Persons performing services directly to Buyers, their respective successors, assigns and Affiliates, and agree that they may provide Buyers with all information and documents relating to any Liability for which any Buyer may be required to respond, in each case involving the Acquired Assets, the Business, the Sale Companies or their respective assets and not relating to any Excluded Asset or Retained Liability.  At Closing, Sellers shall deliver to the applicable Buyers such executed original privilege waivers in the form attached as Exhibit 9.29.B together with a list of their consultants and advisors.  To the extent that any Liability that is the subject of this Section relates both to any Purchased Asset, Business, Sale Company and/or its assets on the one hand, and an Excluded Asset and/or Retained Liability on the other hand then the applicable Seller and Buyer agree that the waiver set forth herein will be effective only upon execution of a mutually acceptable joint defense agreement which the Parties agree to execute on or before Closing.

**9.30    Preservation of Environmental Records.**

Prior to Closing, Sellers and their respective Affiliates will preserve all Environmental Records and GM Environmental Records and will not damage, destroy or alter any Environmental Records or GM Environmental Records.

**9.31    DIP Transfer Matters.**

Subject to the terms and conditions herein provided and if required by applicable Law or the DIP Agreement (or the DIP Agent at the direction of the requisite DIP Lenders), upon

request of any of the Sellers, the Parties shall permit the Sellers to implement a transaction pursuant to which the Sellers transfer, or cause to be transferred, to the DIP Agent on behalf of the DIP Lenders assets secured under the DIP Agreement in satisfaction of the obligations under the DIP Agreement, and the Sellers or the DIP Agent on behalf of the DIP Lenders, as applicable, simultaneously transfers, or causes to be transferred, all of the GM Acquired Assets to the GM Buyers and all of the Company Acquired Assets to the Company Asset Buyers on terms consistent with this Agreement; provided, that in no event shall any such transaction result in a material economic cost to or material adverse effect on the Business, the Acquired Assets, the Buyers or their respective subsidiaries, or increase the Assumed Liabilities.

**9.32** **Reorganization and Restructuring.**

Prior to the Closing, the Sellers, the Sale Companies and Buyers shall consider in good faith any and all internal restructuring steps and consider any transactions and elections as may be requested by the Buyers or Sellers in their respective sole discretion (including capital contributions, cross-chain sales, dividend distributions, spin-offs, mergers, redemptions, tax elections, conversions and reincorporations). Notwithstanding the foregoing, (a) the failure of any such reorganization or restructuring steps to occur shall in no way delay the Closing of the transactions contemplated by this agreement, (b) the applicable Buyers or Sellers, as the case may be, shall bear all costs related to any such reorganization or restructuring including any costs incurred by any the other Parties, and (c) the other Parties shall have no liability for the failure of any such reorganization or restructuring steps to occur.

**9.33** **Certain Other Actions.**

Sellers agree to use commercially reasonable efforts to (a) prior to June 30, 2009, reduce any pledge of the stock of the Sale Companies organized outside the United States owned by Filing Affiliates from one-hundred percent (100%) to sixty-five percent (65%) and to assure that no assets of the Sale Companies organized outside the United States are pledged, (b) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of Delphi Technologies, Inc., a Delaware corporation, in order to permit the unencumbered sale of the shares of such corporation instead of the sale of the assets of such corporation and (c) if requested by Company Buyer within thirty (30) days after the signing of this Agreement, procure a release of liens pertaining to the assets of certain Filing Affiliates that are Company Sellers of Company Sale Securities in order to permit the unencumbered sale of the shares of such Filing Affiliates instead of the sale of such Company Sale Securities. At Company Buyer's sole option, the Company Buyer may elect to purchase the shares of one or more Filing Affiliates instead of purchasing the assets or Company Sale Securities held directly by such Filing Affiliate.

**9.34** **Retained Plans.**

The Parties acknowledge that Delphi may, at its sole election terminate any or all of the Retained Plans .

### 9.35    Certain India Matters.

Delphi Automotive Systems Pvt. Ltd. ("**Delphi India**") has established a letter of credit (the "**India L/C**") in support of its Steering Business. Delphi will cause Delphi India to keep the India L/C in place for no more than ninety (90) days following Closing (the "**India L/C Period**"). Parent will cause the applicable GM Buyer to establish, as soon as possible after Closing and in no event later than ninety (90) days following Closing, a replacement for the India L/C. Within ten (10) days after receipt of an invoice for such costs, Parent will pay or will cause the applicable GM Buyer to pay to Delphi India all costs incurred by Delphi India in connection with keeping the India L/C open during the India L/C Period.

### 9.36    Pending Transactions.

In the event that any of the Pending Transactions are not completed before the Closing, Company Buyer will use commercially reasonable efforts to facilitate completion of the Pending Transactions under the applicable sale and related agreements, including the Transition Services Agreement (subject to Delphi's reimbursement of Company Buyer's actual costs in accordance with the terms of the Transition Services Agreement), and pay to Delphi, in U.S. Dollars, the entire purchase price received from the respective buyers under the Pending Transactions, within ten (10) Business Days after receipt, except that funds paid to a non-U.S. Sale Company will be paid to Delphi as soon as legally permitted under applicable Law, and in advance of amounts paid to other Company Affiliates.

### 9.37    Delphi FICA Litigation.

Delphi shall timely file any FICA refund claims arising in connection with the collective bargaining agreements in 2007. GM Buyer and Company Buyer shall cooperate in the prosecution of the Delphi FICA Litigation.

### 9.38    GM Financing.

**9.38.1.**    Prior to the Closing or the termination of this Agreement, GM shall not (x) terminate the GM Financing Agreements or (y) amend or otherwise modify the terms of the GM Financing Agreements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the GM Financing Agreements or otherwise in a manner that would materially adversely impact the ability of GM or the Company Buyer to consummate, the transactions contemplated by the GM Financing Agreements (including in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.38.2.**    GM shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents, provide the financing contemplated by the GM Financing on the terms and subject to the conditions described in the GM Financing Agreements and otherwise perform and comply on a timely basis with all of its obligations under the GM Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions

and other requirements to the consummation of the financing contemplated by the GM Financing Agreement.

**9.38.3.**     Prior to the Closing or the termination of this Agreement, the Company Buyer shall not (x) terminate the Equity Commitment Letter or the PE Financing Arrangements or (y) amend or otherwise modify the terms of the Equity Commitment Letter or the PE Financing Arrangements (including, in the case of the Buyer Loan Documents, the form thereof), in each case as delivered to Delphi as of the date hereof, to increase the conditionality of the Equity Commitment Letter or the PE Financing Arrangements or otherwise in a manner that would materially adversely impact the ability of the Company Buyer to consummate the transactions contemplated by the Equity Commitment Letter or the PE Financing Arrangements or this Agreement, as the case may be, in the case of each of clauses (x) and (y), without obtaining the prior written consent of Delphi (such consent not to be unreasonably withheld).

**9.38.4.**     The Company Buyer shall, prior to or concurrently with the Closing, execute and deliver the Buyer Loan Documents and otherwise perform and comply on a timely basis with all of its obligations under the PE Financing Agreements and use its commercially reasonable efforts to satisfy on a timely basis all conditions and other requirements to the consummation of the financing contemplated by the PE Financing Agreements.

**9.39    Environmental Matters.**

Notwithstanding anything in this Agreement to the contrary, neither Sellers and their Affiliates, on the one hand, nor any Buyer, on the other hand, assumes any Liability under Environmental Laws of the other.  Nothing in this Agreement is intended to nullify any Liability to any federal, state or local environmental agency under Environmental Laws that either Seller and/or their Affiliates or any Buyer may have as a result of their status as an owner or operator of any property or facility, or as an arranger for disposal of any Hazardous Materials generated at any property or facility.  At Closing, Seller and its Affiliates shall discharge in the pending Bankruptcy Cases, to the extent allowable under the Bankruptcy Code, any and all Liabilities under Environmental Laws that they may have.  After the Closing neither Sellers and their Affiliates, on the one hand, nor any Buyers, on the other hand, shall assert or pursue any Claim against the other under any Environmental Law for any Liability for Hazardous Materials contamination located on a GM Real Property or a Company Real Property.

**9.40    Non-Solicitation.**

Each of Delphi and the Sellers agree, severally, that until the earlier of (i) when this Agreement is terminated under the terms hereof and (ii) the Closing (the "**Non-Solicitation Period**"), Delphi and the Sellers, as applicable, shall not, and shall not knowingly permit Delphi, the Seller or any of their respective officers, directors, agents or Affiliates to solicit or initiate any inquiries or the making of any proposal with respect to the sale (whether by sale of stock, merger, consolidation, sale of assets or other disposition) of all or any part of the GM Business and the Company Business or any significant portion of their consolidated assets or issued or unissued capital stock; provided, however, that nothing in this Agreement shall prevent or restrict Delphi's Board of Directors from taking actions (or directing management to take actions) which (i) the Board reasonably believes are required by their fiduciary duties (taking

90

into account the advice of counsel in appropriate circumstances) or (ii) are in accordance with paragraph 46 of the Modification Procedures Order. From and after the execution of this Agreement, Delphi and the Sellers shall immediately advise the Buyers of the receipt, directly or indirectly, of any inquiries, discussions, negotiations, or proposals relating to a Competing Transaction (including the specific terms thereof and the identity of the other individual or entity or individuals or entities involved) and promptly furnish to the Buyers a copy of any such written proposal in addition to a copy of any information provided to or by any third party relating thereto, in each case only to the extent discussed or provided to Delphi's Board of Directors.

**9.41    Employment, Retirement, Indemnification, and Other Agreements, and Incentive Compensation Programs.**

Prior to Closing, the Company Asset Buyers shall take all actions necessary to enter into or assume (at the Company Asset Buyer's sole discretion) the agreements, obtain insurance coverage and undertake or assume the obligations, in connection with the Specified Director, Officer and Employee Related Liabilities that in the aggregate provide substantially similar economic benefits to the applicable directors, officers and employees as currently exist under existing agreements and policies with respect to Delphi's directors, officers and employees other than with respect to change in control agreements. "**Specified Director, Officer and Employee Related Liabilities**" means (i) employment and incentive agreements and policies (which shall includes equity, supplemental retirement benefits, bonus and other incentive plans and policies to be paid to executives after the effective date of the Plan of Reorganization) with substantially all of Delphi's current, eligible executives who continue to be employed after the effective date of the Plan of Reorganization, (ii) the obligation to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of a director, officer, or employee pursuant to the applicable Delphi and Affiliate of Delphi certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against any director, officer, or employee of the debtors who were in that role as of the date of October 3, 2007 based upon any act or omission related to a director's, officer's or employee's service with, for, or on behalf of Delphi or an Affiliate of Delphi, (iii) the obligation to maintain directors' and officers' insurance providing coverage for those directors, officers, and employees currently covered by such policies for the remaining term of such policy and to maintain tail coverage under policies in existence as of the effective date of the Plan of Reorganization for a period of six years after the effective date of the Plan of Reorganization, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such person's service with, for, or on behalf of the debtors in at least the scope and amount as currently maintained by Delphi and Affiliates of Delphi, and (iv) the obligation to indemnify current or former directors, officers, and employees who were not employed in such capacity by Delphi or an Affiliate of Delphi as of October 3, 2007, solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the insurance coverage referred to in section (iii) or any prior similar policy in an aggregate amount not to exceed $10 million.

91

### 9.42    **India Matters.**

The applicable Delphi Asset Seller in India shall use commercially reasonable efforts to prior to Closing (A) procure a "no objection letter" from the appropriate authority pursuant to section 281(1) of the Income Tax Act, 1961 of India to the proposed transfer of the Acquired Assets of the GM Business conducted in India from the Seller to the Buyer with no conditions included in such objection letter, other than those as are reasonably acceptable to the applicable Seller and applicable GM Buyer and (B) establish proper, clear and valid leasehold rights in favor of the applicable GM Buyer to the premises forming part of the lease for the premises situated in the State of Haryana, India and subject to the Seller furnishing all necessary permission(s) and authorization(s) obtained by AJS Associates and/or individual allottees of the premises forming part of the leases from the Haryana Urban Development Authority for the purpose of creating valid leasehold rights in favor of the GM Buyer.

### 9.43    **Prosecution and Settlement of Appaloosa Claim.**

Prior to the Closing, Delphi shall continue to control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution and, subject to applicable law, shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer which shall not be unreasonably withheld. Following the Closing, (i) GM, GM Buyer and Delphi agree to take appropriate actions and enter into appropriate agreements such that subject to applicable law, GM or GM Buyer shall control the prosecution and settlement of the Appaloosa Claim and shall be responsible for the costs and expenses of such prosecution, and Delphi shall cooperate with GM and GM Buyer in any such prosecution; provided, however, if requested by GM or GM Buyer in writing, Delphi shall prosecute such Claim at the direction of GM or GM Buyer, as applicable, and GM or GM Buyer, as applicable, shall reimburse Delphi for any reasonable, external, out-of-pocket costs and expenses incurred by Delphi in connection with any such prosecution; provided, further, however, that if GM or GM Buyer has requested that Delphi prosecute such Claim as provided above, Delphi shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto without the prior written consent of GM or GM Buyer; (ii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto, in each case for an amount that would be less than the maximum distribution to the C Lenders provided by Article 7.8(e)(iii) of the Plan (the "Threshold"), without the prior written consent of Delphi which shall not be unreasonably withheld; provided, that Delphi may not withhold its consent unless it agrees within 20 days of the request for consent to pay all costs and expenses associated with of the continuing prosecution of the Appaloosa Claim and demonstrates to GM's and GM Buyer's reasonable satisfaction the ability to fund such costs and expenses; provided, further, that Delphi shall not have any right to consent to the entry of any judgment with respect to the Appaloosa Claim or any settlement with respect thereto if the C Lenders would receive an amount from such settlement equal to or greater than the Threshold; (iii) GM and GM Buyer shall not consent to the entry of any judgment with respect to the Appaloosa Claim or enter into any settlement with respect thereto unless such judgment or settlement (A) contains a full release of all counter, cross or similar claims by the defendants and (B) does not contain non-economic relief detrimental to Delphi's current or former officers, directors, or employees; and (iv) GM and GM Buyer shall

92

consult with Delphi regarding any request by Delphi for GM or GM Buyer to consent to the entry of any judgment with respect to the Appaloosa Claim or entry into any settlement.  Delphi and GM and/or the GM Buyer will enter into an agreement in mutually acceptable form for the purpose of facilitating communications regarding the Appaloosa Claim and, to the maximum extent permissible, protecting confidential and privileged information shared in connection therewith.

## ARTICLE 10.
## CONDITIONS TO CLOSING.

**10.1**    <u>Conditions to Obligations of Sellers and Buyers.</u>

The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent.

**10.1.1.**    <u>Plan of Reorganization</u>.  The conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived pursuant to the terms of the Plan of Reorganization, and the Plan of Reorganization does not contain any changes from the draft version delivered to GM and the Buyers on June 1, 2009 that would have a material adverse impact on the Sale without the consent of GM and the Company Buyer or an adverse impact on GM without the consent of GM.  Any exhibits and schedules to the Plan of Reorganization not delivered to the Buyers prior to the date of this Agreement, must not have a material adverse impact on the Sale without the consent of GM and the Company Buyer, a material adverse impact on GM without the consent of GM or a material adverse impact on Company Buyer without the consent of Company Buyer.  The Plan Modification Order shall have been entered and become a Final Order in form and substance satisfactory to GM and Company Buyer.

**10.1.2.**    <u>Governmental Approvals; Plan Modification Order</u>.  All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on <u>Schedule 10.1.2</u>) regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated; <u>provided</u> that to the extent such consent, approval, order, authorization, registration, declaration or filing has not been obtained or completed with respect to an immaterial Acquired Asset, Parent may elect in its sole discretion to cause the applicable Buyer to consummate the acquisition of those Acquired Assets for which such consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and defer the acquisition of all remaining Acquired Assets until such remaining consent, approval, order, authorization, registration, declaration or filing has been obtained or completed and <u>provided further</u> that the full Purchase Price for such assets is paid.

**10.1.3.**    <u>No Order</u>.  There shall not be in effect any Governmental Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

**10.1.4.**    <u>DIP Amendment</u>.

The DIP Agreement shall have been amended or otherwise modified to the extent necessary to permit the consummation of the transactions contemplated hereby, and such amendment or other modification shall be in full force and effect and not be subject to any unsatisfied condition precedent or condition subsequent not otherwise waived by the DIP Lenders.

### 10.2    Conditions to Obligations of Sellers.

The obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**10.2.1.    Accuracy of Warranties.**  The representations and warranties of Buyers contained in Articles 4 and 7 and of GM in Article 6 of this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of date of the Agreement and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

**10.2.2.    Performance of Covenants.**  Each of the Buyers and their Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by them at or prior to the Closing.

**10.2.3.    Delivery of Ancillary Agreements.**  Buyers will have delivered duly executed copies of each of the applicable Ancillary Agreements.

**10.2.4.    Collective Bargaining Agreements.**  GM Buyer and Company Buyer will assume their respective Seller U.S. CBAs, including all amendments and supplements thereto.

**10.2.5.    Hourly Pension Plan.**  Delphi and its Affiliates shall be satisfied that the Delphi HRP will not be an obligation of Delphi following the Closing and Delphi shall have been relieved of all obligations with respect thereto.

**10.2.6.    Consents.**  The UAW, IUE-CWA and the USW will have waived Seller U.S. CBA restrictions upon the sale of operations in a form reasonably satisfactory to Seller.

### 10.3    Conditions to Obligations of GM Buyers.

The obligation of GM Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by GM Buyers):

**10.3.1.    Accuracy of Warranties.**  The representations and warranties of Sellers made to all Buyers or the GM Buyers, but, for the avoidance of doubt, not the representations and warranties of Sellers made exclusively to the Company Buyer, contained in this Agreement

(without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on any Seller's ability to consummate the transactions contemplated by this Agreement.

**10.3.2.**   Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the GM Buyers.

**10.3.3.**   Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM Ancillary Agreements.

**10.3.4.**   Release of Certain Liens.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the GM Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the GM Sales Securities.

**10.3.5.**   Financing.  The Company Buyer shall have received the Class B Purchase Price under the Securities Purchase Agreement; PE and its Affiliates shall not be in breach or default of any material obligations it has under the PE Financing Agreements and PE and its Affiliates shall have executed and delivered the Buyer Loan Documents and the Operating Agreement, which Buyer Loan Documents shall be in full force and effect.

**10.3.6.**   Transfer of Environmental Permits and Approvals.  All material Environmental Permits shall have been transferred, assigned or reissued to Buyers or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, Buyers have received written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**10.3.7.**   Property Transfer Obligations.  All obligations required under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3 shall have been satisfied.

**10.3.8.**   DIP Payoff Letters.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to GM.

**10.4**   **Conditions to Obligations of Company Buyer.**

The obligation of Company Buyer to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (which may be waived in whole or in part by the Company Buyer):

**10.4.1.**   Accuracy of Warranties.  The representations and warranties of Sellers made to all Buyers or the Company Buyer, but, for the avoidance of doubt, not the

95

representations and warranties of Sellers made exclusively to the GM Buyers, contained in this Agreement (without taking into account any materiality or material adverse effect qualification therein), will be true and correct as of the Closing Date as if made on such date without regard to any changes to the schedules referred to in such representations and warranties submitted after the date of this Agreement (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a Material Adverse Effect on any Seller's ability to consummate the transactions contemplated by this Agreement.

**10.4.2.**    Performance of Covenants.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing for the benefit of the Company Buyer.

**10.4.3.**    Delivery of Ancillary Agreements.  Sellers will have delivered duly executed copies of each of the GM/Company Ancillary Agreements, which shall be in full force and effect.

**10.4.4.**    Release of Certain Liens.  The Pension Benefit Guaranty Corporation shall have agreed to remove any Encumbrances of the Pension Benefit Guaranty Corporation on the Company Acquired Assets and the assets of the Sale Companies and the assets of the entities that issued the Company Sales Securities.

**10.4.5.**    Financing.  The Company Buyer shall have received the Class A Purchase Price under the Securities Purchase Agreement and the amount of Loans (as defined in the Buyer Loan Documents) requested by the Company Buyer to be made by GM under the Buyer Loan Documents on the Closing Date, GM and its Affiliates shall not be in breach or default of any material obligations it has under the GM Financing Agreements and GM and its Affiliates shall have executed and delivered the Buyer Loan Documents and the Operating Agreement, which Buyer Loan Documents shall be in full force and effect.

**10.4.6.**    DIP Payoff Letters.  The Sellers shall have delivered to the Buyers the DIP Agreement payoff letters in customary form or reasonably acceptable to Company Buyer.

### ARTICLE 11.
### CLOSING.

**11.1**    **Closing Time and Date.**

**11.1.1.**    Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of all of the transactions contemplated by this Agreement to occur at Closing will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036, at 10:00 a.m. at the month end following two (2) Business Days of the date that all of the conditions set forth in ARTICLE 10 have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may otherwise agree (the "**Closing Date**").  For Tax and accounting purposes, the parties shall use their commercially reasonable efforts to cause the effective time of the transaction to be 11:59 p.m., local time, on the accounting month end

following the Closing Date.  The Closing of the GM Transfer Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

**11.1.2.**    In the event any condition to Closing contained in <u>Section 10.1.2</u> or <u>10.3</u> has not been satisfied with respect to an immaterial Acquired Asset, GM Buyer may elect to delay the Closing with respect to such immaterial Acquired Asset or Sale Company (a "**Temporarily Excluded Assets**"), and shall be required to proceed to Closing with respect to rest of the transactions contemplated by this Agreement.  In such event, (i) GM Buyers will not be deemed to have assumed any Liabilities which relate to the Temporarily Excluded Assets, (ii) the full Purchase Price will be paid at Closing notwithstanding that the Temporarily Excluded Assets have not been transferred, and (iii) Sellers will continue to operate the Temporarily Excluded Assets and will supply GM Buyers and the Sale Companies and perform the other obligations in the same manner as prior to the Closing, except that GM Buyers will be responsible for paying Sellers, in advance, for all of their direct and indirect costs and expenses reasonably incurred in operating the Temporarily Excluded Assets to the extent they exceed revenues generated from operating such Temporarily Excluded Assets until they can be transferred to GM Buyers.  Sellers and GM Buyers will continue to use their respective commercially reasonable best efforts to cause the satisfaction of all unsatisfied conditions precedent to the transfer of the Temporarily Excluded Assets as soon as practicable.  The GM Buyers may elect to close on the transfer of the Temporarily Excluded Assets at any time upon notice to Delphi and the provisions of this Agreement will continue to apply to the Temporarily Excluded Assets as if no Closing under this Agreement had yet taken place.

### 11.2    GM Ancillary Agreements.

At or prior to the Closing, the applicable Sellers will duly execute and deliver to the GM Buyers, and the GM Buyers will duly execute and deliver to GM Sellers, each of the following agreements to which they are to be a party:

**11.2.1.**    The following lease agreements:

A.    Assignment and Assumption Agreement regarding Building 1 at the Somerton, Australia Real Property, substantially in the form of <u>Exhibit 11.2.1.A</u>.

B.    Sublease regarding the Technical Center located at Paris, France, substantially in the form of <u>Exhibit 11.2.1.B</u>.

C.    Sublease regarding the lease located at 1230 West Gila Bend Highway, Valley Industrial Park, Casa Grande, Arizona, substantially in the form of <u>Exhibit 11.2.1.C</u>.

D.    The applicable GM Buyer and applicable Company Buyer will enter into a lease for a portion of the Lockport, New York technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years, providing for a mutually acceptable allocation of use of personal property during the term of such lease.

E.      The applicable GM Buyer and applicable Company Buyer will enter into a lease for the Kokomo, Indiana technical center (including the Personal Property used therein) in form and substance reasonably acceptable to the parties providing, among other things for Company to pay its pro rata share of costs on a triple net basis, plus $1.00 per year, having a term of two years.  During the term of such lease, the applicable GM Buyer shall not sell or otherwise dispose of any of such Personal Property.  The applicable GM Buyer and applicable Company Buyer will use commercially reasonable efforts to develop and implement a separation plan for their respective businesses conducted at Kokomo, Indiana and following such separation, the applicable Company Buyer shall have an option to purchase the real property and/or related Personal Property for the price of $1.00, subject to a lease back to the applicable GM Buyer of the portion that will continue to be occupied by the applicable GM Buyer and the provision for the use by the applicable GM Buyer of the relevant related Personal Property.  The lease back to the GM buyer shall provide for the applicable GM Buyer to pay its pro rate share of costs on a triple net basis, plus $1.00 per year and having such other terms and conditions as agreed to by such parties.

**11.2.2.**    Patent Rights assignments by the applicable GM Sellers to the applicable GM Buyer substantially in the form of <u>Exhibits 11.2.2.A.1</u> through <u>11.2.2.A.16</u>, a Trademark Assignment by the applicable GM Seller to the applicable GM Buyer substantially in the form of <u>Exhibit 11.2.2.B</u>, and a Copyright Assignment by the applicable GM Seller to the applicable GM Buyers substantially in the form of <u>Exhibit 11.2.2.C</u>, whereby recorded title to the Purchased Intellectual Property may be recorded as being transferred from the applicable GM Seller to the applicable GM Buyers, as well as any other deeds, bills of sale, endorsements, assignments, affidavits and other instruments of sale, conveyance, transfer and assignment relating to the Purchased Intellectual Property, including an assignment to the applicable GM Sellers' rights in and to the "Saginaw Steering" name and trademark, any assignment of rights to Intellectual Property under any employment or independent contractor agreements and any necessary releases of security interest in forms appropriate for releasing any security interests filed in any patent offices.

**11.2.3.**    The    following    agreements    (collectively    the    "**GM Transfer Agreements**"):

A.      France Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.A</u>.

B.      Australia Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.B</u>.

C.      India Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.C</u>.

D.      Germany Asset Sale Agreement, substantially in the form set forth in <u>Exhibit 11.2.3.D</u>.

E.      Italy Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.E.

F.      Korea Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.F.

G.      Japan Asset Sale Agreement, substantially in the form set forth in Exhibit 11.2.3.G.

H.      Share Transfer Agreement with respect to Delphi Polska, substantially in the form set forth in Exhibit 11.2.3.H.

**11.2.4.**    The Bill of Sale, substantially in the form set forth in Exhibit 11.2.4.

**11.2.5.**    The Assignment and Assumption Agreement, substantially in the form set forth in Exhibit 11.2.5.

**11.2.6.**    The GM IP License Agreement.

**11.2.7.**    The applicable Seller Transition Services Agreement between Delphi and GM substantially in the form set forth in Exhibit 11.2.7.

**11.2.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3**    **Company Ancillary Agreements.**

At or prior to the Closing, the applicable Company Sellers will duly execute and deliver to the Company Buyer, and the Company Buyer will duly execute and deliver to the applicable Company Sellers, each of the following agreements to which they are to be a party:

**11.3.1.**    Assignments, in recordable form, with respect to each of the Copyrights, Patent Rights, Trademark Rights included within the Purchased Intellectual Property, duly executed by each Seller, as applicable, and in form and substance reasonably satisfactory to Buyer.

**11.3.2.**    The Buyer Transition Services Agreement substantially in the form set forth in Exhibit 11.3.2;

**11.3.3.**    The transition services agreement between Delphi and the Company Buyer, substantially in the form set forth in Exhibit 11.3.3 (the "**Seller Transition Services Agreement**").

**11.3.4.**    The bills of sale, substantially in the form set forth in Exhibit 11.3.4.

**11.3.5.**    The assignment and assumption agreements, substantially in the form set forth in Exhibit 11.3.5.

**11.3.6.**    The Company IP License Agreements.

**11.3.7.**    Lease by GM to Company Buyer of technical centers at Kokomo, Indiana and Lockport, New York pursuant to Sections 11.2.1.D and 11.2.1.E.

**11.3.8.**    Share transfer agreements in customary form as required to effect the sale and transfer of the Sale Securities of the Sale Companies without any Encumbrances other than Permitted Encumbrances.

**11.3.9.**    The Operating Agreement.

**11.3.10.**    Other Ancillary Agreements.

**11.4**    **Sellers' Deliveries at Closing.**

At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the applicable Buyer:

**11.4.1.**    To the extent that equity interests of Sale Companies or the JV Companies are represented by stock certificates, original certificates evidencing the Sale Securities (to the extent applicable in the respective jurisdiction), which certificates will be duly endorsed for transfer or accompanied by duly executed stock transfer powers or other appropriate instruments of assignment and transfer in favor of the relevant Buyer or its permitted assigns.

**11.4.2.**    Quitclaim deeds (or non U.S. equivalent) for the GM Owned Real Property and the Company Owned Real Property, substantially in the form of Exhibit 11.4.2 or such other form of conveyance in substance equivalent to such form of deed.

**11.4.3.**    Copies of the resolutions (or local equivalent) of the boards of directors of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby.

**11.4.4.**    Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Plan Modification Order.

**11.4.5.**    The minutes and other partnership or limited liability company record books of the Sale Companies and all stock transfer ledgers and other records evidencing the equity ownership of the Sale Companies.

**11.4.6.**    Resignations of all directors (or equivalent) and officers of the Sale Companies and of any Seller representatives in similar positions with the JV Companies, except as otherwise requested by Parent no less than ten (10) Business Days prior to the Closing Date.

**11.4.7.**    A non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445(b) of the

Internal Revenue Code so that Buyers are exempt from withholding any portion of the Purchase Price thereunder.

**11.4.8.** All other documents and papers reasonably requested by Buyers to transfer title to the Acquired Assets or Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**11.4.9.** A certificate signed by each Seller, dated the date of the Closing Date (in form and substance reasonably satisfactory to Buyer), certifying that the conditions specified in Section 10.3 have been satisfied as of the Closing.

**11.4.10.** Written acknowledgements from the applicable Governmental Authorities that all material Environmental Permits have been transferred, assigned or reissued to Buyer or, with respect to any material Environmental Permit which cannot be transferred, assigned or reissued prior to Closing, written or other satisfactory acknowledgment from the appropriate Governmental Authority that continued operation after Closing by Buyers pending transfer, assignment or reissuance of any such material Environmental Permit is permissible.

**11.4.11.** Environmental Records and GM Environmental Records without redaction or deletion. Environmental Records and GM Environmental Records located at the Real Property immediately following the Closing will be deemed to be delivered for purposes of this Section 11.4.

**11.4.12.** Copies of all documents required to effect the transfer of ownership and possession of any Real Property under the Indiana Responsible Property Transfer Law, Indiana Code Section 13-25-3.

**11.4.13.** The applicable Transition Services Agreements substantially set forth in Exhibits 11.2.7 and 11.3.3.

**11.4.14.** Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (A) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (B) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

**11.4.15.** Amendments to the Rhodes I and Rhodes II Operating Agreements in the forms previously provided to Sellers.

**11.4.16.** DIP Agreement payoff letter in customary form or reasonably acceptable to Buyers.

**11.5** **Buyers' Deliveries at Closing.**

**11.5.1.** At or prior to the Closing, GM Buyers will deliver or cause to be delivered the following:

A. The waiver by GM of its pre-petition Claims, Administrative Claims, and future Claims in the Bankruptcy Cases including without limitation any

such Claims pursuant to the Global Settlement Agreement, as amended, effective as of September 29, 2008, between Delphi and GM and each of the GM-Delphi Liquidity Agreements;

B.    The payment to Delphi of the DIP Priority Payment;

C.    The payment to Delphi of $291,020,079 in cash;

D.    The assumption or payment of the applicable Cure Amounts for the GM Business;

E.    The payment to Delphi of certain expenses of Delphi and its Filing Affiliates following the Closing as set forth on Exhibit 3.1.1.F.

F.    Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

G.    An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers, certifying that the conditions specified in Section 10.2 have been fulfilled;

H.    Each GM/Company Ancillary Agreement to which a GM Buyers is a party; and

I.    50% of professional fees (not to exceed $15,000,000 as the payment from the GM Buyer) that are Administrative Claims required to be paid in cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the  Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization), plus the costs of solicitation of approval for the Plan of Reorganization that are Administrative Claims not to exceed $12,000,000; provided, that the sum of (x) the amounts paid pursuant to this Section 3.1.1.G, plus (y) applicable Cure Amounts paid or assumed by the GM Buyers, shall not exceed, in the aggregate, $148,000,000.

**11.5.2.**    At or prior to the Closing, Company Buyer will deliver or cause to be delivered the following;

A.    $1.00 (one dollar);

B.    The payment to Delphi of the Parnassus Class C Interest of Company Buyer, either directly or indirectly through one or more intermediaries, which shall be held either by Sellers, a trust or an agent, as determined by Sellers.

C.    50% of professional fees (not to exceed $15,000,000 as the payment by the Company Buyer) that are Administrative Claims required to be paid in

102

cash by the Filing Affiliates in connection with the Filing Affiliates' emergence from Chapter 11 pursuant to the Plan of Reorganization (excluding the costs of solicitation of approval for the Plan of Reorganization).

D.    The assumption or payment of the Cure Amounts for the Company Business;

E.    Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

F.    Each GM/Company Ancillary Agreement to which a Company Buyer is a party;

G.    An officer's certificate, dated as of the Closing Date, executed on behalf of each of the Buyers, certifying that the conditions specified in <u>Section 10.2</u> have been fulfilled; and

H.    Delphi shall assign to Company Buyer and Company Buyer shall assume all of Delphi's rights and obligations under (i) the GM-Delphi Memorandum of Understanding Flint East Operations between Delphi and GM, dated as of December 23, 2008, and (ii) the Leased Hourly Employees Services Agreement dated as of December 19, 2008.

**11.6    Post-Closing Deliveries.**

Promptly following the Closing, the Sale Companies will deliver to the applicable Buyer signature cards from all banks or financial institutions with which the Sale Companies have any account, designating signatures approved by the applicable Buyer.

**11.7    Post-Closing Transfer of Intellectual Property Rights.**

**11.7.1.**    If, after the Closing, either Party identifies any Intellectual Property right, including any application or registration for the Intellectual Property that such Party believes should have been included in its Purchased Intellectual Property, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in such party Purchased Intellectual Property and assigned to such Buyer. If the Parties agree that such Intellectual Property right should have been included in the Purchased Intellectual Property and assigned to another Buyer, Sellers or Buyer or their respective Affiliate, as applicable, shall assign or cause to be assigned such Intellectual Property right to Buyers at no additional cost to Buyers. The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute at no additional cost to Buyers all documents reasonably requested by the other Party to effect such transfer and/or assignment.

**11.7.2.**    If, after Closing, a Buyer identifies any Intellectual Property right, including any patent or patent application that it believes should have been included in the

103

Shared Intellectual Property licensed under the GM IP License Agreement or the Company IP License Agreement, as applicable, but which is reasonably within the scope of Excepted Shared Intellectual Property identified in the GM IP License Agreement or the Company IP License Agreement, as applicable, the Parties shall cooperate to determine in good faith whether such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder.  If the Parties agree that such Intellectual Property right should have been included in the Shared Intellectual Property licensed to Buyers hereunder, the Parties shall amend Schedule 9.9.1.A to specifically exclude such Intellectual Property right from the Excepted Shared Intellectual Property, and Buyers shall receive, via amendment to this Agreement, a license under such Intellectual Property right with terms identical to those of the license granted in Section 9.9.1.  The Parties each covenant and agree on behalf of themselves and their respective Affiliates to execute all documents reasonably requested by the other Party to effect such license.  All amendments, covenants and agreements to be provided under this Section shall be at no additional cost to Buyers.

## ARTICLE 12.
## TERMINATION.

### 12.1    Termination.

This Agreement may be terminated at any time prior to the Closing:

**12.1.1.**    By the mutual written consent of Delphi, Parent and Company Buyer.

**12.1.2.**    By any Party if the Closing has not occurred by September 30, 2009, provided such date shall be extended until November 30, 2009 in the event that all conditions to Closing are satisfied or capable of being satisfied on the Closing Date, other than the condition set forth in Section 10.1.2 and provided further that the terminating party will not have the right to terminate this Agreement if it is in material default hereunder.

**12.1.3.**    By Delphi if (a) the Interim Financing Amendment shall not have been executed and delivered by GM on or prior to June 1, 2009, (b) the Interim Financing Amendment have not been approved by the Bankruptcy Court on or prior to June 10, 2009,  pursuant to one or more orders in form and substance reasonably satisfactory to Delphi, (c) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect  at any time on or after June 10, 2009 or (d) GM breaches any of its material covenants, obligations or agreements under either of the GM-Liquidity Agreements (as modified by the Interim Financing Amendment).

**12.1.4.**    By GM if (a) the Interim Financing Amendment has not been approved by the Bankruptcy Court on or prior to June 10, 2009, pursuant to one or more orders; (b) the GM-Delphi Liquidity Agreements (as modified by the Interim Financing Amendment) fail or otherwise cease to be in full force and effect  at any time on or after June 10, 2009; or (c) Delphi breaches any of its material covenants, obligations or agreements under the GM-Liquidity Agreements (as modified by the Interim Financing Amendment), or an event of default has occurred and is continuing under the Interim Financing Amendment; or (d) the Interim Financing Amendment has otherwise been terminated in accordance with its terms.

104

**12.1.5.**    This Agreement may be terminated by either of GM or Company Buyer if (x) the Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not been entered by the Bankruptcy Court on or prior to July 23, 2009, or (y) such Plan Modification Order in form and substance satisfactory to GM or Company Buyer, as applicable, has not become a Final Order within ten (10) days of such order's entry.

**12.1.6.**    This Agreement will automatically terminate, without any further action by any party hereto, on July 15, 2009 (or such later date as may be mutually agreed upon by GM, Company Buyer and Delphi in writing) if GM is the subject of a case under the Bankruptcy Code and (a) federal court approval of GM's entry into, and performance under, this Agreement and all Ancillary Agreements to which GM is or is to be a party has not been obtained, (b) federal court authority to assume all purchase orders and commercial agreements between Sellers and GM the Ancillary Agreement to which GM is or is to be a party and the Securities Purchase Agreement, (the "**GM Assumed Contracts**"), upon the closing of this Agreement has not been obtained, (c) if GM has received federal court authorization to transfer assets (including the stock of subsidiaries) related to the GM Assumed Contracts to any other person that will then hold substantially all of the Existing GM Assets, GM has not received authority to assign such contracts to such transferee, or (d) GM, or if substantially all of the existing GM Assets have been transferred, the entity that then holds substantially all of the Existing GM Assets, has not agreed in writing to assume the GM Assumed Contracts upon the closing of this Agreement.  For purposes of this Section 12.1.6, "**Existing GM Assets**" means the assets of GM as of the time immediately prior to one of the events set forth in clauses (a), (b), (c) or (d) of the preceding sentence, as applicable.

**12.2**    **Procedure and Effect of Termination.**

    In the event of the termination of this Agreement pursuant to Section 12.1, written notice thereof will forthwith be given to all other Parties.  If this Agreement is terminated:

**12.2.1.**    Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**12.2.2.**    The provisions of the GM or Company Confidentiality Agreement, as applicable, will continue in full force and effect; and

**12.2.3.**    The following Sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: ARTICLE 12 (Termination) and; Sections 14.1 (Fees and Expenses), 14.5 (Assignment), 14.7 (Waiver), 14.8 (Notices), 14.9 (Entire Agreement), 14.11 (Publicity), 14.15 (Governing Law) and 14.16 (Venue and Retention of Jurisdiction).

**12.2.4.**    No party to this Agreement will have any Liability under this Agreement to any other except that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and no Party waives any Claim with respect thereto.

**12.2.5.**    The MRA, including Section 4.06(c) and related provisions, shall be unaffected by such termination.  For avoidance of doubt, under no circumstances shall a default under this Agreement constitute a default under the MRA.

## ARTICLE 13.
## LIABILITY, SURVIVAL.

### 13.1    LIMITATIONS OF LIABILITY.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES.  IN NO EVENT WILL THE COMPANY BUYER OR ANY OF ITS AFFILIATES HAVE ANY LIABILITY PRIOR TO THE CLOSING FOR DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO ACTUAL, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, TO ANY PARTY OR ANY OF THE PARTIES' RESPECTIVE AFFILIATES OR TO ANY OTHER PERSON WITH RESPECT TO THIS AGREEMENT EXCEPT TO THE EXTENT OF THE TERMINATION FEE SET FORTH IN THE EQUITY COMMITMENT LETTER AND THEN SOLELY TO THE PARTIES THERETO TO THE EXTENT PROVIDED THEREIN.

### 13.2    Termination Fee.

In the event that a Termination Fee (as defined in the Securities Purchase Agreement) is payable under the Equity Commitment Letter or the Securities Purchase Agreement to GM,  and GM receives such termination fee in full, then GM shall either (i) agree to consummate all of the transactions under this Agreement in accordance with the terms thereof, including fulfilling the obligations of Company Buyer hereunder, as if this Agreement were not terminated if applicable, or (ii) if GM elects not to so consummate such transactions, then GM shall pay to Delphi an amount equal to the positive difference, if any, equal to (a) the total amount of such Termination Fee less (b) the amount advanced under the Interim Financing Amendment after the date of this Agreement as Tranche C Advances.

Nothing in Section 13.1 or 13.2 shall limit a Party's rights under Section 14.18 of this Agreement.

### 13.3    Survival.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder until fully performed, and each party hereto shall be liable to the other after the Closing for any breach thereof.

106

# ARTICLE 14.
## MISCELLANEOUS.

### 14.1    Fees and Expenses.

Except as may otherwise be specifically provided in this Agreement, each of the Parties will be responsible for its own costs and expenses related to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

### 14.2    Bulk Sales Laws.

Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

### 14.3    Payments in Dollars.

Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. dollars in same day or immediately available funds.

### 14.4    Amendment.

This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties. The Parties acknowledge and agree, however, that the Schedules and the Exhibits, other than Schedule 1.1.A "Assumed Administrative Liabilities", Schedule 2.1.5.F "Excluded Facilities", Schedule 2.1.5.J "Pending Transactions", and Exhibit 3.1.1.F "Wind Up Costs", the IP License Agreements and the GM Company Ancillary Agreements, which are not executed on the date hereof, are in draft form and will be revised and finalized in a manner consistent with this Agreement to the mutual satisfaction of the Parties each acting reasonably, prior to Closing.

### 14.5    Assignment.

This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party and their Affiliates, provided, that except as otherwise provided in this Section 14.5, no assignment of any rights or obligations hereunder will be made by any Buyer without the written consent of Delphi, or by any Seller hereto without the written consent of one or both of GM and Company Buyer based on which Buyer is impacted by the request, except in connection with a Pending Transaction. Any GM Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) (i) to GM or any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or limited liability company), (ii) to the applicable Buyer's lenders or (iii) in connection with the direct or indirect sale, merger, consolidation or similar reorganization of all or a substantial portion of GM's business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder. Upon any such permitted assignment, the references in

107

this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.  Any Company Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, such Buyer's rights to purchase the applicable Acquired Assets or Sale Securities and assume the applicable Assumed Liabilities) to any Affiliate or other designee of Company Buyer; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that no party is released from its obligations hereunder.  Upon any such permitted assignment, the references in this Agreement to the applicable Buyer shall also apply to any such assignee unless the context otherwise requires.

### 14.6    No Successor Liability.

Except where expressly prohibited under applicable law , upon the Closing, the Buyers shall not be deemed to:  (a) be the successor of the Filing Affiliates; (b) have, de facto, or otherwise, merged with or into the Filing Affiliates; (c) be a mere continuation or substantial continuation of the Filing Affiliates or the enterprise(s) of the Filing Affiliates; or (d) be liable for any acts or omissions of the Filing Affiliates in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyers shall not be liable for any Claims against the Filing Affiliates or any of their predecessors or affiliates, and the Buyers shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Filing Affiliates arising prior to the Closing Date, including, but not limited to, Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date, except as expressly provided in this Agreement.  The Buyers acknowledge and agree that this Section 14.6 shall not in any be deemed to expand or modify Sellers' indemnification obligations under this Agreement or any Ancillary Agreement.  Nothing in this provision shall preclude the application of the Alternate Procedure set forth in Section 5 of the Revenue Procedure 2004-53.

### 14.7    Waiver.

Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement:  (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. At any time prior to the Closing Date, the Parties may:  (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**14.8**    <u>Notices</u>.

Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes:  (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

| | |
|---|---|
| If to any GM Buyer: | c/o General Motors Corporation<br>767 Fifth Avenue<br>14th Floor<br>New York, NY 10153<br>Attn:  Director of Business Development<br>Fax:  (212) 418-3623 |
| | and |
| | General Motors Corporation<br>300 GM Renaissance Center<br>Detroit, MI 48265<br>Attn:  General Counsel<br>Fax:  313-665-4960 |
| With a copy to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Ave.<br>Detroit, MI 48226<br>Attn:  Robert B. Weiss<br>Tel.:  (313) 465-7596<br>Fax.:  (313) 465-7597 |
| If to any Company Buyer: | Parnassus Holdings II, LLC<br>c/o Platinum Equity<br>360 North Crescent Drive<br>South Building<br>Beverly Hills, CA 90210<br>Attn:<br>Tel.:<br>Fax: |
| With a copy to: | Schulte Roth & Zabel LLP |

109

919 Third Avenue
New York, NY 10022
Adam Harris, Marc Weingarten
 and David E. Rosewater;
Tel.: (212)-756-2000
Fax: (212) 593-5955


If to Delphi:              DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
Attn: Executive Director of Restructuring
Fax: **(**248**)** 813-2612


With a copy to:          DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
Attn: Deputy General Counsel -
           Transactional & Restructuring
Fax: (248) 813-2491


With a copy to:          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Attn: Eric Cochran
           Marie Gibson
Fax: (212) 735-2000

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

### 14.9    Entire Agreement.

This Agreement, including all agreements incorporated by reference herein, the Ancillary Agreements and the GM Confidentiality Agreement or the Company Confidentiality Agreement, as applicable, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, provided, however that existing commercial agreements between GM and Delphi which are otherwise addressed in this agreement shall not be superceded. This Agreement is the product of negotiations between the Parties and represents the Parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less favorably to any Party.

### 14.10    Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

### 14.11    Publicity.

Except for statements by Delphi in connection with the Bankruptcy Cases or as otherwise required by Law, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without consulting with the other Party.

### 14.12    Headings.

The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

### 14.13    Severability.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable:  (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

### 14.14    Third Parties.

Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

### 14.15    Governing Law.

This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.

### 14.16    Venue and Retention of Jurisdiction.

By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; provided, however, that after the second (2nd) anniversary of the date of this Agreement, the Bankruptcy

Court and the Supreme Court of New York, New York County and the United States District Court for the Southern District of New York (the "**New York Courts**") shall have non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; and, underline{provided}, underline{further}, that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement shall terminate upon the fourth (4th) anniversary of the date of this Agreement and the New York Courts shall have exclusive jurisdiction after the fourth (4th) anniversary of the date of this Agreement.  Each Party further agrees to waive any objection based on forum non conveniens.

### 14.17    Risk of Loss.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

### 14.18    Enforcement of Agreement.

The Parties acknowledge and agree that the covenants and undertakings contained in this Agreement and the Ancillary Agreements relate to matters which are of a special, unique and extraordinary character and that a violation of any of the terms of this Agreement or any Ancillary Agreement will cause irreparable injury to the other Parties and that the amount of such injury will be extremely difficult, if not impossible, to estimate or determine and may not be adequately compensated by monetary damages alone.  Therefore, each Party acknowledges that the other Party will be entitled, in addition to all other rights and remedies available under this Agreement, and Ancillary Agreement, and applicable law, as a matter of course, to an injunction, order of specific performance, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any terms of this Agreement or any Ancillary Agreement without proof of actual damages and without any requirement for the securing or posting of any bond.

### 14.19    Sellers' Obligations.

Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agreement and the Plan Modification Order.  The Filing Affiliates' obligations under this Agreement (including all Exhibits and Ancillary Agreements) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Filing Affiliates, and the reorganized or reconstituted Filing Affiliates, as the case may be, after the effective date of the confirmed plan or plans in the Filing Affiliates' cases.

### 14.20    Bankruptcy Court Approval.

Notwithstanding anything to the contrary herein, the Parties' obligations under this Agreement are expressly subject to entry of the Plan Modification Order.

**14.21**   **Reasonably Equivalent Value.**

As set forth in the Recitals to this Agreement, consideration under the Agreement was provided by all Parties to the Agreement.  This Agreement is not the product of collusion among the Parties and is the result of arms' length negotiations.  Each of the Parties hereto acknowledge and agree that it received reasonably equivalent value for the consideration provided by such Party.

**14.22**   **Identification of Exhibits and Schedules to be Filed Under Seal.**

(i)        The parties agree that certain documents attached as Exhibits and Schedules hereto contain sensitive and confidential business terms which, if publicly disclosed, could detrimentally affect the parties.   Certain of these documents contain detailed proprietary information describing certain aspects of the business relationship between the parties and the parties believe these documents contain sensitive and confidential information of a type not typically disclosed to the public or made available in the automotive industry.  Moreover, certain of these documents contain confidentiality provisions which compel the parties to maintain the confidentiality of the terms of such agreements.

(ii)        The parties hereto agree to use commercially reasonable efforts to obtain approval by the Bankruptcy Court of an order authorizing the parties to file the following Exhibits and Schedules hereto under seal:

<div align="center">Schedules</div>

| | |
|---|---|
| Schedule 1 | Detail of Sellers and GM Buyers |
| Schedule 1.1.A | Assumed Administrative Liabilities |
| Schedule 1.1.B | GM Buyers' Knowledge, Company Buyers' Knowledge and Sellers' Knowledge |
| Schedule 1.1.C | Steering Products |
| Schedule 1.1.D | Excluded Insurance Policies |
| Schedule 1.1.D.1 | Patents |
| Schedule 1.1.D.2 | Trademarks Rights |
| Schedule 1.1.D.3 | Copyrights |
| Schedule 1.1.E | Transferred Insurance Policies |
| Schedule 2 | Details of Sellers and Company Buyer |
| Schedule 2.1.5.F | Excluded Facilities |
| Schedule 2.1.5.J | Pending Transactions |
| Schedule 2.1.5.K | Other Excluded Assets |

<div align="center">113</div>

| | |
|---|---|
| Schedule 2.3.1 | Administrative Claims |
| Schedule 4.3.1 | Sale Companies and JV Companies |
| Schedule 4.3.2 | Capital Stock |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6.2 | Licenses to Affiliates |
| Schedule 4.6.3 | Infringement and Allegations of Infringement of Third Party Intellectual Property |
| Schedule 4.6.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.6.5 | Intellectual Property Notices |
| Schedule 4.8.1 | GM Leased Real Property |
| Schedule 4.8.2 | GM Owned Real Property |
| Schedule 4.9.1. | Historical Financial Statements |
| Schedule 4.9.2 | Financial Statement Exceptions |
| Schedule 4.10 | Compliance with Laws |
| Schedule 4.12.1 | Tax Returns |
| Schedule 4.12.3 | Tax Deficiencies |
| Schedule 4.12.5 | Tax Liens |
| Schedule 4.12.6 | Tax Waivers or Extensions |
| Schedule 4.13.1 | Employee List |
| Schedule 4.13.5 | Proceedings Relating to Employee Benefit Plan |
| Schedule 4.13.6 | Employee Benefit Plan/No Material Liability or Encumbrance under Title IV of ERISA |
| Schedule 4.13.8 | Welfare Benefits |
| Schedule 4.13.9 | Contributions to Seller Employee Benefit Plan |
| Schedule 4.13.12 | No Threatened Labor Stoppage |
| Schedule 4.14.1 | Material Contracts |
| Schedule 4.14.2 | Default/Post-Petition Contracts |
| Schedule 4.15 | Environmental Matters |
| Schedule 4.16 | Insurance Policies |
| Schedule 9.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 9.9.1.A | Excepted Shared Intellectual Property |

114

| Schedule 9.9.1.B | Steering Excluded Products |
| Schedule 9.9.9 | Transfer of Shared Software Licenses |
| Schedule 9.9.10 | Facilities Separation & Relocation Plan |
| Schedule 9.10 | Shared Items Transferred to Buyers |
| Schedule 9.12 | Letters of Credit |
| Schedule 9.20.1(i) | Mexico LTA – Rio Bravo Electricos S.A. de C.V. |
| Schedule 9.20.1(ii) | Mexico LTA – Alambrados y Circuitos Electricos, S.A. de C.V. |
| Schedule 9.20.3(iii) | Mexico LTA – Delphi Ensamble de Cables y Componentes, S. de R.L. de C.V. |
| Schedule 9.20.2 | Post-Closing Mexico Utility Contracts |

## Exhibits

| 1.2 | Operating Agreement |
| 3.1.1.F | Wind Up Costs |
| 9.9.1 | GM IP License Agreement |
| 9.9.3 | Company IP License Agreement |
| 9.9.4 | Pending Transaction IP License Agreement |
| 9.22 | Novation Letter |
| 9.29 | Form of Privilege Waivers |
| 11.2.1.A | Somerton, Australia Transfer and Variation of Lease (Assignment and Assumption Agreement) |
| 11.2.1.B | Paris Technical Center Sublease |
| 11.2.1.C | Casa Grande Sublease |
| 11.2.2.A.1 | U.S. Patent Assignment (Delphi Technologies) |
| 11.2.2.A.2 | EP Jointly Held Patent Applications Assignment (Delphi Technologies) |
| 11.2.2.A.3 | EP Solely Owned Patent Applications Assignment (with Annex 1) (Delphi Technologies) |
| 11.2.2.A.4 | DE Patents Assignment (Delphi France) |
| 11.2.2.A.5 | ES Patents Assignment (Delphi France) |
| 11.2.2.A.6 | FR Patents Assignment (Delphi France) |
| 11.2.2.A.7 | GB Patents Assignment (Delphi France) |
| 11.2.2.A.8 | IT Patents Assignment (Delphi France) |
| 11.2.2.A.9 | U.S. Patent Assignment (Delphi France) |

| | |
|---|---|
| 11.2.2.A.10 | AU Patent Assignment (Delphi Technologies) |
| 11.2.2.A.11 | BR Patent Assignment (Delphi Technologies) |
| 11.2.2.A.12 | CN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.13 | HK Patent Assignment (Delphi Technologies) |
| 11.2.2.A.14 | IN Patent Assignment (Delphi Technologies) |
| 11.2.2.A.15 | JP Patent Assignment (Delphi Technologies) |
| 11.2.2.A.16 | KP Patent Assignment (Delphi Technologies) |
| 11.2.2.B | Omnibus Trademark Assignment (Delphi Technologies) |
| 11.2.2.C | Copyright Assignment (Delphi Technologies) |
| 11.2.3.A | France Asset Sale Agreement* |
| 11.2.3.B | Australia Asset Sale Agreement* |
| 11.2.3.C | India Asset Sale Agreement* |
| 11.2.3.D | Germany Asset Sale Agreement* |
| 11.2.3.E | Italy Asset Sale Agreement* |
| 11.2.3.F | Korea Asset Sale Agreement* |
| 11.2.3.G | Japan Asset Sale Agreement* |
| 11.2.3.H | Netherlands Asset Sale Agreement |
| 11.2.7 | GM/Delphi Seller Transition Services Agreement |
| 11.3.2 | Buyers Transition Services Agreement |

[Remainder of the page left intentionally blank.]

116

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

DELPHI CORPORATION

By: _____
     Name:
     Title:


GM COMPONENTS HOLDINGS, LLC

By: _____
     Name:
     Title:


GENERAL MOTORS CORPORATION (solely with respect to ARTICLE 6 and Sections 9.11.1, 9.19, AND 9.38)

By: _____
     Name:
     Title:


PARNASSUS HOLDINGS II, LLC

By: _____
     Name:
     Title:

117

## **EXHIBIT B**

**Securities Purchase Agreement**

**Confidential Treatment Requested by General Motors Corporation Pursuant to the Freedom of Information Act**

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (the "Agreement") is made as of June 1, 2009 (and revised as of June __, 2009) by and among, Parnassus Holdings I, LLC, a Delaware limited liability company (the "Investor"), Parnassus Holdings II, LLC, a Delaware limited liability company (the "Company") and General Motors Corporation ("GM" or the "Purchaser"). Each of the Investor, the Company and the Purchaser is a "Party" and collectively they are the "Parties" to this Agreement. Capitalized terms used herein but not otherwise defined have the meaning set forth in Section 1.

WHEREAS, upon the terms and conditions stated in this Agreement, (i) the Purchaser wishes to purchase from the Company the number of Class A membership interests (the "Class A Securities") set forth beside the Purchaser's name in Schedule I attached hereto of the Company for the aggregate amount set forth opposite the Purchaser's name in Schedule I and (ii) the Investor wishes to purchase from the Company the number of Class B membership interests (the "Class B Securities") set forth opposite the Investor's name in Schedule I attached hereto of the Company for the aggregate amount set forth opposite the Investor's name in Schedule I;

WHEREAS, the Purchaser, the Investor and the Company are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended, and Rule 506 of Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act (as defined below); and

WHEREAS, the Investor and GM desire to provide the Company with financing for general corporate and working capital needs.

Capitalized terms used herein but not otherwise defined have the meaning set forth in Section 1.

1.    Definitions.  As used herein, the following terms shall have the following meanings:

"Access Agreement" has the meaning ascribed thereto in the Master Disposition Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person. For the purpose of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" has the meaning ascribed thereto in the Master Disposition Agreement.

"Ancillary Documents" means the Master Disposition Agreement, the Loan Documents, the Buyer Transition Services Agreement, the Supply Agreement, the Commercial Agreement,  the Access Agreement, the Operating Agreement, and the Ancillary Agreements.

"Bankruptcy Cases" has the meaning ascribed thereto in the Master Disposition Agreement.

"Bankruptcy Court" has the meaning ascribed thereto in the Master Disposition Agreement.

"Business" means the GM Business or the Company Business, as applicable..

"Business Day" means any day that is not a Saturday or Sunday or a legal holiday on which banks are authorized or required by law to be closed in New York.

"Buyer" has the meaning ascribed thereto in the Master Disposition Agreement.

"Buyer Transition Services Agreement" has the meaning ascribed thereto in the Master Disposition Agreement.

"Class A Securities" has the meaning ascribed to it in the recitals.

"Class B Securities" has the meaning ascribed to it in the recitals.

"Commercial Agreement" has the meaning ascribed thereto in the Master Disposition Agreement.

"Company Business" has the meaning ascribed thereto in the Master Disposition Agreement.

"Delphi" means Delphi Corporation, a Delaware corporation.

"Delphi Subsidiaries" means the subsidiaries of Delphi that are parties to the Master Disposition Agreement.

"Financing" means the debt financing to be provided by GM and the Investor pursuant to the Loan Documents.

"GAAP" has the meaning ascribed thereto in the Master Disposition Agreement.

2

"GM Business" has the meaning ascribed thereto in the Master Disposition Agreement.

"Governmental Order" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"Governmental Authority" shall mean any court, administrative agency or commission or other governmental authority or instrumentality, domestic (federal, state or local) or foreign.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and applicable rules and regulations and any similar state acts.

"Law" has the meaning ascribed thereto in the Master Disposition Agreement.

"Liabililties" has the meaning ascribed thereto in the Master Disposition Agreement.

"Loan Documents" means that certain Credit Agreement among [Parnassus Holding, LLC], the Company, the Investor, the other lenders party thereto and GM as administrative agent to be executed on or prior to the Closing, substantially in the form attached to this Agreement as Exhibit A.

"Master Disposition Agreement" means that certain Master Disposition Agreement, dated as of June 1, 2009 (and revised as of June __, 2009), by and among GM Components Holdings, LLC, the Company, Delphi and the other sellers and buyers party thereto.

"Material Adverse Effect" means any change, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' under the Master Disposition Agreement), results of operations or financial condition of the GM Business or the Company Business, as applicable, taken as a whole, after giving effect to the transactions contemplated by the Master Disposition Agreement, but excludes any effect: (i) resulting from general economic or business conditions (except to the extent such change, occurrence or development has a significantly disproportionate adverse effect on such Business); (ii) affecting companies in its industry or its markets generally (except to the extent such change, occurrence or development has a significantly disproportionate adverse affect on such Business); (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of the Master Disposition Agreement by GM Components Holdings, LLC pursuant to Section 12.1 thereof; (v) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding

3

operation of such Business; (vi) resulting from any act or omission of any Seller taken with respect to the Company Business or the GM Business with the prior written consent of GM or the Company Buyer, as applicable; (vii) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (viii) resulting from the regulatory status of any Buyer; (ix) resulting from acts of war or terrorism, whether or not directed at such Business or Buyer; or (x) resulting from the financial condition of GM or any voluntary or involuntary filing of bankruptcy involving GM.

"Modification Procedures Order" shall mean that certain Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Claims Bar Date and Alternative Transaction Hearing Date, as entered by the Bankruptcy Court on June __, 2009.

"Non-Seller Subsidiaries" means, collectively, the Foreign Subsidiaries and the subsidiaries of Delphi domiciled in the United States that are not Delphi Subsidiaries.

"Operating Agreement" means that certain Amended and Restated Limited Liability Company Agreement of Parnassus Holdings II, LLC, substantially in the form attached to this Agreement as Exhibit B; provided, that in the event that the Purchaser and the Investor agree that the Company should be organized in a different jurisdiction in accordance with Section 7(d), "Operating Agreement" means an appropriate agreement reflecting the terms set forth in the Operating Agreement as much as reasonably practicable, taking into account the entity type and jurisdiction of such Company.

"Person" means an individual, a partnership, a corporation, an association, a limited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Purchased Securities" means the number of Class A Securities and Class B Securities set forth on Schedule I.

"Restricted Securities" means (i) the Purchased Securities issued hereunder, (ii) any securities issued with respect to the Purchased Securities referred to in clause (i) above by way of a stock dividend or stock split or in connection with a combination of stock, recapitalization, merger, conversion, consolidation or other reorganization and (iii) any securities issued pursuant to an exchange of such Purchased Securities. As to any particular Restricted Securities, such securities shall cease to be Restricted Securities when they have (a) been effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (b) become eligible for sale pursuant to Rule 144 (or any similar provision then in force) under the Securities Act without any volume or manner of sale limitations or (c) been otherwise transferred and new certificates for them not bearing the Securities Act legend set forth in Section 11 have been delivered by the Company. If certificated, whenever any particular securities

4

cease to be Restricted Securities, the holder thereof shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing a Securities Act legend of the character set forth in <u>Section 11</u>.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Sellers</u>" has the meaning ascribed thereto in the Master Disposition Agreement.

"<u>Supply Agreement</u>" has the meaning ascribed thereto in the Master Disposition Agreement.

"<u>Transactions</u>" means the transactions contemplated by this Agreement, the Ancillary Agreements and the Master Disposition Agreement.

2.    <u>Authorization and Closing</u>.

(a)    <u>Authorization of the Purchased Securities</u>.    The Company has authorized the issuance and sale to the Purchaser of the Class A Securities and to the Investor of the Class B Securities, in each case having the rights and preferences set forth in the Operating Agreement.

(b)    <u>Purchase and Sale of the Purchased Securities</u>.    Upon the terms and subject to the conditions set forth herein, at the Closing (as defined below):

(i)    the Company shall issue and sell to the Purchaser, and the Purchaser shall purchase from the Company, the number of Class A Securities set forth on <u>Schedule I</u> hereto across from the name of the Purchaser for an aggregate purchase price equal to $2.0 billion (the "<u>Class A Purchase Price</u>"); and

(ii)    the Company shall issue and sell to the Investor or its designated Affiliate, and the Investor shall (or shall cause its designated Affiliate to) purchase from the Company, the number of Class B Securities set forth on <u>Schedule I</u> hereto across from the name of the Investor for an aggregate purchase price equal to $250 million (the "<u>Class B Purchase Price</u>").

(c)    <u>Loan Documents</u>.    Upon the terms and subject to the conditions set forth herein, at the Closing:

(i)    the Purchaser hereby commits to provide to the Company a senior secured first lien credit facility under which the Purchaser agrees to make loans to the Company in an aggregate principal amount of up to $500 million upon the terms and conditions outlined in the Loan Document, and to enter into such Loan Documents; and

5

(ii)     the Investor hereby commits or shall cause its designated Affiliate to commit to provide to the Company a senior secured first lien credit facility under which the Investor agrees to make or the Investor shall cause its designated Affiliate to make loans to the Company in an aggregate principal amount of up to $250 million upon the terms and conditions outlined in the Loan Document, and to enter into such Loan Documents.

(d)     The Closing.    The closing of the purchase and sale of the Purchased Securities (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036 (or at such other place as the Parties may designate in writing) at 10:00 a.m. (New York City time) concurrently with the closing of the transactions contemplated by the Master Disposition Agreement, or at such other place or such other time or date as the Parties may designate (the "Closing Date").

(e)     Purchaser Closing Deliveries.    At or prior to the Closing, the Purchaser will deliver:

(i)     In exchange for the membership interests representing the Purchased Securities being purchased by the Purchaser pursuant to Section 2(b), by wire transfer of immediately available funds to an account designated by the Company no later than two Business Days prior to the Closing Date, an amount equal to the Class A Purchase Price;

(ii)     a copy of the Operating Agreement, duly executed by the Purchaser;

(iii)     an officer's certificate of the Purchaser to the effect that each of the conditions specified in Sections 10(iii) and (v) has been satisfied by the Purchaser;

(iv)     a copy of the Buyer Transition Services Agreement, duly executed by the Purchaser; and

(v)     copies of the Loan Documents, duly executed by the Purchaser.

(f)     Investor Closing Deliveries.    At or prior to the Closing, the Investor will deliver:

(i)     In exchange for the membership interests representing the Class B Securities being purchased by the Investor pursuant to Section 2(b), by wire transfer of immediately available funds to an account designated by the Company no later than two Business Days prior to the Closing Date, an amount equal to the Class B Purchase Price;

6

(ii)     a copy of the Operating Agreement, duly executed by the Investor; and

(iii)    copies of the Loan Documents, duly executed by the Investor.

(g)   <u>Company Closing Deliveries</u>.  At or prior to the Closing, the Company will deliver to the Purchaser, and with respect to items (i) through (v), the Investor:

(i)     a copy of the Operating Agreement, duly executed by the Company;

(ii)    an officer's certificate of the Company to the effect that each of the conditions specified in <u>Sections 8</u> and <u>9</u> has been satisfied;

(iii)   a certificate of the secretary of the Company and each of its subsidiaries (i) attaching the applicable entity's organizational documents and corporate authorizations and certifying that such documents are true, correct and complete and (ii) certifying as to the qualification and election of the applicable entity's officers and the authenticity of officer signatures;

(iv)    good standing certificates for the Company and each of its subsidiaries;

(v)     a copy of the Buyer Transition Services Agreement, duly executed by the Company and its subsidiaries, as applicable; and

(vi)    duly executed copies of the Loan Documents.

3.   <u>Representations and Warranties of the Company</u>.  The Company hereby represents and warrants to the Purchaser and the Investor that:

(a)   <u>Organization and Corporate Power</u>.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  The Company and its subsidiaries have all requisite power and authority to carry out the transactions contemplated by each of this Agreement, the Master Disposition Agreement and the Ancillary Documents to which each is a party.

(b)   <u>Authorization; No Breach</u>.   The execution, delivery and performance of each of this Agreement, the Master Disposition Agreement and the Ancillary Documents to which it is a party have been duly authorized by the Company and its subsidiaries.  Each of this Agreement, the Master Disposition Agreement and the Ancillary Documents to which they are a party constitute valid and binding obligations of the Company and its subsidiaries, enforceable in accordance with its terms except as may be limited by bankruptcy, insolvency,

7

reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies. The execution and delivery by the Company of this Agreement, the Master Disposition Agreement and the Ancillary Documents to which each is a party, the offering, sale and issuance of the Purchased Securities hereunder and the fulfillment of and compliance with the respective terms hereof and thereof by the Company and its subsidiaries, do not and shall not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body pursuant to, (i) the organizational documents of the Company or its subsidiaries, (ii) any law, statute, rule or regulation to which the Company or its subsidiaries are subject, or (iii) any agreement, instrument, order, judgment or decree to which the Company or its subsidiaries are subject prior to the closing of the transactions contemplated by the Master Disposition Agreement, except, in the case of subclauses (ii) and (iii) above, for any conflict, result, default, right or other requirement that could not reasonably be expected to have a material adverse effect on the transaction contemplated hereby.

(c)    <u>Capitalization and Related Matters</u>. (i) <u>Schedule I</u> sets forth the outstanding membership interests of the Company immediately following the Closing. Immediately following the consummation of the transactions contemplated hereby, the Company shall have no outstanding membership interests or securities convertible or exchangeable for membership interests or containing any profit participation features, nor shall it have outstanding any rights or options to subscribe for or to purchase its membership interests or any securities convertible into or exchangeable for its membership interests or any equity appreciation rights or phantom equity plans, except as set forth on <u>Schedule I</u>. Immediately following the consummation of the transactions contemplated hereby and by the Ancillary Documents, all of the outstanding Purchased Securities of the Company shall be validly issued, fully paid and non-assessable.

(ii)    Immediately prior to the closing of the transactions contemplated by the Master Disposition Agreement, the Company has no subsidiaries other than the direct and indirect subsidiaries identified in <u>Schedule II</u> hereto. All of the authorized, issued and outstanding equity securities of each such subsidiary are owned by the Company.

(iii)    The Company has not conducted any business prior to the date hereof and has no, and prior to the Closing Date will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the transactions contemplated by the Master Disposition Agreement and the Ancillary Agreements.

8

(d)    Other Matters.    (i)    There are no statutory or contractual securityholders preemptive rights or rights of refusal to which the Company is a party other than pursuant to the Operating Agreement. (ii) If the representations and warranties of the Purchaser and the Investor set forth in Section 5 are accurate, the offer, sale and issuance of the Purchased Securities is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable state securities laws.

4.    Covenants of the Company and its Subsidiaries.

(a)    The Company shall, and shall cause each of its subsidiaries to, (i) execute and deliver in accordance with Section 2(g) any Ancillary Documents to which it is a party and such other documents, certificates, agreements and other writings and (ii) take such other actions, in each case, as may be necessary or reasonably requested by the Purchaser or the Investor in order to consummate or implement expeditiously the Transactions in accordance with the terms of this Agreement, the Master Disposition Agreement and the Ancillary Documents.

(b)    The Company shall use its commercially reasonable efforts to cause all conditions precedent to the obligations of the Company, the Investor and the Purchaser to be satisfied.    Upon the terms and subject to the conditions of this Agreement, the Company will use its reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.

(c)    The Company shall use its commercially reasonable efforts to obtain all necessary consents, waivers, authorizations and approvals of all Governmental Authorities and of all other Persons required in connection with the execution, delivery and performance of this Agreement, the Master Disposition Agreement and the Ancillary Documents or the consummation of the Transactions in accordance with its agreements under Section 7.13 of the Master Disposition Agreement.

5.    Investment Representations.    Each of the Investor and the Purchaser hereby represents and warrants that:

(a)    Such party is acquiring the Purchased Securities purchased hereunder or acquired pursuant hereto for its own account with the present intention of holding such securities for purposes of investment, and it has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities laws.

(b)    Such party understands that the Purchased Securities have not been registered under the Securities Act or the securities laws of any state and must be held indefinitely unless subsequently registered under the Securities Act and any applicable state securities laws or unless an exemption from such registration becomes or is available.

9

(c)    Such party is an "accredited investor", as defined under Rule 501(a) promulgated under the Securities Act.

(d)    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware and the Investor is a limited liability company duly organized and validly existing and in good standing under the laws of Delaware. Each party has all requisite power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby and to carry out the transactions contemplated by each Ancillary Document to which it is a party. Each party has taken all action as and in the manner required by law, its certificate of incorporation or bylaws or otherwise to authorize the execution, delivery and performance of this Agreement and the other Ancillary Documents to which it is a party and the transactions contemplated hereby and thereby.

(e)    The execution and delivery of this Agreement, and the other Ancillary Documents to which it is a party, do not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under result in a violation of, or require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or government body (other than, with respect to the Purchaser, obtaining requisite Bankruptcy Court approval) pursuant to (i) any provisions of the organizational documents of the Purchaser or any Investor, (ii) any material terms of any material contract or commitment of any kind or character to which the Purchaser or any Investor is a party or by which it or its property may be bound, or (iii) any law, regulation, rule, judgment or order applicable to the Purchaser or any Investor or its respective property except, in the case of subclauses (ii) and (iii) above, for any conflict, result, default, right or other requirement that could not reasonably be expected to have a material adverse effect on the transaction contemplated hereby.

(f)    Subject to obtaining requisite Bankruptcy Court approval in the case of the Purchaser, this Agreement and the other Ancillary Documents to which the Purchaser or any Investor is a party each constitute the valid and binding obligation of the Purchaser or any Investor, as applicable, enforceable in accordance with their terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies.

(g)    None of the Investor or the Purchaser have employed any finder, broker, agent or other intermediary in connection with the origin, negotiation, execution or performance of this Agreement or the purchase of the Purchased Securities hereunder for which the Company would be liable.

6.    Covenants of the Purchaser.

(a)     The Purchaser shall (i) execute and deliver in accordance with Section 2(e) the Ancillary Documents to which it is a party and such other documents, certificates, agreements and other writings and (ii) take such other actions, in each case, as may be necessary or reasonably requested by the Company in order to consummate or implement expeditiously the Transactions in accordance with the terms of this Agreement, the Master Disposition Agreement and the Ancillary Documents.

(b)     The Purchaser shall use its commercially reasonable efforts to cause all conditions precedent to the obligations of the Company, the Investor and the Purchaser to be satisfied.   Upon the terms and subject to the conditions of this Agreement, the Purchaser will use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.

(c)     The Purchaser shall use its commercially reasonable efforts to obtain all necessary consents, waivers, authorizations and approvals of all Governmental Authorities and of all other Persons, if any, required in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is a party in accordance with its agreements under Section 7.13 of the Master Disposition Agreement.

7.     Covenants of the Investor.

(a)     The Investor shall (i) execute and deliver in accordance with Section 2(f) the Ancillary Documents to which it is a party and such other documents, certificates, agreements and other writings and (ii) take such other actions, in each case, as may be necessary or reasonably requested by the Company in order to consummate or implement expeditiously the Transactions in accordance with the terms of this Agreement, the Master Disposition Agreement and the Ancillary Documents.

(b)     The Investor shall use its commercially reasonable efforts to cause all conditions precedent to the obligations of the Company, the Investor and the Purchaser to be satisfied.   Upon the terms and subject to the conditions of this Agreement, the Investor will use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.

(c)     The Investor shall use its commercially reasonable efforts to obtain all necessary consents, waivers, authorizations and approvals of all Governmental Authorities and of all other Persons, if any, required in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is a party consistent with the agreements under Section 7.13 of the Master Disposition Agreement.

11

(d)    <u>Covenant of the Purchaser and the Investor</u>.  The Purchaser and the Investor agree as soon as practicable following execution of the Agreement to substitute for the Company as a party to this Agreement a public limited liability company organized in Luxembourg, or similar vehicle (an "<u>Alternate Vehicle</u>"), to negotiate in good faith the governing and capitalization documents for the Alternate Vehicle reflecting the terms set forth in the Operating Agreement to the greatest extent possible and to substitute such documents for the Operating Agreement (taking into account that the Alternative Vehicle will be taxed as a corporation and not as a partnership, and to appropriately amend this Agreement and the Ancillary Documents to the extent necessary to reflect the substitution of the Alternate Vehicle), unless the Purchaser reasonably determines that the use of an Alternate Vehicle would have significant adverse consequences to the Purchaser or to its investment contemplated by this Agreement, as compared to an investment in the Company, taking into account all benefits and detriments and any potential work-arounds or compensation to the Purchaser for the detriments suggested by the Investor.  In the event that, pursuant to the preceding sentence, an Alternate Vehicle will not be substituted for the Company, the Purchaser acknowledges that, the Investor may require that any sale of substantially all of the business of the Company may be structured as a sale of the membership interests in the Company and, in the case of the Investor, a sale of interests in the Investor (or its successor) to the acquiror.

8.    <u>Conditions to the Obligations of the Purchaser</u>.  The obligation of the Purchaser to purchase and pay for the Class A Securities at the Closing and the other obligations of the Purchaser hereunder required to be performed on the Closing Date shall be subject to the satisfaction (or waiver by such Purchaser) as of the Closing Date of the following conditions:

(i)    The Master Disposition Agreement shall be in full force and effect and all conditions to the obligations of the Company under the Master Disposition Agreement (other than Section 10.4.5 thereof) shall have been satisfied or, with the consent of such Purchaser, waived pursuant to the terms therein, and the acquisition contemplated by the Master Disposition Agreement shall be consummated concurrently with the Closing.

(ii)    The Purchaser shall have received the closing deliveries described in <u>Section 2(f)</u> (other than <u>2(f)(i)</u>) and <u>Section 2(g)</u> hereof and each agreement included therein is in full force and effect.

(iii)    The representations and warranties of the Company contained in this Agreement shall have been true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications) when made and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date), except where the failure to be so true and correct does not constitute,

and would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect.

     (iv)    The Company and its subsidiaries shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Company and its subsidiaries by the Closing Date.

     (v)    There shall not be in effect any Governmental Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

     (vi)    Any applicable waiting period under the HSR Act shall have expired or been terminated and the Purchaser and the Company shall have obtained all necessary consents, waivers, authorizations and approvals of all Governmental Authorities required in connection with the execution, delivery and performance of this Agreement, the Master Disposition Agreement and the Ancillary Documents or the consummation of the Transactions.

     (vii)    The Investor shall be ready, willing and able to purchase the Class B Securities concurrently with the purchase of the Class A Securities by the Purchaser.

     9.    <u>Conditions to the Obligations of the Investor</u>.  The obligation of the Investor to purchase and pay for the Class B Securities at the Closing and the other obligations of the Investor hereunder required to be performed on the Closing Date shall be subject to the satisfaction (or waiver by the Investor) as of the Closing Date of the following conditions:

     (i)    The Master Disposition Agreement shall be in full force and effect and all conditions to the obligations of the Company under the Master Disposition Agreement shall have been satisfied or, with the consent of the Company, waived pursuant to the terms therein, and the acquisition contemplated by the Master Disposition Agreement shall be consummated concurrently with the Closing.

     (ii)    The Investor shall have received, as applicable, the closing deliveries described in <u>Section 2(e)</u> (other than <u>2(e)(i)</u>) hereof and each agreement included therein is in full force and effect.

     (iii)    GM shall have assumed this Agreement and all of the agreements to which GM is a party contained within the Ancillary Documents and as set forth in Section 12.1.6 of the Master Disposition  Agreement, including without limitation, the GM Assumed Contracts ( as such term is defined under the Master Disposition Agreement).

(iv)    There shall not be in effect any Governmental Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

(v)    Any applicable waiting period under the HSR Act shall have expired or been terminated and the Purchaser and the Company shall have obtained all necessary consents, waivers, authorizations and approvals of all Governmental Authorities required in connection with the execution, delivery and performance of  this Agreement, the Master Disposition Agreement and the Ancillary Documents or the consummation of the Transactions.

(vi)    The Purchaser shall be ready, willing and able to purchase the Class A Securities concurrently with the purchase of the Class B Securities by the Investor.

10.    <u>Conditions to the Obligations of the Company</u>.  The obligation of the Company to sell the Purchased Securities and the other obligations of the Company and its subsidiaries hereunder required to be performed on the Closing Date shall be subject to the satisfaction (or waiver by the Company) as of the Closing Date of the following conditions:

(i)    The Master Disposition Agreement shall be in full force and effect and all conditions to the obligations of the Company under the Master Disposition Agreement shall have been satisfied or, with the consent of the Company, waived pursuant to the terms therein, and the acquisition contemplated by the Master Disposition Agreement shall be consummated concurrently with the Closing.

(ii)    The Company shall have received the closing deliveries described in <u>Section 2(e)</u> hereof and each agreement included therein shall be in full force and effect.

(iii)    The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, material adverse effect or similar qualifications) when made and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date), except where the failure to be so true and correct would not have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(iv)    There shall not be in effect any Governmental Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

14

(v)    The Purchaser shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such parties by the Closing Date.

11.    <u>Legend</u>.  If certificated, each certificate for Restricted Securities shall be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER AND COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THAT CERTAIN AMENDED AND RESTATED OPERATING AGREEMENT OF PARNASSUS HOLDINGS II, LLC (THE "<u>COMPANY</u>"), DATED AS OF [_____], 2009, AS AMENDED AND MODIFIED FROM TIME TO TIME, AMONG THE COMPANY AND CERTAIN OTHER PARTIES THERETO. A COPY OF SUCH AGREEMENT SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

12.    <u>Miscellaneous</u>.

(a)    <u>Remedies</u>.  The Purchaser shall have all rights and remedies set forth in this Agreement and the other Ancillary Documents and all of the rights that the Purchaser has under any law.  The Parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any Person having any rights under this Agreement may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.  For the avoidance of doubt, in the event that the Purchaser is entitled to the Termination Fee as set forth in <u>Section 12(b)(iii)</u>, the Purchaser may terminate the Agreement and accept the Termination Fee as liquidated damages or pursue specific performance hereunder.

(b)    <u>Termination</u>.

(i)    This Agreement may be terminated at the election of either the Purchaser or the Investor upon the termination of the Master Disposition Agreement, <u>provided</u> that if terminated by the Purchaser, the Purchaser is not and was not immediately prior the termination of the Master Disposition Agreement in default of any of its obligations hereunder or under the Master Disposition

Agreement, or if terminated by the Investor, the Investor and the Company are not and were not immediately prior the termination of the Master Disposition Agreement in default of any of their respective obligations hereunder or under the Master Disposition Agreement.

(ii)    In the event of termination by the Purchaser or the Investor, prompt written notice thereof shall be delivered to the other Parties and this Agreement shall forthwith become null and void and there shall be no liability on the part of any Party except (1) for the provisions of Section 12(a) (Remedies), this Section 12(b) (Termination), Section 12(c) (Expenses), Section 12(d) (Press Releases), Section 12(e) (Notices), the last sentence of Section 12(f) (Successors and Assigns), Section 12(l) (Governing Law), Section 12(m) (Jurisdiction and Venue), Section 12(n) (Notice of Process) and Section 12(o) (Waiver of Jury Trial) and (2) the fee payable in accordance with clause (iii) below, if applicable.

(iii)    This Agreement also may be terminated at the election of the Purchaser if the Investor or the Company failed to perform any of their obligations under this Agreement or the Master Disposition Agreement. In the event that the Agreement is so terminated by the Purchaser, the Investor shall promptly pay to the Purchaser by wire transfer of same day funds an amount equal to $250,000,000 (the "Termination Fee") such payment to be made within two (2) Business Days following written notice of termination.  If Purchaser so elects to terminate this Agreement, the payment of such Termination Fee shall constitute liquidated damages and full satisfaction of the Company's and the Investor's liabilities and obligations to the Purchaser under this Agreement and the Master Disposition Agreement.

(c)    Expenses.  Each Party shall bear its own expenses incurred by, or on behalf of, such Party in connection with the preparation, negotiation, execution and delivery of this Agreement and the Ancillary Documents to which the Purchaser is party and the satisfaction of the conditions precedent to this Agreement.

(d)    Press Releases.  The Company and the Purchaser will consult with the other before issuing, and provide the other the opportunity to review and comment upon, any press release or other public statements with respect to the transactions contemplated hereby or by the Master Disposition Agreement.

(e)    Notices.  All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument and shall be deemed to have been duly given when delivered in person, by telecopy, by facsimile, by nationally-recognized overnight courier, or by first class registered or certified mail, postage prepaid, addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by the addressee as follows:

if to the Company, to the address set forth below:

16

Parnassus Holdings II, LLC
c/o Platinum Equity Advisors, LLC
360 N. Crescent Drive, South Building
Beverly Hills, California 90210
Attn:
Facsimile:  (310) 712-1863

with copies to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attn:   Marc Weingarten
        David Rosewater
Fax:    (212) 593-5955

If to the Purchaser, to the addresses set forth below:

General Motors Corporation
767 Fifth Avenue
14th Floor
New York, NY 10153
Attn:  Director of Business Development
Fax: (212) 418-3623

and

General Motors Corporation
300 GM Renaissance Center
Detroit, MI 48265
Attn:  General Counsel
Fax: (313) 665-4960

All such notices, requests, consents and other communications shall be deemed to have been delivered (a) in the case of personal delivery or delivery by telecopy or facsimile, on the date of such delivery, (b) in the case of nationally-recognized overnight courier, on the next Business Day and (c) in the case of mailing, on the third Business Day following such mailing if sent by certified mail, return receipt requested.

(f)    Successors and Assigns.  All covenants and agreements in this Agreement by or on behalf of any of the parties hereto will bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not (which, in the case of the Investor shall include any of its Affiliates provided that the Investor shall remain obligated to perform its obligations hereunder to the extent not performed by such Affiliates, and in the case of GM, shall include any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or a

17

limited liability company) and any Person in connection with the direct or indirect transfer, sale, merger, consolidation or similar reorganization of a substantial portion of GM's business). Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement.

(g)    Consent to Amendments.  Except as otherwise expressly provided herein, the provisions of this Agreement may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Purchaser and the Investor.  No other course of dealing between the Company, the Investor and the Purchaser or any delay in exercising any rights hereunder operate as a waiver of any rights of the Purchaser.

(h)    Survival of Representations and Warranties.  All representations and warranties contained herein or made in writing by any party in connection herewith shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, regardless of any investigation made by the Purchaser or on its behalf.

(i)    Severability.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(j)    Entire Agreement.  Except as otherwise expressly set forth herein, this Agreement and the other Ancillary Documents to which the Purchaser is a party embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way.

(k)    Counterparts.    This Agreement may be executed in separate counterparts each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(l)    Governing Law.    This Agreement will be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflicting provision or rule (whether of the State of New York, or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of New York to be applied.  In furtherance of the foregoing, the internal law of the State of New York will control the interpretation and construction of this Agreement,

18

even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

(m)    Jurisdiction and Venue.

(i)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself or himself and its or his property, to the exclusive jurisdiction of any New York state court sitting in New York county or federal court of the United States of America sitting in New York county, and any appellate court presiding thereover, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereunder or thereunder or for recognition or enforcement of any judgment relating thereto, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York state court or, to the extent permitted by law, in any such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it or he may legally and effectively do so, any objection that it or he may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereunder or thereunder in any state or federal court sitting in New York county. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(n)    The parties hereto further agree that the notice of any process required by any such court in the manner set forth in Section 12(e) shall constitute valid and lawful service of process against them, without the necessity for service by any other means provided by law.

(o)    Waiver of Jury Trial. THE COMPANY AND THE PURCHASER HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION OR ENFORCEMENT THEREOF. THE COMPANY AND THE PURCHASER AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

(p)    Modification Procedures Order. Nothing in this Agreement, the Ancillary Agreements or the Ancillary Documents will prevent or restrict GM, its

19

affiliates or representatives from taking any action that is in accordance with paragraph 46 of the Modification Procedures Order.

(q)     Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

* * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

INVESTOR:

PARNASSUS HOLDINGS I, LLC

By: _____
    Name:
    Title:

PURCHASER:

GENERAL MOTORS CORPORATION

By: _____
    Name:
    Title:

COMPANY:

PARNASSUS HOLDINGS II, LLC

By: _____
    Name:
    Title:

OUTSTANDING EQUITY SECURITIES OF THE COMPANY***[1]
(Post-Closing)

| Purchaser | Number of Units of Class A Membership Interests | Number of Units of Class B Membership Interests | Aggregate Purchase Price |
|---|---|---|---|
| Parnassus Holdings I, LLC | 0 | 250,000 | $250,000,000 |
| General Motors Corporation | 2,000,000 | 0 | $2,000,000,000 |
| TOTAL: | 2,000,000 | 250,000 | $2,250,000,000 |

---

[1] Class C Membership Interests will be issued to the Tranche C lenders in accordance with the Master Disposition Agreement.

22

SCHEDULE II

Company Subsidiaries

Delphi Intermediate Holding Corporation (Delaware)

Delphi U.S. Operating Corporation (Delaware)

Delphi Expat Holding Corporation (Delaware)

Delphi IP Holding Corporation (Delaware)

EXHIBIT A

LOAN DOCUMENTS

<u>EXHIBIT B</u>

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF
PARNASSUS HOLDINGS II, LLC

_____

# EXHIBIT C

**Operating Agreement**

Confidential Treatment Requested by General Motors Corporation Pursuant to the Freedom of Information Act

## AMENDED AND RESTATED OPERATING AGREEMENT

### OF

### PARNASSUS HOLDINGS II LLC

Dated as of [_____], 2009

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THIS AMENDED AND RESTATED OPERATING AGREEMENT.

# TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS; INTERPRETATIVE MATTERS ...........................................2
     Section 1.1      Definitions............................................................................ 2
     Section 1.2      Cross-References ................................................................ 10
     Section 1.3      Interpretative Matters ....................................................... 11
     Section 1.4      Expert Determination of Fair Market Value ...................... 12

ARTICLE II      ORGANIZATIONAL MATTERS; GENERAL PROVISIONS....................12
     Section 2.1      Formation........................................................................... 12
     Section 2.2      Name; Office; Registered Agent........................................ 13
     Section 2.3      Purposes; Powers .............................................................. 13
     Section 2.4      Duration ............................................................................ 14
     Section 2.5      No State Law Partnership ................................................. 14
     Section 2.6      Filings; Qualification in Other Jurisdictions..................... 14
     Section 2.7      Income Tax Classification ................................................ 14

ARTICLE III      CAPITALIZATION; MEMBERSHIP INTERESTS ......................................15
     Section 3.1      Membership Interests; Initial Capitalization; Initial Capital Accounts
                                                      ........................................................................................... 15
     Section 3.2      Authorization and Issuance of Additional Membership Interests....... 15
     Section 3.3      Application of Article 8 of the Uniform Commercial Code ........... 16
     Section 3.4      Certification of Membership Interests ............................... 16
     Section 3.5      Capital Accounts............................................................... 17
     Section 3.6      No Right of Partition.......................................................... 17
     Section 3.7      Additional Capital Contributions and Financing ............... 17

ARTICLE IV      SCHEDULE OF MEMBERS; BOOKS AND RECORDS ...........................18
     Section 4.1      Schedule of Members ....................................................... 18
     Section 4.2      Books and Records; Other Documents ............................. 18
     Section 4.3      Certain Tax Matters .......................................................... 19
     Section 4.4      Independent Auditor ......................................................... 21
     Section 4.5      Company Policies ............................................................. 21

ARTICLE V      DISTRIBUTIONS ..............................................................................................21
     Section 5.1      Distributions of Available Cash........................................ 21
     Section 5.2      [Intentionally Deleted]...................................................... 22
     Section 5.3      Successors ......................................................................... 22
     Section 5.4      Distributions of Assets other than Cash ........................... 23
     Section 5.5      Limitation on Distributions............................................... 23
     Section 5.6      Tax Distributions .............................................................. 23
     Section 5.7      Mandatory Payments ........................................................ 24
     Section 5.8      Mandatory Special Distribution........................................ 24
     Section 5.9      Payments Pursuant to the Master Disposition Agreement................. 24

i

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE VI        ALLOCATIONS..................................................................................24

Section 6.1        Allocations of Tax Book Profits and Tax Book Losses...................... 24
Section 6.2        Allocations for Tax Purposes ........................................................... 24
Section 6.3        Certain Accounting Matters ............................................................. 25
Section 6.4        Section 704(c) Allocations ............................................................... 25
Section 6.5        Qualified Income Offset ................................................................... 25
Section 6.6        Gross Income Allocation .................................................................. 25
Section 6.7        Company Minimum Gain Chargeback ............................................. 26
Section 6.8        Member Nonrecourse Debt Minimum Gain Chargeback.................. 26
Section 6.9        Limitations on Tax Book Loss Allocations ....................................... 26
Section 6.10       Member Nonrecourse Deductions ..................................................... 26
Section 6.11       Nonrecourse Deductions .................................................................. 26
Section 6.12       Excess Nonrecourse Liabilities ........................................................ 26
Section 6.13       Ordering Rules ................................................................................. 27
Section 6.14       Curative Allocations ........................................................................ 27

ARTICLE VII       RIGHTS AND DUTIES OF MEMBERS..............................................27

Section 7.1        Members .......................................................................................... 27
Section 7.2        No Management or Dissent Rights .................................................... 27
Section 7.3        No Member Fiduciary Duties ........................................................... 28
Section 7.4        Meetings of Members ....................................................................... 28
Section 7.5        Notice of Meetings........................................................................... 29
Section 7.6        Quorum ........................................................................................... 29
Section 7.7        Voting .............................................................................................. 30
Section 7.8        Action Without a Meeting; Telephonic Meetings ............................. 31
Section 7.9        Record Date ..................................................................................... 32
Section 7.10       Removal or Resignation of Members ................................................ 32
Section 7.11       Liability of Members ........................................................................ 32
Section 7.12       Investment Representations of Members........................................... 33

ARTICLE VIII      BOARD OF MANAGERS; OFFICERS .................................................33

Section 8.1        Establishment of Board of Managers................................................ 33
Section 8.2        General Powers of the Board of Managers ....................................... 33
Section 8.3        Election of Managers ....................................................................... 33
Section 8.4        Meetings.......................................................................................... 34
Section 8.5        Notice of Meetings........................................................................... 35
Section 8.6        Quorum ........................................................................................... 35
Section 8.7        Voting .............................................................................................. 35
Section 8.8        Action Without a Meeting; Telephonic Meetings ............................. 36
Section 8.9        Compensation of Managers; Expense Reimbursement ...................... 36
Section 8.10       Committees of the Board of Managers .............................................. 37
Section 8.11       Delegation of Authority ................................................................... 37

ii

# TABLE OF CONTENTS
## (continued)

Page

Section 8.12     Officers ................................................................................ 37
Section 8.13     Standard of Care; Fiduciary Duties; Liability of Managers and Officers
..................................................................................................... 38
Section 8.14     Disclaimer of Fiduciary Duties to the Class C Holders ..................... 40

ARTICLE IX      TRANSFER OF MEMBERSHIP INTERESTS; SUBSTITUTED
MEMBERS ........................................................................................40

Section 9.1      Limitations on Transfer of Membership Interests ............................ 40
Section 9.2      Void Transfers ................................................................... 41
Section 9.3      Substituted Member ............................................................. 41
Section 9.4      Effect of Transfer ............................................................... 41
Section 9.5      Additional Transfer Restrictions............................................... 41
Section 9.6      Transfer Fees and Expenses .................................................... 42
Section 9.7      Effective Date .................................................................... 42
Section 9.8      Acceptance of Prior Acts ...................................................... 42

ARTICLE X       DISSOLUTION .................................................................................42

Section 10.1     In General......................................................................... 42
Section 10.2     Liquidation and Termination ................................................... 42
Section 10.3     Complete Distribution........................................................... 43
Section 10.4     Filing of Certificate of Cancellation ......................................... 43
Section 10.5     Reasonable Time for Winding Up ............................................. 43
Section 10.6     Return of Capital................................................................ 43
Section 10.7     Antitrust Laws.................................................................... 43
Section 10.8     Other Remedies .................................................................. 43

ARTICLE XI      INDEMNIFICATION...........................................................................44

Section 11.1     General Indemnity .............................................................. 44
Section 11.2     Fiduciary Insurance............................................................. 45
Section 11.3     Rights Non-Exclusive .......................................................... 45
Section 11.4     Merger or Consolidation; Other Entities..................................... 45
Section 11.5     No Member Recourse .......................................................... 45

ARTICLE XII     OTHER AGREEMENTS .......................................................................45

Section 12.1     Transactions with Affiliates................................................... 45
Section 12.2     Class A Securities Issuances; Redemptions................................. 46
Section 12.3     Certain Restrictions............................................................. 46

ARTICLE XIII    CONFIDENTIALITY............................................................................47

Section 13.1     Non-Disclosure .................................................................. 47
Section 13.2     Exceptions........................................................................ 47

ARTICLE XIV     MISCELLANEOUS PROVISIONS...........................................................48

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| Section 14.1 | Amendments | 48 |
| Section 14.2 | Remedies | 48 |
| Section 14.3 | Notice Addresses and Notices | 48 |
| Section 14.4 | Counterparts | 48 |
| Section 14.5 | Assignment | 49 |
| Section 14.6 | Entire Agreement; Waiver | 49 |
| Section 14.7 | Severability | 49 |
| Section 14.8 | Governing Law | 49 |
| Section 14.9 | Independent Contractors; Expenses | 49 |
| Section 14.10 | Press Release | 50 |
| Section 14.11 | Survival | 50 |
| Section 14.12 | Creditors | 50 |
| Section 14.13 | Further Action | 50 |
| Section 14.14 | Delivery by Facsimile or Email | 50 |
| Section 14.15 | Strict Construction | 50 |
| Section 14.16 | Consent to Jurisdiction | 50 |
| Section 14.17 | Waiver of Jury Trial | 51 |
| Section 14.18 | Specific Performance | 51 |

## SCHEDULES AND EXHIBITS

Schedule of Members
Exhibit A  —  Transaction Documents
Exhibit B  —  Company Policies
Exhibit C  —  Environmental Guidelines
Exhibit D  —  Affiliate Transactions
Exhibit E  —  General Motors Consolidation Requirements

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## PARNASSUS HOLDINGS II, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT of Parnassus Holdings II, LLC a Delaware limited liability company (the "Company"), is made and entered into as of [_____], 2009 (the "Effective Date") by and between Parnassus Holdings I, LLC, a Delaware limited liability company ("Platinum"), and General Motors Corporation, a Delaware corporation ("General Motors"), as Members and the Class C Members who are Members on the date hereof and each other Person who at any time becomes a Member in accordance with the terms of this Agreement and the Act.

## RECITALS:

A.      Platinum, as the sole initial member of the Company, formed the Company as a limited liability company pursuant to the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-101 et seq. (the "Act") by causing the filing of a Certificate of Formation of the Company (the "Certificate of Formation") with the office of the Secretary of State of the State of Delaware on May 26, 2009, and entering into the Agreement of Limited Liability Company of the Company, dated as of May 26, 2009 (the "Original Agreement").

B.      [Delphi Corporation, a Delaware corporation ("Old Delphi"), on June [__], 2009 adopted a Plan of Reorganization (the "Reorganization Plan") in its proceedings under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 05-44481 (RDD))]**.**

C.      Old Delphi, the Company and certain other parties entered into a Master Disposition Agreement (the "MDA") pursuant to which, among other things, Old Delphi proposed to sell to the Company certain assets of Old Delphi and certain subsidiaries of Old Delphi, on the terms set forth in the MDA (the "Asset Purchase").

D.      Concurrently therewith, the Company, General Motors and Platinum entered into a Securities Purchase Agreement (the "Securities Purchase Agreement"), pursuant to which, among other things, General Motors subscribed to Class A membership interests in the Company and Platinum subscribed to Class B membership interests in the Company on the terms and conditions set forth in such agreement.

E.      Pursuant to the MDA, Old Delphi is entitled to receive Class C membership interests and, as such, shall become subject to the terms and conditions hereof as a Class C Member as of the date hereof, subject to its right to transfer such interest to one or more of the Tranche C Lenders and/or an entity on their behalf, as provided herein.

F.      In connection with the consummation concurrently herewith of the Asset Purchase and the transactions contemplated by the Securities Purchase Agreement, the parties hereto desire to amend and restate the Original Agreement (i) to admit General Motors as an additional Member, (ii) to set forth the terms for the issuance of the Membership Interests and (iii) to set forth, *inter alia,* their understandings and agreements regarding the governance and certain operations of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, conditions and agreements herein contained, the parties hereto, each intending to be legally bound, agree that the Original Agreement is hereby amended and restated in its entirety, and further agree as follows:

# ARTICLE I
# DEFINITIONS; INTERPRETATIVE MATTERS

Section 1.1    <u>Definitions</u>.  The following terms, as used herein, shall have the following meanings:

"<u>Adjusted Capital Account Balance</u>" means, with respect to any Member, the balance in such Member's Capital Account after giving effect to the following adjustments:

(i)      debits to such Capital Account of the items described in Section 1.704-1(b)(2)(ii)(d)(4) through (6) of the Treasury Regulations; and

(ii)     credits to such Capital Account of such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain or any amount which such Member would be required to restore under this Agreement or otherwise.

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

"<u>Additional Member</u>" means any Person that has been admitted to the Company as a Member after the Effective Date pursuant to <u>Section 3.2(b)</u> by virtue of having received its Membership Interest from the Company and not from any other Member.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, whether through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person, excluding any employee benefit plan or related trust.

"<u>Agreement</u>" means this Operating Agreement and those Exhibits and Schedules attached hereto, as it may be amended or restated from time to time.

"<u>Antitrust Law</u>" means any Law relating to the preservation of or restraint against competition in commercial activities, including the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"<u>Available Cash</u>" means (i) all cash and cash equivalents on hand of the Company from any source, less (ii) cash reasonably reserved by the Company or reasonably anticipated by the Board of Managers to be required to fund the Company's operations and other needs.

"<u>Business Day</u>" means any calendar day other than a Saturday, a Sunday or any other day on which commercial banks in Detroit, Michigan or New York, New York are authorized or required to close.

"Capital Contributions" means any cash or cash equivalents or the Fair Market Value of other property that a Member contributes to the Company with respect to any Membership Interests or other Equity Securities issued pursuant to Article III (net of any liabilities assumed by the Company or to which such property is subject).

"Class A Holders" means Members which hold Class A Membership Interests.

"Class A Membership Interest" means a Membership Interest having the rights and obligations specified with respect to Class A Membership Interests in this Agreement.

"Class B Holders" means Members which hold Class B Membership Interests.

"Class B Manager" means a Manager appointed to the Board of Managers pursuant to Section 8.3(a)(i) or Section 8.3(b).

"Class B Membership Interest" means a Membership Interest having the rights and obligations specified with respect to Class B Membership Interests in this Agreement.

"Class C Holders" means Members which hold Class C Membership Interests.

"Class C Membership Interest" means a Membership Interest having the rights and obligations specified with respect to Class C Membership Interests in this Agreement.

"Class C Return" means eight percent (8%) per annum, calculated on the basis of actual days elapsed and a 365 day year on the Unreturned Class C Amount.

"Code" means the United States Internal Revenue Code of 1986, as amended, and, to the extent applicable, any Treasury Regulations promulgated thereunder.

"Company Class A Interest" means, with respect to a particular Class A Holder at any time, the quotient expressed as a percentage obtained by dividing (i) the number of Class A Membership Interests held by such Class A Holder at such time, by (ii) the number of Class A Membership Interests held by all Class A Holders at such time, as adjusted from time to time pursuant to Article III and Article IX.

"Company Class B Interest" means, with respect to a particular Class B Holder at any time, the quotient expressed as a percentage obtained by dividing (i) the number of Class B Membership Interests held by such Class B Holder at such time, by (ii) the number of Class B Membership Interests held by all Class B Holders at such time, as adjusted from time to time pursuant to Article III and Article IX.

"Company Class C Interest" means, with respect to a particular Class C Holder at any time, the quotient expressed as a percentage obtained by dividing (i) the number of Class C Membership Interests held by such Class C Holder at such time, by (ii) the number of Class C Membership Interests held by all Class C Holders at such time, as adjusted from time to time pursuant to Article III and Article IX.

"Company Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Treasury Regulations for "partnership minimum gain" and, as provided therein, shall generally be determined by computing, for each Nonrecourse Debt of the Company, any Tax Book Profit that the Company would realize if it disposed of the property subject to that liability for no consideration other than full satisfaction of the liability and then aggregating the separate amounts of Tax Book Profit so computed.

"Confidential Information" means, collectively, all documents and information that, in each case, is non-public, confidential or proprietary in nature concerning the Company (including commercial information and information with respect to customers, suppliers, vendors and proprietary technologies or processes), the Members or their Affiliates that was or may in the future be furnished to the Company, any Member or any of their respective Affiliates in connection with (i) the transactions leading up to and contemplated by this Agreement and the other Transaction Documents, including the terms hereof and thereof, or (ii) the operation and activities of the Company; provided that any such information will not be Confidential Information if it is (A) otherwise available to the public through no wrongful action by such Member or Affiliate or (B) otherwise in the rightful possession of such Member or Affiliate from any third Person having, to the knowledge of such Member or Affiliate after reasonable inquiry, no obligation of confidentiality with respect to such information to the other Members or the Company or any of its Subsidiaries, as applicable.

"Control," "Controlled" or "Controlling" means, with respect to any Person, any circumstance in which such Person is directly or indirectly controlled by another Person by virtue of the latter Person having the power to (i) elect, or cause the election of (whether by way of voting capital stock, by contract, trust or otherwise), the majority of the members of the Board of Managers or a similar governing body of the first Person, or (ii) direct (whether by way of voting capital stock, by contract, trust or otherwise) the affairs and policies of such Person.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction as reported for federal income tax purposes with respect to an asset for such year or other period, except that if the Tax Book Value of an asset differs from its adjusted basis for federal income tax purposes, Depreciation shall be an amount which bears the same ratio to such beginning Tax Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Tax Book Value using any reasonable method selected by the Board of Managers.

"Distribution" means each distribution after the Effective Date made by the Company to a Member, whether in cash, property or securities of the Company, pursuant to, or in respect of, Article V (excluding Section 5.7) or Article X.

"Entity" means any general partnership, limited partnership, corporation, association, cooperative, joint stock company, trust, limited liability company, business or statutory trust, joint venture, unincorporated organization or Governmental Entity.

"Equity Securities" means, as applicable, (i) any capital stock, membership or limited liability company interests or other share capital, (ii) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership or limited liability company interests or other share capital or containing any profit participation features, (iii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership or limited liability company interests, other share capital or securities containing any profit participation features or to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable for any capital stock, membership or limited liability company interests, other share capital or securities containing any profit participation features, (iv) any share appreciation rights, phantom share rights or other similar rights, or (v) any Equity Securities issued or issuable with respect to the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, recapitalization, merger, consolidation, conversion or other reorganization.

"Excess Nonrecourse Liability" means an "excess nonrecourse liability" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Exempt Transfer" means the Transfer by a Holder of any Membership Interest (or portion thereof), in accordance with Article IX, (i) to any Affiliate of such Holder (which, in the case of General Motors and Platinum, shall include any Affiliate formed after the date hereof that may be a corporation or a limited liability company), (ii) in the case of any such Transferor which is a Class B Holder, to any Person with the prior written consent of the Majority Class A Holders (which may be given or withheld in their discretion), (iii) in the case of any such Transferor which is a Class A Holder, to any Person with the prior written consent of the Majority Class B Holders (which may be given or withheld in their discretion), and (iv) in the case of General Motors, to any Person in connection with the direct or indirect transfer, sale, merger, consolidation or similar reorganization of a substantial portion of General Motors' business.

"Fair Market Value" means (i) in reference to the Company or Membership Interests, the fair market value for the Company or such Membership Interests as between a willing buyer and a willing seller in an arm's length transaction occurring on the date of valuation, taking into account all relevant factors determinative of value, as reasonably determined by the Board of Managers, (ii) in reference to property or assets owned by the Company, the fair market value of such property or assets as reasonably determined by the Board of Managers, and (iii) in reference to property or assets other than the Company, Membership Interests or properties or assets owned by the Company (including any property or assets contributed to the Company after the Effective Date), the fair market value of such property or assets as reasonably determined by the Board of Managers; provided that if the Majority Class A Holders disagree with the Fair Market Value determined pursuant to clause (i), (ii) or (iii) above in connection with any provision of this Agreement in which reference is made to such Fair Market Value, then the Majority Class A Holders shall have the right to require that such Fair Market Value be submitted to expert determination in accordance with Section 1.4.

"Fiscal Quarter" means each fiscal quarter of the Company and its Subsidiaries, ending on the last day of each of March, June, September and December of any Fiscal Year unless otherwise required by the Code or as otherwise determined by the Board of Managers.

"Fiscal Year" means the fiscal year of the Company and shall be the same as its taxable year, which shall be the year ending December 31 unless otherwise required by the Code or as otherwise determined by the Board of Managers. Each Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year.

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied and maintained throughout the applicable periods both as to classification or items and amounts.

"Governmental Entity" means the United States of America or any other nation, any state, province or other political subdivision, any international or *supra* national entity, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the Company or any of its Subsidiaries or any of the property or other assets of the Company or any of its Subsidiaries.

"Holders" means the Class A Holders, the Class B Holders and the Class C Holders.

"Initial Class A Holders" means General Motors or any Person holding Class A Membership Interests originally acquired by General Motors on the Effective Date that were Transferred to such Person in one or more Transfers occurring after the Effective Date, all of which Transfers constituted Exempt Transfers.

"Initial Class B Holders" means Platinum or any Person holding Class B Membership Interests originally acquired by Platinum on the Effective Date that were Transferred to such Person in one or more Transfers occurring after the Effective Date, all of which Transfers constituted Exempt Transfers.

"Law" means any applicable law, statute, ordinance, rule, regulation, code, order, judgment, tax ruling, injunction or decree of any Governmental Entity, including any Law relating to the protection of the environment.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the Company or any of its Subsidiaries, any filing or agreement to file a financing statement as a debtor under the Uniform Commercial Code or any similar statute of any jurisdiction other than to reflect ownership by a third Person of property leased to the Company or any of its Subsidiaries under a lease that is not in the nature of a conditional sale or title retention agreement.

"Loan Agreement" means that certain Credit Agreement among the Company, Parnassus Funding,LLC, the other lenders party thereto and General Motors as administrative agent, as in effect on the date hereof, as amended in accordance with its terms.

"Majority Class A Holders" means, at any time, the Class A Holders which hold a majority of the then-outstanding Class A Membership Interests.

"Majority Class B Holders" means, at any time, the Class B Holders which hold a majority of the then-outstanding Class B Membership Interests.

"Majority Class C Holders" means, at any time, the Class C Holders which hold a majority of the then-outstanding Class C Membership Interests.

"Majority Initial Class A Holders" means, at any time, the Initial Class A Holders which hold a majority of the then-outstanding Class A Membership Interests held by the Initial Class A Holders.

"Majority Initial Class B Holders" means, at any time, the Initial Class B Holders which hold a majority of the then-outstanding Class B Membership Interests held by the Initial Class B Holders.

"Member" means Platinum, General Motors, the Class C Holders and each other Person who is hereafter admitted as a member of the Company in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as such term is defined in the Act) of the Company.

"Membership Interest" means the class or classes of limited liability company interests of a Member in the Company, as set forth opposite such Member's name on the Schedule of Members hereto from time to time, including such Member's share of the Tax Book Profits and Tax Book Losses of the Company, and also the right of such Member to any and all of the benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the provisions of this Agreement and of the Act. The Company may issue whole or fractional Membership Interests pursuant to the terms of this Agreement.

"Member Nonrecourse Debt" means any Company liability to the extent such liability is nonrecourse for purposes of Section 1.1001-2 of the Treasury Regulations, and a Member (or related Person within the meaning of Section 1.752-4(b) of the Treasury Regulations) bears the economic risk of loss with respect to such liability under Section 1.752-2 of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Section 1.704-2(i)(3) of the Treasury Regulations for "partner nonrecourse debt minimum gain."

"Minimum Class A Condition" means the requirement that the Initial Class A Holders collectively hold at least fifty percent of the Class A Membership Interests acquired by General Motors on the date hereof (determined after adjustment for any Pro Rata Adjustment Events after the date hereof).

"Nonrecourse Debt" means any Company liability to the extent that no Member or related Person bears the economic risk of loss for such liability under Section 1.752-2 of the Treasury Regulations.

"Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Sections 1.704-2(b)(l) and 1.704-2(c)(1).

"Ordinary Course of Business" means the ordinary course of the business of the Company and its Subsidiaries, and including the ordinary course of the business of Old Delphi and its Subsidiaries acquired pursuant to the Reorganization Plan, as conducted prior to the date hereof.

"Original Class C Member" means Delphi Corporation, a Delaware corporation.

"Person" means any individual or Entity.

"Pro Rata Adjustment Event" shall mean, with respect to any class of Membership Interests, any split, reverse split or combination or similar pro rata recapitalization event affecting Membership Interests of such class.

"Senior Executive Officers" means, collectively, the Chief Executive Officer, the President and the Chief Financial Officer.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, bank, savings bank, or other organization or business entity, whether incorporated or unincorporated, which is consolidated with such Person for financial reporting purposes under GAAP. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company. Notwithstanding the foregoing, in no event shall the Company be considered a "Subsidiary" of General Motors for purposes of this Agreement.

"Substituted Member" means any Person that has been admitted to the Company as a Member pursuant to Section 9.3 by virtue of such Person receiving all or a portion of a Membership Interest from a Member and not from the Company.

"Tax Book Profit" and "Tax Book Loss" means, for each Fiscal Year, or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code; provided that for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss, with the following adjustments:

(i)     any income of the Company that is exempt from federal income tax and not otherwise taken in account in computing Tax Book Profit or Tax Book Loss pursuant to this provision shall be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Tax Book Profit or Tax Book

Loss pursuant to this provision, shall be subtracted from such taxable income or loss;

(iii)    gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Tax Book Value of the asset disposed of as determined under Treasury Regulations Section 1.704-1(b)(2)(iv), notwithstanding that the adjusted tax basis of such asset may differ from such Tax Book Value;

(iv)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken in account Depreciation for such Fiscal Year, computed as provided in this Agreement, and

(v)    in the event the Tax Book Value of any Company asset is adjusted to reflect the Fair Market Value of such asset in accordance with the last sentence of the definition of "Tax Book Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Tax Book Profit or Tax Book Loss.

If the Company's taxable income or loss for such Fiscal Year, as adjusted in the manner provided above, is a positive amount, such amount shall be Company's Tax Book Profit for such Fiscal Year, and, if a negative amount, such amount shall be the Company's Tax Book Loss for such Fiscal Year.

"Tax Book Value" of an asset means, as of any particular date, the value at which the asset is properly reflected on the books and records of the Company as of such date in accordance with Section 1.704-l(b)(2)(iv) of the Treasury Regulations as follows:

(i)    The initial Tax Book Value of each asset shall be its cost, unless such asset was contributed to the Company by a Member, in which case the initial Tax Book Value shall be the Fair Market Value for such asset determined by the Board of Managers, and, in each case, such Tax Book Value shall thereafter be adjusted for Depreciation with respect to such asset rather than for the cost recovery deductions to which Company is entitled for federal income tax purposes with-respect thereto.

(ii)    At the discretion of the Board of Managers, the Tax Book Values of all Company assets shall be adjusted to equal their respective Fair Market Values, as reasonably determined by the Board of Managers, as of the following times:

(A)    the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* additional Capital Contribution;

(B)    the Distribution by the Company to a Member of more than a *de minimis* amount of the Company assets, including money, if, as a result of such Distribution, such Member's interest in the Company is reduced;

(C)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-l(b)(2)(ii)(g); and

(D)    at any other time, as permitted by the Treasury Regulations.

"Tranche C Lenders" has the meaning set forth in that certain Amended and Restated Revolving Credit, Term and Guaranty Agreement, dated as of May 9, 2008, among Delphi Corporation, the subsidiaries of Delphi Corporation named therein, the lenders party thereto and the DIP Agent, as amended through May 21, 2009.

"Transaction Documents" means the agreements and other documents set forth on Exhibit A.

"Transfer" means any sale, transfer, assignment, pledge, encumbrance, exchange, or other disposition of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of Law).  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Treasury Regulations" means the regulations, including temporary regulations, promulgated by the United States Treasury Department under the Code.

"Unreturned Original Cost" means, with respect to the Class A Membership Interests, the amount (which shall be not less than zero) equal to (i) $2 billion, minus (ii) the aggregate Fair Market Value of the Distributions and any other cash or non-cash payments made to the holder of such Class A Membership Interests (including such holder's predecessors in interest) in respect of such Class A Membership Interests.

"Unreturned Class C Amount" means (i) $145,510,040 minus (ii) Distributions made to the holders of Class C Membership Interests pursuant to this Agreement which, for the avoidance of doubt, shall not include payments made pursuant to Section 5.7.

"1940 Act" means the United States Investment Company Act of 1940.

**Section 1.2    Cross-References**.  In addition to the terms set forth in Section 1.1, the following terms are defined in the text of this Agreement in the locations specified below:

| Term | Cross-Reference |
| --- | --- |
| Act | Recitals |
| Agents | Section 13.1 |
| Asset Purchase | Recitals |
| Assumed Tax Rate | Section 5.6 |

| Term | Cross-Reference |
|---|---|
| Board of Managers | Section 8.1 |
| Capital Account | Section 3.5 |
| Certificate of Formation | Recitals |
| Chairman | Section 8.3(c) |
| Chief Executive Officer | Section 8.12(c)(i) |
| Chief Financial Officer | Section 8.12(c)(iii) |
| Class A Manager | Section 8.3(a)(i) |
| Company | Preamble |
| Direct Conflict | Section 8.7 |
| Effective Date | Preamble |
| General Motors | Preamble |
| Indemnified Persons | Section 11.1(a) |
| Independent Auditor | Section 4.4 |
| Indirect Conflict | Section 8.7 |
| Managers | Section 8.1 |
| MDA | Recitals |
| Officers | Section 8.12(a) |
| Old Delphi | Recitals |
| Original Agreement | Recitals |
| Platinum | Preamble |
| President | Section 8.12(c)(ii) |
| Proceeding | Section 11.1(a) |
| Reorganization Plan | Recitals |
| Sarbanes-Oxley act | Section 4.4 |
| Secretary | Section 8.12(c)(iv) |
| Securities Purchase Agreement | Recitals |
| Tax Distribution | Section 5.6 |
| Tax Matters Member | Section 4.3(a) |
| Voting Power | Section 7.7(a) |

**Section 1.3**     **Interpretative Matters**. In this Agreement, unless otherwise specified or where the context otherwise requires:

       (a)      the headings of particular provisions of this Agreement are inserted for convenience only and will not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement;

       (b)      words importing any gender shall include other genders;

       (c)      words importing the singular only shall include the plural and vice versa;

       (d)      the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation";

(e)     the words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement;

(f)     references to "Articles," "Exhibits," "Sections" or "Schedules" shall be to Articles, Exhibits, Sections or Schedules of or to this Agreement;

(g)     references to any Person include the heirs, executors, administrators, legal representatives, successors and permitted assigns of such Person where the context so permits;

(h)     the use of the words "or," "either" and "any" shall not be exclusive;

(i)     wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict;

(j)     references to "$" mean the lawful currency of the United States of America;

(k)     references to any agreement, contract, guideline, exhibit or schedule, unless otherwise stated, are to such agreement, contract, guideline, exhibit or schedule as amended, amended and restated, replaced, substituted, modified or supplemented from time to time in accordance with the terms hereof and thereof; and

(l)     references to any Law or a particular provision of any Law, unless otherwise stated, are to such Law and any successor Law or to such provision of Law and the corresponding provision in any successor Law, as applicable.

**Section 1.4**     **Expert Determination of Fair Market Value**.  If the Majority Class A Holders disagree with the Fair Market Value determined pursuant to clause (i), (ii) or (iii) of the definition of "Fair Market Value," then the Majority Class A Holders shall have twenty calendar days following the date of the Board of Managers' valuation to make a written request to the Board of Managers to engage, on behalf of the Company, an investment bank of national reputation to determine such Fair Market Value and shall include in such request their determination of such Fair Market Value.  The investment bank engaged by the Company shall determine the Fair Market Value based on the factors referenced in clause (i) of the definition of "Fair Market Value" and otherwise taking into consideration such factors as it deems relevant. The fees, costs and expenses of such investment bank shall be paid, either (i) by the Company if the investment bank's determination of the Fair Market Value is closer to the Fair Market Value determined by the Majority Class A Holders or (ii) by the Majority Class A Holders (pro rata based upon their relative Company Class A Interests), if the investment bank's determination of the Fair Market Value is closer to the Fair Market Value determined by the Board of Managers.

# ARTICLE II
# ORGANIZATIONAL MATTERS; GENERAL PROVISIONS

**Section 2.1**     **Formation**.

(a)    The Company was formed under the Act by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware on May 26, 2009. The Members agree to continue the Company as a limited liability company under the Act, upon the terms and subject to the conditions set forth in this Agreement.

(b)    The rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. To the extent that the rights, powers, duties, obligations and liabilities of any Members are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**Section 2.2    Name; Office; Registered Agent.**

(a)    The name of the Company is Parnassus Holdings II, LLC. The Board of Managers may change the name of the Company at any time and from time to time. Prompt notification of any such change shall be given to all Members.

(b)    The Company's principal office shall be located at [_____], or such other location in the United States of America as the Board of Managers shall designate from time to time in the manner provided by Law, which need not be in the State of Delaware, and the Company shall maintain records at such place. The Company may maintain offices at such other place or places as the Board of Managers deems advisable. Prompt notice of any change in the principal office shall be given to all Members. The Company's initial registered agent in the State of Delaware for the service of process is as identified in the Certificate of Formation filed with the Secretary of State of the State of Delaware. The Board of Managers may from time to time change the registered agent, and any such change shall be reflected in appropriate filings with the Secretary of State of the State of Delaware.

**Section 2.3    Purposes; Powers.**

(a)    The nature of the business or purposes to be conducted or promoted by the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by Law to a limited liability company organized under the Laws of the State of Delaware.

(b)    Subject to the provisions of this Agreement and except as prohibited by Law, (i) the Company may with the approval of the Board of Managers, enter into, deliver and perform any and all agreements, consents, deeds, contracts, proxies, covenants, bonds, checks, drafts, bills of exchange, notes, acceptances and endorsements, and all evidences of indebtedness and other documents, instruments or writings of any nature whatsoever, all without any further act, vote or approval of any Member, and (ii) the Board of Managers may, pursuant to Section 8.11, authorize (including by general delegated authority) any Person (including any Member, Manager or Officer) to enter into, deliver and perform on behalf of the Company any and all agreements, consents, deeds, contracts, proxies, covenants, bonds, checks, drafts, bills of

exchange, notes, acceptances and endorsements, and all evidences of indebtedness and other documents, instruments or writings of any nature whatsoever.

(c)     Subject to the other provisions of this Agreement, the Company shall do all things necessary to maintain its existence separate and apart from each Member and any Affiliate of any Member, including holding regular meetings of the Board of Managers and maintaining its books and records on a current basis separate from that of any Affiliate of the Company or any other Person.

**Section 2.4     Duration**. The period of the Company's duration commenced on the filing of the Certificate of Formation with the office of the Secretary of State of the State of Delaware on May 26, 2009 and shall continue in full force and effect in perpetuity; provided that Company may be dissolved and wound up in accordance with the provisions of this Agreement and the Act.

**Section 2.5     No State Law Partnership**.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or Officer shall be a partner or joint venturer of any other Member, Manager or Officer by virtue of this Agreement, for any purposes other than as is set forth in Section 2.7, and this Agreement shall not be construed to the contrary.

**Section 2.6     Filings; Qualification in Other Jurisdictions**.  The Company shall prepare, following the execution and delivery of this Agreement, any documents required to be filed or, in the Board of Managers' view, appropriate for filing under the Act, and the Company shall cause each such document to be filed in accordance with the Act, and, to the extent required by Law, to be filed and recorded, and/or notice thereof to be published, in the appropriate place in each jurisdiction in which the Company may have established, or after the Effective Date may establish, a place of business.  The Board of Managers may cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business where the Company is not currently so qualified, formed or registered.  Any Manager or Officer, acting individually as an authorized person within the meaning of the Act, shall execute, deliver and file any such documents (and any amendments and/or restatements thereof) necessary for the Company to accomplish the foregoing.  The Board of Managers may appoint any other authorized persons to execute, deliver and file any such documents.

**Section 2.7     Income Tax Classification**.  The Members intend that the Company be classified as a partnership for United States federal, state and local income tax purposes and the Members shall not elect pursuant to Treasury Regulation § 301.7701-3 to treat the Company otherwise.  Each Member and the Company shall file all tax returns in a manner consistent with such classification and shall take no tax reporting position inconsistent with that classification.

# ARTICLE III
## CAPITALIZATION; MEMBERSHIP INTERESTS

Section 3.1        **Membership Interests; Initial Capitalization; Initial Capital Accounts.**

(a)    The Company shall initially have four authorized classes of Membership Interests, consisting of 2,000,000 Class A Membership Interests, 250,000 Class B Membership Interests, and [such number of] Class C Membership Interests [as may be determined by the Board of Managers]. A Membership Interest shall for all purposes be personal property. For purposes of this Agreement, Membership Interests held by the Company or any of its Subsidiaries shall be deemed not to be outstanding. The Company may issue fractional Membership Interests pursuant to the terms of this Agreement, and all Membership Interests shall be rounded to the fourth decimal place.

(b)    Upon the execution and delivery of this Agreement, each of the Persons named as a Member on the Schedule of Members shall be admitted as a Member of the Company with the type and number of Membership Interests set forth on the Schedule of Members, with effect as of the Effective Date. The Company shall update the Schedule of Members to reflect any changes in the Members and the Membership Interests of the Members in accordance with the terms of this Agreement. The initial Capital Account balance of each Member shall be deemed to be the amount set forth opposite its name on the Schedule of Members.

Section 3.2        **Authorization and Issuance of Additional Membership Interests.**

(a)    The Board of Managers shall have the right to cause the Company to issue and/or create and issue at any time after the Effective Date, and for such amount and form of consideration as the Board of Managers may reasonably determine, subject to the provisions of Article XII, additional Membership Interests (of existing classes or new classes) or other Equity Securities of the Company (including creating additional classes or series thereof having such powers, designations, preferences and rights as may be determined by the Board of Managers). In connection with the foregoing, subject to the provisions of Section 14.1, the Board of Managers shall have the power to make such amendments to this Agreement in order to provide for such additional Membership Interests, and such powers, designations and preferences and rights as the Board of Managers in its discretion deems necessary or appropriate to give effect to such additional authorization or issuance.

(b)    Subject to the provisions of Article XII, the Board of Managers shall have the right to admit Additional Members. A Person may be admitted to the Company as an Additional Member upon furnishing to the Board of Managers (i) a joinder agreement pursuant to which such Person agrees to be bound by all of the terms and conditions of this Agreement, and (ii) such other documents or instruments as may be necessary or appropriate to effect such Person's admission as a Member (including entering into an investor representation agreement or such other similar documents as the Board of Managers may reasonably deem appropriate), which joinder agreement, documents and instruments shall be in form and substance reasonably

satisfactory to the Board of Managers. Such admission shall become effective on the date on which the Board of Managers determines that the foregoing conditions have been satisfied and when any such admission is shown on the books and records of the Company. Upon the admission of an Additional Member, the <u>Schedule of Members</u> shall be amended to reflect the name, notice address, Membership Interests and other interests in the Company, Capital Contributions and initial Capital Account balance of such Additional Member.

**Section 3.3**      **Application of Article 8 of the Uniform Commercial Code**. Each Membership Interest shall constitute a "security" within the meaning of and shall be governed by (a) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (b) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

**Section 3.4**      **Certification of Membership Interests**. Membership Interests shall be issued in non-certificated form; <u>provided</u> that the Board of Managers may cause the Company to issue certificates to a Member representing the Membership Interests held by such Member. If any Membership Interest certificate is issued, then such certificate shall bear a legend substantially in the following form:

> This certificate evidences a [Class __ Membership Interest] representing an interest in Parnassus Holdings II LLC and shall constitute a "security" within the meaning of and shall be governed by (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

> The Membership Interest in Parnassus Holdings II LLC represented by this certificate is subject to restrictions on transfer set forth in that certain Amended and Restated Operating Agreement of Parnassus Holdings II LLC, dated as of [_____], 2009, by and among the members from time to time party thereto, as the same may be amended from time to time.

> The Membership Interest in Parnassus Holdings II LLC represented by this certificate has not been registered under the United States Securities Act of 1933, as amended, or under any other applicable securities laws. Such Membership Interest may not be sold, assigned, pledged or otherwise disposed of at any time

without effective registration under such Act and laws or, in each case, exemption therefrom.

**Section 3.5     Capital Accounts**.  The Company shall maintain a separate capital account (a "Capital Account") for each Member in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.  Subject to the foregoing:

(a)     each Member's Capital Account shall be increased by the amount of cash and the Fair Market Value of the property actually contributed to the Company, such Member's allocable share, if any, of any Tax Book Profits of the Company, and the amount of any Company liabilities for which principal responsibility for payment is assumed by such Member or which are secured by any property distributed to such Member,

(b)     each Member's Capital Account shall be decreased by the amount of cash and the Fair Market Value of any Company property distributed to the Member pursuant to any provision of this Agreement, such Member's allocable share, if any, of any Tax Book Losses of the Company, and the amount of any liabilities of such Member for which principal responsibility for payment is assumed by the Company or which are secured by any property contributed by such Member to the Company;

(c)     the provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations;

(d)     no interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts;

(e)     a Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distributions from the Company, except as expressly provided herein;

(f)     no loan made to the Company by any Member shall constitute a Capital Contribution to the Company for any purpose.  The amount of any loan shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such loan is made; and except as required by the Act, no Member shall have any liability for the return of the Capital Contributions of any other Member.

**Section 3.6     No Right of Partition**.  All property of the Company, whether tangible or intangible, shall be deemed to be owned by the Company as an entity.  No Member shall have any interest in specific Company property solely by reason of being a Member. Except as specifically contemplated by this Agreement, any other Transaction Document or any other written agreement between the Company and any Member, no Member shall (a) have the right to seek or obtain partition by court decree or operation of Law of any property of the Company or any of its Subsidiaries, (b) have the right to own or use particular or individual assets of the Company or any of its Subsidiaries, or (c) be entitled to distributions of specific assets of the Company or any of its Subsidiaries.

**Section 3.7     Additional Capital Contributions and Financing**.     No Member shall be required to make any additional Capital Contribution to the Company in respect

of the Membership Interests then held by such Member or to provide any additional financing to the Company; _provided_ that a Member may make additional Capital Contributions or provide additional financing to the Company if approved by the Board of Managers and otherwise made in accordance with the applicable provisions of this Agreement. The provisions of this Section 3.7 are intended solely for the benefit of the Members in their capacity as Members, and, to the fullest extent permitted by Law, shall not be construed as conferring any benefit upon any creditor (including a Member in its capacity as a creditor) of the Company (and no such creditor shall be a third party beneficiary of this Agreement), and no Member shall have any duty or obligation to any creditor of the Company to make any additional Capital Contributions or to provide any additional financing or to cause the Board of Managers or any other Member to consent to the making of additional Capital Contributions or to the provision of additional financing.

## ARTICLE IV
## SCHEDULE OF MEMBERS; BOOKS AND RECORDS

**Section 4.1**    **Schedule of Members**. The Company shall maintain and keep at its principal office the Schedule of Members on which it shall set forth the name and notice address of each Member, the aggregate number of Membership Interests of each class and the aggregate amount of cash Capital Contributions that have been made by such Member at any time, and the Fair Market Value of any property other than cash contributed by such Member with respect to the Membership Interests (including, if applicable, a description and the amount of any liability assumed by the Company or to which contributed property is subject).

**Section 4.2**    **Books and Records; Other Documents**.

(a)    The Company shall keep, or cause to be kept, (i) complete and accurate books and records of account of the Company, (ii) minutes of the proceedings of meetings of any class of Members, the Board of Managers and any committee of the Board of Managers, and (iii) a current list of the Managers and Officers and their notice addresses. Any of the foregoing books, minutes or records may be in written form or in any other form capable of being accurately and completely converted into written form within a reasonable time. The books of the Company (other than books required to maintain Capital Accounts) shall be kept on the accrual basis of accounting, and otherwise in accordance with GAAP, and shall at all times be maintained or made available at the principal office of the Company. The Company shall, and shall cause its Subsidiaries to, (A) make and keep financial records in reasonable detail that accurately and fairly reflect all financial transactions and dispositions of the assets of the Company and its Subsidiaries and (B) maintain a system of internal accounting controls sufficient to provide reasonable assurances that (1) transactions are executed in accordance with authorization by the Person in charge and are recorded so as to provide proper financial statements and maintain accountability for assets and (2) safeguards are established to prevent unauthorized persons from having access to the assets, including the performance of periodic physical inventories.

(b)    At all times the Company shall maintain at its principal office a current list of the name and notice address of each Member, a copy of the Certificate of Formation,

including any amendments thereto, copies of this Agreement and all amendments hereto, and all other records required to be maintained pursuant to the Act.

(c)     The Company also shall maintain at all times, at its principal office, copies of the Company's federal, state, local and foreign income tax returns and reports, if any, and all financial statements of the Company for all years ending after the Effective Date; provided, however, the Company shall not be required to maintain copies of income tax returns and reports, if any, and any financial statements of the Company for any year which each Member has notified Company in writing that such Member's tax year has been closed.

(d)     If General Motors shall conclude, in its sole discretion, that it is required to consolidate the Company in accordance with GAAP, the Company shall use all commercially reasonable efforts to deliver the items and comply with the terms and conditions set forth on Exhibit D.

(e)     The Company shall prepare and deliver to each Class A Holder that owns at least ten percent (10%) of the outstanding Class A Membership Interests, each Class B Holder that owns at least ten percent (10%) of the outstanding Class B Membership Interests and each Class C Holder that owns at least twenty-five percent (25%) of the outstanding Class C Membership Interests:

(i)     Within (x) 180 days after the end of the Fiscal Year ended December 31, 2009 and (y) 120 days after the end of each Fiscal Year thereafter, financial information regarding the Company and its Subsidiaries consisting of consolidated balance sheets of the Company and its Subsidiaries as of the end of such year and related statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year (or in the case of the Fiscal Year ending December 31, 2009, that portion of such Fiscal Year from the date hereof through the end of such Fiscal Year), all prepared in conformity with GAAP and accompanied by the opinion of independent public accountants of recognized national standing selected by the Company; and

(ii)     Within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (or, in the case of quarterly reports delivered from the date hereof through December 31, 2009, 105 days), financial information regarding the Company and its Subsidiaries consisting of consolidated unaudited balance sheets as of the close of such quarter and the related statements of income and cash flow for such quarter and that portion of the Fiscal Year ending as of the close of such quarter, setting forth in comparative form the figures for the corresponding period in the prior year (provided that such comparison to the corresponding period in the prior year shall not be required until the first quarterly report delivered after the first anniversary of the date hereof if the Company determines in its good faith discretion that it is impracticable to prepare such comparison prior to such date).

**Section 4.3**     **Certain Tax Matters**.

(a)     Pursuant to Section 6231(a) of the Code, or any subsequent similar provision, until changed by a resolution of the Members, Platinum is hereby designated as the

Company's "tax matters partner" within the meaning of Section 6231(a)(7) of the Code (the "Tax Matters Member") and shall have the following rights and responsibilities:

(i)    Subject to the provisions of this Section 4.3, the Tax Matters Member shall be entitled to take any action or decline to take any action with respect to taxes, all as required by Law, except for any action which would be inconsistent with the provisions of Section 2.7.

(ii)    The Tax Matters Member shall take such action as may be necessary to cause each of the other Members to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.

(iii)    The Tax Matters Member is authorized to represent the Company before the IRS and any other Governmental Entity with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Board of Managers deems necessary or advisable.

(iv)    The Tax Matters Member shall promptly inform the Majority Class B Holders and the Majority Class A Holders of all significant matters that may come to its attention in its capacity as the Tax Matters Member and shall forward to the Majority Class B Holders and the Majority Class A Holders copies of all significant written communications it may receive or submit in such capacity, including any written adjustment by any taxing authority which would affect such Members' liability for taxes. The Tax Matters Member agrees to consult with the Majority Class B Holders and the Majority Class A Holders in good faith with respect to any written notice of any inquiries, claims, assessments, audits, controversies or similar events received from any taxing authority, and the Tax Matters Member will not settle or otherwise compromise any material tax issue with respect to the Company without the prior written consent of the Majority Class B Holders and, for so long as the Minimum Class A Condition is satisfied, the Majority Class A Holders, which consent shall not be unreasonably withheld or delayed.

(b)    At the direction of the Tax Matters Member, the Company shall prepare or cause to be prepared the United States federal, state, local, foreign and any other required tax returns of the Company and shall file or cause to be filed such returns on a timely basis, which returns may have been reviewed by the Independent Auditor.

(c)    The Company shall transmit copies of the United States federal tax returns referenced in Section 4.3(b) to the Majority Class B Holders and the Majority Class A Holders on or before forty-five (45) calendar days before the due date of each such return, including any valid extensions thereto. The Company shall not cause any such tax return to be filed unless the Majority Class B Holders and, for so long as the Minimum Class A Condition is satisfied, the Majority Class A Holders have consented to its filing (with a failure to respond within thirty calendar days after receipt being deemed consent); provided, however, that, if the Majority Class B Holders and, for so long as the Minimum Class A Condition is satisfied, the Majority Class A Holders do not consent to the filing of any tax return at least fifteen calendar days before the due date, then the Company (A) shall promptly notify the Majority Class B Holders and, for so long

as the Minimum Class A Condition is satisfied, the Majority Class A Holders of the disputed issues; and (B) may file such return after making a good faith effort to incorporate in such return any comments previously received from the Majority Class B Holders and, for so long as the Minimum Class A Condition is satisfied, the Majority Class A Holders.

(d)    To the extent appropriate, the Majority Class B Holders and the Majority Class A Holders shall be consulted in connection with the preparation and filing of tax returns contemplated by this Section 4.3.

(e)    Promptly following the written request of the Tax Matters Member, the Company shall, to the fullest extent permitted by Law, reimburse and indemnify the Tax Matters Member for all reasonable expenses, including reasonable legal and accounting fees, incurred in connection with any administrative or judicial proceeding with respect to the tax liability of (i) the Company and/or (ii) the Members in connection with the operations of the Company.

Section 4.4    **Independent Auditor**.  The Company and its Subsidiaries at all times shall engage a Person to audit its financial statements (the "Independent Auditor") that (a) is an independent public accounting firm within the meaning of the American Institute of Certified Public Accountants' Code of Professional Conduct (American Institute of Certified Public Accountants, Professional Standards, vol. 2, *et sec.* 101), (b) is a registered public accounting firm (as defused in Section 2(a)(12) of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act")), and (c) if the Company were an "issuer" (as defined in the Sarbanes-Oxley Act), would not be in violation of the auditor independence requirements of the Sarbanes-Oxley Act by reason of its acting as the auditor of the Company and its Subsidiaries.  The Independent Auditor shall be appointed by the Board of Managers and shall be a nationally recognized certified public accounting firm.  The Company shall engage the Independent Auditor from time to time to conduct such review and testing as from time to time may be necessary or reasonably required under the Sarbanes-Oxley Act and to issue to the Company its written opinions and recommendations with respect thereto.

Section 4.5    **Company Policies**.  At the first meeting of the Board of Managers after the Effective Date, the Members shall cause the Board of Managers (a) to reconfirm the policies, standards and procedures relating to the Company and its Subsidiaries set forth on Exhibit B and (b) to adopt or reconfirm, as applicable, the environmental guidelines set forth on Exhibit C.  It is the intent of the parties hereto that the Company and its Subsidiaries operate in compliance with all Laws.

## ARTICLE V
## DISTRIBUTIONS

Section 5.1    **Distributions of Available Cash.**

(a)    Subject to the Act, and except as set forth in this Article V, all Available Cash (and, in the case of the winding up of the Company, subject to Section 10.2) available for distribution to the Members may be distributed to the extent approved by the Board of Managers, in accordance with the applicable provisions of this Article V, in the following amounts and

order of priority (and, for the avoidance of doubt, the parties hereto intend that for purposes of applying the following priorities, all Distributions shall be given cumulative effect):

(i)    first, (A) 69.9134 percent to the Class A Holders, (B) [25.000] percent to the Class B Holders, and (C) 5.0866 percent to the Class C Holders until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (ii) equals $1 billion;

(ii)    second, after the required Distributions pursuant to subparagraph (i) above, simultaneously, (A) 79.2352 percent to the Class A Holders, (B) [15.000] percent to the Class B Holders and (C) 5.7648 percent to the Class C Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A), (B) and (C) of this subparagraph (ii) equals $1,641,757,563;

(iii)    third, after the required Distributions pursuant to subparagraphs (i) through (ii) above, simultaneously, (A) 30.0000 percent to the Class A Holders and (B) 70.0000 percent to the Class B Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (iiii) equals $1,000,000,000; and

(iv)    thereafter, after the required Distributions pursuant to subparagraphs (i) through (iii) above, simultaneously, (A) 40.0000 percent to the Class A Holders and (B) 60.0000 percent to the Class B Holders.

(b)    Each Distribution to the Class A Holders under this Agreement shall be made ratably among the Class A Holders determined as of, and based on the Company Class A Interest of such Class A Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to Section 7.9 with respect to such Distribution.

(c)    Each Distribution to the Class B Holders under this Agreement shall be made ratably among the Class B Holders determined as of, and based on the Company Class B Interest of such Class B Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to Section 7.9 with respect to such Distribution.

(d)    Each Distribution to the Class C Holders under this Agreement shall be made ratably among the Class C Holders determined as of, and based on the Company Class A Interest of such Class C Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to Section 7.9 with respect to such Distribution.

**Section 5.2**    **[Intentionally Deleted]**.

**Section 5.3**    **Successors**.    For purposes of determining the amount of Distributions, each Member shall be treated as having made the Capital Contributions and as having received the Distributions made to or received by its predecessors in respect of any of such Member's Membership Interests.

**Section 5.4**      <u>Distributions of Assets other than Cash</u>.  With the consent of (a) in the case of Distributions to the Class A Holders, the Majority Class A Holders and (b) in the case of Distributions to the Class B Holders, the Majority Class B Holders, in each case subject to the Act, the Company shall be permitted to distribute property consisting of assets other than cash to the Members; <u>provided</u> that no such consent shall be required in connection with any distribution in-kind pursuant to <u>Section 10.2</u>; and provided, further that only cash shall be distributed to the Class C Members pursuant to Distributions made pursuant to this <u>Article V</u>.

**Section 5.5**      <u>Limitation on Distributions</u>.

(a)      Notwithstanding anything to the contrary herein, without the prior approval of the Majority Initial Class A Holders and the Majority Initial Class B Holders, no Distributions shall be made pursuant to <u>Section 5.1</u> so long as the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the date hereof exceeds zero, unless each of the following conditions is satisfied:

(i)      there are no principal amounts outstanding under the Loan Agreement;

(ii)      the distribution occurs later than 18 months following the date hereof;

(iii)      after giving effect to such Distribution, the Company and its Subsidiaries shall have at least $800,000,000 of cash and cash equivalents on hand; and

(iv)      the Company's cash flow from operating activities during the six months prior to the distribution date was positive and the Company reasonably expects that its cash flow from operating activities will continue to be positive for six months following the distribution date; <u>provided</u>, <u>however</u>, if the proposed Distribution would cause the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the date hereof to equal zero, then the conditions set forth in this clause (iv) shall be deemed satisfied.

(b)      The Company shall make the mandatory special Distribution contemplated by <u>Section 5.8</u>, which is a contractual obligation of the Company, regardless of the extent of Available Cash.

**Section 5.6**      <u>Tax Distributions</u>.  Notwithstanding the foregoing, if there is Available Cash, such Available Cash shall be distributed (a "<u>Tax Distribution</u>") in an amount sufficient to enable the Holders to pay projected tax liabilities attributable to allocations of Tax Book Profits and Tax Book Losses by the Company using an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for a corporation resident in Delaware, and assuming that such holder does not have any offsetting losses, deductions or credits ("<u>Assumed Tax Rate</u>").  Tax Distributions shall be paid within 10 days prior to April 15, June 15, September 15 and December 15 of each year based upon the determination by the Board of Managers of the excess of (x) the product of (i) the amount of Tax Book Profits allocated to each holder for the period beginning on January 1 of such year and ending on March 31, May 31, August 31 and November 30 as if each such period were a taxable year and (ii) the Assumed Tax Rate over (y) Tax Distributions previously paid with respect to any prior period within the same taxable year.  Any Tax Distribution shall be treated as an

advance of amounts otherwise distributable to such holder pursuant to Section 5.1(a) such that, in determining a holder's right to distributions pursuant to Section 5.1(a), distributions received by such holder pursuant to this Section 5.6 shall be taken into account as if received pursuant to Section 5.1(a).

> Section 5.7     **Mandatory Payments**.  The Company shall pay ratably to the Class C Holders the accrued and undistributed Class C Return in respect of the Class C Membership Interests (i) on the last Business Day of each calendar quarter, commencing with the end of the first full calendar quarter following the date hereof and (ii) on the day any Distribution is made to the Class C Holders pursuant to Section 5.1.

> Section 5.8     **Mandatory Special Distribution**.  Subject to the Act, on the tenth anniversary of the date of this Agreement, the Company shall distribute the Unreturned Class C Amount to the Class C Members and at such time, (i) the Class C Membership Interests shall be cancelled and (ii) the percentages of the Class A Holders and the Class B Holders set forth in Section 5.1(a) shall be proportionally adjusted, if necessary, to reflect that the Class C Membership Interests are no longer outstanding.

> Section 5.9     **Payments Pursuant to the Master Disposition Agreement**. In accordance with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the Company shall pay an amount equal to $3.00 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $97.00 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $180,000,000.

## ARTICLE VI
## ALLOCATIONS

> Section 6.1     **Allocations of Tax Book Profits and Tax Book Losses**. Except as otherwise provided by this Article VI, the Tax Book Profit and Tax Book Loss of the Company for each Fiscal Year (or portion thereof) shall be determined as of the end of each such Fiscal Year (or portion thereof).  For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to this Article VI with respect to such Fiscal Year, all Tax Book Profits and Tax Book Losses (other than Tax Book Profits and Tax Book Losses specially allocated pursuant to Section 6.5 through Section 6.14) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Tax Book Value thereof and distribute the proceeds thereof pursuant to Section 10.2.

> Section 6.2     **Allocations for Tax Purposes.**  Except as otherwise provided herein, any allocation to a Member for a Fiscal Year or other period of a portion of the Tax Book Profit or Tax Book Loss, or of a specially allocated item, shall be determined to be an allocation to such Member of the same proportionate part of each item of income, gain, loss, deduction or

credit, as the case maybe, as is earned, realized or available by or to the Company for federal tax purposes.

**Section 6.3**    **Certain Accounting Matters.**    For purposes of determining Tax Book Profit, Tax Book Loss or any other items allocable to any period, such items shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under Section 706 of the Code and the Treasury Regulations promulgated thereunder.

**Section 6.4**    **Section 704(c) Allocations.**

(a)    In accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Market Value at the time of contribution.

(b)    In the event that the Tax Book Value of any Company asset is subsequently adjusted in accordance with the last sentence of the definition of Tax Book Value, any allocation of income, gain, loss and deduction with respect to such asset shall thereafter take account of any variation between the adjusted tax basis of the asset to the Company and its Tax Book Value in the same manner as under Section 704(c) of the Code and any Treasury Regulations promulgated thereunder.    Any elections or other decisions relating to such allocations shall be made by the Board of Managers in a manner that reasonably reflects the purpose and intention of this Agreement.

(c)    Allocations pursuant to this <u>Section 6.4</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Tax Book Profit, Tax Book Loss or Distributions pursuant to any provision of this Agreement.

**Section 6.5**    **Qualified Income Offset**.    If any Member receives an unexpected adjustment, allocation or Distribution described in Section 1.704-l(b)(2)(ii)(d)(4) through (6) of the Treasury Regulations in any Fiscal Year or other period which would cause such Member to have a deficit Adjusted Capital Account Balance as of the end of such Fiscal Year or other period, items of Company taxable income and gain as adjusted pursuant to the definition of "Tax Book Profit" shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in such Member's Adjusted Capital Account Balance as quickly as possible.    This <u>Section 6.5</u> is intended to comply with the qualified income offset provision in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.6**    **Gross Income Allocation**.    If any Member would otherwise have a deficit Adjusted Capital Account Balance as of the last day of any Fiscal Year or other period, items of Company taxable income and gain as adjusted pursuant to the definition of "Tax

Book Profit" shall be specially allocated to such Member so as to eliminate such deficit as quickly as possible.

**Section 6.7**    **Company Minimum Gain Chargeback**.    If there is a net decrease in Company Minimum Gain during a Fiscal Year or other period, each Member shall be allocated items of the Company taxable income and gain as adjusted pursuant to the definition of "Tax Book Profit" for such Fiscal Year or other period (and, if necessary, for subsequent Fiscal Years or periods) in proportion to, and to the extent of, such Member's share of such net decrease, except to the extent such allocation would not be required by Section 1.704-2(f) of the Treasury Regulations.    The amounts referred to in this Section 6.7, and the items to be so allocated shall be determined in accordance with Section 1.704-2 of the Treasury Regulations. This Section 6.7 is intended to constitute a "minimum gain chargeback" provision as described in Section 1.704-2(f) or 1.704-2(j)(2) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.8**    **Member Nonrecourse Debt Minimum Gain Chargeback**.    If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a Fiscal Year or other period, then each Member shall be allocated items of the Company income or gain equal to such Member's share of such net decrease, except to the extent such allocation would not be required under Section 1.704-2(i)(4) or 1.704-2(j)(2) of the Treasury Regulations. The amounts referred to in this Section 6.8 and the items to be so allocated shall be determined in accordance with Section 1.704-2 of the Treasury Regulations. This Section 6.8 is intended to comply with the minimum gain chargeback requirement contained in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.9**    **Limitations on Tax Book Loss Allocations**.    With respect to any Member, notwithstanding the provisions of Section 6.1, the amount of Tax Book Loss for any Fiscal Year or other period that would otherwise be allocated to a Member shall not cause or increase a deficit Adjusted Capital Account Balance.    Any Tax Book Loss in excess of the limitation set forth in this Section 6.9 shall be allocated among the remaining Members, *pro rata* based on their respective positive Capital Account balances, to the extent such allocations would not cause such remaining Members to have a deficit Adjusted Capital Account Balance.

**Section 6.10**    **Member Nonrecourse Deductions**.    Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(l) of the Treasury Regulations.

**Section 6.11**    **Nonrecourse Deductions**.    Nonrecourse Deductions, other than Member Nonrecourse Deductions, for any Fiscal Year shall be allocated to the Members *pro rata* based on their respective positive Capital Account balances.

**Section 6.12**    **Excess Nonrecourse Liabilities**.    Nonrecourse Debts of the Company which constitute Excess Nonrecourse Liabilities shall be allocated among the Members *pro rata* based on their respective positive Capital Account balances.

**Section 6.13**      <u>**Ordering Rules**</u>. Anything contained in this Agreement to the contrary notwithstanding, allocations for any Fiscal Year or other period of Nonrecourse Deductions or Member Nonrecourse Deductions, or of items required to be allocated pursuant to the minimum gain chargeback requirements contained in this <u>Article VI</u>, shall be made before any other allocations hereunder.

**Section 6.14**      <u>**Curative Allocations**</u>. The allocations set forth in <u>Section 6.5</u> through <u>Section 6.12</u> inclusive (collectively, the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may result in allocations which are not consistent with the manner in which the Members intend to allocate Tax Book Profit and Tax Book Loss or make Distributions. Accordingly, notwithstanding the other provisions of this Agreement, Members shall reallocate items of income, gain, deduction and loss among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Tax Book Profit and Tax Book Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Tax Book Profit and Tax Book Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero. In addition, if in any Fiscal Year or other period there is a decrease in Company Minimum Gain, or in Member Nonrecourse Debt Minimum Gain, and application of the minimum gain chargeback requirements set forth in this Section would cause a distortion in the economic arrangement among the Members, the Members may, if they do not expect that Company will have sufficient other income to correct such distortion, request the IRS to waive either or both of such minimum gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirements.

## ARTICLE VII
## RIGHTS AND DUTIES OF MEMBERS

**Section 7.1**      <u>**Members**</u>. The Members of the Company, and their respective class and numbers of Membership Interests, are listed on the <u>Schedule of Members</u>. No Person may be a Member without the ownership of a Membership Interest. The Members shall have only such rights and powers as are granted to them pursuant to the express terms of this Agreement and the Act. Except as otherwise expressly provided in this Agreement, no Member, in such capacity, shall have any authority to bind, to act for, to sign for or to assume any obligation or responsibility on behalf of, any other Member or the Company.

**Section 7.2**      <u>**No Management or Dissent Rights**</u>. Except as set forth herein or otherwise required by Law, the Members shall not have any right to take part in the management or operation of the Company other than through the Managers appointed by the Members to the Board of Managers. No Member shall, without the prior written approval of the Board of Managers, take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company, except for actions expressly authorized by the terms of this Agreement. Except as required by Law, Members shall not be

entitled to any rights to dissent or seek appraisal with respect to any transaction, including the merger or consolidation of the Company with any Person.

### Section 7.3    No Member Fiduciary Duties.

(a)    No Member shall, to the maximum extent permitted by the Act and other applicable Law, owe any duties (including fiduciary duties) as a Member to the other Members or the Company, notwithstanding anything to the contrary existing at law, in equity or otherwise; provided, however, that each Member shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

(b)    Except as otherwise expressly provided in this Agreement or any other contractual arrangements between the Company and one or more Members, any Member may engage in or possess any interest in another business or venture of any nature and description, independently or with others, whether or not such business or venture is competitive with the Company or any of its Subsidiaries, and neither the Company nor any other Member shall have any rights in or to any such independent business or venture or the income or profits derived therefrom, and the doctrine of corporate opportunity or any analogous doctrine shall not apply to the Members and the members, shareholders, partners and Affiliates thereof.  The pursuit of any such business or venture shall not be deemed wrongful, improper or a breach of any duty hereunder, at law, in equity or otherwise.  Any Member and the members, shareholders, partners and Affiliates thereof shall be able to transact business or enter into agreements with the Company to the fullest extent permissible under the Act, subject to the terms and conditions of this Agreement.

(c)    Except as otherwise expressly provided in this Agreement or any other contractual arrangements between the Company and one or more Members, if a Member acquires knowledge, other than solely from or through the Company, of a potential transaction or matter that may be a business opportunity for both such Member and the Company or another Member, such Member shall have no duty to communicate or offer such business opportunity to the Company or any other Member and shall not be liable to the Company or the other Members for breach of any duty (including fiduciary duties) as a Member by reason of the fact that such Member pursues or acquires such business opportunity for itself, directs such opportunity to another Person, or does not communicate information regarding such opportunity to the Company.

(d)    The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities of a Member otherwise existing at law or in equity, are agreed by the Members to replace such duties and liabilities of such Member.

### Section 7.4    Meetings of Members.

(a)    An annual meeting of the Class A Holders and Class B Holders shall be held in Detroit, Michigan, New York, New York or at such other place, within or without the State of Delaware, as shall from time to time be determined by the Board of Managers.  Prior to each such annual meeting, the Secretary shall circulate an agenda for such meeting, which

agenda shall include a discussion of the financial reports of the Company most recently delivered to a Member as may be reasonably requested, such other matters relating to the Company as any Holder of more than ten percent (10%) of the Voting Power of the Class A Membership Interests or the Class B Membership Interests shall request to be included in such agenda and such other matters relating to the Company as the representatives of the Class A Holders and Class B Holders attending such meeting shall elect to discuss.  The Managers or Officers of the Company shall participate in the annual meeting; <u>provided</u> that such participation does not unreasonably interfere with the normal performance of their duties.

(b)    A special meeting of the Holders of the Class A Membership Interests or the Class B Membership Interests for any purpose or purposes specified by the person calling the meeting may be called at any time by (i) the Board of Managers, (ii) the Chief Executive Officer, or (iii) any Holder of more than ten percent (10%) of the Voting Power of such class of Class A Membership Interests or Class B Membership Interests.  At any such special meeting, no business shall be transacted and no action shall be taken other than that stated in the notice for such meeting.  The Board of Managers may elect, in its sole discretion, that special meetings of the Holders of different classes of Membership Interests called for the same purpose or purposes may be held on the same date and/or at the same place (whether at the same time or otherwise).

(c)    Each Holder of Class A Membership Interests or Class B Membership Interests shall have the right to attend any meeting of such class of Membership Interests.  Any Holder who is not a natural person shall designate one individual to act as such Holder's legal representative for purposes of voting at any such meeting.

**Section 7.5**    <u>**Notice of Meetings**</u>.  Written notice stating the place, day and time of every meeting of the Holders of any class of Membership Interests and, in case of a special meeting of the Holders of any class of Membership Interests, the purpose or purposes for which the meeting is called, shall be mailed (a) with respect to any annual meeting, not less than ten nor more than sixty calendar days before the date of the meeting (or if sent by facsimile, not less than five Business Days before the date of the meeting) or (b) with respect to any special meeting, not less than five nor more than thirty calendar days before the date of the meeting (or if sent by facsimile, not less than three Business Days before the date of the meeting), in either case to each Holder of such class of Membership Interests entitled to vote at such meeting, at its notice address maintained in the records of the Company by the Secretary.  Such further notice shall be given as may be required by Law, but a meeting may be held without notice if all the Holders of the class of the Membership Interests in respect of which the meeting is called entitled to vote at the meeting are present in person or by telephone or represented by proxy or if notice is waived in writing by those not present, either before or after the meeting.

**Section 7.6**    <u>**Quorum**</u>.  Any number of Holders of at least a majority of the Membership Interests of the class of Membership Interests entitled to vote with respect to the business to be transacted at a meeting of such class of Membership Interests and who shall be present in person or by telephone or represented by proxy at the meeting duly called shall constitute a quorum for the transaction of business.  If such quorum is not present within sixty minutes after the time appointed for such meeting, such meeting shall be adjourned and the Board of Managers shall reschedule the meeting no fewer than three nor more than ten Business Days thereafter.  If such meeting is rescheduled two consecutive times, then those Holders of

class of Membership Interests who are present or represented by proxy at the second such rescheduled meeting shall constitute a valid quorum for all purposes hereunder; <u>provided</u> that written notice of any rescheduled meetings shall have been delivered to all Holders of such class of Membership Interests at least three Business Day prior to the date of each rescheduled meeting.

**Section 7.7**        <u>Voting</u>.

(a)        Except as otherwise required by Law, Class B Holders holding Class B Membership Interests shall vote together, in their capacity as such Holders, as a separate class of Membership Interests.  Except with respect to matters where the separate vote of such class of Membership Interests is expressly required hereunder or as otherwise required by Law, Class A Holders holding Class A Membership Interests, in their capacity as such Holders, shall have no voting power in connection with the election of Managers (other than the election by the Majority Initial Class A Holders, voting as a separate class, of the Class A Manager pursuant to <u>Section 8.3(a)(i)</u>) and no right or authority to vote on or approve any other matter to be voted on or approved by the Members, whether hereunder, under the Act, at law, in equity or otherwise.  Except with respect to matters where the separate vote of such class of Membership Interests is expressly required hereunder or as otherwise required by Law, Class C Holders holding Class C Membership Interests, in their capacity as such Holders, shall have no voting power in connection with the election of Managers and no right or authority to vote on or approve any other matter to be voted on or approved by the Members, whether hereunder, under the Act, at law, in equity or otherwise.  Each Class B Holder shall be entitled to one vote for each Class B Membership Interest held by such Class B Holder, in each case, in connection with the election of Class B Managers and on all matters to be voted upon by the Members or the Class B Members (in each case without prejudice to any consent rights that the holders of any class or portion of any particular class of Membership Interests have expressly been granted under this Agreement).  Each Class A Holder shall be entitled to one vote for each Class A Membership Interest held by such Class A Holder in connection with any matter where the separate vote of the Class A Holders is expressly required hereunder (including in connection with any vote by the Members constituting the Majority Class A Holders and any vote by the Members constituting the Majority Initial Class A Holders with respect to the election of the Class A Manager pursuant to <u>Section 8.3(a)(i)</u>) and as otherwise required by Law.  Each Class C Holder shall be entitled to one vote for each Class C Membership Interest held by such Holder, as applicable, in connection with any matter where the separate vote of the Class C Holders is expressly required hereunder and as otherwise required by Law.  The percentage of the total votes entitled to be cast by any Holder with respect to such Holder's class of Membership Interests, calculated pursuant to this <u>Section 7.7</u>, is herein referred to as the "<u>Voting Power</u>" of such Holder with respect to such class of Membership Interests.

(b)        At any meeting of the Holders of each class of Membership Interests, each Holder of such class of Membership Interests entitled to vote on any matter coming before the meeting shall, as to such matter, have a vote, in person, by telephone or by proxy, equal to the Voting Power of the number of Membership Interests of such class of Membership Interests held in its name on the relevant record date established pursuant to <u>Section 7.9</u>.

(c)     Except as otherwise specified herein, when a quorum is present with respect to the Holders of any class of Membership Interests, the affirmative vote of the holders of a majority of the Voting Power of such class of Membership Interests present in person or represented by proxy at a duly called meeting and entitled to vote on the subject matter shall be the act of the Holders of such class of Membership Interests, unless the question is one upon which by express provisions of Law or of this Agreement a different vote is required, in which case such express provision shall govern and control the decision of such question.  Where a separate vote by any class of Membership Interests is required, the affirmative vote of the Holders of at least a majority of the Voting Power of the Membership Interests of such class present in person or represented by proxy at the meeting of such class shall be the act of such class, unless the question is one upon which by express provisions of Law or of this Agreement a different vote is required, in which case such express provision shall govern and control the decision of such question.

(d)     Each Member entitled to vote at a meeting of the Holders of any class of Membership Interests or to express consent or dissent to any action in writing without a meeting may authorize another person or persons to act for him or her by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  At each meeting of the Holders of any class of Membership Interests, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary, and no Membership Interests may be represented or voted under a proxy that have been found to be invalid or irregular.

### Section 7.8          Action Without a Meeting; Telephonic Meetings.

(a)     Any action required to be taken at any annual or special meeting of the Holders of any class of Membership Interests, or any action that may be taken at any annual or special meeting of the Holders of any class of Membership Interests, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the Holders who signed the consent or consents, shall be signed by the Holders holding not less than a majority of the Membership Interests of such class of Membership Interests.  Any such consent or consents shall be delivered to the Company by delivery to the Company's principal place of business, or an Officer or agent of the Company having custody of the book or books in which proceedings of meetings of the Holders are recorded.  If action is so taken without a meeting by less than unanimous written consent of the Holders of the applicable class of Membership Interests, a copy of such written consent shall be delivered promptly to all Holders of such class of Membership Interests who have not consented in writing.  Any action taken pursuant to such written consent or consents of the Holders of any class of Membership Interests shall have the same force and effect as if taken by the Holders of such class of Membership Interests at a meeting of the Holders of such class of Membership Interests.

(b)     The Holders of each class of Membership Interests may participate in meetings of the Holders of such class of Membership Interests by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a telephonic meeting pursuant to this Section 7.8(b) shall constitute presence at such meeting and shall constitute a waiver of any deficiency of notice.

**Section 7.9**      **Record Date**.  For the purpose of determining the Members entitled to notice of or to vote at any meeting of the Holders of any class of Membership Interests or any adjournment thereof, or entitled to receive a payment of any kind, or in order to make a determination of the Holders of any class of Membership Interests for any other proper purpose, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than seventy calendar days prior to the date on which the particular meeting or action requiring such determination of the Holders of such class of Membership Interests is to be held or taken.  If no record date is fixed by the Board of Managers, the date on which notices of the meetings are mailed or the date on which the resolution of the Board of Managers declaring such Distribution is adopted, as the case may be, shall be the record date.  When a determination of the Holders of a class of Membership Interests has been made as provided in this Section 7.9, such determination shall apply to any adjournment thereof unless the Board of Managers fixes a new record date, which it shall do if the meeting is adjourned to a date more than one hundred twenty calendar days after the date originally fixed.

**Section 7.10**      **Removal or Resignation of Members**.  A Member may not (a) be removed as a Member of the Company without such Member's prior written consent or (b) resign from the Company without the written consent of the Board of Managers, unless otherwise provided in this Agreement.

**Section 7.11**      **Liability of Members**.

(a)      Except as otherwise required by Law or as expressly set forth in this Agreement, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third Person.  Except as required by the Act, each Member shall be liable only to make such Member's Capital Contribution to the Company, if applicable, and the other payments provided for expressly herein.

(b)      Under the Act, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member.  It is the intent of the Members that no Distribution to any Member pursuant to Article V or Article X shall be deemed to constitute money or other property paid or distributed in violation of the Act, and the Members agree that each such Distribution shall constitute a compromise of the Members within the meaning of Section 18-502(b) of the Act, and, to the fullest extent permitted by Law, the Member receiving such Distribution shall not be required to return to any Person any such money or property, except as otherwise expressly set forth herein.  If, however, any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the other Members, and, when funded, shall constitute a Capital Contribution by such Member.

**Section 7.12**    **Investment Representations of Members**.    Each Member hereby represents, warrants and acknowledges to the Company that: (a) such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and is making an informed investment decision with respect thereto; (b) such Member is acquiring interests in the Company for strategic business or investment purposes only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (c) such Member has read, is familiar with, and understands Rule 501 of Regulation D under the Securities Act and represents that such Member is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and (d) the execution, delivery and performance of this Agreement have been duly authorized by such Member.

# ARTICLE VIII
# BOARD OF MANAGERS; OFFICERS

**Section 8.1**    **Establishment of Board of Managers**.    There is hereby established a committee of Member representatives (the "Board of Managers") comprised of natural Persons (the "Managers") having the authority and duties set forth in this Agreement. The size of the Board of Managers shall initially be seven, but shall be automatically reduced to six at such time as the Minimum Class A Condition first ceases to be satisfied, and may from time to time be increased by the Board of Managers with the prior written consent of the Majority Class B Holders.  Subject to Section 8.3, (i) the Class B Managers shall be elected at the annual meeting of the Class B Holders or a special meeting of the Class B Holders called for such purpose, and (ii) the Class A Manager shall be elected at the annual meeting of the Class A Holders or a special meeting of the Class A Holders called for such purpose.  Each Manager elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as provided in this Article VIII.

**Section 8.2**    **General Powers of the Board of Managers**.    The property, affairs and business of the Company shall be managed by or with the direction of the Board of Managers, except as otherwise expressly provided in this Agreement.  In addition to the powers and authority expressly conferred on it by this Agreement, the Board of Managers may exercise all such powers of the Company and do all such lawful acts and things as are permitted by the Act and the Certificate of Formation.  Each Manager shall be a "manager" (as such term is defined in the Act) of the Company but, notwithstanding the foregoing, no Manager shall have any rights or powers beyond the rights and powers granted to such Manager in this Agreement. Except as such power is delegated pursuant to Section 8.11, no Manager acting alone, or with any other Managers, shall have the power to act for or on behalf of, or to bind the Company.

**Section 8.3**    **Election of Managers**.

(a)    For so long as the Minimum Class A Condition is satisfied, the Board of Managers shall be comprised of the following Managers:

(i)    One representative elected by the Majority Initial Class A Holders to the Board of Managers to serve as a Manager (the "Class A Manager"); and

(ii)     The remaining representatives elected by the Majority Class B Holders to the Board of Managers to serve as Managers.

(b)     From and after such time as the Minimum Class A Condition first ceases to be satisfied, the Board of Managers shall be comprised of representatives elected by the Majority Class B Holders to the Board of Managers to serve as Managers.

(c)     The Majority Class B Holders shall appoint the Chairman of the Board of Managers (who shall be a Manager) (the "Chairman").

(d)     Any Manager shall be removed from the Board of Managers or any committee of the Board of Managers with or without cause at the written request of the Holders that have the right to elect such Manager under this Section 8.3, but only upon such written request and under no other circumstances. A Manager shall be removed as Chairman with or without cause at the written request of the Holders that have the right to appoint such Manager to such position under this Section 8.3, but only upon such written request and under no other circumstances.

(e)     Any Manager may resign (and any Manager may resign as Chairman) at any time by giving written notice to the members of the Board of Managers and the Chief Executive Officer or the Secretary.  The resignation of any Manager (or of any Manager as Chairman) shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(f)     If any Manager elected pursuant to Section 8.3(a) or 8.3(b) for any reason ceases to serve as a member of the Board of Managers during such Manager's term as a Manager, the resulting vacancy on the Board of Managers shall be filled, subject to the conditions of this Section 8.3, by a Manager elected by the Holders who initially elected such Manager, unless Section 8.3(a) or Section 8.3(b), as applicable, would provide for a different right of election at such time. If any Manager appointed as Chairman pursuant to Section 8.3(c) for any reason ceases to serve as a member of the Board of Managers (or otherwise resigns as Chairman) during such Manager's term as a Manager, the resulting vacancy as to the position of Chairman shall be filled, subject to the conditions of this Section 8.3, by the Holders who initially appointed such Person as Chairman, unless Section 8.3(c) would provide for a different right of appointment at such time.

(g)     The Holders entitled to elect a Manager pursuant to this Section 8.3 shall use commercially reasonable efforts to fill a vacancy of such representative, in the case of any vacancy as of the Effective Date, within thirty calendar days, and, thereafter, within ninety calendar days after such representative ceases to serve as a member of the Board of Managers or a committee of the Board of Managers.

### Section 8.4     Meetings.

(a)     Regular meetings of the Board of Managers may be held in Detroit, Michigan, New York, New York or at such other place, within or without the State of Delaware, as shall from time to time be determined by the Board of Managers, but in no event less than (i)

four times during any twelve-month period, and (ii) once during any three-month period. Special meetings of the Board of Managers may be called by or at the request of the Chief Executive Officer, and in any event shall be called by the Chief Executive Officer upon the written request of any Manager. Special meeting notices shall state the purposes of the proposed meeting.

(b)    Any Manager or any member of a committee of the Board of Managers who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such Manager attends for the express purpose of objecting or abstaining at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such Manager shall be conclusively presumed to have assented to any action taken unless his or her dissent or abstention shall be entered in the minutes of the meeting or unless his or her written dissent or abstention to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary immediately after the adjournment of the meeting. Such right to dissent or abstain shall not apply to any Manager who voted in favor of such action.

Section 8.5    **Notice of Meetings**.  Written notice stating the place, day and time of every meeting of the Board of Managers and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be mailed not less than five nor more than thirty calendar days before the date of the meeting (or if sent by facsimile or email, not less than three Business Days before the date of the meeting), in each case to each Manager at his or her notice address maintained in the records of the Company by the Secretary. Such further notice shall be given as may be required by Law, but meetings may be held without notice if all the Managers entitled to vote at the meeting are present in person or by telephone or represented by proxy or if notice is waived in writing by those not present, either before or after the meeting.

Section 8.6    **Quorum**.    Unless otherwise provided by Law or this Agreement, the presence of Managers constituting a majority of the voting authority of the whole Board of Managers shall be necessary to constitute a quorum for the transaction of business. If such quorum is not present within sixty minutes after the time appointed for such meeting, such meeting shall be adjourned and the President or acting Chairman shall reschedule the meeting to be held not fewer than two nor more than ten Business Days thereafter. If such meeting is rescheduled two consecutive times, then those Managers constituting a majority of the voting authority of the whole Board of Managers who are present at the second such rescheduled meeting shall constitute a valid quorum for all purposes hereunder; provided that written notice of any rescheduled meeting shall have been delivered to all Managers at least two Business Days prior to the date of such rescheduled meeting. Notwithstanding any provision to the contrary contained herein, interested Managers may be counted in determining the presence of a quorum at a meeting of the Board of Managers or of a committee that authorizes any interested party contract or transaction.

Section 8.7    **Voting**. Each Manager shall be entitled to cast one vote with respect to each matter brought before the Board of Managers (or any committee of the Board of Managers of which such Manager is a member) for approval. Except as otherwise provided by this Agreement, the Act, other Law or the Certificate of Formation, all policies and other matters to be determined by the Managers shall be determined by a majority vote of the members of the Board of Managers present at a meeting at which a quorum is present. No Manager shall be

disqualified from voting on matters as to which such Manager or the Persons that elected such Manager may have a conflict of interest, whether such matter is a direct conflict of interest in connection with which the Person that elected such Manager or any affiliate of such Person will engage in a transaction with the Company or one or more of its Subsidiaries (a "Direct Conflict") or of another nature (an "Indirect Conflict"); provided that (a) prior to voting on any such matter, such Manager shall disclose the fact of any such conflict to the other Managers (other than conflicts arising from such Manager's relationship with the Persons who elected such Manager) and, if such conflict is a Direct Conflict, the material terms of such transaction and the material facts as to the relationship or interest of the Person that elected such Manager or such Person's Affiliate, (b) any Manager may determine to recuse himself or herself from voting on any matter as to which such Manager or the Person that elected such Manager may have a conflict of interest, and whether or not a Manager recuses himself or herself, if such matter is an Indirect Conflict, the Manager shall have no obligation to disclose the nature or substance of the conflict or any information related thereto other than the fact that a conflict exists and (c) no Manager shall have any duty to disclose to the Company or the Board of Managers confidential information in such Manager's possession (which information the Manager has determined in good faith is competitively sensitive) even if it is material and relevant information to the Company and/or the Board of Managers and, in any such case, such Manager shall not be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager by reason of such lack of disclosure of such confidential information.

### Section 8.8        Action Without a Meeting; Telephonic Meetings.

(a)    On any matter requiring an approval or consent of Managers under this Agreement or the Act, the Managers may take such action without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Managers.

(b)    Managers may participate in meetings of the Board of Managers by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a telephonic meeting pursuant to this Section 8.8(b) shall constitute presence at such meeting and shall constitute a waiver of any deficiency of notice.

### Section 8.9        Compensation of Managers; Expense Reimbursement.
Managers that are also Officers of the Company or employees of any of the Members or their Affiliates shall not receive any stated fee for services in their capacity as Managers; provided, however, that nothing herein contained shall be construed to preclude any Manager from serving the Company or any Subsidiary in any other capacity and receiving compensation therefor. Managers that are not also Officers of the Company or employees of any of the Members or their Affiliates may receive a stated salary for their services as Managers, in each case as determined from time to time by the Board of Managers.  Managers shall be reimbursed by the Company for any reasonable out-of-pocket expenses related to attendance at each regular or special meeting of the Board of Managers subject to the Company's requirements with respect to reporting and documentation of such expenses.

**Section 8.10**          **Committees of the Board of Managers.**

(a)      The Board of Managers may by resolution designate one or more committees, each of which shall be comprised of at least one Manager, and may designate one or more of the Managers as alternate members of any committee, who may, subject to any limitations imposed by the Board of Managers, replace absent or disqualified Managers at any meeting of that committee.  To the extent not prohibited by Law, any Manager may attend the meetings of any committee of the Board of Managers on which he or she does not serve, as a non-voting observer.

(b)      Any committee of the Board of Managers, to the extent provided in any resolution of the Board of Managers, shall have and may exercise all of the authority of the Board of Managers, subject to the limitations set forth in Article XII and Section 14.1 or in the one or more resolutions of the Board of Managers establishing such committee.  Any committee members may be removed, or any authority granted thereto may be revoked, at any time for any reason by a majority of the Board of Managers.  Each committee of the Board of Managers may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided in this Agreement or by a resolution of the Board of Managers establishing such committee.

**Section 8.11**          **Delegation of Authority**.  The Board of Managers may, from time to time (acting in any applicable case with any required consent under this Agreement), delegate to any Person (including any Member, Officer or Manager) such authority and powers to act on behalf of the Company as it shall deem advisable in its discretion, subject to the approval rights of the Majority Class B Holders or the Majority Class A Holders, as applicable, specified in this Agreement.  Any delegation pursuant to this Section 8.11 may be revoked at any time and for any reason or no reason by the Board of Managers.

**Section 8.12**          **Officers.**

(a)      The officers of the Company (the "Officers") shall consist of a Chief Executive Officer, a Chief Financial Officer, a President, a Secretary and such other Officers as may be appointed in accordance with the terms of this Agreement.  One Person may hold, and perform the duties of, any two or more of such offices.

(b)      All of the Officers shall be appointed by a majority of the members of the Board of Managers.  Any Officer may be removed, with or without cause, at any time by a majority of the members of the Board of Managers.

(c)      No Officer shall have any rights or powers beyond the rights and powers granted to such Officers in this Agreement or by action of the Board of Managers.  The Chief Executive Officer, President, Chief Financial Officer and Secretary shall have the following duties and responsibilities:

(i)      Chief Executive Officer.  The Chief Executive Officer of the Company (the "Chief Executive Officer") shall perform such duties as may be assigned to him or her from time to time by the Board of Managers.  Subject to the direction of the Board of Managers, he or she shall have, and exercise, direct charge of, and general supervision

over, the business and affairs of the Company. He or she shall from time to time report to the Board of Managers all matters within his or her knowledge that the interest of the Company may require to be brought to its notice, and shall also have such other powers and perform such other duties as may be specifically assigned to him or her from time to time by the Board of Managers. The Chief Executive Officer shall see that all resolutions and orders of the Board of Managers are carried into effect, and in connection with the foregoing, shall be authorized to delegate to the President and the other Officers such of his or her powers and such of his or her duties as the Board of Managers may deem to be advisable.

(ii)    President. The President of the Company (the "President") shall perform such duties as may be assigned to him or her from time to time by the Board of Managers or as may be designated by the Chief Executive Officer.

(iii)    Chief Financial Officer. The Chief Financial Officer of the Company (the "Chief Financial Officer") shall have the custody of the Company's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company, in such depositories as may be designated by the Board of Managers or by any Officer authorized by the Board of Managers to make such designation. The Chief Financial Officer shall exercise such powers and perform such duties as generally pertain or are necessarily incident to his or her office and shall perform such other duties as may be specifically assigned to him or her from time to time by the Board of Managers or the Chief Executive Officer.

(iv)    Secretary. The Secretary of the Company (the "Secretary") shall attend all meetings of the Members of each class of Membership Interests and record all votes and the minutes of all proceedings in a book to be kept for that purpose and shall perform like duties for any committee when required. He or she shall give, or cause to be given, notice of all meetings of the Members of each class of Membership Interests and, when necessary, of the Board of Managers. The Secretary shall exercise such powers and perform such duties as generally pertain or are necessarily incident to his or her office, and he or she shall perform such other duties as may be assigned to him or her from time to time by the Board of Managers or the Chief Executive Officer. To the greatest extent possible, the Secretary shall vote, or cause to be voted, all of the Equity Securities of any Subsidiary of the Company as directed by the Board of Managers.

**Section 8.13    Standard of Care; Fiduciary Duties; Liability of Managers and Officers.**

(a)    Any Member, Manager or Officer, in the performance of such Member's, Manager's or Officer's duties, shall be entitled to rely in good faith on the provisions of this Agreement and on opinions, reports or statements (including financial statements, books of account any other financial information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company and its Subsidiaries) of the following other Persons or groups: (i) one or more Officers or employees of such Member or the Company or any of its Subsidiaries, (ii) any legal counsel, certified public accountants or other Person

employed or engaged by such Member, the Board of Managers or the Company or any of its Subsidiaries, or (iii) any other Person who has been selected with reasonable care by or on behalf of such Member, Manager, Officer or the Company or any of its Subsidiaries, in each case as to matters which such relying Person reasonably believes to be within such other Person's professional or expert competence, The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Act.

(b) On any matter involving a conflict of interest not provided for in this Agreement, each Manager and Officer shall be guided by its reasonable judgment as to the best interests of the Company and its Subsidiaries and shall take such actions as are determined by such Person to be necessary or appropriate to ameliorate such conflict of interest.

(c) Subject to, and as limited by the provisions of this Agreement (including Section 8.7), the Managers and the Officers, in the performance of their duties as such, shall owe to the Company and its Members duties of loyalty and due care of the type owed under Law by directors and officers of a business corporation incorporated under the Delaware General Corporation Law of the State of Delaware; provided that the doctrine of corporate opportunity or any analogous doctrine shall not apply to the Managers; and provided, further, that, other than in connection with a Direct Conflict, no Manager and no Holder that elected such Manager shall have any duty to disclose to the Company or the Board of Managers confidential information in such Manager's or Holder's possession (which information the Manager has determined in good faith is competitively sensitive) even if it is material and relevant information to the Company and/or the Board of Managers and neither such Manager nor such Holder shall be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager or Member by reason of such lack of disclosure of such confidential information. The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including the duty of loyalty and other fiduciary duties) and liabilities of a Manager or Officer otherwise existing at Law or in equity or by operation of the preceding sentence, are agreed by the Members to replace such duties and liabilities of such Manager or Officer. Notwithstanding the foregoing provisions and Section 8.13(f) except as otherwise expressly provided in this Agreement or any other written agreement entered into by the Company or any of its Subsidiaries and any Manager, if a Manager acquires knowledge of a potential transaction or matter that may be a business opportunity for both the Holder that has the right to designate such Manager hereunder and the Company or another Member, such Manager shall have no duty to communicate or offer such business opportunity to the Company or any other Member and shall not be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager by reason of the fact that such Manager directs such opportunity to the Holder that has the right to designate such Manager or any other Person, or does not communicate information regarding such opportunity to the Company, and any such direction of an opportunity by such Manager, and any action with respect to such an opportunity by such Holder, shall not be wrongful or improper or constitute a breach of any duty hereunder, at law, in equity or otherwise.

(d) Except as required by the Act, no individual who is a Manager or an Officer, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that

liability or obligation arises in contract, tort or otherwise solely by reason of being a Manager or an Officer or any combination of the foregoing.

(e)    No Manager or Officer shall be liable to the Company or any Member for any act or omission (including any breach of duty (fiduciary or otherwise)), including any mistake of fact or error in judgment taken, suffered or made by such Person if such Person acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and which act or omission was within the scope of authority granted to such Person; <u>provided</u> that such act or omission did not constitute fraud, willful misconduct, bad faith or gross negligence in the conduct of such Person's office.

(f)    No Manager shall be liable to the Company or any Member for monetary damages for breach of fiduciary duty as a Manager <u>provided</u> that the foregoing shall not eliminate or limit the liability of a Manager:  (i) for any breach of such Manager's duty of loyalty to the Company or its Members (as such duty is modified pursuant to the terms of this Agreement); (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of Law; or (iii) for any transaction from which such Manager derived an improper personal benefit.

**Section 8.14**    **Disclaimer of Fiduciary Duties to the Class C Holders.**  No Manager or Officer of the Company shall, to the maximum extent permitted by the Act and other applicable Law, owe any duties (including fiduciary duties) to the Class C Members, notwithstanding anything to the contrary existing at law, in equity or otherwise.

## ARTICLE IX
## TRANSFER OF MEMBERSHIP INTERESTS; SUBSTITUTED MEMBERS

**Section 9.1**    **Limitations on Transfer of Membership Interests.**

(a)    From and after the Effective Date, no Holder may Transfer any Membership Interests (or any portion thereof), unless the Person to whom such Membership Interests are Transferred, executes, simultaneously with such Transfer, an addendum to this Agreement, setting forth such Person's agreement to be bound by the terms and conditions of this Agreement, and assuming all obligations of the assignor with respect to the acquired Membership Interest, on terms reasonably satisfactory to the Company (acting through its Board of Managers).

(b)    Each Member agrees that the Transfer restrictions set forth in this Agreement may not be avoided by Transferring Equity Securities in any Person who directly or indirectly holds Membership Interests in the Company.

(c)    So long as the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the date hereof exceeds zero, without the prior written consent of the Majority Initial Class A Holders, the Initial Class B Holders shall not Transfer (other than pursuant to Exempt Transfers) more than forty-nine percent of the Class B Membership Interests acquired by Platinum on the date hereof (determined after adjustment for any Pro Rata Adjustment Events after the date hereof).

(d)      Notwithstanding anything to contrary contained herein, the Original Class C Member shall not Transfer its Class C Membership Interests other than to, at the election of the Company made within 30 days of the date hereof, (i) one or more of the Tranche C Lenders directly or (ii) an entity reasonably satisfactory to the Board of Managers that shall hold the Class C Membership Interests on behalf of such lenders.   Thereafter, no Class C Holder may Transfer any Class C Membership Interests other than (i) to another Member or (ii) to a single Person, all of such Holder's Class C Membership Interests.

Section 9.2      **Void Transfers**.   To the greatest extent permitted by the Act and other Law, any Transfer by any Member of any Membership Interests or other interest in the Company in contravention of this Agreement shall be void and ineffective and shall not bind or be recognized by the Company or any other Person.   In the event of any Transfer in contravention of this Agreement, to the greatest extent permitted by the Act and other Law, the purported Transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Member.

Section 9.3      **Substituted Member**.   Each Person to whom any Membership Interest is Transferred in accordance with the provisions of this Article IX shall agree in writing to be bound by the provisions of this Agreement as a holder of such Membership Interests.   Upon such agreement, such Person shall become a Substituted Member entitled to all the rights of a Member with respect to such Membership Interest, and the Schedule of Members shall be amended to reflect the name, notice address, Membership Interests and other interests in the Company of such Substituted Member and to eliminate the name and notice address of and other information relating to the Transferee with regard to the Transferred Membership Interests.

Section 9.4      **Effect of Transfer**.   Following a Transfer of any Membership Interests that is permitted under this Article IX, the Transferee of such Membership Interests shall be treated as having made all of the Capital Contributions in respect of, and received all of the Distributions received in respect of, such Membership Interests, and shall receive allocations and Distributions under Article V, Article VI and Article X in respect of such Membership Interests as if such Transferee were a Member.

Section 9.5      **Additional Transfer Restrictions.**

(a)      Any Member proposing to make a Transfer of its Membership Interest pursuant to this Article IX and the proposed Transferee shall obtain (at its sole cost and expense, but with all reasonable cooperation from the Company) any waivers, consents or approvals from any third Person (including any Governmental Entity) that may be necessary in connection with the proposed Transfer and the admission of the proposed Transferee as a Substitute Member, if applicable.

(b)      Notwithstanding any other provisions of this Article IX, no Transfer of Membership Interests subject to this Article IX may be made unless in the opinion of counsel (who may be counsel for the Company), reasonably satisfactory in form and substance to the Board of Managers and counsel for the Company (which opinion requirement may be waived, in whole or in part, at the discretion of the Board of Managers), such Transfer would not (i) violate any federal securities Laws or any state securities or "blue sky" Laws (including any investor

suitability standards) applicable to the Company or the Membership Interests to be Transferred, (ii) cause the Company to be required to register as an "investment company" under the 1940 Act, (iii) cause the Company to be [insert relevant tax-related provisions based on final determination of legal structure] or (iv) have a material and adverse effect on the Company as a result of any requirement of Law that becomes or that may become applicable in connection with or as a result of such Transfer.

(c)    [Additional tax-related transfer restrictions to be included based on final determination of legal structure.]

**Section 9.6    Transfer Fees and Expenses**.  The Transferor and Transferee of any Membership Interests shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) incurred on behalf of the Company in connection with any Transfer or proposed Transfer, whether or not consummated.

**Section 9.7    Effective Date**.  Any Transfer and any related admission of a Person as a Member in compliance with this Article IX shall be deemed effective on such date that the Transferee complies with the requirements of this Agreement.

**Section 9.8    Acceptance of Prior Acts**.  A Transferee of the Membership Interest of a Member who is admitted to the Company in place and stead of a Member accepts, ratifies and agrees to be bound by all actions duly taken pursuant to the terms and provisions of this Agreement by the Company prior to the date it was admitted to the Company and, without limiting, the generality of the foregoing, specifically ratifies and approves all agreements and other instruments as may have been executed and delivered on behalf of the Company prior to such date and which are in force and effect on such date.

## ARTICLE X
## DISSOLUTION

**Section 10.1    In General**.  The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following:  (a) the written consent of the Majority Class B Holders and the Majority Class A Holders; (b) at any time there are no Members of the Company unless the Company is continued in accordance with the Act; or (c) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**Section 10.2    Liquidation and Termination**.   On the dissolution of the Company, the Board of Managers shall act as liquidator or (in its sole discretion) may appoint one or more representatives, Members or other Persons as liquidator(s).  The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company with all of the power and authority of the Board of Managers.  The steps to be accomplished by the liquidators are as follows:

(a)    the liquidators shall pay, satisfy or discharge from the Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including

the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine); and

(b)    after payment or provision for payment of all of the Company's liabilities has been made in accordance with Section 10.2(a), all remaining assets of the Company shall be distributed in accordance with Section 5.1.

**Section 10.3    Complete Distribution**.   The distribution to a Member in accordance with the provisions of Section 10.2 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its interest in the Company and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Act.  If a Member returns funds to the Company and such funds exceed such Member's *pro rata* share of all funds required to be returned to the Company, then such Member shall have a claim against the other Members for an amount equal to such excess.  Each other Member shall be liable for a *pro rata* portion of such excess equal to the amount such Member would have paid had the amount paid by the Member seeking recovery been recovered from all Members *pro rata* based on the relative amount of funds to be returned by each such Member.

**Section 10.4    Filing of Certificate of Cancellation**.   Immediately following the completion of the distribution of the Company's assets as provided herein, the Board of Managers (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are required to be canceled and take such other actions as may be necessary to terminate the Company.  The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 10.4.

**Section 10.5    Reasonable Time for Winding Up**.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 10.2 to minimize any losses otherwise attendant upon such winding up.

**Section 10.6    Return of Capital**.   The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from Company assets).

**Section 10.7    Antitrust Laws**.   Notwithstanding any other provision in this Agreement, in the event that any Antitrust Law is applicable to any Member by reason of the fact that any assets of the Company shall be distributed to such Member in connection with the winding up of the Company, such Distribution shall not be consummated until such time as the applicable waiting periods (and extensions thereof) under such Antitrust Law have expired or otherwise been terminated with respect to each such Member.

**Section 10.8    Other Remedies**.   Nothing in this Article X shall limit any Member's right to enforce any provision of this Agreement by an action at Law or equity, nor shall an election to dissolve the Company pursuant to this Article X relieve any Member of any

liability for any prior or subsequent breach of this Agreement or another document referred to herein.

## ARTICLE XI
## INDEMNIFICATION

**Section 11.1**     **General Indemnity**.

(a)     To the fullest extent permitted by the Act, the Company, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless each Person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative (each a "Proceeding"), by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager or an officer, or is or was serving at the request of the Company as a manager, director, officer, employee, fiduciary or agent of another Entity (collectively, the "Indemnified Persons") from and against any and all loss, cost, damage, fine, expense (including reasonable fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability actually and reasonably incurred by such Person in connection with such Proceeding if such Person acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith or in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company.

(b)     The Company may pay in advance or reimburse reasonable expenses (including advancing reasonable costs of defense) incurred by an Indemnified Person who is or is threatened to be named or made a defendant or a respondent in a Proceeding; provided, however, that as a condition to any such advance or reimbursement, such Indemnified Person shall agree that it shall repay the same to the Company if such Indemnified Person is finally judicially determined by a court of competent jurisdiction not to be entitled to indemnification under this Article XI.

(c)     The Company shall not be required to indemnify a Person in connection with a Proceeding initiated by such Person against the Company or any of its Subsidiaries if the Proceeding was not authorized by the Board of Managers.  The ultimate determination of entitlement to indemnification of any Indemnified Person shall be made by the Board of Managers in such manner as the Board of Managers may determine.

(d)     Any and all indemnity obligations of the Company with respect to any Indemnified Person shall survive any termination of this Agreement.  The indemnification and

other rights provided for in this <u>Article XI</u> shall inure to the benefit of the heirs, executors and administrators of any Person entitled to such indemnification.

        **Section 11.2**     **<u>Fiduciary Insurance</u>**.  Unless otherwise agreed by the Board of Managers and the Majority Class B Holders, the Company shall maintain, at its expense, insurance (a) to indemnify Company for any obligations which it incurs as a result of the indemnification of Indemnified Persons under the provisions of this <u>Article XI</u>, and (ii) to indemnify Indemnified Persons in instances in which they may not otherwise be indemnified by the Company under the provisions of this <u>Article XI</u>.

        **Section 11.3**     **<u>Rights Non-Exclusive</u>**.  The rights to indemnification and the payment of expenses incurred in defending any Proceeding in advance of its final disposition conferred in this <u>Article XI</u> shall not be exclusive of any other right which any Person may have or hereafter acquire under any Law, provision of this Agreement, any other agreement, any vote of Members or disinterested Managers or otherwise.

        **Section 11.4**     **<u>Merger or Consolidation; Other Entities</u>**.  For purposes of this <u>Article XI</u>, references to "the Company" shall include, in addition to the resulting company, any constituent company (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its managers, directors, officers, employees or agents, so that any Person who is or was a manager, director, officer, employee or agent of such constituent company, or is or was serving at the request of such constituent company as a director, officer, employee or agent of another company, partnership, joint venture, trust or other enterprise, shall stand in the same position under this <u>Article XI</u> with respect to the resulting or surviving company as he or she would have with respect to such constituent company if its separate existence had continued.  For purposes of this <u>Article XI</u>, references to "another Entity" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a Person with respect to any employee benefit plan; and references to "serving at the request of the Company" shall include any service as a manager, director, officer, employee or agent of the Company that imposes duties on, or involves services by, such manager, director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this <u>Article XI</u>.

        **Section 11.5**     **<u>No Member Recourse</u>**.  Anything herein to the contrary notwithstanding, any indemnity by the Company relating to the matters covered in this <u>Article XI</u> shall be provided out of and to the extent of Company assets only and no Member shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

<div align="center">

**ARTICLE XII**
**OTHER AGREEMENTS**

</div>

        **Section 12.1**     **<u>Transactions with Affiliates.</u>**

(a)    Unless otherwise agreed by the Majority Class A Holders, the Company shall conduct, and shall cause each of its Subsidiaries to conduct, all transactions with its Affiliates (other than Subsidiaries of the Company), and the respective current or former officers or directors of such Affiliates, or any of the respective family members of such current or former officers or directors, on terms that are fair and reasonable and no less favorable to the Company or such Subsidiary than it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company, a current or former officer or director of such an Affiliate, or a family member of any such current or former officer or director, respectively, and in compliance with all Laws, it being understood and agreed that (i) all Transaction Documents, (ii) all agreements or arrangements set forth on Exhibit D, and (iii) all transactions approved by (A) the Majority Class A Holders or (B) the Class A Manager, shall each be deemed to be in compliance with this Section 12.1(a). Subject to the terms of this Agreement and any documents referred to herein, neither the Company nor any of its Subsidiaries shall be required to purchase products, services or components from any Member or Affiliate thereof, but may seek quotes for the supply of products, services or components in its Ordinary Course of Business.

(b)    Subject to Section 12.1(a), the Holders (and Affiliates of, and Persons who are otherwise related to, a Member) shall have the right to contract and otherwise deal with Company with respect to the sale, purchase or lease of real and/or personal property, the rendition of services, the lending of money and for other purposes in arm's-length transactions, and to receive the purchase price, costs, fees, commissions, interest, compensation and other forms of consideration in connection therewith, without being subject to claims for self-dealing; provided, however, that neither the Initial Class B Member nor its Affiliates shall be compensated for providing services to the Company except as contemplated by the Management Agreement as described on Exhibit A.

**Section 12.2    Class A Securities Issuances; Redemptions**. So long as any Class A Membership Interests issued to General Motors on the date hereof remain outstanding, without the prior written consent of the Majority Initial Class A Holders, the Company will not (i) issue or sell any Class A Membership Interests (other than to General Motors on the date hereof), or create or issue any new Equity Securities (other than Equity Securities that do not adversely affect the Class A Membership Interests in any manner and, on an economic basis, share only in Distributions previously allocable to the holders of Class B Membership Interests) or (ii) redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose), any Membership Interests that is not on a proportionate basis.

**Section 12.3    Certain Restrictions**. So long as the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the date hereof exceeds zero, (i) the Company shall, and shall cause its Subsidiaries to, comply with the provisions set forth in Article VII of the Loan Agreement (whether or not such agreements remains in effect); provided, however, that this Section 12.3 shall not prevent the Company from incurring or suffering to exist a working capital debt facility on market terms with an aggregate maximum principal amount of $750,000,000, or from creating or suffering to exist any liens or encumbrances securing such indebtedness and (ii) the Company shall not authorize or consent to the filing of any bankruptcy petition or appointment of a receiver with respect to the Company or any of its Subsidiaries. Without the prior written consent of the Majority Class C Holders, the Company will not issue or sell any Class C Membership Interests.

# ARTICLE XIII
## CONFIDENTIALITY

**Section 13.1**     **Non-Disclosure**.  Each Member agrees that it will use, and will cause each of its Affiliates, and each of its and their respective partners, members, managers, shareholders, directors, officers, employees and agents (collectively, "Agents") to use, its commercially reasonable efforts to maintain the confidentiality of all Confidential Information disclosed to it by any other party or the definitive agreements contemplated herein or through its interest in the Company or the operation of its business or the use or ownership of its assets, by limiting internal disclosure of any such information to those Persons who have an actual need to know such information in connection with the business of the Company and will not, without the prior written consent of the disclosing party, use such information other than in connection with the transactions contemplated herein.

**Section 13.2**     **Exceptions**.  Notwithstanding Section 13.1, any party hereto may disclose any Confidential Information:  (a) to any Governmental Entity in connection with applications for approval of the transactions contemplated hereby and the other Transaction Documents (or, in the case of any regulated-Affiliate of a Member, in connection with audits by the applicable Governmental Entities), (b) to financial institutions in connection with financings of the transactions contemplated hereby, (c) in the case of any Member, (i) to a *bona fide* potential Transferee if such Member desires to undertake any Transfer of its Membership Interests permitted by this Agreement, and (ii) to its direct and indirect stockholders, limited partners, members or other equityholders, as the case may be, all materials made available to such Member pursuant to the terms of this Agreement, (d) to any rating or similar agency in connection with its analysis or review of the Company or any of its Subsidiaries, (e) to any other Person if such party becomes compelled by Law (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand, mandatory provision of Law, regulation or stock exchange rule) to disclose any of the Confidential Information.  In addition, each Member may report to its stockholders, limited partners, members or other equityholders, as the case may be, the general status of such Member's investment in the Company (without disclosing specific Confidential Information).  A disclosing Member shall be responsible for a breach by any third Person to whom such disclosing Member discloses Confidential Information in accordance with the terms of subclause (c)(ii) of this Section 13.2.  In the case of clause (e) above, the disclosing party shall (i) provide the other parties hereto with prompt written notice of such requirement so that such non-disclosing parties may seek a protective order or other appropriate remedy or waive compliance with the terms of this Article XIII and (ii) take such reasonable legally available steps as the non-disclosing parties may reasonably request to resist or narrow such requirement (at the expense of the non-disclosing parties).  In the event that such protective order or remedy is not obtained, or that the non-disclosing parties waive compliance with the terms hereof, the disclosing party agrees to furnish only that portion of the Confidential Information that it is advised by counsel is required to be furnished, and to exercise its commercially reasonable efforts to obtain assurance that confidential treatment shall be accorded such Confidential Information.  The obligations with respect to Confidential Information in this Article XIII shall terminate two (2) years after a Person ceases to be a Member; provided, however, that the obligation to maintain the confidentiality of "trade secrets" shall not terminate.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**Section 14.1**      **Amendments**.  Except as otherwise expressly provided herein, this Agreement may only be amended, modified or waived by the Board of Managers with the written consent of the Majority Class B Holders; provided that if any such amendment, modification or waiver would adversely affect in any material respect any Member(s) who have comparable rights under this Agreement disproportionately to the other Members having such comparable rights, such amendment, modification, or waiver shall also require the written consent of a majority in interest of the Member(s) so adversely affected; and provided, further, that if any such amendment, modification or waiver would adversely affect in any respect the rights of any Class A Holder under this Agreement, such amendment, modification, or waiver shall also require the written consent of the Majority Class A Members.  Notwithstanding the foregoing, (i) any amendment that would require any Member to contribute or loan additional funds to the Company or impose personal liability upon any Member shall not be effective against such Member without its written consent and (ii) no consent of any Member shall be required for any amendment, modification or waiver of this Agreement to effectuate the creation or issuance of Membership Interests made in compliance with Section 12.1 and Section 12.2.

**Section 14.2**      **Remedies**.  Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies that such Person has been granted at any time under any other agreement or contract and all of the rights that such Person has under any Law.  Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security) to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law.

**Section 14.3**      **Notice Addresses and Notices**.  All notices, demands, financial reports, other reports and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) sent by facsimile to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if sent by facsimile before 5:00 p.m.  New York time on a Business Day, and otherwise on the next Business Day, or (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications shall be sent to the notice address for such recipient set forth on the Schedule of Members, or in the Company's books and records, or to such other notice address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.  Any notice to the Board of Managers or the Company shall be deemed given if received by the Board of Managers at the principal office of the Company designated pursuant to Section 2.2(b).

**Section 14.4**      **Counterparts**.  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

**Section 14.5**      **Assignment**.  Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the

Members and their respective permitted assigns, but no rights, interests, or obligations of any Member herein may be assigned except Transfers of Membership Interests in compliance with the terms of Article IX; provided, however, that no assignment of this Agreement or any rights hereunder shall be made without the assignee, as a condition of such assignment, assuming in writing its assignor's obligations under this Agreement, to the extent applicable to such assignment.  Notwithstanding the foregoing, General Motors may assign this Agreement and any or all rights or obligations hereunder (i) to General Motors or any of its Affiliates (including any Affiliate formed after the date hereof that may be a corporation or limited liability company) and (ii) to any Person in connection with the direct or indirect transfer, sale, merger, consolidation or similar reorganization of a substantial portion of General Motors, business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein.

          **Section 14.6**      **Entire Agreement; Waiver**.  Subject to Section 14.7, this Agreement and the other documents referred to herein, constitute the entire agreement among the parties and contain all of the agreements among the parties with respect to the subject matter hereof and supersede alt prior agreements and negotiations between the parties concerning the subject matter herein, including the Original Agreement.  Failure by any party hereto to enforce any covenant, duty, agreement, term or condition of this Agreement, or to exercise any right hereunder, shall not be construed as thereafter waiving such covenant, duty, term, condition or right; and in no event shall any course of dealing, custom or usage of trade modify, alter or supplement any term of this Agreement.

          **Section 14.7**      **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

          **Section 14.8**      **Governing Law**.  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

          **Section 14.9**      **Independent Contractors; Expenses**.  This Agreement does not constitute any party hereto the partner, agent or legal representative of any other party hereto, except to the extent that Company is classified as a partnership for United States federal income tax purposes and the Members are treated as "partners" for such tax purposes.  Each party hereto is independent and responsible for its own expenses (except as otherwise agreed pursuant to Article XI), including attorneys' and other professional fees incurred in connection with the transactions contemplated by this Agreement.

          **Section 14.10**      **Press Release**.  Each of the Members shall consult with the Majority Class B Holders before issuing any press releases or otherwise making any public

statements with respect to this Agreement or the transactions contemplated hereby, and no Member shall issue any press release or make any public statement without the prior written consent of the Majority Class B Holders, except as may be required by Law and then only with such prior consultation with the Majority Class B Holders to the extent practicable.

**Section 14.11    Survival.**    The provisions of <u>Article XI</u>, <u>Article XIII</u>, <u>Section 14.7</u>, <u>Section 14.8</u>, <u>Section 14.11</u>, <u>Section 14.14</u>, <u>Section 14.16</u> and <u>Section 14.17</u> shall survive and continue in full force in accordance with its terms, notwithstanding any termination of this Agreement or the dissolution of the Company.

**Section 14.12    Creditors.**    None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Members, the Company or any of its Affiliates (other than Indemnified Persons), and no creditor who makes a loan to any Member, the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company profits, losses, Distributions, capital or property other than as a secured creditor.

**Section 14.13    Further Action.**    The parties hereto agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 14.14    Delivery by Facsimile or Email.**    This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or email with scan or facsimile attachment, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

**Section 14.15    Strict Construction.**    The parties hereto have participated collectively in the negotiation and drafting of this Agreement, accordingly, if any ambiguity or question of intent or interpretation arises, then it is the intent of the parties hereto that this Agreement shall be construed as if drafted collectively by the parties hereto, and it is the intent of the parties hereto that no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provisions of this Agreement.

**Section 14.16    Consent to Jurisdiction.**    Each Member hereby irrevocably and unconditionally (a) agrees that any suit, action or proceeding, at law or equity, arising out of or relating to this Agreement shall only be brought in the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction, then in the

applicable Delaware state court), or if under applicable Law exclusive jurisdiction of such suit, action or proceeding is vested in the federal courts, then the United States District Court for the District of Delaware, (b) expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof and (c) waives and agrees not to raise (by way of motion, as a defense or otherwise) any and all jurisdictional, venue and convenience objections or defenses that such party may have in such suit, action or proceeding.   Each party hereto hereby irrevocably and unconditionally consents to the service of process of any of the aforementioned courts.  Nothing herein contained shall be deemed to affect the right of any party hereto to serve process in any manner permitted by Law or commence legal proceedings or otherwise proceed against any other party hereto in any other jurisdiction to enforce judgments obtained in any suit, action or proceeding brought pursuant to this <u>Section 14.16</u>.

**Section 14.17**    <u>**Waiver of Jury Trial**</u>**.    EACH MEMBER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUR OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT.**

**Section 14.18**    <u>**Specific Performance**</u>.    Each of the parties hereto acknowledges and agrees that the other parties hereto would be damaged irreparably in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, each of the parties hereto agrees that the other parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties hereto and the matter (subject to the provisions set forth in <u>Section 14.16</u> above), in addition to any other remedy to which they may be entitled, at law or in equity.

**[END OF PAGE]**

**[SIGNATURE PAGES FOLLOW]**

## SIGNATURE PAGES TO OPERATING AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**PARNASSUS HOLDINGS I, LLC**

By: _____

Name:

Title:

## SIGNATURE PAGES TO OPERATING AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

### GENERAL MOTORS CORPORATION

By: _____

Name:

Title:

## SIGNATURE PAGES TO OPERATING AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

### DELPHI CORPORATION

By: _____
    Name:
    Title:

## **EXHIBIT D**

**Loan Agreement**

FINAL AGREED FORM
JUNE 1, 2009

$750,000,000

CREDIT AGREEMENT

Dated as of [＿＿＿], 2009

among

[PARNASSUS ACQUIROR]
*as the Borrower*

THE LENDERS PARTY HERETO

and

GENERAL MOTORS CORPORATION
*as Administrative Agent*

WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153-0119

CREDIT AGREEMENT, dated as of [░░░░░░░░], 2009, among [PARNASSUS ACQUIROR][1] (the "*Borrower*"), the Lenders (as defined below) and GENERAL MOTORS CORPORATION ("*GM*"), as agent for the Lenders (in such capacity, the "*Administrative Agent*").

## WITNESETH

WHEREAS, the Borrower has requested that the Lenders make available for the purposes specified in this Agreement, the term loan facility described herein; and

WHEREAS, the Lenders are willing to make available to the Borrower such term loan facility upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS

### Section 1.1      Defined Terms

As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Acquisition*" means the acquisition of certain of the assets of Delphi by the Borrower pursuant to the terms of the Master Disposition Agreement.

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or that is controlled by or is under common control with such Person. For the purposes of this definition, "*control*" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agent Affiliate*" means any of the Administrative Agent's Affiliates or any of the Administrative Agent's or its Affiliates' respective officers, directors, employees, agents, advisors or representatives.

"*Agreement*" means this Credit Agreement.

---

[1] Final corporate structure and jurisdiction of Borrower to be agreed between signing of the Master Disposition Agreement and the Closing Date.

"*Alternative Currency*" means any lawful currency other than Dollars that is freely transferable into Dollars.

"*Approved Deposit Account*" means a Deposit Account that is the subject of an effective Deposit Account Control Agreement and that is maintained by a Loan Party with a Deposit Account Bank. "*Approved Deposit Account*" includes all monies on deposit in a Deposit Account and all certificates and instruments, if any, representing or evidencing such Deposit Account.

"*Approved Securities Intermediary*" means a "*securities intermediary*" or "*commodity intermediary*" (as such terms are defined in the UCC) selected by the Borrower and reasonably acceptable to the Administrative Agent.

"*Asset Sale*" has the meaning specified in *Section 7.4 (Sale of Assets)*.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of *Exhibit A (Form of Assignment and Acceptance)*.

"*Available Credit*" means, at any time, the then effective Commitments *minus* the aggregate Outstandings at such time.

"*Bankruptcy Code*" shall mean The Bankruptcy Reform Act of 1978 as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 *et seq.*

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York and any other court having jurisdiction over the Cases from time to time.

"*Benefit Plan*" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Group Member incurs or otherwise has any obligation or liability.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower's Accountants*" means Ernst & Young or other independent nationally-recognized public accountants.

"*Borrowing*" means a borrowing consisting of Loans made on the same day by the Lenders ratably according to their respective Commitments.

"*Borrowing Date*" has the meaning specified in *Section 2.2(a) (Borrowing Procedures)*.

"*Business Day*" means a day of the year on which banks are not required or authorized to close in New York City or Los Angeles.

"*Capital Expenditures*" means, for any Person for any period, the aggregate of amounts that would be reflected as additions to property, plant or equipment on a Consolidated balance sheet of such Person and its Subsidiaries, excluding interest capitalized during construction.

"*Capital Lease*" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, property by such Person as lessee that would be accounted for as a capital lease on a balance sheet of such Person prepared in conformity with GAAP.

"*Capital Lease Obligations*" means, with respect to any Person, the capitalized amount of all Consolidated obligations of such Person or any of its Subsidiaries under Capital Leases.

"*Case*" and "*Cases*" means each of, and collectively, the jointly administered cases of Delphi and certain of its subsidiaries, Case No. 05-44481 pending under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"*Cash Collateral Account*" means any Deposit Account or Securities Account that is (a) established by the Administrative Agent from time to time in its sole discretion to receive cash and Cash Equivalents (or purchase cash or Cash Equivalents with funds received) from the Loan Parties or Persons acting on their behalf pursuant to the Loan Documents, (b) with such depositaries and securities intermediaries as the Administrative Agent may determine in its sole discretion, (c) in the name of the Administrative Agent (although such account may also have words referring to the Borrower and the account's purpose), (d) under the control of the Administrative Agent and (e) in the case of a Securities Account, with respect to which the Administrative Agent shall be the Entitlement Holder and the only Person authorized to give Entitlement Orders with respect thereto.

"*Cash Equivalents*" means (a) Dollars, or money in other currencies received in the ordinary course of business, (b) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed or insured by the United States federal government or any agency thereof, (c) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (d) demand deposit, certificates of deposit and time deposits with maturities of one (1) year or less from the date of acquisition and overnight bank deposits of any commercial bank, supranational bank or trust company having capital and surplus in excess of $500,000,000, (e) repurchase obligations with respect to securities of the types (but not necessarily maturity) described in *clauses (b)* and *(c) above*, having a term of not more than ninety (90) days, of banks (or bank holding companies) or subsidiaries of such banks (or bank holding companies) and non-bank broker-dealers listed on the Federal Reserve Bank of New York's list of primary and other reporting dealers ("*Repo Counterparties*"), which Repo Counterparties have capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign equivalent thereof) and which Repo Counterparties or their parents (if the Repo Counterparties are not rated) will at the time of the transaction be rated "A-1" by S&P (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization, (f) commercial paper rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either case maturing within one (1) year after the day of acquisition, (g) short-term marketable securities of comparable credit quality, (h) shares of money market mutual or similar funds which invest at least 95% in assets satisfying the requirements of *clauses (a)* through *(g)* of this definition, and (i) in the case of a Subsidiary that is not a Domestic

Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"*Change in Law*" means the adoption or taking effect of any law, rule, regulation or treaty or any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority.

"*Change of Control*" means the occurrence of any event, transaction or occurrence as a result of which the Platinum Investors, in the aggregate, cease to own and control, directly or indirectly, all of the voting rights associated with ownership of at least fifty and one tenth of a percent (50.1%) of the outstanding common Stock of the Borrower on a fully diluted basis.

"*Closing Date*" means the first date on which any Loan is made.

"*Code*" means the U.S. Internal Revenue Code of 1986, as currently amended.

"*Collateral*" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien is granted under any Collateral Document.

"*Collateral Documents*" means each Pledge and Security Agreement, the Mortgages, the Deposit Account Control Agreements, the Securities Account Control Agreements and each other document executed and delivered by a Loan Party granting a Lien on any of its property to secure payment of the Obligations.

"*Commitment*" means, with respect to any Lender, the commitment of such Lender to make Loans to the Borrower in the aggregate principal amount outstanding not to exceed the amount set forth opposite such Lender's name on *Schedule I (Commitments)* under the caption "*Commitment*" as amended to reflect each Assignment and Acceptance executed by such Lender and as such amount may be reduced pursuant to this Agreement, and "*Commitments*" means the aggregate Commitments of all Lenders.

"*Competitor*" means a Person engaged in a business substantially similar to any material part of the Parnassus Business, or a Person that, directly or indirectly, controls or is controlled by a Person engaged in a business substantially similar to any material part of the Parnassus Business.

"*Compliance Certificate*" has the meaning specified in *Section 5.1(d) (Financial Statements)*.

"*Consolidated*" means, with respect to any Person, the consolidation of accounts of such Person and its Subsidiaries in accordance with GAAP.

"*Constituent Documents*" means, with respect to any Person, (a) the articles of incorporation, certificate of incorporation, constitution or certificate of formation (or the equivalent organizational documents) of such Person, (b) the by-laws or operating agreement (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election or duties of the directors or managing members of such Person (if any) and the

designation, amount or relative rights, limitations and preferences of any class or series of such Person's Stock.

"*Contaminant*" means any material, substance or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including any petroleum or petroleum-derived substance or waste, asbestos and polychlorinated biphenyls.

"*Contractual Obligation*" of any Person means any obligation, agreement, undertaking or similar provision of any Security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"*Control Account*" means a Securities Account or Commodity Account that is the subject of an effective Securities Account Control Agreement and that is maintained by any Loan Party with an Approved Securities Intermediary. "*Control Account*" includes all Financial Assets held in a Securities Account or a Commodity Account and all certificates and instruments, if any, representing or evidencing the Financial Assets contained therein.

"*Customary Permitted Liens*" means, with respect to any Person, any of the following Liens:

(a)  Liens with respect to the payment of taxes, assessments or governmental charges in each case that are not yet due or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(b)  Liens of landlords arising by statute and liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens, in each case (i) imposed by law or arising in the ordinary course of business, (ii) for amounts not overdue by more than sixty (60) days or that are being contested in good faith by appropriate proceedings and (iii) with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(c)  Liens incurred or pledges or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance or other types of social security or pension benefits, (ii) to secure the performance of, or otherwise required under the terms of, bids, tenders, sales, contracts (other than for the repayment of borrowed money), (iii) in connection with statutory obligations and surety, appeal, customs or performance bonds and similar obligations, and (iv) in connection with letters of credit;

(d)  encumbrances arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar encumbrances on the use of Real Property not materially interfering with the ordinary conduct of the business conducted and proposed to be conducted at such Real Property;

(e)     encumbrances arising under leases or subleases of Real Property that do not, in the aggregate, materially interfere with the ordinary conduct of the business conducted and proposed to be conducted at such Real Property;

(f)     financing statements (i) with respect to a lessor's rights in and to personal property leased to such Person in the ordinary course of such Person's business other than through a Capital Lease or (ii) in connection with sales of accounts receivable, payment intangibles, chattel paper or instruments otherwise permitted under *Section 7.4 (Sale of Assets)*; and

(g)     Liens and rights of set off created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts held at such banks or financial institutions or over investment property held in a securities account, as the case may be, to secure fees and charges in the ordinary course of business or returned items and charge backs in the ordinary course of business, facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts or securities accounts in the ordinary course of business.

"*Debt Issuance*" means the incurrence of Indebtedness of the type specified in *clause (a)* or *(b)* of the definition of "*Indebtedness*" by any Group Member.

"*Default*" means any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

"*Delphi*" means Delphi Corporation, a Delaware corporation.

"*Delphi Real Property Sites*" means the following Real Properties of Delphi in the United States:

(a)     the Brookhaven, Mississippi, Clinton, Mississippi and Warren, Ohio facilities;

(b)     each of the Delphi technical centers; and

(c)     the Delphi headquarters in Troy, Michigan.

"*Deposit Account Bank*" means a financial institution selected by the Borrower and reasonably acceptable to the Administrative Agent.

"*Deposit Account Control Agreement*" has the meaning specified in the Pledge and Security Agreement.

"*Dollar Equivalent*" of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in Dollars determined by using the rate of exchange quoted by Citibank, N.A. in New York, New York at 11:00 a.m. (New York time) on the date of determination (or, if such date is not a Business Day, the last Business Day prior thereto) to prime banks in New York for the spot purchase in the New York foreign exchange market of such amount of Dollars with such Alternative Currency and (c) if such amount is

denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate.

"*Dollars*" and the sign "$" each mean the lawful money of the United States of America.

"*Domestic Person*" means any "*United States person*" under and as defined in Section 770l(a)(30) of the Code.

"*Domestic Subsidiary*" means any Subsidiary of the Borrower organized under the laws of any state of the United States of America or the District of Columbia.

"*Eligible Assignee*" means (a) a Lender or an Affiliate of any Lender or (b) any other Person (other than a natural person) that is not a Competitor approved by (i) the Administrative Agent and (ii) unless an Event of Default shall have occurred and be continuing, the Borrower (each such approval not to be unreasonably withheld or delayed).

"*Environmental Laws*" means all applicable Requirements of Law now or hereafter in effect and as amended or supplemented from time to time, relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*); the Hazardous Material Transportation Act, as amended (49 U.S.C. § 5101 *et seq.*); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 *et seq.*); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*); the Toxic Substance Control Act, as amended (15 U.S.C. § 2601 *et seq.*); the Clean Air Act, as amended (42 U.S.C. § 7401 *et seq.*); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 *et seq.*); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 *et seq.*); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f *et seq.*); and each of their state and local counterparts or equivalents and any transfer of ownership notification or approval statute, including the Industrial Site Recovery Act (N.J. Stat. Ann. § 13:1K-6 *et seq.*).

"*Environmental Liabilities and Costs*" means, with respect to any Group Member, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute and whether arising under any Environmental Law, Permit, order or agreement with any Governmental Authority or other Person, in each case relating to any environmental, health or safety condition or to any Release or threatened Release and resulting from the past, present or future operations of, or ownership of property by, such Group Member.

"*Environmental Lien*" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"*Equity Issuance*" means the issue or sale of any Stock of any Group Member by any Group Member to any Person other than a Group Member.

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means, collectively, any Group Member, and any Person under common control or treated as a single employer with any Group Member within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*ERISA Event*" means (a) a reportable event described in Section 4043(b) (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c)) of ERISA with respect to a Title IV Plan, (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA, (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan, (d) with respect to any Multiemployer Plan, the filing of notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination under Section 4041A of ERISA), (e) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA, (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC, (g) the failure to make any required contribution to a Title IV Plan or Multiemployer Plan, (h) the imposition of a lien under Section 412 of the Code or Section 302 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate, (i) the failure of a Benefit Plan or any trust thereunder to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirement of Law to qualify thereunder or (j) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability upon any ERISA Affiliate under Title IV of ERISA, other than for PBGC premiums due but not delinquent.

"*Eurocurrency Liabilities*" has the meaning assigned to that term in Regulation D of the Federal Reserve Board.

"*Event of Default*" has the meaning specified in *Section 8.1 (Events of Default)*.

"*Excess Cash*" means, for the Borrower for each month during each Fiscal Year commencing with the third full Fiscal Year starting after the Closing Date, an amount equal to the cash and Cash Equivalents of the Borrower and its Subsidiaries (excluding proceeds of Asset Sales) in excess of $1,000,000,000 as of the last day of each such month, as reflected in the financial statements delivered pursuant to *Section 5.1(a) (Monthly Reports)*.

"*Excluded Foreign Subsidiary*" means any Subsidiary that is not a Domestic Subsidiary.

"*Facility*" means the Commitments and the provisions herein related to the Loans.

"*Fair Market Value*" means (a) with respect to any asset or group of assets (other than a marketable Security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic assumptions underlying which have not materially changed since its date, the value set forth in such appraisal and (b) with respect to any marketable Security at any date, the closing sale price of such Security on the Business Day next preceding such date, as appearing in

any published list of any national securities exchange or the NASDAQ Stock Market or, if there is no such closing sale price of such Security, the final price for the purchase of such Security at face value quoted on such Business Day by a financial institution of recognized standing regularly dealing in Securities of such type and selected by the Administrative Agent.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Financial Statements*" means the financial statements of the Borrower and its Subsidiaries delivered in accordance with *Section 5.1 (Financial Statements)*.

"*Fiscal Quarter*" means each of the three month periods ending on March 31, June 30, September 30 and December 31.

"*Fiscal Year*" means the twelve month period ending on December 31.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, that are applicable to the circumstances as of the date of determination.

"*GM*" has the meaning specified in the preamble to this Agreement.

"*GM Transition Services Agreement*" means that certain Transition Services Agreement, dated as of [＿＿＿＿＿＿], 2009, among, *inter alios*, the Borrower and GM.

"*Governmental Authority*" means any nation, sovereign or government, any state or other political subdivision thereof and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any central bank or stock exchange and any supranational bodies such as the European Union or the European Central Bank.

"*Group Member*" means, collectively, the Borrower and its Subsidiaries.

"*Group Structure Chart*" means a organizational chart, list or other similar document in each case in form reasonably acceptable to the Lender and setting forth, for each Subsidiary of the Borrower, (a) the full legal name of such Person, (b) the jurisdiction of organization of such Person, (c) the percentage of shares or other interests of each class of such Person's Stock owned (directly or indirectly) by the Borrower or any of its Subsidiaries and (d) the entity classification for each Subsidiary of the Borrower for United States federal income tax purposes.

"*Guarantor*" means each Subsidiary Guarantor.

"*Guaranty*" means the guaranty, in substantially the form of *Exhibit E (Form of Guaranty)*, executed by the Guarantors.

"*Guaranty Obligation*" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Indebtedness of another Person, if the purpose or intent of such Person in incurring the Guaranty Obligation is to provide assurance to the obligee of such Indebtedness that such Indebtedness will be paid or discharged, or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of Indebtedness of another Person and (b) any liability of such Person for Indebtedness of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such Indebtedness or any security therefor or to provide funds for the payment or discharge of such Indebtedness (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss or (v) to supply funds to, or in any other manner invest in, such other Person (including to pay for property or services irrespective of whether such property is received or such services are rendered), if in the case of any agreement described under *clause (b)(i), (ii), (iii), (iv) or (v) above* the primary purpose or intent thereof is to provide assurance that Indebtedness of another Person will be paid or discharged, that any agreement relating thereto will be complied with or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof.  The amount of any Guaranty Obligation shall be equal to the amount of the Indebtedness so guaranteed or otherwise supported.

"*Hedging Contracts*" means all Interest Rate Contracts, foreign exchange contracts, currency swap or option agreements, forward contracts, commodity swap, purchase or option agreements, other commodity price hedging arrangements and all other similar agreements or arrangements designed to alter the risks of any Person arising from fluctuations in interest rates, currency values or commodity prices.

"*Indebtedness*" of any Person means without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments or that bear interest, (c) all reimbursement and all obligations with respect to letters of credit, bankers' acceptances, surety bonds and performance bonds, whether or not matured, (d) all indebtedness for the deferred purchase price of property or services, other than trade payables incurred in the ordinary course of business that are not overdue by more than 90 days, (e) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all Capital Lease Obligations of such Person and the present value of future rental payments under all synthetic leases, (g) all Guaranty Obligations of such Person, (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock Equivalents of such Person, valued, in the case of redeemable preferred stock, at the greater of its voluntary liquidation preference and its involuntary liquidation preference plus accrued and unpaid dividends, (i) all payments that such Person would have to make in the event of an early termination on the date Indebtedness of such Person is being determined in respect of Hedging Contracts of such Person and (j) all Indebtedness of the type referred to above secured by (or for which the holder of such

Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including Accounts and General Intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; *provided* that in the case of this *clause (j)*, the amount of such Indebtedness shall be deemed to be the Fair Market Value of the property subject to such Lien.

"*Indemnified Matter*" has the meaning specified in *Section 10.4 (Indemnities)*.

"*Indemnitee*" has the meaning specified in *Section 10.4 (Indemnities)*.

"*Information*" means all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any of its Subsidiaries, including, without limitation, any information provided by or made available under *Section 6.7 (Keeping of Books)*; provided that, in the case of information received from the Borrower or any of its Subsidiaries after the date hereof (other than under *Section 6.7 (Keeping of Books)*), such information is clearly and conspicuously identified and labeled, at the time of delivery, as confidential at the top of the information in bold, capital letters.

"*Interest Payment Date*" shall mean the last Business Day of each calendar quarter, commencing with the end of the first full calendar quarter following the Closing Date.

"*Interest Rate Contracts*" means all interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and interest rate insurance.

"*Investment*" means, with respect to any Person, (a) any purchase or other acquisition by such Person of (i) any Security issued by, (ii) a beneficial interest in any Security issued by, or (iii) any other equity ownership interest in, any other Person, (b) any purchase by such Person of all or a significant part of the assets of a business conducted by any other Person, or all or substantially all of the assets constituting the business of a division, branch or other unit operation of any other Person, (c) any loan, advance (other than deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable and similar items made or incurred in the ordinary course of business as presently conducted) or capital contribution by such Person to any other Person, including all Indebtedness of any other Person to such Person arising from a sale of property by such Person other than in the ordinary course of its business, and (d) any Guaranty Obligation incurred by such Person in respect of Indebtedness of any other Person.

"*IP License Agreement*" means that certain Intellectual Property Licenses Agreement, dated as of [_____], 2009, among, *inter alios,* the Borrower and GM.

"*IRS*" means the Internal Revenue Service of the United States or any successor thereto.

"*Land*" of any Person means all of those plots, pieces or parcels of land now owned, leased or hereafter acquired or leased or purported to be owned, leased or hereafter acquired or leased (including, in respect of the Loan Parties, as reflected in the most recent Financial Statements) by such Person.

"*Leases*" means, with respect to any Person, all of those leasehold estates in Real Property of such Person, as lessee, as such may be amended, supplemented or otherwise modified from time to time.

"*Lender*" means GM and each other institution or other entity that (a) is listed on the signature pages hereof as a "*Lender*" or (b) is an Eligible Assignee that from time to time becomes a party hereto by execution of an Assignment and Acceptance.

"*LIBOR*" shall mean with respect to each Loan, the greater of (a) the LIBOR Floor and (b) the rate (adjusted for statutory reserve requirements for Eurocurrency Liabilities) for eurodollar deposits for a period equal to three (3) months appearing on Reuters Screen LIBOR01 Page or if such rate ceases to appear on Reuters Screen LIBOR01 Page, on any other service providing comparable rate quotations at approximately 11:00 a.m., London time. LIBOR shall be determined on the Closing Date and reset on each Interest Payment Date.

"*LIBOR Floor*" shall mean 2.0%.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or the performance of any other obligation, including any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease and any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor.

"*Loan*" has the meaning specified in *Section 2.1 (The Commitments)*.

"*Loan Documents*" means, collectively, this Agreement, the Notes (if any), the Guaranty, the Collateral Documents and each certificate, agreement or document (other than a Related Document) executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

"*Loan Party*" means each of the Borrower and each Guarantor.

"*Mandatory Prepayment Event*" has the meaning specified in *Section 2.6(a) (Mandatory Prepayments)*.

"*Master Disposition Agreement*" means that certain Master Disposition Agreement, dated as of [＿＿＿＿], 2009, among, *inter alios*, the Borrower, GM Components Holdings, LLC, Delphi, and the other sellers party thereto.

"*Material Adverse Change*" means a material adverse change in any of (a) the condition (financial or otherwise), business, operations or properties of the Borrower and its Subsidiaries taken as a whole, (b) the legality, validity or enforceability of any Loan Document, (c) the perfection or priority of the Liens granted pursuant to the Collateral Documents with respect to Collateral having an aggregate Fair Market Value in excess of $25,000,000, (d) the ability of the Borrower to repay the Obligations or of the other Loan Parties to perform their respective obligations under the Loan Documents or (e) the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

"*Material Adverse Effect*" means an effect that results in or causes a Material Adverse Change.

"*Moody's*" means Moody's Investors Service, Inc., or any successor thereto.

"*Mortgage Supporting Documents*" means, with respect to a Mortgage for a parcel of Real Property, each document (including title policies or marked-up unconditional insurance binders (in each case, together with copies of all documents referred to therein), maps, ALTA (or TLTA, if applicable) as-built surveys (in form and as to date that is sufficiently acceptable to the title insurer issuing title insurance to the Administrative Agent for such title insurer to deliver endorsements to such title insurance as reasonably requested by the Administrative Agent), environmental assessments and reports received as an Acquired Asset (as defined in the Master Disposition Agreement) and evidence regarding recording and payment of fees, insurance premiums and taxes) that the Administrative Agent may reasonably request, to create, register, perfect, maintain, evidence the existence, substance, form or validity of or enforce a valid lien on such parcel of Real Property in favor of the Administrative Agent for the benefit of the Secured Parties, subject only to such Liens as the Administrative Agent may approve.

"*Mortgages*" means the mortgages, deeds of trust or other real estate security documents made or required herein to be made by the Borrower or any other Loan Party, each in form and substance reasonably satisfactory to the Administrative Agent.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 400l(a)(3) of ERISA, to which any Group Member or any ERISA Affiliate has any obligation or liability.

"*Net Cash Proceeds*" means proceeds received by any Loan Party after the Closing Date in cash or Cash Equivalents from any (a) Asset Sale, net of (i) the reasonable cash costs of sale, assignment or other disposition, (ii) taxes paid or reasonably estimated to be payable as a result thereof and (iii) any amount required to be paid or prepaid on Indebtedness (other than the Obligations) secured by the assets subject to such Asset Sale, *provided*, *however*, that evidence of each of *clauses (i)*, *(ii)* and *(iii) above* is provided to the Administrative Agent in form and substance reasonably satisfactory to it, (b) Property Loss Event or (c)(i) Equity Issuance (other than any such issuance of common Stock of the Borrower occurring in the ordinary course of business to any director, member of the management or employee of the Borrower or its Subsidiaries pursuant to an employee incentive plan) or (ii) any Debt Issuance permitted under *Section 7.1(d)*, *(i)*, *(j)*, *(l)* or *(m) (Indebtedness)*, in each case net of brokers' and advisors' fees and other costs incurred in connection with such transaction; *provided*, *however*, that in the case of this *clause (c)*, evidence of such costs is provided to the Administrative Agent in form and substance reasonably satisfactory to it.

"*New Lending Office*" has the meaning specified in *Section 2.9(e) (Taxes)*.

"*Non-Funding Lender*" has the meaning specified in *Section 2.2(d) (Borrowing Procedures)*.

"*Non-Loan Party*" means a Subsidiary of the Borrower that is not a Loan Party under this Agreement.

"*Non-U.S. Lender*" has the meaning specified in *Section 2.9(e)* (*Taxes*).

"*Note*" means each promissory note of the Borrower payable to the order of any Lender in a principal amount equal to the amount of the Loan owing to such Lender.

"*Notice of Borrowing*" has the meaning specified in *Section 2.2(a)* (*Borrowing Procedures*).

"*Obligations*" means the Loans and all other amounts, obligations, covenants and duties owing by the Borrower to the Administrative Agent, any Lender or any Indemnitee, of every type and description (whether by reason of an extension of credit, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those obligations under this Agreement or any other Loan Document acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, including all letters of credit, cash management and other fees, interest, charges, expenses, attorneys' fees and disbursements and other sums chargeable to the Borrower under this Agreement and any other Loan Document.

"*OECD Country*" means a member country of the Organisation for Economic Cooperation and Development from time to time.

"*Other Taxes*" has the meaning specified in *Section 2.9(b)* (*Taxes*).

"*Outstandings*" means, at any particular time, the sum of the principal amount of the Loans outstanding at such time.

"*Parnassus Business*" means the business of the Borrower and its Subsidiaries (taken as a whole) as carried on by the Borrower and its Subsidiaries on the Closing Date, constituting automotive products and systems, fuel management systems, transportation components and systems technology, including powertrain, safety, steering, thermal and controls and security systems, wire harness, electrical and electronic architecture and in-car entertainment technologies for the automotive supply and aftermarket industry, along with (a) reasonable extensions, developments or expansions thereof, and (b) business activities incidental, related or reasonably similar thereto, in each case which do not, individually or in the aggregate, result in a material change to the business of the Borrower and its Subsidiaries (taken as a whole), and excluding in any event investments in OEMs or automobile dealers.

["*Parnassus Operating Agreement*" means that certain Amended and Restated Operating Agreement of the Borrower, dated as of [_____], 2009, by and between, *inter alios*, GM and the Platinum Investors.]

"*Parnassus Management Agreement*" means that certain Management Agreement, dated [_____], 2009 by and between one or more Platinum Investors and the Borrower, in form and substance reasonably satisfactory to the Administrative Agent.

"*Participant*" has the meaning specified in *Section 10.2(g)(i)* (*Assignments and Participations*).

"*Patriot Act*" means the USA Patriot Act of 2001 (31 U.S.C. 5318 *et seq.*).

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor thereto.

"*Permit*" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

"*Permitted Acquisition*" means any Proposed Acquisition subject to the satisfaction of each of the following conditions:

(a)    the Administrative Agent shall receive at least 30 days' prior written notice of such Proposed Acquisition, which notice shall include, without limitation, a reasonably detailed description of such Proposed Acquisition;

(b)    such Proposed Acquisition shall only involve assets located in the United States or an OECD Country or any other jurisdiction in which a Group Member maintains assets on the Closing Date and comprising a business, or those assets of a business, of the type engaged in by the Group Members as of the Closing Date;

(c)    such Proposed Acquisition shall be consensual and shall have been approved by the Proposed Acquisition Target's board of directors;

(d)    no additional Indebtedness or other liabilities shall be incurred, assumed or otherwise be reflected on a Consolidated balance sheet of the Borrower and Proposed Acquisition Target after giving effect to such Proposed Acquisition, except (i) Loans made hereunder, (ii) ordinary course trade payables and accrued expenses and (iii) Indebtedness of the Proposed Acquisition Target permitted under *Section 7.1(k) (Indebtedness);*

(e)    the Dollar Equivalent of the sum of all amounts payable in connection with such Proposed Acquisition and all other Permitted Acquisitions consummated on or prior to the date of the consummation of such Proposed Acquisition (including all transaction costs and all Indebtedness, liabilities and Guaranty Obligations incurred or assumed in connection therewith or otherwise reflected in a Consolidated balance sheet of the Borrower and the Proposed Acquisition Target) shall not exceed $75,000,000 in any Fiscal Year or $300,000,000 during the term of this Agreement;

(f)    at or prior to the closing of such Proposed Acquisition, the Borrower (or the Subsidiary making such Proposed Acquisition) and the Proposed Acquisition Target shall have executed such documents and taken such actions as may be required under *Section 6.10 (Additional Collateral and Guaranties);*

(g)    the Borrower shall have delivered to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Lenders and sufficiently in advance and in any case no later than 20 days prior to such Proposed Acquisition, such other financial information, financial analysis, documentation or other information relating to such Proposed Acquisition as the Administrative Agent or any Lender shall reasonably request;

(h)    on or prior to the date of such Proposed Acquisition, the Administrative Agent shall have received, in form and substance reasonably satisfactory to the Administrative Agent, copies of the acquisition agreement, related Contractual Obligations and instruments and all opinions, certificates, lien search results and other documents reasonably requested by the Administrative Agent; and

(i)    at the time of such Proposed Acquisition and after giving effect thereto, (A) no Default or Event of Default shall have occurred and be continuing and (B) if any Loans are made in connection with such Permitted Acquisition, all representations and warranties contained in *Article IV (Representations and Warranties)* and in the other Loan Documents shall be true and correct in all material respects.

"*Permitted Equity Distribution*" means a distribution made by the Borrower to the members of the Borrower pursuant to, and in accordance with, the terms of the Parnassus Operating Agreement, *provided* that there are no Outstandings at the time of such distribution, or required in order to make such distribution.

"*Permitted Indebtedness Threshold Amount*" means $1,000,000,000.

"*Permitted Investment Threshold Amount*" means $600,000,000.

"*Permitted Refinancing*" means renewals, extensions, refinancings and refundings of Indebtedness permitted by *Section 7.1 (Indebtedness)* that (a) are in an aggregate principal amount not greater than the principal amount of such Indebtedness *plus* interest, fees, premiums, costs and expenses accrued and unpaid at the time of such refinancing, and are on terms no less favorable (other than with respect to market interest rates) to any Group Member obligated thereunder and (b) have a weighted average maturity and final maturity (measured as of the date of such renewal, refinancing, extension or refunding) no shorter than that of such Indebtedness.

"*Person*" means an individual, partnership, corporation (including a business trust), joint stock company, estate, trust, limited liability company, unincorporated association, joint venture or other entity or a Governmental Authority.

"*Platinum Investors*" means Platinum Equity, LLC and/or its Related Funds.

"*Pledge and Security Agreement*" means each agreement, in substantially the form of *Exhibit I (Form of Pledge and Security Agreement)*, executed by the Borrower and a Guarantor.

"*Pledged Debt Instruments*" has the meaning specified in the Pledge and Security Agreement.

"*Pledged Stock*" has the meaning specified in the Pledge and Security Agreement.

"*Property Loss Event*" means (a) any loss of or damage to property of any Loan Party that results in the receipt by such Person of proceeds of insurance whose Dollar Equivalent exceeds $25,000,000 (individually or in the aggregate) or (b) any taking of property of any Loan

Party that results in the receipt by such Person of a compensation payment in respect thereof whose Dollar Equivalent exceeds $100,000,000 (individually or in the aggregate).

"*Proposed Acquisition*" means the proposed acquisition by the Borrower or any of its Subsidiaries of all or substantially all of the assets or Stock of any Proposed Acquisition Target, or the merger of any Proposed Acquisition Target with or into the Borrower or any Subsidiary of the Borrower (and, in the case of a merger with the Borrower, with the Borrower being the surviving corporation).

"*Proposed Acquisition Target*" means any Person or any operating division thereof subject to a Proposed Acquisition.

"*Purchasing Lender*" has the meaning specified in *Section 10.7 (Sharing of Payments, Etc.)*.

"*Ratable Portion*" or "*ratably*" means, as of any date of determination, (a) with respect to a Lender's obligation to make a Loan and right to receive payments of interest and principal with respect thereto, (i) prior to the making of the initial Loan, the percentage obtained by dividing (y) such Lender's Commitment, by (z) the aggregate amount of all Lenders' Commitments, and (ii) from and after the making of the initial Loan, the percentage obtained by dividing (y) the principal amount of such Lender's portion of the Outstandings *plus* such Lender's unused Commitment by (z) the principal amount of the Outstandings *plus* all Lenders' unused Commitment.

"*Real Property*" of any Person means the Land of such Person, together with the right, title and interest of such Person, if any, in and to the streets, the Land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on the Land and any fixtures appurtenant thereto.

"*Register*" has the meaning specified in *Section 2.4(b)(i) (Evidence of Debt)*.

"*Reinvestment Deferred Amount*" means, with respect to any Net Cash Proceeds of any Reinvestment Event, the portion of such Net Cash Proceeds subject to a Reinvestment Notice; *provided* that, the amount of Net Cash Proceeds from Reinvestment Events that may be subject to reinvestment shall not exceed $500,000,000 in the aggregate in any Fiscal Year.

"*Reinvestment Event*" means any Specified Asset Sale or Property Loss Event in respect of which the Borrower has delivered a Reinvestment Notice.

"*Reinvestment Notice*" means a written notice executed by a Responsible Officer of the Borrower stating that no Default or Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through one of its Subsidiaries) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Specified Asset Sale or Property Loss Event to acquire replacement assets useful in the business of any Group Member or, in the case of a Property Loss Event, to effect repairs.

"*Reinvestment Prepayment Date*" means, with respect to any Net Cash Proceeds of any Reinvestment Event, the earlier of (a) the date occurring twelve (12) months after such Reinvestment Event if and to the extent that, prior to the end of such twelfth (12th) month, (i) such Net Cash Proceeds have not been used to acquire replacement assets useful in the Parnassus Business (or in the case of a Property Loss Event, to effect repairs), and (ii) neither the Borrower nor any Subsidiary has entered into an agreement or arrangement providing for the use of such Net Cash Proceeds to acquire replacement assets useful in the Parnassus Business (or in the case of a Property Loss Event, to effect repairs) within eighteen (18) months after such Reinvestment Event and (b) the date that is five Business Days after the date on which the Borrower shall have notified the Lender of the Borrower's determination not to use all or any portion of the relevant Reinvestment Deferred Amount for such Net Cash Proceeds to acquire replacement assets useful in the Parnassus Business (or in the case of a Property Loss Event, to effect repairs).

"*Related Documents*" means the Master Disposition Agreement, the Securities Purchase Agreement, the Parnassus Management Agreement, the GM Transition Services Agreement, the IP License Agreement and each other document and instrument executed with respect to either thereof.

"*Related Fund*" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"*Release*" means, with respect to any Person, any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration, in each case, of any Contaminant into the indoor or outdoor environment or into or out of any property owned, leased or operated by any Group Member, including the movement of Contaminants through or in the air, soil, surface water, ground water or property.

"*Remedial Action*" means with respect to the presence of Contaminants present in the environment at concentrations exceeding those allowed by Environmental Laws, all actions taken to (a) clean up, remove, treat or in any other way address any Contaminant in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release so that a Contaminant does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"*Requirement of Law*" means, with respect to any Person, the common law and all federal, state, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees and other determinations of, concessions, grants, franchises, licenses and other Contractual Obligations with, any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Requisite Lenders*" means, collectively, (a) on and prior to the Closing Date, Lenders having more than fifty percent (50%) of the aggregate outstanding amount of the Commitments and (b) after the Closing Date, more than fifty percent (50%) of all unused Commitments and Loans then outstanding.  A Non-Funding Lender shall not be included in the calculation of "*Requisite Lenders.*"

"*Responsible Officer*" means, with respect to the Group Members, the Persons listed on *Schedule R-1 (Responsible Officers)*.

"*Restricted Payment*" means (a) any dividend, distribution or any other payment whether direct or indirect, on account of any Stock or Stock Equivalent of the Borrower or any of its Subsidiaries now or hereafter outstanding and (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Stock or Stock Equivalent of the Borrower or any of its Subsidiaries now or hereafter outstanding.

"*Restructuring*" means the restructuring of the Borrower and its Subsidiaries, including, without limitation, (i) relocating premises and equipment, (ii) closing facilities and disposing of property, plant and equipment, (iii) work force reductions and redundancies, (iv) modernization of technology and other systems, (v) engagement of experts and consultants advising on the restructuring, (vi) recruitment and (vii) any other specific restructuring projects undertaken in consultation with the Administrative Agent.

"*S&P*" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"*Sale Approval Order*" shall mean an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent, approving the Master Disposition Agreement in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

"*Sarbanes-Oxley Act*" means the United States Sarbanes-Oxley Act of 2002.

"*Scheduled Termination Date*" means, the fifth anniversary of the Closing Date.

"*Secured Parties*" means the Lenders and the Administrative Agent.

"*Securities Account Control Agreement*" has the meaning specified in the Pledge and Security Agreement.

"*Securities Purchase Agreement*" means that certain Securities Purchase Agreement, dated as of [_____], 2009 by and among Parnassus Holdings II, LLC, Parnassus Holdings I, LLC, and GM.

"*Security*" means any Stock, Stock Equivalent, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Selling Lender*" has the meaning specified in *Section 10.7 (Sharing of Payments, Etc.)*.

"*Significant Subsidiary*" means any Subsidiary of the Borrower that has a net book value (without giving effect to any write-downs of book value following the Closing Date) in excess of $50,000,000.

"*Specified Asset Sale*" means an Asset Sale of the type described in *Section 7.4(b), (c)(ii) or (f) (Sale of Assets)*.

"*Stock*" means shares of capital stock (whether denominated as common stock or preferred stock), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"*Stock Equivalents*" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"*Subordinated Debt*" has the meaning specified in *Section 7.1(j) (Indebtedness)*.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which an aggregate of more than 50% of the outstanding Voting Stock is, at the time, directly or indirectly, owned or controlled by such Person or one or more Subsidiaries of such Person.

"*Subsidiary Guarantor*" means each Subsidiary of the Borrower party to or that becomes party to the Guaranty.

"*Tax Affiliate*" means, with respect to any Person, (a) any Subsidiary of such Person and (b) any Affiliate of such Person with which such Person files consolidated, combined or unitary tax returns.

"*Tax Return*" has the meaning specified in *Section 4.6(a) (Taxes)*.

"*Taxes*" has the meaning specified in *Section 2.9(a) (Taxes)*.

"*Title IV Plan*" means a pension plan, other than a Multiemployer Plan, covered by Title IV of ERISA and to which the Borrower, any of its Subsidiaries or any ERISA Affiliate has any obligation or liability.

"*UCC*" has the meaning specified in the Pledge and Security Agreement.

"*U.S. Lender*" has the meaning specified in *Section 2.9(f) (Taxes)*.

"*Voting Stock*" means Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons, of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).

"*Wholly-Owned Subsidiary*" of any Person means any Subsidiary of such Person, all of the Stock of which (other than director's qualifying shares, as may be required by law) is owned by such Person, either directly or indirectly through one or more Wholly-Owned Subsidiaries of such Person.

"*Withdrawal Liability*" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

### Section 1.2        Computation of Time Periods

In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each mean "*to but excluding*" and the word "*through*" means "*to and including.*"

### Section 1.3        Accounting Terms and Principles

(a)        Except as set forth below, all accounting terms not specifically defined herein shall be construed in conformity with GAAP and all accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in conformity with GAAP.

(b)        If any change in the accounting principles used in the preparation of the most recent Financial Statements referred to in *Section 5.1* (*Financial Statements*) is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower with the agreement of the Borrower's Accountants and results in a change in any of the calculations required by Article VII (*Negative Covenants*) that would not have resulted had such accounting change not occurred, the parties hereto agree to enter into negotiations in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by the Borrower shall be the same after such change as if such change had not been made; provided, however, that no change in GAAP that would affect a calculation that measures compliance with any covenant contained in *Article VII* (*Negative Covenants*) shall be given effect until such provisions are amended to reflect such changes in GAAP.

### Section 1.4        Conversion of Foreign Currencies

(a)        *Dollar Equivalents*.    The Administrative Agent shall determine the Dollar Equivalent of any amount as required hereby, and a determination thereof by the Administrative Agent shall be conclusive absent manifest error.    The Administrative Agent may, but shall not be obligated to, rely on any determination made by any Loan Party in any document delivered to the Administrative Agent.    The Administrative Agent may determine or redetermine the Dollar Equivalent of any amount on any date either in its own discretion or upon the request of any Lender.

(b)        *Rounding-Off*.    The Administrative Agent may set up appropriate rounding off mechanisms or otherwise round-off amounts hereunder to the nearest higher or lower amount in whole Dollar or cent to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in whole cents, as may be necessary or appropriate.

### Section 1.5        Certain Terms

(a)        The terms "*herein,*" "*hereof,*" "*hereto*" and "*hereunder*" and similar terms refer to this Agreement as a whole and not to any particular Article, Section, subsection or clause in, this Agreement.

(b)      Unless otherwise expressly indicated herein, (i) references in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement and (ii) the words "*above*" and "*below*", when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)      Each agreement defined in this *Article 1* shall include all appendices, exhibits and schedules thereto.  Unless the prior written consent of the Requisite Lenders is required hereunder for an amendment, restatement, supplement or other modification to any such agreement and such consent is not obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, supplemented or modified.

(d)      References in this Agreement to any statute shall be to such statute as amended or modified from time to time and to any successor legislation thereto, in each case as in effect at the time any such reference is operative.

(e)      The term "*including*" when used in any Loan Document means "*including without limitation*" except when used in the computation of time periods.

(f)      The terms "*Lender*" and "*Administrative Agent*" include, without limitation, their respective permitted successors.

(g)      The terms "*Account*", "*Commodity Account*", "*Deposit Account*", "*Entitlement Holder*", "*Entitlement Order*", "*Equipment*", "*Financial Asset*", "*General Intangible*", "*Inventory*", "*Securities Account*" and "*Securities Intermediary*" have the meanings given to them in the UCC.

(h)      The term "*to the knowledge*" of any Person when used in any Loan Document means "*to the knowledge*" of such Person "*after due and proper enquiry*".

(i)      Upon the appointment of any successor Administrative Agent pursuant to *Section 9.6 (Successor Administrative Agent)*, references to GM in *Section 9.3 (The Administrative Agent Individually)* shall be deemed to refer to the financial institution then acting as the Administrative Agent or one of its Affiliates if it so designates.

## ARTICLE II

## THE FACILITY

### Section 2.1      The Commitments

On the terms and subject to the conditions contained in this Agreement, each Lender severally agrees to make loans in Dollars (each, a "*Loan*", and collectively, the "*Loans*") to the Borrower from time to time on any Business Day during the period from the date hereof until the date falling thirty (30) days prior to the Scheduled Termination Date in an aggregate principal amount at any time outstanding for all such Loans by such Lender not to exceed such Lender's Commitment; *provided, however,* that at no time shall any Lender with a Commitment be obligated to make a Loan in excess of such Lender's Ratable Portion of the Available Credit. Amounts of any Loan that is prepaid may not be reborrowed.  Any unused Commitment shall terminate on the date falling thirty (30) days prior to the Scheduled Termination Date.

### Section 2.2        Borrowing Procedures

(a)        Each Borrowing shall be made on notice given by the Borrower to the Administrative Agent not later than 11:00 a.m. (New York time) 15 Business Days prior to the requested borrowing date (the "*Borrowing Date*"), in substantially the form of *Exhibit C* (*Form of Notice of Borrowing*) (the "*Notice of Borrowing*"), specifying, (A) the date of the proposed Borrowing and (B) the aggregate amount of the proposed Borrowing.

(b)        The Administrative Agent shall give to each Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing. Each Lender shall, before 11:00 am. (New York time) on the proposed Borrowing Date, make available to the Administrative Agent at its address referred to in *Section 10.8* (*Notices, Etc.*), in immediately available funds, such Lender's Ratable Portion of the proposed Borrowing. Upon fulfillment (or due waiver in accordance with *Section 10.1* (*Amendments, Waivers, Etc.*)) on the Closing Date, of the applicable conditions set forth *Section 3.1* (*Conditions Precedent to the Initial Loans*) and after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower.

(c)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed Borrowing Date that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of the Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the proposed Borrowing Date in accordance with this *Section 2.2* and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on the Borrowing Date a corresponding amount. If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising the Borrowing and (ii) in the case of such Lender, at the interest rate applicable at the time to the Loans comprising the Borrowing. If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of the Borrowing for purposes of this Agreement. If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(d)        The failure of any Lender to make on the date specified any Loan or any payment required by it (such Lender being a "*Non-Funding Lender*") shall not relieve any other Lender of its obligations to make such Loan or payment on such date but no such other Lender shall be responsible for the failure of any Non-Funding Lender to make a Loan or payment required under this Agreement.

### Section 2.3        Repayment of Loans

The Borrower shall repay the entire unpaid principal amount of each Loan on the Scheduled Termination Date.

### Section 2.4        Evidence of Debt

(a)        Each Lender shall maintain an account or accounts evidencing Indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.  In addition, each Lender having sold a participation in any of its Obligations, acting as agent of the Borrower solely for this purpose and for tax purposes, shall establish and maintain at its address referred to in *Section 10.8 (Notices, Etc.)* a record of ownership in which such Lender shall register by book entry (i) the name and address of each such Participant (and each change thereto, whether by assignment or otherwise) and (ii) the rights, interests or obligation of each such Participant in any Obligation and in any right to receive payment hereunder.

(b)        (i)        The Administrative Agent, acting as agent of the Borrower solely for this purpose and for tax purposes, shall establish and maintain at its address referred to in *Section 10.8 (Notices, Etc.)* a record of ownership (the "*Register*") in which the Administrative Agent agrees to register by book entry the Administrative Agent's, each Lender's interest in each Loan and in the right to receive any payments hereunder and any assignment of any such interest or rights.  In addition, the Administrative Agent, acting as agent of the Borrower solely for this purpose and for tax purposes, shall establish and maintain accounts in the Register in accordance with its usual practice in which it shall record (i) the names and addresses of the Lenders, (ii) the Commitments of each Lender from time to time, (iii) the amount and type of each Loan made, (iv) the amount of any principal or interest due and payable, and paid, by the Borrower to, or for the account of, each Lender hereunder and (v) the amount of any sum received by the Administrative Agent hereunder from the Borrower, whether such sum constitutes principal or interest (and the type of Loan to which it applies), fees, expenses or other amounts due under the Loan Documents and each Lender's share thereof, if applicable.

(ii)        Notwithstanding anything to the contrary contained in this Agreement, the Loans (including the Notes evidencing such Loans) are registered obligations and the right, title, and interest of the Lenders and their assignees in and to such Loans shall be transferable only upon notation of such transfer in the Register.  A Note shall only evidence the Lender's or a registered assignee's right, title and interest in and to the related Loan, and in no event is any such Note to be considered a bearer instrument or obligation.  This *Section 2.4(b)* and *Section 10.2* shall be construed so that the Loans are at all times maintained in "*registered form*" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (or any successor provisions of the Code or such regulations).

(c)        The entries made in the Register and in the accounts therein maintained pursuant to *clauses (a)* and *(b)* above shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.  In addition, the Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement.  Information contained in the Register with respect to any Lender shall be available for inspection by the Borrower, the Administrative Agent, such Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower shall promptly execute and deliver a Note or Notes to such Lender evidencing any Loans of such Lender, substantially in the forms of *Exhibit B* (*Form of Term Note*).

### Section 2.5    Optional Prepayments

(a)    *Term Loans*.  The Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Loans, in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; *provided*, *however* that each partial prepayment shall be in an aggregate amount not less than $5,000,000 and without penalty or premium.  Upon the giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid shall become due and payable on the date specified for such prepayment.  Any such optional prepayment shall be applied in accordance with *Section 2.6(c)*.

(b)    The Borrower shall have no right to voluntarily prepay the principal amount of any Loan other than as provided in this *Section 2.5*.

### Section 2.6    Mandatory Prepayments

(a)    Upon receipt by any Loan Party of Net Cash Proceeds arising (i) from one or more Specified Asset Sales, Property Loss Events or Debt Issuances (excluding Debt Issuances permitted by *clauses (a)* to *(o)* (inclusive) of *Section 7.1* (*Indebtedness*), but including Debt Issuances permitted by *clause (p) of Section 7.1* (*Indebtedness*) to the extent required by such clause) (each, a "*Mandatory Prepayment Event*") in an amount in excess of $25,000,000 for any one Mandatory Prepayment Event, or in excess of $100,000,000 for all Mandatory Prepayment Events in any Fiscal Year, excluding in each case, however, Mandatory Prepayment Events to the extent that the Borrower has delivered a Reinvestment Notice with respect thereto, the Borrower shall, within three (3) Business Days after such receipt, prepay the Loans in an amount equal to 100% of such Net Cash Proceeds (or, where such Reinvestment Notice does not relate to all such Net Cash Proceeds, 100% of the Net Cash Proceeds to which it does not relate).  Any such mandatory prepayment shall be applied in accordance with *clause (c) below*; *provided*, *however*, that, in the case of any Net Cash Proceeds arising from a Reinvestment Event, the Borrower shall, to the extent not reinvested pursuant to such Reinvestment Notice, prepay the Loans on the Reinvestment Prepayment Date, which prepayment shall be applied as provided in *clause (c) below*, in an amount equal to 100% of the Reinvestment Deferred Amount.

(b)    The Borrower shall prepay the Loans in an amount equal to 100% of the Excess Cash.  Any such mandatory prepayment that are required shall (i) be made within three Business Days of delivery of the monthly Financial Statements pursuant to *Section 5.1(a)* (*Monthly Reports*) indicating a requirement to make such mandatory prepayment, and (ii) be applied in accordance with *clause (c) below*.

(c)    Subject to the provisions of *Section 2.8(g)* (*Payments and Computations*), any prepayments made by the Borrower required to be applied in accordance with

this *clause (c)* shall be applied to repay the outstanding principal balance of the Loans (if any) until such Loans shall have been prepaid in full.

(d)    Any Net Cash Proceeds may be retained by the Borrower or the relevant Subsidiary until not required to be prepaid in accordance with this *Section 2.6* unless the aggregate amount of such amounts retained exceed the Dollar Equivalent of $25,000,000 at any time, in which case the Borrower must procure that amounts received in excess of the Dollar Equivalent of $25,000,000 are paid into a Cash Collateral Account as soon as reasonably practicable after receipt by the Borrower or the relevant Subsidiary.  The Borrower authorizes the Administrative Agent to apply amounts credited to the Cash Collateral Account which have not been reinvested pursuant to the relevant Reinvestment Notice by the end of the Reinvestment Prepayment Date to pay amounts due and payable under this *Section 2.6*.

### Section 2.7    Interest

(a)    *Rate of Interest*.  All Loans and the outstanding amount of all other Obligations shall bear interest on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, such Loans and other Obligations are paid in full, except as otherwise provided in *clause (c) below*, at a rate *per annum* equal to the sum of (A) LIBOR and (B) 6.0%.

(b)    *Interest Payments*.  (i) Interest accrued on each Loan shall be payable in arrears (A) on each Interest Payment Date, (B) upon the payment or prepayment thereof in full or in part and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Loan and (ii) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)    *Default Interest*.  Notwithstanding the rates of interest specified in *clause (a) above* or elsewhere herein, the Administrative Agent may, and shall at the direction of the Requisite Lenders, upon written notice to the Borrower require that upon the occurrence of an Event of Default and for as long thereafter as such Event of Default shall be continuing, the principal balance of all Loans and the amount of all other Obligations then due and payable shall bear interest at a rate that is 2.0% *per annum* in excess of the rate of interest applicable to such Loans or other Obligations from time to time.  Such interest shall be payable on the date that would otherwise be applicable to such interest pursuant to *clause (b) above* or otherwise on demand.

### Section 2.8    Payments and Computations

(a)    The Borrower shall make each payment hereunder (including fees and expenses) not later than 1:00 p.m. (New York time) on the day when due, in the currency specified herein (or, if no such currency is specified, in Dollars) to the Administrative Agent at its address referred to in *Section 10.8 (Notices, Etc.)* in immediately available funds without set-off or counterclaim.  The Administrative Agent shall promptly thereafter cause to be distributed immediately available funds relating to the payment of principal, interest or fees to the Lenders, in accordance with the application of payments set forth in *clause (f)* or *(g)* below, as applicable; *provided, however*, that amounts payable pursuant to *Section 2.9 (Taxes)* shall be paid only to the

affected Lender or Lenders.  Payments received by the Administrative Agent after 1:00 p.m. (New York time) shall be deemed to be received on the next Business Day.

(b)     All computations of interest and of fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest and fees are payable.  Each determination by the Administrative Agent of a rate of interest hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)     Each payment by the Borrower of any Loan (including interest or fees in respect thereof) and each reimbursement of various costs, expenses or other Obligation shall be made in the currency in which such Loan was made or expense or other Obligation was incurred; *provided, however*, that Loan Documents duly executed by the Administrative Agent may specify other currencies of payment for Obligations created by or directly related to such Loan Document.

(d)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent that the Borrower shall not have made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon (at the rate applicable to Loans pursuant to *Section 2.7 (Interest)*) for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent.

(f)     Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of *clause (g)* below (or required to be applied in accordance with *Section 2.6(c) (Mandatory Prepayments)*), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows:

(i)     *first*, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(ii)     *second*, to pay all other Obligations then due and payable in respect of the Loans;

(iii)     *third*, as the Borrower so designates.

Payments in respect of the Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion of the Loans; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Ratable Portions.

(g)      The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that, after the occurrence and during the continuance of an Event of Default, notwithstanding the provisions of *Section 2.6(c) (Mandatory Prepayments)* and *clause (f)* above, the Administrative Agent may, and, upon either (A) the written direction of the Requisite Lenders or (B) the acceleration of the Obligations pursuant to *Section 8.2 (Remedies)* shall, deliver a Blockage Notice (as defined in the Deposit Account Control Agreements) to each Deposit Account Bank for each Approved Deposit Account and apply all payments in respect of any Obligations and all funds on deposit in any Cash Collateral Account (including all proceeds arising from a Reinvestment Event that are held in the Cash Collateral Account pending application of such proceeds as specified in a Reinvestment Notice) and all other proceeds of Collateral in the following order:

(i)      *first*, to pay Obligations in respect of any expense reimbursements or indemnities then due to the Administrative Agent;

(ii)      *second*, to pay Obligations in respect of any expense reimbursements or indemnities then due to the Lenders;

(iii)      *third*, to pay Obligations in respect of any fees then due to the Administrative Agent and the Lenders;

(iv)      *fourth*, to pay interest then due and payable in respect of the Loans;

(v)      *fifth*, to pay or prepay principal amounts on the Loans, ratably to the aggregate principal amount of such Loans; and

(vi)      *sixth*, to the ratable payment of all other Obligations;

*provided, however*, that if sufficient funds are not available to fund all payments to be made in respect of any Obligation described above, the available funds being applied with respect to any such Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Obligation ratably, based on the proportion of the Administrative Agent's and each Lender's interest in the aggregate outstanding Obligations described in such clauses. The order of priority set forth above may at any time and from time to time be changed only by the agreement of all of the Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender or by any other Person that is not a Lender.

### Section 2.9      Taxes

(a)      Except as otherwise provided in this *Section 2.9*, any and all payments by any Loan Party under each Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and

all liabilities with respect thereto, excluding (i) in the case of each Lender and the Administrative Agent (A) taxes measured by its net income, and franchise taxes imposed on it, and similar taxes imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such Lender or the Administrative Agent (as the case may be) is organized or has its principal lending office or applicable lending office and (B) any withholding taxes payable with respect to payments under the Loan Documents under laws (including any statute, treaty or regulation) in effect on the Closing Date (or, in the case of (x) an Eligible Assignee, the date of the Assignment and Acceptance) and (y) a successor Administrative Agent, the date of the appointment of such Administrative Agent, (ii) in the case of each Lender, taxes measured by its net income, and franchise taxes imposed on it as a result of a present or former connection between such Lender and the jurisdiction of the Governmental Authority imposing such tax or any taxing authority thereof or therein, and (iii) any taxes that would not have been imposed but for the failure by such Lender or the Administrative Agent to comply with the provisions of *clauses (e) and (f)* of this *Section 2.9* (except where such failure is the result of a Change In Law that occurs after date such Lender becomes a party hereto) (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "*Taxes*").  If any Taxes shall be required by law to be deducted from or in respect of any sum payable under any Loan Document to any Lender or the Administrative Agent (w) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this *Section 2.9*), such Lender or the Administrative Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (x) the relevant Loan Party shall make such deductions, (y) the relevant Loan Party shall pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law and (z) the relevant Loan Party shall deliver to the Administrative Agent evidence of such payment.

(b)    In addition, each Loan Party agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made under any Loan Document or from the execution, delivery or registration of, or otherwise with respect to, any Loan Document (collectively, "*Other Taxes*").

(c)    Each Loan Party shall, jointly and severally, indemnify each Lender and the Administrative Agent for the full amount of Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this *Section 2.9*) paid by such Lender or the Administrative Agent (as the case may be) and any liability (including for penalties, interest and reasonable expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be made within 10 days from the date such Lender or the Administrative Agent (as the case may be) makes written demand therefor specifying in reasonable detail the nature and amount of such Taxes and Other Taxes.

(d)    As soon as practical after the date of any payment of Taxes or Other Taxes by any Loan Party, the Borrower shall furnish to the Administrative Agent, at its address referred to in *Section 10.8 (Notices, Etc.)*, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender or assignee that is organized under the laws of a jurisdiction outside than the United States (a "*Non-U.S. Lender*") shall deliver to the Administrative Agent

and the Borrower two properly completed and duly executed copies of either IRS Form W-8BEN, W-8ECI or W-8IMY or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from United States Federal withholding tax with respect to all payments hereunder. In addition, in the case of a Non-U.S. Lender claiming exemption from United States Federal withholding tax under Section 871(h) or 881(c) of the Code, such Non-U.S. Lender hereby represents that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code), and such Non-U.S. Lender agrees that it shall promptly notify the Administrative Agent and the Borrower in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "*New Lending Office*"). In addition, each Non-U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefor from the Administrative Agent or Borrower.

(f)      Each Lender that is a "United States person" (within the meaning of Section 7701(a)(30) of the Code) (each a "*U.S. Lender*") shall deliver, no later than the date that such Lender becomes a party to this Agreement and on or before the date, if any, such U.S. Lender designates a New Lending Office, to the Administrative Agent and the Borrower two properly completed and duly executed copies of IRS Form W-9, or any subsequent version thereof or successors thereto, certifying that such U.S. Lender is not subject to United States Federal backup withholding tax with respect to any payments hereunder. In addition, each U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefor from the Administrative Agent or Borrower.

(g)      The Administrative Agent or any Lender (or assignee) claiming any indemnity payment or additional payment amounts payable pursuant to this *Section 2.9* shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Administrative Agent or Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Administrative Agent or Lender to disclose any information such Administrative Agent or Lender deems confidential and would not, in the sole determination of such Administrative Agent or Lender (or assignee) be otherwise disadvantageous to such Administrative Agent or Lender (or assignee).

(h)      Without prejudice to the survival of any other agreement of any Loan Party hereunder or under the Guaranty, the agreements and obligations of such Loan Party contained in this *Section 2.9* shall survive the payment in full of the Obligations.

# ARTICLE III

## CONDITIONS TO LOANS

### Section 3.1    *Conditions Precedent to the Initial Loans*

The obligation of each Lender to make the Loans requested to be made by it on the Closing Date is subject to the satisfaction or due waiver in accordance with *Section 10.1 (Amendments, Waivers, Etc.)* of each of the following conditions precedent on or before [●], 2009 (or such later date as may be agreed between the Lenders and the Borrower):

(a)    *Certain Documents*.  The Administrative Agent shall have received on or prior to the Closing Date (and, in respect of the Notice of Borrowing, at least three Business Days prior to the Closing Date) each of the following, each dated the Closing Date unless otherwise indicated or agreed to by the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent and in sufficient copies for each Lender:

(i)    this Agreement, duly executed and delivered by the Borrower and, for the account of each Lender requesting the same, a Note of the Borrower conforming to the requirements set forth herein;

(ii)    the Guaranty, duly executed by each Guarantor;

(iii)    the Pledge and Security Agreement, duly executed by the Borrower and each Guarantor, together with each of the following:

(A)    evidence reasonably satisfactory to the Administrative Agent that, upon the filing and recording of instruments delivered on the Closing Date, the Administrative Agent (for the benefit of the Secured Parties) shall have a valid and perfected first priority security interest in the Collateral, including (x) such documents duly executed by each Loan Party as the Administrative Agent may reasonably request with respect to the perfection of its security interests in the Collateral (including financing statements under the UCC, patent, trademark and copyright security agreements suitable for filing with the Patent and Trademark Office or the Copyright Office, as the case may be, and other applicable documents under the laws of any jurisdiction with respect to the perfection of Liens created by the Pledge and Security Agreement) and (y) copies of UCC search reports as of a recent date listing all effective financing statements that name any Loan Party as debtor, together with copies of such financing statements, none of which shall cover the Collateral except for those that shall be terminated on the Closing Date or are otherwise permitted hereunder;

(B)    all certificates, instruments and other documents representing all Pledged Stock being pledged pursuant to such Pledge and Security Agreement and stock powers for such certificates, instruments and other documents executed in blank; and

(C)    all instruments representing Pledged Debt Instruments being pledged pursuant to such Pledge and Security Agreement duly endorsed in favor of the Administrative Agent or in blank;

(iv)    a favorable opinion of (A) United States counsel to the Loan Parties, in substantially the form of *Exhibit D* (*Form of Opinion of Counsel for the Loan Parties*), (B) foreign counsel to the Loan Parties in jurisdictions to be determined, in each case addressed to the Administrative Agent and the Lenders and addressing such other matters as any Lender through the Administrative Agent may reasonably request and (C) counsel to the Administrative Agent as to the enforceability of this Agreement and the other Loan Documents to be executed on the Closing Date;

(v)    a copy of each Related Document certified as being complete and correct by a Responsible Officer of the Borrower;

(vi)    certificates of the Secretary of State of the state of organization of each Loan Party attesting to the good standing of each such Loan Party;

(vii)    a certificate of the Secretary or an Assistant Secretary of each Loan Party certifying (A) the names and true signatures of each officer of such Loan Party that has been authorized to execute and deliver any Loan Document or other document required hereunder to be executed and delivered by or on behalf of such Loan Party, (B) the by-laws (or equivalent Constituent Document) of such Loan Party as in effect on the date of such certification, (C) a copy of the articles or certificate of incorporation (or equivalent Constituent Document) of such Loan Party as in effect on the date of such certification, certified as of a recent date by the Secretary of State of the state of organization of such Loan Party, and (D) the form resolutions of such Loan Party's Board of Directors (or equivalent governing body) approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party;

(viii)    a certificate of a Responsible Officer to the effect that (A) the condition set forth in *Section 3.2(b)* (*Conditions Precedent to Each Loan*) has, to the knowledge of such Responsible Officer, been satisfied, and (B) no litigation not listed on *Schedule 4.5 (Litigation)* has been commenced against any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect; and

(ix)    such other certificates, documents, agreements and information respecting any Loan Party as any Lender through the Administrative Agent may reasonably request by notice given to the Borrower not less than five Business Days prior to the Closing Date, and that the Borrower is able to provide using reasonable efforts.

(b)    *Sale Approval Order.* The Bankruptcy Court shall have entered the Sale Approval Order, which shall comply in all material respects with the requirements therefore in the Master Disposition Agreement, shall be in full force and effect and shall not have not been reversed or modified and shall not be stayed or subject to a motion to stay, and no appeal or petition for review, rehearing or certiorari with respect thereto shall be pending and the time for taking such appeal or filing any such petition shall have lapsed. Unless waived in accordance with the terms thereof (as in effect on the date hereof), all conditions precedent to the "*Effective Date*" under the Master Disposition Agreement shall have occurred (or shall occur simultaneously with the making of the Loans hereunder).

(c)    *Related Documents and Actions.* The Administrative Agent shall be satisfied that:

(i)      the terms and conditions of the Master Disposition Agreement shall not have been amended, waived or modified without the approval of the Administrative Agent;

(ii)      each of the Master Disposition Agreement and the other Related Documents shall have been approved by all corporate action of the Borrower and each of the other parties thereto, shall have been executed and delivered by each such party, shall be in full force and effect and there shall not have occurred and be continuing any material breach or default thereunder;

(iii)      subject only to the funding of the initial Loans hereunder, all conditions precedent to the consummation of the Acquisition shall have been satisfied or waived with the consent of the Administrative Agent;

(iv)      subject only to the funding of the initial Loans hereunder, the Acquisition shall have been consummated in accordance with the Master Disposition Agreement and all applicable Requirements of Law and all representations and warranties contained in each of the Master Disposition Agreement and the other Related Documents shall be true and correct in all material respects on the Closing Date;

(v)      the Investments contemplated by the Securities Purchase Agreement shall have been consummated in accordance with the Securities Purchase Agreement;

(vi)      the Borrower shall have received an amount of not less than $2,000,000,000 in exchange for the issuance of equity interests in the Borrower, and, notwithstanding *Section 3.4(b)* (*Post-Closing Obligations*), shall have deposited such funds into a Deposit Account that is subject to a Deposit Account Control Agreement on the Closing Date; and

(vii)      good and marketable title to the assets purported to be transferred as of the Closing Date by the terms of each of the Master Disposition Agreement and the Related Documents, free and clear of all Liens (other than Liens permitted pursuant to *Section 7.2 (Liens, Etc.)*), shall be transferred to the Borrower concurrently with the making of the initial Loans under this Agreement.

(d)      *Consents, Etc.*  Each Group Member shall have received all material consents and authorizations required pursuant to any material Contractual Obligation with any other Person and shall have obtained all material Permits of, and effected all material notices to and filings with, any Governmental Authority, in each case, as may be necessary to allow each Group Member lawfully (i) to execute, deliver and perform, in all material respects, their respective obligations hereunder and under the Loan Documents and the Related Documents to which each of them, respectively, is, or shall be, a party and each other agreement or instrument to be executed and delivered by each of them, respectively, pursuant thereto or in connection therewith, (ii) to create and perfect the Liens on the Collateral to be owned by each of them in the manner and for the purpose contemplated by the Loan Documents and (iii) to consummate the Acquisition.  The waiting period (and any extension thereof) applicable to the consummation of the Acquisition under the Hart Scott Rodino Antitrust Improvements Act of 1976 shall have expired or been terminated without any action being taken by any Governmental Authority adverse to the consummation of the Acquisition.

**Section 3.2      Conditions Precedent to Each Loan**

The obligation of each Lender on any Borrowing Date to make any Loan is subject to the satisfaction of each of the following conditions precedent:

(a)      *Request for Borrowing.*  The Administrative Agent shall have received a duly executed Notice of Borrowing.

(b)      *Representations and Warranties; No Defaults.*  The following statements shall be true on the Borrowing Date, both before and after giving effect thereto and to the application of the proceeds thereof:

(i)      the representations and warranties set forth in *Article IV (Representations and Warranties)* and in the other Loan Documents shall be true and correct in all material respects on and as of such Borrowing Date (except to the extent any such representation or warranty related to an earlier date or is qualified by materiality, in which case it shall be true and correct as of such earlier date or in all respects on and as of such Borrowing Date, as the case may be); and

(ii)      no Default or Event of Default shall have occurred and be continuing.

(c)      *No Legal Impediments.*  The making of the Loans on such Borrowing Date does not violate any Requirement of Law on the date of or immediately following such Loan and is not enjoined, temporarily, preliminarily or permanently.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing and the acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a representation and warranty by the Borrower as to the matters specified in *clause (b) above* on the date of the making of such Loan.

**Section 3.3      Determinations of Borrowing Conditions**

For purposes of determining compliance with the conditions specified in *Section 3.1 (Conditions Precedent to the Initial Loans)* and *Section 3.2 (Conditions Precedent to Each Loan)*, each Lender shall be deemed to have consented to, approved, accepted or be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the Borrowing specifying its objection thereto and such Lender shall not have made available to the Administrative Agent such Lender's Ratable Portion of the Borrowing.

**Section 3.4      Post-Closing Obligations**

(a)      Within 60 days after the Closing Date, the Loan Parties shall have delivered Mortgages for (i) all of the Real Properties of the Loan Parties identified on *Schedule 4.17 (Real Property)*, except for Real Properties with a Fair Market Value that is less than $2,500,000, or as may otherwise be agreed by the Administrative Agent, and (ii) each of the

Delphi Real Property Sites, together in each case with all Mortgage Supporting Documents relating thereto.

(b)    Other than the Deposit Account Control Agreement referred to in *Section 3.1(c)(vi)* *(Conditions Precedent to the Initial Loans)*, which Deposit Account Control Agreement shall be required to be delivered on the Closing Date, within 60 days after the Closing Date, the Loan Parties shall have delivered all Deposit Account Control Agreements, duly executed by the corresponding Deposit Account Bank and Loan Party, that, in the reasonable judgment of the Administrative Agent, shall be required for the Loan Parties to comply with *Section 6.11* *(Control Accounts, Approved Deposit Accounts)*.

(c)    Within 60 days after the Closing Date, the Loan Parties shall have delivered all Securities Account Control Agreements duly executed by the appropriate Loan Party and all "*securities intermediaries*" (as defined in the UCC) with respect to all Securities Accounts and securities entitlements of the Borrower and each Guarantor and all "*commodities intermediaries*" (as defined in the UCC) with respect to all commodities contracts and commodities accounts held by the Borrower and each Guarantor.


# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders and the Administrative Agent to enter into this Agreement, the Borrower represents and warrants each of the following to the Lenders and the Administrative Agent, on and as of the Closing Date and after giving effect to the transactions under the Master Disposition Agreement and the making of the Loans and the other financial accommodations on the Closing Date:

### Section 4.1    *Corporate Existence; Compliance with Law*

Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, except where the failure to be in good standing would not, in aggregate, have a Material Adverse Effect, (b) is duly qualified to do business as a foreign entity and in good standing under the laws of each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not, in the aggregate, have a Material Adverse Effect, (c) has all requisite power and authority and the legal right to own, pledge, mortgage and operate its properties, to lease the property it operates under lease and to conduct its business as now or currently proposed to be conducted, except to the extent the failure to have such power, authority or right would not, in the aggregate, have a Material Adverse Effect, (d) is in compliance with its Constituent Documents, (e) is in compliance with all applicable Requirements of Law except where the failure to be in compliance would not, in the aggregate, have a Material Adverse Effect and (f) has all necessary Permits from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for Permits or filings that can be obtained or made by the taking of ministerial action to secure the grant or transfer thereof or the failure to obtain or make would not, in the aggregate, have a Material Adverse Effect.

### Section 4.2        Corporate Power; Authorization; Enforceable Obligations

(a)        The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated thereby:

(i)        are within such Loan Party's corporate, limited liability company, partnership or other powers;

(ii)        have been or, at the time of delivery thereof pursuant to *Article III (Conditions To Loans)* will have been duly authorized by all necessary action, including the consent of shareholders, partners and members where required;

(iii)        do not and will not (A) contravene or violate in any material respect such Loan Party's or any of its Subsidiaries' respective Constituent Documents, (B) violate any other Requirement of Law applicable to such Loan Party (including Regulations T, U and X of the Federal Reserve Board), or any order or decree of any Governmental Authority or arbitrator applicable to such Loan Party, (C) conflict with or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any Related Document or any other material Contractual Obligation of such Loan Party or any of its Subsidiaries, except where such conflict or breach could reasonably be expected to result in a Material Adverse Effect, or (D) result in the creation or imposition of any Lien upon any property of such Loan Party or any of its Subsidiaries, other than those in favor of the Secured Parties pursuant to the Collateral Documents and other Liens permitted pursuant to *Section 7.2 (Liens, Etc.)*; and

(iv)        do not require the consent of, authorization by, approval of, notice to, or filing or registration with, any Governmental Authority or any other Person, other than those listed on *Schedule 4.2 (Consents)* and that have been or will be, prior to the Closing Date, obtained or made, copies of which have been or will be delivered to the Administrative Agent pursuant to *Section 3.1 (Conditions Precedent to the Initial Loans)*, and each of which on the Closing Date will be in full force and effect and, with respect to the Collateral, filings required to perfect the Liens created by the Collateral Documents.

(b)        This Agreement has been, and each of the other Loan Documents will have been upon delivery thereof pursuant to the terms of this Agreement, duly executed and delivered by each Loan Party that is a party thereto.  This Agreement is, and the other Loan Documents will be, when delivered hereunder, the legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against such Loan Party in accordance with its terms, subject to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

### Section 4.3        Ownership of Borrower; Subsidiaries; Borrower Information

(a)        The authorized Stock of the Borrower consists of [●] membership interests, of which [●] of membership interests are issued and outstanding.  All of the outstanding Stock of the Borrower has been validly issued, is fully paid and non-assessable and [●]% of such Stock is owned beneficially and of record by the Platinum Investors, free and clear of all Liens. Other than as set forth on *Schedule 4.3(a) (Ownership of Borrower)*, no Stock of the Borrower is subject to any option, warrant, right of conversion or purchase or any similar right.  Other than as

set forth on *Schedule 4.3(a)* (*Ownership of Borrower*), there are no agreements or understandings to which the Borrower is a party with respect to the voting, sale or transfer of any shares of Stock of the Borrower or any agreement restricting the transfer or hypothecation of any such shares.

(b)     Set forth on *Schedule 4.3(b)* (*Ownership of Subsidiaries*) is a complete and accurate Group Structure Chart as of the Closing Date. As of the Closing Date, the Borrower does not own or hold, directly or indirectly, any Stock of any Person other than the Subsidiaries shown on the Group Structure Chart.

(c)     *Schedule 4.3(c)* (*Borrower Information*) sets forth as of the Closing Date the name, address of principal place of business and, if applicable, tax identification number of the Borrower.

### Section 4.4     Material Adverse Change

Since the Closing Date there has been no Material Adverse Change and there have been no events or developments that, in the aggregate, have had a Material Adverse Effect.

### Section 4.5     Litigation

Except as set forth on *Schedule 4.5 (Litigation)*, there are no pending or, to the knowledge of any Group Member, threatened (in writing) actions, suits, claims, arbitrations, investigations or proceedings affecting the Borrower or any of its Subsidiaries before any court, Governmental Authority or arbitrator other than those that, in the aggregate, would not have a Material Adverse Effect or which questions the validity or enforceability of this Agreement. The performance of any action by any Loan Party required or contemplated by any Loan Document or any Related Document is not restrained or enjoined (either temporarily, preliminarily or permanently).

### Section 4.6     Taxes

(a)     Except as set forth on *Schedule 4.6 (Taxes)*, all federal, state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "*Tax Returns*") required to be filed by the Borrower or any of its Tax Affiliates have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all material taxes, charges and other impositions reflected therein or otherwise due and payable have been paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof except where contested in good faith and by appropriate proceedings if adequate reserves therefor have been established on the books of the Borrower or such Tax Affiliate in conformity with GAAP. No Tax Return is under audit or examination by any Governmental Authority and no written notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by the Borrower and each of its Tax Affiliates from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.

(b)    None of the Borrower or any of its Tax Affiliates has been a member of an affiliated, combined or unitary group other than the group of which the Borrower (or its Tax Affiliate) is the common parent.

### Section 4.7    Full Disclosure

The information prepared or furnished by or on behalf of any Group Member in connection with this Agreement or the Related Documents or the consummation of the transactions contemplated hereunder and thereunder taken as a whole does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not materially misleading.

### Section 4.8    Margin Regulations

The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board), and no proceeds of any Loan will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock, in each case in contravention of Regulation T, U or X of the Federal Reserve Board.

### Section 4.9    No Burdensome Restrictions; No Defaults

(a)    No Group Member (i) is a party to any Contractual Obligation the compliance with one or more of which could reasonably be expected to have, in the aggregate, a Material Adverse Effect or the performance of which by any thereof, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Lien permitted under *Section 7.2 (Liens, Etc.)*) on the assets of any thereof or (ii) is subject to one or more charter or corporate restrictions that would, in the aggregate, have a Material Adverse Effect.

(b)    To the knowledge of the Group Members, (i) no Group Member is in default under or with respect to any Contractual Obligation owed by it, and (ii) no other party is in default under or with respect to any Contractual Obligation owed to any Group Member, other than, in either case, those defaults that, in the aggregate, would not have a Material Adverse Effect.

(c)    No Default or Event of Default has occurred and is continuing.

(d)    To the knowledge of the Borrower, there are no Requirements of Law applicable to any Loan Party or any Subsidiary of any Loan Party the compliance with which by such Loan Party or such Subsidiary, as the case may be, would, in the aggregate, have a Material Adverse Effect.

### Section 4.10    Investment Company Act

No Group Member is an "*investment company*" or an "*affiliated person*" of, or "*promoter*" or "*principal underwriter*" for, an "*investment company*," as such terms are defined in the Investment Company Act of 1940, as amended.

### Section 4.11    Use of Proceeds

The proceeds of the Loans are being used by the Borrower (and, to the extent distributed to them by the Borrower, each other Group Member) solely (a) for the payment of transaction costs, fees and expenses related to the transactions contemplated by the Master Disposition Agreement, (b) for the payment of transaction costs, fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby and (c) for working capital and general corporate purposes.

### Section 4.12    Insurance

Schedule 4.12 (Insurance) sets forth as of the Closing Date (after giving effect to the Acquisition pursuant to the Master Disposition Agreement) a summary of all insurance policies maintained by the Borrower and its Subsidiaries.  All policies of insurance of any kind or nature of the Borrower or any of its Subsidiaries, including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is customarily carried by businesses of the size and character of such Person.

### Section 4.13    Labor Matters

(a)    There are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving any Group Member, other than those that, in the aggregate, would not have a Material Adverse Effect.

(b)    There are no unfair labor practices, grievances, complaints or arbitrations pending, or, to any Group Member's knowledge, threatened, against or involving any Group Member, nor are there any arbitrations or grievances threatened involving any Group Member, in each case, other than those that, in the aggregate, would not have a Material Adverse Effect.

(c)    Except as set forth on Schedule 4.13 (Labor Matters), as of the Closing Date (after giving effect to the Acquisition pursuant to the Master Disposition Agreement), there is no collective bargaining agreement covering any employee of any Group Member.

### Section 4.14    ERISA

(a)    Schedule 4.14 (List of Plans) separately identifies as of the Closing Date (after giving effect to the Acquisition pursuant to the Master Disposition Agreement) all Title IV Plans and all Multiemployer Plans.

(b)    Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 501 of the Code or other Requirements of Law so qualifies, except where such failures, in the aggregate, would not have a Material Adverse Effect.

(c)    Except for those that would not, in the aggregate, have a Material Adverse Effect, (i) each Benefit Plan is in compliance in all material respects with applicable provisions of ERISA, the Code and other Requirements of Law, (ii) there are no existing or pending (or, to the knowledge of any Group Member, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or

investigations involving any Benefit Plan to which any Group Member incurs or otherwise has or could have an obligation or any liability and (iii) no ERISA Event is reasonably expected to occur.

(d)    On the Closing Date (after giving effect to the Acquisition pursuant to the Master Disposition Agreement), no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding that could reasonably be expected to have a Material Adverse Effect.

(e)    Except to the extent set forth on *Schedule 4.14 (List of Plans)*, no ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made that could reasonably be expected to have a Material Adverse Effect.

### Section 4.15    Environmental Matters

Except as disclosed on *Schedule 4.15 (Environmental Matters)*, to the knowledge of the Responsible Officers of the Borrower:

(a)    The operations of each Group Member have been and are in compliance with all Environmental Laws, including obtaining and complying with all required environmental, health and safety Permits, other than non-compliances that, in the aggregate, would not have a reasonable likelihood of the Group Members incurring Environmental Liabilities and Costs after the date hereof that could reasonably be expected to result in a Material Adverse Effect.

(b)    No Group Member or any Real Property currently or within the last [●] years[2] owned, operated or leased by or for any Group Member is subject to any pending or, to the knowledge of any Group Member, threatened, claim, order, agreement, notice of violation, notice of potential liability or is the subject of any pending or threatened proceeding or governmental investigation under or pursuant to Environmental Laws other than those that, in the aggregate, are not reasonably likely to result in the Group Members incurring Environmental Liabilities and Costs that could reasonably be expected to result in a Material Adverse Effect.

(c)    No Real Property owned, operated or leased by any Group Member is a treatment, storage or disposal facility requiring a Permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the regulations thereunder or any state analog.

(d)    There are no facts, circumstances or conditions arising out of or relating to the operations or ownership of the Borrower or of Real Property owned, operated or leased by any Group Member that are not specifically included in the financial information furnished to the Lenders other than those that, in the aggregate, would not have a reasonable likelihood of the Group Members incurring Environmental Liabilities and Costs that could reasonably be expected to result in a Material Adverse Effect.

(e)    As of the date hereof, no Environmental Lien has attached to any Real Property of any Group Member and, to the knowledge of any Group Member, no facts,

---

[2] To correspond with the relevant representation in the Master Disposition Agreement.

circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property, in either case where such Environmental Lien could reasonably be expected to result in a Material Adverse Effect.

(f)    Each Group Member, upon reasonable written request, will provide the Lenders with copies of all environmental, health or safety audits, studies, assessments, inspections, investigations or other environmental health and safety reports relating to the operations of such Group Member or any Real Property of any of them that are in the possession, custody or control of such Group Member.

### Section 4.16    Intellectual Property

Each Group Member owns or licenses or otherwise has the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, Internet domain names, franchises, authorizations and other intellectual property rights (including all Intellectual Property as defined in the Pledge and Security Agreement) that are necessary for the operations of their respective businesses, without infringement upon or conflict with the rights of any other Person with respect thereto, including all trade names associated with any private label brands of any Group Member. To the knowledge of each Group Member, no license, permit, patent, patent application, trademark, trademark application, service mark, trade name, copyright, copyright application, Internet domain name, franchise, authorization, other intellectual property right (including all "Intellectual Property" as defined in the Pledge and Security Agreement), slogan or other advertising device, product, process, method, substance, part or component, or other material now employed, or now contemplated to be employed, by any Group Member infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened (in writing).

### Section 4.17    Title; Real Property

(a)    Each Group Member has good and marketable title to, or valid leasehold interests in, all Real Property and good title to all personal property, in each case that is purported to be owned or leased by it, including those reflected on the most recent Financial Statements delivered by the Borrower, and none of such properties and assets is subject to any Lien, except Liens permitted under *Section 7.2 (Liens, Etc.)*, unless, in each case, the failure to do so could reasonably be expected to result in a Material Adverse Effect. Each Group Member has received all deeds, assignments, waivers, consents, non-disturbance and recognition or similar agreements, bills of sale and other documents in respect of, and have duly effected all recordings, filings and other actions necessary to establish, protect and perfect, its right, title and interest in and to all such property, unless the failure to do so could reasonably be expected to result in a Material Adverse Effect.

(b)    Set forth on *Schedule 4.17 (Real Property)* is a complete and accurate list of all Real Property of each Loan Party and its Subsidiaries and showing, as of the Closing Date, the current street address (including, where applicable, county, state and other relevant jurisdictions), record owner and, where applicable, lessee thereof.

(c)    No portion of any Real Property of any Loan Party or any of its Subsidiaries has suffered any material damage by fire or other casualty loss that has not heretofore been completely repaired and restored, except where the failure to completely repair

and restore such property could reasonably be expected to result in a Material Adverse Effect. Except as set forth on *Schedule 4.17 (Real Property)*, on the Closing Date no portion of any Real Property of any Loan Party or any of its Subsidiaries is located in a special flood hazard area as designated by any federal Governmental Authority.

(d)     All Permits required to have been issued or appropriate to enable all Real Property of any Group Member to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, other than those that, in the aggregate, would not have a Material Adverse Effect.

(e)     No Group Member has received any notice, or has any knowledge, of any pending, threatened or contemplated condemnation proceeding affecting any Real Property of any Group Member or any part thereof, except those that, in the aggregate, would not have a Material Adverse Effect.

### Section 4.18     Related Documents

(a)     The execution, delivery and performance by each Loan Party of the Related Documents to which it is a party and the consummation of the transactions contemplated thereby by such Loan Party:

(i)     are within such Loan Party's respective corporate, limited liability company, partnership or other powers;

(ii)     at the Closing Date will have been duly authorized by all necessary corporate or other action, including the consent of stockholders where required;

(iii)     do not and will not (A) contravene or violate any Loan Party's or any of its Subsidiaries' respective Constituent Documents, (B) violate any other Requirement of Law applicable to any Loan Party, or any order or decree of any Governmental Authority or arbitrator, (C) conflict with or result in the breach of, constitute a default under, or result in or permit the termination or acceleration of, any Contractual Obligation of any Loan Party or any of its Subsidiaries, except for those that, in the aggregate, would not have a Material Adverse Effect or (D) result in the creation or imposition of any Lien upon any property of any Loan Party or any of its Subsidiaries other than a Lien permitted under *Section 7.2 (Liens, Etc.)*; and

(iv)     do not require the consent of, authorization by, approval of, notice to, or filing or registration with, any Governmental Authority or any other Person, other than those that (A) will have been obtained at the Closing Date, each of which will be in full force and effect on the Closing Date, none of which will on the Closing Date impose materially adverse conditions upon the exercise of control by the Borrower over any of its Subsidiaries and (B) in the aggregate, if not obtained, would not have a Material Adverse Effect.

(b)     Each of the Related Documents has been or at the Closing Date will have been duly executed and delivered by each Loan Party that is a party thereto and at the Closing Date will be the legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against such Loan Party in accordance with its terms, subject to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors'

rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     None of the Related Documents has been amended or modified in any respect and no provision therein has been waived, except in each case (i) to the extent permitted by *Section 7.11 (Modification of Related Documents)*, (ii) as previously disclosed to the Administrative Agent, or (iii) to the extent that such amendment, modification or waiver could not reasonably be expected to have a Material Adverse Effect, and each of the representations and warranties therein are true and correct in all material respects and no default or event that, with the giving of notice or lapse of time or both, would be a default has occurred thereunder that could reasonably be expected to have a Material Adverse Effect.

## ARTICLE V

## REPORTING COVENANTS

The Borrower agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation remains outstanding and, in each case, unless the Requisite Lenders otherwise consent in writing:

### Section 5.1     Financial Statements

The Borrower shall furnish to the Administrative Agent (with sufficient copies for each of the Lenders) each of the following:

(a)     *Monthly Reports*.  Within 30 days after the end of each fiscal month in each Fiscal Year (or, in the case of monthly reports delivered from the Closing Date through December 31, 2009, 60 days), financial information regarding the Borrower and its Subsidiaries consisting of Consolidated unaudited balance sheets as of the close of such month and the related statements of income and cash flow for such month and that portion of the current Fiscal Year ending as of the close of such month, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the latest business plan provided pursuant to *clause (f) below* for the current Fiscal Year (provided that such comparison to the corresponding period in the prior year shall not be required until the first monthly report delivered after the first anniversary of the Closing Date if the Borrower determines in its good faith discretion that it is impracticable to prepare such comparison prior to such date), in each case certified by a Responsible Officer of the Borrower as fairly presenting the Consolidated financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b)     *Quarterly Reports*.  Within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (or, in the case of quarterly reports delivered from the Closing Date through December 31, 2009, 105 days), financial information regarding the Borrower and its Subsidiaries consisting of Consolidated unaudited balance sheets as of the close of such quarter and the related statements of income and cash flow for such quarter and that portion of the Fiscal Year ending as of the close of such quarter, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the latest business plan

provided pursuant to *clause (f)* below for the current Fiscal Year (provided that such comparison to the corresponding period in the prior year shall not be required until the first quarterly report delivered after the first anniversary of the Closing Date if the Borrower determines in its good faith discretion that it is impracticable to prepare such comparison prior to such date), in each case certified by a Responsible Officer of the Borrower as fairly presenting the Consolidated financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(c)    *Annual Reports.*  Within (x) 180 days after the end of the Fiscal Year ended December 31, 2009 and (y) 120 days after the end of each Fiscal Year thereafter, financial information regarding the Borrower and its Subsidiaries consisting of Consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such year and related statements of income and cash flows of the Borrower and its Subsidiaries for such Fiscal Year (or in the case of the Fiscal Year ending December 31, 2009, that portion of such Fiscal Year from the Closing Date through the end of such Fiscal Year), all prepared in conformity with GAAP and certified, in the case of such Consolidated Financial Statements, without qualification as to the scope of the audit or as to the Borrower being a going concern by the Borrower's Accountants, together with the report of such accounting firm stating that (i) such Financial Statements fairly present the Consolidated financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (commencing with the reports required to be delivered 120 days after the end of the Fiscal Year ended December 31, 2010) (except for changes with which the Borrower's Accountants shall concur and that shall have been disclosed in the notes to the Financial Statements) and (ii) the examination by the Borrower's Accountants in connection with such Consolidated Financial Statements has been made in accordance with generally accepted auditing standards.

(d)    *Compliance Certificate.*  Together with each delivery of any Financial Statement pursuant to *clause (b)* or *(c)* above, a certificate of a Responsible Officer of the Borrower (each, a "*Compliance Certificate*") stating that no Default or Event of Default has occurred and is continuing or, if a Default or an Event of Default has occurred and is continuing, stating the nature thereof and the action that the Borrower proposes to take with respect thereto.

(e)    *Group Structure Chart and Other Collateral Updates.*  Together with each delivery of any Financial Statement pursuant to *clause (b) or (c)* above, (i) a certificate of a Responsible Officer of the Borrower certifying that the Group Structure Chart attached thereto (or the last Group Structure Chart delivered pursuant to this *clause (e)*) is true, correct, complete and current in all material respects as of the date of such Financial Statement and (ii) a certificate of a Responsible Officer of the Borrower in form and substance satisfactory to the Administrative Agent that all certificates, statements, updates and other documents (including updated schedules) required to be delivered pursuant to the Pledge and Security Agreement by any Loan Party in the preceding fiscal period have been delivered thereunder (or such delivery requirement was otherwise duly waived or extended).  The reporting requirements set forth in this *clause (e)* are in addition to, and are not intended to and shall not replace or otherwise modify, any obligation of any Loan Party under any Loan Document (including other notice or reporting requirements).  Compliance with the reporting obligations in this *clause (e)* shall only provide notice to the Administrative Agent and shall not, by itself, modify any obligation of any Loan Party under any Loan Document, update any Schedule to this Agreement or any schedule to any other Loan

Document or cure, or otherwise modify in any way, any failure to comply with any covenant, or any breach of any representation or warranty, contained in any Loan Document or any other Default or Event of Default.

(f)      *Business Plan*. Not later than 30 days after the start of each Fiscal Year, (i) the annual business plan of the Borrower and its Subsidiaries for such Fiscal Year approved by the Board of Directors of the Borrower, (ii) forecasts prepared by management of the Borrower for each fiscal month in such Fiscal Year and (iii) forecasts prepared by management of the Borrower for each of the following three (3) Fiscal Years, including, in each instance described in *clauses (ii)* and *(iii) above*, (x) a projected year-end Consolidated balance sheet and income statement and statement of cash flows and (y) a statement of all of the material assumptions on which such forecasts are based.

### Section 5.2      Default Notices

As soon as practicable, and in any event within five Business Days after a Responsible Officer of any Loan Party has actual knowledge of the existence of any Default, Event of Default, or an event having had a Material Adverse Effect or having any reasonable likelihood of causing or resulting in a Material Adverse Change, the Borrower shall give the Administrative Agent notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given by telephone, shall be promptly confirmed in writing on the next Business Day.

### Section 5.3      Litigation

Promptly after the commencement thereof, the Borrower shall give the Administrative Agent written notice of the commencement of all actions, suits and proceedings before any domestic or foreign Governmental Authority or arbitrator affecting any Group Member that, in the reasonable judgment of the Borrower or such Group Member, expose such Group Member to liability in an amount aggregating $50,000,000 or more or that is reasonably likely to be adversely determined and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

### Section 5.4      Labor Relations

Promptly after becoming aware of the same, the Borrower shall give the Administrative Agent written notice of (a) any material labor dispute to which any Group Member is, or is reasonably likely to, become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (b) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person.

### Section 5.5      Tax Returns

Upon the request of any Lender, through the Administrative Agent, the Borrower shall provide copies of all federal, state, local and foreign tax returns and reports filed by any Group Member in respect of taxes measured by income (excluding sales, use and like taxes).

**Section 5.6**    **Insurance**

As soon as is practicable and in any event within 90 days after the end of each Fiscal Year, the Borrower shall furnish the Administrative Agent (in sufficient copies for each of the Lenders) with (a) a report in form satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by the Group Members and the duration of such policies and (b) an insurance broker's statement that all premiums then due and payable with respect to such policies have been paid.

**Section 5.7**    **ERISA Matters**

The Borrower shall furnish the Administrative Agent (with sufficient copies for each of the Lenders) each of the following:

(a)    promptly and in any event within 30 days after any Responsible Officer of any Group Member knows or has reason to know that any ERISA Event has occurred that could reasonably be expected to result in liabilities in excess of $50,000,000, written notice describing such event; and

(b)    promptly and in any event within 10 days after any Responsible Officer of a Group Member knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a written statement of a Responsible Officer of the Borrower describing such ERISA Event or waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto.

**Section 5.8**    **Environmental Matters**

The Borrower shall provide the Administrative Agent promptly and in any event within 30 days after any Group Member learning of any of the following, written notice of each of the following:

(a)    that any Loan Party is or may be liable to any Person as a result of a Release or threatened Release that could reasonably be expected to subject such Loan Party to Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect;

(b)    the receipt by any Loan Party of written notification that any real or personal property of such Loan Party is or is reasonably likely to be subject to any Environmental Lien that could reasonably be expected to have a Material Adverse Effect;

(c)    the receipt by any Loan Party of any notice of violation of or potential liability under, or knowledge by such Loan Party that there exists a condition that could reasonably be expected to result in a violation of or liability under, any Environmental Law, except for violations and liabilities the consequence of which, in the aggregate, would not be reasonably likely to subject the Loan Parties collectively to Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect;

(d)    the commencement of any judicial or administrative proceeding or investigation alleging a violation of or liability under any Environmental Law, that, in the

aggregate, if adversely determined, would have a reasonable likelihood of subjecting the Loan Parties collectively to Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect;

(e)    any proposed acquisition of stock, assets or real estate, any proposed leasing of property or any other action by any Loan Party or any of its Subsidiaries other than those the consequences of which, in the aggregate, have reasonable likelihood of subjecting the Loan Parties collectively to Environmental Liabilities and Costs whose Dollar Equivalent that could reasonably be expected to have a Material Adverse Effect;

(f)    any proposed action by any Loan Party or any of its Subsidiaries or any proposed change in Environmental Laws that, (i) in the aggregate, have a reasonable likelihood of requiring the Loan Parties to obtain additional environmental, health or safety Permits or make additional capital improvements to obtain compliance with Environmental Laws that if not obtained or made could reasonably be expected to have a Material Adverse Effect or (ii) shall subject the Loan Parties to additional Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect; and

(g)    upon written request by any Lender through the Administrative Agent, a report providing an update of the status of any environmental, health or safety compliance, hazard or liability issue identified in any notice or report delivered pursuant to this Agreement.

Section 5.9        Other Information

The Borrower shall provide the Administrative Agent or any Lender with such other information respecting the business, properties, condition, financial or otherwise, or operations of the Group Members as the Administrative Agent or such Lender through the Administrative Agent may from time to time reasonably request.


# ARTICLE VI

# AFFIRMATIVE COVENANTS

The Borrower agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation remains outstanding and, in each case, unless the Requisite Lenders otherwise consent in writing:

Section 6.1        Preservation of Corporate Existence, Etc.

Each Significant Subsidiary shall preserve and maintain its legal existence, rights (charter and statutory) and franchises, except as permitted by Sections 7.4 (Sale of Assets) and 7.6 (Restriction on Fundamental Changes; Permitted Acquisitions).

Section 6.2        Compliance with Laws, Etc.

Each Significant Subsidiary shall comply with all applicable Requirements of Law, Contractual Obligations and Permits, except, in each case, where the failure so to comply would not, in the aggregate, have a Material Adverse Effect.

### Section 6.3        Conduct of Business

Each Significant Subsidiary shall (a) conduct its business in the ordinary course and (b) use its reasonable efforts, in the ordinary course, to preserve its business and the goodwill and business of the customers, advertisers, suppliers and others having business relations with any Group Member, except in each case where the failure to comply with the covenants in each of *clauses (a)* and *(b) above* would not, in the aggregate, have a Material Adverse Effect.

### Section 6.4        Payment of Taxes, Etc.

Each Significant Subsidiary shall pay and discharge before the same shall become delinquent, all lawful governmental claims and material taxes, assessments, charges and levies, except where contested in good faith, by proper proceedings and adequate reserves therefor have been established on the books of such Significant Subsidiary in conformity with GAAP.

### Section 6.5        Maintenance of Insurance

The Borrower shall and shall cause each of its Subsidiaries to maintain insurance on and in relation to its business and assets against those risks and to the extent as is usual for businesses of the size and character of the Group Members. All insurances must be with reputable independent insurance companies or underwriters.

### Section 6.6        Access

The Borrower shall, at any time during the continuance of an Event of Default, permit the Lender (or any agents or representatives thereof) to (a) examine and make copies of and abstracts from the records and books of account of the Borrower, (b) visit the properties of the Borrower, (c) discuss the affairs, finances and accounts of the Borrower and its Subsidiaries with any officer or director of the Borrower and (d) communicate directly with the Borrower's Accountants.

### Section 6.7        Keeping of Books

Each Group Member shall keep, proper books of record and account, in which entries shall be made in conformity with GAAP of all financial transactions and the assets and business of each Group Member. Such books and records shall be located at each Group Member's principal place of business or such other location as to which the Administrative Agent has received prior written notice.

### Section 6.8        Maintenance of Properties, Etc.

Each Significant Subsidiary shall maintain and preserve (a) in good working order and condition all of its properties necessary in the conduct of its business, (b) all rights, permits, licenses, approvals and privileges (including all Permits) necessary in the conduct of its business, (c) all registered patents, trademarks, trade names, copyrights and service marks necessary in its business and (d) all other material Collateral, except where failure to so maintain and preserve the items set forth in *clauses (a)*, *(b)* *(c)* and *(d) above* would not, in the aggregate, have a Material Adverse Effect. Each Significant Subsidiary will defend the right, title and interest of the Secured Parties in and to all Collateral against all adverse claims and demands of

all Persons whomsoever, subject to the rights of holders of any Liens permitted under *Section 7.2 (Liens, Etc.)* to the extent reasonably requested by the Administrative Agent or the other Secured Parties.

<p align="center">**Section 6.9      Application of Proceeds**</p>

The Borrower (and, to the extent distributed to them by the Borrower, each Loan Party) shall only use the proceeds of the Loans as provided in *Section 4.11 (Use of Proceeds)*.

<p align="center">**Section 6.10      Additional Collateral and Guaranties**</p>

To the extent not delivered to the Administrative Agent on or before the Closing Date, the Borrower shall promptly do each of the following, unless otherwise agreed by the Administrative Agent:

(a)      deliver to the Administrative Agent such duly executed supplements and amendments to the Guaranty, in each case in form and substance reasonably satisfactory to the Administrative Agent and as the Administrative Agent deems necessary or advisable in order to ensure that each Wholly-Owned Subsidiary of the Borrower that is a Domestic Subsidiary has entered into Guaranty Obligations, as primary obligor and not as surety, guaranteeing the full and punctual payment when due of the Obligations;

(b)      deliver to the Administrative Agent such duly-executed joinder and amendments to the Borrower Pledge and Security Agreement and, if applicable, other Collateral Documents, in each case in form and substance reasonably satisfactory to the Administrative Agent and as the Administrative Agent Lender deems necessary or advisable in order to (i) effectively grant to the Secured Parties a valid, perfected and enforceable first-priority security interest in the Stock and Stock Equivalents and other debt Securities owned by the Borrower; *provided, however*, in no event shall (x) the Borrower be required to pledge any stock of any Excluded Foreign Subsidiary except for 65% of the outstanding Voting Stock of any Excluded Foreign Subsidiary that is directly owned by a Borrower or a Domestic Subsidiary or (y) any assets of any Excluded Foreign Subsidiary be required to be pledged;

(c)      deliver to the Administrative Agent all certificates, instruments and other documents representing all Pledged Stock, any Pledged Debt Instruments and all other Stock, Stock Equivalents and other debt Securities being pledged pursuant to the joinders, amendments and, if requested by the Administrative Agent, within sixty (60) days following such request, foreign agreements executed pursuant to *clause (b) above*, together with (i) in the case of certificated Pledged Stock and other certificated Stock and Stock Equivalents, undated stock powers endorsed in blank and (ii) in the case of any Pledged Debt Instruments and other certificated debt Securities, endorsed in blank, in each case executed and delivered by a Responsible Officer of the Borrower;

(d)      to take such other actions necessary or advisable to ensure the validity or continuing validity of the guaranties required to be given pursuant to *clause (a) above* or to create, maintain or perfect the security interest required to be granted pursuant to *clause (a) above*, including the filing of UCC financing statements in such jurisdictions as may be required by the Collateral Documents or by law or as may be reasonably requested by the Administrative Agent; *provided* that, notwithstanding the foregoing or clause (c), no Group Member shall be required to enter into foreign agreements if the costs to the Group Members of providing such

documents are unreasonably excessive (as determined by the Administrative Agent in consultation with the Borrower) in relation to the benefits of the Administrative Agent and the Lenders afforded thereby;

(e)    if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; and

(f)    to the extent not previously delivered to the Administrative Agent, upon written request of the Administrative Agent, execute and deliver to the Administrative Agent as soon as reasonably practicable, a Mortgage on any Real Property of the Borrower with a Fair Market Value in excess of $2,500,000.

### Section 6.11    Control Accounts, Approved Deposit Accounts

(a)    Subject to *Section 3.4(b)* (*Post-Closing Obligations*), each Loan Party shall (i) deposit in an Approved Deposit Account all cash on hand, (ii) not establish or maintain any Securities Account that is not a Control Account and (iii) not establish or maintain any Deposit Account other than with a Deposit Account Bank; *provided, however*, that each Loan Party may (x) maintain payroll, withholding tax, other fiduciary accounts and cash deposits or similar arrangements in connection with Liens permitted by *Section 7.2* (*Liens, Etc.*) and (y) maintain other accounts as long as the aggregate balance in all such accounts does not exceed $2,000,000 (or such other amount as may be agreed between the Administrative Agent and the Borrower).

(b)    The Administrative Agent may establish one or more Cash Collateral Accounts with such depositaries and Securities Intermediaries as it in its sole discretion shall determine; *provided, however*, that no Cash Collateral Account shall be established with respect to the assets of any Excluded Foreign Subsidiary. The Borrower agrees that each such Cash Collateral Account shall meet the requirements of the definition of "*Cash Collateral Account*". Without limiting the foregoing, funds on deposit in any Cash Collateral Account may be invested, at the option of the Borrower so long as no Default or Event of Default shall have occurred and be continuing at the time of such investment, in Cash Equivalents at the direction of the Administrative Agent and, except during the continuance of an Event of Default, the Administrative Agent agrees with the Borrower to issue Entitlement Orders for such investments in Cash Equivalents as requested by the Borrower; *provided, however*, that the Administrative Agent shall not have any responsibility for, or bear any risk of loss of, any such investment or income thereon. No Group Member and no Person claiming on behalf of or through any Group Member shall have any right to demand payment of any funds held in any Cash Collateral Account at any time prior to the payment in full of all then outstanding and payable monetary Obligations. The Administrative Agent shall apply all funds on deposit in a Cash Collateral Account as provided in *Section 2.6 (Mandatory Prepayments)*.

(c)    The requirements of this *Section 6.11* shall not apply to any Excluded Foreign Subsidiary.

# ARTICLE VII

## NEGATIVE COVENANTS

The Borrower agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation remains outstanding and, in each case, unless the Requisite Lenders otherwise consent in writing:

### Section 7.1        Indebtedness

No Group Member shall, directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness except for the following:

(a)        the Obligations and Guaranty Obligations in respect thereto;

(b)        Indebtedness existing on the date of this Agreement and disclosed on *Schedule 7.1 (Existing Indebtedness)*, together with any Permitted Refinancing of any Indebtedness permitted by this *clause (b)*;

(c)        Guaranty Obligations incurred by any Group Member in respect of Indebtedness of any Group Member that is otherwise permitted by this *Section 7.1* (other than *clause (a)* above);

(d)        Capital Lease Obligations and purchase money Indebtedness incurred by any Group Member to finance the acquisition of fixed assets, together with any Permitted Refinancing of any Indebtedness permitted by this *clause (d)*; *provided, however*, that the Capital Expenditure related thereto is otherwise permitted by *Section 7.16 (Capital Expenditures)* and that the Dollar Equivalent of the aggregate outstanding principal amount of all such Capital Lease Obligations and purchase money Indebtedness, together with other Indebtedness permitted under *clauses (i), (j), (l)* and *(m)* of this *Section 7.1*, shall not exceed the Permitted Indebtedness Threshold Amount at any time;

(e)        a sale and leaseback transaction, to the extent such transaction would constitute Indebtedness; *provided* that an amount equal to all Net Cash Proceeds of such sale and leaseback transaction are applied to the payment of the Obligations as set forth in, and to the extent required by, *Section 2.6 (Mandatory Prepayments)*;

(f)        Indebtedness arising from intercompany loans owing to any Group Member and constituting an Investment permitted under *Section 7.3 (Investments)*;

(g)        Indebtedness arising under any appeal, bid, performance, custom, surety or similar bond entered into in the ordinary course of business;

(h)        Obligations under Hedging Contracts permitted under *Section 7.15 (No Speculative Transactions)*;

(i)        unsecured Indebtedness not otherwise permitted under this *Section 7.1*; *provided, however*, that the Dollar Equivalent of the aggregate outstanding principal amount of all such unsecured Indebtedness, together with other Indebtedness permitted under *clauses (d)*,

*(j), (l)* and *(m)* of this *Section 7.1*, shall not exceed the Permitted Indebtedness Threshold Amount at any time;

(j)    unsecured Indebtedness of the Borrower that is subordinated to the payment in full of the Obligations on terms reasonably satisfactory to the Requisite Lenders (all such Indebtedness permitted to be incurred pursuant to this *clause (j)* being "*Subordinated Debt*"); *provided, however,* that the aggregate Dollar Equivalent of the principal amount of all such unsecured Indebtedness, together with other Indebtedness permitted under *clauses (d), (i), (l)* and *(m)* of this *Section 7.1*, shall not exceed the Permitted Indebtedness Threshold Amount at any time;

(k)    Indebtedness of a newly-acquired Subsidiary pursuant to a Permitted Acquisition that is outstanding on the date such Subsidiary is acquired; *provided* that (i) such Indebtedness was in existence on the date such Person became a Subsidiary of the Borrower or another Subsidiary of the Borrower, (ii) such Indebtedness was not created in contemplation of such Person becoming a Subsidiary of the Borrower or another Subsidiary of the Borrower and (iii) immediately after giving effect to the acquisition of such Person by the Borrower or such Subsidiary of the Borrower no Event of Default shall have occurred and be continuing;

(l)    Indebtedness incurred by Subsidiaries of the Borrower that are not Domestic Subsidiaries pursuant to one or more account securitization or factoring arrangements, provided that that the Dollar Equivalent of the aggregate outstanding amount of all Indebtedness permitted pursuant to this clause (l) , together with other Indebtedness permitted under *clauses (d), (i), (j)* and *(m)* of this *Section 7.1*, shall not exceed the Permitted Indebtedness Threshold Amount at any time;

(m)    Indebtedness in respect of letters of credit in an aggregate amount, together with other Indebtedness permitted under *clauses (d), (i), (j)* and *(l)* of this *Section 7.1*, shall not exceed the Permitted Indebtedness Threshold Amount at any time;

(n)    Indebtedness of the Group Members in connection with the financing of insurance premiums in respect of unearned premiums payable on certain insurance policies maintained by the Group Members;

(o)    Indebtedness from loans, grants or other arrangements made by a government or quasi-government entity, including Indebtedness arising from loans, grants or other arrangements made pursuant to Section 136 of the Energy Independence and Security Act of 2007 (Public Law 110-140; 42 U.S.C. 17013); *provided, however,* that no principal payments of such Indebtedness shall be required to be made prior to the Scheduled Termination Date; and

(p)    Indebtedness in an aggregate principal amount at any time outstanding not to exceed the Dollar Equivalent of $750,000,000, to the extent that prior to the incurrence of such Indebtedness, or with the proceeds of such Indebtedness, there is a corresponding reduction of the Commitments (other than in connection with a Borrowing) or a mandatory prepayment of the Outstandings, as the case may be.

**Section 7.2      Liens, Etc.**

No Group Member shall create or suffer to exist, any Lien upon or with respect to any of their respective properties or assets, whether now owned or hereafter acquired, or assign, any right to receive income or profits, except for the following:

(a)      Liens created pursuant to the Loan Documents;

(b)      Liens existing on the date of this Agreement and disclosed on *Schedule 7.2 (Existing Liens)*;

(c)      Customary Permitted Liens on the assets of Group Members;

(d)      purchase money Liens granted by the Borrower or any of its Subsidiaries (including the interest of a lessor under a Capital Lease and purchase money Liens to which any property is subject at the time, on or after the date hereof, of the Borrower's or such Subsidiary's acquisition thereof) securing Indebtedness permitted under *Section 7.1(d) (Indebtedness)* and limited in each case to the property purchased with the proceeds of such purchase money Indebtedness or subject to such Capital Lease;

(e)      any Lien securing the renewal, extension, refinancing or refunding of any Indebtedness secured by any Lien permitted by *clause (b)* or *(d)* above or this *clause (e)* without any change in the assets subject to such Lien and to the extent such renewal, extension, refinancing or refunding is permitted by *Section 7.1 (Indebtedness)*;

(f)      Liens in favor of lessors securing operating leases permitted hereunder or, to the extent such transactions create a Lien hereunder, sale and leaseback transactions;

(g)      Liens on accounts receivable, related proceeds and related rights and claims of a Group Member that are factored or securitized under an arrangement permitted by *Section 7.1(l) (Indebtedness)*;

(h)      Liens in respect of Indebtedness permitted by *Section 7.1(n) (Indebtedness)*;

(i)      Liens securing any Indebtedness permitted by *Section 7.1(p) (Indebtedness)*; *provided* that Liens securing such Indebtedness must be subject to an intercreditor agreement with the Administrative Agent, in form and substance reasonably satisfactory to the Lenders;

(j)      Liens securing any Indebtedness permitted by *Section 7.1(o) (Indebtedness)* on the assets acquired with the proceeds of such Indebtedness and any related intellectual property used in connection with any project funded with the proceeds of such Indebtedness; *provided* that the relevant Group Members will grant to the Administrative Agent, to the extent permitted by the applicable government or quasi-government entity, a second priority Lien on such assets or intellectual property, as the case may be; and

(k)      Liens not otherwise permitted by the foregoing clauses of this *Section 7.2* securing obligations or other liabilities (other than Indebtedness) of any Loan Party; *provided,*

*however*, that the Dollar Equivalent of the aggregate outstanding amount of all such obligations and liabilities shall not exceed $100,000,000 at any time.

### Section 7.3    Investments

No Group Member shall make or maintain, directly or indirectly, any Investment except for the following:

(a)    Investments existing on the date of this Agreement and disclosed on *Schedule 7.3* (*Existing Investments*) and extensions or renewals of such Investment to the extent not involving any additional Investments other than as the result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities, in each case pursuant to the terms of such Investments as in effect on the date of this Agreement;

(b)    Investments in cash and Cash Equivalents held in a Deposit Account or a Control Account or otherwise in compliance with *Section 6.11(a)* (*Control Accounts, Approved Deposit Accounts*);

(c)    Investments by any Excluded Foreign Subsidiary in cash or Cash Equivalents;

(d)    Investments in payment intangibles, chattel paper (each as defined in the UCC) and Accounts, notes receivable and similar items arising or acquired in the ordinary course of business consistent with the past practice of the Group Member;

(e)    Investments received in settlement of amounts due to the Borrower or any Subsidiary of the Borrower effected in the ordinary course of business;

(f)    Investments in connection with the Restructuring of the Parnassus Business by the Borrower and its Subsidiaries;

(g)    Investments by (i) any Loan Party in any other Loan Party, (ii) any Non-Loan Party in any other Non-Loan Party, or (iii) the Borrower or any other Group Member in connection with a Permitted Acquisition;

(h)    loans from a Non-Loan Party to a Loan Party which are referred to in the definition of, or otherwise constitute, Indebtedness permitted under *Section 7.1* (*Indebtedness*);

(i)    loans or advances to employees, officers and directors of any Group Member in the ordinary course of business (other than any loans or advances that would be in violation of Section 402 of the Sarbanes-Oxley Act); *provided, however,* that the Dollar Equivalent of the aggregate principal amount of all loans and advances permitted pursuant to this *clause (i)* shall not exceed $2,500,000 at any time (or such other amount as may be agreed between the Administrative Agent and the Borrower);

(j)    Guaranty Obligations permitted by *Section 7.1 (Indebtedness)*;

(k)    extensions of trade credit in the ordinary course of business, including, without limitation, to customers or advances, deposits and payment to or with suppliers, lessors or utilities or for workers' compensation or medical insurance;

(l)    customer financing in an amount not to exceed $50,000,000 at any time outstanding;

(m)    Investments in joint ventures; *provided* that the Dollar Equivalent of the aggregate amount of all Investments permitted pursuant to this *clause (m)*, together with all other Investments permitted under *clauses (n)* and *(o)* of this *Section 7.3*, shall not exceed the Permitted Investment Threshold Amount at any time;

(n)    Investments by Loan Parties in Non-Loan Parties; *provided* that the Dollar Equivalent of the aggregate amount of all Investments permitted pursuant to this *clause (n)*, together with all other Investments permitted under *clauses (m)* and *(o)* of this *Section 7.3*, shall not exceed the Permitted Investment Threshold Amount at any time; and

(o)    Investments not otherwise permitted hereby; *provided* that the Dollar Equivalent of the aggregate amount of all Investments permitted pursuant to this *clause (o)*, together with all other Investments permitted under *clauses (m)* and *(n)* of this *Section 7.3*, shall not exceed the Permitted Investment Threshold Amount at any time.

### Section 7.4    *Sale of Assets*

No Group Member shall sell, convey, transfer, lease or otherwise dispose of, any of their respective assets or any interest therein (including the sale or factoring at maturity or collection of any accounts) to any Person, or permit or suffer any other Person to acquire any interest in any of their respective assets or, except in the case of the Borrower, issue or sell any shares of their Stock or any Stock Equivalents (any such disposition being an "*Asset Sale*"), except for the following:

(a)    the sale or disposition of Cash Equivalents or Inventory, in each case in the ordinary course of business;

(b)    the sale or disposition of Equipment that has become obsolete or is no longer necessary for the efficient operation of the Parnassus Business, or is replaced in the ordinary course of business;

(c)    (i) a true lease or sublease of Real Property not constituting Indebtedness and not constituting a sale and leaseback transaction and (ii) a sale of assets pursuant to a sale and leaseback transaction;

(d)    assignments and licenses of intellectual property of Group Members in the ordinary course of business;

(e)    any Asset Sale to the Borrower or any Subsidiary Guarantor, or any assignment or license of intellectual property to any Group Member;

(f)    dispositions of accounts receivable pursuant to securitization or factoring arrangements permitted by *Section 7.1(l)* (*Indebtedness*); and

(g)    any other Asset Sale for Fair Market Value, so long as the cash consideration received in connection with such Asset Sale is at least 75% of the total consideration received and is paid on the closing date of such Asset Sale; *provided, however,* that

with respect to any such Asset Sale pursuant to this *clause (g)*, an amount equal to all Net Cash Proceeds of such Asset Sale are applied to the payment of the Obligations as set forth in, and to the extent required by, *Section 2.6 (Mandatory Prepayments)*.

### Section 7.5    Restricted Payments[3]

No Group Member shall, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment except for the following:

(a)    Restricted Payments by any Subsidiary of the Borrower to the Borrower or any Subsidiary Guarantor;

(b)    dividends and distributions declared and paid on the common Stock of the Borrower and payable only in common Stock of the Borrower;

(c)    cash dividends on the Stock of the Borrower paid and declared in any Fiscal Year solely for the purpose of funding any Permitted Equity Distributions; and

(d)    Restricted Payments by the Borrower to make the payments permitted by *Section 7.8(e)* (*Transactions with Affiliates*).

### Section 7.6    Restriction on Fundamental Changes; Permitted Acquisitions

No Group Member shall, (a) except in connection with a Permitted Acquisition or the Restructuring, (i) merge with any Person, (ii) consolidate with any Person, (iii) acquire all or substantially all of the Stock or Stock Equivalents of any Person or (iv) acquire all or substantially all of the assets of any Person or all or substantially all of the assets constituting the business of a division, branch or other unit operation of any Person, (b) except as permitted under *Section 7.3* (*Investments*) or in connection with a Permitted Acquisition or a Restructuring, enter into any joint venture or partnership with any Person or (c) acquire or create any Subsidiary unless, after giving effect to such creation or acquisition, (i) if such new Subsidiary is a Domestic Subsidiary, such new Subsidiary is a Wholly-Owned Subsidiary of the Borrower, (ii) the Borrower is in compliance with *Section 6.10 (Additional Collateral and Guaranties)* and (iii) the Investment in such Subsidiary is permitted under *Section 7.3 (Investments)*.

### Section 7.7    Change in Nature of Business

The Borrower shall ensure that no substantial change is made to the general nature of the Parnassus Business except as would be consistent with the Restructuring or in connection with Asset Sales permitted under *Section 7.4 (Sale of Assets)*.

### Section 7.8    Transactions with Affiliates

No Group Member shall, except as otherwise expressly permitted herein, or except on a basis no less favorable to the Borrower or, as the case may be, a Subsidiary thereof, as would be obtained in a comparable arm's length transaction with a Person not an Affiliate thereof, do any of the following transactions:

---

[3] Provision for making tax distributions based on structure to be agreed.

(a)    make any Investment in an Affiliate of the Borrower that is not (i) a Subsidiary of the Borrower or (ii) otherwise permitted by *Section 7.3(i)* (*Investments*);

(b)    transfer, sell, lease, assign or otherwise dispose of any asset to any Affiliate of the Borrower that is not a Subsidiary of the Borrower (other than Restricted Payments permitted under *Section 7.5 (Restricted Payments)*);

(c)    merge into or consolidate with or purchase or acquire assets from any Affiliate of the Borrower that is not a Subsidiary of the Borrower;

(d)    except as otherwise permitted under this Agreement, repay any Indebtedness to any Affiliate of the Borrower that is not a Subsidiary of the Borrower; or

(e)    enter into any other transaction directly or indirectly with or for the benefit of any Affiliate of the Borrower that is not a Guarantor (including guaranties and assumptions of obligations of any such Affiliate), except for, in the case of this *clause (e)*:

(i)    transactions on a basis no less favorable to the Borrower or, as the case may be, such Subsidiary thereof as would be obtained in a comparable arm's length transaction with a Person not an Affiliate thereof;

(ii)    salaries and other director or employee compensation to officers or directors of the Borrower or any of its Subsidiaries commensurate with current compensation levels;

(iii)    unless a Default or an Event of Default shall have occurred and be continuing or would result therefrom at the date of such payment, payments (other than payments described in *clauses (iv)* and *(v)* below) pursuant to the Parnassus Management Agreement, in an aggregate annual amount not to exceed an amount to be agreed between the Lenders and the Borrower;[4]

(iv)    expenses and indemnifications required to be paid pursuant to the Parnassus Management Agreement; and

(v)    on the Closing Date, the Borrower may reimburse the Platinum Investors for their out of pocket costs and expenses (including, without limitation, the fees and expenses of outside counsels, financial advisors and other consultants, and any filing or other fees with any Governmental Authority in connection with any notices or filings made pursuant to antitrust laws) incurred by the Platinum Investors in connection with its due diligence investigation of Delphi (or its Subsidiaries) and the negotiation and execution of this Agreement, the Related Documents or any other agreement related thereto, in an aggregate amount of not more than $[4,000,000].[5]

---

[4]  The Platinum Investors and GM will discuss in good faith a reasonable management and/or transaction fee payable to the Platinum Investors, recognizing the circumstances of the Group Members' business and the nature of the transaction. The Platinum Investors are open to utilizing the credit facility to fund such fees.

[5]  Limitation to be agreed.

**Section 7.9**    *Limitations on Restrictions on Subsidiary Distributions; No New Negative Pledge*

Except pursuant to the Loan Documents and any agreements governing Indebtedness or Capital Lease Obligations permitted by *Section 7.1(b), (d), (e), (i), (j)* or *(l) (Indebtedness)* (in the case of agreements permitted by such clauses, any prohibition or limitation shall only be effective against the assets financed thereby), no Group Member shall (a) agree to enter into or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of such Subsidiary to pay dividends or make any other distribution or transfer of funds or assets or make loans or advances to or other Investments in, or pay any Indebtedness owed to, any Group Member or (b) enter into or suffer to exist or become effective any agreement prohibiting or limiting the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues.

**Section 7.10**    *Modification of Constituent Documents*

No Group Member shall change its capital structure (including in the terms of its outstanding Stock) or otherwise amend its Constituent Documents, except for changes and amendments that do not materially affect the rights and privileges of any Group Member and do not materially affect the interests of the Secured Parties under the Loan Documents or in the Collateral.

**Section 7.11**    *Modification of Related Documents*

No Group Member shall (a) alter, rescind, terminate, amend, supplement, waive or otherwise modify any provision of any Related Document (except for modifications to the terms of the Subordinated Debt (or any indenture or agreement in connection therewith) permitted under *Section 7.12 (Modification of Debt Agreements)* and modifications that could not reasonably be expected to adversely affect the interests of the Secured Parties (i) under the Loan Documents or (ii) in the Collateral, in either case in any material respect) or (b) permit any breach or default to exist under any Related Document or take or fail to take any action thereunder, if to do so could reasonably be expected to have a Material Adverse Effect.

**Section 7.12**    *Modification of Debt Agreements*

No Group Member shall change or amend the terms of any Subordinated Debt (or any indenture or agreement or other material document entered into in connection therewith) if the effect of such amendment is to (a) increase the interest rate on such Subordinated Debt (other than interest which is paid-in-kind and not required to be paid in cash prior to the Scheduled Termination Date), (b) change the dates upon which payments of principal or interest are due on such Subordinated Debt other than to extend such dates, (c) change any default or event of default other than to delete or make less restrictive any default provision therein, (d) change the subordination provisions of such Subordinated Debt, (e) change the redemption or prepayment provisions of such Subordinated Debt other than to extend the dates therefor or to reduce the premiums payable in connection therewith or (f) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights to the holder of such Subordinated Debt in a manner adverse to the Secured Parties.

### Section 7.13      *Accounting Changes; Fiscal Year*

No Group Member shall change its (a) accounting treatment and reporting practices or tax reporting treatment, except as required by GAAP or any Requirement of Law and disclosed to the Lenders and the Administrative Agent or (b) Fiscal Year.

### Section 7.14      *Margin Regulations*

No Group Member shall use all or any portion of the proceeds of any credit extended hereunder to purchase or carry margin stock (within the meaning of Regulation U of the Federal Reserve Board) in contravention of Regulation U of the Federal Reserve Board.

### Section 7.15      *No Speculative Transactions*

No Group Member shall engage in any speculative transaction or in any transaction involving Hedging Contracts except for the sole purpose of hedging in the normal course of business and consistent with industry practices.

### Section 7.16      *Capital Expenditures*

The Borrower shall not make or incur, or permit to be made or incurred, Capital Expenditures during each Fiscal Year to be, in the aggregate, in excess of 5.0% of the budgeted gross revenues for the Borrower and its Subsidiaries for such Fiscal Year as reflected in the most recent business plan delivered to the Administrative Agent and the Lenders pursuant to *Section 5.1(f)* (*Business Plan*).

## ARTICLE VIII

## EVENTS OF DEFAULT

### Section 8.1      *Events of Default*

Each of the following events shall be an Event of Default:

(a)      the Borrower shall fail to pay any principal of any Loan when the same becomes due and payable; or

(b)      the Borrower shall fail to pay any interest on any Loan, any fee under any of the Loan Documents or any other Obligation (other than one referred to in *clause (a) above*) and such non-payment continues for a period of three Business Days after the due date therefor; or

(c)      any representation or warranty made or deemed made by any Loan Party in any Loan Document or by any Loan Party (or any of its officers) in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made; or

(d)        any Loan Party shall fail to perform or observe (i) any term, covenant or agreement contained in *Section 6.1 (Preservation of Corporate Existence, Etc.), 6.6 (Access), 6.9 (Application of Proceeds)*, or *6.10 (Additional Collateral and Guaranties)*, or *Article VII (Negative Covenants)*, (ii) or any term, covenant or agreement contained in *Section 5.1 (Financial Statements)* or *5.2 (Default Notices)*, if such failure under this *clause (ii)* shall remain unremedied for 5 Business Days after such information was required to be delivered to the Administrative Agent, or (iii) any other term, covenant or agreement contained in this Agreement or in any other Loan Document if such failure under this *clause (iii)* shall remain unremedied for 20 Business Days after the earlier of (A) the date on which a Responsible Officer of the Borrower becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender; or

(e)        (i) any Significant Subsidiary shall fail to make any payment on any Indebtedness of such Significant Subsidiary (other than the Obligations) or any Guaranty Obligation in respect of Indebtedness of any other Person, and, in each case, such failure relates to Indebtedness having a principal amount of $50,000,000 or more, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) after giving effect to any cure or grace periods, (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such Indebtedness having a principal amount of $50,000,000 or more, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness or (iii) any such Indebtedness having a principal amount of $50,000,000 or more shall become or be declared to be due and payable, or be required to be prepaid or repurchased (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(f)        (i) any Significant Subsidiary shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (ii) any proceeding shall be instituted by or against any Significant Subsidiary seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any Requirement of Law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; *provided, however,* that, in the case of any such proceedings instituted against any Significant Subsidiary (but not instituted by any Significant Subsidiary) either such proceedings shall remain undismissed or unstayed for a period of 20 Business Days or more or any action sought in such proceedings shall occur or (iii) any Significant Subsidiary shall take any corporate action to authorize any action set forth in *clauses (i)* or *(ii) above*; or

(g)        one or more judgments or orders (or other similar process) involving, in the case of money judgments, an aggregate amount whose Dollar Equivalent exceeds $50,000,000, to the extent not covered by insurance, shall be rendered against one or more of the Borrower and its Subsidiaries and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 20 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect, or such judgment shall not have been paid, vacated or discharged; or

(h)      an ERISA Event shall occur and the Dollar Equivalent of the amount of all liabilities and deficiencies resulting therefrom, whether or not assessed, exceeds $100,000,000 in the aggregate; or

(i)      any material provision of any Loan Document after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, any Loan Party that is a party thereto, or any Loan Party shall so state in writing; or

(j)      any Collateral Document with respect to Collateral having a Fair Market Value in excess of $25,000,000 shall for any reason fail or cease to create a valid and enforceable Lien on any Collateral purported to be covered thereby or, except as permitted by the Loan Documents, such Lien shall fail or cease to be a perfected and first priority Lien, or any Loan Party shall so state in writing; or

(k)      there shall occur any Change of Control; or

(l)      one or more Group Member shall have entered into one or more consent or settlement decrees or agreements or similar arrangements with a Governmental Authority or one or more judgments, orders, decrees or similar actions shall have been entered against one or more Group Members based on or arising from the violation of or pursuant to any Environmental Law, or the generation, storage, transportation, treatment, disposal or Release of any Contaminant and, in connection with all the foregoing, any Group Member is likely to incur Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect.

### Section 8.2      Remedies

During the continuance of any Event of Default, the Administrative Agent may and, at the request of the Requisite Lenders, shall, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; *provided, however*, that upon the occurrence of the Events of Default specified in *Section 8.1(f) (Events of Default)*, the Loans, all such interest and all such amounts and Obligations shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower. In addition to the remedies set forth above, the Administrative Agent may exercise any remedies provided for by the Collateral Documents in accordance with the terms thereof or any other remedies provided by applicable law.

# ARTICLE IX

# THE ADMINISTRATIVE AGENT

### Section 9.1      Authorization and Action

(a)      Each Lender hereby appoints GM as the Administrative Agent hereunder and each Lender authorizes the Administrative Agent to take such action as agent on its behalf

and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents and, in the case of the Collateral Documents, to act as agent for the Lenders and the other Secured Parties under such Collateral Documents.

(b)      As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Requisite Lenders, and such instructions shall be binding upon all Lenders; *provided, however,* that the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to personal liability unless the Administrative Agent receives an indemnification satisfactory to it from the Lenders with respect to such action or (ii) is contrary to this Agreement or applicable law. The Administrative Agent agrees to give to each Lender prompt notice of each notice given to it by any Loan Party pursuant to the terms of this Agreement or the other Loan Documents.

(c)      In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders except to the limited extent provided in *Section 2.4(b)*, and its duties are entirely administrative in nature. The Administrative Agent does not assume and shall not be deemed to have assumed any obligation other than as expressly set forth herein and in the other Loan Documents or any other relationship as the agent, fiduciary or trustee of or for any Lender or holder of any other Obligation. The Administrative Agent may perform any of its duties under any Loan Document by or through its agents or employees.

### Section 9.2      *Administrative Agent's Reliance, Etc.*

None of the Administrative Agent, any of its Affiliates or any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it, him, her or them under or in connection with this Agreement or the other Loan Documents, except for its, his, her or their own gross negligence or willful misconduct. Without limiting the foregoing, the Administrative Agent (a) may treat the payee of any Note as its holder until such Note has been assigned in accordance with *Section 10.2 (Assignments and Participations)*, (b) may rely on the Register to the extent set forth in *Section 2.4 (Evidence of Debt)*, (c) may consult with legal counsel (including counsel to the Borrower or any other Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (d) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made by or on behalf of any Group Member in or in connection with this Agreement or any other Loan Document, (e) shall not have any duty to ascertain or to inquire either as to the performance or observance of any term, covenant or condition of this Agreement or any other Loan Document, as to the financial condition of any Loan Party or as to the existence or possible existence of any Default or Event of Default, (f) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the attachment,

perfection or priority of any Lien created or purported to be created under or in connection with, this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto or thereto and (g) shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which writing may be a telecopy or electronic mail) or any telephone message believed by it to be genuine and signed or sent by the proper party or parties.

### Section 9.3    The Administrative Agent Individually

With respect to its Ratable Portion, GM shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender. The terms "*Lenders*", "*Requisite Lenders*" and any similar terms shall, unless the context clearly otherwise indicates, include, without limitation, the Administrative Agent in its individual capacity as a Lender or as one of the Requisite Lenders. GM and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with, any Loan Party as if GM were not acting as the Administrative Agent.

### Section 9.4    Lender Credit Decision

Each Lender acknowledges that it shall, independently and without reliance upon the Administrative Agent or any other Lender, conduct its own independent investigation of the financial condition and affairs of the Borrower and each other Loan Party in connection with the making and continuance of the Loans. Each Lender also acknowledges that it shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and other Loan Documents. Except for the documents expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lenders, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party that may come into the possession of the Administrative Agent or any Affiliate thereof or any employee or agent of any of the foregoing.

### Section 9.5    Indemnification

Each Lender agrees to indemnify the Administrative Agent and each of its Affiliates, and each of their respective directors, officers, employees, agents and advisors (to the extent not reimbursed by the Borrower), from and against such Lender's aggregate Ratable Portion of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements (including fees, expenses and disbursements of financial and legal advisors) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against, the Administrative Agent or any of its Affiliates, directors, officers, employees, agents and advisors in any way relating to or arising out of this Agreement or the other Loan Documents or any action taken or omitted by the Administrative Agent under this Agreement or the other Loan Documents; *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or such Affiliate's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including fees, expenses and disbursements of financial and legal advisors) incurred by the

Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of its rights or responsibilities under, this Agreement or the other Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower or another Loan Party.

### Section 9.6        Successor Administrative Agent

The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Requisite Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, selected from among the Lenders.  In either case, such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required upon the occurrence and during the continuance of an Event of Default).  Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.   After such resignation, the retiring Administrative Agent shall continue to have the benefit of this *Article IX* as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

### Section 9.7        Concerning the Collateral and the Collateral Documents

(a)       Each Lender agrees that any action taken by the Administrative Agent or the Requisite Lenders (or, where required by the express terms of this Agreement, a greater proportion of the Lenders) in accordance with the provisions of this Agreement or of the other Loan Documents, and the exercise by the Administrative Agent or the Requisite Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders and other Secured Parties.  Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive right and authority to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection herewith and with the Collateral Documents, (ii) execute and deliver each Collateral Document and accept delivery of each such agreement delivered by any Group Member, (iii) act as collateral agent for the Lenders and the other Secured Parties for purposes of the perfection of all security interests and Liens created by such agreements and all other purposes stated therein, *provided*, *however*, that the Administrative Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for the Administrative Agent and the Lenders for purposes of the perfection of all security interests and Liens with respect to the Collateral, including any Deposit Accounts maintained by a Loan Party with, and cash and Cash Equivalents held by, such Lender, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such action as is necessary or desirable to maintain the perfection and priority of the

security interests and Liens created or purported to be created by the Collateral Documents and (vi) except as may be otherwise specifically restricted by the terms hereof or of any other Loan Document, exercise all remedies given to the Administrative Agent, the Lenders and the other Secured Parties with respect to the Collateral under the Loan Documents relating thereto, applicable law or otherwise.

        (b)        Each of the Lenders hereby consents to the release and hereby directs, in accordance with the terms hereof, the Administrative Agent to release (or, in the case of *clause (ii)* below, release or subordinate) any Lien held by the Administrative Agent for the benefit of the Lenders against any of the following:

        (i)        all of the Collateral and all Loan Parties, upon termination of the Commitments and payment and satisfaction in full of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable;

        (ii)        any assets that are subject to a Lien permitted by *Section 7.2(d)* or *(e) (Liens, Etc.)*; and

        (iii)        any part of the Collateral sold or disposed of by a Loan Party if such sale or disposition is permitted by this Agreement (or permitted pursuant to a waiver of or consent to a transaction otherwise prohibited by this Agreement).

Each of the Lenders hereby directs the Administrative Agent to execute and deliver or file such termination and partial release statements and do such other things as are necessary to release Liens to be released pursuant to this *Section 9.7* promptly upon the effectiveness of any such release.

### Section 9.8        *Collateral Matters Relating to Related Obligations*

        The benefit of the Loan Documents and of the provisions of this Agreement relating to the Collateral shall extend to and be available in respect of any Obligation that is otherwise owed to Persons other than the Administrative Agent and the Lenders (collectively, "*Related Obligations*") solely on the condition and understanding, as among the Administrative Agent and all Secured Parties, that (a) the Related Obligations shall be entitled to the benefit of the Loan Documents and the Collateral to the extent expressly set forth in this Agreement and the other Loan Documents and to such extent the Administrative Agent shall hold, and have the right and power to act with respect to, the Guaranty and the Collateral on behalf of and as agent for the holders of the Related Obligations, but the Administrative Agent is otherwise acting solely as agent for the Lenders and shall have no fiduciary duty, duty of loyalty, duty of care, duty of disclosure or other obligation whatsoever to any holder of Related Obligations, (b) all matters, acts and omissions relating in any manner to the Guaranty, the Collateral, or the omission, creation, perfection, priority, abandonment or release of any Lien, shall be governed solely by the provisions of this Agreement and the other Loan Documents and no separate Lien, right, power or remedy shall arise or exist in favor of any Secured Party under any separate instrument or agreement or in respect of any Related Obligation, (c) each Secured Party shall be bound by all actions taken or omitted, in accordance with the provisions of this Agreement and the other Loan Documents, by the Administrative Agent and the Requisite Lenders, each of whom shall be entitled to act at its sole discretion and exclusively in its own interest given its own Commitments and its own interest in the Loans and other Obligations to it arising under this Agreement or the other Loan Documents, without any duty or liability to any other Secured Party or as to any

Related Obligation and without regard to whether any Related Obligation remains outstanding or is deprived of the benefit of the Collateral or becomes unsecured or is otherwise affected or put in jeopardy thereby, (d) no holder of Related Obligations and no other Secured Party (except the Administrative Agent and the Lenders, to the extent set forth in this Agreement) shall have any right to be notified of, or to direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under this Agreement or the Loan Documents and (e) no holder of any Related Obligation shall exercise any right of setoff, banker's lien or similar right except to the extent provided in *Section 10.6 (Right of Set-off)* and then only to the extent such right is exercised in compliance with *Section 10.7 (Sharing of Payments, Etc.)*.

## ARTICLE X

## MISCELLANEOUS

### Section 10.1      *Amendments, Waivers, Etc.*

(a)      No amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Deposit Account Control Agreements and the Securities Account Control Agreements) nor consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be in writing and (x) in the case of any such waiver or consent, signed by the Requisite Lenders (or by the Administrative Agent with the consent of the Requisite Lenders) and (y) in the case of any other amendment, by the Requisite Lenders (or by the Administrative Agent with the consent of the Requisite Lenders) and the Borrower, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however*, that no amendment, waiver or consent shall, unless in writing and signed by each Lender directly affected thereby, in addition to the Requisite Lenders (or the Administrative Agent with the consent thereof), do any of the following:

(i)      waive any condition specified in *Section 3.1 (Conditions Precedent to the Initial Loans)* or *Section 3.2 (Conditions Precedent to Each Loan)*, except with respect to a condition based upon another provision hereof, the waiver of which requires only the concurrence of the Requisite Lenders and, in the case of the conditions specified in *Section 3.1 (Conditions Precedent to the Initial Loans)* or *Section 3.2 (Conditions Precedent to Each Loan)*, subject to the provisions of *Section 3.3 (Determinations of Borrowing Conditions)*;

(ii)      increase any Commitment of any Lender or subject any Lender to any additional obligation;

(iii)      extend the scheduled final maturity of any Loan owing to such Lender, or waive, reduce or postpone any scheduled date fixed for the payment or reduction of principal or interest of any such Loan or fees owing to such Lender (it being understood that *Section 2.6 (Mandatory Prepayments)* does not provide for scheduled dates fixed for payment) or for the reduction of such Lender's Commitment;

(iv)      reduce, or release the Borrower from its obligations to repay, the principal amount of any Loan owing to such Lender (other than by the payment or prepayment thereof);

(v)    reduce the rate of interest on any Loan outstanding and owing to such Lender or any fee payable hereunder to such Lender;

(vi)    expressly subordinate any of the Obligations or any Liens securing the Obligations;

(vii)    postpone any scheduled date fixed for payment of interest or fees owing to such Lender or waive any such payment;

(viii)    change the aggregate Ratable Portions of Lenders required for any or all Lenders to take any action hereunder;

(ix)    release all or substantially all of the Collateral except as provided in *Section 9.7(b) (Concerning the Collateral and the Collateral Documents)* or release the Borrower from its payment obligation to such Lender under this Agreement or the Notes owing to such Lender (if any) or release any Guarantor from its obligations under the Guaranty except in connection with the sale or other disposition of a Subsidiary Guarantor (or all or substantially all of the assets thereof) permitted by this Agreement (or permitted pursuant to a waiver or consent of a transaction otherwise prohibited by this Agreement); or

(x)    amend *Section 9.7(b) (Concerning the Collateral and the Collateral Documents), Section 10.7 (Sharing of Payments, Etc.),* this *Section 10.1* or either definition of the terms "*Requisite Lenders*" or "*Ratable Portion*";

and *provided, further* that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or the other Loan Documents; and *provided, further* that the Administrative Agent may, with the consent of the Borrower, amend, modify or supplement this Agreement to cure any ambiguity, omission, defect or inconsistency, so long as such amendment, modification or supplement does not adversely affect the rights of any Lender.

(b)    The Administrative Agent may, but shall have no obligation to, with the written concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

### Section 10.2    *Assignments and Participations*

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of *clause (b) below* or (ii) by way of participation in accordance with the provisions of *clause (g)* below. Nothing in this Agreement, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their

respective successors and permitted assigns, Participants to the extent provided in *clause (g)* below, and, to the extent expressly contemplated hereby, each of the Administrative Agent and the Lenders, their respective Affiliates and each of their respective partners, directors, officers, employees, agents, trustee, representatives, attorneys, consultants and advisors) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Each Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations hereunder; *provided, however,* that any such assignment shall be subject to the following conditions:

(i)    No consent shall be required for any assignment except:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default shall have occurred and be continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person who is not a Lender or an Affiliate of a Lender.

(ii)    The parties to each assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note (if the assigning Lender's Loans are evidenced by a Note), subject to such assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(c)    Subject to acceptance and recording thereof by the Administrative Agent in the Register pursuant to *Section 2.4 (Evidence of Debt)*, from and after the later of (i) the date such assignment is recorded in the Register and (ii) the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, (B) the Notes (if any) corresponding to the Loans assigned thereby shall be transferred to such assignee by notation in the Register and (C) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under the Loan Documents (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of *Sections 2.9 (Taxes), 10.3 (Costs and Expenses), 10.4 (Indemnities)* and *10.5 (Limitation of Liability)* with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *clause (g)* of this *Section 10.2*.

(d)    The Administrative Agent shall maintain at its address referred to in *Section 10.8 (Notices, Etc.)* a copy of each Assignment and Acceptance delivered to and accepted by it and shall record in the Register the names and addresses of the Lenders and the principal amount of the Loans (and stated interest thereon) owing to each Lender from time to time and the

Commitments of each Lender. Any assignment pursuant to this *Section 10.2* shall not be effective until such assignment is recorded in the Register.

(e)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, the Administrative Agent shall, if such Assignment and Acceptance has been completed, (i) accept such Assignment and Acceptance, (ii) record or cause to be recorded the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. Within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall, if requested by such assignee, execute and deliver to the Administrative Agent, new Notes payable to such assignee in an amount equal to the Commitments assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has surrendered any Note for exchange in connection with the assignment and has retained Commitments hereunder, new Notes payable to the assigning Lender in an amount equal to the Commitments retained by it hereunder. Such new Notes shall be dated the same date as the surrendered Notes and be in substantially the form of *Exhibit B (Form of Note)*.

(f)    In addition to the other assignment rights provided in this *Section 10.2*, each Lender may pledge or assign a security interest in all or any portion of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans) to secure obligations of such Lender without notice to or consent of the Administrative Agent or the Borrower, including any pledge or assignment to secure obligations to any Federal Reserve Bank (pursuant to Regulation A of the Federal Reserve Board);

*provided, however*, that no such assignment or grant shall release such Lender from any of its obligations hereunder except, in the case of a subsequent foreclosure pursuant to an assignment as collateral, if such foreclosure is made in compliance with the other provisions of this *Section 10.2* other than this *clause (f)* or *clause (g)* below.

(g)    (i)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Eligible Assignee (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(ii)    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that would (A) reduce the amount, or postpone any date fixed for, any amount (whether of principal, interest or fees) payable to such Participant under the Loan Documents, to which such Participant would otherwise be entitled under such participation or (B) result in the release of all or substantially all of the Collateral other than in accordance with *Section 9.7(b) (Concerning the Collateral and the Collateral Documents)*. Subject to *clause (h)* below, the Borrower agrees that each Participant shall be entitled to the benefits of *Section 2.9 (Taxes)* to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to *clause (b) above*, but only to the

extent such Participant complies with the obligations of *Section 2.9 (Taxes)* as though it were a Lender at the time such Participant is claiming such benefits thereto. To the extent permitted by law, each Participant also shall be entitled to the benefits of *Section 10.6 (Right of Set-off)* as though it were a Lender, provided such Participant agrees to be subject to *Section 10.7 (Sharing of Payments, Etc.)* as though it were a Lender.

(h)    A Participant shall not be entitled to receive any greater payment under *Section 2.9 (Taxes)* than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(i)    The words "*execution*," "*signed*," "*signature*," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### Section 10.3    Costs and Expenses

(a)    The Borrower agrees upon demand to pay, or reimburse the Administrative Agent for, all of the Administrative Agent's reasonable internal and external audit, legal, appraisal, valuation, filing, document duplication and reproduction and investigation expenses and for all other reasonable out-of-pocket costs and expenses of every type and nature (including the reasonable fees, expenses and disbursements of the Administrative Agent's counsel, Weil, Gotshal & Manges LLP, local legal counsel, auditors, accountants, appraisers, printers, insurance and environmental advisors, and other consultants and agents) incurred by the Administrative Agent in connection with any of the following: (i) the Administrative Agent's audit and investigation of the Group Members in connection with the preparation, negotiation or execution of any Loan Document or the Administrative Agent's periodic audits of the Group Members, as the case may be, (ii) the preparation, negotiation, execution or interpretation of this Agreement (including, without limitation, the satisfaction or attempted satisfaction of any condition set forth in *Article III (Conditions To Loans)*), any Loan Document or any proposal letter or commitment letter issued in connection therewith, or the making of the Loans hereunder, (iii) the creation, perfection or protection of the Liens under any Loan Document (including any reasonable fees, disbursements and expenses for local counsel in various jurisdictions), (iv) the ongoing administration of this Agreement and the Loans, including consultation with attorneys in connection therewith and with respect to the Administrative Agent's rights and responsibilities hereunder and under the other Loan Documents, (v) the protection, collection or enforcement of any Obligation or the enforcement of any Loan Document, (vi) the commencement, defense or intervention in any court proceeding relating in any way to the Obligations, any Loan Party, any of the Borrower's Subsidiaries, the Acquisition, the Related Documents, this Agreement or any other Loan Document, (vii) the response to, and preparation for, any subpoena or request for document production with which the Administrative Agent is served or deposition or other proceeding in which the Administrative Agent is called to testify, in each case, relating in any way to the Obligations, any Loan Party, any of the Borrower's Subsidiaries, the Acquisition, the Related Documents, this Agreement or any other Loan Document or (viii) any amendment,

consent, waiver, assignment, restatement, or supplement to any Loan Document or the preparation, negotiation and execution of the same.

(b)    The Borrower further agrees to pay or reimburse the Administrative Agent and each of the Lenders upon demand for all documented out-of-pocket costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel and costs of settlement), incurred by the Administrative Agent or such Lenders in connection with any of the following: (i) in enforcing any Loan Document or Obligation or any security therefor or exercising or enforcing any other right or remedy available by reason of an Event of Default, (ii) in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "*work-out*" or in any insolvency or bankruptcy proceeding, (iii) in commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to the Obligations, any Loan Party, any of the Borrower's Subsidiaries and related to or arising out of the transactions contemplated hereby or by any other Loan Document or Related Document or (iv) in taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in *clause (i), (ii)* or *(iii) above*.

(c)    The foregoing *clauses (a)* and *(b)* of this *Section 10.3* shall not apply to Taxes, or any Taxes excluded from the definition of "Taxes" pursuant to *Section 2.9(a) (Taxes)*, each of which shall be solely covered by *Section 2.9 (Taxes)* of this Agreement.

### Section 10.4    Indemnities

(a)    The Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and each of their respective Affiliates, and each of the directors, officers, employees, agents, trustees, representatives, attorneys, consultants and advisors of or to any of the foregoing (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in *Article III (Conditions To Loans)* (each such Person being an "*Indemnitee*")) from and against any and all claims, damages, liabilities, obligations, losses, penalties, actions, judgments, suits, costs, disbursements and expenses, joint or several, of any kind or nature (including fees, disbursements and expenses of financial and legal advisors to any such Indemnitee) that may be imposed on, incurred by or asserted against any such Indemnitee in connection with or arising out of any investigation, litigation or proceeding, whether or not such investigation, litigation or proceeding is brought by any such Indemnitee or any of its directors, security holders or creditors or any such Indemnitee, director, security holder or creditor is a party thereto, whether direct, indirect, or consequential and whether based on any federal, state or local law or other statutory regulation, securities or commercial law or regulation, or under common law or in equity, or on contract, tort or otherwise, in any manner relating to or arising out of this Agreement, any other Loan Document, any Obligation, any Related Document, or any act, event or transaction related or attendant to any thereof, or the use or intended use of the proceeds of the Loans or in connection with any investigation of any potential matter covered hereby (collectively, the "*Indemnified Matters*"); provided, however, that the Borrower shall not have any liability under this *Section 10.4* to an Indemnitee with respect to any Indemnified Matter that has resulted primarily from the gross negligence or willful misconduct of that Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(b)    The Borrower shall indemnify the Administrative Agent and the Lenders for, and hold the Administrative Agent and the Lenders harmless from and against, any and all claims for brokerage commissions, fees and other compensation made against the Administrative

Agent and the Lenders for any broker, finder or consultant with respect to any agreement, arrangement or understanding made by or on behalf of any Loan Party or any of its Subsidiaries in connection with the transactions contemplated by this Agreement.

(c)     The Borrower, at the request of any Indemnitee, shall have the obligation to defend against any investigation, litigation or proceeding or requested Remedial Action, in each case contemplated in *clause (a)* above, and the Borrower, in any event, may participate in the defense thereof with legal counsel of the Borrower's choice.   In the event that such Indemnitee requests the Borrower to defend against such investigation, litigation or proceeding or requested Remedial Action, the Borrower shall promptly do so and such Indemnitee shall have the right to have legal counsel of its choice participate in such defense.  No action taken by legal counsel chosen by such Indemnitee in defending against any such investigation, litigation or proceeding or requested Remedial Action, shall vitiate or in any way impair the Borrower's obligation and duty hereunder to indemnify and hold harmless such Indemnitee.

(d)     The Borrower agrees that any indemnification or other protection provided to any Indemnitee pursuant to this Agreement (including pursuant to this *Section 10.4*) or any other Loan Document shall (i) survive payment in full of the Obligations and (ii) inure to the benefit of any Person that was at any time an Indemnitee under this Agreement or any other Loan Document.

(e)     The foregoing *clauses (a), (b), (c)* and *(d)* of this Section 10.4 shall not apply to Taxes, or any Taxes excluded from the definition of "Taxes" pursuant to *Section 2.9(a) (Taxes)*, each of which shall be solely covered by *Section 2.9 (Taxes)* of this Agreement.

### Section 10.5     Limitation of Liability

(a)     The Borrower agrees that no Indemnitee shall have any liability (whether in contract, tort or otherwise) to any Loan Party or any of their respective Subsidiaries or any of their respective equity holders or creditors for or in connection with the transactions contemplated hereby and in the other Loan Documents and Related Documents, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnitee's gross negligence, bad faith or willful misconduct. In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).  The Borrower hereby waives, releases and agrees (each for itself and on behalf of its Subsidiaries) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(b)     IN NO EVENT SHALL ANY AGENT AFFILIATE HAVE ANY LIABILITY TO ANY LOAN PARTY, LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT OR CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY OR ANY AGENT AFFILIATE'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT SUCH LIABILITY OF ANY AGENT AFFILIATE IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT AFFILIATE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

### Section 10.6    *Right of Set-off*

Upon the occurrence and during the continuance of any Event of Default each Lender and each Affiliate of a Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender or its Affiliates to or for the credit or the account of any Group Member against any and all of the Obligations now or hereafter existing whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and even though such Obligations may be unmatured. Each Lender agrees promptly to notify the Borrower after any such set-off and application made by such Lender or its Affiliates; *provided*, *however*, that the failure to give such notice shall not affect the validity of such set-off and application. Each Lender agrees that it shall not, without the express consent of the Requisite Lenders (and that, it shall, to the extent lawfully entitled to do so, upon the request of the Requisite Lenders) exercise its set-off rights under this *Section 10.6* against any deposit accounts of the Loan Parties and their Subsidiaries maintained with such Lender or any Affiliate thereof. The rights of each Lender under this *Section 10.6* are in addition to the other rights and remedies (including other rights of set-off) that such Lender may have.

### Section 10.7    *Sharing of Payments, Etc.*

(a)    If any Lender (directly or through an Affiliate thereof) obtains any payment (whether voluntary, involuntary, through the exercise of any right of set-off (including pursuant to *Section 10.6 (Right of Set-off)*) or otherwise) of the Loans owing to it, any interest thereon, fees in respect thereof or amounts due pursuant to *Section 10.3 (Costs and Expenses)* or *10.4 (Indemnities)*, *2.9 (Taxes)* or otherwise receives any Collateral or any *"Proceeds"* (as defined in the Pledge and Security Agreement) of Collateral (other than any payments pursuant to *Section 2.9 (Taxes)*) (in each case, whether voluntary, involuntary, through the exercise of any right of set-off (including pursuant to *Section 10.6 (Right of Set-off)*) or otherwise) in excess of its Ratable Portion of all payments of such Obligations obtained by all the Lenders, such Lender (a *"Purchasing Lender"*) shall forthwith purchase from the other Lenders (each, a *"Selling Lender"*) such participations in their Loans or other Obligations as shall be necessary to cause such Purchasing Lender to share the excess payment ratably with each of them.

(b)    If all or any portion of any payment received by a Purchasing Lender is thereafter recovered from such Purchasing Lender, such purchase from each Selling Lender shall be rescinded and such Selling Lender shall repay to the Purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Selling Lender's ratable share (according to the proportion of (i) the amount of such Selling Lender's required repayment in relation to (ii) the total amount so recovered from the Purchasing Lender) of any interest or other amount paid or payable by the Purchasing Lender in respect of the total amount so recovered.

(c)    The Borrower agrees that any Purchasing Lender so purchasing a participation from a Selling Lender pursuant to this *Section 10.7* may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**Section 10.8    Notices, Etc.**

(a)    *Addresses for Notices.*   All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, or by any telecommunication device capable of creating a written record (including electronic mail), and addressed to the party to be notified as follows:

(i)    if to the Borrower:

[Parnassus Acquiror]
[Address]
Attention: [●]
Telecopy no: [●]
E-Mail Address: [●]

and

Platinum Equity, LLC
360 North Crescent Drive, South Bldg
Beverly Hills, California 90210
Attention:  General Counsel
Telephone:  (310) 712-1850
Facsimile:  (310) 772-2694

with a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention:  Frederic L. Ragucci
Facsimile:  (212) 756-200
Email:  frederic.ragucci@srz.com

(ii)    if to any Lender, at the address specified opposite its name on *Schedule II (Addresses for Notices)* or on the signature page of any applicable Assignment and Acceptance; and

(iii)    if to the Administrative Agent:

General Motors Corporation
767 Fifth Avenue
New York, NY  10153
Attention:  Director of Business Development
Facsimile:  (212) 418-3623

and

General Motors Corporation
300 Renaissance Center
Detroit, MI  48265
Attention:  General Counsel
Facsimile:  (313) 665-4960

with a copy to:

Weil, Gotshal & Manges, LLP
767 Fifth Avenue,
New York, New York 10153-0119
Attention:  Ted Waksman, Esq., and Richard A. Ginsburg, Esq.
Telecopy no:  (212) 310-8007
E-Mail: ted.waksman@weil.com and richard.ginsburg@weil.com

or at such other address as shall be notified in writing (x) in the case of the Borrower and the Administrative Agent, to the other parties and (y) in the case of all other parties, to the Borrower and the Administrative Agent.

(b)    *Effectiveness of Notices*.  All notices, demands, requests, consents and other communications described in *clause (a)* above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, (ii) if delivered by mail, when deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in *clause (a)* above; *provided, however*, that notices and communications to the Administrative Agent pursuant to *Article II (The Facility)* or *Article IX (The Administrative Agent)* shall not be effective until received by the Administrative Agent.

### Section 10.9    No Waiver; Remedies

No failure on the part of any Lender or the Administrative Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.   The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

### Section 10.10    Governing Law

This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

### Section 10.11    Submission to Jurisdiction; Service of Process

(a)    Any legal action or proceeding with respect to this Agreement or any other Loan Document may be brought in the courts of the State of New York located in the City of New York or of the United States of America for the Southern District of New York, and, by execution and delivery of this Agreement, the Borrower hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or

based on the grounds of *forum non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

(b)    The Borrower hereby irrevocably consents to the service of any and all legal process, summons, notices and documents in any suit, action or proceeding brought in the United States of America arising out of or in connection with this Agreement or any other Loan Document by the mailing (by registered or certified mail, postage prepaid) or delivering of a copy of such process to the Borrower at its address specified in *Section 10.8 (Notices, Etc.)*. The Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Nothing contained in this *Section 10.11* shall affect the right of the Administrative Agent or any Lender to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against the Borrower or any other Loan Party in any other jurisdiction.

(d)    If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder in Dollars into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase Dollars with such other currency at the spot rate of exchange quoted by the Administrative Agent at 11:00 a.m. (New York time) on the Business Day preceding that on which final judgment is given, for the purchase of Dollars, for delivery two Business Days thereafter.

### Section 10.12    Waiver of Jury Trial

EACH OF THE ADMINISTRATIVE AGENT, THE LENDERS AND THE BORROWER IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

### Section 10.13    Marshaling; Payments Set Aside

None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations. To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders or any such Person receives payment from the proceeds of the Collateral or exercises their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, right and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

### Section 10.14    Section Titles

The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto, except when used to reference a section. Any reference to the number of a clause, sub-clause or subsection hereof immediately followed by a reference in parenthesis to

the title of the Section containing such clause, sub-clause or subsection is a reference to such clause, sub-clause or subsection and not to the entire Section; *provided, however*, that, in case of direct conflict between the reference to the title and the reference to the number of such Section, the reference to the title shall govern absent manifest error. If any reference to the number of a Section (but not to any clause, sub-clause or subsection thereof) is followed immediately by a reference in parenthesis to the title of a Section, the title reference shall govern in case of direct conflict absent manifest error.

### Section 10.15    Effectiveness; Execution in Counterparts

This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have been notified by each Lender that such Lender has executed it. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed signature page of this Agreement by facsimile transmission, electronic mail shall be as effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all parties shall be lodged with the Borrower and the Administrative Agent.

### Section 10.16    Entire Agreement

This Agreement, together with all of the other Loan Documents and all certificates and documents delivered hereunder or thereunder, embodies the entire agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. In the event of any conflict between the terms of this Agreement and any other Loan Document, the terms of this Agreement shall govern.

### Section 10.17    Confidentiality

Each Lender and the Administrative Agent agree to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder, (f) subject to an agreement containing provisions substantially the same as those of this *Section 10.17*, to (i) any assignee of or Participant in any option described in *Section 10.2 (Assignments and Participations)* or any prospective assignee of or Participant in any option described in *Section 10.2 (Assignments and Participations)*, any of its rights or obligations under this Agreement or (ii) any actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) to any swap or derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder, (iii) any rating agency or (iv) the CUSIP

Service Bureau or any similar organization, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this *Section 10.17* or (ii) becomes available to the Administrative Agent or any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.  Any Person required to maintain the confidentiality of the Information as provided in this *Section 10.17* shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

### Section 10.18    Patriot Act Notice.

Each Lender subject to the Patriot Act hereby notifies the Borrower that, pursuant to Section 326 of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, including the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**[PARNASSUS ACQUIROR]**,
*as Borrower*

By: _____
    Name:
    Title:

**GENERAL MOTORS CORPORATION**,
*as Administrative Agent*

By: _____
    Name:
    Title:

**GENERAL MOTORS CORPORATION**,
*as Lender*

By: _____
    Name:
    Title:

**PARNASSUS FUNDING, LLC**,
*as Lender*

By: _____
    Name:
    Title:

**SCHEDULE I TO**
**CREDIT AGREEMENT**


**<u>COMMITMENTS</u>**


| Lender | Amount |
|---|---|
| General Motors Corporation | $500,000,000 |
| Parnassus Funding, LLC | $250,000,000 |
| | |
| Total: | $750,000,000 |

# TABLE OF CONTENTS

ARTICLE I        DEFINITIONS, INTERPRETATION AND ACCOUNTING
                 TERMS ................................................................................. 1

    Section 1.1    Defined Terms ............................................................. 1

    Section 1.2    Computation of Time Periods ..................................... 21

    Section 1.3    Accounting Terms and Principles ................................ 21

    Section 1.4    Conversion of Foreign Currencies ............................. 21

    Section 1.5    Certain Terms .............................................................. 22

ARTICLE II       THE FACILITY ................................................................. 22

    Section 2.1    The Commitments ....................................................... 22

    Section 2.2    Borrowing Procedures ................................................ 23

    Section 2.3    Repayment of Loans ................................................... 24

    Section 2.4    Evidence of Debt ........................................................ 24

    Section 2.5    Optional Prepayments ................................................ 25

    Section 2.6    Mandatory Prepayments ............................................ 25

    Section 2.7    Interest ........................................................................ 26

    Section 2.8    Payments and Computations ...................................... 26

    Section 2.9    Taxes ........................................................................... 28

ARTICLE III      CONDITIONS TO LOANS ................................................ 31

    Section 3.1    Conditions Precedent to the Initial Loans .................. 31

    Section 3.2    Conditions Precedent to Each Loan ........................... 34

    Section 3.3    Determinations of Borrowing Conditions .................. 34

    Section 3.4    Post-Closing Obligations ........................................... 35

ARTICLE IV       REPRESENTATIONS AND WARRANTIES .................... 35

    Section 4.1    Corporate Existence; Compliance with Law ............. 35

    Section 4.2    Corporate Power; Authorization; Enforceable Obligations ................. 36

    Section 4.3    Ownership of Borrower; Subsidiaries; Borrower Information ............. 37

    Section 4.4    Material Adverse Change ........................................... 37

    Section 4.5    Litigation .................................................................... 37

    Section 4.6    Taxes ........................................................................... 37

    Section 4.7    Full Disclosure ........................................................... 38

    Section 4.8    Margin Regulations .................................................... 38

**TABLE OF CONTENTS**
**(continued)**

**Page**

Section 4.9    No Burdensome Restrictions; No Defaults...........................................38

Section 4.10    Investment Company Act ...................................................................39

Section 4.11    Use of Proceeds ...............................................................................39

Section 4.12    Insurance..........................................................................................39

Section 4.13    Labor Matters ...................................................................................39

Section 4.14    ERISA...............................................................................................39

Section 4.15    Environmental Matters .....................................................................40

Section 4.16    Intellectual Property .........................................................................41

Section 4.17    Title; Real Property ..........................................................................41

Section 4.18    Related Documents...........................................................................42

ARTICLE V        REPORTING COVENANTS ...............................................................43

Section 5.1    Financial Statements.........................................................................43

Section 5.2    Default Notices .................................................................................45

Section 5.3    Litigation ...........................................................................................45

Section 5.4    Labor Relations .................................................................................45

Section 5.5    Tax Returns........................................................................................46

Section 5.6    Insurance............................................................................................46

Section 5.7    ERISA Matters ..................................................................................46

Section 5.8    Environmental Matters .....................................................................46

Section 5.9    Other Information ..............................................................................47

ARTICLE VI      AFFIRMATIVE COVENANTS ..........................................................47

Section 6.1    Preservation of Corporate Existence, Etc .........................................47

Section 6.2    Compliance with Laws, Etc ..............................................................48

Section 6.3    Conduct of Business .........................................................................48

Section 6.4    Payment of Taxes, Etc ......................................................................48

Section 6.5    Maintenance of Insurance.................................................................48

Section 6.6    Access................................................................................................48

Section 6.7    Keeping of Books ..............................................................................48

Section 6.8    Maintenance of Properties, Etc.........................................................48

Section 6.9    Application of Proceeds.....................................................................49

Section 6.10    Additional Collateral and Guaranties ..............................................49

Section 6.11    Control Accounts, Approved Deposit Accounts...................................50

**TABLE OF CONTENTS**
**(continued)**

**Page**

ARTICLE VII    NEGATIVE COVENANTS ...................................................................51

Section 7.1    Indebtedness ...........................................................................51

Section 7.2    Liens, Etc ...............................................................................52

Section 7.3    Investments ............................................................................53

Section 7.4    Sale of Assets.........................................................................54

Section 7.5    Restricted Payments ...............................................................55

Section 7.6    Restriction on Fundamental Changes; Permitted Acquisitions .............56

Section 7.7    Change in Nature of Business.................................................56

Section 7.8    Transactions with Affiliates....................................................56

Section 7.9    Limitations on Restrictions on Subsidiary Distributions; No New Negative Pledge.......................................................57

Section 7.10    Modification of Constituent Documents ...............................57

Section 7.11    Modification of Related Documents......................................57

Section 7.12    Modification of Debt Agreements.........................................58

Section 7.13    Accounting Changes; Fiscal Year ........................................58

Section 7.14    Margin Regulations ..............................................................58

Section 7.15    No Speculative Transactions ................................................58

Section 7.16    Capital Expenditures.............................................................58

ARTICLE VIII    EVENTS OF DEFAULT ...................................................................59

Section 8.1    Events of Default ...................................................................59

Section 8.2    Remedies ................................................................................60

ARTICLE IX    THE ADMINISTRATIVE AGENT ...........................................................61

Section 9.1    Authorization and Action ......................................................61

Section 9.2    Administrative Agent's Reliance, Etc ....................................62

Section 9.3    The Administrative Agent Individually..................................62

Section 9.4    Lender Credit Decision..........................................................62

Section 9.5    Indemnification......................................................................63

Section 9.6    Successor Administrative Agent.............................................63

Section 9.7    Concerning the Collateral and the Collateral Documents ....................64

Section 9.8    Collateral Matters Relating to Related Obligations...............................65

ARTICLE X    MISCELLANEOUS ...................................................................65

Section 10.1    Amendments, Waivers, Etc ..................................................65

**TABLE OF CONTENTS**
**(continued)**

Section 10.2    Assignments and Participations ............................................................ 67

Section 10.3    Costs and Expenses .......................................................................... 69

Section 10.4    Indemnities ...................................................................................... 71

Section 10.5    Limitation of Liability ...................................................................... 72

Section 10.6    Right of Set-off ................................................................................ 72

Section 10.7    Sharing of Payments, Etc. ................................................................ 73

Section 10.8    Notices, Etc. ..................................................................................... 73

Section 10.9    No Waiver; Remedies ....................................................................... 75

Section 10.10   Governing Law ................................................................................. 75

Section 10.11   Submission to Jurisdiction; Service of Process .................................. 75

Section 10.12   Waiver of Jury Trial ......................................................................... 76

Section 10.13   Marshaling; Payments Set Aside ....................................................... 76

Section 10.14   Section Titles ................................................................................... 76

Section 10.15   Effectiveness; Execution in Counterparts .......................................... 76

Section 10.16   Entire Agreement ............................................................................. 77

Section 10.17   Confidentiality ................................................................................. 77

Section 10.18   Patriot Act Notice. ........................................................................... 77

**Schedules**

Schedule I          –        Commitments
Schedule II         –        Addresses for Notices
Schedule 4.2        –        Consents
Schedule 4.3(a)     –        Ownership of Borrower
Schedule 4.3(b)     –        Ownership of Subsidiaries
Schedule 4.3(c)     –        Borrower Information
Schedule 4.5        –        Litigation
Schedule 4.6        –        Taxes
Schedule 4.12       –        Insurance
Schedule 4.13       –        Labor Matters
Schedule 4.14       –        List of Plans
Schedule 4.15       –        Environmental Matters
Schedule 4.17       –        Real Property
Schedule 7.1        –        Existing Indebtedness
Schedule 7.2        –        Existing Liens
Schedule 7.3        –        Existing Investments
Schedule R-1        –        Responsible Officers

**<u>TABLE OF CONTENTS</u>**
**(continued)**

<u>**Page**</u>

**Exhibits**

Exhibit A    –    Form of Assignment and Acceptance
Exhibit B    –    Form of Term Note
Exhibit C    –    Form of Notice of Borrowing
Exhibit D    –    Form of Opinion of Counsel for the Loan Parties
Exhibit E    –    Form of Guaranty
Exhibit I    –    Form of Pledge and Security Agreement

## **EXHIBIT E**

### **Commercial Agreements**

EXECUTION COPY

## COMMERCIAL AGREEMENT

This Commercial Agreement (this "Agreement") is entered into this 1st day of June, 2009, by and between General Motors Corporation, a Delaware corporation, on behalf of itself and its subsidiaries ("GM"), on the one hand, and Parnassus Holdings II, LLC, a Delaware limited liability company, on behalf of itself and its subsidiaries and affiliates now existing and to be formed ("PEN"), on the other hand. Each of PEN and GM is referred to individually herein as a "Party" and collectively as the "Parties."

### *RECITALS*

A.    Contemporaneous with the execution of this Agreement, Delphi Corporation and certain other seller parties (collectively, "Delphi"), GM, GM Components Holdings, LLC, a wholly owned subsidiary of GM ("GMN"), PEN and certain other buyer parties are entering into a Master Disposition Agreement (the "MDA") under which GMN will purchase certain assets from Delphi and PEN will purchase certain other assets from Delphi (the "Purchase Transaction").

B.    In connection with the Purchase Transactions, GM and PEN have reached certain commercial agreements as more fully set forth below.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, GMN and PEN agree as follows:

### *TERMS AND CONDITIONS*

1.    **Effective Date/Term.**

This Agreement shall take effect upon the Closing Date (as defined in the MDA) (the "Effective Date") provided that the Closing Date occurs on or before September 30, 2009. If the aforementioned condition is not timely satisfied, this Agreement shall automatically terminate and neither GM nor PEN will have any obligations pursuant to the terms of this Agreement. Except as specifically provided herein or as mutually agreed by the Parties, this Agreement will terminate on the date that is three years from the Effective Date (the "Term").

2.    **Inter-Company Sales.**

2.1    Purchase by GM. From the Effective Date through the Term, PEN will sell to GM, and GM will purchase from PEN, GM's production, service and bank build requirements of the component produced at the PEN sites which were sold intercompany between the respective Delphi plants before the Effective Date, with pricing equal to Delphi's internal pricing between plants as of January 1, 2009.

**6.    Interpretations.**

6.1    For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

6.2    As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

6.3    The words "hereof", "herein", "hereby", and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

6.4    References to an article or section, or an exhibit, are (unless otherwise stated) references to an article or section of, or an exhibit to, this Agreement.  References to a schedule are (unless otherwise stated) references to a schedule this Agreement.

6.5    Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

6.6    All accounting terms not otherwise specifically defined herein shall be construed in accordance with GAAP.

**7.    No Waiver; Cumulative Remedies; Unenforceability.**

No party to this Agreement shall by any act, delay, indulgence, omission, or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement.  A waiver by any party of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which that party would otherwise have had on a subsequent occasion.  No failure to exercise, nor any delay in exercising, any right, power, or privilege under this Agreement, by any party shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law.    Should any provision of this Agreement be held invalid or unenforceable, the remainder of this Agreement will not be affected thereby.

**8.    Waivers and Amendments; Successors and Assigns.**

3

No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by the parties hereto. This Agreement and all of the parties' obligations are binding upon their respective successors and assigns, and together with the rights and remedies of the parties under this Agreement, inure to the benefit of the parties and their respective successors and assigns. PEN may not assign or transfer any right or obligation under this Agreement without the prior written consent of GM.

9.     **Notices.**

All notices, requests, and other communications that are required or may be given under this Agreement must be in writing, and shall be deemed received, (A) in the case of notice by certified mail, the earlier of the date the notice is received, or the fifth (5th) day following the date of posting; (B) in the case of notice by postage prepaid overnight air express mail, the earlier of the date the notice is received, or the fifth (5th) day following the date of posting; (C) in the case of notice by facsimile transmission confirmed by certified mail or postage prepaid overnight air express mail, as of the date following the day the facsimile transmission is dispatched; and (C) in the case of notice by courier service, as of the date the notice is received, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section):

|  |  |
|---|---|
| If given to PEN: | Parnassus Holdings II, LLC<br>360 North Crescent Drive<br>South Building<br>Beverly Hills, CA 90210<br>Facsimile: (310) 712-1863<br>Attn: Eva Kalawski |
| If given to GM: | General Motors Corporation<br>Av Ejercito Nacional #843 Col Granada<br>Mexico City, Mexico 11520<br>Facsimile: 52-55-5901-3571<br>Attn: Randall L. Pappal |
| with a copy to: | General Motors Corporation<br>M/C 482-C23-D24<br>300 Renaissance Center<br>P.O. Box 300<br>Detroit, MI 48265-3000<br>Facsimile: (313) 665-4960<br>Attn: General Counsel |
| and to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, Michigan 48226 |

4

Facsimile:  (313) 465-7631
Attn:  Frank L. Gorman

10.    **No Intended Third Party Beneficiary.**

The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement, except as expressly set forth in this Agreement.

11.    **Counterparts.**

This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  For purposes of this Agreement, facsimile signatures shall also constitute originals.

12.    **Entire Agreement; Ambiguous Language.**

This Agreement, together with any other agreements and schedules referenced to herein or executed in connection with this Agreement, constitutes the entire understanding of the parties in connection with the subject matter hereof.  This Agreement may not be modified, altered, or amended except by an agreement in writing signed by the parties hereto.  This Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by PEN and GM and their respective counsel.  Therefore, any ambiguous language in this Agreement will not necessarily be construed against any particular party as the drafter of such language.

13.    **Governing Law.**

This Agreement is made in the State of Michigan and shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

14.    **Confidentiality.**

The parties hereto agree that the contents contained herein are confidential and not intended for dissemination beyond the parties hereto without the express written consent of each of the parties hereto.  Notwithstanding the foregoing, any party may disclose the existence and terms of this Agreement (i) to the extent required by law (including the rules of any applicable stock exchange) or by any governmental agency or required or requested to be disclosed pursuant to legal process (including discovery requests) or pursuant to any bankruptcy, insolvency or similar proceeding involving either of the parties hereto, (ii) to the extent necessary to enforce this Agreement and (iii) to any employee, officer, director, agent, affiliate, representative, investor, partner, member,

5

shareholder or actual or potential financing source of such party or such Party's affiliates (provided that any such person or entity is directed to maintain such information in confidence as contemplated by this Section 14 and that such Party shall be responsible and liable for the failure of any such person or entity to maintain such information in confidence as contemplated by this Section 14).

15.     <u>**CONSULTATION WITH COUNSEL.**</u>  **THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.**

16.     <u>**WAIVER OF JURY TRIAL.**</u> **THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT, THE PURCHASE ORDERS, OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHOM SUCH RELINQUISHMENT WILL BE CHARGED.**

*[Signatures appear on the following page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date set forth above.

**PARNASSUS HOLDINGS II, LLC**        **GENERAL MOTORS CORPORATION**

By:_____        By:_____

Name:  Johnny Lopez                         Name:_____

Title:    Vice President                       Title:_____

**EXHIBITS:**

Exhibit A:      Lockport Component Pricing
Exhibit B:      Terms and Conditions of Purchase
Exhibit C:      Intellectual Property License and Other Rights

[Signature Page to Commercial Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date set forth above.

**PARNASSUS HOLDINGS II, LLC**          **GENERAL MOTORS CORPORATION**

By:_____          By:_____

Name:  Johnny Lopez                   Name:  Walter Borst

Title:   Vice President               Title:   Treasurer

**EXHIBITS:**

Exhibit A:      Lockport Component Pricing
Exhibit B:      Terms and Conditions of Purchase
Exhibit C:      Intellectual Property License and Other Rights

[Signature Page to Commercial Agreement]

**EXECUTION COPY**

## ACCESS AGREEMENT

Parnassus Holdings II, LLC, on behalf of itself and its subsidiaries and affiliates now existing and to be formed ("Supplier"), and General Motors Corporation, on behalf of itself and its affiliates ("GM" or the "Customer"), enter into this Access Agreement (this "Agreement") on June 1, 2009.

## RECITALS

A.    Supplier and Customer are parties to that certain Component Supply Agreement dated of even date hereof (the "Component Supply Agreement"), pursuant to which Supplier will supply to Customer, and Customer will purchase from Supplier, certain component parts and assemblies, all as more specifically set forth in the Component Supply Agreement.  In accordance with the terms of the Component Supply Agreement, Customer has issued or will issue Purchase Orders (as defined in the Component Supply Agreement) to Supplier relating to the purchase and supply of such component parts and assemblies.

B.    Those Purchase Orders which relate to the production of component parts or assemblies at Access Facilities (defined below), along with any other purchase orders or supply agreements, whether now existing or entered into in the future between GM, a GM affiliate or subsidiary, or a GM Tier I supplier, on the one hand, and Supplier, on the other hand, relating to the production of component parts or assemblies at the Access Facilities are referred to herein collectively as the "Access Facilities Supply Contracts" and individually as an "Access Facilities Supply Contract".  The component parts or assemblies supplied under the Access Facilities Supply Contracts are referred to herein collectively as the "Component Parts" and individually as a "Component Part".

C.    Supplier acknowledges that Supplier's failure to allow Customer to exercise its Right of Access (as defined below) in accordance with the terms of this Agreement will cause the Customer irreparable harm.

D.    Supplier is entering into this Agreement for the benefit of Customer to afford the Customer the right to use certain of Supplier's assets as provided below if an "Event of Default" (defined below) occurs.

BASED ON THE FOREGOING RECITALS which are incorporated as representations and warranties of the parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Supplier and the Customer agree as follows:

## TERMS AND CONDITIONS

1.    **Defined Terms**.  In addition to those terms defined elsewhere in this Agreement, the following terms have the indicated meanings, unless the context otherwise requires:

"Access Facilities" means those facilities set forth on Schedule 1.

"Accounts" means any "account" or "chattel paper," as defined in Sections 9-102(a)(2) and 9-102(a)(11), respectively, of the "Code" (defined below), owned now or hereafter by Supplier, and also means and includes (i) all accounts receivable, contract rights, book debts, notes, drafts, instruments, documents, acceptances, payments under leases and other forms of obligations, now owned or hereafter received or acquired by or belonging or owing to Supplier (including under any trade name, styles, or division thereof) whether arising out of goods sold or leased or services rendered by Supplier or from any other transaction, whether or not the same involves the sale of goods or services by Supplier (including, without limitation, any such payment obligation or right to payment which might be characterized as an account, contract right, general intangible, or chattel paper under the Code in effect in any jurisdiction); (ii) all monies due to or to become due to Supplier under all contracts for the sale or lease of goods or the performance of services by Supplier (whether or not yet earned by performance on the part of Supplier) now in existence or hereafter arising; and (iii) deposit accounts, insurance refunds, tax refunds, tax refund claims and related cash and cash equivalents, now owned or hereafter received or acquired by or belonging or owing to Supplier.

"Brookhaven Facility" means all of Supplier's facilities, warehouses and engineering centers used to manufacture, assemble and sub assemble, pack, store, test or validate Component Parts, in each case located in Brookhaven, Mississippi, including, without limitation, the facility located at 925 Industrial Park Road, Brookhaven, Mississippi.

"Code" means the Uniform Commercial Code as in effect in the State of Michigan as of the date of this Agreement.

"Clinton Facility" means all of Supplier's facilities, warehouses and engineering centers used to manufacture, assemble and sub assemble, pack, store, test or validate Component Parts, in each case located in Clinton, Mississippi, including, without limitation, the facility located at 1001 Clinton Industrial Park, Clinton, Mississippi.

"Component Parts" has the meaning set forth in Recital B above.

"Contract Rights" means all rights of Supplier (including to payment) under each "Contract" (defined below).

"Contracts" or individually, a "Contract," means any licensing agreements and any and all other contracts, supply agreements, or other agreements used in and necessary for the manufacture, production or assembly of Component Parts and in or under which Supplier may now or hereafter have any right, title, or interest and which pertain to the lease, sale, or other disposition by Supplier of "Equipment" (defined below), "Inventory" (defined below), fixtures, real property, or the right to use or acquire personal property, as any of the same may from time to time be amended, supplemented, or otherwise modified.

2

"Documents" means all "documents" as defined in Section 9-102(a)(30) of the Code.

"Equipment" means any "equipment," as that term is defined in Section 9-102(a)(33) of the Code, now or hereafter owned by Supplier, which is used in and necessary for the manufacture, production or assembly of Component Parts, and will also mean and include all such machinery, equipment, vehicles, furnishings, and fixtures (as such terms are defined in Section 9-102(a)(41) of the Code) now owned or hereafter acquired by Supplier, including, without limitation, all items of machinery and equipment of any kind, nature and description, whether affixed to real property or not, as well as all additions to, substitutions for, replacements of or accessions to any of the foregoing items and all attachments, components, parts (including spare parts), and accessories whether installed thereon or affixed thereto in each case only if and to the extent used in and necessary for the manufacture of Component Parts.

"Event of Default" will mean any of the following events:

(a)    Any event or circumstance shall occur or condition shall exist under the Loan Agreement if the effect of such event, circumstance or condition is to accelerate or permit the acceleration of the Loan Agreement, unless such event, circumstance, or condition is waived or cured;

(b)    Supplier repudiates in writing its obligations to supply Component Parts under an unexpired Access Facilities Supply Contract, and such repudiation is not rescinded in writing within twelve (12) hours after a written demand from GM to Supplier's Chief Executive Officer with a copy to each of Supplier's other notice recipients as set forth in Section 23 of this Agreement, provided that such twelve (12) hour period will no longer apply if GM's production at any one or more of GM's assembly plants worldwide is actually interrupted;

(c)    Supplier materially breaches its obligations to supply Component Parts under an unexpired Access Facilities Supply Contract (including the Component Supply Agreement as it relates to the Access Facilities), the consequence of which is the substantial likelihood that GM's production at any one or more of GM's assembly plants worldwide may be imminently interrupted, provided, however that with respect to any unintentional breach (e.g., a quality spill), Supplier shall have a twenty four (24) hour cure period; provided that such twenty four (24) hour period will no longer apply if GM's production at any one or more of GM's assembly plants worldwide is actually interrupted;

(d)    One or more of Supplier's loan facilities expire or are terminated without Supplier providing to GM written evidence of a binding substitute financing commitment or an accommodation agreement or forbearance agreement relating to such expired or terminated loan facility, provided that such written evidence of binding substitute financing commitment or such forbearance agreement or accommodation agreement has not expired or been terminated, the consequence of which is the substantial likelihood that GM's production at any one or more of GM's assembly plants worldwide may be imminently interrupted;

3

(e)    Supplier acknowledges in writing that it is unable or unwilling to continue to produce the Component Parts for GM or a GM Tier 1 supplier in accordance with the terms of an unexpired Access Facilities Supply Contract;

(f)    Supplier fails to acknowledge in writing within a reasonable period of time that it will continue to produce Component Parts for GM in accordance with the terms of an unexpired Access Facilities Supply Contract, the consequence of which is the substantial likelihood that GM's production at any one or more of GM's assembly plants worldwide may be imminently interrupted;

(g)    Any secured or lien creditor commences any foreclosure or other enforcement action against a material portion of the Operating Assets at any Access Facility and such foreclosure or other enforcement action is not stayed within 10 business days and does not remain stayed thereafter;

(h)    Any Lender (including a substitute or replacement lender) commences any foreclosure or other enforcement action against a material portion of the Operating Assets at any Access Facility; or

(i)    Supplier demands financial or other accommodations from GM or a GM affiliate that are in addition to GM or such affiliate's obligations under an Access Facilities Supply Contract or other agreement between the parties and threatens to cease supplying Component Parts to GM in accordance with the terms of an unexpired Access Facilities Supply Contract if such demands are not met and such threat is not withdrawn in writing within forty-eight (48) hours after receipt of written notice from GM.

"General Intangibles" means all "general intangibles," as such term is defined in Section 9-102(a)(42) of the Code, now or hereafter owned by Supplier, which are used in or necessary for the manufacture, production or assembly of Component Parts, including, without limitation, customer lists, rights in intellectual property, goodwill, trade names, service marks, trade secrets, patents, trademarks, copyrights, applications therefore or for any registrable rights listed in this definition, permits, licenses, now owned or hereafter acquired by Supplier, but excluding items described in the definition of Accounts.

"Instruments" means all "instruments," as defined in Section 9-102(a)(47) of the Code.

"Intellectual Property" means all now existing or hereafter acquired patents, trademarks, copyrights, inventions, licenses, discoveries, processes, know-how, techniques, trade secrets, designs, specifications and the like (regardless of whether such items are now patented or registered, or registrable, or patentable in the future), and all technical, engineering, or other information and knowledge, product and production data and drawings, which are used in or necessary for the manufacture, production or assembly of Component Parts including, without limitation, all items, rights and property defined as "intellectual property" under 11 U.S.C. Section 101, as amended from time to time.

4

"Inventory" means any "inventory," as that term is defined in Section 9-102(a)(48) of the Code, wherever located, now owned or hereafter acquired by Supplier or in which Supplier now has or hereafter may acquire any right, title or interest including, without limitation, all goods and other personal property now or hereafter owned by Supplier which are leased or held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the manufacture of Component Parts, or in the processing, packaging or shipping of the same, and all finished goods that are Component Parts.

"Loan Agreement" means that certain Credit Agreement of even date herewith between Supplier and the lenders party thereto.

"Lenders" means any of Supplier's current or future secured lenders or any successor thereto, including lenders refinancing the loans extended by the Lenders.

"Obligations" means the obligation to provide the Customer or its designee(s) the "Right of Access" (defined below).

"Operating Assets" means all of Supplier's interest in the assets used in or necessary for the production, assembly, sub-assembly, testing and validation of Component Parts, whether located at an Access Facility or at a sub-supplier's facility, including Equipment, Real Estate, Contract Rights and General Intangibles, but specifically excluding any Accounts, Inventory, Documents, Instruments, chattel paper and "Proceeds" (defined below) of such excluded items and "Proceeds" of General Intangibles.

"Proceeds" has the meaning provided it under Section 9-102(a)(64) of the Code and, in any event, will include, but not be limited to: (i) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Supplier from time to time with respect to any of the Operating Assets or Real Estate; (ii) any and all payments (in any form whatsoever) made or due and payable to Supplier from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Operating Assets or Real Estate by any governmental body, authority, bureau, or agency (or any Person acting under color of governmental authority); and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Operating Assets or Real Estate.

"Real Estate" means the real property associated with the Access Facilities.

"Vandalia Facility" means all of Supplier's facilities, warehouses and engineering centers used to manufacture, assemble and sub assemble, pack, store, test or validate Component Parts, in each case located in Vandalia, Ohio, including, without limitation, the facility located at 250 Northwoods Boulevard, Vandalia, Ohio, with the exception of the area of Supplier's facility exclusively dedicated to safety engineering.

"Vienna Facility" means all of Supplier's facilities, warehouses and engineering centers used to manufacture, assemble and sub assemble, pack, store, test or validate

Component Parts, in each case located in Vienna, Ohio, including, without limitation, the facility located at 3400 Aeropark Drive, Vienna, Ohio.

"Warren Facility" means all of Supplier's facilities, and warehouses used to manufacture, assemble and sub assemble, pack, or store Component Parts, in each case located in Warren, Ohio and Rootstown, Ohio, including, without limitation, the facilities located at (i) Larchmont & North River Road, Warren, Ohio; and (ii) 5245 South Prospect Street, Rootstown, Ohio.

2.    **Grant of Liens and Security Interests**.  As collateral security for the Obligations, Supplier hereby grants to the Customer (i) a continuing lien and security interest in the Operating Assets and mortgage on the Real Estate, whether now owned or hereafter acquired by Supplier, or in which Supplier now has or at any time in the future may acquire any right, title or interest, and (ii) a security interest and lien on, and a collateral assignment of, the Intellectual Property used in, and necessary for the production of Component Parts (collectively, the "Collateral").  Further, Supplier hereby grants the Customer permission to file any financing statements, security interests, and/or mortgages deemed necessary by the Customer to perfect its security interest and mortgage granted hereby.  The security interests and mortgages granted to the Customer pursuant to this Agreement to secure the Obligations are junior to the liens, security interests and mortgages granted to the Lenders in all respects but in all cases the Lenders' exercise of their rights and remedies with respect to their liens and security interests against the Operating Assets and mortgages on the Real Estate are subject to the terms of this Agreement.  The Lenders may take any necessary action to protect their rights in the Collateral, conditioned upon such action not impairing Customer's "Right of Access" (defined below).  Customer's rights as a secured creditor under this Agreement will be strictly limited to enforcing the Right of Access.  The security interest and liens in the Operating Assets and Real Estate granted to GM is this paragraph shall terminate and become of no further force and effect, without any action or document of any kind, upon expiration of the Term of this Agreement.  GM hereby grants Supplier permission, effective upon the automatic termination of the security interest granted by this paragraph, to file any termination statement with respect to any financing statement filed by GM in connection with the Operating Assets or Real Estate.

3.    **Right of Access**.

(a)    General.  Upon an Event of Default and, if such Event of Default relates only to some limited subset of the Access Facilities  then solely with respect to the Access Facilities (but in any event as to every plant at such Access Facilities) at which the Component Parts that are subject to the Event of Default are manufactured , the Customer or its designee(s) will have a right, but not the obligation, to use and have access to the Operating Assets and Real Estate to manufacture, process and/or ship Component Parts manufactured at such Access Facilities (the "Right of Access") for a period of up to three hundred sixty (360) days from the date Customer provides the written notice referenced below (the "Access Period").  Customer may invoke the Right of Access at any one or more Access Facility at any time after the occurrence of an Event of Default with respect to Component Parts manufactured at such Access Facility by delivering written notice to Supplier indicating its intention to invoke the Right of

6

Access. The Customer will have no right to sell, transfer, or dispose of the Operating Assets or the Real Estate as part of the Right of Access. If the Right of Access is not invoked as to all of the Access Facilities, subject to the terms of this Agreement, it may be invoked thereafter as to additional Access Facilities.

        (b)    <u>The Customer's Obligations</u>. If the Customer invokes the Right of Access for itself or its designee(s), in lieu of payment for Component Parts produced after exercise of the Right of Access, the Customer will, as to each Access Facility at which the Customer has exercised the Right of Access:

        (i)    use such reasonable care toward preservation of the Operating Assets and Real Estate as a prudent owner would use in connection with the custody and preservation of its own assets, and indemnify, defend and hold harmless Supplier, its officers and directors, from any physical damage to property, including, without limitation, the Operating Assets and Real Estate, or physical injury suffered by any persons (including, without limitation, employees, contractors and other third parties) caused by or arising out of the Customer's or its designee's use of the Operating Assets and Real Estate during the Access Period; provided, however, the foregoing indemnity obligations will not apply to claims arising out of or related to conditions which existed or events that occurred before the Access Period. Customer's indemnity obligation will survive the expiration or any earlier termination of this Agreement;

        (ii)    insure and maintain the Operating Assets and Real Estate in the same condition as existed on the date the Customer exercised the Right of Access, ordinary wear and tear excepted;

        (iii)    pay the actual costs and expenses incurred in connection with the manufacturing of Component Parts during the Access Period, including, without limitation, rent, utilities and other overhead expenses, prorated property taxes and assessments attributable to the Operating Assets and Real Estate;

        (iv)    subject to the Customer's or its designee's right to use and have access to the Operating Assets and Real Estate during the Access Period, afford Supplier's representatives (and representatives of the Lenders, secured creditors and mortgagees or lessors of the Operating Assets and/or Real Estate) reasonable access to inspect the Operating Assets and the Real Estate being utilized by Customer, to prepare for a liquidation or going-concern sale of the Operating Assets and Real Estate at the end of the Access Period, and to sell any asset other than the Operating Assets and Real Estate prior to expiration of the Access Period;

        (v)    subject to (a) Supplier's other customers agreeing to make payment to the Customer or its designee(s), as applicable, on account of its allocable share of overhead and related expenses

7

and all direct expenses related to such other customer's production;
(b) Supplier making the necessary tangible personal property
available for use during the Access Period, and (c) Supplier or
Supplier's other customers providing GM or its designee an
appropriate license for any intellectual property necessary for the
production of parts for such customer, the Customer agrees, for
itself and its designee(s), to produce parts for such other customers
during the Access Period or, at the election of Supplier's other
customers, to provide the other customers access provided such
customers do not interfere with the production of Component Parts;
and

(vi)    pay on a monthly basis in arrears, and prorated for any partial
months, to the Lenders for Supplier's account, an access fee (the
"Access Fee") for the Access Facilities where the Right of Access is
exercised in accordance with Schedule 3(b)(vi).

(c)    Supplier's Obligations.    If Customer invokes its Right of Access,
Supplier will comply with the following:

(i)    At Customer's election and in its sole discretion, Supplier will use
its best efforts to continue to employ those of its employees which
the Customer determines are necessary to maintain production of
Component Parts (the "Employees") and in turn lease the
Employees to the Customer or the Customer's designee(s), and the
Customer or its designee(s) will fund all costs and expenses
relating to Supplier's employment of the Employees incurred during
the Access Period.  Without limiting the generality of the foregoing,
the Customer or its designee(s) will fund all amounts incurred by
Supplier to meet its regular payroll obligations, including salaries,
wages, payroll taxes, workers' compensation, unemployment
insurance, disability insurance, welfare, pension contributions and
other payments and contributions required to be made by Supplier
with respect to the Employees, which are incurred during the
Access Period, but in no event will the Customer be liable under
this Agreement for any costs for unfunded pension liability, actuarial
liability, past service unfunded actuarial liability or solvency or other
deficiency relating to any pension plan, retiree medical plan, OPEB
obligation or other obligations relating to service prior to the time
the Customer exercised the Right of Access.  Notwithstanding the
foregoing, under no circumstances will the Customer be
responsible for reimbursing Supplier for costs and expenses
relating to Supplier's employment of the Employees to the extent
the Employees are performing services unrelated to the production
of the Component Parts;

(ii)    During the Access Period, Supplier will not increase compensation
or benefits of the Employees without the consent of the Customer,

8

except as may be required by applicable law or pre-existing contract;

(iii)    During the Access Period, Supplier and its subsidiaries and affiliates will continue, as requested by Customer or its designee, to provide any and all services provided by Supplier and its subsidiaries and affiliates to the Access Facilities subject to the Right of Access prior to the exercise of such Right of Access to the extent necessary to allow for production of the Component Parts for Customer or its designee at the applicable Access Facilities to continue uninterrupted. The above obligation is independent of, and not conditioned upon, a written agreement being in force between Supplier and any of its affiliates or subsidiaries. Customer or its designee will reimburse Supplier its subsidiaries or affiliates as applicable, on net 15th prox payment terms for such services for a price equivalent to Supplier's its subsidiary's or affiliate's, as applicable, cost in providing such services (i.e., all direct and indirect costs, including SG&A, engineering and other overhead charges). In addition, during the Access Period, Supplier and its subsidiaries and affiliates will continue to supply component parts or assemblies used in manufacturing or assembling the Component Parts, as reasonably requested by GM or its designee and to the extent necessary to allow for production of the Component Parts for GM or its designee at the applicable Access Facilities to continue uninterrupted. To the extent that Supplier is a party to a contract with an affiliate or subsidiary for the supply of component parts or assemblies used in manufacturing or assembling the Component Parts, at the request of GM or its designee, Supplier will provide GM or its designee with the benefit of such contracts during the Access Period. Customer or its designee will reimburse Supplier or its subsidiaries or affiliates, as applicable, on net 15th prox payment terms for such supply at piece prices equivalent to Supplier's or its subsidiary's or affiliate's, as applicable, actual cost (i.e., all direct and indirect costs, including SG&A, engineering and other overhead charges) plus 10%. Supplier or its affiliate or subsidiary, as applicable, will provide Customer or its designee with appropriate financial data and backup information to determine the validity of any such piece price proposed by Supplier. In the event of any dispute over the cost of the services or the piece prices to be paid for such component parts during the Access Period, the parties will submit such dispute to expedited binding arbitration. In any case, Supplier and its subsidiaries and affiliates will provide such services and supply such component parts without interruption and GM will pay the undisputed cost and piece prices to Supplier or its subsidiaries or affiliates, as applicable, during the pendency of any such arbitration proceedings, with the differential being placed in escrow subject to the decision of the arbitrator.

9

(iv)    Supplier will indemnify, defend and hold the Customer, its designee(s) and its employees and agents harmless of, from and against any and all costs, expenses (including all court costs and reasonable attorneys' fees), losses, damages, liabilities or injury arising from claims or liabilities arising or accruing as a result of Supplier's activities and operations prior to the date of the Customer's exercise of the Right of Access, regardless of when such claims are asserted. Supplier's indemnity obligations under this Section 4(c)(iv) will survive the expiration or any earlier termination of this Agreement; and

(v)    During the Access Period, Supplier agrees that the Customer and its designee(s) and agents and representatives will have reasonable access to Supplier's books and records for the sole purposes of confirming and calculating the amounts due, if any, from the Customer under this Agreement.

(vi)    Supplier and its subsidiaries and affiliates will allow Customer, its designee(s) and its employees and agents to have unrestricted access to the engineering center located at 4551 Research Parkway, Education Drive, Warren, Ohio to perform testing, engineering and validation activities during the Access Period for the Component Parts produced at the Access Facilities for which GM or its designee has exercised the Right of Access. Customer's access will not preclude Supplier from continuing to utilize the engineering center for other customers; provided such utilization does not unreasonably disrupt GM's production, testing or engineering requirements. In connection with such testing, engineering and validation activities, Supplier and its subsidiaries and affiliates will have the right to reasonably restrict GM's or GM's designee's access as required to prevent the disclosure of confidential, proprietary or sensitive information related to Supplier's other customers or the component parts manufactured by Supplier for such other customers, provided, however, Supplier will take reasonable steps to accommodate Customer's rights of access for testing, engineering and validation hereunder when in potential conflict with the need to maintain confidentiality as referenced above.

(d)    <u>Right to Terminate</u>. The Customer will have the absolute right to terminate the Right of Access as to any facility upon ten (10) business days' written notice to Supplier. Upon expiration of such notice period, the Access Period will terminate as to such facility and, except for the Customer's obligation to pay amounts payable under this Agreement not paid as of the termination of the Access Period, the Customer will have no further obligations or liabilities (other than its indemnification obligations) to Supplier on account of the Right of Access as to such facility.

10

(e)    <u>Indemnification</u>.  To the extent a party ("<u>Indemnitee</u>") makes a claim against the other party ("<u>Indemnifying Party</u>") for indemnification in accordance with this Agreement, Indemnitee agrees the following will apply:

(i)    The Indemnifying Party's indemnity obligations will be secondary to any applicable insurance coverage or indemnities from third parties. In addition, the Indemnifying Party's indemnity does not include any losses, liabilities, claims or damages or expenses to the extent the same are determined in a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of Indemnitee.

(ii)    If Indemnitee becomes aware of any claims, demands, actions or proceedings for which it will be seeking indemnification, it must use its best efforts in good faith to promptly notify the Indemnifying Party in writing of same; failure to provide such notice will only affect the Indemnifying Party's liability to the extent that the Indemnifying Party suffers damage or injury as a result of the failure to give such prompt notice. The Indemnifying Party will have the right, at its expense, to assume the defense thereof (retaining counsel of its choosing) and the Indemnifying Party will have the right, in its unfettered discretion, to settle any such claims or actions on any basis it deems appropriate. Indemnitee may, but is not required to engage a single firm of separate counsel of its choice in connection with any matters to which the Indemnifying Party's indemnification relates, provided that Indemnifying Party will at no time be obligated to pay for more than one firm on behalf of Indemnitee.

(iii)    Indemnitee agrees that it must: (1) refrain from taking action that has a material adverse impact on the defense of such claim; (2) cooperate fully with the defense of any claims made hereunder at the Indemnifying Party's cost and expense; and (3) upon the Indemnifying Party's request, provide reasonable assistance to the Indemnifying Party (at the Indemnifying Party's cost and expense) in the defense of such claim.

(f)    **<u>Specific Performance</u>.  IN CONNECTION WITH ANY ACTION OR PROCEEDING TO ENFORCE THE RIGHT OF ACCESS, SUPPLIER ACKNOWLEDGES THAT THE CUSTOMER WILL NOT HAVE AN ADEQUATE REMEDY AT LAW, THAT THE OPERATING ASSETS AND REAL ESTATE ARE UNIQUE AND THAT THE CUSTOMER WILL BE ENTITLED TO SPECIFIC PERFORMANCE OF SUPPLIER'S OBLIGATIONS TO AFFORD THE CUSTOMER ITS RIGHT OF ACCESS UNDER THIS AGREEMENT.**

(g)    **<u>Irreparable Harm; Limitation of Notice</u>.  SUPPLIER ACKNOWLEDGES THAT THE CUSTOMER WILL SUFFER IRREPARABLE HARM IF THE CUSTOMER INVOKES THE RIGHT OF ACCESS AND SUPPLIER FAILS TO**

11

COOPERATE WITH THE CUSTOMER IN ALLOWING THE CUSTOMER TO EXERCISE THE RIGHT OF ACCESS UNDER THIS AGREEMENT. ACCORDINGLY, PROVIDED THAT SUPPLIER RECEIVES TWENTY-FOUR (24) HOURS' ACTUAL NOTICE OF ANY REQUEST FOR HEARINGS IN CONNECTION WITH PROCEEDINGS INSTITUTED BY THE CUSTOMER, SUPPLIER WAIVES, TO THE FULLEST EXTENT POSSIBLE UNDER APPLICABLE LAW, THE RIGHT TO NOTICE IN EXCESS OF TWENTY-FOUR (24) HOURS IN CONNECTION WITH ANY JUDICIAL PROCEEDINGS INSTITUTED BY THE CUSTOMER TO ENFORCE THE RIGHT OF ACCESS.

4.    **Tooling Acknowledgement**.   Supplier acknowledges and agrees to the rights of GM in the GM Owned Tooling as set forth in Section 4 of the Supply Agreement between Supplier and GM of even date herewith.

5.    **Purchase Option**.

(a)    Supplier grants to GM or its designee(s), upon GM's exercise of the Right of Access, an Option (the "Option") to purchase all or any Supplier-owned tooling (including primary tooling, secondary tooling or any other tooling not otherwise owned by GM), all or any portion of returnable containers and/or dunnage, and all or any machinery or equipment that is owned by Supplier and, in each case, is dedicated to the manufacture or transport of Component Parts at or from the Access Facility at which GM has exercised the Right of Access and not used to manufacture or transport products for other customers (collectively, "Designated Equipment") for a price equal to the orderly liquidation value of such Designated Equipment, as determined by an appraiser mutually agreeable to the parties, on the date of exercise of the Option.  In the event of any dispute over the Option price for the Designated Equipment, the parties will submit such dispute to expedited binding arbitration.   Notwithstanding any dispute regarding the Option Price, GM will have the right to remove the Designated Equipment from the Access Facility provided GM pays the Option price designated by Supplier prior to such removal.  The disputed portion of the Option price will be placed in escrow subject to the decision of the arbitrator.

(b)    Any such purchase under the Option will be free and clear of all liens, encumbrances or security interests.

(c)    Supplier acknowledges that the Option price constitutes a commercially reasonable price for the Designated Equipment and that any sale pursuant to the foregoing will be deemed to be commercially reasonable in all respects, including method, time, place and terms.  Upon exercise of the Option and payment of the Option price, GM or its designee(s) will have the right to take immediate possession of the applicable Designated Equipment without further payment of any kind and to own, operate, use and enjoy, sell, assign, transfer and/or convey the same, and Supplier hereby agrees to cooperate with GM or its designee(s) in its taking possession and control of the subject Designated Equipment.

6.    **Cooperation in Resourcing**.  Upon the occurrence of an Event of Default and GM's exercise of its Right of Access, GM will have the right to resource any or all Component Part production that is the subject of the Event of Default to alternative

12

suppliers. .Supplier will fully cooperate with GM in connection with such resourcing including, without limitation, by providing Customer copies of tool line-ups, tool processing sheets, repair logs, bill of materials, PPAP packages, tool drawings, names and locations of vendors and sub-suppliers of tooling, raw materials, components and outside processing, and by providing Customer and its agents, representatives, designees, consultants, officers, employees and potential successor suppliers immediate access to the Access Facilities for the purpose of inspecting and removing Tooling, viewing current production processes and taking any other reasonable actions in connection with resourcing production of the Component Parts.

7.    **Obligation to Purchase Inventory**.  If the Customer elects to exercise the Right of Access, the Customer will purchase all raw materials, work in process and finished goods inventory specifically relating to the Component Parts manufactured at the facility at which the Customer exercised the Right of Access which are both "usable" by the Customer and in a "merchantable" condition (collectively, the "Purchased Inventory").  For purposes of this Agreement, the term "usable" means not obsolete as determined in accordance with applicable industry standards for the Purchased Inventory and usable in the production of Component Parts in the quantities called for by the Customer's fabrication authorizations production releases and other binding commitments issued against current Access Facilities Supply Contracts in effect as of the date the Customer exercises the Right of Access.

The Purchased Inventory purchased by the Customer must be sold free and clear of any and all liens, claims, encumbrances and security interests.  The Customer will only be obligated to purchase the Inventory under this Agreement if all requirements of this Paragraph 4 are satisfied and the Customer is allowed to take possession of or use the Inventory no later than five (5) days after Customer's exercise of the Right of Access.  The Customer will purchase the Inventory for the following amounts:

    (a)    for raw materials, 100% of Supplier's actual invoice cost;

    (b)    for work in process, 80% of pro-rated current purchase order price for the Component Parts in question based on percentage of completion; and

    (c)    for finished goods, the price called for by the underlying Access Facilities Supply Contract.

Customer will make payment to the Supplier for the Purchased Inventory within thirty (30) days after the date the Customer exercises its Right of Access.  Supplier acknowledges that the foregoing prices to be paid for the Purchased Inventory constitute commercially reasonable prices, and that any sale pursuant to the foregoing will be deemed to be commercially reasonable in all respects, including method, time, place, and terms.

8.    **License**.  Subject to subsection (a) below, Supplier hereby grants to the Customer a perpetual, fully paid up, worldwide, non-exclusive, irrevocable right and license to use any of its Intellectual Property that is necessary to develop, manufacture, assemble and/or sell the Component Parts to make, have made, use, have used, sell, offer to sell, import, export, reproduce, copy, prepare derivative works, and distribute all

13

Component Parts and any derivatives and/or re-use/extension thereof for GM-products (the "License"). The Customer's right to use the License will include the right to grant one or more third parties sublicenses for the manufacture or sub-assembly of the applicable Component Parts, provided, however, that any sublicensee must satisfy the terms of this Agreement and any such sublicensing will neither limit, discharge or modify nor have any other effect on the Customer's obligations under this Agreement.

      (a)    <u>Right to Use License</u>. Although the License is being granted to the Customer as of the date set forth above, the Customer agrees that neither it nor its sublicensees will utilize the License with respect to Intellectual Property utilized at a given Access Facility, unless and until (a) the Customer exercises the Right of Access, or (b) the date on which an Event of Default occurs that remains uncured for three days after Supplier received written notice thereof, as to such Access Facility, at which time the utilization of the License will be limited to Component Parts produced at the applicable Access Facility and any derivatives and/or re-use/extension thereof for GM-products, however, the License will not be limited to production within the applicable Access Facility, rather, the License may be used to manufacture the Component Parts and any derivatives and/or re-use/extension thereof for GM-products at a location other than the applicable Access Facility.

      (b)    <u>No Royalty</u>. For all purposes, subject to payments required under third party licenses (provided that such third parties are not Supplier's subsidiaries or affiliates and provided that such third party license payments do not spring into effect upon GM's exercise of the Right of Access), Supplier has been fully paid for the License and other rights granted to the Customer under this Agreement (except as otherwise provided in this Agreement) and no royalties, fees, payments, charges or other consideration will be due from the Customer on account of the License or this Agreement or the Customer's (or sublicensee's) use of the License or other rights granted pursuant to this Agreement (except as otherwise provided in this Agreement).

      (c)    <u>Protection of Ownership</u>. The Customer will treat and preserve the Intellectual Property in accordance with the same practices employed by the Customer to safeguard its own intellectual property against unauthorized use and disclosure and will only use such information, data and trade secrets in connection with the License. The foregoing obligations of the Customer will not be applicable to information which is now or becomes hereafter available to the public through no action, conduct, admission or fault of the Customer.

      (d)    The provisions of this Section 8 will survive the expiration or any earlier termination of this Agreement.

    9.    **<u>Rights of the Customer; Limitations on the Customer's Obligations</u>**. Unless the Customer exercises the Right of Access, in which case the Customer will have the obligations as are expressly provided in this Agreement, except as provided by applicable law, the Customer will not have any obligation or liability by reason of or arising out of this Agreement nor will the Customer be required or obligated in any manner to perform or fulfill any of the obligations of Supplier under this Agreement.

14

10.    **Remedies**. Upon an Event of Default, the Customer will have all rights and remedies provided in this Agreement, in any other agreements with Supplier, and all rights and remedies available under applicable law. Supplier waives any right it may have to require Customer to foreclose its security interest and/or reduce the Obligations to a monetary sum. If Customer exercises the Right of Access, the Customer will be treated as a secured party in possession and the Customer's use and occupancy of the Operating Assets will not be deemed to be acceptance of such assets in satisfaction of the Obligations. Further, all of the Customer's rights and remedies under this Agreement are cumulative and not exclusive of any rights and remedies under any other agreement or under applicable law or at equity.

11.    **Injunctive Relief**. Given the possibility that the Customer will incur significant damages if Supplier fails to timely satisfy its obligations to the Customer and the Customer's assembly plant operations will be negatively impacted, and because the Customer does not have adequate remedy at law and could be irreparably harmed by such events, Supplier agrees that the Customer will be entitled to injunctive relief (both prohibitive and mandatory) to enforce the terms and conditions of this Agreement.

12.    **Representations and Warranties**.

(a)    Title; No Other Security Interests. Except for the liens and security interests identified on Schedule 14(a), Supplier owns the Operating Assets and Real Estate free and clear of any and all liens, security interests or claims of others, which are reasonably likely to interfere with GM's Right of Access.

(b)    Accuracy of Information. All information, certificates, or statements given to the Customer under this Agreement must be true and complete in all material respects, when given.

(c)    Authority. The parties to this Agreement have the necessary authority and control to satisfy their respective obligations under this Agreement.

13.    **Covenants**. Supplier covenants and agrees with the Customer that from and after the date of this Agreement until the Obligations are fully performed:

(a)    Further Documentation. At any time and from time to time, upon the written request of the Customer, and at Customer's sole expense, Supplier will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Customer may reasonably request for the purpose of obtaining the full benefits of this Agreement and of the rights and powers herein granted.

(b)    Payment of Obligations. Prior to an exercise of the Right of Access by the Customer, if any, Supplier will pay promptly when due, all rent payments, taxes, assessments and governmental charges or levies imposed upon or relating to the Operating Assets and the Real Estate or in respect of Supplier's income or profits, as well as all claims of any kind (including, without limitation, claims for labor, materials or supplies) against or with respect to the Operating Assets and the Real Estate. GM shall

15

not make any payment of the foregoing obligations on Supplier's behalf without Supplier's consent, which consent will not be unreasonably withheld.

(c)    Sales or Dispositions of Assets; Certain Uses Prohibited.  Supplier will not sell or otherwise dispose of the Operating Assets or the Real Estate without the written consent of the Customer, which consent shall not be unreasonably withheld or delayed, except for (i) Inventory in the ordinary course of business; (ii) surplus or obsolete assets or assets which are no longer used in or necessary for the production or assembly of Component Parts; or (iii) sales that are part of Supplier's sale of an entire product line, business unit or division, provided that the purchaser, in connection with such sale, assumes and takes an assignment of this Agreement and the post-closing obligations of Supplier under this Agreement without modification as to the Access Facilities it acquires.  Further, Supplier will not use any of the Operating Assets or the Real Estate in any way which would materially adversely affect the Customer's Right of Access or the Customer's other rights and remedies under this Agreement. Supplier acknowledges and agrees that it will be reasonable for the Customer to withhold consent if the proposed sale or encumbrance materially impairs, or is reasonably likely to materially impair, the Customer's rights under this Agreement.

(d)    Limitations on Modifications of Agreements, etc.  Supplier will not, other than in the ordinary course of business: (i) amend, modify, terminate, or waive any provision of any Contract, or enter into any Contract, which might materially adversely affect the Customer's Right of Access; or (ii) fail to exercise promptly and diligently each and every right which it may have under each Contract in any manner which could materially adversely affect the Customer's Right of Access or the Customer's other rights or remedies under this Agreement.

(e)    Maintenance of Insurance.  Supplier will, at its expense, keep and maintain the Operating Assets and the Real Estate insured against all risk of loss or damage from fire, theft, malicious mischief, explosion, sprinklers, and all other hazards or risks of physical damage included within the meaning of the term "extended coverage" in amounts as are ordinarily insured against by other similar businesses. Supplier will furnish Customer evidence of said insurance upon Customer's written request.

(f)    Right of Inspection; Cooperation.   In addition to any rights the Customer may have under the Access Facilities Supply Contracts or any other agreements with Supplier, the Customer and its representatives will, at Customer's expense, upon reasonable request and at reasonable times, have the right to enter into and upon any premises where any of the Operating Assets and the Real Estate are located for the purpose of inspecting the same, observing their use or otherwise protecting the Customer's interests therein, provided that Customer will not be permitted to have access to Operating Assets or portions of the Real Estate or observe production (i) dedicated to Supplier's other customers, or (ii) that would disclose confidential, proprietary or sensitive information related to Supplier's other customers or the component parts manufactured by Supplier for such other customers, provided, however, Supplier will take reasonable steps to accommodate Customer's rights of inspection and observation hereunder when in potential conflict with the need to

16

maintain confidentiality as referenced above. Furthermore, Customer's access shall not unreasonably interfere with Supplier's operations. The Customer will take reasonable steps to maintain the confidentiality of information obtained by the Customer, except as required by law.

(g) <u>Notice of Default</u>. Supplier will provide notice to the Customer, by way of facsimile transmission and overnight express mail service, of its or its attorneys' or agents' receipt of any notice of default received from a creditor that holds an interest in the Operating Assets or from any lessor of any Operating Assets or the Real Estate, including but not limited to taxing authorities and the landlord to the Facilities. Supplier hereby grants to the Customer the option, but not the obligation, to exercise whatever rights to cure defaults that Supplier has under such agreements or by law.

14.    **Secured Party and Lessor Acknowledgments**.

(a)    Except with respect to purchase money security interests, Supplier will not enter into any proposed security agreement or lending commitment related to exit financing or working capital financing, in which the proposed lender or secured party does not expressly agree to the acknowledgement and consent referenced below. Concurrently with execution of this Agreement, Supplier will provide to Customer (a) the Lenders' acknowledgment of and consent to the rights granted to the Customer under this Agreement by providing to Customer a form substantially similar to <u>Schedule 14(a)</u> executed by duly authorized representatives of the Lenders, and (b) the acknowledgment and consent of any secured party other than the Lenders holding a security interest in any of the Operating Assets or Real Estate to the rights granted to the Customer under this Agreement in a form substantially similar to <u>Schedule 14(a)</u>.

(b)    Concurrently with execution of this Agreement, Supplier will use commercially reasonable efforts to provide to Customer the acknowledgement and consent of any personal property lessors of material Operating Assets to the rights granted to the Customer under this Agreement by providing a copy to Customer of a form executed by such party substantially similar to <u>Schedule 14(b)</u>.

(c)    If subsequent to execution of this Agreement Supplier intends to grant additional or further security interests, liens or mortgages in a material portion of Operating Assets or the Real Estate to any additional parties, ten (10) business days prior to granting such liens, security interests, mortgages, or leaseholds, Supplier must deliver to the Customer an acknowledgment from such secured creditors, mortgagees, and/or lessees in a form substantially similar to <u>Schedule 14(a)</u> or <u>14(b)</u>, as appropriate, provided the Customer executes a subordination agreement as contemplated under Section 2 of this Agreement.

15.    **Term**. The rights granted to the Customer under this Agreement will continue until the Class A Members, as defined in the Amended and Restated Operating Agreement of Parnassus Holdings LLC contemplated by the Securities Purchase Agreement dated _____, 2009, shall have received distributions pursuant to such Operating Agreement which equal $2.0 Billion (the "<u>Term</u>"). If the Customer has invoked the Right of Access before the expiration of the Term of this

17

Agreement, the Term will expire upon the earlier of the expiration of the Access Period or the Customer's termination of the Access Period.

16. **Confidential Information and Data**. Without limiting the Customer's rights under this Agreement, to the extent the Operating Assets include or the Customer or its designee(s) otherwise comes into possession of or becomes aware of, Supplier's trade secrets or proprietary information during the Customer's exercise of the Right of Access, the Customer and its designee(s) must except as required by applicable law, keep the information, data, and trade secrets confidential.

17. **Severability**. Should any provision of this Agreement be held invalid, prohibited or unenforceable in any one jurisdiction it will, as to that jurisdiction only, be ineffective to the extent of such holding without invalidating the remaining provisions of this Agreement, and any such holding does not invalidate or render unenforceable that provision in any other jurisdiction wherein it would be valid and enforceable.

18. **Authorization**. The parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation that they represent and that their signatures bind said corporations to the terms of this Agreement.

19. **Section Headings**. The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation of this Agreement. All references to Sections, Schedules, and Exhibits are to Sections, Schedules, and Exhibits in or to this Agreement unless otherwise specified.

20. **No Waiver; Cumulative Remedies**. The Customer will not by any act, delay, indulgence, omission, or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement. A waiver by the Customer of any right or remedy under this Agreement on any one occasion will not be construed as a bar to any right or remedy which the Customer would otherwise have had on a subsequent occasion. No failure to exercise nor any delay in exercising on the part of the Customer any right, power, or privilege under this Agreement, will operate as a waiver, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law.

21. **Waivers and Amendments; Successors and Assigns**. No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by Supplier and the Customer. This Agreement and all of Supplier's obligations are binding upon the successors and assigns of Supplier, and together with the rights and remedies of the Customer under this Agreement, inure to the benefit of the Customer, and its successors and assigns; provided, however, that Supplier may not assign or transfer any right or obligation under this Agreement without the prior written consent of the Customer.

18

22.    **Governing Law and Forum**.  This Agreement is made in the State of Michigan and will be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to principles of conflicts of laws.  The parties agree that the federal and state courts sitting in Wayne County, Michigan, have personal jurisdiction over the parties and that proper jurisdiction and venue for any dispute arising from or under this Agreement will be in the federal or state courts sitting in Wayne County, Michigan.

23.    **Notices**.  All notices, requests, and other communications that are required or may be given under this Agreement must be in writing, and will be deemed to have been given on the date of delivery, if delivered by hand, facsimile or courier, or three (3) days after mailing, if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section):

| | |
|---|---|
| If given to Supplier: | Parnassus Holdings II, LLC<br>360 North Crescent Drive<br>South Building<br>Beverly Hills, CA 90210<br>Facsimile:  (310) 712-1863<br>Attn:  Eva Kalawski |
| If given to GM: | General Motors Corporation<br>Av Ejercito Nacional #843 Col Granada<br>Mexico City, Mexico 11520<br>Facsimile:  52-55-5901-3571<br>Attn:  Randall L. Pappal |
| with a copy to: | General Motors Corporation<br>M/C 482-C23-D24<br>300 Renaissance Center<br>P.O. Box 300<br>Detroit, MI  48265-3000<br>Facsimile:  (313) 665-4960<br>Attn:  General Counsel |
| and to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, Michigan  48226<br>Facsimile:  (313) 465-7631<br>Attn:  Frank L. Gorman |

24.    **No Intended Third Party Beneficiary**.  The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement.

19

25. **Counterparts**.  This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered will be an original, but all of which together will constitute one and the same instrument, and it will not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  For purposes of this Agreement, signatures obtained by facsimile will constitute original signatures.

26. **Entire Agreement; Conflicts**.  This Agreement together with any other agreements and schedules executed in connection with this Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof.  This Agreement may not be modified, altered, or amended except by an agreement in writing signed by the Customer and Supplier.  The terms and conditions of the Access Facilities Supply Contracts will be unaffected by this Agreement except to the extent that an inconsistency or conflict exists between the express terms of the Access Facilities Supply Contracts and this Agreement in which event the terms of this Agreement will govern and control.   To the extent any term or condition of this Agreement is inconsistent or in conflict with the terms of any other agreements between the parties, the terms of this Agreement will govern and control.

27. **CONSULTATION WITH COUNSEL.   THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.**

28. **WAIVER OF JURY TRIAL.  THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES.  NO PARTY WILL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned have each caused this Access Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first written above.

**PARNASSUS HOLDINGS II, LLC**

By: _____
Name:  Johnny López
Title:  Vice President

**GENERAL MOTORS CORPORATION**

By: _____
Name:
Title:

**PARNASSUS HOLDINGS II, LLC,**
on behalf of its subsidiaries and affiliates to be formed

By: _____
Name:  Johnny López
Title:  Vice President

| | | |
|---|---|---|
| **Schedule 1:** | - | **Access Facilities** |
| **Schedule 3(b)(i):** | - | **Access Fees** |
| **Schedule 14(a):** | - | **Lender's Acknowledgement and Consent** |
| **Schedule 14(b):** | - | **Lessor's Acknowledgement and Consent** |

[Signature Page to Access Agreement]

IN WITNESS WHEREOF, the undersigned have each caused this Access Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first written above.

**PARNASSUS HOLDINGS II, LLC**

By: _____
Name:  Johnny Lopez
Title:   Vice President

**GENERAL MOTORS CORPORATION**

By: _____
Name:  Walter Borst
Title:  Treasurer

**PARNASSUS HOLDINGS II, LLC,**
on behalf of its subsidiaries and affiliates to be formed

By: _____
Name:  Johnny Lopez
Title:   Vice President

| | | |
|---|---|---|
| <u>**Schedule 1**</u>: | - | **Access Facilities** |
| <u>**Schedule 3(b)(i)**</u>: | - | **Access Fees** |
| <u>**Schedule 14(a)**</u>: | - | **Lender's Acknowledgement and Consent** |
| <u>**Schedule 14(b)**</u>: | - | **Lessor's Acknowledgement and Consent** |

[Signature Page to Access Agreement]

EXECUTION COPY

## SUPPLY AGREEMENT

This Supply Agreement (this "Agreement") is entered into this 1st day of June 2009, by and between General Motors Corporation, a Delaware corporation, on behalf of itself and its subsidiaries ("GM"), on the one hand, and Parnassus Holdings II, LLC, a Delaware limited liability company, on behalf of itself and its subsidiaries and affiliates now existing and to be formed ("PEN" or "Supplier"), on the other hand. Each of Supplier and GM is referred to individually herein as a "Party" and collectively as the "Parties."

## *RECITALS*

A.     Contemporaneous with the execution of this Agreement, Supplier and certain other buyer parties and Delphi Corporation and certain other seller parties (collectively, "Delphi") are entering into a Master Disposition Agreement (the "MDA") under which Supplier will purchase certain Delphi businesses (the "Purchased Businesses") (the "Purchase Transaction").

B.     As more fully set forth below, Supplier and GM have reached certain agreements with respect to Supplier's supply of component parts, service parts, and/or finished goods (i) currently produced and supplied to GM and its affiliates and controlled subsidiaries by the Purchased Businesses (the "Existing Component Parts") pursuant to various purchase orders, supply agreements and other arrangements or other contracts in writing as of the Effective Date between GM and Delphi relating to the Purchased Businesses (the "Existing Purchase Contracts"), and (ii) to be produced and supplied to GM by Supplier (the "New Component Parts," and together with the Existing Component Parts, the "Component Parts") pursuant to various purchase orders, supply agreements and other arrangements or other contracts to be entered into between GM and Supplier after the Purchase Transaction is consummated (the "New Purchase Contracts," and together with the Existing Purchase Contracts, the "Purchase Contracts").

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, GM and Supplier agree as follows:

## *TERMS AND CONDITIONS*

1.     **Effective Date.** This Agreement shall take effect upon the closing of the Purchase Transaction (the "Effective Date"), provided that the closing of the Purchase Transaction occurs on or before September 30, 2009. If this condition is not timely satisfied, this Agreement shall automatically terminate and neither GM nor Supplier will have any obligations pursuant to the terms of this Agreement.

2.     **Purchase and Supply of Component Parts.**

2.1     General Terms and Conditions. The terms and conditions of GM's General Terms and Conditions of Purchase dated September 2004 (the "Terms and Conditions") and GM's terms relating to long-term contracts (the "Long Term

Contract Provisions") (together, the "GTC"), copies of which are attached to this Agreement as combined Exhibit A, shall apply to the Existing Purchase Contracts for which the existing terms and conditions are not specified therein. For all other Existing Purchase Contracts, the terms and conditions contained in the Existing Purchase Contract will apply. Notwithstanding anything to the contrary contained herein, in the event of any conflict between the terms of this Agreement and the terms of any applicable Purchase Contract or the GTC, the terms of this Agreement will control.

2.2    Existing Business. On the Effective Date, Supplier will take an assignment of and assume the Existing Purchase Contracts, subject to the following:

(A)    Supply. From and after the Effective Date, Supplier shall produce and supply GM with its production, service and bank-build requirements of the Existing Component Parts under the terms of the Existing Purchase Contracts, except as expressly modified by this Agreement.

(B)    Duration. Notwithstanding the term of the applicable Existing Purchase Contract, Supplier's obligation to produce and supply to GM each Existing Component Part produced at Supplier's North American facilities shall continue in effect until the end of the applicable vehicle program life (plus extensions of such program through build-out).

(C)    North American Price Downs. The piece price for Existing Component Parts produced at Supplier's North American facilities shall be the piece price as of the Effective Date as specified in the applicable Existing Purchase Contracts, subject to the total price adjustments for productivity improvements set forth on the attached Exhibit B, ███████████████ ████████████████████████████ The pricing for all other Existing Purchase Contracts will be in accordance with the terms of such Purchase Contracts.

(D)    Warranty Agreements. In connection with the Purchase Transaction, Supplier will take an assignment of and assume the Warranty, Settlement and Release Agreement and Covenant Not to Sue between Delphi and GM, dated August 14, 2007, as amended on February 5, 2008 and July 31, 2008 (as so amended, the "2007 Warranty Settlement Agreement").

(E)    Competitiveness. For Component Parts produced at Supplier's North American facilities, for the period beginning on the Effective Date and ending on the date that is 6 months after the Effective Date, GM will not exercise its right to terminate for competitiveness an Existing Purchase Order under the terms of the Long Term Contract Provisions. After such 6 month period, and continuing until the date that is 48 months after the Effective Date, GM will provide Supplier with 60 days in which to cure any uncompetitive terms in an Existing Purchase Contract.

2

2.3    New Business. Supplier shall produce and supply to GM the New Component Parts in accordance with the terms of the applicable New Purchase Contracts negotiated and entered into between GM and Supplier.

3.    **Resourcing Cooperation.** Supplier shall cooperate with GM if GM decides to resource business from Supplier to an alternative supplier ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Such cooperation shall include, without limitation, providing GM copies of tool line-ups, tool processing sheets, bills of material, PPAP packages and tool drawings and, by providing GM and its agents, representatives, designees, consultants, officers, employees and potential successor suppliers access to Supplier's manufacturing facilities for inspecting Tooling (defined below), viewing current production processes, and preparing for resourcing.

4.    **Tooling Acknowledgement.**

4.1    Supplier acknowledges and agrees that all tooling, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto (collectively, "Tooling") used by Supplier only in connection with its manufacture of GM-component parts (or where any other use is immaterial in amount or proportion) or otherwise paid for by GM or owned by GM, are owned by GM and are being held by Supplier or, to the extent Supplier has transferred GM Owned Tooling to third parties, by such third parties, as bailees at will (collectively, the "GM Owned Tooling"). Nothing herein waives or limits GM's rights and interests in Tooling under any Tooling purchase order or other agreement between GM and Delphi or GM and Supplier.

4.2    From and after the Effective Date, Supplier will provide GM with access to Supplier's facilities to conduct tooling audits, including taking photographs, preparing tooling lists and marking GM Owned Tooling as GM-owned. Supplier and GM will work together in good faith to identify GM Owned Tooling under this Section 4 and any applicable Existing Purchase Contracts.

4.3    Neither Supplier nor any other person or entity other than GM have any right, title or interest in GM Owned Tooling other than Supplier's right to utilize GM Owned Tooling in the manufacture of Component Parts. Upon the request of GM, GM Owned Tooling shall be immediately released to GM or delivered to GM by Seller. The rights and obligations contained in this Section shall continue notwithstanding the expiration or termination of this Agreement.

4.4    In the event of a dispute over whether any Tooling is GM Owned Tooling, the Tooling subject to the dispute will be presumed to be GM Owned Tooling (subject to any other customer ownership rights in the event such Tooling is used for production for other customers) pending resolution of the dispute, and GM will have the right to immediate possession of the Tooling pending resolution of

3

the dispute, but the Tooling will remain subject to any claim or right to payment of Supplier for the disputed amounts (despite Supplier's relinquishment of possession).

4.5    For any Tooling which was ever subject to a GM tooling purchase order and any replacements or refurbishments thereof, Supplier shall not use any such Tooling for the production of parts for sale into the aftermarket, unless Supplier has prior written approval from GM to do so.

5.    **Inventory Bank.**    Supplier shall produce an inventory bank of Component Parts in quantities requested by GM (the "Inventory Bank"). Supplier shall ship the Inventory Bank Parts as such parts are produced to a location designated by GM, and GM shall take possession of and pay for such parts in accordance with the terms of this Agreement. GM shall also pay Supplier's incremental costs incurred in manufacturing the Inventory Bank including, without limitation, shipping, packaging, and external storage costs (the "Incremental Bank Costs")

Upon GM's request for an Inventory Bank, Supplier shall promptly provide a schedule to GM setting forth the Incremental Bank Costs Supplier anticipates that it will incur in connection with building the Inventory Bank ("Bank Build Budget"). GM shall not be obligated to reimburse Supplier for any Incremental Bank Costs that have not been disclosed to GM and approved in writing before being incurred.

6.    **Access and Security Agreement.**    Supplier shall execute and deliver the Access and Security Agreement attached as Exhibit C with respect to all Supplier facilities listed on the attached Exhibit D.

7.    **Certain Agreements Not Assigned.**    Neither the Amended and Restated Master Restructuring Agreement between Delphi and GM dated September 12, 2008, nor that certain document entitled "Draft – August 3, 2007 1:31 am - For Discussion Purposes Only" regarding Delphi's supply of certain connectors to GM, are being assigned to Supplier.

8.    **Information Rights.**    Supplier agrees that GM and its designees shall have access to Supplier's operations during regular business hours, upon reasonable request and prior notice, and to the extent that such access does not unreasonably interrupt such operations, for the purpose of meeting with Supplier's representative in order to monitor Supplier's performance under this Agreement. Such meetings will be conducted pursuant to a mutually agreed-upon agenda in advance of the meetings.

## GENERAL TERMS

9.    **Authorization.**    The parties executing this Agreement warrant that they have the corporate power and authority to execute this Agreement and this Agreement has been duly authorized by the parties.

4

10. **Cooperation.** Each party agrees to cooperate fully with the other parties and to take all additional actions that may be necessary to give full force and effect to this Agreement.

11. **Interpretation**

    11.1    For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

    11.2    As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

    11.3    The words "hereof", "herein", "hereby", and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

    11.4    References to an article or section, or an exhibit, are (unless otherwise stated) references to an article or section of, or an exhibit to, this Agreement. References to a schedule are (unless otherwise stated) references to a schedule this Agreement.

    11.5    Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

    11.6    All accounting terms not otherwise specifically defined herein shall be construed in accordance with GAAP.

12. **No Waiver; Cumulative Remedies; Unenforceability.** No party to this Agreement shall by any act, delay, indulgence, omission, or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement. A waiver by any party of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which that party would otherwise have had on a subsequent occasion. No failure to exercise, nor any delay in exercising, any right, power, or privilege under this Agreement, by any party shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law. Should any provision of this Agreement be held invalid or unenforceable, the remainder of this Agreement will not be affected thereby.

5

13.    **Waivers and Amendments; Successors and Assigns.**  No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by the parties hereto.  This Agreement and all of the parties' obligations are binding upon their respective successors and assigns, and together with the rights and remedies of the parties under this Agreement, inure to the benefit of the parties and their respective successors and assigns.  Supplier may not assign or transfer any right or obligation under this Agreement without the prior written consent of GM.

14.    **Notices.**  All notices, requests, and other communications that are required or may be given under this Agreement must be in writing, and shall be deemed received, (A) in the case of notice by certified mail, the earlier of the date the notice is received, or the fifth (5th) day following the date of posting; (B) in the case of notice by postage prepaid overnight air express mail, the earlier of the date the notice is received, or the fifth (5th) day following the date of posting; (C) in the case of notice by facsimile transmission confirmed by certified mail or postage prepaid overnight air express mail, as of the date following the day the facsimile transmission is dispatched; and (C) in the case of notice by courier service, as of the date the notice is received, addressed as set forth below (which addresses may be changed, from time to time, by notice given in the manner provided in this Section):

|  |  |
|---|---|
| If given to Supplier: | Parnassus Holdings II, LLC<br>360 North Crescent Drive<br>South Building<br>Beverly Hills, CA 90210<br>Facsimile: (310) 712-1863<br>Attn: Eva Kalawski |
| If given to GM: | General Motors Corporation<br>Av Ejercito Nacional #843 Col Granada<br>Mexico City, Mexico 11520<br>Facsimile: 52-55-5901-3571<br>Attn: Randall L. Pappal |
| with a copy to: | General Motors Corporation<br>M/C 482-C23-D24<br>300 Renaissance Center<br>P.O. Box 300<br>Detroit, MI 48265-3000<br>Facsimile: (313) 665-4960<br>Attn: General Counsel |
| and to: | Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, Michigan 48226<br>Facsimile: (313) 465-7631<br>Attn: Frank L. Gorman |

6

15. **No Intended Third Party Beneficiary.**  The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement, except as expressly set forth in this Agreement.

16. **Counterparts.**  This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  For purposes of this Agreement, facsimile signatures shall also constitute originals.

17. **Entire Agreement; Ambiguous Language.**  This Agreement, together with any other agreements and schedules referenced to herein or executed in connection with this Agreement, constitutes the entire understanding of the parties in connection with the subject matter hereof.  This Agreement may not be modified, altered, or amended except by an agreement in writing signed by the parties hereto.  This Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by Supplier and GM and their respective counsel. Therefore, any ambiguous language in this Agreement will not necessarily be construed against any particular party as the drafter of such language.

18. **Governing Law.**  This Agreement is made in the State of Michigan and shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

19. **Confidentiality.**  The parties hereto agree that the contents contained herein are confidential and not intended for dissemination beyond the parties hereto without the express written consent of each of the parties hereto.  Notwithstanding the foregoing, any party may disclose the existence and terms of this Agreement (i) to the extent required by law (including the rules of any applicable stock exchange) or by any governmental agency or required or requested to be disclosed pursuant to legal process (including discovery requests) or in connection with any bankruptcy, insolvency or similar proceeding involving any of the parties hereto, (ii) to the extent necessary to enforce this Agreement and (iii) to any employee, officer, director, agent, affiliate, representative, investor, partner, member, shareholder or actual or potential financing source of such party or such Party's affiliates (provided that any such person or entity is directed to maintain such information in confidence as contemplated by this Section 19and that such Party shall be responsible and liable for the failure of any such person or entity to maintain such information in confidence as contemplated by this Section 19).

20. **CONSULTATION WITH COUNSEL.  THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES**

7

OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.

21.    WAIVER OF JURY TRIAL. THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT, THE PURCHASE CONTRACTS, OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHOM SUCH RELINQUISHMENT WILL BE CHARGED.

*[Signatures Appear on the Following Page]*

8

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date set forth above.

**PARNASSUS HOLDINGS II, LLC**

By:_____

Name:  Johnny Lopez

Title:    Vice President

**GENERAL MOTORS CORPORATION**

By:_____

Name:_____

Title:_____

**EXHIBITS:**

| | |
|---|---|
| Exhibit A: | General Terms and Conditions of Purchase |
| Exhibit B: | Productivity Price Reduction Schedule |
| Exhibit C: | Form of Access and Security Agreement |
| Exhibit D: | Access Sites |

[Signature Page to Supply Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date set forth above.

**PARNASSUS HOLDINGS II, LLC**

By:_____

Name: Johnny Lopez

Title: Vice President

**GENERAL MOTORS CORPORATION**

By:_____

Name:___Walter Borst_____

Title:___Treasurer_____

**EXHIBITS:**

Exhibit A:    General Terms and Conditions of Purchase
Exhibit B:    Productivity Price Reduction Schedule
Exhibit C:    Form of Access and Security Agreement
Exhibit D:    Access Sites

[Signature Page to Supply Agreement]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                         :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **GENERAL MOTORS CORP.,** *et al.*, | : | **09-50026 (REG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**ORDER APPROVING (I) MASTER DISPOSITION AGREEMENT FOR PURCHASE OF CERTAIN ASSETS OF DELPHI CORPORATION, (II) RELATED AGREEMENTS, (III) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (IV) AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION, AND (V) ENTRY INTO ALTERNATIVE TRANSACTION IN LIEU THEREOF**

Upon the motion, dated June 20, 2009 (the "**Motion**"), of General Motors Corporation ("**GM**") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105, 363, and 365 of the Bankruptcy Code,[1] for entry of an order authorizing and approving GM's (i) purchase, and guarantee of purchase, of certain assets of Delphi pursuant to the MDA, (ii) entry into the SPA, the Loan Agreement, and the Commercial Agreements with Parnassus in connection with Parnassus' purchase of substantially all of the remaining assets of Delphi, (iii) assumption of certain executory contracts in connection with the sale of certain of Delphi's assets and assignment of such contracts and leases to Vehicle Holdings, (iv) entry into an agreement with the PBGC in connection with such transaction, and (v) entry into an alternate transaction with the successful bidder at the Delphi Auction, all as more fully described in the Motion; it is

---
[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

FOUND AND DETERMINED THAT:[2]

A.     The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.).

B.     Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Due and proper notice of the Motion was provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Treasury, (iii) the attorneys for Delphi, (iv) the attorneys for Parnassus and Platinum, (v) the attorneys for Export Development Canada, (vi) the attorneys for the agent under GM's prepetition secured term loan agreement, (vii) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (viii) the attorneys for the statutory committee of unsecured creditors appointed in these chapter 11 cases, (ix) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (x) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (xi) the United States Department of Labor, (xii) the attorneys for the National Automobile Dealers Association, (xiii) the attorneys for the ad hoc bondholders committee, (xiv) the U.S. Attorney's Office,

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

S.D.N.Y., (xv) the attorneys for the PBGC, and (xvi) all entities that requested notice in these

chapter 11 cases under Fed. R. Bankr. P. 2002, and no other or further notice need be provided.

  E.  GM has provided adequate assurance that it will promptly cure any defaults under

the GM Assumed Contracts.

  F.  GM has provided adequate assurance of future performance by Vehicle Holdings

of the GM Assigned Contracts, and no further showing of adequate assurance is necessary.

  G.  Based upon the record of the hearing to consider the relief requested in the

Motion (the "**Hearing**") and all of the proceedings had before the Court, the relief sought in the

Motion is in the best interests of the Debtors, their estates, and their creditors.

  H.  The legal and factual bases set forth in the Motion establish just cause for the

relief granted herein.

  NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

  1.  The Motion is granted and all objections thereto are overruled to the extent not

already resolved or dismissed.

  2.  The MDA, the SPA, the Loan Agreement, the Operating Agreement, and the

Commercial Agreements are hereby approved, and GM is authorized, but not directed, pursuant

to sections 105 and 363 of the Bankruptcy Code, to enter into such documents as well as

Ancillary Agreements (in each case, as may be modified so as not to materially increase

payments to be made by GM) and perform obligations thereunder.

  3.  GM is authorized, but not directed, pursuant to sections 105 and 363 of the

Bankruptcy Code, to enter into, and perform obligations under, an Acceptable Alternative

Transaction that (i) has terms that, taken as a whole, are, in GM's judgment, equally or more

advantageous to GM than the Proposed Transaction, (ii) does not require GM to expend

materially more in the aggregate than what it would expend in respect of the Proposed

Transaction, and (iii) is approved by the U.S. Treasury.

4.      GM is authorized, but not directed, upon the closing of either the Proposed

Transaction or an Acceptable Alternative Transaction to assume the GM Assumed Contracts

pursuant to section 365 of the Bankruptcy Code.

5.      GM is authorized, but not directed, to assign the GM Assigned Contracts after

assumption by GM, to Vehicle Holdings upon or after the closing of the Proposed GM Sale.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to this Order.

Dated: July __, 2009
        New York, New York


                                                   _____
                                                   United States Bankruptcy Judge