```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :   Chapter 11
In re                                                       :   Case No. 09-50026 (REG)
                                                            :   (Jointly Administered)
General Motors Corporation, et al.,                         :
     Debtors.                                               :   Objection to 363 Sale
                                                            :       (Document #92)
------------------------------------------------------------X
```

June 16, 2009

The Honorable Robert E. Gerber
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408



Dear Judge Gerber:

As an individual I am writing to voice my concerns concerning the sale of the good assets of General Motors ("GM") to a new entity during bankruptcy. I apologize that my letter may not be in an acceptable form, but I'll try for substance over form.

As an unsecured creditor, holding General Motors Bonds, I would like to submit my objections to the sale of the assets of General Motors under the Section 363 as indicated in document No. 92:

Motion for Sale of Property under Section 363(b)/Debtors Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (A) The Sale Pursuant to The Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing filed by Stephen Karotkin on behalf of General Motors Corporation. (Attachments: # 1 Exhibit A - Proposed Master Sale and Purchase Agreement # 2 Exhibit Sale Order # 3 Exhibit C - Sale Procedures Order # 4 Exhibit D - Form of Assumption and Assignment Notice # 5 Exhibit E - Form of Assumption and Assignment Notice # 6 Exhibit F- Form of UAW Retiree Notice # 7 Exhibit G - Form of Publication Notice) (Karotkin, Stephen) (Entered: 06/01/2009)

My major objection is not the sale of assets to a new entity as this appears to be the preferred avenue to restructure the ailing company. Rather my objection and concern relate to the disproportionate and biased distribution of the ownership of the "new GM".

Page 2

I purchased two series of General Motors bonds, commonly referred to as retail bonds or "baby bonds", as they were sold to the public with a face value or par value of $25. They traded under the symbols HGM and XGM on the NYSE, until being delisted on June 2, following the bankruptcy filing of General Motors on June 1.

I purchased the bonds throughout 2005 in several lots, and held them in my traditional IRA and 401(K) accounts. The interest payments accrued to my retirement account to be used upon retirement for living and medical expenses. I hold $100,000 face value, acquired in 2005. The following is a summary.

| Description of the Bonds Interest rate-Maturity date | NYSE Symbol | Date of Purchase | CUSIP | Face Value | No. of Share |
|---|---|---|---|---|---|
| 7.25% due 7/15/2041 | XGM | 2005 | 370442774 | $67,500 | 2700 |
| 7.35% due 10/1/2051 | HGM | 2005 | 370442766 | $32,500 | 1300 |

As the national economic situation deteriorated in 2007, which was exacerbated by the lending crunch of fall 2007, General Motors auto sales took a precipitous slide. As the economic climate continued to deteriorate by late 2008 General Motors was facing bankruptcy without Government intervention. The Auto Task force stepped in the first part of 2009 and mandated a restructuring plan of General Motors, acceptable to the Auto Task Force/US Treasury Department with a June 1, 2009 deadline.

As an individual bondholder, I could only look on as an observer. The Task Force initially mandated that General Motors reduce their bond debt of $27.2 billion in an equity-for-debt swap in a tender offer dated April 27, 2009. There was a 30 day window for acceptance or rejecting the offer of 10% ownership of the "new GM", which would be comprised of the best assets of the company. This offer t the Bondholders represented just a few cents on the dollar of recovery of the bond principle loan amounts. It was mandated by the Task Force that 90% of the Bondholders needed to accept the offer. Since more than 10% of the Bondholders held insurance in the form or Credit Default Swaps (CDS) it was in their best interest to get a bankruptcy filing to be paid in full. (11.3% of the bonds had CDS based on the subsequent CDS auction held June 12, 2009) The threshold was impossible to achieve from the start due to the percentage of CDS holders. The debtor indicated on May 27, at the tender deadline that only 15% of the bondholders had accepted the offer.

On May 27, the debtor offer a "sweetened" offer of 10% of the new General Motors plus warrants to buy an additional 15% at predetermined strike prices based on the asset value of the restructured company. The offer was presented in a telephone conference call with a 48 hour deadline for acceptance. The email votes were to be among institutional bondholder (about 80% of the $27.2 billion in bond debt.)

Page 3

The finally tally was reported in the news media as 54% in favor or the new offer. This percentage was indicated to be acceptable by the Auto Task Force and a bankruptcy filing came June 1. At no point along the line were the $5.0 billion in individual retail bonds asked to have a say in the negotiations. The debtor, along with the Task Force, dictated the terms of the offer.

There was no "good faith negotiations", rather a "take it or leave it" offer. The offer as it stands gives the unsecured creditors 10% or the new GM, plus warrants to purchase at unrealistic strike prices in the future. Individuals were essentially bullied and intimidated by the debtor and governmental agency to relinquish their claims. The threat of "liquidation" and "no recovery" was held out as the punishment for not relinquishing their claims.

While the negotiation with the institutional bondholders was occurring, negotiations with other unsecured creditors such as the UAW were being finalized. The final share of the "new General Motors was 17.5%, with warrants for a 2.5% share at an astronomically high strike price, $6.5 billion in preferred stock paying a 9% dividend, a $2.5 billion note and $9 billion in cash.

The disparity between unsecured creditors which I thought under bankruptcy law would be the same creditor class, is appalling. Bondholders receive an estimated $0.10 on the dollar while their equals as unsecured creditors, the United Auto Workers ("UAW") health trust, receive an estimated $0.70 on the dollar for their claims.

The US Governments for their financial assistance and efforts receive 60% of the new General motors.

No one could give any idea what the priority scheme was that allows equal creditors to be treated in such a different manner. I guess anything can happen and be agreed upon outside of bankruptcy court. I did not agree, and was not even asked for my consent.

Now that we are in bankruptcy court I think we can look at ownership distribution based on priority of claims. I looked in the bankruptcy code under Chapter 11, section 507 which outlines priority. There doesn't seem to be a guideline that fits the Debtor and Auto Task Force division of asset and ownership of the New General Motors.

The priority structure is defined primarily by § 507 of the Bankruptcy Code (11 U.S.C. § 507.)

As a general rule secured creditors—creditors who have a security interest, or collateral, in the debtor's property—will be paid before unsecured creditors. The government has promised to pay the secured creditors, so far so good. Unsecured creditors' claims are prioritized by § 507. Each priority level must be paid in full before the next lowest priority level may receive payment, if I read the statue correctly.

Page 4

My objection with the sale of the good assets of General Motors is based on the disproportionate ownership share as outlined in the motion. I would hope that the Court will review and then reapportion the ownership share along the lines of the bankruptcy code. Then have the creditors vote on the plan.

I am very conscience that the economic times are unique, unusual, and uncertain in many aspects. But this is not an excuse, which has been put forth for a quick sale with a disproportionate, biased, and unfair ownership/recovery distribution. I believe the individual bondholders have not been treated in "good faith" by the debtor or the Task Force. I'm hoping the Court will take an introspective look and use the bankruptcy law to reapportion the claims and recovery distribution.

Ron Bloom, Senior Advisor at the US Treasury Department and one of the heads of the Auto Task Force, do not agree on some issues --but I take heart in a pronouncement buried in his statement before the Senate Banking Committee on June 10, 2009. On page four where he mentions that 55% of the bondholders had agreed to the equity for debt swap is his statement-- *"The bankruptcy court process will be used to confirm this treatment for those bondholders and other unsecured creditors that failed to accept or did not participate in the offer."* I take that to mean the Task Force will bow to the decision of the bankruptcy court as to the legitimacy or changes that may occur in their distribution of claims and ownership of New GM plan.

In summary I believe the sale of the good assets to the new GM under the current ownership structure as presented by the debtor and the Task Force is preferential to groups within the same creditor class. My hope is the bankruptcy court will reallocate the ownership position according to their priority before a sale is consummated.

Thank you for allowing me to address the Court on this matter and for hearing my objection. I appreciate the Court's consideration or my concerns.

Respectfully submitted,

Kenton Boettcher

Mailing Address:
25422 Trabuco Road, Suite 105-301
Lake Forest, California  92630

Phone: (949) 859-1057
Email: gmbondholder@yahoo.com

Attachments: Statement by Ron Bloom, Senior Advisor at the U.S. Treasury Department before the Senate Banking Commission, June 10, 2009

**Statement by Ron Bloom**
**Senior Advisor at the U.S. Treasury Department**
**before the**
**Senate Banking Committee**
**June 10, 2009**

Good morning.

Chairman Dodd, Ranking Member Shelby, members of the Senate Banking Committee, thank you for the opportunity to testify before you today.

## Introduction

Over the past several months, the Obama Administration has been working to manage an historic crisis in the American auto industry. President Obama inherited an auto industry that had lost 50% of its sales volume and over 400,000 jobs in the year before he took office. Two companies – GM and Chrysler – had received substantial loans from the prior Administration and were requesting substantial additional assistance that only a government could provide.

Without additional assistance, both of these companies faced uncontrolled bankruptcies and almost certain liquidation, which would have caused substantial job loss with a ripple effect throughout our entire economy. However, President Obama was unwilling to put additional tax dollars on the line unless these companies and their stakeholders were willing to fundamentally restructure, address prior bad business decisions, and chart a path toward long-term financial viability without ongoing government assistance.

Therefore, the President decided to give both GM and Chrysler a chance to work with their stakeholders and secure the sacrifices necessary to make them stronger, leaner, and more competitive in a way that would justify an investment of additional taxpayer dollars.
In only a few months, both GM and Chrysler – working with their stakeholders and the President's Auto Task Force – have achieved a level of restructuring that many thought impossible. In virtually every respect, the concessions these companies have secured exceed the restructuring conditions included in the December 2008 loan agreements to GM and Chrysler. While difficult, these actions position both companies for future viability. As a result, the President has decided to stand behind these restructurings with additional financial assistance. Consistent with the prior Administration's loan agreements, this assistance is being provided from the U.S. Treasury out of the TARP program.

After proceeding through a fair and open bankruptcy process, the new Chrysler-Fiat alliance has now been approved and is scheduled to close its sale agreement on Wednesday June 10, 2009. While General Motors is likely to take somewhat longer to move through the bankruptcy process, we are confident that it too will emerge quickly as a stronger more viable global company.

This restructuring process has required deep and painful sacrifices from all stakeholders – including workers, retirees, suppliers, dealers, creditors, and the countless communities that rely on a vibrant American auto industry. But the steps that the President has taken have not only helped to stabilize the auto industry and saved hundreds of thousands of jobs- but for the first time in decades - they have also given GM and Chrysler a chance to become viable, competitive American businesses with bright futures.

**President Obama's Auto Task Force**

In recognition of the unique role of the American auto industry to our economy and the multifaceted challenges that industry was facing, on February 15, 2009 the President appointed an Auto Task Force to oversee his Administration's efforts to help support and restructure the industry. The Task Force is co-chaired by Treasury Secretary Timothy Geithner and National Economic Council Director Lawrence Summers, and includes representatives from a broad range of agencies and offices throughout the executive branch.[1] The Task Force is staffed by a joint Treasury-NEC team, of which I am a senior member. This team reports to the Task Force and its co-chairs, who report up to the President.

From the beginning of this process, the President gave the Auto Task Force two clear directions regarding its approach to the auto restructurings. The first was to refrain from intervening in the day-to-day management of these companies. Our role has been to act as a potential investor of taxpayer resources, and as such we have not become involved in specific business decisions like where to open a new plant or which dealers to close. This is the job of management and while we have been engaged in dialogue and discussion about their approach, we have not substituted our judgment about specific decisions for theirs.

Second, the President was clear that he wanted us to behave in a commercial manner – that is to be sure that all stakeholders were treated fairly and received neither more nor less than they would have, simply because the government was involved.

Because the investments made by both the prior and current Administrations to support the auto companies have come from the TARP, the Task Force and its staff's activities have been subject to the full range of disclosure and reporting requirements under the EESA statute. This includes oversight by the GAO, EESA's Financial Stability Oversight Board, and the Special Inspector General for TARP or "SIGTARP," and the Congressional Oversight Panel established under EESA, as well as required reporting to multiple House and Senate committees.

**Chrysler**

On February 17, 2009, Chrysler submitted a detailed business and operating plan for assessment by the Auto Task Force. While this plan took several steps to restructure the struggling Company, it did not go far enough to address Chrysler's issues with scale, quality, technology, and product portfolio. For these and other reasons, on March 30 the President announced that he had determined that as a stand-alone company, Chrysler was not viable. However, The President also determined that Chrysler could achieve viability through a partnership that addressed the shortcomings of its viability plan. The partner most likely to fill this role was the international automobile manufacturer, Fiat.

Over the next month, Chrysler worked closely with Fiat and its other stakeholders to secure the necessary concessions to reach agreement around a viable partnership. On April 30, the President determined that Chrysler had made sufficient progress in its commercial viability to justify an additional investment of U.S. taxpayer resources. In order to effectuate these agreements, on April

---

[1] The other members of the Task Force are the secretaries of Transportation, Commerce, Labor, and Energy, along with the Chair of the President's Council of Economic Advisers, the Director of the Office of Management and Budget, the EPA Administrator, and the Director of the White House Office of Energy and Climate Change.

30 Chrysler filed for bankruptcy. One month later, after a court process that gave all creditors a chance to raise their concerns, the bankruptcy court approved the sale of substantially all of Chrysler's assets to the new Chrysler-Fiat Alliance. On June 5, this judgment was affirmed unanimously by a three-judge panel of the Second Circuit Court of Appeals. On Tuesday, June 9 the U.S. Supreme Court denied an application to stay the closing of the Chrysler-Fiat Alliance.

As a result, the new Chrysler-Fiat Alliance is scheduled to close its sale agreement on Wednesday, June 10, 2009 and successfully emerge from the bankruptcy process. When that occurs, Chrysler's future success will be in the hands of its executives, managers, and workers – as it would be for any private company. But the President's commitment to completing this alliance in this short period of time helped ensure that tens of thousands of jobs that would have been lost if Chrysler had liquidated will now be saved.

Reaching this point with this historic alliance was only possible because of an unprecedented degree of sacrifice from Chrysler, Fiat, and all their key stakeholders:

- *The UAW has made important concessions on wages, benefits, and retiree health care.* These concessions have brought Chrysler's compensation in line with Toyota and other transplants. In addition, the UAW retirees exchanged a $10 billion fixed obligation to the VEBA retiree health trust for a $4.6 billion unsecured note and stock in the new Chrysler. This arrangement shifts substantial risk onto the retiree health care trust and will likely result in meaningful reductions in retiree health care benefits for Chrysler's 150,000 retirees. While the Trust, beyond a single seat on the Company's Board of Directors, will have no role in the governance of the Company, the ability of the Trust to provide decent benefits over the long-term will require that the Company's stock become valuable, thus importantly aligning the interests of the Company and a key stakeholder.

- *Chrysler's largest secured creditors agreed to an exchange of $2 billion in cash for their $6.9 billion in outstanding secured debt.* The Court determined that the $2 billion was well in excess of the liquidation value of Chrysler[2] and thus found this to be a very normal and conventional treatment of secured creditors in the bankruptcy process. In addition, it was always made clear to the secured lenders that no one contested their right and they were therefore free, to take their collateral and do with it as they pleased, including either liquidating the company or operating it. Instead, they made a commercial choice to take their recovery in cash.

- *Chrysler and Fiat determined that meaningful actions were required to reduce the overcapacity in both the Company's plant footprint and dealer network. Therefore the restructuring included reductions in plants and dealers across the United States.* These decisions, while difficult, will help make Chrysler more competitive and help ensure the success of the Company in the future. Importantly, as part of its dealer rationalization effort, Chrysler has made clear that every dealer that is not receiving a franchise agreement going forward has a guarantee that they "will be made whole, less inspection and shipment costs, for all remaining inventory."[3]

- *The U.S. and Canadian governments have provided working capital and exit financing to support the Chrysler-Fiat Alliance.* The total funding provided by the U.S. Treasury for this

---

[2] $800 million on the high end of the range, as cited in the Opinion Granting Debtor's Motion Seeking Authority to Sell, Judge Gonzalez, filed 5/31/09, page 19.
[3] Memo from Steve Landry, Chrysler, to All Chrysler, Dodge, and Jeep Dealers, Dated June 5. 2009.

effort is $8.1 billion, with the governments of Canada and Ontario providing just over $2 billion.

The Company's successful emergence from bankruptcy, in conjunction with financial support from the U.S. and Canada, would put the new Chrysler-Fiat Alliance on solid footing to succeed and generate jobs well into the 21st century.

**General Motors**

On March 30, 2009, President Obama laid out a framework for General Motors to achieve financial viability. This framework required the company to rework its business plan, accelerate its operational restructuring and make far greater reductions in its outstanding liabilities. After two months of significant work by the company's management and engagement with its stakeholders, GM developed such a plan. As a result, the President deemed GM's plan viable and on June 1, 2009 committed approximately $30.1 billion of additional federal assistance from the TARP to support the company's restructuring. To effectuate its plan, General Motors filed for bankruptcy protection and will utilize Section 363 of the bankruptcy code to clear away the remaining impediments to its successful re-launch.

As with Chrysler, every one of the company's stakeholder has made substantial sacrifices as part of this process. These sacrifices include:

- *The UAW made significant concessions on compensation that will result in wage rates comparable to foreign competitors. In addition,* The GM VEBA retiree health trust exchanged a $20 billion fixed obligation for a $2.5 billion note and stock in the new GM (in the form of $6.5 billion in preferred stock, 17.5% in common equity of the new GM and warrants to purchase an additional 2.5% in common equity at a $75 billion strike price).

- *Unsecured bondholders agreed to exchange $27.1 billion of their claims for 10% of the equity of new GM, plus warrants for an additional 15% of the new Company.* This outcome allows the bondholders to recover more than what was implied by the market price of their bonds, and substantially more than they would have recovered if the government had not intervened and GM had liquidated. Prior to the bankruptcy filing The Steering Committee of a group of GM bondholders confirmed that a majority of GM's bondholders supported the deal, and the percentage of individual and institutional bondholder in supporters is now over 55%. The bankruptcy court process will be used to confirm this treatment for those bondholders and other unsecured creditors that failed to accept or did not participate in the offer.[4]

- *GM has designed and announced a reduction in its dealer network and reduction in its plant footprint.* These steps are part of the company's broad effort to right-size the business to reflect current and expected levels of demand. The resulting GM will operate with a dramatically improved cost structure that lowers its breakeven point to a 10 million annual unit environment

---

[4] While some unsecured creditors – including trade creditors and warrantee holders – will receive substantially greater recoveries than the unsecured bondholders, this reflects conventional and well-settled bankruptcy practice. As Judge Gonzalez explained in the Opinion Granting Debtor's Motion Seeking Authority to Sell, filed 5/31/09, page 1: "The sale transaction for which authorization is sought (the "Sale Transaction" or "Fiat Transaction") is similar to that presented in other cases in which exigent circumstances warrant an expeditious sale of assets prior to confirmation of a plan. The fact that the U.S. government is the primary source of funding does not alter the analysis under bankruptcy law."

compared to a prior breakeven point of more than 16 million. Because of the reduced debt and other post-retirement benefit obligations, New GM will have credit statistics consistent with well capitalized peers. This provides the company with a path to a sustainable future.

- *The U.S. and Canadian governments will provide substantial financial assistance to support this restructuring.* GM will receive $30.1 billion in new assistance from the U.S. Treasury under the TARP program.[5] In return, the U.S. Treasury will receive $8.8 billion in debt and preferred securities as well as a 60% equity stake in the restructured company. (The U.S. Treasury's equity stake is about 50% on a fully diluted basis). The Governments of Canada and Ontario will invest $9.5 billion and receive a proportional share of each of these securities.

While GM's restructuring plan will result in substantial short-term sacrifices including further job reductions and dealer closings, the long term result will be a more competitive American automobile industry that will continue the long history of American growth and innovation.

**Understanding the U.S. Government's Ownership Stake in General Motors**

As the President has made clear, The Obama Administration is a reluctant shareholder in General Motors. We inherited a situation in which GM needed substantial capital that only the government could provide. At the same time, GM had been hobbled for years by an unsustainable debt burden. In this context, piling on irresponsible amounts of new debt on top of the new GM would have simply repeated the mistakes of the past. Likewise, giving away the equity stake to which taxpayers were rightly entitled would have been irresponsible.

Therefore, the Administration made the decision to take the equity that taxpayers are entitled to, alongside a firm conviction to manage that investment commercially and exit our position as quickly as is practicable. The Administration has articulated a set of four principles that will govern its approach to managing ownership interests in financial and automotive companies that will apply directly to the government's approach to GM:

- *The government has no desire to own equity stakes in companies any longer than necessary, and will seek to dispose of its ownership interests as soon as practicable.* Our goal is to establish strong and viable companies that can quickly be profitable and contribute to economic growth and jobs without government involvement.

- *In exceptional cases where the U.S. government feels it is necessary to respond to a company's request for substantial assistance, the government will reserve the right to set upfront conditions to protect taxpayers, promote financial stability and establish the foundation for future growth.* When necessary, these conditions may include restructurings similar to that now underway at GM as well as changes to ensure a strong board of directors that selects management with a sound long-term vision to restore their companies to profitability and to end the need for government support as quickly as possible.

- *After any up-front conditions are in place, the government will protect the taxpayers' investment by managing its ownership stake in a hands-off, commercial manner.* The government will not

---

[5] Total UST commitment for GM is $49.5bn, of which $19.4bn was funded prior to bankruptcy filing on June 1st. UST commitment to debtor-in-possession funding is $30.1bn.

interfere with or exert control over day-to-day company operations. No government employees will serve on the boards or be employed by these companies.

- *As a common shareholder, the government will only vote on core governance issues, including the selection of a company's board of directors and major corporate events or transactions.* While protecting taxpayer resources, the government intends to be extremely disciplined as to how it intends to use even these limited rights.

**Steps to Stabilize Auto Finance Market**

A viable auto industry requires automotive financing for dealers and consumers. The vast majority of automobile purchases in the U.S. are financed, including an estimated 80%-90% of consumer purchases and substantially all dealer inventory purchases. As Chrysler wrote in their viability plan, "[t]he availability of credit for automotive customers and dealers is the single most important element of Chrysler's viability."

Following the collapse of Lehman Brothers, credit availability to auto dealers and consumers was severely impaired. The impact of the contraction of credit was dramatic: loan approval rates dropped, interest rates increased, and financing terms tightened. This was particularly true for domestic manufacturers, most acutely for Chrysler and General Motors products as uncertainty about the future of the companies impaired the ability of GMAC and Chrysler Financial to access the capital markets.

With Chrysler posed for a successful reorganization through a sale to the New Chrysler entity, the brighter prospects for General Motors in the context of the U.S. Treasury's support of GM's reorganization, the stabilization of the value of domestic automobiles, and the creation of healthy dealer networks, credit spreads in auto asset-backed securities markets have tightened considerably in recent weeks. For example, the spread against comparable 3-year Swap rates of prime automotive retail AAA ABS have tightened by roughly 100 basis points since March and 400 basis points from their peak of more than 600 bps in November 2008. However, the current spread of 200 basis points is still above historical averages of less than 25 bps.[6]

Having the capital markets recognize the stability of the value of domestic automobiles as collateral will be the most effective mechanism for improving the provision of credit to automotive dealers and consumers. Until that time, as with many lending markets in the current financial crisis, some government support of the U.S. automotive financing marketplace has been and will continue to be required to ensure that U.S. dealers and consumers have access to the necessary financing to buy cars. To date, the U.S. Government has provided support to the automotive finance sources through a number of notable programs:

- *TALF, the joint U.S. Treasury and Federal Reserve program, in which automotive finance companies have raised over $16.8 billion for retail and lease lending through June, 2009.* Issuers participating in this program include Ford, Nissan, BMW, CarMax, and Honda, among others (Ford issued $3.0 billion of TALF-supported retail financing in March, and an additional $1.9 billion of retail and $0.8 billion of lease TALF-supported financing in June). While dealer floorplan loans are eligible under TALF, the rating agencies must make their own independent determinations, and the rating agencies have not rated floor plan securities AAA, regardless of

---

[6] Source: Deutsche Bank Auto Industry Outlook, May 28, 2009, and FRBNY TALF June Subscription Report

the credit enhancement offered. The Federal Reserve and Treasury continue to review and study the eligibility requirements across asset classes.

- *U.S. Treasury support for automotive finance companies.* In January, the Bush Administration loaned $1.5 billion to a subsidiary of Chrysler Financial to enable Chrysler Financial to continue making retail auto loans to creditworthy Chrysler customers during the first quarter of 2009. More recently, the U.S. Treasury invested an additional $7.5 billion of capital in GMAC to fulfill two goals: (1) to enable the company to take on financing for Chrysler dealers and customers, and (2) to increase the company's capital by addressing a portion of its capital needs as identified through the stress test process GMAC completed with the Federal Reserve. As a result, GMAC, which has been a leader in providing automotive credit since 1919, is healthier and more diverse, and therefore well positioned to continue to finance creditworthy GM and Chrysler dealers and customers. As of Tuesday, June 09, 2009 GMAC has made significant progress on-boarding Chrysler dealers for both retail and wholesale floor plan financing. Retail on-boarding is nearly complete, with 2,288 Chrysler dealers (96% of all go-forward Chrysler dealerships) activated and ready to submit retail applications to GMAC. Wholesale floor plan on-boarding continues as planned, with 1,491 dealers activated and ready to finance new units (representing 90% of all go-forward dealerships that were previously financed by Chrysler Financial or GMAC). Finally, GMAC is prepared to fund the redistributed vehicles from rejected dealers to the go-forward dealers it finances (estimated 15,000 units)."

**Stabilizing the Auto Supply Base**

Because of the credit crisis and the rapid decline in auto sales, many of the nation's auto parts suppliers have been unable to access credit and have been facing growing uncertainty about the prospects for their businesses and for the auto companies that rely on them. Suppliers that ship parts to auto companies generally receive payment about 45-60 days after shipment. In a normal credit environment, suppliers can either sell or borrow against those commitments—so-called "receivables"—in the interim period to pay their workers and fund their ongoing operations. However, due to the current uncertainty about the ability of the auto companies to honor their obligations, banks have been unwilling to extend credit against these receivables.

On March 19, 2009 the U.S. Treasury announced a $5 billion Automotive Supplier Support Program to help address this problem.[7] Any eligible domestic auto company may participate. This program has provided the necessary stability to suppliers and the OEMs at a critical time. Nonetheless, the Task Force is mindful of the continuing challenges facing auto suppliers and is continuing to actively monitor the health and state of the supply base during this period of industry restructuring.

**Conclusion**

---

[7] The Program is implemented through a special purpose vehicle ("SPV") and functions as follows: The OEMs initially identify critical suppliers to participate in the Program. Once included, the OEM submits receivables of the Suppliers eligible for the Program. For those receivables, a participating supplier is entitled to be paid directly from the SPV. Suppliers have the option of receiving payment immediately, in which case they pay a 3% discount, or receiving payment under the supply contract's normal payment terms (usually 45-60 days), in which case the supplier pays a 2% discount. In either scenario, since the supplier receives payment from a government-funded SPV, the payment is certain. When the OEM's payment is due to the supplier under the terms of their contract, the OEM makes the payment to the SPV. The SPV thus bears the risk of the OEM's non-payment, and the supplier is secure.

In a better world, the choice to intervene in the companies would not have had to be made. But amid the worst economic crisis in three-quarters of a century, the Administration's decisions avoided a devastating liquidation and put a stop to the long practice in the auto industry of kicking hard problems down the road. While difficult for all stakeholders involved, these restructurings provide GM and Chrysler with a new lease on life and a chance to fundamentally restructure and succeed.