June 14, 2009

**In Re General Motors Corp., et al, Debtors**
**Chapter 11 Case No. 09-50026 (REG)**

Hon. Robert E. Gerber, Bankruptcy Judge
United States Bankruptcy Court - Southern District of New York
One Bowling Green
New York, NY 10004-1408



*Re: Objection of Robert W. Hartnagel to this Court's Orders dated June 1, 2009*

Dear Judge Gerber:

In reply to the notification I recently received concerning the above-referenced Orders, I want to respectfully call the Court's attention to a series of objections that I filed in opposition to what I continue to believe was an excessive and unreasonably broad "scope of indemnification" that was granted to the named defendants (along with a wide-ranging group of identified heirs and business associates) in a consolidated class action lawsuit decided in the United States District Court, Eastern District of Michigan, Southern Division entitled "In Re General Motors Corp. Securities and Derivative Litigation (MDL No. 1749, Master Case No. 06-md-1749)."

My prior objections are individually identified in the official District Court docket as having been filed by Robert W. Hartnagel on December 10 and 22, 2008 and on January 5, 2009 respectively, and all are electronically available on the Federal Court PACER system.

I would like to request that all of these documents be incorporated by reference in this proceeding in support of a continuing objection on my part to any further such indemnification or relief from personal financial liability--or accountability--that may be either considered or granted to any of the Named Defendants or other parties identified in the above-styled Master Case throughout the course of this proceeding.

To hopefully aid the Court's consideration of the central premise underlying my objections, I am enclosing herewith Sections A through E reflecting a number of Exhibits which accompanied the initial statement of objections identified above that were submitted to the District Court on December 10, 2009. I also want to call special attention to the following excerpts from the same document, which states as follows:

> "The central issues under review in the lawsuit focus almost exclusively on alleged misrepresentations concerning the financial condition of General Motors *that were published in prospectuses and other financial statements associated with the sale and purchase of specific debt security offerings.* Significantly, the Respondent has been unable to identify a single reference in the pleadings dealing with either *GM Proxy Statement communications or shareholder consideration of annual meeting business*

***or operating policy matters.*** It [also] seems appropriate to emphasize that these two subjects are treated as distinctly separate, if not mutually exclusive, under Sections 10b and 14a of the Securities Exchange Act respectively. (Emphasis added.)

"...The Respondent hereby objects to "The Notice" on the grounds that all alleged conduct occurring under Section 14a-9 of the Securities Act (presumably including everything during and since the Class Period) was neither identified nor addressed by the Named Plaintiffs or their Counsel thus far in these proceedings, ***but will nonetheless be meticulously and totally shielded from any subsequent Securities or Derivative litigation under the sweeping personal absolution and indemnification of the Named Defendants that has been preliminarily ordered under the proposed settlement terms.***" (Emphasis added.)

Considering the sharp legal distinction that clearly exists between "material omissions and misrepresentations" that may have occurred within the context of ***proxy statement disclosures*** (under Section 14a-9) and those involving ***debt security prospectuses*** (under Section 10b), it is difficult to escape the conclusion that shareholders who may have been damaged by the former type of conduct might quite properly be entitled to pursue a ***separate cause of action*** to recover damages, and not simply to be swept--without any opportunity whatsoever to establish the specific nature of the harm they have experienced--into a single, and decidedly non-representative, category of financial injury.

The principle contention being offered in this objection is that the negotiated settlement reached in this consolidated class action litigation has in fact produced a ***fundamental defect*** in the final disposition of MDL No. 1749, Master Case No. 06-md-1749 that is sufficiently prejudicial and detrimental to the interests of potential Section 14a-9 Class Action participants as to justify reevaluation of the FINAL JUDGMENT dated January 6, 2009 before any further disposition of assets is permitted to occur, and moreover, that the implementation of Section 21 of this JUDGMENT could be appropriate. Section 21 provides as follows:

"In the event that this Settlement does not become effective in accordance with the terms of the Stipulation, notwithstanding [paragraph] 5 above, this Order and Final Judgment shall be considered null and void to the extent provided by and in accordance with the Stipulation, and this Order and Final Judgment shall be vacated; and in such event, all orders entered in accordance with the Stipulation shall be vacated."

I want to conclude by observing that a great many General Motors shareholders who have lost their entire investments are now having considerable difficulty understanding exactly how, and why, some of the same high level executives who in some cases guided a great corporation to the brink of bankruptcy were simultaneously able to safeguard their own financial well-being in this manner--while simultaneously negotiating billions of dollars in taxpayer-generated financial support to presumably help, among other things, to insure that those benefits will continue to be payable.

The experiences described in the accompanying Exhibits have quite frankly caused me to seriously question whether certain agencies of our government have for a good many years not only treated certain major corporations as "too big to fail," but perhaps far more disturbingly, have been viewing certain top level executives of those same corporations as *TOO POWERFUL TO PROSECUTE.*

In my own opinion, any such a practice would amount to an abject betrayal of the "equal justice for all" principle that is both embodied in our Constitution and emblazoned above the doorway to the Supreme Court of the United States.

For a very long time, I have tried my level best to address the situation described in the attachments in as positive and respectful a manner as I possibly could. The only avenue for continuing to do so at this point is to urge you to give these comments as much serious consideration as you may feel my objections deserve.

Sincerely,

Robert W. Hartnagel
7605 Carta Valley Drive
Dallas, Texas 75248
(973) 233-8090


Enclosure:  Exhibit Sections A-E to Robert W. Hartnagel's statement of objections in
            MDL No. 1749, Master Case No. 06-md-1749, filed December 10, 2008 (21 pages)


Dated June 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing letter (without the exhibits provided to the Court) have been timely served by U.S. Postal Service Priority Mail on counsel of record listed below.

Robert W. Hartnagel


Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, NY 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkn, Esq., and Ajoseph H. Smoinsky, Esq.)

The debtors, C/O General Motors Corporation, 300 Renaissance Center, Detroit, MI 48265 (Attn: Lawrence S. Buonomo, Esq.)

The United States Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C.
(Attn: Matthew Feldman, Esq.)

Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser
One World Financial Center, New York, NY 10281 (Attn: John J. Rapisardi, Esq.)

Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor
New York, NY 10019  (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.)

Office of the Trustee of the Southern District of New York, 33 Whitehall Street, 21st Floor
New York, NY 10004  Attn: Diana G. Adams, Esq.)

Cohen, Weiss and Simon, attorneys for the UAW, 330 W. 42nd Street, New York, NY 10036
(Attn: Babette Ceccotti, Esq.)

Cleary Gottleib Steen & Hamilton LLP, attorneys for the UAW, One Liberty Plaza, New York,
NY  10006  (Attn: James L. Bromley, Esq.)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE GENERAL MOTORS CORP.
SECURITIES AND DERIVATIVE LITIGATION

_____/

MDL No. 1749
Master Case No. 06-md-1749
Hon. Gerald E. Rosen
This Document Relates to:
2:06-cv-12258-GER
2:06-cv-12259-GER

# EXHIBITS

## TO

## REQUEST TO INVALIDATE THE PROPOSED SETTLEMENT NOTICE BECAUSE IT COMPROMISES THE FIFTH AMENDMENT RIGHTS OF GM SHAREHOLDERS

<u>Index of Exhibits</u>

A. **Letter to SEC Chairman concerning skyrocketing top executive pensions**

B. **Correspondence concerning rejection of no-action request to exclude 2007 shareholder proposal recommending GM Board action to limit pensions**

C. **Chronology of SEC correspondence and statement of conditions applicable to data that was supplied and rationale used to support conclusions reached**

D. **24-year overview of CEO pension benefit entitlement growth and summary of communication practices used to create it**

E. **Key excerpts from 2003-06 correspondence with SEC and IRS**

F. **Overview of grand jury probes into GM regarding pensions, post-retirement benefits and financial reporting**

G. **Summary of GM Common Stock purchases during the Class Period**

BY CERTIFIED MAIL - NO. 7002 2410 0003 8725 2997

February 21, 2005

**EXHIBIT A** 

William H. Donaldson, Chairman
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D. C.  20549

Dear Chairman Donaldson:

When I initially contacted the Securities and Exchange Commission fourteen months ago concerning the skyrocketing pension benefits of General Motors executives, it was my understanding that the lifetime annual pension entitlements of GM's top level management had increased approximately *two thousand percent* since the start of the company's first "restructuring" initiatives in the mid-1980s.  That seemed bad enough at the time.  A more recent examination of GM proxy statements, however, revealed that I had underestimated the total dollar amount of these pension benefit increases by a factor of five or more. Depending on what years are selected as a basis for comparison, it now appears that the increase in CEO pensions actually falls somewhere between ***nine and fifteen thousand percent*** above the level that existed prior to the commencement of "restructuring."  (Details of this latest examination are presented as Exhibits A-D to this letter.)

At the time these benefit plan changes were being proposed, GM shareholders were repeatedly assured that the compensation and pension enhancements they were asked to authorize were necessary to keep GM's employee benefit plans "competitive" with those of other major corporations.  If this was indeed the case, this same kind of monstrous escalation of executive retirement benefits also must have been occurring on a concurrent basis in companies all across America.

While it is widely recognized that executive compensation levels have soared to 400 (or more) times those of rank and file personnel, a 15,000 percent increase in the amount being paid to *former* employees who have ceased to perform any services whatsoever to the company--is absolutely outrageous.  I think every shareholder in America should be demanding to know exactly when, how, or even IF they were ever advised that this kind of geometric expansion of executive retirement benefits was taking place. When this country is wrestling with a massive projected shortfall in *subsistance-level* Social Security benefit payments for its citizens, it is hard to see what possible justification their could be for top level *employees* of giant corporations slipping benefit plan increases of this magnitude past the *owners* of those companies on the basis that "competitive considerations" supposedly *required* it.

I again urge the Commission to carefully consider the long term implications of these practices, as well as the fundamental legality of the manner in which these pension modifications were accomplished. Over the last two decades, this country has quite literally been ***under attack from within*** by a generation of ***Information Age opportunists*** who are systematically ***plundering*** the financial resources and benefit plan assets of America's largest corporations.  An appropriate ***"disgorgement"*** of excess pension benefits, and a return to more sensible levels of executive compensation, could help resolve the Social Security challenge and give a major shot-in-the arm to the future global competitiveness of U.S. businesses.

Sincerely,

Robert W. Hartnagel
7605 Carta Valley Drive
Dallas, TX 75248



**EXHIBIT B**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

April 19, 2007

Anne T. Larin
Attorney and Assistant Secretary
General Motors Corporation
MC 482-C23-D24
300 Renaissance Center
P.O. Box 300
Detroit, MI 48265-3000

Re:     General Motors Corporation
         Incoming letter dated April 10, 2007

Dear Ms. Larin:

This is in response to your letter dated April 10, 2007 concerning the shareholder proposal submitted to General Motors by Robert W. Hartnagel. We also have received letters from the proponent on April 12, 2007 and April 13, 2007. On April 4, 2007, we issued our response expressing our informal view that General Motors could not exclude the proposal from its proxy materials for its upcoming annual meeting.

After reviewing the information contained in your letter, we find no basis to reconsider our position.

Sincerely,

Martin P. Dunn
Deputy Director

cc:     Robert W. Hartnagel
         7605 Carta Valley Drive
         Dallas, TX 75248

April 28, 2007

Mr. Martin Dunn, Deputy Director
Office of Chief Counsel
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F. Street, N.W.
Washington, D.C. 20549

**Re: Denial of GM no-action request concerning Robert Hartnagel shareholder proposal.**

Dear Mr. Dunn:

I learned yesterday evening that, despite the SEC's denial of GM's no-action request, the company has once again omitted my shareholder proposal from its proxy materials. I happen to believe that doing so is a tragedy for GM shareholders and I am writing to urge the SEC to take immediate action to prevent the likely consequences from becoming irreparable. Specifically:

1. Almost half of GM's 90-page proxy statement is devoted to matters that are directly related to *executive compensation,* including two highly important requests for stockholder approval of management proposals calling for major revisions to the current annual and long-term incentive plans. Among other things, these recommended changes would have the effect of significantly limiting any possibility of altering and/or subsequently withholding incentive compensation executives have already received. *GM in other words, is attempting to "lock in" the very benefits my proposal seeks to identify and control.*

2. The complex and obscure verbiage of the three Exhibits which identify the full significance of these proposed changes is virtually unintelligible to a typical shareholder and entirely beyond the capacity of even the most avid proxy statement reader to digest and comprehend within the available time limitation for making a decision. This is pure and simply "bulk obfuscation" at its worst and, to me, it flies in the face of the SEC's "plain language" requirement.

3. Omitting my proposal (despite the SEC's no-action request rejection) has the effect of depriving shareholders of an "historical overview" of executive compensation and pension accrual practices that is *entirely material* to shareholders' basic understanding of the consequences of their vote regarding the proposed incentive plan changes. As such, I believe excluding my proposal is a deliberate violation of Proxy Rule 14a-9. I also want to point out that this is precisely the sort of problem that I attempted to identify in my April 7, 2006 letter to Nancy M. Morris in response to the SEC's request for public comment regarding proposed executive compensation disclosure requirements. (Please see page two of Exhibit A.)

4. In order to prevent irreparable injury to the interests of GM shareholders, I believe it may be appropriate for the SEC to seek an *injunction* to, at the very least, delay the implementation of any changes which would result from shareholder authorization of these incentive plan changes until the issue of omitting this proposal in violation of Proxy Rule 14-a is conclusively resolved.

5. In support of this recommendation, I am enclosing the following documents that were prepared for possible use in the event my proposal was incorporated in this year's GM proxy statement. I believe the information they provide essentially meets the judicial burden required for successfully obtaining an injunction:

    <u>Exhibit B</u>: (Overview of compensation and pension accrual practices)

    <u>Exhibit C</u>: (History of proponents unsuccessful attempts to verify pertinent financial data)

    <u>Exhibit D</u>: (Description of context in which compensation excesses evolved)

6. The entire three-year history of this proposal submission is a textbook illustration of GM's classic approach to evading and frustrating any attempt to make the company do anything it does not choose to do:  (1) Stall.  (2) Stonewall.  (3) Use its vast political influence and economic resources behind the scenes to get its procedural ducks in line.  (4) Then, whenever the company chooses, simply blow the opposition right out of the water by making the consequences of opposing whatever action it decides to take appear so seemingly onerous (both to the opponent, and more importantly, to the overall best interest of the company, the nation, the world and the known universe in general) that <u>not</u> doing exactly what GM wants is "obviously" unthinkable.

Nuts!  Tolerating and essentially condoning that sort of tactic is what has gotten the company and to some extent, the country, into the mess they both are in today.  In my opinion, ***GM is breaking the law*** and the fact is, there is only one party to this proceeding that has the authority and the power to confront and successfully counteract this strategy--and that is the Federal government. Doing so in this instance would seem to me to be a worthy and important opportunity to exercise that power.

I hope that this information, and this overall shareholder proposal effort, can be useful in some way in encouraging that sort of action.  Thank you for considering my recommendations.

Sincerely,

Robert W. Harthagel
7605 Carta Valley Drive
Dallas, TX 75248
(972) 233-8090

**EXHIBIT C**



## *Special note:*

*Since December, 2003, General Motors management has prevented GM shareholders from considering the following shareholder proposal aimed at controlling the <u>skyrocketing lifetime pension entitlements</u> of top GM executives. This recommendation urges the board of directors to adopt a "leveling formula" in the calculation of executive retirement benefits which would eliminate the huge compensation windfall that has resulted from reducing executive head count by fifty percent—<u>without making a commensurate cut in the total aggregate amount of annual bonus awards being paid out.</u> Also shown below are key excerpts from three years of correspondence with the Securities and Exchange Commission which identify specific examples of the deceptive shareholder communication practices that were used to produce the current unprecedented expansion of top executive pensions.*

*The financial data and calculations included in these attachments are based on the proponent's own examination of various GM documents and publications. While the information is believed to be correct, no such assurance is intended or should be inferred. Despite repeated requests to GM asking that the accuracy of this data be either confirmed or corrected, no response was forthcoming. Any opinions or conclusions expressed are likewise those of the proponent. They are offered for the purpose of summarizing and explaining the rationale that was presented to the Securities and Exchange Commission during the three years this proposal has been excluded from GM's annual proxy statements. Both the proposal and supporting explanations are an attempt to make a serious contribution to the discussion of a complex and difficult subject in the belief that there is, and should be, plenty of room in it for more than one point of view.*

**2007 General Motors shareholder proposal:**

\*                    \*                    \*

RESOLVED: GM shareholders request our Board of Directors to halt the senior executive compensation windfall that is being created by directing the entire financial saving resulting from the elimination of incentive award payments to half of GM's upper management group into the annual incentive compensation and lifetime pension entitlements of surviving executives.

We urge the Board to immediately begin the process of eliminating this huge compensation bonanza by developing a "leveling formula" to reduce the amount of payments that can be used to calculate the pension benefits of GM's highest level executive group. The proposed formula would act to routinely adjust these benefit accruals by the same percentage that the total executive population has changed in any given year compared to an average baseline executive employment level during the six year period immediately preceding commencement of GM's restructuring initiatives.

When highly paid executives who are performing their regular management duties create a substantial financial saving by using company-supplied technology, company facilities, and the efforts of other company personnel working on company time, that saving belongs to the company and its shareholders. It should not be treated simply as a compensation windfall for the executives who produced it.

SUPPORTING STATEMENT: In accordance with early GM "restructuring" objectives, the total number of executives eligible to receive annual incentive compensation awards was reduced by more than fifty percent. At the same time, the formula which routinely determined the total amount of revenue that could be made available for the payment of executive incentive awards in any given year (irrespective of the number of executives who were eligible to receive such awards) remained unchanged. As a result, each year since this massive executive head count reduction was accomplished, the formula continued to generate an aggregate level of funding that was comparable to what previously would have been paid to almost twice the current number of GM executives.

Instead of directing this potential saving toward the attainment of overall GM financial operating objectives, the entire amount is being distributed each year to surviving and current GM executives in the form of greatly expanded incentive compensation payments. While this practice has been justified to shareholders on the basis of surveys of industry-wide compensation practices, these surveys primarily reflect a "racing-your-own-shadow" comparison with companies whose highest level executives are also benefiting from precisely the same kind of restructuring-generated incentive award windfall.

Of even greater significance, however, are the longer term consequences of this practice. Due to a series of concurrent modifications to the GM Salaried Employee Retirement Benefit Plan, these same inflated annual incentive awards now are becoming translated into enormously expanded pension entitlements for a steadily increasing number of senior executive retirees. As a result, this employee benefit plan has been in effect transformed into an extremely lucrative, lifetime, deferred compensation arrangement for senior level management, as well as a huge unfunded long term liability for GM.

It is time to put the brakes on skyrocketing top executive pensions. Vote FOR this proposal.

\*                    \*                    \*

**EXHIBIT D** 

## HOW--AND WHY--TOP GM EXECUTIVE PENSION BENEFITS "SKYROCKETED"

| "Recovery" Percentage (35 vs. 45 yrs. of service) | Projected CEO final 5-yr. earnings base (as shown in proxy statements) | Modifications to GM Salaried Employee Retirement Plan and key changes in proxy statement disclosure practices |
|---|---|---|
| | Year | |

*Key point*: The final projected five-year earnings base used in 1980 and 2004 proxy statements to calculate future CEO pension benefits increased *almost five thousand percent* (from $85,000 to $4,155,500). At the same time this expansion was occurring, the "recovery formula" (i.e., the percentage of total compensation that is paid as a pension benefit under the GM Salaried Employee Retirement Plan) was increased from a "capped" maximum benefit of $110,000 to an "uncapped" *eighty six percent* of the applicable 2004 compensation base. As described below, the timing and nature of GM proxy statement disclosures prevented shareholders from identifying--until long after the proposed benefit plan changes had been voted on--the full consequences of the modifications they had been called upon to authorize. (See Exhibit A)

*How top executive pension benefit increases were created:*
The omission of data reflecting both the annual dollar amount of bonus awards granted and the specific number of individuals receiving them served to *conceal* the fact that *a fifty percent reduction in bonus eligible personnel* was not accompanied by a commensurate reduction in the total aggregate amount of bonus compensation being distributed to "surviving" executives. This massive displacement of executive personnel was accomplished in part by making a *surreptitious unilateral modification* to the mutually accepted terminology of the *written contract* governing the employment of all North American GM salaried employees. (Exhibit B)

From 1996 forward, proxy statements disclosed only compensation data for the five top executive officers. At no time from 1988-2006 did any proxy statement disclose the *total aggregate dollar amount* of bonus awards granted to the entire bonus eligible group.

Starting in 1992, the number of bonus eligible recipients was described only in terms of generalized projections or approximations, rather than stating the *actual* number of individuals who received bonuses in each succeeding year. (Exhibit C) An "alternative formula" was added in 1991 to allow *incentive compensation* to be included in executive pension benefit accruals.

In 1990, benefit "recovery" formulas were increased *sixteen percent.* To even detect that this change had occurred, shareholders were required to perform their own math calculations on data contained in statistical tables in two separate proxy statements. (Exhibit D)

In 1986, a $110,000 "cap" on executive pensions was eliminated--without any explanation to shareholders of the expected consequences of this change. At the same time, the pension "recovery" percentages shown in proxy statement tables were also increased. These changes had the combined effect of *tripling* the benefit amount payable to executives with salaries above $110,000.

While this "cap" elimination was accomplished by inserting *just twelve words* in the middle of a single paragraph in a *38-page* proxy statement (Exhibit E), it represented a dramatic departure from the incremental increases that had occurred in prior years, and essentially amounted to a total abandonment of the "welfare benefit" character of the Salaried Employee Retirement Benefit Plan as it pertained to top level management. Instead, this benefit plan was fundamentally altered into a highly lucrative, *lifetime "deferred compensation plan"* for senior GM executives--*and only they were aware it had happened.*

| Recovery | Year | Earnings base |
|---|---|---|
| 67 / 86 % | 2004 | $ 4,155,500 |
| | 2003 | 4,460,600 |
| | 2002 | 3,554,333 |
| | 2001 | 4,403,300 |
| | 2000 | 4,293,000 |
| | 1999 | 3,451,000 |
| | 1998 | 3,270,000 |
| | 1997 | 2,709,583 |
| | 1996 | 1,088,183 |
| | 1995 | 1,246,677 |
| | 1994 | 1,498,750 |
| | 1993 | 973,500 |
| | 1992 | 1,498,750 |
| | 1991 | 2,064,833 |
| | 1990 | 883,333 |
| 54 / 73 % | 1989 | 793,333 |
| | 1988 | 721,667 |
| | 1987 | 658,333 |
| | 1986 | 135,933 |
| 25 % | 1985 | 166,413 |
| | 1984 | 154,919 |
| | 1983 | 154,919 |
| | 1982 | 143,544 |
| | 1981 | 92,335 |
| | 1980 | 85,000* |

* Before 1980, all pensions payable under the GM Salaried Employee Retirement Benefit Plan were capped at $85,000. The cap was raised to $110,000 at the April 25, 1980 annual meeting. The practice of making proxy statement disclosures showing the projected total dollar amount of each key executive's "trusteed" and "total" pension benefits *ENDED* in 1990.

**EXHIBIT E** 

## EXCERPTS FROM 2004-06 CORRESPONDENCE WITH THE S.E.C. CONCERNING ROBERT W. HARTNAGEL SHAREHOLDER PROPOSAL AIMED AT "LEVELING" GM EXECUTIVE PENSION ENTITLEMENTS

March 9, 2004--RWH letter to Office of Chief Counsel, SEC Division of Corporation Finance:

"The objective of this proposal is to encourage GM shareholder awareness of, and prompt attention to, what might arguably be called the most challenging and important corporate governance issue facing this company and this country today: ***controlling skyrocketing executive compensation and pension benefit entitlements***. The proposal is moreover an attempt to frame the discussion within the context of a possible ***solution***, as opposed to a simple restatement of the problem, and more importantly, to do so while the problem is still potentially correctable. Delaying this discussion for an additional sixteen months (or until another proposal addressing the same problem can be incorporated into future GM proxy materials) would not only postpone a badly needed shareholder response to this pressing concern, but possibly permit additional impediments to be placed in the path of ever finding a workable solution. (An example of such a an impediment might include the possible amendment of State Constitutions to prevent any future modification of existing pension benefits).

December 23, 2003--Text of original shareholder proposal submitted to GM Secretary's office:

"The GM Salaried Employee Retirement Plan was initially authorized by company shareholders for the purpose of providing a modest and generally proportional level of post-retirement income to all salaried employees on the basis of cumulative length of service. Before restructuring initiatives were begun in the mid-1980s, all salaried employee pensions, including those received by the very highest level executives, were subject to a benefit "cap" which limited the maximum pension any salaried employee could receive to $110,000 per year. Just prior to initiating the effort to accomplish a fifty percent executive head count reduction, this cap was eliminated, and since that time, the pension entitlements of the highest level executives have increased more than 2,000 percent.** As a practical matter, where executive pensions are concerned, the original "welfare benefit" character of the salaried retirement plan has been entirely abandoned, and the plan now has been transformed into a highly lucrative "deferred

compensation arrangement for former management personnel. This proposal identified the primary reason for this dramatic escalation in executive "pension" benefits and suggests an appropriate basis for shareholders to respond by initiating a concerted effort to reverse the policies which have produced these compensation excesses and recapture the substantial revenues which increasingly are being required to pay for them.

## *2008 UPDATE:*

*Depending on the particular criteria used in making a comparison, it now appears that CEO pensions have increased between EIGHT AND TEN THOUSAND PERCENT from pre-restructuring levels.*

## March 9, 2004--RWH letter to Office of Chief Counsel, SEC Division of Corporation Finance:

Understanding the full public policy significance of this particular governance issue requires careful consideration of the cumulative effect of the massive transfer of wealth that would occur, for example, over the next 25 years if, for the first time in this nation's history, American businesses (often called the "engines of our democracy") become "harnessed" to an obligation for providing enormously inflated <u>lifetime</u> so-called "pension" benefits to a steadily increasing number of former executives. The beneficiaries of these huge retirement benefit payments would no longer perform any services whatsoever to the corporations whose (future) employees will be responsible for supplying the productivity gains needed to meet the largely <u>unfunded</u> financial obligations that these expanded future "pension" entitlements have created.

It is also important to recognize the particular manner in which this enormous expansion of executive compensation has been accomplished. By way of illustration, it is significant to note that it required *just twelve words,* inserted in the middle of a single paragraph in a <u>38-page</u> 1985 GM proxy statement to remove a "cap" which historically had limited the maximum amount of any salaried employee pension to $110,000 annually. This seemingly "minor" change, along with the subsequent addition of an "alternate formula" which added *incentive awards* to the same calculation, has permitted the pension entitlements of top GM executives to literally explode in a single decade into multi-million-dollar *lifetime annual* entitlements, compared to the $110,000 maximum limit which existed prior to the start of "restructuring" initiatives.

Perhaps even more significantly--*from the standpoint of the full disclosure requirements which are imposed by SEC Proxy Rule 14a-9(a)*--there was no practical way (other than by laboriously assembling the pension projection charts that were presented *in four separate GM proxy statements,* and then personally making the complicated mathematical calculations needed to identify the year-to-year rate of progression of pension entitlements that occurred during a single four-year time period) that any individual shareholder could have detected that a number of highly important pension eligibility changes were being made. These same imperceptible changes, however, in combination with the prior $110,000 eligibility "cap" removal, subsequently proved to be enormously beneficial to the select few top level executives whose pension entitlements actually exceeded the previous company-wide pension benefit limitation. As a practical matter, shareholders could not possibly have recognized the full significance of the proposed benefit plan modifications they were being asked to authorize."

January 10, 2004--RWH letter to Outside Members of the General Motors Board of Directors:

"GM Proxy Statement disclosure practices in recent years have made it virtually impossible for an individual shareholder to determine with any real precision what the aggregate impact of this explosion of annual incentive awards may be. Instead, the statement appears primarily to be an attempt to justify the philosophy upon which these awards are based, without revealing either the total amount of executive compensation being awarded in any given year, or the aggregate long term cost of proposed benefit improvements. This information is needed *before*, not after, the changes become irreversible.

It is only by estimating the annual effect of executive employment trends since 1989 and making assumptions reflecting the pattern of funding practices after the commencement of "restructuring" and applying these same assumptions to the information supplied in the Annual Report that even a general estimate of these consequences can be developed. The calculations made in conjunction with submission of this shareholder proposal suggest the following:

1. Total 1983-89 incentive awards: $ **1,414,300,000**
2. **Estimated** total 1990-2002 annual incentive awards: $ **6,152,500,000**
3. Executive head count reduction 1983-2000 = 3,348, (**or 50.3% of pre-1983 level**)

(and, in accordance with the rationale previously presented in this shareholder proposal,)

4. **Estimated** 1983-2000 "**OVERPAYMENT**" of annual incentive compensation on a "**constant-per-capita**" basis compared to pre-restructuring executive employment levels and traditional incentive plan funding practices: $ **3,586,663,000**

Perhaps the most startling conclusion of all is the fact that this entire $3.5 billion (?) "overpayment" presumably is being translated into expanded lifetime "pension" entitlements for the same executives who initially received this amount in the form of expanded annual bonus payments. (Other incentive compensation, stock options and pre and post-retirement benefits are not reflected in these calculations.)"

January 10, 2004--RWH letter to Outside Members of the General Motors Board of Directors:

"Most GM shareholders would reject, both on ethical and legal grounds, any management practice that permitted one group of *employees* to create a personal financial benefit as a direct mathematical consequence of eliminating the jobs and benefit entitlements of another group of *employees*. Yet it would appear that this is precisely what is taking place with respect to the creation and allocation of incentive pay. Shareholders might also wonder why, for instance, if this massive infusion of additional compensation is necessary for "competitive" reasons, it is not being provided through established salary administration procedures, and on the basis traditional individual performance reviews, instead of through an across-the-board annual bonanza of incentive plan funding."

<u>May 3, 2004--RWH letter to Jonathan Katz, Secretary, Securities and Exchange Commission</u>:

"As the correspondence described above has explained, these inflated pension entitlements have been created on the basis of a long-standing pattern of shareholder deception and proxy statement slight-of-hand. Because similar practices have also been adopted by the management of other major American corporations, the resulting nationwide "phenomenon" of grossly disproportionate and excessive executive compensation entitlements now has become <u>one of the most important public policy issues</u> this nation has ever faced.

*This is due in large part to the fact that the same inflated annual bonuses corporate executives routinely receive subsequently are creating a "turnaround factor" which effectively funnels massive amounts of corporate resources directly into substantial and recurring so-called "voluntary" <u>individual</u> contributions to corporate Political Action Committees. The enormous aggregate influence these PAC contributions are generating has in turn significantly altered the traditional balance of power (and influence over government operations) to the considerable detriment of individual citizens and in favor of those who control major U.S. Corporations*." (Emphasis added.)

<u>March 9, 2004--RWH letter to Office of Chief Counsel, Division of Corporation Finance, SEC</u>:

"(2) Since the start of GM's first "restructuring" program in the mid-1980s, the lifetime, annual "pension" entitlement of GM's most recent CEO "retiree" has increased more than TWO THOUSAND PERCENT**--from $110,000 in 1985 to *$2.25 million* in 2001. In addition, there is no longer any limitation whatsoever incorporated in GM's salaried retirement benefit plan which would in any way restrict just how high top executive pensions conceivably could go in the future. At a time when Federal Reserve Chairman Greenspan has issued ominous warnings about the inevitable need for cutting social security benefits for millions of future retirees, and considering the fact that enormous increases in top executive retirement benefits are occurring throughout corporate America, it seems entirely clear that this is indeed an "extraordinary" public policy concern if there ever was one.

(3) It seems equally clear that few (non-executive) GM shareholders would have *knowingly* authorized anything even approaching this kind of gigantic percentage increase in executive "pension" benefits based on the GM common stock dividends that were paid during the same period. For this reason, another "extraordinary" public policy consideration is also applicable to this proposal, namely, the highly questionable nature of the shareholder communication and proxy statement disclosure practices that have been employed for the purpose of both creating and sustaining the barely discernible compensation and benefit plan increases that have been put in place.

(4) Eliminating the jobs of *fifty percent* of GM's 6,800 top level executives--and then dividing-up the incentive awards these displaced employees would otherwise have received to create the revenues needed to pay for massive compensation and benefit increases for "surviving" executives--presents still another directly applicable and highly "extraordinary" public policy concern. GM's concurrent failure to disclose financial data in its annual proxy materials which

would have permitted shareholders to determine either the total amount of each year's "bonus pot" or the precise number of executives sharing it, at the same time they were being asked to authorize even greater increases suggests an additional shareholder governance concern.

(5) Perhaps the most troubling public policy consideration of all, however, arises from the fact that all of the above issues reflect routine operating practices by the management of a corporation which traditionally has occupied a truly unique position of influence and leadership, impacting virtually every aspect of national affairs. "What's good for GM," as the saying goes, "is good for America--and visa versa." Unfortunately, in this particular instance, it appears that it is the "visa versa" part that could require a good deal closer examination by both large and small individual GM shareholders.

(6) During precisely the same time period that GM was pursuing the particular restructuring practice that is articulated in the enclosed U.S. News and World Report article, top GM representatives were occupying key leadership positions in some of the most highly respected business organizations in the country. These same organizations were responsible for planning a broad range of public policy initiatives that subsequently were adopted and implemented by some of the largest corporations in America. (Please note that the enclosed Business Roundtable membership list is included to illustrate the extremely broad scope and nature of this involvement, and not to suggest that either this organization or any of its members participated in creating the practices described in this letter.)

(7) Stated bluntly, the main reason that a public policy exception to the SEC's proxy rules should be granted in this instance is that, unprecedented or otherwise, from an individual shareholder's perspective, the reward structure for top level managers in American corporations is essentially *out of control*. In a single twenty-year period, CEO compensation has grown to *four hundred times* the pay of a typical worker and pension entitlements can be *five hundred times as large*, and even larger, plus many other benefits. Both individual shareholders and the institutions responsible for protecting their interests should be permitted to consider the opportunity that this proposal provides to begin the long and difficult process of *reversing* the practices which have created these enormous imbalances and *recapturing* the money that is being diverted from general operating revenues to pay for them.

(8) To state the problem even more bluntly, it could be time for the owners of American corporations to consider the deeply troubling possibility that the same so-called "competitive compensation studies" that helped to produce these massive executive compensation and benefit increases may in actual practice be an Information Age equivalent to the totally NON-competitive practice of *"price-fixing"* with respect to the cost of executive services, and in addition, that they acted primarily to advance the interests of a *"corporate oligarchy"* resulting from the increasing concentration of wealth and authority in this country over the same two decades. Webster's Third New International Dictionary describes one meaning of the term "oligarchy" as a form of "autocratic control by a small faction, resulting from corporate concentration." The New Encyclopedia Britannica describes the concept of oligarchy as "power exercised by a small and privileged group for selfish purposes."



## VIEW FROM THE TOP

Piece by piece we see the head count coming down. What we do is put the budget in, and just wipe people out of the budget. Then we measure managers against it. If they don't take their people out, they don't meet their budget and their incentive compensation suffers."

Roger Smith

"I could cut $350 million out of research and engineering, but I would be selling our future."

U.S. NEWS & WORLD REPORT, Oct. 27, 1986

### VIEW FROM THE TOP

## Taming the corporate wildebeest

# The Business Roundtable

## OFFICERS

### Chairman
Roger B. Smith

### Cochairmen
John F. Akers
Theodore F. Brophy
Edmund T. Pratt, Jr.

### President
William L. Lurie

### Executive Directors
James Keogh
*Public Information*

Richard F. Kibben
*Construction*

Samuel L. Maury
*Washington*

(June 1966)

## POLICY COMMITTEE

JOHN F. AKERS · IBM
SAMUEL H. ARMACOST · BankAmerica
H. BREWSTER ATWATER · General Mills
STEPHEN D. BECHTEL, JR. · Bechtel
ROBERT A. BECK · The Prudential
WILLIAM W. BOESCHENSTEIN · Owens-Corning Fibergla
JOHN F. BOOKOUT · Shell Oil
THEODORE F. BROPHY · GTE
JAMES E. BURKE · Johnson & Johnson
JOHN L. CLENDENIN · BellSouth
WILLIAM S. COOK · Union Pacific
JOHN J. CREEDON · Metropolitan Life Insurance
EDWARD DONLEY · Air Products and Chemicals
ROBERT F. ERBURU · Times Mirror
JOHN B. FERY · Boise Cascade
CLIFTON C. GARVIN, JR. · Exxon
RICHARD L. GELB · Bristol-Myers
ROBERTO C. GOIZUETA · Coca-Cola
HOWARD GOLDFEDER · Federated Department Stores
ROBERT A. HANSON · Deere
RAYMOND A. HAY · LTV
RICHARD E. HECKERT · DuPont
WILLIAM R. HOWELL · J.C. Penney
DAVID T. KEARNS · Xerox
ROBERT D. KILPATRICK · CIGNA
WILLIAM S. LEE · Duke Power
JAMES T. LYNN · Aetna Life & Casualty
RICHARD J. MAHONEY · Monsanto
ROBERT H. MALOTT · FMC
HAMISH MAXWELL · Philip Morris
JOHN F. McGILLICUDDY · Manufacturers Hanover
JOHN K. McKINLEY · Texaco
RUBEN F. METTLER · TRW
RICHARD M. MORROW · Amoco
JOHN D. ONG · Goodrich
PAUL F. OREFFICE · Dow Chemical
CHARLES W. PARRY · ALCOA
DONALD E. PETERSEN · Ford
EDMUND T. PRATT, JR. · Pfizer
JOHN S. REED · Citicorp
JOHN M. RICHMAN · Dart & Kraft
JAMES D. ROBINSON III · American Express
DAVID M. RODERICK · U.S. Steel
ANDREW C. SIGLER · Champion International
JOHN G. SMALE · Procter & Gamble
ROGER B. SMITH · General Motors
EDSON W. SPENCER · Honeywell
HAYS T. WATKINS · CSX
JOHN F. WELCH, JR. · General Electric
THOMAS H. WYMAN · CBS
JOHN A. YOUNG · Hewlett-Packard

### Honorary Members

REGINALD H. JONES · General Electric
THOMAS A. MURPHY · General Motors
DAVID PACKARD · Hewlett-Packard
IRVING S. SHAPIRO · DuPont

The Business Roundtable is an association of business executives who examine public issues that affect the economy and develop positions which seek to reflect sound economic and social principles. Established in 1972, the Roundtable was founded in the belief that business executives should take an increased role in the continuing debates about public policy.

The Roundtable believes that the basic interests of business closely parallel the interests of the American people, who are directly involved as consumers, employees, investors and suppliers. Thus, business leaders, although they speak as individuals, have responsibilities which relate to many factors that affect economic well-being — including jobs, products, services and return on investment.

A principal strength of the Roundtable is the extent of participation by the chief executive officers of the member firms. Working in task forces on specific issues, they direct research, supervise preparation of position papers, recommend policy and speak out on the issues. In this process, the Roundtable draws on the staffs of member companies for talent and expertise. In addition to the task forces there are a number of standing committees composed mostly of executives at the vice-presidential level.

Activities of the task forces and committees are reviewed by the Roundtable Policy Committee. Position papers approved by that committee are circulated to members and to the government, and are made available for use in the public discussion of issues.

In an effort to insure a broad base of information for the decision-making process, membership of the Roundtable is diversified. Member selection reflects the goal of having representation varied by category of business and by geographic location. Thus, the members, some 200 chief executive officers of companies in all fields, can present a cross section of thinking on national issues.

The Roundtable is selective in the issues it studies. A principal criterion is the impact the problem will have on the social and economic well-being of the nation. The Roundtable works only on issues where its members' business experience can make a significant contribution. It has continuing liaison with other organizations dealing with national problems.

<u>January 26, 2004--RWH letter to SEC Commissioner Harvey J. Goldschmid</u>:

"The enormous escalation that has taken place in top executive compensation and benefit entitlements in this country over the last two decades has been propelled in part by the simple fact that the benefits of this particular phenomenon are being shared by all upper level managers, not only inside American corporations, but throughout the highest echelon of virtually every institution and organization charged with the responsibility of safeguarding the interests of individual investors--and citizens. It is most certainly <u>not</u> a time when the voices of small individual investors should be muted. They are the ones whose financial "boats" are no longer "rising" in a manner that is in any way commensurate with this particular "tide."

<u>March 15, 2004--RWH letter to SEC Chairman William H. Donaldson; Commissioner Paul S. Atkins; Commissioner Roel C. Campos; Commissioner Cynthia A. Glassman and Commissioner Harvey J. Goldschmid</u>:

"We need to begin considering the rather troubling possibility that, a couple of decades ago, while most of us were mowing the grass or watching Monday Night Football, some very bright people who had been given the responsibility for managing some of the largest corporations in America (as well as the vast array of state-of-the-art Information Age technology that these same companies had bought and paid for) quietly put their heads together and figured out a way to "stack the economic deck" dramatically in their own favor.

This country cannot hope to deal effectively with the enormous scope of this kind of problem simply by initiating protracted legal confrontations with a small number of protagonists in a continuing procession of executive misconduct "horror cases." The fact is, all of these cases essentially involve different examples of the same basic problem. The declining fortunes of a great many Americans cannot be attributed solely to the increasing pressures of "global competition" or to the effects of inexorable economic trends. The true cause is far more likely to be found in the fundamental nature of human behavior--*and greed*.

For this reason, it might be useful to recall the behavioral principle that was so clearly demonstrated by Pavlov's "salivating dogs" a century ago: *When you reward certain kinds of behavior, you will get more of it.* The shareholders of American businesses need to begin the process of reasserting the authority (which ultimately rests primarily in their hands) for *controlling* skyrocketing executive compensation and benefit entitlements based on a clear understanding that this same fundamental principle of human behavior *also works in reverse*."

<u>January 10, 2004--RWH letter to Outside Members of the General Motors Board of Directors</u>:

"The arrival of the "information age" and its vastly enhanced computer technology has endowed a single generation of corporate managers with the truly awesome power to implement changes of such enormous scope and complexity that they have far outdistanced the ability of anyone not in possession of these capabilities to even perceive, much less evaluate, the full

consequences of their actions. It is the same sort of advantage that must have accompanied the arrival of the steam engine and the bow and arrow. Those who initially <u>controlled</u> this technology were able to achieve great rewards from doing so.

This shareholder proposal is intended to focus on one highly significant consideration which separates this technological "revolution" from the ones that came before it. On one hand, the "Information Age" has been characterized by the speed and sheer magnitude of the changes that are occurring. At the same time, it might be appropriate to remember that the people who have acquired the raw power being generated by this revolution are <u>employees</u>, not owners, of the <u>corporations</u> which bought and paid for this technology--and for this reason, the resulting financial rewards should be apportioned accordingly.

Shareholders, and their elected representatives, need to begin actively challenging, and not simply accepting, the glib assertion that it is "competitive factors" rather than the concurrent actions of similarly-situated executives that may have so greatly altered today's nationwide executive compensation levels. We need to probe far more vigorously into the future consequences of a reward system that differs so profoundly from the one that has propelled both our company and our country to greatness. And we must make absolutely certain that the present highly inflated levels of lifetime so-called "pension" benefits for former executives are truly serving the long term best interests of shareholders, employees and the great many other constituencies that are being so dramatically impacted by these practices.

My objective in writing this letter has been to comment as candidly and pointedly as possible about a complex and difficult subject, in the belief that there is plenty of room in it for more than one point of view. The opinions expressed are my own and they reflect my best effort to make a constructive contribution to identifying and describing concerns which I believe are shared by a great many Americans."

<u>February 8, 2004--RWH letter to Office of Chief Counsel, SEC Division of Corporation Finance:</u>

"The time may well have arrived when it has become not only appropriate, but unavoidable, to face what could be the most important "public policy" consideration of all, not simply as it concerns any particular shareholder proposal, but as it relates to virtually every aspect of today's computer-controlled, money-dominated, twenty first century "Information Age." The consideration is simply this:

There are those who appear to believe that this country's brightest promise lies in creating a new generation of "governing elite" drawn from the ranks of current and former corporate leaders who are sustained by enormous company-provided compensation and "pension" entitlements to assume the awesome responsibility for guiding this nation's destiny.

There are others who believe just as strongly in the need to retain a reward system that places its primary focus on <u>expanding opportunities for the greatest number of citizens</u>, and who are equally convinced that--*IF* this type of reward system remains in place--the same

hard-working, high-principled, sometimes rough-edged, but always remarkable people who built this nation into the envy of the civilized world can somehow manage to keep the ball rolling for a little while longer.

An open exchange of ideas is a vital force in any democracy, including a "shareholder democracy," and any restraint on participation in that exchange can be subject to abuse. While limitations such as the one created by Rule 14a-8(f)(1) could have been appropriate in the past, in today's business climate, they may well have become just another impediment to effective shareholder governance.

*   *   *(Note: The following letter and attachments were submitted to the Securities and   *   *
       Exchange Commission in response to a request for public comments regarding
       the Commission's proposed executive compensation disclosure requirements.)

April 7, 2006

Nancy M. Morris
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-9303

**File Number S7-03-06:   Proposed Executive Compensation Disclosure Requirements**

Ladies and Gentlemen:

Ratchet, Ratchet and Bingo" is the corporate name Warren Buffet has jokingly assigned to a mythical compensation consulting firm which, over the last two decades, has conspired with top corporate executives to create the enormous compensation and benefit increases the Commission now proposes to expose in its revised proxy statement disclosure requirements.

The truly unfortunate thing about this particular "gag line" is that the title actually provides a strikingly accurate description of the process that has been, and is being, used to create these huge increases. Even worse, however, it suggests a major potential weakness in the particular corrective action the SEC is now recommending. Instead of restraining the expansion of executive entitlement growth by giving shareholders a "shock and awe" exposure to the grand total "bingo" payout numbers that corporate managements have been generating for themselves, the end result might be just the opposite.

The problem I see in this approach is that, by focusing shareholder attention on an entirely new set of even more awesome *future* compensation disclosure numbers, they may well be distracted from giving an appropriate amount of attention to an even more important element of the current problem. That is: the grossly inappropriate role that deceitful proxy statement slight-of-hand "ratcheting" practices have played in creating the current--but soon to be outdated--outrageous executive compensation totals. The real danger is that the "old" outrageous numbers may actually start to look almost reasonable by comparison. In this way, by essentially "institutionalizing" (and thereby legitimizing) a new and even higher "competitive" standard based on what "everybody else is paying," an additional *upward* pressure on pay and benefits could actually be generated.

There is also another possible flaw in the Commission's restraint-building plan. CEOs have not shown themselves to be at all reluctant to disclose their current levels of compensation, and there is no reason to believe that they will ever become too embarrassed to continue to do so in the future, no matter how much they may increase. If this is the case, the newly tightened SEC disclosure requirements would simply amount to a classic case of "locking the barn door" on the existing compensation baseline after the "farm animals" have not only already eaten their fill from the corporate "trough," but they also have insured that the "feast" will continue for as long as they live (i.e., in "retirement").

Expecting shareholders to encourage the company whose shares they own to become first in line to *decrease* the compensation provided for "their" CEO is entirely unrealistic. This is a huge, long term problem that simply cannot be effectively addressed by shareholders on a company-by-company basis. Like it or not, it has reached a point where it can only be approached as a *regulatory* matter--certainly not by either expecting or permitting the Commission to set executive pay scales, but rather by initiating an aggressive enforcement initiative under the statutory mandate the Commission received in the Securities Exchange Act of 1934.

The SEC needs to begin imposing *an appropriate level of accountability*--under Proxy Rule 14a-9(a)--for the deceitful communication practices that repeatedly have been used to deny shareholders the level of information that would have been necessary to fully understand the long term consequences of the compensation and benefit plan modifications they were being called upon to consider. As shown in Exhibit C, this rule specifically prohibits the use of material omissions or deceptions in conjunction with proxy solicitations.

Even more to the point, the same top executives who both originated and proposed many of these modifications for shareholder approval have routinely enjoyed unrestricted access to confidential strategic forward operating plans which provided a clear view of the eventual financial consequences of their recommendations. Using nonpublic information in this manner to create a personal financial gain, while at the same time restricting shareholder access to information that was necessary for making an informed decision, is a particularly reprehensible and prohibited form of "*insider dealing*."

If the Commission's proposed new disclosure standards are not accompanied by a vigorous enforcement action directed against abuses of this kind, those same standards could actually become a disservice to the investing public in still another way. The fact is, it is impossible to gain a truly meaningful understanding of the sheer magnitude of the changes that the "ratchet, ratchet and bingo" strategy has produced unless the total dollar amount of compensation and benefit payments can be viewed against a historical background which shows, not simply where we are today, but even more importantly, what an extremely short time it has taken to get there. The Commission's proposed disclosure does not currently require corporations to reveal compensation and benefit growth against a framework that shows this longer term perspective.

*It is time to start questioning whether these gains came from competition <u>or collusion</u>.*

To illustrate the full extent of the increases that have been occurring in corporations all across America (as well as the manner in which they were created) I have enclosed the two detailed overviews that are identified as <u>Exhibits A and B</u>. The proxy statement disclosures they describe show that the direct compensation paid to the company's top executives during the covered time period *increased by almost 5,000 percent*. Projected lifetime pension benefit entitlements *increased by 15,000 percent\** during the same 23-year time span. (Stock options, restricted stock grants, health care, deferred compensation, perks, severance in the event of certain types of separation and other types of tax free benefits and assistance are not reflected in these examples.)

Even gigantic total payout numbers (like those the Commission's proposed *future* disclosure requirements can be expected to produce) will be only marginally useful to shareholders--unless they can be evaluated in comparison to what top corporate executives were being paid as recently as the start of "restructuring" initiatives in the early 1980s. As these examples show, when the numbers are presented in this way, the changes become truly startling. Shareholders are entitled to see exactly how and why these enormous increases in executive compensation have been occurring at precisely the same time "global competitiveness" considerations were supposedly having such a vastly different impact on so many other company employees. It is particularly ironic that the only place corporate executives seem willing to tolerate grossly noncompetitive practices is in the area of executive pay.

For years, shareholders have been literally bombarded with self-serving management communications aimed at both explaining and justifying this extraordinary run-up in both direct compensation, and even more importantly, in skyrocketing lifetime pension benefit entitlements. Considering the current level of shareholder "numbness" regarding proxy statement disclosures in general, and the cumulative effect of the "global competitiveness" drumbeat that has been used to justify essentially any change management chooses to make, there is essentially nothing they can or will be able to do about it--based solely on their own initiatives--within the realities of current proxy voting procedures. The only really appropriate way to fix a problem like this is to give shareholders an opportunity to fundamentally reconsider the decisions they previously were required to make, but this time, to do so on the basis of complete rather than misleading information.

When these well-recognized "runaway" executive compensation practices degenerate to the point where they start to provide good "gag lines" for luncheon speeches, the time surely has arrived for the government agency responsible for protecting shareholder interests to do something more than simply insure that they are being told exactly how many dollars are being siphoned away from the operating revenues and benefit plan trust funds of America's largest corporations.

<u>*2008 UPDATE:*</u>
*Depending on the particular criteria used in making a comparison, it now appears that CEO pensions have increased between EIGHT AND TEN THOUSAND PERCENT from pre-restructuring levels.*

I know this is an extremely complex problem reflecting the convergence of a variety of technological, legal and political developments. It is not difficult to understand that it has taken a good deal of time to even recognize, much less respond effectively to the challenges that have come with them. It is precisely because the problem has persisted for so long that the solution at this point requires such a truly extraordinary regulatory response. That response, in my opinion at least, is entirely justified.

If the present executive compensation abuses are not halted soon, the massive transfer of wealth and power that the "Ratchet, Ratchet and BINGO" scam is causing will irrevocably alter the entire political, social and economic structure of this country.

Sincerely,


Robert W. Hartnagel
Dallas, Texas