**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------- )
                          )

**In re:**                            )            **Chapter 11**
                          )

**General Motors Corporations, *et al.,***   )       **Case No.  09-50026 (REG)**
                          )

           **Debtors**               )        **(Jointly Administered)**
                          )

----------------------------------------------- )

## OBJECTION TO DEBTORS' MOTION
**PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k), AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

      The Creditors, Shareholders and parties in interest in the above captioned case, Ronald Dean Davis and Sandra Earlene Davis, hereby file this objection to the Motion of Debtors, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, to (I) approve (A) the sale pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored purchaser, free and clear of liens, claims, encumbrances, and other interests, (B) the assumption and assignment of certain executory contracts and unexpired lease, and (C) other relief, and (II) schedule sale approval hearing [Docket No. 92] (the "Sale Motion") filed by the above captioned debtors. In support of our Objection, we respectfully state and represent as follows:

**1 OF 28**

## PRELIMINARY STATEMENT

On Monday June 1, 2009, the Debtors filed the Sale Motion. The Sale Motion and the accompanying exhibits (252 pages) and the Memorandum of Law in support of the Sale Motion (164 pages) seek approval of detailed sales procedures on a very little notice. The sale of the Debtors' assets pursuant to the proposed Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), is flawed and does not conform to the Bankruptcy Court rule of law and equitable distribution of Debtors' assets.

The Sale Motion should be denied because it seeks approval of a sale transaction that cannot be approved under the Bankruptcy Code. The Court should not permit a patently illegal sales process to go forward. The sale proposed by the Debtors constitutes an impermissible *sub rosa* plan of reorganization that strips the unsecured creditors of the protections of section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code") and improperly attempts to extinguish their property rights without their consent. Indeed, the sale is far from an arm's length transaction, but rather, is the result of a tainted sales process dominated by the United States government. The UAW Retiree Settlement Agreement inherent in the MPA is preferential treatment of the claims of the "UAW" over that of equal standing unsecured creditors under section 547 of the Bankruptcy Code. The 363 sale is designed to bypass the rights of the unsecured creditors without their approval. Small Bondholders have not been permitted Due Process. The Official Committee of Unsecured Creditors of General Motors Corporation does not represent the rights of the Small Bondholders. Under these circumstances, the Sale Motion should be denied.

## BACKGROUND

1.      On April 27, 2009 the Debtors issued the $27.2 billion Exchange Offers and Consent Solicitations for any and all of the Outstanding Notes ("Exchange Offer"). The Exchange Offer was unsuccessful and withdrawn by the Debtors on Wednesday May 27, 2009. On Friday May 29, 2009, the "sweetened" exchange offer, defined in greater detail below, was proposed by the Debtors with a deadline of acceptance on Saturday May 30, 2009. The Debtors have claimed that holders of approximately 54% of the outstanding indentures value have approved the sweetened exchange offer. The Debtors have not offered proof of this allegation or stipulation that the approval represented a majority of the individual indentures holders.

2.      On Friday May 29, 2009 the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") announced that a majority of the union membership had approved the proposed modifications to the 2007 UAW Settlement Agreement (the "Tentative Agreement"). These modifications were to include changes to the existing Voluntary Employees' Beneficiary Association trust sponsored by the Debtors. ("the Internal VEBA")

3.      On Monday June 1, 2009 (the "Petition Date"), each of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors are operating their business as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes.

4.    On Monday June 1, 2009 the Debtors filed the Sale Motion, seeking approval of bidding procedures and approval of a sale that, without question, constitutes a *sub rosa* plan of reorganization.

5.    On Tuesday June 2, 2009 the Court approved the procedures for the Sale Motion with the sale hearing scheduled for June 30, 2009. The deadline for objections to the Sale Motion is Friday June 19, 2009.

## OBJECTION

### A.    The Sale Motion Should Be Denied Because the Proposed Sale Is Improper and Cannot Be Approved By the Bankruptcy Court.

The Sale Motion should be denied because the proposed 363 sale is patently improper and cannot be approved under the Bankruptcy Code. Among other things, the proposed sale is an illegal *sub rosa* plan of reorganization, improperly transfers value from unsecured creditors, cannot be approved over the objection of the unsecured creditors and was not proposed in good faith.

### B.    The Proposed Sale Constitutes an Illegal *Sub Rosa* Plan that Redistributes Value Among Creditor Classes.

The terms of the proposed 363 sale (the "363 Sale"), as explained in the Debtors' current papers, clearly constitutes a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale.  See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a

sale of assets."). The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the interest of the *estate*, and not unfair to the creditors. The proposed sale fails each of these requirements. Recognizing this failure, the Sale Motion focuses largely on the interests of the United States economy, the automotive industry and other interests. But the focus of the inquiry has to be on the Debtors' creditors. The proposed sale is clearly unfair to them and ignores the absolute priority scheme established by the Bankruptcy Code.

### C.   The Sale Is Not Proposed In Good Faith.

The facts stated in the Sale Motion (and the supporting declarations) do not support any finding that (i) the "New GM" is a purchaser in "good faith" under section 363(m) of the Bankruptcy Code, or (ii) would vitiate the relief provided by section 363(n) of the Bankruptcy Code. The Debtors have the burden to establish the "good faith" of "New GM". Indeed, the court is "required to make a finding with respect to the 'good faith' of the purchaser" Ginther v. Ginther Trusts (In re Ginther Trusts), 238 F.3d 686, 689 (5th Cir. 2001), cert. denied, 534 U.S. 814 (2001). Based on the facts adduced, the burden on the Debtors is unsustainable and no finding of good faith is appropriate. The sale of assets by the Debtors to "New GM" is not a sale that was negotiated by independent parties at arm's length. Rather, it is a sale that was orchestrated entirely by the U.S. Treasury and foisted upon the Debtors without regard to corporate formalities, the fiduciary duties of the Debtors' officers and directors, or the other important checks and balances typically found in good faith sales.  Both actions are clearly inconsistent with the requirements of a good faith sale. The government exerted extreme pressure to coerce all of the Debtors' constituencies into accepting a deal which is being done largely for the benefit of "UAW" workers at the expense of the unsecured creditors.

Under the circumstances, the sale transaction does not meet the standard under section 363(n) and the "New GM" simply cannot establish that it is a good faith purchaser in connection with the proposed sale.

### D.   Preferential Treatment and Transfer of Debtors Assets.

The "UAW" was working for the Debtors under a "2007 UAW Settlement Agreement" until the Debtors' filing date. Prior to the filing, the Debtors' and the U.S. Treasury tried to coerce the "UAW" and the Unsecured Bondholders into accepting an equity exchange in return for their claims against the Debtors. Simultaneously while the Debtors' and the U.S. Treasury negotiated a new agreement with the "UAW", the Debtors' issued the "Exchange Offer". The Debtors and the U.S. Treasury engaged in heavy handed tactics and threatened a bankruptcy filing to exhort agreement from both the "UAW" and the Unsecured Bondholders to unacceptable terms that were dictated by the U.S. Treasury as condition of future funding. The "Exchange Offer" was unsuccessful and withdrawn by the Debtors on Wednesday May 27, 2009. On Friday May 29, 2009 the "UAW" issued a public announcement that a majority of the membership had accepted the proposed modifications to the "2007 UAW Settlement Agreement" known as "the Tentative Agreement", defined in greater detail below.  The U.S. Treasury was the lead facilitator in the negotiations with the "UAW" and liberally employed the threat of bankruptcy to obtain their desired resolution.  The "Tentative Agreement" was orchestrated by the Debtors, the U.S. Treasury and the "UAW" in an attempt to protect the "UAW" Trust Fund called the "Voluntary Employee Beneficiary Association" (the "Internal VEBA") transactions from bankruptcy proceedings.  The "Tentative Agreement" was negotiated to shift the existing obligations of the Debtor outside of the bankruptcy proceedings and simultaneously replace them with new

obligations of the "New GM" as stipulated in the MPA. In accordance with the MPA, the "New VEBA" will receive from the "New GM" approximately the same value amount that was owed by the Debtor prior to the filing. The MPA stipulates that the "New VEBA" will receive all payments directly from the "New GM" effectively avoiding the bankruptcy proceeding all together. Although the "Internal VEBA" represented a trust account that was sponsored by the Debtors, there existed a Creditor / Debtor relationship between the Debtor and the "Internal VEBA" which was represented by the current under funding indebtedness and the present value of the future payments. If the MPA is permitted to succeed, this obligation of the Debtor will be forgiven and replaced with a new obligation, of similar value, to the same "Internal VEBA" with a changed name the "New VEBA". In re Melon Produce, Inc. 076 F.2d 71 (1st Cir. 1992) the Appeals Court ruled "Creation of perfected security interest in property is itself "preference" when creation or perfection of security interest takes place during preference period and other criteria for holding occurrence to be preference are satisfied."

As stipulated in the "Exchange Offer" the approximate present value of obligations owed to the "Internal VEBA" was stipulated as $20 billion prior to the filing on June 1, 2009. It was further specified that the total amount owed the "Internal VEBA" was approximately $1.4 billion, which represented the total amount of obligations to continue to provide post-retirement health care coverage under the GM plan from July 1, 2009 to December 31, 2009. (which would not be addressed by the VEBA modifications) and approximately $18.6 billion, which represents the present value of the future payments to the "Internal VEBA" as required under the current "VEBA Settlement Agreement".

In Debtors' Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto, that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") will be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"). Prior to Debtors' filing, the "2007 UAW Settlement Agreement" terms and conditions with the "Internal VEBA" obligations were effective. On Friday May 29, 2009 (one day prior to the Debtor's filing) the "UAW" announced that a majority of the union membership had approved the proposed modifications to the "2007 UAW Settlement Agreement" (the "Tentative Agreement"). These modifications were to include changes to the existing "Internal VEBA" trust sponsored by the Debtors. The "Tentative Agreement" was not consummated prior to the Debtors' filing. The "2007 UAW Settlement Agreement" is a contract with specific rights and obligations on the part of the Debtors and the "UAW" and the "Internal VEBA".

Under the "Tentative Agreement" the proposed modifications to the "UAW Retiree Settlement Agreement", the Purchaser has agreed to provide, among other things: (i) shares of common stock of the Purchaser representing 17.5% of the Purchaser's total outstanding common stock, (ii) a note of the Purchaser in the principal amount of $2.5 billion (Payable in three cash payments on 2013, 2015 and 2017, of $1.384 billion (including accrued interest at 9%), (iii) shares of cumulative perpetual preferred stock of the Purchaser in the amount of $6.5 billion (Paying an annual 9% cash dividend of $585 million), (iv) warrants to acquire 2.5% of the Purchaser's equity, and (v) the assets held in a Voluntary Employees' Beneficiary Association trust

sponsored by the Debtors (the "Internal VEBA") and to be transferred by the Purchaser as part of the 363 Transaction, in each case to a new Voluntary Employees' Beneficiary Association sponsored by an employees beneficiary association (the "New VEBA"), which will have the obligation to fund certain retiree benefits for the Debtors' retirees and surviving spouses represented by the "UAW" .

**Existing "Internal VEBA" Assets Transferred in January 2010.** Along with the new payment structure described below, in January 2010 the "New VEBA" will receive the assets of an internal trust fund (the "Internal VEBA"). As of March 31, 2009 the value of assets in the fund was approximately $9.4 billion.

**New $2.5 Billion Note.** Under the new funding structure, the "New VEBA" will receive a new Note, payable in cash, with a principal amount of $2.5 billion. Cash payments under the new Note (including accrued 9% interest) will be $1.384 billion payable as follows:

$1.384 billion payable in 2013

$1.384 billion payable in 2015

$1.384 billion payable in 2017

**New $6.5 Billion in Preferred Stock.** The "New VEBA" will also receive Preferred Stock in the "New GM" with a face value of $6.5 billion. This Preferred Stock includes a 9% cash dividend payment structure, under which $585 million is payable annually for as long as the "New VEBA" holds the stock. This dividend payment must be made before the "New GM" can pay any dividends to the holders of its common stock. If the "New GM" delays payment of the dividends on the Preferred Stock, it will not be allowed to pay dividends to its common shareholders until it becomes current on the "New VEBA" 's Preferred Stock dividend obligations.

**VEBA to own Significant GM Common Stock.** Another requirement of the U.S. Treasury Department loans was that a portion of the value received by the "New VEBA" be in the form of common stock. To meet that requirement, the "New VEBA" will receive an initial allocation of 17.5% of the stock in the "New GM". The United States and Canadian Governments will receive 72.5% of the initial stock, and bondholders will receive 10%. The "New VEBA" will also have the right to designate a member of "New GM"'s Board of Directors, with "UAW" consent. The "New VEBA" will be required to vote its "New GM" shares in the same proportion as the votes of other shareholders.

**Additional Warrants.** In addition to the direct ownership of the Preferred and Common Stock described above, the "New VEBA" will also receive a Warrant, which represents the right to an additional 2.5% of the Common Stock of the "New GM", with a strike price determined by an aggregate $75 billion equity value for the "New GM".

**"New VEBA" Recovery Under the Proposed 363 Sale.** The attached Exhibit "A" summarizes the estimation of the proposed MPA exchange of value between the "New GM" and the "New VEBA" after the sale is consummated (if the cost to exercise the warrants is zero). The estimated recovery to the "New VEBA" may range from *$0.89 to $0.99* on the dollar of principal amount of credit.

To offset the Unsecured Bondholders debt, the proposed 363 Sale includes a provision for the "New GM" to issue shares of common stock to "Old GM" in bankruptcy representing approximately 10% of the common stock of the "New GM" as of the closing of the sale. The "New GM" will also issue to "Old GM" in bankruptcy warrants to purchase up to 15% of the shares of common stock of the "New GM" on a

fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the "New GM" and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the "New GM" *(GM can elect partial and cashless exercises of the warrants)*. The "New GM" will also assume certain liabilities, all as set forth more fully in the MPA. In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), "Old GM" in bankruptcy will receive an additional 2% of the common stock of the "New GM" as of the closing of the sale.

**Unsecured Bondholders Recovery Under the Proposed 363 Sale.** The attached Exhibit "B" summarizes the estimation of the proposed MPA exchange of value between the "New GM" and the "Old GM" in bankruptcy after the sale is consummated (if the cost to exercise the warrants is zero). In accordance with the MPA, the Net Purchase Price shall be paid by the "New GM" to the "Old GM" in bankruptcy. That amount has not been disclosed, but for estimation purposes it could be assumed that approximately $5.0 billion would be paid into the bankruptcy. The estimated recovery to the Unsecured Bondholders may range from *$0.35 to $0.42* on the dollar of principal amount of indenture. The actual Unsecured Bondholder recovery in bankruptcy could vary from *$0.24 to $0.31* on the dollar of principal amount of credit (for a Net Purchase Price of $1.0 billion), to *$0.50 to $0.57* on the dollar of principal amount of credit (for a Net Purchase Price of $10.0 billion).

The above values include other approved claims against the Debtors that amount to approximately $7.8 billion that would result in total claims against the Debtors

of $35.0 billion. The above values do not reflect dilution which may result from additional unsecured claims against the Debtors that are not funded by the "New GM". The above values do not include the additional 2% of the outstanding common stock of the "New GM" to be contributed to "Old GM" in bankruptcy if claims exceed $35.0 billion. Also, the costs of the bankruptcy have not been included.

The above comparison illustrates the preferential treatment of the MPA towards the "New VEBA" at the detriment of the Unsecured Bondholders. The "New VEBA" will be receiving approximately *2.36 to 2.54* times better recovery than the Unsecured Bondholders. The MPA stipulates that the "New VEBA" will receive payments in the form of cash and equity outside of the continuing bankruptcy proceedings wherein the Unsecured Bondholders will be forced to share their recovery with the other approved claimants in the bankruptcy proceedings. The Unsecured Bondholders will be deprived of their asset value and income until the court approves any distribution of funds. Many of the Unsecured Bondholders are retirees living on fixed incomes and the periodic interest payments from their bonds provided a substantial part of the funds desperately needed to meet their daily living expenses. The loss of income will have a dramatic impact on thousands of retirees who will now have to decide how to spend their reduced retirement income on the necessities of life like food, medicine, housing, transportation, etc. and they will be forced to decide which they will have to live without. The financial impact of this bankruptcy proceeding may be so dire to many of these people that they may also have to seek bankruptcy as the only viable solution to their economic distress. The Bankruptcy Code does not permit such discrimination between two classes of unsecured creditors on the same priority. In re George Rodman, Inc. 792 F.2d 125 (10th Cir. 1986) the Appeals Court recognized that

a "Preference" exists when a debtor makes payment or other transfer to a certain creditor or creditors and not to others. They also recognized that there is no requirement for valuation of the property transferred in order to determine whether Debtor has received "new value" from the transfer.   The Bankruptcy Code defines "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the Debtors' equity or redemption. This broad definition encompasses the creation and release of liens.

**11 U.S.C Section 547 (b)**   In accordance 11 U.S.C Section 547 (b) of the Bankruptcy Code the Trustee may avoid any transfer of an interest of the debtor in property -

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing  of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if -

(A) the case were a case under chapter 7 of this  title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**Qualification of "New VEBA" for Preference** A Preference must meet the five elements of 11 U.S.C Section 547 (b) to be voidable:

**(1) to or for the benefit of a creditor** - The existing obligation of the Debtor to the creditor under the "2007 UAW Settlement Agreement" to fund the "Internal VEBA" with $20.0 billion in cash and present value of future contributions was forgiven by the "UAW" in exchange for the "Tentative Agreement" terms and conditions and modifications to the "UAW Retiree Settlement Agreement". The existing obligation of the Debtors was exchanged for a promise of monetary value and equity value in the proposed "New GM". The "UAW" and the "New VEBA" benefit by being removed and isolated from the bankruptcy proceeding.

**(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;** - Under the "UAW" agreement prior to filing, the Debtors' owed the "Internal VEBA" $20.0 billion in cash and present value of future contributions. The "UAW" membership accepted the "Tentative Agreement" terms and conditions and modifications to the "UAW Retiree Settlement Agreement" in exchange for a promise of monetary and equity value in the proposed "New GM".

**(3) made while the debtor was insolvent;** - The Debtors had reported in SEC filings negative equity for a long period of time and the Debtors were only able to remain out of bankruptcy on funds provided by the U.S. Treasury. The Debtors "Exchange Offer" dated April 27, 2009, specifically threatened bankruptcy filing as the only alternative. The bankruptcy filing was exploited in the news media several weeks

prior to the actual filing.  It would be hard to image that anyone would not have been aware of the impending bankruptcy filing.

**(4) made - (A) on or within 90 days before the date of the filing of the petition;** -  The "Tentative Agreement" terms and conditions which included the exchange as proposed, negotiated and submitted to a membership vote by the "UAW" was approved on Friday May 29, 2009 (the day before filing). The execution and consummation of the exchange is inherent in the proposed 363 sale transaction.

**(5) that enables such creditor to receive more than such creditor would receive if - (A) the case were a case under chapter 7 of this  title**; - The Debtors documents (Liquidation Analysis prepared by Alix Partners dated May 27, 2009) extensively substantiate that the estimated net proceeds from liquidation would range from $6.5 to $9.7 billion.  The attached Exhibit "C" summarizes the estimation of the recovery for the "New VEBA" unsecured claim of $20 billion combined with the Unsecured Bondholders claims of $27.2 billion and the estimated other allowed claims of $7.8 billion for total claims of approximately $55.0 billion. This would translate into a recovery of approximately $2.3 to $3.4 billion for the "AWU" and "New VEBA".  The resultant recovery would be approximately *$0.12 to $0.17* on the dollar.  The estimated recovery to the "New VEBA" under the proposed 363 sale transaction may range from *$0.89 to $0.99* on the dollar of principal amount of credit.  The "UAW" and the "New VEBA" will clearly benefit from the proposed arrangement by a factor of *5.8 to 7.4*. The above values do not reflect dilution which may result from additional unsecured claims against the Debtors. Also, the costs of the bankruptcy have not been included.

**(5) (B) the transfer had not been made;** - If the proposed "UAW" "Tentative Agreement" was removed from the MPA and the "New VEBA" was required

to join in the bankruptcy proceedings, the "New VEBA" unsecured claim of $20.0 billion would be combined with the Unsecured Bondholders claims of $27.2 billion and the estimated other allowed claims of $7.8 billion for total claims of approximately $55.0 billion. In accordance with the MPA, the Net Purchase Price shall be paid by the "New GM" to the "Old GM" in bankruptcy. That amount has not been disclosed, but for estimation purposes it could be assumed that approximately $5.0 billion would be paid into the bankruptcy. In accordance with the approved "Tentative Agreement", the "New GM" would also contribute to the "Old GM" in bankruptcy the specified amounts that were to have gone directly to the "New VEBA" in accordance with "Tentative Agreement". The attached Exhibit "D" summarizes the estimation of the exchange of value between the "New GM" and the "Old GM" in bankruptcy after the sale is consummated (if the cost to exercise the warrants is zero). The estimated recovery to the "UAW" and the "New VEBA" may range from *$0.55 to $0.63* on the dollar of principal amount of credit. The attached Exhibit "E" (Sensitivity Analysis) illustrates the dramatic impact of the value of the Net Purchase Price that would be paid by the "New GM" to the "Old GM" in bankruptcy. The actual "New VEBA" recovery in bankruptcy could vary from *$0.48 to $0.56* on the dollar of principal amount of credit to (for a Net Purchase Price of $1.0 billion), to *$0.64 to $0.72* on the dollar of principal amount of credit (for a Net Purchase Price of $10.0 billion). Based on this analysis, it is easy to recognize that the "UAW" and the "New VEBA" would benefit significantly by remaining outside of bankruptcy proceedings. The estimated recovery to the "New VEBA" under the proposed 363 sale transaction may range from *$0.89 to $0.99* on the dollar of principal amount of credit. The "UAW" and the "New VEBA" will clearly benefit from the proposed arrangement by a factor of *1.6*. The above values do not reflect dilution which

may result from additional unsecured claims against the Debtors. Also, the costs of the bankruptcy have not been included.

**(5) (C) such creditor received payment of such debt to the extent provided by the provisions of this title.** – The "New VEBA" would be required to remain in the bankruptcy proceedings and the MPA transactions specified in the "UAW" "Tentative Agreement" would be made by the "New GM" to the "New VEBA" The "New VEBA" claims would be combined with all other claims in a priority distribution in accordance with the Bankruptcy Code. The "New VEBA" unsecured claim of $20.0 billion would be combined with the Unsecured Bondholders claims of $27.2 billion and the estimated other allowed claims of $7.8 billion for total claims of approximately $55.0 billion. The estimation of the exchange of value between the "New GM" and the "New VEBA" in bankruptcy would be the same as stated in the preceding paragraph. The estimated recovery to the "UAW" and the "New VEBA" may range from *$0.56 to $0.64* on the dollar of principal amount of credit (depending of the Actual Net Purchase Price).

On the filing date, the Debtors' owed to the "UAW" Trust Fund "Internal VEBA" approximately $20.0 billion as stipulated above. The "Internal VEBA" was an unsecured creditor of the Debtors and as such, the "Internal VEBA" should remain in the bankruptcy proceedings along with all other unsecured creditors to receive their prorated distribution in accordance with the priority established by the Bankruptcy Code. The Debtors, the "UAW" and the U.S. Treasury have orchestrated a preferential transfer of funds away from the Debtors' estate at the detriment of the other unsecured creditors who have been deprived of funds that would otherwise have been distributed. The U.S. Trustee is requested to intervene and take affirmative steps in the bankruptcy court to stop the proposed Preference from succeeding. The court shall not approve the 363

sale which includes the Preference. The court shall enforce the rule of law and prevent the inequitable distribution of the Debtors' estate.

### E.    The Proposed Sale Does Not Have Unsecured Creditor Approval.

The Debtors have claimed in news media press releases that holders of approximately 54% of the outstanding indentures value have approved the "sweetened" exchange offer which expired on Saturday May 30, 2009. The Debtors have not offered proof of this allegation or stipulation that the indicated approval represented a majority of the total individual indentures holders.  The small Unsecured Bondholders represent a larger percentage of the total Unsecured Creditors than the large institutional bondholders. The large institutional bondholders may hold a greater percentage of the total outstanding unsecured debt, but they do not represent the majority of the total Unsecured Creditors who hold that debt. There are estimates that the large institutional bondholders represent only about 20 percent (20%) of the total Unsecured Creditors. A multitude of small bondholders that represent the majority of the total Unsecured Creditors do not approve the "sweetened" exchange offer. The burden of proof lies with the Debtors to confirm their allegation with the names (and bondholdings) of unsecured creditors who voted for the "sweetened" exchange offer. The court shall not approve the 363 sale which tramps on the rights of the unsecured creditors.  The court shall enforce the rule of law and prevent the proposed MPA sale which is designed to bypass the rights of the unsecured creditors.

### F.    Small Bondholders have not been permitted Due Process. The formal Unsecured Creditors Committee does not Represent the rights of the Small Bondholders.

On June 3, 2009, the Trustee appointed an official committee of unsecured creditors ("the Unsecured Creditors' Committee") consisting of fifteen (15) people that represent mostly large corporate and institutional bondholders. The small individual unsecured bondholder is not represented on this committee. Prior to the Debtors' filing, GM and the U.S. Treasury negotiated directly with the Ad Hoc Creditors which represented the interests of the large institutional bondholders. Unlike the large institutional investors who bought GM bonds as investments under a strategy which generally included insurance against the risk of devaluation known as credit default swaps, many small individual Unsecured Bondholders purchased GM bonds with a large portion of their lifetime savings in the hopes of maintaining a secure source of retirement income. Although the large institutional bondholders were cushioned against the possibility of default by GM through various highly technical insurance programs, the small bondholder was left naked and unprotected from the ravage of the financial markets. As the price of GM stock fell, the price of GM bonds also plunged. The small bondholders were paralyzed by the deterioration and devaluation of their lifetime savings as well as the loss of their security for a retirement income. Sophisticated hedging strategies and other motivating factors influenced the large bondholders to readily accept the proposed bond for equity exchange under the MPA. The large bondholder is in a position to recover significantly more in relation to their holdings than the small individual bondholder, who essentially will loose a vast majority of their lifetime savings.

## **RESERVATION OF RIGHTS**

The above stated Unsecured Bondholders reserve the right to amend this Objection to add additional facts, as may be determined by their further investigation.

## MEMORANDUM OF LAW

The legal bases of the above stated Unsecured Bondholders Objection are incorporated above. Therefore, the above stated Unsecured Bondholders respectively request that this Court deem it satisfactory, or in the alternative, waive any further requirement of the filing of a separate memorandum of law in support.

## RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, the above stated Unsecured Bondholders respectively request that this Court enter an Order;

1)   Denying the Motion of Debtors.

2)   If the Court intends to allow the Debtors to proceed with the sale, requiring the Debtors to substantially modify the MPA to join the "UAW" and the "New VEBA" in the bankruptcy proceeding as an unsecured creditor of the Debtors along with the Unsecured Bondholders and all other approved claims to receive their prorated distribution in accordance to the priority established by the Bankruptcy Code.

3)   If the Court intends to allow the Debtors to proceed with the sale, requiring the Debtors to substantially modify the MPA requiring all payments; equity stock in the "New GM", warrants for stock in the "New GM", cash, notes or any other form of indebtedness; for exchange, substitution or repayment of the prior obligation of Debtors to the "Internal VEBA"; to or for the benefit of the "UAW" and the "New VEBA"; be paid directly into the bankruptcy to be distributed in accordance to the priority established by the Bankruptcy Code.

4)   Providing the above stated Unsecured Bondholders with such other relief as appropriate.

## CONCLUSION

The Honorable Robert E. Gerber, this Objection has not been entered to request special or preferential treatment for the Unsecured Bondholders. This Objection has been filed in an attempt to sway the Court to Order that the Debtors continue the bankruptcy proceedings in a manner in which the Unsecured Bondholders are treated fairly and equally in the specified order of priority in accordance with the Bankruptcy Code. The Court is respectfully requested to ignore the attempts of political, social and special interest groups to influence the outcome of the bankruptcy proceedings. We are confident that you will administer justice fairly, impartially and equally to all.

In accordance with General Order M-182, a PDF file of the subject filing is attached on a 3.5 inch floppy disk with one (1) courtesy hard copy to be delivered to the Hon. Robert E. Gerber.

Dated:  Tulsa, Oklahoma
        June 17, 2009

*Ronald Dean Davis*
Ronald Dean Davis

*Sandra Earlene Davis*
Sandra Earlene Davis

4014 South 135th East Avenue
Tulsa, Oklahoma  74134-5612
(981) 628-1624
rdsedavis@sbcglobal.com
Creditors & Shareholders of Debtor

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this 17th day of June, 2009 that a true and correct copy of the foregoing **"OBJECTION TO DEBTORS' MOTION"** was served via prepaid first class postage through the United States Postal Service, to the following:

Harvey R, Miller
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153


Diana G. Adams
The Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, New York 10004

Ronald Dean Davis

# Exhibits to Objection to Debtors' Motion

A.    MPA Exchange of Value Between the "New GM" and the "New VEBA" in Accordance with the Proposed 363 Sale

B.    MPA Exchange of Value Between the "New GM" and the "Old GM" in Bankruptcy in Accordance with the Proposed 363 Sale

C.    The Value of "VEBA" Unsecured Claim Under Liquidation

D.    The Value of "VEBA" Unsecured Claim Under Bankruptcy

E.    Sensitivity Analysis - The Value of "VEBA" Unsecured Claim Under Bankruptcy

# Exhibit "A"

## MPA Exchange of Value Between the "New GM" and the "New VEBA" in

## Accordance with the Proposed 363 Sale

### "Internal VEBA" Debt Forgiveness

| | |
|---|---|
| Amount Owed by "Old GM" | **$1.4 Billion** |
| Present Value of Future Payments | **$18.6 Billion** |
| **Total Debt Forgiven** | **$20.0 Billion** |

### Value of Payments to "New VEBA" under the 363 Sale

| | |
|---|---|
| New $2.5 Billion Note (9%)<br>$1.384 billion payable in 2013<br>$1.384 billion payable in 2015<br>$1.384 billion payable in 2017 | **$4.15 Billion** |
| New GM Preferred Stock (9% Dividend) * | **$6.5 Billion** |
| New GM Common. Stock (17.5%) | **$6.7 - $8.4 Billion** |
| New GM Common. Stock Warrant (2.5%) | **$0.5 - $0.7 Billion** |
| **Total Payments** | **$17.9 - $19.8 Billion** |

(*) "New GM" Preferred Stock does not include annual 9% dividend.
"Internal VEBA" $9.4 Billion Transfer not included
Stock Warrant Value based on zero cost with a strike price determined by an aggregate
$75 billion equity value for the "New GM"
Imputed Equity and Warrants value from Declaration of J. Stephen Worth in Support of
the Proposed Sale of DEBTORS' Assets to Vehicle Acquisition Holdings LLC, Project
Maine at p. 14.

### Creditors Recovery under the 363 Sale (Cents/Dollar)

| | |
|---|---|
| "New VEBA" Claim Recovery | **$0.89 - $0.99** |

# Exhibit "B"

## MPA Exchange of Value Between the "New GM" and the "Old GM" in Bankruptcy

## in Accordance with the Proposed 363 Sale

### Claims Under Bankruptcy

| | |
|---|---|
| Unsecured Creditors Claims | $27.2 Billion |
| Other Approved Claims | $7.8 Billion |
| Total Claims | $35.0 Billion |

### Value of "New GM" Payments to "Old GM" (Unsecured Bondholders)

| | |
|---|---|
| New GM Common. Stock (10%) | $3.8 - $4.8 Billion |
| New GM Common. Stock Warrant (7.5%) | $2.1 - $2.9 Billion |
| New GM Common. Stock Warrant (7.5%) | $1.5 - $2.1 Billion |
| Total Valve | $7.4 - $9.8 Billion |

Stock Warrant #1 Value based on zero cost with a strike price determined by an aggregate $15 billion equity value for the "New GM".

Stock Warrant #2 Value based on zero cost with a strike price determined by an aggregate $30 billion equity value for the "New GM".

Value does not include additional 2% common stock of "New GM" contingent on total claims of exceeding $35 billion.

Imputed Equity and Warrants value from Declaration of J. Stephen Worth in Support of the Proposed Sale of DEBTORS' Assets to Vehicle Acquisition Holdings LLC, Project Maine at p. 14.

### Value of "New GM" Payments to "Old GM"

| | |
|---|---|
| Net Purchase Price | $5.0 Billion |

Assumed Amount – Actual Amount to be Determined from Actual Net Purchase Price.

### Bankruptcy Assets Under the Proposed 363 Sale

| | |
|---|---|
| Total Assets | $12.4 - $14.8 Billion |

Assumed Amount – Actual Amount to be Determined from Actual Net Purchase Price.

### Creditors Recovery Under Bankruptcy

| | |
|---|---|
| Unsecured Creditors Claims Recovery | $9.6 - $11.5 Billion |
| Other Approved Claims Recovery | $2.8 - $3.3 Billion |
| Total Claims Recovery | $12.4 - $14.8 Billion |

### Creditors Recovery Under Bankruptcy (Cents/Dollar)

| | |
|---|---|
| Unsecured Creditors Claims Recovery | $0.35 - $0.42 |
| Other Approved Claims Recovery | $0.35 - $0.42 |
| Total Claims Recovery | $0.35 - $0.42 |

# Exhibit "C"

### The Value of "New VEBA" Unsecured Claim Under Liquidation

**Claims Under Liquidation**

| | |
|---|---|
| "New VEBA" Claim | **$20.0 Billion** |
| Unsecured Creditors Claims | **$27.2 Billion** |
| Other Approved Claims | **$7.8 Billion** |
| **Total Claims** | **$55.0 Billion** |

**Liquidation Proceeds**

| | |
|---|---|
| **Total Proceeds** | **$6.5 - $9.7 Billion** |

Liquidation value from Declaration of J. Stephen Worth in Support of the Proposed Sale of DEBTORS' Assets to Vehicle Acquisition Holdings LLC, Alix Partners – Liquidation Analysis at p. 6.

**Creditors Recovery Under Liquidation**

| | |
|---|---|
| "New VEBA" Claim Recovery | **$2.3 - $3.4 Billion** |
| Unsecured Creditors Claims Recovery | **$3.3 - $4.9 Billion** |
| Other Approved Claims Recovery | **$0.9 - $1.4 Billion** |
| **Total Claims Recovery** | **$6.5 - $9.7 Billion** |

**Creditors Recovery Under Liquidation (Cents/Dollar)**

| | |
|---|---|
| "New VEBA" Claim Recovery | **$0.12 - $0.18** |
| Unsecured Creditors Claims Recovery | **$0.12 - $0.18** |
| Other Approved Claims Recovery | **$0.12 - $0.18** |
| **Total Claims Recovery** | **$0.12 - $0.18** |

# Exhibit "D"

### The Value of "New VEBA" Unsecured Claim Under Bankruptcy

#### Claims Under Bankruptcy

| | |
|---|---|
| "New VEBA" Claim | **$20.0 Billion** |
| Unsecured Creditors Claims | **$27.2 Billion** |
| Other Approved Claims | **$7.8 Billion** |
| **Total Claims** | **$55.0 Billion** |

#### Value of "New GM" Payments to "Old GM" ("VEGA")

| | |
|---|---|
| New $2.5 Billion Note (9%)<br>$1.384 billion payable in 2013<br>$1.384 billion payable in 2015<br>$1.384 billion payable in 2017 | **$4.15 Billion** |
| New GM Preferred Stock (9% Dividend) | **$6.5 Billion** |
| New GM Common. Stock (17.5%) | **$6.7  -  $8.4 Billion** |
| New GM Common. Stock Warrant (2.5%) | **$0.5  -  $0.7 Billion** |
| **Total Payments Value** | **$17.8  -  $19.8 Billion** |

#### Value of "New GM" Payments to "Old GM" (Unsecured Bondholders)

| | |
|---|---|
| New GM Common. Stock (10%) | **$3.8  -  $4.8 Billion-** |
| New GM Common. Stock Warrant (7.5%) | **$2.1  -  $2.9 Billion-** |
| New GM Common. Stock Warrant (7.5%) | **$1.5  -  $2.1 Billion-** |
| **Total  Payments Valve** | **$7.4  -  $9.8 Billion** |

See notes on Exhibit "B".

#### Value of "New GM" Payments to "Old GM"

| | |
|---|---|
| **Net Purchase Price** | **$5.0 Billion** |

Assumed Amount – Actual Amount to be Determined from Actual Net Purchase Price.

#### Bankruptcy Assets Available for Distribution

| | |
|---|---|
| **Total Assets** | **$30.3  -  $34.6 Billion** |

Assumed Amount – Actual Amount to be Determined from Actual Net Purchase Price.

#### Creditor Recovery Under Bankruptcy

| | |
|---|---|
| "New VEBA" Claim Recovery | **$11.0  -  $12.6 Billion** |
| Unsecured Creditors Claims Recovery | **$15.0  -  $17.1 Billion** |
| Other Approved Claims Recovery | **$4.3  -  $4.9 Billion** |
| **Total Claims Recovery** | **$30.3  -  $34.6 Billion** |

#### Creditors Recovery Under Bankruptcy (Cents/Dollar)

| | |
|---|---|
| "VEBA" Claim Recovery | **$0.55 - $0.63** |
| Unsecured Creditors Claims Recovery | **$0.55 - $0.63** |
| Other Approved Claims Recovery | **$0.55 - $0.63** |
| **Total Claims Recovery** | **$0.55 - $0.63** |

# Exhibit "E"

## Sensitivity Analysis - The Value of "New VEBA" Unsecured Claim Under Bankruptcy

### "New VEBA" RECOVERY IN BANKRUPTCY



| Net Purchase Price | Low Recovery | High Recovery |
|---|---|---|
| 1,000,000,000 | 0.4773 | 0.5555 |
| 2,000,000,000 | 0.4955 | 0.5737 |
| 3,000,000,000 | 0.5137 | 0.5919 |
| 4,000,000,000 | 0.5319 | 0.6100 |
| 5,000,000,000 | 0.5500 | 0.6282 |
| 6,000,000,000 | 0.5682 | 0.6464 |
| 7,000,000,000 | 0.5864 | 0.6646 |
| 8,000,000,000 | 0.6046 | 0.6828 |
| 9,000,000,000 | 0.6228 | 0.7009 |
| 10,000,000,000 | 0.6409 | 0.7191 |