| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | HEARING DATE: June 25, 2009<br>HEARING TIME: 9:45 a.m. |

---------------------------------------------------------- x
In re:                                                     :
                                                           :  Chapter 11
GENERAL MOTORS CORP., *et al.*,                            :
                                                           :  Case No. 09-50026 (REG)
                            Debtors.                       :
                                                           :  (Jointly administered)
---------------------------------------------------------- :
                                                           x

**THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 363 FOR AN ORDER AUTHORIZING THE DEBTORS TO EMPLOY AND RETAIN AP SERVICES, LLC AS CRISIS MANAGERS AND TO DESIGNATE ALBERT A. KOCH AS CHIEF RESTRUCTURING OFFICER, *NUNC PRO TUNC* TO THE PETITION DATE**

**TO: THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY JUDGE:**

Diana G. Adams, the United States Trustee for Region 2 (the "United States Trustee"), objects to the Debtors' motion for an order authorizing the employment and retention of AP Services, LLC ("APS") as crisis managers and to designate Albert A. Koch as Chief Restructuring Officer ("CRO") for the Debtors, *nunc pro tunc* to the Petition Date (the "Motion").

**I.    INTRODUCTION**

The Debtors seek to employ and retain APS and Mr. Koch as crisis manager and CRO for this estate with a proposed fee structure that is unreasonable. The Motion contemplates the employment of Mr. Koch as CRO at an hourly rate of $835 per hour, plus the use of up to 68 individuals as Additional Temporary Staff[1] with hourly rates that top out at over $1,000 per

---

[1] Capitalized terms used in this Objection without definitions shall have the meanings ascribed to them in the Motion and the Engagement Letter.

hour.[2] Based on prepetition compensation figures, APS collected from the Debtors approximately $38 million in fees within 90 days of the Petition Date, including approximately $16 million for services rendered in May 2009. APS also seeks a Success Fee in the amount of $13 million upon the closing of the contemplated sale transaction of the Debtors. Moreover, APS seeks a Discretionary Fee of an unknown but potentially unlimited amount that will be determined at the Debtors' sole discretion with no input from the Court, the United States Trustee or virtually any creditor constituency. The fee structure for the APS retention is more than generous – it is excessive.

The APS fees cannot be viewed in a vacuum. The Debtors have also sought to retain Evercore Group LLC ("Evercore") as financial advisors, and to pay Evercore a success bonus tied to the closing of the same sale for which APS is to receive a bonus. The scope of services to be performed by the two firms has some apparent overlaps,[3] and the overall bonuses to be paid related to the currently-contemplated sale are very high given the nature of the events that led to the transaction.

The Debtors and APS must prove that the terms of this retention and employment are necessary, reasonable and beneficial to this estate. The Motion fails to provide any credible evidence to support the terms of this employment, both as to the necessity of the contemplated services and, most notably, the fee structure. APS stands to make tens of millions of dollars in this retention just through its hourly rates. Adding the Success Fee to those hourly fees results in

---

[2] 58 of the 68 have hourly rates in excess of $500 per hour, with more than 25 of them charging between $700 and $1,100 per hour based on the current exchange rate.

[3] *See* Exhibit A for a chart listing the duties of APS and Evercore.

-2-

an unreasonably rich fee structure. Yet, that is not all that APS may receive. Of equal or greater concern is the Discretionary Fee, which is described essentially as a second success fee.

The Debtors have the sole discretion to pay this unknown but potentially unlimited fee. This compensation request is all the more incredible in light of the fact that the Debtors are also retaining a financial advisor which is asking for its own success bonus. Not only does the scope of services of these two financial advisors have some apparent overlap, but it is impossible to justify these inordinately large bonuses under the circumstances of these cases.

This was not the circumstance where the Debtors' crisis management team through its own unique and extraordinary efforts identified a white knight to save the company and the jobs of the debtor's employees. On the contrary, neither APS nor Evercore had any success at finding either a purchaser or funder for the Debtors. In light of all these circumstances, the APS Application clearly exceeds the bounds of reasonableness.

**II.    FACTS**

    **A.    Background**

1.    On June 1, 2009 (the "Petition Date"), General Motors and certain subsidiary debtors (collectively referred to as the "Debtors") filed voluntary cases under Chapter 11 of the Bankruptcy Code.

2.    The Debtors continue to operate and manage their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On June 3, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases. *See* ECF Doc. No. 356.

4.    The Debtors are among the largest automobile manufacturers in the world. The

problems affecting the Debtors' business have been the subject of much attention for the past few months. The United States Government (the "Government") has taken the lead in proposing and sponsoring the Debtors' restructuring. Through this bankruptcy filing, the Debtors intend to implement this restructuring plan. The Debtors propose to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code to a Government sponsored and funded purchaser (the "Government-Funded Purchaser"). To facilitate this sale, the Government is providing debtor-in-possession financing in the total amount of approximately $50 billion.

5. The Debtors propose to consummate the sale of their assets within thirty (30) days of the Petition Date. The motion to approve the sale is scheduled for hearing on June 30, 2009. The Government-Funded Purchaser is the stalking horse bidder. Unless a higher and better bid is received through the auction process, then the Debtors will seek the approval of sale to the Government-Funded Purchaser at the June 30th sale hearing. The deadline for competing bids was June 19. Upon information and belief, no competing bids were submitted.

### B. The APS Motion

6. On June 12, 2009, the Debtors filed the Motion seeking to retain APS as the Debtors' crisis manager and Mr. Koch as CRO, accompanied by the Declaration of Albert A. Koch in Support of the Motion (the "Koch Decl.") and an engagement letter between the Debtors and APS dated May 29, 2009 (the "Engagement Letter"). *See* ECF Doc. No., Exhibit 952.

#### 1) Scope of Services

7. Pursuant to the Application and the Engagement Letter, as the appointed CRO, Mr. Koch will report directly to the Debtors' Chief Executive Officer, and will assist the Debtors in evaluating and implementing strategic and tactical options through the restructuring process,

including any sale of assets. APS also agreed to provide certain temporary staff to assist Mr. Koch (the "Temporary Staff").

8. According to the Application, Mr. Koch and the Temporary Staff will provide the following services: a) assist the Debtors in the negotiation and completion of the sale of assets to the Government-Funded Purchaser (the "Government-Funded Sale"); and b) support the negotiation of, and participating in the review of, the proposed structure of the Government-Funded Sale. Upon the closing of the Government-Funded Sale, the Board of Directors will appoint Mr. Koch as the Chief Executive Officer of the Debtors and certain Temporary Staff may become officers of the Debtors.

### 2) Prepetition Compensation

9. According to the Koch Decl., APS and/or its affiliate, AlixPartners, LLP ("Alix Partners") received payments from the Debtors within the 90 days before the Petition Date in the aggregate amount of $38,858,941.08. *See* Koch Decl., at 5, ¶ 13. In addition, APS and/or AlixPartners received a $20 million retainer payment. *Id*. The following chart summarizes some of the relevant payments made by the Debtors to APS and/or AlixPartners prepetition:

| | |
|---|---|
| Total Fees paid, including retainers | $58,858,941.08 |
| Payments made in May 2009 for services rendered during that month | $16,497,202.03 |
| Monthly Rate for services in connection with "Global Genesis Cost Management Project" | $131,250.00 |

### 3) Proposed Postpetition Compensation

10. The proposed postpetition compensation for APS is a combination of hourly fees, the Success Fee, and the Discretionary Fee. For his CRO duties, Mr. Koch will be paid at a

rate of $835 per hour. The Motion lists the 68 individuals APS anticipates assigning to this case as Temporary Staff along with their hourly rates of up to over $1,000 per hour.[4]

11. The Success Fee of $13 million will be paid to APS if the Debtors complete the Government-Funded Sale. The Discretionary Fee is in an amount to be determined at the Debtors' sole discretion. APS is eligible to be paid the Discretionary Fee if the bankruptcy case both "yields extraordinarily positive results" and "demonstrates that APS added significant value in achieving the consummation of the Government-Funded Sale and the presentation of the plan of liquidation."

12. The following chart summarizes the potential compensation to be paid to APS under the assumption that the Government-Funded Sale is approved:

|  | **NewCo Sale Approved** |
|---|---|
| Hourly Fees | Unknown, but based on May figures, these fees may average $16,000,000.00 per month |
| Global Genesis Cost Management Project | $131,250.00 |
| Success Fee | $13,000,000.00 |
| Discretionary Fee | Unknown, essentially no parameters and no limits |

### 4) Retention of Evercore Group L.L.C.

13. Contemporaneous with the filing of this Motion, the Debtors have sought

---

[4] There are a number of individuals listed on the Temporary Staff list whose hourly rates are provided in a foreign currency denomination. The United States Trustee has calculated those rates in United States dollars based upon current exchange rates.

approval of the retention of Evercore as investment banker and financial adviser (the "Evercore Application"). *See* ECF Doc. No. 954. The United States Trustee has filed an objection to the Evercore Application on many of the same grounds as this objection, including the unreasonable fee structure for Evercore.

14. According to the Evercore Application, Evercore received $46,627,333.22 in fees and expenses from the Debtors within a year of the Petition Date. The Debtors propose to pay Evercore a flat monthly fee of $400,000 per month until the consummation of the Government-Funded Sale. The Debtors also propose to pay Evercore numerous transaction/success fees. As noted in the United States Trustee's Objection to the Evercore Application, if the Government-Funded Sale is consummated, then Evercore will receive an additional $17,900,000 in success fees.[5]

15. The bottom line is that the Debtors have already paid over $85 million to APS and Evercore, and they now seek to employ these two financial advisory firms and to pay them post-petition fees totaling approximately $50 million for work performed during the limited time between the filing of the case and the consummation of the Government-Funded Sale, without providing any documentation to support those services. In sum, APS and Evercore stand to receive total fees from the Debtors of approximately $130 million if the Government-Funded Sale is consummated. In addition, APS will continue to receive hourly fees and will be entitled to receive a Discretionary Bonus after the closing of the sale.

---

[5] Evercore will still receive other success fees if the Government-Funded Sale is not consummated. There are various permutations to those success fees as noted in the United States Trustee's Objection.

### III. ARGUMENT

The United States Trustee objects to the Motion because the Debtors and APS have failed to meet their burden of proof that the terms of the APS employment are necessary, reasonable and beneficial to the estate. In particular, there is no justification or basis to support a reasonableness finding for APS's fee structure.

While the Motion to retain and employ APS is not filed under section 327(a), but instead under the Crisis Manager Protocol standards of section 363, the standards used to assess the retention of a professional apply as well to a crisis manager employment. In other words, the burden of proof lies with the Debtors and APS to demonstrate that APS' employment, and the terms thereof, are necessary, reasonable and beneficial to the estate.

The Debtors propose to pay huge fees to APS. The hourly fees and the Success Fee will amount to tens of millions of dollar. What is even more distressing with this fee structure, however, is the Debtors' request for approval of a Discretionary Fee that has no boundaries in amount and scope. The Debtors and APS are asking this Court to approve the APS retention and compensation as reasonable even though a major element of its compensation is both unknown and discretionary. Such approval would be inappropriate.

This Court has found that when assessing the reasonableness of the professional fees on a transaction fee structure, the court must find that the work performed by the professional was beneficial to the estate, which requires the court to look to the nexus between the work performed and the results achieved. *See In re XO Communications, Inc.*, 398 B.R. 106 (S.D.N.Y. 2008). These same standards should apply to the employment of APS, which is a professional financial advisory firm.

Credible evidence has not been presented to support the reasonableness of the terms and conditions of the APS retention. The Debtors and APS cannot meet their burden of proof by simply citing the numerous Chapter 11 cases in which APS has been employed.

No one will questions that this case is unique and involves very complex issues. Yet, as noted *supra* in the charts summarizing both its prepetition and postpetition fees, APS stands to make an extraordinary amount of money through its representation of the Debtors. Those figures are only the known amounts to be received, because the Debtors have the discretion to pay further amounts to APS, including a second success fee. This Court cannot find that APS's compensation is reasonable without knowing what specific services APS will render, whether those services prove beneficial, and the nexus between the services rendered and the results achieved. The fact remains that there must be evidence to support the reasonableness of the terms of this retention, including the fee structure. The Debtors and APS have not met that burden.

APS seeks to assign an army of personnel to this engagement, which may include up to 68 individuals all charging hourly rates that in some cases exceed $1,000 per hour. No one knows for sure how much those monthly fees will be based just upon the hourly rates but, as an example, the Debtors paid APS and/or AlixPartners over $16 million in fees for May 2009. One can certainly assume APS might possibly bill hourly fees in the neighborhood of $16 million per month for at least the first few months of this case. If and when the Government-Funded Sale is consummated, APS will receive the Success Fee of $13 million. It will also be entitled to receive a Discretionary Fee once a plan is presented (not confirmed). These two success fees are not tied to creditor recoveries, but are instead simply earned when certain milestones in this case are met.

When the prepetition fees are considered, the amounts of money to be paid to APS are staggering. In addition, as noted *supra*, the total fees proposed to be paid to APS and Evercore will most likely add up to approximately $130 million without considering the Discretionary Fee for APS.[6]

The Debtors and APS must prove the reasonableness of the APS retention, especially the proposed fee structure. This Court should demand and require proper evidence to support the reasonableness of the terms of the retention.

---

[6]The proposed payment of these substantial bonuses is also subject to the constraints of § 503(c)(2) of the Bankruptcy Code. Section 503(c) was added to the Bankruptcy Code in 2005 to address perceived abuses whereby managers and others involved in large bankruptcy cases were enriching themselves while stakeholders were receiving little or no return on their investments or claims. Section 503(c)(2) provides:

> (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid —
> . . .
>> (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

APS and Mr. Koch are clearly consultants or officers whom the Debtors are seeking to hire after the date of the filing of the petition, and the payment of substantial bonuses to APS is certainly a transaction that is outside the Debtors' ordinary course of business. The Debtors therefore must demonstrate that these payments are justified by the facts and circumstances of the case.

## IV. CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that this Court grant the relief requested herein and grant such other and further relief as it deems just and proper.

Dated: New York, New York
      June , 2009

Respectfully submitted,

DIANA G. ADAMS
UNITED STATES TRUSTEE

By: /s/ Linda A. Riffkin
Linda A. Riffkin
Assistant United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004-1408
Tel. No. (212) 510-0500

# EXHIBIT A

| Scope of Services | |
|---|---|
| AP Services | Evercore |
| **General Scope of Services:**<br><br>Assist the Company in evaluating and implementing strategic and tactical options through the restructuring process, including any sale of its assets. | **General Scope of Services:**<br><br>Provide the Company with general investment banking advice and to advise it in connection with any Restructuring, Financing and/or Sale transactions. |
| | Reviewing and analyzing the Company's business, operations and financial projections. |
| Assist the Company and its advisors in the negotiation and completion of the sale of assets and operations contemplated by the Company (the "Transaction") to a US Treasury sponsored purchaser ("New GM"). On behalf of the Company (the "Company" or "Oldco"), to support the negotiation of, and participate in the review of, the proposed structure of the Transaction, including the assets to be sold and transferred to New GM and the liabilities to be assumed by New GM as a part of the purchase price, and the negotiation and implementation of various transitional contractual relationships between Oldco and New GM. | Advising and assisting the Company in a Restructuring, Financing and/or Sale transaction, if the Company determines to undertake such a transaction;<br><br>Sale Assistance:<br>　i. Structuring and effecting a Sale;<br>　ii. Identifying interested parties and/or potential acquirors and, at the Company's request, contacting such interested parties and/or potential acquirors; and<br>　iii. Advising the Company in connection with negotiations with potential interested· parties and/or acquirors and aiding in the consummation of a Sale transaction |

| | |
|---|---|
| Al Koch and the Temporary Staff will oversee the administration of the Company's bankruptcy case, including compliance with bankruptcy court reporting requirements and the discharge of obligations of the Company pursuant to the Code, and at the direction of the Board, shall propose, file and implement a plan of liquidation under chapter 11 in accordance with the Code.<br><br>Al Koch and the Temporary Staff will seek to monetize assets, settle and administer claims as soon as practicable.<br><br>Assist the Company, as requested, in relation to its investments in subsidiaries and affiliates and business counterparts and any other actions consistent with Code and applicable authorities. | Providing financial advice in developing and implementing a Restructuring, which would include:<br>i. Assisting the Company in developing a restructuring plan or plan of reorganization, including a plan of reorganization pursuant to the Bankruptcy Code;<br>ii. Advising the Company on tactics and strategies for negotiating with various stakeholders regarding the Plan;<br>iii. Providing testimony, as necessary, with respect to matters on which Evercore has been engaged to advise the Company; and,<br>iv. Providing the Company with other financial restructuring advice as Evercore and the Company may deem appropriate. |
| | Rendering an opinion (a "Fairness Opinion") to the Board of Directors of the Company as to the fairness, from a financial point of view, of the consideration to be paid or received by the Company in connection with a Master Sale and Purchase Agreement (the "MSPA") with Auto Acquisition LLC ("NewCo") and the other parties named therein, which will provide for a sale of the Purchased Assets (the "Purchased Assets"), as defined in the MSPA, pursuant to authorization that will be sought under section 363 of the Bankruptcy Code (11 U.S.C. §101, et seq.) (the "NewCo Transaction"). |