Hearing Date: June 25, 2009 at 9:45 a.m.
(Eastern Time)

Neil A. Goteiner (NG 1644)
Dean M. Gloster (*Pro Hac Vice* Application Pending)
Nan E. Joesten (*Pro Hac Vice* Application Pending)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Attorneys for General Motors Retirees Association

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. 09-50026 (REG) |
| GENERAL MOTORS CORP., *et al.* | (Jointly Administered) |
| Debtors. | |

**REPLY OF GENERAL MOTORS SALARIED RETIREES IN SUPPORT OF GMRA'S APPLICATION FOR APPOINTMENT OF A SALARIED RETIREES COMMITTEE PURSUANT TO 11 U.S.C. § 1114(D)**

24677\1975258.1

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*Abbruscato v. Empire Blue Cross and Blue Shield*,
    2004 U.S. Dist. LEXIS 18286 (S.D.N.Y. September 10, 2004)..........................................4

*Aleo v. Keyspan Corp.*,
    2006 U.S. Dist. LEXIS 55049 (E.D.N.Y. Aug. 7, 2006).......................................................5

*American Federation of Grain Millers, AFL-CIO v. International Multifoods Corp.*,
    116 F.3d 983 (2d Cir. 1977).................................................................................................2

*In re Anchor Glass Container Corp.*,
    342 B.R. 878 (Bankr. M.D. Fla. 2005) ...............................................................................11

*Bidlack v. Wheelabrator Corp.*,
    993 F.3d 603 (7th Cir. 1993) ................................................................................................4

*Bouboulis v. Transport Workers Union of America*,
    442 F.3d 55 (2d Cir. 2006)...................................................................................................2

*In re CF&I Fabricators*,
    163 B.R. 858 (Bankr. D. Utah 1994) .................................................................................11

*In re Chateaugay Corp.*,
    111 B.R. 399 (S.D.N.Y. 1990)...........................................................................................11

*In re Delphi Corp.*,
    2009 Bankr. LEXIS 576 (Bankr. S.D.N.Y. Mar. 10, 2009) .................................................5

*Devlin v. Empire Blue Cross and Blue Shield*,
    274 F.3d 76 (2d Cir. 2001)..........................................................................................2, 3, 4

*In re Doskicil*,
    130 B.R. 870 (Bankr. D. Kan. 1991) ...................................................................................6

*In re Farmland Industrial, Inc.*,
    294 B.R. 903 (Bankr. W.D. Mo. 2003)..............................................................................11

*In re Federated Department Stores, Inc.*,
    132 B.R. 572 (Bankr. S.D. Ohio 1991)..............................................................................12

*Feifer v. Prudential Insurance Company*,
    306 F.3d 1202 (2d Cir. 2002)...............................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Joyce v. Curtiss-Wright Corp.*,
 171 F.3d 130 (2d Cir. 1990)..........................................................................................2

*In re Lykes Brothers S.S. Co.*,
 233 B.R. 497 (Bankr. M.D. Fla. 1997) .......................................................................11

*Moore v. Metropolitan Life Insurance Co.*,
 856 F.2d 488 (2d Cir. 1988)..........................................................................................1

*In re N. America Royalties, Inc.*,
 276 B.R. 860 (Bankr. E.D. Tenn. 2002) .....................................................................11

*In re New York Trap Rock Corp.*,
 126 B.R. 19 (S.D.N.Y. 1991).................................................................................10, 11

*In re Speco Corp.*,
 195 B.R. 674 (S.D. Ohio 1996....................................................................................11

*Sprague v. General Motors Corp.*,
 133 F.3d 388 (6th Cir. 1998) ............................................................................1, 5, 6, 7

## FEDERAL STATUTES

11 U.S.C.
  § 1114................................................................................................................ *passim*
  § 1114(*l*)...........................................................................................................5, 7, 8, 10
  § 1129(a)(13) ...............................................................................................................8, 9

## OTHER AUTHORITY

Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on
 Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th
 Cong., 1st Sess. 16 ...................................................................................................9, 10

S. Rep. No. 119, 100th Cong., 2d Sess. 7,
 *reprinted in* 1988 U.S.C.C.A.N. 683, 689 ...........................................................................9

Susan J. Stabile, *Protecting Retiree Medical Benefits In Bankruptcy: The Scope Of
 Section 1114 of the Bankruptcy Code,* 14 Cardozo L. Rev. 1911, 1946 (1993)...................9

**GMRA's Motion Should Be Granted**

1.      The Oppositions of both Debtors and the Creditors Committee disregard the fundamental fact that Debtors have already cut, and announced further cuts of, the salaried retirees' benefits that Congress intended to protect under Section 1114, automatically triggering the requirement that this Court appoint an 1114 Committee.  Furthermore, both the Sixth Circuit's *Sprague* decision and the Second Circuit's *Moore* decision do not help Debtors.  Indeed, *Sprague's* undisputed written record is evidence that the Salaried Retirees' benefits are not all fully amendable.  And in any event, Section 1114 protects benefits that are amendable, as numerous courts have held.  GMRA's Application for Appointment of an 1114 Committee to negotiate with Debtors regarding these additional announced cuts should be granted.

**GM Did Not Reserve The Right To Amend Retiree Benefits**

2.      Debtors' reliance on both *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), and the Second Circuit's decision in *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988) is misplaced.  *Sprague* is not controlling, and *Moore* is distinguishable on its facts.  The law of the Second Circuit plainly sets out that the documents already admitted by the Debtors via the *Sprague* decision are sufficient to trigger the protections that should be afforded the Salaried Retirees pursuant to Section 1114.

3.      In *Moore,* the Second Circuit found that plaintiff retirees could not present, "specific written language that is reasonably susceptible to interpretation as a promise" to vest their retirement benefits.  There, the retirees proffered some filmstrips and informal presentations and argued that these communications overrode the plain language of defendant's Summary Plan Descriptions.  Not surprisingly, the retirees lost.  In contrast, at bar, GMRA will present the Court with the same evidence the *Sprague* court considered—actual Summary Plan Descriptions from prior years that expressly promised lifetime benefits for Salaried Retirees without

24677\1975258.1

reservations of any kind. Moreover, even if the Court were to find the Summary Plan Descriptions ("SPDs") merely ambiguous, GMRA will also present the Court with other formal writings that were sent annually to the retirees over a number of years, again promising lifetime benefits without reservation of any ability to modify or terminate. These are not filmstrips seen by a limited number of retirees, or an informal letter from a union president. GM sent this official documentation to all employees to identify part of their consideration for working for GM. Thus, Debtors cannot escape from the stubborn fact that, under applicable Second Circuit law, from (at least) 1974 until (at least) 1987 *every one* of the Salaried Retirees was performing under a unilateral contract whereby GM guaranteed them lifetime benefits that GM would pay for once they reached full retirement eligibility. GM assumed those obligations and they cannot ignore them now.

4.  In the Second Circuit, "[t]he standard that we have adopted is whether the plan documents contain 'specific written language that is reasonably susceptible to interpretation as a promise' to vest the benefits." *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 60 (2d Cir. 2006), citing to *Devlin* v. *Empire Blue Cross and Blue Shield,* 274 F.3d 76, 80 & 84 (2d Cir. 2001) and quoting *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1990). If there is a conflict between a summary plan description and the underlying plan documents, "it is the [SPD] that controls." *Id*. at 442 F.3d 61, citing to *American Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*, 116 F.3d 983 (2d Cir. 1977).

5.  The Second Circuit has repeatedly stated the benefit vesting test: "Under our standard, then, the plaintiffs here must first identify 'specific written language that is reasonably susceptible to interpretation as a promise." *Devlin*, 274 F.3d at 84. The attached Summary Plan Descriptions, along with Personal Benefit Summaries, contain numerous examples of language

reasonably susceptible to interpretation as a promise. *See* Declaration of Neil A. Goteiner, filed concurrently herewith, Exs. 1-6 ("[y]our health care coverage will be continued for your lifetime," [1979 Personal Benefit Summary] Ex. 1; "The Insurance Program provides protection for you and your eligible dependents against a wide range of Health Care expenses while you are an active employee and after your retirement," [Your GM Benefits, A Handbook for Salaried Employees (1980)], Ex. 2; "If you retire from GM (except at employe [sic] option between ages 55 and 60 when your age and credited service total less than 85): . . . your health care coverage will be continued for your lifetime." [1980 (Healthcare), Employee Compensation Statement], Ex. 3; same as Ex. 2 [1983 Personal Benefit Summary], Ex. 4; "Generally, your participation in the Health Care Program can be continued in retirement." [1988 GM Benefit Booklet], Ex. 5; "Generally, under current provisions, your participation in the Salaried Health Care Program can be continued in retirement." [1995 GM Benefit Booklet], Ex. 6).

   6. These examples meet the test in *Devlin*, which noted that the retirees had identified two relevant statements in the defendant's pre-1987 SPDs that they felt promised them vested benefits. The first statement was that "retired employees, after completion of twenty years of full-time permanent service and at least age 55 will be insured." The *Devlin* court stated the following with respect to that language:

> We believe that this statement can be reasonably read as promising such insurance so long as employees retire after age 55 and have provided full-time permanent service to Empire for at least twenty years. This provision can be construed as an offer that specifies performance as the means of acceptance—sometimes referred to as an offer for a unilateral contract—and promises lifetime life insurance benefits upon performance. Therefore, by 'performing' (that is, working for at least twenty years until attaining the age of 55), the plaintiffs accepted this offer.

*Id.* The Second Circuit went on to reject the defendant's contention that the company had properly asserted a right of unilateral termination by inserting unilateral termination language in

its 1987 SPD. The Court summed it up by stating that "[w]e reject Empire's argument because after the plaintiffs began performance, pursuant to the pre-1987 SPDs, Empire was not free to revoke." *Id.*

7. The second *Devlin* statement was also from pre-1987 SPDs: life insurance coverage "will remain at [the annual salary level] for the remainder of their lives." *Devlin*, 274 F.3d at 85. The Second Circuit found that "[s]uch 'lifetime' language, we believe, is sufficient to create a triable issue of fact as to whether Empire promised to vest retiree life insurance benefits at the stated level. *Id.*, citing to *Bidlack v. Wheelabrator Corp.*, 993 F.3d 603, 605-08 (7th Cir. 1993) (en banc).

8. The Second Circuit went on to add that "[b]ecause of the ambiguity of the language, the ultimate determination of whether Empire promised lifetime benefits should be left to the trier of fact, likely assisted by extrinsic evidence to clarify the meaning of the ambiguous language." *Id.*, citing to *Bidlack* at 609. In a footnote relating to extrinsic evidence, the Court noted that exit letters given to the retirees "arguably reinforces the plaintiffs' interpretation of the relevant plan documents." *Id.*, n. 7. At bar too, to the extent that there is any ambiguity, GMRA can show the Court several official GM documents sent to all of the Affected Retirees stating that they have lifetime benefits at GM's cost.

9. *Devlin* does not stand alone. *See also Feifer v. Prudential Insurance Company*, 306 F.3d 1202, 1211 (2d Cir. 2002) (noting that if an employee was promised future benefits that would vest in the future before the introduction of later documents purporting to provide the right of unilateral termination, the later documents *cannot* diminish the rights of the employees who accepted the earlier terms by continuing in the employ of their employer) (emphasis supplied); *Abbruscato v. Empire Blue Cross and Blue Shield*, 2004 U.S. Dist. LEXIS 18286 *21

(S.D.N.Y. September 10, 2004) (language in plan documents pre-1987 reflected vested benefits that could not be un-vested by inclusion in unilateral termination language in subsequent retiree plan documents); *Aleo v. Keyspan Corp.*, 2006 U.S. Dist. LEXIS 55049 at *18 (E.D.N.Y. Aug. 7, 2006) (finding that documents external to retiree plan implying a lifetime or vested benefit made unilateral termination reservation in plan documents inapplicable).[1]

### The Decision in *Sprague v. GM* Has No Affect Upon This Case

10.     Debtors understandably rely on *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998), but this Court should not.  As *Sprague*'s dissenting opinions discuss, the majority decision is fundamentally flawed.  The majority ignored that there were many years when GM's Summary Plan Descriptions and supporting documents made promises of lifetime benefits without any reservation of an ability to modify or terminate, and that the salaried retirees, or some large percent of them, performed under these contracts.

11.     The *Sprague* majority opinion did reflect that GM had long provided summary plan descriptions to its employees, describing retiree benefits as early as 1965.  Specifically, the court initially noted that *some* (but therefore not all) of summary plan descriptions provided to its employees reflected a right of unilateral termination.  *Id*. at 394.  The majority decision also noted that GM provided summary plan descriptions over many years to its employees promising "lifetime" health care coverage, and that GM would "pay the full cost" of such coverage, without reservation of rights.  *Id*.

---

[1] In the *Delphi* case, Judge Drain recently exercised his discretion to appoint an 1114 committee to represent retirees' interests, including settling their appeal rights to an order authorizing benefit reductions.  In that pre-Section 1114(*l*) case, filed before the new statutory changes became effective, the court held that 1114 did not otherwise require appointment of a committee to protect purely amendable benefits.  The court also found that Delphi employees, who signed a separate waiver of benefits at the time their company was spun off from GM, did not have vested retiree health benefits by virtue of being former GM employees.  *In re Delphi Corp.*, Case No. 05-44481 (RDD), 2009 Bankr. LEXIS 576 (Bankr. S.D.N.Y. Mar. 10, 2009).

12. Citing to the undisputed written record, Chief Judge Martin's dissenting opinion vigorously reasoned that GM had repeatedly promised retirees lifetime health care in a variety of written materials, and "only occasionally" included a reservation of rights to change retiree benefits. 133 F.3d at 409. The *Sprague* majority, however, made no attempt to address why workers who started and/or continued to work for GM from 1974 through 1985 would not be entitled to rely upon the summary plan descriptions that *affirmatively* provided for lifetime benefits paid for by GM and containing *no* asserted right of unilateral termination.

13. Further, *Sprague* is inconsistent with Second Circuit precedent where those retirees would have a vested right to health benefits. Employees working during a period when SPDs made affirmative promises of vested benefits without a stated right of unilateral termination are *not* subject to be terminated later. *See Devlin*, discussed above at ¶¶ 5-7.

14. Another reason for this Court to decline to follow *Sprague* is that during counsel's short involvement, without formal discovery, other summary plan documents and related documentary evidence have surfaced that *Sprague* appears not to have considered. (*See* Goteiner Declaration, Exs. 1-6.) Also, GM acquired Hughes during this time, and Hughes employees may also have received vested commitments. Accordingly, not only is *Sprague* erroneous under Second Circuit law, it is apparent that some part of the Salaried Retiree group have arguments that were not even addressed in *Sprague*.

### Section 1114 Protects Even Amendable Benefits

15. Debtors' Opposition relies primarily on *In re Doskicil*, 130 B.R. 870 (Bankr. D. Kan. 1991), to suggest that Section 1114 does not apply because General Motors has supposedly reserved the contractual right to modify the retirees' benefit plans. But GM's reliance assumes that GM has legitimately reserved the right to amend or modify benefits. *Sprague*, however, acknowledged that at various times GM has unequivocally stated that retirees would have health

benefits for life, in plan booklets that did not retain the right to amend or modify. *Sprague,* 133 F.3d at 394.

16. But even if the Salaried Retiree benefits at issue here were somehow amendable, courts have held that Section 1114 still affords them protection. Congress' addition of § 1114(*l*) in 2005 is further indication that Section 1114 applies to amendable benefits.

### **Debtors Modified Benefits Within 180 Days Of Filing Chapter 11**

17. Debtors' Opposition further obfuscates the application of Section 1114, suggesting that because they have not filed a motion to change benefits, an 1114 committee is premature. But this is circular where Debtors' position is that they do not need to file any motion, because the Salaried Retirees' benefits are amendable. In any event, Debtors have already announced that they intend to cut retiree medical benefits for non-union retirees by two-thirds effective January 1, 2010. Most important, GM has already modified benefits in the 180 days before the Chapter 11 filing, while insolvent, therefore automatically triggering the protections of 1114(*l*), which makes it critical to appoint a committee to negotiate with the Debtor over whether to challenge these prepetition benefit cuts.[2]

18. In arguing that § 1114(*l*) does not apply, GM's Opposition (¶ 26) must import a restriction into Section 1114(*l*) that does not exist – namely, that the changes in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 providing Chapter 11 protection for

---

[2] Debtors' Opposition details at least three separate changes to Salaried Retiree benefits, admitting that the effective date of at least one of those changes, the reduction in the amount of salaried retiree life insurance coverage, was accelerated in a decision communicated to participants by letters mailed on or about February 16, 2009. Opp'n. at ¶ 6. Debtors admit that the other two changes were put into effect "during the beginning of 2009 in the ordinary course of GM's operations." *Id.* This does not relieve Debtors from the strict language of § 1114(*l*), which applies "[i]f the debtor, during the 180-day period ending on the date of the filing of the petition – (1) modified retiree benefits; and (2) was insolvent on the date such benefits were modified . . . ." There is no question that General Motors was insolvent as of the beginning of 2009, when it modified retiree benefits.

24677\1975258.1          7

retiree benefits that are changed within 180 days of bankruptcy somehow does not apply if the benefits were amendable. But they do apply. In Section 1114(*l*) Congress expanded Section 1114's protection to any benefits the debtor had modified in the 180 days prior to the bankruptcy filing when the debtor was insolvent, without reference to amendability. 11 U.S.C. § 1114(*l*). Thus, Congress confirmed that the protections of the statute <u>must</u>, in accordance with its plain language, apply to benefits that the debtor reserved the right to amend, outside bankruptcy. (Section 1114(*l*), of course, *only* applies to benefits the debtor actually did amend outside bankruptcy, prior to the commencement of the case.)

**Coupled With Section 1129(a)(13), Section 1114 Demonstrates Congress' Intent that a Debtor Must Negotiate Over Termination of *any* Retiree Medical and Life Insurance Benefits During the Pendency of the Bankruptcy Case**

19.     If a debtor truly and completely reserved the right to modify or terminate retiree medical and life insurance benefits outside of bankruptcy, the protections of Section 1114 are of limited duration—they only apply during the pendency of the bankruptcy case, unless the debtor commits, as part of the 1114 negotiation process, to preserve some benefits for a post-confirmation period (as, of course, a debtor might do in return for agreed cuts during the case.) Section 1129(a)(13) provides, as one of the requirements for confirmation, only that a debtor must, post-confirmation of the plan, preserve benefits it agreed to as part of the 1114 process "for the duration of the period the debtor has obligated itself." 11 U.S.C. § 1129(a)(13).

20.     The statute thus sets up a framework to encourage negotiated changes to even amendable retiree benefits that the debtor wants to modify during the Chapter 11 case. In return for agreed upon cuts the debtor may agree to limited protections for other benefits. This is consistent with the clear Congressional purpose to provide protections for critical retiree medical and life insurance benefits during the pending bankruptcy case. "Congress responded to the particular vulnerability of retirees by passing a statutory provision that gives all retirees a

protection they would not otherwise have had but for the fact that their former employer filed for bankruptcy." Susan J. Stabile, *Protecting Retiree Medical Benefits In Bankruptcy: The Scope Of Section 1114 of the Bankruptcy Code*, 14 Cardozo L. Rev. 1911, 1946 (1993).

21. Not only are retirees especially vulnerable as a class, but "they also are in a very weak negotiating position with the debtor, and therefore less able than others to protect their interests." *Id.* at 1947. Having already made their contribution to the company, sometimes decades ago, "there is nothing that retirees have that the company needs." Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 16 (statement of Senator Heinz). As a result, their benefits are seen as the first cost that can be cut without endangering the debtor's ongoing business.

22. In response to retirees' vulnerability and to create some equity, Congress passed Section 1114 to give retirees substantive and procedural protections to allow for negotiation on a level playing field, and to allow courts to weigh the harm and fairness of deep cuts to retiree medical, disability, and survivor benefits. *See* S. Rep. No. 119, 100th Cong., 2d Sess. 7, *reprinted in* 1988 U.S.C.C.A.N. 683, 689 ("the Committee recognizes that the special treatment of retiree benefits [is] created by section 1114"); *see Stabile*, at 1949 ("special protection really means allowing retirees to stand on a more equal footing with other creditors … fair and equitable treatment does not necessarily mean treating all parties equally"). Moreover, the negotiation provision of Section 1114 allows for win-win agreements, as retirees have the potential to negotiate current benefit cuts in return for the debtor's commitment that amendable benefits won't be cut further for a specific time frame – a commitment which will be enforceable post-confirmation under Section 1129(a)(13).

23. As Senator Hefflin explained, Section 1114 "would also provide with respect to *all* retirees that the employers can modify retiree insurance benefits in the absence of a negotiated settlement *only* if the court authorizes such modifications and when such modifications are necessary to enable the company to continue its business fairly and equitably to all parties." Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 1 (1987) (statement of Senator Hefflin).

24. Moreover, the legislative history of Section 1114 must be understood against the backdrop of events leading to the statute's enactment. As the Bankruptcy Court for the Southern District of New York explained in *In re New York Trap Rock Corp.,* 126 B.R. 19 (S.D.N.Y. 1991), "[t]his legislation was enacted in response to the termination of the health and life insurance benefits of approximately 79,000 retirees in the LTV Corporation Chapter 11 case. Pursuant to this legislation, a trustee in bankruptcy or a debtor in possession is required to continue to pay retiree benefits throughout reorganization under a 'plan, fund, or program' and at the levels maintained prior to the filing of the bankruptcy case, until or unless a modification is agreed to by the parties or ordered by the court." *Id.* at 21-22. This backdrop confirms that Congress intended that changes to retiree medical and insurance benefits be negotiated once a debtor has sought Chapter 11 relief.

### Debtors' Few Authorities Do Not Undermine Section 1114's Broad Protection for Amendable Benefits

25. The statutory language, clarifying amendment in Section 1114*(l)*, and legislative history all trump Debtors' assertion that Section 1114 does not mean what it says and that Debtors can impose cuts to critical benefits without complying with the statute. As the court in *In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003) concluded: "There is

nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue." *Id.* at 917. "In this Court's view, § 1114 prohibits a debtor from terminating or modifying any retiree benefits (as defined in that section) during a Chapter 11 case unless the debtor complies with the procedures and requirements of § 1114, regardless of whether the debtor has a right to unilaterally terminate the benefits." *Id*. at 914. *See also In re Speco Corp.,* 195 B.R. 674, 678 (S.D. Ohio 1996); *In re New York Trap Rock Corp.*, 126 B.R. 19 (S.D.N.Y. 1991).

26.     Debtors' authorities do not justify the sudden and sweeping elimination of retiree health benefits; several are not on point: *In re Anchor Glass Container Corp.*, 342 B.R. 878 (Bankr. M.D. Fla. 2005) ("Not before this court is whether or not the Debtor can modify or terminate the benefits it may owe to its salaried retirees."); *In re Lykes Bros. S.S. Co.,* 233 B.R. 497, 517 (Bankr. M.D. Fla. 1997) (mentioning Section 1114 in only one paragraph of a 41-page opinion with no description of any non-union retiree medical benefits, or any discussion of a request for formation of a Section 1114 committee). Likewise, *In re N. Am. Royalties, Inc*., 276 B.R. 860 (Bankr. E.D. Tenn. 2002), is factually distinguishable where the company was ceasing operations and retirees had been provided notice, filed objections, and given an opportunity for discovery. *In re CF&I Fabricators*, 163 B.R. 858 (Bankr. D. Utah 1994), like *In re Chateaugay Corp.,* 111 B.R. 399 (S.D.N.Y. 1990), merely concluded that where the union workers ended up with no collective bargaining agreement, there was no contractual right to benefits to enforce. *In re CF&I*, 163 B.R. at 874. Other courts have picked up on the distinction that Debtors do not acknowledge, the difference between a right that naturally expires by its own terms (as in the expired collective bargaining agreement in *Chateaugay*), and a right which a debtor affirmatively

seeks to terminate upon entering bankruptcy. *See In re Federated Dept. Stores, Inc.,* 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) (concluding that "[t]he cases of *In re Doskocil* and *In re Chateaugay Corp.* stand simply for the proposition that expiration of old contract rights involving retiree benefits may operate to short-circuit the modification process [of Section 1129(a) and 1114]"). Further, to the extent that Debtors' cases predate the 2005 BAPCPA amendments, Debtors' interpretation run afoul of the amendments.

### Salaried Retirees Need Their Own Representation

27. Most important, GM is seeking a quick sale of its assets to a newly formed company, which is not assuming any obligation to pay anything for retirees from its predecessor. GM has admitted that the U.S. Treasury has already agreed that a specific dollar amount for those benefits and executive non-qualified pensions is acceptable. The critical issue is whether a retiree committee representative of retirees will be involved in the discussions and negotiations of how that money is to be allocated to protect the most critical benefits, or whether a few GM executives or Treasury department officials, with their own interests, will decide without committee input. The statutory framework of Chapter 11 explicitly intends for the retirees to have a seat at the negotiating table as these decisions are made. An 1114 Committee should be appointed.

28. The Creditors' Committee also suggests that only New GM and Treasury should address the retirees' concerns. But by then it will be too later—the assets would have been sold free of any claim, and New GM would have assumed none of the obligations. There would be no statutory basis or leverage for such a negotiation.

### Conclusion

29. The medical, prescription drug, life insurance and other protected benefits are a matter of basic survival for tens of thousands of retirees living on fixed incomes who already

spent their decades of service at GM and often don't have other health care options. It is critical that this Court appoint a representative committee to represent the non-union retirees in preserving something of those benefits and implementing cuts to minimize the most devastating harms. The GMRA respectfully requests that this Court follow the statute and do so.

Dated:    San Francisco, California
          June 23, 2009

                                        FARELLA BRAUN & MARTEL LLP


                                        By:    */s/ Neil A. Goteiner*_____
                                               Neil A. Goteiner
                                               Dean M. Gloster
                                               Nan E. Joesten

                                        235 Montgomery Street
                                        San Francisco, California  94104
                                        (415) 954-4400

                                        Attorneys for General Motors Retirees Association