Hearing Date: June 30, 2009 at 9:45 A.M.
Original Objection Deadline: June 19, 2009 at 5:00 P.M.
Extended Objection Deadline: June 22, 2009 at 12:00 Noon

Oliver Addison Parker, Pro Se
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Ph: (954) 599-6468
Fax: (954) 772-6468
splitapart@prodigy.net
Florida Bar No. 235891

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

In re

GENERAL MOTORS CORP., *et al.*,

Debtors.

-------------------------------------------------------- x

Chapter 11

Case No. 09-50026 (REG)

(Jointly Administered)

**AMENDMENT TO OBJECTION OF OLIVER ADDISON PARKER**
**TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k),**
**AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND**
**OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;**
**AND (II) SCHEDULE SALE APPROVAL HEARING**

**AND**

**JOINDER IN AND ADOPTION OF**
**THE UNOFFICIAL COMMITTEE OF FAMILY & DISSIDENT GM BONDHOLDERS'**
**OBJECTION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k),**
**AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND**
**OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;**
**AND (II) SCHEDULE SALE APPROVAL HEARING**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Oliver Addison Parker, Pro Se, ("Parker") pursuant to the provisions of F.R.C.P. 15(a) and F.R.B.P. 7015 herewith files this amendment (the "Amendment to Objection") to his previously filed objection (the "Objection") to the Motion of General Motors Corp. ("GM") and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), made pursuant to U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) approve (A) the sale pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-sponsored purchaser ("the Purchaser"), free and clear of liens, claims, encumbrances, and other interests; (B) the assumption and assignment of certain executory contracts and unexpired leases; and (C) other relief; and (II) Schedule Sale Approval Hearing [Docket No. 92] (the "Sale Motion").  In support of his Amendment to Objection, Parker respectfully states and represents as follows:

### GROUNDS FOR ALLOWING AMENDMENT

1.      Parker is a bondholder and more specifically is the owner and holder of 200,000 shares of 6.250% Series C Convertible Senior Debentures Due 2033 (stock symbol GPM) issued July 2, 2003 with a principle value of $5,000,000.00 plus accrued interest as of June 1, 2009 of $130,208.33, for a total indebtedness owed by GM to Parker as creditor of $5,130,208.33.

2.      On June 19, 2009 at 8:51 A.M., Parker timely filed his Objection to the proposed 363 "sale".

3.      Subsequent to the timely filing of his Objection on June 19th, Parker discovered that these bonds contained the following limitation on the power of GM to mortgage their assets

(the "limitation on liens provision"):[1]

> **Limitation on Liens.**   For the benefit of the senior debt securities, we will not … issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of ours or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether …  now owned or hereafter acquired) **without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the senior debt securities … shall be secured equally and ratably with such Debt**, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of ours and our Manufacturing Subsidiaries … does not at the time exceed 20% of the stockholders equity of us and our consolidated subsidiaries, as determined in accordance with accounting principles generally accepted in the U.S. and shown on the audited consolidated balance sheet contained in the latest published annual report to our stockholders.

> The above restrictions shall not apply to Debt secured by:

> …

>  (v) Mortgages on property of ours or a Manufacturing Subsidiary in favor of the United States of America  … or any department, agency or instrumentality … thereof  … to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages;  …

> The subordinated debt indenture does not include any limitation on our ability to incur these types of liens. [Emphasis mine.]

(See Page 23 of the Prospectus dated June 19, 2003 and attached to the Prospectus Supplement for the $4,000,000,000 in General Motors Corporation 6.250% Series C Convertible Senior Debentures Due 2033, the pertinent portions of which are attached hereto as Exhibit 4.)   To the best of Parker's knowledge, information and belief, all of the senior debt bonds issued by GM contain a similar limitation on liens provision.

---

[1] Parker discovered the limitations on liens provision by reading the Adversarial Complaint by the Narumanchis . [Docket No. 1568] and then checking his prospectus, the relevant portions of which are attached hereto as Exhibit 4.

4.      The fact that Parker's bonds (and most probably, all GM senior debt bonds) contains this limitation on liens provision provides additional grounds for objecting to the proposed 363 "sale" in that under its terms either (1) Parker (and the other senior bondholders) now have a third lien of equal rank and priority with that of the United States Government upon virtually all property owned by GM or (2) the Government does not have a lien on said assets (or at least not a lien that is superior to the interests of the bondholders), or (3) if the Government does have a lien on said assets that is superior to the interests of the bondholders, then the Government wrongfully acquired said lien, and its actions in doing so (a) constitutes a tortuous interference with the bondholders contractual rights under the bonds, (b) establishes bad faith and wrongful conduct on the part of both the Government and GM, (c)  is further evidence demonstrating the Government's control of GM, (d) goes to the issue of equitable subordination, and (e) is additional grounds for Parker's claim that the Government's actions constitute a taking of the bondholders property without just compensation in violation of the 5th Amendment.

5.      Without abandoning his original Objection, Parker (by means of this Amendment to Objection) wants to amend said original Objection so as to include these additional grounds for objecting to the proposed 363 "sale".

6.      Also subsequent to the timely filing of his Objection on June 19th, Parker discovered that the Unofficial Committee of Family & Dissident GM Bondholders had timely filed their own objection (the "Dissidents' Objection" [Docket No. 1969]) to the proposed 363 "sale".

7.      Without abandoning his original Objection or the additional grounds set forth in this Amendment to Objection, Parker wants to join in and adopt as additional grounds for objecting to the proposed 363 "sale" the grounds set forth in the Dissidents' Objection.

8.      Under the provisions of F.R.C.P. 15(a) and F.R.B.P. 7015 "[a] party may amend

the party's pleading once as a matter of course at any time before a responsive pleading is served

or, if the pleading is one to which no responsive pleading is permitted and the action has not

been placed upon the trial calendar, the party may so amend it at any time within 20 days after it

is served."

9.      As of this time, no response to the Objection has been served.  However, an

objection is a pleading that does not usually require a response.  The Objection was filed and

served on Friday, June 19, 2009.  This Amendment to Objection is being filed on Monday

Morning, June 22, 2009 (the next business day) and is being served on June 22, 2009 by United

States Mail, postage prepaid, and by telephonic facsimile.  Thus this Amendment to Objection

may be made without leave of Court and is timely under the provisions of F.R.C.P. 15(a) and

F.R.B.P. 7015.

10.      Pursuant to the provisions of F.R.C.P. 15(c) and F.R.B.P. 7015 the Amendment to

Objection relates back to the original Objection, and since the original Objection was timely filed

pursuant to the provisions of this Court's June 2, 2009 Order Approving Procedure for Sale, the

Amendment to Objection is also timely filed pursuant to the provisions of said Order.

11.      Alternatively, if leave of Court is required for amendment, F.R.C.P. 15(a) and

F.R.B.P. 7015 further provides that "[o]therwise a party may amend the party's pleading only by

leave of court or by written consent of the adverse party; and leave shall be freely given when

justice so requires."

12.      The Financial Times has reported that the Official Committee of Unsecured

Creditors has obtained an extension for filing objections until June 22, 2009.  (See "GM plans

comeback a month early" by Bernard Simon in Toronto Published: June 18 2009, a copy of

5

which is attached hereto as Exhibit 5).  Thus, this Amendment to Objection is timely pursuant to

the provisions of  this Court's June 2, 2009 Order Approving Procedure for Sale [Docket No.

274] as extended.  That the Creditors Committee has obtained such an extension demonstrates

that the Debtors and other parties will not be prejudiced by allowing the amendment.

      13.    Even if the Financial Times is mistaken and the Court has not extended the

deadline for objections until June 22, 2009, this Amendment to Objection is being filed and

served on the next business day after the filing and service of the original Objection; the Debtors

and other parties will not be materially prejudiced by allowing the amendment[2]; and the

amendment will allow issues to be heard that in justice ought to be heard and resolved prior to

the Court's decision regarding the proposed 363 "sale".  Under these circumstances, justice

would seem to require allowing the amendment.

## AMENDMENT TO OBJECTION OF OLIVER ADDISON PARKER

      14.    Without abandoning his original Objection filed June 19, 2009, Parker herewith

amends said Objection so as to include these additional grounds for objecting to the proposed

363 "sale".

## BACKGROUND[3]

      15.    The 6.250% Series C Convertible Senior Debentures Due 2033 (stock symbol

GPM) that Parker owns were issued on July 2, 2003.   These bonds contained the following

limitation on the power of GM to mortgage their assets (the "limitation on liens provision"):

---

[2] The Debtors are already on notice that these issues will be raised.  See the Adversarial Complaint by the
Narumanchis [Docket No. 1568] regarding the limitations on liens provision of the senior bonds and see the
"Dissident's Objection". [Docket No. 1969] for the remaining issues.

[3] Certain of the facts set forth herein are based upon the representations of the Debtors in the Sale Motion.  Others
are based upon the affidavit of Frederick A. Henderson, GM's CEO.  Parker reserves the right to challenge such
representations, and nothing herein shall constitute a waiver of such right.

***Limitation on Liens.***    For the benefit of the senior debt securities, we will not … issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of ours or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether …  now owned or hereafter acquired) **without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the senior debt securities  … shall be secured equally and ratably with such Debt**, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of ours and our Manufacturing Subsidiaries … does not at the time exceed 20% of the stockholders equity of us and our consolidated subsidiaries, as determined in accordance with accounting principles generally accepted in the U.S. and shown on the audited consolidated balance sheet contained in the latest published annual report to our stockholders.

The above restrictions shall not apply to Debt secured by:

….

 (v) Mortgages on property of ours or a Manufacturing Subsidiary in favor of the United States of America  … or any department, agency or instrumentality … thereof … to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages; …

The subordinated debt indenture does not include any limitation on our ability to incur these types of liens. [Emphasis mine.]

(See Page 23 of the Prospectus dated June 19, 2003 and attached to the Prospectus Supplement for the $4,000,000,000 in General Motors Corporation 6.250% Series C Convertible Senior Debentures Due 2033, the pertinent portions of which are attached hereto as Exhibit 4.)   To the best of Parker's knowledge, information and belief, all of the senior debt bonds issued by GM contain a similar limitation on liens provision.

16.    On December 31, 2008, GM and the U.S. Treasury entered into an agreement (the "U.S. Treasury Loan Agreement") that provided the Debtors with emergency financing of up to

an initial $13.4 billion (later increased to $19.4 billion[4]) pursuant to a secured term loan facility

(the "U.S. Treasury Facility"). (See Henderson Aff. ¶¶ 54.)   Under the terms of the U.S.

Treasury Loan Agreement, the U.S. Treasury Facility is secured by a first priority lien on and

security interest in substantially all the unencumbered assets of GM and the guarantors, as well

as a junior lien on encumbered assets, subject to certain exceptions.  The U.S. Treasury Facility

is also secured by a pledge of the equity interests held by GM and the guarantors in certain

foreign subsidiaries, also subject to certain exceptions. (See Henderson Aff. ¶¶ 55.)

17.     In their Sale Motion, the Debtors seek authority to "sell" substantially all of GM's

assets (including approximately $87 billion in net operating losses for use as a tax loss carry

forward) to the Purchaser.  Under the terms of the sale the United States Government is treated

as a secured debtor holding a third lien or better on essentially all of the Debtors' property, while

the senior bondholders (like Parker) are treated not only as unsecured creditors, but as unsecured

creditors whose claims are junior to those of the UAW VEBA and the UAW Pension Plan..

## ADDITIONAL OBJECTIONS

### I.    The Senior Bondholders (Like Parker) Are Secured Creditors Whose Liens Enjoy Equal Rank And Priority With Those Of The Government.

18.     On December 31, 2008, GM issued debt to the United States Government in the

amount of $13.4 billion (subsequently increased to $19.4 billion[5]) secured by a first priority lien

on and security interest in substantially all the unencumbered assets of GM and the guarantors, as

well as a junior lien on encumbered assets, subject to certain exceptions.  The debt was also

secured by a pledge of the equity interests held by GM and the guarantors in certain foreign

subsidiaries, also subject to certain exceptions. (See Henderson Aff. ¶¶ 54 – 55.)

---

[4] Or $20.6 billion – its not clear which.

[5] Or $20.6 billion – its not clear which.

19.     The debt issued by GM to the Government and secured by a lien on and security interest in virtually everything owned by GM was not given to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such liens and security interests.

20. Furthermore, on December 31, 2008 shareholder equity was below zero – it was negative $85 billion.  (See Henderson Aff. Pg. 75.)

21.     Under the limitations on liens provision of the senior bondholders' bonds, GM could not grant the Government a lien on virtually everything it owned without concurrently granting to its bondholders (like Parker) an identical lien on the same property securing the bond debt equally and ratably with the debt of the Government.  Thus, under the terms of the senior bond debt instruments (like that given to Parker), when GM gave the Government a lien on virtually all of its assets it simultaneously gave the same identical lien to the bondholders on the same assets which lien has equal priority with that of the Government.  In other words, there is not a lien on virtually all of the Debtors' assets securing payment of $19.4 billion that is owed to the Government, rather there is an equal and ratable lien on virtually all of the Debtors assets securing payment of $47.4 billion, 59% of which is owed to the senior bondholders (like Parker) and 41% of which is owed to the Government.

**A.     The Proposed 363 "Sale" Is An Unconstitutional Taking
In Violation Of The Fifth Amendment.**

22.     As part of its proposed 363 "sale", the Government proposes to sell virtually all of the Debtors' assets to the Purchaser free and clear of the above described liens held by the senior bondholders on said property.  Further, the Government does not propose to divide the proceeds of the sale ratably between the parties, to wit, 59% to the bondholders and 41% to the

Government.  Instead the Government proposes to give approximately 8% of the equity in the

Purchaser[6] to the senior bondholders (like Parker) in full satisfaction of their 28 billion in claims

and liens, while giving themselves 60% of the equity in the Purchaser, plus approximately $9

billion in assumed (and presumably secured) debt and Preferred Stock in satisfaction of 19.4

billion in claims and liens and while giving the UAW VEBA (which is an unsecured creditor

who is owed $30 billion[7]) 17.5% of the equity in the Purchaser, plus approximately $9 billion in

new promissory notes and Preferred Stock plus $9.4 billion in cash[8] and while fully assuming or

paying (without reduction) the following debts:  $5.9 billion owed to the other secured creditors

(whose claims are apparently senior to those of the bondholders and the Government)[9], $5.4

billion to trade creditors (whose claims are unsecured) and approximately $30 billion to the

UAW and non-UAW Pension Plans (whose claims are unsecured).  In other words, everyone but

the senior bondholders and the unsecured non-trade creditors get paid between 67 cents on the

dollar and 100 cents on the dollar while the senior bondholders and the unsecured non-trade

creditors get paid less than 3 cents on the dollar.

23.    The Supreme Court long ago recognized that a secured creditor's interest in

specific property is protected in bankruptcy under the Fifth Amendment. Louisville Joint Stock

---

[6] While the Government proposes to give 10% of the equity in the purchaser to the Debtors for distribution to the
bondholders, the bondholders must share this with the unsecured non-trade creditors.  Since the unsecured non-trade
creditors are owed an estimated $6 billion, the bondholders will only receive 8% of the Purchaser's equity.
[7] This includes $9.4 billion in cash or cash equivalents presently held in an internal escrow account by GM for
payment to the UAW VEBA in January 1, 2010.

[8] As part of the transaction, GM is transferring to Purchaser approximately $9.4 billion in cash or cash equivalents
presently held in an internal escrow account by GM.  While GM is contractually obligated to pay said $9.4 billion to
the UAW VEBA on January 1, 2010, said obligation has not yet matured and the monies are not yet due and
payable.

[9] Parker is no longer sure that the claims of said secured creditors are in fact senior to those of the senior
bondholders and demands strict proof of said seniority.

Land Bank v. Radford, 295 U.S. 555, 589, 594 (1935). That case involved a Depression-era
statute that was intended to help bankrupt farmers avoid losing their land in mortgage
foreclosure. But rather than mandate some form of moratorium, which had been upheld, see
Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398 (1934), the statute in Radford took a
unique approach to the bankruptcy process. The bankrupt debtor could achieve a release of the
security interests either (i) with the lender's consent, purchasing the property at its then appraised
value by making deferred payments for two to six years at statutorily-set interest rates; or (ii) if
the lender refused the purchase option, by having the bankruptcy court stay the proceedings for
up to five years during which time the debtor could use the property by paying a rent set by the
court, which payments would be for the benefit of all creditors, with a purchase option at the end
of that period. Id. at 575-76.

24.    Justice Brandeis noted that the "essence of a mortgage" is the right of the secured
party "to insist upon full payment before giving up his security [i.e., the property pledged]." Id.
at 580. In invalidating the statute, the Court noted that no bankruptcy law had ever "sought to
compel the holder of a mortgage to surrender to the bankrupt either the possession of the
mortgaged property or the title, so long as any part of the debt thereby secured remained unpaid."
Id. at 581-82. Commenting on the law allowing the debtor to repay less than the full amount
owing and keep the property, the Court also noted that no prior law had "attempted to enlarge the
rights or privileges of the mortgagor as against the mortgagee" including by going beyond
reducing the debtor's liabilities to "supply [the debtor] with capital with which to engage in
business in the future." Id. at 582.

25. Holding that secured creditors could not be treated this way, the Court stated that

"[t]he bankruptcy power . . . is subject to the Fifth Amendment," and that the pernicious aspect of this law was its "taking of substantive rights in specific property acquired by the bank prior to the act." Id. at 589-90.[10] Thus, Congress could not pass a law that could be used to deny to secured creditors their rights to realize upon the specific property pledged to them or "the right to control meanwhile the property during the period of default." Id. at 595.[11] That is precisely what the Government would have the Debtors do here.

26. The Government is demanding that the collateral that secures the debts that are owed to the senior bondholders (like Parker) be stripped away from the senior bondholders' liens— thereby impairing the rights of the senior bondholders to realize upon those assets—so that it may be put in the Purchaser. The plan is then to use those assets to benefit both the Government (whose lien is of equal priority with that of the bondholders) and unsecured creditors in this proceeding, all of whom will then recover substantially more (between 67 and 100 cents on the dollar) than the senior bondholders (who receive less than 3 cents on the dollar). Radford specifically disallowed this type of procedure as antithetical to the idea of a lien on property. That the Government would do this to help the United States address difficult economic times is not an answer. Indeed, the same justification was expressly rejected in Radford, where Justice Brandeis noted that a statute which violated secured creditors' rights, but which was passed for sound public purposes relating to the Great Depression, could not be saved because "the Fifth

_____

[10] The legislative history relating to adequate protection under section 363 echoes this commitment under the Fifth Amendment to protecting the value of property pledged to secured creditors. See S. Rep. No. 95-989, at 49, 53, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835, 5839 (citing Radford and finding that "the purpose of the section is to insure that the secured creditor receives the value for which he bargained"); H.R. Rep. No. 95-595, at 339, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295 (to similar effect).

[11] Tellingly, in Wright v. Union Central Life Ins. Co., 311 U.S. 273, 278 (1940), the Court upheld the revised version of the statute at issue in Radford based on safeguards "to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the [pledged] property."

Amendment commands that, however great the nation's need, private property shall not be thus taken even for a wholly public use without just compensation." Id. at 602.

**B.      The Debtors Have Failed To Satisfy The Requirements Of 11 U.S.C. § 363(f)**

27.      A sale free and clear of third party interests must comply with one of the provisions of section 363(f)(1) though (5).  The Debtors Sale Motion does not address section 363(f), and therefore the motion is defective.[12]

**C.      The Proposed Sale Eliminates The Senior Bondholders' Right
To Credit Bid Granted By Section 363(k)**

28. Under a sale pursuant to section 363 of the Bankruptcy Code, a holder of a secured claim, such as the senior bondholders have the right to credit bid for the purchase of the asset that is the subject of the sale. The secured party's right to credit bid is expressly granted by statute:

> At a sale under subsection (b) of this section of property that is subject to a lien that secured an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).  Credit bidding permits a secured creditor to bid its debt and take title to the property in order to, among other things, protect against a debtor's sale of its collateral for less than its debt. The Debtors here propose to abrogate the senior bondholders' right to credit bid granted by section 363(k), without compensation or cause.

29. Courts have consistently held that if the creditor has a valid lien on the property, the secured creditor can credit bid the face amount of its claim, even if the claim is potentially

---

[12] It is the Debtors burden to establish their right to conduct a 363 "sale".  If the Debtors claim that the requirements of section 363(f) are satisfied, the bondholders have a right to know which subsection(s) of  (1) through (5) they rely upon prior to the hearing on their motion.

undersecured. See In re SubMicron Sys. Corp., 432 F.3d 448, 459 (3d Cir. 2006) ("It is well

settled among district and bankruptcy courts that creditors can bid the full face value of their

secured claims under § 363(k)."); In re SunCruz Casinos, LLC, 298 B.R. 833, 839 (Bankr. S.D.

Fla. 2003) ("[A] secured creditor may credit bid the entire amount of its claim, including the

unsecured portion thereof."); In re Realty Inv., Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987)

(finding that the "allowed claim" for purposes of credit bidding is the creditor's total claim

without reference to the "value" of the property); 3 COLLIER ON BANKRUPTCY ¶ 363.09 (15th ed.

rev. 2008). A secured creditor's claims are treated as equal to cash for the purposes of credit

bidding. See In re HNRC Dissolution Co., 340 B.R. 818 (E.D. Ky. 2006) ("Clearly 11 U.S.C. §

363(k) treats credit bids as a method of payment—the same as if the secured creditor has paid

cash and then immediately reclaimed the cash in payment of the secured debt.").[13]

30. The sale procedures adopted by the Court do not permit the secured bondholders to

credit bid their $28 billion in claims at the sale.  The secured bondholders' right to credit bid

cannot be abrogated without some compensation or adequate protection, yet that is just what the

Debtors seek to do through the proposed sale.

### D.    The Sale And Redistribution Of Value Favors Certain Creditors And/Or Classes Of Creditors And Is Unfair

31.    A fundamental tenet of bankruptcy law is that unfair treatment of creditors is

prohibited, and that the debtors bear the burden to prove that creditors are being treated fairly.

Channel One, 117 B.R. at 496; see also In re Engman, 395 B.R. at 620 (sale must be made in

"good faith" and must be "in the best interests of the estate and creditors"); In re Dow Corning

Corp., 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996) (sale must be "fair and equitable," "in good

faith" and "in the best interests of the estate").

32.    As part of its proposed 363 "sale", the Government proposes to sell virtually all of the Debtors' assets to the Purchaser free and clear of the above described liens held by the senior bondholders on said property.  Further, the Government does not propose to divide the proceeds of the sale ratably between the parties, to wit, 59% to the bondholders and 41% to the Government.  Instead the Government proposes to give approximately 8% of the equity in the Purchaser[13] to the senior bondholders (like Parker) in full satisfaction of their $28 billion in claims and liens, while giving themselves 60% of the equity in the Purchaser, plus approximately $9 billion in assumed (and presumably secured) debt and Preferred Stock in satisfaction of 19.4 billion in claims and liens and while giving the UAW VEBA (which is an unsecured creditor who is owed $30 billion[14]) 17.5% of the equity in the Purchaser, plus approximately $9 billion in new promissory notes and Preferred Stock plus $9.4 billion in cash[15] and while fully assuming or paying (without reduction) the following debts:  $5.9 billion owed to the other secured creditors (whose claims are apparently senior to those of the bondholders and the Government)[16], $5.4 billion to trade creditors (whose claims are unsecured) and approximately $30 billion to the UAW and non-UAW Pension Plans (whose claims are unsecured).  In other words, everyone but the senior bondholders and the unsecured non-trade creditors get paid between 67 cents on the

---

[13] While the Government proposes to give 10% of the equity in the purchaser to the Debtors for distribution to the bondholders, the bondholders must share this with the unsecured non-trade creditors.  Since the unsecured non-trade creditors are owed an estimated $6 billion, the bondholders will only receive 8% of the Purchaser's equity.

[14] This includes $9.4 billion in cash or cash equivalents presently held in an internal escrow account by GM for payment to the UAW VEBA in January 1, 2010.

[15] As part of the transaction, GM is transferring to Purchaser approximately $9.4 billion in cash or cash equivalents presently held in an internal escrow account by GM.  While GM is contractually obligated to pay said $9.4 billion to the UAW VEBA on January 1, 2010, said obligation has not yet matured and the monies are not yet due and payable.

[16] Parker is no longer sure that the claims of said secured creditors are in fact senior to those of the senior bondholders and demands strict proof of said seniority.

dollar and 100 cents on the dollar while the senior bondholders and the unsecured non-trade creditors get paid less than 3 cents on the dollar.

33.    Further, it appears that the Government will continue to have a lien against the property sold to the Purchaser for approximately $7 billion of debt and that the other secured creditors whose liens are allegedly senior to the bondholders and the Government will also retain their liens whereas the bondholders' lien will be extinguished for less than 3 cents on the dollar.

34.    It is obvious that the proposed 363 "sale" is neither fair nor reasonable. The Debtors therefore cannot show that the proposed sale treats the bondholders fairly.

## II.    The Government's Lien Is Not Senior To The Bondholders' Claims

35.    The limitations on liens provision of the senior bondholders' bonds prohibited, GM from granting the Government a lien on virtually everything it owned without concurrently granting to its senior bondholders (like Parker) an identical lien on the same property securing the bond debt equally and ratably with the debt of the Government.  Assuming, *arguendo*, despite the limitations on liens provision, that somehow the Government acquired a lien on virtually everything that GM owned while the senior bondholders did not, it would still be true that GM did not have the power to give the Government a lien on its assets that was superior to the claims of the bondholders.  While the Government may have a lien on those assets that is superior to every other unsecured GM creditor, under the terms of the senior bondholders' bonds, the Government does not have a lien that is superior to the claims of the bondholders.

36.    A fundamental tenet of bankruptcy law is that unfair treatment of creditors is prohibited, and that the debtors bear the burden to prove that creditors are being treated fairly. Channel One, 117 B.R. at 496; see also In re Engman, 395 B.R. at 620 (sale must be made in "good faith" and must be "in the best interests of the estate and creditors"); In re Dow Corning

Corp., 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996) (sale must be "fair and equitable," "in good faith" and "in the best interests of the estate").

37.     Despite the fact that the Government does not have a lien that is superior to the claims of the senior bondholders, the Debtors' proposed 363 "sale" would give to the Government in satisfaction of $19.4 billion in debt 60% of the equity in the Purchaser, plus approximately $9 billion in assumed (and presumably secured) debt and Preferred Stock, not to mention what is given to the UAW VEBA, the other secured creditors, the trade creditors and the UAW and non-UAW Pension Plans.  Each of these creditors would receive between 67 and 100 cents on the dollar while the senior bondholders receive less than 3 cents on the dollar. This is discriminatory, this is unfair and this is inequitable.  Accordingly, the Debtors' proposed 363 "sale" of the Debtors' business should be denied.

**III.    If The Government's Lien Is Senior To The Bondholders' Claims Then The Government Wrongfully Acquired Said Lien**

38.     The limitations on liens provision of the senior bondholders' bonds prohibited, GM from granting the Government a lien on virtually everything it owned without concurrently granting to its bondholders (like Parker) an identical lien on the same property securing the bond debt equally and ratably with the debt of the Government.  Assuming, *arguendo*, despite the limitations on liens provision, that somehow the Government both (1) acquired a lien on virtually everything that GM owned while the senior bondholders did not, and that (2) the Government's lien on the Debtors' assets are superior to the claims of the bondholders, then the Government's acquisition of this lien was wrongful.

39.     It was wrongful because the Debtors' could not grant the Government the lien without violating the limitations on liens provision of the senior bondholders' bonds.

40.    It was wrongful because the Government could not acquire this lien without tortuously interfering with the bondholders' contractual rights under the bonds.

41.    It was wrongful because contractual rights and especially corporate bonds (like those held by Parker) are a form of intangible personal property protected by both Article I, Section 10 of the United States Constitution and by the Fifth Amendment.  Under the takings clause of the Fifth Amendment, the Government cannot take away property rights, incuding intangible personal property rights, without paying just compensation.  The limitations on liens provision of the senior bondholders bonds created just such intangible personal property rights. When the Government accepted the lien on virtually all of the Debtors' property, it violated the senior bondholders' property rights.  That is, it took those rights away from bondholders.  But it did not pay compensation.  Thus the Government's acquisition of its lien was wrongful and in violation of the takings clause of the Fifth Amendment.

42.    The Supreme Court long ago recognized that property rights are protected in bankruptcy proceedings under the Fifth Amendment. See <u>Louisville Joint Stock Land Bank v. Radford</u>, 295 U.S. 555, 589, 594 (1935), holding explicitly that "[t]he bankruptcy power . . . is subject to the Fifth Amendment," Id. at 589-90.  Thus, Congress could not pass a law that would take one person's property and give it to another under the guise of a bankruptcy proceeding.[17] Yet that is precisely what the Government is attempting to do here, take money that under Chapter 11 of the Bankruptcy Code ought to be paid to the senior bondholders and give it instead to the Government and to UAW retirees through their VEBA and to other favored creditors.

43.    The Government is demanding that the Debtors assets be stripped away from them and given to the Purchaser—thereby impairing the rights of the senior bondholders to

---

[17] Section 1129(b)(1) of the Bankruptcy Code acknowledges this prohibition by requiring, among other things, that a plan of reorganization may not unfairly discriminate among similarly situated creditors and must be both fair and equitable.

realize a recovery upon those assets—so that those assets may be used to benefit the

Government, the UAW retirees and other favored creditors.  These favored creditors will then

recover between 67 and 100 cents on the dollar, which is substantially more than the less than 3

cents on the dollar that senior bondholders can expect to recover.  <u>Radford</u> specifically

disallowed this type of procedure as antithetical to the constitutional protections afforded to

property rights. That the Government would do this to help the United States address difficult

economic times is not an answer. Indeed, the same justification was expressly rejected in

<u>Radford</u>, where Justice Brandeis noted that a statute which violates property rights, but which

was passed for sound public purposes relating to the Great Depression, could not be saved

because "the Fifth Amendment commands that, however great the nation's need, private property

shall not be thus taken even for a wholly public use without just compensation." Id. at 602.41.

44.    The Government's actions both in wrongfully acquiring its lien and now in its

demand that the Debtors assets be stripped away from them and given to the Purchaser—thereby

impairing the rights of the senior bondholders to realize a recovery upon those assets—so that

those assets may be used to benefit the Government, the UAW retirees and other favored

creditors, establishes bad faith.

45.    The Government's actions both in wrongfully acquiring its lien and now in its

demand that the Debtors assets be stripped away from them and given to the Purchaser—thereby

impairing the rights of the senior bondholders to realize a recovery upon those assets—so that

those assets may be used to benefit the Government, the UAW retirees and other favored

creditors, is further evidence demonstrating the Government's control of the Debtors,

46.    The Government's actions both in wrongfully acquiring its lien and now in its

demand that the Debtors assets be stripped away from them and given to the Purchaser—thereby

impairing the rights of the senior bondholders to realize a recovery upon those assets—so that

those assets may be used to benefit the Government, the UAW retirees and other favored

creditors, also goes to the issue of equitable subordination.  Because of its wrongful conduct and

evident bad faith, the Government's secured claim for $19.4 billion should be equitably

subordinated to the $28 billion claims of the senior bondholders.

### JOINDER IN AND ADOPTION OF THE OBJECTION OF THE UNOFFICIAL COMMITTEE OF FAMILY & DISSIDENT GM BONDHOLDERS

47.    Without abandoning either his original Objection filed June 19, 2009, or the

above and foregoing Amendment to Objection, Parker herewith joins in and adopts as if more

fully set forth herein the Objection of the Unofficial Committee of Family & Dissident GM

Bondholders  (the "Dissidents' Objection" [Docket No. 1969]) so as to include as additional

grounds for objecting to the proposed 363 "sale" the grounds stated in said Dissidents'

Objection.

### MEMORANDUM OF LAW

48.    The legal bases of Parker's original Objection are incorporated in said Objection.

The legal bases of Parker's above and foregoing Amendment to Objection are incorporated said

Amended Objection.  And the legal bases of the Dissidents' Objection in which Parker joins and

adopts are incorporated in said Dissident Objection.

49.    Parker therefore respectfully requests that this Court deem it satisfactory, or in the

alternative, waives any further requirement of the filing of a separate memorandum of law in

support of said original Objection, the above and foregoing Amendment to Objection or the

Dissidents' Objection which Parker joins and adopts.

### CONCLUSION

50.    The Sale Motion asks this Court to approve an illegal redistribution of the

Debtors' value that flatly ignores the most basic creditor protections established by the

Bankruptcy Code and bypasses the priority scheme established by the Bankruptcy Code. It also

asks the Court to approve the taking of the senior bondholders property and the extinguishment

ot their lien on virtually everything that the Debtors own without just compensation.  The Sale

Motion should therefore be denied and the Government's secured claim in the Debtors' estate

should be equitably subordinated to the claims of the bondholders and the other unsecured non-

trade creditors.

### Prayer For Relief

WHEREFORE, Parker, respectfully requests this Honorable Court for the following

relief:

(A)      Allow Parker to amend his previously filed Objection so as to include both the

grounds for objection stated above in this Amendment to Objection and the grounds for objection

stated in the Dissidents' Objection;

(B)      Entry of an order denying the Debtors' Sale Motion and granting such other and

further relief as the Bankruptcy Court deems just and proper.


Dated: June 22, 2009
       New York, New York

                                        Oliver Addison Parker, Pro Se
                                        283 Codrington Drive
                                        Lauderdale By The Sea, FL 33308
                                        Ph: (954) 599-6468
                                        Fax: (954) 772-6468
                                        splitapart@prodigy.net
                                        Florida Bar No. 235891



                                        By: _____
                                            Oliver Addison Parker, Pro Se


21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and accurate copies of the above and foregoing document

have been served by both United States Mail, postage prepaid, and by telephonic facsimile this

22nd day of June, 2009 to the following named individuals:

(a)  The attorneys for the Debtors:

Harvey R. Miller, Esq.
Stephen Karotkin, Esq.
Joseph H. Smolinsky, Esq
Weil, Gotshal & Manges LLP
767 Fifth Avenue,
New York, New York 10153
Fax No. 212-310-8001


(b)  The attorneys for the Purchaser

John J. Rapisardi, Esq.
Cadwalader, Wickersham & Taft LLP,
One World Financial Center,
New York, New York 10281
Fax No. 212-415-8350

(c)  The attorneys for the Creditors Committee;

Gordon Z. Novod, Esq.
Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
Fax No. 212-715-8000

(d)  The attorney for the UAW

James L. Bromley, Esq.
Cleary Gottlieb Steen & Hamilton LLP,
One Liberty Plaza
New York, New York 10006
Fax No. 212-225-3999

(e) The attorneys for the UAW,

Babette Ceccotti, Esq.
Cohen, Weiss and Simon LLP,
330 W. 42nd Street,
New York, New York 10036
Fax No. 212-695-5436

(f) The attorneys for Export Development Canada,

Michael J. Edelman, Esq.
Michael L. Schein, Esq.
Vedder Price, P.C.,
1633 Broadway, 47th Floor,
New York, New York 10019
Fax No. 212-407-7799

(g)

Diana G. Adams, Esq.
The Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street, 21st Floor,
New York, New York 10004
Fax. No. 212-668-2255

(h)

David S. Jones, Esq. and
Matthew L. Schwartz, Esq.
The U.S. Attorney's Office, S.D.N.Y.,
86 Chambers Street, Third Floor,
New York, New York 10007
Fax No. 212-637-3750

By: _____

Oliver Addison Parker, Pro Se

424B5 1 d424b5.htm PROSPECTUS SUPPLEMENT

Filed Pursuant to Rule 424(b)(5)
Registration No. 333-105949

**PROSPECTUS SUPPLEMENT**
**(To Prospectus dated June 19, 2003)**



# $4,000,000,000
# General Motors Corporation

**6.250% Series C Convertible Senior Debentures Due 2033**

———————————

We are offering $4,000,000,000 principal amount of 6.250% Series C Convertible Senior Debentures Due 2033.

The Series C debentures are convertible into shares of our $1$^2$/3 par value common stock, at your option, under any of the following circumstances: (1) the closing sale price of our $1$^2$/3 par value common stock exceeds specified thresholds, (2) the trading price of the Series C debentures falls below specified thresholds, (3) the Series C debentures are called for redemption or (4) upon the occurrence of other specified corporate events. The Series C debentures are convertible at a conversion price of $47.62 per share, which is equal to a conversion rate of 0.525 shares per $25.00 principal amount of Series C debentures, subject to adjustment. We may pay you an amount of cash equivalent to the shares of our $1$^2$/3 par value common stock otherwise required to be delivered upon conversion. We will pay interest on the Series C debentures on January 15 and July 15 of each year, beginning January 15, 2004. We may redeem the Series C debentures, in whole or in part, on or after July 20, 2010 for an amount in cash equal to the redemption prices set forth herein. You may require us to repurchase your Series C debentures on July 15 of 2018, 2023 and 2028, or, if any of those days is not a business day, on the next succeeding business day, for an amount equal to the principal amount plus accrued and unpaid interest. We may elect to pay the repurchase price in cash, shares of our $1$^2$/3 par value common stock or any combination thereof. We have listed the Series C debentures on the New York Stock Exchange under the symbol "GPM" and expect trading of the debentures to commence on June 27, 2003.

Our $1$^2$/3 par value common stock is listed on the New York Stock Exchange under the symbol "GM." On June 26, 2003, the last sale price of our $1$^2$/3 par value common stock as reported on the New York Stock Exchange was $35.94 per share.

**Investing in the debentures involves risks. See "Risk Factors" beginning on page S-5.**

———————————

Exhibit No. 4

PROSPECTUS

# $10,000,000,000

# GENERAL MOTORS CORPORATION

**Debt Securities**
**Common Stock (par value $1 $2/3$)**
**Class H Common Stock (par value $0.10)**
**Preference Stock (par value $0.10)**
**Preferred Stock (without par value)**
**Purchase Contracts**
**Depositary Shares**
**Warrants**
**Units**

———————————————

We may offer from time to time debt securities, $1 $2/3$ par value common stock, Class H common stock, preference stock, preferred stock, purchase contracts, depositary shares, warrants or units. The aggregate initial offering price of all securities sold by us under this prospectus will not exceed $10,000,000,000. We will provide specific terms of these securities in supplements to this prospectus. You should read this prospectus and any supplement carefully before you invest.

Our $1 $2/3$ par value common stock is listed in the United States on the New York Stock Exchange, the Chicago Stock Exchange, the Pacific Stock Exchange and the Philadelphia Stock Exchange under the symbol "GM." Our Class H common stock is listed on the New York Stock Exchange under the symbol "GMH."

———————————————

We reserve the sole right to accept and, together with our agents from time to time, to reject in whole or in part any proposed purchase of securities to be made directly or through any agents.

———————————————

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

June 19, 2003

You should rely only on the information contained in or incorporated by reference into this prospectus or any accompanying supplemental prospectus. We have not authorized anyone to provide you with different information or make any additional representations. We are not making an offer of these securities in any state or other jurisdiction where the offer is not permitted. You should not assume that the information contained in or incorporated by reference into this prospectus or any prospectus supplement is accurate as of any date other than the date on the front of each of such documents. The terms "General Motors," "GM," "we," "us," and "our" refer to General Motors Corporation. The term "Hughes" refers to Hughes Electronics Corporation, a wholly owned subsidiary of GM.

## TABLE OF CONTENTS

| | |
|---|---|
| About this Prospectus | 1 |
| Principal Executive Offices | 2 |
| Where You Can Find More Information | 2 |
| Incorporation of Certain Documents by Reference | 3 |
| Description of General Motors Corporation | 4 |
| Ratio of Earnings to Fixed Charges and Ratio of Earnings to Fixed Charges and Preference Stock Dividends | 5 |
| Use of Proceeds | 5 |
| Overview of Our Capital Stock | 6 |
| Description of 1 2/3 Par Value Common Stock and Class H Common Stock | 8 |
| Description of Preferred Stock | 16 |
| Description of Preference Stock | 18 |
| Description of Debt Securities | 20 |
| Description of Purchase Contracts | 27 |
| Description of Depositary Shares | 28 |
| Description of Warrants | 31 |
| Description of Units | 34 |
| Forms of Securities | 37 |
| Plan of Distribution | 39 |
| Legal Matters | 42 |
| Experts | 42 |

## ABOUT THIS PROSPECTUS

This prospectus, along with a prospectus for General Motors Nova Scotia Finance Company, a wholly owned subsidiary of GM, is part of a registration statement that we filed with the Securities and Exchange Commission, referred to as the SEC in this prospectus, utilizing a "shelf" registration process. Under this shelf process, we may sell any combination of our securities and General Motors Nova Scotia Finance Company may sell its guaranteed debt securities, as described in the related prospectus, in one or more offerings. The aggregate initial offering price of all securities sold by us under this prospectus will not exceed $10,000,000,000. This prospectus provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with additional information described below under "Incorporation of Certain Documents By Reference."

1

(iii) "Manufacturing Subsidiary" means any Subsidiary (A) substantially all the property of which is located within the continental United States of America, (B) which owns a Principal Domestic Manufacturing Property and (C) in which our investment, direct or indirect and whether in the form of equity, debt, advances or otherwise, is in excess of $2,500,000,000 as shown on our books as of the end of the fiscal year immediately preceding the date of determination; provided, however, that "Manufacturing Subsidiary" shall not include Hughes Electronics Corporation and its Subsidiaries, General Motors Acceptance Corporation and its Subsidiaries (or any corporate successor of any of them) or any other Subsidiary which is principally engaged in leasing or in financing installment receivables or otherwise providing financial or insurance services to us or others or which is principally engaged in financing our operations outside the continental United States of America.

(iv) "Mortgage" means any mortgage, pledge, lien, security interest, conditional sale or other title retention agreement or other similar encumbrance.

(v) "Principal Domestic Manufacturing Property" means any manufacturing plant or facility owned by us or any Manufacturing Subsidiary which is located within the continental United States of America and, in the opinion of our Board of Directors, is of material importance to the total business conducted by us and our consolidated affiliates as an entity.

(vi) "Subsidiary" means any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by us, or by one or more Subsidiaries, or by us and one or more Subsidiaries.

***Limitation on Liens.***    For the benefit of the senior debt securities, we will not, nor will we permit any Manufacturing Subsidiary to, issue or assume any Debt secured by a Mortgage upon any Principal Domestic Manufacturing Property of ours or any Manufacturing Subsidiary or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether such Principal Domestic Manufacturing Property, shares of stock or indebtedness are now owned or hereafter acquired) without in any such case effectively providing concurrently with the issuance or assumption of any such Debt that the senior debt securities (together with, if we shall so determine, any other indebtedness of us or such Manufacturing Subsidiary ranking equally with the senior debt securities and then existing or thereafter created) shall be secured equally and ratably with such Debt, unless the aggregate amount of Debt issued or assumed and so secured by Mortgages, together with all other Debt of ours and our Manufacturing Subsidiaries which (if originally issued or assumed at such time) would otherwise be subject to the foregoing restrictions, but not including Debt permitted to be secured under clauses (i) through (vi) of the immediately following paragraph, does not at the time exceed 20% of the stockholders equity of us and our consolidated subsidiaries, as determined in accordance with accounting principles generally accepted in the U.S. and shown on the audited consolidated balance sheet contained in the latest published annual report to our stockholders.

The above restrictions shall not apply to Debt secured by:

(i) Mortgages on property, shares of stock or indebtedness of any corporation existing at the time such corporation becomes a Manufacturing Subsidiary;

(ii) Mortgages on property existing at the time of acquisition of such property by us or a Manufacturing Subsidiary, or Mortgages to secure the payment of all or any part of the purchase price of such property upon the acquisition of such property by us or a Manufacturing Subsidiary or to secure any Debt incurred prior to, at the time of, or within 180 days after, the later of the date of acquisition of such property and the date such property is placed in service, for the purpose of financing all or any part of the purchase price thereof, or Mortgages to secure any Debt incurred for the purpose of financing the cost to us or a Manufacturing Subsidiary of improvements to such acquired property;

23

(iii) Mortgages securing Debt of a Manufacturing Subsidiary owing to us or to another Subsidiary;

(iv) Mortgages on property of a corporation existing at the time such corporation is merged or consolidated with us or a Manufacturing Subsidiary or at the time of a sale, lease or other disposition of the properties of a corporation as an entirety or substantially as an entirety to us or a Manufacturing Subsidiary;

(v) Mortgages on property of ours or a Manufacturing Subsidiary in favor of the United States of America or any State thereof, or any department, agency or instrumentality or political subdivision of the United States of America or any State thereof, or in favor of any other country, or any political subdivision thereof, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any indebtedness incurred for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages; or

(vi) any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any Mortgage referred to in the foregoing clauses (i) to (v); provided, however, that the principal amount of Debt secured thereby shall not exceed by more than 115% the principal amount of Debt so secured at the time of such extension, renewal or replacement and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the Mortgage so extended, renewed or replaced (plus improvements on such property).

The subordinated debt indenture does not include any limitation on our ability to incur these types of liens.

**_Limitation on Sales and Lease-Backs._**    For the benefit of the senior debt securities, we will not, nor will we permit any Manufacturing Subsidiary to, enter into any arrangement with any person providing for the leasing by us or any Manufacturing Subsidiary of any Principal Domestic Manufacturing Property owned by us or any Manufacturing Subsidiary on the date that the senior debt securities are originally issued (except for temporary leases for a term of not more than five years and except for leases between us and a Manufacturing Subsidiary or between Manufacturing Subsidiaries), which property has been or is to be sold or transferred by us or such Manufacturing Subsidiary to such person, unless either:

(i) we or such Manufacturing Subsidiary would be entitled, pursuant to the provisions of the covenant on limitation on liens described above, to issue, assume, extend, renew or replace Debt secured by a Mortgage on such property equal in amount to the Attributable Debt in respect of such arrangement without equally and ratably securing the senior debt securities; provided, however, that from and after the date on which such arrangement becomes effective the Attributable Debt in respect of such arrangement shall be deemed for all purposes under the covenant on limitation on liens described above and this covenant on limitation on sale and lease-back to be Debt subject to the provisions of the covenant on limitation on liens described above (which provisions include the exceptions set forth in clauses (i) through (vi) of such covenant); or

(ii) we shall apply an amount in cash equal to the Attributable Debt in respect of such arrangement to the retirement (other than any mandatory retirement or by way of payment at maturity), within 180 days of the effective date of any such arrangement, of Debt of ours or any Manufacturing Subsidiary (other than Debt owned by us or any Manufacturing Subsidiary) which by its terms matures at or is extendible or renewable at the option of the obligor to a date more than twelve months after the date of the creation of such Debt.

The subordinated debt indenture does not include any limitations on sales and lease-backs.

## Defeasance

If the terms of a particular series of debt securities so provide, we may, at our option, (a) discharge its indebtedness and its obligations under the applicable indenture with respect to such series or (b) not comply with certain covenants contained in the applicable indenture with respect to such series, in each case by depositing

24

# GM plans comeback a month early

By By Bernard Simon in Toronto

Published: June 18 2009 22:27 | Last updated: June 18 2009 22:59

General Motors        is preparing to relaunch itself as a leaner company by mid-July, a month earlier than envisaged when the Detroit carmaker filed for bankruptcy protection on June 1.

The judge overseeing GM's Chapter 11 case has set Friday as the deadline for objections to its restructuring plan for most parties.

Barring a surprise, GM and its advisers are confident that none of the roughly 500 objections submitted so far will derail the timetable, under which the court is due to consider the sale of most of its assets to a new entity on June 30.

"It really is remarkably quiet," one person familiar with the process said. According to another, the company is drawing up plans to reveal its new board of directors and possibly a raft of senior management changes around the middle of July.

Most of the objections raised so far relate to suppliers' concerns about the amount and timing of payments by the "new" GM under contracts taken on by the existing company. Assets of the "old" GM will remain in Chapter 11 to be sold or wound down for the benefit of creditors.

Possible stumbling blocks include a potential backlash from unsecured creditors as well as dissidents among holders of $27bn in unsecured bonds. A small group of dissident bondholders, holding less than 1 per cent of the securities, has asked the court to allow them to form a committee which would give them a formal voice in the proceedings.

The official committee of unsecured creditors met Fritz Henderson, GM's chief executive, last week. Tom Mayer, the committee's legal adviser, said on Thursday that the committee was still examining its options. He said the unsecured creditors had obtained an extension for objections until June 22.

At the time GM filed for court protection, holders of about 54 per cent of the bonds had approved its offer of a 10 per cent equity stake and warrants for another 15 per cent. GM is restructuring under a seldom used provision of the US bankruptcy code: a normal process would require approval of two-thirds of the securities. The US government is set to emerge as GM's biggest shareholder, with a 60 per cent stake.

Eric Ivester, a restructuring specialist at law firm Skadden Arps, said: "It's certainly unique when the government is both the acquirer and the provider of debtor-in-possession financing."

GM has taken steps to assuage the two groups – secured creditors and dealers – that worked hardest to derail Chrysler's journey through bankruptcy court. GM has pledged to repay secured claims in full.

Although GM has told 1,100 of its 6,000 dealers that their sales and service franchises will not be renewed, it has taken a more conciliatory stance than Chrysler.

Robert Gerber, the judge hearing GM's case, has a debtor-friendly reputation. If all goes to plan, the hearing will take a few days.

Copyright The Financial Times Limited 2009

Exhibit No. 5