Hearing Date: June 30, 2009 at 9:45 A.M.
Objection Deadline: June 19, 2009 at 5:00 P.M.

Oliver Addison Parker, Pro Se
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Ph: (954) 599-6468
Fax: (954) 772-6468
splitapart@prodigy.net
Florida Bar No. 235891

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

In re

GENERAL MOTORS CORP., *et al.*,

Debtors.

-------------------------------------------------------- x

Chapter 11

Case No. 09-50026 (REG)

(Jointly Administered)

**OBJECTION OF OLIVER ADDISON PARKER**
**TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k),**
**AND (m), AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND**
**OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;**
**AND (II) SCHEDULE SALE APPROVAL HEARING**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Oliver Addison Parker, Pro Se, ("Parker") herewith files this objection (the "Objection")

to the Motion of General Motors Corp. ("GM") and the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), made pursuant to U.S.C. §§ 105, 363(b), (f), (k), and

(m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) approve (A) the sale pursuant to

the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S.

Treasury-sponsored purchaser ("the Purchaser"), free and clear of liens, claims, encumbrances,

and other interests; (B) the assumption and assignment of certain executory contracts and

unexpired leases; and (C) other relief; and (II) Schedule Sale Approval Hearing [Docket No. 92]

(the "Sale Motion").  In support of his Objection, Parker respectfully states and represents as

follows:

<h2 style="text-align:center">PRELIMINARY STATEMENT</h2>

Parker is a bondholder and more specifically is the owner and holder of 200,000 shares of

6.250% Series C Convertible Senior Debentures Due 2033 (stock symbol GPM) with a principle

value of $5,000,000.00 plus accrued interest as of June 1, 2009 of $130,208.33, for a total

indebtedness owed by GM to Parker as creditor of $5,130,208.33.

In their Sale Motion, the Debtors seek authority to "sell" substantially all of GM's assets

(including approximately $87 billion in net operating losses for use as a tax loss carry forward)

to the Purchaser.  The basic terms of "sale" are as follows:  (1) the United States Government

will receive 304 million shares (or 60%) of the Common Stock of the Purchaser, plus 83.9

million shares of Series A Preferred Stock paying a 9% cumulative dividend (worth an estimated

$2.1 billion), plus the Purchaser will assume $6.7 billion of debt presently owed by the Debtors

to the U.S. Government; (2) the Canadian and Ontario Governments will collectively receive

58.3 million shares (or 12.5%) of the Common Stock of the Purchaser, plus 16.1 million shares

of Series A Preferred Stock paying a 9% cumulative dividend (worth an estimated $402 million);

(3) the UAW retirees (through the UAW VEBA) will receive 87.5 million shares (or 17.5%) of

Common Stock of the Purchaser, plus warrants for an additional 15.15 million shares of common

stock exercisable at $150.00 a share, plus 260 million shares of Series A Preferred Stock paying

a 9% cumulative dividend (worth an estimated $6.5 billion), plus a new promissory note from

the Purchaser in the principle amount of $2.5 billion with interest payable at the rate of 9% per

2

annum payable in three equal installments on July 15 of 2013, 2015 and 2017, plus

approximately $9.4 billion in cash or cash equivalents to be paid to UAW VEBA on January 1,

2010;[1] (4) the Purchaser will assume all of the approximately $6 billion owed by the Debtors to

the non-U.S. Government secured creditors; (5) the Purchaser will assume and pay virtually all

of the Debtors' trade payables totaling $5.4 billion; (6) the Purchaser will assume an estimated

$1.2 billion in future warranty claims for existing GM Vehicles; and finally, (7)  the Debtors

estate will be allowed to retain $950 million of the approximately $21 billion cash on hand and

in addition will receive 50 million shares (or 10%) of the Common Stock of the Purchaser, plus

warrants for an additional 45.45 million shares of common stock exercisable within 7 years at

$30.00 a share, plus warrants for an additional 45.45 million shares of common stock exercisable

within 10 years at $60.00 a share.  The $950 million will be used to pay the costs of winding

down the Debtors' estate, including the costs of administration. Upon the close of the Debtors'

estate, the common stock and warrants will be distributed to the Debtors' remaining unsecured

creditors, to wit, to the Debtors' bondholders (like Parker), who are collectively owed

approximately $28 billion, to the United States Government, who will be owed $950 million, and

to an undetermined number of other unsecured non-trade creditors and claimants, who are owed

an undetermined amount estimated to be no more than $6 billion.  There is a further proviso that

if the total claims of the remaining unsecured creditors exceed $35 billion, then the Debtors

estate will receive an additional 10 million shares (or 2%) of common stock.

---

[1] As part of the transaction, GM is transferring to Purchaser approximately $9.4 billion in cash or cash equivalents presently held in an internal escrow account by GM.  While GM is contractually obligated to pay said $9.4 billion to the UAW VEBA on January 1, 2010, said obligation has not yet matured and the monies are not yet due and payable.  (See Henderson Aff. at Pg. 15, footnote 3.  [Docket No. 21]))

The proposed 363 "sale" is not really a sale.  The only money changing hands goes from the Debtors to the Purchaser, and not, as one would expect in a real sale, the other way around.[2] Further, there is no third party purchaser, no white knight.  The Purchaser is a newly created corporation owned and controlled by an insider, to wit, the United States Government, the Debtors' single largest secured creditor and the source of the Debtors' DIP financing.  Further, this insider (the United States Government) not only owns and controls the Purchaser, but also effectively controls Debtors, as evidenced by (among other things) the fact that the government fired and replaced GM's CEO, fired and replaced GM's Board of Directors, decided whether and when the Debtors should file a bankruptcy, decided which creditors the Debtors could negotiate with pre-bankruptcy (and which it could not), and decided which unsecured creditors should be treated as favored creditors receiving full (or nearly full) payment and which should be treated as disfavored creditors receiving less than 3 cents on the dollar.

Following such proposed "sale" and distribution, there will be nothing substantive left in this case. Indeed, the government has repeatedly stated its objective of reorganizing GM within a 60-day time period. To do so, the government needs to avoid the requirements of Chapter 11. The government has done exactly that, by seeking approval of a *sub rosa* plan without following any of the required procedures for confirmation. The Debtors' position is that its business is subject to such rapid deterioration that it is effectively a melting ice cube; however, this provides no grounds for the approval of an illegal *sub rosa* plan. The courts can approve the sale of deteriorating assets, but there is no authority for approving a distribution scheme in a Section 363 sale. Indeed, with the exception of In re CHRYSLER, LLC, *et al,* Case No. 09-50002, presently pending in the United States Bankruptcy Court for the Southern District of New York, (the facts

---

[2] As part of the transaction, GM is transferring over $20 billion (all of its cash on hand except for $950 million retained by the Debtors' estate) to the Purchaser, including the approximately $9.4 billion in cash or cash equivalents mentioned in footnote 1, above.

of which are clearly distinguishable from those presented by Debtors' proposed 363 "sale")[3] not

a single court has ever approved a sale and distribution of proceeds as proposed here.

In addition to being an illegal *sub rosa* plan, the Debtors' Sale Motion seeks to overturn

one of the most fundamental tenets of creditor rights in disregard of over 100 years of

bankruptcy jurisprudence, to wit, that creditors of equal rank receive proportionally equal

payouts.  The Debtors' proposed restructuring of stakeholders' rights will pay the UAW retirees

(who are unsecured creditors) approximately 82 cents on the dollar while paying less than 3

cents on the dollar to the bondholders and other unsecured non-trade creditors – who are

creditors of equal rank with the UAW retirees.

In addition, the financing proposed by the section 363 "sale" is illegal. The United States

Treasury Department (the "Treasury Department") is accessing funds under the Troubled Asset

Relief Program ("TARP"). TARP, however, provides funds only for the purchase of troubled

assets from financial institutions. GM is an automotive company, not a financial institution. The

Treasury Department is also improperly controlling GM, without authority, before it even

purports to purchase any assets.

Further, net-operating losses cannot be sold independently of the sale of the corporate

entity as a whole.  More specifically, the only way that anyone can purchase GM's tax loss carry

forwards is by purchasing more than 50% of GM as a corporate entity (and not just GM's assets).

A Bankruptcy court does not have the authority to sever the tax loss carry forward from the

corporate ownership of GM.

---

[3] In Chrysler, there was a third party white knight, to wit, Fiat.  Further, monies actually changed hands, to wit, $2 billion in cash paid by the purchaser.  Finally, the class of creditors to which the objectors in Chrysler belonged were overwhelmingly in favor of the 363 sale – thus the Chrysler objectors were subject to a cram down and did not have the required standing to prevent the sale.

Finally, according to ¶¶ 101 (at Page 42) and Schedule 4 (at Page 95) of the affidavit of

the Debtors' CEO (the "Henderson Aff." [Docket No. 21]), the Debtors have $172.8 billion in

liabilities and only $82.3 billion in assets.  However, a closer examination of both the affidavit

(especially ¶¶ 99 – 131) and of Schedule 4 reveals that the Debtors true liabilities are as follows:

| | |
|---|---|
| U. S. Government secured debt | $20.6 billion[4] |
| Other secured debt | $5.9 billion |
| Total secured debt | $26.5 billion |
| UAW VEBA (unsecured) | $30 billion |
| Bondholder debt (unsecured) | $28 billion |
| Trade payables (unsecured) | $5.4 billion |
| The Supplier Receivables Facility (unsecured) | $700 million[5] |
| Estimated contingent liabilities (unsecured) | $6 billion[6] |
| Total unsecured debt | $70.1 billion |
| Total debt (both secured and unsecured) | $96.55 billion |

Closer examination further reveals that the $82.3 billion in assets includes $21 billion in cash and

does not include the $87 billion in net operating losses that are available as a tax loss carry

forward.   At a corporate tax rate of 35%, this tax loss carry forward is worth approximately

$30.45 billion to an acquiring corporation.  Thus, the Debtors' estate has $112.74 billion worth

of assets with which to pay $96.55 billion in liabilities.  Subtracting out the $21 billion and

---

[4] This includes $1.2 billion of Warrant Notes, which sum has been segregated and will be used to pay an estimated
$1.2 billion in future warranty obligations for existing GM Vehicles.

[5] It is unclear whether or not this amount is part of $20.6 billion in U. S. Government secured debt.

[6] This estimate is taken from the Master Sale and Purchase Agreement which provides that if the total claims of the
remaining unsecured creditors (including bondholders like Parker  –  who are collectively owed $28 billion and the
U.S. Government who will be owed 950 million) exceed $35 billion, then the Debtors estate will receive an
additional 10 million shares (or 2%) of common stock.
.

assuming a 75% discount in liquidation for the remaining assets, there is $43.9 billion available

with which to pay $96.55 billion in liabilities.  Paying the secured debt in full first, there remains

$17.4 billion with which to pay $70.1 billion in unsecured claims.  Thus, in liquidation,

unsecured creditors could reasonably expect to receive 25 cents on the dollar while secured

creditors are paid in full.  However, if the Debtors' 363 "sale" is allowed to go through as

proposed, bondholders (like Parker) and the other unsecured non-trade creditors can expect to

receive less than 3 cents on the dollar while UAW retirees receive 67 cents on the dollar.  Thus,

the proposed 363 "sale" is actually a proposal to inequitably gut the Debtors estate for the benefit

of favored creditors (the UAW retirees) at the expense of disfavored creditors (bondholders and

non-trade creditors).  Such a proposal would never get the required votes needed to pass a

Chapter 11 plan of distribution.  Nor would one expect a Bankruptcy Court to approve of such a

plan.

Accordingly, the Debtors' motion must be denied.

## BACKGROUND[7]

1.      On June 1, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code [Docket No. 1], thereby commencing their

respective chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors purport to be

operating their businesses as debtors and debtors in possession pursuant to sections 1107 and

1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for

procedural purposes.

2.      On June 1, 2009, the Debtors filed the Sale Motion. [Docket No. 92]   On June 1,

---

[7] Certain of the facts set forth herein are based upon the representations of the Debtors in the Sale Motion.  Others
are based upon the affidavit of Frederick A. Henderson, GM's CEO.  Parker reserves the right to challenge such
representations, and nothing herein shall constitute a waiver of such right.

2009, the Court held a hearing to consider proposed bidding procedures. [Docket No. 97]   On

June 2, 2009, the Court approved the bidding procedures and set the hearing to consider the Sale

for Motion for June 30, 2009. [Docket No. 274]

### I.        The Global Financial Crisis And TARP

3.        In December of 2007, the United States economy entered into the worst recession

since the Great Depression, which resulted in an unprecedented response from the United States

government (the "Government"). Perhaps the most widely reported element of that response was

the Emergency Economic Stabilization Act of 2008 ("EESA"), which was passed by Congress

and signed by President George W. Bush on October 3, 2008. 12 U.S.C. § 5201. One critical

component of the EESA was Title I – Troubled Asset Relief Program (TARP), which gives the

Secretary of the Treasury the power to purchase "troubled assets" from "financial institutions."

12 U.S.C. § 5211. TARP authorized the Government to inject hundreds of billions of dollars into

the national banking system in order to restore confidence in the economy and reestablish the

flow of credit.

4.        The second half of 2008 and the first quarter of 2009 can only be characterized as

the worst economic downturn and credit market environment since the Great Depression. (See

Henderson Aff. ¶¶ 41.)   GM (along with the rest of the automotive industry) suffered

tremendous losses in 2008, following drastic reductions in automobile sales. (See Henderson

Aff. ¶¶ 46.)   Under these extraordinary conditions, GM's liquidity rapidly eroded to a level

below what was necessary to operate the business. . (See Henderson Aff. ¶¶ 47.)

### II.       GM Seeks Government Assistance

5.        By the fourth quarter of 2008, GM's deteriorating cash position caused it to seek

financial assistance from the Government. . (See Henderson Aff. ¶¶ 47.)  Shortly before that

request, then-Treasury Secretary Henry Paulson testified that TARP only authorized investment in financial institutions, and the "auto companies fall outside of that purpose." (See Oversight of Implementation of the Emergency Economic Stabilization Act of 2008 and of Government Lending and Insurance Facilities; Impact on Economy and Credit Availability: Hearing Before the H. Comm. on Fin. Servs., 110th Cong. 19 (Nov. 18, 2008) (statements of Henry M. Paulson, Jr.).)  Subsequently, GM was instructed by the Treasury Department to seek Congressional authorization if it wanted Government assistance.

6.      GM then lobbied for such authorization and, although on December 10, 2008, the House of Representatives passed the Auto Industry Financing Restructuring Act (H.R. 7321, 110th Cong. § 10 (2008)), the Senate did not and the bill was not enacted into law.

7.      Less than a week after having failed to obtain congressional authority to provide financing to GM, the Treasury Department remarkably declared that GM, an automobile company, was actually a "financial institution" after all, and that the Treasury Department could therefore access TARP funds on its behalf.  That complete reversal of the Treasury's prior position is plainly without merit.

8.      On December 31, 2008, GM and the U.S. Treasury entered into an agreement (the "U.S. Treasury Loan Agreement") that provided the Debtors with emergency financing of up to an initial $13.4 billion (later increased to $19.4 billion) pursuant to a secured term loan facility (the "U.S. Treasury Facility"). Under the terms of the U.S. Treasury Loan Agreement the U.S. Government became a third lien holder on virtually all property owned by GM.  The loan bears an interest rate at approximately 5% per annum. (See Henderson Aff. ¶¶ 54.)   The U.S. Treasury Loan Agreement required that the Company develop a proposal to transform its business and demonstrate future viability. (See Henderson Aff. ¶¶ 59.)  Although the maturity date of the loan

was December 30, 2011, the U.S. Treasury Loan Agreement provided that the Government had

the right to accelerate the entire amount due if either (1) GM failed to submit a restructuring

plan, or "viability plan," by February 17, 2009 (after the inauguration of a new president), or (2)

the Government failed to accept the plan by March 31, 2009.   Upon acceleration the loans and

other obligations under the U.S. Treasury Loan Agreement would become due and payable in

full within 30 days.  (See Henderson Aff. ¶¶ 58.)

        9.      This loan agreement left GM at the mercy of the Treasury Department in a

number of ways. First, the amount of the loan was not nearly enough to fund a meaningful

restructuring. It was simply an interim lifeline that would postpone GM's collapse until after the

new administration took office in January 2009. Second, the Treasury Department would have

complete discretion to determine whether GM's viability plan was satisfactory. If the

Government chose to reject the plan, it would have the right to call in the full amount of the loan.

Third, even if GM put forth a reasonable viability plan, the Government made no commitment to

provide the additional funds necessary to allow GM to implement its plan.

### III.    The Government Rejects GM's Plan And GM Cedes Control

        10.      As required by the U.S. Treasury Loan Agreement GM submitted its plan to the

President's Task Force on the Auto Industry on February 17, 2009. (See Henderson Aff. ¶¶ 60.)

        11.      On March 29, 2009, newly elected President Barack Obama fired Rick Wagoner,

the CEO of GM (who was opposed to a GM bankruptcy filing) and replaced him with Fritz A.

Henderson (who was open to the possibility of GM's filing for bankruptcy).  The following day

the President announced the rejection of GM's viability plan. The President outlined a series of

actions that GM needed to take by June 1, 2009 to receive additional federal assistance,

including reaching an agreement with GM's bondholders and the UAW VEBA regarding debt

reduction, and the submission of a revised business plan that was more aggressive in terms of scope and timing. (See Henderson Aff. ¶¶ 62 – 64.)   The President further announced that most of GM's board of directors would be replaced over the next several months.

12.    Following the speech, the Treasury Department informed GM that it must reduce its bondholder debt by 90% and its UAW VEBA obligations by 50% through an exchange of debt for equity or face bankruptcy. (See Henderson Aff. ¶¶ 71 – 72.) However, while GM was allowed to offer the UAW VEBA a 39% equity interest in GM (later reduced to a 17.5% equity interest) for a $10 billion reduction in GM's UAW VEBA obligations, GM was only allowed to offer the bondholders a 10% equity interest in GM in exchange for a $24.3 billion reduction in bondholder obligations.  When an informal committee of bondholders attempted to make a counter offer, they were informed by Frederick A. Henderson (GM's CEO) that the Treasury Department would not allow him to negotiate and that the exchange offer was a take it or leave it proposition.  Needless to say, while the UAW VEBA was willing to exchange debt for equity on the terms offered, the overwhelming majority of bondholders were not.[8]

13.    Also following the President's speech, GM was further instructed by the Treasury Department to prepare for bankruptcy and a Section 363 "sale" of assets to a U.S. Treasury sponsored purchaser in anticipation that the majority of bondholders would refuse to exchange debt for equity on the terms offered.  (See Henderson Aff. ¶¶ 74.)   GM's agreement to act as instructed marked the end of independent management. In clear violation of its fiduciary duties to its bondholders and shareholders, GM stopped functioning as a private company and became an instrument of a third-lien lender, the U.S. Government.

---

[8] Following the overwhelming rejection of the exchange offer by GM bondholders, on May 27, 2009 the Treasury Department sweetened the offer to bondholders by offering 10% of the Purchaser's common stock plus stock warrants equal to 15% of the Purchaser's common stock (half exercisable at $30.00 a share and half exercisable at $60.00 a share) if the bondholders would agree not to object to the proposed Section 363 sale.  Only bondholders owning 54% (by value) of the outstanding bonds accepted – not enough to force a cram down.

IV.    **GM Files For Bankruptcy To Wipe Out Bondholder Debt**

14.    On June 1, 2009, the Debtors commenced these Chapter 11 cases. As with its other major business decisions, the timing of the filing and the venue were made by the Government.  Even though the cases were filed under chapter 11 of the Bankruptcy Code, it is very clear that the Debtors have no intention (or even possibility) of reorganizing these estates. Instead, the Debtors have filed the Sale Motion seeking to sell substantially all of their assets, including their net operating losses, free and clear of liens, to a newly formed company solely created for the purpose of this transaction, to wit, the Purchaser. (See Henderson Aff. ¶¶ 74 – 81.)

15.    The purpose of this transaction is to transfer value from the bondholders and the other unsecured non-trade creditors to the UAW retirees without regard for the well-established principle that creditors or equal rank have equal proportional recoveries.  For example, though the bondholders and the other unsecured non-trade creditors will recover only a 10% equity in the Purchaser plus stock warrants equal to 15% of the Purchaser's common stock (half exercisable at $30.00 a share and half exercisable at $60.00 a share) and no money, the UAW retirees will receive (through the UAW VEBA for an unsecured claim of approximately $30 billion[9]), $9.4 billion in cash, $6.5 billion in preferred stock, a new $2.5 billion promissory note, a 17.5% equity in the Purchaser and stock warrants equal to 2.5% of the Purchasers common stock exercisable at $150.00 a share. (See Sale Motion ¶¶ 26.)  Thus while the bondholders  and the other unsecured non-trade creditors will only receive 3 cents on the dollar, the UAW retirees will recover 67 cents on the dollar.

16.    Following the sale the Debtors will cease to function as a going concern and will

---

[9] This includes the $9.4 billion presently held in escrow by GM for payment to the UAW VEBA on January 1, 2010. (See Henderson Aff. at Pg. 15, footnote 3.)

be left with only those assets that the Treasury Department deems to be of little or no value.  The

Debtors describe the sale as of "substantially all" of their assets. (See Sale Motion ¶¶ 16 and

Henderson Aff. ¶¶ 74.)

17.     Even though this transaction will reorder the economic interests of every GM

stakeholder, the Debtors have ignored fundamental issues related to this transaction. While the

Debtors claim that liquidation would be disastrous for GM's stakeholders (See Sale Motion ¶¶

38 and Henderson Aff. ¶¶ 5, 97 – 98.), they offer no evidence that would support this claim.

Debtors have made no effort to determine whether selling its assets to the Purchaser as a going

concern would bring creditors a better recovery than a liquidation of GM's component parts.

They simply assume that in liquidation bondholders and other unsecured creditors would receive

no recovery whatsoever.  (See Henderson Aff. ¶¶ 5.)  However, a close examination of Frederick

A. Henderson's affidavit (Henderson Aff. ¶¶ 99 – 131) reveals that the Debtors true liabilities are

as follows:

| | |
|---|---|
| U. S. Government secured debt | $20.6 billion[10] |
| Other secured debt | $5.9 billion |
| Total secured debt | $26.5 billion |
| UAW VEBA (unsecured) | $30 billion |
| Bondholder debt (unsecured) | $28 billion |
| Trade payables (unsecured) | $5.4 billion |
| The Supplier Receivables Facility (unsecured) | $700 million[11] |
| Estimated contingent liabilities (unsecured) | $6 billion[12] |

---

[10] This includes $1.2 billion of Warrant Notes, which sum has been segregated and will be used to pay an estimated $1.2 billion in future warranty obligations for existing GM Vehicles.

[11] It is unclear whether or not this amount is part of $20.6 billion in U. S. Government secured debt.

| | |
|---|---|
| <u>Total unsecured debt</u> | <u>$70.1 billion</u> |
| Total debt (both secured and unsecured) | $96.55 billion |

Furthermore, the $82.3 billion in assets listed by Henderson includes $21 billion in cash and does not include the $87 billion in net operating losses that are available as a tax loss carry forward. (See Henderson Aff., Schedule 4, Pg. 75.) At a corporate tax rate of 35%, this tax loss carry forward is worth approximately $30.45 billion to an acquiring corporation. Thus, the Debtors' estate has $112.74 billion worth of assets with which to pay $96.55 billion in liabilities. Subtracting out the $21 billion and assuming a 75% discount in liquidation for the remaining assets, there is $43.9 billion available with which to pay $96.55 billion in liabilities. Paying the secured debt in full first, there remains $17.4 billion with which to pay $70.1 billion in unsecured claims. Thus, in liquidation, unsecured creditors (including bondholders and non-trade creditors) could reasonably expect to receive 25 cents on the dollar while secured creditors are paid in full. However, if the Debtors' 363 "sale" is allowed to go through, bondholders and the other unsecured non-trade creditors can expect to receive less than 3 cents on the dollar, while UAW retirees would receive 67 cents on the dollar. It would thus appear that bondholders and the other unsecured non-trade creditors would fare better in liquidation then if the proposed 363 "sale" were allowed to proceed. The proposed 363 "sale" is actually a proposal to inequitably gut the Debtors estate for the benefit of favored creditors (the UAW retirees) at the expense of disfavored creditors (bondholders and the other unsecured non-trade creditors). Clearly the proposed 363 "sale" violates the Debtors fiduciary duty to work for the benefit of all stakeholders and not just a favored few.

---

[12] This estimate is taken from the Master Sale and Purchase Agreement which provides that if the total claims of the remaining unsecured creditors (including bondholders like Parker – who are collectively owed $28 billion and the U.S. Government who will be owed 950 million) exceed $35 billion, then the Debtors estate will receive an additional 10 million shares (or 2%) of common stock.
.

18.    The Debtors have likewise ignored the structure of the "sale: transaction. The

Debtors' do not (and apparently cannot) state the expected value of the Purchaser after

completion of the proposed 363 "sale", the amount of debt the Purchaser can safely support, the

expected value of the Purchaser's common stock being distributed under the "sale" transaction or

why the common stock is being allocated as proposed in the Sale Motion. The Debtors did not

play any role in negotiating the capital structure of the Purchaser and did not decide what any of

its stakeholders would receive as part of the transaction. All of these decisions were made by the

Debtors largest secured creditor, the United States Government.

19.    The Debtors abdicated each of these critical management decisions to the

Treasury Department, whose only legally cognizable interest in these cases is that of a third-lien

lender.

## OBJECTION

### I.    The Proposed Sale Constitutes An Illegal *Sub Rosa* Plan That Distributes The Value Of The Collateral Among Creditor Classes

20.    An expedited sale of substantially all of a debtor's assets, coupled with a

distribution to the debtor's creditors of the value derived from the sale, which effectively

terminates the debtor's business, is universally recognized as an impermissible *sub rosa* plan of

reorganization. Here, the proposed "sale" goes far beyond what courts permit for an expedited

sale. And it is far more than a sale of assets to preserve the value of a wasting asset, which is the

conventional rationale for expedited sales under section 363. Instead, the proposed "sale"

transaction is part of a multi-faceted plan that would allocate the value of the on-going enterprise

and virtually all of its assets among creditor classes without the protections of the plan process.

### A.    The Debtors Attempt To Short Circuit The Plan Process

21.    As shown below, courts have refused to approve section 363 sales that "short

15

circuit" the requirements of chapter 11. The sale proposed by the Debtors is designed primarily

to benefit the UAW retirees, without affording bondholders and the other unsecured non-trade

creditors whose claims have equal rank with that of the UAW retirees the protections and

requirements of a plan, disclosure statement and confirmation procedures as contemplated in

sections 1122 to 1129 of the Bankruptcy Code.

22.    The seminal case prohibiting sales as *sub rosa* plans is <u>Braniff</u>: "The debtor and

the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for

confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in

connection with a sale of assets." <u>PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)</u>,

700 F.2d 935, 940 (5th Cir. 1983).  In <u>Braniff</u>, the terms of the proposed sale included (a) the

issuance of scrip that would only be used in a plan and only to fund obligations to former

employees and shareholders, (b) that debt would be required to vote a portion of its deficiency

claims in favor of any future plan approved by a majority of the Official Committee of

Unsecured Creditors, and (c) releases in favor of Braniff and its directors and officers. Id. at

939-40. The court recognized the potential for mischief if a section 363 sale of substantially all

of a debtor's assets is not closely scrutinized. The court held that where a proposed sale:

> attempts to specify the terms whereby a reorganization plan is to be adopted, the
> parties and the district court must scale the hurdles erected in Chapter 11 . . . .
> Were this transaction approved, and considering the properties proposed to be
> transferred, little would remain save fixed based equipment and little prospect or
> occasion for further reorganization.

Id. at 940; see also <u>In re Abbotts Dairies of Pa.</u>, 788 F.2d 143, 150 (3d Cir. 1986) (holding that

the "good faith" requirement of a section 363 sale is to be used to assure that by means of an

asset sale a debtor does not abrogate the protections afforded to creditors by section 1129 of the

Bankruptcy Code and the plan confirmation process).

23.    The court's analysis in <u>In re Westpoint Stevens Inc.</u>, 333 B.R. 30 (S.D.N.Y.

2005), is particularly instructive with respect to the increased scrutiny that must be applied to the

sale of substantially all of a company's assets outside the context of a chapter 11 plan. In

<u>Westpoint</u>, the bankruptcy court approved a sale of substantially all of the debtors' assets in

exchange for cash and a transfer of certain unregistered securities and subscription rights to

acquire securities of the corporate parent of the purchaser. Id. at 33-34. The sale order (i)

provided that certain secured creditors would receive replacement liens in the securities, (ii)

placed a value on the securities, (iii) directed a distribution of a portion of the securities to the

senior secured creditors in full and complete satisfaction of their claims, and (iv) a partial

distribution of the securities to junior lienholders, free and clear of the senior secured creditors'

liens. Id.

24.    The senior secured creditors appealed, arguing that the sale order converted more

than $240 million of secured monetary claims against the debtors into an illiquid minority equity

interest in the parent of successor entities of the debtor. Id. at 34. The district court for the

Southern District of New York reversed, holding that the rights of the senior secured creditors

could not be abrogated and that the bankruptcy court lacked authority to approve such a

transaction under section 363 of the Bankruptcy Code. The court then warned of the dangers of

a "powerful creditor" and debtor creating a proposed sale to create value for "favored

constituencies"—the very situation the instant case presents:

> The Bankruptcy Court pointed to no authority, nor has this court despite the
> extensive research efforts of counsel and the undersigned's own chambers found
> any, standing for the proposition that an action in permanent derogation of a
> senior creditor's contractual rights can be forced upon that creditor for the
> purpose of providing 'adequate protection' to a junior creditor . . . . Taken to its
> logical extreme, the Bankruptcy Court's notion of adequate protection would
> allow a powerful creditor and a debtor anxious to achieve some value for its
> favored constituencies to run roughshod over disfavored creditors' rights, so long

as a section 363(b) asset sale transaction could be defended as an exercise of reasonable business judgment in the context of dire economic circumstances.

Id. at 49-50.

25.     While Westpoint specifically dealt with a 363 asset sale that impaired a secured creditors rights in favor of junior creditors, its holding applies with equal force to a proposed "sale" that impairs the rights of a class of unsecured creditors in favor of another class of unsecured creditors of equal rank.  The district court specifically held that "section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures." Id. at 52. As the Westpoint court further explained, "[w]here it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section." Id.; see also Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.), 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan."); Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780 F.2d 1223, 1226-28 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11.' " (citations omitted) "[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization . . . .").

26.     As the court further explained, section 363 cannot be used to abrogate Chapter 11 plan protections: "If a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's [sic] rights under, for example 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless. Undertaking reorganization piecemeal

18

pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan." Id.

27.    The <u>Westpoint</u> court's analysis is on point. Under the transaction proposed by the Debtors, the Debtors would sell substantially all of their assets—including approximately $87 billion in net operating losses for use as a tax loss carry forward—to the Purchaser.   The Debtors then propose that the Purchaser would give to GM for distribution to the bondholders and the other unsecured non-trade creditors (who are collectively owed $35 billion) no cash, but only 50 million shares (or 10%) of the Common Stock of the Purchaser, plus warrants for an additional 45.45 million shares of common stock exercisable within 7 years at $30.00 a share, plus warrants for an additional 45.45 million shares of common stock exercisable within 10 years at $60.00 a share, while giving favored unsecured stakeholders (the UAW retirees) 87.5 million shares (or 17.5%) of Common Stock of the Purchaser, plus warrants for an additional 15.15 million shares of common stock exercisable at $150.00 a share, plus 260 million shares of Series A Preferred Stock paying a 9% cumulative dividend (worth an estimated $6.5 billion), plus a new promissory note from the Purchaser in the principle amount of $2.5 billion with interest payable at the rate of 9% per annum payable in three equal installments on July 15 of 2013, 2015 and 2017, plus approximately $9.4 billion in cash or cash equivalents to be paid to UAW VEBA on January 1, 2010,[13]  (See Sale Motion, at ¶¶ 26; Henderson Aff., at Pg. 15, footnote 3; Henderson Aff. at Pg. 75.)  In other words, the Debtors propose that the Purchaser give to GM for distribution to the bondholders and the other unsecured non-trade creditors less than 3 cents on the dollar while giving the UAW retirees approximately 67 cents on the dollar.  Just as in <u>Westpoint</u>, the Debtors

---

[13] As part of the transaction, GM is transferring to Purchaser approximately $9.4 billion in cash or cash equivalents presently held in an internal escrow account by GM.  While GM is contractually obligated to pay said $9.4 billion to the UAW VEBA on January 1, 2010, said obligation has not yet matured and the monies are not yet due and payable.

cannot use Section 363 to force the bondholders and the other unsecured non-trade creditors to take a distribution in satisfaction of their claims that is disproportionately less then the distribution given in satisfaction of the UAW retirees claims, claims that are of equal rank with those of the bondholders and other non-trade unsecured creditors.  Such a transaction is an impermissible *sub rosa* plan that, if approved, would abrogate the Chapter 11 plan protections of section 1129 of the Bankruptcy Code.

> **B.    The Proposed Allocations Among Creditor Classes Violate The Priority Scheme Established By The Bankruptcy Code**

28.    The equitable remedies that may be available in a chapter 11 case to achieve the goal of reorganization are circumscribed by the Bankruptcy Code. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988). The U.S. Supreme Court in Ahlers rejected a plan which sought to favor certain equity holders over certain creditors based on the purported contribution of future "labor, experience, and expertise." Id. at 199, 204-05. The Court held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code" and that a "fair and equitable" reorganization is one which complies with the Bankruptcy Code. Id. at 206-207.

29.    Here, the Debtors specifically seek to obtain the benefits of the section 1129 confirmation process, through an accelerated section 363 transaction, while flatly ignoring the requirements and creditor protection of section 1129 of the Bankruptcy Code.  Section 1129(b)(1) of the Bankruptcy Code requires, among other things, that a plan of reorganization may not unfairly discriminate among similarly situated creditors and must be both fair and equitable. The Debtors' proposed 363 "sale" violates each of these principles.  The claims of the UAW retirees (through the UAW VEBA) are unsecured and of equal rank with the claims of the bondholders and the other unsecured non-trade creditors.  Yet the UAW retirees are receiving 76

20

cents on the dollar while the bondholders and other unsecured non-trade creditors are receiving only 3 cents on the dollar. This is discriminatory, this is unfair and this is inequitable. Accordingly, any proposed "sale" of the Debtors' business should not be approved except through the section 1129 confirmation process, which assures to all creditors and other parties in interest full disclosure, the opportunity to vote on their fates and the protections of a fully noticed confirmation process. The proposed 363 "sale" has at least in part been structured so as to eliminate (or clearly has the effect of eliminating) voting and objection rights that would otherwise exist. Moreover, if a majority in number rejected the plan, then the plan could only be confirmed if the bondholders and the other unsecured non-trade creditors were not unfairly discriminated against vis-a-vis other *pari passu* unsecured claims such as trade claims and the UAW retirees VEBA claim. The proposed 363 "sale" provides no such protection and allows substantially all the value of the Debtors' estates to be distributed out to other stakeholders in satisfaction of their claims at the expense of the bondholders and other unsecured non-trade creditors.

30.     Further, in a contested plan confirmation process, the bondholders and the other unsecured non-trade creditors would be able to fully test and challenge the Debtors' view of both enterprise value and liquidation value; an opportunity the present process deprives them of.

## II.     The Government's Actions Exceed Its Statutory Authority and Are Improper

31.     It is axiomatic that the Executive Branch's authority must derive either from an act of Congress or from the Constitution itself. Youngstown Sheet & Tube Co., 343 U.S. 579, 585 (1952).

32.     Here, the Executive Branch relies on Title 1 of the Emergency Economic Stabilization Act of 2008 ("EESA"), better known as the Troubled Asset Relief Program or

TARP.  EESA, however, limits the spending under TARP to purchases of "troubled assets" of

"financial institution[s]".  12 U.S.C. § 5211(a).  Further, EESA is explicit that troubled assets are

**only** to be purchased from "financial institution[s]."  12 U.S.C. § 5211(a)(1).

33.    And the EESA expressly lists the types of entities that are financial institutions as

"any bank, savings association, credit union, security broker or dealer, or insurance company".

12 U.S.C. § 5202(5).  This list clearly does not include automakers.  Another federal statute the

Bank Holding Company Act ("BHCA"), further illustrates the definition of financial institution,

defining the activities that are "financial in nature" as including:

> (A)    Lending, exchanging, transferring, investing for others, or safeguarding
> money or securities.
>
> (B)    Insuring, guaranteeing, or indemnifying against loss, harm, damage,
> illness, disability, or death, or providing and issuing annuities, and acting
> as principal, agent, or broker for purposes of the foregoing, in any State.
>
> (C)    Providing financial, investment, or economic advisory services, including
> advising an investment company (as defined in section 3 of the Investment
> Company Act of 1940 [15 U.S.C.A. § 80a-3]).
>
> (D)    Issuing or selling instruments representing interests in pools of assets
> permissible for a bank to hold directly.
>
> (E)    Underwriting, dealing in, or making a market in securities.
>
> (F)    Engaging in any activity that the Board has determined, by order or
> regulation that is in effect on November 12, 1999, to be so closely related
> to banking or managing or controlling banks as to be a proper incident
> thereto (subject to the same terms and conditions contained in such order
> or regulation, unless modified by the Board).
>
> (G)    Engaging, in the United States, in any activity that—
>
>> (i)    a bank holding company may engage in outside of the United
>> States; and
>>
>> (ii)    the Board has determined, under regulations prescribed or
>> interpretations issued pursuant to subsection (c)(13) of this section
>> (as in effect on the day before November 12, 1999) to be usual in

>connection with the transaction of banking or other financial
>operations abroad.

12 U.S.C. § 1843(k)(4).[14] Again, making and selling cars obviously does not qualify.

34.    That TARP was aimed at financial institutions—that is the types of already

regulated institutions listed in the TARP definition of "financial institution"—and not auto

manufacturers, is also confirmed by the other sections of EESA which expand previously

authorized statutory mandates for the Federal Reserve, FDIC and Treasury Department. See 12

U.S.C. §§ 5233 (EESA § 126 regarding FDIC authority), 5235 (EESA § 129 regarding the

Federal Reserve's loan authority), 5236 (EESA § 131 regarding the Treasury's authority as to the

Exchange Stabilization Fund), and 5241 (regarding an increase in FDIC deposit and share

insurance).

35.    In his testimony before Congress on November 18, 2008, Treasury Secretary

Paulson unequivocally stated "that the auto companies fall outside that purpose [of TARP]."

(See Oversight of Implementation of the Emergency Economic Stabilization Act of 2008 and off

Government Lending and Insurance Facilities; Impact on Economy and Credit Availability:

Hearing Before the H. Comm. on Fin. Servs., 110th Cong. 19 (Nov. 18, 2008)).

36.    The House of Representatives further reiterated this inescapable conclusion when

it attempted to authorize the Executive Branch to bailout the automotive manufacturing industry

after enacting TARP, an act that would have been unnecessary if TARP was available for such

purpose. The Auto Industry Financing and Restructuring Act, H.R. 7321, 110th Cong. § 10

(2008), passed by the House of Representatives attempted, and failed, to authorize the Executive

Branch to do what the Treasury Department is attempting to do here. That legislation failed in

---

[14] The BHCA also includes certain other categories of activity that are considered "financial in nature," which relate
to certain types of potential acquisitions by bank holding companies, and do not affect the analysis here. See 12
U.S.C. § 1843(k)(4)(H)-(I).

the Senate. As a result, the Executive Branch (including the Treasury Department) never

received Congressional authorization to bail out auto manufacturers, as it is attempting to do

here.

37.     Even the Treasury Department has recognized that TARP funds are available only

to financial institutions. In its December 18, 2008 determination, Secretary Paulson concluded

that TARP funds would be made available to GM because "such thrift and other holding

companies engaged in the manufacturing of automotive vehicles and the provision of credit and

financing in connection with the manufacturing and purchase of such vehicles are 'financial

institutions' . . . ." (Treasury Department Determination dated Dec. 19, 2009, attached hereto as

Exhibit 1.)  However, the GM entity that extends credit is General Motors Acceptance

Corporation (GMAC), which is not one of the Debtors in this case, and is not the recipient of any

of the TARP funds being used to finance this bankruptcy.  Consequently, under the Treasury

Department's own determination, TARP funds are not available to fund the Debtors'

reorganization.

38.     The Treasury Department now ignores the statutory language, intent, and purpose

and even its own prior determinations and the failed auto bailout bill, proceeding on the

remarkable position that TARP funds can be used to purchase assets of  "any institution" that is

"established and regulated under the laws of the United States and have significant operations in

the United States." (Treasury Department Determination dated April 29, 2009, attached hereto as

Exhibit 2.)  The Treasury Department has simply, and improperly, read out of the definition of

"financial institution" the word "financial" as well as the list of representative financial

institutions that confirms the limits on the scope of TARP. 12 U.S.C. § 5202(5).  The Treasury

Department's "interpretation" eviscerates the clear Congressional intent of TARP and is squarely

at odds with well-settled principles of statutory construction concerning the definition of

"financial institution" as set forth in the EESA. If the phrase "any institution" were to be

interpreted to mean literally any institution of any nature, regardless of whether it was financial

in nature, the qualifier "financial" and the listing of types of financial institutions that follows

would be utterly meaningless and effectively written out of the statute. See Leocal v. Ashcroft,

543 U.S. 1, 12 (2004) ("we must give effect to every word of a statute wherever possible").[15]

### A.    The Sale Motion Violates The Plain Language Of The EESA And Is An Unconstitutional Taking

39.    TARP also contains express language prohibiting the impairment of the

bondholders' rights, which is being attempted through the guise of the section 363 sale.  Section

119(b)(2) of the EESA provides that "[a]ny exercise of the authority of the Secretary pursuant to

this chapter shall not impair the claims or defenses that would otherwise apply with respect to

persons other than the Secretary." 12 U.S.C. § 5229(b)(2).

---

[15] In Hibbs v. Winn, 542 U.S. 88, 101 (2004), the Supreme Court examined whether the term "assessment" in the phrase "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law" was so broad as to signify the entire taxing plan. In rejecting that view, the Court explained:

> We do not focus on the word "assessment" in isolation, however. Instead, we follow "the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it." General Dynamics Land Systems, Inc. v. Cline, 540 U.S. 581, 596, 124 S.Ct. 1236, 1246, 157 L.Ed.2d 1094 (2004) (internal quotation marks omitted). In § 1341 and tax law generally, an assessment is closely tied to the collection of a tax, i.e., the assessment is the official recording of liability that triggers levy and collection efforts.

> The rule against superfluities complements the principle that courts are to interpret the words of a statute in context. See 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181-186 (rev. 6th ed. 2000) ("A statute should be construed as that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . ." (footnotes omitted)). If, as the Director asserts, the term "assessment," by itself, signified "[t]he entire plan or scheme fixed upon for charging or taxing," Brief for Petitioner 12 (quoting Webster's New International Dictionary of the English Language 166 (2d ed. 1934)), the TIA would not need the words "levy" or "collection"; the term "assessment," along, would do all the necessary work.

See also Rapanos v. United States, 547 U.S. 715, 731-32 (2006) (noting that the qualifier "navigable" in the term "navigable waters" is not devoid of significance).

40.     As discussed above, if the Debtors are successful in obtaining approval of the section 363 sale, the bondholders and other unsecured non-trade creditors would receive less than 3 cents on the dollar.  Meanwhile, the UAW retirees (through the VEBA) would receive 67 cents on the dollar – a far higher recovery rate than paid to the bondholders and other unsecured non-trade creditors.  As such, the Debtors' plan is to use section 363 to strip itself of the assets that would normally be used to satisfy the claims of the bondholders and the other unsecured non-trade creditors and use those assets *instead* to preferentially satisfy the unsecured VEBA claims of the UAW retirees, which are of equal rank with the claims of the bondholders and the other unsecured non-trade claims.

41.     Not only do the Government's actions far exceed its statutory authority, they also subject the Government to potential lender liability and equitable subordination actions. "[A] creditor will be held to an insider standard where it is found that it dominated and controlled the debtor." Official Comm. Of Unsecured Creditors of the Debtors v. Austin Fin. Servs. (in re KDI Holdings, Inc.), 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1990). When such a creditor overwhelmingly dominates the debtor, there is a merger of identity and the creditor will be held to a fiduciary standard. Id. at 512; see also Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), 554 F.3rd 382, 411-12 (3d Cir. 2009) (finding "egregious" conduct where the creditor had exerted such influence and control as to qualify as an "insider" acting to the detriment of other creditors); In re Process-Manz Press Inc., 236 F. Supp. 333 (N.D. Ill. 1964) (upholding the Referee's ruling that the claimant was "in substance the owner" of the bankrupt and therefore a fiduciary), rev'd on jurisdictional grounds, 369 F.2d 513 (7th Cir. 1966).

42.     Here, the Government has taken control over GM's business, and has used that control to impose its own plan of reorganization at the expense of other creditors. This

would normally subject a party to liability. See, e.g., <u>Melamed v. Lake County Nat'l Bank</u>, 727

F.2d 1399 (6th Cir. 1984) (finding that lender's actions to "salvage" the corporate borrower were

sufficient to state a claim of tortious interference with the debtor's business relationships).

43.     Corporate bonds (like those held by Parker) are a form of intangible personal

property protected by both Article I, Section 10 of the United States Constitution and by the Fifth

Amendment.  The Supreme Court long ago recognized that property rights are protected in

bankruptcy proceedings under the Fifth Amendment. See <u>Louisville Joint Stock Land Bank v.</u>

<u>Radford</u>, 295 U.S. 555, 589, 594 (1935), holding explicitly that "[t]he bankruptcy power . . . is

subject to the Fifth Amendment," Id. at 589-90.  Thus, Congress could not pass a law that would

take one person's property and give it to another under the guise of a bankruptcy proceeding.[16]

Yet that is precisely what the Treasury Department is attempting to do here, take money that

under Section 1129(b)(1) of the Bankruptcy Code ought to be paid to the bondholders and to the

other unsecured non-trade creditors and give it instead to the UAW retirees through their VEBA.

44.     The Treasury Department is demanding that the Debtors assets be stripped away

from them and given to the Purchaser—thereby impairing the rights of the bondholders and the

other unsecured non-trade creditors to realize a recovery upon those assets—so that those assets

may be used to benefit the UAW retirees, who will then recover 67 cents on the dollar, which is

substantially more than the less than 3 cents on the dollar that bondholders and the other

unsecured non-trade creditors can expect to recover.  <u>Radford</u> specifically disallowed this type of

procedure as antithetical to the constitutional protections afforded to property rights. That the

Treasury Department would do this to help the United States address difficult economic times is

not an answer. Indeed, the same justification was expressly rejected in <u>Radford</u>, where Justice

---

[16] Section 1129(b)(1) of the Bankruptcy Code acknowledges this prohibition by requiring, among other things, that a plan of reorganization may not unfairly discriminate among similarly situated creditors and must be both fair and equitable.

09-50026-mg    Doc 2194    Filed 06/19/09    Entered 06/23/09 09:27:49    Main Document
Pg 28 of 48

Brandeis noted that a statute which violates property rights, but which was passed for sound public purposes relating to the Great Depression, could not be saved because "the Fifth Amendment commands that, however great the nation's need, private property shall not be thus taken even for a wholly public use without just compensation." Id. at 602.

> **B.    The EESA And TARP Do Not Authorize The Government
> to Control GM Or Its Bankruptcy**

45.    In addition to the fact that TARP funds cannot be used to purchase troubled assets of car manufacturers, rather than financial institutions, and that use here improperly impairs the bondholders' rights, the statute also does not permit the Treasury Department to take effective possession of GM, impose new management and dictate the terms of its continued operations and ultimate survival. See Youngstown, 343 U.S. at 588-89. There is no statutory authority for the Treasury Department's actions in effectively causing the marshaling and sale of the Debtors' assets by way of a particular sale process so as to ensure that the bondholders and other unsecured non-trade creditors are paid only 3 cents on the dollar while also ensuring that the UAW retirees (through the VEBA) are paid 67 cents on the dollar. This may be the type of authority that the Treasury Department or its sub-agencies may exercise with respect to financial institutions, but those powers come with specific Congressional authorization and are expressly limited by the scope of the enabling statutes in question. The very specificity of those statutes shows that Congress knows how to cloak an agency with such powers—something Congress never did in the EESA or TARP. See, e.g., 12 U.S.C. § 1821(d)(2) (powers of FDIC with respect to failed depositary institutions); 45 U.S.C. 701, et seq. ("Railroad Reorganization Act") (establishing detailed procedures for railroad reorganizations under the bankruptcy laws); 11 U.S.C. § 1163 (detailing authority of Transportation Secretary in railroad bankruptcy proceeding).

46.     Absent such express statutory authority, even the federal banking regulators do not have unlimited power in marshaling assets and classifying creditors. See, e.g., Wheeler v. Greene, 280 U.S. 49 (1929) (Federal Farm Loan Bank as receiver had no authority under statute to maintain suit to enforce stockholders' liability); Sharpe v. F.D.I.C., 126 F.3d 1147, 1155 (9th Cir. 1997) (FDIC exceeded statutorily granted powers in attempting to record a reconveyance of the debtor's deed of trust for which it did not pay full consideration); Adagio Inv. Holding Ltd. v. F.D.I.C., 338 F. Supp.2d 71, 73 (D.D.C. 2004) (noting broad FDIC powers under section 1821, but finding that "none of these broad powers encompasses the right to reclassify deposits without authorization…"). TARP contains no reference—or even hint—of Treasury Department authority to direct the course of a Chapter 11 proceeding as to a private company like GM.

**III.    A Sale Of Substantially All Of A Debtor's Assets Is Subject To Close Scrutiny And A Heightened Burden, That Debtors Fail To Satisfy**

47.     Section 363(b)(1) of the Bankruptcy Code provides the general authority for a debtor to sell assets outside the ordinary course of business. However, when a debtor proposes to sell substantially all of its assets and without the structure of a chapter 11 disclosure statement and plan, courts impose higher scrutiny, recognizing that such a sale constitutes an essential termination of the debtor's on-going business, leaving only the orderly distribution of the sale proceeds to be performed under the law governing the priority of creditors.

**A.    Close Scrutiny And A Heightened Burden Apply**

48.     Courts are required to ensure that a debtor does not use the cover of a section 363 sale to effect a plan of reorganization without compliance with the rigors mandated in a judicial confirmation of a plan. In re Channel One Communications, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987) (the transaction "must be closely scrutinized and the

proponent bears a heightened burden of proving the elements necessary for authorization.")); In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); Western Auto Supply Co. v. Savage Arms, Inc., 43 F.3d 714, 720 n.9 (1st Cir. 1994) (order confirming a chapter 11 liquidation sale warrants special "bankruptcy court scrutiny"); 3 COLLIER ON BANKRUPTCY, ¶ 363.02[3]; see, e.g., Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (due to the fact that "there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court")); In re CGE Shattuck, LLC, 254 B.R. 5, 12 (Bankr. D. N.H. 2000) (looking through form to substance and rejecting creditor disclosure that would circumvent the requirements of chapter 11 of the Bankruptcy Code).

49.    The Debtors must prove the following elements to gain approval of the Sale Motion: (i) the existence of a sound business purpose for conducting the sale without a disclosure statement and plan; (ii) there has been accurate and reasonable notice of the sale; (iii) the price to be paid is fair and reasonable; and (iv) the sale will not unfairly benefit insiders or the prospective purchasers, or **unfairly favor a creditor or class of creditors**. Channel One, 117 B.R. at 496 (emphasis added); see also In re Engman, 395 B.R. 610, 620 (Bankr. W.D. Mich. 2008) (sales must be "fair and reasonable in price and made in 'good faith'" and must be "in the best interests of the estate and creditors") (internal quotations and citations omitted). As demonstrated below, the Debtors cannot satisfy the required elements of a section 363 sale.

50.    The proposed sale fails to satisfy the heightened standards applicable to sales of substantially all of a debtor's assets. As addressed below, (i) the proposed sale violates priority among creditors, (ii) was not negotiated in good faith, (iii) does not serve the best interest of the

estate and creditors (other than certain favored creditors), (iv) is an illegal *sub rosa* plan, and (v)

eliminates all of the protections of a Chapter 11 reorganization.

1.  **No Sound Business Purpose Exists For Approval Of The Sale Motion
    And Redistribution Of Value**

51. To determine if an asset sale under section 363(b) is permissible, the "judge

determining [the] § 363(b) application [must] expressly find from the evidence presented before

him [or her] at the hearing [that there is] a good business reason to grant such an application."

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-1 (2d

Cir. 1983) (a debtor should not sell substantially all of its assets outside the ordinary course of

business under section 363(b) absent an "articulated business justification"); see also Stephens

Indus., Inc., v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Montgomery Ward Holding

Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del.

2008).  Here, no legitimate reason exists to take value properly belonging to the bondholders and

the other unsecured non-trade creditors and distribute it to the UAW retirees (through their

VEBA) when their several claims are of equal rank. Although the Debtors claim that they are

preserving "going concern" value, they have no intention of remaining a going concern. Instead,

they plan to sell everything to the Purchaser, which entity ultimately will benefit from any

"going concern" value purchased by paying the UAW retirees and other favored creditors.

Preservation of value for a non-Debtor to the detriment of bondholders and other unsecured non-

trade creditors can hardly be considered a good business reason for the estates.

52.     Debtors claim that the proposed 363 "sale" must go forward because GM's auto

sales will fall off a cliff if there is a protracted bankruptcy and consequently that there is no time

for a normal Chapter 11 plan of reorganization and confirmation process.  However, the facts

contradict Debtors' melting ice cube theory.  The sales data for May is in, and all the concerns

about auto sales for Chrysler and GM falling off a cliff with the bankruptcy cloud circling

overhead never really materialized.  General Motors sales were only down 29.0% compared to

May of 2008, which marks the fourth straight month of sequentially improving sales.  GM still

sold more than 18% more vehicles than Ford, the company with the second most sales during the

month. And GM still sells more cars than Chrysler, Daimler, Volkswagen, and Nissan combined

in a given month.  (See "May Auto Sale: Sales Continue Despite Bankruptcy", <u>Wall Street

Strategies Hotline</u> by Charles Payne, attached as Exhibit 3.)  Apparently, GM's bankruptcy

proceedings are not keeping auto buyers at bay and have not harmed GM's sales.

53.    The Debtors have produced no evidence indicating why the proposed transaction

could not be accomplished in a plan process other than that such sale likely would not satisfy the

Chapter 11 confirmation standards. Courts should not approve proposed sales under section 363,

however, when the proposed transaction would not be approved if proposed in a plan. See

<u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390

U.S. 414, 450 (1968) (finding that expedition does not justify abandoning proper standards); <u>In

re Continental Airlines, Inc</u>., 780 F.2d 1223, 1226 (5th Cir. 1986) ("When a proposed transaction

specifies the terms for adopting a reorganization plan, the parties and the district court must scale

the hurdles erected in Chapter 11.") (internal citation omitted); <u>In re Lionel Corp.</u>, 722 F.2d

1063, 1071 (2d Cir. 1983) (rejecting proposed sale because it "ignores the equity interests

required to be weighed and considered under Chapter 11" and holding that "[t]he need for

expedition . . . is not justification for abandoning proper standards") (internal citation

omitted).

**2.    The Debtors Did Not Provide Accurate And Reasonable Notice**

54.    The Debtors acted as if they were selling a Chevy Aveo and not a multinational

corporation with billions of dollars in assets. Indeed, the sales procedures proposed by the

Debtors were designed to do nothing more than give the appearance of legitimacy to the

proposed sale that is nothing more than an illegal *sub rosa* plan. The sales procedures effectively

precluded anyone but the Government from bidding on the Debtors' assets, and thus, were

inherently unfair and did not comply with the fundamental purpose for bidding procedures—to

maximize the sale price for the Debtors' assets.

55.    The sale procedures provide just three weeks for potential bidders to put in a

final offer for substantially all of the Debtors' assets. This is clearly insufficient time for seeking

potential bids.  For example, in the Chrysler bankruptcy, Scott R. Garberding, Chrysler's Senior

Vice President and Chief Procurement Officer, testified that it took four months and over 200

people to put the Chrysler's deal with Fiat deal together.  (Chrysler Sales Hearing Transcript at

89-92.)  Mr. Garberding also testified that the failure to provide adequate time would eliminate

bidders. (Hr'g Tr. at 97.)

56.    To compound the absurdity of seeking bids within three weeks, the Debtors

mandated that any bid must require the purchaser to assume all of the Debtors liabilities to the

UAW, the UAW VEBA and the UAW Pension Plan on terms that are not materially more

burdensome or conditional than the terms of the proposed 363 "sale" to the Purchaser, and that it

not be conditioned upon obtaining financing or the outcome of any unperformed due diligence

by the bidder.  That the Debtors require a bidder to assume billions in liabilities held by certain

favored unsecured creditors, and assume certain collective bargaining agreements, whether or

not doing so maximizes value for the estates, and further require that the bids be made without

the protection of any due diligence, financing contingencies, or other bid protections, shows that

these provisions are not designed to generate bids but rather to discourage them.  The Debtors

cannot establish a business purpose for requiring competing bids that includes terms that provide

no benefit to the estate, and such requirement simply demonstrates that the Debtors are not

exercising any business judgment, but are merely implementing the direction of the Treasury

Department.

57.     Also telling is that the sale procedures provided broad rights to reject bids upon

consultation with, among others, the UAW and the Treasury Department—one of the sponsors of

the Debtors' proposed sale transaction. The sale procedures simply further evidence the Debtors'

and the Government's attempt to push through this Court the prearranged Government-GM-

UAW *sub rosa* plan, without concern for the law.

**3.     The Sale Price Is Not Fair And Reasonable**

58.     The Debtors have offered no evidence regarding what value the Debtors could

receive, outside of the proposed "sale" that the Debtors and the Government are bulldozing

through this Court. However, a close examination of Frederick A. Henderson's affidavit

(Henderson Aff. ¶¶ 5, 97 – 131) indicates that the Debtors have $112.74 billion worth of assets

with which to pay $96.55 billion in liabilities.  Subtracting out the $21 billion in cash and

assuming a 75% discount in liquidation for the remaining assets, there is $43.9 billion available

with which to pay $96.55 billion in liabilities.  Paying the secured debt in full first, there remains

$17.4 billion with which to pay $70.1 billion in unsecured claims.  Thus, in liquidation,

unsecured creditors (including bondholders and non-trade creditors) could reasonably expect to

receive 25 cents on the dollar while secured creditors are paid in full.  However, if the Debtors'

363 "sale" is allowed to go through, bondholders and the other unsecured non-trade creditors can

expect to receive less than 3 cents on the dollar, while UAW retirees (through their VEBA)

would receive 67 cents on the dollar.  It would thus appear that bondholders and the other

unsecured non-trade creditors would fare better in liquidation then if the proposed 363 "sale" were allowed to proceed.  Clearly the proposed 363 "sale" is neither fair nor reasonable. Even more importantly, though, aside from the sale price itself, it is the allocation of proceeds that is grossly unfair to the bondholders and the other unsecured non-trade creditors.

### 4.    The Sale And Redistribution Of Value Unfairly Benefits Insiders Or The Prospective Purchaser

59.    The proposed 363 "sale" of assets by the Debtors to the Purchaser is not a transaction that was negotiated by independent parties at arms' length. Rather, it is a transaction that was orchestrated entirely by the President and the Treasury Department and foisted upon the Debtors without regard to corporate formalities, the fiduciary duties of the Debtors' officers and directors or the other important checks and balances typically found in good faith sales. Indeed, well before the filing, the Debtors had ceased to function as an independent company and had become an instrumentality of the Government. On March 29, 2009, newly elected President Barack Obama fired Rick Wagoner, the CEO of GM, because he was opposed to a GM bankruptcy filing and replaced him with Fritz A. Henderson who was supportive of the idea. The following day the President announced (1) that most of GM's board of directors would be replaced over the next several months and that (2) he was rejecting GM's viability plan and that (3) GM had 60 days to fix the plan to his satisfaction or go into bankruptcy.  Furthermore, the conditions insisted on by the President and the Treasury Department for avoiding bankruptcy (that the bondholders agree to accept a disproportionately smaller recovery that that given to the UAW VEBA) made bankruptcy unavoidable.  All of the pre-bankruptcy negotiations with stakeholders concerning the terms of the 363 "sale" were conducted by the Treasury Department (a third lien holder) and not by the Debtors.  Neither the Debtors nor the bondholders were allowed to participate in the pre-bankruptcy negotiations.  The bondholders were given a take it

35

or leave it proposal which the bondholders rejected.  Finally, all of the terms of the proposed 363

"sale" were dictated to the Debtors by the Treasury Department without consultation, negotiation

or other input.  All of these actions are clearly inconsistent with the requirements of a good faith

sale. Under the circumstances, the Purchaser simply cannot establish that it is a good faith

purchaser in connection with the proposed "sale".

> **5.    The Sale And Redistribution Of Value Favors Certain Creditors
> And/Or Classes Of Creditors And Is Unfair**

60.    A fundamental tenet of bankruptcy law is that unfair treatment of creditors is

prohibited, and that the debtors bear the burden to prove that creditors are being treated fairly.

Channel One, 117 B.R. at 496; see also In re Engman, 395 B.R. at 620 (sale must be made in

"good faith" and must be "in the best interests of the estate and creditors"); In re Dow Corning

Corp., 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996) (sale must be "fair and equitable," "in good

faith" and "in the best interests of the estate"). In liquidation, unsecured creditors (including

bondholders and non-trade creditors) could reasonably expect to receive 25 cents on the dollar

while secured creditors are paid in full.  However, if the Debtors' 363 "sale" is allowed to go

through, bondholders and the other unsecured non-trade creditors can expect to receive less than

3 cents on the dollar, while UAW retirees (through their VEBA) would receive 67 cents on the

dollar.  It is obvious that the proposed 363 "sale" is neither fair nor reasonable. The Debtors

therefore cannot show that the proposed sale treats the bondholders and other unsecured non-

trade creditors fairly.

> **IV.    Any Finding Of "Good Faith" Under Section 363(m) Is Inappropriate**

61.    The facts stated in the Sale Motion (and the supporting declarations) do not

support any finding that (i) the Purchaser is a purchaser in "good faith" under section 363(m) of

the Bankruptcy Code, or (ii) would vitiate the relief provided by section 363(n) of the

Bankruptcy Code. The Debtors have the burden to establish the "good faith" of the Purchaser.

Indeed, the court is "required to make a finding with respect to the 'good faith' of the purchaser."

Ginther v. Ginther Trusts (In re Ginther Trusts), 238 F.3d 686, 689 (5th Cir.), cert. denied, 534

U.S. 814 (2001). Based on the facts adduced, the burden on the Debtors is unsustainable and no

finding of good faith is appropriate.

62.     To facilitate bankruptcy sales, Congress provided that the validity of a sale to a

good faith purchaser will not be affected by a reversal or modification of the order approving the

sale unless the order is stayed pending appeal. 11 U.S.C. § 363(m).  Collusion, coercion, and any

other attempt to take unfair advantage destroys good faith. Here, there is no good faith purchaser.

The Treasury Department is on both sides of the transaction, controlling both the Debtors and

Purchaser, and is forcing the sale to promulgate the Executive Branch's political agenda to the

detriment of the bondholders and other unsecured non-trade creditors.

## V.    The Government's Secured Claim against the Debtors' estate is subject to equitable subordination

63.     "[A] creditor will be held to an insider standard where it is found that it

dominated and controlled the debtor." Official Comm. Of Unsecured Creditors of the Debtors v.

Austin Fin. Servs. (in re KDI Holdings, Inc.), 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1990). When

such a creditor overwhelmingly dominates the debtor, there is a merger of identity and the

creditor will be held to a fiduciary standard. Id. at 512; see also Schubert v. Lucent Techs., Inc.

(In re Winstar Commc'ns, Inc.), 554 F.3rd 382, 411-12 (3d Cir. 2009) (finding "egregious"

conduct where the creditor had exerted such influence and control as to qualify as an "insider"

acting to the detriment of other creditors); In re Process-Manz Press Inc., 236 F. Supp. 333 (N.D.

Ill. 1964) (upholding the Referee's ruling that the claimant was "in substance the owner" of the

bankrupt and therefore a fiduciary), rev'd on jurisdictional grounds, 369 F.2d 513 (7th Cir.

1966).

64.     Well before the bankruptcy filing, the Debtors had ceased to function as an

independent company and had become an instrumentality of the Government. On March 29,

2009, newly elected President Barack Obama fired Rick Wagoner, the CEO of GM, because he

was opposed to a GM bankruptcy filing and replaced him with Fritz A. Henderson who was

supportive of the idea.   The following day the President announced (1) that most of GM's board

of directors would be replaced over the next several months and that (2) he was rejecting GM's

viability plan and that (3) GM had 60 days to fix the plan to his satisfaction or go into

bankruptcy.  Furthermore, the conditions insisted on by the President and the Treasury

Department for avoiding bankruptcy (that the bondholders agree to accept a disproportionately

smaller recovery that that given to the UAW VEBA) made bankruptcy unavoidable.  All of the

pre-bankruptcy negotiations with stakeholders concerning the terms of the 363 "sale" were

conducted by the Treasury Department  (a third lien holder) and not by the Debtors.  Neither the

Debtors nor the bondholders were allowed to participate in the pre-bankruptcy negotiations.  The

bondholders were given a take it or leave it proposal which the bondholders rejected.  Finally, all

of the terms of the proposed 363 "sale" were dictated to the Debtors by the Treasury Department

without consultation, negotiation or other input.

65.  Clearly, the Government has taken control over GM's business, and has used that

control to impose its own plan of reorganization at the expense of other creditors. This

would normally subject a party to liability. See, e.g., Melamed v. Lake County Nat'l Bank, 727

F.2d 1399 (6th Cir. 1984) (finding that lender's actions to "salvage" the corporate borrower were

sufficient to state a claim of tortious interference with the debtor's business relationships).

66.    Accordingly, the Governments secured claim against the Debtor's estate ought to be equitably subordinated to the claims of the bondholders and the other unsecured non-trade creditors.

**VI.    Even The Executive Branch Must Comply With The Bankruptcy Code**

67.    In this case, the Court is being asked to determine whether the proposed "sale" is appropriate. The fate of the U.S. automotive industry is high on the national agenda and is being closely monitored by the public. In recent months, high ranking members of the Executive Branch have dedicated substantial time and resources in an effort to rescue this troubled industry. Although the level of public interest and the federal Government's involvement make this case unusual, these circumstances do not change the absolute rights of the bondholders and the other unsecured non-trade creditors to the protections provided by the Bankruptcy Code.

68.    Nevertheless, apparently ignoring the plain letter of the law, the Debtors and the Government have asked the Court to approve the Sale Motion, which seeks to alter the very priority established by the Bankruptcy Code. The transaction that the Debtors and the Government seek to implement is designed primarily to benefit one class of unsecured creditors (the UAW retires) at the expense of another class of unsecured creditors (the bondholders and the other non-trade creditors) of equal rank, and to grant those claims a preference in contradiction of the law. The system of checks and balances put in place by the United States Constitution should not be influenced or disturbed by the Executive Branch's priorities.

69.    Given the current political environment, the significance of an independent judiciary cannot be overstated. "The Federal Judiciary was [] designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained

impartial." N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 58 (1982). Indeed,

the Supreme Court has warned that permitting "the political branches [] the power to switch the

Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of

government, leading to a regime in which Congress and the President, not [the judiciary], say

'what the law is.'" Boumediene v. Bush, 128 S. Ct. 2229, 2259 (2008) (citing Marbury v.

Madison, 1 Cranch 137, 177 (1803)).  Here, the Executive Branch has effectively "turned off"

the constitutional property rights of the bondholders and the other unsecured non-trade creditors.

This "denial of constitutionally protected rights demands judicial protection," notwithstanding

the fact such protection necessitates this Court "entering into [a] political thicket[]." Reynolds v.

Sims, 377 U.S. 533, 566 (1964).

        70.    Despite the pressures of other Government and societal forces, the creditor

protections inherent in the chapter 11 process must be upheld.

## CONCLUSION

        71.    The Sale Motion asks this Court to approve an illegal redistribution of the

Debtors' value that flatly ignores the most basic creditor protections established by the

Bankruptcy Code and bypasses the priority scheme established by the Bankruptcy Code. It

should be denied and the Government's secured claim in the Debtors' estate should be equitably

subordinated to the claims of the bondholders and the other unsecured non-trade creditors.

        WHEREFORE, Parker, respectfully requests entry of an order denying the Debtors' Sale

Motion and granting such other and further relief as the Bankruptcy Court deems just and proper.

Dated: June 18, 2009
      New York, New York

Oliver Addison Parker, Pro Se
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Ph: (954) 599-6468
Fax: (954) 772-6468
splitapart@prodigy.net
Florida Bar No. 235891

By:_____
     Oliver Addison Parker, Pro Se

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that true and accurate copies of the above and foregoing document have been served by Federal Express Delivery this 18th day of June, 2009 to the following named individuals:

(a)  The attorneys for the Debtors:

Weil, Gotshal & Manges LLP
767 Fifth Avenue,
New York, New York 10153
(Attn: Harvey R. Miller, Esq.,
Stephen Karotkin, Esq., and
Joseph H. Smolinsky, Esq.)

(b)  The attorneys for the Purchaser

Cadwalader, Wickersham & Taft LLP,
One World Financial Center,
New York, New York 10281
(Attn: John J. Rapisardi, Esq.)

(c) The attorneys for the Creditors Committee;

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
(Attn: Gordon Z. Novod)

(d) The attorney for the UAW
Cleary Gottlieb Steen & Hamilton LLP,
One Liberty Plaza
New York, New York 10006
(Attn: James L. Bromley, Esq.)

(e) The attorneys for the UAW,

Cohen, Weiss and Simon LLP,
330 W. 42nd Street,
New York, New York 10036
(Attn: Babette Ceccotti, Esq.)

(f) The attorneys for Export Development Canada,

Vedder Price, P.C.,
1633 Broadway, 47th Floor,
New York, New York 10019
(Attn: Michael J. Edelman, Esq. and
Michael L. Schein, Esq.);

(g) the Office of the United States Trustee
    for the Southern District of New York
    33 Whitehall Street, 21st Floor,
    New York, New York 10004;
    (Attn: Diana G. Adams, Esq.),

(h) The U.S. Attorney's Office, S.D.N.Y.,
    86 Chambers Street, Third Floor,
    New York, New York 10007
    (Attn: David S. Jones, Esq. and
    Matthew L. Schwartz, Esq.),


By:_____
    Oliver Addison Parker, Pro Se



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.

SECRETARY OF THE TREASURY

## DETERMINATION

WHEREAS, section 101 of the Emergency Economic Stabilization Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to establish the Troubled Asset Relief Program (the "TARP") to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with the Act and the policies and procedures developed and published by the Secretary;

WHEREAS, section 3(5) of the Act defines the term "financial institution" to mean any institution, including, but not limited to, any bank, savings association, credit union security broker or dealer, or insurance company, established and regulated under the laws of the United States, the District of Columbia, Commonwealth of Puerto Rico, Commonwealth of Northern Mariana Islands, and having significant operations in the United States, but excluding any central bank of, or institution owned by, a foreign government.

WHEREAS, section 3(9)(A) of the Act defines the term "troubled assets" to mean residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability;

WHEREAS, section 3(9) (B) of the Act further defines the term "troubled assets" to mean any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System (the "Chairman"), determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress;

WHEREAS, section 3(1) of the Act defines the term "appropriate committees of Congress" to mean the Committee on Banking, Housing, and Urban Affairs, the Committee on Finance, the Committee on the Budget, and the Committee on Appropriations of the Senate; and the Committee on Financial Services, the Committee on Ways and Means, the Committee on the Budget, and the Committee on Appropriations of the House of Representatives;

WHEREAS, certain thrift and other holding companies which are engaged in the manufacturing of automotive vehicles and the provision of credit and financing in connection with the manufacturing and purchase of such vehicles have applied under the TARP Systemically Significant Failing Institutions Program (the "SSFI") requesting that the Department of the Treasury purchase obligations of such companies consistent with the SSFI;

WHEREAS, such thrift and other holding companies engaged in the manufacturing of automotive vehicles and the provision of credit and financing in connection with the

manufacturing and purchase of such vehicles are "financial institutions" for purposes of section 3(5) of the Act as they are "institution[s]" established and regulated under the laws of the United States and have significant operations in the United States; and,

WHEREAS, as Secretary, I have consulted with the Chairman, and we have jointly concluded that the TARP's purchase of the obligations is necessary to promote stability to the financial system of the United States.

NOW, THEREFORE, I HEREBY DETERMINE that the obligations of such financial institutions are financial instruments the purchase of which is necessary to promote stability to the financial system of the United States, and, as such, are "troubled assets," as that term is defined in section 3(9)(B) of the Act, and eligible to be purchased under the TARP; and

I HEREBY direct that this determination be transmitted to the appropriate committees of Congress.

Henry M. Paulson, Jr.

December 19, 2008



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C.

SECRETARY OF THE TREASURY

## DETERMINATION

WHEREAS, section 101 of the Emergency Economic Stabilization Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to establish the Troubled Assets Relief Program (the "TARP") to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with the Act and the policies and procedures developed and published by the Secretary;

WHEREAS, section 3(5) of the Act defines the term "financial institution" to mean any institution, including, but not limited to, any bank, savings association, credit union security broker or dealer, or insurance company, established and regulated under the laws of the United States or any State, territory, or possession of the United States, the District of Columbia, Commonwealth of Puerto Rico, Commonwealth of Northern Mariana Islands, Guam, American Samoa, or the United States Virgin Islands, and having significant operations in the United States, but excluding any central bank of, or institution owned by, a foreign government;

WHEREAS, section 3(9)(A) of the Act defines the term "troubled assets" to mean residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability;

WHEREAS, section 3(9)(B) of the Act further defines the term "troubled assets" to mean any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System (the "Chairman"), determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress;

WHEREAS, section 3(1) of the Act defines the term "appropriate committees of Congress" to mean the Committee on Banking, Housing, and Urban Affairs, the Committee on Finance, the Committee on the Budget, and the Committee on Appropriations of the Senate; and the Committee on Financial Services, the Committee on Ways and Means, the Committee on the Budget, and the Committee on Appropriations of the House of Representatives;

WHEREAS, the TARP has established the Automotive Industry Financing Program ("AIFP") to purchase and fund commitments to purchase troubled assets from holding companies and other companies engaged in the manufacturing of automotive vehicles in order to prevent a significant disruption of the American automotive industry, a risk to financial market stability and a negative effect on the real economy of the United States;

WHEREAS, certain companies engaged in the manufacturing of automotive vehicles have applied under the TARP AIFP requesting that the Department of the Treasury purchase debt obligations or equity of such holding companies and other companies consistent with the AIFP;

WHEREAS, such holding companies and other companies are "financial institutions" for purposes of section 3(5) of the Act as they are "institutions" established and regulated under the laws of the United States and have significant operations in the United States; and

WHEREAS, as Secretary, I have consulted with the Chairman, and we have jointly concluded that the TARP's purchase of the debt obligations or equity is necessary to promote financial market stability.

NOW, THEREFORE, I HEREBY DETERMINE that the debt obligations or equity of such institutions are financial instruments the purchase of which is necessary to promote financial market stability, and, as such, are "troubled assets," as that term is defined in section 3(9)(B) of the Act, and eligible to be purchased under the TARP; and

I HEREBY direct that this determination be transmitted to the appropriate committees of Congress.


Timothy F. Geithner


April 29, 2009



**Hotline** with Charles Payne    **SUBSCRIBE NOW!**
The wealth building investing service for value and growth investors



Login: _____
Password: _____
☐ remember me
Sign Up | Lost Password

| Home | Member Services | Tools & Research | About Us | Education | Services | Your Account | Help |

# May Auto Sales: Sales Continue Despite Bankruptcy

6/3/2009
By David Silver, Research Analyst

**More Articles by David Silver**

May Auto Sales: Sales Continue Despite Bankruptcy

General Motors Files Bankruptcy

End of an Era

May flowers looked more like dandelions than actual flowers, but hey, at least it's not the dirt and dying grass we have been seeing over the past few months. Alright, that may be a bad metaphor, but you get the point. Auto sales are still dismal, but are much better than the past few months and continue to surpass what the Street is expecting. So Chrysler is in Chapter 11 protection and the "New Chrysler" is about to emerge from bankruptcy (more about this later) and General Motors (GM) is now under the court's protection. General Motors' filing represents the largest industrial filing, and the fourth largest of all time (Lehman Brothers is still the largest bankruptcy filing), and hopes are that GM will be able to emerge in 60-90 days.



Charles Payne, Wall Street Strategies CEO, appears every week on FOX News Business shows including Bulls & Bears, Cashin' In, Cavuto and FOX and Friends.

**FREE daily commentary! Click here**
No credit card is needed.

The real story though is that May auto sales were expected to see another dramatic drop but didn't fall that far. Additionally, all the concerns about auto sales for Chrysler and GM falling off a cliff with the bankruptcy cloud circling overhead never really materialized. General Motors sales were only down 29.0% compared to May of 2008, which marks the fourth straight month of sequentially improving sales. I always find it amusing when analysts and talking heads come on TV and say that General Motors doesn't offer the right vehicles because the Company isn't selling cars anymore. GM still sold more than 18% more vehicles than the company with the second most sales during the month (just happens to be Ford (F) this month). GM still sells more cars than Chrysler, Daimler, Volkswagen, and Nissan combined in a given month.

Not to take anything away from Ford, the Company has been doing a great job (relatively) in navigating the current crisis and is taking market share. This marks the second straight month (but only the second in the last fourteen) when Ford outsold Toyota during the month. The table below will outline the total monthly sales, how it compares to May of 2008 as well as the percent change for year to date figures. The seasonally adjusted annual sales rate, or SAAR, rose to 9.91 million vehicles, according to Autodata, up from a pace of 9.32 million in April. Sales slipped below 10 million units per year for the first time in 26 years in January. The production levels in the auto industry are slowly declining to match demand. We estimate that currently the industry would be profitable with an industry SAAR of approximately 14 million vehicles, and if all the plant shutdowns and idlings are taken into account (assuming it starts tomorrow), it would take sales of approximately 11.5 million to 12 million to make the entire industry profitable.

| Company | Vehicles | Change Y/Y | Change Year To Date |
|---|---|---|---|
| General Motors | 190,881 | -29.0% | -41.4% |
| Ford Motor Company | 161,197 | -24.1% | -37.9% |
| Toyota Motor Company | 152,583 | -40.7% | -38.5% |
| Chrysler | 79,010 | -46.9% | -46.3% |
| Daimler | 16,303 | -33.4% | -27.0% |
| Volkswagen | 19,568 | -12.4% | -19.5% |
| Nissan Motor Company | 67,489 | -33.1% | -35.2% |
| Honda Motor Company | 98,344 | -41.5% | -34.4% |

The auto industry (and economy) has swallowed two auto makers going into bankruptcy, and with sales still on a decline of 34% year over year during the month, it matches the 34% drop in April. Similar to the housing market, the automakers are having what is tantamount to a fire sale on its inventory. With almost 2,000 dealerships slated to close over the next six months (789 Chrysler and approximately 1,200 General Motors,) dealers are looking to liquidate the cars on the lot and not be left holding millions of unsold inventory.

The WStreet Market Commentary delivers the daily unbiased insight and guidance of Charles Payne and the Wall Street Strategies Research Desk.

The daily commentary takes a common sense look at the big picture, gives you advice on sector rotation and trends and helps you determine how news may affect your portfolio. We forecast what the future drivers of the market will be by interpreting the fundamental, technical, and behavioral aspects of the market.

From time to time, the commentary includes free stock picks and trading strategies to help you make money and maintain financial and mental balance in the stock market. The commentary is delivered twice a day, in the morning and afternoon, keeping you informed at pivotal times and frequently includes analysis of the major indices and actionable analysis of individual issues.

Take control of your future starting today. Simply click here to create your account.



May was an unbelievably busy month for the automakers (if you include June 1 as well). It saw two thirds of Detroit's Big Three file for bankruptcy, one almost emerge from bankruptcy, brands were put up for sale, plants were closed, dealerships were closed, and a new era began for the entire industry.

Let's start at the beginning: Chrysler filed for bankruptcy on May 1 and GM filed for bankruptcy on June 1. Chrysler is on the brink of re-emerging from bankruptcy with the good assets of the "Old Chrysler" being sold to Fiat to form the "New Chrysler" (GM is trying to follow this same line of action, using a 363 sale to sell its good assets to a holding company to form the new company, with the bad assets staying in bankruptcy indefinitely). That is my biggest problem with all the news about how quick this bankruptcy was for Chrysler. Yes, some of the assets are about to emerge, but the assets that were deemed not acceptable will continue to sit in bankruptcy, and in our opinion Chrysler will not fully emerge until all its parts are fixed, not just the part above the water (think an iceberg).

Second: Part of the GM bankruptcy filing was the announcement that the Company will shed many of its brands and concentrate on its "core 4" brands (refer to wstreet.com for our past articles on the subject) consisting of Chevrolet, Cadillac, GMC, and Buick. Pontiac will be discontinued, Saab will hopefully be sold, Hummer was sold to a Chinese private equity firm, Sichuan Tengzhong Heavy Industrial Machinery Company, and news on the sale of Saturn should be forthcoming in the next few weeks. Also part of the restructuring is more plant and dealership closures for both GM and Chrysler. Chrysler announced it would close 789 dealerships, while GM said it would close as many as 1,200 dealerships and hopes to increase that number to 3,000 by 2011.

Finally: The new era in the auto industry began on May 18 with the ushering in of the new CAFÉ standards by President Obama. It was a whose who on the stage with President Obama as auto executives, union executives, governors, cabinet members and even some people I had no idea who they were all crowded on a stage to hear the ground breaking announcement. In President Obama's plans the total average mpg for every vehicle being driven in the United States will be 35.5 mph (includes a 42 mpg for cars and approximately 30 mpg for light trucks), and has to be accomplished by 2016 (4 years earlier and 5 mpg better than Bush's previous Energy Plan). This is a daunting task for the industry and one that will require a great deal of investment both from the tax payers and the auto manufactures as new models and new technology will need to be developed and plants will need to be retooled. The auto companies took the deal because an individual state led emission law would cripple the industry (not just the American auto manufacturers) more than it already is.

Ford continues to impress me with how well it is doing, and its new additions to its fleet with the new Taurus and the Fusion Hybrid have catapulted GM with respect to higher fuel efficiency vehicles, but we continue to say that the industry is not out of the woods yet. Auto sales continue to be dismal and the economy still has a lot of job losses it needs to swallow. Earlier in the article, we said that we believed that more production still had to go offline to meet the current demand levels. The industry SAAR is improving, but not at a fast enough pace to save Ford, Toyota, Honda, Nissan, or Daimler even more pain. The mantra "less bad" continues to live in the auto industry.

Through the remainder of the year, expect to see continued sequential improvements with the strongest months coming in October and November as the economy begins to show its first signs of growth (and not just the "green shoots"). That being said, we like the foreign auto manufactures as an investment, Toyota and Daimler being our two favorites, while for the ultra long term hold investors (you know the stock you buy for your kids college fund), we recommend buying shares of Ford. By the end of the year, we feel it will be at least an $8 stock, but there could be some near term weakness.

Home | Products & Services | Education | In The Media | Help | About Us |
Disclaimer | Privacy Policy | Terms of Use |
All Rights Reserved.