Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
Telephone: (516) 741-6565
Facsimile: (516) 741-6706

and

Russell R. Johnson III, Esq.
John M. Merritt, Esq.
Law Firm Of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862

*Co-Counsel for Suez/VWNA/DEGS of Lansing, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                            :
In re:                                      :    Chapter 11
                                            :
**GENERAL MOTORS CORP.,** *et al.*,         :    Case No. 09-50026 (REG)
                                            :
                    Debtors.                :    (Jointly Administered)
                                            :
-------------------------------------------------------x

**DECLARATION OF KEVIN HOOKER IN SUPPORT OF OBJECTION OF CERTAIN
UTILITY COMPANIES TO MOTION OF DEBTORS FOR ENTRY OF ORDER
PURSUANT TO 11 U.S.C. §§ 105(a) AND 366 (I) APPROVING DEBTORS' PROPOSED
FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING
PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III)
PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING
<u>SERVICE</u>**

I, Kevin Hooker, declare as follows:

1. I am the Vice President of Suez/VWNA/DEGS of Lansing, LLC ("Lansing") and have been in that position for 2 years. In my position as Vice President of Lansing, I assist in the credit and bankruptcy operations of Lansing, a Delaware limited liability company comprised of the following members: SUEZ-DEGS of Lansing, LLC ("Suez-DEGS") and Veolia Water North America Operating Services, LLC ("Veolia") (Suez-DEGS and Veolia are collectively referred to as the "Members").

2. Except as otherwise stated, all facts contained within this Declaration are based upon personal knowledge, my review of Lansing's business documents, correspondence and relevant documents, or my opinion based upon my experience concerning the operations of Lansing. If called upon to testify, I would testify to the facts set forth in this Declaration.

3. On behalf of Lansing, I submit this Declaration in support of the *Objection Of Certain Utility Companies To Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, And (III) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service* (the "Objection").

4. In making this Declaration, I am familiar with the contents of the Objection and the *Motion Of Debtors For Entry Of Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, And (III) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service* (the "Utility Motion"). Accordingly, I am aware of the Debtors' offer to provide their utilities with a two-week deposit.

5. The Debtors and Lansing are parties to that certain prepetition contract for the provision of utility services and more formally known as the *First Amended And Restated Utility*

*Services Agreement Among Trigen/Cinergy-USFOS of Lansing, LLC, City of Lansing Board of Water and Light, And General Motors Corporation, Worldwide Facilities Group, Lansing Grand River Assembly Plant*, dated August 12, 2004 (the "Lansing Agreement").

6.     Under the Lansing Agreement, Lansing has provided prepetition and continues to provide postpetition utility services, as further defined under the Lansing Agreement, to the Debtors' assembly facility located in Lansing, Michigan. Further, the Lansing Agreement became effective on November 11, 1999, and terminates as of 11:59 p.m. on November 30, 2014. The Parties agreed, however, that the terms of the Lansing Agreement would automatically continue and extend thereafter on a month-to-month basis unless terminated by either party upon at least 180 days written notice and/or the Parties agreed to terms of a specific extension.

7.     It is part of my job responsibility on behalf of the Members to: (A) review the Debtors' accounts with Lansing; (B) address any credit issues of the Debtors in relation to Lansing; and (C) address all issues concerning the Debtors' bankruptcy cases in relation to Lansing and in particular, the Lansing Agreement, including, without limitation, Lansing's request for adequate assurance of payment and the Debtors' obligations for their potential assumption and assignment of the Lansing Agreement.

8.     Lansing's relationship with the Debtors is governed by the express contractual terms set forth under the Lansing Agreement. Under Lansing's billing cycle as created within the Lansing Agreement, the Debtors receive approximately one month of utility goods and/or services before Lansing issues a bill for such charges. Once a bill is issued, the Debtors have approximately 60 days to pay all undisputed amounts of the applicable bill. Further, the Debtors have the right to raise a good-faith dispute concerning any amount of a bill and withhold payment

equal to that amount. For any amounts that are subsequently determined by the parties to be due and payable following the resolution of a good-faith dispute, the Debtors must remit payment within ten (10) business days together with applicable interest. Accordingly, under Lansing's billing cycle, the Debtors could receive at least 3 or more months of unpaid charges before Lansing could cease the supply of utility goods and/or services to the Debtors for a postpetition payment default.

9.  Pursuant to the Lansing Agreement, Lansing provided the Debtors with utility goods and services prior to the petition date of June 1, 2009. Debtors' unpaid prepetition amount due to Lansing pursuant to the Lansing Agreement is approximately $213,637.43.

10. Lansing continues to provide post-petition utility goods and services to the Debtors pursuant to the Lansing Agreement.

11. At this time, there is no postpetition amount currently due under the Lansing Agreement. Under Lansing's billing cycle as set forth within the Lansing Agreement, Lansing will issue the first postpetition bill to the Debtors on or after July 1, 2009.

12. The amount of postpetition security necessary to secure Lansing's billing exposure as created under the billing cycle of the Lansing Agreement is $2,273,240 which represents a two-month cash deposit.

13. Accordingly and based upon Lansing's billing exposure as created under the billing cycle of the Lansing Agreement, Lansing seeks adequate assurance of payment from the Debtors in the form of a two-month cash deposit in the amount set forth herein.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 23rd day of June 2009, at Cincinnati, Ohio.

_____
Kevin Hooker