Hearing Date and Time: June 25, 2009 at 9:45 a.m. (Eastern Time)

Harvey R. Miller, Esq.
Stephen Karotkin, Esq.
Joseph H. Smolinsky, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors
And Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
**In re:** :
: **Chapter 11**
:
**GENERAL MOTORS CORPORATION, et al.,** : **Case No. 09-50026-REG**
:
:
: **Jointly Administered**
**Debtors.** :
:
------------------------------------------------------------x

**FIRST SUPPLEMENTAL DECLARATION OF WILLIAM C. REPKO
IN SUPPORT OF THE
APPLICATION FOR AN ORDER PURSUANT
TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 2014(a) AUTHORIZING THE
EMPLOYMENT AND RETENTION OF EVERCORE GROUP L.L.C.
AS INVESTMENT BANKER AND FINANCIAL ADVISOR
FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

I, William C. Repko, make this Declaration under 28 U.S.C. § 1746 and state:

1. I am a Senior Managing Director of Evercore Group L.L.C. ("**Evercore**"), an investment banking firm that maintains offices at 55 East 52nd Street New York, NY 10055, and I make this declaration (the "**Declaration**") on behalf of Evercore. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2. I submitted a declaration (the "**Initial Declaration**") in support of the application dated June 12, 2009 (the "**Application**") of General Motors Corporation and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**" and each, a "**Debtor**"), (a) for authorization to employ and retain Evercore as investment banker and financial advisor for the Debtors *nunc pro tunc* to June 1, 2009 (the "**Petition Date**") and (b) for authorization to continue to provide investment banking and financial advisory services to the Debtors in their capacity as interested parties in the Delphi Case (as defined in the Application). The Initial Declaration was attached as Exhibit B to the Application.

3. I am submitting this First Supplemental Declaration to provide further information requested by the United States Trustee regarding certain items in the Initial Declaration, as well as to respond to certain statements in the objections to the Application filed by the Ad Hoc Committee of Consumer Victims of General Motors (the "**Consumer Group**"), the Ad Hoc Committee of Personal Injury Asbestos Claimants (the "**Asbestos Group**"), the United States Trustee (the "**U.S. Trustee**"), and the Official Committee of the Unsecured Creditors (the "**Creditors' Committee**"). Capitalized terms not defined in this First Supplemental Declaration have the meanings given to them in the Initial Declaration.

4. In paragraph 12 of the Initial Declaration, I referred to a senior managing director of Evercore's private-equity affiliate, who is not involved with this engagement and who is a member of the board of directors of Caterpillar, Inc. That individual's name is John T. Dillon.

5. In paragraph 13 of the Initial Declaration, I described certain relationships between Evercore Partners and Mizuho Securities Co., Ltd. and certain of its affiliates. Evercore does not and will not represent or advise Mizuho Securities Co., Ltd. or its affiliates regarding

the Debtors or these Chapter 11 cases. These relationships will not affect Evercore's ability to provide sound and unbiased advice to the Debtors.

6. In paragraph 29 of the Initial Declaration, I noted that the Debtors had provided Evercore with an advance of $100,000 for the fees and expenses of legal counsel to Evercore. As of the Petition Date, $5,634 of such advance had not been applied by Evercore's counsel to fees and expenses incurred prior to the Petition Date. This remaining amount will be held in counsel's trust account to be applied to post-petition legal fees and expenses, subject to applicable orders of this Court.

7. In paragraphs 10 and 11 of the objection of the Consumer Group (Docket no. 1892), the Consumer Group suggests that Evercore received more than $30 million in fees and expenses prior to the Petition Date and stands to receive $60 million or more in additional compensation post-petition. The Asbestos Group makes similar suggestions on pages 2 and 3 of its objection (Docket no. 1968); there are statements in the objections by the U.S. Trustee and the Creditors' Committee that also indicate confusion over the terms of the GM Engagement Letter. The following sub-paragraphs of this Declaration correct some of the inaccuracies in the objectors' statements. For ease of reference, they are numbered to correspond to the sub-paragraphs of paragraph 11 of the Consumer Objection.

(a) Evercore's engagement terminates upon the consummation of the NewCo Transaction. Thus, if the Court were to approve the NewCo Transaction and it were to be consummated in July of this year, as presently proposed and contemplated, Evercore's Monthly Fees would total $800,000, not the $9.6 million calculated by the Consumer Group.

(b)     The Fairness Opinion Fee of $6 million was paid to Evercore prior to the Petition Date.  Therefore, Evercore is <u>not</u> requesting an additional Fairness Opinion Fee post-petition.  Furthermore, as provided in the GM Engagement Letter, 50% of the Fairness Opinion Fee will be credited against the NewCo Transaction Fee.[1]

(c)     Pursuant to discussions with the United States Trustee, Evercore has agreed to reduce the DIP Structuring Fee to $1 million.

(d)     The Delphi Fee of $2 million is payable only upon the consummation of a plan of reorganization or the sale or other transfer of all or substantially all of the assets or business of Delphi Corporation in a single transaction or series of transactions.  Evercore would expend substantial time and effort related to the Delphi Case before either of these events would occur.  In any case, I do not believe that it is appropriate to take the Delphi Fees into account when analyzing the reasonableness of the fees payable to Evercore for its work related to the Debtors' restructuring.[2]  Evercore's advice to the Debtors in their capacities as creditors in the Delphi Case is distinct from its other work for the Debtors; the Delphi assignment has been handled by a separate team from the Evercore personnel advising the Debtors regarding their own restructuring.  Receipt of the Delphi Fees is contingent on certain events that are not connected to the success of the NewCo Transaction or similar events in this case.

(e)     The NewCo Transaction Fee of $30 million would be reduced by the following credits:  $10 million of Forward Restructuring Fees; $4 million of Advisory

---

[1] All credits discussed herein are subject to the qualifications in paragraph 2(i) of the GM Engagement Letter.

[2] As Evercore is advising the Debtors in their capacities as creditors in the Delphi case, it has not received and does not propose to receive fees from the Debtors "relating to work performed *for* Delphi" (U.S. Trustee Objection, page 13, emphasis added).

Fees; and $3 million of the Fairness Opinion Fee. All of these credited amounts were paid to Evercore prior to the Petition Date. Thus, the incremental NewCo Transaction Fee payable to Evercore upon consummation of the NewCo Transaction would be $13 million.

(f) If a Sale, other than the NewCo Transaction, were consummated, the Sale Fee would be determined under paragraph 2(c)(ii) of and Annex 2 to the GM Engagement Letter, which is also reproduced in different form in paragraph 13(d) of the Application. The Sale Fee would not be determined by GM and Evercore privately. Moreover, paragraph 5 of the GM Engagement Letter provides that the Debtors may engage another firm to advise them regarding any Sale, and in that case, Evercore will not be entitled to a Sale Fee with respect to that Sale. To the extent that the Consumer Group's comment is intended to refer to paragraph 2(h) of the GM Engagement Letter, which refers to negotiations regarding fees to be paid for any services for which no specific fee is provided in the GM Engagement Letter, that paragraph is not applicable to a Sale. Nevertheless, Evercore acknowledges that any fee resulting from such negotiations would be subject to review and approval by this Court.

(g) The Restructuring Fee and the NewCo Transaction Fee are mutually exclusive; only one or the other will be paid. If the NewCo Transaction is approved and consummated, Evercore will not receive a Restructuring Fee, as provided in paragraph 2(k) of the GM Engagement Letter. If the NewCo Transaction is not approved or is not consummated, and the Debtors restructure by another means, the Restructuring Fee of $30 million would be reduced by the following credits: $10 million of Forward Restructuring Fees; $4 million of Advisory Fees; and 50% of Financing Fees.

The $10 million of Forward Restructuring Fees and $4 million of Advisory Fees were paid to Evercore prior to the Petition Date.  Because of the possibility that such a Restructuring could result in Other Financing that would give rise to an Other Financing Fee, it is not possible to calculate the precise amount of the credit for Financing Fees, but the credit would be at least $500,000 (50% of the DIP Structuring Fee).  Thus, the incremental Restructuring Fee payable to Evercore upon consummation of a Restructuring would be no more than $15.5 million.[3]  In that scenario, Evercore would not receive the NewCo Transaction Fee.

8. The U.S. Trustee Objection also contains several distinct inaccuracies:

(a) Evercore did not receive $46 million in fees prior to the Petition Date (see U.S. Trustee Objection, page 5).  Prior to the Petition Date, Evercore received $24,530,368.16 in fees and expenses related to the Debtors' restructuring.[4]  This sum includes the $10 million in Forward Restructuring Fees and the $6 million Fairness Opinion Fee referenced by the U.S. Trustee.

(b) Evercore has not performed work for Delphi.  In particular, Evercore has not received and does not propose to receive fees from the Debtors "relating to work performed for Delphi" (U.S. Trustee Objection, page 13).

9. Evercore's involvement with the Debtors, and in particular with their dealings with the United States, has been substantial.  In particular:

---

[3] The Restructuring Fee is payable only if there is a successful restructuring of the Debtors.  In a liquidation, Evercore would not be entitled to the Restructuring Fee at all.

[4] Evercore has also received a total of $6 million for fees in connection with the Delphi engagement.  As described in subparagraph (d) above, these fees were received for work which is distinct from the advice Evercore is giving to the Debtors on their own restructuring.

(a) Evercore's involvement with the Debtors started in June 2008 and included advising the Debtors with respect to (i) potential secured or unsecured financings; (ii) strategic transactions with other original equipment manufacturers, (iii) asset dispositions, including assets in Europe, (iv) review of the Debtors' several viability plan(s), including submissions to the United States Congress, also known as VP1 and VP2, (v) possible out-of-court restructurings and bond exchanges, and (vi) in-court restructurings, including via a sale under section 363 of the Bankruptcy Code or otherwise.

(b) Evercore, as financial advisor to the Debtors, has had a regular dialogue, on the Debtors' behalf or along with the Debtors, with the United States Treasury, its related entities and representatives (the "**Government**"), and the Government's advisors on an extensive variety of topics. Evercore has been involved in all financial aspects of the Debtors' financing needs, the consideration of strategic transactions, and their preparation for a bankruptcy filing, communicating both directly and indirectly with the Government and preparing the Debtors for meetings with the Government.

(c) Evercore was an integral part of the structuring, sizing, and negotiations of the terms of the Government's loans to the Debtors under the TARP program, in a process that started in the winter of 2008-09.

(d) Evercore also has been intimately involved with the Debtors' obtaining DIP financing from the Government, including due diligence, structuring, loan sizing, and detailed negotiations of terms and covenants, which took place over several weeks preceding the Petition Date.

(e) Evercore continues to provide substantial advice and services to the Debtors with respect to the NewCo Transaction. Evercore has been closely involved in virtually every aspect of planning, structuring, analyzing and executing the NewCo Transaction, including direct and indirect negotiations with the Government and its advisors. Evercore also facilitated discussions with the Government and its advisors in their analyses of the Debtors' VP4 plan and integrated financial models. Most recently, Evercore has been an interface between the Debtors and the Creditors' Committee and its professionals in assisting the Creditors' Committee to understand the Debtors' assets and capital structure, and to facilitate the committee's review of the NewCo Transaction. In addition, Evercore has had substantial interactions with the Canadian and Ontario governments and their respective advisors on a large number of matters relating to the Debtors' Canadian operations, the DIP financing, the NewCo Transaction, and related matters.

Executed on June 24, 2009.

/s/ William C. Repko
William C. Repko