**Hearing Date and Time: June 25, 2009 at 9:45 a.m. (Eastern Time)**

Harvey R. Miller, Esq.
Stephen Karotkin, Esq.
Joseph H. Smolinsky, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors
And Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                              :
**In re:**                                    :
                                              :          **Chapter 11**
                                              :
**GENERAL MOTORS CORP.,** *et al.,*           :          **Case No. 09-50026 (REG)**
                                              :
                                              :
                                              :          **Jointly Administered**
                          **Debtors.**        :
                                              :
------------------------------------------------------------x

**RESPONSE OF DEBTORS TO (I) OBJECTION OF AD HOC COMMITTEE OF
CONSUMER VICTIMS OF GENERAL MOTORS, (II) OBJECTION OF THE AD HOC
COMMITTEE OF PERSONAL INJURY ASBESTOS CLAIMANTS, (III) OBJECTION
OF THE UNITED STATES TRUSTEE, AND (IV) LIMITED OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS'
APPLICATION FOR AN ORDER AUTHORIZING THE EMPLOYMENT
AND RETENTION OF EVERCORE GROUP L.L.C.
AS INVESTMENT BANKER AND FINANCIAL ADVISOR
<u>FOR THE DEBTORS NUNC PRO TUNC TO THE PETITION DATE</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................5

I.      The Evercore Fees Are Reasonable ................................................................ 5

A.      The Legal Standard ........................................................................................ 5

B.      The Extent of the Evercore Fees ................................................................... 6

C.      The Evercore Fees Are Customary in the Market ......................................... 10

D.      Evercore Has Performed and Continues to Perform Significant Work for the Debtors, Including in Connection with the NewCo Transaction................... 10

E.      Evercore's Fees Should Not Be Reduced Merely Because the NewCo Transaction May Be Promptly Consummated ............................................... 12

F.      The Services Provided by Evercore Are Not Duplicative of Those Provided By AP Services, LLC ................................................................................... 15

II.      The Indemnification Agreement Complies with the Bankruptcy Code ........ 16

III.      The Compensation Structure of Evercore Should Not Be Re-Examined Under Section 330 of the Bankruptcy Code Except Upon an Objection by the United States Trustee ............................................................................................... 18

IV.      Evercore Has Made Sufficient Disclosures .................................................. 19

V.      Payment of Evercore Fees Should Not Be Conditioned upon Administrative Solvency of the Estate ................................................................................... 20

## **TABLE OF AUTHORITIES**

### **CASES**

*In re Ames Dep't Stores*, 76 F.3d 66 (2d Cir. 1996) .........................................................6

*In re Bally Total Fitness*, Case No. 08-14818 (BRL) (Bankr. S.D.N.Y.).....................................19

*In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y.) ...................................17

*In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y.) ...............................................6

*In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991) .................5, 17

*Duncan v. Walker*, 533 U.S. 167 (2001).........................................................................................6

*In re Frontier Airlines, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y.) ...............................19

*In re Global Crossing Ltd.*, No. 02-40187 (REG) (Bankr. S.D.N.Y.)....................................17, 19

*In re Joan and David Halpern Inc.*, 248 B.R. 43 (Bankr. S.D.N.Y. 2000) ........................5, 17, 18

*In re Lyondell Chemical Company*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y.) ..............17, 19

*In re Northwest Airlines Corp.*, 400 B.R. 393 (Bankr. S.D.N.Y. 2009).......................................13

*In re Pan Am Hosp. Corp.*, 312 B.R. 706  (Bankr. S.D. Fla. 2004). ...............................................6

*In re Smart World Technologies, LLC*, 552 F.3d 228 (2d Cir. 2009)...........................................18

*United Artists Theatre Co. v. Walton*, 315 F.3d 217 (3d Cir. 2003)...............................................18

*In re XO Communications, Inc.*, 398 B.R. 106 (Bankr. S.D.N.Y. 2008)..................................5, 13

### **FEDERAL STATUTES**

11 U.S.C. § 328(a) ...............................................................................................3, 4, 5, 6, 13, 18

11 U.S.C. § 330(a) ...............................................................................................4, 5, 13, 18, 19

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("**GM**") and its affiliated debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby respond to the objections to their application (the "**Application**," Docket No. 954) for an order authorizing the employment and retention of Evercore Group L.L.C. ("**Evercore**") as investment banker and financial advisor for the Debtors *nunc pro tunc* to June 1, 2009 (the "**Petition Date**"). In support of this response (the "**Response**"), the Debtors respectfully submit the following:[1]

## PRELIMINARY STATEMENT

1. The objections to the Application confuse several important facts. As outlined in the Application, Evercore would be entitled to receive the following compensation upon the successful consummation of the currently contemplated sale of the Debtors' assets:

| | |
|---|---|
| Monthly Fees:[2] | $800,000 |
| DIP Structuring Fee:[3] | $1,000,000 |
| NewCo Transaction Fee:[4] | $13,000,000 |
| Total:[5] | $14,800,000 |

---

[1] Capitalized terms not defined in this Response have the meanings given to them in the Application.

[2] Monthly Fees of $400,000 for June and July, assuming the NewCo Transaction closes in July.

[3] Reduced by Evercore from $2.5 million, as described below.

[4] The NewCo Transaction Fee of $30 million, reduced by the following credits: $10 million of Forward Restructuring Fees; $4 million of Advisory Fees; and $3 million of the Fairness Opinion Fee.

[5] Under certain circumstances, Evercore may earn an additional $2 million fee for advice to the Debtors in connection with the Delphi case.

2.      The objections to the Application confuse the amount of fees Evercore would receive from the Debtors' estates and incorrectly presume that the fees would be much higher than shown above.  The actual fees that would be payable to Evercore are comparable to, if not lower than, the fees approved and awarded in bankruptcy cases of similar or less complexity and similar or lower stakes.  The objecting parties also may be confused regarding the extent of Evercore's work performed to date in connection with the Debtors' restructuring, which work has been quite substantial and valuable to the Debtors' estates.

3.      On May 29, 2009, Evercore and GM executed an engagement letter (the "**GM Engagement Letter**"), which provides the terms and conditions of the Debtors' retention of Evercore as their investment banker and financial advisor.  These terms and conditions are representative of other engagement letters in the market involving financial advisors of similar stature (*see* declaration of William C. Repko in support of the Application (the "**Repko Declaration**"), ¶ 33), and were heavily negotiated by GM and Evercore over several weeks.  The Debtors were represented and advised by outside restructuring counsel throughout the negotiations.  These negotiations resulted in a variety of modifications to the terms of the Evercore engagement.

4.      As a result of their extensive arm's-length negotiations, the parties agreed that Evercore would be compensated based upon a fee structure as described in more detail in the Application and the GM Engagement Letter (any fees payable to Evercore being the "**Evercore Fees**").  Like other investment bankers, Evercore does not charge for its services on an hourly basis. The customary practice of investment bankers, including Evercore, is to charge fixed monthly fees, plus additional fixed and percentage fees that are payable upon the occurrence of

certain transactions or events.  The fee structure agreed upon in the GM Engagement Letter is based on the same principles.

5.    GM and Evercore had previously entered into an indemnification agreement effective as of September 5, 2008 (the "**Indemnification Agreement**"), which was also an arm's-length transaction.  Upon executing the GM Engagement Letter, the parties agreed to leave their obligations under the Indemnification Agreement unaltered. The Indemnification Agreement conforms to the standards set forth in *In re Global Crossing Ltd.*, No. 02-40187 (REG) (Bankr. S.D.N.Y. Feb. 26, 2002) (authorizing the Debtors' retention of The Blackstone Group L.P.).

6.    This Response addresses the objections to the Application in (a) the objection (the "**Consumer Objection**," Docket No. 1892) of the Ad Hoc Committee of Consumer Victims of General Motors (the "**Consumer Group**"), (b) the objection (the "**Asbestos Objection**," Docket No. 1968) of the Ad Hoc Committee of Personal Injury Asbestos Claimants (the "**Asbestos Group**"), (c) the objection (the "**U.S. Trustee Objection**," Docket No. 2189) of the United States Trustee (the "**U.S. Trustee**"), and (d) the limited objection (the "**Committee Objection**," Docket No. 2232, and collectively with the Consumer Objection, the Asbestos Objection, and the U.S. Trustee Objection, the "**Objections**") of the Official Committee of the Unsecured Creditors (the "**Creditors' Committee**," and collectively with the Consumer Group, the Asbestos Group, and the U.S. Trustee, the "**Objectors**").

7.    The Objectors make the following arguments in opposition to the Application:

(a) The Evercore Fees arguably are not reasonable under section 328 of the Bankruptcy Code.  *See* Consumer Objection, ¶¶ 6-18; Asbestos Objection, section

B(ii)-(v); U.S. Trustee Objection, pages 5-8.  Alternatively, the Application arguably does not contain sufficient information to permit interested parties to evaluate whether the fees are reasonable under section 328 (s*ee* Committee Objection, ¶¶ 9-16; U.S. Trustee Objection, pages 10-13);

(b) The engagement of Evercore should be conditioned upon this Court's further re-examination of the compensation structure under section 330 of the Bankruptcy Code (s*ee* Consumer Objection, ¶ 20; Asbestos Objection, section B(i); U.S. Trustee Objection, pages 10-13);

(c) The Debtor should not indemnify Evercore under the terms of the Indemnification Agreement (s*ee* Consumer Objection, ¶ 19; Asbestos Objection, section B(vi));

(d) In order to examine the reasonableness of the compensation, "Evercore should be required to disclose who at Evercore will receive how much of the proposed compensation" (s*ee* Asbestos Objection, section B(i)); and

(e) The payment of the Evercore Fees should be conditioned upon the administrative solvency of the Debtors' estates (s*ee* Committee Objection, ¶ 17).

8.    Many of the Objectors' arguments result from confusion or misunderstanding of the terms of Evercore's engagement.  To further clarify the terms of the GM Engagement Letter, the Debtors have submitted the <u>First Supplemental Declaration of William C. Repko in Support of the Application for an Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) Authorizing the Employment and Retention of Evercore Group L.L.C. as Investment Banker and Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date</u> (the "**First Supplemental Repko Declaration**").

9.       The Debtors respectfully submit that the terms of the GM Engagement Letter, including, without limitation, the Evercore Fees, are reasonable and consistent with the requirements of the Bankruptcy Code.  Consequently, Evercore's retention should be approved pursuant to section 328(a).

## ARGUMENT

### I.       The Evercore Fees Are Reasonable

#### A.       The Legal Standard

10.       The Debtors requested approval of the terms of the GM Engagement Letter pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis . . . ."  11 U.S.C. § 328(a).

11.       The Second Circuit and other courts have established a "market-driven" approach to reasonableness.  *See, e.g., In re Ames Dep't Stores*, 76 F.3d 66, 71 (2d Cir. 1996) (stating that the "compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy cases"); *In re XO Communications, Inc.*, 398 B.R. 106, 113 (Bankr. S.D.N.Y. 2008) (stating that the analysis of the reasonableness of advisors' fees is "market driven" under both sections 328 and 330 of the Bankruptcy Code); *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991) (confirming that "Congress intended that market forces set the rate" of reasonable professional compensation); *In re Joan and David Halpern Inc.*, 248 B.R. 43, 44 (Bankr. S.D.N.Y. 2000) (when approving an employment of an advisor that included debtor's duty to indemnify the advisor, referring to the

fact that such indemnification provisions were "customary and usual").  The following non-exhaustive list of factors may be considered in determining reasonableness: (a) whether terms of an engagement agreement reflect normal business terms in the marketplace; (b) the relationship between the Debtor and the professionals (i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arm's-length negotiation); (c) whether the retention, as proposed, is in the best interests of the estate; and (d) whether there is creditor opposition to the retention and retainer provisions. *See, e.g.*, *In re Pan Am Hosp. Corp.*, 312 B.R. 706, 710 (Bankr. S.D. Fla. 2004).

12.    Section 328(a) of the Bankruptcy Code allows the Debtors to employ a professional "on *any* reasonable terms and conditions of employment" (emphasis added).  The word "any" is not surplusage.  Rather, the Court must give effect to every clause and word of a statute. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001).  The phrase "any reasonable terms" in section 328(a) of the Bankruptcy Code means, first, that there may be more than one set of reasonable terms for employment of a professional, and second, that if the proposed terms are within the universe of reasonable terms, a debtor should have its application granted.

B.    The Extent of the Evercore Fees

13.    Some of the Objectors appear to have significantly misunderstood the amount of fees that may be payable to Evercore in connection with Evercore's engagement as a financial advisor relating to the Debtors' restructuring.  For example, Evercore did not receive $46 million in fees prior to the Petition Date (*see* U.S. Trustee Objection, page 5).  Prior to the Petition Date, Evercore received $24,530,368.16 in fees and expenses related to the Debtors'

restructuring.[6]   This sum includes the $10 million in Forward Restructuring Fees and the $6 million Fairness Opinion Fee referenced by the U.S. Trustee.  The Consumer Group believes that Evercore received more than $30 million in fees and expenses prior to the Petition Date and stands to receive $60 million or more in additional compensation post-petition.  *See* Consumer Objection, ¶¶ 10-11.  The Asbestos Group makes similar suggestions.  *See* Asbestos Objection, pages 2-3.

14.     In order to resolve any confusion over Evercore's compensation, the First Supplemental Repko Declaration provides additional information on the fee structure and terms of compensation.   The following sub-paragraphs of this Response also correct some of the inaccuracies in the Objectors' statements.   For ease of reference, they are numbered to correspond to the sub-paragraphs of paragraph 11 of the Consumer Objection.

(a)     Evercore's engagement terminates upon the consummation of the NewCo Transaction.  Thus, if the Court were to approve the NewCo Transaction and it were to be consummated in July of this year, as presently proposed and contemplated, Evercore's Monthly Fees would total $800,000, not the $9.6 million calculated by the Consumer Group.

(b)     The Fairness Opinion Fee of $6 million was paid to Evercore prior to the Petition Date.  Therefore, Evercore is <u>not</u> requesting an additional Fairness Opinion Fee post-petition.  Furthermore, as provided in the GM Engagement Letter, 50% of the Fairness Opinion Fee will be credited against the NewCo Transaction Fee.[7]

---

[6] Evercore has also received a total of $6 million for fees in connection with the Delphi engagement.  These fees were received for work which is distinct from the advice Evercore is giving to the Debtors on their own restructuring.

[7] All credits discussed herein are subject to the qualifications in paragraph 2(i) of the GM Engagement Letter.

(c)    Pursuant to discussions with the U.S. Trustee, Evercore has agreed to reduce the DIP Structuring Fee to $1 million.

(d)    The Delphi Fee of $2 million is payable only upon the consummation of a plan of reorganization or the sale or other transfer of all or substantially all of the assets or business of Delphi Corporation in a single transaction or series of transactions.  Evercore would expend substantial time and effort related to the Delphi Case before either of these events would occur.  In any case, it is not appropriate to take Delphi Fees into account when analyzing the reasonableness of the fees payable to Evercore for its work related to the Debtors' Chapter 11 cases.[8]  Evercore's advice to the Debtors in their capacities as creditors in the Delphi Case is distinct from its other work for the Debtors.  Receipt of the Delphi Fees is contingent on certain events that are not connected to the success of the NewCo Transaction or similar events in this case.

(e)    The NewCo Transaction Fee of $30 million would be reduced by the following credits:  $10 million of Forward Restructuring Fees; $4 million of Advisory Fees; and $3 million of the Fairness Opinion Fee.  All of these credited amounts were paid to Evercore prior to the Petition Date.  Thus, the incremental NewCo Transaction Fee payable to Evercore upon consummation of the NewCo Transaction would be $13 million.

(f)    If a Sale, other than the NewCo Transaction, were consummated, the Sale Fee would be determined under paragraph 2(c)(ii) of and Annex 2 to the GM Engagement Letter, which is also reproduced in different form in paragraph 13(d) of the

---

[8] As Evercore is advising the Debtors in their capacities as creditors in the Delphi case, it has not received and does not propose to receive fees from the Debtors "relating to work performed for Delphi" (U.S. Trustee Objection, page 13).

Application. The Sale Fee would not be determined by GM and Evercore privately. Moreover, paragraph 5 of the GM Engagement Letter provides that the Debtors may engage another firm to advise them regarding any Sale, and in that case, Evercore will not be entitled to a Sale Fee with respect to that Sale. To the extent that the Consumer Group's comment is intended to refer to paragraph 2(h) of the GM Engagement Letter, which refers to negotiations regarding fees to be paid for any services for which no specific fee is provided in the GM Engagement Letter, that paragraph is not applicable to a Sale. Nevertheless, Evercore acknowledges that any fee resulting from such negotiations would be subject to review and approval by this Court.

(g)    The Restructuring Fee and the NewCo Transaction Fee are mutually exclusive; only one or the other will be paid. If the NewCo Transaction is approved and consummated, Evercore will not receive a Restructuring Fee, as provided in paragraph 2(k) of the GM Engagement Letter. If the NewCo Transaction is not approved or is not consummated, and the Debtors restructure by another means, the Restructuring Fee of $30 million would be reduced by the following credits: $10 million of Forward Restructuring Fees; $4 million of Advisory Fees; and 50% of Financing Fees. The $10 million of Forward Restructuring Fees and $4 million of Advisory Fees were paid to Evercore prior to the Petition Date. Because of the possibility that such a Restructuring could result in Other Financing that would give rise to an Other Financing Fee, it is not possible to calculate the precise amount of the credit for Financing Fees, but the credit would be at least $500,000 (50% of the DIP Structuring Fee). Thus, the incremental Restructuring Fee payable to Evercore upon consummation of a

Restructuring would be no more than $15.5 million.[9]  In that scenario, Evercore would not receive the NewCo Transaction Fee.

C.      The Evercore Fees Are Customary in the Market

15.      The central factor in determining the reasonableness of the compensation is the value of such services in the market.  The compensation payable under the GM Engagement Letter is comparable to the compensation generally charged by investment banking and financial advisory firms of similar stature to Evercore and for comparable engagements, both in and out of court.  The Objectors do not claim anything to the contrary, nor do they provide any evidence that this is not the case.  As demonstrated by information contained in Exhibit A attached hereto, the Evercore Fees are consistent with customary fees approved for payment to financial advisors.  In fact, the success fee that Evercore would be entitled to in these cases, as a percentage of pre-petition debt – the most common measure of fees in the restructuring field – is far below the average success fee in the largest bankruptcy cases to date.  At the same time, the complexity of this case and the amount of work involved are probably unparalleled.

D.      Evercore Has Performed and Continues to Perform Significant Work for the Debtors, Including in Connection with the NewCo Transaction

16.      Evercore has performed and continues to perform substantial services for the Debtors.  Those services have directly and significantly contributed to the progress that has been made in connection with the NewCo Transaction.  As discussed in detail in the Application, the Repko Declaration, and the First Supplemental Repko Declaration, Evercore's work has included the following:

---

[9] The Restructuring Fee is payable only if there is a successful restructuring of the Debtors.  In a liquidation, Evercore would not be entitled to the Restructuring Fee at all.

(a)       Evercore's involvement with the Debtors started in June 2008 and included advising the Debtors with respect to (i) potential secured or unsecured financings; (ii) strategic transactions with other original equipment manufacturers, (iii) asset dispositions, including assets in Europe, (iv) review of the Debtors' several viability plan(s), including submissions to the United States Congress, also known as VP1 and VP2, (v) possible out-of-court restructurings and bond exchanges, and (vi) in-court restructurings, including via a sale under section 363 of the Bankruptcy Code or otherwise.

(b)       Evercore, as financial advisor to the Debtors, has had a regular dialogue, on the Debtors' behalf or along with the Debtors, with the United States Treasury, its related entities and representatives (the "**Government**"), and the Government's advisors on an extensive variety of topics.  Evercore has been involved in all financial aspects of the Debtors' financing needs, the consideration of strategic transactions, and their preparation for a Chapter 11 filing, communicating both directly and indirectly with the Government and preparing the Debtors for meetings with the Government.

(c)       Evercore was an integral part of the structuring, sizing, and negotiations of the terms of the Government's loans to the Debtors under the TARP program, in a process that started in the winter of 2008-09.

(d)       Evercore also has been intimately involved with the Debtors' obtaining DIP financing from the Government, including due diligence, structuring, loan sizing, and detailed negotiations of terms and covenants, which took place over several weeks preceding the Petition Date.

(e)    Evercore continues to provide substantial advice and services to the Debtors with respect to the NewCo Transaction.  Evercore has been closely involved in virtually every aspect of planning, structuring, analyzing and executing the NewCo Transaction, including direct and indirect negotiations with the Government and its advisors.  Evercore also facilitated discussions with the Government and its advisors in their analyses of  the Debtors' VP4 plan and integrated financial models.  Most recently, Evercore has been an interface between the Debtors and the Creditors' Committee and its professionals in assisting the Creditors' Committee to understand the Debtors' assets and capital structure, and to facilitate the committee's review of the NewCo Transaction.  In addition, Evercore has had substantial interactions with the Canadian and Ontario governments and their respective advisors on a large number of matters relating to the Debtors' Canadian operations, the DIP financing, the NewCo Transaction, and related matters.

17.    In short, Evercore's work for the Debtors has been significant and multifaceted over a period of nearly a year.  The NewCo Transaction is the culmination of very substantial efforts by Evercore on the Debtors' behalf.  Although it is true, as the Objectors suggest, that the Government eventually became directly involved in the NewCo Transaction, that outcome was by no means foreordained.  Indeed, in December 2008, the United States Congress voted to reject legislation making emergency loans available to the automotive industry.

E.    <u>Evercore's Fees Should Not Be Reduced Merely Because the NewCo Transaction May Be Promptly Consummated</u>

18.    The Objectors contend that the advanced stage of the proposed sale of the Debtors' assets pursuant to the NewCo Transaction requires that any fees based on that transaction should be reduced because a significant portion of the work relating to NewCo Transaction was performed pre-petition (*see, e.g.*, Asbestos Objection, section B(v)).    The Objectors further contend that certain of Evercore's tasks outlined in the GM Engagement Letter will arguably not be performed, or will involve little work, and that the Evercore Fees are consequently not justified.    For example, the Asbestos Group argues that there likely will be few post-petition alternatives to be explored by the Debtors and Evercore and that "it is not clear what 'investment banking and advisory services in connection with the evaluation and possible implementation of strategic alternatives' Evercore will be performing for Debtors that would merit the compensation that the [Application] sets forth" (Section B(ii) (quoting the GM Engagement Letter)).

19.    These statements do not properly apply the legal principles under section 328(a).    The Objectors wrongly claim that the reasonableness of the Evercore Fees should be judged solely based on the amount of post-petition work performed and measured in terms of hours or a similar metric.    Hours worked is not the appropriate criterion by which to examine the reasonableness of a financial advisor's fees.

20.    The Objectors cite two cases for support: *In re XO Communications, Inc.*, 398 B.R. 106 (Bankr. S.D.N.Y. 2008) (Gonzalez, J.) and *In re Northwest Airlines Corp.*, 400 B.R. 393, 400 (Bankr. S.D.N.Y. 2009) (Morris, J.).    Neither of these cases involved section 328(a) of the Bankruptcy Code, since the court had not pre-approved the fees at issue at the outset of the cases.    Instead, in these cases, the financial advisors asked for a success fee (i) under section 330(a) of the Bankruptcy Code; and (ii) *after* the transaction was already

completed.  *See XO Communications*, 398 B.R. at 108;  *Northwest Airlines*, 400 B.R. at 397.  For

example, when denying success fees to the financial advisor to Northwest Airlines, this Court

stated, "the circumstances surrounding [the Northwest Airlines' financial advisor's] retention

deviate from the customary terms under which financial advisors are retained and compensated."

*Id.* at 399.

        21.    To the extent the *XO Communications* case discusses, in *dicta*, the proper

standard of analyzing a fee application under section 328(a), nothing in that discussion

undermines the appropriateness of the Evercore Fees.  Contrary to what the Objectors imply,

Judge Gonzalez' ruling provides no support whatsoever to the claim that when determining the

reasonableness of the success fee under section 328(a), a court may look only at the amount of

work, in terms of hours, yet to be performed.  To the contrary, the proper standard is

straightforward: "reasonableness," considering all the facts and circumstances, including the

market rates.

        22.    If the Objectors' arguments were to prevail and Evercore's compensation

for its work performed for the NewCo Transaction were reduced due to the possibility of quick

consummation of the sale, Evercore would be stripped of the compensation it has rightfully

earned.  The Objectors' assumption that "Evercore has evidently already been paid for its pre-

petition work" (*see, e.g.*, Asbestos Objection, section B(v)) is false.  Evercore's compensation

arrangement with the Debtors has included a success fee component since the parties executed

the engagement letter dated December 23, 2008.  Since the NewCo Transaction has not been

consummated, Evercore obviously has not received a success fee for that transaction.  The

logical consequence of accepting the Objectors' argument would be that success fees can never

be paid to restructuring specialists when a bankruptcy filing is part of the restructuring – before a

bankruptcy filing, there is no success that could trigger a success fee, but after the bankruptcy filing, so the Objectors contend, the only work "remaining," which may not amount to much in terms of hours, should be taken into account. This is a fundamental misunderstanding of the legal standard applicable here – reasonableness – which does not favor hourly fees over success fees.

F.    The Services Provided by Evercore Are Not Duplicative of Those Provided By AP Services, LLC

23.    The U.S. Trustee argues that the Evercore Fees may be unreasonable under the circumstances if Evercore's services are duplicative of the work performed by AP Services, LLC ("APS"), which the Debtors have engaged as crisis managers. *See* U.S. Trustee Objection, pages 7-8, 11. In fact, however, Evercore and APS are not duplicating one another's work, and each is serving in a separate, well-defined role that complements the work being performed by the other.

24.    The roles of Evercore and APS are quite distinct. Evercore serves as the Debtors' investment banker and financial advisor. Thus, as is customary for firms in those roles in restructuring engagements, Evercore's principal responsibilities have concerned transactions necessary to restructure the Debtors' affairs and the financing necessary to permit the transactions to be accomplished. In contrast, APS serves in crisis-management and business operation functions, and one of its managing directors has been appointed as the Debtors' chief restructuring officer. These functions, as is also customary, principally involve operations, liquidity, contractual relationships, contested matters necessary to conduct these cases, claims administration, various reports required by the Bankruptcy Code and Rules, and similar matters.

25.     The process by which the Debtors developed the NewCo Transaction provides an example of the division of labor between Evercore and APS. As described in detail in the Declaration of J. Stephen Worth in Support of the Proposed Sale of Debtors' Assets to Vehicle Acquisition Holdings LLC (Docket No. 431), Evercore was requested to provide a fairness opinion to the board of directors of General Motors Corporation regarding the proposed NewCo Transaction. Among the many items considered by Evercore in formulating that opinion was a liquidation analysis prepared by AlixPartners LLP, an affiliate of APS. Evercore did not independently consider or determine the value creditors might receive in a Chapter 7 liquidation; conversely, APS did not value the NewCo Transaction or advise the GM directors regarding the transaction's fairness from a financial point of view. Thus, without duplication of efforts, the two firms were able to provide GM with the analyses necessary for the board to make an informed decision to proceed with the NewCo Transaction.

26.     In addition, as the Creditors' Committee accurately notes, much of APS' work will be performed <u>following</u> the closing of the NewCo Transaction. In contrast, if the NewCo Transaction is consummated, Evercore's engagement by the Debtors will terminate (*see* paragraph 5 of the GM Engagement Letter). Thus, there will be <u>no</u> duplication of efforts after the closing of the NewCo Transaction.

## II.     The Indemnification Agreement Complies with the Bankruptcy Code

27.     The Consumer Group and the Asbestos Group claim that the Debtors should not indemnify Evercore from and against claims and liabilities incurred by Evercore or certain affiliated persons of Evercore arising out of Evercore's engagement. The Asbestos Group concedes that "an indemnification agreement may be permissible where it is part of a retention agreement whose terms are, taken as a whole, both fair and reasonable and in the best

interests of the estate . . ." (Asbestos Objection, section B(vi)).  As discussed above, the terms of the GM Engagement Letter, taken as a whole, are just that, and the Objectors have not demonstrated anything that would indicate to the contrary.  The Indemnification Agreement is part of the complete retention package, it was negotiated between sophisticated parties on an arm's-length basis, and its provisions are customary for these types of transactions.

28.    The Asbestos Group cites *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991), to support its claim that the terms of the Indemnification Agreement should not be approved by this Court.  Clearly, even if *Drexel Burnham* indeed did once prohibit approval of indemnification provisions, this Court no longer follows that case.  *See In re Joan and David Halpern Inc.*, 248 B.R. 43, 47 (Bankr. S.D.N.Y. 2000) (after referring to *Drexel Burnham*, concluding that the terms of the financial advisor's engagement that included an indemnification provision which excluded only liabilities based on the advisor's bad faith, gross negligence, or willful misconduct, were "fair and reasonable").   Indemnification arrangements between debtors and financial advisors are customary, both in this Court and elsewhere.  *See, e.g.*, *In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 17, 2009) (Docket No. 473) (stating that the Debtors were bound to the indemnification provision except in cases of indemnitee's "bad-faith, self-dealing, breach of fiduciary duty, if any, gross negligence or willful misconduct"); *In re Lyondell Chemical Company*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 25, 2009) (Docket No. 956) (stating that the indemnification provisions in the engagement letter, which are substantially similar to the terms of the Indemnification Agreement, were "reasonable terms and conditions of employment"); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. April 26, 2006) (Docket No. 1370) (approving retention and indemnification of Miller Buckfire & Co., LLC); *In re Global*

*Crossing Ltd.*, No. 02-40187 (REG) (Bankr. S.D.N.Y. Feb. 26, 2002) (approving an indemnification provision except in cases of advisor's bad faith, self-dealing, breach of fiduciary duty, gross negligence and willful misconduct).

29.    The proper test for determining whether an indemnification agreement should be approved is "reasonableness" under section 328(a) of the Bankruptcy Code.  *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 228-34 (3d Cir. 2003); *Joan & David*, 248 B.R. at 47.  The terms of the Indemnification Agreement, which do not protect Evercore in case of its gross negligence or willful misconduct, are customary and reasonable.  *See United Artists*, 315 F.3d at 234; *Joan & David*, 248 B.R. at 47.

### III.    The Compensation Structure of Evercore Should Not Be Re-Examined Under Section 330 of the Bankruptcy Code Except Upon an Objection by the United States Trustee

30.    The Consumer Group argues that all parties in interest, other than the U.S. Trustee, would be deprived of due process rights and opportunity to be heard if only the U.S. Trustee has the right to object to Evercore's fee applications under section 330 of the Bankruptcy Code.  That is incorrect. Once a court approves fee arrangements under Section 328(a), a full section 330 reasonableness review upon application of any party in interest is unnecessary and not appropriate.  Section 328(a) allows advisors to avoid "a full post-hoc reasonableness inquiry" of compensation structures by seeking judicial pre-approval at the start of a case.  *See In re Smart World Technologies, LLC*, 552 F.3d 228, 232 (2d Cir. 2009).  Pre-approval is appropriate where the information necessary to assess the reasonableness of a financial advisor's fees is available at the time of retention, and pre-approval reduces the potential for later litigation.  This

is particularly appropriate when the compensation is back-ended and contingent upon the occurrence of future events.

31.     Moreover, granting section 330 review to anyone but the U.S. Trustee would be inconsistent with the standard practice in this District. The Consumer Group and the Asbestos Group have not stated why this Court should deviate from that practice in this case.[10] *See, e.g., In re Lyondell Chemical Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb, 25, 2009) (Docket No. 956) (authorizing Debtors' retention of Evercore and reserving section 330 review for the U.S. Trustee only); *In re Bally Total Fitness*, Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Jan. 28, 2009) (Docket No. 546) (authorizing the Debtors' retention of Houlihan Lokey Howard & Zukin Capital and reserving section 330 review for the U.S. Trustee only); *In re Frontier Airlines, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. June 18, 2008) (Docket No. 363) (authorizing the Debtors' retention of Seabury Securities LLC and reserving 330 review for the U.S. Trustee only); *In re Global Crossing Ltd.*, No. 02-40187 (REG) (Bankr. S.D.N.Y. Feb. 26, 2002) (authorizing the Debtors' retention of The Blackstone Group L.P. and reserving section 330 review for the U.S. Trustee only).

### IV.    Evercore Has Made Sufficient Disclosures

32.     The Asbestos Group argues that "Evercore should be required to disclose who at Evercore will receive how much of the proposed compensation, so that when an Evercore professional testifies in the case the parties will be able to discern whether that witness has an economic interest in the subject of his or her testimony" (Asbestos Objection, section B(i)).  No part of the fees payable to Evercore pursuant to the GM Engagement Letter will be paid directly to any individual at Evercore.

---

[10] The proposed order submitted with the Application preserves the right of the U.S. Trustee to object to the reasonableness of Evercore's fees under section 330.

**V.      Payment of Evercore Fees Should Not Be Conditioned upon Administrative Solvency of the Estate**

33.      The Creditors' Committee argues that the payment of any fees to Evercore should be made contingent upon the administrative solvency of the Debtors' estates and the viability of a plan of liquidation (*see* Committee Objection, ¶ 17).  Whatever the merits of this position may be in other cases, it should not be a matter of concern in this case.

34.      Upon the closing of the NewCo Transaction, the Debtors' obligations under their pre-petition secured credit facility and their DIP Financing facility will be satisfied.  The Debtors' estates will thus be relieved of tens of billions of dollars in secured debt.  Stated differently, essentially all of the remaining assets of the Debtors' estates, including the consideration received by the estates from NewCo, will be available for the payment in full of administrative claims.

[Signature Page Follows]

For the reasons set forth above, the Debtors submit that the standards of review set forth in the proposed retention order, and the Evercore Fees, are each reasonable and fully consistent with the letter and spirit of the Bankruptcy Code and are in the best interests of the Debtors and their estates.

Dated: June 24, 2009
      New York, New York

           /s/ Stephen Karotkin
           Harvey R. Miller
           Stephen Karotkin
           Joseph H. Smolinsky

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

**<u>Exhibit A</u>**

**Debtor Advisor Fee Study of 2005 - 2009 Top 10 Bankruptcies by Amount of Prepetition Debt** [1]
*($ in millions)*

| Company | Chapter 11 Filing | Debtor Financial Advisor | Prepetition Debt | Completion Fee | Completion Fee (% of Debt) | Monthly Fee |
|---|---|---|---|---|---|---|
| (1) General Growth Properties, Inc. | 4/16/2009 | Miller Buckfire | $24,853 | $22.50 | 0.09% | $0.30 |
| (2) Lyondell Chemical Company | 1/6/2009 | Evercore Partners | $24,429 | $18.50 | 0.08% | $0.35 |
| (3) Calpine Corporation | 12/20/2005 | Miller Buckfire | $22,536 | $14.00 | 0.06% | $0.25 |
| (4) Charter Communications, Inc. | 3/27/2009 | Lazard | $21,586 | $16.00 | 0.07% | $0.25 |
| (5) Northwest Airlines Corp. | 9/14/2005 | Seabury | $17,915 | $13.50 | 0.08% | $0.15 |
| (6) Tribune Company | 12/8/2008 | Lazard | $12,973 | $16.00 | 0.12% | $0.20 |
| (7) R.H. Donnelly | 5/28/2009 | Lazard | $9,959 | $13.00 | 0.13% | $0.20 |
| (8) Idearc Inc. | 3/31/2009 | Moelis | $9,515 | $9.00 | 0.09% | $0.30 |
| (9) AbitibiBowater Inc. | 4/16/2009 | Blackstone | $6,150 | $11.00 | 0.18% | $0.38 |
| (10) Nortel Networks | 1/14/2009 | Lazard | $4,520 | $15.00 | 0.33% | $0.25 |
| **Mean** | | | | | **0.12%** | **$0.26** |
| **Median** | | | | | **0.09%** | **$0.25** |
| **General Motors Corp.** | **6/1/2009** | **Evercore** | **$112,508** | **$30.00** | **0.03%** [2] | **$0.40** [3] |
| **General Motors Corp. excl. Pension & OPEB** | **6/1/2009** | **Evercore** | **$54,088** | **$30.00** | **0.06%** | **$0.40** [3] |

(1) Excludes financial bankruptcies (e.g. Lehman Brothers)
(2) Including $58,420 million of restructured pension and OPEB liabilities
(3) Reflects monthly fee for the first 24 months. Monthly fee is reduced to $0.25 thereafter