Hearing Date:  June 25, 2009, at 9:45 a.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                       :
In re:                                 :          Chapter 11 Case No.
                                       :
GENERAL MOTORS CORP., et al.,          :          09-50026 (REG)
                                       :
               Debtors.                :          (Jointly Administered)
                                       :
-----------------------------------------------------------------x
```

## DEBTORS' REBUTTAL TO REPLY
## OF GENERAL MOTORS RETIREES ASSOCIATION FOR THE
## APPOINTMENT OF A RETIREES COMMITTEE PURSUANT TO 11 U.S.C. § 1114(d)

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("**GM**") and its affiliated debtors (collectively, the

"**Debtors**"), in rebuttal to the reply of the General Motors Retirees Association ("**GMRA**") for

the appointment of a retirees committee (the "**Retirees Committee**") pursuant to section 1114(d)

of title 11, United States Code (the "**Bankruptcy Code**"), dated June 23, 2009 (the "**Reply**")

[Docket No. 263], respectfully represent:

### The Issue of Vesting Of Salaried Retiree Benefits Has Been Judicially Decided And Is Applicable To The GMRA Motion

1.      The GMRA Reply recognizes that its motion for the appointment of a

Retirees Committee must fail if GM possesses the contractual right to amend or terminate the

Salaried OPEB Plans.[1]  Accordingly, the GMRA Reply attempts to establish that salaried retirees

hold vested benefits that cannot be changed under the Employee Retirement Income Security Act

of 1974, as amended, 29 U.S.C. §§1001 *et seq.* ("**ERISA**") and, therefore, are subject to section

1114 of the Bankruptcy Code.  The argument posited by GMRA is that the *en banc* decision of

the United States Court of Appeals for the Sixth Circuit in *Sprague v. General Motors Corp.,*

133 F.3d 388 (6th Cir. 1998) is inapposite and irrelevant to the GMRA Motion because the

chapter 11 cases are pending in the Second Circuit.  The attempt by GMRA to circumvent

*Sprague* should be rejected.

2.      *Sprague* is directly on point.  In that case, a purported class action was

brought against GM by retired salaried employees alleging, "that GM violated [ERISA] by

denying them 'paid-up' lifetime health care benefits."  133 F.3d at 388.  In connection with

---

[1] Capitalized terms have the same definitions as set forth in the Debtors' response to the GMRA Motion.

*Sprague*, the United States District Court for the Eastern District of Michigan had certified as a class approximately 50,000 employees of GM who had taken early retirement and declined to grant class status to approximately 34,000 "general retirees" who had retired in accordance with GM's normal criteria.  As to the general retirees, the District Court held that under the pertinent plan documents, none of the retiree benefits vested.  In respect of the early retirees, the District Court had ruled that GM was estopped to rely on the terms of the plan documents to defeat the claims of any early retirees because of certain individual arrangements incidental to early retirement.

3.    On appeal, an eight judge majority of the Sixth Circuit affirmed the judgment of the District Court as to the general retirees.  In respect of the early retirees as pertinent to the GMRA Motion, the Sixth Circuit, on the merits, concluded that the claims of salaried retirees that their benefits were vested under the Salaried OPEB Plans failed as a matter of law.

4.    The Sixth Circuit described the retirees' complaint in *Sprague* as follows:

> The main thrust of the plaintiff's complaint was the GM had bound itself to provide salaried retirees and their spouses basic health coverage for <u>life</u>, entirely at GM's expense.

(emphasis added).  133 F.3d at 395.  The plaintiff retirees asserted that the right to lifetime coverage vested upon retirement and could never be changed or revoked.  The position taken in *Sprague* is precisely identical to that which is asserted by the salaried retirees in this Court.

5.    The Sixth Circuit noted that the plaintiff retirees', "first theory of recovery is that GM committed a breach of the terms of the plan documents when it implemented the changes in 1988."  In dealing with that theory of recovery, the Sixth Circuit noted that welfare

plans such as the Salaried OPEB Plans are specifically exempted from vesting requirements to

which pension plans are subject under ERISA.  Accordingly, employers such as GM, "are

generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare

plans." *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 1228, 131

L.Ed.2d 94 (1995) (citing *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert.*

*denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990)).  The Sixth Circuit recognized that

once benefits are vested, it renders them forever unalterable.  Therefore, it is stated:

> Because vesting of welfare plan benefits is not required by
> law, an employer's commitment to vest such benefits is not
> to be inferred lightly; the intent to vest "must be found in
> the plan documents and must be stated in clear and express
> language."

*Sprague,* 133 F.3d at 400.  Thus, it is the plaintiff's burden to prove that GM intended to vest

benefits on salaried retirees.

6.    The Sixth Circuit reviewed the salaried retirees' benefits plan.  It found:

> Most of the summary plan descriptions unambiguously
> reserved GM's right to amend or terminate the plan.  For
> example:
>
> > General Motors Corporation reserves the right to
> > amend, change or terminate the Plans and Programs
> > described in this booklet."  Your GM Benefits
> > (1984)
> >
> > The Corporation reserves the right to amend,
> > modify, suspend or terminate the Program in whole
> > or in part, at any time, by action of its Board of
> > Directors.  Your Benefits in Retirement (1985).

*Id.* at 401.

7.    The retiree plaintiffs attempted to counter the above statement by arguing

that the plan summaries distributed by GM also stated that the retirees health care coverage

would be paid "at no cost to" them and "for [their] lifetime[s]." In exactly the same fashion as the arguments posed by GMRA in the motion at bar, the retiree plaintiffs argued that the "lifetime" language created an ambiguity that had to be resolved by extrinsic evidence.

8.      The Sixth Circuit considered the argument made by the retiree plaintiffs and stated:

> We have rejected this argument in the past, and we reject it again now. We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.

9.      The Sixth Circuit also determined that, "the failure [on the part of GM] to allude to [the] power [to amend or terminate] in some of the booklets did not prejudice GM's right, clearly stated in the plan itself, to change the plan terms." *Id*. The Sixth Circuit went on to state:

> GM's failure to include in some summaries a notice of its right to change the plan does not trump the clearly-stated right to so do in the plan itself.

*Id*. Indeed, the Sixth Circuit noted that GM was not required to disclose in the summary plan descriptions that the retiree plaintiffs' benefits were not vested. *Id*. The fact that GM did not tell retirees at every possible opportunity that the terms of the retirees' benefit plan was subject to change did not result in an eradication of GM's right to amend or terminate the plan and did not vest the retirees

10.     The holding of the Sixth Circuit is on all fours. It is clearly binding on the 114 salaried retirees that initiated the *Sprague* case. Likewise, it is binding on all salaried retirees because the issues presented by GMRA are virtually identical to those determined by the

Sixth Circuit.  In those situations in which an entity who was not a party to the first action, or in privity with a party to the first action, nevertheless, will be bound by the decision in the first action, if the party to the first action, "was an adequate representative of the other's interests." *Colby v. JCPenney Co., Inc.,* 811 F.2d 1119, 1124 (7th Cir. 1987).  Thus, a person is bound by a prior judgment as the parties to the first action were so closely aligned with the interests of the non-party so as to be the non-party's virtual representative.  *Chase Manhattan Bank N.A. v. Celotex Corp., et al.,* 56 F.3d 343, 345-6 (2nd. Cir. 1995); *Aerojet – General Corp. v. Askew*, 511 F.2d 719 (5th Cir.), *cert. denied*, 423 U.S. 908 (1975).

11.     The interests of the salaried retirees who prosecuted the *Sprague* case and the interests of GMRA retirees are identical.  The issues presented in *Sprague* are the same as presented by the motion at bar.  The *Sprague* retiree plaintiffs were the virtual representatives of the GMRA salaried retirees.  Under the doctrine of virtual representation, as enunciated in *Chase Manhattan Bank N.A. v. Celotex Corp., supra,* the *en banc* decision of the Sixth Circuit in *Sprague* is binding on the GMRA salaried retirees.  Accordingly, section 1114 of the Bankruptcy Code is not applicable to GM and, hence, the appointment of a Retiree Committee under section 1114(d) is inappropriate.

### GM, In the Exercise Of Its Contractual Right, Has Unilaterally Amended and Changed The Salaried OPEB Plans In The Regular Course of Business Since The *Sprague* Decision

12.     Since 2002 through 2008, Salaried OPEB Plans have been unilaterally amended by GM to increase retirees cost sharing of benefits, i.e., monthly contributions, deductibles, co-pays and co-insurance.  The cost sharing on the part of salaried retirees rose from 24% in 2002 to 41% in 2008.  In particular, the cost increases as a result of the amendments made by GM through 2008 were:

2002--24%
2003--29%
2004--28%
2005--32%
2006--36%
2007--38%
2008--41%

Further, effective January 1, 2009, such health care benefits applied solely to salaried retirees

who are pre-age 65.  Salaried retirement health care benefits were cancelled for salaried retirees

age 65 and older effective January 1, 2009.  As noted in GM's response in connection with that

amendment of the Salaried OPEB Plans, most of such retirees and their surviving spouses

receive a $300 monthly pension benefit.

13.     Since 2002, other terms and conditions of the Salaried OPEB Plans have

changed.  In general, the cost to retirees for much of the coverage under the Salaried OPEB Plans

increased throughout the decade.  These amendments made by GM include the following:

a.  From 2002 to 2008 the health care retiree benefits applied to all salaried
    retirees, but since 2009, these benefits applied solely to salaried retirees who
    are pre-age 65;

b.  Since 2009 salaried retiree health care was cancelled for participants age 65
    and older.  Most of these applicable retirees and their surviving spouses
    receive a $300 monthly pension benefit;

c.  Since 2002 various terms and conditions of the Health Care Program have
    changed.  In general, the costs to retirees for most of the coverages in this
    Program have increased throughout the decade.  These include the following:

    - **2002**:  Deductibles for Preferred Provider Organizations ("**PPOs**")
      were added for the first time at $300/$600 for an individual and
      family, Health Maintenance Organizations ("**HMOs**") adopted a two-
      tier prescription drug co-pay of $5 generic/$10 brand;

    - **2003**: Retiree and surviving spouse contributions to the Program
      were adjusted to the active salaried employee levels, a vision care
      monthly contribution was added, HMO Plans increased their cost-
      sharing;

    - **2004**: Three-tier prescription co-payment was instituted;

- **2005**:  Deductibles and plan maximums changed in the program; prescription drug co-pays increased for non-preferred brand name drugs;  HMO co-pays increased;

- **2006**: various medical plans were eliminated or consolidated; HMO co-pays increased; Prescription drug co-pay increased; Dental plan contributions increased;

- **2007**: Enhanced PPO deductibles increased, dental coverages changed to restrict some coverages, HMO co-pays increased and added an out-of-pocket maximum; some prescription drug coverages became more restricted; and retiree and surviving spouse coverage changed with the introduction of the Retiree Health Care Cap which defined the amount that GM would spend in the future toward the cost of retiree healthcare.  The cap was set at the average amounts spent in 2006 and going forward, whenever average annual costs exceed the cap, cost-shifting changes are put into effect for retirees to maintain GM costs at capped levels;

- **2008**: Enhanced PPO deductibles and out-of-pocket maximums increased, Health Savings Account ("**HSA**") PPO deductibles and out-of-pocket maximums increased; prescription drug coverage was made more expensive; retiree and surviving spouse coverage costs were increased for prescription drugs, HMO co-pays and out-of-pocket maximums increased;

- **2009**: Dependent eligibility decreased from age 25 to age 24; dental and vision monthly contributions increased; dental cost share increased; HMOs increased the prescription drug co-pays; prescription drug coverage in general increased its co-pays; health care coverage for retirees age 65 and older is eliminated; most of these retirees and surviving spouses receive a $300 monthly pension benefit.

d.  Since the cost increases in the Health Care Program from 2002 to the present and all the significant changes to the terms and conditions of the Health Care Program since then, which have restricted coverages or made coverages more expensive.

Other than the statements made in the GMRA Motion, over the past decade, to the best of the knowledge of GM, not a single salaried retiree filed an action against GM to challenge such changes and cost increases as a violation of ERISA or an unlawful amendment of purported vested benefits.  Accordingly, the salaried retirees are collaterally estopped and have waived any right to challenge GM's contractual right to amend or terminate the Salaried OPEB Plans.

14.     The exhibits attached to the declaration of Neil A. Gotenier as part of the

GMRA reply are excerpts of plan summaries, etc., all of which antedate the *Sprague* decision.

As set forth above, extensive substantive and material amendments and changes were made to

the Salaried OPEB Plans subsequent to *Sprague*.  The reply exhibits do not in any way diminish

or dilute the decision in *Sprague*.  The eight judge majority decision constitutes the applicable

law and not the views expressed in the dissenting opinions.

15.     GM has repeatedly advised salaried retirees of its right to amend or

terminate.  The first section of the plan document summary of the Health Care Program, dated

January 1, 2001, states:

> The Corporation reserves the right to amend, modify,
> suspend or terminate the Program in whole or in part, at
> any time, by action of its Board of Directors or other
> committee expressly authorized by the Board to take such
> action.  No enrollee described in this Program may be
> deemed to have any vested right to continued coverage
> under any or all of the provisions of the Program.

16.     The Summary Plan Description of the Health Care Program, as set forth in

the benefits handbook for salaried retirees states:

> General Motors Corporation reserves the right to amend,
> change, or terminate the Plans and Programs described in
> this booklet.  The Plans and Programs can be amended only
> in writing by an appropriate committee or individual as
> expressly authorized by the Board of Directors.  No other
> oral or written statements can change the terms of a benefit
> Plan or Program.

It is the same reservation of rights language as appears in the plan document for the Health Care

Program.

17.     GMRA contends that on the same facts as presented to the *Sprague* court,

this Court should determine that GM did not reserve and retain the right to amend or terminate

salaried retiree benefits.  In other words, this Court should be oblivious to the obvious, i.e., and

disregard the extensive *en banc* analysis by the Sixth Circuit that has been followed by a decade

of unilateral changes made by GM to the Salaried OPEB Plans without a single formal objection

by any salaried retiree.  *Sprague* cannot be ignored under applicable principles of law.  The

efforts of GMRA to circumvent *Sprague* because GM's chapter 11 case is pending in the

Southern District of New York should be rejected.  That GMRA asks this Court to construe the

precise language that was considered in *Sprague* and litigated by salaried retirees with the

identical interests as the GMRA retirees in a manner different than what was decided in *Sprague*

is plainly wrong.  It is inconsistent with efficient judicial administration.  The *Sprague* case

carefully analyzed the precise same language presented by the Gotenier Declaration and

concluded that it did not vest benefits in GM's salaried retirees.  The conduct of GM in making

substantive and significant changes in the Salaried OPEB Plans during the last decade and the

acquiescence of salaried retirees to such amendments is consistent with and is an

acknowledgement of the decision of the Sixth Circuit that GM retained its right to amend,

modify or terminate the Salaried OPEB Plans.  Moreover, as Judge Drain recently noted in his

Modified Bench Ruling on Debtors' Salaried OPEB Termination Motion in the chapter 11 case

of *Delphi Corporation*, et al. Case No. 05-44481 (RDD), March 10, 2009, "the law in the Second

Circuit, although it may differ somewhat from the Sixth Circuit, is still very restrictive when

considering whether to give beneficiaries of welfare plans rights that are not set forth by a clear,

affirmative promise in the plan documents, or through, for example, a theory of promissory

estoppel." *See Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55 (2d. Cir. 2006), *Warren*

*Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 2008 U.S. Dist. LEXIS 101780 (S.D.N.Y.

Dec. 9, 2008), *Eagan v. Marsh & McLennan Cos., Inc.*, 2008 U.S. Dist. LEXIS 6647 (S.D.N.Y.

Jan. 29, 2008).  A copy of the Modified Bench Ruling is attached.  Consistent with the applicable

principles of law, *Sprague* is the governing decision applicable to GMRA.

18.    The Debtors' chapter 11 cases have not yet come to the stage of chapter 11

plan negotiations.  Assuming the approval and consummation of the proposed sale of

substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, it is

contemplated that the Debtors will propose a plan of liquidation of their assets.  Any negotiations

in connection with such a plan will not occur in the immediate future.  There is no urgency, at

this juncture, for the appointment of a Retirees Committee.  Moreover, to the extent that salaried

retirees have an interest in the administration of the chapter 11 cases, they are ably represented

by their attorneys and may participate in the chapter 11 cases to the extent they deem it

appropriate.  Their right to do so is clearly established by section 1109 of the Bankruptcy Code.

To the extent that they make a substantial contribution, their professionals may be compensated

under section 503(b) of the Bankruptcy Code.

## Conclusion

19.    The *Sprague* decision that resulted from litigation prosecuted by GM

salaried retirees arguing the identical arguments as presented by GMRA, and the subsequent

uncontested conduct of GM in amending and modifying the Salaried OPEB Plans, establishes

clearly and unambiguously that GM reserved and retained the right to amend, modify or

terminate Salaried OPEB Plans.  GM's salaried retirees do not possess vested benefits under

such Plans.  Under the applicable judicial principles, the *Sprague* decision is binding upon the

GMRA salaried retirees.  The facts and circumstances, and the Sixth Circuit decision concerning

Salaried OPEB Plans, cannot be denied.  In the circumstances, section 1114 of the Bankruptcy

Code does not apply to the GMRA salaried retirees.  Consequently, there is no basis for the

appointment of a Retirees Committee under section 1114(d).  The motion of GMRA should be

denied.

Dated: New York, New York
       June 24, 2009

/s/ Harvey R. Miller
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - -  x
                                   :
3                In re             : Chapter 11
4                                  :
5  DELPHI CORPORATION, <u>et al.,</u>  : Case No. 05-44481 (RDD)
6                                  :
7                                  :
                                   : (Jointly Administered)
8  Debtors.                        :
9                                  :
   - - - - - - - - - - - - - - -  x
10

11        **MODIFIED BENCH RULING ON DEBTORS' SALARIED**
              **OPEB TERMINATION MOTION**
12

13  THE COURT:  I have before me a motion by the debtors in this

14  case for authority under Section 363(b) of the Bankruptcy Code

15  to modify, in various significant measures, what they refer to

16  as "OPEB" but what also can be described as welfare plans,

17  including health and insurance plans, under ERISA.  The debtors

18  take the position that notwithstanding that the subject matter

19  of these plans involves reimbursing or providing for the

20  reimbursement of "payments for retired employees and their

21  spouses and dependants, for medical, surgical or hospital care

22  benefits, or benefits in the event of sickness, accident,

23  disability or death," that their request need not, and in fact

24  should not, be governed by Section 1114 of the Bankruptcy Code.

25  The language I was quoting appears in Section 1114(a), which

1   defines, for purposes of Section 1114, the term "retiree

2   benefits."

3   Bankruptcy Code Section 1114(e) provides that

4   "notwithstanding any other provision of this title, the debtor

5   in possession . . . shall timely pay and shall not modify any

6   retiree benefits," except (as provided in Section

7   1114(e)(1)(A)) under Sections 1114(g) or (h) of the Bankruptcy

8   Code or, alternatively, if the debtor in possession and the

9   authorized representative of the recipients of those benefits

10   have agreed to the modification of such payments.  11 U.S.C. §

11   1114(e).

12   The debtors contend that Section 1114's regime does

13   not apply to the present request because the various welfare

14   plans are, under the terms of the plan documents themselves,

15   modifiable at will.  That is, the debtors contend that Section

16   1114 applies only to vested retiree benefits, or such benefits

17   that can be modified only by operation of the Bankruptcy Code,

18   such as rejection under Bankruptcy Code Section 365, and does

19   not otherwise alter the debtors' pre-bankruptcy rights or

20   agreements, including the right under applicable non-bankruptcy

21   law to modify or terminate such plans at will.  To preclude

22   such a modification, therefore, would itself modify the plans.

23   The debtors have approximately 15,000 present and

24   former employees who would be affected by this motion, many of

25   whom would clearly be affected in very dire ways.  The debtors

1    provided notice of the motion by actually sending a copy of it

2    to all of these individuals, and, under the Court's case

3    management order, that notice was sufficient, although it fell

4    within the bare minimum of the twenty days set forth in

5    Bankruptcy Rule 2002(a)(2).

6         The motion was objected to by approximately 1,600

7    individuals.  There have been, in addition, many slightly

8    untimely objections.  Most of those objections were by

9    unrepresented individuals.  However, some individuals or groups

10   of individuals have retained quite able counsel to represent

11   them, and I have considered their objections at length, both as

12   submitted in writing and made orally at this hearing.

13        The objectors essentially make two points.  First,

14   they contend that under the plain language of Section 1114, as

15   well as principles of statutory construction, the debtor's

16   interpretation of what constitutes a retiree benefit that is

17   required to be dealt with under Section 1114 is wrong and that,

18   instead, Congress, in Sections 1114(a) and (e), overrode the

19   pre-petition contracts between companies such as Delphi and the

20   beneficiaries of health and welfare plans and required that,

21   before those contracts could be modified -- notwithstanding the

22   language in those contracts permitting modification at will --

23   during the course of a Chapter 11 case (at least prior to the

24   effective date of a Chapter 11 plan), the debtor must go

25   through the process set forth in Section 1114 to meet the

1   requirements of either Section 1114(g), for emergency interim

2   relief, or Section 1114(h), for permanent relief.

3        They also contend, as a factual matter, that the

4   debtors' assertion that the OPEB benefits are modifiable at

5   will is incorrect.  Thus, they argue, even if the debtors'

6   interpretation of Section 1114 is right, the debtors' motion

7   should be denied because, in fact, the debtors do not have the

8   right to modify these benefits unilaterally under applicable

9   non-bankruptcy law.  They also argue that even if the current

10  factual record has not identified any retirees with vested

11  future benefits, the possibility that such retirees may exist

12  should preclude granting the debtors' motion.

13       As noted during oral argument, the first issue is an

14  issue that has long been identified by courts and commentators,

15  and one, as the parties have pointed out, where there is

16  conflicting authority.  The leading commentator on bankruptcy

17  law, Collier on Bankruptcy, analyzes this issue at some length

18  in 7 Collier on Bankruptcy, ¶¶ 1114.03[1] and [2] (15th ed.

19  2008) at 1114-15-20.  Citing the applicable case law, and to

20  the extent there is meaningful commentary, most of the

21  commentary, as well, Collier reaches the conclusion, in accord

22  with the majority of the courts that have addressed the issue,

23  that a debtor in possession need not comply with the procedures

24  and requirements of Section 1114 if it has the right to

25  terminate or modify benefits unilaterally under the welfare

1    plan in question and applicable non-bankruptcy law: "The

2    section applies only to benefits that have been previously

3    promised by the debtor; it does not create any new obligations

4    on the trustee or debtor in possession." Id. at 1114-16.

5    (Collier notes, however, the conflicting authority and

6    potentially conflicting arguments. Id. at 1114-18.)

7         The starting point for my analysis is the language of

8    the statute, and that is my ending point, as well, if the

9    provision's meaning is unambiguous and does not lead to a

10   clearly unintended or absurd result. In re Ron Pair Enters.,

11   489 U.S. 235, 242 (1989). But I conclude, particularly in

12   light of two fundamental principles underlying the Bankruptcy

13   Code, as well as my review of the statute, that the provision's

14   language does not compel the interpretation given by the

15   objectors.

16        Again, that interpretation is that Section 1114

17   creates a federal law overriding pre-petition contractual

18   rights of the debtors that would permit them to modify or

19   terminate retiree health and welfare benefits during the course

20   of a Chapter 11 case. Frankly, I cannot think of another

21   provision of the Bankruptcy Code that would create such a

22   federal right improving on the prepetition contractual rights

23   of a third-party constituent as a result of the filing of a

24   bankruptcy case.

25        Perhaps the closest analogy (other than Section

1    1114(1), which is discussed later) would be Bankruptcy Code

2    Section 546(b), which permits creditors to continue to perfect

3    certain interests for a limited period post-bankruptcy; but

4    even that extension is premised on preserving existing pre-

5    bankruptcy rights that were interrupted by the bankruptcy case.

6    Congress also arguably enacted such a provision when it amended

7    Section 546(c) under the 2005 amendments of the Code, in

8    BAPCPA.  Pub. L. No. 109-8, 119 Stat. 23.  However, that

9    provision, which refers to a forty-five day reclamation right,

10   has been interpreted by the majority of courts, I think

11   correctly, as not creating a federal right that improves upon

12   creditors' substantive rights under applicable non-bankruptcy

13   law.  As Judge Lifland stated in the Dana case, reading the

14   amendment to Section 546(c) to have imposed a substantial

15   change to an established pre-bankruptcy right would violate a

16   fundamental tenet of the Bankruptcy Code in that it would

17   enhance the substantive non-bankruptcy rights of one set of

18   creditors at the inevitable expense of other creditors simply

19   because a bankruptcy petition has been filed.  See In re Dana

20   Corp., 367 B.R. 409, 418 (Bankr. S.D.N.Y. 2007), which cites,

21   among other cases, Butner v. United States, 440 U.S. 48 (1979),

22   for the basic proposition that property interests in bankruptcy

23   cases are defined by state law or otherwise applicable non-

24   bankruptcy law unless some federal bankruptcy interest requires

25   a different result in recognition that prepetition contract

1   rights and property interests should not be analyzed

2   differently or enhanced simply because an interested party is

3   involved in a bankruptcy case.

4        Although it has not otherwise re-written prepetition

5   contracts to add rights against debtors, Congress has given

6   certain prepetition claims priority (for example domestic

7   support obligations and certain employee and benefit plan

8   claims, in Bankruptcy Code Sections 507(a)(1) and 507(a)(4)-

9   (5), respectively).  But, in considering claims to be accorded

10  priority treatment in bankruptcy, courts have consistently

11  relied on a second, related fundamental bankruptcy principle

12  against which the objectors' interpretation of Section 1114

13  also collides.  That is, as the Second Circuit recently

14  reiterated in In re Bethlehem Steel Corp., 479 F.3d 167, 172

15  (2d Cir. 2007), given the debtor's limited resources are

16  presumptively to be equally distributed in bankruptcy cases

17  among creditors, statutory priorities must be narrowly

18  construed.  This is because bankruptcy is ultimately a zero sum

19  game: whatever is added as a priority to one constituent's

20  claim comes out of the other similarly situated constituents'

21  pockets.  Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.,

22  547 U.S. 651, 667 (2006).

23       I believe that Congress is fully aware of these

24  fundamental principles when it amends the Bankruptcy Code, and,

25  accordingly, that when Congress amended Section 1114 it was not

- 8 -

1    writing on a clean slate.  Dewsnup v. Timm, 502 U.S. 410, 419

2    (1992).  Thus, one must be reluctant to accept arguments that

3    would interpret Section 1114 to effect a major change in pre-

4    Code practice if that change was not the subject of at least

5    some discussion in the legislative history.  Id.

6          Everyone understands the origin of Section 1114.  It

7    grew out of the suspension of health and welfare benefits by

8    LTV Corporation, after it filed its bankruptcy case, in the

9    belief that it had the duty to do so because Section 1113 of

10    the Bankruptcy Code didn't apply, and, therefore, it need not

11    pay benefits under such prepetition agreements unless they were

12    assumed under Section 365 of the Code.  That is, Bankruptcy

13    Code Section 1113 had been enacted to make the rejection of

14    collective bargaining agreements more difficult, but there was

15    no similar limitation on rejecting retiree benefits.  See

16    generally 7 Collier on Bankruptcy ¶ 1114.01[3], at 1114-11-12.

17          Congress reacted to LTV's decision by drafting what

18    eventually became Section 1114.  Id.  But, as was made clear

19    over seventeen years ago, the issue of whether Congress went

20    beyond precluding a debtor to cease performing its welfare and

21    benefit agreements without going through the process delineated

22    in Section 1114 to actually precluding a debtor from exercising

23    the non-bankruptcy law rights to modify or terminate those

24    agreements was viewed as open under the statute.  See In re

25    Ionosphere Clubs, 134 B.R. 515, 517 (Bankr. S.D.N.Y. 1991)

1   ("[Section 1114] has spawned diverse and sometimes inconsistent

2   interpretations and theories as to the substantive and

3   procedural standards necessary for modification of retiree

4   benefits.  Expressed colloquially, these interpretations are

5   all over the lot.").

6        In re Doskocil Cos., Inc., 130 B.R. 870 (Bankr. D.

7   Kan. 1991), first addressed the issue directly and concluded

8   that Section 1114 does not apply to modifications to retiree

9   benefits that the debtor has the right to modify or terminate

10  at will under applicable non-bankruptcy law.  Id. at 877.

11  Doskocil relied heavily, however, although not entirely, on In

12  re Chateaugay Corp., 945 F.2d 1205 (2d Cir. 1991), cert denied

13  502 U.S. 1093 (1992).  Chateaugay involves, as the objectors

14  point out, the issue raised by a modifiable agreement, but an

15  agreement that, post-bankruptcy, terminated by its terms.

16  However, the Second Circuit's analysis, consistent with Butner,

17  focused on the pre-petition non-bankruptcy law rights of the

18  parties and did not envision, except in the dissent, that

19  Congress created a new federal right under the predecessor of

20  Section 1114 (which for all intents and purposes, I view as

21  equivalent to Section 1114 on this issue) that effectively

22  froze the debtor's retiree obligations as of the petition date

23  regardless of the debtor's prepetition contract rights.  In re

24  Chateaugay Corp., 945 F.3d at 1208-09.

25       Doskocil has been cited favorably by a number of

1    courts, perhaps the most on point being the District Court of

2    New Jersey in In re New Valley Corp., 1993 U.S. Dist. LEXIS

3    21420 (D. N.J. Jan. 28, 1993). See also In re North Am.

4    Royalties, Inc., 276 B.R. 860, 866 (Bankr. E.D. Tenn. 2002)

5    ("Section 1114 . . . says nothing about whether the debtor can

6    exercise a power reserved in the contract to terminate it and

7    thereby end any obligation for retiree benefits as defined in §

8    1114(a). Despite § 1114, the debtor can terminate the contract

9    as allowed by the terms."); In re CF&I Fabricators of Utah,

10   Inc., 163 B.R. 858, 574 (Bankr. D. Utah 1994) ("The Bankruptcy

11   Code does not create new rights upon filing bankruptcy that

12   were not in existence prior to filing."), appeal dismissed, 169

13   B.R. 984 (D. Utah 1994); In re Lykes Bros. Steamship Co., Inc.,

14   233 B.R. 497, 517 (Bankr. M.D. Fla. 1997) (retiree benefits

15   were terminable at will and effectively terminated during the

16   chapter 11 case without requirement to comply with Section

17   1114).

18        Doskocil was, however, rejected by the analysis of

19   the Bankruptcy Court for the Western District of Missouri in In

20   re Farmland Indus., 294 B.R. 903 (Bankr. W.D. Mo. 2003). An

21   unpublished opinion in the Ames Dep't Stores case by Bankruptcy

22   Judge Conrad also took the view that Section 1114 appears to

23   apply to contractually modifiable benefits, as did the District

24   Court in that case. In re Ames Dep't Stores, Inc., 1992 U.S.

25   Dist. LEXIS 18275 (S.D.N.Y. Nov. 30, 1992), vacated on other

1    grounds, 76 F.3d 66 (2d Cir. 1996).  However, in the context of

2    a ruling on a fee application related to that dispute in the

3    Ames case, the Second Circuit noted in dicta that both of those

4    decisions were made without any reference to any of the case

5    law or analysis that I have just summarized; and, while the

6    Second Circuit did not rule how it would come out on the

7    interpretation of Section 1114's applicability to unvested,

8    modifiable-at-will rights, it noted favorably the numerous

9    authorities supporting the debtors' position.  In re Ames Dep't

10   Stores, 76 F.3d at 71.  In addition, Bankruptcy Judge Conrad,

11   himself, in In re Drexel Burnham Inc., 138 B.R. 723 (Bankr.

12   S.D.N.Y. 1992), favorably cited both Doskocil and Chateauguay

13   when approving confirmation of a chapter 11 plan that permitted

14   the modification of retiree plan benefits at will consistent

15   with the debtor's pre-petition plan documents.  Id. at 763.

16          The objectors have pointed out that Judge Conrad's

17   ruling, which appears to reflect an about-face from his

18   unreported ruling in Ames, is properly viewed as being under

19   Bankruptcy Code Section 1129(a)(13), not section 1114, and that

20   Section 1129(a)(13) can be read to say that no matter how

21   Section 1114 applies to OPEB benefits arising before the

22   effective date of a chapter 11 plan, a chapter 11 plan itself

23   need only preserve such benefits as they exist in that welfare

24   plan and go no further.  Thus, if those benefits are modifiable

25   or terminable at will, the objectors concede that Section

1    1129(a)(13) will not enhance the rights of plan beneficiaries

2    to preclude such modification or termination.  That is, I

3    think, the correct interpretation.

4         Whether this interpretation of Section 1129(a)(13)

5    supports the objectors' position on Section 1114, however, is

6    another matter.  Contrary to their interpretation of Section

7    1114, it strikes me as odd that Section 1114 would give broader

8    rights to the beneficiaries of welfare plans for the limited

9    postpetition pre-confirmation period than, as the objectors

10   concede, Section 1123(a)(13) does for the much more significant

11   period after the chapter 11 plan goes effective -- the chapter

12   11 plan being the primary focus of chapter 11 negotiations.  I

13   would rather harmonize the two provisions, that is, Sections

14   1129(a)(13) and 1114, by taking the view that each recognizes

15   that the debtor's obligations under retiree benefit plans that

16   are modifiable at will are qualified by a right under non-

17   bankruptcy law to modify or terminate.  See In re N. Am.

18   Royalties, Inc., 276 B.R. at 867, in which the court noted that

19   if Sections 1114 and 1129(a)(13) prevent termination as allowed

20   by the contract, Congress created a system for chapter 11

21   debtors that it did not impose outside of chapter 11 under

22   ERISA, a system, moreover, that would provide better treatment

23   for such benefits than pension benefits under a collective

24   bargaining agreement.  "Congress could have intended these

25   unusual results, but the court will not attribute that intent

1   to Congress without convincing evidence, which does not exist.

2   Instead, the court understands that § 1114 and § 1129(a)(13)

3   were enacted against the background of ERISA, which allows a

4   contract for retiree welfare benefits to provide the employer

5   the right to terminate." Id. (It should be noted that the one

6   case that specifically rejected the Doskocil approach,

7   apparently interpreted Section 1129(a)(13), contrary to Drexel

8   and other cases taking the same position (see In re Lykes Bros.

9   Steamship Co., Inc., 233 B.R. at 517; In re Federated Dep't

10  Stores, Inc., 132 B.R. 572, 575 (Bankr. S.D. Ohio 1991)), as

11  precluding post-effective date modification. In re Farmland

12  Indus., 294 B.R. at 917-18; see also In re Ormet Corp., 355

13  B.R. 37, 43 (S.D. Ohio 2006) ("Section 1129 simply requires

14  that a plan provide for the same level of retiree benefits that

15  § 1114 protects after the bankruptcy petition is filed." The

16  bankruptcy court had found Section 1129(a)(13) was satisfied

17  because it was modifiable at will, an issue that was not

18  appealed.))

19          The objectors also point to another provision of the

20  Bankruptcy Code, Section 1114(l), to support their view that at

21  least in this one area Congress intended to rewrite a debtor's

22  prepetition agreements in favor of a particular constituency

23  merely as a result of the filing of the bankruptcy petition.

24  Section 1114(l) was enacted in 2005 pursuant to the BAPCPA

25  amendments; it permits the court on the motion of a party in

1    interest and after notice and hearing to reinstate benefits

2    that were modified during the 180-day period preceding the

3    filing of the bankruptcy petition, unless the court finds that

4    the balance of the equities clearly favors such modification.

5    Thus, the objectors correctly argue, this provision does

6    represent an intrusion by Congress, contrary to the principle

7    set forth in Butner and the foregoing cases, into the parties'

8    prepetition contractual relations, one that is not, moreover,

9    like intrusions under Sections 547 and 544 and 548 of the Code,

10   which are for the benefit of the debtor's estate generally,

11   but, rather, is only for the benefit of a discrete group --

12   retirees under benefit plans.

13        Section 1114(l), however, does not specifically deal

14   with the issue of plans modifiable as of right and could

15   conceivably apply to pre-bankruptcy breaches by debtors in

16   financial distress of vested rights.  More importantly, even if

17   it does also apply to modifiable plans, I do not view Section

18   1114(l), which applies to a specific type of prepetition

19   action, as overruling Doskocil and the line of cases that

20   follow it, which apply to postpetition actions, nor does there

21   appear to me to be any legislative history or other policy

22   statement accompanying the 2005 amendment that would clearly

23   set forth Congress' intention generally in Section 1114(l) to

24   override, beyond its specific terms, the fundamental principle

25   that bankruptcy does not give new rights to individual parties

1   in interest or to cut back on the tenet set forth by the

2   Supreme Court in <u>Butner</u>.  I note in this regard that after

3   BAPCPA's enactment of Section 1114(l), a bill was introduced in

4   the House of Representatives that <u>would</u> have overturned the

5   <u>Doskocil</u> interpretation of Section 1114, but it was not

6   enacted.  See H.R. 3652, 110th Cong. § 9 (2007), which would

7   have added the following clause at the end of Section 1114(a):

8   ", whether or not the debtor asserts a right to unilaterally

9   modify such payments under such plan, fund or program."

10  Section 1114(l), then, can just as easily suggest that Congress

11  restricted special "vesting" under Section 1114 to the limited

12  circumstances set forth in the BAPCPA amendment, and, in a

13  broader sense, that Congress had actual knowledge of the

14  <u>Doskocil</u> majority rule when it enacted BAPCPA in 2005 and

15  failed to take action to alter the judiciary's interpretation

16  of and general adherence to it.

17        For those reasons I believe that the debtors'

18  interpretation of Section 1114 is the correct one, and that,

19  if, in fact, the debtors have the unilateral right to modify a

20  health or welfare plan, that modifiable plan is the plan that

21  is to be maintained under Section 1114(e), with the debtors'

22  pre-bankruptcy rights not being abrogated by the requirements

23  of Section 1114.

24        The second issue raised by the objectors is an

25  interesting issue to put in context, given the Second Circuit's

1    guidance in In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir.

2    1993), on the limited nature of summary proceedings, including

3    those under Section 363(b).  I believe, given the interplay

4    here of Section 363(b) with Section 1114, however, that before

5    a bankruptcy court should permit a debtor to modify or

6    terminate a health or welfare plan under Section 363(b) on the

7    theory that it has the right to do so under applicable non-

8    bankruptcy law, the debtor must make a significant showing that

9    it, in fact, has such a unilateral right and that the benefits

10   are not vested.

11          That is what the debtor has done here, however.

12   Given the benefit plan documents, including the summary plan

13   descriptions, or SPDs, and the absence of any evidence in this

14   record that would indicate that the debtors otherwise promised,

15   or the debtors' predecessors otherwise promised, to the

16   beneficiaries of those plans who are affected by this motion,

17   that, notwithstanding the language in the Delphi plan

18   documents, those plans are not modifiable at will.  The only

19   evidence that has been submitted to counter the language in the

20   Delphi plan documents (including the SPDs) pertains to the

21   plans of GM Corporation, the debtors' predecessor.  Those

22   documents, however, all predate the decision of the Sixth

23   Circuit in Sprague v. General Motors Corp., 133 F.3d, 388 (6th

24   Cir. 1998), which found GM's plan to be modifiable.  Given that

25   record, it appears to me that the debtors have very clearly

1    made the showing that they have the right to modify the plans

2    at will.

3            The objectors contend that since this Court sits in

4    the Second Circuit it should be bound by Second Circuit law on

5    this issue, and that under Second Circuit law, at least in some

6    respects pertaining to promises by a predecessor corporation

7    such as GM may be viewed differently from the holding of the

8    Court of Appeals in the Sixth Circuit's <u>Sprague</u> case.  No one

9    has briefed for me the choice of law issue and I've not

10   considered it at length, although I assume that general federal

11   law applies to what is ultimately a question under ERISA.  In

12   any event, I have two observations.  The first is that after

13   the issuance of the <u>Sprague</u> en banc opinion in January of 1998,

14   it would seem to me that any subsequent employee of Delphi who

15   had been covered by a GM plan would clearly be on notice of the

16   <u>Sprague</u> decision and how to interpret the language that existed

17   in the GM plans prior to his or her transfer to Delphi, and

18   that that notice would be, I believe, clear that the types of

19   provisions that have been submitted to me, for example, in

20   Exhibit 80, would not suffice to create a vested benefit right.

21   The employees whose benefit rights were actually determined by

22   <u>Sprague</u> would, moreover, appear to be bound by that decision.

23           Secondly, as set forth I believe most recently by the

24   Second Circuit in <u>Bouboulis v. Transp. Workers Union of Am.</u>,

25   442 F.3d 55 (2d Cir. 2006), but also in a number of District

1    Court decisions that have come down since then, including

2    Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,

3    2008 U.S. Dist. LEXIS 101780 (S.D.N.Y. Dec. 9, 2008), and Eagan

4    v. Marsh & McLennan Cos., Inc., 2008 U.S. Dist. LEXIS 6647

5    (S.D.N.Y. Jan. 29, 2008), the law in the Second Circuit,

6    although it may differ somewhat from the Sixth Circuit, is

7    still very restrictive when considering whether to give

8    beneficiaries of welfare plans rights that are not set forth by

9    a clear, affirmative promise in the plan documents, or through,

10   for example, a theory of promissory estoppel.  See also

11   Robinson v. Sheet Metal Workers' Nat'l Pension Fund, 515 F.3d

12   93, 99 (2d Cir. 2008).

13        So again, on this record, it appears to me clear that

14   the debtors have met their factual burden, which I view as a

15   serious one, to take this motion outside of the ambit of

16   Section 1114.

17        I view the burden to be so serious (and also

18   recognize that the notice here, while sufficient as a legal

19   matter, was sufficient only to permit fairly recent involvement

20   by counsel in a fairly abstruse area to develop the record)

21   that I believe, however, that I should exercise my authority

22   under Section 1114(d) to appoint a committee of retirees to act

23   as a representative notwithstanding my belief that the debtors,

24   on the basis of this record, are not bound by the 1114 regime

25   generally.  I believe that it would be appropriate, given the

1    importance of the factual issues and the timing of this motion,

2    to give that committee a specific charge, which is to review

3    the factual record to determine whether, under the logic that

4    I've just set forth with regard to vesting under ERISA, and

5    notwithstanding the language in the plan documents, there is

6    any group of beneficiaries of these plans, any retirees, who

7    would have vested rights, notwithstanding the language of the

8    plan documents and notwithstanding the Court's conclusion that

9    following Sprague they were on notice as to the inefficacy of

10   the argument that the documents addressed in Sprague overrode

11   the ability of GM to terminate the benefits at will or to

12   modify them at will, to the extent that they were not actually

13   bound by the Sprague ruling.

14         I believe, given the very clear expertise and active,

15   although recent, involvement of the three counsel for objector

16   groups, and the great number of objectors, that the U.S.

17   Trustee can form such a committee out of the people who are

18   participating in the courtroom today and that the committee can

19   move promptly to conduct its analysis and meet and confer with

20   the debtors on whether, in fact, there would be, under my

21   logic, a retiree or retirees who would be covered by Section

22   1114.

23         I should make it clear that service as a

24   representative on this committee would not preclude any

25   individual party's right to appeal my ruling, so that, although

1   they would be fulfilling this task, they would not be deemed to

2   have agreed with the first part of my ruling, which is that

3   Section 1114 doesn't apply to this motion unless there is a

4   vested benefit.

5        The work of that committee on this point should be

6   done so that any argument that would be made to modify my

7   provisional ruling would be heard on Wednesday, March 11 at 10

8   o'clock.  And I'm assuming that would mean that some formal

9   pleading would be filed in the preceding week and that there

10  would be a dialogue with the debtors.  I take the debtors at

11  their word that if, in fact, retirees are identified who do

12  have vested benefits, they would go through a Section 1114

13  process with them.  And so I think there should be an ongoing

14  dialogue with the debtors on that point.

15       I also believe that this committee should be

16  authorized to at least explore with the debtors the cost and

17  ability to utilize the federal tax credit identified by one of

18  the objectors.

19       I have debated whether to set a finite budget for the

20  committee's actions or merely a budget that I believe would be

21  sufficient to get them to a position where they might convince

22  me of the merits of exceeding that budget in a subsequent fee

23  application.  I've decided to do the latter, and that the

24  budget, which I don't view as a license to spend but merely as

25  what I believe clearly would be sufficient for this task, would

1   be 200,000 dollars.

2            As far as the preliminary grant of the motion, having

3   dealt with what I believe are the two main legal issues, let me

4   ultimately deal with the standard that I believe emerges from

5   that analysis, which is whether the debtors have satisfied good

6   business judgment under Section 363(b) of the Bankruptcy Code

7   in modifying the OPEB programs as set forth in their motion.

8   See In re Orion Pictures, 4 F.3d at 1099; In re N. Am.

9   Royalties, 276 B.R. at 766.

10           It is crystal clear to me, on this record and my

11  understanding of the case, that, at this time, and for the

12  foreseeable future, the debtors are well within their business

13  judgment in assuming that they will need to eliminate the

14  projected OPEB liability, which is projected to be in excess of

15  1.1 billion dollars, from their balance sheet in order to

16  reorganize.

17           I also believe, on this record, that given the

18  debtors' serious need to conserve cash and all of the other

19  steps they have taken to do so, as detailed primarily in

20  Mr. Miller's declaration, as well as my knowledge of the

21  current funding of the debtors, that every dollar counts for

22  these debtors, and, therefore, that the savings of 1.5 million

23  dollars a week and projected cash savings of seventy million

24  dollars a year for the pre-plan period, the period prior to the

25  effective date of a reorganization plan, is also of extreme

1   importance to the debtors, and that actions taken by the

2   debtors to save such money, including by modifying these

3   benefits, are taken in good business judgment in light of the

4   rights, as I see them, of the retirees.

5        The debtors, I believe properly, did not take this

6   step for almost four years given their assessment of the

7   business realities of their operations, the inducement to

8   employees of having such benefit plans in place, and their

9   desire to maintain good relations with their retirees.  But

10  over the last two or three months their business, like the auto

11  business generally, has gone through such enormous adverse

12  changes that I recognize that such changed circumstances lead

13  them to make this decision now.

14       So I will enter an order granting the motion,

15  including permitting the debtors to take the initial steps to

16  implement it.  Those initial steps, as far as they consist of

17  giving notice to employees, should also note that there is this

18  procedure in place to determine if anyone is, in fact, vested.

19  And also the order will provide for an opportunity for a

20  hearing on March 11 to convince me, consistent with the

21  parameters that I've outlined in this ruling, that there are

22  individuals or groups of individuals who in fact may be

23  properly vested and therefore would be covered by Section 1114.

24       Given the time constraints here, I'm not going to

25  require the debtors to settle that order but I think you should

1   work it out first with the U.S. Trustee and then promptly

2   circulate it to the counsel who've been active in this hearing

3   and then submitted to court.   Thank you.

4

5   Dated: March 10, 2009
    New York, New York

6
                                   /s/ Robert D. Drain
7                                  U.S. Bankruptcy Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25