UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
In re                                           :    Chapter 11 Case No.
:
GENERAL MOTORS CORP., *et al.*,                 :    09-50026 (REG)
:
Debtors.                                        :    (Jointly Administered)
:
------------------------------------------------------------x

## SUPPLEMENTAL AFFIDAVIT OF FREDERICK A. HENDERSON
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF MICHIGAN    )
                     )    ss:
COUNTY OF WAYNE      )

Frederick A. Henderson, being duly sworn, hereby deposes and says:

1. I am the President, Chief Executive Officer and a Director of General Motors Corporation, a Delaware corporation ("GM" or the "Company"), which together with its affiliated debtors (collectively, the "Debtors"), are debtors in possession in the above-captioned chapter 11 cases.

2. The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code on June 1, 2009. Contemporaneously with the filing of those chapter 11 petitions, I submitted an affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local Rules to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of, among other things, the motion pursuant to Section 363 of the Bankruptcy Code (referred to in the Affidavit as the 363 Motion) to approve the sale of substantially all of the Debtors' assets to, and the assumption and assignment of certain executory contracts and unexpired leases of personal property and

nonresidential real property by, Vehicle Acquisition Holdings LLC (referred to in the Affidavit as the 363 Transaction).[1]

3. I submit this supplemental affidavit (the "Supplemental Affidavit") pursuant to Rule 1007-2 of the Local Rules to update the Court and other parties in interest on events that have occurred since the commencement of, and to provide further facts regarding, these chapter 11 cases -- events and facts which only underscore the exigencies of the current situation and the need for expeditious approval of the 363 Transaction and further refute any contrary suggestion in certain of the objections that have been submitted to the Court.

4. The 363 Motion was initiated because there simply was *no* viable alternative for preservation of the GM business and maximization of the Debtors' value other than by the implementation of the 363 Transaction. Following GM's well publicized chapter 11 filing and notice of rights to bid, the 363 Transaction remains the *only* option to ensure the survival of GM's business and save hundreds of thousands of jobs and countless suppliers and dealers that depend upon GM business throughout the automotive sector. Equally critical is the continuing need for prompt approval of the 363 Transaction. The need for speed has intensified, as the emergence of a New GM is a significant part of the effort to persuade and encourage consumers to purchase GM products. In addition, it is essential to alleviate the stress on GM's supplier and dealer network -- businesses that rely on GM, in some cases exclusively, for their financial viability. Many of these businesses have already commenced their own bankruptcy cases and many more will likely do so if the 363 Transaction is not promptly approved. In short, the pressure to obtain *prompt* approval of the 363 Transaction has not abated since June 1.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Affidavit, filed June 1, 2009 (Docket No. 21).

*The Liquidity Crisis of the Supplier Industry*
*<u>Continues to Worsen During These Chapter 11 Cases</u>*

5.  The fate of GM's suppliers is directly tied to the outcome of the proposed 363 Transaction. Many of GM's suppliers are already in the midst of a severe liquidity crisis, which has only been exacerbated by the current shutdown of certain GM production facilities for up to eleven weeks (referred to in the Affidavit as the Temporary Shutdown). Certain of these closed facilities are expected to resume operations by July 13, 2009 under the assumption that the 363 Transaction is promptly approved. If, however, New GM is not able promptly to commence operations, many of GM's suppliers will have further draconian reductions in revenue and no income, forcing the very real possibility of having to shut down their own respective operations -- perhaps permanently -- and thereby terminating thousands of jobs.

6.  The severe constraints facing suppliers were most recently demonstrated when, on June 9, 2009, the Motor & Equipment Manufacturers Association ("<u>MEMA</u>"), which represents motor vehicle parts suppliers -- the nation's largest manufacturing sector, employing some 686,000 people in the United States -- and the Original Equipment Suppliers Association ("<u>OESA</u>"), the original equipment market segment association of MEMA, submitted a formal plan to the U.S. Treasury requesting immediate emergency funding of $8 to $10 billion (largely in the form of loan guarantees) to stabilize the increasingly deteriorating condition of the country's supplier base. The submission cited both a continued lack of available credit and severely reduced production levels (including as a result of the GM and Chrysler chapter 11 cases) as reasons for the country's supplier industry being on the verge of collapse. Perhaps most telling, the submission indicated that 13 major U.S. direct suppliers and two additional indirect suppliers already had initiated bankruptcy cases or had their assets seized by creditors in 2009; and it predicted the same result for many more suppliers in the near term. Other press

reports indicate that up to 21 suppliers (including suppliers to GM) have filed for bankruptcy, including Visteon Corporation, Metaldyne Corporation and Noble International Ltd.

7. On June 17, 2009, the supplier industry's request for emergency funding was rejected. Accordingly, the threat to supplier viability continues to be real. Many have failed and many others are close to failing. Without prompt approval of the 363 Transaction and the renewal and ramp-up in production by New GM, the effect on certain GM suppliers may be fatal.

*Prompt Approval of the 363 Transaction Will Ensure That Thousands of Dealerships Remain in Business*

8. In the years leading up to these chapter 11 cases, GM's dealer network development group undertook significant efforts to enhance the competitiveness and profitability of the GM dealer network. Specifically, between 2004 and 2008, GM resources assisted in realigning, relocating, consolidating, and "un-dualing" (*i.e.*, removal of non-GM dealership operations from GM dealerships) hundreds of dealerships throughout the country.

9. Currently, as part of the 363 Transaction -- indeed, as had long been recognized in the "Viability Plans" that GM submitted to the U.S. Treasury -- a further restructuring or channeling of GM's dealer network is essential in order for New GM to be a viable company capable of surviving cyclical downturns. A leaner, more profitable dealer network with higher average sales throughput will reduce GM's costs -- primarily relating to support GM provides for information technology systems, dealer and sales incentives, field sales, service and training, service parts and advertising. This level of support currently costs GM roughly $1,000 per vehicle and GM estimates that the proposed dealership restructuring will result in substantial annual cost savings over time. While a restructuring of the dealer network will necessarily include a reduction in the number of GM dealerships, as set forth in the Affidavit, the 363 Transaction will allow the substantial majority of the current GM dealerships

to continue operations -- while providing a significant "wind-down" period for (rather than abrupt rejection of dealership agreements and the attendant shut-down of) discontinued dealers.

10.  Specifically, prior to the filing of these chapter 11 cases, GM's dealership network consisted of approximately 6,000 dealerships, representing the largest dealership network in the United States. As part of the dealership reduction integral to the 363 Transaction, New GM is expected to emerge with approximately 4,100 dealers. Each of these dealers has been offered, through a participation agreement, a modification of their current dealership agreement, as a result of which they will have the opportunity for increased throughput and profitability. This plan was reviewed with the National Automobile Dealers Association and the GM National Dealer Council. To date, 99.6% of the GM dealers that were offered a participation agreement have signed and returned such agreements. This acceptance rate reflects both the fairness of the proposal and the strong desire of the accepting dealers to support New GM. Consummation of the 363 Transaction and the implementation of the modified dealership agreements would permit New GM to continue to have the largest and most extensive dealer network in the country.

11.  Importantly, with regard to virtually all of the remaining dealers that will not be part of the New GM dealer network on a long term basis (the "Wind-Down Dealers"), GM is *not* simply rejecting and terminating these dealer agreements. Rather, GM has offered the Wind-Down Dealers the opportunity to accept "wind-down" agreements that will allow them to stay in business until October 2010 so that they can -- in an orderly fashion -- sell down their inventories and provide warranty service to customers with the continued support of GM. Under the wind-down agreements, dealers will receive rent and other sales support. To date, 98.8% of the subject dealers have executed the wind-down agreements. Although we recognize that the

forced closing of a business is always difficult, GM has attempted to address these situations in a fair and supportive manner, and we believe that the acceptance rate reflects the fairness of the program. In addition, under an appeal process set up by GM to reconsider dealer wind-downs, GM has decided to retain sixty-four (64) dealers formerly scheduled for wind-down.

### *Alternative Benefits Structure Offered to GM's Non-UAW Retirees*

12.    Subsequent to the commencement of these chapter 11 cases, an alternative benefits structure, commensurate with the retiree benefits offered to GM's salaried employees and in lieu of a claim for benefits against the Debtors' estates, was offered to unions other than the UAW on behalf of their member-retirees. To date, such offer has been accepted by a number of other unions, including the International Brotherhood of Electrical Workers (IBEW), the International Association of Machinists (IAM), Carpenters Local 687, Interior Systems Local 1045 and the International Brotherhood of Painters and Allied Trades of the United States and Canada, Sign and Display Union Local 591 (IBPA). In contrast, this offer has been declined by the IUE-CWA, the United Steelworkers (ISW) and the International Union of Operating Engineers (IUOE).

\*    \*    \*

13.    The facts remain immutable: the prompt approval of the 363 Transaction is the only alternative to the liquidation of the Debtors' assets and the attendant loss of hundreds of thousands of automotive related jobs. The consequences of the failure to expeditiously close the 363 Transaction would be extraordinarily harmful to the interests of all of GM's economic stakeholders, as well as the public interest. This is the only option that will preserve any value for the Debtors, their employees and the principal economic stakeholders of these chapter 11 cases.

The foregoing is true and correct to the best of my knowledge, information and belief.

*[signature]*

Frederick A. Henderson
President & Chief Executive Officer of
General Motors Corporation

Sworn to and subscribed before me, a notary public for the State of Michigan, County of Wayne, this 25 day of [6], 2009

*[signature]*
Notary Public

RENA D. MILLER
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Jul 21, 2010
ACTING IN COUNTY OF Wayne