June 19, 2009

ATTENTION LIZA,

I called earlier and was told I could not FAX, but when Leroy McKnight called me back he said you told him we could mail these today attention to you and they would be counted in as our objections

Thank You

Robert ~~Leuber~~

JUNE 19, 2009

1 of 3

Dear Judge Gerber,

(1.) Please forgive my amateur attempt to prevent an injustice by objecting this bankruptcy agreement. We GM retirees who oppose it and this taking of our hard earned, vested and paid for benefits without being given credit for our VEBA sacrifices of 2006 and 2007 (at the time the attorney claimed that it was comparable to the tobacco settlement) are overwhelmed and underinformed. No attorney wants to represent us because of the politics of going against the UAW and GM. We feel we are the most vulnerable members of this case, with no vote (because this was not supposed to be allowed by ERISA and the Supreme Court and other decisions) and no real representation. The workers voted away our earned health care benefits while keeping theirs. Its like mugging the old folks while the police watch, something from a third world country.

Granted, GM is experiencing difficulties because of the economy. Something they contributed to with SUV sales and GMAC's involvement in the housing mortgage fiasco. But they have engineered themselves into this bankruptcy to take GM retirees hard earned, vested and paid for benefits. GM made money on retirees health care by collecting

premiums when we worked, then investing that money in their business overseas.

Ford set themselves up to weather this foreseeable storm. GM set themselves up to go bankrupt and get free money. They also changed GMAC into a bank to get more free money and until April were still trying to buy Chrysler. They are putting their profits in their overseas division while charging the costs to the North American opperations. During this crisis they purchased their Ren. Center headquarters in Detroit. They were renting it.

They have paid obscene bonuses to their executives. Only an honest audit by the bankruptcy court can expose how many bookkeeping tricks they have used.

Professor Robert Riesch the former Secretary of (Labor) called this kind of thing, a transfer of wealth from the poor to the rich.

(2.) And object to the UAW representing the give away of retiree benefits and allowing the workers to vote away retiree vested benefits while the workers keep theirs and the UAW keep their dual pensions and health care benefits is a conflict of interest. And why keep questionable "legal service" benefits while giving up health care?

(3.) And object to the UAW giving up 22% of the "new GM" (from 39% to 17%) so that the bondholders would come on board to avoid bankruptcy. Now with them getting more, that was supposed to avoid bankruptcy, but GM went bankrupt anyway, foul.

3 of 3

(4.) And object to the fact that notice of bankruptcy was insufficient and untimely, ± ½ million retirees cannot address this properly. Sincerely

Robert Henderson

Robert Henderson
PO Box 526
Swartz Creek MI
48473

ENCLOSED:

L.   44G - GLOBAL
O        - WORKER
     45G - BONUSES
     3E - DECISION
3pgs - 4E - 1984 OWEN BIEBER
2pgs - BB - VOTING
     A3 - HYBRID '72 SKYLARK



## Region 1-C
## WORKER-TO-WORKER

1940 W. Atherton Rd. • Flint, Michigan 48507 • (810) 767-0910 • FAX (810) 767-3206

**BOB ROTH**
DIRECTOR

**DUANE ZUCKSCHWERDT**
ASSISTANT DIRECTOR

# INTERESTING POINTS ON THREATS TO THE UNITED STATES ECONOMY

Most Americans have been led to believe that the problem with America's competitiveness is that American workers earn too much money.

Below are the ratios of the top manager's average wages in relation to the worker's wages in five of the industrial nations of the world:

| | |
|---|---|
| For every $1.00 a Japanese worker makes, the top manager makes..... | $11.00 |
| For every $1.00 a Mexican worker makes, the top manager makes..... | $20.00 |
| For every $1.00 a German worker makes, the top manager makes..... | $30.00 |
| For Every $1.00 a British worker makes, the top manager makes ..... | $30.00 |
| For every $1.00 a United States worker makes, the top manager makes..... | $531.00 |

For example: an American worker that makes $45,000.00 per year, the top officer of their company is making $23,805,000.00!

Source: Michigan Wayne State University

mbopeiuu494



| GM INVEST ***BILLIONS*** in its "Global Portfolio" | | | | | | |
|---|---|---|---|---|---|---|
| DATE | Corporation Investing | AMOUNT | Corporate Recipient | Country | City or state | Source |
| 09/12/92 | GM | $375,000,000 | state-owned FSO | Poland | ? | N.Y. Times |
| 05/07/96 | GM | $329,000,000 | state-owned FSO | Poland | Gliwice | N.Y. Times |
| 12/03/96 | GM | $3,500,000,000 | GM Global | BRAZIL | ? | N.Y. Times |
| 12/18/98 | GM | $1,250,000,000 | GM Global | China | 15 ventures | N.Y. Times |
| 12/18/98 | GM | $750,000,000 | GM Global | China | Shanghai | N.Y. Times |
| 10/01/00 | GM | $1,500,000,000 | GM Global | BRAZIL | ? | findarticles.com/p/articles |
| 01/08/01 | GM | $650,000,000 | GM-Opel | Germany | Russelsheim | Automotive Industries |
| 2001 | GM | $340,000,000 | GM-Avto Vaz | Russia | Togliatti | AP Business Writer |
| 2/25/03 | GM | $60,000,000 | Bangalore | India | Halol | www.rediff.com |
| 7/13/03 | GM | $3,000,000,000 | (FDI)GM Global | China | ? | (China Daily) |
| 2/25/03 | GMCL | $2,500,000,000 | GMCL | Canada | many | gmcanada.com |
| 7/2/04 | GM | $800,000,000 | zafira model | Poland | Gliwice | *Rzeczpospolita* |
| 2004 | GM | $80,000,000 | Isuzu KB | S. Africa | | www.southafrica.info/doing_business |
| 2004 | GM | $50,000,000 | GM S. African Arm | South Africa | Port Elizabeth | www.southafrica.info/doing_business |
| 4/1/05 | GM | $100,000,000 | GMSA | S. Africa | Port Elizabeth | www.southafrica.info/doing_business |
| 4/1/05 | GM | $2,900,000,000 | GMSA | S. Africa | | www.southafrica.info/doing_business |
| 4/1/06 | GM | $650,000,000 | GM Global | Mexico | San Luis Potosi | Detroit Free Press |
| 5/29/06 | GM | $200,000,000 | GM Global | Russia | St Petersburg | (Reuters) |
| 8/3/06 | GM | $450,000,000 | GM Global | India | 2nd Plant inTelegaon | wordpress.com |
| 8/5/06 | GM | | GM Global | India | Expations at Halol | www.edmunds.com/insideline |
| tjs 8/18/2006 | TOTAL | $19,484,000,000 | | | | |

## COMPENSATION
# Autoworkers' pay compares closely in U.S.

**JASON ROBERSON**
FREE PRESS STAFF WRITER

Figures from automakers indicate that domestic manufacturers and Japanese-owned rivals operating plants in the United States are fairly close on hourly pay for assembly workers, particularly when bonuses from the profitable foreign companies are factored in.

Other factors, such as the value and cost of benefits, figure into total compensation, which cannot be calculated exactly because of several unknowns.

**OVERTIME:** Overtime is traditionally a way in which autoworkers have boosted their pay, but its impact on pay last year is impossible to calculate. It varies by plant, and automakers did not release data.

Successful foreign automakers often use overtime but avoid major overtime surges.

In the '90s, Detroit's autoworkers came to count on extra hours, said Ron Harbour, president of Harbour Consulting and publisher of a comprehensive analysis of automaking labor efficiency.

Harbour said UAW-represented plants used to work a lot of overtime to fix defects.

"But that's less prevalent today because they've made improvements and can meet their schedule in eight hours," Harbour said, adding that several domestic-owned plants rank among the best in his study.

Overtime also dwindled last year because Detroit's automakers were trying to cut North American production by a combined 15% in the fourth quarter.

**INSURANCE:** Foreign automakers operating in the United States provide health insurance, though employees often pay a portion of the premiums as well as co-pays. Toyota Motor Corp. said it estimates workers' average annual costs at the Georgetown, Ky., plant at $700.

Honda Motor Co. has no deductible or premium for health care coverage, but workers have a co-pay for office visits and medication. Annual health checkups are free, Honda spokesman Ed Miller said.

General Motors Corp., Ford Motor Co. and Chrysler Group pay the full cost of health insurance for UAW workers, who, like retirees, have some $5 co-pays for doctor visits.

**PENSIONS:** The UAW has defined-benefit pensions at no cost to employees. The plans guarantee retirees a certain amount each month. UAW workers also have the option of buying into plans such as 401(k)s to supplement their retirement income.

In comparison, Honda's and Toyota's retirement programs are a mix of a defined-contribution pension and a 401(k), whose value depends on investment returns, company representatives said. Nissan did not provide information about its retirement plan.

"So the risk is on the employee," Harley Shaiken, a professor at the University of California at Berkley, who specializes in labor issues, said of Toyota's system.

**LEGACY COSTS:** The difference in retiree insurance and pension costs are a big part of what the domestic automakers call legacy costs. At Chrysler, for instance, retiree health care and pension add up to $1,400 to the price of each U.S.-made vehicle.

### Net income (in billions)
Here's a look at GM and Toyota's annual incomes over past years:



Source: Free Press research                                   Detroit Free Press

### Bonuses
Here's how much in annual bonuses top automakers have paid out to workers over the years:

| Year | Toyota | Honda | GM | Ford | DaimlerChrysler |
|---|---|---|---|---|---|
| 2006 | $6,000-8,000 | $4,485.00 | $0 | $0 | $650.00 |
| 2005 | Unavailable | 4,996.00 | 0 | 0 | 1,540.00 |
| 2004 | Unavailable | 4,608.00 | 186.00 | 600.00 | 1,500.00 |
| 2003 | Unavailable | 4,639.00 | 170.00 | 195.00 | 0 |
| 2002 | Unavailable | 3,639.00 | 934.00 | 160.00 | 460.00 |
| 2001 | Unavailable | 4,218.00 | 0 | 0 | 0 |
| 2000 | Unavailable | 5,138.00 | 803.00 | 6,700.00 | 375.00 |
| 1999 | Unavailable | 4,519.00 | 1,775.00 | 8,000.00 | 8,100.00 |
| 1998 | Unavailable | 4,306.00 | 213.00 | 6,100.00 | 7,400.00 |
| 1997 | Unavailable | 1,706.00 | 750.00 | 4,400.00 | 4,600.00 |
| 1996 | Unavailable | 1,581.00 | 302.00 | 1,800.00 | 7,900.00 |
| 1995 | Unavailable | 749.00 | 814.00 | 1,700.00 | 3,200.00 |
| 1994 | Unavailable | 1,206.00 | 589.00 | 4,000.00 | 8,000.00 |
| 1993 | Unavailable | 1,581.00 | 0 | 1,350.00 | 4,300.00 |
| 1992 | Unavailable | 1,602.00 | 0 | 0 | 421.00 |
| 1991 | Unavailable | 1,706.00 | 0 | 0 | 0 |
| 1990 | Unavailable | 1,622.00 | 0 | 0 | 0 |
| 1989 | Unavailable | 1,830.00 | 50.00 | 1,025.00 | 0 |
| 1988 | Unavailable | 720.00 | $266.00 | 2,800.00 | 720.00 |
| 1987 | Unavailable | 1,539.00 | 0 | 3,700.00 | 500.00 |
| 1986 | Unavailable | 2,704.00 | 0 | 2,100.00 | 500.00 |
| 1985 | Unavailable | 0 | 347.00 | 1,200.00 | 0 |
| 1984 | Unavailable | 0 | 543.00 | 2,000.00 | 0 |
| 1983 | Unavailable | 0 | 643.00 | 400.00 | 0 |
| Total | Unavailable | $63,297.00 | $8,385.00 | $48,230.00 | $50,166.00 |

Source: Free Press research                                   Detroit Free Press

April 23, 1984

**To**     International Executive Board

**From**    Owen Bieber

**Subject**   Retiree Health and Life Insurance

       As a result of recent UAW court victories in UAW v. Yard-Man, 114 LRRM 2489, 716 F.2d 1476 (6th Cir. 1983), cert. denied 52 U.S.L.W. 355 (1984) and UAW v. Cadillac Malleable, __ F.2d __ (6th Cir. 1984), we anticipate that the duration of retiree health insurance coverage may become a most significant issue in negotiations with UAW employers. Please review this memorandum with your staff.

       In Yard-Man, the Sixth Circuit held that retiree health and life insurance promise survives the closing of the plant and the termination of the labor agreement and continued for the full life of each retiree. The language of the labor agreement stated, "The company will provide insurance benefits equal to the active group benefits...for the former employee and his spouse." Among other things, the court held that retiree benefits "are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon the achievement of retiree status there is an inference that the parties intended those benefits to continue as long as the beneficiary remains a retiree."

       Many of our labor agreements contain ambiguous language as to the duration of the retiree health and life insurance benefits. We do not recommend that UAW bargaining representatives attempt to clarify this language. The potential value of any clarification is not worth the risks if we are unsuccessful and create bad bargaining history which can be used against us at a later date. Any discussions during negotiations may be evidence of the parties' intent as to the duration of retiree benefits.

       At the same time, we anticipate that many employers may attempt to do so; indeed, they may even change the language of the benefits in this area without bringing it to the union's attention. That is, some employers may agree to benefit improvements for the retiree package, including insurance improvements, but add language to the "improvements" specifying that the companies' insurance promise is "for the duration of this agreement." Some employers may even attempt to insert limiting language in employee booklets and/or summary plan descriptions. UAW negotiators are cautioned against agreeing to such changes or clarifications.

       In addition, negotiators are cautioned against agreeing to pay premiums during no-contract periods such as strikes. If such agreement is essential, it should be done "under protest." In any event, the UAW Strike Insurance Department should be consulted.

Page Two (2)

In <u>Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass</u>, 404 U.S. 157 (1971), the U.S. Supreme Court determined that retirees were not "employees" and specifically held:

(1) that retirement benefits for past retirees was not a mandatory subject, and neither party could therefore bargain to impasse or, for that matter, even insist that the issue be discussed. Past retirement benefits are therefore a permissive subject which the parties can discuss if they mutually agree.

(2) that "vested retirement benefits may not be altered without the pensioner's consent."

Thus, where employers attempt to force us to discuss the duration of benefits for past retirees, the Legal Department should be consulted regarding possible legal defenses.

While the UAW and employers may mutually agree to discuss improvements in benefits for past retirees (as we have done historically) the court indicated that any reductions must be consented to by the individual retirees.

Unfortunately, we anticipate that some employers, given the large financial costs involved, will improperly attempt to circumvent these defenses by refusing to enter into a new agreement until the union agrees to "clarify" the duration of the retiree health insurance promise. Also, since the employer can insist on bargaining to limit the duration of such benefits for <u>future</u> retirees, every effort should be made to avoid getting that issue isolated.

If the employer can't be convinced to drop its demand, we are not legally required to "take a strike" on this issue. However, we should make a clear record of our disagreement by preferably asking the employer for a "hold harmless" clause. If we can't get that, at a minimum we should send the employer a letter making it clear that we are entering into the new labor agreement "under protest." (Sample attached.) Notice of the retiree-dispute should also be sent to the UAW Legal and Social Security Departments for consideration of the legal rights of the retirees.

If you have any questions about this matter, please consult with the UAW Legal Department or the Social Security Department.

Fraternally,

OB/paw
opeiu494aflcio
attachment
c.c.  Bill Hoffman
      Leonard Page
      Jack Turner
      Jerry Wilse

# Retirees Voting on Collective Bargaining

Where we stand        THE ADMINISTRATION CAUCUS        Paid for voluntary contributions. Union bud

We anticipate that a few delegates will try to force a floor debate and vote on a proposed change to the UAW Constitution that would allow retirees to vote in contract ratification votes and on modifications to collective bargaining agreements.

Before discussing our position, it's useful to review the convention history on this issue. The issue of retiree voting rights was addressed by the 13th Constitutional Convention in 1951 and the 17th Constitutional Convention in 1959.

**Background**

In 1951, convention delegates approved a new section to Article 6 that created "Retired Membership Status," giving UAW retirees "all of the privileges of membership," including the right to vote in all elections, including contract ratification and strike authorization votes. Although the new section was adopted by the Convention, delegates noted that the ranks of retirees were rapidly growing and expressed concern that retirees eventually would be able to out vote active workers. In response to that concern, the chair of the Constitution Committee stated that "if the problem presents itself," it could be addressed by future Constitutional Conventions.

Over the next several years, that concern grew as the ranks of UAW retirees increased substantially and in some local unions or departments of plants surpassed the number of active workers. Thus, at the 17th Constitutional Convention in 1959, delegates revisited the issue of retiree voting rights. The Constitution Committee proposed a change that restricted retirees from voting in elections for local union leaders engaged in collective bargaining, in contract ratification votes, and in strike authorization votes.

As then Secretary-Treasurer Emil Mazey explained to the convention delegates: "The problem that we are trying to meet here is a problem that is growing in our Union. We have many situations where the percentage of retirees represents a sizable portion of the membership of a local union, and it is possible for the retirees to make the decisions as to whether or not a contract is accepted, as to whether or not a strike ought to take place; it is possible for retirees to make a determination at the present time as to who the stewards are going to be, even though they may be outside of the plant for nine years and don't know the new personnel inside the shop. The intended purpose of these changes is to meet that problem so that the people who are doing the collective bargaining and the basic collective bargaining decisions are the people who are actively affected by these decisions."

Later in the debate, Secretary-Treasurer Mazey noted: "We have a very practical situation where the older our Union gets, the further away are the retirees from the day-to-day problems [of the workplace] The whole purpose of this is to be realistic in dealing with the problems of our Union in the most effective and democratic way possible."

Vice President Leonard Woodcock, who had worked with the Constitution Committee on this proposal, pointed out: "On the question of the right to strike, it should be made obvious to the outside world the strike votes in our Union are made by those who have to do the striking."

Vice President Woodcock continued: "The same thing is true with regard to the ratification of the working agreements as with the in-plant personnel. It does not make any second class citizenship. It makes clear what the division of the actualities now in existence is."

Based on the reasoning presented by Secretary-Treasurer Mazey, Vice President Woodcock and a number of delegates, the 17th Constitutional Convention approved the constitutional change restricting the voting rights of retirees.

## Where We Stand

We believe the position taken by the Convention in 1959 was both fair and sound. The arguments advanced by Emil Mazey and Leonard Woodcock at the convention were carefully thought through and squarely grounded in the realities of our Union. If anything, their arguments are even more compelling today as in many instances retirees outnumber active workers by a substantial margin and, equally important, have been removed from the day-to-day issues of the workplace for decades.

As Vice President Woodcock noted in 1959, restricting the voting rights of our retirees by no means indicates that we consider them "second class citizens." We honor their contributions to our Union and, more important, have fought long, hard and effectively to advance their interests over the decades. Our commitment to our retirees is rock solid - and will remain so.

**The position on voting rights for retirees adopted by the 7th Constitutional Convention has served all UAW members - active and retired - well. We ask you to keep it intact and REJECT any efforts to change it.**

not eligible to run for President of Local 7 by reason of his status as a retired member.[4] Article 6, §19, provides:

> "Any member in good standing who is retired, shall be entitled to a 'retired membership status' which, without being required to pay dues during the period of such retirement, shall entitle her/him to all the privileges of membership except the right to vote in elections conducted pursuant to Article 19, Section 3; Article 45, Section 2; and Article 50, Sections 1 and 2. Appropriate cards denoting such membership status shall be prepared by the International Union and furnished to Local Unions on request and at cost. The regular withdrawal-transfer provisions of this Constitution shall be applicable if such retired member returns to active employment."

Article 19, §3, relates to ratification of collective bargaining agreements. Article 45, §3, governs the elections of stewards and committeepersons. Article 50, §§1 and 2, concerns strike votes. It is apparent to us that the framers of the Constitution, while otherwise providing full membership rights to retirees, intended specifically to exclude them as a class from participation in all aspects of the collective bargaining and contract administration processes. This conclusion is reinforced by an official interpretation of Article 6, §19, of the International Executive Board in January, 1960, which states in pertinent part:

> "...A retired member would also be ineligible to run for a Local Union executive office where election to that office also automatically made her/him a member of a Bargaining Committee or any other such office which required seniority in any particular unit, division or department of the workplace."[5]

---

[4]   Because we find ourselves in unanimous agreement with the IEB's interpretation of Article 6, §19, of the Constitution, we do not reach the somewhat complex jurisdictional issue raised by the Union in its answer to Hawkin's appeal. While the Union characterizes this as a challenge to an election, it actually is a challenge to President Yokich's ruling made in response to Local 7 member Anthony Moore's inquiry as to whether, as a Local retiree, he would be eligible to run for President of the Local. President Yokich ruled he was not eligible. Hawkins, also a retiree, and as such affected by Yokich's ruling, on April 16, 1999, challenged Yokich's decision under Article 33 of the Constitution. President Yokich's letter to Chairperson Sanders dated April 15, 1999, states: "This is a decision of the President interpreting the International UAW Constitution.", but does not refer to Article 13, §8. Also, there is nothing to show that Hawkins was aware of the contents of Yokich's letter to Sanders at the time he filed his appeal. When he did learn of Yokich's position, he promptly took exception to it. (Record, p. 39).

[5]   Pages 2 through 15 of the record deal with excerpts from prior communications dealing with the subject of retirees to hold and run for office in their local unions. None of these is inconsistent with the IEB's official interpretation of Article 6, §19.

**A3**

February 8, 2009
SUNDAY
The Flint Journal

## Gary Flinn
### Flinn's Journal

# Hybrid power rooted in ... '72 Skylark

Prius, schmius. You want a pioneering gasoline-electric hybrid vehicle? Look no further than engineer Victor Wouk's Buick Skylark.

From 35 years ago.

Yes, three decades before hybrid cars became commercially available, a prototype hybrid car was built in 1973, using a four-door '72 Skylark.

The car had excellent gasoline mileage, greatly surpassed 1976 emission standards and had a top speed of 80 mph. Then, (cue Darth Vader music) an Environmental Protection Agency administrator canceled the project.

It all started with Wouk (brother of "The Caine Mutiny" author Herman Wouk). The late Victor Wouk, born in 1919 in New York City, formed his first company in 1946 and grew it into the largest maker of high-voltage power supplies. He formed other companies and developed a passion for electric vehicles.

Wouk realized in the 1960s that batteries lacked the necessary speed and range for commercial viability. That decade, he hit on a solution: Combine the low emissions of an electric motor with the power and range of a gasoline engine.

**Wanna see?**
• You can check out Victor Wouk and his prototype 1972 Buick Skylark hybrid at http://eands.caltech.edu/articles/LXVII3/wouk.html

Wouk credits the idea to American engineer H. Piper, who filed for a patent in 1905 for a combined electric and gasoline motor to improve early motor vehicle performance. A few production models were made, including a 1916 Woods Dual-Power gasoline and electric model in the collection of The Henry Ford in Dearborn.

While Wouk was criticized for rejecting the all-electric vehicle, his hybrid idea certainly reduced emissions.

In 1970, the Clean Air Act required automakers to reduce automotive emissions 95 percent by 1976. That year, the Federal Clean Car Incentive Program was started. Wouk teamed with a colleague, Charlie Rosen, to develop a prototype.

They decided to use the Skylark, provided by General Motors and likely built in Flint, as there was plenty of room under the hood for additional equipment — namely, eight heavy-duty police-car batteries, a 20-kilowatt DC electric motor and a Mazda RX-2 rotary engine.

In 1974, the prototype was tested at the EPA's emissions-testing laboratories in Ann Arbor. Even though the vehicle was optimized for low pollution emissions rather than for high fuel economy, it got 30 miles per gallon — more than twice the fuel economy it had before it

▶ Flinn, A4

## Flinn: Hybrid power rooted in ... '72 Skylark | ◀ A3

was converted.

Exhaust emissions were only 9 percent of those from a typical car from that era and easily met the 1976 requirements. Detroit's production offerings didn't get there until 1986.

Despite the glowing data, an EPA administrator in charge of motor vehicle regulation named Eric Stork rejected the results and canceled the project. Stork, who headed the EPA's Mobile Source Air Pollution Control Program, opposed hybrids from the beginning, believing the technology wasn't practical for cars.

The project was dead, but Wouk continued to promote the idea in speeches and journals for the next 30 years and pitched the concept to Detroit automakers. He wrote an article on hybrid electric vehicles in the October 1997 issue of Scientific American magazine.

Meanwhile, (more Darth Vader music) Japanese automakers got interested. In 1997, the Toyota Prius became the first hybrid car to become commercially available when it was introduced in Japan. The Prius was introduced in the United States in August 2000 as a 2001 model.

Among the first people to obtain one was Wouk, who leased the car and proudly drove it around, feeling vindicated.

When Wouk died of cancer in his Manhattan home in 2005 at age 86, obituaries hailed him as an early developer of hybrid car technology and called him either the grandfather or the godfather of the hybrid electric car.

### Kettering connection

The Prius was Japanese, sure, but it did have some local ancestry. One of the engineers behind its success was a 1970 graduate of General Motors Institute, now Kettering University.

David Hermance became the foremost American expert on hybrid electric vehicles. He was killed in a plane crash in 2006 at age 59 and was posthumously awarded an honorary doctorate in engineering by Kettering.

Kettering now is active in teaching hybrid vehicle technology. In 2006, Ford donated two Escape hybrid sport utility vehicles for teaching and research. Kettering partnered with Michigan State University and the Mass Transportation Authority in 2007 to put five MTA hybrid electric/diesel-powered minibuses on the road.

Kettering professors James Gover and Juan Pimentel are active in hybrid research and teaching.

Pimentel had his own experience with the U.S. government's disinterest in electric vehicle development.

"In 2003, in response to a U.S. government call for proposals for international cooperation, I assembled a top-notch team of international experts and prepared a project to develop a prototype powertrain for an electric vehicle," Pimentel said. "Unfortunately, the project was not funded."

Now that Detroit automakers are making serious moves toward alternative-fuel vehicles, such as the Chevrolet Volt, the pioneering work of Wouk more than 30 years ago suggests things would be different today had the EPA not killed hybrid vehicle research in 1974.

"There aren't enough people knowledgeable enough in Washington with the vision to fund projects crucial to the industrial interests of the U.S., such as hybrids or electric vehicles that should have been funded 30, 20, 10 years ago," Pimentel said.

*Gary Flinn of Flint writes about local history. He can be reached at gflinn@iavbbs.com.*