# MEMORANDUM OF UNDERSTANDING
## Flint Child Development Program
### February _17_, 2009

During current negotiations, the parties discussed the cost and feasibility of continuing to provide subsidized child care benefits to UAW-GM employees. The parties agreed that since 2007 negotiations, progress has been made toward reducing subsidy costs at UAW-GM Child Care Centers and Consortiums. However, due to current economic conditions the discussion centered on whether the Center for Human Resources (CHR) should continue to subsidize costs at the Flint Child Development Center (FCDC).

As a result of these discussions, the following agreements were reached:

- The Flint Child Development Center will suspend operations effective June 30, 2009. Following suspension, the parties will jointly pursue the sale of the current FCDC facility and other assets.

- The Board of Directors – Joint Activities will review the Flint Child Development program in the future to determine if funding is sufficient and it is feasible to pursue a more cost effective alternative plan for subsidizing UAW-GM active traditional employee child care in the Flint, Michigan area.

For International Union, UAW

For General Motors Corporation

85

# MEMORANDUM OF UNDERSTANDING
## Saturn Creative Learning Center
### February *17*, 2009

During current negotiations, the parties discussed the cost and feasibility of continuing to provide subsidized child care benefits to UAW-GM employees. The parties agreed that since 2007 negotiations, progress has been made toward reducing subsidy costs at UAW-GM Child Care Centers and Consortiums. However, due to current economic conditions the discussion centered on whether the Center for Human Resources (CHR) should continue to subsidize child care cost at the Saturn Creative Learning Center (SCLC).

As a result of these discussions, the following agreements were reached:

- Effective immediately, the parties will jointly pursue re-negotiating the current contract between Saturn Corporation and Knowledge Learning Corporation for the purpose of eliminating long term subsidy liability. Within ninety (90) days of this agreement, the parties will submit to the Board of Directors – Joint Activities, a business case for the appropriate timing to suspend operations at SCLC.

- Following suspension of SCLC operations, the Board of Directors – Joint Activities will determine in the future, if funding is sufficient and it is feasible to pursue a more cost effective alternative plan for subsidizing UAW-GM active traditional employee child care in the Spring Hill, Tennessee area.


**For International Union, UAW**

*R Bieber*

*Paul J. Mitchel*

**For General Motors Corporation**

*(signature)*

*Dorothy Hennessy*


86

# MEMORANDUM OF UNDERSTANDING
## Child Care and Elder Care Resource and Referral (CCECRR) Program
### February _17_, 2009

During current negotiations, the parties discussed the agreement reached during 2007 negotiations to reduce costs associated with the Child Care and Elder Care Resource and Referral (CCECRR) program. The discussions focused on the need to expedite the implementation of a cost reduction plan for providing CCECRR services to UAW-represented employees in line with declining Center for Human Resources (CHR) revenue and accruals.

As a result of these discussions, it was agreed that sixty (60) days following the effective date of this agreement, all CCECRR services will be insourced and administered by the CHR Work/Family Department utilizing current CHR resources and staffing. The services of the CCECRR program will be limited to basic items such as providing Child Care/Elder Care network information and disseminating Work/Life Balance material to eligible UAW-GM active traditional employees. The cost to administer the CCECRR program excluding employee wages and benefits will not exceed $150,000 annually. The CHR Joint Activities System (JAS) will also be utilized to disseminate agreed upon CCECRR basic information and services to UAW-GM active traditional employees.


**For International Union, UAW**

_R Biber_

_Paul Mitchell_


**For General Motors Corporation**

_(signature)_

_Timothy E. Kresessy_


87

## Memorandum of Understanding
## RE: Tuition Assistance Program

### May 15, 2009

During current negotiations, the parties discussed the worsening economic climate faced by General Motors and the financial impact on the Center for Human Resource's (CHR) operating budget. It was understood that business conditions in the auto industry continue to deteriorate requiring further cutbacks in manufacturing volumes, headcount, and fewer hours worked in General Motors plants.

As a result of these discussions, the UAW-GM CHR Joint Activities Board of Directors, which has a fiduciary responsibility to preserve the CHR's financial stability, evaluated joint program spending for the current fiscal year to determine whether the Tuition Assistance Program (TAP) should continue to be funded. Based on the projected decline in CHR revenue, effective June 1, 2009, the Board agreed to suspend TAP for all active, retired, and laid-off employees, as well as surviving spouses of deceased employees. It was further agreed that the Board would review TAP in the future to determine if funding is sufficient and it is feasible to consider the program for reinstatement to levels agreed to during 2007 bargaining.

For the International Union, UAW:        For General Motors Corporation:

_____        _____

_____        _____







## Memorandum of Understanding
## UAW-GM Scholarship Program for Dependent Children
## February *17*, 2009

During current negotiations, the parties discussed the worsening economic climate faced by General Motors and the financial impact on the Center for Human Resources (CHR) operating budget. It was understood that business conditions in the auto industry continue to deteriorate requiring further reductions in manufacturing volumes, headcount, and hours worked in General Motors plants. Since CHR funding is based on hours worked, this unprecedented downward spiral has deepened negative spending.

As a results of these discussions, the UAW-GM CHR Joint Activities Board of Directors, which has a fiduciary responsibility to preserve the CHR's financial stability, evaluated joint program spending for the 2009 fiscal year to determine whether the Scholarship Program for Dependent Children (DSP) should continue to be funded. Based on the projected decline in CHR revenue, the Board agreed to suspend DSP benefits for dependents of UAW-GM active, retired and deceased employees effective January 1, 2009. It was further agreed that the Board would review DSP in the future to determine if funding levels are sufficient and it is feasible to consider the program for reinstatement.

**For International Union, UAW**

**For General Motors Corporation**

89

SUBMISSION # _2_B_
DATE _2-17-09_
TIME _____

## MEMORANDUM OF UNDERSTANDING
### Health and Safety - Joint Research and Occupational Health Advisory Board
### (OHAB)
### February 17, 2009

During these negotiations, the parties discussed the need to reduce administrative costs associated with retaining the Occupational Health Advisory Board.

Current research commitments and activities will continue through the term of the Agreement. The Occupational Advisory Board will be disbanded. Outside consultants or recognized specialists may be retained on an as needed basis.


For International Union, UAW                    For General Motors Corporation


90

SUBMISSION # _3_
DATE _2/17/09_
TIME _12:45 p.m._

# MEMORANDUM OF UNDERSTANDING
## Health and Safety
### February 17, 2009

The parties agree to the following change regarding positions referenced in the UAW-GM National Agreement, Document 7, Attachment A.

The Industrial Hygiene Technician (IHT) and Joint Ergonomic Technician (JET) positions, responsibilities, and duties will be combined into one joint program representative. This joint program representative allocation will be consistent with the current allocation as determined for the Joint Ergonomic Technician, referenced in Attachment A, Section VII, Ergonomics.

These changes will become effective immediately once notification is given by the Vice President of the General Motors Department to the GM Vice President of Labor Relations no later than January 1, 2010.

This Memorandum of Understanding supersedes any and all terms contained within in Local or National Agreements that are inconsistent with this Memorandum of Understanding.

For International Union, UAW

_Cindy Symnnik_ 2-17-09

_Paul Mitoff_


For General Motors Corporation

_Edna Patten_   2/17/09 @12:45 p.m.

_Timothy Kennessy_

91

6)

# MEMORANDUM OF UNDERSTANDING
## SOURCING
## ENHANCED INSOURCING PROCESS
### February 17, 2009

During these negotiations, the Union expressed concern regarding the Corporation's lack of progress toward attainment of the insourcing commitments set forth during 2007 Negotiations. The parties understand that the market downturn and resulting economic distress it has placed on the ability of the Corporation to fund activities such as insourcing have contributed to the current lack of progress in that area.

As a way to provide additional structure to the process of identifying insourcing opportunities during these economically challenging times, while at the same time improving the competitive position of the Corporation, the parties have agreed to enlist the aid of a mutually agreed upon independent consultant.

The objectives of engaging this consultant will include, but not necessarily be limited to:
- Assisting the joint parties in identifying and evaluating work that can be done competitively in GM-UAW locations
- Providing insight regarding evaluation tools to be used in the process

Within 30 days following the consultant being retained, an initial meeting will be held with him/her and the National Sourcing Committee to discuss the general nature of the process and to listen to initial suggestions he/she may have regarding work categories believed to hold the most competitive potential.

Within 90 days following this meeting, the GM and UAW Sourcing Staffs shall develop additional details around how the process will operate. A GM Financial representative may participate in these discussions as appropriate.

This Enhanced Insourcing Process does not eliminate the Corporation's insourcing obligations identified in the 2007 UAW-GM National Agreement and those identified during these "Special Negotiations." The parties understand that the overall measure of success of this process will be to reach an objective decision regarding insourcing proposals such that the best competitive financial outcome for the Corporation is realized.

For the International Union, UAW:                    For General Motors Corporation:

_Gary Bent_ (signature)                              (signature)

TA                                    TA
Tedak                                 2/17/09
2-17-09                               12 55 PM
12 55 AM

92

ipB02

## MEMORANDUM OF UNDERSTANDING
## GMX 351 MALIBU SUBASSEMBLIES

### FEBRUARY 17, 2009

With regard to discussions held between the parties relative to certain Body Shop Subassemblies for the GMX 351 Malibu, the Corporation committed to investigate alternative work content that could be done competitively within GM-UAW facilities which, if brought in-house, would satisfy the spirit and intent of the 2007 Agreement commitments pertaining to the Sourcing Moratorium.

It is understood that if such content cannot be identified and placed in-house, then the provisions of the Sourcing Moratorium will be observed with respect to the subject Malibu subassemblies.

For the International Union, UAW:                    For General Motors Corporation:

_____                    _____

_____                    _____

93

mmal35A01

4)9

# MEMORANDUM OF UNDERSTANDING
## SOURCING
## GLOBAL PURCHASING AND SUPPLY CHAIN COMPETITIVENESS REVIEW
### February 17, 2009

To further align our mutual interests of ensuring the Corporation's competitiveness, the parties have agreed that the Vice President and Director of the GM Department of the UAW, the GMNA Vice President of Labor Relations, and the Group Vice President, Global Purchasing and Supply Chain, will meet quarterly for a high level Competitiveness Review. The Competitiveness Review will include subjects such as sourcing, improved commonality, competitive cost structures, and leading edge technologies.

For the International Union, UAW:

For General Motors Corporation:

TA
2/17/09
12:15 PM

Felix
2-17-09
12:5 Pm

94

## MEMORANDUM OF UNDERSTANDING
### February 17, 2009

During the current negotiations, the parties engaged in extensive discussion regarding a new plant in Flint. The parties acknowledged that the Corporation's current financial position, due to the current market downturn and excess capacity, does not lend itself to the building of a new plant. In this regard, Management assured the Union that it will re-evaluate the feasibility of a new plant in Flint upon improvements in the marketplace and the Corporation's financial situation.

For the International Union, UAW:

_____

_____

For General Motors Corporation:

_____

_____

95

## MEMORANDUM OF UNDERSTANDING
## POWERTRAIN VOLUMES
### February 17, 2009

During these negotiations the parties agreed to renew the concept of equitable allocation of volume which will result in a temporary volume increase (approximately 200 units per day) at Flint South.  The longer term plan continues to show Flint South being fully utilized at 800 units per day.

For the International Union, UAW:                    For General Motors Corporation:

_____                    _____

_____                    _____

96

nptvlA01

## MEMORANDUM OF UNDERSTANDING
### RE: INVESTMENT IN U.S.
#### February 17, 2009

During these negotiations, the Company and the Union held extensive discussions regarding the importance of maintaining a strong manufacturing presence in the U.S. and the need to secure and protect job opportunities for UAW members. The Company and the Union also discussed the challenges of the economy and the Company's financial condition. In the event that improvements in U.S. market demand and business conditions provide upside volume, priority will be given to locating that capacity in the United States. In addition to current vehicle architecture and components, management will consider placing future architectures and/or components in U.S. plants. Management reaffirms its plans to meet the insourcing commitments identified in the 2007 UAW/GM National Agreement and during this set of negotiations. As part of the established process of communication, the Union will be given the opportunity to understand the capacity alternatives and the business rationale.

For the International Union, UAW:                For General Motors Corporation:

_____                _____

_____                _____

97

## MEMORANDUM OF UNDERSTANDING
## SOURCING
## INVESTMENT IN MEXICO
### February 17, 2009

During these discussions, the parties spent considerable time on the subjects of competitiveness particularly as it impacts the long-term viability of both the Corporation and the UAW as an institution. The parties recognize that the requirements of the federal loans make it especially key for the Corporation to maintain a competitive and financially strong manufacturing base in the U.S., and in so doing, protect jobs for its employees.

The parties agreed that effective February 17, 2009, prior to the Company making any additional product commitments in Mexico, discussions regarding these investment plans would be held with the UAW in advance of any final decision being made. The Corporation recognizes the Union's desire to propose alternatives.

For the International Union, UAW:

For General Motors Corporation:

TA
Felik
2-17-09
12 ²⁰ pm

TA
2/17/09
12 ²⁰ pm
Mitchel

98

## MEMORANDUM OF UNDERSTANDING
### RE: COMPACT / SMALL CAR INVESTMENT IN U.S.
#### May 16, 2009

During these negotiations, the Company and the Union held extensive discussions regarding the importance of maintaining a strong manufacturing presence in the U.S. and the need to secure and protect job opportunities for UAW members. The Company and the Union also discussed the challenges of the economy and the Company's financial condition.

The parties understand that the compact / small car segment is extremely competitive and in order for the Company to consider investing in producing such vehicles in the U.S., innovative labor agreement provisions will have to be put in place so that such production can be done profitably under what may be extremely challenging market conditions.

It is with these understandings that the Company agrees to the following:
- Assembly Operations
  - The Company will invest in a compact / small car assembly site in the U.S., utilizing an idled GM-UAW facility
  - The selected site will be tooled for a capacity of approximately 160,000 annual units of production
  - The products allocated to this site will be versions off the compact / small car architectures that are not produced at any other U.S. facility at that time
  - The manufacturing strategies which will be employed when setting up the assembly operations for this product allocation include
    - Body Shop subassembly content consistent with Global Core Panel Strategy
    - General Assembly VAA subassembly work performed in-house
    - Facility maintenance for the assembly site to be provided by a Third Party Provider in accordance with Document 159 of the 2007 GM-UAW National Agreement
- Stamping Operations
  - The Company will utilize an idled GM-UAW Stamping Site
  - The selected site will be tooled for the capacity required to support the volume of the compact / small car assembly site only
  - The manufacturing strategies which will be employed when setting up the stamping operations to support compact / small car assembly include
    - Global Core Panels only, for both Stamping and Die Construction; other non-core stampings may be considered on a business case basis.
    - Facility maintenance for the stamping site to be provided by a Third Party Provider in accordance with Document 159 of the 2007 GM-UAW National Agreement.

mbccinvusas_D04



- Applicable to Assembly and Stamping Operations
  - o  The local agreements conform to 100% attainment of the Competitive Operating Agreement principles
  - o  The Company and the Union will work together, utilizing the provisions of the 2007 GM-UAW National Agreement and 2009 Addendum thereto, to arrive at innovative ways to staff these operations.

For the International Union, UAW:

_____

_____

For General Motors Corporation:

_____

_____

100

## MEMORANDUM OF UNDERSTANDING
## RE: IMPORTS TO THE U.S. MARKET – ADDED SHIFTS
### May 16, 2009

The Company commits that it will not add shifts at a non-U.S. plant that supplies vehicles to the U.S. market which are similar to vehicles also supplied by an operating U.S. plant, unless the additional shift(s) are a direct result of increased demand in the non-U.S. markets serviced by those plants. Adding shift(s) to a non-U.S. plant may also occur if the U.S. plant(s) that supply these similar products are operating on three shifts.

Pursuant to the allocations assumed by the Viability Plan, this commitment would apply to Ft. Wayne and Flint C/K (linked to Silao) as well as Lordstown and Lansing Delta Township (linked to Ramos Arizpe).

In addition, it was agreed that in the event production schedules, having been established, subsequently decrease, the parties will discuss how such volume reductions will be implemented.

For the International Union, UAW:

General Motors Corporation:

101



## MEMORANDUM OF UNDERSTANDING
### RE: IMPORTS TO THE U.S. MARKET – STAND-BY U.S. CAPACITY
### May 16, 2009

During these negotiations, the Company and the Union held extensive discussions regarding the importance of maintaining a strong manufacturing presence in the U.S. and the need to secure and protect jobs for UAW members. The Company and the Union also discussed the challenges of the economy, the Company's financial condition and the need for the Company to make effective use of its global architectures and manufacturing footprint in order to respond quickly and economically to revenue enhancing opportunities in the U.S. market.

The Company recognizes that the contributors to its ongoing viability – the American taxpayers, the UAW, the U.S. Treasury and others – have the expectation that their contributions will be focused on maintaining U.S. automobile industry jobs and as such, the Company also recognizes that an important balance must be struck between this expectation and the Company's obligation to make the best possible use of its global assets in order to return to a sustained level of profitability from which all the aforementioned contributors, as well as all of its employees and stock holders, will benefit.

In the Viability Plan, the Company has put forward its best effort at matching a well utilized U.S. production capacity to what it expects the demand to be in the U.S. Market. This is supplemented strategically with units from plants outside the U.S. in order to capitalize fully both on its installed capacity and on revenue opportunities across all market segments. The U.S. plant idlings resulting from implementation of the Viability Plan were discussed at length between the parties and the Company shares the concerns expressed by the Union with respect to impacts on employees and communities. The Union also raised the concern that if the volumes being forecast as part of the Viability Plan are below those actually realized, the U.S. operations may have exited too much capacity in certain segments. In order to address this concern, the Company will designate three assembly plants and one stamping plant idled as result of the implementation of the Viability Plan as stand-by locations, to be reactivated if U.S. market volume exceeds the level projected in that Plan to the extent that added installed capacity is required to meet U.S. market demand.

For the International Union, UAW:

_____

_____

For General Motors Corporation:

_____

_____

mimpusmkt_C03

_102_

### Memorandum of Understanding
### Delphi Keep Sites

### May 16, 2009

As the parties discussed earlier this year, General Motors has been in negotiations with Delphi regarding the return of certain sites to the Corporation as a wholly owned subsidiary. As part of the overall GM restructuring plan required by the Loan Agreement with the U.S. Treasury, the parties have agreed GM will assume ownership of the following sites:

Delphi Saginaw Steering – Saginaw,
Delphi Thermal Systems - Lockport,
Delphi Powertrain - Rochester,
Delphi Powertrain Systems - Grand Rapids, and
Delphi Electronics and Safety – Kokomo.

Furthermore, recognizing the Corporation's responsibility to these Keep Sites, noted in the 2007 UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring (MOU) dated June 22, 2007, General Motors re-commits to adhere to the product allocations indicated in Attachments A and A-1 of that MOU. Given business changes since 2007, a number of product programs in the GM portfolio have been cancelled or delayed. Consequently, a number of the new product programs awarded to these five sites have also been impacted. The attached document shows the original programs awarded along with an update on their status.

GM will employ all UAW-represented employees at these sites, including active and inactive (e.g. currently on the rolls, whether on temporary layoff, indefinite layoff, workers' compensation, disability or other leaves of absences) under the terms and conditions of all applicable collective bargaining agreements. These agreements include:

- 2003 Delphi National Agreement as amended
- Applicable Local Agreements
- May 2004 Supplemental New Hire Hourly Benefits as amended
- UAW-Delphi-GM M.O.U. Delphi Restructuring and its Attachments dated June 22, 2007
- UAW-GM-Delphi Flowback Agreement, providing rights to return to GM for employees hired on or before 10/18/99
- M.O.U. Covering UAW Delphi Employees Hired after October 18, 1999 and before October 6, 2003 (extended to October 10, 2005 during 2007 National Agreement bargaining) providing rights to return to GM for employees hired between 10/19/99 and 10/7/05.
- Benefit eligibility matrix for Delphi employees at keep sites.

The applicability of any agreement that may have been inadvertently omitted from the above list will be addressed by the national parties.

*103*

The parties agree it is in the best interest of General Motors, the UAW and the employees of these facilities to take actions consistent with but not limited to those agreed to by the parties during the GM/UAW 2009 February and May Addendum bargaining. It is believed these actions will improve the competitiveness of the sites thereby enhancing their long term viability. After the conclusion of the parties' discussions surrounding GM's restructuring, the Corporation and the International Union will hold discussions on what action must be taken to ensure long term competitiveness. Once these discussions have concluded, the parties will meet with each site location's leadership to review the agreed upon actions that were developed. Negotiations on these actions will be completed as soon as possible but no later than December 1, 2009.

In the future, should a third party express an interest in any of these sites as an ongoing business, we will work collectively to achieve a mutually agreeable arrangement. It is recognized the only way to ensure long term viability is to establish a cost structure which positions these sites to win future business by participating in and winning a competitive bid process. We commit to working jointly with the UAW to identify new business opportunities. During the quarterly Competitiveness Reviews attended by the UAW leadership, the GMNA Vice President of Labor Relations, and the Group Vice President of Global Purchasing, future business opportunities for these sites to competitively bid on will be highlighted.

For the International Union, UAW:    For General Motors Corporation:

_____    _____

_____    _____

mdks_C03

Attachment A-1

# Grand Rapids Product Plan



| **GM-Delphi Proposal** | | | | | |
|---|---|---|---|---|---|
| **Current Business** | **2008** | **2009** | **2010** | **2011** | **2012** |
| HFV6 Cam Phaser | | | | | EOP Not Defined |
| 12mm Lash Adjusters | | | | | EOP Not Defined |
| Valve Lifters | | | | | EOP Not Defined |
| Gen IV Cylinder Deactivation | | | | | EOP Not Defined |
| Line Engine (L4; L5; L6) Cam Phasers | | | | | |

**New Product Program Awards**

Gen V Cylinder Deactivation (6.2 DOHC & 5X OHV) — 6.2 Cancelled, 5X has been awarded

Gen V Lash Adjusters (6.2 DOHC) — Cancelled

*Gen V Cam Phasing

4.5 HO V8 Diesel 12mm Lash Adjuster — Carryover part currently w/Delphi

*Not awarded due to technical capability



GM

5/14/09

Attachment A-1

# Rochester Product Plan



| GM-Delphi Proposal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Current Business** | **2008** | **2009** | **2010** | **2011** | **2012** | | **2013** | **2014** | **2015** |
| Canister - GMT345/355 | | | | | | 355 Only | | | |
|    - GMT360/560 | | | | | | | | | |
|    - GMT610/9XX | | | | | | | EOP 610 2014    900 2015 | | |
|    - GMX222/295 | | | | | | | | | |
| EGR Valves | | | | | | | | | |
| Fuel Rails   - HVV6 (3.5/3.9L) | | | EOP end of 2010 CY | | | | | | |
|    - L850 (2.2L) | | | | EOP end of 2011 CY | | | | | |
|    - L4 (2.8L); L5 (3.5L); L6 (4.2L) | | | | | | | | | |
|    - 3800V6, 8.1V8 (3.8L/8.1L) | | | | | | | | | |
| IAFM   - GEN IV | | | | | | | | | |
|    - 4.3L | | | | | | | | | |
| Intake Manifold (3.8L) | | | | | | | | | |
| Gen IV LOMA | | | | | | | | | |

**New Product Program Awards**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gen V IAM - SIDI Truck (5X OHV & 6.2 DOHC) | 2013 | | | | | |
| Gen V Rails; Injectors - SIDI 5X OHV | 2013 | | | | | |
| Gen V MPFI (Intake Manifold; Rails; Injectors) | 2013 | | | Cancelled | | |
| Canister - NG Sigma/Zeta/GMT7XX/GMT560 | 2013 | | | | | |
| Gen V LOMA (5X OHV & 6.2 DOHC) | 2013 | | | | | |

Note: As of this writing, Fuel Cell products are not fully developed and associated costs and market prices are not well defined. In that regard, Delphi will commit the North American work to the Rochester Site with the understanding that the local parties will develop, as soon as feasible, a manufacturing plan that financially supports the production and assembly work being placed at the Site. If any disputes arise between the local parties concerning the plan, either party may request assistance from the National Parties.

GM

2

5/14/09

Attachment A-1

# Lockport Product Plan



| GM-Delphi Proposal | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Business** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** |

**HVAC/PTC**

- GMX245
- GMT360/370
- GMT560/610
- H2
- GMT900
- GMX211
- GMX215

**PT Cooling**

- Delta/Epsilon
- GMX222/272
- Epsilon 2

**New Product Program Awards**

| | |
|---|---|
| C3XX HVAC/PTC | Cancelled |
| GMT913/915 H2 HVAC/PTC | Cancelled |
| GMX553/556 HVAC/PTC | Cancelled |
| GMX711/721/731 HVAC/PTC | Cancelled |
| GMX716 XLR HVAC/PTC | Cancelled |
| GMT9XX Diesel & Gas RAD/CAC | Awarded |



GM  GM Confidential

3

5/16/09

Attachment A-1

# Kokomo Product Plan







<u>Attachment A-1</u>  # Saginaw Steering Product Plan (1/2)

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GMT345 | | | | | Tilt | | | | EOP July 2009 | | | |
| GMT355 | | | CB | | Tilt | 32 DO | | | EOP July 2012 | | | |
| GMT360 | Base | | CB | | Tilt | 32 TP | | | | | | |
| GMT530 | | X | | | X | | | EOP July 2012 | | | | |
| GMT560 | | | | | X | | | | | | | 2013 |
| GMT610 | Base | 680 | P | | | | | | | | | 2013 |
| GMT610 | | | | | Tilt | | | | | | | 2013 |
| GMT900 | Base | 680 | P | | Tilt | 37 / 60 TP | | | | | | |
| H2 | | 680 | P | | Tilt | 60 TP | | | | | | |
| Epsilon | Manual | | | X | | 27 / 32TP | | | EOP April 2012 | | | |
| Epsilon | Base | | CB | | R&T | 27 / 32TP | | | EOP April 2012 | | | |
| GMT201 | Base | | CB | | | 32 TG | | | | | | |
| GMT265 | | | | | X | | | | | | | |
| GMT319 | | | CB | | | | | | EOP July 2010 | | | |
| GMX001 | | | | | | 27TP | | | EOP March 2010 | | | |
| GMX211 | Base | | CB | | Tilt | 27 / 32 TP | | | EOP Jan 2013 | | | |
| GMX215 | Magnasteer | | | | Tilt: Pwr | | | | | | | |
| GMX222 | Base / Mag-E | | CB | | Tilt: Base/Pwr | 27 TP/32 UTJ | | | | | | |
| GMX231 | Base | | CB | | Tilt | 27 / 32 TP | | | | | | |
| GMX245 | Magnasteer | | F | | Tilt | | | | EOP May 2014 | | | |
| GMX272 | Mag-E | | CB | | Tilt: Pwr | 32 UTJ | | | | | | |
| GMX295 | | | | | Tilt: Pwr | | | | EOP Dec 2010 | | | |
| GMX320 | | | | | X | X | | | | | | |
| GMX365 | Base / Mag | | CB | | Tilt | 27 / 32 TP | | | | | | |
| GMX367 | Magnasteer | | CB | | Tilt | 27 / 32 TP | | | | | | |



GM    GM Confidential

5

5/16/09

<u>Attachment A-1</u>     # Saginaw Steering Product Plan (2/2)

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Future Production Booked Business

**GMNA Cars**

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | | Status |
|---|---|---|---|---|---|---|---|---|
| NA Delta II | | | | | | X | | Awarded |
| NA Epsilon II | X | | | | | X | | Awarded |
| Zeta: GMX511/521/551 | | | | | X | X | | Awarded, 511 cancelled |
| GMX553/556 | | | | | X | X | | Awarded |

## New Product Program Awards

| Program Name | R&P Gear | Integral Gears | Pumps | CEPS | Columns | Half-shafts | | Status |
|---|---|---|---|---|---|---|---|---|
| C3xx | X | X | X | | X | Frt X , RR X | | Cancelled |
| | | | | | Hydraulic and EPS | | | |
| GMT915 | | X | X | | X | X | | Cancelled |
| Next Gen GMT355 | | | | | X | | | TBD |
| Family A Steering Pump | | | X | | | | | Awarded |



5/16/09

# MOU (UNPUBLISHED)

~~(NOT TO BE PUBLISHED)~~

## MEMORANDUM OF UNDERSTANDING
### SOURCING
## UNION INVOLVEMENT AND SUPPLIER RELATIONS

### February 17, 2009

During these discussions the union expressed concern that under certain circumstances, the Corporation's cost targets for seat suppliers may create an unintended imbalance between that labor cost component of a fully competitive bid and other elements comprising the bid. The parties agree that, considering other factors, $35 per hour all in can be an appropriate labor standard for this work. The Corporation emphasized that labor rates are one of several variables that will continue to be evaluated during the bidding process.

The parties acknowledge that there are many ways in which a seat supplier and the Union can achieve a competitive labor cost structure that enables the supplier to provide a competitive bid to the Corporation. The Union assured the Corporation that in circumstances where it represents employees of a Corporation supplier, it explores a variety of means to ensure a competitive fully fringed labor rate including such things as wage grow-ins and collaborative efforts towards continuous improvement, including waste reduction, improved quality, and other efficiencies.


For the International Union, UAW:          For General Motors Corporation:

_____          _____

_____          _____

# DOCUMENTS

**DELETE**

**Doc. No. 1**

**Interpretation of the Time and One-
Half Provisions of the National
Agreement
Paragraph (85)(a)
(Special Case Caused by Short Shift)**

In the event an employee works more than eight consecutive straight time hours on a shift (exclusive of an unpaid lunch period) under circumstances where the present daily overtime provisions and interpretations would make the time worked in excess of eight hours on that shift payable at straight time, such time worked in excess of eight hours on that shift will be paid for at time and one-half. Any such time worked and paid at time and one-half instead of straight time, will be considered as having been paid at straight time for purposes of computing daily overtime within the 24-hour cycle in which such time worked occurs.

# WORKING HOURS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Example: | Special Case Caused By Short Shift | | | D - Calendar Day HW - Hours Worked ST - Straight Time T 1/2 - Time and One-Half DT - Double Time PH - Pay Hours | | | | | |

| D | FROM | D | TO | HW | ST | T 1/2 | DT | PH | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| S | 7:00 A | | 3:30 P | 8 | | | 8 | 16 | |
| M | 6:00 A | | 3:30 P | 9 | 8 | 6:00 A-7:00 A | | 9.5 | |
| T | 6:00 A | | 11:30 A | 5.5 | 4.5 | 6:00 A-7:00 A | | 6 | (1) |
| W | 6:00 A | | 3:30 P | 9 | 8 | 2:30 P-3:30 P | | 9.5 | (2) |
| Th | 6:00 A | | 3:30 P | 9 | 8 | 6:00 A-7:00 A | | 9.5 | |
| F | 6:00A | | 3:30 P | 9 | 8 | 6:00 A-7:00 A | | 9.5 | |

(1)    Sent home or excused by Management.

(2)    Under G-153 and G-208, all 9 hours would be at ST. Under the 1967 interpretation, the hour from 2:30 to 3:30 p.m. would be at T 1/2 but would be counted as a straight time hour for purposes of computing daily overtime for the 24-hour cycle from 7:00 a.m. Wednesday to 7:00 a.m. Thursday.

Doc. No. 2

### Interpretation of
### Working Hours Section

**(Delayed Starting Time on Sunday Night)**

In negotiations, the Union has cited the following examples:

An employee is scheduled to start work at 12:01 a.m. on Monday and at 10:30 p.m. for the rest of the week.  The first eight hours beginning at 12:01 a.m. Monday were paid at straight time.

An employee starts a week at 10:30 p.m. Monday.  This shift is also worked Tuesday night, Wednesday night, Thursday night and Friday night.  The shift beginning 10:30 p.m. Saturday may or may not be worked.  The employee is brought in Sunday night but instead of starting at the usual time of 10:30 p.m., the starting time is delayed until 12:01 a.m. Monday.  The next week is then started at the usual time of 10:30 p.m. Monday.  The first 8 hours beginning at 12:01 a.m. Monday were paid at straight time.

The Corporation advised the Union that in these and similar cases, the shift that starts at 12:01 a.m. on Monday will be considered a Sunday shift and paid at double time provided the employee has been compensated ~~worked~~ in excess of forty (40) hours in the work week. ~~The employee's 24-hour cycle shall be considered to have started at 10:30 p.m. Sunday night.~~

[See Par. (82),(86)(85)]

114

**Doc. No. 3**

## Interpretation of
## Working Hours Section

### (Special Double Time Case)

During negotiations the Union has cited a situation in which a third shift employee worked seven shifts in the week and received no double time under the following circumstances.

**Example #1**

The employee worked the first five days of the week beginning each day at the regular shift starting time. The employee's sixth shift was advanced from 12:01 a.m. Saturday to 11:00 p.m. Friday and the employee then worked eight hours. The seventh shift was advanced from 12:01 a.m. Sunday to 11:00 p.m. Saturday.

**Example #2**

The employee worked the first five days of the week beginning each day at the regular shift starting time. Then the employee's sixth shift was advanced from 12:01 a.m. Saturday to 11:00 p.m. Friday and eight hours were then worked. The seventh shift was advanced from 12:01 a.m. Sunday to 3:30 p.m. Saturday.

The Corporation advised the Union that if this or other such cases occur where the starting time of the employee's seventh shift is advanced from Sunday to Saturday, the employee involved will be paid at double time for the hours worked by the employee on the seventh shift worked even though the shift starting time falls on Saturday, provided the employee has been compensated in excess of forty (40) hours during the week.

[See Par. (86)]

D-03A01

115

## DELETE

**Doc. No. 4**

### Interpretation of
### ~~Working Hours Section~~

### (Special Protracted Work Period Case)

During negotiations, the Union cited a situation in which an employee worked for a continuous period of more than twenty-four (24) consecutive hours where the hours worked in excess of twenty-four (24) were paid for at straight time.

The Corporation advised the Union that in such a case, those continuous hours worked in excess of twenty-four (24) will be paid for at the rate of time and one-half unless such hours would otherwise be paid for at a higher premium pursuant to the provisions of the Working Hours Section of the National Agreement. Any such time worked and paid at time and one-half instead of straight time, will be considered as having been paid at straight time for purposes of computing daily overtime within the 24-hour cycle in which such time worked occurs.

[See Par. (85)(a)-(c),(86)]

116

# MEMORANDUM OF UNDERSTANDING
## RE: ATTENDANCE

### May 17, 2009

The parties have agreed to modify the Special Procedure for Attendance contained in Document 8 of the 2007 GM-UAW National Agreement in accordance with the attached document.

The parties also agreed that employees who have active Attendance Improvement Steps issued under the 2007 Special Procedure for Attendance will have the most recent entry on their record reduced one step upon the effective date of the modified Special Procedure for Attendance contained within the 2009 Addendum.

For the International Union, UAW:       For General Motors Corporation:

_____       _____

_____       _____

117

map_C03

**Doc. No. 8**

## MEMORANDUM OF UNDERSTANDING -- SPECIAL PROCEDURE FOR ATTENDANCE

The Corporation and the International Union agree that the problem of unwarranted absenteeism must be addressed in a cooperative and constructive manner. Both parties recognize that unwarranted absences adversely impact quality, cost and efficiency and in so doing constitute a threat to the job security of all employees.

The parties also recognize that sometimes absenteeism is the result of personal or unforeseen problems in an employee's life and that such problems must be addressed in a reasonable and responsible manner.

Based on the foregoing the parties agree to adopt this Special Procedure for Attendance. This procedure is intended to encourage regular attendance through corrective discussion, use of approved contractual time off, and the availability of the Employee Assistance Program, while at the same time expecting employees to accept responsibility for their own attendance behavior.

**Special Procedure for Attendance**

**1.** This procedure will apply to all employees who have acquired seniority pursuant to Paragraph (57) of the National Agreement.

**2.** This Special Procedure for Attendance is a process in which the reason for an absence is no longer relevant nor required. Recognizing that there are contractually acceptable reasons for missing work, certain absences by their definition are not subject to the Improvement Steps of this procedure.

**3.** The action taken by Management as a result of the Attendance Improvement Steps of this procedure is subject to the Disciplinary Layoffs and Discharges

Section of the National Agreement and ~~therefore,~~ the Grievance Procedure Section of the National Agreement <u>as hereinafter defined.  Grievances filed in regards to this Special Procedure will be initiated at the Second Step and shall be strictly limited in scope to claims that the procedure was improperly administered.  Grievances may be filed following the termination of employment at the 6th Step of the Procedure claiming that the instant absence, tardiness or failure to call in was due to documented extraordinary circumstances beyond the employee's control.</u>  ~~During a Paragraph (76a) interview associated with the Attendance Improvement Steps, the employee will be advised of the special procedure for attendance.~~  <u>and the availability</u> ~~of the Employee Assistance Program.~~

**4.**  This procedure is separate and distinct from the plant's standard corrective disciplinary procedures.  All instances of employee absence, except the excludable absences as defined in paragraph 5, below, will be addressed through this procedure.

**5.**  Absences excluded from this procedure which will not place the employee into the Attendance Improvement Steps are as follows:

- Informal Leave of Absence – Paragraph (103)
- Formal Leave of Absence – Paragraph (104)
- Formal Leave of Absence – Paragraph (105a)
- Sick Leave of Absence - Paragraph (106) – when receiving Sickness and Accident benefits
- Compensable Leave – Paragraph (108)
- Leave of Absence for Union Activity – Paragraphs (109) & (109a)
- Leave of Absence for Public Office – Paragraphs (110) & (110a)
- Leave of Absence for Military Service – Paragraph (112)
- Educational Leave of Absence – Paragraph (113)
- Leave of Absence – Apprentice Training – Paragraph (113a)
- Absence for Jury Duty – Paragraph (218)
- Absence for Short-Term Active Duty – Paragraph (218a)
- Bereavement – Paragraph (218b)
- Approved Vacation

ap_C03                                    2

- Vacation Restricted (VR) – Paragraph (194) –
  (Up to five (5) instances of absence as defined
  in Paragraph 8, below)
- Approved FMLA
- Disciplinary Layoff or Suspension
- Absences required to be protected by law

**6.** Instances of absence subject to this procedure are
defined as follows:

**A.** One (1) day ~~Single~~ or two (2) consecutive days
of absence will be treated as one (1) absence.

**B.** Absences of three (3) or more consecutive days
will be treated as two (2) separate absences.

~~B~~ **C.** Tardiness of four (4) hours or more, or five
(5) hours or more in plants with Alternative Work
Schedules.

**7.** Employees are expected to request time off as far in
advance of the absence as possible. When instances
occur where an absence or tardiness as defined above
could not be planned in advance, employees ~~should
make every reasonable effort~~ are required to call in to
report their absence or tardiness ~~as early as possible~~ at
least thirty (30) minutes prior to the scheduled starting
time of the shift for which they will be absent or tardy
unless they can provide a satisfactory reason to
Management for such failure to call in. If an employee
fails to call in, the absence is considered an instance in
this procedure, whether or not it is permitted under this
policy. For all locations, the number utilized for
reporting unplanned absence or tardiness is: 1-800-222-
8889.

**8.** Absences not excused in advance will result in
Paragraph (194) Vacation Restricted (VR) hours being
allocated to each hour of absence, up to eight (8) hours,
on each day of such absence. During any eligibility
year, employees will be limited to a maximum of five
(5) instances where VR time will be allocated to an
absence which was not excused in advance. Employees
who are placed in Step 4 or 5 in the Attendance
Improvement Steps must receive prior approval for use
of VR hours.

**9.** Use of VR hours will not be permitted, unless excused in advance, on the following days:

   A. Holiday qualifying days as specified in Paragraph (203)(3).

   B. The last scheduled workday in the week preceding a Monday holiday specified in Paragraph (203).

   C. The next scheduled workday in the week following a Friday holiday specified in Paragraph (203).

   D. ~~Absences on any of the above days, which may be the result of documented extraordinary circumstances beyond the employee's control, will be taken into consideration by Management as possible justification to excuse the absence.~~

**10.** Instances of absence beyond those identified in paragraph 5, ~~above,~~ <u>failure to call in as referenced in paragraph 7,</u> or an unexcused absence occurring on a day identified in paragraph 9, ~~above,~~ will be subject to the Attendance Improvement Steps. A Paragraph (76a) interview will be offered in accordance with Paragraph (3) above. <u>During a Paragraph (76a) interview conducted in connection with the Third Step of this Procedure, the employee will be advised of the availability of the Employee Assistance Program.</u> ~~Following a Paragraph (76a) interview, and prior to assessing an Attendance Improvement Step, an employee who has had an absence, due to documented extraordinary circumstances beyond their control, may request an Attendance Review Meeting (ARM) be convened. The ARM will be conducted as follows:~~

   A. ~~The regular participants in ARM's will be determined by the Chairperson of the Shop Committee and the Personnel Director. The ARM will be held and a decision rendered within two (2) working days following the employee's return to work. This time period may be extended by mutual agreement. If extended, it will be limited to no more than five (5) working days from the employee's return to work.~~

   B. ~~Consistent with Paragraph (2) above, the ARM will review the documented extraordinary circumstances for the subject absence. The employee's past attendance record, including compliance with calling in an absence or~~

121

TA 5/19/09
MALL
TA 5/17/09
gMe

~~tardiness, will also be included in this review.
The ARM will also provide information to the
employee regarding the Employee Assistance
Program and elements of this procedure.~~

~~C. If the members of the ARM cannot reach mutual
agreement, Management reserves the right to
assess the next appropriate step of the
Attendance Improvement Steps. A grievance
may be filed as a result of placement into the
Attendance Improvement Steps. Such grievance
will initially be presented at the Shop
Committee Step of the Grievance Procedure.~~

## ATTENDANCE IMPROVEMENT STEPS

| Step | Absence/Instance | Action | Time on Record |
|------|------------------|--------|----------------|
| 1 | First | First Written Warning | 6 Months – Providing no further non-excludable absences; extended by periods of leaves. |
| 2 | Second | Second Written Warning | ~~6~~ 12 Months – Providing no further non-excludable absences; extended by periods of leaves. |
| 3 | Third | Referral to EAP Services and Balance of Shift Plus 1 Week Unpaid Time Off | 18 Months – Providing no further non-excludable absences; extended by periods of leaves |

T.A 5/17/09
MRG
JPS 5/17/09
JMM

| 4 | Fourth | Balance of Shift Plus 2 Week Unpaid Time Off | 18 Months – Providing no further non-excludable absences; extended by periods of leaves |
| 5 | Fifth | Balance of Shift Plus 30 Day Unpaid Time Off | 18 Months – Providing no further non-excludable absences; extended by periods of leaves. |
| 6 | Sixth | Termination of Employment | |

An employee facing termination pursuant to this Procedure (6th Step) may request to have their pending termination reviewed by the Personnel Director (or their designate) and the Shop Chairman (or their designate) to consider whether the employee's instant absence or failure to call in was due to documented extraordinary circumstances beyond their control.  If the local parties agree not to take further action, the employee will remain at their current Step of the Procedure.  However, should the parties not reach agreement, Management reserves the right to terminate the employee.

**11.** This Special Procedure for Attendance will become effective on ~~January 1, 2008~~ the first Monday of the second month following the effective date of the 2009 National Agreement Addendum.  The Special Procedure for Attendance contained in the 200~~3~~7 National Agreement will remain in effect until that ~~date~~ time.

**12.** The Special Procedure for Attendance establishes fixed outcomes with respect to all matters contained in the Attendance Improvement Steps chart and supersedes all local understandings and agreements pertaining to attendance matters.  Each action will remain on record until the defined "Time on Record" for that step has expired.  In the event an employee is issued a subsequent action, all prior actions will remain on record until the most recent action attains its defined

"Time on Record," at which time the employee's record
will be cleared of this and all previous action steps.

## NATIONAL COMMITTEE ON ATTENDANCE

**13.** The National Committee on Attendance will consist
of <u>two (2)</u> ~~three (3)~~ representatives of the Corporation
and <u>two (2)</u> ~~three (3)~~ representatives of the International
Union. <u>The National Committee will meet twice a year
at a mutually agreeable time and place to review
attendance data and discuss ways to reduce unwarranted
absenteeism.</u>

~~The National Committee shall:~~

~~**A.** Meet periodically at a mutually agreeable time
and place.~~

~~**B.** Explore ways to reduce unwarranted
absenteeism, particularly as it relates to the larger
problem of long term absenteeism.~~

~~**C.** Review attendance, grievance and ARM data
and make necessary or desirable recommendations on
the effectiveness of attendance procedures.~~

~~**D.** Recommend and develop relevant training
programs.~~

~~**E.** Review problems concerning serious or unusual
situations creating unwarranted absenteeism and make
appropriate recommendations.~~

~~**14.** The parties are specifically empowered to
periodically review and evaluate this procedure and
make mutually satisfactory adjustments in the
mechanics of its operation during the term of this
Agreement.~~

IN WITNESS WHEREOF, the parties hereto
have caused their names to be subscribed by their duly
authorized officers and representatives on this <u>26</u><sup>th</sup> day
of ~~September~~ <u>May</u>, 200<s>7</s><u>9</u>.

International Union,          General Motors
      UAW                    Corporation

Cal Rapson                    Diana D. Tremblay
Garry Bernath                 Joe C. Ponce

[See Par. (191)]
[See Doc. 46]

ap_C03                        8    125

# MEMORANDUM OF UNDERSTANDING BETWEEN THE PARTIES REGARDING EXCERPTS FROM THE MINUTES OF ATTENDANCE SUBCOMMITTEE

The parties agree that the following Excerpts from the Minutes of Attendance Subcommittee of the 2007 National Agreement are no longer applicable:

Subject:

Annual Perfect Attendance – Vehicle Purchase Voucher
Document 8
Document 8 – Adjustment of Attendance Corrective Action Steps



126

**Doc. No. 56**

## RELIEF TIME - CERTAIN OPERATIONS

## GENERAL MOTORS CORPORATION

~~September 26, 2007~~
February 16, 2009

Mr. Cal Rapson
Vice President and Director
General Motors Department
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan   48214

Dear Mr. Rapson:

The relief time in automobile manufacturing plants on
operations on which the employees' manual operations
are continuous and which cannot be left unattended and
for which the Corporation provides "tag" relief, and on
certain other operations that the Corporation determines
are likewise of such a nature as to give the employees
no control over their work pace, shall be twenty ~~three~~
(2~~0~~3) minutes before lunch and twenty ~~three~~ (2~~0~~3)
minutes after lunch on a regular eight (8) hour shift,
making a total of forty ~~six~~ (4~~0~~6) minutes. This will not
affect relief allowance now in effect on certain specific
operations due to environmental job conditions. The
amount of such relief shall be modified accordingly for
a shift other than a regular eight (8) hour shift. The
Plant Management may, by mutual agreement with the
Local Union, allocate the relief before and after lunch to
not more than two (2) periods before lunch and two (2)
periods after lunch.

Sufficient labor will be provided to enable employees to
obtain the above relief taking into consideration that the
first hour at the start of the shift and the first one-half
hour after lunch are not ordinarily required for relief
except in emergencies.

It is further understood that this policy supercedes any
local agreements or practices regarding this subject that
conflict with this policy.

D-56B02                                1    127

he parties have agreed to continue the following
nformal procedure to address complaints regarding this
ubject.

1. The complaint may be raised by the Chairperson
   of the Shop Committee directly with the Plant
   Personnel Director.

2. If not resolved, the Chairperson may refer the
   problem to a representative of the General
   Motors Department of the International Union
   who may request a meeting with either a
   representative of a divisional Central Office or a
   member of the Corporation Labor Relations
   Section to discuss the complaint and take
   appropriate action.

This letter and this informal procedure are not intended
o prejudice the position of either General Motors or the
UAW.

Very truly yours,


Diana D. Tremblay
GMNA Vice President
Labor Relations

[See Doc. 40, Att.A]
[See CSA #4]

D-56B02                              2    128

Doc. No. 87

## SUSPEND

## COLA CALCULATION

## GENERAL MOTORS CORPORATION

September 26, 2007

Mr. Cal Rapson
Vice President and Director
General Motors Department
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan   48214

Dear Mr. Rapson:

This letter is to confirm certain agreements reached by
General Motors Corporation and the International
Union, UAW, regarding the calculation of the Cost of
Living Allowance pursuant to Paragraphs (101)(d)
through (101)(l) of the National Agreement.

The table in Paragraph (101)(h) has been constructed to
provide that 1¢ adjustments in the Cost of Living
Allowance shall become payable, sequentially, for each
0.08, 0.08, 0.08, 0.08, 0.08, and 0.09 change in the
Index, and so forth, with that sequence of changes being
repeated thereafter in the table so as to produce an
average adjustment over time of 1¢ for each 0.08159
change in the Index.

If the Union claims that the Corporation's calculations
in any particular instance were not made in accordance
with the terms of this Letter of Understanding, it may
pursue such claim in accordance with the provisions of
Paragraph (55) of the new National Agreement.

      Very truly yours,


      Diana D. Tremblay
      **GMNA Vice President**
      **Labor Relations**

**Attachment**
      [See Par. (101)(d),(101)(g),(101)(h)]
        [See CSA #10]

## SUSPEND

## COLA CALCULATION

**Attachment**

### ENGINEERING METHOD OF ROUNDING

The following rules of rounding shall apply to the determination of the Consumer Price Index:

1.  If the leftmost of the digits discarded is less than 5, the preceding digit is not affected. For example, when rounding to four digits, 130.646 becomes 130.6.

2.  If the leftmost of the digits discarded is greater than 5, or is 5 followed by digits not all of which are zero, the preceding digit is increased by one. For example, when rounding to four digits, 130.557 becomes 130.6.

3.  If the leftmost of the digits discarded is 5, followed by zeros, the preceding digit is increased by one if it is odd and remains unchanged if it is even. The number is thus rounded in such a manner that the last digit retained is even. For example, when rounding to four digits, 130.5500 becomes 130.6 and 130.6500 becomes 130.6.

d-87aB02

131

<u>**SUSPEND**</u>

Doc. No. 101

## COLA CALCULATION CONVERSION

### UAW INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA

September 26, 2007

Ms. Diana D. Tremblay
GMNA Vice President
Labor Relations
General Motors Corporation
30009 Van Dyke Avenue
Warren, Michigan   48090

Dear Ms. Tremblay:

During these negotiations, the parties discussed the relationship between the employee paid health care benefits received by UAW-General Motors employees and the general cost of living.  As a result of these discussions, the parties agreed to base future cost of living adjustments on the Consumer Price Index for Urban Wage Earners and Clerical Workers (current series, CPI-W, for all items less medical care, not seasonally adjusted, United States City Average), as published by the Bureau of Labor Statistics (1982 – 1984 = 100).  This will become the new Index.

This letter is to confirm that the changes to Paragraphs (101)(f), (101)(g), and (101)(h) of the 2003 National Agreement and to Document No. 87, the letter of understanding on COLA calculation required for the conversion to the new Index, are intended to maintain the same mathematical wage replacement ratio as existed for the May – July 2003 quarter.

In this regard, it is our intention to construct cost of living adjustment tables in the following manner:

132

Tables shall be based on a new formula value that bears the same relationship to the May-June-July 2003 average for the new Index that the previous formula value of 0.25 bears to the May-June-July 2003 average for the all items CPI-W on the 1967 base. This yields a new formula of a one cent adjustment for each 0.08159 change in the new Index.

New adjustment brackets will be taken to two decimal places and will follow a repeating cycle of .08, .08, .08, .08, .08, .09, .08, .08, .08, .08, .08, .09, etc.

Very truly yours,


Cal Rapson
Vice President and Director
UAW General Motors Department

# LETTERS PUBLISHED

**GM** **General Motors**

Labor Relations

February 17, 2009

Mr. Cal Rapson
Vice President and Director
General Motors Department
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan   48214

Dear Sir:

During these negotiations, the parties discussed many issues related to the Company's supply base.
As a result, the Corporation and the Union agreed to discuss the current supply base and review
opportunities to improve the supplier base during the recently instituted Competitiveness Reviews.
These quarterly meetings, attended by the Vice President and Director of the GM Department of the
UAW, the GMNA Vice President of Labor Relations, and the Group Vice President, Global
Purchasing and Supply Chain, will provide a venue to resolve issues concerning supplier viability.

The Company appreciates the Union's efforts to help resolve distressed supplier issues.

Sincerely,

Diana D. Tremblay
GMNA Vice President
Labor Relations

134

# BENEFITS/SUB/PENSION

# MEMORANDUM OF UNDERSTANDING
## RE: Benefit Representation

The following changes modify the 2007 Unpublished Letter Agreement regarding Benefit Representation:

The letter agreement indicates that the seven benefit representatives supporting the following closed locations; Brea, Van Nuys, Trenton, Syracuse, Danville, Tarrytown, and Livonia would not be replaced if they left due to normal attrition.  Subsequently, the parties agree to offer the remaining representatives the 2009 special attrition package.  If they do not elect a SAP option then such representatives would be placed at a location in accordance with Appendix A of the 2007 UAW-GM National Agreement.  If their seniority does not provide for such placement, then the representative would be placed on layoff until such opening became available.


2·17·09

135

$^{DS}$ 2·7·09

# MEMORANDUM OF UNDERSTANDING
## RE: LIFESTEPS COMMUNICATION

### Signing Page

### February 17, 2009

The Miscellaneous Letter entitled LifeSteps Program is modified to include the following sentence at the end of the letter:

- Effective April 1, 2009, the periodic LifeSteps communication will be suspended pending a return to favorable business conditions.

For the International Union, UAW:                    For General Motors Corporation:

_Mike Grimes_ 2/17/09                              _LP Coleo_ 2/17/09

_____                          _____

136

## Memorandum of Understanding
### RE: CHR Funding

### May 16, 2009

During current negotiations, the parties discussed the worsening economic climate faced by General Motors and the financial impact on the Center for Human Resource's (CHR) operating budget. It was understood that business conditions in the auto industry continue to deteriorate requiring further cutbacks in manufacturing volumes, headcount, and fewer hours worked in General Motors plants.

As a result of these discussions, it was agreed that effective June 1, 2009, the current joint program funding accrual formula will be suspended and the current balance of unused National, Reservoir, and Health and Safety joint funds will be replaced by an allocation of $6 million per month. Unused portions of the monthly allocation will be accumulated and at the time the funds provided by GM exceed the CHR spending by $14 million, the funding will shift to a "pay as you go" system for the remainder of the 2007 GM-UAW National Agreement. In addition, the current joint program local funding accrual formula will be suspended and the current balance of unused local joint funds will be replaced by $0.4 million per month for the remainder of 2009, $0.3 million a month for 2010, and $0.2 million per month for 2011 through the remaining term of the agreement. Each GM-UAW facility will be allocated a portion of the local joint funds based on its active population and will continue to request funds by following the Funding guidelines.

For the International Union, UAW:            For General Motors Corporation:

_____            _____

_____            _____





# MEMORANDUM OF UNDERSTANDING
## RE: SUPPLEMENTAL UNEMPLOYMENT BENEFITS

### May 16, 2009

**Administration of Employee on Layoff**

An employee on a Qualifying Layoff shall be eligible for benefits under the
Supplemental Unemployment Benefit (SUB) Plan and for benefits under the Transition
Support Program (TSP). A Qualifying layoff is either of the following:

- indefinite layoff;
- temporary layoff in an instance, as jointly identified by the parties, in which the
  Company modifies shifts or work schedules to enhance operating performance
  and continues to actively employ employees that otherwise would be placed on
  layoff.

**Supplemental Unemployment Benefits**

The provisions of the 2007 UAW-GM Supplemental Agreement regarding the
Supplemental Unemployment Benefit (SUB) Plan shall be modified as follows:

- Employees with at least one (1) year, but less than ten (10) years of seniority shall
  be eligible to receive SUB Regular Benefits for Qualifying Layoffs for a
  maximum of 26 weeks during the life of the 2007 UAW-GM Collective
  Bargaining Agreement subsequent to the effective date of this Memorandum.
- Employees with at least ten (10) but less than twenty (20) years of seniority shall
  be eligible to receive SUB Regular Benefits for Qualifying Layoffs for a
  maximum of 39 weeks during the life of the 2007 UAW-GM Collective
  Bargaining Agreement subsequent to this Memorandum.
- Employees with twenty (20) or more years of seniority shall be eligible to receive
  SUB Regular Benefits for Qualifying Layoffs for a maximum of 52 weeks during
  the life of the 2007 UAW-GM Collective Bargaining Agreement subsequent to
  the effective date of this Memorandum.
- In calculating the weekly SUB Regular Benefits for an employee on a Qualifying
  Layoff, the offsets for State System Benefits received for that week shall apply.
  If an employee is receiving wages from another employer, their SUB payment
  may be carved by an amount not to exceed the UI benefit that employee would
  otherwise be entitled to if he or she was unemployed.

DS 5/16/09
8:55pm

5/16/09
8:55 pm

5-16-09
8:55

138

**Transition Support Program**

An employee on a Qualifying Layoff who exhausts his or her maximum eligibility for
SUB Regular Benefits payments (i.e., 26, 39, or 52 weeks, depending on years of
seniority) shall be eligible for subsequent benefits under the Transition Support Program
(TSP). The TSP shall provide a weekly benefit payment calculated as 50% of the
employee's gross weekly wages, based on a 40-hour week, with duration of eligibility
based on seniority as follows:

- Employees with less than ten (10) years of seniority as of the date of their
  Qualifying Layoff shall, upon exhaustion of their SUB Regular Benefit maximum
  eligibility, be eligible to receive TSP benefit payments for a maximum of 26
  weeks during the life of the 2007 UAW-GM Collective Bargaining Agreement
  subsequent to the effective date of this Memorandum.
- Employees with at least ten (10) but less then twenty (20) years of seniority as of
  the date of their Qualifying Layoff shall, upon exhaustion of their SUB Regular
  Benefit maximum eligibility, be eligible to receive TSP benefit payments for a
  maximum of 39 weeks during the life of the 2007 UAW-GM Collective
  Bargaining Agreement subsequent to the effective date of this Memorandum.
- Employees with twenty (20) or more years of seniority as of the date of their
  Qualifying Layoff shall, upon exhaustion of their SUB Regular Benefit maximum
  eligibility, be eligible to receive TSP benefit payments for a maximum of 52
  weeks during the life of the 2007 UAW-GM Collective Bargaining Agreement
  subsequent to the effective date of this Memorandum.
- In calculating the weekly TSP Benefits for an employee on a Qualifying Layoff,
  the offsets for State UI Benefits received for that week shall apply.

An employee may elect, prior to becoming eligible for TSP benefits, to opt out of TSP
benefits and receive a lump-sum cash payment; in doing so, the employee shall forfeit
eligibility for weekly TSP benefit payments, and also shall forfeit all recall rights. The
gross (pre-tax) amount of the opt out lump-sum cash payment is calculated as $10,000
plus the maximum TSP benefit for which the employee would otherwise be eligible (i.e.,
50 percent of the employee's gross weekly wages, based on a 40-hour week, multiplied
by either 26, 39, or 52, depending on the employee's seniority). An employee who elects
to opt out of the TSP will continue to receive healthcare coverage for the remainder of the
months of extended coverage for which he or she would have been eligible, based on
years of seniority at the time of layoff, had he or she not elected to opt out of the TSP.

The parties will collaboratively work together with local, state, and national
governmental agencies to indentify various alternative funding options for retraining
employees on Qualifying Layoff.

**Supplemental Unemployment Benefits for Entry Level Employees**

The SUB eligibility and duration provisions for Entry-Level employees, as specified in
the UAW-GM Entry Level Wage & Benefit Agreement of the 2007 National Agreement,
are modified according to the following provisions:

- For Entry-Level employees with at least one (1) year but less than three (3) years
  of seniority, eligibility for Regular Benefits for periods of Qualifying Layoff
  under the SUB Plan shall be limited to a maximum of 13 weeks during the life of
  the 2007 UAW-GM Collective Bargaining Agreement.
- For Entry-Level employees with three (3) or more years of seniority, eligibility
  for Regular Benefits for periods of Qualifying Layoff under the SUB Plan shall be
  limited to a maximum of 26 weeks during the life of the 2007 UAW-GM
  Collective Bargaining Agreement.
- Entry-Level employees with less than one (1) year of seniority shall be ineligible
  for SUB Regular Benefits.

In calculating the weekly SUB Regular Benefit for an employee on a Qualifying
Layoff, the offsets for State System Benefits received for that week shall apply.   If an
employee is receiving wages from another employer, their SUB payment may be
carved by an amount not to exceed the UI benefit that employee would otherwise be
entitled to if he or she was unemployed.

For the International Union, UAW:                For General Motors Corporation:

_____                _____

_____                _____

DS
5/16/09
8:55 pm
DLK
5/14/09
8:55 pm

140

2009 UAW SUB-Layoff MOU 051309-a.doc                                Page 3 of 3

PP
5/16/09
8:55 pm

International Union, United Automobile
  Aerospace and Agricultural Implement
  Workers of America, UAW
8000 East Jefferson Avenue
Detroit, MI 48214

Attn:        Mr. Cal Rapson
             Vice President and Director
             General Motors Department

Dear Mr. Rapson:

This letter confirms the understanding between the Company and the Union
regarding the following letters in the Supplemental Agreement covering the
Supplemental Unemployment Benefit Plan, Exhibit D to the Agreement between
General Motors Corporation and the UAW dated September 26, 2007:

             Continuing SUBenefits
             Extended SUBenefits Idled Plants
             C-SUB/E-SUB Entitlement
             GIS Elimination

These letters and the provisions contained in these letters will be suspended
effective with the signing of the Memorandum of Understanding RE:
Supplemental Unemployment Benefits dated February 17, 2009.  These letters
and the provisions contained in these letters will be reinstated effective with the
reinstatement of the original provisions of Exhibit D to the Agreement between
General Motors Corporation and the UAW dated September 26, 2007.

                    Very truly yours,

                    GENERAL MOTORS CORPORATION

                    Diana D. Tremblay
                    GMNA Vice President
                    Labor Relations

Accepted and Approved:

INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By:  Cal Rapson

141        DD 2-17-09        DS 2-17-09

## Memorandum of Understanding
## Re: Modification to UAW-GM Entry Level Wage and Benefit Agreement
### (Pension Plan)

### February 17, 2009

The parties have agreed that Section II (Pensions) of Attachment B-1 to the Memorandum of Understanding UAW-GM Entry Level Wage & Benefit Agreement shall be modified to permit GM the discretion to provide pension benefits to Entry-Level Wage Employees through a new pension plan separate and distinct from the GM Hourly-Rate Employee Pension Plan.  The parties agree that they will explore the potential benefits of establishing a separate cash balance pension plan for these employees and that, after discussions with the UAW, GM may split out Entry Level Wage Employees covered under the provisions of the Personal Retirement Plan from the GM Hourly-Rate Employee Pension Plan into such new pension plan.  These potential changes in administration shall not modify or alter in any way the benefit levels provided in any Pension Plan covering UAW-Represented Hourly Employees.

For the International Union, UAW:            For General Motors Corporation:

_2-17-09_                                    _2/17/09_

**Memorandum of Understanding**
**Modifications to the 2007 UAW-GM Health Care Program**
**May 16, 2009**

Mr. Calvin Rapson
Vice President and Director
UAW General Motors Department
Detroit, MI 48214

Dear Mr. Rapson:

During these negotiations, the Corporation and Union discussed proposed changes to eligibility for active employees and retirees. As such, the following changes in eligibility will be made for active employees:

>Effective immediately, no new Sponsored Dependents will be enrolled pursuant to the provisions of Art. III, 9(d).

>Effective October 1, 2009, coverage will cease for any child enrolled as a Principally Supported Children pursuant to the provisions of Art. III, 9(c)(1)(i).

>Effective October 1, 2009, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent.

The following changes in eligibility will be made for retirees:

>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, no new Sponsored Dependents will be enrolled pursuant to the provisions the Plan.

>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any child enrolled as a Principally Supported Children pursuant to the provisions of the Plan.

>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent.

For the International Union, UAW:

_____

_____

For General Motors Corporation:

_____

DS 5/16/09
11:30 pm

143

7A 5-16-09

Sponsored Dependents_C03

# MEMORANDUM OF UNDERSTANDING
## RE:  2007 UAW-GM SUPPLEMENTAL AGREEMENT COVERING
## THE LIFE AND DISABILITY BENEFITS PROGRAM

### May 16, 2009

The following changes modify the identified provisions of the 2007 UAW-GM Supplemental Agreement covering Life and Disability Benefits Program ("Program"):

The parties have agreed to continue to work together to address issues impacting the Life and Disability Program. Specifically, the parties agree that:

1.  They will jointly complete the review of the disability forms to ensure that the forms provide the necessary information to support the pilot process described below. This review is underway and will be completed by the end of the second quarter of 2009.

2.  Effective August 1, 2009, and until the end of the 2007 National Agreement, the parties will initiate a pilot process for the review and disposition of a sample of Sickness and Accident (S & A) claims. In this pilot process, for an employee to be deemed to be wholly and continuously disabled under the provisions of Article II, Section 6(a), the employee must provide medical evidence, satisfactory to the Carrier (third party administrator) that substantiates total disability, i.e. medical substantiation.  Absent medical information that substantiates total disability, the employee's claim for benefits under the Program will be denied.

3.  This pilot will be applied only to the following locations:  Orion Assembly Center, GMVM-Spring Hill Manufacturing, Arlinton Assembly Center, Romulus Powertrain, Flint Metal Fabricating, and Mansfield Metal Fabricating.

4.  The denial of any claim under the process described above will be subject to The Procedure For The Review of Denied Claims with expedited review at the third step with a member of GM Employee Benefits staff and the International UAW staff. The review of the claim will be facilitated by a third party administrator (Sedgwick CMS) nurse professional who was not involved in the initial disposition of the claim.  The Parties will meet to discuss these claims at least monthly.

For the International Union, UAW:                    For General Motors Corporation:

_____                    _____

_____                    _____

DS  5/16/09
11:30 pm
JLK  5/16/09
11:30 pm

144

T/A
JJ  5-16-09
11:30 pm

DisabilityLang051609.docx



**Unpublished**
**Memorandum of Understanding**
**Modifications to the 2007 UAW-GM Health Care Program**
**May 16, 2009**

Mr. Calvin Rapson
Vice President and Director
UAW General Motors Department
Detroit, MI  48214

Dear Mr. Rapson:

Subject:  Method Used for Determining the Corporation's Contributions for Alternative Plans

During these negotiations, the Corporation and Union discussed the method and process used in determining the Corporation's monthly contributions as described in the Miscellaneous Letters, Contributions - Alternative Plans, and Supplemental Methodology – Alternative Plans. The parties agreed the present method could be improved and should reflect other measures of plan performance as a means of determining the value of the plan to the member and the Corporation.

Effective with the 2010 Plan Year (January through December), the following method will be used for determining the local carrier composite premium (Umbrella Rate):

1.  The Umbrella Rate will be calculated for active employees.  The cost of Hospital, Surgical, Medical, Prescription Drug, and Mental Health/Substance Abuse Coverages for employees covered under the Entry Level Wage & Benefit Agreement will be excluded from this local Umbrella Rate calculation, and they will not be enrolled in HMOs/PPOs.
2.  If less than one thousand five hundred (1,500) employees and dependents are enrolled in the local carrier, the local carrier will be considered to have a non-credible population. When the local carrier has a non-credible population, the Umbrella Rate for southeast Michigan local plan (Detroit/Flint), adjusted for differences in component premium rates (i.e., single, two-party, family) and adjusted for area cost differences for hospital, and medical, surgical will be used as a proxy for the local plan Umbrella Rate.
3.  The local carrier Umbrella Rate will be adjusted to align its age and gender mix to the alternative plan. A mutually agreed upon independent actuary will be asked to develop such adjustments and the parties will mutually agree to such adjustments.  Consideration will be given to the age/sex factor tables agreed to between Ford Motor Company and the UAW on October 30, 2007.
4.  The following margin of error corridor brackets will be used based on the number of members when the local Umbrella Rate is below the alternative plan composite premium (i.e., over 10,000, plus/minus 3% error, 5,000 to 10,000, plus/minus 5% error; 2,500 to 5,000, plus/minus 10% error; 1,000 to 2,500 plus/minus 20% error; 500 to 1000 plus/minus 40% error; under 500, cannot be measured.)  The alternative plan will be considered to be under the Umbrella rate when its composite premium is below the upper limit of the comparator Umbrella Rate's upper margin of error corridor.
5.  The local carrier Umbrella Rate will be calculated by an independent actuary selected by mutual agreement of the parties and paid by General Motors.
6.  The independent actuary will follow the methodology described in this letter.  The actuary will establish a method to assure that alternative plans are not disadvantaged by the implementation of the TCN plan as referenced in the Miscellaneous Letter CUCHCB.

MOU HMO_D04

145

Additionally appropriate adjustments will be made for drug utilization differences for the TCN.

The independent actuary will determine the trend forecast and other elements to calculate the Umbrella Rate based on at least most recent available rolling two years of actual hospital, surgical, medical, and prescription drug claim experience. The parties may provide input to the actuary regarding other relevant economic data. The independent actuary will make recommendation to the parties on the trend rate to be used for each calendar year, along with their rationale and justification for the proposed rate no later than June 1 preceding the next Plan Year. Based on the actuary's recommendation, the Corporation and the Union will jointly determine the trend rate to be used. The parties will establish a regular cadence of meetings to review progress and core data to ensure timely decisions, and will establish a process by which core data is shared, stored, and made available in a secured "online" environment to ensure transparency of core data.

The method for comparing the local carrier Umbrella Rate to the alternative plan composite premium described in the Miscellaneous Letters, Contributions – Alternative Plans, and Supplemental Methodology – Alternative Plans will continue to be used. If the alternative plan composite premium is below the Umbrella Rate, the plan will be offered for the next Plan Year. If the alternative plan composite premium continues to be above the Umbrella Rate the process described below will be applied.

1. The parties will work together to persuade the alternative plan to reduce its composite premium to a level below the Umbrella Rate.
2. The parties may change the alternative plan design by mutual agreement and request a new bid from the alternative plan based on the new plan design by July 1 preceding the new Plan Year.
3. If the alternative plan composite premium continues to be above the Umbrella Rate after the parties have implemented items 1 and 2 above, the parties will issue a joint letter to the alternative plan by August 1 preceding the new Plan Year requiring the alternative plan to reduce its composite premium to a level below the Umbrella Rate.
4. If the alternative plan does not reduce its composite premium below the Umbrella Rate after step 3 above, the employee monthly contribution will be calculated as defined in the Miscellaneous Letter Contributions – Alternative Plans. The parties may mutually agree to require the monthly contribution from the alternative plan enrollees and in that case the alternative plan will be offered in the upcoming Plan Year.
5. If the parties do not agree to require monthly contributions from the alternative plan enrollees the alternative plan will be sent a termination letter no later than August 15th preceding the upcoming Plan Year.

In the case of Health Plus, Blue Care Network (except for BCN Lansing, see below), Health Alliance Plan, and MercyCare Health Plan, the parties agree that these plans would continue to be offered through the life of the 2007 Agreement and open to new enrollment. Should their composite premium be above the Umbrella Rate, the parties will examine alternative means to reduce the HMO's composite premium.

The parties agree BCN Lansing will be open to enrollment effective November 1, 2009. The parties further agree to commission an independent evaluation of BCN Lansing's composite premium beginning January 1, 2011. Should such independent evaluation demonstrate that BCN Lansing's composite premium is above the Umbrella rate, the parties will examine

alternative means to reduce BCN Lansing's composite premium. If those efforts fail, BCN Lansing will be discontinued effective August 1, 2011.

For the International Union, UAW:          For General Motors Corporation:

<u>PENSION PLAN</u>

Workers Compensation

GENERAL MOTORS CORPORATION
May 16, 2009

International Union, United Automobile,
  Aerospace and Agricultural Implement
  Workers of America, UAW
8000 East Jefferson Avenue
Detroit, Michigan  48214

Attention: Mr. Cal Rapson
           Vice President and Director
           General Motors Department

Dear Mr. Rapson:

During the 2009 negotiations, the parties discussed the 2007 letter
agreement titled "Workers Compensation".  That letter agreement
stated:

> "This letter of agreement constitutes an amendment to the 2007
> GM-UAW Pension Plan and shall be construed and applied as if it
> were therein incorporated."

> "Pursuant to Subsection 354(14) of the Michigan Workers
> Compensation Act, as amended, until termination or earlier
> amendment of the 2007 Collective Bargaining Agreement for
> employees who are injured and retire on or after October 1, 2007,
> workers compensation payments for such employees shall be reduced
> by disability retirement benefits payable under the Hourly-Rate
> Employees Pension Plan to the extent that the combined workers
> compensation payments, initial Social Security Disability
> Insurance Benefit amount, and the initial disability retirement
> benefit (per week) exceed the employee's gross Average Weekly
> Wage at the time of injury.  In no event shall such reduction be
> greater than the disability retirement benefit payable."

**As a result of the 2009 negotiations, the parties have agreed that the
2007 letter agreement, referenced above, will be amended such that,
effective January 1, 2010, the provisions of the 2007 letter agreement
will be applied to all retirees who retired prior to January 1, 2010,
regardless of their date of retirement or injury.**

**Additionally, the parties have agreed that, for employees who retire
on or after January 1, 2010, the above referenced 2007 letter titled
Workers Compensation will be eliminated and that, pursuant to the
Michigan Workers Compensation Act, workers compensation payable for
all such retirees shall be reduced, commencing January 1, 2010, by**

148

<u>PENSION PLAN</u>

**<u>pension or retirement payments payable under the Hourly-Rate Employees
Pension Plan.</u>**


Very truly yours,

GENERAL MOTORS CORPORATION

<u>Diana D. Tremblay</u>
<u>GMNA</u> Vice President
Labor Relations

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By:  <u>Cal Rapson</u>


b09d


- 244 -

149

UP-9                                                      Workers Compensation

**GM**

General Motors Corporation
Employee Benefits and
Human Resources Operations
Mail Code 482-C26-A68
300 Renaissance Center
Detroit, Michigan 48265-3000
USA

Fax # (313) 665-6728

~~NEW LETTER~~
~~(UNPUBLISHED LETTER AGREEMENT)~~

~~(B)~~

~~International Union, United Automobile,~~
~~Aerospace and Agricultural Implement~~
~~Workers of America, UAW~~
~~8000 East Jefferson Avenue~~
~~Detroit, Michigan  48214~~

~~Attention:  Mr. Cal Rapson~~
~~Vice President and Director~~
~~General Motors Department~~

~~Dear Mr. Rapson:~~

~~With respect to the "Workers Compensation" letter contained in~~
~~the Hourly-Rate Employees Pension Plan, GM agrees that if the~~
~~Michigan Supreme Court or the Michigan Court of Appeals,~~
~~whichever court issues the final order, rules that the reduction~~
~~as described in such letter is in violation of Section 354(14) of~~
~~the Michigan Workers Compensation Act, as amended, GM agrees to~~
~~stop such reductions.  The UAW agrees to not initiate or support~~
~~any action or claim challenging the contents of the letter.~~

~~Very truly yours,~~

~~GENERAL MOTORS CORPORATION~~

~~Diana D. Tremblay~~
~~GMNA Vice President~~
~~Labor Relations~~

~~Accepted and Approved:~~

~~INTERNATIONAL UNION, UNITED AUTOMOBILE,~~
~~AEROSPACE AND AGRICULTURAL IMPLEMENT~~
~~WORKERS OF AMERICA, UAW~~

~~By:  Cal Rapson~~

150

b09a

## MEMORANDUM OF UNDERSTANDING
## RE: ENTRY LEVEL WAGE & BENEFIT AGREEMENT

### May 17, 2009

During these negotiations, the parties discussed the need to establish competitive levels of compensation. As a result, the parties agreed to the following modifications to the Memorandum of Understanding - Entry Level Wage & Benefit Agreement of the 2007 GM/UAW National Agreement:

- All new production employees hired through the September 14, 2015 expiration of the 2011 GM/UAW National Agreement will be classified as entry level employees and subject to the provisions of the Entry Level Wage & Benefit Agreement

- There will be no limit on the number of entry level employees that may be hired prior to September 14, 2015

- Upon the expiration of the 2011 GM/UAW National Agreement, the parties will mutually agree to a hiring limit that is based on the entry level percentage as of September 14, 2015, but no more than 25% and no less than 20% of the total GM-UAW hourly population

- The "Production" and "Starting" wage rates are frozen at current levels, and provisions for future Wage Formula Increases are suspended for the duration of the 2007 GM/UAW National Agreement. However, new hires will continue to progress from the established starting rates to the full production rate consistent with the MOU's provisions regarding wages.

- Also noted was the agreement reached during previous negotiations that suspended Performance Bonus payments for entry level employees

The aforementioned changes are specific to the wage provisions of the Entry Level Wage & Benefit Agreement. Other portions of that agreement (e.g. Benefits) remain subject to further discussion by the parties and amendment during these negotiations.

For the International Union, UAW:          For General Motors Corporation:

_____          _____

_____          _____

| 5 |



melwbaltr_G07

# MEMORANDUM Of UNDERSTANDING
## UAW-GM ENTRY LEVEL WAGE & BENEFIT AGREEMENT

In accordance with and as part of the 2007 UAW-GM National Agreement and the subsequent 2009 Addendum between International Union, UAW (hereinafter referred to as UAW) and General Motors Corporation (hereinafter referred to as GM), the UAW and GM agree as follows regarding wage and benefit levels and other matters applicable to certain employees hired after the effective date of the 2007 UAW-GM National Agreement. Except as otherwise specified in this Memorandum, employees hired after the effective date of this Memorandum will be covered in all respects by the UAW-GM 2007 National Agreement.

Notwithstanding the foregoing, or anything else to the contrary, Article 2 of this Memorandum applies to all UAW-represented GM facilities covered by the 2007 UAW-GM National Agreement.

**Article 1**

~~Duration~~

~~This Memorandum shall take effect on the effective date of the 2007 UAW-GM National Agreement ("Effective Date") and continue until 11:59 p.m. (Detroit time) on September 14, 2011, subject to the modification and termination provisions of Paragraph (223) of the 2007 UAW-GM National Agreement.~~

**Applicability**

The terms of this Memorandum apply to all entry level employees at all GM facilities covered by the UAW-GM National Agreement. ~~"Entry level employees" means~~ All production ~~regular~~ employees hired during the remaining term of the 2007 GM-UAW National Agreement and through the term of the 2011 GM-UAW National Agreement will be classified as "entry level employees." No limit will be placed on the number of entry level employees that may be hired prior to September 14, 2015. Upon expiration of the 2011 GM-UAW National Agreement, the parties will mutually agree to a hiring limit based on the entry level percentage as of September 14, 2015. However, the cap can be no more than 25% and no less than 20% of the total GM-UAW hourly population. Should the

number of entry level employees exceed the mutually
agreed upon percentage above, the national parties will
determine a process for the orderly transition of the
appropriate number of entry level employees to non-
entry level status. ~~on or after the date of this~~
~~Memorandum into the non-core work functions~~
~~identified on Attachment A of this Memorandum. The~~
~~entry level wage rate identified in this Memorandum~~
~~shall apply to any such entry level employees until such~~
~~employee becomes a regular, non-entry level employee~~
~~as provided in Appendix A of the 2007 GM-UAW~~
~~National Agreement.~~

## Seniority and Transfers

Employees hired under this Memorandum will be
eligible to transfer within the classifications covered by
this Memorandum in accordance with applicable
National or Local Agreement provisions, and may
apply and be transferred, if qualified, to the skilled
trades, apprentice or EIT classifications.
Notwithstanding any such transfer, these employees
will continue to be covered by this Memorandum.

## Wages and Classification Groupings

There are three (3) production wage rates and
corresponding classification groupings set forth in
Attachment A to this Memorandum. Disputes over the
placement of any remaining classifications into these
classification groupings that are not resolved by the
local parties will be referred to the National Parties.

Employees covered by this Memorandum will receive
the following rates of pay:

|                   | Group A | Group B | Group C |
|-------------------|---------|---------|---------|
| Production Rates - | ~~$16.23~~ | ~~$15.30~~ | ~~$14.50~~ |
|                   | $17.26  | $16.28  | $15.43  |
| Starting Rates -  | ~~$14.61~~ | ~~$14.00~~ | ~~$14.00~~ |
|                   | $15.53  | $14.65  | $14.00  |

~~A Performance Bonus equal to three percent (3%) of~~
~~Qualified Earnings will be paid in 2008, 2009, 2010~~
~~and 2011 to employees covered by this Memorandum~~
~~in accordance with the following table, provided the~~
~~employee has seniority as of the designated eligibility~~
~~date:~~

153

| Eligibility Date | Amount | Payable during week ending |
|---|---|---|
| ~~April 28, 2008~~ | ~~3% of qualified earnings~~ | ~~May 25, 2008~~ |
| ~~April 27, 2009~~ | ~~3% of qualified earnings~~ | ~~May 24, 2009~~ |
| ~~April 26, 2010~~ | ~~3% of qualified earnings~~ | ~~May 23, 2010~~ |
| ~~April 25, 2011~~ | ~~3% of qualified earnings~~ | ~~May 22, 2011~~ |

~~An employee's Performance Bonus will be based on the qualified earnings during the 52 consecutive pay periods immediately preceding the pay period in which each designated eligibility date falls. Qualified Earnings for this purpose shall be calculated on the same basis and on the same compensation as performance bonuses are calculated in the UAW-GM National Agreement.~~

1. Wages

a.  Production Employee New Hire Rates
    For all production employees hired after the Effective Date of this Memorandum, new hire rates shall be established at the greater of (a) $14.00 per hour, or (b) 90% of the ~~prevailing~~ Production Rate for the respective classification. Employees hired at the 90% level will receive four wage progression increases, one every 26 weeks in an amount equal to 2.5% of the ~~then prevailing~~ Production Rate, until reaching the Production Rate for the relevant classification over the course of 104 weeks. Employees hired at the $14.00 rate will receive four wage progression increases, one every 26 weeks, in the amount necessary to achieve the ~~then prevailing~~ Production Rate over the course of 104 weeks in four proportional increases. These proportional increases shall be equal to the difference between the ~~then prevailing~~ Production Rate for the classification and the employee's then-current rate multiplied by 25% for the first progression increase; 33% for the second; 50% for the third; and 100% for the fourth and final progression increase. ~~All new hires will also receive the wage increases described in Section 1.b below.~~

b. ~~Wage Formula Increases~~ Skilled Trades Employee Rates

~~Effective with the Monday of the week that includes the first scheduled workday of 2008 (12/31/2007), 2009 (1/5/2009), 2010 (1/4/2010) and 2011 (1/3/2011), the hourly wage rate for each production employee will be increased by a percentage equal to the greater of (a) the annual percentage increase in average hourly earnings, excluding overtime, of employees in the Manufacturing sector (BLS Series CEU3000000033) or (b) the annual percentage increase in the All Items, Less Medical, CPI-W Index (1982-84=100), both as calculated for the 12 month period ending with the month of August prior to the respective increase date. In the event a calculated increase exceeds 3.75%, wages will be increased by 3.75% and the parties will determine a mutually acceptable disposition of the excess, guided by the twin goals of enhancing UAW members' job and income security and the company's competitiveness. In the event the wage formula generates a negative result, wages will not be reduced. Instead, the negative result, up to a negative 3.75%, would be used as a direct offset to the next subsequent formula increase (and subsequent increases after that, if necessary, until fully offset). For example, if the formula produced a negative result of 1.34% in one year followed by a 2.45% increase in the next year, the adjusted increase in the second year would be a net 1.11%. The engineering method of rounding will be adopted for all Wage Formula calculations: to three decimal places for the Manufacturing sector average hourly earnings component; to four decimal places for the annual inflation component; to four decimal places for year-to-year percentage changes for each of these components; and to two decimal places for new base hourly wage rates following application of a four decimal Wage Formula increase.~~

~~c. Wage Formula Basis~~

~~In the event that either of the BLS Series data as referenced above is eliminated, the parties will adopt a mutually agreeable successor or replacement series for use in future calculations. When calculating a Wage Formula result for a current year, BLS data from the preceding year's calculation will become the basis for the current year formula and will not be changed to reflect subsequent revisions in the published data, nor will a Wage Formula adjustment for a prior year be changed as a result of subsequent revisions in the underlying data.~~

The wage rates for skilled trades employees provided in the UAW-GM National Agreement will continue to cover skilled trades employees, including journeymen/women hired after the Effective Date, new apprentices hired directly into an apprentice classification after the Effective Date, and production employees hired under this Memorandum who are subsequently promoted to a journeyman/woman classification, transferred to EIT or EITS status, or indentured as an apprentice.

**Vacation Entitlement**

The maximum annual vacation entitlement for employees covered by this Memorandum shall be 160 hours.

~~**Independence Week Period**~~

~~National Agreement Paragraphs (202) (d), (202) (e), (202) (f) and (202) (g) will not apply to employees covered by this Memorandum. For any days on which an employee covered by this Memorandum who has obtained seniority and is not scheduled to work during the Independence Week Period, such employee will have the option of using Vacation Entitlement hours, if available, or be granted an unpaid leave of absence for such Independence Week Period.~~

**Memorandum of Joint Activities and Legal Services**

The funding provisions of Section III, subsections A and B of the Memorandum of Understanding – Joint Activities and Item 19 (Contract Settlement Agreement) of the UAW-GM National Agreement will continue to be applicable for entry level employees covered by this Memorandum. Such employees will be covered by the Training Program, Health & Safety Program, Quality Network Program, the administration of the Dependent Care Spending Plan, specific Work/Family Programs, i.e. the Diversity Program, Employee Assistance Program, Critical Incident Intervention Program, and the Workplace Violence Initiatives Program. These programs, services and related activities will continue to be jointly administered, developed and implemented. In addition, entry level employees covered by this Memorandum will be included within the scope of Exhibit I – Group Legal Services Plan.

Document 129 – Retiree Tuition Assistance Plan,
Document 130 – UAW-GM Scholarship Program for
Dependent Children, the Tuition Assistance Program,
Pre-and Post-Retirement programs, the National Paid
Educational Leave Program, Child and Elder Care
referral services, the Homework Hotline, and any
subsidy for any child care center usage will not be
provided for employees covered by this Memorandum.

Such programs or services will be offered if the parties
are able to develop a process for making such programs
or services available to employees covered by this
Memorandum on a space-available basis without cost.

## Document 38 – Orientation Program

The National New Hire Orientation Program developed
by the Center for Human Resources will be modified to
incorporate a thorough understanding of the industry's
need to transform to meet the challenges of the
marketplace. The program will include the role of the
parties in preserving jobs while still maintaining the
core values historically provided in the parties'
bargaining agreements.

## Benefit Plans

Except as set forth in this Memorandum or Attachment
B, employees covered by this Memorandum will be
covered by the benefit plans set forth in the UAW-GM
National Agreement.

## Appendix K

Appendix K is not applicable to employees covered by
this Memorandum.

## Article 2

## Scope

Except as specifically provided in this Memorandum,
all provisions of the 2007 UAW-GM National
Agreement, Agreements and understandings and local
agreements existing as of the Effective Date shall apply
to employees covered by this Memorandum.

Any future changes to the UAW-GM National
Agreement, Agreements or understandings will apply to

employees covered by this Memorandum only by
express agreement between the National Parties.

## Compliance - Dispute Resolution

Disputes, local and national, involving the application
or interpretation of this Memorandum, including but not
limited to the commitments set forth in Article 1 above,
will be reviewed by a Joint Committee consisting of
three (3) members appointed by the UAW Vice
President and Director of the General Motors
Department and three (3) members appointed by the
Vice President, Labor Relations, General Motors
Corporation.

The Joint Committee shall meet at least quarterly. GM
and the UAW shall advise the Joint Committee at each
meeting of any issues surrounding the administration
and implementation of this Memorandum. GM will
provide information as necessary on any issues raised
for discussion or resolution. The parties commit to the
thorough investigation of and the prompt resolution of
all issues discussed relative to this Memorandum.

The Joint Committee will have full authority to settle
all matters that are properly before it, recognizing that
disputes governed by appeal procedures of the
respective Benefit Plans, and other issues consistent
with applicable law, may be outside the scope of the
Committee's authority. If the Joint Committee is
unable to resolve a matter properly before it, the matter
will be referred directly to arbitration, using the
arbitration provisions, including the restrictions on the
powers of the Umpire, contained in the UAW-GM
National Agreement. Such matters will immediately
move to the top of the arbitration docket.

**Attachment A**

**Agreement Wage Structure**

| A | B | C |
|---|---|---|
| **Highest Rates** | **Medium Rates** | **Minimum Rates** |
| Machining (PT) | Sub Assembly | Truck Driver |
| - Camshafts | Inspection | Material Handling |
| - Connecting Rods | Non Core Stampings | Unitizing |
| Others | Non Core Blanks | Warehousing |
| | Others | Kitting |
| | | Sequencing |
| | | Repacking |
| | | Others |

## MEMORANDUM OF UNDERSTANDING
## 2009 SPECIAL ATTRITION PROGRAM

This Memorandum of Understanding governs the 2009 Special Attrition Program.

1.   The Corporation and International Union, UAW will jointly develop a communication plan designed to explain to employees their options agreed to in this Memorandum.  This 2009 Special Attrition Program will be presented to all UAW represented employees at all Assembly, Stamping, Powertrain, Engineering and PPO facilities, as well as selected SPO facilities no later than February 6, 2009.

2.   Employees as of the date of this Memorandum will be given the opportunity to designate their choice within 45 calendar days from the date of the roll-out by selecting from the following options.  Eligibility for any option that includes retirement is subject to the eligibility requirements for that retirement.

   a. Retire effective April 1, 2009 under the Normal or Voluntary provisions of the 2007 GM-UAW Pension Plan.  Employees will receive a $25,000 vehicle voucher and $20,000 cash payment (less applicable taxes).  The vehicle voucher will be valid for a period of 18 months and is transferrable to a maximum of one individual.

   b. Retire effective April 1, 2009 as a Mutually Satisfactory Retirement under the provisions of the 2007 GM-UAW Pension Plan at age 55 but not 65 with 10 or more years of credited service (at age 50 for employees laid off on or after October 1, 1984 as a result of a plant closing where no other General Motors plants are in the same geographical area).

   c. Voluntarily Quit General Motors effective April 1, 2009.  Employees will receive a $25,000 vehicle voucher and $20,000 cash payment (less

160

applicable taxes). The vehicle voucher will be valid for a period of 18 months and is transferrable to a maximum of one individual.

3. For only those employees who are not eligible to retire under the Normal or Voluntary provisions of the 2007 GM-UAW Pension Plan effective on April 1, 2009, but who later will first become eligible between April 1 and December 31, 2009, such employees may also elect the Normal or Voluntary Retirement option and immediately retire on the first day of the month following their eligibility for retirement.

4. It is understood that those GM-UAW Plant employees, who have elected to: (i) retire under option (a); (ii) retire as a Mutually Satisfactory Retirement under option (b); (iii) voluntarily quit under option (c); or (iv) elected to not respond or fail to timely respond will not be eligible to exercise any other rights under this Memorandum.

5. The vehicle voucher amount and cash payment are taxable income to the employee receiving the vehicle voucher and cash payment and are subject to all applicable taxes (i.e., federal, state, FICA and local).

Employees must utilize GM Family First (gmfamilyfirst.com) to obtain a vehicle voucher authorization number. The sale of any vehicle voucher authorization number via any public venue (i.e., newspaper, eBay) is prohibited.

6. Each employee of GM-UAW Plants will be required to sign the 2009 Special

161

Attrition Program, GM-UAW Plants Conditions of Participation Release Form and all other applicable forms when making a selection under this Memorandum.

7.    The following employees are not eligible for the Special Attrition Program:

- Entry Level Employees

- Employees at Davison Road, Flint East and Needmore Road

8.    Any issues arising during the implementation of this 2009 Special Attrition Program will be promptly addressed by the National Parties.

Whereas, the parties hereto have caused their names to be duly subscribed by their duly authorized officers and representatives this 2nd day of February 2009.

INTERNATIONAL UNION, UAW                    GENERAL MOTORS CORPORATION

_____                         _____

_____                         _____

_____                         _____

162

# MEMORANDUM OF UNDERSTANDING
## 2009 SPECIAL ATTRITION PROGRAM
### Phase II

This Memorandum of Understanding governs the 2009 Special Attrition Program, Phase II.

1. The Corporation and International Union, UAW will jointly develop a communication plan designed to explain to employees their options agreed to in this Memorandum. This 2009 Special Attrition Program will be presented to all UAW represented employees at all Assembly, Stamping, Powertrain, Engineering, SPO and PPO facilities (with the exception of three locations noted below), no later than June 9, 2009. A maximum of 16,000 employees Corporate-wide will be eligible to participate in this program. In the event the requests to participate in the Program exceed the cap, employees from closed plants will have first priority followed by highest corporate seniority employees at all other plants.

2. Employees as of the date of this Memorandum will be given the opportunity to designate their choice within 45 calendar days from the date of the roll-out by selecting from the following options. Eligibility for any option that includes retirement is subject to the eligibility requirements for that retirement.

    a. Retire effective August 1, 2009 under the Normal or Voluntary provisions of the 2007 GM-UAW Hourly Pension Plan. Under this option,

2009 SAP_B02

Any agreement regarding these proposals is subject to the terms and required approvals and certifications set forth in the
Loan and Security Agreement entered into between GM and the United States Treasury

163

TA  5/16/09
ARS  mkb



employees in production classifications, at the time of their election, will receive a Twenty Five Thousand Dollar ($25,000) vehicle voucher (less applicable taxes) and a Twenty Thousand Dollar ($20,000) cash payment (less applicable taxes). Employees in skilled trades classifications, at the time of their election, will receive a Twenty Five Thousand Dollar ($25,000) vehicle voucher (less applicable taxes) and a Forty Five Thousand Dollar ($45,000) cash payment (less applicable taxes). The vehicle voucher will be valid for a period of 18 months and is transferrable to a maximum of one individual.

For those employees who are not eligible to retire under the Normal or Voluntary provisions of the 2007 GM-UAW Hourly Pension Plan effective August 1, 2009, but who later will first become eligible between September 1 and December 31, 2009, such employees may also elect the Normal or Voluntary Retirement option and immediately retire on the first day of the month following their eligibility for retirement.

b.  Retire effective August 1, 2009 under the provisions of the Diana D. Tremblay letter dated May ___, 2009 regarding Mutually Satisfactory Retirements (50 years of age with at least 10 years of credited service).

c.  Any employee with at least 28 years and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:
   i.  Employees electing this pre-retirement program must be eligible no later than August 1, 2009.
   ii.  Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the GM-UAW Hourly Pension Plan in effect at the time of retirement.
   iii. The gross monthly wages while in the program will be:
      1.  29 years credited service as of August 1: $2,900
      2.  28 years credited service as of August 1: $2,850
      Wages will be paid weekly on an hourly basis (2080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

d.  Voluntarily Quit General Motors effective August 1, 2009 and relinquish all seniority and rights under GM benefits plans (other than deferred vested pension benefits).

Under this option, at the time of their election, employees will receive a Twenty Five Thousand Dollar ($25,000) vehicle voucher (less applicable taxes) and the following cash payment (less applicable taxes) dependent

Any agreement regarding these proposals is subject to the terms and required approvals and certifications set forth in the Loan and Security Agreement entered into between GM and the United States Treasury

164

TA  5/16/09
ANS MRG.

on seniority or credited service (whichever is greater) as of the effective
date of the voluntary quit:

i. Less than 10 years: $45,000

ii. 10 years or more and less than 20 years: $80,000

iii. 20 or more years: $115,000

The vehicle voucher will be valid for a period of 18 months and is
transferrable to a maximum of one individual.

Employees electing this option will not be eligible for pension
supplements, post-employment life insurance, or post-employment
health care coverage or contributions from GM or from a VEBA that is
intended to be established consistent with other agreements between
GM and the UAW, or any other benefit or compensation from GM.

It is understood that those GM-UAW Plant employees who have elected

to: (i) retire under option (a); (ii) retire as a Mutually Satisfactory Retirement

under option (b); (iii) pre-retire under option (c), (iv) voluntarily quit under option

(d); or (v) elected to not respond or fail to timely respond will not be eligible to

exercise any other rights under this Memorandum or any letter of agreement

referred to above.

The vehicle voucher amount and cash payment are taxable income to the

employee and both are subject to all applicable taxes (i.e., federal, state, FICA

and local).  The voucher is taxable upon election of the authorization and the

payment is taxable upon receipt.

2009 SAP_B02

Any agreement regarding these proposals is subject to the terms and required approvals and certifications set forth in the
Loan and Security Agreement entered into between GM and the United States Treasury

Employees must utilize GM Family First (gmfamilyfirst.com) to obtain a vehicle
voucher authorization number.  The sale of any vehicle voucher authorization
number via any public venue (i.e., newspaper, eBay) is prohibited.

Each employee of GM-UAW Plants will be required to sign the 2009 Special
Attrition Program, GM-UAW Plants Conditions of Participation Release Form and
all other applicable forms when making a selection under this Memorandum.

The parties understand that this Special Attrition Program will pull forward the
normal timetable for attrition and therefore increase the near term annual cost of
the VEBA.  The parties agree to address this issue in the VEBA discussions.

The following employees are not eligible for the Special Attrition Program:
- Entry Level Employees
- Employees at Davison Road, Flint East and Needmore Road

Employees who participated in the April 1, 2009 Special Attrition Program and
received a cash payment will receive an additional payment (less applicable
taxes) equal to the net difference between the cash payments under this
Program and the prior Program effective August 1, 2009.  Additionally,
employees participating in the April 1, 2009 Special Attrition Program will not be

2009 SAP_B02

Any agreement regarding these proposals is subject to the terms and required approvals and certifications set forth in the
Loan and Security Agreement entered into between GM and the United States Treasury

166

eligible for this 2009 Phase II Pre-Retirement Program or to change their SAP option.

Any issues arising during the implementation of this 2009 Special Attrition Program will be promptly addressed by the National Parties.

Whereas, the parties hereto have caused their names to be duly subscribed by their duly authorized officers and representatives this _16_ day of _May_ 2009.

INTERNATIONAL UNION, UAW          GENERAL MOTORS CORPORATION

_____          _____

_____          _____

_____          _____

2009 SAP_B02

Any agreement regarding these proposals is subject to the terms and required approvals and certifications set forth in the Loan and Security Agreement entered into between GM and the United States Treasury

167

## UAW-GM MEMORANDUM OF UNDERSTANDING
## APPLICATION OF CORPORATE SENIORITY FOR
## CURRENT AND FORMER SATURN EMPLOYEES
## MAY 16, 2009

During recent discussions concerning the Application of Corporate Seniority relative to all current and former Saturn employees, the parties agreed that the following terms and conditions will apply:

1)  All current and former Saturn production or skilled trades employees will have their Plant Seniority Date or Date of Entry established pursuant to the terms and conditions of Appendix A – Memorandum of Understanding Employee Placement of the September 26, 2007 Agreement between General Motors Corporation and the UAW, as if they had never broken seniority when transferring between General Motors and the former Saturn Corporation.

2)  No provisions of any Local Agreement may supersede or conflict with the application and implementation of this Memorandum of Understanding.

3)  The implementation of the terms and conditions of this Memorandum will not be the foundation for any prior or future claims by any current or former employee.

4)  The Spring Hill Operations will implement this change by August 1, 2009.  The parties recognize that adjustments to the seniority dates of employees transferred to other locations within General Motors may require additional time to complete, but will be done as expeditiously as possible.

For the International Union, UAW: _____

_____

For General Motors Corporation: _____

_____

168

msatcsC02

# VEBA ADDENDUM

VEBA Note and Equity Terms
May 24, 2009

Following is a summary of the proposed principal terms for the transactions related to the restructuring of the obligations of General Motors Corporation ("GM") to the Voluntary Employee Beneficiary Association ("New VEBA") in connection with GM's efforts to effect a restructuring with the support of the United States Department of the Treasury ("UST"). No obligation or right on the part of any party hereto will arise as a result of this term sheet unless and until the Parties execute definitive agreements, and then such rights and obligations will be governed by the terms and conditions of such definitive agreements.

| Proposed Terms | |
|---|---|
| 2009 Health Care Expense | • GM to continue retiree medical benefits with respect to claims incurred on or prior to December 31, 2009 and the New VEBA will be responsible for claims incurred after December 31, 2009, in accordance with the existing Settlement Agreement.<br><br>• Beginning with claims incurred on and after the later of (a) July 1, 2009, or (b) receipt of necessary court approval, the plan administered by GM shall be amended to reflect the changes set out in Exhibit A hereto. |
| Existing Internal VEBA Assets | • Existing Internal VEBA assets (which at March 31, 2009 had a balance of approximately $9.4 billion) will continue to be held and invested, and will be turned over to the New VEBA, in accordance with the terms of the existing Settlement Agreement. Changes in asset values of the Existing Internal VEBA from March 31, 2009 through December 31, 2009 shall have no impact on any terms of the VEBA Note, Equity or Perpetual Preference Equity. New VEBA will be responsible for claims incurred after December 31, 2009, in accordance with the existing Settlement Agreement. |
| New VEBA Note Principal Amount | • $2.5 billion |
| New VEBA Note Payment Term | • Fixed payments in cash on July 15 of each of the following years:<br><br>| Year | Amount |<br>|---|---|<br>| 2013 | $1,384 million |<br>| 2015 | $1,384 million |<br>| 2017 | $1,384 million | |
| Other New VEBA Note Terms | • Transferable at any time in whole or in part; demand, shelf, and piggyback registration rights no less favorable than those of any debt issued to the UST.<br><br>• Pari passu with any debt issued to the UST in the restructuring ("UST Note"); subordinate to any exit financing including UST delayed draw term loan, revolver or any other third party exit financing entered into with the consent of UST ("Exit Financing").<br><br>• Other note terms, including security interests, if applicable, to be no less favorable than the UST Note or any other debt issued in the transaction, |

1

169

| | |
|---|---|
| | other than Exit Financing. |
| | • Any modifications made by UST to the UST Note will be binding on the VEBA Note, except for any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or impairs any right to bring suit for payment. |
| Equity | • New VEBA equity will represent 17.5% of common stock, after giving effect to the equity ownership of UST, other creditors and, if applicable, existing shareholders; all other equity issuances (including as a result of warrants issued as part of the transaction) shall dilute all holders ratably. |
| | • Tag along, preemptive, reporting, and other rights consistent with securities of this type. |
| | • Equity is transferable, in whole or in part, at any time. |
| Equity Registration Rights | • New Equity shall have demand, shelf, and piggyback registration rights no less favorable than the equity issued to the UST or any other party in the transaction. |
| | • In no event shall the New VEBA be entitled to less than three demand and shelf registrations, with no more than one of each in any 12-month period (including unlimited takedowns under any shelf registration statement). |
| Perpetual Preference Equity | • New VEBA will receive a $6.50 billion cumulative perpetual preference stock with a 9% dividend per annum, payable quarterly in cash. |
| | • Each share will have a liquidation preference of $25 per perpetual preference share. |
| | • Callable on terms no less favorable than the preference equity held by the UST, but in no event callable prior to December 31, 2014. The redemption price shall be paid in cash. |
| | • Junior to all existing and future debt, senior to common stock and all future preferred stock and pari passu with the preference equity held by the UST. |
| | • Transferable at any time in whole or in part. |
| | • Other terms typical for securities of this type, and no less favorable than those applicable to the preference equity held by the UST or any other party in the transaction. |
| Perpetual Preference Equity Sale Rights | • Perpetual Preference Equity shall have demand, shelf, and piggyback registration rights no less favorable than those of the preference equity issued to the UST or any other party in the transaction. |
| Warrants | • New VEBA to receive warrants to acquire 2.5% of equity at any time prior to the expiration date; all other equity issuances (including as a result of warrants issued as part of the transaction) shall dilute all holders ratably. |

2

170

| | |
|---|---|
| | • Strike price set at $75 billion equity value.<br><br>• Expiration date at December 31, 2015.<br><br>• Transferable at any time in whole or in part; registration rights consistent with those applicable to the common equity held by the New VEBA.<br><br>• Shall contain other terms typical for securities of this type, including anti-dilution, reporting, and cashless exercise provisions and other terms consistent with the UST equity. |
| Implementation Date | • The term Implementation Date as it appears and wherever found in the Settlement Agreement shall be December 31, 2009 and shall be applied consistent with the 2009 health care expense understanding referred to above. |
| Amendment to Trust Agreement | • The Trust Agreement, as approved by the court as part of the 2008 VEBA Settlement Agreement, shall be amended to eliminate the January 1, 2012 restriction on benefit modifications by the Committee and the Committee shall therefore have authority to establish benefit levels with effect from January 1, 2010. |
| Governance | • New VEBA to have the right to nominate one GM Board member, with UAW consent.<br><br>• New VEBA GM shares to be voted in the same proportion as votes cast by all stockholders, in accordance with the existing Settlement Agreement. |
| Pension Plan | • No termination or adverse modification of Pension Plans covering UAW-represented employees and retirees.<br><br>• Pension Pass Though mechanism from existing Settlement Agreement eliminated. |
| Life Insurance and Legal Services Expense | • GM shall continue coverage of retiree life insurance and legal services benefits, in accordance with 2007 National Agreement. |
| 2009 SAP | • With regard to employees who retire under the June / July 2009 SAP program (excluding buyouts), GM and the UAW will agree on the contract cost for providing Retiree Medical Benefits by determining the appropriate average cost per contract for pre-Medicare and Medicare eligible participants.<br><br>• On or before January 5, 2010, GM shall pay to the New VEBA such contract cost, discounted at 9%, times the number of participants in each such category for the 24 month period following the later of January 1, 2010 and the date of retirement under the SAP.<br><br>• Milliman and GM representatives will meet as soon as practical to determine the appropriate cost per person. |
| Other | • Subject to final documentation, ratification, and court approval. |

171

Exhibit A – 2009 Retiree Benefit Modifications

Beginning with claims incurred on the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the benefit plan provided by GM for UAW- represented retirees, surviving spouses and their eligible dependents as amended by the Settlement Agreement approved by the Court July 31, 2008, will be changed as follows:

| | |
|---|---|
| Prescription Drug Co-Pays (applicable to all retirees, surviving spouses and their eligible dependents).[a] | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand (formulary and non-formulary)<br>• $25 Specialty<br><br>Mail Order (90 day supply)<br>• $20 Generic<br>• $50 Brand (formulary and non-formulary)<br>• $50 Specialty |
| Catastrophic Plan for retirees and surviving spouses (and their eligible dependents) who elect into the Plan or fail to pay required monthly contributions. | Plan no longer offered.<br><br>Impacted retirees, surviving spouses and eligible dependents will be defaulted into the Traditional Care Network (TCN) unless "no coverage" is specifically requested. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra).[a] | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension. |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Aciphex, Prevacid, Protonix).[a] | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome. |
| Vision Program | No longer offered. |
| Dental Program | No longer offered. |
| Emergency Room Co-Pay [a] | $100 (waived if admitted). |
| Medicare Part B Special Benefit ($76.20 per month for Medicare-eligible retirees) enrolled in Medicare | No longer offered by health plan.<br><br>This benefit is no longer offered by the Health Care Plan. This modification is not applicable to approximately 21,500 retirees and surviving spouses who are currently receiving the benefit and who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust. There will be no change in these payments from the pension trust for the retirees described in the preceding sentence. |
| "Protected Retirees" who meet the provisions of | Monthly contribution requirement of $11 (flat rate |

4

| | |
|---|---|
| the Affordability Test (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33). [a] | regardless of family status).<br><br>In all other respects, the same administrative provisions and plan design requirements applicable to all other General retirees shall apply. |
| Monthly Contribution Requirements (General Retirees) [a] | No change (currently $11/single and $23/family). |
| Deductible, Co-Pay and out-of-pocket (OOP) Requirements (General Retirees) | No changes<br>• Deductible: $164 single/$328 family<br>• Co-insurance: 10% in network 30% out of network<br>• OOP Max: $273 single in network $546 family in network |
| Implementation | The parties will work together to effect a mutually-agreed transition and implementation as soon as practicable. GM and the UAW will mutually agree upon communications. |
| Dependents Eligibility – Retirees | Effective upon receipt of necessary court approvals, no new Principally Supported Children or Sponsored Dependents will be enrolled pursuant to the provisions the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any child enrolled as a Principally Supported Child pursuant to the provisions of the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent. |

a Modifications also to be comprehended in the HMO plan designs.

173