LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By: DAVID S. JONES
    JEFFREY S. OESTERICHER
    MATTHEW L. SCHWARTZ
    JOSEPH N. CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile: (212) 637-2750

**Hearing Date: June 30, 2009**
**Hearing Time: 9:00 AM**

- and -

John J. Rapisardi
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| GENERAL MOTORS CORP., *et al.*, | 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF HARRY WILSON

    1.    I am an employee of the United States Department of the Treasury ("Treasury"), and serve as a senior member of the working group (the "Auto Team") implementing the policies of the Presidential Task Force on the Auto Industry, an inter-agency task force created at the direction of the President of the United States earlier this year. I have served in this role since March 2009. Prior to this, I did not have public sector experience. I

09-50026-mg    Doc 2577    Filed 06/25/09    Entered 06/25/09 19:13:03    Main Document
Pg 2 of 11

received the opportunity to join the Auto Team after I sent an e-mail detailing my background to a prospective advisor to the Auto Team. I had decided to consider a potential position on the Auto Team because I felt the massive dislocation in the U.S. automotive industry created an important public policy matter and because I felt my private sector experience and skills could be a valuable addition to a team seeking to address these issues. I do not anticipate remaining with Treasury after the Auto Team's work is complete.

2. I submit this declaration in support of General Motors' ("GM's") *Motion for Sale of Property under Section 363(b) / Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing* [Docket No. 92].

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and experience as a member of the Auto Team, my discussions with members of GM's senior management or other interested parties, and my review of relevant documents. Pursuant to this Court's Case Management Order, this declaration constitutes the direct testimony I would give if called to testify.

4. Most recently before joining the Auto Team, I was a general partner at Silver Point Capital, a multi-strategy investment fund managing several billion dollars in equity capital. My responsibilities at Silver Point included overseeing a number of operational and financial restructurings as well as investing in and working with troubled companies. Prior to

2

joining Silver Point, I worked at a variety of financial firms including Goldman, Sachs & Co. and The Blackstone Group. I do not have any agreements, implicit or explicit, with any other entity that I will work for it after I resign from government service.

5. I am a graduate of Harvard Business School and Harvard College.

6. My responsibilities as a senior member of the Auto Team consist primarily of (a) generally overseeing the financial and business diligence of the various companies in our purview and (b) specifically leading the Auto Team's day-to-day efforts with respect to GM.

7. The United States of America – acting through Treasury and the Auto Team – has implemented various programs to support and stabilize the domestic automotive industry. Those programs have included, among other things, providing credit support for receivables issued by certain domestic automobile manufacturers, and support for consumer warranties.

8. Treasury has also provided direct loans to automobile manufacturers. In late 2008, GM requested a loan from Treasury. Following arm's length negotiations, Treasury determined to make available to GM billions of dollars in an emergency secured loan to enable GM to avoid a chaotic "freefall" liquidation while it developed a new business plan. I understand that when Treasury first extended credit to GM in December 2008 under the emergency secured loan, there was no other lender willing to loan to GM on such a condensed time frame and taking into account GM's available collateral.

9. Treasury and GM entered into a loan and security agreement on December 31, 2008 (the "LSA"), which provided GM up to $13.4 billion in term financing on a secured, delayed draw basis. Under the LSA, GM immediately borrowed $4 billion, followed by $5.4

3

billion less than a month later, and the remaining $4 billion on February 17, 2009. The LSA required GM to submit by February 17, 2009, a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress in late 2008. Among other initial conditions on Treasury's willingness to lend, GM was to demonstrate its long-term viability by reducing its outstanding public bond debt (approximately $27 billion) by two-thirds, and converting from cash to common stock at least half of the value of its pending $20 billion contribution to a union health care trust.

10. GM has only sought the emergency financing from Treasury under Treasury's Troubled Asset Relief Program ("TARP").. As contrasted with other TARP transactions that involve Treasury making direct investments in troubled companies in return for common or preferred equity, Treasury structured the GM transactions as a loan with the only equity received by Treasury being in the form of warrants described below. The LSA between Treasury and GM had terms and covenants of a loan rather than an equity investment (although many of the terms and covenants were more lenient or favorable than "market terms"). Treasury also entered into intercreditor agreements with GM's other senior lenders in order to set forth the secured lenders' respective prepetition priority.[1] Treasury received first liens on GM's and the guarantors' equity interests in their respective domestic subsidiaries (other than certain domestic subsidiaries expressly excluded because of regulatory, contractual or practical prohibitions to a pledge thereof) and certain of their respective foreign subsidiaries (limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual property, real estate (other than manufacturing plants or facilities), inventory that was not pledged to other lenders, and cash and cash equivalents. Treasury also received second liens on certain additional collateral. The

---

[1] A copy of the Intercreditor Agreement is attached hereto as Exhibit A.

4

LSA had separate collateral documents, which included: (i) a guaranty and security agreement, (ii) an equity pledge agreement and (iii) an intellectual property pledge agreement. The LSA loans were interest-bearing with a rate equal to 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%. The Default Rate on this loan was 5.00% above the non-default rate. In connection with this loan, Treasury also received warrants to purchase equity in GM. These warrants were in addition to, and distinct from, the secured debt and are separately documented.

11. In connection with GM's loan requests from Treasury, GM submitted a "viability plan" on February 17, 2009, which outlined a number of steps it intended to take to make itself more competitive, including an operational turnaround. The Auto Team reviewed and analyzed that plan and found, after a total consideration of all relevant factors taken as a whole, that GM's plan was not adequate. A copy of the "Viability Determination" dated March 30, 2009, is attached hereto as Exhibit B. On March 30, 2009, President Obama announced publicly that GM's efforts to develop a long-term viability plan had fallen short and that the advancement of any additional federal loans to GM beyond the subsequent sixty-day period would require a substantially more aggressive effort to map out a clear path to long-term viability. GM was free, however, to seek funding from any entity other than Treasury on any terms it could negotiate. The Auto Task Force did not restrict GM from seeking alternative funding. In fact, at no point did the Auto Task Force or Treasury require that GM accept funding from the government or prohibit GM from seeking equity funding or loans from other sources, and on a number of occasions I made clear to GM management that the Auto Team and Treasury would prefer to see GM develop a private sector financing solution, if at all possible. The Auto Team has also done nothing to prevent GM from seeking strategic relationships with other automobile manufacturers or other willing partners. The funds advanced to GM under the LSA –

5

approximately $19.4 billion in total, as of the petition date (all on a secured basis)[2] – were critical to GM's survival during the past several months. They are equally critical to GM's survival today.

12. Treasury, the Auto Team, GM, a variety of stakeholders including holders of GM's unsecured debt instruments and the United Auto Workers (the "UAW") worked exhaustively to achieve a comprehensive out-of-court overhaul of GM's finances and cost structure. These and other efforts are detailed in the First Day Affidavit of Frederick Henderson. [Docket No. 21]. Simultaneously with these efforts, GM and Treasury also considered the possibility that GM would be unable to meet its needs other than through a chapter 11 filing. Although it was not Treasury or GM's first choice, it ultimately became clear that the only viable course was for GM to pursue – with the support of Treasury, the Government of Canada, and other constituents – a transaction under section 363(b) of chapter 11 of title 11 of the United States Code (the "363 Transaction").

13. There are several critical reasons why the 363 Transaction is necessary on the time-frame proposed to the Court in these cases, including (a) it will permit New GM (as defined below) to begin manufacturing automobiles as quickly as possible, (b) it will reduce the amount of money Treasury is being asked to lend and (c) most importantly, a rapid emergence from bankruptcy creates the highest probability of avoiding the catastrophic and expensive meltdown in GM auto sales that virtually all industry observers predicted would happen in the event of a GM bankruptcy filing. It is Treasury's belief that only a rapid and certain emergence from bankruptcy can provide consumers the confidence necessary to make a major purchase like

---

[2] Treasury and GM entered into amended credit agreements to provide for an additional $2 billion in financing that GM borrowed on April 22, 2009, and another $4 billion that GM borrowed on May 20, 2009.

6

an automobile. Importantly, Treasury cannot make an open-ended commitment to GM that Treasury will continue to fund GM's operations if GM's critical assets languish in the bankruptcy process.

14. The details and documentation of the 363 Transaction were negotiated at arm's length between Treasury and its advisors and GM and its advisors. GM had numerous independent advisors that it selected without any input from the government. These advisors included experienced counsel, restructuring experts, and investment bankers.

15. In the spring of 2009, Treasury and GM began negotiating the Master Sale and Purchase Agreement (the "MSPA"). For approximately one month, Treasury and GM and their respective counsel engaged in sometimes contentious arm's length negotiations. Negotiations between Treasury and GM commenced with the term sheets to the MSPA provided by GM on or about May 1, 2009, and continued with subsequent rounds of discussions regarding the specific language of the MSPA through its execution on June 1, 2009.

16. Throughout the spring of 2009, GM and Treasury, as well as the UAW and the UAW VEBA, the Debtors' prepetition secured lenders, certain of the Debtors' prepetition unsecured lenders, and Treasury's Canadian co-investors engaged in negotiations over the terms of the sale and related issues including financing. These negotiations continued through the Debtors' bankruptcy filings on June 1, 2009 (the "Petition Date"), and beyond. During the period from May 22 through June 1, the parties engaged in nearly around the clock negotiations at GM's New York headquarters and the office of their counsel. Since the Petition Date, the negotiations have expanded to include the Debtors' statutory committee of unsecured creditors and other interested parties, and Treasury, as purchaser, has made certain concessions to those parties in the course of those negotiations.

17. On the day GM filed for bankruptcy, GM, Treasury and Export Development Canada (the "EDC") sought court approval of a Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Facility"). Negotiations with respect to the DIP Facility went on simultaneously with the MSPA and under similar circumstances. The additional funding under the DIP Facility was and is critical for GM to avoid a value-destroying "free-fall" liquidation. The Bankruptcy Court approved the DIP Facility, on an interim basis, on June 2, 2009 in the amount of $15 billion. [Docket No. 292]. The total availability under the DIP Facility is $33.3 billion. The DIP Facility terms, covenants, collateral and priority are similar to the analogous provisions in the LSA in many respects. The non-default rate for Eurodollar loans is the sum of (a) the greater of (i) the LIBOR rate for the period of the applicable loan, adjusted for certain reserve requirements, and (ii) 2.00%, plus (b) 3.00%. The default interest rate, if applicable, is the otherwise applicable non-default rate plus 5.00%. At Treasury's sole discretion, the otherwise applicable non-default rate may be the rate of interest applicable to ABR loans plus 2.00%. The Bankruptcy Court issued a final order on June 25, 2009, approving the DIP Facility.

18. Prior to the closing of the proposed sale, Treasury will own 100% of NGMCO, Inc. ("New GM") – a newly created Delaware Corporation incorporated for the purpose of acquiring certain assets of GM through the 363 Transaction. To purchase substantially all of the assets of GM, New GM will credit bid the claims of Treasury under the secured DIP Facility (except for the $7,072,488,605 associated with the exit financing and the $950 million associated with the wind down fund described below), in addition to all claims of Treasury under the secured LSA. New GM's credit bid far exceeds the value of all of the assets of GM, which has a liquidation value as determined by AlixPartners, LLP ("AlixPartners") of

8

between $6.5 billion and $9.7 billion. I have no reason to dispute the AlixPartners valuation. That valuation demonstrates that Treasury's credit bid far exceeds the value attainable in a GM liquidation, the only other option available to the company.

19.   As a purchaser seeking to buy assets that will enable New GM to be as competitive as possible, New GM negotiated the 363 Transaction to limit to the maximum extent its successor liabilities, as advised by counsel. New GM has only voluntarily assumed liabilities where it sees a necessary and compelling business purpose for doing so.

20.   Pursuant to the terms of the MSPA, New GM will allocate 17.5% of its common equity on an undiluted basis to a new Voluntary Employee Beneficiary Association formed pursuant to an agreement between New GM and its unionized work force (the "New VEBA"). That equity stake is being given to the UAW on account of the value that the UAW will provide to New GM in its efforts to compete effectively in the auto industry. New GM views the UAW's skilled workforce as essential to its future operations and engaged in negotiations to reach a revised collective bargaining agreement, which includes an agreement on the New VEBA. It would be impossible for New GM to operate without a skilled workforce. If the UAW failed to cooperate with New GM post-petition, there would be no functioning company. The equity stake was not intended to be – and is not in form or substance – a distribution on account of any claims the UAW may have in GM's chapter 11 cases.

21.   New GM will also allocate 10% of its equity on an undiluted basis to Old GM's bankruptcy estate as part of the 363 Transaction.[3] Additionally, in the event that the Bankruptcy Court determines that the estimated amount of allowed prepetition general unsecured

---

[3]   After these various equity allocations, Treasury will own approximately 61% of New GM and EDC will own approximately 11.5% of New GM.

9

claims against the Debtors exceed $35 billion, then New GM will allocate, on a sliding scale, up to 2% of its equity to Old GM as part of the 363 Transaction. Finally, New GM will issue warrants to purchase up to 15% of the shares of common stock of New GM, with the initial exercise prices of $30.00 and $55.00 per warrant, subject to certain adjustments. The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and New GM can elect partial and cashless exercises. This equity allocation will be distributed by GM as part of any chapter 11 plan that is ultimately confirmed by the Bankruptcy Court. Treasury has not directed how the equity will be allocated among GM's existing creditors.

22. Upon closing of the 363 Transaction, New GM will assume $7,072,488,605 of the debt provided to old GM under the DIP loan in an amended and restated credit agreement. When the extended financing is transferred to New GM, this financing, combined with the new CBA between New GM and the UAW and other cost-saving measures undertaken in connection with Old GM's chapter 11 cases, will enable New GM to provide adequate assurance of future performance to parties who have had their contracts assumed by Old GM and assigned as part of the 363 Transaction.

23. Finally, in addition to the allocation of equity to Old GM's estates as part of the 363 Transaction, Treasury is providing a substantial amount of money to Old GM to wind down its estates. Pursuant to the terms of the DIP Facility, Treasury will provide the Debtors with $950 million to wind-down the Debtors' estates after completion of the proposed 363 Transaction. The $950 million will permit Old GM to wind its estates down in an appropriately-funded manner, pay reasonable professional fees, dispose of assets left behind in the estates, and ultimately to confirm a chapter 11 plan that permits Old GM to distribute a percentage of the equity in New GM. Any amounts remaining will ultimately revert to New GM.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct.

Executed:   June 25, 2009,
            New York, New York

                                                /s/  Harry Wilson
                                                HARRY WILSON