**<u>EXHIBIT A</u>**

**EXECUTION COPY**

## INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "Agreement"), dated as of February 17, 2009, between GELCO CORPORATION d/b/a GE FLEET SERVICES, (as more specifically defined below, "GE"), THE UNITED STATES DEPARTMENT OF THE TREASURY (as more specifically defined below, the "UST Representative"), for itself and the other UST Secured Parties (as defined below), and GENERAL MOTORS CORPORATION (as more specifically defined below, "GM").

## RECITALS

## W I T N E S S E T H:

WHEREAS, GM and GE have entered into a Loan and Security Agreement dated as of October 2, 2006 (as amended by the first amendment thereto dated as of September 27, 2007, the second amendment thereto dated as of November 29, 2007, and the third amendment thereto dated as of the date hereof (the "Third Amendment"), and as the same from time to time may be further amended, supplemented, restated or otherwise revised, refinanced or replaced, the "GE Credit Agreement"), pursuant to which GE has agreed to make certain loans to GM.

WHEREAS, GM and the UST Representative have entered into the UST Credit Agreement (as defined below), pursuant to which the UST Representative has agreed to make certain loans to GM.

WHEREAS, pursuant to the GE Credit Agreement, GM has granted to GE Liens (as defined below) on the GE Collateral (as defined below) as security for payment and performance of the GE Secured Obligations (as defined below).

WHEREAS, pursuant to the terms of the GE Credit Agreement, GM generally may not incur, maintain or otherwise suffer to exist any Liens on the GE Collateral other than those securing the GE Secured Obligations.

WHEREAS, pursuant to the UST Credit Agreement, GM has granted to the UST Representative junior Liens on the GE Collateral to secure the UST Secured Obligations (as defined below), subject to execution and delivery of an amendment to the GE Credit Agreement permitting GM to grant such Liens, and to the terms and conditions of this Agreement and the agreements of the UST Secured Parties made herein.

WHEREAS, GE has agreed to amend the GE Credit Agreement, by executing and delivering the Third Amendment, in order to permit, among other things, the grant to the UST Secured Parties of junior Liens on the GE Collateral as security for payment and performance of the UST Secured Obligations in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which is expressly recognized by all of the parties hereto, the parties agree as follows:

17552355

### Section 1.    Defined Terms.

1.1    Definitions.Unless otherwise defined herein, terms defined in the GE Credit Agreement and used herein shall have the meanings given to them in the GE Credit Agreement as defined therein as of the date of this Agreement.

(b)    The following terms shall have the respective meanings set forth below:

"Additional US Government Debt" means indebtedness under any credit facility (other than the UST Credit Agreement or any Permitted Refinancing Document) provided to GM or any of its Subsidiaries by any US Governmental Authority to the extent such credit facility is secured by all or any part of the GE Collateral; provided, however, that an agent or trustee for the holders of such indebtedness has agreed to be bound by the terms of this Agreement with respect to such indebtedness.

"Additional US Government Representative" means each agent or trustee for the holders of any Additional US Government Debt.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. §§ 101-1532), as amended from time to time.

"Bankruptcy Law" means each of the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Business Day" means any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Cash Collateral" has the meaning provided in Section 363(a) of the Bankruptcy Code.

"DIP Financing" means any financing obtained by GM during any Insolvency Proceeding or otherwise pursuant to any Bankruptcy Law, including any such financing obtained by GM under Section 363 or 364 of the Bankruptcy Code or under any similar provision of any Bankruptcy Law.

"GE" means GELCO Corporation, a Delaware corporation, d/b/a GE Fleet Services, together with its successors and assigns with respect to the GE Credit Agreement.

"GE Collateral" means all (i) property that constitutes "Collateral" as defined in the GE Credit Agreement on the date hereof (for the sake of clarity, including after acquired property that constitutes "Collateral" as so defined, and Proceeds of the foregoing), (ii) property that becomes "Collateral" pursuant to Section 5.1 of the GE Credit Agreement, and any Proceeds thereof, and (iii) property of the type described in clause (i) or (ii) of this definition that would constitute "Collateral" under the GE Credit Agreement but for the operation of Section 552 of the Bankruptcy Code following the commencement of an Insolvency Proceeding with respect to GM and in which GE or any GE Secured Party is granted a Lien as adequate protection with respect to its interests in the GE Collateral.

"GE Credit Agreement" has the meaning set forth in the Recitals.

"GE Pledged Collateral" has the meaning set forth in Section 2.1(n) below.

"GE Secured Obligations" means the "Obligations" as defined in the GE Credit Agreement.

"GE Secured Obligations Payment Date" means the first date on which (i) the GE Secured Obligations (other than those that constitute Unasserted Contingent Obligations), and all Post-Petition Charges (if any) owed to the GE Secured Parties, have been indefeasibly paid in cash in full (or cash collateralized or defeased in accordance with the terms of the GE Credit Agreement), (ii) all commitments to extend credit under the GE Credit Agreement have been terminated, (iii) there are no outstanding letters of credit or similar instruments issued under the GE Credit Agreement (other than such as have been cash collateralized or defeased in accordance with the terms of the GE Credit Agreement), and (iv) unless the UST Secured Obligations Payment Date has occurred, GE has delivered a written notice to the UST Representative, stating that the events described in clauses (i), (ii) and (iii) above have occurred to the satisfaction of GE (which notice shall be promptly provided by GE).

"GE Secured Parties" means, at any time, GE and any other holders of the GE Secured Obligations outstanding at such time.

"GM" means General Motors Corporation, a Delaware corporation, together with its successors and assigns with respect to the GE Credit Agreement and the UST Credit Agreement.

"Insolvency Proceeding" means each of the following, in each case with respect to GM or any property or indebtedness of GM: (i) any voluntary or involuntary case or proceeding under any Bankruptcy Law or any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, (ii) any case or proceeding seeking receivership, liquidation, reorganization, winding up or other similar case or proceeding, (iii) any case or proceeding seeking arrangement, adjustment, protection, relief or composition of any debt, (iv) any case or proceeding seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official and (v) any general assignment for the benefit of creditors.

"Lien" means any mortgage, pledge, hypothecation, assignment for security, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Notice" has the meaning set forth in Section 5.1 below.

"Permitted Refinancing Debt" means any indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease, discharge or refund, the UST Secured Obligations; provided, however, that such indebtedness may be in a principal amount greater than the principal amount of the UST Secured Obligations; provided further, however, that an agent or trustee for the holders of such indebtedness has agreed to be bound by the terms of this Agreement with respect to Liens on all or any portion of the GE Collateral securing such indebtedness; provided further, however, that "Permitted Refinancing Debt" shall not include any DIP Financing.

"Permitted Refinancing Documents" means the agreements, instruments and other documents executed in connection with the incurrence of any Permitted Refinancing Debt, including, without limitation, any agreements or documents relating to the Liens securing such Permitted Refinancing Debt.

"Permitted Refinancing Representative" means any agent or trustee for the holders under any Permitted Refinancing Debt.

"Post-Petition Charges" means all interest, fees, expenses or other charges or amounts accruing or that would have accrued pursuant to the GE Credit Agreement or the UST Credit Agreement, as

17552355

applicable, or pursuant to Section 506 of the Bankruptcy Code or any other provision of Bankruptcy Law, after the commencement of any Insolvency Proceeding, irrespective of whether a claim for post-filing or post-petition interest (or entitlement to fees or expenses or other charges or amounts) is allowed in any such Insolvency Proceeding.

"Post-Petition Securities" means any debt securities or other indebtedness received in full or partial satisfaction of any claim as part of any Insolvency Proceeding.

"President's Designee" means the "President's Designee," as that term is defined in the UST Loan Agreement.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Uniform Commercial Code in effect in the State of New York on the date hereof.

"Refinancing" or "Refinance" means, with respect to any indebtedness, any other indebtedness (including any DIP Financing and any Post-Petition Securities received on account of such indebtedness) issued as part of a refinancing, extension, renewal, defeasance, discharge, amendment, restatement, modification, supplement, substitution, restructuring, replacement, exchange, refunding or repayment thereof.

"Secured Obligations" means, collectively, (i) all GE Secured Obligations and (ii) all UST Secured Obligations.

"Secured Parties" means the GE Secured Parties and the UST Secured Parties.

"Senior Recovery" has the meaning set forth in Section 2.1(g) below.

"Third Amendment" has the meaning set forth in the Recitals.

"Unasserted Contingent Obligations" means, at any time, GE Secured Obligations or UST Secured Obligations, as the case may be, for taxes, costs, indemnifications, reimbursements, damages and other liabilities (excluding (i) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any GE Secured Obligation or UST Secured Obligation, as the case may be, and (ii) contingent reimbursement obligations with respect to amounts that may be drawn under outstanding letters of credit) with respect to which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of contingent reimbursement obligations with respect to indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Governmental Authority" means any Governmental Authority located in the United States of America, and any Person who is directly or indirectly owned or controlled by one or more US Governmental Authorities. For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"UST Credit Agreement" means the Loan and Security Agreement, dated as of December 31, 2008, by and among GM, as borrower, the guarantors party thereto, and The United States Department of the Treasury, as the same from time to time may be amended, modified, supplemented or otherwise

revised; provided, however, that following the incurrence of any Permitted Refinancing Debt and upon the applicable Permitted Refinancing Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, "UST Credit Agreement" shall also mean the loan agreement (or similar agreement, instrument or document) executed in connection with the incurrence of such Permitted Refinancing Debt; provided, further, however, that following the incurrence of any Additional US Government Debt and upon the applicable Additional US Government Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, "UST Credit Agreement" shall also mean the loan agreement (or similar agreement, instrument or document) executed in connection with the incurrence of such Additional US Government Debt.

"UST Loan Documents" means the "Loan Documents," as that term is defined in the UST Credit Agreement; provided, however, that following the incurrence of any Permitted Refinancing Debt and upon the applicable Permitted Refinancing Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, "UST Loan Documents" shall also mean the applicable Permitted Refinancing Documents; provided, further, however, that following the incurrence of any Additional US Government Debt and upon the applicable Additional US Government Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, "UST Loan Documents" shall also mean the applicable Additional US Government Documents.

"UST Representative" means The United States Department of the Treasury, in its capacity as lender under the UST Loan Documents, together with its successors and assigns in such capacity; provided, however, that following the incurrence of any Permitted Refinancing Debt and upon the applicable Permitted Refinancing Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, the UST Representative shall be deemed to be the agent of such Permitted Refinancing Representative for all purposes under this Agreement; provided, further, however, that following the incurrence of any Additional US Government Debt and upon the applicable Additional US Government Representative's agreement in writing to be bound by the terms of this Agreement as if originally a party hereto, the UST Representative shall be deemed to be the agent of such Additional US Government Representative for all purposes under this Agreement.

"UST Secured Obligations" means, collectively, the unpaid principal of and interest on the advances under the UST Credit Agreement and all other obligations and liabilities of GM and any Subsidiary of GM that is a borrower, issuer or primary obligor under the UST Credit Agreement (including, without limitation, interest accruing at the then applicable rate provided in the UST Credit Agreement after the maturity of the indebtedness thereunder and all Post-Petition Charges) to the holders of such indebtedness or other obligations, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, the UST Loan Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether on account of principal, interest, reimbursement obligations, fees, prepayment premiums, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to any UST Representative or to the holders of such obligations that are required to be paid by GM pursuant to the terms of any of the foregoing agreements).

"UST Secured Obligations Payment Date" means the first date on which (i) the UST Secured Obligations (other than those that constitute Unasserted Contingent Obligations), and all Post-Petition Charges (if any) owed to the UST Representative and/or any UST Secured Party, have been indefeasibly paid in cash in full (or cash collateralized or defeased in accordance with the terms of the UST Loan Documents), (ii) all commitments to extend credit under the UST Loan Documents have been terminated, (iii) there are no outstanding letters of credit or similar instruments issued under the UST Loan Documents (other than such as have been cash collateralized or defeased in accordance with the terms of the UST Loan Documents), and, (iv) unless the GE Secured Obligations Payment Date has occurred, the

UST Representative has delivered a written notice to GE stating that the events described in clauses (i), (ii) and (iii) above have occurred to the satisfaction of the UST Representative (which notice shall be promptly provided by the UST Representative).

"UST Secured Parties" means, at any time, the UST Representative and any other holder of UST Secured Obligations outstanding at such time.

"UST Standstill Period" has the meaning set forth in Section 3.1(a) below.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

## Section 2.    Intercreditor Provisions.

2.1    UST Secured Debt. The UST Representative, for itself and each of the other UST Secured Parties, and GE, for itself and each of the other GE Secured Parties, agrees to, and shall be bound by, the following terms and conditions:

(a)    Any and all Liens on the GE Collateral now existing or hereafter created arising in favor of the UST Representative or any other UST Secured Party securing the UST Secured Obligations, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, are expressly junior in priority, operation and effect to any and all Liens on the GE Collateral now existing or hereafter created or arising in favor of the GE Secured Parties securing the GE Secured Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to which the UST Representative or any other UST Secured Party may now or hereafter be a party, and regardless of the time, order or method of grant, attachment, recording or perfection of any financing statements or other security interests, assignments, pledges, deeds, mortgages and other Liens, charges or encumbrances or any defect or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform Commercial Code or any applicable law or any agreement with respect to the GE Secured Obligations or the UST Secured Obligations or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any GE Secured Party securing any of the GE Secured Obligations are otherwise subordinated, voided, avoided, invalidated or lapsed.

(b)    Neither the UST Representative nor any other UST Secured Party shall object to or contest, or support any other Person in objecting to or contesting, in any proceeding (including, without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of any Lien on the GE Collateral granted to any GE Secured Party; provided, however, that the UST Representative and UST Secured Parties shall be permitted to negotiate with the GE Secured Parties to amend this Agreement regarding, inter alia, the relative rights of the Secured Parties in the GE Collateral; provided further, however, that nothing

contained herein shall obligate or require any GE Secured Party to negotiate with the UST Representative or any other UST Secured Party regarding, or agree to, any such suggested amendment. Notwithstanding any failure by any GE Secured Party to perfect its Lien on the GE Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the Lien on the GE Collateral granted to the GE Secured Parties, the priority and rights as between the GE Secured Parties, on the one hand, and the UST Representative and the other UST Secured Parties, on the other hand, with respect to the GE Collateral shall be as set forth herein. Neither GE nor any other GE Secured Party shall object to or contest, or support any other Person in objecting to or contesting, in any proceeding (including, without limitation, any Insolvency Proceeding), the validity, extent, perfection, priority or enforceability of any Lien on the GE Collateral granted to the UST Representative or any other UST Secured Party, so long as such Lien is subordinated to the Lien on the GE Collateral in favor of the GE Secured Parties on the terms set forth in this Agreement.

(c)    Neither the UST Representative nor any other UST Secured Party shall, in or in connection with any Insolvency Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case with respect to any of the GE Collateral, including, without limitation, with respect to the determination of any Liens or claims held by any GE Secured Party or the value of any claims of such parties under Section 506(a) of the Bankruptcy Code or otherwise; provided, however, that the UST Representative and any other UST Secured Party may file a proof of claim in any Insolvency Proceeding, subject to and consistent with the limitations contained in this Agreement; provided, further, however, that the UST Representative and any other UST Secured Party may seek to provide DIP Financing to GM and in connection therewith, to obtain Liens on any or all of the GE Collateral that may be superior to, or pari passu with, the Lien of the GE Secured Parties; provided, further, however, that nothing contained herein shall be construed as a consent by GE or any of the other GE Secured Parties, to such DIP Financing or any Liens granted in connection therewith, or a waiver by any such party of its right to object to any such DIP Financing or any Liens granted in connection therewith.

(d)    If GM becomes subject to any Insolvency Proceeding, and if GE consents in writing to the provision of any DIP Financing to GM, which DIP Financing requires the subordination of the Liens on the GE Collateral securing the GE Secured Obligations to Liens on the GE Collateral that will secure obligations under any DIP Financing or proposed DIP Financing to GM, whether or not some or all of the proceeds thereof are being used to Refinance all or any portion of the GE Secured Obligations, then the UST Representative and each of the other UST Secured Parties will subordinate (and will be deemed hereunder to have subordinated) its Liens (other than any such Liens granted under the DIP Financing) on the GE Collateral (including Liens, if any, granted as adequate protection of its interests in the GE Collateral) (i) to the Liens on the GE Collateral that will secure obligations under such DIP Financing on the same terms as the Liens securing the GE Secured Obligations are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), and (ii) to any adequate protection provided to GE or any GE Secured Party on account of the applicable party's interests in the GE Collateral, in connection with the provision of such DIP Financing. Neither the UST Representative nor any other UST Secured Party will request or accept adequate protection or any other relief in connection with the subordination of Liens described in this Section 2.1(d), except as set forth in Section 2.1(f) below.

17552355

(e)     Neither the UST Representative nor any other UST Secured Party will seek relief from the automatic stay or from any other stay in any Insolvency Proceeding or take any action in derogation thereof, in each case with respect to any GE Collateral, without the prior written consent of the GE Secured Parties; provided, however, that the UST Representative or any other UST Secured Party shall be permitted to take any of the foregoing actions without the prior written consent of the GE Secured Parties in connection with the provision or proposed provision by the UST Representative or any other UST Secured Party of DIP Financing to GM; provided, further, however, that nothing contained herein shall be construed as a consent by any of the GE Secured Parties to such DIP Financing, or a waiver by any such party of its right to object to any such relief from the automatic stay or any other stay.

(f)     Neither the UST Representative nor any other UST Secured Party shall object to or contest, or support in any manner any other Person objecting to or contesting, (i) any request by GE or any other GE Secured Party seeking adequate protection of such party's interests in the GE Collateral, or the provision of any adequate protection of such interests to any such party, (ii) any objection by GE or any other GE Secured Party to any motion, relief, action or proceeding based on a claim of a lack of adequate protection with respect to such party's interests in the GE Collateral, or (iii) the payment of Post-Petition Charges to GE or any other GE Secured Party with respect to the GE Collateral.  Notwithstanding anything contained in this Section 2.1(f) (but subject to all other provisions of this Agreement, including, without limitation, Section 2.1(j) below), in any Insolvency Proceeding, if GE or any of the other GE Secured Parties is granted adequate protection of its interests in the GE Collateral, whether in connection with any DIP Financing or use of Cash Collateral or otherwise, then the UST Representative and/or any other UST Secured Party may seek or accept adequate protection with respect to its interests in the GE Collateral; provided, however, that such adequate protection must be solely of the same kind and, if such adequate protection is in the form of a Lien, be granted solely on the same assets, as the adequate protection provided to GE and/or any other GE Secured Party, as applicable, with respect to its interests in the GE Collateral; provided further, however, that any adequate protection provided to the UST Representative or any other UST Secured Party with respect to such party's interests in the GE Collateral that constitutes a superpriority or similar claim for payment shall be junior in priority, operation and effect to any such superpriority or similar claim for payment provided to GE and/or any other GE Secured Party, as applicable, as adequate protection of its interests in the GE Collateral; provided further, however, that any adequate protection provided to the UST Representative or any other UST Secured Party with respect to such party's interests in the GE Collateral that constitutes a Lien shall be junior in priority, operation and effect to any such Lien provided to GE or any other GE Secured Party, as applicable, as adequate protection of its interests in the GE Collateral and, in accordance with Section 2.1(a) above, to the extent such Lien is on the GE Collateral, it shall be junior in priority, operation and effect to any and all Liens on the GE Collateral in favor of GE or any other GE Secured Party securing the GE Secured Obligations.  In the event the UST Representative or any other UST Secured Party is granted or accepts adequate protection of its interests in the GE Collateral in accordance with this Section 2.1(f), then the UST Representative or such other UST Secured Party, as applicable, agrees that GE and the other GE Secured Parties shall also be granted (or deemed to be granted for all purposes under this Agreement, including Section 2.1(i) below) adequate protection of the same kind (and, if such adequate protection is in the form of a Lien, granted on the same assets) as the adequate protection granted to the UST Representative or UST Secured Party, as applicable, and which is senior in priority, operation

and effect to the adequate protection granted to the UST Representative or other UST Secured Party, as applicable. Any payments or other distributions received by the UST Representative or any other UST Secured Party as, or on account of, adequate protection of its respective interests in the GE Collateral (including payments or distributions made to such party on account of Liens granted to such party as adequate protection of its interests in the GE Collateral) shall be subject to turnover to GE pursuant to Section 2.1(i) below. The UST Representative and each of the other UST Secured Parties agrees that, except as expressly set forth in this Section 2.1(f), it shall not seek or accept adequate protection with respect to its interests in the GE Collateral without the prior written consent of GE.

(g)    If any GE Secured Party is required in any Insolvency Proceeding or otherwise to disgorge, turn over or otherwise pay to a debtor in possession, trustee, receiver or similar Person, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a fraudulent or preferential transfer, any amount received by such party pursuant to the GE Credit Agreement (a "Senior Recovery"), whether received from or on behalf of GM as proceeds of the GE Collateral or other security, as a result of enforcement of any right of set-off or otherwise, then the GE Secured Obligations shall be reinstated to the extent of such Senior Recovery and shall be deemed to be outstanding as if such payment had not occurred and the GE Secured Obligations Payment Date shall be deemed not to have occurred. If this Agreement shall have been terminated prior to such Senior Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. The UST Representative and other UST Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefits of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

(h)    Neither the UST Representative nor any other UST Secured Party shall, in an Insolvency Proceeding or otherwise, oppose any sale, collection or other disposition of any GE Collateral that is consented to in writing by GE, and the UST Representative and each other UST Secured Party shall be deemed to have consented, under Section 363 of the Bankruptcy Code and otherwise, to any such sale, collection or other disposition of GE Collateral and to GE and any other GE Secured Party credit bidding its Liens on such GE Collateral in any such sale, collection or other disposition (pursuant to Section 363(k) of the Bankruptcy Code or otherwise), and the UST Representative and each other UST Secured Party shall be deemed to have consented to the release of its Liens on such GE Collateral; provided, however, that proceeds from such sale, collection or other disposition of GE Collateral shall be distributed in accordance with Section 9.3 of the GE Credit Agreement (in existence as of the date hereof) regardless of whether an Event of Default (as defined in the GE Credit Agreement) has occurred and is continuing at the time such distributions are to be made; provided further, however, that GM hereby irrevocably instructs GE, and GE hereby agrees, to make any payments with respect to the proceeds of GE Collateral on which the UST Secured Parties have a Lien, otherwise to be paid to GM under Section 9.3(d) of the GE Credit Agreement, to the UST Representative to be applied as Proceeds of Collateral in accordance with Section 4.06 of the UST Loan Agreement or Section 3(f) of the UST Security Agreement (each in existence as of the date hereof), as

applicable, in each case regardless of whether an Event of Default (as defined in the applicable UST Loan Document) has occurred and is continuing at the time such payments are to be made; provided further, however, that, for the avoidance of doubt, nothing contained herein shall be construed as a consent by the President's Designee to any sale, collection or other disposition of any GE Collateral; a waiver of any notice or other obligations of GM to the President's Designee under the UST Loan Documents or otherwise with respect to such sale, collection or other disposition; or any waiver, limitation or other restriction on the rights and duties of the President's Designee with respect to such sale, collection or other disposition.

(i)    Each of the UST Representative and the other UST Secured Parties acknowledges and agrees that because of, among other things, the different rights in the GE Collateral of the UST Representative and the other UST Secured Parties, on the one hand, and GE and the other GE Secured Parties, on the other hand, the UST Secured Obligations are fundamentally different from the GE Secured Obligations and must be separately classified in any plan of reorganization proposed or adopted in any Insolvency Proceeding. Each of the UST Representative and the other UST Secured Parties hereby acknowledges and agrees that, regardless of whether the claims with respect to the GE Collateral of GE and the other GE Secured Parties, on the one hand, and the UST Representative and the other UST Secured Parties, on the other hand, are deemed by any court or any third party to constitute a single secured claim (rather than separate senior and junior secured claims), whether in a plan of reorganization or otherwise, all distributions received by the UST Representative or any other UST Secured Party (whether pursuant to a plan of reorganization or otherwise and including, without limitation, distributions made to such party as or on account of adequate protection of such party's interest in the GE Collateral) shall be reallocated to reflect the relative priority of the parties' Liens on and rights with respect to the GE Collateral as provided in this Agreement (with the effect being that, to the extent that the aggregate value of the GE Collateral is sufficient (ignoring all claims held by the UST Representative and the other UST Secured Parties), GE and the other GE Secured Parties shall be entitled to receive, in addition to amounts distributed to them with respect to principal, pre-petition interest and other claims, all amounts owing on account of Post-Petition Charges (regardless of whether such charges have been allowed in such Insolvency Proceeding) with respect to the GE Collateral before any distribution is made on account of the claims held by the UST Representative and the other UST Secured Parties with respect to the GE Collateral, with the UST Representative and each other UST Secured Party hereby acknowledging and agreeing to hold in trust for the benefit of, and turn over to, GE all amounts otherwise received or receivable by it (whether under a plan of reorganization or otherwise) with respect to its respective interests in the GE Collateral, as and when received, to the extent necessary to effectuate the intent of this Section 2.1(i), even if such turnover has the effect of reducing the claim or recovery of the UST Representative or any other UST Secured Party). The provisions of this Section 2.1(i) shall be enforceable by GE against the UST Representative and each other UST Secured Party at any time prior to the occurrence of the GE Secured Obligations Payment Date.

(j)    Neither the UST Representative nor any other UST Secured Party shall oppose or seek to challenge any claim by GE or any GE Secured Party for allowance or payment in any Insolvency Proceeding of Post-Petition Charges with respect to any GE Secured Obligation on account of the GE Collateral. Subject to Section 2.1(f) above, neither GE nor any other GE Secured Party shall oppose or seek to challenge any claim by the UST Representative or any

other UST Secured Party for allowance in any Insolvency Proceeding of Post-Petition Charges with respect to any UST Secured Obligation on account of the GE Collateral; provided, however, that nothing in this Section 2.1(j) shall in any way modify or limit the obligations of the UST Representative and each other UST Secured Party under Section 2.1(i) above, and the right of GE to enforce the provisions thereof.

(k)    This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of any Insolvency Proceeding.

(l)    If, prior to the GE Secured Obligations Payment Date, the UST Representative or any other UST Secured Party receives any Post-Petition Securities on account of its Liens on any GE Collateral in any Insolvency Proceeding, and such Post-Petition Securities are secured by any Lien on all or a portion of the GE Collateral that is also subject to Liens securing Post-Petition Securities received by GE or any other GE Secured Party on account of any GE Secured Obligations in such Insolvency Proceeding, such Liens shall be junior and subordinate to the Liens securing Post-Petition Securities received on account of the GE Secured Obligations to the same extent as Liens on the GE Collateral securing UST Secured Obligations are junior and subordinate to Liens on the GE Collateral securing the GE Secured Obligations as provided in this Agreement, and shall in all respects be subject to the terms of this Agreement; provided, however, that the foregoing shall not apply to any Post-Petition Securities with respect to which the UST Representative or any other UST Secured Party receiving such Post-Petition Securities has been granted a superior or pari passu Lien on all or a portion of the GE Collateral in connection with any DIP Financing; provided further, however, that nothing herein shall be construed as a consent by GE or any of the GE Secured Parties to such DIP Financing or the granting of such superior or pari passu Liens, or a waiver by any such party of its right to object to any such DIP Financing or the granting of such superior or pari passu Liens.

(m)    Prior to the GE Secured Obligations Payment Date, any GE Collateral, including, without limitation, any GE Collateral constituting Proceeds, that may be received by the UST Representative or any other UST Secured Party in violation of this Agreement, shall be segregated and held in trust, and shall be promptly paid over to GE, for the benefit of the GE Secured Parties, in the same form as received, with any necessary endorsements, and each UST Secured Party hereby authorizes GE to make any such endorsements as agent for the UST Representative (which authorization, being coupled with an interest, is irrevocable); provided, however, that none of the foregoing restrictions shall apply to any GE Collateral in which the UST Representative or any other UST Secured Party receiving such GE Collateral has been granted a superior or pari passu Lien in connection with any DIP Financing or otherwise; provided, further, however, that nothing contained herein shall be construed as a consent by GE or any of the GE Secured Parties to such DIP Financing or the granting of such superior or pari passu Liens, or a waiver by any such party of its right to object to any such DIP Financing or the granting of such superior or pari passu Liens; provided, further, however, that, for the avoidance of doubt, nothing in this Section 2.1(m) shall be construed as limiting or otherwise restricting the right of the UST Representative or any other UST Secured Party to Refinance some or all of the UST Secured Obligations in accordance with the other provisions of this Agreement.

(n)    GE and each of the other GE Secured Parties agrees to hold that part of the GE Collateral that is in its possession or control (or in the possession or control of its agents or bailees), to the extent that possession or control thereof is taken to perfect a Lien thereon under the Uniform Commercial Code (such GE Collateral being the "GE Pledged Collateral"), as collateral agent for the applicable GE Secured Parties and as bailee for the UST Representative and each of the other UST Secured Parties (such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code), and any assignee of any of the foregoing, solely for the purpose of perfecting the Liens granted under the GE Credit Agreement and the UST Loan Documents, respectively, subject to the terms and conditions of this Section 2.1(n).   Upon the occurrence of the GE Secured Obligations Payment Date, if any of the UST Secured Obligations remain unsatisfied, GE and each of the other GE Secured Parties shall, in lieu of releasing the GE Pledged Collateral to GM, deliver the GE Pledged Collateral to the UST Representative or otherwise in accordance with the UST Representative's instructions.    GE shall have no obligation whatsoever to the UST Representative or any other UST Secured Party to ensure that the GE Pledged Collateral is genuine or owned by GM, or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.1(n). The duties or responsibilities of GE under this Section 2.1(n) shall be limited solely to holding the GE Pledged Collateral as bailee in accordance with this Section 2.1(n) and the delivery thereof. GM acknowledges and agrees to the this Section 2.1(n).

(o)    To the maximum extent permitted by law, the UST Representative and each other UST Secured Party waives any claim it might, or might in the future, have against GE or any other GE Secured Party with respect to, or arising out of, any action or failure to act or any error of judgment, negligence or mistake or oversight whatsoever on the part of GE or any other GE Secured Party or any of their respective directors, officers, employees, agents or Affiliates with respect to any exercise of rights or remedies under the GE Credit Agreement or this Agreement. Neither GE nor any other GE Secured Party, nor any of their respective directors, officers, employees, agents or Affiliates, shall be liable for failure to demand, collect or realize upon any of the GE Collateral or other collateral, or upon any guaranty, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any GE Collateral or to take any other action whatsoever with respect to the GE Credit Agreement or the UST Loan Documents, except as expressly provided in this Agreement.  To the maximum extent permitted by law, GE and each other GE Secured Party waives any claim it might, or might in the future, have against any US Governmental Authority, including, without limitation, the UST Representative and each other UST Secured Party, with respect to, or arising out of, any action or failure to act or any error of judgment, negligence or mistake or oversight whatsoever on the part of the UST Representative or any other UST Secured Party or any of their respective directors, officers, employees, agents or Affiliates with respect to any exercise of rights or remedies under the UST Loan Documents or this Agreement.

2.2    Amendment of Credit Agreements.   GE may not amend, supplement, restate or otherwise revise, Refinance or replace the GE Credit Agreement without the prior written consent of the UST Representative if such amendment, supplement, restatement, revision, Refinancing or replacement would:

(a)    extend the Scheduled Termination Date past November 30, 2010;

(b)     increase the Commitment to be in excess of $150,000,000 or otherwise increase the maximum principal amount outstanding under the GE Credit Agreement to be in excess of $157,500,000; or

(c)     increase the rates at which interest, or interest following an Event of Default, are calculated under the GE Credit Agreement to be in excess of those rates set forth in the GE Credit Agreement as in effect on the date hereof, after giving effect to the Third Amendment (but disregarding increases arising from increases from time to time in LIBOR or the Base Rate).

2.3    <u>Rights Preserved</u>.  All rights and interests of the GE Secured Parties and the UST Secured Parties hereunder, shall remain in full force and effect irrespective of any circumstances that otherwise might constitute a defense available to, or a discharge of, GM with respect to the GE Secured Obligations or any UST Secured Party with respect to this Agreement.

2.4    <u>Information Concerning Financial Condition of GM</u>.  Each Secured Party hereby assumes responsibility for keeping itself informed of the financial condition of GM and all other circumstances bearing upon the risk of nonpayment of the GE Secured Obligations or the UST Secured Obligations.  No Secured Party shall have any duty to advise any other Secured Party of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any information to any other Secured Party, it shall be under no obligation (i) to update or revise any such information, (ii) to provide any such information to such other Secured Party or any other party on any subsequent occasion, (iii) to undertake any investigation not a part of its regular business routine, or (iv) to disclose any other information.

**Section 3.    Enforcement Rights, Inspection Rights.**

3.1    <u>Enforcement under the GE Credit Agreement.</u>

(a)     Until the GE Secured Obligations Payment Date has occurred, whether or not any Insolvency Proceeding has been commenced, the UST Secured Parties (i) will not exercise or seek to exercise any rights or remedies with respect to any of the GE Collateral (including, without limitation, the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any UST Secured Party is a party, or any marshalling, appraisal, valuation or any other right that may otherwise be available under any applicable Requirement of Law with respect to all or any portion of the GE Collateral to the UST Representative or any other UST Secured Party in its capacity as beneficiary of a junior Lien on such GE Collateral) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, that (A) the UST Representative and any other UST Secured Party may exercise any or all such rights or remedies after the passage of a period of at least 120 days has elapsed since the earlier to occur of (1) the date on which GE declared the existence of any Event of Default under and as defined in the GE Credit Agreement, and demanded the repayment of all the principal amount of any GE Secured Obligations (unless such Event of Default and demand for repayment is rescinded, in which case such Event of Default and demand for repayment shall be deemed never to have occurred for purposes of this clause (i)(A)(1)), and (2) the date on which GE received notice from the UST Representative of its

intent to exercise such rights or remedies (the "UST Standstill Period"); provided further, however, that, notwithstanding anything herein to the contrary, in no event shall the UST Representative exercise any rights or remedies with respect to the GE Collateral if, notwithstanding the expiration of any UST Standstill Period, GE shall have commenced and be diligently pursuing the exercise of its rights or remedies with respect to all or any material portion of the GE Collateral (and notice of such exercise has been given to the UST Representative in accordance with Section 3.5(a) below); (ii) will not contest, protest or object to any foreclosure proceeding or action brought by GE or any other exercise by GE of any rights and remedies relating to the GE Collateral under the GE Credit Agreement or otherwise; (iii) subject to their rights under clause (i) above, will not object to the forbearance by GE from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the GE Collateral, in each case so long as the interests of the UST Representative and the other UST Secured Parties attach to the proceeds thereof, subject to the relative priorities described in Section 2.1(a) above; (iv) will not take or cause to be taken any action, the purpose or effect of which is to make any Lien with respect to any UST Secured Obligation pari passu with or senior to, or to give the UST Representative or any UST Secured Party any preference or priority relative to, the Liens with respect to the GE Secured Obligations held by GE or the GE Secured Parties with respect to any of the GE Collateral (other than a DIP Financing in accordance with Section 2.1 above); and (v) will have no right to direct either GE or any other GE Secured Party to exercise any right, remedy or power with respect to the GE Collateral or pursuant to the GE Credit Agreement.

(b)    Until the GE Secured Obligations Payment Date has occurred, whether or not any Insolvency Proceeding has been commenced, GE and the GE Secured Parties shall have the right to enforce rights, exercise remedies (including set off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the GE Collateral without any consultation with or the consent of the UST Representative or any other UST Secured Party. In exercising rights and remedies with respect to the GE Collateral, GE and the other GE Secured Parties may enforce the provisions of the GE Credit Agreement and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by any of them to sell or otherwise dispose of GE Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code and of a secured creditor under Bankruptcy Law of any applicable jurisdiction. GE agrees to provide at least the lesser of (i) five days' or (ii) the number of days remaining in the UST Standstill Period, notice to the UST Representative of its intent to exercise and enforce its respective rights and remedies with respect to a material portion of the GE Collateral.

(c)    Notwithstanding the foregoing, the UST Representative and any other UST Secured Party may:

(i)    take any action (not adverse to the priority status of the Liens on the GE Collateral securing the GE Secured Obligations, or the rights of GE or any other GE Secured Party to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its respective junior Liens in the GE Collateral;

(ii)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the UST Representative or any other UST Secured Party, including, without limitation, any claims secured by the GE Collateral, if any, in each case in accordance with the terms of this Agreement; and

(iii)    exercise any of its rights or remedies with respect to the GE Collateral after the termination of the UST Standstill Period to the extent permitted by Section 3.1(a) above.

(d)    The UST Representative, on behalf of itself and the other UST Secured Parties, agrees that it will not take or receive any GE Collateral or any Proceeds of GE Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any GE Collateral in its capacity as a prepetition secured creditor, unless and until the GE Secured Obligations Payment Date has occurred, except as expressly provided in Section 3.1(a) above. Without limiting the generality of the foregoing, unless and until the GE Secured Obligations Payment Date has occurred, except as expressly provided in Sections 3.1(a) and 3.1(c) above, the sole right of the UST Representative and the UST Secured Parties with respect to the GE Collateral is to hold a Lien on the GE Collateral pursuant to the applicable UST Loan Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, after the GE Secured Obligations Payment Date has occurred.

(e)    Subject to Sections 3.1(a) and 3.1(c) above:

(i)    the UST Representative, for itself and on behalf of the other UST Secured Parties, agrees that the UST Representative and the other UST Secured Parties will not take any action that would hinder any exercise of remedies under the GE Credit Agreement or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the GE Collateral, whether by foreclosure or otherwise;

(ii)    the UST Representative, for itself and on behalf of the other UST Secured Parties, hereby waives any and all rights it or the other UST Secured Parties may have as a junior lien creditor or otherwise to consent to or object to the manner in which GE or the other GE Secured Parties seek to enforce or collect the GE Secured Obligations or the Liens securing the GE Secured Obligations, in each case granted on any of the GE Collateral and undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of GE or any of the other GE Secured Parties is adverse to the interest of the UST Secured Parties; and

(iii)    the UST Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in the UST Loan Documents (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of GE or the other GE Secured Parties with respect to the GE Collateral as set forth in this Agreement or the GE Credit Agreement.

(f)    Except as specifically set forth in Sections 3.1(a) and 3.1(c) above, nothing in this Agreement shall prohibit the receipt by the UST Representative or any other UST Secured Party

of the required payments of interest, principal and other amounts owed with respect to the applicable UST Secured Obligations so long as such receipt is not the direct or indirect result of the exercise by the UST Representative or any other UST Secured Party of rights or remedies as a secured creditor (including set off) or enforcement in contravention of this Agreement of any Lien on the GE Collateral held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies GE or the other GE Secured Parties may have with respect to the GE Collateral.

(g)     Prior to the occurrence of the GE Secured Obligations Payment Date, whether or not any Insolvency Proceeding has been commenced by or against GM, GE Collateral or Proceeds thereof received in connection with the sale or other disposition thereof, or collection thereon, upon the exercise of remedies by GE or the other GE Secured Parties, shall be applied by GE to the GE Secured Obligations in such order as specified in the GE Credit Agreement. Upon the occurrence of the GE Secured Obligations Payment Date, GE shall deliver to the UST Representative any GE Collateral and Proceeds of GE Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the UST Representative to the UST Secured Obligations in such order as specified in the UST Loan Documents.

3.2    Cooperation. The UST Representative, on behalf of itself and the other UST Secured Parties, agrees that each of them shall take such actions as the GE Secured Parties shall reasonably request in connection with the exercise by the GE Secured Parties of their rights set forth herein with respect to the GE Collateral.

3.3    Actions Upon Breach.

(a)     If any UST Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against GM or the GE Collateral, or otherwise acts (or fails to act) in a manner contrary to this Agreement, GM, with the prior written consent of GE, may interpose as a defense or dilatory plea the making of this Agreement, and any GE Secured Party, as applicable, may intervene and interpose such defense or plea in its or their name or in the name of GM.

(b)     If any GE Secured Party acts (or fails to act) in a manner contrary to this Agreement, GM, with the prior written consent of the UST Representative, may interpose as a defense or dilatory plea the making of this Agreement, and any UST Secured Party, as applicable, may intervene and interpose such defense or plea in its or their name or in the name of GM.

(c)     Should any UST Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the GE Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any GE Secured Party (in its own name or in the name of GM) may obtain relief against such UST Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the UST Representative on behalf of each UST Secured Party that (i) the GE Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each

UST Secured Party waives any defense that the GE Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

(d)    Should any GE Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the GE Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any UST Secured Party (in its own name or in the name of GM) may obtain relief against such GE Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by GE on behalf of each GE Secured Party that (i) the UST Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each GE Secured Party waives any defense that the UST Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

3.4    Inspection Rights.  Any GE Secured Party and its representatives and invitees may exercise its inspection rights with respect to the GE Collateral as permitted by the GE Credit Agreement, without notice to, the involvement of or interference by any UST Secured Party or liability to any UST Secured Party.

3.5    Notices of Certain Events.

(a)    GE hereby agrees to notify the UST Representative promptly after learning of the occurrence of any of the following events:  (i) the occurrence of any default or event of default or situation which, but for the passage of time, would constitute a default or event of default under the GE Credit Agreement to the extent it has sent a notice to (in which case a copy of such notice shall be simultaneously sent to the UST Representative), or received a notice from, GM with respect thereto; (ii) any Refinancing of all or any portion of the GE Secured Obligations; and (iii) any amendment, modification, restatement or supplement to the terms of the GE Credit Agreement.  Further, GE agrees to provide at least the lesser of (x) three days' or (y) the number of days remaining in any applicable UST Standstill Period, notice to the UST Representative of GE's intent to exercise and enforce its rights and remedies with respect to the GE Collateral or to institute an Insolvency Proceeding against GM on account of the GE Secured Obligations.

(b)    The UST Representative hereby agrees to notify GE promptly after learning of the occurrence of any of the following events:  (i) the occurrence of any default or event of default or situation which, but for the passage of time, would constitute a default or event of default under the UST Loan Documents, to the extent it has sent a notice to (in which case a copy of such notice shall be simultaneously sent to GE), or received a notice from, GM with respect thereto; (ii) any Refinancing of all or any portion of the UST Secured Obligations; and (iii) any amendment, modification, restatement or supplement to the terms of the UST Loan Documents. Further, the UST Representative agrees to provide at least three days' notice to GE of the UST Representative's intent to exercise and enforce its rights and remedies with respect to the GE Collateral (subject to Section 3.1(a) above) or to institute an Insolvency Proceeding against GM on account of the UST Secured Obligations.

(c)    Except as expressly provided in this Agreement, each of the Secured Parties agrees that, without the necessity of any reservation of rights against it, and without notice to or

further assent by it, any demand for repayment of any of the Secured Obligations may be rescinded in whole or in part by the applicable Secured Party, and any Secured Obligation may be continued, and any Secured Obligations, or the liability of GM upon or for any part thereof, or any collateral or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, waived, surrendered, or released by the applicable Secured Party, in each case without notice to or further assent by the other Secured Parties, and without impairing, abridging, releasing or affecting the subordination and other agreements provided for herein.

### Section 4.    Rights as Unsecured Creditor.

Notwithstanding anything contained herein to the contrary, the Secured Parties hereby agree that they shall not assert any rights and remedies as an unsecured creditor against GM in a manner which would contravene the understandings and agreements set forth herein including, without limitation, with respect to Lien and payment priority, consenting to DIP Financing, and requests for adequate protection.

### Section 5.    Miscellaneous.

5.1    Notices.    All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder (any of the foregoing, a "Notice") shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth below, or to such other address as such party may hereafter specify.  Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received:  (a) upon receipt (or first refused delivery) if mailed, (b) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier.  All written notices so given shall be deemed effective upon receipt or, if mailed, upon the earlier to occur of receipt or first refused delivery.

5.2    Mutual Consent.  The UST Representative, in its capacity as lender under the UST Credit Agreement, hereby consents to the entry by GM into the Third Amendment and performance by GM of their obligations thereunder.  The consent set forth in this Section 5.2 is intended, and shall be deemed, to satisfy the requirements of Section 11.04 of the UST Credit Agreement with respect to a modification of a provision of the UST Credit Agreement.

GE confirms that GM and any of its Subsidiaries are permitted under the GE Credit Agreement to, subject to the terms of the UST Loan Documents and this Agreement, grant Liens on any GE Collateral in favor of the UST Representative, for the benefit of the UST Secured Parties; provided however, that any such Liens upon the GE Collateral (a) shall be junior in priority to the Liens securing the GE Secured Obligations, and (b) are subject to this Agreement or an intercreditor agreement with GE in form and substance acceptable to such party in its sole discretion.

17552355

5.3     Other Rights Reserved.  Except as expressly provided herein, GE, each of the other GE Secured Parties, the UST Representative and each of the other UST Secured Parties reserve all rights with respect to (a) objecting in any Insolvency Proceeding or otherwise to any action taken by any other party to this Agreement with respect to the GE Collateral or otherwise, including the seeking by any party hereto of adequate protection (other than as provided in Sections 2.1(f) and 2.1(j) above), or the assertion by any party hereto of any of its rights and remedies under the GE Credit Agreement or the UST Loan Documents or any other agreement, instrument or document, and (b) seeking to provide any DIP Financing to GM, and objecting (subject to the provisions of Section 2.1(d) above) to any proposal for DIP Financing made by any other party.

5.4     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

5.5     Authorization.  By its signature, each person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

5.6     APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5.7     SUBMISSION TO JURISDICTION; WAIVERS.

(a)     ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:

(i)     ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;

(ii)     WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;

(iii)     AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS FOR NOTICES AS PROVIDED HEREIN; AND

(iv)     AGREES THAT SERVICE AS PROVIDED ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b)    EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER.    THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.    EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.    EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.    THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 5.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)    EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

5.8    <u>Binding on Successors and Assigns</u>.  This Agreement shall be binding upon the parties hereto and their respective successors, assigns, participants and any holder of all or any portion of the indebtedness covered by this Agreement, whether such interest is legal, economic or otherwise.

5.9    <u>Amendment</u>.  No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each of the Secured Parties or their authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, GM shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement.

5.10    <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>.    This Agreement shall become effective when executed and delivered by the parties hereto.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding, and the terms of this Agreement shall survive, and

shall continue in full force and effect, in any Insolvency Proceeding, and after the occurrence of either or both the GE Secured Obligations Payment Date and the UST Secured Obligations Payment Date. The rights and obligations under this Agreement of each party hereto shall not be affected by the vote of any party hereto to accept or reject a plan of reorganization or liquidation proposed in any Insolvency Proceeding relating to GM, the GE Collateral, or the receipt by any party hereto of any cash, securities or other property distributed in any Insolvency Proceeding, except as expressly provided in this Agreement. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to GM shall include GM as debtor and debtor in possession and any receiver or trustee for GM in any Insolvency Proceeding.

5.11    No Third Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns. No other person shall have or be entitled to assert rights or benefits hereunder. GM understands that this Agreement is for the sole benefit of the Secured Parties and their respective successors and assigns, and that neither GM nor any of its Subsidiaries or Affiliates are intended beneficiaries or third party beneficiaries of this Agreement or any of the provisions hereof.

5.12    Priority of UST Liens. Each UST Secured Party acknowledges and agrees that it will not use any right it might have as a U.S. Governmental Authority to claim any Lien on or interest in the GE Collateral securing the UST Secured Obligations that would be treated differently in any manner than the manner in which its Liens on the GE Collateral securing the UST Secured Obligations are treated under this Agreement.

17552355

IN WITNESS WHEREOF, the parties hereto have caused this Intercreditor Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

GENERAL MOTORS CORPORATION

By: _____
Name: Adil Mistry
Title: Assistant Treasurer

Address for Notices:

767 Fifth Avenue, 14th Floor,
New York, NY - 10153
Attn:  Manager Structured Finance
Tel:  212 418 6219
Fax:  212 418 6419

With Copies to:

Legal Staff
23rd Floor
300 Renaissance Center
Detroit, MI 48265-3000
Attn:  Martin Darvick

*[Signature page to Intercreditor Agreement]*

GELCO CORPORATION d/b/a GE FLEET
SERVICES

By: *Christina L Selby*

Name: Christina L Selby

Title: Senior Vice President Finance

Address for Notices:

GE Corporate Financial Services
201 Merritt
Norwalk, Connecticut 06856-5201
Attn: Operations Site Leader - 2nd Floor
Tel: 203 956-4146
Fax: 203 229-5788

With Copies to:

GE Commercial Finance, Fleet Services
3 Capital Drive
Eden Prairie, MN 55344
Attn: Loan Operations Leader
Tel: (952) 828-1000
Fax: (952) 828-2742

and

GE Commercial Finance, Fleet Services
3 Capital Drive
Eden Prairie, MN 55344
Attn: General Counsel
Tel: (952) 828-1000
Fax: (952) 828-2742

*[Signature page to Intercreditor Agreement]*

THE UNITED STATES DEPARTMENT OF THE
TREASURY

By: _____
    Name:  Neel Kashkari
    Title:  Interim Assistant Secretary of the Treasury for
    Financial Stability


Address for Notices:
    1500 Pennsylvania Avenue, NW
    Washington, D.C. 20220
    Attention:  Chief Counsel Office of Financial
    Stability
    Facsimile:  (202) 927-9219

*[Signature page to Intercreditor Agreement]*

**<u>EXHIBIT B</u>**

Determination of Viability Summary                                                    March 30, 2009
General Motors Corporation

<u>**GM February 17 Plan**</u>
**Viability Determination**

**Summary**

The Loan and Security Agreement of December 31, 2008 between the General Motors Corporation and the United States Department of the Treasury ("LSA") laid out conditions that needed to be met by March 31, including the approval of Labor Modifications, VEBA Modifications, and the commencement of a Bond Exchange (all as defined in the LSA).

As of the date of this memo, the above steps have not been completed, nor are they expected to be completed by March 31. As a result, General Motors has not satisfied the terms of its loan agreement. Additionally, after substantial effort and review, the President's Designee[1] has concluded that the GM plan, in its current form, is not viable and will need to be restructured substantially while GM operates under an amendment to the existing LSA. It is strongly believed, however, that such a substantial restructuring will lead to a viable GM.

This determination of viability was based on a thorough review, as conducted by the Task Force and its outside advisors and as summarized below, of the Company's submitted plan and prospects.  While there were many individual considerations, no single factor was critical to the assessment. Rather, the ultimate determination of viability was based upon a total consideration of all relevant factors, taken as a whole.

General Motors is in the early stages of an operational turnaround in which the Company has made material progress in a number of areas, including purchasing, product design, manufacturing, brand rationalization and its dealer network. Despite these steps, a great deal more progress needs to be made, and GM's plan contemplates initiatives that will take many years to complete. In the end, GM's plan is based on a number of assumptions that will be very challenging to meet without a more dramatic restructuring in which many of its planned changes are accelerated. A few highlights:

- **Market Share:** GM has been losing market share to its competitors for decades, yet its plan assumes only a very moderate decline, despite reducing fleet sales and shuttering brands that represent 1.8% of its current market share.
- **Price:** The plan assumes improvement in net price realization despite a severely distressed market, lingering consumer quality perceptions, and an increase in smaller vehicles (where the Company has previously struggled to maintain pricing power).
- **Brands/Dealers:** The Company is currently burdened with underperforming brands, nameplates and an excess of dealers. The plan does not act aggressively enough to curb these problems.
- **Product mix:** GM earns a large share of its profits from high-margin trucks and SUVs, which are vulnerable to a continuing shift in consumer preference to smaller vehicles. Additionally, while the Chevy Volt holds promise, it will likely be too expensive to be commercially successful in the short-term.
- **Legacy liabilities:** In GM's plan, its cash needs associated with legacy liabilities grow to unsustainable levels, reaching approximately $6 billion per year in 2013 and 2014.

Moreover, even under the Company's optimistic assumptions, the Company continues to experience negative free cash flow (before financing but after legacy obligations) through the projection period, failing a fundamental test of viability.

In short, while the Company has made meaningful progress in its turnaround plan over the last few years, the progress has been far too slow, allowing the Company to continue to lag the best-in-class competitors. As a result, the President's Designee has found that General Motors' plan is not viable as it is currently structured. However, because of GM's scale, franchise and progress to date, we believe that there could be a viable business within GM if the Company and its stakeholders engage in a substantially more aggressive restructuring plan.

1

**Determination of Viability Summary**                                        **March 30, 2009**
**General Motors Corporation**

**Detailed Determination**

The Loan and Security Agreement of December 31, 2008 between the General Motors Corporation and the United States Department of the Treasury ("LSA") laid out various conditions that needed to be met by March 31, including:

(a) Approval of the Labor Modifications (Compensation Reductions, the Severance Rationalization and the Work Rule Modifications) by the members of the Unions;

(b) Receipt of all necessary approvals of the VEBA Modifications other than regulatory and judicial approvals; provided, that the Borrower must have filed and be diligently prosecuting applications for any necessary regulatory and judicial approvals; and

(c) The commencement of an exchange offer to implement a Bond Exchange.

As of the date of this memo, none of the above steps has been completed. As a result, General Motors has not satisfied the terms of its loan agreement.

The LSA also requires that the President's Designee review the Restructuring Plan Report in order to determine whether General Motors has taken all necessary steps to achieve and sustain the long-term viability, international competitiveness and energy efficiency of the Company and its subsidiaries

Since receiving the Company's plan on February 17th, the Government has engaged in substantial efforts to assess its viability. This work has involved staff from the Department of the Treasury, National Economic Council, Council of Economic Advisors as well as the numerous other Cabinet agencies involved in the President's Task Force on the Auto Industry. The working group has also worked extensively with several dozen individuals at industry-leading consulting, financial advisory and law firms. Numerous outside experts and affected stakeholders have been consulted. As a result of this work, the President's Designee has concluded that the General Motors plan, in its current form, is not viable and will need to be restructured substantially in order to lead to a viable General Motors. It is strongly believed, however, that such a substantial restructuring will lead to a viable General Motors.

While the President's Designee considered many factors when assessing viability, the most fundamental benchmark was the following: for a business to be viable, it must be able – after accounting for spending on research and development and capital expenditures necessary to maintain and enhance the company's competitive position -- to generate positive cashflow and earn an adequate return on capital over the course of a normal business cycle.

Progress to date:

General Motors is in the early stages of an operational turnaround in which GM has made material progress in a number of areas:

- o Purchasing: GM has organized its purchasing globally, with its purchasing organization taking advantage of GM's global scale, and has put into place a rigorous, metric-oriented approach to drive supplier quality and cost improvements.
- o Product design: GM has refined its product design process to create global vehicle platforms, thus allowing GM to reduce engineering costs and improve the content of its cars. These global platforms leverage the scale of the business and allow GM to amortize product development costs over a large range

2

**Determination of Viability Summary**                                         **March 30, 2009**
**General Motors Corporation**

of models. GM has also, since 2005, focused on customer needs, interior designs, styling and quality to provide more attractive products. Examples of successes of this initiative include the 2008 North American Car of the Year Chevy Malibu and the 2008 Motor Trend Car of the Year Cadillac CTS (though they constitute a modest share of GM's portfolio today).

o  Manufacturing: GM has worked to create greater flexibility within its facilities, allowing for increased capacity utilization and an enhanced ability to spread its significant fixed costs across a broader car base.

o  Brand rationalization: The recently announced decisions to divest or shut down Saab, Saturn and Hummer, while late, were important steps in reducing the Company's brand portfolio and allowing it to focus its financial and human resources on a smaller number of higher quality brands.

o  Dealer network: GM has been eliminating dealers from markets where it is oversaturated, as well as eliminating dealers who are either unprofitable or create a poor customer experience.

However, it is important to recognize that a great deal more progress needs to be made, and that GM's plan is based on fairly optimistic assumptions that will be challenging in the absence of a more aggressive restructuring.

- The plan contemplates that each of its restructuring initiatives will continue well into the future, in some cases until 2014, before they are complete.
  - o  The slow pace at which this turnaround is progressing undermines the Company's ability to compete against large, highly capable and well-funded competitors. GM's plan forecasts it to catch up to (and, in some cases, surpass) its competitors' current performance metrics; however, its key competitors are constantly working to improve as well, potentially leaving GM further behind over time.
- Given the slow pace of the turnaround, the assumptions in GM's business plan are too optimistic.
  - o  Market Share
    - ▪  GM has been losing market share slowly to its competitors for decades. In 1980, GM's US market share was 45%; in 1990, GM's US share was 36%, in 2000, its share was 29%. In 2008, its share was 22%. In short, GM has been losing 0.7% per year for the last 30 years.
      - • Yet, in its forecast, GM assumes a much slower rate of decline, 0.3% per year until 2014, even though it is reducing fleet sales and shuttering brands which represent a loss of 1.8% market share, of which only a fraction will be retained. Management's plan to achieve this is driven by a reduction in nameplates and an ensuing increase in marketing spend per nameplate.
      - • Furthermore, in the current plan, GM has retained too many unprofitable nameplates that tarnish its brands, distract the focus of its management team, demand increasingly scarce marketing dollars and are a lingering drag on consumer perception, market share and margin.
  - o  Price
    - ▪  In 2006 and 2007, GM North America achieved a 30.4% contribution margin. Then, the plan assumes, despite a severely distressed market, that margins increase to 30.8% in 2009 and 30.7% in 2010. These figures remain at 30.9% in 2013 and 30.3% in 2014, despite GM's plan to increase its focus on passenger cars and crossovers, which have traditionally earned lower margins.
    - ▪  Fundamentally, the lingering consumer perception is that GM makes lower-quality cars (despite meaningful improvements in the last few years), which in turn leads to greater discounting, which harms GM's price realizations and depresses profitability. These lower price points are an important impediment to enhanced GM profitability and need to be reversed over time in order for GM to bring its margins into line with its best-in-class peers.

3

**Determination of Viability Summary**                                                            **March 30, 2009**
**General Motors Corporation**

- o Brands/dealers
  - ▪ GM has been successfully pruning unprofitable or underperforming dealers for several years. However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur. These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales.
  - o Europe
    - ▪ GM's European operations have experienced negative results for at least the last decade with a sharp decline in market share from 12.9% to 9.3% between 1995 and 2008, leaving the Company with high fixed costs and low capacity utilization.
    - ▪ The European business is seeking additional capital beyond the funds requested from the Treasury. These funds have not been allocated and thus represent a risk to the viability of GM's current plan.
  - o Product mix and CAFE compliance
    - ▪ GM earns a disproportionate share of its profits from high-margin trucks and SUVs and is thus vulnerable to energy cost-driven shifts in consumer demand. For example, of its top 20 profit contributors in 2008, only nine were cars.
    - ▪ GM is at least one generation behind Toyota on advanced, "green" powertrain development. In an attempt to leapfrog Toyota, GM has devoted significant resources to the Chevy Volt. While the Volt holds promise, it is currently projected to be much more expensive than its gasoline-fueled peers and will likely need substantial reductions in manufacturing cost in order to become commercially viable
    - ▪ Absent the successful introduction of a number of new-generation nameplates, as described in the Company's plan, GM's product portfolio is more vulnerable to CAFE standard increases than the portfolios of many of its competitors (although GM is in compliance today with current standards). Many of its products fail to meet the minimum threshold on fuel economy and rank in the bottom quartile of fuel economy achievement.
  - o Legacy liabilities – cash costs
    - ▪ As GM moves through its forecast period, its cash needs associated with legacy liabilities grow, reaching approximately $6 billion per year in 2013 and 2014. To meet this cash outflow, GM needs to sell 900,000 additional cars per year, creating a difficult burden that leaves it fighting to maximize volume rather than return on investment.
- • Even under the Company's optimistic assumptions, the Company remains breakeven, at best, on a free cash flow basis throughout the projection period, thus failing the fundamental test of viability.
  - o Under its own plan, GM generates $14.5bn of negative free cash flow over its 6 year forecast period. Even in 2014, on its own assumptions, GM generates negative free cash flow after servicing legacy obligations.
  - o Given the highly challenging current market, the Company is already behind plan in its overall volume expectations and market share for calendar year 2009.
  - o Since the Company has built a plan with little margin for error, even slight swings in its assumptions produce significant and ongoing negative cash flows. For example, a 1% share miss in overall global sales, all else being equal, in 2014 would lead to a $2 billion cash flow reduction in that year.

In short, while the Company has made meaningful progress in its turnaround plan over the last few years, the progress has been far too slow, allowing the Company to continue to lag the best-in-class competitors. Furthermore, even if the projected plan is achieved, the cash flow forecast is quite modest, leaving the Company little margin for error in what will

4

**Determination of Viability Summary**                                        **March 30, 2009**
**General Motors Corporation**

be a very difficult turnaround. As a result, the President's Designee has found that General Motors' plan is not viable as it is currently structured. However, given the improvements that have been made to date, and the path on which these improvements place GM, we believe that there could be a viable business within GM if the Company and its stakeholders engage in a substantially more aggressive restructuring plan.

**Obama Administration New Path to Viability for GM & Chrysler**

In accordance with the March 31, 2009 deadline in the U.S. Treasury's loan agreements with General Motors and Chrysler, the Obama Administration is announcing its determination of the viability of the companies, pursuant to their February 17, 2009 submissions, and is laying out a new finite path forward for both companies to restructure and succeed. These findings and new framework for success are consistent with the President's commitment to support an American auto industry that can help revive modern manufacturing and support our nation's effort to move toward energy independence, but only in the context of a fundamental restructuring that will allow these companies to prosper without taxpayer support.

---

## Key Findings

- **Viability of Existing Plans:** The plans submitted by GM and Chrysler on February 17, 2009 did not establish a credible path to viability. In their current form, they are not sufficient to justify a substantial new investment of taxpayer resources. Each will have a set period of time and an adequate amount of working capital to establish a new strategy for long-term economic viability.

- **General Motors:** While GM's current plan is not viable, the Administration is confident that with a more fundamental restructuring, GM will emerge from this process as a stronger more competitive business. This process will include leadership changes at GM and an increased effort by the U.S. Treasury and outside advisors to assist with the company's restructuring effort. Rick Wagoner is stepping aside as Chairman and CEO. In this context, the Administration will provide GM with working capital for 60 days to develop a more aggressive restructuring plan and a credible strategy to implement such a plan. The Administration will stand behind GM's restructuring effort.

- **Chrysler:** After extensive consultation with financial and industry experts, the Administration has reluctantly concluded that Chrysler is not viable as a stand-alone company. However, Chrysler has reached an understanding with Fiat that could be the basis of a path to viability. Fiat is prepared to transfer valuable technology to Chrysler and, after extensive consultation with the Administration, has committed to building new fuel efficient cars and engines in U.S. factories. At the same time, however, there are substantial hurdles to overcome before this deal can become a reality. Therefore, the Administration will provide Chrysler with working capital for 30 days to conclude a definitive agreement with Fiat and secure the support of necessary stakeholders. If successful, the government will consider investing up to the additional $6 billion requested by Chrysler to help this partnership succeed. If an agreement is not reached, the government will not invest any additional taxpayer funds in Chrysler.

- **A Fresh Start to Implement Aggressive Restructurings:** While Chrysler and GM are different companies with different paths forward, both have unsustainable liabilities and both need a fresh start. Their best chance at success may well require utilizing the bankruptcy code in a quick and surgical way. Unlike a liquidation, where a company is broken up and sold off, or a conventional bankruptcy, where a company can get mired in litigation for several years, a structured bankruptcy process – if needed here – would be a tool to make it easier for General Motors and Chrysler to clear away old liabilities so they can get on a path to success while they keep making cars and providing jobs in our economy.

## Key Findings, Cont.

- **A Commitment to Consumer Warrantees:** The Administration will stand behind new cars purchased from GM or Chrysler during this period through an innovative warrantee commitment program.

- **Appointment of a Director of Auto Recovery:** The Administration also announced that Edward Montgomery, a top labor economist and former Deputy Secretary of Labor, will serve as Director of Recovery for Auto Workers and Communities. Dr. Montgomery will work to leverage all resources of government to support the workers, communities and regions that rely on the American auto industry.

## Detailed Findings on GM and Chrysler Plans

### GENERAL MOTORS

***Viability Determination:*** Based on extensive analysis and the advice of a range of financial and industry advisors, the Administration has determined that GM has not presented a viable plan that would succeed, even in an improved economic environment. While GM has made progress in its turnaround to date, GM's current plan will not result in a healthy company that is meaningfully cash flow positive in a normalized business environment and thus able to support its operations and obligations without continued government support. (A summary of the Administration's findings is provided separately).

The Administration does believe that there is a path to a viable GM and is confident that the company can emerge from this crisis as a strong, competitive business. However, this will require a more aggressive strategy to transform the company's operations than the current management has designed and deeper stakeholder concessions than those specified in the initial loan agreement.

***New Framework for a Fresh Start Restructuring:*** Today, GM is announcing that Rick Wagoner is stepping aside as Chairman and CEO. Kent Kresa will serve as interim Chairman and current President Fritz Henderson will serve as CEO. GM is embarking on a process with the goal of replacing a majority of the board over the coming months. When complete, these changes will bring fresh thinking and new vision to the Company while maintaining a degree of continuity in the current challenging environment.

In this context, the Administration is willing to provide GM with adequate working capital for a finite period of 60 days to develop and implement a more aggressive plan. During this period, the Administration team, consisting of Treasury officials as well as private sector auto industry and restructuring experts retained by the Administration, will work closely with the company. These industry and restructuring experts will help focus this process on:

- *Sustainable profitability:* A viable GM should be able to generate meaningful positive free cash flow in a normalized business environment, generate net free cash flow over the course of a business cycle and invest capital in research and development and capital expenditures sufficient to maintain or enhance its competitive position while also earning an adequate return on its capital.

- *A healthy balance sheet:* The restructuring must substantially reduce GM's outstanding debt and existing liabilities to a level where they are consistent with both its normalized cash flow and the cyclical nature of its business. Given the deterioration in the auto market since late last year, this will require substantially greater balance sheet concessions than those called for in the existing loan agreements.

- *More aggressive operational restructuring:* The restructuring plan must rapidly achieve full competitiveness with foreign transplants and more aggressively implement significant manufacturing, headcount, brand, nameplate and retail network restructurings.

- *Technology leadership:* The new GM will have a significant focus on developing high fuel-efficiency cars that have broad consumer appeal because they are cost-effective, have good performance and are reliable, durable and safe.

In order to execute a new, more aggressive restructuring plan within 60 days, we will work with GM to use all available tools to implement this plan. The best path to achieve this may well be an expedited, court-supervised process to extinguish unsustainable liabilities, should an out-of-court restructuring not be possible. The Administration is prepared to stand by GM throughout this process to ensure that GM emerges with a fresh start and a promising future. Consumers thinking about buying a GM car and workers and communities that depend on this iconic American company should have confidence that GM can and will come out of this crisis as a stronger, leaner and more competitive car company.

## CHRYSLER

**_Viability Determination_:** After extensive consultation, the Administration has determined that Chrysler has not demonstrated that it can achieve long-term viability as a stand-alone company. In particular, Chrysler's plan contains a number of assumptions that are unrealistic or overly optimistic. (A summary of the Administration's findings is provided separately).

Independent financial analysts and industry experts are nearly unanimous in their views that, to be competitive in the decades to come, auto companies will need to transform their processes and products to improve efficiency, reduce costs and offer a higher-quality, more fuel-efficient fleet. These transformations will require substantial investment that Chrysler – according to its own plan – is not capable of making. Therefore, the Administration does not believe that on its own, Chrysler can achieve the scale or depth of product mix necessary to compete in the 21st century global auto market.

**_Chrysler/Fiat Partnership_:** Chrysler has also proposed a partnership with Fiat, which has the potential to address some of these problems and provide Chrysler with a path to viability.  A Chrysler/Fiat alliance could lead to Chrysler manufacturing fuel-efficient vehicles using Fiat's technology while benefiting from the managerial expertise of the Fiat senior leadership that successfully led a turnaround in Fiat over the past five years.  In addition, the product mix and geographic reach of both companies is very complementary.

The original partnership was unacceptable for several reasons, including the fact that Fiat could have gained majority ownership of Chrysler before American taxpayers had their investment in the company paid back. After consulting with the President's Auto Task Force, Chrysler and Fiat have agreed to important changes to their original agreement that would provide greater protections for U.S. taxpayers and would help ensure that new, fuel efficient Chrysler cars and engines are built in the U.S.

***Finite Period to Pursue a Deal:*** However, while the Administration sees promise in this deal, substantially more needs to be accomplished to make this plan viable. In this context, the Administration is willing to provide Chrysler with 30 days of working capital to execute an acceptable partnership. The Administration believes Chrysler is being given a reasonable opportunity to finalize the agreement but is unwilling, in the absence of a long-term solution, to continue to invest taxpayer dollars in this company.

If a definitive agreement is reached, the Administration is willing to consider lending up to the additional $6 billion requested by Chrysler to help the plan succeed. If the Chrysler/Fiat partnership has not been successfully concluded within 30 days, and in the absence of another viable partnership, the government will not invest any additional money in the company.

***Requirements for Additional Government Support:*** Fiat, Chrysler and all of Chrysler's stakeholders must clearly understand that for this deal to succeed, significant hurdles must be cleared:

- First, Chrysler must restructure its balance sheet so that it has a sustainable debt burden. This at a minimum will require extinguishing the vast majority of Chrysler's outstanding secured debt and all of its unsecured debt and equity, other than trade creditors providing normal trade terms.

- Second, Chrysler, Fiat and the UAW need to reach an agreement that entails greater concessions than those outlined in the existing loan agreements.

- Third, Chrysler and Fiat need to demonstrate with a greater degree of detail an operating plan that is truly viable, that can generate meaningful positive cash flow in a normal business environment and that can demonstrate credibly that taxpayer loans will be repaid on a timely basis.

- Fourth, the final plan agreed by Chrysler, Fiat and their stakeholders must not, under appropriately conservative operating assumptions, require than $6 billion of post-restructuring loans from the U.S Treasury.

- Fifth, Chrysler must have a viable, adequately capitalized mechanism to finance the purchase of Chrysler cars by its dealers and customers.

- Finally, Chrysler needs a credible plan to execute this restructuring. Given the magnitude of the concessions needed, the most effective way for Chrysler to emerge from this restructuring with a fresh start may be by using an expedited bankruptcy process as a tool to extinguish liabilities.

### *SUPPORT FOR CONSUMERS AND THE AUTO INDUSTRY*

The Administration is committed to standing behind a tough but necessary industry restructuring that will result in stronger, more viable American car companies. During this process, the Administration wants to ensure that consumers have confidence in the cars they buy and suppliers that depend on viable auto companies have some support to weather this storm.  Our actions are not intended to slow the necessary

consolidation and rationalization of key elements of the auto industry, but will help stabilize the industry during this period of transition.

***Protection of consumer warrantees:*** Consumers who are considering new car purchases should have the confidence that even in this difficult period, their warrantees will be honored. That is why the Administration is launching an innovative new program that will provide government-funded protection for warrantees issued by participating domestic auto manufacturers.  The program will be available for all new warranties on new vehicles purchased from participating auto manufacturers during the period in which those manufacturers are restructuring.  Both General Motors and Chrysler have already indicated their intention to participate. Details on this program are provided HERE.

***Supplier support program:*** Trade creditor support will be essential to the success of the effort to restructure GM and Chrysler. The vast majority of the trade at GM and, as part of the Fiat deal, at Chrysler, will carry through the process and be fully paid. In addition, the Administration recently announced a new $5 billion Supplier Support Program. This program is already providing suppliers with the confidence they need to continue shipping their parts and the support they need to help access loans to pay their employees and continue their operations. The Administration will work closely with the car companies to implement this program in the weeks ahead and monitor closely the state of the automotive supply base.

***Unlocking the Flow of Credit for Consumers and Dealers:*** A healthy automotive industry requires consumers who want to buy cars and are creditworthy to have access to credit. Unfortunately, in the current financing environment, even consumers with excellent credit histories have difficulty gaining access to credit. The Administration remains committed to improving access to credit in general and with respect to automotive purchases specifically. The launch of the Term Asset-Backed Securities Loan Facility (TALF) has expanded the funding available for retail auto loans, thereby directly helping consumers.  And the Administration remains committed to facilitating the access to funding for the automotive finance companies that provide credit to these consumers.  These efforts will be continued and expanded upon to ensure that consumers have the financing they need to purchase vehicles going forward.


## *AUTO TASK FORCE INITIATIVE TO SUPPORT AND REVITALIZE AUTO INDUSTRY WORKERS AND COMMUNITIES*

The President is fully committed to standing behind the American auto industry, which is the backbone of our manufacturing base. To this purpose, the President's Task Force on Autos is launching a new initiative to support and help revitalize American auto communities. The Administration's goal is to both help revitalize the American auto industry and to help manufacturing communities in Michigan and the broader region create new businesses, new jobs and bring in new industries for a stronger economic future. And when despite all of our best efforts, individuals and communities are hard hit -- we will take all possible steps to ensure we are working as swiftly and in as coordinated a fashion as possible to provide relief and paths to re-employment.

This government-wide effort will require substantial leadership and coordination. Today, the President appointed Ed Montgomery, former Deputy Secretary of the Labor Department and current Dean at the University of Maryland, to become Director of Recovery for Auto Communities and Workers. Dr. Montgomery has more than 25 years experience working on issues related to worker training and local economic development and has worked first hand with State and local government agencies and non-profits in Michigan and Ohio on strategies to revitalizing areas hit by job loss.

In his new role, Dr. Montgomery will bring all parties – workers, firms, unions, other private sector employers, community-based organizations, state and local governments, and foundations – to the table to maximize communication and cooperation and to develop innovative strategies for relief and recovery. He will ensure that communities and workers can take full advantage of all available resources and to ensure that the funds are distributed quickly, efficiently and equitably

He will work with the Administration, relevant Governors and Congressional leaders to launch new executive and legislative initiatives to support these distressed communities and help them retool and revitalize their economies. He will identify and pursue all possible opportunities, including for example, initiatives to:

- Maximize the effectiveness of Recovery Act funds for new and more diverse economic development for new jobs, business and industry through various means including local infrastructure, housing, education and new industry.
- Deploy rapid response unit to communities facing plant closings to both meet immediate needs and to develop strategies for new job growth.
- Extend Trade-Adjustment-Assistance (TAA) to the auto industry, including retraining, healthcare extensions, income support and wage insurance.
- Attract major defense, research, green industry and other project to the region. Channel Workforce Investment Act (WIA) and other emergency grant funds to the region.
- Work with stakeholders to develop new legislative efforts to direct emergency support to affected communities and regions, and bring new jobs and economic opportunities to these areas.