1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                June 25, 2009

                9:03 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion of Debtors for Entry of an Order Pursuant to

3   11 U.S.C. §§ 361, 362, 363, and 364 (i) Authorizing the Debtors

4   to Obtain Post-petition Financing, Including on an Immediate,

5   Interim Basis; (ii) Granting Superpriority Claims and Liens;

6   (iii) Authorizing the Debtors to Use Cash Collateral; (iv)

7   Granting Adequate Protection to Certain Prepetition Secured

8   Parties; (v) Authorizing the Debtors to Prepay Certain Secured

9   Obligations in Full Within Forty-Five Days; and (vi) Scheduling

10  a Final Hearing Pursuant to Bankruptcy Rule 4001

11

12  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13  U.S.C. Sections 105, 363, and 364 Authorizing Debtors to (i)Pay

14  Pre-petition Claims of Certain Essential Suppliers, Vendors and

15  Services Providers; (ii)Continue Troubled Supplier Assistance

16  Program; and (iii)Continue Participation in the United States

17  Treasury Auto Supplier Support Program

18

19  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

20  U.S.C. §§ 105(a) and 366 (i)Approving Debtors Proposed Form of

21  Adequate Assurance of Payment; (ii)Establishing Procedures for

22  Resolving Objections By Utility Companies; and (iii)Prohibiting

23  Utilities from Altering, Refusing, or Discontinuing Service

24

25

3

1

2     HEARING re Motion of Debtors for Entry of Orders Pursuant to 11

3     U.S.C. §§ 105, 361, 362, 363, and 507 (i)Authorizing Use of

4     Cash Collateral; (ii)Granting Adequate Protection to the

5     Revolver Secured Parties; (iii)Granting Adequate Protection to

6     the Term Loan Secured Parties, and (iv) Scheduling a Final

7     Hearing Pursuant to Bankruptcy Rule 4001

8

9     HEARING re Application For An Order Pursuant To Sections 327(a)

10    And 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a)

11    Authorizing the Employment and Retention of Evercore Group

12    L.L.C. as Investment Banker and Financial Advisor for the

13    Debtors Nunc Pro Tunc to the Petition Date

14

15    HEARING re Motion of the Debtors Pursuant to 11 U.S.C. § 363

16    for an Order Authorizing the Debtors to Employ and Retain AP

17    Services, LLC As Crisis Managers and to Designate Albert A.

18    Koch as Chief Restructuring Officer, Nunc Pro Tunc to the

19    Petition Date

20

21    HEARING re Motion to Appoint Committee Motion of Ad Hoc

22    Committee of Consumer Victims of General Motors for Appointment

23    of Official Committee of Tort Claimants Pursuant to 11 U.S.C.

24    §1102(a)(2)

25

4

1

2  HEARING re Motion to Appoint Committee Motion for an Order

3  (i)Appointing a Legal Representative for Future Asbestos

4  Personal Injury Claimants; and (ii)Directing the United States

5  Trustee to Appoint an Official Committee of Asbestos Personal

6  Injury Claimants

7

8  HEARING re Application of the General Motors Retirees

9  Association for Order to Appoint a Retiree Committee Pursuant

10  to 11 U.S.C. Section 1114(d)

11

12  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13  U.S.C. Sections 105(a) and 363(b) (i)Authorizing Debtors to Pay

14  Prepetition Obligations to Foreign Creditors; and

15  (ii)Authorizing and Directing Financial Institutions to Honor

16  and Process Related Checks and Transfers

17

18  HEARING re Motion of the Debtors Pursuant to 11 U.S.C. Sections

19  105(a) and 362 for Entry of (i)Interim and Final Orders

20  Establishing Notification Procedures Regarding Restrictions on

21  Certain Transfers of Interests in the Debtors; and (ii)Orders

22  Scheduling a Final Hearing

23

24

25

5

1

2   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3   U.S.C. Sections 105(a), 345(b), 363(b) and 363(c) and 364(a),

4   and Fed. R. Bankr. P. 6003 and 6004 (A)Authorizing Debtors to

5   (i)Continue Using Existing Cash Management System; (ii)Honor

6   Certain Pre-petition Obligations Related to Use of Cash

7   Management System; and (iii)Maintain Existing Bank Accounts and

8   Business Forms; (B)Extending Time to Comply with 11 U.S.C.

9   Section 345(b); and (C)Scheduling a Final Hearing

10

11   HEARING re Debtors' Motion Pursuant to Section 363 of the

12   Bankruptcy Code for Authority to Exercise Put Rights

13

14   HEARING re of Debtors for Entry of Order Granting Additional

15   Time to File Reports of Financial Information or to Seek

16   Modification of Reporting Requirements Pursuant to Bankruptcy

17   Rule 2015.3

18

19   HEARING re Application of the Debtors Pursuant to 11 U.S.C. §§

20   327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) for Authority

21   to Employ Weil, Gotshal & Manges LLP as Attorneys for the

22   Debtors, Nunc Pro Tunc to the Commencement Date

23

24

25

6

1

2  HEARING re Application of the Debtors Pursuant to Section

3  327(e) of the Bankruptcy Code and Rules 2014(a) and 2016(b) of

4  the Federal Rules of Bankruptcy Procedure for Authorization to

5  Employ and Retain Jenner & Block LLP as Attorneys for the

6  Debtors, Nunc Pro Tunc to the Commencement Date

7

8  HEARING re Application Under 11 U.S.C. §§327(e) And 328(a)

9  Authorizing Debtors to Employ and Retain Honigman Miller

10 Schwartz And Cohn LLP as Special Counsel for the Debtors, Nunc

11 Pro Tunc to the Petition Date

12

13 HEARING re Application Of Debtors for Entry of Order Pursuant

14 to 28 U.S.C. § 156(c) Authorizing Retention and Employment of

15 The Garden City Group, Inc. as Notice and Claims Agent Nunc Pro

16 Tunc to the Commencement Date

17

18

19

20

21

22

23

24

25 Transcribed by:  Lisa Bar-Leib

VERITEXT REPORTING COMPANY

212-267-6868                                                      516-608-2400

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtor General Motors Corporation

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  HARVEY R. MILLER, ESQ.

9         STEPHEN KAROTKIN, ESQ.

10        JOSEPH H. SMOLINSKY, ESQ.

11

12   JENNER & BLOCK LLP

13        Proposed Special Counsel for GM

14        919 Third Avenue

15        37th Floor

16        New York, NY 10022

17

18   BY:  PATRICK J. TROSTLE, ESQ.

19

20

21

22

23

24

25

8

1

2   JENNER & BLOCK LLP

3        Proposed Special Counsel for GM

4        330 North Wabash Avenue

5        Chicago, IL 60611

6

7   BY:   DANIEL MURRAY, ESQ.

8        (TELEPHONICALLY)

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:   LAUREN M. MACKSOUD, ESQ.

16        THOMAS MOERS MATER, ESQ.

17        AMY CATON, ESQ.

18

19

20

21

22

23

24

25

9

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8   BY:  BRIAN S. MASUMOTO, ESQ.

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        U.S. Attorney's Office

12        86 Chambers Street

13        New York, NY 10007

14

15   BY:  DAVID S. JONES, AUSA

16        MATTHEW L. SCHWARTZ, AUSA

17

18   BINGHAM MCCUTCHEN LLP

19        Attorneys for Deutsche Bank AG

20        399 Park Avenue

21        New York, NY 10022

22

23   BY:  ERIN H. MAUTNER, ESQ.

24        JEFFREY S. SABIN, ESQ.

25

10

1

2   CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for U.S. Treasury Auto Task Force

4        One World Financial Center

5        New York, NY 10281

6

7   BY:  LESLIE W. CHERVOKAS, ESQ.

8

9   CADWALADER, WICKERSHAM & TAFT LLP

10       Attorneys for U.S. Treasury Auto Task Force

11       1201 F Street, N.W.

12       Washington, DC 20004

13

14  BY:  DOULAS S. MINTZ, ESQ.

15

16  FARELLA BRAUN & MARTEL LLP

17       Attorneys for

18       Russ Building

19       235 Montgomery Street

20       San Francisco, CA 94104

21

22  BY:  NEIL A. GOTEINER, ESQ.

23

24

25

11

1

2    HONIGMAN MILLER SCHWARTZ AND COHN LLP

3         Attorneys for Debtor/Defendant General Motors Corporation

4         2290 First National Building

5         660 Woodward Avenue

6         Detroit, MI 48226

7

8    BY:  ROBERT B. WEISS, ESQ.

9

10   KELLEY DRYE & WARREN LLP

11        Attorneys for Law Debenture; LBA Realty

12        101 Park Avenue

13        New York, NY 10178

14

15   BY:  JENNIFER A. CHRISTIAN, ESQ.

16

17   MCGUIREWOODS LLP

18        Attorneys for Dominion Retail, Inc.

19        1345 Avenue of the Americas

20        Seventh Floor

21        New York, NY 10105

22

23   BY:  SHAWN R. FOX, ESQ.

24

25

12

1

2    MORGAN, LEWIS & BOCKIUS LLP

3         Attorneys for JPMorgan Chase Bank

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:  RICHARD S. TODER, ESQ.

8         ANDREW GOTTFRIED, ESQ.

9

10   ORRICK, HERRINGTON & SUTCLIFFE LLP

11        Attorneys for Ad Hoc Dealer Committee

12        666 Fifth Avenue

13        New York, NY 10103

14

15   BY:  ALYSSA D. ENGLUND, ESQ.

16

17   SIMMONSCOOPER LLC

18        Attorneys for

19        707 Berkshire Blvd.

20        East Alton, IL 62024

21

22   BY:  ROBERT W. PHILLIPS, ESQ.

23

24

25

13

1

2    SIMPSON THACHER & BARTLETT LLP

3         Attorneys for Citicorp USA, Inc., as Agent

4         425 Lexington Avenue

5         New York, NY 10017

6

7    BY:   PETER V. PANTALEO, ESQ.

8         ANNE L. KNIGHT, ESQ.

9

10   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

11        Attorneys for Ad Hoc Committee of Unsecured Creditors

12        2323 Bryan Street

13        Suite 2200

14        Dallas, TX 75201

15

16   BY:   SANDER L. ESSERMAN, ESQ.)

17

18   VEDDER PRICE P.C.

19        Attorneys for Export Development Canada

20        1633 Broadway

21        47th Floor

22        New York, NY 10019

23

24   BY:   MICHAEL L. SCHEIN, ESQ.

25

14

1

2    VINSON & ELKINS LLP

3         Attorneys for Mason Capital

4         666 Fifth Avenue

5         26th Floor

6         New York, NY 10103

7

8    BY:  DENIS F. CRONIN, ESQ.

9         CRAIG KORNREICH, ESQ.

10

11   WHITE AND WILLIAMS LLP

12        Attorneys for Nicor Gas

13        One Penn Plaza

14        250 West 34th Street

15        Suite 4110

16

17   BY:  KAREL S. KARPE, ESQ.

18

19

20

21

22

23

24

25

15

1

2    ALLARD & FISH, P.C.

3         Attorneys for Creditor Severstal North America, Inc.

4         535 Griswold

5         Suite 2600

6         Detroit, MI 48226

7

8    BY:  DEBORAH L. FISH, ESQ.

9         (TELEPHONICALLY)

10

11   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

12        Attorneys for LBA Realty Fund III; PruSKS Brannan

13        Associates

14        Three Embarcadero Center

15        12th Floor

16        San Francisco, CA 94111

17

18   BY:  IVAN M. GOLD, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

16

1

2   DAVIS POLK & WARDWELL

3        Attorneys for Interested Party Ford Motor Company

4        450 Lexington Avenue

5        New York, NY 10017

6

7   BY:   BRIAN M. RESNICK, ESQ.

8        (TELEPHONICALLY)

9

10   DLA PIPER LLP U.S.

11        Attorneys for Creditor Hewlett Packard

12        550 South Hope Street

13        Suite 2300

14        Los Angeles, CA 90071

15

16   BY:   KAROL K. DENNISTON, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

17

```
 1

 2     FROST BROWN TODD LLC

 3           Lexington Financial Center

 4           250 West Main

 5           Suite 2800

 6           Lexington, KY 40507

 7

 8     BY:  ROBERT V. SARTIN, ESQ.

 9           (TELEPHONICALLY)

10

11     HANGLEY ARONCHICK SEGAL & PUDLIN

12           Attorneys for NCR Corporation

13           One Logan Square

14           18th & Cherry Streets

15           27th Floor

16           Philadelphia, PA 19103

17

18     BY:  MATTHEW A. HAMERMESH, ESQ.

19           (TELEPHONICALLY)

20

21

22

23

24

25
```

18

1

2     MOTLEY RICE, LLC

3          28 Bridgeside Blvd.

4          Mt. Pleasant, SC 29464

5

6     BY:   JEANETTE M. GILBERT, ESQ.

7          (TELEPHONICALLY)

8

9     SCHIFF HARDIN LLP

10         Attorneys for Columbia Gas of Ohio; Columbia Gas of

11         Virginia

12         233 South Wacker Drive

13         Suite 6600

14         Chicago, IL 60606

15

16    BY:   JASON TORF, ESQ.

17         (TELEPHONICALLY)

18

19    SIDLEY AUSTIN LLP

20         Attorneys for Multiple Lenders

21         One South Dearborn

22         Chicago, IL 60603

23

24    BY:   KENNETH P. KANSA, ESQ.

25         (TELEPHONICALLY)

19

1

2     STAHL COWDEN CROWLEY ADDIS LLC

3          Attorneys for GM National Retiree Association

4          55 West Monroe Street

5          Suite 1200

6          Chicago, IL 60603

7

8     BY:   JON D. COHEN, ESQ.

9          (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

                        P R O C E E D I N G S

1

2          THE COURT:  Good morning.

3          ALL:  Good morning, Your Honor.

4          THE COURT:  GM.  Mr. Miller, good morning.  You want

5  to come on up and give me your recommendation as to how you

6  believe we should proceed both with the DIP which we have on

7  for 9:00 and also for the 9:45 calendar matters?

8          MR. MILLER:  Yes, Your Honor.  Harvey Miller, Weil

9  Gotshal & Manges for the debtors.  Your Honor, there is one

10  matter on the 9:00 calendar, as you pointed out, which is the

11  motion for a final approval of the DIP financing.  I believe,

12  Your Honor, all issues with respect to that have been resolved.

13  And Mr. Karotkin will explain that as we go on.

14          As to the 9:45 calendar, Your Honor, there are listed

15  nine uncontested matters and eight contested matters.  As to

16  those contested matters, Your Honor, essentially, most of them

17  have been resolved with the exception, Your Honor, of the

18  motion for the appointment of an ad hoc committee of asbestos

19  claimants and the motion for the appointment of a retiree

20  committee.  Those two matters are still open, Your Honor, and

21  would be heard at Your Honor's convenience after the 9:45

22  calendar call.

23          The motion, Your Honor, with respect to the retention

24  of Evercore Group LLC, we are requesting, Your Honor, that that

25  matter be adjourned until the hearing scheduled for July 2,

21

1    2009.  We're hopeful to resolve that matter, Your Honor.  We

2    have scheduled tentative meetings with the U.S. trustee's

3    office in an effort to resolve that application.

4            So, Your Honor, basically, there are two matters

5    which will be submitted today for Your Honor's determination

6    with respect to the additional creditors' committees, the

7    request for the appointment of a future representative for

8    future asbestos claimants and the motion for the appointment of

9    a retirees' committee under Section 1114(b) of the Bankruptcy

10   Code.

11           THE COURT:  Okay.  Fair enough.  Do we want to go

12   straight then into DIP financing?

13           MR. MILLER:  Yes.

14           THE COURT:  You're going to hand off to your partner,

15   Mr. Karotkin, on that?

16           MR. MILLER:  I certainly want to, Your Honor.

17           THE COURT:  All right.  Mr. Karotkin, come on up,

18   please?  Good morning.

19           MR. KAROTKIN:  Good morning, Your Honor.  Stephen

20   Karotkin, Weil Gotshal & Manges for the debtors.  As Mr. Miller

21   indicated, Your Honor, we're pleased to report that in

22   connection with the motion to approve the debtor-in-possession

23   financing on a final basis, we have reached a consensus with

24   all of the objecting parties as well as with the creditors'

25   committee and the secured lenders. And that is embodied in a

22

1    revised order which I have a blackline copy of which I'm please

2    to hand up to the Court.

3              THE COURT:  That would be very helpful.  Thank you.

4              MR. KAROTKIN:  May I approach, sir?

5              THE COURT:  Yes, sir.

6              MR. KAROTKIN:  Your Honor, the proposed order

7    resolves the four objections that were raised which are,

8    basically, categorized in four categories.  One was by various

9    governmental entities with respect to liens they have as to

10   personal property and real property.  One is with respect to

11   NCR as to their assertion of a constructive trust.  There was

12   another objection by Deutsche Bank with respect to the payment

13   of hedging obligations under the outstanding revolving credit

14   facility.  And the final objection related to a landlord which

15   wanted its lease hold interests -- the debtors' lease hold

16   interests with respect to its property carved out of the

17   collateral grant.  And all of those issues have been addressed

18   in the order.

19             THE COURT:  All right.  Do you want to pause and give

20   any counterparties to those objections a chance to confirm that

21   they're satisfied with the way by which you resolved them?

22             MR. KAROTKIN:  Sure.

23             THE COURT:  Mr. Sabin, you coming up?

24             MR. KAROTKIN:  Before Mr. Sabin speaks, in

25   anticipation of what he's going to say, hopefully to truncate

23

1    the hearing, Your Honor, we have agreed -- and I actually think

2    the DIP order is clear that in connection with the payment of

3    the pre-petition secured obligations to the JPMorgan group, the

4    Citigroup group and with respect to the hedging obligations,

5    the order provides they will be paid three business days after

6    the approval of the DIP loan on a final basis.  And we will

7    confirm on the record that when we pay the Citibank group and

8    the JPMorgan group, we will also pay the hedging obligations at

9    the same time.

10            THE COURT:  Okay.  Mr. Sabin, good morning.

11            MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

12    from Bingham McCutchen on behalf of Deutsche Bank AG.

13    Paragraph 19 of the revised proposed order that's in front of

14    you reflects the agreement, resolves in full the obligations.

15    My thank you to Mr. Karotkin and everyone else for bearing with

16    us as we work through the resolution.  And I think that if this

17    Court were to enter it with those words in it, it resolves in

18    full the objections.

19            THE COURT:  Okay.  Fair enough.  Anyone else?  All

20    right.  Given that the objections have been resolved and given

21    the showings that were made at the outset of the case, I'm not

22    going to make extensive findings on the record now, Mr.

23    Karotkin.  I think they're set forth in your proposed order.

24            MR. KAROTKIN:  They are, Your Honor.  And I would

25    like to point out one of the proposed findings which is in

24

1   paragraph (f) on page 12 which has been requested by the United

2   States Treasury.  And they are here to address that if you have

3   any questions with that.

4        THE COURT:  Okay.  Also, I realize -- and I see Ms.

5   Caton, you came up perhaps to speak.  I gather there was a

6   dialogue going on with the creditors' committee.  And if

7   there's anything that is desirable for the creditors' committee

8   to put on the record, I certainly want to give it that

9   opportunity.  Ms. Caton, good morning.

10       MS. CATON:  Thank you, Your Honor.  Amy Caton from

11  Kramer Levin Naftalis & Frankel on behalf of the creditors'

12  committee.  As you noted, there were a number of modifications

13  that were made with the order at the request of the creditors'

14  committee.  And I just want to highlight a couple of those.

15       THE COURT:  Of course.

16       MS. CATON:  The first one is that one of the

17  creditors' committee's main concern here is what happens to be

18  the state after the sale closes.  And I think the parties'

19  intent from the beginning is then that 950 millions or an

20  amount up to -- well, potentially greater than but, likely, 950

21  million dollars, will be left behind to fund the wind down of

22  these estates and pay administrative and priority claims.

23  However, when we started the negotiation of the DIP order, I

24  don't believe that these provisions were really made clear.

25  And that's one of the things that we have done in the DIP

25

1    order.  And that's highlighted in paragraph 21.

2            I think that the new provisions in here will allow us

3    to hopefully confirm a Chapter 11 plan of distribution and make

4    sure that the new GM stock and warrants are distributed to

5    unsecured creditors.

6            The second point that I would like to make clear is

7    that in paragraphs 5 and 6 of the DIP order that administrative

8    and priority claims are now senior in right of payment of

9    repayment to the DIP and that the DIP is non-recourse to the

10   new GM stock and warrants because this is, as we believe,

11   intended for distribution to unsecured creditors.

12           We still think that we have a ways to go before we

13   get to a final wind down to make this -- I guess, the budgets

14   clear.  We're still negotiating the wind down budget.  We need

15   to negotiate an amendment to the DIP credit facility to make it

16   appropriate for a wind down.  Right now, there are a number of

17   covenants and events of default that are a little stricter than

18   what we would like to see on a going forward basis.  And it's

19   our understanding that the parties intend to do this prior to

20   closing of the sale.  And paragraph 21 sets out specifically

21   that the committee is to be included in the negotiations in

22   this process.

23           Lastly, we did make a few changes to the order vis-a-

24   vis the committee's rights with respect to the pre-petition

25   lenders.  The highlight of these are that the committee's

26

1    investigation period of certain claims against the pre-petition

2    lenders has been extended till July 31st.  And secondly, any

3    claims by the agent on a going forward basis after it's paid

4    next week for reimbursement of the fees is now nonrecourse to

5    the new GM stock and warrants..

6            And with those changes, Your Honor, the committee

7    supports the entry of the DIP order.

8            THE COURT:  Okay.  Fair enough.  Thank you.  Good

9    morning, Mr. Schein.

10           MR. SCHEIN:  Good morning, Your Honor.  Michael

11   Schein, Vedder Price, on behalf of Export Development Canada.

12   Just one clarification made by committee counsel, the carve-out

13   in paragraph five with respect to the admin claims of the case

14   and the DIP to priority claim come into effect after a closing

15   of the 363 sales transaction, not prior to it.

16           THE COURT:  Okay.  And you're merely helping me

17   better understand what's in this document?

18           MR. SCHEIN:  Correct.

19           THE COURT:  Okay.  Anybody else?  All right.  Forgive

20   me.  Mr. Schwartz, United States Attorney's Office.

21           MR. SCHWARTZ:  Good morning, Your Honor.  Matthew

22   Schwartz for the United States of America.  As the debtors'

23   papers amply demonstrate, the credit that's being extended by

24   the government and other lenders in this case was the only

25   credit that was available to the debtors and the deal was

1   negotiated at arm's length between experienced professionals.

2   Nonetheless, the source of the DIP funds in this case is

3   somewhat unusual and so we've asked for the finding that's in

4   paragraph F of the redline order before you that speaks to the

5   authority of the United States to expend TARP funds to make the

6   DIP loan.  I think that the language in the paragraph speaks

7   for itself and the basis for the finding was set forth at

8   length in the government's opening statement that was filed on

9   the first day in these cases --

10        THE COURT:  Yes.  I remember that.

11        MR. SCHWARTZ:  -- as well as the documents that were

12   attached to it and the other document that we asked that the

13   Court take judicial notice of yesterday.

14        THE COURT:  Okay.  Fair enough.  I see no reason not

15   to include that.  It'll be included.

16        MR. SCHWARTZ:  Thank you, Your Honor.

17        THE COURT:  Anything else?  Anyone?  All right.  Mr.

18   Karotkin, for the reasons set forth in the opening papers, as

19   supplemented by the submission of the United States and

20   revisions made to deal with other parties' needs and concerns,

21   the final DIP financing is approved on the form of the order in

22   which it's been presented to me and subject to the need to get

23   other stuff done today, it will be entered sometime today.

24        MR. KAROTKIN:  Thank you, sir.

25        THE COURT:  Thank you.  Have a good day.  Now --

28

1        MR. KAROTKIN:  Could I make a suggestion, Your Honor?

2        THE COURT:  Yes.

3        MR. KAROTKIN:  I'm sorry to interrupt.  The matter

4   number 1 on the agenda on page 4, which is -- it relates to two

5   proposed orders for use of cash collateral and adequate

6   protection, those are related to the DIP and those also have

7   been resolved among the parties.  The same issues were raised

8   by the landlords, the state taxing authorities, with respect to

9   those proposed orders. Again, they have been resolved on the

10  same basis.  The committee raised the same issues that Ms.

11  Caton addressed as to their time to challenge the liens and

12  claims of those parties in the same language -- virtually the

13  same language including -- included in the final DIP order has

14  been included in those proposed final cash collateral orders as

15  well.  And I do have marked copies from the interim orders

16  which I can hand up to you, sir.

17        THE COURT:  You are reading my mind, Mr. Karotkin.

18  So long as nobody is prejudiced by their not being here yet,

19  I'd like to go right into those matters and the one you

20  suggested is most logically connected.  So far as you're aware,

21  anybody who was going to be here at 9:45 is either here or told

22  you they wouldn't be here?

23        MR. KAROTKIN:  That's my understanding, sir.  We

24  circulated copies to the taxing authority's lawyers, to the

25  landlord last night and they were -- they were comfortable with

29

1   the language.  In fact, they agreed to the language, so they

2   are on board, sir.

3          THE COURT:  Okay.  Fair enough.

4          MR. KAROTKIN:  May I approach?

5          THE COURT:  In a half a second, you may.  I just want

6   to be sure that the creditors' committee doesn't want to be

7   heard in any way on this.  Ms. Caton?

8          MS. CATON:  No, Your Honor.

9          THE COURT:  Okay.  Yes, Mr. Karotkin -- well

10  actually, I'm going to ask for a variant of that.  I'm going to

11  ask that you or one of your folks provide all the orders to my

12  courtroom deputy at a convenient break.  You can hand up the

13  cash collateral to me now but the mechanics of entry will be

14  separately handled.  Am I right that this -- aside from the

15  fact that of course it's a final -- principally papers the

16  understandings with the folks who entered those limited

17  objections?

18         MR. KAROTKIN:  Yes, sir.

19         THE COURT:  Okay.  All right.  It's approved and

20  we're going to deal with this the same way we dealt with the

21  final DIP.

22         MR. KAROTKIN:  Thank you, sir.

23         THE COURT:  Thank you.  Mr. Miller?

24         MR. MILLER:  Your Honor, may I make a suggestion at

25  this time?

30

1          THE COURT:  Yes, please.

2          MR. MILLER:  That we could take the uncontested

3    matters that's on the 9:45 calendar.

4          THE COURT:  Yes.  Certainly.  And if you know that

5    your counterparties or folks who want to be heard on further

6    matters are already here, we can move into that as well.  Do

7    you want to handle the uncontested ones or put them on one of

8    your folks?

9          MR. MILLER:  I'll handle them, Your Honor.

10         THE COURT:  Okay.

11         MR. MILLER:  They start at number 9 on the agenda for

12   9:45.  The first motion, Your Honor, is the motion to get a

13   final order authorizing the debtors to pay for pre-petition

14   obligations to foreign creditors and authorizing and directing

15   financial institutions to honor and process related checks and

16   transfers.  This was heard, Your Honor, on June 1 and Your

17   Honor entered an interim order.  There are no objections to the

18   entry of the final order.

19         THE COURT:  Okay.  Given that and the provisions of

20   my case management order, motion granted.

21         MR. MILLER:  Thank you, Your Honor.  Number 10, Your

22   Honor, is the motion for final orders establishing notification

23   procedures regarding restrictions on certain transfers of

24   interest in the debtor.  This is the NOL motion, Your Honor.

25         THE COURT:  I remembered my dialogue with Mr.

31

1    Karotkin on this.

2              MR. MILLER:  Yeah.  He refused to take the lectern

3    this at this point, Your Honor.

4              THE COURT:  Understandably.  Granted.

5              MR. MILLER:  Thank you, Your Honor.  Number 11 is the

6    order to -- a final order.  You entered an interim order, Your

7    Honor, on cash management.  There are no objections to the

8    final proposed order.

9              THE COURT:  Granted.

10             MR. MILLER:  Number 12, Your Honor, is the motion of

11   the debtors to -- for authority to exercise a put.  This

12   relates, Your Honor, to the claims which Your Honor approved

13   the rejection some time ago at a hearing.  One the claims we

14   have a twenty-five percent interest in and a right to put our

15   interest to the other party.  As a result of this put, Your

16   Honor, the estate will recover approximately 350,000 dollars.

17             THE COURT:  Granted.

18             MR. MILLER:  Thank you.  Number 13, Your Honor, is

19   the motion to grant additional time to file reports of

20   financial information or to seek modification of reporting

21   requirements pursuant to Bankruptcy Rule 2015.3.  There are no

22   objections to that Your Honor.

23             THE COURT:  Granted.

24             MR. MILLER:  Number 14, Your Honor, is the

25   application of the debtors to engage Weil Gotshal & Manges

1    under a general retainer as attorneys for the debtor nunc pro

2    tunc to the commencement date.  This order, that will be

3    proposed, Your Honor, was negotiated with the Office of the

4    United States Trustee.  There are no objections to this matter.

5              THE COURT:  Granted.

6              MR. MILLER:  Number 15, Your Honor, is the

7    application of the debtors to engage the law firm of Jenner &

8    Block LLP as attorneys for the debtors, pursuant to Section

9    327(e).  Jenner & Block, Your Honor, will be serving, Your

10   Honor, as conflicts counsel and special corporate counsel.

11   There is a supplemental declaration of Mr. Murray in connection

12   with the application and there are no objections to this

13   application, Your Honor.

14             THE COURT:  Granted.

15             MR. MILLER:  Number 16, Your Honor, is the

16   application to engage under Section 327(e) the law firm of

17   Honigman, Miller, Schwartz & Cohn, LLP as special counsel.  Mr.

18   Weiss appeared before you, Your Honor, in connection with a

19   suppliant matter two weeks ago.  There are no objections to

20   this application, Your Honor.

21             THE COURT:  Granted.

22             MR. MILLER:  The last uncontested matter in this part

23   of the calendar, Your Honor, is the application authorizing the

24   retention and employment of the Garden City Group, Inc. as

25   notice and claims agent nunc pro tunc to the commencement date.

33

1      There are no objections to that, Your Honor.

2                THE COURT:  Granted.

3                MR. MILLER:  I would also note, Your Honor, that item

4      on the contested calendar motion, item number -- let me get to

5      it.  I think it's item number 6, Your Honor, which was the

6      motion of the consumer -- ad hoc consumer victims committee for

7      the appointment of an additional committee of unsecured

8      creditors to represent consumer victims was withdrawn without

9      prejudice.

10               THE COURT:  Okay.

11               MR. MILLER:  We could do some other motions, Your

12     Honor.  I don't know if --

13               THE COURT:  It's all right.

14               MR. MILLER:  Subject to Your Honor's ruling that if

15     somebody shows up at 9:45, we can always go back.

16               THE COURT:  Okay.  Do you know whether anybody has

17     indicated to you that they're going to wish to show up on the

18     motion to pay essential suppliers and all that?

19               MR. MILLER:  Mr. Smolinsky, Your Honor.

20               THE COURT:  If you're in doubt, I think I need to

21     wait till 9:45 but I would prefer to deal with the easier ones

22     most quickly.

23               MR. SMOLINSKY:  Your Honor, everything is resolved.

24     I did represent that I would put one thing on the record and as

25     long as I do that, I think we're fine to go forward.

34

1          THE COURT:  Sure.  Go ahead, Mr. Smolinsky.

2          MR. SMOLINSKY:  Your Honor, we're here today seeking

3    entry of a final order with respect to the debtors' essential

4    supplier programs.  There were two objections filed.  One was

5    filed by Panasonic Electric Works Corporation.  The other by

6    Clements (ph.) Inc.  Both objections have been voluntarily

7    withdrawn but I did agree to clarify on the record -- Your

8    Honor, you may recall that we attached to our motion a trade

9    agreement and it was the debtors' intent to require critical

10   vendors to sign a trade agreement and return it.  These two

11   objections were related to that agreement.  They had some

12   issues with it.  I think they understand --

13         THE COURT:  They didn't want to give you everything

14   you were looking for, for the benefit of the estate?

15         MR. SMOLINSKY:  That's right, Your Honor.  But the

16   answer was easy.  You don't have to sign it and you're not a

17   critical vendor.

18         THE COURT:  You anticipated the first question I

19   would be asking in the argument, if there had been one.

20         MR. SMOLINSKY:  But Your Honor, I think they wanted

21   me to clarify that because they did not sign the trade

22   agreement, they're not bound by any of the terms contained in

23   that trade agreement.

24         THE COURT:  If they don't sign an agreement, they're

25   not bound by it?

35

1       MR. SMOLINSKY:  That's right, Your Honor.  And with

2   that, Your Honor, the objections are resolved.  The creditors'

3   committee did engage us in some dialogue about the form of the

4   final order.  We did add some clarifying language to make

5   certain that we would provide the creditors' committee with the

6   information that they need to be up to speed on how we

7   implemented that order and I'm happy to report that I don't

8   think there are any issues with respect to that.

9       THE COURT:  All right.  Fair enough.  I do want to

10  give the creditors' committee a chance to comment if it wants

11  to.  Mr. Mater, good morning.

12      MR. MATER:  Good morning, Your Honor.  Thomas Moers

13  Mater for Kramer, Levin, Naftalis & Frankel representing the

14  committee.  We have no issues.  We have certain supplier

15  matters that are referenced in our limited objection to the

16  general transaction but we're working those through and with

17  respect to what Mr. Smolinsky put on the record, we have

18  nothing further to add.

19      THE COURT:  Fair enough.  Then with the

20  clarifications and anything that you arranged for, Mr.

21  Smolinsky, the motion's granted.

22      MR. MILLER:  Your Honor, I think we could proceed

23  with the utilities motion which is item 2.

24      THE COURT:  Fair enough.

25      MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor

36

1    entered a final order with respect to the utility motion on

2    June 1st.  The procedures provided that objections could be

3    filed to the form of adequate assurances by the 15th of June.

4    We received -- of the 261 utilities that were noticed in

5    connection with the order, we received objections from 35

6    utilities.  We have finally resolved all of the objections

7    except for a very few, I believe two objections, and we believe

8    that we have agreements in principle with respect to those two.

9    What I'd like, Your Honor, and I could share it with chambers

10   so that the docket accurately reflects the resolution of these

11   matters is that two of the objections, it's docket number 764

12   and 915, will be adjourned until the 30th of June so that we

13   can presumably deliver final resolutions of those matters.

14           THE COURT:  Pause, please, Mr. Smolinsky.  On those

15   adjournments, you have comfort that they're not going to turn

16   off the lights on you between now and then?

17           MR. SMOLINSKY:  Yes, Your Honor, we're still within

18   the thirty days so I don't think that that would be an issue.

19           THE COURT:  Okay.

20           MR. SMOLINSKY:  With respect to the remaining

21   motions, they are resolved and I believe they can be marked off

22   calendar and we could provide Your Honor with the docket

23   numbers.

24           THE COURT:  Okay.  Are there folks who are waiting to

25   be heard on this?  Would you come up please?  And,

37

1   unfortunately, I don't know everybody.  If you could identify

2   yourself on the record.

3           MS. KARPE:  Apologize, Your Honor.  Karel Karpe,

4   White & Williams for Nicor Gas.  Your Honor, I have spoken to

5   Mr. Smolinsky and we do have an agreement in principle.  But I

6   noticed that there was a first supplemental list filed sometime

7   very early this morning.  And it looks like there's the Nicor

8   Gas accounts have been transferred to that notice.  But it does

9   look like there may be an additional one.

10          So just to preserve my client's rights, Your Honor,

11  we filed an objection at docket number 1099 which I didn't hear

12  referenced this morning.  And all I want to do is just get some

13  assurance on the record that the objection that we previously

14  filed and any other accounts that Nicor and the debtor may have

15  are all rolled over to that next one.  We believe that we will

16  have an agreement in the next day and so I don't think that

17  this is going to prejudice either the debtor and we do not plan

18  on turning off any utility.

19          THE COURT:  Okay.  Mr. Smolinsky?

20          MR. SMOLINSKY:  Your Honor, just to clarify, an

21  additional list was filed this morning, as we're entitled to do

22  under the order.  The purpose of the list was not to add any

23  contracts or any utilities.  The purpose was to actually

24  eliminate certain utilities that had claims that their

25  contracts were forward contracts and not utilities.  And that

38

1    was the agreement by which certain of the objections were

2    resolved.  So I'll work with Nicor to make sure that they're

3    comfortable, but we did not have any utility companies to that

4    list.

5             THE COURT:  Okay.  You okay with that, Ms. Karpe?

6             MS. KARPE:  Yeah, Your Honor.  The only difference

7    that I noted this morning is that there was a difference in the

8    account numbers.  I'm sure that Mr. Smolinsky and I can work

9    our issues at and we should have a resolution, we hope, by

10   tomorrow.

11            THE COURT:  Very good.  Thank you.  Mr. Fox?

12            MR. FOX:  Good morning, Your Honor.  Shawn Fox from

13   McGuireWoods on behalf of the Dominion Retail, Inc.  With the

14   debtors' representation that they're not seeking to treat

15   Dominion Retail as a utility, our objection is resolved.

16            THE COURT:  Very good.  Thank you.  All right.

17   Anybody else on 366 issues, utility issues?  There being no

18   response, your mechanism is fine, Mr. Smolinsky.  So we'll be

19   locked in for all of those that have been resolved and it'll be

20   continued for the couple that haven't been?

21            MR. SMOLINSKY:  That's right, Your Honor.

22            THE COURT:  Very good.  Okay.  Thank you.

23            MR. MILLER:  If Your Honor please, item number 3 has

24   been resolved.  Mr. Karotkin -- that's the use of cash

25   collateral and the explanation that Mr. Karotkin gave.

1          Item 4, which is the Evercore Group LLC, as stated,

2     Your Honor, we request that be adjourned to July 2nd.

3          In connection with item number 5, Your Honor, which

4     is the motion of the debtors to employ and retain AP Services

5     LLC as crisis managers and to designate Albert A. Koch as chief

6     restructuring officer nunc pro tunc to the commencement date,

7     we have reached an agreement, Your Honor, with the Office of

8     the United States Trustee and we have a statement to put on the

9     record.

10        (Pause)

11        MR. MILLER:  Your Honor, I am just informed by Mr.

12    Karotkin that we have to meet with the Office of the U.S.

13    Trustee during break.

14        THE COURT:  Okay.

15        MR. MILLER:  So we'll put that off.

16        THE COURT:  We'll defer that one, then.

17        MR. MILLER:  Item 6 is a report, Your Honor, has been

18    withdrawn without prejudice.  And that leaves, Your Honor,

19    items 7 and 8, 7 being the motion of the ad hoc committee of

20    asbestos personal injury claimants for an order appointing a

21    legal representative, a future asbestos personal injury

22    claimant and directing the  United States trustee to appoint an

23    official committee of asbestos personal injury claimants.

24        THE COURT:  Okay.  Mr. Esserman here?

25        MR. ESSERMAN:  Yes, Your Honor.

40

1          THE COURT:  You want to come on up, please.  Somebody

2    give Mr. Esserman a place to sit at the counsel table?

3    Although, Mr. Esserman, after my preliminary remarks I'm going

4    to want you to speak first.  And when you do, you'll be at the

5    main counsel lectern.

6          Give me a moment, please.

7      (Pause)

8          THE COURT:  All right.  Folks, make your

9    presentations as you see fit but, Mr. Esserman, when it's your

10   turn, I'm going to need you to address not just the matters

11   that were set forth in the papers but the terrain as it now

12   exists as a consequence of my ruling on Tuesday.

13          We have, as I understand it, in your motion, the

14   regular tort litigants motion having been withdrawn, double

15   barreled issues and of course the future claims rep is a little

16   different then me forming another official committee.  But on

17   the matter of the official committee, in addition to the things

18   that you've briefed, I would appreciate it if by the time that

19   you're done you help me understand how it would be, if it is in

20   fact the case, that your request is different than the one for

21   the bondholders that I addressed on Tuesday.

22          On the future claims rep portion, the debtors told us

23   that it's not looking for a channeling injunction and that

24   we're going to have a liquidation here and that the debtor

25   isn't going to be looking for a discharge.  And I need your

41

1    help in understanding why those aren't some pretty important

2    facts.

3            I also want you to address, before you're done, what

4    seemingly is the case, I forgot which of the briefs I saw said

5    that, which focus on the fact that this, unlike the other case

6    in which you've been before me, is hardly an asbestos driven

7    case and that asbestos claims, compared to the totality of the

8    claims of all the other creditors in this case, are very, very

9    small percentage.

10           So, Mr. Esserman, come on up, please.  Good to see

11   you again.  Came in from Texas?

12           MR. ESSERMAN:  I did, Your Honor.  Nice to see you.

13   Sandy Esserman of Stutzman Bromberg Esserman & Plifka in

14   Dallas, movant today, and I will address all the questions that

15   Your Honor asked.  First I'd like to say that on behalf of the

16   ad hoc committee, and we have filed a 9019 --

17           THE COURT:  You said a 9019.  Did you mean that or a

18   2019?

19           MR. ESSERMAN:  A 2019; sorry.

20           THE COURT:  I would have been delighted to hear it

21   was a 9019 but I didn't think we were quite there yet.

22           MR. ESSERMAN:  No.  I guess I was anticipating the

23   future, hopefully.  Anyway, Your Honor has raised the

24   significant issues, I think, that I will address, each one of

25   those issues.  I'd like to address them in this context, in

42

1    light of the paper filed by the creditors' committee yesterday,

2    which was, I thought, a very significant paper in which the

3    creditors' committee filed what they called a limited objection

4    to the sale but in fact was a statement by the creditors'

5    committee and a full objection that provided that any sale that

6    does occur in this case cannot bond future claimants and should

7    not bond future claimants.

8            In light of the position taken by that committee and

9    in light of where we are, I no longer wish to proceed and would

10   adjourn a portion of our motion with regard to seeking a

11   separate committee at this time.  We will continue to be active

12   in the case; the ad hoc committee is not going away.  We are

13   not seeking official status.  This case and the context it was

14   filed, the motion was filed, coming off the Chrysler situation,

15   gave us great pause, gave the ad hoc committee great pause.

16   Just to give Your Honor a context of what I'm referring to, in

17   the Chrysler case the committee was -- had a lot of creditors

18   on it which wound up being assumed and paid in full after the

19   sale was approved, which caused wholesale resignations from the

20   creditors' committee.  In fact, I think a majority of the

21   creditors' committee in Chrysler had resigned after the sale

22   was approved because they were paid in full.  And that was a

23   difficult situation for those creditors that were "left behind"

24   in Chrysler.  Hopefully that is not going to be the case in the

25   GM case or the GM committee, which would, in great part,

43

1    alleviate the necessity for a separate committee.

2         I would like to distinguish or answer --

3    nevertheless, I'd like to answer some of your questions very

4    briefly.  For instance, how is this any different from, say, a

5    Dana which has been referenced in many of the papers, in which

6    asbestos claims were a relatively small percentage of the

7    population of claims versus the situation -- similar situation

8    in Chrysler.

9         In Dana, the asbestos claims -- and I moved for -- it

10   was pointed out that I moved for a separate committee and I did

11   and we were very active in that case.  But in Dana, they passed

12   the asbestos claims through.  They passed them through as

13   unimpaired and there was testimony in Dana that asbestos claims

14   were not only passed through to the entity but any successor

15   liability claims that anyone wanted to bring against New Dana

16   could be brought.  There was no concession that, in fact, they

17   were good claims or that they should succeed.  But that they

18   could survive the reorganization.

19        There was also extensive testimony that there was

20   adequate assets and insurance to pay asbestos claims in full,

21   in full.  So there was a lot of testimony there that, one,

22   asbestos claims were a very small piece of that puzzle; and

23   two, they were passed through.  Three, there was adequate

24   provision made for their compensation.  And to the extent

25   people look to Dana as a model case of how to deal with this

44

1    and how to dispose of not having a futures rep and a

2    committee -- I'm not necessarily endorsing that.  We still

3    disagree with those decisions, but that example does stand.

4    And as far as I know, post confirmation, has worked.

5           In this case, if, in fact, those situations --

6    situation is going to hold true and future claims, as the

7    creditors' committee has pointed out in their paper filed

8    yesterday, and I would urge Your Honor to read it at his

9    convenience, are going to be able to be asserted against what

10   will be called the New GM.  And GM does not seek to channel or

11   restrict in any way those claims.  Perhaps a futures

12   representative may not be needed.  Perhaps a, what I'll call a

13   future tort czar, future claims tort czar, not just for

14   asbestos claims but in thinking about this last night you've

15   got future damage claims, future rollover claims, future design

16   defect claims, future gas tank explosion claims for GM cars out

17   there in the public that have not yet occurred.  And as long as

18   those claims are not impaired in any sense and can be brought

19   against the surviving entity, then I think we need to rethink

20   this whole -- the direction that I was trying to push the pile,

21   so to speak.

22          On the other hand, if GM's position is no, Mr.

23   Esserman, we are absolutely taking this issue on dead square

24   and we are going to eliminate those claims and leave them

25   behind with no compensation or no special pot or no trust or no

45

1    whatever, I think that's a different situation.  And I think we

2    need to then think about how we can protect the public and how

3    we can protect the future claimants and the people that are

4    going to be damaged in the future, be it asbestos, be it

5    consumers, be it rollover victims, be it gas tank explosions,

6    etcetera.  So perhaps this is yet to play out.

7            The way I read GM's papers, and hopefully I'm wrong,

8    is they intend to constrict those claims.  They intend not to

9    pass those claims through.  They intend to, through a 363

10   device, eliminate those claims for the "New GM" whether they

11   gave good or bad publicity on that in the future.

12           So, I think, to a certain extent, we sort of need to

13   see where GM's going to take us on this ride.  And see if, in

14   fact, they're willing to accede to the issues raised by the

15   creditors' committee and frankly raised first by me in our

16   papers in the objection to the sale.  And in fact, if you will,

17   pass those claims through the estate.

18           I would note that one comment on appointing of an FCR

19   that the debtor made was the ad hoc committee -- ad hoc

20   asbestos claimants request to appoint an FCR at this early

21   stage of these cases should be denied.  Well, I know that if it

22   had been made later it would have been too late.  And I think,

23   in fact, you need to address this issue up front in a case and

24   early.  And if Your Honor decides to or GM is going to decide

25   to severely restrict future consumer claims, future tort

46

1   claims, future asbestos claims, it needs to decide which

2   direction to go.  And if that's the case I think it'd be only

3   prudent and a protection of the public to appoint somebody to

4   protect those interests and make sure those interests are

5   protected.

6        If not, I think the Supreme Court, as recently as

7   last week, in the Travelers vs. Bailey decision, which I was

8   involved in from the trial court all the way to the Supreme

9   Court; and lost, I might add, ultimately.  But I think that

10   it's sort of in the eye of the beholder whether the case is a

11   loss or a win because you have to look at what the Court said.

12   And the Court, sort of, said it wasn't -- it said you can't

13   collaterally attack orders.  You can't collaterally attack,

14   say, a 1986 order in 2004.

15        But on the other hand, it left open the question as

16   to who's bound by those orders.  Were my clients, in that case,

17   Pearly Bailey -- Pearly Lee Bailey, a widow of a Mizo (ph.)

18   victim, was she bound by that order?  And the Court remanded it

19   to the Second Circuit to decide whether or not, in fact, she

20   was bound because she was not present before the Court, didn't

21   have notice, etcetera.  Those issues all remained open, which

22   is why I say there's a lot of legs left in that case and a lot

23   of legs left after that decision for me in the Second Circuit

24   and in the bankruptcy court.

25        But what we can learn from that case is, and what the

47

1   Supreme Court I think was telling the public and telling the

2   Court was, you need to protect your rights at the time.  You

3   need to have your rights protected at the time.  And Congress,

4   through 524(g) has in fact; set forth a mechanism to protect

5   future unknown claims in an asbestos situation.  And is

6   specifically referenced that protection and it said -- the

7   Court said we do not decide whether any particular respondent

8   is bound by the 1986 orders.  They assumed that everyone was

9   bound and that relates very much to this case.  I think it's

10   almost dead-on this case.

11       If GM is trying to bind everybody and all the

12   futures, I think Congress has set forth in the asbestos context

13   and the Supreme Court affirmed last week, how that's done.  And

14   that's done through a 524(g) situation.  Or I could analogize

15   to that and say that a future tort czar, to protect the

16   futures.  And if not, then due process provides that those

17   people are not bound.  And I'm willing to, frankly, live with

18   either result.  I'm willing, if GM says it wants to go the Dana

19   route, I think that's a mistake but they can go the Dana route.

20   If GM wants to proceed a different route, I'm fine with that.

21       So in many respects, I punt this to GM.  If GM is in

22   fact going to try and cut everyone off at the knees for future

23   claims, I think they need to take this podium and say that.

24   And then I think they need to either live with the consequences

25   of not having a future claims tort czar or future claims rep or

48

1    not.  And also risk whether or not the order that they want

2    gets entered by this Court.  Thank you.

3         THE COURT:  All right.  Thank you.  Mr. Miller?

4    (Pause)

5         MR. MILLER:  Harvey Miller for the debtors.  Your

6    Honor, I wish Mr. Esserman had called last evening, I might

7    have gotten another hour of sleep.  As I understand his

8    presentation, the motion for the appointment of additional

9    committee of asbestos claimants is withdrawn without prejudice.

10        THE COURT:  That's my understanding as well.  Mr.

11   Esserman?

12        MR. ESSERMAN:  We would prefer to adjourn it.

13        MR. MILLER:  We would prefer to have it withdrawn

14   without prejudice.  We don't need it on the calendar, Your

15   Honor.

16        THE COURT:  All right.  Gentlemen, one of the things

17   I would like to do is to get more money into the pockets of

18   creditors.  I don't want to make people file more pieces of

19   paper then have already been filed in this case.  I'm sure you

20   got less sleep than I did, Mr. Miller, but the goal is the

21   same.

22        That portion can be continued but, frankly, I'm going

23   to set it for a date pretty far out, Mr. Esserman, without

24   prejudice for you to advance it on the calendar.  We keep them

25   on calendar so they don't fall between the outfielders but this

49

1    is really a distinction without a difference, gentlemen.

2    Continue, Mr. Miller.

3           MR. MILLER:   So that leaves, Your Honor, the question

4    of the future representative.   As Your Honor pointed out in

5    your opening remarks, 524(g) is a section of the Bankruptcy

6    Code which relates to a debtor proposing a plan of

7    reorganization that incorporates a channeling order where

8    asbestos claims are going to be channeled to a particular fund

9    for satisfaction, which is derivative out of the Johns Mandel

10   (ph.) case.

11          As we have said in our papers, Your Honor, there is

12   no intention on the part of GM to propose a channeling order.

13   And since we are proposing to do a plan of liquidation there

14   will be no discharge.   In that context, Your Honor, there is no

15   justification for the appointment of a future claimant

16   representative.   And I would direct Your Honor's attention to

17   the case of Locks vs. U.S. Trustee at 157 B.R. 89, a decision

18   of the United States District Court for the Western District of

19   Pennsylvania which held that in a case of a liquidation, rather

20   than a reorganization, there is no mandatory requirement for a

21   future claimant representative.

22          We are not proposing, in any way Your Honor, a

23   channeling order.   And as Mr. Esserman has pointed out, there

24   are negotiations going on with the official creditors'

25   committee as to the scope of the order which will be requested

50

1    in connection with the 363 transaction.  Where those

2    negotiations come out at this point, Your Honor, we're not

3    prepared to say.  There is active negotiation on all of the

4    issues that Mr. Esserman referred to.  They will be before Your

5    Honor on the hearing on June 30th.

6         In the context of where we are today, 524(g) is

7    simply not applicable and there is no basis here, today, for

8    the appointment of a future representative for future asbestos

9    victims.  Which, and also, as the Court pointed out in Locks

10   vs. U.S. Trustee, there is an inherent conflict between the

11   current asbestos claimants and the future claimants that may

12   have to be considered at a future date.  But in the

13   circumstances where we find ourselves today, Your Honor, there

14   is no basis for the appointment of a future representative.

15   And I say that, Your Honor, without prejudice to a future

16   application if that becomes appropriate.

17        THE COURT:  Okay.  Thank you.  Mr. Esserman, any

18   reply?  Oh, forgive me.  Mr. Mayer, come on up, please.

19        MR. MAYER:  Thank you, Your Honor.  Tom Mayer, again,

20   for the official committee.  And our limited objection is

21   exactly what it states to be.  But Mr. Esserman is correct that

22   certain of the issues that he raised we decided to raise

23   ourselves.  And it was no mean fete getting a fifteen-member

24   committee to agree to take that position.  We have on that

25   committee; I think I can do this from memory, two indentured

51

1    trustees representing approximately twenty-seven billion

2    dollars of debt.  We have the PBGC whose contingent liability

3    dwarfs that of the bonds.  We have three unions who are

4    receiving quite disparate treatment.  We have three dealers who

5    are receiving quite disparate treatment.  Two suppliers, one

6    advertising agency, two product liability claimants and an

7    asbestos representative.  I think I got to fifteen.

8          And the issues that Mr. Esserman raised were debated

9    at considerable length by what is not even so much a model

10   United Nations and we took the position we took in our papers

11   with respect to future claims.

12         We agree with Mr. Miller that there is no call for a

13   futures representative at this time.  If it becomes necessary,

14   we can deal with it at a future time.  But it is our position,

15   as set forth in the papers as Mr. Esserman noted, that we don't

16   believe that an order entered by this Court can bond future

17   claimants.  We don't believe 524 is applicable here.  We don't

18   think 524 is mandatory and there was no conceivable stretch

19   under which a 524(g) plan could possibly be confirmed in this

20   case.  It will never be a case where the asbestos claimants are

21   getting a majority of an operating company and no discharge is

22   being sought for it.

23         So if at some point in the future it becomes

24   necessary to deal with a futures claim issue, we can deal with

25   it at this time.  And at this point we see no basis for either

52

1    the appointment of a committee or the appointment of futures

2    representatives.  If you have questions, I'm happy to answer.

3              THE COURT:  No, I really don't.  Thank you.

4              MR. MAYER:  Thank you, Your Honor.

5              THE COURT:  Okay.  Mr. Esserman, I'll take any reply.

6              MR. ESSERMAN:  Future claims are being passed through

7    the estate unimpaired.  I see no reason for an appointment

8    either at this time, Your Honor.  Thank you.

9              THE COURT:  All right.  Everybody sit in place for a

10   second.

11      (Pause)

12             THE COURT:  Folks, the motion is denied without

13   prejudice to renewal if either the debtor proposes a channeling

14   injunction in the future or decides to propose a standalone

15   plan.

16             Mr. Esserman, if you want to take this up on appeal,

17   I'll give you full findings of fact and conclusions of law at

18   the end of the day today, but I don't want so many people in

19   the courtroom to have to await a recess for me to deliver those

20   findings which would likely be as long as they were on Tuesday.

21             MR. ESSERMAN:  Unnecessary, Your Honor.

22             THE COURT:  All right.  Thank you.  Is our next

23   matter the retirees committee?

24             MR. MILLER:  Yes, Your Honor.

25             THE COURT:  Do you folks want to go straight into it

53

1   or do you think anybody would want or need a five or ten minute

2   break?

3          MR. MILLER:  I would ask Your Honor for a five minute

4   break.  I would like to have that opportunity to meet with the

5   U.S. trustee.

6          THE COURT:  Certainly.  Okay.  We're in recess for --

7   until -- would an extra five minutes be prudent, Mr. Miller?

8          MR. MILLER:  Absolutely, Your Honor.

9          THE COURT:  Let's resume at 10:15.  We're in recess.

10         (Recess from 9:56 a.m. until 10:15 a.m.)

11         THE COURT:  Mr. Miller?

12         MR. MILLER:  Harvey Miller for the debtors.  Your

13  Honor, may we go back to the motion to engage AP Services?

14         THE COURT:  Certainly.

15         MR. MILLER:  Mr. Karotkin, please?

16         THE COURT:  Mr. Karotkin.

17         MR. KAROTKIN:  Thank you, Your Honor.  Stephen

18  Karotkin, Weil Gotshal & Manges, for the debtors.  In

19  connection with the application of the debtors to retain AP

20  Services, Your Honor, there was only one substantive objection

21  filed by the Office of the United States Trustee.  I believe

22  that the unsecured creditors' committee either filed a pleading

23  or requested certain clarification in any proposed order, which

24  were are more than willing to address.

25         With respect to the objection raised by the Office of

54

1   the United States Trustee, we have reached a resolution of that

2   dispute which we propose to embody in a revised proposed order,

3   which we will circulate with Ms. Adams as well as with the

4   unsecured creditors' committee.  But I would like to state on

5   the record the resolution that's been agreed to, if I might?

6           THE COURT:  Yes.  Go right ahead.

7           MR. KAROTKIN:  Thank you, sir.  I'm just going to go

8   to the substantive points.  With respect to the success fee

9   described and contained in their retention agreement, there

10  would be no objection to payment of fifty percent of the

11  success fee as provided in the retention agreement, on the

12  closing of the sale transaction, subject to AP Services filing,

13  prior to such payment, a supplemental affidavit with the Court

14  summarizing the services rendered by AP Services with respect

15  to the sale transaction.

16          Second, both the payment of the balance of the

17  success fee, which is proposed to be paid one year following

18  the closing of the sale transaction, and any discretionary fee,

19  as that term is defined in the application, both of those

20  payments shall be subject to review under the reasonableness

21  standards set forth in Sections 330 and 331 of the Bankruptcy

22  Code, including the filing of an appropriate fee application by

23  AP Services, including time records.

24          And finally, Your Honor, no person from AP Services

25  involved in the engagement, can bill at a rate higher than the

55

1    rate billed by Mr. Koch, as that rate may be adjusted from time

2    to time, on notice to the Office of the United States Trustee.

3    And I believe that, I hope, accurately sets forth the

4    understanding.  And if I have stated something --

5            THE COURT:  Mr. Matsumoto, forgive me.  Could you

6    pull a nearby microphone over unless you want to come to the

7    main lectern?

8            MR. MATSUMOTO:  That's correct, Your Honor.

9            THE COURT:  Okay.

10           MR. MATSUMOTO:  He's accurately said it.

11           THE COURT:  Mr. Mater.

12           MR. MOERS MATER:  That is correct, Your Honor.  That

13   reflects the agreement with the committee.

14           THE COURT:  All right.  Did everybody who weighed in

15   on this or wanted to, have a chance to be heard?  Okay.  As

16   modified by the understandings with the U.S. trustee and the

17   creditors' committee, that retention is approved.  And at your

18   convenience, you or one of your colleagues can get me the

19   revised order papering that understanding.

20           MR. KAROTKIN:  Thank you, sir.

21           THE COURT:  Thank you.

22           MR. MILLER:  If Your Honor pleases, Harvey Miller

23   again.  Your Honor, one housekeeping detail.

24           THE COURT:  Yes.

25           MR. MILLER:  The filing of a memorandum of law in

56

1   support of the proposed Section 363 transaction is due tonight.

2   There are objections, Your Honor, that are still coming in.

3   They've come in every day.  They're still streaming in.  What

4   we would propose, Your Honor, is to file our memorandum of law.

5   But we would like the extension, Your Honor, to amend that

6   memorandum before the commencement of the hearing on June 30th,

7   to take into account the additional objections that are coming

8   in.

9        THE COURT:  I need a little help from you here, Mr.

10   Miller, in a couple of ways.  First, I thought the time for

11   objections to what you're doing had come and gone.  You're

12   dealing with the practical problem that people, either because

13   they disregarded the deadline or didn't get notice of the

14   deadline, are still giving you stuff?

15        MR. MILLER:  I think one day, Your Honor, ECF was

16   down and that delayed a lot of things.  Some people claim they

17   did not get notice.  And they're just continually streaming in,

18   Your Honor.

19        THE COURT:  I hear you.  When were you thinking of --

20   you did file one brief already.  And this, I take it, would be

21   like a reply brief to the objections?

22        MR. MILLER:  Yes, Your Honor.

23        THE COURT:  And what was your thought as to when I

24   would get something I could work with?

25        MR. MILLER:  The hearing is on Tuesday, Your Honor.

57

1    Monday, 5:00, 6:00.

2            THE COURT:  Umm --

3            MR. MILLER:  I'll make a concession, Your Honor.

4    Noon.

5            THE COURT:  I feel like I'm playing Let's Make a

6    Deal.  I'm not going to default you if you can't make noon, but

7    I'd like you to try very hard to do that.

8            MR. MILLER:  Very good, Your Honor.  Thank you.

9            THE COURT:  Thank you.  Mr. Schwartz?

10           MR. SCHWARTZ:  On that point.  Mr. Miller said that

11   the deadline was this evening.  We were under the impression

12   that it was tomorrow.  And we were intending to put in papers

13   as well, if that's acceptable.

14           THE COURT:  Sure, you can do that.

15           MR. SCHWARTZ:  Thank you.

16           THE COURT:  Okay.  Are we now up to retirees, Mr.

17   Miller?

18           MR. MILLER:  Yes, sir.

19           THE COURT:  All right.  I would like counsel for the

20   retirees to come on up, but then, only to get a place at

21   counsel table.  Make room for him, folks.  Somehow, make room

22   for him, because I have some preliminary observations.  Mr.

23   Mater, you get a place at the -- okay, that's fine.

24           Folks, make your presentations as you see fit, but by

25   the time you're done, I want you to address the following

58

1    questions and concerns.  It seems to me, subject to your rights

2    to be heard, that 1114(d) has two prongs, one of which is

3    mandatory, if it applies; the other which is discretionary.

4    The mandatory part being "shall order, if the debtor seeks to

5    modify or not pay the retiree benefits"; and the discretionary

6    part being "or if the Court otherwise determines that it is

7    appropriate."  Now a "shall" proceeds the second also, but when

8    you give me the ability to determine whether it's appropriate,

9    it seems to me, that changes it into a discretionary

10   determination.  But it also seems to me, subject to your rights

11   to be heard, that neither of those requirements applies unless

12   1114 applies at all.

13          Now, on that, it appears to me that there are two

14   principal legal issues which I'll get to in half a second.  But

15   I also have a factual question for which I'd like your help,

16   Mr. Miller, or from whoever on your team is going to be arguing

17   it; which is, are the debtors' plans the same with respect to

18   both its retiree pension plans and also its welfare plans,

19   which I understand to be its health and life insurance plans?

20   Or is there some distinction between them?  That's more in the

21   nature of a factual predicate, just so I know what we're

22   talking about, either changing or leaving subject to the

23   possibility of a change.

24          But then, when we get to the legal prongs, it seems

25   to me that one of the issues I have to deal with is whether

59

1    1114 applies at all.  And on that -- and forgive me, on behalf

2    of the retirees, I'm not sure if I got your name?

3              MR. GOTEINER:  I'm sorry, Your Honor.  Neil Goteiner.

4              THE COURT:  Goteiner?

5              MR. GOTEINER:  Yes.

6              THE COURT:  Thank you.  Mr. Goteiner, it appeared to

7    me that in arguing the issue as to whether 1114 applied, you

8    took kind of a national perspective.  And I'm wondering, and I

9    would find your help valuable, in telling me whether I should

10   take a national perspective on the one hand, or whether I, as a

11   judge sitting in the Second Circuit in the Southern District of

12   New York, can appropriately consider a national perspective, or

13   whether I have to give greater attention to a decision of the

14   Second Circuit and of the case law in the Southern District of

15   New York.

16             Now, I think many people might believe that a

17   bankruptcy judge in the Second Circuit is bound by a decision

18   of the Second Circuit, and I've got the Chateaugay decision.

19   It's also the case that I'm on record in four or five or six

20   published decisions as saying that even though I'm not bound by

21   the decisions of other bankruptcy judges in this district, that

22   I believe that the interests of consistency for the financial

23   community, for the bankruptcy community in this district, are

24   very important, and therefore that I follow the decisions of

25   other bankruptcy judges in the Southern District of New York,

60

1    in the absence of clear error.

2         Now, I was a little surprised, Mr. Goteiner, that at

3    least in your opening brief, unless I missed it, there was no

4    attention to Judge Drain's decision in Delphi.  Now, obviously,

5    there was greater discussion of it by the debtors and the

6    creditors' committee when they filed their next round of

7    briefs.  And while you mentioned it in your reply, you didn't

8    really address, unless again I missed it, the substantive

9    holdings that Judge Drain had with respect to whether 1114

10   applies or whether I should follow his decision or whether his

11   decision was incorrect in any way.  Some might regard his

12   decision, albeit originally dictated, as one of the most

13   comprehensive and extensive discussions of this area that

14   anybody has ever written at any level in the federal system.

15   So I want both sides to address Judge Drain's decision

16   extensively, either up or down, whether it's right or wrong,

17   and address whether I should follow it or not.

18        Then we get to Sprague.  As I read Sprague, and it's

19   long and it's complicated, and I'm not claiming to be the only

20   person who can read it or understand it, it appeared to me to

21   be an 8-1-1-3 en banc decision.  And it looked to me that when

22   you looked at the plans, insofar as they affected the general

23   retirees, as contrasted to the early retirees, it was a 10 to 3

24   decision, putting aside the class action issue, which isn't

25   material to our concerns.  And it also appears to me that for

61

1    either most or all of the GM community, their situation is more

2    analogous to the general retiree situation rather than the

3    early retiree situation, because the principal difference was

4    the early retirees had separate deals that may have been

5    explained to them when they were asked to take early

6    retirement.

7          Now, one thing that was a matter of some difficulty

8    for me, from both sides, is that the contentions that Sprague

9    was wrong came up only in the reply brief filed on behalf of

10   the retiree committee, your folks, Mr. Goteiner.  And that

11   forced the debtor to deal with a whole new issue in a surreply,

12   which the debtor did, but then you didn't have a chance to

13   reply to that.  Now, debtor has stated in its surreply that res

14   judicata applies, binding on the retirees here, and also even

15   that collateral estoppel applies.  I'm wondering whether the

16   more appropriate course is to analyze this, principally, on

17   bases of stare decisis where you have the classic blue Buick.

18         I don't want to foreclose you folks from other points

19   that you want to make, but by the time you're done, please be

20   sure to have covered at least those.  Okay.  Your motion, Mr.

21   Goteiner.

22         MR. GOTEINER:  Neil Goteiner, General Motors

23   Retirees' Association.  Your Honor, I think the questions you

24   asked obviously go to the core of issues, and so I'll address

25   them up front.  And basically I'll constrain my general

62

1    comments to dealing with your questions.

2         THE COURT:  You don't have to constrain them, just be

3    sure you've covered them by the time you're done.

4         MR. GOTEINER:  Well, I'm constraining -- I'm saying

5    I'm constraining them, because they're core.

6         THE COURT:  Okay.

7         MR. GOTEINER:  And I haven't thought about every

8    point, but I think I can deal with them.  Let me begin by

9    saying this.  If you look at the statute, 1114, and you look at

10   the way it's structured, you don't have that much legislative

11   history on tap.  We have some, but very little.  But if you

12   look at it, what is it doing?  It uses the word "any benefit".

13   And it's a very, very modest proposal.  And this addresses part

14   of what Judge Drain did as well.

15        What Judge Drain did and what the debtors are doing -

16   - what some courts are doing, I respectfully submit

17   incorrectly, is that they're treating this exercise as a

18   summary judgment motion.  Judge Drain asked about abrogation of

19   rights and that 1114 is not supposed to abrogate rights, and

20   he's not familiar with other sections with the Bankruptcy Code

21   that create rights.  We're not creating rights here.  All that

22   1114 did was to create a forum, a platform for discussion so

23   that people, like the 122,000 members of this retiree group who

24   are not represented, has a chance to deal with and talk with

25   management about critical -- and this is not overly florid or

63

1     dramatic -- life-threatening decisions.

2            And Congress understood that.  So what happens is,

3     there's a discussion, a conversation that occurs.  And by the

4     way, Your Honor, it can occur very, very quickly.  This is not

5     going to delay any decisions.  There are lawyers on both sides

6     who can handle these issues, and management can handle them.

7     So you have the discussion.  And usually these things work out

8     fine, because this particular group, my clients, understands

9     that there has to be cuts, that there has to be serious cuts.

10    But the point is, to have those people whose lives are being

11    affected making the decisions, and not having them be made by

12    executives; not having them been made by other people who don't

13    understand and really live these issues.

14           So that needs to be stated.  And I didn't really see

15    that discussion in the cases.  This is not a summary judgment

16    motion.  What happens is, if there's going to be a

17    disagreement, and in the unlikely event that the committee --

18    if it was selected and formed -- in the unlikely event that the

19    committee disagreed with the debtor, then what happens?  Then

20    it comes -- then and only then does it come to Your Honor.  And

21    then you deal with some of the Sprague questions versus what we

22    think should control, which is the Devlin case in the Second

23    Circuit, which also addresses one of Your Honor's questions.

24           The debtor suggests that it's Sprague all the way.

25    That's not true.  Your Honor, I have not read all Your Honor's

64

1     decisions on this, but the Second Circuit has pointed out in

2     the Caesar case, I believe, as well as in other cases when they

3     were dealing the factors versus the Pro Arcs (ph.) cases, that

4     was around 1980.  I can get the cites to you on that.  That

5     when you're dealing with federal questions, Your Honor should

6     be looking at courts in the Second Circuit.  It's national, it

7     is national, but still, when you're looking at federal

8     questions, it's perfectly appropriate, and some courts say you

9     should look to the Second Circuit.

10          Now, I know that -- and so that means the Court

11    should also consider the Devlin -- and I'm saying we shouldn't

12    even be getting into that now, but if you look at the Devlin

13    burden analysis, in the Devlin burden analysis, you determined

14    whether there's an ambiguity.  Under the Sprague analysis, the

15    burden is on the retirees there to show it was clear and

16    unambiguous.  That is not the law of the Second Circuit.

17          THE COURT:  Pause, please, Mr. Goteiner, because if I

18    heard you right as you were getting into that, you mentioned

19    Pro Arts.  And sadly, I'm well aware of that case because in

20    the Adelphia case, I had issued a decision where I expressed

21    the view that the Third Circuit couldn't understand a matter of

22    Pennsylvania law correctly, or at least a two-judge majority in

23    a Third Circuit decision, and that they ignored a decision of

24    the Pennsylvania Supreme Court.  And while I wasn't reversed on

25    the issue because there were satisfactory alternative grounds,

65

1    it was pointed out to me that I, as a bankruptcy judge, don't

2    have the ability to tell a circuit court that it was wrong when

3    it's construing a matter of state law within its home state

4    district.  And I think that's what Pro Arts stands for among --

5            MR. GOTEINER:  State law.

6            THE COURT:  State law.

7            MR. GOTEINER:  Correct.

8            THE COURT:  Now, it appeared to me that even -- when

9    I was reading Sprague, that even though there isn't much

10   discussion of Michigan law, when they're talking about contract

11   formation as contrasted to what ERISA provides, that's got to

12   be state law.

13           MR. GOTEINER:  They didn't -- Your Honor, they didn't

14   discuss it.  And my -- I have the same question.  All right?

15   And it seemed at that level and at the level that Your Honor is

16   grappling with, it seems that the state issues are subsumed in

17   federal issues.  And look, there are a lot of blanks in

18   Sprague.  And there were a lot of disconnects and

19   discontinuities between the majority decision and the dissent.

20   The majority says most of the plans had the termination

21   language.  The dissents, in a robust and animated dissent, says

22   that some of them did.  But in any event, it was clear that it

23   was all over the lot, and most could be fifty-one percent.  So

24   I'm aware of the point.  I'm also aware of Factors, in fact, it

25   was one of my first cases.  I was representing the estate of

66

1    Elvis Presley and flew down to Graceland.  I remember that case

2    very well.

3              THE COURT:  That is Pro Arts, isn't it?

4              MR. GOTEINER:  Yes, Factors, Pro Arts.  So I'm aware

5    of that case, as well.  So in dealing with these issues, I

6    think 1114 trumps the analysis for today.  And all I'm saying,

7    1114 is a very modest proposal.  And where Judge Drain was

8    wrong was he started talking about creation of rights and

9    abrogation of rights.  That's not what would happen today if

10   Your Honor appointed an 1114 committee.  And by the way, Judge

11   Drain did appoint an 1114 committee after this long analysis.

12             THE COURT:  Albeit for a fairly limited purpose.

13             MR. GOTEINER:  Albeit for a fairly limited purpose,

14   but there was -- he left wedges in his decision.  And it

15   depends on what was going to come up in that analysis.  And

16   things do come up.

17             But the point is, the fair and equitable calculus

18   that Congress imposes on the debtor, on the retirees who are

19   not represented like the UAW -- I just want to make that clear;

20   it's an obvious statement -- what Congress imposes is a very

21   reasonable and quick approach.  And that was my major problem

22   with Judge Drain's decision.  He -- and by the way, I'll tell

23   you -- I'll take responsibility for part of that because we

24   were involved in that, as Your Honor may or may not know.  And

25   we were involved in the briefing, and we were co-counsel on

1      that point.  But I got more involved in this matter, and as I

2      started to look at the literature and I started to look at all

3      the cases, it became clear to me that, with all due respect to

4      these -- to very distinguished lawyers and judges, the

5      fundamental aspect and driving purpose of 1114 has been missed

6      in all this.  And what's happening is -- and so what I'm

7      looking for is an Occam's razor that gets down to the

8      fundamentals and explains what 1114 is.  And 1114 is as I

9      stated, I won't repeat it, and I doubt many people would

10     disagree with me on my right, but that's what it is.

11            And then Judge Drain did more than that.  Then Judge

12     Drain talked about his analysis of 1114(l).  What does that

13     mean?  Although I don't think you have to characterize this as

14     a vested right, as I was just saying, because that's not what

15     we're doing here.  We're not aggregating rights.  But what

16     Congress did do in 1114 is to create at least a vested

17     procedure outside of bankruptcy, for the 180 days preceding

18     bankruptcy.  To me, it's a dizzying non-sequitur -- and this is

19     also why I disagree with Judge Drain -- for to say that exists

20     in a pre-bankruptcy context that doesn't exist during

21     bankruptcy.

22            1114(l) has meaning.  And it only has meaning if you

23     apply it logically and consistently, and I think Judge Drain

24     missed that.  And frankly, everyone did.  But that's what

25     1114(l) means.  And --

68

1          THE COURT:  Well, pause, please, Mr. Goteiner.

2     Because -- and maybe the creditors' committee picked this point

3     up in its opposition to you or in -- I don't remember where I

4     got this from, to tell you the truth -- but there are different

5     scenarios under which, prepetition, a debtor can adversely

6     affect its retiree rights.  It can do it by exercising the

7     right that the debtor thinks it has to amend or terminate

8     unilaterally because it contends that its plan documents

9     provide it with that entitlement or that right.  Or it can do

10    it because it says we simply can't afford it.  And we're

11    changing it and maybe those guys can sue us.  I think it's

12    agreed that in the second -- or at least not very

13    controversial -- that in the second category, adversely

14    affected retirees can have had it and go after the debtor under

15    1114(l).  But I think somebody said, again, I think it was the

16    creditors' committee, that the jury may still be out -- or the

17    legal equivalent to that -- as to whether 1114 applies when the

18    debtor uses a right of amendment or termination that it

19    otherwise has in its plan documents.  Is that your

20    understanding, as well?

21          MR. GOTEINER:  Well, that's what they're saying, but

22    the --

23          THE COURT:  That's what the creditors' committee is

24    saying, you're saying?

25          MR. GOTEINER:  Right, well, I think the debtor --

69

1          THE COURT:  Well, I guess what I'm interested in is

2     your view on that.

3          MR. GOTEINER:  Well, I'm interested in their view, as

4     well.  But my point is that the wording of 1114 is so broad, so

5     all-encompassing with any benefit, Congress was aware that

6     there are amendable benefits, and with that kind of language.

7     But when you combine that with the modest procedural rights

8     that 1114 provides, again, that's the simplest explanation of

9     what's happening here.  It's premature to decide this now.  And

10    we do know, because of announcements that they've been

11    transparent about this to a degree, that they're going to be

12    cutting two-thirds of benefits.  You know, these are critical

13    benefits.  So it's happening now.  This process is happening

14    now.  And it also happened in the six months prior to June 1,

15    which is an 1114(l) situation.

16          So I just disagree with the -- there's a lot, as I

17    say, of Talmudic analysis in all these decisions.  And

18    particularly, Judge Drain's was excellent, it's true.  I mean,

19    he covered the ground.  But the fact that he had the excellent

20    legal analysis doesn't say to me that he covered the

21    fundamental point of what 1114(a) says.  And on top -- and

22    1114(l), as well, where I think he's dead wrong.

23          But on top of that, if we even want to get into this

24    analysis, he says that bankruptcy law does not create rights.

25    Well, that's not true.  Preference rights, 1113 rights, 363

70

puts limits on a debtor's use of a third party lender's cash

collateral during a Chapter 11 case providing substantive

protections that don't exist outside bankruptcy.  Section 363

gives assets buyers the right to buy assets free and clear of

liens.  Section 364 gives third party post-petition lenders the

right, under limited circumstances, to get priming liens,

granting them a lien on collateral ahead of existing lenders

which cannot be done outside bankruptcy, so he's wrong on that

as well.  And, again, these points were not fully briefed.  But

as I read the decision, I started asking these questions, and

they didn't make sense.

So I could deal more with Judge Drain's decision, but

I think with respect to those fundamental points, though, and I

know it's the most comprehensive decision out there, today.

Painfully so.  But, it doesn't mean he's right.  And so I

respectfully suggest this is for Your Honor to wrestle with to

determine whether he is correct or not correct on the

fundamentals and also on this overarching point of whether we

should decide this now.  Is that what Congress had in mind?

And I respectfully submit they didn't.

So I think I have answered Your Honor's questions.

Let me just look at my notes for one second, Your Honor.  Ah,

let's address Sprague just for a minute longer because Your

Honor raised the res judicata possibility.  Your Honor also

said well, that was a class action; we don't need to involve

71

1    ourselves with that.  But we do.  We have --

2         THE COURT:  Your point being that they expressly

3    denied class action status for both of the two major classes?

4         MR. GOTEINER:  Precisely.  No -- class actions have

5    significant meaning, obviously, and they have significant

6    meeting, and as defendants, we sometimes stipulate to class

7    certification because of what it means for final peace, global

8    peace.  But there is no class representative there.  There is

9    nothing close to the privity type issues in these virtual

10   representation cases.

11        THE COURT:  Well, pause, please, Mr. Goteiner,

12   because you're absolutely right on the significance of class

13   action.  But is it the case that if there had been certified a

14   class action, the decision would be a no-brainer on res

15   judicata.  And the question really is, in the absence of a

16   class action, what's left?

17        MR. GOTEINER:  Well, you said stare decisis, but

18   again, Your Honor, that really has to do with, you know, there

19   are all sorts of things that occur in a class action.  Okay, I

20   do that kind of work, as well.  And there are all sorts of

21   decisions that are made.  You have to take a look at whether

22   the subclasses were defined correctly.  I don't know, I can't

23   answer your question because I also -- there are lacunae in

24   Sprague that don't make sense to me.  And it just wasn't

25   because you had an impassioned chief -- I think it was the

1    chief judge saying it was wrong.

2            THE COURT:  It was Martin, if I recall.

3            MR. GOTEINER:  I'm sorry?  Judge Martin was chief

4    judge --

5            THE COURT:  Yes.

6            MR. GOTEINER:  -- at that point.

7            THE COURT:  Yes.

8            MR. GOTEINER:  And it's not only the lacunae that

9    exist there, but theoretically, to me, it doesn't make sense

10   given the ambiguities that did exist.  But the Sixth Circuit

11   said, all right, this is our view, we see no ambiguity.  But

12   the Sixth Circuit went off on the Wise decision.  And that was,

13   as I recall it, that page, that was the first primary decision

14   they cited was Wise from the Fifth Circuit.  However, in

15   Devlin, the Second Circuit said we can see how the district

16   court could have been led by Wise into making the decision it

17   did, but we don't go that direction in the Second Circuit.  So

18   the core theoretical groundwork for Sprague finds itself

19   rejected in Devlin.  Now, I don't think Devlin cited -- I think

20   Devlin maybe came down a month or two after, I'm not sure.  But

21   there was no cross-referencing of the two.  And I also note

22   that in the debtors' brief, although I read it quickly, I

23   didn't see a reference to Devlin.

24            So, as I say, it's Sprague.  So I don't see

25   Sprague -- it's certainly not anything close to virtual

73

1    representation.  There's not the privity, there's not the same

2    motivation, it is not a one-on-one linkage that you found in

3    Chase.  It just isn't.  It's an aborted class action.  You

4    cannot cherry-pick from Sprague and take one point, and then

5    say it binds everyone, all the retirees.  You just can't.  It

6    is limited and it is not what the Second Circuit would buy into

7    as I read Devlin.

8           And I must say, with all due respect, Judge Drain was

9    wrong there, as well.  Now, I do recall that there was briefing

10   on this choice-of-law issue in the Delphi matter, and I'm not

11   quite sure because this came in late last night so I haven't

12   had time to check, I'm not sure because I think the judge in

13   the -- Judge Drain, in the decision that he announced from the

14   bench, said the parties hadn't briefed on him on the choice-of-

15   law issue.  Then there was briefing after that pursuant to his

16   comment.  But I don't know what happened between -- and maybe

17   counsel here does know -- I don't know what happened between

18   that briefing and Judge Drain's decision.  But clearly, he did

19   not take into account Second Circuit law, and he should have

20   because the Second Circuit controls Judge Drain in this issue.

21   Or at least, that's what the Second Circuit in Caesar (ph.)

22   said, and that's what is drawn from the analysis in Factors v.

23   Pro Arts.

24          So, let me just see if I -- I think -- Your Honor,

25   does that cover your main points?  I think it does.

74

1          THE COURT:  I think it does, too.

2          MR. GOTEINER:  So why don't I stop there and reserve

3     any additional time after I hear the opposition.

4          THE COURT:  Sure.

5          MR. GOTEINER:  Thank you very much.

6          THE COURT:  Mr. Miller?

7          MR. MATER:  Your Honor, please, Harvey Miller on

8     behalf of the debtors again.  Your Honor the law is perfectly

9     clear that Section 1111 -- I'm sorry, 1114 of the bankruptcy

10    code, does not apply with respect to a retiree plan that is

11    terminable or amendable or modifiable unilaterally by the plan

12    sponsor.  And while counsel may refer to Sprague as an aborted

13    class action case, it's certainly beside that GM had an

14    unqualified right to modify these retirement plans, and that

15    was heavily litigated, and that's what the Sixth Circuit

16    decided in the decision that you referred to.  So if GM has the

17    right to modify or terminate these retirement plans, then

18    Section 1114 does not apply and there should be no retiree

19    committee.

20          Counsel claims that Sprague decision should not be

21    binding on this Court.  And he says that the -- there's no

22    finding that the issues are exactly the same or there was an

23    alignment.  Well, what was Sprague about, Your Honor?  It was a

24    claim violation of ERISA that GM unilaterally modified and

25    terminated rights that the retirees claim in violation of

75

1    ERISA, because if it was a plan subject to ERISA, GM could not

2    do that unilaterally.  So this welfare plan, the Sixth Circuit

3    held, is modifiable by GM and it went through the different

4    plans and came to the conclusion that all of the plans reserved

5    to GM the right to modify or terminate and that right

6    continues, Your Honor.  And those are GM plans.

7         Now, counsel says, and the moving parties say, "Well,

8    now we're in the Second Circuit and Sprague doesn't apply."  We

9    argue, as we have in our brief, Your Honor, that there is

10   virtual representation.  And notwithstanding that the class

11   action certification was vacated, the claim's rights

12   asserted -- the same rights that are being asserted in

13   connection with this motion, Your Honor.  So now we move, Your

14   Honor, to the Delphi case.  And what happened in Delphi?

15   Exactly the same thing.

16        The argument was being made, by the plan

17   beneficiaries, that Delphi did not have the right to modify or

18   terminate these benefits unilaterally.  That was the issue that

19   was presented.  And the important factor in that, Your Honor,

20   is that Delphi plans were GM plans because Delphi was a spinoff

21   from GM, I think, in 1999, and those plans were all GM plans.

22   And as Your Honor pointed out, Judge Drain, in a very

23   comprehensive bench decision, came to the conclusion that

24   Delphi had the unilateral right to terminate and modify the

25   plans and therefore 1114 was not applicable, but he did appoint

76

1       a committee.  And he appointed a committee for a very limited

2       purpose.

3             There was a contention made that certain of the

4       beneficiaries had vested rights and if their rights were vested

5       then Delphi could not unilaterally modify or terminate those

6       rights.  So he appointed a committee for a specifically limited

7       purpose to explore and file a report as to whether any of the

8       rights were vested.

9             THE COURT:  Can you help me, if you know, as to why,

10      especially if these were former GM people, they might have had

11      vested rights?  Like, could they have retired before the first

12      of the plan descriptions were issued that reserved the right to

13      modify or was it some different basis?

14            MR. MILLER:  No, Your Honor.  It wasn't because of a

15      date or a time.  Within Delphi, there were other acquisitions

16      that form part of Delphi; American Axle Company and some other

17      companies.  It may have been that those companies had plans

18      that were in existence when they were merged.  And there may

19      have been the employees that came from those companies that

20      have vested benefits.

21            THE COURT:  In other words, they became Delphi

22      retirees but their retirement rights had been created back when

23      they were employees for different companies?

24            MR. MILLER:  That's correct, Your Honor, as I

25      understand it.

1          THE COURT:  I'm with you now, okay.

2          MR. MILLER:  Now, subsequently to the bench opinion,

3     Your Honor, which was issued on -- in the early part of 2009,

4     Judge Drain again revisited the issues that were presented and

5     in a transcript, which I was only able to get last night, Your

6     Honor.

7          THE COURT:  I think it's now on Westlaw also, maybe

8     Lexis also.

9          MR. MILLER:  It's March 11, 2009.  He considered the

10    report that came back from this committee.  And if I may, Your

11    Honor, I would hand up a copy of the transcript.

12         THE COURT:  I read it last night.

13         MR. MILLER:  And I would refer Your Honor to page --

14         THE COURT:  Finding it is a different question.  For

15    that, maybe you do have to hand it up.

16         MR. MILLER:  I have one if Your Honor would like it?

17         THE COURT:  Yes.  Why don't you do that.  Give me a

18    second, please, Mr. Miller.

19        (Pause)

20         THE COURT:  Go ahead, please.

21         MR. MILLER:  I would refer Your Honor to page 61.

22    And if I may, I would read.  This is in consideration of the

23    report that the committee that he had appointed rendered.

24         THE COURT:  Wait.  Did you say 61?

25         MR. MILLER:  61, Your Honor.

78

1          THE COURT:  Oh, I see.  The pagination on what I read

2     yesterday is different than what you just gave me.  Go ahead,

3     please.

4          MR. MILLER:  Starting with the first full sentence,

5     "With respect to the first point, as I noted, probably too much

6     I lent during oral argument, I continue to believe that the

7     Sixth Circuit Sprague decision is one in which the Sixth

8     Circuit at length determined, en banc, that there was no

9     ambiguity in the respect of GM's reservation of rights to

10    modify, at will, it's welfare plans.  Including for the

11    period" --

12         THE COURT:  Forgive me, Mr. Miller.  I'm having

13    trouble finding it in the one you gave me as well.  You said --

14    this is with respect to Sprague, right?

15         MR. MILLER:  Yes, Your Honor.

16         THE COURT:  Go on, please.  I'm not sure if I can

17    find it here, but I'll just listen to what you've given to me.

18         MR. MILLER:  All right.  "That there was no ambiguity

19    in respect of GM's reservation of rights to modify, at will,

20    it's welfare plans including for the period in question and

21    that -- or I could conclude otherwise, I would not be doing so

22    by applying a different standard than that which is applied in

23    the Second Circuit under Bouboulis v. Transport Workers Union

24    of American 442 F.3d 55 (2006), namely that the plan documents

25    contain specific written language that is reasonably

79

1    susceptible to interpretation as a promise to vest benefits.

2    Language quoted from Devlin v. Empire Blue Cross and Blue

3    Shield 274 F.3d 7684 (2001).  Instead, what I would be doing

4    would be, in essence, reversing the majority's conclusion in

5    the en banc Sprague opinion that there was no ambiguity in the

6    relevant documents.  And that, in fact, it was clearly

7    understood that GM had reserved the right to modify.

8        Based on the analysis of the record, which I believe

9    is one that is clearly pointed out as such by the descent of

10   Chief Judge Martin in that case, I don't believe there's any

11   difference as far as how the Sprague Court and the Second

12   Circuit would review the underlying documents.

13       In any event, I believe that that portion of the

14   report that went beyond my charge or my assignment to the

15   committee, since it, in essence, sought to reargue my earlier

16   ruling, and in addition sought to suggest that the assumption

17   by Delphi pursuant to the master separation agreement, which

18   appears at Exhibit 90 in the U.S. Employee Matter's Agreement,

19   which was referred to there and appears in here most readily at

20   supplemental Exhibit 4, provided for the transfer to Delphi and

21   the assumption by Delphi of GM's legal responsibilities for

22   OPEB claims.

23       My conclusion was in February and is now that in

24   assuming such legal responsibilities at the time, Delphi and GM

25   were both fully aware of the Sprague decision, which predated

80

1    these agreements which found that GM has no legal

2    responsibilities in respect to these claims.  And in light of

3    the clear evidence that all of Delphi's plans and all of GM's

4    plans, at least since 1985, contained a clear unambiguous

5    reservation of the right to terminate or plan documents contain

6    such reservation that I cannot ignore the context of the

7    Sprague decision as underlying the parameters of what Delphi

8    adequately assumed and what GM transferred to it."

9         I will submit to Your Honor, that on reconsideration,

10   Judge Drain went even further then the bench opinion.  And I

11   submit to Your Honor that it's incontestable that GM had the

12   right and has the right to modify, terminate, any of these

13   welfare plans.  And in that context, Your Honor, then GM is not

14   subject to 1114 and there is no need for a retiree's committee.

15        As to the -- Your Honor's question with respect to

16   the salaried OPEB plan and the pension plans, the pension plans

17   will be assumed by New GM and the salaried retiree plans, as

18   modified, will be assumed by New GM.  There are cuts being

19   made, Your Honor.  These are cuts, and as we pointed out in our

20   papers, since 2002 we outlined the various changes that have

21   been made by GM in these particular plans which increase the

22   cost to the employees from something like twenty-four percent

23   to forty-one percent over that decade.  And these changes were

24   made unilaterally, Your Honor, by GM and there's never been in

25   that period in time an action by any salaried retiree

81

1  contesting that that was a violation of vested benefits in any

2  way, shape or form.

3              THE COURT:  Pause, please, Mr. Miller.  Let me get it

4  straight.  I take it, for the retirees that we're talking about

5  here, they have rights of essentially three times.  They have

6  pensions, which if I heard you right, are being taken over if

7  the 363 is approved by New GM and would remain unchanged.  Then

8  they have a number two, health, and number three, insurance,

9  which would be taken over by the New GM by the modified form in

10 which they were modified before the filing date?

11             MR. MILLER:  Yes, Your Honor.

12             THE COURT:  Okay.

13             MR. MILLER:  Now, the pension plan --

14             THE COURT:  And pause, please; a follow-up.  Are

15 there any changes contemplated beyond those that were

16 announced --

17             MR. MILLER:  Not currently.

18             THE COURT:  -- prior to the filing date?

19             MR. MILLER:  Not currently.  But I point out, Your

20 Honor, the pension plan is a defined benefits plan.  The --

21 which is a qualified plan.  The welfare plans are not

22 qualified.  These are discretionary plans with GM.

23             THE COURT:  Okay.  Continue, please.

24             MR. MILLER:  Also, Your Honor, in the March 11th oral

25 decision, subsequent oral decision by Judge Drain, he likewise

82

1    deals with 1114(l).  And he says very specifically in there,

2    Your Honor, that there is no indication whatsoever that

3    Congress intended to change the applicability of 1114 when it

4    adopted 1114(l).  In fact, there was nothing in the

5    congressional record.  There is no indication whatsoever that

6    Congress was changing the laws that existed prior to the

7    adoption of 1114(l), and I think it was in 2005.

8            So the law is, Your Honor, that if a welfare plan is

9    subject to unilateral termination or modification, then 1114

10   doesn't apply.

11           Now, in connection, Your Honor, with discussions with

12   the company, there's nothing holding back counsel and his group

13   from contacting GM.  You don't need a retiree committee to do

14   that.  There can be discussions and there is actually, a, as I

15   understand it, Your Honor, a salaried retirees' committee of

16   some type that does periodically discuss these issues with GM.

17           So we come back to the bottom line issue, Your Honor.

18   Is 1114 applicable to these particular welfare plans?  Judge

19   Drain, in his very comprehensive bench opinion said, no.

20   Subsequently, in his consideration of the report of that

21   committee which was appointed for a specific purpose, he

22   reiterated that.  He also went further, Your Honor, and said

23   that the Second Circuit, at least in his opinion, would not

24   vary at all from the Sprague decision.  And we would submit to

25   Your Honor the Sprague decision should be binding.  Yes, it's

83

1    binding on the 114 plaintiffs in that action, but when you look

2    at the issues that were litigated in that case, they are

3    precisely the issues that would come up here:  did GM have the

4    right to unilaterally terminate or modify?

5            The Second Circuit en banc, as Your Honor pointed

6    out, nature as majority, on certain issues, and 1011, on other

7    issues, found that GM had that right.  And all of the plans,

8    Your Honor, had the reservation of that right.  And it's been

9    consistent.  And in that context, Your Honor, there should be

10   no retiree committee in this case which would just simply add

11   more cost.  And as Your Honor pointed out in your decision last

12   Tuesday, all that means is you're transferring more costs to

13   the general creditors.  And in that context, Your Honor, we

14   submit there should be no committee.

15           THE COURT:  All right.  Thank you.  Mr. Mayer,

16   creditors' committee?

17           MR. MAYER:  Thank you, Your Honor.  Tom Mayer for the

18   official committee of unsecured creditors.  We echo the

19   debtors' view that because the contract provides for

20   modification at GM's will, I don't mean to minimize the

21   hardship that a termination or modification at the debtors'

22   option may impose on individuals but that's the agreement they

23   have; that's the effect of the agreement.  And with respect to

24   the Sixth Circuit versus Second Circuit, if I may pick up on a

25   comment Your Honor made, one of the unfortunate results of

84

1    going a different way here is to take a decision on these

2    precise documents and say the Sixth Circuit got wrong looking

3    at the documents before it.  I think perhaps Your Honor was

4    referring to a resonance to your earlier decision on the Third

5    Circuit.  Sixth Circuit, it's not just that it's interpreting

6    ERISA, it's interpreting these documents.  And to seek a

7    different decision in this Court when the Sixth Circuit has

8    looked at these documents, I think would be very unfortunate.

9    But that being said, there's one other major point that is sort

10   of the elephant in the room that is being overlooked and was

11   critical in the Chrysler case where we were involved, who are

12   the negotiations with, Your Honor?

13        A statement has been made that "GM" is cutting its

14   benefits by two-thirds.  Who's going to pay the one-third

15   that's left?  It's New GM.  The elephant in the room is the

16   government.  The government is the owner of New GM and any

17   relief that this committee is seeking is going to have to be

18   paid by New GM.  That's the only entity that's going to have

19   any plans going forward.  That's the only entity that's going

20   to be set up to pay retiree medical benefits going forward.

21   Any discussion has to be with New GM.

22        And if I may go back to an issue, Your Honor, at the

23   very beginning of this hearing as a shout point at 1114 and

24   there is a nay point at 1113.  We are not in the shout section,

25   no one has moved to terminate or modify retiree medical

85

1    benefits.  Largely because no -- the debtor has nothing, the

2    committee does not think that's necessary.

3            If you're in the nay part of 1114, and this is where

4    we start diverging from Delphi with respect to the need for any

5    committee in the first play, the fact of the matter is these

6    negotiations aren't with Old GM.  They're with New GM.  And I

7    think the Court should take that into account just as Judge

8    Gonzalez did in conjunction with the Chrysler decision where we

9    had a very similar set of arguments, and Judge Gonzalez

10   basically said, "Look, your discussion with new co."  And 1114

11   is not set up to facilitate a third party's discussions with an

12   acquirer.  It is the acquirer who is going to make the

13   decisions here.  That's the reality and I think that Your Honor

14   can take account of that in determining in whether you should

15   exercise discretion to appoint a committee here.  Because I

16   think that's the elephant in the room.

17           We cited to the Chrysler transcript.  We did not

18   include a copy of it in our pleading because we called chambers

19   and was told that because that transcript had not been made an

20   official record yet, it was not appropriate for us to provide

21   copies to the world by attaching it to our pleadings.  I have

22   copies here if you want --

23   TZIPPY2 14900

24           THE COURT:  This is what?  For the protection of

25   court reporters?  Because it's a public document.

86

1    MR. MILLER:  Well, yes, Your Honor.  I think that's

2    exactly what it is.  I have copies here.  I'm happy to hand

3    them out.

4    THE COURT:  Well, I must say, the most important

5    thing is to get one to Mr. Goteiner because I thought I was

6    allowed to read that transcript and I read the Gonzalez

7    transcript.

8    MR. MILLER:  I'm happy to provide it and I apologize

9    for not having done so but we were given instructions.

10   THE COURT:  Well, I think we've got to get a copy to

11   Mr. Goteiner.  I mean, you cited that transcript in your brief,

12   if I recall, at the end as your last point.  Didn't you, Mr.

13   Miller.

14   MR. MILLER:  Yes, Your Honor.  I did so and as I said

15   I apologize for not having attached it but we were told by

16   chambers, because of the court reporter's rules, that we

17   couldn't make copies available to everybody.

18   THE COURT:  Well, I'm sorry.  I didn't know that

19   chambers told you that.  Mr. Goteiner should have been given it

20   before now and I'm going to take a recess to allow him to

21   comment on it, if he wants to, before we're all done.

22   MR. MILLER:  Certain.

23   THE COURT:  I'm sorry.  Sometimes my chambers tells

24   people things that I never know about and they don't have the

25   same sensitivities that I do.  There are rules to protect

87

1    court reporters and sometimes those rules just have to be

2    trumped.  Okay.

3              MR. MILLER:  I have nothing further.

4              THE COURT:  All right.  Does anybody want to be heard

5    before I give Mr. Goteiner a chance to reply?  No.  Mr.

6    Goteiner, your option.  Would you like me to take a recess now

7    to give you a chance to read it?  The Gonzalez decision?

8              MR. GOTEINER:  Well --

9              THE COURT:  On the one hand it was referred to in Mr.

10   Miller's brief or in his firm's brief, I forgot whether he was

11   a signer, but on the other hand, the underlying transcript

12   wasn't there.

13             MR. GOTEINER:  Your Honor, if I may, might I respond

14   for a few minutes to arguments --

15             THE COURT:  Certainly.

16             MR. GOTEINER:  -- and then take a recess?

17             THE COURT:  Yes.

18             MR. GOTEINER:  Okay.  Well, the one overarching

19   argument that has not been dealt with is the 1114 process and

20   that what's gone on in some of the decisions and what debtors

21   and creditor committee wants to do is to turn this into a

22   summary judgment determination.  It's too premature for that.

23   And you know it's premature when they get back to Sprague.  I

24   also just read Drain's -- Judge Drain's decision or transcript

25   and he even points out that he's clear with respect to all the

1    plans, at least since 1985.  So what happens to the plans

2    before 1985?  So, there's a large number of retirees who come

3    within that time period.  Judge Drain starts talking about no

4    ambiguity but it's not a factual issue only, Your Honor.  And

5    this is -- unfortunately, we have to go back and take a look at

6    the decisions but Devlin -- it's a legal issue.  The question

7    is, what would the Devlin court decide as to whether it was

8    ambiguous.  We respectfully submit that Devlin, again, not

9    cited to except in Judge Drain's decision but with no analysis,

10   makes it real clear that under Second Circuit analysis, Judge

11   Martin was right; it was ambiguous.

12          And the notion of making a decision at this point and

13   totally sidestepping Congress' provision of an 1114 proceeding

14   because debtor suggests it's going to be more money, I think

15   absolutely flies in the face of what Congress intended

16   particularly when you're talking about billions of dollars of

17   benefits to people who truly -- this really is the archetypical

18   situation where you have widows and orphans.  And it's just --

19   it's grossly unfair.  But putting aside fairness and equity, it

20   flies in the face of 1114.  That's precisely what Congress

21   wanted to avoid; a quickly determined summary judgment

22   determination without giving the retirees a chance to sit down

23   and at least be the assistant captain of their fate.  That is

24   not what Congress had in mind and the notion of having an

25   informal ad hoc committee without portfolio as opposed to an

1    1114 committee, I suggest is absurd.  And again, flies in the

2    face of what 1114 does.

3            THE COURT:  Pause please, Mr. Goteiner.  I didn't

4    want to interrupt you when you made the point.  You pointed out

5    that Judge Drain's decision said, in substance, I don't

6    remember the exact words, at least since 1985 retirees had been

7    told that the company reserved the right to change the welfare

8    plans.  Do you know how many retirees there are who retired

9    before 1985 and, if I'm allowed to ask a compound question, how

10   many of them aren't sixty-five where they would get Medicare

11   rights and therefore their medical needs would be greater than

12   they would be if you got an entitlement to Medicare?

13           MR. GOTEINER:  I do not know that number.  I do not

14   know that number.  And as --

15           THE COURT:  That's almost twenty-five years ago.

16           MR. GOTEINER:  Oh, I understand.  I understand.  I

17   don't know that number but there are other rights as well.

18   There's life insurance, health bene -- you know, health

19   benefits might -- that would be an issue, I understand that but

20   if there's life insurance issues.  So, all I'm saying is that

21   there's ambiguity there as well.  And when you look at Judge

22   Martin's decision, I'm not trying to hold close to my bosom the

23   descending opinion for all purposes.  But the point is, for

24   purposes of Second Circuit analysis, it bears close reading.

25   Judge Martin pointed out how some of the materials were

90

1    deceptive.  So, yes, the majority opinion decided it was

2    unambiguous under the Wise standard.  That is not, I

3    respectfully submit, what the Second Circuit would do, not

4    withstanding Judge Drain's view of it in this transcript.

5         But again, that issue is so premature to what 1114 is

6    all about but what is does underlie is how this would be

7    singularly inappropriate, where you have that kind of

8    ambiguity, that kind of dissension about what these plan

9    documents mean and decide the issue now and say no 1114

10   committee because it's going to cost the debtor a few bucks

11   compared to the billions that are at issue for these people.  It

12   doesn't make sense.  And I respectfully submit is not

13   consistent with what the Second Circuit does.

14        And there may be vested benefits.  I know the

15   debtor's counsel's saying there's no vested benefits.  That's

16   another issue.  It could well be, depending upon how the Second

17   Circuit would rule on whether there was sufficient ambiguity,

18   that they would find vested benefits.  If the Second Circuit

19   found or agreed with Judge Martin that there was, for instance,

20   deception or at least unclarity, I think the Second Circuit

21   would come out differently.  And that's what, respectfully

22   submitted, Your Honor has to grapple with.  But again, that's

23   for a different day.  There's been enough of a showing today

24   and in the papers and in everything that even Judge Drain said

25   in hi supplement, to make it clear this is singularly

1   unappropriate for the kind of judgment that defendants want

2   entered today, given what's at risk.

3          So it all -- this is more than just mother and apple

4   pie.  It really has to do with the practicalities of how these

5   decisions should be made and they can be made very quickly.

6   Your Honor could put a time period on it.  And within a couple

7   of days, the trustee can select a committee and the parties,

8   within a few more days after that, can sit down and start to

9   talk.  The down side is so miniscule compared to what's at

10  stake that I submit that cost benefit analysis mitigates very

11  heavily in terms of appointing the committee.

12         And I think that covers all issues except this

13  1411(l).  The 1411(l) statute is real clear.  There's no doubt

14  about it.  And I see a lot of evasion --

15         THE COURT:  Well, isn't it just as ambiguous as

16  1114(d) is?

17         MR. GOTEINER:  Well, Your Honor, okay --

18         THE COURT:  I mean, neither one -- each of them could

19  have said not withstanding any provision of contract that gives

20  the company greater rights and then proceed into what it says.

21         MR. GOTEINER:  Your Honor --

22         THE COURT:  Conversely, I suppose, it could've taken

23  the opposite view.  But one of the practical problems that guys

24  in my position have is we're sworn to follow instructions from

25  Congress and Congress sometimes doesn't do its job as well as

92

1    it might.

2         MR. GOTEINER:  Your Honor, I agree with that

3    obviously but then we have things to help judges and we have a

4    series of cases from the early 80s from the U.S. Supreme Court.

5    I think one of them was called Cannon in dealing -- at Touche

6    Ross -- in dealing with how you interpret congressional statute

7    when there is preexisting law.  And the Congress is presumed to

8    understand what the law was and yet they didn't put in that

9    little fillip at the end of the statute, why?  Because it was

10   good enough.  It said any benefit.  Congress is presumed to

11   know there is such a thing as amendable benefits.  And yes, I

12   read Judge Drain's point that there was even a proposal to deal

13   with Doxell (ph.); I saw that.  But that Congress rejects that

14   when Congress has language like any benefit, when the costs are

15   so minimal, I think speaks volumes.  And that is -- that

16   stubborn and irreducible fact and logic is something that the

17   defendant -- that the debtors have not dealt with.

18        THE COURT:  When Congress wanted to overrule Lilly

19   Ledbetter, it did so pretty clearly, didn't it?

20        MR. GOTEINER:  Sometimes they do.  Sometimes they do.

21   But when they don't, all you can do is go back to Sutherland, I

22   think that's the treatise, and go back to the Supreme Court

23   cases that talk about how you interpret statutory language when

24   there is existing law and when there is law that may be

25   inconsistent.  And again, that discussion has not taken place

93

1    enough here.  So, I think with -- that all the practicalities,

2    all the legislative interpretations that we've been discussing,

3    point to the appointment of an 1114 committee.  And again, the

4    cost benefit analysis says this very clearly.  And I'll stop

5    there, I'll take a --

6            THE COURT:  I don't want you quite to stop, Mr.

7    Goteiner --

8            MR. GOTEINER:  Okay.

9            THE COURT:  -- because on the wholly discretionary

10   point, I guess if 1114 doesn't apply at all, people can debate

11   about whether I'm even supposed to take a discretionary

12   analysis, but assume I do.  Toward the end of its brief, the

13   creditors committee pointed out that negotiation is with the

14   wrong entity and that the negotiation would have to be with

15   Treasury or new GM or somebody other than the debtor in

16   possession.  And that brings up Judge Gonzalez's holding and

17   I'm at a mind that I should give you a chance to comment on

18   that if you want it.  And since I'm going to have to take at

19   least a recess to do this anyway, just to go through what we

20   have, I wonder if you would like to reserve the right to say

21   something before I finally rule during a recess to take a look

22   at Gonzalez's decision and tell me if you thought Arthur

23   Gonzalez got it wrong.

24           MR. GOTEINER:  I'll do that, Your Honor, and you

25   know, again, I will do that.  I just want to make one more

94

1    point.  That -- which is subsumed in my prior points, it's

2    really not necessary for this Court to say the Sixth Circuit

3    got it wrong.  Again, not today.  It's just not.  But the only

4    thing I ask Your Honor to consider in making this decision, you

5    know debtors speak with certainty that hasn't been seen since

6    the twelfth century about what amendable benefits are and

7    whether they exist here and that is just not true.  And no

8    matter how many times you say it, that it's clear, even if

9    Judge Drain says he doesn't think there's ambiguity, that

10   doesn't make it true.  It is not certain here.  And that is

11   another point that's subsumed in Congress's wisdom about 1114

12   and I'll take a look at the transcript.

13           THE COURT:  Okay.  Thank you.

14           MR. GOTEINER:  Thank you.

15           THE COURT:  Folks, I'd like you to take an early

16   lunch and be back by 12:30.  I can't guarantee you that I'll be

17   ready by then but hopefully you can get something to eat

18   between now and then.  Give you enough time to both get a

19   sandwich down and also read Judge Gonzalez's transcript, Mr.

20   Goteiner.  And then I'll try to give you a decision after that

21   lunch break but not before giving Mr. Goteiner another chance

22   to be heard if he wants to.  Okay, we're in recess.

23       (Recess from 11:30 a.m. until 1:37 p.m.)

24           THE COURT:  I apologize for keeping you all waiting.

25   Before I come to a final decision, I want to give you, Mr.

1    Goteiner, an opportunity to comment on Judge Gonzalez's

2    decision since it was noted by the creditors' committee and is

3    at least arguably fairly relevant to this determination.

4        MR. GOTEINER:  Thank you, Your Honor.  Neil Goteiner,

5    Farella Braun + Martel, for the General Motors Retirees

6    Association.  I had a chance to take a look at the transcript.

7    I would just note a couple of distinctions and then get back to

8    a basic point.  Of course, here we do know that GM has

9    announced that there's going to be cuts in the order of

10    magnitude of two-thirds.  And we also know that there have been

11    prepetition cuts as well in the six-month period.

12        So were we to abandon at this point the 1114 process,

13    you would be -- what would be happening is that the committee

14    would be giving up whatever rights it has under 1114.  It would

15    lose leverage because, of course, New GM would not be a debtor.

16        And -- but I did go beyond that, obviously.  I took a

17    look at the practicalities that Judge Gonzalez was addressing,

18    and of course there are practicalities, but here it's not the

19    same sequence and it's not the same -- or different

20    personalities, completely different personalities, as in

21    Chrysler.

22        You will have committee speaking with people who are

23    going to be involved to some degree in New GM.  And lots of

24    things can happen in these negotiations.  Yes, it's possible

25    that the representatives of GM who will be in the New GM will

96

1    simply say okay, hats have changed, we reject what we agreed to

2    with you.  But it's quite possible that that won't happen and

3    that there will be some agreements that are reached with the

4    1114 committee participating that, in the negotiation process

5    and the relationships that develop during negotiations, will be

6    passed on to some of the same people in the New GM and they

7    will abide by what they agreed as they negotiated as part of

8    the 1114 process.

9          At least there's no reason to assume that will not

10   happen.  And, indeed, I think the way even the creditors'

11   committee phrased it is that this committee may not be the

12   appropriate person -- the appropriate party to negotiate now.

13   And anything is possible, but the atmospherics and the elements

14   are quite different here than in Chrysler.  And there's a

15   stronger argument/brief of appointing an 1114 committee.

16         And that's what 1114 says should happen in any event.

17   So that's my submission.

18         THE COURT:  Just one question before I give anyone

19   else a chance to comment, if they wish, because I like your

20   idea of being realistic.  Earlier in your remarks just a moment

21   ago you said you were concerned about giving up leverage.

22   Unrealistic to know that leverage tends to be something that

23   people think about all the time in large bankruptcy cases,

24   maybe smaller ones too.  But to what extent, in your view,

25   should I, as a judge who's supposed to call balls and strikes

97

1    the way he sees them, be guided by giving one party or another

2    leverage against the party with the different perspective?

3              MR. GOTEINER:  Well, leverage is whatever is

4    provided, and I use leverage -- I'm not backing away from the

5    word "leverage", it's a reasonable word to use, but the whole

6    panoply of dynamics that are embraced by 1114, because it has

7    to be equitable and fair, that's the leverage I'm talking

8    about.

9              So, and that, by the way -- leverages goes both ways,

10   Your Honor, because my clients, at the end of the day, have far

11   less leverage than the debtor has.  So it's far worse, from my

12   clients' point of view, than a two-way street.

13             THE COURT:  Okay.

14             MR. GOTEINER:  So that is why, I respectfully submit,

15   Your Honor should have not a moment's pause that there's any

16   untoward leverage given to the 1114 committee.  This is

17   precisely what 1114 contemplated; no more.

18             THE COURT:  Okay.  Thank you.  I know we've been at

19   this for a long time, but if either the debtors or the

20   creditors' committee who brought up Judge Gonzalez's decision

21   want to be heard before I take another brief recess, I'll

22   permit that.  Mr. Mayer?

23             MR. MAYER:  Yes, Your Honor, thank you.  Unless you

24   have questions, I don't think I have anything to add.

25             THE COURT:  Okay.  Mr. Miller?

98

1          MR. MILLER:  And if Your Honor please, I would just

2      point out, in order for --

3          THE COURT:  You're very tall, Mr. Miller.  Can you

4      either lift that microphone up or come to the main lectern?

5          MR. MILLER:  Thank you, Your Honor.  I would just

6      point out, in order for this committee to have any effect and

7      to provide the leverage which counsel says they need, you would

8      have to determine that GM does not have the right to modify or

9      terminate any of these claims.  And the record is, I think,

10     crystal clear that GM has the right to terminate or modify any

11     of these claims.

12          And what we're talking about, Your Honor, is a

13     situation which hopefully, in my view, is a few days.  The sale

14     hearing is scheduled for Tuesday.  Hopefully we will finish it

15     next week.  It's important that this company emerges -- these

16     assets emerge as part of a New GM that's going to have any

17     chance of success.

18          Counsel's talking about give the U.S. Trustee three

19     or four days to appoint a committee, the committee's got to

20     organize, it's going to have to hire professionals, probably a

21     financial advisor, a statistician, and so on.  By the time all

22     of that happens, Your Honor, hopefully, if we're right, and

23     Your Honor approves it, the transaction will have been

24     consummated.

25          So the leverage that is so important, and which is

99

1    the only purpose for which this motion has been brought, will

2    be of no avail because New GM will be off as a new OEM

3    manufacturing cars and trucks without the stigma, if I can use

4    that word, of bankruptcy, which is the objective for this

5    transaction.

6            So the negotiations, Your Honor, are going to be with

7    the debtor which is going forward with the plan of liquidation.

8    And in the context of the liquidation, even if 1114 applied,

9    it's going to have to be rejected under 1114 because there's

10    not going to be any ongoing company.

11            So what we're down to, Your Honor, and Your Honor put

12    your finger on it, is leverage, that if Your Honor would grant

13    this motion and appoint a retirees' committee, the next thing

14    that will happen is a request to defer the 363 transaction,

15    which affects a lot of parties-in-interest and affects all of

16    the creditors and affects the ability of this company to

17    survive going forward.

18            So there's a real downside, Your Honor, to this

19    motion, notwithstanding what counsel says.

20            THE COURT:  All right.  Thank you.  All right, folks,

21    I've made you wait a long time.  I'm going to ask you now to

22    sit in place and wait with me here in the courtroom for a

23    minute.

24        (Pause)

25            THE COURT:  Okay, folks once more I apologize for

100

1    keeping you all waiting.  In this contested matter in a case

2    under Chapter 11 of the Code, the General Motors Retiree

3    Association, which I'll refer to as the "Retirees Association",

4    moves for an order pursuant to Section 1114 of the Code,

5    appointing an official 1114 committee.  Its motion is opposed

6    by the debtors and the creditors' committee.

7            The motion is denied, though without prejudice to

8    reconsideration at a later time under appropriate

9    circumstances, largely in accordance with the ruling by my

10    colleague Judge Drain in Delphi on March 10 of this year.  The

11    following are my findings of fact, conclusions of law and bases

12    for the exercise of my discretion in connection with this

13    determination.

14            Turning first to my findings of fact, as facts I find

15    that GM offers retiree benefits to salaried retirees who

16    started work before 1993 under two plans:  the GM Salaried

17    Health Care Program, which I'll refer to as the "Health Care

18    Program", which includes medical, prescription drug, dental and

19    vision care; and the GM Life and Disability Benefits Program,

20    which I'll call the "Life Insurance Program", which provides

21    life insurance benefits.  I refer to the two programs together

22    as the "Welfare Plans".

23            The inference is compelling, and I so find, that the

24    benefits offered under the Welfare Plans are quite important to

25    many retirees, particularly those who are still under sixty-

1    five and who are ineligible for Medicare.

2         The salaried retirees are separate and apart from

3    hourly retirees whose interests have been represented by the

4    UAW or other unions.  At this point, they have no officially

5    designated representative, though, from everything I've seen so

6    far, the Retirees Association has been a forceful and effective

7    advocate on their behalf.  And to the extent any retirees might

8    have unsecured claims, their interests in that regard would be

9    well-protected by the official creditors' committee.

10        Retirees are required to reenroll in these plans at

11   the beginning of each calendar year, prior to which GM provides

12   enrollment forms accompanied by an enrollment brochure

13   explaining changes in benefits for the upcoming year.  The

14   debtors assert that these brochures have contained an

15   unequivocal statement of GM's right to amend, modify or

16   terminate the plans.  But that was not always so.  The Retirees

17   Association asserts that, at least between 1974 and 1987,

18   salaried retirees were performing under unilateral contracts

19   that guaranteed lifetime benefits upon retirement without

20   having also received statements reserving the right to amend or

21   terminate.  And the Retirees Association points to specific

22   language in benefit handbooks that it asserts could reasonably

23   be interpreted as a promise to provide such benefits.  However,

24   these matters were a subject of litigation, extensive

25   litigation, going all the way up to an en banc decision of the

102

1    Sixth Circuit Court of Appeals, which I'll describe more fully

2    in my conclusions of law.

3         GM effected changes in its retiree Welfare Plans from

4    time to time.  Prior to these Chapter 11 cases, three changes

5    were made that are at least arguably significant.  On July

6    2008, effective January 1, 2009, GM eliminated medical, dental,

7    vision and extended care coverage for salaried retirees, their

8    surviving spouses and their dependents age sixty-five or older.

9    In September 2008, GM changed the plans to comply with a cap on

10   salaried retiree health care; it was approved by the GM board

11   of directors in 2007.  And in February of this year, GM

12   accelerated a planned reduction in salaried retiree life

13   insurance, which had previously been announced in 2006 and was

14   going to be effective in 2017, in respect to whose details are

15   not material here, effective May 1, 2009.  All but the third

16   change, the one announced in February and effective May 1, were

17   communicated to salaried retirees more than six months prior to

18   the filing date, a time which is arguably significant to

19   parties' rights.

20        GM has not proposed any further changes in either of

21   the plans, at least insofar as it would implement them.  And

22   under the proposed sale agreement, assuming, of course, that it

23   is approved, and without prejudging that issue in any way, the

24   purchaser knew GM will assume responsibility for them going

25   forward but as modified prepetition in the manner I just

1    described to provide them in lesser amounts.

2        Turning now to my conclusions of law and bases for

3    the exercise of my discretion, as usual I start with the words

4    of the statute.  Section 1114 of the Code provides, in relevant

5    part, in its subsection (d), "The Court, upon motion by any

6    party-in-interest, and after notice and a hearing, shall order

7    the appointment of a committee of retired employees if the

8    debtor seeks to modify or not pay the retiree benefits or if

9    the Court otherwise determines that it is appropriate to serve

10   as the authorized representative, under this section, of those

11   persons receiving any retiree benefits not covered by a

12   collective bargaining agreement.  The United States Trustee

13   shall appoint any such committee."

14       Thus, under the statute, the Court must order the

15   appointment of the committee if the debtor seeks to modify or

16   not pay the retiree benefits.  Alternatively, it may order the

17   appointment if the Court otherwise determines that it's

18   appropriate to serve as a bargaining representative for

19   retirees not covered by a collective bargaining agreement.

20       The Retirees Association contends that Section 1114

21   of the Code applies to what the debtors did prepetition and

22   would do post-petition here and that I thus should appoint a

23   retirees' committee under each of the two separate regimes

24   under which a retirees' committee should be appointed.  I

25   disagree with the Retirees Association with respect to the

1    first, and for the most part with respect to the second,

2    although I think I should reserve room to have the ability

3    going forward to make a discretionary limited appointment if

4    circumstances not present now but in the future later warrant.

5          Turning to the matter of mandatory appointment, the

6    backdrop as to the mandatory appointment issue is the fact

7    that, as discussed in my findings of fact above, at some point

8    in time GM started to tell its employees, who were of course

9    its prospective retirees, that their welfare plans could be

10   amended, modified or terminated.  GM and the creditors'

11   committee contend that Section 1114 doesn't apply when a debtor

12   simply exercises the rights to modify or terminate that it has

13   outside of bankruptcy.  But the Retirees Association, in

14   contrast, contends that 1114 applies to any modification or

15   termination of retiree rights under a welfare plan, whether

16   such termination or modification is authorized under non-

17   bankruptcy law or not.  And thus, in substance, it argues that

18   Section 1114 improves upon non-bankruptcy law rights.

19         Though Sections 1114(d), (e) and (l) are, in my view,

20   ambiguous, and the cases are somewhat split in this area, I

21   must agree with GM and the creditors' committee.  The Retirees

22   Association says at page 9 of its motion that, quote, "A few

23   courts have held, on a divided issue of law where other courts

24   disagree, that this Section 1114 does not protect in bankruptcy

25   benefits the Debtor retained the unfettered right to amend

105

1   outside of bankruptcy", quote.  But I can't regard that as a

2   fully accurate description of the state of the law, especially

3   in this circuit and district.  In fact, I think it's exactly

4   the opposite.

5        The Retirees Association cites the Second Circuit's

6   decision in LTV Steel Company v. United Mine Workers, In re

7   Chateaugay Corporation, 945 F.2d 1205 (2nd Cir. 1991), as being

8   one of the cases that holds against the retirement committee on

9   this issue.  And, of course, Chateaugay does.  Chateaugay says,

10  in fact, "The Bankruptcy Protection Act", which was the statute

11  by which 1114's predecessor came into being, and from which

12  1114 evolved, "requires that during reorganization the parties

13  continue to provide benefits according to the plan in effect at

14  the time of the declaration of bankruptcy.  The Bankruptcy

15  Protection Act does not alter the terms of that plan."  945

16  F.2d at 1209.  And that's exactly why Judge Restani dissented

17  in that case.

18       But while acknowledging Chateaugay, the Retirees

19  Association doesn't give enough recognition, in my view, to the

20  fact that Chateaugay is a controlling decision of the Second

21  Circuit, binding on me and the other judges in this circuit.

22  Likewise, the Retirees Association cites decisions of a former

23  visiting judge who sat in this district, and a district who

24  affirmed him, in the case of Ames Department Stores,

25  insufficient attention to the fact that those decisions were,

1    with respect, strikingly lacking in consideration of the

2    applicable case law.  They can only be read as having been

3    roundly criticized by this circuit in a subsequent decision in

4    Ames (see 76 F.3d 66 at page 71), though not on direct appeal,

5    and while the thoughts were expressed in dictum.

6         The district court decision, which is available

7    electronically but isn't published, expressed its conclusions

8    in what some might say was an ipse dixit fashion, without

9    parsing the words of the statute or relying upon any case law,

10   which at that point in time included about nine cases, as

11   observed by Judge Lifland in Ionosphere Clubs, 134 B.R. 515 at

12   page 517 (1991).  Unfortunately, the decision of the bankruptcy

13   court was equally thin.

14        In that later Ames decision, the circuit held, "We

15   think that there's a substantial room for disagreement with the

16   categorical holding in the district court's orders that the

17   debtor was required to follow the requirements of Section

18   1114;" reading from page 71, 76 F.3d at 71.  And while the

19   circuit in that Ames decision merely held that it couldn't be

20   said that the argument for the debtor's interpretation was

21   frivolous, that being an appeal of a sanctions determination or

22   a denial of fees for pursuing a frivolous argument, and while

23   the circuit expressly stated that it wasn't examining the,

24   quote, "present status of the pertinent law", quote, id at 71,

25   it was hardly an endorsement of the lower court's views.  In

1    fact, the circuit made a point to cite Chateaugay and Doskocil,

2    Federated Department Stores, New Value, and Collier as examples

3    of authorities that had gone the other way.  And it went on to

4    observe that Collier -- Collier on Bankruptcy, of course --

5    provides that Section 1114 does not, however, protect retiree

6    benefits beyond the contractual obligations of the debtor.

7         And the circuit observed, with respect to the

8    bankruptcy court and district court Ames decisions upon which

9    the Retirees Association relies, not one of the foregoing

10   authorities was discussed or even mentioned by either the

11   bankruptcy court or the district court.  More importantly,

12   neither court cited any interpretative authority that

13   conflicted with that above cited.

14        Now, make no mistake, I don't read that decision as

15   having ruled in favor of the principle for which the debtors

16   and the creditors' committee argue here.  In fact, it expressly

17   stated that it was not then ruling on the existing law.  But

18   what I think it very effectively does, if not conclusively so,

19   is say that I shouldn't be relying on those lower court Ames

20   decisions.

21        But perhaps most importantly, in its briefing on this

22   motion the Retirees Association failed even to mention Judge

23   Drain's decision in March of this year in Delphi, 2009 WL

24   637315 (Bankr. S.D.N.Y. Mar. 10, 2009), until the Retirees

25   Association filed its reply.  And even then the Retirees

108

1    Association failed sufficiently, in my view, in that reply to

2    acknowledge all of the things Judge Drain said and to discuss

3    his substantive analysis before the retirees' committee

4    properly commented on the relatively limited relief that Judge

5    Drain had ultimately granted in Delphi.  Of course, the

6    Retirees Association made up for that in oral argument, but I

7    think Judge Drain's decision in Delphi is of great importance.

8          I've previously noted many times in writing my view

9    as to the importance of consistency in the decisions in the

10   bankruptcy court in this district and that I follow the

11   decisions of the other bankruptcy judges in this district, in

12   the absence of clear error.  But when we're talking about the

13   Delphi decision, I think that's feigned praise since, in my

14   view, Judge Drain's analysis was plainly correct and, by far,

15   the most comprehensive and well-reasoned of any of the

16   decisions in the 1114 area.

17         I note, by the way, that when I talk of Judge Drain's

18   decision, although I'm principally speaking of his decision of

19   March 10, there was a supplemental argument on or about March

20   11, as evidenced in a separate transcript to which I'll be

21   referring in a moment or two, and that getting one's arms

22   around Judge Drain's Delphi rulings is best achieved by

23   consideration of both of the two decisions.

24         Judge Drain also dealt with the argument that I also

25   heard here, that Chateaugay was overruled by statute by the

1    inclusion of new Section 1114(l) in BAPCPA.  Judge Drain

2    disagreed, and so do I.  As Judge Drain observed, Section

3    1114(l), however, does not specifically deal with the issue of

4    plans modifiable as of right and could conceivably apply to

5    pre-bankruptcy breaches by debtors in financial distress of

6    vested rights.

7           More importantly, even if it does apply to modifiable

8    plans, I do not view Section 1114(l), which applies to a

9    specific type of prepetition action, as overruling Doskocil and

10   the line of cases that follow it which apply to post-petition

11   actions.  Nor does there appear to me to be any legislative

12   history or other policy statements accompanying the 2005

13   amendment that would clearly set forth Congress's intention

14   generally in Section 1114(l) to override, beyond its specific

15   terms, the fundamental principle that bankruptcy does not give

16   new rights to individual parties-in-interest or to cut back on

17   the tenet set forth by the Supreme Court in Butner.

18          Now, I have not discussed the underlying principles

19   as thoroughly as Judge Drain did there.  In this oral dictated

20   decision, I don't know if that's necessary or appropriate.  But

21   I've carefully read Judge Drain's analysis and I concur in it

22   in full, even putting aside the deference in respect to which I

23   give the decisions of my colleague judges.  And since

24   Chateaugay and Delphi are in alignment, I'm ruling in

25   accordance with each of them that Section 1114 doesn't apply to

110

1    employee benefit plans that are terminable or amendable

2    unilaterally by the plan sponsor.  Putting it another way,

3    Section 1114 does not trump any agreement between a company and

4    its employee that gives the company the right to amend or

5    terminate a welfare plan.

6         Thus, in terms of arguably persuasive authority,

7    we're left only with the decision in Farmland Dairies.  If one

8    were to look solely at the words of the statute, which, as I've

9    noted, is ambiguous, the Farmland Dairies view is not

10   necessarily an unreasonable one.  But Farmland can't be

11   reasonable with the weight of authority in this area, only part

12   of which I've noted above, and Farmland Dairies is inconsistent

13   with the law in this circuit and district.  Of course, when I

14   speak of the weight of the authority I'm not counting noses;

15   I'm looking at it qualitatively and at what level it was

16   decided.  That consideration is particularly relevant to

17   Chateaugay and Delphi.  And, as I've noted, I regard Delphi as

18   by far the most thoughtful and comprehensive decision in this

19   area.  So for any retirees as to whom the debtor reserved the

20   right to modify before they retired, they don't have rights

21   under 1114.

22        So then we get to Sprague.  GM and the creditors'

23   committee each cite the Sixth Circuit's en banc decision in

24   Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998),

25   as having ruled that the health care programs explicitly permit

1    GM to unilaterally amend or terminate benefits under those

2    programs.  Sprague does hold that, although the Retirees

3    Association is correct in noting that Sprague was a split

4    decision and that it also isn't binding on me.  And I agree

5    with the Retirees Association, and perhaps the debtors agree

6    with it as well -- I don't think they addressed it one way or

7    the other -- that, on a question of federal law, Second Circuit

8    law, and not Sixth Circuit law, controls in any area where the

9    law of the two circuits is inconsistent.

10          But Judge Drain ruled, and I concur, that, and I'm

11    quoting Judge Drain, "I continue to believe that the Sixth

12    Circuit Sprague decision is one in which the Sixth Circuit at

13    length determined en banc that there was no ambiguity in

14    respect of GM's reservation of rights to modify at will its

15    welfare plans, and that, were I to conclude otherwise, I would

16    not be doing so by applying a different standard than that

17    which is applied in the Second Circuit under Bouboulis v.

18    Transport Workers Union of America, 442 F.3d 55 (2nd Cir.

19    2006), namely, that the plan documents contained, quote,

20    'specific written language that is reasonably susceptible to

21    interpretation as a promise to vest benefits', end quote."  I'm

22    quoting from the transcript of the Delphi hearing of March 11,

23    2009, which probably should be read as a supplemental and

24    second Delphi decision.  See also the comments Judge Drain made

25    in the course of argument at page 11.

112

1          And I recognize that sometimes judges say things in

2     oral argument that they don't mean or that they're throwing up

3     just to be devil's advocates, but from the context I believe

4     that Judge Drain meant it here.  If you read the opinions, they

5     really are applying the same standard.  They're basically

6     saying there was nothing ambiguous.

7          Now, when I use the words above, quote, "specific

8     written language that is reasonably susceptible to

9     interpretation as a promise", quote, those words being the

10    words that Judge Drain used, they in turn were a quotation from

11    Bouboulis, 442 F.3d at page 61.  And the Bouboulis words, in

12    turn, were a quotation from the Second Circuit's decision in

13    Devlin v. Blue Cross and Blue Shield, 274 F.3d at 84.

14         So when I rely on Judge Drain's analysis in this area

15    and I concur with it, it's very clear to me that he gave

16    careful consideration to both Bouboulis and Devlin and made a

17    knowing and accurate determination that there was no material

18    difference between Second Circuit law and Sixth Circuit law in

19    this regard.

20         Thus, at the risk of a slight repetition, stating a

21    similar thing a different way, I find insufficient basis to

22    conclude that the standard that the Sixth Circuit applied in

23    Sprague would be materially different than the standard that

24    the Second Circuit would apply.

25         Now, is the Sprague conclusion debatable under those

113

1    standards?  I think it plainly is.  And if I were writing on a

2    clean slate, I think I might well have agreed with the Boyce

3    Martin dissent.  But as to the issues upon which GM relies upon

4    it, Sprague was an eight-to-five decision as to the early

5    retirees, and a ten-to-three decision as to the general

6    retirees.  And the general retirees' analysis is the one that's

7    more closely on point here.

8           A ten-to-three split isn't close, but once more I'd

9    agree that this isn't a counting game.  Rather, I look at it

10   qualitatively and see things as Judge Drain commented on in

11   argument.  Judge Drain observed, "You may agree with Judge

12   Martin, and maybe if one were writing on a clean slate one

13   might agree with Judge Martin, but the Sixth Circuit ruled, and

14   I find it very hard for me, when there's no difference in the

15   standard, to say oh, the Sixth Circuit was wrong;" reading from

16   the March 11 transcript at page 11.

17          Where the circuit court, with ten judges no less,

18   having ruled as it did with respect to general retirees,

19   addressing the same issues we have here, I think that as a

20   matter of stare decisis I should respect its ruling and follow

21   it.

22          Folks, as is implied by what I just said, I note that

23   I'm doing so as a matter of stare decisis.  I am not so ruling

24   on the applicability of res judicata one way or the other, and

25   I'm not relying on the doctrine of res judicata.  I have some

114

1    reservations as to whether res judicata applies is not very

2    similar to those Judge Drain had.  But I don't need to reach

3    that issue.  In my view, Sprague and Delphi are so dramatically

4    on point that they counsel the result I reach here on

5    traditional bases of stare decisis.  We have what we refer to

6    in law school as the "blue Buick".

7           So now we get to the application of Section 1114(d).

8    Turning first to its mandatory portion, GM hasn't moved for

9    permission to change any retiree welfare plan benefits, which

10   is hardly surprising in light of its position that it doesn't

11   need court approval to do so and the case law that I described

12   above, and I'm going to follow that it has the right to

13   unilaterally amend or terminate such benefits.  As at least the

14   first portion of 1114 doesn't apply at all, if not the entirety

15   of 1114(d), or 1114 at all for that matter, there's no occasion

16   to apply the mandatory portion of Section 1114.  So I'm going

17   to deny appointment insofar as it's premised on the contention

18   that appointment is mandatory.

19          Turning now to discretionary appointment, though

20   appointment of a retiree committee isn't mandatory, I need also

21   to consider discretionary appointment.  As I noted, Section

22   1114(d) provides that the Court shall order the appointment of

23   a committee of retired employees if the Court otherwise

24   determines that it is appropriate.  One can make an argument

25   that if 1114 doesn't apply at all, there's no occasion to apply

115

1    the provision in 1114 providing discretionary authority either.

2    But I think the better view might be consistent with what Judge

3    Drain concluded in Delphi:  that bankruptcy judges should have

4    the discretion to appoint a retirees' committee, especially if

5    its budget can be kept under control, in any instances where it

6    would really accomplish something.

7         I don't reach that issue today because I here do not

8    consider the appointment of a committee now to be necessary or

9    appropriate for retirees for whom GM has the right to amend or

10   terminate benefits, for, while I well understand the importance

11   of these kinds of benefits to any retiree, believe me I do, I

12   can't change retirees' non-bankruptcy rights.  And there is no

13   need to form a committee to argue or negotiate with respect to

14   entitlements under Section 1114(l) as that can be done by the

15   Retirees Association as an ad hoc committee with rights under

16   Section 1109.  See In re Anchor Glass Container Corp., 342 B.R.

17   878 at page 882, Middle District of Florida 2005 decision by

18   Judge Alex Paskay.

19        As Judge Paskay noted in that case, "Unlike Section

20   1114(e), which contemplates motions brought by, and the debtor

21   negotiating with, an authorized representative, Section

22   1114(l), similar to Section 1114(d), depends upon a motion

23   brought by a party-in-interest.  Section 1114(l) does not

24   require, nor does it contemplate, the appointment of a

25   committee."

1          I also made a similar point when I considered the

2     application of the Ad Hoc Committee of Family and Dissident

3     Bondholders a couple of days ago.  In most, if not all, cases

4     under the Code, an ad hoc committee can be heard perfectly

5     satisfactorily under 1109 without being designated as a formal

6     official committee.

7          Similarly, I share concerns articulated by the

8     creditors' committee as to unnecessary costs in this case.  And

9     I also agree with another creditors' committee point, which, in

10    my view, is quite significant.  Even assuming that New GM were

11    to be making further modifications in the future, assuming, of

12    course, that I approve the 363 sale, all salaried retiree

13    benefits would be entirely New GM's responsibilities.  Thus,

14    any modifications to such benefits would have to be negotiated

15    with New GM and/or the U.S. Treasury.

16         As Judge Gonzalez noted in Chrysler, "A retiree

17    committee should be appointed only if it's necessary to

18    negotiate with the debtors, not with a purchaser of the

19    debtors' assets."  See the transcript of Judge Gonzalez's May

20    14 hearing in Chrysler at page 35.

21         With all of that said, I can't rule out the

22    possibility that appointing a retirees' committee might be

23    desirable and thus appropriate to facilitate some kind of

24    negotiations in the future or any kind of a settlement,

25    including with respect to any appeal of the determination I'm

117

1    making today, or in connection with some other matters where it

2    would bring something to the table beyond appearing and being

3    heard in a fashion for which it could already do that under

4    1109.  That might be helpful, by way of example, to bind absent

5    parties or dissenters.

6         That appears to be the rationale upon which Judge

7    Drain allowed the formation of a committee, or one of them --

8    the other isn't applicable here -- though with a limited

9    200,000 dollar budget.  And if it turned out to be necessary or

10   desirable to do that here, I might be of a mind to do the same

11   thing if asked.  But that isn't now necessary, if it ever will

12   be.  For instance, I don't need a supplemental report of the

13   type that Judge Drain did, and which was an element of the

14   limited appointment authority that he granted.  I'll simply

15   note now that this ruling is without prejudice to any such

16   eventuality.

17        Accordingly, the motion is denied without prejudice

18   to reconsideration in the event of an eventuality of the type I

19   just described.

20        Mr. Miller, you or your folks are to settle an order

21   in accordance with this ruling at your earliest reasonable

22   convenience.

23        MR. MILLER:  Yes, sir.

24        THE COURT:  All right, folks.  Do we have any further

25   business for today?

118

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  All right, I want to thank you for

3    waiting as long as you did on the matter that I had taken under

4    advisement.  We're adjourned for the day.  Have a good day.

5          ALL:  Thank you, Your Honor.

6          (Whereupon these proceedings were concluded at 2:25 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for final order authorizing debtors to pay pre-petition obligations to foreign creditors and authorizing and directing financial institutions to honor and process related checks and transfers granted | 30 | 20 |
| Debtors' motion for final orders establishing notification procedures regarding restrictions on certain transfers of interest in the debtor granted | 31 | 4 |
| Debtors' motion for final order on cash management granted | 31 | 9 |
| Debtors' motion for authority to exercise a put | 31 | 17 |
| Debtors' motion to grant additional time to file reports of financial information or to seek modification of reporting requirements granted | 31 | 23 |
| Debtors' application to retain Weil Gotshal & Manges as attorneys nunc pro tunc to commencement date granted | 32 | 5 |

120

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' application to retain Jenner & Block LLP pursuant to Section 327(e) as conflicts counsel and special corporate counsel granted | 32 | 14 |
| Debtors' application to retain under Section 327(e) Honigman, Miller, Schwartz & Cohn, LLP as special counsel granted | 32 | 21 |
| Debtors' application authorizing retention and employment of The Garden City Group, Inc. as notice and claims agent nunc pro tunc to commencement date granted | 33 | 2 |
| Debtors' motion seeking entry of final order with respect to the debtors' essential supplier programs granted | 35 | 21 |
| Motion of ad hoc committee of asbestos personal injury claimants for order appointing a future asbestos personal injury claimant denied without prejudice | 52 | 12 |

121

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion to retain AP Services LLC as crisis managers and to designate Albert A. Koch as chief restructuring officer nunc pro tunc to commencement date | 55 | 17 |
| Application of the General Motors Retirees Association for order to appoint retiree committee pursuant to 11 U.S.C. Section 1114(d) denied without prejudice to reconsideration | 117 | 17 |

122

1

2                    C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Also transcribed by:  Tzippy Geralnik

12                           Pnina Eilberg

13                           Penina Wolicki

14                           Dena Page

15                           Ellen Kolman

16                           Clara Rubin

17

18     Veritext LLC

19     200 Old Country Road

20     Suite 580

21     Mineola, NY 11501

22

23     Date:  June 26, 2009

24

25