

Slip Copy                                                                                                                     Page 1
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 (Cite as: 2008 WL 2968408 (E.D.Mich.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
INTERNATIONAL UNION, UNITED AUTOMO-
BILE, AEROSPACE, AND AGRICULTURAL IM-
PLEMENT WORKERS OF AMERICA and Earl L.
Henry, Bonnie J. Lauria, Raymond B. Bailey, Theo-
dore J. Genco, Marvin C. Marlow, Charles R. Miller,
Laverne M. Soriano and John Huber, on behalf of
themselves and all other persons similarly situated,
Plaintiffs,
v.
GENERAL MOTORS CORPORATION, Defendant.
**No. 07-CV-14074-DT.**

July 31, 2008.

Julia Penny Clark, Bredhoff and Kaiser, Washington, DC, Michael F. Saggau, International Union, UAW, Detroit, MI, William T. Payne, Pittsburgh, PA, Edward J. Feinstein, Ellen M. Doyle, John E. Stember, Pamina G. Ewing, Stephen M. Pincus, Stember Feinstein, Pittsburgh, PA, for Plaintiffs.

Andrew B. Bloomer, Richard C. Godfrey, Kirkland & Ellis, Chicago, IL, Daniel M. Share, Eugene Driker, Jeffrey M. Stefan, Barris, Sott, Detroit, MI, Edward W. Risko, General Motors Corporation, Detroit, MI, for Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

ROBERT H. CLELAND, District Judge.

**\*1** Before the court is this health care benefits class action in which the contesting parties have presented to the court a proposed global settlement agreement. The court received written objections from members of the class, who were also permitted to orally object during a June 3, 2008 fairness hearing. After the hearing, the parties submitted joint proposed findings of fact and conclusions of law in support of final approval of the class action settlement, which the court has thoroughly examined. A majority of the proposed findings and conclusions are uncontested and the court has adopted them in large measure and rejects all objections inconsistent with these findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

**A. The Parties**

1. The individual named Plaintiffs in this action are Earl L. Henry, Bonnie J. Lauria, Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, Laverne M. Soriano, and John Huber ("Class Representatives").

2. The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") also is a plaintiff in this action.

3. The Defendant is General Motors Corporation ("GM").

4. The UAW and GM are parties to a series of collective bargaining agreements ("CBAs") under which GM provides health care benefits to qualifying retirees and their spouses, surviving spouses, and dependents. The Class Representatives represent a class of these retirees, spouses, and dependents.

5. Plaintiff Henry was employed by GM in Flint, Michigan, and was a member of the bargaining unit represented by the UAW until his retirement in 1988. (Decl. of Earl L. Henry, Dkt. # 26-17.) After his retirement from GM, Mr. Henry was elected by fellow retirees as the Chairperson of the UAW retired workers council covering the Michigan counties of Otsego, Cheboygan, Antrim and Charlevoix. *Id* .

6. Plaintiff Lauria was employed by GM in Bay City, Michigan, and was a member of the bargaining unit represented by the UAW until her retirement in 2000. (Decl. of Bonnie J. Lauria, Dkt. # 26-18.) After her retirement from GM, Mrs. Lauria was elected by fellow retirees as the Chairperson of the UAW retired workers council covering the Michigan counties of Clare, Crawford, Missaukee, Ogemaw and Roscommon. *Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
(Cite as: 2008 WL 2968408 (E.D.Mich.))

7. Plaintiff Bailey was employed by GM in Willow Run, Michigan, and was a member of a bargaining unit represented by the UAW until his retirement in 1993. (Decl. of Raymond B. Bailey, Dkt. # 26-19.) Following his retirement, Mr. Bailey was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union. *Id.*

8. Plaintiff Genco was employed by GM in Fredericksburg, Virginia, where he was a member of a bargaining unit represented by the UAW. (Decl. of Theodore J. Genco, Dkt. # 20-20.) After his retirement in 2002, Mr. Genco was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union. *Id.*

**\*2** 9. Plaintiff Marlow was employed by GM at its Lakewood Plant in Atlanta, Georgia, and was a member of a bargaining unit represented by the UAW. (Decl. of Marvin C. Marlow, Dkt. # 26-21.) After his retirement in 1991, Mr. Marlow was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union, and was also elected to the regional UAW retired workers council. *Id.*

10. Plaintiff Miller was employed by GM in Baltimore, Maryland, and was a member of a bargaining unit represented by the UAW. (Decl. of Charles R. Miller, Dkt. # 26-22.) After his retirement in 2002, Mr. Miller was elected by fellow retirees to serve on the executive board of his local union. *Id.*

11. Plaintiff Soriano is the surviving spouse of Jack Soriano, who was employed by GM in Lordstown, Ohio until his retirement in 1985. (Decl. of Laverne M. Soriano, Dkt. # 26-23.) Mrs. Soriano has served on the executive board of the UAW retired workers chapter covering GM retirees from Mr. Soriano's local union. *Id.*

12. Plaintiff Huber was employed by Delphi Corporation ("Delphi") in Rochester, New York, and was a member of a bargaining unit represented by the UAW. (Decl. of John Huber, Dkt. # 26-24.) Mr. Huber retired from Delphi in 2007. *Id.* Pursuant to collective bargaining agreements between GM, Delphi and the UAW, Mr. Huber is deemed to be a re-

tiree of GM. (Am. Compl. at ¶ 13, Dkt. # 33; Answer to Am. Compl. at ¶ 13, Dkt. # 36.)

**B. The Certified Class**

13. The court has certified a class ("Class") comprising all persons who are:

(i) GM-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii) surviving spouses and dependents of any GM-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii) UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv) surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                      Page 3
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
(Cite as: 2008 WL 2968408 (E.D.Mich.))

in Section K.2 of such Memorandum of Under-standing or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

**\*3** (v) GM-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any GM-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit (other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan.

Order Granting Class Representatives' Motion for Class Certification at ¶ 8, Dkt. # 34.)

14. Members of the Class ("Class Members") and the Class Representatives are represented in this proceeding by William T. Payne, John Stember, Edward J. Feinstein, Ellen Doyle, Pamina Ewing and Stephen Pincus (collectively, "Class Counsel") of Stember Feinstein Doyle & Payne, LLC.

### C. The *Henry I* Litigation

15. In 2005, GM was providing retiree health care benefits to a class of approximately 470,000 retirees, spouses and dependents. (2/21/08 Decl. of William T. Payne at ¶ 1, Dkt. # 26-03.)

16. In June 2005, GM announced that it would implement unilateral reductions in health care benefits provided to GM's UAW retirees. (*Id.* at ¶ 2.)

17. In response, the UAW and individual plaintiffs sued GM in this court in Civil Action No. 05-73991 ("*Henry I*"). (*See* Am. Compl. in No. 5-73991, Dkt. # 5.)

18. The parties in *Henry I* entered into a settlement agreement (the "*Henry I* Settlement Agreement") compromising their legal dispute, at least through September 14, 2011. The court certified a class of GM-UAW retirees, spouses and dependents and approved the parties' *Henry I* Settlement Agreement. *See UAW v. GM*, No. 05-73991, 2006 WL 891151 (the "*Henry I* Class").

19. The Sixth Circuit affirmed this court's decision in *UAW v. GM*, 497 F.3d 615 (6th Cir.2007).

20. The *Henry I* settlement preserved for the *Henry I* Class a quality health care program through at least September 14, 2011, the date upon which either GM or the UAW could terminate the agreement and restore the parties to their respective legal positions asserted before the Settlement. Thus, the *Henry I* settlement did not permanently resolve the parties' dispute concerning whether GM may unilaterally reduce or terminate retiree health care benefits. The *Henry I* Settlement Agreement provides that if the Agreement is terminated, the class would be free to bring suit to reinstate benefits as they existed before implementation of the settlement, and GM would be free to reassert its claim that it has the right to reduce or terminate those benefits.

**\*4** 21. The *Henry I* Settlement Agreement provided for the amendment of GM's health care program and the establishment of a Defined Contribution Voluntary Employees' Beneficiary Association trust (referred to as the "DC-VEBA" or "Existing External VEBA") for the purpose of funding costs that would otherwise be borne by retirees under the amended plan. *Henry I, 2006 WL 891151, at \*4*. Under the terms of the *Henry I* Settlement, GM remained responsible for providing retiree health care coverage. *Id.* at \*6.

### D. GM's Continuing Financial Struggle

22. Despite GM's efforts to improve its financial performance overall and specifically in North America, its largest and most significant market, and notwithstanding savings associated with the *Henry I* Settlement Agreement, GM has continued to experience considerable losses and declining market share. (*See, e.g.,* Decl. of David W. Meline ("Meline Decl.") at ¶¶ 3, 8, Dkt. # 51-2; Decl. of Michael Raleigh ("Raleigh

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Decl.") at ¶ 6, Dkt. # 51-3.

23. In 2005, GM's North American operations (GMNA) reported a loss, before taxes, of more than $11 billion, with GM reporting an overall consolidated net loss of $10.4 billion. In 2006, while overall GM lost $1.98 billion, its North American operations lost more than $7.5 billion. And in 2007, GM's North American operations generated another $3.3 billion loss, with the company reporting a consolidated net loss of $38.7 billion. (Meline Decl. at ¶ 4.) The evidence shows that GM and specifically its North American operations continue to generate substantial losses that cannot be sustained if GM is to achieve long-term success. (*Id.*)

24. GM's financial and competitive problems have adversely affected the value of its business, which has continued to decline dramatically. (*Id.* at ¶ 6.) The evidence shows that, in this decade alone, GM's market capitalization-a measure of the company's value as determined by the market price of its outstanding shares of stock-has fallen more than 80 percent, from $66 billion in May 2000 to less than $12 billion currently. (*Id.*) GM's stock price has dropped sharply, from more than $90.00 per share in April 2000 to less than $20.19 as of May 14, 2008. (*Id.* at ¶ 8.)

25. GM's credit rating has also declined as a result of its financial difficulties. (*Id.* at ¶ 7.) In 1985, GM's credit rating was "AA+", within what is regarded as "investment grade." By March 2005, GM's credit rating had been downgraded to non-investment grade or "junk" bond status. Today GM's credit rating remains several levels below investment grade, at either a "B" or "B-".(*Id.*) This significant and sustained deterioration in the company's credit rating, which has continued since the date the court approved the *Henry I* Settlement Agreement, has exacerbated GM's deteriorating financial condition by limiting its access to the capital required to fund its businesses and, where capital is available, by making it significantly more costly.(*Id.*)

*5 26. GM's continuing financial troubles reflect a long downward business trend. In general, GM's position in the United States market has significantly declined over the last two decades. (*Id.* at ¶ 5.) From 1971 to 1985, GM occupied more than 40 percent of the United States automobile market. Since then, with

the entrance of numerous new vehicle brands in North America, GM's United States market share has steadily eroded to 23.5 percent in 2007.(*Id.*)

### E. The Role Of Retiree Health Care Costs In GM's Financial Struggle

27. Even after the *Henry I* Settlement Agreement, GM's health care costs have had a significant negative effect on its business and financial condition. (Raleigh Decl. at ¶¶ 3-5.) GM's future financial responsibility for coverage under a defined benefit plan is reflected on the company's balance sheet in the form of Other Post Employment Benefit or "OPEB" obligation, the largest portion of which is attributable to retiree health care for former hourly employees. (*Id.*)

28. The evidence shows that GM's OPEB obligation extends far into the future and numerous different variables influence its calculation-including mortality rates, health care inflation rates and asset return rates. Because of these variables, there is substantial uncertainty surrounding an assessment or appraisal of the actual costs of this obligation, which adversely affects lending institutions' assessment of the company's creditworthiness. (*Id.*)

29. GM's OPEB obligation and health care costs continue to adversely impact its financial health and ability to compete. The evidence also demonstrates that GM's uncertain but substantial OPEB liability affects lenders' evaluation of risk, limiting its access to capital for business operations. (*Id.* at ¶ 6; Meline Decl. at ¶ 7.)

30. Similarly, as widely reported in the press, GM's health care costs have been a significant factor in weakening investor confidence in GM's financial condition. As one prominent national newspaper reported last fall, "[i]nvestors are also wary of unknown and growing liabilities, like long-term health care costs. G.M.'s burden is one reason its stock price, more than $90 a share in 2000, has languished." (Meline Decl. at ¶ 8 (quoting Micheline Maynard, *With U.A.W. Accord, G.M. Looks to a New Detroit,* N.Y. Times, Sept. 27, 2007).)

31. In addition, because many foreign competitors lack the health care legacy expenses of long-established companies such as GM, these foreign

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

companies continue to have a significant pricing and competitive advantage. (*Id.* at ¶ 5.) The evidence shows that in 2007, for example, GM's total labor cost per hour was approximately $25 to $30 greater than the estimated total labor cost per hour for Japanese auto manufacturers (*e.g.*, Toyota, Honda, Nissan).(*Id.*) A key driver of this labor cost disparity is health care cost, the large majority of which is retiree health care. Indeed, the disparity is so large that last year (as in prior years), GM's United States health care expense on a per vehicle basis was greater than the amount spent by GM per vehicle for steel. (*Id.; see also* Decl. of Michael Raleigh at ¶ 4, *Henry I* Dkt. # 1360.)

**\*6** 32. The record shows that GM's health care obligation has a negative impact on its business in two fundamental respects. First, it diverts resources from business operations. Second, it erodes investor confidence, thereby increasing the cost of the resources needed to fuel those operations. (Meline Decl. at ¶ 9.) Thus, at a critical time when significant investment is needed to meet emerging Corporate Average Fuel Economy ("CAFE") requirements, GM's retiree health care obligation has restricted its ability to invest in new plant machinery and equipment, as well as in alternative propulsion technologies, on a scale equivalent to GM's key competitors. (*Id.*)

33. Although GM's health care costs are projected to improve somewhat as a result of the *Henry I* Settlement Agreement, GM expects that its OPEB obligation will continue to limit its access to unsecured capital resources, eroding its already precarious financial condition. (Raleigh Decl. at ¶¶ 6, 10; Meline Decl. at ¶¶ 10-11.) Without access to unsecured debt markets, GM will need to resort to asset sales or secured debt funding, which greatly diminishes its flexibility, increases its costs, and reduces its ability to withstand weaker periods of the business cycle. (Raleigh Decl. at ¶ 6.)

34. GM submitted evidence of its continued efforts to address its financial condition through significant operational changes, intended to both reduce costs and improve its market share. (*Id.* at ¶ 9.) For example, GM has reduced structural costs by $9 billion annually. (*Id.*) In addition, GM has introduced several new vehicle models in the past two years and is actively pursuing the next generation of alternative fuel technology, such as the plug-in Volt concept

electric vehicle, fuel cells and bio-fuels. (*Id.*)

### F. GM's Business And Its Impact On Michigan And Other Communities

35. Despite its struggles, GM remains one of America's largest employers. Either directly or indirectly, more than 750,000 Americans earn their living building, marketing and selling GM cars and trucks; almost half a million retirees and surviving spouses receive a pension from GM; and more than 700,000 salaried and hourly retirees and their dependents receive health care from GM. (Meline Decl. at ¶ 13; *see also* Raleigh Decl. at ¶ 3.)

36. Given its size, GM is vital to the economies of southeast Michigan, the State of Michigan as a whole and other United States communities. The evidence shows that, as Michigan's largest employer, the company operates from more than 50 locations statewide, directly employing over 61,000 Michigan residents with an annual payroll of $7.8 billion. (Raleigh Decl. at ¶ 13; *see also* Meline Decl. at ¶ 13.) Almost three times that number of individuals (167,000) are GM retirees residing in Michigan. (Raleigh Decl. at ¶ 13.) GM's North America manufacturing operations spend considerable amounts in supply and materials purchases, with the vast majority from a base of about 4,000 United States suppliers. (Decl. of Leigh J. Dushane ("Dushane Decl.") at ¶ 2, Dkt. # 51-4.) More than 1,000 of GM's United States suppliers are located in Michigan.(*Id.* at ¶ 3.)

**\*7** 37. Beyond Michigan, GM operates vehicle assembly plants in 13 states and maintains other operations, such as service parts warehousing facilities, throughout the country. (Meline Decl. at ¶ 13.) In the past five years alone, GM has made capital investments totaling more than $20 billion in the United States, and purchased hundreds of billions of dollars in parts and supplies. GM spends more than $6 billion annually in research and development, and in 2007 alone spent more than $8 billion. (*Id.* at ¶ 14.)

### G. Events Leading To Henry II

38. In 2007, GM announced that it would terminate the *Henry I* Settlement Agreement according to its terms at the end of 2011 and unilaterally reduce retirees' health care benefits at that time. (Payne Decl. at ¶ 10.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                    Page 6
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
**(Cite as: 2008 WL 2968408 (E.D.Mich.))**

39. During negotiations between GM and the UAW during August and September 2007, the UAW and GM discussed the prospect of establishing a new VEBA, completely independent of GM, with increased funding that would assume total responsibility for providing retiree health care. (*Id.*)

40. Class Counsel actively followed these negotiations, and continued to maintain contact with both the UAW and the *Henry I* Class Representatives throughout the course of the negotiations. (*Id.* at ¶ 11.)

41. The GM/UAW discussions resulted in a tentative agreement that had the following basic features:

(a) Assuming that Class Representatives, Class Counsel and the Court approved the settlement, a new VEBA would be funded with an amount likely totaling (on a present value basis as of January 2008) at least $33 billion, and the new VEBA would assume responsibility for providing retiree health benefits for retirees starting in 2010.

(b) Assuming approval, GM would also continue to pay all benefits before the VEBA took over in 2010 at an estimated cost of $5.4 billion on a present value basis.

(c) Under the tentative agreement, the *Henry I* program and all benefits of the *Henry I* settlement would continue without change at least through 2011. Whether benefits or participant contributions would have to be adjusted or other actions taken by the VEBA committee thereafter would depend on many factors to be considered by a committee focused upon maintaining substantial health care benefits as its guiding priority, including whether GM remains financially viable so it can make the required payments and whether new or existing government health care programs are implemented or improved (which could actually result in benefits being improved).

(Payne Decl. at ¶ 11.)

42. The *Henry I* class representatives objected to GM's announcement that it would terminate the *Henry I* Settlement Agreement in 2011 and thereafter

unilaterally reduce retirees' health care benefits. They authorized Class Counsel to bring a second lawsuit contending that their retiree benefits were vested and that any unilateral reduction of benefits would violate the relevant CBAs. (*Id.* at ¶ 12.)The *Henry I* Class Representatives also authorized Class Counsel Payne to seek to re-open *Henry I.*(*Id.*)

**\*8** 43. Plaintiff John Huber (a 2007 Delphi retiree) authorized Class Counsel to add him as an additional plaintiff in the new litigation. (*Id.* at ¶ 13.)

### H. Plaintiffs ' Claims And GM's Response

44. The Class Representatives, together with the UAW as a co-Plaintiff, filed this action ("Henry II") on September 26, 2007. (Compl., Dkt.# 1.)

45. Plaintiffs brought Count I of the Amended Complaint under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking a declaration that retiree health care benefits cannot be unilaterally terminated or modified by GM, and a permanent injunction prohibiting such termination or modification. (Am. Compl. at ¶ 3, Dkt. # 33.)

46. In Count II, the Class Representatives asserted a claim under § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (a)(3), seeking the same declaratory and injunctive relief as Count I. (*Id.* at ¶ 4.)

47. GM filed its Answer and Affirmative Defenses to the Amended Complaint on March 6, 2008. In its Answer, GM denied that the retiree health care benefits it provides are vested benefits that GM cannot unilaterally modify or terminate. GM also asserted affirmative defenses, including that the plaintiffs' claims are barred by the terms of the CBAs, as well as by acquiescence, waiver, ratification and/or estoppel. (Answer and Affirmative Defenses at ¶¶ 1-9, Dkt. # 39.)

### I. The Parties' Negotiations

49. In connection with the 2007 negotiations, GM provided the UAW with extensive information about its financial condition and health care expenditures, including confidential and proprietary financial in-

09-50026-mg    Doc 2631-2    Filed 06/26/09    Entered 06/26/09 15:59:33    Henry II
Decision    Pg 7 of 28

Slip Copy                                                                 Page 7
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 **(Cite as: 2008 WL 2968408 (E.D.Mich.))**

formation and analysis. (*See* 2008 Settlement Agreement at § 3, Dkt. # 27-3.) This information was reviewed by the UAW and its advisors, including leading investment bankers, actuaries and legal experts, who assessed GM's financial condition and analyzed the benefits of the proposed arrangement and created financial and cash-flow models to determine the funds that would be needed to provide ongoing retiree health care benefits under the Settlement Agreement. (*Id.*) Representatives of the UAW and its team of advisors also met with GM officials, who answered questions and provided further detail, as requested. (*Id.*)

49. On September 26, 2007, the UAW and GM entered into a memorandum of understanding ("MOU") that provisionally resolved their dispute. (MOU, Dkt. # 26-15.) The MOU established a framework for a full and complete settlement of their dispute concerning retiree health care. (*See Id.*)

50. Active GM-UAW employees ratified the MOU on October 10, 2007. (Decl. of Andrew B. Bloomer at Tab A, Dkt. # 27-12.)

51. The proposed framework for settlement was contingent on approval by Class Counsel following Class Counsel's independent investigation.

52. Even after Class Counsel completed their investigation and approved the framework, many details remained to be negotiated among the parties. (Payne Decl. ¶ 34.)

**\*9** 53. Class Counsel, the UAW and GM did in fact negotiate a detailed, comprehensive agreement, the February 21, 2008 Settlement Agreement presented to this court with the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice. (*See* Settlement Agreement, Dkt. # 27-03.)

54. Class Counsel was an active participant and negotiated matters in addition to or different from what was in the MOU, including changes in the conversion price or "strike" price associated with the Convertible Note and standards for investment management once the VEBA is established. Payne Decl. ¶ 34. The final agreement is referred to herein as the "2008 Settlement Agreement."

### J. Investigation By UAW And Class Counsel Of The Likelihood Of A GM Default In The Future And Adequacy Of Proposed Funding Of The New VEBA

55. Before entering into the MOU, the UAW retained experts to advise the union about the risk of a future GM default and the impact of a default on retiree health obligations.

56. The UAW retained Lazard Frères & Co., LLC ("Lazard") to perform the financial analysis and Milliman to perform the actuarial analysis. Each company is among the leaders in its respective field.

57. The evidence showed that GM gave the Class, the UAW and their advisors access to a large quantity of confidential and actuarial information. For example, GM gave Lazard access to relevant financial information, including confidential projections and business plans. (Decl. of Jim Millstein ("Millstein Decl.") at ¶¶ 7-9, Dkt. # 53.)

58. GM's actuaries, Watson Wyatt, provided Milliman with its own model for projecting health care benefit costs in the future, along with historical plan costs and demographic information about the individuals who would be entitled to benefits under the proposed settlement. Lazard and Milliman developed independent cash flow and financial models to analyze the funding requirements and adequacy of the proposed VEBA. (Decl. of Suzanne Taranto ("Taranto Decl.") at ¶ 7, Dkt. # 54; Millstein Decl. at ¶ 15.)

59. Lazard concluded that GM's financial position remains precarious and recommended to the UAW that it explore the establishment of a funded VEBA to protect retirees from the adverse impact that further deterioration in GM's financial position and credit quality could have on its ability to meet its health care obligations to UAW retirees. (Millstein Decl. at ¶¶ 12-13.)

60. After concluding that GM's financial condition justified negotiating a funded VEBA that would assume the responsibility for providing retiree health benefits to the UAW retirees, UAW set out to negotiate for funding at a level that was projected to be adequate to continue providing benefits for the lives

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of all the retirees and dependents eligible for retiree health benefits under UAW collective bargaining agreements, without any material modifications to existing coverages and without requiring any material increase in the retirees' share of the cost. (*Id.* at ¶ 14.)Lazard assisted the UAW in negotiating with GM for higher valued VEBA contributions than GM originally offered and provided estimates of the valuation of the Convertible Note that GM would provide to the new VEBA as part of the proposed settlement. (*Id.* at ¶¶ 14-20.)

**\*10** 61. Milliman examined the assumptions that were used in the negotiations between GM and UAW. (*See, e.g.,* Taranto Decl. at ¶¶ 4-6.) With respect to the assumption that the VEBA assets would earn 9 percent annually on investments, Milliman tested some sample expected hypothetical investment portfolios to determine the likelihood of achieving a 9 percent long-term investment return. Milliman reported:

Based on a weighted average payment duration of approximately 12 years, and a "traditional" 60% equity 40% fixed income portfolio, we determined that a 9% return represents just under the 75th percentile of expected returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 25% of the time). More significantly, we reviewed other hypothetical investment portfolios with investment policies comparable to those of very large pension funds (which would more closely approximate our expectation for an investment policy appropriate for a trust of this size), and found that the 9% return represented just over the 50th percentile of returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 50% of the time).

(*Id.* at ¶ 8.) Milliman concluded that the other assumptions about future experience, including life expectancy and future medical cost inflation, were also within a reasonable range. (*Id.* at ¶ 6 and App. A.) After modeling the future solvency of the VEBA under various proposals and assumptions, Milliman advised the UAW that, using the negotiators' assumptions, "the VEBA is projected to have sufficient assets to provide the benefits anticipated in the current settlement agreement over the lifetime of the covered

group of current and future retirees."(*Id.* at ¶ 15.)[FN1]

> FN1. For purposes of modeling the solvency of the VEBA, the negotiators' assumptions included an assumed total value with respect to the convertible note. (*See* Taranto Decl. at ¶ 17.) A portion of that assumed value was attributable to the conversion feature in the note, coupled with derivative contracts included as Exhibit H of the 2008 Settlement Agreement. Milliman did not verify or offer any conclusion with respect to the assumed value of the convertible note, including the conversion feature or the derivative. (*Id.*)

62. Lazard similarly concluded that "[b]ased on the assumptions in the VEBA model (including the convertible note and derivative instrument valuation) and the settlement terms agreed to by the UAW and GM, the VEBA model forecasted solvency throughout the lives of all covered employees with no modifications to benefits and only a slight increase in the cap on escalation of retiree contributions, deductibles and out-of-pocket maximums from 3% annually to 4% annually starting in 2016."(Millstein Decl. at ¶ 20.)

63. Independent of the UAW, Class Counsel also thoroughly reviewed the fairness, reasonableness and adequacy of the proposed settlement. To facilitate this review, the UAW and GM granted Class Counsel access to all relevant financial and actuarial materials, including proprietary and confidential financial information and analyses, and to all documents that Class Counsel requested relating to UAW health care. (Payne Decl. at ¶ 38.) Class Counsel again considered applicable law and engaged in extensive discussions with UAW experts and GM representatives. (*Id.*) In addition, Class Counsel retained their own experts, reviewed material concerning GM's health care costs, and analyzed relevant health care documents and collective bargaining agreements.(*Id.*) Class Counsel's experts also conferred with UAW's experts about issues of concern to them. (*Id.*)

**\*11** 64. Based on Class Counsel's investigation in *Henry I,* Class Counsel had concluded that GM faced ongoing and very serious financial difficulties. The further analysis Class Counsel conducted in Henry II showed that these difficulties remained and would continue. (*Id.* at ¶ 39.)Class Counsel has stated that GM's financial condition was a compelling factor in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Class Counsel's decision to approve the basic concept set forth in the MOU and negotiate the terms of the 2008 Settlement Agreement. (*Id.*) As Class Counsel concluded, no matter how strong the legal claim is on the merits, Class Members would still be vulnerable if there is a significant risk that GM might become insolvent and unable to pay the level of benefits that the Class Members anticipate receiving over their projected life expectancy. (*Id.*)

65. To analyze GM's financial prospects in connection with Henry II, Class Counsel retained John D. Finnerty, Ph.D., Managing Principal of Finnerty Economic Consulting, LLC and Professor of Finance and Director of the MS in Finance Program at Fordham University in New York. (*See* Decl. of William T. Payne in Support of Mot. for Final Approval ("Payne Final Approval Decl.") at ¶ 2, Dkt. # 52-2.) Dr. Finnerty's Expert Report ("Finnerty Report"), and exhibits and appendices showing his qualifications and listing the materials he considered, are found in the record at docket numbers 52-4 to 52-8. Using several different metrics, Dr. Finnerty concluded that there is a substantial possibility that GM will default on its senior debt obligations when examined over a relatively short (3-7 year) time horizon and a higher likelihood of default over a longer time horizon. (Finnerty Report, Dkt. # 52-4.)

66. Based on Dr. Finnerty's assessment of GM's risk of default, Class Counsel concluded that a discounted settlement worth less than the "full value" that Plaintiffs might win through a court determination would be justified here. (Payne Decl. at ¶ 43.) As Class Counsel explained, they are familiar with cases, including ones where they served as class counsel, where retirees achieved victories that later became "hollow" because the losing company then filed for bankruptcy. (*Id.* at ¶ 24.)

67. In addition, Class Counsel concluded that a discounted settlement worth less than "full value" also was justified due to the risks of their ultimately losing the litigation. (*Id.* at ¶ 44.)Class Counsel has extensive experience litigating retiree welfare benefit cases, which often result in years of litigation. (*Id.* at ¶¶ 16-26.)At times, Class Counsel has litigated cases for years and prevailed in the lower court on summary judgment or at trial, only to have the Court of Appeals announce what seemed to be a new standard in reversing judgment and finding for the employer.

(*Id.* at ¶ 23.)Class Counsel notes that they also are familiar with cases where courts, including those in the Sixth Circuit, have ruled that health benefits for certain groups of union retirees are not vested and may be unilaterally altered by their former employers. *See, e.g., Maurer v. Joy Technologies, Inc.,* 212 F.3d 907 (6th Cir.2000); *Bittinger v. Tecumseh Products Co.,* 83 F.Supp.2d 851 (E.D.Mich.1998); *Int'l Union v. Cleveland Gear Corp.,* No. C83-947, 1983 WL 2174 (N.D.Ohio Oct.20, 1983).

*12 68. In addition to considering the prospects of a GM default and of losing the lawsuit on the merits, Class Counsel also considered (1) the range of likely payments into the VEBA and (2) the range of anticipated *Henry I* benefits that the VEBA would likely be able to provide starting in 2012. (Payne Decl. at ¶ 45; Payne Final Approval Decl. at ¶ 3.) For these estimates and analysis, Class Counsel relied on the expert advice of consulting health care actuary Adam Reese, FSA, EA, MAAA, and the Hay Group, where Mr. Reese is a Senior Consultant. (*Id.*) A redacted version of the final Hay Group Report, dated February 14, 2008, is found in the record at docket number 52-3.

69. Hay Group personnel had full access to the actuarial data available to Milliman and Lazard, as well as to published reports and cash flow projections of Watson Wyatt, an actuarial firm retained by GM. (Payne Decl. at ¶ 46.) The Hay Group independently evaluated the actuarial assumptions that were used in the UAW/GM negotiations and independently examined the value of the agreed contributions to the VEBA. The Hay Group concluded that the actuarial assumptions were within the range of reasonable assumptions for such future experience. (Hay Group Report at 7-8.) And with respect to the agreed contributions, the Hay Group assigned different, and somewhat lower, values to some of the expected contributions than had Lazard and Milliman in their analyses. (*Id.* at 3, 9-10.)Finally, the Hay Group developed its own cash flow and financial model to test whether the VEBA assets would be sufficient to provide benefits for as long as the covered retirees and eligible dependents may live. (*Id.*)

70. According to the Hay Group, because of the new VEBA's extended life, it is difficult to project forward with certainty whether the amounts to be paid into the VEBA will be enough to pay all anticipated

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 (Cite as: 2008 WL 2968408 (E.D.Mich.))

benefits for all future years without adding more re-tiree contributions or reducing benefits. This is be-cause the VEBA's funds and expenditures are inher-ently uncertain due to such factors as:

• future investment returns and volatility of returns,

• variation of annual cost changes,

• changes in Medicare,

• the possibility of government-paid national health benefits,

• mortality experience of the retirees,

• unpredictability of GM stock price, and

• possible GM bankruptcy.

(*Id.* at 16.)Considering that uncertainty, the Hay Group estimated how variations in the primary fac-tors would affect the VEBA's ability to continue pro-viding benefits at the level provided for in the *Henry I* Settlement Agreement. Under certain plausible con-ditions, the VEBA would be expected to continue providing those benefits for as long as the retirees and dependents are alive to receive them. Under other conditions, the Hay Group projected that the VEBA Committee would have to reduce benefits at some point in the future in order to continue providing sub-stantial benefits for as long as they will be needed. (*Id.* at 11-16.)

**\*13** 71. The Hay Group Report expressed an opinion as to what types of benefit levels could be provided, given various reasonable assumptions about invest-ment return and medical inflation, if (as expected) the VEBA is funded with at least $33 billion (present value as of January 2008).

72. After considering the Hay Group Report, the Fin-nerty Report, and their own research and experience, Class Counsel concluded that given the serious risk of a future GM default on retiree health obligations, Class Members would be well served if the settle-ment resulted in their securing enough immediate funding for the VEBA to provide for substantial life-time health care benefits, even if future reductions in benefit levels may become necessary. Class Counsel

determined that such a settlement would be prefer-able to Class Members' bearing the continued risk of a default in which they could receive little or nothing.

### K. Class Counsel's Conclusion

73. Based on Class Counsel's professional experience and judgment, Class Counsel concluded that the pos-sibility that the VEBA may not have all the funding needed to provide *Henry I* benefits at anticipated lev-els for the lifetime of all Class Members must be viewed in light of the particular risks inherent in this litigation (e.g., possible GM bankruptcy, chances of losing on the merits), as well as the risks inherent in all class action litigation. (Payne Decl. at ¶ 50.)

74. Class Counsel reached these conclusions based upon analyses of the CBA provisions and the laws applicable to the claims alleged in the Complaint, the burdens and expense of litigation, including the risks and uncertainties associated with protracted trials and appeals, the risks and uncertainties arising from GM's financial condition and the certainty and cost-efficiencies provided by the payments and plan modi-fications set forth in the 2008 Settlement Agreement. (*Id.* at ¶ 51.)

75. Class Representatives and Class Counsel con-cluded that the proposed settlement is fair, reason-able, adequate, and in the best interests of the Class. (*Id.* at ¶ 22.)They accordingly joined in the negotia-tion of the final settlement agreement, filed a motion for class certification and joined with GM and UAW in a motion for preliminary approval of the proposed settlement.

### L. Key Terms Of The 2008 Settlement

76. The 2008 Settlement Agreement provides that an 11-member independent Committee, acting on behalf of an "Employees Beneficiary Association" ("EBA") organized for the purpose of establishing and main-taining a new health care plan ("New Plan"), shall implement the New Plan for the purpose of providing retiree health care benefits to the Class and to a cov-ered group of individuals ("Covered Group"), includ-ing current active employees, who themselves are not members of the Class but who may become entitled to benefits by reason of retirement (or death after becoming eligible for retirement) after October 2007. (2008 Settlement Agreement at 4-5 and § 4.A.-B.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

09-50026-mg    Doc 2631-2    Filed 06/26/09    Entered 06/26/09 15:59:33    Henry II
Decision    Pg 11 of 28

Slip Copy                                                                                          Page 11
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 **(Cite as: 2008 WL 2968408 (E.D.Mich.))**

The EBA will be the plan sponsor.

**\*14** 77. The Committee will serve as named fiduciary and plan administrator of the New Plan. (*Id.* at 4 and Ex. E.) The Committee will have both a fiduciary responsibility and the authority to manage assets and to adjust future benefits after 2011 as necessary for the purpose of continuing to provide substantial lifetime benefits to the entire group of covered retirees and dependents. (*See Id.* at ¶ 5.B.)

78. Once the 2008 Settlement Agreement is finally approved, which approval the court grants herein, it will satisfy, supersede and replace the *Henry I* Settlement Agreement in its entirety. (*Id* . at 1.)

79. Under the terms of the 2008 Settlement, GM will continue to provide the same level of scope of retiree health care benefits for Class Members in accordance with the *Henry I* Settlement until the date when all legal challenges and appeals regarding the 2008 Settlement Agreement have been resolved or exhausted or, if later, January 1, 2010 (the "Implementation Date"). (*Id.* at § 5.A.) Benefits will thereafter be provided and funded under the New Plan and a new VEBA ("New VEBA"). (*Id.* at § 5.B.)

80. Under the 2008 Settlement Agreement, benefit levels will remain the same until at least December 31, 2011 (when GM's unilateral termination of the *Henry I* Settlement Agreement would be effective), except that the New Plan will assess an additional, non-escalating monthly contribution of $51.67 to Class Members who currently receive monthly GM pension benefits. (*Id.* at §§ 5.B, 15; *see* Raleigh Decl. at ¶ 11.) This additional contribution will be offset by a monthly special lifetime pension benefit of $66.70 paid by GM. (2008 Settlement Agreement at § 15.)

81. In *Henry I,* the court previously considered and approved a plan of retiree medical benefits that will continue under the 2008 Settlement Agreement through at least December 31, 2011. Specifically, the court therein held that "the Modified Plan [under the *Henry I* Settlement Agreement] provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost that is substantially less than the cost most other retirees pay." *Henry I,* 2006 WL 891151, at \*17 ("[T]he benefits provided to the plaintiffs-

continued comprehensive health care benefits with only a modest increase in cost-are fair, reasonable, and adequate ...").

82. The evidence shows that this plan remains one of the most comprehensive and, to its participants, least costly employer-sponsored retiree health plans in the United States. (Decl. of Sylvester J. Schieber, Ph.D ("Schieber Decl.") at ¶ 10, Dkt. # 51-5.) Benefits include coverage for a broad range of inpatient and outpatient services, generic and branded drugs and appropriate medical devices for preventive and acute care needs. (*Id.*) The evidence further shows that in virtually every cost category, the medical and prescription drug benefits to be continued under the 2008 Settlement Agreement are provided to participants at costs significantly below those required by typical retiree plans offered by employers and the Plan remains one of the most desirable plans nationally. (*Id.* at ¶ 11.)[FN2]

> FN2. The court notes that these benefits stand in stark contrast to GM's health care benefit plan for its salaried retirees and employees, which requires significant cost contribution. (*See* Raleigh Decl. at ¶ 12.) For example, GM salaried employees employed after 1993 do not receive any health care in retirement. Those salaried retirees and employees who are eligible for health care currently pay a monthly premium of $100 (single) or $200 (family), with ten percent coinsurance on covered services. (*Id.*) Moreover, their annual deductible in the Enhanced PPO Plan ($750-$1,500) is at least twice as high as the current deductible for hourly retirees under the settlement and their annual out-of-pocket maximum is four times higher than for hourly retirees ($2,000-$4,000).(*Id.*) In addition, salaried workers and retirees pay higher prescription drug co-payments than do hourly retirees and are responsible for one hundred percent of increases in health care costs after 2006. (*Id.*)

**\*15** 83. Under the 2008 Settlement Agreement, the Committee will be solely responsible for establishing the scope and level of post-retirement medical benefits available to Class Members as of January 1, 2012, and will have the discretion to raise or lower the level of such benefits. (2008 Settlement Agree-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                      Page 12
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 **(Cite as: 2008 WL 2968408 (E.D.Mich.))**

ment at § 5.B; *see also* 3/4/08 Trans. at 10, 12, Dkt. #
41.) Consistent with its fiduciary responsibilities, the
Committee will have authority to, in its sole discre-
tion, enter into agreements and take all actions that it
deems desirable for the administration of the Trust or
Plan. (2008 Settlement Agreement at § 10. 13.)

84. As of the Implementation Date, the New VEBA
will be the exclusive source of funds to pay for re-
tiree medical benefits for Class Members and, on the
same basis, members of the Covered Group. (*Id.* at
§§ 2, 5.B.)

85. Under the 2008 Settlement Agreement, GM's
payment obligations with respect to the New Plan
and the New VEBA are fixed and capped. (*Id.* at §§
5.B, 8.) Subject to certain express conditions, those
payments (including assets to be transferred from the
Existing External VEBA established under the *Henry
I* settlement) are currently worth an estimated $33
billion at a minimum. The exact amount and value of
all of GM's payments to the new VEBA will depend
on a variety of factors and future events, and condi-
tions set forth in the 2008 Settlement Agreement.
(*See, e.g., Id.* at §§ 7.C, 7.D, 8.C, 8.D, 8.G, 10, 12.F.)
In addition, GM is not responsible for and does not
guarantee: (1) the level or scope of retiree medical
benefits to Class Members under the New Plan; (2)
the asset returns on the funds in the UAW Related
Account, the Temporary Asset Account (established
under the 2008 Settlement Agreement to hold certain
GM payments as described in that Agreement) or the
New VEBA; or (3) whether there will be sufficient
assets in the New VEBA to fund the current scope
and level of benefits indefinitely. (*Id.* at §§ 6, 7.F; see
also *Id.* at 2.)

86. Including the $5.4 billion that GM is estimated to
spend on retiree medical benefits between January 1,
2008 and January 1, 2010, the total value dedicated to
funding retiree medical benefits for Class Members
and the Covered Group measured in today's dollars
will be an estimated $38.4775 billion. This consists
of at least $33.0775 billion using the face value for
the Convertible Note ($4.3725) and $0.165 billion
representing just one Shortfall Payment, plus the $5.4
billion GM is estimated to spend on *Henry I* retiree
medical benefits between January 1, 2008 and Janu-
ary 1, 2010. (*Id.* at § 8; Payne Decl. at ¶ 36; 3/4/08
Tr. at 8-10.)

87. The goal of both the UAW and Class Counsel in
reaching agreement with GM on the amounts to be
contributed to the New VEBA was that there be suf-
ficient assets to continue providing the *Henry I* level
of benefits for the lifetime of all retirees and depend-
ents who will be eligible for those benefits under the
settlement, a period of time assumed to be approxi-
mately 80 years. Because the sufficiency of those
assets depends on the future experience of the new
VEBA, including the rate of investment return on
VEBA assets, future rates of inflation in medical
costs and how long covered retirees and dependents
live, it is difficult to predict whether VEBA assets
will be sufficient to achieve the goal.

**\*16** 88. All assets that GM pays or transfers to the
New VEBA must be used for the exclusive purpose
of providing retiree medical benefits to the partici-
pants of the New Plan and their eligible beneficiaries
and to defray the reasonable expenses of administer-
ing the New Plan. (2008 Settlement Agreement at §
2; 3/4/08 Tr. at 12-13.)

89. Finally, other than the 2008 Settlement Agree-
ment, there are no agreements that were "made in
connection with the proposal,"Fed.R.Civ.P. 23(e)(3),
other than an agreement between the parties and the
United States Department of Labor as described in
the joint filings of the UAW and Class in support of
final approval of the Settlement Agreement.

**M. The 2008 Settlement Is Vital To GM's Turn-
around Plan**

90. In entering into the 2008 Settlement, GM deter-
mined that a final negotiated resolution of the parties'
dispute and GM's retiree health care obligation was
critical to its turnaround plan and the long term suc-
cess and profitability of its business. (Meline Decl. at
¶ 11.) In particular, the 2008 Settlement Agreement
resolves, once and for all, the parties' ongoing dispute
over retiree health care and provides a full, complete
and permanent resolution of all claims among the
parties regarding retiree health care benefits. (2008
Settlement Agreement at 1; Meline Decl. at ¶ 11.)
The 2008 Settlement will substantially improve GM's
opportunity for success by converting GM's OPEB
health care obligation from an uncertain defined
benefit plan to one that is fixed and capped and by
freeing up capital for GM to invest in its core busi-
ness and new product development. (Meline Decl. at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

09-50026-mg   Doc 2631-2   Filed 06/26/09   Entered 06/26/09 15:59:33   Henry II
Decision   Pg 13 of 28

Slip Copy                                                                                                          Page 13
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
**(Cite as: 2008 WL 2968408 (E.D.Mich.))**

¶ 9.)

91. Similarly, GM predicts that the Settlement will significantly limit its exposure to unexpected short-term inflationary spikes in health costs at critical junctures that could frustrate the company's competitive initiatives. (Raleigh Decl. at ¶ 10.) According to GM, the Settlement will enable it to utilize surplus pension resources for retiree health care that would otherwise be inaccessible for such purposes. (*Id.;* 2008 Settlement Agreement at § 15.)

92. The 2008 Settlement Agreement also removes the substantial burden to GM of administering retiree health care benefits and provides the certainty of a cap and limit on GM's obligation to pay for such benefits. (Meline Decl. at ¶ 11.) This benefits GM's business planning, and GM anticipates that it will be viewed favorably by investors, lenders and credit rating agencies. (*Id.*) Together with other aspects of GM's turnaround plan, the Settlement is intended to eventually produce an upgrade in GM's credit rating, giving the company greater access to capital markets, improved cash flow and investment flexibility and is also intended to positively impact its stock value-all of which are essential to the company's long-term success. (Raleigh Decl. at ¶ 10.)

93. The parties reasonably concluded that, in the absence of a permanent negotiated resolution, GM will continue to bear the significant competitive, fiscal and litigation challenges associated with its OPEB obligation and retiree health care costs. (Meline Decl. at ¶ 10.) GM asserted that, without the 2008 Settlement Agreement, GM would terminate the *Henry I* Settlement Agreement in 2011 according to its terms and take unilateral action to modify retiree health care costs. (*Id.* at ¶ 12.)The UAW and the Class would oppose any such action, and the inevitable result would be prolonged and expensive litigation. While GM believes that it would prevail in any such case, GM might not. Moreover, even if GM were ultimately successful in litigation, the delay in obtaining a final resolution of GM's retiree health care obligation, which very likely would take several years, could thwart the company's ability to address its financial difficulties, further eroding the confidence of creditors, investors, GM shareholders, financial and credit markets, car buyers and the press. (*Id.*) The parties concluded that the 2008 Settlement avoids these problems by addressing and permanently re-

solving the most significant obligation facing GM's future. (*Id.* at ¶ 15.)

## N. The Class Notice

**\*17** 94. On February 28, 2008, following the filing of the parties' Joint Motion for Preliminary Approval of the 2008 Settlement Agreement, GM issued a notice of proposed class settlement to the federal and state attorneys general as required under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715(b). (Fraga Decl. at ¶¶ 11-14 & Ex. E thereto.) It also provided notice to the Class by mailing Class Notice packets via First Class Mail to each of the 521,979 Class Members. (*Id.* at ¶¶ 4-7.)

95. The Class Notice informed Class Members that they could object to the 2008 Settlement Agreement and that those Class Members who are also members of the *Henry I* class could object to the "Joint Motion for Relief from Judgment" in the *Henry I* case. (Class Notice at ¶¶ 1-2, 9, 12-13; Publication Class Notice, Dkt. # 27-18; *see also* Joint Motion for Relief from Judgment Under Rule 60(b)(5) or (6), Dkt. # 1443 in *Henry I.*)

96. In addition to the mailed notices, GM also provided notice by publication in the March 29, 2008 weekend edition of the *Detroit News & Free Press* and the March 28, 2008 edition of *USA Today.*(Fraga Decl. at ¶¶ 4, 15.)

97. Each notice described the terms of the 2008 Settlement Agreement, informed Class Members of their right to object and the date of the fairness hearing and (in the case of mailed notice) included a copy of the entire 2008 Settlement Agreement with exhibits (excluding Exhibit B ("Convertible Note"), Exhibit F ("Registration Rights Agreement") and Exhibit H ("Master Terms and Conditions for Capped Convertible Bond Hedging Transactions"), which were deemed too large and impractical for direct mail delivery). (Class Notice at ¶¶ 6, 17; Publication Class Notice.)

98. The Class Notice further informed Class Members that a complete copy of the 2008 Settlement Agreement, including all exhibits thereto: (1) was available on the Internet; (2) could be obtained by calling a toll-free number; and (3) could be inspected during business hours in the Office of the Clerk of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Court, as well as at Class Counsel's and UAW's offices. (Class Notice at ¶ 17; Publication Class Notice; Fraga Decl. at ¶ 4.)

99. The Class Notice mailing was performed by using a master list maintained for GM by Fidelity Investment Management Research Corporation, the record keeper for GM employee benefit plans, including the GM Hourly Health Care Plan covering hourly retirees, spouses, dependents and surviving spouses. (Decl. of Mark Shepherd ("Shepherd Decl.") at ¶¶ 3-4 & Ex. F hereto, Dkt. # 51-6; Fraga Decl. at ¶¶ 5-7.)

### O. Objections

100. Neither the Attorney General of the United States, nor the Attorney General of any State, has filed any objection to the 2008 Settlement Agreement in response to the Class Action Fairness Notice sent to them on February 28, 2008.

101. Only 42 Class Members-or about eight thousandths of one percent of the entire Class-submitted timely objections.[FN3] (See Objections, Dkt. # 45.)

> FN3. An untimely 43rd objection from Peter Beltran was received one day before the Fairness Hearing. The court has reviewed this objection and finds it does not raise a ground to disapprove of the 2008 Settlement, even if it had been timely submitted.

*18 102. Twenty-three Class Members objected to the 2008 Settlement Agreement only; three Class Members objected to the Joint Motion for Relief from Judgment in Henry I only; and sixteen Class Members objected to both.

### P. Fairness Hearing

103. The court held a Fairness Hearing on June 3, 2008. Only three Class Members appeared at the Hearing. Two objected to the proposed settlement. One raised a "concern" about the amount to be paid to the VEBA, but said it was not an objection. (See Fairness Hearing Tr. at 35-54, Dkt. # 58.)

### II. CONCLUSIONS OF LAW

### A. Jurisdiction

1. The court has jurisdiction in this action under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132(e)(1) and (f).

### B. Class Certification

2. For a class to be certified, the proposed group of litigants must satisfy the four requirements of Rule 23(a) and fall within one of the three subdivisions of Rule 23(b). General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1992). Based on the record after the fairness hearing, the court concludes that these requirements are met.

3. **Numerosity.** There are approximately 522,000 individuals in the plaintiff class, amply satisfying the Rule 23(a)(1) requirement that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1); see Henry I, 497 F.3d at 625 (class consisting of 476,676 retirees and dependents was "undoubtedly 'so numerous that joinder of all members is impracticable' " (citation omitted)); see also, e.g., Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n. 1 (6th Cir.1997) (finding that an objection to numerosity requirement in 1,000-member class was "frivolous"); Reese v. CNH Am. LLC, 227 F.R.D. 483, 486 (E.D.Mich.2005) (certifying claims of 1,400 retirees); Rankin v. Rots, 220 F.R.D. 511, 517 (E.D.Mich.2004) (certifying ERISA claims for class alleged to be in the "thousands").

4. **Commonality.** The Rule 23(a)(2) requirement of commonality " 'simply requires a common question of law or fact.' " Reese, 227 F.R.D. at 487 (quoting Bittinger, 123 F.3d at 884). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 422 (6th Cir.1998).

5. Whether GM has a unilateral right to modify retiree benefits is a question of law common to the Class. See Henry I, 497 F.3d at 625 ("because the claims of all retirees stem[med] from the collective bargaining agreements negotiated between GM and the UAW, they share[d] 'common' 'questions of law or fact' " (citation omitted)); Bittinger, 123 F.3d at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 (Cite as: 2008 WL 2968408 (E.D.Mich.))

879, 884 (finding commonality where retirees sought guaranteed lifetime, fully-funded benefits, even though a series of different CBAs governed those benefits); *Reese*, 227 F.R.D. at 487 (commonality established even though plaintiffs retired at different times and under different CBAs); *Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 596 (E.D.Mich.1996) (evaluation of effect of defendants' reservation of rights provides common question satisfying Rule 23(a)(2)).

*19 6. **Typicality.** A ' "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *In re Am. Med. Sys. ,* 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3-13, at 3-76). As with commonality, the typicality requirement is not an onerous one; so long as there is a strong similarity of legal theories, the requirement is met "even if substantial factual distinctions exist between the named and unnamed class members." Rankin, 220 F.R.D. at 518;*see also Bittinger,* 123 F.3d at 884-85; *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993).

7. Here, Plaintiffs claim that GM's planned unilateral modifications to retiree health care benefits violate its obligations under ERISA and its contractual obligations under the collective bargaining agreements. That claim satisfies the typicality requirement, notwithstanding any possible factual variations with respect to individual class members. *Henry I*, 497 F.3d at 625 ("the claims of the class representatives-that the retirees' healthcare benefits are vested under ERISA and the LMRA-generally are 'typical' of the claims of every other member of the class" (citation omitted)); *Bittinger,* 123 F.3d at 884 (claim that defendant "originally planned to provide lifetime, fully-funded benefits to retirees" satisfies typicality); *see also Reese,* 227 F.R.D. at 487; *Rankin,* 220 F.R.D. at 518.

8. **Adequacy Of Class Representatives.** The Sixth Circuit has identified two criteria for determining whether class representatives are adequate: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute interests of the class through qualified counsel."

*Senter v. Gen. Motors Corp.,* 532 F.2d 511, 525 (6th Cir.1976). Here, Class Representatives have the same common interest as the unnamed members of the class in protecting retiree health care benefits, and there is nothing to suggest that they would not vigorously protect the interests of the Class. *See Amchem,* 521 U.S. at 625-26 (stating that class members must " 'possess the same interest and suffer the same injury' " to meet the Rule 23(a)(4) adequacy requirement); *Henry I,* 497 F.3d at 626 (absent class members would be adequately represented when the named representatives were "part" of each class and all class members shared a common claim so that their legal interests paralleled the named representatives' interests).

9. There are no potential intra-class conflicts that would jeopardize adequate representation or prevent class certification. In this regard, "it is well settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Georgia State Conference of Branches of NAACP v. Georgia,* 99 F.R.D. 16, 34-35 (S.D.Ga.1983) (citing Federal Practice and Procedure ("Fed. Prac. & Proc.") § 1768; *see also Mueller v. CBS, Inc.,* 200 F.R.D. 227, 238 (W.D.Pa.2001). Hence, mere "differences in the interests of the class representatives and the other class members are not dispositive under Rule 23(a)(4). The key question is whether the interests are antagonistic." *Steiner v. Equimark Corp.,* 96 F.R.D. 603, 610 (W.D.Pa.1983) (emphasis in original); *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625-26 (5th Cir.1999) ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); *Walters v. Reno,* 145 F.3d 1032, 1046 (9th Cir.1998) (determining that factual variations among class members do not defeat adequacy where they are united in seeking relief on behalf of the class).

*20 10. In evaluating the adequacy of potential class counsel, Rule 23(g)(1)(l) requires that the court consider: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law and (4) the resources counsel will commit to repre-

senting the class.

11. Class Counsel in this case are well qualified, more than adequate to the task, and have the resources to commit to representing the Class. *See Henry I, 497 F.3d at 626* (finding Attorney Payne competent, qualified, and prepared to prosecute). Class Counsel have extensive knowledge of the law relating to retiree benefits litigation and have years of experience litigating dozens of actions of this kind. As set forth in footnote one of the Payne Declaration, some of these cases include the following: *Armistead v. Vernitron Corp., 944 F.2d 1287 (6th Cir.1991); Asarco, Inc. v. United Steel Workers of Am.,* No. 03-1297, 2005 U .S. Dist. LEXIS 20873 (D.Ariz. July 26, 2005); *Bower v. Bunker Hill Co., 725 F.2d 1221 (9th Cir.1984),* on remand,114 F.R.D. 587, 675 F.Supp. 1254 (E.D.Wash.1986); *Crown Cork & Seal v. United Steelworkers of Am., 32 E.B.C.1950 (W.D.Pa.2004); Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir.1989)* (affirming 110 CCH Lab. Cases ¶ 10,878 (S.D.W.V., April 19, 1988)); *Mamula v. Satralloy, 578 F.Supp. 563 (S.D.Ohio 1983);* Mioni v. Bessemer Cement Co., 4 E.B.C. 2390 (W.D.Pa.1983); *Policy v. Powell Pressed Steel Co., 770 F.2d 609 (6th Cir.1985); Rexam, Inc. v. United Steelworkers of Am., 31 E.B.C. 2562 (D.Minn.2003); Senn v. United Dominion, 951 F.2d 806 (7th Cir.1992); Shultz v. Teledyne, 657 F.Supp. 289 (W.D.Pa.1987); Smith v. ABS Industries, 890 F.2d 841 (6th Cir.1989); Steelworkers v. Connors Steel Co., 855 F.2d 1499 (11th Cir.1988); Steelworkers v. Textron, Inc., 836 F.2d 6 (1st Cir.1987).*

12. **Rule 23(b)(2).** Finally, the Class may be certified under Rule 23(b)(2) in that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."Fed.R.Civ.P. 23(b)(2). The requirements of this subsection are met when "the common claim is susceptible to a single proof and subject to a single injunctive relief." *Senter, 532 F.2d at 525.* Courts routinely certify claims challenging an employer's modification of health care benefits under Rule 23(b)(2), holding that, in such cases, the employer's alleged conduct is directed at the class as a whole and hence class-wide injunctive or declaratory relief is appropriate. *See Henry I, 497 F.3d at 625* ("GM has threatened to modify all retiree healthcare benefits

unilaterally, 'thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.' " (citation omitted)); *Fox v. Massey-Ferguson, Inc., 172 F.R.D. 653, 665 (E.D.Mich.1995)* ("[I]t is abundantly clear that the ... decision by [the defendant] with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate."); *Halford, 161 F.R.D. at 20* (certifying claim that the defendant has a contractual obligation to provide lifetime health care benefits to retirees and eligible spouses). Plaintiffs' claims in this case are all based on the contested question of whether GM may unilaterally modify retirees' health care benefits-claims that are "susceptible to a single proof and subject to a single injunctive remedy," and hence are properly certified under Rule 23(b)(2). *Senter, 532 F.2d at 525.*

*21 13. Accordingly, the court will grant certification of the Class, as defined in paragraph thirteen of the court's findings of fact.

### C. Final Approval of the Class Action Settlement

14. The court evaluates the proposed settlement in light of the general federal policy favoring the settlement of class actions. *Henry I, 497 F.3d at 632; Clark Equip. Co. v. Int'l Union, Allied Indus. Workers, 803 F.2d 878, 880 (6th Cir.1986)* (per curiam); *Franks v. Kroger Co., 649 F.2d 1216, 1224 (6th Cir.1981),* vacated and modified on other grounds by *670 F.2d 1121 (6th Cir.1982); In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 530 (E.D.Mich.2003); Berry v. Sch. Dist., 184 F.R.D. 93, 97 (W.D.Mich.1998).*

15. Given this well-settled policy, "a district court's role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.' " *Clark Equip. Co., 803 F.2d at 880* (quoting *Officers For Justice v. Civil Service Comm'n, 688 F.2d 615, 625 (9th Cir.1982); Berry, 184 F.R.D. at 97* ("The court's role ...'is properly limited to the minimum necessary to protect the interests of the class and the public' "); *Bronson v. Board of*

*Educ.*, 604 F.Supp. 68, 78 (S.D.Ohio 1984); Fed.R.Civ.P. 23(e)(1)(C) (stating that court may approve class settlement "on finding that it is fair, reasonable, and adequate").

16. Because the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation, the court should not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981); *Henry I*, 497 F.3d at 631 (inquiry into fairness of settlement "understandably does not require us to 'decide the merits of the case or resolve unsettled legal questions' " (citation omitted)); *Clark Equip. Co.*, 803 F.2d at 880 (a court should not examine "the factual or legal disputes which underlie the merits of the dispute").

17. Nor should the court engage in the " 'detailed and thorough investigation that it would undertake if it were actually trying the case.' " *Berry*, 184 F.R.D. at 98;Fed. Prac. & Proc. § 1797.5 ("The court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial. Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

18. In evaluating a proposed class settlement, the court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.' " *Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d 559, 567 (6th Cir.2001); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1976); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D.Fla.2002) ("[e]ven when the Court becomes aware of one or more objecting parties, the Court is not 'required to open to question and debate every provision of the proposed compromise.' "); 4 Newberg § 11:57 ("The court, in its discretion, may limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement.").

*22 19. Courts have fashioned a series of factors to assist in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution:

(i) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement;

(ii) the risks, expense, and delay of further litigation;

(iii) the judgment of experienced counsel who have competently evaluated the strength of their proofs;

(iv) the amount of discovery completed and the character of the evidence uncovered;

(v) whether the settlement is fair to the unnamed class members;

(vi) objections raised by class members;

(vii) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and

(viii) whether the settlement is consistent with the public interest.

*In re Cardizem*, 218 F.R.D. at 522; *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir.1992).

20. The court may choose to consider only those factors that are actually relevant to the settlement at hand, and may weigh particular factors according to the demands of the case. *Id.* at 1205-06.

**D. The Relevant Factors**

**1. The Likelihood Of Success On The Merits**

21. A significant factor in the court's evaluation of a proposed settlement is the likelihood of success on the merits weighed against the relief offered in the settlement. *General Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir.1984).

22. Although this factor requires " 'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.' " *Berry*, 184 F.R.D. at 98. The ultimate question is "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Cardizem*, 218 F.R.D. at 522;*see also Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993

WL1318607, at *2 ("It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable").

23. In assessing the relative risk and benefits of the settlement, the court must not " 'decide the merits of the case or resolve unsettled legal questions.' " *Henry I*, 497 F.3d at 631 (quoting *Carson, 450 U.S. at 88 n. 14).* "The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Id.* at 632.

24. Here, Plaintiffs' claims rest on the same question as in *Henry I*: Do the collective bargaining agreements vest former union workers with health care benefits upon retirement? Plaintiffs' Amended Complaint makes the same basic claims as in *Henry I*, and seeks to enjoin the same conduct by GM, i.e., GM's unilateral modification of retiree health care benefits. (*See* Am. Compl., Dkt. # 33.) Plaintiffs likewise rely on the same GM / UAW collective bargaining agreements considered in *Henry I*. It is Plaintiffs' view in both cases that these CBAs demonstrate the parties' intent that retiree benefits be vested. (*See Id.* at ¶¶ 24-26; *Int'l Union, UAW v. Yard-Man, Inc.,* 716 F.2d 1476, 1482 (6th Cir.1983). It is GM's view, here as in *Henry I*, that retiree health care benefits are not vested. According to GM, the company unambiguously reserved its right to modify those benefits. (Ans. to Am. Compl. at ¶¶ 6-13, 24, Dkt. # 36; *see also Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir.1998).*

*23 25. In short, the parties' claims and defenses in this case turn on the same question as in *Henry I*:"Do the collective-bargaining agreements vest former union workers with their healthcare benefits upon retirement?" *Henry I, 497 F.3d at 631*. As in *Henry I*, the parties' fundamental disagreement on the answer to that question is a "legitimate legal and factual disagreement" appropriate for settlement. 497 F.3d at 632; *Henry I, 2006 WL 891151, at *15* ("The ultimate issue in this case is whether retiree health care benefits are vested, an issue upon which the plaintiffs and defendant have historically been, and remain, deeply divided.").

26. In its order affirming this court's final approval of the settlement in *Henry I*, the Sixth Circuit summa-

rized the parties' competing answers to this question as follows:

The retirees and the UAW point to the *Yard-Man* line of cases as support for their position that the retirees' healthcare benefits vested upon retirement. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc., 716 F.2d 1476, 1482 (6th Cir.1983)* (holding that there was "sufficient evidence" of intent to vest retirees with benefits "in the language of [the] agreement itself"); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc., 190 F.3d 768, 773-74 (6th Cir.1999); Smith v. ABS Indus., Inc., 890 F.2d 841, 846 (6th Cir.1989).* Consistent with these cases, they argue, both collective bargaining agreements contain the requisite vesting language: "The health care coverages an employee has at the time of retirement ... shall be continued."GM JA 785.

GM and Ford invoke the *Sprague* line of cases-to the effect that "an employer's commitment to vest" must be stated "in clear and express language" in the plan documents. *Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir.1998)* (en banc) (internal quotation marks omitted).

Consistent with these cases, they argue, a reservation of rights to modify retiree healthcare benefits is inconsistent with the claim that those benefits have irreversibly vested, *see Maurer v. Joy Techs., Inc., 212 F.3d 907, 919 (6th Cir.2000); BVR Liquidating, 190 F.3d at 773,* and note that the two companies' retiree healthcare plans contain such a reservation, *see*GM JA 550 ("Any rate of payment by the enrollee and any other terms and conditions of the Program may be changed at any time by the Corporation").

*Henry I, 497 F.3d at 631* (some citations omitted).[FN4]

> FN4. The Sixth Circuit's recent opinion in *Noe v. PolyOne Corp.,* does not resolve the legal dispute. 520 F.3d 548, 2008 U.S.App. LEXIS 5763, at *5-6 (6th Cir.2008). Indeed, each party argues that *Noe* supports its position.

27. In sum, the court's task "is not to decide whether one side is right or even whether one side has the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

better of these arguments."*Id.* at 632.Otherwise, the court would "be compelled to defeat the purpose of a settlement in order to approve a settlement."*Id.* Rather, the court should determine whether the parties are using settlement to resolve a legitimate legal and factual disagreement. That is indeed the case now as in *Henry I.*

**\*24** 28. Plaintiffs have concluded that risk of loss, even if unlikely, would produce consequences so grave that they are worth avoiding through a settlement that continues comprehensive health care benefits for the Class.[FN5]*See Enter. Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 246 (S.D.Ohio 1991) (" '[C]lass counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class.'"); *Priddy v. Edelman,* 883 F.2d 438, 447 (6th Cir.1989) ("The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement."); *In re Rent-Way Sec. Litig.,* 305 F.Supp.2d 491, 509 (W.D.Pa.2003) ("As is true in any case, the proposed Settlement 'represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution.") (citation omitted); *Schaefer v. Tannian,* 895 F.Supp. 175, 178 (E.D.Mich.1995) ("The court need not disapprove the settlement because a plaintiff might have received more if the case had been fully litigated."); *Brown v. Steinberg,* Nos. 84-4654, 84-4665 and 84-8001, 1990 WL 145151 (S.D.N.Y. Sept.22, 1990) (holding that class settlements may be approved though they are only a fraction of the potential recovery, collecting cases).

> FN5. As the Sixth Circuit concluded in *Henry I:*
>
> What makes these settlements particularly sensible, moreover, is that, even if this merits question favored one party over the other, the retirees still would have had ample reason to control the resolution of this dispute through negotiation today rather than litigation tomorrow. If we decided for the sake of argument that the retirees were likely to lose the *Yard-Man/Sprague* debate, little would stand in the way of the car companies' reducing or even eliminating the retirees' healthcare

benefits in the future. If we decided for the sake of argument that the retirees were likely to win the debate, any such victory would run the risk of being a Pyrrhic one because the cost of insisting on irreversible healthcare benefits might well be-and indeed almost certainly would be-the continuing downward spiral of the companies' financial position. If GM's automotive divisions lost $11.4 billion in 2005 while spending $3.7 billion to pay retiree healthcare benefits (and Ford's division lost $3.9 billion while spending $2.4 billion on retirees), it takes little imagination to picture the future financial toll this burden would place on the two companies. While we need not embellish the point by raising the prospect of bankruptcy, it is well to remember that the Federal Government's Pension Benefit Guaranty Corporation, which provides pension guarantees for the employees and retirees of financially distressed companies, has no sister agency that provides the same guarantees for retiree healthcare benefits.

In view of the risks the retirees faced from losing and winning the *Yard-Man/Sprague* debate, it is no wonder that Payne recommended settlement to the class representatives; no wonder that the named representatives consented to each settlement; no wonder that less than one half of one percent of class members objected to either settlement, ...; and no wonder that both district courts thought that the settlement was a fair way of handling the risks of litigation, *see*GM JA 140 ("[C]ost increases entailed by the settlement are modest ... [and][t]he potential loss of all benefits, due to either GM's financial collapse or GM's prevailing on the merits, would be far more harsh for Class Members."). And in view of the other factors we must consider-the federal policy favoring settlement of class actions, *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir.2004), the signal importance of GM and Ford to the economies of Michigan and the country, and the extensive information-sharing between the companies, the UAW, the class

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

representatives and even McKnight and Bronson that preceded the settlements, it is no wonder that both district courts approved the final settlements as "fair, reasonable, and adequate" under Rule 23(e)(1)(C). We see it the same way.

Id. at 632-33 (some citations omitted).

29. Courts routinely recognize that settlements do not equal the full value of the loss claimed by the plaintiffs. "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." Weinberger v. Kendrick, 698 F.2d 61, 65 (2d Cir.1982) (approving class settlement where "recovery will be only a negligible percentage of the losses suffered by the class"); Lazy Oil Co. v. Witco Corp., 95 F.Supp.2d 290, 339 (W.D.Pa.1997) (collecting cases where courts approved class action settlements providing from 0.2 percent to 16 percent of potential recovery), aff'd, 166 F.3d 581 (3rd Cir.1999).

30. Moreover, "[a] just result is often no more than an arbitrary point between competing notions of reasonableness." In re Corrugated Container Antitrust Litig. (II), 659 F.2d 1322, 1325 (5th Cir.1981); see also Lazy Oil Co., 95 F.Supp.2d at 338. Thus, in assessing the settlement, the court must determine "whether it falls within the 'range of reasonableness,' not whether it is the most favorable possible result in the litigation." In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 319 (N.D.Ga.1993).

31. Here, the court concludes that the proposed settlement falls well within this range of reasonableness and that the benefits to the Class from the Settlement are substantial.

32. All of the experts who have provided evidence of their efforts to model the sufficiency of the negotiated funding of the VEBA agree that it is not possible to predict with certainty whether the funding for the new VEBA will be sufficient to accomplish the UAW's objective in negotiating the terms for this settlement, namely, to provide benefits at the current levels (except for an assumed increase in the cap on annual increases in retiree cost from 3 to 4 percent in 2016) for the lifetimes of the entire class and the covered group. Different assumptions and different models produced different projections, but all of the experts agreed that the principal actuarial assumptions (not including the value of the convertible note and derivative instrument, as described in footnote 1 of the Findings of Fact) that were used in negotiating the VEBA funding were within a range of reasonableness. Only future experience will tell which of those assumptions are realized.

*25 33. The court has given careful consideration, in accordance with the urging of the United States Department of Labor (as the parties reported in their memoranda supporting the motion for final approval), to the report of Adam Reese. His report states that under certain plausible conditions, the VEBA would be expected to continue providing benefits at the current levels for as long as the Class Members are alive to receive them. Under other plausible conditions, his report projects that the VEBA Committee would have to reduce benefits at some point in the future in order to continue providing substantial benefits for as long as they will be needed. If benefit reductions of any magnitude prove to be necessary in the future, those reductions would undoubtedly create some hardship for class members, but the court has concluded that in the absence of the settlement, the class faces greater risks of future benefit reductions or even termination of those benefits. Under these circumstances, the court concludes that the settlement is fair, reasonable and adequate for the class.

## 2. The Risks, Expense, And Delay Of Further Litigation

34. Complex litigation of the sort involved here is costly and time-consuming, as demonstrated by previous cases in this circuit involving modifications to retiree benefits. For example, GM salaried workers and retirees commenced litigation in 1989, challenging the modification of their health care benefits. The case was not resolved until nine years later, after a trial and hearing (and rehearing) in the Sixth Circuit. See Sprague, 133 F.3d 388. Similarly, seven years of litigation were required for the parties in Yard-Man to achieve finality. Yard-Man, Inc., 716 F.2d at 1482. The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement. See In re Cincinnati Policing, 209 F.R.D. 395, 400 (S.D.Ohio 2002) ("[T]he court has no doubt that the trial of this class action would be a long, arduous

Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 **(Cite as: 2008 WL 2968408 (E.D.Mich.))**

process requiring great expenditures of time and money on behalf of both the parties and the court.... The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted); *Robinson v. Ford Motor Co.,* No. 04-00844, 2005 WL 5253339 (S.D. Ohio June 15, 2005).

35. Given GM's current financial struggle, the delay necessary to litigate the dispute would benefit no one. For GM, success at litigation may come too late to effect the turnaround essential to GM's continued viability. For the Class, the parties recognize that absent this settlement, GM may be unable to continue to provide retiree health care benefits to the Class.

36. In short, success at litigation (for either side) may prove illusory, a prospect that makes settlement a reasonable course of action. *In re Rio Hair Naturalizer Prods. Liab. Litig.,* No. MDL 1055, 1996 WL 780512, at *13 (E.D.Mich. Dec.20, 1996) ("[A] victory by Plaintiffs at trial, given Defendants' limited funds, would be pyrrhic."); *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo.1974) ("[T]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, 'It has been held proper to take the bird in the hand instead of a prospective flock in the bush.' ").

### 3. The Judgment Of Experienced Counsel

**\*26** 37. Class Counsel here fully support the proposed settlement. The endorsement of the parties' counsel is entitled to significant weight and supports the fairness of the class settlement. It is "well recognized that the court should defer to the judgment of experienced counsel who has competently evaluated the strength of the proofs."*Mich. Hosp. Ass'n v. Babcock,* No. 89-00070, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D.Mich. Feb. 11, 1991); *Cotton v. Hinton,* 559 F.2d 1326, 1330 (11th Cir.1977) ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties"); *Berry,* 184 F.R.D. at 104 ("[T]he court generally will give deference to plaintiffs' counsel's determination to settle a case").

38. Where, as here, counsel are reputable practitioners and experienced in complex class action litiga-

tion, their collective judgment in favor of the settlement is entitled to considerable weight. *Ass'n for Disabled Ams.,* 211 F.R.D. at 467 ("[T]he Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.' ").

### 4. The Amount of Discovery Completed and the Nature of the Evidence Uncovered

39. In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced. *Levell v. Monsanto,* 191 F.R.D. 543, 557 (S.D.Ohio 2000) (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement).

40. Thus, the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties. *Newby v. Enron Corp.,* 394 F.3d 296, 306 (5th Cir.2004) (" 'Formal discovery [is not] a necessary ticket to the bargaining table.'"); *Cotton,* 559 F.2d at 1332 (upholding settlement despite fact that little formal discovery had been conducted and noting that, "[b]eing an extra judicial process, informality in the discovery of information is desired"); *In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 159 (4th Cir.1991) ("[D]ocuments filed by plaintiffs and evidence obtained through informal discovery yielded sufficient undisputed facts" to evaluate the settlement); *Robinson,* 2005 WL 5253339 (approving settlement without formal discovery).

41. The court need not possess sufficient "evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."*Newberg* § 11:45; *In re Rio Hair Naturalizer,* 1996 WL 780512, at *13. Instead, this court need only have " 'sufficient facts before him to intelligently approve or disapprove the settlement.' " *Epstein v. Wittig,* No. 03-4081, 2005 WL 3276390, at *7 (D.Kan. Dec.2, 2005); *Gen. Tire & Rubber,* 726 F.2d at 1084 n. 6. Here, the court has substantial familiarity not only with the claims of the parties and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the facts and arguments underlying their respective positions, but also with the nature and conduct of the settlement negotiations and the parties' informal but comprehensive exchange of information.

**\*27** 42. The evidence demonstrates that there was full disclosure in this case by GM to the Class and UAW of GM's business and financial condition, GM's health care liability and the relevant CBAs and health care plan documents. Both UAW and the Class selected experts and undertook independent analyses of GM's financial condition and legal position. There was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the court can assess the parties' agreement.

### 5. The Settlement is Fair to the Unnamed Class Members

43. Courts may scrutinize settlements to determine whether absent class members have lost out in favor of attorneys and named class members. In this case, the Class is cohesive and the 2008 Settlement Agreement affects all similarly-situated Class Members in the same manner. No preference is granted to the Class Representatives under the settlement and, because all Class Members have a unitary interest in seeking the best possible benefits for retirees, there is no risk of an undue burden on absent Class Members. *Heit v. Van Ochten,* 126 F.Supp.2d 487, 490-91 (W.D.Mich.2001); 5-23 Moore's Federal Practice § 23.164.

### 6. The Number of Objections Raised by Class Members Supports Approval of the Settlement

44. "A court should not withhold approval of a settlement merely because some class members object."*Mich. Hosp. Ass'n,* 1991 U.S. Dist. LEXIS 2058, at \*10; *see also Robinson,* 2005 WL 5253339, at \*16;Fed. Prac. & Proc. § 1797. 1 ("[T]he fact that there is opposition does not necessitate disapproval of the settlement.").

45. In this case, GM provided notice to the Class by First Class Mail and by publication. The Notice was easily understood, succinctly and accurately summarized the terms of the Settlement Agreement, and informed Class Members of their rights-including their right to object to the Henry II 2008 Settlement

Agreement and (for those Class Members who are also members of the *Henry I* class) to the "Joint Motion for Relief from Judgment" in the *Henry I* case. This notice was the best practicable under the circumstances and fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process. After receiving this notice, only forty-three out of approximately 521,979 Class Members (0.008 percent) have submitted an objection to the 2008 Settlement Agreement. This level of opposition is considerably lower-about 32 times so-than even the level of opposition in *Henry I,* where less than three tenths of one percent (0.27 percent) of the class objected.

46. The court notes the proponents' argument that an overwhelming degree of silence on the part of other members of the class could indicate support for the 2008 Settlement, but finds that an inference to that effect is weak. Silence could also variously indicate apathy, confusion, disorganization, literacy problems, timidity or a number of other things. The silence experienced here indicates to the court not the presence of approval, but simply the absence of concerted opposition. Such a substantial absence of opposition is one additional indicator favoring approval of the 2008 Settlement. *See Robinson,* 2005 WL 5253339, at \*17 ("[A] relatively small number of class members who object is an indication of a settlement's fairness") (citing Newberg § 11.48). The specific content of the filed objections is discussed below.

### E. The Settlement Was The Product Of Arm's-Length Negotiations

**\*28** 47. Courts presume the absence of fraud or collusion unless there is evidence to the contrary. *In re Rio Hair Naturalizer,* 1996 WL 780512, at \*14 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary."); *Granada Invs., Inc.,* 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *Hemphill v. San Diego Bd. Ass'n of Realtors, Inc.,* 225 F.R.D. 616, 621 (S.D.Cal.2004); Newberg (4th) § 11:51. Here, there have not even been any allegations of fraud or collusion.

48. To the contrary, there is an ongoing adversarial relationship between the Class and UAW, on the one

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

hand, and GM, on the other hand, with respect to the question of GM's asserted right to unilaterally change, modify or terminate health care benefits, and the parties are in fundamental and irreconcilable disagreement on this issue. Further, if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion. *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 152 (S.D.Ohio 1992) ("In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper.").

### F. The Public Interest

49. The evidence submitted by GM amply catalogues the impact of GM's continued viability on the economy of southeast Michigan, the State as a whole and the nation. The delay and risks of litigation have an impact not only on GM, the UAW and the Class, but also on the families, businesses, and communities that depend on GM's continued competitiveness and viability. The court concludes that those interests are advanced by the 2008 Settlement Agreement. The 2008 Settlement Agreement serves the public interest also by conserving the resources of the parties and the court, and by promoting the "strong public interest in encouraging settlement of complex litigation and class action suits." *In re Cardizem,* 218 F.R.D. at 530. Furthermore, absent this settlement, in the event that GM goes bankrupt, it is possible that the over 500,000 class members would be left without any company-provided retiree medical benefits.

### G. Objections To The Settlement

50. As noted, out of the approximately 522,000 Class Members who were sent notice, forty-three individuals-or .008 percent-submitted Objections. (Objections, Dkt.# 45.) Only about one out of every 12,500 Class Members objected.

51. Of the forty-three Objections submitted, seventeen fail to state any specific grounds or simply assert that the settlement was "unfair" or too complicated. (*Id.* at Objections1-3, 6-9, 16-19, 25, 30-31, 37 and 40-41.) An additional five Objections do not address the settlement apart from expressing dissatisfaction about the existing level of health care benefits retirees are already receiving. (*Id.* at Objections4-5 and 22-24.)

*29 52. Other Objections maintain that retiree health benefits had been provided in written documents that could not be altered and/or that these benefits had been promised for life. (*Id.* at Objections10, 12-15, 32, 36 and 38.)

53. Six Objections claim that the Class Representatives and/or Class Counsel were ineffective and/or did not represent their interests. (*Id.* at Objections11, 19, 27-29 and 42.)

54. Other Objections argue that this case should not be certified as a class action and/or that Class Members should be permitted to opt out, (*Id.* at Objections11, 19 and 27-29), or that they should have been permitted to vote on the agreement, (*Id.* at Objections27 and 28). One objector asserts that the UAW did not have the right to negotiate on behalf of retired employees.(*Id.* at Objection # 29.)

55. Other Objections allege faults in the design, funding and management of the VEBA. (*Id.* at Objections11-12, 20-21, 26 and 33-35.)

56. One Objector states the settlement should not apply to him due to his workers' compensation settlement, which he alleges provides for a certain level of retiree health benefits. (*Id.* at Objection # 39.)

57. Objector Leroy McKnight filed an objection incorporating the objections he filed in *Henry I.*(*Id.* at Objection # 29.)

58. One Objector states that Class Counsel should not receive attorneys' fees for their work on this case. (*Id.*)

59. None of these objections, singly or together, provides a basis for disapproving the parties' settlement. As discussed below and as shown throughout the submissions of the Class, the UAW and GM, the settlement is fair, reasonable and adequate. Accordingly, final approval is warranted.

### 1. Objections Stating No Specific Grounds or Asserting Only the General "Unfairness" of the Settlement

60. With respect to objections stating no specific

Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
 (Cite as: 2008 WL 2968408 (E.D.Mich.))

grounds or asserting only the general "unfairness" of the settlement, because "there is no way for the court to determine the basis for these objections or whether any such objections have merit, they are of little use." *In re Rio Hair Naturalizer,* 1996 WL 780512, at *14; *Sunrise Toyota, Ltd. v. Toyota Motor Co.,* No. 71-1335, 1973 WL 778, at *6 (S.D.N.Y. Feb.20, 1973) (rejecting objections based on "conclusory allegations"); *Fed. Prac. & Proc. § 1797.* 1 ("Only clearly presented objections ... will be considered.").

61. In sum, the objections that do not specify any grounds beyond general unfairness provide no basis for rejecting the settlement.

## 2. Benefits are Vested and / or that GM Told Employees Benefits Were for Life

62. Some Class Members assert that benefits are vested and can never change. Class Counsel also concluded that there are strong arguments to be made that the retiree medical benefits at issue are vested. However, Class Counsel also recognize that there are countervailing arguments, and should this case proceed to litigation, there is no doubt that GM would argue vigorously that benefits are not vested. If the case were to proceed and the Class were to lose, GM would be free to sharply curtail or even eliminate benefits altogether after the *Henry I* settlement expired.

*30 63. Furthermore, as this court held in *Henry I,* a disagreement over the merits of the parties' dispute is not a basis for disapproving the settlement. *Henry I,* 2006 WL 891151, at *22-23 ("the law provides for settlement of even so-called 'meritorious' claims, reflecting the fact that settlements are generally based on several different considerations"); *see Laskey v. UAW,* 638 F.2d 954, 956 (6th Cir.1981) ("[T]he objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation."); *In re Wash. Pub. Power Supply,* 720 F.Supp. at 1394 (finding that objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs").

64. Some objectors have asserted that they were told by GM or UAW representatives that their benefits were for life. In analyzing the Class's legal claims, Class Counsel assumed that such representations

were made, i.e., that extrinsic evidence would support the claim of vesting (Payne Final Approval Decl. at ¶ 5), and still concluded that the settlement was fair and reasonable.

65. Moreover, while extrinsic evidence is relevant if the controlling documents are ambiguous, it is not dispositive. *Golden v. Kelsey-Hayes Co.,* 73 F.3d 648, 654 (6th Cir.1996). In other words, the fact that retirees were told that benefits were for life does not establish that these benefits are vested. *McCoy v. Meridian Automotive Sys., Inc.,* 390 F.3d 417, 422 (6th Cir.2004) ("When ambiguities exist ..., the court may examine extrinsic evidence of the parties' intent."). Accordingly, the existence of extrinsic evidence supporting the Class's case on the merits does not render settlement of that case unfair or unreasonable.

## 3. Class Representatives and / or Class Counsel are Inadequate

66. None of the objections includes any specific discussion of, or complaints about, the performance of Class Counsel or the Class Representatives, other than a general dislike for the terms of the settlement. Moreover, Mr. Leroy McKnight simply attempts to incorporate his entire objection from *Henry I* without any explanation of how or in what particulars those objections, already once rejected, are relevant to this case or warrant a different conclusion. As noted above, the court has concluded that representation was adequate, and these objections do not offer any grounds for rejecting the settlement. [FN6]

> FN6. Indeed, the Sixth Circuit singled out Attorney Payne as being particularly well qualified to represent the Class:
>
> Payne has practiced labor law for almost 24 years, has litigated almost 50 retiree healthcare class actions at the trial and appellate levels, has authored numerous articles on the law of retirement benefits, has contributed to BNA's treatise on employee benefits and heads the American Bar Association's Subcommittee for Benefit Claims and Individual Rights. In view of Payne's background, both classes would have been hard pressed to find someone with greater "experience in handling class

actions ... and claims of the type asserted in the action" or an attorney with more "knowledge of the applicable law." Fed.R.Civ.P. 23(g)(1)(C)(i). Not only was Payne qualified, he also was prepared, if need be, to prosecute these cases: He had six attorneys plus substantial support staff ready to assist him; he retrieved and reviewed "boxes of materials" from GM and Ford, including all of the financial information the two companies shared with the UAW, GM JA 256; Ford JA 274; he hired an independent financial consultant to analyze the fiscal health of the companies; and by all appearances he thoroughly investigated the potential claims of both classes under ERISA and the LMRA. Payne, in brief, was willing to, and indeed did, commit substantial "resources ... to representing the class[es]." Fed.R.Civ.P. 23(g)(1)(C)(i).

*Henry I,* 497 F.3d at 62-27.

67. Finally, this court found that Mr. McKnight's objections in *Henry I* did not provide a ground for disapproving that settlement, and the Court of Appeals affirmed that ruling. There is no reason to reach a different conclusion now on the identical objections reasserted by Mr. McKnight in this case.

#### 4. Objection that Retirees Should be Permitted to Opt-Out of the Class Action

68. In *Henry I,* the court previously considered and rejected objections claiming that retirees should be permitted to opt-out of the class action:

**\*31** the Class here has a "common claim"-i.e., that their benefits are vested-which "is susceptible to a single proof and subject to a single injunctive remedy," and no possible claim for money damages. Senter, 532 F.2d at 525; Coleman v. GMAC, 220 F.R.D. 64 (M.D.Tenn.2004); McGee v. E. Ohio Gas Co., 200 F.R.D. 382, 391 (S.D.Ohio 2001) (where "the putative class seeks a judgment 'settling the legality of the behavior with respect to the class as a whole,' " Rule 23(b)(2) certification is proper) (quoting Fed.R.Civ.P. 23 advisory committee's note).

Permitting class members to opt out from this homogenous and unified class would necessarily mean that different retirees could have different rights under the same GM health care plan, making effective declaratory or injunctive relief-as well as administration of benefits under the Settlement-impossible. *See Van Gemert v. Boeing Co., 590 F.2d 433, 439 (2d Cir.1978); Day v. NLO, 851 F.Supp. 869, 885 (S.D.Ohio 1994)* ("Opting out is generally not reasonable because plaintiff-by-plaintiff injunctive relief is not practical."). It would also " 'permit the institution of separate litigation and would defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication,' " undermining the efficacy of any settlement. *Kyriazi v. W. Elec. Co., 647 F.2d 388, 393 (3d Cir.1981)* (quoting *Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 252-53 (3d Cir.1975)); Ass'n for Disabled Ams., Inc., 211 F.R.D. at 473* (same).

In the absence of individual claims for monetary relief, allowing opt outs is not only unnecessary, but would destroy the very basis of the Class' claims and requested relief, as well as the purpose of any class treatment. *Stewart v. Rubin, 948 F.Supp. 1077, 1090 (D.D.C.1996)* (Rule 23(b)(2) is "designed specifically to avoid the risks of inconsistency, prejudice, or inequity that would result to persons similarly situated in the absence of a unitary adjudication of their common claims."); *Heit v. Van Ochten,* 2001 U.S. Dist. LEXIS 532, at *4 (W.D.Mich.2001); *see Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1240 (9th Cir.1998)* (holding that class counsel was not inadequate for failing to insist on opt-out rights where claims were predominantly for monetary relief).

*Henry I,* 2006 WL 891151, at *31-32.

#### 5. The Parties Should not be Relieved of the Obligations of the *Henry I* Judgment

69. The *Henry I* judgment specified the particular benefit program and premiums, co-pays, deductibles and out-of-pocket maximums that are to remain in place through September 14, 2011, but it did not finally resolve disputed issues concerning continuation and design of the Plan after that date. Instead, the *Henry I* judgment provided that either GM or the UAW *could* terminate the judgment after September

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

14, 2011. As discussed above, GM has announced that it will exercise its right to do so.

**\*32** 70. Under the 2008 Settlement Agreement, the plan design and other benefits of the *Henry I* judgment will remain unchanged through at least December 31, 2011. Thus, the relief that was secured in *Henry I* has been made a part of the relief to the Class in this case. In these circumstances, the court has concluded that it is in the best interest of the Class to approve the 2008 Settlement Agreement, which both preserves the relief that the Class obtained through the settlement in *Henry I* and provides additional relief into the indefinite future for the purpose of continuing to provide their retiree health benefits for life, if possible, under the new VEBA.

### 6. Retirees Should Have Been Allowed to Vote on the Settlement

71. Federal Rule of Civil Procedure 23 does not require that proposed class action settlements be submitted to class members for a vote or ratification or that Class Counsel seek class approval. *Henry I,* 2006 WL 891151, at \*23 (discussing the claimed right to vote on the settlement and finding that there was no such right under law or the UAW Constitution); *League of Martin v. City of Milwaukee,* 588 F.Supp. 1004, 1023 (E.D.Wis.1984) (rejecting objections based on lack of class-wide ratification vote and noting that there will always be dissent within a class); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2nd Cir.1987) (collecting cases wherein courts approved settlements notwithstanding objections ranging from 20 percent to 56 percent of the Class).

72. Moreover, Class Members who disapprove of the settlement have the opportunity to submit objections and to also participate in the fairness hearing.

### 7. Objection that the UAW did not Have the Right to Negotiate for the Retirees

73. One objector, citing *Allied Chem. Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 174, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), asserted that the UAW did not have the authority to negotiate on behalf of its retirees. The court reviewed and rejected this Objection in *Henry I:*

In *Pittsburgh Plate Glass,* the Supreme Court held only that retirees were not "employees" within the meaning of the National Labor Relations Act, and that an employer therefore had no legal duty to bargain with the union over the benefits of workers who were already retired. *Pittsburgh Plate Glass* does not hold that a union cannot adequately represent a class of retirees in a class action. Moreover, even as to collective bargaining, the Court emphasized that, if the employer agreed, a union could bargain on behalf of its retirees.*Id.* at 181 n. 20.

The Sixth Circuit and other courts have since held that a union may negotiate for, and assert rights on behalf of, retirees. E.g., *Yard-Man, Inc.,* 716 F.2d at 1486; *Communications Workers v. Mich. Bell Tel. Co.,* 820 F.2d 189, 192 (6th Cir.1987) ("[T]he union had standing to assert the retirees' rights under the [CBA] to which it was a party."); *Rossetto v. Pabst Brewing Co.,* 128 F.3d 538, 540 (7th Cir.1997); *United Steelworkers v. Canron, Inc.,* 580 F.2d 77, 80-81 (3d Cir.1978); *UAW v. Acme Precision Prods., Inc.,* 515 F.Supp. 537, 540 (E.D.Mich.1981). UAW has historically taken the position that it can represent retirees and has, in fact, done so.

**\*33** *Henry I,* 2006 WL 891151, at \*24;*aff'd* 497 F.3d at 627.

74. In any event, the Class has been represented throughout this matter by independent Class Counsel. *Id.* at \*25-27.That representation has included negotiating final settlement documents, analyzing and evaluating the merits and GM's financial health, and assuring the interests of the Class in maintaining quality retiree healthcare have been protected.

### 8. The Design, Funding and Management of the VEBA

75. Objectors also allege faults in the design, funding and management of the VEBA, including: (1) that the VEBA should apply only to current employees (Objections20-21, 26 and 33-35); (2) GM should control the VEBA and put more money in later if funds run out (Objections20-21, 26 and 33-35); (3) the identity of all members of the VEBA Committee should have been provided (Objection # 11); (4) the VEBA Committee should not be able to change the scope of benefits in the future (Objection # 11); (5) the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Agreement should have articulated who will control the VEBA's assets (Objection # 11); and (6) the funding of the VEBA should not depend on a promissory note tied to GM stock with an unknown value (Objection # 12).[FN7] As in *Henry I*, these objectors "have provided no analysis or evidence to support their suggested concern[s]." 2006 WL 891151, at *35. Moreover, like any investment, the performance of the VEBA is subject to numerous factors that cannot be predicted with certainty. Although there is a risk that the assets of the VEBA may not be sufficient to fund benefits at the existing level for the lives of all participants, the parties-in fashioning a compromise-are entitled to allocate the risk of investment performance among themselves. *Id.* Moreover, the court has found that there is a substantial risk that the class would lose all of their medical benefits if the settlement were not approved. The court has also found that Class Counsel reasonably concluded that the class is better off with the risk inherent in the settlement than with the current risk of losing their benefits entirely. Because that conclusion is reasonable, the court concludes that the objection that the VEBA might have insufficient assets to maintain existing levels of benefits does not require disapproval of the settlement.

> FN7. Objection # 12 by Alexander Ellis also states that "[t]he funding of the VEBA is greatly based on a promissory note of GM stock with an unknown value. I question the obligation and rule of law under both ER-ISA and the Securities and Exchange Commission to fully inform and apprise all members on pertinent financial data on Company's Finances and stock value, before voting to accept an agreement funded by GM Stock as the main financial instrument of funding. Such mandated information under the law was not given to members who were asked to ratify the agreement."This objection misapprehends the transaction. First, the Convertible Note does not itself constitute "GM Stock." Rather, it is an instrument of indebtedness, redeemable at maturity at its face value ($4.3725 billion) plus interest. Under certain circumstances, the note is optionally convertible to GM stock. Second, contrary to Mr. Ellis' statement, the stock component of the note is only small fraction of the total VEBA funding under the settlement. And finally, even assuming some dis-

closure obligation had been triggered, there is no indication whatsoever that GM's public filings or the detailed financial information provided to the UAW and the Class were somehow lacking.

76. Objections asserting that the settlement should apply only to active employees misconstrue the nature of this litigation and the purpose of the settlement, which is to resolve once and for all the parties' dispute regarding GM's role in providing health care benefits *to retirees.*Whether and under what circumstances GM and the UAW should structure an alternative health care mechanism for active employees is beyond the scope of this proceeding. In addition, GM's active employees have contributed and will contribute substantially to the funding for the VEBA.

77. As for the objections that the VEBA committee members have not been identified, these also are without merit. The six Independent Members were in fact identified and their biographies were included, along with detailed procedures for their replacement over time. (Notice to Class at 125-26, Fraga Decl. Ex. A, Dkt. # 51-7.) Because the other five are to be appointed and may be removed at any time by the UAW, and because they constitute a minority, the court has concluded that it was not necessary for them to be named in advance and communicated to the Class in the Notice.

**\*34** 78. The objection that the VEBA Committee should not be able to change the scope of benefits in the future also is without merit. The Committee is charged with providing quality health care for all members of the Class, with the objective of maintaining substantial benefits throughout the lifetimes of all members of the Class and the Covered Group. (Trust Agreement at §§ 10.2(a) and (b), Dkt. # 43-6.) The Committee has been vested with discretion to make changes in order to do so. The Committee has a fiduciary obligation under ERISA and the controlling documents to act in the best interests of the Class. (*See Id.* at § 10.11; 29 U.S.C. § 1104(a)(1).) Any provision restricting the Committee's ability to fulfill these obligations would detract from, not enhance, the fairness of the settlement.

### 9. Worker's Compensation Settlement Guaranteed a Certain Scope and Cost of Benefits

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098
**(Cite as: 2008 WL 2968408 (E.D.Mich.))**

79. One objector (Eugene Szopa, Jr.) objects to the Settlement on the ground that he has an "agreement" with GM arising from a workers compensation claim he filed several years ago. (Objection # 39.) GM has provided evidence that there is no agreement with Mr. Szopa. Rather, Mr. Szopa has been receiving workers compensation benefits from GM, including certain medical coverage, since 1991. (Decl. of Kelley Shultz at ¶ 3, Dkt. # 51-11.) Mr. Szopa's entitlement to such benefits is governed by Michigan's Worker's Disability Compensation Act, MCL § 418.101, et seq. The Worker's Disability Act provides coverage only for injuries and illnesses arising out of work related activities; it does not provide coverage for medical expenses related to other causes. Because any medical coverage provided by a State's workers compensation statute is unaffected by this settlement, this objection is not a basis upon which to reject the settlement agreement.

### 10. Objector McKnight's Incorporation of His *Henry I* Objections

80. Leroy McKnight has filed an objection incorporating his objections to the *Henry I* lawsuit-although he did not articulate the relevance or connection of those objections to the 2008 Settlement Agreement. Each of Mr. McKnight's objections were thoroughly considered and rejected by this court in a ruling that was subsequently affirmed by the Sixth Circuit. To the extent those objections may have relevance here, Mr. McKnight has provided no basis for reaching a different conclusion in this case and the court again rejects those objections.

### 11. Payment Of Fees To Class Counsel

81. One objector states that Class Counsel should not be paid for their work in this case but fails to provide any explanation for this objection.

82. GM has agreed to pay Class Counsel's fees based on hours of work performed at reasonable market rates. This payment will neither affect nor reduce the relief provided to the Class.

83. ERISA authorizes payment of attorneys' fees by a defendant to class counsel. *See* 29 U.S.C. § 1132(g)(1). The court approved a payment of fees to Class Counsel in *Henry I* and Class Representatives have previously articulated why Class Counsel are

entitled to attorneys' fees (Mot. for Attorneys Fees and Expenses, Dkt. # 42).

### III. CONCLUSION

**\*35** For the reasons stated above, the court finds that the parties' 2008 Settlement Agreement is reasonable, fair and adequate, and the court APPROVES the parties' 2008 Settlement Agreement in all respects and as to all parties.

E.D.Mich.,2008.
International Union, United Auto., Aerospace, and Agr. Implement Workers of America v. General Motors Corp.
Slip Copy, 2008 WL 2968408 (E.D.Mich.), 156 Lab.Cas. P 11,098

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.