**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- x
                         ::

In re:                         ::      Chapter 11

                         ::

GENERAL MOTORS CORP., *et al.*,   ::      Case No. 09-50026 (REG)

                         ::

               Debtors.   ::      (Jointly Administered)

------------------------------------------------------------------------- x

**THE UNITED STATES OF AMERICA'S STATEMENT IN SUPPORT OF DEBTORS'
MOTION TO APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND
PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S.
TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS; (B) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (C) OTHER RELIEF**

                                   LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile: (212) 637-2750
E-mail:  david.jones6@usdoj.gov
        jeffrey.oestericher@usdoj.gov
        matthew.schwartz@usdoj.gov
        joseph.cordaro@usdoj.gov

DAVID S. JONES
JEFFREY S. OESTERICHER
MATTHEW L. SCHWARTZ
JOSEPH N. CORDARO
Assistant United States Attorneys
     – Of Counsel –

     and

John J. Rapisardi, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
     – Of Counsel to the Presidential
     Task Force on the Auto Industry –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

RESPONSE...............................................................................................................................2

    A.    The Purchaser's Agreement with the UAW and Assumption of
           Contracts Do Not Constitute a *Sub Rosa* Plan ........................................................2

    B.    New GM Is Entitled to Credit Bid Treasury's Secured Debt ..................................5

          1.    New GM's Right to Credit Bid Has Been Authorized by a Final
                 Order of this Court .....................................................................................5

          2.    Recharacterization or Subordination of Treasury's Prepetition
                 Loans to the Debtors Would Not Impact the Sale ......................................7

          3.    No Basis Exists to Recharacterize or Subordinate the LSA ......................9

                 a.    No Objector Has Demonstrated Grounds For
                      Recharacterization............................................................................9

                 b.    Equitable Subordination Is Not Appropriate ................................12

    C.    Treasury, GM, and Others Negotiated the Terms of the 363 Transaction
           In Good Faith, and At Arms' Length...................................................................14

    D.    Treasury Is Authorized to Provide Funding to GM Under the
           Troubled Asset Relief Program ..........................................................................15

CONCLUSION........................................................................................................................19

# TABLE OF AUTHORITIES

*Cases*

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................................13

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...............................................................................10

*In re Airadigm Commc'ns, Inc.*,
    376 B.R. 903 (Bankr. W.D. Wis. 2007),
    *aff'd,* 392 B.R. 392 (W.D. Wis. 2008) .............................................................................12

*Algonquin Power Income Fund v. Ridgewood Heights, Inc.*
    *(In re Franklin Indust. Complex, Inc.)*,
    No. 01-67459, 2007 WL 2509709 (Bankr. N.D.N.Y. Aug. 30, 2007) .............................10

*Bayer Corp. v. Masco Tech., Inc.* (*In re AutoStyle Plastics, Inc.*),
    269 F.3d 726 (6th Cir. 2001) ...........................................................................................10

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th Cir. 1977) ...........................................................................................12

*In re Chrysler, LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009),
    *aff'd*, No. 09-2311-bk (2d Cir. June 5, 2009) ..................................................2, 4, 5, 12, 17

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006).............................................................................................9

*Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.)*,
    333 B.R. 30 (S.D.N.Y. 2005).............................................................................................3

*In re G Survivor Corp.*,
    171 B.R. 755 (Bankr. S.D.N.Y. 1994),
    *aff'd sub nom. John Forsythe Co. v. G. Licensing, Ltd.*,
    187 B.R. 111 (S.D.N.Y. 1995)...........................................................................................3

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
    126 F.3d 380 (2d Cir. 1997)............................................................................................14

*In re Maxwell Newspapers Inc.*,
    981 F.2d 85 ........................................................................................................................3

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.*
    *(In re Sunbeam Corp.)*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002),
    *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003) .......................................................12, 13

*Official Comm. of Unsecured Creditors of the Debtors v.*
    *Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) ...........................................…………………… 11, 12

*Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*,
    272 B.R. 74 (Bankr. S.D.N.Y. 2002) .............................................................................13

*In re Rock Indus. Mach. Corp.*,
    572 F.2d 1195 (7th Cir. 1978) .....................................................................................14

*Rockville Orthopedic Assocs. v. Kort (In re Rockville Orthopedic Assocs.)*,
    377 B.R. 438 (Bankr. D. Conn. 2007) ..........................................................................10

*Travelers Indem. Co. v. Bailey*,
    – U.S. –, 2009 WL 1685625 (June 18, 2009) ..................................................................7

*Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*,
    981 F.2d 85 (2d Cir. 1992)............................................................................................3

*United States v. Noland*,
    517 U.S. 535 (1996)....................................................................................................13

*Viera v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)*,
    378 B.R. 120 (Bankr. D.S.C. 2007) ..........................................................................9, 10

*Statutes*

11 U.S.C. § 365(b) ...............................................................................................................3

12 U.S.C. § 1843(k)(4) ........................................................................................................18

12 U.S.C. § 3401(1) ............................................................................................................18

12 U.S.C. § 5202(5) ............................................................................................................18

12 U.S.C. § 5211 ................................................................................................................16

31 U.S.C. § 5312(a)(2)........................................................................................................18

The United States of America, on behalf of the United States Department of the Treasury ("Treasury" or the "Government"), by its attorney Lev L. Dassin, Acting United States Attorney for the Southern District of New York, respectfully submits this statement in support of the motion of General Motors Corporation and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") to approve (a) the sale (the "363 Transaction") pursuant to the Master Sale and Purchase Agreement ("MPSA") with Vehicle Acquisition Holdings LLC[1] ("Purchaser" or "New GM"), a purchaser sponsored by Treasury, free and clear of liens, claims, interests and encumbrances, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith, and (c) certain related relief (the "Sale Motion").[2]

## PRELIMINARY STATEMENT

1.      As set forth in the *Statement of the United States of America Upon the Commencement of General Motors Corporation's Chapter 11 Case* [docket No. 37] (the "Government's Opening Statement"), the Government fully supports the 363 Transaction, which, if consummated, will facilitate a rebirth of the American automobile industry. Treasury's role as a lender to the Debtors pre- and post-petition and as a sponsor of the Purchaser is certainly extraordinary, but, as the Debtors' consolidated reply to all objections to the Sale Motion (the "Debtors' Reply") makes clear, the Sale Motion seeks relief that, far from being extraordinary, is squarely permitted by well-settled precedent.

2.      The Debtors' Reply thoroughly addresses all of the objections to the Sale Motion, and the Government joins in it completely. We file this limited response solely to

---

[1]      Vehicle Acquisition Holdings LLC's name is now NGMCO, Inc.

[2]      Unless specifically defined, capitalized terms have the same meaning as in the Sale Motion.

address certain objections[3] directly implicating Treasury or the Purchaser concerning (i) New

GM's agreement with the UAW; (ii) Treasury's ability to credit bid prepetition loans to the

Debtors; (iii) the good faith of Treasury and the Purchaser; and (iv) Treasury's use of Troubled

Asset Relief Program ("TARP") funds.  Each of these objections should be overruled.

## RESPONSE

**A.    The Purchaser's Agreement with the UAW and Assumption of Contracts Do Not Constitute a Sub Rosa Plan**

3.    Certain objectors assert that the 363 Transaction constitutes an

impermissible *sub rosa* plan.  *See, e.g.*, F&D Bondholders Objection ¶¶ 13-15.  These objectors

base their argument on, among other things, the Purchaser's intention, in connection with the 363

Transaction, to (i) be assigned substantially all executory contracts with direct suppliers, (ii)

make offers of employment to all of the Debtors' nonunionized employees and employees

represented by the UAW, and (iii) be assigned a modified collective bargaining agreement with

the UAW, including an agreement to provide certain assets to a new voluntary employees'

beneficiary association that will have the obligation to fund certain retiree medical benefits for

the Debtors' retirees and surviving spouses represented by the UAW (the "New VEBA").  *See*

*id*.  These objectors do little more than rehash the same argument rejected by Judge Gonzalez in

Chrysler's bankruptcy.  *See In re Chrysler, LLC*, 405 B.R. 84, 97-100 (Bankr. S.D.N.Y. 2009),

*aff'd*, No. 09-2311-bk (2d Cir. June 5, 2009).

---

[3]    Objections to the Sale Motion addressed in this statement include, without limitation, the objection of the Unofficial Committee of Family & Dissident GM Bondholders (the "F&D Bondholders") [docket no. 1969] (the "F&D Bondholders Objection"); the memorandum of law (supplementing a preliminary objection) filed by *pro se* creditor R. Narumanchi [docket no. 2357] (the "Narumanchi Objection"); and the objections of *pro se* creditor O. Parker [docket nos. 2193 and 2194] (collectively, the "Parker Objection" and, together with the Narumanchi Objection, the "*Pro se* Objections").

2

4.    A proposed sale pursuant to section 363 of the Bankruptcy Code becomes an impermissible *sub rosa* plan of reorganization when the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors.  *See Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.)*, 333 B.R. 30, 51 (S.D.N.Y. 2005).  The 363 Transaction does not do that – all of the consideration provided to the Debtors' estates will be distributed pursuant to a chapter 11 plan subject to the supervision of, and confirmation by, the Court.  None of the facts referred to by the Objectors even implicates the concerns of the *Westpoint Stevens* court.

5.    Put simply, none of these facts causes the 363 Transaction to constitute a *sub rosa* plan of reorganization.  Pursuant to section 365(a) of the Bankruptcy Code, a debtor-in-possession may assume certain executory contracts or unexpired leases and, pursuant to section 365(f), it may assign such contracts or leases.  In any section 363 sale of substantially all of the assets of a debtor, the purchaser, commonly with input from the debtor, identifies the assets that it desires to purchase and the contracts that it desires the debtor to assume and assign.  *See In re G Survivor Corp.*, 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994) (finding that "the ability to designate which contracts it wished to have rejected was a valuable right, for which [the purchaser] bargained"), *aff'd sub nom John Forsythe Co. v. G. Licensing, Ltd.*, 187 B.R. 111 (S.D.N.Y. 1995); *see generally Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 981 F.2d 85, 90-91 (2d Cir. 1992) (finding, under the higher "good cause" standard of § 1113(c)(2), that it is permissible to reject a contract to make a sale more attractive to a buyer).  Further, parties to contracts that are assumed in a bankruptcy case are entitled to cure payments and adequate assurance of future performance.  *See* 11 U.S.C. § 365(b).

6.    Here, New GM, with substantial input from the Debtors, has made a business decision as to which contracts it wants to assume, including a large percentage of

3

existing contracts with direct suppliers. A number of these direct suppliers produce unique components for the Debtors' product lines that cannot easily, or timely, be replaced. These suppliers are vital to the product lines being acquired by New GM. Similarly, New GM has determined that its employment of certain of the Debtors' employees will benefit the new enterprise. As Judge Gonzalez held in *Chrysler*, "such creditors may receive more favorable treatment than other creditors either in their class or a higher priority class. Nevertheless, such treatment is not considered a violation of the priority rules nor does it transform a sale of assets into a *sub rosa* plan." 405 B.R. at 99.

7.    New GM intends to assume the modified agreement with the UAW, a skilled workforce that is essential to New GM's future operations following the 363 Transaction. Without the UAW's cooperation with the Purchaser following the sale, no functioning company would exist. Accordingly, the Purchaser engaged in extensive, arms' length negotiations with the UAW. After those negotiations, the Purchaser and the UAW reached agreement on terms for collective bargaining agreements, including an agreement addressing the ongoing provision of certain employee and retiree benefits following the closing of the 363 Transaction. As a consequence of that agreement and the benefits it would have for New GM, the Purchaser determined to allocate certain equity interests in New GM, a $2.5 billion note, and other assets to the New VEBA. These elements of consideration are part of the negotiated exchange between the Purchaser and the UAW. The UAW agreed to this settlement both as a condition to the UAW's amendment of its collective bargaining agreements, and in settlement of potential claims for retiree benefit obligations against the Purchaser, as purported successor to the Debtors. Further, the UAW made clear that any amended collective bargaining agreement is contingent on New GM providing retiree medical benefits, as contemplated by the new VEBA agreement. In return, and as consideration, the UAW agreed to substantial modifications to the collective

4

bargaining agreement. The consideration provided by the Purchaser comes from equity in New GM. That equity would not otherwise inure to the benefit of the Debtors' estates, and the consideration is not on account of the UAW's pre-petition claims against the Debtors' estates.

8.     Such agreements are "neither a diversion of value from the Debtors' assets nor an allocation of the proceeds from the sale of the Debtors' assets. The allocation of ownership interests in the new enterprise is irrelevant to the estates' economic interests." *Chrysler*, 405 B.R. at 99. Judge Gonzalez further found that the UAW and other parties with which the purchaser had negotiated agreements were "not receiving distributions on account of their prepetition claims. Rather, consideration to these entities is being provided under separately-negotiated agreements with [the purchaser]." *Id*. Accordingly, the proposed 363 Transaction is not an improper *sub rosa* plan and should be approved.

**B.     New GM Is Entitled to Credit Bid Treasury's Secured Debt**

    **1.     New GM's Right to Credit Bid Has Been Authorized by a Final Order of this Court**

9.     The F&D Bondholders assert that Treasury should not be permitted to credit bid the entire amount of its prepetition loans, on the basis that those loans should be recharacterized as equity contributions. *See* F&D Bondholders Objection ¶¶ 30-35. Certain *pro se* objectors also request recharacterization or equitable subordination of Treasury's loans, which can also be read as objections to credit bidding. *See*, *e.g.*, Narumanchi Objection at 6-9 (recharacterization); Parker Objection ¶¶ 63-66 (subordination).

10.     As a threshold matter, this Court has already determined that the Purchaser may credit bid the amounts owed under both the pre- and postpetition loans. Pursuant to the

now-final Bid Procedures Order,[4] a credit bid under the MPSA of amounts owed under the DIP

Facility and the LSA is a "Qualified Bid."

> 11. The Sale Motion clearly and explicitly states that under the MPSA:

> The purchase price for the Purchased Assets is equal to the sum of

> - *a section 363(k) credit bid in an amount equal to (i) the amount of Indebtedness of Parent and its Subsidiaries owed to the Purchaser as of the Closing pursuant to the [LSA] and the DIP Facility, less (ii) approximately $7.7 billion [now $7.9 billion, as explained* infra, *¶ 8] of indebtedness under the DIP Facility;*

> - *the UST Warrant;*

> - *the issuance by the Purchaser to GM of 10% of the Common Stock of the Purchaser as of the Closing;*

> - *warrants to purchase up to 15% of the shares of common stock of the Purchaser, with the initial exercise prices for equal amounts of the warrants based on $15 billion and $30 billion equity values of the Purchaser. The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and GM can elect partial and cashless exercises; and*

> - *the assumption by the Purchaser of the Assumed Liabilities.*

Sale Motion ¶ 18 (footnote omitted; emphasis supplied); *see also* MPSA § 3.2(a)(i).  According

to the Sale Procedures appended to and incorporated into the Bid Procedures Order, "[f]or all

purposes hereof, the Purchaser's offer to acquire the Purchased Assets pursuant to the MPSA

shall constitute a Qualified Bid."  Sale Procedures at 4.  *See also* Bid Procedures Order ¶ 6 ("The

---

[4]     Order Pursuant To 11 U.S.C. §§ 105, 363, And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006 (I) Approving Procedures For Sale Of Debtors' Assets Pursuant To Master Sale And Purchase Agreement With Vehicle Acquisition Holdings LLC, A U.S. Treasury-Sponsored Purchaser; (II) Scheduling Bid Deadline And Sale Hearing Date; (III) Establishing Assumption And Assignment Procedures; And (IV) Fixing Notice Procedures And Approving Form Of Notice [docket no. 274] ("Bid Procedures Order").

Sale Procedures, which are incorporated herein by reference, are approved and shall govern all bids and sale procedures relating to the Purchased Assets."). The Bid Procedures Order was not appealed and became final. Accordingly, parties may no longer challenge that the MPSA, including the credit bidding of the DIP and LSA loans, constitutes a Qualified Bid in accordance with the Sale Procedures, and those objections should be overruled on the basis of *res judicata*. *See*, *e.g.*, *Travelers Indem. Co. v. Bailey*, – U.S. –, 2009 WL 1685625 (June 18, 2009) (bankruptcy court's final order not subject to collateral attack and may be enforced in accordance with its terms).

### 2. Recharacterization or Subordination of the Treasury's Prepetition Loans to the Debtors Would Not Impact the Sale

12.     Although the objectors are not always specific about which loans they seek to subordinate or recharacterize, any contention that the DIP Facility (approved by this Court) can be recharacterized or subordinated is utterly lacking in merit.[5]   Instead, the Government construes these arguments as referring only to the approximately $19.4 billion owed by GM to Treasury under the Amended and Restated Credit Agreement between GM and the U.S. Treasury dated December 31, 2008 (the "LSA").

13.     But even if the Purchaser were not permitted to credit bid the prepetition loans and could only credit bid the DIP loan, the outcome of the Sale would not change. By the time of the 363 Transaction, Treasury and its Canadian co-lenders will have advanced approximately $33.4 billion under the DIP Facility to the Debtors, and the Purchaser's right to

---

[5]     *See, e.g.,* Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties, ¶¶ E, 3, 6, 10, 17, 18 [docket no. 2529] ("Final DIP Order").

credit bid amounts owed under the DIP Facility cannot be disputed. The deadline for submitting competing bids in the Sale expired on June 22, and the Debtors have informed the Government that no other bids were received. Thus, a credit bid by Treasury (as well as the Canadian lenders), even if limited to amounts owed under the DIP Facility,[6] would be more than sufficient to constitute the highest and best bid in the Sale.

14.    The F&D Bondholders argue that the Purchaser must provide additional cash consideration if the prepetition loans are recharacterized as equity. But in reality, in addition to the fact that the Purchaser's offer would still constitute the highest and best bid even without any credit bid of the prepetition loans, recharacterization of the loans and credit bidding of amounts due under the LSA *yields exactly the same result to the estate*. If the LSA loans were recharacterized as equity, no distributions would be made in liquidation of the Debtors' estates on account of the loans (unless creditors are paid in full, an event that is inconceivable in these cases). Similarly, in the proposed credit bid, the LSA would be satisfied and extinguished in connection with the sale, and no distributions would be made on account of the loans. Why additional consideration would be required from the Purchaser in one circumstance but not the other is incomprehensible.

15.    Recharacterization or subordination of the LSA loans potentially could impact creditors' recoveries *only* if Treasury credit bids less than the entire amounts owed under the LSA, and distributions are subsequently made on account of the loans in liquidation of the Debtors' estates. Of course, that hypothetical situation is irrelevant, since Treasury *is* credit

---

[6]    At the time of the 363 Transaction, the amount owed under the DIP Credit Facility is expected to equal approximately $33.4 billion less approximately $7.9 billion – consisting of $7.088 billion that will serve as a working capital facility for New GM and $950 million that will be used to wind down the estates of the Debtors.

bidding the full amount owed under the LSA.  Further, as explained above, because the entire

amount owed under the loan facilities will be credit bid pursuant to the MPSA (as well as

additional consideration including warrants and equity in New GM), recharacterization or

subordination of the LSA loans would have absolutely no consequence.

**3.    No Basis Exists to Recharacterize or Subordinate the LSA**

16.    There is also no basis to recharacterize or subordinate the LSA loans.  The

LSA is virtually identical in significant respects to the DIP Facility approved by the Court.  Thus,

the argument that the LSA is not a loan cannot be squared with the Court's approval of the DIP

Facility (without objection from the F&D Bondholders).  Finally, any argument in favor of

equitable subordination is equally meritless.

**a.    No Objector Has Demonstrated Grounds for Recharacterization**

17.    To prove that the LSA was an equity contribution rather than a loan, an

objector "needs to demonstrate that the intent of the parties at the time they entered into the

transaction was to enter into an investment relationship, not a lending relationship." *Viera v.*

*AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)*, 378 B.R. 120, 124 (Bankr. D.S.C.

2007) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448,

455-56 (3d Cir. 2006)).  Although that intent "may be inferred from the language of the contract,

the conduct of the parties, and the economic reality of the surrounding circumstances," evidence

of that language, conduct, or economic reality must be introduced to sustain this claim. *Id.*   No

such evidence exists here.

18.    The F&D Bondholders recognize that under applicable law, courts

examine eleven factors in determining whether debt should be recharacterized as equity.  F&D

Objection ¶ 33.  Yet the F&D Bondholders do not even attempt to argue that more than three of

the eleven factors are present here.  *Id*.  Even a cursory examination of the eleven factors

underscores that the Government has acted as a lender:

1.  the names given to instruments, if any, evidencing the indebtedness;
2.  the presence or absence of a fixed maturity date and schedule of payments;
3.  the presence or absence of a fixed rate of interest and interest payments;
4.  the source of repayments;
5.  the adequacy or inadequacy of capitalization;
6.  the identity of interest between the creditor and the stockholder;
7.  the security, if any, for the advances;
8.  the corporation's ability to obtain financing from outside lending institutions;
9.  the extent to which the advances were subordinated to the claims of outside creditors;
10.  the extent to which the advances were used to acquire capital assets; and
11.  the presence or absence of a sinking fund to provide repayments.

*See Bayer Corp. v. Masco Tech., Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 749 (6th Cir.

2001); *see also Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin*

*Indust. Complex, Inc.)*, No. 01-67459, 2007 WL 2509709, at *1 (Bankr. N.D.N.Y. Aug. 30,

2007) (applying the *AutoStyle* factors); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re*

*Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (same); *Rockville*

*Orthopedic Assocs. v. Kort (In re Rockville Orthopedic Assocs.),* 377 B.R. 438, 442 (Bankr. D.

Conn. 2007) (same).  As noted by this Court in *Adelphia*, "in order to state a claim upon which

relief can be granted . . . any complaint would have to plead facts to trigger the applicability of

the *AutoStyle* factors or their equivalent, or a meaningful subset of them."  365 B.R. at 75 n. 216

(dismissing recharacterization claim premised solely on allegation that funds received were used

by debtor as equity contribution).

19.    None of the objectors satisfies these standards.  As previously noted, the

F&D Bondholders only attempt to demonstrate the presence of three factors.  While the

Narumanchi Objection attempts to address each of the eleven factors, it achieves no greater

success.  *See* Narumanchi Objection at 6-9.  Any attempt at recharacterization fails because the

LSA bears the undisputed hallmarks of a loan, not an equity investment, and easily passes the

*Autostyle* test.  Among other things:

- Treasury structured its prepetition transactions with GM as (i) a loan, in the form of the LSA, in addition to (ii) a *separate*, and separately documented, equity component in the form of warrants.

- The LSA has customary terms and covenants of a loan rather than an equity investment.  For example, the LSA contains provisions for pre-payment, and provides for remedies in the event of a default.

- The LSA is secured by first liens on GM's and the guarantors' equity interests in most of their domestic subsidiaries and certain of their foreign subsidiaries (limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual property, real estate (other than manufacturing plants or facilities), inventory that was not pledged to other lenders, and  cash and cash equivalents in the United States.

- Treasury also received second liens on certain additional collateral, and thus its claim for repayment under the LSA is, in part, junior to the claims of other creditors.

- The LSA requires the grant of security by its terms, as well as by separate collateral documents, including: (i) a guaranty and security agreement, (ii) an equity pledge agreement and (iii) an intellectual property pledge agreement.

- Loans under the LSA are interest-bearing with a rate of 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%.  The Default Rate on this loan is 5.00% above the non-default rate.

20.    Moreover, Treasury always treated the loans as debt, and advances to GM under the LSA were conditioned upon GM's demonstration to the Government of a viable plan to regain competitiveness and repay the loans.  As set forth in the Government's Opening Statement, from the moment that Treasury put the very first dollar of emergency financing into GM, Treasury has acted as a prudent lender seeking to protect its investment and thus expressly conditioned its financial commitment upon GM's meaningful progress towards long-term viability.  Other secured creditors of the Debtors also clearly recognized the LSA loans as debt

11

by entering into an intercreditor agreement with Treasury in order to set forth the secured lenders' respective prepetition priority.  *See* Ex. A to the Declaration of Harry Wilson [docket no. 2577] ("Wilson Declaration").

21.    Finally, claims for recharacterization (as well as equitable subordination) are extraordinary, even when asserted against insiders.  Against non-insiders such as Treasury,[7] they are virtually impossible to plead (or are non-existent).  *See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 363-64 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003); *In re Airadigm Commc'ns, Inc.*, 376 B.R. 903, 915 (Bankr. W.D. Wis. 2007), *aff'd,* 392 B.R. 392 (W.D. Wis. 2008).  "Even if there is room for a recharacterization cause of action in the Bankruptcy Code, it can only be sought against an insider of the debtor.  Despite many courts' assertions in *dicta* that none of the innumerable factors used to decide recharacterization questions is dispositive . . . no court has recharacterized a non-insider's claim."  *In re Airadigm Commc'ns, Inc.*, 376 B.R. at 915.

**b.    Equitable Subordination Is Not Appropriate**

22.    The Parker Objection also requests equitable subordination of Treasury's loans.  Parker Objection ¶¶ 63-66.  To establish a claim for equitable subordination under section 510(c)(1) of the Bankruptcy Code, a plaintiff must prove that (1) the holder of the claim being subordinated engaged in inequitable conduct; (2) the inequitable conduct resulted in injury to

---

[7]    Certain objectors assert that Treasury is an "insider" of the Debtors.  Judge Gonzalez rejected similar arguments in *Chrysler*, noting that a lender does not become an insider simply because it conditions funding on the borrower's compliance with specified conditions.  *Chrysler*, 405 B.R. at 107-08 (citing *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (concluding that a lender does not control a debtor when it offers advice to its management, "even where the lender threatens to withhold future loans should the advice not be taken")).

creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *See United States v. Noland*, 517 U.S. 535, 538-39 (1996) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)); s*ee also Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 103 (Bankr. S.D.N.Y. 2002).

23.    Parker cannot demonstrate that the Government engaged in inequitable conduct or caused harm to other creditors.  To the contrary, the considerable evidence and affidavits provided by the Debtors demonstrate conclusively that without the Government's assistance, the Debtors would have been forced to commence a chaotic, "freefall" liquidation, resulting in far lower recoveries to creditors than will be provided under the 363 Transaction. Indeed, according to the only liquidation analysis submitted by any party in connection with this motion, unsecured creditors would receive *no* recovery in a liquidation scenario.  *See* GM Corporation Liquidation Analysis prepared by AlixPartners, attached as Exhibit B to the Declaration of Albert Koch [docket no. 435].

24.    Further, against a non-insider like Treasury, a party must meet an extraordinarily high standard to establish an equitable subordination claim.  *See Sunbeam Corp.*, 284 B.R. at 363-64.  Equitable subordination can be pursued against a non-insider only where the defendant's conduct was "egregious" – *i.e.*, "substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation."  *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994).  Nothing in the Parker Objection even comes close to suggesting such egregious conduct.

**C.    Treasury, GM, And Others Negotiated The Terms Of The 363 Transaction In Good Faith, And At Arms' Length**

25.    The Parker Objection further asserts that the 363 Transaction was not negotiated by the parties in good faith or at arms' length, and thus that New GM is not entitled to the protections of section 363(m) of the Bankruptcy Code.  *See* Parker Objection ¶¶ 61-62. Parker makes this claim "based on the facts adduced" and his assertion that "[t]he Treasury Department is on both sides of the transaction, controlling both the Debtors and Purchaser, and is forcing the sale to promulgate the Executive Branch's political agenda to the detriment of the bondholders and other unsecured non-trade creditors."  *Id*.  The evidence is clearly to the contrary.

26.    While the Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m), the Second Circuit has explained that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

27.    As thoroughly set forth in the First Day Affidavit of Frederick Henderson [docket no. 21] and in the Wilson Declaration, the 363 Transaction was the product of intense arms'-length negotiations.   Throughout the process, GM was represented by numerous independent advisors, including experienced counsel, restructuring experts, and investment bankers that it selected without any input from the Government.  Once GM determined that it needed to enter chapter 11 to effect its plan for long-term competitiveness and success, and that a

14

transaction pursuant to section 363 of the Bankruptcy Code was the optimal way to do so, Treasury and GM and their respective counsel and advisors engaged in extensive, hard-fought and arms' length negotiations lasting several months.  Over time, the negotiations expanded to involve the United Autoworkers and the UAW VEBA, the Debtors' prepetition secured lenders, certain of the Debtors' prepetition unsecured lenders, and Treasury's Canadian co-lenders.  After the commencement of these cases, negotiations also included the Creditors' Committee and other interested parties.  The negotiations were conducted without fraud or collusion, and all parties were represented throughout by experienced independent advisors and counsel.

28.    In the Final DIP Order, this Court held that Treasury and the Debtors proposed and negotiated the terms and provisions of the DIP Facility in good faith, at arms' length, and without collusion.  *See* Final DIP Order ¶ E.  As set forth in the Wilson Declaration, negotiation of the DIP Facility occurred concurrently with, as a part of, and under the same circumstances as negotiations over the terms of the 363 Transaction.  *See* Wilson Declaration ¶ 16.  As the evidence has demonstrated conclusively that the financing provided by Treasury to the Debtors was negotiated and entered into in good faith, at arms' length, and without collusion, the related and concurrently negotiated sale transaction cannot be found otherwise.

29.    Indeed, the Government's conduct in these negotiations epitomizes good faith: Treasury provided billions of dollars in financing that no other lender would provide, on below-market terms, in order to avoid GM's liquidation, preserve Treasury's existing investment in GM, and enable the transformation of a great American enterprise.  Based upon the ample evidence of the Purchaser's good faith, arms' length negotiations throughout the entire sale process, and the complete absence of any evidence to the contrary, the Court should find that it is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

D.    **Treasury Is Authorized to Provide Funding to GM Under the Troubled Asset**
**Relief Program**

30.    Finally, the Parker Objection also raises a host of arguments revolving around the fact that the Government (as opposed to a purely commercial lender) is the substantial acquirer of GM's assets, claiming, for example, that the Government lacked the statutory authority to make either the Prepetition Loan or the DIP Loan. This is a losing line of attack, for at least three reasons. *First*, the objection is moot because the 363 Transaction does not involve the expenditure of any federal funds, but rather stems from the exercise of the Government's right to credit bid its secured debt. *Second*, as Judge Gonzalez squarely held in *Chrysler*, an individual creditor lacks standing to raise this sort of argument. And *third*, the argument is wrong.

31.    As set out at greater length in the Government's Opening Statement, the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765 (2008), created TARP, which generally authorizes the purchase by the United States of "troubled assets from any financial institution." 12 U.S.C. § 5211. Relying on the authority vested in him by EESA, the Secretary of the Treasury determined that the prepetition loan embodied in the LSA and the DIP Credit Facility were appropriate expenditures of TARP funds.

32.    But the 363 Transaction does not involve any expenditure of TARP funds – it simply involves a credit bid by New GM of amounts due on previous loans under the LSA and the DIP Credit Facility – and so Parker's objection is moot. No party objected to the use of TARP funds in connection with the DIP Credit Facility; thus, the Debtors have already received TARP funds with the express sanction of this Court, which entered an order approving the DIP Credit Facility on June 25, 2009. The Final DIP Order specifically held that "[t]he U.S. Treasury's extension of credit to, and resulting security interest in, the Debtors as set forth in the

16

DIP Credit Facility and as authorized in the Interim Order and this Final Order is a valid use of funds pursuant to EESA." Final DIP Order ¶ F. Accordingly, Treasury's ability to expend TARP funds on GM, and GM's ability to accept them, has been conclusively resolved in these cases. Parties are not free to relitigate the issue in the context of the 363 Transaction.

33. Even if the 363 Transaction did involve TARP funds, moreover, individual creditors lack standing to challenge the Government's statutory authority to use them, for at least two reasons. *First*, as in *Chrysler*, unsecured creditors have not, and cannot, establish the injury-in-fact necessary to establish constitutional standing under Article III because "all holders of unsecured claims are receiving no less than what they would receive in a liquidation." *Chrysler*, 405 B.R. at 83. As noted, unsecured creditors would receive *nothing* in a liquidation. *See supra* ¶ 23 (discussing AlixPartners liquidation analysis). *Second*, even assuming that the 363 Transaction itself injures them, unsecured creditors cannot demonstrate their standing because they cannot show that any such injury is "fairly traceable" to the Government's use of TARP funds, as opposed to by the 363 Transaction itself. As Judge Gonzalez explained, "[i]f a non-governmental entity were providing the funding in this case, the [objectors] would be alleging the same injury. . . . In this light, it is not the actions of the lender that the [objectors] are challenging but rather the transaction itself. Specifically, the [objectors'] alleged injury is not fairly traceable to the U.S. Treasury's actions because the [objectors] would suffer the same injury regardless of the identity of the lender." 405 B.R. at 83.

34. In any event, any challenge to the Government's use of TARP funds – in connection with the LSA or the DIP Credit Facility because, again, there is no TARP money being used in connection with the 363 Transaction – is wrong on its merits. The Parker Objection proceeds from the mistaken assumption that GM is not a "financial institution," as a recipient of TARP funds must be. But "financial institution" is defined explicitly in EESA as

"any institution . . . established and regulated under the laws of the United States or any State, territory, or possession of the United States . . . and having significant operations in the United States . . . ." 12 U.S.C. § 5202(5). GM plainly meets that definition: it is established under Delaware law, is "regulated" by the United States and by numerous states, and has "significant operations in the United States."

35.    The argument to the contrary in the Parker Objection erroneously assumes that the term "financial institution" has some inherent meaning separate and apart from its definition in EESA, pointing to other statutes administered by Treasury. But that only proves the point that the term "financial institution" does *not* have a plain meaning, but rather it is a term of art that has differing meanings in different legal contexts. For example, the Bank Secrecy Act defines the term expansively to include, among other things, currency exchangers, insurance companies, pawnbrokers, travel agencies, dealers in precious metals or stones, casinos, automobile dealerships, and the United States Postal Service. *See* 31 U.S.C. 5312(a)(2). In the Right to Financial Privacy Act, on the other hand, the term is defined narrowly, to include only "any office of a bank, savings bank, card issuer . . . , industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution." 12 U.S.C. § 3401(1).[8] A "financial institution," in other words, is whatever the relevant statute defines it to be. In EESA, that's "any institution . . . established and regulated under the laws of the United States or any State, territory, or

---

[8]    That said, the Parker Objection does not actually point to a statute that defines the term "financial institution," but rather to a statutory definition of things that "are financial in nature" – although expressly only for purposes of that specific subsection. *See* 12 U.S.C. § 1843(k)(4). Of course, among the things financial in nature is "[l]ending . . . money" – something GM regularly does to its suppliers.

possession of the United States . . . and having significant operations in the United States . . . ." – which obviously includes GM.[9]

**CONCLUSION**

36.    For the reasons just given, as well as for the reasons set out in the Debtors' Reply, the Government respectfully requests that the Court overrule all objections to the 363 Transaction and approve the Sale Motion so that New GM can emerge as a new force in the domestic automotive industry – and thereby avoid the Debtors' liquidation, preserve the Government's existing investment in GM, and enable an outcome that serves both the broad spectrum of economic stakeholders in these cases and the public at large.

---

[9]    The Parker Objection also asserts that the 363 Transaction amounts to an unconstitutional taking, in violation of the Fifth Amendment.  But that presupposes that an unsecured creditor has a property interest in the assets being acquired by New GM, which is obviously incorrect.

Dated: June 26, 2009
      New York, New York

                                    LEV L. DASSIN
                                    Acting United States Attorney for the
                                    Southern District of New York,
                                    Attorney for the United States of America

                   By:    /s/  Matthew L. Schwartz
                                    DAVID S. JONES
                                    JEFFREY S. OESTERICHER
                                    MATTHEW L. SCHWARTZ
                                    JOSEPH N. CORDARO
                                    Assistant United States Attorneys
                                    86 Chambers Street, Third Floor
                                    New York, New York 10007
                                    Telephone: (212) 637-2739/2698/1945/2745
                                    Facsimile:  (212) 637-2750
                                    E-mail:  david.jones6@usdoj.gov
                                              jeffrey.oestericher@usdoj.gov
                                              matthew.schwartz@usdoj.gov
                                              joseph.cordaro@usdoj.gov

John J. Rapisardi, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
– Of Counsel to the Presidential
Task Force on the Auto Industry –
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:   (212) 504-6666
E-mail:  john.rapisardi@cwt.com