**EXECUTION COPY**

### AMENDED AND RESTATED

**MASTER SALE AND PURCHASE AGREEMENT**

**BY AND AMONG**

**GENERAL MOTORS CORPORATION,**

**SATURN LLC,**

**SATURN DISTRIBUTION CORPORATION**

**AND**

**CHEVROLET-SATURN OF HARLEM, INC.,**

*as Sellers*

**AND**

**EXECUTION COPY**

~~VEHICLE ACQUISITION HOLDINGS LLC,~~

**NGMCO, INC.,**

*as Purchaser*

**DATED AS OF**

**JUNE ~~1,~~26, 2009**

# TABLE OF CONTENTS

**DESCRIPTION**                                                                    **PAGE**

ARTICLE I DEFINITIONS ............................................................................2

Section 1.1        Defined Terms. ................................................................2
Section 1.2        Other Interpretive Provisions. ......................................~~20~~23

ARTICLE II PURCHASE AND SALE ......................................................~~21~~23

Section 2.1        Purchase and Sale of Assets; Assumption of Liabilities. .....~~21~~23
Section 2.2        Purchased and Excluded Assets. ..................................~~21~~23
Section 2.3        Assumed and Retained Liabilities. ...............................~~26~~28
Section 2.4        Non-Assignability. ........................................................~~29~~32

ARTICLE III CLOSING; PURCHASE PRICE ........................................~~31~~33

Section 3.1        Closing. ..........................................................................~~31~~33
Section 3.2        Purchase Price. ..............................................................~~31~~34
Section 3.3        Allocation. .....................................................................~~32~~35
Section 3.4        Prorations. .....................................................................~~33~~35
Section 3.5        Post-Closing True-up of Certain Accounts. ......................36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS .....~~34~~37

Section 4.1        Organization and Good Standing. ...............................~~34~~37
Section 4.2        Authorization; Enforceability. ...................................~~34~~37
Section 4.3        Noncontravention; Consents. ......................................~~34~~37
Section 4.4        Subsidiaries. ..................................................................~~35~~38
Section 4.5        Reports and Financial Statements; Internal Controls. .....~~35~~38
Section 4.6        Absence of Certain Changes and Events. ....................~~36~~39
Section 4.7        Title to and Sufficiency of Assets. ..............................~~38~~41
Section 4.8        Compliance with Laws; Permits. ................................~~38~~41
Section 4.9        Environmental Laws. ...................................................~~39~~42
Section 4.10       Employee Benefit Plans. .............................................~~39~~42
Section 4.11       Labor Matters. ..............................................................~~41~~44
Section 4.12       Investigations; Litigation. ...........................................~~42~~45
Section 4.13       Tax Matters. ...................................................................~~42~~45
Section 4.14       Intellectual Property and IT Systems. ........................~~43~~46
Section 4.15       Real Property. ...............................................................~~44~~47
Section 4.16       Material Contracts. .......................................................~~45~~48
Section 4.17       Dealer Sales and Service Agreements for Continuing Brands. ...~~46~~49
Section 4.18       Sellers' Products. ..........................................................~~46~~49
Section 4.19       Certain Business Practices. ..........................................~~46~~49
Section 4.20       Brokers and Other Advisors. .......................................~~47~~50

Section 4.21          Investment Representations. ................................................. ~~47~~50
Section 4.22          No Other Representations or Warranties of Sellers. ................ ~~48~~51

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER .......... ~~48~~51

Section 5.1           Organization and Good Standing. .................................... ~~48~~51
Section 5.2           Authorization; Enforceability. ........................................ ~~48~~52
Section 5.3           Noncontravention; Consents. .......................................... ~~49~~52
Section 5.4           Capitalization. .............................................................. ~~49~~53
Section 5.5           Valid Issuance of Shares. ............................................... ~~51~~54
Section 5.6           Investment Representations. ........................................... ~~51~~54
Section 5.7           Continuity of Business Enterprise. .................................. ~~51~~55
Section 5.8           Integrated Transaction. .................................................. ~~52~~55
Section 5.9           No Other Representations or Warranties of Sellers. ......... ~~52~~55

ARTICLE VI COVENANTS .................................................................. ~~52~~56

Section 6.1           Access to Information. .................................................. ~~52~~56
Section 6.2           Conduct of Business. ..................................................... ~~53~~57
Section 6.3           Notices and Consents. .................................................... ~~57~~60
Section 6.4           Sale Procedures; Bankruptcy Court Approval. ................. ~~58~~61
Section 6.5           Supplements to ~~Excluded~~Purchased Assets~~, Assumed Liabilities and~~
                      ~~Retained Liabilities.~~
                      ~~59~~                                                                    62
Section 6.6           Assumption or Rejection of Contracts. .......................... ~~60~~62
Section 6.7           Deferred Termination  Agreements; Participation Agreements. ~~62~~65
Section 6.8           [Reserved] .................................................................. ~~63~~66
Section 6.9           Purchaser Assumed Debt; Wind Down Facility. ............... ~~63~~66
Section 6.10          Litigation  and Other Assistance. .................................. ~~63~~66
Section 6.11          Further Assurances. ..................................................... ~~64~~67
Section 6.12          Notifications. .............................................................. ~~65~~68
Section 6.13          Actions by Affiliates. .................................................... ~~66~~69
Section 6.14          Compliance Remediation. .............................................. ~~66~~69
Section 6.15          Product Certification, Recall and Warranty Claims. .......... ~~66~~69
Section 6.16          Tax Matters; Cooperation. ............................................ ~~66~~69
Section 6.17          Employees; Benefit Plans; Labor Matters. ..................... ~~70~~74
Section 6.18          TARP. ........................................................................ ~~75~~79
Section 6.19          Guarantees; Letters of Credit. ...................................... ~~75~~79
Section 6.20          Customs Duties. ........................................................... ~~75~~79
Section 6.21          Termination of Intellectual Property Rights. ................... ~~75~~79
Section 6.22          Trademarks. ................................................................ ~~76~~80
Section 6.23          Preservation of Records. ............................................... ~~77~~81
Section 6.24          Confidentiality. ........................................................... ~~77~~81
Section 6.25          Privacy Policies. .......................................................... ~~78~~82
Section 6.26          Supplements to Sellers' Disclosure Schedule. ................. ~~78~~82
Section 6.27          Real Property Matters. .................................................. ~~78~~82
Section 6.28          Equity Incentive Plans. ................................................. ~~80~~84

Section 6.29          Purchase of Personal Property Subject to Executory Contracts.          84
Section 6.30          Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased
                      Assets; Ren Cen Lease.          84
Section 6.31          Delphi Agreements.          85
Section 6.32          GM Strasbourg S.A. Restructuring.          85
Section 6.33          Holding Company Reorganization.          85
Section 6.34          Transfer of Promark Global Advisors Limited and Promark Investment
                      Trustees Limited Equity Interests.          86
Section 6.35          Transfer of Equity Interests in Certain Subsidiaries.          86

ARTICLE VII CONDITIONS TO CLOSING          ~~80~~86

Section 7.1           Conditions to Obligations of Purchaser and Sellers.          ~~80~~86
Section 7.2           Conditions to Obligations of Purchaser.          ~~81~~87
Section 7.3           Conditions to Obligations of Sellers.          ~~84~~91

ARTICLE VIII TERMINATION          ~~87~~93

Section 8.1           Termination.          ~~87~~93
Section 8.2           Procedure and Effect of Termination.          ~~88~~94

ARTICLE IX MISCELLANEOUS          ~~89~~95

Section 9.1           Survival of Representations, Warranties, Covenants and Agreements and
                      Consequences of Certain Breaches.          ~~89~~95
Section 9.2           Notices.          ~~89~~95
Section 9.3           Fees and Expenses; No Right of Setoff.          ~~90~~97
Section 9.4           Bulk Sales Laws.          ~~91~~97
Section 9.5           Assignment.          ~~91~~97
Section 9.6           Amendment.          ~~91~~98
Section 9.7           Waiver.          ~~91~~98
Section 9.8           Severability.          ~~91~~98
Section 9.9           Counterparts; Facsimiles.          ~~92~~98
Section 9.10          Headings.          ~~92~~98
Section 9.11          Parties in Interest.          ~~92~~98
Section 9.12          Governing Law.          ~~92~~99
Section 9.13          Venue and Retention of Jurisdiction.          ~~92~~99
Section 9.14          Waiver of Jury Trial.          ~~93~~99
Section 9.15          Risk of Loss.          ~~93~~99
Section 9.16          Enforcement of Agreement.          ~~93~~99
Section 9.17          Entire Agreement.          ~~93~~100
Section 9.18          Publicity.          ~~93~~100
Section 9.19          No Successor or Transferee Liability.          ~~94~~100
Section 9.20          Time Periods.          ~~94~~101
Section 9.21          Sellers' Disclosure Schedule.          ~~94~~101
Section 9.22          No Binding Effect.          ~~95~~101

# EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Parent Warrant A |
| Exhibit B | Form of Parent Warrant B |
| Exhibit C | UAW Active Labor Modifications |
| Exhibit D | Form of UAW Retiree Settlement Agreement |
| Exhibit E | Form of VEBA Warrant |
| Exhibit F | Certain Excluded Owned Real Property |
| Exhibit G | Certain Retained Workers' Compensation Claims |
| Exhibit H | Form of Sale Procedures Order |
| Exhibit I | Form of Sale Approval Order |
| Exhibit J-1 | Form of Deferred Termination Agreement for Saturn Discontinued Brand Dealer Agreements |
| Exhibit J-2 | Form of Deferred Termination Agreement for Hummer Discontinued Brand  Dealer Agreements |
| Exhibit J-3 | Form of Deferred Termination Agreement for non-Saturn and non-Hummer Discontinued Brand Dealer Agreements and Excluded Continuing Brand Dealer Agreements |
| Exhibit K | Form of Participation Agreement |
| Exhibit L | Form of Subdivision Master Lease ~~Term Sheet~~ |
| Exhibit M | Form of Assignment and Assumption of Willow Run Lease |
| Exhibit N | Form of Ren Cen Lease |
| Exhibit O | Form of Equity Registration Rights Agreement |
| Exhibit N | ~~[Reserved]~~Exhibit OP   Form of Bill of Sale |
| Exhibit P | ~~Form of Assignment and Assumption Agreement~~Exhibit Q   Form of Assignment and Assumption Agreement |
| Exhibit R | Form of Novation Agreement |
| Exhibit ~~R~~S | Form of Government Related Subcontract Agreement |
| Exhibit ~~S~~T | Form of Intellectual Property Assignment Agreement |
| Exhibit ~~T~~U | Form of Transition Services Agreement |
| Exhibit ~~U~~V | Form of Assignment and Assumption of Real Property Leases |
| Exhibit ~~V~~W | Form of Assignment and Assumption of Harlem Lease |
| Exhibit X | Form of Master Lease Agreement |
| Exhibit ~~W~~ | ~~Form of SPO Lease~~Exhibit ~~X~~Y   Form   of   Certificate   of Designation of Purchaser for Preferred Stock |
| Exhibit ~~Y~~Z | VEBA Note Term Sheet |

## **AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT**

THIS AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT (this "Agreement"), dated as of June 1,26, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, on the date hereofJune 1, 2009 (the "Petition Date"), Sellers intend to filethe Parties entered into that certain Master Sale and Purchase Agreement (the "Original Agreement"), and, in connection therewith, Sellers filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser desires to purchase, accept and acquire from Sellers all of the Purchased Assets (as hereinafter defined) and assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities (as hereinafter defined), in each case, in accordance with the terms and subject to the conditions set forth in this Agreement and the Bankruptcy Code;

WHEREAS, on the date hereofPetition Date, Purchaser has entered into equity subscription agreements with each of Canada, Sponsor and the New VEBA (each as hereinafter defined), pursuant to which Purchaser has agreed to issue, on the Closing Date (as hereinafter defined), the Canada Shares, the Sponsor Shares, the VEBA Shares, the VEBA Note and the VEBA Warrant (each as hereinafter defined);

WHEREAS, pursuant to the equity subscription agreement between Purchaser and Canada, Canada has agreed to (i) contribute on or before the Closing Date an amount of Indebtedness (as hereinafter defined) owed to it by General Motors of Canada Limited ("GMCL"), which results in not more than $1,288,135,593 of such Indebtedness remaining an obligation of GMCL, to Canada immediately following the Closing (the "Canadian Debt Contribution") and (ii) exchange immediately following the Closing the $3,887,000,000 loan to be made by Canada to Purchaser for additional shares of capital stock of Purchaser;

WHEREAS, the transactions contemplated by this Agreement are in furtherance of the conditions, covenants and requirements of the UST Credit Facilities (as hereinafter defined) and are intended to result in a rationalization of the costs, capitalization and capacity with respect to the manufacturing workforce of, and suppliers to, Sellers and their Subsidiaries (as hereinafter defined); and

WHEREAS, it is contemplated that Purchaser willmay, in accordance with the terms of this Agreement, prior to the Closing (as hereinafter defined), engage in one or more related

transactions (the "Holding Company Reorganization") generally designed to reorganize Purchaser and one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Purchaser into a holding company structure that results in Purchaser becoming a direct or indirect, wholly-owned Subsidiary of a newly-formed Delaware corporation ("Holding Company"); and

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, direct the transfer of the Purchased Assets on its behalf by assigning its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser, such that following the Closing (as hereinafter defined), Purchaser will be a holding company.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties (as hereinafter defined) hereby agree as follows:

## ARTICLE I
## DEFINITIONS

*Section 1.1    Defined Terms.*  As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"Adjustment Shares" has the meaning set forth in **Section 3.2(c)(i)**.

"Advisory Fees" has the meaning set forth in **Section 4.20**.

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Affiliate Contract" means a Contract between a Seller or a Subsidiary of a Seller, on the one hand, and an Affiliate of such Seller or Subsidiary of a Seller, on the other hand.

"Agreed G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in **Section 3.3**.

"Alternative Transaction" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more Persons other than Purchaser (or its Affiliates).

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the

Novation Agreement, the Government- Related Subcontract Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service ~~Contract~~Contracts (if required), the ~~SPO Lease (if required)~~Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

"Antitrust Laws" means all Laws that (i) are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or the lessening of competition through merger or acquisition or (ii) involve foreign investment review by Governmental Authorities.

"Applicable Employee" means all (i) current salaried employees of Parent and (ii) current hourly employees of any Seller or any of its Affiliates (excluding Purchased Subsidiaries and any dealership) represented by the UAW, in each case, including such current salaried and current hourly employees who are on (a) long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence or (b) layoff status or who have recall rights.

"Arms-Length Basis" means a transaction between two Persons that is carried out on terms no less favorable than the terms on which the transaction would be carried out by unrelated or unaffiliated Persons, acting as a willing buyer and a willing seller, and each acting in his own self-interest.

"Assignment and Assumption Agreement" has the meaning set forth in **Section 7.2(c)(v)**.

"Assignment and Assumption of Harlem Lease" has the meaning set forth in **Section 7.2(c)(xiii).**

"Assignment and Assumption of Real Property Leases" has the meaning set forth in **Section 7.2(c)(xii)**.

"Assignment and Assumption of Willow Run Lease" has the meaning set forth in **Section 6.27(e).**

"Assumable Executory Contract" has the meaning set forth in **Section 6.6(a)**.

"Assumable Executory Contract Schedule" means Section 1.1A of the Sellers' Disclosure Schedule.

"Assumed Liabilities" has the meaning set forth in **Section 2.3(a)**.

"Assumed Plans" has the meaning set forth in **Section 6.17(e)**.

"Assumption Effective Date" has the meaning set forth in **Section 6.6(~~e~~d)**.

"Bankruptcy Avoidance Actions" has the meaning set forth in **Section 2.2(b)(xi)**.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plans" has the meaning set forth in **Section 4.10(a)**.

"Bidders" has the meaning set forth in **Section 6.4(c)**.

"Bids" has the meaning set forth in **Section 6.4(c)**.

"Bill of Sale" has the meaning set forth in **Section 7.2(c)(iv)**.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York, New York.

"CA" has the meaning set forth in **Section 6.16(g)(i)**.

"Canada" means 7176384 Canada Inc., a corporation organized under the Laws of Canada, and a wholly-owned subsidiary of Canada Development Investment Corporation, and its successors and assigns.

"Canada Affiliate" has the meaning set forth in **Section 9.22**.

"Canada Shares" has the meaning set forth in **Section 5.4(c)**.

"Canadian Debt Contribution" has the meaning set forth in the Recitals.

"Claims" means all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choses in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due or to become due, and all rights and remedies with respect thereto.

"Claims Estimate Order" has the meaning set forth in **Section 3.2(c)(i)**.

"Closing" has the meaning set forth in **Section 3.1**.

"Closing Date" has the meaning set forth in **Section 3.1**.

"Collective Bargaining Agreement" means any collective bargaining agreement or other written or oral agreement, understanding or mutually recognized past practice with respect to Employees, between any Seller (or any Subsidiary thereof) and any labor organization or other

Representative of Employees (including the UAW Collective Bargaining Agreement, local agreements, amendments, supplements and letters and memoranda of understanding of any kind).

"Common Stock" has the meaning set forth in **Section 5.4(b)**.

"Confidential Information" has the meaning set forth in **Section 6.24.**

"Confidentiality Period" has the meaning set forth in **Section 6.24**.

"Continuing Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Continuing Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer, other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Continuing Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Buick, Cadillac, Chevrolet and GMC.

"Contracts" means all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied).

"Copyright Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to reproduce, publicly display, publicly perform, distribute, create derivative works of or otherwise exploit any works covered by any Copyright.

"Copyrights" means all domestic and foreign copyrights, whether registered or unregistered, including all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship (including all compilations of information or marketing materials created by or on behalf of any Seller), acquired, owned or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof) and all reissues, renewals, restorations, extensions and revisions thereof.

"Cure Amounts" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Purchaser of the Purchased Contracts.

"Damages" means any and all Losses, other than punitive damages.

"Dealer Agreement" has the meaning set forth in **Section 4.17**.

"Deferred Executory Contract" has the meaning set forth in **Section 6.6(bc)**.

"Deferred Termination Agreements" has the meaning set forth in **Section 6.7(a)**.

"Delayed Closing Entities" has the meaning set forth in **Section 6.35**.

"Delphi" means Delphi Corporation.

"Delphi Motion" means the motion filed by Parent with the Bankruptcy Court in the Bankruptcy Cases on June 20, 2009, seeking authorization and approval of (i) the purchase, and guarantee of purchase, of certain assets of Delphi, (ii) entry into certain agreements in connection with the sale of substantially all of the remaining assets of Delphi to a third party, (iii) the assumption of certain Executory Contracts in connection with such sale, (iv) entry into an agreement with the PBGC in connection with such sale and (v) entry into an alternative transaction with the successful bidder in the auction for the assets of Delphi.

"Delphi Transaction Agreements" means (i) either (A) the MDA, the SPA, the Loan Agreement, the Operating Agreement, the Commercial Agreements and any Ancillary Agreements (in each case, as defined in the Delphi Motion), which any Seller is a party to, or (B) in the event that an Acceptable Alternative Transaction (as defined in the Delphi Motion) is consummated, any agreements relating to the Acceptable Alternative Transaction, which any Seller is a party to, and (ii) in the event that the PBGC Agreement is entered into at or prior to the Closing, the PBGC Agreement (as defined in the Delphi Motion) and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each of the agreements described in clauses (i) or (ii) hereof may be amended from time to time.

"DIP Facility" means that certain Third Lien Secured Superpriority Debtor-in-Possession Credit Agreement entered into or to be entered into by Parent, as borrower, certain Subsidiaries of Parent listed therein, as guarantors, Sponsor, as lender, and Export Development Canada, as lender.

"Discontinued Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Discontinued Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Discontinued Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Hummer, Saab, Saturn and Pontiac.

"Disqualified Individual" has the meaning set forth in **Section 4.10(f)**.

"Employees" means (i) each employee or officer of any of Sellers or their Affiliates (including (a) any current, former or retired employees or officers, (b) employees or officers on

long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence and (c) employees on layoff status or with recall rights); (ii) each consultant or other service provider of any of Sellers or their Affiliates who is a former employee, officer or director of any of Sellers or their Affiliates; and (iii) each individual recognized under any Collective Bargaining Agreement as being employed by or having rights to employment by any of Sellers or their Affiliates.  For the avoidance of doubt, Employees includes all employees of Sellers or any of their Affiliates, whether or not Transferred Employees.

"Employment-Related Obligations" means all Liabilities arising out of, related to, in respect of or in connection with employment relationships or alleged or potential employment relationships with Sellers or any Affiliate of Sellers relating to Employees, leased employees, applicants, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, whether filed or asserted before, on or after the Closing.  "Employment-Related Obligations" includes Claims relating to discrimination, torts, compensation for services (and related employment and withholding Taxes), workers' compensation or similar benefits and payments on account of occupational illnesses and injuries, employment Contracts, Collective Bargaining Agreements,  grievances originating under a Collective Bargaining Agreement, wrongful discharge, invasion of privacy, infliction of emotional distress, defamation, slander, provision of leave under the Family and Medical Leave Act of 1993, as amended, or other similar Laws, car programs, relocation, expense-reporting, Tax protection policies, Claims arising out of WARN or employment, terms of employment, transfers, re-levels, demotions, failure to hire, failure to promote, compensation policies, practices and treatment, termination of employment, harassment, pay equity, employee benefits (including post-employment welfare and other benefits), employee treatment, employee suggestions or ideas, fiduciary performance, employment practices, the modification or termination of Benefit Plans or employee benefit plans, policies, programs, agreements and arrangements of Purchaser, including decisions to provide plans that are different from Benefit Plans, and the like.  Without limiting the generality of the foregoing, with respect to any Employees, leased employees, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, "Employment-Related Obligations" includes payroll and social security Taxes, contributions (whether required or voluntary) to any retirement, health and welfare or similar plan or arrangement, notice, severance or similar payments required under Law, and obligations under Law with respect to occupational injuries and illnesses.

"Encumbrance" means any lien (statutory or otherwise), charge, deed of trust, pledge, security interest, conditional sale or other title retention agreement, lease, mortgage, option, charge, hypothecation, easement, right of first offer, license, covenant, restriction, ownership interest of another Person or other encumbrance.

"End Date" has the meaning set forth in **Section 8.1(b)**.

"Environment" means any surface water, groundwater, drinking water supply, land surface or subsurface soil or strata, ambient air, natural resource or wildlife habitat.

"Environmental Law" means any Law in existence on the date ~~hereof~~of the Original Agreement relating to the management or Release of, or exposure of humans to, any Hazardous Materials; or pollution; or the protection of human health and welfare and the Environment.

"Equity Incentive Plans" has the meaning set forth in **Section 6.28**.

"Equity Interest" means, with respect to any Person, any shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, options or rights for the purchase or other acquisition from such Person of such shares (or such other ownership or profits interests) and other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"Equity Registration Rights Agreement" has the meaning set forth in **Section 7.1(c)**.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes any Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Tax Code or Section 4001(a)(14) of ERISA.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in **Section 2.2(b)**.

"Excluded Cash" has the meaning set forth in **Section 2.2(b)(i)**.

"Excluded Continuing Brand Dealer Agreements" means all Continuing Brand Dealer Agreements, other than those that are Assumable Executory Contracts.

"Excluded Contracts" has the meaning set forth in **Section 2.2(b)(vii)**.

"Excluded Entities" has the meaning set forth in **Section 2.2(b)(iv)**.

"Excluded Insurance Policies" has the meaning set forth in **Section 2.2(b)(xiii)**.

"Excluded Personal Property" has the meaning set forth in **Section 2.2(b)(vi)**.

"Excluded Real Property" has the meaning set forth in **Section 2.2(b)(v)**.

"Excluded Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Excluded Entities and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Executory Contract" means an executory Contract or unexpired lease of personal property or nonresidential real property.

"Executory Contract Designation Deadline" has the meaning set forth in **Section 6.6(a)**.

"Existing Internal VEBA" has the meaning set forth in **Section 6.17(h)**.

"Existing Saginaw Wastewater Facility" has the meaning set forth in **Section 6.27(b)**.

"Existing UST Loan and Security Agreement" means the Loan and Security Agreement, dated as of December 31, 2008, between Parent and Sponsor, as amended.

"FCPA" has the meaning set forth in **Section 4.19**.

"Final Determination" means (i) with respect to U.S. federal income Taxes, a "determination" as defined in Section 1313(a) of the Tax Code or execution of an IRS Form 870-AD and, (ii) with respect to Taxes other than U.S. federal income Taxes, any final determination of Liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise, including the expiration of a statute of limitations or a period for the filing of ~~claims~~Claims for refunds, amended Tax Returns or appeals from adverse determinations.

"Final Order" means (i) an Order of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such Order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such Order.

"FSA Approval" has the meaning set forth in **Section 6.34**.

"G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"GAAP" means the United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period.

"GMAC" means GMAC LLC.

"GM Assumed Contracts" has the meaning set forth in the Delphi Motion.

"GMCL" has the meaning set forth in the Recitals.

"Governmental Authority" means any United States or non-United States federal, national, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Government Related Subcontract Agreement" has the meaning set forth in **Section 7.2(c)(vii)**.

"Harlem" has the meaning set forth in the Preamble.

"Hazardous Materials" means any material or substance that is regulated, or can give rise to Claims, Liabilities or Losses, under any Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos or asbestos-containing materials, lead and any noxious, radioactive, flammable, corrosive, toxic, hazardous or caustic substance (whether solid, liquid or gaseous).

"Holding Company" has the meaning set forth in the Recitals.

"Holding Company Reorganization" has the meaning set forth in the Recitals.

"Indebtedness" means, with respect to any Person, without duplication:  (i) all obligations of such Person for borrowed money (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (ii) all obligations of such Person to pay amounts evidenced by bonds, debentures, notes or similar instruments (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (iii) all obligations of others, of the types set forth in clauses (i)-(ii) above that are secured by any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but only to the extent so secured; (iv) all unreimbursed reimbursement obligations of such Person under letters of credit issued for the account of such Person; (v) obligations of such Person under conditional sale, title retention or similar arrangements or other obligations, in each case, to pay the deferred purchase price for property or services, to the extent of the unpaid purchase price (other than trade payables and customary reservations or retentions of title under Contracts with suppliers, in each case, in the Ordinary Course of Business); (vi) all net monetary obligations of such Person in respect of interest rate, equity and currency swap and other derivative transaction obligations; and (vii) all guarantees of or by such Person of any of the matters described in clauses (i)-(vi) above, to the extent of the maximum amount for which such Person may be liable pursuant to such guarantee.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Trade Secrets, Software, all rights under the Licenses and all concepts, ideas, know-how, show-how, proprietary information, technology, formulae, processes and other general intangibles of like

nature, and other intellectual property to the extent entitled to legal protection as such, including products under development and methodologies therefor, in each case acquired, owned or licensed by a Seller.

"Intellectual Property Assignment Agreement" has the meaning set forth in **Section 7.2(c)(viii)**.

"Intercompany Obligations" has the meaning set forth in **Section 2.2(a)(iv)**.

"Inventory" has the meaning set forth in **Section 2.2(a)(viii)**.

"IRS" means the United States Internal Revenue Service.

"Key Subsidiary" means any direct or indirect Subsidiary (which, for the avoidance of doubt, shall only include any legal entity in which a Seller, directly or indirectly, owns greater than 50% of the outstanding Equity Interests in such legal entity) of Sellers (other than trusts) with assets (excluding any Intercompany Obligations) in excess of Two Hundred and Fifty Million Dollars ($250,000,000) as reflected on Parent's consolidated balance sheet as of March 31, 2009 and listed on Section 1.1BC of the Sellers' Disclosure Schedule.

"Knowledge of Sellers" means the actual knowledge of the individuals listed on Section 1.1CD of the Sellers' Disclosure Schedule as to the matters represented and as of the date the representation is made.

"Law" means any and all applicable United States or non-United States federal, national, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Final Order.

"Landlocked Parcel" has the meaning set forth in **Section 6.27(c)**.

"Leased Real Property" means all the real property leased or subleased by Sellers, except for any such leased or subleased real property subject to any Contracts designated as Excluded Contracts.

"Lemon Laws" means a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.

"Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

"Licenses" means the Patent Licenses, the Trademark Licenses, the Copyright Licenses, the Software Licenses and the Trade Secret Licenses.

"Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', consultants', engineers' and experts' fees and expenses).

"LSA Agreement" means the Amended and Restated GM-Delphi Agreement, dated as of June 1, 2009, and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each such agreement may be amended from time to time.

"Master Lease Agreement" has the meaning set forth in **Section 7.2(c)(~~xiii~~xiv)**.

"Material Adverse Effect" means any change, effect, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the Purchased Assets, Assumed Liabilities or results of operations of Parent and its Purchased Subsidiaries, taken as a whole; provided, however, that the term "Material Adverse Effect" does not, and shall not be deemed to, include, either alone or in combination, any changes, effects, occurrences or developments: (i) resulting from general economic or business conditions in the United States or any other country in which Sellers and their respective Subsidiaries have operations, or the worldwide economy taken as a whole; (ii) affecting Sellers in the industry or the markets where Sellers operate (except to the extent such change, occurrence or development has a disproportionate adverse effect on Parent and its Subsidiaries relative to other participants in such industry or markets, taken as a whole); (iii) resulting from any changes (or proposed or prospective changes) in any Law or in GAAP or any foreign generally accepted accounting principles; (iv) in securities markets, interest rates, regulatory or political conditions, including resulting or arising from acts of terrorism or the commencement or escalation of any war, whether declared or undeclared, or other hostilities; (v) resulting from the negotiation, announcement or performance of this Agreement or the DIP Facility, or the transactions contemplated hereby and thereby, including by reason of the identity of Sellers, Purchaser or Sponsor or any communication by Sellers, Purchaser or Sponsor of any plans or intentions regarding the operation of Sellers' business, including the Purchased Assets, prior to or following the Closing; (vi) resulting from any act or omission of any Seller required or contemplated by the terms of this Agreement, the DIP Facility or the Viability Plans, or otherwise taken with the prior consent of Sponsor or Purchaser, including Parent's announced shutdown, which began in May 2009; and (vii) resulting from the filing of the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by any Subsidiary of Parent) or from any action approved by the Bankruptcy Court (or any other court in connection with any such other proceedings).

"New VEBA" means the trust fund established pursuant to the Settlement Agreement.

"Non-Assignable Assets" has the meaning set forth in **Section 2.4(a)**.

"Non-UAW Collective Bargaining Agreements" has the meaning set forth in **Section 6.17(m)(i).**

"Non-UAW Settlement Agreements" has the meaning set forth in **Section 6.17(m)(ii).**

"Notice of Intent to Reject" has the meaning set forth in **Section 6.6(b)**.

"Novation Agreement" has the meaning set forth in **Section 7.2(c)(vi)**.

"Option Period" has the meaning set forth in **Section 6.6(b)**.

"Order" means any writ, judgment, decree, stipulation, agreement, determination, award, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"Ordinary Course of Business" means the usual, regular and ordinary course of business consistent with the past practice thereof (including with respect to quantity and frequency) as and to the extent modified in connection with (i) the implementation of the Viability Plans; (ii) Parent's announced shutdown, which began in May 2009; and (iii) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent), in the case of clause (iii), to the extent such modifications were approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any such other proceedings), or in furtherance of such approval.

"Organizational Document" means (i) with respect to a corporation, the certificate or articles of incorporation and bylaws or their equivalent; (ii) with respect to any other entity, any charter, bylaws, limited liability company agreement, certificate of formation, articles of organization or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (iii) in the case of clauses (i) and (ii) above, any amendment to any of the foregoing other than as prohibited by **Section 6.2(b)(vi)**.

"Original Agreement" has the meaning set forth in the Recitals.

"Owned Real Property" means all real property owned by Sellers (including all buildings, structures and improvements thereon and appurtenances thereto), except for any such real property included in the Excluded Real Property.

"Parent" has the meaning set forth in the Preamble.

"Parent Employee Benefit Plans and Policies" means all (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and all pension, savings, profit sharing, retirement, bonus, incentive, health, dental, life, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, post-retirement (including retiree medical or retiree life, voluntary employees' beneficiary associations, and multiemployer plans (as defined in Section 3(37) of ERISA)), severance, retention, change in control, vacation, cafeteria, sick leave, fringe, perquisite, welfare benefits or other employee benefit plans, programs, policies, agreements or arrangements (whether written or oral), including those plans, programs, policies, agreements and arrangements with respect to which any Employee covered by the UAW Collective Bargaining Agreement is an eligible participant, (ii) employment or individual consulting Contracts and (iii) employee manuals and written policies, practices or understandings relating to employment, compensation and benefits, and in the case of clauses (i) through (iii), sponsored, maintained, entered into, or contributed to, or required to be maintained or contributed to, by Parent.

"Parent SEC Documents" has the meaning set forth in **Section 4.5(a)**.

"Parent Shares" has the meaning set forth in **Section 3.2(a)(iii)**.

"Parent Warrant A" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit A**.

"Parent Warrant B" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit B**.

"Parent Warrants" means collectively, Parent Warrant A and Parent Warrant B.

"Participation Agreement" has the meaning set forth in **Section 6.7(b)**.

"Parties" means Sellers and Purchaser together, and "Party" means any of Sellers, on the one hand, or Purchaser, on the other hand, as appropriate and as the case may be.

"Patent Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to manufacture, use, lease, or sell any invention, design, idea, concept, method, technique or process covered by any Patent.

"Patents" means all inventions, patentable designs, letters patent and design letters patent of the United States or any other country and all applications (regular and provisional) for letters patent or design letters patent of the United States or any other country, including applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, and all reissues, divisions, continuations, continuations in part, revisions, reexaminations and extensions or renewals of any of the foregoing.

"PBGC" has the meaning set forth in **Section 4.10(a)**.

"Permits" has the meaning set forth in **Section 2.2(a)(xi)**.

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties) or liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and in each case for which appropriate reserves have been established (and to the extent that such liens relate to a period ending on or

before December 31, 2008, the amount of any such Liability is accrued or reserved for as a Liability in accordance with GAAP in the audited consolidated balance sheet of Sellers at December 31, 2008); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; and (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests.; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify,

amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Personal Information" means any information relating to an identified or identifiable living individual, including (i) first initial or first name and last name; (ii) home address or other physical address, including street name and name of city or town; (iii) e-mail address or other online contact information (e.g., instant messaging user identifier); (iv) telephone number; (v) social security number or other government-issued personal identifier such as a tax identification number or driver's license number; (vi) internet protocol address; (vii) persistent identifier (e.g., a unique customer number in a cookie); (viii) financial account information (account number, credit or debit card numbers or banking information); (ix) date of birth; (x) mother's maiden name; (xi) medical information (including electronic protected health information as defined by the rules and regulations of the Health Information Portability and Privacy Act, as amended); (xii) digitized or electronic signature; and (xiii) any other information that is combined with any of the above.

"Personal Property" has the meaning set forth in **Section 2.2(a)(vii)**.

"Petition Date" has the meaning set forth in the Recitals.

"PLR" has the meaning set forth in **Section 6.16(g)(i)**.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Privacy Policy" means, with respect to any Person, any written privacy policy, statement, rule or notice regarding the collection, use, access, safeguarding and retention of Personal Information or "Personally Identifiable Information" (as defined by Section 101(41A) of the Bankruptcy Code) of any individual, including a customer, potential customer, employee or former employee of such Person, or an employee of any of such Person's automotive or parts dealers.

"Product Liabilities" has the meaning set forth in **Section 2.3(a)(ix)**.

"Promark UK Subsidiaries" has the meaning set forth in **Section 6.34**.

"Proposed Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Purchase Price" has the meaning set forth in **Section 3.2(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.2(a)**.

"Purchased Contracts" has the meaning set forth in **Section 2.2(a)(x)**.

"Purchased Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Transferred Entities, and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Purchased Subsidiaries Employee Benefit Plans" means any (i) defined benefit or defined contribution retirement plan maintained by any Purchased Subsidiary and (ii) severance, change in control, bonus, incentive or any similar plan or arrangement maintained by a Purchased Subsidiary for the benefit of officers or senior management of such Purchased Subsidiary.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Assumed Debt" has the meaning set forth in **Section 2.3(a)(i)**.

"Purchaser Expense Reimbursement" has the meaning set forth in **Section 8.2(b)**.

"Purchaser Material Adverse Effect" has the meaning set forth in **Section 5.3(a)**.

"Purchaser's Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Purchaser immediately prior to the execution of ~~this~~the Original Agreement.

"Quitclaim Deeds" has the meaning set forth in **Section 7.2(c)(x)**.

"Receivables" has the meaning set forth in **Section 2.2(a)(iii)**.

"Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the Environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

"Relevant Information" has the meaning set forth in **Section 6.16(g)(ii)**.

"Relevant Transactions" has the meaning set forth in **Section 6.16(g)(i)**.

"Ren Cen Lease" has the meaning set forth in **Section 6.30**.

"Representatives" means all officers, directors, employees, consultants, agents, lenders, accountants, attorneys and other representatives of a Person.

"Required Subdivision" has the meaning set forth in **Section ~~6.27~~6.27(a)**.

"Restricted Cash" has the meaning set forth in **Section 2.2(a)(ii)**.

"Retained Liabilities" has the meaning set forth in **Section 2.3(b)**.

"Retained Plans" means any Parent Employee Benefit Plan and Policy that is not an Assumed Plan.

"Retained Subsidiaries" means all Subsidiaries of Sellers and their respective direct and indirect Subsidiaries, as of the Closing Date, other than the Purchased Subsidiaries.

"Retained Workers' Compensation Claims" has the meaning set forth in **Section 2.3(b)(xii)**.

"RHI" has the meaning set forth in **Section 6.30**.

"RHI Post-Closing Period" has the meaning set forth in **Section 6.30**.

"S Distribution" has the meaning set forth in the Preamble.

"S LLC" has the meaning set forth in the Preamble.

"Saginaw Landfill" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Metal Casting Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Nodular Iron Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Service Contract Contracts" has the meaning set forth in **Section 6.27(b)**.

"Sale Approval Order" has the meaning set forth in **Section 6.4(b)**.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve the Sale Procedures and Sale Motion and enter the Sale Approval Order.

"Sale Procedures and Sale Motion" has the meaning set forth in **Section 6.4(b)**.

"Sale Procedures Order" has the meaning set forth in **Section 6.4(b)**.

"SEC" means the United States Securities and Exchange Commission.

"Secured Real Property Encumbrances" means all Encumbrances related to the Indebtedness of Sellers, which is secured by one or more parcels of the Owned Real Property, including Encumbrances related to the Indebtedness of Sellers under any synthetic lease arrangements at the White Marsh, Maryland GMPT - Baltimore manufacturing facility and the Memphis, Tennessee (SPO - Memphis) facility.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" or "Sellers" has the meaning set forth in the Preamble.

"Seller Group" means any combined, unitary, consolidated or other affiliated group of which any Seller or Purchased Subsidiary is or has been a member for federal, state, provincial, local or foreign Tax purposes.

"Seller Key Personnel" means those individuals described on Section 1.1DE of the Sellers' Disclosure Schedule.

"Seller Material Contracts" has the meaning set forth in **Section 4.16(a)**.

"Sellers' Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Sellers to Purchaser immediately prior to the execution of this Agreement, as updated and supplemented pursuant to **Section 6.5**, **Section 6.6** and **Section 6.26**.

"Series A Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Settlement Agreement" means the Settlement Agreement, dated February 21, 2008 (as amended, supplemented, replaced or otherwise altered from time to time), among Parent, the UAW and certain class representatives, on behalf of the class of plaintiffs in the class action of *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007).

"Shared Executory Contracts" has the meaning set forth in **Section 6.6(ed)**.

"Software" means all software of any type (including programs, applications, middleware, utilities, tools, drivers, firmware, microcode, scripts, batch files, JCL files, instruction sets and macros) and in any form (including source code, object code, executable code and user interface), databases and associated data and related documentation, in each case owned, acquired or licensed by any Seller.

"Software Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to use, modify, reproduce, distribute or create derivative works of any Software.

"SPO Lease" has the meaning set forth in **Section 7.2(c)(xiv)**.

"Sponsor" means the United States Department of the Treasury.

"Sponsor Affiliate" has the meaning set forth in **Section 9.22**.

"Sponsor Shares" has the meaning set forth in **Section 5.4(c)**.

"Straddle Period" means a taxable period that includes but does not end on the Closing Date.

"Subdivision Master Lease" has the meaning set forth in **Section 6.27 6.27(a).**

"Subdivision Master Lease Term Sheet" has the meaning set forth in **Section 6.27.**

"Subdivision Properties" has the meaning set forth in **Section 6.27 6.27(a).**

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity (in each case, other than a joint venture if such Person is not empowered to control the day-to-day operations of such joint venture) of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than fifty percent (50%) of the Equity Interests, the holder of which is entitled to vote for the election of the board of directors or other governing body of such corporation, limited liability company, partnership or other legal entity.

"Superior Bid" has the meaning set forth in **Section 6.4(d)**.

"Surviving Representations and Warranties" has the meaning set forth in **Section 9.1(b)**.

"TARP" means the Troubled Assets Relief Program established by Sponsor under the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7001 of Division B, Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time and any guidance issued by a regulatory authority thereunder and other related Laws in effect currently or in the future in the United States.

"Tax" or "Taxes" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth or gross receipts, income, alternative or add-on minimum, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property (including real property and personal property taxes), environmental, windfall profits or other taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority, including any transferee, successor or secondary liability for any such tax and any Liability assumed by Contract or arising as a result of being or ceasing to be a member of any affiliated group or similar group under state, provincial, local or foreign Law, or being included or required to be included in any Tax Return relating thereto.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Taxing Authority" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other Person or body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"<u>Tax Return</u>" means any return, report, declaration, form, election letter, statement or other information filed or required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"<u>Trademark Licenses</u>" means all Contracts naming any Seller as licensor or licensee and providing for the grant of any right concerning any Trademark together with any goodwill connected with and symbolized by any such Trademark or Trademark Contract, and the right to prepare for sale or lease and sell or lease any and all products, inventory or services now or hereafter owned or provided by any Seller or any other Person and now or hereafter covered by such Contracts.

"<u>Trademarks</u>" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers, and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof) and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks.

"<u>Trade Secrets</u>" means all trade secrets or Confidential Information, including any confidential technical and business information, program, process, method, plan, formula, product design, compilation of information, customer list, sales forecast, know-how, Software, and any other confidential proprietary intellectual property, and all additions and improvements to, and books and records describing or used in connection with, any of the foregoing, in each case, owned, acquired or licensed by any Seller.

"<u>Trade Secret Licenses</u>" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any rights with respect to Trade Secrets.

"<u>Transfer Taxes</u>" means all transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby and not otherwise exempted under the Bankruptcy Code, including relating to the transfer of the Transferred Real Property.

"<u>Transfer Tax Forms</u>" has the meaning set forth in **Section 7.2(c)(xi)**.

"<u>Transferred Employee</u>" has the meaning set forth in **Section 6.17(a)**.

"<u>Transferred Entities</u>" means all of the direct Subsidiaries of Sellers and joint venture entities or other entities in which any Seller has an Equity Interest, other than the Excluded Entities.

"<u>Transferred Equity Interests</u>" has the meaning set forth in **Section 2.2(a)(v)**.

"<u>Transferred Real Property</u>" has the meaning set forth in **Section 2.2(a)(vi)**.

"Transition Services Agreement" has the meaning set forth in **Section 7.2(c)(ix)**.

"Transition Team" has the meaning set forth in **Section 6.11(c)**.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"UAW Active Labor Modifications" means the modifications to the UAW Collective Bargaining Agreement, as agreed to in the 2009 Addendum to the 2007 UAW-GM National Agreement, dated May 17, 2009, the cover page of which is attached hereto as **Exhibit C** (the 2009 Addendum without attachments), which modifications were ratified by the UAW membership on May 29, 2009.

"UAW Collective Bargaining Agreement" means any written or oral Contract, understanding or mutually recognized past practice between Sellers and the UAW with respect to Employees, including the UAW Active Labor Modifications, but excluding the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between Parent and the UAW, and the Settlement Agreement.   For purpose of clarity, the term "UAW Collective Bargaining Agreement" includes all special attrition programs, divestiture-related memorandums of understanding or implementation agreements relating to any unit or location where covered UAW-represented employees remain and any current local agreement between Parent and a UAW local relating to any unit or location where UAW-represented employees are employed as of the date hereofof the Original Agreement.   For purposes of clarity, nothing in this definition extends the coverage of the UAW-GM National Agreement to any Employee of S LLC, S Distribution, Harlem, a Purchased Subsidiary or one of Parent's Affiliates; nothing in this Agreement creates a direct employment relationship with a Purchased Subsidiary's employee or an Affiliate's Employee and Parent.

"UAW Retiree Settlement Agreement" means the UAW Retiree Settlement Agreement to be executed prior to the Closing, substantially in the form attached hereto as **Exhibit D**.

"Union" means any labor union, organization or association representing any employees (but not including the UAW) with respect to their employment with any of Sellers or their Affiliates.

"United States" or "U.S." means the United States of America, including its territories and insular possessions.

"UST Credit Bid Amount" has the meaning set forth in **Section 3.2(a)(i)**.

"UST Credit Facilities" means (i) the Existing UST Loan and Security Agreement, dated December 31, 2008, between Parent and Sponsor and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009, and May 27, 20092009, issued by Parent to Sponsor as additional compensation for the extensions of credit under the Existing UST Loan and Security Agreement, dated December 31, 2008. in each case, as amended.

- 22-

"UST Warrant" means the warrant issued by Parent to Sponsor ~~pursuant to and~~ in consideration ~~of the UST Credit Facilities~~for the extension of credit made available to Parent under the Existing UST Loan and Security Agreement.

"VEBA Shares" has the meaning set forth in **Section 5.4(c)**.

"VEBA Note" has the meaning set forth in **Section 7.3(g)(iv)**.

"VEBA Warrant" means warrants to acquire 15,151,515 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit E**.

"Viability Plans" means (i) Parent's Restructuring Plan for Long-Term Viability, dated December 2, 2008; (ii) Parent's 2009-2014 Restructuring Plan, dated February 17, 2009; (iii) Parent's 2009-2014 Restructuring Plan:  Progress Report, dated March 30, 2009; and (iv) Parent's Revised Viability Plan, all as described in Parent's Registration Statement on Form S-4 (Reg. No 333-158802), initially filed with the SEC on April 27, 2009, in each case, as amended, supplemented and/or superseded.

"WARN" means the Workers Adjustment and Retraining Notification Act of 1988, as amended, and similar foreign, state and local Laws.

"Willow Run Landlord" means the Wayne County Airport Authority, or any successor landlord under the Willow Run Lease.

"Willow Run Lease" means that certain Willow Run Airport Lease of Land dated October 11, 1985, as the same may be amended, by and between the Willow Run Landlord, as landlord, and Parent, as tenant, for certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan.

"Willow Run Lease Amendment" has the meaning set forth in **Section 6.27(e)**.

"Wind Down Facility" has the meaning set forth in **Section 6.9(b)**.

*Section 1.2      Other Interpretive Provisions.*   The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including the Sellers' Disclosure Schedule) and not to any particular provision of this Agreement, and all Article, Section, Sections of the Sellers' Disclosure Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "Dollars" or "$" are deemed references to lawful money of the United States.  Unless otherwise specified, references to any statute, listing rule, rule, standard, regulation or other Law (a) include a reference to the corresponding rules and regulations and (b) include a reference to each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time, and to any section of any statute, listing rule, rule, standard, regulation or other Law,

including any successor to such section.  Where this Agreement states that a Party "shall" or "will" perform in some manner or otherwise act or omit to act, it means that the Party is legally obligated to do so in accordance with this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, other than as set forth in **Section 6.30, Section 6.34** and **Section 6.35,** at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

Section 2.2    *Purchased and Excluded Assets.*

(a)    The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

(i)    all cash and cash equivalents, including all marketable securities, certificates of deposit and all collected funds or items in the process of collection at Sellers' financial institutions through and including the Closing, and all bank deposits, investment accounts and lockboxes related thereto, other than the Excluded Cash and Restricted Cash;

(ii)    all restricted or escrowed cash and cash equivalents, including restricted marketable securities and certificates of deposit (collectively, "Restricted Cash") other than the Restricted Cash described in **Section 2.2(b)(ii)**;

(iii)    all accounts and notes receivable and other such Claims for money due to Sellers, including the full benefit of all security for such accounts, notes and Claims, however arising, including arising from the rendering of services or the sale of goods or materials, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, other than intercompany receivables (collectively, "Receivables");

(iv)    all intercompany obligations ("Intercompany Obligations") owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;

(v)    (A) subject to **Section 2.4**, all Equity Interests in the Transferred Entities (collectively, the "Transferred Equity Interests") and (B) the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Transferred Entity;

(vi)    all Owned Real Property and Leased Real Property (collectively, the "Transferred Real Property");

(vii)    all machinery, equipment (including test equipment and material handling equipment), hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, supplies, vehicles, spare parts in respect of any of the foregoing and other tangible personal property (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit) that does not constitute Inventory (collectively, "Personal Property"), including the Personal Property located at the Excluded Real Property and identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule;

(viii)    all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;

(ix)    (A) all Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property associated with the Discontinued Brands), and (B) all rights and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing, and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing;

(x)    subject to **Section 2.4**, all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, (A) the UAW Collective Bargaining Agreement and (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date; provided, however, that if any Executory Contract designated as an Assumable Executory Contract is recharacterized by a Final Order as a secured financing, then the real property or personal property that is subject to such Contract shall be a Purchased Asset;

(xi)    subject to **Section 2.4**, all approvals, Contracts, authorizations, permits, licenses, easements, Orders, certificates, registrations, franchises, qualifications, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Authority, including all pending applications therefor and all renewals and extensions thereof (collectively, "Permits"), other than to the extent that any of the foregoing relate exclusively to the Excluded Assets or Retained Liabilities;

(xii)    all credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(xiii)    all Claims (including Tax refunds) relating to the Purchased Assets or Assumed Liabilities, including the Claims identified on Section 2.2(a)(xiii) of the Sellers' Disclosure Schedule and all Claims against any Taxing Authority for any period, other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xiv)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities;

(xvi)    to the extent provided in **Section 6.17(e)**, all Assumed Plans;

(xvii)    all insurance policies and the rights to the proceeds thereof, other than the Excluded Insurance Policies;

(xviii)    any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period; and

(xix)    any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability.

(b)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain all of their respective right, title and interest in and to, and shall not, and shall not be deemed to, sell, transfer, assign, convey or deliver to Purchaser, and the Purchased Assets shall not, and shall not be deemed to, include the following (collectively, the "Excluded Assets"):

(i)    cash or cash equivalents in an amount equal to $950,000,000 (the "Excluded Cash");

(ii)    all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities;

(iii)    all Receivables (other than Intercompany Obligations) exclusively related to any Excluded Assets or Retained Liabilities;

(iv)    all of Sellers' Equity Interests in (A) S LLC, (B) S Distribution, (C) Harlem and (D) the Subsidiaries, joint ventures and the other entities in which any Seller has any Equity Interest and that are identified on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule, and, in each case, their respective direct and indirect Subsidiaries as of the Closing Date (collectively, the "Excluded Entities");

(v)    (A) all owned real property set forth on **Exhibit F** and such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (including, in each case, any structures, buildings or other improvements located thereon and appurtenances thereto) and (B) all real property leased or subleased that is subject to a Contract designated as an "Excluded Contract" (collectively, the "Excluded Real Property");

(vi)    all Personal Property that is (A) located at the Transferred Real Property and identified on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule, (B) located at the Excluded Real Property, except for those items identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule or (C) subject to a Contract designated as an Excluded Contract (collectively, the "Excluded Personal Property");

(vii)    (A) all Contracts identified on Section 2.2(b)(vii) of the Sellers' Disclosure Schedule immediately prior to the Closing, (B) all pre-petition Executory Contracts designated as Rejectable Executory Contracts, (C) all pre-petition Executory Contracts (including, for the avoidance of doubt, the Delphi Transaction Agreements and GM Assumed Contracts) that have not been designated as or deemed to be Assumable Executory Contracts in accordance with **Section 6.6** as of the Executory Contract Designation Deadline or **Section 6.31**, or that are determined, pursuant to the procedures set forth in the Sale Procedures

Order, not to be assumable and assignable to Purchaser, (D) all Collective Bargaining Agreements not set forth on the Assumable Executory Contract Schedule and (E) all non-Executory Contracts for which performance by a third-party or counterparty is substantially complete and for which a Seller owes a continuing or future obligation with respect to such non-Executory Contracts (collectively, the "Excluded Contracts"), including any accounts receivable arising out of or in connection with any Excluded Contract; it being understood and agreed by the Parties hereto that, notwithstanding anything to the contrary herein, in no event shall the UAW Collective Bargaining Agreement be designated or otherwise deemed or considered an Excluded Contract;

(viii)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain;

(ix)    the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Seller and each Excluded Entity;

(x)    all Claims against suppliers, dealers and any other third parties relating exclusively to the Excluded Assets or Retained Liabilities;

(xi)    all of Sellers' Claims under this Agreement, the Ancillary Agreements and the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551 (inclusive), 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related Claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (the "Bankruptcy Avoidance Actions"), but in all cases, excluding all rights and Claims identified on Section 2.2(b)(xi) of the Sellers' Disclosure Schedule;

(xii)    all credits, deferred charges, prepaid expenses, deposits and advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating exclusively to the Excluded Assets or Retained Liabilities;

(xiii)    all insurance policies identified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule and the rights to proceeds thereof (collectively, the "Excluded Insurance Policies"), other than any rights to proceeds to the extent such proceeds relate to any Purchased Asset or Assumed Liability;

(xiv)    all Permits, to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xv)      all Retained Plans; and

(xvi)      those assets identified on Section 2.2(b)(xvi) of the Sellers' Disclosure Schedule.

*Section 2.3      Assumed and Retained Liabilities.*

(a)      The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(i)      $6,711,864,4077,072,488,605 of Indebtedness incurred under the DIP Facility, to be restructured pursuant to the terms of **Section 6.9** (the "Purchaser Assumed Debt");

(ii)      all Liabilities under each Purchased Contract;

(iii)      all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) any Purchased Subsidiary or (B) any joint venture or other entity in which a Seller or a Purchased Subsidiary has any Equity Interest (other than an Excluded Entity) by Sellers;

(iv)      all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

(v)      all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Case through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes), in each case, other than (1) Liabilities of the type described in **Section 2.3(b)(iv)**, **Section 2.3(b)(vi)** and **Section 2.3(b)(ix)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(vi)      all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)      (A) all Liabilities arising under express written emission and limited new vehicle warranties, certified used vehicle warranties and pre-owned vehicle warranties warranties of Sellers that are specifically identified as

- 29 -

warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all Liabilities arising under express written emission and limited warranties and warranties with respect toor new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions), manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)    all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)    all Liabilities (including Liabilities for negligence, strict liability, design defect, manufacturing defect, failure to warn or breach of the express or implied warranties of merchantability or fitness for a particular purpose) to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), in each case, arising out of products delivered to a consumer, lessee or other purchaser of products at or after the Closingwhich arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)    all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)    all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(xiii)    (A) all Employment-Related Obligations and (B) Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered

by the UAW Collective Bargaining Agreement, except for Retained Workers Compensation Claims; ~~and~~

(xiv)    all Liabilities of Sellers underlying any construction liens that constitute Permitted Encumbrances with respect to Transferred Real Property; and

(xv)    ~~(xiv)~~ those other Liabilities identified on Section 2.3(a)(~~xiv~~xv) of the Sellers' Disclosure Schedule.

(b)    Each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, neither Purchaser nor any of its Affiliates shall assume, or be deemed to have assumed, any Indebtedness, Claim or other Liability of any Seller or any predecessor, Subsidiary or Affiliate of any Seller whatsoever, whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities"):

(i)    all Liabilities arising out of, relating to, in respect of or in connection with any Indebtedness of Sellers (other than Intercompany Obligations and the Purchaser Assumed Debt), including those items identified on Section 2.3(b)(i) of the Sellers' Disclosure Schedule;

(ii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) another Seller, (B) any Excluded Subsidiary or (C) any joint venture or other entity in which a Seller or an Excluded Subsidiary has an Equity Interest~~,~~ (other than a Transferred Entity)~~;~~

(iii)    all Liabilities arising out of, relating to, in respect of or in connection with the Excluded Assets, other than Liabilities otherwise retained in this **Section 2.3(b)**;

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(v)      except for Taxes assumed in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, all Liabilities with respect to any (A) Taxes arising in connection with Sellers' business, the Purchased Assets or the Assumed Liabilities and that are attributable to a Pre-Closing Tax Period (including any Taxes incurred in connection with the sale of the Purchased Assets, other than all Transfer Taxes), (B) other Taxes of any Seller and (C) Taxes of any Seller Group, including any Liability of any Seller or any Seller Group member for Taxes arising as a result of being or ceasing to be a member of any Seller Group (it being understood, for the avoidance of doubt, that no provision of this Agreement shall cause Sellers to be liable for Taxes of any Purchased Subsidiary for which Sellers would not be liable absent this Agreement);

(vi)      all Liabilities for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, which, for the avoidance of doubt, shall not include any Transfer Taxes), including Advisory Fees, (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases;

(vii)      all Employment-Related Obligations not otherwise assumed in **Section 2.3(a)** and **Section 6.17**, including those arising out of, relating to, in respect of or in connection with the employment, potential employment or termination of employment of any individual (other than any Employee that is or was covered by the UAW Collective Bargaining Agreement) (A) prior to or at the Closing (including any severance policy, plan or program that exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement) or (B) who is not a Transferred Employee arising after the Closing and with respect to both clauses (A) and (B) above, including any Liability arising out of, relating to, in respect of or in connection with any Collective Bargaining Agreement (other than the UAW Collective Bargaining Agreement);

(viii)      all Liabilities arising out of, relating to, in respect of or in connection with Claims for infringement or misappropriation of third party intellectual property rights;

(ix)      all Product Liabilities arising ~~out of products delivered to a consumer, lessee or other purchaser of products~~in whole or in part from any accidents, incidents or other  occurrences that happen prior to the Closing Date;

(x)      all Liabilities to third parties for death, personal injury, other injury to Persons or damage to property, in each case, arising out of asbestos exposure;

(xi)    all Liabilities to third parties for Claims based upon Contract, tort or any other basis;

(xii)    all workers' compensation Claims with respect to Employees residing in or employed in, as the case may be as defined by applicable Law, the states set forth on **Exhibit G** and such additional workers' compensation Claims set forth on Section 2.3(b)(xii) of the Sellers' Disclosure Schedule ((collectively, "Retained Workers' Compensation Claims");

(xiii)    all Liabilities arising out of, relating to, in respect of or in connection with any Retained Plan;

(xiv)    all Liabilities arising out of, relating to, in respect of or in connection with any Assumed Plan or Purchased Subsidiaries Employee Benefit Plan, but only to the extent such Liabilities result from the failure of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan to comply in all respects with TARP or such Liability related to any changes to or from the administration of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan prior to the Closing Date;

(xv)    the Settlement Agreement, except as provided with respect to Liabilities under Section 5A of the UAW Retiree Settlement Agreement; and

(xvi)    all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

*Section 2.4    Non-Assignability.*

(a)    If any Contract, Transferred Equity Interest (or any interest therein), Permit or other asset, which by the terms of this Agreement, is intended to be included in the Purchased Assets is determined not capable of being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy Code) to Purchaser at the Closing without the consent of another party thereto, the issuer thereof or any third party (including a Governmental Authority) ("Non-Assignable Assets"), this Agreement shall not constitute an assignment thereof, or an attempted assignment thereof, unless and until any such consent is obtained.  Subject to **Section 6.3**, Sellers shall use reasonable best efforts, and Purchaser shall use reasonable best efforts to cooperate with Sellers, to obtain the consents necessary to assign to Purchaser the Non-Assignable Assets before, at or after the Closing; provided, however, that neither Sellers nor Purchaser shall be required to make any expenditure, incur any Liability, agree to any modification to any Contract or forego or alter any rights in connection with such efforts.

(b)    To the extent that the consents referred to in **Section 2.4(a)** are not obtained by Sellers, except as otherwise provided in the Ancillary Documents to which one or more Sellers is a party, Sellers' sole responsibility with respect to such

Non-Assignable Assets shall be to use reasonable best efforts, at no cost to Sellers, to (i) provide to Purchaser the benefits of any Non-Assignable Assets; (ii) cooperate in any reasonable and lawful arrangement designed to provide the benefits of any Non-Assignable Assets to Purchaser without incurring any financial obligation to Purchaser; and (iii) enforce for the account of Purchaser and at the cost of Purchaser any rights of Sellers arising from any Non-Assignable Asset against such party or parties thereto; provided, however, that any such efforts described in clauses (i) through (iii) above shall be made only with the consent, and at the direction, of Purchaser.  Without limiting the generality of the foregoing, with respect to any Non-Assignable Asset that is a Contract of Leased Real Property for which a consent is not obtained on or prior to the Closing Date, Purchaser shall enter into a sublease containing the same terms and conditions as such lease (unless such lease by its terms prohibits such subleasing arrangement), and entry into and compliance with such sublease shall satisfy the obligations of the Parties under this **Section 2.4(b)** until such consent is obtained.

(c)    If Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b)**, Purchaser shall perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto, the obligations (including payment obligations) of the applicable Seller thereunder or in connection therewith arising from and after the Closing Date and if Purchaser fails to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may (i) suspend their performance under **Section 2.4(b)** in respect of the Non-Assignable Asset that is the subject of such failure to perform unless and until such situation is remedied, or (ii) perform at Purchaser's sole cost and expense, in which case, Purchaser shall reimburse Sellers' costs and expenses of such performance immediately upon receipt of an invoice therefor.  To the extent that Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b),** Purchaser shall indemnify, defend and hold Sellers harmless from and against any and all Liabilities relating to such Non-Assignable Asset and arising from and after the Closing Date (other than such Damages that have resulted from the gross negligence or willful misconduct of Sellers).

(d)    For the avoidance of doubt, the inability of any Contract, Transferred Equity Interest (or any other interest therein), Permit or other asset, which by the terms of this Agreement is intended to be included in the Purchased Assets to be assigned or transferred to Purchaser at the Closing shall not (i) give rise to a basis for termination of this Agreement pursuant to **ARTICLE VIII** or (ii) give rise to any right to any adjustment to the Purchase Price.

## ARTICLE III
## CLOSING; PURCHASE PRICE

*Section 3.1    Closing*.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the date that falls at least three (3) Business Days following the satisfaction and/or waiver of all conditions to the Closing set forth in **ARTICLE VII** (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the

satisfaction or waiver of such conditions), or on such other date as the Parties mutually agree, at the offices of Jenner & Block LLP, 330 North Wabash919 Third Avenue, Chicago, Illinois 60611,New York City, New York 10022-3908, or at such other place or such other date as the Parties may agree in writing.  The date on which the Closing actually occurs shall be referred to as the "Closing Date," and except as otherwise expressly provided herein, the Closing shall for all purposes be deemed effective as of 9:00 a.m., New York City time, on the Closing Date.

Section 3.2    *Purchase Price.*

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to:  (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less (1) $6,711,864,407 of Indebtedness under the DIP Facility, and (2) $950,000,000$8,022,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

(b)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall (i) offset, pursuant to Section 363(k) of the Bankruptcy Code, the UST Credit Bid Amount against Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility; (ii) transfer to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the UST Warrant; and (iii) issue to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the Parent Shares and the Parent Warrants.

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates.  If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) days of entry of the Claims Estimate Order, issue 10,000,000 additional shares

of Common Stock (the "<u>Adjustment Shares</u>") to Parent, as an adjustment to the Purchase Price.

(ii)    The number of Adjustment Shares shall be adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares.

(iii)    At the Closing, Purchaser shall have authorized and, thereafter, shall reserve for issuance the Adjustment Shares that may be issued hereunder.

*Section 3.3    Allocation.*  Following the Closing, Purchaser shall prepare and deliver to Sellers an allocation of the aggregate consideration among Sellers and, for any transactions contemplated by this Agreement that do not constitute an Agreed G Transaction pursuant to **Section 6.16**, Purchaser shall also prepare and deliver to the applicable Seller a proposed allocation of the Purchase Price and other consideration paid in exchange for the Purchased Assets, prepared in accordance with Section 1060, and if applicable, Section 338, of the Tax Code (the "<u>Allocation</u>").  The applicable Seller shall have thirty (30) days after the delivery of the Allocation to review and consent to the Allocation in writing, which consent shall not be unreasonably withheld, conditioned or delayed.  If the applicable Seller consents to the Allocation, such Seller and Purchaser shall use such Allocation to prepare and file in a timely manner all appropriate Tax filings, including the preparation and filing of all applicable forms in accordance with applicable Law, including Forms 8594 and 8023, if applicable, with their respective Tax Returns for the taxable year that includes the Closing Date and shall take no position in any Tax Return that is inconsistent with such Allocation; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent the applicable Seller and Purchaser from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation, and neither the applicable Seller nor Purchaser shall be required to litigate before any court, any proposed deficiency or adjustment by any Taxing Authority challenging such Allocation.  If the applicable Seller does not consent to such Allocation, the applicable Seller shall notify Purchaser in writing of such disagreement within such thirty (30) day period, and thereafter, the applicable Seller shall attempt in good faith to promptly resolve any such disagreement.  If the Parties cannot resolve a disagreement under this **Section 3.3**, such disagreement shall be resolved by an independent accounting firm chosen by Purchaser and reasonably acceptable to the applicable Seller, and such resolution shall be final and binding on the Parties.  The fees and expenses of such accounting firm shall be borne equally by Purchaser, on the one hand, and the applicable Seller, on the other hand.  The applicable Seller shall provide Purchaser, and Purchaser shall provide the applicable Seller, with a copy of any information described above required to be furnished to any Taxing Authority in connection with the transactions contemplated herein.

*Section 3.4    Prorations.*

(a)    The following prorations relating to the Purchased Assets shall be made:

(i)       Except as provided in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, in the case of Taxes with respect to a Straddle Period, for purposes of Retained Liabilities, the portion of any such Tax that is allocable to Sellers with respect to any Purchased Asset (including, for the avoidance of doubt, with respect to any Purchased Subsidiary) shall be:

(A)      in the case of Taxes that are either (1) based upon or related to income or receipts, or (2) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than Transfer Taxes, equal to the amount that would be payable if the taxable period ended on the Closing Date; and

(B)      in the case of Taxes imposed on a periodic basis, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this clause (i) shall be computed by reference to the level of such items on the Closing Date. All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the applicable Seller, Seller Group member, or Seller Subsidiary.

(ii)      All charges for water, wastewater treatment, sewers, electricity, fuel, gas, telephone, garbage and other utilities relating to the Transferred Real Property shall be prorated as of the Closing Date, with Sellers being liable to the extent such items relate to the Pre-Closing Tax Period, and Purchaser being liable to the extent such items relate to the Post-Closing Tax Period.

(b)      If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Purchasers and Sellers shall prorate such items as and when the actual invoices are issued to the appropriate Party.  The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party.

*Section 3.5       Post-Closing True-up of Certain Accounts.*

(a)      Sellers shall promptly reimburse Purchaser in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including

wire and similar transfers of funds, written or initiated by Sellers prior to the Closing in respect of any obligations that would have constituted Retained Liabilities at the Closing, and that clear or settle in accounts maintained by Purchaser (or its Affiliates) at or following the Closing.

(b)     Purchaser shall promptly reimburse Sellers in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including wire and similar transfers of funds, written or initiated by Sellers following the Closing in respect of any obligations that would have constituted Assumed Liabilities at the Closing, and that clear or settle in accounts maintained by Sellers (or their Affiliates) at or following the Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Parent SEC Documents or in the Sellers' Disclosure Schedule, each Seller represents and warrants severally, and not jointly, to Purchaser as follows:

*Section 4.1     Organization and Good Standing.*  Each Seller and each Purchased Subsidiary is duly organized and validly existing under the Laws of its jurisdiction of organization.  Subject to the limitations imposed on Sellers as a result of having filed the Bankruptcy Cases, each Seller and each Purchased Subsidiary has all requisite corporate, limited liability company, partnership or similar power, as the case may be, and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  Each Seller and each Purchased Subsidiary is duly qualified or licensed or admitted to do business, and is in good standing in (where such concept is recognized under applicable Law), the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, in each case, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected to have a Material Adverse Effect.  Sellers have made available to Purchaser prior to the execution of this Agreement true and complete copies of Sellers' Organizational Documents, in each case, as in effect on the date of this Agreement.

*Section 4.2     Authorization; Enforceability.*  Subject to the entry and effectiveness of the Sale Approval Order, each Seller has the requisite corporate or limited liability company power and authority, as the case may be, to (a) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (b) perform its obligations hereunder and thereunder; and (c) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which such Seller is a party.  Subject to the entry and effectiveness of the Sale Approval Order, this Agreement constitutes, and each Ancillary Agreement, when duly executed and delivered by each Seller that is a party thereto, shall constitute, a valid and legally binding obligation of such Seller (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of Purchaser), enforceable against such Seller in accordance with its respective terms and conditions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

*Section 4.3    Noncontravention; Consents.*

(a)    Subject, in the case of clauses (i), (iii) and (iv), to the entry and effectiveness of the Sale Approval Order, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by such Seller of the transactions contemplated hereby and thereby, do not (i) violate any Law to which the Purchased Assets are subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of such Seller; (iii) result in a material breach or constitute a material default under, or create in any Person the right to terminate, cancel or accelerate any material obligation of such Seller pursuant to any material Purchased Contract (including any material License); or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon the Purchased Assets, except for any of the foregoing in the case of clauses (i), (iii) and (iv), that would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to the entry and effectiveness of the Sale Approval Order, no consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority (other than the Bankruptcy Court) is required by any Seller for the consummation by each Seller of the transactions contemplated by this Agreement or by the Ancillary Agreements to which such Seller is a party or the compliance by such Seller with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority, the failure of which to be received or made would not reasonably be expected to have a Material Adverse Effect.

*Section 4.4    Subsidiaries.*    Section 4.4 of the Sellers' Disclosure Schedule identifies each Purchased Subsidiary and the jurisdiction of organization thereof.  There are no Equity Interests in any Purchased Subsidiary issued, reserved for issuance or outstanding.  All of the outstanding shares of capital stock, if applicable, of each Purchased Subsidiary have been duly authorized, validly issued, are fully paid and nonassessable and are owned, directly or indirectly, by Sellers, free and clear of all Encumbrances other than Permitted Encumbrances.  Sellers, directly or indirectly, have good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries and, upon delivery by Sellers to Purchaser of the outstanding Equity Interests of the Purchased Subsidiaries (either directly or indirectly) at the Closing, good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries will pass to Purchaser (or, with respect to any Purchased Subsidiary that is not a direct Subsidiary of a Seller, the Purchased Subsidiary with regard to which it is a Subsidiary will continue to have good and valid title to such outstanding Equity Interests).  None of the outstanding Equity Interests in the Purchased Subsidiaries has been conveyed in violation of, and none of the outstanding Equity Interests in the Purchased Subsidiaries has been issued in violation of (a) any preemptive or subscription rights, rights of first offer or first refusal or similar rights or (b) any voting trust, proxy or other Contract (including options or rights of first offer or first refusal) with respect to the voting, purchase, sale or other disposition thereof.

*Section 4.5      Reports and Financial Statements; Internal Controls.*

(a)      (i) Parent has filed or furnished, or will file or furnish, as applicable, all forms, documents, schedules and reports, together with any amendments required to be made with respect thereto, required to be filed or furnished with the SEC from April 1, 2007 until the Closing (the "Parent SEC Documents"), and (ii) as of their respective filing dates, or, if amended, as of the date of the last such amendment, the Parent SEC Documents complied or will comply in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the Parent SEC Documents contained or will contain any untrue statement of a material fact or omitted or will omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date hereof of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(b)      (i) The consolidated financial statements of Parent included in the Parent SEC Documents (including all related notes and schedules, where applicable) fairly present or will fairly present in all material respects the consolidated financial position of Parent and its consolidated Subsidiaries, as at the respective dates thereof, and (ii) the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date hereof of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(c)      Parent maintains a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for inclusion in the Parent SEC Documents in accordance with GAAP and maintains records that (i) in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its consolidated Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are made only in accordance with appropriate authorizations and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets.  There are no (A) material weaknesses in the design or operation of the internal controls of Parent or (B) to the Knowledge of Sellers, any fraud, whether or not material, that involves management or other employees of Parent or any Purchased Subsidiary who have a significant role in internal control.

*Section 4.6    Absence of Certain Changes and Events.*  From January 1, 2009 through the date hereof, except as otherwise contemplated, required or permitted by this Agreement, there has not been:

(a)    (i) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value) with respect to any Equity Interests in any Seller or any Key Subsidiary or any repurchase for value of any Equity Interests or rights of any Seller or any Key Subsidiary (except for dividends and distributions among its Subsidiaries) or (ii) any split, combination or reclassification of any Equity Interests in Sellers or any issuance or the authorization of any issuance of any other Equity Interests in respect of, in lieu of or in substitution for Equity Interests of Sellers;

(b)    other than as is required by the terms of the Parent Employee Benefit Plans and Policies, the Settlement Agreement, the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement or as may be required by applicable Law, in each case, as may be permitted by TARP or under any enhanced restrictions on executive compensation agreed to by Parent and Sponsor, any (i) grant to any Seller Key Personnel of any increase in compensation, except increases required under employment Contracts in effect as of January 1, 2009, or as a result of a promotion to a position of additional responsibility, (ii) grant to any Seller Key Personnel of any increase in retention, change in control, severance or termination compensation or benefits, except as required under any employment Contracts in effect as of January 1, 2009, (iii) other than in the Ordinary Course of Business, adoption, termination of, entry into or amendment or modification of, in a material manner, any Benefit Plan, (iv) adoption, termination of, entry into or amendment or modification of, in a material manner, any employment, retention, change in control, severance or termination Contract with any Seller Key Personnel or (v) entry into or amendment, modification or termination of any Collective Bargaining Agreement or other Contract with any Union of any Seller or Purchased Subsidiary;

(c)    any material change in accounting methods, principles or practices by any Seller, Purchased Subsidiary or Seller Group member or any material joint venture to which any Seller or Purchased Subsidiary is a party, in each case, materially affecting the consolidated assets or Liabilities of Parent, except to the extent required by a change in GAAP or applicable Law, including Tax Laws;

(d)    any sale, transfer, pledge or other disposition by any Seller or any Purchased Subsidiary of any portion of its assets or properties not in the Ordinary Course of Business and with a sale price or fair value in excess of $100,000,000;

(e)    aggregate capital expenditures by any Seller or any Purchased Subsidiary in excess of $100,000,000 in a single project or group of related projects or capital expenditures in excess of $100,000,000 in the aggregate;

(f)        any acquisition by any Seller or any Purchased Subsidiary (including by merger, consolidation, combination or acquisition of any Equity Interests or assets) of any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeded $100,000,000;

(g)        any discharge or satisfaction of any Indebtedness by any Seller or any Purchased Subsidiary in excess of $100,000,000, other than the discharge or satisfaction of any Indebtedness when due in accordance with its terms;

(h)        any alteration, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Seller or any Key Subsidiary or any material joint venture to which any Seller or any Key Subsidiary is a party, or the adoption or alteration of a plan with respect to any of the foregoing;

(i)        any amendment or modification to the material adverse detriment of any Key Subsidiary of any material Affiliate Contract or Seller Material Contract, or termination of any material Affiliate Contract or Seller Material Contract to the material adverse detriment of any Seller or any Key Subsidiary, in each case, other than in the Ordinary Course of Business;

(j)        any event, development or circumstance involving, or any change in the financial condition, properties, assets, liabilities, business, or results of operations of Sellers or any circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to the end of the most recent fiscal year end) of Sellers that has had or would reasonably be expected to have a Material Adverse Effect; or

(k)        any commitment by any Seller, any Key Subsidiary (in the case of clauses (a), (g) and (h) above) or any Purchased Subsidiary (in the case of clauses (b) through (f) and clauses (h) and (j) above) to do any of the foregoing.

*Section 4.7        Title to and Sufficiency of Assets.*

(a)        Subject to the entry and effectiveness of the Sale Approval Order, at the Closing, Sellers will obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Purchased Assets, which shall be transferred to Purchaser, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)        The tangible Purchased Assets of each Seller are in normal operating condition and repair, subject to ordinary wear and tear, and sufficient for the operation of such Seller's business as currently conducted, except where such instances of noncompliance with the foregoing would not reasonably be expected to have a Material Adverse Effect.

*Section 4.8    Compliance with Laws; Permits.*

(a)    Each Seller and each Purchased Subsidiary is in compliance with and is not in default under or in violation of any applicable Law, except where such non-compliance, default or violation would not reasonably be expected to have a Material Adverse Effect.  Notwithstanding anything contained in this **Section 4.8(a)**, no representation or warranty shall be deemed to be made in this **Section 4.8(a)** in respect of the matters referenced in **Section 4.5**, **Section 4.9**, **Section 4.10**, **Section 4.11** or **Section 4.13**, each of which matters is addressed by such other Sections of this Agreement.

(b)    (i) Each Seller has all Permits necessary for such Seller to own, lease and operate the Purchased Assets and (ii) each Purchased Subsidiary has all Permits necessary for such entity to own, lease and operate its properties and assets, except in each case, where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect.  All such Permits are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

*Section 4.9    Environmental Laws.*  Except as would not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Sellers, (a) each Seller and each Purchased Subsidiary has conducted its business on the Transferred Real Property in compliance with all applicable Environmental Laws; (b) none of the Transferred Real Property currently contains any Hazardous Materials, which could reasonably be expected to give rise to an undisclosed Liability under applicable Environmental Laws; (c) as of the date of this Agreement, no Seller or Purchased Subsidiary has received any currently unresolved written notices, demand letters or written requests for information from any Governmental Authority indicating that such entity may be in violation of any Environmental Law in connection with the ownership or operation of the Transferred Real Property; and (d) since April 1, 2007, no Hazardous Materials have been transported in violation of any applicable Environmental Law, or in a manner reasonably foreseen to give rise to any Liability under any Environmental Law, from any Transferred Real Property as a result of any activity of any Seller or Purchased Subsidiary.  Except as provided in **Section 4.8(b)** with respect to Permits under Environmental Laws, Purchaser agrees and understands that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this **Section 4.9**.

*Section 4.10    Employee Benefit Plans.*

(a)    Section 4.10 of the Sellers' Disclosure Schedule sets forth all material Parent Employee Benefit Plans and Policies and Purchased Subsidiaries Employee Benefit Plans (collectively, the "Benefit Plans").  Sellers have made available, upon reasonable request, to Purchaser true, complete and correct copies of (i) each material Benefit Plan, (ii) the three (3) most recent annual reports on Form 5500 (including all schedules, auditor's reports and attachments thereto) filed with the IRS with respect to each such Benefit Plan (if any such report was required by applicable Law), (iii) the most recent actuarial or other financial report prepared with respect to such Benefit Plan, if any, (iv) each trust agreement and insurance or annuity Contract or other funding or

financing arrangement relating to such Benefit Plan and (v) to the extent not subject to confidentiality restrictions, any material written communications received by Sellers or any Subsidiaries of Sellers from any Governmental Authority relating to a Benefit Plan, including any communication from the Pension Benefit Guaranty Corporation (the "PBGC"), in respect of any Benefit Plan, subject to Title IV of ERISA.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) each Benefit Plan has been administered in accordance with its terms, (ii) each of Sellers, any of their Subsidiaries and each Benefit Plan is in compliance with the applicable provisions of ERISA, the Tax Code, all other applicable Laws (including Section 409A of the Tax Code, TARP or under any enhanced restrictions on executive compensation agreed to by Sellers with Sponsor) and the terms of all applicable Collective Bargaining Agreements, (iii) there are no (A) investigations by any Governmental Authority, (B) termination proceedings or other Claims (except routine Claims for benefits payable under any Benefit Plans) or (C) Claims, in each case, against or involving any Benefit Plan or asserting any rights to or Claims for benefits under any Benefit Plan that could give rise to any Liability, and there are not any facts or circumstances that could give rise to any Liability in the event of any such Claim and (iv) each Benefit Plan that is intended to be a Tax-qualified plan under Section 401(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is qualified and any trust established in connection with any Benefit Plan that is intended to be exempt from taxation under Section 501(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is exempt from United States federal income Taxes under Section 501(a) of the Tax Code (or similar provisions under non-United States law).  To the Knowledge of Sellers, no circumstance and no fact or event exists that would be reasonably expected to adversely affect the qualified status of any Benefit Plan.

(c)    None of the Parent Employee Benefit Plans and Policies or any material Purchased Subsidiaries Employee Benefit Plans that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) has failed to satisfy, as applicable, the minimum funding standards (as described in Section 302 of ERISA or Section 412 of the Tax Code), whether or not waived, nor has any waiver of the minimum funding standards of Section 302 of ERISA or Section 412 of the Tax Code been requested.

(d)    No Seller or any ERISA Affiliate of any Seller (including any Purchased Subsidiary) (i) has any actual or contingent Liability (A) under any employee benefit plan subject to Title IV of ERISA other than the Benefit Plans (except for contributions not yet due), (B) to the PBGC (except for the payment of premiums not yet due), which Liability, in each case, has not been fully paid as of the date hereof, or, if applicable, which has not been accrued in accordance with GAAP or (C) under any "multiemployer plan" (as defined in Section 3(37) of ERISA), or (ii) will incur withdrawal Liability under Title IV of ERISA as a result of the consummation of the transactions contemplated hereby, except for Liabilities with respect to any of the foregoing that would not reasonably be expected to have a Material Adverse Effect.

(e)    Neither the execution of this Agreement or any Ancillary Agreement nor the consummation of the transactions contemplated hereby (alone or in conjunction with any other event, including termination of employment) will entitle any member of the board of directors of Parent or any Applicable Employee who is an officer or member of senior management of Parent to any increase in compensation or benefits, any grant of severance, retention, change in control or other similar compensation or benefits, any acceleration of the time of payment or vesting of any compensation or benefits (but not including, for this purpose, any retention, stay bonus or other incentive plan, program, arrangement that is a Retained Plan) or will require the securing or funding of any compensation or benefits or limit the right of Sellers, any Subsidiary of Sellers or Purchaser or any Affiliates of Purchaser to amend, modify or terminate any Benefit Plan. Any new grant of severance, retention, change in control or other similar compensation or benefits to any Applicable Employee, and any payout to any Transferred Employee under any such existing arrangements, that would otherwise occur as a result of the execution of this Agreement or any Ancillary Agreement (alone or in conjunction with any other event, including termination of employment), has been waived by such Applicable Employee or otherwise cancelled.

(f)    No amount or other entitlement currently in effect that could be received (whether in cash or property or the vesting of property) as a result of the actions contemplated by this Agreement and the Ancillary Agreements (alone or in combination with any other event) by any Person who is a "disqualified individual" (as defined in Treasury Regulation Section 1.280G-1) (each, a "Disqualified Individual") with respect to Sellers would be an "excess parachute payment" (as defined in Section 280G(b)(1) of the Tax Code).  No Disqualified Individual or Applicable Employee is entitled to receive any additional payment (e.g., any Tax gross-up or any other payment) from Sellers or any Subsidiaries of Sellers in the event that the additional or excise Tax required by Section 409A or 4999 of the Tax Code, respectively is imposed on such individual.

(g)    All individuals covered by the UAW Collective Bargaining Agreement are either Applicable Employees or employed by a Purchased Subsidiary.

(h)    Section 4.10(h) of the Sellers' Disclosure Schedule lists all non-standard individual agreements currently in effect providing for compensation, benefits and perquisites for any current and former officer, director or top twenty-five (25) most highly paid employee of Parent and any other such material non-standard individual agreements with non-top twenty-five (25) employees.

*Section 4.11    Labor Matters.*  There is not any labor strike, work stoppage or lockout pending, or, to the Knowledge of Sellers, threatened in writing against or affecting any Seller or any Purchased Subsidiary.  Except as would not reasonably be expected to have a Material Adverse Effect: (a) none of Sellers or any Purchased Subsidiary is engaged in any material unfair labor practice; (b) there are not any unfair labor practice charges or complaints against Sellers or any Purchased Subsidiary pending, or, to the Knowledge of Sellers, threatened, before the National Labor Relations Board; (c) there are not any pending or, to the Knowledge of Sellers, threatened in writing, union grievances against Sellers or any Purchased Subsidiary as to

which there is a reasonable possibility of adverse determination; (d) there are not any pending, or, to the Knowledge of Sellers, threatened in writing, charges against Sellers or any Purchased Subsidiary or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices; (e) no union organizational campaign is in progress with respect to the employees of any Seller or any Purchased Subsidiary and no question concerning representation of such employees exists; and (f) no Seller nor any Purchased Subsidiary has received written communication during the past five (5) years of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation of or affecting Sellers or any Subsidiary of Sellers and, to the Knowledge of Sellers, no such investigation is in progress.

Section 4.12    *Investigations; Litigation.*    (a) To the Knowledge of Sellers, there is no investigation or review pending by any Governmental Authority with respect to any Seller that would reasonably be expected to have a Material Adverse Effect, and (b) there are no actions, suits, inquiries or proceedings, or to the Knowledge of Sellers, investigations, pending against any Seller, or relating to any of the Transferred Real Property, at law or in equity before, and there are no Orders of or before, any Governmental Authority, in each case that would reasonably be expected to have a Material Adverse Effect.

Section 4.13    *Tax Matters.*    Except as would not reasonably be expected to have a Material Adverse Effect, (a) all Tax Returns required to have been filed by, with respect to or on behalf of any Seller, Seller Group member or Purchased Subsidiary have been timely filed (taking into account any extension of time to file granted or obtained) and are correct and complete in all respects, (b) all amounts of Tax required to be paid with respect to any Seller, Seller Group member or Purchased Subsidiary (whether or not shown on any Tax Return) have been timely paid or are being contested in good faith by appropriate proceedings and have been reserved for in accordance with GAAP in Parent's consolidated audited financial statements, (c) no deficiency for any amount of Tax has been asserted or assessed by a Taxing Authority in writing relating to any Seller, Seller Group member or Purchased Subsidiary that has not been satisfied by payment, settled or withdrawn, (d) there are no audits, Claims or controversies currently asserted or threatened in writing with respect to any Seller, Seller Group member or Purchased Subsidiary in respect of any amount of Tax or failure to file any Tax Return, (e) no Seller, Seller Group member or Purchased Subsidiary has agreed to any extension or waiver of the statute of limitations applicable to any Tax Return, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired, (f) no Seller, Seller Group member or Purchased Subsidiary is a party to or the subject of any ruling requests, private letter rulings, closing agreements, settlement agreements or similar agreements with any Taxing Authority for any periods for which the statute of limitations has not yet run, (g) no Seller, Seller Group member or Purchased Subsidiary (A) has any Liability for Taxes of any Person (other than any Purchased Subsidiary), including as a transferee or successor, or pursuant to any contractual obligation (other than pursuant to any commercial Contract not primarily related to Tax), or (B) is a party to or bound by any Tax sharing agreement, Tax allocation agreement or Tax indemnity agreement (in every case, other than this Agreement and those Tax sharing, Tax allocation or Tax indemnity agreements that will be terminated prior to Closing and with respect to which no post-Closing Liabilities will exist), (h) each of the Purchased Subsidiaries and each Seller and Seller Group

member has withheld or collected all Taxes required to have been withheld or collected and, to the extent required, has paid such Taxes to the proper Taxing Authority, (i) no Seller, Seller Group member or Purchased Subsidiary will be required to make any adjustments in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481(a) or 263A of the Tax Code or any similar provision of foreign, provincial, state, local or other Law as a result of transactions or events occurring, or accounting methods employed, prior to the Closing, nor is any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to any Seller, Seller Group member or Purchased Subsidiary, (j) the Assumed Liabilities were incurred through the Ordinary Course of Business, (k) there are no Tax Encumbrances on any of the Purchased Assets or the assets of any Purchased Subsidiary (other than Permitted Encumbrances for which appropriate reserves have been established (and to the extent that such liens relate to a period ending on or before December 31, 2008, the amount of any such Liability is accrued or reserved for as a Liability in accordance with GAAP in the audited consolidated balance sheet of Sellers at December 31, 2008)), (l) none of the Purchased Subsidiaries or Sellers has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Tax Code, (m) none of the Purchased Subsidiaries, Sellers or Seller Group members has participated in any "listed transactions" or "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, (n) there are no unpaid Taxes with respect to any Seller, Seller Group member or Purchased Asset for which Purchaser will have liability as a transferee or successor and (o) the most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve for all Taxes payable by Sellers, the Purchased Subsidiaries and the members of all Seller Groups for all taxable periods and portions thereof through the date of such financial statements.

Section 4.14   *Intellectual Property and IT Systems.*

(a)   Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and each Purchased Subsidiary owns, controls, or otherwise possesses sufficient rights to use, free and clear of all Encumbrances (other than Permitted Encumbrances) all Intellectual Property necessary for the conduct of its business in substantially the same manner as conducted as of the date hereof; and (ii) all Intellectual Property owned by Sellers that is necessary for the conduct of the business of Sellers and each Purchased Subsidiary as conducted as of the date hereof is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, has not been abandoned or allowed to lapse, in whole or in part, and to the Knowledge of Sellers, is valid and enforceable.

(b)   Except as would not reasonably be expected to have a Material Adverse Effect, all necessary registration, maintenance and renewal fees in connection with the Intellectual Property owned by Sellers have been paid and all necessary documents and certificates in connection with such Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or applicable foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining or renewing such Intellectual Property.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, no Intellectual Property owned by Sellers is the subject of any licensing or franchising Contract that prohibits or materially restricts the conduct of business as presently conducted by any Seller or Purchased Subsidiary or the transfer of such Intellectual Property.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the Intellectual Property or the conduct of Sellers' and the Purchased Subsidiaries' businesses does not infringe, misappropriate, dilute, or otherwise violate or conflict with the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any Person; (ii) to the Knowledge of Sellers, no other Person is now infringing or in conflict with any  Intellectual Property owned by Sellers or Sellers' rights thereunder; and (iii) no Seller or any Purchased Subsidiary has received any written notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any third party.

(e)    Except as would not reasonably be expected to have a Material Adverse Effect, no holding, decision or judgment has been rendered by any Governmental Authority against any Seller, which would limit, cancel or invalidate any Intellectual Property owned by Sellers.

(f)    No action or proceeding is pending, or to the Knowledge of Sellers, threatened, on the date hereof that (i) seeks to limit, cancel or invalidate any Intellectual Property owned by Sellers or such Sellers' ownership interest therein; and (ii) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(g)    Except as would not reasonably be expected to have a Material Adverse Effect, Sellers and the Purchased Subsidiaries have taken reasonable actions to (i) maintain, enforce and police their Intellectual Property; and (ii) protect their material Software, websites and other systems (and the information therein) from unauthorized access or use.

(h)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and Purchased Subsidiary has taken reasonable steps to protect its rights in, and confidentiality of, all the Trade Secrets, and any other confidential information owned by such Seller or Purchased Subsidiary; and (ii) to the Knowledge of Sellers, such Trade Secrets have not been disclosed by Sellers to any Person except pursuant to a valid and appropriate non-disclosure, license or any other appropriate Contract that has not been breached.

(i)    Except as would not reasonably be expected to have a Material Adverse Effect, there has not been any malfunction with respect to any of the Software, electronic data processing, data communication lines, telecommunication lines, firmware, hardware,

Internet websites or other information technology equipment of any Seller or Purchased Subsidiary since April 1, 2007, which has not been remedied or replaced in all respects.

(j)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the consummation of the transactions contemplated by this Agreement will not cause to be provided or licensed to any third Person, or give rise to any rights of any third Person with respect to, any source code that is part of the Software owned by Sellers; and (ii) Sellers have implemented reasonable disaster recovery and back-up plans with respect to the Software.

*Section 4.15    Real Property.*    Each Seller owns and has valid title to the Transferred Real Property that is Owned Real Property owned by it and has valid leasehold or subleasehold interests, as the case may be, in all of the Transferred Real Property that is Leased Real Property leased or subleased by it, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances.  Each of Sellers and the Purchased Subsidiaries has complied with the terms of each lease, sublease, license or other Contract relating to the Transferred Real Property to which it is a party, except any failure to comply that would not reasonably be expected to have a Material Adverse Effect.

*Section 4.16    Material Contracts.*

(a)    Except for this Agreement, the Parent Employee Benefit Plans and Policies, except as filed with, or disclosed or incorporated in, the Parent SEC Documents or except as set forth on Section 4.16 of the Sellers' Disclosure Schedule, as of the date hereof, no Seller is a party to or bound by (i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC); (ii) any non-compete or exclusivity agreement that materially restricts the operation of Sellers' core business; (iii) any asset purchase agreement, stock purchase agreement or other agreement entered into within the past six years governing a material joint venture or the acquisition or disposition of assets or other property where the consideration paid or received for such assets or other property exceeded $500,000,000 (whether in cash, stock or otherwise); (iv) any agreement or series of related agreements with any supplier of Sellers who directly support the production of vehicles, which provided collectively for payments by Sellers to such supplier in excess of $250,000,000 during the 12-month period ended December 31, 2008; (v) any agreement or series of related agreements with any supplier of Sellers who does not directly support the production of vehicles, which, provided collectively for payments by Sellers to such supplier in excess of $100,000,000 during the 12-month period ended April 30, 2009; (vi) any Contract relating to the lease or purchase of aircraft; (vii) any settlement agreement where a Seller has paid or may be required to pay an amount in excess of $100,000,000 to settle the Claims covered by such settlement agreement; (viii) any material Contract that will, following the Closing, as a result of transactions contemplated hereby, be between or among a Seller or any Retained Subsidiary, on the one hand, and Purchaser or any Purchased Subsidiary, on the other hand (other than the Ancillary Agreements); and (ix) agreements entered into in connection with a material joint venture (all Contracts of the type described in this **Section 4.16(a)** being referred to herein as "<u>Seller Material Contracts</u>").

(b)     No Seller is in breach of or default under, or has received any written notice alleging any breach of or default under, the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no other party to any Seller Material Contract or material License is in breach of or default under the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Seller Material Contract or material License is a valid, binding and enforceable obligation of such Seller that is party thereto and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.17    *Dealer Sales and Service Agreements for Continuing Brands.*  Parent is not in breach of or default under the terms of any United States dealer sales and service Contract for Continuing Brands other than any Excluded Continuing Brand Dealer Agreement (each, a "Dealer Agreement"), where such breach or default would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no other party to any Dealer Agreement is in breach of or default under the terms of such Dealer Agreement, where such breach or default would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Dealer Agreement is a valid and binding obligation of Parent and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.18    *Sellers' Products.*

(a)     To the Knowledge of Sellers, since April 1, 2007, neither Sellers nor any Purchased Subsidiary has conducted or decided to conduct any material recall or other field action concerning any product developed, designed, manufactured, sold, provided or placed in the stream of commerce by or on behalf of any Seller or any Purchased Subsidiary.

(b)     As of the date hereof, there are no material pending actions for negligence, manufacturing negligence or improper workmanship, or material pending actions, in whole or in part, premised upon product liability, against or otherwise naming as a party any Seller, Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, or to the Knowledge of Sellers, threatened in writing or of which Seller has received written notice that involve a product liability Claim resulting from the

ownership, possession or use of any product manufactured, sold or delivered by any Seller, any Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, which would reasonably be expected to have a Material Adverse Effect.

(c)    To the Knowledge of Sellers and except as would not reasonably be expected to have a Material Adverse Effect, no supplier to any Seller has threatened in writing to cease the supply of products or services that could impair future production at a major production facility of such Seller.

*Section 4.19    Certain Business Practices.*    Each of Sellers and the Purchased Subsidiaries is in compliance with the legal requirements under the Foreign Corrupt Practices Act, as amended (the "FCPA"), except for such failures, whether individually or in the aggregate, to maintain books and records or internal controls as required thereunder that are not material.  To the Knowledge of Sellers, since April 1, 2007, no Seller or Purchased Subsidiary, nor any director, officer, employee or agent thereof, acting on its, his or her own behalf or on behalf of any of the foregoing Persons, has offered, promised, authorized the payment of, or paid, any money, or the transfer of anything of value, directly or indirectly, to or for the benefit of: (a) any employee, official, agent or other representative of any foreign Governmental Authority, or of any public international organization; or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any act or decision of such recipient in the recipient's official capacity, or inducing such recipient to use his, her or its influence to affect any act or decision of such foreign government or department, agency or instrumentality thereof or of such public international organization, or securing any improper advantage, in the case of both clause (a) and (b) above, in order to assist any Seller or any Purchased Subsidiary to obtain or retain business for, or to direct business to, any Seller or any Purchased Subsidiary and under circumstances that would subject any Seller or any Purchased Subsidiary to material Liability under any applicable Laws of the United States (including the FCPA) or of any foreign jurisdiction where any Seller or any Purchased Subsidiary does business relating to corruption, bribery, ethical business conduct, money laundering, political contributions, gifts and gratuities, or lawful expenses.

*Section 4.20    Brokers and Other Advisors.*    No broker, investment banker, financial advisor, counsel (other than legal counsel) or other Person is entitled to any broker's, finder's or financial advisor's fee or commission (collectively, "Advisory Fees") in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers or any Affiliate of any Seller.

*Section 4.21    Investment Representations.*

(a)    Each Seller is acquiring the Parent Shares for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Each Seller agrees that it shall not transfer any of the Parent Shares, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Each Seller is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)     Each Seller understands that the acquisition of the Parent Shares to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Each Seller and its officers have experience as an investor in the Equity Interests of companies such as the ones being transferred pursuant to this Agreement and each Seller acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Parent Shares to be acquired by it pursuant to the transactions contemplated by this Agreement.

(d)     Each Seller further understands and acknowledges that the Parent Shares have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Parent Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)     Each Seller acknowledges that the offer and sale of the Parent Shares has not been accomplished by the publication of any advertisement.

Section 4.22    No Other Representations or Warranties of Sellers.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN THIS **ARTICLE IV**, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26**, AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THEM OR OTHER COMMUNICATIONS BETWEEN THEM OR ANY OF THEIR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION, OR ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR

REPRESENTATIVES OR (C) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

*Section 5.1     Organization and Good Standing.*     Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation. Purchaser has the requisite limited liability companycorporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

*Section 5.2     Authorization; Enforceability.*

(a)     Purchaser has the requisite limited liability companycorporate power and authority to (i) execute and deliver this Agreement and the Ancillary Agreements to which it is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party.

(b)     This Agreement constitutes, and each of the Ancillary Agreements to which Purchaser is a party, when duly executed and delivered by Purchaser, shall constitute, a valid and legally binding obligation of Purchaser (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of each Seller that is a party thereto and the other applicable parties thereto), enforceable against Purchaser in accordance with its respective terms and conditions, except as may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

*Section 5.3     Noncontravention; Consents.*

(a)     The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by Purchaser of the transactions contemplated hereby and thereby, do not (i) violate any Law to which Purchaser or its assets is subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of Purchaser; or (iii) create a breach, default, termination, cancellation or acceleration of any obligation of Purchaser under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties is bound or subject, except for any of the foregoing in the cases of clauses (i) and (iii), that would not reasonably be expected to

have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby or thereby or to perform any of its obligations under this Agreement or any Ancillary Agreement to which it is a party (a "Purchaser Material Adverse Effect").

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Purchaser for the consummation by Purchaser of the transactions contemplated by this Agreement or the Ancillary Agreements to which it is a party or the compliance by Purchaser with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Governmental Authority, the failure of which to be received or made would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

*Section 5.4    Capitalization.*

(a)    As of the date hereof, Sponsor ~~is the sole member of Purchaser. Purchaser will convert into a Delaware corporation prior to the Closing, and following such conversion and immediately prior to the Closing, Sponsor will hold~~holds beneficially and of record 1,000 shares of common stock, par value $0.01 per share, of Purchaser, which constitutes all of the outstanding capital stock of Purchaser.~~ For the avoidance of doubt, the term "Purchaser" shall also be deemed to refer to the Purchaser following conversion to a Delaware corporation for all purposes hereunder.~~, and all such capital stock is validly issued, fully paid and nonassessable.

(b)    Immediately following the Closing, the authorized capital stock of Purchaser~~, as converted,~~ (or, if a Holding Company Reorganization has occurred prior to the Closing, Holding Company) will consist of 2,500,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), and 1,000,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock"), of which 360,000,000 shares of Preferred Stock are designated as Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock").

(c)    Immediately following the Closing, (i) Canada or one or more of its Affiliates will hold beneficially and of record 58,368,644 shares of Common Stock and 16,101,695 shares of Series A Preferred Stock (collectively, the "Canada Shares"), (ii) Sponsor or one or more of its Affiliates collectively will hold beneficially and of record 304,131,356 shares of Common Stock and 83,898,305 shares of Series A Preferred Stock (collectively, the "Sponsor Shares") and (iii) the New VEBA will hold beneficially and of record 87,500,000 shares of Common Stock and 260,000,000 shares of Series A Preferred Stock (collectively, the "VEBA Shares"). Immediately following the Closing, there will be no other holders of Common Stock or Preferred Stock.

(d)    Except as provided under the Parent Warrants, VEBA Warrants, Equity Incentive Plans or as disclosed on the Purchaser's Disclosure Schedule, there are and,

immediately following the Closing, there will be no outstanding options, warrants, subscriptions, calls, convertible securities, phantom equity, equity appreciation or similar rights, or other rights or Contracts (contingent or otherwise) (including, without limitation, any right of conversion or exchange under any outstanding security, instrument or other Contract or any preemptive right) obligating Purchaser to deliver or sell, or cause to be issued, delivered or sold, any shares of its capital stock or other equity securities, instruments or rights that are, directly or indirectly, convertible into or exercisable or exchangeable for any shares of its capital stock.  There are no outstanding contractual obligations of Purchaser to repurchase, redeem or otherwise acquire any shares of its capital stock or to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any other Person.  There are no voting trusts, shareholder agreements, proxies or other Contracts or understandings in effect with respect to the voting or transfer of any of the shares of Common Stock to which Purchaser is a party or by which Purchaser is bound. Except as provided under the Equity Registration Rights Agreement or as disclosed in the Purchaser's Disclosure Schedule, Purchaser has not granted or agreed to grant any holders of shares of Common Stock or securities convertible into shares of Common Stock registration rights with respect to such shares under the Securities Act.

(e)     Immediately following the Closing, (i) all of the Canada Shares, the Parent Shares and the Sponsor Shares will be duly and validly authorized and issued, fully paid and nonassessable, and will be issued in accordance with the registration or qualification provisions of the Securities Act or pursuant to valid exemptions therefrom and (ii) none of the Canada Shares, the Parent Shares or the Sponsor Shares will be issued in violation of any preemptive rights.

*Section 5.5     Valid Issuance of Shares.* The Parent Shares, Adjustment Shares and the Common Stock underlying the Parent Warrants, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement and the related warrant agreement, as applicable, will be (a) validly issued, fully paid and nonassessable and (b) free of restrictions on transfer other than restrictions on transfer under applicable state and federal securities Laws and Encumbrances created by or imposed by Sellers.  Assuming the accuracy of the representations of Sellers in **Section 4.21**, the Parent Shares, Adjustment Shares and Parent Warrants will be issued in compliance with all applicable federal and state securities Laws.

*Section 5.6     Investment Representations.*

(a)     Purchaser is acquiring the Transferred Equity Interests for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Purchaser agrees that it shall not transfer any of the Transferred Equity Interests, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)     Purchaser is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Purchaser understands that the acquisition of the Transferred Equity Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Purchaser and its officers have experience as an investor in Equity Interests of companies such as the ones being transferred pursuant to this Agreement and Purchaser acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Transferred Equity Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)    Purchaser further understands and acknowledges that the Transferred Equity Interests have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Transferred Equity Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)    Purchaser acknowledges that the offer and sale of the Transferred Equity Interests has not been accomplished by the publication of any advertisement.

Section 5.7    *Continuity of Business Enterprise.*  It is the present intention of Purchaser to directly, or indirectly through its Subsidiaries, continue at least one significant historic business line of each Seller, or use at least a significant portion of each Seller's historic business assets in a business, in each case, within the meaning of Treas. Reg. § 1.368-1(d).

Section 5.8    *Integrated Transaction.*  Sponsor has contributed, or will, prior to the Closing, contribute the UST Credit Facilities, a portion of the DIP Facility that is owed as of the Closing and the UST Warrant to Purchaser solely for the purposes of effectuating the transactions contemplated by this Agreement.

Section 5.9    *No Other Representations or Warranties of Sellers.*  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN **ARTICLE IV**, PURCHASER FURTHER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN

CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26**, AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF IT OR OTHER COMMUNICATIONS BETWEEN IT OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION OR (C) ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (D) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

**ARTICLE VI**
**COVENANTS**

*Section 6.1      Access to Information.*

(a)      Sellers agree that, until the earlier of the Executory Contract Designation Deadline and the termination of this Agreement, Purchaser shall be entitled, through its Representatives or otherwise, to have reasonable access to the executive officers and Representatives of Sellers and the properties and other facilities, businesses, books, Contracts, personnel, records and operations (including the Purchased Assets and Assumed Liabilities) of Sellers and their Subsidiaries, including access to systems, data, databases for benefit plan administration; provided however, that no such investigation or examination shall be permitted to the extent that it would, in Sellers' reasonable determination, require any Seller, any Subsidiary of any Seller or any of their respective Representatives to disclose information subject to attorney-client privilege or in conflict with any confidentiality agreement to which any Seller, any Subsidiary of any Seller or any of their respective Representatives are bound (in which case, to the extent requested by Purchaser, Sellers will use reasonable best efforts to seek an amendment or appropriate waiver, or necessary consents, as may be required to avoid such conflict, or restructure the form of access, so as to permit the access requested); provided further, that notwithstanding the notice provisions in **Section 9.2** hereof, all such requests for access to the executive officers of Sellers shall be directed, prior to the Closing, to the Chief Financial Officer of Parent or his designee, and following the Closing, to the Chief Restructuring Officer of Parent or his or her designee.  If any material is withheld pursuant to this **Section 6.1(a)**, Seller shall inform Purchaser in writing as to the general nature of what is being withheld and the reason for withholding such material.

(b)      Any investigation and examination contemplated by this **Section 6.1** shall be subject to restrictions set forth in **Section 6.24** and under applicable Law.  Sellers shall

cooperate, and shall cause their Subsidiaries and each of their respective Representatives to cooperate, with Purchaser and its Representatives in connection with such investigation and examination, and each of Purchaser and its Representatives shall use their reasonable best efforts to not materially interfere with the business of Sellers and their Subsidiaries.  Without limiting the generality of the foregoing, subject to **Section 6.1(a),** such investigation and examination shall include reasonable access to Sellers' executive officers (and employees of Sellers and their respective Subsidiaries identified by such executive officers), offices, properties and other facilities, and books, Contracts and records (including any document retention policies of Sellers) and access to accountants of Sellers and each of their respective Subsidiaries (provided that Sellers and each of their respective Subsidiaries, as applicable, shall have the right to be present at any meeting between any such accountant and Purchaser or Representative of Purchaser, whether such meeting is in person, telephonic or otherwise) and Sellers and each of their respective Subsidiaries and their Representatives shall prepare and furnish to Purchaser's Representatives such additional financial and operating data and other information as Purchaser may from time to time reasonably request, subject, in each case, to the confidentiality restrictions outlined in this **Section 6.1**.  Notwithstanding anything contained herein to the contrary, Purchaser shall consult with Sellers prior to conducting any environmental investigations or examinations of any nature, including Phase I and Phase II site assessments and any environmental sampling in respect of the Transferred Real Property.

Section 6.2      *Conduct of Business.*

(a)      Except as (i) otherwise expressly contemplated by or permitted under this Agreement, including the DIP Facility; (ii) disclosed on Section 6.2 of the Sellers' Disclosure Schedule; (iii) approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent); or (iv) required by or resulting from any changes to applicable Laws, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, Sellers shall and shall cause each Purchased Subsidiary to (A) conduct their operations in the Ordinary Course of Business, (B) not take any action inconsistent with this Agreement or with the consummation of the Closing, (C) use reasonable best efforts to preserve in the Ordinary Course of Business and in all material respects the present relationships of Sellers and each of their Subsidiaries with their respective customers, suppliers and others having significant business dealings with them, (D) not take any action to cause any of Sellers' representations and warranties set forth in **ARTICLE IV** to be untrue in any material respect as of any such date when such representation or warranty is made or deemed to be made and (E) not take any action that would reasonably be expected to materially prevent or delay the Closing.

(b)      Subject to the exceptions contained in clauses (i) through (iv) of **Section 6.2(a),** each Seller agrees that, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or

delayed), such Seller shall not, and shall not permit any of the Key Subsidiaries (and in the case of clauses (i), (ix), (xiii) or (xvi), shall not permit any Purchased Subsidiary) to:

       (i)     take any action with respect to which any Seller has granted approval rights to Sponsor under any Contract, including under the UST Credit Facilities, without obtaining the prior approval of such action from Sponsor;

       (ii)     issue, sell, pledge, create an Encumbrance or otherwise dispose of or authorize the issuance, sale, pledge, Encumbrance or disposition of any Equity Interests of the Transferred Entities, or grant any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any such Equity Interests;

       (iii)     declare, set aside or pay any dividend or make any distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value with respect to any Equity Interest of Seller or any Key Subsidiary), except for dividends and distributions among the Purchased Subsidiaries;

       (iv)     directly or indirectly, purchase, redeem or otherwise acquire any Equity Interests or any rights to acquire any Equity Interests of any Seller or Key Subsidiary;

       (v)     materially change any of its financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as permitted by GAAP, a SEC rule, regulation or policy or applicable Law, or as modified by Parent as a result of the filing of the Bankruptcy Cases;

       (vi)     adopt any amendments to its Organizational Documents or permit the adoption of any amendment of the Organizational Documents of any Key Subsidiary or effect a split, combination or reclassification or other adjustment of Equity Interests of any Purchased Subsidiary or a recapitalization thereof;

       (vii)     sell, pledge, lease, transfer, assign or dispose of any Purchased Asset or permit any Purchased Asset to become subject to any Encumbrance, other than a Permitted Encumbrance, in each case, except in the Ordinary Course of Business or pursuant to a Contract in existence as of the date hereof (or entered into in compliance with this **Section 6.2**);

       (viii)     (A) incur or assume any Indebtedness for borrowed money or issue any debt securities, except for Indebtedness for borrowed money incurred by Purchased Subsidiaries under existing lines of credit (including through the incurrence of Intercompany Obligations) to fund operations of Purchased Subsidiaries and Indebtedness for borrowed money incurred by Sellers under the DIP Facility or (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of

any other Person, except for Indebtedness for borrowed money among any Seller and Subsidiary or among the Subsidiaries;

(ix)    discharge or satisfy any Indebtedness in excess of $100,000,000 other than the discharge or satisfaction of any Indebtedness when due in accordance with its originally scheduled terms;

(x)    other than as is required by the terms of a Parent Employee Benefit Plan and Policy (in effect on the date hereof and set forth on Section 4.10 of the Sellers' Disclosure Schedule), any Assumed Plan (in effect on the date hereof) the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement, the Settlement Agreement, the UAW Retiree Settlement Agreement or as may be required by applicable Law or TARP or under any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor, (A) increase the compensation or benefits of any Employee of Sellers or any Purchased Subsidiary (except for increases in salary or wages in the Ordinary Course of Business with respect to Employees who are not current or former directors or officers of Sellers or Seller Key Personnel), (B) grant any severance or termination pay to any Employee of Sellers or any Purchased Subsidiary except for severance or termination pay provided under any Parent Employee Benefit Plan and Policy or as the result of a settlement of any pending Claim or charge involving a Governmental Authority or litigation with respect to Employees who are not current or former officers or directors of Sellers or Seller Key Personnel), (C) establish, adopt, enter into, amend or terminate any Benefit Plan (including any change to any actuarial or other assumption used to calculate funding obligations with respect to any Benefit Plan or any change to the manner in which contributions to any Benefit Plan are made or the basis on which such contributions are determined), except where any such action would reduce Sellers' costs or Liabilities pursuant to such plan, (D) grant any awards under any Benefit Plan (including any equity or equity-based awards), (E) increase or promise to increase or provide for the funding under any Benefit Plan, (F) forgive any loans to Employees of Sellers or any Purchased Subsidiary (other than as part of a settlement of any pending Claim or charge involving a Governmental Authority or litigation in the Ordinary Course of Business or with respect to obligations of Employees whose employment is terminated by Sellers or a Purchased Subsidiary in the Ordinary Course of Business, other than Employees who are current or former officers or directors of Sellers or Seller Key Personnel or directors of Sellers or a Purchased Subsidiary) or (G) exercise any discretion to accelerate the time of payment or vesting of any compensation or benefits under any Benefit Plan;

(xi)    modify, amend, terminate or waive any rights under any Affiliate Contract or Seller Material Contract (except for any dealer sales and service Contracts or as contemplated by **Section 6.7**) in any material respect in a manner that is adverse to any Seller that is a party thereto, other than in the Ordinary Course of Business;

(xii)    enter into any Seller Material Contract other than as contemplated by **Section 6.7**;

(xiii)    acquire (including by merger, consolidation, combination or acquisition of Equity Interests or assets) any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeds $100,000,000;

(xiv)    alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Key Subsidiary, or adopt or approve a plan with respect to any of the foregoing;

(xv)    enter into any Contract that limits or otherwise restricts or that would reasonably be expected to, after the Closing, restrict or limit in any material respect (A) Purchaser or any of its Subsidiaries or any successor thereto or (B) any Affiliates of Purchaser or any successor thereto, in the case of each of clause (A) or (B), from engaging or competing in any line of business or in any geographic area;

(xvi)    enter into any Contracts for capital expenditures, exceeding $100,000,000 in the aggregate in connection with any single project or group of related projects;

(xvii)    open or reopen any major production facility; and

(xviii)    agree, in writing or otherwise, to take any of the foregoing actions.

*Section 6.3    Notices and Consents.*

(a)    Sellers shall and shall cause each of their Subsidiaries to, and Purchaser shall use reasonable best efforts to, promptly give all notices to, obtain all material consents, approvals or authorizations from, and file all notifications and related materials with, any third parties (including any Governmental Authority) that may be or become necessary to be given or obtained by Sellers or their Affiliates, or Purchaser, respectively, in connection with the transactions contemplated by this Agreement.

(b)    Each of Purchaser and Parent shall, to the extent permitted by Law, promptly notify the other Party of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement and permit the other Party to review in advance any proposed substantive communication by such Party to any Governmental Authority. Neither Purchaser nor Parent shall agree to participate in any material meeting with any Governmental Authority in respect of any significant filings, investigation (including any settlement of the investigation), litigation or other inquiry unless it consults with the other Party in

advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate at such meeting; provided, however, in the event either Party is prohibited by applicable Law or such Governmental Authority from participating in or attending any such meeting, then the Party who participates in such meeting shall keep the other Party apprised with respect thereto to the extent permitted by Law. To the extent permitted by Law, Purchaser and Parent shall coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing, including, to the extent reasonably practicable, providing to the other Party in advance of submission, drafts of all material filings, submissions, correspondences or other written communications, providing the other Party with an opportunity to comment on the drafts, and, where practicable, incorporating such comments, if any, into the final documents. To the extent permitted by applicable Law, Purchaser and Parent shall provide each other with copies of all material correspondences, filings or written communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement.

(c)     None of Purchaser, Parent or their respective Affiliates shall be required to pay any fees or other payments to any Governmental Authorities in order to obtain any authorization, consent, Order or approval (other than normal filing fees and administrative fees that are imposed by Law on Purchaser), and in the event that any fees in addition to normal filing fees imposed by Law may be required to obtain any such authorization, consent, Order or approval, such fees shall be for the account of Purchaser.

(d)     Notwithstanding anything to the contrary contained herein, no Seller shall be required to make any expenditure or incur any Liability in connection with the requirements set forth in this **Section 6.3**.

*Section 6.4     Sale Procedures; Bankruptcy Court Approval.*

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing Bids with respect to an Alternative Transaction. Nothing contained herein shall be construed to prohibit Sellers and their respective Affiliates and Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Alternative Transaction but only to the extent that Sellers determine in good faith that such actions are permitted or required by the Sale Procedures Order.

(b)     On ~~or before the first Business Day after the date hereof~~the Petition Date, Sellers ~~shall file~~filed with the Bankruptcy Court the Bankruptcy Cases under the Bankruptcy Code. ~~As soon as practicable after the date hereof, but in any event no later than two (2) Business Days hereafter, Sellers shall file with the Bankruptcy Court~~ and a motion (and related notices and proposed Orders) (the "Sale Procedures and Sale Motion")~~, in form and substance reasonably satisfactory to Purchaser and the UAW~~, seeking entry of (i) the sale procedures order, in the form attached hereto as **Exhibit H** (~~or in such other form that is reasonably satisfactory to Purchaser and the UAW,~~ the

- 62-

"Sale Procedures Order"), and (ii) the sale approval order, in the form attached hereto as **Exhibit I** (or in such other form that is reasonably satisfactory to Purchaser and the UAW, the "Sale Approval Order"). Sellers shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Procedures Order as soon as practicable following the filing of the Sale Procedures and Sale Motion. The Sale Approval Order shall declare that if there is an Agreed G Transaction, (A) this Agreement constitutes a "plan" of Parent and Purchaser solely for purposes of Sections 368 and 354 of the Tax Code and (B) the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers, are intended to constitute a reorganization of Parent pursuant to Section 368(a)(1)(G) of the Tax Code. To the extent reasonably practicable, Sellers shall consult with and provide Purchaser and the UAW a reasonable opportunity to review and comment on material motions, applications and supporting papers prepared by Sellers in connection with this Agreement prior to the filing or delivery thereof in the Bankruptcy Cases.

(c)    Purchaser acknowledges that Sellers may receive bids ("Bids") from prospective purchasers (such prospective purchasers, the "Bidders") with respect to an Alternative Transaction, as provided in the Sale Procedures Order. All Bids (other than Bids submitted by Purchaser) shall be submitted with two copies of this Agreement marked to show changes requested by the Bidder.

(d)    If Sellers receive any Bids, Sellers shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest or otherwise best Bid or Bids from the Bidders (the "Superior Bid"), which will be determined in accordance with the Sale Procedure Order.

(e)    Sellers shall use their reasonable best efforts to (i) cause the Bankruptcy Court to hold the Sale Hearing as soon as practicable, and in no event later than June 30, 2009; and (ii) obtain entry of the Sale Approval Order on the Bankruptcy Court's docket as soon as practicable, and in no event no later than July 10, 2009.

(f)    Sellers shall use reasonable best efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required Persons in the Bankruptcy Cases (including all holders of Encumbrances and parties to the Purchased Contracts), a notice of the Sale Procedures and Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by Orders of the Bankruptcy Court), the Sale Procedures Order or other Orders of the Bankruptcy Court, including General Order M-331 issued by the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(g)    Sellers shall provide Purchaser with a reasonable opportunity to review and comment on all motions, applications and supporting papers prepared by Sellers in connection with this Agreement (including forms of Orders and of notices to interested parties) prior to the filing or delivery thereof in the Bankruptcy Cases. All motions,

applications and supporting papers prepared by Sellers and relating to the approval of this Agreement (including forms of Orders and of notices to interested parties) to be filed or delivered on behalf of Sellers shall be reasonably acceptable in form and substance to Purchaser.  Sellers shall provide written notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  In the event the Sale Procedures Order and the Sale Approval Order is appealed, Sellers shall use their reasonable best efforts to defend such appeal.

(h)    Purchaser agrees, to the extent reasonably requested by Sellers, to cooperate with and assist Sellers in seeking entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, including attending all hearings on the Sale Procedures and Sale Motion.

*Section 6.5    Supplements to ~~Excluded~~Purchased Assets~~, Assumed Liabilities and Retained Liabilities~~.*

(a)    ~~Subject to **Section 6.6**, Purchaser shall, until the date that is two (2) Business Days prior to the Sale Hearing, have the right to designate in writing (i) additional assets it wishes to designate as "Excluded Assets" on **Exhibit F** or any subsection of Section 2.2(b) of the Sellers' Disclosure Schedule, as applicable (and may remove any asset identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule) and (ii) additional Liabilities it wishes to designate as "Assumed Liabilities" on any subsection of Section 2.3(a) of the Sellers' Disclosure Schedule.  Promptly upon Purchaser's designation of an additional asset as an "Excluded Asset" or an additional Liability as an "Assumed Liability," **Exhibit F** or the appropriate subsection of Section 2.2(a), Section 2.2(b) or Section 2.3(a) of the Sellers' Disclosure Schedule, as applicable, shall be updated to reflect such designation and such additional asset or additional Liability shall thereafter be deemed to be an Excluded Asset or Assumed Liability, as applicable, for all purposes under this Agreement.~~

(b)    ~~Until the date that is two (2) Business Days prior to the Sale Hearing, Purchaser and Sellers may mutually agree and jointly designate in writing any workers' compensation Claims against any Seller they wish to designate or remove as an additional Retained Liability on **Exhibit G** or Section 2.3(b)(xii) of the Sellers' Disclosure Schedule.~~  Purchaser shall, from the date hereof until the Executory Contract Designation Deadline, have the right to designate in writing additional Personal Property it wishes to designate as Purchased Assets if such Personal Property is located at a parcel of leased real property where the underlying lease has been designated as a Rejectable Executory Contract pursuant to **Section 6.6** following the Closing.

*Section 6.6    Assumption or Rejection of Contracts.*

(a)    The Assumable Executory Contract Schedule sets forth a list of Executory Contracts entered into by Sellers that Sellers may assume and assign to Purchaser in accordance with this **Section 6.6(a)** (each, an "Assumable Executory Contract").  Any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule and Section

6.6(a)(ii) of the Sellers' Disclosure Schedule shall automatically be designated as an ~~Assumed~~Assumable Executory Contract and deemed to be set forth on the ~~Assumed~~Assumable Executory Contract Schedule. Purchaser may, ~~from the date hereof~~ until the Executory Contract Designation Deadline, designate in writing any additional Executory Contract it wishes to designate as an Assumable Executory Contract and include on the Assumable Executory Contract Schedule, or any Assumable Executory Contract it no longer wishes to designate as an Assumable Executory Contract and remove from the Assumable Executory Contract Schedule; provided, however, that (i) Purchaser may not designate as an Assumable Executory Contract any (A) Rejectable Executory Contract, unless Sellers have consented to such designation in writing or (B) Contract that has previously been rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, and (ii) Purchaser may not remove from the Assumable Executory Contract Schedule (v) the UAW Collective Bargaining Agreement, (w) any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule or Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, (x) any Contract that has been previously assumed by Sellers pursuant to Section 365 of the Bankruptcy Code, (y) any Deferred Termination Agreement (or the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) or (z) any Participation Agreement (or the related Continuing Brand Dealer Agreement)~~, in the case of clauses (y) and (z) above, unless Sellers have consented to such removal in writing (such consent not to be unreasonably withheld, conditioned or delayed). For~~. Except as otherwise provided above, for each Assumable Executory Contract, ~~the~~ Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing Date or a later date (but not an earlier date). The term "Executory Contract Designation Deadline" shall mean the date that is thirty (30) calendar days following the Closing Date, or if such date is not a Business Day, the next Business Day, or if mutually agreed upon by the Parties, any later date up to and including the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization. For the avoidance of doubt, the Executory Contract Designation Deadline may be extended by mutual agreement of the Parties with respect to any single unassumed and unassigned Executory Contract, groups of unassumed and unassigned Executory Contracts or all of the unassumed and unassigned Executory Contracts.

(b)    Sellers may, ~~from the date hereof~~ until the ~~Executory Contract Designation Deadline~~Closing, provide written notice (a "Notice of Intent to Reject") to Purchaser of Sellers' intent to designate any Executory Contract (that has not been designated as an Assumable ~~Executory Contract or a Deferred~~ Executory Contract) as a Rejectable Executory Contract (each a "Proposed Rejectable Executory Contract"). Following receipt of a Notice of Intent to Reject, Purchaser shall as soon as reasonably practicable, but in no event later than fifteen (15) calendar days following receipt of a Notice of Intent to Reject (the "Option Period"), provide Sellers written notice of Purchaser's designation of one or more Proposed Rejectable Executory Contracts identified in such Notice of Intent to Reject as an Assumable Executory Contract~~; provided, however, if the Notice of Intent to Reject is received by Purchaser at or after Closing and prior to the Executory Contract Designation Deadline, Purchaser may, in lieu of designating such~~ Proposed Rejectable Executory Contract as an Assumable Executory

~~Contract, designate such Proposed Rejectable Executory Contract as a Contract subject to subsequent designation by Purchaser as an Assumable Executory Contract pursuant to Section 6.6(a) (each a "Deferred Executory Contract")~~.  Each Proposed Rejectable Executory Contract that has not been designated by Purchaser as an Assumable ~~Executory Contract or Deferred~~ Executory Contract during the applicable Option Period shall automatically, without further action by Sellers, be designated as a Rejectable Executory Contract.  A "Rejectable Executory Contract" is an Executory Contract that Sellers may, but are not obligated to, reject pursuant Section 365 of the Bankruptcy Code ~~(a "Rejectable Executory Contract")~~.

(c)   Immediately following the Closing, each Executory Contract entered into by Sellers and then in existence that has not previously been designated as an Assumable Executory Contract, a Rejectable Executory Contract or a Proposed Rejectable Executory Contract, and that has not otherwise been assumed or rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, shall be deemed to be an Executory Contract subject to subsequent designation by Purchaser as an Assumable Executory Contract or a Rejectable Executory Contract (each a "Deferred Executory Contract").

(d)   ~~(c)~~ All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; provided, however, that in the case of ~~all~~each (A) Assumable Executory ~~Contracts~~Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  ~~Notwithstanding~~Except as provided in Section 6.31, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time ~~following the date hereof~~, any Rejectable Executory Contract; provided, however, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether

- 66 -

designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers'  Disclosure Schedule (the "Shared Executory Contracts"), without the prior written consent of Purchaser.

(e)    (d) AtFrom and after the Closing and until the Executory Contract Designation Deadlineduring the applicable period specified below, Purchaser shall be obligated to pay or cause to be paid all amounts due in respect of Sellers' performance (i) under each Proposed Rejectable Executory Contract, during the pendency of the applicable Option Period under such Proposed Rejectable Executory Contract, (ii) under each Deferred Executory Contract, for so long as such Contract remains a Deferred Executory Contract and, (iiiii) under each Assumable Executory Contract, as long as such Contract remains an Assumable Executory Contract and (iv) under each GM Assumed Contract, until the applicable Assumption Effective Date.  At and after the Closing and until such time as any Shared Executory Contract is either (y) rejected by Sellers pursuant to the provision set forth in this **Section 6.6** or (z) assumed by Sellers and subsequently modified with Purchaser's consent so as to no longer be applicable to the affected Owned Real Property, Purchaser shall reimburse Sellers as and when requested by Sellers for Purchasers' and its Affiliates' allocable share of all costs and expenses incurred under such Shared Executory Contract.

(f)    (e) Sellers and Purchaser shall comply with the procedures set forth in the Sale Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this **Section 6.6**.

(g)    (f) No designation of any Executory Contract for assumption and assignment or rejection in accordance with this **Section 6.6** shall give rise to any right to any adjustment to the Purchase Price.

(h)    (g) Without limiting the foregoing, if, following the Executory Contract Designation Deadline, Sellers or Purchaser identify an Executory Contract that has not previously been identified as a Contract for assumption and assignment, and such Contract is important to Purchaser's ability to use or hold the Purchased Assets or operate its businesses in connection therewith, Sellers will assume and assign such Contract and assign it to Purchaser without any adjustment to the Purchase Price; provided that Purchaser consents and agrees at such time to (i) assume such Executory Contract and (ii) and discharge all Cure Amounts in respect hereof.

*Section 6.7    Deferred Termination Agreements; Participation Agreements.*

(a)    Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into short-term deferred voluntary termination agreements in substantially the form attached hereto as **Exhibit J-1** (in respect of all Saturn Discontinued Brand Dealer Agreements), **Exhibit J-2** (in respect of all Hummer Discontinued Brand Dealer Agreements) and **Exhibit J-3** (in respect of all non-Saturn and non-Hummer

Discontinued Brand Dealer Agreements and all Excluded Continuing Brand Dealer Agreements) that will, when executed by the relevant dealer counterparty thereto, modify the respective Discontinued Brand Dealer Agreements and selected Continuing Brand Dealer Agreements (collectively, the "Deferred Termination Agreements").  For the avoidance of doubt, (i) each Deferred Termination Agreement, and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement modified thereby, will automatically be an Assumable Executory Contract hereunder upon valid execution of such Deferred Termination Agreement by the parties thereto and (ii) all Discontinued Brand Dealer Agreements that are not modified by a Deferred Termination Agreement, and all Continuing Brand Dealer Agreements that are not modified by either a Deferred Termination Agreement or a Participation Agreement, will automatically be a Rejectable Executory Contract hereunder.

(b)    Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into agreements, substantially in the form attached hereto as **Exhibit K** that will modify all Continuing Brand Dealer Agreements (other than the Continuing Brand Dealer Agreements that are proposed to be modified by Deferred Termination Agreements) (the "Participation Agreements").  For the avoidance of doubt, (i) all Participation Agreements, and the related Continuing Brand Dealer Agreements, will automatically be Assumable Executory Contracts hereunder upon valid execution of such Participation Agreement and (ii) all Continuing Brand Dealer Agreements that are proposed to be modified by a Participation Agreement and are not modified by a Participation Agreement will be offered Deferred Termination Agreements pursuant to **Section 6.7(a)**.

Section 6.8    [Reserved]

Section 6.9    *Purchaser Assumed Debt; Wind Down Facility.*

(a)    Purchaser shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of the Purchaser Assumed Debt so as to be assumed by Purchaser immediately prior to the Closing.  Purchaser shall use reasonable best efforts to enter into definitive financing agreements with respect to the Purchaser Assumed Debt so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $950,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at LIBOR plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof), and to be subject to mandatory repayment from the proceeds of asset sales (other than the sale of Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof).  Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

*Section 6.10    Litigation and Other Assistance.*  In the event and for so long as any Party is actively contesting or defending against any action, investigation, charge, Claim or demand by a third party in connection with any transaction contemplated by this Agreement, the other Parties shall reasonably cooperate with the contesting or defending Party and its counsel in such contest or defense, make available its personnel and provide such testimony and access to its books, records and other materials as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that no Party shall be required to provide the contesting or defending party with any access to its books, records or materials if such access would violate the attorney-client privilege or conflict with any confidentiality obligations to which the non-contesting or defending Party is subject.  In addition, the Parties agree to cooperate in connection with the making or filing of claims, requests for information, document retrieval and other activities in connection with any and all Claims made under insurance policies specified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule to the extent any such Claim relates to any Purchased Asset or Assumed Liability.  For the avoidance of doubt, this **Section 6.10** shall not apply to any action, investigation, charge, Claim or demand by any of Sellers or their Affiliates, on the one hand, or Purchaser or any of its Affiliates, on the other hand.

*Section 6.11    Further Assurances.*

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all actions necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement in accordance with the terms hereof and to bring about the satisfaction of all other conditions to the other Parties' obligations hereunder; provided, however, that nothing in this Agreement shall obligate Sellers or Purchaser, or any of their respective Affiliates, to waive or modify any of the terms and conditions of this Agreement or any documents contemplated hereby, except as expressly set forth herein.  The Parties acknowledge that Sponsor's acquisition of interest is a sovereign act and that no filings should be made by Sponsor or Purchaser in non-United States jurisdictions.

(b)    The Parties shall negotiate the forms, terms and conditions of the Ancillary Agreements, to the extent the forms thereof are not attached to this Agreement, on the basis of the respective term sheets attached to this Agreement, in good faith, with such Ancillary Agreements to set forth terms on an Arms-Length Basis and incorporate usual and customary provisions for similar agreements.

(c)    ~~Promptly following the date hereof, and until~~Until the Closing, Sellers shall ~~designate~~maintain a team of appropriate personnel (each such team, a "Transition Team") to assist Purchaser and its Representatives in connection with Purchaser's efforts to complete prior to the Closing the activities described below.  Sellers shall use their reasonable best efforts to cause the Transition Team to (A) meet with Purchaser and its Representatives on a regular basis at such times as Purchaser may reasonably request and (B) take such action and provide such information, including background and summary

information, as Purchaser and its Representatives may reasonably request in connection with the following activities:

> (i)    evaluation and identification of all Contracts that Purchaser may elect to designate as Purchased Contracts or Excluded Contracts, consistent with its rights under this Agreement;

> (ii)    evaluation and identification of all assets and entities that Purchaser may elect to designate as Purchased Assets or Excluded Assets, consistent with its rights under this Agreement;

> (iii)    maintaining and obtaining necessary governmental consents, permits, authorizations, licenses and financial assurance for operation of the business by Purchaser following the Closing;

> (iv)    obtaining necessary third party consents for operation of the business by Purchaser following the Closing;

> (v)    implementing the optimal structure for Purchaser and its subsidiaries to acquire and hold the Purchased Assets and operate the business following the Closing;

> (vi)    implementing the assumption of all Assumed Plans and otherwise satisfying the obligations of Purchaser as provided in **Section 6.17** with respect to Employment Related Obligations; and

> (vii)    such other transition matters as Purchaser may reasonably determine are necessary for Purchaser to fulfill its obligations and exercise its rights under this Agreement.

*Section 6.12    Notifications.*

(a)    Sellers shall give written notice to Purchaser as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE IV** being or becoming untrue or inaccurate in any material respect as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Sellers to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Sellers under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.2** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Sellers' representations or warranties, a failure to perform any of the covenants or agreements of Sellers or a failure to have satisfied the conditions to the obligations of Sellers under this Agreement.  Such notice shall be in form of a certificate signed by an executive officer of Parent setting forth the details of such event and the action which Parent proposes to take with respect thereto.

(b)     Purchaser shall give written notice to Sellers as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE V** being or becoming untrue or inaccurate in any material respect with respect to Purchaser as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case as of such date), (ii) the failure by Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Purchaser under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.3** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Purchaser's representations or warranties, a failure to perform any of the covenants or agreements of Purchaser or a failure to have satisfied the conditions to the obligations of Purchaser under this Agreement.  Such notice shall be in a form of a certificate signed by an executive officer of Purchaser setting forth the details of such event and the action which Purchaser proposes to take with respect thereto.

Section 6.13     *Actions by Affiliates.*  Each of Purchaser and Sellers shall cause their respective controlled Affiliates, and shall use their reasonable best efforts to ensure that each of their respective other Affiliates (other than Sponsor in the case of Purchaser) takes all actions reasonably necessary to be taken by such Affiliate in order to fulfill the obligations of Purchaser or Sellers, as the case may be, under this Agreement.

Section 6.14     *Compliance Remediation.*  Except with respect to the Excluded Assets or Retained Liabilities, prior to the Closing, Sellers shall use reasonable best efforts to, and shall use reasonable best efforts to cause their Subsidiaries to use their reasonable best efforts to, cure in all material respects any instances of non-compliance with Laws or Orders, failures to possess or maintain Permits or defaults under Permits.

Section 6.15     *Product Certification, Recall and Warranty Claims.*

(a)     From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

(b)     From and after the Closing, Purchaser shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written ~~emission and limited new vehicle warranties, certified used vehicle warranties and pre-owned vehicle warranties~~<u>warranties of Sellers that are specifically identified as warranties and</u> delivered in connection with the sale of new, certified used or pre-owned vehicles ~~manufactured or sold by Sellers or Purchaser~~ ~~prior to or after the Closing and (ii) express written emission and limited warranties with respect to~~<u>or</u> new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and

transmissions), manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws. In connection with the foregoing clause (ii), (A) Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers and (B) for avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties.

(c)     For the avoidance of doubt, Liabilities of the Transferred Entities arising from or in connection with products manufactured or sold by the Transferred Entities remain the responsibility of the Transferred Entities and shall be neither Assumed Liabilities nor Retained Liabilities for the purposes of this Agreement.

*Section 6.16     Tax Matters; Cooperation.*

(a)     Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers, the Purchased Subsidiaries and the Purchased Assets in a manner consistent with past practices (except as otherwise required by Law), and shall provide Purchaser prompt opportunity for review and comment and shall obtain Purchaser's written approval prior to filing any such Tax Returns. After the Closing Date, at Purchaser's election, Purchaser shall prepare, and the applicable Seller, Seller Subsidiary or Seller Group member shall timely file, any Tax Return relating to any Seller, Seller Subsidiary or Seller Group member for any Pre-Closing Tax Period or Straddle Period due after the Closing Date or other taxable period of any entity that includes the Closing Date, subject to the right of the applicable Seller to review any such material Tax Return. Purchaser shall prepare and file all other Tax Returns required to be filed after the Closing Date in respect of the Purchased Assets. Sellers shall prepare and file all other Tax Returns relating to the Post-Closing Tax Period of Sellers, subject to the prior review and approval of Purchaser, which approval may be withheld, conditioned or delayed with good reason. No Seller or Seller Group member shall be entitled to any payment or other consideration in addition to the Purchase Price with respect to the acquisition or use of any Tax items or attributes by Purchaser, any Purchased Subsidiary or Affiliates thereof. At Purchaser's request, any Seller or Seller Group member shall designate Purchaser or any of its Affiliates as a substitute agent for the Seller Group for Tax purposes. Purchaser shall be entitled to make all determinations, including the right to make or cause to be made any elections with respect to Taxes and Tax Returns of Sellers, Seller Subsidiaries, Seller Groups and Seller Group members with respect to Pre-Closing Tax Periods and Straddle Periods and with respect to the Tax consequences of the Relevant Transactions (including the treatment of such transactions as an Agreed G Transaction) and the other transactions contemplated by this Agreement, including (i) the "date of distribution or transfer" for purposes of Section 381(b) of the Tax Code, if applicable; (ii) the relevant Tax periods and members of the Seller Group and the Purchaser and its Affiliates; (iii) whether the Purchaser and/or any of its Affiliates shall be treated as a continuation of Seller Group; and (iv) any other determinations required under Section 381 of the Tax Code. Purchaser shall have the sole right to represent the interests, as

applicable, of any Seller, Seller Group member or Purchased Subsidiary in any Tax proceeding in connection with any Tax Liability or any Tax item for any Pre-Closing Tax Period, Straddle Period or other Tax period affecting any such earlier Tax period.  After the Closing, Purchaser shall have the right to assume control of any PLR or CA request filed by Sellers or any Affiliate thereof, including the right to represent Sellers and their Affiliates and to direct all professionals acting on their behalf in connection with such request, and no settlement, concession, compromise, commitment or other agreements in respect of such PLR or CA request shall be made without Purchaser's prior written consent.

(b)     All Taxes required to be paid by any Seller or Seller Group member for any Pre-Closing Tax Period or any Straddle Period shall be timely paid.  To the extent a Party hereto is liable for a Tax pursuant to this Agreement and such Tax is paid or payable by another Party or such other Party's Affiliates, the Party liable for such Tax shall make payment in the amount of such Tax to the other Party no later than three (3) days prior to the due date for payment of such Tax, unless a later time for payment is agreed to in writing by such other Party.  To the extent that any Seller or Seller Group member receives or realizes the benefit of any Tax refund, abatement or credit that is a Purchased Asset, such Seller or Seller Group member receiving the benefit shall transfer an amount equal to such refund, abatement or credit to Purchaser within fourteen (14) days of receipt or realization of the benefit.

(c)     Purchaser and Sellers shall provide each other with such assistance and non-privileged information relating to the Purchased Assets as may reasonably be requested in connection with any Tax matter, including the matters contemplated by this **Section 6.16**, the preparation of any Tax Return or the performance of any audit, examination or other proceeding by any Taxing Authority, whether conducted in a judicial or administrative forum.  Purchaser and Sellers shall retain and provide to each other all non-privileged records and other information reasonably requested by the other and that may be relevant to any such Tax Return, audit, examination or other proceeding.

(d)     After the Closing, at Purchaser's election, Purchaser shall exercise exclusive control over the handling, disposition and settlement of any inquiry, examination or proceeding (including an audit) by a Governmental Authority (or that portion of any inquiry, examination or proceeding by a Governmental Authority) with respect to Sellers, any Subsidiary of Sellers or any Seller Group, provided that to the extent any such inquiry, examination or proceeding by a Governmental Authority could materially affect the Taxes due or payable by Sellers, Purchaser shall control the handling, disposition and settlement thereof, subject to reasonable consultation rights of Sellers.  Each Party shall notify the other Party (or Parties) in writing promptly upon learning of any such inquiry, examination or proceeding. The Parties and their Affiliates shall cooperate with each other in any such inquiry, examination or proceeding as a Party may reasonably request.  Neither Parent nor any of its Affiliates shall extend, without Purchaser's prior written consent, the statute of limitations for any Tax for which Purchaser or any of its Affiliates may be liable.

(e)    Notwithstanding anything contained herein, Purchaser shall prepare and Sellers shall timely file all Tax Returns required to be filed in connection with the payment of Transfer Taxes.

(f)    From the date of this Agreement to and including the Closing Date, except to the extent relating solely to an Excluded Asset or Retained Liability, no Seller, Seller Group member or Purchased Subsidiary shall, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed, and shall not be withheld if not resulting in any Tax impact on Purchaser or any Purchased Asset), (i) make, change, or terminate any material election with respect to Taxes (including elections with respect to the use of Tax accounting methods) of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture to which any Seller or Purchased Subsidiary is a party, (ii) settle or compromise any Claim or assessment for Taxes (including refunds) that could be reasonably expected to result in any adverse consequence on Purchaser or any Purchased Asset following the Closing Date, (iii) agree to an extension of the statute of limitations with respect to the assessment or collection of the Taxes of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture of which any Seller or Purchased Subsidiary is a party or (iv) make or surrender any Claim for a refund of a material amount of the Taxes of any of Sellers or Purchased Subsidiaries or file an amended Tax Return with respect to a material amount of Taxes.

(g)

(i)    Purchaser shall treat the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers (such transactions, collectively, the "Relevant Transactions"), as a reorganization pursuant to Section 368(a)(1)(G) of the Tax Code with any actual or deemed distribution by Parent qualifying solely under Sections 354 and 356 of the Tax Code but not under Section 355 of the Tax Code (a "G Transaction") if (x) the IRS issues a private letter ruling ("PLR") or executes a closing agreement ("CA"), in each case reasonably acceptable to Purchaser, confirming that the Relevant Transactions shall qualify as a G Transaction for U.S. federal income Tax purposes, or (y) Purchaser determines to treat the Relevant Transactions as so qualifying (clause (x) or (y), an "Agreed G Transaction"). In connection with the foregoing, Sellers shall use their reasonable best efforts to obtain a PLR or execute a CA with respect to the Relevant Transactions at least seven (7) days prior to the Closing Date. At least three (3) days prior to the Closing Date, Purchaser shall advise Parent in writing as to whether Purchaser has made a determination regarding the treatment of the Relevant Transactions for U.S. federal income Tax purposes and, if applicable, the outcome of any such determination.

(ii)    On or prior to the Closing Date, Sellers shall deliver to Purchaser all information in the possession of Sellers and their Affiliates that is reasonably related to the determination of whether the Relevant Transactions constitute an

Agreed G Transaction ("Relevant Information"), and, after the Closing, Sellers shall promptly provide to Purchaser any newly produced or obtained Relevant Information.  For the avoidance of doubt, the Parties shall cooperate in taking any actions and providing any information that Purchaser determines is necessary or appropriate in furtherance of the intended U.S. federal income Tax treatment of the Relevant Transactions and the other transactions contemplated by this Agreement.

(iii)    If Purchaser has not determined as of the Closing Date whether to treat the Relevant Transactions as an Agreed G Transaction, Purchaser shall make such determination in accordance with this **Section 6.16** prior to the due date (including validly obtained extensions) for filing the corporate income Tax Return for Parent's U.S. affiliated group (as defined in Section 1504 of the Tax Code) for the taxable year in which the Closing Date occurs, and shall convey such decision in writing to Parent, which decision shall be binding on Parent.

(iv)    If the Relevant Transactions constitute an Agreed G Transaction under this **Section 6.16**: (A) Sellers shall use their reasonable best efforts, and Purchaser shall use reasonable best efforts to assist Sellers, to effectuate such treatment and the Parties shall not take any action or position inconsistent with, or fail to take any necessary action in furtherance of, such treatment (subject to **Section 6.16(g)(vi)**); (B) the Parties agree that this Agreement shall constitute a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code; (C) the board of directors of Parent and Purchaser shall, by resolution, approve the execution of this Agreement and expressly recognize its treatment as a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code, and the treatment of the Relevant Transactions as a G Transaction for federal income Tax purposes; (D) Sellers shall provide Purchaser with a statement setting forth the adjusted Tax basis of the Purchased Assets and the amount of net operating losses and other material Tax attributes of Sellers and any Purchased Subsidiary that are available as of the Closing Date and after the close of any taxable year of any Seller or Seller Group member that impacts the numbers previously provided, all based on the best information available, but with no Liability for any errors or omissions in information; and (E) Sellers shall provide Purchaser with an estimate of the cancellation of Indebtedness income that Sellers and any Seller Group member anticipate realizing for the taxable year that includes the Closing Date, and shall provide revised numbers after the close of any taxable year of any Seller or Seller Group member that impacts this number.

(v)    If the Relevant Transactions do not constitute an Agreed G Transaction under this **Section 6.16**, the Parties hereby agree, and Sellers hereby consent, to treat the sale of the Purchased Assets by Parent as a taxable asset sale for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.  In addition, the Parties hereby agree, and Sellers hereby consent, to treat the sales of the Purchased Assets by S Distribution and Harlem as taxable asset sales for all Tax purposes, to make any elections pursuant to Section 338 of

the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.

(vi)    No Party shall take any position with respect to the Relevant Transactions that is inconsistent with the position determined in accordance with this **Section 6.16**, unless, and then only to the extent, otherwise required to do so by a Final Determination.

(vii)    Each Seller shall liquidate, as determined for U.S. federal income Tax purposes and to the satisfaction of Purchaser, no later than December 31, 2011, and each such liquidation may include a distribution of assets to a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4, the terms of which shall be satisfactory to Purchaser.

(viii)    Effective no later than the Closing Date, Purchaser shall be treated as a corporation for federal income Tax purposes.

*Section 6.17    Employees; Benefit Plans; Labor Matters.*

(a)    *Transferred Employees*.    Effective as of the Closing Date, Purchaser or one of its Affiliates shall make an offer of employment to each Applicable Employee. Notwithstanding anything herein to the contrary and except as provided in an individual employment Contract with any Applicable Employee or as required by the terms of an Assumed Plan, offers of employment to Applicable Employees whose employment rights are subject to the UAW Collective Bargaining Agreement as of the Closing Date, shall be made in accordance with the applicable terms and conditions of the UAW Collective Bargaining Agreement and Purchaser's obligations under the Labor Management Relations Act of 1974, as amended.    Each offer of employment to an Applicable Employee who is not covered by the UAW Collective Bargaining Agreement shall provide, until at least the first anniversary of the Closing Date, for (i) base salary or hourly wage rates initially at least equal to such Applicable Employee's base salary or hourly wage rate in effect as of immediately prior to the Closing Date and (ii) employee pension and welfare benefits, Contracts and arrangements that are not less favorable in the aggregate than those listed on Section 4.10 of the Sellers' Disclosure Schedule, but not including any Retained Plan, equity or equity-based compensation plans or any Benefit Plan that does not comply in all respects with TARP.    For the avoidance of doubt, each Applicable Employee on layoff status, leave status or with recall rights as of the Closing Date, shall continue in such status and/or retain such rights after Closing in the Ordinary Course of Business. Each Applicable Employee who accepts employment with Purchaser or one of its Affiliates and commences working for Purchaser or one of its Affiliates shall become a "Transferred Employee."    To the extent such offer of employment by Purchaser or its Affiliates is not accepted, Sellers shall, as soon as practicable following the Closing Date, terminate the employment of all such Applicable Employees.    Nothing in this **Section 6.17(a)** shall prohibit Purchaser or any of its Affiliates from terminating the employment of any Transferred Employee after the Closing Date, subject to the terms and conditions of the UAW Collective Bargaining Agreement.    It is understood that the intent of this **Section 6.17(a)** is to provide a

seamless transition from Sellers to Purchaser of any Applicable Employee subject to the UAW Collective Bargaining Agreement. Except for Applicable Employees with non-standard individual agreements providing for severance benefits, until at least the first anniversary of the Closing Date, Purchaser further agrees and acknowledges that it shall provide to each Transferred Employee who is not covered by the UAW Collective Bargaining Agreement and whose employment is involuntarily terminated by Purchaser or its Affiliates on or prior to the first anniversary of the Closing Date, severance benefits that are not less favorable than the severance benefits such Transferred Employee would have received under the applicable Benefit Plans listed on Section 4.10 of the Sellers' Disclosure Schedule. Purchaser or one of its Affiliates shall take all actions necessary such that Transferred Employees shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual (except in the case of a defined benefit pension plan sponsored by Purchaser or any of its Affiliates in which Transferred Employees may commence participation after the Closing that is not an Assumed Plan), in any employee benefit plans (excluding equity compensation plans or programs) covering Transferred Employees after the Closing to the same extent as such Transferred Employee was entitled as of immediately prior to the Closing Date to credit for such service under any similar employee benefit plans, programs or arrangements of any of Sellers or any Affiliate of Sellers; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such Transferred Employee or the funding for any such benefit. Such benefits shall not be subject to any exclusion for any pre-existing conditions to the extent such conditions were satisfied by such Transferred Employees under a Parent Employee Benefit Plan as of the Closing Date, and credit shall be provided for any deductible or out-of-pocket amounts paid by such Transferred Employee during the plan year in which the Closing Date occurs.

(b)     *Employees of Purchased Subsidiaries*.  As of the Closing Date, those employees of Purchased Subsidiaries who participate in the Assumed Plans, may, subject to the applicable Collective Bargaining Agreement, for all purposes continue to participate in such Assumed Plans, in accordance with their terms in effect from time to time. For the avoidance of any doubt, Purchaser shall continue the employment of any current Employee of any Purchased Subsidiary covered by the UAW Collective Bargaining Agreement on the terms and conditions of the UAW Collective Bargaining Agreement in effect immediately prior to the Closing Date, subject to its terms; provided, however, that nothing in this Agreement shall be construed to terminate the coverage of any UAW-represented Employee in an Assumed Plan if such Employee was a participant in the Assumed Plan immediately prior to the Closing Date. Further provided, that nothing in this Agreement shall create a direct employment relationship between Parent or Purchaser and an Employee of a Purchased Subsidiary or an Affiliate of Parent.

(c)     *No Third Party Beneficiaries*. Nothing contained herein, express or implied, (i) is intended to confer or shall confer upon any Employee or Transferred Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, (ii) except as set forth in **Section 9.11**, is intended to confer or shall confer upon any individual or any legal Representative of any individual (including employees, retirees,

or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement or (iii) shall be deemed to confer upon any such individual or legal Representative any rights under or with respect to any plan, program or arrangement described in or contemplated by this Agreement, and each such individual or legal Representative shall be entitled to look only to the express terms of any such plans, program or arrangement for his or her rights thereunder. Nothing herein is intended to override the terms and conditions of the UAW Collective Bargaining Agreement.

(d)    *Plan Authority.*    Nothing contained herein, express or implied, shall prohibit Purchaser or its Affiliates, as applicable, from, subject to applicable Law and the terms of the UAW Collective Bargaining Agreement, adding, deleting or changing providers of benefits, changing, increasing or decreasing co-payments, deductibles or other requirements for coverage or benefits (e.g., utilization review or pre-certification requirements), and/or making other changes in the administration or in the design, coverage and benefits provided to such Transferred Employees.    Without reducing the obligations of Purchaser as set forth in **Section 6.17(a)**, no provision of this Agreement shall be construed as a limitation on the right of Purchaser or its Affiliates, as applicable, to suspend, amend, modify or terminate any employee benefit plan, subject to the terms of the UAW Collective Bargaining Agreement.    Further, (i) no provision of this Agreement shall be construed as an amendment to any employee benefit plan, and (ii) no provision of this Agreement shall be construed as limiting Purchaser's or its Affiliate's, as applicable, discretion and authority to interpret the respective employee benefit and compensation plans, agreements arrangements, and programs, in accordance with their terms and applicable Law.

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies.*    As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (the "Assumed Plans"), for the benefit of the Transferred Employees and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to

Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP.  Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(f)    *UAW Collective Bargaining Agreement.*  Parent shall assume and assign to Purchaser, as of the Closing, ~~each of the Collective Bargaining Agreements identified on the Assumable Executory Contracts Schedule (including~~ the UAW Collective Bargaining Agreement~~)~~ and all rights and Liabilities of Parent relating thereto (including~~, without limitation,~~ Liabilities for wages, benefits and other compensation, unfair labor practices, grievances, arbitrations and contractual obligations).   With respect to the UAW Collective Bargaining Agreement, Purchaser agrees to (i) recognize the UAW as the exclusive collective bargaining representative for the Transferred Employees covered by the terms of the UAW Collective Bargaining Agreement, (ii) offer employment to all Applicable Employees covered by the UAW Collective Bargaining Agreement with full recognition of all seniority rights, (iii) negotiate with the UAW over the terms of any successor collective bargaining agreement upon the expiration of the UAW Collective Bargaining Agreement and upon timely demand by the UAW, (iv) with the agreement of the UAW or otherwise as provided by Law and to the extent necessary, adopt or assume or replace, effective as of the Closing Date, employee benefit plans, policies, programs, agreements and arrangements specified in or covered by the UAW Collective Bargaining Agreement as required to be provided to the Transferred Employees covered by the UAW Collective Bargaining Agreement, and (v) otherwise abide by all terms and conditions of the UAW Collective Bargaining Agreement.  For the avoidance of doubt, the provisions of this **Section 6.17(f)** are not intended to (A) give, and shall not be construed as giving, the UAW or any Transferred Employee any enhanced or additional rights or (B) otherwise restrict the rights that Purchaser and its Affiliates have, under the terms of the UAW Collective Bargaining Agreement.

(g)    *UAW Retiree Settlement Agreement.*  Prior to the Closing, Purchaser and the UAW shall have entered into the UAW Retiree Settlement Agreement.

(h)    *Assumption of Existing Internal VEBA.*  Purchaser or one of its Affiliates shall, effective as of the Closing Date, assume from Sellers the sponsorship of the voluntary employees' beneficiary association trust between Sellers and State Street Bank and Trust Company dated as of December 17, 1997, that is funded and maintained by Sellers ("Existing Internal VEBA") and, in connection therewith, Purchaser shall, or shall cause one of its Affiliates to, (i) succeed to all of the rights, title and interest (including the rights of Sellers, if any) as plan sponsor, plan administrator or employer) under the Existing Internal VEBA, (ii) assume any responsibility or Liability relating to the Existing Internal VEBA and each Contract established thereunder or relating thereto, and (iii) to operate the Existing Internal VEBA in accordance with, and to otherwise comply with the Purchaser's obligations under, the New UAW Retiree Settlement Agreement between Purchaser and the UAW, effective as of the Closing and subject to approval by a court having jurisdiction over this matter, including the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW's share of assets in the Existing Internal

VEBA to the New VEBA.  The Parties shall cooperate in the execution of any documents, the adoption of any corporate resolutions or the taking of any other reasonable actions to effectuate such succession of the settlor rights, title, and interest with respect to the Existing Internal VEBA.  For avoidance of doubt, Purchaser shall not assume any Liabilities relating to the Existing Internal VEBA except with respect to such Contracts set forth in Section 6.17(h) of the Sellers' Disclosure Schedule.

(i)     *Wage and Tax Reporting*.  Sellers and Purchaser agree to apply, and cause their Affiliates to apply, the standard procedure for successor employers set forth in Revenue Procedure 2004-53 for wage and employment Tax reporting.

(j)     *Non-solicitation*.  Sellers shall not, for a period of two (2) years from the Closing Date, without Purchaser's written consent, solicit, offer employment to or hire any Transferred Employee.

(k)     *Cooperation*.  Purchaser and Sellers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this **Section 6.17**; provided, that all records, information systems data bases, computer programs, data rooms and data related to any Assumed Plan or Liabilities of such, assumed by Purchaser, shall be transferred to Purchaser.

(l)     *Union Notifications*.  Purchaser and Sellers shall reasonably cooperate with each other in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, the UAW and relevant Governmental Authorities and governmental officials concerning the transactions contemplated by this Agreement, including any notice to any of Sellers' retired Employees represented by the UAW, describing the transactions contemplated herein.

(m)     *Union-Represented Employees (Non-UAW).*

(i)     Effective as of the Closing Date, Purchaser or one of its Affiliates shall assume the collective bargaining agreements, as amended, set forth on Section 6.17(m)(i) of the Sellers' Disclosure Schedule (collectively, the "Non-UAW Collective Bargaining Agreements") and make offers of employment to each current employee of Parent who is covered by them in accordance with the applicable terms and conditions of such Non-UAW Collective Bargaining Agreements, such assumption and offers conditioned upon (A) the non-UAW represented employees' ratification of the amendments thereto (including termination of the application of the Supplemental Agreements Covering Health Care Program to retirees and the reduction to retiree life insurance coverage) and (B) Bankruptcy Court approval of Settlement Agreements between Purchaser and such Unions and Proposed Memorandum of Understanding Regarding Retiree Health Care and Life Insurance between Sellers and such Unions, as identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule and satisfaction of all conditions stated therein.  Each such non-UAW hourly employee on layoff status,

leave status or with recall rights as of the Closing Date shall continue in such status and/or retain such rights after the Closing in the Ordinary Course of Business, subject to the terms of the applicable Non-UAW Collective Bargaining Agreement.  Other than as set forth in this **Section 6.17(m)**, no non-UAW collective bargaining agreement shall be assumed by Purchaser.

(ii)    Section 6.17(m)(ii) of the Sellers' Disclosure Schedule sets forth agreements relating to post-retirement health care and life insurance coverage for non-UAW retired employees (the "Non-UAW Settlement Agreements"), including those agreements covering retirees who once belonged to Unions that no longer have any active employees at Sellers.  Conditioned on both the approval of the Bankruptcy Court and the non-UAW represented employees' ratification of the amendments to the applicable Non-UAW Collective Bargaining Agreement providing for such coverage as described in **Section 6.17(m)(i)** above, Purchaser or one of its Affiliates shall assume and enter into the agreements identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule.  Except as set forth in those agreements identified on Section 6.17(m)(i) and Section 6.17(m)(ii) of the Sellers' Disclosure Schedule, Purchaser shall not assume any Liability to provide post-retirement health care or life insurance coverage for current or future hourly non-UAW retirees.

(iii)    Other than as expressly set forth in this **Section 6.17(m)**, Purchaser assumes no Employment-Related Obligations for non-UAW hourly Employees.  For the avoidance of doubt, (A) the provisions of **Section 6.17(f)** shall not apply to this **Section 6.17(m)** and (B) the provisions of this **Section 6.17(m)** are not intended to (y) give, and shall not be construed as giving, any non-UAW Union or the covered employee or retiree of any Non-UAW Collective Bargaining Agreement any enhanced or additional rights or (z) otherwise restrict the rights that Purchaser and its Affiliates have under the terms of the Non-UAW Collective Bargaining Agreements identified on Section 6.17(m)(i) of the Sellers' Disclosure Schedule.

*Section 6.18    TARP.*  From and after the date hereof and until such time as all amounts under the UST Credit Facilities have been paid in full, forgiven or otherwise extinguished or such longer period as may be required by Law, subject to any applicable Order of the Bankruptcy Court, each of Sellers and Purchaser shall, and shall cause each of their respective Subsidiaries to, take all necessary action to ensure that it complies in all material respects with TARP or any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor prior to the Closing.

*Section 6.19    Guarantees; Letters of Credit.*  Purchaser shall use its reasonable best efforts to cause Purchaser or one or more of its Subsidiaries to be substituted in all respects for each Seller and Excluded Entity, effective as of the Closing Date, in respect of all Liabilities of each Seller and Excluded Entity under each of the guarantees, letters of credit, letters of comfort, bid bonds and performance bonds (a) obtained by any Seller or Excluded Entity for the benefit of the business of Sellers and their Subsidiaries and (b) which is assumed by Purchaser as an Assumed Liability.  As a result of such substitution, each Seller and Excluded Entity shall be

released of its obligations of, and shall have no Liability following the Closing from, or in connection with any such guarantees, letters of credit, letters of comfort, bid bonds and performance bonds.

Section 6.20    *Customs Duties.*    Purchaser shall reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Purchaser with respect to periods following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under any Seller's importer or exporter identification numbers and bonds or guarantees with respect to periods following the Closing.

Section 6.21    *Termination of Intellectual Property Rights.*    Each Seller agrees that any rights of any Seller, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests and including transfers resulting from this **Section 6.21**), whether owned or licensed, shall terminate as of the Closing. Before and after the Closing, each Seller agrees to use its reasonable best efforts to cause the Retained Subsidiaries to do the following, but only to the extent that such Seller can do so without incurring any Liabilities to such Retained Subsidiaries or their equity owners or creditors as a result thereof: (a) enter into a written Contract with Purchaser that expressly terminates any rights of such Retained Subsidiaries, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests), whether owned or licensed; and (b) assign to Purchaser or its designee(s): (i) all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks, in each case, that are owned by such Retained Subsidiaries and that contain or are confusingly similar with (whether in whole or in part) any of the Trademarks; and (ii) all other intellectual property owned by such Retained Subsidiaries. Nothing in this **Section 6.21** shall preserve any rights of Sellers or the Retained Subsidiaries, or any third parties, that are otherwise terminated or extinguished pursuant to this Agreement or applicable Law, and nothing in this **Section 6.21** shall create any rights of Sellers or the Retained Subsidiaries, or any third parties, that do not already exist as of the date hereof. Notwithstanding anything to the contrary in this **Section 6.21**, Sellers may enter into (and may cause or permit any of the Purchased Subsidiaries to enter into) any of the transactions contemplated by Section 6.2 of the Sellers' Disclosure Schedule.

Section 6.22    *Trademarks.*

(a)    At or before the Closing (i) Parent shall take any and all actions that are reasonably necessary to change the corporate name of Parent to a new name that bears no resemblance to Parent's present corporate name and that does not contain, and is not

confusingly similar with, any of the Trademarks; and (ii) to the extent that the corporate name of any Seller (other than Parent) or any Retained Subsidiary resembles Parent's present corporate name or contains or is confusingly similar with any of the Trademarks, Sellers (including Parent) shall take any and all actions that are reasonably necessary to change such corporate names to new names that bear no resemblance to Parent's present corporate name, and that do not contain and are not confusingly similar with any of the Trademarks.

(b)     As promptly as practicable following the Closing, but in no event later than ninety (90) days after the Closing (except as set forth in this **Section 6.22(b)**), Sellers shall cease, and shall cause the Retained Subsidiaries to cease, using the Trademarks in any form, whether by removing, permanently obliterating, covering, or otherwise eliminating all Trademarks that appear on any of their assets, including all signs, promotional or advertising literature, labels, stationery, business cards, office forms and packaging materials.  During such time period, Sellers and the Retained Subsidiaries may continue to use Trademarks in a manner consistent with their usage of the Trademarks as of immediately prior to the Closing, but only to the extent reasonably necessary for them to continue their operations as contemplated by the Parties as of the Closing.  If requested by Purchaser within a reasonable time after the Closing, Sellers and Retained Subsidiaries shall enter into a written agreement that specifies quality control of such Trademarks and their underlying goods and services.  For signs and the like that exist as of the Closing on the Excluded Real Property, if it is not reasonably practicable for Sellers or the Retained Subsidiaries to remove, permanently obliterate, cover or otherwise eliminate the Trademarks from such signs and the like within the time period specified above, then Sellers and the Retained Subsidiaries shall do so as soon as practicable following such time period, but in no event later than one-hundred eighty (180) days following the Closing.

(c)     From and after the date of this Agreement and, until the earlier of the Closing or termination of this Agreement, each Seller shall use its reasonable best efforts to protect and maintain the Intellectual Property owned by Sellers that is material to the conduct of its business in a manner that is consistent with the value of such Intellectual Property.

(d)     At or prior to the Closing, Sellers shall provide a true, correct and complete list setting forth all worldwide patents, patent applications, trademark registrations and applications and copyright registrations and applications included in the Intellectual Property owned by Sellers.

*Section 6.23    Preservation of Records.*  The Parties shall preserve and keep all books and records that they own immediately after the Closing relating to the Purchased Assets, the Assumed Liabilities and Sellers' operation of the business related thereto prior to the Closing for a period of six (6) years following the Closing Date or for such longer period as may be required by applicable Law, unless disposed of in good faith pursuant to a document retention policy. During such retention period, duly authorized Representatives of a Party shall, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such books and records held by the other Parties for any proper purpose, except as may be prohibited

by Law or by the terms of any Contract (including any confidentiality agreement); provided that to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other legal privilege with respect thereto, the Parties shall take all reasonable best efforts to permit such disclosure without the waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.  The access provided pursuant to this **Section 6.23** shall be subject to such additional confidentiality provisions as the disclosing Party may reasonably deem necessary.

Section 6.24    *Confidentiality.*    During the Confidentiality Period, Sellers and their Affiliates shall treat all trade secrets and all other proprietary, legally privileged or sensitive information related to the Transferred Entities, the Purchased Assets and/or the Assumed Liabilities (collectively, the "Confidential Information"), whether furnished before or after the Closing, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it is or was furnished, as confidential, preserve the confidentiality thereof, not use or disclose to any Person such Confidential Information and instruct their Representatives who have had access to such information to keep confidential such Confidential Information.  The "Confidentiality Period" shall be a period commencing on the date ~~hereof~~of the Original Agreement and (a) with respect to a trade secret, continuing for as long as it remains a trade secret and (b) for all other Confidential Information, ending four (4) years from the Closing Date.  Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Sellers, any of their Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed, including any applicable requirements of the SEC or any other Governmental Authority responsible for securities Law regulation and compliance or any stock market or stock exchange on which any Seller's securities are listed.

Section 6.25    *Privacy Policies.*    At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; provided that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available.

Section 6.26    *Supplements to Sellers' Disclosure Schedule.*    At any time and from time to time prior to the Closing, Sellers shall have the right to supplement, modify or update Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule (a) to reflect changes and developments that have arisen after the date ~~hereof~~of the Original Agreement and that, if they existed prior to the date ~~hereof~~of the Original Agreement, would have been required to be set forth on such Sellers' Disclosure Schedule or (b) as may be necessary to correct any disclosures contained in such Sellers' Disclosure Schedule or in any representation and warranty of Sellers that has been rendered inaccurate by such changes or developments.    No supplement, modification or amendment to Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule shall without the prior written consent of Purchaser, (i) cure any inaccuracy of any

representation and warranty made in this Agreement by Sellers or (ii) give rise to Purchaser's right to terminate this Agreement unless and until this Agreement shall be terminable by Purchaser in accordance with **Section 8.1(f)**.

*Section 6.27   Real Property Matters.*

(a)   Sellers and Purchaser acknowledge that certain real properties (the "Subdivision Properties") may need to be subdivided or otherwise legally partitioned in accordance with applicable Law (a "Required Subdivision") so as to permit the affected Owned Real Property to be conveyed to Purchaser separate and apart from adjacent Excluded Real Property.  Section 6.27 of the Sellers' Disclosure Schedule contains a list of the Subdivision Properties that was determined based on the current list of Excluded Real Property.  Section 6.27 of the Sellers' Disclosure Schedule may be updated at any time prior to the Closing to either (i) add additional Subdivision Properties or (ii) remove any Subdivision Properties, which have been determined to not require a Required Subdivision or for which a Required Subdivision has been obtained.  Purchaser shall pay for all costs incurred to complete all Required Subdivisions.  Sellers shall cooperate in good faith with Purchaser in connection with the completion with all Required Subdivisions, including executing all required applications or other similar documents with Governmental Authorities.  To the extent that any Required Subdivision for a Subdivision Property is not completed prior to Closing, then at Closing, Sellers shall lease to Purchaser only that portion of such Subdivision Property that constitutes Owned Real Property pursuant to ~~a mutually acceptable lease (the "Subdivision Master Lease"), which is consistent with the terms contained in the Subdivision Master Lease Term Sheet~~the Master Lease Agreement (Subdivision Properties) substantially in the form attached hereto as **Exhibit L** (the "Subdivision Master Lease ~~Term Sheet~~").  Upon completion of a Required Subdivision affecting an Owned Real Property that is subject to the Subdivision Master Lease, the Subdivision Master Lease shall be terminated as to such Owned Real Property and such Owned Real Property shall be conveyed to Purchaser by Quitclaim Deed for One Dollar ($1.00) in stated consideration.

(b)   Sellers and Purchaser acknowledge that the Saginaw Nodular Iron facility in Saginaw, Michigan (the "Saginaw Nodular Iron Land") contains a wastewater treatment facility (the "Existing Saginaw Wastewater Facility") and a landfill (the "Saginaw Landfill") that currently ~~services~~serve the ~~adjacent~~ Owned Real Property commonly known as the GMPT - Saginaw Metal Casting facility (the "Saginaw Metal Casting Land").  ~~In the event that Purchaser designates the~~The Saginaw Nodular Iron Land has been designated as an Excluded Real Property~~, between the date of this Agreement and the Closing, Purchaser shall investigate and inform Sellers as to whether Purchaser intends to construct a new wastewater treatment facility on the Saginaw Metal Casting Land. In the event that Purchaser informs Sellers of its intent to build a new wastewater treatment facility, then at Closing Sellers shall use reasonable best efforts to enter into a service agreement~~ under Section 2.2(b)(v) of the Sellers' Disclosure Schedule.  At the Closing (or within sixty (60) days after the Closing with respect to the Saginaw Landfill), Sellers shall enter into one or more service agreements with ~~a~~one or more third party ~~contractor (~~contractors (collectively, the "Saginaw Service ~~Contract~~Contracts") to operate the Existing Saginaw Wastewater Facility and the

Saginaw Landfill for the benefit of the Saginaw Metal Casting Land until such time as the new wastewater treatment facility is completed. The terms and conditions of the Saginaw Service ContractContracts shall be on terms mutually acceptable to Sellers and Purchaser, and Sellers; provided that the term of each Saginaw Service Contract shall not extend beyond December 31, 2012. 2012, and Purchaser shall have the right to terminate any Saginaw Service Contract upon prior written notice of not less than forty-five (45) days. At any time during the term of the Saginaw Service Contracts, Purchaser may elect to purchase the Existing Saginaw Wastewater Facility, the Saginaw Landfill, or both, for One Dollar ($1.00) in stated consideration; provided that (i) Purchaser shall pay all costs and fees under the Saginaw Service Contract. In the event that Purchaser elects not to build a new wastewater treatment facility, then upon completion ofrelated to such purchase, including the costs of completing any Required Subdivision necessary to effectuate the terms of this 0Section 6.27(b), (ii) Sellers shall (i) convey title to the Existing Saginaw Wastewater Facility, the Saginaw Landfill and/or such other portion of the Saginaw Nodular Iron Land as is required by Purchaser to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill, including lagoons, but not any other portion of the Saginaw Nodular Iron Land, to Purchaser by quitclaim deed and (iiiii) Sellers shall grant Purchaser such easements for utilities over the portion of the Saginaw Nodular Iron Land retained by Sellers as may be required to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill.

(c)     Sellers and Purchaser acknowledge that access to certain Excluded Real Property owned by Sellers or other real properties owned by Excluded Entities and certain Owned Real Property that may hereafter be designated as Excluded Real Property on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (a "Landlocked Parcel") is provided over land that is part of the Owned Real Property.   To the extent that direct access to a public right-of-way is not obtained for any Landlocked Parcel by the Closing, then at Closing,  Purchaser, in its sole election, shall for each such Landlocked Parcel either (i) grant an access easement over a mutually agreeable portion of the adjacent Owned Real Property for the benefit of the Landlocked Parcel until such time as the Landlocked Parcel obtains direct access to the public right-of-way, pursuant to the terms of a mutually acceptable easement agreement, or (ii) convey to the owner of the affected Landlocked Parcel by quitclaim deed such portion of the adjacent Owned Real Property as is required to provide the Landlocked Parcel with direct access to a public right-of-way.

(d)     At and after Closing, Sellers and Purchasers shall cooperate in good faith to investigate and resolve all issues reasonably related to or arising in connection with Shared Executory Contracts that involve the provision of water, water treatment, electricity, fuel, gas, telephone and other utilities to both Owned Real Property and Excluded Real Property.

(e)     Parent shall use reasonable best efforts to cause the Willow Run Landlord to execute, within thirty (30) days after the Closing, or at such later date as may be mutually agreed upon, an amendment to the Willow Run Lease which extends the term of the Willow Run Lease until December 31, 2010 with three (3) one-month options to extend, all at the current rental rate under the Willow Run Lease (the "Willow Run Lease

Amendment"). In the event that the Willow Run Lease Amendment is approved and executed by the Willow Run Landlord, then Purchaser shall designate the Willow Run Lease as an Assumable Executory Contract and Parent and Purchaser, or one of its designated Subsidiaries, shall enter into an assignment and assumption of the Willow Run Lease substantially in the form attached hereto as **Exhibit M** (the "Assignment and Assumption of Willow Run Lease").

Section 6.28 *Equity Incentive Plans*. Within a reasonable period of time following the Closing, Purchaser, through its board of directors, will adopt equity incentive plans to be maintained by Purchaser for the benefit of officers, directors, and employees of Purchaser that will provide the opportunity for equity incentive benefits for such persons ("Equity Incentive Plans").

Section 6.29 *Purchase of Personal Property Subject to Executory Contracts.* With respect to any Personal Property subject to an Executory Contract that is nominally an unexpired lease of Personal Property, if (a) such Contract is recharacterized by a Final Order of the Bankruptcy Court as a secured financing or (b) Purchaser, Sellers and the counterparty to such Contract agree, then Purchaser shall have the option to purchase such personal property by paying to the applicable Seller for the benefit of the counterparty to such Contract an amount equal to the amount, as applicable (i) of such counterparty's allowed secured Claim arising in connection with the recharacterization of such Contract as determined by such Order or (ii) agreed to by Purchaser, Sellers and such counterparty.

Section 6.30 *Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets; Ren Cen Lease.* Notwithstanding anything to the contrary set forth in this Agreement, in lieu of or in addition to the transfer of Sellers' Equity Interest in Riverfront Holdings, Inc., a Delaware corporation ("RHI"), Purchaser shall have the right at the Closing or at any time during the RHI Post-Closing Period, to require Sellers to cause RHI to transfer good and marketable title to, or a valid and enforceable right by Contract to use, all or any portion of the assets of RHI to Purchaser. Purchaser shall, at its option, have the right to cause Sellers to postpone the transfer of Sellers' Equity Interest in RHI and/or title to the assets of RHI to Purchaser up until the earlier of (i) January 31, 2010 and (ii) the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization (the "RHI Post-Closing Period"); provided, however, that (a) Purchaser may cause Sellers to effectuate said transfers at any time and from time to time during the RHI-Post Closing Period upon at least five (5) Business Days' prior written notice to Sellers and (b) at the closing, RHI, as landlord, and Purchaser, or one of its designated Subsidiaries, as tenant, shall enter into a lease agreement substantially in the form attached hereto as **Exhibit N** (the "Ren Cen Lease") for the premises described therein.

Section 6.31 *Delphi Agreements.* Notwithstanding anything to the contrary in this Agreement, including **Section 6.6**:

(a) Subject to and simultaneously with the consummation of the transactions contemplated by the MDA or of an Acceptable Alternative Transaction (in each case, as defined in the Delphi Motion), (i) the Delphi Transaction Agreements shall, effective immediately upon and simultaneously with such consummation, (A) be deemed to be

Assumable Executory Contracts and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the date of such consummation.

(b)        The LSA Agreement shall, effective at the Closing, (i) be deemed to be an Assumable Executory Contract and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the Closing Date. To the extent that any such agreement is not an Executory Contract, such agreement shall be deemed to be a Purchased Contract.

Section 6.32    *GM Strasbourg S.A. Restructuring.*    The Parties acknowledge and agree that General Motors International Holdings, Inc., a direct Subsidiary of Parent and the direct parent of GM Strasbourg S.A., may, prior to the Closing, dividend its Equity Interest in GM Strasbourg S.A. to Parent, such that following such dividend, GM Strasbourg S.A. will become a wholly-owned direct Subsidiary of Parent. Notwithstanding anything to the contrary in this Agreement, the Parties further acknowledge and agree that following the consummation of such restructuring at any time prior to the Closing, GM Strasbourg S.A. shall automatically, without further action by the Parties, be designated as an Excluded Entity and deemed to be set forth on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule.

Section 6.33    *Holding Company Reorganization.*    The Parties agree that Purchaser may, with the prior written consent of Sellers, reorganize prior to the Closing such that Purchaser may become a direct or indirect, wholly-owned Subsidiary of Holding Company on such terms and in such manner as is reasonably acceptable to Sellers, and Purchaser may assign all or a portion of its rights and obligations under this Agreement to Holding Company (or one or more newly formed, direct or indirect, wholly-owned Subsidiaries of Holding Company) in accordance with **Section 9.5**. In connection with any restructuring effected pursuant to this **Section 6.33**, the Parties further agree that, notwithstanding anything to the contrary in this Agreement (a) Parent shall receive securities of Holding Company with the same rights and privileges, and in the same proportions, as the Parent Shares and the Parent Warrants, in each case, in lieu of the Parent Shares and Parent Warrants, as Purchase Price hereunder, (b) Canada, New VEBA and Sponsor shall receive securities of Holding Company with the same rights and privileges, and in the same proportions, as the Canada Shares, VEBA Shares, VEBA Warrant and Sponsor Shares, as applicable, in each case, in connection with the Closing and (c) New VEBA shall receive the VEBA Note issued by the same entity that becomes the obligor on the Purchaser Assumed Debt.

Section 6.34    *Transfer of Promark Global Advisors Limited and Promark Investment Trustees Limited Equity Interests.*    Notwithstanding anything to the contrary set forth in this Agreement, in the event approval by the Financial Services Authority (the "FSA Approval") of the transfer of Sellers' Equity Interests in Promark Global Advisors Limited and Promark Investments Trustees Limited (together, the "Promark UK Subsidiaries") has not been obtained as of the Closing Date, Sellers shall, at their option, have the right to postpone the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries until such time as the FSA Approval is obtained. If the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries is postponed pursuant to this **Section 6.34**, then (a) Sellers and Purchaser shall effectuate the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries no later than five (5)

Business Days following the date that the FSA Approval is obtained and (b) Sellers shall enter into a transitional services agreement with Promark Global Advisors, Inc. in the form provided by Promark Global Advisors, Inc., which shall include terms and provisions regarding: (i) certain transitional services to be provided by Promark Global Advisors, Inc. to the Promark UK Subsidiaries, (ii) the continued availability of director and officer liability insurance for directors and officers of the Promark UK Subsidiaries and (iii) certain actions on the part of the Promark UK Subsidiaries to require the prior written consent of Promark Global Advisors, Inc., including changes to employee benefits or compensation, declaration of dividends, material financial transactions, disposition of material assets, entry into material agreements, changes to existing business plans, changes in management and the boards of directors of the Promark UK Subsidiaries and other similar actions.

*Section 6.35    Transfer of Equity Interests in Certain Subsidiaries.*  Notwithstanding anything to the contrary set forth in this Agreement, the Parties may mutually agree to postpone the transfer of Sellers' Equity Interests in those Transferred Entities as are mutually agreed upon by the Parties ("Delayed Closing Entities") to a date following the Closing.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

*Section 7.1    Conditions to Obligations of Purchaser and Sellers.*  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver (to the extent permitted by applicable Law), prior to or at the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Approval Order and the Sale Procedures Order on terms acceptable to the Parties and reasonably acceptable to the UAW, and each shall be a Final Order and shall not have been vacated, stayed or reversed; provided, however, that the conditions contained in this **Section 7.1(a)** shall be satisfied notwithstanding the pendency of an appeal if the effectiveness of the Sale Approval Order has not been stayed.

(b)    No Order or Law of a United States Governmental Authority shall be in effect that declares this Agreement invalid or unenforceable or that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(c)    Sponsor shall have delivered, or caused to be delivered to Sellers and Purchaser an equity registration rights agreement, substantially in the form attached hereto as **Exhibit ~~M~~O** (the "Equity Registration Rights Agreement"), duly executed by Sponsor.

(d)    Canada shall have delivered, or caused to be delivered to Sellers and Purchaser the Equity Registration Rights Agreement, duly executed by Canada.

(e)    The Canadian Debt Contribution shall have been consummated.

(f)     The New VEBA shall have delivered, or caused to be delivered to Sellers and Purchaser, the Equity Registration Rights Agreement, duly executed by the New VEBA.

(g)     Purchaser shall have received (i) consents from Governmental Authorities, (ii) Permits and (iii) consents from non-Governmental Authorities, in each case with respect to the transactions contemplated by this Agreement and the ownership and operation of the Purchased Assets and Assumed Liabilities by Purchaser from and after the Closing, sufficient in the aggregate to permit Purchaser to own and operate the Purchased Assets and Assumed Liabilities from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing (after giving effect to (A) the implementation of the Viability Plans; (B) Parent's announced shutdown, which began in May 2009; and (C) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent).

(h)     Sellers shall have executed and delivered definitive financing agreements restructuring the Wind Down Facility in accordance with the provisions of **Section 6.9(b)**.

*Section 7.2     Conditions to Obligations of Purchaser.*  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Purchaser waive the conditions contained in **Section 7.2(d)** or **Section 7.2(e)**:

(a)     Each of the representations and warranties of Sellers contained in **ARTICLE IV** of this Agreement shall be true and correct (disregarding for the purposes of such determination any qualification as to materiality or Material Adverse Effect) as of the Closing Date as if made on the Closing Date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect.

(b)     Sellers shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by Sellers prior to or at the Closing.

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser:

(i)     a certificate executed as of the Closing Date by a duly authorized representative of Sellers, on behalf of Sellers and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.2(a)** and **Section 7.2(b)** have been satisfied;

(ii)     the Equity Registration Rights Agreement, duly executed by Parent;

(iii)     stock certificates or membership interest certificates, if any, evidencing the Transferred Equity Interests (other than in respect of the Equity Interests held by Sellers in RHI, Promark Global Advisors Limited, Promark Investments Trustees Limited and the Delayed Closing Entities, which the Parties agree may be transferred following the Closing in accordance with **Section 6.30**, **Section 6.34** and **Section 6.35**), duly endorsed in blank or accompanied by stock powers (or similar documentation) duly endorsed in blank, in proper form for transfer to Purchaser, including any required stamps affixed thereto;

(iv)     an omnibus bill of sale, substantially in the form attached hereto as **Exhibit ~~O~~P** (the "Bill of Sale"), together with transfer tax declarations and all other instruments of conveyance that are necessary to effect transfer to Purchaser of title to the Purchased Assets, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(v)     an omnibus assignment and assumption agreement, substantially in the form attached hereto as **Exhibit ~~P~~Q** (the "Assignment and Assumption Agreement"), together with all other instruments of assignment and assumption that are necessary to transfer the Purchased Contracts and Assumed Liabilities to Purchaser, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(vi)     a novation agreement, substantially in the form attached hereto as **Exhibit ~~Q~~R** (the "Novation Agreement"), duly executed by Sellers and the appropriate United States Governmental Authorities;

(vii)     a government related subcontract agreement, substantially in the form attached hereto as **Exhibit ~~R~~S** (the "Government Related Subcontract Agreement"), duly executed by Sellers;

(viii)     an omnibus intellectual property assignment agreement, substantially in the form attached hereto as **Exhibit ~~S~~T** (the "Intellectual Property Assignment Agreement"), duly executed by Sellers;

(ix)     a transition services agreement, substantially in the form attached hereto as **Exhibit ~~T~~U** (the "Transition Services Agreement"), duly executed by Sellers;

(x)     all quitclaim deeds or deeds without warranty (or equivalents for those parcels of Owned Real Property located in jurisdictions outside of the United States), in customary form, subject only to Permitted Encumbrances, conveying the Owned Real Property to Purchaser (the "Quitclaim Deeds"), duly executed by the appropriate Seller;

(xi)    all required Transfer Tax or sales disclosure forms relating to the Transferred Real Property (the "Transfer Tax Forms"), duly executed by the appropriate Seller;

(xii)    an assignment and assumption of the leases and subleases underlying the Leased Real Property, in substantially the form attached hereto as **Exhibit ~~U~~V** (the "Assignment and Assumption of Real Property Leases"), together with such other instruments of assignment and assumption that are necessary to transfer the leases and subleases underlying the Leased Real Property located in jurisdictions outside of the United States, each duly executed by Sellers; provided, however, that if it is required for the assumption and assignment of any lease or sublease underlying a Leased Real Property that a separate assignment and assumption for such lease or sublease be executed, then a separate assignment and assumption of such lease or sublease shall be executed in a form substantially similar to **Exhibit ~~U~~V** or as otherwise required to assume or assign such Leased Real Property;

(xiii)    an assignment and assumption of the lease in respect of the premises located at 2485 Second Avenue, New York, New York, substantially in the form attached hereto as **Exhibit W** (the "Assignment and Assumption of Harlem Lease"), duly executed by Harlem;

(xiv)    ~~(xiii)~~ an omnibus lease agreement in respect of the lease of certain portions of the Excluded Real Property that is owned real property, substantially in the form attached hereto as **Exhibit ~~V~~X** (the "Master Lease Agreement"), duly executed by Parent;

~~(xiv)in the event the premises located at 6200 Grand Pointe Drive, Grand Blanc, Michigan is designated by Purchaser as an Excluded Real Property, a lease agreement for premises located in Grand Blanc, Michigan,~~ substantially in the form attached hereto as **Exhibit W** ~~(the "SPO Lease"), duly executed by Parent;~~

(xv)    *[Reserved]*;

(xvi)    ~~(xv)~~ the Saginaw Service ~~Contract~~Contracts, if required, duly executed by the appropriate Seller;

(xvii)    ~~(xvi)~~ any easement agreements required under **Section 6.27(c)**, duly executed by the appropriate Seller;

(xviii)    ~~(xvii)~~ the Subdivision Master Lease, if required, duly executed by the appropriate Sellers;

(xix)    ~~(xviii)~~ a certificate of an officer of each Seller (A) certifying that attached to such certificate are true and complete copies of (1) such Seller's Organizational Documents, each as amended through and in effect on the Closing

Date and (2) resolutions of the board of directors of such Seller, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Seller is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(e)**, and (B) certifying as to the incumbency of the officer(s) of such Seller executing this Agreement and the Ancillary Agreements to which such Seller is a party;

(xx)    ~~(xix)~~ a certificate in compliance with Treas. Reg. §1.1445-2(b)(2) that each Seller is not a foreign person as defined under Section 897 of the Tax Code;

(xxi)    ~~(xx)~~ a certificate of good standing for each Seller from the Secretary of State of the State of Delaware;

(xxii)    ~~(xxi)~~ their written agreement to treat the Relevant Transactions and the other transactions contemplated by this Agreement in accordance with Purchaser's determination in **Section 6.16**;

(xxiii)    ~~(xxii)~~ payoff letters and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements), each in a form reasonably satisfactory to the Parties and duly executed by the holders of the secured Indebtedness; and

(xxiv)    ~~(xxiii)~~ all books and records of Sellers described in **Section 2.2(a)(xiv)**.

(d)    The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by the applicable Sellers and assigned to Purchaser, and shall be in full force and effect.

(e)    The UAW Retiree Settlement Agreement shall have been executed and delivered by the UAW and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

(f)    The Canadian Operations Continuation Agreement shall have been executed and delivered by the parties thereto in the form previously distributed among them.

*Section 7.3    Conditions to Obligations of Sellers.*    The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Sellers waive the conditions contained in **Section 7.3(h)** or **Section 7.3(i)**:

(a)    Each of the representations and warranties of Purchaser contained in **ARTICLE V** of this Agreement shall be true and correct (disregarding for the purpose of such determination any qualification as to materiality or Purchaser Material Adverse Effect) as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Purchaser Material Adverse Effect.

(b)    Purchaser shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers:

(i)    Parent Warrant A (including the related warrant agreement), duly executed by Purchaser;

(ii)    Parent Warrant B (including the related warrant agreement), duly executed by Purchaser;

(iii)    a certificate executed as of the Closing Date by a duly authorized representative of Purchaser, on behalf of Purchaser and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.3(a)** and **Section 7.3(b)** are satisfied;

(iv)    stock certificates evidencing the Parent Shares, duly endorsed in blank or accompanied by stock powers duly endorsed in blank, in proper form for transfer, including any required stamps affixed thereto;

(v)    the Equity Registration Rights Agreement, duly executed by Purchaser;

(vi)    the Bill of Sale, together with all other documents described in **Section 7.2(c)(iv)**, each duly executed by Purchaser or its designated Subsidiaries;

(vii)    the Assignment and Assumption Agreement, together with all other documents described in **Section 7.2(c)(v)**, each duly executed by Purchaser or its designated Subsidiaries;

(viii)    the Novation Agreement, duly executed by Purchaser or its designated Subsidiaries;

(ix)    the Government Related Subcontract Agreement, duly executed by Purchaser or its designated Subsidiary;

(x)      the Intellectual Property Assignment Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xi)      the Transition Services Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xii)      the Transfer Tax Forms, duly executed by Purchaser or its designated Subsidiaries, to the extent required;

(xiii)      the Assignment and Assumption of Real Property Leases, together with all other documents described in **Section 7.2(c)(xii)**, each duly executed by Purchaser or its designated Subsidiaries;

(xiv)      the Assignment and Assumption of Harlem Lease, duly executed by Purchaser or its designated Subsidiaries;

(xv)      (xiv) the Master Lease Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xv) the SPO Lease (if required), duly executed by Purchaser or its designated Subsidiaries;

(xvi)      *[Reserved]*;

(xvii)      (xvi) the Subdivision Master Lease, if required, duly executed by Purchaser or its designated Subsidiaries;

(xviii)      (xvii) any easement agreements required under **Section 6.27(c)**, duly executed by Purchaser or its designated Subsidiaries;

(xix)      (xviii) a certificate of a duly authorized representative of Purchaser (A) certifying that attached to such certificate are true and complete copies of (1) Purchaser's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of Purchaser, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which Purchaser is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(eg)**, and (B) certifying as to the incumbency of the officer(s) of Purchaser executing this Agreement and the Ancillary Agreements to which Purchaser is a party; and

(xx)      (xix) a certificate of good standing for Purchaser from the Secretary of State of the State of Delaware.

(d)      Purchaser shall have converted to a Delaware corporation and shall have filed an amended and restated certificate of incorporation and shall have adopted amended and restated bylaws.*[Reserved]*

(e)    Purchaser shall have filed a certificate of designation for the Preferred Stock, substantially in the form attached hereto as **Exhibit X̶Y**, with the Secretary of State of the State of Delaware.

(f)    Purchaser shall have offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (iii) transferred to Sellers the UST Warrant and (iv) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(g)    Purchaser shall have delivered, or caused to be delivered, to Canada, Sponsor and/or the New VEBA, as applicable:

(i)    certificates representing the Canada Shares, the Sponsor Shares and the VEBA Shares in accordance with the applicable equity subscription agreements in effect on the date hereof;

(ii)    the Equity Registration Rights Agreement, duly executed by Purchaser;

(iii)    the VEBA Warrant (including the related warrant agreement), duly executed by Purchaser; and

(iv)    a note, in form and substance consistent with the terms set forth on **Exhibit Y̶Z** attached hereto, to the New VEBA (the "VEBA Note").

(h)    The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by Purchaser, and shall be in full force and effect.

(i)    The UAW Retiree Settlement Agreement shall have been executed and delivered, shall be in full force and effect, and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

## ARTICLE VIII
## TERMINATION

*Section 8.1    Termination.*  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing Date as follows:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by either Sellers or Purchaser, if (i) the Closing shall not have occurred on or before August 15, 2009, or such later date as the Parties may agree in writing, such date not to be later than September 15, 2009 (as extended, the "End Date"), and (ii) the Party seeking to terminate this Agreement pursuant to this **Section 8.1(b)** shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure of the transactions contemplated hereby to close on or before such date;

(c)    by either Sellers or Purchaser, if the Bankruptcy Court shall not have entered the Sale Approval Order by July 10, 2009;

(d)    by either Sellers or Purchaser, if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a Final Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the sale of a material portion of the Purchased Assets;

(e)    by Sellers, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform has not been cured by the End Date, provided that (i) Sellers shall have given Purchaser written notice, delivered at least thirty (30) days prior to such termination, stating Sellers' intention to terminate this Agreement pursuant to this **Section 8.1(e)** and the basis for such termination and (ii) Sellers shall not have the right to terminate this Agreement pursuant to this **Section 8.1(e)** if Sellers are then in material breach of any its representations, warranties, covenants or other agreements set forth herein;

(f)    by Purchaser, if Sellers shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would (if it occurred or was continuing as of the Closing Date) give rise to the failure of a condition set forth in **Section 7.2(a)** or **Section 7.2(b)** to be fulfilled, (ii) cannot be cured by the End Date, provided that (i) Purchaser shall have given Sellers written notice, delivered at least thirty (30) days prior to such termination, stating Purchaser's intention to terminate this Agreement pursuant to this **Section 8.1(f)** and the basis for such termination and (iii) Purchaser shall not have the right to terminate this Agreement pursuant to this **Section 8.1(f)** if Purchaser is then in material breach of any its representations, warranties, covenants or other agreements set forth herein; or

(g)    by either Sellers or Purchaser, if the Bankruptcy Court shall have entered an Order approving an Alternative Transaction; or.

(h)    by Purchaser, if Sellers do not file the Bankruptcy Cases and the Sale Procedures and Sale Motion on or before June 3, 2009.

*Section 8.2        Procedure and Effect of Termination.*

(a)        If this Agreement is terminated pursuant to **Section 8.1**, this Agreement shall become null and void and have no effect, and all obligations of the Parties hereunder shall terminate, except for those obligations of the Parties set forth this **Section 8.2** and **ARTICLE IX**, which shall remain in full force and effect; provided that nothing herein shall relieve any Party from Liability for any material breach of any of its representations, warranties, covenants or other agreements set forth herein.  If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement shall, to the extent practicable, be withdrawn from the agency or other Person to which they were made.

(b)        If this Agreement is terminated by Sellers or Purchaser pursuant to **Section 8.1(a)** through **Section 8.1(d)** or **Section 8.1(g)** or by Purchaser pursuant to **Section 8.1(f)**, Sellers, severally and not jointly, shall reimburse Purchaser for its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Purchaser in connection with this Agreement and the transactions contemplated hereby (the "Purchaser Expense Reimbursement").  The Purchaser Expense Reimbursement shall be paid as an administrative expense Claim of Sellers pursuant to Section 503(b)(1) of the Bankruptcy Code.

(c)        Except as expressly provided for in this **Section 8.2**, any termination of this Agreement pursuant to **Section 8.1** shall be without Liability to Purchaser or Sellers, including any Liability by Sellers to Purchaser for any break-up fee, termination fee, expense reimbursement or other compensation as a result of a termination of this Agreement.

(d)        If this Agreement is terminated for any reason, Purchaser shall, and shall cause each of its Affiliates and Representatives to, treat and hold as confidential all Confidential Information, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it was furnished.  For purposes of this **Section 8.2(d)**, Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Purchaser, any of its Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed.

**ARTICLE IX**
**MISCELLANEOUS**

*Section 9.1        Survival of Representations, Warranties, Covenants and Agreements and Consequences of Certain Breaches.* (a)        ~~Except as set forth in **Section 9.1(b)**, the~~ The representations and warranties of the Parties contained in this Agreement shall be extinguished by and shall not survive the Closing, and no Claims may be asserted in respect of, and no Party shall have any Liability for any breach of, the representations and warranties.  All

covenants and agreements contained in this Agreement, including those covenants and agreements set forth in **ARTICLE II** and **ARTICLE VI**, shall survive the Closing indefinitely.

(b)    The representations and warranties contained in **Section 4.1, Section 4.2, Section 4.4, Section 4.7(a), Section 4.22, Section 5.1, Section 5.2, Section 5.4, Section 5.5** and **Section 5.9** (the "Surviving Representations and Warranties") shall survive until the third anniversary of the Closing and Purchaser, on the one hand, and any Seller, on the other hand, shall be entitled to make a Claim for Damages against the other Party with respect to the Surviving Representations and Warranties, subject to such survival period.

*Section 9.2    Notices.*    Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

|  |  |
|---|---|
| If to any Seller: | General Motors Corporation |
|  | 300 Renaissance Center |
|  | Tower 300, 25th Floor, Room D55 |
|  | M/C 482-C25-D81 |
|  | Detroit, Michigan 48265-3000 |
|  | Attn: General Counsel |
|  | Tel.: 313-667-3450 |
|  | Facsimile: 248-267-4584 |
|  |  |
| With copies to: | Jenner & Block LLP |
|  | 330 North Wabash Avenue |
|  | Chicago, Illinois 60611-7603 |
|  | Attn:  Joseph P. Gromacki |
|  | Michael T. Wolf |
|  | Tel.:  312-222-9350 |
|  | Facsimile:  312-527-0484 |
|  |  |
|  | and |
|  |  |
|  | Weil Gotshal & Manges LLP |
|  | 767 Fifth Avenue |
|  | New York, New York 10153 |
|  | Attn: Harvey R. Miller |
|  | Stephen Karotkin |
|  | Raymond Gietz |

Tel.: 212-310-8000
Facsimile: 212-310-8007

If to Purchaser:    ~~Vehicle Acquisition Holdings LLC~~NGMCO, Inc.
c/o The United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington D.C. 20220
Attn: Chief Counsel Office of Financial Stability
Facsimile: 202-927-9225

With a copy to:    Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn:    John J. Rapisardi
R. Ronald Hopkinson
Tel.:  212-504-6000
Facsimile:  212-504-6666

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 9.2**, then to the last addressee as so designated.

Section 9.3    *Fees and Expenses; No Right of Setoff.*  Except as otherwise provided in this Agreement, including **Section 8.2(b)**, Purchaser, on the one hand, and each Seller, on the other hand, shall bear its own fees, costs and expenses, including fees and disbursements of counsel, financial advisors, investment bankers, accountants and other agents and representatives, incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.   In furtherance of the foregoing, Purchaser shall be solely responsible for (a) all expenses incurred by it in connection with its due diligence review of Sellers and their respective businesses, including surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, Uniform Commercial Code lien and other searches and (b) any cost (including any filing fees) incurred by it in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.  No Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement, any Ancillary Agreement or any other commercial arrangement entered into in between or among such Parties and/or their respective Affiliates.

Section 9.4    *Bulk Sales Laws.*  Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

Section 9.5    *Assignment.*  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any

such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of Sellers, Purchaser may (i) assign or (ii) direct the transfer on its behalf on or prior to the Closing of all, or any portion, of its right to rights to purchase, accept and acquire the Purchased Assets, and its obligation obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, under this Agreement to Holding Company or one or more Affiliates of newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser; provided, further, that no such assignment or delegation shall relieve Purchaser of any of its obligations under this Agreement.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 9.6    Amendment.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

Section 9.7    Waiver.    At any time prior to the Closing, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; or (c) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law).  Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

Section 9.8    Severability.    Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 9.9    Counterparts; Facsimiles.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by

facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

Section 9.10    *Headings.*    The descriptive headings of the Articles, Sections and paragraphs of, and Schedules and Exhibits to, this Agreement, and the table of contents, table of Exhibits and table of Schedules contained in this Agreement, are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 9.11    *Parties in Interest.*    This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successors and assigns; provided, that (a) for all purposes each of Sponsor, the New VEBA, and Canada shall be express third-party beneficiaries of this Agreement and (b) for purposes of **Section 2.2(a)(x)** and **(xvi)**, **Section 2.2(b)(vii)**, **Section 2.3(a)(x)**, **(xii)**, **(xiii)** and **(~~xiv~~xv)**, **Section 2.3(b)(xv)**, **Section 4.6(b)**, **Section 4.10**, **Section 5.4(c)**, **Section 6.2(b)(x)**, **(xv)** and **(xvii)**, **Section 6.4(a)**, **Section 6.4(b)**, **Section 6.6(a)**, **(~~e~~d)**, **(~~e~~f)** and **(~~f~~g)**, **Section 6.11(c)(i)** and **(vi)**, **Section 6.17**, **Section 7.1(a)** and **(f)**, **Section 7.2(d)** and **(e)** and **Section 7.3(g)**, **(h)** and **(i)**, the UAW shall be an express third-party beneficiary of this Agreement. Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.12    *Governing Law.*    The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

Section 9.13    *Venue and Retention of Jurisdiction.*    Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); provided, however, that this **Section 9.13** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

*Section 9.14    Waiver of Jury Trial.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

*Section 9.15    Risk of Loss.*  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Purchased Assets shall be borne exclusively by Sellers.

*Section 9.16    Enforcement of Agreement.*  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each Party agrees that it will not oppose the granting of such relief on the basis that the requesting Party has an adequate remedy at law.

*Section 9.17    Entire Agreement.*  This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

*Section 9.18    Publicity.*  Prior to the first public announcement of this Agreement and the transactions contemplated hereby, Sellers, on the one hand, and Purchaser, on the other hand, shall consult with each other regarding, and share with each other copies of, their respective communications plans, including draft press releases and related materials, with regard to such announcement.    Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party or Parties, as applicable, which approval shall not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the Party intending to make such release, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers list securities; <u>provided</u>, that the Party intending to make such release shall use reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party or Parties, as applicable, with respect to the text thereof; <u>provided</u>, further, that, notwithstanding anything to the contrary contained in this section, no Party shall be prohibited from publishing, disseminating or otherwise making public, without the prior written

approval of the other Party or Parties, as applicable, any materials that are derived from or consistent with the materials included in the communications plan referred to above. In an effort to coordinate consistent communications, the Parties shall agree upon procedures relating to all press releases and public announcements concerning this Agreement and the transactions contemplated hereby.

Section 9.19    *No Successor or Transferee Liability.*  Except where expressly prohibited under applicable Law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, neither Purchaser nor any of its Affiliates or stockholders shall be deemed to (a) be the successor of Sellers; (b) have, de facto, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) other than as set forth in this Agreement, be liable for any acts or omissions of Sellers in the conduct of Sellers' business or arising under or related to the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, neither Purchaser nor any of its Affiliates or stockholders shall be liable for any Claims against Sellers or any of their predecessors or Affiliates, and neither Purchaser nor any of its Affiliates or stockholders shall have any successor, transferee or vicarious Liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Sellers' business or any obligations of Sellers arising prior to the Closing, except as provided in this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Sellers' business prior to the Closing.

Section 9.20    *Time Periods.*  Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days or any other time period specified herein shall be taken within the applicable number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

Section 9.21    *Sellers' Disclosure Schedule.*  The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Sellers' Disclosure Schedule.  Inclusion of information in the Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party.  The specific disclosures set forth in the Sellers' Disclosure Schedule have been organized to correspond to Section references in this Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in the Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of this Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

Section 9.22    *No Binding Effect.*  Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall (i) be binding on or create any obligation on the part of Sponsor, the United States Government or any branch, agency or political subdivision thereof (a "Sponsor Affiliate") or the Government of Canada, or any crown corporation, agency or department thereof (a "Canada Affiliate") or (ii) require Purchaser to initiate any Claim or

other action against Sponsor or any Sponsor Affiliate or otherwise attempt to cause Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate to comply with or abide by the terms of this Agreement.  No facts, materials or other information received or action taken by any Person who is an officer, director or agent of Purchaser by virtue of such Person's affiliation with or employment by Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate shall be attributed to Purchaser for purposes of this Agreement or shall form the basis of any claim against such Person in their individual capacity.

[Remainder of the page left intentionally blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION


By: _____

     Name:  Frederick A. Henderson
     Title:   President and Chief Executive
           Officer


SATURN LLC


By: _____

     Name:  Jill Lajdziak
     Title:   President


SATURN DISTRIBUTION CORPORATION


By: _____

     Name:  Jill Lajdziak
     Title:   President


CHEVROLET-SATURN OF HARLEM, INC.


~~By:~~ By: _____

     _____
     Name:  Michael Garrick
     Title:   President

VEHICLE ACQUISITION HOLDINGS LLC
BY: THE UNITED STATES DEPARTMENT OF
THE TREASURY, ITS SOLE MEMBER

NGMCO, INC.


By: By: _____

_____

Name: Duane Morse Sadiq A. Malik
Title:   Chief Risk Vice President and
Compliance Officer Treasurer

Document comparison by Workshare Professional on Friday, June 26, 2009 11:40:04 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://CHICAGO/1766936/1 |
| Description | CHICAGO-#1766936-v1-Gum_-_Amended_and_Restated_Master_Sale_and_Purchase_Agreement |
| Document 2 ID | PowerDocs://CHICAGO/1766936/9 |
| Description | CHICAGO-#1766936-v9-Gum_-_Amended_and_Restated_Master_Sale_and_Purchase_Agreement |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 410 |
| Deletions | 323 |
| Moved from | 12 |
| Moved to | 12 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 757 |

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit A**

Form of Parent Warrant A

**EXHIBIT A**

## FORM OF PARENT WARRANT A

**WARRANT AGREEMENT**

**dated as of *[_____]*, 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[●]**
**as Warrant Agent**

## ARTICLE 1
## DEFINITIONS

Section 1.01.        Certain Definitions ............................................................................... 1

## ARTICLE 2
## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.        Issuance of Warrants ............................................................ 9

Section 2.02.        Execution and Authentication of Warrants .......................................... 9

Section 2.03.        Form of Warrant Certificates ............................................... 9

Section 2.04.        Transfer Restrictions and Legends .................................... 10

Section 2.05.        Transfer, Exchange and Substitution ................................. 11

Section 2.06.        Global Warrants ................................................................ 12

Section 2.07.        Surrender of Warrant Certificates ..................................... 14

## ARTICLE 3
## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.        Exercise of Warrants ......................................................... 14

Section 3.02.        Procedure for Exercise ...................................................... 14

Section 3.03.        Settlement of Warrants ..................................................... 14

Section 3.04.        Delivery of Common Stock ............................................... 15

Section 3.05.        No Fractional Shares to Be Issued ................................... 16

Section 3.06.        Acquisition of Warrants by Company .............................. 16

Section 3.07.        Direction of Warrant Agent .............................................. 16

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## ADJUSTMENTS

Section 5.01.        Adjustments to Exercise Price .......................................... 17

Section 5.02.        Adjustments to Number of Warrants ................................ 21

Section 5.03.        Certain Distributions of Rights and Warrants; Shareholder
                     Rights Plan ........................................................................ 21

Section 5.04.        No Impairment ................................................................... 22

Section 5.05.        Other Adjustments if Net Share Settlement Applies ........................ 23

Section 5.06.    Discretionary Adjustments ................................................. 23

Section 5.07.    Restrictions on Adjustments .............................................. 23

Section 5.08.    Deferral of Adjustments ................................................... 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes ................. 24

Section 5.10.    Consolidation, Merger and Sale of Assets ......................... 29

Section 5.11.    Common Stock Outstanding ................................................ 29

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 30

Section 5.13.    Calculations Final ........................................................... 30

Section 5.14.    Notice of Adjustments ...................................................... 30

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity ........... 31

Section 5.16.    Statements on Warrants ..................................................... 31

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ................................................. 31

Section 6.02.    Mutilated or Missing Warrant Certificates ......................... 32

Section 6.03.    Modification, Waiver and Meetings ................................... 32

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes .................................................. 33

Section 7.02.    Change of Warrant Agent .................................................. 33

Section 7.03.    Compensation; Further Assurances ................................... 35

Section 7.04.    Reliance on Counsel ........................................................ 35

Section 7.05.    Proof of Actions Taken .................................................... 35

Section 7.06.    Correctness of Statements ................................................ 35

Section 7.07.    Validity of Agreement ...................................................... 36

Section 7.08.    Use of Agents ................................................................ 36

Section 7.09.    Liability of Warrant Agent ................................................ 36

Section 7.10.    Legal Proceedings .......................................................... 36

Section 7.11.    Other Transactions in Securities of the Company ............................ 36

Section 7.12.    Actions as Agent ............................................................ 36

Section 7.13.    Appointment and Acceptance of Agency ......................... 37

Section 7.14.    Successors and Assigns .................................................... 37

1766891

Section 7.15.     Notices ............................................................................................. 37

Section 7.16.     Applicable Law .................................................................................. 38

Section 7.17.     Benefit of this Warrant Agreement .................................................... 38

Section 7.18.     Registered Warrantholders................................................................. 38

Section 7.19.     Inspection of this Warrant Agreement ............................................... 38

Section 7.20.     Headings ............................................................................................ 38

Section 7.21.     Counterparts ...................................................................................... 39


EXHIBIT A     FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........    A-1

EXHIBIT B     FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C     FORM OF GLOBAL WARRANT LEGEND................................C-1

EXHIBIT D     FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E     FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
              RESTRICTIONS ..........................................................................E-1

EXHIBIT F     FORM OF COMMON STOCK REQUISITION ORDER.............F-1

1766891

# WARRANT AGREEMENT

This Warrant Agreement ("**Warrant Agreement**") dated as of *[_____]*, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and

1

shall be determined by customary investment banking practices using the Black Scholes model.  For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the seven year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant

2

Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Date as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.  Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Distribution Date**" has the meaning set forth in Section 2.04.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $30.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the seven (7) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[   ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

6

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is

7

listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**VEBA Exercise Price**" means the 'Exercise Price' as such term is defined in the VEBA Warrant Agreement.

"**VEBA Warrant Agreement**" means the warrant agreement dated as of [      ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which UAW Retiree Medical Benefits Trust was the 'Initial Warrantholder' as defined therein.

"**VEBA Warrants**" means the warrants issued pursuant to the VEBA Warrant Agreement.

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

8

Section 2.01.  *Issuance of Warrants.*  (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein).  The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)    Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.  *Execution and Authentication of Warrants.*  (a)  Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)    Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.  *Form of Warrant Certificates.*  Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not

9

inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04.    *Transfer Restrictions and Legends.* This Section 2.04 shall not apply to Warrants and/or Common Stock which have been issued, distributed or sold pursuant to an effective registration statement or are otherwise exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code (the date as of which this Section 2.04 does not apply to such Warrants and/or Common Stock, the "**Distribution Date**").

(a)    Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of

10

the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)     Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.   *Transfer, Exchange and Substitution.*   (a)  Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)     A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)     Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form

11

satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied. To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates. No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants. If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.   *Global Warrants.*   (a)  The Warrants shall initially be issued in the form of Certificated Warrants. However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary. Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant

12

Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)     Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)     The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent

13

Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07. *Surrender of Warrant Certificates.* Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

ARTICLE 3

EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01. *Exercise of Warrants.* At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02. *Procedure for Exercise.* (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b) The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03. *Settlement of Warrants.* (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

14

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.    *Delivery of Common Stock.*  (a)  In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.  *No Fractional Shares to Be Issued.*  (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date.  However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.  *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent.*  (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.  In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and

16

settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

## ARTICLE 4

[RESERVED]

## ARTICLE 5

ADJUSTMENTS

Section 5.01. *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or

17

immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$ = the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

$Y$ = the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

18

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.  In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred.  To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.  In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$ =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$ =    the Current Market Price; and

$FMV$ =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property, rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

19

In the event of a reduction of the VEBA Exercise Price under the VEBA Warrant Agreement (other than pursuant to Article 5 of the VEBA Warrant Agreement) below 125% of the Exercise Price as adjusted to such date pursuant to this Article 5, such reduction shall be treated as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of the outstanding VEBA Warrants with a VEBA Exercise Price equal to 125% of the Exercise Price as adjusted to such date pursuant to this Article 5 and (ii) the Black Scholes Warrant Value of the outstanding VEBA Warrants immediately following such reduction in VEBA Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =    the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$    =    the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

20

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be  a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02.  *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.  *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.*  (a)  Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)    are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be

21

deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)     If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)     In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)     in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)     in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)     If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.  If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

22

Section 5.04.  *No Impairment.*  The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05.  *Other Adjustments if Net Share Settlement Applies.*  To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06.  *Discretionary Adjustments.*  The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days.  In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect.  The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07.  *Restrictions on Adjustments.*   (a)  Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b)     Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)     upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

23

(ii)      for a change in the par value of the Common Stock.

(c)      In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)      No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)      No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)      If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.  *Deferral of Adjustments.*  In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.  For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.  *Recapitalizations, Reclassifications and Other Changes*.  (a)  If any of the following events occur:

(i)    any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)    any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").  In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

(i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

25

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.  If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.  Failure to deliver such notice shall not affect the legality or validity of such amendment.

26

(e)    Change of Control Event:

(i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)    calculate the Change of Control Estimated Payment Amount;

(B)    deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "**Redemption**");

(C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "**Change of Control Payment Date**"));

4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

5)    that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)    if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been

27

amended in connection with such Change of Control Event pursuant to Section 5.09);

7)      any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)      the name and address of the Warrant Agent.

(ii)      Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)      On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "**New Warrants**") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)      No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)      Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)      The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the

28

respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)     The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)     The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)     If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10.    *Consolidation, Merger and Sale of Assets.*  (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)     the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)     the Company provides written notice of such assumption to the Warrant Agent.

(b)     In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.    *Common Stock Outstanding.*  For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held,

29

directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)     The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.   The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.  Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)     If, prior to the Distribution Date, the Common Stock has been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on such exchange as of the Distribution Date the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants. If, as of the Distribution Date, the Common Stock has not yet been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange.

Section 5.13. *Calculations Final.* The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14. *Notice of Adjustments.* Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate. The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15. *Warrant Agent Not Responsible for Adjustments or Validity.* The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

### Other Provisions Relating to Rights of Warrantholders

31

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.  All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*  (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)  Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)  However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)  change the Expiration Date;

(ii)  increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

ARTICLE 7

CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*  (a)  The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*    (a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.  *Compensation; Further Assurances.*  The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.  *Reliance on Counsel.*  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.  *Proof of Actions Taken.*  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.  *Correctness of Statements.*  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07. *Validity of Agreement.* The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08. *Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09. *Liability of Warrant Agent.* The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10. *Legal Proceedings.* The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11. *Other Transactions in Securities of the Company.* The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

36

Section 7.12.  *Actions as Agent.*  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.  *Appointment and Acceptance of Agency.*  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.  *Successors and Assigns.*  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15.  *Notices.*  Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> **[NGMCO, Inc.]**
> *[_____]*
> *[_____]*
> Attention:  Treasurer
> Telephone:  *[_____]*
> Facsimile:  *[_____]*
>
> With a copy to:
>
> *[_____]*
> *[_____]*
> *[_____]*
> Attention:  *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention: Treasurer
Telephone: *[_____]*
Facsimile: *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.  *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.  *Benefit of this Warrant Agreement.*  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.  *Registered Warrantholders.*  Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.  *Inspection of this Warrant Agreement.*  A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

38

Section 7.20.  *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.  *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

39

1766891

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____
      Name:
      Title:

[●], as Warrant Agent

By: _____
      Name:
      Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

1766891

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766891

**EXHIBIT C**

## FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

C - 1

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

D - 1

**[NGMCO, Inc.]**

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2016.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
　　　　Name:
　　　　Title:

Attest

By: _____
　　　　Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
　　　　Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

## [NGMCO, Inc.]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.  A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

1766891

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:    [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

> elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

> elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____         _____
                                                      (Registered Warrantholder)



                                          By:  _____
                                               Authorized Signature
                                               Address:
                                               Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

The initial Number of Warrants represented by this Global Warrant is _____. In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|      |      |      |      |      |
|      |      |      |      |      |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date:    _____


_____
Name of Transferee


By:    _____
         Name:
         Title:


(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:  [_____]

[Insert name of transferee]

By:  _____
        Name:
        Title:

E - 1

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention:  Treasurer

Re:      DWAC Issuance
         Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**").  Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

        Number of Shares:         _____

                                  _____ Original Issue or

                                  _____ Transfer from Treasury Account

        Broker Name:              _____

        Broker's DTC Number:      _____

        Contact and Phone:        _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit B**

Form of Parent Warrant B

**EXHIBIT B**

**FORM OF PARENT WARRANT B**

**WARRANT AGREEMENT**

**dated as of [_____], 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[●]**
**as Warrant Agent**

## ARTICLE 1
## DEFINITIONS

Section 1.01.      Certain Definitions ............................................................................... 1

## ARTICLE 2
## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.      Issuance of Warrants ............................................................ 9

Section 2.02.      Execution and Authentication of Warrants ......................... 9

Section 2.03.      Form of Warrant Certificates .............................................. 9

Section 2.04.      Transfer Restrictions and Legends .................................... 10

Section 2.05.      Transfer, Exchange and Substitution ................................ 11

Section 2.06.      Global Warrants ................................................................ 12

Section 2.07.      Surrender of Warrant Certificates .................................... 14

## ARTICLE 3
## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.      Exercise of Warrants ......................................................... 14

Section 3.02.      Procedure for Exercise ..................................................... 14

Section 3.03.      Settlement of Warrants ..................................................... 14

Section 3.04.      Delivery of Common Stock .............................................. 15

Section 3.05.      No Fractional Shares to Be Issued .................................... 16

Section 3.06.      Acquisition of Warrants by Company ............................... 16

Section 3.07.      Direction of Warrant Agent .............................................. 16

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## ADJUSTMENTS

Section 5.01.      Adjustments to Exercise Price .......................................... 17

Section 5.02.      Adjustments to Number of Warrants ................................. 21

Section 5.03.      Certain Distributions of Rights and Warrants; Shareholder
                   Rights Plan ....................................................................... 21

Section 5.04.      No Impairment .................................................................. 22

Section 5.05.      Other Adjustments if Net Share Settlement Applies ......... 23

Section 5.06.    Discretionary Adjustments................................................... 23

Section 5.07.    Restrictions on Adjustments ............................................. 23

Section 5.08.    Deferral of Adjustments..................................................... 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes ................. 24

Section 5.10.    Consolidation, Merger and Sale of Assets......................... 29

Section 5.11.    Common Stock Outstanding ............................................. 29

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ...................... 30

Section 5.13.    Calculations Final ............................................................. 30

Section 5.14.    Notice of Adjustments ...................................................... 30

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity........... 31

Section 5.16.    Statements on Warrants .................................................... 31

ARTICLE 6
OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders................................................. 31

Section 6.02.    Mutilated or Missing Warrant Certificates ........................ 32

Section 6.03.    Modification, Waiver and Meetings ................................. 32

ARTICLE 7
CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes................................................. 33

Section 7.02.    Change of Warrant Agent ................................................. 33

Section 7.03.    Compensation; Further Assurances ................................... 35

Section 7.04.    Reliance on Counsel ........................................................ 35

Section 7.05.    Proof of Actions Taken .................................................... 35

Section 7.06.    Correctness of Statements................................................. 35

Section 7.07.    Validity of Agreement ...................................................... 36

Section 7.08.    Use of Agents................................................................... 36

Section 7.09.    Liability of Warrant Agent................................................ 36

Section 7.10.    Legal Proceedings............................................................ 36

Section 7.11.    Other Transactions in Securities of the Company ............................ 36

Section 7.12.    Actions as Agent .............................................................. 36

Section 7.13.    Appointment and Acceptance of Agency ......................... 37

Section 7.14.    Successors and Assigns..................................................... 37

iii

Section 7.15.    Notices ............................................................................................. 37

Section 7.16.    Applicable Law ................................................................................. 38

Section 7.17.    Benefit of this Warrant Agreement ................................................... 38

Section 7.18.    Registered Warrantholders ................................................................ 38

Section 7.19.    Inspection of this Warrant Agreement ............................................... 38

Section 7.20.    Headings ........................................................................................... 38

Section 7.21.    Counterparts ...................................................................................... 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND ............................... C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
RESTRICTIONS ......................................................................... E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER ............. F-1

## WARRANT AGREEMENT

This Warrant Agreement ("**Warrant Agreement**") dated as of *[_____]*, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the Master Sale and Purchase Agreement (as may be amended, modified or supplemented in accordance with its terms, the "**Master Sale and Purchase Agreement**") dated as of June 1, 2009 by and among General Motors Corporation (the "**Initial Warrantholder**"), Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, the Company has agreed to issue to the Initial Warrantholder an aggregate initial Number of Warrants issued hereunder equal to 45,454,545, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01. *Certain Definitions.*  As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and

1

shall be determined by customary investment banking practices using the Black Scholes model.  For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the ten year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant

Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time. Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Distribution Date**" has the meaning set forth in Section 2.04.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $55.00 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, the date that is the ten (10) year anniversary of the date hereof.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" has the meaning set forth in the Recitals.

5

"**Master Sale and Purchase Agreement**" has the meaning set forth in the Recitals.

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[   ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

6

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is

7

listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**VEBA Exercise Price**" means the 'Exercise Price' as such term is defined in the VEBA Warrant Agreement.

"**VEBA Warrant Agreement**" means the warrant agreement dated as of [      ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which UAW Retiree Medical Benefits Trust was the 'Initial Warrantholder' as defined therein.

"**VEBA Warrants**" means the warrants issued pursuant to the VEBA Warrant Agreement.

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

ARTICLE 2

Issuance, Execution and Transfer of Warrants

8

Section 2.01.  *Issuance of Warrants.*  (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 45,454,545 (such Number of Warrants subject to adjustment from time to time as described herein).  The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)      Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)      All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.  *Execution and Authentication of Warrants.*  (a)  Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)      Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)      No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03.  *Form of Warrant Certificates.*  Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not

9

1766891

inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04.    *Transfer Restrictions and Legends.* This Section 2.04 shall not apply to Warrants and/or Common Stock which have been issued, distributed or sold pursuant to an effective registration statement or are otherwise exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code (the date as of which this Section 2.04 does not apply to such Warrants and/or Common Stock, the "**Distribution Date**").

(a)    Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) pursuant to a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of

10

the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)  Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form

11

satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)    When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.  To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)    A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.  *Global Warrants.*  (a)  The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary.  Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)    Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant

12

Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)    Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)    Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)    A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent

13

Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07. *Surrender of Warrant Certificates.* Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

ARTICLE 3

EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01. *Exercise of Warrants.* At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02. *Procedure for Exercise.* (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)     The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

Section 3.03. *Settlement of Warrants.* (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant. Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)      If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)      If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.   *Delivery of Common Stock.*  (a)  In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)      (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)      deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

(iii)      if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.  *No Fractional Shares to Be Issued.*  (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date.  However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.  *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent.*  (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3.  In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and

16

settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.  *Adjustments to Exercise Price.*  The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$  =  the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$  =  the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or

17

immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)     The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$ = the total number of shares of Common Stock issuable pursuant to such rights, warrants or convertible securities; and

$Y$ = the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

18

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance. In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property, rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

19

In the event of a reduction of the VEBA Exercise Price under the VEBA Warrant Agreement (other than pursuant to Article 5 of the VEBA Warrant Agreement) below 125% of the Exercise Price as adjusted to such date pursuant to this Article 5, such reduction shall be treated as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of the outstanding VEBA Warrants with a VEBA Exercise Price equal to 125% of the Exercise Price as adjusted to such date pursuant to this Article 5 and (ii) the Black Scholes Warrant Value of the outstanding VEBA Warrants immediately following such reduction in VEBA Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$ = the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

20

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)    For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be  a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02.  *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03.  *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.*  (a)  Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)    are deemed to be transferred with such shares of Common Stock;

(ii)    are not exercisable; and

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be

21

deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)    In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)    If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.  If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

1766891

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.* (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

(b) Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i) upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

23

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05.  For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.  *Recapitalizations, Reclassifications and Other Changes*.  (a)  If any of the following events occur:

(i)    any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)    any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**").  In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

(i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

25

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09. If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with. The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such amendment.

26

(e)    Change of Control Event:

(i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)    calculate the Change of Control Estimated Payment Amount;

(B)    deliver to the Warrant Agent a notice of redemption (a "**Redemption Notice**"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "**Redemption**");

(C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "**Change of Control Payment Date**"));

4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

5)    that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)    if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been

27

amended in connection with such Change of Control Event pursuant to Section 5.09);

7)      any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)      the name and address of the Warrant Agent.

(ii)      Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)      On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "**New Warrants**") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)      No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)      Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)      The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the

28

respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)    The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10.  *Consolidation, Merger and Sale of Assets.*  (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.  *Common Stock Outstanding.*  For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held,

directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)      The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12. The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5. Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)      If, prior to the Distribution Date, the Common Stock has been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on such exchange as of the Distribution Date the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants. If, as of the Distribution Date, the Common Stock has not yet been registered under Section 12(b) of the Exchange Act and listed on a national securities exchange, the Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange.

Section 5.13. *Calculations Final.* The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

1766891

Section 5.14.  *Notice of Adjustments.*  Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment.  The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.  *Warrant Agent Not Responsible for Adjustments or Validity.*  The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed,  herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16.  *Statements on Warrants.*  The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.  However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

### Other Provisions Relating to Rights of Warrantholders

31

1766891

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.  All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*  (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

(iii)   impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)   impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)   deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)   reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)   reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

ARTICLE 7

CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.   *Payment of Certain Taxes.*   (a)   The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)   The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.   *Change of Warrant Agent.*   (a)   The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.   If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.   If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.  After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations.  Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder.  As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock.  Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act.  In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07.  *Validity of Agreement.*  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08.  *Use of Agents.*  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09.  *Liability of Warrant Agent.*  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10.  *Legal Proceedings.*  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11.  *Other Transactions in Securities of the Company.*  The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 7.12.  *Actions as Agent.*  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.  *Appointment and Acceptance of Agency.*  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.  *Successors and Assigns.*  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15.  *Notices.*  Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

**[NGMCO, Inc.]**
*[_____]*
*[_____]*
Attention:  Treasurer
Telephone:  *[_____]*
Facsimile:  *[_____]*

With a copy to:

*[_____]*
*[_____]*
*[_____]*
Attention:  *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

37

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention: Treasurer
Telephone: *[_____]*
Facsimile: *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.    *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.    *Benefit of this Warrant Agreement.*    Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.    *Registered Warrantholders.*    Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.    *Inspection of this Warrant Agreement.*    A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 7.20.  *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.  *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766891

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**


By: _____
      Name:
      Title:


[•], as Warrant Agent


By: _____
      Name:
      Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

1766891

**EXHIBIT C**

### FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766891

**EXHIBIT D**

### FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

D - 1

**[NGMCO, Inc.]**

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: [_____], 2019.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
       Name:
       Title:

Attest

By: _____
       Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
       Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

## [NGMCO, Inc.]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.  A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:    [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises _____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

_____; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

_____

D - 6

Dated:_____          _____
                                        (Registered Warrantholder)




                                       By: _____
                                            Authorized Signature
                                            Address:
                                            Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

    The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date:    _____


_____
Name of Transferee


By:    _____
        Name:
        Title:


(Sign exactly as your name appears on the other side of this Certificate)

NOTICE:  The  signature(s)  should  be  guaranteed  by  an  eligible  guarantor institution  (banks,  stockbrokers,  savings  and  loan  associations  and  credit  unions  with membership  in  an  approved  signature  guarantee  medallion  program),  pursuant  to  S.E.C. Rule 17Ad-15.

D - 10

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:  [_____]

[Insert name of transferee]

By:  _____
Name:
Title:

E - 1

1766891

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention: Treasurer

Re:    DWAC Issuance
       Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**").  Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:    _____

_____ Original Issue or

_____ Transfer from Treasury Account

Broker Name:    _____

Broker's DTC Number:    _____

Contact and Phone:    _____

F - 1

1766891

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:


cc:      [*Insert name*] via facsimile [*insert fax number*]
         Broker

F - 2

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit C**

UAW Active Labor Modifications

## AGREEMENT BETWEEN GENERAL MOTORS CORPORATION AND THE UAW

### May 17, 2009

The UAW and GM have agreed to the terms set forth in this Agreement (including its attachments). This Agreement shall constitute an Addendum to the 2007 GM-UAW National Agreement.

With respect to the terms of the attached Memorandums of Understanding calling for suspensions of compensation or benefits, or other amendments to existing contractual provisions, the amendments and/or suspensions will last until the expiration of the 2007 UAW-GM National Agreement unless other expiration dates are specifically required by the Loan and Security Agreement between GM and the UST or, unless otherwise modified or terminated by the mutual agreement of the parties.

The provisions of this document and its attachments are subject to the terms of ratification by the membership of the UAW.

For the International Union, UAW:                    For General Motors Corporation:

CSA_A01 with signature.doc

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit D**

Form of UAW Retiree Settlement Agreement

## UAW RETIREE SETTLEMENT AGREEMENT

This settlement agreement (together with the Exhibits hereto, the "Settlement Agreement"), dated [_____], 2009, is between [New Co] ("New Co"), by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), by and through its attorneys. The UAW also enters into this Settlement Agreement as the authorized representative, as defined in Section 1114(c)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), of those persons receiving retiree benefits, as defined in Section 1114(a) of the Bankruptcy Code, pursuant to collectively bargained plans, programs and/or agreements between [New Co] and the UAW and who are members of the Class or the Covered Group, as those terms are defined herein. This Settlement Agreement shall cover and has application to:

    (i)      the Class;

    (ii)     the Covered Group;

    (iii)    the Existing External VEBA;

    (iv)    the trustee and committee that administer the Existing External VEBA;

    (v)     the Existing Internal VEBA;

    (vi)    the trustees that administer the Existing Internal VEBA;

    (vii)   the UAW;

    (viii)  the [New Co] Plan; and

    (ix)   [New Co].

General Motors Corporation ("GM") agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU"). GM, the UAW, and the Class entered into a settlement agreement in the class action of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, *aff'd, Int'l Union, UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ("Henry I"). Thereafter, GM, the UAW, and the Class entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 26, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "Henry II Settlement").

Subsequent to entering into the MOU and the Henry II Settlement, GM filed a bankruptcy action, known as *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009), pursuant to which [New Co] purchased certain assets of GM (such purchase, the "Sale Transaction"). The UAW asserted that, under Document Nos. 13 and 91 of the GM-UAW National Agreement, [New Co] was bound by the terms of the MOU. According to the UAW, any sale of GM's assets required UAW approval and, in the event of a sale, [New Co] was bound by the terms of the MOU. [New Co] denied that Document Nos. 13 and 91 of the GM-UAW National Agreement and the MOU applied to [New Co] and took the position that it was free to make decisions with respect to retiree health care benefits on a unilateral basis. After due consideration of the factual and legal arguments regarding this issue, as well as the costs, risks, and delays associated with litigating the issue, [New Co] and the UAW have agreed to

enter into this Settlement Agreement, which will be presented to the Bankruptcy Court for approval after notice is provided to affected parties.

This Settlement Agreement recognizes and approves on the basis set forth herein: (i) the adoption of the [New Co] Plan; (ii) the amendment of the [New Co] Plan to terminate coverage for and exclude from coverage the Class and the Covered Group; (iii) the transfer of the UAW Related Account of the Existing Internal VEBA to the New VEBA; (iv) the termination of participation by the Class and the Covered Group under the Existing Internal VEBA; (v) the termination of the Existing External VEBA in conjunction with the establishment of the New Plan, and the transfer to the New VEBA of all assets and liabilities of the Existing External VEBA; (vi) that all claims for Retiree Medical Benefits incurred after the Implementation Date by the Class and the Covered Group, including but not limited to COBRA continuation coverage where such election is or had been made on or after retirement and any coverage provided on a self-paid basis in retirement, shall be solely the responsibility and liability of the New Plan and the New VEBA; (vii) the Committee's designation under the New Plan and New VEBA as named fiduciary and administrator of the New Plan; (viii) that the New Plan shall replace the [New Co] Plan with respect to the provision of Retiree Medical Benefits to the Class and the Covered Group after the Implementation Date; (ix) that the New VEBA shall receive certain payments as described herein from the Existing Internal VEBA, the Existing External VEBA, and [New Co]; (x) that [New Co]'s obligation to pay into the New VEBA is fixed and capped as described herein; and (xi) that the New VEBA shall serve as the exclusive funding mechanism for the New Plan.

## 1.    Definitions

2009 Benefits Changes.  The term "2009 Benefits Changes" shall mean those plan design changes set forth in Exhibit F to this Settlement Agreement, which changes are effective on the later of July 1, 2009 and the Initial Effective Date.

Adjustment Event.  The term "Adjustment Event" is defined in Section 13 of this Settlement Agreement.

Admissions.  The term "Admissions" shall mean any statement, whether written or oral, any act or conduct, or any failure to act, that could be used (whether pursuant to Rules 801(d)(2) or 804(b)(3) of the Federal Rules of Evidence, a similar rule or standard under other applicable law, the doctrines of waiver or estoppel, other rule, law, doctrine or practice, or otherwise) as evidence in a proceeding of proof of agreement with another party's position or proof of adoption of, or acquiescence to, a position that is contrary to the interest of the party making such statement, taking such action, or failing to act.

Approval Order or Judgment.  The terms "Approval Order" or "Judgment" shall mean an order obtained from the Bankruptcy Court approving and incorporating this Settlement Agreement in all respects as set forth in Section 28 of this Settlement Agreement.

Bankruptcy Court.  The term "Bankruptcy Court" shall mean the United States Bankruptcy Court with respect to *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009).

Class or Class Members.  The term "Class" or "Class Members" shall mean all persons who are:

(i)    [New Co]-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii)    surviving spouses and dependents of any [New Co]-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii)    UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv)    surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(v)    [New Co]-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or under the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any [New Co]-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit (other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan.

Class Counsel.  The term "Class Counsel" shall mean the law firm of Stember, Feinstein, Doyle & Payne, LLC, or its successor, as well as such other counsel as may be retained thereby or work on behalf thereof.

Class Representatives.  The term "Class Representatives" shall mean Earl L. Henry, Bonnie J. Lauria, Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, Laverne M. Soriano, and John Huber.

Closing.  The term "Closing" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Closing Date.  The term "Closing Date" shall have the meaning given thereto in the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto.

Committee.  The term "Committee" shall mean the governing body set forth in Section 4.A of this Settlement Agreement that acts on behalf of the EBA and serves as the named

fiduciary and administrator of the New Plan, as those terms are defined in ERISA and that is so described in the Trust Agreement.

Common Stock.    The term "Common Stock" shall mean the number of shares of Common Stock, par value $0.01 per share, of [New Co], required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Court.    The term "Court" shall mean the United States District Court for the Eastern District of Michigan.

Covered Group. The term "Covered Group" shall mean:

(i)  all [New Co] Active Employees who had attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW or [New Co] and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan, the [New Co] Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii)  all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan, or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii)  all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008;

(iv)  all former [New Co]-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit, and upon retirement are eligible for Retiree Medical Benefits from GM or [New Co], as applicable, and/or under the GM Plan, the [New Co] Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW or [New Co] and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v)  all eligible surviving spouses and dependents of a [New Co] Active Employee, former [New Co]-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM or [New Co] and/or under the GM Plan, the [New Co] Plan or the New Plan, as applicable.

Debt.    The term "Debt" shall mean notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

Dispute Party.    The term "Dispute Party" is defined in Section 26.B of this Settlement Agreement.

DOL.    The term "DOL" shall mean the United States Department of Labor.

Employees Beneficiary Association or EBA. The term "Employees Beneficiary Association" or "EBA" shall mean the employee organization within the meaning of section 3(4) of ERISA that is organized for the purpose of establishing and maintaining the New Plan, with a membership consisting of the individuals who are members of the Class and the Covered Group, and on behalf of which the Committee acts.

Equity Subscription Agreement. The term "Equity Subscription Agreement" shall mean the Equity Subscription Agreement, dated June 1, 2009, by and between the New VEBA and Vehicle Acquisition Holdings, LLC.

ERISA. The term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Existing External VEBA. The term "Existing External VEBA" shall mean the defined contribution – Voluntary Employees' Beneficiary Association trust established pursuant to the Henry I Settlement.

Existing Internal VEBA. The term "Existing Internal VEBA" shall mean the General Motors Welfare Benefit Trust that was maintained by GM and, as of the Closing Date, will be sponsored by [New Co].

General Motors Asset Management Valuation Policies and Procedures. The term "General Motors Asset Management Valuation Policies and Procedures" shall mean GMAM's valuation policies and procedures, copies of which have been provided to the UAW and Class Counsel, as the same may be amended from time to time by GMAM (who shall notify the UAW and the Committee about any such intended amendments in a timely manner).

GM. The term "GM" is defined in the third paragraph of this Settlement Agreement.

GMAM. The term "GMAM" shall mean Promark Global Advisors Inc., formerly known as General Motors Asset Management Corporation, and its subsidiaries, or, when specifically referring to the investment manager for the Existing Internal VEBA, Promark Investment Advisors, Inc., formerly known as General Motors Investment Management Corporation. GMAM is a wholly owned subsidiary of GM.

GM Plan. The term "GM Plan" shall mean the Retiree Medical Benefits as provided pursuant to the General Motors Health Care Program for Hourly Employees in effect under the Henry II Settlement for the Class and the Covered Group.

GM-UAW National Agreements. The term "GM-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between GM and the UAW covering GM employees represented by the UAW. The current GM-UAW National Agreement is dated October 15, 2007.

Henry I. The term "Henry I" is defined in the second paragraph of this Settlement Agreement.

Henry I Settlement. The term "Henry I Settlement" shall mean the settlement agreement, dated December 16, 2005, approved by the Court in Henry I.

Henry II. The term "Henry II" is defined in the second paragraph of this Settlement Agreement.

Henry II Settlement. The term "Henry II Settlement" is defined in the second paragraph of this Settlement Agreement.

Indenture. The term "Indenture" shall mean the loan agreement, credit agreement or other form of document to be entered into by [New Co] with respect to the [New Co] Note, substantially in the form set forth in Exhibit B to this Settlement Agreement.

Implementation Date. The term "Implementation Date" shall mean the later of December 31, 2009 or the Closing Date.

Indemnified Party. The term "Indemnified Party" is defined in Section 23 of this Settlement Agreement.

Indemnification Liabilities. The term "Indemnification Liabilities" is defined in Section 23 of this Settlement Agreement.

Indemnity Expenses. The term "Indemnity Expenses" is defined in Section 23 of this Settlement Agreement.

Independent Attestation. The term "Independent Attestation" shall mean an agreed-upon procedures engagement performed for [New Co], the UAW and the Committee by a nationally recognized independent registered public accounting firm selected by [New Co] and conducted in accordance with the attestation standards of the Public Company Accounting Oversight Board, the subject matter of which would be whether specified assets of the Existing Internal VEBA have been valued in accordance with the General Motors Asset Management Valuation Policies and Procedures. The agreed-upon procedures shall be mutually agreed among the accounting firm, [New Co] and the Committee in connection with any such engagement.

Initial Accounting Period. The term "Initial Accounting Period" shall mean the period before the date that [New Co] determines that its obligations, if any, with respect to the New Plan made available to the Class and Covered Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent.

Initial Effective Date. The term "Initial Effective Date" shall mean the date on which the Bankruptcy Court enters the Approval Order.

Interest. The term "Interest" shall mean an interest rate of 9 percent (9%) per annum (computed on the basis of a 360-day year consisting of twelve 30-day months and the number of days elapsed in any partial month), credited and compounded annually, unless otherwise specified in this Settlement Agreement.

Mitigation. The term "Mitigation" shall have the same meaning as in the Henry I Settlement.

MOU. The term "MOU" is defined in the third paragraph of this Settlement Agreement.

National Institute for Health Care Reform or Institute. The term "National Institute for Health Care Reform" or "Institute" is defined in Section 31 of this Settlement Agreement.

[New Co]. The term "[New Co]" is defined in the first paragraph of this Settlement Agreement.

[New Co] Active Employees.  The term "[New Co] Active Employees" shall mean those hourly employees of [New Co] or, for periods prior to the Closing Date, GM who, as of September 14, 2007 or any date thereafter, are covered by the 2007 GM-UAW National Agreement or are covered by any subsequent GM-UAW National Agreement or [New Co]-UAW National Agreement.  For purposes of this definition, "active employee" shall include hourly employees on vacation, layoff, protected status, medical or other leave of absence, and any other employees who have not broken seniority as of September 14, 2007.

[New Co] Equity.  The term "[New Co] Equity" shall mean the Common Stock, the Preferred Stock and the Warrant.

[New Co] Note.  The term "[New Co] Note" shall mean the $2.5 billion Note due July 15, 2017 of [New Co] substantially in the form set forth in Exhibit I hereto.

[New Co] Plan.  The term "[New Co] Plan" shall mean the GM Plan, as amended by the 2009 Benefits Changes.

[New Co]-UAW National Agreements.  The term "[New Co]-UAW National Agreements" shall mean the agreement(s) negotiated on a multi-facility basis and entered into between [New Co] and the UAW covering [New Co] employees represented by the UAW.

[New Co]-UAW Represented Employees.  The term "[New Co]-UAW Represented Employees" shall mean those individuals represented by the UAW in their employment with GM prior to the Closing Date, or [New Co] after the Closing Date.

New Plan.  The term "New Plan" shall mean the new retiree welfare benefit plan that is established and maintained by the EBA for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group, and that is funded in part by the [New Co] Separate Retiree Account of the New VEBA.

New VEBA.  The term "New VEBA" shall mean the UAW Retiree Medical Benefits Trust that was established pursuant to the Henry II Settlement and is further described in Section 4 of this Settlement Agreement.

Non-UAW Related Account.  The term "Non-UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

Pension Plan.  The term "Pension Plan" shall mean the General Motors Hourly-Rate Employees Pension Plan, as assumed by [New Co].

Preferred Stock.  The term "Preferred Stock" shall mean the number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share of [New Co], having terms substantially as set forth in Exhibit J hereto, required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

Relevant [New Co] Equity Agreements.  The term "Relevant [New Co] Equity Agreements" shall mean (i) the Stockholders Agreement, among [New Co], the New VEBA, and the other [New Co] stockholder parties thereto, substantially in the form set forth in Exhibit K and (ii) the Equity Registration Rights Agreement, by and among [New Co], the New VEBA and the other parties thereto, substantially in the form set forth in Exhibit D hereto.

Retiree Medical Benefits.  The term "Retiree Medical Benefits" shall mean all post-retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.

SAP.  The term "SAP" is defined in Section 12.B of this Settlement Agreement.

Subsidiary.  The term "Subsidiary" shall mean any corporation or other entity of which at least a majority of the outstanding stock or other beneficial interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other governing body of such corporation or other entity (irrespective of whether or not at the time stock or other beneficial interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time owned by [New Co], or by one or more Subsidiaries, or by [New Co] and one or more Subsidiaries.

Transition Payments.  The term "Transition Payments" is defined in Section 12.A of the Settlement Agreement.

Trust Agreement.  The term "Trust Agreement" shall mean the UAW Retiree Medical Benefits Trust Agreement, as amended as set forth in Exhibit E to this Settlement Agreement.

UAW. The term "UAW" is defined in the first paragraph of this Settlement Agreement.

UAW Related Account.  The term "UAW Related Account" is defined in Section 6.A of this Settlement Agreement.

UAW Releasees.  The term "UAW Releasees" shall mean the UAW, the Class, the Class Representatives, Class Counsel and the Covered Group and anyone claiming on behalf of, through or under them by way of subrogation or otherwise.

Warrant.  The term "Warrant" shall mean Warrants to acquire shares of Common Stock, par value $0.01 per share, of [New Co] substantially in the form set forth in Exhibit L hereto, and required to be issued to the New VEBA pursuant to the Equity Subscription Agreement.

## 2.    Purpose of New Plan and New VEBA

The retiree benefits provided for in this Settlement Agreement have resulted from extensive negotiations and affect the rights of the Class and the Covered Group.  [New Co] Active Employees are not members of the Class.  Therefore, medical benefit coverage for [New Co] Active Employees prior to their retirement are not within the scope of this Settlement Agreement and shall continue to be provided in accordance with the terms of the applicable collective bargaining agreement and health care benefit plan.  Similarly, Retiree Medical Benefits for [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 are outside the scope of this Settlement Agreement and such benefits, if any, shall be provided in accordance with the applicable provisions of the GM-UAW National Agreements.

Nothing in this Settlement Agreement modifies the rights or obligations of [New Co] or the UAW to negotiate over health care benefits for [New Co] Active Employees who are not members of the Covered Group and future retirees who are not members of the Covered Group upon the expiration of the GM-UAW National Agreements, which have been assumed by [New Co],or at any earlier time if [New Co] and the UAW mutually agree.  Any changes resulting from subsequent negotiations shall be applied only to employees who retire after any such

- 8 -

agreement is reached and shall not otherwise affect the rights of Class Members or the Covered Group hereunder or [New Co]-UAW Represented Employees who become seniority employees after September 14, 2007 but who retire prior to the time any such agreement is reached.

With regard to participation in the [New Co] Plan, all references to retirees in this Settlement Agreement shall be deemed to include the Covered Group. For purposes of this Settlement Agreement, any reference to health care benefits to be provided hereunder to Class Members or the Covered Group shall be deemed to include such benefits provided to any of their respective spouses and dependents subject to all the terms and conditions of the applicable plan, including but not limited to eligibility requirements.

The New Plan and the New VEBA shall, after the Implementation Date, be the employee welfare benefit plan and trust that are exclusively responsible for all Retiree Medical Benefits for which [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan formerly would have been responsible with respect to the Class and the Covered Group. All assets paid or transferred by [New Co] to the New VEBA (including any investment returns thereon) shall be credited to the [New Co] Separate Retiree Account and must be used for the exclusive purposes of (A) providing Retiree Medical Benefits to the participants of the New Plan and their eligible beneficiaries and (B) defraying the reasonable expenses of administering the New Plan, as set forth in the Trust Agreement. All obligations of [New Co], the [New Co] Plan and any other [New Co] entity or benefit plan for Retiree Medical Benefits for the Class and the Covered Group arising from any agreement(s) between [New Co] and the UAW shall be forever terminated as of the Implementation Date. [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement. Eligibility rules for the New Plan shall be the same as those currently included in the [New Co] Plan, and may not be expanded.

### 3.      Factual Investigation and Legal Inquiry and Decision to Settle

Throughout the 2009 negotiations over the terms of this Settlement Agreement, the parties engaged in extended discussions concerning the GM bankruptcy filing, the terms of the sale pursuant to Section 363 of the Bankruptcy Code, retiree medical costs, and the obligations attendant to [New Co] being determined a successor to GM with respect to retiree health care. The UAW was provided with extensive information as to [New Co's] projected financial condition and health care expenditures. On behalf of the UAW, a team of investment bankers, actuaries, and legal experts have reviewed [New Co]'s information and provided the UAW with an assessment as to the state of [New Co]'s financial condition and analyzed the benefits of entering into this Settlement Agreement. [New Co] representatives also met with UAW representatives and its team of experts to answer questions and provide further detail, as requested.

The UAW has completed due diligence with respect to the Settlement Agreement utilizing professional financial and legal advisors and has determined that it is fair, reasonable and in the best interest of the Class and the Covered Group. Class Counsel has had access to the information provided to the UAW and has reviewed this Settlement Agreement and believes that, in consideration of all the circumstances, it is fair, reasonable, and in the best interest of all members of the Class.

4.    **New Plan and New VEBA**

A.    Committee.  The New Plan and New VEBA, both subject to ERISA, shall be administered by the Committee.  The Committee consists of 11 members, 5 of whom were appointed by the UAW and 6 of whom are independent members, who were appointed pursuant to the Court's July 31, 2008 order approving the Henry II Settlement.  In the event that any member of the Committee resigns, dies, becomes incapacitated or otherwise ceases to be a member, a replacement member shall be appointed, as described in the Trust Agreement.

B.    Establish and Maintain.  The EBA, acting through the Committee, shall establish and maintain the New Plan for the purpose of providing Retiree Medical Benefits to the Class and the Covered Group as set forth in this Settlement Agreement.  The Committee shall begin administering the New Plan so as to be able to provide Retiree Medical Benefits for the Class and the Covered Group with respect to claims incurred after the Implementation Date.  The Committee established the New VEBA on October 16, 2008.  The New Plan shall be ERISA-covered and the New VEBA shall meet the requirements of Section 501(c)(9) of the Internal Revenue Code.  All payments to the New Plan and the New VEBA made or caused to be made by [New Co] under the Settlement Agreement are payments pursuant to section 302(c)(2) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. 186(c)(2).

C.    Limitation on [New Co] Role.  No member of the Committee shall be a current or former officer, director or employee of GM or [New Co] or any member of the GM or [New Co] controlled group; provided however, that a retiree who was represented by the UAW in his/her employment with GM or [New Co] or an employee of [New Co] who is on leave from [New Co] and who is represented by the UAW is not precluded by this provision from serving on the Committee.  No member of the Committee shall be authorized to act for [New Co] or shall be an agent or representative of [New Co] for any purpose.  Furthermore, [New Co] shall not be a fiduciary with respect to the New Plan or New VEBA, and will have no rights or responsibilities with respect to the New Plan or New VEBA other than as specifically set forth in this Settlement Agreement.

5.    **Provision and Scope of Retiree Medical Benefits**

A.    On and Before the Implementation Date.  With respect to claims incurred on and before the Implementation Date, without regard to whether such claims were incurred before, on or after the execution of this Settlement Agreement, Retiree Medical Benefits for the Class and the Covered Group will be provided either by GM or [New Co], as applicable, in accordance with the [New Co] Plan.  Mitigation payments from the Existing External VEBA (for those entitled thereto) shall continue to apply during this period.  As soon as reasonably practicable following the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the dental benefits provided by the Existing External VEBA shall terminate with respect to claims incurred after such date.  The payment by [New Co] and/or the [New Co] Plan of Retiree Medical Benefits for claims incurred on and before the Implementation Date will not reduce [New Co]'s payment obligations to the New Plan and the New VEBA under this Settlement Agreement; but in no event shall [New Co] be responsible for payment of claims to the extent that such claims have been paid by GM or the GM Plan.

B.    After the Implementation Date.  With respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be

- 10 -

the exclusive source of funds to provide Retiree Medical Benefits for the Class and the Covered Group, including but not limited to COBRA continuation coverage, where such election is made after retirement.  Neither [New Co], the [New Co] Plan, the Existing Internal VEBA, nor any other [New Co] person, entity, or benefit plan shall have any responsibility or liability for Retiree Medical Benefits for individuals in the Class or in the Covered Group for claims incurred after the Implementation Date.  [New Co]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement.

C.      Amendment of the New Plan.    On and after January 1, 2010, the Committee shall have such authority to establish Benefits as described in the Trust Agreement, including raising or lowering benefits.  However, in no event may the Committee amend the New Plan or New VEBA to provide benefits other than Retiree Medical Benefits until the expiration of the Initial Accounting Period.  The ability of the New Plan and the New VEBA to pay for Retiree Medical Benefits will depend on numerous factors, many of which are outside of the control of UAW, the Committee, the New Plan and the New VEBA, including, without limitation, the investment returns, actuarial experience and other factors.

D.      Termination of [New Co] Plan and Reimbursement of [New Co].    The Approval Order shall provide that all obligations of [New Co] and all provisions of the [New Co] Plan in any way related to Retiree Medical Benefits for the Class and/or the Covered Group, and all provisions of applicable collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with this Settlement Agreement and the fundamental understanding that all [New Co] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement.  Summary Plan Descriptions of the [New Co] Plan shall reflect the termination of the responsibilities of [New Co] and the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein.

The New Plan and New VEBA shall reimburse [New Co] or the [New Co] Plan, as applicable, for any Retiree Medical Benefits advanced or provided by [New Co] or the [New Co] Plan with regard to claims incurred by members of the Class and the Covered Group after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred after the Implementation Date or where [New Co] is notified of an intent by a member of the Class and the Covered Group to retire under circumstances where there is insufficient time to transfer responsibility for Retiree Medical Benefits to the New Plan and [New Co] or the [New Co] Plan provides interim coverage for Retiree Medical Benefits.  To the extent such reimbursement may not be permitted by law, the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, and the Committee will fully cooperate with [New Co] to secure any legal or regulatory approvals that are necessary to permit such reimbursement.

6.      **Division of Existing Internal VEBA**

A.      UAW Related Account.    Pursuant to the Henry II Settlement GM divided the Existing Internal VEBA into two bookkeeping accounts.  One account consisted of the percentage of the Existing Internal VEBA's assets as of January 1, 2008 that was equal to the estimated percentage of GM's hourly OPEB liability covered by the Existing Internal VEBA

attributable to Non-UAW represented employees and retirees, their eligible spouses, surviving spouses and dependents ("Non-UAW Related Account"). The second account consisted of the remaining percentage of the assets in the Existing Internal VEBA as of January 1, 2008 ("UAW Related Account").

As of March 31, 2009, the amount in the UAW Related Account was valued at approximately $9.4 billion.

B.    Investment of Assets. GMAM shall oversee the investment of the assets in the Existing Internal VEBA with respect to the UAW Related Account until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA pursuant to Section 12 of this Settlement Agreement. All such assets shall continue to be invested under the existing investment policy (as may be amended from time to time by [New Co] who shall notify the UAW and the Committee about intended amendments in a timely manner) applicable to the Existing Internal VEBA. Investment returns, net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), on all assets of the Existing Internal VEBA on and after January 1, 2008 shall be applied to these accounts proportionally in relation to the value of the assets in the UAW Related Account in relation to the total amount of assets in the Existing Internal VEBA. In other words, investment returns (i.e., the percentage return on the total Existing Internal VEBA), net of Existing Internal VEBA trust expenses (this shall only include expenses to the extent permitted by ERISA), shall be applied to the value of the UAW Related Account and separately to the value of the Non-UAW Account (as adjusted to reflect any withdrawals by GM or [New Co]). However, neither GM nor GMAM nor [New Co] guarantee or warrant the investment returns on the assets in the Existing Internal VEBA.

Until such time as the assets attributable to the UAW Related Account are transferred to the New VEBA, [New Co] agrees to cause GMAM to periodically inform and hold discussions with the UAW and the Committee about the investment results of and decisions regarding the assets in the Existing Internal VEBA. During such period, GMAM shall, with respect to the performance of its duties in managing the Existing Internal VEBA, participate in the following meetings and provide the following reports to the UAW and the Committee: (i) quarterly reports of Existing Internal VEBA asset class and benchmark performance for relevant time periods; and (ii) semi-annual or quarterly meetings with UAW and/or Committee representatives to report on Existing Internal VEBA returns and analysis of performance, and to review significant activities affecting investments. Any input from the UAW and/or the Committee shall not be a basis of GMAM's investment decisions within the meaning of the DOL regulations set forth at 29 C.F.R. § 2510-3.21(c).

C.    Disposition of Assets. No amounts shall be withdrawn by [New Co] from the UAW Related Account, including its investment returns, until transfer to the New VEBA under Section 12. GMAM and the Committee shall enter into discussions in advance of such transfer with regard to the method of transferring and/or otherwise handling any illiquid or otherwise non-transferable investments in the Existing Internal VEBA so as to preserve as much as possible the economic value of such investments and minimize any losses due to the liquidation of assets. Such discussions shall commence in a timely fashion and be completed as soon as reasonably practicable. The determinations made by GMAM as a product of these discussions with the Committee regarding the way to transfer illiquid or otherwise non-transferable investments in the Existing Internal VEBA shall be final and binding on [New Co], the UAW, the Committee, the Class and the Covered Group.

7.      [Reserved]

8.      **[New Co] Payments to New Plan and New VEBA**

[New Co]'s financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement.  The timing of all payments to the New VEBA shall be as set forth in Section 12 of this Settlement Agreement; it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group after the Implementation Date, and that all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group shall terminate as of the Implementation Date, as set forth in this Settlement Agreement.  All assets shall be transferred or paid by [New Co] free and clear of any liens, claims or other encumbrances.  Pursuant to this Settlement Agreement, [New Co] shall have the following, and only the following, obligations to the New VEBA and the New Plan, and all payments and transfers in this Section 8 of this Settlement Agreement shall be credited to the [New Co] Separate Retiree Account of the New VEBA:

A.      Special Attrition Plan.  In accordance with Section 12.A of this Settlement Agreement, [New Co] shall pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the terms of the Special Attrition Plan agreed to by GM and the UAW and ratified on May 29, 2009 (the "SAP"), excluding those [New Co] Active Employees who accepted buyouts.

B.      UAW Related Account.  In accordance with Section 12.B of this Settlement Agreement, [New Co] shall cause the transfer to the New VEBA of the assets (or, with regard to any illiquid or otherwise non-transferable investments, equivalent alternatives resulting from discussions between GMAM and the Committee pursuant to Section 6.C of this Settlement Agreement) of the UAW Related Account in the Existing Internal VEBA, net of Existing Internal VEBA trust expenses (which shall include expenses only to the extent permitted by ERISA).

C.      [New Co] Note.  In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the financial institution that will serve as trustee under the Indenture, if applicable, or to the other counterparty to the Indenture (the "Indenture Trustee") a counterpart signature page to the Indenture (and issue the [New Co] Note to the New VEBA pursuant to the terms and conditions thereof).  [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture).  [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Indenture (and the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Indenture (or the issuance of the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Note to the New VEBA pursuant to the terms and conditions of the Indenture), or result in any such breach

or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Note to the New VEBA).

D.    [New Co] Equity.    In accordance with Section 12.D of this Settlement Agreement, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement.    [New Co] shall pay any and all documentary, stamp or similar issue taxes that may be payable with respect to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement).    [New Co] represents and warrants that its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) in accordance with this Settlement Agreement will not conflict with or constitute a breach or default under any law or contractual obligation by which [New Co] is bound or to which it or its property is subject; and [New Co] will not take any action prior to its execution and delivery of counterpart signature pages to the Relevant [New Co] Equity Agreements (or the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) that would render [New Co] unable to so execute and deliver such agreements (or issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement), or result in any such breach or default occurring as a result of such execution and delivery of such agreements (or such issuance of the [New Co] Equity to the New VEBA).

9.    [Reserved]

10.    [Reserved]

11.    [Reserved]

**12.    Deposits to the New VEBA**

A.    Transition Payments; SAP Payments.    Until the Implementation Date, within 30 days of any request by the Committee, [New Co] shall pay to the New VEBA such amounts ("Transition Payments") as the Committee shall request, provided that there shall be no more than five such requests prior to the Implementation Date and the aggregate of all such payments shall not exceed $19,950,000.    Such amounts shall represent an advance to the New VEBA to cover reasonable and necessary preparatory expenses incurred by the New Plan or New VEBA in anticipation of the transition of responsibility for Retiree Medical Benefits as of the Implementation Date as set forth in Section 5 of this Settlement Agreement.    These advance payments shall not increase or add to the amounts [New Co] has agreed to pay under this Settlement Agreement.

[New Co] shall also pay to the New VEBA the contract cost for providing Retiree Medical Benefits for those [New Co] Active Employees who retire under the SAP (excluding those [New Co] Active Employees who accepted buyouts). The contract cost shall be determined by the parties after execution of this Settlement Agreement as follows:

(i) The parties' respective actuaries shall meet and confer as soon as practicable to determine the average cost per contract for four retiree categories: (1) Pre-Medicare Eligible single, (2) Pre-Medicare family, (3) Medicare single, and (4) Medicare family.

(ii) Based upon the categories set forth in (i) above, the parties will develop an average annual cost calculation for each category.

(iii) As soon as reasonably practicable after conclusion of the SAP, the parties will jointly assign the SAP participants to the appropriate category according to their respective circumstances and calculate an average annual cost per SAP participant.

On or before January 5, 2010, [New Co] shall pay to the New VEBA such aggregate contract cost, discounted by the Interest rate set forth in this Settlement Agreement, for the twenty-four month period following the later of January 1, 2010 and the date of retirement under the SAP. The foregoing payment shall be reduced, dollar-for-dollar, by any Transition Payments made pursuant to this Section 12.A, plus Interest.

B.    Deposit of the UAW Related Account. Within 10 business days after the Implementation Date, [New Co] shall direct the trustee of the Existing Internal VEBA to transfer to the New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA, the amount of which shall be determined as provided in Section 6 of this Settlement Agreement. The Approval Order shall provide that, upon such transfer, the Existing Internal VEBA shall be deemed to be amended to terminate participation and coverage regarding Retiree Medical Benefits for the Class and the Covered Group, effective as of the Implementation Date. Accruals for trust expenses (this shall only include expenses to the extent permitted by ERISA) through the date of transfer shall be made and an amount equal to the UAW Related Account's share of such accruals shall be retained within the Existing Internal VEBA to pay such expenses. After payment of these trust expenses is completed, a reconciliation of the accruals and the actual expenses (this shall only include expenses to the extent permitted by ERISA) shall be performed. [New Co] agrees to cause the payment to the New VEBA by the Existing Internal VEBA of any overaccruals for the UAW Related Account's share of such expenses. Similarly, in the event of an underaccrual the New VEBA shall return to the Existing Internal VEBA the amount of the underaccrual of expenses for the UAW Related Account.

C.    Deposit of the Existing External VEBA. The Approval Order shall direct the committee and the trustees of the Existing External VEBA to transfer all assets and liabilities into the New VEBA and terminate the Existing External VEBA within 15 days after the Implementation Date. This transfer of assets and liabilities shall include, but not be limited to, the transfer of all rights and obligations granted to or imposed on the Existing External VEBA under Section 14.C(e) of the Henry I Settlement.

D.    Issuance of [New Co] Note. On the Closing Date, [New Co] shall execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture and issue the [New Co] Note to the New VEBA under the Indenture. Such execution and delivery of the Indenture (and the issuance of the [New Co] Note to the New VEBA under the Indenture) shall only occur as permitted by law. [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement. The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals. If [New Co] and the New VEBA cannot timely obtain necessary legal or

regulatory approvals, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Note to the New VEBA that provide equivalent economic value to the New VEBA.  Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the Indenture Trustee a counterpart signature page to the Indenture (and to issue the [New Co] Notes to the New VEBA under the Indenture) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the Indenture Trustee of the Indenture.

        E.      <u>Issuance of [New Co] Equity</u>.  On the Closing Date, [New Co] shall execute and deliver to the New VEBA counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto) and issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement.  Such execution and delivery of the Relevant [New Co] Equity Agreements (and the issuance of the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) shall only occur as permitted by law.  [New Co] and/or the New Plan, as applicable, shall apply for any necessary legal or regulatory approvals, including but not limited to the prohibited transaction exemptions described in Section 22 of this Settlement Agreement and any required federal or state bank regulatory approvals.  The UAW, the Class, and the Covered Group shall support and cooperate with any such requests for legal or regulatory approvals.  If [New Co] and the New VEBA cannot timely obtain necessary legal or regulatory approvals, as specified in the Equity Subscription Agreement, the parties shall meet and discuss appropriate alternatives to the issuance of the [New Co] Equity to the New VEBA that provide equivalent economic value to the New VEBA.  Notwithstanding the foregoing, the obligations of [New Co] to execute and deliver to the New VEBA the Relevant [New Co] Equity Agreements (and to issue the [New Co] Equity to the New VEBA pursuant to the terms and conditions of the Equity Subscription Agreement) pursuant to this Settlement Agreement shall be subject to the execution and delivery by the New VEBA of the Relevant [New Co] Equity Agreements to the relevant counterparties of each such agreement.  On the Closing Date, the New VEBA shall execute and deliver to [New Co] counterpart signature pages to the Relevant [New Co] Equity Agreements (except the Equity Subscription Agreement, which was previously executed by the parties thereto).

        If a deposit or payment or any portion thereof is made by [New Co] to the New VEBA by mistake under any provision of this Settlement Agreement, the Committee shall, upon written direction of [New Co], return such amounts as may be permitted by law to [New Co] (plus earnings thereon from the date of payment to but excluding the date of return) within 30 days of notification by [New Co] that such payment was made by mistake.  If a dispute arises with regard to such payment, the dispute will be resolved pursuant to Section 26 of this Settlement Agreement.

    **13.**    **Adjustment Events**

        A.      <u>Adjustment Event</u>.  "Adjustment Event" shall mean the determination of the value of any assets in lieu of which [New Co] elects to transfer cash to the New VEBA pursuant to Sections 8.B and 12.B of this Settlement Agreement.

        B.      <u>Due Diligence and Adjustment Mechanism</u>.

        In connection with any Adjustment Event, [New Co] shall deliver, as soon as practicable, to the Committee (or the UAW prior to establishment of the Committee) information in

reasonable detail about the determinations made with regard to such Adjustment Event and the work papers, underlying calculations and other documents and materials on which such determinations are based, including non-privileged materials from [New Co]'s advisors, if any (collectively, the "Determination Materials").

The Committee shall have 30 days from receipt of the Determination Materials from [New Co] to submit to [New Co] a written request for an Independent Attestation of a determination(s) listed in Section 13.A of this Settlement Agreement.  As a part of this review process, the Committee may ask for additional information regarding the calculations, and the data and information provided by [New Co].  [New Co] shall as promptly as practicable, respond to all reasonable requests from the Committee for such additional information.  However, a request for additional information shall not extend the 30 day review period, unless an extension is reasonably necessary to allow the Committee to review such additional information, but in no event longer than 45 days from receipt of the Determination Materials.

All determinations made with regard to a determination(s) listed in Section 13.A of this Settlement Agreement shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA, unless the Committee timely submits a request for an Independent Attestation. If the Committee timely submits such a request, [New Co] shall engage a nationally recognized independent registered public accounting firm to conduct an Independent Attestation regarding a determination(s) listed in Section 13.A of this Settlement Agreement.  The Independent Attestation shall be final and binding on [New Co], the UAW, the Class, the Covered Group, the Committee and the New Plan and New VEBA.

Nothing in the foregoing paragraphs shall prevent the division, deposit, withdrawal or transfer of any assets the valuation of which is not in dispute pending resolution of the disputed amounts.

C.    Confidentiality.  All information and data provided by [New Co] to the UAW, Class Counsel, and/or the Committee as a part of this due diligence and adjustment process shall be considered confidential.  The UAW, Class Counsel, and the Committee shall use such information and data solely for the purpose set forth in this Section 13 of the Settlement Agreement.  The UAW, Class Counsel, and the Committee shall not disclose such information or data to any other person without [New Co]'s written consent, provided that the UAW, Class Counsel, and the Committee may disclose such information and data to their attorneys and professional advisors, subject to the agreement of such attorneys and advisors to the confidentiality restrictions set forth herein.

**14.    Future Contributions**

The UAW, the Class and the Covered Group may not negotiate any increase of [New Co]'s funding or payment obligations set out herein.  The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New Co] to:  (i) provide any additional payments to the New VEBA other than those specifically required by this Settlement Agreement; (ii) make any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through any other means.  Provided that, the UAW may propose that [New Co] Active Employees be

permitted to make contributions to the New VEBA of amounts otherwise payable in profit sharing, COLA, wages and/or signing bonuses, if not prohibited by law.

### 15.    Pension Benefits

[New Co] and the UAW agree that this Settlement Agreement shall in no way obligate [New Co] to effect the amendment to the Pension Plan contemplated by Section 15 of the Henry II Settlement, but not implemented, to provide to retirees and eligible surviving spouses who are members of the Class or the Covered Group a flat monthly special lifetime benefit of $66.70, as provided for in the Henry II Settlement.

[New Co] and the UAW further agree that this Settlement Agreement shall in no way obligate the New Plan and New VEBA to assess an additional non-escalating monthly contribution payable by retirees and eligible surviving spouses of the Class and the Covered Group for Retiree Medical Benefits of $51.67 per month, as provided for in the Henry II Settlement.

The Approval Order shall provide that there will be no requirement to amend the Pension Plan as provided for in Section 15 of the Henry II Settlement.

### 16.    Administrative Costs

The New VEBA will be responsible for all costs to administer the New Plan and the New VEBA commencing on the Implementation Date and continuing thereafter.  The New Plan and the New VEBA trust agreement shall be drafted consistent with this requirement.

### 17.    Trust Agreement; Segregated Account; Indemnification

Assets paid or transferred to the New VEBA by or at the direction of [New Co], including all investment returns thereon, shall be used solely to provide Retiree Medical Benefits to the Class and the Covered Group as defined in this Settlement Agreement until expiration of the Initial Accounting Period.  Thereafter, Benefits will be provided to the Class and the Covered Group as described in the Trust Agreement.  The Trust Agreement shall provide: (i) for the [New Co] Separate Retiree Account to be credited with the assets deposited or transferred to the New VEBA by [New Co], or at [New Co]'s direction, under this Settlement Agreement; (ii) that the assets in the [New Co] Separate Retiree Account may be used only to provide Benefits (as defined in the Trust Agreement) for such Class and such Covered Group; and (iii) that under no circumstances will [New Co] or the [New Co] Separate Retiree Account be liable or responsible for the obligations of any other employer or for the provision of Retiree Medical Benefits or any other benefits for the employees or retirees of any other employer.

Further, the Trust Agreement shall provide that the Committee, on behalf of the New VEBA, shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the New VEBA's ability to own the [New Co] Note and the [New Co] Equity or as may be required to comply with all applicable laws and regulations, including but not limited to federal and state banking laws and regulations.

To the extent permitted by law, the New VEBA shall indemnify and hold the Committee, the UAW, [New Co], the [New Co] Plan, and the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the New Plan and New VEBA, unless such liability arises from their gross negligence or intentional misconduct, or

breach of this Settlement Agreement. The Committee shall not be required to give any bond or any other security for the faithful performance of its duties under the Trust Agreement, except as such may be required by law.

### 18.    Subsidies

With regard to claims incurred after the Implementation Date, the New VEBA shall be entitled to receive any Medicare Part D subsidies and other health care related subsidies regarding benefits actually paid by the New VEBA which may result from future legislative changes, and [New Co] shall not be entitled to receive any such subsidies related to prescription drug benefits and other health care related benefits provided to the Class and the Covered Group by the New Plan and New VEBA.

### 19.    [Reserved]

### 20.    Cooperation

A.    Cooperation by [New Co].  [New Co] will cooperate with the UAW and the Committee and at the Committee's request undertake such reasonable actions as will assist the Committee in the transition of responsibility for administration of the Retiree Medical Benefits by the Committee for the New Plan and the New VEBA.  Such cooperation will include assisting the Committee in educational efforts and communications with respect to the Class and the Covered Group so that they understand the terms of the New Plan, the New VEBA and the transition, and understand the claims submission process and any other initial administrative changes undertaken by the Committee.  Before and after the Implementation Date, at the Committee's request and as permitted by law, [New Co] will furnish to the Committee such information and shall provide such cooperation as may be reasonably necessary to permit the Committee to effectively administer the New Plan and the New VEBA, including, without limitation, the retrieval of data in a form and to the extent maintained by [New Co] regarding age, amounts of pension benefits, service, pension and medical benefit eligibility, marital status, mortality, claims history, births, deaths, dependent status and enrollment information of the Class and the Covered Group.  At the request of the Committee, [New Co] will continue to perform the necessary eligibility work for a reasonable period of time, not to exceed 90 days after the Implementation Date in order to allow the Committee to establish and test the eligibility database, and for which [New Co] will be entitled to reimbursement for reasonable costs.  [New Co] shall also assist the Committee in transitioning benefit provider contracts to the New VEBA. [New Co] shall also cooperate with the UAW and the Committee and undertake such reasonable actions as will enable the Committee to perform its administrative functions with respect to the New Plan and the New VEBA, including insuring an orderly transition from [New Co] administration of Retiree Medical Benefits to the New Plan and the New VEBA.

To the extent permitted by law, [New Co] will also allow retiree participants to voluntarily have required contributions withheld from pension benefits and to the extent reasonably practical, credited to the [New Co] Separate Retiree Account of the New VEBA on a monthly basis.  A retiree participant may elect or withdraw consent for pension withholdings at any time by providing 45 days written notice to the Pension Plan administrator or such shorter period that may be required by law.

To the extent permitted by law and if applicable, [New Co] will also cooperate with the Committee to make provision for the New VEBA payments of the $76.20 Special Benefit to be incorporated into monthly [New Co] pension checks for eligible retirees and surviving spouses. It will be the responsibility of the Committee and the New VEBA to advise [New Co]'s pension administrator in a timely manner of eligibility changes with regard to the Special Benefit payment. The timing of the information provided to [New Co]'s pension administrator will determine the timing for the incorporation into the monthly pension check. It will be the responsibility of the Committee and the New VEBA to establish a bank account for the funding of the Special Benefit payments, and [New Co]'s pension administrator will be provided with the approval to draw on that account for the payment of the benefit. The Committee and the New VEBA will assure that the bank account is adequately funded for any and all such payments. If adequate funds do not exist for the payments, then [New Co]'s pension administrator will not make such payments until the required funding is established in the account. It will be the responsibility of the Committee and the New VEBA to audit the eligibility for, and payment of, the Special Benefit. Additionally, the Committee and the New VEBA will be responsible for the payment of reasonable costs associated with [New Co]'s administration of the payment of this Special Benefit and the pension withholdings, including development of administrative and recordkeeping processes, monthly payment processing, audit and reconciliation functions and the like.

[New Co] will be financially responsible for reasonable costs associated with the transition of coverage for the Class and the Covered Group to the New Plan and New VEBA. This shall include the cost of educational efforts and communications with respect to retirees, the New Plan's initial creation of administrative procedures, initial development of record sharing procedures, the testing of computer systems, the Committee's initial vendor selection and contracting, and other activities incurred on or before the Implementation Date, including but not limited to costs associated with drafting the trust agreement for the New VEBA, seeking from the Internal Revenue Service a determination of the tax-exempt status of the New VEBA, plan design and actuarial and other professional work necessary for initiation of the New Plan and New VEBA and the benefits to be provided thereunder. Payments made by [New Co] described in this Section shall not reduce its payment obligations under this Settlement Agreement, and if the New VEBA is a multi-employer welfare trust, the costs described in this Section, to the extent not allocable to a specific employer, shall be pro-rated among the participating companies based on the ratio of required funding for each company. Payment of these costs shall be provided for in the Approval Order.

B. <u>Cooperation With [New Co]</u>. The UAW and the Committee will cooperate and shall timely furnish [New Co] with such information related to the New Plan and New VEBA, in a form and to the extent maintained by the UAW and the Committee, as may be reasonably necessary to permit [New Co] to comply with requirements of the U.S. Securities and Exchange Commission, including, but not limited to, Generally Accepted Accounting Principles, including but not limited to SFAS 87, SFAS 106, SFAS 132R, SFAS 157, and SFAS 158 (as amended), for disclosure in [New Co]'s financial statements and any filings with the U.S. Securities and Exchange Commission.

## 21.    Accounting Treatment

[New Co] has maintained that a necessary element in its decision to enter into this Settlement Agreement is securing accounting treatment that is reasonably satisfactory to [New Co] regarding the transactions contemplated by this Settlement Agreement.  As soon as practicable, [New Co] will discuss the accounting for the New Plan and the New VEBA with [New Co]'s independent auditors, and if either [New Co] or its independent auditors determine it necessary, may also discuss the accounting with the staff of the U.S. Securities and Exchange Commission.  If, as a result of those discussions, [New Co] believes that the accounting for the transaction may not be a "settlement" as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, the parties, at the request of [New Co] shall meet in an effort to restructure the transaction to achieve such accounting, which provides equivalent economic value to the New VEBA.

## 22.    Cooperation on Regulatory and Related Approvals

[New Co], on behalf of itself, the New VEBA and all other parties in interest, shall timely apply for, and the UAW and the New VEBA shall fully cooperate in securing, any legal or regulatory approvals necessary to enable the parties to fulfill the obligations of this Settlement Agreement, including, without limitation, any prohibited transaction exemptions necessary for transactions between any party in interest and the New VEBA.  If [New Co] and the New VEBA do not timely obtain any necessary exemptions and the DOL does not otherwise assure the New VEBA and [New Co], to the reasonable satisfaction of each, that the necessary exemptions will be granted, the parties will meet and discuss an appropriate alternative which provides equivalent economic value to the New VEBA.

## 23.    Indemnification

Subject to approval by the Bankruptcy Court as part of the Judgment, [New Co] hereby agrees to indemnify and hold harmless the UAW and Class Counsel, and its officers, directors, employees and expert advisors (each, an "Indemnified Party"), to the extent permitted by law, from and against any and all losses, claims, damages, obligations, assessments, penalties, judgments, awards, and other liabilities related to any decision, recommendations or other actions taken prior to the date of this Settlement Agreement, including, without limitation, acting as the authorized representative of the Class and the Covered Group (collectively, "Indemnification Liabilities"), and shall fully reimburse any Indemnified Party for any and all reasonable and documented attorney fees and expenses (collectively, "Indemnity Expenses"), as and when incurred, of investigating, preparing or defending any claim, action, suit, proceeding or investigation, arising out of or in connection with any Indemnification Liabilities incurred as a result of an Indemnified Party's entering into, or participation in the negotiations for this Settlement Agreement and the transactions contemplated in connection herewith; provided, however, that such indemnity shall not apply to any portion of any such Liability or Expense that resulted from the gross negligence or willful misconduct by an Indemnified Party; provided, further, that such indemnity shall not apply to any Indemnification Liabilities to a [New Co] Active Employee for breach of the duty of fair representation.

Nothing in this Section 23 or any provision of this Settlement Agreement shall be construed to provide an indemnity for any member or any actions of the Committee; provided however, that an Indemnified Party who becomes a member of the Committee shall remain

entitled to any indemnity to which the Indemnified Party would otherwise be entitled pursuant to this Section 23 for actions taken, or for a failure to take actions, in any capacity other than as a member of the Committee; and provided further, that nothing in this Section 23 or any other provision of this Settlement Agreement shall be construed to provide an indemnity for any Indemnification Liabilities or Indemnity Expenses relating to (i) management of the assets of the New VEBA or (ii) for any action, amendment or omission of the Committee with respect to the provision and administration of Retiree Medical Benefits.

If an Indemnified Party receives notice of any action, proceeding or claim as to which the Indemnified Party proposes to demand indemnification hereunder, it shall provide [New Co] prompt written notice thereof.  Failure by an Indemnified Party to so notify [New Co] shall relieve [New Co] from the obligation to indemnify the Indemnified Party hereunder only to the extent that [New Co] suffers actual prejudice as a result of such failure, but [New Co] shall not be obligated to provide reimbursement for any Indemnity Expenses incurred for work performed prior to its receipt of written notice of the claim.  If an Indemnified Party is entitled to indemnification hereunder, [New Co] will have the right to participate in such proceeding or elect to assume the defense of such action or proceeding at its own expense and through counsel chosen by [New Co] (such counsel being reasonably satisfactory to the Indemnified Party).  The Indemnified Party will cooperate in good faith in such defense.  Upon the assumption by [New Co] of the defense of any such action or proceeding, the Indemnified Party shall have the right to participate in, but not control the defense of, such action and retain its own counsel but the expenses and fees shall be at its expense unless (a) [New Co] has agreed to pay such Indemnity Expenses, (b) [New Co] shall have failed to employ counsel reasonably satisfactory to an Indemnified Party in a timely manner, or (c) the Indemnified Party shall have been advised by counsel that there are actual or potential conflicting interests between [New Co] and the Indemnified Party that require separate representation, and [New Co] has agreed that such actual or potential conflict exists (such agreement not to be unreasonably withheld); provided, however, that [New Co] shall not, in connection with any such action or proceeding arising out of the same general allegations, be liable for the reasonable fees and expenses of more than one separate law firm at any time for all Indemnified Parties not having actual or potential conflicts among them, except to the extent that local counsel, in addition to its regular counsel, is required in order to effectively defend against such action or proceeding.  All such fees and expenses shall be invoiced to [New Co], with such detail and supporting information as [New Co] may reasonably require, in such intervals as [New Co] shall require under its standard billing processes.

If the Indemnified Party receives notice from [New Co] that [New Co] has elected to assume the defense of the action or proceeding, [New Co] will not be liable for any attorney fees or other legal expenses subsequently incurred by the Indemnified Party in connection with the matter.

[New Co] shall not be liable for any settlement of any claim against an Indemnified Party made without [New Co]'s written consent, which consent shall not be unreasonably withheld or delayed.  [New Co] shall not, without the prior written consent of an Indemnified Party, which consent shall not be unreasonably withheld or delayed, settle or compromise any claim, or permit a default or consent to the entry of any judgment, that would create any financial obligation on the part of the Indemnified Party not otherwise within the scope of the indemnified liabilities.

The termination of this Settlement Agreement shall not affect the indemnity provided hereunder, which shall remain operative and in full force and effect. Notwithstanding anything in

this Section 23 to the contrary, this Section 23 of the Settlement Agreement shall not be applicable with respect to any of the matters covered by Section 2.9 of the Equity Registration Rights Agreement.

### 24.    Costs and Attorneys Fees

A.    <u>Fees and Expenses</u>.  [New Co] agrees to reimburse the UAW and Class Counsel at or prior to the consummation of the transactions contemplated in Section 8 for reasonable attorney and professional fees and expenses based on hours worked and determined in accordance with the current market rates (not to include any upward adjustments such as any lodestar multipliers, risk enhancements, success fee, completion bonus or rate premiums) incurred in connection with the negotiation of the Equity Subscription Agreement, the Relevant [New Co] Equity Agreements, the Note, the Indenture, the Warrant and all related transaction agreements and the consummation of the closings thereunder, and all court proceedings, including without limitation, any litigation and discovery, related to obtaining the Approval Order and any other orders required to obtain final approval of the Sale Transaction and any related appeals and motion practice.  The parties may request that the Bankruptcy Court include in its Approval Order reference to [New Co's] reimbursement of fees and expenses pursuant to this Section 24.A.

B.    <u>Fees After the Closing Date</u>.  Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with either Henry II or Henry I or the bankruptcy proceeding, except that any party to this Settlement Agreement may seek such fees and costs as may be allowed by law.

### 25.    Releases and Certain Related Matters

A.    In consideration of [New Co]'s entry into this Settlement Agreement, and the other obligations of [New Co] contained herein, the UAW, acting on its own behalf and as authorized representative of the Class and the Covered Group, hereby consents to the entry of the Judgment, which shall be binding upon all Class Members and the Covered Group.

B.    As of the Closing Date, each UAW Releasee releases and forever discharges each other UAW Releasee and each other Indemnified Party and shall be forever released and discharged with respect to any and all rights, claims or causes of action that such UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of or based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with either Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

C.    As of the Closing Date, the UAW Releasees release and forever discharge [New Co], and its officers, directors, employees, agents, and subsidiaries, and the [New Co] Plan and its fiduciaries, with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims

arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken to carry out this Settlement Agreement in accordance with this Settlement Agreement and applicable law.

D.     As of the Closing Date, the UAW Releasees release and forever discharge the Existing External VEBA and the fiduciaries, trustees, and committee that administer the Existing External VEBA, and the Existing Internal VEBA and the fiduciaries, trustees, and committee that administer the Existing Internal VEBA with respect to any and all rights, claims or causes of action that any UAW Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to (a) any of the claims arising, or which could have been raised, in connection with Henry I, Henry II, or the GM bankruptcy proceedings, concerning the provision of Retiree Medical Benefits and the terms of this Settlement Agreement, (b) any claims that this Settlement Agreement, any document referred to or contemplated herein is not in compliance with applicable laws and regulations, and (c) any action taken by such fiduciaries, trustee and/or committees to carry out this Settlement Agreement and to transfer assets of the Existing External VEBA and Existing Internal VEBA to the New VEBA in accordance with this Settlement Agreement and applicable law.

E.     As of the Closing Date, [New Co] releases and forever discharges the Class Representatives and Class Counsel from any and all claims, demands, liabilities, causes of action or other obligations of whatever nature, including attorney fees, whether known or unknown, that arise from their participation or involvement with respect to the assertion of the claims and negotiations leading to this Settlement Agreement. This release does not extend to obligations arising from the terms of the Settlement Agreement itself.

F.     Neither the entry into this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an Admission by or against [New Co] or any UAW Releasee of any fault, wrongdoing or liability whatsoever.

## 26.     Dispute Resolution

A.     <u>Coverage</u>.  Any controversy or dispute arising out of or relating to, or involving the enforcement, implementation, application or interpretation of this Settlement Agreement shall be enforceable only by [New Co], the Committee and the UAW, and the Approval Order will provide that the Bankruptcy Court will retain jurisdiction to resolve any disputes, and, in the event that the bankruptcy proceeding has been closed or dismissed, the parties agree that any necessary litigation to resolve such disputes shall be brought before the Court. Notwithstanding the foregoing, any disputes relating solely to eligibility for participation or entitlement to benefits under the New Plan shall be resolved in accordance with the applicable procedures such Plan shall establish, and nothing in this Settlement Agreement precludes Class Members from pursuing appropriate judicial review regarding such disputes; provided however, that no claims related to Retiree Medical Benefits for claims incurred after the Implementation Date may be brought against [New Co], any of its affiliates, or the [New Co] Plan.

B.    <u>Attempt at Resolution</u>.  Although the Bankruptcy Court retains exclusive jurisdiction to resolve disputes arising out of or relating to the enforcement, implementation, application or interpretation of this Settlement Agreement, the parties agree that prior to seeking recourse to the Bankruptcy Court, the parties shall attempt to resolve the dispute through the following process:

(i)    The aggrieved party shall provide the party alleged to have violated this Settlement Agreement ("<u>Dispute Party</u>") with written notice of such dispute, which shall include a description of the alleged violation and identification of the Section(s) of the Settlement Agreement allegedly violated.  Such notice shall be provided so that it is received by the Dispute Party no later than 180 calendar days from the date of the alleged violation or the date on which the aggrieved party knew or should have known of the facts that give rise to the alleged violation, whichever is later, but in no event longer than 3 years from the date of the alleged violation.

(ii)    If the Dispute Party fails to respond within 21 calendar days from its receipt of the notice, the aggrieved party may seek recourse to the Bankruptcy Court; provided however, that the aggrieved party waives all claims related to a particular dispute against the Dispute Party if the aggrieved party fails to bring the dispute before the Bankruptcy Court within 180 calendar days from the date of sending the notice.

All the time periods in Section 26 of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

C.    <u>Alternate Means of Resolution</u>.  Nothing in this Section shall preclude [New Co], the UAW, or the Committee from agreeing on any other form of alternative dispute resolution or from agreeing to any extensions of the time periods specified in this Section.

D.    <u>Arbitration for Certain Disputes</u>.  Notwithstanding anything in Section 26.A or 26.B of this Settlement Agreement to the contrary, any dispute or controversy arising under the last paragraph of Section 5.D or the last paragraph of Section 12 of this Settlement Agreement shall be resolved in the following manner:

(i)    While the parties agree that each of the disputes referenced in Section 26.D of this Settlement Agreement may be submitted to arbitration, they first shall endeavor to resolve the dispute through the following procedures:

(1)    the aggrieved party shall provide the other party with written notice of such dispute;

(2)    the written notice in Section 26.D(i)(1) of this Settlement Agreement shall include a description of the alleged violation and identify the Section(s) of the Settlement Agreement allegedly violated;

(3)    the party receiving the notice shall respond in writing within 21 calendar days of receipt of notice; and

(4)    within 21 calendar days of that response the parties shall meet in an effort to resolve the dispute.

- 25 -

All the time periods in this Section 26.D of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

(ii)    Should the parties be unable to resolve the dispute within 30 calendar days from the date of the meeting set forth in Section 26.D(i)(4) of this Settlement Agreement, either party may send written demand to the other party that the issue be resolved by arbitration.  The failure to demand arbitration within 60 calendar days from the date of the meeting set forth in Section 26.D(i)(4) of this Settlement Agreement shall waive any right to such arbitration over the issue, absent mutual written agreement to the contrary by the parties.  If a party fails to make a timely demand for arbitration pursuant to this Section 26.D(ii), such party may not pursue the dispute in court, and the dispute will be resolved on the basis of the position taken by the opposing or answering party.

(iii)    In the event that [New Co], the UAW, or the Committee proceed to arbitration in accordance with this Section 26.D, that dispute shall be submitted to an arbitrator (the "Arbitrator") who will not have the authority to modify or to amend this Settlement Agreement, but only to apply this Settlement Agreement, as written, to particular factual situations based on a preponderance of the evidence.  The Arbitrator shall not have the authority to award punitive or exemplary damages.  Interest shall be paid on any delayed payments as a result of the arbitration process.  The interest will be calculated daily at a rate equal to the OPEB Discount Rate for each day that amounts remain outstanding.  Such arbitration shall take place in Detroit, Michigan unless otherwise agreed upon in writing by the parties.  Any award shall be in writing and issued within 30 days from the close of the hearing, unless the parties otherwise agree.  The award shall be final, conclusive and binding on [New Co], the UAW, and the Committee.  The award may be reduced to judgment in any appropriate court having jurisdiction in accordance with the provisions of applicable law.

(iv)    In the event that a dispute arising under this Section is taken to arbitration, the Arbitrator shall be the arbitrator/umpire used by [New Co] and the UAW for disputes arising under the then applicable [New Co]-UAW National Agreement; provided that, if within 15 days of receipt of the written arbitration demand referred to in Section 26.D(ii), the parties agree in writing that the dispute requires an arbitrator with actuarial expertise, then the Arbitrator shall be a person with actuarial expertise upon whom the parties mutually agree in writing, but failing such mutual agreement with 30 days of receipt of the written arbitration demand referred to in Section 26.D(ii), the arbitrator/umpire used by [New Co] and the UAW for disputes arising under the then applicable [New Co]-UAW National Agreement shall select a person with actuarial expertise to serve as the Arbitrator.

(v)    [New Co], the UAW, and the Committee shall cooperate in setting a hearing date for the arbitration as soon as possible following selection of the Arbitrator.

**27.    Submission of the Settlement Agreement**

The parties shall submit this Settlement Agreement to the Bankruptcy Court and jointly work diligently to have this Settlement Agreement approved by the Bankruptcy Court as soon as possible.  The parties shall give notice to all affected individuals, in a manner approved by the

Bankruptcy Court. The parties shall seek from the Bankruptcy Court any order necessary to comply with the Federal Rules of Bankruptcy Procedure or any other applicable rule of procedure or statutory requirement that must be met to give this Settlement Agreement full force and effect.

### 28. Conditions

This Settlement Agreement is conditioned upon the occurrence or resolution of the conditions described in subparagraphs A and B of this Section. The failure of the conditions described in subparagraphs A and/or B shall render this Settlement Agreement void.

A.    Judgment/Approval Order. The Bankruptcy Court shall have entered a Judgment approving and accepting this Settlement Agreement in all respects and as to all parties, including [New Co], the UAW, the Class and the Covered Group and the Closing shall have occurred in reliance on such Judgment. Such Approval Order shall be reasonably acceptable in form and substance to [New Co] and the UAW. This condition shall be deemed to have failed upon issuance of an order disapproving this Settlement Agreement, or upon the issuance of an order approving only a portion of this Settlement Agreement but disapproving other portions, unless [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, agree otherwise in writing.

B.    Existing Internal VEBA Sponsorship. [New Co], or one of its Subsidiaries, shall assume from GM sponsorship of the Existing Internal VEBA. In connection therewith, [New Co] shall (i) have all of the rights, title and interest as plan sponsor, plan administrator or employer under the Existing Internal VEBA, (ii) have any responsibility, obligation or liability of plan sponsor or plan administrator relating to, the Existing Internal VEBA and each contract, agreement or arrangement established thereunder or relating thereto, and (iii) operate the Existing Internal VEBA in accordance with, and to otherwise comply with the [New Co]'s obligations under, this Settlement Agreement, effective as of the Closing Date and subject to approval by the Bankruptcy Court, including, without limitation, the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW Related Account in the Existing Internal VEBA to the New VEBA.

### 29. No Admission; No Prejudice

A.    Notwithstanding anything to the contrary, whether set forth in this Settlement Agreement, the MOU, the Judgment, or any notice, any documents filed with the Court in either Henry I, Henry II, or the GM bankruptcy proceedings, any documents, whether provided in the course of or in any manner whatsoever relating to the discussions between [New Co] and UAW with respect to health care benefits or relating to this Settlement Agreement, whether distributed, otherwise made available to or obtained by any person or organization, including without limit, [New Co] Active Employees, Class Members, or their spouses, surviving spouses or dependents, or to the UAW or [New Co] in the course of the negotiations that led to entry into this Settlement Agreement, or otherwise:

(i) [New Co] has denied, and continues to deny, that it is responsible for providing medical benefits to retirees. Neither this Settlement Agreement nor any document referred to or contemplated herein may be construed as, or may be viewed or used as, an Admission by or

against the [New Co] of any fault, wrongdoing or liability whatsoever, or as an Admission by [New Co] of any claim or argument made by or on behalf of the UAW, [New Co] Active Employees, the Class or the Covered Group, that it is the successor in interest of GM. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any settlement actions by [New Co] may not be construed, viewed or used as an Admission by or against [New Co].

(ii) The UAW, acting on its own behalf and as the authorized representative of the Class Members, has claimed, and continues to claim, that the allegations, claims and contentions made against [New Co] have merit. Neither this Settlement Agreement nor any document referred to or contemplated herein nor any settlement actions may be construed as, or may be viewed or used as, an Admission by or against any of the UAW, the Class Representatives or the Class Members of any fault, wrongdoing or liability whatsoever or of the validity of any claim or argument made by or on behalf of [New Co] that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor of interest to GM. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any settlement actions by any of the UAW, the Class Representatives or the Class Members, including without limitation, the acceptance of any retiree health care benefits under any of the [New Co] health care plans set forth in this Settlement Agreement, may not be construed, viewed or used as an Admission by or against any of the UAW, the Class Representatives or the Class that [New Co] has a unilateral right to modify or terminate retiree health care benefits, has no obligation to assume the MOU, or that [New Co] is not a successor to GM.

(iii) Entering into this Settlement Agreement and performance of any of the settlement actions shall not be construed as, or deemed to be evidence of, an Admission by any of the parties hereto, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal or forum for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement.

For the purposes of this Section 29, [New Co] refers to [New Co] and the UAW refers to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, as organizations, as well as any and all of their respective directors, officers, employees, and agents.

This Settlement Agreement and anything occurring in connection with reaching this Settlement Agreement are without prejudice to [New Co], the UAW and the Class. The parties may use this Settlement Agreement to assist in securing the Judgment approving the settlement. It is intended that [New Co], the UAW, the Committee, the Class Representatives, the Class, the Covered Group and Class Counsel shall not use this Settlement Agreement, or anything occurring in connection with reaching this Agreement, as evidence against [New Co], the UAW, the Class or the Covered Group in any circumstance except where the parties are operating under or enforcing this Settlement Agreement or the Judgment approving this Settlement Agreement.

### 30. Duration and Termination of Settlement Agreement

This Settlement Agreement will remain in effect unless and until terminated in accordance with this Section and as provided for in Section 28 of this Settlement Agreement. Termination of this Settlement Agreement may occur as follows:

(i) If the Judgment is denied in whole or in material part, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(ii) If an Approval Order satisfactory to the parties, as described in Section 28.A of this Settlement Agreement or any other order authorizing the Sale Transaction, is entered by the Bankruptcy Court, but overturned on appeal or otherwise such that there is or may be a material negative impact on the rights, obligations or benefits provided hereunder to the UAW, the Class, the Covered Group or [New Co], either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement upon 30 days' written notice to the other parties and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

(iii) If any court, agency or other tribunal of competent jurisdiction issues a determination that any part of this Settlement Agreement is prohibited or unenforceable in any material respect, either [New Co] or the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, may terminate this Settlement Agreement by 30 days' written notice to the other party and the rights and obligations of all parties shall revert to the status quo ante as if this Settlement Agreement had never been entered.

Notwithstanding the foregoing, Sections 22, 23, 26 and 29 shall survive the termination of this Settlement Agreement.

### 31. National Institute for Health Care Reform

In recognition of the interest of [New Co], the UAW, the Class and the Covered Group in improving the quality, affordability, and accountability of health care in the United States, the parties agree that as a part of this settlement [New Co] and the UAW shall establish a National Institute for Health Care Reform ("Institute"). The Institute shall be established and receive its first annual funding payment as soon as practicable after the Initial Effective Date on the basis set forth in the term sheet attached hereto as Exhibit G to this Settlement Agreement. The annual funding payment will be payable in four equal quarterly installments. The funding and operation of the Institute shall be separate, independent and distinct from the New Plan and the New VEBA. Any payments by [New Co] to the Institute shall be governed exclusively by the term sheet and are not in any way related to [New Co]'s payment obligations as described in Sections 8 and 12 of this Settlement Agreement.

### 32.    Other Provisions

A.    References in this Settlement Agreement to "Sections," "Paragraphs" and "Exhibits" refer to the Sections, Paragraphs, and Exhibits of this Settlement Agreement unless otherwise specified.

B.    The Bankruptcy Court (or in the event the bankruptcy proceeding has been closed or dismissed, the Court) will, subject to Section 26 of this Settlement Agreement, resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement.    Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Bankruptcy Court or the Court, as applicable, and expressly waives any argument it may have with respect to venue or forum non conveniens.

C.    This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement.    This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

D.    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

E.    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

F.    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.    For purposes of clarification and without limitation as to other beneficiaries, GM is intended to be a third party beneficiary of this Settlement Agreement.

G.    Each of [New Co], the UAW, the Committee, the Class and the Covered Group shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

H.    This Settlement Agreement shall be construed in accordance with applicable federal laws of the United States of America.

I.    Any provision of this Settlement Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent any provision of this Settlement Agreement is invalid or unenforceable as provided for in Section 32.J of this Settlement Agreement, it shall be replaced by a valid and enforceable provision agreed to by [New Co] and the UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group (which agreement shall not be unreasonably withheld) that preserves the same economic effect for the parties under this Settlement Agreement; provided however, that to the extent that such prohibited or unenforceable provision cannot be replaced as contemplated and the consequences of such prohibited or unenforceable provision causes this Settlement Agreement to fail of its essential purpose then this Settlement Agreement may be voided at the sole discretion of the party seeking the benefit of the prohibited or unenforceable provision. Class Counsel is expressly authorized to take all appropriate action to implement this provision.

J.    In the event that any payment referenced in this Settlement Agreement is due to be made on a weekend or a holiday, the payment shall be made on the first business day following such weekend or holiday.

K.    In the event that any legal or regulatory approvals are required to effectuate the provisions of this Settlement Agreement, [New Co], the UAW, the Class, and the Committee will fully cooperate in securing any such legal or regulatory approvals.

L.    Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing and delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, transmitted by email if in an Adobe Acrobat PDF file, or sent by registered or certified mail, postage prepaid, at the following addresses. All such notices and communication shall be effective when delivered by hand, or, in the case of registered or certified mail, Federal Express or other carrier, upon receipt, or, in the case of facsimile or email transmission, when transmitted (provided, however, that any notice or communication transmitted by facsimile or email shall be immediately confirmed by a telephone call to the recipient.):

If to [New Co], addressed to:

Diana Tremblay
GMNA Vice President of Labor Relations
[New Co]
2000 Centerpoint Parkway
Pontiac, MI 48341
Tel: (248) 753-2243

in each case with copies to:

> Francis S. Jaworski
> Office of the General Counsel
> [New Co]
> Mail Code 482-C25-B21
> 300 Renaissance Center
> P.O. Box 300
> Detroit, MI 48265-3000
> Tel: (313) 665-4914
>
> Cadawalder, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attention: R. Ronald Hopkinson/Lisa J. Pauquette/John J. Rapisardi
> Tel: (212) 504-6000

If to UAW, addressed to:

> Daniel W. Sherrick
> General Counsel
> International Union, United Automobile, Aerospace and
> Agricultural Implement Workers of America
> 8000 East Jefferson Avenue
> Detroit, MI  48214
> Tel: (313) 926-5216

with a copy to:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attention: A. Richard Susko/Richard S. Lincer/David I. Gottlieb
> Tel: (212) 225-2000

Each party may substitute a designated recipient upon written notice to the other parties.


[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

**AGREED:**

By: _____          Date:

    Francis S. Jaworski
    [New Co]
    Mail Code 482-C25-B21
    300 Renaissance Center
    P.O. Box 300
    Detroit, MI 48265-3000
    Tel: (313) 665-4914
    francis.s.jaworski@gm.com

    COUNSEL FOR [New Co]

By: _____          Date:

    Daniel W. Sherrick  (P37171)
    8000 East Jefferson Avenue
    Detroit, MI  48214
    Tel: (313) 926-5216

    COUNSEL FOR
    INTERNATIONAL UNION, UNITED AUTOMOBILE,
    AEROSPACE AND AGRICULTURAL IMPLEMENT
    WORKERS OF AMERICA

**ACKNOWLEDGED AND CONFIRMED:**

By: _____          Date:

    William T. Payne
    Stember Feinstein Doyle & Payne, LLC
    Pittsburgh North Office
    1007 Mt. Royal Boulevard
    Pittsburgh, PA  15222
    Tel: (412) 492-8797
    wpayne@stargate.net

    CLASS COUNSEL

# EXHIBITS

Exhibit A:        Trust Agreement

Exhibit B:        [Reserved]

Exhibit C:        [Reserved]

Exhibit D:        Form of Equity Registration Rights Agreement

Exhibit E:        Form of Trust Agreement Amendment

Exhibit F:        2009 Benefits Changes

Exhibit G:        National Institute for Health Care Reform Term Sheet

Exhibit H:        [Reserved]

Exhibit I:        Form of [New Co] Note*

Exhibit J:        Form of Preferred Stock Certificate of Designation

Exhibit K:        Form of Stockholders Agreement**

Exhibit L:        Form of Warrant

*Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit Y to the Master Sale and Purchase Agreement, dated June 1, 2009, by and among [New Co], GM and the other parties thereto (the "MSPA").  The VEBA Note Term Sheet is attached hereto as Exhibit I pending agreement on the final form.

**Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

# EXHIBIT A

# TRUST AGREEMENT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The form of trust agreement attached hereto includes references to Ford Motor Company, Inc. and Chrysler, LLC and to separate class action cases brought against each of those companies by the UAW and a class of each company's retirees.  The form of trust agreement in the attached Exhibit E is designed to accommodate the possibility that settlement agreements are entered into in those cases pursuant to which those companies would also deposit agreed-upon amounts into the trust described in the attached Exhibit E.  But there is currently no settlement agreement in either of those cases, and there is no guarantee that there will be such a settlement agreement, or that any potential settlement of those cases would include an agreement to pay any amount into the trust described in the attached Exhibit E.

In the event that there is no settlement agreement in either or both of those cases, or that any settlement of either or both of those cases does not include a form of trust agreement identical in all respects to the attached Exhibit E, the references to such company and the corresponding case and settlement agreement shall be removed from the form of trust agreement, and the trust agreement shall be conformed to relate solely to the remaining settlement agreements or to this Settlement Agreement as the case may be.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## UAW RETIREE MEDICAL BENEFITS TRUST

THIS TRUST AGREEMENT, entered into and effective as of _____, by and among _____, _____, _____, _____, _____, _____, _____, _____, _____, _____ (the "Committee") and _____ (the "Trustee").

## W I T N E S S E T H:

WHEREAS, General Motors Corporation ("GM"), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), along with respective Class Representatives of plaintiff class members in the case of *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007), have entered into a settlement agreement dated February __, 2008 ("GM Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for GM to make certain deposits and remittances to a trust established as a voluntary employees' beneficiary association (the "Trust"), and credited to the GM Separate Retiree Account in the Trust.

WHEREAS, Chrysler, LLC ("Chrysler"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Chrysler, LLC,* Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007), have entered into a settlement agreement dated _____, 2008 ("Chrysler Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Chrysler to make certain deposits and remittances to the Trust, and credited to the Chrysler Separate Retiree Account in the Trust.

WHEREAS, Ford Motor Company, Inc. ("Ford"), UAW, along with respective class representatives of plaintiff class members in the case of *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007). have entered into a settlement agreement dated _____, 2008 ("Ford Retiree Settlement"), that, subject to Court approvals and other stated conditions, provides for Ford to make certain deposits and remittances to the Trust, and credited to the Ford Separate Retiree Account in the Trust.

WHEREAS, the Settlements contemplate a Committee, as more fully defined herein, (the "Committee") to act on behalf of employees' beneficiary associations (the "EBAs"), which are incorporated in the Trust;

WHEREAS, by an order dated _____, the Court approved the Chrysler Settlement, and by an order dated _____, the Court approved the Ford Settlement, and by an order dated _____, the Court approved the GM Settlement (collectively, the "Court Order");

WHEREAS, through operation of each Court Order the Committee was formed;

WHEREAS, the Trust consists of three separate employees' beneficiary associations (collectively, the "EBAs"), and the membership of each EBA includes the applicable Eligible Group;

WHEREAS, each EBA, acting through the Committee, will establish and maintain a separate employee welfare benefit plan (collectively the "Plans") on behalf of the members of the respective Eligible Groups;

WHEREAS, the Committee, on behalf of the EBAs, has entered into this Trust Agreement to implement the Trust, to be known as the "UAW Retiree Medical Benefits Trust," which shall include the GM Separate Retiree Account, the Ford Separate Retiree Account and the Chrysler Separate Retiree Account (collectively the "Separate Retiree Accounts"), to accept the deposits, contributions, transfers and remittances of, or attributable to, each Company in the respective Separate Retiree Account;

WHEREAS, the purpose of each Separate Retiree Account is to serve as a separate, dedicated account to be used for the sole purpose of funding Benefits provided under the related Plan to the Eligible Group under that Plan and defraying the reasonable expenses of such Plan, as set forth in the GM Retiree Settlement, Ford Retiree Settlement and the Chrysler Retiree Settlement respectively;

WHEREAS, the purpose of this Trust is to allow for the pooled investment of assets credited to each of the Separate Retiree Accounts and to provide the economy of scale to the Committee in providing services for each of the Plans, but not to allow for the assets attributable to any one Separate Retiree Account to offset liabilities or defray the expenses attributable to any other Separate Retiree Account;

WHEREAS, the Committee is willing to serve as the named fiduciary of each Plan and the Trustee desires to serve in such capacity with respect to the Trust;

WHEREAS, the Committee is willing to exercise the authority granted to it herein;

WHEREAS, the Trustee is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement;

WHEREAS, the Trust is intended to comply with the requirements of sections 419A(f)(5)(A) and 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deposits to the Trust are described in section 302(c)(2) of the Labor Management Relations Act, 1947, as amended ("LMRA");

NOW THEREFORE, in consideration of the premises and the covenants contained herein, the Committee and the Trustee agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1   <u>Authorized Investments</u>.  Subject to any investment guidelines established by the Committee and communicated to the Trustee pursuant to Section 10.4, "Authorized Investments" shall not be limited to investments that are defined as legal investments for trust funds under the laws of any jurisdiction.  Authorized Investments shall include, but shall not be limited to (i) cash held in interest bearing accounts or cash equivalents that are credited with earnings; (ii) bonds, debentures, notes, or other evidences of indebtedness; (iii) stocks (regardless of class) or other evidences of ownership in any corporation, partnership, mutual investment fund (including funds for which the Trustee or an affiliate thereof serves as investment manager), investment company, association, joint venture or business trust; (iv) derivative securities, including without limitation future contracts and option contracts; (v) investment contracts issued by legal reserve insurance companies; (vi) collective investment funds; and (vii) any other investment or transaction permitted by applicable law.

Section 1.2   <u>Beneficiary</u>.  A person designated as a beneficiary of a Participant by the Participant, who is in an Eligible Group and who is or may become entitled to Benefits under one of the Plans through his or her relationship with an Eligible Retiree or with a deceased retiree or employee of a Company.

Section 1.3   <u>Benefits</u>.  During the Initial Accounting Period with respect to each Plan, Benefits under each such Plan shall have the same meaning as "Retiree Medical Benefits" (as that term is defined under each Company Settlement), that is, post retirement medical benefits, including but not limited to hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare.  After the Initial Accounting Period ends with respect to a Plan, Benefits, pursuant to an amendment to such Plan, may include any benefit permissible under section 501(c)(9) of the Code and section 3(1) of ERISA.

Section 1.4   <u>Chair</u>.  The Member selected pursuant to Section 9.5 to perform the functions described in Article IX.

Section 1.5   <u>Chrysler</u>.  Chrysler LLC, a Delaware corporation with its principal offices in Auburn Hills, Michigan, and its successors and assigns.

Section 1.6   <u>Chrysler Eligible Group</u>.  The Class or Class Members and the Covered Group as set forth in the Chrysler Settlement and repeated verbatim in Exhibit A.

Section 1.7   <u>Chrysler Health Care Program</u>.  The employee welfare benefit plan maintained by Chrysler as in effect as of October 12, 2007, which provided retiree medical benefits to Chrysler employees who retired from UAW-represented bargaining units.

Section 1.8 <u>Chrysler Retiree EBA</u>.  The UAW Chrysler Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.9   <u>Chrysler Retiree Plan</u>.  The UAW Chrysler Retirees Medical Benefits Plan, as established and maintained by the Chrysler Retiree EBA, as may be amended from time to

time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Chrysler Eligible Group.

Section 1.10  Chrysler Retiree Settlement.  Settlement of the claims in *UAW v. Chrysler, LLC,* Civ. Act. No. _:07-cv-14310 (E.D. Mich. complaint filed _____, 2007).

Section 1.11  Chrysler Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Chrysler Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Chrysler Retiree Plan; and (b) the Benefits provided pursuant to the Chrysler Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Chrysler Separate Retiree Account's share of investment expenses incurred.

Section 1.12  Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.13  Committee.  The group of Independent Members and UAW Members formed pursuant to the Settlements to implement the Trust, to administer each Plan, and to serve as a "named fiduciary" of each Plan within the meaning of section 402(a)(2) of ERISA, including the exercise of authority or control over Plan assets.

Section 1.14  Company.  The term Company shall mean Chrysler, Ford, or GM, as the case may be (collectively the "Companies").

Section 1.15  Company Health Care Plan.  The Chrysler Health Care Program for Hourly Employees, the Ford Retiree Health Program, and the General Motors Health Care Program for Hourly Employees, as the case may be (collectively "Company Health Care Plans").

Section 1.16  EBA.  The Chrysler Retiree EBA, the Ford Retiree EBA, or the GM Retiree EBA, as the case may be (collectively "EBAs").

Section 1.17  Eligible Group.  All individuals who satisfy the requirements to be included in either the Chrysler Eligible Group, the Ford Eligible Group, or the GM Eligible Group, as the case may be (collectively "Eligible Groups").

Section 1.18  Eligible Retiree.  A former employee retired from a Company who satisfies the requirements to be included in an Eligible Group.

Section 1.19  Employer Security.  Any obligation, note, warrant, bond, debenture, stock or other security within the meaning of section 407(d)(1) of ERISA that is acquired or held by the Trust (or arising from any such security through conversion) pursuant a deposit or transfer under one of the Settlements the acquisition or holding of which (i) is not prohibited by sections 406(a)(1)(E) or 406(a)(2) of ERISA, or (ii) is the subject of a prohibited transaction exemption provided under section 408 of ERISA.

Section 1.20  Employer Security Sub-Account.  The sub-account maintained by the Trustee within each Separate Retiree Account to hold separately any Employer Security and any

4

proceeds from the disposition of any Employer Security, at the direction of the Committee or the Independent Fiduciary pursuant to Article XI.

Section 1.21    ERISA.  The Employee Retirement Income Security Act of 1974, as amended through any date relevant under this Trust Agreement, and any successor statute thereto.

Section 1.22    Ford.  Ford Motor Company, a Delaware corporation with its principal office in Dearborn, Michigan, and its successors and assigns.

Section 1.23    Ford Eligible Group.  The Class or Class Members and the Covered Group as set forth in the Ford Settlement and repeated verbatim in Exhibit B.

Section 1.24    Ford Retiree Health Program.  The portion of the Hospital-Surgical-Medical-Drug-Dental-Vision Program maintained by Ford as in effect on and after the effective date of the 2007 UAW-Ford National Collective Bargaining Agreement, which provided retiree medical benefits to Ford hourly employees who retire from UAW-represented bargaining units.

Section 1.25    Ford Retiree EBA.  The UAW Ford Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.26    Ford Retiree Plan.  The UAW Ford Retirees Medical Benefits Plan, as established and maintained by the Ford Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the Ford Eligible Group.

Section 1.27    Ford Retiree Settlement. Settlement of the claims in *UAW v. Ford Motor Co.,* Civ. Act. No. _____ (E.D. Mich. complaint filed _____, 2007).

Section 1.28    Ford Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any Ford Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income, and any other income held in the Trust Fund exclusively to fund the Ford Retiree Plan; and (b) the Benefits provided pursuant to the Ford Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the Ford Separate Retiree Account's share of investment expenses incurred.

Section 1.29    GM.  The General Motors Corporation, a Delaware corporation with its principal offices in Detroit, Michigan, and its successors and assigns.

Section 1.30    GM Eligible Group.  The Class or Class Members and the Covered Group as set forth in the GM Settlement and repeated verbatim in Exhibit C.

Section 1.31    General Motors Health Care Program for Hourly Employees.  The collectively bargained General Motors Health Care Program for Hourly Employees as set forth in Exhibit C-1 of the 2007 and prior GM-UAW National Agreements, as applicable to those GM-UAW Represented Employees who had attained seniority prior to September 14, 2007.

Section 1.32  GM Retiree EBA.  The UAW GM Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

Section 1.33 GM Retiree Plan.  The UAW GM Retirees Medical Benefits Plan, as adopted by the GM Retiree EBA, as may be amended from time to time by the Committee, as specified herein, to make available Benefits to Participants and Beneficiaries included in the GM Eligible Group.

Section 1.34 GM Retiree Settlement.  Settlement of the claims in *UAW v. General Motors Corp.,* Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007).

Section 1.35 GM Separate Retiree Account.  The separate account in the Trust, including any Employer Security Sub-Account attributable to any GM Employer Security, maintained to account for (a) the assets attributable to the deposits, contributions, remittances, subsidies, investment income and any other income and other income held in the Trust Fund exclusively to fund the GM Retiree Plan; and (b) the Benefits provided pursuant to the GM Retiree Plan, other liabilities, administrative expenses attributable to such Benefits, and the GM Separate Retiree Account's share of investment expenses incurred.

Section 1.36 Implementation Date.  The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in the GM Retiree Settlement or the Chrysler Retiree Settlement, as applicable, or with respect to Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

Section 1.37 Independent Fiduciary.  The entity that may be appointed from time to time by the Committee to serve pursuant to Article XI.

Section 1.38  Independent Member.  An individual person who serves as a member of the Committee and is not appointed by UAW, who satisfies the requirements of section 9.1, and whose experience in such fields, without limitation, as health care, employee benefits, asset management, human resources, labor relations, economics, law, accounting or actuarial science indicates a capacity to fulfill the powers and duties of Article X in the manner described in Section 10.11, and wherever practicable, helps to provide a range of relevant experiences to the Committee.

Section 1.39  Initial Accounting Period.  With respect to each Plan, the period before the later of the date that (a) the respective Company determines that its obligations, if any, with respect to the Plan made available to the Participants and Beneficiaries included in that Company's Eligible Group are subject to settlement accounting as contemplated by paragraphs 90-95 of FASB Statement No. 106, as amended, or its functional equivalent; or (b) the Company is no longer obligated to make any further payments or deposits to the Trust, including, but not limited to, any Shortfall Amounts.

Section 1.40 Investment Manager.  An investment manager within the meaning of section 3(38) of ERISA appointed by the Committee in accordance with the provisions of Section 10.5.

Section 1.41 <u>Liaison</u>.  An individual appointed to perform the functions described in Section 9.11.

Section 1.42 <u>LMRA</u>.  The Labor Management Relations Act, 1947, as amended, and any successor statute thereto.

Section 1.43  <u>Member</u>.  A member of the Committee or his or her successor.

Section 1.44  <u>Participant</u>.  An Eligible Retiree who has fulfilled all requirements for participation as determined pursuant to Sections 2.1 and 2.2, who pays any contribution that is required as a condition of coverage, and who receives coverage pursuant to the terms of a Plan.

Section 1.45  <u>Plan</u>.  The Chrysler Retiree Plan, the Ford Retiree Plan, or the GM Retiree Plan, as the case may be (collectively the "Plans").

Section 1.46  <u>Separate Retiree Account</u>.  The Chrysler Separate Retiree Account, the Ford Separate Retiree Account or the GM Separate Retiree Account, as the case may be (collectively the "Separate Retiree Accounts").

Section 1.47 <u>Settlements</u>.  The GM Retiree Settlement, the Chrysler Retiree Settlement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

Section 1.48  <u>Trust Agreement</u>.  This agreement and all of its exhibits, as now in effect and as it may be amended hereafter from time to time by the Committee, acting on behalf of the EBAs.

Section 1.49  <u>Trust or Trust Fund</u>.  The UAW Retiree Medical Benefits Trust established by this Trust Agreement, incorporating each EBA, and comprising all property or interests in property held by the Trustee from time to time under this Trust Agreement

Section 1.50  <u>Trustee</u>.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by the Committee in accordance with Section 8.3.  Any corporation continuing as the result of any merger or consolidation to which the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed automatically to be continuing as the Trustee.

Section 1.51  <u>UAW</u>.  The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, CLC, and any successor thereof.

Section 1.52  <u>UAW Member</u>.  An individual person who serves as a member of the Committee and is appointed by UAW, pursuant to the terms of the Settlements and Article IX of this Trust Agreement.

Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the GM Retiree Settlement when relating to GM and/or the GM Eligible Group, the GM EBA, the GM Retiree Plan and the GM Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust

Agreement, shall have the meaning it has in the Chrysler Retiree Settlement when relating to Chrysler and/or the Chrysler Eligible Group, the Chrysler EBA, the Chrysler Retiree Plan and the Chrysler Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account.  If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

## ARTICLE II
## PARTICIPATION

Section 2.1    <u>Eligibility for Participation</u>.  Any Eligible Retiree or Beneficiary may receive Benefits funded, in whole or in part, by the Trust pursuant solely to the Plan adopted by the Committee in its discretion exercising the powers provided to it under Article X from time to time, on behalf of the EBA to which such Eligible Retiree or Beneficiary belongs.  In exercising its authority under Article X, the Committee may design each Plan to provide for separate bases of participation in the Plan for classes of Participants and Beneficiaries as set forth from time to time in the Plan so long as such design is reasonably related to the purposes for which the Trust was established and, provided further, that any such design only permits participation in the Plan by the Eligible Retirees or Beneficiaries who belong to the EBA on behalf of which the Committee adopted such Plan.   Participation in the Plan is contingent on the Eligible Retiree or Beneficiary satisfying any conditions set forth therein from time to time.  Under no circumstances may individuals other than Eligible Retirees or Beneficiaries be allowed to benefit from the Trust or participate in a Plan.

Section 2.2    <u>Determination by Committee</u>.  Any determination regarding the status of any individual as a Participant or Beneficiary under each Plan shall be solely and exclusively the responsibility of the Committee.

# ARTICLE III
## ESTABLISHMENT OF TRUST

Section 3.1 <u>Purpose</u>. The Trust is established for the purpose of providing Benefits to the Participants and Beneficiaries in accordance with each Plan and as are permissible under section 501(c)(9) of the Code as set forth herein; and upon termination of the Trust, to provide such Benefits to such persons as are permissible under section 501(c)(9) of the Code as set forth herein. The EBAs are incorporated within the Trust, each of which is intended to constitute a separate "employee organization" under section 3(4) of ERISA. The Trust, together with each Plan, is intended to constitute a "voluntary employees' beneficiary association" under section 501(c)(9) of the Code. Each Plan is intended to constitute an "employee welfare benefit plan" within the meaning of section 3(1) of ERISA. The Trust is established to allow for the pooled investment of assets credited to each Separate Retiree Account and to provide the economy of scale to the Committee in purchasing services for each of the Plans. Under no circumstances may the assets credited to one Separate Retiree Account offset the liabilities or defray the expenses attributable to another Separate Retiree Account. Further, each Separate Retiree Account shall be maintained for so long as there remains assets credited thereto.

Section 3.2 <u>Receipt of Funds</u>. The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company shall be accepted only upon the direction of the Independent Fiduciary. The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income. The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

Section 3.3 <u>No Diversion</u>. Except as otherwise provided herein, at no time shall any part of the corpus or income of the Trust Fund be used for or diverted to purposes other than funding Benefits for the exclusive benefit of the Participants and Beneficiaries, including payment of reasonable costs of establishment, amendment and administration of the Trust and each Plan, and at no time shall any part of the net earnings of the Trust Fund improperly inure to the benefit of any private individual as provided in section 501(c)(9) of the Code and section 1.501(c)(9)-4 of the Treasury Regulations promulgated thereunder.

Section 3.4 <u>Fiduciary Duties</u>.

(a) Except as otherwise provided either herein or by applicable law, the responsibilities of each fiduciary acting in such capacity shall be limited to the performance of those duties specifically assigned to it hereunder. No fiduciary shall have any responsibility for the performance of any duty not specifically so assigned, except to the extent such responsibility is imposed by applicable law. The Committee shall be the named fiduciary (as defined in section 402(a)(2) and as described in section 402(c)(3) of ERISA) hereunder with authority to control and manage the operation of the Trust, to the extent set forth herein, and with respect to each Plan independently, except that if an Independent Fiduciary is appointed by the Committee, the Independent Fiduciary, and not the Committee, shall be the named fiduciary with respect to all

discretionary actions regarding the valuation, acceptance, management, disposition and voting of Employer Securities.  Each fiduciary's responsibilities and duties with respect to each Plan shall be limited to the interests of that Plan's Participants and Beneficiaries.

(b) No Company is a fiduciary with respect to the Plans or the Trust.  In addition, (i) neither the Trustee, the Committee nor any person or entity related to the Plans or the Trust has any authority to bind any Company, either directly or indirectly, through any interpretations, findings of fact or conclusions regarding the Plans, the Trust and this Trust Agreement, (ii) no Company exercises any discretionary authority or discretionary control with respect to the management of any Plan or the Trust or exercises any authority or control with respect to the management or disposition of assets governed by this Trust Agreement, (iii) no Company renders investment advice for a fee or other compensation, direct or indirect, with respect to any assets governed by any Plan or by this Trust Agreement, and none has the authority or responsibility to do so, and (iv) no Company has discretionary authority or discretionary responsibility in the administration of any Plan or of the Trust.

Section 3.5    No Guarantee.  Nothing contained in the Trust or the Plans shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay Benefits to any person or make any other payment.  The obligation of a Plan to pay Benefits provided under such Plan is expressly conditioned on the availability of assets attributed to the Separate Retiree Account associated with that Plan to pay Benefits.  This Trust Agreement creates no obligation for any Company to deposit or remit any amount to the Trust Fund.  Except for payments of Benefits under a Plan, no Participant or Beneficiary shall receive any distribution of cash or other thing of current or exchangeable value, either from the Committee or the Trustee, on account of or as a result of the Trust Fund created hereunder.

Section 3.6    No Interest.  Except as provided in Section 12.2 with respect to Participants and Beneficiaries, none of the following persons or entities shall have any right, title or interest, whether legal or equitable, in the assets of the Trust Fund at any time, including following the termination of the Trust: the Companies, the UAW, the Committee, any Eligible Retiree, any Participant, or any Beneficiary.   At no time shall any account or separate fund be considered a savings account or investment or asset of any Eligible Retiree, Participant, Beneficiary, or class of Participants and Beneficiaries.

Section 3.7    Relationship to Settlements.  Notwithstanding anything in this Trust Agreement or the Plans to the contrary, neither the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall construe, interpret or apply this Trust Agreement or the Plans in a manner that would impair any right, would frustrate any purpose, or would be inconsistent with any provision in each applicable Settlement.  No construction, interpretation or application of the Trust or the Plans by the Committee, the Trustee, or any person acting under the authority of the Committee, the Trustee, the EBAs or the Trust shall bind any Company with regard to any dispute or conflict involving the Company.   In the event of a conflict between the Trust Agreement or a Plan and the corresponding Settlement, such Settlement shall control.

# ARTICLE IV
# DEPOSITS TO THE TRUST FUND

Section 4.1    Deposits from the Companies.  The Trust Fund shall accept from the Companies deposits to the Trust Fund, as specified in each Company's Settlement.  All deposits from a Company shall be credited to that Company's respective Separate Retiree Account.

Section 4.2    Remittances of Active Employee Contributions.  The Trust Fund shall accept remittances of active employee contributions, if any.  All such remittances shall be credited to the respective Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the employee contributions are made.

Section 4.3    Medicare Subsidies.  The Trust Fund shall accept Medicare Part D subsidies and any other governmental payments relating to the benefits provided to Participants and Beneficiaries pursuant to the Plans and Trust.  All Medicare subsidies and other governmental payments shall be credited to each Separate Retiree Account attributable to the Participants and Beneficiaries on whose behalf the subsidies or payments are made.

Section 4.4    Participant Contributions.  The Trust Fund shall accept contributions from Participants as permitted or required by the Committee.  Such Participant contributions may be remitted to the Trust Fund from each Company's pension plan pursuant to voluntary, authorized deductions from monthly pension payments from each Company's pension plan.  All Participant contributions shall be credited to the Separate Retiree Account attributable to the Participant making the contribution.

Section 4.5    Deposits and Remittances from Subsequent Employers of Future Eligible Retirees.  In the event of a sale, disposition, joint venture, merger or other corporate transaction that results in the displacement of a Company's Active Employee who is a member of the Covered Group (as those terms are defined in the Company's Settlement), the Trust may, but need not, accept deposits and remittances from a subsequent employer of such displaced employee, provided that such deposits and remittances are pursuant to a collective bargaining agreement between such subsequent employer and UAW.  All deposits and remittances from a subsequent employer shall be credited to the appropriate Separate Retiree Account relating to the displaced employee.

Section 4.6 Other Legal Sources.  The Trust may accept money or property from sources other than those described in Sections 4.1, 4.2, 4.4 and 4.5, provided that acceptance from any such other source is permitted by law and that such money or property is credited to the appropriate Separate Retiree Account(s) to which such money or property relates.

## ARTICLE V
## PAYMENTS FROM THE TRUST FUND

Section 5.1   <u>Payments from the Trust Fund</u>.

(a)  Subject to the direction of the Independent Fiduciary with respect to any Employer
Security, and except as provided in paragraph (b) below, the Trustee shall make
payments from the Trust Fund to pay Benefits under the Plans as directed by the
Committee or its designee.  Any payment of Benefits under the Plans must be charged to
the Separate Retiree Account attributable to the Participant or Beneficiary receiving the
benefits.

(b)  To the extent permitted by law, the Trustee shall be fully protected in making payments
out of the Trust Fund, and shall have no responsibility to see to the application of such
payments or to ascertain whether such payments comply with the terms of any Plan, and
shall not be liable for any payment made by it in good faith and in the exercise of
reasonable care without actual notice or knowledge of the impropriety of such payments
hereunder.  The Trustee may withhold all or any part of any payment as the Trustee in the
exercise of its reasonable discretion may deem necessary to protect the Trustee and the
Trust against any liability or claim on account of any income tax or other tax; and with all
or any part of such payment so withheld, may discharge any such tax liability.  Any part
of any such payment so withheld by the Trustee that may be determined by the Trustee to
be in excess of any such tax liability will upon such determination by the Trustee be paid
to the person or entity from whom or which it was withheld.

Section 5.2   <u>Method of Payments</u>.  The Trustee may make any payment required to be made
by it hereunder, unless directed otherwise by the Committee, by direct electronic deposit of the
amount thereof to the financial institution where the person or entity to whom or to which such
payment is to be made maintains an account, or by mailing a check in the amount thereof by
first class mail in a sealed envelope addressed to such person or entity to whom or to which
such payment is to be made, according to the direction of the Committee.  If any dispute arises
as to the identity or rights of persons who may be entitled to benefits hereunder, the Trustee
may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at
the discretion of the Committee, is settled by written stipulation of the parties concerned.

Section 5.3   <u>Excessive Payments</u>.  If the Trustee or the Committee determines that any
payment under the Trust or any Plan is excessive or improper, the recipient shall make
repayment thereof immediately following receipt of written notice from the Trustee or the
Trustee's agent.  If the recipient fails to make repayment to the Trustee or Trustee's agent of
such excessive or improper payment by the date requested by the Trustee or the Trustee's
agent, the Trustee may deduct the amount of such excessive or improper payment from any
other amounts thereafter payable to such person or may pursue repayment in accordance with
the provisions of Section 6.1(p).  Until repaid to the Trustee or Trustee's agent, the amount of
said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE VI
## TRUSTEE POWERS AND DUTIES

Section 6.1  <u>Powers of the Trustee</u>.  The Trustee shall have the following powers in addition to the powers customarily vested in trustees by law, provided however, that the Trustee's powers with respect to the investment of assets held in the Trust Fund shall be subject to (i) the funding policy established by the Committee and communicated to the Trustee under Section 10.3, (ii) any investment guidelines established by the Committee and communicated to the Trustee under Section 10.4, (iii) the instructions of an Independent Fiduciary appointed pursuant to Section 11.3, solely with respect to any Employer Security, and (iv) the instructions of the Committee or any Investment Manager appointed pursuant to Section 10.5:

(a)     With any cash at any time held by it, to purchase or subscribe for any Authorized Investment, and to retain such Authorized Investment in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(b)     To sell for cash or, with the consent of the Committee, on credit, to convert, to redeem, to exchange for another Authorized Investment, or otherwise to dispose of, any property at any time held by it, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(c)     To retain uninvested all or any part of the Trust Fund, provided that any uninvested assets shall be deposited in an interest-bearing account in any banking or savings institution, including an account established in the name of the Trustee if the Trustee is a depository institution;

(d)     To exercise any option appurtenant to any investment in which the Trust Fund is invested for conversion thereof into another Authorized Investment, or to exercise any rights to subscribe for additional Authorized Investments, and to make all necessary payments therefor, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(e)     To join in, consent to, dissent from or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, or readjustment of the finances of any corporations, entities or properties in which the Trust Fund may be invested, or the sale, mortgage, pledge, or lease of any such property or the property of any such corporation or entity on such terms and conditions as the Trustee may deem wise; to do any act (including the exercise of options, making of agreements or subscriptions, and payment of expenses, assessments, or subscriptions) which may be deemed necessary or advisable in connection therewith; and to accept any Authorized Investment which may be issued in or as a result of any such proceeding, and thereafter to hold the same, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or

14

by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(g)     To purchase any Authorized Investment at a premium or a discount;

(h)     Upon instruction from the Committee, to employ for the benefit of the Trust Fund suitable agents, actuaries, accountants, investment counselors, legal counsel and consultants, and to pay their reasonable expenses and compensation;

(i)     To purchase, to sell, to exercise, to allow to expire without exercise, and to honor the exercise of, options or contracts to purchase or sell stock, commodities, or other assets subject to such options or contracts, except that, with respect to any Employer Security, such action shall be taken only at the direction of an Independent Fiduciary;

(j)     With the consent of the Committee, to borrow, raise or lend moneys, for the purposes of the Trust in such amounts and upon such terms and conditions as the Committee, in its absolute discretion, may deem advisable, and for any such moneys so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging or mortgaging all or any part of the Trust Fund, provided that no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(k)     To cause any Authorized Investment in the Trust Fund to be registered in, or transferred into, its name as Trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund, and the Trustee shall be fully responsible for any misappropriation in respect to any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States, except as may otherwise be permitted under regulations promulgated by the Secretary of Labor;

(l)     To do all acts which it may deem necessary or proper and to exercise any and all powers of the Trustee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust;

(m)     To apply for, purchase, hold, transfer, pay premiums on, surrender, and exercise all incidents of ownership of any insurance contract, any guaranteed income, guaranteed investment, and similar contracts;

(n)     To invest in any collective investment fund, including a short-term collective investment fund maintained by the Trustee or an affiliate of the Trustee;

(o)     To collect income and distributions payable to the Fund;

(p)     Upon instruction from the Committee or, with respect to any Employer Security, only at the direction of the Independent Fiduciary, to begin, maintain or defend any

litigation necessary in connection with the administration of the Plans or the Trust, except that the Trustee shall not be obligated or required to do so unless it has been indemnified to its satisfaction against all expenses and liabilities sustained by it by reason thereof;

(q)      To pay any income tax or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund;

(r)      To retain any funds or property subject to any dispute without liability for payment of interest, or decline to make payment or delivery thereof until final and unappealed adjudication is made by a court of competent jurisdiction;

(s)      Upon instruction from the Committee, to grant consents, take actions and otherwise implement the rights of the Trustee;

(t)      With the consent of the Committee, to act in any jurisdiction where permitted by law to do so or to designate one or more persons, or a bank or trust company, to be ancillary trustee in any jurisdiction in which ancillary administration may be necessary; to negotiate and determine the compensation to be paid to any such ancillary trustee; and to pay such compensation out of principal or income or both; and such ancillary trustee shall be granted with respect to any and all property subject to administration by it all of the powers, authorities and discretion granted in this Trust Agreement to the Trustee; provided, however, that such action as may require the investment of additional funds or the assumption of additional obligations shall not be undertaken without the written consent of the Trustee; and

(u) To cooperate with any of the Companies and/or the UAW in obtaining any judicial or regulatory approvals or relief in accordance with each Company's respective Settlement.

Section 6.2    Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Trustee.

Section 6.3    Standard of Care.  The Trustee shall discharge its duties in the interests of each Plan's Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and Beneficiaries of each Plan and defraying reasonable expenses of administering the Trust and each Plan, and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims, consistent with the provisions of ERISA and the Code.  Subject to the provisions of ERISA, the Trustee will be under no liability or obligation to anyone with respect to any failure of the Committee to perform any of its obligations under the Plans or Trust Agreement or for any error or omission of the Committee.

Section 6.4    Determination of Rights.  The Trustee shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person for coverage under the Plans, or the entitlement of any person to Benefits or payments from the Plans.

Section 6.5   Continuance of Plans.  The Committee, the Trustee, the Independent Fiduciary, the Companies, and UAW do not assume any contractual obligation as to the continuance of the Plans, and no such party shall be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans.  The Trustee's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment, as may be further limited by the requirements of Section 3.5.

Section 6.6   Payment of Expenses.  The Trustee shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses, including fees and expenses of the Independent Fiduciary, reasonably incurred (and where applicable previously approved) by the Trustee or the Committee in connection with establishment, amendment, administration and operation of the Trust or Plans. The expenses shall be allocated to the Separate Retiree Account to which the expenses relate (or, if the expenses cannot reasonably be allocated to one Separate Retiree Account, they shall be allocated among the Separate Retiree Accounts on a reasonable basis as determined by the Committee in a manner that avoids subsidization of any Separate Retiree Account by another Separate Retiree Account).  The Committee shall by written certificate provided to the Trustee request payment for any expenses related to the administration of the Trust.  Upon receipt of the written certificate, the Trustee may make the payment requested by the Committee.

Section 6.7   Reimbursement.  The Trustee will apply the assets of the Trust to reimburse a Company or the respective Company Health Care Plan, as applicable, for any Benefits advanced or provided by the Company or the respective Company Health Care Plan with regard to claims incurred by a Participant on or after the Implementation Date, including, but not limited to situations where a retirement is made retroactive and the medical claims were incurred on or after such Implementation Date or where a Company is notified of an intent by a Participant to retire under circumstances where there is insufficient time to transfer responsibility for Benefits to the applicable Plan and the Company or the respective Company Health Care Plan provides interim coverage for Benefits.  The Trustee and the Committee will fully cooperate with the Company in securing any legal or regulatory approvals that are necessary to permit such reimbursement.  In addition, the Trustee will apply the assets of the Trust to reimburse a Company for any deposits it made by mistake to the Trust, as provided for in that Company's Settlement.  Further, with regard to the transfer of assets from an existing VEBA trust to a Separate Retiree Account, and assumption of any liabilities by a Plan, the Trustee shall apply the assets of the related Separate Retiree Account to satisfy all such liabilities.  In causing the Trust Fund to pay expenses pursuant to this Section 6.7, the Committee shall be acting in its fiduciary capacity with respect to a Plan and the Trust, on behalf of the respective EBA.

Section 6.8   Trustee Compensation.  The Trustee will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit D.  All compensation paid from the Trust Fund to the Trustee or its affiliates shall be disclosed to the Committee.

Section 6.9   <u>Consultation</u>.  The Trustee may engage or consult with counsel or other advisors and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such advisors.

Section 6.10  <u>Reliance on Written Instruments</u>.  The Trustee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 6.11  <u>Bonding</u>.  The Trustee shall be bonded to the extent and in the amount required by Section 412 of ERISA. To the extent permitted by applicable law, the costs of such bonding shall be expenses paid by the Trustee out of the assets of the Trust Fund under Section 6.6.

## ARTICLE VII
## TRUSTEE ACCOUNTS

Section 7.1   <u>Separate Retiree Accounts</u>.  At all times, the Trustee shall maintain each of the Separate Retiree Accounts as a separate account under the Trust for the assets deposited by each Company, or transferred at each Company's direction, to the Separate Retiree Account in accordance with the terms of each Company's Settlement.  Each Separate Retiree Account may be used only to provide Benefits for the Participants and Beneficiaries in the Plan funded by such Separate Retiree Account.  Under no circumstances may a Separate Retiree Account be liable or responsible for the obligations of the Trust to any Participant or Beneficiary other than a Participant or Beneficiary in the Plan that is attributable to the same Eligible Group as that Separate Retiree Account.  The Trustee shall separately account for the assets and liabilities of each Separate Retiree Account; including, without limitation: (a) deposits, contributions, remittances, subsidies, investment and other income from whatever source to each Separate Retiree Account; and (b) Benefits to Participants and Beneficiaries from each respective Separate Retiree Account, and the investment, administrative, and other expenses attributable to the maintenance of each such Separate Retiree Account.  In no event shall the assets of one Separate Retiree Account be used to offset the liabilities or defray the expenses attributable to another Separate Retiree Account.  Notwithstanding the proscriptions in this Section 7.1, unless the Committee expressly decides to establish segregated investment vehicles for specific Separate Retiree Accounts, the assets of the Separate Retiree Accounts, other than Employer Security Sub-Accounts, shall be invested on a pooled basis within the Trust Fund; provided that the interest of each Separate Retiree Account in such pooled Trust Fund is separately accounted for at all times.

Section 7.2   <u>Records</u>.  The Trustee shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to each Separate Retiree Account and the Trust as a whole, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Committee or such person or persons as the Committee may designate.

Section 7.3   <u>Annual Audit</u>.  The Committee shall appoint an auditor to conduct an annual audit of the Trust Fund, a statement of the results of which shall be provided to the Trustee and also made available for inspection by interested persons at the principal office of the Trust.

Section 7.4   <u>Claims Limited to Amounts in Applicable Account</u>.  In any legal action against the Trust Fund, the rights of any Participant or Beneficiary against the Trust Fund shall be limited to the amount of assets in the Separate Retiree Account attributable to such Participant or Beneficiary, and the rights of any other person or entity shall be limited to the amount of assets in the Separate Retiree Account attributable to the Plan to which the claim relates.

Section 7.5   <u>Furnishing Written Accounts</u>.  The Trustee shall furnish the Committee a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during each calendar quarter, and showing the securities and other properties held, and their fair market values at the end of each calendar quarter.  Such written account shall be furnished to the Committee within thirty (30) days after the close of each calendar quarter.

Section 7.6   <u>Accounting and Taxable Year, Cash Basis</u>.  The accounting and taxable year of the Trust shall be the calendar year.  All accounts of the Trustee shall be kept on a cash basis.

Section 7. 7   <u>Judicial Proceedings</u>.  If the Trustee and the Committee cannot agree with respect to any act or transaction reported in any statement, the Trustee shall have the right to have its accounts settled by judicial proceedings in which only the Trustee and the Committee shall be necessary parties.  Subject to the provisions of ERISA, the Trustee shall not be required to file, and no Participant or Beneficiary shall have any right to compel, an accounting, judicial or otherwise, by the Trustee.

# ARTICLE VIII
## PROCEDURES FOR THE TRUSTEE

Section 8.1    <u>Removal</u>.  The Trustee may be removed by the Committee at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Trustee of the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.2    <u>Resignation</u>.  The Trustee may resign by filing with the Committee a written resignation that shall take effect sixty (60) days after the date of such filing, unless prior thereto a successor Trustee has been appointed by the Committee.  In no event may the Trustee's resignation take effect before a successor Trustee has been appointed.  If the Committee fails to appoint a successor Trustee, the resigning Trustee may seek the appointment of a successor Trustee in the manner set forth in Section 8.3.

Section 8.3    <u>Successor Trustee</u>.  The Committee may appoint a successor Trustee by delivering to the successor Trustee an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an acceptance in writing, executed by the successor Trustee so appointed.  Such appointment shall take effect upon the date specified in Section 8.1 or 8.2, as applicable.  If no appointment of a successor Trustee is made by the Committee within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the removed or resigning Trustee, appoint a successor Trustee after such notice to the Committee and the removed or resigning Trustee, as such court may deem suitable and proper.

Section 8.4    <u>Amendment to Trust Document for Successor Trustee</u>.  The Committee may appoint a successor Trustee by securing from the successor Trustee an amendment to this Trust Agreement, executed by both the successor Trustee and an authorized representative of the Committee, which replaces the current Trustee with the successor Trustee, appointing such successor Trustee, and by delivering to the removed or resigning Trustee an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

Section 8.5    <u>Effect of Removal or Resignation of Trustee.</u>  Upon the removal or resignation of the Trustee in accordance with Section 8.1 or 8.2, the Trustee shall remain responsible for any and all actions taken by the Trustee prior to such removal or resignation, but except as required by ERISA shall not be responsible for any and all actions taken by the successor Trustee.

Section 8.6    <u>Merger or Consolidation of the Trustee</u>.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Trustee is a party, or any corporation to which substantially all the business and assets of the Trustee may be transferred, will be deemed to be continuing as the Trustee.

## ARTICLE IX
## PROCEDURES FOR COMMITTEE

Section 9.1   <u>Composition of Committee</u>.  The Committee shall consist of eleven individual persons, consisting of six (6) Independent Members and five (5) UAW Members.  No Member of the Committee shall be a current or former officer, director or employee of any of the Companies; provided, however, a retiree who was represented by the UAW in his or her employment with a Company, or an employee of a Company who is on leave from the Company and is represented by the UAW, may be a UAW Member.  No Member shall be authorized to act for a Company or be an agent or representative of a Company for any purpose.  Furthermore, no Company shall be a fiduciary with respect to any of the Plans or the Trust, and the Companies will have no rights or responsibilities with respect to the Plans or the Trust other than as specifically set forth in the Company Settlements. This limitation on Company participation on the Committee and the limitation set forth in Section 3.5 of this Trust Agreement are not subject to change, amendment or alteration. No Independent Member, or any family member, employer, or partner of an Independent Member, shall have any financial or institutional relationship with a Company or UAW if such relationship could reasonably be expected to impair such person's exercise of independent judgment.

Section 9.2   <u>Term of Office</u>.  Each Member shall continue to serve as such until his or her death, incapacity to serve hereunder, resignation, removal, or the expiration of his or her term. Independent Member terms shall be for three (3)-year periods, except the initial terms of four (4) of the six (6) original Independent Members, two (2) of whom shall have an initial term of two (2) years, and two of whom shall have an initial term of one (1) year, as described in Exhibit E.  An Independent Member may serve more than one term.

Section 9.3   <u>Resignation</u>.  A Member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least thirty (30) days' advance written notice to the Committee (or such shorter notice as the Committee may accept as sufficient) stating a date when such resignation shall take effect. Such resignation shall take effect on the date specified in the notice or, if a successor Member has been appointed effective as of an earlier date, on such earlier date.

Section 9.4   <u>Removal; Appointment of Successor Committee Members</u>.

(a)   An Independent Member may be removed or replaced, and a successor designated, at any time by an affirmative vote of nine (9) of the other Members of the Committee in the event that such other Members lose confidence in the capacity or willingness of the Independent Member being replaced or removed to fulfill his or her duties and responsibilities as a Member as set forth in this Trust Agreement.  In the event of a vacancy of an Independent Member position, whether by expiration of term, resignation, removal, incapacity, or death of an Independent Member, a successor Independent Member shall be elected by the affirmative vote of nine (9) Members, and when possible, such successor Independent Member shall be elected prior to the expiration of the term, resignation, removal, incapacity, or death of the Independent Member being replaced.

(b)    The UAW Members shall serve at the discretion of the UAW International President, and may be removed or replaced, and a successor designated, at any time by written notice from the UAW International President to the Committee.

(c)    Each successor Member shall signify his or her acceptance of the appointment and his or her responsibilities under this Agreement in writing.

(d)    If no appointment of a successor Independent Member is made within a reasonable time after his or her expiration of term, resignation, removal or other event, an arbitrator selected pursuant to the procedures established in Subsection 9.9(e) may be engaged upon application of any Member to appoint a successor Independent Member to the Committee.  If the failure to appoint an Independent Member is the result of factors unrelated to a dispute among Members, any Member may apply to a court of competent jurisdiction to ask the court to appoint a successor Independent Member to the Committee as such court may deem suitable and proper.

Section 9.5    Chair.  The Committee shall select a chair from among its Members (the "Chair"). The term of the Chair will continue until he or she ceases to be a Member, resigns as Chair or is replaced as Chair with another Member by majority vote among the remaining Members.

Section 9.6    Meetings.

(a)    The Committee shall hold meetings as frequently as is necessary to ensure the efficient administration of the Trust and Plan and shall hold a minimum of four (4) meetings during each calendar year.  The Chair, or any six (6) Members, may call a special meeting of the Committee by giving at least five (5) days' advance written notice of the time and place thereof to all other Members.

(b)    The Chair, or another such individual or individuals so designated by the Chair, shall (i) preside over Committee meetings; (ii) prepare the Committee meeting agenda; (iii) oversee Trust operations between Committee meetings and report to the Committee on such operations; and (iv) perform such other functions as the Committee determines.

(c)    One Member, or another individual so designated, shall maintain minutes of all Committee meetings, but such minutes need not be verbatim.  Copies of such minutes shall be provided to all Members and to such other parties as the Committee may designate.

Section 9.7    Place of Meeting; Telephonic Meetings.  Meetings of the Committee shall be held in the Detroit, Michigan metropolitan area as designated in the notice of meeting.  Meetings of the Committee may be held through any communications equipment or other technology if all persons participating can hear each other, and such participation in a meeting shall be considered presence at the meeting for all purposes, including Section 9.8.

Section 9.8    Quorum.  A majority of the Members of the Committee then in office shall constitute a quorum for the purpose of transacting any business; provided that at least one Independent Member and one UAW Member are present.

Section 9.9    <u>Vote of the Members</u>.

(a)    Each Member of the Committee present at the meeting shall have one vote. Except as otherwise specified in this Trust Agreement, all actions of the Committee shall be by majority vote of the entire Committee, provided that at least one Independent Member and one Union Member must be a Member in the majority for any Committee action to take effect. Notwithstanding anything in this Subsection 9.9(a) to the contrary, any action by the Committee taken after the 2011 calendar year that would not be permitted under Subsection 10.2(d) before the expiration of the 2011 calendar year shall require an affirmative vote of nine (9) Members to take effect.

(b)    The vote of any absent Independent Member of the Committee may be cast in accordance with a written proxy delivered to any other Independent Member of the Committee present at the meeting, and the vote of any absent UAW Member of the Committee may be cast in accordance with a written proxy delivered to any other UAW Member of the Committee present at the meeting.

(c)    In the event that a vacancy exists in the number of Independent Members, or that an Independent Member is absent (and has not delivered a proxy), a majority of the Independent Members present shall be entitled to cast the vote otherwise exercisable by the Independent Member not present.  In the event that a vacancy exists in the number of UAW Members, or that a UAW Member is absent (and has not delivered a proxy), a majority of the UAW Members present shall be entitled to cast the vote otherwise exercisable by the UAW Member not present.

(d)    In addition to decisions made at meetings, action may be taken without a meeting pursuant to a written (including e-mail) or telephone poll by the Chair (or his designee); provided that any action taken in a telephone poll must be confirmed in writing (including e-mail) by each Member who voted for the action taken either before or as soon as practicable following the vote (but no later than thirty (30) days after the vote).

(e)    In the event that an action does not take effect – including, without limitation, an action under Subsection 9.9(a) that requires nine (9) affirmative votes to take effect – notwithstanding all Independent Members voting in favor, or alternatively all UAW Members voting in favor, any Committee Member may refer the issue to arbitration pursuant to the procedures established from time to time by the Committee.  In addition, any Committee Member may refer the failure to appoint a successor Independent Member pursuant to Subsection 9.4(d) to an arbitrator, in which case the arbitrator may select the successor Independent Member.  The determination of the arbitrator shall be final and binding on all parties to the Trust.  The costs and expenses of such arbitration (including attorneys' fees for separate counsel for Members on each side of the issue) shall be paid from the Trust unless paid by any other source, or unless otherwise ordered by the arbitrator.  The arbitrator's decision must be consistent with the terms of the Trust and, if the dispute concerns an amendment to the Trust, the arbitrator may not issue a decision contrary to the terms of Section 12.1 hereof.

Section 9.10    <u>Fees and Expenses</u>.  To the extent permitted by ERISA, Members of the Committee will be entitled to reasonable compensation for the performance of their duties hereunder.  Members of the Committee may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of their duties.  The fees and expenses of the Committee shall be deemed to be fees and expenses of the Trust and shall be reimbursed from the Trust Fund consistent with the restrictions set forth in this Section 9.10.

(a)    Independent Members shall receive an annual retainer of $30,000, payable in equal quarterly installments in arrears, and a meeting fee of $2,000 for each meeting of the Committee in which such Independent Member participates, provided, however, that the combination of retainer and meeting fees shall not exceed $46,000 per calendar year. In the event that an Independent Member's tenure on the Committee ends on a day other than the last day of the quarter for which a quarterly installment of his or her annual retainer is due, he or she shall be paid for the pro rata portion of such quarter that coincides with his or her tenure on the Committee.  For purposes of the meeting fee, participation by telephone or other simultaneous communication device shall qualify an Independent Member for a participation fee only if the meeting is scheduled and anticipated to last at least one (1) hour.  Participation in telephonic conferences to address ad hoc issues do not qualify an Independent Member for a participation fee.

(b)    UAW Members who are eligible to receive compensation for participation on the Committee shall receive the amounts described in Subsection 9.10(a) above for Independent Members.  Any Member who is an employee of the UAW or a local union affiliated therewith shall not be eligible to receive compensation for service as a Member. Notwithstanding the prohibition on compensation otherwise described in this Subsection 9.10(b), UAW Members shall be entitled to receive reimbursements for reasonable expenses properly and actually incurred in the performance of a UAW Member's duties pursuant to this Trust Agreement.

(c)    The Chair shall receive a fee of $5,000 per year, payable in quarterly installments in arrears, for service as the Chair, in addition to the compensation received as a Member pursuant to Subsection 9.10(a) or Subsection 9.10(b), whichever is applicable.

(d)    Other than UAW Members who are prohibited from receiving compensation pursuant to Subsection 9.10(b), nothing herein shall prohibit or limit any Member from receiving fees from the Trust Fund for services rendered at the request of the Committee (<u>e.g.</u>, reasonable fees for attendance at retiree meetings to explain the operation of the programs contemplated by the Settlements and/or this Trust Agreement).

(e)    The fees and limits described in Subsection 9.10(a) and (b) above shall be increased each calendar year after 2008 by each calendar year's percentage increase, if any, to the consumer price index for urban wages (CPI-W).

Section 9.11    <u>Liaison</u>.

(a)    The Liaison's primary roles, as further detailed in this section, shall be:

    (1)      to work, as the Liaison deems appropriate, alongside any and all Trust personnel, outside advisors, consultants, professionals, and service providers retained by the Trust, on all matters pertaining to the operation of the Trust,

    (2)      to stay informed about all facets of the Trust's activities, and

    (3)      to maintain open lines of communications in regard to all activities of the Trust – including, without limitation, its funding status and the administration of the Benefits provided under the Plans – among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) retiree representatives and the UAW.

(b)      The Liaison shall not be a Member and shall not be entitled to a vote on any matter coming before the Committee.

(c)      The Liaison shall maintain open lines of communications regarding the activities of the Trust among and between (i) the Trust and the Committee, (ii) the Eligible Retirees and Beneficiaries, and (iii) the retiree representatives and the UAW in regard to all activities of the Trust.  Specifically, the Liaison shall maintain communications with, among others, elected leaders of retiree chapter organizations, Class Representatives (and, until the Implementation Date, Class Counsel), UAW officials (in addition to UAW Members), Trust personnel, and the Independent Members and UAW Members.

(d)      The Liaison may attend all meetings of the Committee and any Sub-Committee established pursuant to Section 10.8.

(e)      The Liaison shall be permitted to consult with and work alongside any and all Trust personnel on any facet of the operations of the Trust, including but not limited to activities related to investment of Trust assets, administration of the Benefits provided under the Plans, retention of outside advisors, consultants, professionals and service providers, and the hiring of personnel needed for operation of the Trust.

(f)      The Liaison shall have access to any and all information developed or utilized by Trust personnel in connection with the operation of the Trust, including but not limited to information provided by any outside advisors, consultants, professionals or service providers retained by the Trust.  In the event that the Liaison is provided information that is subject to a privilege that the Trust or Committee may assert, the Liaison shall not take any action that would cause such privilege to be violated.

(g)      The Liaison shall be permitted to work alongside Trust personnel in the development of recommendations that may be made to the Committee by Trust personnel regarding any matter to come before the Committee.

(h)     The Liaison shall be permitted to work alongside Trust personnel in connection with the work of any outside advisors, consultants, professionals or service providers retained by the Trust.

(i)     The UAW, acting through the International President, shall have the right to appoint the Liaison.

(j)     Until the first Implementation Date of any of the Company's Settlements, the Liaison may be an active employee on the UAW staff.  On and after such implementation date, the Liaison shall not be an active member of the UAW Staff (but such person shall not be prohibited from performing work for the UAW on a consulting or other part-time basis, on matters unrelated to the operation of the Trust; provided that such work does not interfere with the Liaison's ability to perform his or her duties as the Liaison).

(k)     The Trust shall provide compensation for the Liaison as provided as follows:

    (1)     If the Liaison is an active member of the UAW staff, the Trust shall not provide any compensation of any kind to the UAW Liaison.  In such circumstance, the Trust shall provide reimbursement to the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

    (2)     If the Liaison is not an active member of the UAW staff, and the UAW designates the Liaison to perform the duties of such office on a full-time basis, the Trust shall (a) pay the Liaison an annual salary of $140,000 adjusted annually on the same basis as the adjustments for Committee Members as described in Section 9.10(e), (b) pay meeting fees in the same manner as paid for Committee Members pursuant to Section 9.10(a), (c) provide the Liaison a package of employee benefits (insurance, pension, vacation, and other fringe benefits) no less favorable than that provided to Trust personnel at the senior management level, if any, and (d) reimburse the Liaison for reasonable expenses properly and actually incurred in the performance of the Liaison's duties pursuant to this Trust Agreement.

    (3)     If the Liaison is not an active member of the UAW staff and the UAW designates the Liaison to perform the duties of such office on less than a full-time basis, (a) the compensation provided in sub-section 9.11(k)(2)(a) above shall be reduced proportionately, (b) the Trust shall provide additional reasonable compensation for the performance of specific duties in the same manner as permitted for Committee Members pursuant to Section 9.10(d),  and (c) all other provisions of Section 9.11(k)(2) shall continue to apply without adjustment.

(l)      The Liaison shall be fully bound to adhere to the Code of Ethics attached as
Exhibit I and any failure to adhere to the Code of Ethics shall be grounds for immediate
disqualification.

# ARTICLE X
## POWERS AND DUTIES OF THE COMMITTEE

Section 10.1    General.  The Committee, acting on behalf of the EBAs, shall be responsible for the implementation, amendment and overall operation of the Trust Fund and the establishment, amendment, maintenance, and administration of the Plans.  Subject to the provisions of this Trust Agreement and applicable laws, the Committee shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Trust Fund, and to interpret the terms of the Plans and Trust.  Subject to Section 3.7, the decisions of the Committee will be final and binding on all Participants and Beneficiaries and all other affected parties to the maximum extent allowed by law.

Section 10.2    Benefits.

    (a)    Adoption of the Plans.  The Committee, on behalf of the EBAs, shall adopt the Plans to provide Benefits to Participants and Beneficiaries and may amend the Plans from time to time. The terms of the Plans as initially adopted are set forth in subsection (d) of this section.  Thereafter, the Committee on behalf of the EBAs may amend the Plans from time to time to provide Benefits as it may determine in its sole and absolute discretion; provided, however, that the Committee shall have no authority to provide any benefits other than Retiree Medical Benefits until the end of the Initial Accounting Period.  Furthermore, the eligibility rules of each respective Plan shall be the same as those provided by the respective Company Health Care Plan and may not be expanded by the Committee.  The Plans may provide for different benefit structures for different groups of Participants or Beneficiaries, including, without limitation, different groups of Participants or Beneficiaries included in the same Eligible Group, and may provide for different contributions for such groups; provided, however, that such differences within or among Eligible Groups are reasonably related to a rational purpose and consistent with the relevant provisions of this Trust Agreement.  The rights of the Committee described in this Section 10.2 shall be exercised in a manner consistent with the Settlements.  Although the Committee shall be under no obligation to design the Plans to assure that the assets of the Trust Fund are sufficient to provide Benefits to all potential Participants and Beneficiaries of the Plans in all subsequent years, the Committee's long-term objective in designing the Plans, absent countervailing circumstances, shall be to provide meaningful health benefits to all Participants and Beneficiaries included in each Eligible Group.

    (b)    Benefits Design.  The Plans shall provide Benefits designed by the Committee in its sole discretion, acting on behalf of the EBAs as a fiduciary to the Plans, subject to Sections 1.3, 10.2(a) and 10.2(d).  The Benefit design shall include rules to determine which of the Participants and Beneficiaries of the Trust will receive Benefits under the Plans, in what form and in what amount.  The Plans may include co-pays, Participant and Beneficiary contributions, and any other features that the Committee from time to time determines appropriate or desirable in its sole discretion.  In designing the Plans and the Benefits to be provided thereunder, the Committee may take into account circumstances that it determines to be relevant, including, without limitation, the degree to which

Participants and Beneficiaries have alternative resources or coverage sources, pension levels under the Company's pension plans have changed, and the resources of the Trust Fund based upon expected deposits, remittances, and other sources of funding. In exercising its authority over benefit design, the Committee shall be guided by the principle that the Plans should provide substantial health benefits for the duration of the lives of all Participants and Beneficiaries.

(c)    Method of Providing Benefits.  Benefits under a Plan may be fully insured, partially insured or self-insured, as determined from time to time by the Committee in its sole discretion and in accordance with the funding policy established pursuant to Section 10.3. In all events, the expected cost of Benefits to be provided under each Plan during any calendar year shall not exceed the amount of assets expected to be available under the Separate Retiree Account related to such Plan to cover such costs during such calendar year.

(d)    Initial Benefits.  Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Chrysler Retiree Plan shall provide the Benefits specified in Exhibit F(1), the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2), and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3). The Benefits specified in Exhibits F(1), F(2) and F(3) shall be the Benefits provided for under the terms of each Company's respective Settlement. During the period that the Plans are providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to Section 5.A.2(h) of the Settlement Agreement between GM and UAW dated December 16, 2005, Section ___ of the Settlement Agreement between Ford and UAW dated _____, and similar provisions of the Chrysler Health Care Program.

(e)    Medicare Part B Benefits.  The initial Benefits provided pursuant to Subsection 10.2(d) under each Plan shall include a subsidy of the Medicare Part B premiums attributable to such Participants in an amount no lower in dollar value than $76.20 per month.

(f)    Design Principles.  In exercising its authority under this Section 10.2, the Committee shall adhere to the design principles described in Exhibit G. A Plan only may provide Benefits as defined in Section 1.3.

Section 10.3   Funding Policy.  Subject to the direction of the Independent Fiduciary with respect to the Employer Securities, the Committee will establish a funding policy for each Plan and communicate that funding policy to the Trustee.

Section 10.4   Investment Guidelines.  Except with respect to the authority of the Independent Fiduciary with respect to the Employer Securities, the Committee shall cause investment guidelines for managing (including the power to acquire and dispose of) all or any part of the Trust Fund and communicate that policy to the Trustee to be established. In so doing, the Committee shall adhere to the investment practice standards set forth in Exhibit H.

Section 10.5    <u>Appointment of Investment Managers</u>.  The Committee may appoint one or more Investment Managers to manage, or to select one or more Investment Managers to manage, all or part of the Trust Fund and enter into an agreement with the Investment Manager(s).  If an Investment Manager is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1, as limited by investment guidelines adopted by the Committee, with respect to the portion of the Trust Fund over which it has investment discretion, and the Trustee's duties with respect to that portion of the Trust Fund shall be limited to following the instructions of the Investment Manager.

Section 10.6    <u>Government Reports and Returns</u>.  The Committee shall file all reports and returns, including but not limited to, any IRS Form 5500 series and IRS Form 990 series that are required to be made with respect to the Trust and a Plan.

Section 10.7    <u>Compromise or Settle Claims</u>.  The Committee may compromise, settle and release claims or demands in favor of or against the Trust or the Committee on such terms and conditions as the Committee may deem advisable, and payment shall be made from the Separate Retiree Account to which the claim or demand relates (or, if the claim or demand relates to more than one Separate Retiree Account, on a basis commensurate with the portion of the claim relating to each Separate Retiree Account).

Section 10.8    <u>Appointment of Third Parties; Delegation of Authority</u>.  The Committee may appoint a third party to perform any functions assigned to it by the Committee to the extent permitted under applicable law.  The Committee may by adoption of a written resolution delegate to any two or more Members the authority to act on behalf of the full Committee to the extent set forth in the resolution.  In the event of such a delegation, the resulting sub-committee shall have at least one Independent Member and one UAW Member, and subcommittee action shall require the affirmative vote of at least one Independent Member and one UAW Member. Any action taken on behalf of the Committee pursuant to the delegation shall be reported to the Committee at its next regularly scheduled meeting.

Section 10.9    <u>Consultation</u>.  The Committee may engage or consult with counsel or other advisors and, in accordance with the provisions of Section 6.6, may direct the Trustee to pay reasonable compensation therefor from the Trust Fund and may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 10.10   <u>Reliance on Written Instruments</u>.  Each Member of the Committee shall be fully protected in acting upon any instrument, certificate or paper reasonably believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 10.11   <u>Standard of Care</u>.  The Committee and each Member shall discharge their duties in the interests of Participants and Beneficiaries of each Plan and for the exclusive purpose of providing Benefits to such Participants and Beneficiaries and defraying reasonable expenses of administering the Trust and each Plan and shall act with the care, skill, prudence

and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, consistent with the provisions of ERISA and the Code.  In exercising their discretion with respect to providing Benefits to Participants and Beneficiaries of each Plan, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in such Plan.  In exercising their discretion with respect to defraying reasonable expenses of administering the Trust or Plans, the Committee and each Member shall consider exclusively the interests of the Participants and Beneficiaries in the Plans.

Section 10.12   <u>Bonding</u>.  The Members of the Committee shall be bonded in the amount required by section 412 of ERISA and may be covered by liability insurance in accordance with section 410(b) of ERISA.  To the extent permitted by applicable law, the costs of such bonding and insurance shall be expenses paid by the Trustee under Section 6.6.

Section 10.13   <u>Discretionary Authority</u>.  Except as the Committee's powers are limited by specific provisions of this Trust Agreement, including without limitation, the provisions of Article IX, the Committee (or its designee) shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret this Trust Agreement, each Plan and any other Plan documents, to make its own motions, resolutions, administrative rules and regulations, contracts, or instruments and to decide all matters arising in connection with the operation or administration of the Trust or Plans.  Benefits under the Plans will be paid only if the Committee or its designee decides in its discretion that the applicant is entitled to them.  Without limiting the generality of the foregoing, the Committee, on behalf of each EBA and the Trust, shall have the sole and absolute discretionary authority to:

(a)    take all actions and make all decisions with respect to the eligibility for, and the amount of, Benefits payable under a Plan;

(b)    formulate, interpret and apply rules, regulations and policies necessary to administer a Plan in accordance with its terms;

(c)    decide questions, including legal or factual questions, relating to the calculation and payment of Benefits under a Plan;

(d)    determine the standard of proof and the sufficiency of evidence as to any factual question arising under a Plan;

(e)    resolve and/or clarify any ambiguities, inconsistencies and omissions arising under this Trust Agreement, each Plan, or other Plan documents;

(f)    process, and approve or deny Benefit claims and rule on any Benefit exclusions;

(g)    settle or compromise disputed claims as provided in Section 10.7 on such terms as the Committee determines to be in the best interest of the Participants and Beneficiaries;

(h)    enforce any contribution, remittance or payment obligation set forth in Article IV; and

(i)    do all acts which it may deem necessary or proper and to exercise any and all powers of the Committee under this Trust Agreement upon such terms and conditions as it may deem to be in the best interests of the Trust or Plans.

Subject to Section 3.7 of this Trust Agreement, all determinations made by the Committee or its designee with respect to any matter arising under the Trust, each Plan, and any other Plan documents shall be final and binding on all affected parties, including without limitation Participants, Beneficiaries, and any other persons who have claims against the Trust Fund and a Plan through any of them.  In the event that the terms of a Plan are inconsistent with the terms of this Trust Agreement, the Trust Agreement controls.

Section 10.14    No Individual Liability on Contracts.  The Members of the Committee shall not be liable personally, either individually or jointly, for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Members shall not be exempt from personal liability for willful misconduct, breach of fiduciary duty, or fraud, and the Trust shall not indemnify the Members for such liabilities.

Section 10.15    The Companies and UAW Not Liable for Conduct of Committee.  In their capacity as Members, the Members of the Committee, individually and jointly, are not officers, agents, employees, or representatives of the Companies or UAW.  In their capacity as Members, each Member is a principal acting independently of the UAW.  To the extent permitted by applicable law, the UAW (and their employees, officers, and directors) shall not be liable for any act, omission, contract, obligation, or undertaking of the Committee or its officers, agents, or representatives.  Under no circumstances will any Company or their employees, officers, directors or agents be responsible for or have any liability for any act, omission, contract, obligation or undertaking of the Committee or its officers, agents or representatives.

Section 10.16    Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Committee, Members, employees of the Committee, persons acting on the Committee's behalf pursuant to an express written delegation, and the Liaison (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys' fees, incurred personally in defense of any claim that seeks a recovery of any loss to a Plan or Trust Fund or for any damages suffered by any party to or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Committee – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Committee or an independent fiduciary), provided that the Committee shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 10.17    Indemnifications.  To the extent permitted by law, the Trust shall indemnify and hold the Committee, the UAW, the Companies, the Chrysler Health Care Program, the Ford

Retiree Health Program, the General Motors Health Care Program for Hourly Employees, the employees, officers and agents of each of them harmless from and against any liability that they may incur in connection with the Plans and Trust, unless such liability arises from gross negligence, intentional misconduct or breach of their respective Company Settlement. All costs associated with the indemnity provided under this Section 10.17 shall be borne solely by the Separate Retiree Account to which such costs relate.

Section 10.18    <u>Subrogation and Reimbursement</u>.    Subject to the limitations of Section 10.2(d), the Committee shall maintain, as part of each Plan, a comprehensive subrogation and reimbursement policy, updated from time to time as appropriate.

Section 10.19    <u>Code of Ethics</u>.    The Committee shall maintain a code of ethics to govern the conduct of Members and staff, if any, when acting on behalf of the Trust or a Plan or otherwise in their official capacity. The initial code of ethics is attached at Exhibit I. It may be amended by the Committee in light of experience and evolving standards, consistent with principles of good governance and fiduciary principles.

Section 10.20    <u>Presumption of Control</u>.    The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own GM's common stock, Ford's Common Stock, the 6.75% Series U Convertible Senior Debentures Issued by GM Due December 31, 2012, or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

## ARTICLE XI
## INDEPENDENT FIDUCIARY

Section 11.1    <u>General</u>.  Upon the appointment of an Independent Fiduciary by the Committee pursuant to Section 11.3, this Article XI shall be given effect.

Section 11.2    <u>Independent Fiduciary With Respect to Employer Security</u>.  Any provision of this Trust Agreement to the contrary notwithstanding, the Trustee shall have no discretionary authority or powers with respect to any Employer Security and all such discretionary authority shall rest with the Independent Fiduciary.  The Trustee shall hold any Employer Security in the respective Employer Security Sub-Account and shall be subject to direction by the Independent Fiduciary with respect to the acceptance, management, disposition, and voting of the Employer Security.  The Independent Fiduciary shall be a named fiduciary (as defined in section 402(a)(2) of ERISA) and investment manager (within the meaning of section 3(38) of ERISA) with respect to all discretionary actions regarding the valuation, acceptance, management, disposition, and voting of any Employer Security.  The Trustee shall be entitled to rely upon the identification by the Committee of the Independent Fiduciary until notified in writing by the Committee that an Employer Security Sub-Account's assets are no longer subject to the Independent Fiduciary's management.  During any period of time in which the Independent Fiduciary manages the Employer Security Sub-Accounts, the Trustee shall act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts.  The Trustee shall continue to receive all assets purchased against payment therefor and to deliver all assets sold against receipt of the proceeds therefrom.  The Independent Fiduciary may from time to time issue orders on behalf of the Trustee for the purchase or sale of securities directly to an underwriter or broker or dealer and for such purpose the Trustee shall, upon request, execute and deliver to such Independent Fiduciary one or more trading authorizations.  The Trustee shall have no responsibility or liability to anyone relating to the asset management decisions of the Independent Fiduciary except to the extent that the Trustee has failed to act strictly in accordance with any directions of the Independent Fiduciary with respect to the Employer Security Sub-Accounts.  The Trustee shall be under no duty to make or review any recommendation with respect to any such decision.  The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment made or sold pursuant to the direction of the Independent Fiduciary nor by reason of the failure to take any action with respect to any investment which was acquired pursuant to any such direction in the absence of further direction of the Independent Fiduciary.

Section 11.3    <u>Appointment of Independent Fiduciary</u>.  The Committee, in its sole discretion, shall appoint an Independent Fiduciary to manage the Employer Security Sub-Accounts, or for any other purpose as required by law, by delivering a written instrument to the Independent Fiduciary, which the Independent Fiduciary shall acknowledge in writing.   The Independent Fiduciary shall be a bank, trust company or registered investment adviser under the Investment Advisers Act of 1940, as amended.

Section 11.4    <u>Removal</u>.  The Independent Fiduciary may be removed by the Committee at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Independent Fiduciary of the appointment of a successor Independent Fiduciary in the manner set forth in

Section 11.6 below, provided that no such successor Independent Fiduciary shall be appointed in the event that the Trust then holds no Employer Security.

Section 11.5    <u>Resignation</u>.  The Independent Fiduciary may resign by delivering to the Committee a written resignation that shall take effect sixty (60) days after the date of such filing or such earlier date that a successor Independent Fiduciary has been appointed by the Committee.

Section 11.6    <u>Successor Independent Fiduciary</u>.  As expeditiously as is practicable under the circumstances, the Committee shall appoint a successor Independent Fiduciary by delivering to the successor Independent Fiduciary an instrument in writing, executed by an authorized representative of the Committee, appointing such successor Independent Fiduciary, and by delivering to the removed or resigning Independent Fiduciary an acceptance in writing, executed by the successor Independent Fiduciary so appointed.  Such appointment shall take effect upon the date specified in Section 11.4 or 11.5 above, as applicable.  In the event that the Trust Fund acquires or holds an Employer Security with respect to which an Independent Fiduciary is required, and no appointment of a successor Independent Fiduciary is made by the Committee by the date specified in Section 11.4 or Section 11.5, whichever the case may be, any court of competent jurisdiction may, upon application by the retiring Independent Fiduciary, appoint a successor Independent Fiduciary after such notice to the Committee and the retiring Independent Fiduciary, as such court may deem suitable and proper.  The Committee, and a resigning and successor Independent Fiduciary shall avoid whenever possible any period during which no Independent Fiduciary has accepted an appointment to manage an Employer Security being held in a Employer Security Sub-Account.

Section 11.7    <u>Independent Fiduciary Compensation and Expenses</u>.  The Trustee will apply the assets of the Trust Fund in accordance with Section 7.1, to pay the fees and expenses of the Independent Fiduciary in the amounts and on the dates set forth in the agreement between the Independent Fiduciary and the Committee.

Section 11.8 <u>Confidential Information</u>.  In exercising its duties pursuant to Section 11.2, an Independent Fiduciary may receive confidential information from a Company under an agreement to not reveal such information to the Committee or any Member, subject to any obligation to disclose such information that may be imposed by ERISA, in which case the Company will be notified, in advance.

**ARTICLE XII**
**AMENDMENT, TERMINATION AND MERGER**

Section 12.1   <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Committee; provided that (i) under no circumstances shall any of the Plans or the Trust Agreement be amended or modified to provide benefits or payment for benefits other than Retiree Medical Benefits for the Participants and Beneficiaries until expiration of the Initial Accounting Period; (ii) no amendment shall alter or conflict with a Company's Settlement; and (iii) no amendment shall amend or modify Articles I, IV and XII, Sections 2.1, 3.1, 3.4(b), 3.5, 3.7, 5.1(a), 6.1(u), 6.5, 6.7, 7.1, 7.4, 9.1, 9.2, 9.3, 9.4, 9.7, 9.8, 9.9, 9.10, 10.1, 10.2(a), (b), (d), (e) and the last sentence of (f), 10.7, 10.13 (last flush paragraph), 10.15, 10.16, 10.17, 10.20, Exhibits F(1), F(2) and F(3), or the definitions of Eligible Groups in Exhibits A through C; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plans under section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall increase the responsibilities of the Trustee hereunder unless the Trustee has first consented to such amendment.

Section 12.2   <u>Termination</u>.

(a)  Before the expiration of the Initial Accounting Period with respect to each Plan, the Trust shall not be terminated.  Thereafter, the Trust and this Trust Agreement may be terminated by the Committee in writing, with a copy of such written instrument to be provided to the Trustee, whenever the Committee, on behalf of the EBAs, and in its sole discretion determines that the Trust is no longer effective in serving its purposes or that the interests of the Participants and Beneficiaries could be better served through an alternative arrangement taking into account the requirements of Section 7.1.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Committee in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of Benefits to Participants and Beneficiaries entitled to payments for claims arising prior to such termination; and (iii) at the discretion of the Committee, in accordance with section 501(c)(9) of the Code and ERISA, for the benefit of Participants and Beneficiaries in such fashion as the Committee determines.  The Companies, UAW or the Committee shall not have any beneficial interest in the Trust Fund. The Trust Fund shall remain in existence until all assets have been distributed.

(b)  Following termination, the Trustee and the Committee shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 12.3   <u>Transfer of Assets</u>.  After the Initial Accounting Period has expired with respect to a Plan, and to the extent permitted by applicable law and subject to the restrictions of Section 7.1, some or all of the assets of the Trust Fund attributable to a Separate Retiree Account with respect to which the Initial Accounting Period has expired, may at the discretion of the Committee acting in a fiduciary capacity be transferred directly to another trust for the purpose of providing Benefits to some or all of the Participants and Beneficiaries in the Plan

with respect to which the Initial Accounting Period has expired on such terms and conditions as the Committee may determine.

Section 12.4    <u>Merger of Trusts or Transfer of Assets</u>.  In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Chrysler, Ford, and GM – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Rights in Trust Fund.  No Eligible Retiree, Participant, Beneficiary, or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right relating to the Trust or a Plan against the Trustee, the Committee, the Independent Fiduciary, UAW, or the Companies, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 13.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Participant or Beneficiary to any Benefits or future payments hereunder or under the provisions of a Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant or Beneficiary, nor shall any such Participant or Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the Benefits or payments which he may expect to receive, contingent or otherwise, under a Plan or this Trust Agreement, provided that assignments of benefit payments to a health care provider under a Plan may be permitted pursuant to rules adopted by the Committee in its sole discretion.

Section 13.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 13.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 13.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 13.6    Usage.  The plural use of a term defined in Article I in the singular shall mean all of the entities defined by such term.

Section 13.7    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (ii) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (iii) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

If to the Trustee:

[**insert name and address**]


If to the Committee:

[**insert name and address**]

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST

INDEPENDENT MEMBERS

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]


UAW MEMBERS

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]

_____          Dated: _____
[**insert name**]


TRUSTEE

[**insert name of institution**]

By: _____

_____
Print Name

_____
Title

Dated: _____

## Exhibit A

### Chrysler Eligible Group

**[To be copied from Settlement Agreement when it is final.  This will include both the "Class" and the "Covered Group."]**

**Exhibit B**

**Ford Eligible Group**

**[To be copied from Settlement Agreement when it is final.  This will include both the
"Class" and the "Covered Group."]**

**Exhibit C**

**GM Eligible Group**

The term "GM Eligible Group" as used in this Trust Agreement shall mean the Class or Class Members and the Covered Group as set forth in the GM Settlement and reiterated verbatim in this Exhibit C:

Class or Class Members.  The term "Class" or "Class Members" shall mean all persons who are:

(i)  GM-UAW Represented Employees who, as of October 15, 2007, were retired from GM with eligibility for Retiree Medical Benefits under the GM Plan, and their eligible spouses, surviving spouses and dependents;

(ii)  surviving spouses and dependents of any GM-UAW Represented Employees who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or under the GM Plan;

(iii) UAW retirees of Delphi Corporation ("Delphi") who as of October 15, 2007 were retired and as of that date were entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and their eligible spouses, surviving spouses and dependents of all such retirees;

(iv)  surviving spouses and dependents of any UAW-represented employee of Delphi who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(v)  GM-UAW Represented Employees or former UAW-represented employees who, as of October 15, 2007, were retired from any previously sold, closed, divested or spun-off GM business unit (other than Delphi) with eligibility to receive Retiree Medical Benefits from GM and/or the GM Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(vi) surviving spouses and dependents of any GM-UAW Represented Employee or any UAW-represented employee of a previously sold, closed, divested or spun-off GM business unit

44

(other than Delphi), who attained seniority and died on or prior to October 15, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from GM and/or the GM Plan.

<u>Covered Group</u>. The term "Covered Group" shall mean:

(i)  all GM Active Employees who have attained seniority as of September 14, 2007, and who retire after October 15, 2007 under the GM-UAW National Agreements, or any other agreement(s) between GM and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the GM Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii)  all UAW-represented active employees of Delphi or a former Delphi unit who retire from Delphi or such former Delphi unit on or after October 15, 2007, and upon retirement are entitled to or thereafter become entitled to Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999, and the eligible spouses, surviving spouses and dependents of all such retirees;

(iii)  all surviving spouses and dependents of any UAW-represented employee of Delphi or a former Delphi unit who dies after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible or thereafter become eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan under the terms of the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007, Attachment B to the UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated June 22, 2007 (without regard to whether any of the conditions described in Section K.2 of such Memorandum of Understanding or Section 2 of such Attachment B occur), or the Benefit Guarantee agreement between GM and the UAW dated September 30, 1999;

(iv) all former GM-UAW Represented Employees and all UAW-represented employees who, as of October 15, 2007, remain employed in a previously sold, closed, divested, or spun-off GM business unit (other than Delphi), and upon retirement are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan by virtue of any other agreement(s) between GM and the UAW, and their eligible spouses, surviving spouses and dependents; and

(v)  all eligible surviving spouses and dependents of a GM Active Employee, former GM-UAW Represented Employee or UAW-represented employee identified in (i) or (iv) above who attained seniority on or prior to September 14, 2007 and die after October 15, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from GM and/or the GM Plan or the New Plan.

**Exhibit D**

**[Trustee's fees]**

**Exhibit E**

| Name | Date of Term Expiration |
| --- | --- |
| Robert Naftaly*** | January 1, 2012 |
| Olena Berg-Lacey | January 1, 2012 |
| David Baker Lewis | January 1, 2011 |
| Teresa Ghilarducci | January 1, 2011 |
| Marian Udow-Phillips | January 1, 2010 |
| Ed Welch | January 1, 2010 |

Committee Chair: ***

---

**Biographical Material**

**Robert Naftaly, C.P.A.,** is the retired President and CEO of PPOM, an independent operating subsidiary of Blue Cross/Blue Shield of Michigan (BCBSM), and Executive Vice President, Chief Operating Officer for the Blues.  Previously, he was Senior Vice President, Chief Financial Officers and Treasurer for BCBSM.  Mr. Naftaly also served as the
Director of the Department of Management and Budget of the State of Michigan from 1983 to 1987.  He has also served on several other Boards, including the Detroit Investment Fund, Walsh College, Meadowbrook Insurance Group, Blue Cross/Blue Shield of Maryland, and the Board of Governors of Wayne State University.

**Olena Berg-Lacey** served from 1993 to 1998 as Assistant Secretary of Labor, Employee Benefits Security Administration.  In that capacity, she directed the Department of Labor's activities regarding enforcement of ERISA, including fiduciary standards governing 700,000 private pension plans with over $3.5 trillion in assets.  From 1991 to 1993, she served in the State Treasurer's Office for the state of California, where she had primary responsibility for management and investment of more than $20 billion of assets on behalf of the State.  In that capacity, she also represented the California Treasurer on the board of the State's pension funds (CalPERS and CalSTRS) which together invest over $100 billion of retirement money on behalf of California's public employee retirement programs.  A graduate of the University of California and the Harvard Business School, Ms. Berg-Lacey has also held a variety of positions in the private sector involving asset management and institutional investments.

**David Baker Lewis** is a prominent attorney, with broad experience in municipal finance and municipal bond law. He is the Chairman of the Board of Directors of Lewis & Munday. He has served on the Boards of Directors of several major corporate entities, including Conrail, Comerica Bank, TRW, Henry Ford Health Systems, Harper-Grace Hospitals, the Detroit Medical Center and H & R Block. He has also been Associate Professor of Law at the Detroit College of Law, and served as the Chair of the National Association of Securities Professionals.

**Teresa Ghilarducci** is currently Professor of Economics and Schwartz Chair in Economic Policy Analysis at the New School in New York City. She previously served for 25 years as professor of Economics at Notre Dame University. She also served a fellowship in economics at the Harvard Law School. Her academic work focuses on the economics of retirement security. She served as a member of the Advisory Board to the Pension Benefit Guaranty Corporation (a Presidential appointment) from 1995 to 2002, and was appointed by the governor of Indiana to the Board of Trustees for the Indiana Public Employees' Retirement Fund for a term from 1997 to 2002. Congressional committees have called upon her to testify as an expert witness more than 12 times on a variety of subjects related to retirement security and other economic issues.

**Marianne Udow-Phillips** is currently the Director of the Center for Healthcare Quality and Transformation, a healthcare policy analysis group affiliated with the University of Michigan health care system and Blue Cross/Blue Shield. She previously served for 3 years as the Director of the Michigan Department of Human Services, the state agency responsible for delivering a wide variety of support services to Michigan residents. Prior to her appointment to the Department of Human Services, she served in a variety of executive positions, including Senior Vice President for Health Care Products and Provider Services and Senior Vice President for Corporate Strategy and Health Care Administration, at Blue Cross Blue Shield of Michigan. She has also served as the Senior Vice President and Vice President of Plans and Operations for Mercy Alternative and Care Choices.

**Ed Welch** is an attorney and currently serves as director of the Workers' Compensation Center in the School of Labor and Industrial Relations at Michigan State University. From 1991 to 1999 he was the editor of the newsletter *On Workers Compensation*. He was the Director of the Michigan Bureau of Workers' Disability Compensation from 1985 through 1990. Mr. Welch was elected a charter member for workers' compensation of the National Academy of Social Insurance and served as the Vice-President of the International Association of Industrial Accident Boards and Commissions as well as a member of the Board of Directors of the Institute for Work and Health, a research organization in Toronto, Ontario.

## Exhibit F(1)

[Initial Benefits for Participants in the Chrysler Retiree Plan]

## **Exhibit F(2)**

[Initial Benefits for Participants in the Ford Retiree Plan]

## Exhibit F(3)

### Initial Benefits for Participants and Beneficiaries in the GM Retiree Plan

Beginning on the GM Implementation Date and continuing through 2011, the initial Benefits provided by the GM Retiree Plan shall include only the following:

- All Benefits for which GM, the General Motors Health Care Program for Hourly Employees, and any other GM entity or benefit plan would have been responsible before the GM Implementation Date – including, without limitation, the catastrophic plan and COBRA continuation coverage – at the levels described in the settlement agreement approved in Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) ("Henry I"):

- The mitigation payments funded before the GM Implementation Date by the General Motors Defined Contributions Health Benefit Trust shall offset the Participant contributions, deductibles, co-payments and co-insurance payments at the same levels as in Henry I.

- The dental benefits funded before the GM Implementation Date by the General Motors Defined Contribution Health Benefit Trust shall be provided at the same levels as provided before the GM Implementation Date.

- An additional Participant contribution of $51.67 per month shall be required from those Participants who receive after the GM Implementation Date a flat monthly special lifetime benefit from the General Motors Hourly-Rate Employees Pension Plan of $66.70 per month.

As provided in Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering the initial Benefits provided under this Exhibit F(3), including, without limitation, making any changes that could have been adopted by joint action of GM and the UAW pursuant to Section 5.A.2(h) of the settlement agreement approved in Henry I.

## Exhibit G

## Design Principles

The Committee recognizes the complexity and fragmented nature of our nation's ever-changing health care system. To the extent practical, the Committee will seek to implement each Plan in a manner consistent with the guidelines set out below, subject to both the financial requirements of such Plan and its Purpose.

1. Health care includes individual patient treatment, the alleviation of pain and suffering and the development of practices and procedures to improve the health status of Participants.

2. The Committee shall promote quality health care delivered to Participants in a manner consistent with respect and dignity, and the recognition of the confidentiality of private patient information.

3. The Committee's goal is to provide health care that is effective, safe, efficient and timely, delivered in a culturally competent manner with a recognition of the physical and cognitive challenges present among aged Participants.

4. The Committee will pursue integrated health care approaches to better assess the health risks of Participants and achieve better health outcomes.

5. The Committee will operate each Plan and assess its performance in accordance with evolving best practices measured by both internal and external benchmarks.

6. The Committee shall provide health care coverage to Participants on a basis that is reasonably accessible to Participants, affordable and sustainable.

7. The Committee will develop avenues of communication to keep Participants informed with regard to access to care, the quality of care and operations of the Plan in which they participate.

8. In selecting health care plans and providers, the Committee shall favorably consider health care entities that are non-profit and act in a manner respectful of workers' rights.

9. In selecting health care plans and providers, the Committee will seek to provide both health care and health plan administration within the United States.

10. The Committee will make efforts to assure that Participants are treated with respect and dignity, with due consideration given to their physical and cognitive challenges.

**Exhibit H**

**STATEMENT OF INVESTMENT PRACTICES**

The following Statement of Investment Practices ("SIP") shall be adopted as "Best Practices" for the VEBA's Committee, Investment Managers and Independent Fiduciaries.  It is the intent that these Best Practices evolve over time, taking into account developments in the law, changes in available investments and other changes as the Committee, from time to time, may determine relevant.  To the extent that there are inconsistencies between this document and the Trust Agreement, the Trust Agreement shall control.  All defined terms in this SIP shall have the same meaning as defined in the Trust Agreement for the VEBA unless otherwise defined herein.  It is also intended that these Best Practices, as amended from time to time, be incorporated in an Investment Policy Statement developed by the Committee.

The Committee is the Named Fiduciary with management and control of the assets of the VEBA with the power as set forth in the Trust Agreement to: (1) appoint Investment Managers with respect to non-Employer Securities; (2) appoint Investment Managers who themselves have the power to appoint Investment Managers; and (3) appoint Independent Fiduciaries with respect to Employer Securities.  The Committee shall retain such responsibility unless and until it delegates that duty pursuant to the terms of the Trust Agreement and such persons accept such responsibilities by a document in writing.

Where the Trust Agreement permits someone else to be appointed as an Investment Manager or Independent Fiduciary (the "Investment Fiduciaries"), as the case may be, and that person accepts such responsibilities by a document in writing, that person shall be an Investment Fiduciary, and the Committee shall act as the Appointing Fiduciary with responsibility for monitoring the performance of the Investment Fiduciary, except to the extent that the Investment Fiduciary is appointed by the Court pursuant to Section 11.6 of the Trust Agreement.  The Committee may also appoint Investment Managers with the authority to appoint other Investment Managers, in which case any Investment Manager so appointed shall act as the Appointing Fiduciary, provided that the Committee shall retain responsibility to monitor any Investment Manager acting as an Appointing Fiduciary.

Subject to the requirements of the Trust Agreement with respect to the Employer Securities, the Committee may appoint one or more Investment Fiduciaries to manage all or part of the Trust Fund and enter into an agreement with any Investment Fiduciary so appointed.  If an Investment Fiduciary is appointed, it shall have the appurtenant investment authority of the Trustee specified in Section 6.1 of the Trust Agreement, as limited by investment guidelines adopted by the Committee and communicated to such Investment Fiduciary with respect to the portion of the Trust Fund over which it has investment discretion.  The Trustee's duties with respect to that portion of the Trust Fund subject to such Investment Fiduciary's discretion and control shall be limited to following the instructions of the Investment Fiduciary to the extent consistent with Employee Retirement Income Security Act of 1974 ("ERISA").  The Investment Fiduciary so appointed is a fiduciary and must acknowledge so in writing as required by Section 3(38) of ERISA.  Each Investment Fiduciary shall be monitored by the relevant Appointing Fiduciary.

Each Appointing Fiduciary should conduct periodic reviews of the appointed Investment Fiduciary not less than annually (and more frequently as appropriate under the circumstances)

with a view to determining whether such Investment Fiduciary should continue to be retained by the VEBA.

**S-1.1: The Committee shall develop and update from time to time an Investment Policy Statement that reflects these Investment Practices.**

The Investment Policy Statement should be a written statement developed by the Committee and updated from time to time that describes:

     a.  a prudent process for the Committee to select and retain Investment Fiduciaries,

     b.  the duties and responsibilities of the fiduciaries involved in asset management,

     c.  asset allocation, diversification and rebalancing guidelines,

     d.  appropriate investment guidelines, benchmarks and investment objectives against which the performance of the Investment Fiduciary is to be evaluated,

     e.  the due diligence criteria for selection of Investment Fiduciaries,

     f.  a general definition of the selection and monitoring criteria for Investment Fiduciaries, investments and service vendors,

     g.  the actions that can or will be taken as a result of the monitoring,

     h.  procedures for controlling and accounting for investment expenses.

     i.  requirements that investments be managed in accordance with applicable laws, trust documents, and written investment guidelines.

     j.  requirements that each fiduciary of the VEBA act in accordance with ERISA.

     k.  requirements that each fiduciary of the VEBA act in accordance with the "prudent man" rule as defined in Section 404(a)(1)(B) of ERISA.

     l.  requirements that each fiduciary of the VEBA shall discharge his, her or its duties with respect to the VEBA solely in the interest of the participants and beneficiaries of each Plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering each Plan as required by Section 404(a)(1)(A) of ERISA.

     m.  requirements that the VEBA be established and maintained pursuant to a written instrument as required by Section 402(a) of ERISA.

     n.  requirements that the Committee and the Investment Fiduciaries act in accordance with any applicable Plan Document, guidelines and other documents governing each Plan as required by Section 404(a)(1)(D) of ERISA.

     o.  requirements that copies of relevant documents governing the acts of the Investment Fiduciaries be provided to the Investment Fiduciaries.

     p.  procedures under the VEBA for allocation of responsibilities for its operation and administration consistent with the Trust Agreement and Sections 402, 403 and 405 of ERISA.

     q.  procedures requiring that any allocation or delegation permitted by the Trust Agreement or by Sections 402, 403 and 405 of ERISA be defined, documented and acknowledged at the time of such delegation of allocation.

     r.  requirements that any entity assuming a position which involves the exercise of fiduciary duties with respect to the management of VEBA plan assets under ERISA should sign a written acknowledgement that it acknowledges the acceptance of such duties and has read these Best Practices, as amended from time to time, and agrees to act in accordance with them.

**S.-1.2    Fiduciaries and parties in interest should not be involved in self-dealing as prohibited in Section 406 of ERISA.**

    a.   No fiduciary shall cause a Plan to engage in a transaction, if such fiduciary knows or should know that such transaction constitutes a direct or indirect transaction between the plan and a party in interest to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(a) of ERISA

    b.   No fiduciary with respect to a Plan shall: (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan, to the extent that such transaction constitutes a non-exempt transaction prohibited by Section 406(b) of ERISA.

    c.   The Committee should adopt policies and procedures with respect to conflicts of interests and the management of potential conflicts of interests.  Such policies should be disseminated to members of the Committee, Investment Fiduciaries, the Trustee and affected employees of the VEBA.  Each Investment Fiduciary and each affected employee should certify annually that he, she or it has received the applicable policies and procedures and confirm that he, she or it has complied with such policies in the previous year.  These policies initially should be based on the UAW conflict of interest policy.

    d.   No fiduciary should be retained for a reason other than competence, cost, experience and other matters relevant to the fiduciary's ability to perform the functions assigned to such fiduciary in a cost effective manner.

**S.-1.3 The Committee and each Investment Fiduciary should take prudent steps to protect and safeguard the assets from theft and embezzlement.**

    a.   The Committee should establish for procedures for the VEBA to maintain, or cause others to maintain, one or more fidelity bonds covering the plan fiduciaries and other persons who handle funds or other property of the plan as required by Section 412 of ERISA and Section 10.12 of the Trust Agreement.

    b.   The Committee should take prudent steps to seek payment of any contributions that are past due and have not been paid in accordance with Section 10.13 of the Trust Agreement.

**S.-1.4    Except to the extent permitted by Department of Labor Regulations, no fiduciary may maintain the indicia of ownership of any assets of the VEBA outside the jurisdiction of the district courts of the United States as required by Section 404(b) of ERISA.**

    a.   The Committee should establish procedures, which may consist of a covenant from its Investment Fiduciaries, to ensure that the indicia of ownership of the assets of the VEBA are not maintained outside the jurisdiction of the district courts of the United States, except as permitted by the Department of Labor Regulations.

**S.-2.1    The Committee should establish an investment strategy consistent with requirements of the Trust Agreement and  the purposes of the VEBA.**

a.  The Committee should determine the expected modeled return on VEBA assets and identify an appropriate level of investment risk, taking into account expected returns over time and short-term liquidity needs.  In determining the expected return the Committee should consider:

    1.  Diversification requirements to reduce the VEBA's exposure to losses.
    2.  Selection of asset classes consistent with the expected risk and return.
    3.  The projected return of the portfolio relative to the funding objectives of the VEBA.
    4.  Such other factors as the Committee may deem appropriate.

b.  The Committee should develop an investment strategy based upon such expected return and expected level of risk. In no circumstances shall the Committee be responsible for guaranteeing any expected return.

c.  The Committee should review the VEBA's investment strategy at minimum once a year and make any changes as appropriate.

**S.-2.2  The Committee should establish investment guidelines to be communicated to Investment Fiduciaries consistent with the investment strategy developed.**

a.  The investment guidelines should be sufficiently detailed to permit each Investment Fiduciary to implement and manage the specific investment strategy for which it was appointed.  In the discretion of the Committee, these investment guidelines provided to the Investment Fiduciary should:

    1.  Define the duties and responsibilities of the Investment Fiduciary
    2.  Define any applicable diversification and rebalancing guidelines.
    3.  Include any relevant selection criteria for asset classes and investments.
    4.  Set forth the appropriate benchmarks, indices, peer groups, and the investment objectives against which the performance of the Investment Fiduciary is to be evaluated.
    5.  Define such due diligence criteria for selecting investments that the Committee in the exercise of prudence determines the Investment Fiduciary should incorporate as part of its investment process.
    6.  Define the relevant monitoring criteria for the Investment Fiduciary.
    7.  Define the relevant procedures for controlling and accounting for investment expenses.

b.  The Committee should review the investment guidelines at a minimum once each year to ensure that investment objectives are analyzed and modified as prudent.

**S.-3.1  The Committee  should select Investment Fiduciaries, delegate investment duties to such Investment Fiduciaries, and allocate assets to each Investment Fiduciary to manage consistent with the investment strategy and the investment guidelines applicable to it.**

a.  The Committee should follow a due diligence process in selecting Investment Fiduciaries that selects among providers based on an objective assessment of their qualification, the quality of the work performed, the reasonableness of the fees, and any such other factors as the Committee deems appropriate and relevant.  The Committee should maintain a written record of the process used to select such Investment Fiduciaries.

    b.  The Committee should establish procedures to reasonably assure that each Investment Fiduciary or other staff appointed by them has the necessary experience and qualifications needed to oversee the assets allocated to their portfolio.

        1.  The Committee should maintain a list of Investment Fiduciaries, including, as part thereof, the Investment Fiduciaries' credentials and experience in carrying out the duties assigned to them.

        2.  The Committee should require periodic reporting from the Investment Fiduciaries as to the work performed.

        3.  To the extent the Committee hires staff with investment management-related responsibilities, the Committee should develop written job descriptions for such staff, including, as part thereof, the expected credentials and experience of all staff assigned or exercising such authority.

        4.  All fees for investment management should be "reasonable compensation" as defined in Section 408(b)(2) of ERISA.

            i.  The Appointing Fiduciary should take reasonable steps to assure that all compensation, direct or indirect, is reasonable under Section 408(b)(2) of ERISA.

           ii.  If the compensation of the Investment Fiduciary will be performance based, the Appointing Fiduciary should review such proposed compensation arrangement in light of the risks associated with the manner of compensation and the potential amount to be paid.

           iii.  The Committee should review any proposed finder's fees or other forms of compensation for asset placement in connection with selection of Investment Fiduciaries to determine whether such compensation is reasonable.

           iv.  The Committee should periodically review such fees to determine if fees remain reasonable in light of the services performed.

        5.  The Committee should establish a prudent process for periodically assessing the effectiveness of the VEBA's fiduciary structure including the Committee and other fiduciaries in meeting their responsibilities.

**S.-3.2  Each Investment  Fiduciary should give appropriate consideration to the facts and circumstances relevant to the particular investment or investment course of action in accordance with the "prudent man" rule of ERISA.**

    a.  Each Investment Fiduciary shall prudently investigate the merits of any potential investment to be made for the VEBA.

    b.  Appropriate consideration with respect to an investment includes a determination that the particular investment or investment course of action is reasonably designed to comply with the investment guidelines provided to the Investment Fiduciary, taking into consideration the risk of loss and the opportunity for gain associated with the investment or investment course of action.

    c.  Each Investment Fiduciary should have the requisite expertise, knowledge and information necessary to prudently implement the investment strategy and guidelines.

    d.  If the Investment Fiduciary lacks sufficient knowledge or sophistication to manage a portion of the VEBA's assets under its authority consistent with the investment strategy or guidelines, the Investment Fiduciary should delegate the investment duties to a knowledgeable professional.

**S.-3.3 Each Appointing Fiduciary shall periodically review the performance of the appointed Investment Fiduciary.**

a.   The Appointing Fiduciary should review the performance of the Investment Fiduciary
appointed, at least annually and more frequently as circumstances may warrant, with regards
to:

1.   Compliance with these investment practice standards, any investment guidelines and with
the purposes and needs of the VEBA.

2.   Comparison of the investment's performance to appropriate benchmarks, indices, peer
groups, and the investment objectives against which the performance of the Investment
Fiduciary is evaluated.

3.   Compliance with the conflict of interest policy, as long as doing so is reasonable under
the circumstances. (The Appointing Fiduciary may rely on a certification of the
Investment Fiduciary that it has complied with such conflict of interest policies.)

4.   The quality and timeliness of the Investment Fiduciary's response to requests for
information.

5.   The level of service provided as compared to the costs and fees.

6.   The quality and timeliness of the Investment Fiduciary's reports to the Appointing
Fiduciary and, where applicable, the Committee, Trustee or plan participants and
beneficiaries.

7.   Any education and information provided to the Appointing Fiduciary, the Committee or
the plan participants by the Investment Fiduciary.

8.   Qualitative and/or organizational changes of Investment Fiduciaries, such as:

i.   Staff turnover in determining whether the quality of the service or the investment
results provided in the past may be maintained in the future.

ii.   Changes in the organizational structure of the Investment Fiduciary, including
mergers and/or acquisitions that could affect the quality of the service or the
investment results in the future.

b.   The nature and results of the monitoring should be recorded in writing, including
documentation of any actions recommended, reviewed or taken.

c.   Control procedures should be in place to periodically review policies for best execution and
proxy voting.

1.   The Appointing Fiduciary should review the Investment Fiduciary to determine whether
the Investment Fiduciary has reasonable procedures in place to secure best execution of
the plan's brokerage transactions.  The Appointing Fiduciary may consider the cost of
commissions for the transaction, the quality and reliability of the execution and any other
factors as the Appointing Fiduciary deems relevant.

2.   The Appointing Fiduciary should establish a procedure to review any commissions paid
on such transactions at the direction of the Investment Fiduciary to determine if they are
reasonable in light of the value of the brokerage and research services or are otherwise
permissible under Section 28(e) of the Securities Exchange Act of 1934.

3.   The Appointing Fiduciary should monitor the procedures employed by an Investment
Manager in voting proxies and actions taken in connection with the voting of proxies to
ensure that the interests of plan participants and beneficiaries are protected by such
actions (or inaction), and are not subordinated to other considerations.  An Independent
Fiduciary should retain all discretionary authority over voting proxies for the Employer
Securities in accordance with Section 11.2 of the Trust Agreement.

**Exhibit I**

## Code of Ethics

In order for the Trust to continue the protection from the otherwise debilitating financial consequences that would accompany illness that has been afforded many thousands of UAW retirees of the automobile industry over the decades through the collective bargaining agreements between the UAW and Chrysler, Ford and GM – which protection has been essential to maintaining the dignity and financial security of such UAW retirees – the Committee must administer the Trust, and Trust personnel must act, in complete good faith and honesty, and with a single-minded dedication to protecting the interests of the Participants and Beneficiaries. To this end, this Code of Ethics shall govern the conduct of all those persons charged with implementation and administration of the Trust.

The following principles shall apply to members of the Committee as well as to any and all employees, professional staff and others employed in any staff capacity by the Trust. All such persons are referred to herein as "representatives and employees of the Trust." The Committee shall also inform all vendors, suppliers, outside consultants, health care providers and any other parties performing services for or on behalf of the Trust of this Code of Ethics and inform them that the Committee expects all such persons or entities to respect the provisions of this Code of Ethics. (For purposes of this Code of Ethics, references to family or families means spouses, children, grandparents, grandchildren, uncles, aunts, nieces, nephews by blood or marriage).

1.      The assets of the Fund are held in trust for the benefit of the Participants and Beneficiaries. The Participants and Beneficiaries are entitled to assurance that Trust assets are not dissipated, are invested wisely, and are spent only for proper purposes.

2.      The Participants and Beneficiaries are also entitled to assurance that representatives and employees of the Trust will be motivated solely by consideration of the best interests of the Participants and Beneficiaries, and will never allow their actions in administration of the Trust to be motivated in any respect by their own self-interest or any other factor that could result in decisions being taken that could work to the detriment of the Participants and Beneficiaries.

3.      Service as a representative or employee of the Trust is service *in the interest of the Participants and Beneficiaries.* Pursuing any other goal will injure the reputation of the individual involved as well as the Trust itself. Even more importantly, pursuing any goal other than the best interests of the Participants and Beneficiaries will undermine the Trust's ability to provide benefits to Participants and Beneficiaries.

4.      It is vital that all representatives and employees of the Trust conduct their day-to-day activities in accordance with these principles and in a manner consistent with the special responsibility they have to the Participants and Beneficiaries. Employees and representatives of the Trust must demonstrate – by their

conduct as well as their words – that they are dedicated solely to helping the Participants and Beneficiaries and are not motivated by any other goal or in any sense seeking to enrich themselves, their families, or business associates, or gain any advantage for themselves, their families, or business associates from their relationship to the Trust.

5.   The Trust shall conduct its proprietary functions, including all contracts for purchase or sale or for rendering services in accordance with the best practices of well-run institutions, including the securing of competitive bids for major contracts.

6.   The Trust shall not permit any of its funds to be invested in a manner designed to result in profit or advantage for any representative or employee of the Trust, his or her family, or business associates.

7.   There shall be no contracts of purchase or sale or for rendering services which will result in profit or advantage for any representative of the Trust, his or her family or business associates.  Nor shall any representative or employee of the Trust accept profit or special advantage for himself or herself, his or her family or business associates from a business – including, without limitation, a vendor or service provider – with which the Trust has a business relationship of any kind.

8.   The Trust shall not make loans to its representatives or employees, or members of their families, for any purpose, including financing the private business of such persons.

9.   No representative or employee of the Trust shall have any compromising personal ties, direct or indirect, with outside agencies such as insurance carriers, brokers, or consultants – including with any representative, employee or agent of any such agencies, carriers, broker or consultants – doing business with the Trust.

10.  The Trust shall fully comply with all applicable legal and accounting requirements, including with respect to maintaining its books and records in accordance with accepted accounting practices and conducting periodic audits as required by law.  The financial records of the Trust shall be made available to retired participants and others as required by law.

11.  Any person who represents the Trust has a duty to serve the best interests of the Participants and Beneficiaries.  Therefore, every representative and employee of the Trust must avoid any outside transaction which even gives the appearance of a conflict of interest.  The special fiduciary nature of these positions requires the highest loyalty to the duties of the office.

12.  No representative or employee of the Trust shall have any personal financial interest which conflicts with her/his duties on behalf of the Trust.

13.     No representative or employee of the Trust shall have any substantial financial interest (even in the publicly-traded, widely-held stock of a corporation), in any business with which the Trust has any business relationship.

14.     No representative or employee of the Trust shall accept "kickbacks," under-the-table payments, gifts or entertainment of any value or any personal payment of any kind from a business or professional enterprise with which the Trust does business, nor arrange to have any such financial payments or perquisites inure to the benefit of their family or business associates.

15.     All staffing decisions and decisions regarding use of outside vendors shall be made based solely on consideration of the best interests of the Participants and Beneficiaries.  No staff shall be hired, nor any consultants or other vendors used in connection with the conduct of the Trust's affairs, as a result of personal or family ties to existing representatives or employees of the Trust, the UAW, or any of the contributing employers.

16.     The Participants and Beneficiaries are entitled to be reasonably informed as to how the Trust's assets are used and cared for.  Toward this end, the Committee shall – at least annually – provide reasonable notice (by mailed notice to Participants and Beneficiaries or other suitable means) in a form understandable by Participants and Beneficiaries of the status of the Trust and the applicable Separate Retiree Account, including:

   a.   The funding status of the applicable Separate Retiree Account.

   b.   The amount spent on Benefits from the applicable Separate Retiree Account in the prior year.

   c.   The amount spent on administrative costs (including items such as rent, utilities, consulting fees, outside services, salaries, and the like) from the applicable Separate Retiree Account in the prior year.

   d.   The number of Participants and Beneficiaries drawing benefits from the applicable Separate Retiree Account in the prior year.

   e.   The Committee's current projections regarding solvency of the applicable Separate Retiree Account, and any anticipated Benefit adjustments that may be required over the following five year period.

   f.   Applicable Company contributions and remittances made during the prior year.

   g.   The outcome of the Cash Flow Projection required by the Company Settlements with respect to the applicable Separate Retiree Account.

   h.   The investment returns for the preceding year, as well as such longer periods as the Committee may determine.

# EXHIBIT B

# [RESERVED]

# EXHIBIT C

# [Reserved]

# EXHIBIT D

# FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

## EXHIBIT O

## FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of [_____], 2009 by and among [_____], a Delaware corporation (the "Corporation"), THE UNITED STATES DEPARTMENT OF THE TREASURY (the "UST"), 7176384 CANADA INC., a corporation organized under the laws of Canada ("Canada"), the UAW RETIREE MEDICAL BENEFITS TRUST, a voluntary employees' beneficiary association (the "VEBA"), and [_____], a Delaware corporation (the "Debtor").[1]

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

*Section 1.1    Certain Defined Terms.*  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with

---

[1] In the event that any of the other Sellers under the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

the SEC by the Corporation so that such registration statement or report would not be materially misleading; (b) would not be required to be made at such time but for the filing of such registration statement; and (c) the Corporation has a *bona fide* business purpose for not disclosing publicly.

"Adverse Effect" shall have the meaning set forth in **Section 2.1.6**.

"Advice" shall have the meaning set forth in **Section 2.7**.

"Affiliate" means, with respect to any Person, any other Person who Controls, is Controlled by or is under common Control with, such Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Canada" shall have the meaning set forth in the Preamble.

"Co-Managers" shall have the meaning set forth in Section **2.1.4(a)**.

"Common Stock" shall have the meaning set forth in the Recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Corporation Shelf Registration" shall have the meaning set forth in **Section 2.2.1**.

"Debtor" shall have the meaning set forth in the Preamble.

"Demand Registration" shall have the meaning set forth in **Section 2.1.1(a)**.

"Demand Request" shall have the meaning set forth in **Section 2.1.1(a)**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) securities pursuant to one or more Demand Registrations pursuant to **Article 2** hereof, (b) securities registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) securities registered on Form S-3 or any successor form covering solely securities issued under a dividend reinvestment program.

"FINRA" shall have the meaning set forth in **Section 2.5(a)(xvii)**.

"Government Holder" means the UST or Canada.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Holder" means each of (a) the UST, Canada, the VEBA and the Debtor and (b) any direct or indirect transferee of any such Holder who shall become a party to this Agreement in accordance with **Section 2.10**.

"Indemnitee" shall have the meaning set forth in **Section 2.9.1**.

"Indemnitor" shall have the meaning set forth in Section 2.9.3(a) but shall, for the avoidance of doubt, exclude the Government Holders and the VEBA for purposes of providing indemnification hereunder.

"Initial Sale Time" shall have the meaning set forth in **Section 2.9.1**.

"Inspectors" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"IPO" means the Corporation's first public offering of Common Stock (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms).

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.6**.

"Lead Underwriters" shall have the meaning set forth in **Section 2.1.4(a)**.

"Losses" shall have the meaning set forth in **Section 2.9.1**.

"Market Value" shall mean with respect to any particular class or type of Registrable Securities (a) at any time securities of the same class or type as the applicable Registrable Securities are listed on a national securities exchange, the closing price of such class or type of securities on the trading day immediately preceding the date of the Demand Request or Transfer Notice, (b) at any time that the Warrants are not listed on a national securities exchange but the Common Stock is listed on a national securities exchange, for each Warrant, the closing price of one share of Common Stock multiplied by the number of shares of Common Stock for which such Warrant is then exercisable (assuming cashless exercise), or (c) other than in the case of clause (a) or clause (b), the estimated market value determined in good faith by the Corporation based upon the advice of a nationally recognized independent investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to the UST or if the UST is not the Requesting Holder, the Holders of a majority of the Registrable Securities covered by the Demand Request or Transfer Notice).

"Master Sale and Purchase Agreement" means the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 and as amended from time to time, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and NGMCO, Inc.

"Material Adverse Change" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Corporation and its subsidiaries, taken as a whole.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Piggyback Offering" shall have the meaning set forth in **Section 2.2.1**.

"Preferred Stock" shall have the meaning set forth in the Recitals.

"Records" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"Registrable Securities" means (a) Warrants and the shares of Common Stock and/or Preferred Stock owned from time to time by the UST, Canada, the VEBA and the Debtor as of the date hereof and set forth on Annex I hereto, (b) the shares of Common Stock issued or issuable to any Holder upon exercise of a Warrant, (c) any additional securities of the Corporation issued to the Debtor pursuant to Section 3.2 of the Master Sale and Purchase Agreement and (d) any equity security issued in exchange for or with respect to any shares of Common Stock referred to in clauses (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with a registration statement; (ii) have been sold pursuant to Rule 144 under the Securities Act (or any successor provision); (iii) are held by a Holder that may sell all such Registrable Securities held by it in a single day pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision); (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are held by any Person who is not a Holder. For purposes hereof, "a majority of the Registrable Securities" and

"on the basis of the number of Registrable Securities" shall be determined assuming the exercise of the Warrants in full.

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants or financial advisors or any other Person acting on behalf of such Person.

"Requesting Holders" shall have the meaning set forth in **Section 2.1.1(a)**.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Shelf Registration" shall have the meaning set forth in **Section 2.1.2(a)**.

"Suspension Notice" shall have the meaning set forth in **Section 2.7**.

"Take-Down" shall have the meaning set forth in **Section 2.1.2(b)**.

"Transfer Notice" shall have the meaning set forth in **Section 2.1.2(b)**.

"UST" shall have the meaning set forth in the Preamble.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Designee" shall mean the person(s) authorized by the Committee (as defined in the UAW Retiree Medical Benefits Trust Agreement dated [_____] between [_____] and [_____]) to execute this Agreement and/or carry out the transactions contemplated hereby.

"Warrants" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally.*  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

# ARTICLE 2
# REGISTRATION RIGHTS

*Section 2.1    Demand Registration.*

*Section 2.1.1    Request for Registration.*

(a)    Subject to **Section 2.1.3**, any Holder or Holders of Registrable Securities shall have the right to require the Corporation to file a registration statement under the Securities Act for a public offering of all or part of its or their Registrable Securities (a "Demand Registration"), by delivering to the Corporation written notice stating that such right is being exercised, naming, if applicable and to the extent known by such Holder or Holders, any other Holders whose Registrable Securities are to be included in such registration (collectively, the "Requesting Holders"), specifying the number and type of each such Holder's Registrable Securities to be included in such registration, specifying whether the Registrable Securities to be included by the Requesting Holder are all of the Registrable Securities then held by such Requesting Holder and, subject to **Section 2.1.4** hereof, describing the intended method of distribution thereof (a "Demand Request"). Subject to **Section 2.1.3**, after receipt of any Demand Request, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.

(b)    Subject to **Section 2.1.3** and **Section 2.1.7**, the Corporation shall file the registration statement in respect of a Demand Registration as promptly as practicable and, in any event, (i) with respect to the filing of a Form S-3, within forty-five (45) days and (ii) with respect to the filing of any other type of registration statement, within ninety (90) days after receiving a Demand Request, and shall use reasonable best efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

*Section 2.1.2    Shelf Registration; Take-Downs.*

(a)    Subject to **Section 2.1.3**, with respect to any Demand Registration, at any time that the Corporation is eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) with respect to the Registrable Securities, the Requesting Holders may request that the Corporation (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration, or (ii) at any time that a registration statement pursuant to Rule 415 covering Registrable Securities is effective, register additional Registrable Securities of the Requesting Holders pursuant to such shelf registration statement to effect such Demand Registration (in either case, a "Shelf Registration"). For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" for all purposes under this Agreement except as otherwise provided in **Section 2.1.3**.

(b)    Subject to **Section 2.1.3**, any Holder or Holders with Registrable Securities registered pursuant to a Shelf Registration that intends to effect an underwritten offering with respect to such Registrable Securities shall deliver a notice to the Corporation at least fifteen (15) days prior to the commencement of such underwritten offering, stating (i) that such Holder or Holders intend to effect an underwritten offering of all or part of the Registrable Securities

included by such Holder or Holders in the Shelf Registration, (ii) if applicable and to the extent known by such Holder, any other Holders whose Registrable Securities are to be included in the underwritten offering, (iii) the number and type of each such Holder's Registrable Securities to be included in such underwritten offering, (iv) whether the Registrable Securities to be included by such Holder are all of the Registrable Securities then held by such Holder, and (v) the proposed timetable for such underwritten offering. Any Holder with Registrable Securities registered pursuant to a Shelf Registration that intends to effect any other sale or transfer of such Registrable Securities (each a "Take-Down") shall deliver a notice to the Corporation at least five (5) days prior to effecting such non-underwritten sale or transfer, stating (i) that such Holder intends to effect a non-underwritten sale or transfer of all or part of the Registrable Securities included by such Holder in the Shelf Registration, (ii) the number and type of the Registrable Securities to be included in such sale or transfer and (iii) the proposed manner and timetable for such sale or transfer. A notice provided by any Requesting Holder pursuant to the first two sentences of this **Section 2.1.2(b)** is referred to herein as a "Transfer Notice." Subject to **Section 2.1.3**, after receipt of any Transfer Notice, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**. For the avoidance of doubt, a Take-Down shall not be deemed to be a Demand Registration and shall not be subject to **Section 2.1.3**.

(c)    Subject to **Section 2.1.3**, the Corporation shall use its reasonable best efforts to keep any Shelf Registration requested pursuant to **Section 2.1.2(a)** continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Holders until the earlier of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) and (ii) the date as of which all of such Requesting Holders are permitted to sell their Registrable Securities without registration pursuant to Rule 144 under the Securities Act without volume limitation or other restrictions on transfer thereunder.

(d)    The Corporation shall, from time to time, supplement and amend the Shelf Registration if required by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for such Shelf Registration.

*Section 2.1.3    Limitations.*

(a)    Notwithstanding anything to the contrary herein, a Holder shall not be permitted to request a Demand Registration prior to one hundred eighty (180) days after the date of this Agreement, unless prior thereto the Corporation has a class of equity securities registered under Section 12(b) of the Exchange Act.

(b)    A Holder (other than the UST) shall not be permitted to request a Demand Registration prior to the time the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act.

(c)    A Holder shall not be permitted to request a Demand Registration, or submit a Transfer Notice with respect to an underwritten offering pursuant to a Shelf Registration, within one hundred eighty (180) days after either (i) the effective date of a previous Demand

7

Registration (other than a Shelf Registration) or (ii) the completion of any underwritten offering pursuant to a Shelf Registration.

(d)    A Holder shall not be permitted to submit a Demand Request, or a Transfer Notice for an underwritten offering, or effect any such Demand Registration or underwritten offering unless such Demand Request or Transfer Notice for an underwritten offering is for (i) a number of Registrable Securities having a Market Value equal to or exceeding $100 million in the aggregate, or (ii) all of the Registrable Securities then held by the Requesting Holder.

(e)    The Corporation shall not be required to effect, (i) until (but excluding) the third anniversary of the date hereof, more than two (2) Demand Registrations (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period, and (ii) from and including the third anniversary of the date hereof, more than one (1) Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period. Notwithstanding the foregoing, (i) the VEBA shall have the right, from and including the third anniversary of the date hereof, to request one additional Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) during any consecutive twelve (12) month period, and (ii) for the avoidance of doubt, the limitations set forth in this **Section 2.1.3** shall not apply to any non-underwritten Take-Down by any Holder under a Shelf Registration.

*Section 2.1.4    Demand Registrations for Underwritten Offerings.*

(a)    At the request of the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities submitting a Demand Request or Transfer Notice for an underwritten offering of Registrable Securities, the Corporation shall direct the applicable underwriter to conduct such offering in the form of a "firm commitment." With respect to any such underwritten offering, (i) the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering shall select the investment banking firm or firms to lead the underwritten offering (the "Lead Underwriters"); provided that such Lead Underwriters shall be reasonably acceptable to the Corporation, and (ii) the Corporation shall select the other investment banking firms, if any, to co-manage such underwritten offering (the "Co-Managers"), provided that such Co-Managers shall be reasonably acceptable to the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering.

(b)    If a Demand Registration is for an underwritten offering or a transfer pursuant to a Shelf Registration involves an underwritten offering, no Holder may participate in any such underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation; provided that such arrangements are subject to the consent of the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering, and (ii) completes and executes all questionnaires,

powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such underwritten offering other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation (if agreed to) of each such Holder to indemnify the Lead Underwriters and any Co-Managers pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such offering and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

    *Section 2.1.5 Rights of Nonrequesting Holders and the Corporation.* Subject to **Section 2.1.3**, after receipt of any Demand Request or any Transfer Notice relating to an underwritten offering pursuant to a Shelf Registration, the Corporation shall promptly (but in any event within five (5) days) give written notice of (i) such proposed Demand Registration to all other Holders or (ii) such Transfer Notice to such other Holders whose securities are covered by such Shelf Registration, who shall have the right, exercisable by written notice to the Corporation within five (5) days of their receipt of the Corporation's notice, to elect to include in such Demand Registration or underwritten offering such portion of their Registrable Securities as they may request. All Holders requesting to have their Registrable Securities included in a Demand Registration or underwritten offering shall be deemed to be "Requesting Holders" for purposes of this **Section 2.1**. For the avoidance of doubt, subject to **Section 2.1.6**, the Corporation may register in any Demand Registration any equity securities of the Corporation.

    *Section 2.1.6 Priority on Demand Registrations.* With respect to any underwritten offering based on a Demand Registration (including an underwritten offering pursuant to a Shelf Registration), if the Lead Underwriters (after consultation with the Co-Managers) advise that the inclusion of the securities proposed to be included in such registration would adversely affect the price, timing or distribution of the offering or otherwise adversely affect its success (an "Adverse Effect"), the Corporation shall include in such underwritten offering (a) first, the Registrable Securities, pro rata among the Requesting Holders on the basis of the number of Registrable Securities owned by each such Requesting Holder, and (b) second, any other securities requested to be included in such underwritten offering (including securities to be sold for the account of the Corporation); provided, however, that if more than 25% of the Registrable Securities of any Holder subject to a Demand Request or Transfer Notice for an underwritten offering are excluded pursuant to the terms of this **Section 2.1.6** from the applicable Demand Registration or underwritten offering pursuant to a Shelf Registration, the offering shall not be deemed to constitute a Demand Registration for the purposes of **Section 2.1.3**.

    *Section 2.1.7 Deferral of Filing; Suspension of Use.* The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of any registration statement required by or filed pursuant to **Section 2.1**, at any time if (a) the Corporation determines, in its sole discretion, that such action or use (or proposed action or use) would

require the Corporation to make an Adverse Disclosure, or (b) prior to receiving the Demand Request or Transfer Notice, as applicable, the board of directors of the Corporation had determined to effect a registered underwritten public offering of Company equity securities or Company securities convertible into or exchangeable for Company equity securities for the Corporation's account and the Corporation had taken substantial steps (such as selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not exercise its rights to deferral or suspension pursuant to this **Section 2.1.7**, and shall not so effect any such deferral or suspension, for more than a total of one hundred eighty (180) days (which need not be consecutive) in any consecutive twelve (12) month period.  In making any such determination to defer the filing or effectiveness, or suspend the use, of a registration statement required by **Section 2.1**, the Corporation shall not be required to consult with or obtain the consent of any Holder or any investment manager therefor, and any such determination shall be in the sole discretion of the Corporation, and neither the Holders nor any investment manager for any Holder shall be responsible or have any liability therefor.  The Corporation shall promptly notify the Holders of any deferral or suspension pursuant to this **Section 2.1.7** and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable and will promptly notify each Holder in writing of the termination of any such deferral or suspension.

Section 2.1.8 *Withdrawal from Demand Registration.*    Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Corporation with written notice.  Upon receipt of such written notice, the Corporation shall continue all efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of **Section 2.1.3(b)** or **Section 2.1.3(d)**, in which case, the Corporation may in its sole discretion cease all efforts to proceed with registration or the underwritten offering.  If the Corporation ceases all efforts to secure registration or effect the underwritten offering pursuant to this **Section 2.1.8**, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering pursuant to a Shelf Registration for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Request or Transfer Notice or (ii) the Requesting Holders pay or reimburse the Corporation for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering; provided that if, after a Demand Registration has become effective or an underwritten offering of Registrable Securities has been commenced, it is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, it shall be deemed not to have been effected and shall not count as a Demand Registration or underwritten offering for the purposes of **Section 2.1.3**.

Section 2.2    *Piggyback Offerings.*

Section 2.2.1    *Right to Piggyback.*  Each time the Corporation proposes to offer any of its equity securities in a registered underwritten offering (other than pursuant to an Excluded Registration) under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than a Holder) (a "Piggyback Offering"), the Corporation shall give prompt written notice to each Holder of Registrable

Securities (which notice shall be given not less than twenty (20) days prior to (i) the offering in the case of an underwritten offering pursuant to Rule 415 under the Securities Act (or any successor rule) (a "<u>Corporation Shelf Registration</u>") or (ii) the anticipated filing date of the Corporation's registration statement in a registration other than a Corporation Shelf Registration), which notice shall offer each such Holder the opportunity to include any or all of its Registrable Securities in such underwritten offering, subject to the limitations contained in **Section 2.2.2** hereof. Each Holder who desires to have its Registrable Securities included in such underwritten offering shall so advise the Corporation in writing (stating the number and type of Registrable Securities desired to be registered or included) within fifteen (15) days after the date of such notice from the Corporation. Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Securities in any underwritten offering pursuant to this **Section 2.2.1** by giving written notice to the Corporation of such withdrawal. Subject to **Section 2.2.2** below, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein. Notwithstanding the foregoing, the Corporation may at any time withdraw or cease proceeding with any such offering if it shall at the same time withdraw or cease proceeding with the offering of all other equity securities originally proposed to be included in such offering.

*Section 2.2.2    Priority on Piggyback Offerings.*

(a)    If a Piggyback Offering was initiated by the Corporation, and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities the Corporation proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder, and (iii) third, any other securities requested to be included in such Piggyback Offering. If as a result of the provisions of this **Section 2.2.2(a)**, any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw its request to include its Registrable Securities in such Piggyback Offering.

(b)    If a Piggyback Offering was initiated by a security holder of the Corporation (other than a Holder), and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities requested to be included therein by the security holders requesting such Piggyback Offering and the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such Piggyback Offering (including securities to be sold for the account of the Corporation). If as a result of the provisions of this **Section 2.2.2(b)** any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Securities in such Piggyback Offering.

(c)    No Holder may participate in a Piggyback Offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting

arrangements approved by the Corporation and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in customary form and reasonably satisfactory to the Holders, reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation, if agreed to, of each such Holder to indemnify the underwriters pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such registration and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

Section 2.2.3    Selection of Underwriters.    The Corporation shall select the investment banking firm or firms to manage the Piggyback Offering.

Section 2.2.4    No registration of Registrable Securities effected pursuant to this **Section 2.2** shall be deemed to have been effected pursuant to **Section 2.1.1** or **Section 2.1.2** or shall relieve the Corporation of its obligations under **Section 2.1.1** or **Section 2.1.2**.

Section 2.3    SEC Form S-3.    Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to cause Demand Registrations to be registered on Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) once the Corporation becomes eligible to use such form, and if the Corporation is not then eligible under the Securities Act to use such form, Demand Registrations shall be registered on the form for which the Corporation then qualifies. After becoming eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3, the Corporation shall use its reasonable best efforts to remain so eligible.

Section 2.4    Holdback Agreements.

(a)    The Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of the offering pursuant to a Demand Registration, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of any registration statement in connection with an underwritten Demand Registration (other than a Shelf Registration), except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common

Stock) in effect on the date of the Demand Request, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(b)    If any Holders of Registrable Securities provide a Transfer Notice relating to an underwritten offering of Registrable Securities registered pursuant to a Shelf Registration, the Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of such underwritten offering, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the pricing date for such underwritten offering, except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Transfer Notice, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(c)    Each Holder agrees, in the event of an underwritten offering of equity securities by the Corporation (whether for the account of the Corporation or otherwise), not to offer, sell, contract to sell or otherwise dispose of any Preferred Stock, Warrants, Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 under the Securities Act (except as part of such underwritten offering), during the sixty (60) day period (or such lesser period in each case as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, the pricing date for such underwritten offering); provided, however, that (i) any applicable period shall terminate on such earlier date as the Corporation gives notice to the Holders that the Corporation declines to proceed with any such offering and (ii) the sum of all holdback periods applicable to the Holders shall not exceed one hundred twenty (120) days (which need not be consecutive) in any given twelve (12) month period.

Section 2.5    *Registration Procedures.*

(a)    If and whenever the Corporation is required to effect the registration of any Registrable Securities pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Corporation shall use its reasonable best efforts to effect the registration and the sale, as applicable, of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as expeditiously as possible:

(i)    prepare and file with the SEC, pursuant to **Section 2.1** with respect to any Demand Registration, a registration statement on any appropriate form under the Securities Act with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective as promptly as practicable; provided that as far in advance as practicable before filing such registration statement or any amendment thereto, the Corporation shall furnish to the selling Holders copies of reasonably complete drafts of all such documents prepared to be filed (including exhibits), and any such selling Holder shall have the opportunity to object to any information contained therein and the Corporation shall make corrections reasonably requested by such selling Holder with respect to such information prior to filing any such registration statement or amendment; provided, further, that the Corporation shall not file any such registration statement, and any amendment thereto, to which a Holder shall reasonably object in writing on a timely basis, unless in the Corporation's judgment such filing is necessary to comply with applicable law;

(ii)    except in the case of a Shelf Registration, prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the selling Holders thereof set forth in such registration statement;

(iii)    in the case of a Shelf Registration, comply with the provisions of **Section 2.1.2(c)** and **Section 2.1.2(d)**;

(iv)    furnish to each selling Holder of Registrable Securities and the underwriters of the securities being registered, without charge, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such selling Holders or underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such selling Holders or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.1.7**, **Section 2.4(c)**, **Section 2.6** and **Section 2.7** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by each selling Holder and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(v)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the Lead Underwriters or managing underwriters reasonably request (or, in the event the registration statement does not relate to an underwritten offering, as the selling Holders of a majority of such Registrable Securities being offered may reasonably request); use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts

and things which may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such selling Holder in such jurisdictions; provided, however, that the Corporation shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction or (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject;

(vi)    promptly notify each selling Holder and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation, or threatened initiation, of any proceedings for that purpose, or (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vii)    permit any selling Holder that might reasonably be deemed to be an underwriter or a Controlling Person of the Corporation to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Corporation in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(viii)    make available members of the management of the Corporation or the applicable Corporation subsidiaries for reasonable assistance in the selling efforts relating to any offering of Registrable Securities covered by a registration statement filed pursuant to this Agreement, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and road shows); provided, however, that management need only be made available for one such offering for each of the UST, Canada and the VEBA in any twelve (12) month period;

(ix)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Corporation's first fiscal quarter commencing after the effective date of a

registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement shall be deemed to be satisfied if the Corporation timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(x)    if requested by the Lead Underwriters, managing underwriters or any selling Holder, promptly incorporate in a prospectus supplement or post-effective amendment such information as the Lead Underwriters, managing underwriters or any selling Holder reasonably requests to be included therein, including, with respect to the Registrable Securities being sold by the selling Holders, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(xi)    as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each selling Holder;

(xii)    cooperate with the selling Holders and Lead Underwriters or the managing underwriters to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the Lead Underwriters, managing underwriters or such selling Holders may request at least two (2) business days prior to any sale of the Registrable Securities and keep available and make available to the Corporation's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(xiii)    promptly make available for inspection by any selling Holder, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or Representative retained by any such selling Holder or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (xiii) if (A) the Corporation believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) such selling Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in a form acceptable to the

Corporation; and provided, further, that each selling Holder of Registrable Securities agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xiv)    furnish to each selling Holder and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Corporation (which may be in-house counsel) provided that such counsel is reasonably acceptable to such Holders and the underwriter, and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the selling Holders, Lead Underwriters or managing underwriters reasonably requests;

(xv)    cause the Registrable Securities included in any registration to be (A) in the case of an IPO, listed on a securities exchange or exchanges or an inter-dealer quotation system, as determined by the Corporation, or (B) in the case of a registration other than an IPO, (1) listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed or (2) quoted on an inter-dealer quotation system if similar securities issued by the Corporation are quoted thereon, as applicable;

(xvi)    provide a transfer agent and registrar for all Registrable Securities registered hereunder and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(xvii)    cooperate with each selling Holder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("FINRA");

(xviii)    during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xix)    notify each selling Holder of Registrable Securities promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xx)    subject to **Section 2.1.4(b)** and **Section 2.2.2(c)**, enter into such agreements (including underwriting agreements) as are customary in connection with an underwritten registration; and

(xxi)    advise each selling Holder of such Registrable Securities, promptly after it receives notice or obtains knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(b)    The selling Holders shall reasonably cooperate with the Corporation in the preparation and filing of any registration statement under the Securities Act pursuant to this Agreement and provide the Corporation with all information reasonably necessary to complete such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of any selling Holder (or not proceed with such registration) if such selling Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.  Promptly following any sale or other transfer of any Registrable Securities, each Holder shall notify the Corporation in writing thereof, which notice shall specify the amount and type of securities involved, the date of the sale or transfer and whether the sale or transfer was effected under a registration statement or otherwise.

(c)    Each of the parties shall treat all notices of proposed transfers and registrations, and all information relating to any blackout periods under **Section 2.1.7** received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Holder) and shall not disseminate such information.

*Section 2.6    Issuer Free Writing Prospectuses.*  The Corporation represents and agrees that, unless it obtains the prior consent of the Holders of a majority of the Registrable Securities participating in a registration or offering or the approval of the counsel for such Holders, and each of the Holders represents and agrees that, unless it obtains the prior consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Corporation represents that any Issuer Free Writing Prospectus shall not include any information that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Section 2.7    Suspension of Dispositions.*  Each Holder agrees that upon receipt of any notice (a "Suspension Notice") from the Corporation of the happening of any event of the kind described in **Section 2.5(a)(vi)(B)** or **(C)** or **Section 2.5(a)(xxi)** such Holder shall forthwith discontinue disposition of Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "Advice") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Corporation, such Holder shall deliver to the Corporation all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.  In the event the Corporation shall give any such notice, the time period regarding the effectiveness of registration statements set forth in **Section 2.5(a)(ii)** hereof, if applicable, shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Securities covered by such registration

statement shall have received the copies of the supplemented or amended prospectus or the Advice. The Corporation shall use its reasonable best efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable.

*Section 2.8    Registration Expenses.* The Corporation shall pay all reasonable fees and expenses incident to the performance of or compliance with its obligations under this **Article 2**, including (a) all registration and filing fees, including fees and expenses (i) with respect to filings required to be made with all applicable securities exchanges and/or FINRA and (ii) of compliance with securities or "blue sky" laws including any fees and disbursements of counsel for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities pursuant to **Section 2.5(a)(v)**, (b) printing expenses, including expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by the Lead Underwriters or managing underwriter(s), if any, or by the Holder, (c) messenger, telephone and delivery expenses of the Corporation, (d) fees and disbursements of counsel for the Corporation, (e) expenses of the Corporation incurred in connection with any "road show" or other marketing efforts, (f) fees and disbursements of all independent certified public accountants (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to this Agreement) and any other Persons, including special experts, retained by the Corporation, and (g) fees up to $250,000 plus reasonable disbursements of one legal counsel for the Requesting Holders in connection with each registration or offering of their Registrable Securities or sale (including, for the avoidance of doubt, a Take-Down) of their Registrable Securities under a Shelf Registration but only if such registration, offering or sale either is effected or, pursuant to **Section 2.7**, is postponed. For the avoidance of doubt, the Corporation shall not be required to pay any, and each Holder shall pay its own, underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any registration statement, or any other expenses of any Holder. In addition, the Corporation shall bear all of its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange or inter-dealer quotation system on which similar securities issued by the Corporation are then listed and the fees and expenses of any Person, including special experts, retained by the Corporation.

*Section 2.9    Indemnification.*

*Section 2.9.1    Indemnification by the Corporation.* The Corporation agrees to indemnify and hold harmless, to the fullest extent permitted by law, each Holder, the trustees of any Holder, the investment manager or managers acting on behalf of any Holder with respect to the Registrable Securities, Persons, if any, who Control any of them, and each of their respective Representatives (each, an "Indemnitee"), from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable costs of investigation and legal expenses) ("Losses") arising out of or caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement described herein or any related prospectus or Issuer Free Writing Prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto), or arising out of or caused by any omission or alleged

omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the Corporation in writing by such Indemnitee or any Person acting on behalf of such Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (a) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the respective Holder that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (b) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to such Holder a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (c) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (d) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (c) above. This indemnity shall be in addition to any liability the Corporation may otherwise have under this Agreement or otherwise. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or any indemnified party and shall survive the transfer of Registrable Securities by any Holder.

Section 2.9.2 *Indemnification by the Holders.* Each Holder (other than the Government Holders, the VEBA and the Debtor) agrees, to the fullest extent permitted under applicable law severally and not jointly, to indemnify and hold harmless each of the Corporation, its directors, officers, employees and agents, and each Person, if any, who Controls the Corporation, to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the respective Holder expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto). No claim against the assets of any Holder shall be created by this **Section 2.9.2**, except as and to the extent permitted by applicable law. Notwithstanding the foregoing, no Holder shall be liable to the Corporation or any such Person for any amount in excess of the net amount received by the Holder from the sale of Registrable Securities in the offering giving rise to such liability.

Section 2.9.3 *Indemnification Procedures.*

(a)    In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted where indemnity may be sought by an Indemnitee

pursuant to any of the preceding paragraphs of this **Section 2.9**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability which it may have to such Indemnitee except to the extent that the Indemnitor was prejudiced by such failure to notify. The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.9.3(a))** the Indemnitee and any others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (a) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (b) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall only be responsible for the reasonable fees and expenses of such counsel. It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any local counsel) for all such Indemnitees not having actual or potential differing interests or legal defenses among them, and that all such fees and expenses shall be reimbursed as they are incurred. The Indemnitor shall not be liable for any settlement of any proceeding affected without its written consent.

(b)     If the indemnification provided for in this **Section 2.9** is unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such Losses, as well as any other relevant equitable considerations. If the indemnification described in **Section 2.9.1** or **Section 2.9.2** is unavailable to an Indemnitee, the relative fault of the Corporation, any Holder and Persons acting on behalf of or Controlling the Corporation or any such Holder shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, a Holder or by Persons acting on behalf of the Corporation or any Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnitor shall not be required to contribute pursuant to this **Section 2.9.3(b)** if there has been a settlement of any proceeding affected without its written consent. No claim against the assets of any Holder shall be created by this **Section 2.9.3(b)**, except as and to the extent permitted by applicable law. Notwithstanding the foregoing, no Holder shall be required to make a contribution in excess of the net amount received by such Holder from the sale of Registrable Securities in the offering giving rise to such liability. For the avoidance of doubt, none of the Government Holders, the VEBA or the Debtor shall be required to make any contribution to any Indemnitee under this Section 2.9.3(b).

*Section 2.9.4    Survival.*  The indemnification contained in this **Section 2.9** shall remain operative and in full force and effect regardless of any termination of this Agreement.

*Section 2.10    Transfer of Registration Rights.*  The rights and obligations of a Holder under this Agreement may be assigned to any transferee or assignee that directly acquires Registrable Securities from such Holder (including, without limitation, in connection with any such assignment by either Government Holder or the VEBA to an affiliate Controlled by such Government Holder or the VEBA, as applicable (provided that Canada may also effect such assignment to an affiliate Controlled by Canada Development Investment Corporation, a Crown corporation and the sole shareholder of Canada or to an affiliate Controlled by [the Department of Finance of Canada]), and in connection with any such assignment by the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction), but only if (a) the respective Holder agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Corporation concurrent with such transfer or assignment and (b) concurrent with such transfer or assignment, such transferee or assignee furnishes the Corporation with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being transferred or assigned, and the transferee or assignee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein as a Holder hereunder.  Notwithstanding the foregoing, (x) any transferee or assignee who becomes bound by the provisions of this Agreement pursuant to the first sentence of this Section 2.10 shall have all rights and obligations as a "Holder" hereunder but, unless such transferee or assignee is either (1) an Affiliate of the UST, Canada, the VEBA or the Debtor or (2) a successor in interest of the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction, such transferee or assignee shall not have any of the rights hereunder that are specific to the UST, Canada, the VEBA or the Debtor, as applicable, and (y) the rights of the Debtor under this Agreement shall not be assigned by the Debtor in connection with the distribution of any Registrable Securities from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction other than any distribution of any Registrable Securities that may be deemed to have been made from the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

*Section 2.11    Rule 144.*  After such time as the Corporation has registered a class of equity securities under Section 12(b) or Section 12(g) of the Exchange Act, or otherwise is required to report under Section 15(d) of the Exchange Act, the Corporation shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and shall take such further action as the Holders may reasonably request, all to the extent required from time to time to enable the Holders to sell Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC.  The Corporation shall promptly upon the request of any Holder furnish to such Holder evidence of the number of shares of Common Stock then outstanding, as of the most recent date practicable.  Any sale or transfer by a Holder of Registrable Securities that could have been effected either as

a sale of securities pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision) or a sale covered by a Shelf Registration shall be deemed for all purposes under this Agreement to be a sale or transfer by such Holder pursuant to, and in accordance with, Rule 144 under the Securities Act.

Section 2.12    *Preservation of Rights.*

(a)    The Corporation will not (x) grant any registration rights to third parties which are inconsistent with the rights granted hereunder or (y) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates the rights expressly granted to the Holders in this Agreement.

(b)    If the Corporation grants any registration rights to a third party that are more favorable to such party than the rights granted to any of the UST, Canada, the VEBA and the Debtor hereunder, the UST, Canada, the VEBA and the Debtor shall be entitled to have their registration rights improved to the level of the registration rights of such third party, and all of the parties hereto shall execute an amendment to this Agreement reflecting such more favorable rights.

Section 2.13    *Registration of Common Stock under Exchange Act; Listing.* Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to (i) file with the SEC a registration statement to register its Common Stock under Section 12 of the Exchange Act and cause such registration statement to be declared effective no later than July 31, 2010 and (ii) cause its Common Stock to be approved for listing on the New York Stock Exchange or any other national securities exchange in connection with a distribution, if any, of Registrable Securities by the Debtor pursuant to a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

## ARTICLE 3
## TERMINATION

Section 3.1    *Termination.*    Other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the obligations of the Corporation hereunder shall terminate upon the time when there are no Registrable Securities remaining.    With respect to each Holder, other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the rights and obligations of such Holder hereunder shall terminate when such Holder no longer holds any Registrable Securities and, with respect to the Debtor, has no further right to receive additional securities of the Corporation pursuant to Section 3.2 of the Master Sale and Purchase Agreement.    Notwithstanding the foregoing, all liabilities or obligations under **Sections 2.8** and **2.9** and **Article 4** shall remain in effect in accordance with the terms of such provisions.

## ARTICLE 4
## MISCELLANEOUS

Section 4.1    *Notices.*    Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or

internationally recognized overnight courier service (charges prepaid); (c) at the time received
when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the
time when confirmation of successful transmission is received (or the first business day
following such receipt if the date of such receipt is not a business day) if sent by facsimile, in
each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile: 212-504-6666

If to the UST:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile: 212-504-6666

If to Canada:

7176384 Canada Inc.
1235 Bay Street, Suite 400
Toronto, ON M54 3K4
Attention: Mr. Michael Carter

Facsimile:  416-934-5009

with a copy to:
Patrice S. Walch-Watson, Esq.
Torys LLP
79 Wellington Street West
Suite 3000
Toronto, ON M5K 1N2
Facsimile: 416-865-7380

If to the VEBA:

UAW Retiree Medical Benefits Trust
P.O. Box 14309
Detroit, Michigan 48214

with a copy to:
Daniel W. Sherrick
General Counsel
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan 48214
Facsimile: 313-822-4844

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Attention: Richard S. Lincer & David I. Gottlieb

If to the Debtor:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:
Jenner & Block LLP
330 North Wabash Avenue

Chicago, Illinois 60611-7603
Attention: Brian R. Boch
    Catherine Abbott
Telephone: 312-222-9350
Facsimile: 312-527-0484

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller
    Stephen Karotkin
    Raymond Gietz
Telephone: 212-310-8000
Facsimile: 212-310-8007

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 4.1**, then to the last addressee as so designated.

Section 4.2    *Authority*. Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.3    *No Third Party Beneficiaries*. This Agreement shall be for the sole and exclusive benefit of (a) the Corporation and its successors and permitted assigns, (b) each Holder (including any trustee thereof) and any other investment manager or managers acting on behalf of such Holder with respect to the Common Stock, Preferred Stock, or the Warrants and their respective successors and permitted assigns and (c) each of the Persons entitled to indemnification under **Section 2.9** hereof. Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 4.4    *No Personal Liability by Trustees*. It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the UST managers and the VEBA Designee not individually or personally but solely in their respective capacities as managers and trustees in the exercise of the powers and authority conferred and vested in them as such trustees and under no circumstances shall any trustee or former trustee have any personal liability in the trustee's individual capacity in connection with this Agreement or any transaction contemplated hereby.

*Section 4.5*   *Cooperation.*  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

*Section 4.6*   *Governing Law; Forum Selection.*  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

*Section 4.7*   *WAIVER OF JURY TRIAL.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

*Section 4.8*   *Successors and Assigns.*  Except as otherwise expressly provided herein, including pursuant to **Section 2.10**, neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation, each Holder, and their respective successors and permitted assigns; provided, that, for the avoidance of doubt, any Person who receives securities of the Corporation as a distribution from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction (other than any such Person that is a successor in interest to the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction) shall not be bound by or have any rights pursuant to this Agreement.

*Section 4.9*   *Entire Agreement.*  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.  This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

*Section 4.10*  *Severability.*   Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is

held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 4.11    *Enforcement of this Agreement.*    The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 4.12    *Amendment.*    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 4.13    *Headings.*    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 4.14    *Counterparts; Facsimiles.*    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement. All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

Section 4.15    *Time Periods.*    Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

Section 4.16    *No Binding Effect on U.S. Government.* Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be binding on or create any obligation on the part of the United States Department of the Treasury or any other department or any agency or branch of the United States Government, or any political subdivision thereof.

Section 4.17    *Canada*.    Notwithstanding anything in this Agreement to the contrary, Canada shall be bound by this Agreement only in its capacity as a Holder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch of the Government of Canada or subdivision thereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Equity Registration Rights Agreement on the date first above written

*[CORPORATION]*

By: _____
Name: _____
Title: _____

**THE UNITED STATES DEPARTMENT OF THE TREASURY**

By: _____
Name: _____
Title: _____

**7176384 CANADA INC.**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**UAW RETIREE MEDICAL BENEFITS TRUST**

By: _____
Name: _____
Title: _____

*[DEBTOR]*

By: _____
Name: _____
Title: _____

**Annex I**

| Holder | Number of Shares of Common Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Common Stock for Which Warrants Are Initially Exercisable |
|---|---|
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Series A Preferred Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Total: | |

# EXHIBIT E

# FORM OF TRUST AGREEMENT AMENDMENT

### AMENDMENT TO THE
### UAW RETIREE MEDICAL BENEFITS TRUST

WHEREAS, General Motors Corporation ("GM"), agreed to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between GM and the UAW (the "MOU").

WHEREAS, GM, the UAW, along with class representatives of the plaintiff class members in the case of *UAW et al. v. General Motors Corp.*, No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, aff'd, Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) entered into a settlement agreement, and thereafter, GM, the UAW, and the class representatives entered into a settlement agreement in the class action of *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) ("Henry II") that was approved by the Court on July 31, 2008 (the "GM Retiree Settlement"), which provides for GM to make certain deposits and remittances to the UAW Retiree Medical Benefits Trust (the "Trust") for the provision of retiree medical benefits.

WHEREAS, subsequent to entering into the MOU and the GM Retiree Settlement, GM filed a bankruptcy action known as *In re General Motors Corporation*, No. 09-50026 (Bankr. S.D.N.Y. filed June 1, 2009) (the "Bankruptcy Proceeding") pursuant to which [GM Newco] purchased certain assets of GM.

WHEREAS, the UAW asserted, and [GM Newco] denied, that [GM Newco] was bound by the terms of the MOU as a successor to GM and was therefore responsible for providing the retiree medical benefits contemplated in the MOU and the GM Retiree Settlement.

WHEREAS, [GM Newco] and the UAW entered into a settlement agreement (the "[GM Newco] UAW Retiree Settlement Agreement") that was approved by the court in the Bankruptcy Proceeding pursuant to which [GM Newco] agreed to provide retiree medical benefits to those that were entitled to retiree medical benefits from GM pursuant to the MOUs and the GM Retiree Settlement in exchange for UAW waiving its claim that [GM Newco] was a successor to GM and responsible for GM's liabilities under the MOUs and the GM Retiree Settlement.

WHEREAS, as part of the [GM Newco] UAW Retiree Settlement Agreement, [GM Newco] agreed to provide benefits under a plan adopted by [GM Newco] and subsequently amended pursuant to the terms of the [GM Newco] UAW Retiree Settlement Agreement.

WHEREAS, the [GM Newco] UAW Retiree Settlement Agreement provides for the Trust to be amended with respect to [GM Newco] to, among other things, allow the Committee to amend the [GM Newco] Retiree Plan on or after January 1, 2010 to modify benefit levels thereunder as well as to eliminate any reference in the Trust to the special pass-through benefit.

NOW THEREFORE, the Committee amends the Trust, effective *[insert date]* as follows (additions bold-underline) (deletions bold-strikethrough):

1.      Inserted after paragraph 16 in the preamble the following:

**WHEREAS, the Trust is amended to provide for the settlement agreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated [insert date here].**

2.      The term "GM Eligible Group" is amended throughout to read "[GM Newco] Eligible Group."

3.      The term "GM Retiree EBA" is amended to read "[GM Newco] Retiree EBA."

4.      The term "GM Retiree Plan" is amended to read "[GM Newco] Retiree Plan."

5.      The term "UAW GM Retirees Medical Benefits Plan" is amended to read "[GM Newco] UAW Retirees Medical Benefits Plan."

6.      The term "GM Separate Retiree Account" is amended to read "[GM Newco] Separate Retiree Account."

7.      The term "GM Employer Security" is amended to read "[GM Newco] Employer Security."

8.      Section 1.19 is amended to read as follows:

Employer Security.  Any obligation, note, warrant, bond, debenture, stock or other security within the meaning of section 407(d)(1) of ERISA that is acquired or held by the Trust (or arising from any such security through conversion) ~~pursuant a deposit or transfer under one of the Settlements the acquisition or holding of which (i) is not prohibited by sections 406(a)(1)(E) or 406(a)(2) of ERISA, or (b) is the subject of a prohibited transaction exemption provided under section 408 of ERISA~~.

9.      Section 1.32 is amended to read as follows:

~~GM~~**[GM Newco]** Retiree EBA.  The UAW ~~GM~~**[GM Newco]** Retirees Employees' Beneficiary Association, an employee organization within the meaning of Section 3(4) of ERISA.

10.     Section 1.34 is amended to read as follows:

~~GM~~**[GM Newco] UAW** Retiree Settlement **Agreement**.  The settlement ~~of the claims in~~**agreement entered into between [GM Newco] and the UAW that addresses the provision of retiree medical benefits and is dated** *[insert date here] ~~UAW v. General Motors Corp., Civ. Act. No. 2:07-cv-14074 (E.D. Mich. complaint filed September 9, 2007)~~*.

11.     Section 1.14 is amended to read as follows:

The term Company shall mean Newco, Ford, or ~~GM~~**[GM Newco]**, as the case may be (collectively the "Companies").

2

12.    Section 1.36 is amended to read as follows:

Implementation Date.  The later of (i) January 1, 2010 or (ii) the "Final Effective Date," as defined in ~~the GM Retiree Settlement or~~ the Newco UAW Retiree Settlement Agreement, **or the "Closing Date" as defined in the [GM Newco] UAW Retiree Settlement Agreement**, as applicable, or with respect to the Ford Retiree Settlement, the later of the "Effective Date" or the "Appeal Completion Date" (as defined in the Ford-UAW Memorandum of Understanding Post-Retirement Medical Care dated November 3, 2007) or as otherwise provided in the Ford Settlement Agreement.

13.    Section 1.47 is amended to read as follows:

Settlements.  The ~~GM~~**[GM Newco] UAW** Retiree Settlement **Agreement**, the Newco UAW Retiree Settlement Agreement and the Ford Retiree Settlement (as referred to in the preamble to this Trust Agreement).

14.    Insert a new Section 1.54 after Section 1.53 to read as follows:

**[GM Newco].  [_____], its successors and assigns.**

15.    Section 3.2 is amended to read as follows:

Receipt of Funds.  The Trust Fund shall accept all sums of money and other property deposited, contributed, remitted, or transferred to the Trust with respect to a Plan and credited to the Separate Retiree Account attributable to such Plan as described in Article IV, provided that any Employer Security issued to the Trust by any Company, other than **(i)** any Newco Employer Security contributed pursuant to the Newco UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 25(A) thereof **or (ii) any [GM Newco] Employer Security contributed pursuant to the [GM Newco] UAW Retiree Settlement Agreement as approved by a bankruptcy court under Section 28(A) thereof**, shall be accepted only upon the direction of the Independent Fiduciary.  The Trustee shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Trustee shall be accountable for the money or other property it receives, but shall not be responsible for the collection of any deposits, contributions, remittances, or transfers due to the Trust.

16.    Section 10.2(d) is amended to read as follows:

Notwithstanding any other provision in this Section 10.2, until the expiration of the 2011 calendar year, the Ford Retiree Plan shall provide the Benefits specified in Exhibit F(2)**, and the GM Retiree Plan shall provide the Benefits specified in Exhibit F(3)**.  The Benefits specified in Exhibit~~s F(1)~~, F(2) ~~**and F(3)**~~ shall be the Benefits provided for under the terms of **the Ford Retiree** ~~each Company's respective~~ Settlement.  During the period that the **Ford Retiree** Plan~~s~~ ~~are~~ **is** providing the initial benefits described in this Section 10.2(d), the Committee may exercise administrative discretion (as permitted under the Trust Agreement) in delivering such benefits, including, without limitation, making any changes that could have been adopted by joint action of a Company and the UAW pursuant to ~~**Section 5.A.2(h) of the Settlement**~~

3

~~Agreement between GM and UAW dated December 16, 2005 and~~ Section ___ of the Settlement Agreement between Ford and UAW dated _____.

17.   Section 10.20 is amended to read as follows:

Presumption of Control.  The Committee shall take all such reasonable action as may be needed to rebut any presumption of control that would limit the Trust's ability to own ~~GM's~~**[GM Newco] Employer Securities under the terms of the [GM Newco] UAW Retiree Settlement Agreement** ~~common stock,~~ Ford's Common Stock~~, the 6.75% Series U Convertible Senior Debentures Issued by GM Due December 31, 2012,~~ or the 5.75% Senior Convertible Notes due 2013 issued by Ford or as may be required to comply with all applicable laws and regulations, including, but not limited to, federal and state banking laws and regulations.

18.   Section 12.4 is amended to read as follows:

In addition to the powers of the Committee pursuant to Sections 12.2 and 12.3 to transfer Trust assets to another trust, subject to the restrictions of Section 7.1, the Committee acting in a fiduciary capacity may merge or accept transfers of assets from other trusts – including, without limitation, trusts maintained by Newco, Ford, and ~~GM~~**[GM Newco]** – into the Trust, provided that the assets attributable to the each Plan are separately accounted for in the respective Separate Retiree Account.

19.   Exhibit F(3) is deleted.

20.   The last paragraph of Article I is amended to read as follows:

Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the ~~GM~~**[GM Newco] UAW Retiree** Settlement **Agreement** when relating to GM and/or the GM **Newco** Eligible Group, the GM EBA, the ~~GM~~**[GM Newco]**Retiree Plan and the ~~GM~~**[GM Newco]** Separate Retiree Account.   Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Newco UAW Retiree Settlement Agreement when relating to Newco and/or the Newco Eligible Group, the Newco EBA, the Newco Retiree Plan and the Newco Separate Retiree Account.  Any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, shall have the meaning it has in the Ford Retiree Settlement when relating to Ford and/or the Ford Eligible Group, the Ford EBA, the Ford Retiree Plan and the Ford Separate Retiree Account.  If any capitalized term used in this Trust Agreement, if not defined in this Trust Agreement, is also used in more than one of the Settlements, such term shall have the meaning it has in the Settlement applicable to the relevant Plan, Eligible Group, or Separate Retiree Account.

21.   Any defined term under the Trust Agreement that has been replaced or modified pursuant to this Amendment shall be replaced or modified throughout the Trust Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**COMMITTEE OF THE UAW RETIREE MEDICAL BENEFITS TRUST**

<u>**INDEPENDENT MEMBERS**</u>

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**


<u>**UAW MEMBERS**</u>

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**

_____          Dated: _____

**[insert name]**


<u>**TRUSTEE**</u> **[insert name of institution]**


By: _____          Dated: _____

          **[insert name]**

5

# EXHIBIT F

# 2009 BENEFITS CHANGES

## 2009 Benefits Changes

Beginning with claims incurred on the later of (a) July 1, 2009 or (b) receipt of necessary court approvals, the benefit plan provided by GM for UAW- represented retirees, surviving spouses and their eligible dependents as amended by the Settlement Agreement approved by the Court July 31, 2008, will be changed as follows:

| | |
|---|---|
| Prescription Drug Co-Pays (applicable to all retirees, surviving spouses and their eligible dependents).[a] | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand (formulary and non-formulary)<br>• $25 Specialty<br><br>Mail Order (90 day supply)<br>• $20 Generic<br>• $50 Brand (formulary and non-formulary)<br>• $50 Specialty |
| Catastrophic Plan for retirees and surviving spouses (and their eligible dependents) who elect into the Plan or fail to pay required monthly contributions. | Plan no longer offered.<br><br>Impacted retirees, surviving spouses and eligible dependents will be defaulted into the Traditional Care Network (TCN) unless "no coverage" is specifically requested. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra).[a] | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension. |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Aciphex, Prevacid, Protonix).[a] | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome. |
| Vision Program | No longer offered. |
| Dental Program | No longer offered. |
| Emergency Room Co-Pay [a] | $100 (waived if admitted). |
| Medicare Part B Special Benefit ($76.20 per month for Medicare-eligible retirees) enrolled in Medicare | No longer offered by health plan.<br><br>This benefit is no longer offered by the Health Care Plan.  This modification is not applicable to approximately 21,500 retirees and surviving spouses who are currently receiving the benefit and who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust.  There will be no change in these payments from the pension trust for the retirees described in the preceding sentence. |
| "Protected Retirees" who meet the provisions of | Monthly contribution requirement of $11 (flat rate |

| | |
|---|---|
| the Affordability Test (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33). [a] | regardless of family status).<br><br>In all other respects, the same administrative provisions and plan design requirements applicable to all other General retirees shall apply. |
| | |
| Monthly Contribution Requirements (General Retirees) [a] | No change (currently $11/single and $23/family). |
| | |
| Deductible, Co-Pay and out-of-pocket (OOP) Requirements (General Retirees) | No changes<br>• Deductible: $164 single/$328 family<br>• Co-insurance: 10% in network 30% out of network<br>• OOP Max: $273 single in network $546 family in network |
| | |
| Implementation | The parties will work together to effect a mutually-agreed transition and implementation as soon as practicable. GM and the UAW will mutually agree upon communications. |
| | |
| Dependents Eligibility – Retirees | Effective upon receipt of necessary court approvals, no new Principally Supported Children or Sponsored Dependents will be enrolled pursuant to the provisions the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any child enrolled as a Principally Supported Child pursuant to the provisions of the Plan.<br><br>Effective the later of (a) October 1, 2009 or (b) receipt of necessary court approvals, coverage will cease for any dependent of an enrollee who is enrolled as a Sponsored Dependent. |

a. Modifications also to be comprehended in the HMO plan designs.

2

# EXHIBIT G

# NATIONAL INSTITUTE FOR HEALTH CARE REFORM TERM SHEET

## National Institute for Health Care Reform

Term Sheet

1. The Institute will be established as an industrywide labor management committee to conduct research and to analyze the current financing and medical delivery systems in the United States, develop targeted and broad-based reform proposals to improve the quality, affordability and accountability of the system, and educate the public, policymakers and others about how these reforms could address the deficiencies in the current system, e.g., skyrocketing costs, massive number of people left uninsured, profit driven decision-making on delivery of care, etc.

2. The Institute is intended to be a premier research and educational health care reform "think tank" dedicated to understanding, evaluating and developing thoughtful and innovative reform measures that would improve the financing and medical delivery systems in the U.S. and expand access to high quality, affordable and accountable health coverage for all Americans.

3. The Institute will be authorized to:

   a. Engage economists, analysts, academics and others who are experts on the U.S. and other health care systems as well as the public policies, physician, hospital and other provider systems that would need to be changed to improve health care quality, affordability and accountability in the U.S.

   b. Conduct studies and analyses of the current system and alternative structures, including ways to provide more effective sources of coverage for early retirees, reduce prescription drug costs, ensure drug safety and better inform patients of appropriate drug choices.

   c. Operate as a clearinghouse for select best practices that should be employed throughout the medical delivery system to ensure that error-free, high quality health care is available throughout the U.S.

   d. Develop innovative policy solutions to improve the current health care system.

   e. Host forums for discussion and debate of public policies that would improve the health care system and facilitate the interaction of ideas among experts.

   f. Formulate wide-ranging communications materials that discuss and describe reform measures.

4. The Institute shall be established as a non-profit, tax-exempt organization pursuant to section 501(c)(3) of the Internal Revenue Code (the "Code"). Neither GM nor the UAW will do anything to jeopardize the 501(c)(3) status of the Institute or disqualify the Institute from obtaining this status.

5. GM agrees to provide funding to the Institute of $3 million annually for five (5) years, provided that Ford Motor Company and Chrysler Corporation participate in the Institute and provide proportional funding.

6. GM and the UAW will be free, at a future date, to establish other organizations to support the mission of the Institute, including but not limited to an organization qualified under section

501(c)(4) of the Code, provided that the governance of any such additional organization(s) shall be structured in accordance with Paragraphs 7 and 9 below.

7.  The Institute shall be governed by a Board of Directors consisting of an equal number of labor and management representatives and a President.  The Bylaws shall provide that, in any matter considered by the Board of Directors, the labor and management representatives shall have equal voting strength.  The UAW shall appoint the labor representatives and GM shall appoint its management representative(s).  GM, the UAW and any other contributing Institute members having a representative(s) on the Board shall have the right to change any of their appointed members at any time and for any reason.  The President shall be entitled to participate in all meetings of the Board of Directors.

8.  The Board shall operate according to a set of bylaws that are agreed to by the labor and management representatives of the Board consistent with the provisions of this term sheet.

9.  The Board shall at all times strive to operate by consensus.  In the event consensus can not be achieved, all decisions made by the Board shall be governed by a super-majority, except as otherwise provided in this paragraph 9 of this Term Sheet.  A super-majority shall be defined as a minimum of all but one vote of the labor and management members of the Board, with no single company having the right to block a decision by the Board.  The approval of additional Institute members, sponsors, affiliates or Board seats, any change to the voting or consensus requirements, and/or any change to the purpose or intent of the Institute will require the unanimous approval of the labor and management members of the Board.

10. The Institute shall work to minimize its administrative expenses and waste.  GM and the UAW shall have the right to audit and review Institute finances and spending.

11. Lobbying will be permitted to the extent allowed for 501(c)(3) organizations.  The names, brands, or logos of the UAW, GM and any other members of the Institute may not be used in Institute publications, press releases, statements, websites, or other communications or materials and the Institute or its employees or affiliates may not state, suggest or imply that any of the parties support any proposals, conclusions, or recommendations without the prior consent of the party whose support is being stated, suggested or implied.  The UAW, GM and any other members of the Institute may use or reprint Institute material, but may not suggest support from any of the other parties or use their names, brands, or logos without their prior consent.

12. GM reserves the right to reduce or withdraw its funding upon 30 days notice if: a) Ford and/or Chrysler do not participate in the Institute and provide proportional financial support; b) the Institute loses its status as, or is failed to be recognized as, a section 501(c)(3) tax-exempt organization; c) inappropriate financial activity is discovered; (d) the institute, its employees or its members or affiliates engage in lobbying activities beyond those described in paragraph 11 of this Term Sheet; or e) any of the restrictions about the use of GM's name, brand, or logos is violated.

13. GM and the UAW will work together to assure the rapid and effective start-up of the Institute.

# EXHIBIT H

# [Reserved]

# EXHIBIT I

# FORM OF [NEWCO] NOTE

Final form to be agreed between [New Co] and the VEBA in conformity with the VEBA Note Term Sheet attached as Exhibit Y to the MSPA.  The VEBA Note Term Sheet is attached here pending agreement on the final form.

# EXHIBIT Z

## VEBA NOTE TERM SHEET

### *[NGMCO, Inc.]*

**Term Sheet for Note due 2017**

Following is a summary of the proposed principal terms for the Note to be issued to the Voluntary Employees' Beneficiary Association ("New VEBA") in connection with the transactions related to the restructuring of the obligations of General Motors Corporation to the New VEBA.

| | |
|---|---|
| Issuer: | *[NGMCO, Inc.]* (the "Company"). |
| Securities Offered: | US$2.5 billion Note (the "Note"). |
| Maturity Date: | July 15, 2017. |
| Interest/Payment: | Implied annual rate of 9% from July 15, 2009, payable in fixed payments in the following amounts in cash on July 15 of each of the following years: |

| Year | Amount |
|------|--------|
| 2013 | $1,384 million |
| 2015 | $1,384 million |
| 2017 | $1,384 million |

| | |
|---|---|
| Guarantees: | Any present and future U.S. subsidiaries of the Company that are borrowers or guarantors with respect to the UST Note will fully and unconditionally guarantee the performance of all obligations of the Company under the Indenture and the Note, which guarantees will be secured to the same extent, if any, as are the obligations of such borrower under, or guarantors of, the UST Note, and subordinated only to any Permanent Financing (as defined below). Each guarantor of the Notes is herein referred to as a "Guarantor" and its guarantee is referred to herein as a "Guarantee." |
| Ranking: | The obligations of the Company under the Notes and of the Guarantors under the Guarantees will: |

- rank equally in right of payment with (1) any debt issued to the United Stated Department of Treasury ("UST") in the restructuring (the "UST Note") and (2) any debt issued to Canada in the restructuring (the "Canada Note");

- be secured on a pari passu basis by the collateral securing the UST Note;

- rank senior in right of payment to all unsecured indebtedness and other obligations of the Company that are by their terms subordinated to the Note;

- rank junior in right of payment to any permanent financing including UST delayed draw term loan, revolver or any other third party permanent financing entered into with the consent of UST ("Permanent Financing"); and

- be effectively subordinated in right of payment to all future first lien secured indebtedness and other obligations of the Company, to the extent of the value of the assets securing such obligations, and be structurally subordinated to all obligations of each of the Company's subsidiaries that are not Guarantors.

| | |
|---|---|
| Intercreditor Agreement | New VEBA, the UST and Canada shall enter into an intercreditor agreement in form and substance satisfactory to the UST, which shall provide that the UST Note, the Canadian Note and the Note shall rank equally and be pari passu and that the UST shall have the sole and exclusive right to exercise all remedies and to grant waivers with respect to the Note and the UST Note. |
| Transferability: | The Note will be transferable at any time in whole or in part to (1) the Company or its subsidiaries, or (2) an unlimited number of institutional accredited investors or qualified institutional buyers in transactions that (a) do not require registration under the Securities Act and (b) do not trigger registration under the Exchange Act; provided that if at any time the UST Note is registered under the Securities Act or exchanged for a note that is entitled to demand, shelf or piggyback registration rights, then the Note will be entitled to demand, shelf, and piggyback registration rights no less favorable than those of the UST Note. |
| Optional Redemption: | The Company may redeem the Note in whole or in part at any time at 100% of its principal amount, together with accrued and unpaid interest, if any, to the redemption date. |
| Covenants | The Note will have the same covenants as the UST Note, including, to the extent made by the Company under the UST Note, covenants in respect of Change of Control, Limitation of Incurrence of Indebtedness, Restricted Payments, Limitations on Liens, Limitation on Sale of Assets, Restrictions on Sale/Leaseback and Limitation on Merger/Consolidation. |
| Default Interest: | 2% penalty interest upon any default under the terms of the Note. |
| Events of Default: | Events of Default will be the same as those in the UST Note, including, without limitation: |

1. Default in payment on the Note when due, subject to any grace period in the UST Note.

2. Default in the observance or performance of covenants, subject to any grace period in the UST Note.

3. Bankruptcy or insolvency events, subject to any grace period in the UST Note.

4. Invalidity of Guarantees to the extent provided in the UST Note, subject to any grace period in the UST Note.

| | |
|---|---|
| Modifications: | Unless (1) UST has transferred more than 75% of the UST Note and (2) the portion of the UST Note held by UST has an outstanding principal |

2

amount that is less than the implied then current principal amount of the VEBA Note (assuming an implied 9% interest rate), any modifications agreed to by UST with respect to the terms of the UST Note will automatically modify, and be binding on, the Note, other than any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or by its express terms limits or restricts any right to bring suit for payment.

Governing Law:                New York.

3

# EXHIBIT J

# FORM OF PREFERRED STOCK CERTIFICATE OF DESIGNATIONS

**EXHIBIT Y**

**Form Of Certificate of Designations**

**Of**

**Series A Fixed Rate Cumulative Perpetual Preferred Stock**

**Of**

**[NGMCO, INC.]**

*[NGMCO, Inc.]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[          ]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares.*  There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock"). The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions.*  The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions.*  The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

1

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters.* For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by *[_____]*, its *[_____]*, this *[__]* day of *[_____]*, 2009.

*[NGMCO, INC.]*

By: _____

Name: *[_____]*

Title: *[_____]*

3

ANNEX A

## STANDARD PROVISIONS

Section 1.    *General Matters; Ranking.* Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions.* As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends.*

(a)    **Rate.** Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)     **Priority of Dividends.** So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

6

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up.* In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption.*

(a)    **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date"). On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)    **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)    **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)    **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)    **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)    **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)    **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)    **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)    **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)    Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)    Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10

7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)    Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)    **Changes after Provision for Redemption**. No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)    **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders.* To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices.* All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights.* No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates.* The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights.* The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form.*

(a)    The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)    If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC. Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)    Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)    So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes. Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)    Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)    Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees. Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)    A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days. In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest. Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend. Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.    *Transfer Restrictions and Legends.* (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

14

Section 15.    *Transfer, Exchange and Substitution.*    (a) Series A Preferred Share Certificates shall be issued in registered form only.  The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided.  All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)    A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer.  Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates.  The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act. No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent.  Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)    When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.   To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

(e)    If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16.    *Surrender of Series A Preferred Share Certificates*.    Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof.    The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17.    *Transfer Agent And Registrar*.    The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be *[        ]* (the "Transfer Agent"). The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

# EXHIBIT A

## FORM OF SERIES A FIXED RATE CUMULATIVE
## PERPETUAL PREFERRED STOCK
## ($25 LIQUIDATION PREFERENCE)

NUMBER

_[_____]_

SHARES

_[_____]_

CUSIP _[_____]_

## *[NGMCO, INC.]*
## **INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE**
## **THIS CERTIFICATE IS TRANSFERABLE**

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

17

This is to certify that _____, is the owner of *[  ]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of *[NGMCO, Inc.]* (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated: [____], 2009

_____          _____
Name:                                      Name:
Title:                                     Title:

                                           Countersigned and Registered

                                           _____ ,

                                           as Transfer Agent and Registrar

                                           By: _____
                                                   Authorized Signature

18

1766819

### *[NGMCO, INC.]*

*[NGMCO, Inc.]* (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT- _____Custodian _____
(Minor)        (Cust)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____shares
of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

Dated_____

_____
Signature

NOTICE: The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____

NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

20

## EXHIBIT B

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

To *[NGMCO, Inc.]* (the "Issuer") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:  [_____]

[Insert name of transferee]

By: _____
      Name:
      Title:

21

1766819

# EXHIBIT C

## GLOBAL SHARE LEGEND

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO *[NGMCO, INC.]* (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766819

# EXHIBIT K

# FORM OF STOCKHOLDERS AGREEMENT

Final form to be agreed among [New Co], the New VEBA, and the other stockholders to be parties thereto, in conformity with the Governance Term Sheet previously furnished to the UAW, with such changes thereto as may be required by the United States Treasury and agreed to by the UAW.

**PRIVILEGED & CONFIDENTIAL**
**CW&T DRAFT**
**6/21/09**

STOCKHOLDERS AGREEMENT

by and among

*[New GM Name]*,

*[_____]*
("UST Vehicle"),

7176384 Canada Inc.,

and

UAW Retiree Medical Benefits Trust

Dated *[_____]*, 2009

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

Section 1.1    Certain Defined Terms........................................................................................1
Section 1.2    Terms Generally................................................................................................6

ARTICLE II
BOARD OF DIRECTORS

Section 2.1    Size of Initial Board..........................................................................................6
Section 2.2    Composition of Board........................................................................................6
Section 2.3    Agreement to Nominate VEBA Nominee..........................................................7
Section 2.4    Agreement to Nominate Canada Nominee..........................................................8

ARTICLE III
CERTAIN COVENANTS AND RESTRICTIONS

Section 3.1    Initial Public Offering.......................................................................................8
Section 3.2    Government Holders Sale of Shares...................................................................8
Section 3.3    Transfer Restrictions.........................................................................................9
Section 3.4    Restrictions on Certain Corporate Actions.......................................................10
Section 3.5    Certificate Legends..........................................................................................10

ARTICLE IV
VOTING AGREEMENT

Section 4.1    Government Holder Participation to Establish Quorum....................................10
Section 4.2    Government Holder Agreement to Vote............................................................11
Section 4.3    VEBA Agreement to Vote................................................................................12
Section 4.4    Irrevocable Proxy............................................................................................12
Section 4.5    Inconsistent Voting Agreements......................................................................13

ARTICLE V
OTHER AGREEMENTS

Section 5.1    Tag-Along Rights.............................................................................................13
Section 5.2    Drag-Along Rights...........................................................................................14
Section 5.3    Preemptive Rights............................................................................................16
Section 5.4    Information Rights............................................................................................17

## ARTICLE VI
## MISCELLANEOUS

| Section 6.1 | Notices. | 17 |
|---|---|---|
| Section 6.2 | Termination. | 19 |
| Section 6.3 | Authority. | 19 |
| Section 6.4 | No Third Party Beneficiaries. | 19 |
| Section 6.5 | No Personal Liability by the VEBA Signatory. | 20 |
| Section 6.6 | Cooperation. | 20 |
| Section 6.7 | Governing Law; Forum Selection. | 20 |
| Section 6.8 | WAIVER OF JURY TRIAL. | 20 |
| Section 6.9 | Assignment; Successors and Assigns. | 20 |
| Section 6.10 | After Acquired Securities. | 20 |
| Section 6.11 | Entire Agreement. | 20 |
| Section 6.12 | Severability. | 21 |
| Section 6.13 | Enforcement of this Agreement. | 21 |
| Section 6.14 | Amendment. | 21 |
| Section 6.15 | Headings. | 21 |
| Section 6.16 | Counterparts; Facsimiles. | 21 |
| Section 6.17 | US Treasury. | 22 |
| Section 6.18 | Canada. | 22 |
| Section 6.19 | Time Periods. | 22 |

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement") is entered into as of
*[_____]*, 2009 by and among *[New GM Name]*, a Delaware corporation (the "Corporation"),
*[_____]*, a limited liability company whose membership interests are held by the United
States Department of the Treasury (together with its Permitted Transferees, the "UST Vehicle"),
7176384 Canada Inc., a corporation organized under the laws of Canada (together with its
Permitted Transferees, "Canada"), and the UAW Retiree Medical Benefits Trust, a voluntary
employees' beneficiary association (together with its Permitted Transferees, the "VEBA").

WHEREAS, each of the Government Holders and the VEBA owns, as of the date hereof,
that number of shares of common stock, par value $0.01 per share, of the Corporation (the
"Common Stock") and that number of shares of Series [__] preferred stock, par value $0.01 per
share, of the Corporation, set forth opposite such Holder's name on **Annex I** hereto;

WHEREAS, the VEBA will also be issued, as of the date hereof, a warrant to acquire
*[_____]* shares of Common Stock (the "Warrant"); and

WHEREAS, the parties hereto wish to enter into this Agreement to govern the rights and
obligations of the parties with respect to certain matters relating to the Corporation and the
Holders' ownership and voting of the Common Stock.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants
contained in this Agreement and for other good and valuable consideration, the value, receipt and
sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

*Section 1.1    Certain Defined Terms.*  As used in this Agreement, the following terms
have the following meanings set forth below or in the Sections set forth below:

"Affiliate" means, with respect to any Person, any other Person which directly or
indirectly Controls or is Controlled by or is under common Control with such Person.  For the
avoidance of doubt, for purposes of this Agreement, the UAW and its Affiliates shall be deemed
to be Affiliates of the VEBA.  For the avoidance of doubt, for purposes of this Agreement, the
UST and each other department or instrumentality of the United States government shall not be
deemed to be Affiliates of the UST Vehicle and each other department or instrumentality of the
Canadian government shall not be deemed to be Affiliates of Canada.

"Agreement" shall have the meaning set forth in the Preamble.

"Beneficial Ownership" or "Beneficially Owned" have the meanings given to such terms
in Rule 13d-3 of the Exchange Act.

"Board" means the board of directors of the Corporation.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in New York City, New York.

"<u>Canada</u>" shall have the meaning set forth in the Preamble.

"<u>Canada Nominee</u>" shall have the meaning set forth in **Section 2.4**.

"<u>Canada Owned Shares</u>" means the shares of Common Stock Beneficially Owned by Canada as of the relevant time.

"<u>Change of Control</u>" means (A) any acquisition or purchase of capital stock of the Corporation, or of all or substantially all of the assets of the Corporation or (B) any merger, consolidation, business combination, recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating to the Corporation, in each case, which would require the vote of the stockholders of the Corporation pursuant to the DGCL or the Certificate of Incorporation of the Corporation.

"<u>Chief Executive Officer</u>" means the duly appointed Chief Executive Officer of the Corporation.

"<u>Common Stock</u>" shall have the meaning set forth in the Recitals.

"<u>Compelled Sale</u>" shall have the meaning set forth in **Section 5.2.**

"<u>Compelled Sale Notice</u>" shall have the meaning set forth in **Section 5.2.**

"<u>Consent</u>" means any consent, approval, authorization, waiver, grant, franchise, concession, agreement, license, exemption or other permit or order of, registration, declaration or filing with, or report or notice to, any Person.

"<u>Control</u>" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"<u>Corporation</u>" shall have the meaning set forth in the Preamble.

"<u>Co-Sale Holders</u>" shall have the meaning set forth in **Section 5.1.**

"<u>Co-Sale Notice</u>" shall have the meaning set forth in **Section 5.1.**

"<u>DGCL</u>" means the Delaware General Corporation Law, as amended from time to time.

"<u>Drag-Along Buyer</u>" shall have the meaning set forth in **Section 5.2.**

"<u>Electing Holder</u>" shall have the meaning set forth in **Section 5.2.**

"Equity Registration Rights Agreement" means the Equity Registration Rights Agreement, dated as of the date hereof, by and among the Corporation, the VEBA, the UST Vehicle, Canada and General Motors Corporation.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Executive Officer" means any officer who (i) is subject to Section 16(a) of the Exchange Act or (ii) would be subject to Section 16(a) of the Exchange Act if the Common Stock was registered under Section 12 of the Exchange Act.

"Fiscal Year" means the fiscal year of the Corporation.  Each Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year.

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied and maintained throughout the applicable periods both as to classification of items and amounts.

"Government Holder" means the UST Vehicle or Canada.

"Governmental Approval" means any Consent of, with or to any Governmental Authority, and includes any applicable waiting periods associated with any Governmental Approvals.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Governmental Order" means any Order, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on a Person.

"Group" has the meaning given to such term in Section 13(d)(3) of the Exchange Act.

"Holder" or "Holders" means, individually or collectively as the context may require, the UST Vehicle, Canada, and the VEBA.

"Independent" shall have the meaning set forth in **Section 2.2(b)**.

"Initial Shares" means, with respect to any Holder, that number of shares of Common Stock, set forth opposite such Holder's name on **Annex I** hereto.

"IPO" means the earlier to occur of (i) the initial public offering of the Common Stock, (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit

plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms) or (ii) the date on which a Corporation registration statement filed under Section 12(b) or 12(g) of the Exchange Act shall have been declared effective by the SEC following the distribution of the shares of Common Stock Beneficially Owned by General Motors Corporation pursuant to General Motors Corporation's plan of reorganization.

"IPO Date" means the effective date of the registration statement relating to the IPO.

"Joint Slate Procedure" shall mean the following process by which the Government Holders select nominees for directors:  In the event that the UST Vehicle intends to propose a slate of candidates for election (whether at an annual meeting of the Corporation's stockholders, a special meeting the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting), the UST Vehicle shall provide Canada with written notice of its intent to propose a competing slate of candidates not less than 140 days prior to the meeting, in the case of an annual meeting, and not more than 5 days after notice of the meeting was first mailed to the Government Holders, in the case of a special meeting; provided that in either case the UST Vehicle shall use commercially reasonable efforts to give Canada as much advance notice of its intent to propose a competing slate of candidates as reasonably possible.  Within 10 days, in the case of an annual meeting, and 5 days, in the case of a special meeting, of receiving the UST Vehicle's written notice, Canada shall indicate in writing to the UST Vehicle whether or not Canada intends to participate in the slate.  If Canada provides written notice of its intent to participate, such notice must include a list of Canada's nominees.  The number of nominees that Canada may select shall be determined based on Canada's proportional ownership interest in shares of Common Stock Beneficially Owned by the Government Holders in the aggregate at the time of such nominee selection.  If Canada provides timely written notice of its intent to participate (including a list of its nominees), each Government Holder agrees to vote "for" the joint slate of candidates nominated by the Government Holders.  If Canada does not provide timely written notice of its intent to participate (including a list of its nominees) or notifies the UST Vehicle that it does not wish to participate, the UST Vehicle may propose a slate of candidates for election composed entirely of its own nominees, but Canada is under no obligation to vote "for" the candidates nominated by the UST Vehicle.  Neither Government Holder shall propose a slate of candidates for election other than in compliance with this Joint Slate Procedure.

"Law" means any and all applicable United States or non-United States federal, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Governmental Order.

"Material Adverse Event" shall mean (i) trading in securities generally on the New York Stock Exchange shall have been suspended or materially limited or any setting of minimum prices for trading on such exchange shall have been instituted, (ii) a general moratorium on commercial banking activities in the State of New York shall have been declared by either U.S. federal or New York State authorities or there shall have occurred a material disruption in securities settlement or clearance services in the United States, (iii) there shall have occurred any material outbreak or escalation of hostilities or other national or international calamity or crisis

the effect of which on the financial markets of the United States or Canada is such as to make it impracticable or inadvisable to sell the Common Stock or (iv) **[other potential events to be discussed]**.

"Nominee" shall have the meaning set forth in **Section 4.4**.

"Non-Electing Holders" shall have the meaning set forth in **Section 5.2.**

"Order" means any writ, judgment, decree, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"Owned Shares" means the UST Vehicle Owned Shares, the Canada Owned Shares, and the VEBA Owned Shares, as applicable.

"Permitted Transferees" shall mean for each Holder, any Affiliate (solely for the purposes of this definition, without taking into account the last sentence of the definition of Affiliate) of such Holder.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Preemptive Rights Period" shall have the meaning set forth in **Section 5.3.**

"Preemptive Rights Shares" shall have the meaning set forth in **Section 5.3.**

"Proxy" or "Proxies" has the meaning given to such term in Rule 14a-1 of the Exchange Act.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Selling Holder" shall have the meaning set forth in **Section 5.1**

"Sold Shares" shall have the meaning set forth in **Section 5.1.**

"Transfer" means, directly or indirectly, to sell, transfer, distribute, assign, pledge, hedge, encumber, hypothecate or similarly dispose of, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, distribution, assignment, pledge, hedge, encumbrance, hypothecation or similar disposition with or without consideration, voluntarily or by operation of Law.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"UST" means the United States Department of the Treasury.

"UST Vehicle" shall have the meaning set forth in the Preamble.

"UST Vehicle Owned Shares" means the shares of Common Stock Beneficially Owned by the UST Vehicle as of the relevant time.

"VEBA" shall have the meaning set forth in the Preamble.

"VEBA Nominee" shall have the meaning set forth in **Section 2.3**.

"VEBA Owned Shares" shall have the meaning set forth in **Section 4.3**.

"Voting Securities" means securities of the Corporation, including the Common Stock, with the power to vote with respect to the election of directors of the Corporation generally and all securities convertible into or exchangeable for securities of the Corporation with the power to vote with respect to the election of directors of the Corporation generally.

"Warrant" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally.*  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise.  All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise.  Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."  Unless expressly stated otherwise, any Law defined or referred to herein means such Law as from time to time amended, modified or supplemented, including by succession of comparable successor Laws and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## BOARD OF DIRECTORS

*Section 2.1    Size of Initial Board.*  The Board shall initially consist of thirteen (13) directors.  The number of directors may be changed only by vote of the Board in accordance with the bylaws of the Corporation.

*Section 2.2    Composition of Board.*  (a) The initial members of the Board shall be appointed as follows:

(i)    the Board agrees to nominate and the Holders agree to appoint ten (10) directors designated by UST Vehicle, no more than five of whom shall

have been directors of General Motors Corporation immediately prior to the date of this Agreement;

(ii)    the Board agrees to nominate and the Holders agree to appoint one director designated by Canada (which director shall be Independent (as defined below));

(iii)    the Board agrees to nominate and the Holders agree to appoint one director designated by the VEBA (which director shall be Independent (as defined below) or, if not Independent, approved by UST Vehicle, which approval shall not be unreasonably withheld); and

(iv)    the Board agrees to nominate and the Holders agree to appoint the Chief Executive Officer as a director of the Corporation.

(b)    The Holders agree that at all times prior to termination of this Agreement, at least two-thirds of the directors of the Corporation shall be required to be determined by the Board to be independent of the Corporation within the meaning of Rule 303A.02 of New York Stock Exchange Listed Company Manual (or any successor provision) ("Independent"), whether or not any of the shares of Common Stock are then listed on the New York Stock Exchange.

(c)    The nominees to stand for election at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at each adjourned or postponed meeting) shall be nominated by the Board in accordance with the bylaws of the Corporation and **Sections 2.3** and **2.4** hereof.

*Section 2.3    Agreement to Nominate VEBA Nominee.*  So long as the VEBA holds at least 50% of its Initial Shares, at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting), then, and in each such event, the VEBA shall have the right to designate one nominee, which nominee shall be subject to the prior written consent of the UAW and shall be Independent or, if not Independent, approved by UST Vehicle, which approval shall not be unreasonably withheld (the "VEBA Nominee"), to serve as a director.

(a)    From and after the date hereof to and including the IPO Date, the Board agrees to nominate and the Holders agree to appoint such director.

(b)    From and after the IPO Date to and including the date of termination of this Agreement with respect to such Holder in accordance with **Section 6.2**, if the Board shall approve such nominee (such approval not to be unreasonably withheld) the Board shall (i) nominate, and cause the nomination of, the VEBA Nominee, to be a member of the Board and (ii) include the VEBA Nominee in any proxy statement and related materials used by the Corporation in respect of the election to which such nomination pertains.  In the event that the Board does not approve such nominee (or any subsequent nominee), the VEBA shall have the

right to designate a replacement VEBA Nominee, who shall be subject to approval of the Board in accordance with this **Section 2.3**.

Notwithstanding the foregoing, the right of the VEBA to designate a VEBA Nominee at any election pursuant to this **Section 2.3** shall only apply in the event that if the VEBA were not to designate a VEBA Nominee at such election, no member of the Board after such election would have been a continuing VEBA Nominee still designated by the VEBA at such time. In the event that the Board nominates a former VEBA Nominee for re-election not pursuant to a designation by the VEBA with respect to such election, such former VEBA Nominee shall not be considered a VEBA Nominee for the purpose of determining the VEBA's right to designate a nominee at such election.

Section 2.4    Agreement to Nominate Canada Nominee.    So long as Canada holds at least 50% of its Initial Shares, at any time at which the Corporation's stockholders shall have the right to, or shall, vote for or consent in writing to the election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at each adjourned or postponed meeting), then, and in each such event, from and after the date hereof to and including the IPO Date, Canada shall have the right to designate one nominee, which nominee shall be Independent (the "Canada Nominee"), to serve as a director and the Board agrees to nominate and the Holders agree to appoint such director; provided, however, that the right of Canada to designate a Canada Nominee at any election pursuant to this **Section 2.4** shall only apply in the event that if Canada were not to designate a Canada Nominee at such election, no member of the Board after such election would have been a Canada Nominee. In the event that the Board nominates a former Canada Nominee for re-election not pursuant to a designation by Canada with respect to such election, such former Canada Nominee shall not be considered a Canada Nominee for the purpose of determining Canada's right to designate a nominee at such election.

## ARTICLE III
## CERTAIN COVENANTS AND RESTRICTIONS

Section 3.1    Initial Public Offering.    The Government Holders shall use their reasonable best efforts to exercise their demand registration rights under the Equity Registration Rights Agreement and cause an IPO to occur within one year of the date of this Agreement.

Section 3.2    Government Holders Sale of Shares.    UST Vehicle and Canada shall use commercially reasonable efforts, in consultation with one another and their respective underwriters, to conduct the sell down of their respective Initial Shares in an orderly and efficient manner in accordance with the following timeline:

(a)    Each Government Holder shall sell at least [    ]% of its Initial Shares during each year following the IPO.

(b)    Each Government Holder shall have sold at least [    ]% of its Initial Shares prior to the third anniversary of the IPO.

(c)    Each Government Holder shall have sold at least [   ]% of its Initial Shares prior to the sixth anniversary of the IPO.

(d)    Each Government Holder shall have sold [   ]% of its Initial Shares prior to the [   ] anniversary of the IPO.

The timeline set forth in this **Section 3.2** shall be adjusted for any period that the Corporation is not in compliance with its obligations set forth in the Equity Registration Rights Agreement, such that the completion date for any obligations of each Government Holder not required to be completed prior to the date of such non-compliance shall be extended in an amount of time equal to the period of non-compliance.  In addition, the completion date for any obligations of Canada [and the UST Vehicle] set forth in this **Section 3.2** shall be extended in an amount of time equal to (i) the duration of any Material Adverse Event, but only to the extent that such obligation was not required to be completed prior to the date of such Material Adverse Event [and (ii) any period during which a Government Holder is subject to a lockup required by an agreement or an underwriter, but only to the extent that such obligation(s) was not required to be completed prior to the date of such lockup].

Section 3.3    *Transfer Restrictions.*  Subject to the restrictions set forth in this **Section 3.3** (which restrictions shall not apply with respect to sales made in an underwritten offering pursuant to a registration statement of the Corporation), the Holders shall have the right to Transfer all or any portion of their respective Owned Shares, subject to compliance with applicable law.

(a)    Without the prior written consent of the Board, no Holder shall Transfer any shares of Common Stock or any options or warrants to acquire Common Stock, or any interest therein, to any one Person or Group if such Person or Group Beneficially Owns or would as a result of such Transfer Beneficially Own (to the knowledge of the Holder after reasonable inquiry) in excess of 10% of the Common Stock.  Notwithstanding the foregoing, any Holder may Transfer any or all of its shares of Common Stock or any options or warrants to acquire Common Stock to any Permitted Transferee or pursuant to an exchange offer, a tender offer (or a request for invitation for tenders to the extent not prohibited pursuant to **Section 3.3(b)**), merger or consolidation.

(b)    Without the prior written consent of the Board, no Holder shall Transfer any shares of Common Stock or any options or warrants to acquire Common Stock to any automotive vehicle manufacturer or any Affiliate thereof; provided, however, that VEBA and its Permitted Transferees (which shall not include Chrysler Group LLC or any affiliate thereof) shall not be regarded as affiliates of Chrysler for purposes of this provision.

(c)    No Transfer of any shares of Common Stock or any options or warrants to acquire Common Stock in violation of this Agreement or in violation of any restrictive legend on the Common Stock certificates of any Holder shall be made or recorded on the books of the Corporation and any such Transfer shall be void and of no effect.

(d)    Upon the Corporation's request, any Holder shall promptly notify the Corporation in writing of the number of shares of Common Stock then Beneficially Owned by such Holder.

*Section 3.4    Restrictions on Certain Corporate Actions.*  From and after the date hereof to the IPO Date, the Corporation agrees that, so long as Canada Beneficially Owns at least 5% of the aggregate number of shares of Common Stock then issued and outstanding, without the prior written consent of Canada, the Corporation will not take any action to effectuate any of the following:

(a)    a sale of all or substantially all of the assets of the Corporation (by merger or otherwise);

(b)    any voluntary liquidation, dissolution or winding up of the Corporation; or

(c)    an issuance of Common Stock at a price per share less than fair market value, as determined in good faith by the Board of Directors (other than pursuant to an employee benefits plan).

*Section 3.5    Certificate Legends.*  Each Holder covenants and agrees that it will cooperate with the Corporation and take all action necessary to ensure that each certificate representing such Holder's shares of Common Stock and the Warrant shall conspicuously bear a legend in substantially the following form in addition to any other legend that may be required by the Corporation:

THE SALE, TRANSFER, DISTRIBUTION, ASSIGNMENT, HEDGE, PLEDGE, ENCUMBRANCE, HYPOTHECATION OR DISPOSAL OF SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS OF THAT CERTAIN STOCKHOLDERS AGREEMENT, DATED AS OF *[_____]*, 2009 BY AND AMONG *[NEW GM NAME]*, *[UST VEHICLE]*, 7176384 CANADA INC., AND THE UAW RETIREE MEDICAL BENEFITS TRUST, A VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION.

**ARTICLE IV
VOTING AGREEMENT**

*Section 4.1    Government Holder Participation to Establish Quorum.*  From and after the date hereof to and including the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, to the extent required to establish a quorum at such meeting, such Government Holder will appear at such meeting or otherwise cause all shares of Common Stock Beneficially Owned by such Government Holder as of the relevant time to be counted as present thereat for purposes of calculating a quorum.

*Section 4.2    Government Holder Agreement to Vote.*  Each Government Holder hereby irrevocably and unconditionally agrees that:

(a)    from and after the date hereof to and including the earlier to occur of (i) the IPO Date or (ii) the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, or in connection with any proposed action by written consent of the Corporation's stockholders, such Government Holder may vote or cause to be voted (including by written consent, if applicable) its Owned Shares on each matter presented to the stockholders of the Corporation, including the election of directors, in such manner as such Government Holder determines (i.e., "for," "against," "withheld" or otherwise), provided that each Government Holder agrees to vote "for" any VEBA Nominee or Canada Nominee standing for election in accordance with **Section 2.3** and **Section 2.4**, respectively;

(b)    from and after the IPO Date to and including the date of termination of this Agreement with respect to such Government Holder in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, such Government Holder shall not vote or cause its Owned Shares to vote, provided, however, that such Government Holder shall be permitted to vote or cause to be voted its Owned Shares:

(i)    in a vote with respect to any removal of directors only "for," "against" or "withhold" with respect to such removal;

(ii)    in a vote with respect to any election of directors of the Corporation (whether at an annual meeting of the Corporation's stockholders, a special meeting of the Corporation's stockholders called for the purpose of electing directors of the Corporation or at any adjourned or postponed meeting) only "for," "against" or "withhold" with respect to the election of any candidates or directors, as the case may be, that are (A) nominated by the Board, (B) nominated by third parties, or (C) nominated by either Government Holder pursuant to the Joint Slate Procedure, provided that each Government Holder agrees to vote "for" the nominees jointly nominated pursuant to the Joint Slate Procedure, and provided further, that each Government Holder agrees to vote "for" any VEBA Nominee standing for election in accordance with **Section 2.3**;

(iii)    in a vote with respect to any Change of Control to be voted on by the Corporation's stockholders, "for" or "against" such Change of Control transaction;

(iv)    in a vote with respect to any amendment or modification to the Certificate of Incorporation or bylaws of the Corporation which would or may effect any of the matters set forth in **Section 4.2(b)(i), (ii)** or **(iii)**, "for" or "against" such amendment or modification; and

(v)    on each other matter presented to the stockholders of the Corporation, solely to the extent that the vote of the Government Holder is required for

the stockholders to take action at a meeting at which a quorum is present, in the same proportionate manner (either "for," "against," "withheld" or otherwise) as the holders of Common Stock (other than the UST Vehicle, Canada, the VEBA and its Affiliates and the directors and Executive Officers of the Corporation) that were present and entitled to vote on such matter voted in connection with each such matter.

*Section 4.3    VEBA Agreement to Vote.*    The VEBA hereby irrevocably and unconditionally agrees that from and after the date hereof and to and including the date of termination of this Agreement with respect to the VEBA in accordance with **Section 6.2**, at any meeting (whether annual or special and each adjourned or postponed meeting) of the Corporation's stockholders, however called, or in connection with any proposed action by written consent of the Corporation's stockholders, the VEBA will (i) appear at such meeting or otherwise cause all shares of Common Stock Beneficially Owned by the VEBA as of the relevant time ("<u>VEBA Owned Shares</u>") to be counted as present thereat for purposes of calculating a quorum and (ii) vote or cause to be voted (including by written consent, if applicable) such VEBA Owned Shares on each matter presented to the stockholders of the Corporation in the same proportionate manner (either "for," "against," "withheld" or otherwise) as (x) in the case of any proposed stockholder action at a meeting of the Corporation's stockholders, the holders of Common Stock (other than the VEBA and its Affiliates, and the directors and Executive Officers of the Corporation) that were present and entitled to vote on such matter voted in connection with each such matter and (y) in the case of any proposed stockholder action by written consent taken prior to an IPO, all the holders of Common Stock (other than the VEBA and its Affiliates, and the directors and Executive Officers of the Corporation) consented or did not consent in connection with each such matter; provided that, from and after the date hereof to and including the IPO Date, the VEBA agrees to vote "for" any Canada Nominee standing for election in accordance with **Section 2.4**.

*Section 4.4    Irrevocable Proxy.*    This **Section 4.4** is effective from and after the IPO Date to and including the date of termination of this Agreement.  Each of the UST Vehicle, Canada and the VEBA hereby revokes any and all previous Proxies or similar rights granted with respect to its Owned Shares.  Subject to the last two sentences of this **Section 4.4**, upon the request of the Corporation and subject to applicable Law, each of the UST Vehicle, Canada and the VEBA shall, or shall use its reasonable best efforts to cause any Person serving as the nominee (each, a "<u>Nominee</u>") of such Holder with respect to its Owned Shares to, irrevocably appoint the Corporation or its designee as its proxy to vote (or cause to be voted) its Owned Shares in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable).  Such Proxy shall be irrevocable and coupled with an interest.  In the event that any such Nominee for any reason fails to irrevocably appoint the Corporation or its designee as the UST Vehicle's, Canada's or the VEBA's Proxy in accordance with this **Section 4.4**, such Holder shall cause such Nominee to vote its Owned Shares in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable).  In the event that the UST Vehicle, Canada, the VEBA or any of their respective Nominees fails for any reason to vote its Owned Shares in accordance with the applicable requirements of **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable), then the Corporation or its designee shall have the right to vote such Holder's Owned Shares (and withdraw any previous vote) in accordance with **Section 4.2(b)(v)** or **Section 4.3** hereof (as applicable).  Subject to applicable Law, the vote of the Corporation or its designee shall control in the event of any conflict between the vote by the Corporation or its designee of the UST

Vehicle's, Canada's or the VEBA's Owned Shares and a vote by such Holder (or any Nominee on behalf of such Holder) of its Owned Shares. Notwithstanding the foregoing, the proxy granted by the UST Vehicle, Canada, the VEBA or any of their respective Nominees shall be automatically revoked upon termination of this Agreement with respect to such Holder in accordance with its terms.

Section 4.5    *Inconsistent Voting Agreements.*    Each of the UST Vehicle, Canada and the VEBA hereby agrees that such Holder shall not enter into any agreement, contract or understanding with any Person (prior to the termination of this Agreement with respect to such Holder) directly or indirectly to vote, grant a Proxy or power of attorney or give instructions with respect to the voting of such Holder's Owned Shares in any manner which is inconsistent with this Agreement.

**ARTICLE V**
**OTHER AGREEMENTS**

Section 5.1    *Tag-Along Rights.*    (a) If at any time prior to the IPO, the UST Vehicle (for purposes of this **Section 5.1**, the "Selling Holder") desires to sell any or all of its Owned Shares (other than a Transfer to a Permitted Transferee), each of VEBA and Canada (for purposes of this **Section 5.1**, the "Co-Sale Holders") who is not then in breach of this Agreement shall have the right to include a number of such Co-Sale Holder's Owned Shares in such contemplated sale, at the same price per share and upon the same terms and conditions to be paid and given to the Selling Holder, equal to the product (rounded up to the nearest whole number) obtained by multiplying (i) the maximum number of shares of Common Stock that can be included in the contemplated sale and (ii) a fraction (A) the numerator of which is equal to the number of shares of Common Stock held by such Co-Sale Holder and (B) the denominator of which is equal to the number of shares of Common Stock held, in the aggregate, by the Selling Holder and all Co-Sale Holders who elect to include their shares of Common Stock in such sale, in each case exclusive of any shares of Common Stock that are subject to a previously executed binding sale agreement.

(b)    The Selling Holder shall give notice to each of the Co-Sale Holders of each proposed sale giving rise to the rights of the Co-Sale Holders set forth in **Section 5.1(a)** at least 10 Business Days prior to the proposed consummation of any such sale, setting forth the number of shares of Common Stock proposed to be so sold (the "Sold Shares"), the name and address of the proposed transferee or transferees, the proposed amount and form of consideration and the terms and conditions of payment offered by such proposed transferee or transferees, and a representation that the proposed transferee or transferees have been informed of the rights of co-sale provided for in this **Section 5.1** (the "Co-Sale Notice"). The rights of co-sale provided pursuant to this **Section 5.1** must be exercised by any Co-Sale Holder within five business days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Selling Holder indicating such Co-Sale Holder's desire to exercise its rights and specifying the number of shares of Common Stock (up to the maximum number of shares of Common Stock as provided in **Section 5.1(a)**). If the proposed transferee or transferees fail to purchase shares of Common Stock from any Co-Sale Holder that has properly exercised its rights of co-sale under **Section 5.1(a)** on the terms specified above, then the Selling Holder shall not be permitted to make the proposed sale. If none of the Co-Sale Holders gives such notice prior to

the expiration of the five business day period for giving such notice, then the Selling Holder may sell the Sold Shares to any Person on terms and conditions that are no more favorable to the Selling Holder than those set forth in the Co-Sale Notice at any time within a period ending on the later to occur of (x) 120 days following the expiration of such period for giving notice or (y) if a definitive agreement to sell the Sold Shares is entered into by the Selling Holder within such 120-day period, the date on which all applicable approvals and consents of Governmental Authorities with respect to such proposed sale have been obtained and any applicable waiting period under Law have expired or been terminated.  If the Selling Holder has not consummated the proposed sale within the time period set forth in the immediately preceding sentence, then the Selling Holder shall not sell any such shares of Common Stock without again complying with this **Section 5.1**.

(c)　　If any of the Co-Sale Holders exercise their rights under **Section 5.1(a)**, the closing of the purchase of the shares of Common Stock with respect to which such rights have been exercised shall take place concurrently with the closing of the sale of the Selling Holder's interests.

(d)　　The provisions of this **Section 5.1** shall not apply to any proposed sale by any Holder effected pursuant to the demand registration or piggyback provisions of the Equity Registration Rights Agreement.

*Section 5.2    Drag-Along Rights.*  (a)  At any time prior to the IPO, if the UST Vehicle (for purposes of this **Section 5.2**, the "Electing Holder"), determines to sell, in a single transaction or a series of related transactions, to an independent third party or parties (the "Drag-Along Buyer"), any shares of Common Stock, the Electing Holder may require each of VEBA and Canada (the "Non-Electing Holders") to sell or cause to be sold up to a number of their Owned Shares as of such date in such transaction (by merger or otherwise), equal to the product (rounded up to the nearest whole number) obtained by multiplying (i) the maximum number of shares of Common Stock to be included in the contemplated sale and (ii) a fraction (A) the numerator of which is equal to the number of shares of Common Stock held by such Non-Electing Holder and (B) the denominator of which is equal to the number of shares of Common Stock held, in the aggregate, by the Electing Holder and all Non-Electing Holders, to the Drag-Along Buyer, for the same consideration per share of Common Stock and on the same terms and conditions as the Electing Holder, subject to the provisions of this **Section 5.2** (the "Compelled Sale") and to take such other actions with respect thereto as set forth in **Section 5.2(b)** below.

(b)　　The Corporation, if instructed in writing by the Electing Holder, shall send written notice (the "Compelled Sale Notice") of the exercise of the rights pursuant to this **Section 5.2** to each of the Non-Electing Holders setting forth the consideration per share of Common Stock to be paid pursuant to the Compelled Sale and the other terms and conditions of the transaction.  Each Non-Electing Holder, upon receipt of the Compelled Sale Notice, will be obligated to (i) if applicable, vote its shares of Common Stock in favor of such Compelled Sale at any meeting of stockholders of the Corporation called to vote on or approve such Compelled Sale (or any written consent solicited for such purpose), (ii) sell the requisite number of its shares of Common Stock, and participate in the Compelled Sale and (iii) otherwise take all necessary action, including, without limitation, expressly waiving any dissenter's rights or rights of appraisal or similar rights, providing access to documents and records of the Corporation,

entering into an agreement reflecting the terms of the Compelled Sale (although Non-Electing Holders shall not be required to provide representations, warranties and indemnities other than concerning each such Holder's valid ownership of its shares of Common Stock free of all liens, and each such Holder's authority, power and right to enter into and consummate the Compelled Sale without violating any other agreement), surrendering certificates or other instruments representing the shares of Common Stock, duly authorized for transfer or accompanied by a duly executed stock power, cooperating in obtaining any applicable Governmental Approval and otherwise to cause the Corporation to consummate such Compelled Sale.  Any such Compelled Sale Notice may be rescinded by the Electing Holders at any time prior to the execution of any agreement with respect to a Compelled Sale by delivering written notice thereof to the Corporation and all of the Non-Electing Holders.

(c)    The obligations of the Non-Electing Holders pursuant to this **Section 5.2** are subject to the satisfaction of the following conditions:

(i)    in the event that the Non-Electing Holders are required to provide the representations, warranties or indemnities in connection with the Compelled Sale described in **Section 5.2(b)** above, then, each such Holder (A) will not be liable for more than the lesser of (x) its pro rata share of such indemnification payments (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in such Compelled Sale) and (y) the total proceeds actually received by such Holder as consideration for its shares of Common Stock in such Compelled Sale, and (B) such liability shall be several and not joint with any other Person;

(ii)    in the event that the Electing Holders are required to provide representations, warranties or indemnities in connection with the Compelled Sale (other than representations, warranties or indemnities concerning valid ownership of its shares of Common Stock free of all liens, and authority, power and right to enter into and consummate the Compelled Sale without violating any other agreement) and the Electing Holder is required to indemnify the party or parties transacting with the Corporation in the Compelled Sale, then, to the extent such indemnification is not attributable to gross negligence or bad faith with respect to representations, warranties or indemnities, each Non-Electing Holder shall contribute to the extent of the lesser of (x) its pro rata share of such indemnification payments (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in such Compelled Sale) and (y) the total proceeds actually received by such Holder as consideration for its shares of Common Stock in such Compelled Sale.  In any such event, such liability shall be several and not joint with any other Person.  Each Non-Electing Holder shall have full access to any and all evidences or documents related to any such indemnification; and

(iii)    if any Holder is given an option as to the form and amount of consideration to be received, each other Holder shall be given the same option.

(d)    Each Holder shall be obligated to pay his, her or its pro rata share of the expenses incurred in connection with a consummated Compelled Sale (based upon the total consideration received by such Holder divided by the total consideration received by all sellers in

such Compelled Sale) to the extent such costs are incurred for the benefit of all Holders and are not otherwise paid by the Corporation or the acquiring party (costs incurred by or on behalf of a Holder for his, her or its sole benefit will not be considered costs of the transaction hereunder).

(e)    If any Holder fails to sell to the Drag-Along Buyer its Owned Shares to be sold pursuant to this **Section 5.2**, each Holder agrees that the Board shall cause such Owned Shares to be sold to the Drag-Along Buyer on the Corporation's books in consideration of the purchase price, and such Drag-Along Holder's pro rata portion of the purchase price may be held in escrow, without interest, until such time as he, she or it takes such actions as the Board may request in connection with the transaction.

Section 5.3    *Preemptive Rights.*

(a)    At any time prior to the IPO (and not including the IPO itself), the Company shall not issue any shares of Common Stock unless, prior to such issuance, the Company offers such shares of Common Stock to each Holder at the same price per share and upon the same terms and conditions.

(b)    Not less than 20 Business Days prior to the closing of such offering (the "Preemptive Rights Period"), the Company shall send a written notice to each Holder stating the number of shares of Common Stock to be offered (the "Preemptive Rights Shares"), the proposed closing date and the price and terms on which it proposes to offer such shares of Common Stock.

(c)    Within 10 Business Days after the receipt of the notice pursuant to Section 5.3(b), each Holder may elect, by written notice to the Company to purchase shares of Common Stock of the Company, at the price and on the terms specified in such notice, up to an amount equal to the product obtained by multiplying (x) the total number of shares of Common Stock to be issued by (y) a fraction, (A) the numerator of which is the number of shares of Common Stock of such class held by such Holder and (B) the denominator of which is the number of total outstanding shares of Common Stock.

(d)    The closing of any such purchase of shares of Common Stock by such Holder pursuant to this **Section 5.3(d)** shall occur concurrently with the closing of the proposed issuance, as applicable, subject to adjustment to obtain any necessary Governmental Approval.

(e)    Upon the expiration of the Preemptive Rights Period, the Company shall be entitled to sell such Preemptive Rights Shares that the Holders have not elected to purchase for a period ending 120 days following the expiration of the Preemptive Rights Period on terms and conditions not materially more favorable to the purchasers thereof than those offered to the Holders.  Any Preemptive Rights Shares to be sold by the Company following the expiration of such period must be reoffered to the Holders pursuant to the terms of this **Section 5.3** or if any such agreement to Transfer is terminated.

(f)    The provisions of this **Section 5.3** shall not apply to the following issuances of shares of Common Stock:

(i)        incentive shares of Common Stock issued to or for the benefit of employees, officers, directors and other service providers of or to the Company or any Company Subsidiary in accordance with the terms hereof or any applicable incentive plan of the Company;

(ii)        securities issued upon conversion of convertible or exchangeable securities (including warrants) of the Company or any of its subsidiaries that are outstanding as of the date of this Agreement or were not issued in violation of this **Section 5.3**; and

(iii)        a subdivision of shares of Common Stock (including any share distribution or split), any combination of shares of Common Stock (including any reverse share split), shares issued as a dividend or other distribution on the shares of Common Stock or any recapitalization, reorganization, reclassification or conversion of the Company or any of its subsidiaries.

*Section 5.4     Information Rights.*  Prior to the IPO, the Company shall use its reasonable efforts to publish in a press release or other form of public dissemination or deliver to each Holder (i) capsule financial information for each fiscal quarter within 45 days after the end of such quarter and (ii) capsule financial information for each fiscal year within 90 days after the end of such fiscal year.

## ARTICLE VI
## MISCELLANEOUS

*Section 6.1     Notices.*  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the later of the scheduled delivery date or the first business day following such delivery date (if scheduled for delivery on a day that is not a business day) after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:
[_____]
[_____]
[_____]

If to the UST Vehicle:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]

with a copy to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York  10281
Attention: John J. Rapisardi
          R. Ronald Hopkinson
Fax: (212) 504-6666

If to Canada:

7176384 Canada Inc.
1235 Bay Street, Suite 400
Toronto, ON M5R 3K4
Attention:  Mr. Michael Carter
Facsimile:  416-934-5009

with a copy to:

Torys LLP
79 Wellington Street, West, Suite 3000
Toronto, ON M5K 1N2
Attention:  Patrice S. Walch-Watson
Facsimile:  (416) 865-7380
Email:  PWalch-Watson@torys.com

If to the VEBA:

[_____]
[_____]
[_____]
Attention:  [_____]
Telephone:  [_____]
Facsimile:  [_____]

with a copy to:
[_____]
[_____]
[_____]

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 6.1**, then to the last addressee as so designated.

Section 6.2    *Termination.*    All rights, restrictions and obligations hereunder shall terminate with respect to a Holder, and this Agreement shall have no further force and effect upon such Holder, when such Holder Beneficially Owns less than 2% of the aggregate number of shares of Common Stock then issued and outstanding; provided, that all rights and obligations under this **Article VI** shall continue in perpetuity.

Section 6.3    *Authority.*    Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 6.4    *No Third Party Beneficiaries.*    This Agreement shall be for the sole and exclusive benefit of (i) the Corporation and its successors and permitted assigns and (ii) each Holder (including any trustee thereof) and their respective successors and permitted assigns. Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 6.5      *No Personal Liability by the VEBA Signatory.*  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the signatory on behalf of the VEBA not individually or personally but solely in his capacity as [Chairman of the Committee of the VEBA] in the exercise of the powers and authority conferred and vested in him in such capacity and under no circumstances shall the signatory have any personal liability in an individual capacity in connection with this Agreement or any transaction contemplated hereby.

Section 6.6      *Cooperation.*  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

Section 6.7      *Governing Law; Forum Selection.*  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

Section 6.8      *WAIVER OF JURY TRIAL.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 6.9      *Assignment; Successors and Assigns.*  Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise), other than an assignment to a Permitted Transferee in connection with a Transfer made in accordance with this Agreement, without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation and each Holder. Except for a Permitted Transferee, no purchaser or recipient of shares of Common Stock from a Holder shall have any rights under this Agreement.

Section 6.10    *After Acquired Securities.*  All of the provisions of this Agreement shall apply to all of the Voting Securities now Beneficially Owned or that may be issued or Transferred hereafter to any Holder hereto in consequence of any additional issuance, purchase, exchange or reclassification of any of the Voting Securities, corporate reorganization, or any other form or recapitalization, consolidation, merger, share split or share divide, or that are acquired by a Holder in any other manner.

Section 6.11    *Entire Agreement.*  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject

matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.  This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 6.12    Severability.    Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 6.13    Enforcement of this Agreement.    The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 6.14    Amendment.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 6.15    Headings.    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 6.16    Counterparts; Facsimiles.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.  All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

  *Section 6.17 UST Vehicle.* Notwithstanding anything in this Agreement to the contrary, the UST Vehicle shall only be bound by this Agreement in its capacity as stockholder and nothing in this Agreement shall be binding on or create any obligation on the part of the US Treasury in any other capacity or any branch or agency of the United States Government or subdivision thereof.

  *Section 6.18 Canada.* Notwithstanding anything in this Agreement to the contrary, Canada shall only be bound by this Agreement in its capacity as stockholder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch or agency of the Canadian Government or subdivision thereof.

  *Section 6.19 Time Periods.* Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

[Remainder of the page intentionally blank]

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Stockholders Agreement on the date first above written.

**[NEW GM NAME]**

By: _____
Name: _____
Title: _____

**[UST VEHICLE]**

By: _____
Name: _____
Title: _____

**7176384 CANADA INC.**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**UAW RETIREE MEDICAL BENEFITS
TRUST, A VOLUNTARY EMPLOYEES'
BENEFICIARY ASSOCIATION**

By: **[TRUSTEE]**

By: _____
Name: _____
Title: _____

**Annex I**

| Holder | Number of Initial Shares of Common Stock | Series and Number of Initial Shares of Preferred Stock |
|---|---|---|
| UST Vehicle | | |
| Canada | | |
| VEBA | | |
| Total: | | |

| Holder | Number of Shares of Common Stock for which Warrant is Exercisable |
|---|---|
| VEBA | |

# EXHIBIT L

# FORM OF WARRANT

**EXHIBIT E**

## FORM OF VEBA WARRANT

**WARRANT AGREEMENT**

**dated as of [_____], 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[•]**
**as Warrant Agent**

## ARTICLE 1
## DEFINITIONS

Section 1.01.    Certain Definitions...................................................................... 1

## ARTICLE 2
## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.    Issuance of Warrants................................................................. 9

Section 2.02.    Execution and Authentication of Warrants........................... 9

Section 2.03.    Form of Warrant Certificates ................................................ 10

Section 2.04.    Transfer Restrictions and Legends...................................... 10

Section 2.05.    Transfer, Exchange and Substitution ................................. 11

Section 2.06.    Global Warrants ...................................................................... 12

Section 2.07.    Surrender of Warrant Certificates ....................................... 14

## ARTICLE 3
## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    Exercise of Warrants.............................................................. 14

Section 3.02.    Procedure for Exercise ......................................................... 14

Section 3.03.    Settlement of Warrants .......................................................... 15

Section 3.04.    Delivery of Common Stock ................................................... 15

Section 3.05.    No Fractional Shares to Be Issued ...................................... 16

Section 3.06.    Acquisition of Warrants by Company ................................. 16

Section 3.07.    Direction of Warrant Agent .................................................. 16

## ARTICLE 4
## [RESERVED]

## ARTICLE 5
## ADJUSTMENTS

Section 5.01.    Adjustments to Exercise Price .............................................. 17

Section 5.02.    Adjustments to Number of Warrants ................................... 21

Section 5.03.    Certain Distributions of Rights and Warrants; Shareholder
Rights Plan ............................................................................... 21

Section 5.04.    No Impairment ........................................................................ 23

Section 5.05.    Other Adjustments if Net Share Settlement Applies ......... 23

ii

Section 5.06.    Discretionary Adjustments ................................................................. 23

Section 5.07.    Restrictions on Adjustments .............................................................. 23

Section 5.08.    Deferral of Adjustments .................................................................... 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes .................. 25

Section 5.10.    Consolidation, Merger and Sale of Assets ......................................... 29

Section 5.11.    Common Stock Outstanding .............................................................. 30

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ..................... 30

Section 5.13.    Calculations Final ............................................................................. 30

Section 5.14.    Notice of Adjustments ....................................................................... 31

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity ........... 31

Section 5.16.    Statements on Warrants ..................................................................... 31

## ARTICLE 6
### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ................................................................. 32

Section 6.02.    Mutilated or Missing Warrant Certificates ........................................ 32

Section 6.03.    Modification, Waiver and Meetings ................................................... 32

## ARTICLE 7
### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes .................................................................. 33

Section 7.02.    Change of Warrant Agent .................................................................. 33

Section 7.03.    Compensation; Further Assurances .................................................. 35

Section 7.04.    Reliance on Counsel .......................................................................... 35

Section 7.05.    Proof of Actions Taken ...................................................................... 35

Section 7.06.    Correctness of Statements ................................................................. 35

Section 7.07.    Validity of Agreement ....................................................................... 36

Section 7.08.    Use of Agents .................................................................................... 36

Section 7.09.    Liability of Warrant Agent ................................................................. 36

Section 7.10.    Legal Proceedings ............................................................................. 36

Section 7.11.    Other Transactions in Securities of the Company ............................. 36

Section 7.12.    Actions as Agent ............................................................................... 37

Section 7.13.    Appointment and Acceptance of Agency ........................................... 37

Section 7.14.    Successors and Assigns ..................................................................... 37

iii

Section 7.15.      Notices ................................................................................. 37

Section 7.16.      Applicable Law ..................................................................... 38

Section 7.17.      Benefit of this Warrant Agreement .................................... 38

Section 7.18.      Registered Warrantholders ................................................. 38

Section 7.19.      Inspection of this Warrant Agreement .............................. 38

Section 7.20.      Headings ............................................................................... 39

Section 7.21.      Counterparts ......................................................................... 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........ A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND ............................... C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
             RESTRICTIONS ........................................................................ E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER ............. F-1

# WARRANT AGREEMENT

This Warrant Agreement ("Warrant Agreement") dated as of *[_____]*, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the UAW Retiree Settlement Agreement dated as of *[_____]*, 2009 between the Company, by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, by and through its attorneys (the "**UAW Retiree Settlement Agreement**"), the Company has agreed to issue to the Initial Warrantholder (as defined below) an aggregate initial Number of Warrants issued hereunder equal to 15,151,515, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and shall be determined by customary investment banking practices using the Black Scholes

1

model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the seven year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

2

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement dated as of June 1, 2009 by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, as may be amended, modified or supplemented in accordance with its terms.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

3

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time. Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

4

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $126.92 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, December 31, 2015, regardless of whether such date is a Trading Day.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" means UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association or any "affiliate" thereof (as defined under Rule 144 under the Securities Act).

5

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[ ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Parent Exercise Price**" means, with respect to each Parent Warrant Agreement, the 'Exercise Price' as such term is defined in such Parent Warrant Agreement.

"**Parent Warrant Agreement**" means each warrant agreement dated as of [    ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which General Motors Corporation was the 'Initial Warrantholder' as defined therein.

"**Parent Warrants**" means the warrants issued pursuant to the Parent Warrant Agreements.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

7

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Shareholders Agreement**" means the Stockholders Agreement, dated as of *[_____]*, by and among *[_____]*, as may be amended, modified or supplemented in accordance with its terms.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**UAW Retiree Settlement Agreement**" has the meaning set forth in the Recitals.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

8

## ARTICLE 2

### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01. *Issuance of Warrants.* (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 15,151,515 (such Number of Warrants subject to adjustment from time to time as described herein). The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05. All such Warrants shall be dated as of the Closing Date.

(b)     Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02. *Execution and Authentication of Warrants.* (a) Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)     Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)     No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

9

Section 2.03.   *Form of Warrant Certificates.*   Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and  such as may be necessary to conform to customary usage.

Section 2.04.   *Transfer Restrictions and Legends.*   This Section 2.04 shall not apply to Warrants and Common Stock which have been issued, distributed or sold pursuant to an effective registration statement.

(a)   Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)   Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)   Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)   All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)   Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

10

1766885

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the **"Warrant Register"**) in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent. Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner

11

thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)     Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)     When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.  To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)     A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.  *Global Warrants.*  (a) The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary.  Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)     Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

12

1766885

(c)      So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)      Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)      Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees. Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)      A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend. Interests in the Global

13

1766885

Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.    *Surrender of Warrant Certificates.*    Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.    *Exercise of Warrants.*    At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants). Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.    *Procedure for Exercise.* (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

14

Section 3.03.  *Settlement of Warrants.*  (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.  Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.  *Delivery of Common Stock.*  (a) In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

15

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later. However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent). The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.  *No Fractional Shares to Be Issued.*  (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised. If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.  *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.  *Direction of Warrant Agent.* (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of

the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3. In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

## ARTICLE 4

### [RESERVED]

## ARTICLE 5

### ADJUSTMENTS

Section 5.01.    *Adjustments to Exercise Price.* The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$  =  the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for

17

such subdivision or combination, as the case may be;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$ = the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$ = the total number of shares of Common Stock issuable pursuant to

18

such rights, warrants or convertible securities; and

Y    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance. In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred. To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered. In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$SP_0$    =    the Current Market Price; and

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property,

19

rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

In the event of a reduction of the Parent Exercise Price under either of the Parent Warrant Agreements (other than pursuant to Article 5 of a Parent Warrant Agreement), such reduction shall be treated, for purposes of this Warrant Agreement, as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of such outstanding Parent Warrants with a Parent Exercise Price equal to the Parent Exercise Price as adjusted to such date pursuant to Article 5 of the applicable Parent Warrant Agreement and (ii) the Black Scholes Warrant Value of such outstanding Parent Warrants immediately following such reduction in Parent Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

20

$MP_0$   =   the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)      For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02. *Adjustments to Number of Warrants.* Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03. *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.* (a) Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)      are deemed to be transferred with such shares of Common Stock;

(ii)      are not exercisable; and

(iii)    are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)    If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)    In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)    in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)    in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)    If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01. If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to

22

purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.* (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

23

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment them to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon

24

such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05. For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09.  *Recapitalizations, Reclassifications and Other Changes.*  (a) If any of the following events occur:

(i)    any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)    any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)    any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**"). In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

(i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

25

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)    The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)    any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)    any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09. If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5. In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant

26

Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with. The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such amendment.

(e)    Change of Control Event:

(i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

(A)    calculate the Change of Control Estimated Payment Amount;

(B)    deliver to the Warrant Agent a notice of redemption (a "Redemption Notice"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "Redemption");

(C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

(D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "Change of Control Payment Date"));

4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

27

5)      that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)      if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09);

7)      any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)      the name and address of the Warrant Agent.

(ii)      Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)      On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "New Warrants") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)      No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)      Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall

28

initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)    The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)    The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10.    *Consolidation, Merger and Sale of Assets.* (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor

29

entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11. *Common Stock Outstanding.* For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12. *Covenant to Reserve Shares for Issuance on Exercise.* (a) The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12. The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5. Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)    The Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto).

Section 5.13. *Calculations Final.* The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14. *Notice of Adjustments.* Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate. The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15. *Warrant Agent Not Responsible for Adjustments or Validity.* The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same. The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder. The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16. *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement. However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

31

Section 6.01. *No Rights as Stockholders.* Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02. *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03. *Modification, Waiver and Meetings.* (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

1766885

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

ARTICLE 7

CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    *Payment of Certain Taxes.*    (a)  The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.    *Change of Warrant Agent.*    (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

34

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

1766885

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07. *Validity of Agreement.* The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08. *Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09. *Liability of Warrant Agent.* The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10. *Legal Proceedings.* The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11. *Other Transactions in Securities of the Company.* The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

1766885

Section 7.12. *Actions as Agent.* The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof. The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement. No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent. No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13. *Appointment and Acceptance of Agency.* The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14. *Successors and Assigns.* All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15. *Notices.* Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

**[NGMCO, Inc.]**
[_____]
[_____]
Attention: Treasurer
Telephone: [_____]
Facsimile: [_____]

With a copy to:

[_____]
[_____]
[_____]
Attention: [_____]

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

37

1766885

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> /_____/
> /_____/
> Attention: Treasurer
> Telephone: /_____/
> Facsimile: /_____/

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16. *Applicable Law.* The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17. *Benefit of this Warrant Agreement.* Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18. *Registered Warrantholders.* Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19. *Inspection of this Warrant Agreement.* A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

1766885

Section 7.20.  *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21.  *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766885

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____
      Name:
      Title:

[●], as Warrant Agent

By: _____
      Name:
      Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

A - 1

**EXHIBIT B**

## FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THESE SHARES OF COMMON STOCK ARE ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THESE COMMON SHARES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT C**

## FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766885

**EXHIBIT D**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

D - 1

**[NGMCO, Inc.]**

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE: Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: December 31, 2015.

This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

1766885

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
      Name:
      Title:

Attest

By: _____
      Secretary

Countersigned as of the date above written:

[•], as Warrant Agent

By: _____
      Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

## [NGMCO, Inc.]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [•] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

D - 5

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:      [•]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises
_____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a
Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's
name, representing a Number of Warrants at least equal to the number of Exercised
Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants
pursuant to Section 3.03 of the Warrant Agreement and confirms that it
will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay
an amount equal to the Exercise Price (determined as of the relevant
Exercise Date), *multiplied by* the number of Exercised Warrants, by federal
wire or other immediately available funds payable to the order of the
Company to the account maintained by the Warrant Agent and notified to
the Registered Warrantholder as required under Section 3.03(b) of the
Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant
to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)      deliver the Full Physical Share Amount or Net Share Amount, as
applicable, for each of the Exercised Warrants as follows:

_____ ; and

(b)      if the number of Exercised Warrants is less than the Number of Warrants
represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate
representing the unexercised Warrants to:

_____

D - 6

Dated:_____          _____
                                                  (Registered Warrantholder)




                                      By: _____
                                             Authorized Signature
                                             Address:
                                             Telephone:


**[To Be Attached if Warrant is a Global Warrant]**


D - 7

## SCHEDULE A

## SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|---|---|---|---|---|
| | | | | |
| | | | | |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
                                    Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____

_____
Name of Transferee

By: _____
     Name:
     Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:    [_____]


[Insert name of transferee]

By:    _____
          Name:
          Title:


E - 1

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention: Treasurer

Re:    DWAC Issuance
       Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated below via DWAC. The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:        _____

                         _____ Original Issue or

                         _____ Transfer from Treasury Account

Broker Name:             _____

Broker's DTC Number:     _____

Contact and Phone:       _____

F - 1

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit E**

Form of VEBA Warrant

**EXHIBIT E**

## FORM OF VEBA WARRANT

**WARRANT AGREEMENT**

**dated as of *[_____]*, 2009**

**between**

**[NGMCO, Inc.]**

**and**

**[●]**
**as Warrant Agent**

1766885

ARTICLE 1
DEFINITIONS

Section 1.01.        Certain Definitions.............................................................................. 1

ARTICLE 2
ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.        Issuance of Warrants........................................................ 9

Section 2.02.        Execution and Authentication of Warrants......................................... 9

Section 2.03.        Form of Warrant Certificates ........................................................... 10

Section 2.04.        Transfer Restrictions and Legends.................................................... 10

Section 2.05.        Transfer, Exchange and Substitution ............................................... 11

Section 2.06.        Global Warrants................................................................................ 12

Section 2.07.        Surrender of Warrant Certificates .................................................... 14

ARTICLE 3
EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.        Exercise of Warrants........................................................................ 14

Section 3.02.        Procedure for Exercise .................................................................... 14

Section 3.03.        Settlement of Warrants .................................................................... 15

Section 3.04.        Delivery of Common Stock .............................................................. 15

Section 3.05.        No Fractional Shares to Be Issued ................................................... 16

Section 3.06.        Acquisition of Warrants by Company ............................................. 16

Section 3.07.        Direction of Warrant Agent ............................................................. 16

ARTICLE 4
[RESERVED]

ARTICLE 5
ADJUSTMENTS

Section 5.01.        Adjustments to Exercise Price ......................................................... 17

Section 5.02.        Adjustments to Number of Warrants ............................................... 21

Section 5.03.        Certain Distributions of Rights and Warrants; Shareholder
Rights Plan....................................................................................... 21

Section 5.04.        No Impairment.................................................................................. 23

Section 5.05.        Other Adjustments if Net Share Settlement Applies ........................ 23

ii

Section 5.06.    Discretionary Adjustments ................................................................ 23

Section 5.07.    Restrictions on Adjustments ............................................................. 23

Section 5.08.    Deferral of Adjustments .................................................................. 24

Section 5.09.    Recapitalizations, Reclassifications and Other Changes ................ 25

Section 5.10.    Consolidation, Merger and Sale of Assets ...................................... 29

Section 5.11.    Common Stock Outstanding ............................................................ 30

Section 5.12.    Covenant to Reserve Shares for Issuance on Exercise ................... 30

Section 5.13.    Calculations Final ............................................................................ 30

Section 5.14.    Notice of Adjustments ..................................................................... 31

Section 5.15.    Warrant Agent Not Responsible for Adjustments or Validity .......... 31

Section 5.16.    Statements on Warrants ................................................................... 31

ARTICLE 6
OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.    No Rights as Stockholders ............................................................... 32

Section 6.02.    Mutilated or Missing Warrant Certificates ...................................... 32

Section 6.03.    Modification, Waiver and Meetings ................................................ 32

ARTICLE 7
CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.    Payment of Certain Taxes ................................................................ 33

Section 7.02.    Change of Warrant Agent ................................................................ 33

Section 7.03.    Compensation; Further Assurances .................................................. 35

Section 7.04.    Reliance on Counsel ........................................................................ 35

Section 7.05.    Proof of Actions Taken ................................................................... 35

Section 7.06.    Correctness of Statements ............................................................... 35

Section 7.07.    Validity of Agreement ..................................................................... 36

Section 7.08.    Use of Agents .................................................................................. 36

Section 7.09.    Liability of Warrant Agent .............................................................. 36

Section 7.10.    Legal Proceedings ........................................................................... 36

Section 7.11.    Other Transactions in Securities of the Company ........................... 36

Section 7.12.    Actions as Agent ............................................................................. 37

Section 7.13.    Appointment and Acceptance of Agency ........................................ 37

Section 7.14.    Successors and Assigns .................................................................... 37

iii

Section 7.15.    Notices .............................................................................................. 37

Section 7.16.    Applicable Law .................................................................................... 38

Section 7.17.    Benefit of this Warrant Agreement .................................................... 38

Section 7.18.    Registered Warrantholders.................................................................. 38

Section 7.19.    Inspection of this Warrant Agreement ............................................... 38

Section 7.20.    Headings .............................................................................................. 39

Section 7.21.    Counterparts ........................................................................................ 39


EXHIBIT A    FORM OF RESTRICTIVE LEGEND FOR WARRANTS ........    A-1

EXHIBIT B    FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK..B-1

EXHIBIT C    FORM OF GLOBAL WARRANT LEGEND...............................C-1

EXHIBIT D    FORM OF WARRANT CERTIFICATE ..................................... D-1

EXHIBIT E    FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER
RESTRICTIONS .........................................................................E-1

EXHIBIT F    FORM OF COMMON STOCK REQUISITION ORDER.............F-1

## WARRANT AGREEMENT

This Warrant Agreement ("Warrant Agreement") dated as of *[_____]*, 2009 is between **[NGMCO, Inc.]**, a corporation organized under the laws of Delaware (the "**Company**"), and [●] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the UAW Retiree Settlement Agreement dated as of *[_____]*, 2009 between the Company, by and through its attorneys, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, by and through its attorneys (the "**UAW Retiree Settlement Agreement**"), the Company has agreed to issue to the Initial Warrantholder (as defined below) an aggregate initial Number of Warrants issued hereunder equal to 15,151,515, each of which is exercisable for one share of Common Stock (as defined below);

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01. *Certain Definitions.* As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 5.08.

"**Agent Members**" has the meaning set forth in Section 2.06(c).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Black Scholes Proportion**" has the meaning given to it in the definition of "Change of Control Payment Amount."

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Common Stock (as determined in good faith by the Board of Directors based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent) and shall be determined by customary investment banking practices using the Black Scholes

1

model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the price of each share of Common Stock will be the Current Market Price as of the date of determination, (3) the assumed volatility will be determined by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the seven year U.S. Treasury securities and (5) any other assumptions shall be made by the Board of Directors in good faith based upon the advice of such independent investment bank at the time of determination.

"**Board of Directors**" means the board of directors of the Company or any committee of such board of directors duly authorized to exercise the power of such board of directors with respect to the matters provided for in this Warrant Agreement as to which the board of directors is authorized or required to act.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Warrant Agent.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Carryover Warrants**" shall mean, for each Warrant, that portion of such Warrant equal to one minus the Black Scholes Proportion.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Change of Control Date**" shall mean the date on which a Change of Control Event is consummated.

"**Change of Control Estimated Payment Amount**" shall mean, in respect of any Change of Control Event, an estimate of the Change of Control Payment Amount payable on the applicable Change of Control Payment Date, as determined in good faith by the Board of Directors, based upon the advice of an independent investment bank of national standing selected by the Board of Directors and reasonably acceptable to the Warrant Agent, as of a date no more than 20 Business Days and no less than 15 Business Days prior to the Change of Control Date, in a manner consistent with the terms of this Warrant Agreement and the Warrants, including the definitions of Black Scholes Warrant Value and Change of Control Payment Amount.

2

"**Change of Control Event**" shall mean (i) the acquisition by a Person (other than the Company or a subsidiary of the Company) in a tender offer or a series of related tender offers of 80% or more of the outstanding Common Stock (determined on a fully-diluted basis), (ii) the consolidation or merger of the Company with or into another Person (other than a subsidiary of the Company), or (iii) a sale of all or substantially all of the Company's assets, in each of clauses (i) through (iii) in which all or any portion of the consideration paid or exchanged for Common Stock, or into which Common Stock is converted, consists of Other Property.

"**Change of Control Payment Amount**" shall mean an amount in Cash equal to the product of (1) the Black Scholes Warrant Value of a Warrant on a Change of Control Date immediately prior to the consummation of such Change of Control Event multiplied by (2) a fraction, (x) the numerator of which is the fair market value of the Other Property received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (as determined by an independent investment bank of national standing selected by the Company and determined by customary investment banking practices) and (y) the denominator of which is the sum of (a) the Closing Sale Price of the Registered and Listed Shares received in exchange for a share of Common Stock in a Change of Control Event as of the Change of Control Date (if any), and (b) the fair market value (determined as above) of the Other Property as of the Change of Control Date received in exchange for a share of Common Stock in a Change of Control Event (such fraction referred to herein as the "**Black Scholes Proportion**").

For purposes of determining the Change of Control Payment Amount, if holders of Common Stock are entitled to receive differing forms or types of consideration in any transaction or series of transactions contemplated by the definition of "Change of Control Event," each holder shall be deemed to have received the same proportion of Other Property and Registered and Listed Shares that all holders of Common Stock in the aggregate elected or were required to receive in such transaction or transactions.

"**Change of Control Payment Date**" has the meaning set forth in Section 5.09(e).

"**Close of Business**" means 5:00 p.m. New York City time.

"**Closing Date**" has the meaning given thereto in the Master Sale and Purchase Agreement dated as of June 1, 2009 by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and the Company, as may be amended, modified or supplemented in accordance with its terms.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other

security is then listed or quoted; *provided, however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**Common Stock**" means the common stock, par value $0.01 per share, of the Company authorized at the date of this Warrant Agreement or as such stock may be constituted from time to time.  Subject to the provisions of Section 5.09 and Section 5.10, shares issuable upon exercise of Warrants shall include only shares of the class designated as Common Stock of the Company as of the date of this Warrant Agreement or shares of any class or classes resulting from any reclassification or reclassifications or change or changes thereof and that have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion that the total number of shares of such class resulting from all such reclassifications or changes bears to the total number of shares of all such classes resulting from such reclassifications or changes.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[    ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank

or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent. If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system, the Current Market Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Cut-Off Time**" has the meaning set forth in Section 5.09(e).

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 5.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit D hereto.

"**Exercise Price**" means initially $126.92 per Warrant, subject to adjustment pursuant to Article 5.

"**Expiration Date**" means, for any Warrant, December 31, 2015, regardless of whether such date is a Trading Day.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.06(b).

"**Initial Warrantholder**" means UAW Retiree Medical Benefits Trust, a voluntary employees' beneficiary association or any "affiliate" thereof (as defined under Rule 144 under the Securities Act).

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such Trading Day, on Bloomberg page "[   ].[N] <Equity> AQR.", or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent.  If the Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional Securities exchange or quotation system, the Net Share Settlement Price shall be the price per share of Common Stock that the Company could obtain from a willing buyer for shares of Common Stock sold by the Company from authorized but unissued shares of Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 5 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Common Stock during such period.

"**New Warrant Exercise Price**" shall be equal to the product of (i) the Exercise Price then in effect and (ii) one minus the Black Scholes Proportion.

"**New Warrants**" has the meaning set forth in Section 5.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 5.

"**Officer's Certificate**" means a certificate signed by any two officers of the Company, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller.

"**Other Property**" means any cash, property or other securities other than Registered and Listed Shares.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Parent Exercise Price**" means, with respect to each Parent Warrant Agreement, the 'Exercise Price' as such term is defined in such Parent Warrant Agreement.

"**Parent Warrant Agreement**" means each warrant agreement dated as of [      ], 2009 between **[NGMCO, Inc.]** and [ ] as Warrant Agent pursuant to which General Motors Corporation was the 'Initial Warrantholder' as defined therein.

"**Parent Warrants**" means the warrants issued pursuant to the Parent Warrant Agreements.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any Cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of Cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such Cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Redemption**" has the meaning set forth in Section 5.09(e).

"**Redemption Notice**" has the meaning set forth in Section 5.09(e).

"**Reference Property**" has the meaning set forth in Section 5.09(a).

"**Registered and Listed Shares**" shall mean shares of the common stock of the surviving entity in a consolidation, merger, or combination or the acquiring entity in a tender offer, except that if the surviving entity or acquiring entity has a parent corporation, it shall be the shares of the common stock of the parent corporation, provided, that, in each case, such shares (i) have been registered (or will be registered within 30 calendar days following the Change of Control Date) under Section 12 of the Exchange Act with the Securities and Exchange Commission, and (ii) are listed for trading on the New York Stock Exchange or any other national securities exchange (or will be so listed or admitted within 30 calendar days following the Change of Control Date).

"**Reorganization Event**" has the meaning set forth in Section 5.09(a).

7

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Shareholders Agreement**" means the Stockholders Agreement, dated as of *[_____]*, by and among *[_____]*, as may be amended, modified or supplemented in accordance with its terms.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 5.03.

"**UAW Retiree Settlement Agreement**" has the meaning set forth in the Recitals.

"**Unit of Reference Property**" has the meaning set forth in Section 5.09(a).

"**Unit Value**" has the meaning set forth in Section 5.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [●], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.05.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

8

## ARTICLE 2

### ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01.  *Issuance of Warrants.*  (a) The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Initial Warrantholder on the Closing Date, a single Certificated Warrant in the name of the Initial Warrantholder, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 15,151,515 (such Number of Warrants subject to adjustment from time to time as described herein).  The Warrant Agent shall, upon receipt of such Certificated Warrant and Authentication Order, authenticate and deliver such Certificated Warrant to the Initial Warrantholder in accordance with Section 2.02 and register the Initial Warrantholder as the Warrantholder of such Warrants in accordance with Section 2.05.  All such Warrants shall be dated as of the Closing Date.

(b)    Except as set forth in Section 2.05 and Section 6.02, the Warrants issued to the Initial Warrantholder on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02.  *Execution and Authentication of Warrants.*  (a) Warrants shall be executed on behalf of the Company by any Executive Vice President, any Senior Vice President, and any Vice President of the Company and attested by its Secretary or any one of its Assistant Secretaries. The signature of any of these officers on Warrants may be manual or facsimile. Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)    Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, a proper officer of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)    No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such certificate upon any Warrant shall be conclusive evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

9

Section 2.03.   *Form of Warrant Certificates.*  Each Warrant Certificate shall be in substantially the form set forth in Exhibit D hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and  such as may be necessary to conform to customary usage.

Section 2.04.   *Transfer Restrictions and Legends.*  This Section 2.04 shall not apply to Warrants and Common Stock which have been issued, distributed or sold pursuant to an effective registration statement.

(a)    Each Warrant issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Warrants may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any Warrants as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Warrant Certificates representing such Warrants for exchange pursuant to Section 2.05 in accordance with the procedures of the Warrant Agent (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the Warrant Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Warrant Certificate for a like Number of Warrants, which shall not bear such legend.

(b)    All shares of Common Stock issued to a Warrantholder upon exercise of a Warrant shall bear the legend set forth in Exhibit B hereto.

(i)    Shares of Common Stock issued to a Warrantholder upon exercise of a Warrant may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by such Warrantholder except (A) in compliance with applicable transfer restrictions set forth in the Shareholders Agreement and (B)(I) pursuant to a registration statement that has become effective under the Securities Act or (II) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any such shares of Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that the shares of Common Stock can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock (together with any legal opinions, certifications or other evidence as may reasonably be required by the Company or the transfer agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear such legend.

(c)    Any Warrant that is purchased or owned by the Company or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Company or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Warrants no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

Section 2.05.    *Transfer, Exchange and Substitution.*    (a)    Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.  All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    A Warrantholder may transfer a Warrant only upon surrender of such Warrant for registration of transfer.  Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.  Such Warrantholder will also provide a written certificate (substantially in the form of Exhibit E hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Warrants.  The Warrant Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Warrant hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner

11

thereof for all purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)      Every Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(d)      When Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.  To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(e)      A Certified Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.06.  *Global Warrants.*  (a) The Warrants shall initially be issued in the form of Certificated Warrants.  However, if the Warrants are sold pursuant to an effective registration statement filed with the SEC, or if the Company so elects at any time, any Certificated Warrants may be presented to the Warrant Agent by Warrantholders in exchange for one or more Global Warrants up to the aggregate Number of Warrants then outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary.  Upon such presentation, the Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for authentication and delivery in accordance with Section 2.02.

(b)      Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit C hereto (the "**Global Warrant Legend**").

12

(c)     So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes.  Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(d)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(e)     Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees.  Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with the rules and procedures of the Depositary.

(f)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest.  Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.06(f) shall not bear the Global Warrant Legend.  Interests in the Global

13

Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.06(f).

(g)    The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.07.  *Surrender of Warrant Certificates.*    Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 6.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof.  The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

ARTICLE 3

EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01.  *Exercise of Warrants.*  At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).  Any Warrants not exercised prior to such time shall expire unexercised.

Section 3.02.  *Procedure for Exercise.*  (a)  To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes as set forth in Section 7.01(b), or (ii) in the case of a Global Warrant, the Warrantholder must comply with the procedures established by the Depositary for the exercise of Warrants.

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant.  However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.

14

Section 3.03.  *Settlement of Warrants.*  (a)  Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.  Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)    If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 7.15, and  on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at *[specify bank]*, unless the Company has previously instructed otherwise in writing.

(c)    If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional shares or fractional Warrants as provided in Section 3.05.

Section 3.04.  *Delivery of Common Stock.*  (a)  In connection with the delivery of shares of Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)    (A) if such shares of Common Stock are in book-entry form at the Depositary, deliver Common Stock by electronic transfer (with the assistance of the Company and the transfer agent of Common Stock, if necessary) to such Warrantholder's account, or any other account as such Warrantholder may designate, at the Depositary or at an Agent Member, or (B) if such shares of Common Stock are not in book-entry form at the Depositary, requisition from the transfer agent of the Common Stock and deliver to or upon the order of such Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Common Stock to which such Warrantholder is entitled, registered in such name or names as may be directed by such Warrantholder;

(ii)    deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05; and

15

(iii)    if the Number of Warrants represented by a Warrant Certificate shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)    Each Person in whose name any shares of Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(c)    Promptly after the Warrant Agent shall have taken the action required above (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05.    *No Fractional Shares to Be Issued.*  (a)  Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Common Stock upon exercise of any Warrants.

(b)    If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Common Stock valued at the Net Share Settlement Price as of the Exercise Date. However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)    Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock.

Section 3.06.    *Acquisition of Warrants by Company.*  The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07.    *Direction of Warrant Agent.*  (a)  The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of

16

the Warrants and the payment or delivery, as the case may be, of Cash and/or Common Stock as described in this Article 3. In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid, or Common Stock to be delivered, to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

[RESERVED]

ARTICLE 5

ADJUSTMENTS

Section 5.01.  *Adjustments to Exercise Price.*  The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Common Stock as a dividend or distribution to all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for

17

such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be; and

$OS_1$    =    the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, such dividend, distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be. If any dividend or distribution or subdivision or combination of the type described in this Section 5.01(a) is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the Exercise Price that would then be in effect if such dividend or distribution or subdivision or combination had not been declared or announced, as the case may be.

(b)    The issuance to all holders of Common Stock of rights or warrants entitling them for a period expiring 60 days or less from the date of issuance of such rights or warrants to purchase shares of Common Stock (or securities convertible into Common Stock) at less than (or having a conversion price per share less than) the Current Market Price of Common Stock, in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0 + Y}{OS_0 + X}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such issuance;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such issuance;

$OS_0$    =    the number of shares of Common Stock outstanding immediately prior to the Close of Business on the Record Date for such issuance;

$X$    =    the total number of shares of Common Stock issuable pursuant to

18

such rights, warrants or convertible securities; and

Y    =    the aggregate price payable to exercise such rights, warrants or convertible securities *divided by* the Current Market Price.

Such adjustment shall become effective immediately after the Close of Business on the Record Date for such issuance.  In the event that the issuance of such rights, warrants or convertible securities is announced but such rights, warrants or convertible securities are not so issued, the Exercise Price shall again be adjusted to be the Exercise Price that would then be in effect if the Record Date for such issuance had not occurred.  To the extent that such rights or warrants are not exercised prior to their expiration or shares of Common Stock are otherwise not delivered pursuant to such rights, warrants or convertible securities, upon the expiration, termination or maturity of such rights, warrants or convertible securities, the Exercise Price shall be readjusted to the Exercise Price that would then be in effect had the adjustments made upon the issuance of such rights, warrants or convertible securities been made on the basis of the delivery of only the number of shares of Common Stock actually delivered.  In determining the aggregate price payable for such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, as well as any consideration received in connection with the conversion of any convertible securities issued upon exercise of such rights or warrants, and the value of such consideration, if other than Cash, shall be determined in good faith by the Board of Directors.

(c)    The dividend or distribution to all holders of Common Stock of (i) shares of the Company's Capital Stock (other than Common Stock), (ii) evidences of the Company's indebtedness, (iii) rights or warrants to purchase the Company's securities or the Company's assets or (iv) property or Cash (excluding any ordinary cash dividends declared by the Board of Directors and excluding any dividend, distribution or issuance covered by clauses (a) or (b) above), in which event the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where:

EP$_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

EP$_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

SP$_0$    =    the Current Market Price; and

FMV    =    the fair market value (as determined in good faith by the Board of Directors), on the Record Date for such dividend or distribution, of the shares of Capital Stock, evidences of indebtedness or property,

19

rights or warrants so distributed or the amount of Cash (other than in the case of ordinary cash dividends declared by the Board of Directors) expressed as an amount per share of outstanding Common Stock.

In the event of a reduction of the Parent Exercise Price under either of the Parent Warrant Agreements (other than pursuant to Article 5 of a Parent Warrant Agreement), such reduction shall be treated, for purposes of this Warrant Agreement, as a distribution of property where the FMV of such property for purposes of this adjustment shall be equal to the absolute value of the difference between (i) the Black Scholes Warrant Value of such outstanding Parent Warrants with a Parent Exercise Price equal to the Parent Exercise Price as adjusted to such date pursuant to Article 5 of the applicable Parent Warrant Agreement and (ii) the Black Scholes Warrant Value of such outstanding Parent Warrants immediately following such reduction in Parent Exercise Price, expressed as an amount per share of outstanding Common Stock.

Such decrease shall become effective immediately after the Close of Business on the Record Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (c) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ =    the average of the Closing Sale Prices of the Capital Stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

20

$MP_0$ =     the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(d)     For the purposes of Section 5.01(a), (b) and (c), any dividend or distribution to which Section 5.01(c) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock (or both), shall be deemed instead to be a dividend or distribution of the indebtedness, assets or shares of Capital Stock other than such shares of Common Stock or rights or warrants (and any Exercise Price adjustment required by Section 5.01(c) with respect to such dividend or distribution shall be made in respect of such dividend or distribution (without regard to the parenthetical in Section 5.01(c) that begins with the word "excluding")) immediately followed by a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Exercise Price adjustment required by Section 5.01 with respect to such dividend or distribution shall then be made), except, for purposes of such adjustment, any shares of Common Stock included in such dividend or distribution shall not be deemed "outstanding immediately prior to the Close of Business on the Record Date."

Section 5.02. *Adjustments to Number of Warrants.* Concurrently with any adjustment to the Exercise Price under Section 5.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 5.03. *Certain Distributions of Rights and Warrants; Shareholder Rights Plan.* (a) Rights or warrants distributed by the Company to all holders of Common Stock (including under any Shareholder Rights Plan in existence on the date hereof or hereafter put into effect) entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

(i)     are deemed to be transferred with such shares of Common Stock;

(ii)     are not exercisable; and

21

(iii)      are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 5 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 5 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 5 (subject in all respects to Section 5.03(d)).

(b)      If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights (subject in all respects to Section 5.03(d)).

(c)      In addition, except as set forth in Section 5.03(d), in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 5.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 5 was made (including any adjustment contemplated in Section 5.03(d)):

(i)      in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a Cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

(ii)      in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

(d)      If a Company shareholders rights plan under which any rights are issued provides that each share of Common Stock issued upon exercise of Warrants at any time prior to the distribution of separate certificates representing such rights shall be entitled to receive such rights, prior to the separation of such rights from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall not be adjusted pursuant to Section 5.01.  If, however, prior to any exercise of a Warrant, such rights have separated from the Common Stock, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be adjusted at the time of separation as if the Company dividended or distributed to all holders of Common Stock, the Company's Capital Stock, evidences of the Company's indebtedness, certain rights or warrants to

22

purchase the Company's securities or other of the Company's assets as described in Section 5.01(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 5.04. *No Impairment.* The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholder.

Section 5.05. *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 5 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 5.06. *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange, decrease the Exercise Price and/or increase the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and/or increased Number of Warrants for each Warrant Certificate and the period during which the decrease and/or increase will be in effect. The Company may make such decreases in the Exercise Price and/or increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 5, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 5.07. *Restrictions on Adjustments.* (a) Except in accordance with Section 5.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing.

1766885

(b)    Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i)    upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)    for a change in the par value of the Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 5.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (i) annually, on each anniversary of the Closing Date, (ii) immediately prior to the time of any exercise, and (iii) five Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(f)    If the Company takes a record of the holders of Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 5.08.    *Deferral of Adjustments.*    In any case in which Section 5.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Common Stock or other securities or assets issuable upon

24

such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Common Stock or fractional Warrant pursuant to Section 3.05. For the purposes of this Section 5.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 5.09. *Recapitalizations, Reclassifications and Other Changes*. (a) If any of the following events occur:

(i)     any recapitalization;

(ii)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 5.01(a) applies);

(iii)   any consolidation, merger or combination involving the Company;

(iv)    any sale or conveyance to a third party of all or substantially all of the Company's assets; or

(v)     any statutory share exchange,

(each such event a "**Reorganization Event**"), in each case as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then, subject to Section 5.09(e), following the effective time of the transaction, the right to receive shares of Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Common Stock, a "**Unit of Reference Property**"). In the event holders of Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to a Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock in such Reorganization Event.

(b)     At any time from, and including, the effective time of a Reorganization Event:

(i)     if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)     if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)     The value of a Unit of Reference Property (the "**Unit Value**") shall be determined as follows:

(i)     any shares of common stock of the successor or purchasing corporation or any other corporation that are traded on a national or regional stock exchange included in such Unit of Reference Property shall be valued as if such shares were "Common Stock" using procedures set forth in the definition of "Closing Sale Price" in Section 1.01;

(ii)    any other property (other than Cash) included in such Unit of Reference Property shall be valued in good faith by the Board of Directors (in a manner not materially inconsistent with the manner the Board of Directors valued such property for purposes of the Reorganization Event, if applicable) or by a New York Stock Exchange member firm selected by the Board of Directors; and

(iii)   any Cash included in such Unit of Reference Property shall be valued at the amount thereof.

(d)     On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 5.09.  If the Reference Property in connection with any Reorganization Event includes shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 5.  In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 5.09, the Company shall promptly file with the Warrant Agent an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Unit of Reference Property after the relevant

26

Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register, within 20 Business Days after execution thereof.  Failure to deliver such notice shall not affect the legality or validity of such amendment.

    (e)    Change of Control Event:

    (i)    No less than 15 Business Days prior to the scheduled closing of a Change of Control Event, the Company shall:

    (A)    calculate the Change of Control Estimated Payment Amount;

    (B)    deliver to the Warrant Agent a notice of redemption (a "Redemption Notice"), which shall be binding on the Company and on all Warrantholders, stating that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time shall be redeemed on the Change of Control Payment Date at a price equal to the Change of Control Payment Amount (the "Redemption");

    (C)    cause a notice of the Redemption to be sent at least once to the Dow Jones News Service or similar business news service in the United States; and

    (D)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice stating:

    1)    that the Redemption is being made pursuant to this Section 5.09(e) and that all Warrants (other than Carryover Warrants, if any) that have not been exercised prior to the Cut-Off Time will be redeemed on the Change of Control Payment Date for payment of the Change of Control Payment Amount;

    2)    a reasonably detailed explanation of the Change of Control Estimated Payment Amount, including (x) a statement of the amount of the Change of Control Estimated Payment Amount, together with a reasonably detailed explanation of the calculation of such amount, and (y) the formula for calculating the Black Scholes Warrant Value and the Change of Control Payment Amount;

    3)    the date of the Redemption (which shall be a Business Day no later than five (5) Business Days following the Change of Control Date (the "Change of Control Payment Date"));

    4)    the Net Share Amount for each Warrant as of a date not more than five (5) Business Days prior to the date of the Redemption Notice (assuming Net Share Settlement is applicable with respect to the exercise of such Warrant);

27

5)        that no outstanding Warrant may be exercised after the Close of Business on the day prior to the Change of Control Date (the "**Cut-Off Time**");

6)        if applicable, that New Warrants will be issued to the Warrantholders on the Change of Control Payment Date in accordance with the terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09);

7)        any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Redemption; and

8)        the name and address of the Warrant Agent.

(ii)        Within two (2) Business Days prior to the Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Change of Control Payment Amount for all outstanding Warrants (other than the Carryover Warrants, if any).

(iii)        On the Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall redeem all outstanding Warrants (other than Carryover Warrants, if any) pursuant to the Redemption, (B) the Warrant Agent shall mail to each holder of Warrants so redeemed payment in Cash in an amount equal to the aggregate Change of Control Payment Amount in respect of such redeemed Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants (the "New Warrants") representing the Carryover Warrants (if any); provided that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 5.09(e)(v), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(iv)        No Warrant (which for the avoidance of doubt does not include New Warrants) may be exercised after the Cut-Off Time.

(v)        Following the Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 5.09(a), subject to Section 5.09(b) and Section 5.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Change of Control Event pursuant to Section 5.09); provided, that, for purposes of this Section 5.09(e)(v), (A) each Unit of Reference Property shall

28

initially only consist of the Registered and Listed Shares included in such Unit of Reference Property and (B) the initial exercise price for each New Warrant shall be equal to the New Warrant Exercise Price.

(vi)    The provisions of this Section 5.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 5.09(e), the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

(f)    The Company hereby agrees not to become a party to any Reorganization Event or Change of Control Event unless its terms are consistent in all material respects with this Section 5.09.

(g)    The above provisions of this Section 5.09 shall similarly apply to successive Reorganization Events and Change of Control Events.

(h)    If this Section 5.09 applies to any event or occurrence, no other provision of this Article 5 with respect to anti-dilution adjustments (which for the avoidance of doubt, does not include the covenant set forth in Section 5.10) shall apply to such event or occurrence.

Section 5.10.    *Consolidation, Merger and Sale of Assets.*  (a)  The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions the consolidated assets of the Company and its subsidiaries substantially as an entirety to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions so long as:

(i)    the successor assumes all the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor

29

entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 5.11.  *Common Stock Outstanding.*  For the purposes of this Article 5, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 5.12.  *Covenant to Reserve Shares for Issuance on Exercise.*  (a)  The Board of Directors has authorized and will reserve for issuance such number of shares of Common Stock as the Board of Directors believes will be issuable upon the exercise of all outstanding Warrants for shares of Common Stock (assuming, for purposes of this covenant, that Full Physical Settlement applies to all Warrants exercised hereunder). The Company covenants that all shares of Common Stock that shall be so issuable shall be duly and validly issued, fully paid and non-assessable.

(b)    The Company agrees to authorize and direct its current and future transfer agents for the Common Stock to reserve for issuance the number of shares of Common Stock specified in this Section 5.12.  The Company shall instruct the transfer agent to deliver to the Warrant Agent, upon written request from the Warrant Agent substantially in the form of Exhibit F (or as separately agreed between the Warrant Agent and the transfer agent), stock certificates (or beneficial interests therein) required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement. The Company shall pay to the Warrant Agent, as agent for the Warrantholders, any Cash that may be payable as provided in this Article 5.  Promptly after the date of expiration of Warrants, the Warrant Agent shall certify to the Company the aggregate Number of Warrants then outstanding, and thereafter no shares shall be required to be reserved in respect of such Warrants.

(c)    The Company shall use its reasonable best efforts to apply and cause to have listed on a national securities exchange the Warrants and, subject to notice of issuance (if any), the shares of Common Stock issued and/or issuable upon exercise of the Warrants as soon as reasonably practicable following the date on which the Common Stock is registered under Section 12(b) of the Exchange Act and listed on a national securities exchange (other than shares of Common Stock bearing the restrictive legend set forth on Exhibit B hereto).

Section 5.13.  *Calculations Final.*  The Company shall be responsible for making all calculations called for under this Warrant Agreement. These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants. The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders. The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

30

Section 5.14.  *Notice of Adjustments.*  Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail to Warrantholders a notice of the adjustment. The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 5.15.  *Warrant Agent Not Responsible for Adjustments or Validity.*  The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed,  herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 5, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 5, or to comply with any of the covenants of the Company contained in this Article 5.

Section 5.16.  *Statements on Warrants.*  The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 5, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.  However, the Company may at any time in its sole discretion (which shall be conclusive) make any change in the form of Warrant Certificate that it may deem appropriate and that does not materially adversely affect the interest of the Warrantholders; and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE 6

### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 6.01.  *No Rights as Stockholders.*  Warrantholders shall not be entitled, by virtue of holding Warrants, to vote, to consent, to receive dividends, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Common Stock issued upon settlement of the Warrants.

Section 6.02.  *Mutilated or Missing Warrant Certificates.*  If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity as the Company may require.  Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone.  An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.  All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 6.03.  *Modification, Waiver and Meetings.*  (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as explicitly set forth in Article 5);

32

1766885

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    impair or adversely affect the exercise rights of Warrantholders, including any change to the calculation or payment of the Full Physical Share Amount or the Net Share Amount, as applicable;

(v)    deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants;

(vi)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(vii)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

ARTICLE 7

CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 7.01.  *Payment of Certain Taxes.*  (a)  The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Common Stock upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided, however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 7.02.  *Change of Warrant Agent.*  (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of

33

any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided, however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority. After appointment, any successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Warrant Agreement without any further act. In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases

Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 7.03.    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 7.04.    *Reliance on Counsel.*    The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 7.05.    *Proof of Actions Taken.*    Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 7.06.    *Correctness of Statements.*    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be

35

required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 7.07. *Validity of Agreement.* The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 7.08. *Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents and the Warrant Agent shall not be responsible for the misconduct or negligence of any agent or attorney, provided due care had been exercised in the appointment and continued employment thereof.

Section 7.09. *Liability of Warrant Agent.* The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 7.10. *Legal Proceedings.* The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.

Section 7.11. *Other Transactions in Securities of the Company.* The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

36

Section 7.12.  *Actions as Agent.*  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 7.13.  *Appointment and Acceptance of Agency.*  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 7.14.  *Successors and Assigns.*  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 7.15.  *Notices.*  Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> **[NGMCO, Inc.]**
> *[_____]*
> *[_____]*
> Attention:  Treasurer
> Telephone:  *[_____]*
> Facsimile:  *[_____]*
>
> With a copy to:
>
> *[_____]*
> *[_____]*
> *[_____]*
> Attention:  *[_____]*

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently

given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

*[_____]*
*[_____]*
Attention:  Treasurer
Telephone:  *[_____]*
Facsimile:  *[_____]*

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 7.16.  *Applicable Law.*  The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed by the law of the State of New York without giving effect to the principles of conflicts of laws thereof.

Section 7.17.  *Benefit of this Warrant Agreement.*  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 7.18.  *Registered Warrantholders.*  Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 7.19.  *Inspection of this Warrant Agreement.*  A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent). The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

1766885

Section 7.20. *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 7.21. *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1766885

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[NGMCO, Inc.]**

By: _____
     Name:
     Title:

[•], as Warrant Agent

By: _____
     Name:
     Title:

**EXHIBIT A**

### FORM OF RESTRICTIVE LEGEND FOR WARRANTS

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT B**

### FORM OF RESTRICTIVE LEGEND FOR COMMON STOCK

[THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THESE SHARES OF COMMON STOCK ARE ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THESE COMMON SHARES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

1766885

**EXHIBIT C**

## FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

1766885

**EXHIBIT D**

### FORM OF WARRANT CERTIFICATE

[FACE]

No. _____

CUSIP No. _____

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO **[NGMCO, Inc.]** (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A SHAREHOLDERS AGREEMENT, DATED [●], 2009, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

D - 1

**[NGMCO, Inc.]**

[Designation of Warrants]

NUMBER OF WARRANTS: Initially, [_____] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2009 between **[NGMCO, Inc.]** and [●], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Common Stock.

EXERCISE PRICE: Initially, $[_____] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE: Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT: Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Common Stock per Warrant exercised, together with Cash in lieu of any fractional Warrants, or (b) without any payment therefor, a number of shares of Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE: At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE: Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE: December 31, 2015.

    This Warrant Certificate certifies that _____, or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

    In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Common Stock equal to the relevant Full Physical Share Amount or Net Share

D - 2

Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

D - 3

IN WITNESS WHEREOF, **[NGMCO, Inc.]** has caused this instrument to be duly executed.

Dated: _____

**[NGMCO, Inc.]**

By: _____
         Name:
         Title:

Attest

By: _____
         Secretary

Countersigned as of the date above written:

[●], as Warrant Agent

By: _____
         Authorized Officer

D - 4

[FORM OF REVERSE OF WARRANT CERTIFICATE]

### [NGMCO, Inc.]

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2009 (the "**Warrant Agreement**"), between the Company and [●] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein. Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement. A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]

[_____]
[_____]

Attention:      [●]

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises
_____ Warrants (the "**Exercised Warrants**") and delivers to you herewith a
Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's
name, representing a Number of Warrants at least equal to the number of Exercised
Warrants.

The Registered Warrantholder hereby either:

elects for Full Physical Settlement to apply to the Exercised Warrants
pursuant to Section 3.03 of the Warrant Agreement and confirms that it
will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay
an amount equal to the Exercise Price (determined as of the relevant
Exercise Date), *multiplied by* the number of Exercised Warrants, by federal
wire or other immediately available funds payable to the order of the
Company to the account maintained by the Warrant Agent and notified to
the Registered Warrantholder as required under Section 3.03(b) of the
Warrant Agreement; or

elects for Net Share Settlement to apply to the Exercised Warrants pursuant
to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)      deliver the Full Physical Share Amount or Net Share Amount, as
applicable, for each of the Exercised Warrants as follows:

_____; and

(b)      if the number of Exercised Warrants is less than the Number of Warrants
represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate
representing the unexercised Warrants to:

_____

D - 6

Dated:_____        _____
                                                    (Registered Warrantholder)




                                              By:  _____
                                                    Authorized Signature
                                                    Address:
                                                    Telephone:


**[To Be Attached if Warrant is a Global Warrant]**

D - 7

**SCHEDULE A**

**SCHEDULE OF INCREASES OR DECREASES IN WARRANTS**

The initial Number of Warrants represented by this Global Warrant is _____.
In accordance with the Warrant Agreement dated as of [_____], 2009 among the Company
and [●], as Warrant Agent, the following increases or decreases in the Number of Warrants
represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |

D - 8

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____
Name, Address and Zip Code of Assignee

and irrevocably appoints _____
Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

D - 9

Date: _____

_____
Name of Transferee

By: _____
    Name:
    Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE: The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

D - 10

1766885

**EXHIBIT E**

## FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS

In connection with the sale, assignment and transfer of _____ Warrants by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such Warrants are being transferred:

To **[NGMCO, Inc.]** (the "**Issuer**") or any subsidiaries thereof; or

Pursuant to a registration statement that has become effective under the Securities Act; or

Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Warrant Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Warrant Agent will refuse to register any of the Warrants evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:    [_____]

[Insert name of transferee]

By:    _____
             Name:
             Title:

1766885

**EXHIBIT F**

## FORM OF COMMON STOCK REQUISITION ORDER

[*Date*]

Via Facsimile [_____]

**[NGMCO, Inc.]**
[_____]
[_____]
Attention:  Treasurer

Re:      DWAC Issuance
          Control No. _____

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Common Stock as indicated
below via DWAC.  The shares are being issued to cover the exercise of Warrants under the
Warrant Agreement, dated as of [_____], 2009, between **[NGMCO, Inc.]** and [●], as
Warrant Agent (the "**Warrant Agreement**"). Defined terms used but not defined herein
have the meaning assigned to them in the Warrant Agreement.

        Number of Shares:          _____

                                   _____ Original Issue or

                                   _____ Transfer from Treasury Account

        Broker Name:               _____

        Broker's DTC Number:       _____

        Contact and Phone:         _____

F - 1

1766885

The Broker will initiate the DWAC transaction on (date).

Sincerely,

[●.],
as Warrant Agent

By: _____
Name:
Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
       Broker

F - 2

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit F**

Certain Excluded Owned Real Property

# EXHIBIT F

## CERTAIN EXCLUDED OWNED REAL PROPERTY

| | Site Name | Property Address | City | State | Zip |
|---|---|---|---|---|---|
| 1. | GMVM - Wilmington Assembly | 801 Boxwood Road PO Box 1512 - 19899 | Wilmington | DE | 19804-2041 |
| 2. | Stamping - Indianapolis | 340 White River Parkway West Drive South 50 | Indianapolis | IN | 46206 |
| 3. | GMPT - Flint North #5/#10/#81 | 902 E Hamilton Avenue | Flint | MI | 48550 |
| 4. | GMPT – Livonia | 12200 Middlebelt | Livonia | MI | 48150 |
| 5. | GMVM - Pontiac Assembly | 2100 S Opdyke Road | Pontiac | MI | 48341 |
| 6. | Stamping - Pontiac North Campus[1] | 220 East Columbia | Pontiac | MI | 48340 |
| 7. | Stamping - Grand Rapids | 300 36th Street SW | Wyoming | MI | 49548-2107 |
| 8. | GMPT - Willow Run | 2930 Ecorse Road | Ypsilanti | MI | 48197-0935 |
| 9. | GMPT - Massena | Route 37 East | Massena | NY | 13662-0460 |
| 10. | Stamping - Mansfield | 2525 West Fourth Street PO Box 2567 - 44906 | Mansfield | OH | 44906-1269 |
| 11. | GMVM - Moraine Assembly[2] | 2601 West Stroop Road | Moraine | OH | 45439 |
| 12. | GMPT - Parma Complex[3] | 5400 Chevrolet Boulevard PO Box 30098 | Parma | OH | 44130 |
| 13. | Stamping - Pittsburgh | 1451 Lebanon School Road | West Mifflin | PA | 15122 |
| 14. | GMPT - Fredericksburg | 11032 Tidewater Trail | Fredericksburg | VA | 22408 |
| 15. | GMVM - Shreveport Assembly | 7600 General Motors Boulevard | Shreveport | LA | 71129 |
| 16. | Stamping- Shreveport | 7600 General Motors Boulevard | Shreveport | LA | 71129 |

---

[1] Does not include Plant #14 and the real property underlying Plant #14 and associated utilities for stamping and Powertrain facilities, which is part of the Transferred Real Property.

[2] Does not include the GMPT - Moraine (DMAX) improvements and associated real property, which is part of the Transferred Real Property.

[3] Does not include the GMVM - Parma Stamping improvements and associated real property, which is part of the Transferred Real Property.

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit G**

Certain Retained Workers' Compensation Claims

# EXHIBIT G

## CERTAIN RETAINED WORKERS' COMPENSATION CLAIMS

Alabama
Georgia
New Jersey
Oklahoma

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit H**

Form of Sale Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
               :

In re                      :          **Chapter 11 Case No.**
               :

**GENERAL MOTORS CORP.**, *et al.*,   :          **09-50026 (REG)**
               :

            **Debtors.**    :          **(Jointly Administered)**
               :

---------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 AND FED. R. BANKR. P. 2002,
6004, AND 6006 (I) APPROVING PROCEDURES FOR SALE
OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE
AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,
A U.S. TREASURY-SPONSORED PURCHASER;
(II) SCHEDULING BID DEADLINE AND SALE HEARING DATE;
(III) ESTABLISHING ASSUMPTION AND ASSIGNMENT PROCEDURES;
AND (IV) FIXING NOTICE PROCEDURES AND APPROVING FORM OF NOTICE**

Upon the motion, dated June 1, 2009 (the "Motion"),[1] of General Motors

Corporation ("GM") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors" or the "Company"),[2] pursuant to sections

105, 363, and 365 of title 11, United States Code (the "Bankruptcy Code") and Rules 2002,

6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for,

among other things, entry of an order, (A) approving the proposed sale procedures annexed

hereto as Exhibit "A" (the "Sale Procedures"); (B) scheduling a bid deadline and sale hearing

date; (C) establishing procedures for assuming and assigning the Assumable Executory

Contracts; and (D) fixing notice procedures and approving forms of notice; and upon any

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Sale Procedures, or the MPA, as applicable.

[2] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

objections to the Motion (the "Objections"); and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York, (ii) the attorneys for the United

States Department of the Treasury (the "U.S. Treasury"), (iii) the attorneys for Export

Development Canada ("EDC"), (iv) the attorneys for the agent under GM's prepetition secured

term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and

restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims

against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union,

United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"),

(viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and

Furniture Workers—Communications Workers of America, (ix) the United States Department of

Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys

for the ad hoc bondholders committee, and it appearing that no other or further notice need be

provided; and a hearing having been held on June 1, 2009, to consider the relief requested in the

Motion (the "Sale Procedures Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the Sale

Procedures Hearing, and all of the proceedings had before the Court; and the Court having

reviewed the Motion and any Objections and found and determined that the relief sought in the

Motion as provided herein is necessary to avoid immediate and irreparable harm to the Debtors

and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:[3]

A.    The Debtors have articulated good and sufficient reasons for this Court to

grant the relief requested in the Motion regarding the sale process, including the Court's (i)

approval of the Sale Procedures, (ii) approval of the Assumption and Assignment Procedures,

(iii) approval of and authorization to serve the Sale Notice, the Assumption and Assignment

Notice, and the Special UAW Retiree Notice (each as hereinafter defined), and (iv) approval of

and authorization to publish the Publication Notice (the "Sale Procedures Relief").

B.    The Debtors have articulated good and sufficient reasons for, and the best

interests of their estates will be served by, this Court scheduling a subsequent hearing (the "Sale

Hearing") to consider whether to grant the remainder of the relief requested in the Motion,

including the approval of the sale of substantially all the assets (the "Purchased Assets") of the

Sellers in accordance with either the (i) proposed Master Sale and Purchase Agreement, dated as

of June 1, 2009, substantially in the form annexed to the Motion as Exhibit "A" (together with all

exhibits and agreements attached thereto, the "MPA"),[4] by and among GM and its Debtor

subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC (the

"Purchaser"), a purchaser sponsored by the U.S. Treasury, or (ii) such other Marked Agreement

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[4] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

that may constitute the Successful Bid (the "Replacement Agreement"), free and clear of all

liens, claims, encumbrances, and interests, including rights or claims based on any successor or

transferee liability (with the same to attach to the proceeds therefrom) pursuant to section 363 of

the Bankruptcy Code (the "363 Transaction").

C.      The Purchased Assets are "wasting assets" that will not retain going

concern value over an extended period of time.  As such, the Debtors' estates will suffer

immediate and irreparable harm if the relief requested in the Motion is not granted on an

expedited basis consistent with the provisions set forth herein and in the MPA.

D.      The notice of the Sale Hearing (the "Sale Notice"), substantially in the

form annexed hereto as Exhibit "B," is reasonably calculated to provide parties in interest with

proper notice of the proposed sale of the Purchased Assets, the Sale Procedures, the 363

Transaction, and the Sale Hearing.

E.      Publication of the Publication Notice, substantially in the form annexed

hereto as Exhibit "C," as set forth herein is reasonably calculated to provide all unknown

creditors and parties not otherwise required to be served with a copy of the Sale Notice pursuant

to this Order with proper notice of the proposed sale of the Purchased Assets, the Sale

Procedures, the 363 Transaction, and the Sale Hearing.

F.      The Assumption and Assignment Notice, substantially in the form

annexed hereto as Exhibit "D," is reasonably calculated to provide all counterparties to the

Assumable Executory Contracts with proper notice of the potential assumption and assignment

of their respective executory contracts or Leases, any Cure Amounts relating thereto, and the

Assumption and Assignment Procedures.

G.      The UAW Special Retiree Notice (as defined below) including the Cover

Letter to UAW-Represented Retirees describing the 363 Transaction and the UAW Retiree

Settlement Agreement and the notice (together, the "UAW Retiree Notice") to the retirees of the

Debtors and of certain retirees of Delphi Corporation ("Delphi"), a former unit of GM, including

certain retirees of former Delphi units and former GM units, and their respective surviving

spouses, who are eligible to receive, now or in the future, Retiree Medical Benefits ( as defined

in the UAW-Retiree Settlement Agreement) (collectively, the "UAW-Represented Retirees"),

copies of which are annexed hereto as Exhibit "E," are reasonably calculated to provide the

UAW-Represented Retirees with proper notice of the 363 Transaction, the Sale Procedures, the

Sale Hearing, and the UAW Retiree Settlement Agreement.

   H.  The Motion and this Order comply with all applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Guidelines for the

Conduct of Asset Sales established by the Bankruptcy Court on September 5, 2006 pursuant to

General Order M-331.

   I.  The 363 Transaction includes the transfer of "personally identifiable

information" (as defined in section 101(41A) of the Bankruptcy Code).  As such, the transfer of

personally identifiable information shall not be effective until a Consumer Privacy Ombudsman

is appointed and issues its findings and the Court has an opportunity to review the findings and

issue any rulings that are appropriate.

   J.  Due, sufficient, and adequate notice of the relief requested in the Motion

and granted herein has been given to parties in interest.

   K.  This Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).

   NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

1.      The Sale Procedures Relief requested in the Motion is granted as provided

herein.

2.      The Objections are overruled except as otherwise set forth herein.

3.      The Sale Procedures, which are incorporated herein by reference, are

approved and shall govern all bids and sale procedures relating to the Purchased Assets.  The

Debtors are authorized to take any and all actions necessary or appropriate to implement the Sale

Procedures.

4.      The deadline for submitting a Qualified Bid shall be June 22, 2009 (the

"Bid Deadline"), as further described in the Sale Procedures.

5.      The deadline for objecting to approval of the 363 Transaction, including

the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests,

including rights or claims based on any successor or transferee liability (or for UAW-

Represented Retirees to object to the UAW Retiree Settlement Agreement), shall be June 19,

2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline"), *provided, however,* that in the

event the Sale Procedures result in a Successful Bidder other than the Purchaser, the deadline for

objecting to the sale of the Purchased Assets to such Successful Bidder shall be at the Sale

Hearing.

6.      The Purchaser shall constitute a Qualified Bidder for all purposes and in

all respects with respect to the Sale Procedures and is not required to make a Good Faith Deposit.

7.      The Court shall conduct the Sale Hearing on June 30, 2009, at 9:45 a.m.

(Eastern Time), at which time the Court will consider approval of the 363 Transaction to the

Successful Bidder and approval of the UAW Retiree Settlement Agreement.  In the event the

Successful Bidder is not the Purchaser, non-Debtor parties to the Assumable Executory

Contracts may raise objections to adequate assurance of future performance at the Sale Hearing.

8.     The Debtors are authorized to conduct the 363 Transaction (or other

similar transaction if the Successful Bidder is a party other than the Purchaser) without the

necessity of complying with any state or local bulk transfer laws or requirements.

9.     The notices described in subparagraphs (a)-(d) below are approved and

shall be good and sufficient, and no other or further notice shall be required if given as follows:

(a)     The Debtors (or their agent) serve, within three (3) days after entry of this
Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or
other method reasonably calculated to provide notice, a copy of this Order
upon: (i) the attorneys for the U.S. Treasury, (ii) the attorneys for Export
Development Canada, (iii) the attorneys for the agent under the Debtors'
prepetition secured term loan agreement, (iv) the attorneys for the agent
under the Debtors' prepetition amended and restated secured revolving
credit agreement (v) the attorneys for the statutory committee of unsecured
creditors appointed in the Debtors' chapter 11 cases (the "Creditors
Committee") (if no statutory committee of unsecured creditors has been
appointed, the holders of the fifty largest unsecured claims against the
Debtors on a consolidated basis), (vi) the attorneys for the UAW, (vii) the
attorneys for the International Union of Electronic, Electrical, Salaried,
Machine and Furniture Workers—Communications Workers of America;
(viii) the United States Department of Labor; (ix) the attorneys for the
National Automobile Dealers Association, (x) the attorneys for the ad hoc
bondholders committee; (xi) any party who, in the past three years,
expressed in writing to the Debtors an interest in the Purchased Assets and
who the Debtors and their representatives reasonably and in good faith
determine potentially have the financial wherewithal to effectuate the
transaction contemplated in the MPA, (xii) non-Debtor parties to the
Assumable Executory Contracts, (xiii) all parties who are known to have
asserted any lien, claim, encumbrance, or interest in or on the Purchased
Assets, (xiv) the Securities and Exchange Commission, (xv) the Internal
Revenue Service, (xvi) all applicable state attorneys general, local
environmental enforcement agencies, and local regulatory authorities,
(xvii) all applicable state and local taxing authorities, (xviii) the Federal
Trade Commission, (ixx) all applicable state attorneys general, (xx)
United States Attorney General/Antitrust Division of the Department of
Justice, (xxi) the U.S. Environmental Protection Agency and similar state
agencies, (xxii) the United States Attorney's Office, (xxiii) all dealers with
current agreements for the sale or leasing of GM brand vehicles, (xxiv) the
Office of the United States Trustee for the Southern District of New York,
and (xxv) all entities that requested notice in these chapter 11 cases under
Bankruptcy Rule 2002; and

(b)     On or before the Mailing Deadline, the Debtors (or their agent) serve by
first-class mail, postage prepaid, or other method reasonably calculated to

provide notice, the Sale Notice, substantially in the form annexed hereto as Exhibit "B," upon (i) all other known creditors and (ii) all equity security holders of the Debtors of record as of May 27, 2009.

(c)    On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the assumption and assignment of the Assumable Executory Contracts and the proposed cure amounts relating to the Assumable Executory Contracts (the "Assumption and Assignment Notice"), substantially in the form annexed hereto as Exhibit "C," upon the non-Debtor parties to the Assumable Executory Contracts.

(d)    On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the 363 Transaction and the UAW Retiree Settlement, as well as a cover letter from the UAW describing the UAW Retiree Settlement Agreement and communicating the UAW's support of the 363 Transaction, including the UAW Retiree Settlement Agreement (collectively, the "UAW Retiree Notice"), substantially in the form annexed hereto as Exhibit "E," upon (i) the UAW, (ii) the attorneys for the UAW, and (iii) all of the UAW-Represented Retirees.  On the Mailing Deadline or as soon as practicable thereafter, the Debtors will cause the MPA, the Motion, the Sale Procedures Order, the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto (other than those containing commercially sensitive information), to be published on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http:/www.gmcourtdocs.com, in an area dedicated to retiree-related information (this website disclosure and the UAW Retiree Notice, collectively the  "UAW Special Retiree Notice").

(e)    On the Mailing Deadline, or as soon as practicable thereafter, the Debtors shall cause the Publication Notice to be published (i) once in (a) the global edition of *The Wall Street Journal*, (b) the national edition of *The New York Times*, (c) the global edition of *The Financial Times*, (d) the national edition of *USA Today*, (e) *Detroit Free Press/Detroit News*, (f) *Le Journal de Montreal*, (g) *Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The National Post*, and (ii) on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http::/www.gmcourtdocs.com.

10.    The following procedures (the "Assumption and Assignment Procedures")
shall govern the assumption and assignment of the Assumable Executory Contracts in connection
with the sale of the Purchased Assets to the Purchaser:[5]

Determination of Assumable Executory Contracts

- The Sellers shall maintain a schedule (the "Schedule") of Executory Contracts and Leases that the Purchaser has designated as Assumable Executory Contracts. From the date of the MPA until thirty (30) days after the Closing Date (or a later date if mutually agreed upon by the Sellers and the Purchaser) (the "Executory Contract Designation Deadline"), the Purchaser may (i) designate any additional Executory Contracts or Leases as Assumable Executory Contracts and add such Assumable Executory Contracts to the Schedule or (ii) remove any Assumable Executory Contract from the Schedule, in which case the Executory Contract or Lease shall cease to be an Assumable Executory Contract. The right of the Purchaser to add or remove Executory Contracts and Leases from the Schedule is subject to certain exceptions.[6]

- For each Assumable Executory Contract, the Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing or a later date (the "Proposed Assumption Effective Date").

- In addition to the Schedule, the Sellers shall maintain a secure website (the "Contract Website") that the non-Debtor counterparty to an Assumable Executory Contract can access to find current information about the status of its respective Executory Contract or Lease. The Contract Website contains, for each Assumable Executory Contract, (i) an identification of each Assumable Executory Contract that the Purchaser has designated for assumption and assignment and (ii) the Cure Amounts that must be paid to cure any prepetition defaults under such respective Assumable Executory Contract as of the Commencement Date. The information on the Contract Website shall be made available to the non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor Counterparty"), but shall not otherwise be publicly available.

---

[5] If a party other than the Purchaser is the Successful Bidder, or if a transaction other than the 363 Transaction is consummated, then these Assumption and Assignment Procedures may be modified by further order of this Court.

[6] For example, if an Assumable Executory Contract has already been assumed and assigned, it cannot be removed from the Schedule.

Procedures for Providing Notice of Assumption and Assignment

- Following the designation of an Executory Contract or Lease as an Assumable Executory Contract, the Debtors shall provide notice (the "Assumption and Assignment Notice") to the Non-Debtor Counterparty to the Assumable Executory Contract, substantially in the form annexed hereto as Exhibit "D," setting forth (i) instructions for accessing the information on the Contract Website relating to such Non-Debtor Counterparty's Assumable Executory Contract and (ii) the procedures for objecting to the proposed assumption and assignment of the Assumable Executory Contract.

Procedures for Filing Objections to Assumption and Assignment and Cure Amounts

- Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "Contract Objections") must be made in writing, filed with the Court, and served on the Objection Deadline Parties (as defined below) so as to be received no later than ten (10) days after the date of the Assumption and Assignment Notice (the "Contract Objection Deadline") and must specifically identify in the objection the grounds therefor.  The "Objection Deadline Parties" are (i) the Debtors, c/o General Motors Corporation, 30009 Van Dyke Avenue, Warren, Michigan 48090-9025 (Attn:  Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

- Unless a Contract Objection is filed and served before the Contract Objection Deadline, the Non-Debtor Counterparty shall be deemed to have consented to the assumption and assignment of its respective Assumable Executory Contract and the respective Cure Amount and shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Sellers, their estates, or the Purchaser.

Procedures for Resolving Objections

- If a timely Contract Objection is filed solely as to the Cure Amount (a "Cure Objection"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date, the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable

10

following resolution of such disputed Cure Amount: To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty may meet and confer in good faith to attempt to resolve any such objection without Court intervention. A call center has been established by the Debtors for this purpose. If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows: (a) with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

- If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court. If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

- If the Debtors, the Purchaser, and the non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

Effective Date of Assumption

- All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the Assumption Resolution Date (as defined below). The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline or the only Contract Objection that has been filed on or prior to the Contract Objection Deadline is a Cure Objection, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection other than a Cure Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract.

- Contingent upon the approval of the 363 Transaction and concurrently with the consummation of the 363 Transaction (without prejudice to the conditions set forth in the MPA), (i) the UAW Collective Bargaining Agreement shall be deemed to be an Assumable Executory Contract as to which the Assumption and Assignment Notice need not be sent and which will not be listed on the Schedule or the Contract Website (ii) the Debtors shall assume and assign the UAW Collective Bargaining Agreement

to the Purchaser as of the Closing Date, and each non-Debtor party to the UAW
Collective Bargaining Agreement shall be deemed to have consented to such
assumption and assignment.

11.    Except as otherwise provided in paragraph 10 hereof with respect to

Assumable Executory Contracts, in order to be considered, an objection to the 363 Transaction

(or for UAW-Represented Retirees, the UAW Retiree Settlement Agreement), must be filed with

the Court and served upon the following so as to be received by the Objection Deadline:  (i)

Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New

York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky,

Esq.); (ii) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit,

Michigan 48265 (Attn:  Lawrence S. Buonomo, Esq.); (iii) Cadwalader, Wickersham & Taft

LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281

(Attn:  John J. Rapisardi, Esq.); (iv) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room

2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (v) Vedder Price, P.C.,

attorneys for EDC, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J.

Edelman, Esq. and Michael L. Schein, Esq.); (vi) the attorneys for the Creditors Committee; (vii)

the UAW, 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:  Daniel W. Sherrick,

Esq.); (viii) Cleary Gottlieb Steen & Hamilton LLP, attorneys for the UAW, One Liberty Plaza,

New York, New York 10006 (Attn: James L. Bromley, Esq.); (xi) Cohen, Weiss and Simon

LLP, attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn:  Babette

Ceccotti, Esq.); (xii) the Office of the United States Trustee for the Southern District of New

York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York

10004; and (xiii) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn:  David S. Jones, Esq. and Matthew L. Schwartz, Esq.).  Contract

Objections and Cure Objections must be filed and served in accordance with the procedure set forth in paragraph 10 herein.

12.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, to the consummation and performance of the 363 Transaction contemplated by the MPA or a Participation Agreement, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, of each of the Purchased Assets transferred as part of the 363 Transaction), the approval of the UAW Retiree Settlement Agreement, or the assumption and assignment of any Executory Contract or Lease.

13.     The U.S. Trustee is directed to appoint a Consumer Privacy Ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code as soon as practicable.

14.     Notwithstanding any possible applicability of Bankruptcy Rules 6004 or 6006, or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

15.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to this Order.

Dated: New York, York
      June [__] 2009


_____
United States Bankruptcy Judge

# EXHIBIT A

## SALE PROCEDURES

## SALE PROCEDURES

By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), sought, among other things, approval of the process and procedures through which it will determine the highest or otherwise best price for the purchase of substantially all the assets (the "Purchased Assets") of the Debtors (the "Sellers").  On June 2, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Sale Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best price for the Purchased Assets through the process and procedures set forth below (the "Sale Procedures").

On June 30, 2009, as further described below, in the Motion, and in the Sale Procedures Order, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing"), at which the Debtors shall seek entry of an order (the "Sale Order") authorizing and approving the sale of the Purchased Assets (the "363 Transaction") pursuant to either (i) that certain Master Sale and Purchase Agreement (the "MPA") between the Sellers and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), substantially in the form annexed as Exhibit "A" to the Motion, or (ii) a different Successful Bid (as defined below).

## Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in purchasing the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors (with a copy to the Purchaser):

(i) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; and

(ii) The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the 363 Transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, and (y) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the 363 Transaction.

A "Qualified Bidder" is a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the 363 Transaction, whose bid meets all of the Bid Requirements described below *and* that the Debtors, in their discretion but after consulting with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors Committee") determine is likely to consummate the 363 Transaction, if selected as the Successful Bidder, after taking into account all relevant legal, regulatory, and business considerations.  The Purchaser is a Qualified Bidder and is not required to make a Good Faith Deposit (as defined below).

Within two (2) business days after the Debtors and the Purchaser receive from a Potential Bidder all the materials required by subparagraphs (i) and (ii) above, the Debtors shall determine, in consultation with their advisors, the UAW, and the Creditors Committee, and shall notify the Purchaser and the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.

## Obtaining Due Diligence Access

To obtain due diligence access or additional information regarding the Purchased Assets or the Sellers, a Qualified Bidder (other than the Purchaser) must first provide the Debtors with a written nonbinding expression of interest (the "Expression of Interest") regarding (i) the Qualified Bidder's proposed 363 Transaction, (ii) the purchase price range, (iii) the structure and financing of the 363 Transaction, (iv) any conditions to closing that it may wish to impose, and (v) the nature and extent of additional due diligence it may wish to conduct. If the Debtors, in their business judgment, determine that a Qualified Bidder that has submitted an Expression of Interest is reasonably likely to make a bona fide offer that would result in greater value being received for the benefit of the Sellers' estates than under the MPA (a "Qualifying Expression of Interest"), then the Debtors shall afford such Qualified Bidder reasonable due diligence, including the ability to access information from a confidential electronic data room concerning the Purchased Assets (the "Data Room").

Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Sellers, the Purchased Assets, and/or the 363 Transaction to any person except to the Purchaser or another Qualified Bidder who makes a Qualifying Expression of Interest. The Debtors shall give the Purchaser any confidential memoranda (the "Confidential Memoranda") containing information and financial data with respect to the Purchased Assets and access to all due diligence information provided to any other Qualified Bidder.

The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. If the Debtors determine that due diligence material requested by a Qualified Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Qualified Bidder, the Debtors shall post such materials in the Data Room and provide notification of such posting by electronic transmission to the Qualified Bidders and not previously provided to the Purchaser.

Unless the Debtors determine otherwise, the availability of additional due diligence to a Qualified Bidder will cease after the Bid Deadline (as defined below).

## Bid Deadline

**The deadline for submitting bids by a Qualified Bidder shall be June 22, 2009, at 5:00 p.m. (Eastern Time) (the "Bid Deadline")**

Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver (i) one written copy of its bid and (ii) two copies of the MPA that has been marked to show amendments and modifications to the MPA, including price and terms, that are being

proposed by the Qualified Bidder (a "<u>Marked Agreement</u>"), to (a) the Debtors, c/o General
Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn:  Lawrence S.
Buonomo, Esq.), (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue,
New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph
H. Smolinsky, Esq.); (c) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312,
Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (d) Cadwalader, Wickersham & Taft
LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281
(Attn:  John J. Rapisardi, Esq.); (e) the attorneys for the Creditors Committee; (f) the
International Union, United Automobile, Aerospace and Agricultural Implement Workers of
America (the "<u>UAW</u>"), 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:  Daniel W.
Sherrick, Esq.); (g) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One
Liberty Plaza, New York, New York 10006 (Attn:  James L. Bromely, Esq.); (h) Cohen, Weiss
and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036
(Attn:  Babette Ceccotti, Esq.); (i) Vedder Price, P.C., attorneys for Export Development Canada,
1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and
Michael L. Schein, Esq.)

## Due Diligence from Bidders

The Debtors and their advisors shall be entitled to due diligence from a Qualified
Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the
Debtors.  Each Qualified Bidder shall comply with all reasonable requests for additional
information and due diligence access by the Debtors or their advisors.  Failure of a Qualified
Bidder to fully comply with requests for additional information and due diligence access will be
a basis for the Debtors to determine that a bid made by the Qualified Bidder is not a Qualified
Bid.

## Bid Requirements

A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that
the Qualified Bidder offers to consummate a 363 Transaction pursuant to the Marked
Agreement, (ii) confirming that the offer shall remain open until the closing of a 363 Transaction
to the Successful Bidder (as defined below), (iii) enclosing a copy of the Marked Agreement, and
(iv) including a certified or bank check, or wire transfer, in the amount of $500 million to be held
in escrow as a good-faith deposit (the "<u>Good Faith Deposit</u>").

In addition to the foregoing requirements, a bid or bids must:

(a) provide that the Qualified Bidder (i) agrees to the assumption by the Debtors
and assignment to such Qualified Bidder of any collective bargaining agreements
entered into by and between the Debtors and the UAW with the exception of (a)
the agreement to provide certain retiree medical benefits specified in the
Memorandum of Understanding Post-Retirement Medical Care, dated September
26, 2007, between the Company and the UAW; and (b) the Settlement
Agreement, dated February 21, 2008, between the Company and the UAW, and
(ii) will enter into the UAW Retiree Settlement Agreement;

(b) be on terms that are not materially more burdensome or conditional than the terms of the MPA;

(c) not be conditioned on obtaining financing or the outcome of unperformed due diligence by the bidder;

(d) not request or entitle the bidder to any breakup fee, expense reimbursement, or similar type of payment; and

(e) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

A timely bid received from a Qualified Bidder and that meets the requirements set forth above (the "Bid Requirements") will be considered a Qualified Bid if the Debtors, in consultation with their advisors, the UAW, and the Creditors Committee, reasonably believe that such bid would be consummated if selected as the Successful Bid (as defined below).  For all purposes hereof, the Purchaser's offer to acquire the Purchased Assets pursuant to the MPA shall constitute a Qualified Bid.

## Acceptance of Qualified Bids

The Debtors shall present to the Bankruptcy Court at the Sale Hearing the Qualified Bid that the Debtors, in their business judgment, determine, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the highest or best offer for the Purchased Assets and is in the best interests of the Debtors and their estates in the Debtors' chapter 11 cases (the "Successful Bid," and the bidder with respect thereto, the "Successful Bidder").  At the Sale Hearing, certain findings will be sought from the Bankruptcy Court, including that (i) the Successful Bidder was selected in accordance with these Bidding Procedures, and (ii) consummation of the 363 Transaction as contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Sellers and their estates in these chapter 11 cases.

In the event that, for any reason, the Successful Bidder fails to close the 363 Transaction contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the bid that the Debtors in their business judgment determined, in consultation with their advisors, the UAW, and the Creditors Committee, would provide the next highest or otherwise best value for the Purchased Assets and is otherwise in the best interests of the Debtors after the Successful Bid (the "Next Highest Bidder").

## Return of Good Faith Deposit

Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Bidding Procedures shall be returned upon or within one (1) business day after entry of the Sale Order.  The Good Faith Deposit of the Successful Bidder required to submit such a deposit under the Bidding Procedures shall be held until the closing of

the 363 Transaction and applied in accordance with the Successful Bid.  The Good Faith Deposit of the Next Highest Bidder shall be retained in escrow until 48 hours after the closing of the 363 Transaction.  Pending the closing of the 363 Transaction, the Good Faith Deposit of the Successful Bidder and the Next Highest Bidder shall be maintained in an interest-bearing escrow account.  If the closing does not occur, the disposition of Good Faith Deposits shall be as provided in the Successful Bid and Next Highest Bid, as applicable.

## <u>EXHIBIT B</u>

**FORM OF SALE NOTICE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
In re                                         :        **Chapter 11 Case No.**
                                              :
**GENERAL MOTORS CORP.,** *et al.***,**       :        **09-50026 (REG)**
                                              :
                        **Debtors.**          :        **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

### NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER

PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2, 2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption, assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and unexpired leases of personal property and nonresidential real property (the "Assumable Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of objections, if any, to the relief requested in the Motion.

A.      THE MASTER SALE AND PURCHASE AGREEMENT

The total consideration under the MPA for the sale of the Purchased Assets is equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3 billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A."  In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

B.    THE SALE HEARING

The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York  10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time).  The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

**RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn:  Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn:  David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline"**).

The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

C.    COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order.  Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

Dated:  New York, New York
         June 2, 2009

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT C

**FORM OF PUBLICATION NOTICE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
             :

In re                     :         **Chapter 11 Case No.**
             :

**GENERAL MOTORS CORP.,** *et al.*,    :         **09-50026 (REG)**
             :

           **Debtors.**     :         **(Jointly Administered)**
             :
---------------------------------------------------------------x

**NOTICE OF SALE HEARING TO SELL SUBSTANTIALLY ALL**
**OF DEBTORS' ASSETS PURSUANT TO MASTER SALE AND PURCHASE**
**AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC,**
**A U.S. TREASURY-SPONSORED PURCHASER**

        PLEASE TAKE NOTICE THAT upon the motion (the "Motion"), of General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), dated June 1, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has issued an order dated June 2, 2009 (the "Sale Procedures Order"), among other things, (i) scheduling a hearing (the "Sale Hearing") to approve (a) the Master Sale and Purchase Agreement, dated as of June 1, 2009 (the "MPA"), by and among GM and its Debtor subsidiaries (collectively, the "Sellers") and Vehicle Acquisition Holdings LLC. (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), with respect to the sale of substantially all the Debtors' assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances, and other interests, and subject to higher or better offers (the "363 Transaction"); (b) the assumption, assignment, and sale to the Purchaser pursuant to the MPA of certain executory contracts and unexpired leases of personal property and nonresidential real property (the "Assumable Executory Contracts"); and (c) the settlement agreement (the "UAW Retiree Settlement Agreement"), between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); (ii) approving certain procedures for the submission and acceptance of any competing bids (the "Sale Procedures"); (iii) approving a procedure for the assumption, assignment, and sale to the Purchaser pursuant to the MPA of the Assumable Executory Contracts; (iv) approving the form and manner of notice of the Motion and the relief requested therein and of the Sale Hearing; and (v) setting a deadline for the filing of objections, if any, to the relief requested in the Motion.

A.       THE MASTER SALE AND PURCHASE AGREEMENT

        The total consideration under the MPA for the sale of the Purchased Assets is equal to the sum of (i) a credit bid in the amount of the outstanding indebtedness owed to the Purchaser as of the closing pursuant to certain secured loans extended by the U.S. Treasury and Export Development Canada, less approximately $8 billion (estimated to be approximately $48.3 billion at July 31, 2009); (ii) the surrender of a warrant to purchase GM shares previously issued to the U.S. Treasury in connection with the secured loans extended by the U.S. Treasury; (iii) the

issuance to GM of shares of common stock of the Purchaser representing approximately 10% of the common stock of the Purchaser as of the closing of the sale; (iv) the issuance to GM of warrants to purchase up to 15% of the shares of common stock of the Purchaser on a fully diluted basis, with one half exercisable at any time prior to the seventh anniversary of issuance at an initial exercise price based on a $15 billion equity value of the Purchaser and the other half exercisable at any time prior to the tenth anniversary of issuance at an initial exercise price based on a $30 billion equity value of the Purchaser (GM can elect partial and cashless exercises of the warrants); and (v) the assumption by the Purchaser of certain assumed liabilities, all as set forth more fully in the MPA, a copy of which is annexed to the Motion as Exhibit "A." In addition, if the aggregate amount of allowed general unsecured claims against the Debtors exceeds $35 billion, as estimated by an order of the Bankruptcy Court (which the Debtors may seek at any time), GM will receive an additional 2% of the common stock of the Purchaser as of the closing of the sale.

B.    THE SALE HEARING

The Sale Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on June 30, 2009, at 9:45 a.m. (Eastern Time). The Sale Hearing may be adjourned without notice by an announcement of the adjourned date at the Sale Hearing.

**RESPONSES OR OBJECTIONS, IF ANY, TO THE RELIEF SOUGHT IN THE MOTION SHALL BE FILED** with the Clerk of the Bankruptcy Court and served upon: (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (g) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004; and (h) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.), **SO AS TO BE RECEIVED NO LATER THAN JUNE 19, 2009, AT 5:00 P.M. (EASTERN TIME) (the "Objection Deadline").**

The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, the approval of the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

C.    COPIES OF THE MOTION AND SALE PROCEDURES ORDER

This Notice provides only a partial summary of the relief sought in the Motion and the terms of the Sale Procedures Order.  Copies of the Motion, the MPA (excluding certain commercially sensitive information), and Sale Procedures Order are available for inspection (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

BY ORDER OF THE COURT

Dated:  New York, New York  
       June 2, 2009

WEIL, GOTSHAL & MANGES LLP  
767 Fifth Avenue  
New York, New York 10153  
Telephone: (212) 310-8000  
Facsimile: (212) 310-8007  

Attorneys for Debtors  
and Debtors in Possession

## EXHIBIT D

**FORM OF ASSUMPTION AND ASSIGNMENT NOTICE**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
:
In re                                 :        Chapter 11 Case No.
:
**GENERAL MOTORS CORP.,** *et al.*,     :        09-50026 (REG)
:
Debtors.   :        (Jointly Administered)
:
-------------------------------------------------------------x

### NOTICE OF (I) DEBTORS' INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS, UNEXPIRED LEASES OF PERSONAL PROPERTY, AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) CURE AMOUNTS RELATED THERETO

PLEASE TAKE NOTICE THAT:

      1.      By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a final hearing for approval of the 363 Transaction (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.       The MPA, which, together with certain ancillary agreements, contemplates a set of related transactions for the sale of substantially all the Debtors' assets, defined as the "Purchased Assets" in Section 2.2(a) of the MPA, including certain Contracts and Leases, subject to higher or better offers.

3.       The MPA contemplates, and the proposed order approving the Motion (the "Sale Order"), if approved, shall authorize the assumption and assignment to the Purchaser of certain Contracts and Leases pursuant to section 365 of title 11, United States Code (the "Bankruptcy Code").  The Sellers maintain a schedule containing Contracts and Leases that the Debtors may assume and assign to the Purchaser (collectively, the "Assumable Executory Contracts"). You are receiving this Notice because you are a party to one or more of the Assumable Executory Contracts.

4.       **THE SCHEDULE CONTAINS A LIST OF ASSUMABLE EXECUTORY CONTRACTS THAT MAY BE ASSUMED.  THE PURCHASER RESERVES THE RIGHT UNDER THE MPA TO EXCLUDE ANY ASSUMABLE EXECUTORY CONTRACT FROM THE LIST OF ASSUMABLE EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED BY NO LATER THAN THE DESIGNATION DEADLINE DISCUSSED IN PARAGRAPH 10 BELOW.**

5.       The Debtors maintain a secure website which contains information about your Assumable Executory Contracts, including amounts that the Debtors believe must be paid to cure all prepetition defaults under the respective contracts as of the Commencement Date in accordance with section 365(b) of the Bankruptcy Code (the "Cure Amounts").  In order to view the Cure Amount for the Assumable Executory Contract to which you are a party, you must log onto http://www.contractnotices.com (the "Contract Website").  To log on, please use the user name and password provided to you with this notice.  The username and password will enable you to access the Cure Amount for the particular Assumable Executory Contract to which you are a party.

6.       Please review the Cure Amount for your Assumable Executory Contract. In some instances, additional terms or conditions of assumption and assignment with respect to a particular Assumable Executory Contract is provided on the Contract Website.

7.       Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "Contract Objections"), including objections to the Cure Amount, must be made in writing and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") so as to be received **no later than ten (10) days after the date of this Notice** (the "Objection Deadline") by (i) the Debtors, c/o General Motors Corporation, Cadillac Building, 30009 Van Dyke Avenue, Warren, Michigan 48090-9025 (Attn:  Warren Command Center, Mailcode 480-206-114); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael

J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

8.      If a timely Contract Objection is filed solely as to the Cure Amount (a "Cure Objection"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date (as hereinafter defined), the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable following resolution of such disputed Cure Amount: To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor Counterparty") may meet and confer in good faith to attempt to resolve any such objection without Court intervention. The Call Center (as defined in paragraph 19) has been established by the Debtors for this purpose. If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows: (a) with respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

9.      If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court. If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

10.      If the Debtors, the Purchaser, and the Non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

11.      If you agree with the respective Cure Amount(s) listed in the Contract Website with respect to your Assumable Executory Contract(s), and otherwise do not object to the Debtors' assumption and assignment of your Assumable Executory Contract, you are not required to take any further action.

12.      Unless an Objection is filed and served before the Objection Deadline, you shall be deemed to have consented to the assumption and assignment of your Assumable Executory Contract and the Cure Amount(s) for your Assumable Executory Contract(s), and you shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, or the Purchaser.

13.      Up to the date that is thirty (30) days following the closing of the 363 Transaction, or if such date is not a Business Day (as defined in the MPA), the next Business

Day, or such other later date as mutually agreed upon by the Purchaser and the Debtors (the "Designation Deadline"), the Purchaser may, in its sole discretion, subject to certain limitations specified in the MPA (applicable only as between the parties thereto), exclude any of the Assumable Executory Contracts by providing notice on the Contract Website. Upon such designation, the Contract or Lease referenced therein shall no longer be considered a Assumable Executory Contract, shall not be deemed to be, or to have been, assumed or assigned, and shall remain subject to assumption, rejection, or assignment by the Debtors. Until the Designation Deadline, the Purchaser also may, subject to certain limitations specified in the MPA (applicable only as between the parties thereto) designate additional Contracts or Leases as Assumable Executory Contracts to be assumed and assigned by providing notice to the affected Non-Debtor Counterparties. The Contract Website shall be updated from time to time to reflect the then current status of your contract as well as the proposed effective date (the "Proposed Assumption Effective Date"), if any, of the assumption and assignment of particular contracts.
'

14.    The Debtors' decision to assume and assign the Assumable Executory Contracts is subject to Bankruptcy Court approval and consummation of the 363 Transaction, and, absent such consummation, each of the Assumable Executory Contracts will not be assumed or assigned to the Purchaser and shall in all respects be subject to further administration under the Bankruptcy Code. All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the date following expiration of the Objection Deadline if no Contract Objection, other than to the Cure Amount, has been timely filed, or, if a Contract Objection, other than to the Cure Amount, has been filed the date of the Assumption Resolution Stipulation or the date of a Bankruptcy Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract. Until the Assumption Effective Date, assumption and assignment thereof is subject to the Purchaser's rights to modify the designation of Assumable Executory Contracts as set forth in paragraph 13 above. Except as otherwise provided by the MPA, the Purchaser shall have no rights in and to a particular Assumable Executory Contract the Assumption Effective Date.

15.    The inclusion of any document on the list of Assumable Executory Contracts shall not constitute or deemed to be a determination or admission by the Debtors or the Purchaser that such document is, in fact, an executory contract or Lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.

16.    Any Contract Objection shall not constitute an objection to the relief generally requested in the Motion (e.g., the sale of the Purchased Assets by the Debtors to the Purchaser free and clear of liens, claims, encumbrances, and interests), and parties wishing to object to the relief generally requested in the Motion must file and serve a separate objection in accordance with the procedures approved and set forth in the order of the Bankruptcy Court approving the Sale Procedures.

17.    If a party other than the Purchaser is determined to be the highest and best bidder for the assets to be sold pursuant to the 363 Transaction, you will receive a separate notice providing additional information regarding the treatment of your contract(s) or Lease(s); *provided, however*, that if the applicable Cure Amount has been established pursuant to the procedures set forth in this Notice, it shall not be subject to further dispute if the new purchaser seeks to acquire such contract or Lease.

18.     This Notice is subject to the full terms and conditions of the Motion, the order of the Bankruptcy Court approving the Sale Procedures, and the Assumption and Assignment Procedures set forth in the order approving the Sale Procedures, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

19.  If you have questions about the Assumable Executory Contracts or proposed Cure Amounts, you may call 1-888-409-2329 (in the United States) or 1-586-947-3000 (outside the United States) (the "Call Center").

Dated: New York, New York
            June 2, 2009


_____

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT E

## FORM OF UAW RETIREE NOTICE

**A Message to UAW GM Retirees**

Dear Brothers and Sisters,

As we all know, GM is engulfed in a severe crisis.  GM's staggering losses during 2008 and 2009 have forced the company to file for bankruptcy.  The Company has also been forced to rely on loans from the federal government in order to maintain its operations.  In this environment, we are fighting every day to preserve and protect to the greatest extent possible our hard-won gains, particularly for the retirees, and surviving spouses of retirees, who helped build this industry with your years of loyal service.

Last December, after a lengthy process that included congressional hearings and petitioning the White House, the federal government granted GM a short-term emergency operating loan in order to avoid an immediate liquidation of the company at that time.  As part of that loan, GM was required to submit a restructuring plan to the Treasury Department by February 17, 2009. On March 30, President Obama announced that the company's February 17 plan didn't go far enough in reducing costs and laying the groundwork for sustainability.  He said GM would have to identify additional cost savings and debt reductions if GM were to receive additional financial support.  The Treasury Department's auto task force also required deeper concessions from UAW members, retirees and other company stakeholders.

On May 28, GM announced that the Treasury Department would provide additional financial support in connection with a court-supervised restructuring of GM, in accordance with the terms of a broad restructuring agreement worked out between Treasury, GM, the UAW and representatives of GM's bondholders.

The agreement under which the Treasury Department will extend this new financial support includes a new schedule of contributions to the trust fund that will provide retiree medical benefits beginning in 2010.  It also includes modifications to the collective bargaining agreement for active employees.  The UAW active workforce ratified that agreement May 29.  Based on these agreements, the United States government will provide a total of over $50 billion in financial support to allow GM to complete its restructuring.

GM's recent bankruptcy filing is part of the agreement reached with the Treasury Department. The goal of the bankruptcy filing is to allow for swift court approval of the restructuring so that the company can move forward to implement the agreements between the parties.

## Proposed Sale

To complete the restructuring, a new company will be formed which will purchase the operating assets of GM.  If approved by the Bankruptcy Court, the new company will enter into the agreements with the UAW covering both active and retired workers.  The initial ownership of the new corporation will be allocated as follows:

> ➢ 72.5% --   United States and Canadian Governments

> ➢ 17.5% --   UAW Retiree Benefits Trust Fund

> 10%  --  Bondholders

As part of the approval of the proposed sale, the Bankruptcy Court will also be asked to approve the new UAW Retiree Settlement Agreement, summarized below.  As described more fully in Paragraph 6 of the attached document, if the court approves both the sale and the UAW Retiree Settlement Agreement, responsibility for providing retiree benefits for the duration of 2009, and for making the contributions to the VEBA, will shift to the new company (which will then own GM's operating assets).

Attached to this letter is a formal notice from the Bankruptcy Court regarding the proposed sale. As described in that notice, the Bankruptcy Court will soon hold a hearing to consider the proposed sale and the UAW Retiree Settlement Agreement.

**Pension Plan Continues Without Change**

The restructuring agreements provide that the new company will take over responsibility for the GM UAW pension plan.  That plan will continue operations and pension benefits will be continued at their current level.

**Retiree Medical Benefits**

Retiree medical benefits were one of the most significant issues addressed in 2007 bargaining. The 2007 National UAW-GM Agreement established a new Trust Fund (called a "Voluntary Employees' Beneficiary Association" or "VEBA"), which is responsible for retiree medical benefits starting on January 1, 2010.  The 2007 Agreement established a series of cash contributions by the Company to the VEBA, beginning on January 1, 2010.

In order for GM to receive the necessary government support -- which will allow the company to complete its restructuring and continue operations into the future -- we were required to support a series of changes to the retiree medical and VEBA agreements.

In this difficult situation, we were able to preserve the core medical benefits for retirees.  These were hard fought issues and the changes described below are certainly painful.  But if we had not agreed to support these changes, the U.S. Treasury would not have provided the additional support to GM.  Without this critical government support, GM's near term future would be in serious peril and GM would face almost certain liquidation.

The following summarizes the principal features of the proposed agreement.

**Existing Internal VEBA Assets Transferred in January 2010.**  Along with the new payment structure described below, in January 2010 the VEBA will receive the assets of an internal trust fund maintained at GM (called the "Internal VEBA").  The value of the assets in that fund is currently approximately $10 billion.  GM had sought to use these assets to cover the cost of benefits prior to the January 1, 2010 implementation, which would have depleted these assets and diminished the cash balance in the new VEBA.  We successfully resisted these efforts and

the new VEBA will therefore receive the full value of these Internal VEBA assets on January 1, 2010 as outlined in the 2007 agreement.

The assets in the Internal VEBA have been invested by GM on the VEBA's behalf since January 1, 2008.  The value of these assets has been negatively impacted by conditions in the investment market during 2008 and so far in 2009.  These assets will continue to be invested during the balance of 2009 and will be transferred to the new VEBA on January 1, 2010.

**New $2.5 Billion Note.**  Under the new funding structure, the VEBA will receive a new Note, payable in cash, with a principal amount of $2.5 billion.   Cash payments under the new Note (including accrued interest) will be $1.384 billion payable in each of 2013, 2015 and 2017.

**New $6.5 Billion in Preferred Stock.**  The VEBA will also receive Preferred Stock in the new company with a face value of $6.5 billion.  This Preferred Stock includes a 9% cash dividend payment structure, under which $585 million is payable annually for as long as the VEBA holds this stock.  This dividend payment must be made before the new company can pay any dividends to the holders of its common stock.  If the company delays payment of the dividends on the Preferred Stock, it will not be allowed to pay dividends to its common shareholders until it becomes current on the VEBA's Preferred Stock dividend obligations.  While this preference over the common shareholders makes it likely the new company will consistently pay the preferred dividend, there is a risk that market conditions or other factors beyond the control of the UAW may result in the company delaying these preferred dividends for some period of time.

**VEBA to own Significant GM Common Stock.**  Another requirement of the Treasury Department loans was that a portion of the value received by the VEBA be in the form of common stock.  To meet that requirement, the VEBA will receive an initial allocation of 17.5% of the stock in the new company.  The United States and Canadian Governments will receive 72.5% of the initial stock, and bondholders will receive 10%.

The VEBA will also have the right to designate a member of GM's Board of Directors, with UAW consent.  The VEBA will be required to vote its GM shares in the same proportion as the votes of other shareholders.

The overall restructuring of GM will eliminate a tremendous portion of GM's other debt obligations.  With a greatly improved balance sheet, as well as significant restructuring of business operations, there is a realistic prospect that the stock in the new company will represent significant value in the future.  If and when that occurs, a significant portion of that value will be captured by the VEBA through this stock ownership.

**Warrants.**  In addition to the direct ownership of the Preferred and Common Stock described above, the new VEBA will also receive a Warrant, which represents the right to an additional 2.5% of the Common Stock of the new company, with a strike price determined by an aggregate $75 billion equity value for the new company.  This will allow the VEBA to realize additional value if the total value of the stock of the new company exceeds that value at any point prior to expiration of the new Warrant.

The new VEBA agreement includes mechanisms for the VEBA to sell the Common and Preferred Stock, as well as the new Warrants, to other parties under certain conditions.

**Pension Pass Through Eliminated.**  One funding mechanism under the 2007 Agreement was called the "Pension Pass Through."  Under that arrangement, the new VEBA was scheduled to impose an additional monthly contribution requirement, and the GM pension benefits were to increase by a corresponding amount.  This mechanism has been eliminated and its value is instead reflected in the new Note and other instruments described above.

**Mitigation VEBA Assets Transferred.**  Under the existing agreements, an independent VEBA is  currently providing dental benefits and certain "mitigation" payments (i.e. covering a significant portion of the co-pays, deductibles and contributions that retirees would otherwise be required to pay under the 2005 agreement).  Under the 2007 Agreement and the proposed new agreement, the assets in this existing independent VEBA (called the "Mitigation VEBA") will be transferred into the new VEBA on January 1, 2010.  It is expected that the assets in the Mitigation VEBA will be approximately $700 million on January 1, 2010 but the actual balance will depend on investment performance and other factors during the balance of 2009.  As explained below, the dental benefits currently provided by the Mitigation VEBA will be eliminated in accordance with the proposed new agreement.

**VEBA Committee can adjust benefits beginning in 2010.**  As under the 2007 Agreement, the VEBA will be governed by an 11-member Committee, including 5 members appointed by the UAW and 6 Independent Members.  Under the 2007 Agreement, that Committee had the authority, starting on January 1, 2012, to adjust benefits so that benefit levels can be kept consistent with the assets in the Trust.  Under the proposed agreement, the Committee will be allowed to make necessary benefit adjustments beginning when the VEBA assumes responsibility on January 1, 2010.

## Immediate Changes in Benefit Levels Required

Under the 2007 Agreement, GM remained responsible for providing retiree medical benefits through the end of 2009, with the new VEBA taking over responsibility on January 1, 2010.  In the discussions over the last several weeks, the company sought an "early implementation" of this transition.  Had we agreed to that approach, the assets of the VEBA would have been depleted to pay benefits for the remainder of 2009.

We succeeded in avoiding this depletion of the VEBA's assets during 2009.  The new company will therefore continue to provide retiree medical benefits for the balance of 2009 until the new VEBA takes over responsibility.  In exchange, however, the Treasury Department insisted that the benefits be immediately reduced to reflect GM's difficult financial situation.  In order to maintain the support of the Government, therefore, we were required to agree to the following changes in benefits.  These changes will be effective on July 1, 2009 (or later if court approval is delayed beyond that date).

| Prescription Drug Co-Pays | Retail (34 day supply)<br>• $10 Generic<br>• $25 Brand<br><br>Mail Order (90 day supply) |
|---|---|

|  | • $20 Generic<br>• $50 Brand |
|---|---|
| Catastrophic Plan for retirees and surviving spouses who fail to pay required monthly contributions | No longer offered.   Retirees and surviving spouses currently in Catastrophic Plan will be given opportunity to join regular plan. |
| Coverage for Erectile Dysfunction (ED) medications (e.g. Viagra, Cialis, Levitra) | No longer offered, except in prior authorized cases of Pulmonary Arterial Hypertension |
| Coverage for the Proton Pump Inhibitor drug class (e.g. omeprazole, Prilosec, Zegerid, Nexium, Achiphex, Prevacid, Protonix) | No longer offered, except in prior authorized cases of Barrett's Esophagitis and Zoellinger-Ellison Syndrome |
| Vision Program | No longer offered |
| Dental Program | No longer offered |
| Emergency Room Co-Pay | $100 (waived if admitted) |
| Medicare Part B Special Benefit ($76.20 per month for retirees enrolled in Medicare) | No longer offered by health plan.<br><br>This modification is not applicable to approximately 24,800 retirees and surviving spouses who retired or began receiving surviving spouse benefits before October 1979, and whose benefit is provided through the pension trust.  The payments will continue for these pre-1979 retirees and surviving spouses. |
| "Low Income Retirees" (less than $8,000 annual pension and monthly basic benefit rate of less than $33.33) | Monthly contribution requirement of $11 (flat rate regardless of family status)<br><br>In all other respects, these retirees and surviving spouses will be included in same plan as other retirees and surviving spouses. |
| Monthly Contribution Requirements (General Retirees) | No Change (currently $11/single and $23/ family) |
| Deductible and Co-Pay Requirements (General Retirees) | No Change (currently $164 annual deductible and $273 annual (single) out-of-pocket maximum) |
| Sponsored Dependents and Principally Supported Children | Consistent with changes made to the active medical program, the retiree medical program will not allow the designation of new "sponsored dependents" or "principally supported children."  The provisions allowing new dependents to be added as a result of adoption or legal guardianship will continue in effect. |

## The Future Outlook

In the early years of the VEBA's existence, it is unlikely that the VEBA will be able to sell the stock in the new company.  The new VEBA will therefore be required to use the $10 billion in immediate contributions from the Internal VEBA at GM, along with the assets of the Mitigation VEBA and the $585 million annual cash dividend payment on the Preferred Stock, to provide retiree medical benefits during 2010 and 2011.  Because of the uncertainty regarding the long-term value of the stock, the Committee will likely be required to make further adjustments in the benefit levels for 2010 and 2011.  The extent of those future adjustments will depend on many factors, including investment returns in the Internal and Mitigation VEBA's during the remaining months of 2009, and whether the dividends on the new $6.5 billion in Preferred Stock are delayed.

If the stock can be sold in 2012 or thereafter for significant value, the Committee will be able to take that new value into account and restore some or all of the benefits that are being reduced under these arrangements.  In other words, if the current restructuring efforts are successful and the company returns to viability, the UAW retirees stand to reap the benefit of that recovery through the VEBA's significant stock ownership.

We urge your support for these proposed agreements.  In these difficult circumstances, we believe they provide the best possible protection for your retiree benefits.

In solidarity,

Ron Gettelfinger                    Cal Rapson, *Vice President*                    Bill Payne
*UAW  President*                    *and Director, UAW GM Department*                    *Counsel to the Class*

---

### Important Notes

For further information about the proposed agreement and the process for court review of the proposed agreements and the proposed sale, please refer to the enclosed legal notice.  Full and complete copies of the proposed retiree health agreement can be found on the website referred to in that notice.

**If you support the proposed agreement, you do not need to take any action at this time.  Information about the modified medical plan will be sent to you following court approval.  If you wish to object to the proposed agreements, you must file a written objection as described in the enclosed legal notice.**

Counsel to the Class Representatives participated in negotiation of the 2007 retiree medical agreements which were approved by the District Court for the Eastern District of Michigan on July 31, 2008.  Although the Class Representatives are not formal parties to the new agreements described above, Counsel to the Class Representatives has reviewed the proposed agreements and is in full support of the efforts to obtain Bankruptcy Court approval of the new agreements.  Counsel for the Class has entered an appearance in the Bankruptcy case and will be supporting approval of the proposed agreements.

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :
In re                                       :          Chapter 11 Case No.
                                            :
GENERAL MOTORS CORP., *et al.*,             :          09-50026 (REG)
                                            :
                          Debtors.          :          (Jointly Administered)
                                            :
------------------------------------------------------------x

### NOTICE TO DEBTORS' RETIREES REPRESENTED BY THE INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA OF SALE OF DEBTORS' ASSETS AND APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

PLEASE TAKE NOTICE THAT:

1.      By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"),[1] have sought, among other things, authorization and approval of (a) the sale of substantially all the Debtors' assets pursuant to that certain Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") (the "363 Transaction"), free and clear of liens, claims, encumbrances, and other interests, (b) certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets (the "Sale Procedures"), (c) the assumption and assignment of certain executory contracts and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") in connection with the 363 Transaction, (d) that certain settlement agreement between the Purchaser and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") consented to by representatives of members of the "Class" of the Debtors' retirees and surviving spouses represented by the UAW such representatives, the "Class Representatives") to be executed at the closing of the 363 Transaction (the "UAW Retiree Settlement Agreement"), and (e) scheduling a hearing for approval of the 363 Transaction and the UAW Retiree Settlement Agreement (the "Sale Hearing").[2]

---

[1] The Debtors and their respective Tax ID numbers are as follows:  General Motors Corporation, Tax ID No. 38-0572515; Saturn, LLC, Tax ID No. 38-2577506; Saturn Distribution Corporation, Tax ID No. 38-2755764; and Chevrolet-Saturn of Harlem, Inc., Tax ID No. 20-1426707.

[2] Copies of the Motion and the MPA (without certain commercially sensitive attachments) may be obtained by accessing the website established by the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

2.      The Sale Hearing is scheduled to be conducted on June 30, 2009 at 9:45 a.m. (Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, Room 621, New York, New York 10004 (the "Bankruptcy Court"), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, to consider the approval of the MPA or any higher or better offer by a Successful Bidder (as defined in the Sale Procedures) and approval of the UAW Retiree Settlement Agreement. If the Purchaser is the Successful Bidder, the Debtors anticipate seeking entry of an order approving the 363 Transaction substantially in the form of the order attached to the Motion as Exhibit "B" (the "Sale Order"). The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

3.      Coverage of Retiree Medical Benefits (as defined in the UAW Retiree Settlement Agreement) will continue to be provided to UAW-Represented Retirees (as defined in the Sale Procedures Order) and their eligible dependents without interruption by either GM or the Purchaser up until December 31, 2009, in accordance with the terms of agreements negotiated and agreed to by the UAW, which include certain benefit reductions to take effect on July 1, 2009 (or, if later, Bankruptcy Court approval, if needed).

4.      Contingent upon the Bankruptcy Court's approval of the 363 Transaction, and concurrently with the sale of the Debtors' assets pursuant to the 363 Transaction, the Debtors will assume and assign to the Purchaser any collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment"), with the exception of (a) the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW ("MOU"); and (b) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (the "2008 Settlement Agreement"), which was approved by the United States District Court for the Eastern District of Michigan in the class action styled *Int'l Union, UAW, et al. v. General Motors Corporation*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) (final order entered July 31, 2008).

5.      The Purchaser has agreed, among other things, to enter into the proposed UAW Retiree Settlement Agreement, pursuant to which the Purchaser will make contributions to a voluntary employee beneficiary association trust (the "New VEBA") in respect of non-pension retiree benefits to the UAW-Represented Retirees on terms that differ from the terms of the MOU and the 2008 Settlement Agreement. Among other things, the UAW Retiree Settlement Agreement provides for the funding of the New VEBA with a combination of (i) shares of the Purchaser's common stock representing 17.5% of the aggregate common equity interest in the Purchaser; (ii) a promissory note of the Purchaser in the principal amount of $2.5 billion, payable in three equal cash installments on July 15 of 2013, 2015, and 2017; (iii) shares of the Purchaser's cumulative perpetual preferred stock in the amount of $6.5 billion, with a 9% dividend per annum, payable quarterly in cash; (iv) warrants to acquire newly issued shares of the Purchaser representing 2.5% of the Purchaser's common equity outstanding at December 31, 2009, issuable at any time prior to December 31, 2015; and (v) the assets held in the existing voluntary employee beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser, which at March 31, 2009 had a value of approximately $9.4 billion.

6.      In addition, GM, the UAW, and the Class Representatives have entered into an agreement, dated May 29, 2009 (the "UAW Claims Agreement"), pursuant to which the UAW and Class Representatives agreed, subject to the consummation of the 363 Transaction and the UAW Retiree Settlement Agreement becoming effective following approval of the Bankruptcy Court, to take further actions to release claims against GM and its subsidiaries, and their employees, officers, directors, and agents, relating to retiree medical benefits pursuant to the MOU, Settlement Agreement, and UAW collective bargaining agreements, *provided* that such claims may be reinstated if the rights or benefits of the UAW-Represented Retirees under the UAW Retiree Settlement Agreement are adversely impacted by reason of any reversal or modification of the Bankruptcy Court's approval of the 363 Transaction or UAW Retiree Settlement Agreement.

7.      The UAW is the authorized representative of the UAW-Represented Retirees for purposes of approval of the UAW Retiree Settlement Agreement pursuant to section 1114 of the United States Bankruptcy Code.  At the Sale Hearing, the Debtors will request approval by the Bankruptcy Court of the UAW Retiree Settlement Agreement as an agreement with the UAW, as the authorized representative of the UAW-Represented Retirees.

8.      A copy of the MPA (without certain commercially sensitive attachments) and the Motion (including the proposed Sale Order), the Sale Procedures Order as entered by the Bankruptcy Court (with the Sale Procedures attached), the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto, may be obtained (i) by accessing (a) the website of the Bankruptcy Court at http://www.nysb.uscourts.gov, or (b) the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com/ or (ii) by visiting the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  Copies also may be obtained by faxing a written request to the attorneys for the Debtors, Weil, Gotshal & Manges LLP (Attn:  Russell Brooks, Esq.) at 212-310-8007.

9.      **Responses or objections, if any, to the relief sought in the Motion, including the approval of the UAW Retiree Settlement Agreement, must be made in writing and filed with the Clerk of the Bankruptcy Court (at the address shown in paragraph 2 above), and served upon (a) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (b) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (c) the attorneys for the Creditors Committee; (d) Cleary Gottlieb Steen & Hamilton LLP, the attorneys for the UAW, One Liberty Plaza, New York, New York 10006 (Attn:  James L. Bromley, Esq.); (e) Cohen, Weiss and Simon LLP, the attorneys for the UAW, 330 W. 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.); (f) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (g) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004., so as to be received no later than June 19, 2009, at 5:00 p.m. (Eastern Time) (the "Objection Deadline").**

10.     The failure of any person or entity to file a response or objection on or before the Objection Deadline shall be deemed a consent to the 363 Transaction and the other relief requested in the Motion, including approval of the UAW Retiree Settlement Agreement, and shall bar the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Procedures, the Motion, the 363 Transaction, and the UAW Retiree Settlement Agreement, and the Debtors' consummation of the 363 Transaction.

11.     This Notice is subject to the full terms and conditions of the Motion, the Sale Procedures Order, the MPA, and the UAW Retiree Settlement Agreement, which shall control in the event of any conflict.  The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

12.     If you have questions about the 363 Transaction or the UAW Retiree Settlement Agreement, you may call 1-800-489-4646 (the "Call Center").

Dated:  New York, New York
        June 2, 2009

 

 

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit I**

Form of Sale Approval Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                 :

In re                            :          **Chapter 11 Case No.**
                                 :

**GENERAL MOTORS CORP.,** *et al.*,   :       **09-_____ (___)**
                                 :

              **Debtors.**     :       **(Jointly Administered)**
                                 :
-------------------------------------------------------------x

**ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT**
**TO MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
**WITH THE SALE; AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated June 1, 2009 (the "Motion"), of General Motors

Corporation ("GM") and certain of its subsidiaries, as debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 363, and 365

of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for, among other things, entry

of an order authorizing and approving (A) that certain Master Sale and Purchase Agreement,

dated as of June 1, 2009, by and among GM and its Debtor subsidiaries (collectively, the

"Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by

the United States Department of the Treasury (the "U.S. Treasury"), together with all related

documents and agreements as well as all exhibits, schedules, and addenda thereto (the "MPA"), a

copy of which is annexed hereto as Exhibit "A"; (B) the sale of the Purchased Assets[1] to the

Purchaser free and clear of liens, claims, encumbrances, and interests, including rights or claims

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the
Motion or the MPA.

based on any successor or transferee liability; (C) the assumption and assignment of the

Assumable Executory Contracts; (D) the establishment of certain Cure Amounts; and (E) the

UAW Retiree Settlement Agreement; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York of Any and

All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §

157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided in accordance with this Court's Order,

dated June __, 2009 (the "Sale Procedures Order"), and it appearing that no other or further

notice need be provided; and a hearing having been held on June 30, 2009, to consider the relief

requested in the Motion (the "Sale Hearing"); and upon the Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 (the "Henderson Affidavit"), the record of the

Hearing, and all of the proceedings had before the Court; and the Court having reviewed the

Motion and any objections thereto (the "Objections") and found and determined that the relief

sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and

their estates, as contemplated by Bankruptcy Rule 6003 and is in the best interests of the

Debtors, their estates and creditors, and other parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to

this proceeding pursuant to Fed. R. Bankr. P. 9014.

B.      To the extent any of the following findings of fact constitute conclusions

of law, they are adopted as such.  To the extent any of the following conclusions of law

constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion, the MPA, and the 363

Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is

proper under 28 U.S.C. §§ 1408 and 1409.

D.      The statutory predicates for the relief sought in the Motion are sections

105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004,

and 6006.

E.      As evidenced by the affidavits and certificates of service and Publication

Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11

cases and the wasting nature of the Purchased Assets and based on the representations of counsel

at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient

notice of the Motion, the Sale Procedures, the 363 Transaction, the Assumption and Assignment

Procedures, the UAW Retiree Settlement Agreement, and the Sale Hearing have been provided

in accordance with Bankruptcy Rules 2002(a), 6004(a), and 6006(c) and in compliance with the

Sale Procedures Order; (ii) such notice was good and sufficient, reasonable, and appropriate

under the particular circumstances in these chapter 11 cases, and reasonably calculated to reach

and apprise all holders of liens, claims, encumbrances, and other interests, including rights or

claims based on any successor or transferee liability, about the Sale Procedures, the sale of the

Purchased Assets, the 363 Transaction, and the assumption and assignment of the Assumable

Executory Contracts, and to reach all UAW-Represented Retirees about the UAW Retiree

Settlement Agreement and the assumption by GM of that certain Letter Agreement, dated May

29, 2009, between GM, the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") and Stember, Feinstein, Doyle & Payne, LLC (the

"UAW Claims Agreement") relating thereto; and (iii) no other or further notice of the Motion,

the 363 Transaction, the Sale Procedures, the Assumption and Assignment Procedures, the UAW

Retiree Settlement Agreement, the UAW Claims Agreement, and the Sale Hearing or any

matters in connection therewith is or shall be required.  With respect to parties who may have

claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors

(including, but not limited to, potential contingent warranty claims against the Debtors), the

Publication Notice was sufficient and reasonably calculated under the circumstances to reach

such parties.

> F.      As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the

Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have adequately

marketed the Purchased Assets and conducted the sale process in compliance with the Sale

Procedures Order; (b) a reasonable opportunity has been given to any interested party to make a

higher or better offer for the Purchased Assets; (c) the consideration provided for in the MPA

constitutes the highest or otherwise best offer for the Purchased Assets and provides fair and

reasonable consideration for the Purchased Assets; (d) the 363 Transaction will provide a greater

recover for the Debtors' creditors than would be provided by any other practical available

alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (e) no other

entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or

their estates; (f) the consideration to be paid by the Purchaser under the MPA exceeds the

liquidation value of the Purchased Assets; and (g) the Debtors' determination that the MPA

constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound

exercise of the Debtors' business judgment.

   G.  The actions represented to be taken by the Sellers and the Purchaser are

appropriate under the circumstances of these chapter 11 cases and are in the best interests of the

Debtors, their estates and creditors, and other parties in interest.

   H.  Approval of the MPA and consummation of the 363 Transaction at this

time is in the best interests of the Debtors, their creditors, their estates, and all other parties in

interest.

   I.  The Debtors have demonstrated compelling circumstances and a good,

sufficient, and sound business purpose and justification for the sale of the Purchased Assets

pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the

immediate approval of the MPA and the 363 Transaction because, among other things, the

Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion

is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11

cases and the risk of deterioration in the going concern value of the Purchased Assets pending

the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii)

preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the

widespread and adverse economic consequences for the Debtors, their estates, their creditors,

employees, the automotive industry, and the national economy that would be threatened by

protracted proceedings in these chapter 11 cases.

   J.  The consideration provided by the Purchaser pursuant to the MPA (i) is

fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a

greater recovery to the Debtors' estates than would be provided by any other available

alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

      K.      The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

      L.      In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

      M.      Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

      N.      The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  The 363 Transaction does not constitute a sub rosa plan of reorganization.

      O.      The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Sellers nor the Purchaser has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

P.        The Purchaser is a good faith purchaser under section 363(m) of the

Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Q.        The Purchaser is not an "insider" of any of the Debtors, as that term is

defined in section 101(31) of the Bankruptcy Code.

R.        The Debtors, the Purchaser, and the UAW, as the exclusive collective

bargaining representative of the Debtors' employees and the authorized representative of the

UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, engaged in good

faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree

benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters.

Conditioned upon the consummation of the 363 Transaction and approval of the Bankruptcy

Court, the Purchaser and the UAW have entered into that certain Retiree Settlement Agreement,

dated _____, 2009 (the "UAW Retiree Settlement Agreement"), which resolves the ongoing

provision of certain retiree benefits.  Under the UAW Retiree Settlement Agreement, the

Purchaser has agreed to make contributions of cash, stock, and warrants of New GM, as well as

to transfer the assets of an existing voluntary employees' beneficiary association sponsored by

GM and to be acquired by the Purchaser in the 363 Transaction, to a new voluntary employees'

beneficiary association sponsored by the UAW (the "New VEBA"), which will have the

obligation to fund certain health and welfare benefits for the Debtors' retirees and surviving

spouses represented by the UAW (the "UAW-Represented Retirees").  GM and the UAW, as the

authorized representative of the UAW-Represented Retirees, as well as the representatives for

the class of plaintiffs in a certain class action against GM (the "Class Representatives"), through

class counsel, Stemper, Feinstein, Doyle and Payne LLC ("Class Counsel"), negotiated in good

faith the UAW Claims Agreement, which requires the UAW and the Class Representatives to

take further actions to effectuate the extinguishment of certain claims against the Debtors, among

others, relating to retiree benefits in the event the 363 Transaction is consummated and the

Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree

Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse

impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree

Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the

UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof.

        S.      Concomitantly with the 363 Transaction, the Debtors will assume and

assign to the Purchaser modified and duly ratified collective bargaining agreements entered into

by and between the Debtors and the UAW (the "UAW CBA Assignment").  The Debtors, the

Purchaser, the UAW and Class Representatives intend that their actions in connection with the

UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of

certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. §

186(c)(2).

        T.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability, including, but not limited to (i) those that purport to give to any

party a right or option to effect any forfeiture, modification, right of first refusal, or termination

of the Sellers' or the Purchaser's interest in the Purchased Assets, or any similar rights, (ii) those

relating to taxes arising under or out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the consummation of the Sale (the "Closing"), and (iii)

(a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other

title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first

refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on

the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership and

(b) all debts arising in any way in connection with any agreements, acts, or failures to act, of any

of the Sellers or any of the Sellers' predecessors or affiliates, claims (as that term is defined in

the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or

other commitments, restrictions, interests and matters of any kind and nature, whether known or

unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement

of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including, but not limited to, Claims otherwise arising under doctrines of successor or

transferee liability to the extent permitted by law.

U.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction contemplated thereby, thus adversely affecting the Debtors,

their estates, and their creditors, if the sale of the Purchased Assets to the Purchaser, the

assignment of the Assumable Executory Contracts to the Purchaser, and the assumption of the

Assumed Liabilities by the Purchaser were not, except as otherwise provided in the MPA, free

and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever, or if

the Purchaser would, or in the future could, be liable for any of such liens, claims,

encumbrances, or other interests, including rights or claims based on any successor or transferee

liability.

V.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or

claims based on any successor or transferee liability, because, in each case, one or more of the

standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those (i)

holders of liens, claims, encumbrances, and other interests, including rights or claims based on

any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory

Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Those (i) holders of liens, claims, encumbrances, or other interests, including rights or claims

based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable

Executory Contracts who did object fall within one or more of the other subsections of section

363(f) of the Bankruptcy Code and are adequately protected by having their liens, claims,

encumbrances, and other interests, if any, including rights or claims based on any successor or

transferee liability, attach to the cash proceeds of the 363 Transaction ultimately attributable to

the property against or in which they claim a lien, claim, encumbrance, or other interest,

including rights or claims based on any successor or transferee liability.

    W.  Under the MPA, GM is transferring all title and interest in Memphis, TN

SPO Warehouse and White Marsh, MD Allison Transmission Plant (the "TPC Property") to the

Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims,

encumbrances, and interests, including any liens on the TPC Property under the Tennessee

Master Lease and Open End Leasehold Deeds of Trust, dated as of November 18, 1999, between

General Motors Corporation and Wilmington Trust Company, not in its individual capacity but

solely as Owner Trustee under the Trust Agreement dated as of May 28, 1999 ("Wilmington

Trust Company") and the related agreements and the Maryland Master Lease and Mortgages,

dated as of September 8, 1999, between General Motors Corporation and Wilmington Trust

Company and the related agreements (the "TPC North Agreement").  The TPC North Agreement

is a secured financing, and Wilmington Trust Company shall be entitled to a lien equal to the

value of the TPC Property in the proceeds received by the Sellers under the 363 Transaction as

adequate protection under section 363(e) of the Bankruptcy Code.  If the Debtors and

Wilmington Trust Company are unable to agree to the value of the TPC Property for the purpose

of determining the amount of Wilmington Trust Company's secured claim, the Debtors or

Wilmington Trust Company shall file a motion with this Court seeking a determination of the

amount of Wilmington Trust Company's secured claim.

X.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction if the sale of the Purchased Assets was not free and clear of all

liens, claims, encumbrances, and other interests, including rights or claims based on any

successor or transferee liability other than Assumed Liabilities, or if the Purchaser would, or in

the future could, be liable for any such liens, claims, encumbrances, and other interests,

including rights or claims based on any successor or transferee liability (collectively, the

"Retained Liabilities") that expressly are not assumed by the Purchaser, as set forth in the MPA.

The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that

none of the Purchaser, its affiliates, their present or contemplated members or shareholders

(other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will

have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at

law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability or Retained Liabilities.

Y.    The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Assumable Executory Contracts to the Purchaser in

connection with the consummation of the 363 Transaction, and the assumption and assignment

of the Assumable Executory Contracts is in the best interests of the Debtors, their estates and

creditors, and other parties in interest.  The Assumable Executory Contracts being assigned to,

and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets

being purchased by the Purchaser, and, accordingly, such assumption and assignment of the

Assumable Executory Contracts and liabilities are reasonable, enhance the value of the Debtors'

estates, and do not constitute unfair discrimination

Z.      For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW;

- the Agreement between the UAW and General Motors Corporation, dated September 26, 2007 (effective October 15, 2007) (the "UAW CBA") shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.  Assumption and assignment of the UAW CBA is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code.  Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement Agreement).  The Debtors, the Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

AA.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumable Executory Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Assumable Executory Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.  The Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts and approval of the assumption and assignment for a particular Assumable Executory Contract thereunder, the Debtors shall be forever released from any and all liability under the Assumable Executory Contract.

BB.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein.  The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

CC.    The Debtors currently maintain certain privacy policies that govern the use of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code) in conducting their business operations.  The 363 Transaction may contemplate the transfer of certain personally identifiable information to the Purchaser in a manner that may not be consistent with certain aspects of their existing privacy policies.  Accordingly, on June __, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on

June __, 2009.  The Court has given due consideration to the facts, including the exigent

circumstances surrounding the conditions of the sale of personally identifiable information in

connection with the 363 Transaction.  No showing has been made that the sale of personally

identifiable information in connection with the 363 Transaction violates applicable

nonbankruptcy law.

   DD. This Order constitutes approval, pursuant to Bankruptcy Rule 9019, of the

compromise and settlement embodied in the UAW Retiree Settlement Agreement, and such

compromise and settlement meets all of the requirements set forth in Bankruptcy Rule 9019.

   EE. This Order constitutes a final order within the meaning of 28 U.S.C.

§.158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds

that there is no just reason for delay in the implementation of this Order and expressly directs

entry of judgment as set forth herein.

   NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

**General Provisions**

   1. The Motion is granted in its entirety, and entry into and performance

under, and in respect of, the MPA and the 363 Transaction is approved, as further described

herein.

   2. All Objections to the Motion or the relief requested therein that have not

been withdrawn, waived, or settled, and all reservation of rights included in such Objections are

overruled on the merits.

## Approval of the MPA

3.       The MPA, and all the terms and conditions thereof, is approved.

4.       Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under, and comply with the terms of, the MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and conditions of the MPA and this Order.

5.       The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the MPA, together with all additional instruments and documents that the Sellers or the Purchaser deem necessary or appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the MPA.

6.       This Order and the MPA shall be binding in all respects upon all known and unknown creditors of, and equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability, all non-Debtor parties to the Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and their Affiliates and subsidiaries, the Purchased Assets, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the MPA or this Order.

### Transfer of Purchased Assets Free and Clear

7.       Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller may possess with respect thereto.

8.       Except as expressly permitted or otherwise specifically provided by the MPA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

9.  The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

10.  On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, including rights or claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance, or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

11.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

12.     All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

13.     Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

14.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order.

15.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the 363 Transaction contemplated by the MPA.

**<u>Approval of the UAW Retiree Settlement Agreement</u>**

16.     The UAW Retiree Settlement Agreement, the transactions contemplated therein, and the terms and conditions thereof, are approved.  The Debtors, the Purchaser, and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to, and in accordance with, the terms and conditions of the UAW Retiree Settlement Agreement and this Order, including the obligation of the Purchaser to reimburse the UAW for certain expenses relating to the 363 Transaction and the transition to the New VEBA arrangements.  The Trust Amendments are approved and the VEBA

Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree

Settlement Agreement)

17.    In accordance with the terms of the UAW Retiree Settlement Agreement,

(a) as of the Closing, the requirement of Section 15 of the Settlement Agreement, dated July 31,

2008, in the class action styled *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action

No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) to amend the General Motors Hourly-Rate

Employees Pension Plan shall be terminated and void, and (b) on the later of December 31,

2009, or the Closing of the 363 Transaction, (i) the committee and the trustees of the Existing

External VEBA (as hereinafter defined) are directed to transfer to the New VEBA all assets and

liabilities of the voluntary employees' beneficiary association established pursuant to the

settlement agreement in the class action styled *UAW et al. v. General Motors Corp.*, No. 05-CV-

73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006), *aff'd*, *Int'l Union, UAW v. General Motors

Corp.*, 497 F.3d 615 (6th Cir. 2007) (the "Existing External VEBA") within fifteen (15) days

thereafter, and coverage under the Existing External VEBA as to the Class and Covered Group

(each as defined in the UAW Retiree Settlement Agreement) shall terminate upon the completion

of such transfer, and (ii) all obligations and liabilities of the Purchaser relating to retiree medical

benefits for the Class and Covered Group shall terminate, and the Purchaser shall not thereafter

have any such obligations and liabilities, in each case as provided in and in accordance with

Section 5(D) of the UAW Retiree Settlement Agreement.

## Approval of GM's Assumption of the UAW Claims Agreement

18.    Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized to perform their obligations under, or in connection with, the implementation of the

UAW Claims Agreement and comply with the terms of the UAW Claims Agreement pursuant

to, and in accordance with, the terms and conditions of the UAW Claims Agreement and this

Order.

**Assumption and Assignment to the Purchaser of Assumable Executory Contracts**

19.     Pursuant to sections 105(a), 363, and  365 of the Bankruptcy Code and

subject to and conditioned upon the Closing of the 363 Transaction, the Debtors' assumption and

assignment to the Purchaser of the Assumable Executory Contracts is approved, and the

requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed

satisfied.

20.     The Debtors are authorized and directed in accordance with sections

105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of

the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures

Order and the MPA, the Assumable Executory Contracts free and clear of all liens, claims,

encumbrances, or other interests of any kind or nature whatsoever, including rights or claims

based on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute

and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably

deems may be necessary to assign and transfer the Assumable Executory Contracts and Assumed

Liabilities to the Purchaser.

21.     The Assumable Executory Contracts shall be transferred and assigned to,

pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and

effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable

Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of

the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,

pursuant to section 365(k) of the Bankruptcy Code.  The Sellers shall be relieved from any

further liability with respect to the Assumable Executory Contracts after such assumption and

assignment to the Purchaser. Each Assumable Executory Contract is an executory contract or
unexpired lease under section 365 of the Bankruptcy Code. The Debtors may assume each of
their respective Assumable Executory Contracts in accordance with section 365 of the
Bankruptcy Code. The Debtors may assign each Assumable Executory Contract in accordance
with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumable
Executory Contract that prohibits or conditions the assignment of such Assumable Executory
Contract or terminate, recapture, impose any penalty, condition renewal or extension, or modify
any term or condition upon the assignment of such Assumable Executory Contract, constitute
unenforceable antiassignment provisions which are void and of no force and effect. All other
requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the
assumption by the Debtors and assignment to the Purchaser of each Assumable Executory
Contract have been satisfied. At such time as provided in the Sale Procedures Order and the
MPA, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be
fully and irrevocably vested in all right, title, and interest of each Purchased Contract. Any
portion of any of the Debtors' unexpired leases of nonresidential real property that purport to
permit the respective landlords thereunder to cancel the remaining term of any such leases if the
Sellers discontinue their use or operation of the Leased Real Property are void and of no force
and effect and shall not be enforceable against the Purchaser, its assignees and sublessees, and
the landlords under such leases shall not have the right to cancel or otherwise modify such leases
or increase the rent, assert any Claim, or impose any penalty by reason of such discontinuation,
the Sellers' cessation of operations, the assignment of such leases to the Purchaser, or the
interruption of business activities at any of the leased premises.

      22.    All undisputed defaults or other obligations of the Sellers under the
Purchased Contracts arising or accruing prior to the Assumption Effective Date (without giving

effect to any acceleration clauses or any default provisions of the kind specified in section

365(b)(2) of the Bankruptcy Code) shall be cured at the Assumption Effective Date or as soon

thereafter as practicable by payment of the Cure Amounts (as hereinafter defined) by the

Purchaser, and upon paying such amounts the Purchaser shall have no further liability or

obligation arising or accruing prior to the date of the Closing, except for disputed Cure Amounts

and as otherwise expressly provided in the MPA.  The Database maintained by the Debtors with

respect to the Assumable Executory Contracts, which is referenced and is accessible as set forth

in the Assumption and Assignment Notice, reflects the sole amounts necessary under section

365(b) of the Bankruptcy Code to cure all monetary defaults under the Assumable Executory

Contracts (the "Cure Amounts"), and no other amounts are or shall be due to the non-Debtor

parties in connection with the assumption by the Debtors and assignment to the Purchaser of the

Assumable Executory Contracts.

23.     Each non-Debtor party to an Assumable Executory Contract is forever

barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the

Purchaser, their successors or assigns, or their respective property, any default arising prior to, or

existing as of, the Closing, or, against the Purchaser, any counterclaim, defense, setoff, or other

Claim asserted or assertable against the Sellers and (ii) imposing or charging against the

Purchaser or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as

a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory

Contracts.  The validity of such assumption and assignment of the Assumable Executory

Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to

an Assumable Executory Contract.

24.     Except as provided in the MPA or this Order, after the Closing, the

Debtors and their estates shall have no further liabilities or obligations with respect to any

Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of

such Claims are forever barred and estopped from asserting such Claims against the Debtors,

their successors or assigns, and their estates.

25.    The failure of the Sellers or the Purchaser to enforce at any time one or

more terms or conditions of any Assumable Executory Contract shall not be a waiver of such

terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and

condition of the Assumable Executory Contracts.

26.    The assignments of each of the Assumable Executory Contracts are made

in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**<u>Additional Provisions</u>**

27.    Except for the Assumed Liabilities expressly set forth in the APA, none of

the Purchaser, its successors or assigns, or any of their respective affiliates shall have any

liability for any Claim that arose prior to the Closing Date, relates to the production of vehicles

prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the MPA or any of the transactions or documents ancillary

thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:

(i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Purchased Agreements from and after the Closing);

(ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation

or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious

liabilities of any kind or character for any Claims, including, but not limited to, under any theory

of successor or transferee liability, de facto merger or continuity, environmental, labor and

employment, and products or antitrust liability, whether known or unknown as of the Closing,

now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or

unliquidated.

28.    Effective upon the Closing and except as otherwise provided by

stipulation filed with or announced to the Court with respect to a specific matter, all persons and

entities are forever prohibited and enjoined from commencing or continuing in any manner any

action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or

other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with

respect to any (i) Claim other than Assumed Liabilities, or (ii) successor or transferee liability of

the Purchaser for any of the Debtors, including, without limitation, the following actions:  (a)

commencing or continuing any action or other proceeding pending or threatened against the

Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets,

including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner

any judgment, award, decree, or order against the Debtors as against the Purchaser, its

successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (c)

creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as

against the Purchaser or its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind for

any obligation of any of the Debtors as against any obligation due the Purchaser or its

successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (e)

commencing or continuing any action, in any manner or place, that does not comply, or is

inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or

actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or

refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or

conduct any of the businesses operated with such assets.

29.    Except for the Assumed Liabilities, or as expressly permitted or otherwise

specifically provided for in the MPA or this Order, the Purchaser shall have no liability or

responsibility for any liability or other obligation of the Sellers arising under or related to the

Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided in this Order and the MPA, the Purchaser shall not be liable for any Claims

against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no

successor, transferee, or vicarious liabilities of any kind or character, including, but not limited

to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto

merger, or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Sellers or any obligations of the Sellers arising prior to the Closing, including,

but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of,

in connection with, or in any way relating to the operation of the Purchased Assets prior to the

Closing.  The Purchaser has given substantial consideration under the MPA for the benefit of the

holders of liens, claims, encumbrances, or other interests.  The consideration given by the

Purchaser shall constitute valid and valuable consideration for the releases of any potential

Claims of successor liability of the Purchaser, which releases shall be deemed to have been given

in favor of the Purchaser by all holders liens, claims, encumbrances or other interests against the

Sellers or their respective assets.

30.    The consideration provided by the Purchaser for the Purchased Assets

under the MPA shall be deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

31.    The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

32.    If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

33.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated, and that the conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

34.    Each and every federal, state, and local governmental agency or
department is authorized to accept any and all documents and instruments necessary and
appropriate to consummate the transactions contemplated by the MPA.

35.    Any amounts that become payable by the Sellers to the Purchaser pursuant
to the MPA (and related agreements executed in connection therewith, including, but not limited
to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative
expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code
and (b) be paid by the Debtors in the time and manner provided for in the MPA without further
Court order.

36.    The transactions contemplated by the MPA are undertaken by the
Purchaser without collusion and in good faith, as that term is used in section 363(m) of the
Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization
provided in this Order to consummate the 363 Transaction shall not affect the validity of the 363
Transaction (including the assumption and assignment of any of the Assumable Executory
Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a
purchaser in good faith of the Purchased Assets and is entitled to all the protections afforded by
section 363(m) of the Bankruptcy Code.

37.    Subject to further Court order and consistent with the terms of the MPA
and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and
shall, take appropriate measures to maintain and preserve, until the consummation of any chapter
11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or
other audio or digital recordings and data in, or retrievable from, computers or servers relating to
or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business,
and (b) the cash management system maintained by the Debtors prior to the Closing pursuant to

the order of the Court entered on June __, 2009 (Docket No. ___), as such system may be

necessary to effect the orderly administration of the Debtors' estates.

38.     Nothing in this Order or the MPA releases, nullifies, or enjoins the

enforcement of any liability to a governmental unit under environmental statutes or regulations

(or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner or operator of property after the date of entry of this

Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor liability

doctrine with respect to any liabilities under environmental statutes or regulations for penalties

for days of violation prior to entry of this Order.  Nothing in this paragraph should be construed

to create for any governmental unit any substantive right that does not already exist under law.

39.     No law of any state or other jurisdiction, including any bulk sales law or

similar law, shall apply in any way to the transactions contemplated by the 363 Transaction, the

MPA, the Motion, and this Order.

40.     The terms and provisions of the MPA and this Order shall be binding in all

respects upon, and shall inure to the benefit of the Debtors, their estates, and their creditors, the

Purchaser and its respective affiliates, successors, and assigns, and any affected third parties,

including, but not limited to, all persons asserting a lien, claim, encumbrance, or other interest in

the Purchased Assets, notwithstanding any subsequent appointment of any trustee(s) under any

chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall

be binding.

41.     The failure to specifically include any particular provisions of the MPA in

this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

the Court that the MPA be authorized and approved in its entirety.

42.    The MPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

43.    The provisions of this Order are nonseverable and mutually dependent on each other.

44.    Pursuant to Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

45.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets.

Dated: New York, York
         [_____ __], 2009

_____
United States Bankruptcy Judge

EXHIBIT A

## **MASTER SALE AND PURCHASE AGREEMENT**

TO BE INSERTED

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-1**

Form of Deferred Termination Agreement for Saturn Discontinued Brand Dealer
Agreements

# EXHIBIT J-1

## FORM OF DEFERRED TERMINATION AGREEMENT FOR SATURN DISCONTINUED BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between **[RETAILER ENTITY CORPORATE NAME]** ("Retailer"), and SATURN DISTRIBUTION CORPORATION ("SDC").

### RECITALS

A.       Retailer and SDC are parties to a Retailer Agreement (the "Retailer Agreement") for Saturn Motor Vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Retailer Agreement.

B.       SDC is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  No trustee has been appointed and SDC is operating its business as debtor-in-possession.

C.       SDC and Saturn, LLC (an Affiliate, as hereinafter defined, of SDC) intend to sell, convey, assign and otherwise transfer certain of their assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.       SDC has considered moving and may, at its option, move to reject the Retailer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, before the closing of the 363 Sale unless Retailer executes and delivers this Agreement to SDC on or before June 12, 2009.

E.       In return for the payments set forth herein and SDC's willingness not to pursue the immediate rejection of the Retailer Agreement in the Bankruptcy Case, Retailer desires to enter into this Agreement (i) to allow Retailer, among other things, to wind down its Saturn Retail Facility Operations in an orderly fashion (specifically including the sale of all Retailer's new Motor Vehicles), (ii) to provide for Retailer's voluntary termination of the Retailer Agreement, SDC's payment of certain monetary consideration to Retailer, Retailer's covenants regarding its continuing Saturn Retail Facility Operations under the Retailer Agreement, as supplemented by the terms of this Agreement (the "Subject Retailer Operations"), and (iii) Retailer's release of SDC, Saturn, LLC and their related parties from any and all liability arising out of or connected with the Retailer Agreement, any predecessor agreement(s) thereto, and the relationship between SDC and Retailer relating to the Retailer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Retailer and SDC hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.       Assignment-363 Sale.  Retailer acknowledges that SDC has the right, but not the obligation, to assign the Retailer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, SDC may, in its sole discretion, assign the Retailer Agreement

and this Agreement to the 363 Acquirer. Retailer specifically agrees to such assignment and agrees that it will not object to or protest any such assignment.

2.    <u>Termination of Retailer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Retailer hereby covenants and agrees to conduct the Saturn Retail Facility Operations until the effective date of termination of the Retailer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Retailer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Retailer hereby terminates the Retailer Agreement by written agreement in accordance with Article 21A(2) thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Retailer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Retailer has sold all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Retailer Agreement prior to January 1, 2010, Retailer may request that SDC or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, SDC or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Retailer Agreement, Retailer hereby conveys to SDC or the 363 Acquirer, as applicable, a non-exclusive right to use Retailer's customer lists and service records for the Subject Retailer Operations, and within ten (10) days following SDC's or the 363 Acquirer's, as applicable, written request, Retailer shall deliver to SDC or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.    <u>Payment to Retailer.</u>

(a)    Subject to Sections 1 and 2 above, in consideration of (i) Retailer's execution and delivery to SDC of this Agreement, (ii) Retailer's agreement to sell its new Motor Vehicle inventory as set forth below, and (ii) the termination of the Retailer Agreement by written agreement in accordance with Article 21(A)(2) thereof (as set forth in Section 2 of this Agreement), SDC or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Retailer the sum of ($_____) (the "<u>Termination Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Retailer's covenants, releases and waivers set forth herein, and Retailer's transfer to SDC or the 363 Acquirer, as applicable, of a non-exclusive right to use its customer lists and service records.

(b)    SDC shall pay twenty-five percent (25%) of the Termination Payment Amount (the "<u>Initial Payment Amount</u>") to Retailer by crediting Retailer's open account maintained by SDC or the 363 Acquirer, as applicable (the "<u>Open Account</u>"), in accordance with its standard practices and on or before the date ten (10) business days following the later of (i) SDC's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  SDC or the 363 Acquirer, as applicable, shall pay the balance of the Termination Payment Amount (the "<u>Final Payment Amount</u>") to Retailer, subject to the terms of this Agreement, by crediting Retailer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Retailer has sold all of its new Motor

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

Vehicle inventory for the Existing Model Line prior to the termination of the Retailer Agreement, (ii) Retailer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Retailer's delivery to SDC or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Retailer has paid all sales, use, and other taxes or evidence reasonably satisfactory to SDC or the 363 Acquirer, as applicable, that SDC or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Retailer Agreement in accordance with Section 2(b) above, (v) compliance with the terms of Section 4(c) below, (vi) SDC's or the 363 Acquirer's, as applicable, receipt of the fully executed Supplemental Termination Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to the Subject Retailer Operations), and (vii) SDC's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals.  SDC or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)        In addition to any other setoff rights under the Retailer Agreement, payment of all or any part of the Termination Payment Amount may, in SDC's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Retailer to SDC or the 363 Acquirer, as applicable, or their Affiliates, and/or (ii) delayed in the event SDC or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Retailer relating to the Subject Retailer Operations including, but not limited to, all or any part of the Termination Payment Amount (each, a "<u>Competing Claim</u>"), in which event SDC or the 363 Acquirer, as applicable, may delay payment of all or any part of the Termination Payment Amount until SDC or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.    <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by SDC hereunder, upon the termination of the Retailer Agreement, as provided in Section 2 of this Agreement, and cessation of the Subject Retailer Operations, the following terms shall apply in lieu of Retailer's rights to receive termination assistance, whether under the Retailer Agreement or applicable laws, all of which rights Retailer hereby waives:

(a)        Neither SDC nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Retailer any Motor Vehicles whatsoever.

(b)        Neither SDC nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Retailer any Parts or Accessories or Special Tools whatsoever.

(c)        Retailer shall eliminate or remove from the Retailer Premises all Retailer-owned signs (freestanding or not) for the Subject Retailer Operations within thirty (30) days following the effective date of termination at no cost to SDC or the 363 Acquirer, as applicable.  Retailer understands and agrees that neither SDC nor the 363 Acquirer, as applicable, will purchase any Retailer-owned signs used in connection with the Subject Retailer Operations.  Retailer hereby waives any rights it may have to require either SDC or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Retailer Operations.  Retailer shall provide, or shall cause the owner of the Retailer Facility Premises to provide, GMDI access to the Retail Facility Premises in order for GMDI to remove all SDC signs leased to Retailer by GMDI.  Retailer understands and agrees that the Termination Payment Amount was determined by SDC in part based on Retailer's agreement that it will timely remove all signs for the Subject Retailer Operations and will not require or attempt to require SDC or the 363 Acquirer, as

applicable, to purchase any or all of such signs pursuant to the provisions of the Retailer Agreement or any applicable statutes, regulations, or other laws.

(d)    Retailer expressly agrees that the provisions of Article 22 of the Retailer Agreement do not, by their terms, apply to this termination.

(e)    Retailer expressly agrees that all termination rights of Retailer are set forth herein and expressly agrees that any termination assistance otherwise available to Retailer as set forth in the Retailer Agreement or any state statute or regulation shall not apply to Retailer's termination of the Retailer Agreement**.**

(f)    The terms of this Section 4 shall survive the termination of this Agreement**.**

5.    <u>Release; Covenant Not to Sue; Indemnity</u>.

(a)    Retailer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Retailer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Retailer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Retailer or anyone claiming through or under Retailer may have as of the date of the execution of this Agreement against SDC, Saturn Corporation, General Motors Corporation, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>SDC Parties</u>"), arising out of or relating to (i) the Retailer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the Retail Facility Premises for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of Retailer's facilities, locations or requirements, Saturn Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that SDC shall pay any SFE payments due to Retailer for the second (2nd) quarter of 2009 and neither SDC nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Retailer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with the Subject Retailer Operations under the Retailer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Retailer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days of the date of this Agreement, (y) the payment to Retailer of any incentives currently owing to Retailer or any amounts currently owing to Retailer in its Open Account, or (z) any claims of Retailer pursuant to Article 13E of the Retailer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by SDC or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. SDC or the 363 Acquirer, as applicable, shall not charge back to Retailer any warranty claims approved and paid by SDC or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that SDC or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

(b)        As set forth above, SDC reaffirms the indemnification provisions of Article 13E of the Retailer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Retailer.

(c)        Retailer, for itself, and the other Retailer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Retailer Agreement by SDC to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.  As a result of the foregoing, any such breach shall absolutely entitle SDC or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 5.  In addition, SDC or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 5 by Retailer, including, without limitation, the right to specific performance.

(d)        Retailer shall indemnify, defend and hold the SDC Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the SDC Parties, or any of them, arising from, relating to, or caused by Retailer's (or any other  Retailer Party's) breach of this Agreement or Retailer's execution or delivery of or performance under this Agreement.  "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e)        The terms of this Section 5 shall survive the termination of this Agreement.

6.    Subject Retailer Operations. From the effective date of this Agreement until the effective date of termination of the Retailer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a)  Retailer shall not, and shall have no right to, purchase Saturn Motor Vehicles from SDC or the 363 Acquirer, as applicable, which rights Retailer hereby waives.

(b)  Retailer shall have the right to purchase service parts from SDC or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Retail Facility Premises during the term of this Agreement.  Retailer shall have no obligation, however, to follow the recommendations of the Saturn service parts inventory management process, which recommendations are provided for guidance purposes only. Retailer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than SDC or the 363 Acquirer, as applicable), including but not limited to orders recommended by Saturn, LLC, shall not be eligible for return.

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c)  Retailer shall not, and shall have no right to, propose to SDC or the 363 Acquirer, as applicable, (under  Article 20 of the Retailer Agreement or otherwise) or consummate a change in Retailer Operator, a change in ownership, or, subject to SDC's or the 363 Acquirer's, as applicable, option, a transfer of the retailer business or its principal assets to any Person; provided, however, that SDC or the 363 Acquirer, as applicable, shall honor the terms of  Article 20A of the Retailer Agreement upon the death or incapacity of the Retailer Operator, except that the term of any new retailer agreement under Article 20A shall expire on October 31, 2010, subject to the terms of this Agreement.  Accordingly, neither SDC nor the 363 Acquirer, as applicable, shall have any obligation (under Article 20 of the Retailer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d)  In addition to all other matters set forth herein, the following portions of the Retailer Agreement shall not apply; Article 5 (Shared Responsibility), Article 6 (Dispute Resolution Process), after August 31, 2009, Article 13A and 13C(1) (concerning ordering of new Motor Vehicles), Article 15 ( Business Planning), Article 18 (Training), Article 20B (Changes in Management and Ownership), and Article 22 (Termination Assistance).

(e)    Except as expressly otherwise set forth herein, the terms of the Retailer Agreement, shall remain unmodified and in full force and effect.

7.  <u>Due Authority</u>.  Retailer and the individual(s) executing this Agreement on behalf of Retailer hereby jointly and severally represent and warrant to SDC that this Agreement has been duly authorized by Retailer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8.  <u>Confidentiality</u>.  Retailer hereby agrees that, without the prior written consent of SDC or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Retailer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9.  <u>Informed and Voluntary Acts</u>.  Retailer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

10.  <u>Binding Effect</u>.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns.  Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that SDC assigns the Retailer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

11.  <u>Effectiveness</u>.  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Retailer and is received by SDC on or before **June 12, 2009**.

12.  <u>Continuing Jurisdiction</u>.  By executing this Agreement, Retailer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 12 shall survive the termination of this Agreement.

16 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766880

13. <u>Other Agreements</u>.

(a)        Retailer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between SDC, or one or more of its Affiliates, and Retailer, provided that SDC or the 363 Acquirer, as applicable, and Retailer shall enter into any amendment or modification to the Channel Agreements required as a result of SDC's restructuring plan, in a form reasonably satisfactory to SDC or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b)        The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Retailer Agreement) between SDC, or one or more of its Affiliates, and Retailer imposing on Retailer obligations with respect to its Subject Retailer Operations under the Retailer Agreement, including, without limitation, obligations to relocate Subject Retailer Operations, to construct or renovate facilities, not to protest establishment or relocation of other Retailers, to conduct exclusive Subject Retailer Operations under the Retailer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from SDC or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Retailer Agreement between Retailer and SDC (each a "<u>Termination Agreement</u>"), (ii) any performance agreement of any kind between Retailer and SDC (each a "<u>Performance Agreement</u>"), or (iii) any agreement between Retailer (or any Affiliate of Retailer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of General Motors Corporation ("<u>AHI</u>"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Retailer shall comply with all of the terms of such agreements with AHI). Retailer acknowledges that SDC shall be entitled to, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case.  By executing this letter agreement, Retailer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to SDC's rejection of such Termination Agreements or Performance Agreements.

(c)        All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Retailer Agreement (pursuant to Section 2(b) hereof), except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Retailer Agreement, Retailer and SDC shall enter into documents in recordable form reasonably satisfactory to SDC or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Retailer or Retailer's Affiliates.

14. Governing <u>Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

15. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

16. <u>Complete Agreement of the Parties</u>.    This Agreement**,** the Retailer Agreement, and the schedules, exhibits and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement.    The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.    No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.    The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766880

IN WITNESS WHEREOF, Retailer and SDC have executed this Agreement as of the day and year first above written.

**[RETAILER ENTITY CORPORATE NAME]**

By:_____

Name:_____
Title:_____

**SATURN DISTRIBUTION CORPORATION**

By:_____
　　　Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY RETAILER AND RECEIVED BY SDC ON OR BEFORE JUNE 12, 2009, OR IF RETAILER CHANGES ANY TERM OR PROVISION HEREIN.**

## EXHIBIT A

## SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Retailer"), for the use and benefit of _____, a _____ ("SDC") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.    Retailer and SDC are parties to a Retailer Sales and Service Agreement for Saturn motor vehicles (the "Retailer Agreement").

B.    Retailer and SDC are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

**C.    [IF RETAILER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [SDC assigned all of its right, title and interest in the Retailer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Retailer agreed to terminate and cancel the Retailer Agreement and all rights and continuing interests therein by written agreement and to release SDC and its related parties from any and all liability arising out of or connected with the Retailer Agreement, any predecessor agreement(s) thereto, and the relationship between SDC or the 363 Acquirer, as applicable, and Retailer relating to the Retailer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Retailer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Retailer hereby agrees as follows:

1.    Termination of Retailer Agreement.

(a) Retailer hereby terminates the Retailer Agreement by written agreement in accordance with Section 14.2 thereof.  The effective date of such termination shall be _____, 20__.

(b) Retailer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Retailer.

(c) Retailer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

2.  <u>Release; Covenant Not to Sue; Indemnity</u>.

(a)  Retailer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Retailer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Retailer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Retailer or anyone claiming through or under Retailer may have as of the date of the execution of this Agreement against SDC, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>SDC Parties</u>"), arising out of or relating to (i) the Retailer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the Retail Facility Premises for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of Retailer's facilities, locations or requirements, Saturn Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Retailer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Retailer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Subject Retailer Operations under the Retailer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Retailer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Retailer of any incentives currently owing to Retailer or any amounts currently owing to Retailer in its Open Account, or (z) any claims of Retailer pursuant to Article 13E of the Retailer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by SDC of any amounts due or to become due to SDC or any of its Affiliates.  SDC shall not charge back to Retailer any warranty claims approved and paid by SDC prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that SDC may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)  Retailer, for itself, and the other Retailer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert **[(i)]** any Claim that is covered by the release provision in subparagraph (a) above **[IF RETAILER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Retailer Agreement or the Original Deferred Termination Agreement by SDC to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** As a result of the foregoing, any such breach shall absolutely entitle SDC to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 2.  In addition, SDC shall have all other equitable rights in connection with a breach of this Section 2 by Retailer, including, without limitation, the right to specific performance.

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

(c)  Retailer shall indemnify, defend and hold the SDC Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the SDC Parties, or any of them, arising from, relating to, or caused by Retailer's (or any other Retailer Parties') breach of this Agreement or Retailer's execution or delivery of or performance under this Agreement.  "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.  Due Authority.  Retailer and the individual(s) executing this Agreement on behalf of Retailer hereby jointly and severally represent and warrant to SDC that this Agreement has been duly authorized by Retailer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.  Confidentiality.  Retailer hereby agrees that, without the prior written consent of SDC, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Retailer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.  Informed and Voluntary Acts.  Retailer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.  Binding Effect.  This Agreement shall be binding upon any replacement or successor Retailer as referred to in the Retailer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor Retailer as referred to in the Retailer Agreement and any successors or assigns, and shall benefit any of SDC's successors or assigns.

7.  Continuing Jurisdiction. By executing this Agreement, Retailer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 7 shall survive the termination of this Agreement.

8.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9.  No Reliance.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

IN WITNESS WHEREOF, Retailer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-2**

Form of Deferred Termination Agreement for Hummer Discontinued Brand Dealer
Agreements

## EXHIBIT J-2

## FORM OF DEFERRED TERMINATION AGREEMENT FOR HUMMER DISCONTINUED BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between *[DEALER ENTITY CORPORATE NAME]* ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for HUMMER motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the

Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2.    <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.    <u>Payment to Dealer.</u>

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $_____ (the "<u>Termination Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM or the 363 Acquirer, as applicable, shall pay twenty-five percent (25%) of the Termination Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM or the 363 Acquirer, as applicable (the "<u>Open Account</u>"), in accordance with its standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM or the 363 Acquirer, as applicable, shall pay the balance of the Termination Payment Amount (the "<u>Final Payment Amount</u>") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within

2

ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals.  GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Termination Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Termination Payment Amount (each, a "<u>Competing Claim</u>"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.   <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)  Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations.  Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations.  Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Termination Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership

3

Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d)  Dealer expressly agrees that the provisions of Section 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e)  Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f)  The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates.  GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

4

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

(b)   As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c)   Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5.  In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

(d)   Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement.  "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e)   The terms of this Section 5 shall survive the termination of this Agreement.

6.   Subject Dealership Operations.      From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a)   Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b)   Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement.  Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

5

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

8. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

9. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

10. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

11. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

12. <u>Continuing Jurisdiction</u>.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

13. <u>Other Agreements</u>.

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766881

(a)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.  In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b)  The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case.  By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c)  All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

14.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

15.  Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

16.  Breach.  In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

7

16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

17. Complete Agreement of the Parties.    This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement.    The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.    No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.    The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766881

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

**[DEALER ENTITY CORPORATE NAME]**

By:_____

Name:_____
Title:_____

**GENERAL MOTORS CORPORATION**

By:_____
      Authorized Representative

# THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.

1766881

<u>EXHIBIT A</u>

**<u>SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT</u>**


THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT (this "<u>Agreement</u>") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("<u>Dealer</u>"), for the use and benefit of _____, a _____ ("<u>GM</u>") and _____, a _____ corporation ("363 Acquirer").

## RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for HUMMER motor vehicles (the "<u>Dealer Agreement</u>").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "<u>Original Deferred Termination Agreement</u>"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

**C.    [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM or the 363 Acquirer and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    <u>Termination of Dealer Agreement</u>.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof.  The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

2.  <u>Release; Covenant Not to Sue; Indemnity</u>.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates.  GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)  Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert **[(i)]** any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Deferred Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.]** As a result of the foregoing, any such breach shall absolutely entitle SDC or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Retailer from contesting SDC's application for injunctive relief and prohibiting any further act by Retailer in violation of this Section 2.  In addition, SDC shall have all other equitable rights in connection with a breach of this Section 2 by Dealer, including, without limitation, the right to specific performance.

(c)  Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement.  "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.  Due Authority.  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.  Confidentiality.  Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.  Informed and Voluntary Acts.  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.  Binding Effect.  This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7.  Continuing Jurisdiction. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto.  The terms of this Section 7 shall survive the termination of this Agreement.

8.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9.  No Reliance.  The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement.  No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____

Name:_____

Title:_____

**16 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766881

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit J-3**

Form of Deferred Termination Agreement for non-Saturn and non-Hummer Discontinued
Brand Dealer Agreements and Excluded Continuing Brand Dealer Agreements

# EXHIBIT J-3

## FORM OF DEFERRED TERMINATION AGREEMENT FOR NON-SATURN AND NON-HUMMER DISCONTINUED BRAND DEALER AGREEMENTS AND EXCLUDED CONTINUING BRAND DEALER AGREEMENTS

THIS DEFERRED TERMINATION AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between *[DEALER ENTITY CORPORATE NAME]* ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.     Dealer and GM are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for *[BRAND WINDING DOWN]* motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.     GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").   No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.     GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.     GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.     In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

---

**12  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1.  <u>Assignment-363 Sale</u>.  Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

2.  <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  <u>Payment to Dealer</u>.

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $_____ (the "<u>Deferred Termination Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Deferred Termination Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "<u>Open Account</u>"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM

2

or the 363 Acquirer, as applicable, shall pay the balance of the Deferred Termination Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Deferred Termination Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c) In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Deferred Termination Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Deferred Termination Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Deferred Termination Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4. Complete Waiver of All Termination Assistance Rights. In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b) Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c) Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the

3

Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Deferred Termination Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

(d)  Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e)  Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f)  The terms of this Section 4 shall survive the termination of this Agreement.

5.  Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates.  GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM

4

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766870

or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. <u>Subject Dealership Operations</u>.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("<u>RIM</u>") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the

5

future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c)  Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section 12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement.  Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d)  In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e)  Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7.  No Protest.

(a)  GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b)  Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c)  Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7.  Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7.  Dealer expressly intends that it shall be forever deprived of any such claim, demand,

6

cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)     Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach.  As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7.  In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8.  Due Authority.  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9.  Confidentiality.  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10.  Informed and Voluntary Acts.  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11.  Binding Effect.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns.  Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12.  Effectiveness.  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13.  Continuing Jurisdiction.     By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14.  Other Agreements.

(a)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.  In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

7

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties. This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written

8

instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement.  The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

*[DEALER ENTITY CORPORATE NAME]*

By:_____

Name:_____

Title:_____


**GENERAL MOTORS CORPORATION**


By:_____
    Authorized Representative


**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

## EXHIBIT A

## SAMPLE SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT

THIS SUPPLEMENTAL DEFERRED TERMINATION AGREEMENT AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

## RECITALS

A.    Dealer and GM are parties to a Dealer Sales and Service Agreement for _____ motor vehicles (the "Dealer Agreement").

B.    Dealer and GM are parties to that certain Deferred Termination Agreement dated June __, 2009 (the "Original Deferred Termination Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Deferred Termination Agreement.

**C.    [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Deferred Termination Agreement to the 363 Acquirer.]**

D.    Pursuant to the Original Deferred Termination Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between **[GM or the 363 Acquirer]** and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.    Dealer executes this Agreement in accordance with Section 3 of the Original Deferred Termination Agreement.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.    Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof.  The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Deferred Termination Agreement.

2.  Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates.  GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)  Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert **[(i)]** any Claim that is covered by the release provision in subparagraph (a) above **[IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Deferred Termination Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement**.]  Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. Due Authority. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. Confidentiality. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. Informed and Voluntary Acts. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. Binding Effect. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. Continuing Jurisdiction. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. No Reliance. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766870

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____
Name:_____
Title:_____

**12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766870

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit K**

Form of Participation Agreement

# EXHIBIT K

# FORM OF PARTICIPATION AGREEMENT



General Motors Corporation

June 1, 2009

Via Federal Express

**[DEALER ENTITY CORPORATE NAME]**
**[DEALER ADDRESS]**

> Re:    *GM Dealer Sales and Service Agreement/Participation Agreement*

Attention: _____

      **[DEALER ENTITY CORPORATE NAME]** ("Dealer") and General Motors Corporation ("GM") are parties to a Dealer Sales and Service Agreement (the "Dealer Agreement") for **[BRAND RETAINED]** motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this letter agreement have the definitions set forth for such terms in the Dealer Agreement.

      GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  No trustee has been appointed and GM is operating its business as debtor-in-possession.

      GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"), to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case involves, among other things, the restructuring of its current dealer network. Part of that restructuring includes focus on and retention of those dealers who, based on a number of factors, GM believes have an opportunity to be successful dealers selling and servicing GM's products.

      Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers representing the Existing Model Line, the retained dealers, including Dealer, will have the opportunity to increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's dealer network and for Dealer's performance to be in line with such increased opportunity.

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

In consideration for Dealer's execution and delivery of, and performance under, this letter agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer Agreement in the Bankruptcy Case, and (ii) shall assign the Dealer Agreement to the 363 Acquirer as part of the 363 Sale, provided such sale closes.

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreement and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Line, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before **June 12, 2009**, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreement, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before **June 12, 2009**, GM may, in its sole discretion, move to reject the Dealer Agreement in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. <u>Defined Terms</u>. All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreement.

2. <u>Sales Performance</u>. Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreement. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreement alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreement, as supplemented by this letter agreement.

3. <u>New Vehicle Inventory</u>. Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Line and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Line to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in

08  **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

2

1766884

Section 2 above.  In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

4.    Exclusivity.  During the remaining term of the Dealer Agreement (the "Exclusivity Period"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing Model Line at the premises authorized for the conduct of Dealership Operations under the Dealer Agreement (the "Dealership Premises").  During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Line (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreement, other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreement, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days after written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of their remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreement.

5.    No Protest.  In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a)    GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Line at a site located in the vicinity of the Dealership Premises (the "Proposed Site"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "No Protest Commencement Date"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for the Existing Model Line at or in the vicinity of the Proposed Site.

(b)    Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "GM Parties"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire,

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of the Existing Model Line described in Section 5(a) above.

(c)  Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5.  Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5.  Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)  Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5.  In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.  <u>Release; Covenant Not to Sue; Indemnity</u>.  In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale:

(a)  Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreement or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2nd) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due to or become due to either or any of their Affiliates.

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766884

(b)  As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(c)  Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.  Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6.  In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(d)  Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement.  "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses.  "Person" means an individual, partnership, limited liability company, association, corporation or other entity.  A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e)  The terms of this Section 6 shall survive the termination of this letter agreement.

7.  Compliance.  In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreement in the 363 Sale, from and after the Effective Date:

(a)  Dealer shall continue to comply with all of its obligations under the Dealer Agreement, as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreement and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein.

(b)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer.  In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control.  The term "Channel Agreements" shall mean agreements (other than the Dealer Agreement) between GM and Dealer imposing on Dealer

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766884

obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case.  By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8.  Breach and Remedies.  In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreement, as supplemented by this letter agreement, GM and the 363 Acquirer shall have all of its rights and remedies under the Dealer Agreement, as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreement, as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement upon the termination by its terms of the Dealer Agreement, as supplemented by this letter agreement.  In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreement, as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreement (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreement), and (y) Dealer waives all other rights under the Dealer Agreement, as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9.  Miscellaneous.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary

08  **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766884

corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b)  This letter agreement shall supplement the Dealer Agreement as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreement, which shall expire no later than October 31, 2010.

(c)  Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreement shall remain in full force and effect as written.  Additionally, the Dealer Agreement, as referenced in any other document that the parties have executed, shall mean the Dealer Agreement as supplemented by this letter agreement.

(d)  This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e)  The Dealer Agreement, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreement, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f)  The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g)  The Dealer Agreement, as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

(h)  By executing this Agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto.  The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i)  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j)  If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766884

This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreement as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

*[Signature Page Follows]*

**08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

1766884

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

**GENERAL MOTORS CORPORATION**


By:_____
      Authorized Representative


APPROVED AND AGREED TO THIS
___ DAY OF JUNE, 2009

***[DEALER ENTITY CORPORATE NAME]***


By: _____

Name: _____
Title:  _____


# THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.

08  THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

1766884

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit L**

Form of Subdivision Master Lease

**EXHIBIT L**

## FORM OF SUBDIVISION MASTER LEASE

**MASTER LEASE AGREEMENT**
**(Subdivision Properties)**

**between**

**GENERAL MOTORS CORPORATION,**
**a Delaware corporation**
**("Landlord")**

**and**

*[NEWCO],*
**a Delaware corporation**
**("Tenant")**

**Dated:  _____, 2009**

# TABLE OF CONTENTS

**Section**                                                                                                    **Page**

1. LEASE SCHEDULE AND EXHIBITS ....................................................................1

2. AGREEMENT TO LEASE .................................................................................1

3. LEASE TERM ...................................................................................................1

4. RENTAL PAYMENTS ........................................................................................1

    4.1     Rent .............................................................................................................1
    4.2     Services ........................................................................................................1
    4.3     Interest on Late Payments ...........................................................................2

5. USE .................................................................................................................2

6. TAXES .............................................................................................................2

7. CONDITION OF LEASED PREMISES ................................................................3

8. MAINTENANCE ................................................................................................3

9. ASSIGNMENT AND SUBLETTING ....................................................................3

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ..............................................3

11. ALTERATIONS AND IMPROVEMENTS; LIENS ...............................................3

    11.1   Alterations, Additions and Improvements ....................................................3
    11.2   Tenant Liens.................................................................................................4
    11.3   Landlord Liens .............................................................................................4

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY ............................4

13. INSURANCE.....................................................................................................5

    13.1   Tenant's Insurance .......................................................................................5
    13.2   Form of Insurance .......................................................................................5
    13.3   Form of Insurance .......................................................................................5

14. DAMAGE AND CONDEMNATION.....................................................................6

15. [INTENTIONALLY DELETED]...........................................................................6

16. [INTENTIONALLY DELETED]...........................................................................6

17. EVENTS OF DEFAULT; REMEDIES.................................................................6

    17.1   Events of Default ........................................................................................6

17.2    Remedies ................................................................................................................7
17.3    Landlord Defaults ...................................................................................................7
17.4    Limitation on Liability ............................................................................................7

18. ENVIRONMENTAL ........................................................................................................8

19. NOTICE ..............................................................................................................................8

20. ENTRY UPON LEASED PREMISES ............................................................................8

21. GENERAL PROVISIONS ...............................................................................................8

21.1    Brokerage ................................................................................................................8
21.2    Amendments. ...........................................................................................................8
21.3    Severability .............................................................................................................9
21.4    Attorney's Fees .......................................................................................................9
21.5    Time of Essence ......................................................................................................9
21.6    Waiver .....................................................................................................................9
21.7    Successors and Assigns ...........................................................................................9
21.8    Governing Law ........................................................................................................9
21.9    Estoppel Agreements ..............................................................................................9
21.10   Subordination, Non-Disturbance Agreement ..........................................................9
21.11   Intentionally Omitted ..............................................................................................9
21.12   Force Majeure ........................................................................................................10
21.13   Consent ..................................................................................................................10
21.14   Time Period for Payment .......................................................................................10
21.15   Execution of Lease .................................................................................................10
21.16   Counterparts ...........................................................................................................10
21.17   Confidentiality .......................................................................................................10
21.18   Dispute Resolution .................................................................................................11
21.19   Gender ....................................................................................................................11
21.20   Memorandum of Lease ...........................................................................................12

22. WAIVER OF LANDLORD LIEN ..................................................................................12

23. LANDLORD COVENANTS ...........................................................................................12

24. SUBDIVISION OF PROPERTY ...................................................................................12

Exhibit A - Leased Premises
Exhibit B - Retained Premises
Exhibit C - Form of Memorandum of Lease

## LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Subdivision Properties) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | General Motors Corporation, Delaware corporation. |
| 2. | Tenant: | *[NEWCO]*, a Delaware corporation. |
| 3. | Date of Lease: | *[_____ __]*, 2009. |
| 4. | Leased Premises: | The term "Leased Premises" shall mean (a) the land owned by Landlord (the "Land") cross-hatched on Exhibits A-1 through A-8 attached hereto and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements and fixtures located on the Land (collectively with the Buildings, the "Improvements"), and (d) all appurtenances belonging to or in any way pertaining to said Land and Improvements, subject to Section 24 hereof. For the avoidance of doubt, the Leased Premises does not include the Retained Premises (as hereinafter defined). |
| 5. | Separate Leased Premises: | Individually, each separate Leased Premises depicted on each of Exhibits A-1 through A-8. |
| 6. | Retained Premises: | The term "Retained Premises" shall mean (a) the land owned by Landlord and not leased to Tenant cross-hatched on Exhibits B-1 through B-8 attached hereto and made a part hereof, (b) the building or buildings located on such land, (c) any other improvements located on such land, and (d) all appurtenances belonging to or in any way pertaining to such land, buildings and improvements that, in the cases of (a) through (d) above, do not constitute Separate Leased Premises. |
| 7. | Property: | Collectively, the Leased Premises and the Retained Premises. |
| 8. | Commencement Date: | *[_____ __]*, 2009. |
| 9. | Termination Dates: | See Section 3. |
| 10. | Outside Termination Date: | July 31, 2029. |

1

| 11. | Term: | The term commencing on the Commencement Date and expiring on the Termination Date with respect to each Separate Leased Premises, but in no event later than the Outside Termination Date. |
|---|---|---|
| 12. | Base Rent: | $1.00 per annum, payable on the Commencement Date and annually thereafter or, at Tenant's option, prepayable in full for the entire Term. |
| 13. | Use: | See Section 5. |

14.    Landlord's Address:    *[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

15.    Tenant's Address:    *[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

16.    Exhibits to Lease:    Exhibit A – Leased Premises
Exhibit B – Retained Premises
Exhibit C - Form of Memorandum of Lease

# MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Leased Premises; and

WHEREAS, Tenant desires to lease the Leased Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.    LEASE SCHEDULE AND EXHIBITS**.  The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference.  All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule.  The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.    AGREEMENT TO LEASE.**  Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises. Landlord acknowledges that Tenant currently owns all of the Tenant Trade Fixtures and Personal Property (as hereinafter defined).

**3.    LEASE TERM.**  Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the respective Termination Date with respect to each Separate Leased Premises. The "Termination Date" with respect to each Separate Leased Premises is the earlier of (a) the date on which Landlord conveys the Separate Leased Premises to Tenant in accordance with Section 24 hereof or (b) the Outside Termination Date.

**4.    RENTAL PAYMENTS**

**4.1    Rent.**  Tenant shall pay to Landlord the annual base rent (the "Base Rent") in the amount set forth in the Lease Schedule.  In addition, Tenant shall pay Landlord as additional rent (the "Additional Rent"; together with the Base Rent, the "Rent") any reasonable costs reasonably incurred by Landlord for which Tenant is responsible in accordance with this Lease.  Except as set forth in this Lease and except with respect to any matter caused by the gross negligence or willful misconduct of Landlord, Tenant shall be responsible for all costs associated with the Leased Premises that accrue or arise after the Commencement Date.  Tenant shall pay any Additional Rent within thirty (30) days after receipt of a reasonably detailed invoice therefor from Landlord.  Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule).

**4.2    Services.**  Except as otherwise agreed in writing by Tenant and Landlord (including, without limitation, in the Purchase Agreement (as hereinafter defined)), Landlord shall not be responsible for providing or arranging for any services for the Leased Premises or to Tenant with respect to the Leased Premises, including, without limitation, maintenance and

1

repair, electricity, gas, water or other utility services, janitorial services, or security services. Notwithstanding the foregoing, Landlord shall cooperate with Tenant in Tenant obtaining any of the aforesaid services it requires for the Leased Premises.  Notwithstanding anything to the contrary contained herein, to the extent such services are provided to any Separate Leased Premises at Tenant's request pursuant to an agreement to which Landlord (as opposed to Tenant) is a party, Landlord shall deliver to Tenant upon receipt any invoices it receives for such services provided to such Separate Leased Premises after the Commencement Date and Tenant shall pay its equitable share (based on the amount of such services used by Tenant, in Tenant's reasonable discretion) on or before the due date thereof.  The parties acknowledge and agree that such services include, but are not limited to, the provision of steam and compressed air at the Separate Leased Premises located in Pontiac, Michigan pursuant to agreements currently in place.

           **4.3**    <u>**Interest on Late Payments.**</u>  In the event that Tenant fails to pay Rent, and such amount is not paid within fifteen (15) business days after the date on which Rent is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "<u>Default Rate</u>").

         **5.**    <u>**USE.**</u>  Tenant may use the Leased Premises in a manner substantially similar to the manner in which the Leased Premises were used by General Motors Corporation prior to the Commencement Date and for any other use permitted or allowed by or under applicable laws. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to Tenant's use and occupancy of the Leased Premises.  Tenant may, at its sole cost and expense, contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate or allowable legal proceeding or process and provided that upon final adjudication, determination or settlement of such proceeding or process Tenant shall immediately pay any amounts due and/or comply therewith.

         **6.**    <u>**TAXES.**</u>  All ad valorem real property taxes or special improvement taxes allocable to the Leased Premises and all property taxes allocable to the personal property located thereon (including all penalties and interest thereon) for any period within the Term shall be paid by Tenant before they become delinquent.  Notwithstanding anything to the contrary contained herein, Landlord shall be responsible for paying any taxes allocable to the Retained Premises and the personal property located thereon before they become delinquent.  Within ten (10) business days after Landlord's or Tenant's receipt of any original tax bill for the Property, the recipient shall deliver copies thereof to the other party.  Landlord and Tenant shall thereafter cooperate reasonably and in good faith to allocate such taxes between the Leased Premises and the Retained Premises and the personal property located thereon.  Landlord and Tenant shall cooperate reasonably and in good faith to contest any tax or assessment upon or against the Property, or any part thereof, or the improvements at any time situated thereon, as applicable, by appropriate legal proceedings which shall have the effect of preventing the collection of the tax or assessment so contested, provided that upon final adjudication of such proceeding Landlord and Tenant shall immediately pay their proportionate shares of any amounts due in accordance

with this <u>Section 6</u>.  Landlord hereby grants Tenant a power-of-attorney to contest taxes in accordance with this Section 6 if Landlord fails to fulfill its obligations hereunder.  Landlord shall not settle any tax contests or waive the right to contest any taxes or other charges without Tenant's consent, which may be withheld in Tenant's sole and absolute discretion.  The obligations of Landlord and Tenant under this provision shall survive the expiration or termination of the Lease.

7.    **CONDITION OF LEASED PREMISES.**  Tenant acknowledges that it accepts the Leased Premises in their "As-Is" condition on the Commencement Date.  Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Leased Premises, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

8.    **MAINTENANCE.**  Landlord shall have no responsibility for any maintenance and repair of and replacements to the Leased Premises of any nature whatsoever (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord), including, without limitation, any capital, extraordinary and normal repairs and replacements to the Leased Premises, normal maintenance, the maintenance of the roof, footings, foundations, walls, structural elements, HVAC, mechanical, plumbing and electrical serving the Leased Premises exclusively.  Notwithstanding anything to the contrary contained herein, Tenant may elect to perform or elect not to perform the same in its sole discretion, provided that Tenant shall indemnify Landlord from any penalties or fines imposed on Landlord by any applicable governmental authority if Tenant elects not to perform any maintenance or repair of or make any replacements to the Leased Premises (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord).

9.    **ASSIGNMENT AND SUBLETTING.**  Tenant may assign its interest in this Lease (as to the entire Leased Premises or as to any Separate Leased Premises) and sublease all or any portion of the Leased Premises without obtaining the consent of Landlord.

10.    **LANDLORD'S TITLE AND QUIET ENJOYMENT.**  Landlord represents and warrants that Landlord owns fee simple title to the Leased Premises and has full right and authority to make this Lease.  Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Leased Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord.

11.    **ALTERATIONS AND IMPROVEMENTS; LIENS**.

11.1    **Alterations, Additions and Improvements.**  Tenant may, at its own expense and without Landlord's consent, make any alterations, additions or improvements to the Leased Premises which Tenant deems desirable.    All such alterations, additions and improvements shall be made in accordance with all applicable laws and ordinances.  Tenant shall not be required to restore the Leased Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term.

**11.2    Tenant Liens.**  Tenant shall not permit the Property to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Landlord has entered into a contract to sell the Retained Premises, as a condition precedent to the right to contest, Tenant shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Landlord's title in the Retained Premises and any proceeds accruing from the sale thereof.  Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

**11.3    Landlord Liens.**  Landlord shall not permit the Property to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Property by, or at the direction or sufferance of Landlord; provided, however, that Landlord shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Landlord shall not be deemed in default hereunder as a result of such lien so long as Landlord is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Tenant desires to assign or sublease its interest in this Lease as to any one or more of the Separate Leased Premises, as a condition precedent to the right to contest, Landlord shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Tenant's or Landlord's interest in the applicable Separate Leased Premises and any proceeds accruing from the assignment thereof.  Subject to Landlord's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.3, Tenant, at its option, may take all action Tenant deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Landlord shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Tenant for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Tenant in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Landlord under the provisions of this Section 11.3 shall survive the expiration or termination of this Lease.

**12.    TENANT TRADE FIXTURES AND PERSONAL PROPERTY.**  Tenant currently owns all of the trade fixtures, machinery, equipment, all inventories of vehicles, raw

materials, work-in-progress, finished goods, supplies, stock, parts, packaging materials and other accessories thereto, and other personal property located on the Leased Premises and Tenant may during the Term install in or on the Leased Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached to the Leased Premises. Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Leased Premises at any time during the Term.

13.    **INSURANCE**.

13.1    **Tenant's Insurance.**    Throughout the Term, Tenant shall maintain insurance insuring:

(a)    The Building and any other Improvements at any time situated upon the Leased Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage). The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage.

(b)    Tenant, Landlord (as an "additional insured"), and any permitted mortgagee of Landlord, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Leased Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $5,000,000.00.

(c)    All contents and trade fixtures, furniture and furnishings in the Leased Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

13.2    **Landlord's Insurance.**    Throughout the Term, Landlord shall maintain insurance insuring Landlord, Tenant (as an "additional insured"), and any mortgagee of Tenant, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Retained Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Landlord shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

13.3    **Form of Insurance.**    All of said insurance required by this Section 13 shall be in form and with companies licensed in the state in which the respective Separate Leased Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide

that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord. Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord. Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant. Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease.

**13.4    Mutual Waiver.** Landlord and Tenant hereby waive all claims and rights of recovery against the other and their respective officers, directors, employees, agents and representatives for any loss or damage to their respective properties or interests, which loss is insured against, or required to be insured against, by Landlord or Tenant (as applicable) pursuant to this Section 13, regardless of fault or negligence and regardless of the amount of insurance proceeds collected or collectible under any insurance policies in effect, and Landlord and Tenant each represent and warrant to the other that all such policies permit such waiver and contain, and will contain, enforceable waiver of subrogation endorsements.

**14.    DAMAGE AND CONDEMNATION.** In the event of any casualty, taking or condemnation for a public or quasi public use or purpose by a competent authority affecting any Separate Leased Premises, (a) neither party may terminate this Lease, provided that this Lease shall automatically terminate with respect to a Separate Leased Premises if such entire Separate Leased Premises is taken or condemned; (b) Tenant shall be entitled to all insurance proceeds or awards in connection with such casualty or condemnation; and (c) Tenant may elect, in its sole discretion and at its sole cost (except with respect to any insurance proceeds), to restore such Separate Leased Premises.

**15.    [INTENTIONALLY DELETED].**

**16.    [INTENTIONALLY DELETED].**

**17.    EVENTS OF DEFAULT; REMEDIES**.

**17.1    Events of Default.** Each of the following events shall constitute an "Event of Default":

(a)    If Tenant shall fail to pay any Rent to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Tenant receives written notice of such failure to pay Rent from Landlord;

(b)    If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence;

(c)    If Tenant shall be adjudged an involuntary bankrupt, or a decree or

order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

(d)    If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

(e)    If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension; or

(f)    If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof.

**17.2    Remedies.**  Upon the occurrence of any one or more Events of Default, Landlord may at its election pursue any and all remedies available at law or in equity (other than termination of this Lease), including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Leased Premises.

**17.3    Landlord Defaults.**  If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed ninety (90) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

**17.4    Limitation on Liability.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO <u>SECTION 16</u> HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

18.    **ENVIRONMENTAL.**  Any Liabilities arising under any Environmental Law relating to (A) conditions present on the Property, (B) Landlord's ownership of the Property, (C) Tenant's occupancy of the Property or (D) Landlord's or Tenant's failure to comply with Environmental Laws (as all such terms are defined in the Purchase Agreement) with respect to the Property shall be governed by <u>Sections 2.3(a)(viii)</u> and <u>2.3(b)(iv)</u> of the Amended and Restated Master Sale and Purchase Agreement (the "<u>Purchase Agreement</u>") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, with the Leased Premises treated as a Purchased Asset (as such term is defined in the Purchase Agreement) for such purpose and the provisions thereof shall be deemed incorporated by reference herein for that purpose.  Notwithstanding anything to the contrary contained in the Purchase Agreement, however, in no event shall Landlord be entitled to terminate this Lease in connection with this <u>Section 18</u>.

19.    **NOTICE.**  All notices or demands required or permitted to be given or served pursuant to this Lease shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule).  Such addresses may be changed from time to time by either party by serving notice as above provided.  In no event shall personal delivery at the Leased Premises be deemed an effective means of notice.

20.    **ENTRY UPON LEASED PREMISES.**  Neither Landlord nor Landlord's representatives shall be permitted to enter the Leased Premises during the Term without Tenant's prior written consent, which may be withheld in Tenant's sole discretion.  If Tenant consents to any such entry, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Leased Premises at all times.

21.    **GENERAL PROVISIONS**.

21.1    **Brokerage.**  Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction.  Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

21.2    **Amendments.**  No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

**21.3    Severability.**  If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**21.4    Attorney's Fees.**  In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

**21.5    Time of Essence.**  Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**21.6    Waiver.**  No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision.  Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

**21.7    Successors and Assigns.**  All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

**21.8    Governing Law.**  This Lease shall be construed in accordance with the laws of the state of Michigan, except that for purposes of enforcing or construing this Lease with respect to any Separate Leased Premises located outside the state of Michigan, the laws of the state in which such Separate Leased Premises is located shall apply in lieu of the laws of the state of Michigan.

**21.9    Estoppel Agreements.**  Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

**21.10    Subordination, Non-Disturbance Agreement.**  Prior to entering into any financing with respect to any Retained Premises in accordance with Section 23 hereof, at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to the applicable Separate Leased Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

**21.11    Intentionally Omitted.**

**21.12    Force Majeure.**  Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "Force Majeure Events"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event.  The foregoing definition of Force Majeure Events shall apply only during the Term.

**21.13    Consent.**  Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed unless expressly stated otherwise herein.  Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

**21.14    Time Period for Payment.**  Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

**21.15    Execution of Lease.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises and this document shall become effective and binding only upon the execution and delivery hereof by Tenant and by Landlord.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

**21.16    Counterparts.**  This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

**21.17    Confidentiality.**  Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("Confidential Information").  Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties.   Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party.  Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

The following information shall not constitute Confidential Information for purposes of this <u>Section 21.17</u>:

(a)    any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

(b)    any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

(c)    any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

(d)    any information that the non-disclosing party is legally required to disclose; or

(e)    any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

**21.18    <u>Jurisdiction for Dispute Resolution</u>.** (a)    Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Lease and to decide any claims or disputes that may arise or result from, or be connected with, this Lease, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 19</u> hereof; <u>provided</u>, <u>however</u>, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 19</u>.

**21.19    <u>Gender</u>.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

**21.20  <u>Memorandum of Lease</u>.**  On the Commencement Date, the parties shall execute a Memorandum of Lease in the form attached hereto as <u>Exhibit C</u> with respect to each Separate Leased Premises, and Tenant, at its cost, may record each such Memorandum of Lease in the applicable county recorder's office.

**22.    <u>WAIVER OF LANDLORD LIEN</u>.**  Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Leased Premises and Tenant Trade Fixtures and Personal Property and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

**23.    <u>LANDLORD COVENANTS</u>.**  During the Term, Landlord covenants as follows: (a) Landlord shall make timely payment of taxes, water charges and other items that might give rise to liens affecting the Property (except to the extent Tenant is obligated to pay for such costs with respect to the Leased Premises) and Landlord shall indemnify, defend and hold Tenant harmless from and against any and all costs or damages incurred by Tenant in connection with such liens, (b) Landlord hereby grants to Tenant a power-of-attorney to make such payments on behalf of Landlord if Landlord fails to do so in accordance with this Lease, (c) Landlord shall not take any action that might adversely affect the Property without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Property after the Commencement Date.  Notwithstanding the foregoing, during the Term, Landlord may incur an Encumbrance in the form of a mortgage or deed of trust on the Retained Premises in connection with financing obtained by Landlord, provided that (i) such mortgage or deed of trust shall expressly exclude the Separate Leased Premises and shall state that such mortgage or deed of trust shall be subordinate in all respects to this Lease with respect to the Property, (ii) the lender of such financing shall be reasonably acceptable to Tenant, and (iii) Landlord shall indemnify, defend and hold Purchaser harmless from and against any and all costs or damages incurred by Tenant in connection with such financing.

**24.    <u>SUBDIVISION OF PROPERTY</u>.**  From and after the Commencement Date, Landlord and Tenant shall cooperate in good faith and shall diligently prosecute the subdivision of each Separate Leased Premises from the applicable Retained Premises (each, a "<u>Required Subdivision</u>") at Tenant's cost.  Landlord hereby grants Tenant a power-of-attorney to prosecute such application on behalf of Landlord if Landlord fails to fulfill its obligations under this <u>Section 24</u> within five (5) days after receiving written notice from Tenant of such failure.  Upon completion of a Required Subdivision affecting a Separate Leased Premises, such Separate Leased Premises shall be conveyed to Tenant by a quitclaim deed for One Dollar ($1.00) in stated consideration and this Lease shall terminate with respect to such Separate Leased Premises upon such conveyance, provided that this Lease shall remain in full force and effect with the remainder of Leased Premises.  If Landlord and Tenant are unable to complete a Required Subdivision with respect to any Separate Leased Premises within a reasonable period of time, then, at Tenant's request, Landlord and Tenant shall cooperate in good faith and shall diligently proceed to resolve the subdivision issues by alternative means, including, but not limited to, submitting the applicable Separate Leased Premises to the condominium regime for the applicable jurisdiction.

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

*[NEWCO]*, a Delaware corporation

By: _____
Name:   _____
Title: _____

**LANDLORD:**

**GENERAL MOTORS CORPORATION**,
  a Delaware corporation

By: _____
Name:   _____
Title: _____

SIGNATURE PAGE TO MASTER LEASE AGREEMENT (SUBDIVISION PROPERTIES)

1770416

## Exhibit A

### Leased Premises

[See Exhibits A-1 through A-[_____] attached hereto]

## <u>Exhibit A-1</u>

**Leased Premises - Pontiac, Michigan**

[Attached Hereto]

## Exhibit A-2

**Leased Premises - Romulus, Michigan**

[Attached Hereto]

# Exhibit A-3

**Leased Premises - Fairfax, Kansas**

[Attached Hereto]

## **Exhibit A-4**

**Leased Premises - Grand Blanc, Michigan**

[Attached Hereto]

## Exhibit A-5

**Leased Premises - Lordstown, Ohio**

[Attached Hereto]

## **Exhibit A-6**

**Leased Premises - Moraine, Ohio**

[Attached Hereto]

## <u>Exhibit A-7</u>

**Leased Premises - Saginaw, Michigan**

[Attached Hereto]

# Exhibit A-8

**Leased Premises - Toledo, Ohio**

[Attached Hereto]

## Exhibit B

**Leased Premises**

[See Exhibits B-1 through B-[_____] attached hereto]

## Exhibit B-1

**Retained Premises - Pontiac, Michigan**

[Attached Hereto]

## Exhibit B-2

**Retained Premises - Romulus, Michigan**

[Attached Hereto]

## Exhibit B-3

**Retained Premises - Fairfax, Kansas**

[Attached Hereto]

## **Exhibit B-4**

**Retained Premises - Grand Blanc, Michigan**

[Attached Hereto]

## **Exhibit B-5**

**Retained Premises - Lordstown, Ohio**

[Attached Hereto]

## __Exhibit B-6__

**Retained Premises - Moraine, Ohio**

[Attached Hereto]

1770416

## Exhibit B-7

**Retained Premises - Saginaw, Michigan**

[Attached Hereto]

## Exhibit B-8

**Retained Premises - Toledo, Ohio**

[Attached Hereto]

## Exhibit C

### Form of Memorandum of Lease

**Prepared by and after recording
return to:**

_____

_____

_____

_____

### MEMORANDUM OF LEASE

This Memorandum of Lease ("Memorandum") is made as of this \_\_\_\_\_ day of _____, 2009, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

WHEREAS, Landlord and Tenant are parties to that certain Master Lease Agreement (Subdivision Properties) dated _____, 2009 (the "Lease"), pursuant to which Tenant leases a portion of the real property (the "Separate Leased Premises") located in _____, _____ and more particularly described on Exhibit A attached hereto and by this reference made a part hereof (the "Property") from Landlord; and

WHEREAS, Landlord and Tenant desire to place of record this Memorandum of Lease;

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.    Lease.  Landlord has leased to Tenant the Separate Leased Premises under the terms, conditions and provisions contained in the Lease, such Lease being expressly incorporated herein by reference.

2.    Term.  The Lease is for a term beginning on _____, 2009 and terminating with respect to the Separate Leased Premises on the earlier of (a) the date on which Landlord conveys the Separate Leased Premises to Tenant in accordance with the Lease or (b) _____, 2029.

3.    Certain Landlord Covenants.  Under the Lease, Landlord has agreed not take any action that might adversely affect the Property without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Lease), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Property after the Commencement Date.  Notwithstanding the foregoing, during the Term, the Lease permits Landlord to incur an Encumbrance in the form of a mortgage or deed of trust on the portion of the Property not constituting the Separate Leased Premises in connection with financing obtained by Landlord, provided that (i) such mortgage or deed of trust shall expressly exclude the Separate Leased Premises and shall state that such mortgage or deed of trust shall be

subordinate in all respects to this Lease with respect to the Property, (ii) the lender of such financing shall be reasonably acceptable to Tenant, and (iii) Landlord shall indemnify, defend and hold Purchaser harmless from and against any and all costs or damages incurred by Tenant in connection with such financing.

4.   <u>Other Provisions</u>.  This Memorandum is not a complete summary of the unrecorded Lease.  Reference should be made to the unrecorded Lease for the full terms, conditions and provisions thereof.

5.   <u>Conflicts</u>.  This Memorandum is prepared solely for the purpose of recordation to give notice of the Lease and shall not constitute an amendment or modification of the Lease.  In the event of any conflict or inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the unrecorded Lease, the terms and provisions of the Lease shall govern and control in all respects.

6.   <u>Successors and Assigns</u>.  This Memorandum shall run with the land described on <u>Exhibit A</u> hereto and shall be binding upon and inure to the benefit of the Landlord and the Tenant and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**TENANT:**

*[NEWCO]*, a Delaware corporation


By:   _____
Name:   _____
Title:   _____


**LANDLORD:**

**GENERAL MOTORS CORPORATION**,
 a Delaware corporation


By:   _____
Name:   _____
Title:   _____

**[To be inserted prior to recording:  legal description, proper recording, notary, witnessing requirements for state in which Separate Leased Premises is located]**

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit M**

Form of Assignment and Assumption of Willow Run Lease

# EXHIBIT M

## FORM OF ASSIGNMENT AND ASSUMPTION OF WILLOW RUN LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE OF LAND (this "Assignment"), dated as of *[_____  __]*, 2009 (the "Effective Date"), is made by and among GENERAL MOTORS CORPORATION, a Delaware corporation ("Assignor"), and ***[NGMCO, Inc.]***, a Delaware ***[corporation]*** ("Assignee").  Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignor, Assignee and certain other parties entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended from time to time, the "Purchase Agreement"); and

WHEREAS, the Wayne County Airport Authority (as successor-in-interest to the Board of County Road Commissioners of the County of Wayne, Michigan), as landlord, and Assignor, as tenant, are parties to that certain Willow Run Airport Lease of Land dated October 11, 1985, as amended by that certain Amendment to Lease of Land dated as of ***[July 28]***, 2009 (as so amended, the "Lease"), relating to certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan (the "Premises"); and

WHEREAS, the Purchase Agreement requires Assignor to convey and transfer to Assignee, and Assignee to assume, all of Assignor's right, title and interest, as tenant, in, to and under the Lease, together with all rights, options, interests, liabilities, obligations and benefits thereunder (collectively, the "Additional Obligations"), but specifically excluding the Retained Liabilities associated with the Lease and the Additional Rights, if any, and all liabilities under Section 4 of this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Assignment.  As of the Effective Date, Assignor hereby sells, assigns, transfers, conveys and delivers unto Assignee, its successors and assigns, all of the right, title and interest that Assignor possesses in, to and under the Lease, together with all Additional Obligations thereunder, excluding therefrom, (i) any Retained Liabilities associated with the Lease and the Additional Rights, if any, and (ii) all liabilities under Section 4 of this Assignment.

2.    Assumption.  Assignee hereby accepts such assignment of the Leases, together with the Additional Obligations, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Leases that arise from and after the Effective Date, excluding therefrom, (i) any Retained Liabilities associated with the Lease and the Additional Obligations, if any, and (ii) all liabilities under Section 4 of this Assignment.

3.    <u>Rentals, Taxes and Deposits</u>.  All advance rental payments, real estate taxes and other payments made or by Assignor under the Lease shall be prorated between Assignor and Assignee as of the Effective Date of this Assignment in accordance with the terms of the Purchase Agreement.

4.    <u>Environmental</u>.

4.1    <u>Definitions</u>.  As used in this <u>Section 4</u>, the following terms shall have the following meanings:

(a)    "<u>Contamination</u>" means the presence at the Premises, at a quantity or level which exceeds the amount that would require an investigation, clean up, or other response action under Environmental Law, of any Hazardous Material in surface water, groundwater, ambient air, or surface or subsurface soil.

(b)    "<u>Environmental Law</u>" means any law in existence at the date hereof relating to the management or Release of, or exposure of humans to, any Hazardous Materials, pollution or the protection of human health and the environment, including surface water, groundwater, ambient air, surface or subsurface soil, natural resources or wildlife habitat.

(c)    "<u>Environmental Permits</u>" means any consents, licenses, permits, or other approvals required by any governmental authority under Environmental Law.

(d)    "<u>Hazardous Materials</u>" means any material or substance that is regulated, or can give rise to Liabilities or Losses, under an Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos-containing materials, lead, and any noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous).

(e)    "<u>Liabilities</u>" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any law, claim, governmental order, contract or otherwise.

(f)    "<u>Losses</u>" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', technical consultants', engineers' and experts' fees and expenses).

(g)    "<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

2

4.2     Agreements Regarding Environmental Matters under the Lease. Assignor and Assignee hereby acknowledge that:

(a)     the Assignor will retain all Liabilities for (i) all Contamination, including any Releases, in, at, on, under or emanating onto or from the Premises, regardless of when such Contamination may have occurred, and (ii) any on-going consequences or responsibilities relating to this Contamination;

(b)     the Assignor will be responsible for managing and funding the liabilities referenced in Section 4.2(a); and

(c)     the Assignee will only be responsible for compliance with applicable Environmental Laws and Environmental Permits directly related to its operations at the Premises.

(d)     Assignor retains or shall assume any Liability, including responsibility for the investigation, clean up, or other response action required under Environmental Law, related to any Contamination, including the Release of Hazardous Materials, in, at, on, under or emanating onto or from the Premises which occurred prior to, on or after the Effective.  Except as provided by Section 4.2(e), (i) Assignor will take all actions required by or under any Environmental Law to address any Contamination in, at, on, under or emanating onto or from the Premises or other environmental conditions, matters, or issues, which, in each case may affect the Premises, and (ii), Assignor hereby forever waives, discharges and releases any claims or causes of action it has or may have against Assignee related to the existence or Release of Hazardous Materials in, at, on, under or emanating onto or from the Premises or other violation of Environmental Law prior to the Effective Date, or on or after the Effective Date.

(e)     Assignee shall conduct its operations at the Premises in compliance with applicable Environmental Laws and any Environmental Permits required at the Premises.  Assignee shall be responsible for (i) any fines or penalties resulting directly and exclusively from Assignee's noncompliance with Environmental Laws or Environmental Permits at the Premises; and (ii) for site specific environmental clean up or other costs incurred by Assignor that Assignor establishes, pursuant to a non-appealable administrative or judicial determination, arose directly and exclusively from Assignee's gross negligence or willful misconduct in connection with the operation, maintenance or repair of any Facility ("Additional Costs") and not from the acts of any third party.  Further, Assignee will indemnify, defend and hold Assignor harmless from and against any and all fines or penalties to the extent exclusively and directly caused by Assignee's noncompliance with Environmental Laws or Environmental Permits at the Premises and from all Additional Costs incurred by Assignor at the Premises.

(f)     Assignor will promptly notify Assignee (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises, any adjacent parcel, or other nearby real property of which Assignor has knowledge related in any way to any Contamination, environmental conditions, matters, or issues.  Assignor will also notify the Assignee of any Release or threatened Release of any Hazardous Materials of which Assignor has knowledge that occurs in, at, on, under or emanates

3

from the Premises or any adjacent parcel to the Premises after the Effective Date and which is not caused exclusively and directly by the Assignee's activity on the Premises.

(g)    Assignee will promptly notify the Assignor (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises which relate in any way to any Contamination, environmental conditions, matters, or issues in connection with the Premises of which Assignee has knowledge. Assignee will also promptly notify Assignor of any Release or threatened Release of any Hazardous Materials which occurs in, at, on, under or emanates from the Premises, and which are caused exclusively and directly by the Assignee's current activities on the Premises. Other than providing Assignor with the notices provided for in this Section 4.2(g), Assignee will have no obligation to address, clean up, investigate, or otherwise respond to any Contamination on, at, in, under or emanating from the Premises, regardless of when such Contamination may have occurred.

(h)    The obligations in this Section 4 shall survive the expiration or termination of this Lease and the occurrence and discharge of any other obligation under this Assignment.

5.    Conflicts with Purchase Agreement.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

6.    Successors and Assigns; No Third Party Beneficiaries.  This Assignment is for the sole benefit of Assignor, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignor, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

7.    Modification.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

8.    Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease, the Law of the jurisdiction where the Premises are located.

9.    Construction of Assignment.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may

have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

10.    <u>Severability</u>.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

11.    <u>Captions</u>.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

12.    <u>Counterparts</u>.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignor and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1772791

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Lease of Land as of the day and year first above written.

**GENERAL MOTORS CORPORATION**, a
Delaware corporation

By: _____
     Name: _____
     Title: _____

*[NGMCO, INC., a Delaware corporation]*

By: _____
     Name: *[_____]*
     Title: *[_____]*

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit N**

Form of Ren Cen Lease

**EXHIBIT N**

**FORM OF REN CEN LEASE**

**MASTER LEASE AGREEMENT**
**(Renaissance Center)**

**between**

**RIVERFRONT HOLDINGS, INC.,**
**a Delaware corporation**
**("Landlord")**

**and**

*[_____],*
**a Delaware *[_____]***
**("Tenant")**

**Dated:  _____, 2009**

1

# TABLE OF CONTENTS

**Section**                                                                                                   **Page**

1. LEASE SCHEDULE AND EXHIBITS ...................................................................1

2. AGREEMENT TO LEASE .................................................................................1

3. LEASE TERM ......................................................................................................1

4. RENTAL PAYMENTS .........................................................................................1

    4.1    Rent ........................................................................................................1
    4.2    Services ..................................................................................................2
    4.3    Interest on Late Payments .....................................................................2

5. USE .......................................................................................................................2

6. TAXES ...................................................................................................................2

7. CONDITION OF LEASED PREMISES ...............................................................3

8. MAINTENANCE ...................................................................................................3

9. ASSIGNMENT AND SUBLETTING ...................................................................3

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ...........................................3

11. ALTERATIONS AND IMPROVEMENTS; LIENS .............................................3

    11.1    Alterations, Additions and Improvements ...........................................3
    11.2    Tenant Liens..........................................................................................4
    11.3    Landlord Liens ......................................................................................4

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY ...........................4

13. INSURANCE..........................................................................................................5

    13.1    Tenant's Insurance ...............................................................................5
    13.2    Form of Insurance ................................................................................5

14. DAMAGE AND CONDEMNATION.....................................................................5

15. [INTENTIONALLY DELETED].............................................................................5

16. [INTENTIONALLY DELETED].............................................................................6

17. EVENTS OF DEFAULT; REMEDIES ..................................................................6

    17.1    Events of Default ..................................................................................6
    17.2    Remedies...............................................................................................6

i

   17.3    Landlord Defaults ................................................................................7
   17.4    Limitation on Liability...........................................................................7

18. ENVIRONMENTAL .................................................................................7

19. NOTICE ...................................................................................................7

20. ENTRY UPON LEASED PREMISES .....................................................8

21. GENERAL PROVISIONS .......................................................................8

   21.1    Brokerage .............................................................................................8
   21.2    Amendments. ........................................................................................8
   21.3    Severability ..........................................................................................8
   21.4    Attorney's Fees ....................................................................................8
   21.5    Time of Essence ...................................................................................8
   21.6    Waiver ..................................................................................................8
   21.7    Successors and Assigns.........................................................................8
   21.8    Governing Law .....................................................................................8
   21.9    Estoppel Agreements ............................................................................8
   21.10  Subordination, Non-Disturbance Agreement.........................................9
   21.11  Intentionally Omitted ...........................................................................9
   21.12  Force Majeure ......................................................................................9
   21.13  Consent ................................................................................................9
   21.14  Time Period for Payment .....................................................................9
   21.15  Execution of Lease...............................................................................9
   21.16  Counterparts .......................................................................................10
   21.17  Confidentiality ...................................................................................10
   21.18  Intentionally Deleted..........................................................................10
   21.19  Gender ................................................................................................10
   21.20  Memorandum of Lease .......................................................................10

22. WAIVER OF LANDLORD LIEN ..........................................................11

23. LANDLORD COVENANTS ..................................................................11

24. SIGNAGE ..............................................................................................11

25. ASSIGNMENT AND ASSUMPTION OF CONTRACTS.......................11

   25.1    Assignment and Assumption ..............................................................11
   25.2    Revenue from Contracts. ....................................................................11


Exhibit A - Leased Premises
Exhibit B - Form of Memorandum of Lease

1774192

## LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Renaissance Center) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | Riverfront Holdings, Inc., Delaware corporation. |
| 2. | Tenant: | *[_____]*, a Delaware *[_____]*. |
| 3. | Date of Lease: | *[_____ __]*, 2009. |
| 4. | Leased Premises: | The term "Leased Premises" shall mean (a) the land owned by Landlord (the "Land") that is located within the area outlined on the depiction attached hereto as Exhibit A and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements and fixtures located on the Land and owned by Landlord (collectively with the Buildings, the "Improvements"), and (d) all appurtenances belonging to or in any way pertaining to said Land and Improvements. |
| 5. | Commencement Date: | *[_____ __]*, 2009. |
| 6. | Termination Date: | See Section 3. |
| 11. | Term: | The term commencing on the Commencement Date and expiring on the Termination Date. |
| 12. | Base Rent: | $1.00 per month, payable on the Commencement Date and monthly thereafter or, at Tenant's option, prepayable in full for the entire Term. |
| 13. | Use: | See Section 5. |
| 14. | Landlord's Address: | *[_____]*<br>*[_____]*<br>*Attn: [_____]*<br>*Fax: [_____]*<br>*E-mail: [_____]*<br><br>With a copy to:<br><br>*[_____]*<br>*[_____]*<br>*Attn: [_____]* |

1

*Fax: [_____]*
*E-mail: [_____]*

15.   Tenant's Address:   *[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

16.   Exhibits to Lease:   Exhibit A – Leased Premises
Exhibit B - Form of Memorandum of Lease

2

## MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Leased Premises; and

WHEREAS, Tenant desires to lease the Leased Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.    LEASE SCHEDULE AND EXHIBITS.**  The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference.  All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule.  The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.    AGREEMENT TO LEASE.**  Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises and any and all fixtures, machinery, equipment and personal property (collectively, the "Landlord Fixtures and Personal Property") owned or leased by Landlord and located on the Leased Premises.

**3.    LEASE TERM.**  Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the earlier of (i) the date on which the stock of Landlord or title to the Leased Premises is transferred to Tenant or an affiliate of Tenant in accordance with the Amended and Restated Master Sale and Purchase Agreement (the "Purchase Agreement") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, or (ii) October 31, 2009 (as may be extended in accordance with this Section 3, the "Termination Date").  Notwithstanding the foregoing, Tenant may extend the Term through January 31, 2010 on all of the terms and conditions of this Lease by providing Landlord prior written notice on or before October 1, 2009 of Tenant's election to extend the Term.

**4.    RENTAL PAYMENTS**

**4.1    Rent.**  Tenant shall pay to Landlord the base rent (the "Base Rent") in the amount set forth in the Lease Schedule.  In addition, Tenant shall pay Landlord as additional rent (the "Additional Rent"; together with the Base Rent, the "Rent") any reasonable costs reasonably incurred by Landlord for which Tenant is responsible in accordance with this Lease.  Except as set forth in this Lease and except with respect to any matter caused by the gross negligence or willful misconduct of Landlord, Tenant shall be responsible for all costs associated with the Leased Premises that accrue or arise during the Term.  Tenant shall pay any Additional Rent within thirty (30) days after receipt of a reasonably detailed invoice therefor from Landlord. Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule).

1

**4.2**    **Services.**    Except as otherwise agreed in writing by Tenant and Landlord (including, without limitation, in the Purchase Agreement (as hereinafter defined)), Landlord shall not be responsible for providing or arranging for any services for the Leased Premises or to Tenant with respect to the Leased Premises, including, without limitation, maintenance and repair, electricity, gas, water or other utility services, janitorial services, or security services. Notwithstanding the foregoing, Landlord shall cooperate with Tenant in Tenant obtaining any of the aforesaid services it requires for the Leased Premises.    Notwithstanding anything to the contrary contained herein, to the extent such services are provided to the Leased Premises at Tenant's request pursuant to a Contract (as hereinafter defined) that cannot be assigned to Tenant in accordance with Section 25 without cost or without triggering a right to terminate the Contract by the other party thereto, the Contract shall not be assigned to Tenant, Landlord shall not take any adverse action with respect to such Contract, and Tenant, upon receipt of any invoices it receives from Landlord for services provided under the Contract after the Commencement Date, shall pay Landlord any amounts due thereunder on or before the due date thereof.

**4.3**    **Interest on Late Payments.**    In the event that Tenant fails to pay Rent, and such amount is not paid within fifteen (15) business days after the date on which Rent is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "Default Rate").

**5.**    **USE.**    Tenant may use the Leased Premises in a manner substantially similar to the manner in which the Leased Premises were used by General Motors Corporation prior to the Commencement Date and for any other use permitted or allowed by or under applicable laws. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to Tenant's use and occupancy of the Leased Premises.    Tenant may contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate or allowable legal proceeding or process and provided that upon final adjudication, determination or settlement of such proceeding or process Tenant shall immediately pay any amounts due and/or comply therewith.

**6.**    **TAXES.**    All real property taxes or special improvement taxes payable during the Term with respect to the Leased Premises, all property taxes levied or assessed against the Landlord Fixtures and Personal Property, and all property taxes levied or assessed against the Tenant Trade Fixtures and Personal Property (as hereinafter defined) (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Leased Premises, for any period within the Term, shall be paid by Tenant, before they become delinquent.    Landlord shall deliver copies of all tax bills it receives to Tenant within ten (10) business days after receipt thereof.    Tenant shall deliver to Landlord duplicate receipts and canceled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder.    Provided no Event of Default shall have occurred and be continuing hereunder, Tenant may contest any tax or assessment upon or

2

against the Leased Premises, or any part thereof, or the improvements at any time situated thereon, so long as the Tenant shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due.  The obligations of Tenant under this provision shall survive the expiration or termination of the Lease.

      **7.**    **<u>CONDITION OF LEASED PREMISES</u>.**  Tenant acknowledges that it accepts the Leased Premises in their "As-Is" condition on the Commencement Date.  Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Leased Premises, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

      **8.**    **<u>MAINTENANCE</u>.**  Landlord shall have no responsibility for any maintenance and repair of and replacements to the Leased Premises of any nature whatsoever (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord), including, without limitation, any capital, extraordinary and normal repairs and replacements to the Leased Premises, normal maintenance, the maintenance of the roof, footings, foundations, walls, structural elements, HVAC, mechanical, plumbing and electrical serving the Leased Premises exclusively.  Notwithstanding anything to the contrary contained herein, Tenant may elect to perform or elect not to perform the same in its sole discretion, provided that Tenant shall indemnify Landlord from any penalties or fines imposed on Landlord by any applicable governmental authority if Tenant elects not to perform any maintenance or repair of or make any replacements to the Leased Premises (except maintenance, repair and replacements necessitated by the gross negligence or willful misconduct of Landlord).

      **9.**    **<u>ASSIGNMENT AND SUBLETTING</u>.**  Tenant may assign its interest in this Lease (as to the entire Leased Premises or as to any portion thereof) and sublease all or any portion of the Leased Premises without obtaining the consent of Landlord.

      **10.**    **<u>LANDLORD'S TITLE AND QUIET ENJOYMENT</u>.**  Landlord represents and warrants that Landlord owns fee simple title to the Leased Premises and has full right and authority to make this Lease.  Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Leased Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord, subject to the rights of space tenants under existing leases.

      **11.**    **<u>ALTERATIONS AND IMPROVEMENTS; LIENS</u>.**

      **11.1**    **<u>Alterations, Additions and Improvements</u>.**  Tenant may, at its own expense and without Landlord's consent, make any alterations, additions or improvements to the Leased Premises which Tenant deems desirable.  All such alterations, additions and improvements shall be made in accordance with all applicable laws and ordinances.  Tenant shall not be required to restore the Leased Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term.

1774192

**11.2    Tenant Liens.**    Tenant shall not permit the Leased Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien.  Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

**11.3    Landlord Liens.**    Landlord shall not permit the Leased Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Leased Premises by, or at the direction or sufferance of Landlord; provided, however, that Landlord shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Landlord shall not be deemed in default hereunder as a result of such lien so long as Landlord is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Tenant desires to assign or sublease its interest in this Lease, as a condition precedent to the right to contest, Landlord shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Tenant's or Landlord's interest in the Leased Premises and any proceeds accruing from the assignment thereof.  Subject to Landlord's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.3, Tenant, at its option, may take all action Tenant deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Landlord shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Tenant for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Tenant in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate.  The obligations of Landlord under the provisions of this Section 11.3 shall survive the expiration or termination of this Lease.

**12.    TENANT TRADE FIXTURES AND PERSONAL PROPERTY.**    Tenant currently owns certain trade fixtures, machinery, equipment, and other personal property located on the Leased Premises and Tenant may during the Term install in or on the Leased Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached

1774192

to the Leased Premises.  Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Leased Premises at any time during the Term.

13.  **INSURANCE**.

13.1  **Tenant's Insurance.**  Throughout the Term, Tenant shall maintain insurance insuring:

(a)  The Building and any other Improvements at any time situated upon the Leased Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage).  The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage.

(b)  Tenant, Landlord (as an "additional insured"), and any permitted mortgagee of Landlord, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Leased Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

(c)  All contents and trade fixtures, furniture and furnishings in the Leased Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

13.2  **Form of Insurance.**  All of said insurance required by this Section 13 shall be in form and with companies licensed in the state in which the respective Leased Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord.  Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord.  Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant.  Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease.

14.  **DAMAGE AND CONDEMNATION.**  In the event of any casualty, taking or condemnation for a public or quasi public use or purpose by a competent authority affecting the Leased Premises, (a) neither party may terminate this Lease; (b) Tenant shall be entitled to all insurance proceeds or awards in connection with such casualty or condemnation; and (c) Tenant may elect, in its sole discretion and at its sole cost (except with respect to any insurance proceeds), to restore the Leased Premises.

15.  **[INTENTIONALLY DELETED].**

16.      **[INTENTIONALLY DELETED]**.

17.      **EVENTS OF DEFAULT; REMEDIES**.

17.1    **Events of Default.**    Each of the following events shall constitute an "Event of Default":

(a)     If Tenant shall fail to pay any Rent to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Tenant receives written notice of such failure to pay Rent from Landlord;

(b)     If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence;

(c)     If Tenant shall be adjudged an involuntary bankrupt, or a decree or order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

(d)     If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

(e)     If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension; or

(f)     If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof.

17.2    **Remedies.**    Upon the occurrence of any one or more Events of Default, Landlord may at its election pursue any and all remedies available at law or in equity (other than termination of this Lease), including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue

6

for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Leased Premises.

**17.3    Landlord Defaults.**  If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed sixty (60) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

**17.4    Limitation on Liability.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO SECTION 16 HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

**18.    ENVIRONMENTAL.**  Any Liabilities arising under any Environmental Law relating to (A) conditions present on the Leased Premises, (B) Landlord's ownership of the Leased Premises, (C) Tenant's occupancy of the Leased Premises or (D) Landlord's or Tenant's failure to comply with Environmental Laws (as all such terms are defined in the Purchase Agreement) with respect to the Leased Premises shall be governed by Sections 2.3(a)(viii) and 2.3(b)(iv) of the Purchase Agreement, with the Leased Premises treated as a Purchased Asset (as such term is defined in the Purchase Agreement) for such purpose and the provisions thereof shall be deemed incorporated by reference herein for that purpose.  Notwithstanding anything to the contrary contained in the Purchase Agreement, however, in no event shall Landlord be entitled to terminate this Lease in connection with this Section 18.

**19.    NOTICE.**  All notices or demands required or permitted to be given or served pursuant to this Lease shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule).  Such addresses may be changed from time to time by either party by serving notice as above provided.  In no event shall personal delivery at the Leased Premises be deemed an effective means of notice.

7

**20.    ENTRY UPON LEASED PREMISES.**    Neither Landlord nor Landlord's representatives shall be permitted to enter the Leased Premises during the Term without Tenant's prior written consent, which may be withheld in Tenant's sole discretion.  If Tenant consents to any such entry, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Leased Premises at all times.

**21.    GENERAL PROVISIONS.**

**21.1    Brokerage.**    Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction.  Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

**21.2    Amendments.**    No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

**21.3    Severability.**    If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**21.4    Attorney's Fees.**    In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

**21.5    Time of Essence.**    Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**21.6    Waiver.**    No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision.  Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

**21.7    Successors and Assigns.**    All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

**21.8    Governing Law.**    This Lease shall be construed in accordance with the laws of the state of Michigan.

**21.9    Estoppel Agreements.**    Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and

effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

      **21.10**  **Subordination, Non-Disturbance Agreement.**  Prior to entering into any financing encumbering the Leased Premises in accordance with this Lease (including <u>Section 23</u> hereof), at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to the applicable Separate Leased Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

      **21.11**  **Intentionally Omitted.**

      **21.12**  **Force Majeure.**  Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "<u>Force Majeure Events</u>"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event.  The foregoing definition of Force Majeure Events shall apply only during the Term.

      **21.13**  **Consent.**  Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed unless expressly stated otherwise herein.  Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

      **21.14**  **Time Period for Payment.**  Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

      **21.15**  **Execution of Lease.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises and this document shall become effective and binding only upon the execution and

9

delivery hereof by Tenant and by Landlord.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

      **21.16**  **Counterparts.**  This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

      **21.17**  **Confidentiality.**  Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("<u>Confidential Information</u>").  Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties.  Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party.  Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

      The following information shall not constitute Confidential Information for purposes of this <u>Section 21.17</u>:

        (a)    any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

        (b)    any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

        (c)    any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

        (d)    any information that the non-disclosing party is legally required to disclose; or

        (e)    any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

      **21.18**  **Intentionally Deleted.**  **Gender.**  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

      **21.20**  **Memorandum of Lease.**  At Tenant's request, the parties shall execute a Memorandum of Lease in the form attached hereto as <u>Exhibit B</u> with respect to the Leased Premises, and Tenant, at its cost, may record such Memorandum of Lease in the applicable county recorder's office.

1774192

22.    **WAIVER OF LANDLORD LIEN.**  Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Leased Premises and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

23.    **LANDLORD COVENANTS.**  During the Term, Landlord covenants that Landlord shall not take any action that might adversely affect the Leased Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Leased Premises after the Commencement Date.

24.    **SIGNAGE**.  During the Term, Tenant shall have the exclusive right to maintain and install, at Tenant's sole cost and expense, its building signage on any portion of the Leased Premises, subject to the rights of existing tenants.  Exterior signage installed by Tenant after the date hereof shall comply with applicable law.

25.    **ASSIGNMENT AND ASSUMPTION OF CONTRACTS**.

25.1    **Assignment and Assumption.**  During the Term, Landlord hereby sells, assigns, transfers, conveys and delivers unto Tenant, its successors and assigns, all of its right, title and interest in, to and under any and all leases, service contracts, property and hotel management agreements and other similar such agreements (collectively, the "Contracts") affecting or related to the Leased Premises and/or the ownership, operation, maintenance and repair thereof, together with all rights, options, interests and benefits thereunder (including, without limitation, any guaranties and security deposits (together with all accrued interest thereon) held by Landlord thereunder (collectively, the "Additional Rights"), subject to the rights of space tenants and other third parties in and to the Contracts.  Tenant hereby accepts such assignment of the Contracts, together with the Additional Rights, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Contracts that arise from and after the Commencement Date.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Contracts shall be prorated between Landlord and Tenant as of the Commencement Date in accordance with the terms of the Purchase Agreement.  On or before the Termination Date, Tenant shall sell, assign, transfer, convey and deliver the Contracts to Landlord.

25.2    **Revenue from Contracts.**  During the Term, Landlord shall continue to receive any and all revenue and/or rents due under the Contracts and shall, promptly upon receipt thereof, turn over such revenue or rents to Tenant unless directed otherwise by Tenant.

**[Signature Pages to Follow]**

11

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

*[_____]*, a Delaware *[_____]*

By: _____
Name: _____
Title: _____

**LANDLORD:**

RIVERFRONT HOLDINGS, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO MASTER LEASE AGREEMENT (RENAISSANCE CENTER)

## Exhibit A

### Leased Premises



## Exhibit B

**Form of Memorandum of Lease**

**Prepared by and after recording
return to:**

_____

_____

_____

_____

## MEMORANDUM OF LEASE

This Memorandum of Lease ("Memorandum") is made as of this \_\_\_\_\_ day of _____, 2009, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

WHEREAS, Landlord and Tenant are parties to that certain Master Lease Agreement (Renaissance Center) dated _____, 2009 (the "Lease"), pursuant to which Tenant leases the real property located in Detroit, Michigan and more particularly described on Exhibit A attached hereto and by this reference made a part hereof (the "Leased Premises") from Landlord; and

WHEREAS, Landlord and Tenant desire to place of record this Memorandum of Lease;

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.    Lease.    Landlord has leased to Tenant the Leased Premises under the terms, conditions and provisions contained in the Lease, such Lease being expressly incorporated herein by reference.

2.    Term.    The Lease is for a term beginning on _____, 2009 and terminating with respect to the Leased Premises on the earlier of (a) the date on which the stock of Landlord is transferred to Tenant in accordance with the Amended and Restated Master Sale and Purchase Agreement (the "Purchase Agreement") dated as of June 26, 2009 between Landlord, Tenant and the other parties named therein, or (ii) September 30, 2009 (either, the "Termination Date").

3.    Certain Landlord Covenants.    During the Term, Landlord covenants that Landlord shall not take any action that might adversely affect the Leased Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion, including, without limitation, incurring any Encumbrance (as such term is defined in the Purchase Agreement), consenting to any Encumbrance or failing to contest or notify Tenant of any Encumbrance affecting the Leased Premises after the Commencement Date.

4.    <u>Other Provisions</u>.  This Memorandum is not a complete summary of the unrecorded Lease.  Reference should be made to the unrecorded Lease for the full terms, conditions and provisions thereof.

5.    <u>Conflicts</u>.  This Memorandum is prepared solely for the purpose of recordation to give notice of the Lease and shall not constitute an amendment or modification of the Lease.  In the event of any conflict or inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the unrecorded Lease, the terms and provisions of the Lease shall govern and control in all respects.

6.    <u>Successors and Assigns</u>.  This Memorandum shall run with the land described on <u>Exhibit A</u> hereto and shall be binding upon and inure to the benefit of the Landlord and the Tenant and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first set forth above.

**TENANT:**

*[_____]*, a Delaware *[_____]*

By:    _____
Name:    _____
Title:    _____


**LANDLORD:**

RIVERSIDE HOLDINGS, INC., a Delaware corporation


By:    _____
Name:    _____
Title:    _____

**[To be inserted prior to recording:  legal description, proper recording, notary, witnessing requirements for state in which the Leased Premises is located]**

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit O**

Form of Equity Registration Rights Agreement

# EXHIBIT O

## FORM OF EQUITY REGISTRATION RIGHTS AGREEMENT

This EQUITY REGISTRATION RIGHTS AGREEMENT (this "Agreement") is entered into as of *[_____]*, 2009 by and among *[_____]*, a Delaware corporation (the "Corporation"), THE UNITED STATES DEPARTMENT OF THE TREASURY (the "UST"), 7176384 CANADA INC., a corporation organized under the laws of Canada ("Canada"), the UAW RETIREE MEDICAL BENEFITS TRUST, a voluntary employees' beneficiary association (the "VEBA"), and *[_____]*, a Delaware corporation (the "Debtor").[1]

WHEREAS, each Holder owns, as of the date hereof, that number of shares of common stock, par value $0.01 per share, of the Corporation (the "Common Stock") set forth opposite such Holder's name on Annex I hereto;

WHEREAS, the VEBA and the Debtor each own, as of the date hereof, one or more warrants initially exercisable for that number of shares of Common Stock set forth opposite such Holder's name on Annex I hereto (collectively, the "Warrants");

WHEREAS, as of the date hereof, the Government Holders and the VEBA each own that number of shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Preferred Stock"), set forth opposite such Holder's name on Annex I hereto;

WHEREAS, concurrently with the execution of this Agreement, the Corporation, the UST, Canada and the VEBA have executed that certain Stockholders Agreement, dated as of the date hereof;

WHEREAS, the Corporation has agreed to provide the UST, Canada, the VEBA and the Debtor with registration rights with respect to such shares of Common Stock, Warrants and Preferred Stock held by such Holders and their permitted assigns, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

*Section 1.1    Certain Defined Terms*.  As used in this Agreement, the following terms have the following meanings set forth below or in the sections set forth below:

"Adverse Disclosure" means public disclosure of material non-public information that, in the Corporation's good faith judgment, after consultation with independent outside counsel to the Corporation, (a) would be required to be made in any registration statement or report filed with

---

[1] In the event that any of the other Sellers under the Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009, by and among the Corporation, the Debtor and the other seller parties thereto, receive equity securities of the Corporation in connection with the closing of the transactions contemplated thereby, such Sellers shall be added as parties hereto and included as Holders hereunder.

the SEC by the Corporation so that such registration statement or report would not be materially misleading; (b) would not be required to be made at such time but for the filing of such registration statement; and (c) the Corporation has a *bona fide* business purpose for not disclosing publicly.

"Adverse Effect" shall have the meaning set forth in **Section 2.1.6**.

"Advice" shall have the meaning set forth in **Section 2.7**.

"Affiliate" means, with respect to any Person, any other Person who Controls, is Controlled by or is under common Control with, such Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Canada" shall have the meaning set forth in the Preamble.

"Co-Managers" shall have the meaning set forth in Section **2.1.4(a)**.

"Common Stock" shall have the meaning set forth in the Recitals.

"Control" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through the ownership of voting securities, general partnership interests or management member interests, by contract or trust agreement, pursuant to a voting trust or otherwise. "Controlling" and "Controlled" have the correlative meanings.

"Corporation" shall have the meaning set forth in the Preamble.

"Corporation Shelf Registration" shall have the meaning set forth in **Section 2.2.1**.

"Debtor" shall have the meaning set forth in the Preamble.

"Demand Registration" shall have the meaning set forth in **Section 2.1.1(a)**.

"Demand Request" shall have the meaning set forth in **Section 2.1.1(a)**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Excluded Registration" means a registration under the Securities Act of (a) securities pursuant to one or more Demand Registrations pursuant to **Article 2** hereof, (b) securities registered on Form S-4 or S-8 or any similar successor forms, (c) securities convertible into or exercisable or exchangeable for Common Stock and (d) securities registered on Form S-3 or any successor form covering solely securities issued under a dividend reinvestment program.

"FINRA" shall have the meaning set forth in **Section 2.5(a)(xvii)**.

"Government Holder" means the UST or Canada.

"Governmental Authority" means any United States or non-United States federal, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Holder" means each of (a) the UST, Canada, the VEBA and the Debtor and (b) any direct or indirect transferee of any such Holder who shall become a party to this Agreement in accordance with **Section 2.10**.

"Indemnitee" shall have the meaning set forth in **Section 2.9.1**.

"Indemnitor" shall have the meaning set forth in Section 2.9.3(a) but shall, for the avoidance of doubt, exclude the Government Holders and the VEBA for purposes of providing indemnification hereunder.

"Initial Sale Time" shall have the meaning set forth in **Section 2.9.1**.

"Inspectors" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"IPO" means the Corporation's first public offering of Common Stock (whether such offering is primary or secondary) that is underwritten by a nationally recognized investment bank, pursuant to a registration statement filed under the Securities Act and declared effective by the SEC (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, or a registration statement on Form S-4, Form S-8 or a successor to one of those forms).

"Issuer Free Writing Prospectus" shall have the meaning set forth in **Section 2.6**.

"Lead Underwriters" shall have the meaning set forth in **Section 2.1.4(a)**.

"Losses" shall have the meaning set forth in **Section 2.9.1**.

"Market Value" shall mean with respect to any particular class or type of Registrable Securities (a) at any time securities of the same class or type as the applicable Registrable Securities are listed on a national securities exchange, the closing price of such class or type of securities on the trading day immediately preceding the date of the Demand Request or Transfer Notice, (b) at any time that the Warrants are not listed on a national securities exchange but the Common Stock is listed on a national securities exchange, for each Warrant, the closing price of one share of Common Stock multiplied by the number of shares of Common Stock for which such Warrant is then exercisable (assuming cashless exercise), or (c) other than in the case of clause (a) or clause (b), the estimated market value determined in good faith by the Corporation based upon the advice of a nationally recognized independent investment banking firm retained by the Corporation (at the sole expense of the Corporation) for this purpose (which investment banking firm shall be reasonably acceptable to the UST or if the UST is not the Requesting Holder, the Holders of a majority of the Registrable Securities covered by the Demand Request or Transfer Notice).

"<u>Master Sale and Purchase Agreement</u>" means the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 and as amended from time to time, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation, Chevrolet-Saturn of Harlem, Inc. and NGMCO, Inc.

"<u>Material Adverse Change</u>" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Corporation and its subsidiaries, taken as a whole.

"<u>Person</u>" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"<u>Piggyback Offering</u>" shall have the meaning set forth in **Section 2.2.1**.

"<u>Preferred Stock</u>" shall have the meaning set forth in the Recitals.

"<u>Records</u>" shall have the meaning set forth in **Section 2.5(a)(xiii)**.

"<u>register</u>," "<u>registered</u>" and "<u>registration</u>" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness (or automatic effectiveness) of such registration statement.

"<u>Registrable Securities</u>" means (a) Warrants and the shares of Common Stock and/or Preferred Stock owned from time to time by the UST, Canada, the VEBA and the Debtor as of the date hereof and set forth on <u>Annex I</u> hereto, (b) the shares of Common Stock issued or issuable to any Holder upon exercise of a Warrant, (c) any additional securities of the Corporation issued to the Debtor pursuant to Section 3.2 of the Master Sale and Purchase Agreement and (d) any equity security issued in exchange for or with respect to any shares of Common Stock referred to in clauses (a), (b) or (c) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or similar transaction, or otherwise.   As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been registered under the Securities Act and disposed of in accordance with a registration statement; (ii) have been sold pursuant to Rule 144 under the Securities Act (or any successor provision); (iii) are held by a Holder that may sell all such Registrable Securities held by it in a single day pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision); (iv) cease to be outstanding (whether as a result of exercise, redemption, repurchase, conversion or otherwise); or (v) are held by any Person who is not a Holder.  For purposes hereof, "a majority of the Registrable Securities" and

"on the basis of the number of Registrable Securities" shall be determined assuming the exercise of the Warrants in full.

"<u>Representatives</u>" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants or financial advisors or any other Person acting on behalf of such Person.

"<u>Requesting Holders</u>" shall have the meaning set forth in **Section 2.1.1(a)**.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"<u>Shelf Registration</u>" shall have the meaning set forth in **Section 2.1.2(a)**.

"<u>Suspension Notice</u>" shall have the meaning set forth in **Section 2.7**.

"<u>Take-Down</u>" shall have the meaning set forth in **Section 2.1.2(b)**.

"<u>Transfer Notice</u>" shall have the meaning set forth in **Section 2.1.2(b)**.

"<u>UST</u>" shall have the meaning set forth in the Preamble.

"<u>VEBA</u>" shall have the meaning set forth in the Preamble.

"<u>VEBA Designee</u>" shall mean the person(s) authorized by the Committee (as defined in the UAW Retiree Medical Benefits Trust Agreement dated *[_____]* between *[_____]* and *[_____]*) to execute this Agreement and/or carry out the transactions contemplated hereby.

"<u>Warrants</u>" shall have the meaning set forth in the Recitals.

*Section 1.2    Terms Generally*.  The definitions in **Section 1.1** shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," unless the context expressly provides otherwise. All references herein to Articles, Sections, paragraphs, subparagraphs or clauses shall be deemed references to Articles, Sections, paragraphs, subparagraphs or clauses of this Agreement, unless the context requires otherwise. Unless otherwise specified, the words "this Agreement," "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."  Unless expressly stated otherwise, any law defined or referred to herein means such law as from time to time amended, modified or supplemented, including by succession of comparable successor laws and references to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## REGISTRATION RIGHTS

*Section 2.1    Demand Registration.*

*Section 2.1.1    Request for Registration.*

(a)    Subject to **Section 2.1.3**, any Holder or Holders of Registrable Securities shall have the right to require the Corporation to file a registration statement under the Securities Act for a public offering of all or part of its or their Registrable Securities (a "Demand Registration"), by delivering to the Corporation written notice stating that such right is being exercised, naming, if applicable and to the extent known by such Holder or Holders, any other Holders whose Registrable Securities are to be included in such registration (collectively, the "Requesting Holders"), specifying the number and type of each such Holder's Registrable Securities to be included in such registration, specifying whether the Registrable Securities to be included by the Requesting Holder are all of the Registrable Securities then held by such Requesting Holder and, subject to **Section 2.1.4** hereof, describing the intended method of distribution thereof (a "Demand Request"). Subject to **Section 2.1.3**, after receipt of any Demand Request, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.

(b)    Subject to **Section 2.1.3** and **Section 2.1.7**, the Corporation shall file the registration statement in respect of a Demand Registration as promptly as practicable and, in any event, (i) with respect to the filing of a Form S-3, within forty-five (45) days and (ii) with respect to the filing of any other type of registration statement, within ninety (90) days after receiving a Demand Request, and shall use reasonable best efforts to cause the same to be declared effective by the SEC as promptly as practicable after such filing.

*Section 2.1.2    Shelf Registration; Take-Downs.*

(a)    Subject to **Section 2.1.3**, with respect to any Demand Registration, at any time that the Corporation is eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) with respect to the Registrable Securities, the Requesting Holders may request that the Corporation (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration, or (ii) at any time that a registration statement pursuant to Rule 415 covering Registrable Securities is effective, register additional Registrable Securities of the Requesting Holders pursuant to such shelf registration statement to effect such Demand Registration (in either case, a "Shelf Registration"). For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" for all purposes under this Agreement except as otherwise provided in **Section 2.1.3**.

(b)    Subject to **Section 2.1.3**, any Holder or Holders with Registrable Securities registered pursuant to a Shelf Registration that intends to effect an underwritten offering with respect to such Registrable Securities shall deliver a notice to the Corporation at least fifteen (15) days prior to the commencement of such underwritten offering, stating (i) that such Holder or Holders intend to effect an underwritten offering of all or part of the Registrable Securities

included by such Holder or Holders in the Shelf Registration, (ii) if applicable and to the extent known by such Holder, any other Holders whose Registrable Securities are to be included in the underwritten offering, (iii) the number and type of each such Holder's Registrable Securities to be included in such underwritten offering, (iv) whether the Registrable Securities to be included by such Holder are all of the Registrable Securities then held by such Holder, and (v) the proposed timetable for such underwritten offering.  Any Holder with Registrable Securities registered pursuant to a Shelf Registration that intends to effect any other sale or transfer of such Registrable Securities (each a "Take-Down") shall deliver a notice to the Corporation at least five (5) days prior to effecting such non-underwritten sale or transfer, stating (i) that such Holder intends to effect a non-underwritten sale or transfer of all or part of the Registrable Securities included by such Holder in the Shelf Registration, (ii) the number and type of the Registrable Securities to be included in such sale or transfer and (iii) the proposed manner and timetable for such sale or transfer.  A notice provided by any Requesting Holder pursuant to the first two sentences of this **Section 2.1.2(b)** is referred to herein as a "Transfer Notice."  Subject to **Section 2.1.3**, after receipt of any Transfer Notice, the Corporation shall comply with the applicable notice requirements set forth in **Section 2.1.5**.  For the avoidance of doubt, a Take-Down shall not be deemed to be a Demand Registration and shall not be subject to **Section 2.1.3**.

(c)     Subject to **Section 2.1.3**, the Corporation shall use its reasonable best efforts to keep any Shelf Registration requested pursuant to **Section 2.1.2(a)** continuously effective under the Securities Act in order to permit the prospectus forming a part thereof to be usable by the Holders until the earlier of (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) and (ii) the date as of which all of such Requesting Holders are permitted to sell their Registrable Securities without registration pursuant to Rule 144 under the Securities Act without volume limitation or other restrictions on transfer thereunder.

(d)     The Corporation shall, from time to time, supplement and amend the Shelf Registration if required by the Securities Act, including the rules, regulations or instructions applicable to the registration form used by the Corporation for such Shelf Registration.

*Section 2.1.3   Limitations*.

(a)     Notwithstanding anything to the contrary herein, a Holder shall not be permitted to request a Demand Registration prior to one hundred eighty (180) days after the date of this Agreement, unless prior thereto the Corporation has a class of equity securities registered under Section 12(b) of the Exchange Act.

(b)     A Holder (other than the UST) shall not be permitted to request a Demand Registration prior to the time the Corporation has registered a class of equity securities under Section 12(b) of the Exchange Act.

(c)     A Holder shall not be permitted to request a Demand Registration, or submit a Transfer Notice with respect to an underwritten offering pursuant to a Shelf Registration, within one hundred eighty (180) days after either (i) the effective date of a previous Demand

Registration (other than a Shelf Registration) or (ii) the completion of any underwritten offering pursuant to a Shelf Registration.

(d)    A Holder shall not be permitted to submit a Demand Request, or a Transfer Notice for an underwritten offering, or effect any such Demand Registration or underwritten offering unless such Demand Request or Transfer Notice for an underwritten offering is for (i) a number of Registrable Securities having a Market Value equal to or exceeding $100 million in the aggregate, or (ii) all of the Registrable Securities then held by the Requesting Holder.

(e)    The Corporation shall not be required to effect, (i) until (but excluding) the third anniversary of the date hereof, more than two (2) Demand Registrations (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period, and (ii) from and including the third anniversary of the date hereof, more than one (1) Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) in the aggregate during any consecutive twelve (12) month period. Notwithstanding the foregoing, (i) the VEBA shall have the right, from and including the third anniversary of the date hereof, to request one additional Demand Registration (which shall include for this purpose any underwritten offering pursuant to a Shelf Registration but shall exclude a Shelf Registration) during any consecutive twelve (12) month period, and (ii) for the avoidance of doubt, the limitations set forth in this **Section 2.1.3** shall not apply to any non-underwritten Take-Down by any Holder under a Shelf Registration.

*Section 2.1.4    Demand Registrations for Underwritten Offerings.*

(a)    At the request of the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities submitting a Demand Request or Transfer Notice for an underwritten offering of Registrable Securities, the Corporation shall direct the applicable underwriter to conduct such offering in the form of a "firm commitment." With respect to any such underwritten offering, (i) the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering shall select the investment banking firm or firms to lead the underwritten offering (the "Lead Underwriters"); provided that such Lead Underwriters shall be reasonably acceptable to the Corporation, and (ii) the Corporation shall select the other investment banking firms, if any, to co-manage such underwritten offering (the "Co-Managers"), provided that such Co-Managers shall be reasonably acceptable to the UST or Canada, or if the UST or Canada is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering.

(b)    If a Demand Registration is for an underwritten offering or a transfer pursuant to a Shelf Registration involves an underwritten offering, no Holder may participate in any such underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Corporation; provided that such arrangements are subject to the consent of the UST, or if the UST is not participating in the proposed offering, the Holders of a majority of the Registrable Securities to be registered or included in such underwritten offering, and (ii) completes and executes all questionnaires,

8

powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such underwritten offering other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation (if agreed to) of each such Holder to indemnify the Lead Underwriters and any Co-Managers pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such offering and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

*Section 2.1.5  Rights of Nonrequesting Holders and the Corporation.*  Subject to **Section 2.1.3**, after receipt of any Demand Request or any Transfer Notice relating to an underwritten offering pursuant to a Shelf Registration, the Corporation shall promptly (but in any event within five (5) days) give written notice of (i) such proposed Demand Registration to all other Holders or (ii) such Transfer Notice to such other Holders whose securities are covered by such Shelf Registration, who shall have the right, exercisable by written notice to the Corporation within five (5) days of their receipt of the Corporation's notice, to elect to include in such Demand Registration or underwritten offering such portion of their Registrable Securities as they may request.  All Holders requesting to have their Registrable Securities included in a Demand Registration or underwritten offering shall be deemed to be "Requesting Holders" for purposes of this **Section 2.1**.  For the avoidance of doubt, subject to **Section 2.1.6**, the Corporation may register in any Demand Registration any equity securities of the Corporation.

*Section 2.1.6  Priority on Demand Registrations.*  With respect to any underwritten offering based on a Demand Registration (including an underwritten offering pursuant to a Shelf Registration), if the Lead Underwriters (after consultation with the Co-Managers) advise that the inclusion of the securities proposed to be included in such registration would adversely affect the price, timing or distribution of the offering or otherwise adversely affect its success (an "Adverse Effect"), the Corporation shall include in such underwritten offering (a) first, the Registrable Securities, pro rata among the Requesting Holders on the basis of the number of Registrable Securities owned by each such Requesting Holder, and (b) second, any other securities requested to be included in such underwritten offering (including securities to be sold for the account of the Corporation); provided, however, that if more than 25% of the Registrable Securities of any Holder subject to a Demand Request or Transfer Notice for an underwritten offering are excluded pursuant to the terms of this **Section 2.1.6** from the applicable Demand Registration or underwritten offering pursuant to a Shelf Registration, the offering shall not be deemed to constitute a Demand Registration for the purposes of **Section 2.1.3**.

*Section 2.1.7  Deferral of Filing; Suspension of Use.*  The Corporation may defer the filing (but not the preparation) or the effectiveness, or suspend the use, of any registration statement required by or filed pursuant to **Section 2.1**, at any time if (a) the Corporation determines, in its sole discretion, that such action or use (or proposed action or use) would

require the Corporation to make an Adverse Disclosure, or (b) prior to receiving the Demand Request or Transfer Notice, as applicable, the board of directors of the Corporation had determined to effect a registered underwritten public offering of Company equity securities or Company securities convertible into or exchangeable for Company equity securities for the Corporation's account and the Corporation had taken substantial steps (such as selecting a managing underwriter for such offering) and is proceeding with reasonable diligence to effect such offering; provided, however, that the Corporation shall not exercise its rights to deferral or suspension pursuant to this **Section 2.1.7**, and shall not so effect any such deferral or suspension, for more than a total of one hundred eighty (180) days (which need not be consecutive) in any consecutive twelve (12) month period.  In making any such determination to defer the filing or effectiveness, or suspend the use, of a registration statement required by **Section 2.1**, the Corporation shall not be required to consult with or obtain the consent of any Holder or any investment manager therefor, and any such determination shall be in the sole discretion of the Corporation, and neither the Holders nor any investment manager for any Holder shall be responsible or have any liability therefor.  The Corporation shall promptly notify the Holders of any deferral or suspension pursuant to this **Section 2.1.7** and the Corporation agrees that it will terminate any such deferral or suspension as promptly as reasonably practicable and will promptly notify each Holder in writing of the termination of any such deferral or suspension.

   *Section 2.1.8  Withdrawal from Demand Registration*.   Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Corporation with written notice.  Upon receipt of such written notice, the Corporation shall continue all efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of **Section 2.1.3(b)** or **Section 2.1.3(d)**, in which case, the Corporation may in its sole discretion cease all efforts to proceed with registration or the underwritten offering.  If the Corporation ceases all efforts to secure registration or effect the underwritten offering pursuant to this **Section 2.1.8**, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering pursuant to a Shelf Registration for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Request or Transfer Notice or (ii) the Requesting Holders pay or reimburse the Corporation for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering; provided that if, after a Demand Registration has become effective or an underwritten offering of Registrable Securities has been commenced, it is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, it shall be deemed not to have been effected and shall not count as a Demand Registration or underwritten offering for the purposes of **Section 2.1.3**.

   *Section 2.2    Piggyback Offerings*.

   *Section 2.2.1   Right to Piggyback*.  Each time the Corporation proposes to offer any of its equity securities in a registered underwritten offering (other than pursuant to an Excluded Registration) under the Securities Act (whether for the account of the Corporation or the account of any equity holder of the Corporation other than a Holder) (a "Piggyback Offering"), the Corporation shall give prompt written notice to each Holder of Registrable

Securities (which notice shall be given not less than twenty (20) days prior to (i) the offering in the case of an underwritten offering pursuant to Rule 415 under the Securities Act (or any successor rule) (a "<u>Corporation Shelf Registration</u>") or (ii) the anticipated filing date of the Corporation's registration statement in a registration other than a Corporation Shelf Registration), which notice shall offer each such Holder the opportunity to include any or all of its Registrable Securities in such underwritten offering, subject to the limitations contained in **Section 2.2.2** hereof.  Each Holder who desires to have its Registrable Securities included in such underwritten offering shall so advise the Corporation in writing (stating the number and type of Registrable Securities desired to be registered or included) within fifteen (15) days after the date of such notice from the Corporation.  Any Holder shall have the right to withdraw such Holder's request for inclusion of such Holder's Registrable Securities in any underwritten offering pursuant to this **Section 2.2.1** by giving written notice to the Corporation of such withdrawal.  Subject to **Section 2.2.2** below, the Corporation shall include in such underwritten offering all such Registrable Securities so requested to be included therein.  Notwithstanding the foregoing, the Corporation may at any time withdraw or cease proceeding with any such offering if it shall at the same time withdraw or cease proceeding with the offering of all other equity securities originally proposed to be included in such offering.

*Section 2.2.2    Priority on Piggyback Offerings.*

(a)    If a Piggyback Offering was initiated by the Corporation, and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities the Corporation proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder, and (iii) third, any other securities requested to be included in such Piggyback Offering. If as a result of the provisions of this **Section 2.2.2(a)**, any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw its request to include its Registrable Securities in such Piggyback Offering.

(b)    If a Piggyback Offering was initiated by a security holder of the Corporation (other than a Holder), and if the managing underwriter advises that the inclusion of the securities proposed to be included in such Piggyback Offering would cause an Adverse Effect, the Corporation shall include in such Piggyback Offering (i) first, the securities requested to be included therein by the security holders requesting such Piggyback Offering and the Registrable Securities requested to be included in such Piggyback Offering, pro rata among the holders of such securities on the basis of the number of securities owned by each such holder, and (ii) second, any other securities requested to be included in such Piggyback Offering (including securities to be sold for the account of the Corporation). If as a result of the provisions of this **Section 2.2.2(b)** any Holder shall not be entitled to include all Registrable Securities in such Piggyback Offering that such Holder has requested to be so included, such Holder may withdraw such Holder's request to include Registrable Securities in such Piggyback Offering.

(c)    No Holder may participate in a Piggyback Offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting

arrangements approved by the Corporation and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in customary form and reasonably satisfactory to the Holders, reasonably required under the terms of such underwriting arrangements; provided, however, that no such Holder shall be required to make any representations or warranties in connection with any such registration other than representations and warranties as to (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of all liens, claims, and encumbrances, (B) such Holder's power and authority to effect such transfer, and (C) such matters pertaining to compliance with securities laws as may be reasonably requested; provided, further, however, that (i) any obligation, if agreed to, of each such Holder to indemnify the underwriters pursuant to any such underwriting arrangements shall (1) only be with respect to information it provides to the Corporation in writing for use in such underwritten offering, (2) be several, not joint and several, and (3) be limited to the net amount received by such Holder from the sale of its Registrable Securities pursuant to such registration and (ii) neither the Government Holders nor the VEBA shall be required to indemnify any Indemnitee pursuant to this Agreement.

Section 2.2.3  *Selection of Underwriters*.  The Corporation shall select the investment banking firm or firms to manage the Piggyback Offering.

Section 2.2.4  No registration of Registrable Securities effected pursuant to this **Section 2.2** shall be deemed to have been effected pursuant to **Section 2.1.1** or **Section 2.1.2** or shall relieve the Corporation of its obligations under **Section 2.1.1** or **Section 2.1.2**.

Section 2.3  *SEC Form S-3*.  Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to cause Demand Registrations to be registered on Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 (or any successor forms) once the Corporation becomes eligible to use such form, and if the Corporation is not then eligible under the Securities Act to use such form, Demand Registrations shall be registered on the form for which the Corporation then qualifies. After becoming eligible to use Form S-3 or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3, the Corporation shall use its reasonable best efforts to remain so eligible.

Section 2.4  *Holdback Agreements*.

(a)  The Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of the offering pursuant to a Demand Registration, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of any registration statement in connection with an underwritten Demand Registration (other than a Shelf Registration), except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common

Stock) in effect on the date of the Demand Request, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(b)    If any Holders of Registrable Securities provide a Transfer Notice relating to an underwritten offering of Registrable Securities registered pursuant to a Shelf Registration, the Corporation shall not effect any public sale or distribution of its equity securities or any securities convertible into or exchangeable or exercisable for its equity securities, except in each case as part of such underwritten offering, during the sixty (60) day period (or such lesser period as the Lead Underwriters or managing underwriters may permit) beginning on the pricing date for such underwritten offering, except for (i) sales or distributions pursuant to registrations on Form S-4 or Form S-8 or any successor form, (ii) the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holder thereof, of options, warrants or other securities convertible into or exercisable or exchangeable for Common Stock pursuant to the terms of such options, warrants or other securities, (iii) sales or distributions pursuant to the terms of any other agreement to issue shares of Common Stock (or any securities convertible into or exchangeable or exercisable for Common Stock) in effect on the date of the Transfer Notice, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination and (iv) the issuance of shares of Common Stock in connection with transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course.

(c)    Each Holder agrees, in the event of an underwritten offering of equity securities by the Corporation (whether for the account of the Corporation or otherwise), not to offer, sell, contract to sell or otherwise dispose of any Preferred Stock, Warrants, Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 under the Securities Act (except as part of such underwritten offering), during the sixty (60) day period (or such lesser period in each case as the Lead Underwriters or managing underwriters may permit) beginning on the effective date of the registration statement for such underwritten offering (or, in the case of an offering pursuant to an effective shelf registration statement pursuant to Rule 415, the pricing date for such underwritten offering); provided, however, that (i) any applicable period shall terminate on such earlier date as the Corporation gives notice to the Holders that the Corporation declines to proceed with any such offering and (ii) the sum of all holdback periods applicable to the Holders shall not exceed one hundred twenty (120) days (which need not be consecutive) in any given twelve (12) month period.

Section 2.5    Registration Procedures.

(a)    If and whenever the Corporation is required to effect the registration of any Registrable Securities pursuant to this Agreement, subject to the terms and conditions of this Agreement, the Corporation shall use its reasonable best efforts to effect the registration and the sale, as applicable, of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Corporation shall as expeditiously as possible:

(i)     prepare and file with the SEC, pursuant to **Section 2.1** with respect to any Demand Registration, a registration statement on any appropriate form under the Securities Act with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective as promptly as practicable; <u>provided</u> that as far in advance as practicable before filing such registration statement or any amendment thereto, the Corporation shall furnish to the selling Holders copies of reasonably complete drafts of all such documents prepared to be filed (including exhibits), and any such selling Holder shall have the opportunity to object to any information contained therein and the Corporation shall make corrections reasonably requested by such selling Holder with respect to such information prior to filing any such registration statement or amendment; <u>provided</u>, <u>further</u>, that the Corporation shall not file any such registration statement, and any amendment thereto, to which a Holder shall reasonably object in writing on a timely basis, unless in the Corporation's judgment such filing is necessary to comply with applicable law;

(ii)    except in the case of a Shelf Registration, prepare and file with the SEC such amendments, post-effective amendments, and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of not less than one hundred eighty (180) days (or such lesser period as is necessary for the underwriters in an underwritten offering to sell unsold allotments) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the selling Holders thereof set forth in such registration statement;

(iii)    in the case of a Shelf Registration, comply with the provisions of **Section 2.1.2(c)** and **Section 2.1.2(d)**;

(iv)    furnish to each selling Holder of Registrable Securities and the underwriters of the securities being registered, without charge, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), any documents incorporated by reference therein and such other documents as such selling Holders or underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such selling Holders or the sale of such securities by such underwriters (it being understood that, subject to **Section 2.1.7**, **Section 2.4(c)**, **Section 2.6** and **Section 2.7** and the requirements of the Securities Act and applicable state securities laws, the Corporation consents to the use of the prospectus and any amendment or supplement thereto by each selling Holder and the underwriters in connection with the offering and sale of the Registrable Securities covered by the registration statement of which such prospectus, amendment or supplement is a part);

(v)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as the Lead Underwriters or managing underwriters reasonably request (or, in the event the registration statement does not relate to an underwritten offering, as the selling Holders of a majority of such Registrable Securities being offered may reasonably request); use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period in which such registration statement is required to be kept effective; and do any and all other acts

and things which may be reasonably necessary or advisable to enable each selling Holder to consummate the disposition of the Registrable Securities owned by such selling Holder in such jurisdictions; provided, however, that the Corporation shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) consent to general service of process in any such jurisdiction or (C) take any action that would subject it to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject;

(vi)    promptly notify each selling Holder and each underwriter and (if requested by any such Person) confirm such notice in writing (A) when a prospectus or any prospectus supplement or post-effective amendment has been filed and, with respect to a registration statement or any post-effective amendment, when the same has become effective, (B) of the issuance by any state securities or other regulatory authority of any order suspending the qualification or exemption from qualification of any of the Registrable Securities under state securities or "blue sky" laws or the initiation, or threatened initiation, of any proceedings for that purpose, or (C) of the happening of any event which makes any statement made in a registration statement or related prospectus untrue or which requires the making of any changes in such registration statement, prospectus or documents so that they shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, as promptly as practicable thereafter, prepare and file with the SEC and furnish a supplement or amendment to such prospectus so that, as thereafter deliverable to the purchasers of such Registrable Securities, such prospectus shall not contain any untrue statement of a material fact or omit a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vii)    permit any selling Holder that might reasonably be deemed to be an underwriter or a Controlling Person of the Corporation to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Corporation in writing, which in the reasonable judgment of such Holder and its counsel should be included;

(viii)    make available members of the management of the Corporation or the applicable Corporation subsidiaries for reasonable assistance in the selling efforts relating to any offering of Registrable Securities covered by a registration statement filed pursuant to this Agreement, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and road shows); provided, however, that management need only be made available for one such offering for each of the UST, Canada and the VEBA in any twelve (12) month period;

(ix)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, including the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, and make generally available to the Corporation's security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than thirty (30) days after the end of the twelve (12) month period beginning with the first day of the Corporation's first fiscal quarter commencing after the effective date of a

registration statement, which earnings statement shall cover said twelve (12) month period, and which requirement shall be deemed to be satisfied if the Corporation timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(x)     if requested by the Lead Underwriters, managing underwriters or any selling Holder, promptly incorporate in a prospectus supplement or post-effective amendment such information as the Lead Underwriters, managing underwriters or any selling Holder reasonably requests to be included therein, including, with respect to the Registrable Securities being sold by the selling Holders, the purchase price being paid therefor by the underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and promptly make all required filings of such prospectus supplement or post-effective amendment;

(xi)     as promptly as practicable after filing with the SEC of any document which is incorporated by reference into a registration statement (in the form in which it was incorporated), deliver a copy of each such document to each selling Holder;

(xii)     cooperate with the selling Holders and Lead Underwriters or the managing underwriters to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under applicable law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the Lead Underwriters, managing underwriters or such selling Holders may request at least two (2) business days prior to any sale of the Registrable Securities and keep available and make available to the Corporation's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

(xiii)     promptly make available for inspection by any selling Holder, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or Representative retained by any such selling Holder or underwriter (collectively, the "Inspectors"), all financial and other records and pertinent corporate documents (collectively, the "Records") and properties of the Corporation, as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Corporation's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided, however, that, unless the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, the Corporation shall not be required to provide any information under this subparagraph (xiii) if (A) the Corporation believes, after consultation with counsel for the Corporation, that to do so would cause the Corporation to forfeit an attorney-client privilege that was applicable to such information or (B) if either (1) the Corporation has requested and been granted from the SEC confidential treatment of such information contained in any filing with the SEC or documents provided supplementally or otherwise or (2) the Corporation reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing, unless prior to furnishing any such information with respect to clause (B) such selling Holder of Registrable Securities requesting such information agrees to enter into a confidentiality agreement in a form acceptable to the

Corporation; and underlined provided, further, that each selling Holder of Registrable Securities agrees that it shall, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Corporation and allow the Corporation, at its expense, to undertake appropriate action and to prevent disclosure of the Records deemed confidential;

(xiv)    furnish to each selling Holder and underwriter a signed counterpart of (A) an opinion or opinions of counsel to the Corporation (which may be in-house counsel) provided that such counsel is reasonably acceptable to such Holders and the underwriter, and (B) a comfort letter or comfort letters from the Corporation's independent public accountants, each in customary form and covering such matters of the type customarily covered by opinions or comfort letters, as the case may be, as the selling Holders, Lead Underwriters or managing underwriters reasonably requests;

(xv)    cause the Registrable Securities included in any registration to be (A) in the case of an IPO, listed on a securities exchange or exchanges or an inter-dealer quotation system, as determined by the Corporation, or (B) in the case of a registration other than an IPO, (1) listed on each securities exchange, if any, on which similar securities issued by the Corporation are then listed or (2) quoted on an inter-dealer quotation system if similar securities issued by the Corporation are quoted thereon, as applicable;

(xvi)    provide a transfer agent and registrar for all Registrable Securities registered hereunder and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(xvii)    cooperate with each selling Holder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the Financial Industry Regulatory Authority ("FINRA");

(xviii)    during the period when the prospectus is required to be delivered under the Securities Act, promptly file all documents required to be filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act;

(xix)    notify each selling Holder of Registrable Securities promptly of any request by the SEC for the amending or supplementing of such registration statement or prospectus or for additional information;

(xx)    subject to **Section 2.1.4(b)** and **Section 2.2.2(c)**, enter into such agreements (including underwriting agreements) as are customary in connection with an underwritten registration; and

(xxi)    advise each selling Holder of such Registrable Securities, promptly after it receives notice or obtains knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued.

(b)    The selling Holders shall reasonably cooperate with the Corporation in the preparation and filing of any registration statement under the Securities Act pursuant to this Agreement and provide the Corporation with all information reasonably necessary to complete such preparation as the Corporation may, from time to time, reasonably request in writing, and the Corporation may exclude from such registration the Registrable Securities of any selling Holder (or not proceed with such registration) if such selling Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.  Promptly following any sale or other transfer of any Registrable Securities, each Holder shall notify the Corporation in writing thereof, which notice shall specify the amount and type of securities involved, the date of the sale or transfer and whether the sale or transfer was effected under a registration statement or otherwise.

(c)    Each of the parties shall treat all notices of proposed transfers and registrations, and all information relating to any blackout periods under **Section 2.1.7** received from another party with the strictest confidence (and in accordance with the terms of any applicable confidentiality agreement among the Corporation and the Holder) and shall not disseminate such information.

*Section 2.6    Issuer Free Writing Prospectuses*.  The Corporation represents and agrees that, unless it obtains the prior consent of the Holders of a majority of the Registrable Securities participating in a registration or offering or the approval of the counsel for such Holders, and each of the Holders represents and agrees that, unless it obtains the prior consent of the Corporation, it shall not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Corporation represents that any Issuer Free Writing Prospectus shall not include any information that conflicts with the information contained in a registration statement or prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the registration statement and the prospectus, shall not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Section 2.7    Suspension of Dispositions*.  Each Holder agrees that upon receipt of any notice (a "Suspension Notice") from the Corporation of the happening of any event of the kind described in **Section 2.5(a)(vi)(B)** or **(C)** or **Section 2.5(a)(xxi)** such Holder shall forthwith discontinue disposition of Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus, or until it is advised in writing (the "Advice") by the Corporation that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Corporation, such Holder shall deliver to the Corporation all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.  In the event the Corporation shall give any such notice, the time period regarding the effectiveness of registration statements set forth in **Section 2.5(a)(ii)** hereof, if applicable, shall be extended by the number of days during the period from and including the date of the giving of the Suspension Notice to and including the date when each seller of Registrable Securities covered by such registration

statement shall have received the copies of the supplemented or amended prospectus or the Advice. The Corporation shall use its reasonable best efforts and take such actions as are reasonably necessary to render the Advice as promptly as practicable.

*Section 2.8    Registration Expenses.*  The Corporation shall pay all reasonable fees and expenses incident to the performance of or compliance with its obligations under this **Article 2**, including (a) all registration and filing fees, including fees and expenses (i) with respect to filings required to be made with all applicable securities exchanges and/or FINRA and (ii) of compliance with securities or "blue sky" laws including any fees and disbursements of counsel for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities pursuant to **Section 2.5(a)(v)**, (b) printing expenses, including expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by the Lead Underwriters or managing underwriter(s), if any, or by the Holder, (c) messenger, telephone and delivery expenses of the Corporation, (d) fees and disbursements of counsel for the Corporation, (e) expenses of the Corporation incurred in connection with any "road show" or other marketing efforts, (f) fees and disbursements of all independent certified public accountants (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to this Agreement) and any other Persons, including special experts, retained by the Corporation, and (g) fees up to $250,000 plus reasonable disbursements of one legal counsel for the Requesting Holders in connection with each registration or offering of their Registrable Securities or sale (including, for the avoidance of doubt, a Take-Down) of their Registrable Securities under a Shelf Registration but only if such registration, offering or sale either is effected or, pursuant to **Section 2.7**, is postponed. For the avoidance of doubt, the Corporation shall not be required to pay any, and each Holder shall pay its own, underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any registration statement, or any other expenses of any Holder. In addition, the Corporation shall bear all of its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange or inter-dealer quotation system on which similar securities issued by the Corporation are then listed and the fees and expenses of any Person, including special experts, retained by the Corporation.

*Section 2.9    Indemnification.*

*Section 2.9.1    Indemnification by the Corporation.*  The Corporation agrees to indemnify and hold harmless, to the fullest extent permitted by law, each Holder, the trustees of any Holder, the investment manager or managers acting on behalf of any Holder with respect to the Registrable Securities, Persons, if any, who Control any of them, and each of their respective Representatives (each, an "Indemnitee"), from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable costs of investigation and legal expenses) ("Losses") arising out of or caused by any untrue statement or alleged untrue statement of a material fact contained in any registration statement described herein or any related prospectus or Issuer Free Writing Prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto), or arising out of or caused by any omission or alleged

omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the case of the prospectus, in light of the circumstances in which they were made, not misleading, except insofar as such Losses arise out of or are caused by any such untrue statement or omission included or omitted in conformity with information furnished to the Corporation in writing by such Indemnitee or any Person acting on behalf of such Indemnitee expressly for use therein; provided, however, that the foregoing indemnity agreement with respect to any preliminary prospectuses or Issuer Free Writing Prospectuses shall not inure to the benefit of such Indemnitee if the Person asserting any Losses against such Indemnitee purchased Registrable Securities and (a) prior to the time of sale of the Registrable Securities to such Person (the "Initial Sale Time") the Corporation shall have notified the respective Holder that the preliminary prospectus or Issuer Free Writing Prospectus (as it existed prior to the Initial Sale Time) contains an untrue statement of material fact or omits to state therein a material fact required to be stated therein in order to make the statements therein not misleading, (b) such untrue statement or omission of a material fact was corrected in a preliminary prospectus or, where permitted by law, Issuer Free Writing Prospectus and such corrected preliminary prospectus or Issuer Free Writing Prospectus was provided to such Holder a reasonable amount of time in advance of the Initial Sale Time such that the corrected preliminary prospectus or Issuer Free Writing Prospectus could have been provided to such Person prior to the Initial Sale Time, (c) such corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) was not conveyed to such Person at or prior to the Initial Sale Time and (d) such Losses would not have occurred had the corrected preliminary prospectus or Issuer Free Writing Prospectus (excluding any document then incorporated or deemed incorporated therein by reference) been conveyed to such Person as provided for in clause (c) above.  This indemnity shall be in addition to any liability the Corporation may otherwise have under this Agreement or otherwise.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any Holder or any indemnified party and shall survive the transfer of Registrable Securities by any Holder.

Section 2.9.2  *Indemnification by the Holders*.  Each Holder (other than the Government Holders, the VEBA and the Debtor) agrees, to the fullest extent permitted under applicable law severally and not jointly, to indemnify and hold harmless each of the Corporation, its directors, officers, employees and agents, and each Person, if any, who Controls the Corporation, to the same extent as the foregoing indemnity from the Corporation, but only with respect to Losses arising out of or caused by an untrue statement or omission included or omitted in conformity with information furnished in writing by or on behalf of the respective Holder expressly for use in any registration statement described herein or any related prospectus relating to the Registrable Securities (as amended or supplemented if the Corporation shall have furnished any amendments or supplements thereto).  No claim against the assets of any Holder shall be created by this **Section 2.9.2**, except as and to the extent permitted by applicable law. Notwithstanding the foregoing, no Holder shall be liable to the Corporation or any such Person for any amount in excess of the net amount received by the Holder from the sale of Registrable Securities in the offering giving rise to such liability.

Section 2.9.3  *Indemnification Procedures*.

(a)    In case any claim is asserted or any proceeding (including any governmental investigation) shall be instituted where indemnity may be sought by an Indemnitee

pursuant to any of the preceding paragraphs of this **Section 2.9**, such Indemnitee shall promptly notify in writing the Person against whom such indemnity may be sought (the "Indemnitor"); provided, however, that the omission so to notify the Indemnitor shall not relieve the Indemnitor of any liability which it may have to such Indemnitee except to the extent that the Indemnitor was prejudiced by such failure to notify.  The Indemnitor, upon request of the Indemnitee, shall retain counsel reasonably satisfactory to the Indemnitee to represent (subject to the following sentences of this **Section 2.9.3(a)**) the Indemnitee and any others the Indemnitor may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any Indemnitee shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnitee unless (a) the Indemnitor and the Indemnitee shall have mutually agreed to the retention of such counsel, (b) the Indemnitor fails to take reasonable steps necessary to defend diligently any claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnitor and the Indemnitee and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests or legal defenses between them and, in all such cases, the Indemnitor shall only be responsible for the reasonable fees and expenses of such counsel.  It is understood that the Indemnitor shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate law firm (in addition to any local counsel) for all such Indemnitees not having actual or potential differing interests or legal defenses among them, and that all such fees and expenses shall be reimbursed as they are incurred.  The Indemnitor shall not be liable for any settlement of any proceeding affected without its written consent.

(b)    If the indemnification provided for in this **Section 2.9** is unavailable to an Indemnitee in respect of any Losses referred to herein, then the Indemnitor, in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or Controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such Losses, as well as any other relevant equitable considerations.  If the indemnification described in **Section 2.9.1** or **Section 2.9.2** is unavailable to an Indemnitee, the relative fault of the Corporation, any Holder and Persons acting on behalf of or Controlling the Corporation or any such Holder shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Corporation, a Holder or by Persons acting on behalf of the Corporation or any Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The Indemnitor shall not be required to contribute pursuant to this **Section 2.9.3(b)** if there has been a settlement of any proceeding affected without its written consent.  No claim against the assets of any Holder shall be created by this **Section 2.9.3(b)**, except as and to the extent permitted by applicable law.  Notwithstanding the foregoing, no Holder shall be required to make a contribution in excess of the net amount received by such Holder from the sale of Registrable Securities in the offering giving rise to such liability.  For the avoidance of doubt, none of the Government Holders, the VEBA or the Debtor shall be required to make any contribution to any Indemnitee under this Section 2.9.3(b).

Section 2.9.4    *Survival.*  The indemnification contained in this **Section 2.9** shall remain operative and in full force and effect regardless of any termination of this Agreement.

Section 2.10    *Transfer of Registration Rights*. The rights and obligations of a Holder under this Agreement may be assigned to any transferee or assignee that directly acquires Registrable Securities from such Holder (including, without limitation, in connection with any such assignment by either Government Holder or the VEBA to an affiliate Controlled by such Government Holder or the VEBA, as applicable (provided that Canada may also effect such assignment to an affiliate Controlled by Canada Development Investment Corporation, a Crown corporation and the sole shareholder of Canada or to an affiliate Controlled by [the Department of Finance of Canada]), and in connection with any such assignment by the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction), but only if (a) the respective Holder agrees in writing with the transferee or assignee to assign such rights, and a copy of such agreement is furnished to the Corporation concurrent with such transfer or assignment and (b) concurrent with such transfer or assignment, such transferee or assignee furnishes the Corporation with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being transferred or assigned, and the transferee or assignee agrees in writing with the Corporation to be bound by all the provisions and obligations contained herein as a Holder hereunder.  Notwithstanding the foregoing, (x) any transferee or assignee who becomes bound by the provisions of this Agreement pursuant to the first sentence of this Section 2.10 shall have all rights and obligations as a "Holder" hereunder but, unless such transferee or assignee is either (1) an Affiliate of the UST, Canada, the VEBA or the Debtor or (2) a successor in interest of the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction, such transferee or assignee shall not have any of the rights hereunder that are specific to the UST, Canada, the VEBA or the Debtor, as applicable, and (y) the rights of the Debtor under this Agreement shall not be assigned by the Debtor in connection with the distribution of any Registrable Securities from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction other than any distribution of any Registrable Securities that may be deemed to have been made from the Debtor to any successor in interest, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

Section 2.11    *Rule 144*.  After such time as the Corporation has registered a class of equity securities under Section 12(b) or Section 12(g) of the Exchange Act, or otherwise is required to report under Section 15(d) of the Exchange Act, the Corporation shall file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and shall take such further action as the Holders may reasonably request, all to the extent required from time to time to enable the Holders to sell Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC.  The Corporation shall promptly upon the request of any Holder furnish to such Holder evidence of the number of shares of Common Stock then outstanding, as of the most recent date practicable. Any sale or transfer by a Holder of Registrable Securities that could have been effected either as

a sale of securities pursuant to, and in accordance with, Rule 144 under the Securities Act (or any successor provision) or a sale covered by a Shelf Registration shall be deemed for all purposes under this Agreement to be a sale or transfer by such Holder pursuant to, and in accordance with, Rule 144 under the Securities Act.

*Section 2.12    Preservation of Rights.*

(a)   The Corporation will not (x) grant any registration rights to third parties which are inconsistent with the rights granted hereunder or (y) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates the rights expressly granted to the Holders in this Agreement.

(b)   If the Corporation grants any registration rights to a third party that are more favorable to such party than the rights granted to any of the UST, Canada, the VEBA and the Debtor hereunder, the UST, Canada, the VEBA and the Debtor shall be entitled to have their registration rights improved to the level of the registration rights of such third party, and all of the parties hereto shall execute an amendment to this Agreement reflecting such more favorable rights.

*Section 2.13   Registration of Common Stock under Exchange Act;  Listing.* Notwithstanding anything to the contrary herein, the Corporation shall use its reasonable best efforts to (i) file with the SEC a registration statement to register its Common Stock under Section 12 of the Exchange Act and cause such registration statement to be declared effective no later than July 31, 2010 and (ii) cause its Common Stock to be approved for listing on the New York Stock Exchange or any other national securities exchange in connection with a distribution, if any, of Registrable Securities by the Debtor pursuant to a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction.

## ARTICLE 3
## TERMINATION

*Section 3.1     Termination.*   Other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the obligations of the Corporation hereunder shall terminate upon the time when there are no Registrable Securities remaining.   With respect to each Holder, other than **Sections 2.8** and **2.9** and **Article 4**, this Agreement and the rights and obligations of such Holder hereunder shall terminate when such Holder no longer holds any Registrable Securities and, with respect to the Debtor, has no further right to receive additional securities of the Corporation pursuant to Section 3.2 of the Master Sale and Purchase Agreement.   Notwithstanding the foregoing, all liabilities or obligations under **Sections 2.8** and **2.9** and **Article 4** shall remain in effect in accordance with the terms of such provisions.

## ARTICLE 4
## MISCELLANEOUS

*Section 4.1    Notices.*   Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or

internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first business day following such receipt if the date of such receipt is not a business day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to the Corporation:

*[_____]*
*[_____]*
*[_____]*
Attention: *[_____]*
Telephone: *[_____]*
Facsimile: *[_____]*

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
        R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile: 212-504-6666

If to the UST:

*[_____]*
*[_____]*
*[_____]*
Attention: *[_____]*
Telephone: *[_____]*
Facsimile: *[_____]*

with a copy to:
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: John J. Rapisardi
        R. Ronald Hopkinson
Telephone: 212-504-6000
Facsimile: 212-504-6666

If to Canada:

7176384 Canada Inc.
1235 Bay Street, Suite 400
Toronto, ON M54 3K4
Attention: Mr. Michael Carter

Facsimile:  416-934-5009

with a copy to:
Patrice S. Walch-Watson, Esq.
Torys LLP
79 Wellington Street West
Suite 3000
Toronto, ON M5K 1N2
Facsimile: 416-865-7380

If to the VEBA:

UAW Retiree Medical Benefits Trust
P.O. Box 14309
Detroit, Michigan 48214

with a copy to:
Daniel W. Sherrick
General Counsel
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan 48214
Facsimile: 313-822-4844

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Attention: Richard S. Lincer & David I. Gottlieb

If to the Debtor:

*[_____]*
*[_____]*
*[_____]*
Attention: *[_____]*
Telephone: *[_____]*
Facsimile: *[_____]*

with a copy to:
Jenner & Block LLP
330 North Wabash Avenue

Chicago, Illinois 60611-7603
Attention: Brian R. Boch
        Catherine Abbott
Telephone: 312-222-9350
Facsimile: 312-527-0484

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller
        Stephen Karotkin
        Raymond Gietz
Telephone: 212-310-8000
Facsimile: 212-310-8007

provided, however, if any party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 4.1**, then to the last addressee as so designated.

Section 4.2    Authority.  Each of the parties hereto represents to the other that (a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate or organizational action and no such further action is required, (c) it has duly and validly executed and delivered this Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

Section 4.3    No Third Party Beneficiaries.  This Agreement shall be for the sole and exclusive benefit of (a) the Corporation and its successors and permitted assigns, (b) each Holder (including any trustee thereof) and any other investment manager or managers acting on behalf of such Holder with respect to the Common Stock, Preferred Stock, or the Warrants and their respective successors and permitted assigns and (c) each of the Persons entitled to indemnification under **Section 2.9** hereof.  Nothing in this Agreement shall be construed to give any other Person any legal or equitable right, remedy or claim under this Agreement.

Section 4.4    No Personal Liability by Trustees.  It is expressly understood and agreed by the parties hereto that this Agreement is being executed and delivered by the UST managers and the VEBA Designee not individually or personally but solely in their respective capacities as managers and trustees in the exercise of the powers and authority conferred and vested in them as such trustees and under no circumstances shall any trustee or former trustee have any personal liability in the trustee's individual capacity in connection with this Agreement or any transaction contemplated hereby.

Section 4.5    *Cooperation*.  Each party hereto shall take such further action, and execute such additional documents, as may be reasonably requested by any other party hereto in order to carry out the purposes of this Agreement.

Section 4.6    *Governing Law; Forum Selection*.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles of the State of New York other than Section 5-1401 of the General Obligations Law of the State of New York.  Any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced exclusively in the courts of the State of New York located in the Borough of Manhattan or (to the extent subject matter jurisdiction exists therefor) the U.S. District Court for the Southern District of New York, and the parties irrevocably submit to the jurisdiction of both courts in respect of any such action or proceeding.

Section 4.7    *WAIVER OF JURY TRIAL*.  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 4.8    *Successors and Assigns*.  Except as otherwise expressly provided herein, including pursuant to **Section 2.10**, neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and benefit the Corporation, each Holder, and their respective successors and permitted assigns; provided, that, for the avoidance of doubt, any Person who receives securities of the Corporation as a distribution from the Debtor as part of any plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction (other than any such Person that is a successor in interest to the Debtor, including any liquidating trust established under a plan of reorganization or liquidation that has been confirmed by any bankruptcy court of competent jurisdiction) shall not be bound by or have any rights pursuant to this Agreement.

Section 4.9    *Entire Agreement*.  This Agreement (together with the Annex) contains the final, exclusive and entire agreement and understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.  This Agreement shall not be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 4.10   *Severability*.  Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is

held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 4.11    *Enforcement of this Agreement*.    The parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each party agrees that it will not oppose the granting of such relief on the basis that the requesting party has an adequate remedy at law.

Section 4.12    *Amendment*.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the parties.

Section 4.13    *Headings*.    The descriptive headings of the Articles, Sections and paragraphs of, and the Annex to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 4.14    *Counterparts; Facsimiles*.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement. All signatures of the parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and be binding upon such party.

Section 4.15    *Time Periods*.    Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days shall be taken within that number of calendar days (and not business days); provided, however, that if the last day for taking such action falls on a day that is not a business day, the period during which such action may be taken shall be automatically extended to the next business day.

Section 4.16    *No Binding Effect on U.S. Government*. Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be binding on or create any obligation on the part of the United States Department of the Treasury or any other department or any agency or branch of the United States Government, or any political subdivision thereof.

     *Section 4.17    Canada*.    Notwithstanding anything in this Agreement to the contrary, Canada shall be bound by this Agreement only in its capacity as a Holder and nothing in this Agreement shall be binding on or create any obligation on the part of Canada in any other capacity or any branch of the Government of Canada or subdivision thereof.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto, being duly authorized, have executed and delivered this Equity Registration Rights Agreement on the date first above written

*[CORPORATION]*

By: _____

Name: _____

Title: _____

**THE UNITED STATES DEPARTMENT OF THE TREASURY**

By: _____

Name: _____

Title: _____

**7176384 CANADA INC.**

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

**UAW RETIREE MEDICAL BENEFITS TRUST**

By: _____

Name: _____

Title: _____

*[DEBTOR]*

By: _____

Name: _____

Title: _____

**Annex I**

| Holder | Number of Shares of Common Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Common Stock for Which Warrants Are Initially Exercisable |
|---|---|
| VEBA | |
| Debtor | |
| Total: | |

| Holder | Number of Shares of Series A Preferred Stock |
|---|---|
| UST | |
| Canada | |
| VEBA | |
| Total: | |

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit P**

Form of Bill of Sale

# EXHIBIT P

## FORM OF OMNIBUS BILL OF SALE

THIS OMNIBUS BILL OF SALE (this "Bill of Sale"), dated as of *[_____ __]*, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S LLC and S Distribution, "Transferors", and each a "Transferor"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Transferee"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Transferors and Transferee are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Transferors desire to sell, transfer, assign, convey and deliver to Transferee, and Transferee desires to purchase, accept and acquire from Transferors, all of Transferors' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    Assignment.  Pursuant to the Purchase Agreement, each Transferor hereby sells, transfers, assigns, conveys and delivers to Transferee any and all right, title and interest that such Transferor possesses in and to all of the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements), and Transferee hereby purchases, accepts and acquires from each Transferor such Purchased Assets.  Notwithstanding anything to the contrary contained herein, Transferors are not selling, transferring, assigning, conveying or delivering to Transferee any Excluded Assets.

Section 2.    Further Assurances.  Transferors shall execute any other documentation and take such other actions, at Transferee's sole cost and expense, as may be reasonably requested by Transferee to enable Transferee to perfect and sustain its rights in and to the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements).

Section 3.    Power of Attorney.  In furtherance of the foregoing, each Transferor irrevocably constitutes and appoints Transferee the true and lawful attorney of such Transferor with full power of substitution and give and grant unto Transferee full power and authority in the name and stead of such Transferor, but on behalf and for the benefit of Transferee, at any time and from time to time, to demand, sue for, recover and receive any and all Claims of every kind and description whatsoever relating to the Purchased Assets (except for the Intellectual Property and the Transferred Real Property, which are governed by separate conveyance agreements),

other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate solely to the Excluded Assets or Retained Liabilities and any of the foregoing  and to do all acts and things in relation to such Purchased Assets that Transferee shall deem desirable, for the purpose of fully vesting in Transferee all right, title and interest in and to such Purchased Assets. Such power of attorney is coupled with an interest and is irrevocable by such Transferor, by reason of such Transferor's dissolution or for any reason whatsoever.

Section 4.    Disclaimer. OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDITION OF THE PURCHASED ASSETS OR THE SUITABILITY THEREOF FOR ANY PURPOSE.  OTHER THAN AS SET FORTH IN SECTION 4.7(B) OF THE PURCHASE AGREEMENT, TRANSFERORS HEREBY EXPRESSLY DISCLAIM ANY WARRANTIES AS TO MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE CONDITION OF THE PURCHASED ASSETS. TRASNFERORS HAVE EXECUTED THIS BILL OF SALE TO SELL, TRANSFER, ASSIGN, CONVEY AND DELIVER TO TRANSFEREE THE PURCHASED ASSETS ON A AS-IS BASIS AND WHEREVER LOCATED, WITH ALL FAULTS.

Section 5.    Conflicts with Purchase Agreement.  This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.  In the event of any conflict between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    Miscellaneous.

(a)    Governing Law.  The construction, interpretation and other matters arising out of or in connection with this Bill of Sale shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    Successors and Assigns; No Third Party Beneficiaries.  This Bill of Sale is for the sole benefit of Transferors, Transferee and their respective successors and permitted assigns, and nothing express or implied in this Bill of Sale is intended or shall be construed to confer upon or give to any Person, other than Transferors, Transferee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Bill of Sale.

(c)    Counterparts.  This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of the Parties may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

2

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Bill of Sale to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

Name: *[_____]*
Title:  *[_____]*

SATURN LLC

By: _____

Name: *[_____]*
Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____

Name: *[_____]*
Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: *[_____]*
Title:  *[_____]*

*[NGMCO, INC.]*

By: _____

Name: *[_____]*
Title: *[_____]*

1759866

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit Q**

Form of Assignment and Assumption Agreement

# EXHIBIT Q

## FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of *[_____ __]*, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S, LLC and S Distribution, "Assignors", and each a "Assignor"), and *[NGMCO, Inc.]*, a *[Delaware corporation]* ("Assignee").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignors and Assignee are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to transfer, assign and delegate to Assignee, and Assignee desires to accept and assume from Assignors, the Assumed Liabilities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.        Assignment.  Each Assignor hereby assigns, transfers and delegates all of the Assumed Liabilities (other than the Leased Real Property Contracts and the Intellectual Property, which are governed by separate conveyance agreements) to Assignee, and Assignee hereby assumes and agrees to pay or perform as and when due, or otherwise discharge, such Assumed Liabilities.  Notwithstanding anything contained herein to the contrary, Assignors are not assigning, transferring or delegating to Assignee, and Assignee is not assuming or agreeing to pay, any Retained Liabilities.

Section 2.        Further Assurances.  Assignee shall execute any other documentation and take such other actions, at Assignors' sole cost and expense, as may be reasonably requested by Assignor to cause Assignee to accept and assume the Assumed Liabilities as contemplated by this Agreement.

Section 3.        Conflicts with Purchase Agreement.  This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

1760141

Section 4.    <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1760141

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Assignment and Assumption Agreement to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

     Name: *[_____]*
     Title:  *[_____]*

SATURN LLC

By: _____

     Name: *[_____]*
     Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____

     Name: *[_____]*
     Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

     Name: *[_____]*
     Title:  *[_____]*

*[NGMCO, INC.]*

By: _____

     Name: *[_____]*
     Title:  *[_____]*

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit R**

Form of Novation Agreement

# EXHIBIT R

## FORM OF NOVATION AGREEMENT

General Motors Corporation, a corporation organized under the laws of Delaware with its principal office at 300 Renaissance Center, Detroit, MI 48265,  Saturn LLC, a limited liability company organized under the laws of Delaware with its principal office at *[_____]*, Saturn Distribution Corporation, a corporation organized under the laws of Delaware with its principal office at *[_____]*, and Chevrolet-Saturn of Harlem, Inc., a corporation organized under the laws of Delaware with its principal office at *[_____]* (each, a "Transferor," and collectively, the "Transferors"); *[NGMCO, Inc.]*, a *[corporation]* organized under the laws of Delaware with its principal office at *[_____]* (the "Transferee"); and the United States of America (the "Government") enter into this Novation Agreement (this "Agreement") as of *[_____ ___]*, 2009.

(a) The parties agree to the following facts:

(1) The Government, represented by various Contracting Officers of *[insert federal agencies]*, has entered into certain Contracts with the Transferors, as listed on Exhibit A, and incorporated in this Agreement by reference. The term "Contracts," as used in this Agreement, means the contracts listed on Exhibit A and any other contracts between any Transferor and *[insert federal agencies]* not listed on Exhibit A on which performance has been contemplated, but which are not closed out on the effective date of this Agreement, and all modifications to such contracts made between the Government and any Transferor before the effective date of this Agreement (whether or not performance and payment have been completed and releases executed if the Government or any Transferor has any remaining rights, duties or obligations under these contracts). Included in the term "Contracts" are also all modifications made on or after the effective date of this Agreement that are under the terms and conditions of those contracts listed on Exhibit A.

(2)  As of *[_____ ___]*, 2009, the Transferors have transferred to the Transferree assets of the Transferors by virtue of the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"), as evidenced by an Omnibus Bill of Sale and an Omnibus Assignment and Assumption Agreement executed in connection therewith, copies of which are attached as Exhibit B and Exhibit C, respectively.

(3) The Transferee has acquired all the assets of the Transferors involved in performing the Contracts by virtue of the above-referenced transfer.

(4) The Transferee has assumed all obligations and liabilities of the Transferors under the Contracts by virtue of the above-referenced transfer.

(5) The Transferee is in a position to fully perform all obligations that may exist under the Contracts.

(6) It is consistent with the Government's interest to recognize the Transferee as the successor party to the Contracts novated to it.

(7) By letter, dated *[_____ ___]*, 2009, the Transferors filed evidence of the above-referenced transfer with the Government, including one copy each, as applicable, of the documents listed in Federal Acquisition Regulation 42.1204(e)(2).

(b) IN CONSIDERATION OF THESE FACTS, THE PARTIES AGREE THAT, BY THIS AGREEMENT ---

(1) The Transferors confirm the transfer to the Transferee, and waive, on behalf of the Transferors but not on behalf of the Transferree, any claims and rights against the Government that it now has or may have in the future in connection with the Contracts.

(2) The Transferee agrees to be bound by and to perform each of the Contracts in accordance with the conditions contained in such Contracts. The Transferee also assumes all obligations and liabilities of, and all claims against, the Transferors under the Contracts novated to it as if the Transferee were the original party to the Contracts.

(3) The Transferee ratifies all previous actions taken by the Transferors with respect to the Contracts novated to it, with the same force and effect as if the action had been taken by the Transferee.

(4) The Government recognizes the Transferee as the Transferors' successor in interest in and to the Contracts novated to it. The Transferee by this Agreement becomes entitled to all rights, title, and interests of the Transferors in and to the Contracts novated to it as if the Transferee were the original party to the Contracts.  Following the effective date of this Agreement, the term "Contractor," as used in the Contracts, shall refer to the Transferee.

(5) The Exhibits to this Agreement are considered integral parts of this Agreement.

(6) Except as expressly provided in this Agreement, nothing in it shall be construed as a waiver of any rights of the Government against any Transferor or of any Transferor or the Transferee against the Government.

(7) All payments and reimbursements previously made by the Government to any Transferor, and all other previous actions taken by the Government under the Contracts, shall be considered to have discharged those parts of the Government's obligations under the Contracts. All payments and reimbursements under a Contract made by the Government after the date of this Agreement in the name of or to any Transferor shall have the same force and effect as if made to the Transferee, and shall constitute a complete discharge of the Government's obligations under the respective Contract, to the extent of the amounts paid or reimbursed.  Nothing herein shall be construed as a waiver of the right of the Transferree to pursue and prosecute claims previously asserted by any Transferor under a Contract novated to the Transferee, or the right of the Transferee to assert any pre-transfer claim that was not waived or released by any Transferor by operation of law (including the conduct of the parties), or mutually resolved by settlement or otherwise by any Transferor and the Government as evidenced by a written instrument executed prior to the effective date of this Agreement.

(8) Each Transferor and the Transferee agree that the Government is not obligated to pay or reimburse any of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer or this Agreement, other than those that the Government in the absence of this transfer or Agreement would have been obligated to pay or reimburse under the terms of the Contracts.

(9) Transferors jointly and severally guarantee payment of all liabilities and the performance of all obligations that the Transferee (i) assumes pursuant to and as of the effective date of this Agreement or (ii) may undertake in the future should the Contracts be modified under their terms and conditions;

2

provided, however, that such future modifications are within the current scope of work and current periods of performance, including any existing options that provide the Government with the unilateral right to extend the term of a Contract.  The Transferors waive notice of, and consent to, any such future modifications that are guaranteed by the Transferors pursuant to this paragraph (9)(ii).

(10) This Agreement, including its attachments, will be appended to each Contract through a modification to such Contract, and the provisions of this Agreement will apply to each such Contract as necessary to implement this Agreement.

(11)   The Contracts shall remain in full force and effect, except as modified by this Agreement.  Each party has executed this Agreement as of the day and year first written above.

3

1760153

IN WITNESS WHEREOF, the undersigned have caused this Novation Agreement to be executed as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name: *[_____]*
      Title:  *[_____]*

SATURN LLC

By: _____
      Name: *[_____]*
      Title:  *[_____]*

SATURN DISTRIBUTION CORPORATION

By: _____
      Name: *[_____]*
      Title:  *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name: *[_____]*
      Title:  *[_____]*

*[NGMCO, INC.]*

By: _____
      Name: *[_____]*
      Title:  *[_____]*

UNITED STATES OF AMERICA

By: _____

    Name: *[_____]*

    Title:  *[_____]*

1760153

**CERTIFICATE**

I, _____, certify that I am the _____ of General Motors Corporation; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

**CERTIFICATE**

I, _____, certify that I am the _____ of Saturn LLC; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

## CERTIFICATE

I, _____, certify that I am the _____ of Saturn Distribution Corporation; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ____ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

**CERTIFICATE**

I, _____, certify that I am the _____ of Chevrolet-Saturn of Harlem, Inc.; that _____, who signed this Agreement for this corporation, was then _____ of this corporation; and that this Agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.  Witness my hand and the seal of this corporation this ___ day of _____, 2009.

By: _____

   Name: _____

   Title: _____

1760153

**Exhibit A**
**Assigned Contracts**

***[forthcoming]***

**Exhibit B**
**Omnibus Bill of Sale**

[attached]

## Exhibit C
## **Omnibus Assignment and Assumption Agreement**

[attached]

EXHIBIT C TO NOVATION AGREEMENT

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit S**

Form of Government Related Subcontract Agreement

## EXHIBIT S

## FORM OF GOVERNMENT RELATED SUBCONTRACT AGREEMENT[1]

This SUBCONTRACT AGREEMENT (this "Subcontract"), dated *[_____   __]*, 2009, is made by and between General Motors Corporation, a Delaware corporation ("Prime Contractor"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("Subcontractor," and together with the Prime Contractor, the "Parties").

**WHEREAS**, Prime Contractor and Subcontractor have entered into an Amended and Restated Master Sale and Purchaser Agreement, dated as of June 26, 2009 (the "Purchase Agreement"), whereby Subcontractor has purchased the Government Prime Contracts (as defined in the Purchase Agreement) and the assets used by Prime Contractor to perform the Government Prime Contracts;

**WHEREAS**, Prime Contractor has entered into certain contracts with the United States Government (the "Government") and currently has pending certain contract proposals that it has submitted to the Government;

**WHEREAS**, Subcontractor will be notifying the Government of assignment of submitting requests (the "Novation Requests") to the Government to novate the Government Prime Contracts (each such Government Prime Contract requiring a Novation Request is referred to herein as a "Novation Contract," and collectively, the "Novation Contracts");

**WHEREAS**, the Government may wish to modify or extend any of the Novation Contracts, or issue new task orders or deliver orders under any such Novation Contract, in order to add additional work to such Novation Contract ("Additional Work"); and

**WHEREAS**, the Parties desire to arrange for the continued performance of the Novation Contracts in accordance with all of their respective requirements and terms until such time as the Government consents to the Novation Request.

**NOW, THEREFORE**, in consideration of the foregoing premises and the agreements contained herein, the Parties agree as follows:

## ARTICLE I
## SCOPE OF WORK

Section 1.1    *Incorporation of Government Prime Contracts*:    *Definitions*.    The Novation Contracts are incorporated by reference herein.  To give effect to the provisions contained in this Subcontract, with respect to the Government Prime Contracts once made a part of this Subcontract, any reference to the "Government" or the "Contracting Officer" shall mean Prime Contractor, unless such reference by its terms is applicable only to the Government.

---

[1]  Subject to confirmation and agreement by Purchaser and Sellers that in light of the nature of this Office Lease, the terms and pricing contained herein represent Arms-Length Basis provisions.

Section 1.2    *Prime Contractor Responsibility*.  Prime Contractor shall retain its legal obligations as a prime contractor in accordance with the Novation Contracts.  Prime Contractor shall provide assistance as reasonably necessary (excluding legal, cost and pricing support) for Subcontractor to perform under the Novation Contracts, upon written request, and at the cost and expense, of Subcontractor.  Prime Contractor agrees to forward to Subcontractor any and all orders or requests for work issued by the Government after the Closing Date.

Section 1.3    *Subcontractor Responsibility*.  Subcontractor shall diligently perform all requirements, and furnish to the Government all services and materials necessary to complete performance of the obligations, of each Novation Contract in accordance with the terms and conditions thereof.  Without limiting the foregoing, unless Prime Contractor indicates otherwise by notice to Subcontractor or applicable law requires otherwise, Subcontractor shall be considered Prime Contractor's agent for purposes of: (a) collecting all amounts that may be due from the other party or parties to each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract; and (b) negotiating or otherwise handling all disputes and issues that may arise in connection with each Novation Contract and that relate to the period of subcontract performance hereunder with respect to such Novation Contract.  Subcontractor shall as promptly as practicable after entering into this Agreement, engage legal counsel and consultants well versed in U.S. government contract law and regulations to supplement the personnel within the Business (as defined in the Purchase Agreement) in the performance of these Novation Contracts.

## ARTICLE II
## RELATIONSHIP OF PARTIES

Section 2.1    *Cooperation*.  Both Parties shall fully cooperate with each other to ensure that all requirements of the Novation Contracts and Additional Work, if applicable, are satisfied and that the transition of performance occurs without disruption or inconvenience to the Government.

Section 2.2    *Communications with Government*.  Subcontractor shall, in the first instance, be responsible for communications with the Government regarding the Novation Contracts.  Subcontractor shall promptly inform Prime Contractor of the substance of any such communications that are material.  Prime Contractor will include Subcontractor (or update Subcontractor) with respect to any material communications with the Government regarding the Novation Contracts.  Prime Contractor shall forward any written communications from the Government referring to or relating to the Novation Contracts to Subcontractor to be received not more than five (5) Business Days from receipt by Prime Contractor.

Section 2.3    *Disclosure*.  The Parties hereby agree that the contents of this Subcontract may be made known to the Government.

Section 2.4    *Award of Additional Work*.  While it may be necessary to seek extensions in delivery schedule or other routine modifications, it is not the intent of either party to expand the Novated Contracts to take on Additional Work beyond that which is within the scope of the subject contract.  Within this parameter, if at any time prior to the expiration, termination, assignment, or novation of a Novation Contract, Subcontractor requests Prime Contractor (a) to

seek an extension or modification of the Novation Contract and/or (b) to submit a proposal or compete for a new task order or delivery order under the Novation Contract, Prime Contractor shall make reasonable efforts (y) to request and obtain such an extension or modification, and/or (z) to obtain award of additional work, such as a task order or delivery order. Prime Contractor's obligation under the immediately preceding sentence is subject to the Parties' express understanding that Subcontractor shall, in the first instance, be responsible for the preparation of any request for extension or modification and of any task order or delivery order proposal and for the conduct of discussions or negotiations with the Government with respect to such request or proposal. Subcontractor shall reimburse Prime Contractor for all out-of-pocket expenses and pay to Prime Contractor reasonable labor and expenses incurred by Prime Contractor in connection with its efforts to request and obtain such Additional Work (including, without limitation, reasonable attorney's fees).

Section 2.5    *Authorization*.

(a)    Prime Contractor hereby appoints and authorizes Subcontractor, its employees and designees, as its exclusive agent for the purpose of submitting proper invoices in Prime Contractor's name to the Government seeking any and all payments under the Novation Contracts.

(b)    Prime Contractor specifically authorizes Subcontractor to submit proper invoices to the Government consistent with the pricing and other requirements set forth in the Novation Contracts. Prime Contractor shall pass on to Subcontractor, without any withholding or setoff, via wire transfer within five (5) Business Days any amounts paid by, and received from, the Government for performance by Subcontractor of its obligations under the Novation Contracts as incorporated herein.

(c)    In the absence of Subcontractor's failure to perform its duties or responsibilities under this **Article II**, Prime Contractor agrees to refrain from undertaking any actions which Subcontractor is authorized to undertake by this **Article II** unless requested to do so by Subcontractor. Prime Contractor also agrees to refrain from retaining another agent to perform any of the actions covered in this **Article II**, thereby making Subcontractor its exclusive agent for the purposes set forth herein.

(d)    Subcontractor shall maintain true and correct books and records pertaining to such invoiced amounts and, upon reasonable notice, shall permit an independent entity hired by Prime Contractor, at Prime Contractor's own expense, to audit sufficiently such books and records to verify the accuracy and appropriateness of all charges.

(e)    For purposes of allowing Subcontractor to fulfill its obligations under this Subcontract, Prime Contractor hereby delegates authority to ***[Subcontractor appointees]***, or their immediate subordinates, to enter into, execute, process and deliver for, or in the name of or on behalf of, Prime Contractor, any proper invoices, task/delivery orders and modifications, amendments or extensions thereto that may arise in the ordinary course relating to the Novation Contracts, as well as task or delivery order proposals in connection with any of the Novation Contracts (the "Contract Documents"); provided that the foregoing authority shall not permit Subcontractor or its employees to issue

checks, drafts, or other orders on the funds of Prime Contractor. Copies of all Contract Documents executed by Subcontractor pursuant to this provision shall be provided to Prime Contractor no later than three (3) Business Days after being executed. Any Contract Documents requiring signatures of both the Government and the Prime Contractor shall be ratified by a counter-signature by Prime Contractor and returned to Subcontractor within three (3) Business Days of receipt by Prime Contractor. Notwithstanding the foregoing, prior to executing any document pursuant to this provision that has a projected monetary value exceeding $**100,000,000**, Subcontractor shall notify Prime Contractor in writing to insure that Prime Contractor is apprised of significant engagements executed by Subcontractor on behalf of Prime Contractor.

(f)     Nothing in this **Article II** is intended or shall be construed to transfer any rights to any Government Prime Contract or usurp, violate or otherwise negate the requirements of the Anti-Assignment Act, 41 U.S.C. § 15(a) or the Assignment of Claims Act, 31 U.S.C. § 3727(a)(1)(b) (the "Acts"). In the event of any claim by any agency of the United States of a violation of any of the provisions of either of the Acts as a result of this **Article II**, Prime Contractor shall assist Subcontractor as is reasonably necessary to correct such claimed violations and seek the Government's ratification of any Contract Document claimed to be an unlawful assignment under the Acts.

## ARTICLE III
## ASSIGNMENT, TERM AND TERMINATION

Section 3.1    *Assignment of Novation Contract*. Once a contract novation is obtained, (i) such Novation Contract will be deemed to have automatically transferred and assigned to Subcontractor on the terms set forth in the Purchase Agreement, (ii) the obligations arising out of the use, performance, ownership or operation of such Novation Contract after the Closing will be deemed to be Assumed Liabilities under the Purchase Agreement, and (iii) the rights pursuant to such Novation Contract will be deemed to be a Purchased Asset under the Purchase Agreement.

Section 3.2    *Term*. The term of this Subcontract shall be from the Closing Date until the earlier of (x) such time as all of the Novation Contracts, including any extensions or options thereto exercised by the Government, are novated as set forth immediately above, completed or terminated or (y) such time this Subcontract is terminated upon mutual agreement by the Parties as evidenced in writing. With respect to each Novation Contract, the responsibilities of the Parties hereunder shall begin upon the Closing Date for each Novation Contract then in effect and shall cease upon the earlier of: (i) contract novation of such Novation Contract as set forth immediately above; (ii) completion or termination of such Novation Contract, including any renewals or options thereto exercised by the Government; (iii) receipt of a written determination by the Government that the Novation Contract may not be subcontracted to the Subcontractor; or (iv) termination of this Subcontract.

Section 3.3    *Termination*. In the event that any one of the Novation Contracts is terminated in whole or in part by the Government prior to contract novation and prior to expiration of the term of this Subcontract, the rights of the Parties concerning the termination shall be governed by the provisions of the applicable termination clause (such as the termination for convenience provisions or the termination for default provisions, as applicable) set forth in

such Novation Contract, except that Subcontractor's rights under such clause shall relate only to the period of subcontract performance hereunder for such Novation Contract. Prime Contractor may terminate Subcontractor's work under any Novation Contract if, and only if, such Novation Contract is terminated by the Government.

Section 3.4    *Government Proposals*.  The terms of this Subcontract shall also apply to any Government Prime Contract awarded to Prime Contractor as a result of a pending bid or proposal that pertain exclusively to the Business and that by its terms requires novation (an "Awarded Contract").  The effective date of this Subcontract with respect to each such Awarded Contract shall be the date on which such Awarded Contract is awarded to Prime Contractor.  For purposes of this Subcontract, the Parties' rights, duties and obligations with respect to each such Awarded Contract are the same as set forth in this Subcontract for Novation Contracts.

## ARTICLE IV
## INDEMNITY AND COMPLIANCE WITH APPLICABLE LAWS

Section 4.1    *Subcontractor Indemnification*.  Prime Contractor shall indemnify, defend and hold harmless Subcontractor and its Affiliates and directors, officers, managers, employees and agents (the "Prime Contractor Indemnified Parties") from, against and in respect of any and all claims, causes of action, losses, grievances, damages, penalties, fines, amounts paid in settlement, costs and expenses (including, reasonable attorney's fees and disbursements) (the "Losses") incurred by the Prime Contractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Prime Contractor or any of its Affiliates, and/or (ii) the performance by Prime Contractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Subcontractor.

Section 4.2    *Prime Contractor Indemnification*.  Subcontractor shall indemnify, defend and hold harmless the Prime Contractor and its respective Affiliates and directors, officers, managers, employees and agents (the "Subcontractor Indemnified Parties") from, against and in respect of any and all Losses incurred by the Subcontractor Indemnified Parties, or any of them, as a result of (i) a breach of this Subcontract by Subcontractor or any of its Affiliates, and/or (ii) the performance by Subcontractor under this Subcontract, except to the extent such Losses result from the gross negligence or willful misconduct of, or a breach of this Subcontract by, Prime Contractor.

Section 4.3    *Compliance with Applicable Laws*.  Prime Contractor agrees to indemnify and defend Subcontractor from any allegation of violation or actual violation of any Government Prime Contract or legal requirement imposed by a Government Prime Contract caused by the actions of Prime Contractor, Prime Contractor's employees, consultants or subcontractors of any Government Prime Contract arising out of Prime Contractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract.  Subcontractor agrees to indemnify and defend Prime Contractor from (i) any allegation of violation or actual violation of law by Subcontractor or its employees, consultants or subcontractors arising out of Subcontractor's performance or failure to perform with respect to any of its obligations under this Subcontract or any of the Novation Contracts subsequent to the date of this Subcontract; or (ii) any violation or alleged violation of

any legal requirement imposed by, or relating to, a Novation Contract.  This provision shall survive the expiration or termination of this Subcontract.

Section 4.4    *Legal Requirements*.  The Parties agree to take necessary precautions to assure compliance with all legal requirements pertaining to the Novation Contracts.

## ARTICLE V
## CONFIDENTIALITY

Section 5.1    *Confidentiality*.  Each Party shall not, and shall cause its Affiliates, officers, directors, employees, representatives, agents and advisors, including attorneys, accountants, consultants, bankers and financial advisors ("Representatives") not to, disclose any information relating to the business of the other Party disclosed to it or its Representatives after the date of this Subcontract by reason of this Subcontract ("Confidential Information"), whenever furnished and regardless of the manner furnished, using efforts which are equivalent to those that the receiving Party uses to protect its own information of a similar nature; provided, however, that Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of disclosure directly or indirectly by the Party receiving such information or any of its Representatives, (ii) was independently acquired or developed by the Party receiving such information without violating any of its obligations hereunder, or (iii) is or becomes available to the receiving Party on a non-confidential basis from a person (other than the disclosing Party or its Representatives) who, to the receiving Party's actual knowledge, is not and was not bound by a confidentiality agreement with the disclosing Party or otherwise prohibited from transmitting the information to the receiving Party. Notwithstanding the foregoing, a Party may make such disclosure necessary to avoid committing a violation of Law or of any rule or regulation of any domestic or foreign securities association, stock exchange or national securities quotation system on which such Party's securities are listed or traded.

Section 5.2    *Survival*.  The provisions of this **Article V** shall survive any expiration or termination of this Subcontract.  Each Party shall use commercially reasonable efforts not to, and shall cause each of their Affiliates and each of their respective Representatives, successors and permitted assigns to use commercially reasonable efforts not to, attempt at any time to access any data, information or system of the other Party except as required to provide or receive services, as the case may be.

## ARTICLE VI
## DISPUTES

Section 6.1    *Resolution of Disputes*.  For the purposes of this Subcontract, the terms "claim," "certification" or "certify," and "dispute" shall have the meaning of the same terms as used in the Contract Disputes Act of 1978 (41 U.S.C. §§ 601-613), FAR Subpart 33.2, and FAR 52.233-1, "Disputes (DEC 1991)."  All disputes arising under or relating to this Subcontract shall be resolved under this **Article VI**.

Section 6.2    *Procedure*.  Subject to **Section 1.3**, with respect to any claim made by Subcontractor for which the Government is or may be liable, Subcontractor agrees that it will

1766534

prepare its claim and will present it to Prime Contractor for submission to the Government under the Contract Disputes Act. Prime Contractor agrees to submit any such claim to the Government, at the expense of Subcontractor and subject to Prime Contractor's determination, in its reasonable discretion, as to the merit of such claim. Prime Contractor shall promptly pay to Subcontractor any amount determined on appeal under the applicable Prime Contract, to the extent such payment relates to the period of Subcontract performance by Subcontractor; provided that such payment by the Prime Contractor is limited to the payment of amounts received from the Government in the dispute, as and when received from the Government. Subcontractor shall have the sole authority to direct the prosecution of the claim. In the event of a denial of a claim by the Contracting Officer, Prime Contractor shall, at the direction and expense of Subcontractor, either appeal or file suit pursuant to the Contract Disputes Act and implementing regulations, or permit Subcontractor to proceed in Prime Contractor's name. The Parties will be bound by the results of that process.

Section 6.3    *Procedure*.  With respect to any dispute between the Parties arising from or related to the Subcontract, for which the Government is not liable, the Parties shall attempt to reach an amicable resolution of the dispute. If the Parties are unable to resolve amicably such a dispute within a reasonable time, the dispute shall be adjudicated in any state court sitting in New York City or any federal court sitting in the Southern District of New York in accordance with **Section 7.10**, applying the laws of the State of Michigan in accordance with **Section 7.9**.

Section 6.4    *Continuation of Performance*.  The Parties shall proceed diligently with performance of this Subcontract, pending final resolution of any request for relief, claim, appeal, dispute or action arising under or in connection with this Subcontract.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    *Notices*.  Any notice, request, instruction or other document to be given hereunder shall be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by facsimile, according to the instructions set forth below. Such notices shall be deemed given: at the time delivered by hand, if personally delivered; one Business Day after being sent, if sent by reputable, overnight courier service; at the time received, if sent by registered or certified mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

If to GM:

General Motors Corporation
300 Renaissance Center
Tower 300, 25th Floor, Room D55
M/C 482-C25-D81
Detroit, Michigan 48265-3000
Attn: General Counsel
Tel.: 313-667-3450
Facsimile: 248-267-4584

With a copy (which shall not constitute notice) to:

Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attn:  Joseph P. Gromacki
          Michael T. Wolf
Tel.:  312-222-9350
Facsimile:  312-527-0484

If to the Subcontractor:

*[NGMCO, Inc.]*
c/o The United States Department of the Treasury
1500 Pennsylvania Avenue, NW
          Washington D.C. 20220
Attn: Chief Counsel Office of Financial Stability
Facsimile: 202-927-9225

With a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attn:   John J. Rapisardi
          R. Ronald Hopkinson
Tel.:  212-504-6000
Facsimile:  212-504-6666

or to such other address or to the attention of such other Party that the recipient Party has specified by prior written notice to the sending Party in accordance with the preceding.

Section 7.2    *Expenses; No Offset*.  Except as expressly provided in this Subcontract, each of the Parties shall bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Subcontract and the transactions contemplated hereby, whether or not such transactions are consummated.  Neither Party may make any offset against amounts due to the other Party or any of the other Party's Affiliates pursuant to this Subcontract or otherwise.

Section 7.3    *Assignment; Successors and Assigns*.  Neither this Subcontract nor any of the rights, interests or obligations provided by this Subcontract may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; provided, however, that either Party may assign its rights under this Subcontract to a Subsidiary. Subject to the preceding sentence and except as otherwise expressly provided herein, this Subcontract shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 7.4    *Amendment; Waiver*.  This Subcontract may be amended only by a written instrument executed and delivered by Prime Contractor and Subcontractor.  At any time prior to the termination of this Subcontract, the Parties may waive compliance with any provision of this Subcontract.  No agreement waiving any provision of this Subcontract shall be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

Section 7.5    *Severability*.  Whenever possible, each provision of this Subcontract shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Subcontract is held to be prohibited by or invalid under Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subcontract.

Section 7.6    *Counterparts*.  This Subcontract may be executed in two or more counterparts, each of which shall be deemed an original, but all such counterparts taken together shall constitute one and the same Subcontract.

Section 7.7    *Descriptive Headings*.  The descriptive headings of this Subcontract are inserted for convenience only and shall not constitute a part of this Subcontract.

Section 7.8    *No Third-Party Beneficiaries*.  This Subcontract does not confer any rights or remedies upon any Person or entity, other than the Parties hereto and their respective successors and permitted assigns.

Section 7.9    *Governing Law*.  THE LAWS OF THE STATE OF MICHIGAN, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF MICHIGAN TO BE APPLIED, GOVERN ALL MATTERS ARISING OUT OF OR RELATING TO THIS SUBCONTRACT, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.

Section 7.10    *Forum Selection; Consent to Service of Process; Waiver of Jury Trial*. Each Party hereby irrevocably (i) submits to the exclusive jurisdiction of any state court sitting in New York City or any federal court sitting in the Southern District of New York in any Action arising out of or relating to this Subcontract, (ii) agrees that all claims in respect of such Action may be heard and determined only in any such court, (iii) hereby waives any claim of inconvenient forum or other challenge to venue in such court, and (iv) agrees not to bring any Action arising out of or relating to this Subcontract in any other court.  The Subcontractor irrevocably designates, appoints and empowers ***[Subcontractor Designee]***, with offices on the date hereof in New York, as its agent with respect to any Action in New York, to receive on its behalf and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such Action, and agrees that the failure of the agent to notify the Subcontractor of any such service of process shall not impair or affect the validity of service.  The Subcontractor further irrevocably consents to the service of process out of any of the courts listed in this **Section 7.10** by the mailing of copies by registered or certified mail, postage prepaid, to the Subcontractor at its address set forth in **Section 7.1**, such service to become effective thirty (30) days after such mailing.  If for any reason ***[Subcontractor***

*Designee]* shall cease to be available to act as agent, the Subcontractor agrees to designate within ten (10) Business Days a new agent in New York on the same terms and for the same purposes. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS INDEMNIFIED PARTIES TO IRREVOCABLY WAIVE, ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS SUBCONTRACT AND/OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 7.11    *Entire Agreement*.    This Subcontract and the Purchase Agreement collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

Section 7.12    *Assurances and Future Cooperation*.    The Parties agree, at any time and from time to time, at the requesting Party's expense, to execute, acknowledge where appropriate, and deliver such further instruments and documents and to take such other action as either Party may reasonably request in order to carry out the intent and purpose of this Subcontract.

**[SIGNATURES ON FOLLOWING PAGE]**

1766534

IN WITNESS WHEREOF, the Parties hereto have caused this Subcontract to be executed and delivered on the date set forth above

GENERAL MOTORS CORPORATION

By: _____
     Name:
     Title:

*[NGMCO, INC.]*

By: _____
     Name:
     Title:

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit T**

Form of Intellectual Property Assignment Agreement

**EXHIBIT T**

**FORM OF OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

THIS OMNIBUS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "<u>Agreement</u>"), dated as of *[_____ __]*, 2009, is made by and among General Motors Corporation, a Delaware corporation ("<u>Parent</u>"), S LLC, a Delaware limited liability company ("<u>S LLC</u>"), Saturn Distribution Corporation, a Delaware corporation ("<u>S Distribution</u>"), and Chevrolet-Saturn of Harlem, Inc. ("<u>Harlem</u>," and together with Parent, S LLC and S Distribution, each an "<u>Assignor</u>," and collectively, "<u>Assignors</u>"), and *[NGMCO, Inc.]*, a Delaware *[corporation]* ("<u>Assignee</u>").  Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

<u>RECITALS</u>

WHEREAS, Assignors and Assignee are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "<u>Purchase Agreement</u>"); and

WHEREAS, pursuant to the Purchase Agreement, Assignors desire to sell, transfer, assign, convey and deliver to Assignee, and Assignee desires to purchase, accept and acquire from Assignors all of Assignors' right, title and interest in and to all Intellectual Property and all rights and benefits associated with the foregoing.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    <u>Assignment</u>.  Assignors hereby sell, transfer, assign, convey and deliver to Assignee all right, title and interest that Assignors possess in and to all (a) Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property for the Discontinued Brands), and (b) all rights and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing (the "<u>Assigned Intellectual Property</u>").  The Assigned Intellectual Property shall include all (a) Patents set forth on <u>Exhibit A</u>, (b) Trademarks set forth on <u>Exhibit B</u> and (c) Copyrights set forth on <u>Exhibit C</u>.

Section 2.    <u>Further Assurances</u>.  Assignors shall execute any other documentation and take such other actions, at Assignee's sole cost and expense, as may be reasonably requested by Assignee to enable Assignee to perfect and sustain its rights in and to the Assigned Intellectual Property.

Section 3.    <u>Power of Attorney</u>.  Each Assignor irrevocably constitutes and appoints Assignee the true and lawful attorney of such Assignor with full power of substitution and gives and grants unto Assignee full power and authority in the name and stead of such Assignor, but on behalf and for the benefit of Assignee, at any time and from time to time, to demand, sue for,

recover and receive any and all Claims of every kind and description whatsoever incident or relating to the Assigned Intellectual Property and to do all acts and things in relation to the Assigned Intellectual Property that Assignee shall deem desirable, for the purpose of fully vesting in Assignee all right, title and interest in and to the Assigned Intellectual Property. Such power of attorney is coupled with an interest and is irrevocable by such Assignor, by reason of such Assignor's dissolution or for any reason whatsoever.

Section 4.    <u>Disclaimer</u>.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS DO NOT MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN CONNECTION WITH OR WITH RESPECT TO ANY OF THE ASSIGNED INTELLECTUAL PROPERTY OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT.  ALL OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY DISCLAIMED.  EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT, ASSIGNORS ARE ASSIGNING THE ASSIGNED INTELLECTUAL PROPERTY TO ASSIGNEE ON AN "AS-IS, WHERE-IS" BASIS.

Section 5.    <u>Conflicts with Purchase Agreement</u>.  This Agreement is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

Section 6.    <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>. The construction, interpretation and other matters arising out of or in connection with this Agreement shall in all respects be governed by and construed (i) to the extent applicable, in accordance with the Bankruptcy Code and (ii) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflicts of laws.

(b)    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Agreement.

(c)    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic

2

delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1759822

IN WITNESS WHEREOF, the undersigned have caused this Omnibus Intellectual Property Assignment Agreement to be duly executed the day and year first written above.

**ASSIGNORS:**

GENERAL MOTORS CORPORATION

By: _____
    Name: *[_____]*
    Title: *[_____]*

S LLC

By: _____
    Name: *[_____]*
    Title: *[_____]*

S DISTRIBUTION CORPORATION

By: _____
    Name: *[_____]*
    Title: *[_____]*

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: *[_____]*
    Title: *[_____]*

**ASSIGNEE:**

*[NGMCO, INC.]*

By: _____
    Name: *[_____]*
    Title: *[_____]*

**State of** _____ )
                      ) ss.
**County of** _____ )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of General Motors Corporation, a Delaware corporation.

_____
Notary Public

**State of** _____ )
                      ) ss.
**County of** _____ )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Saturn LLC, a Delaware limited liability company.

_____
Notary Public

**State of** _____ )
                      ) ss.
**County of** _____ )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Saturn Distribution Corporation, a Delaware corporation.

_____
Notary Public

1759822

**State of** _____    )
                                )  **ss.**
**County of** _____   )


    The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _____ day of _____, 2009, by _____, the _____ of Chevrolet-Saturn of Harlem, Inc., a Delaware corporation.


_____
Notary Public

**Exhibit A**

**Patents**

*[to be provided by Parent]*

**Exhibit B**

**Trademarks**

*[to be provided by Parent]*

**Exhibit C**

**Copyrights**

***[to be provided by Parent]***

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit U**

Form of Transition Services Agreement

## EXHIBIT U

## FORM OF TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of *[_____ __]*, 2009 (the "Effective Date"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem", and collectively with Parent, S LLC and S Distribution, "Sellers", and each a "Seller"), and *[NGMCO, Inc.]*, a Delaware [*corporation]* ("Purchaser").

WHEREAS, pursuant to the Master Sale and Purchase Agreement, dated as of June 1, 2009 and amended and restated as of June 26, 2009 (the "Purchase Agreement"), by and among Sellers and Purchaser, Purchaser is, among other things, acquiring the Purchased Assets and assuming the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement.

WHEREAS, Sellers require certain transition services from Purchaser and Purchaser is willing to provide such transition services on the terms and subject to the conditions contained herein.

WHEREAS, Purchaser requires certain transition services from Sellers and Sellers are willing to provide such transition services on the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## INTERPRETATION; DEFINITIONS

Section 1.1    Definitions.  All capitalized terms used but not defined in this Agreement shall have the same meanings as are given to such terms in the Purchase Agreement. As used in this Agreement, the following terms have the meanings set forth below or in the sections set forth below:

"Additional Purchaser Services" has the meaning set forth in **Section 2.5(a)**.

"Additional Seller Services" has the meaning set forth in **Section 2.5(b)**.

"Agreement" has the meaning set forth in the Preamble to this Agreement.

"Defaulting Party" has the meaning set forth in **Section 4.3.**

"Disputed Amount" has the meaning set forth in **Section 2.9**.

1755824

"Disputing Party" has the meaning set forth in **Section 2.9**.

"Early Termination Consequences" has the meaning set forth in **Section 4.2**.

"Effective Date" has the meaning set forth in the Preamble to this Agreement.

"Force Majeure Event" has the meaning set forth in **Section 2.7**.

"Harlem" has the meaning set forth in the Preamble to this Agreement.

"Incremental Exit Costs" means the additional direct costs and expenses resulting from early termination of a Transition Service as compared to the costs and expenses that would have been incurred if the Transition Service were performed through the scheduled expiration date.

"Invoicing Party" has the meaning set forth in **Section 2.9**.

"Libor-Plus Rate" means, on any date, an interest rate equal to the sum of (i) the average (rounded to the nearest 1/16th of one-percent) of the London Interbank Offered Rates for three-month United States dollar denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law.

"Neutral Arbitrator" has the meaning set forth in **Section 2.9**.

"Parent" has the meaning set forth in the Preamble to this Agreement.

"Parties" means Sellers and Purchaser together, and "Party" shall mean any Seller or Purchaser, individually, as the case may be.

"Purchase Agreement" has the meaning set forth in the Recitals to this Agreement.

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Purchaser Service Providers" has the meaning set forth in **Section 2.1(a).**

"Purchaser Transition Services" has the meaning set forth in **Section 2.1(a).**

"Receiving Party" means the Party or its Subsidiaries receiving Transition Services.

"Regular Shut Down Periods" has the meaning set forth in **Section 2.6**.

"S Distribution" has the meaning set forth in the Preamble to this Agreement.

"S LLC" has the meaning set forth in the Preamble to this Agreement.

"Seller" and "Sellers" each have the meaning set forth in the Preamble to this Agreement.

"Seller Service Providers" has the meaning set forth in **Section 2.1(b).**

"<u>Seller Transition Services</u>" has the meaning set forth in **Section 2.1(b)**.

"<u>Service Provider</u>" means the Party or its Subsidiaries responsible for providing Transition Services.

"<u>Termination Date</u>" has the meaning set forth in **Section 4.1**.

"<u>Termination Notice</u>" has the meaning set forth in **Section 4.2**.

"<u>Third Party Service Provider</u>" means any Unaffiliated Third Party that a Service Provider has designated as a direct or indirect provider or supporter of Transition Services.

"<u>Transition Services</u>" means the Seller Transition Services or Purchaser Transition Services, as the case may be.

"<u>Unaffiliated Third Party</u>" means, with respect to Purchaser, any Person other than Purchaser and its Subsidiaries, and with respect to Sellers, any Person other than Sellers and their Subsidiaries.

*Section 1.2    Interpretation.*  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section and Schedule references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America. Each Party hereto has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties, and consequently this Agreement shall be interpreted without reference to any rule or precept of law to the effect that any ambiguity in a document be construed against the drafter.

## ARTICLE 2
## TRANSITION SERVICES

*Section 2.1    Provision of Transition Services.*

(a)    On the terms and conditions of this Agreement, Purchaser and its Subsidiaries (the "<u>Purchaser Service Providers</u>") shall provide or cause a Third Party Service Provider to provide to Sellers and their Subsidiaries each of the transition services and support functions set forth on <u>Schedule A</u>, as reasonably required by Sellers in connection with (i) the liquidation of Sellers under the provisions of the Bankruptcy Code and (ii) the operation of Sellers in bankruptcy prior to liquidation (collectively, the "<u>Purchaser Transition Services</u>").  However, the Purchaser Service Providers will have no obligation to provide to any Receiving Party any type of service described on <u>Schedule B</u>.

3

(b)     On the terms and conditions of this Agreement, Sellers and their Subsidiaries (the "Seller Service Providers") shall provide or cause a Third Party Service Provider to provide to Purchaser and its Subsidiaries each of the transition services and support functions set forth on Schedule C (collectively, the "Seller Transition Services"). However, the Seller Service Providers will have no obligation to provide to any Receiving Party any type of service described on Schedule D.

(c)     Each Service Provider shall, in rendering Transition Services, use reasonable and ordinary care, skill and diligence (and, to the extent such services had been provided by the Service Provider for its own account or for any of its Subsidiaries before the Closing, in a manner consistent with such historic practice), including with respect to nature, quality and timeliness, and in accordance with any applicable specifications and limitations set forth on Schedule A or Schedule C (the foregoing performance standard, collectively, the "Performance Standard"); provided that with respect to Transition Services that a Service Provider renders for (or obtains from a third party for) its own or its Subsidiaries' operations, a Service Provider shall not be obligated to render such Transition Service in a manner more favorable to the Recipient than the manner in which such Services are performed or obtained by such Service Provider for its own account. With respect to any Transition Service provided by a Third Party Service Provider, the Service Providers shall use commercially reasonable efforts to cause such Third Party Service Provider to provide such Transition Services in accordance with the terms of this Agreement and the applicable service agreement obligating such Third Party Service Provider.

Section 2.2     *Modification of Transition Services*. A Service Provider may make changes from time to time in the manner of performing Transition Services as long as (i) the Service Provider is making similar changes in performing or receiving similar services for itself or its Subsidiaries, (ii) the Service Provider uses commercially reasonable efforts to provide the Receiving Party reasonable advance written notice and (iii) such changes do not have a materially adverse impact on the nature, quality, availability and timeliness of the applicable Transition Services.

Section 2.3     *Compliance with Law*. Notwithstanding anything herein to the contrary, the Service Providers shall not be responsible for providing any Transition Service, or part thereof, if and to the extent such Transition Service would violate applicable Law; provided that, upon the request and at the expense of the Receiving Party, the Services Providers will use commercially reasonable efforts to modify the applicable Transition Service so that such Transition Service may be provided in compliance with applicable Law. No Service Provider shall have any responsibility or liability for failure to provide any, or part of any, Transition Service unable to be provided as contemplated by this **Section 2.3**.

Section 2.4     *Third Party Consents and Providers.*

(a)     Following the Effective Date, the Service Providers may be required to obtain third-party consents and approvals to provide certain Transition Services. The Service Providers shall use commercially reasonable efforts, and the Receiving Parties shall cooperate with the Service Providers, to obtain such consents or approvals. The

4

Parties acknowledge and agree that commercially reasonable efforts and cooperation do not include the payment of any consent fees or other fees or expenses to any third party. The Service Providers shall not be responsible for providing any Transition Service, or part thereof, which is provided or supported by the products or services of a Third Party Service Provider as of the Effective Date, if and to the extent the provision of such Transition Service requires third-party consent or approval that has not been obtained. No Service Provider shall have any responsibility or liability for failure to provide any, or part of any, Transition Service unable to be provided pursuant to this **Section 2.4**. Prior to the time that such consents and approvals are obtained by the Service Providers, the Service Providers and the Receiving Parties shall cooperate to develop and implement reasonable and lawful arrangements designed to provide the benefits of the subject Transition Services (or portion thereof) to the Receiving Parties.

(b)    Certain Transition Services are currently provided and will continue to be provided by Third Party Service Providers. Notwithstanding anything to the contrary contained herein, a Service Provider may also subcontract with an Unaffiliated Third Party to directly or indirectly provide or support any other Transition Services to the Receiving Parties.

*Section 2.5    Requests for Additional Services.*

(a)    Except for services of the type listed on <u>Schedule B</u>, within 180 days after the Effective Date, Sellers may request in writing that additional services be provided and <u>Schedule A</u> be amended to reference such additional services. The Purchaser Service Providers shall use commercially reasonable efforts to provide or cause to be provided the requested services but only if such requested services are reasonably required by Sellers (i) to wind down and liquidate under the provisions of the Bankruptcy Code or (ii) to operate in bankruptcy during liquidation (the "<u>Additional Purchaser Services</u>"). No Purchaser Service Provider shall be obligated to provide any such Additional Purchaser Services unless and until the Parties agree in writing as to the price, specifications and other terms and conditions under which the Purchaser Service Providers shall provide (or cause to be provided) such Additional Purchaser Services; provided that the Parties shall negotiate in good faith and expeditiously with respect to entry into such amendment to <u>Schedule A</u>. Upon such agreement of the Parties, such Additional Purchaser Services shall be deemed to be Transition Services under this Agreement.

(b)    Except for services of the type listed on <u>Schedule D</u>, within 180 days after the Effective Date, Purchaser may request in writing that additional services be provided and <u>Schedule C</u> be amended to reference such additional services. The Seller Service Providers shall use commercially reasonable efforts to provide or cause to be provided the requested services if such requested services were provided by or on behalf of any Seller Service Provider with respect to the business, assets and liabilities acquired by Purchaser pursuant to the Purchase Agreement as of immediately prior to the Closing Date (the "<u>Additional Seller Services</u>"). No Seller Service Provider shall be obligated to perform or cause to be performed any such Additional Seller Services unless and until the Parties agree in writing as to the price, specifications and other terms and conditions

5

under which the Seller Service Providers shall provide (or cause to be provided) such Additional Seller Services; provided that the Parties shall negotiate in good faith and expeditiously with respect to entry into such amendment to <u>Schedule C</u>.  Upon such agreement of the Parties, such Additional Seller Services shall be deemed to be Transition Services under this Agreement.

(c)    At any time after the Effective Date and before the Termination Date, Sellers or Purchaser may request that <u>Schedule A</u> or <u>Schedule C</u> be amended to reference additional or modified specifications. Upon such request the Parties shall negotiate in good faith the adoption of such additional or modified specifications and any corresponding pricing modifications that may be necessary or appropriate. No Service Providers shall be obligated to perform or cause to be performed any Transition Services in accordance with such specifications unless and until mutually agreed by the Parties.

*Section 2.6    Modifications and Shutdowns*.  If a Service Provider determines that it is necessary or appropriate to temporarily suspend a Transition Service due to scheduled or emergency repairs, maintenance and/or modification, the Service Provider shall give the Receiving Party reasonable prior notice of such shutdown (including information regarding the nature of the shutdown and the projected length of such shutdown), unless it is not practical to give such prior notice because the shut down is due to an emergency.  Sellers are hereby notified that the Purchaser Service Providers currently intend to shut down operations for several weeks, twice annually during the periods (i) around the end of December and the beginning of January and (ii) in the month of July (the "<u>Regular Shut Down Periods</u>"), which may result in substantially diminished availability of Transition Services during such periods.  With the goal of minimizing the impact on the Receiving Parties of suspended and reduced Transition Services during the Regular Shut Down Periods, Parties shall cooperate to plan the delivery of Transition Services around such periods.  Purchaser shall provide Sellers reasonable prior written notice of any change in the Regular Shut Down Periods.  In addition, the Service Providers may use the same regularly scheduled information technology support and maintenance windows (during which information systems are not fully available) as were used by Sellers prior to the Closing. The Service Providers shall provide the Receiving Parties reasonable prior written notice of any change in such support and maintenance windows.

*Section 2.7    Force Majeure; Reduction of Services*.  Each Service Provider (including with respect to services performed through Third Party Service Providers) shall be excused from the performance of its obligations under this Agreement, for any period, and to the extent, that such performance is prevented, in whole or in part, as a result of delays caused by any act of God, public enemy, war or threats of same, terrorism or threats of same, epidemic, fire, flood, embargoes, severe weather, civil disturbance, act of government, court order, labor dispute or other cause beyond its reasonable control (a "<u>Force Majeure Event</u>"), and such non-performance shall not be a breach or default hereunder or grounds for termination hereof.  Such affected Service Provider shall give written notice to Sellers or Purchaser, as the case may be, of any such Force Majeure Event as soon as reasonably practicable, and the respective Service Providers (including with respect to services performed through Third Party Service Providers) and Receiving Parties will use commercially reasonable efforts to mitigate the effect of any such Force Majeure Event and its consequences on performance hereunder.

6

     *Section 2.8    Fees for Transition Services*.    The fees to be charged for each Transition Service are set forth on <u>Schedule A</u> and <u>Schedule C</u> and the billing, payment and other terms therefor are set forth on <u>Schedule E</u>.

     *Section 2.9    Disputes*.    The Parties shall exercise commercially reasonable efforts to resolve disputes in good faith as promptly as practicable.  If a Party (the "<u>Disputing Party</u>") in good faith disputes the accuracy or legitimacy of any portion (the "<u>Disputed Amount</u>") of an invoice or charge, then the Disputing Party may, without being in breach of this Agreement, withhold the Disputed Amount when paying such invoice or charge pending resolution of the dispute and will provide written notice of the amount, nature and supporting detail regarding the Disputed Amount to the other Party or Parties (the "<u>Invoicing Party</u>").  Promptly following receipt of such written notice, the dispute resolution process set forth below in this **Section 2.9** shall become applicable and the Parties shall discuss the resolution of such Disputed Amount.  If a full resolution of the Disputed Amount has not occurred within 30 days of the initial discussion described in the foregoing sentence, the Parties shall cooperate to promptly submit for resolution such matter (or the portion  remaining in dispute) to an arbitrator mutually agreed to by the Parties (the "<u>Neutral Arbitrator</u>").    The Parties shall execute, if requested by the Neutral Arbitrator, an engagement letter reasonably satisfactory to the Neutral Arbitrator.  The Parties shall direct the Neutral Arbitrator to render a resolution of such disputed matter within 30 days after its engagement (or such other period agreed upon by the Parties).  The resolution of the Neutral Arbitrator shall be set forth in a written statement delivered to each of the Parties and shall be final, binding, conclusive and non-appealable for all purposes hereunder.  All fees and expenses of the Neutral Arbitrator shall be paid on a 50-50 basis to the Neutral Arbitrator by Sellers on the one hand and Purchaser on the other hand.  The Neutral Arbitrator shall determine the amount of the Disputed Amount due to the Invoicing Party, which amount shall not exceed the Disputed Amount or be less than zero.  If the Neutral Arbitrator determines that the Invoicing Party was due any portion of the Disputed Amount, then the Neutral Arbitrator shall award to the Invoicing Party (i) the portion of the Disputed Amount determined by the Neutral Arbitrator to be payable to the Invoicing Party and (ii) interest, from the date of the invoice giving rise to the dispute, at the Libor-Plus Rate on the portion of the Disputed Amount to which the Invoicing Party is entitled.  Any amount awarded by the Neutral Arbitrator shall be paid by either Purchaser or Sellers, as applicable, by wire transfer of immediately available funds to the account or accounts designated in writing by the other Party or Parties within five Business Days after the date on which the resolution of the Neutral Arbitrator is delivered to the Parties.  Each Service Provider will continue performing Transition Services in accordance with this Agreement pending resolution of any dispute hereunder.

     *Section 2.10    Personnel.*

     (a)    *Designation of Personnel*.  Each Service Provider shall have the right, in its reasonable discretion, to designate which personnel shall be assigned to perform the Transition Services, and shall have the right, in its reasonable discretion, to remove and replace any such personnel at any time and/or designate a Third Party Service Provider.

     (b)    *Financial Responsibility for Personnel*.  Each Service Provider shall be responsible for the payment of all personnel expenses, including wages, required travel and travel related expenses, of its employees performing the Transition Services.

Section 2.11    *Status of Service Providers*.    In all matters relating to this Agreement, each Service Provider shall be acting as an independent contractor and not as an agent, representative or joint venture partner of the Receiving Party.  The Service Providers shall not be liable for any debts, obligations or liabilities of the Receiving Parties.

Section 2.12    *Protective Acknowledgements*.  Each Party acknowledges that the Service Providers are not insurers or guarantors of the Transition Services they provide, are not in the business of providing Transition Services and are providing the Transition Services only as an accommodation to the Receiving Parties.  To facilitate their compliance with their financial reporting requirements, the Purchaser Service Providers may decide not to make changes to any or all of their systems during the last calendar quarter of any year and, therefore, unless otherwise set forth in a plan agreed to by all Parties, the Purchaser Service Providers are not obligated to make any such changes during the last calendar quarter of any year.

Section 2.13    *Receiving Party Obligations*.  Each Receiving Party shall fully cooperate with the Service Providers and Third Party Service Providers with respect to the provision of Transition Services.  Without limiting the foregoing, as necessary to enable the provision of Transition Services by the Service Providers and the Third Party Service Providers, the Receiving Parties shall: (a) adhere in all material respects to the policies of the Service Providers with respect to the protection of proprietary information and other policies regarding the use of information technology resources, to the extent relevant to the Transition Services provided; (b) provide timely responses to any information requested by the Service Providers or the Third Party Service Providers; and (c) provide access to the facilities and assets of the Receiving Parties as requested by the Service Providers or Third Party Service Providers.  The Receiving Parties shall promptly notify Sellers or Purchaser, as the case may be, of any problems or failures with respect to the Transition Services, or any breach or default by any Service Provider or Third Party Service Provider under this Agreement, which notice shall describe the foregoing in reasonable detail, and the Receiving Parties shall cooperate with the Service Providers and the Third Party Service Providers to correct the foregoing.  The Service Providers and the Third Party Service Providers shall be entitled to rely on any instructions or other information provided by the Receiving Parties, and the Service Providers shall not be in breach of or in default under this Agreement as a result of any such reliance; provided that no such instructions shall expand the obligations of the Service Providers hereunder.  The Service Providers shall be excused from their obligation to perform or cause to be performed a Transition Service if and to the extent that (i) such failure to perform or cause to be performed such Transition Service was due to the Receiving Party's failure to perform its responsibilities under this **Section 2.13** and (ii) the Service Providers use commercially reasonable efforts to perform or cause to be performed such Transition Service notwithstanding Receiving Party's failure, if practicable.

Section 2.14    *Transition Service Managers*.  The Seller Services Manager and the Purchaser Services Manager (each as defined below) shall liaise with each other, and seek to resolve in good faith all issues related to the scope, sufficiency and/or performance of Transition Services and any other issues arising in connection with this Agreement.  The Purchaser Services Manager and the Seller Services Manager shall meet periodically (in person or by telephone), as reasonable, for purposes of requesting Transition Services, establishing procedures, reviewing performance and forecasting needs.

(a)    Sellers shall appoint an individual, by giving written notice thereof to Purchaser within three (3) business days following the date hereof, to act as its initial services manager (the "Seller Services Manager"), who will be directly responsible for, among other things, coordinating and managing the delivery of the Seller Transition Services.  The Seller Services Manager will work with the personnel of Sellers, as well as with any Third Party Service Providers providing Seller Transition Services, to address reasonable issues and matters raised by the Purchaser Services Manager relating to this Agreement.  Sellers shall promptly notify Purchaser of the appointment of a new Seller Services Manager.

(b)    Purchaser shall appoint an individual, by giving written notice thereof to Sellers within three (3) business days following the date hereof, to act as its initial services manager (the "Purchaser Services Manager"), who will be directly responsible for, among other things, coordinating and managing the delivery of the Purchaser Transition Services.  The Purchaser Services Manager will work with the personnel of Purchaser, as well as with any Third Party Service Providers providing Purchaser Transition Services, to address reasonable issues and matters raised by the Seller Services Manager relating to this Agreement.  Purchaser shall promptly notify Sellers of the appointment of a new Purchaser Services Manager.

## ARTICLE 3
## CONFIDENTIALITY; PRIVACY

Section 3.1    Confidentiality.    All information (identified by the disclosing Person as confidential or proprietary) shared in the course of providing or receiving Transition Services, including information related to employees, customers or suppliers, will be considered Confidential Information and will be subject to the confidentiality provisions set forth in Section 6.24 of the Purchase Agreement; provided that, notwithstanding the term set forth in Section 6.24 of the Purchase Agreement, the term of the confidentiality obligation with respect to the Confidential Information covered by virtue of this **Section 3.1** shall extend until the second anniversary of the Termination Date.

Section 3.2    Privacy.    Notwithstanding anything herein to the contrary, with respect to Personal Information owned or controlled by the Parties and shared under this Agreement, the Service Providers shall at all times comply with the Privacy Policies of the Party that owns or controls the data, including with respect to using, accessing, storing, handling, processing, transmitting and disposing of Personal Information.  Furthermore, with respect to Personal Information owned or controlled by the Parties and shared under this Agreement, written notice shall be provided to the Party that owns or controls the data, as soon as reasonably practicable after any Party (other than the Party that owns or controls the data) becomes aware of (i) any breach or potential breach of the applicable Privacy Policies of the Party that owns or controls the data, or (ii) any incident where Personal Information may have been accessed by or disclosed to an unauthorized person.

Section 3.3    Survival.    The provisions of this **Article 3** shall survive any expiration or termination of this Agreement.  Each Party shall use commercially reasonable efforts not to, and shall cause their Subsidiaries, successors and permitted assigns to use

9

commercially reasonable efforts not to, attempt at any time to access any data, information or system of the other Party or Parties except as required to provide or receive Transition Services, as the case may be.

# ARTICLE 4
# TERM AND TERMINATION

Section 4.1    *Term and Final Termination*.  This Agreement shall commence on the Effective Date and continue until the date upon which all Transition Services have (i) terminated in accordance with the termination date set forth opposite each Transition Service on Schedule A or Schedule C or (ii) been earlier terminated pursuant to **Section 4.2** (the "Termination Date").

Section 4.2    *Early Termination*.  Notwithstanding anything to the contrary contained in this Agreement, (i) a Receiving Party may terminate all or any Transition Services on not less than 30 days prior written notice to Sellers or Purchaser, as the case may be, unless another notification period is specified on Schedule A or Schedule C (each such notice a "Termination Notice"), and (ii) the Parties may terminate this Agreement or any Transition Services by mutual agreement at any time.  As soon as a Transition Service is terminated, Sellers or Purchaser, as the case may be, shall no longer be obligated to pay any fees for the terminated Transition Services with respect to the period following the effective date of such termination.  As soon as reasonably practicable following its receipt of a Termination Notice, Sellers or Purchaser shall provide to the other Party or Parties, a written notice as to whether the termination of any of the Transition Services that are the subject of the Termination Notice (x) will require termination or partial termination of any of the other Transition Services and/or (y) will result in any Incremental Exit Costs (together, "Early Termination Consequences") and a good faith estimate (together with reasonable supporting documentation) of the aggregate amount of any such Incremental Exit Costs.  If Sellers or Purchaser delivers notification of an Early Termination Consequence, the Receiving Party may withdraw or modify its Termination Notice within 10 days of such notification.  If the Receiving Party does not withdraw or modify such Termination Notice (in writing) within such period, termination of such Transition Services will be final, including with respect to the termination of any other Transition Services identified by the Service Provider as an Early Termination Consequence and Purchaser or Sellers, as the case may be, shall have the obligation to pay the actual amount of any Incremental Exit Costs identified by the other Party or Parties as an Early Termination Consequence, notwithstanding that any such actual amount may be greater or less than the estimated amount, provided that such actual amount does not exceed the good faith estimate of Incremental Exit Costs by more than 10 percent.  Notwithstanding anything to the contrary, no Receiving Party shall have the right to unilaterally reinstitute any Transition Service if such Transition Service has been terminated.

Section 4.3    *Early Termination by Non-Defaulting Party*.  Purchaser on the one hand or Sellers on the other hand may terminate this Agreement (i) upon 30 days prior written notice to the other Party, if such other Party (the "Defaulting Party") is in breach of its payment obligations hereunder (it being understood that a Party will not be deemed to be in breach of such obligations with respect to an invoice or charge so long as it is disputing such invoice or charge in good faith in accordance with **Section 2.9**) or (ii) upon 30 days prior written notice to the Defaulting Party, if the Defaulting Party is in material breach of any of its non-monetary

obligations hereunder, and, in the case of either of clause (i) or (ii), the Defaulting Party fails to cure such breach within the applicable notice period specified above.  Other than as provided in **Section 4.2** and **4.3**, this Agreement may not be terminated by either Party under any circumstances.

Section 4.4    *Effect of Termination*.  If this Agreement is terminated in its entirety pursuant to **Section 4.1**, **4.2** or **4.3,** all obligations of the Parties under this Agreement shall terminate, except for (i) **Articles 3**, **5**, **6** and **7**, the terms and conditions of which shall survive any termination or expiration of this Agreement and (ii) the obligation of any Party to pay (x) all unpaid amounts in respect of Transition Services provided under this Agreement prior to the date of termination, whether or not invoiced prior to such date, and (y) other costs and expenses expressly required by the terms of this Agreement to be borne by such Party, including Incremental Exit Costs.

## ARTICLE 5
## REMEDIES

Section 5.1    *Cure*.  In the event a Service Provider breaches this Agreement by failing to perform in accordance with this Agreement any Transition Service required to be performed under this Agreement, the Receiving Party shall provide notice thereof to Sellers or Purchaser, as applicable, and the applicable Service Provider shall use commercially reasonable efforts to cure such failure, including by performing or re-performing such Transition Service. If, and to the extent, the Service Provider fails to cure such failure within 30 days of receiving such notice, the Receiving Party shall be entitled to and may seek indemnification pursuant to **Section 5.2**.

Section 5.2    *Service Provider Indemnification.*  Subject to **Article 6** and the other limitations set forth in this Agreement, Sellers shall indemnify, defend and hold harmless Purchaser and its Subsidiaries from, against and in respect of any and all Losses incurred by Purchaser and its Subsidiaries, or any of them, as a result of the breach of this Agreement by any Seller Service Provider in connection with the performance of the Seller Transition Services. Subject to **Article 6** and the other limitations set forth in this Agreement, Purchaser shall indemnify, defend and hold harmless Sellers and their Subsidiaries from, against and in respect of any and all Losses incurred by Sellers and their Subsidiaries, or any of them, as a result of the breach of this Agreement by any Purchaser Service Provider in connection with the performance of the Purchaser Transition Services.

Section 5.3    *Exclusivity of Remedy*.  Notwithstanding anything to the contrary herein, the right to performance or re-performance set forth in **Section 5.1** and/or indemnification set forth in **Section 5.2** shall be the sole and exclusive remedies of the Receiving Parties with respect to any breach of this Agreement or any Losses otherwise arising out of or relating to the Transition Services.  In no event shall such remedies be deemed to have failed of their essential purpose.

1755824

# ARTICLE 6
## LIMITATION OF LIABILITY; EXCLUSION OF CONSEQUENTIAL DAMAGES

*Section 6.1    Limitation of Liability.*

(a)    *PURCHASER LIABILITY*.  IN NO EVENT SHALL THE AGGREGATE LIABILITY OF PURCHASER UNDER ANY LEGAL THEORY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED $15,000,000; PROVIDED, HOWEVER, THAT THERE SHALL BE NO LIMITATION ON LIABILITIES RESULTING FROM A WILLFUL BREACH BY THE PURCHASER SERVICE PROVIDERS.

(b)    *SELLERS LIABILITY*.  IN NO EVENT SHALL THE AGGREGATE LIABILITY OF SELLERS UNDER ANY LEGAL THEORY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED $15,000,000; PROVIDED, HOWEVER, THAT THERE SHALL BE NO LIMITATION ON LIABILITIES RESULTING FROM A WILLFUL BREACH BY THE SELLER SERVICE PROVIDERS.

*Section 6.2    EXCLUSION OF CONSEQUENTIAL DAMAGES*.  IN NO EVENT SHALL SELLERS OR PURCHASER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

# ARTICLE 7
## MISCELLANEOUS

*Section 7.1    Notices*.  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

12

| | |
|---|---|
| If to any Seller: | General Motors Corporation<br>300 Renaissance Center<br>Tower 300, 25th Floor, Room D55<br>M/C 482-C25-D81<br>Detroit, Michigan 48265-3000<br>Attn: General Counsel<br>Tel.: (313) 667-3450<br>Facsimile: (248) 267-4584 |
| With copies to: | Jenner & Block LLP<br>330 North Wabash Avenue<br>Chicago, Illinois 60611-7603<br>Attn:  Joseph P. Gromacki<br>        Michael T. Wolf<br>Tel.:  312-222-9350<br>Facsimile:  312-527-0484<br><br>and<br><br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Harvey R. Miller<br>        Stephen Karotkin<br>        Raymond Gietz<br>Tel.: 212-310-8000<br>Facsimile: 212-310-8007 |
| If to Purchaser: | NGMCO, Inc.<br>c/o The United States Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington D.C. 20220<br>Attn: Chief Counsel Office of Financial<br>Stability<br>Facsimile: 202-927-9225 |
| With a copy to: | Cadwalader, Wickersham & Taft LLP<br>One World Financial Center<br>New York, New York 10281<br>Attn:   John J. Rapisardi<br>         R. Ronald Hopkinson<br>Tel.:  212-504-6000<br>Facsimile:  212-504-6666 |

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 7.1**, then to the last addressee as so designated.

Section 7.2    *No Right of Setoff*.    Except as otherwise provided under **Section 2.9** in this Agreement, no Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement or any other commercial arrangement entered into, between or among such Parties and/or their respective Affiliates.

Section 7.3    *Taxes*.    The Receiving Party shall pay any and all sales, use, goods and services or value-added taxes due for the respective Transition Services.

Section 7.4    *Assignment*.    Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of the other Parties, (i) any Party may assign its obligations hereunder to one or more Affiliates of such Party and (ii) Sellers may assign their rights, interests and obligations hereunder to any successor in interest, including, but not limited to, a liquidating trust established under a chapter 11 plan; provided, further, that no such assignment or delegation shall relieve the assigning Party of any of its obligations under this Agreement and the assigning Party shall be liable for any failure on the part of any assignee to perform its obligations hereunder.    Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 7.5    *Amendment*.    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

Section 7.6    *Waiver*.    At any time prior to the Termination Date, the Parties may (a) extend the time for the performance of any of the obligations or other acts of the other Parties or (b) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law).    Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.    The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

Section 7.7    *Severability*.    Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. If any term or provision of this Agreement, or the application thereof to any Person or any

circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 7.8    *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a PDF signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

Section 7.9    *Headings.*  The descriptive headings of the Articles, Sections and paragraphs of, and Schedules to, this Agreement are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof

Section 7.10    *Third Parties.*  Except for the Subsidiaries of Sellers and Purchaser pursuant to **Article 5**, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Receiving Parties, the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.11    *Governing Law.*  The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

Section 7.12    *Venue and Retention of Jurisdiction*.  Except as provided in **Section 2.9**, each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the Transition Services (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); provided, however, that this **Section 7.12** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the Transition Services (and agree not to commence any

15

litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

Section 7.13    *Waiver of Jury Trial*.  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 7.14    *Entire Agreement*.  This Agreement (together with the Purchase Agreement, the Ancillary Agreements and the Schedules) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any other agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 7.15    *Disclaimer*.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF SELLERS, PURCHASER, THE OTHER SERVICE PROVIDERS OR THEIR RESPECTIVE AFFILIATES OR ANY PERSON ACTING ON BEHALF OF ANY SUCH PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AT   LAW OR IN EQUITY WITH RESPECT TO THE TRANSITION SERVICES OR THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT, OR THE ACCURACY, AVAILABILITY, TIMELINESS OR COMPLETENESS OF, OR THE RESULTS TO BE OBTAINED FROM, SUCH TRANSITION SERVICES, AND SELLERS, PURCHASER, THE OTHER SERVICE PROVIDERS AND THEIR RESPECTIVE AFFILIATES HEREBY DISCLAIM THE SAME.

Section 7.16    *Allocation of Obligations of Sellers*.  Sellers shall cooperate to appropriately allocate among themselves the obligations and rights of Sellers under this Agreement, including any obligation to make or right to receive payments.

Section 7.17    *Interpretation of Schedules*.  Within the Schedules, references to Purchaser or Sellers shall be deemed to include the Subsidiaries of such Party or Parties, as appropriate.

**[*SIGNATURE PAGE FOLLOWS*]**

16

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name: *[_____]*
      Title:  *[_____]*


SATURN LLC

By: _____
      Name: *[_____]*
      Title:  *[_____]*


SATURN DISTRIBUTION CORPORATION

By: _____
      Name: *[_____]*
      Title:  *[_____]*


CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name:  *_____]*
      Title:  *[_____]*


*[NGMCO, INC.]*

By: _____
      Name: *[_____]*
      Title:  *[_____]*

## SCHEDULE A

### TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF PURCHASER

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| *PROPERTY MANAGEMENT* | | | |
| **Asset Management Oversight for Idle Manufacturing Facilities**<br>• Administer contracts and manage day-to-day operations of ongoing concerns | • Includes facilities idle at Closing, facilities in the process of being idled at Closing and facilities leased to Purchaser that become idle after Closing<br>• Includes real estate, facility, *etc.* | September 1, 2011 | $8, 250 / month |
| **Asset Management Oversight for Non-Manufacturing Facilities**<br>• Administer leases (including negotiation of amendments to Limited Facility Leases, as necessary) and contracts and manage day-to-day operations of ongoing concerns | | March 1, 2010 | $8, 250 / month |
| **Coordination of Rejected Real Estate Leases**<br>• Perform consulting services related to rejection of leases and landlord liaison and document management<br>• Administer leases and coordinate notices to landlord | • Both immediate and delayed rejections | March 1, 2010 | No cost |
| **Coordination of Rejected Personal Property Leases and Contracts**<br>• Perform consulting services related to rejection of personal property leases and contracts.<br>• Coordinate personal property lease rejection timing, notices to lessors and return of personal property | • Both immediate and delayed rejections<br>• Equipment may be located in facilities owned by Sellers or owned by Purchaser | March 1, 2010 | No cost |
| **Asset Management Oversight for RHI** | | December 31, 2010 | No cost |

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Controlled Properties**<br>• Administer contracts and manage day-to-day operations of all properties owned, leased or controlled by Riverfront Holdings, Inc., except for the premises leased pursuant to the Ren Cen Lease. | | | |
| *FACILITY IDLING PROCESS* | | | |
| **Facility Idling**<br>• Provide the idling services set forth on Schedule A-2 with respect to the facilities of the Sellers and their Subsidiaries set forth on Schedule A-3 | | December 31, 2013 | No cost |
| *ACCESS RIGHTS AND STORAGE SERVICES* | | | |
| **Access Right to Personal Property Owned by or Leased to Sellers and Located in Facilities Owned by or Leased to Purchaser**<br>• Provide Sellers the right to enter Purchaser facilities for purposes of preparing for removal and removing any fixtures, machinery, equipment and personal property that is owned by or leased to Sellers and located at such facility | • Sellers acknowledge that Purchaser may require certain personal property to be removed during plant shut down periods<br>• Sellers shall (i) notify Purchaser not less than three (3) business days prior to entry for removal, (ii) not unreasonably interfere with Purchaser's operations, (iii) be accompanied by a representative of Purchaser and (iv) provide Purchaser a list of items (or categories of items) Sellers intend to remove from the facility | December 31, 2013 | No cost |
| **Storage of Personal Property of Sellers**<br>• Store personal property owned by Sellers (or leased to Sellers) that, as of the Closing, is located in facilities owned by or leased to Purchaser, in order to allow Sellers to prepare for removal and remove the personal property | • Purchaser has the right to remove and store such personal property at alternate locations<br>• Sellers shall not unreasonably interfere with or cause a material | December 31, 2013 | No cost |

Schedule A
2

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| as contemplated by this Agreement | disruption of Purchaser's business or operations in connection with any storage services provided pursuant to this Agreement<br>• Any personal property owned by Sellers not removed from a facility on or before the Service Termination Date shall thereafter be deemed to be abandoned, and Purchaser may, at its election, (i) accept the same or (ii) remove and dispose of the same at Sellers' cost; provided that Sellers shall receive a credit against such costs for any amount Purchaser receives in connection with the sale or other disposition of such personal property<br>• Sellers agree to execute a bill of sale with respect to each such Seller owned item of personal property that is not removed from any facility, upon request of Purchaser | | |
| *SECURITY* | | | |
| **Manage and Provide Security**<br>• Manage and provide security and fire monitoring related to active and idled facilities<br>• Consultation regarding ongoing security requirements for Seller | • Use of third party contractors for on-site security to be paid directly by Sellers | December 31, 2013 | $16,500 / month |
| *ACCOUNTING* | | | |
| **Accounts Payable Processing and Paying Agent Services**<br>• Set up, vouch, approve and reconcile payments | • Use of third party services | January 1, 2013 | $66,000 / month (for Purchaser employees) and $20,000 / month |

Schedule A

3

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Pay invoices on behalf of Sellers; if unable to pay out of Seller accounts, reimbursement will be settled at month end | | | (for third parties) |
| **Accounts Receivable Processing**<br>• Accrue for rental income and other miscellaneous income | | January 1, 2013 | $16,500 / month |
| **General Ledger**<br>• Book entries and perform account reconciliations<br>• Book closing entries<br>• Perform purchase accounting / consideration accounting | | January 1, 2013 | $33,000 / month |
| **Fixed Asset Accounting**<br>• Maintain fixed asset records to reflect asset dispositions and perform related accounting activities | | January 1, 2013 | $49,500 / month |
| **Lease Accounting**<br>• Maintain record entries for lease transaction (e.g. rejection activity)<br>• Perform accounting activities for property and real estate leases | | January 1, 2013 | $16,500 / month |
| **Motors Holding Accounting**<br>• Perform and manage accounting for Motors Holding related transactions | | January 1, 2013 | $16,500 / month |
| **Budget and Forecast**<br>• Provide inputs as necessary to develop budgets and forecasts | | January 1, 2013 | No cost |
| **Court Required Financial Reporting**<br>• Perform all associated activities related to filings as required by the bankruptcy court | | January 1, 2011 | $5,500 / month |
| *TREASURY* | | | |
| **Wind-down of MEI and Elmo II & III** | | October 1, 2009 | $4,125 / month |

Schedule A
4

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Provide general support based on knowledge of previous transactions | | | |
| **Cash Management & Operations**<br>• Manage bank account funding<br>• Perform administration and banking services<br>• Facilitate automated accounting of cash flows<br>• Set up and manage new bank accounts | | August 1, 2010 | $16,500 / month |
| *TAX* | | | |
| **Tax Compliance**<br>• Prepare and file federal, state, local and foreign income and other taxes | | January 1, 2013 | $49,500 / month plus $2,000 / month for third party services |
| **Tax Accounting**<br>• Perform accounting services associated with tax obligations stemming from operations of or the winding down and liquidation of Sellers | | January 1, 2013 | $16,500 / month |
| **Customs**<br>• Provide support for filing of customs duties and reconciliation process as well as post entry compliance<br>• Assist with value reconciliation compliance<br>• Assist with NAFTA reconciliation compliance<br>• Assist with trade program review opportunity and follow up | • Requires additional support from third party administrator engaged by Sellers to reconcile customs duties | June 1, 2011 | $33,000 / month |
| **Property Tax**<br>• Prepare and file real and personal property taxes | | January 1, 2013 | $16,500 / month |
| *PURCHASING* | | | |
| **Negotiate, Source, and Contract Indirect Goods and Services on Behalf of Sellers as Required (Purchasing Services)**<br>• Manage facilities, security, equipment rentals, MRO supplies, and other similar activities | | January 1, 2013 | $16,500 / month |
| *IS&S* | | | |

Schedule A
5

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Manage Assets**<br>• Allow use of eFast system for asset tracking and depreciation | | January 1, 2013 | See Summarized Application Use below |
| **Finance and Accounting**<br>• Allow use of core accounting systems for general ledger activities and associated transaction processing (*e.g.*, eLedger, eTBR)<br>• Allow use of consolidation and reporting tools (*e.g.*, Hyperion)<br>• Allow use of treasury systems for cash management  and cash transactions (*e.g.*, Quantum)<br>• Extract capability to extract financial data required for reporting purposes | | January 1, 2013 | See Summarized Application Use below |
| **Operations**<br>• Allow use of DACOR and eDACOR for creation of POs, payables and cash disbursements | | January 1, 2013 | See Summarized Application Use below |
| **IT Infrastructure Support**<br>• Allow and support network connection for up to 100 non-Purchaser badged personnel<br>• Provide up to 100 laptops and/or desktops computers configured to the GMOL image<br>• Maintain contractor IDs for up to 100 resources<br>• Allow access to printers | • Est. potentially up to 100 contractors | January 1, 2013 | $170 / month / GMOL configured PC |
| **Summarized Application Use** | See descriptions IS&S sections above | January 1, 2013 | $16,500 / month |
| *COMMUNICATIONS* | | | |
| **Coordination of Outside / Stakeholder Messages Assistance**<br>• Reasonably cooperate with Sellers to coordinate press releases and other public statements | | January 1, 2013 | No cost |
| *RETAINED SPLINTER UNION SERVICES* | | | |
| **Payroll Processing** | | | |

Schedule A

6

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| • Upon request from Sellers before or at Closing and subject to agreement on scope, price and terms for providing such services, the Purchaser shall process Sellers' payroll for IUE-represented Moraine Assembly Plant employees. If such service is requested, the Parties shall expeditiously negotiate in good faith to reach agreement on the scope, price, and terms for providing  such service. | • Sellers have been advised of and are aware of Purchaser's payroll processes and systems and acknowledges that there is very limited flexibility to deviate in any way from the Purchaser's payroll process.<br>• Both Parties acknowledge that the provision of payroll services does not include the financial obligation or responsibility for actual wages or benefits | | |
| **Benefits Administration**<br>• Upon request from the Sellers before or at Closing and subject to agreement on scope, price and terms for providing such services, the Purchaser shall administer the benefit plans set forth on Schedule A-4 for current and former employees whose participation in the scheduled plans is deemed required by Sellers under the plans or the collective bargaining agreements set forth on Schedule A-4.  If such service is requested, the Parties shall expeditiously negotiate in good faith to reach agreement on the scope, price, and terms for providing services | • Sellers have been advised and are aware that Purchaser's arrangements with vendors and limited resources, processes and systems provide very limited flexibility to provide benefit administration services that deviate in any way from Purchaser's<br>• Both Parties acknowledge that the provision of benefit administration services does not include the financial obligation or responsibility for actual wages or benefits | | |
| *OTHER* | | | |
| **Insurance Management**<br>• Provide information about insurance in existence immediately prior to Closing | | January 1, 2013 | No cost |

Schedule A

7

1761813

| Service Description | Specifications and Limitations | Service Termination Date | Service Fee |
|---|---|---|---|
| **Background Information on Legal Matters**<br>• Assist Sellers by providing background/factual information regarding legal matters, as reasonably requested by Sellers, subject to Schedule B | | January 1, 2013 | No cost |
| **Books and Records**<br>• Afford Sellers and their authorized representatives reasonable access to and allow them to obtain copies of books and records of Purchaser to confirm Transition Services have been provided as contemplated by this Agreement<br>• Afford Sellers and their authorized representatives reasonable access to and allow them to obtain copies of books and records of Purchaser if and to the extent related to the real property owned by Sellers | • Subject to the provisions of **Article 3**; provided that such access shall also be subject to such additional confidentiality provisions as Purchaser may reasonably deem necessary<br>• Any such access to information shall be conducted during normal business hours and in such a manner as not to materially interfere with the normal operations of the business of a Purchaser | January 1, 2013 | No cost |

Schedule A

8

## SCHEDULE A-2

## FACILITY IDLING PROCESS

The Purchaser Service Providers shall provide to the Receiving Parties at each facility listed on
Schedule A-3 only the following Transition Services for which the Purchaser Service Providers
are identified below as the Responsible Party.  With respect to facilities leased to Purchaser
pursuant to the Master Lease Agreement, Purchaser shall begin to perform such Transition
Services at such time as provided in the Master Lease Agreement or otherwise as mutually
agreeable.  Each type of Transition Service listed below shall be understood by reference to and
performed in accordance with the applicable portions of the "Facilities Idling Playbook"
developed by Sellers prior to the date of the Purchase Agreement, as such document has been
interpreted in the historical practice of Sellers.  Each Party acknowledges that it has received
copy of the "Facilities Idling Playbook."

| Description of Service | Responsible Party |
|---|---|
| **Conveyor Systems** | |
| Review Support/Service Contracts | Purchaser Service Providers |
| Retain Documentation | Purchaser Service Providers |
| Review OEM Service Manuals | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Shutdown Conveyor Equipment | Purchaser Service Providers |
| Spare Parts | Purchaser Service Providers |
| **Body** | |
| Support Contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| SPO | Purchaser Service Providers |
| Weld Water | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Weld Equipment | Purchaser Service Providers |
| Tooling | Purchaser Service Providers |

| Description of Service | Responsible Party |
|---|---|
| Robots | Purchaser Service Providers |
| Hemmers | Purchaser Service Providers |
| Shutdown Dispense Equipment | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Retain Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Communication Equipment | Purchaser Service Providers |
| Boundary Samples | Purchaser Service Providers |
| Parts | Purchaser Service Providers |
| Perceptron | Purchaser Service Providers |
| CMM | Purchaser Service Providers |
| **GA** | |
| GA Technical Support contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| Backup Programmable Devices & Processors | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Shutdown M & E Equipment | Purchaser Service Providers |
| Fixtured Tooling | Purchaser Service Providers |
| Shutdown Robots | Purchaser Service Providers |
| Shutdown Dispense Equipment | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| All Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication - shut off all automatic lubrication equipment as appropriate | Purchaser Service Providers |
| Documentation -all documentation should be accounted for in single depository within the General Assembly Area | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled | Sellers |

Schedule A-2

2

| | Description of Service | Responsible Party |
|---|---|---|
| | Equipment | |
| | Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| | Communication equipment | Purchaser Service Providers |
| | Boundary samples | Purchaser Service Providers |
| | Parts | Purchaser Service Providers |
| | Reclaim any GM property out of plant (loan, repair, *etc*.) | Purchaser Service Providers |
| | Drain fluids from all point of use cribs as appropriate | Purchaser Service Providers |
| | Drain Processing FF systems below the main headers.  If idling is longer than 180 days, anti-rust flush should be loaded into systems below header | Purchaser Service Providers |
| | If length of idling is 180 days or longer, drain systems below the main headers and fill with anti-rust flush | Purchaser Service Providers |
| | Purge all systems.  Cap and/or grease exposed termination points.  Remove and dispose of all bulk containers, barrels, and pails | Purchaser Service Providers |
| | Water Test Booth - drain water from system | Purchaser Service Providers |
| | V.I.N. Room - Tag ID Inventory and Move to Secure Location | Purchaser Service Providers |
| **Paint** | | |
| | Pre-Shutdown | Purchaser Service Providers |
| | Support Contracts | Purchaser Service Providers |
| | General Paint Shop and Conveyors | Purchaser Service Providers |
| | Phosphate Shutdown | Purchaser Service Providers |
| | ELPO Shutdown | Purchaser Service Providers |
| | Sealer, Antichip and Underbody PVC Shutdown | Purchaser Service Providers |
| | Deadner and LASD Shutdown | Purchaser Service Providers |
| | Prime and Topcoat Spray Equipment Shutdown | Purchaser Service Providers |
| | Powder Prime Spray Equipment Shutdown | Purchaser Service Providers |
| | Powder Distribution Systems Shutdown | Purchaser Service Providers |
| | Powder Spray Booths and ASH Shutdown | Purchaser Service Providers |
| | Wet Spray Booths and ASH Shutdown | Purchaser Service Providers |
| | Ovens Shutdown | Purchaser Service Providers |
| | Final Repair Shutdown | Purchaser Service Providers |
| | Paint Circulation Systems Shutdown | Purchaser Service Providers |
| | Misc Enclosure & Decks | Purchaser Service Providers |
| | Cavity Wax | Purchaser Service Providers |
| | Lighting Shutdown | Purchaser Service Providers |
| | Building Air supply Shutdown | Purchaser Service Providers |
| | Abatement Shutdown | Purchaser Service Providers |

1761813

| Description of Service | Responsible Party |
|---|---|
| Compressed Air | Purchaser Service Providers |
| Programs | Purchaser Service Providers |
| Power Tools | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| Communication Equipment | Purchaser Service Providers |
| Boundary Samples | Purchaser Service Providers |
| Miscellaneous | Purchaser Service Providers |
| Housekeeping | Purchaser Service Providers |
| **Powertrain Manufacturing Engineering** | |
| Perform Equipment Idling Prework Tasks | Purchaser Service Providers |
| Perform Equipment Idling Tasks | Purchaser Service Providers |
| Perform Process System Idling Tasks | Purchaser Service Providers |
| Perform Equipment Cleaning Tasks of idled equipment | Sellers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| **Stamping** | |
| Support contracts | Purchaser Service Providers |
| Consumables | Purchaser Service Providers |
| SPO | Purchaser Service Providers |
| Reallocate parts as necessary | Purchaser Service Providers |
| Review Utility Plan | Purchaser Service Providers |
| Cooling System (H2O) | Purchaser Service Providers |
| Compressed Air | Purchaser Service Providers |
| Electricity | Purchaser Service Providers |
| Temperature | Purchaser Service Providers |
| Backup Programmable Devices | Purchaser Service Providers |
| Shutdown Control Panels | Purchaser Service Providers |
| Shutdown Processors | Purchaser Service Providers |
| Shutdown Press Equipment (mechanical) | Purchaser Service Providers |
| TDO Machine Tools | Purchaser Service Providers |

Schedule A-2
4

| Description of Service | Responsible Party |
|---|---|
| Shutdown Robots | Purchaser Service Providers |
| Shutdown blank lube / wash systems | Purchaser Service Providers |
| Hydraulics | Purchaser Service Providers |
| Lubrication | Purchaser Service Providers |
| Documentation | Purchaser Service Providers |
| Cleaning | Purchaser Service Providers |
| Perform Preservation of Equipment Tasks for Idled Equipment | Sellers |
| Perform Periodic Maintenance Tasks for Idled Equipment | Sellers |
| **WFG Energy and Utilities** | |
| Develop and Implement Utilities Management Plan | Purchaser Service Providers |
| Review Existing Operating and Utilities Contracts | Purchaser Service Providers |
| Identify and Implement Equipment Management Needs | Purchaser Service Providers |
| Develop Staffing Plan | Purchaser Service Providers |
| Management Tasks in EUSG Areas During Plant Idle | Purchaser Service Providers |
| Identify and Implement Start-up Procedure | Purchaser Service Providers |
| Provide knowledge support/consultation on continuation / transfer of utility services | Purchaser Service Providers |
| Interface with Plant Closing/Idling team | Purchaser Service Providers |
| **Environmental Services** | |
| Review/Update Site Environmental Calendar Activities | Sellers |
| Manage Waste Issues | Sellers |
| Manage Chemical Issues | Sellers |
| Manage RM contract Ramp-down | Sellers |
| Manage CM contract Ramp-down | Sellers |
| Response Plan Updates | Sellers |
| Ancillary Activities/Facilities (preventive measures) | Sellers |
| Maintain All Required Permitted Monitoring Recordkeeping and Reporting (MRRP) | Sellers |
| Determine Need to operate & maintain Refrigeration Equipment | Sellers |
| Determine if Air Permits should be maintained or terminated | Sellers |
| Determine Abatement Equipment preservation requirements | Sellers |
| Evaluate Water and Waste Permit Changes | Sellers |
| Water Sampling Requirements | Sellers |
| Waste and Water Reports | Sellers |
| UST/AST Issues | Sellers |
| PCB Related Concerns (Understanding Liability, Current/Future, Reporting Activity) | Sellers |

Schedule A-2
5

| Description of Service | Responsible Party |
|---|---|
| Determine Emission Reduction Credits (ERCs) | Sellers |
| Manage Industrial Hygiene Issues | Sellers |

1761813

## SCHEDULE A-3

## SELLER MANUFACTURING FACILITIES TO BE IDLED[1]

**Facilities Owned by Sellers and Leased to Purchaser:**

|     | Site Name | Property Address | City | State | Zip |
|-----|-----------|------------------|------|-------|-----|
| 1. | Stamping - Indianapolis | 340 White River Parkway West Drive South 50 | Indianapolis | IN | 46206 |
| 2. | GMPT - Flint North #5/#10/#81 | 902 E Hamilton Avenue | Flint | MI | 48550 |
| 3. | GMPT - Livonia | 12200 Middlebelt | Livonia | MI | 48150 |
| 4. | GMVM - Pontiac Assembly | 2100 S Opdyke Road | Pontiac | MI | 48341 |
| 5. | Stamping - Pontiac North Campus[2] | 220 East Columbia | Pontiac | MI | 48340 |
| 6. | Stamping - Mansfield | 2525 West Fourth Street PO Box 2567 - 44906 | Mansfield | OH | 44906-1269 |
| 7. | GMPT - Parma Complex[3] | 5400 Chevrolet Boulevard PO Box 30098 | Parma | OH | 44130 |
| 8. | GMPT - Fredericksburg | 11032 Tidewater Trail | Fredericksburg | VA | 22408 |
| 9. | GMPT - Willow Run | 2930 Ecorse Road | Ypsilanti | MI | 48197-0935 |
| 10. | Stamping - Grand Rapids | 300 36th Street SW | Wyoming | MI | 49548-2107 |
| 11. | GMVM - Shreveport Assembly and Stamping Shreveport | 7600 General Motors Boulevard | Shreveport | LA | 71129 |
| 12. | GMVM -Wilmington Assembly | 801 Boxwood Road PO Box 1512 – 19899 | Wilmington | DE | 19804-2041 |

**Facilities Owned by Sellers and not Leased to Purchaser:**

|     | Site Name | Property Address | City | State | Zip |
|-----|-----------|------------------|------|-------|-----|
| 13. | GMPT - Massena | Route 37 East | Massena | NY | 13662-0460 |
| 14. | GMVM - Moraine Assembly[4] | 2601 West Stroop Road | Moraine | OH | 45439 |
| 15. | Stamping - Pittsburgh | 1451 Lebanon School Road | West Mifflin | PA | 15122 |

---

[1] To the extent that the idling process is complete at any of these facilities prior to Closing, the facility should be removed from the chart.
[2] Does not include Plant #14 and the real property underlying Plant #14 or the associated utilities for stamping and PT facilities.
[3] Does not include the GMPT - Parma Stamping improvements and associated real property.
[4] Does not include the GMPT - Moraine (DMAX) improvements and associated real property.

## SCHEDULE A-4

### SELLER PLANS AND COLLECTIVE BARGAINING AGREEMENTS

1. Agreement Regarding Closure of the General Motors Moraine Assembly Plant between General Motors and the IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its Local Union 798

2. Supplemental Agreements Between IUE and GM:

   a. General Motors Life and Disability Benefits Program for Hourly Employees
   b. General Motors Health Care Program for Hourly Employees
   c. General Motors Supplemental Unemployment Benefit Plan
   d. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
   e. General Motors Dependent Care Reimbursement Plan Hourly-Rate Employees in the United States
   f. Guaranteed Income Stream Benefit Program (IUE)
   g. Dependent Scholarship Program for Hourly Employees in the United States
   h. Tuition Assistance Program for Hourly Employees in the United States

3. Supplemental Agreements Between GM and Various Splinter Unions (Teamsters, United Steel Workers,  International Union Operating Engineers (IUOE), Caterers- United Catering, Restaurant, Bar and Hotel Workers (now United Commercial Food Workers), and International Brotherhood of Boilermakers—formerly Metal Polishers, Buffers, Platers Unions):

   a. General Motors Life and Disability Benefits Program for Hourly Employees
   b. General Motors Health Care Program for Hourly Employees
   c. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
   d. General Motors Income Security Plan for Hourly-Rate Employees
   e. Dependent Scholarship Program for Hourly Employees in the United States
   f. Tuition Assistance Program for Hourly Employees in the United States

## SCHEDULE B

## PURCHASER EXCLUDED SERVICES

1. Notwithstanding anything set forth in this Agreement, neither Purchaser nor any of its Affiliates shall provide any services relating to:

   - automotive or product engineering;

   - automotive or product manufacturing;

   - automotive or product distribution;

   - legal advice and services (excluding assisting Sellers by providing background/factual information in response to Seller inquiries); and

   - services to be provided pursuant to the Master Lease Agreement or the SPO Lease.

2. Notwithstanding anything set forth in this Agreement, neither the Purchaser nor any of its Affiliates shall have any obligation to respond to or otherwise address any Hazardous Material Release in surface water, groundwater, ambient air, or surface or subsurface soil under, at, on, in or emanating from or onto any facility or real property owned, operated, leased, used or held for use by Sellers or any of their Affiliates.

3. Notwithstanding anything set forth in this Agreement, nothing in this Agreement shall be interpreted to create a fiduciary relationship between Sellers and any corporate risk management personnel employed by the Purchaser Service Providers.  Further, no Purchaser Service Provider shall be obligated to provide any insurance advisory services (by personnel employed by the Purchaser Service Providers) that could reasonably be expected in the Purchaser Service Provider's professional judgment to expose any such personnel to any breach of fiduciary or other duty, or to any conflict of interest.

1761813

<u>SCHEDULE C</u>

**TRANSITION SERVICES PROVIDED BY OR ON BEHALF OF SELLERS**

**1.  <u>Storage of and Access to Purchaser Personal Property</u>.**

<u>Description of Service</u>:

- Store personal property of Purchaser that, as of the Closing, is located in a facility listed on <u>Schedule C-2</u> (the "<u>Seller Listed Facilities</u>").
- Provide Purchaser the right to enter Seller Listed Facilities for purposes of maintaining, preparing for removal and removing any fixtures, machinery, equipment or other personal property that is owned by or leased to Purchaser and located at such facility.

<u>Specifications and Limitations</u>:

- Purchaser shall
  - notify Sellers not less than three (3) business days prior to entry for removal and
  - provide Sellers a list of items (or categories of items) Purchaser intends to remove from the facility.
- In the event of any disposition of a Seller Listed Facility prior to the removal of all Purchaser personal property (excluding any personal property to be abandoned by Purchaser) from such Seller Listed Facility (the date of the completion of such removal, the "<u>Removal Date</u>"), Sellers will include a provision in the written agreement relating to the disposition of such Seller Listed Facility that such transferee (and its successors) will grant to Purchaser the right to maintain, prepare for removal and remove the Purchaser personal property as contemplated by this Agreement.
- Purchaser shall make repairs necessitated by the removal of its personal property from a Seller Listed Facility to the extent such repairs would be required pursuant to the idling process set forth on <u>Schedule A-2</u>.
- Any personal property of the Purchaser not removed from a Seller Listed Facility on or before the Service Termination Date shall thereafter be deemed to be abandoned, and Sellers may, at their election, (i) accept the same or (ii) remove and dispose of the same at Purchaser's cost; provided that Purchaser shall receive a credit against such costs for any amount Sellers receive in connection with the sale or other disposition of such personal property.
- Upon request of Sellers, Purchaser shall execute a bill of sale with respect to each item of Purchaser owned personal property that is not removed from any Seller Listed Facility by the Termination Date.
- Sellers shall deliver copies of all tax bills (for the Seller Listed Facilities) they receive to Purchaser within ten (10) business days after receipt thereof.  Purchaser shall deliver to Sellers duplicate receipts and cancelled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder.
- Purchaser may contest any tax or assessment upon or against the Seller Listed Facility, or any part thereof, or the improvements at any time situated thereon, so long as the Purchaser shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate

legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Purchaser shall immediately pay any amounts due.

Service Termination Date:

- December 31, 2013.

Service Fee:

- With respect to the period from and after the Closing Date and until the earlier of (i) the one year anniversary of the Closing Date and (ii) the applicable Removal Date, Purchaser shall timely pay, with respect to each Seller Listed Facility, each of the following (the "Operating Expenses"):
    - all utilities and other services (including, but not limited to, site coordination, management and oversight, security, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, including electricity for any heating, ventilating and air conditioning) furnished to and or used in or at the Seller Listed Facility for any purpose; and
    - all real property taxes or special improvement taxes payable against the Seller Listed Facility, all property taxes levied or assessed against the Purchaser's Personal Property located in the Seller Listed Facility (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Seller Listed Facility.
- If the Sellers use a Seller Listed Facility other than for (i) the storage and removal of Seller and Purchaser personal property located in such Seller Listed Facility as of the Closing Date or (ii) activities related to the marketing and sale of such Seller Listed Facility, the Parties will in good faith negotiate a fair allocation of the Operating Expenses between the Parties such that Sellers pay a portion of the Operating Expenses proportionate to their use of the Seller Listed Facility.
- If the Removal Date for any Seller Listed Facility has not occurred by the one year anniversary of the Closing Date, then with respect to the period following the one year anniversary of the Closing Date and until the earlier of (i) the Service Termination Date and (ii) the Removal Date with respect to such Seller Listed Facility, the Purchaser shall pay the Sellers the Operating Expenses plus $0.50 per usable square foot (as set forth with respect to each Seller Listed Facility on Schedule C-2), per annum, payable in equal monthly instalments.

## 2.  **Limited Use of Facilities Leased to Sellers**.

Description of Service

- Provide Purchaser with a right to use and occupy the facilities listed on Schedule C-3 (the "Limited Use Facilities").

Schedule C
2

1761813

- Maintain all insurance required under each lease to which a Seller is a party with respect to a Limited Use Facility (each, a "Limited Facility Lease").

Specifications and Limitations

- Purchaser shall have the right to use the Limited Use Facilities only for (i) the purposes for which the Limited Use Facilities are being used on the Closing Date and (ii) subject to the terms and conditions of the applicable Limited Facility Lease, maintaining, preparing for removal and removing any fixtures, machinery, equipment or other personal property that is owned by or leased to Purchaser and located at the Limited Use Facility subject to such Limited Facility Lease.
- Purchaser's license to use and occupy each Limited Use Facility shall be subject in all respects to the terms and conditions of the applicable Limited Facility Lease.
- During the period Purchaser occupies any portion of a Limited Use Facility, Purchaser shall perform any and all obligations of Sellers under the terms and conditions of the applicable Limited Facility Lease.
- Notwithstanding anything herein to the contrary, Purchaser shall accept this right to use the Seller Listed Facilities in their "as is" condition on the Closing Date.
- Purchaser shall, if practicable, provide Sellers with written notice of its intent to vacate a Limited Use Facility five days before the date upon which Purchaser ceases to occupy a Limited Use Facility; provided that failure to provide such a notice shall not be a breach of this Agreement.
- The rights granted to Purchaser with respect to the Limited Use Facilities shall not constitute an interest in real property.
- Purchaser shall promptly notify Sellers in writing when Purchaser no longer occupies a Limited Use Facility and Sellers shall not reject any Limited Facility Lease until it receives such notice with respect to the applicable Limited Use Facility.
- Sellers shall have the right to bring an action to retake possession of a Limited Use Facility if (i) a Seller has been evicted or eviction proceedings have been commenced against a Seller with respect to such Limited Use Facility or (ii) Purchaser continues to occupy such Limited Use Facility after the Service Termination Date.  The foregoing rights shall be in addition to, and not in limitation of, any other remedy available to Sellers under the Agreement or at law.
- With respect to the SPO Jacksonville facility and the SPO Boston facility, (i) on December 28, 2009, the applicable Seller will assume the Limited Facility Lease for each facility unless the Purchaser otherwise notifies the Sellers in writing at least three Business Days prior to such date and (ii) after the assumption of such Limited Facility Lease, the applicable Seller will reject the Limited Facility Lease when instructed to do so by Purchaser.

Service Termination Date

- December 28, 2009; provided, however, that with respect to the SPO Jacksonville and SPO Boston facilities, the Service Termination Date shall be the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization.

Service Fee

Schedule C
3

- During the period Purchaser occupies any portion of a Limited Use Facility, Purchaser shall pay Sellers the following fees:  (a) the amount of the recurring monthly rentals payable by Sellers under the Limited Facility Lease for such Limited Use Facility, (b) the amount paid by Sellers for insurance with respect to such Limited Use Facility and (c) all other amounts payable by Sellers under the Limited Facility Lease for such Limited Use Facility, whether such amounts are payable to the landlord under the Limited Facility Lease for such Limited Use Facility or to third party utility providers including, but not limited to, gas, electric, telephone, data and other utility providers.
- Purchaser also shall pay to Sellers all amounts payable by Sellers pursuant to the Limited Facility Leases for the SPO Jacksonville facility and the SPO Boston facility for all periods from and after December 29, 2009, whether or not Purchaser is in occupancy of the SPO Jacksonville facility or the SPO Boston facility, as applicable.

## 3. **Permits and Consents**.

Description of Service

- Assist Purchaser, as reasonably requested by Purchaser, in obtaining (i) consents from Governmental Authorities, (ii) Permits, (iii) consents from non-Governmental Authorities and (iv) financial assurance as required under Environmental Laws, including the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et. seq.), Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 6901 et. seq) and similar state laws, in each case, with respect to the ownership and operation of the Purchased Assets and payment of the Assumed Liabilities by Purchaser, sufficient in the aggregate to permit the Purchaser to own and operate the Purchased Assets from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing.
- Sellers shall maintain and extend to Purchaser the use and benefit of all state licenses and approvals related to the manufacture and distribution of motor vehicles, to the extent permitted by applicable law

Specifications and Limitations

- None

Service Termination Date

- December 31, 2009

Service Fee

- No cost

## 4. **Limited Use of Personal Property Subject to Sellers' Equipment Financing**.

Description of Service

- Sellers shall provide Purchaser with the right to use and possess any personal property ("Limited Use Personal Property") that is subject to a contract listed on Schedule C-4 (each, a "Personal Property Contract") during the period beginning on the Closing Date and ending, with respect to each item of Limited Use Personal Property, on the earlier to occur of  (i) the date the applicable Personal Property Contract has been rejected pursuant Section 365 of the Bankruptcy Code (if applicable) by the respective Seller, (ii) the date the respective Seller is otherwise no longer a party bound by the Personal Property Contract or otherwise ceases to have the right to use and possession of the Limited Use Personal Property, (iii) the date on which Purchaser obtains its own right (not under this Agreement) to use and possess the item of Limited Use Personal Property, whether by assumption, purchase or otherwise, and (iv) the date Purchaser notifies the Sellers that Purchaser no longer desires to use or possess all items of Limited Use Personal Property under the applicable Personal Property Contract (the "End Date").
- Sellers shall provide reasonable assistance to Purchaser in connection with the renegotiation, rejection, and/or recharacterization of the Personal Property Contracts.

Specifications and Limitations

- Purchaser shall have the right to use the Limited Use Personal Property only for the purposes for which the Limited Use Personal Property is being used, planned to be used, or capable of being used on the Closing Date.
- Notwithstanding anything herein to the contrary, Purchaser shall accept this right to use the Limited Use Personal Property in an "as is" condition on the Closing Date.
- Purchaser shall control all (i) negotiations and communications with the other parties to each Personal Property Contract regarding the substance, renewal, amendment or reformation of such Personal Property Contract and (ii) litigation or other disputes regarding each Personal Property Contact, including any rejection, partial rejection or action to recharacterize any such contract.  In addition, upon the direction of Purchaser, the Sellers shall execute and deliver any such renewal or amendment of any Personal Property Contract, where such Personal Property Contract (as amended) will thereafter be assumed by a Seller and assigned to Purchaser.
- Purchaser's insurance, care and maintenance of the Limited Use Personal Property shall be subject in all respects to the terms and conditions of the Personal Property Contract.
- Until the End Date applicable to any Limited Use Personal Property, Purchaser shall perform the obligations of Sellers under the Personal Property Contract, as and to the extent Sellers are required to perform such obligations under applicable law, including the Bankruptcy Code.

Service Termination Date

- December 31, 2013

Service Fee

Schedule C
5

- In addition to any amounts due pursuant to Section 6.6(e) of the Purchase Agreement, with respect to the period after the Closing Date and until the End Date for each Personal Property Contract, Purchaser shall pay Sellers all out-of-pocket costs and expenses incurred by Sellers, including attorney's and expert fees, in connection with any negotiation or dispute with respect to such Personal Property Contract.
- If Section 6.6(e) does not apply to a Personal Property Contract, with respect to the period after the Closing Date and until the End Date for each Personal Property Contract, Purchaser shall pay Sellers all amounts payable by Sellers under such Personal Property Contract, and any contracts or agreements entered into in connection therewith, whether such amounts are payable to the counterparty to the Personal Property Contract or to any third party.
- If the End Date occurs in accordance with clause (iv) of the definition of "End Date" by notice to the Seller, then, until such time as the applicable Personal Property Contract has been rejected pursuant Section 365 of the Bankruptcy Code by the respective Seller, Purchaser shall pay Sellers all amounts payable by Sellers under such Personal Property Contract, and any contracts or agreements entered into in connection therewith, whether such amounts are payable to the counterparty to the Personal Property Contract or to any third party; provided that Sellers shall promptly act to reject such Personal Property Contract.

**5.  <u>Management of and Services under Seller TSA Executory Contracts</u>**.

<u>Description of Service</u>

- Allow Purchaser to manage and exercise rights under, for its own account, the Seller TSA Executory Contracts (defined below).
- At the request of Purchaser (including as to amounts, quantity, timing, specifications or otherwise) and for the benefit of Purchaser, Sellers will assist Purchaser with obtaining, directly or indirectly, goods, services and other benefits (and taking other actions) under the Seller TSA Executory Contracts, in accordance with the terms and conditions of the Seller TSA Executory Contracts.
- To the extent requested by Purchaser and to the extent permitted under the applicable Seller TSA Executory Contract, the appropriate Sellers shall extend a sublicense to Purchaser with respect to such Seller TSA Executory Contract.
- "<u>Seller TSA Executory Contracts</u>" means each Executory Contract for which Purchaser is obligated, pursuant to Section 6.6(e) of the Purchase Agreement, to pay or cause to be paid all amounts due in respect of Sellers' performance thereunder, including any Shared Executory Contract; provided that Limited Facilities Leases and Personal Property Contracts shall not be Seller TSA Executory Contracts.

<u>Specifications and Limitations</u>

- Sellers shall not order any goods or services or exercise any rights pursuant to a Seller TSA Executory Contract, except at the request and on behalf of Purchaser; provided that with respect to any Shared Executory Contract, Sellers may order goods or services for their own account.

- Purchaser shall perform the obligations of Sellers under the terms and conditions of the Seller TSA Executory Contracts, as and to the extent Sellers are required to perform such obligations under applicable law, including the Bankruptcy Code.
- Such services will be provided during the period beginning on the Closing Date and ending, with respect to each Seller TSA Executory Contract, on the date the applicable Executory Contract is no longer a Seller TSA Executory Contract.

Service Termination Date

- December 31, 2013

Service Fee

- No cost, except as otherwise specified in Section 6.6(e) of the Purchase Agreement.

Schedule C
7

## SCHEDULE C-2

### SELLER LISTED FACILITIES

| Site Name | Property Address | Usable Square Feet |
|-----------|------------------|--------------------|
| 1. GMPT – Massena | Route 37 East,<br>Massena, NY 13662-0460 | 815,477 |
| 2. GMVM - Moraine Assembly[5] | 2601 West Stroop Road<br>Moraine, OH 45439 | 3,750,503 |
| 3. Stamping – Pittsburgh | 1451 Lebanon School Road,<br>West Mifflin, PA 15122 | 808,474 |
| 4. Romulus Engineering Center | 37350 Ecorse Road<br>Romulus, MI 48174-1376 | 267,338 |
| 5. Pontiac Fiero Site | 900 Baldwin Avenue<br>Pontiac, MI 48340 | 1,772,174 |
| 6. Pontiac Centerpoint Campus – West | 660 South Boulevard East<br>Pontiac, MI 48341 | 580,000 |
| 7. Pontiac Centerpoint Campus – Central | 2000 Centerpoint Parkway<br>Pontiac, MI 48341-3147 | 990,000 |

---

[5] Does not include the GMPT - Moraine (DMAX) improvements and associated real property.

## <u>SCHEDULE C-3</u>

## LIMITED USE FACILITIES

| | Facility Name | Address | City | State |
|---|---|---|---|---|
| 1. | Fuel Cell Activity | 3050 Lomita Boulevard | Torrance | California |
| 2. | RFO Design Hollywood | 5350 Biloxi Avenue | North Hollywood | California |
| 3. | SPO - Fontana | 11900 Cabernet Drive | Fontana | California |
| 4. | Republic Square 1 | 25 Massachusetts Avenue N.W. | Washington | District of Columbia |
| 5. | Huntington Centre I | 2901 SW 149th Avenue | Miramar | Florida |
| 6. | SPO - Jacksonville | 12751 Gran Bay Parkway West | Jacksonville | Florida |
| 7. | COB - Alpharetta | 11700 Great Oaks Way | Alpharetta | Georgia |
| 8. | COB - Naperville | 387 Shuman Boulevard | Naperville | Illinois |
| 9. | RFO – Training Center - Hinsdale, IL | 336 East Ogden Avenue | Hinsdale | Illinois |
| 10. | GMPT - Indianapolis Castleton | 7601 E. 88th Pl | Castleton | Indiana |
| 11. | SPO - Boston | 45 Commerce Way | Norton | Massachusetts |
| 12. | EAS Lease Assumption | TBD | Saginaw | Michigan |
| 13. | Flint Flowthrough Warehouse | 4002 James Cole Blvd | Flint | Michigan |
| 14. | GM Heritage Center | 6400 Center Drive | Sterling Heights | Michigan |
| 15. | Great Lakes Technical Center | South Saginaw Street | Flint | Michigan |
| 16. | Phoenix Center | 31 East Judson Street | Pontiac | Michigan |
| 17. | SPO - Burton | 1215 North Center Road | Burton | Michigan |
| 18. | SPO - Davison Road Processing Center | 4134 Davison Road | Burton | Michigan |
| 19. | SPO - Ypsilanti (Business Center II) | 2625 Tyler Road | Ypsilanti | Michigan |
| 20. | SPO - Ypsilanti (SPO Business Center I ) | 2625 Tyler Road | Ypsilanti | Michigan |
| 21. | SPO Process Engineering Lab | 3023 Airpark Drive N | Flint | Michigan |

|  | Facility Name | Address | City | State |
|---|---|---|---|---|
| 22. | Sterling Heights Tooling Center | 33500 Mound Road | Sterling Heights | Michigan |
| 23. | Troy - OnStar Engineering | 2321 John R Road | Troy | Michigan |
| 24. | Troy Technology Park | 1870 Technology Drive | Troy | Michigan |
| 25. | Willow Run Airport Facility (associated with GMPT Willow Run, Ypsilanti, MI) | Willow Run Airport | Wayne and Washtenaw Counties | Michigan |
| 26. | SPO South West Bulk Center | 125 Fountain Lakes Industrial Drive | St. Charles | Missouri |
| 27. | COB - Somers | 1 Pepsi Way P.O. Box 8500 | Somers | New York |
| 28. | Fuel Cell Activity | 10 Carriage Street | Honeoye Falls | New York |
| 29. | RFO On-Star Charlotte NC | 10101 Claude Freeman Drive | Charlotte | North Carolina |
| 30. | SPO - Cincinnati | 8752 Jacquemin Drive | Westchester | Ohio |
| 31. | SPO - Columbus | 6000 Green Pointe Drive | Groveport | Ohio |
| 32. | SPO West Chester | 9287 Meridian Way | Westchester | Ohio |
| 33. | COB - Irving | 225 E John Carpenter Fwy | Irving | Texas |
| 34. | SPO - Fort Worth | 301 Freedom Drive | Roanoke | Texas |
| 35. | VSSM Call Center - Austin | 7401 E. Ben White Boulevard 3 | Austin | Texas |
| 36. | SPO East Coast Bulk Center | 891 Auto Parts Place | Martinsburg | West Virginia |

Schedule C-3
2

## <u>SCHEDULE C-4</u>

## PERSONAL PROPERTY CONTRACTS

1. Master Lease Agreement dated March 17, 2000, between General Motors Corporation, NAO Worldwide Purchasing Division and The LGR Group, Inc.

2. Master Lease Agreement dated October 19, 2001, between General Motors Corporation and Pacific Rim Capital, Inc.

3. Master Lease Agreement dated November 14, 1994, between Saturn Corporation and First American Capital Management Group, Inc.

4. Master Lease Agreement dated May 1, 1995, between General Motors Corporation and First American Capital Management Group, Inc.

5. Master Lease Agreement dated November 8, 1995, between Saturn Corporation and Chancellor Fleet Corporation

6. Master Lease Agreement dated January 10, 1997, between Saturn Corporation and Yale Financial Services, Inc.

7. Master Lease Agreement dated May 16, 2000, between General Motors Corporation and First American Capital Management Group, Inc.

8. Master Lease Agreement dated March 1, 1997, between General Motors of Canada Limited and CALI Leasing Canada Ltd.

9. Master Lease Agreement dated August 20, 2000, between General Motors Corporation and Fort Street Capital, L.L.C.

10. Master Lease Agreement dated December 22, 1999, between General Motors Corporation and Newcourt Technologies Corporation

11. Master Lease Agreement dated October 29, 1997, between Saturn Corporation and Connell Equipment Leasing Company

12. Master Lease Agreement dated September 5, 2000, between General Motors of Canada Limited and Heller Financial Canada, LTD

13. Lease Agreement (GM 2004A-1) dated as of September 17, 2004 between U.S. Bank Trust National Association and General Motors Corporation

14. Lease Agreement (GM 2004A-2) dated as of September 17, 2004 between U.S. Bank Trust National Association and General Motors Corporation

15. Lease Agreement (GM 2003-A) dated as of December 23, 2003 between U.S. Bank Trust National Association and General Motors Corporation

1761813

16. Lease Agreement (GM 2003B-1) dated as of September 30, 2003 between U.S. Bank Trust National Association and General Motors Corporation

17. Lease Agreement (GM 2003C-1) dated as of December 10, 2003 between U.S. Bank Trust National Association and General Motors Corporation

18. Lease Agreement (GM 2002A-1) dated as of December 20, 2002 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

19. Lease Agreement (GM 2002A-2) dated as of December 20, 2002 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

20. Lease Agreement (GM 2001A-1) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

21. Lease Agreement (GM 2001A-2) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

22. Lease Agreement (GM 2001A-3) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

23. Lease Agreement (GM 2001A-4) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

24. Lease Agreement (GM 2001A-5) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

25. Lease Agreement (GM 2001A-6) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

26. Lease Agreement (GM 2001A-7) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

27. Lease Agreement (GM 2001A-8) dated as of December 18, 2001 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

28. Lease Agreement (GM 2000A-1) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

29. Lease Agreement (GM 2000A-2) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

30. Lease Agreement (GM 2000A-3) dated as of December 15, 2000 between State Street Bank and Trust Company of Connecticut, National Association and General Motors Corporation

31. Lease Agreement (GM 91A-3) dated as of September 27, 1991 between the Connecticut National Bank and Saturn Corporation

## <u>SCHEDULE D</u>

## SELLER EXCLUDED SERVICES

Not applicable.

## SCHEDULE E

## PAYMENT TERMS

1.   *General Consideration*.  Sellers and Purchaser shall pay the price, in U.S. Dollars, for each Transition Service as set forth on <u>Schedule A</u> and <u>Schedule C</u>, respectively; as well as any amounts required to paid pursuant to **Section 7.3** of the Agreement.

2.   *Invoices*.  Except as otherwise provided in this Agreement, within 30 days after the end of each calendar month, Purchaser or the respective Service Provider shall submit one or more reasonably detailed invoices to Parent or the respective Receiving Party for all Purchaser Transition Services provided during such calendar month pursuant to this Agreement and Sellers or the respective Service Provider shall submit one or more reasonably detailed invoices to Purchaser or the respective Receiving Party for all Seller Transition Services provided during such calendar month pursuant to this Agreement.

3.   *Time of Payment*.  Invoices for Transition Services shall be due and payable in accordance with the MNS-2 system, which provides, on average, for payment on the second day of the second month following the date of the invoice or if such MNS-2 system is not utilized, within 40 days after receipt.

4.   *Interest Arrears*.  If the Receiving Party fails to pay when due any invoiced amounts in respect of Transition Services, the Receiving Party shall pay interest on the unpaid amount at the Libor-Plus Rate from the date due until the date paid, without prejudice to and in addition to any other remedy available to the Service Provider under the Agreement or at law.

1761813

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit V**

Form of Assignment and Assumption of Real Property Leases

# EXHIBIT V

## <u>FORM OF OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES AND GUARANTIES</u>

THIS OMNIBUS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASES AND GUARANTIES (this "<u>Assignment</u>"), dated as of *[_____ __]*, 2009, is made by and among General Motors Corporation, a Delaware corporation ("<u>Parent</u>"), Saturn LLC, a Delaware limited liability company f/k/a Saturn Corporation, a Delaware corporation ("<u>S LLC</u>"), and Saturn Distribution Corporation, a Delaware corporation ("<u>S Distribution</u>" and together with Parent and S LLC, each an "<u>Assignor</u>," and collectively, "<u>Assignors</u>"), and *[NGMCO, Inc]*, a Delaware *[corporation]* ("<u>Assignee</u>").  Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## <u>RECITALS</u>

WHEREAS, Assignors, Assignee and Chevrolet-Saturn of Harlem, Inc. are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "<u>Purchase Agreement</u>"); and

WHEREAS, the Purchase Agreement requires Assignors to convey and transfer to Assignee, and Assignee to assume, all of Assignors' right, title and interest, whether as landlord, sublandlord, tenant or subtenant, as the case may be, in, to and under (i) the leases and subleases listed on <u>Exhibit A</u> attached hereto (collectively, the "<u>Leases</u>"), together with all rights, options, interests and benefits thereunder (including, without limitation, any guaranties and security deposits (together with all accrued interest thereon) held thereunder where Assignor is a landlord or sublandlord) (collectively, the "<u>Lease Additional Rights</u>"), and (ii) the guaranties listed on <u>Exhibit B</u> attached hereto (collectively, the "<u>Guaranties</u>"), together with all rights and obligations thereunder (collectively, the <u>Guaranty Additional Rights</u>").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    <u>Assignment</u>.  As of the Closing, Assignors hereby sell, assign, transfer, convey and deliver unto Assignee, its successors and assigns, all of the right, title and interest that Assignors possess in, to and under (i) the Leases, together with all Lease Additional Rights thereunder, excluding therefrom, any Retained Liabilities associated with the Leases and the Additional Rights, if any, and (ii) the Guaranties, together with all Guaranty Additional Rights thereunder, excluding therefrom, any Retained Liabilities associated with the Guaranties and the Guaranty Additional Rights, if any.

2.    <u>Assumption</u>.  Assignee hereby accepts such assignment of the Leases, together with the Lease Additional Rights and the Guaranties, together with the Guaranty Additional Rights, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Leases

and Guaranties that arise from and after the Closing, excluding therefrom, any Retained Liabilities associated with the Leases, Guaranties, the Lease Additional Rights and the Guaranty Additional Rights, if any.

3.  <u>Rentals, Taxes and Deposits</u>.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Leases shall be prorated between Assignor and Assignee as of the Closing of this Assignment in accordance with the terms of the Purchase Agreement.

4.  <u>Conflicts with Purchase Agreement</u>.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

5.  <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of Assignors, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignors, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

6.  <u>Modification</u>.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

7.  <u>Governing Law</u>.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease or Guaranty, the Law of the jurisdiction where the premises underlying the applicable Lease or Guaranty is located.

8.  <u>Construction of Assignment</u>.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

9.  <u>Severability</u>.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

2

10.    <u>Captions</u>.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

11.    <u>Counterparts</u>.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignors may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

1765183

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Assignment and Assumption of Real Property Leases and Guaranties as of the day and year first above written.

GENERAL MOTORS CORPORATION

By: _____

Name: *[_____]*
Title:  *[_____]*


SATURN LLC

By: _____

Name: *[_____]*
Title:  *[_____]*


SATURN DISTRIBUTION CORPORATION

By: _____

Name: *[_____]*
Title:  *[_____]*


*[NGMCO, INC.]*

By: _____

Name: *[_____]*
Title:  *[_____]*

# EXHIBIT A

***[forthcoming]***

# EXHIBIT B

### *[forthcoming]*

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit W**

Form of Assignment & Assumption of Harlem Lease

## EXHIBIT W

## FORM OF ASSIGNMENT AND ASSUMPTION OF HARLEM LEASE

THIS ASSIGNMENT AND ASSUMPTION OF DEALERSHIP SUB-SUB-SUBLEASE (this "Assignment"), dated as of _____ __, 2009, is made by and among CHEVROLET-SATURN OF HARLEM, INC., a Delaware corporation ("Assignor"), and *[_____]*, a Delaware *[limited liability company]* ("Assignee"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Assignor, Assignee and certain other parties are parties to that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, Argonaut Holdings, Inc., as landlord, and Assignor, as tenant, are parties to that certain Dealership Sub-Sub-Sublease dated as of February 8, 2006 October 11, 1985, as amended by that certain Amendment to Lease of Land dated as of *[_____ __]*, 2009 (the "Lease"), relating to certain premises located at 2485 Second Avenue, New York, New York (the "Premises"); and

WHEREAS, the Purchase Agreement requires Assignor to convey and transfer to Assignee, and Assignee to assume, all of Assignor' right, title and interest, as tenant, in, to and under the Lease, together with all rights, options, interests, liabilities, obligations and benefits thereunder (collectively, the "Additional Obligations").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Assignment.  As of the Closing, Assignor hereby sells, assigns, transfers, conveys and delivers unto Assignee, its successors and assigns, all of the right, title and interest that Assignor possesses in, to and under the Lease, together with all Additional Obligations thereunder, excluding therefrom, any Retained Liabilities associated with the Lease and the Additional Obligations, if any.

2.    Assumption.  Assignee hereby accepts such assignment of the Lease, together with the Additional Obligations, and hereby assumes, and agrees to be bound by, and to keep, observe and perform, all of the terms, covenants, conditions, duties and obligations of and under the Lease that arise from and after the Closing, excluding therefrom, any Retained Liabilities associated with the Lease and the Additional Obligations, if any.

3.    Rentals, Taxes and Deposits.  All advance rental payments, real estate taxes and other payments made or received by Assignor under the Lease shall be prorated

between Assignor and Assignee as of the Closing of this Assignment in accordance with the terms of the Purchase Agreement.

4.    <u>Conflicts with Purchase Agreement</u>.  This Assignment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties, covenants and agreements set forth in the Purchase Agreement), all of which are incorporated herein by reference.  In the event of any conflict between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.  Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

5.    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of Assignor, Assignee and their respective successors and permitted assigns, and nothing express or implied in this Assignment is intended or shall be construed to confer upon or give to any Person, other than Assignor, Assignee and their respective successors and permitted assigns, any legal or equitable Claims of any nature whatsoever under or by reason of this Assignment.

6.    <u>Modification</u>.  This Assignment may not be amended or modified in any manner except by a written agreement executed by each of the Parties.

7.    <u>Governing Law</u>.  The construction, interpretation and other matters arising out of or in connection with this Assignment shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws and (c) to the extent required by Law with respect to the enforcement of any Lease, the Law of the jurisdiction where the Premises is located.

8.    <u>Construction of Assignment</u>.  This Assignment shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties, it being recognized that both Assignor and Assignee have contributed substantially and materially to the preparation of this Assignment.

9.    <u>Severability</u>.  If any provision of this Assignment is held to be invalid or unenforceable, then, to the extent that such invalidity or unenforceability shall not deprive either party of any material benefit intended to be provided by this Assignment, the remaining provisions of this Assignment shall remain in full force and effect and shall be binding upon the parties hereto.

10.    <u>Captions</u>.    The captions of this Assignment are for convenience of reference only and do not in any way limit or amplify the terms hereof.

11.    <u>Counterparts</u>.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.  All signatures of Assignor and Assignee may be transmitted by facsimile or electronic submission, and each such facsimile signature or electronic

delivery signature (including a pdf signature) shall, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and shall be binding upon such Party.

[Remainder of the page left intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Dealership Sub-Sub-Sublease as of the day and year first above written.

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: *[_____]*
Title: *[_____]*

*[_____]*

By: _____

Name: *[_____]*
Title: *[_____]*

Argonaut Holdings, Inc., a Delaware corporation, hereby consents to the foregoing assignment and assumption as the landlord under the Lease.

ARGONAUT HOLDINGS, INC.

By: _____

Name: *[_____]*
Title: *[_____]*

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit X**

Form of Master Lease Agreement

**EXHIBIT X**

**FORM OF MASTER LEASE AGREEMENT[1]**

**MASTER LEASE AGREEMENT**
(Excluded Manufacturing Assets)

between

**GENERAL MOTORS CORPORATION,**
a Delaware corporation
("Landlord")

and

*[LEASECO][2]*,
a Delaware corporation
("Tenant")

**Dated: _____, 2009**

---

[1] Subject to confirmation and agreement by Purchaser and Sellers that in light of the nature of this Master Lease Agreement, the terms and pricing contained herein represent Arms-Length Basis provisions.

[2] LEASECO will be a newly formed entity that is wholly-owned by Purchaser, and its only assets will be the leasehold interest in the Premises and the Tenant Trade Fixtures and Personal Property.

1765182

# TABLE OF CONTENTS

**Section**                                                                                                     **Page**

1. LEASE SCHEDULE AND EXHIBITS ...................................................................1

2. AGREEMENT TO LEASE ...............................................................................1

3. LEASE TERM .................................................................................................1

4. RENTAL PAYMENTS .....................................................................................1

   4.1   Rent ..........................................................................................................1
   4.2   Utilities.....................................................................................................2
   4.3   Interest on Late Payments........................................................................2

5. USE.................................................................................................................2

6. TAXES.............................................................................................................3

7. CONDITION OF PREMISES ...........................................................................3

8. MAINTENANCE ..............................................................................................3

   8.1   Capital Repairs.........................................................................................3
   8.2   Tenant's Maintenance...............................................................................4

9. ASSIGNMENT AND SUBLETTING ................................................................4

   9.1   By Tenant .................................................................................................4

10. LANDLORD'S TITLE AND QUIET ENJOYMENT ..........................................4

11. ALTERATIONS AND IMPROVEMENTS; LIENS ...........................................5

   11.1   Alterations, Additions and Improvements ...............................................5
   11.2   Liens.......................................................................................................5

12. TENANT TRADE FIXTURES AND PERSONAL PROPERTY ...........................5

13. INSURANCE....................................................................................................6

   13.1   Tenant's Insurance .................................................................................6
   13.2   Form of Insurance ..................................................................................6
   13.3   Form of Insurance .............................................**Error! Bookmark not defined.**

14. DAMAGE AND CONDEMNATION...................................................................7

   14.1   Damage or Destruction ..........................................................................7
   14.2   Condemnation ........................................................................................7

15. RETURN OF PREMISES; FACILITY IDLING PROCESS...................................8

1765182

16. HOLDOVER ................................................................................................................9

17. EVENTS OF DEFAULT; REMEDIES ........................................................................9

    17.1    Events of Default ....................................................................................9
    17.2    Remedies ...............................................................................................10
    17.3    Landlord Defaults .................................................................................10
    17.4    Limitation on Liability ..........................................................................11

18. ENVIRONMENTAL ....................................................................................................11

    18.1    Definitions ..............................................................................................11
    18.2    Agreements regarding Environmental Matters .......................................12

19. NOTICE .......................................................................................................................13

20. ENTRY UPON PREMISES .........................................................................................13

21. GENERAL PROVISIONS ...........................................................................................14

    21.1    Brokerage ..............................................................................................14
    21.2    Amendments. ........................................................................................14
    21.3    Severability ...........................................................................................14
    21.4    Attorney's Fees .....................................................................................14
    21.5    Time of Essence ....................................................................................14
    21.6    Waiver ...................................................................................................14
    21.7    Successors and Assigns .........................................................................14
    21.8    Governing Law .....................................................................................14
    21.9    Estoppel Agreements ............................................................................15
    21.10   Subordination, Non-Disturbance Agreement .........................................15
    21.11   Intentionally Omitted ............................................................................15
    21.12   Force Majeure .......................................................................................15
    21.13   Consent .................................................................................................15
    21.14   Time Period for Payment .......................................................................15
    21.15   Execution of Lease ................................................................................16
    21.16   Counterparts ..........................................................................................16
    21.17   Confidentiality ......................................................................................16
    21.18   Jurisdiction for Dispute Resolution. ......................................................16
    21.19   Gender ...................................................................................................17

22. WAIVER OF LANDLORD LIEN ................................................................................17

23. CONTRACTION RIGHT .............................................................................................17

24. GUARANTY .................................................................................................................18

Exhibit A - Premises
Exhibit B - Target End Dates
Exhibit C - Rent

Exhibit D - Form of Guaranty

## LEASE SCHEDULE

This Lease Schedule is made a part of that certain Master Lease Agreement (Excluded Manufacturing Assets) attached hereto, including all Exhibits (the "Lease"), between Landlord and Tenant (as such terms are defined below).

| | | |
|---|---|---|
| 1. | Landlord: | **General Motors Corporation**, Delaware corporation. |
| 2. | Tenant: | *[LEASECO]*, a Delaware corporation. |
| 3. | Date of Lease: | *[_____ __]*, 2009. |
| 4. | Premises: | The term "Premises" shall mean (a) the land owned by Landlord (the "Land") at the common addresses set forth on Exhibit A attached hereto and made a part hereof, (b) the building or buildings located on the Land (the "Buildings"), (c) any other improvements located on the Land (collectively with the Buildings, the "Improvements"), and (d) and all appurtenances belonging to or in any way pertaining to said Land and Improvements, subject to Section 23 hereof. |
| 5. | Facility: | Each separate property listed on Exhibit A, including the Land, Buildings, Improvements and appurtenances related thereto. |
| 6. | Longer Term Facility: | Collectively, the Mansfield Facility and the Grand Rapids Facility (as defined on Exhibit A). |
| 7. | Commencement Date: | *[_____ __]*, 2009. |
| 8. | Production Period: | With respect to each Facility, the date commencing on the Commencement Date and expiring on the date set forth in a written notice delivered by Tenant to Landlord with respect to one or more Facilities (each, a "Production End Notice") that a production run has ended at such Facility.  Tenant shall deliver a Production End Notice within ten (10) business days after production has ceased at the applicable Facility or Facilities. |
| 9. | Idling Period: | With respect to each Facility, the period commencing on the date set forth in the Production End Notice and expiring on the Termination Date. |
| 10. | Target End Dates: | See Exhibit B. |

1

1765182

11.  Termination Dates:  See <u>Section 3</u>.

12.  Outside Termination Date:  See <u>Section 3</u>.

13.  Term:  The term commencing on the Commencement Date and expiring on the Termination Date with respect to each Facility, but in no event later than the Outside Termination Date.

14.  Contraction Right:  See <u>Section 23</u>.

15.  Rent:  See <u>Section 4</u> and <u>Exhibit C</u>.

16.  Use:  See <u>Section 5</u>.

17.  Landlord's Address:
*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

18.  Tenant's Address:
*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

With a copy to:

*[_____]*
*[_____]*
*Attn: [_____]*
*Fax: [_____]*
*E-mail: [_____]*

19.  Guarantor:  *[_____]*, a Delaware limited liability company

2

1765182

20.         Exhibits to Lease:              Exhibit A – Premises
                                            Exhibit B – Target End Dates
                                            Exhibit C – Rent
                                            Exhibit D – Form of Guaranty

3

## MASTER LEASE AGREEMENT

THIS LEASE is made and entered into as the date set forth on the Lease Schedule to which this Lease is attached (the "Lease Schedule") by and between Landlord and Tenant.

WHEREAS, Landlord owns the Land and the Improvements and the appurtenances thereto, which together comprise the Premises; and

WHEREAS, Tenant desires to lease the Premises on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, and other valuable consideration, the parties agree as follows:

**1.    LEASE SCHEDULE AND EXHIBITS**.  The Lease Schedule and all Exhibits attached hereto are hereby incorporated herein by this reference.  All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth on the Lease Schedule.  The Tenant and the Landlord are collectively referred to herein as the "Parties".

**2.    AGREEMENT TO LEASE.**  Upon the terms and conditions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises and any and all fixtures, machinery, equipment and personal property (collectively, the "Landlord Fixtures and Personal Property") owned or leased by Landlord, used in connection with the operation, maintenance and/or repair of the Facilities as of the Commencement Date and located on the Premises.

**3.    LEASE TERM.**  Unless sooner terminated or extended pursuant to the terms hereof, the term of this Lease (the "Term") shall commence as of the Commencement Date and shall end on the respective Termination Date with respect to each Facility.  The "Termination Date" with respect to each Facility is the date, after the Target End Date, that is thirty (30) days after Tenant notifies Landlord in writing that this Lease will terminate with respect to such Facility, provided that the Termination Date shall not be later than (a) December 31, 2013 with respect to the Longer Term Facilities or (b) the date that is twelve (12) months after the Target End Date with respect to any other Facility (each, an "Outside Termination Date").

**4.    RENTAL PAYMENTS**

**4.1    Rent.**  During a Production Period with respect to each Facility, Tenant shall pay to Landlord annual base rent equal to One Dollar ($1.00) per useable square foot, as set forth in Exhibit C (the "Rent"), in monthly installments, on or before the first day of each calendar month during the Term hereof.  Rent shall be paid to Landlord at Landlord's Address (as defined in the Lease Schedule) and Rent for any partial months shall be prorated based on the total number of days in that month.  Landlord and Tenant hereby stipulate that the useable square footage with respect to each Facility is set forth on Exhibit A, provided that Landlord and Tenant hereby acknowledge that Tenant leases and is obligated to pay expenses associated with the entirety of each Facility during the Term, each in accordance with the terms of this Lease.  All payments by Tenant shall be made in lawful money of the United States.  During an Idling Period with respect to each Facility, Tenant shall have no further obligation to pay Rent allocable

1

to such Facility, but Tenant shall be obligated to pay all other amounts payable hereunder with respect to such Facility other than taxes on Landlord Fixtures and Personal Property located on such Facility through the Termination Date. Notwithstanding the foregoing, if Tenant has not surrendered a Facility within twelve (12) months after the Target End Date with respect to such Facility, Tenant shall thereafter resume paying Rent on a monthly basis from and after such date, provided that the monthly amount payable during such period shall be equal to fifty percent (50%) of the monthly Rent due in the month in which the Production Period ended, plus all other amounts due and payable hereunder with respect to such Facility through the earlier of (a) the date on which Tenant surrenders the Facility to Landlord or (b) December 31, 2013.

      **4.2**    **Utilities and Services.** From and after the Commencement Date, Tenant shall promptly pay for all utilities and other services (including, but not limited to, water, site coordination, management and oversight, security, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, including electricity for any heating, ventilating and air conditioning in the Premises) furnished to and or used in or at the Premises for any purpose. Notwithstanding the foregoing, to the extent such utilities or services are provided to a Facility pursuant to an agreement to which Landlord (as opposed to Tenant) is a party, Landlord shall deliver to Tenant upon receipt any invoices it receives for such services provided to such Facility after the Commencement Date and Tenant shall pay such invoice on or before the due date thereof.

      **4.3**    **Interest on Late Payments.** In the event that Tenant fails to pay Rent or any other sum due under any provisions of this Lease when due, and such amount is not paid within fifteen (15) business days after the date on which Rent or such other sum is due as herein provided, then such sum shall bear interest thereafter, without prejudice to and in addition to any other remedy available to the Landlord under this Lease or at law, at a rate equal to, on any date, the sum of (i) the average (rounded to the nearest 1/16th of one percent) of the London Interbank Offered Rates for three-month United States dollar-denominated deposits, as published in the Wall Street Journal on such date and (ii) 500 basis points, but in no event greater than the maximum rate then permitted under applicable law (the "Default Rate").

      **5.**    **USE.** Tenant may use the Premises in the manner in which the Premises were used by ***[General Motors Corporation]*** prior to the Commencement Date, for any uses associated with the winddown of production on the Premises, and for any other uses incidental thereto. Tenant may not use the Premises for any other use unless such use is consented to in writing by Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall comply in all material respects with all laws, regulations and other governmental requirements relating to its use and occupancy of the Premises, provided that, notwithstanding the foregoing, Tenant shall not be obligated to cure any such violations or conditions in existence on the Commencement Date, which shall remain the obligation of Landlord, and Tenant may contest any alleged violation of laws, regulations and other government regulations so long as the Tenant, in good faith and with due diligence, contests the same or the validity thereof by appropriate legal proceeding and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due or comply therewith. During the Term, Landlord may enter upon the Premises to remove any fixtures, machinery, equipment and personal property that are owned or leased by Landlord and not used by Tenant, provided that Landlord shall (i) notify Tenant not less than three (3) business days prior to such entry, (ii) not

1765182

unreasonably interfere with Tenant's operations or removal of Tenant's Trade Fixtures and Personal Property on the Premises and must be accompanied by a representative of Tenant made available by Tenant, and (iii) provide Tenant a list of items Landlord intends to remove from the Premises.  Upon expiration of a Production Period with respect to any Facility, Landlord may enter upon such Facility and remove any Landlord Fixtures and Personal Property, provided that Landlord satisfies conditions (i)-(iii) in the previous sentence.

6.    **TAXES.**  All real property taxes or special improvement taxes payable against the Premises, all property taxes levied or assessed against the Landlord Fixtures and Personal Property (but only during the Production Period with respect to each Facility), and all property taxes levied or assessed against the Tenant Trade Fixtures and Personal Property (including all penalties and interest thereon), which may be assessed, levied, imposed upon the same, or any use or occupancy of the Premises, for any period within the Term of this Lease, shall be paid by Tenant, before they become delinquent.  Landlord shall deliver copies of all tax bills it receives to Tenant within ten (10) business days after receipt thereof.  Tenant shall deliver to Landlord duplicate receipts and canceled checks or photocopies thereof showing the payments of all such taxes and assessments, within thirty (30) days after respective payments evidenced thereby, but in no event after any such payment is required to be made hereunder.  Provided no Event of Default shall have occurred and be continuing hereunder, Tenant may contest any tax or assessment upon or against the Premises, or any part thereof, or the improvements at any time situated thereon, so long as the Tenant shall, in good faith and with due diligence, contest the same or the validity thereof by appropriate legal proceeding which shall have the effect of preventing the collection of the tax or assessment so contested, and provided that upon final adjudication of such proceeding Tenant shall immediately pay any amounts due.  The obligations of Tenant under this provision shall survive the expiration or termination of the Lease.

7.    **CONDITION OF PREMISES.**    Tenant acknowledges that it accepts the Premises and the Landlord Fixtures and Personal Property in their "As-Is" condition on the Commencement Date.  Except as expressly set forth herein, Tenant enters into this Lease without any representations or warranties on the part of Landlord, express or implied, as to the condition of the Premises or the Landlord Fixtures and Personal Property, including, but not limited to, the cost of operations and the condition of its fixtures, improvements and systems.

8.    **MAINTENANCE**.

8.1    **Capital Repairs.**  Neither Landlord nor Tenant shall be required to make any extraordinary or capital repairs to or replacements of the Facilities or the Landlord Fixtures and Personal Property.  In the event either Landlord or Tenant elect in its sole discretion to make any extraordinary or capital repairs or replacements, such work shall be commenced and completed in accordance with applicable laws, in a workmanlike manner using materials of a good quality and, as to Landlord, in a manner which does not unreasonably disrupt or interfere with the business activities of Tenant.  If Tenant elects to make any capital repairs to or replacements of any of the Facilities or any of the Landlord Fixtures and Personal Property, Tenant may remove equipment or other personal property installed or purchased by Tenant in connection therewith upon expiration of the Term with respect to any Facility, provided that any such removal shall be performed in accordance with Section 15 hereof.

3

**8.2    Tenant's Maintenance.**  Subject to the limitations set forth in Section 8.1 hereof, during the Production Period, Tenant shall keep and maintain the Landlord Fixtures and Personal Property and the Facilities, including all structural components, exterior doors and windows, and all interior and exterior load-bearing walls, underground utility and sewer pipes, driveways, parking lots, fire protection sprinkler system and all interior and exterior painting, interior plumbing, heating, air conditioning, ventilation, electrical, interior walls, ceilings, floors, windows, doors, sidewalks, and landscaping (including performing snow removal), in substantially the order, repair and working condition in which the Improvements are in as of the Commencement Date, subject to reasonable wear and tear and damage from fire, any other casualty or condemnation and/or the willful acts or omissions of Landlord and its agents, employees, contractors or representatives. All such work shall be commenced and completed in accordance with applicable laws, in a workmanlike manner using materials of a good quality. During the Idling Period, Tenant's obligations with respect to the maintenance of the Landlord Fixtures and Personal Property and the Facilities shall be governed by Section 15 hereof.

**9.    ASSIGNMENT AND SUBLETTING.**

**9.1    By Tenant.**  Subject to the terms of this Section 9, this Lease shall not be assigned by Tenant to any other party, and Tenant shall have no right to sublet the Premises or any part thereof or otherwise permit all or any portion of the Premises to be occupied by any party other than Tenant or Tenant's affiliates (collectively or individually, a "Transfer"), without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  In no event shall Landlord be entitled to recapture the Premises in connection with a request that Landlord consent to a Transfer.  Notwithstanding the foregoing, Tenant may, without Landlord's consent, assign this Lease or sublease or permit occupancy of all or any portion of Premises to any business entities directly or indirectly, controlling, controlled by or under common control with Tenant, or to successors to Tenant by merger, consolidation, reorganization or purchase of Tenant (which shall include, without limitation, the transfer of the voting stock of Tenant or other change in control of Tenant), or to a purchaser of all or substantially all of the assets of Tenant (each a "Permitted Transfer").  In the case of any assignment of this Lease constituting a Permitted Transfer or any other assignment of this Lease to which Landlord consents, Tenant shall not be relieved from any obligations that accrue under this Lease from and after the date of such Permitted Transfer or other assignment of this Lease unless (i) Landlord is reasonably satisfied that such assignee has the financial ability to fulfill all of the Tenant's obligations hereunder, and (ii) the assignee assumes all of Tenant's obligations under this Lease from and after the date of the Permitted Transfer or other assignment and agrees to be bound by all of the terms, covenants and conditions of this Lease.  Any attempted assignment or sublease contrary to the terms and provisions of this Section 9.1 shall be void and of no force and effect.

**10.    LANDLORD'S TITLE AND QUIET ENJOYMENT.**  Landlord represents and warrants that Landlord owns fee simple title to the Premises and has full right and authority to make this Lease.  Landlord covenants that so long as an Event of Default does not then exist, Tenant shall have quiet and peaceful possession and enjoyment of the Premises and shall not be interfered with by Landlord, or any party claiming by, through or under Landlord or any party claiming title superior to Landlord.

4

1765182

## 11.     ALTERATIONS AND IMPROVEMENTS; LIENS.

    **11.1**    **Alterations, Additions and Improvements.** Tenant shall not make any structural alterations, additions or improvements to the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant may, at its own expense and without Landlord's consent, make any non-structural alterations and improvements to the Premises which Tenant deems desirable. All such alterations, additions and improvements shall be made in a workmanlike manner in accordance with all applicable laws and ordinances. At the expiration or sooner termination of the Lease, Landlord agrees to accept the Premises with all alterations, additions and improvements made by Tenant, which alterations, additions and improvements shall thereafter become Landlord's property, and Tenant shall not be required to restore the Premises to the condition existing prior to the making of such alterations, additions and improvements at the commencement of the Term; provided, however, at Tenant's option, Tenant may remove any such alterations or improvements made by Tenant in accordance with Section 15 hereof.

    **11.2**    **Liens.** Tenant shall not permit the Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished in connection with work of any character performed or claimed to have been performed on the Premises by, or at the direction or sufferance of Tenant; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, and Tenant shall not be deemed in default hereunder as a result of such lien so long as Tenant is so contesting such lien; provided, in case of any such lien attaching, or notice or claim thereof being asserted during any period of time in which Landlord has entered into a contract to sell the applicable Facility, as a condition precedent to the right to contest, Tenant shall bond over or otherwise provide security (as permitted by applicable law in such proceeding), the effect of which is to prevent such lien from attaching to Landlord's title in the Premises and any proceeds accruing from the sale thereof. Subject to Tenant's right of contest, in the event that such lien is not released, removed, or bonded over when required in this Section 11.2, Landlord, at its option, may take all action Landlord deems reasonable or necessary to release and remove such lien (without any duty to investigate the validity thereof) and Tenant shall, within ten (10) days following demand, either before or after such release and removal, pay or reimburse Landlord for all reasonable sums, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by Landlord in connection with removal of such lien together with interest thereon from the date incurred until the date paid at the Default Rate. The obligations of Tenant under the provisions of this Section 11.2 shall survive the expiration or termination of this Lease.

## 12.     TENANT TRADE FIXTURES AND PERSONAL PROPERTY.

   Tenant currently owns certain trade fixtures, machinery, equipment, all inventories of vehicles, raw materials, work-in-progress, finished goods, supplies, stock, parts, packaging materials and other accessories thereto, and other personal property located on the Premises and Tenant may during the Term install in or on the Premises other trade fixtures, machinery, equipment and personal property (collectively, the "Tenant Trade Fixtures and Personal Property") as Tenant deems desirable, and all of the Tenant Trade Fixtures and Personal Property shall remain Tenant's property whether or not affixed or attached to the Premises. Tenant may, but shall not be required to, remove the Tenant Trade Fixtures and Personal Property from the Premises at any

time during the Term, provided that any such removal by Tenant shall be performed in accordance with <u>Section 15</u> hereof.

**13.    <u>INSURANCE</u>.**

      13.1    **<u>Tenant's Insurance</u>.**    Throughout the Term, Tenant shall maintain insurance insuring:

      (a)    The Building and any other Improvements at any time situated upon the Premises against loss or damage by fire, lightning, wind storm, hail storm, aircraft, vehicles, smoke, explosion, riot or civil commotion as provided by the Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk" coverage).  The insurance coverage shall be for not less than 100% of the full replacement cost of the Building and other Improvements and building ordinance coverage.  Landlord shall be named as loss payee insured and all proceeds of insurance shall be payable to Landlord.

      (b)    Tenant, Landlord (as an "additional insured"), and any mortgagee of Landlord of which Tenant is given written notice, from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation and arising from, related to or connected with the Premises, for bodily injury to or personal injury to or death of any person, or more than one person, or for damage to property in an amount of not less than $2,000,000.00 combined single limit per occurrence/aggregate, and Tenant shall carry excess liability insurance coverage in an amount not less than $8,000,000.00.

      (c)    All contents and trade fixtures, furniture and furnishings in the Premises to the extent of at least ninety percent (90%) of their replacement cost under Standard Fire and Extended Coverage Policy and all other risks of direct physical loss as insured against under Special Form ("all risk") coverage.

      13.2    **<u>Form of Insurance</u>.**    All of said insurance required of Tenant by this <u>Section 13</u> shall be in form and with companies licensed in the state in which the Premises is located, and shall be AM Best's rated A- and class VII or better, and shall provide that the same shall not be subject to cancellation or termination except after at least ten (10) days prior written notice to Landlord.  Certificates of the insurance policies required to be carried hereunder shall be deposited with the Landlord at the Commencement Date and from time to time, together with copies of the policies, upon request of the Landlord.  Any insurance required of Tenant under this Lease may be furnished under a blanket policy carried by Tenant.  Notwithstanding anything in this Lease to the contrary, Tenant may self-insure any or all of its insurance obligations under this Lease, provided that Tenant shall pay Landlord an amount equal to the insurance proceeds to which Landlord would be entitled under <u>Section 14</u> of this Lease if Tenant had not self-insured.

      13.3    **<u>Mutual Waiver</u>.**    Landlord and Tenant hereby waive all claims and rights of recovery against the other and their respective officers, directors, employees, agents and representatives for any loss or damage to their respective properties or interests, which loss is insured against, or required to be insured against, by Landlord or Tenant (as applicable) pursuant

to this Section 13, regardless of fault or negligence and regardless of the amount of insurance proceeds collected or collectible under any insurance policies in effect, and Landlord and Tenant each represent and warrant to the other that all such policies permit such waiver and contain, and will contain, enforceable waiver of subrogation endorsements.

## 14.    DAMAGE AND CONDEMNATION.

14.1    **Damage or Destruction.**  In the event of damage to, or destruction of, any Building, or any of the other Improvements or access thereto (a "Casualty") with respect to a Facility, Landlord, at its sole cost and expense (except with respect to insurance proceeds), shall repair, restore or rebuild the same to the condition existing prior to the happening of such Casualty, and Tenant shall make available to Landlord for such purpose the proceeds of the insurance it maintains pursuant to Section 13.1(a), provided that Landlord shall only be required to repair, restore or rebuild any Facility under this Section 14.1 to the extent insurance proceeds are available to do so.  Notwithstanding anything to the contrary contained herein, in the event of a Casualty, either party shall have the right to terminate this Lease with respect to the Facility affected by the Casualty, effective on the date of such Casualty (each, a "Casualty Termination Date"), by giving written notice thereof to the other party within thirty (30) days after the Casualty (a "Casualty Notice").  If Landlord is the party that issues a Casualty Notice, Tenant may nullify such Casualty Notice by giving notice to Landlord of such nullification within thirty (30) days after Landlord furnishes its Casualty Notice and, in any such case, this Lease shall not terminate with respect to the affected Facility; provided, however, that, in such case, Landlord shall have no further obligations under this Lease with respect to the restoration of the affected Facility, and Tenant shall pay all costs incurred to restore the affected Facility (using the insurance proceeds received by Landlord and/or Tenant in connection with such Casualty).  On a Casualty Termination Date, the Facility identified in the applicable Casualty Notice shall be deemed to have been removed from Exhibit A and shall no longer constitute a portion of the Premises, this Lease shall terminate with respect to such Facility, and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease.  Notwithstanding the foregoing, from and after a Casualty Termination Date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.  If neither party terminates this Lease, during the period of repair by Landlord and for a period of ninety (90) days following the completion of Landlord's restoration, the Rent allocable to the applicable Facility shall be reduced to an amount which bears the same ratio as the portion of the Facility then available for use bears to the entire Facility.

14.2    **Condemnation.**

(a)    Taking of Whole.  If the whole of the Premises or of any Facility shall be taken or condemned for a public or quasi public use or purpose by a competent authority, or if such a portion of the Premises or any Facility shall be so taken that, in Tenant's sole discretion, Tenant concludes that as a result thereof the balance cannot be used for the same purpose and with substantially the same utility to Tenant as immediately prior to such taking (each, a "Taking"), then, as applicable, (i) the Lease shall terminate with respect to a Taking of the Premises or (ii) the Lease shall terminate

7

only as to the particular Facility subject to a Taking, in either such case upon delivery of possession of the Premises to the condemning authority, and any award, compensation or damages (hereinafter sometimes called the "Award") shall be paid to and be the sole property of Landlord.  Tenant shall have the right to make its own claim for any separate award that may be made by the condemning authority on account of any costs or loss Tenant may sustain in the removal of Tenant Trade Fixtures and Personal Property.

        (b)    Partial Taking.  If only a part of any Facility shall be subject to a Taking, but the Lease is not terminated pursuant to Section 14.2(a) hereof, Tenant shall promptly repair and restore the Facility and all applicable Improvements to a condition that enables Tenant to continue its operations at the Facility and the Rent allocable to such Facility will be adjusted accordingly on a per square foot basis.  In such case, Tenant shall have the right to use the Award to make such repairs and improvements to the Facility that are necessary to enable Tenant to continue its operations at the Facility.

        (c)    Partial Termination.  If the Lease is terminated with respect to less than the entire Premises in accordance with Section 14.2(a), on the termination date set forth in such Section, the applicable Facility shall be deemed to have been removed from Exhibit A and shall no longer constitute a portion of the Premises and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease.  Notwithstanding the foregoing, from and after such applicable termination date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.

## 15.    RETURN OF PREMISES; FACILITY IDLING PROCESS.

        (a)    Facility Idling Process.  The parties acknowledge that Landlord and *[Purchaser]* have entered into that certain Transition Services Agreement dated as of the date hereof (the "Transition Services Agreement").  The parties have agreed that, from and after the expiration of the Production Period for each Facility, such Facility shall be shut down and idled pursuant to and in accordance with the terms, conditions, specifications and limitations of the Transition Services Agreement (the "Facility Idling Process").  Accordingly, from and after the expiration of the Production Period for each Facility, the Transition Services Agreement shall govern Landlord's and Tenant's rights and obligations relating to the Facility Idling Process for such Facility (other than the payment obligations with respect to such Facility during an Idling Period as set forth in Section 4.1 hereof) and that each Facility and the Landlord Fixtures and Personal Property located in each Facility will be returned to Landlord upon the expiration of Term in the condition contemplated by the Facilities Idling Process; provided, however, that to the extent any provisions of the Transition Services Agreement are inconsistent with or conflict with the terms and conditions of Section 18 of this Lease, the terms and conditions of Section18 of this Lease shall govern and control.

        (b)    Removal of Tenant's Property.  From and after the expiration of the Production Period for each Facility, Tenant shall remove any Tenant Trade Fixtures and Personal Property that were not removed from such Facility prior to the expiration of

the Production Period for such Facility.  Tenant shall make repairs necessitated by any removal of Tenant Trade Fixtures and Personal Property to the extent such repairs would be required by the Facility Idling Process.  Any Tenant Trade Fixtures and Personal Property not removed from a Facility by Tenant on or before the Termination Date with respect to such Facility shall thereafter be deemed to be abandoned, and Landlord may, at Landlord's election, (i) accept the same, or (ii) remove and dispose of the same at Tenant's cost; provided that Tenant shall receive a credit against such costs for any amount Landlord receives in connection with the sale or other disposition of such Tenant Trade Fixtures and Personal Property.  If Landlord elects to accept the same, this Lease shall serve as a bill of sale for such Tenant Trade Fixtures and Personal Property that are not removed from any Facility by Tenant.

**16.**    **HOLDOVER.**  Should Tenant continue to occupy any Facility after December 31, 2013, Tenant shall be deemed to be a tenant at sufferance as to such Facility and Tenant shall pay to Landlord, through the date on which Tenant surrenders the Facility to Landlord, monthly rent in an amount equal to one hundred twenty-five percent (125%) of the Rent set forth on <u>Exhibit B</u> with respect to such Facility (the "<u>Holdover Rent</u>") plus all other amounts payable under this Lease with respect to the applicable Facility on the date the Term terminates with respect to the applicable Facility.  The obligation to pay Holdover Rent shall be without prejudice and in addition to any other rights and remedies Landlord may have under this Lease, including, without limitation, the right to recover possession of the applicable Facility.

**17.**    **EVENTS OF DEFAULT; REMEDIES**.

**17.1**    **Events of Default.**  Each of the following events shall constitute an "<u>Event of Default</u>":

(a)    If Tenant shall fail to pay any Rent or any other charge or sum to be paid by Tenant to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of fifteen (15) days after the date on which Rent is due or thirty (30) days after any other charge or sum to be paid by Tenant is due;

(b)    If Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease and such default shall continue for a period of thirty (30) days after written notice to Tenant of such default, and, if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Tenant shall fail to commence promptly to correct such breach and prosecute the same to completion with reasonable diligence; provided, however, that in no event shall such period of cure extend beyond one hundred eighty (180) days in the aggregate;

(c)    If Tenant shall be adjudged an involuntary bankrupt, or a decree or order approving, as properly filed, a petition or answer filed against Tenant asking reorganization of Tenant under the federal bankruptcy laws as now or hereafter amended, or under the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of the entry or granting thereof;

(d)    If Tenant shall file or admit the jurisdiction of the court and the material allegations contained in any petition in bankruptcy or any petition pursuant or purporting to be pursuant to the federal bankruptcy laws as now or hereafter amended;

(e)    If Tenant shall institute any proceeding or shall give its consent to the institution of any proceedings for any relief of Tenant under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension;

(f)    If Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver for Tenant; or a decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated or set aside within one hundred twenty (120) days from the date of entry or granting thereof; or

(g)    If Tenant shall fail to obtain or maintain the insurance as required by Section 13 hereof, in the amounts required thereby, and under the conditions and terms as set forth in said Section 13.

    17.2    **Remedies.**    Upon the occurrence of any one or more Events of Default, Landlord may at its election:

(a)    Terminate this Lease.  Upon termination of the Lease, Tenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to Landlord, and hereby grants to Landlord the full and free right, in compliance with all applicable laws, to enter into and upon the Premises in such event with process of law and to repossess the Premises as Landlord's former estate and to expel or remove Tenant and any others who may be occupying or within the Premises without being deemed in any manner guilty of trespass, eviction, or forcible entry or detainer, and without relinquishing Landlord's rights to Rent or any other right given to Landlord hereunder or by operation of law.  Upon termination of the Lease, Landlord shall be entitled to recover as damages all Rent and other sums due and payable by Tenant to the date of termination; and/or

(b)    Landlord may pursue any and all remedies available at law or in equity, including without limitation, the right to sue Tenant for any and all damages, losses and liabilities, and reasonable costs and expenses (including reasonable attorneys' fees and court costs) incurred by or caused to Landlord arising out of or resulting from any act or omission of Tenant or any Event of Default by Tenant hereunder, and the right to sue for specific performance, and for injunctive relief but excluding for any Rent due following the date on which Tenant vacates the Premises.

    17.3    **Landlord Defaults.**    If Landlord defaults in the performance of any of its obligations, covenants and warranties hereunder and such default continues for a period of thirty (30) days after written notice thereof to Landlord (or in an emergency, Landlord shall fail to cure such default immediately), and if more than thirty (30) days shall reasonably be required to correct the breach complained of in such notice, then if Landlord shall fail to commence

10

promptly to correct such breach and prosecute the same to completion with reasonable diligence not to exceed ninety (90) days, Tenant may, at its option and in addition to all other rights and remedies available to Tenant, cure the same on behalf of Landlord, in which event Tenant may deduct the cost of such cure from Rent next due hereunder, provided that if such Rent is insufficient to fully reimburse Tenant for such costs, any such deficiency (together with interest thereon at the Default Rate) shall be immediately due and payable by Landlord to Tenant upon written demand from Tenant, which demand shall be accompanied by invoices or receipts evidencing such costs.

### 17.4    Limitation on Liability.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN NO EVENT SHALL TENANT OR LANDLORD BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS LEASE (INCLUDING PURSUANT TO SECTION 16 HEREOF), REGARDLESS OF LEGAL THEORY, INCLUDING ANY SUCH DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR LOST PROFITS.

### 18.    ENVIRONMENTAL.

18.1    **Definitions.**  As used in this Section 18, the following terms shall have the following meanings:

(a)    "Contamination" means the presence at the Premises, at a quantity or level which exceeds the amount that would require an investigation, clean up, or other response action under Environmental Law, of any Hazardous Material in surface water, groundwater, ambient air, or surface or subsurface soil.

(b)    "Environmental Law" means any law in existence at the date hereof relating to the management or Release of, or exposure of humans to, any Hazardous Materials, pollution or the protection of human health and the environment, including surface water, groundwater, ambient air, surface or subsurface soil, natural resources or wildlife habitat.

(c)    "Environmental Permits" means any consents, licenses, permits, or other approvals required by any governmental authority under Environmental Law.

(d)    "Hazardous Materials" means any material or substance that is regulated, or can give rise to Liabilities or Losses, under an Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos-containing materials, lead, and any noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous).

(e)    "Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute,

11

1765182

contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any law, claim, governmental order, contract or otherwise.

(f)    "Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', technical consultants', engineers' and experts' fees and expenses).

(g)    "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

**18.2    Agreements regarding Environmental Matters.**    Landlord and Tenant hereby acknowledge that:

(a)    the Landlord will retain all Liabilities for (i) all Contamination, including any Releases, in, at, on, under or emanating onto or from the Premises, regardless of when such Contamination may have occurred, and (ii) any on-going consequences or responsibilities relating to this Contamination;

(b)    the Landlord will be responsible for managing and funding the liabilities referenced in Section 18.2(a); and

(c)    the Tenant will only be responsible, as a short-term tenant, for compliance with applicable Environmental Laws and Environmental Permits directly related to its operations at the Premises.

(d)    Landlord retains or shall assume any Liability, including responsibility for the investigation, clean up, or other response action required under Environmental Law, related to any Contamination, including the Release of Hazardous Materials, in, at, on, under or emanating onto or from the Premises which occurred prior to, on or after the Commencement Date.  Except as provided by Section 18.2(e), (i) Landlord will take all actions required by or under any Environmental Law to address any Contamination in, at, on, under or emanating onto or from the Premises or other environmental conditions, matters, or issues, which, in each case may affect the Premises, and (ii), Landlord hereby forever waives, discharges and releases any claims or causes of action it has or may have against Tenant related to the existence or Release of Hazardous Materials in, at, on, under or emanating onto or from the Premises or other violation of Environmental Law prior to the Commencement Date, or on or after the Commencement Date.

(e)    Tenant shall conduct its operations at the Premises in compliance with applicable Environmental Laws and any Environmental Permits required at the Premises.  Tenant shall be responsible for (i) any fines or penalties resulting directly and exclusively from Tenant's noncompliance with Environmental Laws or Environmental

12

Permits at the Premises; and (ii) for site specific environmental clean up or other costs incurred by Landlord that Landlord establishes, pursuant to a non-appealable administrative or judicial determination, arose directly and exclusively from Tenant's gross negligence or willful misconduct in connection with the operation, maintenance or repair of any Facility ("Additional Costs") and not from the acts of any third party. Further, Tenant will indemnify, defend and hold Landlord harmless from and against any and all fines or penalties to the extent exclusively and directly caused by Tenant's noncompliance with Environmental Laws or Environmental Permits at the Premises and from all Additional Costs incurred by Landlord at the Facilities.

(f)    Landlord will promptly notify Tenant (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises, any adjacent parcel, or other nearby real property of which Landlord has knowledge related in any way to any Contamination, environmental conditions, matters, or issues.  Landlord will also notify the Tenant of any Release or threatened Release of any Hazardous Materials of which Landlord has knowledge that occurs in, at, on, under or emanates from the Premises or any adjacent parcel to the Premises after the Commencement Date and which is not caused exclusively and directly by the Tenant's activity on the Premises

(g)    Tenant will promptly notify the Landlord (and, if in writing, provide copies) of any governmental or third-party filings, notices, or communications concerning the Premises which relate in any way to any Contamination, environmental conditions, matters, or issues in connection with the Premises of which Tenant has knowledge. Tenant will also promptly notify Landlord of any Release or threatened Release of any Hazardous Materials which occurs in, at, on, under or emanates from the Premises, and which are caused exclusively and directly by the Tenant's current activities on the Premises.  Other than providing Landlord with the notices provided for in this Section 18.2(g), Tenant will have no obligation to address, clean up, investigate, or otherwise respond to any Contamination on, at, in, under or emanating from the Premises, regardless of when such Contamination may have occurred.

(h)    The obligations in this Section 18 shall survive the expiration or termination of this Lease and the occurrence and discharge of any other obligation in this Lease.

19.    **NOTICE.**  All notices or demands required or permitted to be given or served pursuant to this Lease and shall be in writing and shall be deemed to have been given or served one (1) business day subsequent to transmittal by nationally recognized prepaid overnight courier, and addressed to Landlord at Landlord's Address or to Tenant at Tenant's Address (as set forth in the Lease Schedule).  Such addresses may be changed from time to time by either party by serving notice as above provided.  In no event shall personal delivery at the Premises be deemed an effective means of notice.

20.    **ENTRY UPON PREMISES.**  Landlord and Landlord's representatives shall be permitted to enter the Premises at all reasonable times during usual business hours upon no less than forty-eight (48) hours' prior notice to Tenant (except in case of emergency) for purposes of

13

(i) performing such repairs, maintenance or replacements to be performed by Landlord pursuant to this Lease, (ii) exhibiting the Premises for sale or mortgage financing or, within the last six (6) months of the Term or during an Extended Term, to prospective tenants; and (iii) curing any Event of Default by Tenant under the terms of this Lease and during any such entry by Landlord or Landlord's representatives (except in case of emergency), at Tenant's option, a representative of Tenant shall accompany Landlord and/or Landlord's representatives through the Premises at all times.

21.    **GENERAL PROVISIONS**.

21.1    **Brokerage.**    Landlord and Tenant each represents and warrants to the other that it has not engaged or dealt with any broker in this transaction. Landlord and Tenant each agree to indemnify and hold the other harmless from and against all liability, claims, demands, damages, or costs of any kind arising from or connected with any broker's commission, finder's fee, consulting fee or other charge claimed to be due any person or entity arising from the indemnifying party's conduct with respect to this Lease.

21.2    **Amendments.**    No amendment or modification of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

21.3    **Severability.**    If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

21.4    **Attorney's Fees.**    In the event Landlord or Tenant is required to use the services of any attorney for the enforcement of any of the terms, covenants or provisions hereof or in the event of any other dispute between Landlord and Tenant concerning this Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and expenses from the non-prevailing party.

21.5    **Time of Essence.**    Subject to Section 21.12 below, time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

21.6    **Waiver.**    No waiver of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach of the same or any other provision. Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act.

21.7    **Successors and Assigns.**    All of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, when permitted hereunder.

21.8    **Governing Law.**    This Lease shall be construed in accordance with the laws of the state of Michigan, except that for purposes of enforcing or construing this Lease with respect to any Facility located outside the state of Michigan, the laws of the state in which such Facility is located shall apply in lieu of the laws of the state of Michigan.

14

1765182

**21.9    Estoppel Agreements.**    Each of Tenant and Landlord agrees that from time to time within ten (10) business days after written request by the other party hereto, it will execute, acknowledge and deliver to the requesting party or to such other party as may be designated by the requesting party, a certificate stating that this Lease is then in full force and effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements under this Lease to be performed by Landlord or Tenant, as applicable, have been satisfied or performed, except as set forth in such certificate; that, to such party's knowledge, there are no existing defenses or offsets of Tenant, except as indicated in such certificate; that Tenant has not paid any rental more than one month in advance, except as indicated in such certificate; and that, to such party's knowledge, the other party is not in default under any provisions of this Lease.

**21.10    Subordination, Non-Disturbance Agreement.**    Prior to entering into any financing that encumbers any portion of the Premises, at Tenant's request, Landlord agrees to deliver to Tenant a subordination, non-disturbance and attornment agreement with respect to such portion of the Premises executed by Landlord's lender in a form reasonably acceptable to such lender and Tenant.

**21.11    Intentionally Omitted.**

**21.12    Force Majeure.**    Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease to be performed on Landlord's or Tenant's part (other than the failure to make any payment due hereunder), if such party's failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble, civil disorder, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party hereto or such party's agents, employees and invitees, or any other cause beyond the reasonable control of Landlord or Tenant, as applicable (collectively, "Force Majeure Events"). In the event of a Force Majeure Event, the period of performance shall be delayed one day for each day of delay caused by the applicable Force Majeure Event.  The foregoing definition of Force Majeure Events shall apply only during the Term.

**21.13    Consent.**    Any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld, conditioned or delayed.  Whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or extension options, or decisions which are specified herein to be in the sole discretion of the applicable party), Landlord and Tenant shall act reasonably and in good faith, and shall take no action that might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed thereby.

**21.14    Time Period for Payment.**    Any time this Lease requires a payment from Landlord to Tenant or from Tenant to Landlord, and no specific time period is set forth herein, such payment shall be deemed due within thirty (30) days after receipt by the paying party of a reasonably detailed, written invoice therefor.

**21.15    Execution of Lease.**  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises and this document shall become effective and binding only upon the execution and delivery hereof by Tenant and by Landlord.  All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein.

**21.16    Counterparts.**  This Lease may be executed in one or more counterparts, and each such counterpart shall constitute an original.

**21.17    Confidentiality.**  Except as may be required by filings with or orders by the Bankruptcy Court (defined below), each party acknowledges that it will have access to certain financial information of the other party ("Confidential Information").  Such Confidential Information shall not be released to the public and will be provided, subject to this paragraph, only to those parties who have a legitimate need for such Confidential Information, including accountants, lawyers, lenders, potential buyers, mortgagees and similar parties.  Neither Landlord nor Tenant shall prepare or provide any materials with respect to this Lease for media distribution, whether it be: print, television, radio, internet or any other commercial distribution, without the approval of the other party.  Landlord and Tenant may prepare any necessary documentation or agenda necessary to secure internal or public approval (if necessary) without said approval being required by the other party.

The following information shall not constitute Confidential Information for purposes of this Section 21.17:

(a)    any information that is available, or becomes available, to the general public without fault of the non-disclosing party;

(b)    any information that can be shown was in the possession of the non-disclosing party prior to receipt of the same from the disclosing party;

(c)    any information that is obtained by the non-disclosing party without an obligation of confidence from a third party who is rightfully in possession of such information and is under no obligation of confidentiality to the disclosing party;

(d)    any information that the non-disclosing party is legally required to disclose; or

(e)    any information that is independently developed by the non-disclosing party without reference or access to the Confidential Information.

**21.18    Jurisdiction for Dispute Resolution.**  (a)    Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Lease and to decide any claims or disputes that may arise or result from, or be connected with, this Lease, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and

16

submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 19</u> hereof; <u>provided</u>, <u>however</u>, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 19</u>.

**21.19    <u>Gender.</u>** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity entity of the person or entity may require.

**22.    <u>WAIVER OF LANDLORD LIEN.</u>** Landlord hereby waives and releases all liens, right of distraint or security interests (whether arising by statute or at common law) in all property, chattels or merchandise which may be placed in the Premises and also upon all proceeds of insurance which may accrue to Tenant by reason of damage to or destruction of any such property, chattels or merchandise.

**23.    <u>CONTRACTION RIGHT</u>.** Tenant shall have the continuing option (the "<u>Contraction Right</u>") during the Term to reduce the Premises at any time during the Term by providing notice to Landlord that Tenant is exercising the Contraction Right (each, a "<u>Contraction Notice</u>"), provided that Tenant may only reduce the Premises by returning an entire Facility (as hereinafter defined) to Landlord and not a portion of a Facility. The Contraction Notice shall include (a) the date on which Tenant shall return the Facility to Landlord, which date shall be not less than forty-five (45) days after delivery of such notice (each, a "<u>Contraction Date</u>") and (b) the identification of the Facility to be returned to Landlord on or before the Contraction Date. Tenant shall deliver the Facility to Landlord on or before the respective Contraction Date in accordance with <u>Section 15</u> hereof in the same condition as if the Contraction Date were the original date set forth in this Lease for expiration of the Term with respect to the applicable Facility. On a Contraction Date, the Facility identified in the applicable Contraction Notice shall be deemed to have been removed from <u>Exhibit A</u> and shall no longer constitute a portion of the Premises, this Lease shall terminate with respect to such Facility, and Landlord and Tenant shall have no further obligations hereunder with respect to such Facility, including, without limitation, the payment of Rent allocable to such Facility, except any obligations hereunder that expressly survive termination of this Lease. Notwithstanding the foregoing, following a Contraction Date, this Lease shall remain in full force and effect with respect to the then-remaining portion of the Premises.

1765182

24. **GUARANTY**.    This Lease is expressly conditioned upon the Guarantor guaranteeing Tenant's payment and performance under this Lease by executing a written guaranty in the form attached hereto as Exhibit D and made a part hereof.

25. **PURCHASE OPTION**.    At any time prior to the Target End Date with respect to the Pontiac North Facility (as such term is defined in Exhibit A), Tenant may elect to purchase the Pontiac North Facility by providing written notice to Landlord of such election.    Within a reasonable time following delivery of such notice to Landlord, Landlord shall convey the Pontiac North Facility to Tenant by a quitclaim deed for One Dollar ($1.00) in stated consideration and this Lease shall terminate with respect to the Pontiac North Facility upon such conveyance, provided that this Lease shall remain in full force and effect with the remainder of Premises.    For avoidance of doubt, the purchase option described in this Section 25 shall apply only to the Pontiac North Facility and shall not apply to any other Facility.

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease by and through their corporate officers thereunto duly authorized, the day and year first above written.

**TENANT:**

*[LEASECO]*, a Delaware corporation

By:    _____
Name:    _____
Title:    _____

**LANDLORD:**

**GENERAL MOTORS CORPORATION**,
a Delaware corporation

By:    _____
Name:    _____
Title:    _____

18

## Exhibit A

## Common Addresses of Premises

| FACILITY | USEABLE SQUARE FOOTAGE |
|---|---|
| 1. Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | 2,111,172 |
| 2. GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | 2,001,070 |
| 3. GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | 1,178,729 |
| 4. GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | 3,378,106 |
| 5. Stamping - Pontiac North Campus, 220 East Columbia, Pontiac, MI 48340 (excluding Plant 14) ("Pontiac North Facility") | 1,464,846 |
| 6. Stamping - Mansfield, 2525 West Fourth Street, PO Box 2567 - 44906, Mansfield, OH 44906-1269 (the "Mansfield Facility") | 2,753,195 |
| 7. GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma, OH, 44130 | 579,544 |
| 8. GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA, 22408 | 280,043 |
| 9. GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI 48198 | 4,723,313 |
| 10. Stamping - Grand Rapids, 300 36th Street SW, Wyoming, MI 49548 (the "Grand Rapids Facility") | 2,324,628 |
| 11. GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | 2,768,105 |
| 12. Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | 867,040 |
| 13. GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | 2,836,064 |
| **TOTAL:** | 27,265,855 |

## Exhibit B

## Target End Dates

| FACILITY | TARGET END DATE |
|---|---|
| 1. Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | 12/31/2011 |
| 2. GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | 12/31/2010 |
| 3. GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | 6/30/2010 |
| 4. GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | 10/31/2009 |
| 5. Pontiac North Facility | 12/31/2010 |
| 6. Mansfield Facility | 6/30/2010 |
| 7. GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma OH, 44130 | 12/31/2010 |
| 8. GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA 22408 | 12/31/2010 |
| 9. GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI | 12/31/2010 |
| 10. Grand Rapids Facility | 12/31/2009 |
| 11. GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | 6/30/2012 |
| 12. Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | 6/30/2012 |
| 13. GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | 7/31/2009 |

EXHIBIT B TO MASTER LEASE AGREEMENT (EXCLUDED MANUFACTURING ASSETS)

## Exhibit C

## Rent

| FACILITY | RENT PER ANNUM |
|---|---|
| 1.  Stamping - Indianapolis, 340 White River Parkway West Drive South 50, Indianapolis, IN 46206 | $2,111,172 |
| 2.  GMPT - Flint North #5/#10/#81, 902 E Hamilton Avenue, Flint, MI 48550 | $2,001,070 |
| 3.  GMPT - Livonia, 12200 Middlebelt, Livonia, MI 48150 | $1,178,729 |
| 4.  GMVM - Pontiac Assembly, 2100 S Opdyke Road, Pontiac, MI 48341 | $3,378,106 |
| 5.  Pontiac North Facility | $1,464,846 |
| 6.  Mansfield Facility | $2,753,195 |
| 7.  GMPT - Parma Complex, 5400 Chevrolet Boulevard, PO Box 30098, Parma, OH, 44130 | $579,544 |
| 8.  GMPT - Fredericksburg, 11032 Tidewater Trail, Fredericksburg, VA, 22408 | $280,043 |
| 9.  GMPT - Willow Run, 2930 Ecorse Road, Ypsilanti, MI 48198 | $4,723,313 |
| 10. Grand Rapids Facility | $2,324,628 |
| 11.  GMVM – Shreveport Assembly (excluding Stamping), 7600 General Motors Blvd., Shreveport, LA | $2,768,105 |
| 12.  Stamping – Shreveport, 7600 General Motors Blvd., Shreveport, LA | $867,040 |
| 13. GMVM - Wilmington Assembly, 801 Boxwood Road, Wilmington, DE | $2,836,064 |
| **TOTAL:** | $27,265,855 |

EXHIBIT C TO MASTER LEASE AGREEMENT

1765182

## Exhibit D

**Form of Guaranty**

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty Agreement") dated as of _____, 2009, is executed by *[_____]*, a Delaware limited liability company ("Guarantor").

WHEREAS, General Motors Corporation, a Delaware corporation, and *[LEASECO]* ("Tenant"), entered into that certain Master Lease Agreement (Excluded Manufacturing Assets) dated as of the date hereof (the "Lease"), pursuant to which Landlord leases to Tenant the Premises (as defined in the Lease).  All capitalized terms used herein that are not specifically defined herein shall have the meanings set forth in the Lease;

WHEREAS, Guarantor is an affiliate of Tenant and Guarantor will benefit by Tenant entering into the Lease; and

WHEREAS, Guarantor has agreed to guarantee the Tenant's obligations, covenants, agreements and liabilities under the Lease and/or with respect to the Premises to Landlord in accordance with the terms and conditions of this Guaranty Agreement.

In consideration of the decision of Landlord to lease the Premises to Tenant, Guarantor agrees as follows:

1.  **Guaranty**.  Upon the terms and subject to the conditions set forth in this Guaranty Agreement, Guarantor unconditionally, absolutely and irrevocably guarantees the full and prompt payment and performance when due of the obligations, covenants, agreements and liabilities of the Tenant under the Lease and/or with respect to the Premises (collectively, the "Obligations").  Guarantor agrees that the Landlord may pursue multiple actions against the Guarantor as necessary to enforce the Landlord's rights under this Guaranty Agreement.  The guaranty set forth herein is one of payment and not of collection.  Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Lease.  Guarantor hereby waives (a) any right to require Landlord to proceed against Tenant or any other guarantor or any other person or entity liable to Landlord and (b) demand of payment, performance, presentation and/or protest of any kind.

2.  **Waiver**.  No delay or failure on the part of the Landlord to exercise any right, power or privilege under this Guaranty Agreement shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege shall preclude any other or further exercise thereof or the exercise of any other power or right, or be deemed to establish a custom or course of dealing or performance between the parties hereto.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

3.  **Termination**.  The obligations of Guarantor under this Guaranty Agreement shall remain in full force and effect until such time as the Obligations have been paid and performed

in full, provided that the obligations of Guarantor under this Guaranty Agreement (a) shall expire with respect to each Facility on the second anniversary of the Termination Date with respect to such Facility and (b) notwithstanding the foregoing, shall remain in effect and enforceable against Guarantor after payment in full of the Obligations if at any time payment of the Obligations is rescinded or otherwise must be restored or returned by the Landlord upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Guarantor, the Tenant or otherwise, all as though such payment had not been made.

4.    **Consent**.    Guarantor consents to, authorizes and grants to the Landlord the full power, in its sole discretion, to deal in any manner with the Lease and the Obligations, including, without limitation, the right: (a) to amend, change, modify or otherwise revise the Lease (together with the Tenant), (b) to take or omit to take any action, grant any consent, and/or exercise any right under the Lease and/or with respect to the Premises, and (c) to consent to assignments, subleases and/or other transfers of the Premises.    The obligations of Guarantor hereunder shall not be released, discharged, or in any way affected, nor shall Guarantor have any rights of recourse against the Landlord by reason of any action that the Landlord may take or omit to take under this Section 5.

5.    **Assignment**.    This Guaranty Agreement shall be binding upon and enforceable against Guarantor and its successors and assigns and shall inure to the benefit of, and be enforceable by, Landlord and their successors and assigns.

6.    **No Third-Party Beneficiaries**.    This Guaranty Agreement is intended for the sole and exclusive benefit of Landlord and their respective successors and assigns and shall not be enforceable by any other party.    This Guaranty Agreement may not be assigned by Guarantor without the prior express written consent of Landlord which consent may be withheld in Landlord's sole discretion, provided that Landlord may not unreasonably withhold such consent in connection with a transfer by Tenant permitted under the Lease.

7.    **Governing Law**.    This Guaranty Agreement shall be construed in accordance with the laws of the state of Michigan.

8.    **Notices**.    Any notice, request or other communication hereunder to Landlord or Guarantor shall be delivered to the addresses set forth in and in accordance with the terms of the Lease, provided that notices to Guarantor shall be delivered to the attention of Guarantor at the addresses set forth for Tenant in the Lease.

9.    **Jurisdiction for Dispute Resolution.**

(a)    Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Guarantor and Landlord (by its acceptance of this Guaranty Agreement) hereby agree that (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the Lease and this Guaranty Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Lease and this Guaranty Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall

be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10</u> hereof; <u>provided</u>, <u>however</u>, that if Landlord's voluntary petition for relief under Chapter 11 of Title 11, U.S.C. §§101 et. seq. has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and the State of New York located in the Borough of Manhattan in the City of New York and any appellate court from any thereof, for the resolution of any such claim or dispute.   The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.   Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the parties hereto hereby consents to process being served by any party to this Lease in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 10</u>.

10.   **<u>Modification</u>**.   The terms of this Guaranty Agreement may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.   No amendment, modification or other change of any of the terms of this Guaranty Agreement shall be effective without the prior written consent of both the Landlord and Guarantor.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty Agreement as of the date first written above.

*[_____]*, a Delaware limited liability company


By: _____

Name: _____

Title: _____

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit Y**

Form of Certificate of Designation of Purchaser for Preferred Stock

**EXHIBIT Y**

**Form Of Certificate of Designations**

**Of**

**Series A Fixed Rate Cumulative Perpetual Preferred Stock**

**Of**

**[NGMCO, INC.]**

*[NGMCO, Inc.]*, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation (the "Board of Directors") or an authorized committee of the Board of Directors in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware on *[_____]*, 2009:

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of Preferred Stock, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions, of the shares of such series be and hereby are as follows:

Part 1. *Designation and Number of Shares*.  There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation a series of preferred stock designated as the "Series A Fixed Rate Cumulative Perpetual Preferred Stock" (the "Series A Preferred Stock").  The authorized number of shares of the Series A Preferred Stock shall be 360,000,000. Such number of shares may be decreased by resolution of the Board of Directors, subject to the terms and conditions hereof; provided that no decrease shall reduce the number of shares of the Series A Preferred Stock to a number less than the number of shares then outstanding.

Part 2. *Standard Provisions*.  The Standard Provisions contained in Annex A attached hereto are incorporated herein by reference in their entirety and shall be deemed to be a part of this Certificate of Designations to the same extent as if such provisions had been set forth in full herein.

Part 3. *Definitions*.  The following terms are used in this Certificate of Designations (including the Standard Provisions in Annex A hereto) as defined below:

(a) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(b) "Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

1

(c) "Junior Stock" means any preferred stock other than this Series A Preferred Stock, the Common Stock and any other class or series of stock of the Corporation.

(d) "Liquidation Amount" means $25 per share of the Series A Preferred Stock.

Part. 4. *Certain Voting Matters*.   For purposes of determining the voting rights of the holders of the Series A Preferred Stock under Section 7 of the Standard Provisions forming part of this Certificate of Designations, each holder will be entitled to one vote for each $25 of Liquidation Amount to which such holder's shares are entitled.

[Remainder of Page Intentionally Left Blank]

2

1766819

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be signed by *[_____]*, its *[_____]*, this *[__]* day of *[_____]*, 2009.

*[NGMCO, INC.]*

By: _____
Name: *[_____]*
Title: *[_____]*

3

ANNEX A

STANDARD PROVISIONS

Section 1.    *General Matters; Ranking*. Each share of the Series A Preferred Stock shall be identical in all respects to every other share of the Series A Preferred Stock. The Series A Preferred Stock shall be perpetual, subject to the provisions of Section 5 of these Standard Provisions that form a part of the Certificate of Designations. The Series A Preferred Stock shall rank senior to the Junior Stock in respect of the right to receive dividends and the right to receive payments or distributions out of the assets of the Corporation upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

Section 2.    *Standard Definitions*. As used herein with respect to the Series A Preferred Stock:

(a) "Agent Members" has the meaning set forth in Section 13(d).

(b) "Applicable Dividend Rate" means 9% per annum.

(c) "Business Day" means any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

(d) "Bylaws" means the bylaws of the Corporation, as they may be amended from time to time.

(e) "Certificate of Designations" means the Certificate of Designations or comparable instrument relating to the Series A Preferred Stock, of which these Standard Provisions form a part, as it may be amended from time to time.

(f) "Charter" means the Corporation's Amended and Restated Certificate of Incorporation, as such may be amended or restated from time to time.

(g) "Dividend Period" has the meaning set forth in Section 3(a).

(h) "Dividend Record Date" has the meaning set forth in Section 3(a).

(i) "DTC" has the meaning set forth in Section 9.

(j) "First Optional Redemption Date" has the meaning set forth in Section 5(a).

(k) "Global Share" means a share of Series A Preferred Stock in the form of a permanent global stock certificate, in definitive, fully registered form.

(l) "Global Share Legend" has the meaning set forth in Section 13(d).

4

(m) "Original Issue Date" means the date on which shares of the Series A Preferred Stock are first issued.

(n) "Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

(o) "Preferred Director" has the meaning set forth in Section 7(b).

(p) "Preferred Share Register" has the meaning set forth in Section 15(a).

(q) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A Preferred Stock.

(r) "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

(s) "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(t) "Series A Preferred Share Certificate" has the meaning set forth in Section 13.

(u) "Share Dilution Amount" has the meaning set forth in Section 3(b).

(v) "Standard Provisions" mean these Standard Provisions that form a part of the Certificate of Designations relating to the Series A Preferred Stock.

(w) "Redemption Price" has the meaning set forth in Section 5(a).

(x) "Transfer Agent" has the meaning set forth in Section 17.

Section 3. *Dividends*.

(a) **Rate**. Holders of the Series A Preferred Stock shall be entitled to receive, on each share of the Series A Preferred Stock, if, as and when declared by the Board of Directors or any duly authorized committee of the Board of Directors, but only out of assets legally available therefor, cumulative cash dividends with respect to each Dividend Period (as defined below) at a rate per annum equal to the Applicable Dividend Rate on (i) the Liquidation Amount per share of the Series A Preferred Stock and (ii) the amount of accrued and unpaid dividends for any prior Dividend Period on such share of Series A Preferred Stock, if any. Such dividends shall begin to accrue and be cumulative from the Original Issue Date, shall compound on each subsequent Dividend Payment Date (*i.e.*, no dividends shall accrue on other dividends unless and until the first Dividend Payment Date for such other dividends has passed without such other dividends having been paid on such date), and shall be payable quarterly in arrears on each Dividend Payment Date, commencing with the first such Dividend Payment Date to occur at least 20 calendar days after the Original Issue Date. In the event that any Dividend Payment Date would

5

otherwise fall on a day that is not a Business Day, the dividend payment due on that date will be postponed to the next day that is a Business Day and no additional dividends shall be payable nor shall interest accrue on the amount payable as a result of that postponement. The period from and including any Dividend Payment Date to, but excluding, the next Dividend Payment Date is a "Dividend Period"; provided that the initial Dividend Period shall be the period from and including the Original Issue Date to, but excluding, the Dividend Payment Date immediately following the Original Issue Date.

Dividends that are payable on Series A Preferred Stock in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series A Preferred Stock on any date prior to the end of a Dividend Period, and for the initial Dividend Period, shall be computed on the basis of a 360-day year consisting of twelve 30-day months and actual days elapsed over a 30-day month.

Dividends that are payable on Series A Preferred Stock on any Dividend Payment Date will be payable to holders of record of the Series A Preferred Stock as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day immediately preceding such Dividend Payment Date or such other record date fixed by the Board of Directors or any duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

Holders of the Series A Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A Preferred Stock as specified in this Section 3 (subject to the other provisions of the Certificate of Designations).

(b)     **Priority of Dividends**. So long as any share of the Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other shares of Junior Stock, and no Common Stock or Junior Stock shall be, directly or indirectly, purchased, redeemed or otherwise acquired for consideration by the Corporation or any of its subsidiaries unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been or are contemporaneously declared and paid in full in cash (or have been declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of the Series A Preferred Stock on the applicable record date). The foregoing limitation shall not apply to (i) a dividend payable on any Junior Stock in shares of any other Junior Stock, or to the acquisition of shares of any Junior Stock in exchange for, or through application of the proceeds of the sale of, shares of any other Junior Stock; (ii) redemptions, purchases or other acquisitions of shares of Common Stock or other Junior Stock in connection with the administration of any employee benefit plan in the ordinary course of business (including purchases to offset the Share Dilution Amount pursuant to a publicly announced repurchase plan); provided that any purchases to offset the Share Dilution Amount shall in no event exceed the Share Dilution Amount; (iii) any dividends or distributions of rights or Junior Stock in connection with a stockholders' rights

plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; (iv) the acquisition by the Corporation or any of its subsidiaries of record ownership in Junior Stock for the beneficial ownership of any other persons (other than the Corporation or any of its subsidiaries), including as trustees or custodians; and (v) the exchange or conversion of Junior Stock for or into other Junior Stock (with the same or lesser aggregate liquidation amount). "Share Dilution Amount" means the increase in the number of diluted shares outstanding (determined in accordance with generally accepted accounting principles in the United States, and as measured from the Original Issue Date) resulting from the grant, vesting or exercise of equity-based compensation to employees and equitably adjusted for any stock split, stock dividend, reverse stock split, reclassification or similar transaction.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside for the benefit of the holders thereof on the applicable record date) on any Dividend Payment Date in full on shares of the Series A Preferred Stock, all dividends declared on the Series A Preferred Stock and payable on such Dividend Payment Date shall be declared pro rata so that the respective amounts of such dividends declared shall bear the same ratio to each other as all accrued and unpaid dividends per share on the shares of the Series A Preferred Stock (including, as provided in Section 3(a) above, any dividends on such amount) (subject to their having been declared by the Board of Directors or a duly authorized committee of the Board of Directors out of legally available funds and including, all accrued but unpaid dividends) bear to each other.

Subject to the foregoing, and not otherwise, such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors or any duly authorized committee of the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and holders of the Series A Preferred Stock shall not be entitled to participate in any such dividends.

Section 4. *Liquidation, Dissolution or Winding Up*. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, then, before any distribution or payment shall be made to the holders of Junior Stock, the holders of the Series A Preferred Stock shall be entitled to be paid in full the respective amounts of the liquidation preferences thereof, which in the case of the Series A Preferred Stock shall be the Liquidation Amount, plus an amount equal to all accrued and unpaid dividends, if any (including, as provided in Section 3(a) above, any dividends on such amount), whether or not declared, prior to such distribution or payment date. If such payment shall have been made in full to the holders of the Series A Preferred Stock, the remaining assets and funds of the Corporation shall be distributed among the holders of Junior Stock, according to their respective rights and preferences and in each case according to their respective shares. If, upon any liquidation, dissolution or winding up of the affairs of the Corporation, the amounts so payable are not paid in full to the holders of all outstanding shares of the Series A Preferred Stock, the holders of the Series A Preferred Stock shall share ratably in any distribution of assets in proportion to the full amounts to which they would otherwise be respectively entitled. Neither the consolidation or merger of the Corporation, nor the sale, lease or conveyance of all or a part of its assets, shall be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the

7

meaning of the foregoing provisions of this Section 4.

Section 5. *Redemption*.

(a)    **Optional Redemption**. The Series A Preferred Stock may not be redeemed by the Corporation prior to December 31, 2014 (the "First Optional Redemption Date"). On or after that date, the Corporation, at its option, may redeem, in whole or in part, at any time and from time to time, out of funds legally available therefor, the shares of the Series A Preferred Stock at the time outstanding, upon notice given as provided in Section 5(c) below, at a redemption price per share equal to the sum of (i) the Liquidation Amount per share and (ii) except as otherwise provided below, any accrued and unpaid dividends (including, as provided in Section 3(a) above, any dividends on such amount) (regardless of whether any dividends are actually declared) to, but excluding, the date fixed for redemption (the "Redemption Price").

The Redemption Price for any shares of the Series A Preferred Stock shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any declared but unpaid dividends payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the Redemption Price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 3 above.

(b)    **No Mandatory Redemption; No Sinking Fund**. The Series A Preferred Stock will not be subject to any mandatory redemption, mandatory repurchase, sinking fund or other similar provisions. Holders of the Series A Preferred Stock will have no right to require redemption or repurchase of any shares of the Series A Preferred Stock.

(c)    **Notice of Redemption**. Notice of every redemption of shares of the Series A Preferred Stock shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this subsection (c) shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of the Series A Preferred Stock designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of the Series A Preferred Stock. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation or any other similar facility, notice of redemption may be given to the holders of the Series A Preferred Stock at such time and in any manner permitted by such facility. Each notice of redemption given to a holder shall state: (1) the redemption date; (2) the number of shares of the Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the Redemption Price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price, but failure duly to give such notice to any holder of shares of the Series A Preferred Stock designated for redemption or any defect in such notice shall not affect the validity of the proceedings for the

8

redemption of any other shares of the Series A Preferred Stock.

(d)    **Partial Redemption**. In case of any redemption of part of the shares of the Series A Preferred Stock at the time outstanding, the shares to be redeemed shall be selected either pro rata or in such other manner as the Board of Directors or a duly authorized committee thereof may determine to be fair and equitable. Subject to the provisions hereof, the Board of Directors or a duly authorized committee thereof shall have full power and authority to prescribe the terms and conditions upon which shares of the Series A Preferred Stock shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e)    **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been deposited by the Corporation, in trust for the pro rata benefit of the holders of the shares called for redemption, with a bank or trust company doing business in the Borough of Manhattan, The City of New York, and having a capital and surplus of at least $500 million and selected by the Board of Directors or a duly authorized committee thereof, so as to be and continue to be available solely therefor, then, notwithstanding that any certificate (if the shares of Series A Preferred Stock are not in book-entry form) for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption from such bank or trust company, without interest. Any funds unclaimed at the end of three years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of such amounts.

(f)    **Status of Redeemed Shares**. Shares of the Series A Preferred Stock that are redeemed, repurchased or otherwise acquired by the Corporation shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of the Series A Preferred Stock may be reissued only as shares of any series of the Preferred Stock other than the Series A Preferred Stock).

Section 6. *Conversion*. Holders of the Series A Preferred Stock shares shall have no right to exchange or convert such shares into any other securities.

Section 7. *Voting Rights*.

(a)    **General**. The holders of the Series A Preferred Stock shall not have any voting rights except as set forth below or as otherwise from time to time required by law.

(b)    **Series A Preferred Stock Directors**. Whenever, at any time or times, dividends payable on the shares of the Series A Preferred Stock have not been paid for an aggregate of six quarterly Dividend Periods or more, whether or not consecutive, the authorized number of directors of the Corporation shall automatically be increased to accommodate the number of the

9

Preferred Directors specified below and the holders of the Series A Preferred Stock shall have the right, voting as a class, to elect two directors (hereinafter the "Preferred Directors" and each a "Preferred Director") to fill such newly created directorships at the Corporation's next annual meeting of stockholders (or at a special meeting called for that purpose prior to such next annual meeting) and at each subsequent annual meeting of stockholders until all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, as provided in Section 3(a) above, any dividends on such amount), on all outstanding shares of the Series A Preferred Stock have been declared and paid in full, at which time such right shall terminate with respect to the Series A Preferred Stock, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent payment failure of the character above mentioned; provided that it shall be a qualification for election for any Preferred Director that the election of such Preferred Director shall not cause the Corporation to violate any corporate governance requirements of any securities exchange or other trading facility on which securities of the Corporation may then be listed or traded that listed or traded companies must have a majority of independent directors. Upon any termination of the right of the holders of shares of the Series A Preferred Stock as a class to vote for directors as provided above, the Preferred Directors shall cease to be qualified as directors, the term of office of all Preferred Directors then in office shall terminate immediately and the authorized number of directors shall be reduced by the number of the Preferred Directors elected pursuant hereto. Any Preferred Director may be removed at any time, with or without cause, and any vacancy created thereby may be filled, only by the affirmative vote of the holders of a majority of the shares of the Series A Preferred Stock at the time outstanding voting separately as a class, to the extent the voting rights of such holders described above are then exercisable. If the office of any Preferred Director becomes vacant for any reason other than removal from office as aforesaid, the remaining Preferred Director may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred.

(c)    **Class Voting Rights as to Particular Matters.**  So long as any shares of the Series A Preferred Stock are outstanding, in addition to any other vote or consent of stockholders required by law or by the Charter, the vote or consent of the holders of at least 66 2/3% of the shares of the Series A Preferred Stock at the time outstanding, voting as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i)    Authorization of Senior or Pari Passu Stock. Any amendment or alteration of the Certificate of Designations for the Series A Preferred Stock or the Charter (including any amendment to the Charter effectuated by a certificate of designations) to authorize or create or increase the authorized amount of, or any issuance of, any shares of, or any securities convertible into or exchangeable or exercisable for shares of, any class or series of capital stock of the Corporation ranking senior to or pari passu with the Series A Preferred Stock with respect to either or both the payment of dividends and/or the distribution of assets on any liquidation, dissolution or winding up of the Corporation;

(ii)    Amendment of the Series A Preferred Stock. Any amendment, alteration or repeal of any provision of the Certificate of Designations for the Series A Preferred Stock or the Charter (including, unless no vote on such merger or consolidation is required by Section

10

7(c)(iii) below, any amendment, alteration or repeal by means of a merger, consolidation or otherwise) so as to adversely affect the rights, preferences, privileges or voting powers of the Series A Preferred Stock; provided, however, that notwithstanding anything to the contrary herein, the vote of 100% of the shares of the Series A Preferred Stock at the time outstanding shall be necessary to (A) reduce the Liquidation Amount, (B) reduce the Applicable Dividend Rate, (C) provide for the payment of dividends on the Series A Preferred Stock to be made in other than U.S. dollars, (D) change any Dividend Payment Date or the First Optional Redemption Date or (E) make dividends on the Series A Preferred Stock non-cumulative; or

(iii)    Share Exchanges, Reclassifications, Mergers and Consolidations. Any consummation of a binding share exchange or reclassification involving the Series A Preferred Stock, or of a merger or consolidation of the Corporation with or into another corporation or other entity, unless in each case (x) the shares of the Series A Preferred Stock remain outstanding and are not amended in any respect or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A Preferred Stock immediately prior to such consummation, taken as a whole;

provided, however, that for all purposes of this Section 7(c), any increase in the amount of the authorized Preferred Stock, or the creation and issuance, or an increase in the authorized or issued amount, whether pursuant to preemptive or similar rights or otherwise, of any other series of the Preferred Stock, or any securities convertible into or exchangeable or exercisable for any other series of the Preferred Stock, ranking junior to the Series A Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and the distribution of assets upon liquidation, dissolution or winding up of the Corporation will not be deemed to adversely affect the rights, preferences, privileges or voting powers, and shall not require the affirmative vote or consent of, the holders of outstanding shares of the Series A Preferred Stock.

(d)    **Changes after Provision for Redemption**. No vote or consent of the holders of the Series A Preferred Stock shall be required pursuant to Section 7(c) above if, at or prior to the time when any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of the Series A Preferred Stock shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been deposited in trust for such redemption, in each case pursuant to Section 5 above.

(e)    **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of the Series A Preferred Stock (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors or any duly authorized committee of the Board of Directors, in its discretion, may adopt from time

11

to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, and applicable law and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

Section 8. *Record Holders*. To the fullest extent permitted by applicable law, the Corporation and any transfer agent for the Series A Preferred Stock may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor any such transfer agent shall be affected by any notice to the contrary.

Section 9. *Notices*. All notices or communications in respect of the Series A Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or Bylaws or by applicable law. Notwithstanding the foregoing, if shares of the Series A Preferred Stock are issued in book-entry form through The Depository Trust Corporation ("DTC") or any similar facility, such notices may be given to the holders of the Series A Preferred Stock in any manner permitted by such facility.

Section 10. *No Preemptive Rights*. No holder of the Series A Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any preemptive right or any other right to remediate dilution with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

Section 11. *Replacement Certificates*. The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

Section 12. *Other Rights*. The shares of the Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

Section 13. *Form.*

(a)    The Series A Preferred Stock shall be initially issued in substantially the form set forth in Exhibit A ("Series A Preferred Share Certificate") and shall have such insertions as are appropriate or required or permitted by this Certificate of Designations and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Corporation may deem appropriate and as are not inconsistent with the provisions of this Certificate of Designations, such as may be required to comply with this Certificate of Designations, any law or any rule of any securities exchange

12

on which the Series A Preferred Stock may be listed, and such as may be necessary to conform to customary usage.

(b)    If the Series A Preferred Stock is sold pursuant to an effective registration statement filed with the Securities and Exchange Commission, or if the Corporation so elects at any time, any Series A Preferred Share Certificates may be presented to the Transfer Agent by holders in exchange for one or more Global Shares up to the aggregate number of shares of Series A Preferred Stock then outstanding, to be registered in the name of DTC, or its nominee, and delivered by the Transfer Agent to DTC, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of DTC.  Upon such presentation, the Corporation shall execute a Global Share representing such aggregate number of shares of Series A Preferred Stock and deliver the same to the Transfer Agent for authentication and delivery.

(c)    Any Global Share shall bear the legend substantially in the form set forth in Exhibit C hereto (the "Global Share Legend").

(d)    So long as a Global Share is registered in the name of DTC or its nominee, members of, or participants in, DTC ("Agent Members") shall have no rights under this Certificate of Designation with respect to the Global Share held on their behalf by DTC or the Transfer Agent as its custodian, and DTC may be treated by the Corporation, the Transfer Agent and any agent of the Corporation or the Transfer Agent as the absolute owner of such Global Share for all purposes.  Accordingly, any such owner's beneficial interest in such Global Share will be shown only on, and the transfer of such interest shall be effected only through, records maintained by DTC or its nominee or its Agent Members, and neither the Corporation nor the Transfer Agent shall have any responsibility with respect to such records maintained by DTC or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Transfer Agent or any agent of the Corporation or the Transfer Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder.

(e)    Any holder of a Global Share registered in the name of DTC or its nominee shall, by acceptance of such Global Share, agree that transfers of beneficial interests in such Global Share may be effected only through a book-entry system maintained by the holder of such Global Share (or its agent), and that ownership of a beneficial interest in the Series A Preferred Stock represented thereby shall be required to be reflected in book-entry form.

(f)    Transfers of a Global Share registered in the name of DTC or its nominee shall be limited to transfers in whole, and not in part, to the Corporation, DTC, their successors, and their respective nominees.  Interests of beneficial owners in a Global Share registered in the name of DTC or its nominee shall be transferred in accordance with the rules and procedures of DTC.

(g)    A Global Share registered in the name of DTC or its nominee shall be exchanged for certificated shares of Series A Preferred Stock only if DTC (A) has notified the Corporation that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act, and (B) a successor to DTC registered as a clearing agency

13

under Section 17A of the Exchange Act is not able to be appointed by the Corporation within 90 days or DTC is at any time unwilling or unable to continue as a depositary and a successor to DTC is not able to be appointed by the Corporation within 90 days.  In any such event, a Global Share registered in the name of DTC or its nominee shall be surrendered to the Transfer Agent for cancellation, and the Corporation shall execute, and the Transfer Agent shall countersign and deliver, to each beneficial owner identified by DTC, in exchange for such beneficial owner's beneficial interest in such Global Share, certificated shares of the Series A Preferred Stock representing, in the aggregate, the number of shares theretofore represented by such Global Share with respect to such beneficial owner's respective beneficial interest.  Any certificated share of Series A Preferred Stock delivered in exchange for an interest in a Global Share pursuant to this Section shall not bear the Global Share Legend.  Interests in the Global Shares may not be exchanged for certificated shares of Series A Preferred Stock other than as provided in this Section 13(g).

(h)    The holder of a Global Share registered in the name of DTC or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Certificate of Designations.

Section 14.    *Transfer Restrictions and Legends.*  (a) Each Series A Preferred Share Certificate issued hereunder shall bear the legend set forth in Exhibit A hereto.

(i)    Shares of Series A Preferred Stock may not be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of by a holder except pursuant to (A) a registration statement that has become effective under the Securities Act or (B) pursuant to an exemption from the registration requirements of the Securities Act, including Rule 144 under the Securities Act.

(ii)    Any shares of Series A Preferred Stock as to which such restrictions on transfer shall have expired in accordance with their terms such that they can be freely sold without limits under the Securities Act and any applicable state securities law may, upon surrender of the Series A Preferred Share Certificate representing such shares for exchange in accordance with the procedures of the Transfer Agent (as defined in Section 17 below) (together with any legal opinions, certifications or other evidence as may reasonably be required by the Corporation or the Transfer Agent in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws), be exchanged for a new Series A Preferred Share Certificate for a like number of shares, which shall not bear such legend.

(b)    Any shares of Series A Preferred Stock that are purchased or owned by the Corporation or any "affiliate" thereof (as defined under Rule 144 under the Securities Act) may not be resold by the Corporation or such affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such shares no longer being "restricted securities" (as defined in Rule 144 under the Securities Act).

14

Section 15.    *Transfer, Exchange and Substitution.*    (a) Series A Preferred Share Certificates shall be issued in registered form only.  The Corporation shall cause to be kept at the office of the Transfer Agent, and the Transfer Agent shall maintain, a register (the "Preferred Share Register") in which, subject to such reasonable regulations as the Corporation may prescribe, the Corporation shall provide for the registration of shares and transfers, exchanges or substitutions of Series A Preferred Share Certificates as herein provided.  All Series A Preferred Share Certificates issued upon any registration of transfer or exchange of or substitution for shares shall be valid obligations of the Corporation, evidencing the same obligations, and entitled to the same benefits under this Certificate of Designations, as Series A Preferred Share Certificates surrendered for such registration of transfer, exchange or substitution.

(b)    A holder may transfer a Series A Preferred Share Certificate only upon surrender of such Series A Preferred Share Certificate for registration of transfer.  Series A Preferred Share Certificates may be presented for registration of transfer and exchange at the offices of the Transfer Agent with a written instruction of transfer in form satisfactory to the Transfer Agent, duly executed by such holder or by such holder's attorney, duly authorized in writing. Such holder will also provide a written certificate (substantially in the form of Exhibit B hereto) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Series A Preferred Share Certificates.  The Transfer Agent shall be entitled to conclusively rely upon any such certification in connection with the transfer of a Series A Preferred Share Certificate hereunder and shall have no responsibility to monitor or verify whether any such transfer complies with the requirements hereunder or otherwise complies with the Securities Act. No such transfer shall be effected until, and the transferee shall succeed to the rights of a holder only upon, final acceptance and registration of the transfer in the Preferred Share Register by the Transfer Agent.  Prior to the registration of any transfer of a Series A Preferred Share Certificate by a holder as provided herein, the Corporation, the Transfer Agent, and any agent of the Corporation or the Transfer Agent may treat the person in whose name Series A Preferred Share Certificates are registered as the owner thereof for all purposes and as the person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(c)    Every Series A Preferred Share Certificate presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Corporation or the Transfer Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Corporation and the Transfer Agent, by the holder thereof or such holder's attorney duly authorized in writing.

(d)    When Series A Preferred Share Certificates are presented to the Transfer Agent with a request to register the transfer of, or to exchange or substitute, such Series A Preferred Share Certificates, the Transfer Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.   To permit registrations of transfers, exchanges and substitutions, the Corporation shall execute Series A Preferred Share Certificates at the Transfer Agent's request and the Transfer Agent shall countersign and deliver such Series A Preferred Share Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Series A Preferred Share Certificates, but the Corporation may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Series A Preferred Share Certificates.

15

(e)    If less than all shares represented by a Series A Preferred Share Certificate are transferred, exchanged or substituted in accordance with this Certificate of Designations, the Series A Preferred Share Certificate shall be surrendered to the Transfer Agent and a new Series A Preferred Share Certificates for a number of shares equal to the shares represented by such Series A Preferred Share Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering holder, shall be executed by the Corporation and delivered to the Transfer Agent and the Transfer Agent shall countersign such new Series A Preferred Share Certificate and shall deliver such new Series A Preferred Share Certificate to the person or persons entitled to receive the same.

Section 16.    *Surrender of Series A Preferred Share Certificates.*    Any Series A Preferred Share Certificate surrendered for registration of transfer, exchange, or substitution of shares represented thereby shall, if surrendered to the Corporation, be delivered to the Transfer Agent, and all Series A Preferred Share Certificates surrendered or so delivered to the Transfer Agent shall be promptly cancelled by the Transfer Agent and shall not be reissued by the Corporation and no Series A Preferred Share Certificate shall be issued hereunder in lieu thereof.    The Transfer Agent shall deliver to the Corporation from time to time or otherwise dispose of such cancelled shares as the Corporation may direct.

Section 17.    *Transfer Agent And Registrar.* The duly appointed Transfer Agent and Registrar for the Series A Preferred Stock shall be *[_____]* (the "Transfer Agent"). The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal; provided further that such successor transfer agent shall be the Transfer Agent for purposes of this Certificate of Designations.

16

## EXHIBIT A

FORM OF SERIES A FIXED RATE CUMULATIVE
PERPETUAL PREFERRED STOCK
($25 LIQUIDATION PREFERENCE)

NUMBER                                                                    SHARES

*[_____]*                                                          *[_____]*

CUSIP *[_____]*

### *[NGMCO, INC.]*
### INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE
### THIS CERTIFICATE IS TRANSFERABLE

[THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.]

[THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER OF THESE SECURITIES AND THE INVESTORS REFERRED TO THEREIN, AND AN EQUITY REGISTRATION RIGHTS AGREEMENT, DATED [●], 2009, AMONG THE ISSUER AND THE HOLDERS REFERRED TO THEREIN, COPIES OF WHICH ARE ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID.]

17

This is to certify that _____, is the owner of *[__]* fully paid and non-assessable shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock, $0.01 par value, liquidation preference $25.00 per share (the "Stock"), of *[NGMCO, Inc.]* (the "Corporation"), transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed.

This certificate is not valid or obligatory for any purpose unless countersigned and registered by the Transfer Agent and Registrar.

Witness the facsimile signatures of its duly authorized officers.

Dated:  [____], 2009

_____          _____
Name:                                   Name:
Title:                                  Title:

                                        Countersigned and Registered
                                        _____,
                                        as Transfer Agent and Registrar

                                        By: _____
                                              Authorized Signature

18

### *[NGMCO, INC.]*

*[NGMCO, Inc.]* (the "Corporation") will furnish, without charge to each stockholder who so requests, a copy of the certificate of designations establishing the powers, preferences and relative, participating, optional or other special rights of each class of stock of the Corporation or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights applicable to each class of stock of the Corporation or series thereof. Such information may be obtained by a request in writing to the Secretary of the Corporation at its principal place of business.

This certificate and the share or shares represented hereby are issued and shall be held subject to all of the provisions of the Corporation's Amended and Restated Certificate of Incorporation and the Certificate of Designations of the Series A Fixed Rate Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 per share) (copies of which are on file with the Transfer Agent), to all of which the holder, by acceptance hereof, assents.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full to applicable laws or regulations:

| TEN COM | - as tenants in common | UNIF GIFT MIN ACT- _____Custodian _____ |
| TEN ENT | - as tenants by the entireties | (Minor)                    (Cust) |
| JT TEN | - as joint tenants with right of | under Uniform Gifts to Minors Act |
| | survivorship and not as | _____ |
| | tenants in common | (State) |

Additional abbreviations may also be used though not in the above list.

―――――――――――――――――

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE

_____

_____

_____ shares
of the capital stock represented by the within certificate, and do(es) hereby irrevocably constitute and appoint _____, Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

19

Dated_____

_____
Signature

NOTICE:  The signature to this assignment must correspond
with the name as written upon the face of this
certificate in every particular, without alteration or
enlargement or any change whatever.

SIGNATURE GUARANTEED

_____
NOTICE: The signature(s) should be guaranteed by
an eligible guarantor institution (banks,
stockbrokers, savings and loan associations, and
credit unions with membership in an approved
signature guarantee medallion program), pursuant
to Rule 17Ad-15 under the Securities Exchange Act
of 1934.

1766819

**EXHIBIT B**

**FORM OF CERTIFICATE OF COMPLIANCE WITH TRANSFER RESTRICTIONS**

In connection with the sale, assignment and transfer of _____ shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock by _____ unto _____ (Please insert social security or other Taxpayer Identification Number of assignee) prior to the expiration of the holding period applicable to sales thereof under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**") (or any successor provision), the undersigned confirms that such shares are being transferred:

> To *[NGMCO, Inc.]* (the "**Issuer**") or any subsidiaries thereof; or

> Pursuant to a registration statement that has become effective under the Securities Act; or

> Pursuant to an exemption from registration provided by Rule 144 under the Securities Act or any other available exemption from the registration requirements of the Securities Act.

Prior to the registration of any transfer in accordance with the third box above, the Issuer and the Transfer Agent reserve the right to require the delivery of such legal opinion, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.

*Unless one of the boxes is checked, the Transfer Agent will refuse to register any of the* shares of Series A Fixed Rate Cumulative Perpetual Preferred Stock *evidenced by this certificate in the name of any person other than the registered holder thereof.*

Date:    [_____]

[Insert name of transferee]

By: _____
          Name:
          Title:

21

1766819

**EXHIBIT C**

**GLOBAL SHARE LEGEND**

UNLESS THIS GLOBAL SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO *[NGMCO, INC.]* (THE "ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SHARE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

**Amended and Restated Master Sale & Purchase Agreement**
**Exhibit Z**

VEBA Note Term Sheet

# EXHIBIT Z

## <u>VEBA NOTE TERM SHEET</u>

### *[NGMCO, Inc.]*

### Term Sheet for Note due 2017

Following is a summary of the proposed principal terms for the Note to be issued to the Voluntary Employees' Beneficiary Association ("<u>New VEBA</u>") in connection with the transactions related to the restructuring of the obligations of General Motors Corporation to the New VEBA.

| | |
|---|---|
| Issuer: | *[NGMCO, Inc.]* (the "<u>Company</u>"). |
| Securities Offered: | US$2.5 billion Note (the "<u>Note</u>"). |
| Maturity Date: | July 15, 2017. |
| Interest/Payment: | Implied annual rate of 9% from July 15, 2009, payable in fixed payments in cash on July 15 of each of the following years: |

| Year | Amount |
|------|--------|
| 2013 | $1,384 million |
| 2015 | $1,384 million |
| 2017 | $1,384 million |

| | |
|---|---|
| Guarantees: | Any present and future U.S. subsidiaries of the Company that are borrowers or guarantors with respect to the UST Note will fully and unconditionally guarantee the performance of all obligations of the Company under the Indenture and the Note, which guarantees will be secured to the same extent, if any, as are the obligations of such borrower under, or guarantors of, the UST Note, and subordinated only to any Permanent Financing (as defined below).  Each guarantor of the Notes is herein referred to as a "<u>Guarantor</u>" and its guarantee is referred to herein as a "<u>Guarantee</u>." |
| Ranking: | The obligations of the Company under the Notes and of the Guarantors under the Guarantees will: |

- rank equally in right of payment with (1) any debt issued to the United Stated Department of Treasury ("<u>UST</u>") in the restructuring (the "<u>UST Note</u>") and (2) any debt issued to Canada in the restructuring (the "<u>Canada Note</u>");

- be secured on a pari passu basis by the collateral securing the UST Note;

- rank senior in right of payment to all unsecured indebtedness and other obligations of the Company that are by their terms subordinated to the Note;

- rank junior in right of payment to any permanent financing including UST delayed draw term loan, revolver or any other third party permanent financing entered into with the consent of UST ("Permanent Financing"); and

- be effectively subordinated in right of payment to all future first lien secured indebtedness and other obligations of the Company, to the extent of the value of the assets securing such obligations, and be structurally subordinated to all obligations of each of the Company's subsidiaries that are not Guarantors.

| | |
|---|---|
| Intercreditor Agreement | New VEBA, the UST and Canada shall enter into an intercreditor agreement in form and substance satisfactory to the UST, which shall provide that the UST Note, the Canadian Note and the Note shall rank equally and be pari passu and that the UST shall have the sole and exclusive right to exercise all remedies and to grant waivers with respect to the Note and the UST Note. |
| Transferability: | The Note will be transferable at any time in whole or in part to (1) the Company or its subsidiaries, or (2) an unlimited number of institutional accredited investors or qualified institutional buyers in transactions that (a) do not require registration under the Securities Act and (b) do not trigger registration under the Exchange Act; provided that if at any time the UST Note is registered under the Securities Act or exchanged for a note that is entitled to demand, shelf or piggyback registration rights, then the Note will be entitled to demand, shelf, and piggyback registration rights no less favorable than those of the UST Note. |
| Optional Redemption: | The Company may redeem the Note in whole or in part at any time at 100% of its principal amount, together with accrued and unpaid interest, if any, to the redemption date. |
| Covenants | The Note will have the same covenants as the UST Note, including, to the extent made by the Company under the UST Note, covenants in respect of Change of Control, Limitation of Incurrence of Indebtedness, Restricted Payments, Limitations on Liens, Limitation on Sale of Assets, Restrictions on Sale/Leaseback and Limitation on Merger/Consolidation. |
| Default Interest: | 2% penalty interest upon any default under the terms of the Note. |
| Events of Default: | Events of Default will be the same as those in the UST Note, including, without limitation: |

1. Default in payment on the Note when due, subject to any grace period in the UST Note.

2. Default in the observance or performance of covenants, subject to any grace period in the UST Note.

3. Bankruptcy or insolvency events, subject to any grace period in the UST Note.

4. Invalidity of Guarantees to the extent provided in the UST Note, subject to any grace period in the UST Note.

| | |
|---|---|
| Modifications: | Unless (1) UST has transferred more than 75% of the UST Note and (2) the portion of the UST Note held by UST has an outstanding principal |

2

amount that is less than the implied then current principal amount of the VEBA Note (assuming an implied 9% interest rate), any modifications agreed to by UST with respect to the terms of the UST Note will automatically modify, and be binding on, the Note, other than any such modification that makes any change that extends the maturity date, extends the date of any fixed payment, reduces the implied interest rate, reduces the amount of principal, changes the currency of payment, modifies any prepayment right or by its express terms limits or restricts any right to bring suit for payment.

Governing Law:                  New York.

3

**Amended and Restated Master Sale & Purchase Agreement**

**Disclosure Schedule**

Execution Version

### First Update to Sellers' Disclosure Schedule

Pursuant to Section 6.5, Section 6.6 and Section 6.26 of that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Agreement"), made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser"), the Sellers' Disclosure Schedule delivered on June 1, 2009, as amended, is hereby being updated as set forth herein (as amended and updated, this "Sellers' Disclosure Schedule"). Unless otherwise defined herein, all capitalized terms used in this Sellers' Disclosure Schedule have the respective meanings assigned to them in the Agreement.

The representations and warranties of Sellers set forth in the Agreement are made and given subject to the disclosures contained in this Sellers' Disclosure Schedule.  Inclusion of information in this Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party.  The specific disclosures set forth in this Sellers' Disclosure Schedule have been organized to correspond to Section references in the Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in this Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of the Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

## Section 1.1C

### Key Subsidiaries

1.  General Motors Product Services, Inc.
2.  OnStar, LLC
3.  General Motors Overseas Distribution Corporation
4.  Argonaut Holdings, Inc.
5.  Riverfront Holdings, Inc.
6.  Adam Opel GmbH
7.  General Motors of Canada Limited
8.  GM Daewoo Auto & Technology Company
9.  General Motors de Mexico, S. de R.L. de C.V.
10. General Motors do Brasil Ltda.
11. GM Europe Treasury Company AB
12. General Motors UK Limited
13. General Motors Espana, S.L.
14. GM Holden Ltd.
15. General Motors Venezolana, C.A.
16. General Motors Italia S.r.l.
17. General Motors Powertrain - Germany GmbH
18. GM Factoring Sociedade de Fomento Comercial Ltda.
19. General Motors Powertrain- Austria GmbH
20. General Motors India Private Limited
21. General Motors Poland Spolka, z.o.o.
22. General Motors CIS, LLC
23. General Motors Belgium N.V.
24. General Motors (Thailand) Limited
25. General Motors de Argentina S.r.l.
26. General Motors South Africa (Pty) Limited
27. General Motors Strasbourg
28. General Motors - Colmotores S.A.
29. General Motors Auto LLC
30. Controladora General Motors, S.A. de C.V.
31. VM Motori S.p.A.
32. DMAX, Ltd.

## <u>Section 1.1D</u>

### Knowledge of Sellers

1. Walter G. Borst
2. Lawrence S. Buonomo
3. Troy A. Clarke
4. Nicholas S. Cyprus
5. Joseph H. DaMour
6. Maureen Kempston Darkes
7. Carl-Peter Foster
8. Frederick A. Henderson
9. Gregory E. Lau
10. Robert S. Osborne
11. David N. Reilly
12. Ray G. Young

## Section 1.1E

### Seller Key Personnel

Group Vice Presidents of Parent and other executives of Parent more senior than Group Vice Presidents.

## Section 2.2(a)(vii)

### Certain Personal Property Located at Excluded Real Property

| General | |
|---|---|
| **Site** | **Personal Property** |
| General | Indirect material and inventory, spare parts and Tooling required to support current and future production at Excluded Real Properties |
| | Mobile equipment - rider fork / lift trucks and tow tractors / tuggers with their ancillary supporting equipment having a certificate of acceptance date of 2003 to the present year |
| | Mobile equipment - walk behind equipment used for lifting, stacking, or moving material and burden carriers / platform trucks with their ancillary supporting equipment having a certificate of acceptance date of 2000 to the present year |
| | Medical equipment- all medical equipment and supplies at Excluded Real Properties |
| | Assets - new and not yet installed at Excluded Real Properties |
| | Fire and personnel safety equipment,  security systems, cameras, video equipment and radios |
| | Maintenance shop cabinets and equipment |
| **WFG** | |
| **Site** | **Personal Property** |
| GMVM - Moraine Assembly | Hydraulic lift and dock equipment, chillers, cooling towers, and filters, chemical tanks and pump systems, hot water boilers, electrical switchgear and transformer, utility system controls and metering,  HVAC temperature control panels, air conditioners, transformers, emergency generator, gates and operators, fitness equipment, paint booth air ventilation fans, VFDs and controls |
| GMVM - Pontiac Assembly | Hydraulic lift and dock equipment, compressed air dryers and filters, utility system controls and metering,  HVAC temperature control panels, air conditioners, electrical switchgear, transformers and bus duct, emergency generator, RO system, paint booth air ventilation fans, VFDs and controls |
| GMVM - Wilmington | Compressed air controls, utility system controls and metering,  HVAC temperature |

|  |  |
|---|---|
|  | control panels, air conditioners, electrical switchgear, transformers and bus duct, emergency generator, fire system panels and controls,  RO system, paint booth RTO including air ventilation fans and VFDs and controls, hydrocarbon vapor monitors and weather station and accessories |
| Stamping - Mansfield | HVAC temperature control panels, wastewater treatment equipment, utility metering,   welder, electrical cable, fuses and disconnects, scrap conveyors and bailer equipment and parts, motion sensors and telemotive equipment, mobile parapet and concrete barriers |
| Stamping - Indianapolis | Utility metering |
| Stamping - Grand Rapids | Office furniture, boiler controls, chillers, mobile air compressors, utility metering |
| Stamping - Pontiac North Campus (other than Plant #14) (Pontiac # 15 and #25) | Utility metering |
| GMPT - Fredericksburg | Hot water boilers, chillers, cooling tower, air compressors, utility metering |
| GMPT - Livonia | Air compressors and compressor controls, utility metering,  HVAC temperature control panels |
| GMPT - Willow Run | Office furniture, air compressors controls, chillers, WWTP pumps, utility metering, HVAC temperature control panels |
| GMPT - Flint North (Plant 5, 10, 81) | Air compressors controls, chillers, utility metering |
| GMPT - Parma | Power Distribution metering |
| **Powertrain Manufacturing** | |
| **Site** | **Personal Property** |
| GMPT -Willow Run | Deburrs, inspection equipment, cranes, tables, carts, tuggers, gear equipment, inspection equipment |
|  | Conveyance Tooling: Spare parts & tooling (including master, fixtures) |
|  | Expense: Carts, Dollies, tables, matting, dunnage trays CNC & gear equipment, broach, hone, gear inspection CNC gear & prismatic equipment hones, deburrs. etc. CNC gear equipment, hones, broach etc. |
|  | Miscellaneous 4L80E Production Equipment |
| GMPT - Massena | Metallurgy and sand lab, complete |

| | Zeiss CMM |
|---|---|
| | Small Conveyor |
| GMPT - Livonia | Block and head line equipment, CMM: V6/8 |
| GMPT - Flint North (Plant 5, 10, 81) | Gen 4 V8 Crank Line, Plant 36 |
| | CMM |
| GMPT - Fredericksburg | 6 spd converter plate cell |
| **Powertrain Engineering** | |
| GMPT - Willow Run (Ypsilanti Engineering Center) | Miscellaneous Cabinets, Carts, and Instrumentation |
| Romulus Engineering Center | Test Stands, Instrumentation, Emissions Analyzers |
| **Assembly** | |
| **Site** | **Personal Property** |
| GMVM-Moraine Assembly | Pollution abatement equipment, safety equipment, robots, pumps, vision cameras, conveyors and associated parts, electrical components, meters, welding equipment; communication, process status displays, Paint cleaning, coating, sealing, & associated application equipment, GA assembly, power tools, shop tools, measurement, & etching equipment, material transports, buss and associated buss plugs |
| GMVM-Pontiac Assembly | Heavy Duty & Dually equipment and tools, Sealer automation cells; right and left doors (front and rear), fender and hood sub assembly cells and related equipment; test equipment; Paint application, sealer and pumping systems, feather duster, RO Water system; DVT validation equipment; robots; conveyor chain, track and parts including fork transfers, turnovers, marriage and load stations; stud welders, C-flex, electrical parts such as PLC's, HMI's, process status displays, torque controllers, cards and related equipment components |
| | Team Room equipment, Simulated Work Environment Cells, Medical Equipment, spare Electrical Switchgear; Material transport equipment, storage racks and lift tables, communication equipment and Compressed Air Dryers |
| GMVM-Wilmington Assembly | Feather Duster, Paint application equipment, vision systems, equipment supporting service part sub assembly tools, conveyor chain, electrical and control components such as |

| | PLC's, Power distribution panels, welding equipment, process status displays and related electrical components |
| | Medical equipment, spare Electrical Switchgear, Electric Powered Hand tools & associated controllers, AGC's, CMM Controllers, specialized lighting; Material transport equipment, storage racks and lift tables, communication equipment, Sealer systems and Pumping equipment |

| NA Press Center | |
| --- | --- |
| **Site** | **Personal Property** |
| Stamping - Grand Rapids | AA5X Transfer Press Systems |
| | A3 Transfer Press Systems |
| | B3 Transfer Press Systems |
| | Blanking Systems |
| | Shear System |
| | TDO Machines |
| | DVC System |
| | Overhead Cranes |
| | Power Distribution |
| | Scrap Systems |
| | Sub Assembly Cells |
| | Dies and Tooling |
| | Storage Racks and Stands |
| | Spare Parts |
| Stamping - Mansfield | AA5X Transfer Press Systems |
| | FOL/EOL/Robots |
| | B3 Transfer Press Systems |
| | B2 Transfer Press Systems |
| | Blanking Systems |
| | Shear System |
| | DVC System |
| | Overhead Cranes |
| | Die Room Equipment |
| | Power Distribution |
| | Scrap Systems |
| | Sub Assembly Cells |
| | Dies and Tooling |
| | Storage Racks and Stands |
| | Spare Parts |
| Stamping- Pontiac North Campus (other than Plant #14) (Pontiac # 15 and #25) | Sub Assembly Cells |
| | Hydroform Press Systems |
| | Sheet Hydro Systems |
| | Spare Parts |
| Stamping-Indianapolis | Prog Press System |

|  | Die Room Equipment |
|--|--|
|  | Spare Parts |
|  | Scrap Systems |
|  | Sub Assembly Cells |
|  | Dies and Tooling |

| WFG Warehouse | |
|--|--|
| **Site** | **Personal Property** |
| Pontiac Fiero Site - Plant 17 Warehouse | Tires (Production and Prototype) |
|  | Wheels (Steel/Aluminum) |
|  | Seats (Production/Prototype) |
|  | Tested Transmissions (Production/Prototype) |
|  | Tested Engines (Production/Prototype) |
|  | Tested Rear Differentials |
|  | Crash sleds (Crash Worthiness equipment) |
|  | Car Bodies (Shell/BIW and other) |
|  | Design - Stored Historical Vehicles |
|  | Design - Clay Models (both full and half scale) |
|  | Design - Fiberglass Models (Both full and half scale) |
|  | Design Equipment - Clay ovens, bucks, frames, tires, etc. |
|  | Design - Paint Color Chip/Charts |
|  | Design - Various Wood Molds |
|  | Truck and Car Exhaust Systems (with converters) |
|  | Truck/Car Dashboards/Consoles (with and without airbags) |
|  | Truck/Car Seats (with and without airbags) |
|  | Baskets/Skids of Miscellaneous car/truck parts (Doors/fenders/bumpers/etc.) |
|  | Baskets/Skid/boxes Facility Related Equipment (Lights/hose reels/shelving/transformers/etc.) |
|  | All - Stored Shop Equipment (Bridgeport Mills/Sanders/Drill Presses/Brakes/etc.) |
|  | All - Litigation/Legal Files/vehicles/etc. |
|  | All - Skids of Miscellaneous Steel/Aluminum (Both Sheet and Tubing) |
|  | All Facility Shop and Equipment (Carpenter/Machine Repair/ Truck Repair/Electrical) |
|  | All Furniture (Office/Storage Cabinets/Plastic Bins/etc.) |
|  | All Storage Racks |
|  | All - Cranes and Conveyor Equipment (Chain/Drives) |

| | |
|---|---|
| | SPO - All Stamped/Treated Sheet Metal Body Parts |
| | Pressed Metal Parts and Equipment |
| | Robots |
| | Buss Duct and Buss Plugs |
| | Power Panels |
| | Fire Extinguishers and Associated Equipment (Hoses/Cabinets/etc.) |
| | Machinery and associated platforms |
| | Mobile Equipment (Owned and Leased) |
| | New - Crates of Machinery/Equipment for "Future Plant Use" |
| | Hem Presses and related Equipment |
| WFG Flint Flowthrough Warehouse | All - Stored Shop Equipment |
| | Robots |
| | Powertrain - Machinery and Equipment, Dynamometers, CNC Machines, Conveyors |
| | Containerization - Assorted plastic containers |
| **WFG Non- Manufacturing** | |
| WFG Pontiac PCC- West | 329 Rigs and Mics support equipment, Hot exhaust burners with controllers, IT computer instrumentation support for rigs, Structural durability test rigs and related equipment |
| | Material Test Lab - All Equipment related to Material Testing |
| | All Equipment related to Calibration Instrumentation |
| | All Equipment involving Captured Test Fleet and Company Vehicle Operations |
| | All Road Load Simulator Equipment, Substation and related Miscellaneous Equipment |
| | All equipment involving air flow and  pressure monitoring Lab Testing |
| | Vehicle hoists, exhaust extractors and miscellaneous garage equipment |
| WFG Pontiac PCC - Central | Detroit Diesel 900KW Generator |
| **SPO** | |
| **Site** | **Personal Property** |
| SPO Columbus | All material handling equipment, audio/visual equipment, computer equipment,  hand held and truck mount terminals, bins, racks, decks & dividers,  pallet jacks, stretch wrappers, furniture and cafeteria, fitness equipment |
| | All parts inventory, packaging suppliers, and containers |

| | |
|---|---|
| SPO East Coast Bulk Center (SPO Martinsburg 2) | All material handling equipment, audio/visual equipment, computer equipment,  hand held and truck mount terminals, bins, racks, decks & dividers,  pallet jacks, stretch wrappers, furniture and cafeteria, fitness equipment |
| | All parts inventory, packaging suppliers, and containers |
| SPO South West Bulk Center | All material handling equipment, audio/visual equipment, computer equipment,  hand held and truck mount terminals, bins, racks, decks & dividers,  pallet jacks, stretch wrappers, furniture and cafeteria, fitness equipment |
| | All parts inventory, packaging suppliers, and containers |

## <u>Section 2.2(a)(xiii)</u>

### Other Matters

Claims against a Transferred Entity arising in connection with the past sales of goods relating to transfer price adjustments in favor of Parent.

**Section 2.2(b)(iv)**

**Excluded Entities**

1.    Alan Reuber Chevrolet, Inc.
2.    Albany Auto Group, LLC
3.    Alhambra Pontiac GMC Buick, Inc.
4.    Alternative Energy Services LLC
5.    Amherst Chevrolet, Inc.
6.    Anixter International, Inc.
7.    Auburn Chevrolet Oldsmobile Cadillac, Inc.
8.    Autocity Buick Pontiac GMC, Inc.
9.    Beacon Chevrolet Oldsmobile, Inc.
10.    Beil Acquisition Corporation
11.    Bennett Pontiac GMC, Inc.
12.    Bensonhurst Chevrolet, Inc.
13.    Buick-GMC of Milford, Inc.
14.    Cadillac of Lynbrook, Inc.
15.    Carnahan Chevrolet, Inc.
16.    Champion Buick Pontiac GMC, Inc.
17.    Chevrolet of Clarks Summit, Inc.
18.    Chevrolet-Oldsmobile-Cadillac of Chicopee, Inc.
19.    Cobb Parkway Chevrolet, Inc.
20.    Colchester Chevrolet, Inc.
21.    Commerce Buick Pontiac GMC, Inc.
22.    Commonwealth on the Lynnway, Inc.
23.    Dadeland Chevrolet, Inc.
24.    DCM Investments, Inc.[1]
25.    DDH Investments of South Texas, Inc.
26.    Decatur Buick Pontiac GMC, Inc.
27.    Douglaston Chevrolet, Inc.
28.    DP Compressors L.L.C.
29.    Elk Grove Buick Pontiac GMC, Inc.
30.    Elk Grove Saturn Auto, Inc.
31.    El-Mo Holding I Corporation
32.    El-Mo Holding II Corporation
33.    El-Mo Leasing II Corporation
34.    El-Mo Leasing III Corporation
35.    El-Mo-Mex, Inc.
36.    Environmental Corporate Remediation Company, Inc.
37.    Ernie Patti Pontiac GMC, Inc.
38.    Exeter Chevrolet Buick Pontiac, Inc.
39.    Fairway Automotive Group, Inc.
40.    Falls Pontiac GMC, Inc.
41.    Family Buick Pontiac GMC, Inc.
42.    Fernandez GMC Pontiac Buick, Inc.
43.    Florence Buick GMC, Inc.

44.    Frankfort Towers Industries, Inc.
45.    Freeborough Automotive, Inc.
46.    Freehold Chevrolet-Geo, Inc.
47.    Frontier Chevrolet, Inc.
48.    GEM Motors, Inc.
49.    GENERAL MOTORS CAPITAL TRUST "D"
50.    GENERAL MOTORS CAPITAL TRUST "G"
51.    General Motors Commercial Corporation
52.    General Motors Export Corporation
53.    General Motors Indonesia, Inc.
54.    General Motors International Operations, Inc.
55.    General Motors Nova Scotia Finance Company
56.    General Motors Receivables Corporation
57.    General Motors Trade Receivables LLC
58.    Gilroy Chevrolet Cadillac, Inc.
59.    GM Auto Receivables Co.
60.    GM DriverSite Incorporated
61.    GM National Car International, Ltd.
62.    GMETR Finance Company Receivables LLC
63.    GMETR Service Parts Receivables LLC
64.    GM Facilities Trust No. 1999-1
65.    GMLG Ltd.
66.    Hawaii Automotive Retailing Group, Inc.
67.    Hope Automotive, Inc.
68.    InQBate Corporation
69.    Integrity Saturn of Chattanooga, Inc.
70.    Jennings Motors, Inc.
71.    John H. Powell Jr. Chevrolet Oldsmobile, Inc.
72.    Joseph Motors, Inc.
73.    Kaufman Automotive Group, Inc.
74.    Kings Mountain Chevrolet, Inc.
75.    Leo Stec Saturn, Inc.
76.    Lexington Motors, Inc.
77.    Lou Sobh Cerritos Saturn, Inc.
78.    Lou Sobh Saturn of Elmhurst, Inc.
79.    Lou Sobh Saturn, Inc.
80.    Lowell Pontiac Buick GMC, Inc.
81.    Manual Transmissions of Muncie, LLC
82.    Martino Pontiac-GMC, Inc.
83.    MDIP-Norcal, Inc.
84.    Merry Oldsmobile, Inc.
85.    Metro Chevrolet, Inc.
86.    Metropolitan Auto Center, Inc.
87.    Miami Lakes Pontiac, Inc.
88.    Millington Chevrolet, Inc.
89.    Miracle Mile Chevrolet Buick, Inc.
90.    Motor Enterprises, Inc.

91.     Motors Trading Corporation
92.     Multiple Dealerships Holdings of Albany, Inc.
93.     New Castle Automotive, Inc.
94.     New Rochelle Chevrolet, Inc.
95.     New-Cen Commercial Corporation
96.     New United Motor Manufacturing, Inc.
97.     North Bay Auto Group, LLC
98.     North Bay Multi-Site, Inc.[1]
99.     North Orange County Saturn, Inc.
100.    Northpoint Pontiac-Buick-GMC Truck, Inc.
101.    Oakland Automotive Center, Inc.
102.    Pacific Dealership Group, Inc.
103.    Park Plaines Chevrolet-Geo, Inc.
104.    Peninsula Pontiac GMC Buick, Inc.
105.    Pontiac Buick GMC of Abilene, Inc.
106.    Pontiac GMC of Latham, Inc.
107.    Port Arthur Chevrolet, Inc.
108.    Premier Investment Group, Inc.
109.    Prestige Saturn of Jacksonville, Inc.
110.    Puente Hills Pontiac GMC Buick, Inc.
111.    Rancho Mirada Chevrolet, Inc.
112.    Remediation and Liability Management Company, Inc.
113.    Riverfront Development Corporation
114.    SAAB Cars Holdings Overseas Corp.
115.    San Francisco Multiple Dealer Holdings, Inc.
116.    Saturn of Central Florida Market Area, Inc.
117.    Saturn of Charlotte Market Area, Inc.
118.    Saturn of New York City, Inc.
119.    Saturn of Ontario, Inc.
120.    Saturn of Raleigh Market Area, Inc.
121.    Saturn of Wilkes Barre, Inc.
122.    Saturn Retail of South Carolina, LLC
123.    Sherwood Pontiac Buick GMC, Inc.
124.    Simpsonville Chevrolet, Inc.
125.    South Bay Multi-Site, Inc.[1]
126.    Subrose Ancillary Pvt. Ltd.[1]
127.    Sutter Hill Investments Mauritius Ltd.[1]
128.    SW Houston Motors Inc.
129.    Tampa Bay Buick, Inc.
130.    Tiens Biotech Group (USA), Inc.
131.    Torrance Buick GMC, Inc.
132.    Tracy Pontiac GMC Cadillac, Inc.

---

[1] Parent has no proof of ownership of this entity.  It is possible that Parent no longer holds interest in this entity.

133. Trenton Chevrolet, Inc.
134. TX Holdco, LLC
135. Valley Stream Automotive, Inc.
136. Valley Stream Motors, Inc.
137. Vanguard Car Rental USA Inc.
138. Vector SCM, LLC
139. W. Babylon Chevrolet-Geo, Inc.
140. Walsh Chevrolet, Inc.
141. Washington Chevrolet, Inc.
142. Westminster Pontiac GMC Buick, Inc.

## Section 2.2(b)(v)

### Excluded Real Property

Manufacturing Properties

Exhibit F to the Agreement is incorporated by reference herein and hereby made a part of this Section 2.2(b)(v) of this Sellers' Disclosure Schedule.

Non-Manufacturing Properties

|  | **Site Name** | **Property Address** | **City** | **State** | **Zip** |
|---|---|---|---|---|---|
| 1. | Danville Central Foundry | I-74 @ G Street | Danville | IL | 61832 |
| 2. | Venture 2000 Industrial Park | 2915 Pendleton Avenue | Anderson | IN | 46016-2459 |
| 3. | 639 Riley Boulevard | 639 Riley Boulevard | Bedford | IN | 47421 |
| 4. | 332 Breezy Hill Lane | 332 Breezy Hill Lane | Bedford | IN | 47421 |
| 5. | 609 Rawlins Mill Road | 609 Rawlins Mill Road | Bedford | IN | 47421 |
| 6. | 1609 Mount Pleasant Road | 1609 Rawlins Mill Road | Bedford | IN | 47421 |
| 7. | 145 Broomsage Road | 145 Broomsage Road | Bedford | IN | 47421 |
| 8. | 112 Bailey Scales Road | 112 Bailey Scales Road | Bedford | IN | 47421 |
| 9. | 641 Riley Boulevard | 641 Riley Boulevard | Bedford | IN | 47421 |
| 10. | 1081 Breckenridge Road | 1081 Breckenridge Road | Bedford | IN | 47421 |
| 11. | Vacant Lot (Inman Court) | Vacant Lot (Inman Court) | Bedford | IN | 47421 |
| 12. | 1119 Breckenridge Road | 1119 Breckenridge Road | Bedford | IN | 47421 |
| 13. | Vacant Lot North of GM Plant - Breckenridge Road | Breckenridge Road | Bedford | IN | 47421 |
| 14. | 402 Bailey Scales Road | 402 Bailey Scales Road | Bedford | IN | 47421 |
| 15. | "M" Street Church - 132 "M" Street | 132 "M" Street | Bedford | IN | 47421 |
| 16. | "M" Street Parsonage - 134 "M" Street | 134 "M" Street | Bedford | IN | 47421 |
| 17. | Five Acres (Danny Wall's) - Vacant Lot Bailey Scales Road | Five Acres (Danny Wall's) - Vacant Lot Bailey Scales Road | Bedford | IN | 47421 |
| 18. | 624 Riley Boulevard A | 624 Riley Boulevard A | Bedford | IN | 47421 |
| 19. | 624 Riley Boulevard B | 624 Riley Boulevard B | Bedford | IN | 47421 |
| 20. | 626 Riley Boulevard A | 626 Riley Boulevard A |  |  |  |
| 21. | 626 Riley Boulevard B | 626 Riley Boulevard B | Bedford | IN | 47421 |
| 22. | 628 Riley Boulevard A | 628 Riley Boulevard A |  |  |  |
| 23. | 628 Riley Boulevard B | 628 Riley Boulevard B | Bedford | IN | 47421 |
| 24. | 630 Riley Boulevard A | 630 Riley Boulevard A |  |  |  |
| 25. | 630 Riley Boulevard B | 630 Riley Boulevard B | Bedford | IN | 47421 |
| 26. | 632 Riley Boulevard A | 632 Riley Boulevard A |  |  |  |
| 27. | 632 Riley Boulevard B | 632 Riley Boulevard B | Bedford | IN | 47421 |
| 28. | 634 Riley Boulevard A | 634 Riley Boulevard A |  |  |  |

| 29. | 634 Riley Boulevard B | 634 Riley Boulevard B | Bedford | IN | 47421 |
| 30. | 224 Madison Street | 224 Madison Street | Bedford | IN | 47421 |
| 31. | 636 Riley Boulevard A | 636 Riley Boulevard A | | | |
| 32. | 636 Riley Boulevard B | 636 Riley Boulevard B | Bedford | IN | 47421 |
| 33. | 637 Riley Boulevard A | 637 Riley Boulevard A | | | |
| 34. | 637 Riley Boulevard B | 637 Riley Boulevard B | Bedford | IN | 47421 |
| 35. | 638 Riley Boulevard A | 638 Riley Boulevard A | | | |
| 36. | 638 Riley Boulevard B | 638 Riley Boulevard B | Bedford | IN | 47421 |
| 37. | 640 Riley Boulevard A | 640 Riley Boulevard A | | | |
| 38. | 640 Riley Boulevard B | 640 Riley Boulevard B | Bedford | IN | 47421 |
| 39. | 641 Riley Boulevard A | 641 Riley Boulevard A | | | |
| 40. | 641 Riley Boulevard B | 641 Riley Boulevard B | Bedford | IN | 47421 |
| 41. | 643 Riley Boulevard A | 643 Riley Boulevard A | | | |
| 42. | 643 Riley Boulevard B | 643 Riley Boulevard B | Bedford | IN | 47421 |
| 43. | 645 Riley Boulevard A | 645 Riley Boulevard A | | | |
| 44. | 645 Riley Boulevard B | 645 Riley Boulevard B | Bedford | IN | 47421 |
| 45. | 330 Robins Way | 330 Robins Way | Bedford | IN | 47421 |
| 46. | 126 Bailey Scales Road | 126 Bailey Scales Road | Bedford | IN | 47421 |
| 47. | 115 Bailey Scales Road | 115 Bailey Scales Road | Bedford | IN | 47421 |
| 48. | 1589 Peerless Road | 1589 Peerless Road | Bedford | IN | 47421 |
| 49. | 1585 Peerless Road | 1585 Peerless Road | Bedford | IN | 47421 |
| 50. | 659 Riley Boulevard | 659 Riley Boulevard | Bedford | IN | 47421 |
| 51. | 105 Valley Lane | 105 Valley Lane | Bedford | IN | 47421 |
| 52. | 572 Broomsage Road | 572 Broomsage Road | Bedford | IN | 47421 |
| 53. | 222 Madison Street | 222 Madison Street | Bedford | IN | 47421 |
| 54. | 228 Madison Street | 222 Madison Street | Bedford | IN | 47421 |
| 55. | 640 North Jackson | 640 North Jackson | Bedford | IN | 47421 |
| 56. | 17 N. Washington | 17 N. Washington | Kokomo | IN | 46901 |
| 57. | Fairfax Land[2] | 100 Kindleberger Road | Fairfax | KS | 66115 |
| 58. | Framingham Landfill | 350 Worcester Road | Framingham | MA | 01702 |
| 59. | Hemphill lot (7+/- acres) | SEC Hemphill & Saginaw | Burton | MI | 48507 |
| 60. | Davison Road land | N/A | Burton | MI | N/A |
| 61. | Clark Street Redevelopment | Former Cadillac Site | Detroit | MI | 48210 |
| 62. | 6241 Cass Avenue | Lot 8 - Cass & Amsterdam Aves. | Detroit | MI | 48202 |
| 63. | Buick City | 902 East Hamilton Avenue | Flint | MI | 48550 |
| 64. | Dort Highway Land[3] | 10800 S. Saginaw Road | Flint | MI | 48507 |
| 65. | Windiate Park Lots | N/A | Flint | MI | N/A |

---

[2] Does not include the GMVM Fairfax Assembly and Stamping - Fairfax improvements and underlying real estate, which is part of the Transferred Real Property.

[3] Does not include the Weld Tool Center - Grand Blanc improvements and underlying real estate, which is part of the Transferred Real Property.

| 66. | GLTC land (11+/- acres) | NWC of Atherton & Saginaw | Flint | MI | 48503 |
| 67. | Flint West - Flint River (Bluff Street) | Chevrolet @ Glenwood | Flint | MI | 48504 |
| 68. | Plant 2, 3 & 6 | 2800 -2801 West Saginaw Street | Lansing Township/ Lansing | MI | 48921-0303 |
| 69. | Former Plant 5 | 2901 South Canal Road | Lansing | MI | 48921 |
| 70. | Former Delco Chassis Plant | 13000 Eckles Road | Livonia | MI | 48151 |
| 71. | 1831 Grondinwood Court | 1831 Grondinwood Court | Milford | MI | 48380 |
| 72. | 1495 Oak Hollow Drive | 1495 Oak Hollow Drive | Milford | MI | 48380 |
| 73. | Pontiac Centerpoint Campus - Central | 2000 Centerpoint Parkway | Pontiac | MI | 48341-3147 |
| 74. | PCC-Validation | 200 South Boulevard West | Pontiac | MI | 48341 |
| 75. | Pontiac Centerpoint Campus - East | 1999 Center Point Parkway East | Pontiac | MI | 48341 |
| 76. | Pontiac Centerpoint Campus - West | 660 South Boulevard East | Pontiac | MI | 48341 |
| 77. | Centerpoint Land (no Etkin ground lease) | Centerpoint Blvd S. of South Blvd | Pontiac | MI | 48341 |
| 78. | ACG - Penske site | 675 Oakland/Cesar E. Chavez Avenue | Pontiac | MI | 48340 |
| 79. | Centerpoint Land (Etkin ground lease) | Centerpoint Blvd S. of South Blvd | Pontiac | MI | 48341 |
| 80. | 652 Meadow Drive | 652 Meadow Drive | Pontiac | MI | 48341-3502 |
| 81. | 642 Meadow Drive | 642 Meadow Drive | Pontiac | MI | 48341-3502 |
| 82. | 631 Meadow Drive | 631 Meadow Drive | Pontiac | MI | 48341-3503 |
| 83. | 607 Meadow Drive | 607 Meadow Drive | Pontiac | MI | 48341-3503 |
| 84. | Employee Development Center | 65 University Drive | Pontiac | MI | 48342 |
| 85. | Powertrain - Romulus Engineering Center[4] | 37350 Ecorse Road | Romulus | MI | 48174-1376 |
| 86. | Saginaw Malleable Iron | 77 West Center Street | Saginaw | MI | 48605 |
| 87. | Saginaw Nodular Iron (PIMS297)[5] | 2100 Veterans Memorial Pkwy | Saginaw | MI | 48605 |

---

[4] Does not include the GMPT - Romulus plant improvements and underlying real estate, which is part of the Transferred Real Property.

[5] Does not include the GMPT - Saginaw Metal Casting improvements and underlying real estate, which is part of the Transferred Real Property.

| 88. | Former Howard W/H - vacant land | 700 Garey Street | Saginaw | MI | 48601 |
| 89. | Vacant Land (76 acres) | Northeast corner of Denton and Ecorse | Van Buren Township | MI | N/A |
| 90. | Former Leed's Assembly Plant | Land south of 6817 Stadium Drive | Kansas City | MO | 64129 |
| 91. | Hyatt Hills Golf Complex | 1300 Raritan Road | Clark | NJ | 7066 |
| 92. | GM Plant | 1445 Parkway Avenue | Ewing | NJ | 08628-3012 |
| 93. | One General Motors Circle | One General Motors Circle | Syracuse | NY | 13206 |
| 94. | Lordstown Excess Land[6] | 1829 Hallock Young Road | Lordstown | OH | 44481 |
| 95. | Moraine Lagoon | 3100 Dryden Road | Moraine/ Dayton | OH | 45439 |
| 96. | Janesville Training Center | Unknown | Janesville | WI | Unknown |

Warehouses

| | Site Name | Property Address | City | State | Zip |
|---|---|---|---|---|---|
| 1. | Flint Flowthrough Warehouse | 4002 James Cole Blvd. | Flint | MI | 48503 |
| 2. | Pontiac Fiero site (excluding Powerhouse) | 900 Baldwin Avenue | Pontiac | MI | 48340 |
| 3. | Pontiac Fiero site (Powerhouse) | 900 Baldwin Avenue | Pontiac | MI | 48340 |

---

[6] Does not include the GMVM - Lordstown Assembly and Stamping - Lordstown improvements and underlying real property, which is part of the Transferred Real Property.

## Section 2.2(b)(vi)

**Certain Excluded Personal Property Located at Transferred Real Property**

None.

## **Section 2.2(b)(vii)**

### **Certain Excluded Non-Executory Contracts**

Section 2.2(b)(xiii) of this Sellers' Disclosure Schedule is incorporated by reference herein and made a part of this Section 2.2(b)(vii) of this Sellers' Disclosure Schedule.

## Section 2.2(b)(xi)

### Certain Bankruptcy Avoidance Actions

Any and all Claims arising from, relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary.

## Section 2.2(b)(xiii)

### Excluded Insurance Policies

1.    Directors and Officers Insurance Policy No.: 480-99-87 with American Insurance Group and various other insurers.
2.    Aircraft Hull & Liability Primary No.: 280949/08A280949/08S1300044592/CVS101553/A1PR000169608AM/AB0802941 with AAU.
3.    Environmental Insurance Policies Nos.: Pollution 0907325; Closure/ Post Closure 0907328; Corrective Action 0907329; and Closure 0907330 related to Excluded Assets.
4.    Crime (Money and Securities) Insurance Policy No.: QA009604 for the period March 1, 2004 through March 1, 2005.

## **Section 2.2(b)(xvi)**

### **Other Excluded Assets**

1.    JPMorgan Chase NY (ABA 02100021) Master Funding Account No. 838723369
2.    JPMorgan Chase NY (ABA 02100021) Collections Account No. 838723377
3.    JPMorgan Chase Syracuse (ABA 021309379) Controlled Disbursement Account No. 838723385

## Section 2.3(a)(xv)

### Other Assumed Liabilities

1.  Personal Liability of any of Sellers' directors, officers or employees with respect to Taxes that arise from Sellers' failure to satisfy such Taxes as a result of the Bankruptcy Cases.
2.  Promissory Note dated January 1, 2000, issued by Parent to Maryland Economic Development Corporation.
3.  Customer Warranty Program contemplated in connection with Amendment No. 4, dated May 27, 2009, to the Loan and Security Agreement dated as of December 31, 2008, between Parent, as borrower, and Sponsor, as the lender.
4.  Supplier Program contemplated in connection with that certain Credit Agreement, dated as of April 3, 2009, between GM Supplier Receivables LLC, as borrower, and Sponsor, as the lender.

### Section 2.3(b)(i)

### Certain Retained Indebtedness

1.  Amended and Restated Credit Agreement, dated as of July 20, 2006, among Parent, GMCL, S LLC, Citicorp USA, Inc., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as syndication agent, and the banks and other financial institutions from time to time a party thereto (the "Revolving Credit Agreement").

2.  Any derivative Contracts under which the non-Seller counterparty is a secured party pursuant to the Revolving Credit Agreement.

3.  UST Credit Facilities.

4.  Term Loan Agreement, dated as of November 29, 2006, among Parent, S LLC, the lenders a party thereto and the co-documentation and administrative agents a party thereto.

5.  Loan and Security Agreement, dated as of October 2, 2006, between Parent and Gelco Corporation d/b/a GE Fleet Services as lender, as amended.

6.  Bond Purchase and Paying Agency Agreement, dated as of May 28, 1986, between Parent and Credit Suisse.

7.  Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among Parent, Deutsche Bank AG London, as fiscal agent, and Banque Generale de Luxembourg S.A., together with the fiscal agent as paying agents.

8.  Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between General Motors Nova Scotia Finance Company, as issuer, Parent, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Bank Général du Luxembourg S.A. as paying agent.

9.  Guarantee Agreement between Parent and the holders of the note under the Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between General Motors Nova Scotia Finance Company, as issuer, Parent, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Bank Général du Luxembourg S.A. as paying agent.

10.  Senior Indenture, dated as of November 15, 1990, between Parent and Citibank, N.A., as trustee, and all securities issued thereunder.

11.  Senior Indenture, dated as of December 7, 1995, between Parent and Citibank, N.A., as trustee, and all securities issued thereunder.

12.  Senior Indenture, dated January 8, 2008, and First Supplemental Indenture, dated February 22, 2008, between Parent and Bank of New York, as trustee, and all securities issued thereunder.

13.  NYCIDA IDB Harlem Auto Mall Industrial Development Revenue Bonds issued June 26, 2004, between Parent, as guarantor, New York City Industrial Agency, as issuer, and Argonaut Holdings, Inc., as agent.

14.  Ohio Water Development Authority Solid Waste Revenue Bonds issued December 24, 2002, between Parent and Ohio Water Development Authority, as issuer.

15.  City of Fort Wayne Pollution Control Revenue Bonds issued December 24, 2002; State of Ohio Pollution Control Revenue Bonds – Refunding issued April 4, 2002, between Parent and the City of Fort Wayne, Indiana, as issuer.

16.  Michigan Strategic Fund Pollution Control Revenue Bonds – Refunding issued July 1, 1995, between Parent and Michigan Strategic Fund, as issuer.

17. City of Moraine, Ohio Solid Waste Disposal Revenue Bonds issued July 1, 1999, between Parent and City of Moraine, Ohio, as issuer.

18. City of Moraine, Ohio Solid Waste Disposal Revenue Bonds issued July 1, 1994, between Parent and City of Moraine, Ohio, as issuer.

19. City of Indianapolis, Indiana Pollution Control Revenue Bonds issued April 27, 1984, between Parent and City of Indianapolis, Indiana.

20. TPC North - 2004 Lease refinancing dated May 28, 1999 between Parent and Wilmington Trust Company (White Marsh, Maryland and SPO-Memphis).

21. Loan Agreement between S Corporation and Industrial Development Board of Maury County, Tennessee, dated as of June 1, 1987.

22. Loan Agreement between S Corporation and Industrial Development Board of Maury County, Tennessee, dated as of September 1, 1987.

23. Loan Agreement between Parent and City of Indianapolis, Indiana, dated as of April 1, 1984.

24. Loan Agreement between Parent and City of Moraine, Ohio, dated as of July 1, 1999.

25. Loan Agreement between Parent and City of Moraine, Ohio, dated as of July 1, 1994.

26. Loan Agreement between Parent and Ohio Water Development Authority, dated as of March 1, 2002.

27. Loan Agreement between Parent and City of Fort Wayne, Indiana, dated as of December 1, 2002.

28. Loan Agreement between Parent and Ohio Water Development Authority, dated as of December 1, 2002.

29. Loan Agreement between Parent and Michigan Strategic Fund, dated as of July 1, 1995.

## <u>Section 4.1</u>

### Organization and Good Standing

None.

## Section 4.2

**Authorization; Enforceability**

None.

<u>Section 4.4</u>

**Subsidiaries**

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| **Foreign Subsidiaries** | | |
| Chevrolet Sociedad Anonima de Ahorro para Fines Determinados | Argentina | |
| General Motors Argentina S.r.l. | Argentina | Suzuki Motor Corporation (0.4%) |
| Sarmiento 1113 S.A. en Liquidacion | Argentina | |
| General Motors Australia Ltd. | Australia | |
| General Motors Investments Pty. Ltd. | Australia | |
| GM Holden Ltd. | Australia | |
| General Motors Holden Sales Pty. Limited | Australia | |
| Holden Employees Superannuation Fund Pty. Ltd. | Australia | |
| Rhodes Automotive Manufacturing Pty Ltd | Australia | |
| Automobile Swoboda Alpenstrasse GmbH | Austria | Swoboda Autohandel GmbH (5.0%) |
| Chevrolet Austria GmbH | Austria | |
| General Motors Austria GmbH | Austria | |
| General Motors Powertrain-Austria GmbH | Austria | |
| General Motors Foreign Sales Corporation | Barbados | |
| Chevrolet Belgium NV | Belgium | |
| General Motors Belgium N.V. | Belgium | Barbara A. Lister-Tait (0.01%) |
| General Motors Coordination Center BVBA | Belgium | |
| General Motors Investment Services Company N.V. | Belgium | |
| GM Automotive Services Belgium NV | Belgium | Barbara A. Lister-Tait (0.1%) |
| General International Insurance Services Limited | Bermuda | |
| General International Limited | Bermuda | |
| Funcap-Comercio e Administracao de Bens Moveis e Valores Ltda. | Brazil | |
| General Motors do Brasil Ltda. | Brazil | Jaime Ardilla (0.00000039%) Jose Carlos Da Silveira Pinheiro Neto (0.00000039%) |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| | | Sandra Mariani (0.00000039%) |
| GM Factoring Sociedade de Fomento Comercial Ltda. | Brazil | Sandra Mariani (0.1%) |
| 2035208 Ontario Inc. | Canada | |
| 2140879 Ontario Inc. | Canada | |
| 3072352 Nova Scotia Company | Canada | |
| 3183795 Nova Scotia ULC | Canada | |
| 3535673 Canada Inc. | Canada | |
| 4259891 Canada Ltd dba HMP on the Mountains | Canada | |
| 4501101 Canada, Inc. | Canada | |
| 6153933 Canada Ltd. | Canada | Other (41.8%) |
| Bill Osborne Chevrolet Ltd. | Canada | Other (35%) |
| CAMI | Canada | Suzuki Motor Corporation (49%) |
| Carrefour 440 Chevrolet Pontiac Buick GMC | Canada | Other (35.7%) |
| Fudiciere Carrefour 440 | Canada | |
| Fugère Pontiac Buick Inc. | Canada | Other (36.5%) |
| General Motors Nova Scotia Investments Ltd. | Canada | |
| General Motors of Canada Limited | Canada | |
| GM GEFS HOLDINGS (CHC4) ULC | Canada | Other (33.33%) |
| GM GEFS HOLDINGS CANADA ULC | Canada | |
| GMCH&SP Private Equity II L.P. | Canada | |
| GMCH&SP Private Equity L.P. | Canada | |
| Scott Drummond Motors Ltd. | Canada | Other (27.5%) |
| 1908 Holdings Ltd. | Cayman Islands | |
| Auto Lease Finance Corporation | Cayman Islands | |
| GMAC Auto Lease Purchase Corporation | Cayman Islands | |
| GM International Sales Ltd. | Cayman Islands | |
| Parkwood Holdings Ltd. | Cayman Islands | |
| General Motors Chile Industria Automotriz Limitada | Chile | |
| GM Inversiones Santiago Limitada | Chile | |
| Delphi Saginaw Lingyun Drive Shaft Co. Ltd | China | Lingyun Industrial Corporation Limited (40%) |
| General Motors (China) Investment Company Limited | China | |
| General Motors Warehousing and Trading (Shanghai) Co. Ltd. | China | |
| Saginaw Lingyun Drive Shaft | China | Hebei Lingyun Industrial group |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| (Wuhu) Co. Ltd | | Co., Ltd. (40%) |
| Saginaw Steering (Suzhou) Co. Ltd. | China | Singapore Holding Company (100%) |
| General Motors - Colmotores S.A. | Colombia | Shareholders, Local (8.55%) Unknown Owner (7.11%) Suzuki Motor Corporation (2.71%) Itochu Corp. (1.53%) |
| General Motors del Ecuador S.A. | Ecuador | |
| HOLDCORP S.A. | Ecuador | |
| Omnibus BB Transportes, S.A. | Ecuador | Holding Dine S.A. (34.09%) Empronorte Overseas (7.45%) Itochu Latin America (5%) Shatzi L.L.C. (0.75%) Chipper Investments L.L.C. (0.75%) Minida L.L.C. (0.75%) |
| Chevrolet Finland Oy | Finland | |
| General Motors Finland Oy | Finland | |
| Chevrolet France | France | Daewoo Electronics Company (0.02%) |
| Espace 328 SARL | France | Stoffel, Claude (40%) |
| General Motors France | France | |
| Hérouville Motors SARL | France | Devere, Gilbert (15%) Hochet, Olivier (15%) Lefranc, Gerard (15%) |
| Steering France SAS | France | |
| Adam Opel GmbH | Germany | |
| ATK Automotive Technology Kaiserslautern GmbH | Germany | |
| Autohaus SAAB GmbH | Germany | |
| Carus Grundstücks-Vermietungsgesellschaft mbH & Co. Objekt Kuno 65 KG | Germany | Carus Grudstucks-Vermietungsgesellschaft (6%) |
| Carus Grundstücks-Vermietungsgesellschaft mbH & Co. Objekt Leo 40 KG | Germany | Carus Grundstücks-Vermietungsgesellschaft mbH & Co. Objekt Juno 65 KG (6%) |
| Chevrolet Deutschland GmbH | Germany | |
| General Motors Powertrain - Germany GmbH | Germany | |
| General Motors Powertrain - Kaiserslautern Germany GmbH | Germany | |
| GM Auslandsprojekte GmbH | Germany | |
| GM Europe GmbH | Germany | |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| Opel Eisenach GmbH | Germany | |
| Opel Live GmbH | Germany | |
| Opel Special Vehicles GmbH | Germany | |
| Opel Wohnbau GmbH | Germany | City of Ruesselsheim (1%) |
| Rhodes Germany GmbH | Germany | |
| SAAB Deutschland GmbH | Germany | |
| General Motors Hellas S.A. | Greece | |
| General Motors (Hong Kong) Company Limited | Hong Kong | |
| Chevrolet Southeast Europe Ltd. | Hungary | |
| General Motors Powertrain - Hungary Ltd. | Hungary | |
| General Motors Powertrain Ltd. | Hungary | |
| General Motors Southeast Europe Ltd. | Hungary | |
| Chevrolet Sales India Private Ltd. | India | |
| General Motors India Private Limited | India | |
| General Motors Technical Center India Private Limited | India | |
| Rhodes India Automotive Private Ltd | India | |
| P.T. G M AutoWorld Indonesia | Indonesia | Arif Pramadana  (0.0004%) |
| P.T. General Motors Indonesia | Indonesia | |
| General Motors Ireland | Ireland | |
| General Motors Israel Ltd. | Israel | |
| GM-UMI Technology Research and Development Ltd. | Israel | Universal Motors Israel Ltd. (49%) |
| Aftermarket Italia S.r.l. | Italy | |
| Caterpillar Logistics SCS | Italy | |
| Chevrolet Italia S.p.A. | Italy | |
| General Motors Italia S.r.l. | Italy | |
| General Motors Powertrain - Europe S.r.l. | Italy | |
| Rhodes Italy Srl | Italy | |
| VM Motori S.p.A. | Italy | |
| General Motors Asia Pacific (Japan) Limited | Japan | |
| GM AutoWorld Yugen Kaisha | Japan | |
| GMI Diesel Engineering Limited K.K. | Japan | Isuzu Motors Limited (40%) |
| Rhodes Japan LLC | Japan | |
| General Motors East Africa Limited | Kenya | ICDC (20%) ICDCIC (17.8%) Itochu Corp. (4.5%) |
| Automotive Steering Korea Limited | Korea | |
| GM Auto World Korea Co. | Korea | |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| GM Daewoo Auto & Technology Company | Korea | Korea Development Bank (27.97%) Shanghai Automotive Industry Corporation (Group) (9.89%) Suzuki Motor Corporation (11.24%) |
| GM Korea Co., Ltd. | Korea | |
| Rhodes Holding I Sarl | Luxembourg | |
| Rhodes Holding II Sarl | Luxembourg | |
| Hicom-Chevrolet, Sdn Bhd | Malaysia | DRB-Hicom Berhad (49%) |
| Cadillac Polanco, S.A. de C.V. | Mexico | |
| Controladora ACDelco S.A. de C.V. | Mexico | |
| Controladora General Motors, S.A. de C.V. | Mexico | |
| General Motors de Mexico, S. de R.L. de C.V. | Mexico | |
| GMAC Holding S.A. de C.V. | Mexico | |
| Sistemas para Automotores de Mexico, S. de R.L. de C.V. | Mexico | |
| Chevrolet Euro Parts Center B.V. | Netherlands | |
| Chevrolet Nederland B.V. | Netherlands | |
| EMWE B.V. | Netherlands | Holdingmaatschappij TH. O. Weijerman B.V. (25%) |
| General Motors Nederland B.V. | Netherlands | |
| GM Powertrain Holding B.V. | Netherlands | |
| ISPOL Holding B.V. | Netherlands | Isuzu Motors Limitied (40%) |
| Rhodes Holding Netherlands BV | Netherlands | |
| General Motors New Zealand Pensions Limited | New Zealand | |
| Holden New Zealand Limited | New Zealand | |
| General Motors Norge AS | Norway | |
| General Motors Peru S.A. | Peru | |
| General Motors Automobiles Philippines, Inc. | Philippines | Francis M. Burdett (0.00018%) Stephen K. Carlisle (0.00018%) Loreto C. Cruz (0.00018%) Teodoro D. Regala (0.00018%) Stephen Nicholas Small |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| | | (0.00018%) |
| Chevrolet Poland Sp. z.o.o. | Poland | |
| General Motors Manufacturing Poland Sp. z.o.o | Poland | |
| General Motors Poland Spolka, z.o.o. | Poland | |
| Isuzu Motors Polska Sp. z.o.o | Poland | |
| Chevrolet Portugal, Lda. | Portugal | |
| General Motors Portugal Lda. | Portugal | |
| GM Global Purchasing and Supply Chain Romania Srl | Romania | |
| General Motors Auto LLC | Russia | |
| General Motors CIS, LLC | Russia | |
| General Motors Daewoo Auto Technology CIS, LLC | Russia | |
| General Motors Asia Pacific (Pte) Ltd. | Singapore | |
| Steering Holding Pte. Ltd | Singapore | |
| BOCO (Proprietary) Limited | South Africa | |
| General Motors South Africa (Pty) Limited | South Africa | |
| GM Plats (Proprietary) Limited | South Africa | |
| Chevrolet Espana, S.A. | Spain | |
| General Motors Automotive Holdings, S.L. | Spain | |
| General Motors Espana, S.L. | Spain | |
| General Motors Europe Holdings, S.L. | Spain | |
| Chevrolet Sverige AB | Sweden | |
| General Motors Nordiska AB | Sweden | |
| General Motors Powertrain-Sweden AB | Sweden | |
| GM Europe Treasury Company AB | Sweden | |
| GM Worldwide Purchasing Sweden AB | Sweden | |
| SAAB Automobile AB | Sweden | |
| SAAB Automobile Investering AB | Sweden | |
| Chevrolet Europe GmbH | Switzerland | |
| Chevrolet Suisse S.A. | Switzerland | |
| General Motors Europe AG | Switzerland | Michael J. Burns (0.01%)<br>Armin Grond (0.01%)<br>Alexander A. Meile (0.01%) |
| General Motors Suisse S.A. | Switzerland | Jacques Hansel (0.052%)<br>Dieter Salzmann (0.052%)<br>Armin Stoll (0.052%) |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| | | Hans Rudolf Zeller (0.052%) |
| GM-SAAB Communication GmbH | Switzerland | Scancars AG (45%) |
| General Motors Taiwan Ltd. | Taiwan, Province of China | Kung-Chou Chu (0.00000012%) Arne Engel (0.00000012%) Terence B. Johnsson (0.00000012%) Bright Lin (0.00000012%) Jerry Lin (0.00000012%) Barbara A. Lister-Tait (0.00000012%) |
| Tai Jin International Automotive Distribution Co. Ltd. | Taiwan, Province of China | |
| General Motors (Thailand) Limited | Thailand | Stephen K. Carlisle (0.0000013%) Kenneth Joseph Cavanaugh (0.0000013%) Raymundo Garza (0.0000013%) Somnuek Ngamtrakulchol (0.0000013%) Stephen Nicholas Small (0.0000013%) Antonio Pantaleon Zara, III (0.0000013%) |
| Chevrolet Sales (Thailand) Limited | Thailand | |
| General Motors Powertrain (Thailand) Limited | Thailand | Stephen K. Carlisle (0.0000062%) Kenneth Joseph Cavanaugh (0.0000062%) Raymundo Garza (0.0000062%) Gerry L. Hargrove (0.0000062%) Stephen Nicholas Small (0.0000062%) Antonio Pantaleon Aguila Zara (0.0000062%) |
| General Motors Southeast Operations Limited | Thailand | |
| Chevrolet Tükiye Otomotive Limited Sirketi | Turkey | |
| General Motors Türkiye Limited Sirketi | Turkey | |
| Rhodes Otomotive Sanayi ve Ticaret Limited Sirketi | Turkey | |
| General Motors Africa and Middle East FZE | United Arab Emirates | |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| 06 Ormskirk Limited | United Kingdom | John Dickson (17.97%) and Paul Byron (14.7%) |
| Aftermarket UK Limited | United Kingdom | |
| Approach (UK) Limited | United Kingdom | Louis Alan Preston (6.39%) |
| Baker (Crewe) Limited | United Kingdom | Baker Holdings Limited (34.74%) |
| Baylis (Gloucester) Limited | United Kingdom | Michael Baylis (6.49%) |
| Berse Road (No. 1) Limited | United Kingdom | |
| Berse Road (No. 2) Limited | United Kingdom | |
| Chevrolet UK Limited Ltd. | United Kingdom | |
| General Motors Limited | United Kingdom | |
| General Motors UK Limited | United Kingdom | |
| Global Tooling Service Company Europe Limited | United Kingdom | |
| GM (UK) Pension Trustees Limited | United Kingdom | |
| GM (UK) Unclassified Pension Trustees Limited | United Kingdom | |
| GM Automotive UK | United Kingdom | |
| GM Daewoo UK Limited | United Kingdom | |
| GM Purchasing Vauxhall UK Limited | United Kingdom | |
| GM Retirees Pension Trustees Limited | United Kingdom | |
| GPSC UK Limited | United Kingdom | |
| H.S.H. Limited | United Kingdom | Baylis (Gloucester) Limited (100%) |
| Haines & Storage | United Kingdom | Baylis (Gloucester) Limited (100%) |
| IBC Pension Trustees Limited | United Kingdom | |
| IBC Vehicles (Distribution) Limited | United Kingdom | Gregory Constantine Nicolaides (0.001%) |
| IBC Vehicles Limited | United Kingdom | |
| Jeffery (Wandsworth) Limited | United Kingdom | Phillip Jeffery (19.7%) |
| Lange (West End) Limited | United Kingdom | Paul Lange (49.06%) |
| Millbrook Pension Management Limited | United Kingdom | |
| Millbrook Proving Ground Limited | United Kingdom | |
| Motors Directors Limited | United Kingdom | |
| Motors Investments (Caernarfon) Limited | United Kingdom | |
| Motors Properties Limited | United Kingdom | |
| Motors Secretaries Limited | United Kingdom | |
| Pearl (Crawley) Limited | United Kingdom | Edward Shepherd (8.88%) Peter Stevens (8.88%) |
| Promark Global Advisors Limited | United Kingdom | |
| Promark Investment Trustees Limited | United Kingdom | |
| Rumble (Bedworth) Limited | United Kingdom | Martin Rumble (17.12%) |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| SAAB City Limited | United Kingdom | |
| SAAB GB Pension Plan Trustees Company Limited | United Kingdom | |
| SAAB Great Britain Limited | United Kingdom | |
| SB (Helston) Limited | United Kingdom | Ian Buse and Saunders (20.63% each) |
| Sherwoods (Darlington) Limited | United Kingdom | Alastair MacConachie (22.12%) |
| Skurrays Limited | United Kingdom | Nicholas Stephen Plevey (21.06%) Nigel Patrick Harvey (5.26%) |
| Southern (Merthyr) Limited | United Kingdom | Ann Morgan (36.16%) |
| Vauxhall Motors Limited | United Kingdom | |
| Vauxhall Powertrain Limited | United Kingdom | |
| VHC Sub-Holdings (UK) | United Kingdom | |
| Vickers (Lakeside) Limited | United Kingdom | Bruce Norris Vickers (25%) |
| Vision Motors Limited | United Kingdom | Tim Pickering (25%) |
| Whitmore's of Edenbridge Limited | United Kingdom | Jeremy Whitmore (15%) |
| Wilson & co. (Motor Sales) Limited | United Kingdom | Robin Wilson (43.71%) |
| General Motors Uruguay, S.A. | Uruguay | |
| General Motors Powertrain - Uzbekistan CJSC | Uzbekistan | JSC Uzavtosanoat (48%) |
| General Motors Uzbekistan | Uzbekistan | JSC Uzavtosanoat (24.16%) |
| General Motors Venezolana, C.A. | Venezuela | |
| Sistemas de Compra Programada Chevrolet, C.A. | Venezuela | |
| Vietnam-Daewoo Motor Co., Ltd | Vietnam | |
| **Domestic Subsidiaries** | | |
| Advantage Chevrolet of Bolingbrook, Inc. | Delaware | Other (25%) |
| Annunciata Corporation | Delaware | |
| Argonaut Holdings, Inc. | Delaware | |
| Athens Chevrolet, Inc. | Delaware | Other (23%) |
| Britain Chevrolet, Inc. | Delaware | Other (25%) |
| Buick Pontiac GMC of Moosic, Inc. | Delaware | Other (17%) |
| Carve-Out Ownership Cooperative LLC | Delaware | |
| Champion Chevrolet, Pontiac, Buick, Inc. | Delaware | Other (29%) |
| Chevrolet of Novato, Inc. | Delaware | Other (25%) |
| Coach Insignia LLC | Michigan | Other (33%) |
| Cole Buick Pontiac GMC | | |
| Curt Warner Chevrolet, Inc. | Delaware | Other (22%) |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| Danny Beck Chevrolet, Inc. | Delaware | Other (18%) |
| Dealership Liquidations, Inc. | Delaware | |
| Delphi Energy and Engine Management Systems UK Overseas Corporation | Delaware | |
| Desert Sun Roswell, Inc. | Delaware | Other (25%) |
| Dinuba Auto Center, Inc. | Delaware | Other (18%) |
| DMAX, Ltd. | Ohio | Other (40%) |
| Fredericktown Chevrolet Company, Inc. | Delaware | Other (16%) |
| Friendly Motors, Inc. | Delaware | |
| Galleria Chevrolet-Cadillac, Inc. | Delaware | |
| Gateway Chevrolet Motor Company | Delaware | |
| GEMA Automotive, Inc. | Delaware | Other (23%) |
| General Motors Asia Pacific Holdings, LLC | Delaware | |
| General Motors Asia, Inc. | Delaware | |
| General Motors China, Inc. | Delaware | |
| General Motors Foundation, Inc. | Michigan | |
| General Motors Global Service Operations, Inc. | Delaware | |
| General Motors International Holdings, Inc. | Delaware | |
| General Motors Korea, Inc. | Delaware | |
| General Motors MNS Center, LLC | | |
| General Motors Overseas Commercial Vehicle Corporation | Delaware | |
| General Motors Overseas Corporation | Delaware | |
| General Motors Overseas Distribution Corporation | Delaware | |
| General Motors Product Services, Inc. | Delaware | |
| General Motors Research Corporation | Delaware | |
| General Motors Thailand Investments, LLC | Delaware | |
| General Motors U.S. Trading Corp. | Nevada | |
| General Sales Company of West Chester, Inc. | Delaware | Other (38%) |
| GM APO Holdings, LLC | Delaware | |
| GM Car Company LLC | Delaware | |
| GM Components Holdings, LLC | Delaware | |
| GM-Di Leasing Corporation | Delaware | |
| GM Eurometals, Inc. | Delaware | |
| GM Finance Co. Holdings LLC | Delaware | |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| GM GEFS L.P. | Nevada | |
| GM Global Steering Holdings, LLC | Delaware | |
| GM Global Technology Operations, Inc. | Delaware | |
| GM Global Tooling Company, Inc. | Delaware | |
| GM LAAM Holdings, LLC | Delaware | |
| GM Overseas Funding, LLC | Delaware | |
| GM Personnel Services, Inc. | Delaware | |
| GM Preferred Finance Co. Holdings LLC | Delaware | |
| GM Preferred Receivables LLC | Delaware | |
| GM Subsystems Manufacturing, LLC | Delaware | |
| GM Supplier Receivables LLC | Delaware | |
| GM Technologies, LLC | Delaware | |
| GM Warranty LLC | Delaware | |
| GMAC Common Equity Trust I[3] | Delaware | |
| GMEH Holding, LLC | Delaware | |
| GMETR Trade Receivables LLC | Delaware | |
| GMOC Administrative Services Corporation | Delaware | |
| GMODC Receivables Funding LLC | Delaware | |
| GMODC Trade Receivables LLC | Delaware | |
| Grand Pointe Holdings, Inc. | Michigan | |
| Joe Morgan Chevrolet-Cadillac, Inc. | Delaware | Other (35%) |
| JS Folsom Automotive, Inc. | Delaware | Other (38%) |
| Koneyren, Inc. | Michigan | |
| Las Cruces Automotive Group, Inc. | Delaware | Other (18%) |
| LBK, LLC | Delaware | |
| Lease Ownership Cooperative LLC | Delaware | |
| Lidlington Engineering Company, Ltd. | Delaware | |
| Mangino Chevrolet, Inc. | Delaware | Other (18%) |
| Metal Casting Technology, Inc. | Delaware | Other (49%) |
| Milton Chevrolet, Inc. (Sobh-Locklear Chevrolet) | Delaware | Other (26%) |
| Monetization of Carve-Out, LLC | Delaware | |
| Moran Cadillac-GMC, Inc. | Delaware | Other (23%) |
| Moran-Chevrolet, Inc. | Delaware | Other (23%) |
| Morris Pontiac-GMC, Inc. | Delaware | Other (29%) |
| Motors Holding San Fernando Valley, Inc. | Delaware | |
| Multi-Use Lease Entity Trust | Delaware | |
| North American New Cars, Inc. | | |

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| OnStar Global Services Corporation | Delaware | |
| OnStar, LLC | Delaware | |
| PIMS Co. | Delaware | |
| Project Rhodes Holding Corporation | Delaware | |
| Promark Global Advisors, Inc. | Delaware | |
| Promark Investment Advisors, Inc. | Delaware | |
| Promark Real Estate Advisors, LLC | Delaware | |
| Promark Trust Bank, N.A. | New York | |
| Renaissance Center Management Company | Michigan | |
| Renaissance Center Management Company | Delaware | |
| Renton Cadillac Pontiac GMC, Inc. | Delaware | Other (19%) |
| Rhodes I, LLC[2] | Michigan | |
| Rhodes II, LLC[2] | Michigan | |
| Riverfront Holdings II, Inc. | Delaware | |
| Riverfront Holdings Phase II, Inc. | Delaware | |
| Riverfront Holdings, Inc. | Delaware | |
| San Patricio Automotive Group, Inc. | Delaware | Other (34%) |
| Saturn County Bond Corporation | Delaware | |
| Slaughter Motor Company, Inc. | Delaware | Other (16%) |
| Smokey Point Buick Pontiac GMC, Inc. | Delaware | Other (28%) |
| Steering Solutions Corporation | Delaware | |
| Steering Solutions Expat Holding Corporation | Delaware | |
| Steering Solutions IP Holding Corporation | Delaware | |
| Steering Solutions Services Corporations | Delaware | |
| Superior Chevrolet, Inc. | Delaware | Other (16%) |
| Taft Automotive, Inc. | Delaware | Other (30%) |
| The DeCuir Group, Inc. | Delaware | Other (26%) |
| Todd Wenzel Chevrolet, Inc. | Delaware | Other (20%) |
| Trimarco Pontiac-Buick-GMC, Inc. (Gary Trimarco Automotive) | Delaware | Other (22%) |
| Truck and Bus Engineering U.K., Limited | Delaware | |
| Vehicle Asset Universal Leasing Trust | Delaware | |
| Vence Lone Star Motors, Inc. | Delaware | |
| VM North America, Inc. | Delaware | |
| WRE, Inc. | Michigan | |

[1] Unless otherwise indicated in this column, Parent and its direct or indirect Subsidiaries have a

| Purchased Subsidiary | Jurisdiction of Organization | Ownership By Third Party (%)[1] |
|---|---|---|
| 100% ownership interest in the Purchased Subsidiaries. [2] This entity is not yet owned by Parent, but will be owned by Parent prior to closing. | | |

1.      Pursuant to the Revolving Credit Agreement, Parent has pledged its Equity Interest in Controladora General Motors, S.A. de C.V. to the lenders thereunder.

2.      Pursuant to the UST Credit Facilities, Parent and certain of its Subsidiaries have pledged their Equity Interests in various direct and indirect Subsidiaries of Parent to Sponsor.

## Section 4.5

**Reports and Financial Statements; Internal Controls**

None.

## **Section 4.7**

### **Title to and Sufficiency of Assets**

None.

## Section 4.8

### Compliance with Laws; Permits

None.

## Section 4.9

**Environmental Laws**

None.

## <u>Section 4.10(a)</u>

## Employee Benefit Plans

<u>Benefit Plans for Hourly Employees</u>

1.  General Motors Hourly-Rate Pension Plan
2.  General Motors Personal Savings Plan for Hourly-Rate Employees in the United States

*Supplemental Agreements Between UAW and GM*

3.  General Motors Life and Disability Benefits Program for Hourly Employees
4.  General Motors Health Care Program for Hourly Employees
5.  General Motors Supplemental Unemployment Benefit Plan
6.  General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
7.  UAW-GM Legal Services Plan for UAW Represented Hourly Employees of General Motors in the United States
8.  General Motors Dependent Care Reimbursement Plan for UAW Represented Hourly Employees in the United States
9.  General Motors Health Care Spending Account Plan for Entry Level Employees
10. Guaranteed Income Stream Benefit Program (UAW)
11. Dependent Scholarship Program for Hourly Employees in the United States
12. Tuition Assistance Program for Hourly Employees in the United States

*Supplemental Agreements Between IUE and GM*

13. General Motors Life and Disability Benefits Program for Hourly Employees
14. General Motors Health Care Program for Hourly Employees
15. General Motors Supplemental Unemployment Benefit Plan
16. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
17. General Motors Legal Services Plan for IUE-CAW Hourly Employees in the United States
18. General Motors Dependent Care Reimbursement Plan Hourly-Rate Employees in the United States
19. Guaranteed Income Stream Benefit Program (IUE)
20. Dependent Scholarship Program for Hourly Employees in the United States
21. Tuition Assistance Program for Hourly Employees in the United States

*Supplemental Agreements Between IAM/PMD and GM*

22. General Motors Life and Disability Benefits Program for Hourly Employees
23. General Motors Health Care Program for Hourly Employees
24. General Motors Supplemental Unemployment Benefit Plan
25. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
26. General Motors Dependent Care Reimbursement Plan for IAM/PMD Represented Hourly Employees in the United States

27.     Dependent Scholarship Program for Hourly Employees in the United States
28.     Tuition Assistance Program for Hourly Employees in the United States
29.     Guaranteed Income Stream Benefit Program (IAM/PMD)

*Supplemental Agreements Between Various Splinter Unions and GM*

30.     General Motors Life and Disability Benefits Program for Hourly Employees
31.     General Motors Health Care Program for Hourly Employees
32.     General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States
33.     General Motors Income Security Plan for Hourly-Rate Employees
34.     Dependent Scholarship Program for Hourly Employees in the United States
35.     Tuition Assistance Program for Hourly Employees in the United States

Benefit Plans For Salaried Employees

36.     General Motors Retirement Program for Salaried Employees in the United States
37.     General Motors Executive Retirement Plan
38.     General Motors Savings-Stock Purchase Program for Salaried Employees in the United States
39.     General Motors Salaried Health Care Program
40.     General Motors Corporation Health Care Reimbursement Plan for Salaried Employees in the United States
41.     General Motors Corporation Dependent Care Reimbursement Plan for Salaried Employees in the United States
42.     General Motors Flexible Compensation Program for Salaried Employees in the United States
43.     General Motors Life and Disability Benefits Program for Salaried Employees in the United States
44.     General Motors Long-Term Care Program for Salaried Employees
45.     Executive Supplemental Disability Income Protection Program
46.     General Motors Severance Program for Salaried Employees in the United States
47.     General Motors Executive Severance Program for Salaried  Employees in the United States
48.     International Service Personnel Program
49.     Permanently International Mobile Staff (PIMS) Employees Individual Account Retirement Plan
50.     Dependent Scholarship Program for Salaried Employees in the United States
51.     Tuition Assistance Program for Salaried Employees in the United States

Other Benefit and Compensation Plans and Policies

52.     General Motors 1997 Stock Incentive Plan
53.     General Motors 2002 Stock Incentive Plan
54.     General Motors 2002 Annual Incentive Plan
55.     General Motors 2007 Annual Incentive Plan
56.     General Motors 2002 Long-Term Incentive Plan
57.     General Motors Corporation 2007 Long-Term Incentive Plan

58. General Motors Deferred Compensation Plan for Executive Employees
59. Individual Nonqualified Deferred Compensation Arrangements
60. Amended General Motors Corporation 2006 Cash-Based Restricted Stock Unit Plan
61. General Motors Corporation 2007 Cash-Based Restricted Stock Unit Plan
62. General Motors Corporation Compensation Plan for Non-Employee Directors
63. General Motors Corporation Non-Employee Directors Long-Term Stock Incentive Plan
64. General Motors Corporation 2007 Global Incentive Plan
65. General Motors Corporation 1998 Stock Option Plan as Amended January 1, 2003
66. General Motors Enhanced Variable Pay Plan for Eligible Salaried Employees in North America (Effective November 30, 2000 as amended December 1, 2007)
67. General Motors Executive Split Dollar Endorsement Plan
68. Personal Umbrella Liability Insurance Program
69. Senior Executive Financial Counseling Program
70. 401(k) Savings Plan Investment Advice Tool (Financial Engines)
71. Financial Planning Option (Ayco)
72. Health Savings Account (Bank of America)
73. Utility Patent Filing Award
74. Defensive Publication Award
75. Tool/Method Award
76. Usage Award
77. "Boss Kettering" Award Program
78. Executive Employee Physicals
79. Work Life Plus Program
80. Adoption Assistance Plan for Salaried Employees
81. Salaried Policies (including, but not limited to leaves, Mutual Separation Policy (MSP), expense reimbursement, relocation, vacation, service awards)
82. Mutual Separation Policy for Executive Employees
83. Senior Management Vehicle Program
84. Product Evaluation Program
85. Work Related Travel Policy
86. New Vehicle Employee Discount Program
87. Company Owned Vehicle Discount Program
88. Supplemental Life Benefits Plan
89. Supplemental Group Life Insurance Plan
90. Quality Network Suggestion Plan
91. Work/Family Employee Assistance Program
92. *Parent participates (contributes) to the following multi-employer plans:*
    Screen Actors Guild-- Producers Pension Plan for Motion Picture Actors
    Screen Actors Guild-- Producers Health Plan for Motion Picture Actors
    AFTRA Health and Retirement Funds
    AFTRA Industrial Account Plan
    AFTRA Industry Cooperative Fund
    Industry Advancement and Cooperative Fund (IACF)
93. Settlement Release with Andrew Pope, Severance (05/01/09)
94. Termination Agreement with Robert Sheipe
95. Settlement Release with Michael Younes, Severance (04/01/09)

96. Settlement Release with Janet Newcomb, Severance (11/01/07)
97. Settlement Release with Florentin Blejdea, Severance (05/07/09)
98. Contracts and arrangements identified on Section 4.10(h) of this Sellers' Disclosure Schedule (subject to discussion with Sponsor)

Purchased Subsidiary Plans

99. The table "General Motors - Global Inventory - Master File" included at the end of this Section 4.10(a) of this Sellers' Disclosure Schedule is incorporated by reference herein and hereby made a part of this Section 4.10(a) of this Sellers' Disclosure Schedule. (Subject to discussion with Sponsor.)
100. Advantage Chevrolet of Bolingbrook, Inc. 401(k) Plan and Pension Plan
101. Las Cruces Automotive Group, Inc. 401(k) Plan
102. Britain Chevrolet, Inc. 401(k) Plan
103. Renton Cadillac Pontiac GMC, Inc. 401(k) Plan
104. Buick Pontiac GMC of Moosic, Inc. 401(k) Plan
105. Champion Chevrolet, Pontiac, Buick, Inc. 401(k) Plan
106. Curt Warner Chevrolet, Inc. 401(k) Plan
107. Desert Sun Roswell, Inc. 401(k) Plan
108. Dinuba Auto Center, Inc. 401(k) Plan
109. Galleria Chevrolet-Cadillac, Inc. 401(k) Plan
110. Trimarco Pontiac-Buick-GMC, Inc. 401(k) Plan
111. GEMA Automotive, Inc. 401(k) Plan
112. General Sales Company of West Chester, Inc. 401(k) Plan
113. JS Folsom Automotive, Inc. 401(k) Plan
114. Mangino Chevrolet, Inc. 401(k) Plan
115. Morris Pontiac-GMC, Inc. 401(k) Plan
116. Chevrolet of Novato, Inc. 401(k) Plan
117. Slaughter Motor Company, Inc. 401(k) Plan
118. Smokey Point Buick Pontiac GMC, Inc. 401(k) Plan
119. Milton Chevrolet, Inc. 401(k) Plan
120. Superior Chevrolet, Inc. 401(k) Plan and Pension Plan
121. Todd Wenzel Chevrolet, Inc. 401(k) Plan
122. San Fernando Valley Automotive, LLC 401(k) Plan

Trusts

123. General Motors - UAW Layoff Benefit Trust 38-6039966
124. General Motors - IUE Welfare Benefit Trust 38-6039965
125. General Motors Savings Plans Master Trust 04-3259743
126. First Plaza Group Trust II 26-6389533
127. General Motors Welfare Benefit Trust 04-3400339
128. General Motors Salaried Employees Pension Trust 13-6369844
129. General Motors Salaried Employees Pension Trust 25-6388249
130. GMAM Group Pension Trust I 01-0719298
131. GMAM Group Pension Trust II 02-0615827
132. GMAM Investment Funds Trust 13-3160892

133.    GMAM Investment Funds Trust II 01-6231432
134.    White Plaza Group Trust 11-3317084
135.    First Plaza Group Trust 25-6295264
136.    Third Plaza Trust 25-6360552
137.    Fourth Plaza Trust 25-6360553
138.    General Motors Hourly Rate Employees Pension Trust 13-6369845
139.    General Motors Hourly-Rate Employees Pension Trust 25-6013833


**Necessary Reductions under Salaried, Executive, and non-UAW Hourly Plans**

Purchaser's obligations to assume benefit plans and to maintain compensation and benefits for one year contemplate the aggregate reduction of the total benefit obligations under Assumed Plans related to Salaried Retiree Life Insurance, Salaried Retiree Health Care, Salaried Non-Qualified Pension, Executive Retiree Life Insurance and hourly (non-UAW) Life Insurance and Health Care plans by approximately two-thirds, as compared to the obligations of Parent as determined as of 12/31/08.

The changes in salaried retiree benefits being implemented for achieving this are identified as follows:

- Retiree Basic Life Insurance for salaried classified and executive retirees reduced to $10,000 effective the first of the month following the Closing Date;
- Retiree Basic Life Insurance for active salaried classified and executive upon their retirement reduced to 50% of base salary;
- Additional salaried retiree co-pays and contributions required for health care plans, effective 1/10. Retiree cost share increases to approximately 45%. No coverage at age 65;
- 10% reduction in accrued ERP benefits as of the date of the close for active employees;
- The current temporary 10% ERP reduction for existing retirees with a combined qualified and nonqualified benefit equal to or less than $100,000 shall become permanent; no additional non-qualified pension reductions shall be made for these retirees;
- A reduction of 2/3 of the ERP amount above the combined qualified and nonqualified benefit greater than $100,000 will be implemented as of the first of the month following the Closing Date; and
- Executive Life Insurance will be cancelled in retirement for all current and future retirees effective the first of the month following the Closing Date.

Health care and life insurance coverage for non-UAW hourly retirees, if provided at all, are intended to match benefit levels provided salaried retirees. Changes affecting non-UAW hourly retirees are identified in Section 6.17(m) of the Agreement or the related sections of this Sellers' Disclosure Schedule.

| General Motors  - Global Inventory - - Master File | | | |
|---|---|---|---|
| | | | |
| **Country** | **Entity** | **Plan Type** | **Plan Name** |
| *DB U.S. GAAP Valuations* | | | |
| United States | U.S. | Defined benefit | General Motors Retirement Program for Salaried Employees |
| United States | U.S. | Defined benefit | United States Executive Retirement Plan (ERP) |
| Canada | Canada | Defined benefit | General Motors Canadian Hourly-Rate Employees Pension Plan |
| Canada | Canada | Defined benefit | General Motors Canadian Retirement Program for Salaried Employees |
| Germany | Germany-5e4 | Defined benefit | Opel Altersversorgung |
| UK | UK-5J8 | Defined Benefit | Vauxhall Motors Ltd Pension Plan |
| Australia | Australia-000 | Defined benefit | Holden Employees Superannuation Fund (HESF) |
| Germany | Germany-5j3 | Defined Benefit | Germany Powertrain (Opel Altersversorgung) |
| UK | UK-5J8 | Defined Benefit | IBC Vehicles Pension Plan |
| Belgium | Belgium-5G7 | Defined Benefit | Retirement Plan for Salaried and Hourly Employees of Opel Belgium |
| UK | UK-5J8 | Defined Benefit | General Motors Retirees Pension Plan |
| Sweden | Sweden-5e3 | Defined Benefit | ITP 2 Salaried Employeed  Sweden Saab |
| Switzerland | Switzerland-552 | Defined Benefit | Personel Welfare Foundation of General Motors Companies of Switzerland |
| Netherlands | Netherlands-5f4 | Defined Benefit | Pensioenreglement van General Motors Corporation Netherlands |
| UK | UK-5J8 | Defined Benefit | Millbrook Pension Plan |
| UK | UK-5J8 | Defined Benefit | Saab GB Pension Plan |
| Mexico | Mexico | Defined benefit | Voluntary Retirement Plan for Salaried Personnel  Pension Plan |
| South Africa | South Africa-000 | Defined benefit | General Motors South Africa Pension Fund |
| UK | UK-5J8 | Defined Benefit | Vauxhall and Associated Companies Pension Fund |

| Germany | Germany-000 | Defined Benefit | Catepillar JV (Opel Altersversorgung) |
| Austria | Austria-5J2 | Defined Benefit | Pension Plan (Alters, Arbeitsunfähigkeits und Hinterbliebenen)  Powertrain |
| Canada | Canada | Defined benefit | Canadian Executive Retirement Plan |
| Germany | Germany-5j5 | Defined Benefit | Germany Powertrain Kaiserslautern (Opel Altersversorgung) |
| Germany | Germany-5g5 | Defined Benefit | Adam Opel JVs (Opel Altersversorgung) |
| Portugal | Portugal-5G0 | Defined Benefit | Pension Supplement Plan |
| Mexico | Mexico | Defined benefit | Seniority Premium |
| Austria | Austria-5H3 | Defined Benefit | Pension Plan (Alters, Arbeitsunfähigkeits und Hinterbliebenen Plan für Dienstnehmer der Opel Austria) GM Austria |
| Sweden | Sweden- 5J1 | Defined Benefit | ITP 2 Salaried Employee, GM Powertrain Swedern AB |
| Colombia | Colombia-000 | Defined benefit | Defined benefit plan  Union Contract benefit |
| South Africa | South Africa-000 | Defined benefit | General Motors South Africa Executive Provident Fund |
| Venezuela | Venezuela-000 | Defined benefit | Clause 29 of the Collective Agreement for the Workers of GM Venzuela |
| Dubai | Dubai- RMO | Defined benefit | Defined benefit plan (EOS) |
| Ecuador | Ecuador-OBB | Defined benefit | Retirement Program |
| Ecuador | Ecuador-GME | Defined benefit | Retirement Program |
| India | India | Defined benefit | General Motors India Ltd Employees' Group Gratuity cum Life assurance Scheme |
| Canada | Canada | Defined benefit | Canadian Excess Plan |
| Canada | Canada | Defined benefit | Canadian Supplemental Executive Retirement Plan |
| United States | U.S. | Defined benefit | United States Benefit Equalization Plan |
| Mexico | Mexico | Defined | Voluntary Retirement Hourly |

| | | benefit | |
|---|---|---|---|
| Dubai | Dubai- MEDC | Defined benefit | Defined benefit plan (EOS) |
| **Non-U.S. GAAP Valuations** | | | |
| Norway | Norway-513 | Defined benefit | Regulation of the Pension Plan 3248 |
| Ireland | Ireland- 5F2 | Defined Benefit | Opel (Ireland) Limited Pension Plan |
| New Zealand | New Zealand | Defined benefit | Holden New Zealand Pension Plan |
| Norway | Norway-513 | Defined benefit | Regulation of the Pension Plan 21467 |
| Norway | Norway-513 | Defined benefit | Regulation of the pension plan 26370 |
| **Small DB Plans - Not Consolidated** | | | |
| France | GM Strasbourg | Defined benefit | Retirement bonus  paid as a lump sum upon employment contract termination |
| Egypt | Egypt-000 | Defined benefit | Retirement Plan |
| Turkey | Turkey-567 | Defined Benefit | Retirement Pay Provision ( Based on the requirement in local legislation in Turkey ) |
| Philippines | The Philippines | Defined Benefit | Retirement Plan |
| Indonesia | Indonesia | Defined benefit | Postemployment benefit  Based on Labour Law No. 13 and CR. |
| Taiwan | Taiwan | Defined Benefit | Old Statutory Pension Plan (prior to July 1, 2005) under Labour Standards Law (LSL) |
| Sweden | Sweden-5e3 | Defined Benefit | SPR (Pension plan took over from former owner Saab-Scania) |
| Sweden | Sweden- 5J1 | Defined Benefit | CEO-plan GM Powertrain Sweden AB |
| China JV | China JV-SGMW | Defined Benefit | Early Retirement Benefit Plan (SGMW ONLY) |
| Greece | Greece-5H2 | Defined Benefit | GROUP PENSION PLAN |
| France - (Sales SC) | France-5F5 | Defined benefit | Additional pension scheme topping up the Social Security and Government complementary Arrco+Agirc pensions |
| Denmark | Denmark-514 | Defined Benefit | 6529-0 Tilsagnsordning AP Pension |

| DB Plan currently accounted for as DC | | | |
|---|---|---|---|
| Kenya | Kenya-000 | Defined benefit | GM East Africa Staff Retirement Benefits Scheme |
| OPEB Plans | | | |
| United States | U.S. | Other post retirement benefit plan | The General Motors Defined Contribution Retiree Health Benefit Trust (Independent VEBA) |
| OPEB Plans - Employee Pay All | | | |
| DC Plans | | | |
| Sweden | Sweden-5e3 | Defined Contribution | Defined Contribution |
| Korea | Korea-GMDAT | Defined Contribution | Personal Pension Insurance |
| France | GM Strasbourg | Defined Contribution | Profit sharing plan |
| China JV | China JV-SGM | Defined Contribution | Supplementary contribution plan (SGM Only) |
| Sweden | Sweden-5e3 | Defined Contribution | Flexible ITP |
| Sweden | Sweden-5e3 | Defined Contribution | Wage Earners |
| Sweden | Sweden-5e3 | Defined Contribution | Early Retirements (Charge) |
| Sweden | Sweden-5e3 | Defined Contribution | ITP 1 Salaried Employees |
| Sweden | Sweden-5e3N | Defined Contribution | Defined Contribution |
| Colombia | Colombia-000 | Defined Contribution | Government termination payment plan (Goverment entity) |
| Sweden | Sweden- 5J1 | Defined Contribution | Flexible ITP |
| Sweden | Sweden- 5J1 | Defined Contribution | Wage Earners |
| Canada | Canada | Defined Contribution | Defined Contribution Registered Pension Plan |
| China JV | China JV-SGMW | Defined Contribution | Supplementary contribution plan (SGMW only) |
| Thailand | Thailand (GM Thailand) | Defined Contribution | Provident Fund |
| Sweden | Sweden-5e3 | Defined Contribution | ELT-plan |
| Thailand | Thailand (Chevrolet | Defined Contribution | Provident Fund |

| | Sales Thailand) | | |
|---|---|---|---|
| France | GM Strasbourg | Defined Contribution | Directors Healthcare plan |
| Sweden | Sweden- 5J1 | Defined Contribution | Early Retirements (Charge) |
| Australia | Australia-000 | Defined Contribution | Defined Contribution Plan - Superannuation |
| India | India | Defined Contribution | GM India Superannuation Scheme |
| Taiwan | Taiwan | Defined Contribution | New Plan |
| Thailand | Thailand (GM Southeast Operations Ltd.) | Defined Contribution | Provident Fund |
| Thailand | Thailand (GM Thailand Powertrain) | Defined Contribution | Provident Fund |
| Ireland | Ireland- 5F2 | Defined Contribution | Defined Contribution |
| Italy | Italy 5F6 | Defined Contribution | FON.TE. |
| Italy | Italy 5F6 | Defined Contribution | MARIO NEGRI |
| Italy | Italy 5k6 | Defined Contribution | COMETA |
| Italy | Italy 5F6 | Defined Contribution | FASDAC - MARIO BESUSSO |
| Sweden | Sweden- 5J1 | Defined Contribution | ITP 1 Salaried Employees |
| Sweden | Sweden- 5J1 | Defined Contribution | Defined Contribution |
| UK | UK-5J8 | Defined Contribution | Chevrolet UK Ltd Group Stakeholder Pension Plan |
| UK | UK-5J8 | Defined Contribution | GM(UK)Unclassified Executive Supplemental Pension Plan |
| United States | U.S. | Defined Contribution | Personal Savings Plan for Hourly-Rate Employees (Profit Sharing) |
| United States | U.S. | Defined Contribution | Personal Savings Plan for Hourly-Rate Employees |
| United States | U.S. | Defined Contribution | Savings-Stock Purchase Plan (S-SPP) |
| Colombia | Colombia-000 | Defined Contribution | Government dismissal payment plan (compounded salary) |

| United States | U.S. | Defined Contribution | Salaried DC Excess |
|---|---|---|---|
| **DC Plans- Gov Mandated** | | | |
| Brazil | Brazil-000 | Defined Contribution - Gov Mandated | FGTS - Employment Security Fund |
| Argentina | Argentina-000 | Defined Contribution - Gov Mandated | Government retirement plan |
| Finland | Finland-5F3 | Defined Contribution - Gov Mandated | Work pension |
| Uzbekistan | UZ | Defined Contribution - Gov Mandated | Government Pension |
| India | India | Defined Contribution - Gov Mandated | Provident Fund |
| France | France-5F5 | Defined Contribution - Gov Mandated | Retraite Sécurité Sociale & Complémentaire |
| **DC Plans with Potential DB features** | | | |
| Brazil | Brazil-000 | Defined Contribution | Previ-GM Retirement Plan |
| Spain | Spain- 5F8 | Defined contribution | Plan de Previsión Social de General Motors España, S.L. para el grupo de empleados de nivel 8 y superiores |
| Greece | Greece-5H2 | Defined contribution | INDIVIDUAL PLAN |
| Spain | Spain- 5H8 | Defined contribution | Plan de Previsión Social de General Motors Europe Holding, S.L. para el grupo de empleados de nivel 8 y superiores |
| Denmark | Denmark-514 | Defined Contribution | 5629-2 Realpensionsordning AP Pension |
| **DC Plans with Potential DB features- Active Life Insurance** | | | |

| South Africa | South Africa-000 | Defined contribution with Active Life Insurance and Disability | Member Freedom Select Individual Investment Provident Plan |
| --- | --- | --- | --- |
| **_DC Plans with Potential DB features- Active & Postretirement Life Insurance_** | | | |
| South Africa | South Africa-000 | Defined contribution with Active Life Insurance, Postretirement Life Insurance and Disability | General Motors South Africa Salaried Provident Fund |
| South Africa | South Africa-000 | Defined contribution with Active Life Insurance, Postretirement Life Insurance and Disability | General Motors South Africa Provident Fund |
| **_Involuntary Termination Plans_** | | | |
| Ecuador | Ecuador-OBB | Termination - involuntary | Termination Benefit |
| Ecuador | Ecuador-GME | Termination - involuntary | Termination Benefit |
| Australia | Australia-000 | Termination - involuntary | Policy - Redundancy - Award Free (ILM Code HUM030) |
| Canada | Canada | Termination - involuntary | Canadian Supplemental Unemployment Benefit Plan (CSUB) Income Maintenance Benefit Plan (IMP) Voluntary Termination of Employment Plan (VTEP) |
| Sweden | Sweden-5e3 | Termination - Involuntary | Separations due to redundancies |
| Canada | Canada | termination - involuntary | General Motors Canadian Layoff Plan for Salaried Employees Salaried Employee Service Termination Plan GMCL Severance Program |
| Argentina | Argentina-000 | Termination - involuntary | Dismissal Indemnity |
| Egypt | Egypt-000 | Termination - | Separation Policy |

| | | | involuntary |
|---|---|---|---|
| Venezuela | Venezuela-000 | Termination - involuntary | Involuntary Termination indemnity |
| China JV | China JV-all | Termination - Involuntary | Statutory Involuntary Termination Benefits Plan |
| Finland | Finland-5F3 | Termination - Involuntary | Legally Required Termination Indemnity |
| China | China | Termination - Involuntary | Involuntary termination benefits |
| Taiwan JV - YLGM | Taiwan JV - YLGM | Termination - Involuntary | New Statutory Involuntary Termination Benefits (effective July 1, 2005) under Labour Pension Act (LPA) |
| Australia | Australia-000 | Termination - involuntary | Policy - Redundancy - GM Grade 8 (ILM Code HUM030) |
| Taiwan | Taiwan | Termination - Involuntary | Old Statutory Involuntary Termination Benefits under Labor Standards Law (LSL)  Prior to July 2005 |
| Taiwan | Taiwan | Termination - Involuntary | New Statutory Involuntary Termination Benefits (effective July 1, 2005) under Labour Pension Act (LPA) |
| Belgium | Belgium-5G7 | Termination - Involuntary | Termination of the employment contract |
| Denmark | Denmark-514 | Termination - Involuntary | Funktionærloven - Fratrædelsesgodtgørelse |
| Poland | Poland-05H5 | Termination - Involuntary | Polish Labour Code - established by Polish Law |
| Poland | Poland-584 | Termination - Involuntary | Polish Labour Code - established by Polish Law |
| Poland | Poland-5B2 | Termination - Involuntary | Polish Labour Code - established by Polish Law |
| Sweden | Sweden- 5J1 | Termination - Involuntary | Separations due to redundancies |
| Turkey | Turkey-567 | Termination - Involuntary | Termination Indemnity |
| UK | UK-5J8 | Termination - Involuntary | Notice of Termination and Statutory Redundancy Payment |
| United States | U.S. | Termination - involuntary | GM Severance Program (GMSP) for Salaried Employees |
| United States | U.S. | Termination - involuntary | GM Mutual Separation Plan |

| Brazil | Brazil-000 | Termination - Involuntary | FGTS 50% fine |
|---|---|---|---|
| Kenya | Kenya-000 | Termination - involuntary | Voluntary or involuntary termination benefits |
| Czech Republic | Czech Republic | Termination - involuntary | Involuntary termination benefits |
| Mexico | Mexico | Termination - Involuntary - Retirement | Termination indemnity |
| Thailand | Thailand (GM Thailand) | Termination - Involuntary - Retirement | Involuntary termination and retirement benefits according to the Thai Labour Law |
| Thailand | Thailand (Chevrolet Sales Thailand) | Termination - Involuntary - Retirement | Involuntary termination and retirement benefits according to the Thai Labour Law |
| South Africa | South Africa-000 | Termination - Involuntary - Retirement | Unemployment Insurance Fund UIF |
| Thailand | Thailand (GM Southeast Operations Ltd.) | Termination - Involuntary - Retirement | Involuntary termination and retirement benefits according to the Thai Labour Law |
| Thailand | Thailand (GM Thailand Powertrain) | Termination - Involuntary - Retirement | Involuntary termination and retirement benefits according to the Thai Labour Law |
| Greece | Greece-5H2 | Termination - Involuntary - Retirement | Staff Leaving Indemnities (SLI) |
| Hungary - Powertrain | Hungary - Powertrain | Termination - Involuntary - Retirement | Termination indemnity |
| Poland | Poland-584 | Termination - Retirement | Polish Labour Code - established by Polish Law |
| Poland | Poland-5B2 | Termination - Retirement | Polish Labour Code - established by Polish Law |
| Poland | Poland-05H5 | Termination - Retirement | Polish Labour Code - established by Polish Law |
| Ecuador | Ecuador-OBB | Termination - voluntary | Termination Benefit |
| Ecuador | Ecuador-GME | Termination - voluntary | Termination Benefit |
| Venezuela | Venezuela-000 | Termination - voluntary | Severance payment required by Law |

| New Zealand | New Zealand | Termination - voluntary - involuntary | Redundancy Policy |
|---|---|---|---|
| Colombia | Colombia-000 | Termination - voluntary - involuntary | Labor Contract benefit - Involuntary termination benefit |
| Korea | Korea | Termination - Voluntary - Involuntary - Retirement | Severance Plan |
| Austria | Austria-5J2 | Termination - Voluntary - Involuntary - Retirement | Legal Termination Indemnity (gesetzliche Abfertigung) |
| Italy | Italy 5k6 | Termination - voluntary - involuntary - retirement | Trattamento di Fine Rapporto (TFR) |
| Korea | Korea-GMDAT | Termination - Voluntary - Involuntary - Retirement | Executive Severance Plan |
| Japan | Japan | Termination - Voluntary - Involuntary - Retirement | Severance benefit |
| Austria | Austria-5H3 | Termination - Voluntary - Involuntary - Retirement | Legal Termination Indemnity (gesetzliche Abfertigung) |
| Italy | Powertrain | Termination - Voluntary - Involuntary - Retirement | Trattamento di Fine Rapporto (TFR) |
| Korea | Korea-GMDAT | Termination - voluntary - involuntary - retirement | Severance Payment |
| Colombia | Colombia-000 | Termination - voluntary - involuntary - retirement | Government dismissal payment plan (GMCol responsability) |
| Chile | Chile-000 | Termination - Voluntary - Involuntary - Retirement | IAS (Indemnization per years of service) |

| Vietnam | Vietnam | Termination - Voluntary - Involuntary - Retirement | Severance plan |
| France - (Sales SC) | France-5F5 | Termination - voluntary - involuntary - retirement | Indemnité de licenciement légale et conventionnelle - Salaried (Cadres) |
| France - (Sales SC) | France-5F5 | Termination - voluntary - involuntary - retirement | Indemnité de licenciement légale et conventionnelle - Hourly (mensuels Non Cadres) |
| Malaysia | Malaysia | Termination - Voluntary - Involuntary - Retirement | 1 Voluntary Separation Scheme 2 Mutual Separation Scheme 3 Lump sum on retirement |
| Italy | Italy 5F6 | Termination - voluntary - involuntary - retirement | Trattamento di Fine Rapporto (TFR) |
| Germany | Germany-5e4 | Deferred Compensation | Deferred Compensation OFK |
| Germany | Germany-5e4 | Deferred Compensation | Deferred Compensation MFK |
| France | France-5F5 | Deferred Compensation | Participation (profit sharing) |
| South Africa | South Africa-000 | Deferred Compensation | GMSA Deferred Compensation |
| ***Executive Bonus Plans*** | | | |
| Argentina | GM Argentina | Annual Incentive | General Motors Annual Incentive Plan |
| Australia | GM Holdens | Annual Incentive | General Motors Annual Incentive Plan |
| Austria | GM Austria | Annual Incentive | General Motors Annual Incentive Plan |
| Belgium | GM Belgium N.V. | Annual Incentive | General Motors Annual Incentive Plan |
| Brazil | GM do Brazil Ltda. | Annual Incentive | General Motors Annual Incentive Plan |
| Canada | GM Canada | Annual Incentive | General Motors Annual Incentive Plan |
| Chile | GM Chile | Annual Incentive | General Motors Annual Incentive Plan |
| China | GM China | Annual Incentive | General Motors Annual Incentive Plan |

| Colombia | GM Colomotores S.A. | Annual Incentive | General Motors Annual Incentive Plan |
|---|---|---|---|
| Denmark | GM Denmark | Annual Incentive | General Motors Annual Incentive Plan |
| Ecuador | GM Ecuador | Annual Incentive | General Motors Annual Incentive Plan |
| France | GM Powertrain | Annual Incentive | General Motors Annual Incentive Plan |
| France | NSC | Annual Incentive | General Motors Annual Incentive Plan |
| Germany | Adam Opel GmbH | Annual Incentive | General Motors Annual Incentive Plan |
| Greece | GM Greece | Annual Incentive | General Motors Annual Incentive Plan |
| Hungary | GM Powertrain | Annual Incentive | General Motors Annual Incentive Plan |
| Hungary | GM SE | Annual Incentive | General Motors Annual Incentive Plan |
| India | GM India | Annual Incentive | General Motors Annual Incentive Plan |
| Italy | Chevrolet | Annual Incentive | General Motors Annual Incentive Plan |
| Italy | GM Italia | Annual Incentive | General Motors Annual Incentive Plan |
| Italy | GMPT | Annual Incentive | General Motors Annual Incentive Plan |
| Italy | SEC | Annual Incentive | General Motors Annual Incentive Plan |
| Japan | GM Japan | Annual Incentive | General Motors Annual Incentive Plan |
| Korea | GM Daewoo Auto & Technology Co. | Annual Incentive | GM Daewoo Annual Incentive Plan |
| Mexico | GM de Mexico | Annual Incentive | General Motors Annual Incentive Plan |
| Netherland | Chevrolet | Annual Incentive | General Motors Annual Incentive Plan |
| Netherland | GM Netherlands | Annual Incentive | General Motors Annual Incentive Plan |
| Peru | GM Peru | Annual Incentive | General Motors Annual Incentive Plan |
| Philippines | GM Philippines | Annual Incentive | General Motors Annual Incentive Plan |
| Poland | GM Poland | Annual | General Motors Annual Incentive |

| | | Incentive | Plan |
|---|---|---|---|
| Poland | GM Poland Mfg | Annual Incentive | General Motors Annual Incentive Plan |
| Portugal | GM Portugal | Annual Incentive | General Motors Annual Incentive Plan |
| Russia - Moscow | CIS/DAT | Annual Incentive | General Motors Annual Incentive Plan |
| Russia - St. Petersburg | GM Auto | Annual Incentive | General Motors Annual Incentive Plan |
| Singapore | General Motors Asia Pacific | Annual Incentive | General Motors Annual Incentive Plan |
| South Africa | GM So Africa | Annual Incentive | General Motors Annual Incentive Plan |
| Spain - Chevrolet | Chevrolet | Annual Incentive | General Motors Annual Incentive Plan |
| Spain - GM | GM Spain | Annual Incentive | General Motors Annual Incentive Plan |
| Sweden | GM Sweden | Annual Incentive | General Motors Annual Incentive Plan |
| Sweden | SAAB Automobile AB | Annual Incentive | General Motors Annual Incentive Plan |
| Switzerland | GM Switzerland | Annual Incentive | General Motors Annual Incentive Plan |
| Taiwan | GM Taiwan | Annual Incentive | General Motors Annual Incentive Plan |
| Thailand | GM Thailand | Annual Incentive | General Motors Annual Incentive Plan |
| UAE | MEO | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | UK - Aftersales | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | UK - Chevrolet | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | UK - GM | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | UK - GM Luton | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | UK - Millbrook Prov Gd | Annual Incentive | General Motors Annual Incentive Plan |
| UK - | Promark | Annual Incentive | Promark Annual Incentive Plan (Executives) |
| US | General Motors | Annual Incentive | General Motors Annual Incentive Plan |
| US | Promark | Annual | Promark Annual Incentive Plan |

| | | Incentive | (Executives) |
|---|---|---|---|
| US | Promark | Profit Sharing | Promark Profit Sharing Plan (Executives) |
| Venezuela | GM Venozalano | Annual Incentive | General Motors Annual Incentive Plan |
| Belgium | Belgium-5G7 | Incentive | Opel Belgium Supplemental Plan to the General Motors Corporation 1997 Stock Incentive Plan |
| Belgium | Belgium-5G7 | Incentive | Opel Belgium Supplemental Plan to General Motors 2002 Stock Incentive Plan |
| UK | UK-GM | Incentive | 2002 U.K. Approved Stock Incentive Plan of General Motors Corporation and Affiliated Companies (the "UK Sub-Plan") |
| France | GM France | Incentive | General Motors Corporation 1997 Stock Incentive Plan National Plan for France |
| France | GM France | Incentive | 2002 Stock Incentive Plan Addendum to the Plan (France) |
| UK | UK-GM | Incentive | Approved UK Sub-Plan of the General Motors Corporation 2007 Long-Term Incentive Plan |
| France | GM France | Incentive | General Motors Corporation 2007 Long-Term Incentive Plan Addendum to the Plan - FRANCE |
| | | | |
| *Variable Pay Plans (Non-Executive Salaried)* | | | |
| Argentina | GM Argentina | Gainsharing | GM Argentina Gainsharing Plan |
| Austria | GM PT Austria | Gainsharing | GM Powertrain Austria Gainsharing Plan |
| Brazil | GM do Brazil Ltda. | Gainsharing | GM do Brazil Gainsharing Plan |
| Colombia | GM Colomotores S.A. | Gainsharing | GM Colomotores Gainsharing Plan |
| Ecuador | GM Ecuador | Gainsharing | GM Ecuador Gainsharing Plan |
| France | GM Powertrain | Gainsharing | GM Powertrain France Gainsharing Plan |
| Hungary | GM Powertrain | Gainsharing | GM Powertrain Hungary Gainsharing Plan |
| Russia - St. Petersburg | GM Auto | Gainsharing | GM Auto Gainsharing Plan |

| Australia | GM Holdens | Global EVP | GM Holden's Global Enhanced Variable Pay Plan |
| Belgium | GM Belgium | Global EVP | GM Belgium Enhanced Variable Pay Plan |
| Canada | GM Canada | Global EVP | GM Canada Global Enhanced Variable Pay Plan |
| Denmark | GM Denmark | Global EVP | GM Denmark Global Enhanced Variable Pay Plan |
| Germany | Adam Opel GmbH | Global EVP | Adam Opel Global Enhanced Variable Pay Plan |
| Greece | GM Hellas | Global EVP | GM Hellas Global Enhanced Variable Pay Plan |
| Hungary | GM SE | Global EVP | GM Hungary Global Enhanced Variable Pay Plan |
| Italy | GMPT | Global EVP | GM Powertrain Italy Enhanced Variable Pay Plan |
| Italy | SEC | Global EVP | GM Italia Enhanced Variable Pay Plan |
| Japan | GM Japan | Global EVP | GM Japan Enhanced Variable Pay Plan |
| New Zealand | GM New Zealand | Global EVP | GM New Zealand Enhanced Variable Pay Plan |
| Peru | GM Peru | Global EVP | GM Peru Enhanced Variable Pay Plan |
| Poland | GM Poland | Global EVP | GM Poland Enhanced Variable Pay Plan |
| Portugal | GM Portugal | Global EVP | GM Portugal Enhanced Variable Pay Plan |
| Russia - Moscow | CIS/DAT | Global EVP | GM Moscow Enhanced Variable Pay Plan |
| South Africa | GM So Africa | Global EVP | GM South Africa Enhanced Variable Pay Plan |
| Spain | GM Espana | Global EVP | GM Espana  Enhanced Variable Pay Plan |
| Sweden | GM Sweden | Global EVP | GM Sweden Enhanced Variable Pay |
| Sweden | SAAB Automobile AB | Global EVP | GM SAAB Enhanced Variable Pay Plan |
| Turkey - | GM Turkey | Global EVP | GM Turkey Enhanced Variable Pay |
| UK - | Vauxhall | Global EVP | Vauxhall Enhanced Variable Pay Plan |
| US | General Motors | Global EVP | General Motors Enhanced Variable Pay Plan |
| Argentina | GM Argentina | Local Variable Pay | Argentina Local Variable Pay Plan |
| Chile | GM Chile | Local Variable | GM Chile Local Variable Pay Plan |

| | | Pay | |
|---|---|---|---|
| China | GM China | Local Variable Pay | GM China Local Variable Pay Plan |
| Ecuador | GM Ecuador | Local Variable Pay | GM Ecuador Variable Pay Plan |
| India | GM India | Local Variable Pay | GM India Variable Pay Plan |
| Italy | SEC | Local Variable Pay | GM Italy SEC Local Variable Pay |
| Italy | GM Italia | Local Variable Pay | GM Italia Local Variable Pay |
| Kenya | GM East Africa LTd. | Local Variable Pay | GM Kenya Variable Pay Plan |
| Korea | GM Daewoo Auto & Technology Co. | Local Variable Pay | GM Daewoo Local Variable Pay Plan |
| Poland | GM Poland Mfg | Local Variable Pay | GM Poland Mfg Local Variable Pay Plan |
| Singapore | GM Singapore | Local Variable Pay | GM Singapore Local Variable Pay Plan |
| Spain - Chevrolet | Chevrolet | Local Variable Pay | GM Espana Chevrolet Local Variable Pay Plan |
| Spain - GM | GM Spain | Local Variable Pay | GM Espana  Local Variable Pay Plan |
| Thailand | GM Thailand | Local Variable Pay | GM Thailand Local Variable Pay Plan |
| UK | UK-Promark | Local Variable Pay | Promark Variable Pay Plan (Non-Executive) |
| UK - | UK - Aftersales | Local Variable Pay | GM UK Aftersales Local Variable Pay |
| UK - | UK - Chevrolet | Local Variable Pay | GM UK Chevrolet Local Variable Pay |
| UK - | UK - GM Luton | Local Variable Pay | GM UK Local Variable Pay Plan |
| UK - | UK - Millbrook Prov Gd | Local Variable Pay | GM UK-Millbrook Proving Grounds Local Variable Pay Plan |
| US | Promark | Local Variable Pay | Promark Variable Pay Plan (Non-Executive) |
| Venezuela | GM Venozalano | Local Variable Pay | GM Venozalano Local Variable Pay Plan |
| Chile | GM Chile | Profit Sharing | GM Chile Profit Sharing Plan |
| Ecuador | GM Ecuador | Profit Sharing | GM Ecuador Profit Sharing Plan |
| France | NSC | Profit Sharing | GM France NSC Profit Sharing Plan |
| France | GM | Profit Sharing | GM Powertrain France Profit Sharing |

| | Powertrain | | Plan |
|---|---|---|---|
| Mexico | GM de Mexico | Profit Sharing | GM de Mexico Profit Sharing Plan |
| Peru | GM Peru | Profit Sharing | GM Peru Profit Sharing Plan |
| UK | Promark | Profit Sharing | Promark Profit Sharing Plan (Non-Executive) |
| US | Promark | Profit Sharing | Promark Profit Sharing Plan (Non-Executive) |
| | | | |
| **Hourly Incentive Plans** | | | |
| Argentina | GM Argentina | Gainsharing | GM Argentina Gainsharing Plan (Hourly) |
| Austria | GM PT Austria | Gainsharing | GM PT Austria Gainsharing Plan (Hourly) |
| Brazil | GM do Brasil | Gainsharing | GM Do Brasil Gainsharing Plan (Hourly) |
| Colombia | GM Colomotores S.A. | Gainsharing | GM Colomotores Gainsharing Plan (Hourly) |
| France | GM PT France | Gainsharing | GM PT France Gainsharing Plan (Hourly) |
| Hungary | GM PT Hungary | Gainsharing | GM PT Hungary Gainsharing Plan (Hourly) |
| Russia | GM Auto - St Petersburg | Gainsharing | GM Auto St. Petersburg Gainsharing Plan (Hourly) |
| Argentina | GM Argentina | Local Variable Pay | GM Argentina Local Variable Pay Plan (Hourly) |
| Chile | GM Chile | Local Variable Pay | GM Chile Local Variable Pay Plan (Hourly) |
| Ecuador | GM Ecuador | Local Variable Pay | GM Ecuador Local Variable Pay Plan (Hourly) |
| Italy | GM Italia | Local Variable Pay | GM Italia Local Variable Pay Plan (Hourly) |
| Kenya | GM East Africa LTd. | Local Variable Pay | GM Kenya Local Variable Pay Plan (Hourly) |
| Korea | GM Daewoo Auto & Technology Co. | Local Variable Pay | GM Daewoo  Local Variable Pay Plan (Hourly) |
| Poland | GM Poland Mfg | Local Variable Pay | GM Poland Local Variable Pay Plan (Hourly) |
| Singapore | General Motors Asia Pacific | Local Variable Pay | GM Singapore  Local Variable Pay (Hourly) |
| Spain | GM Espana | Local Variable | GM Espana Local Variable Pay Plan |

|  |  | Pay | (Hourly) |
|---|---|---|---|
| Thailand | GM Thailand | Local Variable Pay | GM Thailand Local Variable Pay Plan (Hourly) |
| Chile | GM Chile | Profit Sharing | GM Chile Profit Sharing Plan (Hourly) |
| Ecuador | GM Ecuador | Profit Sharing | GM Ecuador Profit Sharing (Hourly) |
| France | GM France - NSC | Profit Sharing | GM France - NSC Profit Sharing (Hourly) |
| France | GM PT France | Profit Sharing | GM PT France - NSC Profit Sharing (Hourly) |

## Section 4.11

**Labor Matters**

Eighty-four retirees and 1102 current employees of GM Daewoo Auto & Technology Company filed claims in January and March of 2007, respectively, claiming that amounts such as research allowance and annual bonus had been wrongfully excluded from the calculation of ordinary wage. A verdict for the retirees' case was rendered in November 2008 (partially in favor of plaintiffs and partially in favor of defendant) and both plaintiffs and defendant appealed in December 2008.

## Section 4.12

### Investigation; Litigation

None.

## Section 4.13

## Tax Matters

U.S. Income Tax Matters

The United States federal statute of limitations is closed through the 2003 federal income Tax year except for an open-ended, restricted waiver that is limited to a United States-Canada transfer pricing dispute and related foreign tax credits. The transfer pricing dispute is currently pending with competent authority. The statute of limitations for the 2004 through 2006 federal income Tax years has been extended to June 30, 2010. Based upon IRS proposed adjustments for the 2004 through 2006 years, neither the proposed audit adjustments nor the extension of the statute of limitations are expected to give rise to a Material Adverse Effect. The IRS has commenced the audit of the 2007 and 2008 federal income Tax years and is in the information gathering stage.

State and Local Tax Matters

Parent and its Subsidiaries file various income, gross income, sales, use, ad valorem, gross receipts, value added, franchise, profits, license, transfer, recording, withholding, payroll, employment, excise and other types of state and local Tax Returns. Many of these Tax Returns are routinely examined by Taxing Authorities, and waivers are routinely requested by and granted to state and local Taxing Authorities. None of these audits or waivers, alone or together, is reasonably expected to give rise to a Material Adverse Effect. Parent and its Subsidiaries have established aggregate reserves for United States state and local Taxes on its March 31, 2009 financial statements of approximately $116 million.

Non-US Tax Matters

Parent and its Subsidiaries file income and other Tax Returns in multiple jurisdictions and are subject to examination by Taxing Authorities throughout the world. Parent and its Subsidiaries' previously filed Tax Returns are currently under review or are subject to open Tax years from 1999 to 2008 with various significant taxing jurisdictions, including, Argentina, Australia, Belgium, Brazil, Canada, Ecuador, France, Germany, Hungary, India, Indonesia, Italy, Mexico, New Zealand, Poland, Russia, South Korea, Spain, Thailand, Turkey, the United Kingdom and Venezuela. These open years contain matters that could be subject to differing interpretations of applicable Tax Laws and regulations as they relate to the amount, timing or inclusion of revenue and expenses or the sustainability of income Tax credits for a given audit cycle. We have recorded a Tax benefit only for those positions that meet the more likely than not standard. Parent and its Subsidiaries have established a total FIN 48 reserve on its March 31, 2009 financial statements for non-United States cash Tax liabilities of approximately $496 million.

## Section 4.14

## Intellectual Property and IT Systems

IP Litigation

| | Case Title | Court | Case No. |
|---|---|---|---|
| | U.S. Lawsuits | | |
| 1. | Automotive Technologies International v. American Honda Motor Company et al. (including Parent) | D. DW | Civil Action No. 06-178-GMS |
| 2. | Automotive Technologies International v. General Motors et al. | E.D. TX | 2:08-CV-57 (JTW) |
| 3. | Chamberlain Group v. Lear (Parent intervened) | N.D. IL | 05 C 3449 |
| 4. | Dura Global Technologies v. Magna Donnelly (indemnity claim against Parent) | E.D. MI | 07-10945 |
| 5. | Dura Global Technologies v. Magna Donnelly II (indemnity claim against Parent) | E.D. TX | 6:08-CV-455 |
| 6. | Parent v. Urban Gorilla | U.S. District UT | 2:06 CV 133 |
| 7. | Kuhl Wheels LLC et al. v. General Motors | E.D. MI / CAFC | 06-CV-15204-DT / 2008-1158 |
| 8. | MHL TEK v. General Motors et al. | E.D. TX | 2:08-cv-00125-TJW-CE |
| 9. | MHL TEK LLC v. Nissan Motor Co. et al. (indemnity claim against Parent) | E.D. TX | 2:07-cv-289-TJW |
| 10. | Mitchell Corporation of Owosso v. General Motors | E.D. TX | 2:08-cv-178 |
| 11. | OnStar v. Micral et al. | N.D. OH | 3:08-cv-2047 |
| 12. | Ronald A. Katz Technology LP v. General Motors & In re Katz Interactive Call Processing Patent Litigation (including Parent) | E.D. Tex / C.D. CA | 9:06cv198 / 07-ML-01816-B-RGK (FFMx) |
| 13. | Parent v. Costar Inc. | C.D. CA | CV 08-7760 CAS (PLAx) |
| 14. | Pisani v. General Motors | US District RI | 1:09 CV 125 |
| 15. | Acadia University v. GM | Nova Scotia | |
| | Non-U.S. Lawsuits | | |
| 16. | Mohamed Samir Abdel Salam, in his capacity as legal representative of the Egyptian Company for Automobiles vs. GM Egypt | Giza First Instance Court, Egypt | |
| 17. | Rogerio Napolitano and Vladan Prokic v. General Motors do Brasil Ltda. | Brazil | 000.04.055200-4 |

| | | | |
|---|---|---|---|
| 18. | Nullity Actions against Ford Global Technolgies, regarding DE 9809865 / EP0953758B1 | Munich Patent Court | 10 Ni 21/07 (EU) |
| 19. | Ford Global Technologies v. Adam Opel | District Court, Duesseldorf | 4a O 409/06 |

Certain Unresolved IP Allegations

| | Alleger | Nature of Allegation | Products/Systems |
|---|---|---|---|
| 1. | AFT Adaptive Force Technology | License USPN 6,384,518 | Piezoelectric coupler |
| 2. | Alliacense | Infringement of MMP patent portfolio | OnStar Nav Unit; ABS, engine, chassis, climate control units; audio amplifier |
| 3. | American Outfitters | Infringe USPN D502,433 | H2 and H3 bumpers |
| 4. | Applied Interact LLC | License USPN 5,508,731; 5,249,044 | unspecified online sweepstakes |
| 5. | Armatron Int. | Infringement of USPN 5,160,927; 5,235,315; 5,432,516; 6,040,765 | Rendezvous, STS obstacle detection system (Bosch) |
| 6. | Avery Dennison | Infringement of USPN 6,228,486; 6,461,722; 6,756,095 | visor heat seal label Saturn Vue |
| 7. | BG Products | Infringement of USPN 6,478,036 | EGR cleaner |
| 8. | Clarke, Dennis | Infringement of USPN 6,794,438; 6,841,602 | thermoset polymers |
| 9. | Cooper Standard | Infringement of USPN 5,875,670 | weatherstripping crimping tool |
| 10. | Daimler AG | Infringement of USPN 6,328,358; 6,184,842; 6,433,753 | radome cover (Kaumagraph Flint Corp.) |
| 11. | De Villeroche, Gerard | Infringement of USPN 4,951,211 | vehicle guide and information system |
| 12. | Directed Electronics | Infringement of USPN 5,146,215; 5,650,774 | Subaru RKE/security systems |
| 13. | DTN/Meteorlogix | License USPN 6,753,784 | Weather alerting service |
| 14. | Duramax Marine | Infringement of TM "DURAMAX" | diesel marine engines |
| 15. | DVD6C | License of patents on DVD technology | Digital Works Inc. past supplier |

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|---|
| 16. | Ford Global Tech. | Infringement of 4,930,836; 5,029,364; 5,364,157; 5,297,841; 5,782,523; 5,752,737; 5,803,516; 6,059,352; 6,581,955; 6,769,729; 7,144,064 | Various body patents |
| 17. | Ford Global Tech. | Infringement of USPN 6,044,318 | H2 throttle control |
| 18. | Ford Global Tech. | Infringement of USPN 6,173,693; EP0953758 | L850 direct injection head (Opel) |
| 19. | Ford Global Tech. | License USPN 7,157,026; 7,029,138; D501,784 | emergency trunk release handles |
| 20. | Gebre, Adamasu | Infringement of USPN 5,297,049; 5,504,683 | navigation systems (suit dismissed w/o prejudice) |
| 21. | General Patent Corp. | Infringement of USPN 5,864,604 | GM Card |
| 22. | Giri, Joseph | Infringement of copyright of mural "The Eagle Band" | Cadillac ad in April 2009 Motor Trend |
| 23. | Honeywell, Transense | Inventorship dispute | vehicle torque SAW sensor |
| 24. | Hoppenstein, Joel | License to USPN 7,246,089 | liability management method |
| 25. | IDT | License USPN 5,999,965 | unspecified VOIP call center systems |
| 26. | Isuzu | Indemnification | Agreement to indemnify in MHL v Nissan for sale of vehicles |
| 27. | Johnson Controls | Chamberlain trade secret | in-vehicle garage door opener |
| 28. | Katulka, Michael | Infringement of USPN 6,607,232 | tailgate support |
| 30. | Kiekert | Infringement of USPN 5,634,677 | Magna door latch on Enclave, Outlook, Acadia, and Traverse |
| 31. | Leemann, Karl and Ruchti, Heinz | Infringement of USPN 5,602,524 | Tire pressure monitoring |
| 32. | Little League Baseball | Infringement of TM "Little League Baseball" | TV commercial (image removed) |

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|---|
| 33. | Lonzame, Pete | Infringement of USPN 5,349,328 (expired 10/23/02) | Tire pressure monitoring |
| 34. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna I |
| 35. | Magna International | Indemnification | Reverse indemnification for rear power sliding windows in Dura v Magna II |
| 36. | Martin, P Jeff | unspecified design | design of Acadia |
| 37. | Meridian Enterprises | License to USPN 5,025,372 | reloadable or personalized cards |
| 38. | NGK Spark Plugs | Infringement of USPN 4,733,056 (exp 3/22/05) | planar oxygen sensor |
| 39. | Nissan | Infringement of USPN 5,135,444 | 5L40 and 5L50 transmissions |
| 40. | Philips | Infirngement of Philips/Sony disc patents | promotional disc w GQ magazine |
| 41. | Pisani, Carol | Fraud related to New Devices submission | seat belt warning |
| 42. | Resqnet.com | Infringement of USPN 5,530,961; 5,831,608; 5,792,659; 5,812,127 | terminal emulator software |
| 43. | Ripley Entertainment | Infringement of TM "Believe it or Not" | Internet-based ads |
| 44. | Scate Technologies | Infringement of unspecified IP | Vision software screen prints |
| 45. | Shelby Enterprises | Infringement of USPN 7,048,019; 7,059,365 | fuel filler pipe assemblies |
| 46. | Sorensen R&D | Infringement of USPN 4,935,184 | AC Delco cordless impact wrench |
| 47. | Suzuki | Indemnification | Agreement to indemnify in Wacoh v Chrysler for design of CAMI vehicles |
| 48. | Suzuki | Indemnification | Agreement to indemnify in MHL v GM for design of CAMI vehicles |

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|---|
| 49. | The Welding Institute | Infringement of USPN 5,460,317; 5,813,592 | robotic welders designed for friction stir welding |
| 50. | Timken | Infringement of USPN 7,285,949 | 4L60E speed sensor |
| 51. | Toyota | Licence USPN 6,530,594; 6,279,941; 6,561,540; 6,089,594; 6,347,268; 6,170,864; 6,371,515 | supplemental restraint system technology |
| 52. | Uth Patents | License USPN 6,494,458; 6,494,460 | Dry Gas Seal Technology |
| 53. | Washington Research Foundation | Infringement of patents | Bluetooth chipsets |
| 54. | Wayne, Andrew, Teresa Barger | Wrongful prosecution of Andrew Barger | |
| 55. | William Reid and NetP&L, Inc. | Lawsuit dismissed w/o prejudice USPN 6,131,120 | GM Identity Management |
| 56. | ZF | Infringement of USPN RE39,960; 7,140,997; 7,217,218; 7,255,661; 7,335,127 | Six-speed FWD automatic transmissions |
| 57. | VW | Infringement of DE19802077C2 | On at least two levels installable luggage compartment panel |
| 58. | VW | Infringement of DE19523358C2 | Locking mechanism for a head restraint |
| 59. | VW | Infringement of DE 196 50 921 B4 | Support rod for headrest in road vehicle |
| 60. | VW | Infringement of EP 1 141 657 B1 | Method and device for reading navigation data |
| 61. | VW | Infringement of EP 0 70 1926 B2 | Multifunction Control Device |
| 62. | Daimler AG | Infringement of DE 44 45 580 C1 | Hard-top vehicle |
| 63. | PSA | | Third stop light with water nozzle |
| 64. | InteressenGemeinschaft für Rundfunk-schutzrechte KG | Infringement of EP 0 347 686 B1 | Rotating transmitter for digital pulses and method of using it |
| 65. | PSA | Infringement of EP 1 314 875 B1, EP 1 704 | Systems for the regeneration of |

| | **Alleger** | **Nature of Allegation** | **Products/Systems** |
|---|---|---|---|
| | | 702 B1, EP 1 203 876 B1, EP 1 086 304 B1, FR 2 774 427, & FR 2 774 428 | diesel particle filters involving post fuel injections during the expansion stroke |
| 66. | Daimler AG | Infringement of DE10254695 B3 | Press-hardened part and method for the production thereof |
| 67. | H. Finke | Infringement of EP1334224B1 | Lining material for Roof Trim |
| 68. | Mittelhäuser | Infringement of EP 1 129 882 B1 | Fuel Filler Flap |
| 69. | Hörauf & Kohler Verwaltungs KG | Infringement of EP0906523 B1 | Glove Box /damping element |
| 70. | BOS GmbH & Co. KG | Infringement of EP 1 296 854 B1 | Flex-Rail-System |
| 71. | VW | Infringement of EP107442 9 | Light Switch Unit |
| 72. | Lindmayer | Infringement of DE195000999 | Door Latch |
| 73. | Kiekert | Infringement of DE4447687 C2 | Power-locking motor-vehicle door latch |

## Section 4.15

## Real Property

None.

## Section 4.17

**Dealer Sales and Service Agreements for Continuing Brands**

None.

## Section 4.18

### Sellers' Products

(a)    Recalls and Field Actions

| Field Action Document Number | Field Action Classification | Field Action Description | Vehicle Model Years | Vehicle Make | Vehicle Model |
|---|---|---|---|---|---|
| A - 070047 | Product Safety Recall | Throttle | 2004 - 2005 | Chevrolet/Pontiac/ Suzuki | Aveo/Wave/Swift+ |
| N - 060074 | Product Safety Recall | Timing Chain | 2001 | Saturn | L Series |
| N - 070027 | Product Emissions Defect Reports and Product Emissions Recall - GMNA Use Only | Catalytic Converter | 2004 | Cadillac | SRX |
| N - 070035 | Product Safety Recall | Engine valve cover / spark plug retainer | 1997 - 2003 | Buick/Pontiac | Regal GS/Gr Prix |
| N - 070123 | Special Coverage Non-Compliance | Intake Valve Seat | 2004 - 2005 | Chevrolet/GMC | Colorado/Canyon |
| N - 070154 | Recall | Windshield Position | 2007 | Chevrolet/Pontiac | Equinox/Torrent |
| N - 070187 | Special Coverage | Instrument Panel Gauges | 2003 - 2004 | Cadillac/Chevrolet/GMC | Escalade/Avalanche/Silverado/ Suburban/Tahoe/Trailblazer/ Denali/Envoy/Sierra |
| N - 070204 | Product Safety Recall | Rear Differential | 2005 - 2007 | Cadillac/Pontiac/Saturn /Opel/Daewoo | CTS/CTS-V/SRX/STS/STS-V/ Solstice/Sky/GT/G2X |
| N - 070252 | Special Coverage | Fuel Injector | 2004 | Chevrolet/GMC | Silverado/Kodiak/Sierra/Topkick |

| Field Action Document Number | Field Action Classification | Field Action Description | Vehicle Model Years | Vehicle Make | Vehicle Model |
|---|---|---|---|---|---|
| N - 070318 | Product Emission Recall | Battery | 2007 | Saturn | VUE/Aura |
| N - 080048 | Product Safety Recall | Heated Washer Module | 2006,    2007 - 2008 | Cadillac/Chevrolet/GMC /Buick/Saturn/Hummer | Escalade/Escalade EXT/ Escalade ESV/Avalanche/Silverado/ Suburban/Tahoe/ Sierra Yukon/ Yukon XL/Acadia/Outlook/ Lucerne/ DTS/H2/ Enclave |
| N - 080207 | Customer Satisfaction Program | Sunroof | 2007 - 2008 | GMC/Saturn/Buick | Acadia/Outlook/Enclave |
| N - 080272 | Special Coverage | Engine Valve Seat Valve Cover / | 2006 | Chevrolet/GMC/Isuzu Pontiac/Buick/ | Colorado/Canyon Gr Prix/Regal/Lumina/ Monte |
| N - 090047 | Product Safety Recall | Spark plug retainer | 1997 - 2003 | Chevrolet/Oldsmobile | Carlo/Impala/Intrigue |

(b)  None.

## **Section 4.19**

### **Certain Business Practices**

None.

### Section 4.20

**Brokers and Other Advisors**

1.      The Blackstone Group LP
2.      Lakeview Capital Management, Inc.
3.      Lazard Ltd.
4.      Morgan Stanley
5.      Evercore Partners
6.      AlixPartners
7.      D.F. King & Co., Inc.
8.      Deutsche Bank Group
9.      PricewaterhouseCoopers
10.     KPMG International
11.     Deloitte Development LLC
12.     Ernst & Young Global Limited
13.     Watson Wyatt Worldwide

## **Section 4.21**

### **Investment Representations**

None.

## Section 6.6(a)(i)

**Mandatory Assumable Executory Contracts to be Assumed at Closing**

1.    The UAW Collective Bargaining Agreement.
2.    Amended and Restated Master Services Agreement, between Parent and GMAC, LLC, dated as of May 22, 2009 and made effective as of December 29, 2008.
3.    Each other Contract between any Seller and GMAC, LLC or any of its Subsidiaries, other than those Contracts mutually agreed to in writing by GMAC, LLC and the applicable Seller.
4.    Lease dated June 20, 2008 by and between NS - 1500 Marquette MS, L.L.C., a Mississippi limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
5.    Lease dated June 20, 2008 by and between NS - 200 Cabot PA, L.L.C., a Pennsylvania limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
6.    Letter Agreement dated February 2, 2009 by and among Parent, NS - 200 Cabot PA, L.L.C., a Pennsylvania limited liability company, and SGD Investments, Inc., a Nebraska corporation, as modified by First Amendment to Lease dated as of June 23, 2009.
7.    Lease dated June 20, 2008 by and between NS - 608 Caperton WV, L.L.C., a West Virginia limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.
8.    Lease dated June 20, 2008 by and between NS - 2200 Willis Miller WI, L.L.C., a Wisconsin limited liability company, as landlord, and Parent, as tenant, as amended by First Amendment to Lease dated as of June 23, 2009.

## <u>Section 6.6(a)(ii)</u>

**Mandatory Assumable Executory Contracts to be Assumed Prior to Executory Designation Deadline**

1. All Executory Contracts identified in the Contract Website (as defined in the Sale Procedures Order) at 5:00 p.m., New York City time, on the date hereof as Executory Contracts to be assumed shall be assumed and assigned as of the effective date provided for in the Contract Website on the date hereof.

2. No Benefit Plan or Non-UAW Collective Bargaining Agreement shall be assumed pursuant to this Section 6.6(a)(ii) of this Sellers' Disclosure Schedule.

## Section 6.17(e)

### Assumed Employee Benefit Plans

1. General Motors Hourly-Rate Employees Pension Plan
2. General Motors Personal Savings Plan for Hourly-Rate Employees in the United States
3. General Motors Life and Disability Benefits Program for Hourly Employees(Supplemental Agreement between UAW and GM)
4. General Motors Health Care Program for Hourly Employees(Supplemental Agreement between UAW and GM) (as amended by the UAW Retiree Settlement Agreement)
5. General Motors Supplemental Unemployment Benefit Plan(Supplemental Agreement between UAW and GM)
6. General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States(Supplemental Agreement between UAW and GM)
7. UAW-GM Legal Services Plan for UAW Represented Hourly Employees of General Motors in the United States (Supplemental Agreement between UAW and GM)
8. Dependent Care Reimbursement Plan for Hourly-Rate Employees in the United States (Supplemental Agreement between UAW and GM)
9. General Motors Health Care Spending Account Plan for Entry Level Employees (UAW)
10. Guaranteed Income Stream Benefit Program (UAW)
11. Dependent Scholarship Program for Hourly Employees in the United States (UAW)
12. Tuition Assistance Program for Hourly Employees in the United States (UAW)
13. General Motors Retirement Program for Salaried Employees in the United States
14. General Motors Executive Retirement Plan
15. General Motors Savings-Stock Purchase Program for Salaried Employees in the United States
16. General Motors Salaried Health Care Program
17. General Motors Corporation Health Care Reimbursement Plan for Salaried Employees in the United States
18. General Motors Corporation Dependent Care Reimbursement Plan for Salaried Employees in the United States
19. General Motors Flexible Compensation Program for Salaried Employees in the United States
20. General Motors Long-Term Care Program for Salaried Employees
21. Executive Supplemental Disability Income Protection Program
22. General Motors Severance Program for Salaried Employees in the United States
23. General Motors Executive Severance Program for Salaried Employees in the United States
24. International Service Personnel Program
25. Permanently International Mobile Staff (PIMS) Employees Individual Account Retirement Plan

26. Quality Network Suggestion Plan (only UAW-represented Employees and active salaried employees)
27. Work Family/Employee Assistance Program (UAW)
28. Dependent Scholarship Program for Salaried Employees in the United States
29. Tuition Assistance Program for Salaried Employees in the United States
30. Purchaser, in its sole discretion, may assume certain individual agreements set forth on Section 4.10(h) of this Sellers' Disclosure Schedule.  In the event Purchaser assumes any individual agreements, such assumed individual agreements shall be set forth on Attachment A to Section 6.17(e) of Sellers' Disclosure Schedule, to be provided immediately prior to Closing.
31. General Motors Corporation Compensation Plan for Non-Employee Directors
32. General Motors Executive Split Dollar Endorsement Plan
33. Personal Umbrella Liability Insurance Program
34. Senior Executive Financial Counseling Program
35. 401(k) Savings Plan Investment Advice Tool (Financial Engines)
36. Financial Planning Option (Ayco)
37. Health Savings Account (Bank of America)
38. Utility Patent Filing Award
39. Defensive Publication Award
40. Tool/Method Award
41. Usage Award
42. "Boss Kettering" Award Program
43. Executive Employee Physicals
44. Work Life Plus Program
45. Adoption Assistance Plan for Salaried Employees
46. Salaried Policies (including, but not limited to leaves, Mutual Separation Policy (MSP), expense reimbursement, relocation, vacation, service awards)
47. Mutual Separation Policy for Executive Employees
48. Executive Company Vehicle Program
49. Product Evaluation Program
50. Work Related Travel Policy
51. New Vehicle Employee Discount Program
52. Company Owned Vehicle Discount Program
53. The General Motors Supplemental Life Benefits Program for Executive Employees
54. The General Motors Life and Disability Benefits Program for Salaried Employees
55. Benefit plans identified under Schedules 6.17(m)(i) and (ii), if any

<u>Trusts</u>

56. General Motors - UAW Layoff Benefit Trust 38-6039966
57. General Motors - IUE Welfare Benefit Trust 38-6039965 (conditioned upon IUE acceptance of modified CBA and IUE's inclusion on schedules under Section 6.17(m))
58. General Motors Savings Plans Master Trust 04-3259743
59. First Plaza Group Trust II 26-6389533

60.    General Motors Welfare Benefit Trust 04-3400339
61.    General Motors Salaried Employees Pension Trust 13-6369844
62.    General Motors Salaried Employees Pension Trust 25-6388249
63.    GMAM Group Pension Trust I 01-0719298
64.    GMAM Group Pension Trust II 02-0615827
65.    GMAM Investment Funds Trust 13-3160892
66.    GMAM Investment Funds Trust II 01-6231432
67.    White Plaza Group Trust 11-3317084
68.    First Plaza Group Trust 25-6295264
69.    Third Plaza Trust 25-6360552
70.    Fourth Plaza Trust 25-6360553
71.    General Motors Hourly Rate Employees Pension Trust 13-6369845
72.    General Motors Hourly-Rate Employees Pension Trust 25-6013833

**Necessary Reductions under Salaried, Executive, and non-UAW Hourly Plans**

Purchaser's obligations to assume benefit plans and to maintain compensation and benefits for one year contemplate the aggregate reduction of the total benefit obligations under Assumed Plans related to Salaried Retiree Life Insurance, Salaried Retiree Health Care, Salaried Non-Qualified Pension, Executive Retiree Life Insurance and hourly (non-UAW) Life Insurance and Health Care plans by approximately two-thirds, as compared to the obligations of Parent as determined as of 12/31/08.

The changes in salaried retiree benefits being implemented for achieving this are identified as follows:

- Retiree Basic Life Insurance for salaried classified and executive retirees reduced to $10,000 effective the first of the month following the Closing Date;
- Retiree Basic Life Insurance for active salaried classified and executive upon their retirement reduced to 50% of base salary;
- Additional salaried retiree co-pays and contributions required for health care plans, effective 1/10. Retiree cost share increases to approximately 45%. No coverage at age 65;
- 10% reduction in accrued ERP benefits as of the date of the close for active employees;
- The current temporary 10% ERP reduction for existing retirees with a combined qualified and nonqualified benefit equal to or less than $100,000 shall become permanent; no additional non-qualified pension reductions shall be made for these retirees;
- A reduction of 2/3 of the ERP amount above the combined qualified and nonqualified benefit greater than $100,000 will be implemented as of the first of the month following the Closing Date; and
- Executive Life Insurance will be cancelled in retirement for all current and future retirees effective the first of the month following the Closing Date.

Health care and life insurance coverage for non-UAW hourly retirees, if provided at all, are intended to match benefit levels provided salaried retirees.  Changes affecting non-UAW hourly retirees are identified in Section 6.17(m) of the Agreement or the related sections of this Sellers' Disclosure Schedule.  To the extent that the foregoing changes do not achieve the aggregate reduction level specified above, Purchaser may implement such other changes as are necessary to satisfy such requirement.

## Section 6.17(h)

### Contracts Relating to the Existing Internal VEBA

None.

## Section 6.17(m)(i)

### Non-UAW Collective Bargaining Agreements

1. 2003 National Agreement between Parent and the International Brotherhood of Electrical Workers ("IBEW"), as amended by the IBEW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by IBEW on June 18, 2009), including its Exhibit A thereto, conditioned upon employees' ratification and upon the court's approval of the IBEW Settlement Agreement identified on Section 6.17(m)(ii) of this Sellers' Disclosure Schedule and the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications) (the "IBEW CBA").   The assumption of the IBEW CBA shall not include pre-Closing Liabilities relating thereto.

2. 2003 National Agreement between Parent and the International Association of Machinists and Aerospace Workers ("IAMAW"), as amended by the IAMAW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by IAMAW on June 16, 2009), including its Exhibit A thereto, conditioned upon ratification and upon the court's approval of the IAMAW Settlement Agreement identified on Section 6.17(m)(ii) of this Sellers' Disclosure Schedule and the waiver and release dated June 15, 2009 and executed by IAMAW on June 16, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications) (the "IAMAW CBA"). The assumption of the IAMAW CBA shall not include pre-Closing Liabilities relating thereo.

## Section 6.17(m)(ii)

### Non-UAW Settlement Agreements

1.  IBEW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by the International Brotherhood of Electrical Workers  on June 18, 2009), conditioned upon the court's approval of the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

2.  IAMAW-Newco Settlement Agreement Regarding Retiree Health Care, Life Insurance, & Modification & Assumption of CBA (executed by the International Association of Machinists and Aerospace Workers on June 16, 2009), conditioned upon the court's approval of and the waiver and release dated June 15 and executed by IAMAW on June 16, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

3.  Newco- Locals 687 & 1045 Settlement Agreement Regarding Retiree Health Care & Life Insurance (executed by Michigan Regional Council of Carpenters, Local 687, and Interior Systems, Local 1045, on June 17, 2009), conditioned upon the court's approval of the waiver and release dated June 16, 2009 and signed by Unions on June 17, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care & Retiree Basic Life Insurance).

4.  Newco-IBPA Settlement Agreement Regarding Retiree Health Care & Life Insurance (executed by the International Brotherhood of Painters and Allied Trades of the United States and Canada, Sign & Display Union Local 591 on June 18, 2009), conditioned upon the court's approval of and the waiver and release dated June 18, 2009 (Re: Proposed Memorandum of Understanding Regarding Retiree Health Care, Retiree Basic Life Insurance and CBA Modifications).

## Section 6.27

## Subdivision Properties

|    | Purchased Asset | Excluded Asset |
|----|-----------------|----------------|
| 1. | Pontiac North Campus, 894 Joslyn Road, Pontiac, Michigan<br><br>Stamping - Pontiac Plant 14 200 East Columbia, Pontiac, MI 48340<br><br>Powerhouse, 900 Baldwin Ave., Pontiac, Michigan 48340 | Stamping - Pontiac North Campus (excluding plant 14), 220 East Columbia, Pontiac, Michigan 48340<br><br>Pontiac Fiero Site (excluding powerhouse), 900 Baldwin Ave, Pontiac, Michigan 48340 |
| 2. | GMPT - Romulus, 36880 Ecorse Road, Romulus, Michigan | Romulus Engineering Center, 37350 Ecorse Road, Romulus, Michigan |
| 3. | GMVM - Fairfax Assembly, 3201 Fairfax Trafficway, Fairfax, Kansas<br><br>Stamping - Fairfax, 3201 Fairfax Trafficway, Fairfax, Kansas | Fairfax Land, 100 Kindleberger Road, Fairfax, Kansas |
| 4. | Weld Tool Center - Grand Blanc, 10800 South Saginaw St., Grand Blanc, Michigan | Dort Highway land, 10800 South Saginaw St., Grand Blanc, Michigan |
| 5. | GMVM - Lordstown Assembly, 2300 Hallock Young Road, Lordstown, Ohio<br><br>Stamping - Lordstown, 2369 Ellsworth-Bailey Road , Lordstown, Ohio | RFO - Lordstown, 1829 Hallock Young Road, Lordstown, Ohio |
| 6. | GMPT - Moraine (DMAX), 2601 W. Stroop Road, Moraine, Ohio | GMVM - Moraine Assembly, 2601 W. Stroop Road, Moraine, Ohio (excluding DMAX) |
| 7. | GMPT - Parma Stamping, 5400 Chevrolet Blvd., Parma, Ohio | GMPT - Parma Complex, 5400 Chevrolet Blvd., Parma, Ohio (Powertrain) |
| 8. | Saginaw Metal Casting, 1629 N. Washington Ave., 48605-5073, Saginaw, Michigan | Saginaw Nodular Iron, 2100 Veterans Memorial Pkwy, Saginaw, Michigan |
| 9. | GMPT - Toledo, 1455 W. Alexis Rd PO Box 909, Toledo, Ohio | REALM parcel located adjacent to Purchased Asset |