# EXHIBIT A

William Fried, Esq.
HERRICK, FEINSTEIN LLP
Attorneys for Plaintiffs
2 Park Avenue
New York, NY  10016
(212) 592-1400
wfried@herrick.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – –x

EVGENY A. FREIDMAN, VLADIMIR BASIN,      :
MAMED DZHANIYEV, Victory Taxi Garage Inc., :      Civ. No. 08-CV-02458 (SAS)
Tunnel Taxi Management, LLC, Downtown Taxi :
Management, LLC, Bazar Taxi Inc., Patron Taxi :      **THIRD AMENDED COMPLAINT**
LLC, Grappa Taxi LLC, Cognac Taxi LLC,        :
Calvados Taxi LLC, Tequila Taxi LLC, Jack     :
Daniels Taxi LLC, Murzik Taxi Inc., Malinka Taxi :   **JURY TRIAL DEMANDED**
Inc., Yagodka Taxi Inc., Persik Taxi Inc., Bratishka :
Taxi Inc., Pumo Taxi Inc., Piguet Taxi Inc.,     :
Kormilitsa Taxi Inc., Prada Taxi, Inc., Student Taxi :
Inc., Hublot Taxi Inc., Torpedo Taxi Inc., Black :
Label Taxi LLC, Praga Taxi Inc., Two Hump Taxi :
LLC, Kroshka Taxi Inc., Lacoste Taxi Inc., Sangria :
Taxi LLC, Volba Taxi Inc.,                      :
                                                :
                        Plaintiffs,             :
                                                :
        -against-                               :
                                                :
GENERAL MOTORS CORP., ELDORADO                  :
NATIONAL, INC., and ARCOLA SALES &              :
SERVICE CORP.,                                  :
                                                :
                        Defendants.             :

– – – – – – – – – – – – – – – – – – – – – – – – – –X

        Plaintiffs Evgeny A. Freidman, Vladimir Basin, Mamed Dzhaniyev, Victory Taxi

Garage, Inc., Tunnel Taxi Management, LLC, Downtown Taxi Management, LLC, Bazar Taxi

Inc., Patron Taxi LLC, Grappa Taxi LLC, Cognac Taxi LLC, Calvados Taxi LLC, Tequila Taxi

LLC, Jack Daniels Taxi LLC, Murzik Taxi Inc., Malinka Taxi Inc., Yagodka Taxi Inc., Persik

Taxi Inc., Bratishka Taxi Inc., Pumo Taxi Inc., Piguet Taxi Inc., Kormilitsa Taxi Inc., Prada

Taxi, Inc., Student Taxi Inc., Hublot Taxi Inc., Torpedo Taxi Inc., Black Label Taxi LLC, Praga

Taxi Inc., Two Hump Taxi LLC, Kroshka Taxi Inc., Lacoste Taxi Inc., Sangria Taxi LLC, and

Volba Taxi Inc. (collectively, "Plaintiffs"), by their attorneys, Herrick, Feinstein LLP, pursuant

to the Court's Opinion and Order dated February 23, 2009, and as and for their Third Amended

Complaint against Defendants General Motors Corp. ("GM"), ElDorado National, Inc.

("ElDorado"), and Arcola Sales & Service Corp. ("Arcola") (collectively, "Defendants"), hereby

allege as follows:

### Nature of the Action

1.     Plaintiffs have sustained extensive losses as a direct and proximate result

of the fraud and material misrepresentations made by GM and ElDorado regarding their

promises to manufacture, retrofit, and sell to Plaintiffs certain Chevrolet Uplanders (the

"Vehicles") for use as wheelchair-accessible taxicabs in New York City in compliance with the

specifications and requirements of the New York City Taxi & Limousine Commission (the

"TLC"). Not only did GM and ElDorado misrepresent that it would provide Plaintiffs with

compliant Vehicles, it engaged in a "bait-and-switch" scheme in an effort to fool Plaintiffs into

approving and accepting their non-compliant Vehicles. Furthermore, ElDorado later

misrepresented to Plaintiffs that the TLC had approved the allegedly "re-engineered" Vehicles,

when the TLC had not, in fact, provided any such approval.

2.     Defendants' fraud has not only resulted in substantial economic losses to

Plaintiffs, but, as GM and ElDorado were well aware, the defects in their products resulted in

wanton and gross disregard for the safety of Plaintiffs' customers, drivers and the public at large.

In addition to fraud against GM and ElDorado, Plaintiffs seek to recover from Arcola for

2

breaches of its sales agreements and from GM and ElDorado for their breaches of their respective express written warranties with respect to the Vehicles.

## Jurisdiction and Venue

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of this action is situated in the Southern District of New York.

## Parties

5.      Evgeny Freidman resides in, is a citizen of, and is domiciled in the State of New York.

6.      Vladimir Basin resides in, is a citizen of, and is domiciled in the State of New York.

7.      Mamed Dzhaniyev resides in, is a citizen of, and is domiciled in the State of New York.

8.      Plaintiffs Freidman, Basin and Dzhaniyev are the only owners and members of the corporations and LLCs named as Plaintiffs in this case. The LLCs and corporations named as plaintiffs in this case are entities set up as the owners of New York City taxi medallions.

9.      Victory Taxi Garage, Inc. is a New York corporation with offices at 102 Foster Avenue, Brooklyn, NY 11230 with its principal place of business in the State of New York.

3

10.    Tunnel Taxi Management, LLC is a limited liability company organized under the laws of the State of New York with offices at 44-07 Vernon Blvd., Long Island City, NY 11101 with its principal place of business in the State of New York.

11.    Downtown Taxi Management, LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

12.    Bazar Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

13.    Patron Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

14.    Grappa Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

15.    Cognac Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

16.    Calvados Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

17.    Tequila Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

HF 4664066v.2 #11894/0002

18.    Jack Daniels Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

19.    Murzik Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

20.    Malinka Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

21.    Yagodka Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

22.    Persik Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

23.    Bratishka Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

24.    Pumo Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

25.    Piguet Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

26.    Kormilitsa Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

27.    Prada Taxi, Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

28.    Student Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

HF 4664066v.2 #11894/0002

29.     Hublot Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

30.     Torpedo Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

31.     Black Label Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

32.     Praga Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

33.     Two Hump Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

34.     Kroshka Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

35.     Lacoste Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

36.     Sangria Taxi LLC is a limited liability company organized under the laws of the State of New York with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

37.     Volba Taxi Inc. is a New York corporation with offices at 330 Butler Street, Brooklyn, NY 11231 with its principal place of business in the State of New York.

HF 4664066v.2 #11894/0002

38.    Upon information and belief, GM is a Delaware corporation whose principal place of business is located at 300 Renaissance Center, Detroit, Michigan 48265. GM is in the business of manufacturing and selling automotive vehicles.

39.    Upon information and belief, ElDorado, a subsidiary of Thor Industries, is a Kansas corporation, with its principal place of business located at 1655 Wall St., Salina, Kansas 67401.  Upon information and belief, ElDorado is in the business of manufacturing and retrofitting automotive vehicles and is considered a "Second Stage Manufacturer."

40.    Arcola Sales & Service Corp. is a corporation whose principal place of business is located at 51 Kero Road, Carlstadt, New Jersey 07072.  Upon information and belief, Defendant Arcola is in the business of selling automotive vehicles.

### Background

41.    The New York City taxicab industry is a private industry closely regulated by the TLC.  The TLC was created in 1971 by New York City Council legislation (Local Law 12) to regulate and improve taxi and livery service in New York City and to establish overall transportation policy governing these services.  Upon information and belief, there are only 13,237 medallion taxicabs currently authorized to accept hails from passengers within the five boroughs of the New York City.

42.    The TLC is responsible for, *inter alia*, licensing and regulating New York City's medallion (yellow) taxicabs, for-hire vehicles (community-based liveries and black cars), commuter vans, paratransit vehicles (ambulettes), and certain luxury limousines.

43.    A "taxicab medallion" is a metallic emblem affixed to the hood of a New York City taxicab that represents a license from the City, authorizing the operation of a taxicab within the City of New York. The number of taxicab medallions in New York City is limited by

7

law. Licensed taxicabs are the only motor vehicles permitted to accept passengers by street hail on the streets of New York City.

44.     Not only is a medallion a license to operate a taxicab and generate income from such operations, but it is also a license to own and operate a small business, to use as security for loans, and to lease the license to other operators for a fee limited by law. Taxicab licenses may also be transferred to another qualified buyer subject to certain restrictions.

45.     An "Accessible Medallion" is a restricted medallion and is defined as a "a taxicab license valid for use only with a vehicle accessible to a passenger using a wheelchair." R.C.N.Y. § 13-01(a). Presently, only 231 out of the 13,237 taxicab medallions in New York City are Accessible Medallions.

**The Retrofitting**

46.     Upon information and belief, the retrofitting process was intended to work as follows: (a) GM would provide ElDorado with the Chevrolet Uplander frame; (b) based on GM's design and with oversight from GM, ElDorado then retrofitted the vehicles for wheelchair-accessibility at its factory in Kansas; and (c) once the vehicles were retrofitted, the vehicles were delivered to Arcola for final sale and delivery.

47.     Upon information and belief, at all relevant times, GM and ElDorado were all working together to induce Plaintiffs to purchase certain Accessible Medallions (discussed below), purchase the Vehicles (which were GM Chevy Uplanders retrofitted by ElDorado pursuant to the process outlined above), fix or repair the Vehicles, and induce Plaintiffs not to cancel their orders for the Vehicles from Defendants once it became evident that the Vehicles were non-compliant with the specifications and requirements of the TLC and the needs of Plaintiffs.

8

48.    Upon information and belief, as directed and/or overseen by GM, ElDorado made substantial changes to the Vehicles, which involved extensive cutting to the body structure and the lengthening and lowering of certain Vehicle components to accommodate the entrance and exit of wheelchair riding occupants to and from the Vehicles. Upon information and belief, as directed and/or overseen by GM, ElDorado substantially modified the suspension system, doors, seats and ground effects on the Vehicles, and these modifications substantially changed the handling, performance and other material safety characteristics of the Vehicles. Upon information and belief, the modifications that GM and ElDorado made to the Vehicles for Plaintiffs were not properly engineered.

49.    Upon information and belief, GM also provided "original equipment manufacturer" (OEM) support, as well as assistance to ElDorado both in producing and repairing ElDorado's failed retrofitting, as discussed below.

50.    Upon information and belief, ElDorado's retrofitting design for the purpose of wheelchair-accessibility severely compromised critical components of the Uplander, such as the rear suspension, the transmission and the sliding door system and the modifications did not take into account the effects that they would have upon other systems, components and features of the Vehicles, such as performance, handling, static stability factors and structural durance.

51.    Upon information and belief, in designing and manufacturing the Vehicles, GM and ElDorado did not sufficiently test and/or properly engineer the Vehicles. Had they done so, they would have detected these substantial defects and either not made the changes that they did or re-engineered the Vehicles to correctly accommodate for the modifications without creating additional safety hazards.

HF 4664066v.2 #11894/0002

**Defendants' Material Misrepresentations**

52.    In early 2006, Plaintiffs were considering purchasing additional Accessible Medallions within New York City.  In or about March 2006, Peter Schenkman, Assistant Commissioner, Safety and Emissions Division of the TLC, put Plaintiff Evgeny Freidman directly in touch with representatives of GM and ElDorado, including Chuck Compagnoni, GM Fleet Account Executive, Northeast Region, and Denny Foerschler of ElDorado, Mobility Division, Eastern Region.  The TLC had informed Mr. Freidman that GM was looking to get back into the taxi business and that GM and ElDorado were interested in producing and selling GM retrofitted vehicles for use as wheelchair accessible taxicabs in New York City.  As soon as the TLC made the introduction, Plaintiffs, through Mr. Freidman, were in regular contact with representatives of all Defendants, including Messrs. Compagnoni of GM, Foerschler of ElDorado and Andrew Rolfe of Arcola, discussing the possibility of purchasing GM retrofitted vehicles for use as wheelchair accessible taxicabs in New York City.

53.    In March 2006, Plaintiffs, including Mr. Freidman, communicated to GM, ElDorado and Arcola, including Messrs. Compagnoni, Foerschler and Rolfe, their needs for the GM retrofitted vehicles to be compliant with the TLC's specifications and suitable for use as wheelchair accessible taxicabs in New York City.  These communications occurred on a regular basis in the spring of 2006.  Representatives from GM, ElDorado and Arcola, including Messrs. Compagnoni, Foerschler and Rolfe, told Plaintiffs, including Mr. Freidman, that Defendants could and would produce GM manufactured and ElDorado retrofitted wheelchair accessible taxicabs -- specifically, Chevrolet Uplander vehicles -- that would comply with the vehicle specifications and requirements of the TLC and be suitable for use as New York City taxicabs operating with Accessible Medallions.  Indeed, in an email dated March 24, 2006 to Mr.

10

HF 4664066v.2 #11894/0002

Freidman, Mr. Compagnoni wrote as follows: "Gene, Thanks for the reply. Have Andy [of Arcola] get me the order #'s of your units and I will expedite." The "units" referenced in the foregoing email concerned the Chevrolet Uplander vehicles that Defendants had represented would comply with the vehicle specifications and requirements of the TLC and be suitable for use as New York City taxicabs operating with Accessible Medallions.

54.    Defendants advertised, represented and warranted to Plaintiffs that the Vehicles complied with the American Disabilities Act (ADA), the Administrative Code of the City of New York, and the TLC wheelchair-accessibility requirements.

55.    In an email dated March 31, 2006, Mr. Foerschler of ElDorado wrote to Mr. Schenkman of the TLC and stated in part as follows:

> Has Chairman Daus signed off on the "Proposed Vehicle Spec's" for the Chevy Uplander? We are anxious to receive and review the final version and be able to tweak our spec's to match up with the TLC's. We are approaching the end of the 2006 model year for the Uplander production and have reserved just a few for this project. We have begun ordering the 2007 Uplander chassis, but don't know how soon to expect delivery of those. We just want to be ready to hit the ground running when everything is in place. I know that Mr. Evgeny Freidman is calling about getting some in service as soon as possible.

56.    In May 2006, the TLC announced that 54 of 308 taxi medallions that New York City was going to auction in June 2006 were to be Accessible Medallions.

57.    On or about May 10, 2006, Defendants presented one of its Chevy Uplanders to the TLC for demonstration in a parking lot in downtown Manhattan. The TLC told Defendants that the Uplander presented would not be suitable for use as a wheelchair accessible taxicab in New York City unless certain modifications were made to the vehicle.

58.    On or about May 11, 2006, the TLC established certain new specifications for New York City taxicabs that would be operating with Accessible Medallions. The new

11

specifications were provided to Defendants. Messrs. Compagnoni of GM and Foerschler of ElDorado told Mr. Freidman that GM and ElDorado could modify the Chevy Uplander to comply with the TLC's new specifications and provide Plaintiffs with Chevy Uplanders to satisfy their needs if they purchased the 54 Accessible Medallions at the public auction in June 2006.

59.    Upon information and belief, Defendants submitted to the TLC written specifications of the modifications they intended to make to the Chevy Uplander to comply with the TLC's new specifications applicable to taxicabs with Accessible Medallions. Defendants' written specifications were approved by the TLC, subject to certain contingencies, on or about June 6, 2006.

60.    Messrs. Compagnoni of GM and Foerschler of ElDorado told Mr. Freidman that the TLC had approved their modified specifications and that they would be used in producing wheelchair accessible taxicabs for the Plaintiffs if they purchased the 54 Accessible Medallions at the public auction and ordered Uplanders from Defendants.

61.    Plaintiffs relied upon the foregoing representations made by Messrs. Compagnoni of GM and Foerschler of ElDorado when they decided to obtain financing for and bid on the 54 Accessible Medallions at the public auction in June 2006.

62.    Plaintiffs would not have obtained financing for and submitted bids for the 54 Accessible Medallions in June 2006 had they known that Defendants' representations were false.

63.    Based upon the representations of Messrs. Compagnoni of GM and Foerschler of ElDorado, Plaintiffs obtained financing for, successfully bid on and purchased all

12

54 of the Accessible Medallions that were offered at the public auction on June 16, 2006 for a total price in excess of $25 million.

64.    Plaintiffs signed "Vehicle Orders" for the Vehicles with Arcola. The Vehicle Orders specified, as Defendants represented and agreed to do in emails and other communications, that as part of the retrofitting process, Defendants would make the Vehicles comply with the TLC's specifications and be suitable for use as New York City taxicabs.

65.    Plaintiffs immediately informed Defendants that they had purchased all 54 of the Accessible Medallions that were auctioned on June 16, 2006. Defendants, including Messrs. Compagnoni of GM and Foerschler of ElDorado, told Mr. Freidman that the first two retrofitted Chevy Uplanders would be ready for shipment the following week and in compliance with the TLC's specifications.

66.    In mid-July 2006, Plaintiffs received the first retrofitted Chevy Uplander from Defendants, which was inspected by the TLC to make sure that it complied with its new specifications. The TLC determined that the first Chevy Uplander delivered to Plaintiffs was: (a) not the same as the Chevy Uplander that had been presented to the TLC on May 10, 2006, and had many more defects and problems than the demonstration model Defendants had presented to the TLC on May 10, 2006; and (b) did not comply with the TLC's new specifications released on or about May 11, 2006 for taxicabs operating with Accessible Medallions. In an email dated July 17, 2006 to Mr. Foerschler of ElDorado, with a cc to Mr. Compagnoni of GM, Peter Schenkman of the TLC wrote in part as follows:

> As discussed, there are issues with this vehicle, that were not present with the demo model that the TLC examined. The first involves the driver seat height . . . . The engine seemed to lack power . . . .
>
> The tinted glass will have to be changed.  * * *

The other issues are a little more serious. I suspect there is an issue with the ride height of this vehicle, it seems very tall and possibly as a result, is causing a lot of body roll, that tosses the passengers in the backseat around and does not makefor [sic] a pleasant riding experience. I got quite carsick in the back of the vehicle with the rolling. I think it might have to do also with lack of thigh support with the seats, since they are short bottom seats or the way they are mounted. * * *

The brake lines as you can see from the photos are fairly mangled and not tucked up under the cover for the fuel lines, which would put them out of harms way. The rear muffler has way too much movement as a result of the placement of the hangers and will bang around and eventually snap off. It will also hit the fuel tank and the rear plat you installed.

The front skid plate, while a nice idea, is too flimsy, will sound like a steel pan drum when rocks hit it, and it is not secured in the front (see photo) Pleas look into this [sic] issues and I look to further discussions on this.

67.     Plaintiffs inspected the first retrofitted Chevy Uplander delivered by Defendants and realized that Defendants had engaged in a "bait-and-switch" scheme -- *i.e.*, the Chevy Uplander that Defendants had delivered pursuant to Plaintiffs orders in July 2006 was not the same vehicle that Defendants had previously shown to Plaintiffs in the spring of 2006 when they induced Plaintiffs to finance and purchase the 54 Accessible Medallions from the TLC and the Uplanders from Defendants to satisfy their needs arising from their newly acquired Accessible Medallions. Plaintiffs further realized that the first retrofitted Chevy Uplander Defendants delivered in July 2006 was materially inferior to the Chevy Uplander that Defendants had previously shown to them and promised would be modified to comply with the TLC's new specifications, as well as Plaintiffs' needs.

68.     Defendants promised to fix and re-engineer the Vehicles to comply with the concerns raised by the TLC and Plaintiffs. On July 17, 2006, Mr. Foerschler sent an email to

14

Mr. Freidman (with cc's to Mr. Rolfe and others within Defendants' companies), stating, in part, as follows:

> I received a call from Peter Schenkman [of the TLC] this morning regarding the initial inspection of your first Amerivan Uplander Taxi. He said that he and you had some concerns about the van. We certainly don't want you to be disappointed in the product we offer.
>
> Please be assured that we will respond promptly and address these concerns that you both have. When you have a moment, please give me a call and we can go over the list that I am developing for your review.
>
> We want you to be satisfied with our product and support and we can't accomplish that without feedback from you and your staff.
>
> I have called Gordon Gove at Arcola and asked him to call you and arrange for you to drive their Demo van tomorrow, to see if it has any of the same issues that Peter [Schenkman of the TLC] detailed on your first unit.
>
> Thanks very much for your business!

69.     As a result of the concerns raised by the TLC and Plaintiffs with respect to the first retrofitted Chevy Uplander delivered by Defendants, GM and ElDorado brought representatives to New York the week of July 16, 2006 to examine the Uplander and compare it with another wheelchair accessible vehicle manufactured by a competitor, Braun. Mr. Freidman was assured by representatives from each of the Defendants at the meeting that the problems identified by the TLC and Plaintiffs would be addressed immediately. Following the meeting, Mr. Rolfe of Arcola told Mr. Freidman that the Defendants were committed to re-engineering the Chevy Uplanders to meet the TLC's and Plaintiffs' requirements.

70.     After the meeting, by email dated July 21, 2006, Mr. Freidman wrote to Mr. Rolfe, with cc's to Messrs. Schenkman, Foerschler, Compagnoni and others within Defendants' companies, and outlined the problems with the Chevy Uplander observed and

15

discussed during the meeting.  Among other things, Mr. Freidman stated as follows: "[I] think

that the el dorado vehicles besides being incredibly proan [*sic*] to major maintenance problems is

as <u>is now unsafe for both driver and passenger!</u> and <u>that is the ultimate concern!</u>"  [Emphasis

added]

71.    As of August 2006, the concerns raised by the TLC with the Vehicles had

still not been fixed by Defendants.  By email dated August 1, 2006, in response to an email from

Mr. Freidman in which Mr. Freidman had stated that he was considering purchasing wheelchair

accessible vehicles from another manufacturer because of Defendants' failed promises, Mr.

Schenkman wrote as follows:

> I certainly understand.  My feeling is that unless Eldorado changes
> their modification to the front end, it will be better, but not good
> enough.  I expect the vehicle(s) they are modifying at Arcola will
> be somewhat better.  I am awaiting GM documentation to see if
> that modification is even permitted under their SVM guidelines.

72.    Based upon Defendants' representations that they could "re-engineer" and

fix the defects and problems identified in the first retrofitted Uplanders delivered to Plaintiffs,

and the substantial investment that Plaintiffs had made in financing their purchases of the 54

Accessible Medallions, for which no revenue was being earned by Plaintiffs to service the debt

owed on the multi-million dollar financing without the Vehicles, Plaintiffs had no choice but to

wait for Defendants to comply with their representations and promises.

73.    On August 15, 2006, Mr. Foerschler advised Mr. Freidman that the re-

engineering or "upfit" on the initial two Uplanders had been completed and they, along with

several more Uplanders, would be delivered to Plaintiffs.  Mr. Freidman was specifically assured

by Mr. Foerschler that the so-called "re-engineered" Uplanders had been approved by the TLC.

16

Upon information and belief, the TLC had not approved the so-called "re-engineered" Uplanders.

74.    The allegedly "TLC approved" and "re-engineered" Uplanders started to be delivered to Plaintiffs in August 2006, and Plaintiffs received all of the Uplanders they had purchased by November 2006.

75.    It was almost immediately evident to Plaintiffs once they received all of the Vehicles, however, that Defendants had failed to comply with their prior material representations that they would supply Plaintiffs with Chevy Uplanders that complied with the TLC's new specifications and were suitable for rigorous use as New York City taxicabs.  The Uplanders delivered by Defendants to Plaintiffs broke down on a daily basis.

76.    It was also evident that GM and ElDorado did not utilize the services of a competent engineer in making their changes to the Vehicles.  For instance, GM and/or ElDorado modified the rear axle bar to make the ride of the Vehicles stiffer and to address the handling concerns expressed by Mr. Schenkman of the TLC in July 2006.  This modification, however, caused a number of the rear axles on the Vehicles to actually detach during operation because GM and ElDorado failed to take into account that a stiffer ride would add greater stress to the U-Bolts and other components securing the rear axles to the Vehicles.

77.    These breakdowns caused Plaintiffs to lose substantial sums of money dues to: (a) towing costs; (b) the time and expense related to performing repairs; (c) lost profits for each shift that each Uplander was in the repair shop; (d) lost drivers who quit because (i) the Uplanders they were supposed to operate were off the road for repairs, and (ii) they feared for their safety due to the nature of the failures occurring with the Uplanders on a regular basis (*e.g.*, doors falling off hinges; engines dropping off their mounts; axles detaching from the vehicles).

17

78.    After Plaintiffs placed the Vehicles in operation, they all required repeated repairs. Plaintiffs had to employ a tow truck more than 300 times to transport broken-down Vehicles to repair shops. Indeed, each of the Vehicles has been removed by Plaintiffs from operation more than one time for necessary repairs and in an attempt to avert further breakdowns.

79.    As a result of the repeated repairs and Plaintiffs' inability to use the Vehicles, Plaintiffs have lost in total more than 7,820 shifts, and more than $2,000,000 in revenues.

80.    Moreover, Plaintiffs suffered negative media publicity as a result of Defendants' material misrepresentations and the failures the Vehicles were experiencing. For example, on one occasion, a photograph was published on the second page of the Daily News of one of the subject Uplanders with its rear axle detached from the vehicle outside of the UN Building.

81.    The problems with the Uplanders were reported by Plaintiffs to the Defendants. Representatives from each of the Defendant corporations promised Plaintiffs that they would repair the Uplanders. Representatives from GM and ElDorado traveled to New York on a number of occasions to discuss the problems with Plaintiffs. Indeed, in an email dated October 18, 2007 to Mr. Freidman, Jeff Montgomery of ElDorado explained Defendants' plan for fixing the problem of axles falling off the Uplanders:

> We installed a set of spring spacers on taxi number 8V76 on September 19, 2007. This van has accumulated 4,646 miles and the spring spacers are serving their purpose by allowing the springs to operate in their intended range and taking the load off the rear shocks and control arms proving to reduce the premature wearing of the OEM control arm bushings. As you are aware, when worn bushings are not replaced rear axles are ruined and trailing arms

18

can break.   Therefore, it made sense to increase the life of the
bushings and reduce the frequency of the maintenance schedule.

It has been our plan to install these spacers on the other vans in
your fleet since late August.   It was at that time that out
independent PE/consulting engineer approved our rear suspension
kit and recommended the addition of the spring spacers.  Thanks to
the positive results from our inspection on October 16 we can now
confidently move forward and install spacers on the other vehicles.
The spacers have been added to the kits HB Chevrolet will be
installing as they continue to work on your vans.  We ask that you
advise us when we can have access to the vans already repaired by
HB and we will inspect and install spacers on these vans as well.
With your permission our technicians can install these spacers at
your garage locations and we are planning to be there next week.
Once the spacers are installed we plan to work on-site and install
suspension kits or replace axles until all units in the fleet are
completed.

We understand there have been delays in scheduling at HB
Chevrolet and we are working with HB and General Motors to
identify other locations and improve the turn around.  * * *

82.    Upon information and belief, despite their promises to do so, Defendants

never employed an engineer to assist them with their modifications to the Uplander.  Rather,

Defendants simply employed inadequate and piece-meal modifications to the Vehicles in an

effort to fool the TLC and Plaintiffs into approving and accepting them, and then jury-rigged the

repairs to the Vehicles when they broke down.

83.    It is clear that the Vehicles were not suitable for use as wheelchair

accessible taxicabs in New York City, not in compliance with the mandates of the TLC and not

in accordance with the material representations previously made by Defendants to Plaintiffs,

which caused Plaintiffs to purchase the 54 Accessible Medallions and place orders with

Defendants for approximately 56 Chevy Uplanders.

84.    The safety problems with the Vehicles included, without limitation, the

following:

19

- Doors opening and falling off the hinges while in operation;

- Axles breaking away from the suspension of the vehicles;

- Tangled brake lines;

- Faulty engine mounts coming loose;

- Static stability and handling issues;

- Problems with defective trailing arm bushings; and

- Mufflers falling off hangars and dangling while in operation (among other problems).

85.    In addition, the Vehicles experienced constant transmission failures and problems with the on-board diagnostic technology ("OBD").

86.    After allowing Defendants a reasonable amount of time to allegedly "re-engineer" the Vehicles (as Defendants promised they would) and fix the problems and safety issues with the Vehicles that were communicated by Plaintiffs to Defendants on numerous occasions (again, as Defendants promised they would), Plaintiffs asked Defendants to take the Vehicles back and replace them with new, properly engineered vehicles which would comply with their prior representations, as discussed above, or refund Plaintiffs for the amounts paid for the Vehicles.  Defendants refused.

87.    Plaintiffs have deposited the vehicles with Defendant Arcola.

88.    Upon information and belief, General Motors has discontinued the particular design of the Chevrolet Uplander that Plaintiffs purchased for use as taxicabs.

20

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Defendant Arcola)

89.     Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

90.     The Vehicle Orders between Plaintiffs and Arcola for the sales of the Chevrolet Uplanders were valid and enforceable.

91.     The Vehicle Orders reflected the bargain between and amongst Plaintiffs and Arcola, and incorporated promises made by Defendants GM and ElDorado, for the purchase of the Vehicles to serve as taxicabs with specific components for wheelchair-accessibility.

92.     At all times relevant herein, Plaintiffs have fully performed their obligations under the foregoing agreements.

93.     Pursuant to the Vehicle Orders, Defendant Arcola agreed to provide Plaintiffs with new Chevrolet Uplanders retrofitted in a condition fit for use as wheelchair-accessible taxicabs.

94.     As received by Plaintiffs, the Vehicles were defective, and were not capable of meeting the standards of quality and performance for a vehicle of its kind.

95.     Plaintiffs, on numerous occasions, gave Defendant Arcola timely notice of the Vehicles' defects; nevertheless, the repairs were never able to cure the fundamental defects and the engineering flaws, as designed, manufactured and made by Defendants ElDorado and GM.

96.     Plaintiffs have not been able to, and will never be able to, reap the benefit of their bargain.

97.     Defendant Arcola has materially breached the Vehicle Orders with Plaintiffs.

21

98.    By reason of the foregoing material breaches of the Vehicle Orders, Plaintiffs have suffered damages, including but no less than the amount paid for the Vehicles, $3,000,000, and consequential and incidental damages, in an amount to be determined at trial but believed to be no less than $3,000,000.

## SECOND CAUSE OF ACTION
### (Breach of Express Warranty Against GM )

99.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

100.    In conjunction with the sale of the Vehicles, GM provided Plaintiffs with a written and purportedly limited warranty (the "GM Warranty").

101.    The GM Warranty provides in part as follows:

GM will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.

**What is Covered**

**Warranty Applies**
This warranty is for GM vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**
The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new or remanufactured parts.

**No Charge**
Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

HF 4664066v.2 #11894/0002

To obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs. A reasonable time must be allowed for the dealer to perform necessary repairs.

### Warranty Period

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

### Bumper-to-Bumper Coverage

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first . . . .

### Powertrain Coverage

The powertrain is covered for 5 years or 100,000 miles, whichever comes first . . . .

**Engine:** Cylinder head, block, timing gears, timing chain, timing cover, oil pump/oil pump housing. OHC carriers, valve covers, oil pan, seals, gaskets, turbocharger, supercharger and all internal lubricated parts as well as manifolds, flywheel, water pump, harmonic balancer and engine mount. Timing belts are covered until the first scheduled maintenance interval.

**Transmission/Transaxle/Transfer Case:** Case, and all internal lubricated parts, torque converter, transfer case, transmission/transaxle mounts, seals and gaskets.

**Drive Systems:** Final drive housing, all internal lubricated parts, axle shafts and bearings, constant velocity joints, axle housing, propeller shafts, universal joints, wheel bearings, locking hubs, front differential actuator, supports, front and rear hub bearings, seals and gaskets.

\*　　\*　　\*

### Accessory Coverages

All GM accessories sold by GM and parts that are permanently installed on a GM vehicle prior to delivery will be covered under the provisions of the New Vehicle Limited Warranty. In the event GM accessories are installed after vehicle delivery, or are replaced under the new vehicle warranty, they will be covered, parts and labor, for the balance of the vehicle warranty, but in no event less than 12 months/12,000 miles. This coverage is only effective for

HF 4664066v.2 #11894/0002

GM accessories permanently installed by a GM dealer or an associated GM-approved Accessory Distributor/Installer (ADI).

\*      \*      \*

102.    The GM Warranty further purportedly provides as follows: **"Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty."** (the "Limited Remedy Clause").

103.    Upon information and belief, all of the defects and problems with the Vehicles, including, without limitation, those specifically discussed above, are covered under the "Bumper-to-Bumper Coverage" provided under the GM Warranty.

104.    Upon information and belief, ElDorado is a "GM-approved Accessory Distributor/Installer (ADI)," and all accessories, additions and modifications performed by ElDorado on the Vehicles, both before and after the dates of delivery, and all of the defects and problems to the Vehicles, including, without limitation, those discussed above, that exist as a result of ElDorado's work and installations, are covered under the "Bumper-to-Bumper Coverage" provided under the GM Warranty.

105.    Upon information and belief, all towing charges incurred by Plaintiffs as a result of the breakdowns of the Vehicles are covered under the "Bumper-to-Bumper Coverage" provided under the GM Warranty.

106.    Upon information and belief, Plaintiffs complied with all of their obligations under the GM Warranty and provided prompt notice to GM and ElDorado, as a "GM-approved Accessory Distributor/Installer (ADI)," of each and every defect and problem in the Vehicles and provided a reasonable amount of time for GM, ElDorado and/or HB Chevrolet to perform the necessary repairs.

107.    Upon information and belief, none of the defects and problems that are at issue in this action are excluded or otherwise not covered under the GM Warranty.

108.    Upon information and belief, the GM Warranty remains in full force and effect and never became void for any reason.

109.    Upon information and belief, GM has materially breached the GM Warranty by, among other things, failing to effect the necessary repairs on the Vehicles within a reasonable amount of time as required by the GM Warranty.

110.    Upon information and belief, GM's breaches of the GM Warranty, including its failure to effect the necessary repairs on the Vehicles within a reasonable amount of time and its numerous failed attempts to effect proper repairs after receiving adequate notice and having a reasonable opportunity to do so, has caused the Limited Remedy Clause to fail of its essential purpose.

111.    Upon information and belief, enforcement of the Limited Remedy Clause would deprive Plaintiffs of a remedy altogether under the circumstances.

112.    Accordingly, all of the defects and failures with the Vehicles, including without limitation, those discussed above, as well as all towing charges, must be covered under the "Bumper-to-Bumper Coverage" provided under the GM Warranty, and the Limited Remedy Clause must be disregarded under the circumstances for failing of its essential purpose, and GM must pay Plaintiffs reimbursement or replacement costs for the Vehicles, the value of which will be proven at trial but is no less than $3,000,000.

HF 4664066v.2 #11894/0002

## THIRD CAUSE OF ACTION
### (Breach of Express Warranty Against ElDorado)

113.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

114.    In conjunction with the sale of the Vehicles, ElDorado provided Plaintiffs with a written and purportedly limited warranty (the "ElDorado Warranty").

115.    The ElDorado Warranty provides in part as follows:

*ElDorado National Corporation (ENC)* warrants to the original purchaser of this product that ElDorado National will repair or replace, at its option, any parts that fail because of a defective material or workmanship as follows:

- Repair or replace for a period of 7 years or 70,000 miles (112,000 km), whichever comes first, the structural component of the ElDorado National installed floor and ramp. * * *

- Repair or replace for a period of 3 years from the in-service date of 36,000 miles (58,000 km), whichever occurs first, all other *Amerivan* components. * * *

- Labor costs for specified parts replaced under this warranty for a period of three years or 36,000 miles from the date of purchase. * * *

*        *        *

116.    The ElDorado Warranty further states that it "is intended to supplement the vehicle manufacturer warranty."

117.    Upon information and belief, all of defects and problems with the Vehicles, including, without limitation, those discussed above, are covered under the ElDorado Warranty as they all have arisen as a result of the parts installed, modifications made and workmanship performed by ElDorado.

HF 4664066v.2 #11894/0002

118.    Plaintiffs complied with all of their obligations under the ElDorado Warranty and provided prompt notice to ElDorado of each and every defect and problem in the Vehicles and provided ElDorado with a reasonable amount of time for it and/or its agents to perform the necessary repairs.

119.    Upon information and belief, none of the defects and problems at issue in this action are excluded by or otherwise not covered by the ElDorado Warranty.

120.    Upon information and belief, the ElDorado Warranty remains in full force and effect and never became void for any reason.

121.    Upon information and belief, the provisions in the ElDorado Warranty which purport to limit Plaintiffs' remedy to repair or replacement of defects or problems are unenforceable under the circumstances because Plaintiffs provided ElDorado with reasonable notice of each of the defects and problems at issue herein and a reasonable amount of time to effect proper repairs. ElDorado, however, was unable to effect proper repairs to the Vehicles.

122.    Accordingly, all of the defects and failures with the Vehicles at issue in this action, including, without limitation, those discussed above, must be covered under the ElDorado Warranty, and any provisions therein which purport to limit Plaintiffs' remedies must be disregarded under the circumstances for failing of their essential purpose, and ElDorado must pay Plaintiffs reimbursement or replacement costs for the Vehicles, the value of which will be proven at trial but is no less than $3,000,000.

## FOURTH CAUSE OF ACTION
### (Fraud and Misrepresentation Against GM and ElDorado)

123.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

HF 4664066v.2 #11894/0002

124.    GM and ElDorado made representations of material facts to Plaintiffs, including, without limitation, the following:

- In May of 2006, before Plaintiffs decided to purchase additional medallions that would be auctioned in June 2006, Chuck Compagnoni of GM represented to Plaintiff Evgeny Freidman that GM, along with ElDorado, could engineer the Chevy Uplander to comply with the TLC's new specifications applicable to taxicabs with Accessible Medallions in New York City and provide Plaintiffs with Chevy Uplanders to satisfy their needs if they purchased the 54 Accessible Medallions at the auction in June 2006.

- Mr. Compagnoni of GM told Mr. Freidman the TLC had approved the written specifications that GM and ElDorado had submitted to the TLC with respect to the Uplander, which written specifications were approved by the TLC on or about June 6, 2006, and that GM and ElDorado would use these specifications in producing wheelchair accessible taxicabs to the Plaintiffs if they purchased the 54 Accessible Medallions and ordered vehicles from Defendants to satisfy their needs with respect to their newly acquired Accessible Medallions.

- In July 2006, after Defendants had delivered its first Uplander to Plaintiffs which was not in compliance with the new specifications of the TLC for taxicabs with Accessible Medallions, Mr. Foerschler of ElDorado told Mr. Freidman that Defendants would fix and "re-engineer" the Uplanders to comply with the TLC's new specifications and Plaintiffs needs.

- In August 2006, Mr. Foerschler of ElDorado told Mr. Freidman that the initial two Uplanders that had been delivered to Plaintiffs had been re-engineered or "upfit," along with several more Uplanders, all of which would be delivered to Plaintiffs shortly. Mr. Foerschler further told Mr. Freidman that the so-called "re-engineered" Uplanders had been approved by the TLC.

125.    In addition, GM and ElDorado engaged in a "bait-and-switch" scheme in that they delivered Plaintiffs Uplanders in July 2006 that were materially different than (and inferior to) the Uplander that GM and ElDorado demonstrated to the TLC on or about May 10, 2006.

126.    The representatives from GM and ElDorado knew that their respective foregoing representations were false when made.

127.    Upon information and belief, the foregoing misrepresentations were made because GM and ElDorado wanted to re-enter the taxicab market in New York City, specifically,

28

the Accessible Medallion taxicab market, and they needed to convince Plaintiffs that they would supply them with wheelchair accessible taxicabs that satisfied the TLC's new specifications and the needs of Plaintiffs if the Plaintiffs purchased the 54 Accessible Medallions being offered at public auction in June 2006. Upon information and belief, GM and ElDorado never intended to fulfill the foregoing representations, but rather intended to try and fool the TLC and Plaintiffs into approving and accepting the Vehicles as delivered to avoid the time and expense of re-engineering the Uplander and to make a greater profit, as further evidenced by the "bait-and-switch" scheme GM and ElDorado perpetrated on the TLC and Plaintiffs.

128.    Plaintiffs justifiably relied upon each of GM's and ElDorado's representations discussed above when they: (1) successfully bid on the 54 Accessible Medallions offered at public auction in June 2006; (2) obtained financing for the 54 Accessible Medallions they purchased; (3) agreed to purchase the Vehicles from Defendants; and (4) decided to continue with the purchase of the Vehicles from Defendants after a number of defects and problems were initially discovered with the Vehicles by the TLC and Plaintiffs, based upon Defendants' representations that they would fix and "re-engineer" the problems to comply with the TLC's new specifications and Plaintiffs' clearly articulated needs, and Defendants' representations that the TLC had, in fact, approved GM's and ElDorado's modifications in or about August 2006.

129.    Each of foregoing representations created a legal duty on behalf of GM and ElDorado, respectively, separate from any other contractual duties these Defendants had to Plaintiffs.

HF 4664066v.2 #11894/0002

130.    The material misrepresentations set forth above were collateral to or extraneous to the warranties set forth in the GM Warranty and the ElDorado Warranty, discussed above.

131.    Plaintiffs have sustained substantial special damages as a result of GM's and ElDorado's fraud and material misrepresentations discussed above, including without limitation, the following: (a) lost revenues (including without limitation lost fares and lost advertising on and in the Vehicles themselves) that would have been realized with respect to the 54 Accessible Medallions purchased in June 2006 based upon Defendants' material representations, had the Vehicles operated as Defendants had promised; (b) finance charges related to the purchase of the 54 Accessible Medallions in June 2006, since Plaintiffs have lost substantial revenues that would have been generated with respect to these Accessible Medallions and used to pay for such charges; (c) substantial costs arising from having to tow and repair the Vehicles as a result of their defects and problems discussed above; (d) the costs to replace the Vehicles with wheelchair accessible taxicabs that satisfied the specifications and requirements of the TLC and Plaintiffs needs or, in the alternative, the purchase price that Plaintiffs paid to Defendants for the Vehicles (in excess of $3,000,000), which Vehicles have been surrendered to Defendants at this point; and (e) the interest that Plaintiffs have incurred as a result of financing the purchase price of the Vehicles.  The true amount of Plaintiffs' damages will be proven at trial.

132.    Moreover, based upon information and belief, GM and ElDorado intentionally and knowingly disregarded safety standards required by the TLC, which resulted in doors on the Vehicles falling off the hinges during operation, engines falling off their mounts, and axles detaching from the Vehicles.  These defects and problems were all communicated by

HF 4664066v.2 #11894/0002

Plaintiffs to Defendants on numerous occasions, to no avail, and endangered the lives of Plaintiffs' drivers and the public, justifying an award of punitive damages against GM and ElDorado.

WHEREFORE, Plaintiffs Evgeny A. Freidman, Vladimir Basin, Mamed Dzhaniyev, Victory Taxi Garage, Inc., Tunnel Taxi Management, LLC, Downtown Taxi Management, LLC, Bazar Taxi Inc., Patron Taxi LLC, Grappa Taxi LLC, Cognac Taxi LLC, Calvados Taxi LLC, Tequila Taxi LLC, Jack Daniels Taxi LLC, Murzik Taxi Inc., Malinka Taxi Inc., Yagodka Taxi Inc., Persik Taxi Inc., Bratishka Taxi Inc., Pumo Taxi Inc., Piguet Taxi Inc., Kormilitsa Taxi Inc., Prada Taxi, Inc., Student Taxi Inc., Hublot Taxi Inc., Torpedo Taxi Inc., Black Label Taxi LLC, Praga Taxi Inc., Two Hump Taxi LLC, Kroshka Taxi Inc., Lacoste Taxi Inc., Sangria Taxi LLC, and Volba Taxi Inc., demand the entry of judgment against Defendants General Motors Corp., ElDorado National Inc., and Arcola Sales & Service Corp. awarding them as follows:

A. On the first cause of action, compensatory damages, including consequential and incidental damages, as a result of Defendant Arcola's breach of contract in an amount to be determined at trial, but no less than $3,000,000, and;

B. On the second cause of action, compensatory damages, including replacement costs or, in the alternative, reimbursement costs, as a result of Defendant GM's breaches of its express warranties in an amount to be determined at trial, but no less than $3,000,000, and;

C. On the third cause of action, compensatory damages, including replacement costs or, in the alternative, reimbursement costs, as a result of Defendant

31

HF 4664066v.2 #11894/0002

ElDorado's breaches of its express warranty in an amount to be determined at trial, but no less than $3,000,000, and;

D.  On the fourth cause of action, compensatory damages, including lost revenues, finance charges with respect to the purchase of the 54 Accessible Medallions, towing and repair costs, and replacement costs or, in the alternative, reimbursement costs concerning the Vehicles and interest that Plaintiffs incurred as a result of financing the purchase price of the Vehicles, which damages arose as a direct and proximate result of GM's and ElDorado's fraud and material misrepresentations to Plaintiffs, the true amount of which will be determined at trial, but in no event is less than $3,000,000, as well as punitive damages in an amount to be proven at trial; and

E.  For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       March 25, 2009

HERRICK, FEINSTEIN LLP

By:_____
       William Fried
       Attorneys for Plaintiffs
       2 Park Avenue
       New York, New York 10016
       (212) 592-1400
       wfried@herrick.com

32