**Wind-Up
Letter**

General Motors Corporation

June 1, 2009

VIA Federal Express

This letter is to advise you that Our Pontiac, Cadillac Dealer Agreements between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Pontiac, Cadillac dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before June 12, 2009.

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

• For the termination of the Dealer Agreements no earlier than January 1, 2010 and no later than October 31, 2010

• For the assignment and assumption of the Dealer Agreements, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "363 Acquirer")

• For the payment of financial assistance in installments in connection with the orderly winding down of your Pontiac, Cadillac operations

• For the waiver of any other termination assistance of any kind

• For a release of claims against GM, the 363 Acquirer and their related parties

• For dealership operations to continue pursuant to the Dealer Agreements, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreements, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down your Pontiac, Cadillac dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before June 12, 2009. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreements (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed Agreements. If we reject the Dealer Agreements, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreements.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Pontiac, Cadillac dealership business and to sell your Pontiac, Cadillac new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION

## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between _____ ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are the parties to Dealer Sales and Service Agreements (the "Dealer Agreements") for Pontiac, Cadillac motor vehicles (the "Existing Model Lines"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreements.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreements in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all of Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreements, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreements, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreements, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreements, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale.    Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreements and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreements and this Agreement to the 363 Acquirer. If GM elects to exercise its option to assign the Dealer Agreements and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RETURNED TO GM ON OR BEFORE JUNE 12, 2009.

2.   Termination of Dealer Agreement.   Subject to the terms of Section 1 above:

(a)   Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreements, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreements, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreements by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreements to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreements prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)   Concurrently with its termination of the Dealer Agreements, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.   Payment to Dealer.

(a)   Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreements by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $70,000 (the "Wind-Down Payment Amount"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)   GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Lines prior to the termination of the Dealer Agreements, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of

certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreements in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(e) below, (vi) GM's or the 363 Acquirer's, as applicable, receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)    In addition to any other setoff rights under the Dealer Agreements, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's, as applicable, reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM, or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.    Complete Waiver of All Termination Assistance Rights.    In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreements, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreements or applicable laws, all of which rights Dealer hereby waives:

(a)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)    Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)    Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreements or any applicable statutes, regulations, or other laws.

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED ...

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreements do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and Dealer Agreements or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreements.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5. Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreements or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either GM or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreements and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

4

14 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED [...]

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. **Subject Dealership Operations.** From the effective date of this Agreement until the effective date of termination of the Dealer Agreements (which shall not occur prior to January 1, 2010), subject to Section 2(e) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable (under Section 12.2 of the Dealer Agreements or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section

5

12.1 of the Dealer Agreements upon the death or incapacity of the Dealer Operator, except that the term of any new Dealer Agreements under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreements or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreements shall not apply: Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreements, shall remain unmodified and in full force and effect.

7. No Protest.

(a) GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Lines in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreements. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of motor vehicle dealerships for any of the Existing Model Lines.

(b) Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of any of such Existing Model Lines.

(c) Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d) Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the the 363 Acquirer, as applicable. As a result of the foregoing, any such breach shall absolutely entitle GM or court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in

6

violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreements and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before <u>June 12, 2009</u>.

13. <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. <u>Other Agreements</u>.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Dealer Agreements) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreements, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreements, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase."

7

Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Subleases" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreements, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreements, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach.  In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties.  This Agreement, the Dealer Agreements, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

By: _____

Name: _____

Title: _____

GENERAL MOTORS CORPORATION

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

9

## EXHIBIT A

### SAMPLE SUPPLEMENTAL WIND-DOWN AGREEMENT

THIS SUPPLEMENTAL WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the ___ day of _____, 20__, by _____, a _____ ("GM") and _____, a corporation ("363 Acquirer"), _____, a _____, for the use and benefit of _____ ("Dealer"),

### RECITALS

A. Dealer and GM are parties to Dealer Sales and Service Agreements for _____ motor vehicles (the "Dealer Agreements").

B. Dealer and GM are parties to that certain Wind-Down Agreement dated June ___, 2009 (the "Original Wind-Down Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Wind-Down Agreement.

C. [IF DEALER AGREEMENTS ASSIGNED TO THE 363 ACQUIRER][GM assigned all of its right, title and interest in the Dealer Agreements and the Original Wind-Down Agreement to the 363 Acquirer.]

D. Pursuant to the Original Wind-Down Agreement, Dealer agreed to terminate and cancel the Dealer Agreements and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreements, any predecessor agreement(s) thereto, and the relationship between [GM or the 363 Acquirer] and Dealer relating to the Dealer Agreements, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E. Dealer executes this Agreement in accordance with Section 3 of the Original Wind-Down Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the promises and covenants contained herein, Dealer hereby agrees as follows:

1. Termination of Dealer Agreements.

(a) Dealer hereby terminates the Dealer Agreements by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be _____, 20__.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Wind-Down Agreement.

2.    Release; Covenant Not to Sue; Indemnity.

(a)  Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreements or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter) and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b)  Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above [IF DEALER AGREEMENTS ASSIGNED TO THE 363 ACQUIRER]] [or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreements or the Original Wind-Down Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or as an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.] Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(c)  Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and

costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3.   **Due Authority.**   Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4.   **Confidentiality.**   Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5.   **Informed and Voluntary Acts.**   Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6.   **Binding Effect.**   This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreements and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreements and any successors or assigns, and shall benefit any of GM's successors or assigns.

7.   **Continuing Jurisdiction.**   By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8.   **Governing Law.**   This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9.   **No Reliance.**   The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

By: _____

Name: _____

Title: _____