UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

General Motors Corp., *et al.*,

Debtors.

---

Chapter 11

Case No.: 09-50026 (REG)

(Jointly Administered)

## REPORT OF CONSUMER PRIVACY OMBUDSMAN

Alan Chapell, Esq., CIPP
Chapell & Associates, LLC
297 Driggs Avenue
Brooklyn, NY 11222
Telephone:    (917) 318-8440
achapell@chapellassociates.com
Date: June 30, 2009

TABLE OF CONTENTS

Introduction ............................................................................................................1

Summary of Findings and Recommendation .......................................................3

   The GM CRM Database ...................................................................................4

   The GM Rewards Cards marketing database ....................................................5

   The Saab Warranty database .............................................................................6

   The Harlem Dealership......................................................................................7

   The Deferred Termination Dealerships .............................................................8

   Additional Background Information and Recommendations.............................9

Applicable Consumer Privacy and Data Protection Laws..................................14

   U.S. Laws........................................................................................................14

   Applicable State Laws ....................................................................................18

The Debtor's Consumer Privacy Policies and Practices ...................................22

Factors to Be Considered...................................................................................25

Recommendations .............................................................................................26

## TABLE OF EXHIBITS

EXHIBIT A                    GM Privacy Policy
EXHIBIT B                    Listing of Debtor owned website URLs
EXHIBIT C                    Chevrolet of Harlem Online Privacy Notice
EXHIBIT D                    Harlem Offline Privacy Notice
EXHIBIT E                    Harlem Red Flag Rules Policy
EXHIBIT F                    GM Dealership Agreement
EXHIBIT G                    List of Customer Data for Deferred Termination Dealerships
EXHIBIT H                    Privacy TCs for dealers receiving customer information re:
                             customers of Deferred Termination Dealerships
EXHIBIT I                    *FTC v. Toysmart.com* Proposed Stipulation and Settlement
EXHIBIT J                    Warren E. Agin, *Handling Customer Data in Bankruptcy Mergers
                             and Acquisitions: Coping with the Consumer Privacy Ombudsman
                             Provisions of the 2005 Bankruptcy Act*

Alan Chapell, the Consumer Privacy Ombudsman, duly appointed pursuant to section

332 of the Bankruptcy Code,[1] respectfully submits this Report to the Court and states:

## Introduction

1.    On June 2, 2009, Judge Robert E. Gerber directed the appointment of a privacy

ombudsman in the order approving the bidding procedures for the sale.[2]

2.    The United States Trustee filed the *Notice of Appointment of Consumer Privacy

Ombudsman* on June 10, 2009, along with the Ombudsman's verified statement of

disinterestedness.

3.    The Ombudsman has prepared this Report in accordance with Section 363(b)(1)(B) of

the Bankruptcy Code to assist the Court in its consideration of the facts, circumstances, and

conditions of the sale by Debtor of its customers' Personally Identifiable Information ("PII").

4.    The purpose of this Report is to provide the Court with the information specified in

section 332(b) of the Bankruptcy Code and to assist the Court in understanding the "applicable

nonbankruptcy law" referenced in section 363(b)(1)(B)(ii) of the Bankruptcy Code.[3]

5.    It should be noted that a tension exists between the language of section 363(b)(1) of

the Bankruptcy Code and established principles of data protection or "privacy" law with respect

to the effective date of privacy policies. The Bankruptcy Code identifies as the relevant privacy

policy the one "in effect on the date of the commencement of the [bankruptcy] case,"[4] while

---

[1] 11 U.S.C. §332 (2006).

[2] See ECF Docket No. 274, Paragraph 13, at 13.

[3] Pursuant to the Bankruptcy Code, the Consumer Privacy Ombudsman may provide this Court with information relating to (1) the Debtors' privacy policy; (2) the potential losses or gains of privacy to consumers if a sale or lease is approved by the Court; (3) the potential costs or benefits to consumers if a sale or lease is approved by the Court; and (4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers. 11 USC § 332 (2006).

[4] 11 USC §363(b)(1) (2006). *See also* Warren E. Agin, *Handling Customer Data in Bankruptcy Mergers and Acquisitions: Coping with the Consumer Privacy Ombudsman Provisions of the 2005 Bankruptcy Act,* IAPP

accepted "privacy" law directs that the relevant privacy policy is the one in place on the date that the information is collected.[5] For reasons that will be explained in Paragraph 75 of this Report, the Consumer Privacy Ombudsman relied upon the privacy policy in place as of April 30, 2009.

6.    In preparing this Report, the Ombudsman has, among other things:

a.    Reviewed the *Bid Procedures Order*;

b.    Reviewed the *Master Sale and Purchase Agreement*;

c.    Review the *Proposed Sale Order*;

d.    Reviewed the GM Privacy Statement currently posted online at the Debtor's websites, including www.GM.com, the full privacy policy text is attached as **Exhibit A**, the list of applicable websites is attached as **Exhibit B;**

e.    Reviewed the privacy polices of Chevrolet-Saturn of Harlem, Inc., including the website privacy policies at www.chevrolet-ofharlem.com and www.saturn-ofharlem.com, the full text of the first is attached as **Exhibit C**, and a sample of the offline privacy notice provided to customers of the Chevrolet-Saturn of Harlem, Inc. is attached as **Exhibit D**;

f.    Reviewed the Chevrolet-Saturn of Harlem, Inc.'s internal privacy document, entitled "Red Flag Rules on Handling Customer's Information," attached as **Exhibit E**;

g.    Reviewed Paragraph 5.7 of the GM Sales and Service Agreement between GM and its dealerships, that pertains to the dealerships' responsibilities pertaining to privacy and customer data, attached as **Exhibit F**;

---

PRIVACY ACADEMY October 2006, page 9 (attached as Exhibit F).

[5] *See In the Matter of Gateway Learning Corp.*, Decision and Order (FTC 2004) available at http://www.ftc.gov/os/caselist/0423047/040917do0423047.pdf (last viewed May 24, 2009), and discussion, *infra*.

h.  Reviewed the confidential list of GM's independent dealerships that were offered wind down or deferred termination agreements for all or some of their GM vehicle lines (collectively, the "Deferred Termination Dealerships");

i.  Reviewed the list of data that was and/or will be collected by the Deferred Termination Dealerships and which may be transferred to GM and to other GM dealerships, attached as **Exhibit G**;

j.  Reviewed the relevant excerpts from the Terms and Conditions Applicable to Dealers Accessing Customer Lists from GM that will be transferred to GM from the Deferred Termination Dealerships, attached as **Exhibit H**;

k.  Discussed, via email and telephone conversations with Debtor's Counsel and Debtor's employee, Debtor's PII-collection activities, practices, and the structure of its customer databases; and

l.  Researched applicable United States federal and state privacy laws.

### Summary of Findings and Recommendation

7.  It is the Consumer Privacy Ombudsman's understanding that General Motors Corporation, et al  (hereafter "Debtor" or "GM") seeks to transfer information from several sources into the new entity ("New GM"):

a.  The information contained in the GM CRM Database;

b.  The information contained in the GM Rewards Cards marketing database;

c.  The information contained in the Saab warranty database;

d.  The information collected by the Harlem Dealership;

e.  The information collected by the Deferred Termination Dealerships;

3

8.  It is the Consumer Privacy Ombudsman's understanding that the vast majority of GM

dealerships in the US are owned and operated independently from Debtor,[6] and therefore,

any consumer information collected by such dealerships are only addressed in this Report to

the extent that such information has been or may be transferred to or is otherwise stored in

the GM CRM Database. Given that GM intends to compel transfer of information from the

Deferred Termination Dealerships, the Ombudsman believes that it is appropriate to evaluate

this transfer as well.

### The GM CRM Database

9.  It is the Consumer Privacy Ombudsman's understanding that GM seeks to transfer

information contained in the GM CRM Database into New GM.

10.  The GM CRM Database contains the following information:

    a.  Information collected via the GM owned web sites listed on Exhibit B

       ("Websites"), including: names, mailing address, phone, all or part of the vehicle

       identification number (for owners) and email address;

    b.  Information collected via GM's independent dealers, affiliates and licensees,

       including: names, mailing address, phone, all or part of the vehicle identification

       number (for owners) and email address;

    c.  Information collected by GM call centers, including: names, mailing address,

       phone, all or part of the vehicle identification number (for owners) and email

       address;

---

[6] As of June 29, 2009, other than the Harlem dealership, there are 64 operating dealerships in which GM has an ownership interest, none of which are debtors in these cases.

    d.   Information collected via GM surveys, sweepstakes entry forms, and business reply cards, including demographic and market research information that is generally not considered personally identifiable;

    e.   Information obtained via Acxiom and other data vendors, that generally does not include information that could on its own be considered personally identifiable, except for email addresses and telephone numbers for individuals already in the CRM database;

    f.   Information from GMAC, which is provided to GM and is used by GM solely in GM's capacity as a service provider to GMAC.  Otherwise, information is not obtained from GMAC and other financing companies.

11. The GM CRM Database contains "personally identifiable information" ("PII") as defined by Section 101(41A) of the Bankruptcy Code.[7]

12. The GM CRM Database does not contain the PII of non-US data subjects.

13. The GM CRM Database does not contain consumer sensitive PII such as social security numbers or credit card numbers.

14. GM collected, maintained and uses the PII contained the GM CRM Database pursuant to a privacy policy (See Exhibit A) that governs the transfer of such information.

### The GM Rewards Cards marketing database

15. It is the Consumer Privacy Ombudsman's further understanding that GM seeks to transfer

---

[7] '[P]ersonally identifiable information' means—
    (A) if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes—
        ''(i) the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;
        ''(ii) the geographical address of a physical place of residence of such individual …''
11 U.S.C. §101(41A) (2006).

information from the GM Rewards Cards marketing database ("GM Rewards Database");

16.  The GM Rewards Database contains the following information: names, email address, vehicle preference, and the time period in which the consumer is looking to purchase or lease a vehicle;

17.  The GM Rewards Database contains "personally identifiable information" ("PII") as defined by Section 101(41A) of the Bankruptcy Code.

18.  The GM Rewards Database does not contain the PII of non-US data subjects.

19.  The GM Rewards Database does not contain sensitive PII such as social security numbers or credit card numbers.

20.  GM collected, maintained and used the PII contained in the GM Rewards Database pursuant to a privacy policy (See Exhibit A) that governs the transfer of such information.

**The Saab Warranty database**

21. It is the Consumer Privacy Ombudsman's further understanding that GM seeks to transfer information from the Saab warranty database;

22.  The Saab warranty database contains the following information: names, postal address, and the vehicle identification number;[8]

23.  The Saab warranty database contains "personally identifiable information" ("PII") as defined by Section 101(41A) of the Bankruptcy Code.

24.  The Saab warranty database for Saab vehicles sold in the U.S. does not contain the PII of non-US data subjects.

---

[8] GM's employees represented that the names and addresses contained in the Saab Warranty database are not used to track warranty claims or to identify vehicles to receive recall notices. For the Saab Warranty database, as well as the other myriad databases GM uses for warranty and recalls (none of which contain PII), the VIN is matched to the customer by a third party, and GM does not receive customer PII from that third party.

6

25.  The Saab warranty database does not contain consumer sensitive PII such as social security numbers or credit card numbers.

26.  GM collected, maintained and used the PII contained in the Saab warranty database pursuant to a privacy policy (See Exhibit A) that governs the transfer of such information.

### The Harlem Dealership

27. It is the Consumer Privacy Ombudsman's further understanding that GM seeks to transfer information collected by Chevrolet-Saturn of Harlem, Inc. (the "Harlem Dealership");

28.  The Harlem Dealership collects the following information: names, postal address, telephone number, vehicle(s) of interest, and email address.

29. The Harlem Dealership also collects information in connection with consumer credit applications, including: name, postal address, telephone number, social security number, bank account number, and employer name and address (Collectively, "Harlem Credit Information").

30. It is the Privacy Ombudsman's understanding that the Harlem Credit Information is stored in hard copy form for up to seven years by the Harlem dealership from customers seeking to finance the purchase of a vehicle, and that such information is securely transferred to GMAC and other financial institutions for processing.

31. It is the Privacy Ombudsman's further understanding that the Harlem dealership also stores the Harlem Credit Information for up to seven years, and that the Harlem Dealership is required to store this information pursuant to Regulation B of the Equal Opportunity Act.[9]

32.  The Harlem Dealership collects and stores "personally identifiable information" ("PII") as defined by Section 101(41A) of the Bankruptcy Code.

---

[9] 15 U.S.C. 1691--1691f

33.  The Harlem Dealership does not collect the PII of non-US data subjects.

34.  The Harlem Dealership collected, maintained and used such PII pursuant to a privacy policy (See Exhibits C, D & E) that governs the transfer of such information.

### The Deferred Termination Dealerships

35. It is the Consumer Privacy Ombudsman's further understanding that GM seeks to transfer information collected by a subset of GM's independent dealerships; dealerships that were offered wind down or deferred termination agreements for all or some of their GM vehicle lines (collectively, the "Deferred Termination Dealerships").

36. The information collected by the Deferred Termination Dealerships includes names, mailing address, phone, all or part of the vehicle identification number and email address.

37. The Deferred Termination Dealerships collect and store "personally identifiable information" ("PII") as defined by Section 101(41A) of the Bankruptcy Code.

38. The Deferred Termination Dealerships do not collect the PII of non-US data subjects.

39.  The information collected by the Deferred Termination Dealerships was collected pursuant to a privacy policy that governs the transfer of such information, and each Deferred Termination Dealerships has its own privacy policy, which is separate from that of GM.

40.  Per a confidentiality agreement executed between the Privacy Ombudsman and GM, the names of the Deferred Termination Dealerships are confidential; however, most of the privacy policies of the Deferred Termination Dealerships (with exceptions noted below) are, in the Ombudsman's opinion, substantially similar to that of the Harlem Dealership privacy policy (See Exhibit C).

41.  GM seeks to transfer this information from the Deferred Termination Dealerships per an agreement that governs the transfer and use of such information (See Exhibit H).

8

## Additional Background Information and Recommendations

42. It is the Privacy Ombudsman's understanding the transfer of PII is to a "Qualified Buyer." A "Qualified Buyer" means an entity that: (i) concentrates in the same business and market as Debtor; (ii) expressly agrees to be Debtor's successor-in-interest as to the customer information; (iii) agrees to be responsible for any violation of that policy following the date of purchase; and (iv) shall not disclose, sell, or transfer customers' PII to any third party in a manner inconsistent with Debtor's Privacy Policy;

43. Where PII is collected pursuant to a privacy policy that allows the transfer of PII to affiliated parties or where a privacy policy was not available at the point of collection, the Privacy Ombudsman recommends that the Court allows the transfer as contemplated by Debtor, under the following conditions:

a. New GM and, as applicable any independent dealership receiving such PII, agrees to abide by Debtor's applicable privacy policy;

b. Debtor and New GM agree to provide notice of the proposed transfer and about New GM and procedures for consumers to opt-out of being contacted by New GM for marketing purposes to those consumers whose PII they hold;

c. Debtor and New GM agree to provide consumers with an opportunity to opt **out** of being contacted by New GM for marketing purposes and an opportunity to opt-out of having information transferred to another dealer; and

d. In cases identified by the Privacy Ombudsman,[10] where there is no privacy policy

---

[10] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination

in place at the point of data collection, New GM shall notify the relevant

dealerships of the requirement to have a privacy policy in place at the point of

collection.

44. Where PII is collected pursuant to a Deferred Termination Dealership privacy policy that

prohibits the sale of PII to non-affiliated parties, the Privacy Ombudsman recommends that

the Court also allows the transfer as contemplated by Debtor, under the following conditions:

a. New GM and, as applicable the independent dealerships receiving such PII, agree
   to abide by GM's applicable privacy policy;

b. GM and New GM agree to provide notice of the proposed transfer to those
   consumers; and

c. GM and New GM agree to provide these consumers with an opportunity to opt-out
   of being contacted by New GM for marketing purposes and opt-in to the proposed
   transfer of PII to another dealer.  New GM agrees to honor such opt outs and to
   only transfer personal information to another dealer with the affirmative opt-in
   consent of the consumer. GM and New GM further agree to honor consumer opt-
   outs that are received by a Deferred Termination Dealership from its customers,
   that such dealership transfers to GM or New GM with such customers' contact
   information. GM and New GM will not transfer such customer's information from
   the Deferred Termination dealer to another dealer.

---

Dealerships by July 1, 2009.

45. Based on the foregoing, the Ombudsman respectfully submits the following

recommendations to the Court, and for purposes of clarity to the extent that any ambiguities

exist as between these recommendations and the rest of this Report, these recommendations

govern.

46. First, the Court should approve the transfer of consumer PII from GM to New GM;

47. Second, in accordance with governing law permitting the transfer of PII, the Court should

require that:

    a.  New GM[11] and as applicable, the independent dealerships[12] receiving such PII

       agree to be bound by and meet the standards established by the privacy policy in

       place at the point the information was collected;

         i.  For purposes of clarity, GM and New GM are thus prohibited from

            marketing using information collected by the Deferred Termination

            Dealerships where the relevant privacy policy specifically prohibited the

            sale or transfer of such information and the consumer has opted out of

            such marketing, and GM and New GM are prohibited from transferring to

---

[11] See Section 6.25 of the Master Sale and Purchase Agreement reads: "At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; provided that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available." As written, Section 6.25 is sufficient to hold New GM responsible for adhering to the terms of GM's privacy policy, and to the terms of the privacy policies of the Deferred Termination Dealerships. While the Master Sale and Purchase Agreement apparently contemplates offering only "opt-out" choice, the Privacy Ombudsman believes that "opt-in" choice may be appropriate under certain conditions, as outlined in this Report.

[12] See the Terms and Conditions Applicable to Dealers Accessing Customer Lists from GM that was or will be transferred to GM from the Deferred Termination Dealerships, attached as Exhibit G. This is sufficient to hold the relevant dealerships to the privacy policies of the Deferred Termination Dealerships. And where affirmative consent is required, GM will be prohibited from transferring such information to any dealership without first obtaining that consumer's opt-in consent.

dealers such information without the affirmative opt-in of consumers.[13]

b.   Debtor and New GM agree to provide notice to any consumer whose PII is being

transferred, including: on GM's website, by email, via posted notices at the Harlem

Dealership and to make available notices and instruct all other independent GM

dealerships to post such notices as practical, via posted notices at all other GM

independent dealerships; and

c.   In cases identified by the Privacy Ombudsman,[14] where there is no privacy policy

in place at the point of data collection, New GM shall notify the relevant

dealerships of the requirement to have a privacy policy in place at the point of

collection.

d.   As part of the notification process, GM and the New GM agree to provide those

consumers with an opportunity to exercise their choice (the "Choice

Requirement") as per the following:

  i.   For consumers with information contained in the GM CRM Database, the

GM Rewards Database, the Saab warranty database, and information

collected by the Harlem Dealership, the Choice Requirement is opt-out

choice;

  ii.   For consumers whose information was collected by the independent

Deferred Termination Dealerships and the privacy policy prohibited the

sale of PII to non-affiliated parties, the Choice Requirement is opt-out

---

[13] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination
Dealerships by July 1, 2009.
[14] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination
Dealerships by July 1, 2009.

12

choice[15] for marketing by New GM; and opt-in for transferring by New GM to a dealer; and

iii.  For consumers whose information was collected by the Deferred Termination Dealerships and where the relevant privacy policy allowed or, in the opinion of the Ombudsman, implied that such information could be sold or transferred, the Choice Requirement is opt-out.

e.  The Privacy Ombudsman recognizes that consumers may have their information stored on more than one of the aforementioned databases, and understands that this may subject GM and New GM to conflicting Choice Requirements pertaining to that consumer. For purposes of clarity, where GM and New GM would otherwise be required by the Court to provide both an opt-in and an opt-out Choice Requirement for the same consumer, GM and New GM are only required to offer opt-out choice.

48. Finally, the Order approving the sale of PII in this instance should also (i) require New GM to file with the Court a statement under oath that it has fully complied with the conditions imposed to protect the PII; (ii) direct the Ombudsman to file a supplemental report confirming such compliance; or (iii) both.

---

[15] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination Dealerships by July 1, 2009.

## Applicable Consumer Privacy and Data Protection Laws

49. In the United States, the "privacy" of consumers' personally identifiable information is primarily regulated by the Federal Trade Commission ("FTC") under the FTC Act, the Children's Online Privacy Protection Act of 1998 ("COPPA"), and the Gramm- Leach-Bliley Act ("GLBA"). However, as no PII from individuals under the age of 13 is contemplated under this transaction, the Ombudsman has chosen not to focus on COPPA in the Report.

### U.S. Laws

50. The FTC Act - Section 5 of the FTC Act declares unfair or deceptive practices in commerce as unlawful.[16] To determine whether section 5's prohibition against deception has been violated, the FTC will first identify what "express claims," and "implied claims," have been made by a company.[17] An "express claim" refers to a factual assertion made in an advertisement or promotion or other publicly available statement such as a corporate policy. An "implied claim" refers to the net impression conveyed by all elements of a company's policies or statements "including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transactions." Section 5 is violated when an express or implied claim is "likely to affect a consumer's choice of or conduct regarding a product" and is "likely to mislead reasonable consumers under the circumstances."[18] In addition, an act or practice may be considered "unfair" if it causes, or is likely to cause, substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and is not reasonably

---

[16] 15 USC §45 (2006).

[17] FTC Policy Statement on Deception, *appended to Cliffdale Associates, Inc.*, 103 FTC 110, 174 (1984), available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm (last viewed May 24, 2009).

[18] *Id.*

avoidable by consumers.[19]

51. The FTC has explicitly applied section 5's prohibitions against deceptive acts and practices to corporate privacy statements made on the Internet and elsewhere in more than a dozen consent orders.[20] The order against *Toysmart* has particular significance here, as it brought about the amendment to the bankruptcy code that now requires the appointment of the privacy ombudsman under certain conditions.

52. The Privacy Policy Enforcement in Bankruptcy Act ("PPEBA") changed the Bankruptcy Code to create the position of Consumer Privacy Ombudsman and provide for the appointment of such Ombudsman in proceedings.

53. This amendment to the Bankruptcy Code came as a result of the Federal Trade Commission's ("FTC") action against Toysmart.com, and incorporated aspects of the final

---

[19] *See generally* FTC Policy Statement on Unfairness, *appended to International Harvester Co.*, 104 FTC 949, 1070 (1984) available at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm (last viewed May 24, 2009).

[20] *See, e.g., United States v. ChoicePoint, Inc.*, Stipulated Final Judgment and Order (N.D. Ga. 2006) available at http://www.ftc.gov/os/caselist/choicepoint/0523069stip.pdf (last viewed May 24, 2009); *In the Matter of Vision I Properties d/b/a CartManager International,* Agreement Containing Consent Order (FTC 2004) available at http://www.ftc.gov/os/caselist/0423068/050310agree0423068.pdf (last viewed May 24, 2009); *In the Matter of Petco Animal Supplies, Inc.*, Decision and Order (FTC 2005) available at http://www.ftc.gov/os/caselist/0323221/050308do0323221.pdf (last viewed May 24, 2009); *In the Matter of Gateway Learning Corp.*, Decision and Order (FTC 2004) available at http://www.ftc.gov/os/caselist/0423047/040917do0423047.pdf (last viewed May 24, 2009); *In the Matter of Tower Records*, Decision and Order (FTC 2004) available at http://www.ftc.gov/os/caselist/0323209/040602do0323209.pdf (last viewed May 24, 2009); *In the Matter of Guess?, Inc. and Guess.com, Inc.*, Decision and Order (FTC 2003) available at http://www.ftc.gov/os/2003/06/guessagree.pdf (last viewed May 24, 2009); *In the Matter of Educational Research Center of America, Inc and Student Marketing Group, Inc.*, Decision and Order (FTC 2002) available at http://www.ftc.gov/os/2003/01/ercaconsent.htm (last viewed November 13, 2006); *In the Matter of the National Research Center for College and University Admissions, Inc.*, Decision and Order, (FTC 2003) available at http://www.ftc.gov/os/2003/01/nrccuamuncedo.htm (last viewed May 24, 2009); *In the Matter of Microsoft Corporation*, Decision and Order (FTC 2002) available at http://www.ftc.gov/os/2002/12/microsoftdecision.pdf (last viewed May 24, 2009); *In the Matter of Eli Lilly and Company*, Decision and Order (FTC 2002) available at http://www.ftc.gov/os/2002/05/elilillydo.htm (last viewed May 24, 2009); *FTC v. Reverseauction.com, Inc.*, Decision and Order (FTC 2000) available at http://www.ftc.gov/os/2000/01/reverseconsent.htm (last viewed May 24, 2009); *In the Matter of Liberty Financial Co.*, Decision and Order (FTC 1999) available at http://www.ftc.gov/os/2000/01/reverseconsent.htm (last viewed May 24, 2009); *In the Matter of Geocities*, Decision and Order (FTC 1999) available at http://www.ftc.gov/os/1999/02/9823015.do.htm (last viewed May 24, 2009).

(proposed) Stipulation and Order from that case.

54. Toysmart. A casualty of the bursting of the Dot-Com bubble, Toysmart.com ("Toysmart") had been engaged in the advertising, promotion, and sale of toys on the Internet.[21] In the course of doing business, Toysmart collected information from its customers, including, among other things, its customers' names, addresses, billing information, and shopping preferences. Toysmart's website included a privacy policy which assured customers that Toysmart "never shared [its customers' PII] with a third party."[22]

55. When Toysmart sought to sell the PII of its customers as part of its Plan of Liquidation, in direct contravention of its privacy policy, the FTC charged Toysmart with engaging in a deceptive trade practice, in violation of Section 5 of the FTC Act,[23] and with violating COPPA,[24] because its customer data included the PII of children under the age of 13.

56. Although the FTC entered into a Stipulation and Settlement that would enable Toysmart to sell its customers' PII under certain conditions, forty-six (46) States' Attorneys General (and two of the FTC's own commissioners) objected, arguing that "never" (in Toysmart's privacy policy) should mean "never" and that Toysmart should not be permitted to sell its customers' PII under any circumstances.[25]

57. Ultimately, Toysmart withdrew the sale, and one of its equity owners, Disney, paid $50,000 for the data and destroyed them. Despite this unhappy conclusion for Toysmart, the

---

[21] *See* First Amended Complaint, Civil Action No. 00-11341 at ¶ 6 (D. Mass. 2000) *available at* http://www.ftc.gov/os/2000/07/toysmartcomplaint.htm (last viewed May 24, 2009).

[22] *Id.* at ¶ 7.

[23] 15 U.S.C. §§45 *et seq.*

[24] Discussed below.

[25] The States' objections rested primarily upon their own "mini-FTC Acts," which prohibited deceptive acts or practices.

terms of the Stipulation and Settlement into which it had entered with the FTC established the criteria to determine the propriety of the transfer of customer PII assets in a bankruptcy proceeding, where the privacy policy does not address that situation.

58. The Stipulation and Settlement provided that Toysmart's customers' PII would be sold only to a "Qualified Buyer," an entity that (a) concentrates in the same business and market as Toysmart; (b) expressly agrees to be Toysmart's successor-in-interest as to the customer information; (c) agrees to be responsible for any violation of that policy following the date of purchase; (d) will use the PII only to fulfill customer orders and to personalize customers' experience on the website; and (e) shall not disclose, sell, or transfer customers' PII to any third party without giving the customers notice and an opportunity to opt-in to the transfer.[26] For the Court's convenience, a true and accurate copy of the FTC's proposed Stipulation and Settlement with Toysmart is attached hereto as **Exhibit I**.

59. The Gramm-Leach-Bliley Act ("GLBA") regulates the privacy of personally identifiable, nonpublic financial information disclosed to non-affiliated third parties by financial institutions. Among other things, the GLBA requires that regulated companies notify consumers of their privacy policies and provide them with notice and the opportunity to opt-out of changes to those policies. The Debtors have provided no information to indicate that they are a financial institution under the GLBA;[27] however, the FTC's rules, regulations, and interpretation of when the GLBA requires notification and opt-out may be informative in this situation.

60. During the FTC's consideration of its Privacy of Consumer Financial Information Rule,

---

[26] *See* Stipulation and [Proposed] Order Establishing Conditions on Sale of Customer Information, Civil Action No. 00-13995 (Bkr. D. Mass. 2000) *available at* http://www.ftc.gov/os/2000/07/toysmarttbankruptcy.1.htm (last viewed May 24, 2009

[27] Chrysler Financial and Chrysler LLC are separate legal entities and Chrysler Financial is not a Debtor.

some entities that submitted comments requested guidance concerning "what notices are

required in the event of a merger of two financial institutions or an acquisition of one

financial institution by another."[28] In its comments on the final rule, the FTC indicated that in

merger or acquisition scenarios

> … [T]he need to provide new initial (and opt-out) notices to the
> customers of the entity that ceases to exist will depend on whether the
> notices previously given to those consumers accurately reflect the
> policies and practices of the surviving entity. If they do, the surviving
> entity will not be required under the rule to provide new notices.[29]

The FTC's interpretation of the GLBA as not requiring notice (and opt-out) in situations in

which an acquirer adopts the policies and practices of the former company is consistent with the

FTC's stipulation and decree in *Toysmart.* For reasons stated in this Report, the Ombudsman's

position is that notice and Choice Requirements are appropriate here despite the fact that New

GM has agreed to adhere to GM's privacy promises.

## Applicable State Laws

61. Most states have consumer protection laws that are consistent with the FTC Act.

62. Debtor's PII contains addresses for consumers in every state.

63. If the proposed PII transfer satisfies the FTC transfer requirements, state laws should

likewise be satisfied.

64. That said, the Consumer Privacy Ombudsman has taken state laws into consideration

when preparing this report, and deems it appropriate to outline some of the state laws that

were taken into consideration. This is not intended to be a complete list.

---

[28] Privacy of Consumer Financial Information, Final Rule, 65 Fed. Reg. 33660 (May 24, 2000).

[29] *Id.* at 33660-33661.

65. <u>State Dealership Laws</u>. Some states have enacted laws that prohibit a franchisor from contractually requiring a franchisee to "release, convey, or otherwise provide customer information, if to do so is unlawful or if the customer objects in writing."[30] Thus, if GM were to contractually require one of its dealership franchises doing business in a state that has enacted such a Dealership Law to release, convey, or otherwise provide customer information back to GM, then GM would be in violation of that State's Dealership law if such transfer were unlawful, or if the customer had objected to such transfer in writing.

66. Here, GM is contractually requiring any of the Deferred Termination Dealerships that execute a Deferred Termination Agreement to transfer certain information (See Exhibit G) to GM under the terms of the Deferred Termination Agreement. Therefore, as the Deferred Termination Agreement may trigger relevant state Dealership Law, the Ombudsman has recommended that the Court require GM and New GM to honor consumer opt-outs that are received by a Deferred Termination Dealership from its customers, that such dealership transfers to GM or New GM with such customers' contact information.

67. <u>State Telemarketing Statutes</u>. In addition to the Federal Telemarketing and Consumer Fraud and Abuse Prevention Act,[31] some individual States have enacted their own laws restricting telemarketing calls.

68. While the relevant Section of the Bankruptcy Act of 2005 restricts a debtor's ability to <u>sell</u> or <u>lease</u> PII outside the ordinary course of business, the Bankruptcy Act does not specifically address privacy requirements around how such information may be used by an acquirer <u>after</u> such time as the PII is sold or leased.[32] Therefore, one could argue that laws

---

[30] §LSA-R.S. 32:1261

[31] 15 U.S.C. §§ 6101-6108

[32] See 11 USC §363(b)(1) (2006). "The trustee, after notice and a hearing, may use, sell, or lease, other than in the

such as telemarketing statues, that focus on how PII may be used - *post*-transaction - should not be an integral part of the analysis when evaluating a bankruptcy under the consumer privacy ombudsman provision in the Bankruptcy Act.

69. In any event, the Privacy Ombudsperson need not address that issue here, as Section 6.25 of the Master Sale and Purchase Agreement binds New GM to adhere to all relevant law in its use of consumer information.

70. Nevertheless, the Ombudsman has recently come across a state telemarketing statute that might be of interest to New GM. In 2007, the Oregon Senate passed SB 117, which states that states that a "person may not engage in the telephone solicitation of a party at a telephone number included on the then current list (a) Published by the administrator of the telephone solicitation program established under ORS 646.572 and / or (b) Maintained by the federal agency[33] designated under ORS 646.572."[34] (The "Oregon Do Not Call statute")

71. What's particularly interesting regarding the Oregon Do Not Call statute is it potentially impacts successor entities. Specifically, in its definition of "Telephone Solicitation" the Oregon Do Not Call statute offers a prior business relationship exemption.[35] Typically, prior

---

ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law."

[33] See ORS 646.572 which described the 'federal "do not call" registry, including but not limited to the registry maintained by the Federal Trade Commission under 16 C.F.R. 310'

[34] ORS 646.561

[35] *See* ORS 646.569 §2(b) "Telephone solicitation" does not include a person soliciting business from prospective purchasers who have previously purchased from: (A) The person making the solicitation; (B) The business enterprise for which the person is calling; or (C) A predecessor of the business enterprise for which the person is calling.

business relationship exemptions in telemarketing laws function as one might expect - they "exempt" a business seeking to make telemarketing calls to consumers who have specifically requested that businesses do not contact them via telephone where that business has (typically within the past 60 days to 18 months depending on the applicable law) conducted some kind of business with the consumer. For example, where a consumer has recently purchased a car, or indicated an interest in purchasing a car (e.g., by requesting a quote) from GM and/or a GM dealership, the business exemption would likely be satisfied as it pertains to most telemarketing laws that offer a prior business relationship exemption. In other words, generally speaking GM could legally make telephone solicitations to a consumer that has otherwise added his name to an applicable do-not-call list if that consumer had previously purchased a car from GM, and if governing law offered a business relationship exemption.

72. However, as it pertains to Oregon's do not call statute, where GM might purportedly be exempt under Oregon's do not call statute, that exemption does not appear to apply to successor entities such as New GM. Per the Oregon Do Not Call statue, the prior business exemption is narrowly tailored to "Financial Institutions" as defined by the Gramm-Leach-Bliley Act ("GLBA").[36] Neither GM nor New GM is a financial institution as defined by GLB. As a result, New GM would not be able to rely on an existing business relationship exemption as it pertains to Oregon residents and should scrub its databases against the do-not-call list prior to making telemarketing calls to Oregon residents.

---

[36] See ORS 646.569 §2(a) "Predecessor of [a] the business enterprise" means a financial institution as defined in 15 U.S.C. 6827." Section 527(4)(A) of the GLB Act, 15 U.S.C. § 6827(4)(A), defines financial institution as "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution."

## The Debtor's Consumer Privacy Policies and Practices

73. The GM privacy policy is currently posted online at the Debtor's websites, including

[www.GM.com](http://www.GM.com). A copy of the policy is attached to this Report as Exhibit A. GM's

employees represented that the policy is referenced (in full or in part) at all (or nearly all)

places where consumer information is collected by GM.

74. The relevant section of the GM privacy policy is outlined in the first paragraph where

GM promises that it will not share PII with anyone other than an affiliated party.

Specifically, the policy reads:

> The information you share with us may be used by GM, our affiliates, our
> licensees, and dealers. It may be used by our suppliers exclusively to provide
> services for GM, and by our business partners to conduct joint marketing
> programs with GM. *It may also be shared in connection with the sale, transfer or
> financing of a significant part of a GM business.* We will not share your personal
> information with third parties other than these, or with any third party for their
> independent use without your permission. (Emphasis added.)

75. It is noteworthy that the sentence, "It (referring to the information customers provide to

GM) may also be shared in connection with the sale, transfer or financing of a significant

part of a GM business" was added on May 1, 2009. Had that sentence been added several

years ago rather than last month, there may not have been a need for a Privacy

Ombudsperson for this proceeding. And while a strict reading of the language in Section

363(b)(1) of the Bankruptcy Code suggests that the relevant privacy policy is the one "in

effect on the date of the commencement of the [bankruptcy] case,"[37] accepted "privacy" law

directs that the relevant privacy policy is the one in place on the date that the information is

---

[37] 11 USC §363(b)(1) (2006). *See also* Warren E. Agin, *Handling Customer Data in Bankruptcy Mergers and Acquisitions: Coping with the Consumer Privacy Ombudsman Provisions of the 2005 Bankruptcy Act,* IAPP PRIVACY ACADEMY October 2006, page 9 (attached as Exhibit I).

collected.[38] The Privacy Ombudsman believes public policy considerations dictate that he should follow generally accepted privacy law here. Otherwise, GM (and future debtors) could simply change their privacy policy upon filling for bankruptcy, which would seem to frustrate the purpose of the 2005 Bankruptcy Act.

76.  Nevertheless, GM's privacy policy as it existed on April 30, 2009 certainly contemplates the transfer of PII to GM affiliates. The Ombudsman believes, however, that since reasonable regulators can disagree, as seen in the case of *Toysmart*, the Ombudsman would recommend that the Debtors not rely on this language alone.[39] The safest course of action would be for the Debtors to notify their customers prior to the sale and provide them with the opportunity to opt-out from the transfer. For purposes of clarity, this applies to: the information contained in the GM CRM Database, the GM Rewards Cards marketing database, and the Saab warranty database.

77. I also reviewed the privacy policy and employee privacy rules pertaining to PII collected at the Harlem Dealership (See Exhibits C, D & E). The relevant section of the Harlem Dealership's privacy policy states:

> This is a GM-sponsored site, and GM will have access to your name and other personal information you enter here. GM dealers and third parties will also have access to personal information you enter here and your browsing activities on this page in order to provide you the dealer locator services you are requesting. The role of each party is explained below and links to applicable privacy statements are provided.

78. The privacy policy of the Harlem Dealership does mention that information provided by consumers will be accessed by GM, GM dealers and third parties. However, it would be

---

[38] *See In the Matter of Gateway Learning Corp.*, Decision and Order (FTC 2004) available at http://www.ftc.gov/os/caselist/0423047/040917do0423047.pdf (last viewed May 24, 2009), and discussion, *infra*.

[39] In fact, one could argue that the very reason that GM altered its privacy statement in May of 2009 is because its privacy and/or legal teams were not convinced that its then existing privacy statement adequately addressed the impending bankruptcy transaction.

unreasonable to expect a consumer reviewing this policy to interpret this language to conclude that his information may also be transferred to a new entity that is created as part of a Bankruptcy proceeding. The Ombudsman once again errs on the side of caution by finding that the policy does not adequately address such a transfer. The safest course of action would be for the Debtors to notify consumers whose information was collected by the Harlem Dealership and provide them with the opportunity to opt-out from the transfer prior to the sale.

79. As discussed previously in this Report, most of the Deferred Termination Dealerships have privacy policies that are substantially similar to those of the Harlem Dealership. Therefore, except as noted below, all information collected by the Deferred Termination Dealerships should be subject to the same notice and opt-out Choice Requirement.

80. Some of the Deferred Termination Dealerships do not have posted privacy policies on their respective websites. The Privacy Ombudsman believes that transferring information collected by those Deferred Termination Dealerships could be considered "unfair" to consumers under Section 5 of the FTC Act. However, the Ombudsman also recognizes that there are compelling reasons for such information to be transferred – for example, warranty and recall purposes.

81. It is worth noting that most of the Deferred Termination Dealership privacy policies (as well as the Harlem Dealership website privacy policy) are a bit unclear regarding the specific data collection practices of the applicable dealership. The privacy policies reference (and in most instances, offer a link to) a separate "dealer" privacy policy. However, in most instances, the link to the "dealer" privacy policy is broken. The Ombudsman strongly urges GM to notify any applicable dealers and ask that they address this issue.

24

82. It is also worth noting that several of the Deferred Termination Dealerships located in the State of California do not have posted privacy policies, and may therefore be in violation of California's Online Privacy Protection Act of 2003.[40] The Ombudsman also strongly urges that GM notify any applicable dealers and ask that they address this issue immediately.

83. Finally, a small percentage of the Deferred Termination Dealerships contain information that specifically states that the dealership will not sell and/or transfer information to third parties. For these Deferred Termination Dealerships, the Ombudsman believes that it would be unfair to consumers to allow the transfer of this information to another dealership without first obtaining those consumers' affirmative consent.

### Factors to Be Considered

84. Bankruptcy Code Section 332 suggests at least four factors as to which the Ombudsman may inform the Court: (a) Debtor's privacy policy; (b) potential losses or gains of privacy to consumers if a sale is approved; (c) the potential costs or benefits to consumers if such sale is approved; and (d) potential alternatives that would mitigate potential privacy losses or potential costs to consumers.[41]

85. As discussed above, none of Debtor's Privacy Policies specifically address the transfer of data in a bankruptcy proceeding.

86. However, for the most part, the transfer of consumer PII contemplated here will have a minimal impact upon consumers.  New GM is in the same business as Debtor, and is likely to maintain many of the same brand names that consumers have grown to trust over the years. In addition to the specter of FTC action, New GM has significant incentive – including but

---

[40] Cal. Bus. & Prof. Code § 22575.
[41] 11 U.S.C. §332.

not limited to the strong incentive of maintaining the value of its brand - to protect the

transferred PII and abide by GM's current privacy policy. Therefore, the transfer of PII to

New GM would only result in a loss of privacy to the consumers involved if New Car Co

were to adopt significantly different privacy practices from that employed by GM.

87. The best way in which to mitigate potential privacy losses to Debtor's customers is to

require New Car Co to continue to meet consumers' privacy expectations. The general

outline of those requirements has been provided in FTC guidance and cases such as

*Toysmart*. The proposed requirements with respect to Debtor's proposed transfer are set forth

below, and Debtor has agreed to abide by these recommendations.

## **Recommendations**

88. It is the Privacy Ombudsman's understanding the transfer of PII is to a "Qualified

Buyer."  A "Qualified Buyer" means an entity that: (i) concentrates in the same business and

market as Debtor; (ii) expressly agrees to be Debtor's successor-in-interest as to the customer

information; (iii) agrees to be responsible for any violation of that policy following the date

of purchase; and (iv) shall not disclose, sell, or transfer customers' PII to any third party in a

manner inconsistent with Debtor's Privacy Policy;

89. Where PII is collected pursuant to a privacy policy that allows the transfer of PII to

affiliated parties or where a privacy policy was not available at the point of collection, the

Privacy Ombudsman recommends that the Court allows the transfer as contemplated by

Debtor, under the following conditions:

a. New GM and, as applicable any independent dealership receiving such PII, agrees to abide by Debtor's applicable privacy policy;

b. Debtor and New GM agree to provide notice of the proposed transfer and about New GM and procedures for consumers to opt-out of being contacted by New GM for marketing purposes to those consumers whose PII they hold;

c. Debtor and New GM agree to provide consumers with an opportunity to opt **out** of being contacted by New GM for marketing purposes and an opportunity to opt-out of having information transferred to another dealer; and

d. In cases identified by the Privacy Ombudsman,[42] where there is no privacy policy in place at the point of data collection, New GM shall notify the relevant dealerships of the requirement to have a privacy policy in place at the point of collection.

90. Where PII is collected pursuant to a Deferred Termination Dealership privacy policy that prohibits the sale of PII to non-affiliated parties, the Privacy Ombudsman recommends that the Court also allows the transfer as contemplated by Debtor, under the following conditions:

a. New GM and, as applicable the independent dealerships receiving such PII, agree to abide by GM's applicable privacy policy;

b. GM and New GM agree to provide notice of the proposed transfer to those consumers; and

c. GM and New GM agree to provide those consumers with an opportunity to opt-out of being contacted by New GM for marketing purposes and opt-in to the proposed

---

[42] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination Dealerships by July 1, 2009.

27

transfer of PII to another dealer.  New GM agrees to honor such opt outs and to

only transfer personal information to another dealer with the affirmative opt-in

consent of the consumer. GM and New GM further agree to honor consumer opt-

outs that are received by a Deferred Termination Dealership from its customers,

that such dealership transfers to GM or New GM with such customers' contact

information. GM and New GM will not transfer such customer's information from

the Deferred Termination dealer to another dealer.

91. Based on the foregoing, the Ombudsman respectfully submits the following

recommendations to the Court, and for purposes of clarity to the extent that any ambiguities

exist as between these recommendations, and the rest of this Report, these recommendations

govern.

92. First, the Court should approve the transfer of consumer PII from GM to New GM;

93. Second, in accordance with governing law permitting the transfer of PII, the Court should

require that:

    f.  New GM[43] and as applicable, the independent dealerships[44] receiving such PII

       agree to be bound by and meet the standards established by the privacy policy in

---

[43] Section 6.25 of the Master Sale and Purchase Agreement reads: "At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; provided that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available." As written, Section 6.25 is sufficient to hold New GM responsible for adhering to the terms of GM's privacy policy, and to the terms of the privacy policies of the Deferred Termination Dealerships. While the Master Sale and Purchase Agreement apparently contemplates offering only "opt-out" choice, the Privacy Ombudsman believes that "opt-in" choice may be appropriate under certain conditions, as outlined in this Report.

[44] See the Terms and Conditions Applicable to Dealers Accessing Customer Lists from GM that was or will be transferred to GM from the Deferred Termination Dealerships, attached as Exhibit G. This is sufficient to hold the relevant dealerships to the privacy policies of the Deferred Termination Dealerships. And where affirmative consent is required, GM will be prohibited from transferring such information to any dealership without first obtaining that consumer's opt-in consent.

place at the point the information was collected;

    i.   For purposes of clarity, GM and New GM are thus prohibited from marketing using information collected by the Deferred Termination Dealerships where the relevant privacy policy specifically prohibited the sale or transfer of such information and the consumer has opted out of such marketing, and GM and New GM are prohibited from transferring to dealers such information without the affirmative opt-in of consumers.[45]

g.   Debtor and New GM agree to provide notice to any consumer whose PII is being transferred, including: on GM's website, by email, via posted notices at the Harlem Dealership and to make available notices and instruct all other independent GM dealerships to post such notices as practical, via posted notices at all other GM independent dealerships; and

h.   In cases identified by the Privacy Ombudsman,[46] where there is no privacy policy in place at the point of data collection, New GM shall notify the relevant dealerships of the requirement to have a privacy policy in place at the point of collection.

i.   As part of the notification process, GM and the New GM agree to provide those consumers with an opportunity to exercise their choice (the "Choice Requirement") as per the following:

    i.   For consumers with information contained in the GM CRM Database, the GM Rewards Database, the Saab warranty database, and information

---

[45] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination Dealerships by July 1, 2009.

[46] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination Dealerships by July 1, 2009.

collected by the Harlem Dealership, the Choice Requirement is opt-out choice;

ii.   For consumers whose information was collected by the independent Deferred Termination Dealerships and the privacy policy prohibited the sale of PII to non-affiliated parties, the Choice Requirement is opt-out choice[47] for marketing by New GM; and opt-in for transferring by New GM to a dealer; and

iii.   For consumers whose information was collected by the Deferred Termination Dealerships and where the relevant privacy policy allowed or, in the opinion of the Ombudsman, implied that such information could be sold or transferred, the Choice Requirement is opt-out.

j.   The Privacy Ombudsman recognizes that consumers may have their information stored on more than one of the aforementioned databases, and understands that this may subject GM and New GM to conflicting Choice Requirements pertaining to that consumer. For purposes of clarity, where GM and New GM would otherwise be required by the Court to provide both an opt-in and an opt-out Choice Requirement for the same consumer, GM and New GM are only required to offer opt-out choice.

94. Finally, the Order approving the sale of PII in this instance should also (i) require New GM to file with the Court a statement under oath that it has fully complied with the

---

[47] The Privacy Ombudsman will provide GM with a confidential list of applicable Deferred Termination Dealerships by July 1, 2009.

30

conditions imposed to protect the PII; (ii) direct the Ombudsman to file a supplemental report

confirming such compliance; or (iii) both.


Dated:        June 30, 2009


                                                            _____/s/Alan Chapell_____
                                                            ALAN CHAPELL

# Exhibit A

http://www.gm.com/privacy/

Home    Careers    Investors    Owners    Retirees    News

Powered by Google

## Privacy

» Printable Version

» Your California Privacy Rights

Your privacy is important to General Motors Corporation (GM), as is your trust in GM products and services. We want you to know that the information you share with us will be treated with care.

GM's Privacy Statement for U.S. Consumers lets you know how we handle personally identifiable information you share with GM through gm.com and certain other GM Websites (e.g., GMGoodwrench.com or Chevrolet.com); at events; on Business Reply Cards (BRCs) and sweepstakes entries; and through our customer call centers. It also applies to information about you and your vehicle we obtain from GM affiliates, GM dealers, GM licensees for consumer merchandise, GM credit card bank partners, and other sources such as those that provide lists of potential vehicle purchasers, current owners, or potential cardholders. We have also included answers to frequently asked questions about features of GM vehicles that record and transmit data regarding vehicle functions. Some GM Websites have supplemental information on privacy, and others have their own privacy statements, which may be accessed at those Websites. (Click for details on the Scope of the Statement).

The information you share with us may be used by GM, our affiliates, our licensees, and dealers. It may be used by our suppliers exclusively to provide services for GM, and by our business partners to conduct joint marketing programs with GM. It may also be shared in connection with the sale, transfer or financing of a significant part of a GM business. **We will not share your personal information with third parties other than these, or with any third party for their independent use without your permission.**

For more information, please read GM's Privacy Statement for U.S. Consumers. For Frequently Asked Questions about privacy, please click here.

» Scope
» Information Collection
» Cookies and Other Tracking Devices
» Outside Links
» Information Security
» Privacy Inquiries
» Changes to the Privacy Statement
» Supplemental Privacy Information
» Your California Privacy Rights
» Frequently Asked Questions

### Scope
This Privacy Statement explains how we handle personal information you share with GM businesses in the United States. We may obtain this information through GM vehicle-related consumer Websites (see table below); at events; on Business Reply Cards (BRCs) and sweepstakes entry forms; and through our customer call centers. It also applies to information about you and your vehicle GM obtains from GM affiliates, GM dealers, GM licensees for consumer merchandise, and other sources such as companies that provide lists of potential vehicle purchasers, current owners, or cardholders.

GM businesses covered by this Privacy Statement include:

| | | | |
|---|---|---|---|
| » Chevrolet | » Saturn | » Oldsmobile | » GM Family First |
| » Buick | » HUMMER | » ACDelco | » GM Fleet |
| » Pontiac | » Saab | » GMGoodwrench | » GM Cardmember Services |
| » GMC | » Cadillac | » Certified Used Vehicles | » GM Supplier Discount |
| | | | » Cadillac Certified Pre-Owned |
| | | | » GM Dealer Employee Discount |
| | | | » GM Military Discount |
| | | | » GM College Discount |
| | | | » Credit Union Member Discount from GM |

GM.com
U.S. Automotive and Credit Card consumer pages on gm.com are covered by this Privacy Statement. The Education pages of GMobility at gm.com have their own privacy statements that address the pages of the Website directed at children. The Careers and Retiree Information sections of gm.com are not consumer sites and are not covered by this Privacy Statement.

Other GM Websites and business units
To provide services, some GM consumer Websites may request additional information or provide services not covered under this general statement. Please click on the links listed below to view the supplemental privacy information that should be read together with this Privacy Statement.

- Investor Information
- Saturn
- GM Cardmember Services
- Vehicle Purchase Programs
- Dealer Candidate Information

Certain other GM, or GM-related, consumer Websites and services have their own privacy statements that can be viewed on their sites. These include OnStar and the GMAC family of businesses (GMACFS.com, GMACrelocation.com, GMACMortgage.com, GMACCF.com, GMACCM.com, GMACinsurance.com, GMACrealestate.com, GMACpolicy.com, GMACre.com, GMACbank.com) and XM Radio. For answers to questions regarding data recording devices and radio frequency identification devices (RFID) used in GM vehicles, see Frequently Asked Questions.

### Information Collection
GM may obtain information about you and your vehicle in a number of ways: For example, our Websites, Business Reply Cards, sweepstakes entries, test-drive incentive applications, surveys, vehicle sales records, and other public sources. While you may use GM's Websites to learn about our products and services without disclosing any information about you or your vehicle, we may ask you to provide us with personal information including:

- contact information (name, address, city, state and Zip Code, e-mail address, and telephone number)
- vehicle information (vehicle identification number (VIN), make, model, model year, selling dealer, date of purchase or lease, etc.)
- demographic information (age range, marital status, household composition, etc.)
- non-credit-related marketing profile information (when you plan to purchase or lease; the vehicle in which you're interested, etc.)
- relationships you have with GM not related to your vehicle (i.e., GM Card or OnStar)

Business Reply Cards and sweepstakes entries you complete at an event or in response to a marketing mailing we send may also ask you to answer some of these same questions so we can tailor what we send to you to your specific interests.

In limited circumstances, you may be asked to provide GM with your social security number. For example, if you win a sweepstakes or receive compensation from GM, GM is required to include your social security number on government tax forms. GM maintains technical, administrative, and physical safeguards designed to protect the confidentiality of your social security number, and to prohibit the unlawful disclosure of and restrict access to this information.

In addition, our GM affiliates, GM dealers, GM merchandise licensees, and other sources such as those that provide lists of potential vehicle purchasers or current owners may give the information they have regarding you or your vehicle to us so that we may serve your needs better.

## Uses

Information about you or your vehicle may be used to respond to your requests for product brochures, to customize and improve communication content, or for marketing or product research. It may also be used to provide you with helpful offers and information on GM products and services.

We may share information about you and your vehicle within GM, with our affiliates, and with our dealers. GM may also share personal information collected with our suppliers for the exclusive purpose of providing services for us (for example, mailing information in response to your request for a vehicle brochure) and with our business partners to conduct joint marketing programs with GM. It may also be shared in connection with the sale, transfer or financing of a significant part of a GM business. Information regarding your GM Card will not be shared with GM dealers.

**GM will not share information about you or your vehicle with any third party for their independent use without your permission.**

You may choose to forward information from one of our Websites or e-mails to another person. E-mail addresses submitted to our E-card or other Forward to a Friend program will not be captured for later use in marketing unless that person consents.

We may disclose information about you or your vehicle as required by law, in conjunction with a government inquiry, or in litigation or dispute resolution.

## Cookies and Other Tracking Devices

We may use cookies and other tracking devices on our Websites. Using cookies on our sites provides benefits to you, such as allowing you to maintain your account login information between visits, or locating a nearby dealer. The use of cookies also allows us to measure site activity to provide a better user experience. Cookies and other tracking devices may be used to tell us the time and length of your visit, the pages you look at on our site, the site you visited just before coming to ours, and the name of your Internet service provider.

We may use third parties to serve GM advertisements on other Websites. In serving GM advertisements, these companies may use cookies and other tracking devices to collect certain information about your visits to other Websites (such as browser type, IP address, which page was visited, and time of day). This information may be used to evaluate our online advertising campaigns or to tailor promotions and other marketing messages to you.

You may elect to refuse cookies. Please refer to your browser Help instructions to learn more about cookies and how to manage their use.

## Outside Links

GM.com may contain links to third-party sites not controlled by GM or covered by this privacy statement, such as those belonging to GM dealers, GM licensees, or independent product review sites. We recommend that you check the privacy statement of other sites you visit before providing any personal information. Generally, we will tell you as you leave our site that another site's privacy statement applies to any data you share on that site.

## Information Security

GM recognizes the importance of safeguarding consumer personal information in GM's possession from theft, inappropriate use, or improper distribution. GM has security policies and procedures appropriate to the level of confidentiality of that data. Our suppliers have signed agreements to protect and use your data according to our requirements. It should, however, be recognized that no company can perfectly protect personal information.

## Privacy Inquiries

If you have concerns or questions regarding GM's consumer privacy practices, please refer to the frequently asked questions that follow, or you may contact us at 1-866-MYPRIVACY (1-866-697-7482). California residents click for more information on Your California Privacy Rights.

## Changes

We retain the right to change this Privacy Statement. We will post changes to this page in a timely manner.

This statement is effective as of 5/1/2009.

## Supplemental Privacy Information

This information supplements the information provided in the GM Privacy Statement for U.S. Consumers.

Investor Information

Collection - On the Investor Information Website we may collect your name, address, phone number, and e-mail address. GM may also receive personal information you provide to GM Stockholder Services through e-mail, written communications, or telephone calls, and from our stock transfer agent, such as account information.

Uses - This personal information may be used for providing you information you have requested. We may share this personal information with suppliers for the purpose of providing the services you request and to provide services for GM. We may also share your information with GM affiliates to provide you with information about GM products and

© 2009 General Motors Corporation

http://www.gm.com/privacy/

Copyright/Trademark    Privacy Statement

services. GM will not share your personal information with other third parties for their independent use. We may disclose your personal information as required by law, in conjunction with a government inquiry, or in litigation or dispute resolution.

Choice and Updating Information - Stockholders wishing to update information with GM's stock transfer agent or their own stockbrokers should contact those parties directly. Opt-outs from GM marketing communications will not affect communications sent on or by or on behalf of GMs stock transfer agent or stockholders.

Privacy Inquiries - For inquiries about how the information you submit to the Investor Information portion of the site or to GM Stockholder Services is handled, please call 313-667-1432.

Saturn

Personal Information Collection - We may request personal information at certain points during your visit to Saturn's Websites. In addition to the information described in the Personal Information section above, this information may include vehicle service information; information regarding when you plan to purchase a new vehicle; your opinions for certain polls; and stories about your Saturn. Providing personal information on Saturn's Websites is optional. In our E-card service, we ask for the e-mail addresses of your friends to send E-cards ; e-mail addresses submitted to this service will be used ONLY for sending the E-cards.

Correcting Your Information - You may correct the contact information (name, address, phone number, and e-mail address) you provide on the Saturn Website by using My Profile. These updates will only affect your data at the Saturn Website or call-center database.

Privacy Inquiries - If you have a question or concern about the privacy practices of the Saturn.com Website, please contact us by sending an e-mail from the Contact Us page or by writing to us at: Saturn Privacy, 100 Saturn Parkway, MD 371-999-S24, Spring Hill, TN 37174.

GM Cardmember Services

Correcting Your Information - You may correct your contact information (name, address, phone number and e-mail address) by logging onto gmcard.com, gmflexcard.com, gmextendedfamily.com or gmbusinesscard.com and going to the "Account" or "Online Banking" portion of the Website. You can also call the Customer Center respective to your Account.

GM Card                          800-771-7363
GM Flexible Earnings Card        800-388-9107
GM Extended Family Card          800-419-6698
GM Business Card                 800-446-5347

You may change your GM Vehicle Preferences and e-mail address by logging into the "Earnings" portion of the site and clicking on "GM Vehicle Preferences" or "GM Profile."

Correcting Your Information - You may correct the contact information (name, address, phone number, and e-mail address) you provide on the GM Cardmember Services Website by using My Profile.

Privacy Inquiries - If you have a question or concern about the privacy practices of the GM Cardmember Services Website, please contact us by sending an e-mail from the Contact Us page or by writing to us at: GM Cardmember Services, 100 Renaissance Center, 482-A00-MAR, Detroit, MI 48265.

Vehicle Purchase Programs

This Supplemental Privacy Information explains how we handle personally identifiable information you share with GM through the Vehicle Purchase Programs (VPP) websites: GM Family First, GM Supplier Discount, GM Dealership Employee Discount, GM College Discount, GM Military Discount and Credit Union Member Discount from GM and through our customer call centers. It also applies to personal information GM obtains for marketing purposes from GM Dealers and other sources for use in theVPP.

Personal Information Collection - You may use the VPP websites to learn about our products and services without disclosing any personal information. We may ask you to provide us with personal information to verify your eligibility for access to the Website or for participation in the vehicle purchase program. Information that may be requested on the VPP websites or at the call center includes: contact information such as name, e-mail address, and telephone number; Website eligibility verification information, such as college name, branch of service or credit union name; and purchase verification information, including birth date and zip code. If you are requesting product information, you may be asked to provide information regarding your vehicle purchase plans, and other household information.

Uses - Personal information about you may be used to respond to your requests for information; to verify your identity for access to the VPP websites and redemption of purchase authorization numbers; to customize and improve communication content; or for marketing research. It may also be used for providing you with helpful offers and information on GM products and services, as well as offers and information from our affiliates and business partners to conduct joint marketing programs with GM.

Personal information supplied about a participant in the VPP is used only to verify eligibility for and redemption of purchase authorization numbers.

Information Security - We take steps to make personal information received from you secure against unauthorized access and use. Personal information submitted on the VPP websites is encrypted during transmission.

Correcting Your Information and Privacy Inquiries - If you would like to correct your personal information or if you have concerns or questions regarding GM's privacy practices, please refer to the frequently asked questions that follow, or you may contact us at 1-866-MYPRIVACY (1-866-697-7482). For GM Family First participants, you may correct your information by contacting your Human Resources representative. For other VPP participants, you may correct your personal information by visiting the following VPP websites.

GM Family First                      gmfamilyfirst.com
GM Supplier Discount                 gmsupplierdiscount.com
GM Dealership Employee Discount      gmded.com
GM College Discount                  gmcollegediscount.com

6/28/09 1:14 PM

http://www.gm.com/privacy/

| GM Military Discount | gmmilitarydiscount.com |
| Credit Union Discount from GM | gm.com/creditunion |

Dealer Candidate Information

Collection and Use: if you apply to become a GM dealer, in the application process we will collect personal information to evaluate your application.

**2008 Disclosure**

Under California Civil Code Section 1798.83, also known as Senate Bill 27, you are entitled to request and receive, free of charge, a copy of GM's California Information Sharing Disclosure Notice for the previous calendar year. You may print this page, or call 1-866-MYPRIVACY (1-866-697-7482) to request a copy.

**California Information-Sharing Disclosure**

This Information-Sharing Disclosure Notice reflects the information-sharing practices of GM during the previous calendar year with third parties for their own commercial marketing purposes. You will notice that the "third parties" listed in this notice are General Motors affiliates. These affiliates are listed as "third parties" because, under Senate Bill 27, any business that is a separate legal entity must be listed as a "third party."

**GM did not share your personal information with non-affiliated third parties for their independent commercial marketing use without your permission.**

GM may have shared the following categories of information with the affiliates listed below so they could use it to offer you other valuable products and services as part of the GM family of companies:

- Contact information (including name, address, city, state, Zip Code, phone number, and e-mail address)
- Vehicle purchase information (including VIN, make, model, model year, selling dealer, purchase date)
- Other non-credit-related marketing profile information (including information you may have provided when expressing interest in, or during your purchase of, our products or services)

Our GM affiliates who may have received your information are as follows:

GMAC Bank
3710 Kennett Pike
Greenville, DE 19807

GMAC Insurance
Personal Lines Group
13736 Riverport Drive,
Suite 700
Maryland Heights, MO 63043

GMAC Insurance
Dealer Products and Services
GM Protection Plan
300 Galleria Officentre - Suite 300
Southfield, MI 48034

GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA 19044

OnStar
400 Renaissance Center
P.O. Box 400
Detroit, MI 48265-4000

Saab Financial Services Corp.
Customer Service Center
P.O. Box 7101
Little Rock, AR 72223-7101
(888) 594-SAAB (7222)

For the full GM Privacy Statement, click here.

**Q1:**
What are "GM affiliates"?

**A:**
As used in this privacy statement, GM affiliates are companies that are owned or controlled by GM, or those companies in which GM has a substantial ownership interest. Some examples include Saturn, Saab, GMAC, GMAC Insurance, Nuvell Credit Company LLC, Nuvell Financial Services LLC and OnStar.

**Q2:**
What is an example of a supplier that provides services to GM?

**A:**
Suppliers are companies that provide services on GM's behalf, such as mailing you a brochure you request.

**Q3:**
What is an example of a GM business partner?

**A:**
By business partners, we mean independent companies that conduct joint marketing programs with GM. An example is HSBC USA, which administers the GM Card and GM Extended Family Card. Another example is XM Radio.

http://www.gm.com/privacy/

**Q4:**
What do you mean when you say "independent use" or that you will ask for my permission before sharing my information?

**A:**
By independent use, we mean for purposes unrelated to GM's and GM affiliates' products and services. For example, if you attend a Buick golf event and the co-sponsor of that event would like to receive the information from the registration form you filled out, you will be asked for your permission on the registration form.

**Q5:**
What do dealers do with my personal information?

**A:**
GM dealers may use your personal information to contact you about your interest in GM products and services and to provide you with information about upcoming events and vehicle incentives. For questions about your dealer's specific privacy practices, please contact your dealer directly.

**Q6:**
If I opt out of receiving communications from my dealer, will I still receive communications from GM?

**A:**
Yes, you may continue to receive communications from us. GM and GM dealers are separate legal entities with their own privacy practices. If you don't want to receive marketing messages from GM regarding our vehicles, you should call 1-866-myprivacy (1-866-697-7482), or visit our Consumer Preference System Website at www.gmcontactpreferences.com.

**Q7:**
Will you use my personal information to send me e-mails?

**A:**
Yes, we may. You can access our privacy statement from the gm.com Website and opt out of unsolicited marketing e-mails. If you have subscribed to a particular e-mail newsletter or other communication (e.g., My GMLINK Service Reminders, etc.), you should follow the instructions in the e-mail or on their Website to unsubscribe. You must contact your dealer separately.

**Q8:**
How do I opt out of receiving unsolicited marketing communications from GM or change my opt-out preferences?

**A:**
If you do not want to receive unsolicited marketing communications from GM or GM business units, please visit our Consumer Preference System Website. This will allow you to opt out of telephone and e-mail communications and/or to change previously submitted opt-out preferences. You can also call 1-866-myprivacy (1-866-697-7482) to opt out of direct mail communications, as well as telephone and e-mail communications, and/or to change previously submitted opt-out preferences.

**Q9:**
How long will my opt-out preferences last?

**A:**
Your GM telephone opt-out preferences will expire five (5) years from the date you submit them. Your GM direct mail opt-out preferences will expire two (2) years from the date of your submission. At this time your e-mail opt-out preferences will not expire. You can change or update your opt-out preferences by clicking here.

**Q10:**
How will you obtain my permission to disclose information about me to a third party?

**A:**
An example is information you provide in a BRC (Business Reply Card). We identify the third party on the card and ask for your permission to share that data with them.

**Q11:**
Does my vehicle have a black box to record data?

**A:**
GM vehicles, like other modern motor vehicles, have a number of sophisticated computer systems that monitor and control several aspects of the vehicle's performance. GM vehicles use on-board vehicle computers to monitor emission control components to optimize fuel economy, to monitor conditions for air bag deployment and, if so equipped, to provide anti-lock braking and to help the driver control the vehicle in difficult driving situations. Some information may be stored during regular operations to facilitate repair of detected malfunctions; other information is stored only in a crash event by computer systems, such as those commonly called event data recorders (EDR).

**Q12:**
Does my vehicle have an RFID feature that transmits my personal data?

**A:**
No, many GM vehicles contain sensing and transmitting devices using the same type of radio frequency transmission technology used in RFIDs that can contain personal information. These devices are used to perform functions such as checking tire pressure. The devices do not store or transmit personal data.

# Exhibit B

June 15, 2009

Appendix B - Websites where GM collects US consumer personal information

| Description | URL |
|---|---|
| General Motors Corporate Website | http://www.gm.com |
| Chevrolet | http://www.chevrolet.com |
| Cadillac | http://www.cadillac.com |
| Buick | http://www.buick.com |
| GMC | http://www.gmc.com/ |
| ACDelco | http://www.acdelco.com |
| GMGoodwrench | http://www.gmgoodwrench.com |
| HUMMER | http://www.HUMMER.com |
| Pontiac | http://www.pontiac.com/ |
| Saab USA | http://www.saabusa.com |
| Saturn | http://www.saturn.com |
| GM Accessories Zone | http://www.gmaccessorieszone.com |
| Performance Parts | http://www.gmperformanceparts.com/ |
| ACDelco TechConnect | http://www.acdelcotechconnect.com |
| GM Owner Center | http://www.gm.com/gmownercenter |
| GM Contact Preferences | http://gmcontactpreferences.com/ |
| Tag Company Vehicles Online | http://www.gmfamilyfirst.com |
| GM Supplier Discount | http://www.gmsupplierdiscount.com |
| GM Military Discount | http://www.gmmilitarydiscount.com/ |
| GM College Discount | https://www.exclusivegmoffer.com/ip-gmpop/initPop.do?program=cgp |
| Credit Union Member Discount from GM | https://www.exclusivegmoffer.com/ip-gmpop/initPop.do?program=cud |
| GM Card Bonus Shop | http://www.gmcardbonusshop.com |
| * GMCS GM Card | http://www.gmcard.com |
| * GM Extended Family Card | http://www.gmextendedfamilycard.com |
| * GM Flexible Earnings Card | http://www.gmflexcard.com |

* For a few credit cards, GM is the sponsor of a rewards program under which cardholders earn points good toward the purchase of a GM vehicle when they use their card. The issuer of the card in each case is an independent financial institution. For the card-related websites, the GM portion of each website is subject to the GM US Consumer Privacy Policy and the financial institution portion is subject to the financial institution's privacy policy.

# Exhibit C

Chevrolet Cadillac of Harlem is a New York Cadillac, Chevrole...    http://www.chevrolet-ofharlem.com/PrivacyPolicy#privacyPolicy

| Home | Vehicles | Financing | Service & Parts | Specials | Dealer Info | En Espanol |
|------|----------|-----------|-----------------|----------|-------------|------------|

### Privacy Policy

This is a GM-sponsored site, and GM will have access to your name and other personal information you enter here. GM dealers and third parties will also have access to personal information you enter here and your browsing activities on this page in order to provide you the dealer locator services you are requesting. The role of each party is explained below and links to applicable privacy statements are provided.

#### Collection and Use of Your Information by GM

When you choose a GM dealer and request a quote or ask a question, the personal information you provide is collected by GM and treated in accordance with the GM Privacy Statement for U.S. Consumers. In addition, GM's use of cookies and other tracking devices is also discussed in GM's Privacy Statement which you can access here: http://www.gm.com /privacy/#scope.

#### Information Directed to Our Dealers

When you complete a form on this website to ask a question of or request a quote from a GM dealer, the information you submit is forwarded by GM to the GM dealer you selected. Each GM dealer is independent of GM and the dealer you direct your communication to will have its own privacy statement. Please contact the dealer or visit the dealer's website for more information on its privacy practices.

#### Use of Cookies and Other Tracking Devices by Third Parties

Cookies placed or recognized on your computer's Web browser by third-party advertising companies on this or other websites are used in conjunction with web beacons at this website to evaluate online advertising or to tailor promotions and other marketing messages to you. One of the third-party advertising companies we use in conjunction with the web beacons on this website is DoubleClick. To learn how to "opt out" from the use of the DoubleClick web beacons, please visit http://www.doubleclick.net/us/corporate/privacy. To disable the collection of information by all web beacons used on this website, you must refuse cookies, as described in GM's Privacy Statement for U.S. Consumers, above.

#### Changes to these Privacy Policies or Statements

Any changes to the treatment of personal information collected on this site will be governed by the Privacy Statement or Policy of the collecting entity. Please review the individual Privacy Policy or Statement for changes.

This Privacy Statement is effective as of April 1, 2008.

#### Terms of Use

Show Dealer Privacy Policy

Chevrolet Cadillac of Harlem | Greater New York City Chevrolet Cadillac Dealer

**Chevrolet Cadillac of Harlem**
2485 Second Ave
New York, NY 10035
Phone: (800) 237-6318
Email: Contact Us
Fax: 646-672-2948
Site Map | Privacy Policy | Terms of Use

# Exhibit D




**CHEVROLET**

*Cadillac.*

**Chevrolet-Cadillac - Saturn of Harlem, Inc.**
2423 Second Avenue
Harlem, N.Y. 10035
646-672-2930



**SATURN**

Advertising Survey _____ E-mail _____

Date _____ Salesperson _____ Mgr. _____ Home # _____

Registered Owner _____ Work # _____

Address _____ City/State/Zip _____

☐ New  Year _____ Make _____ Model _____

☐ Demo  Stock # _____ Serial # _____ License # _____

| **Suggested Retail Price $** _____ | **Trade Information** |
|---|---|
| + Additional Accessories _____ | Year _____ Make _____ Model _____ |
| = Total Price _____ | _____ Miles: _____ |
| | #pmnts _____ @$ _____ = Pay off $ _____ |
| | **A.C.V. $** _____ |

| **25% Cash Down**<br>(Required by most banks) | **Monthly Payments** |
|---|---|
| | |
| **Cash Deposit $** _____<br>**MINIMUM-10%** | **$** _____ |

This is an offer to own now.

X _____

Salesperson cannot accept this offer or obligate seller in any manner whatsoever. Offer is not binding until accepted in writing by officer or sales manager of seller.

| YEARS ON JOB | MONTHLY INCOME $ | SOCIAL SECURITY # | | | | | | | | | DATE OF BIRTH | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | — | | | — | | | | | | |

**FAIR CREDIT REPORTING ACT DISCLOSURE** - I agree that a consumer report may be obtained in connection with this credit application, and, that consumer reports may be obtained in connection with an update, renewal or extension of credit for which application was made. If I ask, I will be told whether or not a consumer report(s) was/were obtained and if such report(s) were obtained, told the name and address of the consumers reporting agency that gave the report(s).

*CUSTOMER SIGNATURE*        *OK TO RUN - MGR. SIGNATURE*

■ _____    ■ _____

In connection with your transaction, **Chevrolet - Cadillac - Saturn of Harlem, Inc.** may acquire information about you as described in this notice, which we handle as stated in this notice. This does not apply to information obtained in a non-financial transaction.

1. We collect nonpublic personal information about you from the following sources:
   ☐ Information we receive from you on applications or other forms in connection with a financial transaction;
   ☐ Information about your transaction with us; affiliates or others;
   ☐ Information we receive from a consumer-reporting agency.

2. We may disclose all of the information we collect, as described above, to companies that perform marketing services or other functions on our behalf or to other financial institutions with whom we have joint marketing agreements. We may make such disclosures about you as a consumer, customer, or former customer.

3. We may also disclose nonpublic personal information about you as a consumer, customer, or former customer, to non-affiliated third parties as permitted by law.

4. We restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with the federal regulations to guard your nonpublic personal information.

_____
Customer Signature

**6600**

CHEVROLET – CADILLAC – SATURN OF HARLEM
2485 SECOND AVENUE
NEW YORK, NEW YORK 10035

## PRIVACY NOTICE

IN CONNECTION WITH YOUR TRANSACTION, CHEVROLET -CADILLAC- SATURN OF HARLEM, INC MAY OBTAIN INFORMATION ABOUT YOU AS DESCRIBED IN THIS NOTICE, WHICH HE HANDLE AS STATED IN THIS NOTICE.

WE COLLECT NONPUBLIC PERSONAL INFORMATION ABOUT YOU FOR THE FOLLOWING SOURCES:
- INFORMATION WE RECEIVE FROM YOU ON APPLICATIONS OR OTHER FORMS
- INFORMATION ABOUT YOUR TRANSACTIONS WITH US, OUR AFFILIATES OR OTHERS , AND
- INFORMATION WE RECEIVE FROM A CONSUMER REPORTING AGENCY.

WE MAY DISCLOSE THE INFORMATION WE COLLECT, AS DESCRIBED ABOVE, TO COMPANIES THAT PERFORM MARKETING SERVICES ON OUR BEHALF OR TO TOHER FINANCIAL INSTITIUTIONS WHTH WHOM WE HAVE JOINT MARKETING AGREEMENTS.  WE MAY MAKE DISCLOSURES ABOUT YOU AS A CONFUSMER, CUSTOMER, OR FORMER CUSTOMER.

WE MAY ALSO DISCLOSE NONPUBLIC PERSONAL INFORMATION ABOUT YOU AS A CONSUMER, CUSTOMER, OR FORMER CUSTOMER, TO NON-AFFILIATED THIRD PARTIES AS PERMITTED BY LAW I. E. WE MAY SHARE YOUR INFORMATION WITH A THIRD PARTY SERVICE PROVIDER TO FURNISH A GIFT TO YOU.  THIS PROVIDER HAS SIGNED AN AGREEMENT NOT TO DISCLOSE THIS INFORMATION OTHER THEN TO PROCESS THE REQUEST.

WE RESTRICT ACCESS TO NONPUBLIC PERSONAL INFORMATION ABOUT YOU TO THOSE EMPLOYEES WHO NEED TO KNOW THAT INFORMATION TO PROVIDE PRODUCTS OR SERVICES TO YOU. WE MAINTAIN IN PHYSICAL, ELECTRONIC, AND PROCEDURAL SAFGUARDS THAT COMPLY WITH FEDERAL REGULATIONS TO GUARD YOUR NONPUBLIC PERSONAL INFORMATION.

CUSTOMER ACKNOWLEGEMENT: I (WE) ACKNOWLEDGE THAT I (WE) RECEIVED A COPY OF THIS NOTICE ON THE DATE INDICATED BELOW.

CUSTOMER _____        CO-SIGNER _____
                         PRINT                                                                  PRINT

CUSTOMER _____        CO-SIGNER _____
                         SIGN                                                                   SIGN

# Exhibit E

# CHEVROLET-SATURN OF HARLEM inc.

2485 SECOND AVENUE, NEW YORK, NEW YORK 10035  WWW.CHEVYSATURNOFHARLEM.COM

## 646-672-2930 / 646-672-2946 (fax)

Your dealer for life!



An American Revolution

People First



The Right Way, The Right Car

# RED FLAG RULES
## ON HANDLING CUSTOMERS INFORMATION

Along with the Red Flags Rule Identity Theft Prevention Program there is also a privacy compliance rule that the dealership will handle customer's information.

Please read the following on how to handle the following information:

- Every customers driver license is to be ran through the Security Data terminal
- No employee is to leave copies of drivers license on copier or desk
- No employee is to leave any signed credit applications on their desk
- Any customer's information should be brought into the F&I office to be put into the deal jacket
- Any signed credit applications should be kept in the deal jacket and brought into the Accounting office
- Any information that's not related to purchasing a vehicle is to be put into the shredding box to be shredded by Cintas
- Accounting Office should have every deal that had a credit bureau report checked
- All files on customers should come to the Accounting Office

_____                          _____

Employee Signature/Date                          Manager's Signature/Date

# Exhibit F

## 5.7    Exchange of Information, and the Handling of Customer Information

General Motors may provide Dealer from time to time certain customer information or other information or data. Dealer agrees to use such information or data only as designated by General Motors, and not to otherwise disclose such information or data without General Motors written permission, unless otherwise required by law. This restriction only applies to information and data provided by General Motors to its dealers, and does not apply to data or information Dealer obtains from its customers or other sources.

To protect the security and confidentiality of customer information Dealer shares with General Motors, General Motors implements and maintains technical, physical and administrative safeguards in accordance with the law. General Motors shall provide privacy statements to its customers that explain how General Motors handles customer personal information, including that it shares customer personal information with General Motors affiliates and dealers as permitted by law. General Motors privacy statement(s) for U.S. consumers shall be made available at www.gm.com, or such other website(s) as General Motors may designate.

To protect the security and confidentiality of customer information General Motors shares with Dealer, Dealer agrees to implement and maintain technical, physical and administrative safeguards in accordance with the law. Further, Dealer agrees to familiarize dealership employees that handle or have

access to customer information received from General Motors with General Motors privacy requirements, and the GM privacy statements found at www.gm.com, or such other website(s) as GM may designate. Dealer shall provide privacy statements to its customers that explain how the

dealership handles customer personal information, including that it shares customer personal information with non-affiliated third parties as permitted by law. Dealer's privacy statement shall be made available at the dealership and at any Dealer websites that collect customer personal information.

## 5.7    Exchange of Information, and the Handling of Customer Information

General Motors may provide Dealer from time to time certain customer information or other information or data. Dealer agrees to use such information or data only as designated by General Motors, and not to otherwise disclose such information or data without General Motors written permission, unless otherwise required by law. This restriction only applies to information and data provided by General Motors to its dealers, and does not apply to data or information Dealer obtains from its customers or other sources.

To protect the security and confidentiality of customer information Dealer shares with General Motors, General Motors implements and maintains technical, physical and administrative safeguards in accordance with the law.  General Motors shall provide privacy statements to its customers that explain how General Motors handles customer personal information, including that it shares customer personal information with General Motors affiliates and dealers as permitted by law.  General Motors privacy statement(s) for U.S. consumers shall be made available at www.gm.com, or such other website(s) as General Motors may designate.

To protect the security and confidentiality of customer information General Motors shares with Dealer, Dealer agrees to implement and maintain technical, physical and administrative safeguards in accordance with the law.  Further, Dealer agrees to familiarize dealership employees that handle or have

access to customer information received from General Motors with General Motors privacy requirements, and the GM privacy statements found at www.gm.com, or such other website(s) as GM may designate.  Dealer shall provide privacy statements to its customers that explain how the

dealership handles customer personal information, including that it shares customer personal information with non-affiliated third parties as permitted by law.  Dealer's privacy statement shall be made available at the dealership and at any Dealer websites that collect customer personal information.

# Exhibit G

| Field Description (Common Name) | Field Description |
|---|---|
| Dealer Number (BAC) | This is the dealership's BAC |
| DMS Type | DMS Name |
| Customer Number | The unique customer number associated with the customer on the invoice (Assigned by the Dealer(BAC)). |
| Customer Full Name or Company Name | First, Middle & Last name of customer on Invoice |
| Customer Salutation | The Customer's salutation such as Mr., Mrs., Miss, Ms., Dr., etc. |
| Customer First Name | The first name of the Customer. |
| Customer Middle Name | The middle name of the Customer. |
| Customer Last Name | The last name of the Customer. |
| Customer Name Suffix | The suffix associated with the customer's Name such as MD, PHD, etc. |
| Customer Address | First address of line of customer (consumer or business) |
| Customer Address 2 | Second address of line of customer (consumer or business) |
| Customer City | The city of the Customer (consumer or business) |
| Customer State | The residential state of the Customer. |
| Customer Postal Code | The residential postal code or zip code of the Customer. |
| Customer Home Phone | The home phone number of the Customer. |
| Customer Work Phone | The business phone number of the Customer. (receive phone number & extension, if present). |
| Customer Cell Phone | Customer's Cell Phone Number (consumer or business) |
| Customer Email Address | The personal email address of the Customer. |
| Customer Do Not Call Flag | Customer has indicated not to call for follow-up contact |
| Customer Do Not Email Flag | Customer has indicated not to email for follow-up contact |
| Customer Do Not Mail Flag | Customer has indicated not to mail for follow-up contact |
| Service Open Date | Date RO was open/created |
| Service Closed Date | Date RO was invoiced/closed |
| Department Type | R&R ERA ONLY Service ("S") /Body Sheet ("B") /Pre-Delivery Inspection ("P") |
| Customer Comments | Customer Complaint |
| Technician Comments | Technician Comments |
| Individual/Business Flag | Individual or Business<br>"I" - Individual<br>"B" - Business |
| Service Advisor ID | The unique number associated with the Service Advisor on the invoice |
| Service Advisor Full Name | The full name of the Service Advisor |
| Service Advisor First Name | The first name of the Service Advisor |
| Service Advisor Last Name | The full name of the Service Advisor |

1

| Field Description (Common Name) | Field Description |
|---|---|
| Repair Order Number | The RO Number of the service record tied to this part invoice. |
| Repair Order Type | "S" - Service RO or<br>"B" - Body Shop RO |
| Repair Order Amount | Repair Order Amount (Sum of Customer Pay, Warranty, Internal amounts) |
| Customer Pay Amount | Customer Pay Amount |
| Warranty Amount | Warranty Amount |
| Internal Amount | Internal Amount as associated with each operation. |
| Operation Code (DMS) | First Operation Code as defined by the DMS |
| Operation Description (DMS) | First Operation Code Description as defined by the DMS |
| Standard Operation Code | Both Standardized Code and Desc (or category) will need to be provided |
| Event Repair Labor Pay Type3 | Transaction Type (Labor from Repair Order)<br><br>Warranty Pay Event = W<br>Customer Pay Event = C<br>Internal Pay Event = I |
| Labor Amount | Dollar amount associated with an invoice line item |
| Event Repair Part Pay Type2 | Transaction Type (Part from Repair Order)<br><br>Warranty Pay Event = W<br>Customer Pay Event = C<br>Internal Pay Event = I |
| Parts Amount | For each price |
| Quantity | The quantity of the given part on a single line on an invoice. |
| Invoice Number | The invoice number associated with the transaction |
| Invoice Line Item | Sequence# from Repair Order; association of DMS Line Item does not exist; line item is assigned as data is pulled |
| Invoice Closed Date (Part) | Date Part was invoiced/closed |
| Part Number (DMS Value) | The unique part number identifier for each part listed on the invoice as originally loaded from the DMS. |
| Part Description (DMS Value) | The unique part number description as originally loaded from the DMS. |
| Dealer-to-Dealer Flag | This field indicates whether the Parts sales is a another dealer or other person/entity. |
| Retail / Wholesale Flag | Parts Ticket Sales<br>"R" - (Retail),<br>"W" -  (Wholesale), |
| Part Unit Cost | Part Unit Cost |
| Total Cost | The total cost of the parts on the invoice.  This field is calculated as the sum of the Net Cost amounts for all line items. |
| Total Invoice | The grand total charged on the invoice.  This field is calculated as the sum of the Total Net, Invoice Tax, Invoice Miscellaneous, Invoice Freight, and Invoice Restock amounts. |
| Vehicle Delivery Date | Date Vehicle delivered to Customer |
| Vehicle VIN | The VIN (Vehicle Identification Number) of the Vehicle |
| Vehicle MFG | Manufacturer ID |
| Vehicle DIV | Vehicle Division / Brand ID |
| Vehicle Make | Indicator of the Brand of the Vehicle |
| Vehicle Model | Model |

2

| Field Description (Common Name) | Field Description |
|---|---|
| Vehicle Year | YYYY |
| Vehicle Merchandise Model Code | Unique combo within VIN to determine Vehicle Make/Model |
| Vehicle Odometer | The mileage listed on the vehicle at the time of the event |
| Retail / Wholesale Flag 1 | Vehicle Sales only<br>"R" - Retail,<br>"W" - Wholesale |
| Fleet Indicator | Indicator to tell if vehicle is a fleet vehicle |
| Vehicle Stock Number | Stock Number |
| Deal_No | Unique number assigned by the DMS to each vehicle sale |
| Deal_Status | The status of the deal: Finalized – indicates a deal that has been posted to accounting. |
| MSRP | MSRP |
| Total Purchase Price | Total Purchase Price plus any add-ons. |
| Buyer_First_Name | Customer First Name |
| Buyer_Last_Name | Customer Last Name |
| Buyer_Street_Address | Customer Address |
| Buyer_City | Customer City |
| Buyer_State | Customer State |
| Buyer_Zip | Customer Postal Code |
| Buyer_Home_Phone | Customer Home Phone |
| Buyer_Work_Phone | Customer Work Phone |
| Buyer_Cell_Phone | Customer Cell Phone |
| Buyer_Email-1 | Customer Email |
| Buyer_Gender | Customer Gender |
| Salesperson First Name | The first name of the Salesperson |
| Salesperson Full Name | The full name of the Salesperson |
| Salesperson ID | The unique number associated with the Salesperson on the invoice |
| Salesperson Last Name | The last name of the Salesperson |
| Trade_Make_1 | Indicator of the Brand of the Vehicle |
| Trade_Model_1 | Model |
| Trade_Year_1 | YYYY |
| Trade-In Vin | Trade-in VIN number |
| New / Used Indicator | Indicator to tell if vehicle sold is New/Used.<br>"N" - New<br>"U" - Used |
| Certified Flag | Certified Flag |
| Dealer Accessory Code Descriptions | New Cars only |
| Factory Accessory Code Descriptions | New Cars only |
| Factory Accessory Codes | New Cars only |
| In Stock Date | Date Vehicle received by Dealer |
| Invoice Amount | Amount entered in the DMS system (could be trade in, or price for new vehicle, etc.)  The cost to the Dealer |

3

# Exhibit H

Excerpts from Terms and Conditions Applicable to Dealers Accessing Customer Lists from GM:


BEFORE ACCESSING THE SYSTEM, IT IS REQUIRED THAT YOU SIGNIFY BELOW THAT YOU BOTH UNDERSTAND AND AGREE TO STRICTLY ABIDE BY THE FOLLOWING TERMS AND CONDITIONS.

…

1. PERMITTED USE: General Motors dealer: Under Article 5.6 of the GM Dealer Sales and Service Agreement, dealers agree to use certain customer information, other information or data provided by GM only as designated by General Motors and not to otherwise disclose such information or data without General Motors written permission or as required by law. Accordingly, I may use names, addresses, and telephone numbers obtained from the electronic manifest list(s) herein ["Contact Data"], subject to the restrictions set forth below, for follow-up telephone calls or mail solicitations SOLELY IN CONNECTION WITH THE MARKETING PROGRAM NAMED ON EACH LIST.
Saturn retailer: I agree to use certain customer information, other information or data provided by GM/Saturn only as designated by General Motors or Saturn and not to otherwise disclose such information or data without General Motors or Saturn's written permission or as required by law. Accordingly, I may use names, addresses, and telephone numbers obtained from the electronic manifest list(s) herein ["Contact Data"], subject to the restrictions set forth below, for follow-up telephone calls or mail solicitations SOLELY IN CONNECTION WITH THE MARKETING PROGRAM NAMED ON EACH LIST.

…

4. NO DISSEMINATION: I will not sell, assign, sublicense, or rent, under any circumstances, the Contact Data

5. ACCESS AND SECURITY: I will limit access to the Contact Data to employees who have a legitimate business need relating to this marketing program. I will provide for the physical, managerial and electronic security of the Contact Data such that it is reasonably maintained and secured from unauthorized access or use during utilization, transmission and storage.

6. THIRD PARTIES: I may designate a third party to access the Contact Data on my behalf, provided that the designee may only use the Contact Data in accordance with this Agreement. Except in connection with this paragraph, I will not disclose to any third party any of the Contact Data.

7. TELEPHONE CALLS:
a. I understand that both state and federal laws dictate to whom and how telephone calls can be made to consumers and that I may be required to register with my state or the Federal Trade Commission for access to lists of telephone numbers that have been registered by consumers who do not wish to receive telephone solicitations. I understand that, unless my telephone calls fit into one of the exceptions to the definition of "telemarketing", it is my responsibility to obtain these lists directly from the state and/or

Federal Trade Commission, and to verify that each number I call, is not listed on a state or the federal "Do Not Call" list.

b. I understand that the telephone numbers on the manifest for GM programs have been checked against the Do Not Call registries merely as a courtesy to dealers, and the telephone numbers presented on the GMAC Opportunities Program manifest HAVE NOT been checked against the Do Not Call registries. I understand that before making ANY telemarketing calls it is my responsibility to obtain those registries directly from the Federal Trade Commission and/or state and to verify that each number I call is not listed on a state or the federal Do Not Call list OR to confirm with my legal counsel that my calls are exempt from these requirements.

c. Further, I understand that both the federal and various state laws regulating telemarketing impose further obligations and restrictions on telephone solicitation pertaining to, among other things, consumers who request not to receive telemarketing calls from me or someone acting on my behalf, call curfews, call content, the use of autodialers and prerecorded messages, etc. I agree that it is my responsibility to be aware of and comply with all applicable federal and state laws.


8. OTHER LIMITATIONS. I will not use the Contact Data to create a parallel database in any manner whatsoever.

...

# Exhibit I

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

In re:

**TOYSMART.COM, LLC, Debtor.**

**Chapter 11**
**Case No. 00-13995-CJK**

**STIPULATION AND ORDER ESTABLISHING CONDITIONS**
**ON SALE OF CUSTOMER INFORMATION**

This Stipulation is entered into this twentieth day of July, 2000, by and between, Toysmart.com, LLC, debtor and debtor-in-possession ("Debtor" or "Toysmart"), and the Federal Trade Commission ("FTC").[1]

WHEREAS, on June 9, 2000, an involuntary petition was commenced against the Debtor under chapter 11 of 11 U.S.C. § 101, et seq. ("Code"). On June 23, 2000, the Debtor filed a consent to the order for relief under chapter 11 of the Code;

WHEREAS, the Debtor is a Delaware limited liability corporation involved in the "e-tail" business. The Debtor has, among other things, advertised, promoted, and sold toys on the Internet including through its Web site www.toysmart.com;

WHEREAS, the FTC is an independent agency of the United States government created pursuant to 15 U.S.C. § 41, et seq. ("FTC Act"). The FTC enforces § 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce;

WHEREAS, the Debtor has collected personal customer information including, but not limited to, consumers' names, addresses, billing information, shopping preferences, and family profile information;

WHEREAS, from at least September 1999 to July 2000, the Debtor's Web site included a privacy statement ("Privacy Statement") stating that (1) "Personal information voluntarily submitted by visitors to our site, such as name, address, billing information and shopping preferences, is never shared with a third party. All information obtained by toysmart.com is used only to personalize your experience online," and (2) "When you register with toysmart.com, you can rest assured that your information will never be shared with a third party;"

---

[1] The FTC assents to this Court's jurisdiction solely for purposes of approval of this Stipulation. Should this Stipulation not be approved by the Bankruptcy Court, the FTC reserves the right to take all actions as it deems necessary and appropriate to protect its exercise of police and regulatory powers.

WHEREAS, on or about May 22, 2000, the Debtor announced that it had ceased operations and began to offer for sale customer information through advertisements appearing in the Wall Street Journal and the Boston Globe and through its Web site;

WHEREAS, on June 29, 2000, the Debtor filed the Debtor's Motion For Authority To Sell Assets (Excluding Inventory) By Public Sale Free And Clear Of Liens, Claims And Encumbrances ("Sale Motion") and related pleadings. Pursuant to the Sale Motion, the Debtor, among other things, seeks to sell a group of assets set forth in Category C and entitled "Web Site Applications, Names, Customer List, and Product Databases" consisting of the Debtor's right, title and interest in customer information, including contents of its customer databases including detailed customer lists and related information, as well as names, trademarks, goodwill, URL names, Web site source code, and data base schemas without content and publishable content located on its Web site (each and together, the "Goodwill"); and

WHEREAS, the FTC has filed a complaint in the United States District Court for the District of Massachusetts, Federal Trade Commission v. Toysmart.com, LLC, Civil Action No. 00-11341-RGS, which alleges that the proposed sale of the customer information would constitute a deceptive act or practice in or affecting commerce under § 5(a) of the FTC Act; and

WHEREAS, the Debtor disputes the FTC's allegations and further responds that it has never violated the Privacy Statement, but in any event, seeks to resolve this matter so as to preserve the value of the Debtor's assets for the benefit of its creditors.

**NOW THEREFORE**, in an effort to resolve this matter without further cost or delay, the parties hereby agree, subject only to the approval of this Court, as follows:

For the purposes of this Agreement, the following definitions shall apply:

>"Qualified Buyer" shall mean an entity that (1) concentrates its business in the family commerce market, involving the areas of education, toys, learning, home and/or instruction, including commerce, content, product and services, and (2) expressly agrees to be Toysmart's successor-in-interest as to the Customer Information, and expressly agrees to the obligations set forth in Paragraphs 2, 3 and 4, below. Nothing herein, however, shall create any liability for such Qualified Buyer as a result of any actions or omissions by the Debtor, as the Customer Information is to be sold free and clear of all liens, claims and encumbrances, except for the Qualified Buyer's obligations under the Privacy Statement.

"Customer Information" shall mean information of or relating to consumers collected by the Debtor, including, but not limited to, name, address, billing information, shopping preferences, order history, gift registry selection, family profile information about consumers' children, such as name, gender, birthday, and toy interests.

"Third Party" shall mean any individual, firm, or organization other than the Qualified Buyer and its successors, except to the extent that disclosure of Customer Information to such an individual, firm, or organization is necessary to maintain the technical

functioning of the Toysmart Web site or customer databases, or to fulfill a consumer's request. "Third Party" includes any affiliates of the Qualified Buyer.

"Privacy Statement" shall mean the privacy statement posted on the Toysmart Web site from at least September 1999 to July 2000, the terms of which are included in full in Exhibit 1.

The Debtor shall only assign or sell its Customer Information as part of the sale of its Goodwill and only to a Qualified Buyer approved by the Bankruptcy Court. In the process of approving any sale of the Customer Information, the Bankruptcy Court shall require that the Qualified Buyer agree to and comply with the terms of this Stipulation.

The Qualified Buyer shall treat Customer Information in accordance with the terms of the Privacy Statement and shall be responsible for any violation by it following the date of purchase. Among other things, the Qualified Buyer shall use Customer Information only to fulfill customer orders and to personalize customers' experience on the Web site, and shall not disclose, sell or transfer Customer Information to any Third Party.

If the Qualified Buyer materially changes the Privacy Statement, prior notice will be posted on the Web site. Any such material change in policy shall apply only to information collected following the change in policy. The Customer Information shall be governed by the Privacy Statement, unless the consumer provides affirmative consent ("opt-in") to the previously collected information being governed by the new policy.

In the event that an order is not entered on or before July 31, 2001, approving the sale of the Customer Information to a Qualified Buyer or approving a plan of reorganization, the Debtor shall, on or before August 31, 2001, delete or destroy all Customer Information in its possession, custody or control, and provide written confirmation to the FTC, sworn to under penalty of perjury, that all such Customer Information has been deleted or destroyed. Pending approval of any sale of the Customer Information to a Qualified Buyer or of a plan of reorganization, the Debtor shall handle Customer Information in accordance with the Privacy Statement.

This Stipulation and Order, after approval by the Bankruptcy Court, shall be attached to and incorporated in full into the terms of any plan of liquidation or reorganization that is ultimately approved in this bankruptcy case.

Of Counsel:

Jeanne M. Crouse
Counsel for Bankruptcy & Redress
Washington, DC 20580
(202) 326-3312

By its Attorneys,

Harold B. Murphy (BBO #567781)
Alex M. Rodolakis (BBO #567781)
Hanify & King
One Federal Street
Boston, MA 02110
(617) 423-0400

FEDERAL TRADE COMMISSION

Debra A. Valentine,

General Counsel,

Federal Trade Commission

Laura Mazzarella

Ellen Finn

Federal Trade Commission

600 Pennsylvania Ave., NW

Washington, DC 20580

(202) 326-3424/(202) 326-3296

TOYSMART.COM, LLC

David N. Lord

Chief Executive Officer

**IT IS SO ORDERED.**

Entered at Boston, Massachusetts, this ___ day of July, 2000.

_____

Honorable Carol J. Kenner

United States Bankruptcy Judge

# EXHIBIT 1

## PRIVACY STATEMENT

### Our promise

At toysmart.com, we take great pride in our relationships with our customers and pledge to maintain your privacy while visiting our site. Personal information voluntarily submitted by visitors to our site, such as name, address, billing information and shopping preferences, is never shared with a third party. All information obtained by toysmart.com is used only to personalize your experience online. This information is received via the following areas of our site: My toysmart and the Gift Center. When you place additional orders, our site will update your order history, which you can view in My toysmart. If you sign up for the gift registry, information you submit will be added to your personal profile. Other than these two instances, the information that you provide us is not supplemented in any way.

### Your option

If you do not wish to receive emails containing promotional offers or contests from toysmart.com, please click the box located at the bottom of the "My toysmart" registration page. If you are already registered and would like to opt-out of such promotional offers, please go to "My toysmart," click on the "My Profile" icon, and unselect the email option located at the bottom of the page. When you register with toysmart.com, you can rest assured that your information will never be shared with a third party.

### Editing your personal information

If you would like to edit your personal information, please click on the "My toysmart" button located on the top of our homepage. Then, simply click on the "My Profile" icon and update any of your information.

### Contests

toysmart.com is committed to protecting the privacy of all children who enter contests on our site. We request only the child's first name and age be sent with the contest entry. We email every child's parent with notification that his or her child has entered the contest. Only winners' parents will be sent a release form, which requests a shipping

address as well a permission request to post the winning entry on our site. No entries will be posted without a parent or guardian's permission, and no prizes will be sent without written consent from the parent or guardian.

**Your information is safe with us!**

All personal information is encrypted on a separate server. Also, we give you the option of further securing your information with the use of a password. To create a personal password, simply go to "My toysmart." Shopping with toysmart.com is guaranteed to be 100% safe. That means we will guarantee your protection against any liability if unauthorized charges are made to your card as a result of shopping at toysmart.com. Simply stated, you are guaranteed a safe and secure transaction every time you shop with us. Visit our "Security" (http://www.toysmart.com/toysmart/ts_cs_security.asp) section for more details.

Questions regarding this statement should be directed to support@toysmart.com.

# Exhibit J

# Handling Customer Data in Bankruptcy Mergers and Acquisitions: Coping with the Consumer Privacy Ombudsman Provisions of the 2005 Bankruptcy Act

## Warren E. Agin[*]

Imagine that your client is purchasing a local air carrier from a bankrupt airline operator. It's a perfect fit. The debtor needs quick cash and acquiring the local carrier, which operated mostly in the Southeast, will allow your client to quickly add a large number of additional routes to Florida in time for the winter vacation season. The fit is so good and the sale process has gone so quickly that no competitors have emerged. You walk into the bankruptcy court sale hearing prepared to figuratively scoop up a bargain for your client.

The sale hearing goes smoothly. The debtor, creditors' committee and bondholders all support the sale. The judge seems pleased. She just has one last question. It's a minor one about how the debtor's customers purchased their airline tickets. "The customers that purchased their tickets on-line – was there a *privacy policy*?"

After October 17, 2005,[1] that question just might stop your sale in its tracks. The 2005 Bankruptcy Act includes changes to Section 363 of the U.S. Bankruptcy Code that will, in some circumstances, limit a bankruptcy debtor's ability to sell or lease consumer information. In short, when a debtor with a privacy policy has collected personal information about consumers, the debtor can only sell or lease the information in compliance with applicable non-bankruptcy law and if either: (a) the sale is consistent with the privacy policy terms; or (b) the Court approves the sale after the appointment of a Consumer Privacy Ombudsman.[2]

This article will first discuss the background to the 2005 Bankruptcy Act's Consumer Privacy Ombudsman provisions. Then, it will discuss and analyze the provisions'

---

[*] Warren E. Agin is a partner with Swiggart & Agin, LLC, an Internet and bankruptcy law boutique in Boston, Massachusetts. Mr. Agin is a chapter 7 panel trustee and is available to serve as a Consumer Privacy Ombudsman in appropriate cases. Former chair of the American Bar Association's E-Commerce and Insolvency Subcommittee and the Boston Bar Association's Computer and Internet Law Committee, Mr. Agin is the author of BANKRUPTCY AND SECURED LENDING IN CYBERSPACE, 3RD ED. (West Group, 2005).

[1] The effective date for most provisions of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, hereafter referred to as the "2005 Bankruptcy Act."

[2] 11 U.S.C. §§ 332, 363(b) (2005).

details. Finally, the article will provide some guidance for anticipating potential sale problems.

### *The Historical Background to the Consumer Privacy Ombudsman Provisions*

The Consumer Privacy Ombudsman provisions found their genesis in The Leahy-Hatch Amendment to Senate Bill 420, the Bankruptcy Reform Act of 2001. That amendment was inspired by the *Toysmart* and *Living.com* cases – and how they addressed bankruptcy sales of consumer information collected pursuant to a privacy policy.

At the beginning of the Internet boom, companies moving on-line had to cope with consumer distrust of the Internet. In particular, consumers, as well as groups dedicated to protecting consumer rights, were concerned about how businesses would use the information consumers provided on-line. To address these concerns, on-line businesses adopted self-regulation and voluntary disclosure of how they would use collected data. The Federal Trade Commission and consumer protection groups encouraged companies to self-regulate in this fashion by adopting "privacy policies." A privacy policy discloses an on-line business' data collection and use practices.[3] Eventually, Federal statutes emerged which required the use of privacy policies in certain regulated industries.[4] On-line privacy policies became ubiquitous, both in regulated industries and in other contexts where their use was voluntary. These privacy policies were, if not legally enforceable contracts, at least representations to consumers about how their information would be used.

*In re Toysmart.com, LLC*[5] was the first bankruptcy case to illustrate the potential danger of a debtor ignoring a privacy policy. The case involved an actual sale of customer data. Toysmart operated an on-line toy store that ran into financial trouble and ceased operations in May 2000. Toysmart had, in 1999, adopted a privacy policy, which stated that Toysmart would not share its customers' data with third parties. After its creditors filed an

---

[3] Warren E. Agin, BANKRUPTCY AND SECURED LENDING IN CYBERSPACE, 3ʳᵈ ED, § 8:4 (West Group, 2005); Raymond P. Nimmer, INFORMATION LAW, § 8.79 (West Group, 2005).

[4] For example the Gramm-Leach-Bliley Act of 1999 includes provisions governing collection and use of personal information by financial institutions. 15 U.S.C. §§ 6801, et seq. (1999). The Health Insurance Portability and Accountability Act of 1996 includes provisions requiring security procedures for electronic medical records. 42 U.S.C. § 1320d (1996).

[5] *In re Toysmart.com, LLC*, Case no. 00-13995-CJK, in the United States Bankruptcy Court for the District of Massachusetts.

involuntary Chapter 11 case against it, Toysmart filed a motion to conduct a public auction of several assets, including its customer data. On learning about the proposed sale of personal information, the FTC sued Toysmart in Federal District Court alleging that the sale of data was an unfair or deceptive business practice violating the FTC Act, and requesting the court enjoin the sale.[6] The FTC also asserted that some of the customer data was collected from children in violation of COPPA.[7] The FTC's action forced the company to limit its sale options in order to settle the complaint. The company agreed to sell the information only to a family-oriented buyer that agreed to abide by Toysmart's privacy policy and the company filed a motion seeking bankruptcy court approval of the settlement.

That settlement did not resolve the problem. Several State Attorney Generals objected to the proposed auction. Their objection asserted that the sale, even if conducted subject to the conditions of the FTC settlement, constituted an unfair or deceptive business practice in violation of the states' consumer protection statutes. Faced with only one bid, by Disney Corporation, and active opposition from the state Attorney Generals, the debtor withdrew the customer data from the auction.[8]

In the *Living.com, Inc.* case, an on-line furniture retailer filed a Chapter 11 case in 2000.[9] Living.com had a privacy policy that stated "...living.com does not sell, trade or rent your personal information to others without your consent." The Texas Attorney General raised concerns over the company's treatment of customer data, and, even though no sale of the data was pending, threatened legal action to protect consumers from any possible violation of their rights. Rather than litigate, Living.com entered into a settlement agreement with the Texas Attorney General. Under the agreement, Living.com's bankruptcy trustee agreed to destroy customers' personal financial data, such as credit card information, and to give customers notice and an opportunity to "opt-out" of a sale before selling their personal data.[10] This meant that before the trustee could sell the data he

---

[6] *FTC v. Toysmart.com, LLC*, civil case no. 00-11341-RGS (D. Mass., filed 7/10/00).

[7] The Children's Online Privacy Protection Act of 1998 ("COPPA"), 15 U.S.C. §6501 et seq.; *FTC v. Toysmart.com, LLC*, civil case no. 00-11341-RGS (D. Mass., filed 7/10/00).

[8] In the end, one of Toysmart's major investors, Disney Corporation, paid the debtor $50,000 for the debtor to destroy the customer data, rather than transfer it.

[9] *In re Living.com, Inc.*, Case. 00-12522, US Bankruptcy Court for the Western District of Texas.

[10] *Cornyn Announces Privacy Settlement with Living.com*, (Official Press Release) viewed at *<www.oag.state.tx.us/newspubs.releases/2000/20000925living.com.htm>* September 25, 2000.

would have to inform customers of the proposed sale and, if the customers so requested, remove their personal information from the data being sold.

The *Toysmart* and *Living.com* cases illustrated the problems raised by the sale of customer data in a bankruptcy case. On the one hand, allowing a sale of data in violation of a privacy policy could constitute an unfair and deceptive business practice and thus violate both Federal and state law. On the other hand, enforcing an overly restrictive privacy policy could prevent an otherwise reasonable sale of customer data to the detriment of creditors. The Bankruptcy Code lacked an efficient mechanism for balancing these interests. It also lacked a viable mechanism for protecting consumer interests in this context. The FTC and state Attorney Generals could not be expected to monitor all business bankruptcy cases and intervene on behalf of customers every time a debtor attempted to sell customer data. The customers themselves might lack the right to enforce the privacy policy as a contract, and, even if they had the inclination would likely lack the means to protect their interests. Certainly, no other participants in the bankruptcy process (other than the Court on its own initiative) would have an interest in hindering a sale to protect consumer rights.

To address these issues, the Leahy-Hatch Amendment was added to the Senate version of The Bankruptcy Reform Act of 2001. Its provisions, with some changes, remained as sections 231 and 232 of the 2005 Bankruptcy Act.

### The Consumer Privacy Ombudsman Provisions of the 2005 Bankruptcy Act

Section 363 of the Bankruptcy Code controls a bankruptcy debtor's ability to use, sell or lease its assets. While a debtor can continue to use, sell or lease its assets in the ordinary course of its business, the bankruptcy court must approve any use, sale or lease of assets outside of the ordinary course of business. Thus, in U.S. bankruptcy cases, a debtor must go through a special sale process before liquidating its assets. This sale process, controlled by section 363, will apply to any sale of assets outside of the ordinary course, including a sale of customer information.

The 2005 Bankruptcy Act makes three changes to the Bankruptcy Code that, together, create a new process for selling or leasing customer information using 11 U.S.C. § 363. First, a new bankruptcy code section 101(41A) defines the term "personally identifiable

information." Second, amendments to section 363 limit the debtor's ability to sell or lease personally identifiable information. Third, a new section 332 controls appointment of Consumer Privacy Ombudsmen and defines his role in the sale process.

Although the Consumer Privacy Ombudsman provisions' definition of "personally identifiable information" is quite lengthy; the concept is simple enough. Basically, personally identifiable information is information obtained from a purchaser of consumer goods or services that is specific to that individual and would, by itself, allow identification of the individual. The actual definition is a little more detailed.

> (41A) The term "personally identifiable information" means—
>
> (A) if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes—
>
>> (i)   the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;
>>
>> (ii)  the geographical address of a physical place of residence of such individual;
>>
>> (iii) an electronic address (including an e-mail address) of such individual;
>>
>> (iv)  a telephone number dedicated to contacting such individual at such physical place of residence;
>>
>> (v)   a social security account number issued to such individual; or
>>
>> (vi)  the account number of a credit card issued to such individual; or
>
> (B) if identified in connection with 1 or more of the items of information specified in subparagraph (A)—
>
>> (i)   a birth date, the number of a certificate of birth or adoption, or a place of birth; or
>>
>> (ii)  any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically.

This definition embodies two concepts. First, that the information must have been provided to the debtor in the context of the sale of consumer goods or services by the debtor. Second, that the information is personally identifiable.

The first concept has importance because of what it excludes as much as because of what it includes. The information must be provided "in connection with obtaining a product

or a service." In short, the information must be provided in connection with a transaction of some sort. The definition appears to exclude, by omission, information collected solely for marketing or advertising purposes.

The information must be provided to and the product or service obtained from "the debtor." This qualification would appear to exclude from the rule personal information collected when a party other than the debtor provides the goods or services. For example, suppose an insurance company obtained personal information from a bank about the bank's customers. The Consumer Privacy Ombudsman provisions would appear to restrict the bank's ability to sell or lease the information, but not the insurance company's.

Finally, the product or service must be obtained "primarily for personal, family or household purposes." In other words, the transaction must be a consumer transaction. The Consumer Privacy Ombudsman provisions will not affect the transfer of information about business customers.

The types of information that qualify as personally identifiable fall into two categories. The first category consists of a list of specific types of information that would allow actual identification or contacting of an individual, including: the individual's first name (or initials) and last name; physical home address; e-mail address; home telephone number; social security number; and credit card account number.

The second category consists of a group of less specific types of information, such as: birth date; birth certificate number; place of birth; or any other information concerning the individual that, if disclosed, will result in the physical or electronic contacting or identification of the individual. Information in the second category, however, will only count as personally identifiable information when associated with one or more items of information in the first group.

In most situations, however, the details will be unimportant in applying the section 101(41A) definition of "personally identifiable information." The list provided in the statute is comprehensive enough that almost any customer database containing individualized information will contain information that qualifies as personally identifiable.

The second Consumer Privacy Ombudsman provision amends section 363(b) to restrict the debtor's ability to sell or lease the personally identifiable information outside of the ordinary course of business.

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—
>
> (A) such sale or such lease is consistent with such policy; or
>
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—
>
> > (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
> >
> > (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

This change only affects sales and leases outside of the ordinary course of business. Transactions inside of the ordinary course of business are authorized by 11 U.S.C. § 363(c)(1), which remains unchanged. Thus, a company that ordinarily leases customer lists can continue to do so, subject only to any applicable non-bankruptcy limitations on its data usage. Also, the Consumer Privacy Ombudsman provisions might not apply to transfers of customer information pursuant to the terms of a plan of reorganization. Since a sale or transfer of estate assets through a plan occurs under the authority provided by bankruptcy code sections 1123(a)(5) and 1141, a restriction on the sale of an asset contained within 11 U.S.C. § 363 might not apply.

Still, the new provision will certainly affect sales under section 363, including sales by trustees in chapter 7 liquidation cases. Given the current penchant for liquidating chapter 11 cases through quick 363 sales, the Consumer Privacy Ombudsman provisions will come into play in a large number of cases – assuming the other conditions of section 363(b)(1) exist.

The Consumer Privacy Ombudsman provisions don't affect all sales of personally identifiable information – three pre-conditions must be in place. First, the debtor must have

disclosed a privacy policy to the individual in connection with offering the good or service. Second, the privacy policy must prohibit the transfer of the personally identifiable information to non-affiliate parties. Third, the privacy policy must be in effect on the date of the commencement of the bankruptcy case.

The first pre-condition may greatly limit the scope of information affected by the Consumer Privacy Ombudsman provisions. It requires that the privacy policy be disclosed in connection with offering the goods or services. In most industries, the business only discloses the privacy policy in connection with transactions conducted over the Internet. Even then, the debtor may not be the entity disclosing the privacy policy. For example, consider the purchase of an airline ticket. The ticket can be purchased from your travel agent over the telephone, through an on-line service such as Travelocity or Orbitz, or from the airline's website. When you purchase the ticket from your travel agent over the telephone, no privacy policy is presented. When you purchase the ticket from Orbitz, the Orbitz website presents you with its privacy policy – not the airline's. Only when you order from the airline's website are you presented with the terms of the airline's privacy policy. If the airline then files a chapter 11 petition, the Consumer Privacy Ombudsman provisions arguably only affect the information collected in connection with the sale of tickets through the airline's own website.

The second pre-condition requires that the privacy policy actually prohibit the transfer of information to parties not affiliated with the debtor. Thus, information is not, by default, non-transferable. Either the privacy policy must contain some explicit promise not to sell the personally identifiable information or applicable non-bankruptcy law must prohibit a transfer of information based on a lack of disclosure in the privacy policy. Many privacy policies do not contain such limitations. Common clauses used in privacy policies will, in fact, allow the transfer of customer information in a merger or a bankruptcy sale.

The reference to "persons that are not affiliated with the debtor," within the second pre-condition, also provides some question of interpretation. First, while the bankruptcy code defines the term "affiliate,"[11] certain applicable privacy statutes, such as the Gramm-

---

[11] 11 U.S.C. § 101(2).

Leach-Bliley Act, also define the term affiliate.[12] These statutes employ specific frameworks regarding what disclosures a privacy policy must include – and these frameworks treat transfers to affiliates differently than transfers to non-affiliates. The drafters might have been referring to these non-bankruptcy definitions of "affiliate," rather than the bankruptcy code definition.

Second, the language is just a pre-condition – a requirement that must be met before the other Consumer Privacy Ombudsman provisions apply. As a practical matter, no privacy policies will prohibit transfers to affiliates while allowing transfers to all non-affiliates. Thus, a privacy policy that does not allow free transfer of personally identifiable information will be subject to the Consumer Privacy Ombudsman provisions. Whether the actual transaction proposed falls within the scope of what the privacy policy allows is then left to another part of the statute.

The third pre-condition is that the privacy policy be in effect on the date the bankruptcy petition is filed. This pre-condition prevents a sale from being held up by the provisions of a privacy policy that was abrogated pre-petition. It also allows the debtor to limit the number of privacy policies that need to be examined in connection with a proposed sale. On the other hand, it prevents a business from changing its privacy policy post-petition in order to limit application of the Consumer Privacy Ombudsman provisions.

The third pre-condition might allow a company to change its privacy policy immediately before it files its bankruptcy petition to resolve a potential problem. Many privacy policies contain "bankruptcy exceptions" – language that allows the company to sell its data freely in the event of a bankruptcy filing. Almost all privacy policies also have language allowing the company to revise the policy at will, and without providing any notice other than by posting the new policy on its website. Thus, some leeway may exist for a company contemplating a bankruptcy filing to "fix" its privacy policy prepetition. On the other hand, a pre-bankruptcy change designed to strip promised rights from consumers in contemplation of a bankruptcy filing might be an unfair or deceptive business practice in violation of the FTC Act.[13]

---

[12] "The term ''affiliate'' means any company that controls, is controlled by, or is under common control with another company." 15 U.S.C. § 6809(6).
[13] 15 U.S.C. § 45(a).

When all three of these pre-conditions apply, the estate representative can only sell or lease the personally identifiable information in two circumstances: first, when the sale or lease is consistent with the privacy policy; or, second, when the Court allows the sale after appointment of a Consumer Privacy Ombudsman.

Theoretically, determining whether the sale or lease is consistent with the privacy policy will require a review of the policy's provisions in light of the law applicable to that policy and the facts of the specific proposed sale. As a practical matter, the "consistent test" will have limited usefulness because of timing issues. If the sale proponent asks the Court for a determination that the sale is consistent with the privacy policy terms, someone objects, and the Court holds the sale is not consistent, then a Consumer Privacy Ombudsman must be appointed and given five days to provide a report. In other words, the "consistent test" is useful only when an objection is unlikely or can be dealt with well before a sale hearing.

When the three pre-conditions are met and the proponent is not relying on the "consistent test," the Court must order a Consumer Privacy Ombudsman appointed and, after receiving the Consumer Privacy Ombudsman's report, review the sale "giving due consideration to the facts, circumstances, and conditions of such sale or such lease." The Court must give the Consumer Privacy Ombudsman at least five days to prepare his report.

The Consumer Privacy Ombudsman provisions do not define what is meant by "the facts, circumstances, and conditions" of the sale. However, it must mean more than just whether or not the sale complies with the privacy policy and applicable law. As pointed out earlier, a Consumer Privacy Ombudsman is not required when the sale is consistent with the privacy policy. This implies that the Court has authority to approve a sale inconsistent with the terms of the privacy policy. On the other hand, even if the Court after considering the "facts, circumstances, and conditions" wants to approve the sale, it can cannot approve it if a "showing was made that such sale or such lease would violate applicable nonbankruptcy law."

In fact, a significant number of statutes restrict transfers of personally identifiable information.[14] In addition to these statutes specifically addressing the use of customer data, a sale must also comply with section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce."[15] The FTC Act provided the FTC with its authority to oppose the sale in the *Toysmart* case. State Attorney Generals have similar enforcement rights under state Consumer Protection Acts, which generally closely track the FTC Act.

Filing a petition in bankruptcy does not absolve a debtor from complying with these statutes. The debtor's ability to use customer data when in bankruptcy remains the same as prior to the bankruptcy filing.[16] The debtor must also manage estate property according to the requirements of the valid laws of the States in which the property is located.[17] The Consumer Privacy Ombudsman provisions do not provide a mechanism for bypassing these statutes. A sale that is "unfair or deceptive" will violate the FTC Act and the Consumer Privacy Ombudsman provisions prohibit such sales – regardless of what the Consumer Privacy Ombudsman might say in his report.

The Consumer Privacy Ombudsman's role in the sale process is far from clear given the statute's language. The fact patterns requiring the Consumer Privacy Ombudsman's involvement seem to fall in between those where the sale is consistent with the privacy policy and those where the sale is illegal. However, Consumer Privacy Ombudsmen will likely be appointed in a broader range of situations and can lend value outside the narrow scope defined by the statute. The Consumer Privacy Ombudsman's report may help the Court understand why a particular sale is consistent with the privacy policy – or violates applicable non-bankruptcy law. The Consumer Privacy Ombudsman might also assist the Court in evaluating claims that a particular sale is "unfair or deceptive." A Consumer Privacy Ombudsman should help the Court understand the effect of the sale on customers, and help the parties restructure the sale, if necessary, so it is fair to customers. In most

---

[14] *The Children's Online Privacy Protection Act of 1998* ("COPPA"), 15 U.S.C. §6501 et seq. (Title XIII, Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1998); implementing regulations at 16 C.F.R. Part 312 et seq.; *The Gramm-Leach-Bliley Act of 1999,* 16 U.S.C. §§ 6801, et seq. (1999); *The Health Insurance Portability and Accountability Act of 1996 (HIPAA],* 42 U.S.C. § 1320d (1996); final regulations at 65 Fed. Reg. 82462; *The Fair Credit Reporting Act,* 15 U.S.C. § 1681.

[15] 15 U.S.C. § 45(a).

[16] *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 493 (3rd Cir. 1997).

[17] 28 U.S.C. § 959(b).

cases, the debtor can conduct a sale in a manner that maximizes sale proceeds and respects, or even benefits, customers.

A new section of the bankruptcy code, section 332, describes the process for appointing the Consumer Privacy Ombudsman and defines the Consumer Privacy Ombudsman's role in the sale process.

> *§ 332. Consumer privacy ombudsman*
>
> *(a) If a hearing is required under section 363(b)(1)(B), the court shall order the United States trustee to appoint, not later than 5 days before the commencement of the hearing, 1 disinterested person (other than the United States trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman.*
>
> *(b) The consumer privacy ombudsman may appear and be heard at such hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B). Such information may include presentation of—*
>
> *(1) the debtor's privacy policy;*
>
> *(2) the potential losses or gains of privacy to consumers if such sale or such lease is approved by the court;*
>
> *(3) the potential costs or benefits to consumers if such sale or such lease is approved by the court; and*
>
> *(4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.*
>
> *(c) A consumer privacy ombudsman shall not disclose any personally identifiable information obtained by the ombudsman under this title.*

When 11 U.S.C. § 363(b) requires a Consumer Privacy Ombudsman, the Court shall order the appointment. The US Trustee makes the actual appointment. The Consumer Privacy Ombudsman must be a disinterested person other than the US Trustee. Hypothetically, the ombudsman could be an FTC commissioner or state Attorney General, although it remains to be seen whether they could satisfy the disinterested requirement.[18] The Consumer Privacy Ombudsman will have a right to appear and be heard at the sale hearing,[19] shall maintain as confidential any "personally identifiable information" he receives,[20] and shall be compensated in the same manner as an examiner.[21] The statute is

---

[18] 11 U.S.C. § 332(a) (2005) requires the U.S. Trustee to appoint "1 disinterested person" to serve as the Consumer Privacy Ombudsman. The term "disinterested" is defined by 11 U.S.C. § 101(14). A creditor, equity security holder, insider or any person with an interest materially adverse to the estate is, by definition, not disinterested.

[19] 11 U.S.C. § 332(b) (2005).

[20] 11 U.S.C. § 332(c) (2005).

not clear as to whether the Consumer Privacy Ombudsman can employ his own professionals.[22]

The Consumer Privacy Ombudsman's role is not explicitly to represent consumers, but to provide the court information to assist the court in deciding whether to allow a non-conforming sale or lease of "personally identifiable information." The statute does not dictate what information the Consumer Privacy Ombudsman must provide the Court, but suggests that the information might include a presentation of the applicable privacy policy, potential loses or gains of privacy to consumers if the sale or lease is approved, potential costs or benefits to consumers of the sale or lease, and potential alternatives to the sale which would mitigate potential privacy losses or potential costs to consumers.[23] In short, the Consumer Privacy Ombudsman appears more of an expert commentator than a consumer advocate, but the act implies the Consumer Privacy Ombudsman's role is to ensure consumer protection.

How the Consumer Privacy Ombudsman will accomplish this task is another question. The Consumer Privacy Ombudsman's job will require completion of three steps: collecting data; analyzing the relevant legal and business issues; and submitting a report to the Court. In addition, the Consumer Privacy Ombudsman's role contemplates that the Consumer Privacy Ombudsman communicate with the sale proponents prior to the sale hearing to attempt to resolve any problems. Such communication will allow the Consumer Privacy Ombudsman to facilitate an asset sale that respects the rights of consumers, instead of simply acting as an impediment to a sale.

Information gathering may prove the most difficult part of the Consumer Privacy Ombudsman's job, especially if the Consumer Privacy Ombudsman only has five days before the hearing. In addition to information about the debtor's privacy policy, the Consumer Privacy Ombudsman will have to understand the nature of the personally identifiable information involved with the sale, the role that information plays in the

---

[21] 11 U.S.C. § 330(a)(1) (2005). The Court may award the Consumer Privacy Ombudsman reasonable compensation based on the actual, necessary services provided. However, section 330(a)(3), which identifies factors for the Court to consider when awarding fees to other professionals, might not apply to Consumer Privacy Ombudsman fee awards.

[22] 11 U.S.C. § 328 appears to limit this right to trustees (and, by extension, debtors-in-possession) and official committees.

[23] 11 U.S.C. § 332(b) (2005)

debtor's current business, the role the information plays in the sale, and the intended and possible uses the buyer has for the information. The Consumer Privacy Ombudsman will have to know, in advance, what information he needs to do his job, where to find that information within a business entity, and how to communicate his needs to the debtor and buyer.

Information in hand, the Consumer Privacy Ombudsman will have to understand the impact the proposed sale will have on consumers. The Consumer Privacy Ombudsman will have to understand data privacy principles and the various laws and rules that govern business use and transfer of customer information. However, the Consumer Privacy Ombudsman's skills must extend beyond just understanding and appreciating the role safeguarding personal information plays in consumer protection. The Consumer Privacy Ombudsman must also understand and appreciate how businesses use personal information and the various ways in which transferability, especially in the bankruptcy context, can actually benefit consumers. Finally, the Consumer Privacy Ombudsman must understand the bankruptcy sale process.

### Coping with the Consumer Privacy Ombudsman Provisions

The hypothetical outlined at the beginning of this article is not that far-fetched. For example, U.S. Airways, currently a chapter 11 debtor, has a privacy policy that states, "US Airways will not sell, trade, or rent personally identifiable information to others, except as outlined in the Dividend Miles and US Airways Golf programs." The privacy policy does not have a merger provision. U.S. Airways does collect personally identifiable information when it sells tickets. It collects, at a minimum, the passenger's name. It would, in any sale of operating assets, want to transfer that information to the buyer. In fact, the buyer would need some of the information in order to honor previously sold tickets. The buyer would require other information to provide existing customers adequate customer service. Under the 2005 Bankruptcy Act, a 363 sale of U.S. Airways' operating assets would require appointment of a Consumer Privacy Ombudsman – and a resulting inability to transfer the customer information might kill the sale.

Given the new statute governing bankruptcy sales of customer data, counsel will have to examine more closely the role customer data will play in each bankruptcy case. The

first issue will always be the existence and terms of a privacy policy. Did a privacy policy exist? What promises or statements were made in the privacy policy? Did the policy state data would never be shared or did it give the customer notice that the information might someday be transferred?

In addition to reviewing the potential impact of the privacy policy, the company should assess whether customer data was legally collected and held before attempting to sell it. Data collected or used in violation of COPPA, GLB or any of the other applicable statutes cannot be sold even in a bankruptcy case, and because of the Consumer Privacy Ombudsman provisions the risk of a problem arising during a 363 sale is now increased.

Debtors should recognize that the Consumer Privacy Ombudsman provisions present a potential "wild card" when selling a business that serves consumers. Without advance planning, the Consumer Privacy Ombudsman may be appointed mere days before the Court rules on whether to allow the sale under section 363(b)(1)(B). Keep in mind that the statute only requires five days advance notice to the Consumer Privacy Ombudsman. Assuming it takes a day or two for the appointment to actually occur, the Consumer Privacy Ombudsman needs at least one day to prepare his report, and the report needs to be filed the day before the hearing; the Consumer Privacy Ombudsman really only has a day or two to obtain the information he needs and digest it. The result is obvious and inevitable – reports prepared by rote and conclusions that simply do not reflect the true relationships between the business, the sale, and the customers. This produces an obvious risk to the sale.

One solution is to structure the sale so the ombudsman is not appointed immediately before the sale hearing. Assuming the parties ask the court to approve a sales procedures order, the order should address the issue of the Consumer Privacy Ombudsman. Where possible, the parties will probably ask the Court to hold that a Consumer Privacy Ombudsman is not necessary, either by finding that no privacy policy applies or that the proposed sale structure is consistent with the privacy policy. The sale procedures order should also include a finding that the sale does not violate any applicable non-bankruptcy law. In the event the Court declines to enter this order, a Consumer Privacy Ombudsman appointment should be sought at the time of the sales procedures hearing. In addition, the 363(b)(1)(B) hearing should not be left to the day of the actual sale hearing. Instead, the

363(b)(1)(B) hearing should be a few days before the sale hearing in case the Consumer Privacy Ombudsman process requires changes to the actual sale agreement.

This solution leaves two potential problems. First, while the Consumer Privacy Ombudsman may now have more than a day or two to analyze the sale, he still will have relatively little time to truly understand the issues. Remember, whether a certain sale of customer information benefits or harms customers is dependent on how the business involved uses that information. Continued conditions or restrictions on the buyer's ability to use and further transfer the customer information will affect whether the transaction should be allowed. Also, reasonable persons can disagree on these issues. For example, in the *Toysmart* case, the FTC agreed to a conditioned sale of the customer information, but several state Attorney Generals were still unwilling to go along.

Second, the Consumer Privacy Ombudsman's report will be very fact specific. While the deal with the stalking horse bidder may be acceptable to the Court, a counter-offer deal may raise additional concerns. The very identity of the buyer may make a significant difference. For example, a debtor may be able to transfer customer information held by a European subsidiary to a French buyer, but not to a U.S. based buyer.

In cases where a Consumer Privacy Ombudsman is clearly needed, the debtor should consider requesting early appointment of a Consumer Privacy Ombudsman. The Consumer Privacy Ombudsman can work with the debtor to structure appropriate sale guidelines so the debtor can offer the customer data on terms it knows the Consumer Privacy Ombudsman will support. The debtor does not want to propose a sale and then find out, after the fact, that the Consumer Privacy Ombudsman's recommendations to the court don't support the sale. The Consumer Privacy Ombudsman can also work with the estate to structure potential sales that will work notwithstanding last minute changes in deal structures.

In the end, all that's required to cope with the Consumer Privacy Ombudsman provisions is proper planning and an appreciation for customer rights. The Consumer Privacy Ombudsman provisions will help address the issues raised in the *Toysmart* and *Living.com* cases by providing a workable framework that lets the courts balance the rights of creditors and customers. Thus, while selling customer data will require greater attention

in future cases, practitioners should be able to avoid the kind of controversy that erupted in the *Toysmart* case.