**PRIVILEGED AND CONFIDENTIAL**
**CWT DRAFT 7/4/09**

$1,175,000,000
AMENDED AND RESTATED SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT


among


MOTORS LIQUIDATION COMPANY
(f/k/a GENERAL MOTORS CORPORATION)
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,


THE GUARANTORS


and


THE LENDERS PARTIES HERETO FROM TIME TO TIME


Dated as of July __, 2009

# TABLE OF CONTENTS

Page

## SECTION 1

### DEFINITIONS

1.1  Defined Terms ........................................................................................................2
1.2  Other Definitional Provisions .............................................................................23
1.3  Conversion of Foreign Currencies .......................................................................23

## SECTION 2

### AMOUNT AND TERMS OF THE LOANS

2.1  Loans....................................................................................................................24
2.2  [Intentionally Omitted] .......................................................................................24
2.3  Repayment of Loans; Evidence of Debt ..............................................................24
2.4  Optional Prepayments..........................................................................................24
2.5  [Intentionally Omitted] .......................................................................................25
2.6  Interest Rates and Payment Dates/Fee Payment Dates/Fees ...............................25
2.7  Computation of Interest and Fees ........................................................................25
2.8  Inability to Determine Interest Rate; Illegality ...................................................26
2.9  Treatment of Borrowings and Payments; Evidence of Debt ...............................26
2.10 Indemnity .............................................................................................................27
2.11 Superpriority Nature of Obligations and Lenders' Liens ....................................27
2.12 Taxes....................................................................................................................27

## SECTION 3

### REPRESENTATIONS AND WARRANTIES

3.1  Existence ..............................................................................................................30
3.2  [Intentionally Omitted] .......................................................................................30
3.3  [Intentionally Omitted] .......................................................................................30
3.4  [Intentionally Omitted] .......................................................................................30
3.5  Action, Binding Obligations ...............................................................................30
3.6  Approvals..............................................................................................................30
3.7  [Intentionally Omitted] .......................................................................................31
3.8  Investment Company Act .....................................................................................31
3.9  [Intentionally Omitted] .......................................................................................31
3.10 Chief Executive Office; Chief Operating Office ................................................31
3.11 Location of Books and Records............................................................................31
3.12 [Intentionally Omitted] .......................................................................................31

Page

3.13  [Intentionally Omitted] ..................................................................................31
3.14  Expense Policy ...........................................................................................31
3.15  Subsidiaries ...............................................................................................31
3.16  Capitalization .............................................................................................31
3.17  Fraudulent Conveyance ..............................................................................31
3.18  USA PATRIOT Act ....................................................................................31
3.19  Embargoed Person ......................................................................................32
3.20  Use of Proceeds ..........................................................................................33
3.21  Representations Concerning the Collateral ...................................................33
3.22  [Intentionally Omitted] ..................................................................................34
3.23  [Intentionally Omitted] ..................................................................................34
3.24  Lien Priority ...............................................................................................34
3.25  [Intentionally Omitted] ..................................................................................35
3.26  [Intentionally Omitted] ..................................................................................35
3.27  [Intentionally Omitted] ..................................................................................35
3.28  Excluded Collateral .....................................................................................35
3.29  Mortgaged Real Property .............................................................................35
3.30  [Intentionally Omitted] ..................................................................................35
3.31  The Final Order ..........................................................................................35
3.32  Wind-Down Budget .....................................................................................35

SECTION 4

CONDITIONS PRECEDENT

4.1  Conditions to Effectiveness ..........................................................................36

SECTION 5

AFFIRMATIVE COVENANTS

5.1  Financial Statements ....................................................................................38
5.2  Notices; Reporting Requirements ..................................................................39
5.3  Existence ....................................................................................................41
5.4  Payments of Taxes .......................................................................................42
5.5  Use of Proceeds ..........................................................................................42
5.6  Maintenance of Existence; Payment of Obligations; Compliance with Law .............42
5.7  Further Identification of Collateral ................................................................43
5.8  Defense of Title ..........................................................................................43
5.9  Preservation of Collateral ............................................................................43
5.10  Maintenance of Papers, Records and Files .....................................................43
5.11  Maintenance of Licenses ..............................................................................44
5.12  Payment of Obligations ................................................................................44
5.13  OFAC .........................................................................................................44
5.14  Investment Company ...................................................................................44
5.15  Further Assurances ......................................................................................44

Page

5.16  Executive Privileges and Compensation..................................................................45
5.17  Aircraft....................................................................................................................46
5.18  Restrictions on Expenses .......................................................................................46
5.19  Employ American Workers Act...............................................................................47
5.20  Internal Controls; Recordkeeping; Additional Reporting.......................................47
5.21  Waivers ...................................................................................................................47
5.22  [Intentionally Omitted] ..........................................................................................48
5.23  Additional Guarantors............................................................................................48
5.24  Provide Additional Information ..............................................................................48
5.25  Inspection of Property; Books and Records; Discussions .......................................48
5.26  [Governance of Borrower]......................................................................................49

SECTION 6

NEGATIVE COVENANTS

6.1   Prohibition on Fundamental Changes ......................................................................49
6.2   Lines of Business ....................................................................................................49
6.3   Transactions with Affiliates....................................................................................49
6.4   Limitation on Liens.................................................................................................50
6.5   Restricted Payments................................................................................................50
6.6   Amendments to Transaction Documents ................................................................51
6.7   Changes in Fiscal Periods .......................................................................................51
6.8   Negative Pledge ......................................................................................................51
6.9   Indebtedness............................................................................................................51
6.10  Investments .............................................................................................................51
6.11  Action Adverse to the Collateral.............................................................................51
6.12  Limitation on Sale of Assets...................................................................................51
6.13  [Intentionally Omitted] ..........................................................................................52
6.14  JV Agreements........................................................................................................52
6.15  Swap Agreements ...................................................................................................52
6.16  Clauses Restricting Subsidiary Distributions..........................................................52
6.17  Sale/Leaseback Transactions ..................................................................................52
6.18  [Intentionally Omitted] ..........................................................................................53
6.19  Modification of Organizational Documents ............................................................53

SECTION 7

EVENTS OF DEFAULT

7.1   Events of Default ....................................................................................................53
7.2   Remedies upon Event of Default .............................................................................55

<u>Page</u>

## SECTION 8

## MISCELLANEOUS

| | | |
|---|---|---|
| 8.1 | Amendments and Waivers | 57 |
| 8.2 | Notices | 58 |
| 8.3 | No Waiver; Cumulative Remedies | 60 |
| 8.4 | Survival of Representations and Warranties | 60 |
| 8.5 | Payment of Expenses | 60 |
| 8.6 | Successors and Assigns; Participations and Assignments | 61 |
| 8.7 | Adjustments; Set-off | 62 |
| 8.8 | Counterparts | 63 |
| 8.9 | Severability | 63 |
| 8.10 | Integration | 63 |
| 8.11 | Governing Law | 63 |
| 8.12 | Submission to Jurisdiction; Waivers | 63 |
| 8.13 | Acknowledgments | 64 |
| 8.14 | Release of Guaranties | 64 |
| 8.15 | Confidentiality | 64 |
| 8.16 | Waivers of Jury Trial | 65 |
| 8.17 | USA PATRIOT Act | 65 |
| 8.18 | Orders | 65 |
| 8.19 | Effect of Amendment and Restatement of the Existing Credit Agreement | 65 |
| 8.20 | New GM Equity Interests | 66 |

Page

ANNEXES:

I     Form of Wind-Down Budget

SCHEDULES:

| | |
|---|---|
| 1.1A | Outstanding Amounts of Tranche C Term Loans |
| 1.1B | Guarantors |
| 1.1C | Mortgaged Property |
| 1.1D | Pledgors |
| 1.1E | [Intentionally Omitted] |
| 1.1F | [Intentionally Omitted] |
| 1.1G | Certain Excluded Subsidiaries |
| 3.3 | [Intentionally Omitted] |
| 3.10 | Chief Executive Office and Chief Operating Office |
| 3.11 | Location of Books and Records |
| 3.15 | Subsidiaries |
| 3.16 | Ownership of North American Group Members |
| 3.21 | Jurisdictions and Recording Offices |
| 3.25 | [Intentionally Omitted] |
| 3.26 | [Intentionally Omitted] |
| 3.28 | Excluded Collateral |

EXHIBITS:

| | |
|---|---|
| A | Form of Amended and Restated Guaranty and Security Agreement |
| B-1 | Form of Secretary's Certificate |
| B-2 | Form of Officer's Certificate |
| C | Form of Assignment and Assumption |
| D-1 | Form of Waiver for the Loan Parties |
| D-2 | Form of Waiver of SEO to Treasury |
| D-3 | Form of Consent and Waiver of SEO to Borrower |
| D-4 | Form of Waiver of Senior Employee to Treasury |
| D-5 | Form of Consent and Waiver of Senior Employee to Borrower |
| E | Form of Legal Opinion of Weil, Gotshal & Manges LLP |
| F | Form of Compliance Certificate |
| G | Form of Amended and Restated Note |
| H | [Intentionally Omitted] |
| I | Form of Amended and Restated Environmental Indemnity Agreement |
| J | Form of Amended and Restated Mortgage |
| K | [Intentionally Omitted] |
| L | Form of Amended and Restated Equity Pledge Agreement |

AMENDED AND RESTATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of July __, 2009, by and among MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation), a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"), the Guarantors (as defined below), and the several lenders from time to time parties to this Agreement (the "Lenders").

W I T N E S S E T H:

WHEREAS, on June 1, 2009 (the "Petition Date"), the Borrower, Saturn, LLC, a Delaware limited liability company, Saturn Distribution Corporation, a Delaware corporation, and Chevrolet-Saturn of Harlem, Inc., a Delaware corporation (each an "Initial Debtor" and collectively, the "Initial Debtors") filed voluntary petitions in the Bankruptcy Court (as defined below) for relief, and commenced cases (each an "Initial Case" and collectively, the "Initial Cases") under the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 3, 2009, the Borrower entered into the Secured Superpriority Debtor-In-Possession Credit Agreement, among the Borrower, the guarantors party thereto and the Lenders (the "Existing Credit Agreement");

WHEREAS, pursuant to the Existing Credit Agreement, the Lenders provided the Borrower with (i) term loans in an aggregate amount equal to $_____ (the "Tranche B Term Loans") and (ii) term loans in an aggregate amount equal to $1,175,000,000 (the "Tranche C Term Loans");

WHEREAS, on June 25, 2009, the Bankruptcy Court entered the Final Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "Final Order") approving the terms and conditions of the Existing Credit Agreement and the Loan Documents (as defined in the Existing Credit Agreement);

WHEREAS, on July __, 2009, the Bankruptcy Court entered the Wind-Down Order pursuant to the Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (the "Wind-Down Order") approving the amendment to the Existing Credit Agreement to provide for Debtors' with post-petition, wind-down financing;

WHEREAS, pursuant to the Master Transaction Agreement (as defined below), on [July __, 2009] [the date hereof] the Treasury (as defined below) exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with its Additional Notes (as defined in the Existing Credit Agreement) and its rights under the Existing UST Term Loan Agreement including the Warrant Note (as defined in the Existing UST Loan Agreement as defined below) and the Additional Notes (as defined in the Existing UST Loan Agreement) to

New CarCo (as defined below) in exchange for common and preferred Capital Stock (as defined below) of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement, on [July __, 2009] [the date hereof] the Canadian Lender exchanged a portion of its Tranche B Term Loans in an amount equal to $_____ together with its Additional Notes to New CarCo in exchange for common and preferred Capital Stock of New CarCo;

WHEREAS, pursuant to the Master Transaction Agreement and in accordance with the Section 363 Sale Order (as defined below), the Borrower sold to New CarCo certain of its assets and property, and New CarCo assumed certain liabilities of the Borrower and its Subsidiaries (as defined below), including a portion of the Treasury's Tranche B Term Loans in an aggregate amount equal to $7,072,488,605 pursuant to the Assignment and Assumption Agreement, dated as of the date hereof (the "New CarCo Assignment and Assumption"), between the Borrower and New CarCo (collectively, and together with the other transactions contemplated by the Transaction Documents, the "Related Section 363 Transactions");

WHEREAS, after giving effect to the Related Section 363 Transactions, the remaining obligations of the Borrower to the Lenders are comprised solely of the Tranche C Term Loans; and

WHEREAS, the Borrower has requested, and the Lenders have agreed, to amend and restate the portion of the Existing Credit Agreement relating to the Tranche C Term Loans on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the parties hereto agree that on the Effective Date, as provided in Section 8.19, the Existing Credit Agreement shall be amended and restated in its entirety as follows:

## SECTION 1

## DEFINITIONS

1.1.    Defined Terms.    As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the three month Eurodollar Rate (for the avoidance of doubt after giving effect to the provisos in the definition thereof) plus 1.00%; provided that, in the event the Required Lenders shall have determined that adequate and reasonable means do not exist for ascertaining the calculation of clause (c), such calculation shall be replaced with the last available calculation of the three month Eurodollar Rate plus 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate shall be effective as of the opening of business on the effective

day of such change in the Prime Rate, the Federal Funds Effective Rate or the three month Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Additional Guarantor":  as defined in Section 5.23.

"Administrative/Priority Claim Payment Amount":  any positive amount equal to the difference between $200,000,000 and the aggregate amount paid or payable (or specifically reserved for payment as such) to satisfy all of the administrative and priority claims comprising the Administrative/ Priority Claim Tranche.

"Administrative/ Priority Claim Payment Date":  the first Business Day after which the administrative and priority claims that comprise the Administrative/ Priority Claim Tranche are satisfied in full or otherwise finalized so that no such claims remain outstanding and unsatisfied, but in no case later than the date on which a liquidation plan with respect to the Debtors is approved by the Bankruptcy Court and declared effective.

"Administrative/Priority Claim Tranche":  an amount under the Wind-Down Budget up to $200,000,000 that was allocated as of the Effective Date to cover anticipated (i) administrative claims related to contract rejections by the Debtors and (ii) priority claims against the Debtors, each as further described in the Wind-Down Budget.  The description of the administrative and priority claims that are to be set forth in the Wind-Down Budget shall reflect such categories, provisions and assumptions such that a good faith estimate, as of the Effective Date, of the sum of the obligations arising from the claims referenced in clauses (i) and (ii) above shall be at least equal to $200,000,000.

"Affiliate":  with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this Agreement, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.  For the avoidance of doubt, pension plans of a Person and entities holdings the assets of such plans, shall not be deemed to be Affiliates of such Person.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's aggregate but unpaid principal amount of such Lender's Loans at such time to the sum of the aggregate but unpaid principal amount of all Lenders' Loans at such time.

"Agreement":  as defined in the preamble hereto.

"Anti-Money Laundering Laws":  as defined in Section 3.18(d).

"Applicable Law":  as to any Person, all laws (including common law), statutes, regulations, ordinances, treaties, judgments, decrees, injunctions, writs and orders of any court,

governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations.

"Applicable Margin":  (A) 2.0% per annum in the case of ABR Loans and (B) 3.0% per annum in the case of Eurodollar Loans.

"Assignee":  as defined in Section 8.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit C.

"Bankruptcy Code":  the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*

"Bankruptcy Court":  the United States Bankruptcy Court for the Southern District of New York (together with the District Court for the Southern District of New York, where applicable).

"Bankruptcy Exceptions":  limitations on, or exceptions to, the enforceability of an agreement against a Person due to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or the application of general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity.

"Bankruptcy Rules":  the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Benefitted Lender":  as defined in Section 8.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the recitals.

"Business Day":  any day other than a Saturday, Sunday or other day on which banks in New York City or Ottawa, Ontario, Canada are permitted to close; provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London Interbank market.

"Canadian Lender":  Export Development Canada, a corporation established pursuant to the laws of Canada, and its successors and assigns.

"Canadian Lender Consortium Members":  each of the Export Development Canada, the Government of Canada and the Government of Ontario.

"<u>Canadian Post-Sale Facility</u>":  the Amended and Restated Loan Agreement, dated as of the [Effective Date], by and among General Motors of Canada Limited, as borrower, the other loan parties thereto, and the Canadian Lender.

"<u>Canadian PV Loan Agreement</u>":  the Loan Agreement, dated as of the [Effective Date], by and among New CarCo, as borrower, the other loan parties thereto, and the Canadian Lender.

"<u>Capital Lease Obligations</u>":  for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"<u>Capital Stock</u>":  any and all equity interests, including any shares of stock, membership or partnership interests, participations or other equivalents whether certificated or uncertificated (however designated) of a corporation, limited liability company, partnership or any other entity, and any and all similar ownership interests in a Person and any and all warrants or options to purchase any of the foregoing.

"<u>Carve-Out</u>":  as defined in the Orders.

"<u>Cases</u>":  the Initial Cases and each other case of a Debtor filed with the Bankruptcy Court and joined with the Initial Cases.

"<u>Cash Equivalents</u>":  shall mean (a) Dollars, or money in other currencies received in the ordinary course of business, (b) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed or insured by the United States or Canadian government or any agency thereof, (c) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, province, commonwealth or territory of the United States or Canada, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least "A" by S&P or "A" by Moody's or equivalent rating, (d) demand deposit, certificates of deposit and time deposits with maturities of one (1) year or less from the date of acquisition and overnight bank deposits of any commercial bank, supranational bank or trust company having capital and surplus in excess of $500,000,000, (e) repurchase obligations with respect to securities of the types (but not necessarily maturity) described in clauses (b) and (c) above, having a term of not more than 90 days, of banks (or bank holding companies) or subsidiaries of such banks (or bank holding companies) and non-bank broker-dealers listed on the Federal Reserve Bank of New York's list of primary and other reporting dealers ("<u>Repo Counterparties</u>"), which Repo Counterparties have capital, surplus and undivided profits aggregating in excess of $500,000,000 (or the foreign equivalent thereof) and which Repo Counterparties or their parents (if the Repo Counterparties are not rated) will at the time of the transaction be rated "A-1" by S&P (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization, (f) commercial paper rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either

case maturing within one (1) year after the day of acquisition, (g) short-term marketable securities of comparable credit quality, (h) shares of money market mutual or similar funds which invest at least 95% in assets satisfying the requirements of clauses (a) through (g) of this definition, and (i) in the case of a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Change of Control": with respect to the Borrower, the acquisition, after the Closing Date, by any other Person, or two or more other Persons acting in concert other than the Permitted Holders, the Lenders or any Affiliate of the Lenders, of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of outstanding shares of voting stock of the Borrower at any time if after giving effect to such acquisition such Person or Persons owns twenty percent (20%) or more of such outstanding voting stock.

"Closing Date": June 3, 2009.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all property and assets of the Loan Parties of every kind or type whatsoever, including tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located, all property of the estates of each Debtor within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law except avoidance actions against the Prepetition Senior Facilities Secured Parties (as defined in the Final Order)), all property pledged to secure the Obligations under each Collateral Document (other than the Orders) and all proceeds, rents and products of the foregoing other than Excluded Collateral. For the avoidance of doubt, the proceeds of the Tranche C Term Loans constitute Collateral.

"Collateral Documents": means, collectively, the Orders, the Guaranty, the Equity Pledge Agreement, each Mortgage, collateral assignment, security agreement, pledge agreement or similar agreements delivered to the Lenders to secure the Obligations. The Collateral Documents (other than the Orders) shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"Committee": any statutory committee appointed in the Cases.

"Compensation Regulations": as defined in Section 5.16(a)(i).

"Compliance Certificate": a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit F, for the immediately prior calendar month and on a cumulative basis from the Petition Date.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control": as defined in the definition of "Affiliate".

"Controlled Affiliate":  as defined in Section 3.18(a).

"Convention":  as defined in Section 2.12(d).

"Debtor":  each of the Initial Debtors and, subject to the written consent of the Required Lenders, each other Subsidiary of the Initial Debtors to the extent that (i) such Subsidiary files with the Bankruptcy Court, (ii) such case is joined with the Cases and (iii) such Subsidiary is subject, by order of the Bankruptcy Court, to the previously issued orders relating to the Cases (including the Orders).

"Debtor Successor":  with respect to any Debtor, (i) a "liquidating trust," within the meaning of Treas. Reg. § 301.7701-4, to which such Debtor's assets are distributed, or (ii) any other entity established for the sole purpose of liquidating the assets of such Debtor.

"Default":  any event, that with the giving of notice, the lapse of time, or both, would become an Event of Default.

"Disposition":  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollar Equivalent":  on any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to an amount denominated in any other currency, the equivalent in Dollars of such amount as determined by the Treasury in accordance with normal banking industry practice using the Exchange Rate on the date of determination of such equivalent.  In making any determination of the Dollar Equivalent, the Treasury shall use the relevant Exchange Rate in effect on the date on which a Dollar Equivalent is required to be determined pursuant to the provisions of this Agreement.  As appropriate, amounts specified herein as amounts in Dollars shall include any relevant Dollar Equivalent amount.

"Dollars" and "$":  the lawful money of the United States.

"Domestic 956 Subsidiary":  any U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Domestic Subsidiary":  any Subsidiary that is organized or existing under the laws of the United States or Canada or any state, province, commonwealth or territory of the United States or Canada.

"EAWA":  the Employ American Workers Act (Section 1611 of Division A, Title XVI of the American Recovery and Reinvestment Act of 2009), Public Law No. 111-5, effective as of February 17, 2009, as may be amended and in effect from time to time.

"EESA":  the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7000 *et al.*  of Division A,

Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time.

"Effective Date":  the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall not be later than the date on which the Related Section 363 Transactions are consummated.

"EISA":  the Energy Independence and Security Act of 2007, Public Law No. 110-140, effective as of January 1, 2009, as may be amended and in effect from time to time.

"Embargoed Person":  as defined in Section 3.19.

"Environmental Agreement":  the Environmental Agreement dated as of the date hereof, executed by the Loan Parties for the benefit of the Lenders, substantially in the form of Exhibit I.

"Environmental Laws":  any and all foreign, Federal, state, provincial, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or natural resources, as now or may at any time hereafter be in effect.

"Environmental Permits":  any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"Environmental Tranche" an amount under the Wind-Down Budget up to $500,000,000 that was allocated as of the Effective Date to cover anticipated environmental related expenses and claims.

"Equity Pledge Agreement":  the Amended and Restated Equity Pledge Agreement dated as of the date hereof, made by each Pledgor in favor of the Lenders, substantially in the form of Exhibit L.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System; provided that the Eurocurrency Reserve Requirements shall be $0 with respect to the Canadian Lender.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such

Interest Period appearing on page LIBOR01 of the Reuters screen as of 11:00 a.m. (London time) two Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on such page of the Reuters screen (or otherwise on such screen), the Eurodollar Base Rate shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Treasury or, in the absence of such availability, by reference to the rate at which a reference institution selected by the Treasury is offered Dollar deposits at or about 11:00 a.m. (New York City time) two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided that, in no event shall the Eurodollar Rate be less than 2.00%.

"Event of Default":  as defined in Section 7.

"Exchange Act":  the Securities and Exchange Act of 1934, as amended.

"Exchange Rate":  for any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into Dollars, as set forth at 11:00 a.m. (New York time) on such day on the applicable Bloomberg currency page with respect to such currency.  In the event that such rate does not appear on the applicable Bloomberg currency page, the Exchange Rate with respect to such currency shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Treasury and the Borrower or, in the absence of such agreement, such Exchange Rate shall instead be the spot rate of exchange of a reference institution selected by the Treasury in the London Interbank market or other market where such reference institution's foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. (New York time) on such day for the purchase of Dollars with such currency, for delivery two Business Days later; provided, however, that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Treasury may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Collateral":  as defined in Schedule 3.28.  For the avoidance of doubt, Excluded Collateral shall at all times include the New GM Equity Interests and tax refunds due to Canadian subsidiaries.

"Excluded Subsidiary":  (i) any JV Subsidiary in which any Loan Party owns less than 80% of the voting or economic interest, (ii) any U.S. Subsidiary of the Borrower listed as one of the "Domestic Entities" on Annex 1 to Schedule 3.28 other than the Loan Parties listed therein, (iii) any Subsidiary of the Borrower existing on the Closing Date that the Borrower does not Control as of the Closing Date (including, without limitation, dealerships wholly owned by the Borrower that are operated by a third party pursuant to an agreement in effect on the Petition Date), (iv) [intentionally omitted] and (v) any Subsidiary set forth on Schedule 1.1G as such Schedule 1.1G may be amended from time to time with the consent of the Required Lenders.

"Executive Order":  as defined in Section 3.19.

"Existing Agreements":  the agreements of the Loan Parties and their Subsidiaries in effect on the Closing Date and any extensions, renewals and replacements thereof so long as any such extension, renewal and replacement could not reasonably be expected to have a material adverse effect on the rights and remedies of the Lenders under any of the Loan Documents.

"Existing Credit Agreement":  as defined in the recitals.

"Existing UST Term Loan Agreement":  the Loan and Security Agreement, dated as of December 31, 2008, between the Borrower and the Treasury.

"Expense Policy":  the Borrower's comprehensive written policy on corporate expenses maintained and implemented in accordance with the Treasury regulations contained in 31 C.F.R. Part 30.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it.

"Final Order":  as defined in the recitals.

"Foreign Assets Control Regulations":  as defined in Section 3.19.

"Foreign 956 Subsidiary":  any Non-U.S. Subsidiary of the Borrower that is a "controlled foreign corporation" as defined in Code Section 957.

"Foreign Subsidiary":  any Subsidiary that is not a Domestic Subsidiary.

"Funding Office":  the office of each Lender specified in Schedule 1.1A or such other office as may be specified from time to time by such Lender as its funding office by written notice to the Borrower.

"GAAP":  generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Authority":  any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, or any federal, state or municipal court, in each case whether of the United States or a foreign jurisdiction.

"Group Members":  the collective reference to the Borrower and its Subsidiaries.

"Guarantee Obligation":  as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee Obligation" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, to the extent required by the Lenders.  The amount of any Guarantee Obligation of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"Guarantor":  each Person listed on Schedule 1.1B and each other Person that becomes an Additional Guarantor.

"Guaranty":  the Amended and Restated Guaranty and Security Agreement dated as of the date hereof, executed and delivered by the Borrower and each Guarantor, substantially in the form of Exhibit A.

"Indebtedness":  for any Person:  (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services; (c) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (g) and (i) of this definition secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others of the type referred to in clauses (a), (b), (d), (e), (f), (h) and (i) of this definition guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner unless the terms of such indebtedness expressly provide that such Person is not liable therefor; (j) the liquidation value of all redeemable preferred Capital Stock of such Person; and (k) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Liabilities":  as defined in Section 8.5.

"Indemnitee":  as defined in Section 8.5.

"Initial Case":  as defined in the recitals.

"Initial Debtors":  as defined in the recitals.

"Interest Payment Date":  (a) as to any ABR Loan, the first day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan, the last day of such Interest Period, and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period":  as to any Eurodollar Loan, (i) initially, the period commencing on the Borrowing Date (as defined in the Existing Credit Agreement) with respect to such Loan and ending three months thereafter; and (ii) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending three months thereafter; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(A)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(B)     any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date; and

(C)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interim Order":  the Interim Order entered June 2, 2009 by the Bankruptcy Court pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) approving this Agreement and authorizing the Loan Parties to obtain Postpetition financing pursuant thereto, (b) granting related Liens and Superpriority Claims, (c) granting adequate protection to certain Prepetition secured parties, and (d) scheduling a final hearing.

"Investments":  as defined in Section 6.10.

"JV Agreement":  each partnership or limited liability company agreement (or similar agreement) between a North American Group Member or one of its Subsidiaries and the relevant JV Partner as the same may be amended, restated, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"JV Partner":  each Person party to a JV Agreement that is not a Loan Party or one of its Subsidiaries.

"<u>JV Subsidiary</u>":  any Subsidiary of a Group Member which is not a Wholly Owned Subsidiary and as to which the business and management thereof is jointly controlled by the holders of the Capital Stock therein pursuant to customary joint venture arrangements.

"<u>Lenders</u>":  as defined in the preamble hereto.

"<u>Lien</u>":  any mortgage, pledge, security interest, lien or other charge or encumbrance (in the nature of a security interest), including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"<u>Loan Documents</u>":  this Agreement, the Notes, the Environmental Indemnity Agreement, the Collateral Documents and each post-closing letter or agreement now and hereafter entered into among the parties hereto.

"<u>Loan Parties</u>":  the Borrower, each Guarantor and the Pledgors.

"<u>Loans</u>":  as defined in Section 2.1.

"<u>Master Transaction Agreement</u>":  that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, among New CarCo and the sellers party thereto.

"<u>Material Adverse Effect</u>":  a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries (taken as a whole), (b) the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any of the Loan Documents to which they are a party, (c) the validity or enforceability in any material respect of any of the Loan Documents to which the Loan Parties are a party, (d) the rights and remedies of the Lenders under any of the Loan Documents, or (e) the Collateral (taken as a whole); <u>provided</u> that, (w) the taking of any action by the Borrower and its Subsidiaries, including the cessation of production, pursuant to and in accordance with the Wind-Down Budget, (x) the filing of the Cases, and (y) any sale pursuant to any Related Section 363 Transaction or any other action taken pursuant to the Orders, shall not be taken into consideration.

"<u>Material Environmental Amount</u>":  $50,000,000.

"<u>Maturity Date</u>":  the first date on which each of the following shall have occurred (which date may be extended by the Lenders in their sole discretion in accordance with Section 8.1):  (i) all claims against the Debtors have been resolved such that there are no remaining disputed claims, (ii) all assets of the Debtors (other than remaining cash) have been liquidated and (iii) all distributions on account of allowed claims have been made, and all other actions that are required under the plan of liquidation (other than the dissolution of the last remaining Debtor) have been completed.  On the Maturity Date, the plan administrator or other individual or entity charged with administering the liquidation plan shall be entitled to retain a de minimis amount of funds to complete the dissolution of the last remaining Debtor.  As used in this definition, references to a Debtor includes its Debtor Successor.

"<u>Moody's</u>":  Moody's Investors Service, Inc. and its successors.

"Mortgage":  each of the mortgages and deeds of trust made by the Borrower or any Guarantor in favor of, or for the benefit of, the Lenders, substantially in the form of Exhibit J, taking into consideration the law and jurisdiction in which such mortgage or deed of trust is to be recorded or filed, to the extent applicable.

"Mortgaged Property":  each property listed on Schedule 1.1C, as to which the Lenders shall be granted a Lien pursuant to the Orders or the Mortgages.

"New CarCo":  General Motors Company (formerly known as NGMCO, Inc.), a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings, LLC.

"New CarCo Assignment and Assumption":  as defined in the recitals.

"New GM Equity Interests":  any stock, warrants, options or other equity interests of New CarCo or any of its Subsidiaries issued to or held by any Debtor (or any of its Subsidiaries) pursuant to the Related Section 363 Transactions, including any (i) subsequent dividends, payment or other distribution thereon, and (ii) proceeds received or receivable upon any disposition thereof.

"Non-Debtor":  each Subsidiary of the Borrower that is not a Debtor.

"Non-Excluded Taxes":  as defined in Section 2.12(a).

"Non-U.S. Lender":  as defined in Section 2.12(d).

"Non-U.S. Subsidiary":  any Subsidiary of any Loan Party that is not a U.S. Subsidiary.

"North American Group Members":  collectively, the Loan Parties and each Domestic Subsidiary that is not an Excluded Subsidiary.

"Notes":  as defined in Section 4.1(a)(vi) and any promissory notes issued in connection with an assignment contemplated by Section 2.3(b).

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Loan Party to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to any Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise.

"OFAC":  the Office of Foreign Assets Control of the Treasury.

"Orders":  the Interim Order, the Final Order and the Wind-Down Order.

"Other Foreign 956 Subsidiary":  any Non-U.S. Subsidiary substantially all of the value of whose assets consist of equity of one or more Foreign 956 Subsidiaries for U.S. federal income tax purposes.

"Other Taxes":  any and all present or future stamp or documentary taxes and any other excise or property taxes, intangible or mortgage recording taxes, charges or similar levies imposed by the United States or any taxing authority thereof or therein arising from any payment made, or from the execution, delivery or enforcement of, or otherwise with respect to this Agreement or any other Loan Document.

"Participant":  as defined in Section 8.6(c).

"Permitted Holders":  any holder of any Capital Stock of the Borrower as of the Closing Date.

"Permitted Indebtedness":

(a)    Indebtedness created under any Loan Document;

(b)    [intentionally omitted];

(c)    trade payables, if any, in the ordinary course of its business;

(d)    Indebtedness existing on the Petition Date and any refinancings, refundings, renewals or extensions thereof (without any increase, or any shortening of the maturity, of any principal amount thereof);

(e)    intercompany Indebtedness of a North American Group Member in the ordinary course of business; provided that, the right to receive any repayment of such Indebtedness (other than Indebtedness meeting the criteria of clause (d) above, or any extensions, renewals, exchanges or replacements thereof) shall be subordinated to the Lenders' rights to receive repayment of the Obligations;

(f)    [intentionally omitted];

(g)    [intentionally omitted];

(h)    Swap Agreements permitted pursuant to Section 6.15 that are not entered into for speculative purposes;

(i)    Indebtedness with respect to (x) letters of credit, bankers' acceptances and similar instruments issued in the ordinary course of business, including letters of credit, bankers' acceptances and similar instruments in respect of the financing of insurance premiums, customs, stay, performance, bid, surety or appeal bonds and similar obligations, completion guaranties, "take or pay" obligations in supply agreements, reimbursement obligations regarding workers' compensation claims, indemnification,

adjustment of purchase price and similar obligations incurred in connection with the acquisition or Disposition of any business or assets, and sales contracts, coverage of long-term counterparty risk in respect of insurance companies, purchasing and supply agreements, rental deposits, judicial appeals and service contracts and (y) appeal, bid, performance, surety, customs or similar bonds issued for the account of any Loan Party in the ordinary course of business;

(j)       Indebtedness incurred in the ordinary course of business in connection with cash management and deposit accounts and operations, netting services, employee credit card programs and similar arrangements and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

(k)       any guarantee by any Loan Party of Permitted Indebtedness; and

(l)       Indebtedness entered into under Section 136 of EISA.

"Permitted Investments":

(a)       any Investment in Cash Equivalents;

(b)       any Investment by a Loan Party in the Borrower, another Loan Party, or a Pledged Entity that is a Domestic Subsidiary;

(c)       [intentionally omitted];

(d)       any Investment (i) existing on the Effective Date, or (ii) consisting of any extension, modification or renewal of any Investment existing on the Closing Date; provided that the amount of any such Investment is not increased through such extension, modification or renewal;

(e)       [intentionally omitted];

(f)       [intentionally omitted];

(g)       [intentionally omitted];

(h)       any Investment otherwise permitted under this Agreement;

(i)       Investments in Indebtedness of, or Investments guaranteed by, Governmental Authorities, in connection with industrial revenue, municipal, pollution control, development or other bonds or similar financing arrangements;

(j)       [intentionally omitted];

(k)       Trade Credit;

(l)       [intentionally omitted];

(m)    Investments (i) received in satisfaction or partial satisfaction of delinquent accounts and disputes with customers or suppliers in the ordinary course of business, or (ii) acquired as a result of foreclosure of a Lien securing an Investment or the transfer of the assets subject to such Lien in lieu of foreclosure;

(n)    commercial transactions in the ordinary course of business with the Borrower or any of its Subsidiaries to the extent such transactions would constitute an Investment;

(o)    conveyance of Collateral in an arm's-length transaction to a Subsidiary that is not a Loan Party or an Affiliate of the Borrower for non-cash consideration consisting of Trade Credit or other Property to become Collateral having a fair market value equal to or greater than the fair market value of the conveyed Collateral; and

(p)    Investments after the Effective Date in (i) dealerships of the Borrower and its Subsidiaries in the United States in an aggregate amount not exceeding $2,500,000 and (ii) General Motors Strasbourg, S.A. in an aggregate amount not exceeding $7,500,000.

"Permitted Liens":  with respect to any Property of any North American Group Member:

(a)    Liens created under the Loan Documents;

(b)    Liens on Property of a North American Group Member existing on the date hereof (including Liens on Property of a North American Group Member pursuant to Existing Agreements; provided that such Liens shall secure only those obligations and any permitted refinancing that they secure on the date hereof);

(c)    [intentionally omitted];

(d)    Liens for taxes and utility charges not yet due or that are being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided;

(e)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or that are being contested in compliance with Section 5.8;

(f)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the proceeds thereof;

(g)    Liens securing Swap Agreements permitted pursuant to Section 6.15;

(h)    Liens created in the ordinary course of business in favor of banks and other financial institutions over balances of any accounts held at such banks or financial institutions or over investment property held in a securities account, as the case may be,

to facilitate the operation of cash pooling, cash management or interest set-off arrangements;

(i)    customary Liens in favor of trustees and escrow agents, and netting and set-off rights, banker's liens and the like in favor of counterparties to financial obligations and instruments, including, without limitation, Swap Agreements permitted pursuant to Section 6.15;

(j)    Liens securing Indebtedness incurred under Section 136 of EISA;

(k)    pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment or other insurance and other social security laws or regulations;

(l)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety, customs and appeal bonds, performance bonds and other obligations of a like nature, or to secure the payment of import or customs duties, in each case incurred in the ordinary course of business;

(m)    zoning and environmental restrictions, easements, licenses, encroachments, covenants and servitudes, rights-of-way, restrictions on use of real property or groundwater, institutional controls and other similar encumbrances or deed restrictions incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any North American Group Member;

(n)    [intentionally omitted];

(o)    judgment Liens securing judgments;

(p)    any Lien consisting of rights reserved to or vested in any Governmental Authority by statutory provision;

(q)    Liens securing Indebtedness described in clauses (d) and (e) of the definition of Permitted Indebtedness;

(r)    pledges or deposits made to secure reimbursement obligations in respect of letters of credit issued to support any obligations or liabilities described in clauses (k) or (l) of this definition;

(s)    [intentionally omitted];

(t)    [intentionally omitted]; and

(u)     other Liens created or assumed in the ordinary course of business of the North American Group Member; provided that the obligations secured by all such Liens shall not exceed the principal amount of $10,000,000.

"Person":   any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Petition Date":  as defined in the recitals hereto.

"Pledged Entity":  a Subsidiary of a Loan Party whose Capital Stock is subject to a security interest in favor of the Lenders pursuant to the Orders or the Collateral Documents.

"Pledgors":  the parties set forth on Schedule 1.1D and each other Person that makes a pledge in favor of the Lenders under the Equity Pledge Agreement.

"Postpetition":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"Prepetition":  when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that arose or was instituted, or another matter that occurred, prior to the Petition Date.

"Prepetition Payment":  a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or trade payables or other Prepetition claims against any Debtor.

"Prime Rate":  the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to borrowers).

"Prohibited Jurisdiction":  any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person":  any Person:

(a)     subject to the provisions of the Executive Order;

(b)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is subject to the provisions of the Executive Order;

(c)    with whom a Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.goofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate or affiliated with a Person listed above.

"Property": any right or interest in or to property (other than tax refunds due to Canadian subsidiaries) of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Quarterly Report": as defined in Section 5.1(f).

"Records": all books, instruments, agreements, customer lists, credit files, computer files, storage media, tapes, disks, cards, software, data, computer programs, printouts and other computer materials and records generated by other media for the storage of information maintained by any Person with respect to the business and operations of the Loan Parties and the Collateral.

"Register": as defined in Section 8.6(b).

"Regulation D": Regulation D of the Board as in effect from time to time.

"Related Section 363 Transactions": as defined in the recitals.

"Required Lenders": at any time, Lenders with Loans constituting a majority of the Loans of all Lenders.

"Requirements of Law": as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court of competent jurisdiction or other Governmental Authority, in each case applicable to and binding upon such Person and any of its property, and to which such Person and any of its property is subject.

"Responsible Officer": as to any Person, the chief executive officer or, with respect to financial matters (including without limitation those matters set forth in Sections 5.1(f) and 5.2(h)), the chief financial officer, treasurer or assistant treasurer of such Person, an individual so designated from time to time by such Person's board of directors or, for the purposes of Section 5.2 only (other than Sections 5.1(f) and 5.2(h)), to include the secretary or an assistant secretary of the Borrower, or, in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer shall mean any officer

authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution (or equivalent); <u>provided</u> that the Lenders are notified in writing of the identity of such Responsible Officer.

"<u>Restricted Payments</u>":  as defined in Section 6.5.

"<u>S&P</u>":  Standard & Poor's Ratings Services and its successors.

"<u>Sale/Leaseback Transaction</u>":  as defined in Section 6.17.

"<u>SEC</u>":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"<u>Section 363 Sale Order</u>":  an order of the Bankruptcy Court approving the Related Section 363 Transactions in form and substance substantially in the form attached to the Transaction Documents or otherwise satisfactory to the Required Lenders.

"<u>Senior Employee</u>":  any of the 25 most highly compensated employees (including the SEOs) of the Loan Parties, as determined pursuant to the rules set forth in 31 C.F.R. Part 30.

"<u>SEO</u>":  a Senior Executive Officer as defined in the EESA and any interpretation of such term by the Treasury thereunder, including the rules set forth in 31 C.F.R. Part 30.

"<u>Special Inspector General of the Troubled Asset Relief Program</u>":  The Special Inspector General of the Troubled Asset Relief Program, as contemplated by Section 121 of the EESA.

"<u>Specified Benefit Plan</u>":  any employee benefit plan within the meaning of section 3(3) of ERISA and any other plan, arrangement or agreement which provides for compensation, benefits, fringe benefits or other remuneration to any employee, former employee, individual independent contractor or director, including any bonus, incentive, supplemental retirement plan, golden parachute, employment, individual consulting, change of control, bonus or retention agreement, whether provided directly or indirectly by any Group Member or otherwise.

"<u>Subsidiary</u>":  with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or shall have the right to have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.  Unless otherwise qualified, all references to a "Subsidiary" or "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim":  a claim against the Borrower or any other Debtor in any of the Cases pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses including administrative expenses specified in sections 503 and 507 of the Bankruptcy Code, whether or not such claim or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement."

"Taxes":  as defined in Section 2.12(a).

"Trade Credit":  accounts receivable, trade credit or other advances extended to, or investment made in, customers, suppliers, including intercompany, in the ordinary course of business.

"Trading With the Enemy Act":  as defined in Section 3.19.

"Tranche B Term Loan":  as defined in the recitals.

"Tranche C Term Loan":  as defined in the recitals.

"Transaction Documents":  each of, and collectively, (i) the Master Transaction Agreement, (ii) the Section 363 Sale Order, (iii) the Transition Services Agreement and (iv) the related manufacturing agreements, asset purchase agreements, organizational documents, finance support agreements and all other related documentation, each as amended, supplemented or modified from time to time in accordance with Section 6.6.

"Transferee":  any Assignee or Participant.

"Transition Services Agreement":  the Transition Services Agreement, dated as of the date hereof, among the Borrower, the other Initial Debtors, and New CarCo, substantially in the form of Exhibit T to the Master Transaction Agreement.

"Treasury":  The United States Department of the Treasury.

"Uniform Commercial Code":  the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States":  the United States of America.

"USA PATRIOT Act":  as defined in Section 3.18(d).

"U.S. Subsidiary": any Subsidiary of any Loan Party that is organized or existing under the laws of the United States or any state thereof or the District of Columbia.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wind-Down": the sale or shutdown of certain businesses and properties of the Debtors and the Subsidiaries thereof.

"Wind-Down Budget": the budget, attached as Annex I hereto, setting forth in reasonable detail all anticipated receipts and disbursements of the Borrower and certain of its U.S. Subsidiaries on a calendar year basis from the Effective Date through and including December 30, 2011, as amended by each Quarterly Report delivered pursuant to Section 5.1(f).

"Wind-Down Order": as defined in the recitals.

1.2.    Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to Group Members not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time and (vi) references to any Person shall include its successors and assigns.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole (including the Schedules and Exhibits hereto) and not to any particular provision of this Agreement (or the Schedules and Exhibits hereto), and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3.    Conversion of Foreign Currencies. (a) For purposes of this Agreement and the other Loan Documents, with respect to any monetary amounts in a currency other than

Dollars, the Dollar Equivalent thereof shall be determined based on the Exchange Rate in effect at the time of such determination (unless otherwise explicitly provided herein).

(b)      The Treasury may set up appropriate rounding off mechanisms or otherwise round-off amounts hereunder to the nearest higher or lower amount in whole Dollar or cent to ensure amounts owing by any party hereunder or that otherwise need to be calculated or converted hereunder are expressed in whole Dollars or in whole cents, as may be necessary or appropriate.

## SECTION 2

## AMOUNT AND TERMS OF THE LOANS

2.1.      <u>Loans</u>.   On the Effective Date, the Lenders made the Tranche C Term Loans in Dollars to the Borrower in the aggregate principal amount of $1,175,000,000 (the "<u>Loans</u>").   The Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral.   The Loans may from time to time be Eurodollar Loans or, solely in the circumstances specified in Section 2.8, ABR Loans.   Loans repaid or prepaid may not be reborrowed.

2.2.      [<u>Intentionally Omitted</u>].

2.3.      <u>Repayment of Loans; Evidence of Debt</u>.   (a) The Loans shall be payable on the Maturity Date; <u>provided</u> that, upon the Administrative/ Priority Claim Payment Date, the portion of the Loans equal to the Administrative/ Priority Claim Payment Amount as of such date shall be due.   Except as otherwise expressly provided herein, the repayment of the Loans shall, subsequent to the closing of the Related Section 363 Transactions, be subject to claims against the Debtors' estates that have priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including costs and expenses of administration that are attendant to the formulation and confirmation of a liquidating chapter 11 plan, whether incurred prior or subsequent to the consummation of the Related Section 363 Transactions, in an aggregate amount up to $1,175,000,000, or such larger amount as approved by the Lenders.

(b)      Pursuant to Section 4.1(a), the Borrower shall execute and deliver the Notes on the Effective Date.   Following any assignment of the Loans pursuant to Section 8.6, the Borrower agrees that, upon the request of any Lender, the Borrower shall promptly execute and deliver to such Lender Notes reflecting the Loans assigned and the Loans retained by such Lender, if any.

2.4.      <u>Optional Prepayments</u>.   (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to each Lender no later than 12:00 noon (New York City time) three Business Days prior to the date such prepayment is requested to be made, which notice shall specify the date of such prepayment, the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such payment; <u>provided</u> that, if a Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.10.   If any such notice is given, the amount specified in

such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid and shall be applied as provided in Section (b). Partial prepayments of Loans shall be in an aggregate principal amount of $20,000,000 or a whole multiple thereof or, if less, the entire principal amount thereof then outstanding.

(b)     Unless the Required Lenders shall otherwise agree, amounts to be applied in connection with prepayments made pursuant to Section 2.4 shall be applied, (i) <u>first</u>, to pay accrued and unpaid interest on, and expenses in respect of, the Loans, and (ii) <u>second</u>, to repay the Loans. Any such prepayment shall be accompanied by a notice to each Lender specifying the aggregate amount of such prepayment and such Lender's Aggregate Exposure Percentage of such prepayment.

2.5.    [<u>Intentionally Omitted</u>].

2.6.    <u>Interest Rates and Payment Dates/Fee Payment Dates/Fees</u>.    (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such Interest Period <u>plus</u> the Applicable Margin.

(b)     Each ABR Loan shall bear interest at a rate per annum equal to the ABR <u>plus</u> the Applicable Margin.

(c)     [Intentionally Omitted].

(d)     (i) At any time any Event of Default shall have occurred and be continuing, (i) all outstanding Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.6 <u>plus</u> 5% per annum, which, in the sole discretion of the Treasury, may be the rate of interest then applicable to ABR Loans, and (ii) all other outstanding Obligations shall bear interest at 5% above the rate per annum equal to the rate of interest then applicable to ABR Loans.

(e)     [Intentionally Omitted].

(f)     Interest shall be payable in arrears on each Interest Payment Date, <u>provided</u> that, interest on the Loans shall not be payable in cash on each Interest Payment Date but shall instead be added to the principal of the Loans on each Interest Payment Date and shall be payable in cash on the Maturity Date.

2.7.    <u>Computation of Interest and Fees</u>.    (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-) day year for the actual days elapsed. The Treasury shall, as soon as practicable, and promptly, notify the Borrower and the other Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Treasury shall, as soon as practicable, and promptly, notify the

Borrower and the other Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Treasury pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Treasury shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Treasury in determining any interest rate pursuant to Section 2.7(a).

2.8.    Inability to Determine Interest Rate; Illegality.  (a)  If prior to the first day of any Interest Period:

(i)    any Lender shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(ii)    any Lender shall have determined that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lender (as conclusively certified by such Lender) of making or maintaining their affected Loans during such Interest Period;

such Lender shall give telecopy or telephonic notice thereof to the Borrower and the other Lenders as soon as practicable thereafter.  If such notice is given pursuant to clause (i) or (ii) of this Section 2.8(a) in respect of Eurodollar Loans, then (1) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made by the affected Lenders as ABR Loans, and (2) any outstanding Eurodollar Loans of the affected Lender, shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such relevant notice has been withdrawn by such Lender, no further Eurodollar Loans by the affected Lenders shall be made or continued as such, nor shall the Borrower have the right to convert ABR Loans to Eurodollar Loans.

(b)    If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, such Lender shall give notice thereof to the Borrower describing the relevant provisions of such Requirement of Law, following which, (i) in the case of Eurodollar Loans, (A) the commitment of such Lender hereunder to make Eurodollar Loans and continue such Eurodollar Loans as such and (B) such Lender's outstanding Eurodollar Loans shall be converted automatically on the last day of the then current Interest Periods with respect to such Loans (or within such earlier period as shall be required by law) to ABR Loans.  If any such conversion or prepayment of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.10.

2.9.    Treatment of Borrowings and Payments; Evidence of Debt. (a)  [Intentionally Omitted].

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.  Amounts paid on account of the Loans may not be reborrowed.

(c)    [Intentionally Omitted].

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 3:00 p.m. (New York City time) on the due date thereof to the Lenders at their respective Funding Offices, in Dollars and in immediately available funds.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

2.10.    <u>Indemnity</u>.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the last day of such Interest Period (or, in the case of a failure to borrow the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) <u>over</u> (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market.  A certificate as to any amounts payable pursuant to this Section 2.10 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error and shall be payable within 30 days of receipt of any such notice.  The agreements in this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.11.    <u>Superpriority Nature of Obligations and Lenders' Liens.</u>  The priority of Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Final Order entered with respect to the Cases.

2.12.   <u>Taxes</u>.  (a)  All payments made by the Borrower under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereinafter imposed, levied, collected, withheld or assessed by any Governmental Authority (collectively, "<u>Taxes</u>"), except for any deduction or withholding required by law.  If the Borrower is required to withhold any Non-Excluded Taxes from any amounts payable to any Lender (i) the Borrower shall make such deductions and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable laws and (ii) the amounts so payable to such Lender shall be increased to the extent necessary to pay to such Lender such additional amounts as may be necessary so that the Lender receives, free and clear of all such Non-Excluded Taxes, a net amount equal to the amount it would have received from the Borrower under this Agreement or any other Loan Document if no such deduction or withholding had been made.  For purposes of this Agreement or any other Loan Document, "<u>Non-Excluded Taxes</u>" are withholding Taxes imposed by the United States or any taxing authority thereof or therein on payments made by the Borrower under this Agreement or any other Loan Document other than (a) withholding Taxes imposed on any Lender as a result of a present or former connection between such Lender and the jurisdiction of the United States or any taxing authority thereof or therein imposing such Tax (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States, (c) any withholding Taxes that exist on the date the Lender becomes a Lender or that arise as a result of a change in status of the Lender as a Governmental Authority which is an agency of the Canadian federal government that is exempt from withholding under the Convention as in effect on the date the Lender becomes a Lender, and (d) withholding Taxes that could be eliminated or reduced by the Lender providing tax forms, certifications, or other documentation.

(b)     In addition, the Borrower shall pay any Other Taxes over to the relevant Governmental Authority in accordance with Applicable Law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof (or if an official receipt is not available, such other evidence of payment as shall be reasonably satisfactory to such Lender).  If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes required to be paid by the Borrower when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, in each case after receiving at least five days' advance written notice from the Lender, the Borrower shall indemnify the Lender, as the case may be, for any incremental taxes, Non-Excluded Taxes or Other Taxes, interest, additions to tax, expenses or penalties that may become payable by any Lender, as the case may be, as a result of such failure.  The indemnification payments under this Section 2.12(c) shall be made within 30 days after the date such Lender, as the case may be, makes a written demand therefor (together with a reasonably detailed calculation of such amounts).

(d)     Each Lender (or any Transferee) (other than the United States government (including the Treasury)) that either (i) is not incorporated under the laws of the United States,

any state thereof, or the District of Columbia or (ii) whose name does not include "Incorporated," "Inc.," "Corporation," "Corp.," "P.C.," "insurance company," or "assurance company" (a "<u>Non-U.S. Lender</u>") shall deliver to the Borrower, so long as such Lender is legally entitled to do so, two originals of either U.S. Internal Revenue Service Form W-9, Form W-8BEN, Form W-8EXP, Form W-8ECI, or in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payment of "portfolio interest", a Form W-8BEN (along with a statement as to certain requirements in order to claim an exemption for "portfolio interest" reasonably acceptable to the Borrower), or Form W-8IMY (with applicable attachments), or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming a complete exemption from (or reduced rate of) United States federal withholding tax on all payments by the Borrower under this Agreement or any other Loan Document.  In addition, each Lender shall provide any other U.S. tax forms (with applicable attachments) as will reduce or eliminate United States federal withholding tax on payments by the Borrower under this Agreement or any other Loan Document.  For the avoidance of doubt, the Canadian Lender shall provide a Form W-8BEN claiming exemption from withholding under the Convention between the United States of America and Canada with respect to Taxes on Income and on Capital (the "<u>Convention</u>") on the Closing Date.  Each Lender (other than the United States government (including the Treasury)) shall provide the appropriate documentation under this clause (d) at the following times (i) prior to the first payment date after becoming a party to this Agreement, (ii) upon a change in circumstances or upon a change in law, in each case, requiring or making appropriate a new or additional form, certificate or documentation, (iii) upon or before the expiration, obsolescence or invalidity of any documentation previously provided to the Borrower and (iv) upon reasonable request by the Borrower.  If a Lender is entitled to an exemption from or a reduction of any non-U.S. withholding Tax under the laws of any jurisdiction imposing such Tax on any payments made by the Borrower under this Agreement, then the Lender shall deliver to the Borrower, at the time or times prescribed by Applicable Law and as reasonably requested by the Borrower, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate, <u>provided</u> that the Lender is legally entitled to complete, execute and deliver such documentation and without material adverse consequences to the Lender.

(e)     If any Lender determines, in its sole good faith discretion, that it has received a refund, credit or other tax benefit in respect of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower (but only to the extent of Non-Excluded Taxes or Other Taxes paid by the Borrower plus any interest thereon paid by the relevant Governmental Authority with respect to such refund), net of all out of pocket third-party expenses of the Lender related to claiming such refund or credit, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund) within 30 days of the date of such receipt.   Notwithstanding anything to the contrary in this Agreement or any other Loan Document, upon the request of the Lender, as the case may be, the Borrower agrees to repay any amount paid over to the Borrower by such Lender pursuant to the immediately preceding sentence if such Lender, as the case may be, is required to repay such amount to such Governmental Authority.  This paragraph shall not be construed to (i) interfere with the rights of any Lender to arrange its tax affairs in whatever manner it sees fit, (ii) obligate any Lender to

claim any tax refund, (iii) require any Lender to make available its tax returns (or any other information relating to its taxes or any computation with respect thereof which it deems in its sole discretion to be confidential) to the Borrower or any other Person, or (iv) require any Lender to do anything that would in its sole discretion prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(f)      Each Lender that is an Assignee shall be bound by this Section 2.12.

(g)      The agreements contained in this Section 2.12 shall survive the termination of this Agreement or any other Loan Document and the payments contemplated hereunder or thereunder.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to enter into this Agreement, each Loan Party represents to the Lenders, with respect to itself and each of its Subsidiaries that is a North American Group Member, in each case subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases, that as of the Effective Date:

3.1.    <u>Existence</u>.   Each North American Group Member (a) is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law.

3.2.    [<u>Intentionally Omitted</u>].

3.3.    [<u>Intentionally Omitted</u>].

3.4.    [<u>Intentionally Omitted</u>].

3.5.    <u>Action, Binding Obligations</u>.   (i) Each North American Group Member has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; (ii) the execution, delivery and performance by each North American Group Member of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and (iii) each Loan Document has been duly and validly executed and delivered by each North American Group Member party thereto and constitutes a legal, valid and

binding obligation of all of the North American Group Members party thereto, enforceable against such North American Group Members in accordance with its terms, subject to the Bankruptcy Exceptions.

3.6.    <u>Approvals</u>.    Except as required under applicable state and federal bankruptcy rules, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by each North American Group Member of the Loan Documents to which it is a party for the legality, validity or enforceability thereof, except with respect to North American Group Members other than the Debtors for filings and recordings or other actions in respect of the Liens pursuant to the Collateral Documents, unless the same has already been obtained and provided to the Lenders.

3.7.    [<u>Intentionally Omitted</u>].

3.8.    <u>Investment Company Act</u>.    None of the Loan Parties is required to register as an "investment company", or is a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to any Federal or state statute or regulation which limits its ability to incur Indebtedness.

3.9.    [<u>Intentionally Omitted</u>].

3.10.    <u>Chief Executive Office; Chief Operating Office</u>.    The chief executive office and the chief operating office on the Closing Date for each North American Group Member is located at the location set forth on <u>Schedule 3.10</u> hereto.

3.11.    <u>Location of Books and Records</u>.    The location where the North American Group Members keep their books and records including all Records relating to their business and operations and the Collateral are located in the locations set forth in <u>Schedule 3.11</u>.

3.12.    [<u>Intentionally Omitted</u>].

3.13.    [<u>Intentionally Omitted</u>].

3.14.    <u>Expense Policy</u>.    The Borrower has taken steps necessary to ensure that (a) the Expense Policy conforms to the requirements set forth herein and (b) the Borrower and its Subsidiaries are in compliance with the Expense Policy.

3.15.    <u>Subsidiaries</u>.    All of the Subsidiaries of each Loan Party at the date hereof are listed on <u>Schedule 3.15</u>, which schedule sets forth the name and jurisdiction of formation of each of their Subsidiaries and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party or any of their Subsidiaries except as set forth on <u>Schedule 3.15</u>.

3.16.    <u>Capitalization</u>.    One hundred percent (100%) of the issued and outstanding Capital Stock of each North American Group Member (other than Borrower) is owned by the Persons listed on <u>Schedule 3.16</u> and, to the knowledge of each Loan Party, such Capital Stock

are owned by such Persons, free and clear of all Liens other than Permitted Liens.  No Loan Party has issued or granted any options or rights with respect to the issuance of its respective Capital Stock which is presently outstanding except as set forth on Schedule 3.16 hereto.

3.17.  <u>Fraudulent Conveyance</u>.  Each North American Group Member acknowledges that it will benefit from the Loans contemplated by this Agreement.  No North American Group Member is incurring Indebtedness or transferring any Collateral with any intent to hinder, delay or defraud any of its creditors.

3.18.  <u>USA PATRIOT Act</u>.  (a) Each North American Group Member represents and warrants that neither it nor any of its respective Affiliates over which it exercises management control (a "<u>Controlled Affiliate</u>") is a Prohibited Person, and such Controlled Affiliates are in compliance with all applicable orders, rules, regulations and recommendations of OFAC.

(b)  Each North American Group Member represents and warrants that neither it nor any of its members, directors, officers, employees, parents, Subsidiaries or Affiliates: (1) are subject to U.S. or multilateral economic or trade sanctions currently in force; (2) are owned or controlled by, or act on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. persons may not conduct business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State.

(c)  None of the Collateral are traded or used, directly or indirectly by a Prohibited Person or organized in a Prohibited Jurisdiction.

(d)  Each North American Group Member has established an anti-money laundering compliance program as required by all applicable anti-money laundering laws and regulations, including without limitation the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "<u>USA PATRIOT Act</u>") (collectively, the "<u>Anti-Money Laundering Laws</u>").

3.19.  <u>Embargoed Person</u>.  As of the date hereof and at all times throughout the term of any Loan, (a) none of any North American Group Member's funds or other assets constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.* (the "<u>Trading With the Enemy Act</u>"), any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or regulations promulgated thereunder or executive order relating thereto (which for the avoidance of doubt shall include but shall not be limited to (i) Executive Order No. 13224, effective as of September 24, 2001 and relating to Blocking Property and Prohibiting

Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (ii) the USA PATRIOT Act), with the result that the investment in the Borrower (whether directly or indirectly), is prohibited by law or any Loan made by the Lenders is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in it with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loan is in violation of law; (c) none of its funds have been derived from any unlawful activity with the result that the investment in it (whether directly or indirectly), is prohibited by law or any Loans is in violation of law; and (d) neither it nor any of its Affiliates (i) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (ii) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".  For purposes of determining whether or not a representation with respect to any indirect ownership is true or a covenant is being complied with under this Section 3.19, no North American Group Member shall be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

3.20.   Use of Proceeds.   (a) The proceeds of the Loans shall be used (i) as permitted in the Wind-Down Order or (ii) to finance working capital needs and other general corporate purposes incurred in connection with the Wind-Down, including the payment of expenses associated with the administration of the Cases; provided that, the North American Group Members may not prepay Indebtedness without the prior written consent of the Required Lenders.

(b)     Notwithstanding anything to the contrary herein, none of the proceeds of the Loans shall be used in connection with (i) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, (ii) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any Lender, any of their respective affiliates or other Canadian Lender Consortium Member with respect to any loans or other financial accommodations made to any North American Group Member prior to the Petition Date, or (iii) any loans, advances, extensions of credit, dividends or other investments to any person not a North American Group Member; provided, however, that the limitations set forth in this Section 3.20(b) shall not preclude the use of the proceeds of the Loans in connection with any claims, causes of action, adversary proceedings or other litigations against any Governmental Authority (excluding the Canadian Lender Consortium Members) with respect to the imposition or administration of any Tax laws or Environmental Laws.  For the avoidance of doubt, the limitations set forth in Section 3.20(b)(i) and (ii) above, shall not limit the use of proceeds with respect to any of the actions and claims described in such clauses against any Governmental Authority that is not (x) a Lender or (y) a Canadian Lender Consortium Member.

(c)     The North American Group Members are the ultimate beneficiaries of this Agreement and the proceeds of Loans to be received hereunder.  The use of the Loans will comply with all Applicable Laws, including Anti-Money Laundering Laws.  No portion of any Loan is to be used, for the "purpose of purchasing or carrying" any "margin stock" as such terms

are used in Regulations U and X of the Board, as amended, and the Borrower is not engaged in the business of extending credit to others for such purpose.

3.21.    <u>Representations Concerning the Collateral</u>.  Each Loan Party represents and warrants to the Lenders:

(a)    No Loan Party has assigned, pledged, conveyed, or encumbered any Collateral to any other Person (other than Permitted Liens) and immediately prior to the pledge of any such Collateral, a Loan Party was the sole owner of such Collateral and had good and marketable title thereto, free and clear of all Liens (other than Permitted Liens), and no Person, other than the Lenders has any Lien (other than Permitted Liens) on any Collateral.  No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral which has been signed by any Loan Party or which any Loan Party has authorized any other Person to sign or file or record, is on file or of record with any public office, except such as may have been filed by or on behalf of a Loan Party in favor of the Lenders pursuant to the Loan Documents or in respect of applicable Permitted Liens.

(b)    The provisions of the Loan Documents are effective to create in favor of the Lenders a valid security interest in all right, title, and interest of each Loan Party in, to and under the Collateral, subject only to applicable Permitted Liens.

(c)    Upon the entry and effectiveness of the Orders and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto, the security interests granted in the Collateral pursuant to the Collateral Documents will constitute perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of the applicable Loan Party in, to and under such Collateral, which can be perfected by filing under the Uniform Commercial Code, in each case, subject to applicable Permitted Liens and as provided in Section 3.24.

(d)    Each Loan Party has and will continue to have the full right, power and authority, to pledge the Collateral, subject to Permitted Liens, and the pledge of the Collateral may be further assigned without any requirement.

3.22.    [Intentionally Omitted].

3.23.    [Intentionally Omitted].

3.24.    <u>Lien Priority</u>.  (a) On and after the Closing Date, and the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on <u>Schedule 3.21</u> attached hereto subject to the Permitted Liens, the provisions of the Loan Documents are effective to create in favor of the Lenders, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Loan Party that owns an interest in such Collateral and any other Person.

(b)      On and after the entry of the Orders and after giving effect thereto and the filing of financing statements on Form UCC-1 naming the Lenders as "Secured Parties" and each Loan Party as "Debtor", and describing the Collateral, in the jurisdictions and recording offices listed on Schedule 3.21 attached hereto, all Obligations owing by the Loan Parties will be secured by:

(i)      valid, perfected, first-priority security interests in and liens (i) with respect to the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is not subject to non avoidable, valid and perfected liens in existence as of the Petition Date (or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to Permitted Liens (other than Liens permitted under clause (a) thereof) and the Carve-Out; and

(ii)      valid, perfected, security, junior interests in and liens pursuant to (i) with respect to the Debtors, section 364(c)(3) of the Bankruptcy Code and (ii) with respect to the Non-Debtor Loan Parties, pursuant to the Collateral Documents (other than the Orders), in each case, on the Collateral that is subject to non avoidable, valid and perfected liens in existence as of the Petition Date, or to non avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out.

(c)      On and after the entry of the Orders and after giving effect thereto, all Obligations owing by the Debtors will be an allowed administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases having priority over all administrative expenses of the kind specified in sections 503 and 507 of the Bankruptcy Code and any and all expenses and claims of the Borrower and the other Debtors, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 328, 506(c), 507(a) or 1114 of the Bankruptcy Code, subject only to the Carve-Out.

3.25.   [Intentionally Omitted].

3.26.   [Intentionally Omitted].

3.27.   [Intentionally Omitted].

3.28.   Excluded Collateral.  Set forth on Annex I to Schedule 3.28 is a complete and accurate list as of the Effective Date of all Excluded Collateral that is Capital Stock of domestic joint ventures, Domestic Subsidiaries, "first-tier" foreign joint ventures, and Foreign 956 Subsidiaries.

3.29.   Mortgaged Real Property.  After giving effect to the recording of the Mortgages, real property identified on Schedule 1.1C shall be subject to a recorded first lien mortgage, deed of trust or similar security instrument (subject to Permitted Liens).

3.30.   [Intentionally Omitted].

3.31.  <u>The Final Order</u>.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Section 7 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.32.  <u>Wind-Down Budget.</u>  All material facts in the Wind-Down Budget are accurate and the Borrower has disclosed to each Lender all assumptions in the Wind-Down Budget, it being understood that in the case of projections, such projections are based on reasonable estimates, on the date as of which such information is stated or certified.

## SECTION 4

## CONDITIONS PRECEDENT

4.1.  <u>Conditions to Effectiveness</u>.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent, satisfaction of such conditions precedent to be determined by the Required Lenders in their reasonable discretion, except as otherwise set forth below:

(a)  <u>Loan Documents</u>.  The Lenders shall have received the following documents, which shall be in form satisfactory to each Lender:

(i)  this Agreement executed and delivered by the Borrower;

(ii)  the Guaranty, executed and delivered by each Guarantor;

(iii)  the Equity Pledge Agreement, executed and delivered by each Pledgor;

(iv)  [intentionally omitted];

(v)  the Environmental Indemnity Agreement, executed and delivered by each Loan Party party thereto; and

(vi)  a promissory note of the Borrower evidencing the Loans of such Lender, substantially in the form of Exhibit G (the "<u>Note</u>"), with appropriate insertions as to date and principal amount.

(b)  <u>Related Section 363 Transactions</u>.  The Required Lenders and their counsel shall be reasonably satisfied that the terms of the Related Section 363 Transactions and of the Transaction Documents are consistent in all material respects with the information provided to the Lenders in advance of the date hereof or are otherwise reasonably satisfactory to the Required Lenders (the Required Lenders acknowledge that the form of Transaction Documents provided to them on or prior to the date hereof are satisfactory).  The Transaction Documents shall have been duly executed and delivered by the parties thereto, all conditions precedent to the Related Section 363 Transactions set forth in the Transaction Documents shall have been satisfied, and the Related Section 363 Transactions shall have been consummated

pursuant to such Transaction Documents substantially contemporaneously with the conditions precedent set forth in this Section 4.1, and no provision thereof shall have been waived, amended, supplemented or otherwise modified, in each case in a manner adverse to the Lenders, without the Required Lender's consent.

(c)     Final Order.    (i) The Final Order shall have been entered by the Bankruptcy Court and shall have been in full force and effect.

(ii)     The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Lenders.

(iii)     The Debtors and their respective Subsidiaries shall be in compliance in all respects with the Final Order.

(iv)     [Intentionally Omitted].

(v)     [Intentionally Omitted].

(d)     New CarCo Assignment and Assumption.  The Borrower and New CarCo shall have executed and delivered the New CarCo Assignment and Assumption, and all conditions precedent to New CarCo's $7,072,488,605 First Lien Credit Agreement between New CarCo and Treasury shall have been satisfied or waived by the Treasury in accordance with the terms therewith substantially contemporaneously with the conditions precedent set forth in this Section 4.1.

(e)     Canadian Post-Sale Facility.  The Canadian Post-Sale Facility, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian Post-Sale Facility.

(f)     Canadian PV Loan Agreement.  The Canadian PV Loan Agreement, in form and substance satisfactory to the Lenders, shall have become effective and the Lenders shall have received all documents, instruments and related agreements in connection with the Canadian PV Loan Agreement.

(g)     [Intentionally Omitted].

(h)     [Intentionally Omitted].

(i)     Wind-Down Budget.  The Borrower shall have delivered to the Lenders the Wind-Down Budget in form and substance satisfactory to the Required Lenders.

(j)     [Intentionally Omitted].

(k)     Litigation.  There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Cases) or threatened in any court or before any arbitrator or Governmental Authority that, in the sole discretion of the Required Lenders, materially or

adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(l)     [Intentionally Omitted].

(m)     Consents.  The Lenders shall have received all necessary third party and governmental waivers and consents, and each Loan Party shall have complied with all applicable laws, decrees and material agreements.

(n)     No Default.  No Default or Event of Default shall exist on the Effective Date or after giving effect to the transactions contemplated to be consummated on the Effective Date pursuant to the Transaction Documents and the Loan Documents.

(o)     Accuracy of Representations and Warranties.  All representations and warranties made by the North American Group Members in or pursuant to the Loan Documents shall be true and correct in all material respects.

(p)     Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Lenders shall have received (i) a certificate of the secretary or assistant secretary of each Loan Party, dated the Effective Date, substantially in the form of Exhibit B-1, with appropriate insertions and attachments, including the certificate of incorporation (or equivalent organizational document) of each Loan Party, certified by the relevant authority of the jurisdiction of organization of such Loan Party (provided that, to the extent applicable, in lieu of delivering the certificate of incorporation and other organizational documents, such certificate may include a certification that such documents not have been amended, supplemented or otherwise modified since the Closing Date), (ii) bring down good standing certifications for each Loan Party from its jurisdiction of organization and (iii) a certificate of the Borrower and each Guarantor, dated the Effective Date, to the effect that the conditions set forth in this Section 4.1 have been satisfied, substantially in the form of Exhibit B-2.

(q)     Legal Opinions.  The Lenders shall have received the executed legal opinion of Weil, Gotshal and Manges LLP, New York counsel to the Loan Parties, substantially in the form of Exhibit E, as to New York law, United States federal law and the Delaware General Corporation Law.

## SECTION 5

## AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees to, and to cause each of its Subsidiaries that is a North American Group Member to, so long as any Loan is outstanding and until payment in full of all Obligations, in each case except as shall be required in connection with the Wind-Down, and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

5.1.    <u>Financial Statements</u>.  The Borrower shall deliver to the Lenders:

(a)    as soon as reasonably possible after receipt by the subject North American Group Member, a copy of any material report that may be prepared and submitted by such North American Group Member's independent certified public accountants at any time or any other material report with respect to the North American Group Members provided to the Borrower and its Subsidiaries pursuant to the Transition Services Agreement;

(b)    from time to time such other information regarding the financial condition, operations, or business of any North American Group Member as any Lender may reasonably request;

(c)    promptly upon their becoming available, copies of such other financial statements and reports, if any, as any North American Group Member may be required to publicly file with the SEC or any similar or corresponding governmental commission, department or agency substituted therefor, or any similar or corresponding governmental commission, department, board, bureau, or agency, federal or state;

(d)    [intentionally omitted];

(e)    notice of and copies of each Debtors' pleadings filed in the Cases in connection with any material contested matter or adversary proceeding in the Cases (but the foregoing may be satisfied by including each of the Lenders and their counsel in a "core service group," to receive copies of all pleadings under any order establishing notice and service requirements in the Cases), and such additional information with respect to such matters as either of the Lenders may reasonably request, and which notice shall also include sending copies of any pleadings or other documents that the Borrower or other Debtors seek to file under seal to each of the lenders and their counsel, <u>provided</u>, <u>however</u>, that if (in addition to the confidentiality provisions of this Agreement) additional confidentiality provisions are needed (i.e. if required by third parties), the Lenders and the Borrower shall endeavor to work out reasonable additional confidentiality terms;

(f)    no later than the twentieth Business Day following the last day of each fiscal quarter, a report (a "<u>Quarterly Report</u>") setting forth in reasonable detail the anticipated receipts and disbursements of the North American Group Members for the immediately succeeding twelve-month period (on a calendar month basis) and the aggregate amount of cash and Cash Equivalents of the North American Group Members as of the last day of the immediately preceding fiscal quarter, in form and substance reasonably satisfactory to the

-39-

Required Lenders. Each Quarterly Report shall be accompanied by a certificate of a Responsible Officer certifying that such Quarterly Report was prepared in good faith and are based on reasonable estimates on the date as of which such information is certified; and

(g)     on the first Business Day of February to occur each year from the Effective Date until the Maturity Date, a report setting forth in reasonable detail the three-year business plan of the Borrower.

5.2.    <u>Notices; Reporting Requirements</u>.  The relevant Loan Party shall deliver written notice to the Lenders of the following:

(a)     <u>Defaults</u>.  Promptly after a Responsible Officer or any officer of a North American Group Member with a title of at least executive vice president becomes aware of the occurrence of any Default or Event of Default, or any event of default under any publicly filed material Contractual Obligation of any Group Member;

(b)     <u>Litigation</u>.  Promptly after a Responsible Officer or an attorney in the general counsel's office of a North American Group Member obtains knowledge of any action, suit or proceeding instituted by or against such North American Group Member or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority (i) in which the amount in controversy, in each case, is an amount equal to $25,000,000 or more, (ii) in which injunctive or similar relief is sought, or (iii) which relates to any Loan Document, the relevant Loan Party shall furnish to the Lenders notice of such action, suit or proceeding;

(c)     <u>Material Adverse Effect on Collateral</u>.   Promptly upon any North American Group Member becoming aware of any default or any event or change in circumstances related to any Collateral which, in each case, could reasonably be expected to have a Material Adverse Effect;

(d)     <u>Judgments</u>.  Promptly upon the entry of a judgment or decree against any Loan Party or any of its Subsidiaries in an amount in excess of $15,000,000;

(e)     <u>Environmental Events</u>.  As soon as possible and in any event within seven Business Days of obtaining knowledge thereof:   (i) any development, event, or condition occurring after the date hereof that, individually or in the aggregate with other developments, events or conditions occurring after the date hereof, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, any Group Member; to the extent such Environmental Permit is material to the continued operations or business of the Group Members or of any manufacturing related facility;

(f)     <u>Material Adverse Effect</u>.  Any development or event that has had or could reasonably be expected to have a Material Adverse Effect;

(g)      <u>Insurance</u>.  Promptly upon any material change in the insurance coverage required of any Loan Party or any other Person pursuant to any Loan Document, with copy of evidence of same attached;

(h)      <u>Compliance Certificate</u>.   On the tenth Business Day of each calendar month, beginning with the first month to occur after the Effective Date, a Compliance Certificate, executed by a Responsible Officer of the Borrower, stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(i)      <u>Investment Reports</u>.   With respect to any Investment made pursuant to clause (p)(i) or (ii) of the definition of Permitted Investments, on the tenth Business Day of each calendar month, beginning with the month immediately following the calendar month in which the first such Investment is made, a report executed by a Responsible Officer of the Borrower, setting forth (x) the amount of each Investment made pursuant to each of clause (p)(i) and/or (p)(ii), if any, in the immediately proceeding calendar month, (y) a description of each such Investment, if any, and (z) the aggregate amount of Investments made pursuant to each of clause (p)(i) and (p)(ii) since the Effective Date, if any, as of the end of the immediately preceding calendar month;

(j)      [Intentionally Omitted];

(k)      [Intentionally Omitted];

(l)      <u>Expense Policy</u>.   Within 15 days after the conclusion of each calendar month, beginning with the month in which the Effective Date occurs, the Borrower shall deliver to the Lenders a certification signed by a Responsible Officer of the Borrower and its Subsidiaries that (i) the Expense Policy conforms to the requirements set forth herein; (ii) the Borrower and its Subsidiaries are in compliance with the Expense Policy; and (iii) there have been no material amendments to the Expense Policy or deviations from the Expense Policy other than those that have been disclosed to and approved by the Lenders; <u>provided</u> that the requirement to deliver the certification referenced in this Section 5.2(l) may be qualified as to the best of such Responsible Officer's knowledge after due inquiry and investigation;

(m)      <u>Executive Privileges and Compensation</u>.   The Borrower shall submit a certification on the [last] day of each month beginning July 2009, certifying that the Borrower has complied with and is in compliance with the provisions set forth in Section 5.16.   Such certification shall be made to the Lenders by an SEO of the Borrower, subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001; and

(n)      <u>Organizational Documents</u>.   Subject to Section 6.6, each North American Group Member shall furnish prompt written notice to the Lenders of any material amendment to such entity's organizational documents and copies of such amendments.

Each notice required to be provided pursuant to this Section 5.2(a)-(f) above shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

5.3.    <u>Existence</u>.  (a) Preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)    pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all their Postpetition obligations of whatever nature, except (i) where such payment, discharge or satisfaction is prohibited by the Orders, the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court or by this Agreement or the Wind-Down Budget, or (ii) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be;

(c)    comply with the requirements of all Applicable Laws, rules, regulations and orders of Governmental Authorities if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect on any Loan Party or the Collateral;

(d)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, and maintain adequate accounts and reserves for all taxes (including income taxes), all depreciation, depletion, obsolescence and amortization of its properties, all contingencies, and all other reserves;

(e)    (i) change the location of its chief executive office/chief place of business from that specified in Section 3.10, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains records with respect to the Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction, it shall give the Lenders written notice thereof not later than ten (10) days after such event occurs, and shall deliver to the Lenders all Uniform Commercial Code financing statements and amendments as the Lenders shall request and take all other actions deemed reasonably necessary by the Lenders to continue its perfected status in the Collateral with the same or better priority;

(f)    keep in full force and effect the provisions of its charter documents, certificate of incorporation, by-laws, operating agreements or similar organizational documents; and

(g)    comply (i) in the case of each North American Group Member that is not a Debtor, with all Contractual Obligations in a manner such that a Material Adverse Effect could not reasonably be expected to result and (ii) in the case of each Debtor, with all material Postpetition Contractual Obligations (including the Transition Services Agreement).

5.4.    <u>Payments of Taxes</u>.  Except as prohibited by the Bankruptcy Code, the Borrower will and will cause each Group Member (i) to timely file or cause to be filed all federal and material state and other Tax returns that are required to be filed and all such Tax returns shall be true and correct and (ii) to timely pay and discharge or cause to be paid and discharged promptly all Taxes, assessments and governmental charges or levies arising Postpetition and imposed upon the Borrower or any of the other Group Members or upon any of their respective incomes or receipts or upon any of their respective properties before the same shall become in

default or past due, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might result in the imposition of a Lien or charge upon such properties or any part thereof; provided that it shall not constitute a violation of the provisions of this Section 5.4 if the Borrower or any of the other Group Members shall fail to pay any such Tax, assessment, government charge or levy or claim for labor, materials or supplies which is being contested in good faith, by proper proceedings diligently pursued, and as to which adequate reserves have been provided.

5.5.    Use of Proceeds.    The Loan Parties and their Subsidiaries shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner generally consistent with the Wind-Down Budget, except as otherwise permitted in Section 3.20(a)(i)).

5.6.    Maintenance of Existence; Payment of Obligations; Compliance with Law.    Subject to the Orders, the Related Section 363 Transactions and the Cases, each Loan Party shall:

(a)    keep all property useful and necessary in its business in good working order and condition; and

(b)    maintain errors and omissions insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing except in the event of self-insurance) and shall not reduce such coverage without the written consent of the Lenders, and shall also maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities. Notwithstanding anything to the contrary in this Section 5.6, to the extent that any North American Group Member is engaged in self-insurance with respect to any of its property as of the Closing Date, such Loan Party may, if consistent with past practices, continue to engage in such self-insurance throughout the term of this Agreement; provided, that the North American Group Members shall promptly obtain third party insurance that conforms to the criteria in this Section 5.6 at the request of the Lenders.

5.7.    Further Identification of Collateral.    Each Loan Party will furnish to the Lenders from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as any Lender may reasonably request, all in reasonable detail.

5.8.    Defense of Title.    Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party warrants and will defend the right, title and interest of the Lenders in and to all Collateral against all adverse claims and demands of all Persons whomsoever, subject to (x) the restrictions imposed by the Existing Agreements to the extent that such restrictions are valid and enforceable under the applicable Uniform Commercial Code and other Requirements of Law and (y) the rights of holders of any Permitted Lien.

5.9.    Preservation of Collateral.   Subject to the Wind-Down, the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, each Loan Party shall do all things necessary to preserve the Collateral so that the Collateral remains subject to a perfected security interest with the priority provided for such security interest under the Loan Documents.  Without limiting the foregoing, each Loan Party will comply with all Applicable Laws, rules and regulations of any Governmental Authority applicable to such Loan Party or relating to the Collateral and will cause the Collateral to comply, with all Applicable Laws, rules and regulations of any such Governmental Authority, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.  No Loan Party will allow any default to occur for which any Loan Party is responsible under any Loan Documents and each Loan Party shall fully perform or cause to be performed when due all of its obligations under the Loan Documents.

5.10.    Maintenance of Papers, Records and Files.   (a) each North American Group Member will maintain all Records in good and complete condition and preserve them against loss or destruction, all in accordance with industry and customary practices;

(b)    each North American Group Member shall collect and maintain or cause to be collected and maintained all Records relating to its business and operations and the Collateral in accordance with industry custom and practice, including those maintained pursuant to the preceding subsection, and all such Records shall be in the possession of the North American Group Members or reasonably obtainable upon the request of any Lender unless the Lenders otherwise approve; and

(c)    for so long as any Lender has an interest in or Lien on any Collateral, each North American Group Member will hold or cause to be held all related Records in trust for such Lender.  Each North American Group Member shall notify, or cause to be notified, every other party holding any such Records of the interests and Liens granted hereby.

5.11.    Maintenance of Licenses.   Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court, except where the failure to do so could not reasonably be likely to have a Material Adverse Effect, each Loan Party shall (i) maintain all licenses, permits, authorizations or other approvals necessary for such Loan Party to conduct its business and to perform its obligations under the Loan Documents, (ii) remain in good standing under the laws of the jurisdiction of its organization, and in each other jurisdiction where such qualification and good standing are necessary for the successful operation of such Loan Party's business, and (iii) shall conduct its business in accordance with Applicable Law in all material respects.

5.12.    Payment of Obligations.   The Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans and each North American Group Member will duly and punctually pay or cause to be paid all fees and other amounts from time to time owing by it hereunder or under the other Loan Documents, all in accordance with the terms of this Agreement and the other Loan Documents.  Each North American Group Member will, and will cause each of its Subsidiaries to, pay (i) with respect to each Debtor its Postpetition obligations; and (ii) with respect to each other Group Member its obligations, in each case including tax liabilities, assessments and governmental charges or levies imposed upon such

Person or upon its income and profits or upon any of its property, real, personal or mixed (including without limitation, the Collateral) or upon any part thereof, as well as any other lawful claims which, if unpaid, could reasonably be expected to become a Lien upon such properties or any part thereof, that, if not paid, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the relevant Loan Party, or such Subsidiary, has set aside on its books adequate reserves with respect thereto and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

5.13.   OFAC.  At all times throughout the term of this Agreement, each Loan Party and its Controlled Affiliates (a) shall be in full compliance with all applicable orders, rules, regulations and recommendations of OFAC and (b) shall not permit any Collateral to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person, and no lessee or sublessee shall be a Prohibited Person or a Person organized in a Prohibited Jurisdiction.

5.14.   Investment Company.  Each North American Group Member will conduct its operations in a manner which will not subject it to registration as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended from time to time.

5.15.   Further Assurances.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each North American Group Member to, from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Lenders may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents that requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that such Lender may be required to obtain from the Borrower or any Group Member such governmental consent, approval, recording, qualification or authorization.

5.16.   Executive Privileges and Compensation.  (a) Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall comply with the following restrictions on executive privileges and compensation:

(i)   the Borrower shall take all necessary action to ensure that its Specified Benefit Plans comply in all respects with the EESA, including, without limitation, the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or any other guidance or regulations

promulgated under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and shall not adopt any new Specified Benefit Plan (x) that does not comply therewith or (y) that does not expressly state and require that such Specified Benefit Plan and any compensation thereunder shall be subject to all relevant Compensation Regulations adopted, issued or released on or after the date any such Specified Benefit Plan is adopted.  To the extent that the Compensation Regulations change, or are implemented in a manner that requires changes to then-existing Specified Benefit Plans, the Borrower shall effect such changes to its Specified Benefit Plans as promptly as practicable after it has actual knowledge of such changes in order to be in compliance with this Section 5.16(a)(i) (and shall be deemed to be in compliance for a reasonable period within which to effect such changes);

(ii)    the Borrower shall be subject to the limits on the deductibility of executive compensation imposed by section 162(m)(5) of the Code, as applicable;

(iii)    the Borrower shall not pay or accrue any bonus or incentive compensation to the Senior Employees, except as may be permitted under the EESA or the Compensation Regulations;

(iv)    the Borrower shall not adopt or maintain any compensation plan that would encourage manipulation of its reported earnings to enhance the compensation of any of its employees;

(v)    the Borrower shall maintain all suspensions and other restrictions of contributions to Specified Benefit Plans that are in place or initiated as of the Closing Date; and

(vi)    the Borrower shall otherwise comply with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, including without limitation the prohibition on golden parachute and tax "gross up" payments, the requirement with respect to the establishment of a compensation committee of the board of directors, and the requirement that the Borrower provide certain disclosures to Treasury and the Borrower's primary regulator.

At all times throughout the term of this Agreement, the Required Lenders shall have the right to require any Group Member to claw back any bonuses or other compensation, including golden parachutes, paid to any Senior Employees in violation of any of the foregoing.

(b)    On or prior to September 15, 2009, the Borrower shall cause (i) its principal executive officer and principal financial officer (or, in each case, a person acting in a similar capacity) and (ii) its compensation committee, as applicable, to provide the certifications to the Treasury and the Borrower's primary regulator required by the rules set forth in 31 C.F.R. Part 30.  The Borrower shall preserve appropriate documentation and records to substantiate such certification in an easily accessible place for a period not less than three years following the Maturity Date.

From the Closing Date until the repayment of all Obligations, the Borrower shall comply with the provisions of this Section 5.16.

5.17.    Aircraft.  With respect to any private passenger aircraft or interest in such aircraft that is owned or held by the Borrower or any of its respective Subsidiaries immediately prior to the Closing Date, such party shall demonstrate to the satisfaction of the Treasury that it is taking all reasonable steps to divest itself of such aircraft or interest.  In addition, the Borrower shall not acquire or lease any private passenger aircraft or interest in private passenger aircraft after the Closing Date.

5.18.    Restrictions on Expenses.    (a) The Borrower shall maintain and implement an Expense Policy, provide the Expense Policy to Treasury and the Borrower's primary regulatory agency, and post the text of the Expense Policy on its Internet website, if the Borrower maintains a company website, and distribute the Expense Policy to all employees covered under the Expense Policy.  Any material amendments to the Expense Policy shall require the prior written consent of the Treasury, and any material deviations from the Expense Policy, whether in contravention thereof or pursuant to waivers provided for thereunder, shall promptly be reported to the Treasury.

(b)    The Expense Policy shall, at a minimum:  (i) require compliance with all Requirements of Law, (ii) apply to the Borrower and all of its Subsidiaries, (iii) govern (A) the hosting, sponsorship or other payment for conferences and events, (B) travel accommodations and expenditures, (C) consulting arrangements with outside service providers, (D) any new lease or acquisition of real estate, (E) expenses relating to office or facility renovations or relocations, and (F) expenses relating to entertainment or holiday parties, (iv) provide for (A) internal reporting and oversight, and (B) mechanisms for addressing non-compliance with the Expense Policy and (v) comply in all respects with the provisions of the Capital Purchase Program and the TARP Standards for Compensation and Corporate Governance, as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30.

5.19.    Employ American Workers Act.  The Borrower shall comply, and the Borrower shall take all necessary action to ensure that its Subsidiaries comply, in all respects with the provisions of the EAWA in all respects.

5.20.    Internal Controls; Recordkeeping; Additional Reporting.    (a) The Borrower shall promptly establish internal controls to provide reasonable assurance of compliance in all material respects with each of the Borrower's covenants and agreements set forth in Sections 5.16, 5.17, 5.18, 5.19 and 5.20(b) hereof and shall collect, maintain and preserve reasonable records evidencing such internal controls and compliance therewith, a copy of which records shall be provided to the Lenders promptly upon request.  On the 15th day after the last day of each calendar quarter (or, if such day is not a Business Day, on the first Business Day after such day) commencing with September 30, 2009, the Borrower shall deliver to the Treasury (at its address set forth in Section 8.2) a report setting forth in reasonable detail (x) the status of implementing such internal controls and (y) the Borrower's compliance (including any instances of material non-compliance) with such covenants and agreements.  Such report shall be accompanied by a certification duly executed by an SEO of the Borrower stating that such quarterly report is accurate in all material respects to the best of such SEO's knowledge, which

certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, Section 1001.

(b)    The Borrower shall use its reasonable best efforts to account for the use and expected use of the proceeds from the Loans.  On the 30th day after the last day of each month (or, if such day is not a Business Day, on the first Business Day after such day) commencing with July 31, 2009, the Borrower shall deliver to the Lenders (at their respective addresses set forth in Section 8.2) a report setting forth in reasonable detail the actual results of the operations of the Borrower and its Subsidiaries for such month, which shall include (without limitation) a budget-to-actual variance analysis.  Such report shall be accompanied by a certification duly executed by an SEO of the Borrower that such monthly report is accurate in all material respects to the best of such SEO's knowledge, which certification shall be made subject to the requirements and penalties set forth in Title 18, United States Code, section 1001.

(c)    The Borrower shall collect, maintain and preserve reasonable records relating to the implementation of all Federal support programs provided to the Borrower or any of its Subsidiaries pursuant to the EESA, the use of the proceeds thereunder and the compliance with the terms and provisions of such programs; provided that the Borrower shall have no obligation to comply with the foregoing in connection with any such program to the extent that such program independently requires, by its express terms, the Borrower to collect, maintain and preserve any records in connection therewith. The Borrower shall provide the Treasury with copy of all such reasonable records promptly upon request.

5.21.  Waivers.  (a)  For any Person who is a Loan Party as of the Closing Date and any Person that becomes a Loan Party after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-1, to be duly executed by such North American Group Member and promptly delivered to the Treasury.

(b)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-2, to be duly executed by such SEO, and promptly delivered to the Treasury.

(c)    For any Person who is an SEO as of the Closing Date and any Person that becomes an SEO after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-3, to be duly executed by such SEO, and promptly delivered to the Borrower (with a copy to the Treasury).

(d)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a waiver, in substantially the form attached hereto as Exhibit D-4, to be duly executed by such Senior Employee, and promptly delivered to the Treasury.

(e)    For any Person who is a Senior Employee as of the Closing Date and any Person that becomes an Senior Employee after the Closing Date, the Borrower shall cause a consent and waiver, in substantially the form attached hereto as Exhibit D-5, to be duly executed by such Senior Employee, and promptly delivered to the Borrower (with a copy to the Treasury).

(f)     For the avoidance of doubt, this requirement will be deemed satisfied for the United States with respect to Loan Parties that are party to the Existing UST Term Loan Agreement and any SEO or Senior Employee, to the extent such Loan Party, SEO or Senior Employee has previously provided such a waiver to the Treasury.

5.22.   [Intentionally Omitted].

5.23.   <u>Additional Guarantors</u>.   Except as otherwise agreed to by the Required Lenders, the Borrower shall cause each Domestic Subsidiary of a North American Group Member who becomes a Debtor after the Closing Date to become a Guarantor (each, an "<u>Additional Guarantor</u>") in accordance with Section 4.24 of the Guaranty, other than (i) [intentionally omitted], (ii) any Foreign 956 Subsidiary, (iii) any Other Foreign 956 Subsidiary and (iv) any Non-U.S. Subsidiary owned in whole or in part by a Foreign 956 Subsidiary, except in the case of clauses (i) through (iv), any Subsidiaries that were guarantors under the Existing UST Term Loan Agreement.

5.24.   <u>Provide Additional Information</u>.   Each North American Group Member shall, promptly, from time to time and upon request of any Lender, furnish to such Lender such information, documents, records or reports with respect to the Collateral, the Indebtedness of the North American Group Members or any Subsidiary thereof or the corporate affairs, conditions or operations, financial or otherwise, of such North American Group Member as any Lender may reasonably request, including without limitation, providing to such Lender reasonably detailed information with respect to each inquiry of such Lender raised with the North American Group Members prior to the Closing Date.

5.25.   <u>Inspection of Property; Books and Records; Discussions</u>.   Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, the Borrower shall, and shall cause each Group Member to, (a) keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of any Lender, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with its independent certified public accountants.

5.26.   [<u>Governance of Borrower</u>].   [The Borrower shall, at all times (subject to turnover thereof), maintain a Board of Directors comprised of five (5) members, three (3) of which shall be chosen by New CarCo and two (2) of which shall be chosen by the Official Committee of Unsecured Creditors in the Borrower's Case (the "<u>Creditors' Committee</u>").   All members of the Board of Directors shall be subject to the prior review by and shall be found to be reasonably acceptable to the Required Lenders, New CarCo, and such Creditors' Committee.]

# SECTION 6

# NEGATIVE COVENANTS

Each Loan Party hereby covenants and agrees to, and to cause itself and each of its Subsidiaries that is a North American Group Member to, so long as any Loan or any interest or fee payable hereunder is owing to any Lender, each North American Group Member will abide by the following negative covenants, in each case except as shall be required in connection with the Wind-Down and subject to the Orders, the Related Section 363 Transactions, the Cases, the Bankruptcy Code and all orders of the Bankruptcy Court issued in connection with the Cases:

6.1.   Prohibition on Fundamental Changes.   No North American Group Member shall, at any time, directly or indirectly, (i) enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or Dispose of all or substantially all of its Property without the Lender's prior consent, provided, any Guarantor may merge, consolidate, amalgamate into, or Dispose of all or substantially all of its Property to another North American Group Member; or (ii) form or enter into any partnership, syndicate or other combination (other than joint ventures permitted by Section 6.14) that could reasonably be expected to have a Material Adverse Effect.

6.2.   Lines of Business.   No North American Group Member will engage to any substantial extent in any line or lines of business activity other than the businesses generally carried on by the North American Group Members as of the Closing Date or businesses reasonably related thereto.

6.3.   Transactions with Affiliates.   No North American Group Member will (a) enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property (including Collateral) or the rendering of any service, with any Affiliate unless such transaction is (i) in the ordinary course of such North American Group Member's business, and (ii) generally upon fair and reasonable terms and, with respect to any transaction with an Affiliate that is not a Group Member, no less favorable to such North American Group Member than it would obtain in an arm's length transaction with a Person which is not an Affiliate (other than any transaction that occurs pursuant to an agreement in effect as of the Petition Date), and in either case, is otherwise permitted under this Agreement, or (b) make a payment that is not otherwise permitted by this Section 6.3 to any Affiliate.   Irrespective of whether such transactions comply with the provisions of this Section 6.3, but subject to the other restrictions set forth elsewhere in this Agreement, the Loan Parties shall be permitted to (x) transact business in the ordinary course with (i) the joint ventures in which the Loan Parties or their Subsidiaries participate and (ii) [intentionally omitted], and (y) make Restricted Payments permitted under Section 6.5.

6.4.   Limitation on Liens.   No North American Group Member will, create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except Permitted Liens.

6.5.   Restricted Payments.   Without the Lenders' consent, no North American Group Member shall, (i) declare or pay any dividend (other than dividends payable solely in

-50-

common Capital Stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any Capital Stock of any North American Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any North American Group Member and (ii) optionally prepay, repurchase, redeem or otherwise optionally satisfy or defease with cash or Cash Equivalents any Indebtedness (any such payment referred to in clauses (i) and (ii), a "Restricted Payment"), other than:

       (a)    redemptions, acquisitions or the retirement for value or repurchases (or loans, distributions or advances to effect the same) of shares of Capital Stock from current or former officers, directors, consultants and employees, including upon the exercise of stock options or warrants for such Capital Stock, or any executive or employee savings or compensation plans, or, in each case to the extent applicable, their respective estates, spouses, former spouses or family members or other permitted transferees;

       (b)    any Subsidiary (including an Excluded Subsidiary) may make Restricted Payments to its direct parent or to the Borrower or any Guarantor that is a Wholly Owned Subsidiary;

       (c)    any JV Subsidiary may make Restricted Payments required or permitted to be made pursuant to the terms of the joint venture arrangements in effect on the Closing Date (or otherwise as approved by the Required Lenders) of holders of its Capital Stock, provided that, the Borrower and its Subsidiaries have received their *pro rata* portion of such Restricted Payments; and

       (d)    any Subsidiary that is not a North American Group Member may make Restricted Payments to any other Subsidiary or Subsidiaries that are not North American Group Members.

For the avoidance of doubt this Section 6.5 shall not restrict in any manner any North American Group Member from Disposing of any New GM Equity Interests.

       6.6.    Amendments to Transaction Documents.  (a) No North American Group Member will amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the indemnities and licenses furnished to New CarCo and its successors or any of its Subsidiaries pursuant to the Transaction Documents such that after giving effect thereto such indemnities or licenses, taken as a whole, shall be materially less favorable to the interests of the Lenders with respect thereto or (b) otherwise amend, supplement or otherwise modify the terms and conditions of the Transaction Documents.

       6.7.    Changes in Fiscal Periods.  No North American Group Member will permit its fiscal year to end on a day other than December 31 or change its method of determining fiscal quarters, in each case, unless otherwise agreed by the Required Lenders.

       6.8.    Negative Pledge.  No North American Group Member will, enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any North American Group Member to create, incur, assume or permit to exist any Lien upon any of the

Collateral, whether now owned or hereafter acquired, other than this Agreement, the other Loan Documents, the Existing Agreements, and Permitted Liens; provided that the agreements excepted from the restrictions of this Section shall include customary negative pledge clauses in agreements providing refinancing Indebtedness or permitted unsecured Indebtedness.

6.9.    Indebtedness.  No North American Group Member will, create, incur, assume or suffer to exist any Indebtedness except Permitted Indebtedness.

6.10.    Investments.  No North American Group Member will make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments"), except Permitted Investments.

6.11.    Action Adverse to the Collateral.  Except as permitted under any provision of this Agreement, no Loan Party shall or shall permit any Pledged Entity that is a Subsidiary to take any action that would directly or indirectly materially impair or materially adversely affect such North American Group Member's title to, or the value of, the Collateral, or materially increase the duties, responsibilities or obligation of any North American Group Member.

6.12.    Limitation on Sale of Assets.  Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases and any other applicable provision of any Loan Document, each North American Group Member shall have the right to Dispose freely of any of its Property (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired.

6.13.    [Intentionally Omitted].

6.14.    JV Agreements.  No North American Group Member or Pledged Entity shall allow any modification or amendment to any JV Agreement, except that any such party that is not a Debtor may modify or amend any JV Agreement; provided that such amendment or modification could not reasonably be expected to have a Material Adverse Effect.

6.15.    Swap Agreements.  The North American Group Members will not itself, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual or anticipated exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

6.16.    Clauses Restricting Subsidiary Distributions.  The Borrower will not, and will not permit any Guarantor to, enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Guarantor to (a) make Restricted Payments in respect of any Capital Stock of such Guarantor held by, or pay any Indebtedness owed to, the Borrower or any other Guarantor, (b) make loans or advances to, or other Investments in, the Borrower or any other Guarantor or (c) transfer any of its assets to the Borrower or any other Guarantor, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Guarantor

imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Guarantor, (iii) any agreement or instrument governing Indebtedness assumed in connection with the acquisition of assets by the Borrower or any Guarantor permitted hereunder or secured by a Lien encumbering assets acquired in connection therewith, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (iv) restrictions on the transfer of assets subject to any Lien permitted by Section 6.4 imposed by the holder of such Lien or on the transfer of assets subject to a Disposition permitted by Section 6.12 imposed by the acquirer of such assets, (v) provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock therein) entered into in the ordinary course of business, (vi) restrictions contained in the terms of any agreements governing purchase money obligations, Capital Lease Obligations or attributable obligations not incurred in violation of this Agreement; provided that, such restrictions relate only to the property financed with such Indebtedness, (vii) restrictions on cash or other deposits imposed by customers under contracts or other arrangements entered into or agreed to in the ordinary course of business, or (viii) customary non-assignment provisions in leases, contracts, licenses and other agreements entered into in the ordinary course of business and consistent with past practices.

6.17.   Sale/Leaseback Transactions.   No North American Group Member will enter into any arrangement with any Person providing for the leasing by any such North American Group Member of real or personal property that has been or is to be sold or transferred by any such North American Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of any such North American Group Member (a "Sale/Leaseback Transaction") other than any Sale/Leaseback Transaction in effect on the Closing Date.

6.18.   [Intentionally Omitted].

6.19.   Modification of Organizational Documents.   No North American Group Member will modify any organizational documents, except (i) as required by the Bankruptcy Code or (ii) in connection with a Disposition permitted by Section 6.12.

# SECTION 7

# EVENTS OF DEFAULT

7.1.   Events of Default.   Notwithstanding the provisions of section 362(c) of the Bankruptcy Code, and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, or any notice to any of the North American Group Members, and subject to the provisions of this Section 7, each of the following events shall constitute an "Event of Default", provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied:

(a)   the Borrower shall default in the payment of any principal of or interest on any Loan when due (whether at stated maturity or upon acceleration), including the failure to pay

the Administrative Priority Claim Payment Amount on or before the Administrative/Priority Claim Payment Date; or

(b)     any Guarantor shall default in its payment obligations under the Guaranty; or

(c)     any Loan Party shall default in the payment of any other amount payable by it hereunder or under any other Loan Document after notification by the Lenders of such default, and such default shall have continued unremedied for three (3) Business Days; or

(d)     any North American Group Member shall breach any covenant contained in Section 5.16 (Executive Privileges and Compensation), Section 5.17 (Aircraft), Section 5.18 (Restrictions on Expenses), Section 5.19 (Employ American Workers Act), Section 5.20 (Internal Controls; Recordkeeping; Additional Reporting), Section 5.21 (Waivers) or Section 6 hereof; or

(e)     any North American Group Member shall default in performance of or otherwise breach non-payment obligations or covenants under any of the Loan Documents not covered by another clause in this Section 7, and such default has not been remedied within the applicable grace period provided therein, or if no grace period, within ten (10) Business Days; or

(f)     any representation, warranty or certification made or deemed made herein or in any other Loan Document by any North American Group Member or any certificate furnished to the Lenders pursuant to the provisions hereof or thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(g)     [intentionally omitted]; or

(h)     [intentionally omitted]; or

(i)     [intentionally omitted]; or

(j)     [intentionally omitted]; or

(k)     any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee or interim trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a receiver and manager, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or an application shall be filed by the Borrower or any of its Subsidiaries for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Lenders against any Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

(l)     except as expressly agreed in writing by the Required Lenders, any Debtor shall make any Prepetition Payment to any general unsecured creditor other than any such

Prepetition Payments that are (i) payable pursuant to an order by the Bankruptcy Court or (ii) permitted by the Wind-Down Budget; or

(m)      [intentionally omitted]; or

(n)      [intentionally omitted]; or

(o)      [intentionally omitted]; or

(p)      any Loan Document shall for whatever reason be terminated, any default or event of default shall have occurred under any Loan Document, the Loan Documents shall for any reason cease to create a valid, security interest in any of the Collateral purported to be covered hereby or thereby, or any North American Group Member's material obligations (including the Borrower's Obligations hereunder) shall cease to be in full force and effect, or the enforceability thereof shall be contested by any North American Group Member; or

(q)      the filing of a motion, pleading or proceeding by any of the other Loan Parties which could reasonably be expected to result in a material impairment of the rights or interests of any Lender under any Loan Document, or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of any Lender under any Loan Document; or

(r)      (i) any order shall be entered reversing, amending, supplementing, staying for a period in excess of five days, vacating or otherwise modifying in any material respect the Final Order without the prior written consent of the Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien or to be otherwise in full force and effect or (iii) any Debtor shall fail to, or fail to cause any North American Group Member to, comply with the Orders; or

(s)      the North American Group Members or any other material Subsidiaries of the Borrower shall take any action in support of any of the events set forth in clauses (k), (l), (m), (q) or (s) or any person other than the North American Group Members or any other material Subsidiaries of the Borrower shall do so, and such application is not contested in good faith by the North American Group Members or any other material Subsidiaries of the Borrower and the relief requested is granted in an order that is not stayed pending appeal; or

(t)      [intentionally omitted]; or

(u)      any Change of Control shall have occurred without the prior consent of the Lenders other than pursuant to the Related Section 363 Transaction; or

(v)      any North American Group Member shall grant, or suffer to exist, any Lien on any Collateral other than Permitted Liens; or the Liens contemplated under the Loan Documents shall cease to be perfected Liens on the Collateral in favor of the Lenders of the requisite priority hereunder with respect to such Collateral (subject to the Permitted Liens); or

(w)      [intentionally omitted]; or

(x)      [intentionally omitted]; or

(y)      [intentionally omitted]; or

(z)      [intentionally omitted]; or

(aa)      [intentionally omitted]; or

(bb)      any North American Group Member (other than a Debtor) shall admit its inability to, or intention not to, perform any of such party's material Obligations hereunder; or

(cc)      a plan shall be confirmed in any of the Cases that does not, or any order shall be entered which dismisses any of the Cases and which order does not comply with the repayment provisions of this Agreement; or any of the Debtors shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

7.2.    Remedies upon Event of Default.  (a) If any Event of Default occurs and is continuing under Section 7.1(l), the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(b)      After the Maturity Date, if any Obligations remain outstanding, the Required Lenders may, by written notice to the Borrower, take any action set forth in Section 7.2(c).

(c)      Upon (but only upon) the occurrence of an event set forth in Section 7.2(a) and (b), the Required Lenders may take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided that (x) with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Lenders shall provide the Borrower (with a copy to counsel for each Committee and to the United States Trustee for the Southern District of New York) with five Business Days' written notice prior to taking the action contemplated thereby, (y) upon receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts, and (z) in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, the specific Event of Default giving rise to the enforcement has occurred and is continuing):

(i)      declare the principal of and accrued interest on the outstanding Loans to be immediately due and payable;

(ii)      [intentionally omitted]

(iii)      set-off any amounts (other than Excluded Collateral) held in any accounts maintained by any Loan Party with respect to which any Lender is a party to a control agreement;

(iv)      compel any Debtor to or to cause any North American Group Member to sell any or all of its assets (other than the Excluded Collateral) that comprise collateral consistent with Section 363(b) of the Bankruptcy Code or any other applicable law, and

credit bid the Loans in any such sale pursuant to Section 363(k) of the Bankruptcy Code or other Applicable Law; or

(v)    take any other action or exercise any other right or remedy (including, without limitation, with respect to the Liens in favor of the Lenders) permitted under and consistent with the Loan Documents or by applicable law.

(d)    Notwithstanding any other provision in this Agreement or the other Loan Documents, the Lenders' rights and remedies set forth in Section 7.2(a), (b) and (c) shall for all purposes be the sole and exclusive remedy of the Lenders and their respective Affiliates under this Agreement and the other Loan Documents, at law or in equity, for all purposes against the Borrower, any of its direct or indirect Subsidiaries (including, the Guarantors), the Pledgors, and any of their respective former, current and future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, members, managers, general or limited partners or assignees upon any Event of Default or for any loss or damage suffered as a result of the breach of any representation, warranty, covenant or agreement contained in this Agreement, the other Loan Documents or otherwise by the Borrower or any of its direct or indirect Subsidiaries, any Pledgor or any Guarantor.

# SECTION 8

## MISCELLANEOUS

8.1.    <u>Amendments and Waivers</u>.    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 8.1 or as otherwise expressly provided herein. The Required Lenders and the Borrower (on its own behalf and as agent on behalf of any other Loan Party party to the relevant Loan Document) may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Lenders may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; except that (x) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the Maturity Date of any Loan or any change to the definition of "Maturity Date", (ii) reductions in the rate of interest or any fee or extensions of any due date thereof, (iii) [intentionally omitted], (iv) imposition of any additional restrictions on assignments and participations, (v) [intentionally omitted] and (vi) modifications to the *pro rata* treatment and sharing provisions of the Loan Documents, and (y) the consent of 100% of the Lenders shall be required with respect to (i) modifications to this Section of any of the voting percentages, the definition of "Required Lenders", or the minimum requirement necessary for all Lenders or Required Lenders to take action hereunder, (ii) prior to the consummation of the Related Section 363 Transactions, the release or subordination of any of the Guarantors or a material portion of the Collateral other than in connection with the Related Section 363 Transactions, (iii) after the consummation of the Related Section 363 Transactions, the release or subordination of all or substantially all of the Guarantors or all or substantially all of the Collateral, (iv) the

assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under this Agreement and (v) amendments, supplements, modifications or waivers of Sections 2.12 (or the rights and obligations contained therein), 4.1(a), 4.1(c)(ii), 4.1(e), 4.1(f), 4.1(m) or 7.1(r), the definition of "ABR" or the minimum notice requirements contained in Section 2.4.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders and all future holders of the Loans.  In the case of any waiver, the Loan Parties and the Lenders shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 8.1; provided that, delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

8.2.    Notices.  (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice or electronic transmission or overnight or hand delivery, when received, addressed as follows in the case of the Borrower and the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:

GM Global Headquarters
Att.  Mail Code 482-C37-A99
300 Renaissance Center
Detroit, MI  48265-3000
Telecopy:  248-262-8491

with a copy to:

Motors Liquidation Company
767 Fifth Avenue, 14th Floor
New York, NY  10153
Attention:  Treasurer
Telecopy:  212-418-3630

and

       Motors Liquidation Company
       300 Renaissance Center
       Detroit, MI  48265-3000
       Attention:  General Counsel
       Telecopy:  248-267-4584

and:

       Weil, Gotshal & Manges LLP
       767 Fifth Avenue
       New York, NY  10153-0119
       Attention:  Stephen Karotkin
                Richard Ginsburg
                Soo-Jin Shim
       Telecopy: 212-310-8007

Treasury:

       The United States Department of the Treasury
       1500 Pennsylvania Avenue, NW
       Washington, D.C.  20220
       Attention:  Chief Counsel Office of Financial Stability
       Telecopy:  202-927-9225
       Email:  OFSChiefCounselNotices@do.treas.gov

with a copy to:

       Cadwalader, Wickersham & Taft LLP
       One World Financial Center
       New York, NY  10281
       Attention:  John J. Rapisardi
       Telecopy:  212-504-6666
       Telephone:  212-504-6000

Canadian Lender:

       Export Development Canada
       151 O'Connor Street
       Ottawa, Ontario
       Canada  K1A 1K3
       Attention:  Loans Services
       Telecopy:  613-598-2514

with a copy to:

>Export Development Canada
>151 O'Connor Street
>Ottawa, Ontario
>Canada  K1A 1K3
>Attention:  Asset Management/Covenants Officer
>Telecopy: 613-598-3186

provided that any notice, request or demand to or upon the Lenders shall not be effective until received.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by each Lender in its sole discretion.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

8.3.    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.4.    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

8.5.    Payment of Expenses.  The Borrower agrees (a) to pay or reimburse the Lenders and any other Canadian Lender Consortium Member for all their (i) reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby (including the reasonable out-of-pocket costs and expenses of the advisors and counsel to each Lender and each other Canadian Lender Consortium Member, but excluding the professional fees of such advisors and counsel to each Lender and each other Canadian Lender Consortium Member), and (ii) costs and expenses incurred in connection with the enforcement or preservation of any rights or exercise of remedies under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith in respect of any Event of Default or otherwise, including the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and each other Canadian Lender Consortium Member, (b) to pay, indemnify, or reimburse each

Lender and each other Canadian Lender Consortium Member for, and hold each Lender and each other Canadian Lender Consortium Member harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying such fees, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (c) to pay, indemnify or reimburse each Lender and each other Canadian Lender Consortium Member, their respective affiliates, and their respective officers, directors, partners, employees, advisors, agents, controlling persons and trustees (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by an Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of, the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, including any of the foregoing relating to the use or proposed use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations or assets of any Group Member, including any of the Mortgaged Properties, and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by any third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities"), provided that the Borrower shall have no obligation hereunder to any Indemnitee (x) for Taxes (it being understood that the Borrower's obligations with respect to Taxes are set forth in Section 2.12) or (y) with respect to Indemnified Liabilities to the extent such Indemnified Liabilities resulted from the gross negligence or willful misconduct of, in each case as determined by a final and nonappealable decision of a court of competent jurisdiction, such Indemnitee, any of its affiliates or its or their respective officers, directors, partners, employees, agents or controlling persons. No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Loans. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 8.5 shall be payable not later than 30 days after written demand therefor. Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the Treasurer of the Borrower as set forth in Section 8.2, or to such other Person or address as may be hereafter

designated by the Borrower in a written notice to the Lenders.  The agreements in this Section 8.5 shall survive repayment of the Loans and all other amounts payable hereunder.

8.6.    <u>Successors and Assigns; Participations and Assignments</u>.    (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, all future holders of the Loans and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (except to its Debtor Successor) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 8.6.

(b)    Any Lender may, without the consent of the Borrower, assign to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it) pursuant to an Assignment and Assumption, executed by such Assignee and such Lender and delivered to the Borrower for its records, to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada or to New CarCo, together with any related rights and obligations thereunder, without the consent of the Borrower.  The Borrower or its agent will maintain a register ("<u>Register</u>") of each Lender and Assignee.  The Register shall contain the names and addresses of the Lenders and Assignees and the principal amount of the loans (and stated interest thereon) held by each such Lender and Assignee from time to time.  The entries in the Register shall be conclusive and binding, absent manifest error.

(c)    Any Lender may, without the consent of the Borrower, sell participations to any other branch, division or agency of the United States or Canadian governments or any government of any state, province, commonwealth or territory of the United States or Canada (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Loans owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 8.1 and (2) directly affects such Participant.  Subject to paragraph (c) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 8.6.  To the extent permitted by law, and subject to paragraph (c) of this Section, each Participant also shall be entitled to the benefits of Section 8.7 as though it were a Lender.  Notwithstanding anything to the contrary in this Section 8.6, each Lender shall have the right to sell one or more participations in all or any part of its Loans or other Obligations to one or more lenders or other Persons that provide financing to such Lender in the form of sales

and repurchases of participations without having to satisfy the foregoing requirements. In the event that a Lender sells a participation in such Lender's rights and obligations under this Agreement, the Lender, on behalf of Borrower, shall maintain a register on which it enters the name, address and interest in this Agreement of all Participants.

8.7. <u>Adjustments; Set-off</u>. (a) Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders, if any Lender (a "<u>Benefitted Lender</u>") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 7, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash in Dollars from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral or the proceeds thereof, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b) In addition to any rights and remedies of the Lenders provided by law, subject to any notice or other requirement contained in the Orders, each Lender shall have the right, without (i) further order of or application to the Bankruptcy Court, or (ii) prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon all amounts owing hereunder becoming due and payable (whether at the stated maturity, by acceleration or otherwise) to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the other Lenders after any such set-off and application made by such Lender; <u>provided</u> that, the failure to give such notice shall not affect the validity of such set off and application.

8.8. <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

8.9. <u>Severability</u>. Any provision of this Agreement that is held to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.10.  <u>Integration</u>.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.  Subject to Section 8.18, in the event of any conflict between this Agreement or any other Loan Document and the Orders, the Orders shall control.

8.11.  <u>Governing Law</u>.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

8.12.  <u>Submission to Jurisdiction; Waivers</u>.  All judicial proceedings brought against any Loan Party hereto arising out of or relating to this Agreement or any other Loan Document, or any Obligations hereunder and thereunder, may be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof.  Each Loan Party hereto hereby irrevocably and unconditionally:

(a)  submits for itself and its property in any such legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)  consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)  agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in Section 8.2 or at such other address of which the Lenders shall have been notified pursuant thereto; and

(d)  waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.13.  <u>Acknowledgments</u>.  The Loan Party hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)  no Lender has any fiduciary relationship with or duty to any Group Member arising out of or in connection with this Agreement or any of the other Loan

Documents, and the relationship between the Lenders, on one hand, and any Group Member, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower or any Subsidiary and the Lenders.

8.14.    <u>Release of Guaranties</u>.    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Lenders hereby agree to take promptly, any action requested by the Borrower having the effect of releasing, or evidencing the release of, any guarantee by any Loan Party of the Obligations to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 8.1.

8.15.    <u>Confidentiality</u>.    Each of the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party or any other Lender pursuant to this Agreement that is designated by such Loan Party as confidential; <u>provided</u> that nothing herein shall prevent any Lender from disclosing any such information (a) to any other Lender or any affiliate of any thereof, (b) subject to an agreement to comply with the provisions of this Section 8.15 (or other provisions at least as restrictive as this Section), to any actual or prospective Transferee or any pledgee of Loans or any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction relating to the Loan Party and its obligations, (c) to its affiliates, employees, directors, trustees, agents, attorneys, accountants and other professional advisors, or those of any of its affiliates for performing the purposes of a Loan Document, subject to such Lender, as the case may be, advising such Person of the confidentiality provisions contained herein, (d) upon the request or demand of any Governmental Authority or regulatory agency (including self-regulated agencies) having jurisdiction (or purporting to have jurisdiction) over it upon notice (other than in connection with routine examinations or inspections by regulators) to the Borrower thereof unless such notice is prohibited or the Governmental Authority or regulatory agency shall require otherwise, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, after notice to the Borrower if reasonably feasible, and, if applicable, after exhaustion of the Group Members' rights and remedies under Section 1.6 of the Department of the Treasury Regulations, 31 C.F.R. Part 1, Subpart A; Sections 27-29 inclusive and 44 of the Access to Information Act, R.S.C., ch A-1 (1985) and Section 28 and Part IV (Sections 50-56 inclusive) of the Freedom of Information and Protection of Privacy Act, R.S.O., ch. F.31 (1990), after notice to the Borrower if reasonably feasible, (f) if requested or required to do so in connection with any litigation or similar proceeding, after notice to the Borrower if reasonably feasible, (g) that has been publicly disclosed, other than in breach of this Section, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

8.16.    <u>Waivers of Jury Trial</u>.    **THE BORROWER AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN**

**ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.17.    USA PATRIOT Act.    Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the USA PATRIOT Act.

8.18.    Orders.    The terms and conditions hereunder shall be subject to the terms and conditions of the Final Order.    In the event of any inconsistency between the terms or conditions of this Agreement and the terms and conditions of the Orders, the terms and conditions of the Orders shall control.    Notwithstanding the foregoing, in the event of any inconsistency between the terms or conditions of Section 8.1 and the terms and conditions of the Orders, the terms and conditions of Section 8.1 shall control.

8.19.    Effect of Amendment and Restatement of the Existing Credit Agreement. On the Effective Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety.    The parties hereto acknowledge and agree that (a) this Agreement and the other Loan Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment and reborrowing, or termination of the "Obligations" (as defined in the Existing Credit Agreement) under the Existing Credit Agreement as in effect prior to the Effective Date and (b) such "Obligations" are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement.

8.20.    New GM Equity Interests.    Each Lender hereby acknowledges and agrees that it, and each Affiliate of any Lender, (a) shall have no right, in any manner whatsoever, to the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans and (b) will not initiate or prosecute any claims, causes of action, adversary proceedings or other litigation seeking recourse against the New GM Equity Interests or any proceeds received from the sale or distribution thereof in satisfaction or repayment of the Loans or otherwise.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MOTORS LIQUIDATION COMPANY

By:_____
    Name:
    Title:

[GUARANTOR]


By:_____
    Name:
    Title:

UNITED STATES DEPARTMENT OF THE
TREASURY, as a Lender


By:_____
        Title:  Interim Assistant Secretary of the
        Treasury for Financial Stability

EXPORT DEVELOPMENT CANADA, as a
Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[Signature Page to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement]