UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
:
In re                                                            :        Chapter 11 Case No.
:
GENERAL MOTORS CORP., *et al.*,                                  :        09- 50026 (REG)
:
Debtors.                       :        (Jointly Administered)
:
------------------------------------------------------------------x

DECISION ON DEBTORS' MOTION FOR
APPROVAL OF (1) SALE OF ASSETS TO
VEHICLE ACQUISITION HOLDINGS LLC;
(2) ASSUMPTION AND ASSIGNMENT OF
RELATED EXECUTORY CONTRACTS; AND
(3) ENTRY INTO UAW RETIREE SETTLEMENT
AGREEMENT

APPEARANCES:[1]
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors and Debtors in Possession*
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller (argued)
       Stephen Karotkin (argued)
       Joseph H. Smolinsky (argued)

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee*
  *of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein (argued)
       Thomas Moers Mayer (argued)
       Robert Schmidt
       Jeffrey S. Trachtman

---

[1]     Principal participants are shown here.  A full listing will be posted when practicable.

LEV L. DASSIN
*Acting United States Attorney for the*
*  Southern District of New York*
*Counsel to the United States of America*
86 Chambers Street, Third Floor
New York, New York 10007
By:    David S. Jones (argued)
       Jeffrey S. Oestericher
       Matthew L. Schwartz (argued)
       Joseph N. Cordaro

-and-

CADWALADER, WICKERSHAM & TAFT LLP
*Counsel to the United States of America*
One World Financial Center
New York, New York 10281
By:    John J. Rapisardi

CLEARY GOTTLIEB STEEN & HAMILTON
*Counsel for The International Union, United Automobile,*
*  Aerospace and Agricultural Implement Workers of*
*  America, AFL-CIO*
One Liberty Plaza
New York, NY 10006
By:    James L. Bromley (argued)
       Avram E. Luft

COHEN, WEISS AND SIMON LLP
*Counsel for The International Union, United Automobile,*
*  Aerospace and Agricultural Implement Workers of*
*  America, AFL-CIO*
330 West 42nd Street
New York, NY  10036
By:    Babette A. Ceccotti (argued)

PATTON BOGGS LLP
*Counsel For The Unofficial Committee*
*  Of Family & Dissident GM Bondholders*
1185 Avenue of the Americas
New York, NY  10036
By:    Michael P. Richman (argued)
       Mark A. Salzberg (*pro hac vice*) (argued)
       James C. Chadwick (*pro hac vice*)
       Melissa Iachan

THE COLEMAN LAW FIRM
*Attorneys for Individual Tort Litigants Callan Campbell,*
  *Kevin Junso, Edwin Agosto, Kevin Chadwick,*
  *and Joseph Berlingieri*
77 West Wacker Dr., Suite 4800
Chicago, IL 60601
By:    Steve Jakubowski (argued)
       Elizabeth Richert

SCHNADER HARRISON SEGAL & LEWIS LLP
*Attorneys for Ad Hoc Committee of Consumer Victims of General Motors*
140 Broadway, Suite 3100
New York, NY 10005-1101
By:    Barry E. Bressler (*pro hac vice*) (argued)
       Richard A. Barkasy (*pro hac vice*)
       Benjamin P. Deutsch

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA P.C.
*Counsel For Ad Hoc Committee of Asbestos Personal Injury Claimants*
2323 Bryan Street, Suite 2200
Dallas, TX 75201
By:    Sander L. Esserman (*pro hac vice*) (argued)
       Robert T. Brousseau (*pro hac vice*)
       Peter D'Apice
       Jo E. Hartwick (*pro hac vice*)

ORRICK, HERRINGTON & SUTCLIFFE LLP
*Counsel to the Unofficial GM Dealers Committee*
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
By:    Roger Frankel (argued)
       Richard H. Wyron

666 Fifth Avenue
New York, NY 10103
By:    Lorraine S. McGowen
       Alyssa D. Englund

KENNEDY, JENNIK & MURRAY, P.C.
*Attorneys for IUE-CWA*
113 University Place, 7th Floor
New York, New  York 10003
By:    Thomas M. Kennedy (argued)
       Susan M. Jennik

NEBRASKA ATTORNEY GENERAL JON BRUNING
*Attorney for the State of Nebraska and on behalf of*
  *the Ad Hoc Committee of State Attorneys General*
The Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509-8920
By:     Leslie C. Levy
        Karen Cordry (argued)

OLIVER ADDISON PARKER
*Pro Se*
283 Codrington Drive
Lauderdale By The Sea, FL 33308
Telephone: (954) 599-6468

N.W. BERNSTEIN & ASSOCIATES, LLC
Attorneys for the Trustees of Environmental Conservation
  and Chemical Corporation Site Trust Fund
800 Westchester Avenue, Suite 319 North
Rye Brook, NY 10573
By:     Norman W. Bernstein (argued)

CAPLIN & DRYSDALE CHARTERED
*Attorneys for Mark Buttita, personal representative of Salvatore Buttita*
375 Park Avenue, 35th Floor
New York, NY 10152
Telephone: (212) 319-7125
By:     Elihu Inselbuch, Esq.
        Rita C. Tobin, Esq.

1 Thomas Circle
Washington, D.C. 20005
Telephone: (202) 862-5000
By:     Peter Van N. Lockwood, Esq.
        Ronald E. Reinsel, Esq. (*pro hac vice*) (argued)

VEDDER PRICE P.C.
Counsel for Export Development Canada
1633 Broadway, 47th Floor
New York, NY 10019
By:     Michael J. Edelman
        Michael L. Schein (argued)
        Erin Zavalkoff-Babej

ROBINSON BROG LEINWAND GREENE, GENOVESE & CLUCK, P.C.
*Attorneys for the Greater New York Automobile Dealers Association*
1345 Avenue of the Americas
New York, NY 10105
By:    Russell P. McRory (argued)
       Fred B. Ringel
Mitchell Greene
Robert R. Leinwand


-and-


MYERS & FULLER P.A.
*Attorneys for the Greater New York Automobile Dealers Association*
2822 Remington Green Circle
Tallahassee, FL 32308
By:    Richard Sox (*pro hac vice*)
       Shawn Mercer (*pro hac vice*)
       Robert Byerts (*pro hac vice*)


GIBSON, DUNN & CRUTCHER LLP
*Attorneys for Wilmington Trust Company, Indenture Trustee*
200 Park Avenue, 47th Floor
New York, NY 10166
Telephone: (212) 351-4000
By:    David Feldman (argued)
       Matthew J. Williams
       Adam H. Offenhartz


KELLEY, DRYE & WARREN LLP
*Counsel for Law Debenture Trust Company of New York,
   as Proposed Successor Indenture Trustee*
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
By:    David E. Retter
       Pamela Bruzzese-Szczygiel
       Jennifer A. Christian (argued)


NEW YORK STATE DEPARTMENT OF LAW
*Environmental Protection Bureau*
The Capitol
Albany, New York
12224
Telephone: (518) 474-2432
By:    Susan Taylor (argued)

LEVY RATNER, P.C.
*Attorneys for United Steelworkers*
80 Eighth Avenue, Eighth Floor
New York, New York 10011
By:    Suzanne Hepner

GORLICK KRAVITZ & LISTHAUS P.C.
*Attorneys for International Union of Operating*
*    Engineers Locals 18S, 101S, and 832S*
17 State Street
New York, NY 10004
By:    Barbara Mehlsack

FARELLA BRAUN & MARTEL LLP
*Attorneys for General Motors Retirees Association*
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
By:    Neil A. Goteiner (argued)
       Dean M. Gloster (*pro hac vice*)
       Nan E. Joesten (*pro hac vice*)

PUBLIC CITIZEN LITIGATION GROUP
*Attorneys for Center for Auto Safety, Consumer Action,*
*    Consumers for Auto Reliability and Safety,*
*    National Association of Consumer Advocates,*
*    and Public Citizen*
1600 20th Street NW
Washington, DC 20009
By:    Adina H. Rosenbaum
       Allison M. Zieve

OTTERBOURG, STEINDLER, HOUSTON
    & ROSEN, P.C.
*Attorneys for GMAC LLC*
230 Park Avenue
New York, NY  10169
By:    Jonathan N. Helfat
       Steven B. Soll

ATTORNEYS FOR THE STATE OF TEXAS
*On behalf of the Texas Dep't of Transportation,*
  *Motor Vehicle Division*
The Texas Attorney General's Office
P.O. Box 12548
Austin, TX 78711-2548
By:    J. Casey Roy (argued)

DIANA G. ADAMS
*United States Trustee*
Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
By:    Diana G. Adams,
       Linda A. Riffkin
       Tracy Hope Davis
       Andrew D. Velez-Rivera
       Brian Shoichi Masumoto

# TABLE OF CONTENTS

Findings of Fact ........................................................................................................ 4
  1.  Background ...................................................................................................... 4
  2.  GM's Dealer Network ...................................................................................... 5
  3.  GM's Suppliers ................................................................................................ 6
  4.  GM's Financial Distress ................................................................................... 6
  5.  U.S. Government Assistance ............................................................................ 7
  6.  GM's First Quarter Results ............................................................................ 12
  7.  The 363 Transaction ...................................................................................... 13
  8.  The Liquidation Alternative .......................................................................... 15
  9.  Fairness of the Transaction ........................................................................... 16
  10. Specifics of the Transaction .......................................................................... 16
       (a) Acquired and Excluded Assets ............................................................... 16
       (b) Assumed and Excluded Liabilities ......................................................... 17
       (c) Consideration ......................................................................................... 18
       (d) Ownership of New GM ........................................................................... 19
       (e) Other Aspects of Transaction ................................................................. 20
       (f) The Proposed Sale Order ........................................................................ 20
  11. Contingent Liabilities .................................................................................... 21
  12. Agreement with UAW .................................................................................... 21
  13. Need for Speed ............................................................................................... 22
  14. Ultimate Facts ................................................................................................ 25
Discussion ............................................................................................................... 26
  1.  Sale Under Section 363 .................................................................................. 26
       (a) Utilization of Section 363 ...................................................................... 26
       (b) Compliance with Standards for Approval of Section 363 Sales ............ 39
       (c) "Sub Rosa" Plan ..................................................................................... 41
       (d) Recharacterization or Subordination of U.S. Treasury Debt ................ 47
       (e) Asserted Inability to Credit Bid ............................................................. 50
  2.  Successor Liability Issues .............................................................................. 50
       (a) Textual Analysis ..................................................................................... 52
       (b) Caselaw .................................................................................................. 57
  3.  Asbestos Issues .............................................................................................. 61
  4.  Environmental Issues ..................................................................................... 63
  5.  Splinter Union Retiree Issues ........................................................................ 66
  6.  Dealer Issues .................................................................................................. 73
  7.  ECC Trust ....................................................................................................... 80
  8.  "Equally and Ratably" Issues ......................................................................... 82
  9.  Unauthorized Use of TARP Funds Issues ..................................................... 83
  10. Cure Objections ............................................................................................. 85
  11. UAW Settlement Objections .......................................................................... 86
  12. Stockholder Objections .................................................................................. 86
  13. Miscellaneous Objections .............................................................................. 87
Conclusion .............................................................................................................. 87

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered chapter 11 cases of  Debtors

General Motors Corporation and certain of its subsidiaries (together, "**GM**"), the Debtors

move for an order, pursuant to section 363 of the Bankruptcy Code, approving GM's sale

of the bulk of its assets (the "**363 Transaction**"), pursuant to a "Master Sale and

Purchase Agreement" and related documents (the "**MPA**"), to Vehicle Acquisitions

Holdings LLC (the "**Purchaser**")[2]—a purchaser sponsored by the U.S. Department of the

Treasury (the "**U.S. Treasury**")—free and clear of liens, claims, encumbrances, and

other interests.  The Debtors also seek approval of the assumption and assignment of the

executory contracts that would be needed by the Purchaser, and of a settlement with the

United Auto Workers ("**UAW"**) pursuant to an agreement (the "**UAW Settlement**

**Agreement**") under which GM would satisfy obligations to an estimated 500,000

retirees.

GM's motion is supported by the Creditors' Committee; the U.S. Government

(which has advanced approximately $50 billion to GM, and is GM's largest pre- and

post-petition creditor); the Governments of Canada and Ontario (which ultimately will

have advanced about $9.1 billion); the UAW (an affiliate of which is GM's single largest

unsecured creditor); the indenture trustees for GM's approximately $27 billion in

unsecured bonds; and an ad hoc committee representing holders of a majority of those

bonds.

---

[2]        When discussing the mechanics of the 363 Transaction, the existing GM will be referred to as
"**Old GM,**" and the Purchaser will be referred to as "**New GM**."

1

But the motion has engendered many objections and limited objections, by a variety of others. The objectors include, among others, a minority of the holders of GM's unsecured bonds (most significantly, an ad hoc committee of three of them (the "**F&D Bondholders Committee**"), holding approximately .01% of GM's bonds),[3] who contend, among other things, that GM's assets can be sold only under a chapter 11 plan, and that the proposed section 363 sale amounts to an impermissible "*sub rosa*" plan.

Objectors and limited objectors also include tort litigants who object to provisions in the approval order limiting successor liability claims against the Purchaser; asbestos litigants with similar concerns, along with concerns as to asbestos ailments that have not yet been discovered; and non-UAW unions ("**Splinter Unions**") speaking for their retirees, concerned that the Purchaser does not plan to treat their retirees as well as the UAW's retirees.

On the most basic issue, whether a 363 sale is proper, GM contends that this is exactly the kind of case where a section 363 sale is appropriate and indeed essential—and where under the several rulings of the Second Circuit and the Supreme Court in this area, GM's business can be sold, and its value preserved, before the company dies. The Court agrees. GM cannot survive with its continuing losses and associated loss of liquidity, and without the governmental funding that will expire in a matter of days. And there are no options to this sale—especially any premised on the notion that the company could

---

[3]    When it filed its objection, the F&D Bondholders Committee, identifying itself as the "Family & Dissident" Bondholders Committee, said it was "representing the interests of" 1,500 bondholders, with bond holdings "believed to exceed $400 million." (F&D Bondholder Comm. Obj. at 1). But even after it filed the second of its Fed.R.Bankr.P. 2019 statements, it did not identify any other bondholders for whom it was speaking, or provide the holdings, purchases and sales information for any others that Rule 2019 requires. Under these circumstances, the Court must consider that the committee speaks for just those three bondholders.

survive the process of negotiations and litigation that characterizes the plan confirmation process.

As nobody can seriously dispute, the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates.  In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.

Neither the Code, nor the caselaw—especially the caselaw in the Second Circuit—requires waiting for the plan confirmation process to take its course when the inevitable consequence would be liquidation.  Bankruptcy courts have the power to authorize sales of assets at a time when there still is value to preserve—to prevent the death of the patient on the operating table.

Nor can the Court accept various objectors' contention that there here is a *sub rosa* plan.  GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan.  Arrangements that will be made by the Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly different needs and concerns—arrangements that the Purchaser needs to create a new GM that will be lean and healthy enough to survive.

Issues as to how any approval order should address *successor liability* are the only truly debatable issues in this case.  And while textual analysis is ultimately inconclusive and caselaw on a nationwide basis is not uniform, the Court believes in *stare decisis*; it follows the caselaw in this Circuit and District in holding that to the extent the Purchaser

has not voluntarily agreed to accept successor liability, GM's property—like that of Chrysler, just a few weeks ago—may be sold free and clear of claims.

Those and other issues are addressed below.  GM's motion is granted.  The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

<u>Findings of Fact</u>[4]

After an evidentiary hearing,[5] the Court makes the following Findings of Fact.

*1.  Background*

GM is primarily engaged in the worldwide production of cars, trucks, and parts. It is the largest Original Equipment Manufacturer ("**OEM**") in the U.S., and the second largest in the world.

GM has marketed cars and trucks under many brands—most of them household names in the U.S.—including Buick, Cadillac, Chevrolet, Pontiac, GMC, Saab, Saturn, HUMMER, and Opel.  It operates in virtually every country in the world.

GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York.  As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 were hourly employees and 72,000 were salaried.  Of GM's 235,000 employees, approximately 91,000 are employed in the U.S.  Approximately 62,000 (or 68%) of those U.S. employees were represented by unions as of March 31, 2009.  The UAW represents by far the largest

---

[4]    To avoid making this lengthy decision even longer, the Court has limited its citations in its Findings of Fact to those matters where they are most useful.

[5]    In accordance with the Court's Case Management Order #1, direct testimony was presented by affidavit and cross-examination and subsequent questioning proceeded live.  After cross-examination, the Court found all witnesses credible, and takes their testimony as true.

portion of GM's U.S. unionized employees, representing approximately 61,000 employees.

As of March 31, 2009, GM had consolidated reported global assets and liabilities of approximately $82 billion, and $172 billion, respectively.  However, its assets appear on its balance sheet at book value, as contrasted to a value based on any kind of valuation or appraisal.  And if GM had to be liquidated, its liquidation asset value, as discussed below, would be less than 10% of that $82 billion amount.

While GM has publicly traded common stock, no one in this chapter 11 case has seriously suggested that GM's stock is "in the money," or anywhere close to that.  By any standard, there can be no doubt that GM is insolvent.  In fact, as also discussed below, if GM were to liquidate, its unsecured creditors would receive nothing on their claims.

*2.  GM's Dealer Network*

Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors.  GM relies heavily on its relationships with dealers, as substantially all of its retail sales are through its network of independent retail dealers and distributors.

The 363 Transaction contemplates the assumption by GM and the assignment to New GM of dealer franchise agreements relating to approximately 4,100 of its 6,000 dealerships, modified in ways to make GM more competitive (as modified, "**Participation Agreements**").  But GM cannot take all of the dealers on the same basis.  At the remaining dealer's option, GM will either reject those agreements, or assume modified agreements, called "**Deferred Termination Agreements.**"

The Deferred Termination Agreements will provide dealers with whom GM cannot go forward a softer landing and orderly termination. GM is providing approximately 17 months' notice of termination.

As of the time of the hearing on this motion, approximately 99% of the continuing dealers had signed Participation Agreements and 99% of the dealers so affected had signed Deferred Termination Agreements.

The agreements of both types include waivers of rights that dealers would have in connection with their franchises. In accordance with a settlement with the Attorneys General of approximately 45 states (the "**AGs**"), the Debtors and the Purchaser agreed to modifications to the Purchase Agreement and the proposed approval order under which (subject to the more precise language in the proposed order) the Court makes no finding as to the extent any such modifications are enforceable, and any disputes as to that will be resolved locally.

*3. GM's Suppliers*

As the nation's largest automobile manufacturer, GM uses the services of thousands of suppliers—resulting in approximately $50 billion in annual supplier payments. In North America alone, GM uses a network of approximately 11,500 suppliers. In addition, there are over 600 suppliers whose sales to GM represent over 30% of their annual revenues. Thus hundreds, if not thousands, of automotive parts suppliers depend, either in whole or in part, on GM for survival.

*4. GM's Financial Distress*

Historically, GM was one of the best performing OEMs in the U.S. market. But with the growth of competitors with far lower cost structures and dramatically lower benefit obligations, GM's leadership position in the U.S. began to decline. At least as a

result of that lower cost competition and market forces in the U.S. and abroad (including

jumps in the price of gasoline; a massive recession (with global dislocation not seen since

the 1930s); a dramatic decline in U.S. domestic auto sales; and a freeze-up in consumer

and commercial credit markets), GM suffered a major drop in new vehicle sales and in

market share—from 45% in 1980 to a forecast 19.5% in 2009.

The Court does not need to make further factual findings as to the many causes

for GM's difficulties, and does not do so.  Observers might differ as to the causes or

opine that there were others as well, and might differ especially with respect to which

causes were most important.  But what is clear is that, especially in 2008 and 2009, GM

suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of

liquidity, putting its future in grave jeopardy.

*5.  U.S. Government Assistance*

By the fall of 2008, GM was in the midst of a severe liquidity crisis, and its ability

to continue operations grew more and more uncertain with each passing day.  As a result,

in November 2008, GM was compelled to seek financial assistance from the U.S.

Government.

The U.S. Government understood the draconian consequences of the situation—

one that affected not just GM, but also Chrysler, and to a lesser extent, Ford (the "**Big

Three**").  And the failure of any of the Big Three (or worse, more than one of them)

might well bring grievous ruin on the thousands of suppliers to the Big Three (many of

whom have already filed their own bankruptcy cases, in this District, Delaware, Michigan

and elsewhere); other businesses in the communities where the Big Three operate; dealers

throughout the country; and the states and municipalities who looked to the Big Three,

their suppliers and their employees for tax revenues.

The U.S. Government's fear—a fear this Court shares, if GM cannot be saved as a

going concern—was of a systemic failure throughout the domestic automotive industry

and the significant harm to the overall U.S. economy that would result from the loss of

hundreds of thousands of jobs[6] and the sequential shutdown of hundreds of ancillary

businesses if GM had to cease operations.

Thus in response to the troubles plaguing the American automotive industry, the

U.S. Government, through the U.S. Treasury and its Presidential Task Force on the Auto

Industry (the "**Auto Task Force**"), implemented various programs to support and

stabilize the domestic automotive industry—including support for consumer warranties

and direct loans.  Thus at GM's request in late 2008, the U.S. Treasury determined to

make available to GM billions of dollars in emergency secured financing in order to

sustain GM's operations while GM developed a new business plan.  At the time that the

U.S. Treasury first extended credit to GM, there was absolutely no other source of

financing available.  No party other than Treasury conveyed its willingness to loan funds

to GM and thereby enable it to continue operating.

The first loan came in December 2008, after GM submitted a proposed viability

plan to Congress.  That plan contemplated GM's shift to smaller, more fuel-efficient cars,

a reduction in the number of GM brand names and dealerships, and a renegotiation of

GM's agreement with its principal labor union.  As part of its proposed plan, GM sought

emergency funding in the form of an $18 billion federal loan.

But the U.S. Government was not of a mind to extend a loan that large, and after

negotiations, the U.S. Treasury and GM entered into a term loan agreement on December

---

[6]     More than 500,000 workers are employed by companies in the U.S. that manufacture parts and
components used by automakers.

31, 2008 (the "**Treasury Prepetition Loan**"), that provided GM up to $13.4 billion in

financing on a senior secured basis.  Under that facility, GM immediately borrowed $4

billion, followed by $5.4 billion less than a month later, and the remaining $4 billion on

February 17, 2009.

At the time this loan was made, GM was in very weak financial condition, and the

loan was made under much better terms than could be obtained from any commercial

lender—if any lender could have been found at all.  But the Court has no doubt whatever,

and finds, that the Treasury Prepetition Loan was intended to be, and was, a loan and not

a contribution of equity.  As contrasted with other TARP transactions that involved the

U.S. Treasury making direct investments in troubled companies in return for common or

preferred equity, the U.S. Treasury structured the Treasury Prepetition Loan as a loan

with the only equity received by the U.S. Treasury being in the form of two warrants.

The agreement had terms and covenants of a loan rather than an equity investment.  The

U.S. Treasury sought and received first liens on many assets, and second liens on other

collateral.  The transaction also had separate collateral documents.  And the U.S.

Treasury entered into intercreditor agreements with GM's other senior secured lenders in

order to agree upon the secured lenders' respective prepetition priorities.

The Court further finds, as a fact or mixed question of fact and law, looking at the

totality of the circumstances, that there was nothing inequitable about the way the U.S.

Treasury behaved in advancing these funds.  Nor did the U.S. Treasury act inequitably to

GM's creditors, who were assisted, and not injured, by the U.S. Treasury's efforts to keep

GM alive and to forestall a liquidation of the company.

GM had provided a business plan to Congress under which GM might restore itself to profitability, but it was widely perceived to be unsatisfactory. The U.S. Treasury required GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress. As conditions to the U.S. Treasury's willingness to provide financing, GM was to:

(i) reduce its approximately $27 billion in unsecured public debt by no less than two-thirds;

(ii) reduce its total compensation to U.S. employees so that by no later than December 31, 2009, such compensation would be competitive with Nissan, Toyota, or Honda in the U.S.;

(iii) eliminate compensation or benefits to employees who had been discharged, furloughed, or idled, other than customary severance pay;

(iv) apply, by December 31, 2009, work rules for U.S. employees in a manner that would be competitive with the work rules for employees of Nissan, Toyota, or Honda in the U.S.; and

(v) make at least half of the $20 billion contribution that GM was obligated to make to a VEBA[7] Trust for UAW retirees ("**VEBA Trust**") in the form of common stock, rather than cash.

---

[7]     GM has used trusts qualified as "voluntary employee beneficiary associations" under the Internal Revenue Code (each, a "**VEBA**"), to hold reserves to meet GM's future obligations to provide healthcare and life insurance benefits ("**OPEB**") to its salaried and hourly employees upon retirement. In substance, the employer makes contributions to the VEBA, and the VEBA funds the health benefits to the retirees.

Thereafter, in March 2009, Treasury indicated that if GM was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive, viability plan under an expedited Court-supervised process to avoid further erosion of value.  In short, GM was to file a bankruptcy petition and take prompt measures to preserve its value while there was still value to save.

The Treasury Prepetition Loan agreement (whose formal name was "Loan and Security Agreement," or "**LSA**") provided that, if, by March 31, 2009, the President's designee hadn't issued a certification that GM had taken all steps necessary to achieve long-term viability, then the loans due to Treasury would become due and payable 30 days thereafter.  And on March 30, the President announced that the viability plan proposed by GM was not satisfactory, and didn't justify a substantial new investment of taxpayer dollars.

But rather than leaving GM to simply go into liquidation, the President stated that the U.S. Government would provide assistance to avoid such a result, *if* GM took the necessary additional steps to justify that assistance—including reaching agreements with the UAW, GM's bondholders, and the VEBA Trust.  The conditions to federal assistance required substantial debt reduction and the submission of a revised business plan that was more aggressive in both scope and timing.

As an alternative to liquidation, the President indicated that the U.S. Treasury would extend to GM adequate working capital for a period of another 60 days to enable it to continue operations.  And as GM's largest secured creditor, the U.S. Treasury would negotiate with GM to develop and implement a more aggressive and comprehensive viability plan.  The President also stated that GM needed a "fresh start to implement the

restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to

help [it] restructure quickly and emerge stronger."  The President explained:

> What I'm talking about is using our existing legal
> structure as a tool that, with the backing of the U.S.
> Government, can make it easier for General Motors
> . . . to *quickly* clear away old debts that are
> weighing [it] down so that [it] can get back on [its]
> feet and onto a path to success; a tool that we can
> use, even as workers stay on the job building cars
> that are being sold.
>
> What I'm not talking about is a process where a
> company is simply broken up, sold off, and no
> longer exists.  We're not talking about that.  And
> what I'm *not talking about is a company that's
> stuck in court for years, unable to get out.*[8]

The U.S. Treasury and GM subsequently entered into amended credit agreements

for the Treasury Prepetition Loan to provide for an additional $2 billion in financing that

GM borrowed on April 24, 2009, and another $4 billion that GM borrowed on May 20,

2009.  The funds advanced to GM under the Treasury Prepetition Loan—ultimately $19.4

billion in total (all on a senior secured basis)—permitted GM to survive through the date

of the filing of its bankruptcy case.

On June 1, 2009 (the "**Filing Date**"), GM filed its chapter 11 petition in this

Court.

*6.  GM's First Quarter Results*

On May 8, 2009, about three weeks before the Filing Date, GM announced its

first quarter 2009 results.  They presented a grim financial picture, and equally grim

trends.  Specifically:

---

[8]    Emphasis added.

(a)  GM's total net revenue decreased by $20 billion (or 47.1%) in

the first three months of 2009, as compared to the corresponding period in

2008;

(b)  Operating losses increased by $5.1 billion from the prior

quarter;

(c)  During this same period, GM had negative cash flow of

$9.4 billion;

(d)  Available liquidity deteriorated by $2.6 billion; and

(e)  Sales by GM dealers in the U.S. fell to approximately 413,000

vehicles in that first quarter—a decline of approximately 49% as

compared to the corresponding period in 2008.

*7.  The 363 Transaction*

As noted above, in connection with providing financing, Treasury advised GM

that, if an out-of-court restructuring was not possible,[9] GM should consider the

bankruptcy process.  That would enable GM to implement a transaction under which

substantially all GM's assets would be purchased by a Treasury-sponsored purchaser

(subject to any higher or better offer), in an expedited process under section 363 of the

Code.

Under this game plan, the Purchaser would acquire the purchased assets; create a

New GM; and operate New GM free of any entanglement with the bankruptcy cases.  If

the sale could be accomplished quickly enough, before GM's value dissipated as a result

of continuing losses and consumer uncertainty, the 363 sale would thereby preserve the

---

[9]      GM tried to accomplish an out-of-court restructuring, as suggested, but was unsuccessful.

going concern value; avoid systemic failure; provide continuing employment; protect the

many communities dependent upon the continuation of GM's business, and restore

consumer confidence.

To facilitate the process, the U.S. Treasury and the governments of Canada and

Ontario (through their Export Development Canada ("**EDC**"))[10] agreed to provide DIP

financing for GM through the chapter 11 process.  But they would provide the DIP

financing *only* if the sale of the purchased assets occurred on an *expedited* basis.  That

condition was imposed to:

> (i) preserve the value of the business;

> (ii) restore (or at least minimize further loss of) consumer
> confidence;

> (iii) mitigate the increasing damage that GM itself, and the
> industry, would suffer if GM's major business operations were to remain
> in bankruptcy; and

> (iv) avoid the enormous costs of financing a lengthy chapter 11
> case.

Treasury also agreed to provide New GM with adequate post-acquisition financing.

Importantly, the DIP financing to be furnished by the U.S. Treasury and EDC is

the only financing that is available to GM.  The U.S. Treasury (with its Canadian EDC

co-lender) is the only entity that is willing to extend DIP financing to GM.  Other efforts

to obtain such financing have been unsuccessful.  Absent adequate DIP financing, GM

will have no choice but to liquidate.  But the U.S. Government has stated it will not

---

[10]    The Canadian EDC participation was sizeable—approximately $3 billion with approximately an
additional $6 billion to be provided later.

provide DIP financing without the 363 Transaction, and the DIP financing will come to an end if the 363 Transaction is not approved by July 10. Without such financing, these cases will plunge into a liquidation.

Alternatives to a sale have turned out to be unsuccessful, and offer no hope of success now. In accordance with standard section 363 practice, the 363 Transaction was subject to higher and better offers, but none were forthcoming. The Court finds this hardly surprising. Only the U.S. and Canadian Governmental authorities were prepared to invest in GM—and then not so much by reason of the economic merit of the purchase, but rather to address the underlying societal interests in preserving jobs and the North American auto industry, the thousands of suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates.

In light of GM's substantial secured indebtedness, approximately $50 billion, the only entity that has the financial wherewithal and is qualified to purchase the assets—and the only entity that has stepped forward to make such a purchase—is the U.S. Treasury-sponsored Purchaser. But the Purchaser is willing to proceed only under an expedited sale process under the Bankruptcy Code.

*8. The Liquidation Alternative*

In connection with its consideration of alternatives, GM secured an analysis (the "**Liquidation Analysis**"), prepared by AlixPartners LLP, of what GM's assets would be worth in a liquidation. The Liquidation Analysis concluded that the realizable value of the assets of GM (net of the costs of liquidation) would range between approximately $6 billion and $10 billion. No evidence has been submitted to the contrary. This was in the context of an assumed $116.5 billion in general unsecured claims, though this could increase with lease and contract rejection claims and pension termination claims.

While the Liquidation Analysis projected some recoveries for secured debt and administrative and priority claims, it concluded that there would be *no recovery whatsoever* for unsecured creditors.  The Court has no basis to doubt those conclusions. The Court finds that in the event of a liquidation, unsecured creditors would recover nothing.

*9. Fairness of the Transaction*

Before the 363 Transaction was presented for Court approval, GM's Board of Directors (the "**Board**") (all but one of whose members were independent, and advised by the law firm of Cravath, Swaine & Moore), received a fairness opinion, dated May 31, 2009 (the "**Fairness Opinion**"), from Evercore Group L.L.C. ("**Evercore**").

The Fairness Opinion's conclusion was that the purchase price was fair to GM, from a financial point of view.  No contrary evidence has been submitted to the Court.

*10. Specifics of the Transaction*

The sale transaction, as embodied in the MPA and related documents, is complex. Its "deal points" can be summarized as follows:

*(a) Acquired and Excluded Assets*

Under the Sale, New GM will acquire all of Old GM's assets, with the exception of certain assets expressly excluded under the MPA (respectively, the "**Purchased Assets**" and the "**Excluded Assets**").  The Excluded Assets chiefly consist of:

(i) $1.175 billion in cash or cash equivalents;

(ii) equity interests in certain Saturn and other entities;

(iii) certain real and personal property;

(iv) bankruptcy avoidance actions;

(v) certain employee benefit plans; and

16

(vi) certain restricted cash and receivables.

*(b) Assumed and Excluded Liabilities*

Old GM will retain all liabilities except those defined in the MPA as "**Assumed
Liabilities**." The Assumed Liabilities include:

(i) product liability claims arising out of products delivered at or
after the Sale transaction closes (the "**Closing**");

(ii) the warranty and recall obligations of both Old GM and New
GM;

(iii) all employment-related obligations and liabilities under any
assumed employee benefit plan relating to employees that are or were
covered by the UAW collective bargaining agreement;

and—by reason of an important change that was made in the MPA after the filing of the
motion—

(iv) broadening the first category substantially, *all* product liability
claims arising from accidents or other discrete incidents arising from
operation of GM vehicles occurring subsequent to the closing of the 363
Transaction, *regardless of when the product was purchased.*

The liabilities being retained by Old GM include:

(i) product liability claims arising out of products delivered prior to
the Closing (to the extent they weren't assumed by reason of the change in
the MPA after the filing of objections);

(ii) liabilities for claims arising out of exposure to asbestos;

(iii) liabilities to third parties for claims based upon "[c]ontract,
tort or any other basis";

17

(iv) liabilities related to any implied warranty or other implied

obligation arising under statutory or common law; and

(v) employment-related obligations not otherwise assumed,

including, among other obligations, those arising out of the employment,

potential employment, or termination of any individual (other than an

employee covered by the UAW collective bargaining agreement) prior to

or at the Closing.

*(c) Consideration*

Old GM is to receive consideration estimated to be worth approximately

$45 billion, plus the value of equity interests that it will receive in New GM. It will come

in the following forms:

(i) a credit bid by the U.S. Treasury and EDC, who will credit bid

the majority of the indebtedness outstanding under their DIP facility and

the Treasury Prepetition Loan;

(ii) the assumption by New GM of  approximately $6.7 billion of

indebtedness under the DIP facilities, plus an additional $1.175 billion to

be advanced by the U.S. Treasury under a new DIP facility (the "**Wind**

**Down Facility**") whose proceeds will be used by Old GM to wind down

its affairs;

(iii) the surrender of the warrant that had been issued by Old GM

to Treasury in connection with the Treasury Prepetition Loan;

(iv) 10% of the post-closing outstanding shares of New GM, plus

an additional 2% if the estimated amount of allowed prepetition general

unsecured claims against Old GM exceeds $35 billion;

18

(v) two warrants, each to purchase 7.5% of the post-closing

outstanding shares of New GM, with an exercise price based on a $15

billion equity valuation and a $30 billion equity valuation, respectively;

and

(vi) the assumption of liabilities, including those noted above.

*(d) Ownership of New GM*

Under the terms of the Sale, New GM will be owned by four entities.

(i) Treasury will own 60.8% of New GM's common stock on an

undiluted basis.  It also will own $2.1 billion of New GM Series A

Preferred Stock;

(ii) EDC will own 11.7% of New GM's common stock on an

undiluted basis.  It also will own $400 million of New GM Series A

Preferred Stock;

(iii) A New Employees' Beneficiary Association Trust ("**New

VEBA**") will own 17.5% of New GM's common stock on an undiluted

basis.  It also will own $6.5 billion of New GM's Series A Preferred

Stock, and a 6-year warrant to acquire 2.5% of New GM's common stock,

with an exercise price based on $75 billion total equity value; and

(iv) Finally, if a chapter 11 plan is implemented as contemplated

under the structure of the Sale transaction, Old GM will own 10% of New

GM's common stock on an undiluted basis.  In addition, if the allowed

prepetition general unsecured claims against Old GM exceed $35 billion,

Old GM will be issued an additional 10 million shares, amounting to

approximately 2% of New GM's common stock.  Old GM will also own

the two warrants mentioned above.

### (e) Other Aspects of Transaction

New GM will make an offer of employment to all of the Sellers' non-unionized

employees and unionized employees represented by the UAW.  Substantially all of old

GM's executory contracts with direct suppliers are likely to be assumed and assigned to

New GM.

After the Closing, New GM will assume all liabilities arising under express

written emission and limited warranties delivered in connection with the sale of new

vehicles or parts manufactured or sold by Old GM.

One of the requirements of the U.S. Treasury, imposed when the Treasury

Prepetition Loan was put in place, was the need to negotiate a new collective bargaining

agreement which would allow GM to be fully competitive, and "equitize"—*i.e.*, convert

to equity—at least one half of the obligation GM had to the UAW VEBA.  Ultimately

GM did so.  New GM will make future contributions to the New VEBA that will provide

retiree health and welfare benefits to former UAW employees and their spouses.  Also, as

part of the 363 Transaction, New GM will be the assignee of revised collective

bargaining agreements with the UAW, the terms of which were recently ratified—though

contingent upon the approval of the entirety of these motions.

### (f) The Proposed Sale Order

Though GM's request has been narrowed, as noted above, to provide that New

GM will assume liability for product liability claims arising from operation of GM

vehicles occurring after the closing of the 363 Transaction (regardless of when the

product was purchased), GM asks this Court, as in the *Chrysler* case, to authorize the

Sale free and clear of all other "liens, claims, encumbrances and other interests," including, specifically, "all successor liability claims."

To effectuate this result, GM has submitted a proposed order to the Court (the "**Proposed Sale Order**") that contains provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.

First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets.[11]

*11.  Contingent Liabilities*

Certain types of GM liabilities are contingent and difficult to quantify.  GM's most recent quarterly report noted present valued contingent liabilities of $934 million for product liability, $627 million for asbestos liability, $307 million for other litigation liability, and $294 million for environmental liability.

*12.  Agreement with UAW*

Workers in the U.S. do not have government provided healthcare benefits of the type that the employees of many of GM's foreign competitors do.  Over the years, GM and the other members of the Big Three committed themselves to offer many of those

---

[11]    Proposed Sale Order ¶ 8.

healthcare benefits, resulting in decreased competitiveness and enormous liabilities.  GM

tried to reduce the costs of healthcare benefits for its employees, but these costs

continued to substantially escalate.  Many of these costs were in the form of obligations

to pay healthcare costs of union employees on retirement.

In 2007 and 2008, GM settled various controversies with respect to its healthcare

obligations by entering into an agreement (the "**2008 UAW Settlement Agreement**"),

generally providing that responsibility for providing retiree healthcare would

permanently shift from GM to a new plan that was independent of GM.  GM would no

longer have to pay for the benefits themselves, but instead would have to make specified

contributions aggregating approximately $20.56 billion to be made by GM into the

VEBA Trust.  The 2008 UAW Settlement Agreement, therefore, fixed and capped GM's

obligations—but in a very large amount.

As part of the 363 Transaction, the Purchaser and the UAW have reached a

resolution addressing the ongoing provision of those benefits.  New GM will make

contributions to the New VEBA, which will have the obligation to fund the UAW retiree

health and welfare benefits.  And under the "**UAW Retiree Settlement Agreement**,"

New GM will put value into the New VEBA, which will then have the obligation to fund

retiree medical benefits for the Debtors' retirees and surviving spouses represented by the

UAW (the "**UAW-Represented Retirees**").

New GM will also assume modified and duly ratified collective bargaining

agreements entered into by and between the Debtors and the UAW.

*13.  Need for Speed*

GM and the U.S. Treasury say that the 363 Transaction must be approved and

completed quickly.  The Court finds that they are right.

Absent prompt confirmation that the sale has been approved and that the transfer of the assets will be implemented, GM will have to liquidate.  There are no realistic alternatives available.

There are no merger partners, acquirers, or investors willing and able to acquire GM's business.  Other than the U.S. Treasury and EDC, there are no lenders willing and able to finance GM's continued operations.  Similarly, there are no lenders willing and able to finance GM in a prolonged chapter 11 case.

The continued availability of the financing provided by Treasury is expressly conditioned upon approval of this motion by July 10, and prompt closing of the 363 Transaction by August 15.  Without such financing, GM faces immediate liquidation.

The Court accepts as accurate and truthful the testimony by GM CEO Fritz Henderson at the hearing:

> Q.  Now, if the U.S. Treasury does not fund on July 10th and the sale order is not entered by that date, what options are there for GM at that point?
>
> A.  Well, if they don't continue, we would liquidate.[12]

The July 10 deadline is important because the U.S. Treasury, like GM itself, has been very concerned about the business status of the company in a bankruptcy process.[13]  GM did worse than expected in fleet sales in June, as fleet sales customers pulled back their orders because they didn't know their status in the bankruptcy.  Although the company did *better* on retail sales than expected in June, it did so for a number of reasons, one of

---

[12]    Audio Recording of Testimony of June 30, 2009.

[13]    *Id.* at 85.

which was the expectation that the chapter 11 case would move quickly, and that the company, in the 363 process, would be successful.[14]  And results were "still terrible."[15]

Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future was uncertain and that was entangled in the bankruptcy process.

Thus the Court agrees that a lengthy chapter 11 case for the Debtors is not an option.  It also agrees with the Debtors and the U.S. Government that it is not reasonable to expect that a reorganization plan could be confirmed in the next 60 days (*i.e.*, 90 days from the Filing Date).

The Auto Task Force talked to dozens of experts, industry consultants, people who had observed General Motors for decades, management, and people who were well versed in the bankruptcy process as part of its planning and work on this matter.  None of them felt that GM could survive a traditional chapter 11 process.  The Auto Task Force learned of views by one of the leading commentators on GM that GM would be making a tragic mistake by pursuing a bankruptcy filing.  It became clear to the Auto Task Force that a bankruptcy with a traditional plan confirmation process would be so injurious to GM as to not allow for GM's viability going forward.[16]

The Court accepts this testimony, and so finds.  A 90 day plan confirmation process would be wholly unrealistic.  In fact, the notion that a reorganization with a plan confirmation could be completed in 90 days in a case of this size and complexity is ludicrous, especially when one is already on notice of areas of likely controversy.

---

[14]     *Id.* at 85-86.

[15]     *Id.* at 103.

[16]     Audio Recording of Testimony of July 1, 2009.

*14. Ultimate Facts*

The Court thus makes the following findings of ultimate facts:

1. There is a good business reason for proceeding with the 363 Transaction now, as contrasted to awaiting the formulation and confirmation of a chapter 11 plan.

2. There is an articulated business justification for proceeding with the 363 Transaction now.

3. The 363 Transaction is an appropriate exercise of business judgment.

4. The 363 Transaction is the only available means to preserve the continuation of GM's business.

5. The 363 Transaction is the only available means to maximize the value of GM's business.

6. There is no viable alternative to the 363 Transaction.

7. The only alternative to the 363 Transaction is liquidation.

8. No unsecured creditor will here get less than it would receive in a liquidation.

9. The UAW Settlement is fair and equitable, and is in the best interests of both the estate and UAW members.

10. The secured debt owing to the U.S. Government and EDC (both postpetition and, to the extent applicable, prepetition) is not subject to recharacterization as equity or equitable subordination, and could be used for a credit bid.

11. The Purchaser is a purchaser in good faith.

<u>Discussion</u>

The substantive objections break down into a number of categories by concept, and the Court thus considers them in that fashion.

*1.  Sale Under Section 363*

Determining the propriety of the 363 Transaction requires confirming that section 363 can be utilized for the sale of this much of GM's assets before confirmation of a reorganization plan; that the necessary showings for approval of any section 363 sale have been made; that the 363 Transaction is not a "*sub rosa*" plan; and that various related issues have been satisfactorily resolved.  The Court considers these in turn.

*(a)  Utilization of Section 363*

The F&D Bondholders, bondholder Oliver Addison Parker ("**Parker**") and several other objectors contend that by disposing of so much of its assets in a single section 363 sale, GM improperly utilizes section 363.  Implicit in that argument is the contention that even under the facts here, section 363 cannot be used to dispose of all or the bulk of a debtor's assets, and that such can be achieved only by means of a reorganization plan.  The Court disagrees.

As usual, the Court starts with textual analysis.  With exceptions not relevant here, section 363 of the Bankruptcy Code provides, in relevant part:

> (b)(1) The trustee,[17] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate….

---

[17]    In all respects relevant here, where (as here, and as is the norm) the debtor remains in possession and the court has not ordered otherwise, the debtor has the rights of the trustee.  *See* Bankruptcy Code section 1107(a) ("Subject to . . . such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation . . . of a trustee serving in a case under this chapter.").

Notably, section 363 has no carveouts from its grant of authority when applied in cases under chapter 11. Section 363 does not provide, in words or substance, that it may not be used in chapter 11 cases for dispositions of property exceeding any particular size, or where the property is of such importance that it should alternatively be disposed of under a plan. Nor does any other provision of the Code so provide.

Then, section 1123 of the Code—captioned "Contents of plan," a provision in chapter 11 which sets forth provisions that a chapter 11 reorganization plan *must* do or contain, and *may* do or contain—provides, as one of the things that a plan *may* do:

> provide for the sale of all or substantially all of the
> property of the estate, and the distribution of the
> proceeds of such sale among holders of claims or
> interests….[18]

But neither section 363 nor section 1123(b)(4) provides that resort to 1123(b)(4) is the *only* way by which all or substantially all of the assets can be sold in a chapter 11 case. Most significantly, neither section 1123(b)(4) nor any other section of the Code trumps or limits section 363, which by its plain meaning permits what GM here proposes to do.

However, the issue cannot be addressed by resort to "plain meaning" or textual analysis alone. GM's ability to sell the assets in question under section 363 is governed by an extensive body of caselaw. Bankruptcy courts in this Circuit decide issues of the type now before the Court under binding decisions of the U.S. Supreme Court and the Second Circuit Court of Appeals, each of which (particularly the latter) has spoken to the issues here. And bankruptcy courts also look to other bankruptcy court decisions, which, in this District and elsewhere, have dealt with very similar facts. While an opinion of one

---

[18]    Section 1123(b)(4).

bankruptcy judge in this District is not, strictly speaking, binding on another, it is the

practice of this Court to grant great respect to the earlier bankruptcy court precedents in

this District,[19] particularly since they frequently address issues that have not been

addressed at the Circuit level.

Here this Court has the benefit of the decisions of Bankruptcy Judge Gonzalez in

the *Chrysler* chapter 11 cases[20]—affirmed by the Second Circuit, for substantially the

reasons Judge Gonzalez set forth in his opinion—on facts extraordinarily similar to those

here.[21] Even more importantly, this Court also has the benefit of the Second Circuit's

decisions in *Lionel*,[22] *LTV*,[23] *Financial News Network*,[24] *Gucci*,[25] and *Iridium*,[26] which

---

[19]  *See*, *e.g.*, *In re Adelphia Communications Corp.*, 359 B.R. 65, 72 n.13 (Bankr. S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

[20]  *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) ("***Chrysler***"), and 405 B.R. 79 (Bankr. S.D.N.Y. 2009) ("***Chrysler-Standing***") (Gonzalez, J.), *aff'd for substantially the reasons stated in the opinions below*, No. 09-2311-bk (2d Cir. Jun. 5, 2009) ("***Chrysler-Circuit***"), *temporary stay vacated and further stay denied*, 129 S.Ct. 2275 (Jun. 9, 2009).

[21]  Though the similarities between this case and *Chrysler* are many, there is a noteworthy difference, as that case had one issue not before the Court here.  In *Chrysler*, Judge Gonzalez had to analyze rights of participants in a secured lending facility who quarreled with their administrative agent's decision to consent to a sale free and clear of secured creditor claims and interests.  *See Chrysler*, 405 B.R. at 100-104.  Here there was no objection by secured creditors, other than a single limited objection by a secured creditor with a lien on property to be transferred, looking for adequate protection as part of the sale.  Here the objecting bondholders are holders of *unsecured* debt, and thus lack the greater rights that secured creditors have in bankruptcy cases.  Of course, the *Chrysler* case never really concerned, as some asserted, an assault on secured creditors' rights; it merely involved dissident minority participants in a secured lending facility being bound by the actions of their agent, pursuant to contractual agreements with the agent that they or their predecessors had agreed to.

[22]  *Comm. of Equity Sec. Holders v. Lionel Corp.(In re Lionel Corp.)*, 722 F.2d 1063, (2d Cir. 1983) ("***Lionel***").

[23]  *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 973 F.2d 141 (2d Cir. 1992) ("***LTV***").

[24]  *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165 (2d Cir. 1992) ("***FNN***").

[25]  *Licensing By Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380 (2d Cir. 1997) ("***Gucci***").

confirm that section 363 sales of major assets may be effected before confirmation, and

lay out the circumstances under which that is appropriate.  And this Court also can draw

upon the Supreme Court's decision in *Piccadilly Cafeterias*,[27] which, while principally

addressing other issues, recognized the common practice in chapter 11 cases of selling

the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a

liquidating plan.

   In *Chrysler*, Judge Gonzalez discussed at great length the evolution of the law in

this area and its present requirements,[28] and this Court need not do so in comparable

length.  Judge Gonzalez, and the Second Circuit affirming him, dealt with the exact issue

presented here: whether under Bankruptcy Code section 363, the bulk of the assets of an

estate can be sold before confirmation.   As Judge Gonzalez noted, *Lionel*—upon whose

standards all of the cases considering pre-confirmation section 363 sales have been

based—speaks directly to whether assets of a bankruptcy estate can be sold "out of the

ordinary course of business and prior to acceptance and outside of any plan of

reorganization."[29]

   The *Lionel* court expressly recognized that section 363(b) "seems on its face to

confer upon the bankruptcy judge virtually unfettered discretion" to authorize sales out of

the ordinary course.[30]  And the *Lionel* court further declared that "a bankruptcy judge

---

[26]     *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir.
        2007) ("***Iridium***").

[27]     *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* --- U.S. ----, ---- n.2, 128 S.Ct. 2326, 2331
        n.2, 171 L.Ed.2d 203 (2008) ("***Piccadilly Cafeterias***").

[28]     *See Chrysler*, 405 B.R. at 94-96.

[29]     *Id.* at 94.

[30]     722 F.2d at 1069.

must not be shackled with unnecessarily rigid rules when exercising the undoubtedly

broad administrative power granted him under the Code,"[31] and that:

> To further the purposes of Chapter 11
> reorganization, a bankruptcy judge must have
> substantial freedom to tailor his orders to meet
> differing circumstances.  This is exactly the result a
> liberal reading of § 363(b) will achieve.[32]

Nevertheless, the Circuit considered it inappropriate to authorize use of section

363(b) to the full extent that section 363(b)'s plain language—with its absence of any

express limitations—would suggest.  Instead, the Circuit established a standard that was

in substance one of common law, but grounded in the overall structure of the Bankruptcy

Code.  The Second Circuit "reject[ed] the requirement that only an emergency permits

the use of § 363(b)."[33]  But it also "reject[ed] the view that § 363 grants the bankruptcy

judge carte blanche."[34]  Concerned that such a construction would "swallow[] up Chapter

11's safeguards,"[35] the *Lionel* court established the more nuanced balancing test that the

lower courts in this Circuit have applied for more than 25 years.  The Circuit declared:

> The history surrounding the enactment in 1978 of
> current Chapter 11 and the logic underlying it
> buttress our conclusion that *there must be some
> articulated business justification,* other than
> appeasement of major creditors, for using, selling or
> leasing property out of the ordinary course of
> business before the bankruptcy judge may order
> such disposition under section 363(b).[36]

It went on to say that:

---

[31]    *Id.*

[32]    *Id.*

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

[36]    *Id.* at 1070 (emphasis added).

> Resolving the apparent conflict between Chapter 11
> and § 363(b) does not require an all or nothing
> approach.  Every sale under § 363(b) does not
> automatically short-circuit or side-step Chapter 11;
> nor are these two statutory provisions to be read as
> mutually exclusive.  Instead, if a bankruptcy judge
> is to administer a business reorganization
> successfully under the Code, then … some play for
> the operation of both § 363(b) and Chapter 11 must
> be allowed for.[37]

And it went on to set forth the rule for which *Lionel* is remembered:

> The rule we adopt requires that a judge determining
> a § 363(b) application expressly find from the
> evidence presented before him at the hearing *a good
> business reason* to grant such an application.[38]

With no less than five decisions from the Circuit holding similarly[39]—not

counting the Circuit's recent affirmance of *Chrysler*—it is plain that in the Second

Circuit, as elsewhere,[40] even the entirety of a debtor's business may be sold without

---

[37]  *Id.* at 1071.

[38]  *Id.* (emphasis added).

[39]  *See Lionel*; *LTV,* 973 F.2d at 143-44 ("In *Lionel,* we adopted a rule that 'requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application,'" and, quoting *Lionel,* reiterating that "First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," and that "a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances."); *FNN,* 980 F.2d at 169 (in considering sale outside of a plan of reorganization, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code"); *Gucci,* 126 F.3d at 387 ("A sale of a substantial part of a Chapter 11 estate . . . may be conducted if a good business reason exists to support it."); *Iridium,* 478 F.3d at 466 ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.").

[40]  *See, e.g., In re Decora Indus.,* No. 00-4459, 2002 WL 32332749, at *3 (D.Del. May 20, 2002) (Farnan, J.) (approving a 363 sale, finding a "sound business purpose" where "the Court understands the precarious financial and business position of Debtors"; their only source of outside financing was a DIP facility that would soon expire, with no source of alternative financing, and where the alternatives were either the proposed sale transaction or termination of business operations and liquidation).

*See also* 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2009) ("**Collier**") (While sales of

waiting for confirmation when there is a good business reason for doing so.  Likewise, in

*Piccadilly Cafeterias,* the Supreme Court, while principally addressing a different issue,[41]

recognized the use of section 363 sales under which all or substantially all of a debtor's

assets are sold.  The Supreme Court stated:

> Chapter 11 bankruptcy proceedings ordinarily
> culminate in the confirmation of a reorganization
> plan.  *But in some cases, as here, a debtor sells all
> or substantially all its assets under § 363(b)(1)
> before seeking or receiving plan confirmation.*  In
> this scenario, the debtor typically submits for
> confirmation a plan of liquidation (rather than a
> traditional plan of reorganization) providing for the
> distribution of the proceeds resulting from the
> sale.[42]

In making the determination as to whether there is a good business reason to

effect a 363 sale before confirmation, the *Lionel* court directed that a court should

consider all of the "salient factors pertaining to the proceeding" and "act to further the

diverse interests of the debtor, creditors and equity holders."[43]  It then set forth a

nonexclusive list to guide a court in its consideration of the issue:

> (a) the proportionate value of the asset to the estate as a whole;
>
> (b) the amount of elapsed time since the filing;

---

substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court,
"[i]t is now generally accepted that section 363 allows such sales in chapter 11, as long as the sale
proponent demonstrates a good, sound business justification for conducting the sale before
confirmation (other than appeasement of the loudest creditor), that there has been adequate and
reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase
price is fair and reasonable.").

[41]   There the issue involved the debtor's entitlement to the "stamp-tax" exemption of Bankruptcy
Code section 1146, after a 363 sale of the entirety of the debtor's assets and confirmation of a plan
distributing the proceeds of the earlier 363 sale.

[42]   128 S.Ct. at 2331 n.2 (emphasis added).

[43]   722 F.2d at 1071.

(c) the likelihood that a plan of reorganization will be proposed
and confirmed in the near future;

(d) the effect of the proposed disposition on future plans of
reorganization;

(e) the proceeds to be obtained from the disposition vis-a-vis any
appraisals of the property;

(f) which of the alternatives of use, sale or lease the proposal
envisions; and "most importantly perhaps,"[44]

(g) whether the asset is increasing or decreasing in value.[45]

Importantly, the *Lionel* court also declared that a bankruptcy court must consider if those
opposing the sale produced some evidence that the sale was not justified.[46]

As the *Lionel* court expressly stated that the list of salient factors was not
exclusive,[47] this Court might suggest a few more factors that might be considered, along
with the preceding factors, in appropriate cases:

(h) Does the estate have the liquidity to survive until confirmation
of a plan?

(i) Will the sale opportunity still exist as of the time of plan
confirmation?

---

[44]    *Id.*

[45]    *Id.* at 1071.

[46]    *Id.*

[47]    *Id.* ("This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy
judge."); *accord Iridium*, 478 F.3d at 466 n.21.

(j) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? And

(k) Is there a material risk that by deferring the sale, the patient will die on the operating table?

Each of the factors that the *Lionel* court listed, and the additional ones that this Court suggests, go to the ultimate questions that the *Lionel* court identified:  Is there an "articulated business justification" and a "good business reason" for proceeding with the sale without awaiting the final confirmation of a plan.

As discussed in Section 1(c) below, a debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.[48]  If, however, the transaction has "a proper business justification" which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized.[49]  Thus as observed in *Chrysler*:

> A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale.  This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing.[50]

As further observed in *Chrysler*, several sales seeking to preserve going concern value have recently been approved in this district, and going back further, many more

---

[48]    *See Chrysler*, 405 B.R. at 95-96.

[49]    *Id.* at 96.

[50]    *Id.* (citations omitted).

have been, as debtors not infrequently could not survive until a plan could be confirmed.
In addition to *BearingPoint*, which Judge Gonzalez expressly noted, many other 363
sales have been approved in chapter 11 cases on this Court's watch, after appropriate
consideration of *Lionel* and its progeny.  In *Our Lady of Mercy Hospital*,[51] for example,
the hospital was sold as a going concern before it ran out of money, saving about 2,300
jobs and a critical supplier of medical services in the Bronx.

In *Adelphia*,[52] a sale under a *plan* was originally proposed by the debtors, but a
section 363 sale had to be effected instead, when intercreditor disputes made it
impossible to confirm a plan in time to save the sale opportunity, and more than
$17 billion in sales proceeds nearly was lost.[53]  Anyone with a knowledge of chapter 11
cases in this District can well understand why none of Harry Wilson's advisors thought
that GM could survive a normal plan confirmation process.

After *Lionel*, *LTV, FNN, Gucci, Iridium* and, of course, *Chrysler*, it is now well
established that a chapter 11 debtor may sell all or substantially all its assets pursuant to
section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good
business reason for doing so.  And here the Court has made exactly such a finding.  In
fact, it is hard to imagine circumstances that could more strongly justify an immediate
363 sale.  As the Court's Findings of Fact set forth at length, GM, with no liquidity of its
own and the need to quickly address consumer and fleet owner doubt, does not have the
luxury of selling its business under a plan.

---

[51]     No. 07-10609 (REG), ECF #284.

[52]     No. 02-41729 (REG).

[53]     *See In re Adelphia Commc'ns Corp*., 368 B.R. 140, 169 (Bankr. S.D.N.Y. 2007) ("**Adelphia-
Confirmation**") (describing the history).

And if that is not by itself enough, the U.S. Treasury's willingness to fund GM is

contingent upon the approval of the 363 Transaction by July 10.  The Court fully

understands the unwillingness of the Government to keep funding GM indefinitely—

especially to await the resolution of disputes amongst creditors trying to maximize their

recoveries.  If the 363 Transaction is disapproved, GM will lose its funding and its

liquidity on July 10, and its only alternative will be liquidation.[54]

In its summation, the F&D Bondholders Committee stated that it was not inclined

to second guess *GM's* view that it had to proceed with a 363 sale, given GM's lack of

alternatives, but that the *Court* should step in to tell everyone that a 363 sale was

unacceptable.  The premise underlying this contention was that the U.S. Government's

July 10 deadline was just posturing, and that the Court should assume that the U.S.

Government cares so much about GM's survival that the U.S. Government would never

let GM die.

---

[54]    Thus the Court needn't spend extensive time in individualized discussion of each of the more
specific factors articulated in *Lionel*, and by this Court, as aids in determining "good business
reason."  Where the proportionate value of the assets being sold is high, as they are here, Factor
(a) (proportionate value of the assets to the estate as a whole) suggests that the situation be given
close factual scrutiny—which the Court has attempted to do, in its rather lengthy Findings of Fact
above—but at most Factor (a) tips only mildly against approval here.  The same is true with
respect to Factor (b) (elapsed time since the filing)—since where the need is most pressing, it
would be foolhardy to wait.  Factors (d) (effect on reorganization), (e) (proceeds to be realized),
and (f) (which alternative is proposed) are inapplicable or favor immediate sale, as the Court finds
that a standalone plan of reorganization is not possible, that the sale would not change distribution
priorities in any ultimate plan, and there are no opportunities to realize greater value.  And all of
the other factors weigh *heavily* in favor of approval.  Factor (g) (whether the asset is increasing or
decreasing in value), expressly stated by the Circuit to be most important, *compels* and not just
favors immediate sale.  So do Factors (h) (lack of liquidity); (i) (no alternative sale opportunity
later); (j) (same, along with no stand-alone plan alternative); and (k) the certainty or near certainty
that in the absence of this sale, the patient will indeed die on the operating table.  (If it matters, the
same conclusion follows even if one does not consider the additional factors this Court suggested.)

The Court also notes the critically important absence of proof tending to support a contrary
finding, as also required by *Lionel*.  *See Lionel*, 722 F.2d at 1071.  Opponents of the sale have
produced no evidence that the sale is *not* justified.

The Court declines to accept that premise and take that gamble. The problem is not that the U.S. Treasury would walk away from GM if this Court took an extra day or so to reach its decision. The problem is that if the 363 Transaction got off track, especially by the disapproval the F&D Bondholders Committee seeks, the U.S. Government would see that there was no means of early exit for GM; that customer confidence would plummet; and that the U.S. Treasury would have to keep funding GM while bondholders (and, then, perhaps others) jousted to maximize their individual incremental recoveries. The Court fully takes Harry Wilson at his word.

In another matter in the *Adelphia* cases, this Court was faced with quite similar circumstances. The Government had the ability to effect a forfeiture of Adelphia assets, and even to indict Adelphia (as a corporation, in addition to the Rigases), which would destroy most, if not all, of Adelphia's value. The Government had indicted Arthur Andersen, with those exact consequences, but many Adelphia creditors argued that the Government would never do it again. And they objected to an Adelphia settlement that paid $715 million to the Government, to forestall all of those potential consequences, among others. This Court approved the settlement, and its determination was affirmed on appeal. This Court stated:

> Would the DoJ have indicted Adelphia, with the threat to the recoveries for innocent stakeholders that such an indictment would have entailed? One would think not, but the DoJ had done exactly that to Arthur Andersen, with those exact consequences. It was at least prudent for Adelphia's Board to protect the entity under its stewardship from its destruction, and to avoid taking such a gamble.[55]

---

[55]    *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 166 (Bankr. S.D.N.Y. 2005) ("***Adelphia Settlement-Bankruptcy***"), *aff'd* 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, J.) ("***Adelphia***

This Court further stated that "[o]nce more, the Adelphia Board cannot be faulted for declining to bet the company on what would be little more than a guess as to the decision the DoJ would make."[56]

GM's counsel noted in summation that the F&D Bondholders Committee was expecting this Court to play Russian Roulette, and the comparison was apt. So that the F&D Bondholders Committee could throw GM into a plan negotiation process, the Court would have to gamble on the notion that the U.S. Government didn't mean it when it said that it would not keep funding GM. There is no reason why any fiduciary, or any court, would take that gamble. This is hardly the first time that this Court has seen creditors risk doomsday consequences to increase their incremental recoveries, and this Court—which is focused on preserving and maximizing value, allowing suppliers to survive, and helping employees keep their jobs—is not of a mind to jeopardize all of those goals.

Thus there is more than "good business reason" for the 363 Transaction here. The Creditors' Committee in this case put it better than this Court could:

> The simple fact is that there are no other viable bids—indeed no serious expressions of interest—to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable. The current transaction is the only option on the table. The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM to the detriment of all involved. *Preventing this harm serves the core purposes of the*

---

*Settlement-District*"), *appeal dismissed*, 222 Fed. App. 7, 2006 WL 3826700 (2d Cir. 2006), *cert. denied*, 128 S.Ct. 114 (2007).

[56]   *Adelphia Settlement-Bankruptcy,* 327 B.R. at 167.

> *Bankruptcy Code and constitutes a strong business*
> *justification under Section 363 of the Code to sell*
> *the debtors' assets outside of a plan process.*[57]

While because of the size of this case and the interests at stake, GM's chapter 11
case can hardly be regarded as routine, GM's proposed section 363 sale breaks no new
ground. This is exactly the type of situation where under the Second Circuit's many
holdings, there is good business reason for an immediate sale. GM does not have the
luxury to wait for the ultimate confirmation of a plan, and the only alternative to an
immediate sale is liquidation.

(b)  *Compliance with Standards for Approval of Section 363 Sales*

With the Court having concluded that the requisite sound business justification
exists for a proposed sale of the type proposed here, the inquiry turns to whether the
routine requirements for any section 363 sale, and appropriate exercise of the business
judgment rule, have been satisfied. The court must be satisfied that (i) notice has been
given to all creditors and interested parties; (ii) the sale contemplates a fair and
reasonable price; and (iii) the purchaser is proceeding in good faith.[58]

These factors are all satisfied here. Notice was extensively given, and it complied
with all applicable rules. As to the sufficiency of the purchase price, the Court is equally
satisfied. No other, much less better, offer was received, and the GM Board even secured
a fairness opinion from reputable advisors, expressing the opinion that the consideration
was, indeed, fair.

---

[57]    Creditors' Comm. Ltd. Obj. ¶ 3 (emphasis added).

[58]    *See, e.g., In re Betty Owens Sch., Inc.,* 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997) (Leisure,
J.), citing *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991) (Longobardi, J.).  *See
also* Judge Farnan's more recent decision in *Decora Industries,* 2002 WL 32332749, at *2.

Finally, the Court has found that the Purchaser has acted in good faith, and as
mixed questions of fact and law, the Court now determines (i) that this legal requirement
for a sale has been satisfied, and (ii) that the Purchaser is entitled to a good faith
purchaser finding—matters that are relevant to the determination under *Betty Owens
Illinois School* and the other cases articulating like requirements, and also to the section
363(m) finding that the U.S. Government understandably desires.  In ruling that the U.S.
Government has indeed acted in good faith, for both of the purposes for which that ruling
is relevant, the Court sees no basis for finding material differences in the standard.

While the Bankruptcy Code does not define the "good faith" that protects
transactions pursuant to section 363(m) (or, for that matter, the "good faith" that courts
require in approving section 363 sales in the first place), the Second Circuit has explained
that:

> Good faith of a purchaser is shown by the integrity
> of his conduct during the course of the sale
> proceedings; where there is a lack of such integrity,
> a good faith finding may not be made.  A
> purchaser's good faith is lost by 'fraud, collusion
> between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair
> advantage of other bidders.'[59]

Here there is no proof that the Purchaser (or its U.S. and Canadian governmental
assignors) showed a lack of integrity in any way.  To the contrary, the evidence
establishes that the 363 Transaction was the product of intense arms'-length negotiations.
And there is no evidence of any efforts to take advantage of other bidders, or get a leg up
over them.  In fact, the sad fact is that there *were no* other bidders.

---

[59]    *Gucci*, 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir.
1978)); *accord id.* (noting also that the relevant fraudulent, collusive actions are those
"specifically intended to affect the sale price or control the outcome of the sale."); *Chrysler*, 405
B.R. at 106 (same).

Thus, the Court finds that the Purchaser is a good faith purchaser, for sale

approval purposes, and also for the purpose of the protections section 363(m) provides.

The Court additionally determines that it finds GM to be in compliance with the

requirements of the business judgment rule, commonly used in consideration of 363 sales

in this District and elsewhere.[60]  As noted in this Court's decision in *Global Crossing,*

and Judge Mukasey's decision in *Integrated Resources*, that rule entails "(1) a business

decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some

courts and commentators, no abuse of discretion or waste of corporate assets."[61]

Here the Court finds it unnecessary to state, one more time, all of the facts that

support a finding that such requirements have been satisfied.  The GM Board's decision

would withstand *ab initio* review, far more than the business judgment test requires.[62]

*(c)  "Sub Rosa" Plan*

The F&D Bondholders, Parker and other objectors also contend that by proposing

the 363 Transaction, GM has proposed the implementation of a forbidden "*sub rosa*"

plan.  The Court disagrees.

---

[60]  *See In re Global Crossing Ltd.*, 295 B.R. 726, 742-44 (Bankr. S.D.N.Y. 2003), relying heavily on
*Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated
Resources, Inc.),* 147 B.R. 650 (S.D.N.Y. 1992) (Mukasey, C.J.).

[61]  *Global Crossing*, 295 B.R. at 743.

[62]  When the Court considers "disinterestedness," it looks to the disinterestedness of GM's Board and
management, and particularly its Board, which is the ultimate decision maker for any corporation.
The Court heard no evidence that either the Board or management chose the sale opportunity over
any other alternative either because of a conflict of interest, or because the Government told them
to.  The Court finds instead that GM's Board and management took the pending opportunity to
save the company because it was the only responsible alternative available.

Finally, the U.S. and Canadian governments did not become "insiders" skewing any
disinterestedness analysis by reason of their assistance to GM.  *See Chrysler*, 405 B.R. at 107
("Nor did the Governmental Entities control the Debtors in that regard [with respect to the
*Chrysler* sale transaction] or become 'insiders' of the Debtors.").

While neither section 363 nor any other provision of the Code defines or
otherwise mentions "*sub rosa*" plans, or provides that they are impermissible, caselaw
(including caselaw in this Circuit and District) recognizes the impropriety of *sub rosa*
plans in instances in which they genuinely exist.[63]  The idea underlying the prohibition
against *sub rosa* plans appears in *Braniff*, the case from which the prohibition emerged.
It is that "the debtor and the Bankruptcy Court should not be able to short circuit the
requirements of Chapter 11 for confirmation of a reorganization plan by establishing the
terms of the plan *sub rosa* in connection with a sale of assets."[64]  A proposed 363 sale
may be objectionable, for example, when aspects of the transaction dictate the terms of
the ensuing plan or constrain parties in exercising their confirmation rights,[65] such as by
placing restrictions on creditors' rights to vote on a plan.[66]  A 363 sale may also may be
objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the
distribution of sale proceeds among different classes of creditors.[67]

But none of those factors is present here.  The MPA does not dictate the terms of
a plan of reorganization, as it does not attempt to dictate or restructure the rights of the
creditors of this estate.  It merely brings in value.  Creditors will thereafter share in that

---

[63]    *See Iridium*, 478 F.3d at 466 (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re
Braniff Airways, Inc),* 700 F.2d 935, 940 (5th Cir. 1983); *Chrysler,* 405 B.R. at 95-96.

[64]    700 F.2d at 940.

[65]    *See Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654 & n.6 (S.D.N.Y. 1995).

[66]    *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec.
Power Coop, Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997).

[67]    *See Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.)*, 333 B.R. 30,
51 (S.D.N.Y. 2005) (Swain, J.).

value pursuant to a chapter 11 plan subject to confirmation by the Court.  A transaction contemplating that does not amount to a *sub rosa* plan.[68]

In the *TWA* chapter 11 case,[69] substantially all of the airline's assets were sold to American Airlines, in a 363 sale.  There too the contention was made that the 363 sale was a *sub rosa* plan.  Judge Walsh rejected the contention.  He explained:

> It is true, of course, that TWA is converting a group of volatile assets into cash.  It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors.  *It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan.*  The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).[70]

Here the objectors principally base their arguments on things the *Purchaser* intends to do.  They complain of the Purchaser's intention, in connection with the 363 Transaction, to

(i) be assigned substantially all executory contracts with direct suppliers,

(ii) make offers of employment to all of the Debtors' nonunionized employees and employees represented by the UAW, and

---

[68]   *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) (the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors.").

[69]   *See In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001) (Walsh, J.).

[70]   2001 WL 1820326, at *12 (emphasis added).

> (iii) be assigned a modified collective bargaining agreement with
> the UAW, including an agreement to contribute to the New VEBA to fund
> retiree medical benefits for UAW members and their surviving spouses.

But these do not give rise to a *sub rosa* plan when the first is merely an example of an element of almost *every* 363 sale (where purchasers designate the contracts to be assumed and assigned), and the second and third are actions by the *Purchaser*.

The Court senses a disappointment on the part of dissenting bondholders that the Purchaser did not choose to deliver consideration to them in any manner other than by the Purchaser's delivery of consideration to GM as a whole, pursuant to which bondholders would share like other unsecured creditors—while many supplier creditors would have their agreements assumed and assigned, and new GM would enter into new agreements with the UAW and the majority of the dealers. But that does not rise to the level of establishing a *sub rosa* plan. The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.

Caselaw also makes clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume *some*, but not all, of the debtor's liabilities, or because some contract counterparties' contracts would not be assumed. As Judge Walsh observed in *TWA*:

> [N]othing in § 363 suggests that disparate treatment
> of creditors, such as is likely to occur here,
> disqualifies a transaction from court approval. The
> purpose of a § 363(b) sale is to transform assets . . .
> into cash in an effort to maximize value.
> *Distribution of the value generated in accordance*
> *with § 1129 and other priority provisions occurs*
> *and is intended to occur subsequent to the sale*.

He further stated:

> The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase.  A purchaser cannot be told to assume liabilities that do not benefit its purchase objective.  *Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.*[71]

Last, but hardly least, the *sub rosa* plan contention was squarely raised, and rejected, in *Chrysler*,[72] which is directly on point and conclusive here.

The *Chrysler* transaction was structured in a fashion very similar to that here, with a combination of sale proceeds to be provided to the seller, assignments of contracts with suppliers, taking on seller employees, and contribution to a VEBA.  Judge Gonzalez rejected the contention that the transaction amounted to a *sub rosa* plan.  He noted that:

> (i)  there was no attempt to allocate sale proceeds away from the objectors (there, first lien lenders);[73]

> (ii)  the fact that counterparties whose executory contracts were being assumed and assigned under section 365, at the election of the purchaser, gave counterparties a *Code-authorized* "more favorable treatment," which neither violated the priority rules nor transformed the sale into a *sub rosa* plan;[74]

> (iii)  the purchaser's ability to choose which contracts it considered valuable did not change that result;[75]

---

[71]    2001 WL 1820326, at *11 (emphasis added).

[72]    *See* 405 B.R. at 97-100.

[73]    *Id.* at 98.

[74]    *Id.* at 99.

[75]    *Id.*

> (iv)  in negotiating with groups essential to its viability (such as its
> workforce) the purchaser was free to provide ownership interests in the
> new entity as it saw fit;[76] and that

> (v)  the purchaser's allocation of value in its own enterprise did not
> elevate its measures into a *sub rosa* plan.[77]

In connection with the last two points, Judge Gonzalez made a critically important
point—that the allocation of value by the purchaser did not affect the *debtor's* interest.  In
that connection, Judge Gonzalez observed:

> In negotiating with those groups essential to its
> viability, New Chrysler made certain agreements
> and provided ownership interests in the new entity,
> which was neither a diversion of value from the
> Debtors' assets nor an allocation of the proceeds
> from the sale of the Debtors' assets.  *The allocation
> of ownership interests in the new enterprise is
> irrelevant to the estates' economic interests.*[78]

Similarly, Judge Gonzalez noted that what the UAW, the VEBA and the U.S. Treasury
would be getting in New Chrysler was not on account of any entitlements any of them
might have in the case before him.  He observed:

> In addition, the UAW, VEBA, and the Treasury are
> not receiving distributions on account of their
> prepetition claims.  Rather, consideration to these
> entities is being provided under separately-
> negotiated agreements with New Chrysler.[79]

---

[76]    *Id.*

[77]    *Id.* at 99-100.

[78]    *Id.* at 99 (emphasis added).

[79]    *Id.*  As he further observed, the UAW in *Chrysler* was providing substantial consideration to New
Chrysler in the form of "unprecedented modifications" to the UAW's collective bargaining
agreement.  *Id.* at 100.  The record supports a similar finding here.

As in *Chrysler* and *TWA,* the Court rules that the 363 Transaction does not constitute an impermissible *sub rosa* plan.

### (d)  Recharacterization or Subordination of U.S. Treasury Debt

The F&D Bondholders and Bondholder Parker contend that some or all of the U.S. Government's secured debt should be recharacterized as equity—or, alternatively, equitably subordinated to unsecured debt—as a predicate for their next contention that it cannot be used as the basis for a credit bid.  The Court disagrees with each contention.

In another of its decisions in the *Adelphia* chapter 11 cases,[80] this Court likewise considered allegations that a secured lender's debt should be recharacterized as equity.  In doing so, the Court applied standards articulated by the Fourth Circuit and Sixth Circuit in the *Dornier Aviation*[81] and *AutoStyle Plastics*[82] cases, which in turn had been based on tax law precedent.

Factors listed in those cases are:

> (1) the names given to the instruments, if any, evidencing the indebtedness;

> (2) the presence or absence of a fixed maturity date and schedule of payments;

> (3) the presence or absence of a fixed rate of interest and interest payments;

> (4) the source of repayments;

---

[80]    *See Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 73-75 (Bankr. S.D.N.Y. 2007) ("***Adelphia-Bank of America***"), *aff'd as to all but an unrelated issue,* 390 B.R. 80 (S.D.N.Y. 2008) (McKenna, J.).

[81]    *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225, 233-34 (4th Cir. 2006).

[82]    *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749-50 (6th Cir. 2001).

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside

lending institutions;

(9) the extent to which the advances were subordinated to the

claims of outside creditors;

(10) the extent to which the advances were used to acquire capital

assets; and

(11) the presence or absence of a sinking fund to provide

repayments.[83]

Here the Court finds that GM was inadequately capitalized at the time the loans

were made; that GM could not obtain financing from outside lending institutions, and that

the record does not show the presence of a sinking fund to provide repayments—three of

the eleven factors that would suggest recharacterization. But of the remainder, every

single factor supports finding that this was genuine debt. Among other factors, as noted

in the Court's Findings of Fact above, this transaction was fully documented as a loan;

was secured debt, complete with intercreditor agreements to address priority issues with

other secured lenders; had interest terms (albeit at better than market rate) and maturity

terms, and, significantly, had *separate* equity features—providing for warrants to

accompany the debt instruments. The Court has previously found, as a fact and mixed

---

[83]    *See Adelphia-Bank of America*, 365 B.R. at 74 (*citing*, *inter alia*, *Dornier Aviation* and *AutoStyle*).

question of fact and law, that the Prepetition Secured Debt was, in fact, debt, and the

Court now determines that as a conclusion of law.[84]

Likewise, the Court disagrees with contentions (principally by bondholder Parker)

that the secured debt held by the U.S. Treasury (and, presumably, the EDC) should be

equitably subordinated. The Court addressed the development of the law of equitable

subordination (and its first cousin, equitable disallowance) in its decision in *Adelphia-

Bank of America*, and need not discuss it in comparable length here. It is sufficient for

the purposes of this decision to say that as originally stated in the famous case of *Mobile

Steel*,[85] a party seeking to establish equitable subordination must prove that (i) the holder

of the claim being subordinated engaged in inequitable conduct; (ii) the inequitable

conduct resulted in injury to creditors or conferred an unfair advantage on the claimant;

and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy

Code.[86] None of those factors has been established here.

First the Court finds that none of the U.S. Treasury, the Government of Canada,

the Government of Ontario, or the EDC acted inequitably in any way. They advanced

funds to help thousands of creditors, citizens, employees of GM, and employees of

suppliers and others. Their efforts to ensure that they were not throwing their money

away in a useless exercise, and were expecting GM to slim down so it could survive

without governmental assistance, are hardly inequitable; they were common sense.

---

[84]    There is no basis for recharacterizing the $33 billion that was the subject of the DIP loans
provided by the U.S. Treasury and the EDC. These were presented to the Court as loans, seeking
approval for post-petition financing under section 364 of the Code.

[85]    *Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692 (5th Cir. 1977).

[86]    *Id.* at 700.

Similarly, the Court finds no harm to creditors; without the challenged efforts, GM would have had to liquidate.  Nor was there any special benefit to any of the Government entities.

Finally, treating the governmental lenders as lenders is hardly inconsistent with the provisions of the Bankruptcy Code.  There is, in short, no basis for equitable subordination here.

### (e)  Asserted Inability to Credit Bid

In light of the conclusions reached in the preceding section, the U.S. Treasury and EDC may, if they choose, assign their secured debt to the Purchaser, and there is then no reason why the Purchaser may not credit bid.

## 2.  Successor Liability Issues

Many objectors—including the Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"), individual accident litigants ("the **Individual Accident Litigants**"), and attorneys for asbestos victim litigants (collectively, "the **Asbestos Litigants**") object to provisions in the proposed sale order that would limit any "successor liability" that New GM might have.  Successor liability claims normally are for money damages—as, for example, the claims by the Individual Accident Litigants are.  If permitted, such claims would be asserted against the successor in ownership of property that was transferred from the entity whose alleged wrongful acts gave rise to the claim.

"As a general rule, a purchaser of assets does not assume the liabilities of the seller unless the purchaser expressly agrees to do so or an exception to the rule exists."[87]

---

[87]    3 *Collier* at ¶ 363.06[7].

Successor liability is an equitable exception to that general rule.[88]  Successor liability

depends on state law, and the doctrines vary from state to state,[89] but generally successor

liability will not attach unless particular requirements imposed by that state have been

satisfied.[90]

 If a buyer cannot obtain protection against successor liability, "it may pay less for

the assets because of the risk."[91]  When the transfer of property takes place in a 363 sale,

and the buyer has sought and obtained agreement from the debtor that the sale will be

free and clear, the bankruptcy court is invariably asked to provide, in its approval order,

that the transferee does not assume liability for the debtor's pre-sale conduct.

 Such a request was likewise made here.  Under the proposed order, in its latest

form, New GM would voluntarily assume liability for warranty claims, and for product

liability claims asserted by those injured after the 363 Transaction—even if the vehicle

was manufactured before the 363 Transaction.  But New GM would not assume any Old

GM liabilities for injuries or illnesses that arose before the 363 Transaction.  And the

proposed order has a number of provisions making explicit findings that New GM is not

subject to successor liability for such matters, and that claims against New GM of that

character are enjoined.[92]

---

[88] *Id.*

[89] *Id.*

[90] *See id.*

[91] *Id.*  Whether the U.S. and Canadian Governments would have lent and ultimately bid a lesser
amount here is doubtful, but this consideration provides the context for deciding legal issues that
presumably will extend beyond this case.

[92] The principal provisions in the proposed order provide, in relevant part:

> Except for the Assumed Liabilities, pursuant to sections
> 105(a) and 363(f) of the Bankruptcy Code, the Purchased
> Assets shall be transferred to the Purchaser in accordance with
> the MPA, and, upon the Closing, shall be free and clear of all

The issues as to the successor liability provisions in the approval order are the most debatable of the issues now before the Court.  Textual analysis is ultimately inconclusive as to the extent to which a 363 order can bar successor liability claims premised upon the transfer of property, and cases on a nationwide basis are split.  But principles of *stare decisis* dictate that under the caselaw in this Circuit and District, the Court should, and indeed must, rule that property can be sold free and clear of successor liability claims.

*(a)  Textual Analysis*

As before, the Court starts with textual analysis.  Section 363(f) provides, in relevant part:

> The trustee may sell property under subsection (b) … of this section free and clear of any interest in such property of an entity other than the estate, only if—

---

liens, claims, encumbrances, and other interests of any kind or nature whatsoever … including rights or claims based on any successor or transferee liability….

Proposed Order ¶ 7.

…[A]ll persons and entities… holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Proposed Order ¶ 8.  Similar provisions are in the MPA.

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Application of section 363(f)'s authority to issue a "free and clear" order with respect to a successor liability claim turns, at least in the first instance, on whether such a claim is an "interest in property."  But while "claim" is defined in the Code,[93] neither "interest" nor "interest in property" is likewise defined.

So in the absence of statutory definitions of either "interest" or "interest in property," what can we discern from the text of the Code as to what those words mean?

First, we know that "interest" includes more than just a lien.  Subsection (f)(3) makes clear that "interest" is broader, as there otherwise would be no reason for (f)(3) to deal with the subset of interests where "such interest is a lien."  *Collier* observes that:

> Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate.  Yet the Code does not define the concept of "interest," of which the property may be sold free.  Certainly a lien is a type of "interest" of which the property may be sold free and clear.  This becomes apparent in reviewing section 363(f)(3), which provides for particular treatment when "such interest is a lien."  *Obviously there must be situations in which the interest is*

---

[93] *See* Section 101(5) of the Code.

53

> *something other than a lien*; otherwise, section
> 363(f)(3) would not need to deal explicitly with the
> case in which the interest is a lien.[94]

Second, we know that an "interest" is something that may accompany the transfer

of the underlying property, and where bankruptcy policy, as implemented by the drafters

of the Code, requires specific provisions to ensure that it *will not* follow the transfer.

The Individual Accident Litigants contend that here the Court should presume

that "equivalent words have equivalent meaning when repeated in the same statute."[95]

But while that is often a useful aid to construction, we cannot do so here.  That is because

"interest" has wholly different meanings as used in various places in the Code,[96] and

assumptions that they mean the same thing here are unfounded.

Thus, those in the bankruptcy community know, upon considering the usage of

"interest" in any particular place in the Code, that "interest" means wholly different

things in different contexts:

> (i) a nondebtor's *collateral*—as used, for example, in consideration
>
> of adequate protection of an interest under sections 361 and 362(d)(1), use
>
> of cash collateral under section 363(c)(2), or in many 363(f) situations,
>
> such as where a creditor has a lien;

---

[94]    3 *Collier* at ¶ 363.06[1] (emphasis added).

[95]    Indiv. Accident Litigants Br. 4, *quoting Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998).

[96]    *See* Postings of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips,
http://www.creditslips.org/creditslips/2009/06/claim-or-interest.html (June 13, 2009, 8:25 PM
EST); and http://www.creditslips.org/creditslips/2009/06/claim-or-interest-part-2.html (June 14,
2009, 6:42 PM EST).  Blogs are a fairly recent phenomenon in the law, providing a useful forum
for interchanges of ideas.  While comments in blogs lack the editing and peer review
characteristics of law journals, and probably should be considered judiciously, they may
nevertheless be quite useful, especially as food for thought, and may be regarded as simply
another kind of secondary authority, whose value simply turns on the rigor of the analysis in the
underlying ideas they express.

(ii) *a legal or equitable ownership of property*—as used, for
example, in section 541 of the Code, or in other section 363(f) situations,
where a nondebtor asserts competing ownership, a right to specific
performance, or the like— or, quite differently,

(iii) *stock* or other equity in the debtor, *as contrasted to debt*—as
used, for example, in section 1111 ("[a] proof of claim or interest is
deemed filed under section 501"), or where a reorganization plan is to
establish classes of claims and interests, under sections 1122 and 1123.

The Individual Accident Litigants place particular emphasis on section 1141(c) of
the Code, asking this Court to compare and contrast it.  They argue that

> In contrast, § 1141(c) of the Bankruptcy Code
> provides that "property dealt with by the plan is free
> and clear of all *claims and interests ... in* the
> debtor." (Emphasis added).  Section 363 and
> 1141(c) are two mechanisms for transfer of estate
> property (one through a sale, the other through a
> plan).  The difference between the words chosen by
> Congress in these two closely related sections
> shows that Congress did not intend a sale under
> § 363(f) to be free and clear of "*claims*," but only of
> "*interests in* such property" because "'it is generally
> presumed that Congress actions intentionally and
> purposely' when it 'includes particular language in
> one section of a statute but omits it in another.'"[97]

But this is not an apt comparison, since when "interests" is used in section
1141(c), it is used with the wholly different definition of (iii) above—*i.e.*, as stock or
another type of equity—in contrast to the very different definitions in (i) and (ii) above,
which are ways by which "interests in property" may be used in section 363(f).

---

[97] Indiv. Accident Litigants Br. 4.

Thus, as Lubben suggests, and the Court agrees, in section 1141 "interest" matches up with "equity," and "claim" matches up with debt.[98]  Section 1141 is of no assistance in determining whether litigation rights transmitted through transfers of property fall within the meaning of "interests in property."  Section 1141 does not provide a yardstick by which section 363(f)'s meaning can be judged.

So where does textual analysis leave us?  It tells us that "interest" means more than a lien, but it does not tell us how much more.  Textual analysis does not support or foreclose the possibility that an "interest in property" covers a right that exists against a new party solely by reason of a transfer of property to that party.  Nor does textual analysis support or foreclose the idea that an "interest" is a right that travels with the property—or that it would do so unless the Code cut it off.   Ultimately textual analysis is inconclusive.  Neither the Code nor interpretive aids tells us how broadly or narrowly—in the particular context of section 363(f)—"interest in property" should be deemed to be defined.[99]

---

[98]    *See* Posting of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, http://www.creditslips.org/creditslips/2009/06/claim-or-interest.html (June 13, 2009, 8:25 PM EST).

[99]    The Individual Accident Litigants also place heavy reliance on *Butner v. United States*, 440 U.S. 48 (1970), *see* Indiv. Accident Litigants Br. 8, suggesting that *Butner* requires deference to state law that might impose successor liability and that this would require excluding successor liability damages claims from any definition of "interest."  But the Court cannot agree.  First, when quoted in full, *Butner* (whose bottom line was that the issue of whether a security interest extended to rents derived from the property was governed by state law) stated:

> The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors.  Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

440 U.S. at 54.  *Butner* further stated (in language the Individual Accident Litigants did not quote):

> Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently

*(b) Caselaw*

Therefore, once again—as in the Court's earlier consideration of *Lionel* and its

progeny and the cases establishing the judge-made law of *sub rosa* plans—the Court

must go beyond the words of the Code to the applicable caselaw.

Viewed nationally, the caselaw is split in this area, both at the Circuit Court level

and in the bankruptcy Courts.  Some courts have held that section 363(f) provides a basis

for selling free and clear of successor liability claims,[100] and others have held that it does

not.[101]

But the caselaw is *not* split in this Circuit and District.  In *Chrysler*, Judge

Gonzalez expressly considered and rejected the efforts to impose successor liability.  And

more importantly, the Second Circuit, after hearing extensive argument on this issue

along with others, affirmed Judge Gonzalez's *Chrysler* order for substantially the reasons

Judge Gonzalez set forth in his *Chrysler* decision.

---

<blockquote>
simply because an interested party is involved in a bankruptcy
proceeding.
</blockquote>

*Id.* at 55.  But the *Butner* court laid out principles by which we determine what is property of the estate; it did not address the different issue of whether a state may impose liability on a transferee of estate property by reason of something the debtor did before the transfer.  Moreover, *Butner* noted that provisions of the Code can and do sometimes trump state law.  And section 363(f), for as much or as little it covers, is exactly such a provision.  In fact, 363(f) is a classic example of an instance where a "federal interest requires a different result."  *Butner* neither supports nor defeats either party's position here.

[100]    *See*, *e.g.*, *Chrysler*, 405 B.R. at 111; *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) ("*TWA*"); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581-82 (4th Cir. 1996).

[101]    *See*, *e.g.*, *Michigan Empl. Sec. Comm. v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147-48 (6th Cir. 1991); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.)*, 327 F.3d 537, 545-46 (7th Cir. 2003); *Fairchild Aircraft Corp. v. Campbell (In re Fairchild Aircraft Corp.)*, 184 B.R. 910, 918 (Bankr. W.D. Tex. 1995), *vacated as moot on equitable grounds*, 220 B.R. 909 (W.D. Tex. 1998).

*See also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (concluding that 363(f) could not be utilized, but that section 105(a) could be used to effect 363 sale free and clear of claims).

This Court has previously noted how *Chrysler* is so closely on point, and this issue is no exception. Judge Gonzalez expressly considered it. In material reliance on the Third Circuit's decision in *TWA*, "the leading case on this issue," Judge Gonzalez held that *TWA*:

> makes clear that such tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5) and are therefore extinguished by the Sale Transaction. The Court follows *TWA* and overrules the objections premised on this argument. … [I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.[102]

This Court has already noted its view of the importance of *stare decisis* in this district,[103] and feels no differently with respect to this issue. This Court follows the decisions of its fellow bankruptcy judges in this district, in the absence of plain error, because the interests of predictability in commercial bankruptcy cases are of such great importance. Apart from the underlying reasons that have caused *stare decisis* to be embedded in American decisional law, *stare decisis* is particularly important in commercial bankruptcy cases because of the expense and trauma of any commercial bankruptcy, and the need to deal with foreseeable events, by pre-bankruptcy planning, to the extent they can be addressed. Likewise, litigation, while a fact of life in commercial bankruptcy cases, takes money directly out of the pockets of creditors, and predictability fosters settlements, since with predictability, parties will have an informed sense as to how any disputed legal issues will be decided.

---

[102]    405 B.R. at 111.

[103]    *See* 27-28, n.19 above.

Though for all of these reasons, this Court would have followed *Chrysler* even if
that case had no subsequent history, we here have a hugely important additional fact.
The Circuit affirmed *Chrysler, and* for "substantially for the reasons stated in the opinion
below."

Those two matters are somewhat different, and each merits attention.  Appellate
courts review judgments (or orders), not statements in opinions.[104]  With the Circuit
having affirmed, application of that principle would not, in the absence of more,
necessarily suggest agreement with any reasoning Judge Gonzalez utilized in reaching his
conclusion.  But it would necessarily support agreement with his bottom line—at least on
matters that were argued to the Circuit on appeal.  Otherwise, the Circuit would not have
affirmed.

Here, of course, there is more—because the Circuit did not simply affirm without
opinion, but it stated, as part of its order, that Judge Gonzalez's decision was affirmed
"for substantially the reasons stated in the opinions below."  While that might hint that
the Circuit generally agreed with Judge Gonzalez's reasoning as well, it does not compel
that conclusion.  At this point, the Court concludes merely that the Circuit agreed with
Judge Gonzalez's successor liability issues bottom line.

But that alone is very important.  One of the matters argued at length before the
Circuit on the appeal was successor liability, both with respect to present claims[105] and

---

[104]    *See, e.g., O'Brien v. State of Vermont (In re O'Brien),* 184 F.3d 140, 142 (2d Cir. 1999);
*Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008).

[105]    *See* Tr. of Arg. before Second Circuit, No. 09-2311 (2d Cir. June 5, 2009) ("**2d Cir. Arg. Tr.**") at
17-22 (current tort claims); 47-49 (current tort claims); 60-62 (current tort claims).

unknown future claims.[106]  They were hardly trivial elements of the appeal, and were a

subject of questioning by members of the panel.[107]  If the Circuit did not agree with Judge

Gonzalez's conclusions on successor liability, after so much argument on that exact issue,

it would not have affirmed.

Thus the Court has, at the least, a judgment by the Second Circuit that 363(f) may

appropriately be invoked to sell free and clear of successor liability claims.  The claims

sought to be preserved here are identical to those in *Chrysler*.  And *Chrysler* is not

distinguishable in any legally cognizable respect.[108]  On this issue, it is not just that the

Court feels that it *should* follow *Chrysler*.  It *must* follow *Chrysler*.  The Second Circuit's

*Chrysler* affirmance, even if reduced solely to affirmance of the judgment, is controlling

authority.[109]

This Court fully understands the circumstances of tort victims, and the fact that if

they prevail in litigation and cannot look to New GM as an additional source of recovery,

they may recover only modest amounts on any allowed claims—if, as is possible, they do

---

[106]    2d Cir. Arg. Tr. at 22-26 (future and, to a limited extent, current, product liability claims); 26-29 (current and future asbestos claims); 45-46 (future asbestos and tort claims); 62-64 (future asbestos claims).

[107]    This Court has previously noted that it is hesitant to draw too much from the questions judges ask in argument.  *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 636 n.44 ("Thoughts voiced by judges in oral argument do not always find their way into final decisions, often intentionally and for good reason.")  Thus the Court does not rely on anything that was said in the way of questions in the *Chrysler* appeal for the purpose of trying to predict the Circuit's thinking or leanings.  This Court looks to the *Chrysler* argument questioning solely for the purpose of noting the issues that were before the Circuit, and that got its substantive attention.

[108]    The Court cannot agree with the suggestion that *Chrysler* is distinguishable because the purchaser there, Fiat, was a commercial entity, and that the purchaser here is an entity formed by the U.S. and Canadian Governments.  We are talking about an issue of statutory interpretation here, and the Code makes no distinction in that regard.

[109]    *Collier* states that "[a]lthough some courts have limited the term ["interest in property," as used in section 363(f)] to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier* at ¶ 363.06[1].  Though *Collier* is of course consistent with this Court's conclusion, the Court regards the caselaw holdings in this Circuit and District as more important.

not have other defendants who can also pay.[110]  But the law in this Circuit and District is

clear; the Court will permit GM's assets to pass to the purchaser free and clear of

successor liability claims, and in that connection, will issue the requested findings and

associated injunction.[111]

*3. Asbestos Issues*

The Asbestos Litigants raise the same successor liability issues just addressed,

and, additionally advance the interests of future victims of asbestos ailments (though their

counsel do not represent any); *future* victims would not yet know that they have any

asbestos ailments, or to whom they might look to bring litigation, if necessary.  The

Asbestos Litigants' concerns as to a sale free and clear of asbestos liability claims, like

those of tort litigants, have already been discussed, and the Court, while also sympathetic

to asbestos victims, must rule similarly.

But the Court must separately address the separate issues concerning asbestos

ailments, in light of the reality that those ailments may take many years to be discovered,

during which asbestos victims would not know that they should be filing claims.

The Asbestos Litigants object to GM's effort to "channel all present and future

asbestos personal injury claims to Old GM and to shield New GM from 'successor

liability' claims . . . without the appointment of a future claims representative and the

other express requirements mandated by Congress in 11 U.S.C. § 524(g)."[112]  But that

---

[110]  They may have to resort to dealers, and the proposed sale motion also contemplates that New GM
will indemnify dealers for losses of this type, whenever the claims arose.  While this would
seemingly greatly reduce the number of instances where a plaintiff cannot recover meaningful
amounts if liability is established, the Court does not suggest that it will cover all of them.

[111]  Findings and an injunction of the character requested were issued in each of *Chrysler* and *TWA*.
*See Chrysler*, No. 09-50002 (Bankr. S.D.N.Y. June 1, 2009) (Order Granting 363 Sale ¶¶ W-BB,
9-23); *TWA*, 322 F.3d at 286-87.

[112]  Asbestos Br. at 2.

overstates, in material part, what GM is trying to do.  It is unnecessary to "channel"

present asbestos injury claims to GM, as that is where they already are, and belong.  And

New GM has not yet done anything wrong, if it ever will.  So the bulk of the Asbestos

Litigants' contention is simply a variant of the successor liability issues that the Court

just addressed, and must be decided the same way.

Where there *is* a separate issue is claims for *future* injuries that people exposed to

asbestos might suffer when they don't yet know of their ailments or the need to sue or

assert a claim.  The Court refers to those as "**Future Claims**," while noting that they are

not yet "claims" as defined in the Bankruptcy Code.  Efforts to deal with such

circumstances led to the enactment of section 524(g) of the Code, which *inter alia*

authorizes injunctions, under a reorganization plan, to enjoin actions against nondebtors

by those who have a right of recovery from a trust created to address their claims, in

accordance with more detailed provisions set out in section 524(g).  (Those provisions

also include the appointment of a future claims representative.)

The Debtors ask for findings that New GM will not be deemed to be a successor

of Old GM, and ask for an injunction barring those holding Future Claims, like others,

from pursuing New GM.  The Asbestos Litigants contend that such an injunction would

walk, talk and quack like a section 524(g) injunction, and that it thus is impermissible.

The Debtors respond that we do not yet have a request to approve a plan, and that these

issues are now premature—better to be considered if and when they ever ask for a 524(g)

injunction.

The Court does not have to decide these issues now, except in a modest way.  The

Asbestos Litigants' counsel represent only individuals with *present* asbestos ailments,

and do not represent future claimants.  Thus the Court has material difficulty in seeing

how they have standing to assert *other's* needs and concerns, or how they would be

persons aggrieved, on any appeal, if the Court ruled adversely to them on future claims

issues.

By the same token, the Court fully recognizes that the notice given on this motion

was not fully effective, since without knowledge of an ailment that had not yet

manifested itself, any recipient would be in no position to file a present claim.[113]

This objection raises classic standing *and* ripeness issues.  And, in addition, the

Court does not know if anyone in the future would have a legally valid objection as to the

requested injunction—especially if Old GM were still in existence, and a claim could be

filed with Old GM.  The Court is doubtful that it should be erecting barriers to GM's

ability to reorganize by creating hurdles at the behest of people who lack standing, but at

the same time, is not of a mind to do anything that might be constitutionally suspect.  The

Future Claims issues, in the Court's view, are best addressed here by adding language to

the injunction paragraph to which objection has been made, applicable (only) to asbestos

claims and demands, making the injunction enforceable "to the fullest extent

constitutionally permissible."  That limitation should address both sides' legitimate future

claims concerns.  The Court's order will read accordingly.

### 4.  Environmental Issues

Certain objectors—most notably, New York's Attorney General (the "**New York

AG**"), who enforces New York's environmental laws, and the St. Regis Mohawk Tribe

---

[113]    *See Chrysler* Arg. Tr. at 46, 47, 72-73 (colloquy, principally with Judge Sack, with respect to this
issue).  Once more, the Court does not read those questions as telegraphing any views or decision
of the Circuit as to these issues, but rather as helping this Court focus on matters worthy of
consideration.

(the "**Tribe**"), in upstate New York (together, the "**Environmental Matters Objectors**")—have voiced concerns as to whether any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations.  Objections of this character were a matter of concern to this Court as well, but they were addressed—very well, in this Court's view—by amendments to the proposed order that were made after objections were due.

The additional language provides that:

> Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order.  Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.[114]

Another paragraph goes on to say:

> Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtors to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  The definition of Environmental Laws in the MPA shall be amended to delete the words "in existence on the date of the

---

[114]    Proposed Order ¶ 61

> Original Agreement." For purposes of clarity, the
> exclusion of asbestos liabilities in section 2.3(b)(x)
> of the MPA shall not be deemed to affect coverage
> of asbestos as a Hazardous Material with respect to
> the Purchaser's remedial obligations under
> Environmental Laws.[115]

Especially collectively, they make it quite clear that neither Old GM nor New GM will be relieved of its duty to comply with environmental laws.

Those changes deal with much, but not all, of the Environmental Matters Objectors' concerns. The remaining objections, however, must be overruled.

The Environmental Matters Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view (as well as the Court's decision to follow *Chrysler*) is this Court's decision, seven years ago, in *MagCorp*.[116] There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue—to what extent could that property be sold free and clear of environmental claims under 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs, or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property

---

[115]    *Id.* ¶ 62.

[116]    Tr. of Hr'g, *In re Magnesium Corporation of America*, No. 01-14312 (Bankr. S.D.N.Y. June 4, 2002) (ECF #290).

required remediation as of that time, any such remediation would be the buyer's responsibility:

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[117]

Those same principles will be applied here. Any Old GM properties to be transferred will be transferred free and clear of successor liability,[118] but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward. And if the State of New York (or, to the extent it has jurisdiction, the Tribe) feels a need to cause any acquiror of Old GM property to engage in remedial action because of environmental issues existing even at the outset of the acquiror's ownership, nothing in this Court's order will stand in its way.

*5.  Splinter Union Retiree Issues*

Three unions—the IUE, the Steelworkers, and the Operating Engineers (referred to by all parties as the "**Splinter Unions**") also have filed an objection. The Splinter Unions submit affidavits from many of their retirees, describing, in moving detail, their difficulties in getting by, and how decreased medical benefits would directly impact them. The hardship would be particularly great on those not yet eligible for Medicare, as the U.S. does not yet have comparable medical insurance for those below the qualifying age, if it ever will.

---

[117]     *Id.* at 129.

[118]     The Court understands that the Purchaser does not want the Massena site and that it will not be transferred to New GM, but it is unclear to the Court whether Old GM will want to sell the Massena site to someone else or abandon it. Certainly, if the Purchaser does not wish to take the Massena site, it does not have to. If Old GM wishes to abandon the Massena site, the Environmental Matters Objectors, or some of them, will have rights to be heard, and may have substantive future rights. The Court does not decide any of those additional issues at this time.

But fully acknowledging, as one must, the hardship that the Splinter Union Retirees would suffer, the legal issue before this Court is whether section 1114 of the Code applies to a transaction of the type we have here, and whether a purchaser of assets must assume liabilities that it does not want to voluntarily assume. The answer to each of those questions must be "no."

The Splinter Unions understandably rely on section 1114 of the Code, a provision that was added to the Code to provide additional rights to retiree insurance benefits, most significantly, medical and life insurance (for the purposes of this discussion, "**Retiree Benefits**"). Generally speaking, section 1114 attempts to balance the needs and concerns of retirees with the reality that large legacy Retiree Benefits obligations not infrequently can impair debtors' ability to reorganize, and that chapter 11 debtors often cannot afford to pay Retiree Benefits as they were previously offered.

While section 1114 is too long to quote here in full, it provides, in substance, for a procedure that must be complied with before a chapter 11 debtor can modify or not pay Retiree Benefits. Modifying or ending benefits requires a motion to be approved by the bankruptcy court. Prior to filing such a motion, the debtor or trustee must first make a proposal to the retirees' representative—usually their union, if there is one, or alternatively a committee to act on their behalf.

The proposal is supposed to provide "for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assure[] that all creditors, the debtor and all of the affected parties are treated fairly and equitably…." The parties are then "to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits."

67

If agreement is not forthcoming, the motion may proceed further.  Under section

1114(g) (with exceptions and provisos not relevant here):

> The court shall enter an order providing for
> modification in the payment of retiree benefits if the
> court finds that—
>
>> (1) the trustee has, prior to the hearing,
>> made a proposal that fulfills the
>> requirements of subsection (f);
>
>> (2) the authorized representative of the
>> retirees has refused to accept such proposal
>> without good cause; and
>
>> (3) such modification is necessary to
>> permit the reorganization of the debtor and
>> assures that all creditors, the debtor, and all
>> of the affected parties are treated fairly and
>> equitably, and is clearly favored by the
>> balance of the equities….

Here GM has stated that before Old GM stops paying or modifies Retiree

Benefits, it will comply with section 1114.  But as a practical matter, Old GM will be

liquidating, and it will not be able to keep making these payments very much longer.

After that, even if Old GM makes a proposal in good faith (as the Court assumes it will),

the Splinter Union retirees may well be left with unsecured claims, with the relatively

low recoveries on their unsecured claims that all other unsecured creditors will receive,

and with the delays in getting distributions on allowed claims that are an unfortunate

reality of the bankruptcy process.

And New GM has not agreed to assume liability for the Splinter Union Retiree

Benefits.[119]  It declined to do so, while going further for other unions, especially the

---

[119]    New GM has offered to assume the liability to provide Retiree Benefits to a certain extent, but in a
dramatically reduced amount.  Its proposal in that regard was unacceptable to the Splinter Unions,
and a counterproposal by the Splinter Unions has not been accepted.  On July 2, the Court

UAW, because with very limited exceptions, the Splinter Unions no longer have active employees working for GM, and the U.S. Treasury—triaging its ability to undertake obligations, and trying to make New GM as lean and as viable as possible—allocated its available money to spend it only where necessary to build a new and stronger GM.[120]

With that by way of backdrop, the Court considers the legal issues. The Splinter Unions argue in substance, that the 363 Transaction constitutes a forbidden *sub rosa* plan. But this contention has previously been addressed. The remaining issue is the extent, if any, to which special 1114 rights for retirees make an otherwise permissible transaction impermissible.

Once more the Court starts with textual analysis, and looks to the words of the statute. The most relevant portions of section 1114 are the portions that impose the continuing duties to pay retiree benefits; not to end or modify them; and to negotiate with unions or other retiree representatives before changing them. Apropos the first (the continuing duty to pay), section 1114(e) is relevant. It provides, in relevant part:

> (e)(1) Notwithstanding any other provision of this title, *the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession),* shall timely pay and shall not modify any retiree benefits, except that—
>
> > (A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of

---

approved settlements between GM and other non-UAW unions under which New GM would assume Retiree Benefits for them, but again in dramatically reduced amounts.

[120]    The obligations in question are very sizeable—more than $3 billion in retiree health care and hundreds of millions more for retirement life insurance. Splinter Union Obj. ¶ 4. Those large figures show why the Splinter Unions care about the issue, and why New GM feels that it cannot assume those obligations when such a small number of Splinter Union members will be working for New GM.

> such payments, pursuant to the provisions of subsections (g) and (h) of this section, or
>
> (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,
>
> after which such benefits as modified shall continue to be paid by the *trustee*.[121]

Thus, under the words of the statute, these are duties imposed upon the trustee (which includes, by express reference, the debtor in possession)—not anyone else.

With respect to the second (the duty not to end or modify), the relevant portion is that same section 1114(e) ("the debtor in possession, or the trustee if one has been appointed … shall not modify any retiree benefits"). Once more, the duty not to end or modify is not statutorily imposed on anyone else.

With respect to the third (the duty to negotiate before filing a motion to modify benefits) the relevant portion is 1114(f):

> (f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the *trustee* shall—
>
> (A) make a proposal to the authorized representative of the retirees ….

Here too, by the words of the Code, the duty is imposed upon the trustee.

Finally, the Court notes that section 363 is silent with respect to any need to first comply with section 1114 before effecting a section 363 sale.

Turning beyond textual analysis to the caselaw, the Court has seen nothing to establish a violation of law. The Splinter Unions cite no authority holding or suggesting that a purchaser of assets from an entity with section 1114 obligations must assume the

---

[121] Section 1114(e) (emphasis added).

debtor seller's duty to comply with section 1114's provisions.  Nor do they cite such law

considering section 1113 of the Code, which, while dealing with collective bargaining

agreements, imposes similar duties.

On the other hand, *Chrysler* is helpful, though it did not expressly address this

issue.  In considering a closely similar transaction, Judge Gonzalez did not find there to

be section 1114 impediments, even for non-UAW retirees.[122]

The Splinter Unions argue that "section 1114 cannot be ignored in the § 363

process,"[123] but that is not what GM is asking the Court to do.  GM acknowledges its

duties to comply with section 1114, and so far as the record reflects, has not failed in any

of its duties in that respect so far.  If, in the future, GM does not comply with its section

1114 duties (or is perceived to be failing to comply in that regard), the Splinter Unions, or

anyone else with standing, could of course bring that to the Court's attention.  But the

Splinter Union's real objection is that the Purchaser is not volunteering to comply with

section 1114, and under the words of the statute, the Purchaser is not within the zone of

persons upon whom section 1114 places duties.

---

[122]  With respect to section 1114 matters and related issues, he stated:

> The objecting retirees represented by the UAW objected to the
> modification of retiree benefits under the settlement agreement
> between New Chrysler and the UAW, but those objections are
> overruled because the UAW was the objectors' authorized
> representative under section 1114, and the modifications were
> negotiated in good faith pursuant to that section.  The
> objecting retirees not represented by the UAW whose benefits
> are adversely impacted may have unsecured claims against the
> Debtors' estates, but the purchased assets are sold free and
> clear of those potential unsecured claims.  For those reasons,
> their objections to the Sale Motion are overruled.  Further, the
> Court finds that if the Sale Motion were not approved, which
> would likely result in the Debtors' liquidation, there would
> likely be no value to distribute any retirees, all of whom would
> be unsecured creditors.

405 B.R. at 110.

[123]  Splinter Union Obj. ¶ 79.

The Splinter Unions note that there is another arguably relevant provision of the Code that must be considered, section 1129(a)(13).  Section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and the provisions in its subsection (a) include a list of requirements for confirmation of any chapter 11 plan. Section 1129(a) provides, in relevant part:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> …
>
> > (13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

There can be no doubt that compliance with section 1129(a)(13), along with the other 15 subsections of section 1129(a), is a requirement for confirmation of a plan.  But the Court has already addressed arguments of this character, as raised by bondholders in different contexts.  The Court is not here considering confirmation of a plan; it is considering a section 363 transaction, and because there is a good business reason for selling the assets now, and there is not here a *sub rosa* plan, requirements of section 1129, including section 1129(a)(13), do not apply.

The Court fully realizes that UAW retirees will get a better result, after all is said and done, than Splinter Union Retirees will, but that is not by reason of any violation of the Code or applicable caselaw.  It is because as a matter of reality, the Purchaser needs a properly motivated workforce to enable New GM to succeed, requiring it to enter into

72

satisfactory agreements with the UAW—which includes arrangements satisfactory to the UAW for UAW retirees. And the Purchaser is not similarly motivated, in triaging its expenditures, to assume obligations for retirees of unions whose members, with little in the way of exception, no longer work for GM.

The Court has also considered the Splinter Unions' point that in pre-bankruptcy planning, GM and the U.S. Treasury focused on the duties to Splinter Union Retirees, and made a conscious decision that Splinter Union retirees would not be offered as good a deal as others. But the Court cannot find that there was any "conspiracy" in that regard, nor that there was any intention to disregard applicable law. The U.S. Treasury, in making hard decisions about where to spend its money and make New GM as viable as possible, made business decisions that it was entitled to make, and the fact that there were so few Splinter Union employees still working for GM was an understandable factor in that decision. The Court's responsibility is not to make fairness judgments as to those decisions, but merely to gauge those decisions under applicable law.

The Splinter Unions' objection must be overruled.

*6. Dealer Issues*

As noted, the 363 Transaction contemplates that GM's present dealer network of about 6,000 dealers will be made more efficient, continuing approximately 4,100 of its dealers, and ending its relationship, though not instantly, with approximately 1,900 others.[124] In cooperation with States AGs, and the Unofficial Dealers Committee[125] (the

---

[124]     Henderson Decl. ¶¶ 92-93.

[125]     The Unofficial GM Dealers Committee was formed prior to the filing of GM's chapter 11 case by the GM National Dealer Council in coordination with the National Automobile Dealers Association. It was formed to act as a voice for the dealer body's collective interests in connection GM's restructuring efforts. Its members sell and service vehicles under GM brands in locations all over the country.

"**Dealer Committee**"), GM and the Purchaser agreed on additional language in the sale

order for the protection of dealers, and the AGs and the Dealer Committee withdrew their

objections to the sale. However, a local dealers association, the Greater New York

Automobile Dealers Association (the "**New York Dealers Association**"), seeking to be

heard as an *amicus*, filed a brief contending that the Participation Agreements and

Deferred Termination Agreements that more than 99% of GM dealers entered into were

coerced and unlawful.

Initially, the Court deals with a matter of standing, to which it became more

sensitive, after oral argument, upon rereading the New York Dealers Association's

*amicus* brief. The New York Dealers Association does not purport to speak for a single

identified GM dealer. It does not seek standing under section 1109. It speaks only as an

*amicus*. And in addition, the main thrust of the New York Dealers Association *amicus*

brief is not the protection of *GM* dealers. It is the protection of their *competitors*. The

interests of *GM* dealers were the subject of the negotiations with the Dealer Committee

and the AGs, and resolved to their satisfaction. While the New York Dealers Association

objection professes to be speaking for the interests of GM dealers, its principal thrust is

very different; it is to protect the interests of others who are competing with GM and

(especially since it is a dealers' organization), competing with GM dealers.[126]

Under these circumstances, the Court must note the lack of standing and that the

New York Dealers Association may be heard as nothing more than as an *amicus*; note

that the New York Dealers Association does not have section 1109 rights; and note that at

---

[126]    *See, e.g.,* N.Y. Auto Dealers Obj. at ¶¶ 19, 20 ("GM seeks, through this proceeding, to gain
advantage over other manufacturers."); *id.* ("Permitting GM in bankruptcy, to ignore state dealer
laws upsets the competitive balance among GM and every other automotive manufacturer.").

least seemingly, if not plainly, the New York Dealers Association has interests largely

adverse to those whom it is professing to help.[127]

Then, turning to the merits of the New York Dealers Association arguments

(assuming that, as *amicus*, it has any standing to make them), any objection that the New

York Dealers Association might make—though it never says that it is making an

"objection"—would have to be overruled, and to the extent it is making an objection, it *is*

overruled.  While the Court understands the unattractive choices that many dealers had to

face, the Court cannot go so far as to hold that these agreements were "coerced" or are

unlawful—even if (as the Court assumes, without deciding) those dealer rights could not

be so modified outside of bankruptcy.

Implementation of federal bankruptcy policy permits debtors, for the benefit of

the creditor body as a whole, to alter creditors' and contract counterparties' contractual

rights.  Corporate reorganization, by its nature, requires parties in interest to consider

unattractive choices.  One of the relevant rights in bankruptcy is the right of a debtor to

reject an executory contract with its contract counterparty, for the benefit of the debtor's

other creditors.  All concerned with GM's future knew that GM had to slim down and

improve its dealer network, and that this required modifying dealer agreements before

they were assumed and assigned—a process that led to the Participation Agreements.

Similarly, as an alternative to simply leaving dealers who would otherwise be terminated

in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other

rights – a process that led to the Deferred Termination Agreements.  Those offers secured

---

[127]    It also at least seemingly would not be a person aggrieved with standing to appeal, but that is an
issue for the appellate courts.

widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.

The alternative, in each case was rejection.  Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights.  But here GM was not obligated, as a matter of law, to choose between leaving its dealer contracts unmodified or rejecting them.  It could, if it wished, offer its contract counterparties deals that would more appropriately meet each side's needs and concerns, without fear that such deals would be subject to collateral attack by reason of assertions of coercion.

Directly on point are comments this Court made at the bankruptcy court level, and Judge Kaplan made at the district court level, in the *Adelphia* chapter 11 cases.  There, in connection with the DoJ Settlement discussed above,[128] Adelphia agreed to provide $715 million to the United States Government (on behalf of both the DoJ and the SEC) in exchange for dropping threats of indictment and forfeiture, and settling claims that might otherwise have been pursued by the SEC.  The settlement was attacked by Adelphia creditors, who charged that it was the result of unlawful coercion.  In the same decision to which this Court previously referred, this Court disagreed, and on appeal, so did Judge Kaplan.

This Court stated:

> [W]here the "coercion" results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of "coercion."  As one of the

---

[128]    *See* discussion at 37, above.

> banks' counsel aptly noted in argument on this motion, it is what we call "leverage."[129]

Judge Kaplan, affirming, agreed—even going so far as to quote the language this Court just used—and continued:

> What the appellants characterize as coercion was no different in principle than the pressure that leads the overwhelming majority of defendants in criminal cases to plead guilty—the risk that a conviction after trial will result in a harsher sentence than is likely to be imposed following a guilty plea. Yet guilty pleas in such circumstances rightly are considered voluntary and uncoerced in any relevant sense.[130]

For decades, counterparties to executory contracts with bankruptcy debtors have known that their agreements could be rejected, and debtors and contract counterparties have negotiated deals as alternatives to that scenario. When they have been so negotiated (with all knowing that the debtor has the option to reject if the existing deal is not modified to its satisfaction), that has never been regarded as unlawful coercion. Rather, it has been recognized as an appropriate use of the leverage that Congress has given to debtors for the benefit of all of the other creditors who are not contract counterparties, and for whom the restructuring of contractual arrangements is important to any corporate restructuring.

The Court's observation in questioning at oral argument, with respect to dealer contract modifications, that "no good deed goes unpunished" (perhaps naively thinking at the time that the New York Dealers Association was advocating the interests of *GM* dealers) was, as it probably sounded, an indication of frustration with the New York

---

[129]    *Adelphia Settlement-Bankruptcy*, 327 B.R. at 166.

[130]    *Adelphia Settlement-District*, 337 B.R. at 477.

Dealers Association's argument.  And what the Court could have said then, and what it is saying now, is that the *last* thing bankruptcy courts should be doing is to be forcing debtors and their contract counterparties into situations where rejection is the only lawful alternative, subjecting other creditors to dilution on their recoveries by running up rejection damages, and subjecting contract counterparties to the full hardships of an executory contract rejection.  There is no basis in law or fact for holding that these contractual modifications were unlawfully "coerced."  Disapproving contractual modifications of the type here would be squarely inconsistent with the goals of corporate reorganization.

As a practical matter, modifications negotiated by the Dealers Committee and the State Attorneys General mooted out many, if not all, of the New York Auto Dealers' complaints about the loss of dealer protection laws.  To the extent they did not, however, the Court notes that Judge Gonzalez dealt with these same contentions in another decision in *Chrysler*.  After concluding that Chrysler's rejection of dealership agreements constituted a valid exercise of business judgment, Judge Gonzalez found that the state franchise laws at issue, like those at issue here, frustrated the purposes of (and, thus, were preempted by) section 365.[131]  To the extent that laws of the type relied upon by the New York Dealers Association—either state or federal—impair the ability to reject, or to assume and assign, they must be trumped by federal bankruptcy law.  And to the extent that nonbankruptcy law prohibits debtors and their contract counterparties from finding mutually satisfactory less draconian alternatives to rejection, it likewise must be trumped.

---

[131]    *See In re Old Carco LLC*, 2009 WL 1708813, *11-*17 (Bankr. S.D.N.Y. Jun. 19, 2009); *see also id.* at *16 ("'Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield'") (quoting *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009)).

As Judge Gonzalez explained:

> Specifically and by no means exclusively, statutory notice periods of, *e.g.*, 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts it will assume and assign or reject by allowing other dealers to restrict that power.[132]

Judge Gonzalez also made clear that 28 U.S.C. § 959(b), on which the New York Dealers Association's *amicus* brief heavily relies, did not alter the Court's "preemption analysis," because that provision "does not de-limit the precise conditions on contract rejection"—particularly where, as in *Chrysler* and here, the pertinent state laws concern "consumer convenience and costs and the protection of local businesses, rather than a concern over public safety."[133]

---

[132]    2009 WL 1708813 at *16; *see also Vallejo*, 403 B.R. at 77 (holding that "Congress enacted section 365 to provide debtors the authority to reject executory contracts. This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause.") (internal citation omitted).

[133]    2009 WL 1708813, at *14-15. *See also* 2009 WL 1708813, at *15 ("In sum, the Dealer Statutes . . . are concerned with protecting economic or commercial interests and are thus preempted by the Bankruptcy Code notwithstanding 28 U.S.C. § 959(b)") (citing *In re Baker & Drake, Inc.*, 35 F.3d

To the extent that the New York Auto Dealers Association complains that GM
gets a "competitive advantage over others not in bankruptcy,"[134] that likewise is a
complaint with respect to federal bankruptcy policy, which gives companies a chance to
reorganize and shed burdensome obligations to achieve a greater good.  That GM's
reorganization will make New GM and GM dealers more competitive is not a bad thing;
it is exactly the point.

The New York Auto Dealers' Association lacks standing to have its comments
deemed to be an objection.  To the extent that its *amicus* comments can be deemed to
constitute an objection, any such objection is overruled.

*7.  ECC Trust*

The Environmental Conservation and Chemical Corporation Site Trust Fund (the
"**ECC Trust**") has also filed a limited objection.  The ECC Trust was created as a means
to implement a Consent Decree that GM and other parties entered into with the United
States and the State of Indiana to clean up hazardous materials at the EnviroChem
Superfund Site in Zionsville, Indiana (the "**Zionsville Site**").  The Consent Decree was
approved in 1991 by the United States District Court for the Southern District of Indiana.
Under the authority of the Consent Decree, the Trustee for the ECC Trust issued an
assessment on April 20, 2009, requiring GM to pay approximately $63,000 into the ECC
Trust.  Shortly before the due date, GM notified the ECC Trust that it would not be
paying its share, and filed its chapter 11 petition shortly thereafter.

---

1348, 1353 (9th Cir. 1994)); *id.* at *16 n.32 (stating that "state law protections cannot be used to
negate the Debtors' rejection powers under § 365 . . . .  'The requirement that the debtor in
possession continue to operate *according to* state law requirements imposed on the debtor in
possession (i.e., § 959(b)) does not imply that its powers under the Code are *subject to* the state
law protections.'") (quoting *In re PSA, Inc.*, 335 B.R. 580, 587 (Bankr. D. Del. 2005) (emphasis in
original)).

[134]   N.Y. Auto Dealers Obj. ¶ 20.

For now it is sufficient to note that the ECC Trust requests that this Court, using its "equitable powers," require that the Purchase Agreement be modified such that the ECC Trust's claim be designated an "Assumed Liability." Unfortunately, the Court cannot do that.

This Court need not, at this juncture, decide the vast majority of the issues presented by the parties at oral argument—including, especially, whether a consent decree is considered a contract or a judicial decree for enforcement purposes, and whether this particular consent decree created a monetary obligation, which would be regarded like any other unsecured claim, or was in fact a mandatory injunction to clean up the Site.

The ECC Trust's present rights are against *Old GM*. Under the ECC Trust's best case scenario, as argued, the ECC Trust may be able to secure equitable relief against Old GM. But whether the ECC Trust can enforce an injunction against Old GM, or must instead live with an unsecured claim, is an issue for another day.

Whatever the ECC Trust's rights are against Old GM, there is no basis for this Court to use its "equitable powers" to force the Purchaser to assume this liability. This Court has found that the Purchaser is entitled to a free and clear order. The Court cannot create exceptions to that by reason of this Court's notions of equity. As this Court noted in another of its *Adelphia* decisions, it is not free to use its equitable powers to circumvent the Code.[135] Decisions of the Second Circuit make it clear that, even with the presence of section 105(a), bankruptcy judges are not free to do whatever feels right.[136]

---

[135]    *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y. 2006).

[136]    *See, e.g., In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 & n. 4 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the

Insufficient justification has been provided for this Court to force the Purchaser to assume this liability, in the face of section 363(f)'s explicit language allowing the sale of property "free and clear" of such liabilities. The Court is aware that the requested relief would have a very modest impact on the Purchaser, but is nevertheless required to issue a principled decision.

8. *"Equally and Ratably" Issues*

Pro se unsecured bondholders Parker and Radha R. M. Narumanchi raise objections that they should be treated as secured creditors, and have not been. They contend that the indenture for their bonds (the 1995 issue, whose indenture trustee, represented by skilled counsel, did not raise a similar objection) had an "equal and ratable clause," boosting their bonds to secured debt status if liens were therafter put on certain manufacturing facilities. They then contend that when the 2008 Prepetition Financing was put in place, it triggered their equal and ratable clauses, making them secured.

The Court agrees that the bonds have an equal and ratable clause. But it cannot agree that it was triggered. The 2008 Prepetition Financing Documents expressly carved out from the grant of the security interest under those documents any instance where it would trigger, *inter alia*, the equal and ratable clause.

---

importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); *In re Joint Eastern & Southern District Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir. 1992) ("*Asbestos Litigation*") ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); *see also In re Aquatic Dev. Group, Inc.,* 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring) ("*Aquatic Development*") ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."'"), quoting *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003) ("*Dairy Mart*"), in turn quoting *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986).

The 2008 Prepetition Financing granted the U.S. Treasury a lien, subject to
exceptions not applicable here, on a wide array of property.  But it expressly did not put a
lien on what it called "**Excluded Collateral**."[137]  Excluded Collateral included, among
other things:

> (v) any Property, including any debt or Equity
> Interest and any manufacturing plan or facility
> which is located within the continental United
> States, to the extent that the grant of a security
> interest therein to secure the Obligations *will result
> in a lien, or an obligation to grant a lien, in such
> Property to secure any other obligation.*[138]

Thus when liens were granted in favor of the U.S. Treasury in December 2008,
the U.S. Treasury was not granted a lien on any of the Excluded Collateral—including, as
relevant here, anything that would trigger the equal and ratable clause.[139]

*9.  Unauthorized Use of TARP Funds Issues*

Bondholder Parker (so far as the Court can tell, the only one of the 850 objectors)
objects to the 363 Transaction on the additional ground that the U.S. Government was not
authorized to use TARP funds to assist the auto industry, and hence that the 363
Transaction is unlawful.  The Court agrees with the United States Attorney that the issue
of the U.S. Treasury's lending authority now is moot, and that Mr. Parker lacks standing
to raise the issue.  Thus the Court does not need to reach the third issue.

---

[137]   *See* 2008 Prepetition Agreement Section 4.01 (proviso generally providing that collateral would
not include "Excluded Collateral," a term defined elsewhere in that agreement).

[138]   *Id.* Section 1.01 – "Excluded Collateral"(v) ("Definitions") (emphasis added).

[139]   It does not matter if, as Parker suggested but did not prove, the U.S. Treasury unintentionally or
even intentionally recorded a mortgage or UCC-1 covering the property mentioned in the equal
and ratable clause.  Doing so would only have *perfected* a lien, assuming that one was granted in
the first place.  Here there was no grant of any lien, and perfecting such a nonexistent lien would
be meaningless.

First, the Court agrees that the objection is moot.  The 363 Transaction does not

involve any expenditure of TARP funds.  It simply involves a credit bid by the

Purchaser—as an assignee of secured debt held by the EDC (as to whom no objection is

made) and the U.S. Treasury—of amounts due on previous loans under the U.S. Treasury

Prepetition Loan and the DIP Financing Facility.

No party objected to the use of TARP funds in connection with the DIP Financing

Facility, or when GM got the assistance it did before the filing of GM's chapter 11 case.

And the Court approved the DIP Financing Facility after full hearing and notice.  It was

*then* that the U.S. Treasury became a lender, not now.  Complaints that the U.S. Treasury

should not have lent the money to GM are now moot.

Second, the Court once more agrees with the United States Attorney that Mr.

Parker lacks standing to challenge the U.S. Government's lending authority here.  Judge

Gonzalez addressed this exact issue in *Chrysler-Standing,*[140] the second of the two

decisions that were affirmed by the Circuit.

The Court does not need to repeat all of the elements of Judge Gonzalez's

analysis in *Chrysler-Standing*, nor what this Court has stated previously with respect to

the importance of *stare decisis,* or its compliance with decisions of the Second Circuit.

Here, as in *Chrysler-Standing*, an unsecured creditor like Mr. Parker does not establish

the injury-in-fact necessary to establish constitutional standing under Article III because

"all holders of unsecured claims are receiving no less than what they would receive in a

liquidation."[141]  And even assuming that the 363 Transaction itself injured bondholders

like Mr. Parker (though it is difficult to see how, since without the 363 Transaction, GM

---

[140]    *See* 405 B.R. at 83.

[141]    *Chrysler-Standing*, 405 B.R. at 83.

would have to liquidate), Mr. Parker cannot demonstrate standing because he cannot show that any such injury is "fairly traceable" to the Government's use of TARP funds, as opposed to the 363 Transaction itself.

As Judge Gonzalez explained in *Chrysler-Standing*, "[i]f a non-governmental entity were providing the funding in this case, the [objectors] would be alleging the same injury. . . .  In this light, it is not the actions of the lender that the [objectors] are challenging but rather the transaction itself.  Specifically, the [objectors'] alleged injury is not fairly traceable to the U.S. Treasury's actions because the [objectors] would suffer the same injury regardless of the identity of the lender."[142]

Under these circumstances, the Court need not address Mr. Parker's third point. This objection is overruled.

*10.  Cure Objections*

Many contract counterparties—more than 500—voiced objections to GM's estimated cure amounts, generally expressing different perceptions as to the exact amounts GM owes them.  These differences would eventually have to be resolved, since to assume an executory contract (and GM is assuming thousands of them), most prepetition defaults would have to be cured.

GM proposed a mechanism for fixing the cure amount entitlements—an amalgam of exchanges of information, negotiation, ADR, and court determination, if needed. Significantly, while many parties had differing views as to the amounts to which they were entitled, none voiced objections to the method GM proposed.  As those counterparties will remain eligible for their full legal entitlements, the Court finds the

---

[142]    *Id.*

proposed mechanism fully satisfactory, and it is unnecessary and inappropriate to rule on

all of the cure amount issues here.

### 11.  *UAW Settlement Objections*

Approximately 56 UAW retirees—somewhat numerous in number, but a

miniscule portion of the estimated 500,000 covered under the UAW Settlement

Agreement—object to the UAW Settlement Agreement.  In general, they express

(understandable) disappointment with a settlement that results in a reduction of their

health benefits.  But they do not articulate objections legally cognizable under the law.

The Curson testimony, in particular, evidences the sensitivity to member and

retiree needs and concerns evidenced by the UAW leadership.  As discussed at

considerable length above, the UAW had to make very hard decisions as to concessions it

would make on behalf of its members and retirees to preserve GM's viability—and to

avoid a liquidation that would be disastrous for the people the UAW was trying to help.

The UAW was successful in preserving an acceptable level of core medical benefits.

And as the UAW properly observes in its brief, if the UAW had not done as well as it

did, its agreement would not have been ratified.

Given the alternatives, it is easy to find that the UAW settlement is fair and

equitable, from the perspective of both the GM estate and UAW members.  It falls well

within the range of reasonableness from GM's perspective, and is fair, reasonable and in

the best interest of the UAW retirees.

### 12.  *Stockholder Objections*

Many GM stockholders, understandably disappointed that the 363 Transaction

will leave them with no recovery, have voiced objections.  Once again, the Court is

sensitive to their concerns, but cannot help them.  GM is hopelessly insolvent, and there

is nothing for stockholders now.  And if GM liquidates, there will not only be nothing for stockholders; there will be nothing for unsecured creditors.

Under those circumstances, GM stockholders cannot claim to be aggrieved by the transactions before the Court here.

*13.  Miscellaneous Objections*

The Court cannot lengthen this decision further by specifically addressing any more of the approximately 850 objections that were raised on this motion.  The Court has canvassed them and satisfied itself that no material objections other than those it has specifically addressed were raised and have merit.  To the extent those objections were not expressly addressed in this decision, they are overruled.

<u>Conclusion</u>

The 363 Transaction is approved.  The Court is entering an order in accordance with this Decision.[143]

Dated: New York, New York         _s/Robert E. Gerber_____
       July **5**, 2009                     United States Bankruptcy Judge

---

[143]  The order entered by the Court differs from the revised proposed order submitted by the Debtors in a few respects:  The order entered by the Court adds this Decision to the places where Findings of Fact are set forth and where Conclusions of Law may be found. It adds "to the fullest extent constitutionally permissible" in connection with the injunction as to successor liability claims, to address notice or other due process issues that might otherwise exist with respect to future asbestos claims or "demands" as discussed above.  And like the order entered by Judge Gonzalez in *Chrysler*, the order shortens the Fed.R.Bankr.P. 6004(h) period, but still provides 4 days, so as to avoid effectively precluding any appellate review.