**IF YOU HAVE RECEIVED THIS NOTICE AND ARE A
CONTRACT-COUNTERPARTY TO AN AGREEMENT WITH
THE DEBTORS, PLEASE REVIEW <u>EXHIBIT A</u>, ATTACHED
TO THE MOTION (AS DEFINED BELOW), TO DETERMINE IF THE
MOTION AFFECTS YOUR AGREEMENT AND YOUR RIGHTS THEREUNDER.**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :         Chapter 11 Case No.
                                    :
GENERAL MOTORS CORP., et al.,       :         09-50026 (REG)
                                    :
                      Debtors.      :         (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

**NOTICE OF DEBTORS' MOTION
PURSUANT TO 11 U.S.C. § 365 AUTHORIZING
(A) THE REJECTION OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC
<u>DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF</u>**

**PLEASE TAKE NOTICE THAT:**

       PLEASE TAKE NOTICE that upon the annexed motion, dated July 6, 2009

(the "**Motion**"), of General Motors Corporation and its affiliated debtors, as debtors and debtors

in possession (collectively, the "**Debtors**"), for an order, pursuant to section 365 of title 11,

United States Code to reject certain executory contracts and unexpired leases with certain

domestic dealers (collectively, the "**Executory Contracts**"), as more fully set forth in the

Motion, a hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy

Judge, in Room 621 of the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, New York 10004, on **August 3, 2009 at 9:45 a.m.**

**(Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) Weil,

Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York

10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan

48265 (Attn: Lawrence S. Buonomo, Esq.); (iii) Cadwalader, Wickersham & Taft LLP, attorneys

for the United States Department of the Treasury, One World Financial Center, New York, New

York 10281 (Attn: John J. Rapisardi, Esq.); (iv) the United States Department of the Treasury,

1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Matthew Feldman,

Esq.); (v) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th

Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein,

Esq.); (vi) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of

unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Kenneth

H. Eckstein, Esq., Thomas Moers Mayer, Esq., Adam C. Rogoff, Esq., and Gordon Z. Novod,

Esq.); (vii) the International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America ("**UAW**"), 8000 East Jefferson Avenue, Detroit, Michigan 48214 (Attn:

Daniel W. Sherrick, Esq.); (viii) Cleary Gottlieb Steen & Hamilton LLP, attorneys for the UAW,

One Liberty Plaza, New York, New York 10006 (Attn: James L. Bromley, Esq.); (xi) Cohen,

Weiss and Simon LLP, attorneys for the UAW, 330 W. 42nd Street, New York, New York

10036 (Attn: Babette Ceccotti, Esq.); (xii) the Office of the United States Trustee for the

Southern District of New York (Attn: Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor,

New York, New York 10004; (xiii) the affected counterparties to the Executory Contracts; and

(xiv) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New

York 10007 (Attn: David S. Jones, Esq. and Matthew L. Schwartz, Esq.), so as to be received no

later than **July 28, 2009, at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no objections are timely filed and served with respect to the Motion, the

Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order

substantially in the form of the proposed order annexed to the Motion, which order may be

entered with no further notice or opportunity to be heard offered to any party.

Dated: New York, New York
        July 6, 2009

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**HEARING DATE AND TIME: August 3, 2009 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: July 28, 2009 at 4:00 p.m. (Eastern Time)**

**IF YOU HAVE RECEIVED THIS NOTICE AND ARE A
CONTRACT-COUNTERPARTY TO AN AGREEMENT WITH
THE DEBTORS, PLEASE REVIEW <u>EXHIBIT A</u>, ATTACHED
TO THE MOTION (AS DEFINED BELOW), TO DETERMINE IF THE
MOTION AFFECTS YOUR AGREEMENT AND YOUR RIGHTS THEREUNDER.**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11 Case No.
                                        :
GENERAL MOTORS CORP., et al.,           :        09-50026 (REG)
                                        :
                       Debtors.         :        (Jointly Administered)
                                        :
---------------------------------------------------------------x
```

**OMNIBUS MOTION OF DEBTORS FOR
ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105
AND 365 AUTHORIZING (A) THE REJECTION OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC
<u>DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF</u>**

# TABLE OF CONTENTS

**Page**

Relief Requested ....................................................................................................................1

Jurisdiction ...........................................................................................................................2

Preliminary Statement...........................................................................................................2

Facts Relevant to this Motion ...............................................................................................5

    A.  The Debtors' Need to Rationalize their Dealer Network...........................................5

    B.  The Dealership Evaluation Process .........................................................................8

    C.  The Participation and Wind-Down Agreements.......................................................9

    D.  The Dealer Franchise Agreements.........................................................................11

    E.  The State Dealer Laws ..........................................................................................13

The Relief Requested Should be Approved by the Court.......................................................14

    A.  The Debtors have a Right to Reject the Affected Dealer Agreements in the Exercise of their Sound Business Judgment ..........................................................15

    B.  Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws.................17

    C.  Rejection of the Affected Dealer Agreements Concludes the Dealer Relationship and Entitles the Debtors to Full Enforcement of Rejection.....................20

Notice.................................................................................................................................22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Balco Equities, Inc.*, 323 B.R. 85 (Bankr. S.D.N.Y. 2005)........................................15

*In re Bethlehem Steel Corp.*, 291 B.R. 260 (Bankr. S.D.N.Y. 2003) ................................18

*In re Child World, Inc.*, 142 B.R. 87 (Bankr. S.D.N.Y. 1992) ...........................................15

*In re Chipwich, Inc.*, 54 B.R. 427 (Bankr. S.D.N.Y. 1985)................................................17

*In re City of Vallejo*, 403 B.R. 72 (Bankr. E.D. Cal. 2009)....................................18, 19, 20

*In re G Survivor Corp.*, 171 B.R. 755 (Bankr. S.D.N.Y. 1994), *aff'd*, 187 B.R.
111 (S.D.N.Y. 1995)...........................................................................................15,17

*In re Helm*, 335 B.R. 528 (Bankr. S.D.N.Y. 1996)...........................................................15

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707
(1985)....................................................................................................................19

*In re Lavigne*, 114 F.3d 379 (2d Cir. 1997).....................................................................14

*In re Minges*, 602 F.2d 38 (2d Cir. 1979) ........................................................................15

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)....................................................14, 15

*Nostas Associates v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18 (2d
Cir. 1996) ...............................................................................................................15

*In re Old Carco LLC*, No. 09-50002, 2009 Bankr. LEXIS 1382 (Bankr. S.D.N.Y.
June 19, 2009), *aff'd*, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009) .............16, 18,
.........................................................................................................................19, 20

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4
F.3d 1095 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).....................................14

*In re PSA, Inc.*, 335 B.R. 580 (Bankr. D. Del. 2005) ........................................................21

*In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676 (Bankr. M.D. Fla. 1991).........18

*In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001) .......................15, 17

*Volkswagen of America, Inc. v. Dan Hixson Chevrolet Co. (In re Dan Hixson
Chevrolet Co.)*, 12 B.R. 917 (Bankr. N.D. Texas 1981)...................................................18

*In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845 (Bankr. W.D. Pa. 1987) ............16, 17

*Wheeling-Pittsburgh*, 72 B.R. at 849 ..............................................................................18

## FEDERAL STATUTES

28 U.S.C. § 1334.............................................................................................................26

28 U.S.C. § 1408...............................................................................................................2

28 U.S.C. § 1409...............................................................................................................2

28 U.S.C. § 157.................................................................................................................2

28 U.S.C. § 959(b)...........................................................................................................20

11 U.S.C. § 105.................................................................................................................1

11 U.S.C. § 365……………………………………………………..1, 14, 15, 18, 19, 20

U.S. Const., art. VI, cl. 2.................................................................................................19

## STATE STATUTES

Cal. Veh. Code § 3000......................................................................................................13

Cal. Veh. Code §§ 3060-61...............................................................................................13

Cal. Veh. Code §§ 3062-63...............................................................................................13

Ga. Code Ann. § 10-1-620................................................................................................13

Ga. Code Ann. §§ 10-1-651-53.........................................................................................13

Mich. Comp. Laws § 445.1561.........................................................................................13

Mich. Comp. Laws §§ 445.1567-72 ..................................................................................13

Mich. Comp. Laws §§ 445.1573-78 ..................................................................................13

Mich. Comp. Laws §§ 445.1576........................................................................................13

N.Y. Veh. & Traf. Law §461.............................................................................................13

N.Y. Veh. & Traf. Law §463(2) ........................................................................................13

N.Y. Veh. & Traf. Law §§ 463-67.....................................................................................13

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("**GM**") and its affiliated debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent:

### <u>Relief Requested</u>

1.      The Debtors request entry of an order pursuant to sections 105 and 365 of title 11, United States Code (the "**Bankruptcy Code**"):

(i)      authorizing the Debtors to reject, effective as of July 10, 2009 (the "**Rejection Date**"), the following executory contracts (collectively, the "**Affected Dealer Agreements**"):  (i) all Sales and Service Dealership Agreements (the "**Dealer Franchise Agreements**")[1] for the dealers identified on **Exhibit A** attached hereto (collectively, the "**Affected Dealers**") *who did not accept* Wind-down or Participation Agreements (as described below) and (ii) all ancillary and related agreements between the Debtors and the Affected Dealers (collectively, the "**Ancillary Agreements**");[2]

(ii)      determining that any state and local statutes, rules and regulations (collectively, the "**Dealer Laws**") of any kind or nature whatsoever, are preempted by the Bankruptcy Code to the extent that they purport to, or could be interpreted or applied to, interfere with, undermine or impact the full and complete rejection of the Affected Dealer Agreements; and

(iii)      determining the scope and consequences of the Debtors' rejection of the Affected Dealer Agreements.

2.      In accordance with rule 6006(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the proposed list of Affected Dealer Agreements

---

[1]   The Dealer Franchise Agreements include, without limitation, all Sales and Service Dealership Agreements entered into with each Affected Dealer and any amendments, modifications, supplements, addenda, restatements or exhibits to those agreements.

[2]   The Ancillary Agreements may include, without limitation, software license agreements, data exchange and electronic commerce agreements, options, sign leases, dealer improvement and image agreements, target market support agreements, letters of intent, channeling agreements, deferred termination agreements, site control agreements and other similar agreements.  By this Motion, the Debtors seek to reject all Ancillary Agreements with the Affected Dealers that relate to the dealership locations listed on the attached **<u>Exhibit A</u>**.

identified on **Exhibit A** lists the 38 counterparties that are the subject of this Motion

alphabetically and contains fewer than 100 executory contracts.  A proposed order (the "**Order**")

is attached to the Motion as **Exhibit B**.

## Jurisdiction

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Preliminary Statement

4.      On July 5, 2009, the Court approved the sale (the "**363 Transaction**") of

substantially all of the Debtors assets to NGMCO, Inc., a purchaser sponsored by the United

States Department of the Treasury (the "**Purchaser**").[3]  As determined by the Court in the Sale

Order, the 363 Transaction was the best, indeed, the only, viable means to save and carry

forward GM's business in a new enterprise ( "**New GM**") that will maximize and realize the

going concern value of GM's assets.

5.      As part of the 363 Transaction — indeed, as had long been recognized in

the "Viability Plans" that GM submitted to the U.S. Treasury — a rationalization of GM's

extensive dealer network (the "**Dealer Network**") was essential in order for New GM to be a

viable company capable of surviving ever increasing foreign competition and cyclical economic

downturns.  A reduction in the number of GM dealerships (the "**Dealerships**") was a necessary

component of this rationalization effort, and was carried out by GM through a comprehensive,

objective and quantitative evaluation of each Dealership.  In determining which Dealerships

---

[3] The Order of the Court approving the Amended Master Sale and Purchase Agreement (the "**MPA**"), by and among
the Debtors and the Purchaser (the "**Sale Order**"), is stayed until Thursday July 9, 2009.  Accordingly, the 363
Transaction has yet to close.

would not be retained by New GM, the Debtors evaluated numerous factors, including, but not limited to: minimum sales thresholds, customer satisfaction indices, working capital needs, profitability, whether a Dealership sold competing non-GM brands, Dealership location and other market factors.

6.    As discussed in more detail below, a leaner, more profitable Dealer Network with higher annual vehicle sales per Dealership (or "**throughput**") is essential to reducing GM's staggering dealer support costs and a critical component of helping to ensure the viability of New GM.  Indeed, the Purchaser would not have entered into the 363 Transaction without a rationalization of GM's underperforming Dealer Network.

7.    While the rationalization of the Dealer Network included a reduction in the number of Dealerships, the 363 Transaction allowed for the substantial majority of GM's dealers (collectively, the "**Dealers**" ) to continue operations in New GM on a long-term basis. These Dealers were offered a Participation Agreement (the "**Participation Agreements"**), which provided for their Dealership Franchise Agreement to be assumed and assigned to New GM, subject to certain modifications.  The terms of the Participation Agreement and the supplement thereto were reviewed with the National Automobile Dealers Association ("**NADA**") and the GM National Dealer Council.  As of the date of this Motion, over 99% of the Dealers that were offered  Participation Agreements signed and returned such agreements.  This acceptance rate reflects both the fairness of the proposal and the strong desire of the accepting Dealers to support New GM.  Under the 363 Transaction, the Debtors will be assuming and assigning the Participation Agreements to New GM.

8.    Importantly, with respect to the remaining dealers that were not offered Participation Agreements and will not be retained as part of the New GM dealer network on a long-term basis (the "**Wind-Down Dealers**"), GM did not seek to abruptly reject and terminate

3

their Dealership Franchise Agreements.  Rather, GM offered the Wind-Down Dealers the

opportunity to accept "wind-down" agreements (the "**Wind-Down Agreements**") that will allow

them to stay in business until October 2010 so that they can — in an orderly fashion — sell

down their inventories and continue to provide warranty and other services to their customers

with the continued support of New GM.

9.      Although GM would have been well within its rights under the

Bankruptcy Code to seek to reject the Wind-Down Dealers immediately (as was done in

Chrysler's chapter 11 cases), GM elected instead to offer these Dealers Wind-Down Agreements,

which will help minimize the financial and other hardships that would have been associated with

an immediate rejection and dealership shut down.  Not surprisingly, over 98% of the Wind-

Down Dealers accepted and executed the Wind-Down Agreements.  While the Debtors

recognize that the closing of a business is always difficult, it made a concerted effort to address

these situations in a fair and supportive manner and to provide a soft landing for the Wind-Down

Dealers.  GM believes that the acceptance rate of the Wind-Down Agreements reflects the

fairness of the program.  The accepted Wind-Down Agreements will be assumed and assigned to

New GM as part of the 363 Transaction.

10.     The alternative to the rationalization of the Dealer Network is that GM

would have been forced to liquidate — and *all* Dealerships would have ceased to be GM

dealerships, including the approximately 4,100 Dealerships that accepted Participation

Agreements and will now continue to operate under New GM.  The Affected Dealers, whose

Dealership Franchise Agreements and Ancillary Agreements the Debtors seek authorization to

reject by this Motion, include only those 38 Dealers who did not accept either a Participation

Agreement or Wind-Down Agreement.  The Debtors made good faith efforts to gain agreement

from all of the Dealers, including the Affected Dealers.  For example, in addition to written

4

notice, the Debtors set up a dedicated call center to contact each of the Affected Dealers to

inform them about the benefits of accepting a Wind-Down Agreement compared to rejection.

Despite these efforts, the Affected Dealers, who represent less than 2% of the Dealers offered a

Participation or Wind-Down Agreement, elected not to accept GM's offer.

11.     The Affected Dealers have left the Debtors with no other reasonable

business choice than to seek the rejection of the Affected Dealer Agreements.  After the closing

of the 363 Transaction, the Debtors will no longer manufacture GM vehicles, nor will they retain

any rights to the GM vehicle brands that were sold to the Purchaser under the MPA. Therefore,

the Debtors have no business need or legal ability to continue any of the Affected Dealer

Agreements.  Accordingly, the Debtors, in the exercise of their sound business judgment, submit

this Motion to reject the Affected Dealer Agreements.

### Facts Relevant to this Motion

**A.     The Debtors' Need to Rationalize their Dealer Network**

12.     Prior to the filing of these chapter 11 cases, the Debtors sold virtually all

of their vehicles to consumers in the United States through their Dealer Network.  As of June 1,

2009, there were approximately 6,000 Dealers in the Dealer Network, some of whom market one

GM brand exclusively (e.g., Chevrolet, Buick, GMC or Cadillac), while others market and sell

multiple brands of GM vehicles.  The extensive Dealer Network includes retail Dealerships in

every state and major metropolitan market area across the United States.  Although the Debtors'

extensive Dealer Network provided a robust outlet for the sale of GM vehicles, the size and scope of

the Dealer Network created significant challenges as market conditions became more

competitive and demographic factors shifted dramatically over time.

13.     GM's Dealer Network developed over an extended time period in which

the Debtors' market share was growing and was far greater than it is now, and when there was

far less, or even no meaningful foreign competition. Over time, the market for new and used

motor vehicles fundamentally changed.  The automobile market was flooded with imports from

foreign Original Equipment Manufactures ("**OEMs**") with far lower cost structures and

dramatically lower legacy benefit obligations than GM.  These OEMs, including Toyota, Honda,

Nissan and others, began to enter the domestic market in the 1970s and have continually

captured a larger share of the automotive market.  As a result, GM has faced increasing financial

pressures on profitability as the market share of GM and other domestic OEMs, such as Chrysler

and Ford, declined over time in the face of this increasing foreign competition.  For example,

GM's domestic market share fell from 45% in 1980 to 22% in 2008, and its market share

forecast for 2009 is 19.5%.

14.     Despite the Debtors' efforts over the years, the contraction in the Dealer

Network has not kept pace with the decline in GM's market share.  This resulted in an excess of

Dealerships, which caused many Dealers' throughput to fall well below targeted or profitable

levels.  In fact, as of the commencement of the Debtors' chapter 11 cases, more than half of the

Dealerships in the Dealer Network were unprofitable.  Even more glaring, in 2009, on average,

more than 80 Dealerships per month were going out of business due to the economic downturn,

increased local competition and deteriorating market conditions.

15.     Because of the Dealers' insufficient throughput and only marginal

network-wide profitability, GM is forced to spend *more than $2 billion annually* on Dealer

related subsidies for, among other things, wholesale floor plan support, Standards For Excellence

programs, new vehicle inspection payments, free fuel fills, and other incentives paid directly to

Dealers (collectively, the "**Dealer Support Programs**").  In addition to the staggering costs

associated with the Dealer Support Programs, GM spends hundreds of millions of dollars per

year on structural costs related to the Dealer Network, including local advertising assistance,

channel network alignment payments, sales and service consultant fees, Dealer website funding, Dealer support system costs, and Dealer training programs (collectively, the "**Dealer Benefit Programs"**).

16.     Through the 363 Transaction and related efforts, GM undertook a comprehensive process of reviewing all facets of its business.  Central to these efforts were essential changes with respect to GM's underperforming Dealer Network, the cost of which, as noted above, was simply staggering to GM.  In the months leading up to the 363 Transaction, the Debtors conducted a thorough analysis of the Dealer Network to determine the optimal size of a viable Dealer Network — an "ideal" Dealership blueprint for a competitive New GM (the "**Rationalization Process**").  The long-term viability and success of New GM, and the Purchaser's willingness to consummate the 363 Transaction, was dependent on the undertaking of the Rationalization Process.

17.     The Debtors' Rationalization Process examined, among other things: (1) Dealer throughput, (2) Dealer return on investment, (3) consumer convenience, (4) drive-time metrics and (5) shifting market demographics.  From this data, the Debtors determined that a significant reduction in the number of Dealer rooftops — from approximately 6,000 today to a range of 3,600 to 3,800 by the end of 2010 — will allow New GM to systematically reduce virtually all Dealer Support Programs over time, thereby resulting in eventual cost savings for New GM of approximately $2 billion per year.  In addition, the Debtors estimate that Dealer Network reductions over the next several years will eventually yield an estimated $415 million in annual gross structural cost savings due to reduced payments by New GM relating to Dealer Benefit Programs.

18.     In addition to the substantial cost savings that will be realized from the Rationalization Process, New GM believes that the contemplated reductions in the number of

Dealerships will bring New GM's Dealership footprint in line with key competitors across metropolitan, hub town, and rural markets.  The ultimate goal of the Rationalization Process is to improve throughput, thereby allowing Dealers to re-invest capital in their Dealerships and compete more effectively with the locations, staff, aesthetics and amenities that consumers have come to expect from the foreign OEMs.

**B.    The Dealership Evaluation Process**

19.    After determining from the Rationalization Process that the ideal size of the Dealer Network for New GM was approximately 3,600 Dealerships, the Debtors began a comprehensive evaluation of the Dealer Network to identify the most desirable Dealers and Dealership locations (the "**Dealership Evaluation Process**") to be purchased by New GM as part of the 363 Transaction.  The objective of the Dealership Evaluation Process was to reduce and reconfigure the Dealer Network to achieve the goal of having a smaller, yet stronger Dealer Network, consisting of the best dealers, in the most desirable locations, with the best facilities.

20.    The Debtors determined that a purely subjective Dealership Evaluation Process would not be equitable or consistent with the Debtors' past business practices. Therefore, the Debtors relied heavily on objective performance criteria in conducting the Dealership Evaluation Process.  In particular, the Debtors reviewed, analyzed and weighed numerous performance and planning metrics for each Dealership, including among other factors:

- Dealership Sales, which were measured against other Dealerships of a similar size and in a similar size market in the same state;

- Customer Satisfaction Index, which was measured against the average for the region in which the Dealership was located;

- Capitalization, which was measured based on the working capital needs of each Dealership; and

- Profitability, which was determined for each Dealership based on net profits before taxes.

Based on a calculation of the above factors, each Dealership was assigned a Dealership Performance Score ("**DPS**"), with a score of 100 considered average for a particular Dealership. The Debtors determined that Dealerships receiving a DPS of less than 70 were significantly underperforming and would not be retained long-term in New GM. Consequently, those Dealers were offered a Wind-Down Agreement.

21.     The DPS score, however, was not the only factor considered by the Debtors in determining which Dealerships would be retained in New GM. The Debtors also considered other important factors in determining which Dealers would receive Wind-Down Agreements. In addition to Dealerships with a DPS score of below 70, Dealerships who sold Non-GM brands under the same roof and also experienced poor overall performance, Dealerships that sold discontinued GM brands, Dealerships with sales of less than 50 cars per year, Dealerships with inadequate or uncompetitive facilities or locations, and Dealerships unprofitable for three years in a row with inadequate working capital also were not retained by New GM.

22.     Based on the factors described above, the Debtors determined, in the exercise of their sound business judgment, the Dealerships that would best contribute to a successful, viable and more efficient Dealer Network for New GM. The Purchaser demanded a competitive and more efficient Dealer Network for New GM and therefore considered the Rationalization and Dealership Evaluation Process necessary predicates to the consummation of the 363 Transaction.

**C.     The Participation and Wind-Down Agreements**

23.     As noted above, the goal of the Debtors was to have the majority of its Dealerships continue with New GM on a long-term basis and to avoid having to reject the agreements of any Dealerships that would not be retained by New GM. Accordingly, GM

9

offered all of the Dealers in the Dealer Network either a Participation Agreement to continue

with New GM or a Wind-Down Agreement that would allow for the orderly liquidation and

closing of non-retained Dealerships over an extended period of time.

       24.      Approximately 4,100 Dealers were offered Participation Agreements.

Over 99% of the Dealers that were offered a Participation Agreement signed and returned such

agreements.  The terms of the Participation Agreement were reviewed with NADA and the GM

National Dealer Council.  Dealers who agreed to the Participation Agreement had their Dealer

Franchise Agreement assumed by New GM, as modified by the terms of the Participation

Agreement and supplement thereto.

       25.      All Dealers not offered a Participation Agreement were offered a Wind-

Down Agreement.  A Dealer that accepted a Wind-Down Agreement is allowed up to 16 months

to wind down its business and sell its existing inventory to retail consumers at normal transaction

prices.  All of the accepted Wind-Down Agreements were assumed by New GM and Wind-

Down Dealers will remain authorized dealers of New GM.  Under the Wind-Down Agreement,

in return for a substantial monetary payment, the Wind-Down Dealer agreed to waive all future

termination assistance rights under their Dealer Franchise Agreement with respect to new

vehicles, parts, and tools.  The Wind-Down Dealers may not order new vehicles, but can

continue to order parts and perform warranty and other services with the support of New GM.

Furthermore, the Wind-Down Dealers may continue to participate in GM's normal marketing

support programs and will have access to GM auctions to acquire used vehicles, a source of large

potential profits for the Wind-Down Dealers.  Overall, as noted by the Court in the Sale Order,

the Wind-Down Agreements will provide a soft landing for the Wind-Down Dealers by helping

to ease the disruption and financial hardship that would otherwise result from an abrupt

shutdown of their Dealerships.[4]

26.     Finally, it is important to note that all of the Affected Dealers were made

fully aware that not accepting the Wind-Down Agreement would result in the rejection and

termination of their Dealership Franchise Agreement and Ancillary Agreements, as well as the

potential seizure of their inventory by their wholesale floorplan lender.  The Debtors made

repeated efforts, through written notice and call-center phone calls, to explain these

consequences to the Affected Dealers.  Despite such efforts, the Affected Dealers have elected

not to accept the Wind-Down Agreement— in stark contrast to the 98% of similarly situated

Dealers who elected to enter into Wind-Down Agreements.  Due to the decision of only 38

Affected Dealers not to accept a Wind-Down Agreement, the Debtors are seeking, in the exercise

of their sound business judgment, Court authorization to reject their Affected Dealer

Agreements.

**D.     The Dealer Franchise Agreements**

27.     Consistent with industry practice, the Debtors have traditionally used a

standard form Dealership Franchise Agreement (as modified from time to time) for all Dealers.

The Dealership Franchise Agreement governs the terms under which (a) the Debtors sell

vehicles, parts and accessories to the Dealers through GM and (b) the Dealers sell and service the

Debtors' products and provide related services to consumers.  Additionally, the Dealership

---

[4] By way of comparison, in its chapter 11 cases, Chrysler rejected and immediately terminated 789 (or 25%) of its
dealers, without providing any transition assistance or period to orderly wind down their operations.  Unlike
Chrysler's treatment of its non-retained dealers, the Wind-Down Agreement cushions the economic fall of the
Wind-Down Dealers. The Wind-Down Agreement is also beneficial to the Debtors and New GM because it allows
the Wind-Down Dealers to sell off their inventory in an orderly fashion at normal market prices, thereby preventing
a flood of GM inventory being sold in the marketplace at reduced prices from abrupt Dealership liquidations.

Franchise Agreement may incorporate other agreements and obligations between GM and the

Dealers, which are specific to that particular Dealer.

        28.    Under the standard form of the Dealership Franchise Agreement, a dealer

agrees, among other things, to (a) effectively, ethically and lawfully sell and promote the

purchase, lease and use of GM products; (b) ensure that the consumer's purchase and delivery

experience are satisfactory; (c) provide repair services for GM products; and (d) provide

warranty service under GM's warranty programs.  Alternatively, GM agrees, among other things,

to (a) fairly and equitably distribute new vehicles to the dealer (b) provide the dealer with

business planning assistance, and (c) reimburse the dealer for certain authorized warranty work.

        29.    The Dealer Franchise Agreements each have a 5 year term that expires on

October 31, 2010 and is terminable by the Dealer for any reason on not less than 30 days written

notice, or by GM for, among other things, the Dealer's failure to perform certain of its

undertakings and obligations under the Dealership Franchise Agreement.  In addition, the

Dealership Franchise Agreement provides that certain events cause the automatic termination of

the Dealership Franchise Agreement, such as the (a) death of the dealer, (b) failure of dealer to

maintain certain necessary licenses and (c) transfer of the dealership business to another without

prior written notice of such transfer.  Under the terms of the Wind-Down Agreement, the Dealer

Franchise Agreement (as modified by the Wind-Down Agreement) of the Wind-Down Dealers

will expire on their natural expiration date of October 31, 2010.

        30.    In addition, ancillary to the Debtors relationship with the Dealers under

the Dealership Franchise Agreement, the Debtors and the Dealers sometimes enter into certain

Ancillary Agreements, which govern matters such as software licensing, marketing support,

signage, facility and image improvements and other business matters.  By this Motion, the

Debtors also seek to reject all such Ancillary Agreements between the Debtors and the Affected

Dealers.

### E.    The State Dealer Laws

31.    Many states regulate the relationship between automotive manufacturers

and dealers by way of motor vehicle dealer statutes (collectively, the "**Dealer Laws**").    *See, e.g.*,

CAL. VEH. CODE §§ 3000, *et seq.*; MICH. COMP. LAWS §§ 445.1561, *et seq.*; N.Y. VEH. & TRAF.

LAW §§ 461, *et seq.*; GA. CODE ANN. §§ 10-1-620, *et seq.*  In general, Dealer Laws regulate what

OEMs can do with regard to certain dealer networking matters and regulate the terms of the

automotive manufacturer - dealer relationship.  *See, e.g.*, CAL. VEH. CODE §§ 3060–69; MICH.

COMP. LAWS §§ 445.1573–78; N.Y. VEH. & TRAF. LAW §§ 463–67; GA. CODE ANN. §§ 10-1-

651–68.  For example, Dealer Laws often specify, among other things:  (a) the circumstances

under which a manufacturer may cancel, terminate, not renew or otherwise discontinue a dealer

agreement; (b) the notice required by a manufacturer to cancel, terminate, not renew or

discontinue a dealer agreement; and (c) the additional obligations of the manufacturer in the

event of a discontinuance of a dealer agreement.  *See, e.g.*, CAL. VEH. CODE §§ 3060–61; MICH.

COMP. LAWS §§ 445.1567–72; N.Y. VEH. & TRAF. LAW §§ 463(2)(d), (o–p), 466–67; GA. CODE

ANN. §§ 10-1-651–53.

32.    In addition, many Dealer Laws impose substantial limitations on the

power of automotive manufacturers to relocate their dealers, establish new dealerships or modify

existing dealerships over the objection of an affected dealer (collectively, "**Dealers' Blocking**

**Rights**").  *See, e.g.*, CAL. VEH. CODE §§ 3062–63 (providing that a new motor vehicle franchisor

may not relocate an existing dealership or establish an additional dealership over the objections

of franchisees in the market area without showing good cause); MICH. COMP. LAWS §§ 445.1576

(same); N.Y. VEH. & TRAF. LAW §§ 463(2)(cc) (same); GA. CODE ANN. § 10-1-664 (providing

that superior court can grant the petition of an existing dealership to prohibit the establishment or

relocation of a dealership in the applicable market area unless the franchisor proves that the

existing dealership is not providing adequate representation of the applicable vehicle brands and

establishes other requirements).

33.     Under many state regimes, new automotive dealers may file protests or

complaints with motor vehicle dealer boards (the "**Boards**"), state administrative agencies and

other government officials and offices established by the states to oversee the regulation of the

automotive manufacturer - dealer relationship (collectively, the "**Government Entities"**).  In

most states that have them, the Boards typically are comprised of some combination of new or

used dealers, consumers, and other representatives appointed in accordance with state

procedures.  In some states, the Boards or administrative agencies are the only governmental

bodies empowered to review or regulate conduct by automotive manufacturers and dealers or

suspend the licenses of manufacturers or dealers to operate in that state.

### The Relief Requested Should Be Approved by the Court

**A.     The Debtors have a Right to Reject the Affected Dealer Agreements in the
Exercise of their Sound Business Judgment**

34.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521

(1984); *see also In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997).  "[T]he purpose behind

allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-

possession to use valuable property of the estate and to 'renounce title to and abandon

burdensome property.' " *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures

Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994).

14

35.    Courts defer to a debtor's business judgment in rejecting an executory contract or unexpired lease, and upon finding that a debtor has exercised its sound business judgment, approve the rejection under section 365(a) of the Bankruptcy Code.  *See Bildisco & Bildisco*, 465 U.S. at 523 (recognizing the "business judgment" standard used to approve rejection of executory contracts and unexpired leases); *Nostas Assocs. v. Costich* (*In re Klein Sleep Products, Inc.*), 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *In re Minges*, 602 F.2d 38, 42–43 (2d Cir. 1979) (holding that the "business judgment" test is appropriate for determining when an executory contract can be rejected); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994), *aff'd*, 187 B.R. 111 (S.D.N.Y. 1995) (approving rejection of license by debtor because such rejection satisfied the "business judgment" test); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment").

36.    The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.  *See In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 1996) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate.' ") (citation omitted); *In re Balco Equities, Inc.*, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate.") (quoting *G Survivor*, 171 B.R. at 757)).  Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summary affirmed unless it is the product of 'bad faith, or whim or caprice' " *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).

15

37.    In recently approving Chrysler's rejection of hundreds of dealership agreements, Judge Arthur J. Gonzalez held that the traditional business judgment standard applies to an OEM-debtor's rejection of dealership agreements under section 365: "the scope of [the Court's] inquiry regarding the business judgment standard for purposes of rejection does not include an evaluation of whether the Debtors made the *best or even a good* business decision but merely that the decision was made in an exercise of the Debtors' business judgment." *In re Old Carco LLC*, No. 09-50002, 2009 Bankr. LEXIS 1382, at *33 (Bankr. S.D.N.Y. June 19, 2009) ("***Chrysler***"), *aff'd*, 2009 U.S. App. LEXIS 12351 (2d Cir. June 5, 2009).  Further, Judge Gonzalez explained that state franchise laws, by their express terms, do not justify the imposition of some heightened "public interest standard" or "balancing of the equities" standard of section 365 review:

> [W]hile the policies designed to protect the public interest may, in part, underlie the Dealer Statutes, those statutes have been enacted by *state legislatures*, not Congress, and by their very terms protect the public interest of their respective states rather than the national public interest.  Further, the fundamental interests sought to be protected by these state legislatures are the economic interests of local businesses and customer convenience and costs.  Although some Dealer Statutes articulate a public safety concern in such enactments, the public safety issues raised by the closing of dealerships do not create an imminent threat to health or safety.

*Id.* at *11–12 (citation omitted); *see also id.* at *15 n.8 ("[T]he Dealer Statutes have a limited connection to public safety.  The vast majority of Dealer Statutes concern solely commercial issues affecting the dealers and their customers and communities. . . . [T]he health and safety of the public are not threatened by rejection.") (citation omitted).

38.    Thus, under Judge Gonzalez's decision in *Chrysler*, absent a showing of " 'bad faith, or whim or caprice,' " the decision of an OEM-debtor to reject its dealership agreements "must be summarily affirmed."  *Id.* at *13 (quoting *In re Wheeling-Pittsburgh Steel*

16

*Corp.*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987); *see also G Survivor*, 171 B.R. at 757

("Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business

judgment will not be altered.") (citations omitted), *aff'd sub nom. John Forsyth Co. v. G.*

*Licensing, Inc.*, 187 B.R. 111 (S.D.N.Y. 1995); *In re Chipwich, Inc.*, 54 B.R. 427, 430–31

(Bankr. S.D.N.Y. 1985) (similar); *see also In re Trans World Airlines, Inc.*, 261 B.R. at 121–22

(" '[W]hether the debtor is making the best or even a good business decision is not a material

issue of fact under the business judgment test.' ") (quoting *Wheeling-Pittsburgh*, 72 B.R. at

849)).

   39. After the closing of the 363 Transaction, the Debtors will no longer be in

the vehicle manufacturing business, nor will they have the rights or assets required to fulfill the

Debtors obligations under the Affected Dealer Agreements.  The Debtors therefore have no

business reason or the legal ability to retain any GM-branded dealerships on a going forward

basis.  As explained in detail above, the Debtors hoped to avoid having to reject any Dealerships,

and instead offered all Dealers whose Dealership would not continue in New GM a Wind-Down

Agreement.  The Wind-Down Agreement, which was assumed and assigned to New GM as part

of the 363 Transaction, provided for the orderly closing of non-retained Dealerships over the

next 16 months.  The Affected Dealers elected not to accept the Debtors' Wind-Down

Agreement, thereby leaving the Debtors with no choice but to seek to reject the Affected Dealer

Agreements.  Accordingly, the Debtors should be authorized to reject the Affected Dealer

Agreements as of the Rejection Date.

**B.**  **Section 365 of the Bankruptcy Code Preempts Any State Dealer Laws**

   40. Outside of bankruptcy, Dealer Laws often place restrictions on the

termination of dealership agreements or other efforts to conclude or impinge upon the

commercial relationship between an OEM and its authorized dealers.  By contrast, an OEM that

is a chapter 11 debtor has a right under the Bankruptcy Code to either assume or reject its executory contracts. Indeed, a fundamental purpose of section 365 of the Bankruptcy Code is to enable a debtor to benefit from contracts that are beneficial to it and to reject those contracts that are not, thereby maximizing the value of its estate. *See, e.g.*, *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003). As such, the Dealer Laws are preempted by the Bankruptcy Code to the extent that they purport to interfere with or undermine the Debtors' ability to reject executory contracts or unexpired leases, including the proposed rejection of the Affected Dealer Agreements. This was the express and unequivocal holding by Judge Gonzalez in *Chrysler*: "the Court concludes that the Dealer Statutes are preempted by § 365 with respect to rejection of the Rejected Agreements." *Chrysler*, 2009 LEXIS 1382, at *42.

41. As Judge Gonzalez clearly articulated in *Chrysler*, the Dealer Laws must not be seen to impair or supersede those core bankruptcy rights that the Debtors possess under section 365 of the Bankruptcy Code. *Id.* at *62–66; *see also In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("Congress enacted section 365 to provide debtors the authority to reject contracts . . . [t]his authority preempts state law by virtue of the Bankruptcy Clause [and] the Supremacy Clause."); *Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co.* (*In re Dan Hixson Chevrolet Co.*), 12 B.R. 917, 923 (Bankr. N.D. Texas 1981) (holding that section 365 of the Bankruptcy Code preempted a Texas law requiring a "good cause" hearing if a dealer protests a manufacturer's attempted termination of a dealer agreement, because permitting the "good cause" proceeding to continue might frustrate the purposes of federal bankruptcy law); *In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991) (holding that section 365 of the Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement otherwise would have been terminated under Florida dealer laws).

42.    The Supremacy Clause of the United States Constitution[5] preempts and invalidates state laws that "interfere with, or are contrary to," federal law. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (citations omitted). In particular, federal law preempts state law when a comprehensive scheme of federal law is enacted that shows Congressional intent to occupy the whole field in that area, or the federal law directly conflicts with the state law. *Id.* at 713 (citations omitted).

43.    Applying these federal preemption principles, section 365 (and the remainder of the Bankruptcy Code) fully occupy the field of inquiry concerning rejection of agreements in bankruptcy and the consequences arising therefrom. State Dealer Laws are fully preempted to the extent that they purport to limit, restrict or impose any burdens or requirements on the Debtors in connection with exercising their fundamental rights under section 365 of the Bankruptcy Code to terminate their business commercial relationships with the Affected Dealers through rejection.

44.    Thus, Judge Gonzalez held that the state franchise laws at issue in *Chrysler*, the very same state laws at issue here, frustrated the purposes of (and, thus, were preempted by) section 365. *See Chrysler*, 2009 LEXIS 1382, at *11–17; *see also id.* at *62 (" 'Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield.' ") (quoting *Vallejo*, 403 B.R. at 77). As Judge Gonzalez explained:

> Specifically and by no means exclusively, statutory notice or waiting periods of, *e.g.*, 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of

---

[5] *See* U.S. CONST., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding.").

obligations once the debtor has rejected the contract.  Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected.    Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate.  So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts it will assume and assign or reject by allowing other dealers to restrict that power.

*Id.* at *62; *see also Vallejo*, 403 B.R. at 77 (holding that "Congress enacted section 365 to provide debtors the authority to reject executory contracts.  This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause.") (internal citation omitted).

45.    Finally, Judge Gonzalez also made clear that 28 U.S.C. § 959(b) did not alter the Court's "preemption analysis," because that provision "does not de-limit the precise conditions on contract rejection" — particularly where, as here, the pertinent state laws concern "consumer convenience and costs and the protection of local businesses, rather than a concern over public safety."  *Chrysler*, 2009 LEXIS 1382, at *56–58.[6]

**C.    Rejection of the Affected Dealer Agreements Concludes the Dealer Relationship and Entitles the Debtors to Full Enforcement of Rejection**

46.    The rejection of the Affected Dealer Agreements is critical to both the wind-down of the Debtors' operations and to the successful emergence of New GM.  By rejecting the Affected Dealer Agreements, the Debtors are terminating their commercial relationships with the Affected Dealers, and the Affected Dealers no longer should be able to enforce their rights under the Affected Dealer Agreements.  Thus, due to rejection, the Affected

---

[6] *See also id.* at 63–64 n.32 (stating that "state law protections cannot be used to negate the Debtors' rejection powers under § 365 . . . .  'The requirement that the debtor in possession continue to operate *according to* state law requirements imposed on the debtor in possession (i.e., § 959(b)) does not imply that its powers under the Code are *subject to* the state law protections.' ") (quoting *In re PSA, Inc.*, 335 B.R. 580, 587 (Bankr. D. Del. 2005))).

Dealers no longer may serve as authorized franchised dealers for the Debtors, or more importantly, for New GM. Nor may they enforce other contractual rights under the Affected Dealer Agreements, except in the context of a rejection damages claim. If the Affected Dealers continue to hold themselves out in the marketplace as authorized dealers of New GM, it will undoubtedly create confusion in the marketplace and could be extremely detrimental to the successful launch of and brand image of New GM.

47. Nevertheless, the Debtors anticipate that some of the Affected Dealers or Government Entities may be uncertain or confused as to the effect of the rejection of the Affected Dealer Agreements or may even seek to bring claims that interfere with the orderly rejection of such agreements. As noted above, the Debtors seek through rejection of the Affected Dealer Agreements to make a clean and complete break from their historic business relationships with the Affected Dealers. Accordingly, the Debtors believe that it is imperative to the successful formation of New GM and the Debtors orderly wind-down that the Affected Dealers and Government Entities not mistakenly or purposefully take actions to undermine, contradict or otherwise impair the legal and practical effect of the rejections sought by this Motion.

48. Therefore, just as was approved in Chrysler, the Debtors have requested in their proposed Order, and it is essential that the Court finds, that the rejection of the Affected Dealer Agreements, pursuant to section 365 of the Bankruptcy Code, is a conclusion of the commercial relationship and cuts off all rights of the Affected Dealers thereunder, except to the extent that the Affected Dealers may wish to pursue rejection damages consistent with the claims resolution process that will be established by the Court.

49. First, as was ordered by Judge Gonzalez in *Chrysler*, the Debtors request that the Court find that, as a result of the rejection of the Affected Dealer Agreements, (a) each

Affected Dealer shall have no further rights (direct, indirect, contractual or otherwise) to act as

an authorized vehicle dealer of the Debtors or New GM; and (b) each Affected Dealer's status as

a Dealer is hereby deemed to be revoked, annulled and cancelled for all purposes. Second, also

consistent with Judge Gonzalez's ruling in *Chrysler*, the Debtors request that the Court find that,

as of the Rejection Date, each such Affected Dealer no longer is authorized, appointed or

permitted (contractually or otherwise) to, among other things:

> (a)    undertake any advertising, sales, repair or service of any New GM

branded products under the terms of the Affected Dealer Agreements;

> (b)    hold itself out to any third party as an authorized Dealer of the Debtors or

of New GM for any purpose;

> (c)    display, distribute or otherwise use any signage, promotional or other

materials bearing or containing the Debtors' or New GM's trademarks and service marks,

including, without limitation, company and vehicle make and model names and logos; and

> (d)    exercise or enforce any other rights, entitlements, privileges or status

arising from or related to the Affected Dealer Agreements or having previously been a Dealer of

the Debtors, including any rights under Dealer Laws, other than through the assertion of rejection

damages claims in this Court.

## <u>Notice</u>

> 50.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York, (ii) the attorneys for the United States

Department of the Treasury, (iii) the attorneys for Export Development Canada, (iv) the

attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for

the agent under GM's prepetition amended and restated secured revolving credit agreement,

(vi) the attorneys for the statutory committee of unsecured creditors appointed in these chapter

11 cases, (vii) the attorneys for the International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America, (viii) the attorneys for the International Union of

Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of

America, (ix) the United States Department of Labor, (x) the attorneys for the National

Automobile Dealers Association, (xi) the attorneys for the ad hoc bondholders committee, (xii)

the U.S. Attorney's Office, S.D.N.Y., (xiii) the counterparties to the Affected Dealer

Agreements, and (xiv) all entities that requested notice in these chapter 11 cases under Fed. R.

Bankr. P. 2002.  The Debtors submit that, in view of the facts and circumstances, such notice is

sufficient and no other or further notice need be provided.

      51.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

      WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
     July 6, 2009

               /s/ Joseph H. Smolinsky_____
               Harvey R. Miller
               Stephen Karotkin
               Joseph H. Smolinsky

               WEIL, GOTSHAL & MANGES LLP
               767 Fifth Avenue
               New York, New York 10153
               Telephone: (212) 310-8000
               Facsimile: (212) 310-8007

               Attorneys for Debtors
               and Debtors in Possession

**Exhibit A**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 1 | B & J Motors, Inc. | Craig Cox | 201 W First St Ogallala, NE 69153 | 197959 | Buick | 11/1/05 |
| 2 | B & J Motors, Inc. | Craig Cox | 201 W First St Ogallala, NE 69153 | 197959 | Chevrolet | 11/1/05 |
| 3 | Bruce Chevrolet, Inc. | D. Bruce Patchett | 1084 SW Oak St Hillsboro, OR 97123 | 114411 | Chevrolet | 11/1/05 |
| 4 | Bruce Chevrolet, Inc. | D. Bruce Patchett | 1084 SW Oak St Hillsboro, OR 97123 | 114411 | Chevrolet Medium Duty Truck | 11/1/05 |
| 5 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | Buick | 11/1/05 |
| 6 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | Pontiac | 11/1/05 |
| 7 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | GMC Truck | 11/1/05 |
| 8 | Cardenas Autoplex Inc. | Renato Cardenas | 111 S Loop 499 Harlingen, TX 78550 | 117713 | Cadillac | 11/1/05 |
| 9 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | Buick | 3/10/08 |
| 10 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | GMC Truck | 3/10/08 |
| 11 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | Pontiac | 3/10/08 |
| 12 | Cassel GMC Truck Sales Corp. | James Cassel | 550 N Ocean Ave Patchogue, NY 11772 | 119244 | GMC Medium Duty Truck | 11/1/05 |
| 13 | Cassel GMC Truck Sales Corp. | James Cassel | 550 N Ocean Ave Patchogue, NY 11772 | 119244 | GMC Truck | 11/1/05 |
| 14 | Clyde Chevrolet-Buick, Inc. | Brien Meehan | 808 Talcottville Rd Vernon-Rockville, CT 06066 | 117923 | Chevrolet | 11/1/05 |
| 15 | Clyde Chevrolet-Buick, Inc. | Brien Meehan | 808 Talcottville Rd Vernon-Rockville, CT 06066 | 117923 | Buick | 11/1/05 |
| 16 | Colonial Chevrolet Co., Inc. | Ernest Ray Smith | 2380 US Highway 61 South Woodville, MS 39669 | 114371 | Chevrolet | 11/1/00 |
| 17 | D'Andrea Buick, Inc. | Nicholas D'Andrea | 7051 S Western Ave Chicago, IL 60636 | 167893 | BPG | 8/15/08 |
| 18 | Dean Newton Cadillac-GMC, Inc. | Duane Sparks | 519 W Broadway Lewistown, MT 59457 | 221557 | GMC Truck | 6/2/06 |
| 19 | Dean Newton Cadillac-GMC, Inc. | Duane Sparks | 519 W Broadway Lewistown, MT 59457 | 221557 | Cadillac | 6/2/06 |
| 20 | Everett Chevrolet-Geo, Inc. | John Reggans | 7300 Evergreen Way Everett, WA 98203 | 158937 | Chevrolet | 3/10/08 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

**Exhibit A**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 21 | First United, Inc. | Roque De La Fuente | 1385 E Main St<br>El Cajon, CA 92021 | 119153 | Cadillac | 11/1/05 |
| 22 | Forrest Chevrolet-Cadillac, Inc. | Charles Forrest | 2400 N Main<br>Cleburne, TX 76033 | 112300 | Chevrolet | 11/1/05 |
| 23 | Forrest Chevrolet-Cadillac, Inc. | Charles Forrest | 2400 N Main<br>Cleburne, TX 76033 | 112300 | Cadillac | 11/1/05 |
| 24 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | Buick | 11/1/05 |
| 25 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | Pontiac | 11/1/05 |
| 26 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | GMC Truck | 11/1/05 |
| 27 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Chevrolet | 11/1/05 |
| 28 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Pontiac | 11/1/05 |
| 29 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Buick | 11/1/05 |
| 30 | Gulf Coast Truck and Equipment Company, Inc. | John Cross | 2260 Hall Mill Rd<br>Mobile, AL 36606 | 204727 | GMC Medium Duty Truck | 11/1/05 |
| 31 | Gulf Coast Truck and Equipment Company, Inc. | Chad Cross | 3440 Birmingham Hwy<br>Montgomery, AL 36108 | 204728 | GMC Medium Duty Truck | 11/1/05 |
| 32 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Chevrolet | 11/1/05 |
| 33 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Pontiac | 11/1/05 |
| 34 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Buick | 11/1/05 |
| 35 | Huntley Chevrolet, Inc. | Alan Wulbert | 13980 Automall Dr<br>Huntley, IL 60142 | 208013 | Chevrolet | 11/1/05 |
| 36 | J.T.E. Epps Motors, Inc. | Emerson Epperson | 1935 US 25 E<br>Middlesboro, KY 40965 | 112725 | Chevrolet | 11/1/05 |
| 37 | J.T.E. Epps Motors, Inc. | Emerson Epperson | 1935 US 25 E<br>Middlesboro, KY 40965 | 112725 | Buick | 11/1/05 |
| 38 | Keystone Automotive, Inc. | Kevin Serra | 40941 US Hwy 280<br>Sylacauga, AL 35150 | 112646 | Chevrolet | 11/1/05 |
| 39 | Larry Menke Inc. | Lawrence Menke | 6 Heitzinger Plaza<br>Seaside, CA 93955 | 118726 | Buick | 4/14/09 |
| 40 | Matt Gay Chevrolet Oldsmobile, Inc. | David Gay | 325 Mims Rd<br>Sylvania, GA 30467 | 112475 | Chevrolet | 11/5/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

**Exhibit A**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 41 | Mount Kisco Chevrolet Cadillac Hummer, Inc. | Adrian Quinn | 175 N Bedford Rd Mount Kisco, NY 10549 | 111124 | Chevrolet | 9/29/2006 |
| 42 | Mount Kisco Chevrolet Cadillac Hummer, Inc. | Adrian Quinn | 175 N Bedford Rd Mount Kisco, NY 10549 | 111124 | Cadillac | 9/29/2006 |
| 43 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Chevrolet | 11/1/05 |
| 44 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Buick | 11/1/05 |
| 45 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Cadillac | 11/1/05 |
| 46 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | GMC Truck | 11/1/05 |
| 47 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Pontiac | 11/1/05 |
| 48 | Nordling Motors, Inc. | Thomas Nordling | 428 Market St Osage City, KS 66523 | 116186 | GMC Truck | 11/1/05 |
| 49 | Nordling Motors, Inc. | Thomas Nordling | 428 Market St Osage City, KS 66523 | 116186 | Pontiac | 11/1/05 |
| 50 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | Buick | 11/1/05 |
| 51 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | Pontiac | 11/1/05 |
| 52 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | GMC Truck | 11/1/05 |
| 53 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | Chevrolet | 4/16/09 |
| 54 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | Pontiac | 4/16/09 |
| 55 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | GMC Truck | 4/16/09 |
| 56 | Pletcher Motor Company, Inc. | Rodney Pletcher | 1001 W Pike St Goshen, IN 46526 | 117207 | Cadillac | 11/1/05 |
| 57 | Quinlan's Equipment, Inc. | John Quinlan | 1030 S Superior St Antigo, WI 54409 | 119385 | GMC Truck | 11/1/05 |
| 58 | Rapp Chevrolet, Inc. | Glen Rapp | 700 S Broadway Marion, SD 57043 | 111731 | Chevrolet | 11/1/05 |
| 59 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin Blackwell, OK 74631 | 112366 | Chevrolet | 11/1/05 |
| 60 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin Blackwell, OK 74631 | 112366 | Buick | 11/1/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

**Exhibit A**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 61 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | Cadillac | 11/1/05 |
| 62 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | GMC Truck | 11/1/05 |
| 63 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | Pontiac | 11/1/05 |
| 64 | Terry Gage Chevrolet-Oldsmobile, Inc. | Terry Gage | Hwy 65 North<br>Marshall, AR 72650 | 160246 | Chevrolet | 11/1/05 |
| 65 | The Ramey Garage, Inc. | Robert Mccully | 669 Beulah St<br>Ramey, PA 16671 | 118782 | Buick | 11/1/05 |
| 66 | Tom Sparks Buick, Inc. | Thomas Sparks | 216 S First St<br>De Kalb, IL 60115 | 118875 | Buick | 11/1/05 |
| 67 | Tygart Valley Motor Co. Inc. | Rick Wyatt | Rte 250 S Elkins Shpg Plaza<br>Elkins, WV 26241 | 240636 | Cadillac | 1/28/08 |
| 68 | Walters Chevrolet-Pontiac, Inc. | John Walters | 308 Main St<br>Groton, NY 13073 | 115278 | Chevrolet | 11/1/05 |
| 69 | Walters Chevrolet-Pontiac, Inc. | John Walters | 308 Main St<br>Groton, NY 13073 | 115278 | Pontiac | 11/1/05 |
| 70 | Watkins Trucks, Inc. | Robert Watkins | 4031 New Castle Ave<br>New Castle, DE 19720 | 119328 | GMC Medium Duty Truck | 11/1/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                          :
In re                                                     :          **Chapter 11 Case No.**
                                                          :
**GENERAL MOTORS CORP., *et al.*,**                       :          **09-50026 (REG)**
                                                          :
                                      **Debtors.**        :          **(Jointly Administered)**
                                                          :
------------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 365 AUTHORIZING (A) REJECTION
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN
DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

Upon the Motion, dated July 6, 2009 (the "**Motion**"),[1] of General Motors

Corporation and its affiliated debtors, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105 and 365 of

title 11, United States Code (the "**Bankruptcy Code**"), for entry of an order authorizing (a) the

rejection of executory contracts and unexpired leases with certain domestic Dealers and (b)

granting certain related relief, all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§ 1334; and due and proper notice of the Motion having been provided, and it appearing that no

other or further notice need be provided; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all

parties in interest and that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it

is

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that each of the Affected Dealer Agreements is an executory contract capable of being rejected under section 365 of the Bankruptcy Code; and it is further

ORDERED that the rejection of the Affected Dealer Agreements, as set forth herein, (1) constitutes an exercise of sound business judgment by the Debtors, made in good faith and for legitimate commercial reasons; (2) is appropriate and necessary under the circumstances described in the Motion; and (3) is warranted and permissible under sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006; and it is further

ORDERED that the Debtors are authorized to reject the Affected Dealer Agreements with respect to the Dealers and Dealership locations identified on **Annex I** attached hereto and incorporated herein by reference.  Effective as of July 10, 2009 (the "**Rejection Effective Date**"), all such Affected Dealer Agreements are rejected pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that as provided for under the MPA, approved by this Court on July 5, 2009, only those Dealers that were offered, and accepted, Participation Agreements or Wind-Down Agreements (collectively, the "**Authorized Dealers**") will be allowed to continue their Dealership operations, as provided for in those agreements, as part of New GM; and New GM has determined not to accept an assignment of any of the Affected Dealer Agreements; and it is further

ORDERED that pursuant to section 365 of the Bankruptcy Code, as a result of the rejection of the Affected Dealer Agreements, each Affected Dealer shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer of the Debtors.  As

2

such, immediately as of the Rejection Effective Date, each such Affected Dealer is no longer

authorized to, among other things:

> (a)     undertake any advertising, sales, repair or service of any of the Debtors' or
> New GM's products as an Authorized Dealer under the terms of the
> Affected Dealer Agreements;

> (b)     hold itself out to any third party as an Authorized Dealer of the Debtors or
> New GM for any purpose;

> (c)     display, distribute or otherwise use any signage, promotional or other
> materials bearing or containing the Debtors' or New GM's trademarks,
> tradenames and servicemarks, except that it may use the Debtors' or New
> GM's descriptive brand and vehicle model names solely for the purpose of
> identifying and advertising its inventory for sale to the extent permitted by
> applicable law for a party that is not an Authorized Dealer of the Debtors;
> and

> (d)     the Debtors may exercise any and all of their rights provided for in the
> Affected Dealer Agreements' termination provisions; and it is further

ORDERED that all Affected Dealers who wish to assert claims against the

Debtors arising out of or related to the rejection of the Affected Dealer Agreements (collectively,

"**Rejection Damages Claims**") must file a proof of claim for such Rejection Damages Claims no

later than the general bar date to be established by the Court in these cases under Bankruptcy

Rule 3003(c)(3) or make any administrative claim request by such other applicable deadline, and

in accordance with such other procedures, as may be established by the Court for the assertion of

such claims under section 503(a) of the Bankruptcy Code.  If an Affected Dealer fails to file a

timely and proper Rejection Damages Claim, such Affected Dealer shall be forever barred,

estopped and enjoined from asserting such Rejection Damages Claim against the Debtors or

voting or receiving distributions under any plan in these cases on account of such Rejection

Damages Claim.  All issues relating to the allowance, amount, priority and treatment of any

Rejection Damage Claim or any other claim, right or remedy asserted by the Affected Dealers

are preserved.  The Debtors and other parties in interest reserve and retain the right to object to

any Rejection Damages Claims or other claims filed or asserted by the Affected Dealers

(including as to allowance, amount, priority and treatment of such claims), or any other asserted

rights or remedies, on any and all available grounds; and it is further

ORDERED that to the extent that any Dealer Laws conflict with the terms of this

Order or the impact of the rejection of the Affected Dealer Agreements under the Bankruptcy

Code and applicable case law, such laws are preempted by the Bankruptcy Code, pursuant to the

Supremacy Clause of the United States Constitution; and it is further

ORDERED that this Court shall retain jurisdiction to resolve all matters relating

to the implementation, enforcement and interpretation of this Order.  Without limiting the

foregoing, the Court also shall retain jurisdiction with respect to this Order and the Affected

Dealer Agreements over (a) any actions by the Affected Dealers against New GM, or the Debtors

or the property of their estates, including, without limitation, any actions in violation of the

automatic stay under section 362 of the Bankruptcy Code; and (b) any Rejection Damages

Claims or other claims alleged against the Debtors' estates, and any objections or defenses

thereto.

Dated: New York, New York
            _____, 2009


                                              _____
                                              UNITED STATES BANKRUPTCY JUDGE

### ANNEX I

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 1 | B & J Motors, Inc. | Craig Cox | 201 W First St Ogallala, NE 69153 | 197959 | Buick | 11/1/05 |
| 2 | B & J Motors, Inc. | Craig Cox | 201 W First St Ogallala, NE 69153 | 197959 | Chevrolet | 11/1/05 |
| 3 | Bruce Chevrolet, Inc. | D. Bruce Patchett | 1084 SW Oak St Hillsboro, OR 97123 | 114411 | Chevrolet | 11/1/05 |
| 4 | Bruce Chevrolet, Inc. | D. Bruce Patchett | 1084 SW Oak St Hillsboro, OR 97123 | 114411 | Chevrolet Medium Duty Truck | 11/1/05 |
| 5 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | Buick | 11/1/05 |
| 6 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | Pontiac | 11/1/05 |
| 7 | C. Thompson Automotive, Inc. | A.Claude Thompson | 1706 Montague Ave Ext Greenwood, SC 29649 | 116453 | GMC Truck | 11/1/05 |
| 8 | Cardenas Autoplex Inc. | Renato Cardenas | 111 S Loop 499 Harlingen, TX 78550 | 117713 | Cadillac | 11/1/05 |
| 9 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | Buick | 3/10/08 |
| 10 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | GMC Truck | 3/10/08 |
| 11 | Carmark, LLC | Gregg Carter | 621 N Washington Seymour, TX 76380 | 243044 | Pontiac | 3/10/08 |
| 12 | Cassel GMC Truck Sales Corp. | James Cassel | 550 N Ocean Ave Patchogue, NY 11772 | 119244 | GMC Medium Duty Truck | 11/1/05 |
| 13 | Cassel GMC Truck Sales Corp. | James Cassel | 550 N Ocean Ave Patchogue, NY 11772 | 119244 | GMC Truck | 11/1/05 |
| 14 | Clyde Chevrolet-Buick, Inc. | Brien Meehan | 808 Talcottville Rd Vernon-Rockville, CT 06066 | 117923 | Chevrolet | 11/1/05 |
| 15 | Clyde Chevrolet-Buick, Inc. | Brien Meehan | 808 Talcottville Rd Vernon-Rockville, CT 06066 | 117923 | Buick | 11/1/05 |
| 16 | Colonial Chevrolet Co., Inc. | Ernest Ray Smith | 2380 US Highway 61 South Woodville, MS 39669 | 114371 | Chevrolet | 11/1/00 |
| 17 | D'Andrea Buick, Inc. | Nicholas D'Andrea | 7051 S Western Ave Chicago, IL 60636 | 167893 | BPG | 8/15/08 |
| 18 | Dean Newton Cadillac-GMC, Inc. | Duane Sparks | 519 W Broadway Lewistown, MT 59457 | 221557 | GMC Truck | 6/2/06 |
| 19 | Dean Newton Cadillac-GMC, Inc. | Duane Sparks | 519 W Broadway Lewistown, MT 59457 | 221557 | Cadillac | 6/2/06 |
| 20 | Everett Chevrolet-Geo, Inc. | John Reggans | 7300 Evergreen Way Everett, WA 98203 | 158937 | Chevrolet | 3/10/08 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

## ANNEX I

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 21 | First United, Inc. | Roque De La Fuente | 1385 E Main St<br>El Cajon, CA 92021 | 119153 | Cadillac | 11/1/05 |
| 22 | Forrest Chevrolet-Cadillac, Inc. | Charles Forrest | 2400 N Main<br>Cleburne, TX 76033 | 112300 | Chevrolet | 11/1/05 |
| 23 | Forrest Chevrolet-Cadillac, Inc. | Charles Forrest | 2400 N Main<br>Cleburne, TX 76033 | 112300 | Cadillac | 11/1/05 |
| 24 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | Buick | 11/1/05 |
| 25 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | Pontiac | 11/1/05 |
| 26 | Forrest Pontiac-Buick-GMC Truck, Inc. | Charles Forrest | 2408 N Main<br>Cleburne, TX 76033 | 116550 | GMC Truck | 11/1/05 |
| 27 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Chevrolet | 11/1/05 |
| 28 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Pontiac | 11/1/05 |
| 29 | Graves Pontiac-Chevrolet-Buick, Inc. | Ronald Graves | 4040 N First St<br>Milan, TN 38358 | 114213 | Buick | 11/1/05 |
| 30 | Gulf Coast Truck and Equipment Company, Inc. | John Cross | 2260 Hall Mill Rd<br>Mobile, AL 36606 | 204727 | GMC Medium Duty Truck | 11/1/05 |
| 31 | Gulf Coast Truck and Equipment Company, Inc. | Chad Cross | 3440 Birmingham Hwy<br>Montgomery, AL 36108 | 204728 | GMC Medium Duty Truck | 11/1/05 |
| 32 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Chevrolet | 11/1/05 |
| 33 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Pontiac | 11/1/05 |
| 34 | Harbortown Auto, Inc. | James Brogan Jr | 311 Spar St<br>Ontonagon, MI 49953 | 164635 | Buick | 11/1/05 |
| 35 | Huntley Chevrolet, Inc. | Alan Wulbert | 13980 Automall Dr<br>Huntley, IL 60142 | 208013 | Chevrolet | 11/1/05 |
| 36 | J.T.E. Epps Motors, Inc. | Emerson Epperson | 1935 US 25 E<br>Middlesboro, KY 40965 | 112725 | Chevrolet | 11/1/05 |
| 37 | J.T.E. Epps Motors, Inc. | Emerson Epperson | 1935 US 25 E<br>Middlesboro, KY 40965 | 112725 | Buick | 11/1/05 |
| 38 | Keystone Automotive, Inc. | Kevin Serra | 40941 US Hwy 280<br>Sylacauga, AL 35150 | 112646 | Chevrolet | 11/1/05 |
| 39 | Larry Menke Inc. | Lawrence Menke | 6 Heitzinger Plaza<br>Seaside, CA 93955 | 118726 | Buick | 4/14/09 |
| 40 | Matt Gay Chevrolet Oldsmobile, Inc. | David Gay | 325 Mims Rd<br>Sylvania, GA 30467 | 112475 | Chevrolet | 11/5/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

**ANNEX I**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 41 | Mount Kisco Chevrolet Cadillac Hummer, Inc. | Adrian Quinn | 175 N Bedford Rd Mount Kisco, NY 10549 | 111124 | Chevrolet | 9/29/2006 |
| 42 | Mount Kisco Chevrolet Cadillac Hummer, Inc. | Adrian Quinn | 175 N Bedford Rd Mount Kisco, NY 10549 | 111124 | Cadillac | 9/29/2006 |
| 43 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Chevrolet | 11/1/05 |
| 44 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Buick | 11/1/05 |
| 45 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Cadillac | 11/1/05 |
| 46 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | GMC Truck | 11/1/05 |
| 47 | Mullins Motors, Inc. | David Small | 3369 Hwy 76 East Mullins, SC 29574 | 116444 | Pontiac | 11/1/05 |
| 48 | Nordling Motors, Inc. | Thomas Nordling | 428 Market St Osage City, KS 66523 | 116186 | GMC Truck | 11/1/05 |
| 49 | Nordling Motors, Inc. | Thomas Nordling | 428 Market St Osage City, KS 66523 | 116186 | Pontiac | 11/1/05 |
| 50 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | Buick | 11/1/05 |
| 51 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | Pontiac | 11/1/05 |
| 52 | Norman-Blackmon Motor Company, Inc. | Stephen Norman | 801 E Commerce St Greenville, AL 36037 | 118843 | GMC Truck | 11/1/05 |
| 53 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | Chevrolet | 4/16/09 |
| 54 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | Pontiac | 4/16/09 |
| 55 | Northstate Motors, Inc. | Brian Leach | 246 E Walker St Orland, CA 95963 | 176606 | GMC Truck | 4/16/09 |
| 56 | Pletcher Motor Company, Inc. | Rodney Pletcher | 1001 W Pike St Goshen, IN 46526 | 117207 | Cadillac | 11/1/05 |
| 57 | Quinlan's Equipment, Inc. | John Quinlan | 1030 S Superior St Antigo, WI 54409 | 119385 | GMC Truck | 11/1/05 |
| 58 | Rapp Chevrolet, Inc. | Glen Rapp | 700 S Broadway Marion, SD 57043 | 111731 | Chevrolet | 11/1/05 |
| 59 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin Blackwell, OK 74631 | 112366 | Chevrolet | 11/1/05 |
| 60 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin Blackwell, OK 74631 | 112366 | Buick | 11/1/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).

**ANNEX I**

| | Dealer Name | Majority Owner | Dealer Address | Dealer Code | GM Brand | Contract Date |
|---|---|---|---|---|---|---|
| 61 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | Cadillac | 11/1/05 |
| 62 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | GMC Truck | 11/1/05 |
| 63 | Sonny Cannon Auto Plaza, Inc. | William Cannon | 220 W Doolin<br>Blackwell, OK 74631 | 112366 | Pontiac | 11/1/05 |
| 64 | Terry Gage Chevrolet-Oldsmobile, Inc. | Terry Gage | Hwy 65 North<br>Marshall, AR 72650 | 160246 | Chevrolet | 11/1/05 |
| 65 | The Ramey Garage, Inc. | Robert Mccully | 669 Beulah St<br>Ramey, PA 16671 | 118782 | Buick | 11/1/05 |
| 66 | Tom Sparks Buick, Inc. | Thomas Sparks | 216 S First St<br>De Kalb, IL 60115 | 118875 | Buick | 11/1/05 |
| 67 | Tygart Valley Motor Co. Inc. | Rick Wyatt | Rte 250 S Elkins Shpg Plaza<br>Elkins, WV 26241 | 240636 | Cadillac | 1/28/08 |
| 68 | Walters Chevrolet-Pontiac, Inc. | John Walters | 308 Main St<br>Groton, NY 13073 | 115278 | Chevrolet | 11/1/05 |
| 69 | Walters Chevrolet-Pontiac, Inc. | John Walters | 308 Main St<br>Groton, NY 13073 | 115278 | Pontiac | 11/1/05 |
| 70 | Watkins Trucks, Inc. | Robert Watkins | 4031 New Castle Ave<br>New Castle, DE 19720 | 119328 | GMC Medium Duty Truck | 11/1/05 |

The Affected Dealer Agreements subject to rejection include all Sales and Service Dealership Agreements of the above listed Affected Dealers and any amendments or supplements thereto, as well as all Ancillary Agreements (all as defined in the Motion).