KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-3275
Facsimile: (212) 715-8000
Thomas Moers Mayer
Kenneth H. Eckstein
Robert T. Schmidt
Adam C. Rogoff

*Counsel for the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                           :
In re:                                                     :        Chapter 11 Case No.:
                                                           :
GENERAL MOTORS CORP., et al.,                              :        09-50026 (REG)
                                                           :
                            Debtors.                       :        (Jointly Administered)
                                                           :
---------------------------------------------------------- X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO (I) THE AD HOC COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS' MOTION FOR AN ORDER
CERTIFYING SALE ORDER FOR IMMEDIATE APPEAL
TO THE UNITED STATES COURT OF APPEALS, PURSUANT TO
28 U.S.C. § 158(d)(2) OR IN THE ALTERNATIVE FOR A STAY
OF THE SALE ORDER, PURSUANT TO FED. R. BANKR. P. 8005,
AND (II) MOTION OF THE INDIVIDUAL ACCIDENT LITIGANTS
FOR AN ORDER CERTIFYING THE SALE ORDER FOR IMMEDIATE
APPEAL TO THE UNITED STATES COURT OF APPEALS PURSUANT
TO 28 U.S.C. § 158(d)(2) ON THE ISSUE OF SUCCESSOR LIABILITY**

TO:    THE HONORABLE ROBERT E. GERBER,
       UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-

captioned debtors and debtors-in-possession (the "**Debtors**" or "**GM**"), by and through its

undersigned counsel, hereby submits this objection (the "**Objection**") to: (i) the Ad Hoc

Committee of Asbestos Personal Injury Claimants' (the "**Asbestos Committee**") Motion for an Order Certifying Sale Order for Immediate Appeal to the United States Court of Appeals, Pursuant to 28 U.S.C. § 158(d)(2) or in the Alternative for a Stay of the Sale Order, Pursuant to Fed. R. Bankr. P. 8005; and (ii) the Motion of the Individual Accident Litigants (the "**Individual Accident Litigants**") for an Order Certifying the Sale Order for Immediate Appeal to the United States Court of Appeals Pursuant to 28 U.S.C. § 158(d)(2) on the Issue of Successor Liability (collectively, the "**Motions**").  In support of its Objection, the Committee represents as follows:

## PRELIMINARY STATEMENT

Following weeks of negotiation, days of discovery, countless hours analyzing the transaction and, finally, three days of hearings, the Committee is satisfied that the proposed sale of substantially all of the Debtors' assets in return for, among other things, the purchaser's assumption of certain liabilities and satisfaction of other claims with the purchaser's equity represents the best possible outcome for the Debtors' estates.  The Committee supported the sale in this Court and does so here.  The Committee acknowledges that the transaction comes at a cost.  Many creditors are "left behind" at the Debtors with a recovery in equity securities that they find inadequate.  Certain of those creditors, including certain members of the Committee, have appealed or may appeal the Court's order approving the sale, and the Committee's arguments herein are without prejudice to the arguments taken by Committee members in their individual capacity.  Nevertheless, while the Committee does not challenge these claimants' right to appeal, the Committee sees no justification for a stay pending appeal.  The Committee also opposes certification for direct appeal to the United States Court of Appeals for the Second Circuit, which increases the risk that a stay will be granted for administrative purposes when the substantive grounds for a stay cannot be met.  The deadline for closing the sale transaction is fast

KL2 2611899.6

approaching.  The Asbestos Committee should not be permitted to jeopardize a resolution of these cases that is supported by the vast majority of the Debtors' creditors.  Thus, the Court should deny the Asbestos Committee's request for a stay pending appeal or, at a minimum, require the posting of a multi-billion dollar bond as a condition to granting any stay.   The Court should also deny the Individual Accident Litigants' motion for certification to the United States Court of Appeals for the Second Circuit for the reasons set forth below.

## BACKGROUND

1.        On July 5, 2009, the Court entered an order (the "**Sale Order**") [Dkt. No. 2968] and opinion (the "**Sale Decision**") [Dkt. No. 2967] authorizing the sale (the "**Sale**") of substantially all of the Debtors assets to NGMCO, Inc. ("**New GM**").

2.        The Sale Order provides that the assets of GM (in such capacity, "**Old GM**") covered by the Sale are transferred "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever . . . including rights or claims based on any successor or transferee liability."  Sale Order ¶ 7.

3.        In addition, the Sale Order enjoins all persons and entities "from asserting against the Purchaser . . . such person's or entities' liens, claims, encumbrances, and other interests including rights or claims based on any successor or transferee liability."  Sale Order ¶ 8.  Future claims or demands based on exposure to asbestos are enjoined only "to the fullest extent constitutionally permissible."  *Id.*

4.        The Sale Order provides that it is to be effective as of 12:00 noon EDT on Thursday, July 9, at which time the Debtors and New GM are authorized to close the transaction. Sale Order ¶ 70.

5.      On July 6, the Asbestos Committee and the Individual Accident Litigants (the "**Appellants**") each filed notices of appeal (the "**Appeals**") from the Sale Order.  [Dkt. Nos. 2970 and 2988.]

6.      The Asbestos Committee is comprised of seven personal injury and wrongful death claimants and one attorney.  *See* Verified Statement of Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation, Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure [Dkt. No. 2459].

7.      The Individual Accident Litigants are five personal injury/product liability claimants of the Debtors.  *See* Verified Statement of the Coleman Law Firm Pursuant to Bankruptcy Rule 2019 [Dkt. No. 1932].

**OBJECTION**

**A.      The Sale Order Should Not Be Stayed Pending Appeal**

8.      In evaluating whether to grant a stay pending appeal, courts consider four factors: (i) whether the movant will suffer irreparable injury absent a stay; (ii) whether a party will suffer substantial injury if a stay is issued; (iii) whether the movant has demonstrated "a substantial possibility, although less than a likelihood, of success" on appeal; and (iv) the public interests that may be affected.  *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1992).  The party seeking a stay pending appeal bears the "heavy burden" of proving its entitlement to the stay.  *In re Adelphia Commc'ns Corp.,* 333 B.R. 649, 659 (S.D.N.Y. 2005); *accord United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir. 1995).  Here, the application of the four factors weighs against the grant of a stay.

### i. The Asbestos Committee Has Not
### Established a Threat of Irreparable Injury

9.      While the Asbestos Committee[1] states that a failure to obtain a stay "may well

moot the issues for appeal," it is noteworthy that it does not actually contend that failure to

obtain a stay will moot its appeal.  Instead, it contends that "*the Debtors will argue* that Section

363(m) could essentially prevent [the Sale] from being reversed."  Asbestos Committee Motion ¶

8-9 (emphasis added); *see also id.* ("the appeal will be argued by Debtors to effectively moot the

issues").

10.      It is debatable whether the likelihood of mootness alone constitutes irreparable

harm.  Indeed, one of the cases that the Asbestos Claimants rely on for this proposition concedes

that it represents the minority position.  *See ACC Bondholder Group v. Adelphia Commc'ns

Corp. (In re Adelphia Commc'ns Corp.),* 361 B.R. 337 (S.D.N.Y. 2007) ("A majority of courts

have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *c.f

Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 177 B.R. 791, 805 n.12

(S.D.N.Y. 1995) ("Although the threat of mootness alone is not dispositive of the issue of

irreparable injury, it is a relevant factor.").  Regardless of whether the likelihood of mootness

alone constitutes irreparable harm, the Asbestos Committee has not sustained its heavy burden of

demonstrating that there is a likelihood of mootness absent a stay.  It is not sufficient to simply

posit that the Debtors are likely to make this argument.[2]

---

[1] The Individual Accident Litigants do not seek a stay pending appeal.

[2] Indeed, it is possible that the Asbestos Committee has carefully chosen its words so as to preserve its ability to
argue that the sale does ***not*** moot its appeal.

KL2 2611899.6

### ii.    GM's Creditors Will Suffer
### Substantial Injury if a Stay is Issued

11.    The record at the hearing on the Sale established – and this Court explicitly found – that the Debtors have, for some time, managed to continue to operate their businesses only as a result of the financial assistance provided by the United States Treasury ("**Treasury**").  Sale Decision p. 23.  Treasury has stated that its continued financing of the Debtors is conditioned on approval of the Sale, and that its financing will cease if the Sale does not close by August 15, 2009.  *See* June 1 Hearing Transcript, p. 75-76 (testimony of Harry Wilson); Sale Decision p. 23.  There are no other prospective purchasers of the Debtors assets, nor is there any time left to search out alternative purchasers or to develop and confirm a chapter 11 plan as an alternative to a sale.  The Debtors would be unable to sustain their operations if they were left to pursue these alternatives without Treasury financing.  Accordingly, if the Sale does not close promptly, the Debtors will liquidate.

12.    The Committee respectfully refers the Court to the Affidavit of Michael Eisenband, attached as Exhibit A.  Mr. Eisenband refers to the Declaration of J. Stephen Worth of Evercore Partners,  Dkt. No. 425 (the "**Worth Declaration**"), estimating the total New GM enterprise value at between $63.1 billion and $73.1 billion, and the liquidation value of the Debtors at between $6.5 billion and $9.7 billion.  A stay of the transaction risks total value to all GM creditors of the difference between New GM's enterprise value and the Debtors' liquidation value – between $53.4 billion and $66.6 billion.

13.    Mr. Eisenband also refers to the Worth Declaration for an estimate of the value of equity securities to be issued to unsecured creditors:  $7.4 billion to $9.8 billion.  In a liquidation, unsecured creditors would receive nothing.  See Declaration of Albert Koch, and the Liquidation Analysis attached thereto as Exhibit B [Dkt. No. 435].  A stay of the transaction thus risks total

value to unsecured creditors of $7.4 billion to $9.8 billion.  Thus the second factor weighs

heavily against a stay.

### iii.    The Asbestos Committee Has Not Demonstrated a Substantial Possibility of Success on Appeal

14.    As this Court recognized in the Sale Decision, Second Circuit precedent already

establishes that section 363 sales of major assets may be effected prior to confirmation of a plan

in appropriate circumstances.  *See* Sale Decision at 28-29 (citing *Comm. of Equity Sec. Holders*

*v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir. 1983); *Off. Comm. of Unsecured*

*Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d

141 (2d Cir. 1992); *Consumer News & Bus. Channel P'ship v. Fin. News Network, Inc. (In re*

*Fin. News Network, Inc.),* 980 F.2d 165 (2d Cir. 1992); *Licensing By Paolo, Inc. v. Sinatra (In re*

*Gucci),* 126 F.3d 380 (2d Cir. 1997); *Motorola v. Comm. of Unsecured Creditors (In re Iridium*

*Operating LLC),* 478 F.3d 452 (2d Cir. 2007)).  The Asbestos Committee has not distinguished

these cases.

15.    As to issues of successor liability, the Asbestos Committee has not cited to any

precedent in the Second Circuit that would support its claim to a substantial possibility of

success on appeal.

### iv.    The Public Interest Weighs Against a Stay

16.    The stay sought by the Asbestos Committee is against the public interest.  The

President of the United States has stated that the survival of General Motors is important to the

general welfare of the economy, and in consequence has committed billions of dollars to the

survival of these debtors.  These facts would seem probative of the public interest.

**B.      In the Event a Stay is Granted, it Should be
      <u>Conditioned on the Posting of a Substantial Bond</u>**

17.      Where the grant of a stay risks causing harm to non-moving parties, courts have not hesitated to condition stays on the posting of substantial bonds. *See, e.g., Adelphia,* 361 B.R. at 368-69 (requiring bond of $1.3 billion). Indeed, "if a stay pending appeal is likely to cause harm by diminishing the value of an estate or 'endanger [the non-moving parties'] interest in the ultimate recovery,' and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties." *Id.* at 368 (alterations in original). A movant seeking a stay without having to post a bond bears the burden of demonstrating why waiver of the traditional requirement is justified. *Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.),* No. 06-cv-4128, 2007 WL 1346616, *4 (S.D.N.Y. May 9, 2007). An inability to post a sufficient bond is not justification for waiver. *See Triple Net Investments IX, LP v. DJK Residential LLC (In re DJK Residential LLC),* No. 08-10375, 2008 WL 650389, *5 (S.D.N.Y. Mar. 7, 2008) (noting that the argument that the cost of a bond would be prohibitive "only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders were erroneously stayed").

18.      Here, the grant of a stay pending appeal threatens to derail the Sale and to force a liquidation of the Debtors. As noted above, liquidation would cost all creditors between $53.4 billion and $66.6 billion, and unsecured creditors in particular $7.4 billion to $9.8 billion. In such circumstances the Court should condition the grant of any stay on the posting of a bond of between **$53.4 billion** and **$66.6 billion.** This represents the Committee's best estimate of the difference between the enterprise value of New GM upon closing of the Sale and the funds

available for distribution to creditors after wind down expenses in a hypothetical liquidation.  *See* Affidavit of Michael Eisenband, attached as Exhibit A.

C.    **The Court Should Deny the Request for Certification to the Second Circuit**

19.    The Appellants' request for immediate certification of the Appeals to the Second Circuit represents a thinly-disguised attempt to obtain a stay based on administrative procedure rather than substantive grounds.  *See* United States Court of Appeals for the Second Circuit Rule 27(b) (clerk's notation that status quo is to be maintained pending a hearing shall have the effect of a stay).  Moreover, appellants advance no argument that would justify immediate certification. Their appeal poses neither an issue that is in dispute in this Circuit nor an interest of national importance.

20.    By contrast, the reorganization of Chrysler LLC did pose an issue of national importance:  whether the Troubled Asset Relief Program authorized the United States Treasury to loan Chrysler billions of dollars (the "**TARP Issue**").  Chrysler's dissenting banks cited the TARP Issue in seeking mandatory removal of the reference to the United States District Court. When United States District Judge Griesa refused to withdraw the reference, he was sufficiently concerned about the TARP Issue to caution the parties against depriving the dissenting banks of their right to appeal.[3]  There is no TARP Issue in this case.

21.    Therefore, for the reasons stated above, the Committee opposes certifying this appeal to the United States Court of Appeals for the Second Circuit.

---

[3]  *See In re Chrysler LLC,* No. 09-04743, Dkt. No. 1 (S.D.N.Y. 2009) (dissenting banks' contention that the government had violated federal law in providing financing for the sale implicated a "very, very important matter of great public interest") (May 26 Hearing Transcript, p. 49).  See Transcript attached as Exhibit B.

KL2 2611899.6

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that the Court enter an order denying the relief requested in the Motions or, to the extent a stay is granted, conditioning such stay on the posting of a substantial bond, and granting such other and further relief as the Court deems just and proper.

Dated: July 7, 2009
New York, New York

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

By: s/Thomas Moers Mayer
Thomas Moers Mayer
Kenneth H. Eckstein
Robert T. Schmidt
Adam C. Rogoff
1177 Avenue of the Americas
New York, NY  10036
(212) 715-3275

*Counsel for the Official Committee of Unsecured Creditors*

KL2 2611899.6

# **Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                            :

In re:                            :        Chapter 11 Case No.:
                            :

GENERAL MOTORS CORP., et al.,   :        09-50026 (REG)
                            :

             Debtors.     :        (Jointly Administered)
                            :

-------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF THE OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO (I) THE AD HOC COMMITTEE
OF ASBESTOS PERSONAL INJURY CLAIMANTS' MOTION FOR AN ORDER
CERTIFYING SALE ORDER FOR IMMEDIATE APPEALTO THE UNITED STATES
COURT OF APPEALS, PURSUANT TO28 U.S.C. § 158(d)(2) OR IN THE
ALTERNATIVE FOR A STAY OF THE SALE ORDER, PURSUANT TO FED. R.
BANKR. P. 8005, AND (II) MOTION OF THE INDIVIDUAL ACCIDENT LITIGANTS
FOR AN ORDER CERTIFYING THE SALE ORDER FOR IMMEDIATE APPEAL
TO THE UNITED STATES COURT OF APPEALS PURSUANT
<u>TO 28 U.S.C. § 158(d)(2) ON THE ISSUE OF SUCCESSOR LIABILITY</u>**

STATE OF NEW YORK      )
                       )  ss.
COUNTY OF NEW YORK    )

I, Michael Eisenband, being duly sworn, hereby deposes and says:

1.        I am a Senior Managing Director with FTI Consulting, Inc. (together with its wholly

owned subsidiaries, agents, independent contractors and employees "**<u>FTI</u>**"), a financial advisory

services firm with numerous offices throughout the country.  I submit this Affidavit on

behalf of FTI (the "**<u>Affidavit</u>**") in support of the objection (the "**<u>Objection</u>**") of the Official

Committee of Unsecured Creditors (the "**<u>Committee</u>**") to General Motors Corporation, *et al.*, the

debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the

"**<u>Debtors</u>**"), to (I) The Ad Hoc Committee Of Asbestos Personal Injury Claimants' Motion For An

KL2 2594445.1

Order Certifying Sale Order For Immediate Appeal to The United States Court Of Appeals, Pursuant To 28 U.S.C. § 158(D)(2) Or In The Alternative For A Stay of The Sale Order, Pursuant To Fed. R. Bankr. P. 8005, And (Ii) Motion Of The Individual Accident Litigants For An Order Certifying The Sale Order For Immediate Appeal To The United States Court Of Appeals Pursuant To 28 U.S.C. § 158(D)(2) On The Issue Of Successor Liability (the "**Motions**").  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2.	On July 7, 2009, the Court entered an order (the "**Order**") on the Motions stating that parties are to address the size of the bond that would be appropriate if the Court were otherwise inclined to issue a stay.  The Order further states that "If, as is possible, parties wish to bring to the Court's attention the loss or lack of loss that would be occasioned by delay (as relevant to the size of the bond or otherwise), supporting facts should be presented by affidavit."

3.	In support of this Affidavit, I have reviewed the Declaration of J. Stephen Worth in Support of the Proposed Sale of Debtors' Assets to Vehicle Acquisition Holdings LLC, executed on May 31, 2009 (the "**Worth Declaration**"), excerpted portions of which is attached hereto as Exhibit 1.

4.	Treasury's[1] continued financing of the Debtors is conditioned on approval of the Sale by July 10, 2009.  *See* July 1 Hearing Transcript p. 74 – 76 (testimony of Harry Wilson).  As set forth in the Worth Declaration,  the only other alternative open to the Debtors in the event that the 363 transaction does not proceed in the absence of further financing being available will be liquidation.  *See* paragraph 24 of the Worth Declaration.  Therefore, the loss that would be occasioned by delay of the 363 transaction would approximate the difference between the enterprise

---

1 Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

value of New GM upon closing of the proposed 363 transaction and the funds available for distribution to creditors, after wind down expenses, in a hypothetical liquidation.

5.      As set forth in the Worth Declaration, the total New GM enterprise value after completion of the proposed 363 transaction is between $63.1 billion and $73.1 billion. *See* page 16 of Exhibit F to the Worth Declaration. As set forth in the Worth Declaration, the estimated net proceeds available for distribution to all creditors under a hypothetical liquidation scenario, assuming the 363 transaction did not occur, and after wind down expenses, is between $6.5 billion and $9.7 billion. *See* page 6 of Exhibit D to the Worth Declaration.

6.      Moreover, as set forth in the Worth Declaration, the total imputed value of the equity and warrants in New GM that is being reserved for distribution to unsecured creditors of the Debtors' estate remaining after the 363 transaction is between $7.4 billion and $9.8 billion. *See* page 14 of Exhibit F to the Worth Declaration. As set forth in the Worth Declaration, under a hypothetical liquidation scenario, after paying wind down costs, there would be insufficient funds for distribution to general unsecured creditors. *See* page 6 of Exhibit D to the Worth Declaration. Moreover, the magnitude of loss is that much greater for those unsecured creditors whose claims are scheduled to be assumed by New GM pursuant to the 363 transaction.

7.      Therefore, the estimated value loss to the estate from delay of timely approval of the 363 transaction is between $53.4 billion and $66.6 billion. The estimated value loss to general unsecured creditors from delay of the 363 transaction is between $7.4 billion and $9.8 billion. For the reasons set forth in the Objection, the Committee requests that the Court enter an order denying the relief requested in the Motions. However, if the Court were so inclined to grant a stay, the

Committee submits that the Court should require a bond of between $53.4 billion and $66.6 billion,

or at a minimum between $7.4 billion and $9.8 billion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated this 7th day of July 2009.

_____

Michael Eisenband

SUBSCRIBED AND SWORN TO BEFORE ME this 7th day of July 2009.

_____

Notary Public

My Commission Expires:

LINDA J. PEARSON
NOTARY PUBLIC, STATE OF NEW YORK
No. 01PE6110512
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES MAY 24, 2012

# **EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x
                                                            :
In re                                                       :       Chapter 11
                                                            :
General Motors Corporation, *et al.,*                       :       Case No. _____
                                                            :
                                                            :       (Jointly Administered)
                           Debtors.                         :
                                                            :
----------------------------------------------------------- x

**DECLARATION OF J. STEPHEN WORTH**
**IN SUPPORT OF THE**
**PROPOSED SALE OF DEBTORS' ASSETS TO VEHICLE ACQUISITION HOLDINGS**
**LLC**

I, J. Stephen Worth, make this Declaration under 28 U.S.C. § 1746 and state:

1.      I am a Managing Director with Evercore Group L.L.C. (together with its

wholly-owned subsidiaries, agents, independent contractors and employees, "Evercore"),

financial advisor to General Motors Corporation and the other above-captioned debtors and

debtors in possession (collectively the "Debtors" and, together with their non-debtor affiliates,

"GM").  I submit this Declaration in support of the proposed sale and transfer of substantially all

of the Debtors' assets (the "Purchased Assets") to a newly formed entity ("Vehicle Acquisition

Holdings LLC"), all as more fully described in the Motion (as defined below).[1]

---

[1] Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing (the "Motion").

## PROPOSED 363 SALE

20.     GM has analyzed a range of alternatives to raise liquidity, reduce its financial leverage and achieve its operational objectives, including the use of the U.S. Bankruptcy Code.  It has been GM's preferred objective to restructure its business out-of-court, based on a concern that revenue would decline rapidly and confidence in GM's brands would be permanently impaired in a bankruptcy.  As a result, to the extent bankruptcy strategies have been considered, the focus has been on achieving a very rapid exit of GM's operating businesses from bankruptcy.

21.     As part of its engagement, the Engagement Team (as defined below) worked closely with GM in the development of its liquidity preservation plan and on its attempts to raise new capital in July-September of 2008, advised GM on a potential combination with Chrysler in the fall of 2008, assisted in the development of the Viability Plan submitted to the U.S. Treasury on February 17, 2009 (in particular Appendix J and Appendix L to that submission), reviewed and analyzed the update to the operating plan developed by GM from April through May of 2009, as well as the scenarios for a new, post-363 Sale GM ("NewCo") developed in contemplation of the 363 Sale.  In addition, we have reviewed and relied upon the Liquidation Analysis of GM prepared by AlixPartners LLP (the "Liquidation Analysis"), a copy of which is attached hereto as Exhibit D, for purposes of the Opinion.

22.     Timing was an important consideration in the decision to pursue the 363 Sale, notably the combination of: (a) the challenge in reaching agreement with labor unions on restructuring of legacy costs and achieving competitive wages and benefits, (b) the time requirements for a public solicitation for a pre-packaged bankruptcy, (c) the June 1, 2009 maturity of the Series D Convertible Notes, (d) the likelihood that continued uncertainty over the

future of GM would continue to negatively impact business performance, and (e) the deadlines established by the U. S. Treasury as GM's largest lender.

23.     The Debtors also have filed the <u>Declaration of William C. Repko in Support of Debtors' Proposed Debtor in Possession Financing Facility</u>, a copy of which (without exhibits) is attached hereto as Exhibit E.

24.     The availability of financing, or lack thereof, is a principal factor in GM's decision to pursue the 363 Sale.  The combination of (a) the fact that no bona fide potential buyers other than Vehicle Acquisition Holdings LLC have expressed an interest in acquiring GM, (b) that there is no alternative source to finance a restructuring for GM, either in or out of bankruptcy, and (c) that the DIP Financing proposal offered by the U.S. Treasury and Export Development Canada is conditioned on the 363 Sale, support the conclusion that the Company is faced with a choice between the 363 Sale or the immediate liquidation of the business.  Evercore worked closely with GM to review its options at each stage of the process.

25.     The terms and conditions of the proposed 363 Sale are set forth in the Master Sale and Purchase Agreement and are described in the Motion.

26.     Financial projections for NewCo are attached as an appendix to the Fairness Opinion Presentation to the Company's Board of Directors and included in Exhibit F. The projections were developed by GM to reflect, among other things, the effects of their operational and financial restructuring plan as well as the impact of the bankruptcy filing in the context of the 363 Sale.  As described in Exhibit F, the financial projections were utilized by Evercore for purposes of establishing a range of values for the common equity of NewCo.

**Exhibit D:**

**<u>Liquidation Analysis Prepared by AlixPartners</u>**

# Executive Summary

**General Motors Corporation**
**Liquidation Analysis**
**Consolidated Debtors**
**As of June 1, 2009**

(In USD Billions)

| ASSETS | Hypothetical Liquidation Value | | |
|---|---|---|---|
| | Low | High | Midpoint |
| Cash & Cash Equivalents | $ 2.0 | $ 2.0 | $ 2.0 |
| Accounts Receivable | 0.5 | 0.6 | 0.5 |
| Inventory | 0.6 | 0.9 | 0.8 |
| Property, Plant & Equipment | 1.3 | 2.1 | 1.7 |
| Other Assets | 0.2 | 0.4 | 0.3 |
| Equity in Subsidiaries | 3.5 | 4.5 | 4.0 |
| Intellectual Property | 1.0 | 1.2 | 1.1 |
| **Total Proceeds From Assets** | **$ 9.1** | **$ 11.7** | **$ 10.4** |
| | | | |
| Costs Associated With Liquidation | | | |
| Chapter 7 Trustee Fees | $ 0.1 | $ 0.1 | $ 0.1 |
| Other Professional Fees | 0.1 | 0.1 | 0.1 |
| Wind Down Costs | 2.5 | 1.8 | 2.2 |
| Total | $ 2.7 | $ 2.0 | $ 2.4 |
| | | | |
| **Estimated Net Proceeds Available for Distribution** | **$ 6.5** | **$ 9.7** | **$ 8.1** |

| RECOVERIES | Est Claim | Hypothetical Recovery Value | | |
|---|---|---|---|---|
| | | Low | High | Midpoint |
| Revolving Credit Facility | $ 3.9 | $ 2.7 | $ 3.0 | $ 2.8 |
| *Recovery Rate* | | 70.2% | 77.1% | 73.7% |
| Term Loan | $ 1.5 | $ 0.4 | $ 0.9 | $ 0.6 |
| *Recovery Rate* | | 26.3% | 60.8% | 43.6% |
| First U.S. Treasury Facility | $ 20.5 | $ 2.6 | $ 4.9 | $ 3.7 |
| *Recovery Rate* | | 12.7% | 23.7% | 18.2% |
| Administrative and Priority Claims | $ 2.8 | $ 0.7 | $ 1.0 | $ 0.9 |
| *Recovery Rate* | | 26.8% | 34.1% | 30.5% |
| **General Unsecured Claims** | **$ 116.5** | **$ -** | **$ -** | **$ -** |
| *Recovery Rate* | | 0.0% | 0.0% | 0.0% |

**Asset Value**
- The value of the assets was based on a review of the March 31, 2009 balance sheet, discussions with management and other professionals.
- Equity in Subsidiaries reflects the estimated value of both foreign and domestic subsidiaries. The value of the subsidiaries was determined on a distressed going concern basis for subsidiaries considered to be solvent stand alone businesses.

**Costs Associated with Liquidation**
- Chapter 7 and Other Professional Fees were determined as a percentage of recovery value.
- Wind Down Costs reflect the estimated costs to secure, maintain and sell the estates assets.

**Secured Debt Recoveries**
- Secured debt recoveries are based on the recovery value of the collateral for each facility.
- The First US Treasury Facility claim is based on the current balance of $19.4 billion, plus the obligations under the Warrant Promissory Note.

**Administrative and Priority Claims**
- The estimated $2.8 billion of Administrative and Priority claims is primarily comprised of employee claims and s503(b)(9) claims. The Debtors and their advisors believe these estimates are conservative, and could be much higher, in the event of an actual Chapter 7 liquidation.

**General Unsecured Claims**
- The Liquidation Analysis assumes the General Unsecured Claims are equal to those presented on the March 31, 2009 balance sheet. Certain contingent General Unsecured Claims that would likely occur in a hypothetical Chapter 7 Liquidation such as lease/contract rejection claims, additional pension termination claims or other litigation claims are not reflected on the March 31, 2009 balance sheet. If an estimate of these contingent claims were to be included it is likely the estimated General Unsecured Claim amount would increase.

**Exhibit F:**

**<u>Materials Relating to Fairness Opinion Presentation to GM Board of Directors</u>**

*Confidential*

# Analysis of Proposed Transaction
## NewCo Equity and Warrants

*($ in billions)*

### Imputed Value of Equity and Warrants in NewCo

| | % NewCo Ownership | Strike Price | Term | NewCo Value | |
|---|---|---|---|---|---|
| Purchaser Warrant A | 7.5% | $15.0 | 7 years | $2.1 | - | $2.9 |
| Purchaser Warrant B | 7.5% | $30.0 | 10 years | 1.5 | - | 2.1 |
| **Total Value from Warrants** | **15.0%** | | | **$3.6** | - | **$5.0** |
| **Value of 10% in NewCo** | **10.0%** | NA | NA | **$3.8** | - | **$4.8** |
| **Total Equity and Warrants in NewCo** | | | | **$7.4** | - | **$9.8** |

EVERCORE PARTNERS

# Analysis of Proposed Transaction

## Capitalization of NewCo

*Confidential*

*($ in billions)*

- NewCo's capital structure is expected to be substantially improved as a result of:
  - The Purchaser's credit bid of $49bn in indebtedness in exchange for NewCo equity and $2.5bn of Preferred Stock
  - The elimination of $27bn of unsecured debt
  - The decrease of $18bn in the VEBA obligation in exchange for NewCo equity and $6.5bn of Preferred Stock
  - The reduction in projected Canadian pension contributions, CAW OPEB obligation and Other OPEB obligations
- The Transaction achieves the strategic objective of providing sufficient liquidity to execute the operating plan and significantly deleverage the capital structure

### Pro-Forma Enterprise Value of NewCo

| | 2010 | | 2012 |
|---|---|---|---|
| NewCo Equity Value | $38.0 | - | $48.0 |
| Excess Cash | | | (12.3) |
| Government Debt | | | 8.0 |
| Other Debt | | | 6.1 |
| PV of UAW VEBA Obligations | | | 3.7 |
| PV of CAW VEBA Obligations | | | 0.7 |
| PV of Expected Future Pension Contributions | | | 9.9 |
| Preferred | | | 9.0 |
| **Total NewCo Enterprise Value** | **$63.1** | **-** | **$73.1** |

| *Credit Statistics* | 2010 | 2011 | 2012 |
|---|---|---|---|
| Net Debt & Pfd. / EBITDA | 2.5x | 1.2x | 0.6x |
| Total Debt & Pfd. / EBITDA | 3.8 | 2.2 | 1.9 |
| EBITDA / Interest | 3.6 | 6.6 | 7.5 |
| EBITDA / (Interest + Capex) | 1.0 | 1.5 | 1.8 |

# **Exhibit B**

1

95QSCHRYSLER

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   CHRYSLER LLC, et al.,
3
4                    Plaintiffs,
4
5            v.                          09 Civ. 4743
5
6   INDIANA STATE TEACHERS' RETIREMENT
6   FUND, et al.,
7
7                    Defendants.
8
8   ------------------------------x
9
9                                        May 26, 2009
10                                       11:45 a.m.
10
11  Before:
11
12                      HON. THOMAS P. GRIESA,
12
13                                       District Judge
13
14                          APPEARANCES
14
15  JONES DAY
15       Attorneys for Plaintiff
16  BY:  THOMAS F. CULLEN, JR.
16
17  WHITE & CASE
17       Attorneys for Defendant Indiana State Teachers'
18       Retirement Fund
18  BY:  GLENN M. KURTZ
19
19  JEANNETTE A. VARGAS, ESQ.
20  SEAN H. LANE, ESQ.
20       U.S. Department of Justice
21       U.S. Attorney's Office
21
22  SIMPSON, THACHER & BARTLETT LLP
22       Attorneys for J.P. Morgan Chase
23  BY:  PETER V. PANTALEO
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

95QSCHRYSLER

1    KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
1         Attorneys for Creditors' Committee
2    BY:  KENNETH ECHSTEIN
2
3    VEDDER PRICE P.C.
3         Attorneys for Export Development Canada
4    BY:  MICHAEL J. EDELMAN
4
5    SULLIVAN & CROMWELL LLP
5         Attorneys for Fiat
6    BY:  ROBINSON B. LACY
6
7
7
8
9                                    -  -  -
10
10
11
11
12
12
13
13
14
14
15
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

95QSCHRYSLER
```
 1                  (Case called)
 2                  THE COURT:  What I would like to start by saying is
 3     that you can assume I read the briefs but that does not in any
 4     way eliminate the need for discussion here.  I think we all
 5     know that when the issues are complicated oral argument is very
 6     important.  However, I would like to start by asking some
 7     rudimentary questions.  The answer to these questions are
 8     probably somewhere in the papers but I don't say that I read
 9     all the papers.
10                  Let's start with the bonds.  I think the way that they
11     have been referred to, in some submissions at least, is
12     priority bonds.
13                  What is the way you would like to have them named?
14                  MR. KURTZ:  Senior secured lenders, your Honor.
15                  THE COURT:  They are bonds, aren't they?
16                  MR. KURTZ:  They are loans, your Honor.
17                  THE COURT:  They are loans?
18                  MR. KURTZ:  Correct.
19                  THE COURT:  Senior secured loans, right?
20                  MR. KURTZ:  Correct.
21                  THE COURT:  Alright.  And they were issued in what,
22     late 2007?
23                  MR. KURTZ:  Correct.
24                  THE COURT:  They mature when according to their terms?
25                  MR. KURTZ:  I think their original term would have
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

4

95QSCHRYSLER

```
 1   taken them from 2012 but by reason of filing they are today.
 2             THE COURT:  According to the original terms of the.
 3             MR. KURTZ:  We are confirming it's 2012, your Honor.
 4             Just one moment.
 5             Perhaps counsel to the administrative agent for the
 6   facility can supply us with that date.
 7             MR. PANTALEO:  Your Honor, Peter Pantaleo, Simpson
 8   Thacher.
 9             I am not positive.  I think it's 2012, your Honor.
10             THE COURT:  That can be confirmed.  I would be
11   interested.
12             How about interest?  Was interest to be paid
13   periodically?  What were the terms about the interest?
14             MR. PANTALEO:  The term --
15             THE COURT:  I looked in the original agreement.  It
16   was too difficult for me.  I couldn't find what the interest
17   was.
18             MR. PANTALEO:  It varies.  It could be either 3
19   percent above the LIBOR rate -- well, 3 percent above base rate
20   or 4 percent in the 4 percent above LIBOR.
21             THE COURT:  Is interest to be paid periodically?
22             MR. PANTALEO:  On a quarterly basis.
23             THE COURT:  Quarterly interest.
24             MR. PANTALEO:  Maturity is 2013.
25             MR. KURTZ:  June 15, 2013.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

95QSCHRYSLER

1                THE COURT:  Quarterly interest.
2                Thank you very much.
3                Were the interest payments being made up until the
4     time of the bankruptcy or or not?
5                MR. KURTZ:  My understanding is they were.
6                MR. PANTALEO:  Yes, your Honor.  There were no
7     defaults up to the bankruptcy.  Bankruptcy was the first
8     default.
9                THE COURT:  If you can answer this:  Under the terms
10    of the Section 363 sale, what happens to these loans?  Do they
11    get wiped out?  Do they survive?  I know the material about the
12    $2 billion but if I can just get a description in quite precise
13    terms.
14               MR. KURTZ:  The collateral that supports the secured
15    loans will be transferred to a new Chrysler, and $2 billion
16    will be supplied to the lenders.  There will be a $5 billion
17    deficiency which will receive no payout whatsoever but will
18    exist as an unsecured claim.  At the same time there will be
19    distribution to other unsecured creditors.
20               THE COURT:  You are going beyond my question.
21               You say transfer to a new Chrysler?
22               MR. KURTZ:  Correct.
23               THE COURT:  Let me make a note.
24               And the $2 billion is --
25               MR. KURTZ:  Being made available to the estate in old
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6

95QSCHRYSLER
```
 1   Chrysler to pay out to the senior secured lenders.
 2              THE COURT:  To the estate for what?
 3              MR. KURTZ:  For distribution to the senior secured
 4   lenders.
 5              THE COURT:  Now, the total amount of senior secured
 6   loans we refer to it as roughly $7 billion?
 7              MR. KURTZ:  Correct.
 8              THE COURT:  And do the loans still remain outstanding
 9   or are they cancelled or what happens to them?
10              MR. KURTZ:  They remain outstanding and the senior
11   secured lenders have a $5 billion deficiency claim.
12              THE COURT:  But the security is gone, right?
13              MR. KURTZ:  Correct, all of it.
14              MR. PANTALEO:  Your Honor, that is not correct.
15              THE COURT:  I am going to come to you.  One at a time.
16              MR. KURTZ:  All or substantially all the security
17   would be gone.  Anything left behind we understand results in
18   further distribution to the senior secured lenders.
19              THE COURT:  But just as a technical matter is it still
20   true that the assets of Chrysler would be security for that 5
21   billion, just as a technical matter?
22              MR. KURTZ:  The facility has a security interest in
23   substantially all the assets of Chrysler but all of those
24   assets are being transferred to new Chrysler.  So there will be
25   nothing left in old Chrysler to pay out the senior secured
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

95QSCHRYSLER
1    lenders but the $2 billion.
2                THE COURT:  And what is transferred to new Chrysler
3    will not be security for the senior secured loans, is that
4    right?
5                MR. KURTZ:  That is correct.  That is being released.
6                THE COURT:  Okay.
7                THE COURT:  Now, will interest still be due?
8                MR. KURTZ:  Due?  Your Honor, everything will be due.
9    None of it will be paid.
10               THE COURT:  Okay.
11               Now, you are Mr. --
12               MR. KURTZ:  I am Mr. Kurtz, Glenn Kurtz of White &
13   Case.
14               THE COURT:  I know.
15               I am going to turn to this gentleman, Mr. --
16               MR. PANTALEO:  Mr. Pantaleo from Simpson Thacher, your
17   Honor.  My client is J.P. Morgan.
18               THE COURT:  What do you say on the questions I asked?
19               MR. PANTALEO:  Your Honor, substantially all of our
20   collateral has been sold to new Chrysler and in exchange for
21   that Mr. Kurtz is correct, the agent is to receive the $2
22   billion in cash for distribution to the lenders but not all of
23   the collateral is being transferred.  Some of it, including
24   about 8 plants, are left behind.  Those remain subject to our
25   liens and remain subject to the balance of our claim of $5
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

95QSCHRYSLER
1    billion.
2            THE COURT:  So there are 8 plants left behind?
3            MR. PANTALEO:  Plus other miscellaneous assets.
4            THE COURT:  In other words, some assets.
5            MR. PANTALEO:  Yes, some, the value of which is highly
6    uncertain at this point.
7            THE COURT:  Just a minute.
8            Is there any plan to pay off the remaining 5 billion?
9            Is there any plan to pay interest on the remaining 5
10   billion?
11           MR. PANTALEO:  There isn't yet, your Honor.  But that
12   will be the subject of the balance of the Chrysler bankruptcy
13   case is to address that liability plus the other liabilities
14   that remain unpaid at Chrysler.  They don't belong to our
15   client but belong to other creditors.
16           THE COURT:  Right now there is no plan.
17           MR. PANTALEO:  Right now there is no plan.
18           MR. KURTZ:  Your Honor, perhaps I can clarify.  We
19   have been told that the assets that are left behind are
20   valueless; that there will be no additional distribution, and
21   everybody is proceeding on the basis that there will be a $2
22   billion payout on a $7 billion obligation and that is all there
23   will be, and the reason that those plants were left behind was
24   because they were of no value to new Chrysler on an ongoing
25   basis.

9

95QSCHRYSLER

```
 1              I don't want there to be some misunderstanding that
 2    there is to be additional value even approaching 5 billion.
 3    There will be zero further distributions based on any assets
 4    left behind simply because new Chrysler doesn't want those
 5    assets.
 6              THE COURT:  Okay.
 7              MR. CULLEN:  Your Honor, if I may, Thomas Cullen of
 8    Jones Day representing Chrysler.
 9              That is not true.  It's not true that those assets are
10    valueless.  There will be a wind-down.
11              THE COURT:  What are they worth?
12              MR. CULLEN:  We don't know as of yet, your Honor.  We
13    have a liquidation analysis that puts some numbers on it.
14              THE COURT:  What does the analysis say?
15              MR. CULLEN:  The analysis says they are somewhere in
16    the range of above $1 billion for those assets but at the top
17    end of the range, but we will be selling 8 plants.  Some of the
18    plants have recently received various investments.  But the
19    idea that they are valueless is not quite true.  What value
20    they will achieve --
21              THE COURT:  They are not worth 5 billion.
22              MR. CULLEN:  No, by no means.
23              THE COURT:  Let's go on with the argument that you
24    wish to present and we will start with you, Mr. Kurtz.  You are
25    the maker of the motion.
```

10

95QSCHRYSLER

```
 1              MR. KURTZ:  Thank you, your Honor.
 2              To start with something somewhat administrative, there
 3      are two motions before your Honor today, a motion to withdraw
 4      the reference and a motion for a stay.  The reason there are
 5      two motions is really a matter of timing before the court.  We
 6      believe that the reference must be withdrawn and if the court
 7      resolves that motion, then there is no reason to address the
 8      stay.  The concern we have --
 9              THE COURT:  How about the motion for the trustee and
10      the examiner?
11              MR. KURTZ:  That is an interesting point because that
12      has to be resolved before the sales motion is heard by the
13      Bankruptcy Court and we have asked to have that resolved
14      barring a motion -- I am sorry, barring a withdrawal of the
15      reference before we have the 363 hearing or at the same time.
16      We have not gotten a agreement on that and, in fact, we have a
17      conference with Judge Gonzalez at 4 p.m. today to find out even
18      whether the sales motion will proceed without having the
19      trustee motion which will moot it.
20              There is a concern if that does not get heard by that
21      court or barring success in our motion in another court it will
22      be rendered moot.
23              THE COURT:  The way I understand your motion is that
24      you have filed the motion for the trustee and the examiner in
25      the Bankruptcy Court but you ask this court to decide that
```

11

95QSCHRYSLER
```
 1   motion as a consequence of your basic motion to withdraw the
 2   reference.
 3              MR. KURTZ:  That is correct, Judge.
 4              THE COURT:  Okay.
 5              Go ahead.
 6              MR. KURTZ:  In any case if your Honor needs more time
 7   to resolve this motion that is why we have the stay application
 8   here.  It's for you to find sufficient time.  It's not for any
 9   other reason and so I am not going to focus on that in today's
10   argument unless your Honor has questions on it.  I am going to
11   move instead to the motion to withdraw.
12              This case presents extraordinary and precedent-setting
13   circumstances that will have broad and significant implications
14   on the U.S. automotive industry and the manner in which the
15   federal government attempts to address the current financial
16   crisis.  The opposition here tries to avoid these far-reaching
17   issues by focusing on bankruptcy law but obviously we are not
18   here about bankruptcy law.
19              What is extraordinary is not that the Treasury
20   Department is reorganizing Chrysler without a plan of
21   reorganization and the attendant protections, and that the
22   reorganization violates fundamental principles of absolute
23   priority, though those issues are also very significant.  What
24   is extraordinary here, what is precedent setting here is that
25   the federal government without authority is orchestrating and
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

95QSCHRYSLER

1    funding this plan in violation of the Constitution and TARP.
2            Those are important federal questions that must be
3    decided by the district court.  The test for mandatory
4    withdrawal is simply where the "resolution" of a proceeding
5    requires consideration of both Title XI and other laws of the
6    United States.  Where the court would have to engage in an
7    interpretation of the significant issue of federal law
8    withdrawal of the reference required is mandatory.  The
9    standard is more easily met where the issue is one of first
10   impression and there is no dispute that we have a very
11   important constitutional and federal issue here of first
12   impression.
13           The government itself has characterized this as an
14   extraordinary and unprecedented case.  The federal question we
15   raise here rise under the TARP, which was enacted under the
16   Emergency Economic Stabilization Act, or EESA.  The first issue
17   is whether the Executive Branch has any authority whatsoever
18   under TARP to spend TARP funds to purchase the collateral of
19   Chrysler --
20           THE COURT:  Can you talk a little slower?
21           MR. KURTZ:  The first issue is whether the Executive
22   Branch has any authority whatsoever under TARP to spend TARP
23   funds to purchase the collateral of Chrysler securing the
24   Indiana pensioners loans.
25           The second issue is whether the Treasury Department
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13

95QSCHRYSLER

1   has exceeded its authority under TARP and effectively taking
2   over Chrysler, and now there is a third issue of first
3   impression.
4           The opposition's primary objection here questions the
5   standing of the Indiana pensioners to raise the TARP issues.
6   None of those three issues has ever been considered much less
7   decided before by any court.
8           THE COURT:  I am going to cut through something.
9           I am going to tell you right now that in my view the
10  Indiana funds or Indiana pensioners have standing to make their
11  motions and let's proceed with other matters.
12          MR. KURTZ:  I will do that, your Honor.  I appreciate
13  the clarification.
14          Let me, then, move really to what gets decided and
15  what doesn't get decided on a motion to withdraw the reference,
16  and what gets decided is simply whether there is a significant
17  federal issue that has been raised.  What does not get decided
18  is that actual issue.
19          The underlying objection to the sales motion gets
20  decided only after there has been a withdrawal of the
21  reference.  So at this point in the proceedings on our motion
22  the inquiry is really whether we have raised a substantial
23  federal question, not whether we are right.  And although that
24  actually ends the inquiry for purposes of this motion I do want
25  to briefly address the merits to show that we raise a very

14

95QSCHRYSLER
1   substantial issue.
2           The first issue, as I noted, is the unauthorized use
3   of TARP.  TARP makes funds available to purchase troubled
4   assets from "financial institutions".  Without burdening the
5   record by simply repeating our brief, it's probably enough just
6   to note the obvious fact that Chrysler is not a financial
7   institution.  It's a car company.  Chrysler doesn't satisfy any
8   common understanding of the term financial institution.  It
9   doesn't fall even near any of the listed terms in the TARP
10  statute itself making up banks, savings associations, insurance
11  companies.  It doesn't fall near the definition of other
12  federal law, such as the Bank Holding Company Act.
13          The Treasury Secretary himself specifically testified
14  before Congress that TARP is not available for automakers.  The
15  house passed an automaker bailout bill on December 10, 2008 and
16  that bill failed in the Senate.  So Congress has made
17  absolutely clear that it would not authorize Treasury to spend
18  money on an automotive bailout.  Even a determination by
19  treasury to use TARP here was based on a premise that Chrysler
20  provides credit; that Chrysler Financial, however, not any of
21  the debtors, and Chrysler Financial is not a recipient of the
22  TARP funds.
23          THE COURT:  Well, the federal government made a loan
24  to Chrysler of $4 billion in what was it, early 2009?  When was
25  that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95QSCHRYSLER
```
 1                MR. CULLEN:  January 2nd, your Honor.
 2                THE COURT:  January 2nd, okay, $4 billion.  And the
 3    federal government is proposing to make debtor-in-possession
 4    financing available in the Chapter XI.  Cull.
 5                MR. KURTZ:  That is correct.
 6                MR. CULLEN:  They have provided such
 7    debtor-in-possession financing.
 8                THE COURT:  Along with the Canadian government?
 9                MR. CULLEN:  Along with the Canadian government.
10    There was a motion on that decided --
11                THE COURT:  Has the money been paid?
12                MR. CULLEN:  Some of the money has been used.
13                THE COURT:  But January 2 was the original loan.
14                MR. CULLEN:  Yes.
15                MR. KURTZ:  Correct.
16                We are told that that money is gone, Judge; that there
17    is no recovery on it.  That money was used to burn and it's
18    gone.  And it's junior to the secured loan here.
19                THE COURT:  Look, just to save you repeating, I think
20    there is a substantial issue about the interpretation of that
21    statute, EESA.
22                MR. KURTZ:  The emergency Economic Stabilization Act
23    and TARP.
24                THE COURT:  EESA, which established TARP, and that has
25    not yet been decided.  It certainly hasn't been decided by the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

16

95QSCHRYSLER

```
 1   Bankruptcy Court and it's not going to be decided by me today,
 2   but there is an issue.
 3          Is that enough to require a withdrawal of reference
 4   under section 157?
 5          MR. KURTZ:  It is, your Honor.  And there are only two
 6   defenses.  Mandatory withdrawal applies whenever there is a
 7   significant interpretation of federal law.  It's mandatory.
 8   Having identified the significant issue, having identified it
 9   as a question of first impression my burden is discharged.
10   There are really only two objections that I could cull from the
11   numerous oppositions that were put in.  The first was the
12   defense that somehow the resolution of the TARP issue would not
13   be essential and therefore it wasn't something that had to be
14   reviewed by the district court.  Essential means that the
15   resolution of the issue could impact the decision on the
16   underlying motion, here the sales motion, the trustee motion.
17   The opposition offers a rather wishful thinking that the issue
18   does not have to be resolved at all.
19          Frankly, it's difficult for us to even understand that
20   conclusory assertion.  The Indiana pensioners have lodged an
21   objection based on the constitutional violations and the
22   violations of TARP.  That.objection needs to be heard whether
23   by this court, which is the correct court, or by the Bankruptcy
24   Court.
25          THE COURT:  I don't disagree that it's important.  The
```

17
95QSCHRYSLER
1    Treasury Department says in its brief it is clear that in
2    lending to Chrysler and in proposing to own the assets of new
3    Chrysler, the Treasury Department relied in substantial part on
4    the authority granted to it by EESA, which established TARP.
5    That is the Treasury Department that says that, so I don't
6    really buy the idea, which certainly has been voiced by other
7    parties, that it is irrelevant.
8            My problem is this:  That I think you are a little too
9    absolutist about you have a burden to show the necessity of
10   interpreting a federal statute and maybe a constitutional
11   provision, and that is it.  It seems to me the case law takes a
12   less absolutist approach.  For instance, timing.  There are
13   parties who say that you are too late.  So I ask you why is it
14   that the motion to withdraw the reference was made, and I think
15   the date of the making of the motion was May 20, wasn't it?
16           MR. KURTZ:  It was, your Honor.
17           THE COURT:  Okay.
18           MR. KURTZ:  It was either the evening of the 19th or
19   the morning of the 20th, I am not sure.
20           THE COURT:  Let's say the 20th.
21           MR. KURTZ:  Okay.
22           THE COURT:  I think I heard about it on the 20th.
23           MR. KURTZ:  Very well, your Honor.
24           THE COURT:  Now, look, the Chapter XI proceeding was
25   filed April 30.  Why did it take 3 weeks after a lot had gone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

18

95QSCHRYSLER

 1    on in the Bankruptcy Court before the Indiana funds filed a
 2    motion to withdraw the reference?
 3              MR. KURTZ:  Thank you, Judge.
 4              That is the second objection that was raised that I
 5    did intend to respond to and there are four responses, Judge.
 6    The first is that the Indiana pensioners received formal notice
 7    of the proceedings of the sale hearing on May 18.
 8              THE COURT:  Formal notice doesn't do much for me.
 9              MR. KURTZ:  But, your Honor, then let me move to an
10    another thing.
11              The factual predicate that this has to happen, and
12    this has to happen by tomorrow, is just wrong.  The closing
13    documents require a closing by July 15 so there is more than
14    ample time for the correct court to resolve the substantial
15    constitutional and federal issue here.  A delay of a week or
16    more is utterly irrelevant, we submit.
17              Two, it is the government that dictated this timing
18    and this is really a problem here.  The government chose to put
19    Chrysler in bankruptcy at exactly at this time and to announce
20    publicly that they would blow through this process in 30 to 60
21    days, which is absolutely unprecedented for a case of even a
22    fraction of the size and complexity of this one.  And, in
23    short, the plan was to run everyone over, and discovery, which
24    we are first receiving over the weekend and trying to digest,
25    is confirming that.  This discovery showed the debtors advised

19

95QSCHRYSLER
1    against the schedule here.  In fact, --
2            THE COURT:  You are reading things and it doesn't help
3    me.  I will understand you better if you just talk to me.
4            MR. KURTZ:  Your Honor, the debtors themselves sent an
5    e-mail to the government just four days before the bankruptcy
6    was commenced complaining about the government's imposed
7    schedule of trying to blow through a sales hearing at that time
8    on June 15, which is considerably later than what they
9    ultimately went with.  And the debtor's lead counsel told the
10   government that this "was a big mistake," that it would require
11   that they "stuff a judge," that they "would risk credibility,"
12   and that ended with "the impossible is getting to be too hard."
13           So the government itself has created a schedule that
14   it is attempting to impose in order to blow through objections,
15   to run people over.  The only milestone that they rely on is
16   their own right to walk away from the deal on July 15, which is
17   still quite a ways away.
18           THE COURT:  What is the July 15 date?
19           MR. KURTZ:  On June 15 if you don't close you can give
20   a notice of default and then there is a 30-day extension.  So
21   the first time the government could actually walk away from a
22   transaction is on July 15.
23           THE COURT:  This is under the proposed terms?
24           MR. KURTZ:  In the 363 sale.
25           THE COURT:  Say that again.

20

95QSCHRYSLER

```
 1                MR. KURTZ:  The government has set June 15 as the date
 2   for compliance with conditions.
 3                THE COURT:  June 15.
 4                MR. KURTZ:  That is the June 15 date that has been
 5   included in the opposition papers.  But --
 6                THE COURT:  Just a minute.
 7                And what about July 15?
 8                MR. KURTZ:  And if there is a failure to satisfy
 9   conditions on June 15, then there is a 30-day extension which
10   brings you to July 15.
11                THE COURT:  An automatic 30 days?
12                MR. KURTZ:  Automatic on the request of a party.
13                THE COURT:  Say it again?
14                MR. KURTZ:  Automatic on the request of a party.
15                Putting aside the fact that there is more than ample
16   opportunity to have a hearing here and putting aside the fact
17   that the debtors themselves --
18                THE COURT:  You didn't finally answer my question.
19                I asked why -- and obviously it's of interest the
20   timing you have talked about.  But the question is why wasn't
21   this petition for motion for withdrawal filed earlier before a
22   fair amount of work had been done by the bankruptcy judge and
23   objections had been heard and hearing about the vetting process
24   had gone on.  A lot of work had been done.
25                MR. KURTZ:  The Indiana pensioners acted promptly as a
```

21

95QSCHRYSLER
1  state public pension fund as fast as they could act after
2  learning of these problems.
3          THE COURT:  When did they learn of these problems?
4          MR. KURTZ:  They didn't receive formal notice --
5          THE COURT:  I am not asking about formal notice.  Come
6  on.
7          MR. KURTZ:  I don't have the answer of the date they
8  learned.  I believe it was the week leading up to the 15th.
9          THE COURT:  Weren't you in the Bankruptcy Court?
10         MR. KURTZ:  Not for this client, Judge.
11         THE COURT:  For similarly situated lenders?
12         MR. KURTZ:  Yes, I was in for an ad hoc group of
13  bondholders that did not include the Indiana pensioners.
14         THE COURT:  But they were holders of the same loans,
15  weren't they?
16         MR. KURTZ:  They were, Judge.
17         THE COURT:  And you were doing what?
18         MR. KURTZ:  We were raising objections to the sales
19  procedure motion and the DIP financing motion.
20         THE COURT:  The same kind of thing you are raising
21  now, right?
22         MR. KURTZ:  We did not raise the TARP issues.  We had
23  objections to how this was being pushed through.  We had
24  objections under bankruptcy law as to violations of the
25  absolute priority and othere matters which the judge
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

22

95QSCHRYSLER

1    effectively said would be addressed in a sales motion, but we
2    did not raise the TARP issue before the bankruptcy judge.
3            THE COURT:  Let me just say this to you:  I am very
4    slow to criticize a party or a lawyer on the question of
5    timing.  Obviously if there is a statute of limitations, but we
6    are not talking about.  Because I feel that it takes time
7    sometimes to decide what you are going to do, and people can
8    change their minds, and this is a complicated matter and it
9    could take some time.  After all, you didn't wait 6 months.  It
10   could take some time to really decide what position to take
11   finally if there was to be a motion to withdraw the reference.
12   And you filed a brief that obviously took a lot of work.
13           By the same token, it seems to me the case law
14   indicates that if a bankruptcy proceeding has gone along to a
15   fairly ripe stage and, indeed, the work is about concluded,
16   then it can well be appropriate for a district court to deny
17   the kind of motion you are making.  That is what I am talking
18   about.  I am not really seeking to say that as a matter of law
19   you are out of time.  There is argument along that line.  That
20   really is not my point.
21           But I am seriously concerned, I have to tell you,
22   about whether there should be a withdrawal of the reference
23   rather than letting bankruptcy Judge Gonzalez finish his work,
24   decide the motion, and then having the appeal, which there
25   would be an appeal as of right to the district court after

23

95QSCHRYSLER

1   that.  And I don't think that you have an absolute right to say
2   regardless of the timing and regardless of the circumstances
3   you have some kind of absolute right to have the reference
4   withdrawn.  I think the timing has something to do with it.
5            MR. KURTZ:  Your Honor, let me respond as follows:  I
6   guess where I wanted to start with is context.  Whenever one
7   addresses time and how quickly one moves one has to look at all
8   the facts, all the circumstances in the context.  In the cases
9   that you mentioned people waited months and sometimes years.
10  They went through the very same issues with the bankruptcy
11  court and they really tried to raise them afresh with the
12  district court.  So the timing of the facts and circumstances
13  are basically critical here.
14           The first fact I would like to address with your Honor
15  is the schedule was established to put in an objection to the
16  sales motion on an unprecedented expedited schedule over the
17  objection of others.
18           THE COURT:  What are you talking about now?
19           MR. KURTZ:  I am talking about the sales motion got
20  filed on I think the 4th, on a Sunday.
21           THE COURT:  On what?
22           MR. KURTZ:  May 4, on a Sunday.  That is when the
23  sales motion got filed.  They set a schedule that week that
24  required objections be filed by the 19th at 4 p.m.  That was
25  the context for people to consider their rights, consider

24

95QSCHRYSLER
1    whether they wanted to go forward with an objection, and
2    consider how they would respond to a motion that was made on a
3    Sunday night, May 4, which was --
4              THE COURT:  Wait a minute.  Sunday was May 3rd.
5              MR. KURTZ:  Then May 3rd, your Honor.
6              THE COURT:  Alright.
7              MR. KURTZ:  The schedule that the court set with the
8    parties was May 19th for objections.  That was the period of
9    time that every party was told officially and finally that you
10   can assess these issues, you can decide how you want to proceed
11   and you must respond to us by 4 p.m. on May 19.  That set the
12   clock.
13             Now, state agencies, public pension funds and
14   everybody else has to now go through this material, digest it,
15   consider the expense, consider the other issues, consider
16   hiring counsel, discuss it with counsel and have counsel put
17   together papers, and they have to do that in a very short
18   period of time.  The fact that the court set the 19th as a time
19   to respond to the motion for a sale I submit suggests that that
20   is more than adequate in terms of timing for filing both the
21   objection and for the first time because it had never been
22   joined, issues joined upon an objection to the motion to
23   withdraw.  If you don't file an objection --
24             THE COURT:  I see your point.
25             MR. KURTZ:  It's like until we file an objection we
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

25

95QSCHRYSLER
1   don't have an issue joined.  We wouldn't be able to file a
2   motion to withdraw the reference, and we did it in accordance
3   with a court order and we relied on that.  The other issue,
4   Judge --
5           THE COURT:  In other words, you did two things.  You
6   filed objections and you filed your motion to withdraw the
7   reference almost simultaneously.
8           MR. KURTZ:  Exactly, after staying up all night
9   working on it.  And we rely on the court order and until issue
10  was joined, until there is an objection, we can't move to
11  withdraw the reference because it's not a contested matter as
12  to us.  We would be without standing to come in and say I know
13  there is a motion here, I don't object but I would like to
14  withdraw it.  So we complied with the court order.  I never
15  heard, and there is certainly no authority, that you are not
16  entitled to mandatory withdrawal because you met a court order
17  deadline on an objection.
18          The other issue, and I really don't want to have this
19  go without some focus, is this is being pushed through, as I
20  said.  Treasury is deciding the schedule and they decided it
21  over the objection of very, very experienced debtor's counsel
22  who specifically told them that it was going to jam a judge,
23  and us by definition even more than a judge; that it was
24  impossible; that it was a big mistake, and it was such a bad
25  idea you would risk credit boils.  Those were all quotes four
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

26

95QSCHRYSLER
1   days before a schedule and that was for a schedule that would
2   have the hearing on June 15, not May 27.
3          I don't think a party can create their own exigent
4   circumstances and then rely on those to cry prejudice.  The
5   government is requiring us to move.  We have had 6 days to go
6   through discovery, fact discovery and expert discovery, on a
7   multi-billion dollar matter.  We are getting documents today on
8   depositions that we took yesterday.  A whole team of people are
9   taking depositions.  This is a run-over and --
10         THE COURT:  What depositions are going on?
11         MR. KURTZ:  The government depositions going forward
12  today, some Treasury Department, the UAW, the union deposition
13  going forward.
14         THE COURT:  Who is taking those depositions?
15         MR. KURTZ:  We and other objectors.  We have spent an
16  inordinate amount of time --
17         THE COURT:  What other objectors are working?
18         MR. KURTZ:  In particular no other objectors are
19  raising the federal law issues we are raising, but there are
20  dealers that are being closed down and aren't happy about it
21  who are raising objections.
22         THE COURT:  But the discovery that is being taken, who
23  represents people who are doing discovery?
24         MR. KURTZ:  The pension is represented by my firm are
25  taking discovery.  I think Squire Sanders is representing an ad
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

27

95QSCHRYSLER

```
 1   hoc group I believe of dealers that are going to be I think
 2   closed down, although I haven't focused greatly on their
 3   objections.   And I have seen a chart of other objectors but I
 4   don't know that they are anything but the typical bankruptcy
 5   objections.
 6            Our objection goes to federal law.  So only our
 7   objection is the subject of --
 8            THE COURT:  I am interested if discovery is going on,
 9   here we have this hearing tomorrow.
10            MR. KURTZ:  That is my point, your Honor.
11            THE COURT:  We have a hearing tomorrow.  Are you
12   telling me discovery is going on relevant to the hearing
13   tomorrow?
14            MR. KURTZ:  Absolutely.
15            THE COURT:  What is going on today?
16            MR. KURTZ:  The most important discovery we have in
17   the case, the depositions of senior executives of the debtor,
18   the representatives of the Treasury Department and the
19   representatives of the unions.  We are supposed to take that
20   discovery today and somehow cross examine witnesses tomorrow.
21   That is the kind of schedule that they are imposing.
22            THE COURT:  What kind of hearing is set for tomorrow?
23            MR. KURTZ:  The 363 sale, evidentiary.
24            THE COURT:  Evidentiary hearing.
25            MR. KURTZ:  We are expected to try the case tomorrow.
```

28

95QSCHRYSLER
```
 1              THE COURT:  Is there an estimate of how long that
 2   hearing will take place?
 3              MR. KURTZ:  We have not been supplied with an
 4   estimate.  I would believe it will be at least one full day,
 5   perhaps two full days.  Maybe other people have different
 6   views.  I would imagine it would be complete by the end of the
 7   week.
 8              THE COURT:  By the end of the week?
 9              MR. KURTZ:  Correct.  So the idea that the government
10   is going to complain about delay while we are operating on all
11   8 cylinders, relevant to a Chrysler, is just remarkable to us.
12   They are really just jamming us.  These are fundamentally
13   important issues.
14              THE COURT:  Let's depart from the question of timing.
15              This gets to the merits, and I know that I am not
16   deciding the merits of the sale motion but enough has been said
17   about it to make me ask a few questions and I have got
18   questions for other counsel but I have questions for you.
19              I have read the other papers and they almost uniformly
20   make a very strong plea to have no procedural interference with
21   what is going on in the bankruptcy court because any
22   interference with that could jeopardize this sale and mean that
23   a going concern would be destroyed.  You have read all of that.
24              MR. KURTZ:  I certainly have, Judge.
25              THE COURT:  And I will hear more about it from them.
```

29

95QSCHRYSLER
1    But in your papers you don't deal with that at all and
2    basically I think what you say is you are for a liquidation.
3                MR. KURTZ:  No, Judge.
4                THE COURT:  Well, I don't get anything else out of
5    your papers than that I am afraid.
6                MR. KURTZ:  I will take responsibility for that
7    failure.  Your Honor, what we ask for --
8                THE COURT:  You didn't fail.  You filed excellent
9    papers, but you can't say everything and that is why we have
10   questions.
11               MR. KURTZ:  Your Honor, I guess what I tried to say
12   and what our position is is that we brought a venue motion
13   because this is the proper venue to hear the matter.  In terms
14   of what happens with the company, if our client does better in
15   a liquidation, then we are in favor of a liquidation.  I don't
16   think it's ever going to come to that.  The sale, as I
17   mentioned, has to happen before July 15.  So there is ample
18   opportunity to have a full and fair hearing.  In fact, we are
19   prepared to go forward this week, next week.  We will get
20   nowhere near July 15.  We are not looking to pocket veto or
21   anything like that.  We are ready to go forward as soon as the
22   court can hear us.
23               THE COURT:  But I still think it is a fair question to
24   you as to what your client's ultimate objective is.  I am
25   looking at page 3 of your motion to appoint a trustee and an
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

30

95QSCHRYSLER
1    examiner and you say, "Provisions of the law require the court
2    to appoint a Chapter XI trustee (or convert the case to Chapter
3    VII) where the debtor's business is suffering substantial or
4    continual decline with no reasonable chance of rehabilitation.
5    Here the debtor's own filings establish that this is the case."
6            Now, let me just get one more thing please.
7            Well, maybe I don't have any other thing.
8            MR. KURTZ:  Your Honor, let me answer that this way:
9    The reason that we want a trustee is because the Treasury
10   Department in violation of law has taken over Chrysler and our
11   debtor is not able to discharge its fiduciary duties to the
12   estate and do what we need to get done so we would like to have
13   somebody put in place that is not in a position to have to bow
14   down to the government and can actually do what a debtor is
15   supposed to do in bankruptcy.  The ultimate objector your Honor
16   asked is there is a substantial diversion of value that is
17   going from the collateral securing the loans for the Indiana
18   pensioners to selected and favored unsecured creditors of this
19   administration, like the unions, like the government itself.  I
20   mean, this is basically a sham.  You have Chrysler in business
21   today writing Chrysler is a company that makes certain kinds of
22   cars that have certain plants, and they have certain employees,
23   and you flip the switch after 363 sale and what do you have?
24   You have Chrysler.  It makes the same cars.  It has the same
25   employees.  It has the same plants but somehow we are not in a
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

31

95QSCHRYSLER
```
 1   reorganization.  We are in a sale of assets.
 2          THE COURT:  Just stick to my question.  I am not
 3   saying that your client doesn't have a right to perhaps insist
 4   on a liquidation.  I am not saying that.  But it is not
 5   irrelevant to ask what your client's objective is.
 6          MR. KURTZ:  I agree, your Honor.  I guess what I am
 7   trying to say is we want to capture more of the value
 8   associated with our collateral.  The new entity is worth a
 9   minimum I believe of $20 billion just based on the
10   reinstatement of unsecured notes and obligations and the like.
11   So we believe we are getting a diversion of value.  All we want
12   is more of the value.  We are willing to take all kinds of
13   haircuts on value but we want more of the value.
14          And a liquidation, your Honor, is really not any
15   different, by the way, than what they are purporting to do now.
16   At least whether you credit that or not they are selling
17   assets.
18          THE COURT:  There is a difference between a going
19   concern -- look here, and I will discuss it with the other
20   lawyers obviously, but nobody in this room I think knows what
21   would happen to new Chrysler in 6 months or a year.  If it goes
22   through it might work out well or it might not work out well,
23   who knows?  But the thing is is a court going to take steps
24   which might not give the new Chrysler a chance?
25          MR. KURTZ:  I understand.
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

32
95QSCHRYSLER

1          THE COURT:  That is just one way to look at one
2     aspect, but that is one thing I am thinking of.
3          MR. KURTZ:  Let me try to answer that two ways.
4          One is let me give you a corresponding policy argument
5     which is that the rule of law should apply even if there is
6     adverse social consequences; that that is really the foundation
7     of our judiciary and I am not really here as much as maybe
8     people would like to be here to figure out exactly what would
9     be best for the country.
10         I am really here to figure out what is best for the
11    client I represent but I will tell you that capital markets --
12    it's just as important to respect the integrity of capital
13    markets if we want to have loans going forward than it is to
14    talk about plant closings.  I will also say that there is sort
15    of an analogy that gets used in circumstances like this where
16    there is some allegation of harm.  Again, the government
17    controls us.  The government doesn't have to call the default.
18    The government can't do it until July 15, and it also can do
19    this any way they want.  But the real issue -- and people call
20    this sometimes a melting ice cube.  We won't have any problem
21    with selling the ice cube before it melts, although in this
22    case the government took it out of a freezer and took it out of
23    the sun and said, "It's melting, let me do what I want to do,"
24    even as it's selling the ice cube and worrying about how to
25    distribute the value.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

33

95QSCHRYSLER
```
 1              You can't just run over the secured creditors' rights
 2     because you want to make a sale.  We have no problem with the
 3     sale.  We have a problem with the distribution of consideration
 4     to unsecured creditors in connection with that sale.
 5              THE COURT:  I am going to suggest, let me hear from
 6     some of the others and I will be back to you.
 7              MR. KURTZ:  Thank you, Judge.
 8              THE COURT:  Okay.
 9              MR. CULLEN:  May it please the contract, your Honor,
10     Thomas Cullen of Jones Day representing Chrysler, and I believe
11     several other people want to speak and I will try to be as
12     direct as I might.
13              First, with respect to the schedule that we are
14     operating on in the bankruptcy court, which gives us the kind
15     of procedural posture of the case we now have.  That schedule
16     and the DIP loan were approved based upon evidentiary
17     proceedings in front of the bankruptcy court where arguments
18     and evidence about the ability and the workability of that
19     schedule and the impact on the debtor and the degree to which
20     the debtor had to get through the proceeding rapidly were all
21     presented and considered by the bankruptcy court and ruled upon
22     in connection with accepting the DIP loan and in connection
23     with accepting --
24              THE COURT:  What is going on with Chrysler?  The
25     papers say all manufacturing ceased May 1.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

95QSCHRYSLER

```
 1                Is that right?
 2                MR. CULLEN:  That is right.
 3                THE COURT:  Okay.
 4                Now, let's suppose the sale goes through, what is
 5    supposed to happen?
 6                MR. CULLEN:  If the sale goes through what immediately
 7    happens, and this was testimony in front of the bankruptcy
 8    court mainly by Mr. Iwisition who is referenced in your papers
 9    here and who is referenced in the  bankruptcy court's
10    rulings --
11                THE COURT:  Who?
12                MR. CULLEN:  Iwisition, which rhymes with inquisition.
13                THE COURT:  How do you spell him?
14                MR. CULLEN:  Jeepers, your Honor?
15                THE COURT:  Don't worry.  A good speller will be
16    along.
17                MR. CULLEN:  Okay.
18                He testified that what we really need to do, you can
19    have the plants down for a certain amount of time but you have
20    got to keep your relationship --
21                THE COURT:  But what will happen?  Will the plants
22    reopen and start making Chrysler cars?
23                MR. CULLEN:  We will try to get back into production
24    to catch the last part of the 2009 model year, yes, your Honor,
25    immediately.  We will be back into production by August.
```

35

95QSCHRYSLER
```
 1              THE COURT:  What is Chrysler making?  Are they making
 2   Dodges also?
 3              MR. CULLEN:  Yes.
 4              THE COURT:  Any other brands?
 5              MR. CULLEN:  Dodges, Jeeps, Plymouth Caravan, which is
 6   a minivan.  There is a range of platforms.
 7              THE COURT:  But the idea would be to get back into
 8   production of the Chrysler products?
 9              MR. CULLEN:  Newco would get back into production of
10   Chrysler products almost immediately, yes.
11              With respect to the time, as a legal matter I think
12   inadvertently I am sure Mr. Kurtz misinterpreted the underlying
13   contract documents.  The sale document, the primary sale
14   documents, the master transaction agreement between Chrysler on
15   the one hand and Fiat on the other has a date of June 15 --
16   June 15 Fiat can walk away.  It can be extended to July 15 with
17   only regulatory approvals, and we have world-wide regulatory
18   approvals mainly on antitrust grounds that we had to get as
19   well.  So the July 15 date is meant to give an extra 30 days if
20   that is the only thing outstanding.  But Fiat gets to walk this
21   deal.
22              THE COURT:  They get to walk if what?
23              MR. CULLEN:  If it's not closed by June 15.
24              Now, with respect to bringing up these issues, I
25   mentioned --
```

95QSCHRYSLER

```
 1                THE COURT:  What about the federal government?
 2                MR. CULLEN:  Fiat's participation is a condition of
 3     the federal government's participation.  It's all in a package.
 4                THE COURT:  The other proposed owner is, should we
 5     say, the UAW or --
 6                MR. CULLEN:  UAW or the pension fund.  The buyer is
 7     going to distribute --
 8                THE COURT:  There is another name -- VEBA.
 9                MR. CULLEN:  Voluntary Benefit Associate Account.
10                THE COURT:  How do you spell that?
11                MR. CULLEN:  V-E-B-A.
12                THE COURT:  That is really associated with the UAW?
13                MR. CULLEN:  It's a trust which administers certain
14     benefits for the UAW.
15                THE COURT:  Alright.
16                MR. CULLEN:  And those are the people on the buyer's
17     said of the 363 sales transaction as it's configured.  Now,
18     that sales transaction old Chrysler is not, as Mr. Kurtz would
19     lead to you believe, on both sides of that transaction.  None
20     of the equity owners have an equity in new Chrysler.  None of
21     the executive suite has any plans to move over, the office of
22     the chairman, move over into new Chrysler.  This is a new buyer
23     that is going to be run by a new board of directors and managed
24     by Sergio Marchionne, the CEO, as the CEO, who is the head of
25     Fiat.  This is a genuine sale to start with.  And I mention to
```

37

95QSCHRYSLER

```
 1    the court --
 2              THE COURT:  Is anybody paying any money?
 3              MR. CULLEN:  The value that is created by the
 4    transaction is the following:  That Fiat is bringing rights to
 5    product lines, rights to technology, rights to distribute in
 6    Europe for the new Chrysler, and that is their contribution,
 7    not in cash.
 8              THE COURT:  The what?
 9              MR. CULLEN:  That is their contribution to the new
10    company, not in cash.  In return for that contribution, they
11    are getting a 20 percent equity stake in the new company which
12    can go up to 35 percent based on certain performance benchmarks
13    for the new company over time.  But those determinations are
14    made on the buyer's side of the equation because Fiat and the
15    U.S. government are the buyers and the U.S. government is
16    supplying the cash, the $2 billion, which is the consideration
17    for the sale of the assets that old Chrysler is selling to new
18    Chrysler.
19              THE COURT:  Just a minute.
20              So Fiat is not putting up cash.  VEBA is not going to
21    be putting up cash, right?
22              MR. CULLEN:  No, your Honor.
23              THE COURT:  How much is the government going to put up
24    in cash?
25              MR. CULLEN:  The government has already put up, as we
```

38

95QSCHRYSLER

```
 1   discussed.  There was the $4 billion loan on January 2nd.
 2             THE COURT:  Which is undoubtedly gone.
 3             MR. CULLEN:  There is the DIP loan which is --
 4             THE COURT:  A little over 3 billion.
 5             MR. CULLEN:  4.9 billion in total.
 6             THE COURT:  With the Canadian government.
 7             MR. CULLEN:  Yes, right.
 8             THE COURT:  Alright.
 9             MR. CULLEN:  And then there is the 2 billion, which is
10   the purchase money.  And so that is the money that the U.S.
11   government --
12             THE COURT:  Is that all the cash that Chrysler needs?
13             MR. CULLEN:  In terms of cash that Chrysler needs,
14   there are two aspects to what is going to happen after the
15   sale.  One is the 2 billion comes in and it will go out for the
16   first lienholders, and if I may correct slightly and make sure
17   I understood what had transpired in front of the court, my
18   understanding is that there is no release of the liens; that
19   what happens is the liens remain in place when the collateral
20   is sold and attached to the proceeds, so it's an existing lien,
21   not released, attached to the proceeds, which would be the $2
22   billion.
23             THE COURT:  Is it attached to anything else?
24             MR. CULLEN:  In terms of how the distribution will
25   take place --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

95QSCHRYSLER
```
 1              THE COURT:  I mean, is the lien attached to any other
 2    assets at old Chrysler?
 3              MR. CULLEN:  It attaches to all the proceeds of sale.
 4    I think with respect to the distribution of the residual
 5    value --
 6              THE COURT:  I am asking are there other assets at old
 7    Chrysler to which the lien applies?  And I think somebody said
 8    the answer is yes.
 9              MR. CULLEN:  Yes, there are 8 plants.
10              THE COURT:  Alright.
11              Let me go back.  I don't quite tally up sensibly who
12    is going to own.  If -- let me just call it the trust.  The
13    trust owns 5 percent I think.
14              MR. CULLEN:  Yes, your Honor.
15              THE COURT:  And Fiat initially 20 percent.
16              MR. CULLEN:  Yes, your Honor.
17              THE COURT:  The papers say that the U.S. government is
18    going to own 8 percent.
19              MR. CULLEN:  Yes, your Honor.
20              THE COURT:  Well, if you add up 55 and 20 and 8, it's
21    83 percent.
22              MR. CULLEN:  Canada has 2 percent.
23              THE COURT:  Canada 2, alright.
24              MR. CULLEN:  And the other 15 percent, your Honor, is
25    Fiat's earn-out, if you will.  Fiat can get the 35 percent if
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

95QSCHRYSLER
1   it achieves certain financial benchmarks in the performance of
2   the company.
3           THE COURT:  In other words, Fiat has a kind of a
4   warrant or something like that.  It has a right.
5           MR. CULLEN:  It has a right.
6           THE COURT:  It has a right.
7           MR. CULLEN:  Yes.  So the other numbers that the court
8   cited are, in effect, the post dilution numbers once Fiat gets
9   to its right.
10          Now, with respect to the --
11          THE COURT:  Look, this goes way beyond my province in
12  a way, but there has been so much said in the papers about the
13  advantage of this transaction, and is is there any kind of pro
14  forma financial statements or cash flow statements or anything
15  to indicate that this is going to be a going concern, a viable
16  thing, in other words, they open the plants again, they start
17  making Chryslers, and the problems that existed at Chrysler
18  didn't start in 2008.
19          MR. CULLEN:  No, your Honor.
20          THE COURT:  They didn't.  And whatever problems they
21  were does anybody say they are solved?  The problems with the
22  union, all those obligations, have all those been solved?
23          MR. CULLEN:  "Solved" is a heavy word, your Honor.
24          THE COURT:  I know.
25          MR. CULLEN:  But what has happened is that in the time
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

41

95QSCHRYSLER

1  period after the first government loan the government and
2  Chrysler and Fiat all were in an intense period of modeling the
3  future and of negotiating with the various other
4  constituencies -- labor, suppliers, dealers, lenders -- to come
5  out with a sustainable package of assets and obligations that
6  could be a viable concern.  Fiat is particularly appealing for
7  this purpose --
8            THE COURT:  Why?
9            MR. CULLEN:  Because it solves three of the basic
10 strategic problems of Chrysler.  During this period there was
11 also heavy negotiation with the union.  There is a new
12 collective bargaining agreement which is part of this.  There
13 is a new set of obligations to the VEBA, reduced, which is part
14 of this.  There is the impact on the debt which we have already
15 talked about.  But Fiat addresses for Chrysler, and this is why
16 Chrysler found Fiat, if you will, in its world-wide search for
17 a strategic partner, it gives it additional scale as a
18 purchaser.
19           THE COURT:  What does that mean?
20           MR. CULLEN:  It's a bigger purchaser.  It can get a
21 better price.  It can have more uniformity.  It can spread
22 costs over more cars.
23           Number 2, it gives it a broader product line and a
24 broader product line in the lower end, if you will, of size and
25 fuel consumption cars which Chrysler needs in order to meet
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

42

95QSCHRYSLER
1    CAFE standards and which Chrysler needs in order to sustain its
2    dealers, a broader product line, and it gives it geographic
3    scope, which is the ability to sell Jeeps, for instance,
4    through the Fiat distribution network in Europe and in Latin
5    America, as well as the ability to sell Fiat's and the small
6    Fiat 500, for instance, in the United States.
7              THE COURT:  Do they sell well in Europe?
8              MR. CULLEN:  Very well.
9              THE COURT:  Anybody have a picture of what one looks
10   like?
11             MR. CULLEN:  They look like one of those little
12   non-distinct European really teeny cars, your Honor.
13             THE COURT:  Are they going to go over well in Texas?
14             MR. CULLEN:  You know, your Honor, there are two
15   schools of thought on all of that but with respect to what
16   happened in the middle of 2008 was the shift away from big
17   stinking trucks to littler cars.  Is that something that was
18   permanent?  Is it going to be as much as it was then?  We do
19   know that the government is going to require us to meet 35
20   miles a gallon under CAFE or the Corporate Average Fuel
21   Efficiency.  We do know that without a substantial portion of
22   our product line at those levels we do know that we can't reach
23   that.
24             THE COURT:  Do we know that the public is going to buy
25   those cars?  And can the government really come along and force
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

43

95QSCHRYSLER

1    us to buy those cars?
2            MR. CULLEN:  No one knows.
3            THE COURT:  They probably can't.  The thing is
4    there something about profit, not ideology, but is there
5    something about profit that is built into this transaction?
6            MR. CULLEN:  Yes, your Honor.
7            THE COURT:  And the market?
8            MR. CULLEN:  Yes, your Honor.
9            THE COURT:  What is that?
10           MR. CULLEN:  Your Honor, when we first went to the
11   government, Chrysler first went to the government to get the
12   loans, what we had to do was present a viability analysis and
13   the viability analysis had to show that we were going to have
14   positive EBIDA, earnings before interest tax depreciation, that
15   we were going to have positive cash flow in order to pay off
16   and address these loans over the near term and at every point
17   Chrysler would negotiate with Fiat about what were the
18   appropriate assumptions with respect to the overall demand for
19   cars in the United States at a depressed level now, and will
20   probably work it's way back to the 2007 level probably not by
21   until 2013.
22           One of our planning complaints was within that SAR
23   what do we sell and what kind of profit do we make on it?  And
24   we have it by product line and by geography and we have it for
25   the new cars that we are going to bring out.  So we have those

44

95QSCHRYSLER

1    EBIDA figures that have been negotiated out and show positive
2    numbers, show a viable enterprise for this company going
3    forward.
4            THE COURT:  Look, you sort of have gotten into a
5    subject which is germane to the motion, and that is this:  The
6    claim is that the Chrysler management while Chrysler was debtor
7    in possession, the management basically vacated the process of
8    negotiating this sale and left it entirely to the White House
9    and the Treasury Department and the claim is that they
10   basically didn't even know what was going on.
11           MR. CULLEN:  That, your Honor, is grossly untrue.  It
12   is a shameful calumny on these people.  What this company has
13   been doing for the past year in the face of the worst auto
14   market in 30 years is trying desperately to restructure this
15   market and to find a deal that was bankable by someone to
16   preserve this company and to preserve a piece of Chrysler and
17   preserve the product brands going forward.  And so what they
18   did was working 24-7 on this, they looked at the durable core
19   of assets that this company had, the trucks and the jeeps and
20   the minivans that people had always bought, and they thought in
21   what configuration can these durable, valuable things go
22   forward?  We need money, first.  We need someone who is going
23   to bank our ability to go forward.  So we had to go to
24   somebody.  We needed a partner and we needed a bank to save
25   this durable core of Chrysler.  And we looked all last year,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

45

95QSCHRYSLER

1    all of 2008, around the world talking to various partners,
2    talking to General Motors, talking to Nissan, talking to
3    everyone who would talk to us about this, and trying to gauge
4    who could act with that.
5            And then when we got to the end point of that process,
6    what we really needed, then we went to our first lien lenders
7    and said can you tied us over?  Are you interested in investing
8    in this in these troubled times?  Perhaps understandably enough
9    they weren't interested.
10           THE COURT:  You mean you asked them for more money?
11           MR. CULLEN:  More money, yes, your Honor.  We asked
12   them for both more money and concessions, to lessen the debt
13   load so we had a viable business prospect going forward.  They
14   were not at that time interested in either.  This drove us into
15   the arms of the government and as the banker of last resort we
16   had to present to the government a viable deal.  We had to
17   present to Fiat a viable package of assets that could, when
18   combined with the government financing and the Fiat products,
19   present something that could go forward.  That was our effort.
20           Was the government and what the government was willing
21   to finance important to us in that time period?  Of course it
22   was.  We desperately, desperately needed that financing or we
23   would have to liquidate.  And so we negotiated hard with the
24   government.  We negotiated hard with Fiat.  We negotiated hard
25   with the unions in order to put together a package that could

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46

95QSCHRYSLER
1   sustain a sale, that could sustain a purchase price.
2           THE COURT:  Is it correct, and there are a lot of
3   details that I can't get into, but is it correct that the
4   management of Chrysler actively participated in a negotiation
5   of the terms of the 363 sale?
6           MR. CULLEN:  Absolutely, your Honor.  Absolutely.
7           THE COURT:  What is claimed is that this was really
8   the work of the White House and the Treasury Department and
9   that the management of Chrysler stepped aside and just let it
10  happen under the will of the White House and the Treasury
11  Department, and at least in the days leading up to the Chapter
12  XI and what has happened since.
13          Do you get my question?
14          MR. CULLEN:  I do get your question.
15          THE COURT:  What is the answer?
16          MR. CULLEN:  The answer to the question is that we
17  were always attempting to achieve 100 percent buy-off in the
18  sale --
19          THE COURT:  Achieve what?
20          MR. CULLEN:  100 percent consensus of all the
21  stakeholders in what we were trying to do.  We had attempted to
22  negotiate with -- we, Chrysler, had attempted to negotiate with
23  the first lienholders about what kind of concessions they would
24  make in order to make the resulting company viable.  It came to
25  a point where they said to us you are not providing the cash.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

95QSCHRYSLER

1    You, Chrysler, are not providing the cash, so we, the first
2    lienholders, want to negotiate directly with the U.S.
3    government to see what we can achieve in direct negotiations
4    because you are not providing the money that is going to pay
5    us, the government is.  And so what we did in order to satisfy
6    our fiduciary duty to maximize value for the estate is we were
7    trying hard, as I said, to pull together a package of assets
8    that we were going to sell and that was salable and that would
9    sustain the kind of price that the banks could agree to and the
10   government could agree to, and the banks negotiated directly
11   with the government.  When it came right to the eve --
12            THE COURT:  You say the banks.
13            MR. CULLEN:  The first lien secured.
14            THE COURT:  Who negotiated on their behalf?
15            MR. CULLEN:  J.P. Morgan, its lawyers.  Citibank was
16   involved in the negotiations.  We made various offers ourselves
17   to the first lienholders.
18            THE COURT:  Was Simpson Thacher representing them?
19            MR. CULLEN:  Yes.  And I will say this:  That at the
20   very last moment of this process when it looked like we might
21   get 100 percent of the first lienholders and we were hoping to
22   do so, we went back to the government because we didn't have
23   the extra money to provide ourselves and said, please, could
24   you please sweeten the offer to the banks?  And they did.
25            THE COURT:  They did?

48

95QSCHRYSLER
```
 1                 MR. CULLEN:  And they did.  They did.
 2                 THE COURT:  Sweeten it from what to what?
 3                 MR. CULLEN:  At the last moment there was an offer on
 4       the table, as I understand it, to the banks of the number that
 5       was finally agreed to, which was $2 billion.  We went to the
 6       government and others went to the government and said could we
 7       please do more than that for these banks?  The government gave
 8       a time limited offer of $2.250 billion with a time limit on it
 9       to get 100 percent of the banks and it did not happen.
10                 THE COURT:  What do you mean it did not happen?
11                 MR. CULLEN:  They didn't get 100 percent and so the
12       final number was 2 billion for the agreeing banks, for the
13       whole facility but without --
14                 THE COURT:  You were trying to get literal consent
15       from all the secured lenders.
16                 MR. CULLEN:  We were trying to get 100 percent to stay
17       out of the bankruptcy.  Without 100 percent consent we have a
18       default.  So that is where we were on that.
19                 Now, if I can go back --
20                 THE COURT:  I tell you what, you have been very busy
21       answering my questions but I think we are running a little on
22       the late side and there are a few other people to hear from.
23                 MR. CULLEN:  Can I say one thing?
24                 THE COURT:  Oh, of course.
25                 MR. CULLEN:  Just on the core issue here, which is
```

49

95QSCHRYSLER
```
 1  that the 157 case law, I think that 157 in the legislative
 2  history and in this circuit, in this district court, provides a
 3  relatively narrow and functional basis for withdrawal.  The
 4  issue has to be novel and it has to be essential.  And it's
 5  rooted really in the desire to not allow collateral issues to
 6  the bankruptcy expertise to derail the bankruptcy with
 7  diversions, with things that are outside the range.  It's a
 8  thing of a functional company's competence of the bankruptcy
 9  court and the district court.
10         THE COURT:  I am pretty well aware of that.
11         Let me just say this:  That I don't think any hearing
12  before the bankruptcy court or before this court or any appeal
13  needs to take forever, but I do think this:  That the issues
14  that have been explored in a somewhat tentative way this
15  morning need to be written out.  There needs to be a
16  resolution.  Otherwise a very, very important matter of great
17  public interest will be misunderstood, and it isn't up to me to
18  tell Judge Gonzalez how to run his court or how to write his
19  opinions, but I am learning a lot this morning that is very
20  important for me both as a judge and, frankly, as a citizen.  I
21  have learned a lot from Mr. Kurtz.  I am learning a lot from
22  you, and I haven't even gone around the room.
23         This is a matter which has been written about in the
24  press, and all kinds of things have been said.  And the press
25  has its way of being critical, you know, and so all I am saying
```

50

95QSCHRYSLER
1   is I certainly hope that before this is all over there is
2   really in some opinion there is a full exposition of the facts.
3   It will help the public.  It will help the financial world, the
4   public in general, and it hasn't yet been done by any means.
5   And it hasn't had the opportunity that it should and I just
6   hope that it will.
7              I really have to go to the other lawyers.
8              MR. CULLEN:  You left one question outstanding that I
9   feel a need to respond to on the procedure.  With respect to
10  the TARP and unconstitutional use of improper and
11  unconstitutional use of TARP objection, that was made on May 4
12  by White & Case on behalf of the previous clients in connection
13  with the DIP and the other filings.  I would point to the
14  post-petition financing order on page 19 that they filed on May
15  4, paragraph 32, and Exhibits G and H of the government's
16  filing.  So the problem with TARP was brought up in
17  relationship to the DIP issue on the 4th.
18             THE COURT:  Alright.  Thank you.
19             Who is next please?
20             MR. PANTALEO:  Good afternoon, your Honor, Peter
21  Pantaleo from Simpson Thacher.
22             I represent J.P. Morgan, who is the agent of the first
23  lien credit facility.  Your Honor --
24             THE COURT:  I hope Mr. Kurtz got the word around.  The
25  first thing I saw Friday night when I got home was the paper
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

51

95QSCHRYSLER
```
 1  filed on behalf of J.P. Morgan.  You remember, I don't know if
 2  you were here, but the very first meeting we had I said that I
 3  had no idea who was involved in all aspects of this and as far
 4  as I knew I didn't own any stock or the trust and I didn't own
 5  any stock in anything having to do with Chrysler.  The trust,
 6  the trustee, owned stock on Morgan Chase.  I told Mr. Kurtz on
 7  the phone Friday night, and I hope he circulated the word.
 8          As far as I am concerned I have no problem but I don't
 9  want it to be a concealed fact.  And it would have been
10  possible, but not very practical, to get a new judge in Friday
11  night.  So if I hear no objections I hear no objections on.
12          MR. KURTZ:  I will just confirm for the record that I
13  did circulate that information.
14          THE COURT:  Alright.
15          But go ahead please.
16          MR. PANTALEO:  Thank you, your Honor.
17          Your Honor, I had understood that your Honor had
18  determined that you didn't want to hear argument on standing
19  and so I won't be speaking to the cases that were cited in the
20  pleadings but I do think, your Honor, it would be useful for
21  the court to understand a little bit about our process and the
22  agreements that we had in place because it does speak directly
23  to the two basic questions you had asked counsel, both on
24  timing as well as ultimately what is it --
25          THE COURT:  What I am interested in as far as any
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

95QSCHRYSLER

1   representative of the secured lenders is what did such
2   representative do in connection with the Chapter XI, in
3   connection with the negotiation of the proposed sale.  What did
4   they do?
5          MR. PANTALEO:  Your Honor, before the company went
6   into bankruptcy we negotiated the terms of a consent that is
7   binding on all of the lenders in the syndicate by virtue of a
8   contract that all the lenders have signed.  And the terms of
9   that consent your Honor heard before was that the company with
10  our permission would sell the collateral or most of our
11  collateral, some of it is not being sold.
12         THE COURT:  Did you get every secured lender to sign
13  that?
14         MR. PANTALEO:  We received consent from lenders
15  holding in excess of 92 percent of the amount of the debt.
16         THE COURT:  I understand.  But not 100 percent.
17         MR. PANTALEO:  Not 100 percent.  And as your Honor
18  probably is aware when you have a large syndicated deal the
19  contract is clear that 100 percent is not required.  If it was
20  required we would never ever reach an agreement because
21  understandably, your Honor, there is always someone, and here
22  we have someone, who as they honestly told you simply wants
23  more value.
24         THE COURT:  Alright.
25         MR. PANTALEO:  So what we did before the filing is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

95QSCHRYSLER

```
 1    J.P. Morgan as agents with the steering committee composed of
 2    other first lien lenders spent weeks negotiating.
 3            THE COURT:  Who did you negotiate with?
 4            MR. PANTALEO:  Generally speaking directly with the
 5    source of funding for the money, for the recovery we were
 6    looking for, which is the government.  And it was a natural
 7    instinct on our part being lenders, understanding that there
 8    was a source of funding, to negotiate directly with that
 9    source.  And so that is basically the process that we had for
10    several weeks leading up to the bankruptcy.  Prior to
11    bankruptcy, just prior to bankruptcy, an agreement had been
12    reached that ultimately was accepted by 92 percent of the
13    holders of the debt.  And this agreement was to consent in
14    bankruptcy to the sale of the collateral in exchange for the $2
15    billion.
16            So when we started bankruptcy we had that agreement
17    and, your Honor, we had a conference call with all the lenders
18    prior to bankruptcy.  We explained the proposed terms.  We
19    asked for their support.
20            Mr. Kurtz's clients were among those lenders and so
21    they knew as of the end of April exactly what the terms were,
22    what the proposed deal was.  And while it was always the
23    objective of the agent, and you can understand why, to try to
24    get everybody to say yes, to have as much consensus as
25    possible, in a circumstance like this it just wasn't possible.
```

54

95QSCHRYSLER

1  But we got a fair amount of consensus and, frankly, more than
2  what is required under the terms of the agreement.  So in
3  addition, however, to having an agreement with the government
4  and ultimately therefore with Chrysler as to the terms under
5  which we would consent to the sale, we also have an agreement
6  in place with all the lenders.  And that agreement says two
7  things.  First, it says that in the event of a bankruptcy --
8          THE COURT:  What lenders?
9          MR. PANTALEO:  All the lenders, the loan documents
10  which everyone signs.
11          THE COURT:  When do they sign that?
12          MR. PANTALEO:  They sign when they become lenders.
13          THE COURT:  I am aware of that.
14          MR. PANTALEO:  The loan trades periodically so some
15  are original lenders --
16          THE COURT:  Incidentally, were the loans marketable,
17  could people trade them?
18          MR. PANTALEO:  They were being traded, yes.
19          THE COURT:  Were they being traded in 2009?
20          MR. PANTALEO:  Yes, very likely.
21          THE COURT:  Do you have any idea what they were being
22  traded at?
23          MR. PANTALEO:  Well, again, likely and what we had
24  understood, I didn't verify this myself, it was approximately
25  14 cents on the dollar.

55

95QSCHRYSLER

```
 1              THE COURT:  Going back to Mr. Kurtz, when did the
 2      Indiana pension funds take out their loans or whatever?
 3              MR. KURTZ:  Just one second, your Honor.  I just need
 4      to consult the declaration.
 5              THE COURT:  Okay.
 6              MR. KURTZ:  We disclosed all that information in a
 7      bankruptcy filing, form 2019.  I will see if I have it with us.
 8              MR. PANTALEO:  I have it.
 9              Glenn, do you want me to give it to you?
10              MR. KURTZ:  Yes, thank you.
11              They were purchased on the following dates:  August 13
12      through 15, 2008 -- each of them was.  They were all purchased
13      between August 13 and August 15, 2008.
14              THE COURT:  At what prices?
15              MR. KURTZ:  43 cents.
16              THE COURT:  On the dollar?
17              MR. KURTZ:  On the dollar.
18              THE COURT:  Okay.
19              MR. PANTALEO:  So, your Honor, just before bankruptcy
20      having negotiated the terms of the syndicate's consent to the
21      sale of the collateral in a bankruptcy proceeding for $2
22      billion in cash, we notified the lenders generally obviously
23      because we needed a sufficient number of lenders to support
24      this, including Mr. Kurtz's client, and we reached agreement
25      with the company.
```

56

95QSCHRYSLER

1          As I was saying earlier, your Honor, each of the
2     lenders also has an agreement with each other, including with
3     the agents and the collateral trustee, and basically that
4     agreement says two things.  It says -- and I am simplifying
5     this,  your Honor -- it says if there is a bankruptcy, then
6     it's really up to my client, the agent, with the consent of a
7     majority of the holders in amount, which it had, to direct or
8     to consent to the sale of collateral in the context of a
9     bankruptcy proceeding or any foreclosure or in any process in
10    which the collateral is liquidated for cash.
11         THE COURT:  Look, I appreciate you going into that but
12    I have maybe an oversimplified position on standing.  The
13    question is did the plaintiffs have standing to make the
14    motions they are making before this court?  And the answer to
15    me is yes under the bankruptcy while they are an interested
16    party or they are interested parties, it doesn't take away one
17    bit from anything you have said but as far as being able to
18    make the motions that they are making, they have standing to
19    make these motions.  The bankruptcy court has heard their
20    objections and has treated them as being interested parties.
21    It doesn't mean anything that you say about the rights of where
22    you stand on what you are talking about.  It doesn't mean that
23    you are wrong.
24         But let's go to another point.  Frankly, if you tell
25    me that you take the position that you negotiated in good faith

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

95QSCHRYSLER

1  with the government who was going to provide the money, that is
2  your position, right?
3          MR. PANTALEO:  It is, your Honor.  And it's also our
4  position that they have already consented by virtue of the
5  agreements that they have signed.
6          THE COURT:  Well, alright.
7          MR. PANTALEO:  I apologize, your Honor.  That is the
8  last I will say of it.  But I think it's important for your
9  Honor to appreciate that.  To us it's less about standing as it
10 is about --
11         THE COURT:  I am right now more interested in finding
12 out -- not that factual issues are going to get resolved at
13 this hearing, but I want to know the positions of the parties.
14 The position of Chrysler is that the management negotiated
15 actively.  The position of Morgan Chase is that you negotiated
16 actively on behalf of the secured lenders.
17         MR. PANTALEO:  With the steering committee as well,
18 yes, your Honor.
19         THE COURT:  With the steering committee, yes.  That is
20 really all I need.  That is sort of what I need to know at the
21 moment.
22         MR. PANTALEO:  And that when the company filed
23 bankruptcy full disclosure was made to the lenders at the end
24 of April of the terms of the sale, of the terms of the DIP
25 financing.  Obviously they all knew that TARP money was used

58

95QSCHRYSLER

1  back in January and, you know, to us, your Honor, the issue is
2  in addition to obviously what I said a few minutes ago, which
3  is they have already consented to this, the issue is not so
4  much TARP money but it seems to us, your Honor, the issue is
5  it's just not enough money.
6          Your Honor, that goes to the heart of the fact that,
7  you know, we have a deal.  And while we would have liked more
8  money we would have liked the last amount of government money
9  to be 4 just like it was for the DIP, just like it was in
10 January, instead of 2, but at some point you reach a deal and
11 people agree and people are bound and it's not about where the
12 money is coming from.  I mean, they are very honest about it.
13 They are just saying they want more.  I appreciate that, your
14 Honor.  We all do.
15         THE COURT:  I think what they are basically saying
16 is -- maybe they are not quite saying it this way -- that here
17 is a sale and we are told we have to accept so many cents on
18 the dollar, the face amount of the notes, and we are given this
19 prediction that there is this going concern that is going to go
20 forward and there certainly shouldn't be a liquidation, but
21 what if 6 months from now new Chrysler is in bankruptcy?
22         MR. PANTALEO:  That is why we took cash.
23         THE COURT:  And so there is a liquidation anyway, and
24 we didn't get very much out of this process.  That is what they
25 are really saying, that this deal was rammed down the throats

59

95QSCHRYSLER

1   of the people and that is what they are complaining about.
2           MR. PANTALEO:  Sure, your Honor, but 92 percent of the
3   debt holders didn't have to say yes.  They could have said no.
4   They could have said no as these gentlemen are saying no.
5           THE COURT:  They certainly could have done that.
6           MR. PANTALEO:  They said yes.  They decided maybe for
7   the reasons your Honor indicated that there may be risks
8   associated with perhaps the new Chrysler so they took cash.  We
9   are the only parties getting cash in this deal.  All the other
10  stake holders are not getting cash.
11          THE COURT:  Well, not a lot of cash is coming in.
12          MR. PANTALEO:  Not a lot of cash is coming in but
13  whatever is coming in is coming to us.
14          THE COURT:  It isn't up to me to decide, but do you
15  think there is enough cash coming into new Chrysler?
16          MR. PANTALEO:  Your Honor, I don't know the answer
17  because from our perspective since we are getting paid and we
18  no longer have claims against new Chrysler and we still have
19  some old claims against old Chrysler, it's not really a concern
20  of ours.
21          THE COURT:  I know.  Well, it's beyond anything I can
22  deal with.
23          THE COURT:  I am going to thank you, and who else
24  would like to speak, and we need to wind this up.
25          Thank you very much.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60

95QSCHRYSLER

 1            MR. PANTALEO:  Thank you, your Honor.
 2            MS. VARGAS:  Good morning, your Honor, Jeannette
 3    Vargas, United States Attorney's Office on behalf of the United
 4    States Treasury.
 5            As you said, I will attempt to be brief and I would
 6    like to make two essential points O points that have been
 7    raised earlier in this morning's discussions.  The first
 8    relates to the timing of the withdrawal motion which is an
 9    issue that we raised in our brief.
10            THE COURT:  Yes, you did.
11            MS. VARGAS:  Mr. Kurtz focused rightly on the May 19
12    objection date for the withdrawal, for the sale objection.  But
13    that is not the relevant date.  There are a number of times
14    earlier in the proceedings when his clients could have involved
15    themselves in bankruptcy proceedings and could have withdrawn
16    the reference.
17            On April 30 was the petition date and that was the
18    date upon which the Treasury Department immediately, that same
19    evening, filed its statement with the bankruptcy court
20    disclosing to all parties the Treasury's role in the
21    proceedings, the statutory authority upon which we based our
22    role in the proceeding, specifically the EESA statute that was
23    referred to earlier, disclosed the terms on which we were
24    providing financing, et cetera.
25            On May 1st, the next day, Chrysler filed their motion

95QSCHRYSLER
1   to approve the interim debtor-in-possession financing and, as
2   Mr. Cullen stated earlier, a different group of similarly
3   situated secured lenders filed an objection to that interim DIP
4   order and they raised the very EESA issues.  That was on May 4,
5   I believe, or perhaps May 3rd, excuse me.  May 3rd the sale
6   motion was filed.  At any time they could have filed an
7   objection to the sale motion.  They don't have to wait until
8   May 19.  May 19 is the date by which it has to be filed.  There
9   is nothing to say that they couldn't have submitted an
10  objection to that earlier.
11          But perhaps the most fundamental date at which they
12  could have raised their objections is the date upon which the
13  bidding procedures order was heard, which was on May 5.  And at
14  that time they could have come forward and contested the
15  schedule that was being set.  And we heard Mr. Kurtz say a lot
16  about the schedule being rammed down their throats.  Well, they
17  did not appear in opposition to the schedule that was being
18  set.  There was an opportunity for objections.  There was an
19  opportunity to be heard on the schedule.
20          There was an evidentiary hearing before Judge Gonzalez
21  on the schedule, and witnesses provided testimony.  There was
22  cross examination I believe.  There was documentary evidence
23  and Judge Gonzalez, having heard all the evidence, decided that
24  this expedited schedule was absolutely necessary because
25  Chrysler is a wasting asset and if there was any possibility

62

95QSCHRYSLER
1  that it was going to be preserved as a going concern that the
2  schedule had to be May 27 for the sale hearing.  Yes, is that a
3  quick schedule?  It is.  But in these times it's not
4  unprecedented as we know in past years, Lehman I believe went
5  to sale within 7 days of filing its petition date when it was
6  sold.  If they had had these concerns about the schedule they
7  could have preserved their right to come forward.  But we did
8  not hear from them until May 19, and we did not hear from them
9  on this withdrawal motion on May 20.
10          And specific to the issues about EESA, again I note
11  that those same issues were raised in this case by these
12  attorneys in a brief that looks very similar to the withdrawal
13  motion that we are adjudicating today on May 4, the same
14  constitutional issues.  They mentioned the purported authority
15  of Treasury under the EESA, the constitutional-takings argument
16  that they raised in their papers, citation to the Bradford
17  rule.  We will see some of the paragraphs indeed are verbatim.
18          So to say that May 19 was the earliest date they could
19  have come forward is false.  And another point on timing is we
20  have already heard that even before the Chapter XI was filed
21  the administrative agent was soliciting consents from the
22  secured lenders.  There is no party in interest here who is
23  unaware that Chrysler was going into Chapter XI.  There was no
24  party in interest who was unaware of the negotiations that were
25  taking place, that there was a possible Fiat deal on the table,

63

95QSCHRYSLER

1   the United States government's involvement.  This notion they
2   received formal notice on May 18 and they had no idea this was
3   going on before that really flies in the face of the publicity
4   that has surrounded this and even the facts we have heard here
5   today.
6           THE COURT:  I understand what you are saying.  I wish
7   you would address -- and other lawyers have addressed it but
8   you have a segment about the application of Section 157(D).
9   Regardless of the merits there certainly is statutory
10  interpretation raised by the Indiana funds and interpretation
11  of the U.S. Constitution, and Mr. Kurtz has taken the position
12  that that is really sufficient for mandatory withdrawal of
13  reference.
14          What do you say to that?
15          MS. VARGAS:  Your Honor, we say it's not sufficient.
16          Let me respond in two parts.  First, and I understand
17  your Honor expressed thoughts about the standing issue earlier,
18  but let me just explain the disjunction between the harm that
19  they are alleging and the EESA issues that they are raising.  I
20  think they are best summed up by Mr. Kurtz himself when he
21  concluded his statements earlier and he said we have no problem
22  with the sale.  We have a problem with the distribution of
23  assets in connection with that sale.  That is correct.  They
24  don't have a problem with the sale.  They don't have a problem
25  with the Treasury providing $2 billion.  What they would like

64
95QSCHRYSLER
```
 1   is for the Treasury to provide them with more EESA money.  That
 2   is not a harm attributable to whether or not the Treasury is
 3   properly financing the Chrysler sale through the EESA statute.
 4   That is a complaint about --
 5             THE COURT:  Look, legal briefs have a lot of different
 6   elements but certainly, unless I am reading it completely
 7   wrong, they are objecting to the method by which this sale was
 8   arrived at, the proposed sale was arrived at.  And they are
 9   objecting that the proposed sale favors certain parties and
10   disfavors the secured lenders.
11             MS. VARGAS:  We agree, your Honor.
12             THE COURT:  So they are certainly claiming harm as a
13   result of what they say is a violation of a federal statute and
14   a violation of the federal Constitution.  So they are
15   raising -- and maybe they are wrong, but they are raising those
16   issues and is that not enough to get them a withdrawal of the
17   reference under 157(D)?
18             Let's put timing aside.  Let's talk about the
19   relationship, however you want to answer that.  That is my
20   question.
21             MS. VARGAS:  Your Honor, the short answer is no.  The
22   Second Circuit's interpretation of 157(D) is that it is a very
23   narrow scope and that is the resolution --
24             THE COURT:  How would you define the narrow scope?
25             MS. VARGAS:  The narrow scope is that the resolution
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

95QSCHRYSLER
```
 1   of the motion that is pending before the bankruptcy court,
 2   which is in this case the sale motion, must centrally depend
 3   upon resolution of the federal question and it can't be
 4   intertwined with Bankruptcy Code issues which are really the
 5   province and expertise of the bankruptcy court.  In this case
 6   exactly as you articulated, what they are concerned about is
 7   the fact that there are priority issues.  They are claiming
 8   that unsecureds are getting distributions in advance of the
 9   secured creditors.  That is a bankruptcy issue.  They are
10   complaining that the Department of Treasury has seized what
11   they call constructive control over Chrysler's operations.
12   That is an issue that the bankruptcy courts routinely resolve
13   under 363(M) of the Bankruptcy Code which speaks to the good
14   faith of the negotiations and courts examine in that context
15   whether or not the transaction was an arm's length or whether
16   or not there was an insider role being played by in this
17   example, for example, the Treasury.  These are issues that the
18   bankruptcy courts resolve all the time and --
19            THE COURT:  In other words, the conduct of the parties
20   before the court, or the issues about the conduct of the
21   parties before the court.
22            MS. VARGAS:  Exactly.  That is a factual question that
23   will be decided at evidentiary hearing and either the
24   bankruptcy court is going to hear evidence that will suggest
25   that the Treasury behaved appropriately, which is what we think
```

66
95QSCHRYSLER

1   the evidence will show.  They will contest that evidentiary
2   hearing saying that we constructively seized Chrysler and the
3   bankruptcy court will resolve those issues under the Bankruptcy
4   Code.  But EESA doesn't speak to any of those issues.  There is
5   nothing in EESA that speaks to how involved can the Treasury be
6   in negotiating the 363 sale, how involved can it be in
7   negotiations with various stake holders.  The statute doesn't
8   speak to that.
9           The only question under EESA is whether or not
10  Chrysler is a financial institution.  But that has nothing to
11  do with the issues they are raising.  It has nothing to do with
12  the resolution of the sale motion.  So under the Second Circuit
13  case law as it has been defined there is no substantially
14  material issue of federal law.
15          THE COURT:  Okay.
16          I am going to let you go.  Thank you very much.
17          I think we are reaching a point of exhaustion so let
18  us try to wind this up.
19          MR. ECKSTEIN:  Your Honor, good afternoon.  My name is
20  Kenneth Eckstein and I am with the law firm of Kramer Levin.
21  We are counsel for the official committee of unsecured
22  creditors in the case.
23          I appreciate your Honor has heard a good deal already
24  so I will try to very briefly address what I think are one or
25  two bankruptcy issues that I think are directly relevant to the

67

95QSCHRYSLER
1    court's consideration on the motion today.
2            THE COURT:   Okay, do that.
3            MR. ECKSTEIN:   First of all, your Honor, I would like
4    to make sure you have a perspective of where I sit in the case.
5    On May 5 an official creditors' committee was appointed to
6    represent a diverse constituency of unsecured creditors
7    affected by the Chapter XI case.   On our committee we have 11
8    members, including several dealers who do business with
9    Chrysler, some of whom are going to be dealing with new
10   Chrysler, some of whom will not be dealing with new Chrysler
11   and will have their dealer contracts rejected.   We have several
12   suppliers who have contracts with Chrysler.   We have the UAW.
13   We have the PBGC, and we have two product liability or tort
14   claimants who represent claimants who have claims against
15   existing Chrysler and are concerned about what rights and what
16   treatment their claims are going to receive as a result of this
17   transaction.
18           Your Honor, my committee has very diverse and
19   complicated interests in this transaction and have come to this
20   in some respects under a great deal of time pressure and have
21   had to deal with an extremely fast-paced bankruptcy case and
22   have had to try to integrate ourselves into these facts
23   probably with as much haste as any of the parties.
24           Having said that, your Honor, my committee has reached
25   the conclusion that fundamentally it is very favorable for all

68

95QSCHRYSLER
```
 1   parties in this case for this transaction to occur.  We would
 2   love to make changes to the transaction and the committee is
 3   trying to work with various constituencies to make sure that
 4   this transaction is done in a manner that is most beneficial to
 5   the interests of all unsecured creditors.  But the reality is
 6   the alternative to this transaction is liquidation.   The
 7   deadline for third parties other than Fiat to make a competing
 8   offer for this company has now run and as parties predicted, no
 9   other third party has surfaced and made a competing offer for
10   this company.  We are therefore confronted with either
11   proceeding with this negotiated transaction through Section 363
12   of the Bankruptcy Code or resorting to liquidation.
13           My clients, very much like Mr. Kurtz's clients, would
14   like to improve the transaction.  But the fact of the matter is
15   we all appreciate that we are dealing with a very difficult
16   business situation and legal situation that is being addressed
17   by the Bankruptcy Code.
18           The legal point, your Honor, that I would like to
19   bring to your Honor's attention really goes to the question
20   that was just being addressed a moment ago by the
21   representative of the government, and that is are the issues
22   that need to be confronted in this bankruptcy case, are they
23   basically bankruptcy issues or are these really issues that
24   implicate nonbankruptcy federal law?  28 U.S.C. 157(D) only
25   permits or only requires the withdrawal of the reference if
```

69

95QSCHRYSLER
```
 1   substantial and material consideration of nonbankruptcy law,
 2   federal statutes, is necessary to the resolution of the case.
 3           Now, if we step back and if we look at the reality of
 4   this case, there are many, many complex bankruptcy issues that
 5   are going to need to be decided.  And I don't want for a moment
 6   to minimize the significance of the issues that are being
 7   raised by the objectors.  And a court is going to have to
 8   consider a host of technical objections to this transaction in
 9   order to determine whether or not the transaction should or
10   should not be approved.  Nobody has quarreled with the
11   suggestion that the transaction that is being proposed has
12   controversy to it.  Should this transaction be permitted to
13   proceed under Section 363 of the Bankruptcy Code rather than
14   through a plan of reorganization?  That is a very serious
15   question.
16           THE COURT:  Say that again.
17           MR. ECKSTEIN:  Should this transaction be permitted to
18   proceed through Section 363 of the Bankruptcy Code, which is
19   the Bankruptcy Code section that permits the sale of property
20   by a debtor in possession, or, alternatively, should the debtor
21   be required to proceed with his transaction under the more
22   complex, time-consuming process of a plan of reorganization?
23           Now, that is a very important question.  I don't
24   minimize that.  But that is a Bankruptcy Code question.  The
25   question has been raised is this what is referred to in the
```

70

95QSCHRYSLER
1   case law as a sub rosa plan, essentially a plan of
2   reorganization that is disguised in a 363 sale.  That is a very
3   good question.  That is being briefed as we speak before the
4   bankruptcy court.  That is a complicated bankruptcy law
5   question and, your Honor, we would submit that is a bankruptcy
6   law question that should be heard by the bankruptcy court.  The
7   court should hear evidentiary testimony.  It should be briefed,
8   and if people are not satisfied with the outcome of that issue,
9   there is an appellate process, first to the district court and
10  then, if necessary, to the Court of Appeals, and ultimately in
11  certain cases to the U.S. Supreme Court.  But that is
12  fundamentally a bankruptcy question.
13          Now, there has been a lot said today whether the
14  parties negotiated this transaction appropriately or, in
15  essence, was the transaction negotiated in good faith.  One of
16  the issues that is going to have to be confronted by the
17  bankruptcy court when these hearings begin tomorrow is whether
18  or not ultimately the parties will be entitled to rely upon a
19  finding by the bankruptcy court under a section of 363 referred
20  to as 363(M) as to whether or not this transaction was proposed
21  in good faith.  That is an evidentiary finding that is
22  contemplated specifically by the Bankruptcy Code and that
23  really goes to the issues that your Honor has been hearing
24  today.
25          THE COURT:  What part of 363 are you talking about?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

71

95QSCHRYSLER

1          MR. ECKSTEIN:  Section 363(M), as in Mary,
2     contemplates essentially the question of whether or not a
3     transaction has been negotiated in good faith.  It's a factual
4     finding that is typically included in an order approving a sale
5     under Section 363.  And if you look at the order that is being
6     proposed in this case certainly the buyer is going to want an
7     order from the bankruptcy court that the transaction was
8     negotiated and implemented in good faith.  And that is going to
9     go directly to the issues that have been discussed today.
10          Now, if we step back for a moment and we ask ourselves
11     to be pragmatic, while I understand that the objectors have
12     raised the TARP issue, and it's a creative suggestion as to why
13     maybe they can fit within the standards for withdrawal, the
14     reality is whether it was the U.S. government or whether it was
15     Citibank or whether it was Barclays or any other institution,
16     if somebody had come along and loaned Chrysler $4 billion as
17     debtor-in-possession financing, Mr. Kurtz would still be
18     getting up today and saying I don't like the business terms of
19     the transaction.  I don't believe it is fair.  I believe some
20     parties are getting too much at my expense.
21          We all appreciate that is not a new problem certainly
22     in bankruptcy.  That is what we argue about day in, day out.
23     How do you allocate a limited pool of resources among a
24     constituency of competing creditors?  That is what a bankruptcy
25     case really boils down to.  And what Mr. Kurtz is raising is a

72

95QSCHRYSLER

 1   legitimate question but he should be bringing that question to
 2   the bankruptcy court, have the bankruptcy court make a finding,
 3   and ultimately if he doesn't like the conclusion he can take it
 4   up on appeal.  And what this essentially seems to be, at least
 5   to us, is a frustration with the response that Mr. Kurtz's
 6   clients are getting from the bankruptcy judge and attempt maybe
 7   to see whether there is another court that will be more
 8   friendly, more accommodating to requests, essentially to see
 9   whether or not maybe by shifting the venue we will get a better
10   reception.
11           Now, I appreciate the suggestion but we can't lose
12   sight of the fact that this is a very fundamental legal motion
13   and the reality is the issues that we have to decide in this
14   case are fundamentally bankruptcy law issues.
15           Can the assets be sold free and clear of the bank's
16   claims?  We heard today the banks have liens on substantially
17   all the assets.  There is a very, very technical process under
18   way as to whether or not the banks have appropriately consented
19   to letting the assets be sold free and clear in exchange for $2
20   billion of cash.  Whether or not 2 billion is the right number
21   or not, there is a legal question.  That is implicated by
22   Section 363(F) of the Bankruptcy Code.
23           Does Section 363(F) of the Bankruptcy Code permit the
24   court to approve the sale of assets free and clear of liens,
25   free and clear of claims?  My clients, members of the unsecured

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95QSCHRYSLER
1   creditors committee, also have issues about whether or not it
2   is or is not appropriate to sell assets free and clear of
3   claims.  For example, if you are a product liability claimant
4   and you have claims against Chrysler, there is a question
5   raised, and if you look at the objections the question is
6   should new Chrysler be responsible for product liability claims
7   for vehicles that were purchased prior to the transaction?
8   That is a difficult question.  That is a Bankruptcy Code
9   question governed by Section 363(F).
10          THE COURT:  Let me ask you this:  What you have said
11  is there is either a sale or a liquidation.  In other words,
12  you do not believe that it is viable for the bankruptcy court
13  to turn around and say now we must consider this to be a
14  reorganization and go through the processes of reorganization.
15  I take it you don't feel that there is time or opportunity for
16  such a thing, right?
17          MR. ECKSTEIN:  Your Honor, we are satisfied in the
18  short time that we have been involved in this case that this
19  company does not have the financial flexibility to essentially
20  work through what is at minimum a 90- to 120-day plan
21  confirmation process.
22          THE COURT:  Now, look, I am going to ask a little
23  different question.  I don't know any specifics but assuming
24  that there is on the table the sale, which of course there is,
25  is there an opportunity for the bankruptcy court if there was

74

95QSCHRYSLER

 1  some sound suggestion for modification of the terms of sale to
 2  entertain that idea, or is it a total take it or leave it on
 3  the demand of somebody or without the demand of somebody is it
 4  an absolutely take it or leave it thing without any opportunity
 5  for anybody to voice any suggestion about improvement or
 6  modification?
 7          MR. ECKSTEIN:  Your Honor, that is an important
 8  question.  The answer is there are, as we speak, extensive
 9  negotiations that are going on among all of the parties in this
10  case over many aspects of this transaction.  Every aspect of
11  this transaction is still being discussed.  I don't want to
12  suggest to your Honor that the economics are going to change
13  because it takes agreement, but there are releases that are
14  being sought.  There are treatment of various constituencies
15  that are being discussed.  There are numerous important issues
16  affecting many parties in this case, including the lenders, the
17  unsecured creditors, the lenders, the PBGC, the union.  Every
18  party at the table today has issues that are still the subject
19  of discussion and I expect will continue to be discussed both
20  up to the sale here in conclusion and there will still be
21  issues that have to be discussed after the sale is concluded
22  because your Honor asked me, and I want to make sure your Honor
23  appreciates, that we anticipate is this bankruptcy case is
24  going to be a two-step case.  Assuming the sale transaction is
25  approved, then the sale will ultimately get consummated and, as

95QSCHRYSLER
```
 1   your Honor heard, there will be residual assets left over and
 2   we would expect that at that point in time there will be a plan
 3   of reorganization proposed to deal with the distribution of the
 4   remaining assets to the various creditor groups and so there
 5   will, in fact, be a second step to this case, although nobody
 6   should minimize the fact that the first step is, from a
 7   business standpoint, where all the marbles are.
 8               THE COURT:  Well, on that I am really saying what I am
 9   saying with some trepidation because I am sure it's way out of
10   my realm but obviously it's not up to me to wish anything
11   should happen.  It's up to me to decide the issues that are
12   before me, but, on the other hand, there has been a lot said in
13   the papers over and over and over about the desirability of
14   this plan and the need not to frustrate it and so forth, and
15   you don't have to live in this country too long to worry about
16   the fact that some plan like this could work or it could be a
17   disaster in 6 months, and I am not saying that to say anything
18   except we know from experience that there are problems and I am
19   not basing my statement on any information at all except just
20   that history shows that this is a problem area.  So I assume
21   that there would be an opportunity in the course of the further
22   bankruptcy proceeding for people to voice ideas of how to
23   improve this for the sake of all concerned.
24               I assume that that can be done, right?
25               MR. ECKSTEIN:  Your Honor, it absolutely can be done
```

76
95QSCHRYSLER

1  and needs to be done and I think, as your Honor correctly
2  points out, there is no guarantee that even if this transaction
3  is approved that the company will be successful.
4          THE COURT:  I assume that it would be the desire of
5  the people in this room who are trying to foster the plan that
6  they would want as good a plan as possible with as best a good
7  assurance as possible.
8          MR. ECKSTEIN:  That is exactly the goal and obviously
9  the goal is to have a new Chrysler that is financially viable
10 and sound and has the best opportunity to be competitive in the
11 marketplace.  I think as Mr. Pantaleo indicated, his clients,
12 the lenders, that include Mr. Kurtz's clients, they are
13 receiving cash.  They are essentially being very conservative
14 about the future.  The employees, the dealers, the suppliers,
15 they are all going to be doing business with new Chrysler in
16 the future and they are the ones who are in a sense taking the
17 biggest risk that new Chrysler is going to be successful and if
18 it's not successful they will have received nothing for
19 essentially this process, but there is certainly hope and
20 expectation that by allowing new Chrysler to get implemented
21 through this process we maximize the chance that there will be
22 jobs; that there will be a supply chain; that there will be a
23 dealer chain; that there will be the ability for this company
24 to rehabilitate.
25          And, your Honor, if you think in sort of the macro

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77

95QSCHRYSLER
1  perspective, Chapter XI is a unique statute because there is no
2  other country in the world that really had as forward thinking
3  a bankruptcy statute as the United States Bankruptcy Code
4  because the United States Bankruptcy Code permits the
5  possibility of reorganization rather than knee jerk into
6  liquidation.  And this is a technique that has been used in
7  other cases and it has been used successfully.  Obviously it
8  depends on business, but this is a legal technique that the
9  bankruptcy court is familiar with and my recommendation, your
10 Honor, from where we sit is let the bankruptcy court finish its
11 job and let the appellate process if it has to work through,
12 but to take this case literally at a day before the hearing and
13 turn it upside down to start again in another venue, because
14 that is what would have to happen, and deal with the same
15 questions, really is not accomplishing what we think is the
16 goals of reorganization.
17          THE COURT:  Fine, thank you.
18          Does anybody else wish to speak?
19          We have to conclude.
20          MR. LACY:  Robinson Lacy, your Honor.  I represent
21 Fiat and new Chrysler and I think I am the one person in the
22 room whose sole interest is the viability of the ongoing
23 business.
24          Fiat obviously would not be here and would not have
25 signed up for this if it did not believe that new Chrysler was
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

78

95QSCHRYSLER

1  a viable company.  Provided that the hearing on the sale motion
2  can be heard tomorrow, Fiat does not care whether that motion
3  is heard by the bankruptcy court or by your Honor or by any
4  other judge of this court or even, as sometimes happens, by a
5  judge of this court assisted by the bankruptcy judge.  I will
6  say since nobody else has said it, for some reason it has been
7  overlooked, Section 157(D) requires withdrawal for a matter
8  that involves consideration of a federal statute governing
9  interstate commerce and the Constitution is not such a thing.
10  The constitutional issues are no basis whatsoever for
11  withdrawal.
12          However, as I say, it doesn't matter to us what judge
13  hears this provided it's heard tomorrow.  Fiat is signed up for
14  a deal through the 15th of June.  It does not have a right to
15  walk away in general until the 15th of June but every single
16  day that goes by hurts the ongoing enterprise.  It will hurt
17  the owners of the new enterprise.  It will hurt the UAW, the
18  VEBA, the Treasury, and it will hurt Fiat.  Every single day,
19  as you have heard, the plants are idle.  There are no parts
20  being purchased from any of the suppliers.
21          THE COURT:  I understand that.  I want to ask you:  Is
22  Fiat satisfied that the arrangements with the UAW and the funds
23  is in satisfactory shape so that the company can be profitable?
24          MR. LACY:  It's absolutely satisfied with that.
25          THE COURT:  I understand your point.  I am going to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

79
95QSCHRYSLER
1  finish up with anybody else who wishes to speak.
2          Thank you very much.
3          MR. EDELMAN:  Good afternoon, your Honor.  My name is
4  Michael Edelman of Vedder Price.  We represent Export
5  Development Canada.
6          EDC is a lender here that has provided over $1 billion
7  of debtor-in-possession loans.  In addition, you have asked
8  before earlier in this hearing, we are also providing funding
9  for some of the new Chrysler entities after the sale.  We
10 support the positions of Chrysler, the agent or the senior
11 secured lenders, the U.S. Treasury and the official committee,
12 and Fiat in their opposition to the motion.
13         The minority lenders arguments to withdraw the
14 reference on the sale motion and other matters is based upon an
15 allegation that the matters being decided are dependent upon
16 substantial and material considerations of nonbankruptcy law.
17 Under Second Circuit directives this determination of the
18 substantial material considerations is is to be determined
19 narrowly.
20         Contrary to the contentions of the minority lenders,
21 there is no requirement, there is no substantial or material
22 considerations of nonbankruptcy law that is required in these
23 cases.  The matters before the bankruptcy court are typical
24 bankruptcy matters.  These are, as we heard before, sale
25 motions, motions regarding distribution of assets, issues
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

80

95QSCHRYSLER
1    regarding priority, whether or not assets are to be sold free
2    and clear. whether a trustee should be appointed.  Each of
3    these are fundamental Bankruptcy Code matters and are decided
4    by the bankruptcy court and are not the basis for withdrawal of
5    the reference.
6            So we think that the issues raised by what I call the
7    minority lenders, because they do only hold $42.5 million of a
8    $6.9 billion facility, that all these arguments are red
9    herrings to try to insert an aura of nonbankruptcy federal law.
10   But all you have to do is look at what is being cited by
11   bankruptcy to know otherwise.
12           To start the normal bankruptcy process they are
13   alleging allegations about TARP and EESA and none of that has
14   anything to do with what is happening with the sale or their
15   new motions for a trustee to be appointed.  In fact, what they
16   are really arguing about is that the source of funding that has
17   been provided by the other lender here, the U.S. government,
18   was inappropriate, but as we have already heard that funding
19   has occurred.  Much of that funding occurred in January and
20   debtor-in-possession loans were approved and we haven't heard
21   that they admitted that none of these TARP or EESA issues were
22   raised in the hearing regarding the debtor-in-possession
23   financing.
24           So even if they are right that there are issues here
25   regarding TARP or EESA and that the co-lender here made loans
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

81

95QSCHRYSLER
1    that are inappropriate, that has nothing to do with the matters
2    currently before the bankruptcy court.  We think that the
3    fallacy of their arguments are highlighted by the fact that
4    they completely ignore that Export Development Canada has
5    provided over $1 billion of financing during these cases alone
6    and several more billion outside of these cases.  So our
7    involvement here is an inconvenient truth for the minority
8    lenders.
9            THE COURT:  I think I heard this earlier, but will
10   Canada provide any cash in the new transaction?
11           MR. EDELMAN:  That is actually part of the bankruptcy
12   courts.  We have committed to make financing for a subsidiary
13   of the Newco Chrysler, so, yes, we are committed to make
14   financing going forward.
15           THE COURT:  In Canada?
16           MR. EDELMAN:  In Canada, but that is a wholly-owned
17   subsidiary of the Newco being created.
18           THE COURT:  Can you estimate what that amount of money
19   would be?  Maybe you can't.
20           MR. EDELMAN:  I can.  It's actually in the term sheet.
21   I think it's $928 million in U.S. dollars, in excess of $1
22   billion Canadian using the exchange rate.
23           THE COURT:  I am going to have to let you go.  You are
24   making a good statement but I think we need to wind our hearing
25   up.

82

95QSCHRYSLER

1           MR. EDELMAN:  Thank you, your Honor.  We would like to
2      repeat, we ask the motions be be denied.
3           THE COURT:  Any rebuttal, Mr. Kurtz?
4           MR. KURTZ:  Thank you, your Honor.  I will try to be
5      brief.
6           THE COURT:  Your people bought the bonds for what?
7           MR. KURTZ:  43 cents.
8           THE COURT:  Go ahead please.
9           MR. KURTZ:  Let me try to reach a couple of these
10     issues.  The first I want to talk about is I feel I need to
11     reiterate we are here on a venue motion.  I heard a lot of
12     opposition, the vast majority of which was directed to whether
13     the sale should be approved or not and all we are asking is
14     that we get a hearing in district court on the TARP issue.
15     This court recognized and noted the need to have a real full,
16     complete record and an exposition on these important issues
17     which are being followed publicly and have extremely important
18     ramifications.
19          THE COURT:  Let me interrupt you to say that I am
20     fully cognizant that I am not today deciding the merits of
21     objections.  There are two things I want to learn about and
22     that is what are the issues, but I am not resolving those
23     issues.  And what has become very apparent to me is there are
24     issues of law and there are issues of fact.  But that has been
25     from my standpoint the purpose of what has certainly been an

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

83

95QSCHRYSLER
```
 1   extensive inquiry.  Also, we get a feel of the contention of
 2   the other side of what is at stake if the process that is now
 3   going on is interfered with.  What I want to say is under no
 4   circumstances am I deciding the issues on the merits.
 5           Go ahead.
 6           MR. KURTZ:  Thank you, your Honor.
 7           I would just at least emphasize that the exposition
 8   that would be appropriate here and that your Honor recognized
 9   is obviously not going to take place if there is a sale hearing
10   tomorrow where we don't even have an opportunity to digest what
11   was learned today in depositions and the like.
12           THE COURT:  What are you saying?  If there was what?
13           MR. KURTZ:  If the sale hearing takes place tomorrow
14   it's very difficult to have a full record and an exposition, as
15   your Honor indicated, because we are still just learning
16   information from depositions from all the primary players in
17   the first instance this afternoon.  We have to digest that and
18   try the case tomorrow before we would have any opportunity to
19   come here, and in the absence of a withdrawal.  So I am
20   suggesting that while we won't get anywhere near harming any
21   dates or June 15 or otherwise, your Honor, there is ample
22   opportunity to have a sales motion heard here next week or any
23   other time.
24           I will note, though, that this emphasis on taking an
25   appeal is just wrong.  It's not a defense to a motion to
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

84

95QSCHRYSLER

1  withdraw the reference and it's not a substitute for having the
2  federal issues interpreted by the correct court here in
3  district court and, in fact, I submit it's actually strategic.
4  And we have already seen here that if you file an appeal, if
5  you make a motion for a stay on appeal, you may have a bond.
6  They have already suggested the bond be $2 billion.  They know
7  that can't be posted by the Indiana pensioners and so the idea
8  here would be if we can simply avoid a review in the first
9  instance on these important federal laws before this court we
10 will never have to have that review because nobody will be able
11 to afford the bond that we will seek here.  So I think the idea
12 of an appeal --
13           THE COURT:  I don't understand what point you are
14 making now.
15           MR. KURTZ:  The point I am making is everyone says
16 let's just have this matter resolved in the first instance by
17 the bankruptcy court instead of having the reference withdrawn
18 and then they will just address the same issues on appeal.  And
19 what I am saying is if we come up on appeal they are going to
20 demand a $2 billion bond that is already in their papers in
21 opposition to motions we brought in this court and that is
22 going to make it --
23           THE COURT:  Somehow I didn't catch that.
24           MR. KURTZ:  It's in all the state papers.
25           THE COURT:  They say they want a $2 billion bond?

85

95QSCHRYSLER

1            MR. KURTZ:  Correct.
2            THE COURT:  Posted for an appeal from the bankruptcy
3    judge?
4            MR. KURTZ:  Correct, Judge.  That is exactly what they
5    will do.  That is a standard tactic in bankruptcy court.
6            THE COURT:  Is it standard to demand such a bond?
7            MR. KURTZ:  I think what we will end up with is we
8    have an automatic ten-day sale for a 363 sale and there has
9    been a request to shorten that.  We won't have ten days for
10   appeal.  I suspect that probably it will be shortened and we
11   have to come up for a stay and on the stay they will say we
12   have to get a bond to get a stay.  If you don't get the appeal
13   heard in a day-shortened period of time, something less, they
14   will say they are moot, and there are cases out there that say
15   it's true.  The sale is consummated, objections are mooted, and
16   there is never a review of these important issues.
17           So that is where they are heading with all of this and
18   that is another reason we have to withdraw the reference.
19           Your Honor, in terms of the actual legal standards on
20   withdrawing the reference, mostly what I have heard is somehow
21   it's not essential and there are bankruptcy law issues.  We
22   certainly do not dispute, and I hope the fact there are
23   important bankruptcy law issues, which are problematic here,
24   but the TARP issue is the subject of this motion and ignoring
25   it doesn't make it go away.  It is essential.  It is

86

95QSCHRYSLER

1  dispositive.  If we are correct, and I have seen no defense at
2  all to whether we are or not, it is clear that the government
3  cannot use the TARP funds as they propose to do to finance the
4  sale.  There is no sale.  And the fact that Canada has some
5  money in the game is of no relevance because they don't have
6  enough in to finance the 363 sale.  So, in fact, there will
7  never be a need to reach any of the bankruptcy law issues in
8  this case if we are correct.  That is why you have a statute
9  for bringing before a district court matters that will impact
10  the bankruptcy motion that is being withdrawn, your Honor, and
11  not only will it impact it it will resolve it.  If Treasury
12  can't take over Chrysler and form what they have done here and
13  if they can't finance the sale the sale goes away, the security
14  interests stay in place.
15           On the take-over of Chrysler, there is a lot of sort
16  of talking around the edges here but in fact the testimony has
17  already been that the government handled all the negotiations
18  with the union and the VEBA for the 55 percent interest.  The
19  CFO of Chrysler couldn't even tell us what the negotiations
20  were and how the amounts were determined and said he read about
21  the deal when he opened up the Wall Street Journal.  There is
22  no dispute that the government handled --
23           THE COURT:  Look, I am convinced that the issues that
24  you raise are issues.  What I have heard about is that there
25  are other sides and that so often happens, but you don't have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

95QSCHRYSLER

1   to spend much time convincing me that there are issues because
2   that has been abundantly demonstrated on the floor today.
3           I think I am going to have to ask that we conclude
4   this.
5           MR. KURTZ:  I would make one more statement because I
6   think it's important.
7           There have actually been conflicting statements but
8   the government says we made that TARP argument before Judge
9   Gonzalez and he overruled it.  That is just not true.  We have
10  never made this argument.  I was in court.  I know what we
11  argued and what we didn't argue and it hasn't been raised.  It
12  hasn't been approved.  Incidentally the creditors committee,
13  who, by the way, supports the deal because they are getting in
14  most instances full recovery where the secureds are getting 29
15  cents, actually said this hasn't been raised.  That can be
16  determined on the papers, but I can assure the court that we
17  have not briefed this issue before right now.
18          THE COURT:  Thank you.
19          MR. KURTZ:  I am sure we made this clear earlier but
20  if your Honor does need time to reach a ruling on this, then we
21  would have to address the stake because the sales are otherwise
22  going forward tomorrow morning.
23          THE COURT:  Thank you.
24          My intention is to announce right now how I am ruling
25  on the motions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

88
95QSCHRYSLER

1           I will return to my office and prepare a brief
2    decision, and whatever can be written by 4 o'clock can be
3    written, and whatever can't be written by 4 o'clock will not be
4    written.  I think that time is of the essence and that is the
5    way I have approached this.
6           The matter came to me last Wednesday.  The case was
7    assigned to Judge Preska but Judge Preska is away this week so
8    it was referred to me by Judge Preska since I am the Part 1
9    judge this week.  But it was my plan to have a very prompt
10   hearing and to have the matter disposed of before tomorrow so
11   there wouldn't be a need for a stay and there wouldn't be any
12   delay at all, whichever way I decided.  And with that in mind I
13   will confess I worked through the weekend on the papers.  I was
14   certainly happy to do that.  But I am simply saying that to
15   illustrate that there can be prompt movement by the courts.
16          Now, the motion to withdraw the reference is a serious
17   motion but I am denying it.  And I will not go into any
18   reasons.  They will be stated in whatever I can write between
19   now and 4 o'clock, maybe a little after 4.
20          The motion for a stay is academic and the motion for
21   the appointment of a trustee and an examiner will remain with
22   the bankruptcy court and will not be decided by me because I am
23   not withdrawing the reference.
24          Now, I want to say something about what happens in
25   this court as the case moves on.  The issues about the sale,

89

95QSCHRYSLER

1   and so forth, will be decided by the bankruptcy judge.  It is
2   my understanding that any party who feels aggrieved by the
3   decision of the bankruptcy judge has a right of appeal to the
4   district court.
5          Now, I don't know whether there is anything to be said
6   about this but I want to say to all parties there should be a
7   fair opportunity to appeal.  I am not keeping the case now but
8   I am fully aware of the need for a right of appeal after the
9   bankruptcy judge does his work, and the various parties who
10  have opposed the motion to withdraw the reference have relied
11  to some extent on the fact that there is a right of appeal.
12         Now, I hope I do not hear of any attempts to obstruct
13  that right of appeal or make it unduly difficult because of
14  some inappropriate request for some exorbitant bond.  The
15  people opposing the withdrawal of the reference have relied on
16  that right of appeal and that right of appeal should exist and
17  it should be able to be exercised without any hindrance.
18         We will adjourn now and I hope to have a written
19  decision out by 4 or as soon thereafter as I can possibly do
20  it.
21         Thank you.
22         MR. KURTZ:  Thank you, Judge.
23         MR. CULLEN:  Thank you, Judge.
24
25                            - - -

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300